## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-[____] (____)** |
| **INC., a Delaware corporation, <u>et al.</u>,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | |
| | : | |

## DECLARATION OF HOLLY ETLIN IN SUPPORT OF
## <u>CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF</u>

I, Holly Etlin, hereby declare:

1.      I am a Managing Director of AlixPartners LLP. I am currently employed

the above-captioned debtors and debtors in possession (the "Debtors") to evaluate and implement

strategic and tactical options through the restructuring process.

2.      I submit this Declaration in connection with the voluntary chapter 11

petitions and first-day motions of the Debtors in the above-captioned chapter 11 cases. Any

capitalized term not expressly defined herein shall have the meaning ascribed to that term in the

relevant first-day motion or application. All facts set forth in this Declaration are based on my

personal knowledge, upon information supplied to me by people who report to me at the

Debtors' operations, upon information supplied to me by the Debtors' professionals and

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

consultants, upon my review of relevant documents, or upon my opinion based on my experience

and knowledge with respect to the Debtors' operations, financial condition and related business

issues. If I were called upon to testify, I could and would testify competently to the facts set

forth herein, and I am authorized to submit this Declaration on behalf of the Debtors.

        3.      The Debtors have requested various types of relief in "first-day" motions

(collectively, the "First Day Motions") in order to minimize the adverse effects of the

commencement of their chapter 11 cases on their business. This Declaration sets forth the

relevant facts in support of each First Day motion and application filed by the Debtors

concurrently herewith. I believe that a critical and necessary element in successfully

reorganizing the Debtors is the approval of the Debtors' First Day Motions. The factual

background and support of each First Day Motion is set forth below.

**A.**    **Motion of Debtors and Debtors in Possession for an Order Directing Joint Administration of Related Chapter 11 Cases**

        4.      I am informed by counsel that the joint administration of the Debtors'

cases will facilitate and promote an economically efficient administration of these cases, permit

the Clerk of the Court to utilize a single general docket for these cases, and combine notices to

creditors of the Debtors' respective estates and other parties in interest which will result in

savings to the estates.

        5.      I am further informed by counsel that, if joint administration is ordered,

the Debtors, the Court, creditors and other parties in interest will be able to avoid incurring

considerable unnecessary time and expense in connection with, among other things, the need to

file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors

and other parties in interest.

6.    Additionally, I am informed by counsel that joint administration will

further enable parties in interest in these chapter 11 cases to be aware of the various matters

before the Court in all of the Debtors' cases.

7.    Consequently, I believe and submit that the joint administration of these

chapter 11 cases is in the best interest of the Debtors, the Debtors' estates, their creditors and

other parties in interest.

**B.    Motion of the Debtors and Debtors in Possession for an Order Authorizing
the Debtors and Debtors in Possession to (I) Continue all Insurance Policies
and Agreements Relating Thereto, (II) Continue Certain Premium Financing
Arrangements Relating Thereto, and (III) Honor Certain Obligations in
Respect Thereto Pursuant to Section 105(a) and 363(b) of the Bankruptcy
Code**

8.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the

Debtors seek authorization to: (i) maintain and continue to make all postpetition payments

(including postpetition fees and premiums) with respect to the Insurance Policies and the

Premium Finance Agreement on an uninterrupted basis; (ii) to maintain and continue on an

uninterrupted basis the Debtors' prepetition practices with respect to each policy or contract; (iii)

pay any prepetition premiums related to the Insurance Policies to the extent that the Debtors

determine, in their discretion, that such payment is necessary to avoid cancellation, default,

alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or

proceeds provided under the Insurance Policies; and (iv) enter into new policies and/or bonds or

assume existing policies and/or bonds in the ordinary course of business.

9.    In connection with the operation of the Debtors' business and the

management of their properties, the Debtors maintain various insurance policies through third-

party insurance carriers (the "Insurance Carriers") providing coverage for, inter alia, property,

general liability, employee benefits legal liability, commercial automobile liability, commercial

umbrella liability, difference in condition coverage for flood and earthquake damages, directors'

and officers' liability, directors' and officers' "run-off" liability, employment practices liability,

fire liability, flood liability, wind liability, employee/commercial crime, fiduciary liability, lender

environmental collateral protection liability, mortgage bankers' bond, mortgage bankers'

professional liability, REO portfolio security liability, workers' compensation, medical accident

and health liability, insurance agent/broker professional liability, and certain bonds  (the

"Insurance Policies").

           10.      The Insurance Policies are essential to the preservation of the Debtors'

businesses, properties and assets, and, in many cases, such insurance coverage is required by

various regulations, laws and contracts that govern the Debtors' business conduct.  Since the

Insurance Policies are essential to the Debtors' businesses and restructuring, the Debtors believe

it is in the best interests of their estates to permit the Debtors to honor their obligations under the

current insurance contracts.  Any other alternative would likely require considerable additional

cash expenditures and would be detrimental to the Debtors' reorganization efforts.  In order to

prevent such a scenario, the Debtors request the following authority:

           **(i)**      **Authority to Pay Insurance Policy Premiums**

           11.      The Debtors request the authority to pay any prepetition premiums related

to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such

payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or

any form of impairment to the coverage, benefits or proceeds provided under the Insurance

Policies.  Although the Debtors are not presently aware of any such premium obligations or the

necessity of such payment, the Debtors seek this authority out of an abundance of caution, in

recognition of the critical necessity of keeping their insurance policies in current effect, and out

4

of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Insurance Policies.

12.    The Debtors request the authority to continue to pay the premiums due under the Insurance Policies in the ordinary course of business. This will ensure that (a) the insurance coverage provided under the Insurance Policies is not interrupted and (b) the Debtors are not forced to procure hastily-arranged replacement insurance coverage on less favorable terms and conditions. The Insurance Policies provide the Debtors with essential insurance coverage. Any interruption in such coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the insurance carrier under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carrier under the Insurance Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain types and levels of insurance coverage; (d) the possible inability to obtain similar types and levels of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

(ii)    **Authority to Maintain the Premium Finance Agreement**

13.    To maintain their insurance coverage, the Debtors often are required to prepay the full premiums for the applicable coverage period. Prepaying the full premiums imposes a significant financial burden on the Debtors. To lessen this burden, prior to the Petition Date, the Debtors entered into a premium financing agreement with AICCO, Inc. ("AICCO") to finance the premiums of certain of their Insurance Policies (collectively, the "Financed Insurance

Policies").

14. Under that certain Premium Finance Agreement dated as of March 29, 2007, by and among AICCO and NCF (the "Premium Finance Agreement"), AICCO pays the premiums due under the Financed Insurance Policies, and the Debtors are then obligated to repay the amount financed through a cash down payment and subsequent periodic installment payments over the term of the Premium Finance Agreement. The cash down payment was approximately $293,317. The current installment payments are approximately $88,088 per month, beginning April 17, 2007. The final installment payment pursuant to the Premium Finance Agreement is due on November 17, 2007.

15. The Debtors must be permitted to maintain the Premium Finance Agreement. If the Financed Insurance Policies are allowed to lapse and the Debtors experience a corresponding lapse in the Financed Insurance Policies as a result, the Debtors could be exposed to substantial liability for damages to persons or property or for losses incurred by the Debtors and others. This would also cause the Debtors to violate the guidelines of the Office of the United States Trustee, which require the Debtors to maintain the Insurance Policies.

16. Moreover, if postpetition installment payments under the Premium Finance Agreement are not paid as they come due, AICCO may seek relief from the automatic stay to terminate the Financed Insurance Policies.[2] If AICCO succeeds in such a request, the Debtors would be forced to seek replacement insurance coverage. Even if the Debtors were able to purchase replacement insurance coverage, it is doubtful that the Debtors would be able to do so on terms and conditions as favorable as those presently in place under the Financed Insurance Policies. Given the current circumstances, there is no assurance that the Debtors would be able

---

[2] Pursuant to the Premium Finance Agreements, the Debtors assigned to AICCO all sums payable with reference to the Insurance Policies as security for payment of the Premium Finance Agreements.

6

to obtain replacement insurance quickly enough to prevent a lapse in coverage.

17.     Accordingly, the Court should permit the Debtors to continue their premium financing arrangements.  The Debtors also request permission to enter into any new premium financing agreements in the ordinary course of business.

### (iii)   Authority to Pay Workers' Compensation Deductibles

18.     Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.  The Debtors have purchased workers' compensation policies (the "Workers' Compensation Policies"), which are issued by The Hartford ("Hartford") and Travelers Casualty and Surety Co ("Travelers").  The Debtors pay estimated annual premiums of approximately $50,737 to Hartford and approximately $326,867 to Travelers[3] regardless of the number or amount of claims made under the policies.  The term of the Workers' Compensation Policies is from February 25, 2007 through February 25, 2008.

19.     The Debtors are also liable to Travelers, Ace American Insurance Company ("Ace") and CNA Insurance Company ("CNA") for a deductible portion of the claims made against workers' compensation policies issued by Travelers, Ace and CNA for the periods from February 25, 2004 through the present.  Although the Debtors believe they are current in payments of the premiums for the Workers' Compensation Policies as of the Petition Date, the Debtors believe that it is likely they will be required to reimburse Travelers, Ace and CNA for deductible payments in respect of claims paid under the Workers' Compensation Policies.[4]

---

[3] Both the Hartford and Travelers premium amounts are inclusive of certain taxes and surcharges.

[4] With respect to Travelers and Ace, deductibles are billed monthly.  With respect to CNA, deductibles are billed quarterly.

7

### (iv)   Authority to Enter into Additional Insurance Policies

20.     Finally, because most of the remaining insurance policies expire annually, the Debtors seek authority to renew their Insurance Policies or enter into new Insurance Policies on competitive terms without further Court approval. As the time for payment and renewal of these policies arrives at different times of the year, the Debtors may not be able to renew the Insurance Policies on time and could be forced to pay higher rates and/or expend money to acquire a new provider. As the Insurance Policies must be renewed at different times, the Debtors would be forced to appear in Court continuously to renew their Insurance Policies, a procedure that would impose an extraordinary burden on the Debtors' estates and restructuring efforts.

21.     Clearly, the Debtors will need to continue their Insurance Policies throughout the duration of these chapter 11 cases. The Debtors respectfully suggest that the renewal or negotiation of these Insurance Policies falls squarely within their ordinary course of business and, counsel informs me that, but for the constraints of section 363 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to enter into insurance policies. To reduce the administrative burden of these chapter 11 cases, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew their Insurance Policies or enter into new Insurance Policies at the conclusion of the term of the current Insurance Policies including the entry into any premium financing arrangements therefor.

C.     **Motion of the Debtors and Debtors in Possession for an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

22.     By this Motion, the Debtors seek, <u>inter alia</u>, entry of an order that (i) authorizes but does not direct the Debtors to pay Employee Obligations, Employee

8

Deductions and Employee Expenses (as defined herein), (ii) authorizes but does not direct the

Debtors to continue their practices, programs and policies in effect as of the Petition Date with

respect to all Employee Obligations (including honoring paid time off accrued, but unused, as of

the Petition Date), Employee Deductions and Employee Expenses, (iii) authorizes and directs the

bank at which the Debtors maintain an account from which the Debtors' payroll obligations are

disbursed and all other banks or lending institutions maintaining payroll and employee benefits

accounts to honor and pay all prepetition and postpetition checks issued or to be issued and fund

transfers requested or to be requested by the Debtors in respect of the Employee Obligations,

Employee Deductions and Employee Expenses and (iv) authorizes but does not direct the

Debtors to pay certain Employee Obligations to terminated Employees.  The Debtors also seek

authority to issue new postpetition checks or fund transfer requests with respect to prepetition

obligations that may have been dishonored by the banks in respect of the Employee Obligations,

Employee Deductions and Employee Expenses, if necessary.

        23.      The Debtors' business in particular and the industry generally has been

severely negatively impacted by a variety of factors over the last several months.  In large part as

a result of these pressures, the Debtors commenced these bankruptcy cases in order to downsize

their operations, reduce expenses, promptly market their businesses and consummate sales of

assets as soon as practicable.

        24.      The need for stability during the sale process is particularly critical since

the Debtors largely operate service businesses.  For example, the Debtors' loan servicing

platform requires a stable work force, working capital to service loans, and maintenance of an

infrastructure.  Similarly, the Debtors' loan origination platform requires the maintenance of an

infrastructure or it will dissipate quickly.  It is essential that the human beings who are

9

maintaining these businesses for sale have the resources to keep them operating or the stakeholders will likely suffer and their recoveries drop precipitously. As well, it is critical that customer, vendors and employees maintain confidence that the Debtors will have sufficient liquidity to effect an orderly sale process, as opposed to winding down abruptly.

25.     This is not to say, however, that the Debtors are planning on business as usual pending these sales. Working closely with Lazard and their financial advisor, AlixPartners ("Alix"), the Debtors have implemented appropriate steps to cut costs dramatically while still maintaining going concern business operations. For example, the Debtors recently implemented significant layoffs in their work force and are filing with their bankruptcy petitions motions to reject leases for facilities that are not necessary for a substantially scaled back loan origination business. These are just examples; the Debtors and Alix have implemented tight controls on cash expenditures. The Debtors will continue to work to pare expenses consistent with allowing their servicing business to continue to operate to its historic high standards, and with maintaining the base human and other infrastructure that is key to testing a going concern sale of their loan origination platform.

(i)     **Salaries and Wages**

26.     In reaction to slowdown in the real estate market, the Debtors began terminating employees at the beginning of 2007. On March 1, 2007, the Debtors terminated approximately 235 employees, reducing the number of employees at the time of the filing of the petitions to approximately 6,583, of whom approximately 6,516 are full time and 67 are part-time (collectively, the "Employees"). The Debtors anticipate an additional reduction in force of approximately 3,200 Employees on the Petition Date. As a result of the commencement of the Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the

10

Debtors will be prohibited from paying or otherwise satisfying their prepetition obligations to the Employees, including their obligations under wage, salary, retirement, healthcare, and various other benefit programs (collectively, the "Employee Obligations"). In addition, checks, wire transfers and direct deposit transfers issued in respect of the Employee Obligations will be dishonored. To ensure that remaining Employees do not terminate their employment at this critical time for the Debtors, and to minimize the personal hardship all Employees would suffer if prepetition employment-related obligations are not paid or honored when due, the Debtors seek authority to honor, in their discretion, such obligations, including those described above.

27.    The Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the significant reduction in workforce will very likely cause the remaining Employees to question their future employment prospects with the Debtors. While the Employees have demonstrated loyalty to the Debtors despite the uncertainty during the months prior to the commencement of these cases, their search for a sense of stability with regard to compensation and benefits may lead to an epidemic of remaining Employee departures. The remaining Employees will look to the treatment of the terminated Employees when evaluating their future with the Debtors. Payment of Employee Obligations to terminated Employees is justifiable for this reason alone. A significant deterioration in morale among remaining Employees at this critical time undoubtedly would have a devastating impact on the Debtors, their customers, the value of their assets and business and their ability to maximize value through the sale process.

28.    The Employees are essential to the success of the Debtors' business. The cost of replacing and then retraining Employees -- particularly in the Debtors' specialized servicing business -- will outweigh the cost of honoring the prepetition Employee Obligations. The Employees are key to the Debtors' business value and any significant number of additional

11

departures will substantially and adversely impact the Debtors' businesses and result in

immediate and irreparable harm to the creditors and the estates. Consequently, it is critical that

the Debtors continue, in the ordinary course, the personnel policies, programs and procedures

that were in effect prior to the Petition Date. If the checks issued and fund transfers requested in

payment of the Employee Obligations are dishonored, or if such accrued obligations are not

timely honored postpetition, the Employees will suffer extreme hardship and may be unable to

pay their daily living expenses. Likewise, it would be inequitable to require the Employees to

bear personally any business expenses that were incurred on behalf of the Debtors with the

expectation that they would be reimbursed.

29.     In the ordinary course of their businesses, the Debtors, through their payroll

processor, Accenture LLP, make payroll direct deposits and issue payroll checks on a bi-weekly

basis for services rendered by its Employees. The Debtors' last payroll direct deposits and

checks issued prior to the Petition Date for its Employees relating to the two week period from

March 5, 2007 through March 18, 2007 were issued on March 23, 2007 and were thus

approximately five days in arrears, reflecting wages earned in the two week period up to and

including the Sunday of the prior week. The next scheduled payday for Employees is April 6,

2007 and will relate to the two week pay period from March 19, 2007 through April 1, 2007 and

thus includes only amounts earned prior to the Petition Date. The Debtors estimate that

outstanding prepetition amounts for the payroll of the Employees as of the Petition Date is

approximately $15,000,000.

30.     Additionally, <u>for most of the Debtors' Employees involved in loan</u>

<u>origination, their compensation is largely</u> earned through <u>commission based</u> plans, including a

Wholesale Division and Region Manager Incentive Compensation Plan, a Wholesale Executive

12

Management Incentive Compensation Plan, a Collateral Analyst Incentive Compensation Bonus Plan and a Company Incentive Bonus Plan (the "Incentive Plans"). Employee compensation earned pursuant to the Incentive Plans are in the nature of commissions and are paid concurrently with the Debtors' other payroll obligations. Compensation earned pursuant to an Incentive Plan is paid semi-monthly, monthly or quarterly, depending on the plan. Commissions are earned based on the amount of mortgage loans funded. As compensation paid to the Employees and earned pursuant to the Incentive Plans vary each pay period based on the mortgage loans that are funded, the Debtor is unable to provide a realistic estimate for its future obligations that stem from the Incentive Plans. The Incentive Plans are ordinary course business expenses, and Employees expect to receive payments pursuant to the Incentive Plans as a portion or all of their salaries. The Debtors seek authorization, but not direction, to honor prepetition amounts earned under the Incentive Plans in the ordinary course of business.[5]

31.    Because the Debtors stopped funding mortgage loans in mid-March, Employees who ordinarily earn their salaries as a percentage of loans funded under the Incentive Plans would not be paid. Based on the very nature of the loan origination business, each of the employees is key to the creation of revenue for the Debtors. In order to retain certain key commission-based Employees while the Debtors sought financing and a potential buyer, the Debtors instituted two incentive plan protection plans (the "Retention Plans"). The Debtors agreed to pay eligible employees for the months of March 2007 and April 2007 the greater of the amount earned under an Incentive Plan or seventy-five percent (75%) of their average monthly income earned under the Incentive Plans during the months of December 2006 through February 2007. The Debtors agreed to pay fifty percent of amounts earned under the Retention Plans on

---

[5] Although the Debtors do not believe that payments under the Incentive Programs are prohibited by the automatic stay, out of an abundance of caution, the Debtors describe the Incentive Programs here and request

the 20th and the other fifty percent on the final day of the following month. In other words, the

Debtors agreed to pay fifty percent of the March 2007 payments on April 20, 2007 and the

remaining fifty percent of the March 2007 Retention Plan payments on April 30, 2007.

Employees are not eligible for payment under the Retention Plans unless they are actively

employed by the Debtors on the payment dates. After giving effect to the recent reduction in

force, approximately 1300 employees will be entitled to payment under the Retention Plans. The

Debtors estimate that the total aggregate amount to be paid for March 2007 under the Retention

Plans will be approximately $7,343,000, all of which is for pre-petition amounts earned by

Employees. The Debtors seek authorization, but not direction, to honor prepetition amounts

earned under the Retention Plans in the ordinary course of business.

32.     The Debtors also utilize in the ordinary course of business independent

contractors (the "Independent Contractors"), through employment agencies. The Independent

Contractors perform various functions for the Debtors, including clerical and administrative

services, computer support work and broker services, and are critical to the Debtors' continued

operations. The Independent Contractors are classified and paid separately from the Debtors'

payroll and accounting system. The Debtors are for services (based on hourly rates) performed

by the Independent Contractors. The Debtors seek permission hereunder to pay prepetition

amounts to the Independent Contractors in the ordinary course of business as Employee

Obligations.

33.     Pursuant to section 105(a) and 363(b) of the Bankruptcy Code, the Debtors

seek authority to continue with their payroll schedule in the ordinary course of business and

consequently pay all Employees' prepetition compensation. Such costs are relatively minimal

---

approval of payment of obligations under the Incentive Programs as Employee Obligations.

14

compared with the size of the Debtors' estates and the damage to the Debtors' chapter 11 cases

that would ensue if Employee morale were disrupted by the Debtors' failure to meet the payroll

portion of their Employee Obligations.

**(ii)    Time-Off Days**

34.    The Debtors also seek authority, but not direction, to permit Employees to

use paid time off, holidays, sick days and bereavement leave, whether accrued before or after the

Petition Date (collectively, "Time Off Days"), in accordance with the Debtors' prepetition

policies. Part-time and Full-time Employees working 32 plus hours per week accrue paid time of

("Paid Time Off") based on their length of employment and position.

35.    Generally, Paid Time Off for qualifying, regular, part-time and full-time

Employees accrues as follows:[6]

| | | |
|---|---|---|
| 90 days to 1 year of service | - | 10 annual days Paid Time Off |
| 1 to 2.99 years of service | - | 10 annual days Paid Time Off |
| 0 - 7.99 years of service (Executive) | - | 15 annual days Paid Time Off |
| 3 to 7.99 years of service | - | 15 annual days Paid Time Off |
| 8 or more years of service | - | 20 annual days Paid Time Off |
| 8 or more years of service (Executive) | - | 20 annual days Paid Time Off |

36.    Employees may carry over accrued but unused Paid Time Off hours from

year to year in an amount of up to two times their annual accrual of Paid Time Off hours.

However, once Employees have accrued two times their annual accrual of Paid Time Off hours,

they will cease accruing Paid Time Off hours until they have used some of the Paid Time Off

hours. The Debtors' vacation policy requires that requests for vacation be approved by each

Employee's supervisor.

---

[6] While the description of the Paid Time Off policy set forth herein applies to the vast majority of Employees, there are exceptions. For instance, attorneys employed by the Debtors are eligible for 15 days vacation upon hire. Also, Executive Management Committee Employees are eligible for six weeks vacation after eight years of service. There are also a limited number of Employees hired by an entity recently acquired by the Debtors whose vacation accrual is not subject to the two year cap.

15

37.    The Debtors' policy is to pay an Employee, upon termination, all accrued unpaid vacation at his/her final rate of pay. As of the Petition Date, Employees had accrued unpaid vacation in amount equal to approximately $10,931,000, which represents an average of approximately $1,700 per Employee. The Debtors are seeking authority, but not direction, to pay Employees for prepetition unpaid accrued vacation upon termination, in addition to seeking authority to permit Employees to use Paid Time Off accrued prior to the Petition Date, in accordance with the Debtors' prepetition policies.

38.    In addition, after 90 days of employment, Employees are eligible to receive paid sick leave. Eligible full-time Employees, receive 6 days of paid sick leave during each year of employment and eligible part-time Employees receive 4.5 days of sick leave during each year of employment.

39.    The Debtor also encourage their Employees to be active citizens and volunteers by offering eligible Employees, who have completed 90 days of employment, 16 paid volunteer hours per calendar year to participate in approved charitable activities.

40.    Eligible Employees are also entitled to eight paid holidays and one personal day per calendar year. They are paid their regular base salary or hourly rate of pay for the number of hours they are regularly scheduled to work in a day. Personal days must be used within the calendar year.

41.    In addition, Employees are entitled to up three consecutive days of paid bereavement leave per calendar year for use in the event of a death of an immediate family member. Unused bereavement leave days do not carry forward from one calendar year to the next. Upon termination, Employees do not receive payment for bereavement leave days not taken in that calendar year.

16

42.    Employees are also entitled to up to 10 business days of paid jury duty leave per calendar year for time spent serving on a jury. Unused jury duty leave hours will not carry forward from one calendar year to the next. Upon termination, Employees do not receive payment for jury duty leave hours not taken in that calendar year.

### (iii)    Employee Benefits

43.    As part of the Debtors' Employee Obligations, the Debtors have also established a variety of benefit plans and programs (the "Employee Benefits") designed to assist their Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that arise from illness, disability and death. The Debtors believe that all amounts and obligations related to Employee Benefits accrued prior to the Petition Date have been paid in full except as otherwise noted herein. However, out of an abundance of caution, the Debtors seek authorization, but not direction, to pay or otherwise honor these Employee Benefits in the ordinary course of business.

### a)    Health Plan Benefits

44.    The Debtors have established several health plans. Regular full-time Employees in Hawaii are offered medical benefits through a choice of medical plans administered by Hawaii Medical Service Association (the "HMSA Plan"). Regular full-time Employees located in other states are offered medical benefits through a choice of a medical plans administered by United-Healthcare (the "UHC Plan"). Included in the plans are hospitalization, ambulance service, lab/X-ray treatment and prescription drugs. Regular full-time Employees are also offered dental benefits through a preferred provider option plan administered by MetLife (the "MetLife Dental Plan"). Employees can also elect to obtain vision

17

coverage through participating in a vision plan provided by Vision Service Plan (the "Vision Plan"). Prior to health plan enrollment, an Employee may elect to cover eligible dependents.

45.     The Debtors encourage covered Employees to choose their doctors and hospitals from the UHC Plan, HMSA Plan, MetLife Dental Plan and Vision Plan networks to get the greatest benefit coverage. The Debtors pay approximately $34,000 a month in premiums for the HMSA Plan. The UHC Plan, the MetLife Dental Plan and the Vision Plan are self-funded by the Debtors. The Debtors pay approximately $3 million per month for claims under the UHC Plan and approximately $200,000 per month for administrative fees to UHC. In addition to these amounts, the aggregate amount deducted from Employee payroll checks for the UHC Plan on a monthly basis is approximately $700,000. The Debtors pay approximately $347,000 per month for claims under the MetLife Dental Plan and approximately $20,000 a month for administrative fees. The aggregate amount deducted from Employee payroll checks for the MetLife Dental Plan on a monthly basis is approximately $109,000. The Debtors pay approximately $46,000 a month for claims under the Vision Plan and approximately $7,500 per month for administrative fees. The aggregate amount deducted from Employee payroll checks for the Vision Plan on a monthly basis is approximately $34,000.

46.     Because certain of the medical plans are self-funded, the Debtors also have a stop loss insurance policy with SunLife Assurance Company of Canada for protection against major dollar medical claims. SunLife reimburses the Debtors for any medical claims greater than $275,000. The Debtors pay approximately $75,000 a month in premiums to SunLife.

47.     Pre-petition, approximately 5,700 Employees participate in the UHC Plan, approximately 50 Employees participate in the HMSA Plan, approximately 5,770

18

Employees participate in the MetLife Dental Plan and approximately 5,300 Employees participate in the Vision Plan.

48.    Employees rely on the Debtors to provide continuing medical care. Employee welfare and morale would be significantly harmed if the Debtors were to fail to pay any due amounts with respect to the health insurance plans. As noted above, the Debtors believe that all amounts and obligations related to the health insurance plans prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to the medical insurance benefits in the ordinary course of business.

49.    Furthermore, and for similar reasons, the Debtors seek to continue to perform their obligations under section 4980B of the Internal Revenue Code to provide Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B) with respect to former employees. The Debtors provide their former employees with COBRA administered through UHC. Former employees enrolling in COBRA pay an approximate aggregate amount of $93,000 per month to the Debtors for COBRA benefits. The Debtors in turn pay UHC for medical claims incurred by the former employees. The Debtors pay an additional administration fee to UHC in an approximate amount of $10,000 per month. As noted above, the Debtors believe that all amounts and obligations related to COBRA benefits prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to COBRA benefits in the ordinary course of business.

### b)    Employee Life and Other Insurance Benefits

50.    The Debtors provide to certain Employees basic group life, supplemental life, accidental death and dismemberment ("AD&D"), short-term and long-term disability

coverage and other insurance coverage. The Debtors pay Standard Insurance Company approximately $230,000 per month for basic life, AD&D, short-term and long-term disability insurance coverage premiums. The Debtors also pay state disability insurance to the states of Hawaii and New York. New York and Hawaii state disability payments are mandatory and the payment formula is based on quarterly headcount and payroll amount. The Debtors pay approximately $800 a month for New York state disability coverage and approximately $4,000 a month for Hawaii state disability coverage. In July 2006, the Debtors pre-paid the New York state disability insurance to cover the period from July 2006 through June 2007. Hawaii state disability is due quarterly with next payment due in April 2007.

51.     As noted above, the Debtors believe that all amounts and obligations related to group life, supplemental life, AD&D, short-term and long-term disability and other insurance coverage prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to group life, supplemental life, AD&D, short-term and long-term disability and other insurance coverage in the ordinary course of business.

### c)     Flexible Spending Benefits Program

52.     Employees who anticipate that they will have health care expenses that are not covered by the insurance plan may elect to participate in the Debtors' flexible spending account (the "Flexible Spending Account"), administered by UHC. Employees determine what their total annual out-of-pocket expenses will be and how much they wish to set aside for the year. This amount is divided into 26 equal pre-tax deductions for the pay periods throughout the year and is credited to the Employee's special health care account. Because the deductions are pre-tax, participating Employees' federal, state and social security taxable wages are reduced.

As expenses are incurred, an Employee files claims with UHC, and UHC reimburses the

Employee for qualified expenses with a check. The maximum that can be set aside each year is

$5,000. The amount designated must be used by the end of each year, as any unused portion of

the amount will not be reimbursed to the Employee (as stipulated by the Internal Revenue

Service (the "IRS")).

#### d)    Dependent Care Accounts

53.    Employees who pay for care for children under 13, disabled family

members or elderly family members are eligible to participate in a flexible spending account for

dependent care. Employees who anticipate that they will have dependent care expenses that are

not covered by the insurance plans provided by the Debtors may determine what the total annual

out-of-pocket expenses will be and how much they wish to set aside for the year. This amount is

divided into 26 equal pre-tax deductions for the pay periods throughout the year and is credited

to the Employee's special health care account. Because the deductions are pre-tax, participating

Employees' federal, state and social security taxable wages are reduced. As expenses are

incurred, an Employee may file a claim for reimbursement with UHC and a check will be sent to

such Employee up to the amount contributed to their account. The maximum that can be set

aside each year is $5,000. The amount designated must be used by the end of each year, as any

unused portion of the amount will not be reimbursed to the Employee (as stipulated by the IRS).

#### e)    Retirement Benefits Plan

54.    All regular Employees are eligible to participate in a 401(k) savings and

retirement plan (the "401(k) Plan") administered by JP Morgan. Employees participating in this

program are permitted to contribute an unlimited amount of their salary toward their 401(k) Plan

account up to the amount of the statutory cap. The Debtors also make contributions representing

21

50% of the first 6% contributed by each participating Employee to his or her 401(k) Plan account (collectively, "Matching Contributions"). On average, the Debtors make Matching Contributions of approximately $814,000 during each month, and the Debtors expect to make Matching Contributions of approximately $339,000 for March 19, 2007 through April 1, 2007, all of which relates to the period prior to the Petition Date. All administrative fees are paid by the employee participants, and the Debtors pay approximately $40,000 per year for auditors to review the 401(k) Plan.

55.     Further, the Debtors deduct from Employees' paychecks 401(k) Plan contributions. Failure to timely forward these 401(k) deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended, resulting in potentially personal liability for the Debtors' officers for such deducted amounts. The Debtors estimate that there will be no 401(k) Plan contributions and loan payments as of the Petition Date that have been deducted but not remitted.

56.     The Debtors believe that maintaining the 401(k) Plan and continuing to make Matching Contributions are critical in maintaining Employee morale. Accordingly, the Debtors seek authority to continue in their discretion the 401(k) Plan, to make Matching Contributions and to pay administrative and other related expenses to maintain the 401(k) Plan.

### f)     Special Programs

57.     The Debtors also offer Employees and their dependents access to an employee assistance program (the "Employee Assistance Program") managed by UHC. Through UHC, Employees and eligible family members may receive counseling for certain life issues. The program is designed to help Employees manage stress, balance their work and family responsibilities and to improve the quality of their lives. The Employee Assistance Program

22

costs the Debtors approximately $11,000 per month. This program provides important benefits

to Employees and improves Employee morale at relatively modest cost. The Debtors request

authority to pay any costs related to, and to continue with such Employee Assistance Programs

and related policies in the ordinary course of business.

**g)      Employee Stock Purchase Plan**

58.      The Employees were previously given the opportunity to purchase the

common stock of New Century Financial Corporation through the Employee Stock Purchase

Plan (the "ESPP"). Employees could elect to contribute from 1% to 10% of their pay to the

ESPP. On March 13, 2007, the Securities and Exchange Commission delisted the Debtors'

common stock. Subsequently, the Debtors' board of directors elected to terminate the ESPP and

return amounts from future payrolls allocated as ESPP contributions to the Employees. The

Debtors request authority to continue returning amounts from the payroll previously allocated by

Employees as ESPP contributions to the applicable Employees.

**h)      Prepetition Amounts Withheld from Employee
Paychecks and Related Deductions and
Payments**

59.      The Debtors deduct from their Employees' paychecks (as applicable)

(i) payroll taxes and the Employees' portion of taxes pursuant to the Federal Insurance Claims

Act and unemployment taxes; (ii) Employee contributions for health and disability related

benefits and flexible spending accounts; (iii) Employee contributions to 401(k) Plans; (iv) legally

ordered deductions such as wage garnishments, child support and tax levies; and

(v) miscellaneous other items (collectively, the "Employee Deductions"). The Debtors forward

amounts equal to the Employee Deductions from their operating accounts to appropriate third-

party recipients. While the Debtors do not believe that any funds were deducted from Employee

paychecks but not forwarded to the appropriate third-party recipients as of the Petition Date, out

23

of an abundance of caution, the Debtors seek authority to forward to the appropriate parties any

Employee Deductions that were not forwarded due to the commencement of these chapter 11

cases.

**i)     Reimbursable Expenses**

60.     Eligible Employees may submit certain business-related expenses to the

Debtors for reimbursement (collectively, the "Employee Expenses"). These Employee Expenses

include relocation, car, hotel stays, meals, parking and other travel expenses and business related

costs, as well as monthly telephone and internet allowances for certain approved employees.

Employees incur certain Employee Expenses on corporate credit cards issued to the Employees

pursuant to the Debtors' agreement with American Express Travel Related Services, Inc.

("American Express"). American Express forwards account statements directly to the

Employees and the amounts are paid by the Debtors to American Express. On average,

Employee Expenses cost the Debtor approximately $578,000 per month. As of the Petition Date,

the Debtors estimate they owe Employees approximately $289,000 in reimbursements for

Employee Expenses.[7] The Debtors seek authority, but not direction, to pay these Employee

Expenses, including amounts owed to American Express for Employee Expenses, and to

continue to pay them postpetition in the ordinary course of business.

**D.     Motion of the Debtors and the Debtors in Possession for an Order
        Authorizing the Debtors to Pay Prepetition Use Taxes Pursuant to Section
        105(a), 363 and 507(a) of the Bankruptcy Code**

61.     By this Motion, the Debtors seek entry of an order pursuant to sections 105,

363 and 507(a) of the Bankruptcy Code that authorizes, but does not direct, the Debtors to pay

undisputed prepetition use tax obligations (the "Taxes") owed to the appropriate taxing

---

[7] This estimate includes Employee Expenses which have not yet been submitted for approval and
Employee Expenses which have been submitted but not yet approved.

24

authorities (the "Taxing Authorities") in the ordinary course of business, on an unaccelerated

basis, as payments become due and payable and to the extent adequate funds are available to

make such payments. To the extent that any check payable to a Taxing Authority issued prior to

the Petition Date had not cleared the bank as of the Petition Date, the Debtors also seek entry of

an order (i) authorizing the Debtors' banks to honor such checks and/or any prepetition wire

transfer requests and (ii) authorizing the Debtors to issue replacement checks, submit

replacement fund transfer requests or provide other means of payment to the Taxing Authorities

to the extent necessary to pay all undisputed prepetition use tax obligations.

      62.    On a periodic basis, the Debtors pay to the Taxing Authorities all use tax

collected by funds drawn by check or by means of an electronic funds transfer. Generally, the

Debtors incur use tax when goods from a vendor are sent to the Debtors' headquarters in Irvine,

and then are shipped from Irvine to locations in another state. The Debtors pay use tax to the

states where the goods are sent and used. Accordingly, prior to submitting payment to the

appropriate Taxing Authority for a given period, the Debtors may hold a balance of collected but

unremitted Taxes.

      63.    As of the Petition Date, the Debtors' financial records indicate that the

Debtors are substantially current on their payment of Taxes to all Taxing Authorities. Therefore,

the Debtors seek this relief out of an abundance of caution and to the extent that any Taxes

accrued prepetition were not paid prepetition, paid in an amount that is less than actually owed,

or if any payments sought to be made prepetition are rejected, lost or otherwise not received in

full by any Taxing Authority. On an annual basis the Debtors pay approximately $33,000 in

Taxes. The Debtors estimate that the total amount of Taxes collected prepetition but not yet paid

is under $3000 and will come due by April. These amounts represent a very small fraction of the

Debtors' total assets. The Debtors are seeking only to pay Taxes as they become due in the

ordinary course of the Debtors' businesses and consistent with prepetition business practices.

      64.    The Debtors believe that the failure to pay the Taxes could have a material

adverse impact on their ability to operate in the ordinary course of business. The Debtors are

licensed to do business in all 50 states, and any tax disputes that impair their ability to conduct business in a particular jurisdiction could affect the Debtors' business as a whole. Furthermore, the Debtors believe that many Taxing Authorities may cause the Debtors to be audited if certain of the Taxes are not paid, and such audits will unnecessarily divert the Debtors' attention from their business operations and reorganization. The payment of the Taxes is also necessary to avoid potential administrative difficulties. Withholding of payment of the Taxes will likely cause the Taxing Authorities to take immediate action, including an increase in state audits and lien filings or motions for relief from stay. Prompt and regular payment of the Taxes will help avoid these unnecessary government actions. Given the potential harm if the Taxes are not timely paid, and the fact that the Debtors intend to pay all Taxes in full, there is no reason why the relief requested herein should not be granted.

E.      **Motion of the Debtors and the Debtors in Possession for an Order (A) Authorizing the Continued Use of the Debtors' Centralized Cash Management System, including Operation of Servicer Trust Accounts, (B) Authorizing Maintenance of the Debtors' Existing Bank Accounts and Business Forms, and (C) Extending the Debtors' Time to Comply With Section 345 of the Bankruptcy Code**

65.     By this Motion, the Debtors seek entry of an order pursuant to sections 105(a), 345(b), 363, 364(a), and 364(b) of the Bankruptcy Code and substantially in the form attached hereto as Exhibit C waiving the guidelines (the "U.S. Trustee Guidelines") established by the United States Trustee for the District of Delaware (the "U.S. Trustee") to the extent necessary in order to continue the use of their existing cash management system, including but not limited to the initiation and completion of any intercompany payment and any support transactions. The Debtors also respectfully seek authorization to continue using their prepetition bank accounts and business forms, including a waiver of the requirement that the legend "debtors in possession" be imprinted on any existing checks and business forms, and to continue their use of the existing cash management system. In addition, the Debtors seek authorization to continue their mortgage servicing responsibilities under existing whole loan and securitization programs described below. Finally, the Debtors seek an extension of time to comply with the investment

26

guidelines provided for in section 345(b) of the Bankruptcy Code. The Debtors seek this authorization to insure their orderly entry into bankruptcy and to help efficiently administer their businesses and avoid the disruptions and distractions that would inevitably divert the Debtors' attention from urgent matters during the initial stages of their bankruptcy case

66.    I am informed by counsel that one provision of the U.S. Trustee Guidelines requires a chapter 11 debtor in possession to open new bank accounts and close all existing accounts and that the U.S. Trustee Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the U.S. Trustee.

67.    The Debtors maintain a number of bank accounts in the ordinary course of business. The bank accounts include without limitation depository, operating, and distribution accounts (collectively, the "Bank Accounts"). Currently the Debtors have accounts with Union Bank of California ("Union Bank"), Deutsche Bank Trust Company Americas ("DB"), Deutsche Bank National Trust Company ("DB Trust"), Guarantee Bank, LaSalle Bank, Bank of Hawaii, Washington Mutual, Wells Fargo Bank N.A. ("Wells Fargo"), U.S. Bank, Countrywide, Merrill Lynch, RJ O'Brien & Associates . A true and correct list of the Bank Account names and account numbers is attached hereto as Exhibit A thereto.

68.    The Debtors seek a waiver of the U.S. Trustee's requirement that the Debtors close their bank accounts and open new postpetition bank accounts at depositories authorized by the U.S. Trustee. I am informed by counsel that Rule 2015-2(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") provides that in a chapter 11 case where the Debtors use pre-printed checks, upon motion of a debtor, the Court may, without notice and hearing, permit the debtor to use their existing checks without the designation "Debtor in possession" and to use their existing bank accounts. Although the Debtors do not use pre-printed checks, the Debtors' check printing software will require a programming change to print checks with the designation "Debtors in possession." For example, the checks the Debtors' issue with respect to servicing of loans are electronically administered pursuant to pre-programmed software that the Debtors

27

cannot easily alter because the software does not permit the Debtors to change the payor information on its checks. The programming change to the check printing software would take time and be expensive to implement. As a result, the Debtors seek the Court's permission to print checks without the designation "Debtors in possession."

69.    The Debtors seek a waiver of the requirement that new bank accounts be opened to replace all of the Debtors' existing Bank Accounts because the requirement would unnecessarily disrupt the Debtors' businesses, impair their efforts to successfully reorganize or otherwise cut into transactions to maintain the value of the businesses and would not provide any significant benefit to the Debtors' estates, their creditors or parties in interest. For example, the Debtors' employees would suffer significant hardship if the Debtors were required to substitute new debtor in possession payroll accounts for their existing payroll account and would face attendant delays, confusion and disruption. It is critical to the continued operation of the Debtors' businesses and the preservation of the value of their assets that the Debtors continue to utilize their existing cash management system and Bank Accounts without disruption.

70.    In addition, the filing of the Debtors' bankruptcy petition will undoubtedly be publicized and place a strain on the Debtors' relationships with parties that are essential to the Debtors' continued operations. If the Debtors were required to substitute new debtor in possession bank accounts for their existing Bank Accounts, these relationships will be further strained by the payment delays and confusion that would result from opening the new accounts. Consequently, the Debtors believe that it is imperative that they be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of their businesses, efficiently administer their bankruptcy cases and devote their efforts to a successful sale.

### (i)    Maintenance of the Debtors' Existing Business Forms is in the Best Interests of the Estates

71.    The Debtors also request authority to continue to use all existing correspondence and business forms (including, but not limited to letterhead, purchase orders,

invoices, etc.), as well as checks, without reference to their "debtor in possession" status, in order to minimize expense to the estate.

72.    In the ordinary course of their businesses, the Debtors use many pre-printed correspondence and business forms. In addition, the Debtors contract with third party vendors to prepare certain letters, mortgage payment statements, and escrow analyses for the multitude of loans they service. Attempting to coordinate with these third parties to change these forms would be difficult and expensive. The nature and scope of the Debtors' businesses and the numerous suppliers of goods and services require that the Debtors be permitted to continue using their correspondence and business forms without alteration or modification. Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtors' business operations. Parties doing business with the Debtors undoubtedly will be aware, as a result of the size of these cases and the integrated nature of the industry in which the Debtors operate, of the Debtors' status as a debtor in possession. Further, opening new debtor in possession accounts would be a significant burden due to the number of accounts that the Debtors maintain. Accordingly, the Debtors also request authority to use their respective correspondence and business forms without placing the label "debtor in possession" on each such correspondence or form.

### (ii)    Maintenance of the Debtors' Existing Cash Management System is in the Best Interests of the Estates

73.    The Debtors maintain a complex system of deposit, accounts payable, payroll, operating, trust and custodial accounts, the vast majority of which are maintained with Union Bank of California ("Union Bank"). In total the Debtors' maintain approximately 354 open bank accounts. Exhibit A lists these accounts.[8] Out of an abundance of caution and in order to err on the side of being over inclusive, Exhibit A includes some accounts in the names

---

[8] Every effort has been made to be inclusive, but it is possible that some accounts may have been excluded from Exhibit A and certain Securitization Appointments may have been excluded from Exhibit B. If the Debtors discover any accounts that should have been listed on Exhibit A or Securitization Appointments that should have been listed on Exhibit B, but were inadvertently omitted, they will file a supplement with the Court.

of non-Debtor affiliates and custodial and trust accounts maintained in the name of a Debtor but
where the Debtor merely holds the account (and the funds in it) in trust or as custodian for a third
party.

74.    While the Debtors' cash management system is complex, it can generally
be summarized, organized by the Debtors' main cash flow functions, as follows.

### a.  **Funding loan originations and purchases**

75.    When a loan is originated (either by an independent mortgage broker,
correspondent lender or the Debtors' Retail Division), the loan originator notifies the Debtors to
arrange for the funding of the loan.  Loans are typically funded by the Debtors transferring their
portion of the loan purchase price (e.g., the so-called "haircut") from one of the Debtors'
operating accounts (typically maintained at Union Bank) either (i) to DB Trust (which uses DB
as depositary) or Wells Fargo, which act as Custodian and Disbursement Agents ("Custodians")
under the Debtors' warehouse lending lines of credit, or (ii) directly to the title company to fund
the loan.  To the extent that the loan purchase is funded by one of the Debtors' warehouse
lenders, that lender typically wires its portion of the loan purchase price to DB Trust as
Custodian or Wells Fargo as Custodian.

### b.  **Loan Sales and Securitizations**

76.    When the Debtors sell a pool of loans (either through a whole loan sale or a
securitization), the buyer typically transfers the purchase price to DB Trust or Wells Fargo, as
Custodians, and the Custodians disburse the funds to the warehouse lender and to the Debtors as
appropriate, per the terms of the warehouse loan agreement and custodial arrangement.  The
Debtors' portion of the sale proceeds are typically transferred into one of the Debtors' operating
accounts designated for that purpose.  In securitization transactions, the Debtors often receive a
residual interest issued by the securitization trust which represents a subordinate interest in trust
assets after all other required trust distributions have been made.

c.  **Loan Servicing**

77.    The Debtors, largely through New Century Mortgage Corporation
("NCMC"), service loans. These servicing functions typically include:  collecting and remitting
loan payments received from the borrowers; making required advances; accounting for principal
and interest; customer service; holding escrow or impound funds for payment of taxes and
insurance; and, if applicable, contacting delinquent borrowers and supervising foreclosures and
property dispositions in the event of unremedied defaults.

78.    Traditionally, during the time that the Debtors held a loan for sale or
investment, the Debtors provided interim servicing prior to the disposition of the loan.  These
servicing functions are often performed pursuant to provisions of the warehouse loan agreements
with the Debtors' warehouse lenders.[9]  Servicing warehoused loans typically does not generate
any separate servicing fee income for the Debtors and the Debtors are generally in the process of
transitioning or have transitioned these servicing functions to new servicers selected by the
warehouse lenders.  To the extent that the Debtors are continuing to perform any such servicing
for the loans they hold pursuant to warehouse loans or hold for their own account, this motion
seeks to continue that servicing function.

79.    In addition, and more importantly for the estates, the Debtors provide loan
servicing to third party purchasers of loans in whole loan sales and to the securitization trusts that
are formed when the Debtors' loans are disposed of via securitizations.

i.  **Acting as a servicer for securitized and loans subject to whole loan
sales**

80.    Servicing loans for securitization trusts and purchasers of loans acquired in
whole loan sales is a very important and profitable portion of the Debtors' businesses.  The
Debtors' mortgage servicing rights ("MSR's") are generally established in servicing contracts

---

[9] Several of the warehouse lenders have purported to terminate the Debtors as servicers for warehoused
loans held for disposition and the Debtors have cooperated in transitioning the servicer role on many of these
facilities.

with the securitization trusts or third party whole loan purchasers. For performing these functions, the servicer (usually NCMC) generally receives a servicing fee, one-twelfth of which is paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio. These servicing fees are typically collected from the monthly payments made by the borrowers on the loans. In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties. For the fiscal year ended December 31, 2006, the Debtors estimate that they collected approximately $84 million of servicing fees and approximately $3 million of prepayment penalties, yielding approximately $64 million of servicing income after amortization of MSR's. As of December 31, 2006, the Debtors serviced approximately $28.6 billion of loans owned by third parties. Preserving these MSR's and the Debtors' loan servicing platform is very important to maintaining value for the estates. In order to do so, the Debtors need authorization to continue to perform these servicing functions, which is among the relief sought in this motion.

81.    The Debtors, principally through NCMC, perform loan servicing as "servicer" or "master servicer" on behalf of a number of securitization trusts, including but not limited to those listed in Exhibit B hereto (the "Securitization Appointments") under the terms and conditions of a series of servicing agreements, pooling and servicing agreements, indentures and related documents (collectively, the "Securitization Documents"). As of the Petition Date, the Debtors service $10 billion in principal amount of mortgage loans under the Securitization Appointments for the benefit of the holders of the related mortgaged backed securities. In many instances, Debtor entities such as NC Residual IV Corporation, own residual or other interests in such mortgage backed securities, thus giving their estates a significant economic interest in the proper servicing of the securitized mortgage loans.

82.    Under the Securitization Documents, the Debtor entity acting as mortgage servicer, inter alia, (a) services mortgage loans held by the trusts, in accordance with the terms

32

and conditions thereof, (b) advances principal, interest, and certain "property protection" costs (such as taxes and insurance) with respect to delinquent mortgage loans, unless such amounts are determined to be unrecoverable from the related loans, ("Advances"), (c) performs certain securities related computational, reporting and compliance tasks, and (d) pays certain fees and expenses, and furnishes indemnifications to, the trustee and certain other parties to the Securitization Documents (the "Indemnification Obligations") (items (a) through (d), together with all other obligations undertaken as servicer or master servicer under the Securitization Documents, the "Securitization Servicing Functions").

83.    The timely and orderly performance of the Securitization Servicing Functions is essential to prevent material economic damage to all parties with an interest in the securitization trusts, including the Debtors' estates.  This is particularly true given the "subprime" nature of the mortgage loans held by the securitization trusts, which are prone to losses if not aggressively serviced.

84.    Based on the Debtors' current assessment, the Securitization Servicing Functions are profitable and the Debtors' MSR's constitute important assets of the Debtors' estates.

85.    The trustees under the Securitization Documents, assert that the Debtor entities acting as servicer for the securitizations are subject to termination by the securitization trustee, in certain instances and upon the direction of securities holders, if it breaches certain of its obligations.  The Debtors are informed and believe that, in light of the adverse publicity, securitization trustees or securities holders are likely to seek relief from the automatic stay to terminate one or more of the Securitization Appointments if they are not given reasonable assurances that the Debtor servicing entity will perform the Securitization Servicing Functions. The terms of the order sought in this Motion have been negotiated with the securitization trustee for most of the securitization trusts serviced by Debtor entities and with the Debtors' main collection bank.  The Debtors believe that by providing these assurances, they will enhance the prospect of maintaining their loan servicing platform and realizing its value.  Conversely, such

33

termination of the Debtors' servicing agreements would likely adversely affect the Debtors reorganization efforts as well as the Debtors' economic interests in the related mortgage backed securities.

### ii.  Servicing Loans Sold to Third Party Whole Loan Purchasers

86.    When the Debtors sell loans in whole loan sales, the purchaser often contracts with the Debtors to provide loan servicing, sometimes on an interim basis and sometimes on a longer term basis (particularly when the purchaser does not have the capacity to service loans).  These servicing agreements are typically documented in a servicing agreement with NCMC which has many of the features of the servicing agreements used with securitization trusts.  Like servicing loans held by securitization trusts, performing these functions is a profitable part of the Debtors' businesses and these MSR's are valuable estate assets.

### iii.  Loan Servicing Cash Management

87.    Amounts collected by the Debtors as servicers are deposited in a lock box, collection account.  For example, the Debtors receive approximately 200,000 mortgage payments (checks, coupons and electronic payments) over the course of every month that are sent to and received at Union Bank's lockbox on a daily basis (the "Loan Payments").  Union Bank deposits all funds collected through the Debtors' lockbox account (account number 2210104254).  On a daily basis, via a zero balance accounting transfer, the lockbox account credits the Debtors' payment clearing account (account number 2110104289) (the "Payment Clearing Account").  Union Bank extracts data from the remittance coupon and forwards data to the Debtors' data processor, MortgageServ ("MortgageServ").  MortgageServe creates an Automatic Clearing House ("ACH") file.  The ACH file is sent to the Debtors for review and the Debtors forward the file to Union Bank for processing.  Once processed, the ACH file will direct monies from the Payment Clearing Account to series of custodial accounts established for such applications as principal and interest ("P&I Custodial Accounts"), taxes, assessments and maintenance fees, and

34

insurance with respect to the mortgaged property ("T&I Custodial Accounts") and various escrow accounts (collectively, the "Custodial Accounts"). The servicer then disburses the funds to the appropriate recipient, including, in the case of principal and interest on loans held by the Debtors, to DB Trust or Wells Fargo, as Custodians under a warehouse line of credit, and to an operating account in the name of a Debtor, as appropriate. 10

88.    In the ordinary course of business, the Debtors as servicers open and close Custodial Accounts to make payments for principal and interest taxes, assessments and maintenance fees, insurance and similar costs with respect to the mortgaged property. The other parties to these transactions assert that the Custodial Accounts are not property of the Estates. For example, in a typical securitization transaction, the indenture trustee for the securitization trust will enter into a servicing agreement with NCMC, as servicer, in which NCMC agrees to open custodial trust accounts "held in trust for the benefit of the Owner Trustee, the Indenture Trustee and the Noteholders."11  Similarly, when NCMC acts as servicer for loans sold by the Debtors in a whole loan sale, the servicing agreement typically provides that NCMC, as servicer, "shall segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of deposit or demand accounts, titled 'New Century Mortgage Corporation in trust for [Purchaser],'  The Custodial Account shall be established with a Qualified Depository acceptable to Purchaser.  The Interim Servicer and the Purchaser intend

---

[10] Some of the operating accounts maintained by the Debtors with respect to warehoused loans, are blocked control accounts subject to instructions from the warehouse lender and nothing in this Motion is intended to alter those control mechanisms; i.e., if an account is blocked pursuant to a control agreement with a warehouse lender, this Motion does not seek to unblock it.

[11] See, e.g., Section 3.10(a) of that certain Servicing Agreement dated as of February 27, 2006 by and among New Century Financial Corporation as Master Servicer, New Century Mortgage Corporation, as Servicer, New Century Home Equity Loan Trust 2006-S1, and Deutsche Bank National Trust Company, as Indenture Trustee. This is typical language found in a servicing agreement where NCMC acts as interim servicer in a securitization transaction.

that the Custodial Accounts shall be special deposit accounts."12  It is critical to the Debtors'

operations as servicers that they be allowed to continue to maintain the operations of these

Custodial Accounts in the ordinary course of business.  Thus, out of an abundance of caution, the

Debtors request authority to continue operating as servicer in the ordinary course of business,

including, but not limited to, operating the Custodial Accounts.  In addition, the Debtors request

that the parties to these transactions be authorized to continue any pre-petition customary

practices of billing or otherwise notifying each other of amounts due to each other and of

"netting" such amounts to the extent that the relevant parties agree to such netting.

                89.     Additionally, the Court should authorize Debtors' banks to process, honor

and pay all prepetition checks and transfers relating to funds from the P&I Custodial Accounts

(the "P&I Funds") and the T&I Custodial Disbursement Accounts (the "T&I Funds").

Authorizing and directing the Debtors' banks to process, honor and pay all prepetition checks

and transfers from Custodial Accounts relating to the P&I and T&I Funds will not prejudice

creditors or other parties-in-interest in this case.  Accordingly, the Debtors' banks should be

authorized and directed to process, reverse and debit deposits which are returned by payor banks

in the ordinary course of business, honor and pay all prepetition checks or other transfers related

to the P&I Funds and T&I Funds including, without limitation, checks or other transfers drawn

from the T&I and P&I Custodial Accounts, or otherwise made in the ordinary course of the

Debtors' serviced loans.

### d.   The Debtors' Operating Accounts

                90.     The Debtors, through NCMC, maintain a primary concentration account --

account 2110104025 with Union Bank.  NCMC typically transfers funds out of this

concentration account to a series of payroll, accounts payable and other disbursement accounts

---

[12] Section 2.04 of Second Amended and Restated Flow Interim Servicing Agreement between Goldman
Sachs Mortgage Company, as Purchaser, and New Century Mortgage Corporation, as Interim Servicer, dated as of
May 1, 2006.  This is a typical language found in a servicing agreement where NCMC acts as interim servicer for
loans purchased in whole loan sales.

(generally through zero balance account ("ZBA") transfers, but occasionally into manual imprest accounts).

91.    In addition, the Debtors maintain a series of special depository accounts for such matters as capitalizing certain subsidiaries, supporting certain insurance and other regulatory requirements and other special purposes.

### e.  Summary

92.    The Debtors maintain a large, complex and efficient cash management system.  Given the size and complexity of the Debtors' operations, this system entails over 354 accounts, many of which the Debtors maintain as custodians in trust for third parties. Attempting to alter this system would entail severe disruptions to the Debtors' operations and would threaten to cripple the Debtors' ability to act as loan servicers.  It is essential that the Debtors be permitted to continue to operate their existing cash management system.  The Debtors will not pay, and will instruct each of the banks were the Debtors maintain their non-custodial funds not to pay, any of the Debtors' debts incurred before the Petition Date other than as authorized by the Court.

93.    The cash management system described herein is central to the Debtors' ordinary, usual and essential business practices.  It is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.  It would be extraordinarily difficult, if not impossible, for the Debtors to establish entirely new accounts and a new cash management system.  Thus, maintenance of the existing cash management system is essential to the Debtors and in the best interests of the estates.

94.    Given the size and complexity of the Debtors' operations, as well as the need to preserve and enhance their respective going concern values, the Debtors simply cannot afford a substantial disruption in the Debtors' cash management procedures.  It is essential, therefore, that the Debtors be permitted to continue to consolidate management of their cash and transfer money as needed and in the amounts necessary to continue the operation of their

businesses. If the relief requested herein is granted, the Debtors will not pay out of their non-custodial funds, and each of their banks where the Bank Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

95.    The Cash Management System described herein constitutes the Debtors' ordinary, usual and essential business practices. The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. The widespread use of such systems is attributable to the numerous benefits they provide, including the ability to: (a) tightly control corporate funds; (b) insure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These controls are particularly important here given the significant amount of cash that flows through the Debtors' Cash Management System on an annual basis.

96.    In addition, given the corporate and financial structure of the Debtors, it would be difficult, if not impossible, for the Debtors to establish entirely new accounts and a new cash management system. Establishing new accounts in their place and instructing loan servicing customers and each and every individual mortgagor who is accustomed to making the Loan Payments to a specific account of the changes would substantially disrupt and delay the Debtors' receipt of Loan Payments and provision of services to its loan servicing customers. The Debtors would have to shut down their entire existing Cash Management System and attempt to establish a new cash management system to service loans, including opening new operating and custodial accounts for the benefit of its loan servicing customers. The Debtors submit that this is not practicable and could both severely and irreparably harm the Debtors' ability to operate their businesses. Moreover, such severe disruption would likely substantially harm the Debtors' loan servicing customers and potentially harm individual mortgage holders. Thus, under the circumstances, maintenance of the Debtors' Cash Management System is not only essential to the Debtors, it is also in the best interests of their respective estates and creditors.

97.    If the Debtors are not permitted to continue to use their Cash Management System in its current form (modified to the extent necessary by the debtor in possession financing arrangements), their operations will be severely and perhaps irreparably impaired. Accordingly, the Court should authorize the Debtors' continued use of their existing Cash Management System.

98.    In addition, the Debtors should be granted relief from the U.S. Trustee Guidelines to the extent they require that the Debtors make all disbursements by check. Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct some transactions by wire transfer.  To deny the Debtors the opportunity to conduct wire transfers would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations.  The Court should permit these practices to continue.

99.    It is critical both to the continued operation of the Debtors' businesses and to the preservation of the value of their businesses that the Debtors continue to utilize their existing Cash Management System without disruption.  Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' centralized Cash Management System in its current form (except to the extent it needs to be modified in accordance with the debtor in possession financing arrangements).

**(iii)    Payment of Outstanding Routine Prepetition Expenses Relating to the Operation of the Cash Management System is in the Best Interest of the Debtors' Estates**

100.    In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System and to loan custody.  The Debtors seek authority to pay any such customary prepetition banking and custody fees owed to any of their banks. The banks undoubtedly will assert offset and/or recoupment claims to cover any such fees, so the Debtors' ability to access funds in its accounts depends on reaching an appropriate means of

paying these fees.  Thus, the Debtors seek authority to pay any such customary postpetition

banking and custody fees in the ordinary course as administrative expenses and that no liens

granted to any creditors (including a DIP lender) take priority over these fees.

>     **(iv)    Cause Exists for Extending the Time for the Debtors to
>             Comply With the Requirements of Bankruptcy Code Section
>             345(a)**

101.    I am informed by counsel that section 345(a) of the Bankruptcy Code

authorizes deposits or investments of money of estates, such as the Debtors' cash, only in a

manner that will yield the maximum reasonable net return on such funds, taking into account the

safety of each deposit or investment.  If deposits or investments are not insured or guaranteed by

the United States or backed by the full faith and credit of the United States, section 345(b) of the

Bankruptcy Code provides that, unless the court for cause orders otherwise, the estate must

require the entity with which the money is deposited or invested to obtain a bond in favor of the

United States that is secured by the undertaking of an adequate corporate surety.

102.    The Debtors currently invest any excess cash in conservative, overnight

investments yielding a maximum return on cash based on negotiations with the Debtors' banks.

The Debtors respectfully request a sixty (60) day extension within which to come into

compliance with section 345 of the Bankruptcy Code.  If the Debtors determine that they are

unable to comply with the requirement of section 345 of the Bankruptcy Code within that sixty

(60) day period, the Debtors will file a motion seeking authority to deviate from such

requirements.  The Debtors submit that such extension is warranted by the size and complexity

of these chapter 11 cases.

**F.     Motion of the Debtors and Debtors in Possession for Interim and Final
        Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility
        Providers from Altering, Refusing or Discontinuing Service, (B) Deeming
        Utilities Adequately Assured of Future Performance, and (C) Establishing
        Procedures for Determining Adequate Assurance of Payment**

103.    In the normal course of their business, the Debtors have relationships with

certain utility providers (each, a "Utility Provider" and, collectively, the "Utility Providers") for

the provision of natural gas, electricity, telephone, sewer, sanitation and other services (the

"Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached as Exhibit A to the motion.[13] The Utility Providers service the Debtors' operations throughout the United States.

104.    Prior to the Petition Date, the Utility Providers provided Utility Services to the Debtors at various locations throughout the United States. Ordinarily, upon receipt of a monthly invoice, the Debtors pay each of the Utility Providers directly for the Utility Services provided during the immediately preceding month. To the best of their knowledge, the Debtors have not had significant defaults or arrearages with respect to their undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

105.    Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors, by this Motion and pursuant to sections 105(a) and 366 of the Bankruptcy Code, seek entry of interim and final orders: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of unpaid prepetition invoices; (b) providing that the Utility Providers have "adequate assurance of payment" by virtue of a supplemental two week deposit (a "Utility Deposit") calculated upon the basis of the average bill over the preceding twelve months;[14] (c) establishing procedures for determining requests for additional adequate assurance of payment; (d) providing that if a Utility Provider timely requests in writing additional adequate assurance that the Debtors believe is unreasonable, then, at the request of the Utility Provider and following a reasonable period for discussion and negotiation, the Debtors shall promptly file a motion for determination of adequate assurance of payment (the "Determination Motion") and set such motion for a hearing (the "Determination Hearing"); (e) providing that any Utility Provider that does not timely request additional adequate assurance of payment, as provided for herein, shall be deemed to have adequate

---

[13] The Debtors reserve the right to argue that any of the entities now or hereafter listed on <u>Exhibit A</u> are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

[14] A twelve month payment history was not available for services provided by all Utility Providers. The Debtors calculated the average monthly bill based on the information available.

assurance; and (f) providing that, in the event that a Determination Motion is filed or a Determination Hearing is scheduled, any objecting Utility Provider shall be deemed to have adequate assurance of payment without the need for payment of additional deposits or other securities until an order of the Court is entered to the contrary in connection with such Determination Motion or Determination Hearing.

106.    In order to provide adequate assurance of payment for future services to their Utility Providers, the Debtors propose to make a Utility Deposit equal to two weeks of the Debtors' estimated cost of their utility consumption to each Utility Provider, unless a Utility Provider received adequate assurance of payment for future services prior to the Petition Date.[15] The amount of the Utility Deposits totals approximately $118,016.27 in aggregate deposits for the Utility Providers listed on Exhibit A to the Motion. The Debtors propose to make Utility Deposits to each of the Utility Providers promptly after the entry of an interim order granting this Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition services to the Debtors.

G.    **Motion of the Debtors and Debtors in Possession for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing the Debtors (A) to Honor Prepetition Obligations To Customers Pursuant to the Customer Programs and (B) to Continue the Customer Programs**

107.    By this Motion, the Debtors respectfully request entry of an order pursuant to section 105(a) of the Bankruptcy Code, that authorizes, but does not direct, the Debtors, in their business judgment, (a) to perform and honor their prepetition obligations related to the Customer Programs (as defined below) as they see fit, and (b) to continue, renew, replace, implement new, and/or terminate such of those Customer Programs (as defined below) as they see fit, in the ordinary course of business, without further application to the Court.

108.    Prior to the Petition Date, the Debtors were providing certain services to

---

[15] On March 14, 2007, the Debtors paid Southern California Edison $157,590 as adequate assurance of future performance.

its customers, including, but not limited to a consumer restitution plan (the "Consumer

Restitution Plan"), the funding of manufactured home loans (the "Manufactured Home Loan

Funding") under a program regulated by the Federal Housing Authority ("FHA") and

transferring pipeline loans to other lenders or brokers (the "Transferring Pipeline Loans,"

together with the Consumer Restitution Plan and the Manufactured Home Loan Funding, the

"Customer Programs").  The Customer Programs are described in detail below:

      A.      Consumer Restitution Plan.  The Debtors entered into the Consumer

Restitution Plan in order to mitigate the damages to its customers after the Warehouse

Lenders ceased providing funding for loans originated by the Debtors.  Prior to the

cutoff, certain customers had entered into agreements and paid fees to the Debtors,

including, but not limited to, appraisal fees, fees for credit reports and application

fees, in anticipation of receiving mortgage loans.  The Consumer Restitution Plan

proposes to make whole these customers who were damaged as a result of the

Debtors' liquidity crisis.  Fees received from the customers are in an escrow account

so that refund checks may be generated for the customers.  In addition, the Debtors

propose to set up an escrow account to make equitable restitution payments to the

customers who closed a loan with the Debtors and who either received inferior

funding from an alternative lender or who were not able to obtain any alternative

loan.

B. Manufactured Home Loan Funding.  One of the products the Debtors sell in the

ordinary course of business is loans for manufactured homes (the "Manufactured

Home Loans").  The Manufactured Home Loans are provided by the Debtors through

their FHA approval. These loans are funded through a series of advances, provided at

43

various stages, such as at the time of the purchase of land, the construction of the home, and the attachment of the home to the foundation and to sewer and water lines.

Should the Debtors fail to make the remaining advances on the Manufactured Home Loans, they risk losing their FHA approval. Moreover, should the Debtors cease making further advances, the value of the entire amount of these loans will be lost, as the underlying collateral for these loan will be worthless. The Debtors estimate that the amount of Manufactured Home Loans remaining unfunded is $2.5 million, and hereby request that this court grant the Debtors the authority to continue funding these loans.

C.  Transferring Pipeline Loans.  In connection with its efforts to mitigate the impact on its customers resulting from the Warehouse Lenders' actions to cut-off financing, and consistent with its obligations with the various state regulators, the Debtors have made a concerted effort to reduce the number of mortgage loans in their pipeline that were ready for funding or in other stages of processing, but that had not been funded. The Debtors' efforts included returning most of the loans in its pipeline to the mortgage brokers that submitted the loan applications so that the loans could be placed with other lenders. With respect to its retail division, the Debtors contacted other lenders and mortgage brokers and, with the borrower's consent, transferred their file information to the other lenders and mortgage brokers for further processing. State regulators also assisted in reducing the pipeline by providing the Debtors with referrals of lenders who were willing to assist the Debtors in disposing of their loan inventory. On March 12, 2007, a few days after the Debtors stopped taking loan applications, the Debtors had slightly over 27,000 loans or loan applications in its

44

pipeline. As a result of the efforts taken by the Debtors and their personnel, as of April 2, 2007, the Debtors have disposed of all loans in its pipeline. Out of an abundance of caution, the Debtors request authority to continue transferring pipeline loans to other lenders and mortgage brokers for further processing.

109.     The relief requested by this Motion is necessary in order to alleviate the concerns of the regulators and the Debtors customers, and to preserve the Debtors' reputation and ability to operate. Continued compliance with regulators is critical to the preservation of the Debtors' licenses to operate. The preservation of the licenses is necessary to preserve the going concern value of the Debtors mortgage loan servicing business and loan origination platforms. Without the necessary licenses to operate, those businesses will lose substantial, if not all, value. Moreover, the Debtors believe that the bankruptcy filing and the Debtors' failure to fulfill the prepetition promises made to its customers through the Customer Programs, could further negatively influence consumers' attitudes and behavior toward the Debtors' services unless the Debtors can take the measures requested by this Motion. For these and for the other reasons set forth herein, it is in the best interests of the Debtors, their estates and their creditors to honor prepetition obligations under the Customer Programs and to continue the Customer Programs as they see fit in the ordinary course of business.

110.     Since mid-March, the Debtors have been subject to various actions by state regulators, including cease and desist orders or suspensions. The services provided by the Debtors through the Customer Programs are largely the result of agreements reached with many of the state regulators in order for the Debtors to continue to operate with regulatory approval. The Debtors are engaged in ongoing discussions with state regulators regarding the Debtors' funding constraints and the impact on customers who are in various stages of the loan origination

45

process. The Debtors have advised these regulators that it has ceased accepting loan applications. In addition, the Debtors have advised these regulators that the Debtors are unable to fund any mortgage loans, including mortgage loans for those customers who were already in the loan origination process with the Debtors. The Debtors have been and continue to work cooperatively with these regulators to mitigate the impact on the affected customers, including transferring pending loans and loan applications to other mortgage lenders and implementing the other Customer Programs.

**H.**    **Motion of the Debtors and Debtors in Possession For Entry of an Order Authorizing the Retention of XRoads Case Management Services, LLC As Noticing, Claims, and Balloting Agent to Pursuant to Section 156(c) of the Judicial Code and Bankruptcy Rules 2002-1(f) and 2014(a)**

111.    I am informed and believe that the most effective and efficient manner of noticing the creditors and parties in interest involved in Debtors' chapter 11 cases, and to transmit, receive, docket, maintain, photocopy, and scan claims, is for the Debtors to engage an independent third party to act as the Debtors' notice and claims agent. The Debtors may also require the services of an agent to administer votes regarding a plan of reorganization. Accordingly, the Debtors seek to employ XRoads Case Management Services, LLC ("XRoads") as notice, claims, and balloting agent to assist the Debtors in distributing notices, as necessary, and to process other information pertaining to these chapter 11 cases. The Debtors believe that XRoads is well-qualified to serve in this capacity and that XRoads's retention is in the best interests of the Debtors' estates and their creditors. The Debtors chose XRoads based on its reputation and the competitiveness of its fees.

### III. **ADDITIONAL MOTIONS TO BE HEARD ON REGULAR NOTICE**

**I.**    **Motion of Debtors and Debtors in Possession for an Order Granting Extension of Time to File Schedules and Statements**

112.    The Debtors have approximately 100,000 creditors (including current and former employees). Further, the conduct and operation of the Debtors' business operations

require the Debtors to maintain voluminous books and records and complex accounting systems.

Given the size and complexity of their business operations, the number of creditors, and the fact

that certain prepetition invoices have not yet been received, the Debtors were unable to compile

all of the information necessary to complete and file schedules of assets and liabilities, a

schedule of current income and expenditures, a schedule of executory contracts and unexpired

leases and a statement of financial affairs (collectively, the "Schedules and Statements") which

counsel informs me are required to be filed pursuant to Bankruptcy Rule 1007 and Local Rule

1007-1(b).

113.    Given the urgency with which the Debtors sought chapter 11 relief and

the numerous critical operational matters that the Debtors' staff of accounting and legal

personnel must address in the early days of these cases, the Debtors will not be in a position to

complete the Schedules and Statements within the time specified in Bankruptcy Rule 1007 and

Local Rule 1007-1(b).  Completing the Debtors' Schedules and Statements will require the

Debtors and their advisors to collect, review, and assemble information from multiple locations

throughout the United States.  Nevertheless, recognizing the importance of the Schedules and

Statements in these chapter 11 cases, the Debtors intend to complete the Schedules and

Statements as quickly as possible under the circumstances.

114.    Accordingly, the Debtors respectfully request that the Court extend by

an additional 90 days, for a total of 120 days, until July 31, 2007, the date by which the

Schedules and Statements must be filed, pursuant to Bankruptcy Rule 1007 and Local

Rule 1007-1(b).  Bankruptcy Rule 1007(c) authorizes the Court to grant an extension of the date

by which the Schedules and Statements must be filed "on motion for cause shown."  See also

Del. Bankr. L.R. 1007-1(b) (allowing extensions "for cause").  In view of the substantial size,

scope and complexity of these cases and the volume of material that must be compiled and

reviewed by the Debtors' staff in order to complete the Schedules and Statements for each

Debtor during the initial days of these chapter 11 cases, there is more than ample "cause" for

granting the requested extension.

47

**J.    Motion of the Debtors and Debtors in Possession for Entry of an Order Pursuant to Sections 365 and 554 of the Bankruptcy Code (A) Authorizing and Approving the Rejection of Certain Unexpired Leases of Nonresidential Real Property and (B) Authorizing and Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases of Personal and Non-Residential Real Property**

115.    The Debtors are in the process of reorganizing and restructuring their operations, which requires exiting non-core and unprofitable locations, returning unnecessary equipment, and terminating burdensome contracts in order to minimize costs and strengthen the business.  In connection therewith, the Debtors seek to reject certain real property leases listed on Exhibit A, nunc pro tunc, to the date of this motion and to reject certain real property leases listed on Exhibit B, with rejection effective as of April 30, 2007.  The Debtors further anticipate that, in a very short time, they will seek to reject a number of additional real property leases, personal property leases, and executory contracts.  Absent expedited procedures for managing this process, the Debtors will inevitably suffer delays and resulting administrative costs, which could be significant.  Accordingly, by this Motion and pursuant to sections 365 and 554 of the Bankruptcy Code, the Debtors seek this Court's approval of an order (a) authorizing the Debtors to immediately reject the nonresidential real property leases set forth on Exhibit "A" attached to the motion, with such rejection to be effective nunc pro tunc to the date of this Motion; (b) authorizing the Debtors to reject the nonresidential real property leases set forth on Exhibit "B" attached to the motion, with such rejection to be effective April 30, 2007; and (c) authorizing and approving an expedited procedure for rejecting executory contracts other than the Servicing Agreements (as defined below) and unexpired leases of personal and non-residential real property.

### (i)    Rejection of the Leases

116.    The Debtors are party to the 44 nonresidential real property leases set forth on Exhibit A to the motion (the "Exhibit A Leases") and the 108 nonresidential real property leases set forth on Exhibit B to the motion (the "Exhibit B Leases", together with the Exhibit A Leases the "Leases").  Prior to the Petition Date, the Debtors engaged in a comprehensive review of all their real property lease obligations and determined that the Leases

48

were of no value to the Debtors. The locations at the premises encompassed by the Exhibit A Leases are no longer operational and to reduce losses, the Debtors have already ceased possession of the properties that are the subject of the Exhibit A Leases. The Debtors are currently in the process of vacating the properties that are the subject of the Exhibit B Leases.

117.    The Debtors have further determined that, based on current market conditions, it would be difficult if not impossible for the Debtors to recruit tenants to sublease the spaces, even if they were offered to prospective tenants at substantially lower rental rates than those currently due under the Leases. Accordingly, the Debtors have concluded that no possible benefit can be obtained from retaining the Leases and that it is in their best interests and the best interests of the estates and creditors to reject the Leases on the schedules requested herein.

118.    In the absence of rejection on the schedules requested herein, the Leases will cause the estates to incur substantial amounts of rent and other charges and result in significant expenses with no commensurate benefit to the Debtors, their estates or their creditors. The aggregate monthly rent due under the Exhibit A Leases is in excess of $335,736,52 and the aggregate monthly rent due under the Exhibit B Leases is in excess of $516,736.27. Any such amounts due post-petition will be directly charged to and immediately payable by the Debtors' estates as administrative expenses pursuant to Bankruptcy Code section 365(d)(3).

119.    Here, the Debtors have exercised reasonable business judgment in determining that it is appropriate to reject the Leases. As noted above, prior to the Petition Date the Debtors engaged in a comprehensive review of all their real property lease obligations and determined that the Leases were of no value or were substantially unused by the Debtors.

120.    The Debtors have also determined that rejection of the Leases would result in a net benefit the Debtors, the estates and creditors. After a review of the economic terms of the Leases and the general economic conditions prevailing in the markets where the real estate is located, it is clear that subletting the Leases is not a viable option, even at substantially lower rental rates, and that no possible benefit can be obtained from retaining the Leases.

49

Rejection of the Leases will allow the estates to avoid incurring large amounts of rent and other charges that would result in significant administrative expenses payable by the estate, an amount estimated to be in excess of $852,472.79 per month. Finally, rejection of the Leases will allow the Debtors to focus their attention, resources, and efforts on their reorganization and will greatly simplify business operations.

121. The Debtors also request that the following procedures (the "Rejection Procedures") be approved in connection with the rejection of any executory contract (other than the Servicing Agreements), lease, sublease, or interest in such lease or sublease during the course of the Debtors' bankruptcy proceedings:

122. The Debtors further request that counter-parties to executory contracts, leases or subleases, or interests in such leases and subleases, that are rejected pursuant to the Rejection Procedures be required to file a proof of claim relating to the rejection of such executory contract, lease or sublease, or interest in such lease or sublease, if any, by the later of (a) the claims bar date established in these reorganization cases, if any; and (b) thirty (30) days after the Rejection Date.

123. The Debtors believe that these Rejection Procedures provide a fair and efficient manner for rejecting contracts, leases, subleases, and interests in leases and subleases. These procedures will enable the Debtors to minimize their unnecessary post-petition obligations while also providing parties in interest with adequate notice of lease and contract rejections and an opportunity to object to such relief within a definitive time period.

124. The Debtors submit that adoption of the Rejection Procedures represents the sound exercise of the Debtors' business judgment and a fair balancing of the need of a lessor or contract counter-party for certainty with the Debtors' need to move quickly and to cut off the needless accrual of administrative rent and other post-petition charges.

125. The Debtors are parties to a substantial number of leases and executory contracts. As the Debtors continue to review these agreements, it is certain that they will identify a number of agreements which will need to be rejected. Establishing the Rejection Procedures

50

will minimize the Debtors' post-petition obligations if the Debtors determine, in their sole

discretion, that such lease or contract is unlikely to yield sufficient value to justify the expense of

maintaining the lease or contract. The Rejection Procedures also afford parties in interest the

opportunity to appear and be heard with respect to the rejection of the leases and contracts. In

addition, the Rejection Procedures will save substantial legal expense and Court time that would

otherwise be incurred if multiple hearings were held on separate motions with respect to every

lease or contract that the Debtors determine should be rejected.

K.    **Motion of the Debtors and Debtors in Possession for an Order Providing that
      Creditors' Committees are not Authorized or Required to Provide Access to
      Confidential Information of the Debtors or to Privileged Information**

126.    By this Motion, the Debtors seek entry of an order of the Court

confirming that section 1102(b)(3)(A) of the Bankruptcy Code does not authorize or require any

Creditors' Committee that might be appointed in the Debtors' bankruptcy cases to provide access

to the Debtors' Confidential Information (as defined below) to any creditor that such Creditors'

Committee represents. Furthermore, the Debtors seek entry of an order clarifying that no

Creditors' Committee is authorized or required to provide access to Privileged Information (as

defined below) to any creditor that such Creditors' Committee represents. The relief requested

herein will help ensure that confidential, privileged, proprietary and/or material non-public

information will not be disseminated to the detriment of the Debtors' estates and will aid a

Creditors' Committee in performing its statutory function.

127.    The Debtors are in a highly competitive industry. The dissemination of

the Debtors' Confidential Information to parties who are not bound by any confidentiality

agreement directly with the Debtors could be disastrous for the Debtors. If the Debtors' general

creditors or competitors buying claims could require any Creditors' Committee which may be

appointed to give them access to Confidential Information in the possession of such Creditors'

Committee, such information could easily become public immediately thereafter.

128.    The public dissemination of the Debtors' Confidential Information likely

would cause serious harm to the Debtors' estates. Among other things, the Debtors' business

51

strategies and intended initiatives would become known to the Debtors' competitors, thereby allowing such competitors to adjust to the Debtors' plans and reduce or eliminate the value of such initiatives to the estate. In addition, other Confidential Information of the Debtors, such as compensation levels or other employee information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtors, as well as potentially violate federal and state privacy laws.

L.  **Emergency Motion of Debtors and Debtors in Possession for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362 and 364 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014(A) Approving Debtor-in-Possession Financing with Administrative Expense Superpriority and Secured by Liens, (B) Granting Liens and Superpriority Administrative Expense Claim, (C) Granting Other Relief and (D) Setting Final Hearing**

129.    The Debtors believe that orderly auction sales of their assets and businesses conducted over the next 30 to 60 days is the best (and perhaps only viable) means of maximizing returns for stakeholders. As a result, it is imperative that the Debtors have access to sufficient liquidity to continue funding operations over this time period. Without additional financing, the Debtors expect to exhaust their liquidity within the next 30 to 45 days. Thus, it is imperative that the Debtors obtain the proposed financing.

130.    The proposed DIP Loan is a scaled down facility designed to allow the Debtors to quickly auction their businesses and to maintain their operations in a stable condition pending the completion of certain sales. The Debtors will be seeking expedited bidding procedures and hope to consummate major sales within about 45 days. Particularly given the critical importance of maintaining customer, supplier and employee confidence pending such sales, the Debtors submit that it is appropriate at the time of the first hearing to authorize the Debtors to access the full amount available under the proposed DIP Loan facility.

131.    In order to obtain the most attractive financing possible, Lazard widely solicited proposals for DIP financing. Over the last several weeks, Lazard solicited proposals for DIP financing from 14 financial institutions who are active and sophisticated providers of this type of financing. Ultimately, the most attractive proposal was submitted by the DIP Lenders.

Active and arms' length bargaining produced the Debtor-in-Possession Loan and Security
Agreement dated as of April 2, 2007, by and among the Debtors, Greenwich and CIT.

132.     The proposed DIP Loan is a standalone facility provided by one lender,
CIT, as an independent business matter, and by the other member of the DIP lending syndicate,
Greenwich, as an independent loan and in order to help finance the Debtors as going concerns so
that Greenwich can make a bid for certain of the Debtors' assets. Thus, the Debtors are
simultaneously filing a motion to approve bidding procedures for a sale of certain mortgage
loans and mortgage-backed securities to Greenwich for $50 million, subject to overbid. The DIP
Lenders are willing to provide the DIP facility only if Greenwich is given a fair opportunity to
pursue its bid.

133.     The Debtors have an immediate and critical need for the financing
offered by the DIP Loan. Without it, the Debtors' businesses will be irreparably harmed by,
among other things, the potentially rapid deterioration of their mortgage loan servicing business
and loan origination platform, loss of key employees and deterioration of employee morale - all
of which adversely impact asset values. Consequently, the Debtors believe that the financing
offered by the DIP Lenders is critical and will provide them with the ability to operate their
businesses pending their sale.

134.     The Debtors have concluded, in their business judgment, and based on
the above described efforts of Lazard and the fact the Greenwich bid is subject to overbid, that
the stalking horse bid made by Greenwich for the Purchased Assets and the proposed DIP
Financing were each fair. And each was the best offer the Debtors received for the respective
transaction. The DIP Lenders were willing to provide financing only if Greenwich is given a fair
opportunity to pursue its bid for the Purchased Assets. As a result, one condition of the DIP
Financing requires that the Court approve the bidding procedures discussed herein by April 10,
2007.

## CONCLUSION

135.    The Debtors' goal in the pending cases is to preserve and maximize the value of their business and successfully reorganize.  I believe that, if the Court grants the relief requested in each First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtors' estates, their creditors and other parties in interest.

54

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 2nd day of April, 2007 at _____New York_____, New York

Holly Felder Etlin
Managing Director
AlixPartners LLP