IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-[____] (__) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER AUTHORIZING THE DEBTORS AND DEBTORS IN POSSESSION TO (I) CONTINUE ALL INSURANCE POLICIES AND AGREEMENTS RELATING THERETO AND (II) CONTINUE CERTAIN PREMIUM FINANCING ARRANGEMENTS RELATING THERETO, AND (III) HONOR CERTAIN OBLIGATIONS IN RESPECT THEREOF PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby request the entry of an order authorizing the Debtors to: (i) maintain and continue to make all postpetition payments (including postpetition fees and premiums) with respect to the Insurance Policies (as defined below) and the Premium Finance Agreement (as defined below) on an uninterrupted basis; (ii) maintain and continue on an uninterrupted basis the Debtors' prepetition practices with respect to each policy or contract;

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L P (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership

(iii) pay any prepetition premiums related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or proceeds provided under the Insurance Policies; and (iv) enter into new policies and/or bonds or assume existing policies and/or bonds in the ordinary course of business pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"). In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b).

2. The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND[2]

3. New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting

---

[2] The facts and circumstances supporting this Motion are set forth in the Declarations of Monika McCarthy and Holly Etlin in Support of Chapter 11 Petitions and Request for First Day Relief

standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4. On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

5. On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

6. These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that

3

provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7. As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8. Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9. During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10. The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11. Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

12. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. Further, a motion for joint administration of the Debtors' bankruptcy cases is pending before the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## RELIEF REQUESTED

13. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authorization to: (i) maintain and continue to make all postpetition payments (including postpetition fees and premiums) with respect to the Insurance Policies and the Premium Finance Agreement on an uninterrupted basis; (ii) to maintain and continue on an uninterrupted basis the Debtors' prepetition practices with respect to each policy or contract; (iii) pay any prepetition premiums related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default,

5

alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or proceeds provided under the Insurance Policies; and (iv) enter into new policies and/or bonds or assume existing policies and/or bonds in the ordinary course of business.

14. In connection with the operation of the Debtors' business and the management of their properties, the Debtors maintain various insurance policies through third-party insurance carriers (the "Insurance Carriers") providing coverage for, inter alia, property, general liability, employee benefits legal liability, commercial automobile liability, commercial umbrella liability, difference in condition coverage for flood and earthquake damages, directors' and officers' liability, directors' and officers' "run-off" liability, employment practices liability, fire liability, flood liability, wind liability, employee/commercial crime, fiduciary liability, lender environmental collateral protection liability, mortgage bankers' bonds, mortgage bankers' professional liability, REO portfolio security liability, workers' compensation, medical accident and health liability, insurance agent/broker professional liability, and certain bonds required to do business in certain jurisdictions (the "Insurance Policies"). A list of the Insurance Policies with current funding obligations, the annual premium for each such Insurance Policy, the expiration date of each such Insurance Policy, and the Insurance Carrier with respect to each such Insurance Policy is attached hereto as Exhibit A.

15. The Insurance Policies are essential to the preservation of the Debtors' businesses, properties and assets, and, in many cases, such insurance coverage is required by various regulations, laws and contracts that govern the Debtors' business conduct. Since the Insurance Policies are essential to the Debtors' businesses and restructuring, the Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under the current insurance contracts. Any other alternative would likely require considerable additional

cash expenditures and would be detrimental to the Debtors' reorganization efforts. In order to prevent such a scenario, the Debtors request the following authority:

A. **Authority to Pay Insurance Policy Premiums**

16. The Debtors request the authority to pay any prepetition premiums related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or proceeds provided under the Insurance Policies. Although the Debtors are not presently aware of any such outstanding premium obligations, the Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping their insurance policies in current effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Insurance Policies.

17. The Debtors request the authority to continue to pay the premiums due under the Insurance Policies in the ordinary course of business. This will ensure that (a) the insurance coverage provided under the Insurance Policies is not interrupted and (b) the Debtors are not forced to procure hastily-arranged replacement insurance coverage on less favorable terms and conditions. The Insurance Policies provide the Debtors with essential insurance coverage. Any interruption in such coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the insurance carrier under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carrier under the Insurance Policies; (c) the possible loss of good-standing

7

certification to conduct business in states that require the Debtors to maintain certain types and levels of insurance coverage; (d) the possible inability to obtain similar types and levels of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

B.  **Authority to Maintain the Premium Finance Agreement**

18. To maintain their insurance coverage, the Debtors often are required to prepay the full premiums for the applicable coverage period. Prepaying the full premiums imposes a significant financial burden on the Debtors. To lessen this burden, prior to the Petition Date, the Debtors entered into a premium financing agreement with AICCO, Inc. ("AICCO") to finance the premiums of certain of their Insurance Policies (collectively, the "Financed Insurance Policies").

19. Under that certain Premium Finance Agreement dated as of March 29, 2007, by and among AICCO and NCF (the "Premium Finance Agreement"), AICCO pays the premiums due under the Financed Insurance Policies, and the Debtors are then obligated to repay the amount financed through a cash down payment and subsequent periodic installment payments over the term of the Premium Finance Agreement. The cash down payment of approximately $293,317.00 has been paid. The current installment payments are approximately $88,088.48 per month, beginning April 17, 2007. The final installment payment pursuant to the Premium Finance Agreement is due on November 17, 2007.

20. The Debtors must be permitted to maintain the Premium Finance Agreement. If the Financed Insurance Policies are allowed to lapse and the Debtors experience a corresponding lapse in the Financed Insurance Policies as a result, the Debtors could be exposed to substantial liability for damages to persons or property or for losses incurred by the Debtors

and others. This would also cause the Debtors to violate the guidelines of the Office of the United States Trustee, which require the Debtors to maintain the Insurance Policies.

21. Moreover, if postpetition installment payments under the Premium Finance Agreement are not paid as they come due, AICCO may seek relief from the automatic stay to terminate the Financed Insurance Policies.[3] If AICCO succeeds in such a request, the Debtors would be forced to seek replacement insurance coverage. Even if the Debtors were able to purchase replacement insurance coverage, it is doubtful that the Debtors would be able to do so on terms and conditions as favorable as those presently in place under the Financed Insurance Policies. Given the current circumstances, there is no assurance that the Debtors would be able to obtain replacement insurance quickly enough to prevent a lapse in coverage.

22. Accordingly, the Court should permit the Debtors to continue their premium financing arrangements. The Debtors also request permission to enter into any new premium financing agreements in the ordinary course of business.

C. **Authority to Pay Workers' Compensation Deductibles**

23. Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. The Debtors have purchased workers' compensation policies (the "Workers' Compensation Policies"), which are issued by The Hartford ("Hartford") and Travelers Casualty and Surety Co ("Travelers"). The Debtors pay estimated annual premiums of approximately $50,737.00 to Hartford and approximately $326,867.00 to Travelers[4] regardless of

---

[3] Pursuant to the Premium Finance Agreements, the Debtors assigned to AICCO all sums payable with reference to the Insurance Policies as security for payment of the Premium Finance Agreements.

[4] Both the Hartford and Travelers premium amounts are inclusive of certain taxes and surcharges.

9

the number or amount of claims made under the policies. The term of the Workers' Compensation Policies is from February 25, 2007 through February 25, 2008.

24. The Debtors are also liable to Travelers, Ace American Insurance Company ("Ace") and CNA Insurance Company ("CNA") for a deductible portion of the claims made against workers' compensation policies issued by Travelers, Ace and CNA for the periods from February 25, 2004 through the present. Although the Debtors believe they are current in payments of the premiums for the Workers' Compensation Policies as of the Petition Date, the Debtors believe that it is likely they will be required to reimburse Travelers, Ace and CNA for deductible payments in respect of claims paid under the Workers' Compensation Policies.[5]

### D. Authority to Enter into Additional Insurance Policies

25. Finally, because most of the remaining insurance policies expire annually, the Debtors seek authority to renew their Insurance Policies or enter into new Insurance Policies on competitive terms without further Court approval. As the time for payment and renewal of these policies arrives at different times of the year, the Debtors may not be able to renew the Insurance Policies on time and could be forced to pay higher rates and/or expend money to acquire a new provider. As the Insurance Policies must be renewed at different times, the Debtors would be forced to appear in Court continuously to renew their Insurance Policies, a procedure that would impose an extraordinary burden on the Debtors' estates and restructuring efforts.

26. Clearly, the Debtors will need to continue their Insurance Policies throughout the duration of these chapter 11 cases. The Debtors respectfully suggest that the renewal or negotiation of these Insurance Policies falls squarely within their ordinary course of

---

[5] With respect to Travelers and Ace, deductibles are billed monthly. With respect to CNA, deductibles are billed quarterly.

10

business and, but for the constraints of section 363 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to enter into insurance policies. To reduce the administrative burden of these chapter 11 cases, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew their Insurance Policies or enter into new Insurance Policies at the conclusion of the term of the current Insurance Policies, including the entry into any premium financing arrangements therefore.

## APPLICABLE AUTHORITY

27. There is ample authority for the relief requested herein. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent the abuse of process.

11 U.S.C. § 105(a).

28. Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory authority or under equitable common law principles. "The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). This equitable common law principle "was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S.W. R. Co., 106 U.S. 286, 1 S. Ct. 140, 27 L.Ed. 117 (1882), and is commonly referred to as either the 'doctrine of necessity'

11

or the 'necessity of payment' rule." In re Ionosphere Clubs, Inc., 98 B.R. at 176. "The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during Chapter 11." In re Just For Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999). "The necessity of payment doctrine recognizes that paying certain pre-petition claims may be necessary to realize the goal of Chapter 11 – a successful reorganization." Id. at 825-26.

29. Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay certain critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. See In re Columbia Gas System, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (citing In re Lehigh & New England Rwy. Co., 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "if payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized.'").

30. The Debtors believe that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Policies clearly is in the best interests of the Debtors, their estate and their creditors.[6] Accordingly, the Debtors seek authority to: (i) maintain and continue to make all postpetition payments (including postpetition fees and premiums) with respect to the Insurance Policies and the Premium Finance Agreement on an uninterrupted basis; (ii) to maintain and continue on an uninterrupted basis the Debtors' prepetition practices with respect to each policy or contract; (iii) pay any prepetition premiums and deductibles related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage,

---

[6] As noted above, absent the relief requested herein, the Debtors nevertheless may be required to pay the postpetition installment payments under the Premium Finance Agreements as adequate protection of AICCO's interest in the Insurance Policies.

12

benefits or proceeds provided under the Insurance Policies; and (iv) enter into agreements for additional insurance policies, bonds or premium financing.[7]

## NOTICE

31. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served as required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended from time to time, the "Local Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

32. The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b),

---

[7] To the extent that any Insurance Policy or any other agreement, policy or contract described herein is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors are not, at this time, seeking authority to assume such agreement. Court authorization of payments will not be deemed to constitute postpetition assumption or adoption of an Insurance Policy or any other agreement subject to this Motion as an executory contract pursuant to section 365 of the Bankruptcy Code. The Debtors will review the Insurance Policies and other agreements, and the Debtors reserve all of their rights under the Bankruptcy Code and otherwise with respect thereto.

13

the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NO PRIOR REQUEST

33. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated: April 2, 2007
Wilmington, Delaware

Respectfully submitted,

*/s/ Mark D. Collins*

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Austin K. Barron
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

# EXHIBIT A

## EXHIBIT A
## INSURANCE POLICIES

| Coverage Type | | Policy # | Carriers | Annualized Premiums | Policy Effective Dates |
|---|---|---|---|---|---|
| Commercial Package | Property | FIA 1003282 | Fidelity & Deposit Co. of | $268,373 | 3/17/07 - 3/17/08 |
| | Property | FIA 100256503 | Zurich | $ 15,000 [1] | 5/1/06 - 3/17/07 |
| | Property | FIA 100255601 | Zurich | $ 15,000 [2] | 2/3/05 - 5/1/06 |
| | General Liability | FIA 1003282 | | $150,178 | 3/17/07 - 3/17/08 |
| | Property HI | CP0913762802 | Fidelity & Deposit Co. of | $8,605 | 03/17/07 - 3/17/08 |
| | Property FL Wind | 1430489 | Citizens Insurance | $774 | 5/15/07 to 5/15/08 |
| Commercial Auto | Auto Liability | CAP0016872 | Fidelity & Deposit Co. of | $12,999 | 3/17/07 - 3/17/08 |
| Commercial Umbrella Policy | Excess Liability | UMB9137352 | Fidelity & Deposit C. of | $104,135 | 3/17/07 - 3/17/08 |
| Difference in Conditions (Earth Quake) | Primary $10M | 306912JF1 | Empire Indemnity Ins Co | $330,155 | 3/17/07 -3/17/08 |
| | $10MM excess - $10MM | CPN 10000356001 | Endurance | $100,000 | 3/17/07 -3/17/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8340 | Hartford | $1,805 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8341 | Hartford | $913 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8342 | Hartford | $1,022 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8343 | Hartford | $1,829 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8344 | Hartford | $6,762 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8346 | Hartford | $3,999 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8347 | Hartford | $17,713 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8349 | Hartford | $4,602 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8460 | Hartford | $1,126 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8464 | Hartford | $8,882 | 2/25/07 TO 2/25/08 |
| Workers' Compensation | ABA LL P Workers Comp | 59 WETQ 8468 | Hartford | $2,084 | 2/25/07 TO 2/25/08 |
| TOTALS | | | | $1,055,956 | |

[1] These amounts are estimated and disputed  
[2] These amounts are estimated and disputed

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,[1] | : | Case No. 07-[____] (____) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |

ORDER AUTHORIZING THE DEBTORS AND DEBTORS IN POSSESSION
TO (I) CONTINUE ALL INSURANCE POLICIES AND AGREEMENTS RELATING
THERETO, (II) CONTINUE CERTAIN PREMIUM FINANCING ARRANGEMENTS
RELATING THERETO, AND (III) HONOR CERTAIN OBLIGATIONS IN RESPECT
THEREOF PURSUANT TO 105(a) AND 363(b) OF THE BANKRUPTCY CODE

The matter coming before the Court on the Motion for an Order Authorizing the Debtors and Debtors in Possession to (i) Continue All Insurance Policies and Agreements Relating Thereto, (ii) Continue Certain Premium Financing Arrangements Relating Thereto, and (iii) Honor Certain Obligations in Respect Thereof Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (the "Motion"), filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (c) notice of the Motion was sufficient

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

under the circumstances and that no other or further notice need be provided, and (d) capitalized terms not otherwise defined herein have the meaning given to them in the Motion; and the Court having considered the Declarations of Holly Etlin and Taj Bindra in Support of Chapter 11 Petitions and First-Day Relief; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and after due deliberation and sufficient cause appearing therefore,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The Debtors are authorized, but not directed, to maintain and continue to make all postpetition payments (including postpetition fees and premiums) with respect to the Insurance Policies and the Premium Finance Agreement on an uninterrupted basis.

3. The Debtors are authorized, but not directed, to maintain and continue on an uninterrupted basis the Debtors' prepetition practices with respect to each policy or contract.

4. The Debtors are authorized, but not directed, to pay any prepetition premiums and deductibles related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits or proceeds provided under the Insurance Policies.

5. The Debtors are authorized, but not directed, to enter into new policies and/or bonds or assume existing policies and/or bonds in the ordinary course of business.

6. To the extent that the Insurance Policies, Premium Finance Agreement, or any related contract or agreement, are deemed executory contracts, the relief granted hereby shall

2

not be deemed an assumption of any such contract pursuant to section 365 of the Bankruptcy Code, and all of the Debtors' rights pursuant to section 365 of the Bankruptcy Code are expressly reserved.

7. The Debtors, their officers, employees and agents are authorized to take or refrain from taking such acts as are necessary and appropriate to implement and effectuate the relief granted herein.

8. The Court shall retain jurisdiction over any matters arising from or related to the implementation or interpretation of this Order.

Date: _____, 2007  
     Wilmington, Delaware            _____  
                                             UNITED STATES BANKRUPTCY JUDGE