IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-[____] (___)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | |

**MOTION OF THE DEBTORS AND THE DEBTORS IN POSSESSION FOR AN ORDER
(A) AUTHORIZING THE CONTINUED USE OF THE DEBTORS' CENTRALIZED
CASH MANAGEMENT SYSTEM, INCLUDING OPERATION OF SERVICER TRUST
ACCOUNTS, (B) AUTHORIZING MAINTENANCE OF THE DEBTORS' EXISTING
BANK ACCOUNTS AND BUSINESS FORMS, AND (C) EXTENDING THE DEBTORS'
TIME TO COMPLY WITH SECTION 345 OF THE BANKRUPTCY CODE**

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for entry of an order (a) authorizing the continued use

of the Debtors' existing centralized cash management system, including the continued operation

of trust accounts that are maintained by the Debtors as servicers for loans; (b) authorizing

maintenance of the Debtors' existing bank accounts and business forms; and (c) granting the

Debtors an extension of time to comply with section 345 of title 11 of the United States Code (as

---

[1] The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L P  (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R E O  Corp , a California corporation; New Century R E O  II Corp , a California corporation; New Century R E O  III Corp , a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P , a Delaware limited partnership.

amended from time to time, the "Bankruptcy Code"). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.  This Court has jurisdiction over this Motion under 28 U.S.C. § 157 and 1134. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2.  The statutory predicates for the relief requested herein are sections 105(a), 345(b), 363, 364(a), and 364(b) of the Bankruptcy Code.

## BACKGROUND[2]

3.  New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of

---

[2] The facts and circumstances supporting this Motion are set forth in the Declarations of Monika McCarthy and Holly Etlin in Support of Chapter 11 Petition and Request for First Day Relief.



mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.    On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

5.    On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

6.    These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default

under its credit facility.

7.     As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8.     Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9.     During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10.     The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11.     Although the Debtors have been unsuccessful in obtaining financing that

would permit them to continue originating loans, Debtors were successful in obtaining debtor in

possession financing of up to $150 million, which they expect will provide sufficient working

capital to maintain and stabilize their businesses through the sale of the Debtors' operating

businesses and other assets.

12.     On April 2, 2007 (the "Petition Date"), the Debtors filed the instant

petitions for relief. Further, a motion for joint administration of the Debtors' bankruptcy cases is

pending before the Court. The Debtors are operating their business and managing their affairs as

debtors and debtors in possession.

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek, inter alia, entry of an order pursuant to

sections 105(a), 345(b), 363, 364(a), and 364(b) of the Bankruptcy Code and substantially in the

form attached hereto as Exhibit C waiving the guidelines (the "U.S. Trustee Guidelines")

established by the United States Trustee for the District of Delaware (the "U.S. Trustee") to the

extent necessary to continue the use of their existing cash management system, including but not

limited to the initiation and completion of any intercompany payment and any support

transactions. The Debtors also respectfully seek authorization to continue using their prepetition

bank accounts and business forms, including a waiver of the requirement that the legend "debtors

in possession" be imprinted on any existing checks and business forms, and to continue their use

of the existing cash management system. In addition, the Debtors seek authorization to continue

their mortgage servicing responsibilities under existing whole loan and securitization agreements

described below. Finally, the Debtors seek an extension of time to comply with the investment

guidelines provided for in section 345(b) of the Bankruptcy Code. The Debtors seek this

authorization to insure their orderly entry into bankruptcy and to help efficiently administer their

businesses and avoid the disruptions and distractions that would inevitably divert the Debtors'

attention from urgent matters during the initial stages of their bankruptcy case.

## BASES FOR RELIEF REQUESTED

A.  **Maintenance of the Debtors' Existing Bank Accounts is in the Best Interests of Their Estates**

14.     One provision of the U.S. Trustee Guidelines requires a chapter 11 debtor in possession to open new bank accounts and close all existing accounts. The U.S. Trustee Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the U.S. Trustee.

15.     The Debtors maintain a number of bank accounts in the ordinary course of business. The bank accounts include without limitation depository, operating, and distribution accounts (collectively, the "Bank Accounts"). Currently the Debtors have accounts with Union Bank of California ("Union Bank"), Deutsche Bank Trust Company Americas ("DB"), Deutsche Bank National Trust Company ("DB Trust"), Guarantee Bank, LaSalle Bank, Bank of Hawaii, Washington Mutual, Wells Fargo Bank N.A. ("Wells Fargo"), U.S. Bank, Countrywide, Merrill Lynch and RJ O'Brien & Associates. A true and correct list of the Bank Account names and account numbers is attached hereto as Exhibit A.

16.     The Debtors seek a waiver of the U.S. Trustee's requirement that the Debtors close their bank accounts and open new postpetition bank accounts at depositories authorized by the U.S. Trustee. Rule 2015-2(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") provides that in a chapter 11 case where the Debtors use pre-printed checks, upon motion of a debtor, the Court may, without notice and hearing, permit the debtor to use their existing checks without the designation "Debtor in possession" and to use their existing bank accounts. Although the Debtors do not use pre-printed checks, the Debtors' check printing software will require a programming change to print checks with the designation "Debtor in

possession." For example, the checks the Debtors' issue with respect to servicing of loans are electronically administered pursuant to pre-programmed software that the Debtors cannot easily alter because the software does not permit the Debtors to change the payor information on its checks. The programming change to the check printing software would take time and be expensive to implement. As a result, the Debtors seek the Court's permission to print checks without the designation "Debtor in possession."

17.    The Debtors seek a waiver of the requirement that new bank accounts be opened to replace all of the Debtors' existing Bank Accounts because the requirement would unnecessarily disrupt the Debtors' businesses, impair their efforts to successfully reorganize or otherwise cut into transactions to maintain the value of the businesses and would not provide any significant benefit to the Debtors' estates, their creditors or parties in interest. For example, the Debtors' employees would suffer significant hardship if the Debtors were required to substitute new debtor in possession payroll accounts for their existing payroll accounts and would face attendant delays, confusion and disruption. It is critical to the continued operation of the Debtors' businesses and the preservation of the value of their assets that the Debtors continue to utilize their existing cash management system and Bank Accounts without disruption.

18.    In addition, the filing of the Debtors' bankruptcy petitions will undoubtedly be publicized and place a strain on the Debtors' relationships with parties that are essential to the Debtors' continued operations. If the Debtors were required to substitute new debtor in possession bank accounts for their existing Bank Accounts, these relationships will be further strained by the payment delays and confusion that would result from opening the new accounts. Consequently, the Debtors believe that it is imperative that they be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of their

businesses, efficiently administer their bankruptcy cases and devote their efforts to a successful sale.

19.    In other cases of this size, this Court has waived the strict enforcement of bank account closing requirements and replaced them with alternative procedures that provide the same protection.  See, e.g., In re ResMae Mortgage Corp., No. 07-10177 (Bankr. D. Del. February 13, 2007); In re Exide Technologies, et al., No. 02-11125 (Bankr. D. Del. April 17, 2002); In re W.R. Grace & Co., et al., No. 01-01139 (Bankr. D. Del. April 2, 2001); In re Fruehauf Trailer Corp., No. 96-01563 (Bankr. D. Del. Oct. 8, 1996); In re Seven-Up/RC Bottling Co. of Southern California, No. 96-00738, slip op. (Bankr. D. Del. May 13, 1996); In re Morrison Knudsen Corp., No. 96-01006 (Bankr. D. Del. June 25, 1996); In re Simmons Upholstered Furniture, Inc., No. 94-00635 (Bankr. D. Del. June 28, 1994); In Re Abrasive Indus., Inc., No. 94-00135 (Bankr. D. Del Feb. 22, 1994); In re Trans World Airlines, Inc., et al., No. 92-00115 (Bankr. D. Del. Jan. 31, 1992).

**B.    Maintenance of the Debtors' Existing Business Forms is in the Best Interests of the Estates**

20.    The Debtors also request authority to continue to use all existing correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.), as well as checks, without reference to their "debtor in possession" status, in order to minimize expense to the estate.

21.    In the ordinary course of their businesses, the Debtors use many pre-printed correspondence and business forms. In addition, the Debtors contract with third party vendors to prepare certain letters, mortgage payment statements, and escrow analyses for the multitude of loans they service. Attempting to coordinate with these third parties to change these forms would be difficult and expensive. The nature and scope of the Debtors' businesses and the numerous suppliers of goods and services require that the Debtors be permitted to continue using

their correspondence and business forms without alteration or modification. Changing

correspondence and business forms would be unnecessary and burdensome to the estates, as well

as expensive and disruptive to the Debtors' business operations. Parties doing business with the

Debtors undoubtedly will be aware, as a result of the size of these cases and the integrated nature

of the industry in which the Debtors operate, of the Debtors' status as debtors in possession.

Further, since the Debtors have in excess of 300 bank accounts, opening new debtor in

possession bank accounts would be a significant burden due to the number of bank accounts that

the Debtors currently maintain. Accordingly, the Debtors also request authority to use their

respective correspondence and business forms without placing the label "debtor in possession"

on each such correspondence or form.

        22.     Other courts have allowed debtors to use their prepetition forms without

the "debtor in possession" label. See e.g., In re Young, 205 B.R. 894, 897 (Bankr. W.D. Tenn.

1997) (finding that the United States Trustee had no authority to require the "debtor in

possession" imprint on the debtor's checks); In re Gold-Standard Banking, Inc., 179 B.R. 98,

105-06 (Bankr. N.D. Ill. 1995) (holding United States Trustee's requirements prohibiting

issuance of checks without "debtor in possession" designation to be unenforceable); see also In

re Harnischfeger Indus., Inc. et al., No. 99-02171 (Bankr. D. Del. June 8, 1999) (waiving U.S.

Trustee's requirement for debtors to issue only checks containing "debtor in possession" label).

### C.    Maintenance of the Debtors' Existing Cash Management System is in the Best Interests of their Estates

        23.     The Debtors maintain a complex system of deposit, accounts payable,

payroll, operating, trust and custodial accounts, the vast majority of which are maintained with

Union Bank of California ("Union Bank"). In total, the Debtors' maintain approximately 354

open bank accounts. Exhibit A lists these accounts.[3]  Out of an abundance of caution and in

order to err on the side of being over inclusive, Exhibit A includes some accounts in the names

of non-Debtor affiliates and custodial and trust accounts maintained in the name of a Debtor but

where the Debtor merely holds the account (and the funds in it) in trust or as custodian for a third

party.

        24.     While the Debtors' case management system is complex, it can generally

be described by organizing the Debtors' main cash flow into four primary functional areas, as

detailed below:

    **a.  Funding Loan Originations and Purchases**

        25.     When a loan is originated (either by an independent mortgage broker,

correspondent lender or the Debtors' Retail Division), the loan originator notifies the Debtors to

arrange for the funding of the loan. Loans are typically funded by the Debtors transferring their

portion of the loan purchase price (e.g., the so-called "haircut") from one of the Debtors'

operating accounts (typically maintained at Union Bank) either (i) to DB Trust (which uses DB

as depositary) or Wells Fargo, which act as Custodian and Disbursement Agents ("Custodians")

under the Debtors' warehouse lending lines of credit, or (ii) directly to the title company to fund

the loan. To the extent that the loan purchase is funded by one of the Debtors' warehouse

lenders, that lender typically wires its portion of the loan purchase price to DB Trust as

Custodian or Wells Fargo as Custodian.

---

[3] Every effort has been made to be inclusive, but it is possible that some accounts may have been excluded
from Exhibit A and certain Securitization Appointments may have been excluded from Exhibit B. If the Debtors
discover any accounts that should have been listed on Exhibit A or Securitization Appointments that should have
been listed on Exhibit B, but were inadvertently omitted, they will file a supplement with the Court.

### b. **Loan Sales and Securitizations**

26.    When the Debtors sell a pool of loans (either through a whole loan sale or a securitization), the buyer typically transfers the purchase price to DB Trust or Wells Fargo, as Custodians, and the Custodians disburse the funds to the warehouse lender and to the Debtors as appropriate, per the terms of the warehouse loan agreement and custodial arrangement. The Debtors' portion of the sale proceeds are typically transferred into one of the Debtors' operating accounts designated for that purpose. In securitization transactions, the Debtors often receive a residual interest issued by the securitization trust which represents a subordinate interest in trust assets after all other required trust distributions have been made.

### c. **Loan Servicing**

27.    The Debtors, largely through New Century Mortgage Corporation ("NCMC"), service loans. These servicing functions typically include:  all aspects of servicing mortgage loans, including payment processing (the collecting and remitting of mortgage loan payments received from consumers nationwide), customer service communications and activities, collections communications, making required advances, accounting for principal and interest, holding escrow or impound funds for payment of taxes and insurance, and if applicable, contacting delinquent borrowers to discuss loss mitigation alternatives, supervising foreclosures and resolution of property dispositions in the event of unremedied defaults.

28.    Traditionally, during the time that the Debtors held a loan for sale or investment, the Debtors provided interim servicing prior to the disposition of the loan. These servicing functions are often performed pursuant to provisions of the warehouse loan agreements

with the Debtors' warehouse lenders.[4]  Servicing warehoused loans typically does not generate any separate servicing fee income for the Debtors and the Debtors are generally in the process of transitioning or have transitioned these servicing functions to new servicers selected by the warehouse lenders.  To the extent that the Debtors are continuing to perform any such servicing for the loans they hold pursuant to warehouse loans or hold for their own account, this motion seeks to continue that servicing function.

29.     In addition, and more importantly for the estates, the Debtors provide loan servicing to third party purchasers of loans in whole loan sales and to the securitization trusts that are formed when the Debtors' loans are disposed of via securitizations.

### d.  Acting as a Servicer for Securitized and Loans Subject to Whole Loan Sales

30.     Servicing loans for securitization trusts and purchasers of loans acquired in whole loan sales is a very important and profitable portion of the Debtors' businesses.  The Debtors' mortgage servicing rights ("MSR's") are generally established in servicing contracts with the securitization trusts or third party whole loan purchasers.  For performing these functions, the servicer (usually NCMC) generally receives a servicing fee, one-twelfth of which is paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio.  These servicing fees are typically collected from the monthly payments made by the borrowers on the loans.  In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.  For the fiscal year ended December 31, 2006, the Debtors estimate that they collected approximately $84

---

[4]  Several of the warehouse lenders have purported to terminate the Debtors as servicers for warehoused loans held for disposition and the Debtors have cooperated in transitioning the servicer role on many of these facilities.

million of servicing fees and approximately $3 million of prepayment penalties, yielding

approximately $64 million of servicing income after amortization of MSR's. As of December

31, 2006, the Debtors serviced approximately $28.6 billion of loans owned by third parties.

Preserving these MSR's and the Debtors' loan servicing platform is very important to

maintaining value for the estates. In order to do so, the Debtors need authorization to continue to

perform these servicing functions, which is among the relief sought in this motion.

    31.    The Debtors, principally through NCMC, perform loan servicing as

"servicer" or "master servicer" on behalf of a number of securitization trusts, including but not

limited to those listed in Exhibit B hereto (the "Securitization Appointments") under the terms

and conditions of a series of servicing agreements, pooling and servicing agreements, indentures

and related documents (collectively, the "Securitization Documents"). As of the Petition Date,

the Debtors serviced $10 billion in principal amount of mortgage loans under the Securitization

Appointments for the benefit of the holders of the related mortgaged backed securities. In many

instances, Debtor entities such as NC Residual IV Corporation, own residual or other interests in

such mortgage backed securities, thus giving their estates a significant economic interest in the

proper servicing of the securitized mortgage loans.

    32.    Under the Securitization Documents, the Debtor entity acting as mortgage

servicer, inter alia, (a) services mortgage loans held by the trusts, in accordance with the terms

and conditions thereof, (b) advances principal, interest, and certain "property protection" costs

(such as taxes and insurance) with respect to delinquent mortgage loans, unless such amounts are

determined to be unrecoverable from the related loans, ("Advances"), (c) performs certain

securities related computational, reporting and compliance tasks, and (d) pays certain fees and

expenses, and furnishes indemnifications to, the trustee and certain other parties to the

Securitization Documents (the "Indemnification Obligations") (items (a) through (d), together

with all other obligations undertaken as servicer or master servicer under the Securitization Documents, the "Securitization Servicing Functions").

33.    The timely and orderly performance of the Securitization Servicing Functions is essential to prevent material economic damage to all parties with an interest in the securitization trusts, including the Debtors' estates. This is particularly true given the "subprime" nature of the mortgage loans held by the securitization trusts, which are prone to losses if not aggressively serviced.

34.    Based on the Debtors' current assessment, the Securitization Servicing Functions are profitable and the Debtors' MSR's constitute important assets of the Debtors' estates.

35.    The trustees under the Securitization Documents assert that the Debtor entities acting as servicer for the securitizations are subject to termination by the securitization trustee, in certain instances and upon the direction of securities holders, if it breaches certain of its obligations. The Debtors are informed and believe that, in light of the adverse publicity, securitization trustees or securities holders are likely to seek relief from the automatic stay to terminate one or more of the Securitization Appointments if they are not given reasonable assurances that the Debtor servicing entity will perform the Securitization Servicing Functions. The terms of the order sought in this Motion have been negotiated with the securitization trustee for most of the securitization trusts serviced by Debtor entities and with the Debtors' main collection bank. The Debtors believe that by providing these assurances, they will enhance the prospect of maintaining their loan servicing platform and realizing its value. Conversely, such termination of the Debtors' servicing agreements would likely adversely affect the Debtors' reorganization efforts as well as the Debtors' economic interests in the related mortgage backed securities.

### i. **Servicing Loans Sold to Third Party Whole Loan Purchasers**

36.     When the Debtors sell loans in whole loan sales, the purchaser often contracts with the Debtors to provide loan servicing, sometimes on an interim basis and sometimes on a longer term basis (particularly when the purchaser does not have the capacity to service loans). These servicing agreements are typically documented in a servicing agreement with NCMC which has many of the features of the servicing agreements used with securitization trusts. Like servicing loans held by securitization trusts, performing these functions is a profitable part of the Debtors' businesses and these MSR's are valuable estate assets.

### ii. **Loan Servicing Cash Management**

37.     Amounts collected by the Debtors as servicers are deposited in a lock box, collection account. For example, the Debtors receive approximately 200,000 mortgage payments (checks, coupons and electronic payments) over the course of every month that are sent to and received at Union Bank's lockbox on a daily basis (the "Loan Payments"). Union Bank deposits all funds collected through the Debtors' lockbox account (account number 2210104254). On a daily basis, via a zero balance accounting transfer, the lockbox account credits the Debtors' payment clearing account (account number 2110104289) (the "Payment Clearing Account"). Union Bank extracts data from the remittance coupon and forwards data to the Debtors' data processor, MortgageServ ("MortgageServ"). MortgageServ creates an Automatic Clearing House ("ACH") file. The ACH file is sent to the Debtors for review and the Debtors forward the file to Union Bank for processing. Once processed, the ACH file will direct monies from the Payment Clearing Account to series of custodial accounts established for such applications as principal and interest ("P&I Custodial Accounts"), taxes, assessments and maintenance fees, and insurance with respect to the mortgaged property ("T&I Custodial Accounts") and various escrow accounts (collectively, the "Custodial Accounts"). The servicer then disburses the funds

to the appropriate recipient, including, in the case of principal and interest on loans held by the

Debtors, to DB Trust or Wells Fargo, as Custodians under a warehouse line of credit, and to an

operating account in the name of a Debtor, as appropriate.[5]

38.    In the ordinary course of business, the Debtors as servicers open and close

Custodial Accounts to make payments for principal and interest, taxes, assessments and

maintenance fees, insurance and similar costs with respect to the mortgaged property. The other

parties to these transactions assert that the Custodial Accounts are not property of the Estates.

For example, in a typical securitization transaction, the indenture trustee for the securitization

trust will enter into a servicing agreement with NCMC, as servicer, in which NCMC agrees to

open custodial trust accounts "held in trust for the benefit of the Owner Trustee, the Indenture

Trustee and the Noteholders."[6]  Similarly, when NCMC acts as servicer for loans sold by the

Debtors in a whole loan sale, the servicing agreement typically provides that NCMC, as servicer,

"shall segregate and hold all funds collected and received pursuant to the Mortgage Loans

separate and apart from any of its own funds and general assets and shall establish and maintain

one or more Custodial Accounts, in the form of deposit or demand accounts, titled 'New Century

Mortgage Corporation in trust for [Purchaser],'  The Custodial Account shall be established with

a Qualified Depository acceptable to Purchaser. The Interim Servicer and the Purchaser intend

---

[5] Some of the operating accounts maintained by the Debtors with respect to warehoused loans, are blocked control accounts subject to instructions from the warehouse lender and nothing in this Motion is intended to alter those control mechanisms; i.e., if an account is blocked pursuant to a control agreement with a warehouse lender, this Motion does not seek to unblock it.

[6] See, e.g., Section 3.10(a) of that certain Servicing Agreement dated as of February 27, 2006 by and among New Century Financial Corporation as Master Servicer, New Century Mortgage Corporation, as Servicer, New Century Home Equity Loan Trust 2006-S1, and Deutsche Bank National Trust Company, as Indenture Trustee. This is typical language found in a servicing agreement where NCMC acts as interim servicer in a securitization transaction.

that the Custodial Accounts shall be special deposit accounts."[7] It is critical to the Debtors' operations as servicers that they be allowed to continue to maintain the operations of these Custodial Accounts in the ordinary course of business. Thus, out of an abundance of caution, the Debtors request authority to continue operating as servicer in the ordinary course of business, including, but not limited to, operating the Custodial Accounts. In addition, the Debtors request that the parties to these transactions be authorized to continue any pre-petition customary practices of billing or otherwise notifying each other of amounts due to each other and of "netting" such amounts to the extent that the relevant parties agree to such netting.

39.   Additionally, the Court should authorize the Debtors' banks to process, honor and pay all prepetition checks and transfers relating to funds from the P&I Custodial Accounts (the "P&I Funds") and the T&I Custodial Disbursement Accounts (the "T&I Funds"). Authorizing and directing the Debtors' banks to process, honor and pay all prepetition checks and transfers from Custodial Accounts relating to the P&I and T&I Funds will not prejudice creditors or other parties-in-interest in this case. Accordingly, the Debtors' banks should be authorized and directed to process, reverse and debit deposits which are returned by payor banks in the ordinary course of business, honor and pay all prepetition checks or other transfers related to the P&I Funds and T&I Funds including, without limitation, checks or other transfers drawn from the T&I and P&I Custodial Accounts, or otherwise made in the ordinary course of the Debtors' servicing loans.

---

[7] Section 2.04 of Second Amended and Restated Flow Interim Servicing Agreement between Goldman Sachs Mortgage Company, as Purchaser, and New Century Mortgage Corporation, as Interim Servicer, dated as of May 1, 2006. This is a typical language found in a servicing agreement where NCMC acts as interim servicer for loans purchased in whole loan sales.

### e.  **The Debtors' Operating Accounts**

40.     The Debtors, through NCMC, maintain a primary concentration account --
account 2110104025 with Union Bank.  NCMC typically transfers funds out of this
concentration account to a series of payroll, accounts payable and other disbursement accounts
(generally through zero balance account ("ZBA") transfers, but occasionally into manual imprest
accounts) for NCMC and other Debtors.  Cash is also transferred to this account from other
Debtors.  The Debtors anticipated the need to continue such transfers postpetition and will
continue to track them in a manner consistent with their prepetition practices.  Specifically, each
transfer between the Debtors will be recorded in the accounting records for the respective
Debtor..

41.     In addition, the Debtors maintain a series of special depository accounts
for such matters as capitalizing certain subsidiaries, supporting certain insurance and other
regulatory requirements and other special purposes.

### f.  **Summary**

42.     The Debtors maintain a large, complex and efficient cash management
system.  Given the size and complexity of the Debtors' operations, this system entails over 354
accounts, many of which the Debtors maintain as custodians in trust for third parties.
Attempting to alter this system would entail severe disruptions to the Debtors' operations and
would threaten to cripple the Debtors' ability to act as loan servicers.  It is essential that the
Debtors be permitted to continue to operate their existing cash management system.  The
Debtors will not pay, and will instruct each of the banks where the Debtors maintain their non-
custodial funds not to pay, any of the Debtors' debts incurred before the Petition Date other than
as authorized by the Court.

43.     The cash management system described herein is central to the Debtors'

ordinary, usual and essential business practices. It is similar to those commonly employed by

corporate enterprises comparable to the Debtors in size and complexity. It would be

extraordinarily difficult, if not impossible, for the Debtors to establish entirely new accounts and

a new cash management system. Thus, maintenance of the existing cash management system is

essential to the Debtors and in the best interests of the estates.

44.    Given the size and complexity of the Debtors' operations, as well as the

need to preserve and enhance their respective going concern values, the Debtors simply cannot

afford a substantial disruption in the Debtors' cash management procedures. It is essential,

therefore, that the Debtors be permitted to continue to consolidate management of their cash and

transfer money as needed and in the amounts necessary to continue the operation of their

businesses. If the relief requested herein is granted, the Debtors will not pay out of their non-

custodial funds, and each of their banks where the Bank Accounts are maintained will be

instructed not to pay, any debts incurred before the Petition Date other than as specifically

authorized by this Court.

45.    The Cash Management System described herein constitutes the Debtors'

ordinary, usual and essential business practices. The Cash Management System is similar to

those commonly employed by corporate enterprises comparable to the Debtors in size and

complexity. The widespread use of such systems is attributable to the numerous benefits they

provide, including the ability to: (a) tightly control corporate funds; (b) insure cash availability;

and (c) reduce administrative expenses by facilitating the movement of funds and the

development of timely and accurate account balance and presentment information. These

controls are particularly important here given the significant amount of cash that flows through

the Debtors' Cash Management System on an annual basis.

46.    In addition, given the corporate and financial structure of the Debtors, it

would be difficult, if not impossible, for the Debtors to establish entirely new accounts and a new cash management system. Establishing new accounts in their place and instructing loan servicing customers and each and every individual mortgagor who is accustomed to making the Loan Payments to a specific account of the changes would substantially disrupt and delay the Debtors' receipt of Loan Payments and provision of services to its loan servicing customers. The Debtors would have to shut down their entire existing Cash Management System and attempt to establish a new cash management system to service loans, including opening new operating and custodial accounts for the benefit of its loan servicing customers. The Debtors submit that this is not practicable and could both severely and irreparably harm the Debtors' ability to operate their businesses. Moreover, such severe disruption would likely substantially harm the Debtors' loan servicing customers and potentially harm individual mortgage holders.[8] Thus, under the circumstances, maintenance of the Debtors' Cash Management System is not only essential to the Debtors, it is also in the best interests of their respective estates and creditors.

47.    If the Debtors are not permitted to continue to use their Cash Management System in its current form (modified to the extent necessary by the debtor in possession financing arrangements), their operations will be severely and perhaps irreparably impaired. Accordingly, the Court should authorize the Debtors' continued use of their existing Cash Management System.

48.    In other cases of this size with similar factual circumstances, it has been recognized that strict enforcement of the bank account closing requirements does not serve the rehabilitative purposes of chapter 11. Accordingly, cases in this District have waived such requirements and replaced them with alternative procedures that provide the same protections.

---

[8] The confusion resulting from such a disruption may cause individual mortgage holders to misdirect their loan payments potentially affecting these individual mortgage holders' credit scores.

See, e.g., In re Exide Technologies, No. 02-11125 (Bankr. D. Del. April 17, 2002) (permitting

debtors to maintain existing bank accounts and cash management system); In re W.R. Grace &

Co., No. 01-01139 (Bankr. D. Del. April 2, 2001) (same); In re USG Corp., No. 01-02094

(Bankr. D. Del. June 27, 2001) (same); In re Waccamaw's HomePlace, No. 01-00181 (Bankr. D.

Del. Jan. 17, 2001) (same); In re Trans World Airlines, Inc., No. 01-00056 (Bankr. D. Del. Jan.

10, 2001) (same); In re Plainwell, Inc., No. 00-04350 (Bankr. D. Del., Nov. 22, 2000) (allowing

the debtors to maintain existing bank accounts when changing accounts would be too

burdensome); In re Alamac Knit Fabrics, Inc., No. 00-03746 (Bankr. D. Del. Sept. 25, 2000)

(same); In re AmeriServe Food Distrib., Inc., No. 00-00358 (Bankr. D. Del. Feb. 3, 2000)

(same); In re Harnischfeger Indus., Inc., No. 99-02171 (Bankr. D. Del. June 7, 1999) (same); In

re Acme Metals Inc., No. 98-02179 (Bankr. D. Del. Sept. 29, 1999) (same).

   49. In addition, the Debtors should be granted relief from the U.S. Trustee

Guidelines to the extent they require that the Debtors make all disbursements by check.

Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct

some transactions by wire transfer. To deny the Debtors the opportunity to conduct wire

transfers would interfere with the Debtors' performance of their contracts and unnecessarily

disrupt the Debtors' business operations. The Court should permit these practices to continue.

   50. It is critical both to the continued operation of the Debtors' businesses and

to the preservation of the value of their businesses that the Debtors continue to utilize their

existing Cash Management System without disruption. Accordingly, it is appropriate and

entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court

to approve the Debtors' centralized Cash Management System in its current form (except to the

extent it needs to be modified in accordance with the debtor in possession financing

arrangements).

D.    **Payment of Outstanding Routine Prepetition Expenses**
      **Relating to the Operation of the Cash Management System is in the Best**
      **Interest of the Debtors' Estates**

51.    In the ordinary course of the operation and maintenance of the Cash

Management System, the Debtors incur routine bank charges and fees relating to the

administration of the Cash Management System and to loan custody. The Debtors seek authority

to pay any such customary prepetition banking and custody fees owed to any of their banks.

The banks undoubtedly will assert offset and/or recoupment claims to cover any such fees, so the

Debtors' ability to access funds in its accounts depends on reaching an appropriate means of

paying these fees. The Debtors also seek authority to pay any customary postpetition banking

and custody fees in the ordinary course as administrative expenses and that no liens granted to

any creditors (including a DIP lender) take priority over these fees.

E.    **Cause Exists for Extending the Debtors' Time to Come Into Compliance**
      **With the Deposit Requirements of Section 345 of the Bankruptcy Code**

52.    Section 345(a) of the Bankruptcy Code authorizes deposits or investments

of money of estates, such as the Debtors' cash, only in a manner that will yield the maximum

reasonable net return on such funds, taking into account the safety of each deposit or investment.

If deposits or investments are not insured or guaranteed by the United States or backed by the

full faith and credit of the United States, section 345(b) of the Bankruptcy Code provides that,

unless the court for cause orders otherwise, the estate must require the entity with which the

money is deposited or invested to obtain a bond in favor of the United States that is secured by

the undertaking of an adequate corporate surety.

53.    It is within the Court's discretion to extend or waive the investment

guidelines requirement of section 345(b) of the Bankruptcy Code "for cause." See 11 U.S.C.

§ 345(b); see also 140 Cong. Rec. H10752-01 (October 4, 1994) (section 345(b) investment

guidelines may be "wise in the case of a smaller debtor with limited funds that cannot afford a

risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated Debtors."). The Debtors currently invest any excess cash in conservative, overnight investments yielding a maximum return on cash based on negotiations with the Debtors' banks. The Debtors respectfully request a sixty (60) day extension within which to come into compliance with section 345 of the Bankruptcy Code. If the Debtors determine that they are unable to comply with the requirement of section 345 of the Bankruptcy Code within that sixty (60) day period, the Debtors will file a motion seeking authority to deviate from such requirements. The Debtors submit that such extension is warranted by the size and complexity of these chapter 11 cases.

**NOTICE**

54.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (3) counsel to the DB Trust; (4) counsel to Union Bank of California; (5) the Banks listed on Exhibit A; (6) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petition; and (7) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served as required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit C, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated:  April 2, 2007
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION