## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-[_____] (_____)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | |
| | : | |

## EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 362 AND 364 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (A) APPROVING DEBTOR-IN-POSSESSION FINANCING WITH ADMINISTRATIVE EXPENSE SUPERPRIORITY AND SECURED BY LIENS, (B) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM, (C) GRANTING OTHER RELIEF AND (D) SETTING FINAL HEARING

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), hereby move on an emergency basis for the entry of interim and final orders pursuant to sections 105, 362 and 364 of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to obtain postpetition financing and

---

[1] The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

scheduling a final hearing (the "Final Hearing") to consider the relief requested herein (the

"Motion"). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and

1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined

in 28 U.S.C. § 157(b)(2).

2.      The bases for the relief requested herein are Bankruptcy Code Sections

361, 362, 363 and 364 and Bankruptcy Rules 4001 and 9014.

## BACKGROUND[2]

3.      New Century Financial Corporation, a Maryland corporation ("NCF") and

publicly owned real estate investment trust, is one of the largest specialty mortgage finance

businesses in the United States. Through its subsidiaries and its primary holding company

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and

together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases,

sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending,

or lending to individuals whose borrowing needs were generally not fulfilled by traditional

financial institutions because they did not satisfy the credit, documentation or other underwriting

standards prescribed by conventional mortgage lenders and loan buyers. In September 2005,

NCF through some of its subsidiaries also began offering conventional mortgage loans,

including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration

("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year

ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of

---

[2] The facts and circumstances supporting this Motion are set forth in the Declarations of Monika McCarthy and Holly Etlin in Support of Chapter 11 Petitions and Request for First Day Relief.

mortgage loans, most of which were sold in the secondary market. Since their inception, the

Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of

homebuyers and homeowners across the nation access credit and realize the benefits of home

ownership, including many who might not otherwise have been able to do so.

      4.      On February 7, 2007, NCF announced that it would restate its quarterly

financial statements for the first, second, and third quarters of 2006 after the Debtors discovered

that there may be errors in the application of generally accepted accounting principles regarding

NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various

securities class action lawsuits and shareholder derivative suits.

      5.      On March 2, 2007, NCF announced that it could not timely file its Annual

Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its

audit of NCF's 2006 financial statements until after completion of the internal investigation by

NCF's audit committee. NCF also announced that the Securities and Exchange Commission had

requested a meeting with NCF to discuss these events and that the United States Attorney's

Office had commenced a criminal inquiry.

      6.      These announcements, together with increased borrower defaults that have

adversely affected the subprime mortgage market nationwide, had a devastating impact on the

Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that

provide the short term credit facilities that the Debtors need to originate and purchase loans (each

a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby

threatening their viability. During the following week, the Warehouse Lenders made margin

calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the

Warehouse Lenders began restricting and ultimately ceased providing funding for loans

3

originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7.     As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8.     Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9.     During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10.     The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced

4

these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

       11.     Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

       12.     On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. Further, a motion for joint administration of the Debtors' bankruptcy cases is pending before the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

### RELIEF REQUESTED

       13.     By this Motion, the Debtors request, pursuant to Bankruptcy Code Sections 105, 362 and 364 and Bankruptcy Rules 4001(b) and (c), that the Court enter interim and final orders authorizing, <u>inter alia</u>, the Debtors to enter into a debtor in possession financing facility with Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT") (collectively, the "DIP Lenders") and granting other relief related thereto.

### THE PROPOSED DEBTOR IN POSSESSION FINANCING FACILITY

**A.**    <u>Necessity of Postpetition Financing</u>

       14.     The Debtors' business in particular and the industry generally has been severely negatively impacted by a variety of factors over the last several months. In large part as a result of these pressures, the Debtors commenced these bankruptcy cases in order to downsize their operations, reduce expenses, promptly market their businesses and consummate sales of

assets as soon as practicable. In order to achieve these objectives, the Debtors have an immediate and critical need for debtor-in-possession financing in order to maintain and stabilize their businesses while they market them for sale.

15.     Prior to commencing these cases, the Debtors, working with their investment banker, Lazard Freres & Co. LLC ("Lazard"), aggressively marketed their businesses. This resulted in expressions of interest, bids and committed offers for various components of their businesses. Thus, the Debtors are seeking, or shortly shall seek, the entry of orders establishing bidding and auction procedures for the sale of substantially all their assets and the approval of stalking horse protections for certain bidders who have entered into commitments to purchase certain of the Debtors' businesses and assets at prices that the Debtors believe establish reasonable floors and where the bidders were willing to agree to stalking horse protections that will allow for spirited bidding, rather than chill the process. These sale procedures are the subject of other motions filed contemporaneously herewith or to be filed shortly. The Debtors believe that orderly auction sales of their assets and businesses conducted over the next 30 to 60 days is the best (and perhaps only viable) means of maximizing returns for stakeholders. As a result, it is imperative that the Debtors have access to sufficient liquidity to continue funding operations over this time period. Without additional financing, the Debtors expect to exhaust their liquidity within the next 30 to 45 days. Thus, it is imperative that the Debtors obtain the proposed financing.

16.     The need for stability is particularly critical since the Debtors largely operate service businesses. For example, the Debtors' loan servicing platform requires a stable work force, working capital to service loans, and maintenance of an infrastructure. Similarly, the Debtors' loan origination platform requires the maintenance of an infrastructure or it will

6

dissipate quickly. It is essential that the human beings who are maintaining these businesses for sale have the resources to keep them operating or the stakeholders will likely suffer and their recoveries will drop precipitously. As well, it is critical that customers, vendors and employees maintain confidence that the Debtors will have sufficient liquidity to effect an orderly sale process, as opposed to winding down abruptly.

17. This is not to say, however, that the Debtors are planning on business as usual pending these sales. Working closely with Lazard and their financial advisor, AlixPartners ("Alix"), the Debtors have implemented appropriate steps to cut costs dramatically while still maintaining going concern business operations. For example, the Debtors recently implemented significant layoffs in their work force and are filing with their bankruptcy petitions motions to reject leases for facilities that are not necessary for a substantially scaled back loan origination business. The Debtors and Alix have also implemented tight controls on cash expenditures. The Debtors will continue to work to pare expenses consistent with allowing their servicing business to continue to operate to its historic high standards while maintaining the relevant infrastructure that is key to testing a going concern sale of their loan origination platform.

18. This Motion does not seek the approval of a large DIP loan, certainly not in comparison to the billions of dollars in financing that the Debtors utilized prepetition. The DIP loan proposed herein is a scaled down facility designed to allow the Debtors to quickly auction their businesses and to maintain these operations in a stable condition pending the completion of these sales. The Debtors will be seeking expedited bidding procedures and hope to consummate major sales within about 45 days. Particularly given the critical importance of maintaining customer, supplier and employee confidence pending those sales, the Debtors

7

submit that it is appropriate at the time of the first hearing to authorize the Debtors to access the full amount available under the proposed DIP loan facility.

19.     In order to obtain the most attractive financing possible, Lazard widely solicited proposals for DIP financing. Over the last several weeks, Lazard solicited proposals for DIP financing from 14 financial institutions who are active and sophisticated providers of this type of financing. Ultimately, the most attractive proposal was submitted by the DIP Lenders. Active and arms' length bargaining produced the Debtor-in-Possession Loan and Security Agreement dated as of April 2, 2007, by and among the Debtors, Greenwich and CIT (the "DIP Loan Agreement") that is the subject of this Motion.

20.     This not a defensive DIP loan proposed by a group of existing prepetition lenders. Rather, the proposed DIP loan is a standalone facility provided by one lender, CIT, as an independent business matter, and by the other member of the DIP lending syndicate, Greenwich, as an independent loan and in order to help finance the Debtors as going concerns so that Greenwich can make a bid for certain of the Debtors' assets. Understandably, the DIP Lenders are willing to provide this DIP facility only if Greenwich is given a fair opportunity to pursue its bid, and accordingly the DIP Loan Agreement requires that the Court approve the requested bid procedures expeditiously - by April 10, 2007. The Debtors believe this process is reasonable and facilitates each of the Debtors' primary objectives of (i) providing the financing needed to satisfy the Debtors' liquidity demands and to provide stability so that the Debtors can pursue going concern sales, including the sale of the assets on which Greenwich has bid and (ii) offering a reasonable stalking horse bid so that the Debtors can proceed quickly to a sale, rather than continuing to tread water and burn cash in an inherently fragile business environment.

8

21.     In sum, the Debtors have an immediate and critical need for the financing offered by the DIP Loan. Without it, the Debtors' businesses will be irreparably harmed by, among other things, the potentially rapid deterioration of their mortgage loan servicing business and loan origination platform, loss of key employees and deterioration of employee morale - all of which adversely impact asset values. Consequently, the Debtors believe that the financing offered by the DIP Lenders is critical and will provide them with the ability to operate their businesses pending their sale.

B.     **Summary of Proposed Financing Terms**

22.     A copy of the DIP Loan Agreement is attached hereto as Exhibit A.[3] The proposed order approving the relief requested herein (the "Interim DIP Financing Order") is attached hereto as Exhibit B. The DIP Loan Agreement and Interim DIP Financing Order are collectively referred to herein as the "DIP Loan Documents."

23.     Pursuant to the DIP Loan Agreement, the Debtors will obtain from the DIP Lenders[4] a revolving credit facility providing access to up to $150 million. These loans will be advanced in two tranches.

24.     Tranche A is a revolving loan facility with a borrowing base keyed to a variety of the Debtors' underscore{unencumbered} assets -- (i) a pool of mortgage loans with a face principal amount of approximately $173 million, (ii) various residual interests in mortgage loan securitization trusts (i.e., mortgage-backed securities), (iii) state and Federal income tax refunds that the Debtors are seeking in an amount of approximately $113 million, (iv) a limited partnership interest in Carrington Investment Partners (US), L.P. ("Carrington"), and (iv) the

---

[3] The Debtors are seeking approval of the DIP Loan Agreement in substantially the form attached hereto. The descriptions in this Motion are intended only as general summaries of the terms of the DIP Loan Agreement and are qualified in their entirety by the provisions of the DIP Loan Agreement in its final version.

[4] Greenwich shall act as the administrative agent for the Lenders and CIT as the documentation agent

Debtors' rights to service mortgage loans for a variety of securitization trusts and third party whole loans purchasers on mortgage loans originated by the Debtors and subsequently sold to these purchasers. At the Closing, the Tranche A facility will have a commitment level of $50 million. The DIP Loan Agreement provides that the DIP Lenders can increase this Tranche to $100 million.

25.    Tranche B is a revolving loan facility designed to finance the advances required of the Debtors to service loans and to fund additional working capital needs. Loan servicing is a very important and profitable part of the Debtors' businesses. Maintaining this loan servicing business as a stable going concern, pending sale, is one of the Debtors' paramount objectives. The Debtors presently service approximately $19 billion of loans owned by third parties. The Debtors' mortgage servicing rights ("MSR's") are generally established in servicing contracts with the securitization trusts or third party whole loan purchasers. For performing these functions, the servicer (usually New Century Mortgage Corporation ("NCMC")) generally receives a servicing fee, one-twelfth of which is paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio. These servicing fees are typically collected from the monthly payments made by the borrowers on the loans. In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties. For the fiscal year ended December 31, 2006, the Debtors estimate that they collected approximately $84 million of servicing fees and approximately $3 million of prepayment penalties, yielding approximately $64 million of servicing income after amortization of MSR's. In addition, in many instances, Debtor entities such as NC Residual IV Corporation,

10

own residual or other interests in such mortgage backed securities, thus giving their estates an

additional significant economic interest in the proper servicing of the securitized mortgage

loans.

26.     Loan servicing typically includes: collecting and remitting loan payments

received from the borrowers; making required advances; accounting for principal and interest;

customer service; holding escrow or impound funds for payment of taxes and insurance; and, if

applicable, contacting delinquent borrowers and supervising foreclosures and property

dispositions in the event of unremedied defaults. Proper servicing requires diligence and

sensitivity in order to maximize collections, particularly on delinquent loans, and at the same

time comply with applicable laws and regulations. Servicing contracts also generally require the

servicer to advance principal, interest, and certain "property protection" costs (such as taxes and

insurance) with respect to delinquent mortgage loans, unless such amounts are determined to be

unrecoverable from the related loans ("Advances"). These Advances receive a priority of

payment in the securitization trust documents, but they also require working capital in order to

finance them.

27.     Prior to filing bankruptcy, the Debtors financed these servicer Advances

out of a combination of operating working capital and a Servicer Advance Financing Facility

Agreement between NCMC and Citigroup Global Markets Realty Corp. ("Citigroup Realty")

dated as of August 28, 2003 (the "Servicer Advance Facility"). As of the Petition Date, NCMC

owed Citigroup Realty approximately $32 million secured by these Advances. These Advances

are generally quite valuable collateral, as reflected in high borrowing base advance rates (95%

under the Servicer Advance Facility). Tranche B of the DIP Loan Agreement is designed to take

out the amounts owed to Citigroup Realty, to provide new financing for postpetition servicer

11

Advances and to fund working capital. The Debtors and the DIP Lenders are currently exploring whether to implement Tranche B. If it is implemented, the Debtors expect that Tranche B of the DIP Loan will refinance the Servicer Advance Facility in full. If not, the Debtors are not now seeking to use collections on the Advances in existence on the Petition Date, which would be Citigroup Realty's cash collateral,[5] and presumably the Debtors would either pay over this cash collateral to Citigroup Realty as it is collected or reach an other appropriate resolution, either consensually or pursuant to order of this Court.

28.     The Tranche B facility is capped at $50 million. This facility will be available if the DIP Lenders elect, within 10 business days from entry of the preliminary order approving the DIP Loan Agreement, to provide this financing. If that occurs, the Debtors will owe the DIP Lenders a 2% facility fee based on this additional facility.

29.     In addition, as noted above, the DIP Lenders have the ability to increase the Tranche A Subfacility by $50 million, at which point the Debtors would owe an additional 2% commitment fee on such additional borrowing capacity.

30.     A combination of an increase in the Tranche A Subfacility and the Tranche B Subfacility could bring the total borrowing capacity up to $150 million. However, the Debtors must consent to any increase in the Maximum Credit above $100 million.

31.     Certain principal material terms of the DIP Loan Agreement and the financing contemplated thereby are summarized below:[6]

a.     General Borrowing Terms and Use of Proceeds:

---

[5] The Debtors reserve the right to seek to use Citigroup Realty's cash collateral, but at the present time are not seeking to do so.

[6] The summary of the DIP Loan Agreement is intended only to assist the Court and parties in interest in understanding certain key aspects of the financing facility and is qualified in its entirety by reference to the DIP Loan Agreement. Unless otherwise indicated, capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Loan Agreement.

RLF1-3133909-1

The financing is a revolving credit facility consisting of two tranches as follows: (i) a Tranche A Working Capital Subfacility (the "Tranche A Subfacility") for general corporate purposes and to fund an orderly sale process pursuant to Bankruptcy Code Section 363 (including payment of fees covered by the Carve-Out as defined below) and (ii) a Tranche B Servicing Advance Subfacility (the "Tranche B Subfacility") for repayment of the Servicer Advance Financing Facility with Citigroup Realty, to fund new qualifying servicing Advances and to fund working capital.

b.    <u>Maximum Credit and Borrowings</u>:

Outstanding advances under the DIP Loan Agreement may not exceed $50 million; provided, however, that the DIP Lenders may in their sole discretion increase the maximum credit to $100 million following appropriate diligence by either (i) increasing the Tranche A Subfacility by up to $50 million and/or (ii) within ten (10) business days from the filing of the Interim Order, providing up to $50 million of borrowing capacity to make advances available under the Tranche B Subfacility. In addition, the DIP Lenders and the Borrowers may agree to increase the Maximum Credit by an additional $50 million, bringing the total facility up to a maximum of $150 million. The Tranche B Subfacility and the incremental Tranche A Subfacility commitment shall be subject to the same fee and margin structure. The maximum credit will be reduced by the net proceeds received by the Debtors from the sale of assets included in the Tranche A Borrowing Base.

c.    <u>Borrowing Base</u>:

The borrowing base and the Maximum Credit limit under the DIP Loan Agreement determine the maximum amount that may be borrowed by the Debtors. The borrowing base is calculated by applying a scheduled formula of borrowing base assets and advance rates (ranging from 50% to 80%) (which percentages may be increased in the sole discretion of the Administrative Agent) on their respective lending value. The Carve-Out (as defined below) and an availability reserve in the amount of $10 million shall be deducted from the borrowing base after application of applicable advance rates.

d.    <u>Term and Maturity Date</u>:

The Debtors' ability to borrow under the DIP Loan Agreement and any obligations of the Lenders thereunder shall terminate and all advances outstanding shall be due and payable upon the earliest of (i) ninety (90) days following the initial closing of the financing facility (the "Effective Date"), (ii) thirty (30) days following entry of the Interim Order if the

Final Order has not been entered, (iii) the consummation of any sale pursuant to Bankruptcy Code Section 363 or otherwise of all or substantially all of the Debtors' assets, (iv) the effective date of any plan of reorganization, (v) conversion of any of the Debtors' bankruptcy cases to a case under chapter 7, (vi) dismissal of any of the Debtors' bankruptcy cases or (vii) the occurrence of an event of default and the acceleration of the Advances under the DIP Loan Agreement (the earliest of (i) through (vii), the "Maturity Date").

e.    Interest Rate:

The interest rate on the Tranche A Subfacility and Tranche B Subfacility shall be one-month LIBOR plus 2.75% per annum. Upon the occurrence of an event of default, the interest rate shall be increased by 2.00% per annum.

f.    Fees:

Prior to the Petition Date, the Debtors paid the Lenders a $500,000 fully-earned and non-refundable commitment fee which the Debtors paid upon the parties executing a commitment letter for the DIP Loan.[7] The DIP Loan Agreement requires the Debtors to pay a $500,000 facility fee upon the entry of the Interim DIP Financing Order.[8] In addition, the Debtors will owe an additional facility fee of 2.00% of any increase in the Maximum Credit during the term of the DIP Loan Agreement. If the Obligations are not paid in full on the Maturity Date, the Debtors will owe an additional monthly fee equal to 0.25% of the Maximum Credit in effect immediately prior to the Maturity Date.

g.    Prepayment with Asset Sale Proceeds:

50% of the net proceeds (including net payoffs of senior liens) from any sales or other dispositions of collateral that is not included in the Borrowing Base will be applied as a prepayment of the DIP Facility and will not reduce the Maximum Credit. 100% of the net proceeds from any sales or other dispositions of collateral included in the Tranche A Borrowing Base will be applied as a prepayment first to the Tranche A Advances and second to the Tranche B Advances and will reduce the Maximum Credit and Tranche A Sublimit in the amount of the proceeds applied to the Tranche A Advances. 100% of the net proceeds from any sales or other dispositions of collateral included in the Tranche B

---

[7] Of that commitment fee, $150,000 was initially paid as a work fee prepetition, but later credited against the commitment fee.

[8] Computed as a 2% facility fee on the $50 million initial commitment, with a credit for the $500,000 commitment fee paid by the Debtors prepetition

Borrowing Base will be applied as a prepayment first to the Tranche B Advances and second to the Tranche A Advances.

h.    Collateral:

The DIP Loan Agreement will not prime any existing liens. The indebtedness and obligations under the DIP Loan Agreement will be secured by (i) security interests and liens granted pursuant to Bankruptcy Code Section 364(c)(2) on all assets of the Debtors not otherwise subject to a lien, including without limitation all unencumbered mortgage loans, mortgage loan interests, servicing rights, periodic advances, servicing Advances, residual interests, and other real and personal property, tangible or intangible, including all bank accounts[9], deposits and cash, wherever located, whether now existing or later acquired of the Debtors and the Debtors' bankruptcy estates and all proceeds, products, rents, revenues and profits thereof (**inclusive of any avoidance actions available to the Debtors' bankruptcy estates pursuant to Bankruptcy Code Sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a), subject to the entry of a Final order approving the DIP Loan Agreement**) and (ii) junior security interests and liens pursuant to Bankruptcy Code Section 364(c)(3) in all encumbered assets of the Debtors (other than certain excluded assets to be agreed upon) (the assets described in clauses (i) and (ii) above, the "Collateral"). The liens and security interests granted to the Lenders in the Collateral shall be subject only to (a) the Carve-Out (as described below) and (b) other permitted liens approved by the Lenders in their sole discretion (which shall include the liens granted in collateral under the Debtors' agreements with their warehouse lenders and other liens to be determined).

i.    **Lien on Avoidance Actions:**

**Subject to the entry of a final order approving the DIP Loan Agreement, the security interests and liens securing the indebtedness and obligations under the DIP Loan Agreement will include any avoidance actions available to the Debtors' bankruptcy estates pursuant to Bankruptcy Code Sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a).**

j.    Administrative Priority Claim:

The outstanding obligations due to the Lenders by the Debtors under the DIP Loan Agreement shall be entitled to superpriority administrative claims status pursuant to Bankruptcy Code Section 364(c)(1) with priority

---

[9] Of course, the Debtors' cash management banks will have the ability to offset accounts for charge backs and fees and otherwise charge their customary fees in the ordinary course

RLF1-3133909-1

over all other claims against the Debtors other than the Carve-Out (as described below).

k.     Carve-Out:

The liens and security interests granted to the Lenders in the Collateral shall be subject to a carve-out established for professional fees not to exceed the aggregate amount of $7 million which may consist of (i) up to $4 million in professional fees accruing following an event of default and (ii) up to $3 million in accrued but unpaid professional fees accruing prior to an event of default (the "Carve-Out"); provided, however, that (x) the Carve-Out shall not limit the fees payable to the United States Trustee pursuant to the Bankruptcy Code, 28 U.S.C. § 1930(a) or other similar statute mandating payment of such fees or the fees owing to the clerk of the Court and (y) no portion of the Carve-Out shall be used to challenge the DIP Loan Agreement (including the liens securing the obligations under the DIP Loan Agreement). The professional fees provided for in the Carve-Out may be paid as and when approved by the Bankruptcy Court without regard to whether the DIP Loan Agreement is outstanding or an event of default has occurred and is continuing.

l.     **506(c) Surcharge Waiver:**

**Subject to the entry of a final order approving the DIP Loan Agreement, no costs or expenses of administration shall be imposed against the Collateral under Bankruptcy Code Section 506(c) other than the Carve-Out.**

m.     Events of Default:

The DIP Loan Agreement contains typical events of default for prepetition loan facilities of this type, as well as customary events of default for debtor in possession financing. Defaults include, without limitation: (i) nonpayment, noncompliance with the credit documentation, inaccuracy of representations and warranties, and challenges by any Person to the credit documents, (ii) if any outstanding advances are supported by mortgage servicing rights or servicing advances included in the borrowing base, servicing of the mortgage loans underlying any material portion of the mortgage servicing rights or servicing advances is transferred to a third party and any advances related to such mortgage servicing rights or servicing advances are not paid in connection with such transfer, (iii) any events of default regarding perfection, priority or enforceability of the Lenders' security interest in the Collateral and (iv) standard bankruptcy related events of default.

16

n.    <u>Approval of Bid Procedures for Sale of Certain Assets to Greenwich</u>:

As described above, the Debtors are filing concurrently herewith a motion to approve certain bid procedures and to provide Greenwich stalking horse protections for the sale of certain mortgage-backed securitization interests and certain mortgage loans that are owned by the Debtors. These assets are presently unencumbered, although of course they will become encumbered by liens securing the DIP Loan Agreement. The bidding procedures are standard and the stalking horse protections well within market and are designed to facilitate bidding. The DIP Loan Agreement provides that it will be an event of default under the DIP Loan Agreement if by April 10, 2007 the Court (i) does not enter an order approving Greenwich as the stalking horse bidder for these assets or (ii) does not enter an order approving the related bidding procedures in a form reasonably acceptable to Greenwich. The Debtors believe that this particular term is justified and reasonable under the circumstances and is appropriate in light of the significant benefits provided by the DIP Loan Agreement as well as the benefits provided by Greenwich acting as the stalking horse bidder for these assets.

o.    <u>Remedies</u>: Upon the occurrence of an Event of Default, the DIP Lenders may declare all Obligations due and payable and may cease making any other advances without leave of the Court. However, the DIP Lenders may not foreclose on Collateral or otherwise seize control of assets of the estates without giving at least 3 days Business Days' prior written notice to the Debtors, the Office of the United States Trustee and any official committee.

p.    <u>Expense and Indemnification</u>: The Debtors are required to reimburse the Lenders for their reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with financing facility, including, without limitation, the diligence, documentation, execution, amendment, monitoring and enforcement of the facility, including third party underwriting firms, and will reimburse the Lenders for any costs, expenses or damages (including reasonable attorneys' fees and expenses) resulting from any proceedings related to the facility (including any of the Collateral). The DIP Loan Agreement contains typical indemnification provisions for a financing of this type.

32.    Pursuant to Del.Bankr.L 4001-2(a)(i), the Debtors have highlighted the provisions set forth in paragraphs11.i and 11.l above, which are contained in sections 1.01 and 4.01 of the DIP Loan Agreement and paragraph 7 of the Interim DIP Financing Order and section 4.05 of the DIP Loan Agreement and paragraph 22 of the Interim DIP Financing Order,

respectively, although Del.Bankr.L 4001-2(a)(i)(C) may not be applicable because the Lenders

do not hold any prepetition claims against the Debtors. The Debtors believe that such provisions

are reasonable given the overall benefits of the financing facility and given that the Lenders were

unwilling to provide the contemplated financing without such provisions.

C.    **Efforts to Obtain Postpetition Financing**

33.    Before agreeing to enter into the DIP Loan Agreement, Lazard, on behalf

of the Debtors, solicited proposals for debtor in possession financing from multiple financial

institutions and discussed the potential for obtaining secured or unsecured financing with at least

14 sophisticated and nationally recognized providers of such financing  Although some lenders

expressed interest in providing debtor in possession financing, they included higher costs,

provided more onerous terms, or had other conditions that made them inferior to the DIP Loan

Agreement and the financing proposed by the DIP Lenders. The Debtors believe that the DIP

Loan provides the best available financing package based upon a number of factors including

amount of borrowing availability, cost, ability to enter into the financing facility on short notice

and other factors. Moreover, no prospective lender was willing to provide the necessary

financing without at least the type of protections the Lenders have requested. The Debtors

negotiated the terms of the DIP Loan Agreement with the DIP Lenders at arms' length and in

good faith (as defined in Section 364(e) of the Bankruptcy Code), with all parties represented by

counsel, and the Debtors believe that the negotiated terms are fair and reasonable under the

circumstances. Simply put, as negotiated, the financing facility is the best alternative available

to the Debtors and will enable them to continue operations, pay expenses and pursue an orderly

sale process that maximize the value of their assets.

## BASIS FOR RELIEF REQUESTED

34.    Bankruptcy Code Section 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside of the ordinary course of business and (c) obtaining credit with specialized priority or with security.[10] If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. See 11 U.S.C. § 364(c).

35.    As with other business decisions, in considering whether to approve a debtor's request to obtain postpetition financing the courts typically defer to the debtor's business judgment and its determination that the financing is in the best interests of the estate. See e.g. In re Simasko Prod. Co., 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estates and noting that ("[b]usiness judgments should be left to the board room and not to this Court."); In re Ames Dep't Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties."); see also 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

---

[10]  Bankruptcy Code Section 364(c) provides in pertinent part that:

(c)    if the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

   (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]

   (2)    secured by a lien on property of the estates that is not otherwise subject to a lien ...

11 U.S.C. § 364(c)

36.     As explained below, the Debtors have exercised sound business judgment in determining that a debtor in possession financing facility and the DIP Loan Agreement are appropriate. In order for the Debtors to achieve the necessary liquidity to administer their chapter 11 cases and accomplish an orderly sale of their assets, they must have access to working capital. The Debtors' management examined the available options and determined that entering the DIP Loan Agreement is in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loan Agreement and borrow funds from the Lenders pursuant to the terms described above and take the other actions contemplated by the DIP Loan Documents and as requested herein.

A.     **The Debtors Should Be Authorized to Obtain the DIP Financing Pursuant to Bankruptcy Code Section 364(c)**

37.     Because the Debtors are <u>not</u> seeking to "prime" any prepetition liens - and the Lenders will only be granted liens and security interests in unencumbered property, junior liens and security interests in encumbered property and a superpriority administrative expense claim - the type of financing contemplated under the DIP Loan Agreement is precisely the type authorized and governed by the requirements of Bankruptcy Code Section 364(c).

38.     Although a debtor's decision to borrow should be judged under the business judgment standard, the statutory requirement for obtaining postpetition credit under Bankruptcy Code Section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) as an administrative expense." See In re Garland Corp., 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under Bankruptcy Code Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Thus, Bankruptcy Code Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured

20

credit allowable as an ordinary administrative claim. In re Crouse Group, Inc., 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

      39.     Consequently, in order to obtain postpetition financing pursuant to

Bankruptcy Code Section 364(c), many courts generally require a showing that:

     a.     the debtor is unable to obtain unsecured credit under Bankruptcy Code Section 364(b), (i.e., by allowing a lender only an administrative claim);

     b.     the credit transaction is necessary to preserve the assets of the estate; and

     c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Agua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dep't. Stores Inc.,

115 B.R. 34, 37-39 (Bankr. S.D N.Y. 1990).

## B.    The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis

      40.     Notwithstanding their efforts, the Debtors have been unable to obtain

postpetition financing on an unsecured basis. In fact, a working capital facility of the type and

magnitude needed in these chapter 11 cases - a $150 million revolver - simply could not have

been obtained on an unsecured basis, and none of the institutions from which the Debtors sought

a debtor in possession financing facility were willing to make this level of credit available on an

unsecured basis.

      41.     To show that the credit required is not obtainable on an unsecured basis, a

debtor need not seek credit from every available source, but should extend reasonable efforts to

seek other sources of credit of the type set forth in Bankruptcy Code Sections 364(a) and (b).

See e.g. Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085,

1088 (4th Cir. 1986) (finding that the trustee's unsuccessful efforts to obtain credit from

financial institutions in the immediate geographic area were sufficient and that "[t]he statute

imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames Dep't Stores, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where it had approached several lending institutions).

42.    Indeed, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code Section 364(c) because "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe Co., 789 F.2d at 1088; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

43.    Given the magnitude, complexity and immediacy of the Debtors' financing needs, the Debtors moved diligently and in a targeted manner to assure that the Debtors would be able to negotiate a new financing facility, including by discussing financing options with approximately 13 different institutions and potential sources of credit. The Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Loan Agreement that is presently before the Court which represents a vital step in the path to a successful resolution of these cases. The financing provided under the DIP Loan Agreement will provide the Debtors with necessary liquidity and satisfy their working capital needs during the period of time necessary to market and sell their assets.

44.    The Debtors' efforts to seek necessary debtor in possession financing from other large, experienced lenders satisfy the requirements of Bankruptcy Code Section 364(c) of

22

the Bankruptcy Code. See e.g. In re Dunes Casino Hotel, 69 B.R. 784, 795 (Bankr. D.N.J. 1986)

(debtor made required effort under Section 364 of the Bankruptcy Code based on evidence that

the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by

junior liens, but that at least three such lenders were willing to advance funds secured by a

superpriority lien); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy

court's finding that two national banks refused to grant unsecured loans was sufficient to support

conclusion that the requirement of Bankruptcy Code Section 364 was met).

**C.    Postpetition Financing is Necessary to Preserve and Maximize the Value of the Estate**

45.    It is critical that the Debtors obtain sufficient credit and cash availability to

maintain operations and structure and execute an orderly sale process. In the absence of access

to the credit provided by the DIP Loan Agreement, the Debtors will be unable to make

necessary ordinary course business expenditures or maintain the stability of their businesses

pending conclusion of the sale process. Without the DIP Loan Agreement the Debtors will not

have the resources or support necessary to implement this sale process.

46.    In many respects, the success of these cases depends on the Debtors'

ability to maintain operations and preserve the value of their estates during the chapter 11

process until asset sales are completed. Yet, if this Motion is denied or delayed, the Debtors'

ability to conduct an advantageous sale might be irreparably damaged. In other words, unless

the Debtors are authorized to borrow under the DIP Loan Agreement, their estates will suffer

significant and irreversible harm. Accordingly, the Debtors' need for access to this financing is

urgent and immediate.

23

**D.    The Terms of the DIP Loan Agreement are Fair and Reasonable**

47.    In the Debtors' considered business judgment, the financing under the DIP Loan Agreement is the best financing option available, in particular considering the challenges facing the Debtors and their industry generally. The Debtors also believe that the terms and conditions of the financing are fair and reasonable and they were negotiated by the parties in good faith and at arm's length. The Debtors and their industry are currently facing substantial financial distress and uncertainty. Under the circumstances, no other lender or capital source has offered to provide the Debtors with postpetition financing on terms equal or more favorable to the estates than the proposed DIP Loan Agreement.

48.    In addition, the security liens being granted to the Lenders to secure the Debtors' obligations under the DIP Loan Agreement will not prime any existing valid, perfected and unavoidable security interests of other parties. Given that the Lenders have not previously financed the Debtors, they also do not have any prepetition claims against the Debtors and no portion of the loan proceeds can or will be used to repay any such prepetition claims, and the liens granted to the Lenders does not provide any cross-collateralization protection. For the same reason, there is no request that prepetition liens be validated as is common in cases where a prepetition lender seeks to provide debtor in possession financing. Further, considering that the Lenders do not hold prepetition claims or liens, and are being granted liens on otherwise unencumbered assets or junior liens on encumbered assets, the waiver of Bankruptcy Code Section 506(c) surcharges on the Collateral and liens on avoidance actions does not pose any of the issues that typically exist with lenders that already have liens on estate assets and prepetition claims.

49.    Moreover, the proposed DIP Loan Documents provide generally that the security interests and administrative expense claims granted to the Lenders will be subject to the

Carve-Out which includes up to $4 million in professional fees accruing following an event of default, and even that amount will <u>not</u> limit the fees payable to the United States Trustee. In <u>Ames Dep't. Stores</u>, the bankruptcy court found that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate are adequately assisted by counsel. <u>Ames Dep't. Stores</u>, 115 B.R. at 40.

50.     Likewise, the fees charged by the Lenders under the DIP Loan Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code Section 364. <u>See</u> <u>Resolution Trust Corp. v. Official Unsecured Creditors Committee (In re Defender Drug Stores, Inc.</u>), 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Bankruptcy Code Section 364, including a lender "enhancement fee").

51.     In light of the foregoing, the Debtors submit that they have satisfied the legal prerequisites to borrow on the terms set forth in the DIP Loan Documents. The terms of the DIP Loan Agreement are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loan Agreement and borrow funds from the Lenders on the secured, superpriority administrative basis described above pursuant to Section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the DIP Loan Documents and as requested herein.

## REQUEST FOR INTERIM AND FINAL ORDERS AND FINAL HEARING

52.     Bankruptcy Rules 4001(b) and (c) permit a court to approve a debtor's request to obtain postpetition financing during the period following the filing of a motion requesting such relief "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bank. P. 4001(b)(2) and (c)(2). They also provide that a

25

final hearing on a motion to obtain financing pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after service of such motion. Id.

53.    Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. See e.g. Simasko, 47 B.R. at 449; see also Ames Dep't Stores, 115 B.R. at 36, 38.

54.    Pending a final hearing, the Debtors require immediate financing. Without immediate access to financing, the Debtors will be unable to pay critical obligations and will be unable to pay the costs associated with continued operations. The Debtors must have immediate use of borrowings under the DIP Loan Agreement to pay their operating costs, and funds are urgently needed to meet all of the Debtors' liquidity needs and to administer their chapter 11 cases in an orderly manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the estates and creditors.

55.    Thus, the Debtors request that the Court (i) conduct an expedited hearing on the Motion, (ii) grant the relief sought in this Motion on an interim basis and enter the Interim DIP Financing Order, (iii) schedule a final hearing on this Motion ("Final Hearing") and (iv) establish notice and objection procedures in respect thereof in accordance with Bankruptcy Rule 4001(b) and (c).

56.    The Debtors also request that the Court schedule the Final Hearing on this Motion to occur no later than twenty-five (25) days after entry of the Interim DIP Financing Order as the Lenders' commitment will terminate if a final order authorizing the relief requested herein is not entered within thirty (30) days after entry of the Interim DIP Financing Order. This relief is necessary in order to maintain the value of the Debtors' assets and avoid immediate and irreparable harm and prejudice to the estate.

## NOTICE

### A.    Notice with Respect to Interim Financing Request

57.    The Debtors submit that the exigencies of this case and the immediate need for funds do not permit broad notice of the Debtors' request for interim financing under this Motion. Therefore, the Debtors respectfully requests that the Court deem adequate and sufficient the written and/or telephonic notice of the Motion that has already been or will be given to (i) the Office of the United States Trustee, (ii) the Debtors' 50 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (iii) all parties who filed a request for notice, and (iv) counsel to the DIP Lenders (collectively, the "Notice Parties").

### B.    Notice with Respect to Entry of Interim DIP Financing Order and Final Hearing

58.    Pursuant to Bankruptcy Rule 4001, the Debtors request that they be authorized to serve a notice of entry of the Interim DIP Financing Order and of the Final Hearing, together with a copy of this Motion, and the DIP Loan Agreement, by hand, regular mail, or facsimile upon (i) the Office of the United States Trustee, (ii) counsel to the DIP Lenders, (iii) all of the parties that have filed UCC-1 financing statements against the Debtors, (iv) the Debtors' 50 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (v) all parties who have entered their appearance pursuant to Bankruptcy Rule 2002 and (vi) any Creditors' Committee, once appointed, or Creditors' Committee counsel,

27

if same shall have filed a request for notice. The Debtors respectfully request that any further notice of the Final Hearing, and of relief requested herein, other than as expressly provided for above, be waived.

## **NO PRIOR REQUEST**

59.    No previous motion for the relief sought herein has been made to this or any other court.

28

## CONCLUSION

WHEREFORE the Debtors respectfully request (i) the entry of an order substantially in the form of the proposed Interim Order annexed hereto as Exhibit B; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as is just and proper.

Dated:  April 2, 2007
   Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
Brian Metcalf
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION