(c)    <u>Other Documents</u>.  Each Agent and each Lender shall have received such other documents as such Agent or such Lender or its respective counsel may reasonably request.

**Section 6.    Borrowers Representations and Warranties**.  Each Borrower represents and warrants to the Agents and the Lenders that throughout the term of this Loan Agreement:

6.01    <u>Existence</u>.  Each Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as set forth on <u>Schedule 6.01(a)</u> hereto, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, except as set forth on <u>Schedule 6.01(b)</u> or where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respect with all Requirements of Law.

6.02    <u>Financial Condition</u>.  The Borrowers have heretofore furnished to the Lenders a copy of the Company's audited consolidated balance sheets as of December 31, 2005 with the opinion thereon of KPMG LLP, a copy of which has been provided to Lenders. The Borrowers have also heretofore furnished to the Lenders the related consolidated statement of income and retained earnings and of cash flows for the Borrowers and their consolidated Subsidiaries for the one year period ending December 31, 2005 setting forth comparative form the figures for the previous period.  All such financial statements are materially complete and correct and fairly present in all material respects the consolidated financial condition of the Borrowers and their Subsidiaries and the consolidated results of their operations for the fiscal year ended on such date, all in accordance with GAAP applied on a consistent basis.

6.03    <u>Litigation</u>.  Except as set forth in <u>Schedule 6.03</u>, there are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against any Borrower or any Affiliate of any Borrower or affecting any of the property thereof before any Governmental Authority, (i) as to which individually or in the aggregate there is a reasonable likelihood of an adverse decision which would be reasonably likely to have a Material Adverse Effect, or (ii) which questions the validity or enforceability of any of the Loan Documents or any action to be taken in connection with the transactions contemplated hereby or thereby and there is a reasonable likelihood of a materially adverse decision or a Material Adverse Effect.  The disclosure of any action, suit, arbitration, investigation or proceeding on <u>Schedule 6.03</u> shall not operate as a consent to such matter, or a waiver or an amendment of any right, power, or remedy of any Agent or any Lender with respect to such matter, including the Agents' and the Lenders' right to exercise its remedies in the event that any matter listed on <u>Schedule 6.03</u> is, results in, or has a Material Adverse Change or has a Material Adverse Effect.

6.04    <u>No Breach</u>.  Subject to the entry of the Interim Order (or the Final Order, when applicable), neither (a) the execution and delivery of the Loan Documents or (b) the consummation of the transactions therein contemplated in compliance with the terms and

provisions thereof will conflict with or result in a breach of the charter or by-laws of any Borrower, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or other instrument, indenture, or other material agreement, to which any Borrower or any of its Subsidiaries is a party or by which any of them or any of their property is bound or to which any of them is subject (other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases), or constitute a default under any such instrument, indenture, or other material agreement or (except for the Liens created pursuant to this Loan Agreement) result in the creation or imposition of any Lien upon any property of any Borrower or any of its Subsidiaries, pursuant to the terms of any such agreement or instrument.

6.05    <u>Action</u>.  Subject to the entry of the Interim Order (or the Final Order, when applicable), each Borrower has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party; the execution, delivery and performance by each Borrower of each of the Loan Documents to which it is a party has been duly authorized by all necessary corporate or other action on its part; and each Loan Document has been duly and validly executed and delivered by each Borrower and constitutes a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms.

6.06    <u>Approvals</u>.  No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority, or any other Person, are necessary for the execution, delivery or performance by any Borrower of the Loan Documents to which it is a party or for the legality, validity or enforceability thereof, except for the Interim Order (or the Final Order, when applicable) and those consents which have been obtained.

6.07    <u>Margin Regulations</u>.  Neither the making of any Advance hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

6.08    <u>Taxes</u>.  Each Borrower and its Subsidiaries have filed all Federal income Tax Returns and all other material Tax Returns that are required to be filed by them and have paid all Taxes otherwise required to be paid by them, except for any such taxes (other than payroll Taxes), if any, that are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided in accordance with GAAP or except as permitted by the Bankruptcy Code to the contrary.  The charges, accruals and reserves on the books of each Borrower and its Subsidiaries in respect of taxes and other governmental charges are adequate.  The information provided to the Agents and the Lenders with respect to the Tax Refund Receivables is accurate and complete in all respects.

6.09    <u>Investment Company Act</u>.  No Borrower nor any Subsidiary of a Borrower is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Borrower is subject to any Federal or state statute or regulation which limits its ability to incur indebtedness.

6.10   <u>No Legal Bar</u>.  Subject to the entry of the Interim Order (or the Final Order, when applicable), neither the execution, delivery and performance of this Loan Agreement, the borrowings hereunder and the use of the proceeds thereof nor the provisions of any other Loan Documents will violate any Requirement of Law or Contractual Obligation (other than violations the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases) of any Borrower or of any Subsidiary of a Borrower and will not result in, or require, the creation or imposition of any Lien (other than the Liens created hereunder) on any of its respective properties or revenues pursuant to any such Requirement of Law or Contractual Obligation.

6.11   <u>No Default</u>.  No Borrower nor any Subsidiary of a Borrower is in default under or with respect to any of its Contractual Obligations regarding Servicing Rights in any respect. No Default or Event of Default has occurred and is continuing.

6.12   <u>Collateral; Collateral Security; Administrative Priority</u>.

(a)   No Borrower has assigned, pledged, or otherwise conveyed or encumbered any Collateral to any other Person except as permitted hereunder.  The Borrowers represents that they are the sole owners of the First Lien Collateral and have good and marketable title thereto, free and clear of all Liens, and no Person other than a Borrower or has any Lien on any First Lien Collateral, other than the Lien of the Administrative Agent hereunder.

(b)   The provisions of this Loan Agreement, together with the Interim Order (or the Final Order, when applicable), are effective to create in favor of the Administrative Agent a valid and perfected security interest in all right, title and interest of the Borrowers in, to and under the Collateral.

(c)   Upon the entry of the Interim Order (or the Final Order when applicable), the Administrative Agent has a fully perfected first priority security interest in the First Lien Collateral (including the LNFA Mortgage Notes, the LNFA Mortgage Loans and, with respect to each LNFA Mortgage Loan, in the mortgagee's interest in the related Mortgaged Property).

(d)   Upon the entry of the Interim Order (or the Final Order, as applicable), the security interests granted hereunder in the Collateral will constitute fully perfected security interests with the priority provided for herein in all right, title and interest of the Borrowers in, to and under the Collateral.

(e)   With respect to each LNFA Mortgage Loan included in the Tranche A Borrowing Base, the Borrowers have delivered the Mortgage File including the Mortgage Note to the Custodian to hold pursuant to the Custodial Agreement.

(f)   As of the Closing Date, the Obligations of the Borrowers will constitute allowed administrative expenses in the Chapter 11 Case having priority in payment over all other administrative expenses and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject, as to priority, only to the Carve-Out Amount having priority over the Obligations to the extent set forth in the definition thereof.

(g)    The Lien and security interest of the Administrative Agent on (i) the First Lien Collateral is a valid and perfected first priority Lien and (ii) the other Collateral is a valid and perfected Lien subject, as to priority, only to Liens existing on the Filing Date securing the Senior Claims.

6.13    Chief Executive/Operating Offices.  The chief executive office and the chief operating office of each of the Borrowers and each of their Subsidiaries for the period from (a) the earlier of 5 years prior to the Closing Date and the date that such Person was organized, through and including (b) the Closing Date, is specified on Schedule 6.13.

6.14    Location of Books and Records.  The location where each Borrower keeps its books and records including all computer tapes and records relating to the Collateral is at 18400 Von Karman Avenue, Suite 1000, Irvine, California and the office of the Custodian as set forth in the Custodial Agreement.

6.15    True and Complete Disclosure.  The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of the Borrowers to any Agent or any Lender in connection with the negotiation, preparation or delivery of this Loan Agreement, the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading. All written information furnished after the date hereof by or on behalf of the Borrowers to any Agent or any Lender in connection with this Loan Agreement, the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect, or (in the case of the Budget (other than historical information) or projections) based on reasonable estimates, on the date as of which such information is stated or certified.  There is no Material Adverse Change and no fact known to a Responsible Officer that, after due inquiry, could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Lenders for use in connection with the transactions contemplated hereby or thereby.

6.16    ERISA.  Each Plan to which a Borrower or its Subsidiaries make direct contributions, and, to the knowledge of each Borrower, each other Plan and each Multiemployer Plan, is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Code and any other Federal or State law. No event or condition has occurred and is continuing as to which any Borrower would be under an obligation to furnish a report to the Agents under Section 7.01(g) hereof.  No accumulated funding deficiency (as defined in Section 412 of the Code or Section 302 of ERISA) has occurred with respect to any Plan. No Borrower nor any ERISA Affiliate is subject to any present or potential liability under Title IV of ERISA which, individually or in the aggregate, could have a Materially Adverse Effect. No material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Plan or trust established under Title IV of ERISA has been, or is expected by any Borrower or any ERISA Affiliate to be, incurred by any Borrower or any ERISA Affiliate.  No Borrower nor any ERISA Affiliate has any contingent liability with respect to any post-retirement benefit under any "welfare plan" (as

defined in <u>Section 3(1)</u> of ERISA), other than liability for continuation coverage under Part 6 of Title I of ERISA. No lien under <u>Section 412(n)</u> of the Code or 302(f) of ERISA or requirement to provide security under <u>Section 401(a)(29)</u> of the Code or <u>Section 307</u> of ERISA has been or is reasonably expected by any Borrower or any ERISA Affiliate to be imposed on the assets of any Borrower or any ERISA Affiliate. No Borrower, the Company nor any ERISA Affiliate has engaged in any transaction prohibited by <u>Section 408</u> of ERISA or <u>Section 4975</u> of the Code. As of the Closing Date and throughout the term of the Loan Agreement, each Borrower is not and will not be an "employee benefit plan" as defined in <u>Section 3(3)</u> of ERISA, which is subject to Title I of ERISA, and none of the assets of the Borrowers will constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or section 4975 of the Code.

6.17    <u>No Agent or Lender Licenses</u>. No Lender or Agent will be required as a result of this Loan Agreement or the financing or taking a pledge of the Mortgage Loans to be licensed, registered or approved or to obtain permits or otherwise qualify (i) to do business in any state in which it is not currently so required or (ii) under any state consumer lending, fair debt collection or other applicable state statute or regulation.

6.18    <u>Subsidiaries</u>. All of the Subsidiaries of the Borrowers at the date hereof are listed on <u>Schedule 6.18</u> to this Loan Agreement.

6.19    <u>Origination of LNFA Mortgage Loans</u>. The LNFA Mortgage Loans were originated in all material respects pursuant to origination practices that are legal and proper, prudent, and customary in the residential mortgage loan servicing business.

6.20    <u>Fraudulent Conveyance</u>. None of the Borrowers is transferring any Mortgage Loans with any intent to hinder, delay or defraud any of its respective creditors.

6.21    <u>Orders</u>. The Interim Order (or the Final Order, when applicable) is in full force and effect, and has not been reversed, stayed, modified or amended absent the consent of the Lenders and the Borrowers.

6.22    <u>Servicing Advances</u>. To the extent that any Tranche B Advances are outstanding, the Borrowers hold all rights, title and interest in the Servicing Advances free and clear of all Liens, counterclaims, defenses and rights of set-off.

(b)    Any Servicing Advances which are included in the Borrowing Base hereunder qualify as Servicing Advances under the relevant securitization documents, and the Borrowers have no reason to believe that the foregoing do not qualify for reimbursement to the extent of available funds under the terms of the related securitization documents.

(c)    Any Servicing Advances which are included in the Borrowing Base hereunder are outstanding and have not been waived by or reimbursed to the Borrowers or any of their Affiliates.

6.23    <u>Collection Accounts and Escrow Accounts</u>. The collection accounts and escrow accounts of the Servicer held for the benefit of third parties (including, without limitation, any collection and escrow accounts required to be maintained pursuant to the governing Securitization Trust documents) shall be fully funded (or the applicable amounts shall

be on deposit in segregated accounts) in accordance with the terms of the applicable securitization documents. At any time upon the request of either Agent, the Borrowers shall provide an officer's certificate in support thereof, in form and substance satisfactory to such Agent.

**Section 7.    Covenants of the Borrowers**. Each Borrower covenants and agrees with the Agents and the Lenders that, so long as any Advance is outstanding and until payment in full of all Obligations:

7.01    Financial Statements and Other Information. The Borrowers shall deliver (or cause to be delivered) to each Agent and each Lender:

(a)    by the 15th and last day of each month, the Borrowers shall update the Budget, such updated Budget to be reasonably satisfactory to the Agents and to include actual numbers for historical periods included in the Budget;

(b)    contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Borrowers in the Chapter 11 Cases, with copies of such papers and documents also provided to or served on the Agents' counsel;

(c)    promptly after the sending thereof, copies of all material written reports and all term sheets for a plan of reorganization given by the Borrowers to the Committee or any other official or unofficial creditors' committee in the Chapter 11 Cases;

(d)    promptly after receipt thereof, monthly investor reports for the CCM Fund LP Interest;

(e)    the various borrowing base certificates, reports and other deliveries set forth on Schedule 7.01(e), as and when required by such schedule;

(f)    from time to time such other information regarding the financial condition, operations, or business of the Borrowers or any Affiliate of the Borrowers as any Agent or any Lender may reasonably request; and

(g)    as soon as reasonably possible, and in any event within ten (10) Business Days after a Responsible Officer knows, or with respect to any Plan or Multiemployer Plan to which any Borrower or any of its Subsidiaries makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by a senior financial officer of the Administrative Borrower setting forth details respecting such event or condition and the action, if any, that such Borrower or its ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by the Borrowers or an ERISA Affiliate with respect to such event or condition):

(i)    any reportable event, as defined in Section 4043(b) of ERISA and the regulations issued thereunder, with respect to a Plan, as to which PBGC has not by regulation or otherwise waived the requirement of Section 4043(a) of ERISA that it be

notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, including, without limitation, the failure to make on or before its due date a required installment under Section 412(m) of the Code or Section 302(e) of ERISA, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the Code); and any request for a waiver under Section 412(d) of the Code for any Plan;

(ii)     the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or any action taken by the Borrower, the Company or an ERISA Affiliate to terminate any Plan;

(iii)     the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(iv)     the complete or partial withdrawal from a Multiemployer Plan by any Borrower or any ERISA Affiliate that results in liability under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

(v)     the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days; and

(vi)     the adoption of an amendment to any Plan that, pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if any Borrower or an ERISA Affiliate fails to timely provide security to such Plan in accordance with the provisions of said Sections.

7.02     Litigation.    Each Borrower shall promptly, and in any event within 5 Business Days after service of process on such Borrower, give to the Agents and the Lenders notice of all legal or arbitrable proceedings affecting the Borrowers that questions or challenges the validity or enforceability of any of the Loan Documents or as to which there is a reasonable likelihood of adverse determination which would result in a Material Adverse Effect.

7.03     Existence, Etc.    Each Borrower shall:

(a)     preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises to the extent related to the First Lien Collateral;

(b)     comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities (including, without limitation, truth in lending, real estate settlement procedures and all environmental laws) if failure to comply with such requirements

would be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(c)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

(d)    not move its chief operating office from the addresses referred to in Section 6.13 unless it shall have provided the Administrative Agent 30 days prior written notice of such change;

(e)    pay and discharge and make deposit of all Taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property or which it is otherwise required to deposit prior to the date on which such Taxes are due, except for any such Tax, assessment, charge or levy (excluding payroll Taxes) the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained in accordance with GAAP or except as permitted by the Bankruptcy Code; and

(f)    permit representatives of any Agent, any Lender or any Lender-Related Party, during normal business hours upon one (1) Business Day's prior written notice at a mutually desirable time (or at any time and from time to time during the continuance of an Event of Default), to examine, copy and make extracts from its and the Servicer's books and records, to inspect any of its and the Servicer's Properties, and to discuss its and the Servicer's business and affairs with its and the Servicer's officers, all to the extent reasonably requested by any Agent, any Lender or any Lender-Related Party.

7.04    Prohibition of Fundamental Changes.    Except for Permitted Dispositions, no Borrower will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets.

7.05    Borrowing Base Deficiency.    If at any time there exists a Borrowing Base Deficiency the Borrowers shall cure such Borrowing Base Deficiency in accordance with Section 2.06 hereof.

7.06    Satisfaction of Conditions Precedent for the Final Order.    Each Borrower shall use its reasonable best efforts to satisfy the conditions precedent to obtain the Final Order by _____, 2007.

7.07    Notices.    Each Borrower shall give notice to the Agents and the Lenders promptly:

(a)    upon any Borrower becoming aware of, and in any event within one (1) Business Day after, the occurrence of any Default or Event of Default or any event of default or default under any other material agreement of a Borrower (except any such default the enforcement of which is stayed by the filing of the Chapter 11 Cases);

(b)    upon, and in any event within one (1) Business Day after, service of process on any Borrower or any Affiliate of any Borrower, or any agent thereof for service of

process, in respect of any legal or arbitrable proceedings affecting any Borrower or any Subsidiary or Affiliate of any Borrower (i) that questions or challenges the validity or enforceability of any of the Loan Documents or (ii) in which the amount in controversy exceeds $1,000,000, unless such proceeding is stayed by the commencement of the Chapter 11 Cases;

(c)    upon any Borrower becoming aware of any default related to any First Lien Collateral, any Material Adverse Change, or any Material Adverse Effect;

(d)    upon any Borrower becoming aware during the normal course of its business that the Mortgaged Property in respect of any LNFA Mortgage Loan or Mortgage Loans with an aggregate unpaid principal balance of at least $400,000 has been damaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty, or otherwise damaged so as to materially and adversely affect the Lending Value of such Mortgage Loan; and

(e)    upon the entry of a judgment or decree affecting the Borrowers in an amount in excess of $100,000, unless collection of such judgment or decree is stayed by the commencement of the Chapter 11 Cases.

Each notice pursuant to this <u>Section 7.07</u> shall be accompanied by a statement of a Responsible Officer of the applicable Borrower setting forth details of the occurrence referred to therein and stating what action the applicable Borrower has taken or proposes to take with respect thereto.

7.08    <u>Servicing</u>.

(a)    Each Borrower shall not permit any Person other than NCMC to service LNFA Mortgage Loans without the prior written consent of the Agents, which consent shall not be unreasonably withheld.

(b)    Each Borrower shall cooperate fully with the Agents in the exercise of each of the call options relating to the Securitization Trusts.

(c)    Each Borrower shall agree to apply the collection of Servicing Advances in compliance with the related Securitization Trust documents.

(d)    The Borrowers shall continue to fund all principal and interest advances and New Servicing Advances to the extent necessary to ensure that each Securitization Trust's advance requirement is fully funded each month.

7.09    <u>Servicing Advances</u>.    Each Borrower shall seek reimbursement of Servicing Advances consistent with past practices.

7.10    <u>Lines of Business</u>.    The Borrowers will not engage to any substantial extent in any line or lines of business activity other than the businesses engaged in by the Borrowers as of the Closing Date.

7.11    <u>Transactions with Affiliates</u>.    Other than with respect to transactions solely among the Borrowers, no Borrower will enter into any transaction, including, without limitation,

any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is (a) otherwise permitted under this Loan Agreement or the other Loan Documents, (b) in the ordinary course of such Borrower's business and (c) upon fair and reasonable terms no less favorable to such Borrower than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate, or make a payment that is not otherwise permitted by this Section 7.11 to any Affiliate.

7.12    Use of Proceeds. The Borrowers will use the proceeds of (a) the Tranche A Advances for general corporate purposes of the Borrowers in accordance with the Budget (including to fund an orderly Section 363 sale process and payment of Priority Professional Expenses (as defined in the applicable Order)), (b) the Tranche B Advances to repay the Obligations (as defined in the Citigroup Servicer Advance Facility Agreement), for general corporate purposes and to fund New Servicing Advances and (c) all Advances to fund Lender Expenses, Agent Advances and fees pursuant to Section 3.07(a) and the repayment of any other Obligations.

7.13    Limitation on Liens. No Borrower will, nor will it permit or allow others to, create, incur or permit to exist any Lien, security interest or claim on or to any of its Property that constitutes First Lien Collateral, except for (i) with respect to LNFA Mortgage Loans, Eligible Mortgage Permitted Liens, **[(ii) Liens set forth on Schedule 7.13]** and (iii) liens on the Collateral created pursuant to this Loan Agreement and the other Loan Documents. Each Borrower will defend the Collateral against, and will take such other action as is necessary to remove, any Lien, security interest or claim on or to the Collateral, other than the security interests created or allowed under this Loan Agreement, and each Borrower will defend the right, title and interest of the Agents and the Lenders in and to any of the First Lien Collateral against the claims and demands of all persons whomsoever.

7.14    Limitation on Sale of Assets. No Borrower will convey, sell, lease, assign, transfer or otherwise dispose of (collectively, "Transfer"), any of its Property, business or assets (including, without limitation, receivables and leasehold interests) whether now owned or hereafter acquired, other than Permitted Dispositions.

7.15    Limitation on Distributions. Without the Lenders' consent, no Borrower will make any payment on account of, or set apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any stock or senior or subordinate debt of such Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of such Borrower.

7.16    Restricted Payments. No Borrower shall make any Restricted Payments other than Restricted Payments by any Borrower to any other Borrower.

7.17    Loans, Advances, Investments, Etc. Except for Servicer Advances, the Borrowers shall not make or commit or agree to make any loan, advance, guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Capital Stock, bonds, notes, debentures or other securities of,

or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or permit any of its Subsidiaries to do any of the foregoing, except for: (i) investments existing on the Closing Date, as set forth on <u>Schedule 7.17</u> hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof, (ii) loans and advances by any Borrower to another Borrower made in the ordinary course of business, (iii) to the extent permitted by <u>Section 7.30</u>, Mortgage Loans made by the Borrowers in the ordinary course of business and (iv) cash and Cash Equivalents held in Control Accounts and the Advance Account.

> 7.18    <u>Orders, Administrative Priority; Lien Priority; Payment of Claims</u>.

(a)    The Borrowers shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Orders except for modifications and amendments agreed to by the Agents.

(b)    The Borrowers shall not at any time suffer to exist a priority for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of the Lenders in respect of the Obligations, except for the Carve-Out Amount having priority over the Obligations to the extent set forth in the definition thereof.

(c)    The Borrowers shall not at any time suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Agents and the Lenders in respect of the Collateral except for Liens permitted under <u>Section 7.13</u> hereof.

(d)    Prior to the date on which the Obligations have been paid in full in cash and the Commitments have been terminated, the Borrowers shall not pay any administrative expense claims except (i) Priority Professional Expenses (as defined in the applicable Order) and other payments pursuant to the definition of the term "Carve-Out Amount," (ii) any Obligations due and payable hereunder, (iii) other administrative expense claims incurred in the ordinary course of the business of the Borrowers or their respective Chapter 11 Cases and (iv) as otherwise provided in the Orders.

> 7.19    <u>Information from Servicing Transmission</u>. Each Borrower shall provide (or cause to be provided) to the Agents and the Lenders on a monthly basis no later than 11:00 a.m. eastern time two (2) Business Days prior to each Payment Date (or such other day requested by the Administrative Agent) (i) the Servicing Transmission, on a loan-by-loan basis and in the aggregate, with respect to the LNFA Mortgage Loans serviced by the Servicer, summarizing the Servicer's delinquency and loss experience with respect to LNFA Mortgage Loans serviced by the Servicer (including, in the case of the LNFA Mortgage Loans, the following categories: current, 30-59, 60-89, 90-119, 120-149 and 150+) and (ii) any other information reasonably requested by any Agent or any Lender with respect to the LNFA Mortgage Loans. Each

Borrower also agrees to provide such other information regarding the LNFA Mortgage Loans as any Agent or any Lender may reasonably request from time to time.[3]

       7.20   Residuals Information. Each Borrower shall provide (or cause to be provided) to the Agents and the Lenders on a monthly basis no later than ___ days after the last day of each month monthly remittance information regarding the Residuals and the monthly data tape for the underlying Mortgage Loans. Each Borrower also agrees to provide such other information regarding the residuals as any Agent or any Lender may reasonably request from time to time.

       7.21   No Amendment or Waiver. No Borrower will, without the prior consent of the Lenders, nor will it permit or allow others to amend, modify, terminate or waive any provision of any LNFA Mortgage Loan to which such Borrower is a party in any manner which shall reasonably be expected to materially and adversely affect the value of such Mortgage Loan as Collateral.

       7.22   Maintenance of Property; Insurance. Each Borrower shall keep all of its property useful and necessary in its business in good working order and condition. Each Borrower shall maintain errors and omissions insurance or mortgage impairment insurance and blanket bond coverage in such amounts as are in effect on the Closing Date (as disclosed to the Lenders in writing) and shall not permit the reduction of such coverage without the written consent of the Lenders, and shall also cause to be maintained such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

       7.23   Further Identification of Collateral. Each Borrower will furnish (or cause to be furnished) to the Agents and the Lenders from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as any Agent or any Lender may reasonably request, all in reasonable detail.

       7.24   Interest Rate Protection Agreements. At either Agent's request, the Borrowers shall deliver (or cause to be delivered) to the Agents and the Lenders any and all information relating to Interest Rate Protection Agreements.

       7.25   Alternative Collateral. No Borrower will cause or permit any LNFA Mortgage Loan which is at any time used as collateral for an Advance hereunder to be subsequently used during the term hereof as collateral pursuant to any other financing, note purchase, loan warehouse, repurchase or similar facility maintained by a Borrower with any third party without the express written consent of the Agents and the Lenders, unless such Mortgage Loan is no longer a LNFA Mortgage Loan or has otherwise been released by the Administrative Agent pursuant to Section 4.13 of this Loan Agreement.

---

[3] Discuss additional information regarding MSRs.

7.26    ERISA.  No Borrower will engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by any Agent or any Lender of any of its rights under this Loan Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or result in a violation of a state statute regulating governmental plans that would subject the Lender to liability for a violation of ERISA or such state statute.

7.27    Other Indebtedness.  The Borrowers shall not incur any other Indebtedness (including any accrued interest thereon), other than Indebtedness incurred under this Loan Agreement and Indebtedness set forth on Schedule 7.27.

7.28    Pooling and Servicing Agreements.  Without the consent of the Lenders and subject to the Orders, the Borrowers shall not modify or permit the modification of the Pooling and Servicing Agreements relating to any asset included in the Borrowing Base (including the Residuals, the Servicing Rights and the Servicing Advances) that could have a material adverse effect on such asset.

7.29    No Waiver of Servicing Advances.  Without the consent of the Agents, if there are any outstanding Tranche B Advances, the Borrowers shall not, at any time thereafter while Tranche B Advances are outstanding, waive reimbursement of any Servicing Advances due to the servicer.  While it is the servicer of any Securitization Trust related to the Residuals, the Borrowers shall repurchase mortgage loans from the Securitization Trusts consistent with past practices and the applicable Pooling and Servicing Agreements to manage delinquency and loss triggers enabling the Residuals to cash flow.

7.30    Mortgage Loan Originations and Commitments.  Without the consent of the Lenders, the Borrowers shall not originate or become legally committed to originate any Mortgage Loan until the Borrowers have obtained approval from the Bankruptcy Court of a committed "stalking horse bid" for the Borrowers' loan origination business reasonably acceptable to the Agents.

7.31    Funding of Collection Accounts and Escrow Accounts.  If the collection accounts and escrow accounts of the Servicer held for the benefit of third parties (including, without limitation, any collection and escrow accounts required to be maintained pursuant to the governing Securitization Trust documents) are not fully funded (or the applicable amounts on deposit in segregated accounts) in accordance with the terms of the applicable securitization documents, the Borrowers shall fully fund such accounts within five (5) days of the earlier of (a) obtaining knowledge thereof or (b) notice from either Agent.

7.32    Retention of Lazard and Alix Partners.  The Borrowers shall continue to retain each of Lazard Freres & Co. and Alix Partners to perform substantially the same duties as conducted by such Person as of the Closing Date.

**Section 8.    Events of Default.**  Each of the following events shall constitute an event of default (an "Event of Default") hereunder:

(a)    the Borrowers shall fail to make a payment of any principal of or interest on any Advance when such payment is due (whether at stated maturity or upon acceleration); or

(b)     the Borrowers shall fail to comply with Section 7.05 or shall fail to make any mandatory prepayment under Section 2.06 to cure a Borrowing Base Deficiency; or

(c)     the Borrowers (i) shall fail to remit to the Tranche A Collection Account, the Tranche B Collection Account or the General Collection Account any amounts to be so remitted within 1 Business Day of when due or (ii) shall default in the payment of any other Obligation or any other amount due under any other Loan Document, and such default shall have continued unremedied for 1 Business Day; or

(d)     the Servicer or any Subservicer shall fail to remit to the Tranche A Collection Account any material amount required to be so remitted within 1 Business Day of the date required; or

(e)     any representation, warranty or certification made or deemed made herein (including in Section 6) or in any other Loan Document by any Borrower or any certificate furnished to any Agent or any Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(f)     either Agent determines that any collection accounts or escrow accounts for any of the Securitization Trusts are underfunded in any material respect and such underfunding is not cured within 2 Business Days; or

(g)     (i) the Borrowers shall fail to comply with the requirements of Section 7.02, Section 7.03(a), Section 7.07(a), Section 7.08, Sections 7.12 through 7.18, Section 7.21 or Sections 7.25 through 7.32 hereof; or (ii) the Borrowers shall otherwise fail to observe or perform any other agreement contained in this Loan Agreement or any other Loan Document and such failure to observe or perform shall continue unremedied for a period of 3 Business Days; or

(h)     except for any judgment the enforcement of which is stayed by the commencement of the Chapter 11 Cases, a final judgment or judgments for the payment of money in excess of $1,000,000 in the aggregate per calendar year (to the extent that it is, in the reasonable determination of either Agent, uninsured and provided that any insurance or other credit posted in connection with an appeal shall not be deemed insurance for these purposes) shall be rendered against any Borrower or any of its Subsidiaries by one or more courts, administrative tribunals or other bodies having jurisdiction over them and the same shall not be discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof and any such Borrower or any such Subsidiary shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed or bonded, appeal therefrom and cause the execution thereof to be stayed during such appeal; or

(i)     the Custodial Agreement or any other Loan Document shall for whatever reason (including an event of default thereunder) be terminated or the lien on the Collateral created by this Loan Agreement and the Orders, any Borrower's material obligations hereunder or under any Loan Document shall cease to be in full force and effect or, in either Agent's good

faith determination, otherwise cease to benefit any Agent or any Lender, or the enforceability thereof shall be contested by any Borrower; or

(j)    the occurrence of a Material Adverse Change or a Material Adverse Effect; or

(k)    (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any material "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, any Borrower or any ERISA Affiliate shall fail to make a required installment payment to any Plan on or before the date due under Section 302 of ERISA or Section 412 of the Code, or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Borrower or any ERISA Affiliate, (iii) a reportable event as defined in Section 4043(b) of ERISA and the regulations issued thereunder shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Plan, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Plan shall terminate for purposes of Title IV of ERISA, (v) any Borrower or any ERISA Affiliate shall, or in the reasonable opinion of either Agent is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan, (vi) any Borrower or any ERISA Affiliate shall fail to pay when due or is in default on an amount which it shall have become liable to pay to the PBGC, any Plan, any Multiemployer Plan or a trust established under Section 4049 of ERISA, or (vii) a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that an ERISA Plan must be terminated or have a trustee appointed to administer any ERISA Plan, (viii) any other event or condition shall occur or exist with respect to any Plan which could subject any Borrower or any ERISA Affiliate to any tax, penalty or other liability or the imposition of any lien or security interest on any Borrower or any ERISA Affiliate, (ix) any Borrower shall incur any liability for any post-retirement or post-termination health or life insurance or (x) the assets of any Borrower become or are deemed to be "plan assets" of a plan subject to ERISA or section 4975 of the Code. No Event of Default shall be deemed to be, or have been, waived or corrected because of any disclosure by any Borrower; and in each case in clauses (i) through (ix) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(l)    any Change of Control; or

(m)    any Borrower shall grant, or suffer to exist, any Lien on any Collateral except the Liens in favor of the Administrative Agent and the Secured Parties and other Permitted Liens; or the Liens granted hereunder shall cease to be valid and perfected first priority Liens on the First Lien Collateral in favor of the Agents and the Lenders or there shall be Liens in favor of any Person, except in each case as permitted hereunder; or

(n)    any Borrower shall default under, or fail to perform as required under, or shall otherwise materially breach the terms of any instrument, agreement or contract between such Borrower, on the one hand, and any Agent, any Lender or any of their respective Affiliates on the other; or any Borrower shall default under, or fail to perform as requested under, the terms

of any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds or Indebtedness in excess of $500,000 entered into by such Borrower and any third party, which default or failure entitles any party to require acceleration, prepayment, redemption, purchase or defeasement of any Indebtedness thereunder or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof, excluding, in each case, Indebtedness under this Loan Agreement or any pre-petition **[repurchase agreement,]** loan and security agreement or similar credit facility or agreement for borrowed funds or Indebtedness not affirmed by the Borrowers post-petition and approved by the Bankruptcy Court; or

(o)    an event of default shall have occurred under the Orders or any Control Agreement; or

(p)    to the extent that Advances are supported by Eligible MSRs or Servicing Advances included in the Borrowing Base, servicing of the assets underlying any material portion of such Eligible MSRs or Servicing Advances is transferred to a third party unless, in connection with such transfer, the Borrowers repay any such Advances; or

(q)    the Bankruptcy Court shall not have entered the Final Order by May ___, 2007; or

(r)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Borrower shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(s)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

(t)    (i) the Borrowers file a plan of reorganization in the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents on or before the effective date of such plan or plans or (ii) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents and the release of the Agents and the Lenders in full from all claims of the Borrowers and their respective estates on or before the effective date of such plan or plans upon entry thereof; or

(u)    an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents upon entry thereof; or

(v)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court or any other court of competent jurisdiction without the express prior

written consent of the Lenders, (i) to revoke, reverse, stay, vacate, rescind, modify, supplement or amend the Orders, this Loan Agreement or any other Loan Document or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrowers equal or superior to the priority of the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the definition of "Carve-Out Amount," or (iii) to grant or permit the grant of a Lien on the Collateral other than Liens permitted pursuant to Section 7.13 hereof; or

(w)    an application for any of the orders described in clauses (r), (s), (u), (v) or (aa) shall be made and, if made by a Person other than the Borrowers, such application is not being diligently contested by the Borrowers in good faith; or

(x)    except as permitted by the Orders or as otherwise agreed to by the Agents, the Borrowers shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court (x) in accordance with "first day" orders reasonably satisfactory to the Agents and [(y) **in connection with the assumption of executory contracts and unexpired leases**]; or

(y)    any Person challenges the rights of any Agent or any Lender under this Loan Agreement or any Loan Document, including, without limitation, the Liens hereunder; or

(z)    if by April 10, 2007 (i) the Bankruptcy Court does not enter an order approving Greenwich as the stalking horse bidder for the Purchased Assets as defined in the Commitment Letter dated March 30, 2007 between New Century and Greenwich or (ii) the Bankruptcy Court does not enter an order approving the related bid procedures in a form reasonably acceptable to Greenwich; or

(aa)    an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any of the Borrowers with respect to any claim which in the aggregate could have a Material Adverse Effect; provided, however, that it shall not be an Event of Default if relief from the automatic stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against the Borrowers, or (ii) to permit the commencement of and/or prosecution of a proceeding to collect against an insurance company.

**Section 9.**    **Remedies Upon Default**.

(a)    Upon the occurrence of one or more Events of Default (subject to the expiration of the applicable cure period contained therein), the Administrative Agent may, and shall at the request of the Required Lenders or, so long as CIT is the Documentation Agent, the Documentation Agent, immediately declare the principal amount of the Advances then outstanding to be immediately due and payable, together with all interest and other amounts payable hereunder (including amounts payable pursuant to Sections 2.05, and 3.07 hereof) thereon and reasonable fees and out-of-pocket expenses accruing under this Loan Agreement. Upon such declaration, the balance then outstanding shall become immediately due and payable, without further order of, or application to, the Bankruptcy Court, without presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by each Borrower and the Administrative Agent may exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code), hereunder and under the other Loan Documents, including, but not limited to, the transfer of servicing of the Collateral or the liquidation of the Collateral on a servicing released basis; provided, however, in accordance with the Orders, the Administrative Agent may not consummate foreclosure on the Collateral or otherwise seize control of assets of the Borrowers' Estates (as such term is defined in the Bankruptcy Code) absent 3 Business Days' written notice of an Event of Default hereunder .

(b)    Upon the occurrence of one or more Events of Default, the Administrative Agent shall have the right to obtain physical possession of the Servicing Records and all other files of the Borrowers relating to the Collateral and all documents relating to the Collateral which are then or may thereafter come in to the possession of the Borrowers or any third party acting for the Borrowers and the Borrowers shall deliver to the Administrative Agent such assignments as the Administrative Agent shall request. The Administrative Agent shall be entitled to specific performance of all agreements of the Borrowers contained in this Loan Agreement.

**Section 10.**    **Agents.**

10.01    Appointment. Each Lender (and each subsequent holder of any Advances by its acceptance thereof), hereby irrevocably appoints and authorizes each Agent to perform the duties of such Agent as set forth in this Loan Agreement including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Advances outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and to distribute promptly to each Lender its Pro Rata Share of all payments so received, (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Loan Agreement, provided that such Agent shall not have any liability to the Lenders for such Agent's inadvertent failure to distribute any such notices or agreements to the Lenders and (iii) subject to Section 10.03 of this Agreement, to take such action as such Agent deems appropriate on its behalf to administer the Advances and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof

and thereof. As to any matters not expressly provided for by this Loan Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Notes), each Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all subsequent holders of Notes; provided, however, that no Agent shall be required to take any action which, in the reasonable opinion of such Agent, exposes such Agent to liability or which is contrary to this Loan Agreement or any Loan Document or applicable law.

        10.02 <u>Nature of Duties</u>. The Administrative Agent shall have no duties or responsibilities except those expressly set forth in this Loan Agreement or in the Loan Documents. The duties of the Administrative Agent shall be mechanical and administrative in nature. The Administrative Agent shall not have by reason of this Loan Agreement or any Loan Document a fiduciary relationship in respect of any Lender. Nothing in this Loan Agreement or any of the Loan Documents, express or implied, is intended to or shall be construed to impose upon the Administrative Agent any obligations in respect of this Loan Agreement or any of the Loan Documents except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Borrowers in connection with the making and the continuance of the Advances hereunder and shall make its own appraisal of the creditworthiness of the Borrowers and the value of the Collateral, and no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the initial Advances hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Administrative Agent shall provide to such Lender any documents or reports delivered to the Administrative Agent by the Borrowers pursuant to the terms of this Loan Agreement or any Loan Document. If either Agent seeks the consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. The applicable Agent shall promptly notify each Lender any time that the Required Lenders have instructed such Agent to act or refrain from acting pursuant hereto.

        10.03 <u>Rights, Exculpation, Etc</u>. Each Agent and its directors, officers, agents or employees shall not be liable to the Secured Parties or their participants or assignees for any action taken or omitted to be taken by it under or in connection with this Loan Agreement or the other Loan Documents. Without limiting the generality of the foregoing, each Agent (i) may treat the payee of any Note as the holder thereof until such Agent receives written notice of the assignment or transfer thereof, pursuant to <u>Section 11.16</u> hereof, signed by such payee and in form satisfactory to the Administrative Agent; (ii) may consult with legal counsel (including, without limitation, counsel to such Agent or counsel to the Borrowers), independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Secured Party and shall not be responsible to any Secured Party for any statements, certificates, warranties or representations made in or in connection with this Loan Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Loan Agreement or the other Loan Documents on the part of any Person, the

existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other Property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Loan Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Borrower in connection therewith, nor shall either Agent be responsible or liable to the Secured Parties for any failure to monitor or maintain any portion of the Collateral.    The Administrative Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to <u>Section 3.03</u>, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Secured Party to whom payment was due but not made, shall be to recover from other Secured Parties any payment in excess of the amount which they are determined to be entitled. Each Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Loan Agreement or of any of the Loan Documents such Agent is permitted or required to take or to grant, and if such instructions are promptly requested, such Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Secured Party shall have any right of action whatsoever against either Agent as a result of such Agent acting or refraining from acting under this Agreement, the Notes or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

10.04  <u>Reliance</u>.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Loan Agreement or any of the Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

10.05  <u>Indemnification</u>.  To the extent that either Agent is not reimbursed and indemnified by any Borrower, the Lenders will reimburse and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Loan Agreement or any of the Loan Documents or any action taken or omitted by such Agent under this Loan Agreement or any of the Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, all advances and disbursements made pursuant to <u>Section 10.08</u>; provided, <u>however</u>, <u>that</u> no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such resulted from such Agent's gross negligence or willful misconduct.  The obligations of the Lenders under this <u>Section 10.05</u> shall survive the payment in full of the Advances and the termination of this Loan Agreement.

10.06  <u>Agent Individually</u>.  With respect to its Pro Rata Share of the Total Commitment hereunder, the Advances made by it and the Notes issued to or held by it, each

Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or holder of a Note. The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include such Agent in its individual capacity as a Lender or one of the Required Lenders. The term "Administrative Agent," "Agent" and "Documentation Agent" shall mean the applicable Agent solely in its individual capacity as such Agent hereunder. Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrowers as if it were not acting as an Agent pursuant hereto without any duty to account to the Lenders.

10.07   Successor Agent.

(a)      Either Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Administrative Borrower and each Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)      Upon any such notice of resignation, the other Agent shall appoint a successor Agent (or, in the event that such Agent's Pro Rata Share is less than fifty-one percent, the Required Lenders may appoint a successor Agent) who, in the absence of a continuing Event of Default, shall be reasonably satisfactory to the Administrative Borrower. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Loan Agreement and the other Loan Documents. After an Agent's resignation hereunder as an Agent, the provisions of this Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Loan Agreement and the other Loan Documents.

(c)      If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent shall then appoint a successor Agent who, if an Event of Default is not continuing, shall be reasonably satisfactory to the Administrative Borrower, who shall serve as an Agent until such time, if any, as the Required Lenders appoint a successor Agent as provided above.

10.08    Collateral Matters.

(a)    The Administrative Agent may from time to time, during the occurrence and continuance of a Default or Event of Default, make such disbursements and advances ("Agent Advances") which the Administrative Agent, in its sole discretion, deems necessary or desirable to preserve or protect the Collateral or any portion thereof, to make preparations for Collateral liquidation to enhance the likelihood or maximize the amount of repayment by the Borrowers of the Advances and other Obligations or to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 11.04. The Agent Advances shall be repayable on demand and be secured by the Collateral. In no event shall outstanding Agent Advances exceed 10% of the Tranche A Sublimit nor shall any Agent Advance be outstanding more than 30 days. The Agent Advances shall not constitute Advances but shall otherwise constitute Obligations hereunder. The Agent shall notify each Lender and the Administrative Borrower in writing of each Agent Advance, which notice shall include a description of the purpose of such Agent Advance. Without limitation to its obligations pursuant to Section 10.05, each Lender agrees that it shall make available to the Agent, upon the Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of such Agent Advance. If such funds are not made available to the Agent by such Lender, the Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate.

(b)    The Secured Parties hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Advances and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting Property being sold or disposed of pursuant to a Permitted Disposition or in the ordinary course of any Borrower's business and in compliance with the terms of this Loan Agreement and the other Loan Documents; or constituting Property in which the Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Required Lenders subject to Section 11.01.

(c)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the Secured Parties (as set forth in Section 10.08(b)), each Secured Party agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under Section 10.08(b). Upon receipt by the Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral (or, at the option of the Agent in the absence of such receipt, in reliance on Section 10.08(b)), and upon prior written request by any Borrower, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Secured Parties upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the

Obligations or any Lien upon (or obligations of any Borrower in respect of) all interests in the Collateral retained by any Borrower.

(d)    The Agent shall have no obligation whatsoever to any Secured Party to assure that the Collateral exists or is owned by the Borrowers or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Agreement has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this <u>Section 10.08</u> or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the Secured Parties and that the Agent shall have no duty or liability whatsoever to any other Secured Party.

(e)    The Agent acknowledges that, to the extent that the Collateral includes items (such as stock certificates, Residuals, instruments and chattel paper) which are held in the possession of the Agent, or a third party on its behalf, pursuant to the Loan Documents, the Agent is also holding such items in its possession as agent and bailee of the Secured Parties for the benefit of, and for purposes of perfecting the security interest of, the Secured Parties in such items.

10.09 <u>Documentation Agent.</u>  The Lender identified in this Agreement as the "Documentation Agent" shall not have any obligation, liability, responsibility or duty under this Loan Agreement other than those applicable to all Lenders.  Without limiting the foregoing, in no event shall the "Documentation Agent" have or be deemed to have a fiduciary relationship with any Lender.  Each Lender hereby makes the same acknowledgements with respect to the "Documentation Agent" as it makes with respect to the Administrative Agent in this <u>Section 10</u>.

## Section 11.    Miscellaneous.

11.01 <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement or any Note, and no consent to any departure by the Borrowers therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, and, in the case of an amendment, the Borrowers, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Advances payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any date fixed for any payment of principal of, or interest or fees on, the Advances payable to any Lender, in each case without the written consent of any Lender affected thereby, (ii) increase the Total Commitment, except as contemplated in the definition of "Maximum Credit," (iii) change the percentage of the Total Commitment or of the aggregate unpaid principal amount of the Notes that is required for the Lenders or any of them to take any action hereunder, (iv) amend the definition of "Required Lenders" or "Pro Rata Share," (v) release all or a substantial portion of the Collateral (except as otherwise provided in this Loan Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Administrative Agent for the benefit of

the Secured Parties, or release any Borrower, (vi) modify, waive, release or subordinate the super priority claim status of the Obligations (except as permitted in this Loan Agreement and the Loan Documents), (vii) amend, modify or waive this Section 11.01 of this Loan Agreement, in the case of clauses (ii) through (vii), without the written consent of each Lender, and (viii) amend, modify or waive this Loan Agreement in such a manner that by its terms disproportionately (in comparison with the other Tranche Lenders) affects the rights or duties under this Loan Agreement of any Tranche Lenders, without the written consent of such affected Tranche Lenders. Notwithstanding the foregoing, no amendment, waiver or consent shall affect the rights or duties of either Agent (but not in its capacity as a Lender) under this Loan Agreement or the other Loan Documents, unless in writing and signed by such Agent. The parties to this Loan Agreement acknowledge that all material amendments to this Loan Agreement will require the consent of the Bankruptcy Court.

    11.02  Waiver.  No failure on the part of any Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

    11.03  Notices.

    (a)      Except as otherwise expressly permitted by this Loan Agreement or expressly provided otherwise in the applicable Loan Document, all notices, requests and other communications provided for herein and under the other Loan Documents (including, without limitation, any modifications of, or waivers, requests or consents under, this Loan Agreement) shall be given or made in writing (including, without limitation, by telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof); or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Loan Agreement and except for notices given under Section 2 (which shall be effective only on receipt), all such communications shall be deemed to have been duly given when transmitted by telex or telecopier or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

    (b)      Nothing in this Loan Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrowers or any other Person to serve upon the Lenders in the manner prescribed by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure any pleading or notice required to be given to the Lenders pursuant to the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

11.04    Indemnification and Expenses.

(a)    Each Borrower shall hold each Agent, each Lender-Related Party and each Participant (each Agent, each Lender-Related Party and each Participant, an "Indemnified Party") harmless from and indemnify any Indemnified Party, on an after-Tax basis, against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, the "Indemnified Liabilities") relating to or arising out of this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby. Without limiting the generality of the foregoing, each Borrower agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Indemnified Liabilities with respect to all Mortgage Loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act or the Real Estate Settlement Procedures Act. In any suit, proceeding or action brought by an Indemnified Party in connection with any Mortgage Loan for any sum owing thereunder, or to enforce any provisions of any Mortgage Loan, each Borrower will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by any Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from any Borrower. Each Borrower also agrees to reimburse an Indemnified Party as and when billed by such Indemnified Party for all such Indemnified Party's costs and expenses incurred in connection with the enforcement or the preservation of such Indemnified Party's rights under this Loan Agreement any other Loan Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. Each Borrower hereby acknowledges that, notwithstanding the fact that the Advances are secured by the Collateral, the obligation of each Borrower with respect to each Advance is a recourse obligation of each Borrower. The foregoing to the contrary notwithstanding, the Borrowers shall have no obligation to any Indemnified Party under this Section 11.04 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

(b)    Each Borrower shall pay as and when billed by the Agents and the Lenders all of the Lender Expenses through the Closing Date, including all reasonable out-of-pocket costs and expenses (including reasonable fees, disbursements and expenses of counsel) incurred by the Agents, the Lenders and their Affiliates in connection with the development, due diligence review, preparation and execution of (A) this Loan Agreement and any other Loan Document; and (B) from and after the Closing Date, any Loan Document, amendment, restatement, supplement, or modification of this Loan Agreement or any other Loan Document. Each Borrower shall pay as and when billed by any Agent or any Lender all Lender Expenses from and after the Closing Date including all of the out-of-pocket costs and expenses

incurred by the Agents, the Lenders and any of their respective Affiliates in connection with the consummation and administration of the transactions contemplated hereby and thereby or with respect to the Collateral, including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel, (ii) search fees and filing and recording fees, (iii) all reasonable due diligence, inspection, testing and review costs and expenses, and (iv) those costs and expenses incurred pursuant to Sections 11.04(a), 11.04(f) and 11.16 hereof. Without limiting the foregoing, the Borrowers shall be required to pay the actual charges paid or incurred by any Agent, any Lender or any of their respective Affiliates for the services of any third-party hired by any Agent, any Lender or any of their respective Affiliates for performing financial audits, appraising the Collateral, or assessing compliance by any Borrower or any Affiliate or Subsidiary of any Borrower with the terms, conditions, representations and other provisions of any of the Loan Documents, including, without limitation, third-party underwriting and residual interest valuation firms.

(c)     Without limiting Section 11.04(b), the Lenders shall be authorized to engage a specialty finance consulting firm reasonably acceptable to the Borrowers to assist in reviewing and monitoring this Facility, the Borrowers' operations and business plan and such other matters as the Lenders shall reasonably require. The budget for such services will be reviewed with and subject to the reasonable approval of the Borrowers, and the cost of such engagement will be reimbursed by the Borrowers.

(d)     Without limiting Section 11.04(b), until the Servicing Rights and Servicing Advances are transferred to a third party and the Tranche B Advances are paid in full, the Lenders shall be authorized to engage BearingPoint, Inc. or such other firm acceptable to the Lenders to perform monthly verification of compliance with the Tranche B Borrowing Base, including verification of advance balances, payment posting and account reconciliation. The costs and expenses of such engagement shall be reimbursed by the Borrowers and shall be subject to the limitations set forth in Section 11.04(g).

(e)     The Borrowers shall pay to the Administrative Agent all audit, appraisal, and valuation fees and charges for each financial audit of any Borrower or the Collateral, expenses incurred by any Lender-Related Party for the establishment of electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to monitor or assess the performance of any Borrower under any of the Loan Documents.

(f)     Each Borrower acknowledges that each Agent and each Lender has the right to perform continuing due diligence reviews with respect to any or all of the First Lien Collateral or the Borrowers, as desired by such Agent or such Lender from time to time, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and each Borrower agrees that such Agent or such Lender or its authorized representatives will be permitted during normal business hours on any business day to examine, inspect, make copies of, and make extracts of, the Mortgage Files and any and all documents, records, agreements, instruments or information relating to the Collateral in the possession, or under the control, of the Borrowers or the Custodian. Each Borrower also shall make available to the Agents and the Lenders a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Collateral. The Borrowers, the Agents and the Lenders further agree that all reasonable out-of-pocket costs and expenses incurred by the

Agents and the Lenders in connection with any Agent's or any Lender's due diligence review of Collateral pursuant to this <u>Section 11.04(f)</u> shall be paid by the Borrowers.

(g)    Unless an Event of Default has occurred and is continuing, the costs and expenses incurred in connection with <u>Section 11.04(d)</u> and of any third-party appraisal of the Collateral shall not exceed $50,000 for the first 30 days following the Closing Date and $35,000 per 30-day period thereafter.

11.05    <u>Amendments</u>.    Except as otherwise expressly provided in this Loan Agreement, any provision of this Loan Agreement may be modified or supplemented only by an instrument in writing signed by the Borrowers, the Agents and the Lenders required pursuant to <u>Section 11.01</u> and any provision of this Loan Agreement may be waived by the Lenders required pursuant to <u>Section 11.01</u>.

11.06    <u>Successors and Assigns</u>.    This Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.07    <u>Survival</u>.    The obligations of the Borrowers under <u>Sections 3.06</u> and <u>11.04</u> hereof shall survive the payment of the Obligations and the termination of this Loan Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Agents and the Lenders shall not be deemed to have waived, by reason of making any Advance, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Agents and the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Advance was made.

11.08    <u>Captions</u>.    The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Loan Agreement.

11.09    <u>Counterparts; Telefacsimile Execution</u>.    This Loan Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Loan Agreement by signing any such counterpart. Delivery of an executed counterpart of this Loan Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Loan Agreement. Any party delivering an executed counterpart of this Loan Agreement by telefacsimile also shall deliver an original executed counterpart of this Loan Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Loan Agreement. This Section shall apply to each other Loan Document *mutatis mutandis*.

11.10    <u>LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT; GOVERNING LAW</u>.    THIS LOAN AGREEMENT SHALL BE GOVERNED BY NEW YORK LAW WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS LOAN AGREEMENT), EXCEPT AS

GOVERNED BY THE BANKRUPTCY CODE, AND SHALL CONSTITUTE A SECURITY AGREEMENT WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE.

        11.11   CERTAIN WAIVERS; WAIVER OF JURY TRIAL.

        (a)   EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO OR IN THE NATURE OF SET-OFF, ABATEMENT, SUSPENSION, RECOUPMENT OR OTHER RIGHT TO WITHHOLD ANY PAYMENT OR PERFORMANCE DUE BY SUCH BORROWER OR ON ITS BEHALF, TO OR FOR THE BENEFIT OF ANY AGENT OR ANY LENDER OR RELATED TO THE COLLATERAL.

        (b)   WAIVER OF JURY TRIAL.  EACH OF THE BORROWERS, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

        11.12   Acknowledgments.  Each Borrower hereby acknowledges that:

        (a)   it has been advised by counsel in the negotiation, execution and delivery of this Loan Agreement and the other Loan Documents;

        (b)   each of the Agents and the Lenders has no fiduciary relationship to the Borrowers, and the relationship between the Borrowers and the Agents and the Lenders is solely that of debtor and creditor; and

        (c)   no joint venture exists among or between the Agents, the Lenders and the Borrowers.

        11.13   No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Loan Agreement.

        11.14   New Century as Agent for Borrowers.  Each Borrower hereby irrevocably appoints New Century as the borrowing agent and attorney-in-fact for the Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide the Administrative Agent with all notices with respect to Advances obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their

request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof. Each of the Borrowers expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Agents and the Lenders to do so, and in consideration thereof, each of the Borrowers hereby jointly and severally agrees to indemnify the Indemnified Parties and hold the Indemnified Parties harmless against any and all liability, expense, loss or claim of damage or injury, made against such Indemnified Party by any of the Borrowers or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and the Collateral of the Borrowers as herein provided, (b) the Agents' and the Lenders' reliance on any instructions of the Administrative Borrower, or (c) any other action taken by any Agent or any Lender hereunder or under the other Loan Documents; provided, however, that the Borrowers shall not have any obligation to any Indemnified Party under this Section 11.14 for any Indemnified Liabilities caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

11.15  Hypothecation or Pledge of Collateral. The Agents and the Lenders shall have free and unrestricted use of all First Lien Collateral and nothing in this Loan Agreement shall preclude the Agents and the Lenders from engaging in repurchase transactions with the Collateral or otherwise pledging, repledging, transferring, hypothecating, or rehypothecating the Collateral. Nothing contained in this Loan Agreement shall obligate any Agent or any Lender to segregate any Collateral delivered to such Agent or such Lender by any Borrower.

11.16  Assignments; Participations.

(a)      This Loan Agreement and the Notes shall be binding upon and inure to the benefit of the Borrowers and each Agent and each Lender and their respective successors and assigns (including, except for the right to request Advances, any trustee succeeding to the rights of the Borrowers pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided, however, that each of the Borrowers may not assign or transfer any of their rights hereunder, or under the Notes, without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)      Each Lender may, with the written consent of each Agent (which consent is not to be unreasonably withheld) assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Advances made by it and the Notes held by it); provided, however, that (i) such assignment is in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance, an Assignment and Acceptance, together with any Note subject to such assignment. Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be at least three (3) Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it

immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(i)        By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:    (A) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Loan Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (B) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrowers or any of their Subsidiaries or the performance or observance by the Borrowers of any of their obligations under this Loan Agreement or any other Loan Document furnished pursuant hereto; (C) such assignee confirms that it has received a copy of this Loan Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (D) such assignee will, independently and without reliance upon the Assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Loan Agreement and the other Loan Documents; (E) such assignee appoints and authorizes each Agent to take such action as such Agent on its behalf and to exercise such powers under this Loan Agreement and the other Loan Documents as are delegated to such Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (F) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(ii)        The Administrative Agent shall maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances owing to each Lender from time to time (the "Register").    The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.    The Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(iii)        Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with the Notes subject to such assignment, the

Administrative Agent shall, if both Agents consent to such assignment and if such Assignment and Acceptance has been completed (i) accept such Assignment and Acceptance, (ii) give prompt notice thereof to the Administrative Borrower, (iii) record the information contained therein in the Register, and (iv) prepare and distribute to each Lender and the Administrative Borrower a revised <u>Schedule B</u> hereto after giving effect to such assignment, which revised <u>Schedule B</u> shall replace the prior <u>Schedule B</u> and become part of this Agreement.

(iv)     A Registered Advance (and the Registered Note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each Registered Note shall expressly so provide), together with the surrender of the Registered Note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such Registered Note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new Registered Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).   Prior to the registration of assignment or sale of any Registered Advance (and the Registered Note, if any evidencing the same), the Agents shall treat the Person in whose name such Registered Advance (and the Registered Note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(v)     In the event that any Lender sells participations in a Registered Advance, such Lender shall maintain a register on which it enters the name of all participants in the Advances held by it (the "<u>Participant Register</u>").   A Registered Advance (and the Registered Note, if any, evidencing the same) may be participated in in whole or in part only by registration of such participation on the Participant Register (and each Registered Note shall expressly so provide).   Any participation of such Registered Advance (and the Registered Note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

(vi)     Any foreign Person who purchases or is assigned or participates in any portion of such Registered Advance shall provide the Administrative Agent (in the case of a purchase or assignment) or the Lender (in the case of a participation) with a completed Internal Revenue Service Form W-8 (Certificate of Foreign Status) or a substantially similar form for such purchaser, participant or any other affiliate who is a holder of beneficial interests in the Registered Advance.

(c)     Each Lender may sell participations to one or more banks or other entities ("<u>Participants</u>") in or to all or a portion of its rights and obligations under this Loan Agreement and the other Loan Documents (including, without limitation, all or a portion of any of its Commitments and any Advances made by it); provided, that (i) such Lender's obligations under this Loan Agreement (including without limitation, its Commitment hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Loan Agreement and the other Loan Documents,

and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Advances, or (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Advances or the fees payable under this Agreement, or (C) except for Permitted Dispositions, actions directly effecting a release of all or substantially all of the Collateral or any Borrower.

(d)     Each Lender may furnish any information concerning the Borrowers in the possession of such Lender from time to time to assignees and Participants (including prospective assignees and Participants) only after notifying the Administrative Borrower in writing and securing signed confidentiality statements (a form of which is attached hereto as Exhibit 11.16(d)) and only for the sole purpose of evaluating participations or assignments, as the case may be, and for no other purpose.

(e)     The Borrowers agree to cooperate with the Lenders in connection with any such assignment or participation, to execute and deliver such replacement notes and other documents in order to give effect to such assignment or participation.

11.17  Servicing.

(a)     Each Borrower covenants to maintain or cause the LNFA Mortgage Loans to be serviced pursuant to the Servicing Agreement.

(b)     During the period the Servicer is servicing the LNFA Mortgage Loans, (i) each Borrower agrees that the Administrative Agent, for the benefit of the Secured Parties, has a first priority perfected security interest in all servicing records relating to or evidencing the servicing of such Mortgage Loans, including but not limited to any and all servicing agreements, files, documents, records, data bases, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records, and any other records relating to or evidencing the servicing of such Mortgage Loans (the "Servicing Records"), and (ii) each Borrower grants the Administrative Agent a security interest in all servicing fees relating to the Mortgage Loans, such Borrower's rights relating to the Mortgage Loans and all Servicing Records, to secure the obligation of such mortgage originator or its designee to service in conformity with this Section and the Servicing Agreement and any other obligations of the Borrowers to the Agents and the Lenders.  Each Borrower covenants to safeguard such Servicing Records and to deliver them promptly to the Administrative Agent or its designee (including the Custodian) at the Agent's request.

(c)     If the LNFA Mortgage Loans are serviced by a Subservicer, the Borrowers shall provide a copy of the related servicing agreement to the Administrative Agent at least three (3) Business Days prior to the date on which the Subservicer shall begin subservicing the LNFA Mortgage Loans, which shall be in form and substance reasonably acceptable to the Lenders (the "Servicing Agreement") and shall have obtained the written consent of the Lenders for such Subservicer to subservice such Mortgage Loans.

(d)     Each Borrower agrees that upon the occurrence and during the continuance of an Event of Default, either Agent may terminate NCMC (or any other Borrower

or Affiliate of any Borrower) in its capacity as servicer with respect to LNFA Mortgage Loans and terminate any Servicing Agreement. In addition, the Borrowers shall provide to the Administrative Agent a letter from the Borrowers to the effect that upon the occurrence of an Event of Default, the Administrative Agent may terminate any Servicing Agreement and direct that collections with respect to the LNFA Mortgage Loans be remitted in accordance with the Administrative Agent's instructions. Each Borrower agrees to cooperate with the Administrative Agent in connection with such transfer of servicing.

      (e)    After the Closing Date, until the pledge of any Mortgage Loan is relinquished by the Custodian, the Borrowers will have no right to modify or alter the terms of such Mortgage Loan or consent to the modification or alteration of the terms of any Mortgage Loan, and the Borrowers will have no obligation or right to repossess any Mortgage Loan or substitute another Mortgage Loan, except as provided in any Custodial Agreement.

      (f)    The Borrowers shall permit the Agents to inspect upon reasonable prior written notice (which shall be no more than five (5) Business Days' prior notice) at a mutually convenient time, any Borrower's or any of any Borrower's Subsidiary's or Affiliate's servicing facilities, as the case may be, for the purpose of satisfying the Agents that such Borrower, such Subsidiary or Affiliate, as the case may be, has the ability to service the Mortgage Loans as provided in this Loan Agreement. In addition, with respect to any Subservicer which is not a Borrower or a Subsidiary or Affiliate of a Borrower, each Borrower shall use its best efforts to enable the Agents to inspect the servicing facilities of such Subservicer.

      (g)    To the extent that any provision of this <u>Section 11.17</u> shall be in conflict with the provisions of the Servicing Agreement, the provisions of the Servicing Agreement shall control.

      11.18  <u>Set-Off</u>. In addition to any rights and remedies of each Lender provided by this Loan Agreement and by law, each Lender shall have the right during the continuance of an Event of Default, without prior notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrowers hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all Property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate thereof to or for the credit or the account of any Borrower. Each Lender may set-off cash, the proceeds of the liquidation of any Collateral and all other sums or obligations owed by such Lender or its Affiliates to any Borrower against all of the Borrowers' obligations to such Lender or its Affiliates, whether under this Loan Agreement or under any other agreement between the parties or between any Borrower and any affiliate of such Lender, or otherwise, whether or not such obligations are then due, without prejudice to such Lender's or its Affiliate's right to recover any deficiency. Each Lender agrees promptly to notify the Borrower after any such set-off and application made by such Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

11.19  Entire Agreement.  This Loan Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendments, or change or supplement hereto shall be binding or effective unless the same is set forth in writing by a duly authorized representative of each party hereto.

11.20  Records.  The unpaid principal of and interest on the Notes, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 3.07 hereof, shall at all times be ascertained from the records of the Administrative Agent, which shall be conclusive and binding absent manifest error.

11.21  Confidentiality.  Each Agent, each Lender, each Borrower and their Affiliates shall take normal and reasonable precautions to maintain the confidentiality of all non-public information obtained pursuant to the requirements of this Loan Agreement and the other Loan Documents which has been identified as such by the Borrowers, but may, in any event, make disclosures (i) in the case of any Agent or any Lender, as reasonably required by any participant or assignee in connection with the contemplated assignment of any interest under this Loan Agreement or participations therein, or (ii) as required or requested by any governmental agency or representative thereof or as required pursuant to legal process, or (iii) to its officers, attorneys, accountants, agents, and advisors who are directly involved in the transactions described in this Loan Agreement, or (iv) as required by law, or (v) in connection with litigation involving any Agent or any Lender.

11.22  Public Announcements.  The Agents may issue and disseminate to the public general information describing this credit facility, including a general description of the Borrowers' businesses, and may use Borrowers' names in published advertising and other promotional materials (it being agreed and understood that the Agents shall be equally represented in any such dissemination, advertising and other promotional materials issued by the Borrowers or the Agents, subject to the Agents' consent).

\*   \*   \*   \*   \*

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

<u>BORROWERS</u>

NEW CENTURY FINANCIAL CORPORATION

By:_____
Name: _____
Title: _____

NEW CENTURY MORTGAGE CORPORATION

By:_____
Name: _____
Title: _____

[OTHER NEW CENTURY ENTITIES]

By:_____
Name: _____
Title: _____

<u>Address for Notices:</u>

c/o New Century Financial Corporation
18400 Von Karman
Suite 1000
Irvine, California  92612
Attention:
Telecopier No.:
Telephone No:

With a copy to:

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071-2899
Attention:  Ben H. Logan
Telecopier No.:  213-
Telephone No:  213-
E-mail:  blogan@omm.com

And to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1900 Main Street, 5th Floor
Irvine, California  92614-7321
Attention:  John E. Stoner
Telecopier No.:  949-553-8354
Telephone No:  949-553-1313

ADMINISTRATIVE AGENT

GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.


By:_____
Title:

Address for Notices:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut  06830
Attention: John C. Anderson
Telecopier No.: 203-618-2135
Telephone No.: 203-618-2700


With a copy to:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut  06830
Attention:  General Counsel
Telecopier No.:  203-618-2134
Telephone No.:  203-618-2700


And to:

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
Attention: Maureen E. Sweeney
Telecopier No.:  312-861-2200
Telephone No.:  312-861-2000

DOCUMENTATION AGENT

THE CIT GROUP/BUSINESS CREDIT, INC.


By:_____
Title:

Address for Notices:

The CIT Group/Business Credit, Inc.
505 Fifth Avenue
3rd Floor
New York, New York  10017
Attention:  Renee Singer
Telecopier No.: 212-
Telephone No.: 212-461-7751


With a copy to:

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
Attention: Maureen E. Sweeney
Telecopier No.: 312-861-2200
Telephone No.: 312-861-2000

<u>LENDERS</u>

GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.


By:_____
Title:

<u>Address for Notices</u>:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut  06830
Attention: John C. Anderson
Telecopier No.: 203-618-2135
Telephone No.: 203-618-2700


With a copy to:

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, Connecticut  06830
Attention:  General Counsel
Telecopier No.:  203-618-2134
Telephone No.:  203-618-2700


And to:

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
Attention: Maureen E. Sweeney
Telecopier No.:  312-861-2200
Telephone No.:  312-861-2000

THE CIT GROUP/BUSINESS CREDIT, INC.


By:_____
Title:

<u>Address for Notices:</u>

The CIT Group/Business Credit, Inc.
505 Fifth Avenue
3rd Floor
New York, New York  10017
Attention:  Renee Singer
Telecopier No.:  212-
Telephone No.:  212-461-7751


With a copy to:

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
Attention: Maureen E. Sweeney
Telecopier No.:  312-861-2200
Telephone No.:  312-861-2000

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

---

Dated as of April ___, 2007

---

by and among

**NEW CENTURY FINANCIAL CORPORATION,**
as debtor and debtor-in-possession,

**CERTAIN OF ITS AFFILIATES,**
as debtors and debtors-in-possession,

**THE LENDERS PARTY HERETO,**

**GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.,**
as Administrative Agent,

and

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Documentation Agent

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **Section 1.** | **Definitions and Accounting Matters** | 1 |
| 1.01 | Certain Defined Terms | 1 |
| 1.02 | Accounting Terms and Determinations | 22 |
| 1.03 | Uniform Commercial Code | 22 |
| 1.04 | Construction | 22 |
| **Section 2.** | **Advances, Evidence of Debt and Prepayments.** | 23 |
| 2.01 | Advances | 23 |
| 2.02 | Evidence of Debt | 23 |
| 2.03 | Procedure for Borrowing | 24 |
| 2.04 | Limitation on Types of Advances; Illegality | 26 |
| 2.05 | Repayment of Advances; Interest | 27 |
| 2.06 | Mandatory Prepayment | 27 |
| 2.07 | Optional Prepayments | 29 |
| 2.08 | Requirements of Law | 30 |
| 2.09 | Purpose of Advances | 31 |
| **Section 3.** | **Payments; Computations; Taxes; Fees.** | 31 |
| 3.01 | Payments | 31 |
| 3.02 | Sharing of Payments, Etc | 31 |
| 3.03 | Apportionment of Payments | 31 |
| 3.04 | Computations | 32 |
| 3.05 | Joint and Several Liability of Borrowers | 32 |
| 3.06 | U.S. Taxes | 33 |
| 3.07 | Fees | 34 |
| **Section 4.** | **Collateral Security and Administrative Priority** | 35 |
| 4.01 | Collateral; Security Interest | 35 |
| 4.02 | Administrative Priority | 38 |
| 4.03 | Grants, Rights and Remedies | 38 |
| 4.04 | No Filings Required | 38 |
| 4.05 | Survival | 38 |
| 4.06 | Changes in Locations, Name, etc | 39 |

| | | |
|---|---|---|
| 4.07 | Administrative Agent's Appointment as Attorney-in-Fact | 40 |
| 4.08 | Performance by the Administrative Agent of Borrowers' Obligations | 41 |
| 4.09 | Proceeds | 41 |
| 4.10 | Remedies | 41 |
| 4.11 | Limitation on Duties Regarding Preservation of Collateral | 43 |
| 4.12 | Powers Coupled with an Interest | 43 |
| 4.13 | Release of Security Interest | 43 |
| **Section 5.** | **Conditions Precedent** | 43 |
| 5.01 | Conditions Precedent to Initial Advance | 43 |
| 5.02 | Conditions Precedent to Initial and Subsequent Advances | 46 |
| 5.03 | Conditions Precedent to Tranche B Advances | 47 |
| **Section 6.** | **Borrowers Representations and Warranties** | 48 |
| 6.01 | Existence | 48 |
| 6.02 | Financial Condition | 48 |
| 6.03 | Litigation | 48 |
| 6.04 | No Breach | 48 |
| 6.05 | Action | 49 |
| 6.06 | Approvals | 49 |
| 6.07 | Margin Regulations | 49 |
| 6.08 | Taxes | 49 |
| 6.09 | Investment Company Act | 49 |
| 6.10 | No Legal Bar | 50 |
| 6.11 | No Default | 50 |
| 6.12 | Collateral; Collateral Security; Administrative Priority | 50 |
| 6.13 | Chief Executive/Operating Offices | 51 |
| 6.14 | Location of Books and Records | 51 |
| 6.15 | True and Complete Disclosure | 51 |
| 6.16 | ERISA | 51 |
| 6.17 | No Agent or Lender Licenses | 52 |
| 6.18 | Subsidiaries | 52 |
| 6.19 | Origination of LNFA Mortgage Loans | 52 |
| 6.20 | Fraudulent Conveyance | 52 |
| 6.21 | Orders | 52 |

| | | |
|---|---|---|
| 6.22 | Servicing Advances. | 52 |
| 6.23 | Collection Accounts and Escrow Accounts | 52 |
| **Section 7.** | **Covenants of the Borrowers** | 53 |
| 7.01 | Financial Statements and Other Information | 53 |
| 7.02 | Litigation | 54 |
| 7.03 | Existence, Etc | 54 |
| 7.04 | Prohibition of Fundamental Changes | 55 |
| 7.05 | Borrowing Base Deficiency | 55 |
| 7.06 | Satisfaction of Conditions Precedent for the Final Order | 55 |
| 7.07 | Notices | 55 |
| 7.08 | Servicing | 56 |
| 7.09 | Servicing Advances | 56 |
| 7.10 | Lines of Business | 56 |
| 7.11 | Transactions with Affiliates | 56 |
| 7.12 | Use of Proceeds | 57 |
| 7.13 | Limitation on Liens | 57 |
| 7.14 | Limitation on Sale of Assets | 57 |
| 7.15 | Limitation on Distributions | 57 |
| 7.16 | Restricted Payments | 57 |
| 7.17 | Loans, Advances, Investments, Etc. | 57 |
| 7.18 | Orders, Administrative Priority; Lien Priority; Payment of Claims | 58 |
| 7.19 | Information from Servicing Transmission | 58 |
| 7.20 | Residuals Information | 59 |
| 7.21 | No Amendment or Waiver | 59 |
| 7.22 | Maintenance of Property; Insurance | 59 |
| 7.23 | Further Identification of Collateral | 59 |
| 7.24 | Interest Rate Protection Agreements | 59 |
| 7.25 | Alternative Collateral | 59 |
| 7.26 | ERISA | 60 |
| 7.27 | Other Indebtedness | 60 |
| 7.28 | Pooling and Servicing Agreements | 60 |
| 7.29 | No Waiver of Servicing Advances | 60 |
| 7.30 | Mortgage Loan Originations and Commitments | 60 |

7.31    Funding of Collection Accounts and Escrow Accounts ......................... 60

7.32    Retention of Lazard and Alix Partners ................................................... 60

**Section 8.    Events of Default** ............................................................................. 60

**Section 9.    Remedies Upon Default** ................................................................. 65

**Section 10.    Agents.** .............................................................................................. 65

10.01    Appointment ........................................................................................... 65

10.02    Nature of Duties ..................................................................................... 66

10.03    Rights, Exculpation, Etc ........................................................................ 66

10.04    Reliance ................................................................................................... 67

10.05    Indemnification ....................................................................................... 67

10.06    Agent Individually .................................................................................. 67

10.07    Successor Agent ...................................................................................... 68

10.08    Collateral Matters ................................................................................... 69

10.09    Documentation Agent. ........................................................................... 70

**Section 11.    Miscellaneous** ............................................................................... 70

11.01    Amendments, Etc. ................................................................................... 70

11.02    Waiver ...................................................................................................... 71

11.03    Notices ..................................................................................................... 71

11.04    Indemnification and Expenses ............................................................. 72

11.05    Amendments ........................................................................................... 74

11.06    Successors and Assigns .......................................................................... 74

11.07    Survival .................................................................................................... 74

11.08    Captions ................................................................................................... 74

11.09    Counterparts; Telefacsimile Execution ............................................. 74

11.10    LOAN AGREEMENT CONSTITUTES SECURITY AGREEMENT;
GOVERNING LAW ............................................................................... 74

11.11    CERTAIN WAIVERS; WAIVER OF JURY TRIAL ........................... 75

11.12    Acknowledgments .................................................................................. 75

11.13    No Party Deemed Drafter ..................................................................... 75

11.14    New Century as Agent for Borrowers ................................................. 75

11.15    Hypothecation or Pledge of Collateral .............................................. 76

11.16    Assignments; Participations. ................................................................. 76

11.17    Servicing. ................................................................................................. 79

11.18   Set-Off ................................................................................................... 80

11.19   Entire Agreement ................................................................................... 81

11.20   Records ................................................................................................... 81

11.21   Confidentiality ....................................................................................... 81

11.22   Public Announcements .......................................................................... 81

## SCHEDULES

| | |
|---|---|
| Schedule A | Other Borrowers |
| Schedule B | Lenders and Commitments |
| Schedule C | Budget |
| Schedule D | First Lien Collateral |
| Schedule E | Closing Date Borrowing Base Calculation |
| Schedule F | LNFA Mortgage Loans |
| Schedule G | Residuals |
| Schedule H | Securitization Trusts |
| Schedule I | Authorized Officers |
| Schedule 6.01(a) | Jurisdictions of Organization |
| Schedule 6.01(b) | Licenses, Authorizations, Etc. |
| Schedule 6.03 | Litigation |
| Schedule 6.13 | Chief Operating Office |
| Schedule 6.18 | Subsidiaries |
| Schedule 7.01(e) | Additional Reporting Requirements |
| Schedule 7.13 | Liens |
| Schedule 7.17 | Investments |
| Schedule 7.27 | Indebtedness |

**<u>EXHIBITS</u>**

<u>Exhibit A</u>        Interim Order

<u>Exhibit B</u>        Required Fields for Mortgage Loan Data Transmission

<u>Exhibit C</u>        Notice of Borrowing

<u>Exhibit D</u>        Required Fields for Servicing Transmission

<u>Exhibit 11.16(d)</u>        Form of Confidentiality Agreement