## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,**[1] | : | **Case No. 07-10416 (KJC)** |
| | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | |
| | : | |

### EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH AUCTION OF CERTAIN ASSETS, (B) SCHEDULING HEARING TO CONSIDER PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE AND (B) GRANTING RELATED RELIEF

New Century TRS Holdings, Inc., a Delaware corporation, New Century

Financial Corporation, a Maryland corporation, and their direct and indirect subsidiaries, each as

a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned

counsel, hereby submit this emergency motion (the "Motion") pursuant to sections 105(a), 363,

503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy

Code"), and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for the entry of (i) an order (a) approving bidding procedures and bid

protections in connection with an auction of certain assets, (b) scheduling a hearing (the "Sale

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Hearing") to consider approval of a proposed sale of certain assets (the "Sale") to Greenwich

Capital Financial Products, Inc., or such other prevailing bidder, pursuant to the terms and

conditions of that certain Asset Purchase Agreement, dated as of April 2, 2007, and approving

the form and manner of notice thereof (the "Sale Notice") and (c) granting certain related relief

(the "Bidding Procedures Order") and (ii) an order approving the Sale and granting related relief

(the "Sale Order"). In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over the subject matter of this Motion pursuant

to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought in this Motion are

Bankruptcy Code Sections 105(a), 363, 503 and 507 and Bankruptcy Rules 2002, 6004 and

9014.

## BACKGROUND[2]

3.     New Century Financial Corporation, a Maryland corporation ("NCF") and

publicly owned real estate investment trust, is one of the largest specialty mortgage finance

businesses in the United States. Through its subsidiaries and its primary holding company

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and

together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases,

sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending,

or lending to individuals whose borrowing needs were generally not fulfilled by traditional

financial institutions because they did not satisfy the credit, documentation or other underwriting

---

[2] The facts and circumstances discussed in this section are set forth in the Declarations of Monika
McCarthy and Holly Etlin in Support of Chapter 11 Petitions and Request for First Day Relief.

standards prescribed by conventional mortgage lenders and loan buyers. In September 2005,

NCF through some of its subsidiaries also began offering conventional mortgage loans,

including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration

("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year

ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of

mortgage loans, most of which were sold in the secondary market. Since their inception, the

Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of

homebuyers and homeowners across the nation access credit and realize the benefits of home

ownership, including many who might not otherwise have been able to do so.

        4.      On February 7, 2007, NCF announced that it would restate its quarterly

financial statements for the first, second, and third quarters of 2006 after the Debtors discovered

that there may be errors in the application of generally accepted accounting principles regarding

NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various

securities class action lawsuits and shareholder derivative suits.

        5.      On March 2, 2007, NCF announced that it could not timely file its Annual

Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its

audit of NCF's 2006 financial statements until after completion of the internal investigation by

NCF's audit committee. NCF also announced that the Securities and Exchange Commission had

requested a meeting with NCF to discuss these events and that the United States Attorney's

Office had commenced a criminal inquiry.

        6.      These announcements, together with increased borrower defaults that have

adversely affected the subprime mortgage market nationwide, had a devastating impact on the

Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that

provide the short term credit facilities that the Debtors need to originate and purchase loans (each

3

a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby
threatening their viability. During the following week, the Warehouse Lenders made margin
calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the
Warehouse Lenders began restricting and ultimately ceased providing funding for loans
originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default
under its credit facility.

       7.    As a result of the defaults, the Warehouse Lenders have exercised
remedies under their agreements with the Debtors, including asserting control of the cash flow
from the loans they financed and in some instances exercising strict foreclosure or commencing
foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further
exacerbated the Debtors' liquidity situation.

       8.    Although the Debtors have not had sufficient resources or access to credit
to originate loans, the Debtors continue to operate their mortgage loan servicing business in
accordance with their historically high standards and comply with their obligations under their
agreements with indenture trustees and other parties to provide servicing for mortgage loans.
Because their financing for servicing advances has also been terminated, the Debtors' liquidity
has been additionally constrained by their being required to provide necessary loan servicing
advances from their own working capital.

       9.    During the weeks leading up to the Petition Date (as defined below), the
Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co.
LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital,
or a sale of their businesses to a strategic or financial investor.

      10.    The Debtors' inability to originate loans and the exercise of remedies by
the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale

4

of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11.    Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

12.    On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. Further, a motion for joint administration of the Debtors' bankruptcy cases is pending before the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## RELIEF REQUESTED

13.    The Debtors hereby request, pursuant to Bankruptcy Code Sections 105, 363, 503 and 507 and Bankruptcy Rule 6004, that the Court enter orders facilitating the prompt auction of certain of their assets. Specifically, the Debtors seek the entry of the Bidding Procedures Order that approves bidding procedures and stalking horse bid protections in connection with an auction of certain of their assets, sets a Sale Hearing to consider approval of the Sale and the Sale Notice and grants related relief. In addition, the Debtors seek the entry of the Sale Order that authorizes and approves the Sale and grants related relief.

## NEED FOR IMMEDIATE SALE

14.    The Debtors have commenced these bankruptcy cases in order to downsize their operations, reduce expenses, promptly market their businesses and consummate

5

sales of assets as soon as practicable. Prior to commencing these cases, the Debtors, working with their investment banker, Lazard Freres & Co. LLC ("Lazard"), aggressively marketed their businesses. This resulted in expressions of interest, bids and committed offers for various assets and components of their businesses.

15.    Those offers included a proposal by Greenwich Capital Financial Products, Inc. ("Greenwich") to purchase a pool of mortgage loans and mortgage-backed residual interests in securitization trusts for aggregate proceeds of $50,000,000. The mortgage loans consist of a pool of slightly over 2,000 residential mortgage loans owned by the Debtors. Most of these loans were originated by the Debtors and then sold to securitization trusts and whole loan buyers. But because the borrowers on these loans defaulted soon after the disposition occurred, the buyer had the right to, and did, require the Debtors to repurchase the loans. Other loans in this pool were originated by the Debtors but never disposed of in a loan sale. The mortgage-backed securities that Greenwich is seeking to buy consist of residual class interests issued by various securitization trusts that the Debtors received when they disposed of loans.

16.    The Debtors and Lazard broadly sought offers for these loans and residual mortgage-backed securities and a number of prospective buyers conducted diligence and expressed interest in them. Greenwich made an offer to purchase them which the Debtors concluded established a reasonable floor for an auction and, accordingly, on April 2, 2007, the Debtors entered into an Asset Purchase Agreement (the "APA") with Greenwich whereby Greenwich agreed to purchase these mortgage loans and mortgage-backed securities (as more completely described in the APA, the "Purchased Assets") for aggregate proceeds of $50,000,000 pursuant to Bankruptcy Code Section 363. This sale is subject to higher and better bids and, if qualifying bids are submitted, an auction. A copy of the APA is attached hereto as Exhibit A.

6

17.    As more fully described in the Debtors' simultaneously filed motion for authorization to obtain postpetition financing, Greenwich and The CIT Group/Business Credit, Inc. ("CIT," and together with Greenwich, the "DIP Lenders") also concurrently agreed to provide the Debtors with debtor in possession financing ("DIP Financing"). Among other things, the proposed DIP Financing will help finance the Debtors' continued operations as a going concern so that the Debtors can pursue a number of asset sales, including this particular auction. The Debtors concluded, in their business judgment, that the stalking horse bid made by Greenwich for the Purchased Assets and the proposed DIP Financing were each fair. And each was the best offer the Debtors received for the respective transaction. The DIP Lenders are willing to provide financing only if Greenwich is given a fair opportunity to pursue its bid for the Purchased Assets. As a result, one condition of the DIP Financing requires that the Court approve the bidding procedures discussed herein by April 10, 2007.

18.    The Debtors believe this process is appropriate and will facilitate each of the Debtors' primary objectives. Specifically, it will provide the Debtors with the funding necessary to satisfy their liquidity demands and help stabilize their business so they can pursue going concern sales of their assets, as well as offering a reasonable stalking horse bid from Greenwich on the Purchased Assets. Thus, the Debtors have filed this Motion to approve bidding procedures for the sale of the Purchased Assets to Greenwich for aggregate proceeds of $50,000,000, subject to overbid.

19.    Simply put, the Debtors are in a struggling industry - the sub-prime residential mortgage industry. Without the liquidity available through the DIP Financing, the Debtors will struggle to continue to operate as a going concern and it will be extremely difficult, if not impossible, to conduct orderly sales of their assets and businesses. The Sale, in conjunction with the DIP Financing, provides a unique opportunity for the Debtors to preserve

7

their businesses as going concerns and maximize their value for the estates. And as noted above,

the terms of the DIP Financing requires that these bid procedures be approved by April 10, 2007.

Consequently, the Debtors believe, in the exercise of their business judgment, that the relief

sought by this Motion is not only reasonable, but necessary under the circumstances of this case

to maximize the value of the estates for creditors.

## THE APA AND THE SALE OF ASSETS

20.    Pursuant to the APA, the Debtors propose to sell the Purchased Assets to

Greenwich (or such other third party as Greenwich may designate) free and clear of all liens,

claims and encumbrances for an aggregate purchase price of $50,000,000. This purchase price

will be paid by satisfying any obligations outstanding under the DIP Financing at the time of the

closing, up to the amount of the purchase price, with the remaining balance (if any) to be paid in

cash (subject to a holdback for certain contingent costs and potential deductions).[3]

21.    The APA contains certain minimal representations and warranties and

provides for a $3,000,000 45-day holdback to cover such matters as (i) the Debtors releasing the

borrower on a loan that was sold to Greenwich, (ii) material changes in the foreclosure laws of

the state in which the property is located and (iii) the Debtors' failure to transfer servicing of

these loans to a servicer selected by the buyer. While the Debtors would have preferred no

representations and warranties and no holdback, and bargained hard for both, the sort of matters

that could allow Greenwich to look to the holdback could have a significant impact on the value

of the loans and are generally believed to have a relatively low risk of occurring. Even so, the

Debtors will evaluate any competing bids for such matters as whether they provide superior

---

[3] The description of the APA provided herein is an overview of certain of the significant terms of the Sale The Court and interested parties should refer to the APA, a copy of which is attached hereto as Exhibit A, for complete and detailed terms thereof. To the extent the description of the sale described in this Motion is inconsistent in any way from the terms of the APA, the terms of the APA shall prevail.

terms for the estates with respect to representations and warranties and the presence or absence of a holdback.

22.    The Debtors believe that the proposed Sale provides a reasonable floor for an auction and that the bidding procedures and protections required by Greenwich provide a fair opportunity for open and spirited bidding.

## THE BIDDING PROCEDURES

23.    As set forth in greater detail in Exhibit B attached hereto, Greenwich and the Debtors have negotiated the following proposed procedures and deadlines for the contemplated auction and sale of the Purchased Assets (the "Bidding Procedures"):[4]

> A.    Notice:
>
> The Debtors, in consultation with Lazard, have developed a list of parties whom the Debtors believe may potentially be interested in and whom the Debtors reasonably believe would have the financial resources to consummate a purchase of the Purchased Assets. The list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party," and collectively, the "Contact Parties").
>
> Within two business days of the entry of the Bidding Procedures Order, the Debtors and their advisors will send notice of the proposed Sale, the process for obtaining diligence materials, the process for qualifying as a bidder, the due date for bids and the proposed time and date of the Auction (as defined below) to Contact Parties and other parties in interest and prospects that have or may be identified as potential bidders for the Purchased Assets. The Debtors will also publish notice of the proposed sale and bidding procedures in the Wall Street Journal (National Edition).
>
> B.    Data Room and Access to Information:
>
> Information relevant to the Purchased Assets for evaluation by interested parties, including certain books and records, material contracts and other financial and operational information for due diligence investigation, will be made available via an online data room on intralinks to bidders who have executed a valid nondisclosure agreement. Specific information for

---

[4] The following is intended for summary purposes only. To the extent the description in this Motion is inconsistent in any way from the Bidding Procedures, the terms of the Bidding Procedures shall govern

accessing the dataroom will be provided after execution of such agreements. The diligence period will take place from April 9, 2007 through April 26, 2007.

C.     Qualified Bidders:

To be eligible to participate in the Auction and be deemed a "Qualified Bidder," each party must submit a binding written offer to purchase all or some of the Purchased Assets to the Debtors, Lazard and any Official Committee of Unsecured Creditors appointed in these cases that satisfies each of the following conditions:

I.      States that the bidder, on its own or together with another Qualified Bidder, offers to purchase the Purchased Assets upon the terms and conditions substantially as set forth in the APA.

II.     States that the bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Purchased Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the APA.

III.    Is accompanied by a clean and duly executed asset purchase agreement (a "Modified APA") and a marked Modified APA reflecting the variations from the APA executed by Greenwich.

IV.     States that the bidder is financially capable of consummating the transactions contemplated by the Modified APA.

V.      States that such Qualified Bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets if the Qualified Bidder is the Successful Bidder or the Back-up Bidder (as those terms are defined below).

VI.     Contains such financial and other information that will allow the Debtors to make a reasonable determination of the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, including without limitation such financial and other information setting forth adequate assurance of future performance under Bankruptcy Code Section 365 (if applicable) in a form requested by the Debtors to allow the Debtors to serve such information within one business day

10

after receipt of such information on counter-parties to any contracts or leases being assigned in connection with the proposed sale.

VII.    Identifies with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing.

VIII.   Does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement or similar type of payment.

IX.    Fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any participation.

X.    Is likely to result in value to the Debtors, in the Debtors' reasonable judgment after consultation with their financial and legal advisors, that is more than the aggregate of the value of the sum of (a) the Purchase Price (as defined in the APA), plus (b) the amount of the Break-Up Fee (as defined below), plus (c) $500,000.

XI.    Does not contain any due diligence or financing contingencies of any kind, and does contain evidence that the bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Purchased Assets, which evidence is reasonably satisfactory to the Debtors.

XII.   Includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA;

XIII.  Is accompanied by a cash deposit of at least $1,000,000 (the "Good Faith Deposit").

A competing bid meeting the above requirements shall constitute a "Qualifying Bid" and such bidder shall be a "Qualified Bidder." The Debtors may aggregate separate bids from Qualified Bidders to create a Qualifying Bid. The Debtors shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders when their bids have been determined to be qualified by no later than 5:00 p.m. (prevailing

11

Eastern time) on April 30, 2007. Greenwich shall be deemed a Qualifying Bidder and the APA constitutes a Qualifying Bid for all purposes.

D.    Deadline for Submission of Bids:

All Qualified Bids must be submitted by no later than 5:00 p.m. (prevailing Eastern time) on April 26, 2007 (the "Bid Deadline") to:

I.    The Debtors:

Lazard Freres & Co. LLC
30 Rockefeller Plaza
New York, NY 10020
Facsimile: (212) 830-3647
Email: Evan.Geller@lazard.com
Attention:    Evan Geller

with a copy to:

O'Melveny & Myers LLP
275 Battery Street, Suite 2600
San Francisco, CA 94111
Facsimile: (415) 984-8701
Email: bchristensen@omm.com
Attention:    Suzzanne Uhland, Esq.
              C. Brophy Christensen, Esq.

and

Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
Facsimile: (302) 651-7701
Email: ramos@rlf.com
Attention:    Mark D. Collins, Esq.
              Marcos A. Ramos, Esq.

II.    Greenwich Capital Financial Products, Inc.

Greenwich Capital Financial Products, Inc.
600 Steamboat Road
Greenwich, CT 06830
Facsimile: (203) 422-4478
Attention:    Jon Stapleton

with a copy to:

Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017
Facsimile:  (213) 680-8500
Attention:     Bennett L. Spiegel, Esq.

III.        Official Committee of Unsecured Creditors

[to be determined]

E.    <u>No Qualifying Bids</u>:

If no timely, conforming Qualifying Bids are submitted by the Bid
Deadline, the Debtors shall not hold the Auction (as defined below) and
instead shall request at the Sale Hearing that the Court approve the APA
with Greenwich.

F.    <u>Auction</u>:

In the event that the Debtors timely receive one or more Qualifying Bids
other than the APA, the Debtors shall conduct an auction (the "Auction")
with respect to the Purchased Assets.  The Auction will take place starting
on a date and at a time during the week of April 30, 2007 selected by the
Debtors, which date and time will be identified in the notice identifying
the Qualifying Bidders.  The Auction will be conducted at the offices of
O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New
York, NY 10036, or such other location as designated by the Debtors in a
notice to all Qualified Bidders.  The Auction shall be governed by the
following procedures:

I.       Only representatives of the Debtors, Greenwich, Qualifying
Bidders and the Official Committee of Unsecured Creditors
shall be entitled to be present at the Auction.

II.      Only Greenwich and Qualifying Bidders shall be entitled to
make any subsequent bids at the Auction.

III.     Greenwich may make a credit bid at the Auction pursuant
to Bankruptcy Code Section 363(k) of amounts owed under
the DIP Loan Agreement and may credit bid the amount of
the Breakup Fee.

IV.      Each Qualifying Bidder shall be required to confirm that it
has not engaged in any collusion with respect to the bidding
or the sale.

13

V.      Greenwich and the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative.

VI.     Bidding shall commence at the amount of the highest and/or best Qualifying Bid submitted by the Qualifying Bidders prior to the Auction.

VII.    Qualifying Bidders may then submit successive bids in increments of at least $100,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $100,000 higher than the previous bid.

VIII.   All Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the APA or Modified APA, as applicable, at the Auction.

IX.     The Auction will be conducted so that each Qualified Bidder will be informed of the terms of the previous bid.

The Auction shall continue until there is only one offer that the Debtors determine, subject to Court approval, is the highest and best offer from among Qualifying Bidders and Greenwich submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of the consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each bidder, and the net benefit to the Debtors' estates. The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified APA. For purposes of determining the Successful Bid, any overbid submitted by Greenwich shall be deemed to include the full amount of the Breakup Fee (as defined below). Within three (3) days after the adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of the Auction shall not be considered by the Court.

G.      Back-Up Bidder and Return of Deposits

If an Auction is conducted, the party with the next highest or otherwise Qualifying Bid (including for this purpose Greenwich), as determined by the Debtors in the exercise of their business judgment, at the Auction shall

14

be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 pm (prevailing Eastern time) on the third (3rd) business day following the conclusion of the Auction or the closing of the sale transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court.

Except as otherwise provided in the Bidding Procedures, the Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-up Bidder shall be held by the Sellers until the earlier of the eight (8th) business day following the conclusion of the Auction, or twenty-four (24) hours after the closing of the Sale with the Successful Bidder.

H.   Bidding Protections:

Greenwich shall be entitled to a break-up fee of $1,000,000 (the "Breakup Fee") to be paid by the Debtors in the event they consummate a sale of all or a material portion of the Purchased Assets with a third party other than Greenwich. The Breakup Fee shall be paid in cash as an administrative expense with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and shall be payable pursuant to the terms of the APA.

## THE SALE HEARING AND NOTICE THEREOF

24.   The Debtors request that the Court schedule a Sale Hearing on or about May 7, 2007 to consider approval of the Successful Bid (or the APA, if no Qualifying Bid other than that of Greenwich is received or accepted) and the Sale. At the Sale Hearing, the Debtor will seek the entry of the Sale Order authorizing and approving the sale of the Purchased Asset to Greenwich or other Qualified Bidder, as applicable, pursuant to the terms and conditions set forth in the APA or Modified APA, as the case may be.

25.    Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than case collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2) (c)(1), (i), and (k) and, if applicable, in accordance with §363(b)(2) of the code." Fed. R. Bankr. P. 6004(a). Essentially, Bankruptcy Rule 2002 requires the Debtors to give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale. Bankruptcy Rule 6004 also provides that objections to the proposed Sale "shall be filed and served not less than five days before the proposed action or within the time fixed by the court." Fed. R. Bankr. P. 6004(b).

26.    The timing of the auction and sale process and the proposed date for the Sale Hearing requested by the Debtor is well within the notice procedures mandated by the Bankruptcy Rules as they will be providing at least twenty days notice required by the Bankruptcy Rules. Moreover, scheduling the Sale Hearing for on or about May 7, 2007 is necessary as the failure to close the Sale by May 18, 2007, may be an event of default under the APA. It is also reasonable given the marketing performed by the Debtors and Lazard prior to commencing these cases. These marketing efforts were diligently pursued by them and, while this process was underway, the Debtors continued to experience significant financial and liquidity difficulties. Under the circumstances facing the Debtors, and the significant and carefully targeted marketing prior to the Petition Date, the Debtors believe that the reasonableness of the proposed auction and sale process is evident. Finally, and perhaps most significantly, it is necessary to obtain the maximum recovery for creditors.

27.    Accordingly, the Debtor requests that the Sale Hearing to approve the sale of the Purchased Assets and to consider any properly submitted objections be held on May 7, 2007. The Debtors intend to provide notice of the Sale Hearing by service and publication of the

16

notice attached hereto as Exhibit C. The Debtors also intend to publish notice of the Sale

Hearing in the National Edition of *The Wall Street Journal,* prior to the Sale Hearing.

28.   The Debtor further requests that, pursuant to Bankruptcy Rule 9014,

objections, if any, to the Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware; (c) be filed with the Clerk of the Bankruptcy Court for the District of

Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, at least five (5) days

prior to the Sale Hearing and (d) with a copy served on and received by: (i) counsel for the

Debtors, O'Melveny & Myers LLP, 275 Battery Street, Suite 2600, San Francisco, CA 94111,

Attention: Suzzanne Uhland, Esq. and O'Melveny & Myers LLP, 400 South Hope Street, Los

Angeles, CA 90071, Attention: Ben H. Logan, Esq.; (ii) counsel for the Debtors, Richards,

Layton & Finger, P.A., One Rodney Square, P.O. Box 551 Wilmington, Delaware 19899,

Attention Mark D. Collins, Esq.; (iii) Greenwich Capital Financial Products, Inc., 600

Steamboat Road, Greenwich, CT 06830, Attention: Jon Stapleton; (iv) counsel to Greenwich,

Kirkland & Ellis LLP, 777 South Figueroa Street, Los Angeles, CA 90017, Attention: Bennett

L. Spiegel, Esq and Shirley Cho, Esq.; (v) counsel to Greenwich, Pachulski Stang Ziehl Young

Jones & Weintraub, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE

19899, Attention: Laura Davis Jones, Esq.; (vi) counsel to the Official Committee of Unsecured

Creditors [to be determined] and (vii) the Office of the United States Trustee, 844 King Street,

Suite 2207, Lockbox 35, Wilmington, Delaware 19801.

## APPROVAL OF BREAKUP FEE

29.   Pursuant to the APA, Greenwich shall be entitled to a Breakup Fee of

$1,000,000 in the event the Debtors consummate a sale of all or a material portion of the

Purchased Assets to a third party other than Greenwich, which is to be paid in cash as an

17

administrative expense with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

30.     Bidding incentives, such as the Breakup Fee, encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Associates L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

31.     A proposed bidding incentive, such as the Breakup Fee, should be approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 533 (3rd Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code Section 503(b) govern in the bankruptcy context).

32.     Here, the only bid protection is a modest Breakup Fee that is clearly market and provides a benefit to the estate. The Breakup Fee is a topping fee that constitutes 2% of the overall purchase price offered by Greenwich for the Purchased Assets and will only be

18

RLF1-3134266-2

paid if the Purchased Assets are sold to a higher bidder – meaning that the Debtors, following an auction process, would have to determine that such other bid is higher and better than Greenwich's offer for the Purchased Assets, including factoring into the competing bid the cost of the Breakup Fee. If this occurs, the Debtors will effectively net at least the amount offered by Greenwich, as payment of the Breakup Fee will come exclusively from any overbid and will not reduce the amount paid to the estates. There are no other bid protections such as expense reimbursement provisions, and the Debtors have the ability to consider bids for less than all of the Purchased Assets if the Debtors are able to combine a collection of other bids into a bid that tops Greenwich's highest offer.

33.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." In re Integrated Resources, Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992). Approving the Breakup Fee will commit Greenwich to serve as the stalking horse bidder under the Agreement with a bid that starts any additional bidding or auction for the Purchased Assets at a fair and reasonable purchase price, all to the benefit of the estates. The Debtors believe that the Breakup Fee will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. In other words, if the Purchased Assets are sold to a competing bidder, it will – in all likelihood – be because of Greenwich's crucial role as a stalking horse.

34.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. As noted above, the Breakup Fee of $1,000,000 constitutes 2% of the overall purchase price offered by

19

Greenwich of $50,000,000. This is well within the range of fees typically paid in other significant sales transactions that have been consummated in a bankruptcy setting. See e.g. Consumer News & Business Channel Partnership v. Financial News Network, Inc. (In re Financial News Network Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that the transaction at issue provided for a $8.2 million break-up fee on a $149.3 million transaction); Integrated Resources, 147 B.R. at 662 (approving a $7.5 million break-up fee on a $565 million transaction); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved break-up fee of 2.75%, or $3,000,000 in connection with $110,000,000 sale of real estate).

        35.    For these reasons, and given the benefits provided by the APA, the Debtors urge the Court to approve the Breakup Fee.

### APPROVAL OF AUCTION PROCESS AND SALE OF ASSETS

        36.    Bankruptcy Code Section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

        37.    A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code Section 363 where the transaction represents an exercise of the debtor's sound business judgment. See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3rd Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Rv. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

38.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith. See Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re United Healthcare Svs., Inc., No. 97-21785, 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

39.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See e.g. In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the ... [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Products, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

40.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (P.JW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26,1997); Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets");

21

In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

    41. The Debtors submit that the proposed Sale with Greenwich or other Successful Bidder satisfies the "sound business reason test." The Debtors submit that a prompt sale of the Purchased Assets presents the best opportunity to maximize the value of the Purchased Assets for the estates. The Debtors believe that, absent a prompt sale, the value of the Purchased Assets will substantially decline. In addition, the Debtors believe that the Bidding Procedures and Sale Notice are the best method by which it can obtain the best price for the Purchased Assets and provide interested persons with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets by helping ensure a competitive and fair bidding process. They also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates. Finally, the Debtors submit that the price offered by Greenwich for the Purchased Assets is fair and reasonable. The Debtors and Lazard thoroughly marketed the Purchased Assets prior to the Petition Date, and the offer made by Greenwich was determined by the Debtors in their business judgment to be the best available offer for the Purchased Assets.

## SALE OF ASSETS FREE AND CLEAR OF LIENS AND INTERESTS

    42. The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of claims, interests, liens and encumbrances pursuant to Bankruptcy Code

Section 363(f), with any such claims, interests, liens and encumbrances attaching to the net sale proceeds of the Purchased Assets to the extent applicable.

43.    Bankruptcy Code Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interests, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property, (iv) such interest is in bona fide dispute (v) or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

44.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

45.    The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to any Sale involving the Purchased Assets. In particular, the Debtors believe that any lienholder will be adequately protected by having their liens, if any, attach to the cash proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

23

46.    Although Bankruptcy Code Section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3rd Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3rd Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289. As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, supra, the scope of Bankruptcy Code Section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

47.    Courts have consistently held that a buyer of a debtor's assets under Bankruptcy Code Section 363 takes the assets free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re

24

<u>Hoffman</u>, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); <u>American Living Systems v.</u>

<u>Bonapfel (In re All Am. Of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); <u>WBO</u>

<u>Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership)</u>, 189 B.R.

97, 104-05 (Bankr. 22 E.D. Va. 1995) (Commonwealth of Virginia's right to recapture

depreciation is an "interest" as used in section 363(f)).[5]

        48.     The purpose of an order purporting to authorize the transfer of assets free

and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a

basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct. Under

Bankruptcy Code Section 363(f), Greenwich or a Successful Bidder, as the case may be, is

entitled to know that the Purchased Assets do not have attached latent claims that will be asserted

against them after the Sale is completed. Accordingly, and consistent with the above-cited case

law, the Sale Order should state that the purchaser will not be liable as a successor under any

theory of successor liability, for claims that encumber or relate to the Purchased Assets.

<b><u>FINDING OF GOOD FAITH</u></b>

        49.     Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

---

[5] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims nevertheless find that Bankruptcy Code section 105(a) provides such authority. <u>See In re White Motor Credit Corp.</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

25

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Seventh

Circuit in In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

798 F.2d at 1125 (emphasis omitted) (quoting In re Rock Industries Machinery Corp., 572 F.2d

1195, 1198 (7th Cir. 1978).

     50.    The APA was intensely negotiated at arm's-length with all parties

involved acting in good faith.  The Debtors therefore request that the Court make a finding that

Greenwich, if it is not overbid at the Auction, has acquired the Purchased Assets in good faith

within the meaning of Bankruptcy Code Section 363(m).  In the event there is a Successful

Bidder other than Greenwich, the Debtors intend to present evidence to show that the Successful

Bidder is entitled to the same finding under Bankruptcy Code Section 363(m).

## FINALITY OF ORDER

     51.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless

the court orders otherwise."  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  See Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the

Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate

or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay

period should be eliminated to allow a sale or other transaction to close immediately "where

there has been no objection to the procedure."  10 Collier on Bankruptcy, ¶ 6004.10 (15th rev.

26

ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

52.    The Debtors hereby request that any order approving the sale of the Purchased Assets be effective immediately upon entry by providing that the 10-day stay under Bankruptcy Rule 6004(g) is waived or, in the alternative, if an objection to the sale of the Purchased Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## NOTICE

53.    No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have timely filed requests for notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further relief is required.

27

WHEREFORE, the Debtors respectfully request that the Court (i) grant this

Motion; (ii) enter an order substantially in the form as Exhibit D hereto, approving the Sale

Procedures and scheduling a hearing to consider and approve the Sale Transaction; (iii) after

final hearing, approve the Sale Order in a form to be submitted to the Court; and (iv) grant such

other and further relief as is just and proper.

Dated:  April 2, 2007
        Wilmington, Delaware

Respectfully submitted,


Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

          -and-

Suzzanne S. Uhland
Ben H. Logan
Brian Metcalf
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

28