**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | |
| | : | |

## EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE PROPOSED SALE OF ASSETS USED IN THEIR LOAN SERVICING BUSINESS, (B) SCHEDULING HEARING TO CONSIDER PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE AND (B) GRANTING RELATED RELIEF

New Century TRS Holdings, Inc., a Delaware corporation, New Century

Financial Corporation, a Maryland corporation, and their direct and indirect subsidiaries, each as

a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned

counsel, hereby submit this emergency motion (the "Motion") pursuant to sections 105(a), 363,

365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the

"Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for the entry of (i) an order (a) approving bidding

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

procedures and bid protections in connection with the proposed sale of certain mortgage loan servicing assets, (b) scheduling a hearing (the "Sale Hearing") to consider approval of a proposed sale transaction (the "Sale") with Carrington Mortgage Services, LLC ("Purchaser"), or such other prevailing bidder, pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated as of April 2, 2007, by and among Purchaser, Carrington Capital Management, LLC ("Carrington"), New Century Financial Corporation and New Century Mortgage Corporation ("NCMC"), and approving the form and manner of notice thereof (the "Sale Notice") and (c) granting certain related relief (the "Bidding Procedures Order") and (ii) an order approving the Sale and granting related relief (the "Sale Order").  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a). This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a), 363, 365, 503 and 507 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND[2]

3.     New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States.  Through its subsidiaries and its primary holding company

---

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of Monica McCarthy and Holly Etlin in support of Chapter 11 Petitions and Request for First Day Relief.

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.      On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

5.      On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had

requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

6.     These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7.     As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8.     Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity

has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9. During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10. The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11. Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

12. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief and the Debtors' bankruptcy cases are being jointly administered pursuant to an order of the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## RELIEF REQUESTED

13.    The Debtors hereby request, pursuant to Bankruptcy Code Sections 105, 363, 365, 503 and 507 and Bankruptcy Rules 6004 and 6006, that the Court enter orders facilitating the prompt auction and sale of certain of the Debtors' mortgage loan servicing assets. Specifically, the Debtors seek the entry of a Bidding Procedures Order that approves bidding procedures and stalking horse bid protections in connection with the proposed sale of these assets, sets a Sale Hearing to consider approval of the Sale and the Sale Notice, approves procedures for the Debtors' assumption and assignment of certain executory contracts and leases and grants related relief. In addition, the Debtors seek the entry of the Sale Order that authorizes and approves the Sale and grants related relief.

## NEED FOR IMMEDIATE SALE

14.    The Debtors have commenced these bankruptcy cases in order to downsize their operations, reduce expenses, promptly market their businesses and consummate sales of assets as soon as practicable. Prior to commencing these cases, the Debtors, working with their investment banker, Lazard, aggressively marketed their businesses, including their mortgage loan servicing business (the "Servicing Business"). This resulted in expressions of interest, bids and committed offers for various assets and components of their businesses.

15.    The Debtors' Servicing Business is among the most substantial of the Debtors' operations being offered for sale, as loan servicing has been and remains a very important and profitable part of the Debtors' businesses. The Debtors presently service approximately $19 billion of loans owned by third parties. The Debtors' mortgage servicing rights ("MSRs") are generally established in servicing contracts with securitization trusts or third party whole loan purchasers. For performing these functions, the servicer (usually NCMC)

generally receives a servicing fee, one-twelfth of which is paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio. These servicing fees are typically collected from the monthly payments made by the borrowers on the loans. In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.

16.     For the fiscal year ended December 31, 2006, the Debtors estimate that they collected approximately $84 million of servicing fees and approximately $3 million of prepayment penalties, yielding approximately $64 million of servicing income after amortization of MSRs. In addition, in many instances, Debtor entities, such as NC Residual IV Corporation, own residual or other interests in such mortgage-backed securities, thus giving the estates an additional significant economic interest in the proper servicing of the securitized mortgage loans.

17.     Loan servicing typically includes: (i) collecting and remitting loan payments received from the borrowers; (ii) making required advances; (iii) accounting for principal and interest; (iv) customer service; (v) holding escrow or impound funds for payment of taxes and insurance; and, if applicable, (vi) contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Proper servicing requires diligence and sensitivity in order to maximize collections, particularly on delinquent loans, and at the same time compliance with applicable laws and regulations. Servicing contracts also generally require the servicer to advance principal, interest, and certain "property protection" costs such as taxes and insurance (collectively, "Advances") with respect to delinquent mortgage loans, unless such amounts are determined to be unrecoverable from the

related loans. These Advances receive a priority of payment in the securitization trust documents, but they also require the servicer to have substantial working capital in order to finance them.

18.    For these and other reasons, the Servicing Business, while profitable, is also among the most fragile of the Debtors' operations. It is a service business that depends on maintaining a stable and motivated workforce, particularly since servicing loans, especially subprime loans in default, requires sophistication concerning the legal and practical issues that affect proper loan servicing. It also requires the Debtors to maintain ordinary course relationships with the loan servicing customers – largely the securitization trusts (and the holders of the mortgage-backed securities issued by these trusts) – in order to avoid litigation over whether such customers are entitled to terminate the Debtors' servicing contracts or otherwise interfere with the Debtors' efforts to maintain this business pending a sale.

19.    Moreover, this is a licensed and regulated industry. Over the last month, the Debtors have had daily dialogue with their regulators. Providing a clear answer to how the Servicing Business will continue to operate and how Debtors will transfer operations quickly to a solid new operator should provide additional comfort to the various government agencies with which the Debtors work.

20.    In light of the foregoing, much of the effort expended by the Debtors at the outset of these cases has been designed to maintain the Servicing Business and to continue to service loans up to the Debtors' historic high standards while subjecting such assets to the market to attract potential bidders prior to any significant deterioration in the value of the Servicing Business. For example, the cash management motion filed on the first day of this case goes to great lengths to ensure that the trust and other bank accounts utilized in servicing loans

continue to function properly.[3] Similarly, the Debtors' debtors in possession loan agreement presented to the Court includes a Tranche B Subfacility that can provide up to $50 million to finance the advances required to service loans, plus provide working capital.

21.    The cornerstone of the Debtors' efforts to realize value for their stakeholders from their Servicing Business is the proposed sale to Purchaser, or a bidder that submits a higher and better offer than Purchaser pursuant to bidding procedures established by this Court. The Debtors' ability to obtain approval of, and consummate, a sale of the Servicing Business early in these cases is essential to maintaining the confidence of the Debtors' employees, the securitization trusts that utilize the Debtors for loan servicing and the regulators who govern this industry.

22.    Prior to the Petition Date, Lazard broadly sought offers for the Debtors' Servicing Business. In addition to Carrington, Lazard had advanced discussions with 6 other potential buyers for this business who conducted diligence and explored a purchase, a number of whom made offers. Of these, the Debtors determined that Carrington's offer was the best and the Debtors selected Carrington's offer, as the appropriate stalking horse bid for the Servicing Business.

23.    Carrington was an obvious potential buyer. Carrington and its affiliates own the primary interests in 12 securitization trusts established from 2004-2006 (the "Carrington Securitization Trusts") which hold approximately $8.6 billion of mortgage loans that the Debtors originated and sold to these securitization trusts. NCMC is the servicer of the mortgage loans held in the Carrington Securitization Trusts; so, the Carrington Securitization Trusts provide a

---

[3]    The cash management motion is the product of extensive, and extremely cooperative, work with counsel for the main indenture trustee on the securitization trusts for which the Debtors service loans and with counsel for the Debtors' main cash management bank.

significant portion of the revenue realized by the Debtors' Servicing Business. Carrington has been adamant that appropriate steps be taken to stabilize this servicing arrangement even in the pre-petition period and insisted and conditioned its offer on reaching an agreement with the Debtors, subject to court approval and overbids, before the Debtors filed for bankruptcy protection. The Asset Purchase Agreement, as entered into by the parties, further requires the Debtors to file this Motion promptly upon commencing these cases.

24.     Carrington's senior management explained that the economics of the transaction for Carrington depended largely on the ability of the Debtors to provide a clear message to their employees, customers (including Carrington) and their regulators that there is a sale in process. Otherwise, Carrington feared that the Servicing Business would deteriorate.

25.     The Debtors concur that it is essential to sell this business rapidly and that being able to announce a stalking horse bid at the outset of these cases provides an enormous benefit to the Debtors and their stakeholders.

26.     In addition, the Debtors acquired and hold a 36.75% member interest in Carrington. This limited liability company interest in Carrington is not the subject of the instant Motion. But the Debtors intend to auction it, as well as essentially all their assets, pursuant to auction procedures that will be addressed in a separate motion that the Debtors intend to file very shortly. A sale of the Servicing Business to Purchaser will permit the Debtors to continue to retain an interest in the business by virtue of and to the extent of this equity interest in Carrington. It is an economic benefit that only the Purchaser can provide.

27.     Simply put, given the situation that the Debtors face generally, and particularly the facts specific to the Servicing Business, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates.

LA3:1131370 1

10

## THE APA AND THE SALE OF ASSETS

28.     The proposed transaction is documented in an Asset Purchase Agreement by and among Purchaser, Carrington, NCF and NCMC (NCF and NCMC are referred to herein collectively as the "Sellers"), dated as of April 2, 2007 (the "APA"). A copy of the APA is attached hereto as Exhibit A.[4] NCF (through its Board of Directors) approved the proposed sale of the Servicing Business and authorized the execution of the APA, subject to the approval of this Court, after determining in the exercise of its business judgment that the sale is in the best interest of its estate.

29.     In brief, under the APA, and on the terms and subject to the conditions set forth therein (including approval by this Court of such agreement), Sellers have agreed to sell to Purchaser Sellers' rights with respect to essentially all the assets used in the Debtors' Servicing Business (the "Servicing Business" or "Assets"), including the MSRs with respect to loans held by securitization trusts (the "Business").[5] These assets include:

A.     The Sellers' mortgage service rights ("MSRs") contained in servicing agreements with 28 securitization trusts (12 of which are controlled by Purchaser or its affiliates, the other 16 of which are referred to in the APA as the "New Century Portfolio-Related Assets").

B.     The right to be reimbursed for certain servicing Advances made by the Debtors under these MSRs.

C.     Various contracts related to the Servicing Business.

---

[4] Capitalized terms used herein without description have the meanings set forth in the APA. To the extent of any inconsistency between this Motion and the APA, the terms of the APA shall control.

[5] The Debtors also provide interim loan servicing for loans held for sale, many of which are financed through warehouse loans. The APA does not seek to sell any of these MSRs. Rather, this Motion generally relates

D.     Various real property leases used in the Servicing Business.

E.     Equipment, files, records, intellectual property and certain other assets used in the Servicing Business.

30.     Purchaser will acquire these Assets free and clear of any liens, claims or interests and the Sale Approval Order required by the APA requires that the Court make certain rulings that make this clear. Any valid liens on the assets sold will attach to the sale proceeds (except that the payment in full of the Servicer Advance Facility at closing is a condition of the APA).

31.     The APA also provides that Purchaser will make employment offers to substantially all the Debtors' employees engaged in the Servicing Business at a level of base compensation not less than the level of base compensation as applied to any such respective employees immediately prior to the Closing and with benefits that are substantially similar in the aggregate to those provided by Sellers immediately prior to the Closing Date.

32.     The price to be paid by Purchaser on the Closing Date will be approximately $139 million, subject to adjustments under the APA, and consists of the sum of (A) 0.5% of the principal balance of the mortgage loans held by the Carrington Securitization Trusts plus servicing fees and other rights received by the Debtors on account of these loans since a specified date[6] (this portion of the purchase price would equal approximately $43,800,000 if calculated as of March 25, 2007; the actual calculation will be made as of  May 1, 2007 and is subject to audit and adjustment), plus (B) 0.5% of the principal balance of the mortgage loans included in the New Century Portfolio-Related Assets plus servicing fees and

---

to the sale of MSRs related to loans held by third party securitization trusts

[6] Either April 1, 2007 or May 1, 2007, depending on the date of the closing

other rights received by the Debtors on account of these loans since a specified date[7] (this portion of the purchase price would equal approximately $52,300,000 if calculated as of March 25, 2007; the actual calculation will be made as of May 1, 2007 and is subject to audit and adjustment), plus (C) 90% of the amount of Servicer Advances owed to the Debtors for Advances they made on the MSRs as of May 1, 2007 (which will be used to satisfy any outstanding obligations on the Debtors' Servicer Advance Facility with Citigroup Global Markets Realty Corp. (which balance was approximately $31,500,000 as of March 25, 2007) or the Tranche B Advances under the DIP Loan Agreement, if the DIP Loan is used to takeout the Servicer Advance Facility), minus an indemnification holdback amount (as described below) and certain adjustments.

33.    The APA provides that Purchaser will deliver to an escrow agent a deposit equal to $10 million (roughly 7.2% of the Purchase Price) on or before the Bid Deadline established by this Court pursuant to the bidding procedures order. This good faith deposit will be available to the estates if the Debtors terminate the APA based on a Purchaser breach.

34.    The APA provides for a one-year holdback of 10% of the Cash Purchase Price (approximately $11 million) in order to provide Purchaser security that the Debtors satisfy potential indemnification obligations provided for in the APA.

35.    The APA also will contain schedules listing the executory contracts and unexpired leases used in the Servicing Business that are to be assumed by the Debtors and assigned to Purchaser.

---

[7] Either April 1, 2007 or May 1, 2007, depending on the date of the closing.

36.     Similarly, the APA contains procedures for Purchaser to work with NCMC so that it may provide services to Purchaser post-closing at Purchaser's expense, until Purchaser is able to obtain its regulatory licenses to service loans.

37.     The Debtors believe that the proposed Sale provides a reasonable floor for an auction and that the bidding procedures and protections required by Purchaser provide a fair opportunity for open and spirited bidding.

## THE BIDDING PROCEDURES

38.     The bidding procedures (the "Bidding Procedures") negotiated between Purchaser and the Debtors are set forth in detail in Exhibit B attached hereto. This Motion seeks the entry of a Bidding Procedures Order that adopts these procedures. This Motion is qualified entirely by the more detailed descriptions set forth in Exhibit B, but some of the highlights of the Bidding Procedures are set forth below:

A.     Notice:

Within two business days of the entry of the Bidding Procedures Order, the Debtors will provide notice of the sale to a broad spectrum of parties, including any party who has expressed an interest to the Debtors during the prior 3 months in acquiring the Servicing Business. The Debtors will also publish notice of the bid deadline, auction and sale deadline in the Wall Street Journal (National Edition). And as mentioned above, within two business days of the entry of the Bidding Procedures Order, the Debtors will send notice to the counterparties to executory contracts and leases that the APA proposes be assumed and assigned, listing the cure amounts. Within two business days of the entry of the Bidding Procedures Order, the Debtors and their advisors will send notice of the proposed Sale, the process for obtaining diligence materials, the process for qualifying as a bidder, the due date for bids and the proposed time and date of the Auction (as defined below) to Contact Parties and other parties in interest and prospects that have or may be identified as potential bidders for the assets to be sold pursuant to the APA. The Debtors will also publish notice of the proposed sale and bidding procedures in the Wall Street Journal (National Edition).

B.   Data Room and Access to Information:

Prospective bidders can obtain a copy of the APA and access to the electronic data room established by the Debtors upon signing a confidentiality agreement in substantially the form executed by Carrington. The notice of the sale will identify a contact person at Lazard whom prospective bidders should contact.

C.   Qualification of Bidders:

To be eligible to participate in the Auction and be deemed a "Qualified Bidder," each party must submit evidence of its financial ability to purchase the Servicing Business and such other information as the Debtors request to demonstrate the bidder's ability to purchase the Servicing Business and timely consummate this purchase. No later than April 30, 2007, the Debtors will notify the bidders whom the Debtors determine, in their discretion, to be Qualified Bidders.

D.   Bid Deadline and Requirements of Bids:

Bids are due on April 26, 2007 at 5:00 p.m. (the "Bid Deadline"). All bids must be in writing and include a clean, executed asset purchase agreement, plus a blackline showing changes from the APA with Purchaser. If the bid contemplates the assumption and assignment of executory contracts or leases, the bid will include evidence of the bidders ability to provide adequate assurance of future performance. All bids must also be accompanied by a good faith deposit of $10 million in the form of a certified check or wire transfer payable to an account designated by the Debtors. Bids must provide for aggregate consideration to the estates (including cash and non-cash consideration of at least 110% of the Purchase Price set forth in the APA (the "Minimum Bid Amount"). Bids may not be subject to due diligence, corporate approval, financing, or other conditions, terms or representations deemed unacceptable by the Debtors. Bids must also provide that they will remain open until at least 3 business days after the Sale Hearing, and will be available as a back up bidder in case the bidder selected at the Sale Hearing fails to close within that time period.

E.   Stalking Horse Break-Up Fee and Expense Reimbursement:

The APA provides that Purchaser will be entitled to a break-up fee equal to 3% of the purchase price if the Debtors sell all or substantially all of the Servicing Business to a competing bidder (the "Break-Up Fee"). In addition, the APA provides that if the Debtors sell the Servicing Business to a competing bidder or Purchaser terminates the APA under certain

provisions thereunder, and Purchaser is not a proximate cause of the basis for the termination, the Debtors will reimburse Purchaser for its expenses capped at $1,500,000 in the aggregate (the "Expense Reimbursement").

F.    No Qualifying Bids:

If no timely, conforming Qualifying Bids equal to at least the Minimum Bid Amount are submitted by the Bid Deadline, the Debtors shall not hold the Auction (as defined below) and instead shall request at the Sale Hearing that the Court approve the APA with Purchaser.

G.    Auction:

In the event that the Debtors timely receive one or more Qualifying Bids in an amount in excess of the Minimum Bid Amount, the Debtors shall conduct an auction (the "Auction") of the Servicing Business assets. The Auction will take place starting on a date and at a time during the week of April 30, 2007 selected by the Debtors, which date and time will be identified in the notice identifying the Qualifying Bidders. The Auction will be conducted at the offices of O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, or such other location as designated by the Debtors in a notice to all Qualified Bidders. The Auction will start with the highest and/or best Qualifying Bid in excess of the Minimum Bid Amount and subsequent bids must be in amount at least $500,000 higher than the prior bid. The Debtors will take into account the Break-Up Fee and Expense Reimbursement when determining what bid is highest and/or best. Purchaser may include the Break-Up Fee and Expense Reimbursement in the amount of any subsequent bid that it makes in the Auction and, in the event it is the Successful Bidder (defined below) as a result of a subsequent bid made at the Auction, Purchaser shall be entitled to credit the amount of the Break-Up Fee and Expense Reimbursement against the purchase price of such subsequent bid payable at Closing.

H.    Back-Up Bidder and Return of Deposits:

If an Auction is conducted, the party with the next highest and/or best or otherwise Qualifying Bid (including for this purpose Purchaser), as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 pm (prevailing Eastern time) on the third (3rd) business day following the Sale Hearing. If the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bidder will be deemed to be the new

Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court. Except as otherwise provided in the Bidding Procedures, the Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-up Bidder shall be held by the Sellers until the earlier of the eight (8th) business day following the conclusion of the Auction, or twenty-four (24) hours after the closing of the Sale with the Successful Bidder.

## THE HEARING TO CONSIDER THE SALE AND DEBTORS' ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES AND NOTICE THEREOF

39.     The Debtors request that the Court schedule a Sale Hearing on or about May 7, 2007 to consider approval of the Successful Bid (or the APA, if no Qualifying Bid other than that of Purchaser is received or accepted) and the Sale, and the Debtors' assumption and assignment of certain executory contracts and leases in connection therewith.

40.     Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2) (c)(1), (i), and (k) and, if applicable, in accordance with §363(b)(2) of the code." Fed. R. Bankr. P. 6004(a). Essentially, Bankruptcy Rule 2002 requires the Debtors to give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale. Bankruptcy Rule 6004 also provides that objections to the proposed Sale "shall be filed and served not less than five days before the proposed action or within the time fixed by the court." Fed. R. Bankr. P. 6004(b). Bankruptcy Rule 6006 provides that a "proceeding to assume, reject or assign an executory contract or unexpired lease other than as part of a plan is governed by Rule 9014." Fed. R. Bankr. P. 6006(a); Bankruptcy Rule 9014.

41.    The timing of the Auction and sale process and the proposed date for the Sale Hearing requested by the Debtors is well within the notice procedures mandated by the Bankruptcy Rules as they will be providing at least twenty days notice required by the Bankruptcy Rules. Scheduling the Sale Hearing on or about May 7, 2007 is also reasonable given the extensive marketing performed by the Debtors and Lazard prior to commencing these cases. These marketing efforts were diligently pursued by them and, while this process was underway, the Debtors continued to experience significant financial and liquidity difficulties. Under the circumstances facing the Debtors, and the significant and carefully targeted marketing prior to the Petition Date, the Debtors believe that the reasonableness of the proposed auction and sale process is evident. Finally, and perhaps most significantly, it is necessary to obtain the maximum recovery for creditors.

42.    The Debtors intend to provide notice of the Sale Hearing by service and publication of the notice attached hereto as Exhibit C (the "Sale Hearing Notice"). The Debtors also intend to publish the Sale Hearing Notice in the National Edition of *The Wall Street Journal,* prior to the Sale Hearing.

43.    Additionally, to facilitate the Sale and the assumption and assignment of the executory contracts and leases, the Debtors ask the Court to approve the following procedures pursuant to Bankruptcy Rule 6006 and 9014. First, within two business days after the Court enters the Bidding Procedures Order, the Debtors will serve on the counterparties to these contracts and leases a Notice of Assumption and Assignment in the form attached as Schedule 3 to the proposed Bidding Procedures Order. That Notice of Assumption and Assignment will advise these counterparties of the Debtors' intent to assume and to assign to Purchaser the contract or lease and will list the cure amounts associated with that assumption and

assignment. Second, any counterparty to a contract or lease who objects to the assignment to Purchaser or disputes the cure amount must file an objection stating the basis, including the nature of any dispute over the cure amount. The Debtors propose that any such objections be due at the same time as any other objection to the sale, which objection deadline the Debtors propose to set for May 2, 2007. Third, if the Court approves a bidder other than Purchaser, any counterparty will be able to raise at the sale hearing any additional objections based on an asserted inability of the winning bidder to provide adequate assurance of future performance. If there is a dispute concerning a cure amount, the pertinent Debtor may, in its sole discretion, hold an amount equal to the claimed cure amount in reserve pending further order of the Court or agreement among the parties. So long as the Debtors hold this disputed cure amount in reserve, the Debtors will be able to assume and assign the contract or lease without delay. The APA conditions Purchaser's obligations upon the Sale Order providing Purchaser will not be liable for any disputed cure amount or any other claims under these contracts (including being subject to contract termination) that predate the assignment.

44.    The Debtors further request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale or the Debtors' Notice of Assumption and Assignment: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, at least five (5) days prior to the Sale Hearing and (d) with a copy served on and received by: (i) counsel for the Debtors, O'Melveny & Myers LLP, 275 Battery Street, Suite 2600, San Francisco, CA 94111, Attention: Suzzanne Uhland, Esq. and O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, Attention: Ben H.

Logan, Esq.; (ii) counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square,

P.O. Box 551 Wilmington, Delaware 19899, Attention:  Mark D. Collins, Esq., (iii) counsel for

Carrington and Purchaser, Mayer, Brown, Rowe & Maw LLP, 71 South Wacker Drive, Chicago,

Illinois 60606-4637, Attention: Thomas S. Kiriakos, Esq. and Womble Carlyle Sandridge &

Rice, PLLC, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801, Attention: Steven K.

Kortanek, Esq., (attorneys for Carrington); (iv) counsel to the Official Committee of Unsecured

Creditors [to be determined]; and (v) the Office of the United States Trustee, 844 King Street,

Suite 2207, Lockbox 35, Wilmington, Delaware 19801.

### APPROVAL OF BREAK-UP FEE AND EXPENSE REIMBURSEMENT

45.     Pursuant to the APA, Purchaser shall be entitled to a Break-Up Fee of 3%

of the Purchase Price in the event the Debtors consummate a sale of all or substantially all of the

assets to a third party other than Purchaser, which is to be paid in cash as an administrative

expense with priority over any and all administrative expenses of the kind specified in Sections

503(b) or 507(a)(2) of the Bankruptcy Code.  Following such closing, Sellers shall promptly pay

the Break-Up Fee (and any expense reimbursement) to Purchaser directly from the cash proceeds

of any sale of the Servicing Business to such other Successful Bidder, regardless of any other

competing liens on or claims to such sale proceeds.

46.     Bidding incentives, such as the Break-Up Fee, encourage a potential

purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform

the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent

risks and uncertainties of the chapter 11 process.  "Agreements to provide breakup fees or

reimbursement of fees and expenses are meant to compensate the potential acquirer who serves

as a catalyst or 'stalking horse' which attracts more favorable offers."  In re S.N.A. Nut Co., 186

B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Associates L.P., 96 B.R. 24,

28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a

white knight to enter the bidding by providing some form of compensation for the risks it is

undertaking") (citation omitted).

       47.     A proposed bidding incentive, such as the Break-Up Fee, should be

approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104; see also

In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc.,

140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive

provide some benefit to the debtor's estate. Calpine Corporation v. O'Brien Environmental

Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 533 (3rd Cir. 1999)

(holding even though bidding incentives are measured against a business judgment standard in

non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code Section

503(b) govern in the bankruptcy context).

       48.     Here, the Break-Up Fee constitutes 3% of the gross cash purchase price

offered by Purchaser for the Servicing Business assets and will only be paid if these assets are

sold to a higher bidder – meaning that the Debtors, following an auction process, would have to

determine that such other bid is higher and better than Purchaser's offer for the assets, including

factoring into the competing bid the cost of the Break-Up Fee. If this occurs, the Debtors will

effectively net at least the amount offered by Purchaser, as payment of the Break-Up Fee will

come exclusively from any overbid and will not reduce the amount paid to the estates, and

consequently the estates will have benefited from the floor set by Purchaser's initial bid. The

same is true for the Expense Reimbursement, which is capped and will be paid only if a

competing bid is sufficient to satisfy it and clear an additional amount for the estates, or

Purchaser terminates the transaction because of an event for which it is not responsible.

49.     "The usual rule is that if break-up fees encourage bidding, they are

enforceable; if they stifle bidding, they are not enforceable." In re Integrated Resources, Inc.,

147 B.R. 650, 660 (S.D.N.Y. 1992). Approving the Break-Up Fee will commit Purchaser to

serve as the stalking horse bidder under the APA with a bid that starts any additional bidding or

auction for the assets at a fair and reasonable purchase price, all to the benefit of the estates. The

Debtors are optimistic that Purchaser's bid will be topped and that a spirited auction will ensue.

Indeed, the Debtors believe that the Break-Up Fee will encourage bidding by serving "any of

three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to

establish a bid standard or minimum for other bidders to follow; or (3) to attract additional

bidders." Id. at 662. In other words, if the assets are sold to a competing bidder, it will – in all

likelihood – be because of Purchaser's crucial role as a stalking horse.

50.     In addition, "[a] break-up fee should constitute a fair and reasonable

percentage of the proposed purchase price, and should be reasonably related to the risk, effort,

and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts

and to the magnitude of the transaction, break-up fees are generally permissible." Id. As noted

above, the Break-Up Fee of 3% of the purchase price is within the range of fees typically paid in

other significant sales transactions that have been consummated in a bankruptcy setting. See e.g.

Consumer News & Business Channel Partnership v. Financial News Network, Inc. (In re

Financial News Network Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that the transaction at

issue provided for a $8.2 million break-up fee on a $149.3 million transaction); Integrated

Resources, 147 B.R. at 662 (approving a $7.5 million break-up fee on a $565 million

transaction); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (PJW) (Bankr. D.

Del., June 15, 1998) (court approved break-up fee of 2.75%, or $3,000,000 in connection with

$110,000,000 sale of real estate). Here, the value of the transaction to the Debtors is not

reflected solely by the purchase price -- the Debtors will also realize substantial value for the

transaction in light of their economic interest in the Purchaser. This fact supports the

reasonableness of the proposed Break-Up fee and Expense Reimbursement as well as the

incremental initial bid required for a bidder to be deemed a Qualified Bidder.

51.    For these reasons, and given the benefits provided by the APA, the

Debtors urge the Court to approve the Break-Up Fee and the Expense Reimbursement.

## APPROVAL OF AUCTION PROCESS AND SALE OF ASSETS

52.    Bankruptcy Code Section 363(b)(1) provides that a debtor, "after notice

and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent

part that "[t]he Court may issue any order, process, or judgment that is necessary and appropriate

to carry out the provisions of this title." 11 U.S.C. §105(a).

53.    A sale of a debtor's assets should be authorized pursuant to Bankruptcy

Code Section 363 where the transaction represents an exercise of the debtor's sound business

judgment. See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3rd Cir. 1996); In re

Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines. Inc., No. 01-0056, 2001

Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

54.    Courts typically consider the following factors in determining whether a

proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale,

(b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith. See Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re United Healthcare Svs., Inc., No. 97-21785, 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

55.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See e.g. In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the ... [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Products, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

56.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26,1997); Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed

rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

57.    The Debtors submit that the proposed Sale with Purchaser or other Successful Bidder satisfies the "sound business reason test." The Debtors believe that a prompt sale of the assets presents the best opportunity to maximize value for their estates. The Debtors also believe that, absent a prompt sale, the value of the assets may substantially decline. In addition, the Debtors also believe that the Bidding Procedures and Sale Notice are the best method by which they can obtain the best price for the assets and provide interested persons with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the assets by helping ensure a competitive and fair bidding process. They also will allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates. Finally, the Debtors submit that the price offered by Purchaser for the assets is fair and reasonable. The Debtors and Lazard thoroughly marketed the assets prior to the Petition Date, and the offer made by Purchaser was determined by the Debtors in their business judgment to be the best available offer for the Assets and as the appropriate stalking horse offer for the Assets.

## SALE OF ASSETS FREE AND CLEAR OF LIENS AND INTERESTS

58.    The Debtors further submit that it is appropriate to sell the Assets free and clear of claims, interests, liens and encumbrances pursuant to Bankruptcy Code Section 363(f),

with any such claims, interests, liens and encumbrances attaching to the net sale proceeds of the Assets to the extent applicable.

59.    Bankruptcy Code Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interests, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property, (iv) such interest is in bona fide dispute, or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

60.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

61.    The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to any Sale involving the Assets. In particular, the Debtors believe that any lienholder will be adequately protected by having their liens, if any, attach to the cash proceeds ultimately attributable to the assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor

had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto (provided, however, that Debtors shall ensure that the Servicer Advance Facility is paid in full at closing consistent with the conditions of the APA). In addition, under the APA Purchaser will be responsible for all liabilities arising after consummation closing of the Sale, but except as specifically provided in the APA will not assume any of the Debtors' liabilities in connection with the assets arising prior to closing or as a successor to the Debtors' business or otherwise.

62.    Although Bankruptcy Code Section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. <u>Folger Adam Security v. DeMatteis/MacGregor JV</u>, 209 F.3d 252, 257 (3rd Cir. 2000). In the case of <u>In re Trans World Airlines, Inc.</u>, 322 F.3d 283, 288-89 (3rd Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" <u>Id.</u> at 289. As determined by the Fourth Circuit in <u>In re Leckie Smokeless Coal Co.</u>, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in <u>Folger, supra</u>, the scope of Bankruptcy Code Section 363(f) is not limited to in rem interests. Thus, the Third Circuit in <u>Folger</u> stated that <u>Leckie</u> held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." <u>Folger</u>, 209 F.3d at 258.

63.    Courts have consistently held that a buyer of a debtor's assets under Bankruptcy Code Section 363 takes the assets free from successor liability resulting from pre-

existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716,

732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and

clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94

(2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear

under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329

(Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of

Title VII employment discrimination and civil rights claims of debtor's employees); In re

Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); American Living Systems v.

Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ

Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R.

97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation

is an "interest" as used in section 363(f)).[8]

      64.    The purpose of an order purporting to authorize the transfer of assets free

and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a

basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct. Under

Bankruptcy Code Section 363(f), Purchaser or other Successful Bidder is entitled to know that

the assets do not have attached latent claims that will be asserted against them after the Sale is

---

[8] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims nevertheless find that Bankruptcy Code section 105(a) provides such authority. See In re White Motor Credit Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

completed. Accordingly, and consistent with the above-cited case law, the Sale Approval Order should state that the Purchaser will not be liable as a successor under any theory of successor liability, for claims that encumber or relate to the assets.

## ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS AND LEASES

65.    Section 365(b) of the Bankruptcy Code authorizes a debtor in possession to assume and assign an executory contract or unexpired lease subject to Court approval. Section 365(b) of the Bankruptcy Court requires a debtor in possession to satisfy certain requirements at the time of assumption if a default exists under the contract to be assumed. The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

66.    The proposed assumption and assignment of the Assumed Contracts and Assigned Leases is a sound exercise of the Debtors' business judgment and should be approved. The Assumed Contracts and Assigned Leases are valuable assets of the estates. Upon consummation of the proposed sale to the Purchaser, or such other prevailing bidder, the Debtors will no longer continue to operate their business and will have no use for the Assumed Contracts and Assigned Leases. Accordingly, to the extent that the Debtors can sell the Assumed Contracts and Assigned Leases to a third party in connection with the sale of their businesses, the Debtors can generate cash that can be used to satisfy claims against the estates.

67.    Any assumption and assignment of the Assumed Contracts or Assigned Leases, shall only become effective and binding on the Purchaser, or other prevailing bidder, upon consummation of the Sale at the Closing. Nothing in the APA shall limit the right of the Purchaser, or other prevailing bidder, from removing, and directing the Debtors to reject, an Assumed Contract or Assigned Lease from the list of executory contracts and unexpired leases to be assumed and assigned in connection with the Sale any time prior to consummation of the Sale, without further notice to the non-debtor party to such Assumed Contract or Assigned Lease and without the need for further order of this Court.

## FINDING OF GOOD FAITH

68.    Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d at 1125 (emphasis omitted) (quoting In re Rock Industries Machinery Corn., 572 F.2d 1195, 1198 (7th Cir. 1978).

69.     The APA was intensely negotiated at arm's-length with all parties involved acting in good faith. The Debtors therefore request that the Court make a finding that Purchaser, if it is not overbid at the Auction, has purchased the assets in good faith within the meaning of Bankruptcy Code Section 363(m). In the event there is a Successful Bidder other than Purchaser, the Debtors intend to present evidence to show that the Successful Bidder is entitled to the same finding under Bankruptcy Code Section 363(m).

## FINALITY OF ORDER

70.     The Debtors further request that, pursuant to Bankruptcy Rules 6004(h) and 6006(d), the order approving the Sale Transaction and assumption and assignment of the Assumed Contracts and Assigned Leases not be stayed for any period of time after the entry of such orders.

71.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provide that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of 10 days after the entry of the order unless the court orders otherwise." The Debtor requests that any order approving the Sale Transaction or the Debtors' assumption and assignment of the Assumed Contracts or Assigned Leases be effective immediately by providing that the 10-day stay under Bankruptcy Rules 6006(h) and 6006(d) are waived.

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court

LA3:1131370 1

31

should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

      73.      The Debtors hereby request that any order approving the sale of the assets and the assumption and assignment of the Assumed Contracts and Assigned Leases be effective immediately upon entry by providing that the 10-day stay under Bankruptcy Rule 6004(h) and 6006(d) is waived or, in the alternative, if an objection to the sale of the Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## NOTICE

      74.      No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors proposed post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; (4) counsel to Carrington; (5) all parties who are known to possess or assert a secured claim against the Servicing Business; (6) the Internal Revenue Service; and (7) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors request that the Court (i) grant the Motion; (ii) enter

an order substantially in the form attached as Exhibit D hereto, approving the Bidding

Procedures and scheduling a hearing to consider and approve the Sale Transaction; (iii) after

final hearing, approve the Sale Order in a form to be submitted to the Court; and (iv) grant such

other and further relief as is just and appropriate.

Dated:  April 4, 2007
      Wilmington, Delaware

Respectfully submitted,


Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Brian Metcalf
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION