# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,[1] | : | Case No. 07-[____] (___) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION
FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY
PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS
PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE**

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of an

order, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (as amended

from time to time, the "Bankruptcy Code"), authorizing, but not directing, the Debtors to pay

prepetition wages, compensation and employees. In support of this Motion, the Debtors

respectfully state as follows:

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Date: 4-2-07
Docket No. 10

## JURISDICTION

1.        This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1134. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2.        The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND[2]

### A.     Introduction

3.        New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of

---

[2] The facts and circumstances supporting this Motion are set forth in the Declarations of Monika McCarthy and Holly Etlin in support of Chapter 11 Petitions and Request for First Day Relief.

mortgage loans, most of which were sold in the secondary market. Since their inception, the

Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of

homebuyers and homeowners across the nation access credit and realize the benefits of home

ownership, including many who might not otherwise have been able to do so.

4.      On February 7, 2007, NCF announced that it would restate its quarterly

financial statements for the first, second, and third quarters of 2006 after the Debtors discovered

that there may be errors in the application of generally accepted accounting principles regarding

NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various

securities class action lawsuits and shareholder derivative suits.

5.      On March 2, 2007, NCF announced that it could not timely file its Annual

Report on Form 10-K and that KPMG, LLP NCF's independent auditors, could not complete its

audit of NCF's 2006 financial statements until after completion of the internal investigation by

NCF's audit committee. NCF also announced that the Securities and Exchange Commission had

requested a meeting with NCF to discuss these events and that the United States Attorney's

Office had commenced a criminal inquiry.

6.      These announcements, together with increased borrower defaults that have

adversely affected the subprime mortgage market nationwide, had a devastating impact on the

Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that

provide the short term credit facilities that the Debtors need to originate and purchase loans (each

a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby

threatening their viability. During the following week, the Warehouse Lenders made margin

calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the

Warehouse Lenders began restricting and ultimately ceased providing funding for loans

originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7.     As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8.     Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9.     During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10.     The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other

assets for the benefit of the Debtors' stakeholders.

      11.     Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

      12.     On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. Further, a motion for joint administration of the Debtors' bankruptcy cases is pending before the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

**B.**     **The Employees are Critical to the Sale Process**

      13.     The Debtors' business in particular and the industry generally has been severely negatively impacted by a variety of factors over the last several months. In large part as a result of these pressures, the Debtors commenced these bankruptcy cases in order to downsize their operations, reduce expenses, promptly market their businesses and consummate sales of assets as soon as practicable.

      14.     The need for stability during the sale process is particularly critical since the Debtors largely operate service businesses. For example, the Debtors' loan servicing platform requires a stable work force, working capital to service loans, and maintenance of an infrastructure. Similarly, the Debtors' loan origination platform requires the maintenance of an infrastructure or it will dissipate quickly. It is essential that the human beings who are maintaining these businesses for sale have the resources to keep them operating or the stakeholders will likely suffer and their recoveries drop precipitously. As well, it is critical that

customer, vendors and employees maintain confidence that the Debtors will have sufficient liquidity to effect an orderly sale process, as opposed to winding down abruptly.

15.    This is not to say, however, that the Debtors are planning on business as usual pending these sales. Working closely with Lazard and their financial advisor, AlixPartners ("Alix"), the Debtors have implemented appropriate steps to cut costs dramatically while still maintaining going concern business operations. For example, the Debtors recently implemented significant layoffs in their work force and are filing with their bankruptcy petitions motions to reject leases for facilities that are not necessary for a substantially scaled back loan origination business. These are just examples; the Debtors and Alix have implemented tight controls on cash expenditures. The Debtors will continue to work to pare expenses consistent with allowing their servicing business to continue to operate to its historic high standards, and with maintaining the base human and other infrastructure that is key to testing a going concern sale of their loan origination platform.

## RELIEF REQUESTED

16.    By this Motion, the Debtors seek, inter alia, entry of an order that (i) authorizes but does not direct the Debtors to pay Employee Obligations, Employee Deductions and Employee Expenses (as defined herein), (ii) authorizes but does not direct the Debtors to continue their practices, programs and policies in effect as of the Petition Date with respect to all Employee Obligations (including honoring paid time off accrued, but unused, as of the Petition Date), Employee Deductions and Employee Expenses, (iii) authorizes and directs the bank at which the Debtors maintain an account from which the Debtors' payroll obligations are disbursed and all other banks or lending institutions maintaining payroll and employee benefits accounts to honor and pay all prepetition and postpetition checks issued or to be issued and fund

transfers requested or to be requested by the Debtors in respect of the Employee Obligations,

Employee Deductions and Employee Expenses and (iv) authorizes but does not direct the

Debtors to pay certain Employee Obligations to terminated Employees. The Debtors also seek

authority to issue new postpetition checks or fund transfer requests with respect to prepetition

obligations that may have been dishonored by the banks in respect of the Employee Obligations,

Employee Deductions and Employee Expenses, if necessary.

## A.    Salaries and Wages

17.    In reaction to slowdown in the real estate market, the Debtors began

terminating employees at the beginning of 2007. On March 1, 2007, the Debtors terminated

approximately 235 employees, reducing the number of employees at the time of the filing of the

petitions to approximately 6,583, of whom approximately 6,516 are full time and 67 are part-

time (collectively, the "Employees"). The Debtors anticipate an additional reduction in force of

approximately 3,200 Employees on the Petition Date. As a result of the commencement of the

Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the

Debtors will be prohibited from paying or otherwise satisfying their prepetition obligations to the

Employees, including their obligations under wage, salary, retirement, healthcare, and various

other benefit programs (collectively, the "Employee Obligations"). In addition, checks, wire

transfers and direct deposit transfers issued in respect of the Employee Obligations will be

dishonored. To ensure that remaining Employees do not terminate their employment at this

critical time for the Debtors, and to minimize the personal hardship all Employees would suffer

if prepetition employment-related obligations are not paid or honored when due, the Debtors

seek authority to honor, in their discretion, such obligations, including those described above.

18.    The Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the significant reduction in workforce will very likely cause the remaining Employees to question their future employment prospects with the Debtors. While the Employees have demonstrated loyalty to the Debtors despite the uncertainty during the months prior to the commencement of these cases, their search for a sense of stability with regard to compensation and benefits may lead to an epidemic of remaining Employee departures. The remaining Employees will look to the treatment of the terminated Employees when evaluating their future with the Debtors. Payment of Employee Obligations to terminated Employees is justifiable for this reason alone. A significant deterioration in morale among remaining Employees at this critical time undoubtedly would have a devastating impact on the Debtors, their customers, the value of their assets and business and their ability to maximize value through the sale process.

19.    The Employees are essential to the success of the Debtors' business. The cost of replacing and then retraining Employees -- particularly in the Debtors' specialized servicing business -- will outweigh the cost of honoring the prepetition Employee Obligations. The Employees are key to the Debtors' business value and any significant number of additional departures will substantially and adversely impact the Debtors' businesses and result in immediate and irreparable harm to the creditors and the estates. Consequently, it is critical that the Debtors continue, in the ordinary course, the personnel policies, programs and procedures that were in effect prior to the Petition Date. If the checks issued and fund transfers requested in payment of the Employee Obligations are dishonored, or if such accrued obligations are not timely honored postpetition, the Employees will suffer extreme hardship and may be unable to pay their daily living expenses. Likewise, it would be inequitable to require the Employees to

bear personally any business expenses that were incurred on behalf of the Debtors with the expectation that they would be reimbursed.

20.    In the ordinary course of their businesses, the Debtors, through their payroll processor, Accenture LLP, make payroll direct deposits and issue payroll checks on a bi-weekly basis for services rendered by its Employees. The Debtors' last payroll direct deposits and checks issued prior to the Petition Date for its Employees relating to the two week period from March 5, 2007 through March 18, 2007 were issued on March 23, 2007 and were thus approximately five days in arrears, reflecting wages earned in the two week period up to and including the Sunday of the prior week. The next scheduled payday for Employees is April 6, 2007 and will relate to the two week pay period from March 19, 2007 through April 1, 2007 and thus includes only amounts earned prior to the Petition Date. The Debtors estimate that outstanding prepetition amounts for the payroll of the Employees as of the Petition Date is approximately $15,000,000.

21.    Additionally, for most of the Debtors' Employees involved in loan origination, their compensation is largely earned through commission based plans, including a Wholesale Division and Region Manager Incentive Compensation Plan, a Wholesale Executive Management Incentive Compensation Plan, a Collateral Analyst Incentive Compensation Bonus Plan and a Company Incentive Bonus Plan (the "Incentive Plans"). Employee compensation earned pursuant to the Incentive Plans are in the nature of commissions and are paid concurrently with the Debtors' other payroll obligations. Compensation earned pursuant to an Incentive Plan is paid semi-monthly, monthly or quarterly, depending on the plan. Commissions are earned based on the amount of mortgage loans funded. As compensation paid to the Employees and earned pursuant to the Incentive Plans vary each pay period based on the mortgage loans that are

funded, the Debtor is unable to provide a realistic estimate for its future obligations that stem

from the Incentive Plans. The Incentive Plans are ordinary course business expenses, and

Employees expect to receive payments pursuant to the Incentive Plans as a portion or all of their

salaries. The Debtors seek authorization, but not direction, to honor prepetition amounts earned

under the Incentive Plans in the ordinary course of business.[3]

   22. Because the Debtors stopped funding mortgage loans in mid-March,

Employees who ordinarily earn their salaries as a percentage of loans funded under the Incentive

Plans would not be paid. Based on the very nature of the loan origination business, each of the

employees is key to the creation of revenue for the Debtors. In order to retain certain key

commission-based Employees while the Debtors sought financing and a potential buyer, the

Debtors instituted two incentive plan protection plans (the "Retention Plans"). The Debtors

agreed to pay eligible employees for the months of March 2007 and April 2007 the greater of the

amount earned under an Incentive Plan or seventy-five percent (75%) of their average monthly

income earned under the Incentive Plans during the months of December 2006 through February

2007. The Debtors agreed to pay fifty percent of amounts earned under the Retention Plans on

the 20th and the other fifty percent on the final day of the following month. In other words, the

Debtors agreed to pay fifty percent of the March 2007 payments on April 20, 2007 and the

remaining fifty percent of the March 2007 Retention Plan payments on April 30, 2007.

Employees are not eligible for payment under the Retention Plans unless they are actively

employed by the Debtors on the payment dates. After giving effect to the recent reduction in

force, approximately 1300 employees will be entitled to payment under the Retention Plans. The

---

[3] Although the Debtors do not believe that payments under the Incentive Programs are prohibited by the automatic stay, out of an abundance of caution, the Debtors describe the Incentive Programs here and request approval of payment of obligations under the Incentive Programs as Employee Obligations.

Debtors estimate that the total aggregate amount to be paid for March 2007 under the Retention

Plans will be approximately $7,343,000, all of which is for pre-petition amounts earned by

Employees. The Debtors seek authorization, but not direction, to honor prepetition amounts

earned under the Retention Plans in the ordinary course of business.

   23. The Debtors also utilize in the ordinary course of business independent

contractors (the "Independent Contractors"), through employment agencies. The Independent

Contractors perform various functions for the Debtors, including clerical and administrative

services, computer support work and broker services, and are critical to the Debtors' continued

operations. The Independent Contractors are classified and paid separately from the Debtors'

payroll and accounting system. The Debtors are for services (based on hourly rates) performed

by the Independent Contractors. The Debtors seek permission hereunder to pay prepetition

amounts to the Independent Contractors in the ordinary course of business as Employee

Obligations.

   24. Pursuant to section 105(a) and 363(b) of the Bankruptcy Code, the Debtors

seek authority to continue with their payroll schedule in the ordinary course of business and

consequently pay all Employees' prepetition compensation. Such costs are relatively minimal

compared with the size of the Debtors' estates and the damage to the Debtors' chapter 11 cases

that would ensue if Employee morale were disrupted by the Debtors' failure to meet the payroll

portion of their Employee Obligations.

**B.** **Time-Off Days**

   25. The Debtors also seek authority, but not direction, to permit Employees to

use paid time off, holidays, sick days and bereavement leave, whether accrued before or after the

Petition Date (collectively, "Time Off Days"), in accordance with the Debtors' prepetition

policies. Part-time and Full-time Employees working 32 plus hours per week accrue paid time of

("Paid Time Off") based on their length of employment and position.

      26.    Generally, Paid Time Off for qualifying, regular, part-time and full-time

Employees accrues as follows:[4]

| | | |
|---|---|---|
| 90 days to 1 year of service | - | 10 annual days Paid Time Off |
| 1 to 2.99 years of service | - | 10 annual days Paid Time Off |
| 0 - 7.99 years of service (Executive) | - | 15 annual days Paid Time Off |
| 3 to 7.99 years of service | - | 15 annual days Paid Time Off |
| 8 or more years of service | - | 20 annual days Paid Time Off |
| 8 or more years of service (Executive) | - | 20 annual days Paid Time Off |

      27.    Employees may carry over accrued but unused Paid Time Off hours from

year to year in an amount of up to two times their annual accrual of Paid Time Off hours.

However, once Employees have accrued two times their annual accrual of Paid Time Off hours,

they will cease accruing Paid Time Off hours until they have used some of the Paid Time Off

hours. The Debtors' vacation policy requires that requests for vacation be approved by each

Employee's supervisor.

      28.    The Debtors' policy is to pay an Employee, upon termination, all accrued

unpaid vacation at his/her final rate of pay. As of the Petition Date, Employees had accrued

unpaid vacation in amount equal to approximately $10,931,000, which represents an average of

approximately $1,700 per Employee. The Debtors are seeking authority, but not direction, to

pay Employees for prepetition unpaid accrued vacation upon termination, in addition to seeking

authority to permit Employees to use Paid Time Off accrued prior to the Petition Date, in

accordance with the Debtors' prepetition policies.

---

[4] While the description of the Paid Time Off policy set forth herein applies to the vast majority of
Employees, there are exceptions. For instance, attorneys employed by the Debtors are eligible for 15 days vacation
upon hire. Also, Executive Management Committee Employees are eligible for six weeks vacation after eight years
of service. There are also a limited number of Employees hired by an entity recently acquired by the Debtors whose
vacation accrual is not subject to the two year cap.

29.     In addition, after 90 days of employment, Employees are eligible to receive paid sick leave. Eligible full-time Employees, receive 6 days of paid sick leave during each year of employment and eligible part-time Employees receive 4.5 days of sick leave during each year of employment.

30.     The Debtor also encourage their Employees to be active citizens and volunteers by offering eligible Employees, who have completed 90 days of employment, 16 paid volunteer hours per calendar year to participate in approved charitable activities.

31.     Eligible Employees are also entitled to eight paid holidays and one personal day per calendar year. They are paid their regular base salary or hourly rate of pay for the number of hours they are regularly scheduled to work in a day. Personal days must be used within the calendar year.

32.     In addition, Employees are entitled to up three consecutive days of paid bereavement leave per calendar year for use in the event of a death of an immediate family member. Unused bereavement leave days do not carry forward from one calendar year to the next. Upon termination, Employees do not receive payment for bereavement leave days not taken in that calendar year.

33.     Employees are also entitled to up to 10 business days of paid jury duty leave per calendar year for time spent serving on a jury. Unused jury duty leave hours will not carry forward from one calendar year to the next. Upon termination, Employees do not receive payment for jury duty leave hours not taken in that calendar year.

C.     **Employee Benefits**

34.     As part of the Debtors' Employee Obligations, the Debtors have also established a variety of benefit plans and programs (the "Employee Benefits") designed to assist

their Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that arise from illness, disability and death. The Debtors believe that all amounts and obligations related to Employee Benefits accrued prior to the Petition Date have been paid in full except as otherwise noted herein. However, out of an abundance of caution, the Debtors seek authorization, but not direction, to pay or otherwise honor these Employee Benefits in the ordinary course of business.

### 1.    **Health Plan Benefits**

35.    The Debtors have established several health plans. Regular full-time Employees in Hawaii are offered medical benefits through a choice of medical plans administered by Hawaii Medical Service Association (the "HMSA Plan"). Regular full-time Employees located in other states are offered medical benefits through a choice of a medical plans administered by United-Healthcare (the "UHC Plan"). Included in the plans are hospitalization, ambulance service, lab/X-ray treatment and prescription drugs. Regular full-time Employees are also offered dental benefits through a preferred provider option plan administered by MetLife (the "MetLife Dental Plan"). Employees can also elect to obtain vision coverage through participating in a vision plan provided by Vision Service Plan (the "Vision Plan"). Prior to health plan enrollment, an Employee may elect to cover eligible dependents.

36.    The Debtors encourage covered Employees to choose their doctors and hospitals from the UHC Plan, HMSA Plan, MetLife Dental Plan and Vision Plan networks to get the greatest benefit coverage. The Debtors pay approximately $34,000 a month in premiums for the HMSA Plan. The UHC Plan, the MetLife Dental Plan and the Vision Plan are self-funded by the Debtors. The Debtors pay approximately $3 million per month for claims under the UHC Plan and approximately $200,000 per month for administrative fees to UHC. In addition to these

amounts, the aggregate amount deducted from Employee payroll checks for the UHC Plan on a monthly basis is approximately $700,000. The Debtors pay approximately $347,000 per month for claims under the MetLife Dental Plan and approximately $20,000 a month for administrative fees. The aggregate amount deducted from Employee payroll checks for the MetLife Dental Plan on a monthly basis is approximately $109,000. The Debtors pay approximately $46,000 a month for claims under the Vision Plan and approximately $7,500 per month for administrative fees. The aggregate amount deducted from Employee payroll checks for the Vision Plan on a monthly basis is approximately $34,000.

37.     Because certain of the medical plans are self-funded, the Debtors also have a stop loss insurance policy with SunLife Assurance Company of Canada for protection against major dollar medical claims. SunLife reimburses the Debtors for any medical claims greater than $275,000. The Debtors pay approximately $75,000 a month in premiums to SunLife.

38.     Pre-petition, approximately 5,700 Employees participate in the UHC Plan, approximately 50 Employees participate in the HMSA Plan, approximately 5,770 Employees participate in the MetLife Dental Plan and approximately 5,300 Employees participate in the Vision Plan.

39.     Employees rely on the Debtors to provide continuing medical care. Employee welfare and morale would be significantly harmed if the Debtors were to fail to pay any due amounts with respect to the health insurance plans. As noted above, the Debtors believe that all amounts and obligations related to the health insurance plans prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority

to pay any prepetition costs related to the medical insurance benefits in the ordinary course of business.

40.     Furthermore, and for similar reasons, the Debtors seek to continue to perform their obligations under section 4980B of the Internal Revenue Code to provide Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B) with respect to former employees. The Debtors provide their former employees with COBRA administered through UHC. Former employees enrolling in COBRA pay an approximate aggregate amount of $93,000 per month to the Debtors for COBRA benefits. The Debtors in turn pay UHC for medical claims incurred by the former employees. The Debtors pay an additional administration fee to UHC in an approximate amount of $10,000 per month. As noted above, the Debtors believe that all amounts and obligations related to COBRA benefits prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to COBRA benefits in the ordinary course of business.

2.     **Employee Life and Other Insurance Benefits**

41.     The Debtors provide to certain Employees basic group life, supplemental life, accidental death and dismemberment ("AD&D"), short-term and long-term disability coverage and other insurance coverage. The Debtors pay Standard Insurance Company approximately $230,000 per month for basic life, AD&D, short-term and long-term disability insurance coverage premiums. The Debtors also pay state disability insurance to the states of Hawaii and New York. New York and Hawaii state disability payments are mandatory and the payment formula is based on quarterly headcount and payroll amount. The Debtors pay approximately $800 a month for New York state disability coverage and approximately $4,000 a month for Hawaii state disability coverage. In July 2006, the Debtors pre-paid the New York

state disability insurance to cover the period from July 2006 through June 2007. Hawaii state disability is due quarterly with next payment due in April 2007.

42.    As noted above, the Debtors believe that all amounts and obligations related to group life, supplemental life, AD&D, short-term and long-term disability and other insurance coverage prior to the Petition Date have been paid in full. However, out of an abundance of caution, the Debtors request authority to pay any prepetition costs related to group life, supplemental life, AD&D, short-term and long-term disability and other insurance coverage in the ordinary course of business.

### 3.    Flexible Spending Benefits Program

43.    Employees who anticipate that they will have health care expenses that are not covered by the insurance plan may elect to participate in the Debtors' flexible spending account (the "Flexible Spending Account"), administered by UHC. Employees determine what their total annual out-of-pocket expenses will be and how much they wish to set aside for the year. This amount is divided into 26 equal pre-tax deductions for the pay periods throughout the year and is credited to the Employee's special health care account. Because the deductions are pre-tax, participating Employees' federal, state and social security taxable wages are reduced. As expenses are incurred, an Employee files claims with UHC, and UHC reimburses the Employee for qualified expenses with a check. The maximum that can be set aside each year is $5,000. The amount designated must be used by the end of each year, as any unused portion of the amount will not be reimbursed to the Employee (as stipulated by the Internal Revenue Service (the "IRS")).

### 4.    Dependent Care Accounts

44.    Employees who pay for care for children under 13, disabled family members or elderly family members are eligible to participate in a flexible spending account for dependent care. Employees who anticipate that they will have dependent care expenses that are not covered by the insurance plans provided by the Debtors may determine what the total annual out-of-pocket expenses will be and how much they wish to set aside for the year. This amount is divided into 26 equal pre-tax deductions for the pay periods throughout the year and is credited to the Employee's special health care account. Because the deductions are pre-tax, participating Employees' federal, state and social security taxable wages are reduced. As expenses are incurred, an Employee may file a claim for reimbursement with UHC and a check will be sent to such Employee up to the amount contributed to their account. The maximum that can be set aside each year is $5,000. The amount designated must be used by the end of each year, as any unused portion of the amount will not be reimbursed to the Employee (as stipulated by the IRS).

### 5.    Retirement Benefits Plan

45.    All regular Employees are eligible to participate in a 401(k) savings and retirement plan (the "401(k) Plan") administered by JP Morgan. Employees participating in this program are permitted to contribute an unlimited amount of their salary toward their 401(k) Plan account up to the amount of the statutory cap. The Debtors also make contributions representing 50% of the first 6% contributed by each participating Employee to his or her 401(k) Plan account (collectively, "Matching Contributions"). On average, the Debtors make Matching Contributions of approximately $814,000 during each month, and the Debtors expect to make Matching Contributions of approximately $339,000 for March 19, 2007 through April 1, 2007, all of which relates to the period prior to the Petition Date. All administrative fees are paid by

the employee participants, and the Debtors pay approximately $40,000 per year for auditors to review the 401(k) Plan.

46.    Further, the Debtors deduct from Employees' paychecks 401(k) Plan contributions. Failure to timely forward these 401(k) deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended, resulting in potentially personal liability for the Debtors' officers for such deducted amounts. The Debtors estimate that there will be no 401(k) Plan contributions and loan payments as of the Petition Date that have been deducted but not remitted.

47.    The Debtors believe that maintaining the 401(k) Plan and continuing to make Matching Contributions are critical in maintaining Employee morale. Accordingly, the Debtors seek authority to continue in their discretion the 401(k) Plan, to make Matching Contributions and to pay administrative and other related expenses to maintain the 401(k) Plan.

### 6.    Special Programs

48.    The Debtors also offer Employees and their dependents access to an employee assistance program (the "Employee Assistance Program") managed by UHC. Through UHC, Employees and eligible family members may receive counseling for certain life issues. The program is designed to help Employees manage stress, balance their work and family responsibilities and to improve the quality of their lives. The Employee Assistance Program costs the Debtors approximately $11,000 per month. This program provides important benefits to Employees and improves Employee morale at relatively modest cost. The Debtors request authority to pay any costs related to, and to continue with such Employee Assistance Programs and related policies in the ordinary course of business.

7.      **Employee Stock Purchase Plan**

49.      The Employees were previously given the opportunity to purchase the common stock of New Century Financial Corporation through the Employee Stock Purchase Plan (the "ESPP"). Employees could elect to contribute from 1% to 10% of their pay to the ESPP. On March 13, 2007, the Securities and Exchange Commission delisted the Debtors' common stock. Subsequently, the Debtors' board of directors elected to terminate the ESPP and return amounts from future payrolls allocated as ESPP contributions to the Employees. The Debtors request authority to continue returning amounts from the payroll previously allocated by Employees as ESPP contributions to the applicable Employees.

D.      **Prepetition Amounts Withheld from Employee Paychecks and Related Deductions and Payments**

50.      The Debtors deduct from their Employees' paychecks (as applicable) (i) payroll taxes and the Employees' portion of taxes pursuant to the Federal Insurance Claims Act and unemployment taxes; (ii) Employee contributions for health and disability related benefits and flexible spending accounts; (iii) Employee contributions to 401(k) Plans; (iv) legally ordered deductions such as wage garnishments, child support and tax levies; and (v) miscellaneous other items (collectively, the "Employee Deductions"). The Debtors forward amounts equal to the Employee Deductions from their operating accounts to appropriate third-party recipients. While the Debtors do not believe that any funds were deducted from Employee paychecks but not forwarded to the appropriate third-party recipients as of the Petition Date, out of an abundance of caution, the Debtors seek authority to forward to the appropriate parties any Employee Deductions that were not forwarded due to the commencement of these chapter 11 cases.

**E.**    **Reimbursable Expenses**

51.    Eligible Employees may submit certain business-related expenses to the

Debtors for reimbursement (collectively, the "Employee Expenses"). These Employee Expenses

include relocation, car, hotel stays, meals, parking and other travel expenses and business related

costs, as well as monthly telephone and internet allowances for certain approved employees.

Employees incur certain Employee Expenses on corporate credit cards issued to the Employees

pursuant to the Debtors' agreement with American Express Travel Related Services, Inc.

("American Express"). American Express forwards account statements directly to the

Employees and the amounts are paid by the Debtors to American Express. On average,

Employee Expenses cost the Debtor approximately $578,000 per month. As of the Petition Date,

the Debtors estimate they owe Employees approximately $289,000 in reimbursements for

Employee Expenses.[5] The Debtors seek authority, but not direction, to pay these Employee

Expenses, including amounts owed to American Express for Employee Expenses, and to

continue to pay them postpetition in the ordinary course of business.

<b>BASES FOR RELIEF REQUESTED</b>

52.    As a result of the commencement of the Debtors' chapter 11 cases, and in

the absence of an order of the Court providing otherwise, the Debtors will be prohibited from

paying or otherwise satisfying their prepetition obligations regarding Employee Obligations,

Employee Deductions and Employee Expenses, and the checks, wire transfers and direct deposit

transfers issued in respect of the Employee Obligations, Employee Deductions and Employee

Expenses will be dishonored. To maintain Employee morale at this critical time for the Debtors,

---

[5] This estimate includes Employee Expenses which have not yet been submitted for approval and Employee Expenses which have been submitted but not yet approved.

and to minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid or honored when due, the Debtors seek authority to honor in their discretion such obligations, including those described above.

53.     Pursuant to section 507(a)(4) of the Bankruptcy Code, the Employees' claims for wages and salaries, including vacation, severance and sick leave pay earned within 180 days before the Petition Date are afforded unsecured priority status to the extent of $10,950 per Employee.[6]  Furthermore, section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

54.     Section 105(a) of the Bankruptcy Code provides that

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking an action on making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

55.     The Debtors' petitions for relief under chapter 11 of the Bankruptcy Code very likely will cause the Employees to question their future with the Debtors.  While the Employees have demonstrated loyalty to the Debtors despite the uncertainty during the months prior to the commencement of these cases, their search for a sense of stability with regard to compensation and benefits may lead to an epidemic of Employee departures.

56.     The Employees are essential to the success of the sale of the Debtors' businesses.  Preservation of the value of the estates depends upon a stable work force.  The cost

---

[6] On April 1, 2007, the amount of the unsecured priority status set forth in 11 U.S.C. s 507(a)(4) was automatically adjusted from $10,000 to $10,950 per Employee

of replacing and then retraining Employees will outweigh the cost of honoring the prepetition

Employee-related obligations. Thus, any significant number of remaining Employee departures

or deterioration in morale at this time will substantially and adversely impact the Debtors'

businesses and result in immediate and irreparable harm to the creditors and estates.

Consequently, it is critical that the Debtors continue in their ordinary course personnel policies,

programs and procedures that were in effect prior to the Petition Date. If the checks issued and

fund transfers requested in payment of the Employee Obligations, Employee Deductions and

Employee Expenses are dishonored, or if such accrued obligations are not timely paid

postpetition, the Employees will suffer extreme hardship and may be unable to pay their daily

living expenses. Likewise, it would be inequitable to require the Employees to bear personally

the business expenses that were incurred on behalf of the Debtors with the expectation that they

would be reimbursed.

57.    Authorizing, but not directing, the Debtors to pay the Employee

Obligations, Employee Deductions and Employee Expenses in accordance with the Debtors'

prepetition business practices is in the best interest of the Debtors, the Debtors' creditors and all

parties in interest and will enable the Debtors to continue to operate their business in an

economic, efficient manner without disruption. A significant deterioration in morale among

Employees at this critical time undoubtedly would have a devastating impact on the Debtors,

their customers, the value of their assets and business and their ability to reorganize.

58.    The Debtors submit that the amounts to be paid pursuant to this Motion

are de minimis in light of the importance and necessity of preserving the Employees' services

and morale and the difficulties and losses the Debtors and their estates will suffer if Employees

leave in significant numbers. Further, many of these obligations are not immediate but, rather,

will be satisfied over an extended period of time. The Debtors also submit that there is ample

justification for their belief that even the slightest delay in providing this relief to their

Employees will hamper their operations and damage their estates and as a consequence the

Debtors are anxious to reassure their Employees.

59.    The requested relief will also reduce the administrative burden that

otherwise would be imposed in these cases. The wages and salaries that the Debtors seek to pay

or otherwise honor generally constitute priority claims under the Bankruptcy Code to the extent

of $10,950 per Employee. Because a significant portion of the wages and salaries that the

Debtors seek to pay or otherwise honor likely constitute priority claims pursuant to section

507(a)(4) of the Bankruptcy Code, which must be paid in full pursuant to section 1129(a)(9) of

the Bankruptcy Code in order to confirm a plan, payment of priority obligations at this time

merely affects the timing of such payments.

60.    In other chapter 11 cases, this Court has approved payment of prepetition

claims for compensation, benefits and expense disbursement on the grounds that the payment of

such claims was necessary to effectuate a successful reorganization or sale. See e.g. In re

Advanced Marketing Services, Inc., No. 06-11480 (CSS) (Bankr. D. Del. 2006); In re Three A's

Holdings, L.L.C., No. 06-10886 (BLS) (Bankr. D. Del. 2006); In re Genesis Health Ventures,

Inc., No. 00-02692 (PJW) (Bankr. D. Del. 2000); In re Safelite Glass Corp., No. 00-02252

(MFW) (Bankr. D. Del. 2000); In re Hedstrom Holdings Inc., No. 00-01665 (PJW) (Bankr. D.

Del. 2000); In re Mariner Post-Acute Network, Inc., No. 00-00113 (MFW) (Bankr. D. Del.

2000); In re Mariner Health Group, Inc., No. 00-00215 (MFW) (Bankr. D. Del. 2000).

61.    With respect to the accrued and unpaid Employee Obligations, Employee

Deductions and Employee Expenses, the Debtors request that, to the extent practicable, the

applicable banks be directed to honor checks or fund transfer requests regardless of whether they were issued prior to or after the Petition Date. The Debtors have or will have on deposit sufficient funds in their disbursement accounts to satisfy all the Employee Obligations, Employee Deductions and Employee Expenses so that the banks will not be prejudiced by an order directing them to honor the Debtors' checks or fund transfer requests with respect to such amounts.

62.     Finally, authorization of the payment of the Prepetition Employee Obligations shall not be deemed to constitute postpetition assumption or adoption of any policy, plan, program or employee agreement pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all of its rights under the Bankruptcy Code with respect thereto.

## NOTICE

63.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served as required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended from time to time, the "Local

Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

64. The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated: April 2, 2007
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-[_____] (___) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |

ORDER AUTHORIZING THE DEBTORS AND DEBTORS IN
POSSESSION TO PAY PREPETITION WAGES,
COMPENSATION AND EMPLOYEE BENEFITS PURSUANT TO
SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE

The matter having come before the Court on the Motion of the Debtors and

Debtors in Possession for an Order Authorizing the Debtors to Pay Prepetition Wages,

Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy

Code (the "Motion"), filed by the above-captioned debtors and debtors in possession

(collectively, the "Debtors"); the Court having reviewed the Motion; the Court finding that

(a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (c) notice of this Motion having been

sufficient under the circumstances and no other further notice is required, and (d) capitalized

terms not otherwise defined herein have the meaning given to them in the Motion; and the Court

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

having considered the Declarations of Monika McCarthy and Holly Etlin in Support of Chapter 11 Petitions and First-Day Relief; and the Court having determined that the legal and factual bases set forth in the Motion established just cause for the relief granted herein and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and after due deliberation and sufficient cause appearing;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  The Debtors are authorized, but not obligated or directed, to honor and pay all of the Employee Obligations, Employee Deductions and Employee Expenses (as defined in the Motion), including without limitation prepetition wages, compensation, including Incentive Plans and Retention Plans, and employee benefits and any other obligations as set forth in the Motion, on an unaccelerated basis and in a manner consistent with the Debtors' prepetition business practices and policies, or on a modified basis as set forth in the Motion.

3.  The Debtors are authorized, but not obligated or directed, to continue to honor, pay and maintain all of their employee compensation, including Incentive Plans and Retention Plans, benefit and reimbursement policies, plans, programs, practices and procedures and all related costs and expenses in the ordinary course of their business, to the extent that such policies, plans, programs, practices and procedures were in effect as of the Petition Date.

4.  The Debtors are authorized, but not obligated or directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in respect of Employee Obligations, Employee Deductions and Employee Expenses dishonored as a consequence of the commencement of these chapter 11 cases.

2

5.  The banks and financial institutions at which the Debtors maintain disbursement accounts are authorized and directed to honor and pay all prepetition and postpetition checks issued, and fund transfer requests made, by the Debtors on their payroll accounts in respect of Employee Obligations, Employee Deductions and Employee Expenses to the extent sufficient funds are on deposit in such accounts.

6.  Nothing herein or in the Motion shall be deemed to constitute an assumption of an executory contract, whether under section 365 of the Bankruptcy Code or otherwise, including without limitation any employment or insurance agreement to which the Debtors are party.

7.  The Debtors, their officers, employees and agents, are authorized to take or refrain from taking such acts as are necessary and appropriate to implement and effectuate the relief granted herein.

8.  This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____, 2007
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

3