## EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Related to Doc. No. 12** |

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362 AND 364 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (A) APPROVING DEBTOR-IN-POSSESSION FINANCING WITH ADMINISTRATIVE EXPENSE SUPERPRIORITY AND SECURED BY LIENS, (B) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIM, (C) GRANTING OTHER RELIEF AND (D) SETTING FINAL HEARING

Upon the Emergency Motion of Debtors and Debtors in Possession for Interim and Final Orders (a) Approving Debtor-in-Possession Financing with Administrative Expense Superpriority and Secured by Senior Liens, (b) Granting Liens and Superpriority Administrative Expense Claim, (c) Granting Other Relief and (d) Setting Final Hearing (the "Motion") dated April 2, 2007 of New Century Financial Corporation ("New Century") and the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed in the above-captioned cases (collectively, the "Cases") to, inter alia:

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

(i)       Obtain secured credit pursuant to sections 105 and 364(c) of title 11 of the United States Code (11 U.S.C. § 101 et seq., as amended, the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), from Greenwich Capital Financial Products, Inc. in its capacity as Lender and Administrative Agent[2], ("Greenwich") and The CIT Group/Business Credit, Inc. in its capacity as Lender and Documentation Agent ("CIT") (collectively, the "Secured Parties") pursuant to that certain Debtor-in-Possession Loan and Security Agreement Dated as of April 2, 2007 by and among New Century Mortgage Corporation, as debtor and debtor-in-possession, certain of its Affiliates, as debtors and debtors-in-possession, Greenwich Capital Financial Products, Inc., as Administrative Agent, and The CIT Group/Business Credit, Inc., as Documentation Agent substantially in the form attached as Exhibit A hereto and the related Loan Documents (collectively, the "DIP Loan Agreement") by and among the Debtors and the Secured Parties, in the aggregate principal amount outstanding from time to time of up to $150,000,000 (the "DIP Facility"); and

(ii)      requesting, pursuant to Bankruptcy Rule 4001, that an emergency interim hearing (the "Emergency Interim Hearing") be held before this Court on an emergency basis to consider entry of this interim order authorizing the Debtors to obtain the financing contemplated in the DIP Loan Agreement (the "Interim Order"), and further requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to consider entry of a final order (the "Final Order") authorizing the financing contemplated by the DIP Loan Agreement, as set forth in the Motion and the DIP Loan Agreement;

---

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the DIP Loan Agreement.

The Emergency Interim Hearing having been held on April 3, 2007, upon all of the pleadings filed with the Court and upon the record of the Emergency Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW[3]:**

        A.      **Petition.**  On April 2, 2007 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code .  The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108.  Pursuant to order of this Court, the Debtors' cases are being jointly administered under the case number above.

        B.      **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.      **Necessity of Financing.**  The Debtors submit that the proposed financing pursuant to the DIP Loan Agreement will allow them to continue the operations of their businesses and administer, preserve and increase the value of their estates.  The ability of the Debtors to finance their operations requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtors, their estates and their creditors and the possibility for the Debtors' successful reorganization.  Entry of this Interim DIP Order approving the DIP Facility will benefit the Debtors and their estates and creditors.

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052. Any statements of the Court from the bench at the Emergency Interim Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Order to the extent not inconsistent herewith.

D.     **Willingness to Lend.**  The Secured Parties are willing to make the DIP

Facility available and to make the loans and advances thereunder pursuant to the terms of the

DIP Loan Agreement, only upon the condition that the Secured Parties are granted with respect

to the Obligations as provided herein and in the DIP Loan Agreement, (i) pursuant to section

364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim in each Chapter

11 Case and (ii) Liens on and security interests in the Collateral pursuant to sections 364(c)(2)

and 364(c)(3) of the Bankruptcy Code in the priority set forth herein and in the DIP Loan

Agreement (collectively, the "Secured Parties' Liens").

E.     **No Credit Available on Other Terms**.  The Debtors are unable to obtain

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to

sections 364(a) and 364(b) of the Bankruptcy Code.

F.     **Business Judgment and Good Faith**.  Based on the record before the

Court, the terms of the DIP Facility (including the DIP Loan Agreement) are fair, just, and

reasonable under the circumstances, are appropriate for secured financing to a debtor in

possession, reflect the Debtors' exercise of their prudent business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Based

on the record before the Court, the terms of the DIP Facility have been negotiated in good faith

and at arms' length by and between the parties, with all parties represented by counsel.  Based on

the record before the Court, any credit extended under the terms of the DIP Facility shall be

extended in good faith by the Secured Parties as that term is used in section 364(e) of the

Bankruptcy Code.  Based on the record before the Court, Secured Parties will also be acting in

good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the

transactions contemplated in the DIP Loan Agreement at any time after the entry of this Interim

Order. Based on the record before the Court, Secured Parties are not "insiders" or "affiliates" of any of the Debtors (as such terms are defined in the Bankruptcy Code).

G.    **No Representations or Reliance**. The Debtors stipulate that the Agents, Secured Parties and the Indemnified Parties have made no representations, offered no opinions, and have taken no positions, either individually or collectively, regarding the value of any portion of the Collateral, and, in determining the value of the Collateral, the Debtors have not relied upon any representation, opinion or position of the Agents or the Secured Parties in regard thereto.

H.    **Property of the Estate**. Each item of the Collateral constitutes property of the estate of at least one Debtor.

I.    **Good Cause.** The DIP Facility and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtors, their creditors, and their Estates, as its implementation will, among other effects, provide Debtors with the necessary liquidity (a) to minimize disruption to Debtors' businesses and on-going operations, (b) to preserve and maximize the value of the Estates for the benefit of all creditors of Debtors, and (c) to avoid immediate irreparable harm to Debtors, their creditors, their businesses, their employees, and their assets.

J.    **Notice.** Pursuant to Bankruptcy Rule 4001(c), notice by facsimile of the Emergency Interim Hearing has been given to (i) the United States Trustee, (ii) counsel for the Secured Parties, (iii) all known holders of Liens, encumbrances, or security interests in the Collateral, and (iv) the twenty largest unsecured creditors of the Debtors. Based on the record made by the Debtors, the Court finds that appropriate notice of the Emergency Interim Hearing has been given.

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1.      The Motion is granted in accordance with the terms of this Interim Order. The Debtors are immediately authorized and, pursuant to the terms of this Interim Order and the terms and conditions of the DIP Loan Agreement, empowered to borrow funds under the DIP Facility in such amount or amounts as may be available to or for the benefit of the Debtors from Secured Parties, which shall not exceed the aggregate amount of $150,000,000 for the purposes permitted under the DIP Loan Agreement and this Interim Order.

2.      Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3.      Except as set forth in this Interim Order, the terms and conditions of the DIP Loan Agreement are hereby approved in all respects. All provisions in the DIP Loan Agreement are binding and enforceable in full even if not expressly referenced in this Interim Order. The Debtors and the Secured Parties with respect to the DIP Loan Agreement may finalize, amend, modify, supplement or waive any provision of the DIP Loan Agreement if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Loan Agreement and is not material (in the good faith judgment of the Secured Parties and the Debtors) without any need to apply to, or receive further approval from, the Court.

4.      The Debtors are hereby authorized to (a) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtors under the DIP Loan Agreement, and (b) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtors

to perform all of their Obligations under this Interim Order and the DIP Loan Agreement (collectively, the "DIP Obligations"). Each officer of each Debtor, and each such other individual as may be so authorized by the Board of Directors of such Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Loan Agreement and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtors.

5.    The Debtors are hereby authorized and directed to pay the fees as they come due under the DIP Loan Agreement to Secured Parties without further Court order, including without limitation, the Commitment Fee, the Facility Fee (including the Interim Fee Amount), and all reasonable out-of-pocket costs and expenses of the Secured Parties (including reasonable attorney's fees and expenses) as provided for under the DIP Loan Agreement. The Debtors shall send copies of invoices received by them for such costs and expenses (including attorneys' fees and expenses) to (i) counsel for the United States Trustee, and (ii) counsel to any official committee appointed in these cases.

6.    In providing for the advancement of post-petition financing under the DIP Loan Agreement, each of the Debtors and Secured Parties acknowledges, stipulates and agrees that, in entering into the DIP Loan Agreement, and as consideration therefor:

(a)    all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Agreement to which each Debtor is a party; and

(b)     the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way prime or otherwise adversely affect the Secured Parties' Liens granted under this Interim Order by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise; and

(c)     the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way grant junior encumbrances on the Collateral upon which the Secured Parties possess Liens provided to them under this Interim Order; and further, the Debtors agree that the Debtors shall not otherwise encumber otherwise unencumbered assets.

## COLLATERAL SECURITY

7.     Pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and as protection to the Secured Parties and to secure the repayment of the DIP Obligations, the Administrative Agent, for the benefit of the Secured Parties, shall have and is hereby granted a valid, binding, and enforceable perfected security interest in and to and Lien on all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located; provided, however, that for the purposes of this Interim Order the Liens granted by this paragraph shall only attach to actions available to the Debtors or their bankruptcy estates pursuant to Sections 544, 545, 547, 548, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and the proceeds thereof (collectively, the "Avoidance Actions") upon entry of the Final Order approving such relief.

8.      The Lien in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to section 364(c)(2) of the Bankruptcy Code shall be a valid, binding, and enforceable first priority perfected security interest in and to and Lien on all the Collateral that is included in the Borrowing Base, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, subject as to priority, in the case of the security interest in and to and Lien on all the Collateral that is included in the Tranche B Borrowing Base, only to the Liens securing the Obligations (as defined in the Citibank Servicer Advance Facility Agreement).

9.      The Lien in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to section 364(c)(3) of the Bankruptcy Code shall be a valid, binding, and enforceable first priority perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral except for Collateral subject to Liens existing on the Filing Date securing the Senior Claims; provided however that should any such Lien securing such a Senior Claim be voided, extinguished or determined not be valid, the Liens granted to the Secured Parties hereunder shall, notwithstanding anything to the contrary in Section 551 of the Bankruptcy Code, be deemed perfected first priority liens without any further action by the Secured Parties or this Court.

10.     The Liens and security interests granted to the Secured Parties under this Interim Order and the DIP Loan Agreement shall continue to be at all times first and senior in priority to all other Liens or security interest of every kind and shall not be subordinate or pari passu with any other Lien or security interest or right of setoff, and no Lien or security interest shall be permitted which shall be senior to or pari passu with the Liens and security interests granted to the Secured Parties hereby or under the DIP Loan Agreement; provided, however that

the Secured Parties' Liens shall be junior and shall be subject only to the valid, binding, and enforceable Liens securing and setoff, netting and recoupment rights with respect to the Senior Claims as of the Filing Date and the Carve Out.

11.    The above-described Secured Parties' Liens and security interests granted to the Secured Parties herein shall not (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates as a result of any Avoidance Actions, or (ii) be subordinated to or made pari passu with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise.

12.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Secured Parties' Liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Secured Parties' Liens on and its security interests in the Collateral or to entitle the Secured Parties to the priorities granted herein. The Secured Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the Secured Parties' Liens and security interests granted by or pursuant to this Interim Order or the DIP Loan Agreement.

13.    Upon entry of the Final Order, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for any of the Debtors to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be

deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force

and effect with respect to the transactions granting the Secured Parties a senior security interest

in such interest or the proceeds of any assignment and/or sale thereof by any of the Debtors in

favor of the Secured Parties in accordance with the terms of the DIP Loan Agreement.

14.     Should the Secured Parties, in their sole discretion (but not as a

requirement hereunder), from time to time choose to file financing statements, mortgages,

notices of lien or similar instruments, take possession of any Collateral, or take any other action

to validate or perfect any such security interests or Liens, the Debtors and their officers are

hereby directed to execute any such documents or instruments as the Secured Parties may

reasonably request, and all such documents and instruments shall be deemed to have been filed

or recorded at the time and on the date of the entry of this Interim Order.

15.     The Secured Parties may, in their discretion, file a copy of this Interim

Order as a financing statement with any recording officer designated to file financing statements

or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real

or personal property, and, in such event, the applicable filing or recording officer or registrar is

authorized to file or record such copy of this Interim Order.

16.     The automatic stay imposed under section 362(a) of the Bankruptcy Code

is hereby lifted to grant the Secured Parties' Liens and security interests to the Secured Parties

contemplated by the DIP Loan Agreement and this Interim Order, and is further lifted to the

extent of the exercise by the Secured Parties of any rights or remedies under the DIP Loan

Agreement, subject only to the notice requirement set forth in paragraph 21 herein.

## ADMINISTRATIVE CLAIM

17.     As further protection to the Secured Parties and to secure the repayment of

the DIP Obligations, all of the DIP Obligations shall have the status of allowed superpriority

administrative expense claims, in accordance with section 364(c)(1) of the Bankruptcy Code, and

shall have priority over all administrative expense claims and unsecured claims against the

Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without

limitation, any adequate protection-related claims and any administrative expenses of the kinds

specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a),

507(b), 546(c), 726 and 1114 of the Bankruptcy Code to the extent permitted by applicable law.

18.     Notwithstanding the foregoing provisions of this Interim Order, the

following amounts shall be payable from and chargeable against the Collateral (and prior to the

Secured Parties' Liens) (the "Carve-Out"):

(a)     amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable

to the clerk of the Court (collectively, the "UST/Clerk Fees"); and

(b)     allowed fees and expenses of attorneys, accountants, and other

professionals retained in the Chapter 11 Cases pursuant to sections 327 and 1103 of the

Bankruptcy Code (except to the extent such fees and expenses incurred for services rendered in

connection with the prosecution of actions, claims or causes of action against the Secured Parties

or in improperly preventing or hindering or unreasonably delaying, whether directly or

indirectly, the Secured Parties' assertion or enforcement of the Secured Parties' Liens or

realization upon the Collateral) (the "Priority Professional Expenses"), but the amount entitled to

priority under this sub-clause shall not exceed $7,000,000 outstanding in the aggregate at any

time (the "Carve-Out Amount"), which sublimits shall be as follows:  (i) Priority Professional

Expenses (inclusive of any holdbacks required by the Court) accruing after an Event of Default

shall not exceed $4,000,000 in the aggregate; (ii) any unpaid Priority Professional Expenses

accrued prior to an Event of Default shall not exceed $3,000,000 in the aggregate; and (iii) Union

Bank of California fees shall not exceed $440,000, conditioned upon Union Bank of California

promptly allowing the Debtors immediate access to accounts maintained with Union Bank of

California pursuant to the Court's order approving the maintenance of the cash management

system; provided, however, that after the Secured Parties have provided notice to New Century

of the occurrence of an Event of Default or a default hereunder by the Debtors in any of their

obligations under this Interim Order, any payments actually made to such professionals after the

occurrence of such Event of Default or default hereunder, under sections 330 and 331 of the

Bankruptcy Code or otherwise, to the extent allowed by final order of the Court, shall reduce the

Carve-Out Amount on a dollar-for-dollar basis. Nothing contained herein shall be construed as

consent to the allowance of any fees and expenses referred to above and shall not affect any right

of the Secured Parties to object to the reasonableness of such amounts. For the avoidance of

doubt, the Carve-Out Amount shall not exceed $7,000,000 in the aggregate, irrespective of the

sublimits established in this paragraph 18.

19.    So long as an Event of Default shall not have occurred, Debtors shall be

permitted to pay the Priority Professional Expenses of the kind specified in Section 503(b) of the

Bankruptcy Code allowed under Sections 330 and 331 of the Bankruptcy Code, as the same may

be due and payable, within the parameters of this Interim Order and the amounts to be advanced

pursuant to the DIP Loan Agreement; provided that the aggregate of any such payments made on

or after the occurrence of a Default or Event of Default to professionals shall not exceed the

Carve-Out Amount. The Debtors shall not be permitted under any circumstance to pay, from the

Carve-Out Amount or otherwise, any fees or expenses incurred by any party, including the

Debtors or the Creditors' Committee, in connection with the filing and prosecution or defense of

any claims, causes of action, adversary proceedings or other litigation against the Secured

Parties, including, without limitation, challenging the amount, validity, priority or enforceability

of, or asserting any defense, counterclaim, or offset to, the DIP Obligations or the Secured

Parties' Liens in respect thereof.

20.    No other Liens or priority status, other than Permitted Liens, shall have

priority superior to or pari passu with that granted by this Interim Order to Secured Parties, or

shall be granted while any portion of the DIP Obligations under the DIP Loan Agreement

remains outstanding, absent the express written consent of the Secured Parties.

21.    Notwithstanding the provisions of section 362 of the Bankruptcy Code and

without any further order of, or application or motion to, this Court, in the event of the

occurrence of an Event of Default, and at all times thereafter, and without any restriction or

restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the

Liens and security interests or any other rights granted to the Secured Parties pursuant to the DIP

Loan Agreement, the Secured Parties may, by written notice to the Debtors, (i) terminate

forthwith all or any portion of the DIP Facility and the Secured Parties' obligation to make any

further loans or advances, (ii) declare the DIP Obligations to be immediately due and payable,

and (iii) take any and all actions and exercise any and all rights and remedies allowed under the

DIP Loan Agreement, which the Secured Parties may deem appropriate.  Notwithstanding the

foregoing, but without limiting any of the Secured Parties' rights or remedies, the Secured

Parties shall not consummate foreclosure on the Collateral or otherwise seize control of assets of

the Debtors' estates absent three (3) business days' prior written notice of an Event of Default to

the Debtors, any official committee appointed in these Cases and the Office of the United States Trustee.

   22. Upon entry of the Final Order, neither the Collateral nor Secured Parties shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by any of the Debtors or any other party in interest, until all DIP Obligations are indefeasibly paid in full to the Secured Parties in cash, and no such consent shall be implied from any other action, inaction, or acquiescence by the Secured Parties in these Cases, including but not limited to funding of the Debtors' ongoing operations by the Secured Parties. In no event shall the Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

## MISCELLANEOUS PROVISIONS

   23. Upon entry of the Final Order and upon satisfaction of all DIP Obligations, the Secured Parties solely in their capacity as secured lenders, and each of their respective participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives, successors, and assigns, shall be forever released and discharged from any claims, rights, demands, damages, actions, causes of action, costs, expenses, whether known or unknown, of or by any person or entity and each of its participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives (including any Creditors' Committee), successors, and assigns, arising from or relating to the DIP Loan Agreement, the application of Collateral to the DIP Obligations, or any claim or assertion of a right, interest, or claim in or to the Collateral.

   24. As more fully set forth in Section 11.04 of the DIP Loan Agreement, each Borrower shall hold each Agent, each Lender-Related Party and each Participant (each Agent,

each Lender-Related Party and each Participant, an "Indemnified Party") harmless from and

indemnify any Indemnified Party, on an after-Tax basis, against all liabilities, losses, damages,

judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted

against such Indemnified Party (collectively, the "Indemnified Liabilities") relating to or arising

out of this Interim Order, the DIP Loan Agreement, the Note, any other Loan Document or any

transaction contemplated hereby or thereby, or any amendment, supplement or modification of,

or any waiver or consent under or in respect of, the Loan Agreement, the Note, any other Loan

Document or any transaction contemplated hereby or thereby.  Without limiting the generality of

the foregoing, each Borrower agrees to hold any Indemnified Party harmless from and indemnify

such Indemnified Party against all Indemnified Liabilities with respect to all Mortgage Loans

relating to or arising out of any violation or alleged violation of any environmental law, rule or

regulation or any consumer credit laws, including without limitation laws with respect to unfair

or deceptive lending practices and predatory lending practices, the Truth in Lending Act or the

Real Estate Settlement Procedures Act.

      25.     Nothing in this Interim Order, the DIP Facility, or any other documents

related to these transactions shall in any way be construed or interpreted to impose or allow the

imposition upon the Secured Parties any liability for any claims arising from the pre-petition or

post-petition activities of the Debtors in the operation of their business, or in connection with

their restructuring efforts.  So long as the Secured Parties comply with their obligations under the

DIP Loan Agreement (including Section 4.11 thereof) and their obligations, if any, under

applicable law (including the Bankruptcy Code), (i) the Secured Parties shall not, in any way or

manner, be liable or responsible for (A) the safekeeping of the Collateral, (B) any loss or damage

thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the

value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors; The Secured Parties are each hereby relieved of the requirement to file proofs of claim in the Cases with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

26.    The Secured Parties' Liens, security interests, administrative priorities and other rights and remedies granted to the Secured Parties by the provisions of this Interim Order and any actions taken pursuant hereto, as well as the Debtors' obligations to allow access to the Secured Parties' representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Loan Agreement and this Interim Order, shall continue beyond and survive the expiration of this Interim Order, and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by any of the Debtors under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Loan Agreement), (b) the entry of an order or orders confirming any plan or plans of reorganization in the Cases, or (c) the entry of an order converting these Cases to cases under chapter 7 of the Bankruptcy Code or dismissing these Cases.

27.    The terms and provisions of this Interim Order and the DIP Loan Agreement, and the Secured Parties' Liens and security interests granted to the Secured Parties and the superpriority status of the administrative claims and payment provisions contained in this Interim Order and the DIP Loan Agreement shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, and DIP Loan Agreement is terminated.

28.     The Debtors shall not request any order dismissing or converting these Cases under section 1112 of the Bankruptcy Code unless each and every DIP Obligation of the Debtors to the Secured Parties shall have been paid indefeasibly in full in cash and completely satisfied prior to the entry thereof. The Debtors shall not seek entry of an order providing for the sale of the Collateral under section 363 of the Bankruptcy Code unless either: (i) all DIP Obligations shall have been paid indefeasibly in full in cash and completely satisfied as part of such transaction; or (ii) the Secured Parties expressly consent to said transaction.

29.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Agreement, the Motion, any other order of this Court, or any other agreements and the terms and provisions of this Interim Order, unless such term or provisions herein is phrased in terms of "as defined in" or "as described in," the terms and provisions of this Interim Order shall govern.

30.     New Century is hereby authorized to act on behalf of each other Debtor with respect to the Debtors' rights and obligations under the DIP Loan Agreement. Any notice given to, or demand made on, New Century by the Secured Parties, pursuant to this Interim Order or the DIP Loan Agreement shall constitute notice to, or demand on, all Debtors.

31.     This Interim Order and DIP Loan Agreement shall be valid, binding and enforceable by the Secured Parties against the Debtors, their respective successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of any of the Debtors' Estates; provided, however, that the Secured Parties shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

32.     The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Agreement and any order of the Court with respect to the same.

33.     If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Interim Order and the DIP Loan Agreement, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the original provisions of this Interim Order, and the Secured Parties shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the DIP Facility have been entered into by the Secured Parties in good faith, and, as a result, the Secured Parties are entitled to the protections afforded by Section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Interim Order.

34.     The security interests and Secured Parties' Liens granted to or for the benefit of the Secured Parties hereunder and the rights of the Secured Parties pursuant to this Interim Order shall not be altered, modified, extended, impaired or affected by any plan of reorganization or other order of the Debtors and shall continue after confirmation and consummation of any plan until the DIP Obligations are indefeasibly paid in full.

35.     This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Secured Parties may have to bring or be heard on any matter brought before this Court.

36.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

37.    The Final Hearing on the Motion and DIP Loan Agreement shall be heard before this Court on the _____ day of _____, 2007 at _____ ___.m. in Courtroom ___ at 824 Market Street, Wilmington, Delaware 19801. Any party-in-interest objecting to the relief sought in the Final Order shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection (so as to be received) no later than _____, 2007 by 4:00 p.m. local Delaware time (the "Objections Deadline"), on the Notice Parties. Debtors shall mail copies of this Interim Order and notice of the Final Hearing (including the Objections Deadline) to counsel for the Debtors, counsel for the Secured Parties, the United States Trustee and any counsel chosen to represent any official committee appointed in these Cases.

38.    Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

39.    Notwithstanding anything herein to the contrary, the liens and security interests granted to the Secured Parties shall not extend to accounts maintained by the Debtors in trust or as custodians for the benefit of parties other than a Debtor, or to other assets that are not property of the estates.

40.    Notwithstanding anything to the contrary in the DIP Loan Agreement, it shall not be an Event of Default under the DIP Loan Agreement if the Debtors are not permitted

to retain AlixPartners or Lazard Freres & Co., so long as (an)other financial advisor(s)

reasonably acceptable to the Secured Parties is/are retained.

      41.     No rights of any entity in connection with a contract or transaction of the

kind listed in § 561(a) of the Bankruptcy Code, whatever they might or might not be, are affected

by the entry of this Order.


Dated: _____, 2007          _____
       Wilmington, Delaware         THE HONORABLE KEVIN J. CAREY
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

[DIP Loan Agreement]

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "Loan Agreement"), dated as of April ___, 2007, by and among New Century Financial Corporation, as a debtor and a debtor-in-possession, a Maryland corporation ("New Century" or the "Company"), the affiliates of New Century listed on Schedule A hereto, each as a debtor and a debtor-in-possession (together with New Century, individually a "Borrower" and collectively, the "Borrowers"), the Lenders party hereto and set forth on Schedule B hereto (each individually a "Lender" and collectively, the "Lenders"), Greenwich Capital Financial Products, Inc., a Delaware corporation, as administrative agent for the Secured Parties (as defined herein) (in such capacity, the "Administrative Agent"), The CIT Group/Business Credit, Inc., as documentation agent for the Lenders (in such capacity, the "Documentation Agent" and, together with the Administrative Agent, the "Agents"), and the other Secured Parties (as defined below).

## RECITALS

On **[April 2, 2007]**, the Borrowers commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Borrowers have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Bankruptcy Court has authorized the joint administration of the bankruptcy estate of each Borrower.

Subject to the approval of the Bankruptcy Court, the Borrowers, the Lenders and the Agents wish to enter into an agreement to provide a senior, secured, superpriority debtor-in-possession financing facility of up to $150,000,000 (the "Facility") to the Borrowers, consisting of (a) a revolving credit facility for general corporate purposes (the "Tranche A Facility") and (b) a revolving Servicing Advances facility (the "Tranche B Facility").

The Lenders have agreed, subject to the terms and conditions of this Loan Agreement, to provide such financing to the Borrowers, with certain funds of the Borrowers being used to repay any Advances made hereunder as more particularly described herein.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.**     **Definitions and Accounting Matters.**

1.01    Certain Defined Terms. As used herein, the following terms shall have the following meanings:

"Administrative Agent" shall have the meaning set forth in the preamble hereto.

"Administrative Borrower" shall have the meaning set forth in Section 11.14 hereof.

"Advance" means a Tranche A Advance or Tranche B Advance.

"Advance Account" means that certain account number _____ of New Century maintained with _____.

"Affiliate" has the meaning provided in the Bankruptcy Code.

"Agents" shall have the meaning set forth in the preamble hereto.

"Agent Advances" shall have the meaning set forth in Section 10.08 hereof.

"Applicable Margin" means 2.75% per annum.

"Authorized Officer" means any of the officers listed on Schedule I hereto, as the same may be amended from time to time by the Borrowers' delivery of an updated Schedule I.

"Availability" means, as of any date of determination, the amount that the Borrowers are entitled to borrow as Advances hereunder (after giving effect to all then outstanding Advances, interest thereon, fees, and expenses and all sublimits and reserves then applicable hereunder).

"Avoidance Actions" means actions available to the bankruptcy estate of the Borrowers in the Chapter 11 Cases pursuant to Sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and the proceeds thereof.

"Bankruptcy Code" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Borrower" shall have the meaning set forth in the preamble hereto.

"Borrowing Base" shall mean the sum of (a)(i) the Tranche A Borrowing Base and (ii) the Tranche B Borrowing Base.

"Borrowing Base Deficiency" shall have the meaning set forth in Section 2.06(a) hereof.

"Budget" means the Borrowers' budget attached as Schedule C hereto, as updated from time to time pursuant to Section 7.01(a).

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) a day on which the New York Stock Exchange, the Federal Reserve Bank of New York, the Custodian or banking and savings and loan institutions in the State of New York, Connecticut or California or the City of New York or the city or state in which the Custodian's offices are located are closed, or (iii) a day on which trading in securities on the New York Stock Exchange or any other major securities exchange in the United States is not conducted.

"Capital Lease Obligations" means, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Loan Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Capital Stock" means (i) with respect to any Person that is a corporation, any and all shares, securities, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock and (ii) with respect to any Person that is not a corporation or an individual, any and all partnership, limited liability company membership or other equity interests of such Person.

"Carve-Out Amount" shall have the meaning set forth in the applicable Order.

"Cash Equivalents" means (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition, or (f) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (e) of this definition.

"CCM Fund LP Interest" means the Borrowers' limited partnership interest in Carrington Investment Partners (US), LP.

"Change of Control" means New Century fails to own, directly or indirectly, 100% of the outstanding Capital Stock of the other Borrowers except as a result of a Permitted Disposition.

"Chapter 11 Cases" shall have the meaning set forth in the recitals hereto.

"CIT" means The CIT Group/Business Credit, Inc.

"Citigroup" means Citigroup Global Markets Realty Corp., a New York corporation.

"Citigroup Servicer Advance Facility Agreement" means that certain Servicer Advance Financing Facility Agreement, dated as of August 28, 2003, by and between Citigroup and NCMC, as amended.

"Closing Date" means the date on which the Administrative Agent sends the Administrative Borrower a written notice that each of the conditions precedent set forth in Section 5.01 either has been satisfied or has been waived, which notice shall not be unreasonably withheld or delayed.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of each Borrower's now owned or hereafter acquired right, title and interest in and to each of the following:

      (a)     Accounts;

      (b)     Books;

      (c)     Chattel Paper (whether tangible or electronic);

      (d)     Commercial Tort Claims;

      (e)     Deposit Accounts (including the Tranche A Collection Account, the Tranche B Collection Account, the General Collection Account and the other Control Accounts);

      (f)     Documents;

      (g)     Equipment;

      (h)     Fixtures;

      (i)     General Intangibles and Payment Intangibles (including all Servicing Advances, the Servicing Rights, all causes of action under the Bankruptcy Code or otherwise, including Avoidance Actions, and all rights of the Borrowers under any Servicing Agreement, the Custodial Agreement or any other document);

      (j)     Goods;

      (k)     Instruments;

      (l)     all Interest Rate Protection Agreements;

      (m)     Intellectual Property;

      (n)     Inventory;

      (o)     Investment Property (including the CCM Fund LP Interest);

      (p)     Letter-of-Credit Rights;

      (q)     all Mortgage Loans;

(r)     all Mortgage Loan Documents, including without limitation all promissory notes, and all Servicing Records (as defined in <u>Section 11.17(b)</u> hereof), and any other collateral pledged or otherwise relating to such Mortgage Loans, together with all files, material documents, instruments, surveys (if available), certificates, correspondence, appraisals, computer records, computer storage media, Mortgage Loan accounting records and other books and records relating thereto;

(s)     all mortgage guaranties and insurance (issued by governmental agencies or otherwise) and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any Mortgage Loans and all claims and payments thereunder;

(t)     all other insurance policies and Insurance Proceeds relating to any Mortgage Loans or the related Mortgaged Property;

(u)     Negotiable Collateral;

(v)     all Residuals;

(w)     Supporting Obligations;

(x)     Tax Refund Receivables;

(y)     money or other assets of each such Borrower that now or hereafter come into the possession, custody, or control of any Lender;

(z)     each Borrower's interests in real property owned by such Borrower or its interest (if any) in the real property collateralizing any Mortgage Loan;

(aa)     all Property of the estate of each Borrower (within the meaning of the Bankruptcy Code) and all other Personal Property of the Borrowers, wherever located and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, whether tangible or intangible; and

(bb)     Proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the Proceeds thereof.

"<u>Commitment</u>" means a Tranche A Commitment or Tranche B Commitment.

"<u>Commitment Fee</u>" means the Commitment Fee (as defined in that certain Commitment Letter, dated as of March 30, 2007, by and among New Century, CIT and Greenwich).

"<u>Committee</u>" means an Official Committee of Unsecured Creditors for the Borrowers appointed pursuant to Section 1102(a) of the Bankruptcy Code by the United States

Trustee, as the membership of such committee may from time to time be constituted and reconstituted.

"Company" shall have the meaning set forth in the recitals hereto.

"Contractual Obligation" means as to any Person, any material provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound or any material provision of any security issued by such Person.

"Control Account" means an account subject to a Control Agreement.

"Control Account Party" means the applicable securities intermediary with respect to a securities account or bank with respect to a deposit account.

"Control Agreements" means, as applicable, the Tranche A Collection Account Control Agreement, the Tranche B Collection Account Control Agreement, the General Collection Account Control Agreement and any other control agreement, in form and substance reasonably satisfactory to the Agents, executed and delivered by a Borrower, the Administrative Agent and the Control Account Party in accordance with the terms hereof.

"Custodial Agreement" means the Custodial Agreement, dated as of the date hereof, among the Borrowers, the Custodian, the Servicer and the Administrative Agent, in form and substance satisfactory to the Agents.

"Custodian" means Deutsche Bank National Trust Company and its successors and permitted assigns.

"Custodian Loan Transmission" shall have the meaning set forth in the Custodial Agreement.

"Default" means an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Borrower or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any Property or assets (whether now owned or hereafter acquired) to any other Person, in each case whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Documentation Agent" shall have the meaning set forth in the preamble hereto.

"Dollars" and "$" means lawful money of the United States of America.

"Eligible Mortgage Permitted Liens" means (i) the lien of current real property taxes and assessments which are not due and payable, (ii) with respect to any Mortgage Loan identified on Schedule F as secured by a second lien, the related first mortgage loan, (iii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being

acceptable to mortgage lending institutions generally in the area wherein the property subject to the Mortgage is located or specifically reflected in the appraisal obtained in connection with the origination of the related Mortgage Loan, and (iv) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage, or materially impact the value or utility of any Mortgaged Property.

"Eligible MSRs" means the Servicing Rights with respect to [**certain Carrington and REIT/TRS secutizations**].[1]

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which any Borrower is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which any Borrower is a member.

"Escrow Account" means the "Escrow Account" as that term is defined in the Servicing Agreement.

"Event of Default" shall have the meaning set forth in Section 8 hereof.

"Exception" shall have the meaning set forth in the Custodial Agreement.

"Exception Report" means the exception report prepared by the Custodian pursuant to the Custodial Agreement.

"Excluded Taxes" means, with respect to an Agent, a Lender, a Participant and its Tax Related Persons, only the following Taxes: (a) income, franchise Taxes (imposed in lieu of net income Taxes) or similar Taxes imposed on (or measured by) the net income of such Person by the jurisdiction under the laws of which such Person is organized, in which its principal or applicable lending office is located or in which it is otherwise doing business (other than a jurisdiction in which such Person is treated as doing business as a result of its execution, delivery of any Loan Document or its exercise of its rights or performance of its obligations thereunder or otherwise as a result of its participation (or the participation of an entity in which it owns a beneficial interest) in the transactions contemplated by this Loan Agreement); (b) withholding Taxes imposed by the United States of America on payments to such Person, other than as a result of a change in applicable law occurring after (i) the date that such Person became a party to this Agreement, or (ii) with respect to an assignment, participation, acquisition, designation of a new applicable lending office or the appointment of a successor Agent, the effective date of such assignment, participation, acquisition, designation or appointment, except, in each case, to

---

[1] Please provide additional information.

the extent and at the rate that such Person's predecessor was entitled to such amounts (or in the case of a designation of a new applicable lending office, to the extent such Person was entitled to such amounts with respect to its prior applicable lending office); and (c) Taxes that would not have been imposed but for and solely as a result of the failure of such Person to comply with its obligations under <u>Section 3.06(e)</u>.

"<u>Existing Servicing Advances</u>" means Servicing Advances made by the Borrower on or before the Filing Date.

"<u>Facility Fee</u>" shall have the meaning set forth in <u>Section 3.07(a)</u>.

"<u>Federal Funds Rate</u>" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three primary dealers (other than an affiliate of the Agents).

"<u>Federal Tax Refund Receivable</u>" means the unpaid federal tax refund in respect of prior year tax payments, which, as of the Closing Date, is in an amount equal to approximately $90,800,000.

"<u>Filing Date</u>" means[**April 2, 2007**].

"<u>Final Order</u>" means the order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are satisfactory in form and substance to the Agents), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Lenders and the Borrowers, approving the Advances made and to be made to the Borrowers in accordance with this Loan Agreement and granting the Liens contemplated hereby.

"<u>First Lien Collateral</u>" means the Collateral on which the Administrative Agent, for the benefit of the Secured Parties, is granted or is purported to be granted a first priority Lien pursuant to the Loan Documents, as set forth on <u>Schedule D</u>.

"<u>Funding Date</u>" means the date on which an Advance is made hereunder.

"<u>GAAP</u>" means generally accepted accounting principles as in effect from time to time in the United States of America.

"<u>General Collection Account</u>" means that certain account number _____ named "_____" of the Borrowers maintained with _____.

"<u>General Collection Account Control Agreement</u>" shall mean that certain control agreement with respect to the General Collection Account, in form and substance satisfactory to the Agents, executed and delivered by the Borrowers, the Administrative Agent and _____.

"Governmental Authority" means any nation or government, any state or other political subdivision, agency or instrumentality thereof, any entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over any Borrower or any of its Subsidiaries or properties.

"Greenwich" means Greenwich Capital Financial Products, Inc., a Delaware corporation.

"Guarantee" means, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise), provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances in respect of any mortgaged property. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"Indebtedness" means, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others Guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) any other indebtedness of such Person evidenced by a note, bond, debenture or similar instrument.

"Indemnified Liabilities" has the meaning set forth in Section 11.04.

"Indemnified Party" has the meaning set forth in Section 11.04.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Initial Fee Amount" has the meaning set forth in Section 3.07(a)(i).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Insurance Proceeds" means with respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

"Interest Period" means, with respect to any Advance, (i) initially, the period commencing on the Funding Date with respect to such Advance and ending on the calendar day prior to the next succeeding Monthly Payment Date, and (ii) thereafter, each period commencing on the Monthly Payment Date of a month and ending on the calendar day prior to the Monthly Payment Date of the next succeeding month. Notwithstanding the foregoing, no Interest Period may end after the Termination Date.

"Interest Rate Protection Agreement" means with respect to any or all of the Mortgage Loans or Advances, any interest rate swap, cap or collar agreement or any other applicable hedging arrangements providing for protection against fluctuations in interest rates or the exchange of nominal interest obligations, either generally or under specific contingencies relating to the Mortgage Loans or Advances.

"Interim Order" means the order of the Bankruptcy Court, in the form of Exhibit A hereto, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Lenders and the Borrowers, approving the Advances made and to be made to the Borrowers in accordance with this Loan Agreement and granting the Liens contemplated hereby.

"JPMorgan" means JPMorgan Chase Bank, N.A., a national banking association.

"Lender" shall have the meaning set forth in the preamble hereto.

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by any Agent, any Lender or any Lender-Related Party, (b) reasonable fees or charges paid or incurred by any Lender-Related Party in connection with any Agent's or any Lender's transactions with the Borrowers under the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and Uniform Commercial Code searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Loan Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) out-of-pocket costs and expenses incurred by any Agent or any Lender in the disbursement of funds to the Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by any Lender-Related Party resulting from the dishonor of checks payable by or to any Borrower,

(e) reasonable out-of-pocket costs and expenses paid or incurred by any Lender-Related Party to correct any default or enforce any provision of the Loan Documents, or in monitoring, gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable audit fees and expenses of Lender-Related Parties related to audit examinations of the Collateral, (g) costs and expenses of third party claims or any other suit paid or incurred by any Lender-Related Party in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or any Agent or any Lender's relationship with any Borrower or any of its Affiliates, (h) reasonable out-of-pocket costs and expenses (including attorneys fees) incurred by the Lender-Related Parties in advising, structuring, drafting, documenting, executing, reviewing, administering, syndicating, or amending the Loan Documents, and (i) costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding (other than the Chapter 11 Cases) concerning any Borrower or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking or exercising any remedies concerning the Collateral.

"Lender-Related Party" means the Agents, the Lenders and each of any Agent's or any Lender's, members, Affiliates, sponsors, managing directors, directors, together with its officers, employees, agents, advisors, attorneys and other representatives.

"Lending Value" means

(a)     with respect to the Residuals, the value determined by the Agents in good faith for purposes of collateralizing a loan and assumes all of the Residuals are sold to a single buyer under circumstances in which the seller is in default under a collateralized loan agreement, the buyer is not able to conduct customary levels of due diligence and the servicing of the underlying mortgage loans will be moved to a third party servicer without an economic interest in the Residuals;

(b)     with respect to LNFA Mortgage Loans, the value determined by the Agents in good faith for the purposes of collateralizing a loan and taking into account customary loan characteristics used in valuing such loans and applicable market conditions **[additional criteria]**, and the Agents shall have the right to mark to market the LNFA Mortgage Loans on a daily basis; and

(c)     with respect to Tax Refund Receivables, Eligible MSRs, Servicing Advances and the CCM Fund LP Interest, the value determined by the Agents in good faith for purposes of collateralizing a loan.

In each case, the Agents' determination of Lending Value shall be conclusive upon the parties. The Borrowers acknowledge that the Agents' determination of Lending Value is for lending purposes hereunder and does not purport to be and shall not be deemed to be a determination of fair market value. As of the Closing Date, the determination of the Lending Value with respect to the First Lien Collateral is as set forth on <u>Schedule E</u>.

"LIBO Base Rate" means with respect to each day an Advance is outstanding (or if such day is not a Business Day, the next succeeding Business Day), the rate per annum equal to the rate published by Bloomberg or if such rate is not available, the rate appearing at page 3750 of the Telerate Screen as one-month LIBOR on such date, and if such rate shall not be so quoted, the rate per annum at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., eastern time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency and exchange operations in respect of its Advances are then being conducted for delivery on such day for a period of one month and in an amount comparable to the amount of the Advances to be outstanding on such day.

"LIBO Rate" means with respect to each Interest Period pertaining to an Advance, a rate per annum (reset on a monthly basis) determined by the Administrative Agent in its sole discretion in accordance with the following formula (rounded upwards to the nearest 1/100th of one percent), which rate as determined by the Administrative Agent shall be conclusive absent manifest error by the Administrative Agent:

$$\frac{\text{LIBO Base Rate}}{1.00 - \text{LIBO Reserve Requirements}}$$

The LIBO Rate shall be calculated each Funding Date and Monthly Payment Date commencing with the first Funding Date.

"LIBO Reserve Requirements" means for any Interest Period for any Advance, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of any reserve requirements applicable to any Lender or any Lender-Related Party in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto), dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such Governmental Authority. As of the Closing Date, the LIBO Reserve Requirements shall be deemed to be zero.

"Lien" means any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"LNFA Mortgage Loan" means a Mortgage Loan owned by a Borrower and set forth on Schedule F, which is reasonably deemed eligible for inclusion by the Agents in the calculation of the Tranche A Borrowing Base. Without limiting the foregoing, no Mortgage Loan shall be a LNFA Mortgage Loan unless it meets each of the criteria set forth in the immediately preceding sentence and, in addition, each of the following criteria:

(i)     the Mortgage Loan is secured by a first or second mortgage lien (as reflected on the Mortgage Loan Data Transmission) on a one- to four-family residential property;

(ii)    the Mortgage Loan complies with each of the representations and warranties respecting Mortgage Loans made in Section 6.12, Section 6.19 or any other section, schedule, or exhibit of this Loan Agreement, and in the other Loan Documents;

(iii)    it is a Mortgage Loan for which the Administrative Agent or its designee or the Custodian is in possession of all required Mortgage Loan Documents without Exceptions unless otherwise waived in writing by the Administrative Agent; and

(iv)    the applicable Borrower owns such Mortgage Loan and has authority to pledge such Mortgage Loan to the Administrative Agent.

"Loan Account" means the account on the Administrative Agent's books in the name of the Borrowers.

"Loan Documents" means, collectively, the Control Agreements, the Custodial Agreement, this Loan Agreement, the Orders, the Pledge Agreement, the Security Agreement, the Servicing Agreement, any note or notes executed by the Borrowers in connection with this Loan Agreement and payable to any Lender, and any other agreement entered into, now or in the future, by any Borrower and any Agent or any Lender in connection with this Loan Agreement.

"Majority Tranche A Lenders" means Tranche A Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Tranche A Commitments.

"Majority Tranche B Lenders" means Tranche B Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Tranche B Commitments.

"Material Adverse Change" means an event, fact, circumstance, change in, or effect on the business of any Borrower, any Servicer or any Subservicer, which individually or in the aggregate or on a cumulative basis with any other events, facts, circumstances, changes in, or effects on, the Borrowers, taken as a whole, any Borrower, any Servicer or Subservicer, could reasonably be expected to have a Material Adverse Effect.

"Material Adverse Effect" means a material adverse effect which either occurs after the date hereof or with respect to which any Lender obtains knowledge after the date hereof on (a) the business or operations of any Servicer or any Subservicer, (b) the ability of any Borrower to perform any of its respective obligations under any of the Loan Documents to which it is a party, (c) the validity or enforceability of any of the Loan Documents, (d) the rights and remedies of any Agent or any Lender under any of the Loan Documents or (e) the First Lien Collateral; provided, however, that the commencement of the Chapter 11 Cases, events customarily resulting from the filing of a case under Chapter 11 of the Bankruptcy Code and the Borrowers' efforts to market and sell substantially all of their businesses and assets shall not constitute a Material Adverse Effect.

"Material Contract" means all agreements and contracts evidencing the Residuals and the Mortgage Loans.

"Maximum Credit" means $50,000,000; provided, however, that (a) the Lenders may, in their sole discretion, increase the Maximum Credit to $100,000,000 by either increasing the Tranche A Sublimit by up to $50,000,000 and/or, within ten (10) Business Days from entry of the Interim Order, increasing the Tranche B Sublimit to $50,000,000; provided that, as of the date of any such increase in the Tranche B Sublimit, the Tranche B Borrowing Base shall be at least equal to $42,500,000, (b) without limiting clause (a) hereof, the Maximum Credit may be

further increased to $150,000,000 with the consent of the Lenders and the Borrowers by increasing the Tranche A Sublimit to $100,000,000 and the Tranche B Sublimit to $50,000,000 and (c) the Maximum Credit shall be reduced from time to time in accordance with <u>Section 2.06</u>.

"<u>Monthly Payment Date</u>" means the third Business Day of each month.

"<u>Mortgage</u>" means with respect to a Mortgage Loan, the mortgage, deed of trust or other instrument, which creates, as indicated on the Mortgage Loan Data Transmission, a valid and perfected first priority or valid and perfected second priority Lien on the fee simple or a leasehold estate in such real property.

"<u>Mortgage File</u>" shall have the meaning set forth in the Custodial Agreement.

"<u>Mortgage Loan</u>" means a mortgage loan which the Custodian has been instructed to hold for the Administrative Agent pursuant to the Custodial Agreement, and which Mortgage Loan includes, without limitation, (i) a Mortgage Note, the related Mortgage and all other Mortgage Loan Documents and (ii) all right, title and interest in and to the Mortgaged Property covered by such Mortgage.

"<u>Mortgage Loan Data Transmission</u>" means a computer-readable magnetic or other electronic format incorporating the fields identified on <u>Exhibit B</u>.

"<u>Mortgage Loan Documents</u>" means, with respect to a Mortgage Loan, the documents comprising the Mortgage File for such Mortgage Loan.

"<u>Mortgage Loan List</u>" means the hard copy report provided by or on behalf of the Borrowers which shall include with respect to each Mortgage Loan to be included as Collateral: (i) the Mortgage Loan number, (ii) the Mortgagor's name, (iii) the original principal amount of the Mortgage Loan and (iv) the current principal balance of the Mortgage Loan.

"<u>Mortgage Note</u>" means the original executed promissory note or other evidence of the indebtedness of a mortgagor/borrower with respect to a Mortgage Loan.

"<u>Mortgaged Property</u>" means the real property (including all improvements, buildings, fixtures, building equipment and personal property thereon and all additions, alterations and replacements made at any time with respect to the foregoing) and all other collateral securing repayment of the debt evidenced by a Mortgage Note.

"<u>Mortgagor</u>" means the obligor on a Mortgage Note.

"<u>Multiemployer Plan</u>" means a multiemployer plan defined as such in <u>Section 3(37)</u> of ERISA to which contributions have been or are required to be made by any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA.

"<u>NCMC</u>" means New Century Mortgage Corporation, a California Corporation.

"<u>Net Cash Proceeds</u>" means, with respect to any Disposition by any Person, the amount of cash received (directly or indirectly) from time to time (whether as initial

consideration or through the payment of deferred consideration) by or on behalf of such Person or any of its Subsidiaries, in connection therewith after deducting therefrom only (A) the principal amount of any Indebtedness secured by any senior Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) and interest, fees and expenses in respect thereof which is (x) required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Loan Agreement) or (y) in escrow in connection with such Person contesting such Indebtedness or the Lien securing such Indebtedness in connection with such Disposition, (B) reasonable costs, fees and expenses related to such Disposition reasonably incurred by such Person in connection therewith and paid in cash, and (C) transfer or other taxes paid by such Person in connection therewith, to the extent approved (to the extent such approval is required) by the Bankruptcy Court.

"New Century" shall have the meaning set forth in the preamble hereto.

"New Servicing Advances" means Servicing Advances made by the Borrower on or after the Filing Date pursuant to standards mutually acceptable to the Agents and the Borrowers.

"Note" means each promissory note executed by the Borrowers in favor of a Lender evidencing such Lender's Advances.

"Notice of Borrowing" means the certificate prepared by the Administrative Borrower substantially in the form of Exhibit C, attached hereto.

"Obligations" means all loans, Advances, debts, principal, interest, contingent reimbursement obligations with respect to any of the Loan Documents, premiums, liabilities (including all amounts charged to the Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in Section 3.07 hereof), charges, costs, Agent Advances, Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower or any of its Subsidiaries to any Agent, any Lender or any Lender-Related Party pursuant to or evidenced by the Loan Documents, in each case irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising. Any reference in this Loan Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals or alterations thereof.

"Orders" means the Interim Order and the Final Order.

"Other Taxes" means any and all present or future stamp, registration, transfer or documentary Taxes or any excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, the Loan Documents.

"Participant" shall have the meaning set forth in Section 11.16(b).

"Payment Date" means the first Business Day of each week.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permitted Disposition" means, subject to compliance with Section 2.06 hereof, so long as no Default or Event of Default shall have occurred, (a) any Disposition of mortgage loan Collateral in the ordinary course of business on ordinary business terms (so long as such Disposition does not create a Default or Event of Default), (b) any Disposition of (i) assets that are included in the Borrowing Base or (ii) any Person which is the owner of assets that are included in the Borrowing Base, in each case, on terms and conditions reasonably satisfactory to the Agents (so long as such Disposition does not create a Default or Event of Default) and (c) any Disposition of assets that are not included in the Borrowing Base.

"Permitted Liens" means Liens permitted under Section 7.13 hereof.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"Plan" means an employee benefit or other plan established or maintained by either any Borrower or any ERISA Affiliate and that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Pledge Agreement" means the Pledge Agreement, dated as of the date hereof, executed by the Borrowers in favor of the Administrative Agent for the benefit of the Secured Parties.

"Post-Default Rate" means, in respect of any principal of any Advance or any other amount under this Loan Agreement or any other Loan Document, a rate per annum equal to (a) 2.00% per annum plus (b)(i) the interest rate otherwise applicable to such Advance or other amount, or (ii) if no interest rate is otherwise applicable, the LIBO Rate plus the Applicable Margin.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Borrower.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Pro Rata Share" means, with respect to any Tranche Total Commitment, the percentage obtained by dividing (i) such Lender's Tranche Commitment by (ii) such Tranche Total Commitment, provided, that, if such Tranche Total Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Tranche Advances (including Agent Advances) and the denominator shall be the aggregate unpaid principal amount of all of the applicable Tranche Advances (including Agent Advances).

"Reference Rate" means the rate of interest publicly announced by JPMorgan, its successors or any other commercial bank designated by the Administrative Agent to the

Borrowers from time to time, in New York, New York from time to time as its prime rate or base rate. The prime rate or base rate is determined from time to time by such bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by such bank to any particular class or category of customers. Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Register" shall have the meaning set forth in the Section 11.16(b)(ii).

"Regulations T, U and X" means Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"Required Lenders" means (a) for so long as the Pro Rata Shares of CIT and Greenwich, taken in the aggregate, represent at least 51% of the Commitments (even if the Pro Rata Share of one of them alone represents at least 51% of the Commitments), CIT and Greenwich and (b) in all other cases, Lenders whose Pro Rata Shares, taken in the aggregate, represent at least 51% of the Commitments; provided, however, that, if at any time there are two or more Lenders, then Required Lenders must comprise at least two Lenders.

"Requirement of Law" means as to any Person, (a) the certificate of incorporation and by-laws or other organizational or governing documents of such Person, (b) all laws (including consumer regulatory laws), treaties, rules or regulations, and (c) all determinations of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Required Documents" means those documents identified in **[Section 2(I)]** of the Custodial Agreement.

"Residuals" means the unencumbered securitization residual interests listed on Schedule G hereto and all rights and interests related thereto.

"Responsible Officer" means, as to any Person, the chief executive officer or, with respect to financial matters, the chief financial officer of such Person; provided, that in the event any such officer is unavailable at any time he or she is required to take any action hereunder, Responsible Officer means any officer authorized to act on such officer's behalf as demonstrated by a certificate of corporate resolution.

"Restricted Payments" means with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, without limitation, warrants, options or rights therefor) issued by such Person, whether such securities are now or may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly.

"Second Lien" means with respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a mortgage note which creates a second lien on the Mortgaged Property.

"Second Lien Mortgage Loan" means a LNFA Mortgage Loan secured by the lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property securing financing obtained by the related Mortgagor.

"Secured Parties" means the Agents and the Lenders.

"Securitization Trusts" means the securitizations listed in Schedule H hereto. Schedule H hereto includes all of the securitizations for which any Borrower is providing the servicing.

"Security Agreement" means the Security Agreement, dated as of the date hereof, executed by the Borrowers in favor of the Administrative Agent for the benefit of the Secured Parties.

"Senior Claims" means all valid, perfected, non-avoidable secured claims existing on the Filing Date.

"Servicer" means NCMC or any other Person serving as servicer pursuant to any servicing agreement regarding the servicing of First Lien Collateral or underlying assets.

"Servicing Advances" means advances for the payment of principal and interest with respect to a delinquent securitized mortgage loan and taxes, assessments, maintenance fees, insurance and foreclosure-related expenses with respect to a mortgaged property underlying a securitized mortgage loan made by the Borrowers pursuant to the terms of a Pooling and Servicing Agreement in connection with a Securitization Trust, and the right to reimbursement thereof.

"Servicing Agreement" means a servicing agreement relating to the servicing of Mortgage Loans executed by and between a Borrower, the Servicer and the Administrative Agent, the form and substance of which is reasonably satisfactory to the Agents.

"Servicing File" means with respect to each Mortgage Loan, the file retained by the Servicer consisting of originals of all material documents in the Mortgage File which are not delivered to a Custodian and copies of the Mortgage Loan Documents set forth in [**Section 2**] of the Custodial Agreement.

"Servicing Records" shall have the meaning set forth in Section 11.17(b) hereof.

"Servicing Rights" means Securitization Trust servicing rights, subject to the terms of the Orders.

"Servicing Transmission" means a computer-readable magnetic or other electronic format acceptable to the parties containing the information identified on Exhibit D.

"State Tax Refund Receivables" means unpaid state tax refunds in respect of prior year tax payments, which, as of the Closing Date, are in an amount equal to approximately $23,070,000.

"Subservicer" means _____.

"Subsidiary" means, with respect to any Person, (a) any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, or (b) if such Person is a trust, the depositor of such trust, excluding the Securitization Trusts.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, and shall include all interest, penalties and additions to Tax related thereto.

"Tax Refund Receivables" means the Federal Tax Refund Receivable and the State Tax Refund Receivables.

"Tax Related Person" means any Person (including, without limitation, a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to an Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"Tax Return" means any report, filing, return, information return, document, election, including amendments to any of the foregoing, filed or furnished or required to be filed or furnished with respect to Taxes.

"Termination Date" means the date which is the earliest of (a) the effective date of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (b) 90 days after the Closing Date, (c) the sale of all or substantially all of the Borrowers' assets, whether under Section 363 of the Bankruptcy Code, a confirmed plan of reorganization or otherwise; (d) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (e) the dismissal of any of the Chapter 11 Cases; (f) May __, 2007,[2] if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, and (g) such earlier date on which either (A) all Advances shall become due and payable, in whole, in accordance with the terms of this Loan Agreement and the other Loan Documents or (B) all Advances and all other Obligations for the payment of money shall be paid in full and the Commitments and this Loan Agreement are terminated.

"Total Commitment" means, at any time, the sum of the Commitments.

"Tranche A Advance" shall have the meaning set forth in Section 2.01(a) hereto.

---

[2] 30 days after entry of the Interim Order.

"Tranche A Borrowing Base" means the sum of (a)(i) 80% (or such greater percentage to be determined by the Administrative Agent in its sole discretion) times the aggregate Lending Value of all Residuals that have been, and remain, pledged to, and subject to the first priority lien of, the Administrative Agent hereunder, (ii) 80% (or such greater percentage to be determined by the Administrative Agent in its sole discretion) times the aggregate Lending Value of all LNFA Mortgage Loans that have been, and remain, pledged to, and subject to the first priority lien of, the Administrative Agent hereunder, (iii) 50% (or such greater percentage to be determined by the Administrative Agent in its sole discretion) times the aggregate Lending Value of all State Tax Refund Receivables that have been, and remain, pledged to, and subject to the first priority Lien of, the Administrative Agent hereunder, (iv) 50% (or such greater percentage to be determined by the Administrative Agent in its sole discretion) times the aggregate Lending Value of the Eligible MSRs that have been, and remain, pledged to, and subject to the first priority Lien of, the Administrative Agent hereunder, (v) a percentage to be determined by the Administrative Agent in its sole discretion times the aggregate Lending Value of the Federal Tax Refund Receivable (it is noted that, as of the Closing Date, such percentage is 0%), and (vi) a percentage to be determined by the Administrative Agent in its sole discretion times the aggregate Lending Value of the CCM LP Interest (it is noted that, as of the Closing Date, such percentage is 0%) less the sum of (b)(i) the Carve-Out Amount and (ii) $10,000,000. The Tranche A Borrowing Base may be a negative number.

"Tranche A Collection Account" means that certain account number _____ named "_____" of the Borrowers maintained with _____.

"Tranche A Collection Account Control Agreement" shall mean that certain control agreement with respect to the Tranche A Collection Account, in form and substance satisfactory to the Agents, executed and delivered by the Borrowers, the Administrative Agent and _____.

"Tranche A Commitment" means the commitment of a Tranche A Lender to make Tranche A Advances hereunder in the amount set forth opposite its name on Schedule B hereto or as may subsequently be set forth in the Register from time to time, as the case may be.

"Tranche Advance" means a Tranche A Advance or a Tranche B Advance, as applicable.

"Tranche A Facility" shall have the meaning set forth in the recitals hereto.

"Tranche A Lender" means each Lender that has a Tranche A Commitment or that makes Tranche A Advances.

"Tranche A Sublimit" means, as of the Closing Date, $50,000,000, as such amount may be increased as set forth in the definition of "Maximum Credit" or decreased from time to time pursuant to Section 2.06.

"Tranche B Advance" shall have the meaning set forth in Section 2.01(b) hereto.

"Tranche B Borrowing Base" means the sum of (a)(i) **[75%]** (or such greater percentage to be determined by the Administrative Agent in its sole discretion) of the Lending Value of outstanding Existing Servicing Advances and (ii) **[80%]** (or such greater percentage to be determined by the Administrative Agent in its sole discretion) of the Lending Value of outstanding New Servicing Advances, in each case to the extent that such Servicing Advances are owing pursuant to the terms of the documents governing the Securitization Trusts, are unreimbursed and have not been waived by the Borrowers.

"Tranche B Collection Account" means that certain account number _____ named "_____" of the Borrowers maintained with _____.

"Tranche B Collection Account Control Agreement" shall mean that certain control agreement with respect to the Tranche B Collection Account, in form and substance satisfactory to the Agents, executed and delivered by the Borrowers, the Administrative Agent and _____.

"Tranche B Commitment" means the commitment of a Tranche B Lender to make Tranche B Advances hereunder in the amount set forth opposite its name on Schedule B hereto or as may subsequently be set forth in the Register from time to time, as the case may be

"Tranche B Facility" shall have the meaning set forth in the recitals hereto.

"Tranche B Lender" means each Lender that has a Tranche B Commitment or that makes Tranche B Advances.

"Tranche B Sublimit" means, as of the Closing Date, $0, as such amount may be increased as set forth in the definition of "Maximum Credit" or decreased from time to time pursuant to Section 2.06

"Tranche Commitment" means a Lender's Tranche A Commitment or Tranche B Commitment, as applicable.

"Tranche Lenders" means the Tranche A Lenders (but not the other Lenders) or the Tranche B Lenders (but not the other Lenders), as applicable.

"Tranche Total Commitment" means, at any time, the sum of the applicable Tranche Commitments.

"Transmittal Letter" shall have the meaning ascribed thereto in the Custodial Agreement.

"Trust Receipt" shall have the meaning set forth in the Custodial Agreement.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a

jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"Unrestricted Cash" means cash of the Borrowers other than cash receipts that are pending transfer to the trustee of a Securitization Trust.

1.02    Accounting Terms and Determinations.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared, in accordance with GAAP.

1.03    Uniform Commercial Code.  Any terms used in this Agreement that are defined in the Uniform Commercial Code shall be construed and defined as set forth in the Uniform Commercial Code unless otherwise defined herein.

1.04    Construction.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a record and any record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

## Section 2.    Advances, Evidence of Debt and Prepayments.

2.01    Advances.

(a)    Tranche A Advances.  Subject to fulfillment of the conditions precedent set forth in Sections 5.01 and 5.02 hereof, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, each Tranche A Lender hereby severally agrees, from time to time, on the terms and conditions of this Loan Agreement and the other Loan Documents, to make loans (individually, a "Tranche A Advance"; collectively, the "Tranche A Advances") to the Borrowers in Dollars, on any Business Day (but the Borrowers will endeavor to limit requests for Tranche A Advances to not more frequently than once weekly) from and including the Closing Date to but excluding the Termination Date in an aggregate principal amount at any one time outstanding not to exceed such Tranche A Lender's Pro Rata Share of the Tranche A Borrowing Base as in effect from time to time; provided, that, in no event shall (i) the aggregate principal amount of Tranche A Advances outstanding at any time exceed the Tranche A Sublimit or (ii) the aggregate principal amount of Tranche A Advances outstanding at any time exceed the Tranche A Borrowing Base.

(b)    Tranche B Advances.  Subject to fulfillment of the conditions precedent set forth in Sections 5.01, 5.02 and 5.03 hereof, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, each Tranche B Lender hereby severally agrees, from time to time, on the terms and conditions of this Loan Agreement and the other Loan Documents, to make loans (individually, a "Tranche B Advance"; collectively, the "Tranche B Advances") to the Borrowers in Dollars, on any Business Day (but the Borrowers will endeavor to limit requests for Tranche B Advances to not more frequently than once weekly) from and including the Closing Date to but excluding the Termination Date in an aggregate principal amount at any one time outstanding not to exceed such Tranche B Lender's Pro Rata Share of the Tranche B Borrowing Base as in effect from time to time; provided, that, in no event shall (i) the aggregate principal amount of Tranche B Advances outstanding at any time exceed the Tranche B Sublimit or (ii) the aggregate principal amount of Tranche B Advances outstanding at any time exceed the Tranche B Borrowing Base.

(c)    Subject to the terms and conditions of this Loan Agreement, during such period the Borrowers may borrow, repay and reborrow Tranche A Advances and Tranche B Advances hereunder.

(d)    In no event shall the Lenders be obligated to make an Advance when any Default or Event of Default has occurred and is continuing, and in no event shall the aggregate principal amount of all Advances outstanding at any time exceed the Maximum Credit or the Borrowing Base.

2.02    Evidence of Debt.

(a)    The Administrative Agent shall maintain an account or accounts evidencing the indebtedness of the Borrowers to each Lender resulting from each Advance made by such Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(b)     The entries made in the accounts maintained pursuant to paragraph (a) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Advances in accordance with the terms of this Loan Agreement.

(c)     Any Lender may request that the Advances be evidenced by a promissory note or notes.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note or notes payable to the order of such Lender (or, if requested by such Lender, to such Lender and its assigns) and in a form approved by such Lender.  Thereafter, the Advances evidenced by such promissory note and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the payee named therein or its registered assigns.

2.03    Procedure for Borrowing.

(a)     Borrowing Procedure for Requesting an Advance.  The Administrative Borrower may request a borrowing, on any Business Day during the period from and including the Closing Date to the Termination Date to the extent set forth above for any Tranche Advance, by delivering to the Administrative Agent, with a copy to the Lenders, an irrevocable Notice of Borrowing, appropriately completed and with all required supporting documentation, which Notice of Borrowing must be received no later than 12:00 noon (eastern time) two (2) Business Days prior to the requested Funding Date (except that the Notice of Borrowing for the initial funding on the Closing Date may be delivered on the Closing Date prior to 12:00 noon (eastern time)).  Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Tranche Advances, (ii) the use of the proceeds of such proposed Tranche Advances and (iii) the proposed borrowing date, which must be a Business Day.  The Agents and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent).  Each Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request Advances on behalf of the Borrowers until the Administrative Agent receives written notice to the contrary.  The Agents and the Lenders shall have no duty to verify the authenticity of the signature appearing on any Notice of Borrowing.  Except as otherwise provided in this Section 2.03, Advances shall be made ratably in accordance with each Lender's Pro Rata Share.

(b)     Each Notice of Borrowing pursuant to this Section 2.03 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith.  Each Advance shall be made in a minimum amount of $1,000,000 and shall be in an integral multiple of $500,000.

(c)     Mechanics of Advances.

(i)     Except as otherwise provided in this Section 2.03(c), all Advances under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares, it being understood that no Lender shall be responsible for any default

by any other Lender in that other Lender's obligations to make an Advance requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make an Advance requested hereunder, and each Lender shall be obligated to make the Advances required to be made by it by the terms of this Loan Agreement regardless of the failure of any other Lender to do so.

(ii)    Notwithstanding any other provision of this Loan Agreement, and in order to reduce the number of fund transfers among the parties hereto, the Borrowers, the Agents and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrowers and the Lenders hereby irrevocably authorize the Administrative Agent to, fund, on behalf of the Lenders, Advances pursuant to Section 2.01; provided, however, that the Administrative Agent shall in no event fund such Advances if the Administrative Agent shall have received written notice from the Required Lenders prior to the funding of the proposed Advance that one or more of the conditions precedent contained in Section 5.01, Section 5.02 or Section 5.03 will not be satisfied on the day of the proposed Advance. If the Administrative Borrower gives a Notice of Borrowing requesting an Advance and the Administrative Agent elects not to fund such Advance on behalf of the Lenders, then promptly after receipt of the Notice of Borrowing requesting such Advance, the Administrative Agent shall notify each applicable Lender of the specifics of the requested Advance and that it will not fund the requested Advance on behalf of the Lenders. If the Administrative Agent notifies the Lenders that it will not fund a requested Advance on behalf of the Lenders, each applicable Lender shall make its Pro Rata Share of the Advance available to the Administrative Agent, in immediately available funds, no later than 2:00 p.m. (eastern time) (provided that, except with respect to any Advance to be made on the Closing Date, the Administrative Agent requests payment from such Lender not later than 5:00 p.m. (eastern time) on the prior Business Day) on the date of the proposed Advance. The Administrative Agent will make the proceeds of such Advances available to the Borrowers on the day of the proposed Advance by causing an amount, in immediately available funds, equal to the proceeds of all such Advances received by the Administrative Agent or the amount funded by the Administrative Agent on behalf of the Lenders to be deposited in the Advance Account.

(iii)    If the Administrative Agent has notified the Lenders that the Administrative Agent, on behalf of the Lenders, will fund a particular Advance pursuant to Section 2.03(c)(ii), the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such day and the Administrative Agent, in its sole discretion, may, but shall not be obligated to, cause a corresponding amount to be made available to the Borrowers on such day. If the Administrative Agent makes such corresponding amount available to the Borrowers and such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate plus the Applicable Margin. During the period in which such Lender has not paid such

corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Loan Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrowers shall, for all purposes hereof, be an Advance made by the Administrative Agent for its own account.  Upon any such failure by a Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Administrative Borrower of such failure and the Borrowers shall immediately pay such corresponding amount to the Administrative Agent for its own account.

(iv)    Nothing in this Section 2.03(c) shall be deemed to relieve any Lender from its obligations to fulfill its Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(d)    Upon the Borrowers' request for a borrowing pursuant to Section 2.03(a) above and subject to Section 2.03(c) above, each Lender shall, assuming all conditions precedent set forth in this Section 2.03 and in Sections 5.01, 5.02 and, to the extent applicable, 5.03, have been met, and provided no Default shall have occurred and be continuing (in accordance with Section 2.01), not later than 3:00 p.m. (eastern time) on the requested Funding Date, make an Advance (determined by the Administrative Agent) in an amount equal to such Lender's Pro Rata Share and which would not cause the aggregate amount of Advances then outstanding to exceed the lesser of (x) the Maximum Credit or (y) the Borrowing Base shown on the latest calculation of the Borrowing Base provided to the Agents and the Lenders.  Subject to the foregoing, such borrowing will be made available to the Borrowers in accordance with Section 2.03(c) via wire transfer to the applicable Advance Account in funds immediately available to the Borrowers.

2.04    Limitation on Types of Advances; Illegality.  Anything herein to the contrary notwithstanding, if, on or prior to the determination of any LIBO Base Rate:

(a)    any Lender determines, which determination shall be conclusive, that quotations of interest rates for the relevant deposits referred to in the definition of "LIBO Base Rate" in Section 1.01 hereof are not being provided in the relevant amounts or for the relevant maturities for purposes of determining rates of interest for Advances as provided herein; or

(b)    any Lender determines, which determination shall be conclusive, that the Applicable Margin plus the relevant rate of interest referred to in the definition of "LIBO Base Rate" in Section 1.01 hereof upon the basis of which the rate of interest for Advances is to be determined is not likely adequately to cover the cost to such Lender of making or maintaining Advances; or

(c)    it becomes unlawful for such Lender  to make or maintain Advances hereunder using a LIBO Rate;

then such Lender shall give the Administrative Agent and the Administrative Borrower prompt notice thereof and, so long as such condition remains in effect, the Lenders shall not make additional Advances, and the Borrowers shall, at their option, either prepay such Advances or

pay interest on such Advances at a rate per annum as determined by such Lender taking into account the increased cost to such Lender of making and maintaining the Advances.

2.05    Repayment of Advances; Interest.

(a)    Each Borrower hereby unconditionally promises to pay in full on the Termination Date the then aggregate outstanding principal amount of the Advances and all other Obligations due under this Loan Agreement and the other Loan Documents.

(b)    The Borrowers shall pay to the Administrative Agent for the account of the Lenders interest on the unpaid principal amount of each Advance for the period from and including the date of such Advance to but excluding the date such Advance shall be paid in full, at a rate per annum equal to the LIBO Rate plus the Applicable Margin. Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, the Borrowers shall pay to the Administrative Agent for the account of the Lenders interest at the applicable Post-Default Rate on any principal of any Advance and on any other amount payable by the Borrowers hereunder, for the period from and including the date of occurrence of such Event of Default to but excluding the date such Event of Default is waived or such amount is paid in full. Accrued interest on each Advance as calculated in Section 2.05(b) above shall be payable on each Monthly Payment Date and on the Termination Date, except that interest payable at the Post-Default Rate shall accrue daily and shall be payable promptly upon receipt of invoice. Promptly after the determination of any interest rate provided for herein or any change therein, the Lender shall give written notice thereof to the Borrower.

2.06    Mandatory Prepayment.

(a)    The Administrative Agent shall, on the Business Day prior to each Payment Date (and may on any other Business Day), deliver to the Administrative Borrower a calculation of the Tranche A Borrowing Base and the Tranche B Borrowing Base, as applicable. Such information shall be ascertained from the Servicing Transmission which shall be delivered or caused to be delivered by the Borrowers in accordance with Section 7.19 and such other information as the Administrative Agent shall determine. In the event that such calculations indicate or if at any time (i) the aggregate outstanding principal amount of Tranche A Advances exceeds the Tranche A Borrowing Base, (ii) the aggregate outstanding principal amount of Tranche B Advances exceeds the Tranche B Borrowing Base or (iii) the aggregate outstanding principal amount of Advances exceeds the Borrowing Base (each, a "Borrowing Base Deficiency"), as determined by the Administrative Agent and notified to the Administrative Borrower on any Business Day, the Borrowers shall immediately upon receipt of such written notice by the Administrative Borrower, prepay the Advances in part or in whole, such that after giving effect to such prepayment a Borrowing Base Deficiency no longer exists. To the extent that there are Borrowing Base Deficiencies with respect to more than one Tranche Advance, funds on deposit in the Control Accounts shall be applied as follows: (A) funds on deposit in the Tranche A Collection Account shall be applied first to cure any Borrowing Base Deficiency with respect to Tranche A Advances and second to cure any Borrowing Base Deficiency with respect to Tranche B Advances; (B) funds on deposit in the Tranche B Collection Account shall be applied first to cure any Borrowing Base Deficiency with respect to Tranche B Advances and second to cure any Borrowing Base Deficiency with respect to Tranche A Advances and

(C) funds on deposit in the General Collection Account shall be applied pro rata to the Tranche A Advances and Tranche B Advances.  Notwithstanding the forgoing, to the extent that the Tranche A Borrowing Base exceeds the outstanding Tranche A Advances and/or the Tranche B Borrowing Base exceeds the outstanding Tranche B Advances (such excess, a "Borrowing Base Surplus"), then, to the extent that and for so long as such Borrowing Base Surplus exceeds the aggregate amount of the Borrowing Base Deficiency with respect to the Tranche A Facility and/or the Tranche B Facility, as applicable, then such deficiency with respect to the Tranche A Facility and/or the Tranche B Facility, as applicable, shall not be deemed to be a Borrowing Base Deficiency hereunder.

(b)     Weekly Application of Amounts in the Control Accounts.  On each Payment Date (or, upon the occurrence and during the continuance of an Event of Default, on each Business Day), to the extent not inconsistent with the terms of a purchase agreement for a pending Disposition permitted under this Loan Agreement, the Borrowers shall prepay the Advances as follows:  (i) all proceeds received by the Borrowers (other than as set forth in clause (d) below) in respect of the Residuals, the LNFA Mortgage Loans and other Collateral included in the Tranche A Borrowing Base, if any, together with any amounts on deposit in the Tranche A Collection Account, shall be applied in full to prepay the outstanding principal of first the Tranche A Advances until paid in full and second the Tranche B Advances, (ii) all proceeds received by the Borrowers (other than as set forth in clause (d) below) in respect of the Servicing Advances, if any, together with any amounts on deposit in the Tranche B Collection Account, shall be applied in full to prepay the outstanding principal of first the Tranche B Advances until paid in full and second the Tranche A Advances, and (iii) any amounts on deposit in the General Collection Account (other than as set forth in clause (d) below), shall be applied in full to prepay the outstanding principal of the Tranche A Advances and the Tranche B Advances on a pro rata basis, in each case without a reduction in the Maximum Credit.

(c)     Cash Sweep.  On each Payment Date (or, upon the occurrence and during the continuance of an Event of Default, on each Business Day), the Borrowers shall prepay the outstanding principal of the Advances, as determined by the Administrative Agent, in an amount equal to the aggregate amount of Unrestricted Cash and Cash Equivalents of the Borrowers in excess of $10,000,000, without a reduction in the Maximum Credit.  Upon five (5) days notice to the Borrowers during the continuance of an Event of Default, the Borrowers shall prepay the Advances, as determined by the Administrative Agent, in an amount equal to the aggregate amount of Unrestricted Cash and Cash Equivalents of the Borrowers, with a concurrent reduction in the Maximum Credit and the Tranche A Sublimit or Tranche B Sublimit, as applicable, in the amount of such Unrestricted Cash and Cash Equivalents so applied to repay such Tranche Advances.

(d)     Asset Dispositions.  Immediately upon any Disposition by any Borrower of (i) assets that are not included in the Borrowing Base, the Borrowers shall prepay the outstanding principal of the Advances, as determined by the Administrative Agent, in an amount equal to 50% of the Net Cash Proceeds received by any Borrower in connection with any such event without a reduction in the Borrowing Base or the Maximum Credit, (ii) assets that are included in the Tranche A Borrowing Base, the Borrowers shall prepay the outstanding principal of first the Tranche A Advances, together with accrued and unpaid interest thereon, until paid in full and second the Tranche B Advances, in an aggregate amount equal to 100% of the Net Cash

Proceeds received by any Borrower in connection with any such event with a concurrent reduction in the Maximum Credit and the Tranche A Sublimit in the amount of the Net Cash Proceeds so applied to repay the Tranche A Advances and (iii) assets that are included in the Tranche B Borrowing Base, the Borrowers shall prepay the outstanding principal of <u>first</u> the Tranche B Advances, together with accrued and unpaid interest thereon, until paid in full and <u>second</u> the Tranche A Advances, in an aggregate amount equal to 100% of the Net Cash Proceeds received by any Borrower in connection with any such event.

2.07    <u>Optional Prepayments</u>.

(a)    The Advances are prepayable without premium or penalty, in whole or in part on each Payment Date. The Advances are prepayable at any other time, in whole or in part, in accordance herewith and subject to clause (b) below. Amounts repaid may be reborrowed in accordance with the terms of this Loan Agreement to the extent permitted under <u>Section 2.01(c)</u>. If the Borrowers intend to prepay an Advance in whole or in part from any source other than as required under <u>Section 2.06</u>, the Administrative Borrower shall give two (2) Business Days' prior written notice thereof to the Lenders. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments shall be in an aggregate principal amount of at least $100,000.

(b)    If the Borrowers make a prepayment of the Advances on any day which is not a Payment Date, the Borrowers shall indemnify the Agents and the Lenders and hold the Agents and the Lenders harmless from any actual loss or expense which such Agent or such Lender may sustain or incur arising from (a) the re-employment of funds obtained by any Agent or any Lender to maintain the Advances hereunder or from (b) fees payable to terminate the deposits from which such funds were obtained, in either case, which actual loss or expense shall be equal to an amount equal to the excess, as reasonably determined by such Agent or such Lender, of (i) its cost of obtaining funds for such Advances for the period from the date of such payment through the following Payment Date over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds not utilized by reason of such payment for such period. This <u>Section 2.07</u> shall survive termination of this Loan Agreement and payment of the Advances.

(c)    This Loan Agreement may be terminated by the Borrowers at any time upon payment in full in cash of all Obligations, including all payments required to be made under <u>Sections 2.05</u>, <u>3.06</u> and <u>3.07</u> of this Loan Agreement.

2.08    Requirements of Law.

(a)    If any Requirement of Law (other than with respect to any amendment made after the Closing Date to any Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by any Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Lender-Related Party to any tax of any kind whatsoever with respect to this Loan Agreement or any Advance made by it (excluding net income taxes) or change the basis of taxation of payments to any Lender-Related Party in respect thereof;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of Advances or other extensions of credit by, or any other acquisition of funds by any office of any Lender-Related Party which is not otherwise included in the determination of the LIBO Base Rate hereunder; or

(iii)    shall impose on any Lender-Related Party any other condition;

and the result of any of the foregoing is to increase the cost to any Agent or any Lender, by an amount which such Agent or such Lender deems to be material, of making, continuing or maintaining any Advance or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay such Agent or such Lender such additional amount or amounts as will compensate such Agent or such Lender, on an after-Tax basis, for such increased cost or reduced amount receivable thereafter incurred.

(b)    If any Agent or any Lender shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made after the Closing Date to any Agent's or any Lender's certificate of incorporation and by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by any Lender-Related Party or any corporation controlling any Lender-Related Party with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such corporation's or any Lender-Related Party's capital as a consequence of any obligations hereunder to a level below that which such corporation or any Lender-Related Party (taking into consideration such corporation's or any Lender-Related Party's policies with respect to capital adequacy) by an amount deemed by such Agent or such Lender to be material, then from time to time, the Borrowers shall promptly pay to such Agent or such Lender such additional amount or amounts as will thereafter compensate such Agent or such Lender for such reduction.

(c)    If any Agent or any Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify the Administrative Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts

payable pursuant to this subsection submitted by such Agent or such Lender to the Administrative Borrower shall be conclusive in the absence of manifest error.

      2.09   Purpose of Advances.

      Each Advance shall be used in accordance with Section 7.12.

      **Section 3.**    **Payments; Computations; Taxes; Fees.**

      3.01   Payments. Except to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by the Borrowers under this Loan Agreement, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Tranche A Collection Account, the Tranche B Collection Account or the General Collection Account, as applicable, not later than 12:00 noon, eastern time, on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). Each Borrower acknowledges that it has no rights of any kind with respect to the foregoing accounts (including, without limitation, any right of withdrawal therefrom); provided, that, absent a Default or Event of Default, the Administrative Agent shall release to the Borrowers all funds not otherwise required to be applied to the Obligations.

      3.02   Sharing of Payments, Etc. Except as provided in Section 2.08 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation (other than Loan Sale Obligations) in excess of its Pro Rata Share on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered). The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 3.02 may, to the fullest extent permitted by law, exercise all its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

      3.03   Apportionment of Payments.

      (a)    All payments of principal and interest in respect of outstanding Advances, all payments of fees and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of the Advances as designated by the Person making payment when the payment is made. The Administrative Agent will promptly distribute any such payment to each

Lender, as appropriate, within one (1) Business Day of receipt. So long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall, subject to the provisions of this Agreement, apply all payments in respect of any Obligations and all proceeds of the Collateral as set forth in Section 2.06.

(b)    After the occurrence and during the continuance of an Event of Default or on the Termination Date, the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all payments in respect of any Obligations and all proceeds of the Collateral, subject to the provisions of this Agreement (i) first, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Agents, as Agents, until paid in full; (ii) second, to pay the Obligations in respect of any fees, expense reimbursements and indemnities then due to the Lenders until paid in full; (iii) third, to pay interest due in respect of the Advances and Agent Advances, as determined by the Agents, until paid in full; (iv) fourth, to pay principal of the Advances and Agent Advances, as determined by the Agents, until paid in full; (v) fifth, to the ratable payment of all other Obligations then due and payable, (vi) sixth, to the extent that there has been asserted any claim to which the Agents and/or the Lender-Related Parties may be entitled to indemnification pursuant to the terms of this Loan Agreement, to establish a reserve in an amount determined by the Agents in good faith, and (vii) seventh, to the Administrative Borrower for distribution to the Borrowers or to whomever is legally entitled to such proceeds as ordered by the Bankruptcy Court.

3.04    Computations. Interest on the Advances shall be computed on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

3.05    Joint and Several Liability of Borrowers.

(a)    Notwithstanding anything in this Loan Agreement or any other Loan Document to the contrary, each of the Borrowers hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Loan Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 3.05), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 3.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or

enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b)     The provisions of this <u>Section 3.05</u> are made for the benefit of the Agents, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 3.05</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(c)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

3.06     <u>U.S. Taxes</u>.

(a)     Except as required by applicable law, any and all payments by or on account of any Obligation of the Borrowers hereunder shall be made free and clear of and without deduction for any Taxes; provided, however, that if any deduction of Indemnified Taxes shall be required, then (i) the Borrowers shall increase the sum payable so that after all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.06</u>) the Agents, the Lenders and each of their respective Tax Related Persons receives and retains (after withholding and payment of all Taxes, including income Taxes) an amount equal to the sum it would have received and retained had no such deductions been made, (ii) the Borrowers or the Administrative Agent shall make such deductions and (iii) the Borrowers or the Administrative Agent shall pay the full amount deducted to the relevant Governmental Authorities in accordance with applicable law.

(b)     In addition, each Borrower shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.

(c)     Each Borrower shall indemnify each Agent and each Lender (including for these purposes a Participant), within ten days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or incurred by such Agent or such Lender or their respective Tax Related Persons, as the case may be, relating to, arising out of, or in connection with, this Loan Agreement, the Note, any other Loan Document or any payment or transaction contemplated hereby or thereby, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Such

indemnification shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (including deductions applicable to amounts payable under this Section 3.06 and income Taxes) and payment of all reasonable expenses, the Agents, the Lenders and each of their respective Tax Related Persons receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Indemnified Taxes or Other Taxes. The written demand shall include a certificate setting forth the amount of such Indemnified Taxes and/or Other Taxes. Such certificate shall be conclusive, absent manifest error. For purposes of this Section 3.06 and any provision of any Loan Document requiring payment by the Borrowers on an after-Tax basis, the indemnitee or recipient of such payment (or its Tax Related Persons, as applicable) shall be conclusively presumed to be subject to current income taxation at the highest marginal rate applicable to persons of the indemnitee's classification (e.g., individual, corporation or trust).

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, such Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    To the extent legally entitled to do so, each Agent and each Lender shall furnish to the Administrative Borrower and the Administrative Agent (as applicable) Internal Revenue Service Forms W-8BEN, W-8ECI, W-8IMY or W-9 to the extent necessary to obtain a reduction of or exemption from withholding taxes imposed by the United States of America with respect to payments made by the Borrowers or the Administrative Agent under any Loan Document. Each Lender and each Agent shall provide such forms prior to the first interest payment date after becoming a party to this Agreement and when reasonably and timely requested by the Administrative Borrower or the Administrative Agent (as applicable). "United States persons" (within the meaning of Code section 7701(a)(30)) that are "exempt recipients" (within the meaning of Treasury Regulations section 1.6049-4(c)(1)(ii) (without regard to the second sentence thereof)) shall not be required to furnish an Internal Revenue Service Form W-9, except to the extent required under Treasury Regulations section 1.1441-1(d)(4) (if applicable). None of any Agent, any Lender or any Tax Related Person shall be required to make available any information that it deems confidential to the Borrowers or to any other Person.

3.07    Fees. The Borrowers shall pay to the Administrative Agent the following fees and charges, which fees and charges shall be non-refundable when paid (irrespective of whether this Agreement is terminated thereafter):

(a)    Facility Fee. The Borrowers shall pay to the Administrative Agent for the account of the Lenders a facility fee (the "Facility Fee") equal to, earned and payable as follows:

(i)    upon entry of the Interim Order by the Bankruptcy Court, an amount equal to $1,000,000 (the "Initial Fee Amount") of which $500,000 (the Initial Fee Amount less $500,000 representing a credit for the Commitment Fee) of the Initial Fee Amount shall be payable upon entry of the Interim Order; plus

(ii)    upon the occurrence of any increase in the Maximum Credit pursuant to the definition thereof, an amount equal to 2.00% of the amount of such increase (the "Increase Fee Amount") of which the entire Increase Fee Amount shall be payable upon the date of such increase.

(b)    Additional Fee.  On each Monthly Payment Date, if the Obligations are not paid in full on the Termination Date, the Borrowers shall pay to the Administrative Agent, for the account of the Lenders, a monthly fee equal to the product of (i) 0.0025 and (ii) the Maximum Credit in effect immediately prior to the Termination Date.

## Section 4.    Collateral Security and Administrative Priority.

4.01    Collateral; Security Interest.

(a)    Pursuant to the Custodial Agreement, the Custodian shall hold the Mortgage File and all the Mortgage Loan Documents as exclusive bailee and agent for the Administrative Agent, for the benefit of the Secured Parties, pursuant to the terms of the Custodial Agreement.

(b)    Pursuant to and as provided in the Orders, as security for the full and timely payment and performance of all of the Obligations, each Borrower hereby as of the Closing Date assigns, pledges, transfers and grants to the Administrative Agent, for the benefit of the Secured Parties, pursuant to Section 364 of the Bankruptcy Code, a perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, to secure the payment of the Obligations.  Each Borrower agrees to mark its computer records and tapes to evidence the security interests granted to the Administrative Agent, for the benefit of the Secured Parties, hereunder.

(c)    Each Borrower agrees to direct and to cause all Persons remitting funds (i) with respect to assets that are included in the Tranche A Borrowing Base, to remit such funds to the Tranche A Collection Account, (ii) with respect to assets that are included in the Tranche B Borrowing Base, to remit such funds to the Tranche B Collection Account and (iii) with respect to assets that are not included in the Borrowing Base, to remit such funds to the General Collection Account to the extent that such funds are not required by a Contractual Obligation or an order of the Bankruptcy Court to be deposited elsewhere.  To the extent that any Borrower (or any of its agents or employees) receives any funds that would be remitted to Control Accounts pursuant to the immediately preceding sentence, such Borrower agrees to immediately deposit such funds into the applicable Control Account.

(d)    Upon entry of the Interim Order (and the Final Order, as applicable) and pursuant to its terms, the Lien and security interest in favor of the Administrative Agent referred to in Section 4.01(b) hereof shall be a valid, binding, enforceable and perfected Lien and security interest in favor of the Administrative Agent in the Collateral, prior to all other Liens and security interests in the Collateral except for Liens existing on the Filing Date securing the Senior Claims.  The Lien in favor of the Administrative Agent on the Collateral which is included in the Borrowing Base shall be at all times a valid, binding, enforceable and perfected

first-priority Lien. Such Liens and security interests and their priority shall remain in effect until the Commitments have been terminated and all Obligations have been repaid in cash in full.

(e)     Notwithstanding anything herein to the contrary (i) all Proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted by the Borrowers in this Section 4.01 and in each other Loan Document and by the Interim Order (and the Final Order, as applicable) following an Event of Default shall be subject to the prior payment of the Carve-Out Amount having priority over the Obligations to the extent set forth in the definition thereof, and (ii) no Person entitled to a portion of the Carve-Out Amount shall be entitled, as a result of being entitled to such Carve-Out Amount, to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(f)     In the event that any Collateral is evidenced by or consists of Negotiable Collateral, certificated securities or other instruments and if and to the extent that perfection or priority of the Administrative Agent's security interest is dependent on or enhanced by possession, the applicable Borrower, immediately upon the request of the Administrative Agent, shall endorse and deliver physical possession of such Negotiable Collateral, certificated securities or other instruments to the Administrative Agent.

(g)     At any time after the occurrence and during the continuation of an Event of Default, the Administrative Agent or the Administrative Agent's designee may (a) notify Account Debtors that the Accounts, Chattel Paper, or General Intangibles and any other payment intangibles have been assigned to the Administrative Agent or that Administrative Agent has a security interest therein, (b) collect the Accounts, Chattel Paper, or General Intangibles or other payment intangibles directly and charge the collection costs and expenses to the Loan Account, or (c) exercise Control over all Control Accounts (including the Tranche A Collection Account, the Tranche B Collection Account and the General Collection Account) or, should no Control Agreement be in place, require that the Borrowers act as directed pursuant to Section 4.01(i)(vi) herein. Each Borrower agrees that it will hold in trust for the Lenders, as the Lenders' trustee, any additional bank deposits that it receives and immediately will deliver said additional bank deposits to the Administrative Agent as received by the applicable Borrower.

(h)     Each Borrower authorizes the Administrative Agent to file, transmit, or communicate, as applicable, mortgages, UCC financing statements, Intellectual Property financing statements, original financing statements in lieu of continuation statements, continuation statements and amendments in order to perfect the Administrative Agent's Liens on the Collateral without such Borrower's signature to the extent permitted by applicable law. Notwithstanding the foregoing, at any time upon the request of the Administrative Agent, Borrowers shall execute and deliver to Administrative Agent, any and all mortgages, UCC financing statements, Intellectual Property financing statements, original financing statements in lieu of continuation statements, continuation statements and amendments, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, and all other documents (the "Additional Documents") upon which any Borrower's signature may be required and that the Administrative Agent may request in its discretion, in form and substance satisfactory to Administrative Agent, to perfect and continue perfected or better perfect the Administrative Agent's Liens in the Collateral (whether now owned or hereafter arising or acquired), to create and perfect Liens in favor of the Administrative Agent in any Real Property acquired after the

Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by applicable law, each Borrower authorizes the Administrative Agent to execute any such Additional Documents in the applicable Borrower's name and authorize the Administrative Agent to file such executed Additional Documents in any appropriate filing office. In addition, on such periodic basis as the Administrative Agent shall require, Borrowers shall (a) provide the Administrative Agent with a report of all new patent disclosures and inventions, patent applications, trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names and other source or business identifiers and Internet domain names, copyright applications and material copyrightable works, all forming a part of the Borrowers' Intellectual Property acquired or generated by Borrowers during the prior period, (b) in each Borrower's commercially reasonable discretion, apply for registration or cause to be filed application for registration of such Borrower's Intellectual Property acquired or generated by Borrowers that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) with such appropriate filing office in a manner sufficient to impart constructive notice of Borrowers' ownership thereof, and (c) cause to be prepared, executed, and delivered to the Administrative Agent supplemental schedules to the applicable Loan Documents to identify such Borrower's Intellectual Property as being subject to the security interests created thereunder. In addition, Borrowers agree that, upon acquiring any interest in a Commercial Tort Claim, such Borrower shall, in writing, describe the details of such claim and assign an interest thereto to the Administrative Agent, and upon acquiring any Chattel Paper after the date hereof (electronic, tangible or otherwise), such Borrower shall assign to the Administrative Agent a security interest in such Chattel Paper, or if applicable, deliver such Chattel Paper to the Administrative Agent as Collateral hereunder.

(i)     Each Borrower hereby irrevocably makes, constitutes, and appoints the Administrative Agent (and any of the Administrative Agent's officers, employees, or agents designated by the Administrative Agent) as such Borrower's true and lawful attorney, with power to (i) if such Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 4.01(h), sign the name of such Borrower on any of the documents described in Section 4.01(h), (ii) at any time that an Event of Default has occurred and is continuing, sign such Borrower's name on any invoice or bill of lading relating to the Collateral, drafts against Account Debtors, or notices to Account Debtors, (iii) send requests for verification of Accounts, (iv) endorse such Borrower's name on any deposit item that may come into the possession of the Lenders, (v) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under such Borrower's policies of insurance and make all determinations and decisions with respect to such policies of insurance, (vi) act in all respects as owner of the Control Accounts and direct (or require the Borrowers' authorized signatories to so direct) the Control Account Party to act in accordance with the terms hereof, and (vii) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting the Accounts, Chattel Paper, or General Intangibles directly with Account Debtors, for amounts and upon terms that the Administrative Agent determines to be reasonable, and the Administrative Agent may cause to be executed and delivered any documents and releases that the Administrative Agent determines to be necessary. The appointment of the Administrative Agent as each Borrower's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations