IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Hearing Date: 4/24/07 at 2:30 P.M. |
| | : | Objection Deadline: 4/17/07 at 4:00 P.M. |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER
PROVIDING THAT CREDITORS' COMMITTEES ARE NOT AUTHORIZED OR
REQUIRED TO PROVIDE ACCESS TO CONFIDENTIAL INFORMATION
OF THE DEBTORS OR TO PRIVILEGED INFORMATION**

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby file this Motion (the "Motion") with this Court for

entry of an order pursuant to sections 105(a), 107(b), and 1102(b)(3)(A) of title 11 of the United States

Code (as amended from time to time, the "Bankruptcy Code") and Rule 9018 of the Federal Rules of

Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), providing that any

creditors' committee appointed under section 1102(a) of the Bankruptcy Code in this case (a

"Creditors' Committee") is not authorized or required, pursuant to section 1102(b)(3)(A) of the

Bankruptcy Code, to provide access to the Debtors' confidential and other non-public proprietary

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership

information or to privileged information to the creditors it represents. In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.    The Court has jurisdiction over the motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are section 105(a), 107(b) and 1102 of the Bankruptcy Code.

## BACKGROUND

3.    New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and

2

homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.      On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

5.      On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

6.      These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7.      As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the

3

loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8.      Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9.      During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10.      The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11.      Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating

4

businesses and other assets.

12.    On April 2, 2007 (the "Petition Date"), the Debtors filed the instant

petitions for relief. The Debtors are operating their business and managing their affairs as debtors

and debtors in possession. The Debtors' chapter 11 cases are being jointly administered and have

been consolidated for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

## RELIEF REQUESTED

13.    By this Motion, the Debtors seek entry of an order of the Court confirming

that section 1102(b)(3)(A) of the Bankruptcy Code does not authorize or require any Creditors'

Committee that might be appointed in the Debtors' bankruptcy cases to provide access to the

Debtors' Confidential Information (as defined below) to any creditor that such Creditors'

Committee represents. Furthermore, the Debtors seek entry of an order clarifying that no

Creditors' Committee is authorized or required to provide access to Privileged Information (as

defined below) to any creditor that such Creditors' Committee represents. The relief requested

herein will help ensure that confidential, privileged, proprietary and/or material non-public

information will not be disseminated to the detriment of the Debtors' estates and will aid a

Creditors' Committee in performing its statutory function.

## BASES FOR RELIEF

14.    On April 20, 2005, as part of the Bankruptcy Abuse Prevention &

Consumer Protection Act of 2005, Congress enacted new section 1102(b)(3) of the Bankruptcy

Code. That section states, in relevant part, that a creditors' committee appointed under section

1102(a) of the Bankruptcy Code shall "provide access to information for creditors who (i) hold

claims of the kind represented by that committee; and (ii) are not appointed to the committee."

11 U.S.C. § 1102(b)(3)(A). New section 1102(b)(3)(A) does not indicate how a creditors'

committee should provide "access to information" to the creditors it represents. There is no

5

legislative history to section 1102(b)(3) to provide guidance on the application of this new provision.

15.    The lack of specificity in new section 1102(b)(3)(A) raises significant concerns for debtors and creditors' committees. Typically, a debtor will share various confidential and other non-public proprietary information with a creditors' committee (the "Confidential Information").[2] Creditors' committees use this information to assess, among other things, a debtor's capital structure, opportunities for the restructuring of the debtor's business in chapter 11, the results of any revised operations of the debtor in the bankruptcy case, and the debtor's overall prospects for reorganization under a chapter 11 plan. In addition, creditors' committees typically execute confidentiality agreements or enter into other similar arrangements with debtors. Through these agreements and other arrangements a debtor can ensure that a committee's members will keep its information confidential and will not use Confidential Information except in connection with this chapter 11 case and on terms acceptable to the debtor.

16.    The enactment of new section 1102(b)(3)(A) raises the issue of whether a creditors' committee could be required to share a debtor's Confidential Information with any creditor that the committee represents. In the absence of appropriate protections for the

---

[2] For purposes of this Motion, the term "Confidential Information" shall mean any nonpublic information of the Debtors, including, without limitation, information concerning the Debtors' assets, liabilities, business operations, projections, analyses, compilations, studies, and other documents prepared by the Debtors or its advisors or other agents, which is furnished, disclosed, or made known to the Creditors' Committee, whether intentionally or unintentionally and in any manner, including in written form, orally, or through any electronic, facsimile or computer-related communication Confidential Information shall include (a) any notes, summaries, compilations, memoranda, reports or any other written materials disclosing, discussing, containing or reflecting Confidential Information, whether prepared by the Debtors or the Creditors' Committee, their respective, professionals, advisors or members, or others receiving or holding the Confidential Information; (b) any written Confidential Information that is discussed or presented orally; and (c) any other Confidential Information conveyed to the Creditors' Committee orally that the Debtors or their advisors or other agents advise the Creditors' Committee should be treated as confidential Notwithstanding the foregoing, Confidential Information shall not include any information or portions of information that: (i) is or becomes generally available to the public or is or becomes available to the Creditors' Committee on a non-confidential basis, in each case to the extent that such information became so available other than by a violation of a contractual, legal, or fiduciary obligation to the Debtors; or (ii) was in the possession of the Creditors' Committee prior to its disclosure by the Debtors and is not subject to any other duty or obligation to maintain confidentiality

RLF1-3133722-3

Debtors' Confidential Information, the Debtors might be unwilling to share such information with a Creditors' Committee, which would undoubtedly impede such Creditors' Committee's ability to do its work and impair the working relationship between the Debtors and such Creditors' Committee. Given the importance of the issue, the Debtors are seeking an order of the Court confirming that section 1102(b)(3)(A) does not authorize or require any Creditors' Committee in this case to provide access to the Debtors' Confidential Information to any creditor that such Creditors' Committee represents.

17.    The enactment of new section 1102(b)(3)(A) also raises the issue of whether a creditors' committee could be required to share with any creditor that the committee represents information that is subject to the attorney-client or other state, federal, or other jurisdictional law privilege, whether such privilege is solely controlled by the committee or is a joint privilege with the debtor or a third party (collectively, "Privileged Information"). Given the importance of the issue, the Debtors are seeking clarification that no Creditors' Committee is authorized or required to provide access to Privileged Information to any creditor that such Creditors' Committee represents. Of course, a Creditors' Committee would be permitted, but not required, to provide access to Privileged Information to any party so long as (a) such Privileged Information was not Confidential Information, and (b) the relevant privilege was held and controlled solely by such Creditors' Committee.

18.    When a statute is clear and unambiguous, "the sole function of the courts is to enforce it according to its terms." U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)). However, in "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters . . . the intention of the drafters, rather that the strict language, controls."

Id. at 242 (citing Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982) (internal quotation omitted)).

   19. The Debtors respectfully submit that section 1102(b)(3)(A) is unclear and ambiguous. The statute simply requires a committee "to provide access to information," yet sets forth no guidelines as to the type, kind and extent of the information to be provided. In its extreme, section 1102(b)(A) could be read as requiring a committee to provide access to all information provided to it by a debtor, or developed through exercise of its investigative function, regardless of whether the information is confidential, privileged, proprietary or material non-public information and regardless of whether disseminating such information implicates securities laws disclosure requirements. See 17 C.F.R. §§243.100-243.103 (2005). Accordingly, Courts in this District and elsewhere which have considered this issue have issued orders clarifying that creditors' committees are not authorized or required to provide access to confidential or privileged information. See In re Three A's Holdings, No. 06-10886 (BLS) (Bankr. D. Del. October 13, 2006) (providing that creditors' committee is not authorized or required to provide access to confidential or privileged information); In re Nobex Corp., No. 05-20050 (MFW) (Bankr. D. Del. Feb. 10, 2006) (same); In re FLYi, Inc., No. 05-20011 (MFW) (Bankr. D. Del. Nov. 17, 2005) (same).

   20. As discussed above, the legislative history does not provide any further guidance on this point and merely reiterates the language of section 1102(b)(3). See H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 87 (2005) ("Section 405(b) requires the committee to give creditors having claims of the kind represented by the committee access to information. In addition, the committee must solicit and receive comments for these creditors and, pursuant to court order, make additional reports and disclosures available to them.").

RLF1-3133722-3

21.   Given the ability to share information through the Internet or otherwise, the drafters of section 1102(b)(3) may have intended this provision to mean that a committee's constituency should have easier access to relevant public information about a debtor without the burden of retaining counsel to monitor the numerous proceedings within a bankruptcy case. Congress could not have intended for a committee to be required to provide unfettered access to every type and kind of information that a committee receives from a debtor. If this had been the intention, section 1102(b)(3) would then frustrate numerous provisions of the Bankruptcy Code.

22.   Furthermore, section 107(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to trade secret or confidential research, development, or commercial information."[3]

23.   Section 107(b)(1) is mandatory. Video Software Dealers Ass'n v. Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994) (providing that the protections of section 107(b)(1) are mandatory upon request). As a result, under section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018, this Court is empowered to protect the Debtors' Confidential Information and Privileged Information from disclosure to general creditors.

24.   The Debtors are in a highly competitive industry. The dissemination of the Debtors' Confidential Information to parties who are not bound by any confidentiality agreement directly with the Debtors could be disastrous for the Debtors. If the Debtors' general creditors or competitors buying claims could require any Creditors' Committee which may be appointed to give them access to Confidential Information in the possession of such Creditors' Committee, such information could easily become public immediately thereafter.

---

[3] Section 107(b)(1) is further supported by Bankruptcy Rule 9018, which states, in relevant part, that "on motion or on its own initiative, with or without notice, the court may make any order which justice requires to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information..." Fed. R. Bankr. P. 9018.

9

RLF1-3133722-3

25.    The public dissemination of the Debtors' Confidential Information likely would cause serious harm to the Debtors' estates. Among other things, the Debtors' business strategies and intended initiatives would become known to the Debtors' competitors, thereby allowing such competitors to adjust to the Debtors' plans and reduce or eliminate the value of such initiatives to the estate. In addition, other Confidential Information of the Debtors, such as compensation levels or other employee information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtors, as well as potentially violate federal and state privacy laws.

26.    Of course, if there were a risk that Confidential Information given by the Debtors to a Creditors' Committee would have to be turned over to any creditor, the Debtors would be highly discouraged from giving Confidential Information to any Creditors' Committee in the first place. In fact, the Debtors might conclude that they could not give such information to the committee at all. The inability of a Creditors' Committee to gain access to Confidential Information, in turn, could limit the ability of the committee to fulfill its statutory obligations under the Bankruptcy Code.

27.    As such, the relief sought by the Debtors is not only for the benefit of the Debtors but for the benefit of any Creditors' Committee as well. A Creditors' Committee also will need the benefit of the relief sought in this Motion to ensure that it does not breach the confidentiality agreements it will execute with the Debtors or the bylaws it will execute that will contain confidentiality provisions for the express benefit of the Debtors. A Creditors' Committee cannot be put in a position of either violating section 1102(b)(3)(A) of the Bankruptcy Code or breaching confidentiality agreements and thereby subjecting itself to suit by the Debtors and potentially other parties.

10

28.     Finally, the risk to the Debtors and any Creditors' Committee of such
Creditors' Committee being required to provide access to Privileged Information to the creditors
it represents creates obvious and serious problems. If the Debtors and any Creditors' Committee
believed that there could be a risk that Privileged Information would need to be turned over to
such creditors, with the possible loss of the relevant privilege at that time, the entire purpose of
such privilege would be eviscerated, and both the Debtors and such Creditors' Committee would
likely be unable to obtain the independent and unfettered advice and consultation that such
privileges are designed to foster. Indeed, unless it is made clear that the risk of dissemination of
Privileged Information does not exist, the estate representation structure envisioned by the
Bankruptcy Code would become immediately dysfunctional.

29.     The disclosure of nonpublic or privileged information to such creditors will
not foster a reorganization of the Debtors but will likely cause serious harm to the Debtors'
estates. Therefore, in order to maximize the value of the estates, the Debtors respectfully request
that the relief herein be granted pursuant to sections 105(a), 107(b)(1), and 1102(b)(3)(A) of the
Bankruptcy Code.

### NOTICE

30.     No trustee, examiner or creditors' committee has been appointed in these
chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States
Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc.
("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed
post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a
consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have
timely filed requests for notice under Bankruptcy Rule 2002. In light of the nature of the relief
requested herein, the Debtors submit that no other or further notice is required.

11

RLF1-3133722-3

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated:  April 5, 2007
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION