IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |

## APPLICATION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF O'MELVENY & MYERS LLP AS CO-COUNSEL TO THE DEBTORS PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this application (the "Application") for an order authorizing the Debtors to retain and employ O'Melveny & Myers LLP ("OMM"), nunc pro tunc to April 2, 2007 (the "Petition Date"), as bankruptcy co-counsel pursuant to sections 327 and 328 of Title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"). In support of this Application, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

LA3:1130592.6

## JURISDICTION

1.	This Court has jurisdiction over this Application under 28 U.S.C. §§ 157 and 1134. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2.	The statutory predicates for the relief sought herein are §§ 327 and 328 of the Bankruptcy Code.

## BACKGROUND[2]

3.	New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased[3] approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of

---

[2] The facts and circumstances supporting this Application are set forth in the Declarations of Monika L. McCarthy and Holly Etlin in support of Chapter 11 Petitions and Request for First Day Relief and the Declaration of Suzzanne Uhland, a partner in the firm of O'Melveny & Myers LLP.

[3] As used in this declaration, loan "production" or loans "produced" means both loans that are originated and loans that are purchased.

homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.  As discussed in more detail below, on February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

5.  On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

6.  These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

7. As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

8. Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

9. During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

10. The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

11. Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in

possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

12.     On the Petition Date, the Debtors filed the instant petitions for relief. An order for joint administration of the Debtors' bankruptcy cases has been entered by this Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## RETENTION OF O'MELVENY & MYERS, LLP

13.     Subject to the approval of this Court, the Debtors wish to employ OMM as their bankruptcy co-counsel in connection with the commencement and prosecution of these chapter 11 cases, effective as of the date of commencement of these cases. Pursuant to section 327(a) of the Bankruptcy Code, the Debtors request that the Court approve the employment of OMM under a general retainer, as their general bankruptcy counsel, to perform the extensive legal services that will be necessary during the Debtors' chapter 11 cases.

14.     OMM is a full service international law firm, with more than 1000 lawyers throughout offices located in the United States and abroad. In addition to restructuring, reorganization and bankruptcy expertise, attorneys at OMM provide legal services in virtually every major practice area, including corporate and securities, litigation, intellectual property, banking, tax, employee benefits, real estate, government regulation and international trade.

15.     OMM is well qualified to represent the Debtors. For several years, OMM has represented the Debtors as its general outside corporate counsel, including securities and mergers and acquisition work as well as employee benefits, outsourcing and other transactional matters. Prior to the Petition Date OMM commenced assisting and representing the Debtors in connection with restructuring matters and its potential bankruptcy filing. As a result, OMM has been actively engaged in representing the Debtors in considering various possible strategic transactions and ultimately preparing for these chapter 11 cases. Additionally, OMM is

representing the Debtors in the pending government investigations. In selecting OMM to continue as its counsel, the Debtors considered OMM's knowledge, expertise and experience in the above described areas of law.

16. Through its representation of the Debtors, OMM has acquired detailed knowledge of the Debtors' businesses, financial affairs and capital structure, as well as the legal issues that are likely to arise in these chapter 11 cases. In selecting OMM as their general bankruptcy co-counsel, the Debtors considered OMM's knowledge of the Debtors' operations and finances and its expertise and experience in reorganizations and bankruptcy cases and other areas of expertise that are likely to be relevant to a complete and efficient representation of the Debtors as general bankruptcy counsel.

17. OMM has served as counsel to debtors and creditors in various large and complex bankruptcy cases, including prior experience representing Wherehouse Entertainment, Inc., M T S, Inc. d/b/a Tower Records At Home Corporation, SeraCare Life Sciences, Inc., and Advanced Marketing Services, Inc. In addition, the OMM attorneys who will be primarily responsible for representing the Debtors in matters related to their reorganization are members of OMM's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

18. OMM's depth of experience in business reorganizations and its familiarity with the Debtors makes OMM uniquely qualified to effectively deal with the legal issues that may arise in the context of the Debtors' reorganization. Therefore, the Debtors believe that OMM is well qualified to serve as their co-counsel and that retention of OMM is in the best interests of the estates.

19. OMM's services are necessary to enable and assist the Debtors in performing their duties as debtors and debtors in possession. In connection with these cases, and subject to further order of the Court, the Debtors will utilize OMM to render the following types of professional services:

  a. To advise the Debtors generally regarding matters of bankruptcy law in connection with their chapter 11 cases;

      b.      To advise the Debtors of the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), applicable local bankruptcy rules pertaining to the administration of their cases and U.S. Trustee Guidelines related to the daily operation of their business and the administration of the estates;

      c.      To prepare motions, applications, answers, proposed orders, reports and papers in connection with the administration of the estates;

      d.      To negotiate with creditors, prepare and seek confirmation of a chapter 11 plan and related documents, and assist the Debtors with implementation of the plan;

      e.      To assist the Debtors in the analysis, negotiation and disposition of certain estate assets for the benefit of the estates and their creditors;

      f.      To advise the Debtors regarding bankruptcy related litigation and employment matters;

      g.      To represent the Debtors in connection with their pending government investigation;

      h.      To serve as Debtors' general outside corporate counsel and assist advise and represent the Debtors in general corporate, and securities law matters, Securities and Exchange Commission compliance matters, corporate governance matters, contract review and preparation of corporate documentation, and transactional and corporate law assistance with respect to asset dispositions and negotiation;

      i.      To represent the Debtors in connection with employee benefits and outsourcing matters; and

      j.      To render such other necessary advice and services as the Debtors may require in connection with their cases.

20.     The Debtors have also proposed to retain Richards, Layton & Finger, P.A. ("RLF") as co-counsel in Delaware. RLF will provide additional necessary legal services to the Debtors and will advise the Debtors in connection with the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended from time to time, the "Local Rules") and local practice in Delaware in connection with the prosecution of the Debtors' chapter 11 cases. OMM, the Debtors and RLF have conferred and will continue to confer to ensure that there will be no undue duplication of effort or overlap of work between and among the co-counsel, and that the estates receive the best possible value.

21.     Because of the size and nature of the Debtors' business, the Debtors have engaged, and propose to continue to engage, other specialized corporate counsel, including

Allen Matkins Leck Gamble Mallory & Natsis LLP, the firm that represents the Debtors in connection with their financings, including the Master Repurchase Agreements, and Thacher Proffitt & Wood LLP, the firm that represented the Debtors in securitizations. OMM and those firms have similarly conferred and will continue to work to avoid duplication of efforts.

## COMPENSATION

22. OMM has agreed to accept the following as compensation for the services rendered and expenses incurred in connection with its representation of the Debtors: (1) a retainer; and (2) any such additional sums as may be allowed by this Court based on the time spent and services rendered, the result achieved, the difficulty and complexity encountered, and other appropriate factors. OMM will not be paid any additional compensation by the Debtors prior to the date the plan is confirmed except upon application to and approval by the Bankruptcy Court after notice and a hearing.

23. Prior to the Petition Date, the Debtors paid OMM $2.5 million for fees and expenses for advice and legal services rendered in connection with restructuring advice and the preparation and commencement of the Debtors' cases, as well as to serve as a retainer. See Declaration of Suzzanne Uhland (the "Uhland Declaration") attached hereto as Exhibit A. After deducting fees and expenses previously billed (and paid) for such prepetition legal services plus estimated unbilled prepetition amounts, approximately $1.9 million remains as a retainer, which will be available to be applied to postpetition services. During the ninety days prior to the Petition Date, the Debtors paid invoices in the amounts as set forth in Annex 1 to the Uhland Declaration (showing payments and invoices within ninety days of the Petition Date).

24. The Debtors request authority for OMM to apply the retainer against the amounts owing for services rendered prior to the Petition Date to the extent unbilled. As set forth in the Uhland Declaration, there are no arrangements between OMM and any other entity to share compensation received or to be received in connection with this case other than as among the partners of OMM.

25. Under applicable provisions of the Bankruptcy Code, and subject to the

approval of this Court, the Debtors propose to pay OMM its standard hourly rates and reimburse OMM for expenses according to OMM's customary reimbursement policies. The OMM attorneys and personnel who are expected to be principally responsible for this matter and their respective hourly rates are: Ben Logan $795, Suzzanne Uhland $725, Victoria Newmark $555, Brian Metcalf $540 and Emily Culler $480.

26. The hourly rates set forth above are OMM's standard hourly rates for work of this nature. These rates are set at a level designed to compensate OMM fairly for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.

27. It is OMM's policy to charge its clients in all areas of practice for all other expenses incurred in connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier toll and other charges, regular mail and express mail charges, special or hand delivery charges, document processing, photocopying charges, travel expenses, expenses for "working meals," computerized research, transcription costs, as well as non-ordinary overhead expenses such as secretarial and other overtime. OMM generally charges all of its clients $.15 per page for photocopying and printing expenses and $1.25 per page for out-going facsimile transmissions. For the purpose of these bankruptcy cases, OMM will charge $.10 per page for photocopying and printing expenses and $1.00 per page for out-going facsimile transmissions. OMM otherwise will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to OMM's other clients or as previously fixed by this Court. OMM believes that it is fairer to charge these expenses to the clients incurring them than to increase the hourly rates and spread the expenses among all clients.

## DISINTERESTEDNESS

28. To the best of the Debtors' knowledge, and based on the attached Uhland Declaration, OMM and the attorneys employed by it are disinterested persons who do not hold or represent an interest adverse to the estate and do not have any connection with the Debtors, their creditors, or any other party in interest or with their respective counsel or accountants, with the judges of this Court, or with the United States Trustee or any person

employed in the Office of the United States Trustee, except as set forth herein and in the Uhland Declaration attached hereto as Exhibit A.

## NOTICE

29. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

30. The Debtors submit that this Application does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NO PRIOR REQUEST

31. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors request entry of an order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: April 6, 2007

Respectfully submitted

New Century TRS Holdings, Inc., as Debtor and Debtor in Possession

_____
Monika L. McCarthy, on behalf of the Debtors