UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| *In re* | | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | | |
| INC., a Delaware corporation, *et al.*,[1] | : | |
| | | Case Number 07-10416 (KJC) |
| Debtors. | : | (Jointly Administered) |

Hearing Date:  April 10, 2007 at 3:30 P.M.

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE EMERGENCY MOTION
OF THE DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A)
APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION
WITH AUCTION OF CERTAIN ASSETS, (B) SCHEDULING HEARING TO
CONSIDER PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM AND
MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED RELIEF
(DOCKET ENTRY # 25)**

In  support  of  her  objection  to  the  emergency  motion  of  the  Debtors  and  Debtors-in-

possession for (I) an order (a) approving bidding procedures and bid protections in connection with

the auction of certain assets, (b) scheduling a hearing to consider the proposed sale of certain assets

and approving the form and manner of notice thereof, and (c) granting related relief (the "Motion"),

Kelly Beaudin Stapleton, United States Trustee for Region 3 ("U.S. Trustee"), by and through her

---

[1] 	The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.),
a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware
corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century
Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California
corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California
corporation; New Century Credit Corporation (f/k/a/ Worth Funding Incorporated), a California corporation; NC Asset
Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a
Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California
corporation; New Century R.E.O. II Corp., a California corporation; New Century REO III Corp., a California
corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select
Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial
Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex LLC,
a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

1

counsel, avers:

## INTRODUCTION

1.     Under (i) (an) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a) and (ii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion.

2.     Under 28 U.S.C. § 586, the U.S. Trustee has an overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.   *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the UST as a "watchdog").

3.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion and the issues raised in this objection.

## GROUNDS/BASIS FOR RELIEF

*Consumer Privacy Under 11 U.S.C. § 363(b)(1)*

4.     The Motion does not provide sufficient information for the U.S. Trustee to determine whether a consumer privacy ombudsman needs to be appointed to protect personally identifiable information about individuals.  11 U.S.C. § 363(b)(1) provides:

> (b)(1)  The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell

or lease personally identifiable information[2] to any person unless –

(A) such sale or lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease –

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

5.      Pursuant to the Financial Privacy Rule that is part of the Gramm-Leach-Bliley Financial Services Modernization Act (the "GLB Act"), Pub. L. No. 106-102, 113 Stat. 1338 (1999),

at the time a customer relationship is established, a financial institution must provide a notice to consumers that describes the financial institution's policies and practices with respect to (i) disclosing nonpublic information to affiliates and nonaffiliated parties, including the categories of information that may be disclosed; (ii) disclosing nonpublic personal information of persons who are no longer customers of the financial institution, and (iii) protecting the nonpublic personal information of consumers.

---

[2]

"Personally identifiable information" is defined in 11 U.S.C. § 101(41A) as meaning

(A) if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes –

(i)  the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

(ii)  the geographical address of a physical place of residence of such individual;

(iii)  an electronic address (including an e-mail address) of such individual;

(iv)  a telephone number dedicated to contacting such individual at such physical place of residence;

(v) a social security account number issued to such individual; or

(vi) the account number of a credit card issued to such individual; or

(B) if identified in connection with 1 or more of the items of information specified in subparagraph (A) --

(i)  a birth date, the number of a certificate of birth or adoption, or a place of birth; or

(ii)      any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically.

3

Robert H. Ledig, *Gramm-Leach-Bliley Act Financial Privacy Provisions: The Federal Government Imposes Broad Requirements to Address Consumer Privacy Concerns* (visited Apr. 5, 2007) <http://www.ffhsj.com/bancmail/bmarts/ecdp_art.htm>. In addition to an initial notice, financial institutions are required to periodically provide notice of their privacy practices to customers. *See id.*

6.    The definition of "LNFA Mortgage Loans" in Article I of the Asset Purchase Agreement ("APA") includes the Sellers' rights, title to, and interest in "all legal, credit and servicing files" related to the Loans. Accordingly, "personally identifiable information" is being sold under the APA.

7.    The U.S. Trustee believes that one or more of the Sellers is a "financial institution" for purposes of the GLB Act. The U.S. Trustee intends to obtain a copy of the privacy policy communicated by the Seller(s) to their LNFA Mortgage Loan customers for purposes of assessing whether the conditional prohibition against the sale of personally identifiable information described in 11 U.S.C. § 363(b)(1) is triggered. The U.S. Trustee will report to the Court on this issue at the hearing on the Motion and the related matter of whether a consumer privacy ombudsman should be appointed.

*Break-Up Fee and Expense Reimbursement Provisions*

8.    Article 9.2 of the APA, titled "Break-Up Fee," provides:

> If this agreement is terminated pursuant to Section 9.1(f) or (g), the Company and the Sellers shall, jointly and severally, pay to the Purchaser in immediately available funds a cash fee equal to $1,000,000 (the "Break-Up Fee"), such fee to be paid upon the closing of such sale to a Third Party other than the Purchaser. The Break-Up Fee shall constitute an administrative expense of the Sellers with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code

4

until paid.  The Parties hereby acknowledge that the amounts payable pursuant to this Section 9.2 are commercially reasonable and necessary to induce the Purchaser to enter into and consummate the transactions contemplated by this Agreement.

9.       Under the controlling decision by the United States Court of Appeals for the Third Circuit in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), there are several problems with the Debtors' request to have bid protections approved.  First, the critical inquiry appears to be twofold: first, did the bid protection serve a "permissible purpose," (i.e., "to induce an initial bid")?; and second, was the bid protection necessary to effectuate that purpose?  *O'Brien*, 181 F.3d at 535.  Establishing a "floor" bid which merits bid protections under *O'Brien* means something more than coming forward with a bid – such an interpretation of *O'Brien* would render the administrative expense limitation established by the opinion meaningless.

10.      In the *O'Brien* opinion, the Third Circuit draws a distinction between market-makers and market participants.  A bidder which performs a critical research function (i.e., researching the value of the Debtors' assets) and which does not otherwise have "strong financial incentives to undertake the cost of submitting a bid, including the cost of researching the [value of the Debtors' assets], even in the absence of any promise of reimbursement," may be entitled to bid protections. *O'Brien*, 181 F.3d at 537.  In the Motion, the Debtors state that "[a]pproving the Breakup Fee will commit Greenwich to serve as the stalking horse bidder under the [APA] with a bid that starts any additional bidding or auction for the Purchased Assets at a fair and reasonable purchase price, all to the benefit of the estates."  Mot. ¶ 33.  Unfortunately, the Debtors' statement does not justify approval of bid protections.  First, nothing in the motion suggests that Purchaser performed a critical research function in this instance.  Second, the Purchaser, an affiliate of The Royal Bank of

Scotland, is one of the top subprime mortgage-backed securities underwriters in the United States. *See* RBS Greenwich Capital – Asset Backed Finance (visited April 9, 2007) <http://www.rbsgc.com/RBSGCConnect/AssetBackedFinance.aspx>. Financing and securitizing mortgage loan portfolios is part of Purchaser's ordinary course of business. In short, Purchaser – a market participant – has "strong financial incentives to undertake the cost of submitting a bid." *O'Brien*, 181 F.3d at 537. Purchaser's status as Debtor-in-possession lender in these cases, and the aggressive timetable proposed for the sale process which is tied to the Debtor-in-possession loan, provides further evidence of Purchaser's strategic agenda.

11.    Even if this Court were to disagree with the U.S. Trustee's position regarding the propriety of awarding bid protections in this context, bid protection should be a finite expense reimbursement. In an article cited with approval in *O'Brien*, Professor Markell observes:

> [T]he maximum breakup fee that a court should approve is one that offers to repay a bidder's direct costs of preparing and making its bid. Any additional fee will overcompensate the bidder for its risk in bidding; it pays the bidder for bidding when it would have bid without the fee. Given the direct correlation between revenues from the sale and creditor dividends, paying a fee in excess of reimbursable costs is tantamount to paying a party to do something that it already was going to do. It is wasteful, and should be discouraged.

Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy*, 66 Am. Bankr. L.J. 349, 369 (1992). Here, as the U.S. Trustee pointed out during the "first day" hearing in the above-captioned cases, the suggestion that the only bid protection sought to be awarded is a $1 million breakup fee (Mot. ¶ 32 ("[Aside from the $1 million break-up fee,] [t]here are no other bid protections such as expense reimbursement provisions . . . ." (Emphasis in motion)) is misleading, given that Purchaser is seeking reimbursement for its acquisition-related costs (including professional fees) as part of the

Debtor-in-possession loan.  If this Court determines that a bid protection is appropriate, the only appropriate protection is a capped amount for actual, necessary, and reasonable expenses.  The Debtors' proposal to pay Purchaser a $1 million windfall in addition to its acquisition-related expenses should be rejected.

12.    Furthermore, there is no legal basis for granting the proposed break-up fee superpriority administrative expense status.  11 U.S.C. §§ 364(c) and 507(b) are the only sections of the Code which authorize superpriority claim status, and those sections address (i) the obtaining or incurring of debt in the event that the debtor-in-possession/trustee is unable to obtain unsecured credit and (ii) adequate protection of a secured claim which later proves to be inadequate.  *See* 11 U.S.C. §§ 364(c), 507(b).  Clearly, 11 U.S.C. §§ 364(c) and 507(b) do not apply to the break-up fee which the Debtors propose to pay.  Absent authority supporting the argument that this Court has the authority to elevate break-up fees to superpriority administrative expense status, this Court should reject the Debtors' proposal.

13.    Article 9.1(f) permits the Purchaser or the Company to terminate the APA prior to the Closing Date "if the Sellers consummate a sale of all or a material portion of the Purchased Assets with a Third Party other than the Purchaser."  As noted previously, the U.S. Trustee believes that the request for approval of the bid protections should be denied.  However, in the event that this Court approves all or part of the bid protections, Article 9.1(f) should be restricted to sales "in accordance with the Bankruptcy-Court approved Bidding Procedures;" by way of hypothetical example, the Debtors' estates should not be paying a break-up fee for a liquidation sale of the Purchased Assets which closes six months from now if the Debtors' cases eventually convert to cases under chapter 7.

7

14.     Article 9.1(g) of the APA permits the Purchaser to terminate the APA prior to the Closing Date "if the Company accepts a higher and better offer for the Purchased Assets in accordance with the Bankruptcy-Court approved Bidding Procedures."  Termination of the APA pursuant to Article 9.1(g) creates break-up fee liability under Article 9.2, yet the break-up fee is payable upon the closing of a sale to a third party other than the Purchaser under the express terms of Article 9.2.  Simply put, there is a gap under the APA when Articles 9.1(g) and 9.2 are read together – theoretically, there is a scenario where the Debtors could accept a higher and better offer than Purchaser's bid, yet the sale would not close.  Again, the U.S. Trustee believes that approval of the break-up fee is inappropriate.  In the event that the Court approves the break-up fee, the reference to Article 9.1(g) should be deleted from Article 9.2 to make it clear that the break-up fee is payable only upon the closing of a sale to a third party other than the Purchaser.

*Availability of Supporting Disclosure Schedules to APA*

15.     The supporting schedules for the APA were not attached for the service copy of the Motion.  It is unclear whether the supporting schedules are voluminous and, by extension, expensive to serve.  The U.S. Trustee believes that, if one or more of the supporting documents are voluminous and the Debtors are requesting to serve paper copies of the APA without the voluminous schedules, the Debtors should make the APA and all supporting documents available on the Company's web site or some other free-standing web site so that parties in interest may review them.  The address for the web site should be referenced in the sale notice.

## CONCLUSION

WHEREFORE the UST requests that this Court issue an order denying the Motion or granting other relief consistent with this objection.

Respectfully submitted,

**KELLY BEAUDIN STAPLETON**
**UNITED STATES TRUSTEE**

**BY:**   /s/ Joseph J. McMahon, Jr.
      Joseph J. McMahon, Jr., Esquire (# 4819)
      Trial Attorney
      United States Department of Justice
      Office of the United States Trustee
      J. Caleb Boggs Federal Building
      844 King Street, Room 2207, Lockbox 35
      Wilmington, DE  19801
      (302) 573-6491
      (302) 573-6497 (Fax)

Date:  April 9, 2007