# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | Hearing Date: May 7, 2007 @ 10:00 a.m. |
| | : | Objection Deadline: April 30, 2007 @ 4:00 p.m. |
| | : | |

### DECLARATION OF BRUCE BENNETT IN SUPPORT OF APPLICATION FOR ORDER PURSUANT TO SECTION 327(e) OF THE BANKRUPTCY CODE AUTHORIZING EMPLOYMENT OF HENNIGAN, BENNETT & DORMAN LLP. AS SPECIAL LITIGATION COUNSEL TO THE DEBTORS NUNC PRO TUNC AS OF APRIL 6, 2007

I, BRUCE BENNETT, hereby declare as follows:

1.      I am a member in good standing of the Bar of the State of California. I am admitted to practice before, among other courts, the United States District Courts for the Central, Northern, Southern and Eastern Districts of California, and the Court of Appeals for the Ninth Circuit.

2.      I am a partner in Hennigan, Bennett & Dorman LLP ("HBD"), proposed special litigation counsel to New Century TRS Holdings, Inc., et al., the debtors and debtors in possession herein (the "Debtors").

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

3.      This Declaration is submitted in support of "Application For Order Pursuant To Section 327(e) Of The Bankruptcy Code Authorizing Employment Of Hennigan, Bennett & Dorman LLP As Special Litigation Counsel To The Debtors *Nunc Pro Tunc* to April 6, 2007" (the "Application") filed by the Debtors. Except where otherwise indicated below, I have personal knowledge of the facts set forth in this Declaration. If called and sworn as a witness, I could and would testify competently such facts. This Declaration is made pursuant to Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

4.      With respect to the facts set forth in this background section, I am informed and believe that such facts are true and correct.

5.      New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

6.      As discussed in more detail below, on February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

7.      On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's

- 2 -

audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

8.    These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

9.    As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

10.    On April 2, 2007 (the "Petition Date"), the Debtors filed voluntary petitions for relief. Further, the court entered an order approving the joint administration of the Debtors' chapter 11 cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

11.    On April 5, 2007, UBS Real Estate Securities Inc. ("UBS"), filed a Complaint against the Debtors, initiating Adversary Proceeding No. 07-50875 (KJC) (the "UBS Adversary Proceeding"). Concurrently with such filing, UBS also filed a motion seeking a temporary restraining order and preliminary injunctive relief. A hearing is scheduled on UBS' motion for a temporary restraining order on April 12, 2007.

- 3 -

## HBD'S QUALIFICATIONS

12.     As indicated by the biographical summaries annexed to the Application as Exhibit B, HBD is highly qualified to serve as special litigation counsel in these chapter 11 cases. HBD has experience in virtually all aspects of the law that may arise in connection with the proposed representation. Further, HBD has served as counsel in other large bankruptcy cases, including, but not limited to: the County of Orange; Adelphia Communications Corporation; Hawaiian Airlines, Inc.; WestPoint Stevens, Inc. and affiliates; Solutia Inc., and affiliates; The LTV Corporation and affiliates; Williams Communications Group, Inc., and CG Austria, Inc.; Federated Stores, Inc. (f/k/a Campeau Corporation U.S., Inc.) and affiliates; Komag, Incorporated (f/a/k/a HMT Technology Corporation); Peregrine Systems, Inc., and affiliate; Dade Behring Holdings, Inc.; WestStar Cinemas, Inc. d/b/a Mann Theaters; Liberty House, Inc.; Strouds, Inc.; Aureal Inc.; SmarTalk TeleServices, Inc.; L.A. Gear, Inc.; StorMedia Incorporated; Pacific Coin, Inc.; First Capital Holdings Corp.; RBX Corporation and affiliates; Tucson Electric Power Company; Equatorial Communications Corporation; Evergreen International Aviation, Inc. and affiliates; Crazy Shirts, Inc.; Opal Concepts, Inc., and affiliates; Westwood Equities Corp. (f/k/a Ticor); and House of Fabrics.

13.     Of particular relevance to this case is experience HBD has acquired in dealing with true sale issues arising in connection with certain financing transactions. HBD acted as special litigation counsel for the Debtors in connection with In re LTV Steel Company, Case No. 00-43866 (Bankr. N.D. Ohio). HBD also dealt with similar issues for several clients in the Enron chapter 11 cases.

14.     HBD has stated its desire and willingness to act in these cases and render the necessary professional services as special bankruptcy litigation counsel for the Debtors.

## SERVICES TO BE PROVIDED BY HBD

15.     Subject to further Order of the Court, the Debtors propose that HBD be employed to represent the Debtors, in accordance with the terms of the Retainer Agreement, to provide,

- 4 -

among other things, ordinary and necessary legal services as may be required in connection with the following:

      a.      The UBS Adversary Proceeding, including the requests by UBS for a temporary restraining order and preliminary injunctive relief;

      b.      Representing the Debtors in other bankruptcy and/or commercial litigation matters in this Court or in other courts having jurisdiction over particular matters; and

      c.      Providing such other advice and representation as may be necessary or appropriate in these chapter 11 cases relating to the foregoing.

16.      As indicated in the Retainer Letter, however, the Debtors do not intend for HBD to be responsible for the provision of substantive legal advice outside of the insolvency and business litigation areas, including advice in such areas as patent, securities, trademark, corporate, taxation, labor, criminal or real estate law. Further, the Debtors do not intend for HBD to be required to devote attention to, form professional opinions as to, or advise the Debtors with respect to its disclosure obligations under federal securities or other nonbankruptcy laws or agreements.

### THE EFFECTIVENESS OF HBD'S EMPLOYMENT

17.      Following the close of business (ET) on April 5, 2007, counsel to the Debtors made initial contact with HBD regarding this engagement. A call was convened shortly after such initial contact to discuss the UBS Adversary Proceeding and HBD's interest in serving as special litigation counsel to the Debtors. That night, lawyers at HBD reviewed the complaint and motion seeking a TRO filed in the UBS Adversary Proceeding. HBD determined the next morning, after conducting a preliminary check for conflicts, that it could accept the representation. Because of the expedited timetable on which UBS sought a temporary restraining order and preliminary injunctive relive, HBD immediately began working on a response to the UBS's motion. At the same time, HBD began preparing retention paperwork, including this Application, which was filed as promptly as possible after HBD accepted the retention.

18.     Because of the short amount of time between the filing of the Complaint in the UBS Adversary Proceeding, and the hearing on the requests by UBS for a temporary restraining order and preliminary injunctive relief, the Debtors were unable to obtain this Court's approval of HBD's retention as special litigation counsel to the Debtors prior to the commencement of work by HBD to represent and protect the Debtors' interests in the UBS Adversary Proceeding. The Debtors worked diligently with HBD and filed this Application as soon as practicable. Thus, the Debtors submit that approving HBD's retention in these cases *nunc pro tunc* to April 6, 2007, is appropriate under the circumstances.

## DISCLOSURE CONCERNING CONFLICTS OF INTEREST

19.     To check and clear potential conflicts of interest in these cases, and based upon information known on or near the date of this Application, HBD researched its client database for the past twelve (12) years to determine whether it had any relationships with the following entities (collectively, the "Interested Parties"):

    a.     the Debtors (using both current and former names);

    b.     the 50 largest unsecured creditors for the Debtors on a consolidated bases as identified in the Debtors' chapter 11 petitions;

    c.     the Debtors' secured creditors;

    d.     the Debtors' current directors and senior employees;

    e.     the Debtors' significant shareholders of NCF; and

    f.     professionals that the Debtors have identified as involved in these chapter 11 cases.

20.     The identities of the Interested Parties were provided to HBD by the Debtors and are set forth on Schedule 1 annexed hereto, and incorporated herein by reference. HBD has advised the Debtors that it has not, does not, and will not represent any Interested Party with respect to matters related to the Debtors' chapter 11 cases. HBD has further advised the Debtors that, to the extent its research of its relationships with the Interested Parties indicated that it has represented in the past twelve (12) years, or currently represents, any Interested Party in matters

- 6 -

unrelated to these chapter 11 cases, the identities of such Interested Party (and, for current HBD clients, a brief description of the type of work performed) are set forth below.

21.    To the best of the Debtors' knowledge and belief, insofar as the Debtors have been able to ascertain after reasonable inquiry and except as may be described herein and in the Bennett Declaration, neither HBD nor any of the attorneys employed by it have any connection with the Debtors, their creditors, the Official Committee of Unsecured Creditors (the "Committee"), the Office of the U.S. Trustee, any other party with an actual or potential interest in these chapter 11 cases, or their respective attorneys or accountants.  As disclosed in the Bennett Declaration, among other things:

a.    HBD has not represented, and, does not and will not represent any entity other than the Debtors in matters related to these chapter 11 cases.

b.    As described in paragraph 27 below, HBD did not perform any services for the Debtors prior to the Petition Date and is not a creditor of the Debtors or their estates.

c.    HBD currently represents Maguire Properties, Inc., and certain of its affiliates (collectively, "Maguire") in matters unrelated to these cases.  Nonetheless, HBD does not, and will not, represent Maguire or its affiliates in matters relating to the Debtors or their chapter 11 cases.

d.    HBD currently serves as counsel to the Ad Hoc Committee of Solutia Noteholders (the "Solutia Committee") in those jointly administered chapter 11 cases styled as In re Solutia Inc., et al., which is currently pending before the United States Bankruptcy Court for the Southern District of New York, as Case No. 03-17949 (PCB). An affiliate of UBS is an adjunct member to the Solutia Committee, however, under the by laws of the Solutia Committee, such entity is not a client of HBD, nor does it receive any legal counsel from HBD.  In addition, HBD currently represents Nomura Securities International and certain of its affiliates (collectively, "Nomura") who serve as members of the Solutia Committee.  Nonetheless, HBD does not, and will not, represent Nomura or its affiliates in matters relating to the Debtors or their chapter 11 cases.

e.    HBD currently serves as counsel to four holders of publicly traded notes issued by Premier Entertainment Biloxi LLC and Premier Financial Biloxi Corp., whose bankruptcy cases are currently pending before the United States Bankruptcy Court for the Southern District of Mississippi, styled In re Premier Entertainment Biloxi, LLC, Case Nos. 06-50975 and 06-50976.  One of the holders represented by HBD is Deutsche Asset Management, certain affiliates of which have been identified as creditors of the Debtors. HBD does not and will not represent Deutsche Asset Management or its affiliates in any matters relating to the Debtors or their chapter 11 cases.

f.    In the future, HBD may serve as counsel to certain other Interested Parties in matters unrelated to these cases. In the event that HBD is so retained, HBD will file supplementary disclosures with this Court regarding the nature of such representation of an Interested Party.

g.    HBD also serves or has served as counsel in matters unrelated to these chapter 11 cases where certain of the Interested Parties were adverse to HBD's clients. HBD has agreed to provide a detailed schedule of such entities upon request.

22.    To the best of the Debtors' knowledge, information and belief, HBD represents no interest adverse to the Debtors in the matters for which HBD is proposed to be retained. The Debtors' knowledge, information and belief regarding the matters set forth herein are based, and made in reliance, upon the Bennett Declaration. The employment of HBD as special litigation counsel to the Debtors is appropriate and necessary to enable the Debtors to adequately defend themselves in the UBS Litigation and other similar actions that may be brought against the Debtors during the pendency of these chapter 11 cases. The Debtors submit that its employment of HBD would be in the best interests of the Debtors' respective estates.

## DISCLOSURE OF COMPENSATION

23.    With respect to HBD's services as special litigation counsel, the Debtors request that all legal fees and related costs and expenses incurred by the Debtors on account of services rendered by HBD in these cases be paid as administrative expenses of the estates pursuant to, among other things, sections 330(a), 331 and 503(b) of the Bankruptcy Code. Subject to the Court's approval, on an interim basis, HBD will charge for its legal services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date such services are rendered. HBD has informed the Debtors that its billing rates currently vary from $245 to $805 per hour for attorneys, from $415 to $635 per hour for financial consultants, and from $65 to $255 for paralegals and clerks, and are adjusted periodically, typically on January 1 of each year.[2] The range of billing rates set forth above reflects, among other things, differences in

---

[2] HBD submits that the aforementioned rates be revised to the hourly rates that will be in effect from time to time. Changes in HBD's regular hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

experience levels within classifications, geographic differentials and differences between types of services being provided.

24.     The Debtors understand that, should it become appropriate and cost-effective to do so, HBD also may utilize in this engagement "temporary" attorneys, paralegals, and clerks who are provided to HBD on a contract basis from outside services and for whom HBD will charge a reasonable hourly rate intended to compensate HBD for the costs and overhead associated with such personnel.  A list of the guideline hourly rates for those members of HBD that are expected to render substantial and material services to the Committee is included in the biographical summaries annexed to the Application as Exhibit B.

25.     The Debtors have been billed, and will continue to be billed, at HBD's customary billing rates for matters of this type, together with reimbursement of all reasonable costs and expenses incurred by HBD in connection herewith.  Such expenses include, but are not limited to, charges for messenger services, air couriers, photocopying, postage, long distance telephone service, outgoing facsimile service, computerized legal research facilities (including the time billed for such legal research), process service, investigative searches, and other charges customarily invoiced by law firms.  The Debtors propose to pay HBD at such rates and to reimburse it for such expenses, subject to the provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court of the District of Delaware (the "Local Rules"), and applicable orders of this Court.  Moreover, the Debtors understand that HBD hereinafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any order entered by this Court establishing interim compensation procedures for all services performed and expenses incurred after the Petition Date.

26.     Pursuant to the Retention Agreement, the Debtors also have agreed to pay HBD such additional amounts requested by HBD as would constitute a reasonable fee under all of the circumstances, based upon not only the total number of hours charged at guideline hourly rates,

- 9 -

but also upon such other factors as the complexity of the problems presented, the amounts at issue, the nature, quality and extent of the opposition encountered, the results accomplished, the skill exercised in accomplishing those results, the extent to which our services were rendered outside the Los Angeles area, after normal business hours or on other than normal business days, delays in receipt of compensation, and the extent to which HBD was at risk in being paid. The Debtors have agreed that, after confirmation of a plan of reorganization (or, if earlier, at the conclusion of HBD's engagement), HBD will assess such factors and determine the amount of its total fee after consulting with the Debtors to the extent that such fee exceeds the total number of hours of service provided charged at guideline hourly rates. Thereafter, HBD will seek the allowance of the final fee from this Court.

27.    Prior to the Petition Date, HBD did not perform any services for the Debtors and the Debtors did not make any payments to HBD for services to be provided. Accordingly, HBD does not have a prepetition claim against the Debtors.

28.    HBD has received no promises regarding compensation in these chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in the Bennett Declaration. Further, HBD has no agreement with any nonaffiliated entity to share any compensation earned in these chapter 11 cases.

29.    The Debtors, subject to the provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and further Orders of the Court, propose to pay HBD its customary hourly rates for services rendered, as set forth above, and to reimburse HBD according to its customary reimbursement polices, and submit that such rates are reasonable.

30.    HBD has received no promises regarding compensation in these chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in the Retainer Agreement. Further, HBD has no agreement with any nonaffiliated entity to share any compensation earned in these chapter 11 cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 10, 2007, at New York, New York.

<u> /s Bruce Bennett</u> _____
Bruce Bennett