## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS, INC., a** | : | **Case No. 07-10416 (KJC)** |
| **Delaware corporation, et al.,**[1] | : | |
| | : | Re: Docket No. 70 |
| **Debtors.** | : | |
| | : | **Objection Deadline:  April 11, 2007 at 4:00 p.m.** |
| | : | **Hearing Date:  August 12, 2007 at 3:00 p.m.** |

**OBJECTION OF C-BASS TO EMERGENCY MOTION OF DEBTORS
AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION
WITH THE PROPOSED SALE OF THEIR ASSETS USED IN LOAN
SERVICING BUSINESS, (B) SCHEDULING HEARING TO CONSIDER
PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM
AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED
RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE
AND (B) GRANTING RELATED RELIEF**

Credit-Based Asset Servicing and Securitization LLC ("*C-BASS*"), by counsel, submits

the following as its objection (the "*Objection*") to the bidding procedures and overbid protections

proposed by New Century TRS Holdings, Inc., and its affiliated debtors and debtors in

possession (collectively, the "*Debtors*") in the Emergency Motion of Debtors and Debtors in

Possession for (I) an Order (A) Approving Bidding Procedures and Bid Protections in

---

[1] The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Connection with the Proposed Sale of Their Assets Used in Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and (II) an Order (A) Approving the Proposed Sale and (B) Granting Related Relief (Docket No. 70) (the "*Motion*"):

## Preliminary Statement

1.　　The proposed bidding procedures establish an unduly hurried and overly protective process that is designed to ensure that Carrington Mortgage Services, LLC (the "*Initial Bidder*"), an affiliate of the Debtors, will be the eventual purchaser.[2] The expedited schedule proposed by the Motion will prevent other bidders from having a fair opportunity to conduct the minimum level of due diligence necessary to assess the value of the assets that are the subject of the Motion.　The proposed initial 110% overbid with subsequent $500,000 incremental overbid requirement, together with the excessive proposed break-up fee and expense reimbursement, is without justification and can only serve to chill the bidding process. Moreover, the Official Committee of Unsecured Creditors (the "*Committee*"), formed only two days prior to the objection deadline for this Motion, has not had sufficient opportunity to investigate, among other things, the extensive relationship between the Debtors and the Initial Bidder or the true value of the Initial Bidder's proposed purchase price.　This lack of information is exacerbated by the Debtors' election to withhold the schedules forming part of the proposed asset purchase agreement attached to the Motion that quantify the value of the Initial Bidder's proposed bid.

---

[2]　　The Initial Bidder is affiliated with the Debtors through the Debtors' 36.75% membership interest in Carrington Capital Management, LLC ("*Carrington*"), which is an affiliate, if not the majority owner, of the Initial Bidder. *See* Motion, ¶¶ 23-26.

2.    Thus, C-BASS requests that this Court only approve procedures with modifications designed to encourage transparent, competitive bidding and to protect unsecured creditors' rights:

- <u>No Emergency Necessitating Expedited Sale</u>.  The proposed bidding procedures contemplate that bids will be due by April 26, 2007, and that an auction will take place the week of April 30, 2007. Consequently, under the proposed bidding procedures there will be, at most, 10 business days from the date these procedures are approved to market the assets, qualify bidders, have bidders complete their due diligence and submit bids.  There is no emergency that necessitates such an expedited process.  Thus, C-BASS requests that the deadlines for the bidding and sale process be extended for at least 20 days.

- <u>High Overbids</u>.  The proposed 110% initial overbid and $500,000 incremental overbid amounts are excessive.  C-BASS requests that the initial overbid be reduced to (i) the initial bidders' purchase price, <u>plus</u> (ii) the approved amount of the break-up fee, <u>plus</u> (iii) $200,000, and that the incremental overbid amount be reduced to $200,000.

- <u>High Break-Up/Expense Reimbursement Fees</u>.  The proposed 3% break-up fee plus an expense reimbursement of up to $1,500,000 together represent nearly 4.08% of the proposed total purchase price. Relative to the proposed purchase price, these levels are excessive and should be reduced.  C-BASS proposes a 2% break-up fee plus an expense reimbursement of up to $750,000.

- <u>Credit Bidding The Entire Break-Up Fee</u>.  The Initial Bidder should be authorized only to credit bid the break-up fee approved by this Court. Further, C-BASS requests that the Initial Bidder not be permitted to credit bid the expense reimbursement portion of the break-up fee because this amount will not be known at the auction.

- <u>Inadequate Due Diligence Information</u>.  The proposed procedures provide potential purchasers other than the Initial Bidder only with access to a data room and potential meetings with certain management. C-BASS requests that qualified bidders be provided with the same access to information as the Initial Bidder, including information material to the bidding process that is available to it through its affiliation with the Debtors.

- <u>Inability to Quantify Actual Value of Initial Bidder's Offer</u>.  To ensure that potential bidders have sufficient notice of the value their competing bids must provide to the Debtors' estates, and in order to protect the interests of unsecured creditors by creating an open sales

process, the true value of the proposed purchase price offered by the Initial Bidder must be quantified. C-BASS requests that a full asset purchase agreement, together with all schedules and attachments thereto, be made available to any potential bidder.

- <u>Consultation With Committee</u>.  The bidding procedures should be amended to require the Debtors to provide information to the Committee and to consult with the Committee regarding material aspects of the proposed sale.

- <u>Additional Time for Committee to Investigate</u>.  The deadlines in the bidding procedures should be extended for at least 20 days to give the Committee time to investigate, among other things, the relationship between the Debtors and the Initial Bidder and the value of the Initial Bidder's offer.

**Background**

3.      On April 2, 2007 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "*Bankruptcy Code*").

4.      On April 4, 2007, the Debtors filed the Motion. In the Motion the Debtors request approval of bidding procedures and overbid protections, including an expedited sale process. The Motion identifies the initial bidder for the loan servicing assets (the "*Assets*") as the Initial Bidder. Attached as Exhibit A to the Motion is the Asset Purchase Agreement (the "*APA*") between certain of the Debtors, and the Initial Bidder and Carrington.

5.      On April 9, 2007, the Office of the United States Trustee appointed the members of the Committee. The Committee selected its proposed counsel and advisors on the same date.

6.      C-BASS holds substantial claims against the Debtors and is a member of the Committee. In fact, the Debtors listed C-BASS on the consolidated List of Creditors Holding 50 Largest Unsecured Claims against the Debtors.

7.      As described in the Declaration of Thomas F. Rollauer, Jr. (the "*Rollauer Declaration*"), C-BASS currently has an unsecured claim against the Debtors in the amount of

4

approximately $35 million. *See* Rollauer Declaration. A copy of the Rollauer Declaration is attached as Exhibit A. C-BASS files this Objection as the holder of this substantial unsecured claim.

8.     Prior to the Petition Date, C-BASS engaged in discussions with the Debtors and the Debtors' advisors, Lazard Frères & Co. LLC, regarding C-BASS potentially purchasing the Assets. On March 29, 2007, C-BASS presented the Debtors with a non-binding indication of interest with respect to acquiring the Assets.

## Argument

9.     The Debtors' proposed bidding procedures are not designed to encourage interested parties to conduct due diligence and to submit counteroffers for the Assets. Rather, to the detriment of the Debtors' unsecured creditors, the proposed bidding procedures are designed to prevent counteroffers. Modifications to the proposed bidding procedures are necessary to ensure that the Assets are adequately marketed, that interested parties have an opportunity to make competing offers, and that unsecured creditors' rights are protected.

### A.    There is No Emergency Necessitating an Expedited Sale

10.     Procedural bidding orders should be designed to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E. D. Pa. 1998). Courts have a duty to review a debtor's proposed bidding incentive procedure "to determine that it is reasonable in relation to bidder's efforts and the magnitude and significance of the transaction, and will enhance rather than detract from the bidding process." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992).

11.     There is no emergency that requires the Assets to be sold on the Debtors' proposed expedited schedule. The Debtors currently are servicing the Assets. In fact, if the

Initial Bidder acquires the Assets, *the Debtors may continue to service the Assets after the sale closes in June* while the Initial Bidder acquires the necessary servicing licenses.

12.     Further, the rights afforded the Debtors by filing these bankruptcy cases, including the automatic stay, and the liquidity afforded the Debtors through their interim debtor-in-possession financing facility, have provided the Debtors with substantial relief from the exigencies that may have existed prior to the Petition Date.

13.     While C-BASS acknowledges that it is important that the Debtors move forward with the proposed sale of the Assets without undue delay, fumbling the sale process will cause substantial damages to unsecured creditors.  The increased value that may be obtained in a thoughtful and well-organized sale process is significant relative to any potential losses resulting from the additional time.

14.     Here, the Debtors ask this Court to approve an exceedingly brief schedule for the sale of substantially all of the Debtors' servicing assets. *See* Motion, ¶¶ 38, 39 and 43.  A longer schedule is more likely to maximize value for creditors.  The risk of diminution in the value of the Assets by briefly extending the marketing period is minimal and reasonable to undertake.  In short, it appears that the potential to gain value for creditors through a fair bidding/auction process is greater than any risk of losing value.

15.     The Debtors proposed the following schedule:

|     |     |     |
| --- | --- | --- |
| a. | Monday, April 16, 2007 | Last day to issue notices |
| b. | Thursday, April 26, 2007 | Last day to submit a qualified bid |
| c. | Week of April 30, 2007 | Auction |
| d. | Wednesday, May 2, 2007 | Objection deadline for sale/cure |
| e. | Monday, May 7, 2007 | Sale hearing |

*See* Motion, ¶¶ 38, 39 and 43.

16.     This proposed schedule would permit potential qualified bidders at most only 10 business days to conduct due diligence and submit qualified bids that conform to the Debtors' exacting requirements.  The Debtors' requested sale schedule is too brief and would work to severely chill -- if not eliminate -- bidding, rather than create a climate of open access and fair procedures that would provide unsecured creditors with the highest and best possible value for the Assets.

17.     In addition to the need to extend the deadlines, the proposed schedule should be modified to clarify that the auction will occur after the deadline for objections to the sale and the proposed cure amounts.  Such objections, or the lack thereof, may impact the bidding at the auction and, therefore, the auction should occur after the objection deadline.

18.     As a result, C-BASS respectfully requests that this Court extend each of the deadlines for at least 20 days to allow adequate time for parties to conduct due diligence and make qualified bids on the Assets.  C-BASS further requests that the schedule be modified to clarify that the auction will occur after the deadline for objections to the sale and the proposed cure amounts.

**B.      The Required Overbids Are Excessive and Artificial**

19.     The proposed bidding procedures set an unreasonably high minimum for the initial overbid, in the amount of the 110% of the purchase price set forth in the APA (the "*Minimum Bid Amount*").  *See* Motion, ¶ 38.  Further, the incremental overbid of $500,000 also is too high. *See id.*

20.     Excessive overbid requirements should be discouraged because they chill the bidding process.  Specifically, overbid increments should be "carefully scrutinized in §363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D.

7

Ohio 1992). Further, one court has denied a request to impose $100,000 incremental overbids, which the court believed would "serve to hamper, rather than enhance, any prospects for a higher bid." *In re Twenver, Inc.*, 149 B.R. 954, 956-57 (Bankr. D. Col. 1992).

21.    The proposed 110% Minimum Bid Amount and the $500,000 incremental overbid amount are excessive and would serve to chill bidding. Thus, these proposed amounts unduly burden the Debtors' estates and fail to protect the interests of the Debtors' unsecured creditors because these amounts make it less likely that potential purchasers will submit qualifying bids and that a spirited auction will ensue.

22.    In fact, the Debtors' other currently proposed sale has a much smaller proposed initial overbid and incremental bid amount. Specifically, on the Petition Date the Debtors filed an emergency motion to establish procedures and sell certain mortgage pool assets to Greenwich Capital Financial Products, Inc., or a higher bidder (the "*GCFP Sale Motion*"). The GCFP Sale Motion only requests an initial overbid amount of (i) the proposed purchase price, plus (ii) the break-up fee, plus (iii) $500,000. GCFP Motion, ¶ 23. This is far less than the 110% Minimum Bid Amount requested in the Motion. Similarly, in the GCFP Sale Motion the Debtors only request an incremental overbid of $100,000, which is far less than the $500,000 incremental overbid requested in the Motion. The difference in the purchase prices of the two proposed sales does not justify the substantial increase in the initial and incremental overbid amounts from the GCFP transaction to the sale of the Assets. Instead, the GCFP Sale Motion demonstrates that the overbid amounts proposed in the Motion are excessive and inappropriate.

23.    Moreover, the Debtors have not identified why they believe the 110% Minimum Bid Amount is appropriate. To the extent the Debtors intend to support the 110% Minimum Bid Amount with the argument that a sale to the Initial Bidder will increase the value of their 36.75%

interest in Carrington, the Debtors need to provide creditors with evidence quantifying such additional value rather than just the bare assertions contained in the Motion. Ultimately, the sale of the Assets to the Initial Bidder only will enhance the Debtors' equity stake in Carrington if the market values such purchase as a bargain, which may explain in part why the Debtors seek such extreme bid protections for the Initial Bidder through the Motion.

24.    C-BASS proposes that the Minimum Bid Amount should be reduced to (i) the purchase price identified in the APA, plus (ii) the amount of the break-up fee approved by this Court, plus (iii) $200,000. C-BASS also proposes that the $500,000 incremental overbid amount should be reduced to $200,000. These reductions will encourage bidding and maximize the value the Debtors' estates receive for the Assets.

C.    **The Break-Up Fee Is Excessive and Is Not Entitled to Superpriority Status**

25.    C-BASS objects to the proposed 3% break-up fee plus a $1,500,000 expense reimbursement (collectively the "*Break-Up Fee*") as unreasonably high. *See e.g.*, Motion ¶ 38; APA § 9.2. "Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interest." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004).

26.    Although the Motion advertises that Initial Bidder's proposed purchase price is $139 million, the actual consideration paid may be substantially less. Ten percent (10%) of the purchase price will be held back under the APA and will be paid to the Initial Bidder if the Initial Bidder is entitled to indemnification from the Debtors. The Motion and APA provide little, if any, guidance about the likelihood of such indemnification claims or whether the 10% holdback will ever be paid to the Debtors. Accordingly, it is not clear whether the holdback amount should be used to calculate the true value of the Break-Up Fee. Nevertheless, even if the holdback amount is included, the proposed Break-Up Fee would equal 4.08% of the advertised

$139 million purchase price. This amount is outside industry standards. *Twenver,* 149 B.R. at 955-56 (break-up or topping fees generally approved by courts do not exceed 1-2% of purchase price).

27.    Tellingly, the GCFP Sale Motion only requests approval of a $1 million break-up fee while the proposed purchase price is $50 million. The GCFP Sale Motion also does not request an additional expense reimbursement as a component of the break-up fee. Thus, the total break-up fee sought in the GCFP Sale Motion is only 2% of the proposed purchase price. Consequently, the Debtors other proposed sale demonstrates that the Break-Up Fee requested in the Motion is excessive, especially in light of the fact that the proposed purchase price in the GCGP Sale Motion is less than half of the proposed purchase price for the Assets.

28.    The Debtors attempt to justify the Break-Up Fee as necessary to commit the Initial Bidder to make its initial offer. *See* Motion, ¶ 49. While the rationale for the Break-Up Fee may justify allowing reimbursement of reasonable expenses, plus a reasonable break-up fee, it does not justify the excessive Break-Up Fee requested here. Instead of benefiting the Debtors' estates by committing at least one party to purchase the Assets, the proposed Break-Up Fee triggers the opposite result by chilling the bidding process and, as a consequence, adversely impacting creditors.

29.    Moreover, the case the Debtors primarily rely upon in the Motion, *In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992), does not employ the proper standard for approving a break-up fee. *See* Motion, ¶¶ 49-50. The Third Circuit has rejected the standard for approving break-up fees identified in *Integrated Resources*, and has held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of

the estate." *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). Consequently, the Initial Bidder bears "the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Id.* at 533.

30.    Further, the only case the Debtors cite from a court within the Third Circuit in support of the over 4% Break-Up Fee is *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del. June 15, 1998). The Debtors, however, acknowledge that the court in *Montgomery Ward* only approved a 2.75% break-up fee in connection with a sale for $110 million. *See* Motion, ¶ 50. As a result, *Montgomery Ward* does not support the approval of the requested Break-Up Fee.

31.    In this case, the need for a break-up fee is questionable because, among other things, the Debtors have indicated that multiple parties have expressed interest in the Assets, and it is not clear that the Break-Up Fee is necessary to make the Initial Bidder commit to purchasing the Assets. *See O'Brien*, at 535-37 (noting that where a proposed purchaser would bid on assets without a break-up fee, the break-up fee cannot be characterized as necessary to preserve the value of the estate). Thus, C-BASS objects to the Debtors' request to accord the proposed Break-Up Fee administrative expense or superpriority status under sections 105, 503(b), and/or 507(a)(2) because the proposed Break-Up Fee does not satisfy the standards for allowance as an administrative expense under section 503(b).

32.    In addition, the proposed Break-Up Fee should not be approved because the APA would entitle the Initial Bidder to the expense reimbursement portion of the Break-Up Fee under inappropriate circumstances. Along with providing for the expense reimbursement if another

party wins the auction and purchases the Assets, the APA provides that the Initial Bidder is entitled to the expense reimbursement if the APA is terminated by the Initial Bidder as a result of: (a) the sale to the Initial Bidder not closing by June 4, 2007; (b) the Debtors not complying with the APA or breaching a representation or warranty; or (c) the Debtors selecting another bidder at the auction, irrespective of whether the Debtors ultimately sell the Assets to any such bidder.  *See* APA §§ 9.1(b)(iii); 9.1(c)(1), (ii) and (iii); and 9.2(b).  The Initial Bidder should not be entitled to receive an expense reimbursement under these additional circumstances.

33.    C-BASS requests that this Court deny the Debtor's request for a pre-approved Break-Up Fee, and instead allow the Initial Bidder a 2% break-up fee and the right to submit a request for payment of reasonable administrative expenses up to $750,000 for due diligence undertaken to prepare its proposed bid in the event another party wins the auction and purchases the Assets.  Further, any such expense reimbursement request should be subject to review and objection by parties in interest, including C-BASS.

### D.    Credit Bidding the Entire Break-Up Fee Is Inappropriate

34.    The Debtors' proposal to allow the Initial Bidder to credit bid the entire Break-Up Fee requested in the Motion is inappropriate.  First, the Initial Bidder should be permitted to credit bid only that percentage portion of the Break-Up Fee authorized by this Court, not the entire amount sought in the Motion.  Second, the Initial Bidder should not be permitted to credit bid the expense reimbursement portion of the Break-Up Fee because at the time of the auction, no one will know how much of the expense reimbursement will be authorized by this Court.  Thus, the Initial Bidder should be permitted to credit bid only the percentage portion of the Break-Up Fee authorized by this Court.

E.    **Potential Qualified Bidders Are Given Inadequate Information**

35.    The proposed procedures provide qualified bidders with access only to a data room.  The Initial Bidder, however, is granted access to the Debtors' books and records, management and employees, and physical access to the Debtors' facilities. *See* APA § 6.2.  This inequity is magnified by the fact that the Initial Bidder may have been granted substantially greater access to information than other potential purchasers prior to the bankruptcy as a result of the Initial Bidders' intimate relationship with the Debtors.  Providing the Initial Bidder with greater access to due diligence information will chill bidding and reduce the likelihood that a spirited auction will ensue.  Thus, all qualified bidders should be provided the same access to information as the Initial Bidder.

F.    **The Motion Fails to Quantify the Value of the Initial Bidder's Offer**

36.    In order to ensure that potential qualified bidders have sufficient notice of the value their competing bids must provide to the Debtors' estates, and in order to protect the interests of unsecured creditors by creating an open sales process, the Debtors mush quantify the true value of the proposed purchase price offered by the Initial Bidder.

37.    Specifically, the Debtors and/or the Initial Bidder should quantify the asserted increase in value to the Debtors' membership interest in Carrington arising from a sale to the Initial Bidder, and explain the methodology used to quantify this value.  In addition, the Debtors and/or the Initial Bidder should quantify the decrease in the value of the Initial Bidder's offer resulting from the 10% holdback amount, and explain the methodology used to quantify this value, including disclosure of the assumed liabilities purported to be scheduled in Schedule 1.1(c) of the APA.  Further, the Debtors should clarify the proposed compensation paid by the Initial Bidder in connection with advances secured by second liens.  The APA permits the Initial Bidder to pay the Debtors 90% of the advance amount as and when 100% of any such advance

amount is collected, which arrangement seemingly continues in perpetuity. *See* APA § 4.1(b). If accurate, this unjust arrangement would permit the Initial Bidder to retain the 10% difference between the amount it collects on second lien advances and the amount paid to the Debtors as and when collected.

38.    In fact, the need for additional transparency is demonstrated by the proposed bidding procedures, which require qualified bidders to provide an opinion as to the value of any non-cash consideration and the methodology used in deriving such amounts. *See* Bidding Procedures, ¶ 11. Providing the same types of information for the non-cash consideration contained in the Initial Bidder's offer will increase the transparency of the proposed transaction, and increase the likelihood that the Debtors will receive qualified bids and that a spirited auction will ensue.

39.    The opaque nature of the Initial Bidder's offer is further evidenced by a Reuters news article dated April 10, 2007, 11:49 a.m. (the "*Article*"). A copy of the Article is attached as Exhibit B. In pertinent part, the Article describes the sale of the Assets by stating that the Debtors "agreed to sell its loan servicing unit to hedge fund Carrington Capital Management LLC for $133 million, down from an original $139 million." The basis for this asserted decrease in the purchase price of the Assets is unclear. To the extent the proposed purchase price for the Assets has decreased, the Debtors should provide parties in interest with a complete and forthright explanation for the decrease.

G.    **The Debtors Should Be Required to Consult with the Committee**

40.    The Committee should be integrally involved in the sale process, should be entitled to receive information on all qualifying or potentially qualifying bids in a timely manner, and should be involved in decisions related to evaluation of qualified bidders, evaluation of qualified bids, deadline extensions, the imposition of any additional terms, and the selection of a

winning bidder (subject to Court approval). *See In re Structurlite Plastics Corp.*, 91 B.R. 813, 820 (Bankr. S.D. Ohio 1988) (committee entitled to be provided with sufficient information to evaluate and take position on potential sale of debtor's assets, and such entitlement included right to review proposed sale agreements).

41.    The bidding procedures currently state as follows:

New Century shall endeavor to consult with the Creditors' Committee on a timely basis concerning all acts, decisions or determination that New Century makes, or proposes to make, pursuant to or in connection with these Bidding Procedures and the transactions contemplated hereby.  In the event that New Century and the Creditors' Committee disagree as to the appropriate resolution of any such matter, New Century shall have the authority to decide the matter unless New Century's decision is at odds with the express provisions of this Order, with the Bankruptcy Court to have jurisdiction to hear and resolve any such dispute.

Bidding Procedures, ¶ 26.

42.    These proposed procedures only require the Debtors to "endeavor" to consult with the Committee on acts, decisions or determinations the Debtors make, and do not require the Debtors to provide the Committee with the information the Committee will need to evaluate potential bids or make other decisions.

43.    C-BASS requests that the proposed bidding procedures be amended to require the Debtors to furnish to the Committee any and all expressions of interest (whether qualifying bids or otherwise) and other communications received with respect to the sale immediately upon receipt of such information, and in no event later than 24 hours of receipt.  C-BASS also requests that the proposed bidding procedures be amended to require the Debtors and/or their legal counsel, to consult with the Committee, and/or its legal counsel, on all material matters related to the sale process, including, but not limited to, those matters set forth above. *See In re Donlevy's Inc.*, 111 B.R. 1, 3 (Bankr. D. Mass. 1990) (unsecured creditors held to be third-party beneficiaries of debtor's purchase agreement with buyer).

**H.**     <u>**The Committee Should Be Given Further Time to Investigate**</u>

44.     The deadlines in the proposed bidding procedures should be extended by at least 20 days to give the Committee time to investigate the relationship between the Debtors and the Initial Bidder. Given the extensive dealings between the Debtors and the Initial Bidder, the Committee must have sufficient time to investigate whether the proposed transaction with the Initial Bidder is an arms-length transaction. Not only do the Debtors have a 36.75% interest in Carrington, but Carrington and its affiliates hold residual securities representing an interest in approximately $8.6 billion of mortgage loans the Debtors originated and sold to Carrington. *See* Motion, ¶ 23, 26. Given these extensive dealings, the Committee must have sufficient time to investigate whether the Debtors selected the Initial Bidder's offer based on the consideration to be provided for the Assets, rather than based on the Initial Bidder's extensive relationship with the Debtors.

45.     The Committee also needs the requested 20 day extension to evaluate the Debtors' assertions that the value of the Debtors' 36.75% membership interest in Carrington will increase as a result of a sale of the Assets to the Initial Bidder, which increase the Debtors should demonstrate to the Committee and potential bidders. Similarly, the Committee needs the additional time to determine the extent to which the holdback amount affects the value of the Initial Bidder's offer. Only with this additional time will the Committee be able to properly perform its role of representing the Debtors' unsecured creditors and ensuring that the Debtors select the highest and best offer for the Assets.

46.     C-BASS reserves the right to raise additional objections prior to or at the hearing on the Motion scheduled to be held on April 12, 2007. C-BASS also reserves the right to raise objections to the sale, sale order, and APA.

## Conclusion

WHEREFORE, C-BASS respectfully requests that this Court deny the Debtors' Motion unless and until the proposed bidding procedures and APA are amended to address the issues raised herein and any issues raised at the hearing scheduled to be held on April 12, 2007.

Dated:  April 11, 2007

                    Respectfully submitted,

                    HUNTON & WILLIAMS LLP

                    Peter S. Partee (PP-0766)
                    200 Park Avenue, 53rd Floor
                    New York, New York  10166-0136
                    (212) 309-1000

                    and

                    J.R. Smith (Va. Bar No. 41913)
                    Jason W. Harbour (DE Bar No. 4176, Va. Bar No. 68220)
                    Riverfront Plaza, East Tower
                    951 East Byrd Street
                    Richmond, Virginia  23219-4074
                    (804) 788-8200

                    and

                    ECKERT, SEAMANS, CHERIN & MELLOT, LLC

                    *Michael Busenkell /s/*
                    Michael Busenkell (DE Bar No. 3933)
                    300 Delaware Avenue
                    Suite 1210
                    Wilmington, Delaware  19801

                    Counsel to *Credit-Based Asset Servicing and Securitization LLC*