# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | Proposed Hearing Date: 4/24/07 @ 2:30 p.m. (EDT) |
| | : | Proposed Objection Deadline: 4/20/07 @ 4:00 p.m. (EDT) |
| | : | |
| | : | |

## NOTICE OF MOTION AND HEARING

PLEASE TAKE NOTICE that on April 11, 2007, the above-captioned debtors and debtors in possession (the "Debtors") filed the **Debtors' Emergency Motion for Order Authorizing Payment of (i) Sale-Related Incentive Pay to Senior Management and (ii) Retention and Incentive Pay to Certain Employees Pursuant to Sections 105(a), 363(b)(1), and 503(c)(3) of the Bankruptcy Code** (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that the Debtors contemporaneously filed a *Motion of Debtors and Debtors in Possession to Shorten*

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc ), a Maryland corporation; New Century TRS Holdings, Inc (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R E O Corp , a California corporation; New Century R E O. II Corp , a California corporation; New Century R E O. III Corp , a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P , a Delaware limited partnership.

*4-11-07*
*#185*

*Notice and Objection Periods for Debtors' Emergency Motion for Order Authorizing Payment of (I) Sale-Related Incentive Pay to Senior Management and (II) Retention and Incentive Pay to Certain Employees Pursuant to Sections 105(a), 363(b)(1), and 503(c)(3) of the Bankruptcy Code* (the "Notice Motion") with the Bankruptcy Court. The proposed hearing date and objection deadline set forth herein are consistent with the dates proposed in the Notice Motion.

PLEASE TAKE FURTHER NOTICE that the Debtors have proposed that any responses or objections to the Motion must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before **4:00 p.m. on April 20, 2007 (EDT)**.

PLEASE TAKE FURTHER NOTICE that if any objections or responses are received the Debtors have proposed that a hearing with respect to the Motion be held on **April 24, 2007 at 2:30 p.m. (EDT)** before the Honorable Kevin J. Carey at the United States Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware 19801.

PLEASE TAKE FURTHER NOTICE that once a hearing date and objection deadline have been established, the Debtors will provide notice of such dates to all parties in interest.

IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: April 11, 2007
     Wilmington, Delaware

Mark D. Collins (Bar No. 2981)
Michael J. Merchant (No. 3854)
Paul N. Heath (Bar No. 3704)
Christopher M. Samis (Bar No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Ben H. Logan
Suzzanne S. Uhland
Victoria H. Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Proposed Hearing Date: 4/24/07 @ 2:30 p.m. (EDT) |
| | : | Proposed Objection Deadline: 4/20/07 @ 4:00 p.m. (EDT) |
| | : | |
| | : | |

**DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF
(i) SALE-RELATED INCENTIVE PAY TO SENIOR MANAGEMENT AND
(ii) RETENTION AND INCENTIVE PAY TO CERTAIN EMPLOYEES PURSUANT TO
SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE**

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc, ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"),

hereby submit this emergency motion (the "Motion") for entry of an order, pursuant to sections

105(a), 363(b)(1) and 503(c)(3) of Title 11 of the United States Code (as amended from time to

time, the "Bankruptcy Code"), authorizing, but not directing, payment of (i) sale-related incentive

pay to members of senior management and (ii) employee retention and sales-related incentive pay

to certain employees, as described herein.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R E.O. II Corp , a California corporation; New Century R.E.O. III Corp , a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P , a Delaware limited partnership

The sale-related incentive and employee retention plans proposed by the Debtors herein are critical to encourage and to motivate the Debtors' workforce during this tumultuous period. After years of growth into one of the largest subprime originators and purchasers in the nation, over the past several months, the Debtors have been weathering the effects of a restatement of financial results, a termination of financing for operations, the freeze of operations of the Debtors' substantial loan origination business and major reductions in force. The Debtors are suddenly in the process of selling substantially all of their assets, and doing so in an expedited fashion in an effort to maximize value while the window of opportunity is still open. At this time, the Debtors require the means to motivate leadership and to address steeply declining morale of its employees. The Debtors strongly believe that implementing the sale-related incentive and employee retention plans proposed herein is necessary and appropriate to realize value for their stakeholders.

The sale-related incentive and employee retention program has two components. The first component of the program is a sale-related incentive plan for senior management. Pursuant to this plan, the Debtors shall be authorized to make payments to plan participants only upon the consummation of sales of assets at minimum threshold levels, as described below. Importantly, there are no guaranteed payments to senior management solely for remaining in the employ of the Debtors. Additionally, the plan provides that bonuses shall not be paid with respect to a transaction to participants who receive offers for commensurate employment from a buyer of the Debtors' assets in connection with such transaction. The second component of the program is for key employees who are not members of senior management. If authorized by the Court, this plan will enable the Debtors to pay key employees for remaining with the Debtors while the asset sales are being completed. The plan also contains a limited critical retention pool to be used in

2

unforeseen extraordinary circumstances as deemed necessary by the Debtors. Further, the Debtors would be permitted to pay certain of their key employees incentive bonuses upon the closing of asset sales in an effort to motivate optimal performance where necessary.

Only $2.8 million is sought for retention bonuses guaranteed to employees that remain employed by the Debtors during the asset sales irrespective of the outcome of the sales plus a limited $250,000 critical retention pool to be used for unforeseen, extraordinary circumstances. The balance of the payments that the Debtors are seeking authority to make is 100% contingent upon the Debtors' successful completion of asset sales - thereby aligning the interests of management with stakeholders - and, in respect to senior management, will not be paid at all with respect to the particular transaction to those employees who receive commensurate offers of employment in such transaction. In light of the values, size, complexity and need for expeditious closing of the asset sales, the Debtors keenly believe that the amounts that they seek authority to pay employees herein are reasonable and responsibly targeted towards the objectives that need to be achieved in these cases.

In support of the Motion, the Debtors, by and through their undersigned counsel, respectively represent as follows:

### JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and 1134. Venue is proper under 28 U.S.C. sections 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. section 157(b)(2).

2.      The bases for the relief requested herein are sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

3

## BACKGROUND

1.      New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so,

2.      On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

3.      On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its

4

audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

4.    These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

5.    As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

6.    Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has

been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

7.    During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Freres & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

8.    The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

9.    Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining a commitment for debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

10.    On April 2, 2007 (the "Petition Date"), the Debtors filed petitions for relief. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

11.    The Debtors have commenced these bankruptcy cases in order to downsize their operations, reduce expenses, promptly market their businesses and consummate sales of assets as soon as practicable. Prior to commencing these cases, the Debtors, working with their

investment banker, Lazard, aggressively marketed their businesses. This resulted in expressions of interest, bids and committed offers for various assets and components of their businesses.

12.    Among those offers is a proposal by Carrington Capital Management, LLC ("Carrington"), to purchase the Debtors' servicing business (the "Servicing Business") for proceeds of $133 million, subject to certain adjustments as set forth in the asset purchase agreement. In addition to the Carrington proposal, the Debtors received six other bids for the Servicing Business. Upon careful consideration of the terms of the proposals, the Debtors concluded that the Carrington bid establishes the most reasonable floor for an auction. Accordingly, on April 2, 2007, the Debtors entered into the asset purchase agreement with Carrington as the "stalking horse" for the Servicing Business. The Carrington transaction is subject to qualifying overbids and, if overbids are received, an auction.

13.    The Debtors also received a proposal by Greenwich Capital Financial Products, Inc. ("Greenwich") to purchase a pool of mortgage loans and mortgage-backed residual interests in securitization trusts for aggregate proceeds of approximately $50 million. The Debtors and Lazard broadly sought offers for these loans and residual mortgage-backed securities and a number of prospective buyers conducted diligence and expressed interest in them. On April 2, 2007, the Debtors entered into an asset purchase agreement with Greenwich whereby Greenwich agreed to purchase these mortgage loans and mortgage-backed securities for approximately $50 million. This sale is subject to higher and better bids and, if qualifying bids are submitted, an auction.

14.    The Debtors continue to seek potential buyers for their other assets including the Debtors' wholesale and retail loan origination businesses (the "Loan Origination

Platform") pursuant to bid procedures that have been proposed by the Debtors in a recent motion of the Court, and as well as for other interests in mortgage loan pools.

### RELIEF REQUESTED

15.    By this Motion, the Debtors seek entry of an order under Bankruptcy Code sections 105(a), 363(b)(1) and 503(c)(3): (i) approving the sales incentive and employee retention plans as described below, (ii) authorizing the Debtors to implement the sales incentive and employee retention plans, and (iii) allowing all payments thereunder as administrative expenses of the estates.

### BASES FOR RELIEF REQUESTED

16.    As part of the Debtors' efforts to negotiate and close the Carrington and Greenwich transactions, solicit potential overbidders for these sales and solicit bidders for the Debtors' Loan Origination Platform and other assets, the Debtors' employees including its executives and other officers have been called upon to take on responsibilities and expend significantly more time and effort than contemplated by the normal terms of their employment. These responsibilities include reviewing sale solicitation materials, preparing business plans, gathering and coordinating the dissemination of due diligence information and reviewing, commenting on and negotiating the terms of proposed asset purchase agreements and related documents. The efforts of these employees have been, and continue to be, critical to the Debtors' efforts to consummate transactions of the highest value possible.

17.    By this Motion, the Debtors seek the authority to provide incentives to those members of senior management tasked with navigating the Debtors through this challenging period. At the same time, the Debtors also must maintain the core of their Servicing Business and Loan Origination Platform pending sales of those businesses. The Debtors' Servicing Business is among the most substantial of the Debtors' operations being offered for sale, as the loan servicing

8

business historically has been and remains a profitable business. It is a service business that depends on maintaining a stable and motivated workforce, particularly since servicing loans, especially subprime loans in default, requires sophistication concerning the legal and practical issues that affect proper loan servicing, including daily communications with vendors and regulatory authorities. The Carrington deal is expressly conditioned upon the retention of a certain number of employees. In order to enhance the likelihood of preserving the Carrington deal, it is critical therefore for the Debtors to continue to focus on preserving the resources and employees that support the Servicing Business.

18.     Due to the nature of the Loan Origination Platform and the current status of the Debtors' business operations, it is similarly crucial to focus on retention for employees who work for the Loan Origination Platform. The Debtors are the fourth largest wholesale originator and purchaser of first mortgage loans and were one of the fastest-growing sub-prime lenders in the nation. The Debtors originated and purchased mortgage loans through two divisions, a wholesale division (the "Wholesale Division") and a retail division (the "Retail Division"). The Wholesale Division originated and purchased loans through a network of independent mortgage brokers and correspondent lenders. These regional operating centers are generally staffed by regional managers, regional sales managers, operations managers, account executives and other employees. In 2006, the Wholesale Division was responsible for approximately 85% of the loans produced by the Debtors, which were approximately $50.7 billion. The Retail Division, which operates under Home123 Corporation, originates loans through direct contact with consumers, including through referrals from builders, realtors and other third parties. For 2006, the Retail Division originated approximately 15% of the loans produced by the Debtors. Because the Debtors have ceased originating loans, the individuals upon which the Loan Origination Platform is based have started

9

to leave. The ability of a buyer to originate mortgage loans through a network will be diminished if not eliminated altogether if these employees continue to seek opportunities elsewhere.

19.    The Debtors' remaining employees continue to work against the backdrop of uncertainty of their continued employment and without assumed employment or severance agreements. In addition, employees remaining with the Debtors are without the benefit of pre-petition incentive plans. For core members of the Debtors' personnel, typical pre-petition compensation generally included participation in cash bonus incentive plans that were tied to the Debtors' annual performance. The Debtors offered a Management Incentive Plan, which was provided to employees at the level of Director and above; the Corporate Profit Sharing Plan, which was provided to employees below the Director level; and the Long-Term Incentive Compensation Plan, which was provided to Vice Presidents and above.

20.    To properly and fairly incentivize and reward the performance of critical employees for the benefit of these estates, the board of directors of the Debtors approved the formation of the Executive Incentive Plan ("EIP") and Key Employee Incentive Retention Plan ("KEIRP" and together with the EIP, the "Plans"). The formulation of the Plans is believed by the Debtors to reward appropriately the substantial contribution and performance of these employees. The efforts of these employees have been and will continue to be instrumental in the Debtors' restructuring efforts, including the Debtors' efforts to close the Carrington and Greenwich sales and to market the Debtors' Loan Origination Platform and other assets in order to provide the maximum return to the Debtors' estates and creditors.

### 1.    Summary of the EIP

10

21.    EIP Compensation Pool. The EIP is designed to provide the participants (the "EIP Participants")[2] with greater compensation in the event that they obtain greater value for the Debtors' estates and creditors. (A copy of the EIP Guidelines is attached to the Motion as Exhibit A.) The Debtors propose that conditioned upon the occurrence of either the closing of the asset sales to Carrington and Greenwich or transactions that are higher or otherwise better and the Debtors' other assets, a pool of funds be made available to the EIP Participants (the "EIP Compensation Pool"). Consistent with the Debtors' obligation to maximize value, the Debtors further propose that the EIP Compensation Pool increase only as the value that is available to pay to stakeholders increases.

22.    The size of the EIP Compensation Pool shall increase depending upon realization of various transaction values to enable EIP Participants to participate in "upside" opportunities. The "upside" opportunities of the EIP Participants are broken into four components tied to four separate asset classes of the Debtors, as follows:[3]

- **Servicing Assets Sale.** The contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50.0. There will be no Servicing Asset Sale Contribution if BPS is less than 50.0. If BPS is equal to 50.0, the Servicing Assets Sale Contribution will be $1,164,405. If BPS is greater than 50.0, the Servicing Assets Sale Contribution will be increased proportionately.

- **Mortgage Assets Sale.** The contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,000,000. There will be no Mortgage Asset Sale Contribution if the Mortgage Assets Sale Price is less than $47,000,000. If the Mortgage Asset Sale Price is equal to $47,000,000, the Mortgage Asset Sale Contribution will be

---

[2] The Debtors will provide to the U.S. Trustee, Creditors' Committee and Securities and Exchange Commission ("SEC") a list identifying each EIP Participant by name, job title and salary level and setting forth the amount of incentive bonus that each EIP Participant is qualified to receive under the EIP.

[3] Capitalized terms not otherwise defined shall have the meanings given to them in the EIP.

11

$419,820. If the Mortgage Asset Sale Price is greater than $47,000,000, the Mortgage Assets Sale Contribution will be equal to $419,820 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,000,000.

- **WRO Assets Sale.** The contribution, if any, upon the consummation of the WRO Assets Sale (the "**WRO Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**WRO Assets Sale Price**") equals or exceeds the WRO Assets Sale target price set forth on <u>Exhibit C</u> to the EIP (the "**Target Price**"). There will be no Mortgage Asset Sale Contribution if the WRO Assets Sale Price is less than the Target Price. If the WRO Asset Sale Price is equal to the Target Price, the WRO Asset Sale Contribution will be $1,584,225. If the WRO Asset Sale Price is greater than the Target Price, the WRO Assets Sale Contribution will be equal to $1,584,225 plus 2% of the amount by which the WRO Asset Sale Price exceeds the Target Price.

- **RPML Sale.** The contribution upon the consummation of the RPML Sale to the extent that the Company manages to sell such assets (the "**RPML Sale Contribution**") will be equal to 0.5% of the liquidation price (the "**RPML Sale Price**") e.g. if the RPML Sale Price is equal to $63,250,000, the RPML Sale Contribution will be $316,250 ($63,250,000 X 0.5%).

23.     <u>The EIP Participants</u>. The EIP Participants are the CEO plus seven members of the Debtors' executive management team. Participation in the EIP affords the EIP Participants the opportunity to receive incentive pay targeted at a range of between 45% and 90% of their base annual salary. EIP Participants shall be eligible for distributions from the EIP Compensation Pool within 50 days after each of the asset sales closes.

24.     <u>Additional Requirements</u>. No incentive compensation is earned by an EIP Participant unless and until asset sales are actually consummated. This requirement is to ensure that the funds are actually available to compensate the EIP Participants for their efforts and that the Debtors' estates do not unnecessarily incur an administrative expense. Moreover, to receive incentive compensation, an EIP Participant must be employed by the Debtors through the consummation of the asset sales. This is to ensure that the employee actually completes the work and has performed the needed services necessary to ensure that the asset sales are consummated.

12

Accordingly, by the EIP, the Debtors seek to incentivize the EIP Participants responsible for the sale process to continue their substantial efforts to realize the highest and otherwise best value for the Debtors' estates and creditors by providing them with the EIP that compensates them for the additional time and effort expended in connection with the consummation of asset sales and rewards them for accomplishing results.

### 2. Summary of the KEIRP

25. The successful consummation of the Carrington and Greenwich deals and potential sale of the Debtors' other businesses, in turn, depend upon the Debtors' ability to retain certain non-executive employees with the knowledge and skill to continue the Debtors' business operations. Certain of the Debtors' key employees have a thorough understanding of the Debtors' historic and current operations. These employees have developed extensive institutional knowledge and important relationships with the Debtors' business partners, clients, vendors and other employees. Additionally, they provide critical support services for the Debtors' sale efforts and chapter 11 administration. The KEIRP Participants (as defined below) are employed in the areas of capital markets, facilities, finance, human resources, information technology, legal (law department, compliance, policies and procedures, security and insurance), servicing and marketing. These areas form the backbone of the loan servicing and loan origination businesses of the Debtors. There are also certain core Servicing Business employees who are participants in the Servicing Business tier of the KEIRP (described below).

26. The Debtors' financial difficulties have caused significant concern among employees with respect to prospects for future and continued employment and compensation. The Debtors believe that their employees are being contacted by competitors regarding other positions that offer increased job security and financial opportunity. Employees continue to work for the Debtors based on the Debtors' statements that a retention plan would be adopted.

13

27.    The dual purpose of the KEIRP is to retain key employees of the Debtors to continue to operate the Debtors' businesses in order to enable going concern sales and to encourage the closing of such sales.[4]   (A copy of the KEIRP Guidelines is attached to the Motion as Exhibit B.)  Accordingly, the KEIRP provides for two kinds of payments: (i) employee retention pay to certain key employees of the Debtors based on their continued employment with the Debtors in the maximum aggregate amount of approximately $2.8 million, and (ii) sales-incentive pay to certain key employees based on the successful completion of asset sales.  The KEIRP applies to approximately 123 employees (the "KEIRP Participants" and together with the EIP Participants, the "Plan Participants").[5]

28.    KEIRP Participants fall into five tiers and are eligible to receive employee retention and, in some cases, sales incentive pay targeted at a range of between 15% and 45% (each tier increasing by 10%) of annual base salary based on (1) a consideration of their compensation in effect upon their approval for participation in the KEIRP and (2) employment position classification.  KEIRP Participants who are employees of the Servicing Business only shall be eligible for employee retention awards targeted at a range of between 10% and 30% of base salary.

29.    Tiers I and II.  KEIRP Participants in Tiers I and II are eligible for bonuses in the amount of 35% and 45% of base salary, respectively.  Of the total bonus pay to KEIRP Participants in Tiers I and II, 45% is employee retention pay that is conditioned upon a participant's continued employment by the Debtors on July 9, 2007.  The balance of their KEIRP

---

[4] The Debtors reserve the right to file an additional motion seeking authorization to pay further compensation to employees to wind down the estates after disposition of the Debtors' businesses.
[5] The Debtors will provide to the U.S. Trustee, Creditors' Committee and SEC a list identifying each KEIRP Participant by name, job title and salary level and setting forth the amount of the retention and/or incentive bonus that each KEIRP Participant is qualified to receive under the KEIRP.

14

payments is contingent on the asset sales performance of the Debtors as set forth in the KEIRP Guidelines. See KEIRP Guidelines, "Incentive Pool".

30.    Tiers III and IV. KEIRP Participants in Tiers III and IV (15% and 25% of base salary, respectively) shall receive 100% of bonus pay for which the KEIRP Participant is eligible upon the continued employment with the Debtors on July 9, 2007. Bonus pay to KEIRP Participants in Tiers III and IV is not conditioned upon results in the Debtors' asset sales.

31.    Tier V. KEIRP Participants in Tier V are employees of the Debtors' Servicing Business. These employees are eligible for employee retention bonuses upon their continued employment with the Debtors on June 9, 2007, and their bonus pay is not conditioned upon results in the Debtors' asset sales.

32.    Critical Retention Pool. The Company will contribute $250,000 (the "Critical Retention Pool") to finance bonuses (the "Critical Retention Bonuses") to be paid under the Plan. The Critical Retention Pool may be distributed by the Company in its sole discretion, in addition to any Retention Bonuses or Incentive Bonuses, to recognize contributions made by the Company's employees receiving such Critical Retention Bonuses toward increasing the liquidation value of the Company's assets.

33.    The Debtors believe that the anticipated KEIRP costs are reasonable, fully warranted and absolutely necessary. The Debtors considered a number of factors in designing the KEIRP, including industry standards, the Debtors' historic practices and the nature of the Debtors' businesses. The potential costs associated with the loss of employees would be far in excess of the combined costs of the KEIRP. In addition, the benefits offered within the KEIRP are competitive with those offered by other companies. The incentive component of the KEIRP aligns key employees' incentives with incentives of executive management. Finally, without the KEIRP, the

15

Debtors believe that employees will leave, causing an interruption in the Debtors' various business operations and irreversible harm to the value of the estates.

34.     Specifically, the Servicing Business and the Loan Origination Platform are significant assets that are complex and require specialized knowledge and industry relationships in order to maintain value pending a sale. As noted above, for this reason the Carrington deal is conditioned upon the Debtors retaining a critical number of employees of the Servicing Business. Defections in the work force of the Servicing Business and Loan Origination Platform would be disastrous at this time. Defections would cause the Debtors to incur significant costs in recruiting and attracting similarly qualified replacements, and hiring qualified employees would be extremely difficult given that the Debtors are in bankruptcy -- loss of these employees may make it impossible to close the pending asset sale with Carrington. The loss of key servicing employees would lead to further work force attrition as employee morale would deteriorate with the departures and concomitant increased work demands on remaining employees, and the deal with Carrington would be threatened.

### THE PROPOSED SALES INCENTIVE AND RETENTION PROGRAMS SHOULD BE AUTHORIZED BECAUSE THEY HAVE A SOUND BUSINESS PURPOSE

I.     **The Plans Should Be Approved Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.**

35.     The Debtors respectfully submit that the two applicable sections of the Bankruptcy Code under which the Court should consider the Plans are sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

II.     **Section 363(b) of the Bankruptcy Code**

36.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate " other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be

16

authorized if the debtor demonstrates a " sound business purpose" for it. See In re Lionel Corp.,

722 F. 2d 1063, 1071 (2nd Cir. 1983) (" The rule we adopt requires that a judge determining a

363(b) application expressly find from the evidence presented before him a good business reason

to grant the application. "); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

37.    Once the debtor articulates a valid business justification for a particular

form of relief, the Court reviews the debtor's request under the " business judgment rule." The

business judgment rule" is a presumption that in making a business decision the directors of a

corporation acted on an informal basis, in good faith and in the honest belief that the action was in

the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y.

1992) (quoting Smith v. Van Gorkom, 488 A. 2d 858, 872 (Del. 1985)).

38.    The business judgment rule has vitality in chapter 11 cases and shields a

debtor's management from judicial second-guessing. See id.; see, e.g., Myers v. Martin (In re

Martin), 91 F. 3d 389, 395 (3rd Cir. 1996) (noting that under normal circumstances, courts defer to

a trustee's judgment concerning use of property under Bankruptcy Code section 363(b) when there

is a legitimate business justification); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153

(D. Del. 1999) (affirming bankruptcy court approval of key employee retention program, stating

that "in determining whether to authorize the use, sale or lease of property of the estate under

[section 363(b)], courts require the debtors to show that a sound business purpose justifies such

actions").

**III.    The Plans Also Should Be Evaluated Under Section 503(c)(3) of the Bankruptcy Code, Using the Same Standard as Section 363(b).**

39.    Section 503(c), which is applicable in all bankruptcy cases filed after

October 2005, provides criteria for courts to use in approving certain types of payments to insiders

and "other transfers or obligations that are outside the ordinary course of business." Section 503(c)

17

comprises three sections: (1) a general prohibition of retention plans; (2) limitations on severance payments; and (3) standards governing other transfers to certain employees and consultants, among others, that are outside of the ordinary course. For reasons set forth herein, neither section 503(c)(1) nor section 503(c)(2) are applicable to evaluating the Plans. Thus, to the extent that Plan distributions constitute payments outside the ordinary course of business, they should be evaluated under the standards applicable under section 503(c)(3).

      40.     To begin with, sections 503(c)(1) and (c)(2) expressly do not apply to the KEIRP because those sections apply only to payments to "insiders". Section 101(31) defines an insider as, in pertinent part, a director, an officer, or a person in control of the debtor. See 11 U.S.C. § 101(31). None of the KEIRP Participants are members of the Debtors' board of directors. In addition, the KEIRP Participants, some of whom have titles of vice president, exercise day to day operations, human resources, legal, finance and related functions. They are not "officers" or "persons in control" of the debtor within the meaning of section 101(31). The legislative history of section 101(31) indicates that "an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.Rep. No. 95-989, 95th Cong.2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5810. In determining whether a party is an insider, courts focus on the closeness between the transferee and the debtor, the degree of control or influence the transferee exerts over the debtor, and whether the transactions were conducted at arm's length. OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corporation), 340 B.R. 510, 523-24 (Bankr. D. Del. 2006) (citing cases). The KEIRP Participants were appointed to work as vice presidents and operations positions, not as senior management, and do not report directly to the board. In addition, they have not been involved in developing the Plans or other policies affecting their

18

bonus compensation in these cases. The members of the senior management team that are active in developing company policy and who report to the board are not eligible for awards under the KEIRP. As the KEIRP Participants do not set corporate policy or exercise influence over the payments made to them by the Debtors under the Plans, closer scrutiny reserved for non-arms length payments is not warranted. See, e.g., In re NMI Systems, Inc., 179 B.R. 357, 371 (Bankr. D.C. 1995) (employee reporting to senior vice president and not designated as part of the executive management team is not an insider with respect to transfers made to such employee by the debtor); In re Public Access Technology.com, Inc., 307 B.R. 500, 506 (Bankr. E.D. Va. 2004) (same); Accordingly, sections 503(c)(1) and (c)(2) should not apply to the KEIRP.

41.    Additionally, section 503(c)(1) and (c)(2) do not apply to the EIP. By the statute's plain language, section 503(c)(1) pertains solely to retention plans and section 503(c)(2) addresses only the requirements for severance plans, and neither provision applies to performance-based incentive plans. See, e.g., In re Nobex Corp., No. 05-20050, 01/12/06 Hearing Tr. at 67 (Bankr. Del. 2006) (MFW); In re Calpine Corp., No. 05-60200, 04/26/2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006) (BRL). Indeed, one court recently held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider
> whether the payments are permissible under section 503(c)(3), which
> limits payments made to management and employees, among others,
> outside the ordinary course, unless such payments are shown to be justified
> under the facts and circumstances of chapter 11 case. As one treatise
> points out, the test appears to be no more stringent a test than the one courts
> must apply in approving any administrative expense under 503(b)(1)(A).

In re Dana Corporation, -- B.R. --, 2006 WL 3479406 at *6 (Bankr. S.D.N.Y. 2006). The sales incentive components of the plans are not intended to provide bonuses for retention nor severance pay. In particular, the EIP is comprised of only targeted incentive payments to management employees who are directly involved in implementing the Carrington and Greenwich and other

19

asset sales. These incentive payments are based upon achievement of the asset sales -- and do not have any retention or severance components. Although the EIP Participants must be employed by the Debtors until the asset sales are consummated, that requirement is not to induce the EIP Participants to stay. Rather, that requirement is to ensure that the EIP Participants continue their efforts not only to maintain the going concern value of the Debtors, but to ensure that the tasks necessary to close the transaction are achieved and at the same time providing significant additional services required by the Carrington and Greenwich agreements and the chapter 11 cases. Consequently, the EIP is properly characterized as a performance based, sale-related management incentive plan, not a retention plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(1).

42.     Nor does the EIP constitute severance for insiders subject to the provisions of Bankruptcy Code section 503(c)(2). See 11 U.S.C. § 503(c)(2). The EIP does not provide benefits to plan participants upon termination of their employment with the Debtors. Under the terms of the EIP, a plan participant will receive compensation regardless of whether the participant thereafter remains employed by the Debtors. Therefore, the EIP is a management sales-incentive plan not a severance plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(2).

43.     Therefore, neither section 503(c)(1) nor section 503(c)(2) apply to this motion. Instead, to the extent that distributions under the Plans are payments "outside the ordinary course of business," they should be evaluated under section 503(c)(3). See, e.g., Nobex Corp., No. 05-20050, Hearing Tr. at 67; In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide incentive bonuses under management incentive plan did not violate section 503(c) of the Bankruptcy Code); In re Dana Corporation,

20

2006 WL 3479406 at *12; In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr.

D. Del. July 20, 2006, August 22, 2006, and December 20, 2006) (ordering various relief requested

in connection with debtor's incentive bonus plans pursuant to sections 363(b) and 503(c) of the

Bankruptcy Code).

          44.     Section 503(c)(3) states, in relevant part, that "there shall be neither allowed

nor paid: . . . other transfers or obligations that are outside the ordinary course of business and not

justified by the facts and circumstances of the case...." Since courts have begun to analyze various

payments under section 503(c)(3), they have been unanimous in holding that they must use the

"business judgment" standard as the proper standard for determining whether incentive programs

and the payments thereunder are justified. See, e.g., In re Werner Holding Co. (DE), Inc., Case

No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006); In

re Nobex Corporation, No. 05-20050 (CSS) (Bankr. D. Del. May 15, 2006 and December 21,

2005); In re Riverstone Networks, Inc., No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); In

re Pliant Corporation, No. 06-100001 (MFW) (Bankr. D. Del. March 14, 1006).

          45.     Indeed, Judge Walrath, in the Nobex case, stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any
> other transfers or obligations outside the ordinary course of business. . . . I
> read (c)(3) to be the catch-all and the standard under (c)(3) for any
> transfers or obligations made outside the ordinary course of business are
> those that are justified by the facts and circumstances of the case.... I find
> it quite frankly nothing more than a reiteration of the standard under 363. .
> . under which courts had previously authorized transfers outside the
> ordinary course of business and that [are], based on the business judgment
> of the debtor. . . .

Transcript of January 12, 2006, Hearing at 86-87, In re Nobex Corp., Case No. 05-20050 (MFW)

(Bankr. D. Del.) (an order approving the management incentive plan at issue was entered January

20, 2006). See also In re Dana Corporation, -- B.R. --, 2006 WL 3479406 at *6 (Bankr. S.D.N.Y.

2006) (Judge Lifland agreeing that management incentive programs should be evaluated under the business judgment standard).

**IV.    The Plans Have a Sound Business Purpose, and Should Be Authorized by this Court Pursuant to Sections 363(b)(1) and 503(c)(3).**

46.    The Plans satisfy the applicable standards. To begin with, the Plans are precisely calibrated to achieve the desired performance. The Plans are also fair and reasonable in scope and do not discriminate unfairly.

47.    Among other things, the Plans will reward participants for their significant efforts to date and their increased responsibilities and burdens over the next few months as a result of closing the Carrington and Greenwich transactions and the solicitation of bids for the Debtors' remaining assets. Moreover, as outlined above, the Plans are structured to maximize value for the Debtors' estates and creditors. The sales incentive bonuses are tied directly to the proceeds received by the Debtors in their asset sales. Thus, the motivations of employees eligible for sales incentives are aligned with the motivations of the Debtors. On the flip side, the success of the Debtors' asset sales hinges upon the efforts of management and other key employees. Accordingly, the Debtors believe that valid business reasons exist for the implementation of the sales incentive plans and, thus, that they should be approved.

48.    Secondly, the Debtors' ability to preserve the value of its assets would be substantially hindered if the Debtors are unable to retain the services of employees who retain institutional experience. The fact that the Debtors are in bankruptcy and preserving assets for sale makes it extremely difficult for the Debtors to attract employees at this time. Authorization to implement the Plans will provide the Debtors' employees with a greater sense of financial security thereby minimizing the need to seek other employment which would otherwise distract the employees from the necessary tasks they need to perform for the Debtors. Providing incentives to

22

encourage employees to focus on the Debtors' objectives, and to motivate them to provide optimal levels of performance, is necessary to successfully maintain the business.

49.    Third, the overall cost of the Plans is reasonable, particularly in the context of the magnitude of the sale process. Indeed, it is not too much to say that the Debtors' ability to generate any real recovery for creditors and to provide jobs for the employees in their Servicing Business and Loan Origination Platform lies in the balance, and depends upon the proper and timely execution of asset sales. Of the total payments contemplated by the Plans, only $2.8 million is for guaranteed employee retention payments. Payment of the balance is contingent on the estates' recovery in asset sales.

50.    Finally, targeted incentive and retention programs have repeatedly been recognized by this and other courts, in this district and elsewhere, as having particular value in motivating management teams. See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (approving employee incentive plan providing for cash payments as rewards for attainment of collective operational restructuring goals and personal performance goals in support); In re Global Home Products LLC, Case No. 06-10340 (Gross, J.) (Bankr. D. Del. May 30, 2006) (approving management incentive program provided that plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all of the Debtors' assets); In re Riverstone Networks, Inc., Case No. 06-10110 (Sontchi, J.) (Bankr. D. Del. Apr. 3, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Feb. 21, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals and personal performance goals in support); In re Nobex Corp., Case No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 20, 2006)

(approving "sale-related incentive pay" to officers, contingent on a successful sale of the company for a price in excess of that offered by an existing, stalking horse bidder, in connection with the debtor's pursuit of a sale of the company).

### THE PLANS MAY ADDITIONALLY BE AUTHORIZED PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE

51.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]. " 11 U.S.C. § 105(1).

52.    As stated, the Debtors strongly and reasonably believe that the Plans are critical to their ability to maximize returns to creditors. With respect to the EIP and the sales incentive component of the KEIRP, the compensation payments are essential to reward appropriately the Debtors' employees for their efforts to consummate going concern sales. In turn, maximizing the value of transactions hinges upon the Debtors' continued operations pending a going concern sale or orderly liquidation of the Debtors' assets, to maintain the morale of the Debtors' workforce, and to ensure the focus of the Debtors' employees is centered on the Chapter 11 process. Accordingly, the Debtors submit that retention payments to the KEIRP Participants of the Debtors are necessary to maximize value for their estates, their creditors, and their shareholders.

53.    The Debtors respectfully submit that the post-petition compensation described herein for their employees is an appropriate exercise of the Debtors' business judgment, is necessary and in the best interest of the Debtors, their creditors, and their estates and should be approved under sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code and allowed as administrative expenses under section 503(b) of the Bankruptcy Code.

24

## NOTICE

54.     No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the

District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. and The CIT

Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders;

(3) counsel to the Official Committee of Unsecured Creditors; and (4) all parties who have timely

filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as

amended from time to time, the "Bankruptcy Rules"). The Debtors submit that no other or further

notice is required.

55.     No previous motion for the relief sought herein has been made to this or any

other Court.

25

WHEREFORE, the Debtors respectfully request that the Court enter an Order,

substantially in the form attached hereto as Exhibit C, granting the relief requested in the Motion

and such other and further relief as may be just and proper.

Dated: April 11, 2007
      Wilmington, Delaware

Respectfully submitted,


Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzanne S. Uhland
Ben H. Logan
Victoria A. Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8500

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**EXHIBIT A**
**EIP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# EXECUTIVE INCENTIVE PLAN

**PLAN OBJECTIVE:**

The New Century Financial Corporation Executive Incentive Plan (the "**Plan**") is designed to maximize assets available for distribution to creditors by providing incentives to certain executives of New Century Financial Corporation (the "**Company**") maximize the consideration received by the Company upon the consummation of the sale of the (i) Company's servicing assets and servicing platform pursuant to that certain agreement Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the "**Servicing Assets Sale**") (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc , dated April 2, 2007, or the overbid process contemplated therein (the "**Mortgage Assets Sale**"), (iii) the Company's wholesale, retail and other asset classes (other than assets included in the Servicing Assets Sale, the Mortgage Assets Sale and RPML Sale (as defined below)) (the "**WRO Assets Sale**") and (iv) the Company's REIT portfolio and miscellaneous loans (other than assets included in the Servicing Assets Sale, the Mortgage Assets Sale and the WRO Assets Sale) (the "**RPML Sale**")

**ELIGIBLE EMPLOYEES:**

The Plan covers the employees of the Company and its subsidiaries listed on Exhibit A hereto (the "**Plan Participants**").

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the "**Debtors**"). As a condition precedent of any obligation of the Company to make any payment to a Plan Participant under the Plan, the Plan Participant shall, upon or within thirty (30) days of the date that such payment is made to the Plan Participant or such Plan Participant otherwise becomes entitled to such payment, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B. The Company shall have no obligation to make any payment under the Plan and shall not make any payment to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law

**PLAN POOLS:**

The amounts contributed (each a "**Contribution**") by the Company, if any, to finance payments under the Plan (the "**Plan Pools**") shall be based on the liquidation prices received for sales (the "**Sales**") of the Company's various assets and shall be calculated as follows:

**Servicing Assets Sale**

The Contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50 0  There will be no Servicing Asset Sale Contribution if BPS is less than 50 0  If BPS is equal to 50 0, the Servicing Assets Sale Contribution will be $1,164,405  If BPS is greater than 50 0, the Servicing Assets Sale Contribution will be increased proportionately e g  if BPS is 57 5 (115% of 50 0), the Servicing Assets Sale Contribution will be $1,339,065 (115% of $1,164,605)

**Mortgage Assets Sale**

The Contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,000,000  There will be no Mortgage Asset Sale Contribution if the

Mortgage Assets Sale Price is less than $47,000,000  If the Mortgage Asset Sale Price is equal to $47,000,000, the Mortgage Asset Sale Contribution will be $419,820  If the Mortgage Asset Sale Price is greater than $47,000,000, the Mortgage Assets Sale Contribution will be equal to $419,820 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,000,000 e g  if the Mortgage Assets Sale Price is $54,500,000, the Mortgage Assets Sale Contribution will be $569,820 ($419,820 + (($54,500,000 – $47,000,000) X 2%))

## WRO Assets Sale

The Contribution, if any, upon the consummation of the WRO Assets Sale (the "**WRO Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**WRO Assets Sale Price**") equals or exceeds the WRO Assets Sale target price set forth on <u>Exhibit C</u> (the "**Target Price**").  There will be no Mortgage Asset Sale Contribution if the WRO Assets Sale Price is less than the Target Price  If the WRO Asset Sale Price is equal to the Target Price, the WRO Asset Sale Contribution will be $1,584,225  If the WRO Asset Sale Price is greater than the Target Price, the WRO Assets Sale Contribution will be equal to $1,584,225 plus 2% of the amount by which the WRO Asset Sale Price exceeds the Target Price e g  if the Mortgage Assets Sale Price is $X, which exceeds the Target Price, the WRO Assets Sale Contribution will be calculated as follows: WRO Asset Sale Contribution = ($1,584,225 + (($X – Target Price) X 2%))

## RPML Sale

The Contribution upon the consummation of the RPML Sale to the extent that the Company manages to sell such assets (the "**RPML Sale Contribution**") will be equal to 0 5% of the liquidation price (the "**RPML Sale Price**") e g. if the RPML Sale Price is equal to $63,250,000, the RPML Sale Contribution will be $316,250 ($63,250,000 X 0 5%)

## PLAN PAYMENTS:

Plan Participants shall receive the share of the Plan Pools set forth in <u>Exhibit A</u>; provided however that a Plan Participant will not be eligible to receive a share of a Plan Pool upon the consummation of the corresponding sale if such Plan Participant is offered comparable employment by the purchaser in such sale  Awards will be paid within 50 days following the consummation of each respective Sale

## TERMINATION OF EMPLOYMENT:

Awards under the Plan are offered as discretionary incentive amounts.  If a Plan Participant voluntarily terminates employment or is involuntarily terminated for any reason before the date that any Sale described above in the Section titled "Plan Pools" is consummated, the Plan Participant will not receive any payment under the Plan for the consummation of such Sale.  Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any payment under the Plan, which could result in the Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay such payment (without any interest accruing thereon) until the matter is determined by the Audit Committee.  If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant under the Plan

For purposes of the Plan, the term "**for cause**" means, either before or after the adoption of the Plan:

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not,

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties;

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof); or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to **[Name]**

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason.

**TAXES:**
All payments will be subject to standard withholding and deductions. Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant to the Plan

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions. The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and

3

agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company   Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document

**No Assignment:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution

NB1:712641 10
RLF1-3137613-1

# Exhibit A

## New Century Financial Corporation
## Executive Incentive Plan
## Participant List

| Name | Share of Plan Pools |
|------|---------------------|

NB1:712641 10
RLF1-3137613-1

# Exhibit B

# Form Of Release Agreement

[Attached]

NB1:712641 10
RLF1-3137613-1

# Exhibit C

## Target Price

| WRO Assets Sale Target Price | = | $ |
|---|---|---|

Exhibit C

NB1:712641 10
RLF1-3137613-1

**EXHIBIT B**
**KEIRP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# KEY EMPLOYEE INCENTIVE RETENTION PLAN

**PLAN OBJECTIVE:**

The New Century Financial Corporation Key Employee Incentive Retention Plan (the "**Plan**") is designed to (a) assist New Century Financial Corporation (the "**Company**") to retain key personnel critical to the successful operation of the Company and its subsidiaries and (b) maximize assets available for distribution to creditors by providing incentives to certain personnel to maximize the consideration received by the Company upon the consummation of the sale of (i) the Company's servicing assets and servicing platform pursuant to that certain agreement Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the "**Servicing Assets Sale**"), (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company, pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc , dated April 2, 2007, or the overbid process contemplated therein (the "**Mortgage Assets Sale**") and (iii) the Company's wholesale, retail and other asset classes (other than assets included in the Servicing Assets Sale and the Mortgage Assets Sale and the Company's REIT portfolio and miscellaneous loans) (the "**WRO Assets Sale**")

**ELIGIBLE EMPLOYEES:**

The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "**Tier I Employees**"), "Tier II Employees" (the "**Tier II Employees**"), "Tier III Employees" (the "**Tier III Employees**"), "Tier IV Employees" (the "**Tier IV Employees**") and "Tier V Employees" (the "**Tier V Employees**") (collectively, the "**Plan Participants**"), each attached as part of <u>Exhibit A</u> hereto  All Plan Participants will be eligible to participate in the Retention Pool (as defined below) and the Discretionary Pool (as defined below) and receive Retention Bonuses (as defined below) and Critical Retention Bonuses (as defined below), *however*, only Tier I Employees and Tier II Employees will be eligible to participate in the Incentive Pools (as defined below) and receive Incentive Bonuses (as defined below), with the entitlement to any bonus subject to the other terms and conditions of the Plan as set forth herein.

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the "**Debtors**")  As a condition precedent of any obligation of the Company to pay any Retention Bonus or Incentive Bonus to any Plan Participant, the Plan Participant shall, upon or within thirty (30) days of the date that a Retention Bonus or Incentive Bonus is paid to the Plan Participant or such Plan Participant otherwise becomes entitled to such a bonus, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as <u>Exhibit B</u>  The Company shall have no obligation to pay and shall not pay any Retention Bonus, Incentive Bonus or Incentive Bonus to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law

**PLAN POOLS:**

**Retention Pool**

The Company will contribute $2,822,254 (the "**Retention Pool**") to finance retention bonuses (the "**Retention Bonuses**") to be paid under the Plan

**Incentive Pools**

The amounts contributed (each a "**Contribution**") by the Company, if any, to finance incentive bonuses (the "**Incentive Bonuses**") under the Plan (the "**Incentive Pools**") shall be based on the liquidation prices received for sales (the "**Sales**") of the Company's various assets and shall be calculated as follows:

**Servicing Assets Sale**

The Contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50 0   There will be no Servicing Asset Sale Contribution if BPS is less than 50 0   If BPS is equal to 50 0, the Servicing Assets Sale Contribution will be $437,349   If a BPS is greater than 50 0, the Servicing Assets Sale Contribution will be increased proportionately e g if BPS is 57 5 (115% of 50 0), the Servicing Assets Sale Contribution will be $502,951 (115% of $437,349)

**Mortgage Assets Sale**

The Contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,000,000   There will be no Mortgage Asset Sale Contribution if the Mortgage Assets Sale Price is less than $47,000,000   If the Mortgage Asset Sale Price is equal to $47,000,000, the Mortgage Asset Sale Contribution will be $157,683   If the Mortgage Asset Sale Price is greater than $47,000,000, the Mortgage Assets Sale Contribution will be equal to $157,683 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,000,000 e g  if the Mortgage Assets Sale Price is $54,500,000, the Mortgage Assets Sale Contribution will be $307,683 ($157,683 + (($54,500,000 − $47,000,000) X 2%))

**WRO Assets Sale**

The Contribution, if any, upon the consummation of the WRO Assets Sale (the "**WRO Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**WRO Assets Sale Price**") equals or exceeds the WRO Assets Sale target price set forth on <u>Exhibit C</u> (the "**Target Price**")   There will be no Mortgage Asset Sale Contribution if the WRO Assets Sale Price is less than the Target Price   If the WRO Asset Sale Price is equal to the Target Price, the WRO Asset Sale Contribution will be $595,032   If the WRO Asset Sale Price is greater than the Target Price, the WRO Asset Sale Contribution will be equal to $595,032 plus 2% of the amount by which the WRO Asset Sale Price exceeds the Target Price e g  if the Mortgage Assets Sale Price is $X, which exceeds the Target Price, the WRO Assets Sale Contribution will be calculated as follows: WRO Asset Sale Contribution = ($595,032 + (($X − Target Price) X 2%))

**Critical Retention Pool**

The Company will contribute $250,000 (the "**Critical Retention Pool**") to finance bonuses (the "**Critical Retention Bonuses**") to be paid under the Plan   The Critical Retention Pool may be distributed by the Company in its sole discretion, in addition to any Retention Bonuses or Incentive Bonuses, to recognize contributions made by the Company's employees receiving such Critical Retention Bonuses toward increasing the liquidation value of the Company's assets

**PLAN PAYMENTS:**

Plan Participants shall be eligible to receive that portion of the Retention Pool set forth opposite their name on <u>Exhibit A</u>   Retention Bonuses for Plan Participants who are Tier VI Employees (servicing employees) will be paid on June 9, 2007, and for all other Plan Participants will be paid on July 9, 2007 (the applicable date as to a particular Plan Participant is referred to as his or her "**Release Date**") to all such Plan Participants then actively employed in his or her then currently held position with the Company on a full-time basis in good standing (defined as not, either before or after the adoption of the Plan, having violated the Company's policies and procedures or otherwise engaged in conduct warranting disciplinary action, and performance and attendance at or above expected standards)   If a Plan Participant is on approved leave status during a portion of the period beginning on the Plan implementation date and ending on the Release Date applicable to such Plan Participant (the "**Retention Period**"), such Plan Participant will remain eligible to receive a Retention Bonus, but the Retention Bonus will be pro-rated for the portion(s) of the Retention Period during which he or she was employed on active, full-time status in good standing   If a Plan Participant is on leave status for the majority or the

2

entirety of the Retention Period, or such Plan Participant is not in good standing at the time of the applicable Release Date, such Plan Participant will not be eligible to receive any portion of the Retention Bonus

Additionally, Tier I Employees and Tier II Employees shall receive the share of the Incentive Pools set forth opposite their name on Exhibit A; provided however that a Plan Participant will not be eligible to receive a share of an Incentive Pool upon the consummation of the corresponding sale if such Plan Participant is offered comparable employment by the purchaser in such sale. Incentive Bonuses will be paid to Tier I Employees and Tier II Employees within 50 days following the consummation of each respective Sale

Finally, Critical Retention Bonuses will be paid, if at all, on the Release Date of the Plan Participant receiving such Critical Retention Bonus.

**TERMINATION OF EMPLOYMENT:**
Retention Bonuses under the Plan are offered as discretionary incentive amounts   If a Plan Participant voluntarily terminates employment or is involuntarily terminated "for cause" (as defined below) before such Plan Participant's Release Date, the Plan Participant will not receive any Retention Bonus under the Plan   In the event a Plan Participant's employment is terminated by the Company or one of its subsidiaries other than for cause, the Participant will be entitled to the full amount of his or her Retention Bonus (and his or her Release Date shall be deemed to be the date of such termination of employment)

Incentive Bonuses and Critical Retention Bonuses under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is terminated for any reason prior to his or her Release Date, such Plan Participant will not thereafter be entitled to any Critical Retention Bonus or then unpaid Incentive Bonuses

Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any Retention Bonus, Incentive Bonus or Critical Retention Bonus under the Plan, which could result in the Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay payment of such bonus (without any interest accruing thereon) until the matter is determined by the Audit Committee   If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments of such bonus (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant.

For purposes of the Plan, the term "**for cause**" means, either before or after the adoption of the Plan:

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not;

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties,

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company,

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof), or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to **[Name]**

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason.

**TAXES:**
All payments will be subject to standard withholding and deductions   Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant to the Plan.

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions. The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**")   The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company. Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document.

**No Assignment:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution

# Exhibit A

## New Century Financial Corporation
## Executive Incentive Plan
## Participant List

| TIER I EMPLOYEES | | |
|---|---|---|
| NAME | RETENTION BONUS | PERCENTAGE SHARE OF INCENTIVE POOLS |
|  |  |  |
|  |  |  |

| TIER II EMPLOYEES | | |
|---|---|---|
| NAME | RETENTION BONUS | PERCENTAGE SHARE OF INCENTIVE POOLS |
|  |  |  |
|  |  |  |

| TIER III EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
|  |  |
|  |  |

| TIER IV EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
|  |  |
|  |  |

| TIER V EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
|  |  |
|  |  |

Exhibit A

# Exhibit B

# Form Of Release Agreement

[Attached]

Exhibit B

# Exhibit C

## Target Price

| WRO Assets Sale Target Price | = | $ |
|---|---|---|

Exhibit C

NB1:712649 13
RLF1-3137611-1

**EXHIBIT C**
**PROPOSED FORM OF ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

ORDER AUTHORIZING PAYMENT OF (i) SALE-RELATED INCENTIVE PAY
TO SENIOR MANAGEMENT AND (ii) RETENTION AND INCENTIVE PAY TO
CERTAIN EMPLOYEES PURSUANT TO
SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

Upon the motion (the Motion) of the Debtors for an order, under Bankruptcy Code

sections 363(b), 503(c)(3) and 105 authorizing payment of (i) sale-related incentive pay to senior

management and (ii) retention and incentive pay to certain employees, as more fully set forth in the

Motion; and due and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the relief requested by the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient

cause appearing therefore;

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The Plans are designed to appropriately compensate the Plan Participants to ensure that they remain motivated to perform the requisite tasks to effectuate the asset sales of the Debtors' businesses, given the enormous additional burdens placed upon the participants.

B.      The full experience, expertise, unique skills, and enthusiastic involvement of the Plan Participants are critical to the Debtors' ability to maximize value for their estates pursuant to asset sales.

C.      The post-petition efforts of the Plan Participants extend beyond their ordinary course responsibilities and are critical to the Debtors' efforts to maximize value for their estates pursuant to asset sales.

D.      The Plan Participants are the personnel of the Debtors with the necessary skill and experience to implement the sale process proposed by the Debtors, successfully respond to or negotiate with potential purchasers and ensure that the transactions for which the Debtors seek approval of this Court produce the best results and maximum value for the Debtors and their estates.

E.      The Debtors have demonstrated a compelling and sound business justification for authorizing the Plans, and approving the payments to the Plan Participants thereunder, and the terms of such plans are fair and reasonable under the circumstances, and provide a substantial benefit to the estates.

F.      The EIP is a performance-based plan that is not subject to the limitations on retention and severance plans set forth in Bankruptcy Code sections 503(c)(1) and (2).

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is hereby GRANTED.

2.      The Plans are hereby APPROVED.

3.      The Debtors are authorized, but not directed, to make payments to the Plan

Participants in accordance with the applicable guidelines for the EIP and KEIRP set forth on

Exhibit A and Exhibit B, respectively.

4.      The Debtors are further authorized, but not directed, to make payments to

KEIRP Participants and/or non-Plan Participant employees from the Critical Retention Pool in the

maximum aggregate amount of $250,000.

5.      All payments authorized hereunder shall be allowed administrative expenses

of the Debtors' estates under Bankruptcy Code section 503(b).

6.      This Court shall retain jurisdiction over all matters set forth in the Motion,

including the entitlement of any party to any payment pursuant to the Plans.

SO ORDERED,
this ___ day of April, 2007

                                         _____
                                         THE HONORABLE KEVIN J. CAREY
                                         UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**
**EIP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# EXECUTIVE INCENTIVE PLAN

**PLAN OBJECTIVE:**

The New Century Financial Corporation Executive Incentive Plan (the "**Plan**") is designed to maximize assets available for distribution to creditors by providing incentives to certain executives of New Century Financial Corporation (the "**Company**") maximize the consideration received by the Company upon the consummation of the sale of the (i) Company's servicing assets and servicing platform pursuant to that certain agreement Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the "**Servicing Assets Sale**") (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc , dated April 2, 2007, or the overbid process contemplated therein (the "**Mortgage Assets Sale**"), (iii) the Company's wholesale, retail and other asset classes (other than assets included in the Servicing Assets Sale, the Mortgage Assets Sale and RPML Sale (as defined below)) (the "**WRO Assets Sale**") and (iv) the Company's REIT portfolio and miscellaneous loans (other than assets included in the Servicing Assets Sale, the Mortgage Assets Sale and the WRO Assets Sale) (the "**RPML Sale**")

**ELIGIBLE EMPLOYEES:**

The Plan covers the employees of the Company and its subsidiaries listed on Exhibit A hereto (the "**Plan Participants**")

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the "**Debtors**")  As a condition precedent of any obligation of the Company to make any payment to a Plan Participant under the Plan, the Plan Participant shall, upon or within thirty (30) days of the date that such payment is made to the Plan Participant or such Plan Participant otherwise becomes entitled to such payment, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B  The Company shall have no obligation to make any payment under the Plan and shall not make any payment to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law.

**PLAN POOLS:**

The amounts contributed (each a "**Contribution**") by the Company, if any, to finance payments under the Plan (the "**Plan Pools**") shall be based on the liquidation prices received for sales (the "**Sales**") of the Company's various assets and shall be calculated as follows:

## Servicing Assets Sale

The Contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50.0.  There will be no Servicing Asset Sale Contribution if BPS is less than 50.0.  If BPS is equal to 50.0, the Servicing Assets Sale Contribution will be $1,164,405.  If BPS is greater than 50 0, the Servicing Assets Sale Contribution will be increased proportionately e.g. if BPS is 57 5 (115% of 50 0), the Servicing Assets Sale Contribution will be $1,339,065 (115% of $1,164,605).

## Mortgage Assets Sale

The Contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,000,000  There will be no Mortgage Asset Sale Contribution if the

Mortgage Assets Sale Price is less than $47,000,000. If the Mortgage Asset Sale Price is equal to $47,000,000, the Mortgage Asset Sale Contribution will be $419,820. If the Mortgage Asset Sale Price is greater than $47,000,000, the Mortgage Assets Sale Contribution will be equal to $419,820 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,000,000 e.g. if the Mortgage Assets Sale Price is $54,500,000, the Mortgage Assets Sale Contribution will be $569,820 ($419,820 + (($54,500,000 – $47,000,000) X 2%)).

### WRO Assets Sale

The Contribution, if any, upon the consummation of the WRO Assets Sale (the "**WRO Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**WRO Assets Sale Price**") equals or exceeds the WRO Assets Sale target price set forth on Exhibit C (the "**Target Price**"). There will be no Mortgage Asset Sale Contribution if the WRO Assets Sale Price is less than the Target Price. If the WRO Asset Sale Price is equal to the Target Price, the WRO Assets Sale Contribution will be $1,584,225. If the WRO Asset Sale Price is greater than the Target Price, the WRO Assets Sale Contribution will be equal to $1,584,225 plus 2% of the amount by which the WRO Asset Sale Price exceeds the Target Price e.g. if the Mortgage Assets Sale Price is $X, which exceeds the Target Price, the WRO Assets Sale Contribution will be calculated as follows: WRO Asset Sale Contribution = ($1,584,225 + (($X – Target Price) X 2%)).

### RPML Sale

The Contribution upon the consummation of the RPML Sale to the extent that the Company manages to sell such assets (the "**RPML Sale Contribution**") will be equal to 0.5% of the liquidation price (the "**RPML Sale Price**") e.g. if the RPML Sale Price is equal to $63,250,000, the RPML Sale Contribution will be $316,250 ($63,250,000 X 0.5%).

### PLAN PAYMENTS:

Plan Participants shall receive the share of the Plan Pools set forth in Exhibit A; provided however that a Plan Participant will not be eligible to receive a share of a Plan Pool upon the consummation of the corresponding sale if such Plan Participant is offered comparable employment by the purchaser in such sale. Awards will be paid within 50 days following the consummation of each respective Sale.

### TERMINATION OF EMPLOYMENT:

Awards under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is involuntarily terminated for any reason before the date that any Sale described above in the Section titled "Plan Pools" is consummated, the Plan Participant will not receive any payment under the Plan for the consummation of such Sale. Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any payment under the Plan, which could result in the Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay such payment (without any interest accruing thereon) until the matter is determined by the Audit Committee. If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant under the Plan.

For purposes of the Plan, the term "**for cause**" means, either before or after the adoption of the Plan:

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not;

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties;

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof); or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business.

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to [**Name**].

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason.

**TAXES:**
All payments will be subject to standard withholding and deductions. Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant to the Plan.

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions. The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and

agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company. Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document.

**No Assignment:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution.

# Exhibit A

## New Century Financial Corporation
## Executive Incentive Plan
## Participant List

**Name**

**Share of
Plan Pools**

NB1:712641 10
RLF1-3137613-1

# Exhibit B

# Form Of Release Agreement

[Attached]

NB1:712641 10
RLF1-3137613-1

# Exhibit C

## Target Price

| WRO Assets Sale Target Price | = | $ |
|---|---|---|

Exhibit C

NB1:712641 10
RLF1-3137613-1

**EXHIBIT B**
**KEIRP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# KEY EMPLOYEE INCENTIVE RETENTION PLAN

**PLAN OBJECTIVE:**

The New Century Financial Corporation Key Employee Incentive Retention Plan (the "**Plan**") is designed to (a) assist New Century Financial Corporation (the "**Company**") to retain key personnel critical to the successful operation of the Company and its subsidiaries and (b) maximize assets available for distribution to creditors by providing incentives to certain personnel to maximize the consideration received by the Company upon the consummation of the sale of (i) the Company's servicing assets and servicing platform pursuant to that certain agreement Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the "**Servicing Assets Sale**"), (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company, pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc., dated April 2, 2007, or the overbid process contemplated therein (the "**Mortgage Assets Sale**") and (iii) the Company's wholesale, retail and other asset classes (other than assets included in the Servicing Assets Sale and the Mortgage Assets Sale and the Company's REIT portfolio and miscellaneous loans) (the "**WRO Assets Sale**")

**ELIGIBLE EMPLOYEES:**

The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "**Tier I Employees**"), "Tier II Employees" (the "**Tier II Employees**"), "Tier III Employees" (the "**Tier III Employees**"), "Tier IV Employees" (the "**Tier IV Employees**") and "Tier V Employees" (the "**Tier V Employees**") (collectively, the "**Plan Participants**"), each attached as part of Exhibit A hereto. All Plan Participants will be eligible to participate in the Retention Pool (as defined below) and the Discretionary Pool (as defined below) and receive Retention Bonuses (as defined below) and Critical Retention Bonuses (as defined below), *however*, only Tier I Employees and Tier II Employees will be eligible to participate in the Incentive Pools (as defined below) and receive Incentive Bonuses (as defined below), with the entitlement to any bonus subject to the other terms and conditions of the Plan as set forth herein.

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the "**Debtors**"). As a condition precedent of any obligation of the Company to pay any Retention Bonus or Incentive Bonus to any Plan Participant, the Plan Participant shall, upon or within thirty (30) days of the date that a Retention Bonus or Incentive Bonus is paid to the Plan Participant or such Plan Participant otherwise becomes entitled to such a bonus, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B. The Company shall have no obligation to pay and shall not pay any Retention Bonus, Incentive Bonus or Incentive Bonus to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law.

**PLAN POOLS:**

**Retention Pool**

The Company will contribute $2,822,254 (the "**Retention Pool**") to finance retention bonuses (the "**Retention Bonuses**") to be paid under the Plan.

**Incentive Pools**

The amounts contributed (each a "**Contribution**") by the Company, if any, to finance incentive bonuses (the "**Incentive Bonuses**") under the Plan (the "**Incentive Pools**") shall be based on the liquidation prices received for sales (the "**Sales**") of the Company's various assets and shall be calculated as follows:

Servicing Assets Sale

The Contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50.0. There will be no Servicing Asset Sale Contribution if BPS is less than 50.0. If BPS is equal to 50.0, the Servicing Asset Sale Contribution will be $437,349. If a BPS is greater than 50.0, the Servicing Asset Sale Contribution will be increased proportionately e.g. if BPS is 57.5 (115% of 50.0), the Servicing Assets Sale Contribution will be $502,951 (115% of $437,349).

Mortgage Assets Sale

The Contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,000,000. There will be no Mortgage Asset Sale Contribution if the Mortgage Assets Sale Price is less than $47,000,000. If the Mortgage Asset Sale Price is equal to $47,000,000, the Mortgage Asset Sale Contribution will be $157,683. If the Mortgage Asset Sale Price is greater than $47,000,000, the Mortgage Assets Sale Contribution will be equal to $157,683 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,000,000 e.g. if the Mortgage Assets Sale Price is $54,500,000, the Mortgage Assets Sale Contribution will be $307,683 ($157,683 + (($54,500,000 – $47,000,000) X 2%)).

WRO Assets Sale

The Contribution, if any, upon the consummation of the WRO Assets Sale (the "**WRO Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**WRO Assets Sale Price**") equals or exceeds the WRO Assets Sale target price set forth on Exhibit C (the "**Target Price**"). There will be no Mortgage Asset Sale Contribution if the WRO Assets Sale Price is less than the Target Price. If the WRO Asset Sale Price is equal to the Target Price, the WRO Asset Sale Contribution will be $595,032. If the WRO Asset Sale Price is greater than the Target Price, the WRO Asset Sale Contribution will be equal to $595,032 plus 2% of the amount by which the WRO Asset Sale Price exceeds the Target Price e.g. if the Mortgage Assets Sale Price is $X, which exceeds the Target Price, the WRO Assets Sale Contribution will be calculated as follows: WRO Asset Sale Contribution = ($595,032 + (($X – Target Price) X 2%)).

**Critical Retention Pool**

The Company will contribute $250,000 (the "**Critical Retention Pool**") to finance bonuses (the "**Critical Retention Bonuses**") to be paid under the Plan. The Critical Retention Pool may be distributed by the Company in its sole discretion, in addition to any Retention Bonuses or Incentive Bonuses, to recognize contributions made by the Company's employees receiving such Critical Retention Bonuses toward increasing the liquidation value of the Company's assets.

**PLAN PAYMENTS:**

Plan Participants shall be eligible to receive that portion of the Retention Pool set forth opposite their name on Exhibit A. Retention Bonuses for Plan Participants who are Tier VI Employees (servicing employees) will be paid on June 9, 2007, and for all other Plan Participants will be paid on July 9, 2007 (the applicable date as to a particular Plan Participant is referred to as his or her "**Release Date**") to all such Plan Participants then actively employed in his or her then currently held position with the Company on a full-time basis in good standing (defined as not, either before or after the adoption of the Plan, having violated the Company's policies and procedures or otherwise engaged in conduct warranting disciplinary action, and performance and attendance at or above expected standards). If a Plan Participant is on approved leave status during a portion of the period beginning on the Plan implementation date and ending on the Release Date applicable to such Plan Participant (the "**Retention Period**"), such Plan Participant will remain eligible to receive a Retention Bonus, but the Retention Bonus will be pro-rated for the portion(s) of the Retention Period during which he or she was employed on active, full-time status in good standing. If a Plan Participant is on leave status for the majority or the

entirety of the Retention Period, or such Plan Participant is not in good standing at the time of the applicable Release Date, such Plan Participant will not be eligible to receive any portion of the Retention Bonus.

Additionally, Tier I Employees and Tier II Employees shall receive the share of the Incentive Pools set forth opposite their name on Exhibit A; provided however that a Plan Participant will not be eligible to receive a share of an Incentive Pool upon the consummation of the corresponding sale if such Plan Participant is offered comparable employment by the purchaser in such sale. Incentive Bonuses will be paid to Tier I Employees and Tier II Employees within 50 days following the consummation of each respective Sale.

Finally, Critical Retention Bonuses will be paid, if at all, on the Release Date of the Plan Participant receiving such Critical Retention Bonus.

**TERMINATION OF EMPLOYMENT:**
Retention Bonuses under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is involuntarily terminated "for cause" (as defined below) before such Plan Participant's Release Date, the Plan Participant will not receive any Retention Bonus under the Plan. In the event a Plan Participant's employment is terminated by the Company or one of its subsidiaries other than for cause, the Participant will be entitled to the full amount of his or her Retention Bonus (and his or her Release Date shall be deemed to be the date of such termination of employment).

Incentive Bonuses and Critical Retention Bonuses under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is terminated for any reason prior to his or her Release Date, such Plan Participant will not thereafter be entitled to any Critical Retention Bonus or then unpaid Incentive Bonuses.

Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any Retention Bonus, Incentive Bonus or Critical Retention Bonus under the Plan, which could result in the Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay payment of such bonus (without any interest accruing thereon) until the matter is determined by the Audit Committee. If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments of such bonus (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant.

For purposes of the Plan, the term "**for cause**" means, either before or after the adoption of the Plan:

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not;

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties;

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof); or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business.

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to [**Name**].

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason.

**TAXES:**
All payments will be subject to standard withholding and deductions. Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant to the Plan.

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions. The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company. Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document.

**No Assignment:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution.

# Exhibit A

## New Century Financial Corporation
## Executive Incentive Plan
## Participant List

| TIER I EMPLOYEES | | |
|---|---|---|
| NAME | RETENTION BONUS | PERCENTAGE SHARE OF INCENTIVE POOLS |
| | | |
| | | |

| TIER II EMPLOYEES | | |
|---|---|---|
| NAME | RETENTION BONUS | PERCENTAGE SHARE OF INCENTIVE POOLS |
| | | |
| | | |

| TIER III EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
| | |
| | |

| TIER IV EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
| | |
| | |

| TIER V EMPLOYEES | |
|---|---|
| NAME | RETENTION BONUS |
| | |
| | |

Exhibit A

# Exhibit B

# Form Of Release Agreement

[Attached]

NB1:712649 13
RLF1-3137611-1

# Exhibit C

## Target Price

| WRO Assets Sale Target Price | = | $ |
|---|---|---|

Exhibit C

NB1:712649 13
RLF1-3137611-1