**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| | : | |
| **NEW CENTURY TRS HOLDINGS, INC.**, a Delaware corporation, <u>et al.</u>,[1] | : | Case No. 07-10416 (KJC) |
| | : | |
| | : | Re: Docket No. 70 |
| **Debtors.** | : | |
| | : | Objection Deadline: April 11, 2007 at 4:00 p.m. |
| | : | Hearing Date: August 12, 2007 at 3:00 p.m. |

**OBJECTION OF WELLS FARGO BANK N.A. TO EMERGENCY
MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN
ORDER (A) APPROVING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE PROPOSED SALE OF
THEIR ASSETS USED IN LOAN SERVICING BUSINESS, (B)
SCHEDULING HEARING TO CONSIDER PROPOSED SALE OF
CERTAIN ASSETS AND APPROVING FORM AND MANNER OF
NOTICE THEREOF AND (C) GRANTING RELATED RELIEF AND (II)
AN ORDER (A) APPROVING THE PROPOSED SALE AND (B)
<u>GRANTING RELATED RELIEF</u>**

Wells Fargo Bank N.A. ("*Wells Fargo*"), as trustee, paying agent, registrar, and transfer agent in connection with (i) Carrington Mortgage Loan Trust, Series 2006-NC1 Asset-Backed Pass-Through Certificates; (ii) Carrington Mortgage Loan Trust, Series 2006-NC2 Asset-Backed Pass-Through Certificates; (iii) Carrington Mortgage Loan Trust, Series 2006-NC3 Asset-Backed Pass-Through Certificates; (iv) Carrington Mortgage Loan Trust, Series 2006-NC4

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Asset-Backed Pass-Through Certificates; and (v) Carrington Mortgage Loan Trust, Series 2006-NC5 Asset-Backed Pass-Through Certificates (collectively, the "*Wells Securitization Trusts*"), by counsel, submits the following as its objection (the "*Objection*") to the bidding procedures and overbid protections proposed by New Century TRS Holdings, Inc., and its affiliated debtors and debtors in possession (collectively, the "*Debtors*") in the Emergency Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Proposed Sale of Their Assets Used in Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and (II) an Order (A) Approving the Proposed Sale and (B) Granting Related Relief (Docket No. 70) (the "*Motion*"):

**Preliminary Statement**

1.     The initial bidder should not be approved as the stalking horse bidder for the Debtors mortgage loan servicing business (the "*Servicing Business*") because it is not a qualified mortgage loan servicer under those certain Pooling and Servicing Agreements, listed on the attached Exhibit A (collectively, the "*Pooling and Servicing Agreements*"), governing the Wells Securitization Trusts.  Specifically, the initial bidder is not qualified as a servicer by the Federal National Mortgage Association ("*Fannie Mae*") or the Federal Home Loan Mortgage Corporation ("*Freddie Mac*"), as is required by the Pooling and Servicing Agreements.  As a result, the initial bidder cannot provide adequate assurance of future performance under those contracts as required by 11 U.S.C. § 365.  Further, the initial bidder's offer is materially deficient because it does not propose cure amounts to cure the outstanding breaches, including potential repurchase obligations, under the Pooling and Servicing Agreements.  In addition, the proposed bidding procedures should be substantially revised to address the excessive overbid amounts, the excessive proposed break-up fee and the problems arising from the opaque nature of the initial

bidder's offer. Moreover, the deadlines in the proposed bidding procedures should be extended for at least 20 day to permit Wells Fargo and the Official Committee of Unsecured Creditors (the "*Committee*") to investigate, among other things, the extensive relationship between the initial bidder and the Debtors.

2.      Wells Fargo requests that this Court only approve procedures with modifications designed to encourage transparent, competitive bidding and to protect unsecured creditors' rights:

- The Initial Bidder Is Not An Appropriate Purchaser. The initial bidder does not meet the servicer eligibility requirements required by the Pooling and Servicing Agreements for the Wells Securitization Trusts because the initial bidder is not approved as a mortgage loan servicing loan institution by Fannie Mae or Freddie Mac or demonstrated to be an acceptable servicer to the rating agencies rating the securities issued by such trusts. As a result, Wells Fargo cannot be assured that the initial bidder cannot provide the quality of service required by these agreements. Consequently, the initial bidder cannot provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code. Because the initial bidder cannot meet the adequate assurance of future performance requirements of section 365, the initial bidder cannot purchase the assets and should not be approved as the stalking horse.

- The Initial Bidder's Offer Is Deficient. The initial bidder's offer is deficient because it does not propose cure amounts to satisfy outstanding obligations, including possible repurchase obligations, under the Pooling and Servicing Agreements for the Wells Securitization Trusts.

- High Overbids. The proposed 110% initial overbid and $500,000 incremental overbid amounts are excessive. Wells Fargo requests that the initial overbid be reduced to (i) the initial bidder's purchase price, plus (ii) the approved amount of the break-up fee, plus (iii) $200,000, and that the incremental overbid amount be reduced to $200,000.

- High Break-Up/Expense Reimbursement Fees. The proposed 3% break-up fee plus an expense reimbursement of up to $1,500,000 together represent nearly 4.08% of the proposed total purchase price. Relative to the proposed purchase price, these levels are excessive and should be reduced. Wells Fargo proposes a 2% break-up fee plus and an expense reimbursement of up to $500,000.

- Credit Bidding The Entire Break-Up Fee. The initial bidder should be authorized only to credit bid the break-up fee approved by this Court. Further, Wells Fargo requests that the initial bidder not be permitted to credit bid the expense reimbursement portion of the break-up fee because this amount will not be known at the auction.

- Inadequate Due Diligence Information. The proposed procedures provide potential purchasers other than the initial bidder only with access to a data room and potential meetings with certain management. Wells Fargo requests that qualified bidders be provided with the same access to information as the initial bidder, including information material to the bidding process that is available to it through its affiliation with the Debtors.

- Inability to Quantify Actual Value of Initial Bidder's Offer. To ensure that potential bidders have sufficient notice of the value their competing bids must provide to the Debtors' estates, and in order to protect the interests of unsecured creditors by creating an open sales process, the true value of the proposed purchase price offered by the initial bidder must be quantified. Wells Fargo requests that a full asset purchase agreement, together with all schedules and attachments thereto, be made available to any potential bidder.

- Additional Time for Wells Fargo and Committee to Investigate. The deadlines in the bidding procedures should be extended for at least 20 days to give the Committee time to investigate, among other things, the relationship between the Debtors and the initial bidder and the value of the initial bidder's offer.

**General Background**

3. On April 2, 2007 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "*Bankruptcy Code*").

4. On April 4, 2007, the Debtors filed the Motion. In the Motion the Debtors request approval of bidding procedures and overbid protections, including an expedited sale process. The Motion identifies the initial bidder for the loan servicing assets (the "*Assets*") as Carrington

4

Mortgage Services, LLC (the "*Initial Bidder*"), an affiliate of the Debtors.[2]  Attached as Exhibit A to the Motion is the Asset Purchase Agreement (the "*APA*") between certain of the Debtors, and the Initial Bidder and Carrington.

5. On April 9, 2007, the Office of the United States Trustee appointed the members of the Committee. The Committee selected its proposed counsel and advisors on the same date.

6. Wells Fargo is trustee, *inter alia*, for the Wells Securitization Trusts that are serviced by the Debtors and has a contractual obligation to securityholders of the securities issued by the Wells Securitization Trusts to ensure that only qualified servicers service the Wells Securitization Trusts and to enforce breaches, including potential repurchase obligations, under the Pooling and Servicing Agreements.

## Securitization Generally

7. "Securitization" is a process in which income-producing assets such as mortgage loans or accounts receivable are pooled, then sold to a trust or other "bankruptcy remote" special purpose entity that issues non-recourse securities collateralized or otherwise "backed" by the pool of income-producing assets. Payments on the securities are made with income collected on the assets, and the purchase price for the assets is funded with the proceeds from the issuance of such securities.

8. Frequently, the originator/seller in a securitization retains the right to service the income-producing assets following their sale. Because the originator/seller sells the pool of income-producing assets in a transaction that constitutes a "true sale," however, the originator/seller does not retain an equitable ownership interest in such assets. Accordingly,

---

[2] The Initial Bidder is affiliated with the Debtors through the Debtors' 36.75% membership interest in Carrington Capital Management, LLC ("*Carrington*"), which is an affiliate, if not the majority owner, of the Initial Bidder. *See* Motion, ¶¶ 23-26.

upon a bankruptcy of the originator/seller, only the originator/seller's retained servicing rights constitute property of the debtor's bankruptcy estate under § 541(a)(1) of the Bankruptcy Code; the equitable ownership interest in the income-producing assets itself is excluded from the bankruptcy estate under § 541(d) of the Bankruptcy Code.

9. Securitization thus isolates the creditworthiness of the income-producing assets from the bankruptcy risk of the originator/seller, enabling nationally recognized statistical credit rating agencies such as Standard & Poor's Ratings Group and Moody's Investor Services, Inc. to assign credit ratings to the securities backed by the income-producing assets based exclusively on the credit quality of the assets themselves without reference to the originator/seller's credit rating. This promotes access to the capital markets at a lower cost of funds.

### The Wells Securitization Trusts

10. Pursuant to the Pooling and Servicing Agreements, the Debtors securitized five separate pools of subprime residential mortgage loans (each, a "*Mortgage Loan*"; collectively, the "*Mortgage Loans*") for which Wells Fargo serves as the trustee, paying agent, registrar, and transfer. The Debtors either originated or purchased each of the Mortgage Loans prior to securitization.

11. The Debtors effected these securitizations by selling the respective Mortgage Loans to certain entities affiliated with Carrington, which then sold such Mortgage Loans to Wells Fargo in its capacity as trustee under the Pooling and Servicing Agreements. Pursuant to each of the Pooling and Servicing Agreements, a series of mortgage-backed securities (collectively, the "*Securities*") were issued by the related Wells Securitization Trusts to various purchasers (the "*Securityholders*"). The payments due on each series of Securities are funded, directly or indirectly, by payments of principal and interest by obligors on the Mortgage Loans.

12. The Pooling and Servicing Agreements provide that the one of the Debtors, New Century Mortgage Corporation ("*NC Mortgage*"), retains the right to service the Mortgage Loans. Servicing includes collecting payments from obligors on the Mortgage Loans, remitting payments to Wells Fargo, in its capacity as trustee, providing delinquency and other informational reports, dealing with delinquent obligors on the Mortgage Loans and when necessary, foreclosing and otherwise enforcing the Mortgage Loans on behalf of the Wells Securitization Trusts for the benefit of the Securityholders. As compensation for servicing, NC Mortgage is entitled to fees calculated as a percentage of the outstanding balance of the Mortgage Loans and to other ancillary income such as late payment charges and assumption fees.

13. In its capacity as the trustee, paying agent, registrar, and transfer agent of the Wells Securitization Trusts, Wells Fargo has contractual duties to act on behalf and in the best interest of the Securityholders. The performance of the servicer of the Wells Securitization Trusts directly impacts the performance of the Wells Securitization Trusts. More particularly, a decrease in the quality of servicing on the Mortgage Loans will reduce the value of Securities. Additionally, Wells Fargo serves as indenture trustee under certain "net interest margin" or "NIM" transactions whereby certain of the Securities from the Wells Securitization Trusts are themselves securitized to immediately release at an agreed discount the economic value of such Securities (collectively, the "*NIM Transactions*"). The economic performance of the NIM Transactions is linked directly to the value of the Securities, and thus, the performance of the servicer of the Wells Securitization Trusts. Thus, the Securityholders, to whom Wells Fargo owes a contractual duties, will be harmed by a decrease in the quality of the servicing.

14. NC Mortgage's servicing rights to the Wells Securitization Trusts are among the Assets the Debtors are attempting to sell through the Motion. Accordingly, by the Motion the Debtors seek authority to sell their respective servicing rights under, *inter alia*, the Pooling and Servicing Agreements free and clear of all liens and other encumbrances. By the Motion, the Debtors also seek authority to assume its obligations and to assign all of its servicing rights under the Pooling and Servicing Agreements to the purchaser of the Assets pursuant to section 365 of the Bankruptcy Code.

## Argument

15. The Initial Bidder should not be approved as the stalking horse bidder because it is not an approved Fannie Mae or Freddie Mac servicer, a requirement of the Pooling and Servicing Agreements. Thus, the Initial Bidder cannot provide the adequate assurance of future performance under the Pooling and Servicing Agreements required by Bankruptcy Code section 365. Moreover, the Initial Bidder's offer is deficient because it does not propose cure amounts to satisfy outstanding breaches under the Pooling and Servicing Agreements, including potential repurchase obligations. Although the removal of the Initial Bidder as the stalking horse bidder will cure many of the problems with the proposed bidding procedures, including problems with the overbid amounts, the proposed break-up fee and problems arising from the uncertain nature of the Initial Bidder's offer, this Objection addresses certain of these, and other, problems with the bidding procedures proposed in the Motion.

### A.    The Initial Bidder Is Not an Appropriate Purchaser

16. The Initial Bidder should not be approved as the stalking horse bidder on the Assets because the Initial Bidder cannot provide the adequate assurance of future performance required by Bankruptcy Code section 365. The Pooling and Servicing Agreements, and likely similar Pooling and Servicing Agreements included among the Assets, contain eligibility

8

requirements for entities that service the loans in the Wells Securitization Trusts. The Initial Bidder does not meet these eligibility requirements because the Initial Bidder is not approved as a mortgage loan servicing institution by Fannie Mae or Freddie Mac. In fact, prior to the Petition Date NC Mortgage itself ceased to be a mortgage loan servicing institution approved by Fannie Mae or Freddie Mac. In addition, it is not known whether the Initial Bidder would be acceptable to the rating agencies rating the Securities, whose consent is necessary to transfer servicing under the Pooling and Servicing Agreements.

17. Because the Initial Bidder is not approved as a mortgage loan servicing institution by Fannie Mae or Freddie Mac, the Initial Bidder cannot provide the quality of servicing required under the Pooling and Servicing Agreements. Without being able to provide this quality of servicing, the Initial Bidder cannot provide adequate assurance of future performance under the Pooling and Servicing Agreements as required by Bankruptcy Code section 365. This is important to the Securityholders because the decrease in the quality of servicing that would result from the Initial Bidder acquiring the Assets would decrease the value of the Securities.

18. As a result of its inability to provide the necessary adequate assurance of future performance, the Initial Bidder cannot purchase the Assets and should not be approved as the stalking horse bidder. Accordingly, all of the bid protections to be given to the Initial Bidder should be removed from the bidding procedures. In addition, to ensure that the eventual purchase provides the necessary adequate assurance of future performance, the bidding procedures should be modified so that only mortgage loan servicing institutions approved by Fannie Mae or Freddie Mac and acceptable to rating agencies rating the Securities may be deemed qualified bidders.

### B. The Initial Bidder's Offer Is Deficient

19. The Initial Bidder's offer is deficient because it does not provide cure amounts for the breaches, including potential repurchase obligations, under the Pooling and Servicing Agreements. All defaults under the Pooling and Servicing Agreements, including any repurchase obligations, must be cured for the Debtors to assume and assign the Pooling and Servicing Agreements. *See* 11 U.S.C. § 365. Thus, Wells Fargo requests that the proposed bidding procedures be modified to require any qualified bid to provide proposed cure amounts to satisfy all outstanding defaults and confirm that all outstanding obligations will be assumed under the Pooling and Servicing Agreements.

### C. The Required Overbids Are Excessive and Artificial

20. The proposed bidding procedures set an unreasonably high minimum for the initial overbid, in the amount of the 110% of the purchase price set forth in the APA (the "*Minimum Bid Amount*"). *See* Motion, ¶ 38. Further, the incremental overbid of $500,000 also is too high. *See id*.

21. Excessive overbid requirements should be discouraged because they chill the bidding process. Specifically, overbid increments should be "carefully scrutinized in §363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992). Further, one court has denied a request to impose $100,000 incremental overbids, which the court believed would "serve to hamper, rather than enhance, any prospects for a higher bid." *In re Twenver, Inc.*, 149 B.R. 954, 956-57 (Bankr. D. Col. 1992).

22. The proposed 110% Minimum Bid Amount and the $500,000 incremental overbid amount are excessive and would serve to chill bidding. Thus, these proposed amounts unduly burden the Debtors' estates and fail to protect the interests of the Debtors' creditors because

these amounts make it less likely that potential purchasers will submit qualifying bids and that a spirited auction will ensue.

23. In fact, the Debtors' other currently proposed sale has a much smaller proposed initial overbid and incremental bid amount. Specifically, on the Petition Date the Debtors filed an emergency motion to establish procedures and sell certain mortgage pool assets to Greenwich Capital Financial Products, Inc., or a higher bidder (the "*GCFP Sale Motion*"). The GCFP Sale Motion only requests an initial overbid amount of (i) the proposed purchase price, plus (ii) the break-up fee, plus (iii) $500,000. GCFP Motion, ¶ 23. This is far less than the 110% Minimum Bid Amount requested in the Motion. Similarly, in the GCFP Sale Motion the Debtors only request an incremental overbid of $100,000, which is far less than the $500,000 incremental overbid requested in the Motion. The difference in the purchase prices of the two proposed sales does not justify the substantial increase in the initial and incremental overbid amounts from the GCFP transaction to the sale of the Assets. Instead, the GCFP Sale Motion demonstrates that the overbid amounts proposed in the Motion are excessive and inappropriate.

24. Moreover, the Debtors have not identified why they believe the 110% Minimum Bid Amount is appropriate. To the extent the Debtors intend to support the 110% Minimum Bid Amount with the argument that a sale to the Initial Bidder will increase the value of their 36.75% interest in Carrington, the Debtors need to provide creditors with evidence quantifying such additional value rather than just the bare assertions contained in the Motion. Ultimately, the sale of the Assets to the Initial Bidder only will enhance the Debtors' equity stake in Carrington if the market values such purchase as a bargain, which may explain in part why the Debtors seek such extreme bid protections for the Initial Bidder through the Motion.

25. Wells Fargo proposes that the Minimum Bid Amount should be reduced to (i) the purchase price identified in the APA, plus (ii) the amount of the break-up fee approved by this Court, plus (iii) $200,000. Wells Fargo also proposes that the $500,000 incremental overbid amount should be reduced to $200,000. These reductions will encourage bidding and maximize the value the Debtors' estates receive for the Assets.

### D.  The Break-Up Fee Is Excessive and Is Not Entitled to Superpriority Status

26. Wells Fargo objects to the proposed 3% break-up fee plus a $1,500,000 expense reimbursement (collectively the "*Break-Up Fee*") as unreasonably high. *See e.g.*, Motion ¶ 38; APA §9.2. "Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interest." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004).

27. Although the Motion advertises that Initial Bidder's proposed purchase price is $139 million, the actual consideration paid may be substantially less. Ten percent (10%) of the purchase price will be held back under the APA and will be paid to the Initial Bidder if the Initial Bidder is entitled to indemnification from the Debtors. The Motion and APA provide little, if any, guidance about the likelihood of such indemnification claims or whether the 10% holdback will ever be paid to the Debtors. Accordingly, it is not clear whether the holdback amount should be used to calculate the true value of the Break-Up Fee. Nevertheless, even if the holdback amount is included, the proposed Break-Up Fee would equal 4.08% of the advertised $139 million purchase price. This amount is outside industry standards. *Twenver,* 149 B.R. at 955-56 (break-up or topping fees generally approved by courts do not exceed 1% to 2% of purchase price).

28. Tellingly, the GCFP Sale Motion only requests approval of a $1 million break-up fee while the proposed purchase price is $50 million. The GCFP Sale Motion also does not

request an additional expense reimbursement as a component of the break-up fee. Thus, the total break-up fee sought in the GCFP Sale Motion is only 2% of the proposed purchase price. Consequently, the Debtors other proposed sale demonstrates that the Break-Up Fee requested in the Motion is excessive, especially in light of the fact that the proposed purchase price in the GCGP Sale Motion is less than half of the proposed purchase price for the Assets.

29. The Debtors attempt to justify the Break-Up Fee as necessary to commit the Initial Bidder to make its initial offer. *See* Motion, ¶ 49. While the rationale for the Break-Up Fee may justify allowing reimbursement of reasonable expenses, plus a reasonable break-up fee, it does not justify the excessive Break-Up Fee requested here. Instead of benefiting the Debtors' estates by committing at least one party to purchase the Assets, the proposed Break-Up Fee triggers the opposite result by chilling the bidding process and, as a consequence, adversely impacting creditors.

30. Moreover, the case the Debtors primarily rely upon in the Motion, *In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992), does not employ the proper standard for approving a break-up fee. *See* Motion, ¶¶ 49-50. The Third Circuit has rejected the standard for approving break-up fees identified in *Integrated Resources*, and has held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). Consequently, the Initial Bidder bears "the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Id.* at 533.

31.     Further, the only case the Debtors cite from a court within the Third Circuit in support of the over 4% Break-Up Fee is *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del. June 15, 1998). The Debtors, however, acknowledge that the court in *Montgomery Ward* only approved a 2.75% break-up fee in connection with a sale for $110 million. *See* Motion, ¶ 50. As a result, *Montgomery Ward* does not support the approval of the requested Break-Up Fee.

32.     In this case, the need for a break-up fee is questionable because, among other things, the Debtors have indicated that multiple parties have expressed interest in the Assets, and it is not clear that the Break-Up Fee is necessary to make the Initial Bidder commit to purchasing the Assets. *See O'Brien*, at 535-37 (noting that where a proposed purchaser would bid on assets without a break-up fee, the break-up fee cannot be characterized as necessary to preserve the value of the estate). Thus, Wells Fargo objects to the Debtors' request to accord the proposed Break-Up Fee administrative expense or superpriority status under sections 105, 503(b), and/or 507(a)(2) because the proposed Break-Up Fee does not satisfy the standards for allowance as an administrative expense under section 503(b).

33.     In addition, the proposed Break-Up Fee should not be approved because the APA would entitle the Initial Bidder to the expense reimbursement portion of the Break-Up Fee under inappropriate circumstances. Along with providing for the expense reimbursement if another party wins the auction and purchases the Assets, the APA provides that the Initial Bidder is entitled to the expense reimbursement if the APA is terminated by the Initial Bidder as a result of: (a) the sale to the Initial Bidder not closing by June 4, 2007; (b) the Debtors not complying with the APA or breaching a representation or warranty; or (c) the Debtors selecting another bidder at the auction, irrespective of whether the Debtors ultimately sell the Assets to any such

bidder. *See* APA, §§ 9.1(b)(iii); 9.1(c)(1), (ii) and (iii); and 9.2(b). The Initial Bidder should not be entitled to receive an expense reimbursement under these additional circumstances.

34. Wells Fargo requests that this Court deny the Debtor's request for a pre-approved Break-Up Fee, and instead allow the Initial Bidder a 2% break-up fee and the right to submit a request for payment of reasonable administrative expenses up to $500,000 for due diligence undertaken to prepare its proposed bid in the event another party wins the auction and purchases the Assets. Further, any such expense reimbursement request should be subject to review and objection by parties in interest, including Wells Fargo.

### E. Credit Bidding the Entire Break-Up Fee Is Inappropriate

35. The Debtors' proposal to allow the Initial Bidder to credit bid the entire Break-Up Fee requested in the Motion is inappropriate. First, the Initial Bidder should be permitted to credit bid only that percentage portion of the Break-Up Fee authorized by this Court, not the entire amount sought in the Motion. Second, the Initial Bidder should not be permitted to credit bid the expense reimbursement portion of the Break-Up Fee because at the time of the auction, no one will know how much of the expense reimbursement will be authorized by this Court. Thus, the Initial Bidder should be permitted to credit bid only the percentage portion of the Break-Up Fee authorized by this Court.

### F. Potential Qualified Bidders Are Given Inadequate Information

36. The proposed procedures provide qualified bidders with access only to a data room. The Initial Bidder, however, is granted access to the Debtors' books and records, management and employees, and physical access to the Debtors' facilities. *See* APA, § 6.2. This inequity is magnified by the fact that the Initial Bidder may have been granted substantially greater access to information than other potential purchasers prior to the bankruptcy as a result of the Initial Bidder's intimate relationship with the Debtors. Providing the Initial Bidder with

greater access to due diligence information will chill bidding and reduce the likelihood that a spirited auction will ensue. Thus, all qualified bidders should be provided the same access to information as the Initial Bidder.

### G. The Motion Fails to Quantify the Value of the Initial Bidder's Offer

37. In order to ensure that potential qualified bidders have sufficient notice of the value their competing bids must provide to the Debtors' estates, and in order to protect the interests of unsecured creditors by creating an open sales process, the true value of the proposed purchase price offered by the Initial Bidder must be quantified.

38. Specifically, the Debtors and/or the Initial Bidder should quantify the asserted increase in value to the Debtors' membership interest in Carrington arising from a sale to the Initial Bidder, and explain the methodology used to quantify this value. In addition, the Debtors and/or the Initial Bidder should quantify the decrease in the value of the Initial Bidder's offer resulting from the 10% holdback amount, and explain the methodology used to quantify this value, including disclosure of the assumed liabilities purported to be scheduled in Schedule 1.1(c) of the APA.

39. In fact, the need for additional transparency is demonstrated by the proposed bidding procedures, which require qualified bidders to provide an opinion as to the value of any non-cash consideration and the methodology used in deriving such amounts. *See* Bidding Procedures, ¶ 11. Providing the same types of information for the non-cash consideration contained in the Initial Bidder's offer will increase the transparency of the proposed transaction, and increase the likelihood that the Debtors will receive qualified bids and that a spirited auction will ensue.

40. Moreover, the opaque nature of the Initial Bidder's offer is further evidenced by a Reuters news article dated April 10, 2007, 11:49 a.m. (the "*Article*"). A copy of the Article is

attached as <u>Exhibit B</u>.  In pertinent part, the Article describes the sale of the Assets by stating that the Debtors "agreed to sell its loan servicing unit to hedge fund Carrington Capital Management LLC for $133 million, down from an original $139 million."  The basis for this asserted decrease in the purchase price of the Assets is unclear.  To the extent the proposed purchase price for the Assets has decreased, the Debtors should provide parties in interest with a complete and forthright explanation for the decrease.

### H. The Committee Should Be Given Further Time to Investigate

41.     The deadlines in the proposed bidding procedures should be extended by at least 20 days to give the Committee time to investigate the relationship between the Debtors and the Initial Bidder.  Given the extensive dealings between the Debtors and the Initial Bidder, the Committee must have sufficient time to investigate whether the proposed transaction with the Initial Bidder is an arms-length transaction.  Not only do the Debtors have a 36.75% interest in Carrington, but Carrington and its affiliates hold residual securities representing an interest in approximately $8.6 billion of mortgage loans the Debtors originated and sold to Carrington.  *See* Motion, ¶ 23, 26.  Given these extensive dealings, the Committee must have sufficient time to investigate whether the Debtors selected the Initial Bidder's offer based on the consideration to be provided for the Assets and its ability to qualify and act service as servicer under the Pooling and Servicing Agreements, rather than based on the Initial Bidder's extensive relationship with the Debtors.

42.     The Committee also need the requested 20 day extension to evaluate the Debtors' assertions that the value of the Debtors' 36.75% membership interest in Carrington will increase as a result of a sale of the Assets to the Initial Bidder, which increase the Debtors should demonstrate to the Committee and potential bidders.  Similarly, the Committee needs the additional time to determine the extent to which the holdback amount affects the value of the

Initial Bidder's offer. Only with this additional time will the Committee be able to properly perform its role of representing the Debtors' unsecured creditors and ensuring that the Debtors select the highest and best offer for the Assets.

43.    Wells Fargo reserves the right to raise additional objections prior to or at the hearing on the Motion scheduled to be held on April 12, 2007. Wells Fargo also reserves the right to raise objections to the sale, sale order, and the APA.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Conclusion**

WHEREFORE, Wells Fargo respectfully requests that this Court deny the Debtors' Motion unless and until the proposed bidding procedures and APA are amended to address the issues raised herein and any issues raised at the hearing scheduled to be held on April 12, 2007.

Dated: April 11, 2007

                                            Respectfully submitted,

HUNTON & WILLIAMS LLP

    /s/ Jason W. Harbour
Peter S. Partee (PP-0766)
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

and

J.R. Smith (Va. Bar No. 41913)
Jason W. Harbour (DE Bar No. 4176, Va. Bar No. 68220)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

and

Michael Busenkell (DE Bar No. 3933)
Eckert, Seamans, Cherin & Mellot, LLC.
300 Delaware Avenue
Suite 1210
Wilmington, Delaware 19801

Counsel to *Wells Fargo Bank N.A.*