UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  07-10416(KJC)
                                . Chapter 11
                                . Jointly Administered
  NEW CENTURY TRS HOLDINGS,     .
  INC., a Delaware              . 824 Market Street
  corporation,                  . Wilmington, Delaware  19801
                                .
                    Debtors.    .
                                . April 3, 2007
. . . . . . . . . . . . . . . . 3:34 p.m.


TRANSCRIPT OF FIRST DAY HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Richards, Layton & Finger, P.A.
                            By:  MARK D. COLLINS, ESQ.
                            One Rodney Square
                            920 N. King Street
                            P.O. Box 551
                            Wilmington, DE 19899


For the Debtors:            O'Melveny & Myers, LLP
                            By:  BEN LOGAN, ESQ.
                                 EMILY CULLER, ESQ.
                            400 South Hope Street
                            Suite 1060
                            Los Angeles, CA 90071


For the Debtors:            O'Melveny & Myers, LLP
                            By:  SUZZANNE UHLAND, ESQ.
                            610 Newport Center Drive
                            17th Floor
                            Newport Beach, CA 92660


Audio Operator:             Jason Smith


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No.   (609) 587-3599**

APPEARANCES (Cont'd.):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  JOSEPH McMAHON, ESQ.
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE 19801

For Morgan Stanley Mortgage    Milbank, Tweed, Hadley &
Capital:                        McCloy LLP
                               By:  WILBUR F. FOSTER, JR., ESQ.
                               1 Chase Manhattan Plaza
                               New York, NY  10005

For Bank of America, N.A.:     Potter Anderson & Corroon, LLP
                               By:  LAURIE SELBER SILVERSTEIN,
                               ESQ.
                               Hercules Plaza
                               1313 North Market Street
                               Wilmington, DE 19801

For Bank of America, N.A.:     Kaye Scholer LLP
                               By:  MARGOT B. SCHONHOLTZ, ESQ.
                               425 Park Avenue
                               New York, NY  10022

For Citigroup Global          Campbell & Levine, LLC
Markets Realty Corp.:          By:  MARK T. HURFORD, ESQ.
                               800 N. King Street
                               Suite 300
                               Wilmington, DE  19801

For Citigroup Global          Kirkland & Ellis, LLP
Markets Realty Corp.:          By:  JOSHUA A. SUSSBERG, ESQ.
                               Citigroup Center
                               153 East 53rd Street
                               New York, NY  10022

For Credit Suisse First       Young Conaway Stargatt & Taylor,
Mortgage Capital, LLC and      LLP
DLJ Mortgage Capital, Inc.:    By:  MICHAEL R. NESTOR, ESQ.
                               The Brandywine Building
                               1000 West Street
                               17th Floor
                               P.O. Box 391
                               Wilmington, DE  19899

For Credit Suisse First       Chadbourne & Parke LLP
Mortgage Capital, LLC and      By:  DOUGLAS E. DEUTSCH, ESQ.
DLJ Mortgage Capital, Inc.:    30 Rockefeller Plaza
                               New York, NY  10112

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

                              Young Conaway Stargatt & Taylor,
                               LLP
                              By:  JOEL A. WAITE, ESQ.
                              The Brandywine Building
                              1000 West Street
                              17th Floor
                              P.O. Box 391
                              Wilmington, DE  19899

For Deutsche Bank Structured  Bingham McCutchen LLP
Products:                     By:  ANDREW J. GALLO, ESQ.
                              150 Federal Street
                              Boston, MA  02110

For Residential Funding       Buchanan Ingersoll & Rooney, PC
Company:                      By:  MARY F. CALOWAY, ESQ.
                              The Brandywine Building
                              1000 West Street
                              Suite 1410
                              Wilmington, DE  19801

For Goldman Sachs Mortgage     Ashby & Geddes
Company:                      By:  DON BESKRONE, ESQ.
                              222 Delaware Avenue
                              17th Floor
                              Wilmington, DE  19899

For Goldman Sachs Mortgage     Cleary, Gottlieb, Steen &
Company:                       Hamilton
                              By: JANE KIM, ESQ.
                              One Liberty Plaza
                              New York, NY 10006

For Deutsche Bank National     Pepper Hamilton, LLP
Trust Company:                By:  DAVID B. STRATTON, ESQ.
                              Suite 5100
                              1313 Market Street
                              Wilmington, DE 19899

For Union Bank of              Jeffer, Mangels, Butler
California:                     & Marmaro LLP
                              By:  BARRY V. FREEMAN, ESQ.
                              1900 Avenue of the Stars
                              Seventh Floor
                              Los Angeles, CA  90067

4

# I N D E X

**PAGE**

**WITNESSES FOR THE DEBTORS**

SUNEEL MANDAVA
  Cross Examination by Mr. McMahon                           83
  Redirect Examination by Mr. Logan                          92


**EXHIBITS**

| | | ID | EVD |
|---|---|---|---|
| UST-1 | Thirty day cash flow forecast | 86 | 109 |

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon.

3          MR. COLLINS:  Good afternoon, Your Honor.  For the

4  record, Mark Collins of Richards, Layton & Finger on behalf of

5  the New Century debtors.  First of all, Your Honor, thank you

6  very much for scheduling today's First Day Hearing in these

7  cases and providing us with more than an hour of time this

8  afternoon to work with the many counsel in the courtroom over

9  various issues that they each may have.

10          Your Honor, before turning to the first day agenda,

11  what I thought I'd do is make some brief introductions to the

12  Court.  First, from O'Melveny & Myers, my co-counsel, we have

13  Ben Logan, Suzzanne Uhland and Emily Culler.  From AlixPartners

14  we have Holly Etlin, and she is one of our first day affiants.

15  From Lazard, our investment banker, we have Suneel Mandava.

16  From the company we have Monika McCarthy, who is the senior

17  vice president and assistant general counsel of the parent

18  debtor corporation.  And we also have Taj Bindra who is the CFO

19  of the parent debtor corporation.

20          Your Honor, what I thought I'd do is turn the podium

21  over to Ms. Uhland to provide Your Honor with some additional

22  background about the debtors and what we hope to accomplish in

23  the coming months in these cases.

24          THE COURT:  All right.

25          MR. COLLINS:  Thank you, Your Honor.

1           MS. UHLAND:  Thank you, Your Honor.  These debtors,

2 if you haven't been reading the papers, have been getting quite

3 a lot of press the last month.  New Century is a subprime

4 mortgage lender and it both originates and services mortgage

5 loans.  New Century Financial Corp. is a public company.  It's

6 a Maryland corporation.  It's a real estate investment trust or

7 a REIT, and New Century TRS Holdings is a Delaware corporation.

8 It was a company founded in 1994, based in Southern California,

9 and was the initial company that then underwent the

10 reconversion in 2004.

11           These debtors, together with 13 other debtor

12 subsidiaries, are the entities that have filed petitions.

13 There are approximately ten to 15 other non-debtor subsidiaries

14 that were filed either because they're in the process of

15 dissolution or because they did not have material creditors.

16           New Century is one of the largest subprime mortgage

17 companies in the United States.  As I noted, it both

18 originates, sells and services home mortgage loans.  And in

19 terms of volume, in the year 2006 60 billion of loans were

20 originated by New Century, and it is currently servicing --

21 I'll talk about that a little later -- 19 billion of home

22 mortgage loans.

23           In general, we think of the debtors' assets as having

24 two major businesses, the loan origination business and the

25 loan servicing business.  In addition, there's another category

of assets of the debtors, and those I'll describe a little

later.  They're debtors' financial assets, or their inventory,

which are the loans that they own or other ownership interests

in securities that they own resulting from their loan

origination and securitization businesses.

The debtors' businesses are regulated, and the

debtors to business in all 50 states and the District of

Columbia.  The debtors require these licenses to originate

loans in every state, and in most states they require the same

loan origination licenses to do the -- to perform their

servicing functions.

Prior to filing these cases, the debtors had over

6,000 employees.  Yesterday, in connection with their filings,

the debtors engaged in a substantial reduction in force and

reduced their workforce by thirty-two hundred employees, more

than half.  These employees were in the loan origination

businesses of the debtors and most of them were outside of

California.  Approximately 70 percent of those were in states

other than the Southern California base of the business.

The loan origination business is mostly a wholesale

operation.  In other words, with respect to 85 percent of the

loans originated, there are other independent mortgage brokers

who actually originate the loans.  Fifteen percent,

approximately, of their business is what the debtors refer to

as their retail business.  In this percentage of the business,

1  the debtors would have direct contact with the consumers

2  through retail branches, because those -- in connection with

3  their retail services, they're collecting both -- effectively

4  two levels of the commissions, both the commissions to

5  originate the loan and the -- sort of the second step, the

6  brokerage.  That's very -- while it's only 15 percent of the

7  loans originated, it's a much more substantial portion of their

8  revenue.  Most of the debtors' loans are in the subprime

9  category, in other words, categories that may not be addressed

10 by other traditional lenders, although recently the debtors

11 have increased their percentages of prime or what they call

12 Alt-A loans, which are between prime and subprime.

13         The Court is from other cases, I know, familiar with

14 the general financial structure of the loan origination process

15 and how it relates to the debtors' creditors, but I will take a

16 minute to review that here.  In essence, with respect to the

17 loan origination, when a loan is made the debtors borrow funds

18 from their warehouse lenders and contribute the remaining

19 portion of the funds from their working capital.  This

20 percentage is usually referred to as "the haircut."  The

21 warehouse lender arrangements in recent years have almost --

22 with also prime lenders been converted to loan -- master loan

23 repurchase agreements, and whereas the -- so, as a result of

24 this structure, the debtors -- or New Century funds the loans

25 and by -- the minute it funds the loans, it sells the loan to

1 the repurchase lender or the warehouse lender.  So that during

2 the time period while the loan is on the line, the warehouse

3 lender has title to the loan, but the debtors have the economic

4 benefit of the loan.

5       The debtors leave their loans on these warehouse

6 lines typically from one to three months.  Thereafter, the --

7 New Century would sell those loans either as a -- what we call

8 a "whole loan sale" or pool the loans into a securitization

9 trust.  These pools of loans, the securitization trusts, are

10 separate legal entities, special purpose entities, and are not

11 debtors in this case, even though there are securities with the

12 NC designation that are publicly trading.

13       With respect to the securitization trusts, the

14 debtors perform -- and also with respect to certain of the

15 whole loans that are sold, the debtors provide their servicing

16 function.  The servicing business is a, as I said, a separate

17 business.  It's sort of the second step from the loan

18 origination business and is a separate set of employees and is

19 a different service that's provided.

20       The servicing business is a key and very profitable

21 element of the debtors' business.  The method of servicing --

22 right now, as I said, the debtors are servicing about 19

23 billion of loans.  Approximately ten billion of these loans are

24 the ones in the securitization trusts, and the balance are

25 loans that were sold by the debtors in whole loan sales.

1          The debtors receive funds -- I mean, I'm sorry --

2   receive payment for servicing of approximately half a percent

3   of the loans, and, in addition, in connection with the

4   securitization trusts, the debtors typically retain a residual

5   interest in the trust providing appropriate servicing that is

6   profitable to the debtors both in connection with the fees that

7   they retain and to enhance the value of their residual

8   interests.

9          The subprime mortgage market, like most real estate

10  related industries, is cyclical, and, as the Court has seen,

11  there have been many subprime mortgage lenders and other

12  mortgage lenders who have been affected by the current market

13  conditions.  New Century was no exception.  These companies saw

14  increased borrower defaults, which then resulted in increased

15  claims from certain parties to whom they had sold the loans who

16  had the right to put back nonperforming loans to the sellers.

17         New Century, however, had another material occurrence

18  that happened earlier this year that, together with the

19  cyclical nature of the market, has caused the current liquidity

20  crisis.  On February 7th, New Century announced that it would

21  restate its financial statements for prior quarters, but then

22  on March 2nd made a more substantive announcement that the

23  restatement would be more extensive, that the 10-K would be

24  delayed and that the Securities and Exchange Commission had

25  requested a meeting with New Century to review these matters.

1          As a result of the and following the March 2nd

2   announcement, several events have led to the filing of this

3   Chapter 11 case.  The debtors received margin calls in excess

4   of $150 million, which they were not able to fully satisfy,

5   from the warehouse lenders.  This resulted in defaults on their

6   warehouse lines and ultimately each of the warehouse lenders

7   ceased advancing and making loans to the lenders -- I'm sorry

8   -- to the -- to New Century, and it was unable to continue

9   funding loans.

10          Because of the process of origination at the time

11   that the warehouse lenders ceased funding, New Century had

12   27,000 loans that it had committed to in its pipeline.  On

13   March 12th, the debtors stopped taking new applications from

14   borrowers and since that day has had nearly daily conversations

15   with state regulators.

16          In addition, as a result of the defaults under the

17   warehouse lines, in addition to ceasing funding, the warehouse

18   lenders over the past several days and weeks have exercised

19   their right to take control over the cash flowing from the

20   loans that are on the warehouse lines.  In other words, the

21   principal and interest from the loans recently originated by

22   the debtors that were on the warehouse line, previously the

23   debtors had looked to that cash flow for their liquidity needs

24   and now those proceeds, in addition, are -- those proceeds are

25   being funneled -- or, not funneled -- are being directed to

1  control accounts controlled by the lenders and are not

2  available to the debtors.

3          As I noted, this combination of factors has caused a

4  liquidity crisis of considerable proportions, particularly in

5  light of the fact that the debtors, as a servicing business,

6  have a substantial payroll commitment to their workforce.  Over

7  the past weeks, the debtors and their professionals, their

8  investment bankers, Lazard, and recently engaged, their

9  financial advisors, AlixPartners, and their lawyers have worked

10 day and night to address the liquidity issues, cut costs and

11 seek financing or sale of the businesses in an effort to

12 recapitalize or sell these businesses as going concerns.

13         The fragility of this -- of these debtors and their

14 business cannot be overstated.  This is largely a service

15 business, relying on human capital and working capital, and

16 right now the debtors' loan origination business is, in effect,

17 not operating.  The debtors have had to reallocate to other

18 lenders the 27,000 loans that were previously approved and in

19 their pipeline, and, fortunately for the consumers involved,

20 they have been successful in doing so.  As of today, they have

21 managed to replace all 27,000 loans.

22         But the debtors have a very limited window to sell

23 this loan origination platform for the benefit of all of their

24 creditors.  In light of the fact that it is currently not

25 operating and retaining the necessary human capital employees

1  in order to survive through a sale, it is going to be a

2  challenge.

3        Similarly, the servicing business is -- while the

4  service loans remain in place and the debtors have servicing

5  contracts and, therefore, a continued ability to rely on --

6  have a -- you know, have continuing rights to service the

7  loans, the debtors must perform under those servicing

8  agreements in order to maintain those valuable rights.

9  Fortunately, the debtors to have -- achieved an agreement to

10 sell their servicing business, and I'm going to talk about that

11 in a minute, and that's a -- one of the very -- very beneficial

12 aspects of the -- or fruits of the labor of these many

13 professionals and employees and management of the debtor over

14 the past weeks.

15       Where we are today is -- as I said, we're in a very

16 fragile situation, and the debtors, in order to realize the

17 maximum value for all the stakeholders, need to focus on three

18 key things.  We need to affect a sale of our servicing business

19 and our -- any other assets on a very prompt time frame.  We

20 need financing to get us through those sales, and we need to

21 retain our employees, our human capital, in order to close

22 those sales.

23       In connection -- we are also fortunate, very

24 fortunate, to have negotiated a DIP financing arrangement which

25 we believe is very favorable for the estates and will enable us

14

1  to achieve this process that we've outlined of -- or these

2  goals that we've outlined of achieving these prompt sales of

3  the assets.

4        We're going to, obviously, be addressing the DIP

5  financing at the conclusion of this hearing, but I think it's

6  important to note that this DIP financing is tied to an asset

7  sale of one of the financial assets that I've described.  The

8  DIP financing provided by Greenwich Capital and CIT

9  contemplates that certain of the assets, certain loans owned by

10 the debtors that have not otherwise been sold, and certain

11 residual interests will be sold to Greenwich for approximately

12 -- for $50 million.  That's subject to overbid.

13       That sale, and we can address this at the conclusion,

14 sort of the last matter, we have an order for shortening time

15 of the procedures for that sale, requesting a date of the 10th

16 to approve those bidding procedures.  I think it's appropriate

17 to just raise that timing and that sale when we discuss the DIP

18 financing.

19       Additionally, as announced in the papers yesterday,

20 the debtors have reached an agreement with Carrington Capital

21 Management for a sale of their servicing business for $139

22 million.  This sale will net to the estate approximately $107

23 million because we will be netting out from that approximately

24 $32 million that we have in secured financing for certain

25 servicing advances.  We expect to file a motion to approve that

1  sale later today.  That sale must also be closed on a very

2  expedited time frame, and we'll be seeking bid procedures for

3  that sale probably in the later part of next week.

4        We're also contemplating providing -- or filing a

5  procedures motion for the loan origination business.  We do not

6  have a stalking horse bidder for that business, but given the

7  fragility of that platform, the fact that we are currently not

8  originating loans, that business, to attain any value, must

9  also be marketed and sold in an expedited time frame.  We

10 expect to be filing that motion tomorrow or the next day and,

11 similarly, we'll seek to have bid procedures approved in the

12 latter part of next week.

13       Back to the Carrington sale briefly, one item of note

14 is the Carrington sale does require that the debtor maintain

15 its servicing employees and that 75 percent of our servicing

16 employees accept offers with the buyer.  The servicing

17 business, as our loan origination business, is, by it's very

18 name, servicing, a service business and heavily reliant on the

19 individuals.  This is one of the reasons for the employee

20 relief that we're going to be seeking today, which we

21 understand is unusual, but in this particular case absolutely

22 critical.

23       We are very thankful, with respect to these time

24 issues, that the Court and the United States Trustee have

25 already indicated to us an understanding of the urgency here,

1 which, when you're living it every day, can be evident, but

2 sometimes from a distance is not as easily synthesized.  We're

3 very thankful the United States Trustee has agreed to a prompt

4 committee formation meeting of -- the morning of Monday, April

5 9th, and we understand that that's a prompt time frame and are

6 very grateful for that.  And we also are grateful for the

7 Court's indication of a tentative schedule subject to

8 everything we're going to discuss today.  That illustrates to

9 us an understanding of the timing necessities here.  So, Your

10 Honor, we're, again, thankful for your accommodation this

11 afternoon and understanding, and I think with that we'll start

12 reviewing the other -- unless the Court has questions, other

13 matters that we're seeking relief for today.

14            THE COURT:  No.  I do have questions to ask, comments

15 to make, but I'll make them as we go along.  Thank you.

16            MS. UHLAND:  Okay.  Thank you, Your Honor.

17            MR. COLLINS:  Mark Collins again for the record, Your

18 Honor, on behalf of the debtors.  Your Honor, turning to the

19 items on the agenda, agenda item Number 18 is the debtors'

20 motion for an order directing joint administration of the

21 Chapter 11 cases.  Your Honor, we did make one change to the

22 form of order.  There was a reference to an affidavit being

23 submitted by Mr. Bindra.  That was instead submitted by Ms.

24 McCarthy, and, as a result, we have modified that form of

25 order.  I don't believe there were any other changes to that

1 form of order, and we believe that the relief requested is

2 appropriate.

3        THE COURT:  Does anyone else care to be heard in

4 connection with the joint administration motion?  I hear no

5 response.  I've reviewed it and have no questions.

6        MR. COLLINS:  And, Your Honor, would you like me to

7 hand up orders as we go or at the end of the hearing?

8        THE COURT:  Why don't we wait?

9        MR. COLLINS:  Okay.  Agenda item Number 19, Your

10 Honor, is the motion of the debtors to retain XRoads Case

11 Management Services as the claims and noticing agent in these

12 cases.  Your Honor, what we thought we would do is put this off

13 for today.  We have made a number of changes to the form of

14 order at the request of the United States Trustee.  There is

15 one outstanding issue that relates to the Evergreen retainer

16 that XRoads is requesting, and I believe counsel to XRoads and

17 Mr. McMahon are still in conversations with respect to that.

18 I'm hopeful that that can be resolved and, if so, we would

19 simply request that we submit the agreed upon form of order by

20 certification of counsel.  If we are unable to reach agreement,

21 then it would be heard at the April 24th hearing on these

22 cases.

23        THE COURT:  All right.  I assume that the liability

24 cap, the mediation and arbitration provisions are being

25 addressed --

1            MR. COLLINS:  Yes.

2            THE COURT:  -- in that process, as well as the copy

3 charge.

4            MR. COLLINS:  Your Honor, we did address the first

5 two issues.  I'm not sure we have addressed the copy charge

6 issue, and if Your Honor could remind me with your views on

7 that, we can make that.

8            THE COURT:  To make it consistent with the maximum

9 permitted by local rule.

10            MR. COLLINS:  Okay.  Which I believe is ten cents or

11 15 cents.

12            THE COURT:  Ten cents.

13            MR. COLLINS:  Yes.

14            THE COURT:  Ten cents.

15            MR. COLLINS:  Okay.

16            THE COURT:  It's 15 in the engagement letter.

17            MR. COLLINS:  Okay.  We'll make that change as well,

18 Your Honor.

19            THE COURT:  All right.

20            MR. COLLINS:  And then we'll submit that by

21 certification of counsel if that's acceptable.

22            THE COURT:  Yes.  Those issues -- those were my

23 issues, so if everyone else's issues are resolved you may

24 submit that under certification.

25            MR. COLLINS:  Okay.  Thank you, Your Honor.  Your

1 Honor, the next item is Number 20 which is the debtors' motion

2 for an interim order relating to our utility providers pursuant

3 to Section 366.  We have made a change to the form of order at

4 the request of the United States Trustee.  If Your Honor would

5 turn to -- and I believe Your Honor may have the black-lines

6 that I submitted --

7                THE COURT:  I do.

8                MR. COLLINS:  -- in advance.

9                THE COURT:  Yes.

10                MR. COLLINS:  Paragraph 7 of the form of order

11 provides now that any agreement that the debtors enter into

12 with a utility provider that is different than the two-week

13 deposit that we are proposing in the order will now be filed by

14 stipulation, will be filed with the court and served on the

15 U.S. Trustee, counsel to the committee and to other parties

16 requesting notice under section -- Rule 2002, and obviously all

17 parties' rights under Section 366(3)(c)(a) to object to any of

18 those stipulations is preserved.

19                THE COURT:  Very well.

20                MR. COLLINS:  But on balance, Your Honor, this is a

21 very standard order.  I believe it's in conformity with what

22 the district has entered in the past.  It does provide for a

23 two-week deposit to go out within the first 20 days of the case

24 and does provide utilities with the ability to come back to

25 court if they find that to be unacceptable.

1          THE COURT:  All right.  Does anyone else care to be

2    heard in connection with the utility motion?  I hear no

3    response.  I've reviewed it and have no questions.

4          MR. COLLINS:  Thank you, Your Honor.  Your Honor, the

5    next item is agenda item Number 21, and that is a motion

6    relating to the debtors' request to maintain its insurance

7    policies, continue making the premium financing arrangement

8    payments and to pay any pre-petition premiums that are

9    outstanding.  As mentioned in the motion, Your Honor, we don't

10   believe that we have any outstanding pre-petition premium

11   obligations, but we do seek authority just in case there is

12   something out there that we're not aware of.  We do seek

13   authority to pay all post-petition insurance premium

14   obligations in the ordinary course going forward and to

15   continue to pay our premium finance payments going forward as

16   well.  The U.S. Trustee has asked for a full listing of all of

17   our insurance policies, which we have and will provide to them,

18   but I think it's quite obvious that this debtor needs to

19   maintain its insurance in this matter.  We think it's fairly

20   routine and should be approved by Your Honor.

21         THE COURT:  Does anyone else care to be heard in

22   connection with this motion?  All right.  The only question in

23   my mind was that the relief requested was open-ended and

24   ongoing.  I don't question the necessity for the coverages that

25   are described in the motion, but my thought is is after it gets

1 formed, and I'm assume there will be a committee --

2          MR. COLLINS:  Yes.

3          THE COURT:  -- that the debtor understands that this

4 doesn't preclude the committee from any later challenge if it

5 should be brought before the Court.

6          MR. COLLINS:  I understand, Your Honor.  We believe

7 that it'll be the kind of ordinary course type insurance that

8 we have now, and if there's any issues, obviously, we can bring

9 those to Your Honor.

10          THE COURT:  All right.  With that understanding, I

11 don't have any further questions.   Did I ask, does anyone else

12 care to be heard?  I hear no response.

13          MR. COLLINS:  Your Honor, we thought it might make

14 sense to pass Number 22 for the moment.  That's our case

15 management order.  Put that at the end of the calendar because

16 I know there are parties that would like to make some

17 statements, and I think we -- and the parties are also

18 reviewing the form of order and the changes to it.  That's

19 acceptable to Your Honor?

20          THE COURT:  That's fine with me.

21          MR. COLLINS:  Number 23, Your Honor, is motion to pay

22 use taxes.  As noted in the motion, it's very de minimis, and

23 we have, at the request of the U.S. Trustee, plugged a cap into

24 the form of order at $10,000, and that's acceptable, obviously,

25 to the U.S. Trustee.

1       THE COURT:  All right, does anyone else care to be
2  heard in connection with this motion?  I hear no response.  I
3  have no questions.

4       MR. COLLINS:  All right.  Thank you, Your Honor.
5  Agenda Items 24 and 25 will be presented by Ms. Uhland, Your
6  Honor.  Thank you.

7       MS. UHLAND:  Your Honor, we have a substantial
8  employee motion in light of the number of employees and their
9  somewhat extensive benefit arrangements.  Your Honor, I think
10 what we plan to do, if this is acceptable to Your Honor, is I
11 was going to outline the relief sought in the motion and at the
12 same time hand up for Your Honor and make available to the
13 courtroom the debtors' current 30-day budget which lays out
14 some of the actual payments that are set forth in the motion
15 has some of the more described amounts.  Then, Your Honor, our
16 affiant with respect to these matters, Holly Etlin, is in the
17 courtroom.  I would like to proffer her testimony with respect
18 to the debtors' business judgment and the necessity for these
19 payments as, in effect, our employee motion is largely our
20 critical vendor motion.  But first, Your Honor, I believe it
21 would be appropriate for us to walk through and lay out the
22 relief sought in the motion and tie it to the budget if that's
23 acceptable to the Court.

24       THE COURT:  Go ahead.

25       MS. UHLAND:  May I approach with the --

1          THE COURT:  Yes.  Thank you.

2          MS. UHLAND:  As I outlined previously, Your Honor, as

3  set forth in our papers, the debtors employee base is their

4  critical base of suppliers, if you will, of the key -- key

5  elements of the enterprise.  The debtors, as of the petition

6  date or immediately prior to the downsizing, had over 6,000

7  employees.  As I noted, we did a very substantial reduction in

8  force yesterday, letting go 3,200 employees.

9          The debtors' employees are highly skilled, both in

10 the origination business and the servicing business.  Our

11 servicing employees are working in a very challenging

12 environment.  Our servicing employees' jobs are, in effect, to

13 address payment defaults, among other things, of subprime

14 borrowers, a highly skilled and a highly regulated endeavor.

15 The servicing employees are critical to the servicing business

16 and the current high standards that the debtors have employed

17 in their servicing business and one of the reasons that we have

18 an offer for our servicing business, and that offer right now

19 requires that the debtors retain all of their servicing

20 employees through closing, and 75 percent of them go with our

21 servicer.

22         Our origination employees are similarly highly

23 skilled ane effectively generate the revenue for the loan

24 origination portion of the debtors' business.  Loan origination

25 is the method for the debtors' creating their inventory of

1  loans, which they can later sell or securitize.

2      MR. McMAHON:  Your Honor, if I may be heard briefly?

3  Joseph McMahon for the United States Trustee.  I don't know if

4  this is Ms. Etlin's proffer that we're hearing or whether --

5      MS. UHLAND:  No, just a brief overview.

6      MR. McMAHON:  Overview, okay.  I just wanted to make

7  sure what it is, what we're listening to.  Thank you.

8      THE COURT:  All right, thank you.  You may proceed.

9      MS. UHLAND:  In essence, Your Honor, and we can walk

10 through where we meet the statutory caps, but our employee

11 motion is being made under the Necessity of Payment Doctrine.

12 The Necessity of Payment Document -- Doctrine permits immediate

13 payment of claims in the interest of all parties in the event

14 it facilitates continued operations, and the Necessity of

15 Payment Doctrine was borne out of concerns about payments for

16 employees, in effect by Congress's concerns about employees in

17 the original railroad cases and then only -- then from that

18 extended to other types of vendors.  We believe that this case

19 and these facts, which we're going to lay out through Ms.

20 Etlin, present the appropriate factual premise for necessity of

21 payment, which is the key basis for making this because these

22 payments are absolutely necessary to retain the continued

23 workforce and to, therefore, retain the value of these estates

24 and enable us to complete the sale transactions contemplated.

25      Your Honor, I'd like to turn to the more specific

1 relief sought in the motion and walk a little through and tie

2 it to the cash flow that I proved to the Court.  First, Your

3 Honor, with respect to wages, the timing of our particular

4 bankruptcy filing, which was early yesterday morning, has us in

5 a position that the -- we are effectively at the end of a

6 payroll period.  In the motion, we estimate approximately 15

7 million of payroll, pre-petition payroll, will need to be made.

8 Your Honor, if you look at the 30-day cash flow that I provided

9 to you, it shows approximately 11.2 million of payroll.  That

10 is the payroll for the employees, both continuing and those

11 recently terminated, for that immediate two week pre-petition

12 period.

13        We've estimated that the payroll will be 15 million

14 in the motion.  In effect, it may be -- the total payroll that

15 is pre-petition may be somewhat higher.  We currently have

16 seven to eight million in funded payroll accounts.  What this

17 means is that the debtors have funded -- they funded both a

18 commission payroll last week of 3.8 million and -- I'm going to

19 speak a little bit about this latter -- we funded a

20 reimbursement of the employee stock purchase plan of 1.2

21 million, plus there may be additional amounts that are just

22 uncashed pre-petition payroll checks that remain in the

23 debtors' payroll accounts. That seven to eight million in the

24 payroll accounts is not reflected in the 48 million ending cash

25 balance, which is shown at the bottom of the forecast provided

1 to the Court.  So, in essence, when -- with respect to unpaid

2 wages, the debtors are seeking that they be able to pay the

3 11.2 payroll on 11 -- on April 7th, as well as clear the

4 approximately 3.8 million in commission, 1.2 million of refunds

5 and other unpaid payroll checks.

6         A second portion of unpaid wages addressed in the

7 motion that the debtors are seeking to pay, and we view them as

8 unpaid pre-petition wages, are amounts payable for pre-petition

9 commissions, and those amounts are scheduled to be paid in two

10 payments, one on April 21st and one on April 5th.  With respect

11 to the debtors' loan origination business, as I noted before,

12 the debtors stopped taking new applications on March 12th.  In

13 order to retain their workforce, the debtors agreed to provide

14 certain fixed payments to their previously commissioned

15 origination employees so that they would receive approximately

16 75 percent of what had been their average commission refund --

17 average commission income.

18        The total amount that the debtors seek to pay for the

19 March amounts for that as set forth in the motion is $7.3

20 million.  Those are for the total month of March, 2007.  One

21 thousand two hundred employees are -- would be paid -- are

22 subject to this particular retention.  We named it retention

23 plan, but, in fact, it was commission replacement.  Those

24 commissioned employees were not only being paid so that they

25 would not take jobs with other employers, although that was a

1  key part of the plan, it was those commissioned employees who

2  were the employees that moved the 27,000 unfunded loans that

3  were committed to from March 12th till today, in accordance

4  with the state regulators.  So, the day-to-day and the

5  mechanism of moving those loans was by those commissioned

6  employees.

7           THE COURT:  Are any of these employees insiders?

8           MS. UHLAND:  None of the employees that are in the --

9  this retention plan are insiders.

10          THE COURT:  All right.  So there are no 503(c)(1)

11 implications, at least in the debtors' view anyway.

12          MS. UHLAND:  Not with respect to this -- these

13 payments, the 7.3 million.  There are insiders in the regular

14 payroll.

15          THE COURT:  Thank you.

16          MS. UHLAND:  The 7.3 million, turning back to this

17 30-day cash flow, is paid in two pieces of 3. -- approximately

18 3.65 million.  Those -- one is shown on the April 26th line,

19 the other payment on the May 5th line.  The balance in those

20 two payroll periods would be the regular payroll, which is now

21 much less than 11.2 million because of the reduction in force.

22 So, it's -- and it might have been helpful -- we collapsed

23 these numbers -- but to break it out, because it looks like

24 they're, in effect, a flat payroll, when, in fact, the full --

25 the only full payroll is the April 7th payroll.  The April 21st

1  is 3.65 of these payments, plus a smaller payroll, as is the

2  May 5th payroll.  The balance of the April 21st and May 5th

3  payrolls are pure post-petition.

4          In the order -- staying with the order that is set

5  forth in the motion, the debtors also requested to pay

6  independent contractors.  Since filing the motion and in

7  response to an inquiry by the United States Trustee, we've

8  obtained more information about those independent contractors.

9  They are approximately 50 independent contractors who provide

10  technical support for the debtors, and the -- the debtors can

11  cap that amount at approximately $250,000 paid to independent

12  contractors.  It's not a material part of their services

13  compensation.

14          With respect to vacation, the debtors are seeking to

15  first continue their regular vacation policy, in other words to

16  allow employees to continue to take vacation in accordance with

17  ordinary policy, which includes agreement by their supervisor

18  over this -- during the course of the case.  In addition, the

19  debtors are seeking that they be able to, consistent with their

20  prior policy, pay out insurance to employees -- I'm sorry,

21  insurance -- pay out vacation to employees upon termination.

22  The debtors are seeking authority for the authority but not the

23  direction to do so.  The debtors seek to have the ability to

24  pay out with respect to any terminated employees, i.e.,

25  terminated by the debtor, their vacation pay, but would reserve

1  their right not to make those payments if the employee

2  voluntarily terminates in the post-petition period.

3          THE COURT:  Including, I take it, those employees who

4  were terminated yesterday.

5          MS. UHLAND:  Yes.  And to tie those amounts to the --

6  back to our -- the 30-day cash flow.  The current exposure, as

7  set forth in the motion, of the debtors' accrued and unpaid

8  vacation is approximately $10.9 million.  The payment on April

9  14th represents two weeks salary continuation for the employees

10 that had -- were terminated yesterday and the cash out of their

11 vacation in the amount of approximately $4.3 million, so that

12 the April 14th payment of 10.1 is the payment for the

13 thirty-two hundred employees who were laid off yesterday.

14          There were employees who would have been entitled to

15 the previously described retention plan for -- or the

16 replacement commission plan included in the layoff.  They are

17 not being proposed to be paid any amount post-petition -- or

18 they aren't being proposed to be paid any retention amount

19 post-petition.  So then they have small salary amounts that

20 would be paid post-petition.

21          With respect to the debtors' benefits, the debtors

22 propose that they be able to continue their benefits that were

23 offered pre-petition and, to the extent they fell into a

24 pre-petition pay period, to continue to pay any monthly fees

25 that the debtors have with respect to maintaining those

1 different insurance medical plans and life insurance,

2 independent -- and other insurance benefits.  It is, I think,

3 important to note for the Court that one of the items that may

4 make this a little unusual is that the debtors essentially

5 self-insure for medical, dental and vision, and, as set forth,

6 the debtors pay approximately $3 million a month for claims for

7 medical, 340,000 for claims under the dental plan and 46,000 a

8 month for claims under their vision plan.  Accordingly, in the

9 cash flow that was presented for the Court, there's a medical

10 claim line item that shows a weekly amount, larger the week of

11 the 7th probably due to disruption in payments as a result of

12 the filing, and thereafter approximately $750,000 a week for

13 these medical claims.

14        The debtors request to continue their flexible

15 spending programs and dependent care accounts.  In effect, the

16 debtors are maintaining for the employees their own pretax

17 dollars that have been set aside.

18        With respect to retirement benefits, and this is a

19 number included in the payroll, the debtors due have a 401(k)

20 match of 50 percent of the first six percent contributed, and

21 on average those are $814,000 per month.  The matching

22 contribution in connection with the current payroll we expect

23 to be $339,000.

24        Also of note, and, again, I'm going in the order of

25 the motion, the debtors recently terminated their employee

1  stock purchase plan, or caused the debtors to -- I'm sorry,

2  caused the employees to cease withholding from their paychecks

3  additional amounts.  Because the -- since the debtors are

4  unable to -- are not current in their financial reports, the

5  employees were not able to purchase stock in the stock purchase

6  plan, and so the company took efforts to refund the

7  approximately $1.2 million to them.  Many of those amounts --

8  those amounts were made by check, many of which have not

9  cleared, and that approximately 1.2 million is included in the

10 seven to eight million that's in funded -- what I'll call

11 funded payroll accounts that has not yet cleared.

12          In addition, the debtors are seeking to reimburse

13 employees for their expenses, and they're -- both with respect

14 to expense reports that may be submitted and, in addition,

15 American Express has provided corporate cards to the debtors,

16 and in connection with those programs, both the corporation and

17 the individual employees are liable for those cards.  On

18 average, these employees' expenses are approximately 578,000

19 per month, and as of the petition date, the debtors estimate

20 they owe employees approximately $289,000 in reimbursements.

21 Those reimbursements are also subsumed in the payroll account

22 lines set forth in the cash flow.

23          Before I provide the proffer, Your Honor, I didn't

24 know if you had any questions about any of the specific amounts

25 or the -- or programs.

1          THE COURT:  Well, yes, I do, and they center around,

2    as you might imagine and probably anticipated, those portions

3    which are proposed to be paid to -- for pre-petition

4    obligations with respect to employees who have been terminated.

5    In the papers it is asserted that it's necessary for the I'll

6    say well-being, my words, not necessarily the debtors, of those

7    employees who remain I take it largely or exclusively in the

8    servicing business at this point, that those who have been

9    terminated, who I understand were largely in the origination

10   part of the business, are well treated so that the debtor is

11   assured, as are potential buyers, I suppose, that those

12   employees still employed will remain employed and happily

13   occupied pending such sales.  I mean, do I have that

14   essentially correct?

15          MS. UHLAND:  Essentially, yes.  We believe that the

16   treatment of the exiting employees is critical to the retention

17   of the continued employees.

18          THE COURT:  Okay.  I'm not convinced of that.

19          MS. UHLAND:  And let me also -- just one other fact

20   is there's approximately 600 employees in the servicing

21   business that are just in the servicing business.  That's

22   excluding, you know, corporate and there is still substantial

23   origination employees who are in the remainder that were -- in

24   the balance of the employees, primarily in Southern California.

25          THE COURT:  Okay.

1          MS. UHLAND:  Your Honor, I think that that question

2     is the question, is are these payments necessary, and that is

3     -- we are understanding or anticipating that this would be the

4     question.  That is why we've had -- we've looked at it, thought

5     hard about it and we have a proffer of Ms. Etlin with respect

6     to exactly that issue, with the opportunity for the Court and

7     the United States Trustee to ask questions of her or cross

8     examine her.

9          THE COURT:  Okay.  You may proceed.

10         MS. UHLAND:  Thank you, Your Honor.  Your Honor, in

11    the courtroom today and prepared to testify is Holly Etlin, a

12    seasoned executive with 30 years providing restructuring and

13    reorganization services to companies.  Ms. Etlin's a partner

14    with AlixPartners and before that was a principal with XRoads

15    Solutions Group in New York.

16         Ms. Etlin holds a bachelor's degree from the

17    University of California in Los Angeles.  She is a certified

18    insolvency and restructuring advisor and a certified turnaround

19    professional.  She is also immediate past chairman of the

20    Turnaround Management Association, member of the American

21    Bankruptcy Institution Association of Insolvency and

22    Restructuring Advisors.  Ms. Etlin has served as the CRO and

23    acting CEO of Tanner & Haley, one of the largest luxury

24    destination clubs in the United States.  She stabilized the

25    business, merged it with another destination business within

six months.  Ms. Etlin was also the turnaround advisor to

Winn-Dixie, where she assisted management in identifying and

executing a strategy to reorganize the company, including

downsizing and other cost reduction activities.  She was

previously the CRO of Impath, a cancer pathology company which

was plunged into crisis after accounting irregularities.  In

that capacity, she also stabilized the business, improved cash

flow and restored customer and employee confidence.

        If called to testify, Ms. Etlin would testify as

follows.  The single factor determining the value of the

estates, the value of the estates to recover for the benefit of

creditors in the sale of their business, is retention of

remaining employees.  The debtors operate a service business.

If they do not have a stable workforce to maintain the business

during the sale process, the value to potential buyers will

quickly dissipate.

        Ms. Etlin and her firm is advising the debtors to

take dramatic steps to cut costs, including implementing

significant layoffs in the debtors' workforce.  While cutting

the future cost of retaining employees through recent layoffs

is in their best interest, failing to pay terminated and

remaining employee obligations promised them by the debtors

pre-petition, including but not limited to salary, commission,

vacation employee benefits, would have a devastating impact on

the value of the estates.  Remaining employees will look to the

1  treatment of terminated employees when evaluating whether they

2  should continue their employment with the debtors.  She would

3  further testify if terminated employees are not paid amounts

4  they were previously promised, remaining employees will

5  question the debtors' ability to keep promises of payment and

6  will seek other employment.

7         The servicing employees are highly skilled and

8  motivated, working in a challenging environment collecting

9  defaulted subprime loans in a regulated industry.  These

10  employees are not easily replaced.

11         She would further testify that vacation pay is a

12  lightening rod issue for many of the employees.  Employees that

13  did not stay with the debtors and exited pre-petition were paid

14  their vacation, and those who were terminated post-petition and

15  others would feel that those that remained were punished for

16  continuing to work with the debtors.

17         Further, the debtors origination employees that

18  stayed with the debtors and did not take other income

19  opportunities assisted in transitioning the debtors' loan,

20  providing great value to addressing regulatory issues.

21         A majority of the debtors' employees currently are in

22  Southern California, which has a robust economy, and the

23  employees have other opportunities.  Retention of these

24  employees may be difficult if these employees -- or will be

25  difficult if these employees believe that they will not be

1  treated appropriately by the debtors.

2          Many of the debtors' highly skilled employees are the

3  subject of calls by our competitors.  Many of the debtors'

4  competitors have major operations in Southern California and

5  from that base are targeting some of our key employees.

6          Your Honor, Ms. Etlin would testify, finally, that

7  the payment of all vacation -- or the commitment to pay the

8  vacation to the terminated and continuing employees in an

9  uncapped amount is key to retaining the future -- the remaining

10 employees with the debtors.  That's the conclusion of my

11 proffer.

12         THE COURT:  Does anyone wish to examine Ms. Etlin?  I

13 hear no response.  Does anyone else care to be heard in

14 connection with this motion?  U.S. Trustee?

15         MR. McMAHON:  Your Honor, good afternoon.  Joe

16 McMahon for the Office of the United States Trustee.  Your

17 Honor, our office reviewed the motion and has issues -- I guess

18 one general or a global issue and then issues with regard to

19 specific paragraphs and relief requested that debtors' counsel

20 will identify for you in her presentation.

21         As a general matter, Your Honor, the Office of the

22 United States Trustee is sensitive to these types of requests

23 insofar as particularly their impact on rank and file

24 employees, and with respect to that, Your Honor, the Office of

25 the United States Trustee does not have an objection with

1  respect to specifically the payroll request for the two weeks

2  prior to the petition date or for the vacation cash-out request

3  at Paragraph 28 to the extent that those payments to rank and

4  file employees are subject to the cap set forth in Section

5  507(a)(4) and 507(a)(5).  And with respect to that general

6  request -- general point, Your Honor, excuse me, I think that

7  one of the difficulties with respect to a motion like this is

8  the cap in 507(a)(5) refers to employee benefit plans and

9  certainly the benefits under -- that are payable under Section

10 507(a)(4) are netted against that such that reducing some of

11 the benefits here to numbers is a difficult exercise.  I don't

12 know if the motion clearly delineates at the end of the day

13 what this Court is being asked to pay that would otherwise be a

14 general unsecured claim.

15        But to focus in specifically on a couple of points,

16 Your Honor, Paragraph 21 deals with incentive plans, and, Your

17 Honor, with respect to that paragraph, I'm taking a look at my

18 notes of my conversations with debtors' counsel.  My

19 understanding is that there are no amounts, I guess, due

20 post-petition from here going forward for some period of time.

21 And that -- although certain payments were made under that

22 plan, pre -- under one or more of those plans, excuse me,

23 pre-petition as they are referenced in Paragraph 21.

24        I don't know if we pinned down specifically what the

25 -- my understanding is that there are outstanding checks that

1  have not cleared under one or more of those plans, and I think

2  we have to understand what it is that remains outstanding under

3  those particular plans, Paragraph 21.

4         Paragraph 22 refers to the retention plans, and

5  that's the 7.3 million that was referenced in debtors'

6  counsel's presentation.  Your Honor, we believe that this

7  particular request should go out on notice and I believe our

8  conclusion in that regard is buttressed by a couple of factors.

9  First, given the fact that we are talking about what is

10 essentially an out of the ordinary course retention program, we

11 believe that the official committee of unsecured creditors

12 should have the opportunity to review this at the point at

13 which it is -- it is formed.  And, Your Honor, looking at the

14 DIP budget which was put before Your Honor, if my understanding

15 is correct, the first amounts payable under that -- under the

16 Paragraph 22 retention plans do not become payable until the

17 weekend the 21st of April, such that if we do have a formation

18 meeting next week, there will be ample time for the committee

19 to, I guess, take a look at that particular subject before

20 weighing in on it.

21        Your Honor, I believe that, I think, summarizes where

22 my office is at with respect to this particular motion, unless

23 Your Honor has any questions.

24        THE COURT:  I do not.  Does anyone else care to be

25 heard in connection with this motion?

1              MS. UHLAND:  Your Honor, with respect to the two

2    issues raised by the trustee, first the cap issue.  One of the

3    concerns -- or really the key concern with that is that it's

4    likely that their -- you know, we understand -- we've

5    calculated that with respect to the current payroll that's

6    being made that all amounts are under the cap, the two week

7    payment we know that there's -- of the last two weeks payable

8    that all amounts are under the cap.  But with respect to the

9    vacation cash-out, on average the payments that we anticipate

10   making to the riffed employees is approximately seventeen

11   hundred dollars per employee, on average.  It's about two weeks

12   of compensation, and the -- you know, the balance -- but what

13   we don't know is when we -- and it would be difficult for us to

14   calculate -- is that because we filed at so -- at the end of a

15   pay cycle and we have a full two weeks of accrued unpaid

16   vacation -- I'm sorry -- of accrued wages based on our filing

17   date and when our payroll's made, and the timing of our payment

18   was, you know, nothing to do with our employees, that capping

19   them of a combined pre-petition wages and vacation at a cap

20   just seems, you know, (1) it would be very difficult to

21   calculate, but (2) we believe on average we're close, but it

22   just seems unfair to these individual employees that this

23   particular timing is depriving them of these payments.

24              THE COURT:  You mean you think Congress got it wrong?

25              MS. UHLAND:  Well, it's difficult to layer the

1  priority payments with the -- I mean, you're trying to layer

2  the priority statute, which is the concept, well, you know,

3  there should be some amount we pay to employees that we all

4  feel comfortable is, you know, an amount we can pay to the

5  employees on a priority basis, and there's, you know, how do we

6  -- how do we minimize the effect and the timing of a filing of

7  a massive case with a massive number of employees on an

8  employee population and, at the same time, we are trying to

9  affect -- in order to stabilize this case we knew -- you know,

10  the question was, how do you time a massive layoff?  Do you do

11  a massive layoff, you know, three days before a filing and

12  trigger the cash payments of -- if we had done that, under

13  California law we would have been required to pay in full all

14  accrued vacation, and under many other states.

15       And so we -- there was -- one of the reasons we -- or

16  not a reason, but as a result of the bankruptcy filing, they

17  didn't get their cash payment because of the timing of the

18  bankruptcy filing on the vacation.  So, there's a number of

19  factors here at play, and just in the interest of both fairness

20  and -- and just the logistics -- I mean, as we -- you know, my

21  view is the main reason for these first day hearings that we

22  have is how do we take a massive organization, get it through

23  the abrupt occurrence of a filing and yet, you know, preserve

24  the value to the key -- and provide the services and retain the

25  key people who are necessary to continue?

1          THE COURT:  It seems to me that, while I understand

2   how disruptive a Chapter 11 filing can be, that, frankly, this

3   company may have suffered other events prior to the filing

4   which may have had even a more dramatic effect on its

5   operations, including the various cease and desist orders,

6   including the cutting off of funding from lenders.  I agree

7   that the 11 -- the timing of the 11 creates other issues as

8   well and that they're not necessarily simple, but -- and I

9   don't disagree necessarily either with how you articulate the

10  concept for, in part, what first day hearings can do, but I

11  still have to be mindful of what it was Congress intended with

12  respect to employee obligations, particularly pre-petition

13  ones, and the fact that today -- and, of course, there almost

14  never is, a committee to give its view.

15          And, frankly, my inclination today on the relief

16  that's requested is to grant interim relief only.  I agree with

17  the U.S. Trustee about the retention portion.  No payment,

18  however characterized, it seems to me ought to be made to any

19  employee on pre-petition amounts, whether current or

20  terminated, that exceed the priority limitations and that we

21  revisit the issue I guess as early as, assuming that we end up

22  setting a hearing on April 10th for bidding procedures and

23  perhaps other things, on that date and perhaps later.  I am at

24  the moment on the fence still about whether even the priority

25  amounts should be given to terminated employees.

1          Now, frankly, I see other reasons, at least in my own

2    mind, possibly for paying the terminated employees their two

3    week pre-petition wages, perhaps even more important than the

4    ones the debtors are asserting.  I mean, I understand that some

5    general malaise could be created among remaining employees as a

6    result of the treatment.  I don't -- I give some credit to that

7    argument, but I guess I also look at issues that will be

8    created later by failing to pay them.  I mean, we'll have to go

9    through the bankruptcy process, the claims process and all of

10   those things which, in a case that at least is intended to move

11   as rapidly as this one given the circumstances of the business

12   and the industry, may slow something down later unnecessarily

13   and might be harmful to the administration of the estate.  So,

14   it's not that I don't see reasons to make those payments.  Now,

15   the U.S. Trustee hasn't objected, and I give some credit to

16   that in deciding whether to afford that relief.

17          I guess the other factor weighing in favor of

18   approving that portion of it, even as to terminated employees,

19   is the fact that they weren't voluntary departures and the

20   debtor had to make its decisions for the reasons that you've

21   explained, and they were with the company during a period of

22   time, as we all know, when it probably was not an easy time to

23   be there.

24          So, as I talk it through, I am inclined to approve

25   that portion of the payment, but with respect to the other

1  requests, I'll grant interim relief only, subject to the 507

2  caps, and expect that the retention portion will go out on

3  notice.  The other benefits -- health, dental, vision can be

4  paid as normally they would be.  Now, is there a component that

5  I've missed that we need to address?

6           MS. UHLAND:  Your Honor, give me one moment.  We do

7  need time, but one moment.

8           THE COURT:  Okay.

9                     (Pause)

10           MS. UHLAND:  Your Honor, just I want to clarify two

11  points.  On what was the retention plan, that is in effect, you

12  know, the compensation for those affected employees, 70 to 80

13  percent of their compensation for that period, so as far as

14  putting it out on notice, is the contemplation that we'll

15  address that -- you know, out on notice to be addressed,

16  hopefully at the next hearing that the Court is having on this

17  same schedule or --

18           THE COURT:  April 10th, that's correct.

19           MS. UHLAND:  Okay.

20           THE COURT:  You know, I -- look --

21           MS. UHLAND:  But it's not -- as the U.S. Trustee

22  pointed out, it's funded sometime immediately thereafter, so --

23           THE COURT:  Look, I'm sensitive to the debtors' needs

24  and the reasons that have been expressed, but I do think the

25  U.S. Trustee is right on that one, and it seems to me that's

1   about as early as we can get to it since the formation meeting

2   precedes the hearing by just a couple hours more than 24.

3            MS. UHLAND:  Then on the other piece, if we could

4   clarify, Your Honor, it would aid us greatly, and I think is

5   for the other reasons warranted, if we could simply have a

6   monetary cap of I believe it's now ten thousand nine fifty on

7   the -- on the pre-petition cash payments because of the

8   difficulty of calculating the six month accrual for the

9   vacation.

10           THE COURT:  Is that -- those are the figures as of

11  April 1?  Because they -- they've changed recently, went into

12  effect, and I haven't brought them out to the bench yet.

13           MS. UHLAND:  Yes, it's ten thousand nine fifty.

14           THE COURT:  Okay.

15           MS. UHLAND:  The one timing thing for our employees

16  --

17           THE COURT:  All right.  You okay with that, Mr.

18  McMahon?

19           MR. McMAHON:  Your Honor, I know it went up above

20  10,000.  I don't know whether it's six fifty, nine fifty or

21  whatever.  But we can get the number, right?

22           MS. UHLAND:  Whatever it is.

23           THE COURT:  Wait right there.

24                      (Pause)

25           THE COURT:  Ten thousand nine fifty.  I knew I should

1  have brought these out earlier.

2          MS. UHLAND:  And then the other part was that the --

3  instead of having to try to trace every single date of accrual

4  of vacation that the total vacation is -- we can put out total

5  accrued vacation plus pre-petition wages.  We just need to add

6  those two numbers and cap them, if that's acceptable.

7          MR. McMAHON:  Your Honor, Joseph McMahon.  This goes

8  back to the issue that I raised with Your Honor about netting

9  that goes on when we talk about 507(a)(5) and the application

10 of that cap.  It seems to me that if we do a straight authority

11 under 507(a)(4) to cash out under -- to write checks up to the

12 amount of 10,950 per employee, you're effectively ignoring the

13 fact that there is a cash value that goes with the 401(k)

14 matching benefits and other things like that.  So, you know, we

15 didn't write the statute, you know, the way it is postulated,

16 but it does require a mathematical calculation to be done.

17         THE COURT:  Well, my thought was, to answer your

18 question, counsel, that no payment be made in excess of the

19 caps in the aggregate.  To the extent there's an allocation

20 issue that has to be straightened out later, it seems to me

21 that given the amount of the caps it would be de minimis.

22 That's what I was thinking.

23         MS. UHLAND:  And that's the -- it's not really the

24 allocation issue.  It's when we are going to calculate a

25 payment to an employee, there's going to be an amount of their

1  accrued vacation and there's going to be their unpaid wages,

2  and that technically the statute says that it's for wages

3  accrued in the 180 days prior to filing and depending on how

4  you do the math on -- if somebody hadn't taken vacation for

5  nine months, they might have -- they might have accrued

6  vacation beyond the six month period.  It's that -- it's that

7  math that I have experienced before, not typically substantial,

8  but can be nearly impossible in a company in this size to go

9  through and try to run those calculations.

10           THE COURT:  Well, as I say, assuming you're not

11  exceeding the cap --

12           MS. UHLAND:  But we're not exceeding the ten thousand

13  nine fifty in the combined --

14           THE COURT:  And, again, it becomes an allocation

15  issue.  It seems to me it's going to be de minimis.

16           MS. UHLAND:  I would think so, Your Honor.  I just

17  want to avoid the administrative difficulty if there's a

18  question about the timing of accrual.

19           THE COURT:  Well, I'm not -- it may be that questions

20  may arise later, and I'm not foreclosing that, but for ease of

21  getting beyond the hurdle today --

22           MS. UHLAND:  I understand, Your Honor.  So the cash

23  payment can be made in that amount subject to reconciliation of

24  the priority amount.

25           THE COURT:  Yes.

1          MS. UHLAND:  All right.  So we'll submit a revised

2    order this evening.

3          THE COURT:  Okay.  I will be in tomorrow, so I'll

4    review it and act upon it promptly.

5          MS. UHLAND:  All right.  Thank you, Your Honor.

6          THE COURT:  Mr. McMahon?

7          MR. McMAHON:  Your Honor, I would just ask to see the

8    order before it gets submitted to chambers.

9          THE COURT:  I would hope so.

10         MS. UHLAND:  Certainly --

11                        (Pause)

12         MS. UHLAND:  Your Honor, the next item is our

13   customer motion, or what we're referring to as our "customer

14   motion."  It's really our -- in some ways it's largely to

15   address our regulatory issues, and we have discussed this with

16   the United States Trustee and have some -- some refinements on

17   some of the economic effects of these where -- which we've

18   discussed with them, and the amounts are, in fact, lower based

19   on current information and I think will be -- as far as sort of

20   the dollars involved they may have appeared from the motion.

21         As noted, you know, the debtors ceased as of March

22   1st originating loans and have been working with their

23   regulators to move those loans to other -- to other lenders and

24   have been taking other actions to try to maintain their

25   standing with the regulators so that they can restart and

1 maintain their licenses and restart originations and continue

2 servicing.

3       There are three programs we're seeking authority for

4 in the customer motion.  First, New Century takes certain

5 borrower deposits in connection with loan applications, and

6 they've worked with the regulators to develop a consumer

7 restitution plan to refund those deposits.  This amount was not

8 included in the motion, but the total estimate amount for this

9 refund program is $90,000 and, in fact, that $90,000 was placed

10 in escrow immediately prior to the filing.  So we do not need

11 to use further case to establish that escrow.  It has been

12 established.

13       THE COURT:  Okay.  Now, is it the debtors' position

14 that as of deposit of the escrow it is or is not property of

15 the estate?

16       MS. UHLAND:  Your Honor, I need to -- I have not had

17 an -- I did not realize that the escrow had been established

18 immediately prior.  We would need to review to determine -- the

19 terms of the escrow were reviewed with the regulators to get

20 the -- their understanding and agreement to it, but I am not

21 certain -- I believe that it's been wired to counsel for the

22 debtors, but I don't know if it's been formally established

23 pursuant to an escrow that would not be property of the estate.

24 That's one of the further reasons for seeking relief here

25 today, that up to that 90,000 in escrow that we be permitted,

1  to the extent it is property of the estate, to refund it in

2  accordance with out consumer restitution plan.

3       THE COURT:  Okay.  Now, as I understand that

4  component, it is with respect to customers who are no longer

5  customers.

6       MS. UHLAND:  That's correct, Your Honor.

7       THE COURT:  Okay.  So, I then follow with the

8  question, of what importance is it to pay former customers

9  after the filing of the petition?

10       MS. UHLAND:  The importance to paying the former

11  customers is that this is part of an arrangement that we agreed

12  to with certain regulators in order to maintain our licenses.

13       THE COURT:  Okay.  And I suspected that it was for

14  that reason, but maybe even more so for the ultimate comfort of

15  the company and its management with respect to consequences

16  which might follow if such customers were not repaid.  Am I

17  correct about that?

18       MS. UHLAND:  Well, there's certainly, Your Honor,

19  with respect to the -- there's certainly the effect on the

20  business of having unpaid customers and that negative

21  ramification, which would be the typical customer -- the basis

22  for the typical customer motion, you know, honoring refunds and

23  other obligations for a consumer-type motion, and that is the

24  other basis.

25       THE COURT:  Sure, keep the states attorneys general

1 away.

2          MS. UHLAND:  That's correct, Your Honor.

3          THE COURT:  All right.  I acknowledge there is some

4 benefit to that.  Continue.

5          MS. UHLAND:  The second portion of the -- this motion

6 requests relief to continue to fund certain advances on

7 manufactured housing loans that the debtors have been engaged

8 in pursuant to a federally approved program.  This -- our

9 desire to continue to comply with these loans is based on two

10 bases.  First, our failure to continue making these advances

11 will jeopardize our ability to continue to participate in the

12 manufactured housing program, that it's an important federal

13 program and one of the few federal programs that we are

14 currently still licensed -- or still approved for.  Second --

15                         (Static)

16          THE COURT:  Go ahead.

17          MS. UHLAND:  Second, these loans --

18          THE COURT:  I'm sorry.  By the way, if anyone has an

19 active PDA who's sitting on this side of the bar, turn it off

20 -- that sometimes interferes with the system -- if you would.

21 Thank you.  Go ahead.

22          MS. UHLAND:  The second element, continuing the

23 advances on construction loans, which the debtors estimate and

24 would be willing to limit their authority for on this interim

25 motion to be -- to $2.5 million we can agree on an interim

1  basis to and have revised our order to provide that cap.  And

2  as these are the balance of the advances that we have

3  previously committed to, without making the advances, the loans

4  that were initially funded under these lines, would be

5  essentially valueless.  So that is the second basis for seeking

6  the authority to continue fund those loans.

7          So, it's both maintenance of our regulatory licenses,

8  or our federal approvals in that case, as well as continue to

9  fund those so that the value of those loans is preserved.

10  Those loans do serve as collateral for one of our warehouse

11  lenders, but nonetheless obviously benefits the estate to the

12  extent that value is preserved.

13          Finally, the third piece is the completion of the

14  transfer of the pipeline loans, if necessary.  When we first

15  began the process of transferring the pipeline loans, the

16  regulators were concerned that some lenders might not be

17  willing to take the transfer from us if they could be subject

18  to delay or review from -- if there was any subsequent

19  bankruptcy filing, which there has now been, that those loans

20  were assets of the debtors that were being transferred to them

21  without consideration.  Accordingly, in connection with the

22  original institution of this program, the debtor is committed

23  with the regulators that we would, on the first day of our

24  case, seek specific court authority to continue or to transfer

25  these loans to other lenders.

52

1        We're now at a point that all 27,000 loans have been

2   transferred to other lenders, but out of an abundance of

3   caution and in case there is any documentation to be completed

4   that might be needed to transfer the debtors' property, we're

5   seeking court approval to complete that program.

6        Your Honor, I have a revised order, after discussions

7   this morning with Mr. McMahon, that provides for the $90,000

8   limitation on the amounts in the consumer restitution plan

9   without further order of the Court, the 2.5 million limit on

10  the construction loans without further order of the Court, and,

11  at his request, the debtors -- to the extent there are

12  additional loans identified that have not been transferred to

13  pipeline lenders, we've agreed to notify any creditors'

14  committee and the United States Trustee.

15        THE COURT:  All right, thank you.  Does anyone else

16  care to be heard in connection with this motion?  I hear no

17  response.  Mr. McMahon, anything to add?

18        MR. McMAHON:  No, Your Honor.

19        THE COURT:  Okay.  With those limitations, I'm

20  prepared to approve that relief.

21        MS. UHLAND:  Thank you, Your Honor.  We'll submit the

22  revised order at the conclusion of this hearing.

23        THE COURT:  Very well.

24                    (Pause)

25        THE COURT:  By the way, I'm told that some farther in

J&J COURT TRANSCRIBERS, INC.

1  the back of the courtroom are having difficulty hearing.  We'll

2  all try to speak up, and I'll let you know, despite the fact

3  that this courtroom has been relatively newly built out, we are

4  going to be adding speakers farther back, so hopefully we'll

5  eliminate this problem in the future.

6           MR. LOGAN:  And, Your Honor, I will try to speak up.

7           THE COURT:  Thank you.

8           MR. LOGAN:  Ben Logan of O'Melveny & Myers.  I will

9  address now the motion to approve the debtor-in-possession

10 credit agreement, and, Your Honor, the way I would propose to

11 proceed is to give a brief outline of the motion, the terms of

12 the debtor-in-possession credit agreement, turn second to

13 proffers from two witnesses we have available to deal with some

14 of the critical aspects of the debtor-in-possession credit

15 agreement, and finally address the only written objection we've

16 received, but also some oral discussions with various counsel

17 in the courtroom and the Office of the United States Trustee.

18 And we do have a revised order that addresses many, but not

19 all, of the issues that were raised.

20          Your Honor, if you had asked me a week ago or even

21 Friday if we'd be in the shape we are in today to bring this

22 case before Your Honor, I would not have believed we would be

23 in as good of shape as we are.  As Ms. Uhland said, this

24 business is one that is very fragile.  The debtor-in-possession

25 credit agreement is part of a multi-pronged effort to stabilize

1 this business, to bring it quickly to a sale, to preserve it as

2 a going concern so that we can, in fact, realize the maximum

3 possible value for our stakeholders.

4        It was not easy to find debtor-in-possession

5 financing.  It was not easy to find stalking horse bidders for

6 the two key components of our business that we are going to be

7 present to the Court shortly.  We were, to be honest, quite

8 concerned about whether or not we would be able to maintain the

9 stability of this enterprise so that we could, in fact, bring

10 before the Court's consideration, the creditors' consideration,

11 a going concern, a going concern that could be sold in auction

12 process quickly to realize the maximum possible value for the

13 estates, and we hope those are active auctions with substantial

14 bidders.  But if you had asked me on Friday whether or not we

15 would be in a situation where we have two stalking horse bids

16 and a good solid DIP in place, I'm not sure I could have

17 answered that as positively as I can today.

18        It's critical from the estate's perspective to

19 maintain liquidity and financing so they can pursue that goal,

20 for otherwise we would be faced with a situation where any

21 prospective bidder -- prospective bidder for our assets would

22 know that we were under the gun.  There would be a fire sale.

23 As Lazard and the other professionals would explore possible

24 sales to bidders, they would be operating at a substantial

25 disadvantage, for the bidders would know that we could very

1 well go out of business, they could pick up assets on the

2 cheap.  We would not have a stable environment pursuant to

3 which we could pursue these sales.

4         As we discussed before, the employees would have

5 substantial concern about whether or not their post-petition

6 checks, payroll checks, could be met, and it's absolutely

7 essential that we maintain the workforce that services these

8 loans, that maintains the origination platform.  And I do want

9 to emphasize there is a mothball at origination platform which

10 basically means human beings and pared down number of lease

11 facilities, and it's a substantially reduced workforce, but

12 there is an infrastructure in place reduced to the minimum

13 amount that the professionals who studied this believe is

14 critical to maintain a going concern in the hopes that we can

15 quickly, within the next 30 to 45 days, sell that for

16 substantial value.

17         Without financing, our accounts payable department

18 would have to deal with the imponderables, of dealing with

19 post-petition suppliers who demanded wires, cash in advance.

20 Not only would that strain our liquidity but it would also just

21 place an incredible administrative burden on the operations of

22 the business.  Without debtor-in-possession financing and the

23 cash management order we're going to turn to next, the

24 servicing business would be at -- would be in dire straits.  We

25 really need to maintain the ability to operate our servicing

1  operations, which includes not only employees who have to be

2  cognizant of the extreme degree of regulation in this industry,

3  but be sensitive to how one best goes about collecting a

4  defaulted subprime loan.  That's not an easy job.

5       We have cash flows that Ms. Uhland handed up to the

6  Court before.  They show that if we have the DIP in place, we

7  will run out of cash -- we'll start to borrow under the DIP.

8  Without the DIP we would run out of cash by essentially the end

9  of this month.  We are cognizant of the fact that any cash flow

10 is inherently a reasonable best estimate.  We think it would be

11 imprudent to try to operate a business, particularly a service

12 business of this sort, without a -- without a realistic

13 cushion, without a cushion that gives us the liquidity to at

14 least bring before the Court and the creditors (indiscernible).

15                     (Static)

16           MR. LOGAN:  I turned mine off.

17                     (Pause)

18           THE COURT:  Is that the phone connection, Jason, or

19 is it -- is it here?

20           MR. SMITH:  I'll check (indiscernible).

21           THE COURT:  Yes.  Just one moment.

22           MR. LOGAN:  Certainly.

23                     (Pause)

24           MR. LOGAN:  Boy, I was on a roll.

25           THE COURT:  Well, let me ask then, if anyone on the

1  other side of the bar has an electronic device of any kind

2  still on and that they turn it off.  Maybe we can eliminate the

3  static that way.  Go ahead.

4          MR. LOGAN:  Your Honor, what I think I was saying was

5  that it's essential to let us get from here to there, there

6  being an auction of essentially all of our assets within about

7  30 to 45 days.  It's essential to have a stable platform, and

8  this debtor-in-possession financing facility is a key aspect of

9  that.

10          And let me now describe the structure of that

11  facility, and then I want to talk a little bit about how we

12  were able to persuade our lenders to provide it.  There are two

13  tranches.  The first is just a basic revolver.  On Day 1 it has

14  $50 million of availability.  It's an advance against a

15  borrowing base consisting of some unencumbered collateral.

16  This is not a priming DIP.  This is a DIP that would secured by

17  first priority liens on certain assets that are not presently

18  encumbered, and they comprise the borrowing base, and they are

19  multi-fold.

20          First off, we have what are called LNFA, which is one

21  of the world's greatest acronyms.  It means "loans not financed

22  anywhere."  They aggregate in principal amount $173 million.

23  There's a reason these loans are not financed anywhere.

24  They're not our best loans.  These are by and large loans that

25  we sold.  My wife keeps telling me I have to stop saying "we."

1  My client sold, New Century Financial Corporation sold, largely

2  to hold/own buyers, and after the transaction's closed, the

3  buyers either discovered that the loan didn't meet certain reps

4  and warranties or the customer, the consumer, had an early

5  default under the loan, and that gave the buyers of the loans

6  the ability to put the loans back to New Century.  New Century

7  honored those obligations, and as a result is the proud owner

8  of 173 million face amount of loans not financed everywhere

9  (sic).  It will come as no shock to anyone that our

10  debtor-in-possession lender is not willing to advance $173

11  million against these loans.  They are unencumbered collateral,

12  but they are not the best loans in the world.  But they are

13  part of the collateral base.

14          Second, there are a group of what are called

15  "residuals."  When New Century sold loans to securitization

16  trust, it typically received cash, cash being the proceeds of

17  the senior mortgage-backed securities that were sold by the

18  securitization trust and residuals, which are the junior

19  interest in those mortgage-backed trusts, the securitization

20  trust.  There is a pool of residuals that New Century has that

21  hit has not pledged to anyone.  One of the -- the only written

22  objection we received was from Morgan Stanley, and I want to

23  talk about that later, but to be clear for present purposes,

24  there are some residual interest that the debtors on March 12

25  of this year, a couple weeks ago, pledged to Morgan Stanley.

Those are not, repeat not, the residuals that are being offered as first lien priority collateral to the DIP lenders. We have a compendium of other residual interests that are not encumbered and they comprise the second component of the borrowing base and the first lien collateral.

The third component -- this is my favorite part of the collateral -- are some tax refunds that the debtors have in process, both the state and a federal tax refund. About the only good news that resulted from the restatement of the financials and the like was it turned out we paid more taxes in past years then, in fact, we owed given the fact that we now have net operating losses that we can carry back. The Internal Revenue Code has a provision which expedites those refunds. It typically provides that the Internal Revenue Service must process the refund within 45 days, 60 days. I think it's a maximum of 120, and I probably -- I'm getting in over my head here, but there are some refunds that will be processed quickly for slightly over $100 million. Those refunds, not surprisingly, are not subject to any of our warehouse loan facility collateral. They are unencumbered collateral.

Finally, for purposes of the way at least I analyzed the first tranche, the Tranche A, is an interest that the debtors have in a fund, private equity fund, called CCM, Carrington. Carrington was one of the buyers of many of the loans that New Century has sold over the last two or three

1  years, and in the course of those transactions over the last

2  several years, New Century invested with Carrington and took

3  back a limited partnership interest in the Carrington fund.

4  That also is unencumbered, probably a quite valuable asset, and

5  that is part of the collateral that comprises the first lien

6  facility for the Tranche A piece.

7          There's also a Tranche B piece, which would be up to

8  $50 million which would be made available to New Century if New

9  Century is able to convince the lenders to provide this

10  facility, which relates to the servicing business.  And let me

11  give a little bit of background there.  As Ms. Uhland said, to

12  service loans the servicer, New Century Mortgage Corporation

13  generally, needs to periodically fund certain costs -- either

14  pay taxes related to the underlying real property, sometimes

15  pay interest and principal on the senior securitization notes

16  and basically fund other costs that are really just part and

17  parcel, a very important part, of being the servicer.  It does

18  so under securitization documents that provide a waterfall for

19  recoveries which gives a very high priority to the recovery of

20  what are called advances.  These are servicer advances.  And

21  technically under the servicer agreements, which we sure want

22  to do our utmost to maintain, because that's what we're selling

23  when we're selling the servicing business, at least in large

24  part, under those servicing agreements, the -- I lost my train

25  of thought -- but under those servicing agreements one of the

1  first priorities is to get back these advances.

2         Funding the advances requires liquidity, and

3  pre-petition the debtors had a -- what was called a servicer

4  advance facility with Citigroup, Citigroup Realty, and

5  Citigroup Realty advanced money secured by those advances, the

6  debtors' rights to be reimbursed by the securitization trust

7  when money came in from the borrowers.

8         The train of thought that I was about to lose is --

9  that I had lost was that the debtors are only required to make

10 those advances if they are confident that they will, in fact,

11 be repaid.  You don't have to throw good money after bad.

12 These are solid, good pieces of collateral, indeed to the point

13 that Citigroup pre-petition advanced at a 95 percent advance

14 rate.  And as of the petition date, Citigroup had approximately

15 $31 million outstanding under this facility.

16        We are not seeking today to use Citigroups' cash

17 collateral.  Instead, hopefully over the next ten days we will

18 be able to persuade the DIP lenders to take out Citigroup and

19 provide additional liquidity with advances from them to New

20 Century against the rights to be reimbursed for advances New

21 Century makes as part of its operations as a servicer business.

22        THE COURT:  Okay.  So that addresses one of my

23 questions.  Why does Citigroup Realty have to come out?

24 Because -- the answer is you'll get more.

25        MR. LOGAN:  We will get more.

1          THE COURT:  Okay.

2          MR. LOGAN:  We will get more, Your Honor, and also it

3   will really ease enormously the administration of the servicing

4   business.  It will be an administrative problem, difficulty.  I

5   was going to say nightmare.  It's probably not a nightmare, but

6   it would be a substantial problem for the poor people who have

7   to actually administer this process, to get advances, pay down

8   Citigroup, not get anything re-advanced, because Citigroup has

9   not -- Citigroup has been very clear to us, this is a facility

10  that's terminated.  They stopped advancing pre-petition.  So if

11  we don't have a replacement for Citigroup, we will slowly pay

12  down the Citigroup facility as advances come in.  Quite

13  frankly, the cash flows that Ms. Uhland handed up don't reflect

14  that.  If, in fact, we cannot take out Citigroup there will be

15  advances that come in that won't be replenished by additional

16  advances under this facility, and to the extent that the

17  debtors receive repayment of advances it made to -- as part of

18  its servicer business that will have a -- that will have a hit

19  on our cash flow.

20         THE COURT:  Okay.  And is there any reason why this

21  -- decisions in connection with what you call Tranche B must be

22  made before the April 10th hearing?

23         MR. LOGAN:  Your Honor, I would urge yes, and I want

24  to talk generally about speed and the reason why we would urge

25  Your Honor to approve the full facility today, and that will

1  also get a bit into the proffer.  But if I could indulge Your

2  Honor, I would -- let me say one thing briefly and then, if

3  possible, return to that subject, because it's a very important

4  subject, and I understand that.

5          THE COURT:  Go ahead.

6          MR. LOGAN:  The only reason, quite frankly, that the

7  Tranche B facility isn't part of something we wanted to fund

8  today is that we ran out of time.  This DIP credit agreement

9  was negotiated over -- largely since Friday night.  If you ask

10  our families how much sleep we've gotten since Friday night,

11  the answer is precious little.  And the only reason that the

12  Tranche B facility isn't in place right now is because we had

13  to bite off what we could chew.  We probably bit off more than

14  any rational group of human beings should have tried to chew,

15  but we had to leave something to the side.  This one is an

16  important facility.  I wish we could present it to Your Honor

17  as a fait accompli today.  We are very optimistic that

18  tomorrow, the next day or sometime very quickly we will get the

19  Tranche B facility in place.  If we get it in place, it will be

20  an enormous boon to the debtors' liquidity and to facilitating

21  the administration of the servicing business.

22          A little bit about process.  Approximately three

23  weeks ago the debtors engaged Lazard, and among Lazard's tasks

24  was to pursue debtor-in-possession financing.  Did my

25  microphone go out?

J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  No.

2          MR. LOGAN:  Lazard was also tasked with trying to

3    pursue bidders, buyers for the various business (sic) or the

4    whole business.  With respect to the debtor-in-possession

5    financing piece, Lazard prepared offering materials.  Lazard

6    dedicated a team to this effort.  They solicited essentially

7    every large, sophisticated, known provider of

8    debtor-in-possession financing, and a few who weren't, that

9    they could think of.  There's a group of 14 lenders who were

10   contacted.  The proposal that was ultimately made by CIT and

11   Greenwich was by far the best.

12          And, Your Honor, something that we did not want to

13   put in the papers because until we got here I didn't want CIT

14   and Greenwich to know, is that among of the universe of the 14

15   most of them passed.  There was not a lot of competition for

16   this facility.  There was some, and we tried to get as much

17   competition as possible, but if you focus on the collateral I

18   mentioned, the first lien collateral, it's not traditional,

19   solid, certainly not hard asset collateral.  It's fairly funky

20   collateral, and it takes some lenders with some creativity to

21   be willing to provide a facility of this sort.  This is a

22   business that it's no secret has had a lot of adverse

23   publicity, is in a fragile state, fortunately a far less

24   fragile state with this debtor-in-possession financing facility

25   than it otherwise would have been and fortunately in a far less

fragile state than it otherwise would have been but for the

stalking horse bids that we spent the few hours we had when we

were working on the debtor-in-possession financing facility

trying to bring to a head, but it's not a debtor-in-possession

loan that, quite frankly, was attractive to most.

        We did get other bids, and when the bid proposed by

CIT and Greenwich was compared to the others, it was far more

attractive in a couple respects.  One, pricing.  Just by way of

illustration -- close your ears -- the pricing offered by

Citigroup and Greenwich of LIBOR plus two fifty compares to

LIBOR plus 700 to the other only realistic proposal we got.

Their fees are also less.  And, quite frankly, the other

proposal just wasn't as solid.  We had far less confidence that

we would close with them than we did with CIT and Greenwich,

notwithstanding the fact that in hindsight I'm revealing that

we didn't have a lot of leverage.

        We negotiated and negotiated hard with CIT and

Greenwich.  The fee, for example, that we're representing to

Your Honor today of two percent compares to a three for the

commitment fee, compares to a three percent commitment fee that

they proposed.  We negotiated them down.  We negotiated hard

for availability of the Tranche B facility I mentioned and also

to make sure that we didn't pay fees for facilities that we

didn't utilize, and that's why we have this step-up provision

for the Tranche A facility.  It can go from 50 to a 100 if they

1  in their -- if we persuade them that it's available and if we

2  want it.  If we don't want it, and solely on our consent, we

3  don't pay the fee on that part of the facility.  So, there were

4  long -- they weren't long.  We didn't have long.  They were

5  intense negotiations with CIT and Greenwich over the facility

6  where there was good faith give and take.

7        We are very clear in the papers and I want to be very

8  clear to the Court, that there is tie between the

9  debtor-in-possession loan facility and a stalking horse bid

10 that the Court will consider on Tuesday.  Our DIP lenders are

11 two institutions.  Of course, they have the right to syndicate

12 the facility further.  One is CIT, which is a traditional

13 lender.

14       One other thing I just want to make sure that we

15 understand, this is not a defensive debtor-in-possession loan.

16 These are not a group of pre-petition lenders who are trying to

17 shore up for position, do a roll up, try to effect a Chapter 11

18 process, to do the kind of things that we all know and love.

19 These are really people who are putting out fresh money, and

20 God bless them.

21       There are two of them who are leading the facility,

22 CIT, which is a traditional asset-based lender, loaning against

23 some assets that are not traditional, and their partner,

24 Greenwich.  Greenwich is one of the leading buyers of mortgage

25 loans.  I may have that wrong, but they certainly play in the

1 mortgage loan field.  And they were quite interested in not

2 only providing debtor-in-possession financing, but satisfying

3 one of our other key objectives, and that is making a stalking

4 horse bid for certain assets.

5       They have a stalking horse bid that will be presented

6 to Your Honor next Tuesday to buy the residuals I mentioned and

7 the loans not financed anywhere.  Their stalking horse offer is

8 $50 million.  We hope it gets way overbid, but it is a

9 reasonable starting point.  It comes with a two percent topping

10 fee, and sometimes we call that a break-up fee, but I want to

11 be clear it's a fee that only gets paid if, in fact, we sell

12 those two assets to another buyer, and, of course, the debtor

13 is not going to sell those assets to another buyer unless that

14 higher offer is sufficient to clear the two percent fee.  When

15 we get to the Tuesday hearing, we'll present something that I'm

16 sure is obvious to the Court, which is that a two percent

17 topping fee is well within the range of market conditions.  To

18 be honest, I expected more.  Greenwich is willing to provide

19 the debtor-in-possession financing only if they are given a

20 fair shot to at least get their stalking horse protections

21 presented to the Court on Tuesday.

22       One of the other points of substantial negotiation

23 with them was, what is a realistic date to present those

24 protections to Your Honor?  They wanted a date earlier than

25 April 10.  We argued, and we argued strenuously.  I pulled out

1  some personal pleas with Mr. Spiegel, who's sitting behind us,

2  to at least give us until April 10.  I was shameless about

3  using my family, which is also true, I would be a dead human

4  being if we were in here much earlier than April 10.  And they

5  gave us April 10.  There is a connection between the

6  debtor-in-possession financing facility and that.  There is no

7  requirement that Greenwich win the bind.  There's no

8  requirement that we sell the assets to Greenwich.  There's no

9  requirement that we even sell those assets, period.  What the

10  DIP does require is that by April 10 the Court enter an order

11  approving the stalking horse protections.

12          To be very clear, we are quite comfortable with those

13  stalking horse protections.  They will be argued on Tuesday,

14  and we understand fully that Greenwich would not be making this

15  debtor-in-possession loan unless it had that stalking horse

16  protection.  But with respect to that bid, the debtors would

17  have accepted that stalking horse bid and presented that to the

18  Court if there was no link whatsoever to the

19  debtor-in-possession facility.  The stalking horse bid that we

20  received from Greenwich satisfied one of our key objectives,

21  which was to move quickly to a sale of these assets in a

22  non-fire sale environment.  So, it's a key and important part

23  of the transaction.

24          One thing about the structure I just realized I

25  forgot when I was describing the collateral package that I want

1 to be very clear on, I described the first lien collateral, and

2 that's -- that comprises the borrowing base.  In addition, we

3 grant -- we propose to grant to the DIP lenders a junior lien

4 on everything else the debtors have, saving for avoiding powers

5 which will be for the final hearing.  But we propose to give

6 the DIP lenders a junior lien on everything else.

7          One of the things I will turn to when we get to some

8 of the issues raised by counsel for various warehouse lenders

9 and others is, can we give liens on things we don't own?  No.

10 And there's a provision that's added to the DIP credit

11 agreement, excuse me, the order, the interim order, that states

12 the obvious -- we can't give liens on stuff we don't own, but

13 if we own it, the DIP lenders ask for a second lien, and

14 particularly given the nature of the first lien collateral, we

15 thought that was eminently fair and it's a critical component

16 of the DIP facility.  So, I forgot to mention that when I

17 described the basic structure, and I just wanted to make sure

18 that I mentioned it.

19          Your Honor, I'd like to now turn to the proffer,

20 unless you -- unless the Court has any further questions.

21          THE COURT:  Your colleague may.

22                    (Pause)

23          MR. LOGAN:  Oh, yes, I'm sorry.  Ms. Uhland reminds

24 me that I forgot one other part of the first lien priority

25 package, and that is the right -- some mortgage servicing

1  rights related to the assets that the -- that Greenwich was

2  proposing to bid on also.  These are also unencumbered.  We

3  have a lot of mortgage servicing rights.  These are specific

4  mortgage servicing rights key to the loans not financed

5  anywhere and related to the residual interest.

6        THE COURT:  All right.  I'd like to know, at this

7  point, what objections there are or what provisions have been

8  requested for the revised DIP order that haven't been agreed

9  to.

10        MR. LOGAN:  Give me just a second, Your Honor.

11                    (Pause)

12        MR. LOGAN:  Your Honor, the only written objection we

13  received was from Morgan Stanley.

14        THE COURT:  I've read it.

15        MR. LOGAN:  And I need to give a little background

16  there.  Morgan Stanley has two continuing relations with the

17  debtors.  One is they are one of our warehouse lenders.  They

18  provided a warehouse loan facility that is secured by,

19  according to our view of how you've got to phrase things, or

20  sold to them according to their view of how you ought to view

21  things, a package of loans.  In addition, on March 12 of 2007,

22  there was an amendment to the Morgan Stanley facility pursuant

23  to which the debtors pledged to Morgan Stanley a group of very

24  valuable residual interest in securitization trust.  Against

25  that pool of residual assets and securitization trust, Morgan

1  Stanley advanced $265 million.  Morgan Stanley also purports to

2  have a lien the loan portfolio I described and in the residual

3  interest in the securitization trust to secure claims Morgan

4  Stanley has not at all related to a warehouse loan facility,

5  but instead to various loans that Morgan Stanley purchased as a

6  whole loan purchaser, which gives rise, as I mentioned earlier,

7  to various claims to put loans back to the debtors, and they

8  have asserted very substantial what are called "EPD" claims,

9  and they claim that all of those EPD claims are also secured by

10 the same pool of collateral.

11          I have had many discussions with good friends at

12 Milbank about the position of Morgan Stanley.  The so called

13 loan repurchase agreement that was entered into with Morgan

14 Stanley is highly unusual.  Every other of the warehouse

15 loans/repurchase agreements the debtors have was crafted so

16 that the facility couldn't possibly extend beyond 364 days.

17 The definition in the Bankruptcy Code of a repurchase

18 agreement, which gets a lot of the special protections that

19 Congress, in its great wisdom, gave to repurchase participants

20 requires that the agreement have a term which requires the

21 seller to repurchase what's -- the mortgage loan sold within at

22 least 364 days.  Morgan Stanley's facility does not.  It had a

23 year and a half term to it, and, therefore, we think there's a

24 serious issue as to whether or not it qualifies as a repo, as a

25 repurchase agreement.

1          In addition, as I mentioned before, Morgan Stanley

2    took a lien in these assets, which are either collateral or

3    they're owned (sic) to them subject to rights to put them back

4    to us, however one wants to phrase it, to secure not only a

5    repo, if it's a repo, but also some unrelated EPD claims.  We

6    think that -- I ought to stop.  They have notice for -- the

7    remedy sections also are materially different than the typical

8    repurchase agreement.  They just reference the Uniform

9    Commercial Code.  And accordingly, over the last week or two

10   Morgan Stanley has noticed foreclosure sales of those loans and

11   those repurchase agreements.

12         I've been clear with Milbank that it's their call.

13   They may be violating the automatic stay if they proceed with

14   that.  I don't think it's appropriate to try to decide any of

15   that today.  The Morgan Stanley objection and, quite frankly,

16   the objections that we got orally from most of the other

17   warehouse lenders, were (1) quit calling us warehouse lenders;

18   we think we're repurchase buyers.  Call yourself whatever you

19   want to call yourself.  And (2) we want provisions in this

20   order that provide that nothing in it adversely affects our

21   ability to liquidate repurchase obligations, to carry out

22   whatever our rights are under Section 561 of the Bankruptcy

23   Code, which is one of the sections that gives financial

24   institutions certain special rights.

25         Your Honor, if we start going down that path, we're

1  going to lard up an order with all kinds of things that it

2  doesn't do.  It also doesn't relieve them from the burdens of

3  the automatic stay.  It also doesn't relieve them of their

4  burdens to move in a commercially reasonable fashion.  It

5  doesn't affect the Major League baseball season.  It doesn't do

6  all sorts of things.  And we just think that we are starting

7  down a path that is very, very ill-conceived to try to lard

8  into this order things that it doesn't do.  If they think that

9  they are free to foreclose on that collateral and if they think

10 they're foreclosing on it in a commercially reasonable fashion

11 and they think they don't violate the automatic stay, that's

12 their call, but it's not before the Court today, and we just

13 think it's fundamentally inappropriate to put anything in this

14 order that deals with that.

15         Now, in order to address their issue and also an

16 issue that came in from some very cooperative efforts with some

17 of the institutions that act as the indenture trustee on our

18 securitization trust where we act as loan servicer, we added a

19 statement at the end which says none of the liens granted to

20 the DIP lenders attach to any assets that are not property of

21 the estate, including the custodial accounts, which New Century

22 Mortgage Corporation operates as custodian, as custodian for

23 third parties.  I think that's absolutely appropriate.  That

24 satisfied the servicing people.  And, Your Honor, as far as the

25 warehouse lenders are concerned, I don't think it's appropriate

1  to put anything in this order one way or another, or we will

2  all be sitting here crafting language until the cows come home

3  as to all sorts of things it doesn't do.

4       Your Honor, the U.S. Trustee raised a number of

5  issues, many of them quite technical, and by and large they

6  were things that were in the court of our lenders, and by and

7  large the language the U.S. Trustee wanted was okay with me.

8  They wanted things like the order doesn't survive a dismissal

9  of this case.  That's what the U.S. Trustee wanted.  The

10  secured lenders said no to that.  I understand why they said

11  no.  They want it to be an order that continues to have

12  vitality.

13       There were other issues, and probably the most

14  significant one of which that I ought to mention that the U.S.

15  Trustee raised, to be very clear, the expense reimbursement

16  provisions of the debtor-in-possession loan agreement,

17  obligates the debtors to pay any fees or costs of the lenders

18  under that facility or any agreements related thereto.  The

19  same is true for indemnifications.  Among the agreements

20  related thereto are the proposed asset purchase agreement with

21  Greenwich that won't have any vitality unless the Court

22  approves the stalking horse protections.  But the U.S. Trustee

23  correctly pointed out that if, in fact, the Court approves the

24  stalking horse protections, if that agreement has vitality --

25  right now it's a pre-petition agreement that the Court hasn't

blessed at all -- yes, in fact, we are agreeing to pay the

expenses of counsel for the DIP lenders not only related to

this facility but also to the stalking horse bid.  In talking

to Mr. Spiegel about that, he pointed out no question about it,

these are integrated transactions from their standpoint.

Having them even differentiate their time between the two would

be difficult.  So, we understand their position.  It's a

problem for the Office of the U.S. Trustee.  But we think it's

eminently reasonable.

And finally, Your Honor, just to be very clear, the

Office of the U.S. Trustee has a fundamental problem with

whether we even proceed today.  They would prefer us to put

this off.  And, Your Honor, that relates to some of the issues

I mentioned in my presentation, but which the proffers would

really go to, and that is the critical importance to these

debtors of being able to announce today that the debtors have a

facility that gives them the cushion, gives them the stability,

gives them the ability to move forward to bring before the

Court, after hopefully a very rigorous and vital auction, the

sale of these business that are quite fragile.  That's an issue

that the U.S. Trustee has raised.

THE COURT:  All right.  Thank you.  Why don't you

proceed with the proffers.

MR. LOGAN:  Your Honor, in the court is Suneel

Mandava.  If called to testify, Mr. Mandava would testify first

1 off concerning his background.  He's a certified public

2 accountant, having passed that exam on his first attempt.  He's

3 a graduate of the Wharton School of the University of

4 Pennsylvania, where he received numerous awards which I won't

5 go into.

6　　　　　After graduating from the University of Pennsylvania

7 in 1994, he worked for various investment banks, basically in

8 the M & A field and in providing services, particularly in the

9 financial services industry.  He did that until 1999, and in

10 1999 he went to work for a private equity fund where he was

11 employed for three years, again focusing on the financial

12 services industry.

13　　　　　In 2001 he joined a portfolio company owned by the

14 private equity fund and acted as an operating manager for a

15 company that was one of the leading brokers in the United

16 States for employee benefits and property and casualty products

17 for small and mid-size businesses.  He was senior vice

18 president for corporate development and business analyst for

19 the chief operating officer for that company.

20　　　　　Thereafter, in June of 2003, he joined Lazard,

21 Lazard, Freres & Co., and is a vice president in their

22 financial restructuring group.  While at Lazard, Mr. Mandava

23 has been involved in many substantial representations, often

24 involving Chapter 11 debtors, sometimes in out-of-court

25 transactions.  The out-of-court transactions, in order to

1  protect confidences of the clients, I won't mention them.  But
2  some of the public matters include Tower Automotive, where he
3  is presently engaged and Lazard is presently engaged
4  representing the debtor-in-possession; Oglebay Norton, again a
5  debtor-in-possession in a Chapter 11 case; Northwestern
6  Corporation, which, of course, was the reorganization through
7  Chapter 11 of the electric, gas utility with over $2 billion of
8  debt.  And in the course of those engagements, he quite often
9  was involved in arranging debtor-in-possession and exit
10 financing.  As I said, there are a number of other quite
11 substantial out-of-court transactions that I'll -- the he was
12 involved in.
13        Mr. Mandava would testify that he first began working
14 on the New Century Financial matter in approximately March --
15 approximately March 9, and among his tasks initially was to try
16 to arrange debtor-in-possession financing for this company.  To
17 do that, he and others at Lazard assembled a collection of
18 materials regarding possible debtor-in-possession financing,
19 basically an offering set of materials, and they contacted all
20 of the obvious candidates that they could think of who provide
21 this sort of debtor-in-possession financing.  They also worked
22 with the company and to the extent the company or other
23 professionals such as counsel received inquiries from possible
24 debtor-in-possession lenders, that information was conveyed and
25 funneled to Lazard, which followed up.

1    Mr. Mandava would testify that that effort involved

2 soliciting 14 lenders, and ultimately the best offer for

3 debtor-in-possession financing was proposed by the

4 debtor-in-possession lenders who are before the Court today.

5 He would testify that, quite frankly, given the kind of

6 collateral and the financial condition of the company, there

7 was not a lot of competition.  He would testify that when the

8 proposal was received from CIT and Greenwich, Lazard analyzed

9 the business terms.  Lazard maintains a database of pricing

10 terms for debtor-in-possession loans, which is very broad and

11 very comprehensive, and Mr. Mandava would testify that the

12 pricing of LIBOR plus two fifty was well within the range of

13 reasonableness for a loan of this type.

14    He would testify that the alternative proposal that

15 was closest to the CIT/Greenwich proposal was substantially

16 more expensive in terms of the interest rate.  He would testify

17 that the other facility was also more expensive in terms of its

18 facility fee.

19    Mr. Mandava would testify that intense negotiations

20 ensued with CIT and the Greenwich Group over such matters as

21 the commitment fee and, in fact, those negotiations were

22 successful for the estates in reducing the fee by 100 basis

23 points.  He would testify that there were substantial

24 negotiations over availability.  The Tranche B facility that I

25 mentioned earlier was a topic of substantial discussion.  He

would testify that the tying of the commitment fee to the
facilities only when they, in fact, became available was a
topic of substantial negotiation.  He would testify that the
lenders wanted to charge a fee irrespective of whether or not
it was made available, but he would testify that the debtors
pushed back successfully to have the facility fee kick in only
once the commitment was, in fact, increased.

Mr. Mandava would testify that the bid from The
Greenwich Group for the financial assets that will be a subject
for the hearing on Tuesday was also very well received, that
these assets were marketed widely, that much like the DIP
facility there was not a lot of competition.

Mr. Mandava would testify that Lazard maintains a
database for topping fees and break-up fees and that the two
percent fee being proposed as a stalking horse protection is
well within the range of market conditions and that that fee
would not show bidding and indeed Mr. Mandava would testify
that having that stalking horse bid is very valuable to the
estate and likely to establish a reasonable floor from which we
hope that there will be substantial additional bidding for
these assets.  And he would testify that the market will tell,
but that the Lazard team involved in this effort is going to do
its utmost to try to solicit other interests in those assets
and maximum the return for the estate.

Mr. Mandava would testify that if the Greenwich

1   proposal for those assets was submitted unconnected to any

2   debtor-in-possession financing, Lazard would have recommended

3   to the company that it accept that proposal, for it satisfies

4   one of the two key components of the overall game plan for this

5   case.  And Mr. Mandava would testify that if the

6   debtor-in-possession loan facility were provided without that

7   bid he also would have recommended to management it accept it.

8   He would finally testify that the fact that the two are

9   connected in certain respects doesn't invalidate the business

10  judgment and wisdom of proceeding with both, since each is

11  independently a valid and prudent exercise of business

12  judgment.  He would finally testify that it's eminently

13  reasonable -- or whether it's eminently reasonable or not,

14  we're not going to get a debtor-in-possession loan unless we

15  agree to seek Your Honor's approval of the stalking horse

16  protections.

17        He would then testify that it is very important,

18  essential, for these estates to have a debtor-in-possession

19  loan facility approved, and approved immediately.  He would

20  testify that it is essential to maintain the stability of this

21  business and to proceed to try to maximize value to be able to

22  tell a number of constituents that the companies have

23  stability, they have liquidity and they have the ability to

24  carry off a prudent, orderly sale that maximizes value.

25        He would testify that without such a facility,

1  bidders for assets would view themselves as having an

2  incredible degree of leverage over the company, that they would

3  view the sale process as one of a fire sale.  He would testify

4  that one of the problems the debtors faced in trying to line up

5  pre-petition bids was just that sort of mentality, and he would

6  testify that with a debtor-in-possession facility in place of

7  this sort it his professional judgment that the debtors'

8  ability to maximize value through an auction process will be

9  greatly enhanced.

10         He would testify that having a facility of this sort

11  is important to maintain confidence and stability among

12  employees.  He would testify that this is largely a people

13  business, and no matter what happens with respect to

14  pre-petition wages or vacation or anything else that we all

15  have to be cognizant that when one goes to that office building

16  in Irvine, California, rumors fly, people are scared, and it is

17  essential that the debtors be able to convey a message to their

18  employees, their workforce, that the debtors have sufficient

19  liquidity to make payroll post-petition.

20         He would testify that it's also critical to provide

21  stability and confidence to our suppliers, the company's

22  suppliers, that they, in fact, will be paid.  He would testify

23  that, without that, the company's liquidity would be adversely

24  affected as suppliers demand cash in advance, demand wires,

25  demand cashier's checks and other things that not only put a

1 strain on liquidity but put a strain on the human beings

2 running the accounts payable process.

3        He would testify that the Tranche B facility that we

4 hope to realize soon is a facility that would provide

5 substantial liquidity to the debtors and, in addition,

6 facilitate the operation of the servicing business, and it is

7 essential that the debtors be given the ability to work with

8 the debtor-in-possession lenders quickly to get that in place.

9        He would testify that the collateral being provided

10 to the lenders on a first priority basis and which comprises

11 the borrowing base does not exclude, excuse me, does not

12 include the residual interest provided to Morgan Stanley.

13        And finally, he would testify that in his business

14 judgment, excuse me, in his professional experience, there is

15 an essential need for this debtor-in-possession facility and it

16 is a fair and reasonable facility and should be approved today

17 on an interim basis.  That's the end of the proffer for Mr.

18 Mandava.

19        THE COURT:  All right.  So that I'm clear, I'm being

20 asked to approve an interim DIP arrangement today, but not in

21 any respect being asked to approve bidding procedures.

22        MR. LOGAN:  That is correct, Your Honor.

23        THE COURT:  I understand there's a connection.

24        MR. LOGAN:  There is a connection.

25        THE COURT:  All right.  Does anyone care to examine

Mandava - Cross/McMahon                              83

1  the witness?

2          MR. McMAHON:  Your Honor, I would briefly.

3          THE COURT:  All right.  Mr. Mandava, would you come

4  forward, please?

5          THE CLERK:  Please raise your right hand.

6          SUNEEL MANDAVA, DEBTORS' WITNESS, SWORN

7          THE CLERK:  Please be seated.  Please state your name

8  and, for the record, spell your last name.

9          THE WITNESS:  Suneel Mandava.

10                       CROSS EXAMINATION

11  BY MR. McMAHON:

12  Q    You were in the courtroom to hear your proffer that was

13  just proffered by debtors' counsel, correct?

14  A    Yes.

15  Q    With respect to the process, you begun work obtaining bids

16  for DIP financing on March 9th, correct?

17  A    On or about.  I would say we arrived on the scene on March

18  9th, but concluded that we needed to aggressively pursue DIP

19  financing within a week of that date.

20  Q    Okay.  When did you actually start picking up the phone

21  and contacting potential bidders?

22  A    Bidders for --

23  Q    Strike that.  And this is an important point, I'm sorry,

24  potential financing --

25  A    Towards the end of that first week we were aggressively

1  calling.  We spent the first week looking at other solutions,

2  strategic alternatives for the company and potential bidders

3  for the entire operations.

4  Q    So, temporally the process began, what, a few days after

5  March 9th?

6  A    I think that's fair.

7  Q    The current bid from Greenwich and CIT is a -- is an

8  intertwined situation where they're providing financing as well

9  as Greenwich is serving as a potential bidder in connection

10 with one of the proposed sales by the debtors, correct?

11 A    They are connected in related transactions.

12 Q    In connection with your -- when you say Lazard's work

13 pre-petition, how did it go about the process of obtaining bids

14 for potential financing from potential lenders as opposed to

15 marketing the debtors' assets for sale on the other hand?

16 A    I'm sorry, I don't understand your question.

17 Q    Sure.  When Lazard went out to contact potential funding

18 sources, was it -- did it include -- did those discussions

19 include communications regarding the entities' potential

20 interests in purchasing all or part of the debtors' assets?

21 A    We had numerous discussions with lots of different

22 parties.  There were parties that were looking primarily just

23 to purchase assets, there were parties that were interested in

24 just providing DIP financing, and there were parties that

25 contemplated both.

1  Q    So, would it be fair to say that the communications were

2  -- touched upon either or both subjects when you went out to

3  market?

4  A    Yes.

5  Q    Now, the proffer indicated that Lazard contacted the

6  obvious candidates.  Well, who are they?

7  A    The candidates can be broken down into two groups, those

8  traditional asset-based lenders and then what I would call cash

9  flow or enterprise value lenders.  Many of those would be -- in

10 the latter group would be large money center banks, hedge

11 funds, in the former group.  Again, there's a handful of

12 asset-based lenders that we spoke to.

13 Q    Did Lazard speak to any entities in the subprime lending

14 industry, say -- call strategic purchasers of the -- potential

15 purchasers of the debtors' assets?

16 A    We did speak to a number of parties that are within the

17 industry to consider the assets of the company.

18 Q    Now, the terms -- there was some discussion in the proffer

19 about the -- your belief that the terms are reasonable, and the

20 testimony is -- was that the next higher bid had more fees.  Is

21 that correct?

22 A    It did have a higher facility fee or commitment fee.

23 Q    I guess my question is the next closest bid, how much

24 higher was the facility fee or the commitment fee?

25 A    It was 100 basis points higher, so it contemplated or

1  proposed a three percent fee.

2  Q    Okay.  And in evaluating -- in evaluating that potential

3  bid, did that bid contain any requirement -- strike that.  Was

4  that bid a -- particularly a financing -- is that for a

5  financing commitment or to purchase the debtors' assets or

6  both?

7  A    It was just for a DIP.

8  Q    Okay.  So, in connection with that bid there were no

9  particular restrictions or requirements that a bid procedures

10 or sale hearing take place ten days after the debtors'

11 bankruptcy filing, correct?

12 A    No.  It, again, was a proposal for a DIP.

13           MR. McMAHON:  Your Honor, I'd like to make an

14 exhibit.  May I approach?  Thank you.

15                          (Pause)

16           THE COURT:  Thank you.

17                          (Pause)

18 Q    Sir, I've handed you a copy of the exhibit marked as U.S.

19 Trustee 1.  Do you recognize what that is?

20 A    Yes, it's a 30 day cash flow forecast.

21 Q    Okay.  And under the 30 day projected cash flow forecast,

22 the debtors are not projected to draw on their DIP financing

23 until the -- until the beginning of May, is that correct?

24 A    That is correct.

25 Q    All right.  Now, in connection with Lazard's consideration

1  of the various bids, how do you -- how does Lazard factor in or

2  weigh the -- proceeding with a bid along the lines of what

3  CIT/Greenwich has proposed versus going with a straight

4  financing arrangement that the next best bid has been

5  characterized in your testimony?

6  A     Sure.  When we evaluate bids, we think about them on a

7  number of different bases.  The first, of course, is pure sort

8  of economic, and with respect to that we evaluated the

9  commitment fee or facility fee.  We also evaluate the margin or

10 spread that is being charged for borrowings.  We take into

11 consideration the feasibility and likelihood of closing, and

12 certainty to close particularly when a company is entering into

13 bankruptcy is incredibly important to us.

14         So, when we evaluated the CIT/Greenwich proposal, we

15 compared it to the other proposal we received.  We compared it

16 to another recent bankruptcy that Your Honor is familiar with

17 recently, ResMAE, and then of course we compared it to our

18 database of other comparable DIPs with respect to size.

19         I think you -- I believe you heard already that with

20 respect to the fee, the two percent fee was lower than what was

21 provided in the other proposal.  It is lower than what was

22 proposed or provided in the ResMAE DIP, and it is in line or

23 perhaps on the higher end of the range of other comparable DIPs

24 we saw.  With respect to the margin, at LIBOR plus two

25 seventy-five, it was lower, substantially lower, than the

1  proposal provided which contemplates 700 basis points over

2  LIBOR.  It was lower than what was in the ResMAE proposal,

3  which is 300 basis points over LIBOR, and it's in line or

4  better than what our database of other DIPs indicated.

5          Then with respect to ability to close, the other

6  proposal we received was delivered literally on the eve of

7  signing the Greenwich/Citadel, sorry, the Greenwich/CIT

8  proposal.  Therefore, when considering how far along we were,

9  the timing of our Chapter 11 filing, we needed to go with the

10  proposal that could be executed upon without -- with great

11  certainty versus starting essentially the process of

12  negotiating from the beginning with a new party.

13  Q   Well, but you agree that when you're considering factors

14  like whether or not to use additional time to see whether or

15  not you can drum up additional interest for an additional

16  financing proposal, there is a -- there is certainly a cost

17  associate with that.  You -- I guess presumably when you enter

18  into a commitment like this you're giving up the right to seek

19  -- to explore the market further to test whether or not there

20  is additional sources, correct?

21  A   Again, as I described to you earlier, we commenced this

22  process shortly after March 9th, so we were in the marketplace

23  for two weeks or longer.  We canvassed the market, I would say,

24  thoroughly.  Fourteen parties were contacted, which is

25  generally on the high side of number of parties we would touch

1  or reach out to with respect to a DIP proposal.  So we were

2  satisfied that we had conducted a thorough market test here and

3  availed ourselves and convinced ourselves that we did obtain

4  the best proposal that would be available.

5  Q    Of the 14 parties that you contacted, how many of them

6  were subprime lenders?

7  A    I'm sorry, a subprime lender?

8  Q    Correct.  You said you contacted people within the

9  industry.

10  A    Subprime lenders, if I understand, a company like New

11  Century would not be in the business of providing DIP

12  financing, if I understand your question correctly.

13  Q    But you indicated previously that you had reached out to

14  entities in the industry.

15  A    Sure.

16  Q    And if I interpreted that correctly, that included

17  entities in our debtors' industry, correct?

18  A    Yes, and that would be with respect to purchasing the

19  company or its assets.

20  Q    Okay.  Now, as you know, companies in this industry are

21  facing financial distress as well.  I understand that aspect,

22  but my question to you was, are those -- are those industry

23  members included in your number of 14?

24  A    No.  Those were -- again, that would be in addition to the

25  14.  There are other I would call them strategics we spoke to

1  who did not aggressively pursue at this stage purchasing assets

2  of the company.

3  Q    And do you know -- do you happen to know offhand how many

4  of the 14 were lenders that had -- had actually cut off their

5  financing to the debtors, you know, were you going back to them

6  as opposed to coming up with a new list?

7  A    We tried to reach out to lenders who did not have such

8  conflicts.

9  Q    So the majority of the 14, your testimony is, were

10  entities that do not all into that category?

11  A    That would be correct.

12  Q    Now, if we take a look at Exhibit 1, I'd like to ask you

13  some questions.  The -- part of your testimony is that the

14  proceeding today is important from the standpoint of, I guess,

15  from establishing, I guess, that the debtors have -- strike

16  that.  Part of the reason why it's important to proceed today

17  from the debtors' perspective is that the debtors want to build

18  confidence among certain groups, and I want to just ask you

19  about that.  First, with respect to the conclusion that this

20  DIP will be a salutary development for the employees of the

21  company, do you have any evidence that the employees, I guess,

22  first would have any less confidence in the fact that the

23  debtors currently have $50 million worth of cash on hand to pay

24  the payroll as opposed to going with this additional facility?

25  A    Again, it would only be anecdotal, and I'm not sure you

1  are requesting that I -- are you asking whether I've done any

2  -- conducted any surveys, are you asking me do I have anecdotal

3  evidence of --

4  Q    Do you have -- I mean, do you have any evidence to present

5  to the Court today?

6  A    I've been effectively living in the company's offices for

7  three weeks and can fairly say that the companies are --

8  employees are concerned about the company's financial situation

9  and its survival and, therefore, it's fair to say, in my

10 opinion, that being able to make a communication that there is

11 sufficient liquidity to effect an orderly sale of the company

12 would assuage -- would bring great comfort to employees that

13 there is an ongoing employment opportunity in the future there.

14 Q    Has the company communicated to its employees that it has

15 sufficient cash to take it through the end of April?

16 A    There was a press release that announced this financing

17 which -- the purpose of which was to communicate that there is

18 liquidity available to the company.

19 Q    Okay.  Now, the suppliers which are referenced in your

20 testimony, and you indicated that, I guess, it's critical to, I

21 guess, gain their confidence.  If we take a look at Exhibit

22 UST-1, I'm looking at the accounts payable line.

23 A    Yes.

24 Q    We're talking about, I mean, on a weekly basis it varies

25 somewhere between two million and 55 -- 5.5 million worth of

1 accounts payable during a given week, is that correct?

2 A    That is the number on this page, yes.

3        MR. McMAHON:  Okay.  Your Honor, those are the

4 questions that I have for the witness.

5        THE COURT:  All right.  Does anyone else care to

6 examine this witness?  Is there any redirect?

7        MR. LOGAN:  Very quickly, Your Honor.

8        THE COURT:  Go ahead.

9                    REDIRECT EXAMINATION

10 BY MR. LOGAN:

11 Q    Mr. Mandava, look at the exhibit that the counsel for the

12 Office of the United States Trustee submitted.  I have one very

13 simple question.  In your professional judgment, would it be

14 prudent for a company to wait until it runs out of cash before

15 it obtains debtor-in-possession financing?

16 A    It would be imprudent and, in my experience, I've never

17 worked with a company that waited till it ran out of cash to

18 obtain a DIP.

19        MR. LOGAN:  Your Honor, no further questions.

20        THE COURT:  Any recross?

21        MR. McMAHON:  No, Your Honor.

22        THE COURT:  Thank you sir.  You may step down.

23        MR. LOGAN:  Your Honor, in light of the hour, I'm

24 going to pass on the second witness, who would have been the

25 company's CFO and would have talked about basically oversight

1 of Lazard, so it's largely duplicative, if you will, Your

2 Honor.  So, as far as the proffers are concerned, that's it.  I

3 really, in the course of making the presentation dealt with, at

4 least the way I understand it, the essential objection that was

5 made by the warehouse lenders.  The Office of the U.S. Trustee

6 has also worked with us to craft some changes to the

7 debtor-in-possession financing order, and I can walk Your Honor

8 through those.  We have a red-line version, or just -- however

9 Your Honor would like to proceed.

10         THE COURT:  Well, let me hear from anyone else who

11 cares to be heard first, and then we'll -- then we'll go into

12 our workshop.

13         MR. FOSTER:  Good afternoon, Your Honor.  Wilbur

14 Foster, Milbank, Tweed, Hadley & McCloy, on behalf of Morgan

15 Stanley Mortgage Capital.  As Mr. Logan noted, Morgan Stanley

16 is a party to a mortgage loan repurchase agreement with several

17 of the New Century debtors, and I -- although I dispute Mr.

18 Logan's characterization of that contract, I do agree -- I

19 think he would agree that there's no need to resolve the

20 characterization of that contract or the contracts of similarly

21 situated entities and the property interest they or the debtors

22 have with respect to the property that's subject of the

23 contract.  That's not the issue here.

24         What we're really concerned about is just making sure

25 that what I don't think the debtors have any intention of doing

94

1  somehow happens by having a broad, general debtor-in-possession

2  financing agreement and also a cash management motion written

3  for your typical case that could, without particular

4  limitations, wind up, I think unintentionally -- but that's

5  before the fact, after the fact you've got a DIP lender with

6  364(e) and you have problems to deal with -- but

7  unintentionally limiting or otherwise affecting the rights of

8  parties like Morgan Stanley and others that I gather are here

9  that are similarly situated.

10        One objection we had I think has been resolved.  It

11  was a technical objection.  We had to make it.  There was a

12  reference in the DIP credit agreement to the residuals that

13  were defined as the "unencumbered securitization residual

14  interests listed on Schedule G."  We couldn't get Schedule G.

15  One, it was forthcoming around noon today.  It was held forth

16  as being a draft.  Our concern was that if somehow the residual

17  interests that Mr. Logan described earlier that were

18  transferred to Morgan Stanley under its master repurchase

19  agreement showed up on that exhibit, they are now somehow

20  deemed -- okay, that's technical, and I take his word for it,

21  they're not going to be on that list.  The next two objections

22  --

23        THE COURT:  Well, actually, that goes to the

24  substantive comment he made, which is, you know, we aren't

25  offering liens in things we don't own.  That falls under that

1 category, correct?

2          MR. FOSTER:  Not -- well, not exactly, because let's

3 assume that the debtor has contended that those residuals that

4 were transferred to Morgan Stanley,  I think that it was his

5 position they were not actually sold, they were pledged, okay.

6 Well, if that were true, then the debtors would have an

7 interest in them, and if they put those on Exhibit G, guess

8 what, they're unencumbered.  So not only are they not owned by

9 Morgan Stanley, okay, technical issue and, again, it's --

10          THE COURT:  So that goes away.

11          MR. FOSTER:  I think that's gone away based on what

12 Mr. Logan said.  You are correct.  Another issue, I'll take it

13 a little bit out of turn.  This is a technical issue, and it

14 arises because of the language of the DIP agreement, and it has

15 to do with possible effects on what I'll -- I'll say setoff,

16 but it's really setoff netting recoupment rights.

17          THE COURT:  Well, okay.  As I understand, what you

18 want there is a provision that says we have whatever rights we

19 have under the netting provisions of the Bankruptcy Code, and

20 this is not meant to change that.

21          MR. FOSTER:  Well, no, on this one not exactly, Your

22 Honor.

23          THE COURT:  Okay.

24          MR. FOSTER:  On the -- there's the additional point

25 about the safe harbor contracts, and I'll get to that.  This is

1 something under the DIP agreement itself, and it would apply

2 even to a creditor who is -- or even to a party who does not

3 have the benefit of the safe harbor provisions.  It just comes

4 about because of the way the DIP agreement works.  The DIP

5 agreement says that, "The liens given to the DIP lenders," and

6 this is on Page 9 of the order that was filed with the

7 agreement, "are junior and shall be subject only to the valid,

8 binding and enforceable liens, defined term, securing the

9 senior claims as of the filing date."  Liens is defined in the

10 DIP credit agreement on Page 12 as meaning "Any mortgage, lien,

11 pledge, charge, security interest or similar encumbrance."

12 It's not clear that it picks up setoff rights, netting rights,

13 recoupment rights.  So that's an issue -- my first thought was

14 if we change the definition of lien to include those types of

15 rights.  I don't know how that works through all the documents,

16 and since the DIP order trumps any inconsistencies, our thought

17 was the DIP order could be fixed to take care of that.  I don't

18 think there's an intent to prime setoff rights, whether under a

19 safe harbor contract or not, but there's an argument, there's a

20 potential issue, and, again, when you have DIP lender, we have

21 364(e) concerns to deal with.

22          On the more specific point about the safe harbor

23 contract, I call them safe harbor contracts, those provisions

24 in the Bankruptcy Code, and there are other parties I think

25 that are similarly situated, our concern there is -- we're not

1 seeking to have any of those rights adjudicated.  None of

2 that's before the Court.  The parties have their own positions.

3 But what we don't want is there to be any implication

4 whatsoever that this order somehow changes those rights.

5          Perfect example, if we accept, for example, a -- say

6 the debtors were to characterize a particular repurchase

7 agreement as being not a true sale and buy-back contract, but a

8 pledge to secure financing.  That would mean that the repo

9 counterparty has collateral and has a lien on that.  If the

10 repo counterparty seeks to enforce its rights to dispose of

11 that property, as that party would contend it can do under the

12 Bankruptcy Code safe harbor provisions, well, now there's a

13 junior lien on that property.

14          And then the question is, well, what if some bidder

15 says, well, you know, I understand what happens otherwise, but

16 now you've got some judgment lien, which is what this lien will

17 be once it's entered by this Court, sitting on this property,

18 doesn't that change what could happen?  And my understanding is

19 they're not trying to change whatever those rights are.  They

20 might dispute that rights exist, but they're not trying to

21 change those rights and the exercise of those rights.  So,

22 that's a specific example of how we thought that could come up.

23 There could be others.

24          And this was really inspired by something that's been

25 done in a number of the airline bankruptcy cases, where there's

1  a DIP agreement and there's a special carve out for Section

2  1110 property, and, in fact, that's where the language "limits

3  or otherwise affects" comes from, because that's from 1110, and

4  it's worked in those cases.  That was the inspiration for that,

5  just to make sure that you have a broad agreement and it's good

6  for the general purposes, but there are some very special

7  parties out there and there's no intention to limit or

8  otherwise affect their rights because the concern is if you

9  don't say something that maybe it will be found to have limited

10 or otherwise affected their rights.  So, there's a setoff

11 point.  It's more general.  It's a specific point that's of

12 general application, and then, of course, this concern about

13 there somehow being a possible implication as to effect on the

14 safe harbor contract rights.

15          We had two other points.  One that we raised was the

16 debtors being jointly and severally liable, and there's -- I

17 think it's Section 3.05C of the DIP agreement talks about

18 subordination of any subrogation or contribution claims of

19 debtor/borrowers, but there's no provision for them actually

20 having such claims, and there is an issue, and, in fact,

21 there's a recent decision under Section 509 that says a party

22 that's jointly and severally liable may not have subrogation

23 rights because they're not liable with the debtor on something.

24 They are primarily liable, not secondarily, primarily.  So --

25 and this is something -- Morgan Stanley has no idea how this is

1 going to shake out with respect to its debtors.  It could hurt.

2 It could help.  But we thought it was equitable to have a

3 provision that to the extent that any borrowers paid -- wound

4 up paying more than they got under the DIP, they would have a

5 claim over against the -- what I'll call the excess

6 beneficiaries and have that treated as a super-priority claim,

7 junior to the DIP lenders' super-priority claims.  They have a

8 similar notion, actually, in their cash management motion,

9 although there it's only an administrative claim for

10 inter-company transfers, net inter-company transfers, so that's

11 sort of a general point.  And, again, we don't know how it's

12 going to -- if it's done, if we get that, whether it's going to

13 help or hurt our particular debtors.  It just seems like it's

14 an appropriate thing to do as a matter of fairness from the

15 get-go.

16        And finally, we have -- there's a dispute that we

17 have -- Morgan Stanley has with the debtors now over particular

18 proceeds, and, again, along the same lines as what we said

19 previously, we're just concerned somehow the DIP financing

20 could affect the rights that Morgan Stanley has asserted with

21 respect to these I guess they're called purchase loan proceeds

22 that came to the debtors.  Morgan Stanley asserts rights in

23 them.  The debtor denies it, and we don't want to see that

24 prejudice -- have this DIP financing come in and somehow find

25 out later on that that did something to the rights that we had

1  before the DIP financing was put in.

2         THE COURT:  Thank you.  Let me hear from all the

3  objectors.

4         MR. FOSTER:  Oh, and by -- I just want to say, we

5  were working on language earlier.  There has been some revised

6  language.  I don't know if it's worth going into that right now

7  -- parties state their pieces, but --

8         THE COURT:  Not yet.

9         MR. FOSTER:  Understood.  That's what I thought.

10 Thank you.

11        MR. LOGAN:  Your Honor, can I just raise a scheduling

12 issue?  I'm not going to respond to their substance.

13        THE COURT:  Go ahead.

14        MR. LOGAN:  I was handed a note that brought me back

15 to the harsh reality of the real company.  They have a payroll

16 tomorrow, and the DIP loan, while we think it critically

17 important to get in place, isn't necessary to make tomorrow's

18 payroll.  The case management order is.  And so I was just

19 hoping to bring to Your Honor's attention that somehow

20 hopefully tonight we can get to that as well.  Probably my

21 fault for being overly long as I was blathering on about the

22 DIP, but --

23        THE COURT:  Well, it's not my time you have to worry

24 about.  It's he or she who would be available for docketing.

25        MR. LOGAN:  Understood.

1        THE COURT:  Nancy, are we covered on that?  Jason?

2        MR. SMITH:  (Indiscernible)

3        THE COURT:  All right.

4        MR. LOGAN:  Thank you.

5        THE COURT:  You're covered.  Al right.  Let me hear

6   from others.

7        MS. SILVERSTEIN:  Your Honor, Laurie Silverstein,

8   Potter Anderson & Corroon, on behalf of Bank of America, N.A.

9   I have with me Margot Schonholtz of Kaye Scholer and would

10  orally move her admission pro hac for purposes of today.  She

11  is a member of the bar of the State of New York.  And I'll

12  follow it with a written motion.

13       THE COURT:  Very well.  Thank you.

14       MS. SILVERSTEIN:  Thank you.

15       THE COURT:  Welcome.

16       MS. SCHONHOLTZ:  Thank you, Your Honor.  We represent

17  Bank of America, who is a purchaser of assets pre-petition

18  under two repo agreements entered with New Century entities.

19  The -- those agreements went into default in early March 2007.

20  Default notices were issued, and the debtors immediately

21  commenced turnover of servicing rights, transfer of records,

22  accounts, et cetera.  For today's purposes, I'll just note for

23  the record in the interest of brevity, that I disagree with Mr.

24  Logan's characterization of the agreements the Bank of America

25  entered into, but it is critical that nothing in any of the

1  orders entered today, particularly the DIP order and the cash

2  management order, adversely affects any of B of A's rights

3  under the Bankruptcy Code or its repo agreements.  Again, we

4  are not asking for any adjudication.  We are just asking not to

5  be adversely affected, either directly or indirectly, by the

6  orders entered today.  We asked for a single sentence to be put

7  into the order, hardly larding up the order prior to the

8  agreement -- prior to the hearing, sorry, Your Honor -- and we

9  did not get a positive response.

10         THE COURT:  All right.  Thank you.

11         MS. SCHONHOLTZ:  Thank you.

12         MR. HURFORD:  Your Honor, Mark Hurford of Campbell &

13 Levine.  With me -- on behalf of Citigroup Global Markets

14 Realty Corp.  With me this evening is Joshua Sussberg of the

15 law firm of Kirkland & Ellis.  He's admitted to practice before

16 the bar of the State of New York and the U.S. District Court

17 for the Southern District of New York.  We, Your Honor, able to

18 get a pro hac motion on file for him this afternoon.  It was

19 docketed at Number 41, but I doubt at this point we've got it

20 to your chambers, so if Mr. Sussberg could address the Court at

21 this time, we'd appreciate it.

22         THE COURT:  Very well.  Thank you and welcome.

23         MR. SUSSBERG:  Good evening, Your Honor.  Joshua

24 Sussberg, Kirkland & Ellis, on behalf of Citigroup Global

25 Market (sic) Realty Corp.  I'll be extremely brief.  Mr. Logan

1 | touched upon the fact that Citigroup is a party to a servicer
2 | advance facility and it's contemplated under Tranche B of the
3 | DIP loan that they may, in fact, take out that facility.
4 | Otherwise, they will deal with Citigroup as necessary and as
5 | needed.  I just want to have the record reflect and be clear
6 | that Citigroup reserves all of its rights in connection with
7 | any refinancing or any dealings with its cash collateral at
8 | this time.

9 |         THE COURT:  Including the right to accept payment
10 | in full?

11 |         MR. SUSSBERG:  Absolutely correct, Your Honor.  Thank
12 | you.

13 |         MR. NESTOR:  May it please the Court, Your Honor,
14 | Michael Nestor of Young Conaway Stargatt & Taylor.  I'd like to
15 | introduce Douglas Deutsch, Your Honor, from Chadbourne & Parke.
16 | He's here today.  We have not filed papers, but I would ask
17 | that he be admitted pro hac, and we'll follow it up with
18 | written papers.

19 |         THE COURT:  Very well.

20 |         MR. NESTOR:  Thank you, Your Honor.

21 |         MR. DEUTSCH:  Good afternoon, Your Honor.  Doug
22 | Deutsch from Chadbourne & Parke on behalf of Credit Suisse
23 | First Boston Mortgage Capital, LLC and DLJ Mortgage Capital,
24 | Inc.  Your Honor, also in the interest of brevity, I would note
25 | that with respect to Morgan Stanley, Mr. Foster's comments, we

1 are in agreement with regard to the security.  In particular,

2 we would like to preserve all equitable rights, including our

3 setoff rights, rights for accounting, a constructive trust and

4 the like.  Secondly, we'd like to reserve all rights under 561,

5 Your Honor.

6          THE COURT:  All right.

7          MR. DEUTSCH:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. WAITE:  Good evening, Your Honor.  Joel Waite

10 from Young Conaway Stargatt & Taylor.  Here with me today is

11 Andrew Gallo from Bingham McCutchen.  Mr. Gallo represents

12 Deutsche Bank Structured Products.  My firm has not been

13 formally retained at this point, but I am moving his admission

14 pro hac vice for purposes of today's hearing, and he's a member

15 in good standing of the Massachusetts bar.

16          THE COURT:  I assume you'll follow with a written

17 motion?

18          MR. WAITE:  Yes, we will, Your Honor.

19          THE COURT:  All right.  Thank you.

20          MR. WAITE:  Thank you.

21          THE COURT:  Welcome.

22          MR. GALLO:  Thank you, Your Honor.  Good evening.  I

23 will also be brief.  Deutsche Bank Structured Products is also

24 a party to repurchase agreements with the debtor.  I did

25 mention to debtors' counsel prior to that hearing that one

1   thing that's important for us is that the DIP order

2   specifically mention the provisions of the Bankruptcy Code or

3   at least Section 561 and the contracts therein, that are listed

4   therein, to make sure that it's clear that to the extent anyone

5   has rights under those contracts they are not altered by the

6   order.  Given the debtors' filing which are on record in which

7   they seem to suggest that these are secured financings, and we

8   disagree vehemently with that, we think it's important that at

9   least -- that some of that cloud be reduced by the order

10  specifically mentioning the contracts that are listed in 561.

11          We also have a separate issue for Deutsche Bank in

12  that there were loans -- there are approximately 235 loans that

13  were transferred to Deutsche Bank, at least we would contend

14  were transferred to Deutsche Bank pre-petition, that

15  pre-petition the debtors have informed us that they do not

16  believe that those loans were transferred to Deutsche Bank.  It

17  wasn't clear to us in the papers whether or not those loans

18  were part of the LNFAs, as Mr. Logan classified them, or as

19  part of the first lien collateral.  He has informed me that

20  they are not, so I will take him at that.  And it would be our

21  intention that those -- whatever rights anyone has to those

22  loans are rights that they have and to the extent that there

23  are loans they aren't subject to any of the liens today.

24          Also, with respect to my client and I think many of

25  the other repurchase -- parties to repurchase agreements, the

1  debtor also services those loans, so while title passes to the

2  parties to the repurchase agreements and we own those loans,

3  they are serviced by the debtor.  My understanding, based upon

4  the presentation today, is that the -- nothing in either the

5  DIP order or the cash management order is meant to affect the

6  parties' rights as they exist under the repurchase agreements

7  with respect to that servicing.  Included in those rights is

8  the right to transfer servicing of those loans, which the

9  debtors have been cooperating pre-petition, and we would assume

10 that they would also cooperate in that effort post-petition.

11 So, I think that that needs to be clear as well.  Thank you,

12 Your Honor.

13          THE COURT:  Okay.  Thank you.

14          MR. CALOWAY:  Your Honor, Mary Caloway on behalf of

15 Residential Funding Company.  Prior to the petition date,

16 Residential Funding Company, or RFC, had purchased a number of

17 loans from the debtor, and also pre-petition the servicing of

18 those loans was transferred back to RFC.  RFC had e-mailed

19 debtors' counsel yesterday suggesting the inclusion of two

20 sentences in the DIP order which would make clear that to the

21 extent the first level borrowers, you know, the homeowners,

22 remit funds to the debtors, they'll -- by the way, they've all

23 received a notice that now they're supposed to remit their

24 payments to RFC, but historically the parties understand that

25 some of the borrowers just don't get it and it takes awhile

1  before they start sending the payments to the correct places.

2           THE COURT:  I know.  I used to have Chapter 13s.

3           MS. CALOWAY:  So we just wanted to make sure that the

4  DIP order was clear that the liens given to the DIP lenders or

5  that the definition of "collateral," which is very, very broad,

6  was modified to just make clear that those types of payments,

7  in any form that they came into the debtors, were excluded,

8  that they weren't subject to -- to the DIP order.  It wasn't

9  until I was standing -- sitting here listening to debtors'

10 counsel that I realized I think new Paragraph 39 was intended

11 to address that concern, and new Paragraph 39 says that the

12 liens granted to the secured parties shall not extend to

13 accounts maintained by the debtor as custodian or that are not

14 property of the estates.

15          At first I thought that was a step in the right

16 direction but upon reflection, sitting back on the bench, I

17 started to think that maybe it was actually a little worse,

18 because what we wanted to be clear was that these funds that

19 come in, we don't know, for instance, if they actually go into

20 a custodial account.  RFC has informed me that they believe

21 that sometimes these funds go into the -- into a different

22 account or just the debtors' clearing account or some other

23 account that is not necessarily triggered or named a custodial

24 account.

25          So, while I was hopeful at first and I thought, well,

1  they'll -- this is great, my issue is resolved, I don't think

2  that that sentence actually does it.  It doesn't make it clear

3  enough that those -- the borrower funds that are being held in

4  whatever account they're held in, but are being held by the

5  debtor in trust for the servicer of those loans, is not (a)

6  probably the estate and (c) is certainly -- (b), sorry, I

7  skipped (b) -- (b) is not part of the collateral base being

8  granted to the DIP lenders, and (c) and certainly is not

9  subject to the liens.

10          THE COURT:  Thank you.

11          MS. CALOWAY:  That's where we are.  Thank you, Your

12  Honor.

13          MR. McMAHON:  Your Honor, good evening.  Joe McMahon

14  again for the United States Trustee.  Your Honor is undoubtedly

15  aware from reading the first day affidavit the series of events

16  that led us to these bankruptcy filings, and in particular the

17  February 7th announcement by the debtors that they would have

18  to restate their 2006 financials for the first through the

19  third fiscal quarters to properly account for certain items.

20          It's in that vein, Your Honor, and the adverse impact

21  that that event has had on a number of constituencies, the

22  debtors' creditors and equity security holders, that United

23  States Trustee approaches its role in the bankruptcy process,

24  and that's to ensure that relief, particularly on the first day

25  of bankruptcy cases, which is where we're at today, is limited

1 to that which is absolutely necessary to get us to Point B.

2          And, Your Honor, Your Honor heard the testimony of

3 the debtors' witness with respect to the DIP lending issues,

4 and I want to talk to you about, I guess, what's our big

5 concern today, which is as between two alternatives, which is

6 allowing a committee to get up and running on the 9th and

7 perhaps to revisit the issue of financing.  And it's clear from

8 the evidence in the record, and I would move for admission of

9 Exhibit U.S. Trustee 1 into evidence, Your Honor, that the

10 debtors have sufficient cash to survive for a bit.

11          THE COURT:  All right.  Well, let me stop you there

12 just momentarily.

13          MR. McMAHON:  Sure.

14          THE COURT:  Does anyone have an objection to the

15 admission of UST-1?  I hear no response.  It's admitted without

16 objection.  And then secondly, based on your examination and

17 looking at UST-1, which I'm assuming is identical to the cash

18 flow forecast which debtors' counsel was referring to earlier,

19 it shows a DIP draw, as you pointed out, under the May 5th

20 column, and I'm assuming that's Tranche A.  Am I correct in

21 that?

22          MR. LOGAN:  Yes, Your Honor.

23          THE COURT:  Okay.  I'm seeing nods of assent from the

24 debtors' side of the room.  So let me ask the debtor, at this

25 point is it the debtors' intention if it receives interim

1  approval today that Tranche A wouldn't be drawn upon except in

2  accordance with the cash flow forecast admitted as UST-1?

3            MR. LOGAN:  Your Honor, no.  The -- I'll be very

4  clear about this so called budget.  This is not a cash

5  collateral type order that's tied to a budget.  This is an

6  informational report that we produced for the lenders.  It's a

7  budget.  Like I said in the proffer, things could be a whole

8  lot different than this, and, quite frankly, if the

9  debtor-in-possession financing agreement is not approved, we

10 think they will be a whole lot different than this.  If it

11 turns out that the sun doesn't shine tomorrow and we have a

12 liquidity need or we have an intra-week borrowing need, we very

13 well could draw out of the Tranche A facility.  We could very

14 well draw under the Tranche B facility.

15            THE COURT:  Okay.  Let me ask it another way.

16            MR. LOGAN:  Sure.

17            THE COURT:  Well, based on your earlier response, I'd

18 assume that the debtor did intend within the ten-day period to

19 draw on Tranche B if it was available to it.

20            MR. LOGAN:  Your Honor, yes.

21            THE COURT:  Okay.

22            MR. LOGAN:  If the Tranche B facility were available,

23 we would plan to, as Your Honor questioned counsel for

24 Citigroup, pay them off in full --

25            THE COURT:  I --

1           MR. LOGAN:  -- and I assume they'd have no objection

2 to that.

3           THE COURT:  All right.  I understand that.  Now --

4 but that's Tranche A.  It seems to me that the debtor, in the

5 exercise of its business judgment, however, would not draw on

6 Tranche A unless it needed to.

7           MR. LOGAN:  Absolutely, Your Honor.

8           THE COURT:  Okay.  So, let me put it this way, if I

9 approved the financing, again on an interim basis, the debtor

10 would not chafe under the expectation of the Court that it

11 would not be drawn upon unless it were necessary.

12          MR. LOGAN:  Absolutely correct, Your Honor.

13          THE COURT:  Okay.  That was what I wanted to get to.

14 Mr. McMahon, I interrupted you.  You may continue.

15          MR. McMAHON:  Your Honor, the point I was making was

16 a procedural one, which is if we could get the committee

17 onboard, the testimony clearly establishes that two weeks can

18 provide ample time for the parties in interest to scour the

19 market for financing sources and to evaluate strategic

20 proposals.  Here we believe that in light of the debtors' cash

21 position, which is sufficient for the time being

22 notwithstanding the potential contingencies which debtors'

23 counsels references, that there would be ample room for the

24 committee to step in to be -- to give its input with respect to

25 what direction that issue should go and perhaps the sale issue

1 should take as well.  Right now what we have is we're

2 committing ourselves today to paying presumably a half million

3 dollars I believe is the outstanding amount that's owing in

4 terms of fees for a commitment that ties us to an April 10th

5 date to start the sales process rolling.

6         And that brings me to my second point, Your Honor,

7 which is the following.  We're working as hard as we can to get

8 the committee up and running, obviously.  The formation meeting

9 will go forward on the 9th, which is Monday, at 1:00 p.m.  The

10 concern that we have, Your Honor, is that notwithstanding the

11 fact that if you look at the debtors' top 40 or 50 list, as the

12 case may be, there are a lot of large institutions on there.

13 Many, if not all, of these creditors have some length of time

14 during which they've been dealing with these debtors.  The

15 committee needs some -- a breathing spell to select counsel, to

16 get on its feet, and we just don't think that a formation

17 meeting where counsel may or may not be selected that evening

18 with I guess a proposed time frame of a hearing the next day at

19 3:30 provides the type of say time insofar as the committee

20 would find sufficient to perform its fiduciary duty to its

21 constituency.  That's a significant concern of our office.

22         Putting aside whether or not this Court, you know,

23 does or does not approve the proposed facility that's before

24 the Court, to move through to a few, I guess, more specific

25 items that I raised that were not addressed, I believe that

1  debtors' counsel correctly identified that the term "lender

2  expenses" is defined in the DIP loan documents, and I requested

3  clarification or some -- an answer to the question as to

4  whether or not the DIP lender believes that that includes fees

5  of either lender in its capacity as a potential purchaser, and

6  that the answer to that question was, yes.

7          Suffice it to say then that I'm kind of a bit

8  surprised by picking up the expedited bid procedures sale

9  motion that was filed, I don't know, last night or this

10  morning.  In reading that, one of the selling points of it is

11  that there's only a two percent break-up fee.  In other words,

12  there's no expense reimbursement.  Well, if my interpretation

13  or the interpretation of lender expenses that I would like

14  there to be is not -- is not the case, then if lender expenses

15  do include the sale-related fees, then there is, in fact, an

16  expense reimbursement and, therefore, I guess the text of the

17  sale motion is I guess a bit rosy in its projection.

18          Your Honor, there is another provision in the DIP

19  loan docs which required the retention of Lazard and

20  AlixPartners, and the concern we raised with -- and that's

21  Section 7.32 for the record.  The concern that we raised and to

22  -- as an additional point, Your Honor, the failure to meet that

23  obligation was an event of default in Section 8G of the loan

24  docs.  Obviously, Your Honor, we would expect that retention

25  applications or motions would be submitted for both of those

1 entities.

2        THE COURT:  Let me -- and I expect that they would be

3 too, Mr. McMahon, and let me add something to that, and maybe

4 some in the courtroom have had experience in this court on this

5 type of topic.  I've seen recently frequently DIP and 363

6 motions with some degree of relationship, some more insidious

7 than others, and that's not to suggest that the proposed

8 relationship here is that way, but there are obviously

9 circumstances which have to be viewed carefully because of

10 their relationships, which as the debtor points out may very

11 well turn out to be beneficial.

12        With respect to ties between the DIP and events of

13 default and other things which need to come up separately like

14 bidding procedures, like engagement of professionals, so that

15 those who are involved are clear about how I approach them, I

16 approach them independently, and I decide them based upon the

17 standards that the Bankruptcy Court and decisional law tells me

18 I should employ, and if there are adverse consequences under

19 the DIP because of that, then sometimes that's what happens.

20 And I will consider bidding procedures on their own, break-up

21 fee, topping fee, overbid proposals on their own, regardless of

22 their tie to the DIP, and I just want to -- the parties here to

23 understand that today.

24        MR. McMAHON:  Your Honor, thank you very much for

25 that, but just to be clear as to what the concern is, is that

1 based upon facts that are not known to the Court, perhaps to

2 the debtors or other parties in interest, that the debtors'

3 funding is going to rise or fall on whether or not, for

4 example, Lazard meets the qualification standards under Section

5 327 of the Bankruptcy Code.  Now, as between -- I don't know

6 whether Your Honor's comments mean to suggest that that is, I

7 guess, an appropriate term or condition with respect to the DIP

8 loan, but our concern is that that should -- just should not be

9 the case, obviously.

10          THE COURT:  I understand.

11          MR. McMAHON:  Your Honor, we discussed the 4/10/07

12 deadline for approval of bid procedures.  That actually is an

13 event of default, Section 8 little 2, and then under Section

14 11.04 of the loan docs, there's a relatively broad

15 indemnification provision, and, Your Honor, I guess our concern

16 with that again is matter of scope.  I don't know -- it

17 expressly refers to transactions that are related to the DIP,

18 and it very well could be so broad as to, you know, provide an

19 indemnification obligation in connection with the potential

20 purchaser's activities as a stalking horse or otherwise in

21 connection with the sale process, and we have some concern with

22 respect to that.

23          To roundoff our issues, there's one point I wanted to

24 raise in addition, Your Honor, which is in Paragraph 17, which

25 is the -- there's a laundry list in the DIP order of sections

1  that -- the DIP obligation is going to be taking

2  super-priority expense status over, and some of the traditional

3  sections that are requested but should not be approved, 105,

4  506(c) and 726, to be specific, are referenced in Paragraph 17

5  of the order.  There are other concerns that we have, Your

6  Honor.  Because of the late hour, I'd just as soon defer them

7  to a later date.  I think that the -- I've clearly identified

8  and highlighted our key concerns.

9       THE COURT:  All right.  Before I go back to the

10  debtor, anyone else care to be heard?

11       MR. FOSTER:  Sorry, Your Honor, Wilbur Foster for

12  Morgan Stanley again.  This is just a DIP motion we're talking

13  about now, because I --

14       THE COURT:  That's correct.

15       MR. FOSTER:  Okay.  That's it.  Thank you.

16       MR. BESKRONE:  Good evening, Your Honor.  Don

17  Beskrone.  I'd like to introduce Jane Kim from the Cleary

18  Gotlieb firm.  She's admitted in good standing in New York.  I

19  move her admission and I'll follow up with papers tomorrow.

20  Thank you.

21       THE COURT:  Very well, thank you.  Welcome.

22       MS. KIM:  Thank you, Your Honor.  Jane Kim from

23  Cleary, Gottlieb, Steen & Hamilton on behalf of Goldman Sachs

24  Mortgage Company.  I just wanted to put a statement on the

25  record that earlier this afternoon before the hearing I had

1  given a copy of a letter to counsel for the debtors and counsel

2  for the DIP agents.  The letter had been sent to New Century

3  Mortgage Corporation by Goldman Sachs Mortgage Company last

4  Friday and had identified four loans, and it's Goldman Sachs

5  Mortgage Company's position that with respect to those four

6  loans to the extent New Century Mortgage Corporation still has

7  physical possession of those loans, it is holding them as the

8  lead on the behalf of Goldman Sachs Mortgage Company and that

9  it's not -- those loans are not debtors' property and are not

10 subject to the DIP liens.  Thank you.

11          MR. STRATTON:  Good evening, Your Honor, David

12 Stratton.  Your Honor I represent Deutsche Bank National Trust

13 Company, which is a trustee under several of the securitization

14 trusts and an actual and contingent creditor in this in numbers

15 with so many zeros I can't count them.  We are listed on the

16 list of the 50 largest -- I think the debtor filed a list of 50

17 largest unsecured creditors.  We have not decided whether we

18 will seek a seat on the committee.

19          We -- I rose -- I rise this evening, it's present

20 tense, isn't it, to urge Your Honor to approve the DIP.  It is

21 essential that this company have financing if only to reassure

22 the world that it can make it from here until the end of the

23 case.  We urge Your Honor --

24          THE COURT:  Whenever that may be.

25          MR. STRATTON:  Whenever that may be, precisely, which

1  is not a known finite period of time.  The issues raised by

2  some of the warehouse lenders are issues which Your Honor will

3  sort out, but the big picture issue, which is the approval of

4  the DIP tonight, we believe is essential to the continued

5  viability of the company and, in particular, its servicing,

6  which the continued servicing, that is is key to the value of

7  the case and to preventing further losses in the notes that we

8  act as trustee with respect to.  So we would ask Your Honor to

9  grant the motion.

10            THE COURT:  Thank you.

11            MR. LOGAN:  Finally, somebody who makes sense.

12            THE COURT:  Just goes to show, if you wait long

13  enough --

14            MR. LOGAN:  Your Honor, I will be very brief.  The

15  position of the Office of the United States Trustee about

16  needed to borrow and waiting until we actually make that draw

17  into the DIP raises a very important distinguish -- distinction

18  that lawyers sometimes miss.  U.S. Trustee Exhibit 1 is a cash

19  forecast.  That's when the money actually goes out the door.

20  People and providers and others who are dealing with the

21  debtors, however, are incurring credit risk before the cash is

22  actually incurred.  Just take the example of the formation of

23  the creditors' committee.  We're delighted that the Office of

24  the U.S. Trustee will assemble that group on Monday.  I would

25  like to be able to tell prospective -- whoever is counsel or

1   prospective counsel for the creditors' committee that we have a

2   DIP facility.  They will be accruing fees, O'Melveny & Myers

3   will be accruing fees, Lazard will be accruing fees, suppliers

4   of product to this company will be accruing costs, employees

5   will be working prior to actual payroll date, and we all are

6   bearing the risk of whether or not we're going to get paid, and

7   even though the cash doesn't go out the door until the end of

8   April, the others who deal with this debtor have to have

9   confidence that there's going to be money to pay when it's due.

10  This is a cash forecast.  It's not an accrual.  If we had an

11  accrual statement, we would show needs far, far earlier.

12        Let me deal with the group of warehouse lenders,

13  repurchasers of loans, whatever we want to call them.  And I

14  think, Your Honor, I could never have conveyed the reasons why

15  we resisted "larding up the order," as well making the argument

16  as I think Your Honor understood as we heard the laundry list

17  of things that people want to add.

18        THE COURT:  Well, look, DIP orders, like other

19  situations in Bankruptcy Court, can be like Christmas trees.

20  Everybody wants their own ornament.  And I understand, given

21  the mammoth undertaking this has been for the debtor and its

22  professionals, that it wishes to be as complete but as lean as

23  possible in its pleadings and in the orders that it is seeking.

24  However, I will say this on the other side of the coin.  I have

25  from time to time been called upon to look back years into a

1  case on the language of DIP orders.  It's not unheard of.  So,

2  to the extent that issues have been raised and can be

3  clarified, without offering a hook to those who are expressing

4  their views for later argument to the detriment of the debtor,

5  I'd like to see language included, but I am in agreement, and I

6  don't think those who made comments would disagree with this,

7  that, look, we're not here to resolve those issues, just to

8  make sure they're kept open to the extent that under a DIP they

9  shouldn't otherwise be affected.

10       MR. LOGAN:  Your Honor, and in fact Mr. Collins made

11  a suggestion.  He handed me a note of some language that I

12  think is simple, elegant and we would propose.  Just by way of

13  illustration before I get to it, Deutsche Bank claims that a

14  number of loans that it claims are part of its warehouse

15  facility, we've got an eye to prejudice that issue.  I agree

16  with the concept.  The debtors think that Deutsche Bank

17  improperly has taken loans without any authority.  But, you

18  know, that's an illustration of the kind of Christmas tree that

19  we would get into if we started to go down that path.

20       The language that Mr. Collins suggested, with my

21  twist, would read as follows.  "No rights under Section 561 of

22  the Bankruptcy Code, whatever they might or might not be, are

23  being affected by the entry of this order."  That's the heart

24  of what they argued.  It's simple.  It's elegant.  Your Honor,

25  we're comfortable with that sort of language.  Beyond that we

1  create a Christmas tree.

2         THE COURT:  Well, I'm not -- let me put it this way.

3  Again, given the hour -- and what I expect will happen is after

4  we recess tonight the parties will go back to work and work out

5  the terms of the DIP order, and I would like you to have those

6  discussions with those who made those comments.  That concept

7  is fine with me as you've read.

8         To the extent that -- I have a couple thoughts.  To

9  the extent that somebody feels very strongly that more needs to

10 be done in connection with the language, the parties can reach

11 out to me by conference telephone tomorrow.  I will make myself

12 available for that.

13        The other thing is to remember this is the first

14 hearing.  It's not the final hearing.  And to the extent that

15 these things can await the final order, they should, but to the

16 extent that can't I'm prepared to address them.

17        MR. LOGAN:  That's perfectly appropriate, and I will

18 be here, Your Honor, tomorrow.  Oh, one thing I forgot to

19 mention, too.  The issue the U.S. Trustee raised about Lazard

20 and Alix, we agree wholeheartedly with Your Honor's view that

21 they're independent and if it turns out that these

22 professionals are not retained or we don't get the stalking

23 horse protections on April 10, we've got to deal with the

24 consequences.  We're prepared to live with that.  Both specific

25 to Alix and Lazard, the U.S. Trustee did raise that issue with

1 the DIP lenders, and they are willing to accommodate by

2 adopting some language which makes it clear.  It doesn't have

3 to Lazard or Alix specifically, just a group of professionals

4 that are reputable and satisfactory to them.

5         THE COURT:  Okay.  And I do -- what about the U.S.

6 Trustee's objection concerning the expanse of the term "lender

7 expenses?"  I mean, it seems to me that to be pure about it,

8 even given the relationship and the default triggers, which I'm

9 prepared to approve, but with the understanding that I've

10 expressed in terms of how I view each separate request for

11 relief in the different vehicles which will come up, that the

12 DIP lender ought to be reimbursed for DIP expenses, not for

13 sale-related expenses, and you yourself said earlier it's

14 difficult sometimes to break them up, and I understand this,

15 but it's a problem that has to be addressed I think.

16         MR. LOGAN:  Well, Your Honor, on that, I understand

17 the issue and actually I thank the U.S. Trustee for bringing

18 this to our attention and correcting the motion to approve the

19 stalking horse protections.  It saves us the effort of filing

20 an errata on that.  The DIP lenders are offering us an

21 essential lifeline, and a critical component of that was that

22 we pay unsegregated costs that their counsel has incurred on

23 both documents.  And, Your Honor, I think in the context of a

24 DIP facility which has got very attractive pricing against

25 collateral that's pretty soft, that all things considered it's

1 being offered to us as a deal which includes paying them for

2 their cost of counsel without forcing counsel to try to

3 differentiate the two.  That is a very small price to pay for

4 the extremely great benefits that will rebound to the estate.

5          THE COURT:  Well, we don't know what the number is.

6          MR. LOGAN:  Even with Kirkland & Ellis, Your Honor,

7 the benefits to the estate of having this facility in place are

8 extreme.

9          THE COURT: Be careful who you challenge.  Well --

10 and the same issue, I think, is -- it's another facet of the

11 same issue with respect to the breadth of the indemnification.

12          MR. LOGAN:  Well, Your Honor, there again I think the

13 answer is in large part if Your Honor doesn't approve the

14 stalking horse protections we got in the event of default, but

15 indemnify them for what?  It's -- they made a proposal to the

16 Court.  It was declined.  It seems to me the sort of thing that

17 when I represent lenders and we start to compound conservatism

18 you ask for, but it doesn't bother the debtor and I don't think

19 should bother the estates, because as Your Honor pointed out

20 when we come to April 10th, Your Honor may approve the stalking

21 horse protections, in which case they're going to have stalking

22 horse protections.  Your Honor may not.  If Your Honor doesn't

23 approve the stalking horse protections, we're back to square

24 one on trying to auction these particular assets, and I'm hard

25 pressed to imagine what we're indemnifying them for.  But the

1  lenders, when they are putting out fresh money, which these

2  folks really are, don't want to put out fresh money and -- with

3  margins of profitability on that which are fairly thin and

4  incur risk that somebody is going to sue them and at least they

5  have to spend the cost of defending themselves.  So, Your

6  Honor, again in the context or a package that we think is

7  essential, we urge the Court to accept what the lenders have

8  proposed because it is -- it is a package.  It is.

9          THE COURT:  All right.  I'd like to address the

10  overall concern expressed by the U.S. Trustee, which is a valid

11  one, and that is the pace at which the debtor and others

12  propose both financing and sales, which are related to

13  financing in some respect, move forward.  I've said before in

14  cases that come in, sale cases, and they come in it seems with

15  increasing frequency, that sometimes the best thing a Court can

16  do is actually slow things down.  But, as I've also decided

17  from time to time before, I don't think based on this record

18  this is one of those situations.

19          It's undisputed -- well, two things are undisputed,

20  at least of today.  One is the state of the industry and one is

21  the state of this business within the industry.  And debtor, it

22  seems to me, has met its burden today in demonstrating that

23  unless it's able to have some at least short-term certainty it

24  will not be able to maximize the value of its assets.

25          Understand also that when I sign an interim financing

1  order, it's just that.  It's an interim order, which leads to

2  the next step, and that is the very short period of time

3  between the formation of the committee, and I assume one will

4  be formed, and the next hearing April 10th on bidding

5  procedures and perhaps other issues.

6         The parties should know that I will not hesitate,

7  depending upon what the committee may say or do, if the

8  circumstances warrant, to slow the process down at that point,

9  and there may or may not be consequences to that, but I don't

10  know what the world is going to look like on April 10th.

11  Things, in some cases, develop quickly.  I'm assuming they will

12  continue to do so with respect to this particular company,

13  perhaps for the better.  So I want the parties to be aware of

14  that.

15         I do think, however, under the circumstances that to

16  delay approval of the DIP, even on an interim basis, would not

17  be in the best interests of this estate and its constituents,

18  and I think, on the other hand, approval will enhance the

19  opportunity that the debtor has to maximize value for those

20  various constituents.

21         And I will add one other thing that I tell the

22  parties early on in sales cases, and that is I'm amenable to

23  approving pre-confirmation sales of assets, but as part of

24  that, the debtor needs to show me, not guaranty, but make some

25  demonstration that the sales are but a step or steps toward the

1 goal of developing a confirmable Chapter 11 plan.  As one of my

2 colleagues in another district says, "If you want to rent the

3 courthouse, you have to pay the rent," and that's what I

4 expect.

5          Now, I'll say one more thing.  The U.S. -- nobody

6 raised this as an issue, and that is I'm assuming because of

7 the proposed language with respect to granting liens on Chapter

8 5 actions and 506(c) waivers, and that is they would be

9 effective only upon the entry of a final order, I note that I

10 would be willing to sign an interim order with the expectation

11 that there will be some change in that provision that's

12 proposed.  I'm not asking the lender to concede anything today.

13 But in a case -- especially in a sale case, especially with

14 respect to the Chapter 5 actions, I'm aware and I know

15 everybody else is, that the committee will take great interest

16 in the disposition of those claims.

17          All right.  Does anyone have any questions about the

18 Court's rulings or views with respect to the DIP request and

19 what should be in the order?

20          MR. McMAHON:  Your Honor, Joe McMahon, just very

21 briefly.  I don't know if I accurately gleaned from your -- the

22 Court's brief comments after debtors' counsel presentation what

23 the ruling was with respect to the indemnification provision.

24          THE COURT:  Well, I'll tell you what I think the

25 debtor told me, and that is it wasn't -- it wasn't proposing a

1 change in what the DIP provided.  It may be that's something

2 that can be revisited at the final hearing, and I don't

3 consider that to be an issue that's completely over with.  Now,

4 to what extent it will mean because of what happens between now

5 and the final hearing I can't say with respect to advances

6 made, but I made no ruling with respect to that specifically

7 other than to say I'll approve on an interim basis what has

8 been approved.  Are there any other questions?

9        MR. GALLO:  Your Honor, Andrew Gallo again for

10 Deutsche Bank.  If I understand what Your Honor has said, is

11 that he wants the parties to work out language and then present

12 an order tomorrow, if I understand that correctly.  To borrow

13 your analogy, because of the numerous parties that want to trim

14 this tree, I think it might make sense if we -- or, if it Your

15 Honor can do so, to set an actual time that we -- that the

16 order would be presented because I'm concerned that if people

17 are traveling tonight that everyone have an opportunity to

18 comment on the order and on the language.  I know from our

19 standpoint the language that we -- the debtor proposed would

20 not be sufficient.  Just referencing 561 would not be

21 sufficient for us, but I think we could work something out

22 based upon the parameters Your Honor has set forth tonight.

23        THE COURT:  Well, you know, given -- I'd hate to --

24 I'm not going to -- well, are you asking that I sent a time by

25 which a revised order should be circulated?

1        MR. GALLO:  No.  I think what I'm saying, Your Honor,

2  is that the debtor is going to present a revised order tomorrow

3  I understand for the Court's consideration.

4        THE COURT:  And I would expect it would come in with

5  a certification that says all who made a statement here agree

6  or they don't and we need to talk.

7        MR. GALLO:  Okay.  That solves the problem as well,

8  Your Honor.  Thank you.

9        THE COURT:  Okay.  Are there any other questions?

10  All right.  Shall we take up cash management?

11        MS. CULLER:  Good evening, Your Honor.  Emily Culler

12  from O'Melveny & Myers.  I will try and be brief with this

13  motion given the hour.  The debtors' cash management motion

14  seeks mainly four things.  One is just to continue the use of

15  their existing cash management system, including but not

16  limited to the initiation and completion of inter-company

17  payment and any support transactions.  The debtor also seeks to

18  continue using their pre-petition bank accounts and business

19  forms, including a waiver of the requirement that the legend

20  "Debtor-in-Possession" be imprinted on any existing checks and

21  business forms.

22        The debtor has approximately 350 deposit, accounts

23  payable, payroll, operating, trust and custodial accounts.  As

24  Mr. Logan pointed out, it's very important for us to get an

25  order entered allowing us to continue use of those accounts,

1 for instance, to make payroll tomorrow and to move forward.

2          THE COURT:  All right.  I understand, though, that

3 there are issues with some of the relief requested.  Can you

4 highlight them for me?

5          MS. CULLER:  I'm not aware of an issue with any of

6 the relief requested on the existing bank accounts.  I think

7 there were questions about the servicing portion of the motion,

8 which is the next portion I was going to --

9          THE COURT:  Let's get to that then.

10          MS. CULLER:  Touch on that, okay.  Thank you.  As my

11 colleagues pointed out today and as others in the courtroom

12 pointed out today, the servicing platform is a very important

13 platform for maintaining the value of the estate.  The debtor

14 is requesting herein to continue servicing in the ordinary

15 course of business.  We were lucky enough to have the help of

16 Deutsche Bank National Trust Company, which is the trustee for

17 one of the securitization trusts, who helped us with the

18 language to try and make any party who is a beneficiary of the

19 servicing accounts comfortable with what we've drafted today.

20 I think there was one clarification that I can hopefully work

21 out from the warehouse -- from the wholesale loans.  The motion

22 and the order is intended to apply equally, as far as servicing

23 goes, to the securitization trust and the wholesale loans.  The

24 debtors perform servicing for both types of agreements, and we

25 don't intend to apply the relief requested any differently to

1   any kind of servicing arrangement.

2          And I think previously the repo -- the parties to the

3   repo agreement had mentioned, I guess, that they had the same

4   concerns, that the motion was intended to alter, repair or

5   waive an rights under the repo agreements.  The motion doesn't

6   address the repo agreements at all.  This is just clear-cut.

7   We want to continue our servicing.  We want to continue our

8   existing bank accounts and continue the cash management system.

9          THE COURT:  All right.  Does anyone else care to be

10  heard?

11         MR. FOSTER:  Your Honor, Wilbur Foster, Morgan

12  Stanley.  There was a similar objection to the cash management

13  motion, and if the language can be worked out that Mr. Logan

14  was talking about, I think that can be put in here to resolve

15  the issue.  Again, the problem is it's a very broad cash

16  management motion, and it could affect rights that parties

17  would otherwise have that I don't think it intends to affect.

18  For example, the currently numbered Paragraph 17 has an express

19  prohibition on particular setoff rights.  I don't think they're

20  intending to prohibit setoff rights by parties to safe harbor

21  contracts, so we need -- again, we just need a general

22  provision.  If we can work out the language for the general

23  provision for the DIP order, that language should go in here as

24  well to deal with that kind of problem.  Thank you.

25         MS. SCHONHOLTZ:  Your Honor, Margot Schonholtz again

1  for Bank of America very briefly.  I think the clarification

2  that the servicing provisions also apply to the repos in the

3  order is very helpful because that was one of our main

4  problems, and, again, to the extent there's a need for

5  clarifying language that it doesn't affect existing rights

6  under the agreements or under the Code, that would be helpful.

7  Thank you.

8       MS. CULLER:  Your Honor, we will agree to add the

9  language that Mr. Logan previously read to the cash management

10 motion.  One thing we want to make clear, we have to have this

11 motion entered tonight or as soon as possible in order to make

12 payroll this week.

13      MR. LOGAN:  And, Your Honor, a related point while

14 we're talking about cash management.  Counsel for Union Bank of

15 California, which is our main cash management bank, came up to

16 talk to me about our ability to make payroll.  It's their view

17 that we need a carve out from the liens granted to the DIP

18 lenders to cover $440,000 of possible cash management fees, and

19 once we -- which they're agreeable to, which is part of the DIP

20 order.  When we probed them, it turns out that's the gross

21 number.  They owe the debtors interest back, and so the real

22 net number if it's paid is a couple thousand dollars a month as

23 I understand it.  But Union Bank of California's position is

24 that until we get the DIP order entered with that carve out,

25 they're not going to let us access the bank accounts.  That

1 shuts down payroll.  I don't think it's appropriate to rush

2 through the DIP order, and what we would like the Court to do

3 is be very clear that whatever DIP order is ultimately entered,

4 maybe we do this orally on the record tonight, will have a

5 carve out of up to $440,000 for Union Bank of California's fees

6 just so we don't stiff employees tomorrow.

7 　　　　　THE COURT:  Yes.  Does anyone have any objection to

8 that?  I hear none.  I have none either.

9 　　　　　MR. FREEMAN:  Just one statement on that, Your Honor,

10 and I'm sorry to add any (indiscernible).  Barry Freeman from

11 Jeffer Mangels for Union Bank.  It was not that you --

12 　　　　　THE CLERK:  (Indiscernible)

13 　　　　　MR. FREEMAN:  Jeffer -- Barry Freeman, Jeffer,

14 Mangels, Butler & Marmaro, counsel for Union Bank.  It was not

15 that the bank was holding up the estate.  The Bank just did not

16 know what to do without an order protecting it when the filing

17 occurred, and that was the reason for these orders, so we're

18 not doing anything that offended anybody, including secured

19 parties or whatever, so we needed the order to protect us, not

20 to leverage the debtor.

21 　　　　　THE COURT:  Hard not to offend somebody.  I

22 understand.  All right.  But is the bank satisfied with the

23 exchange.

24 　　　　　MR. FREEMAN:  Yes.

25 　　　　　THE COURT:  All right.  Thank you.  Mr. McMahon, does

1  the U.S. Trustee care to be heard on this?

2          MR. McMAHON:  Cash management?

3          THE COURT:  Yes.

4          MR. McMAHON:  Your Honor, if I could just see a copy

5  of the final order with any changes that are incorporated?  I

6  haven't seen --

7          THE COURT:  All right.  I don't know if it exists

8  yet.  All right.

9          MR. McMAHON:  Let's put it this way.  The issues

10 raised by the parties tonight were, I guess, unrelated to our

11 position.  We were not taking a position in opposition to the

12 motion.

13         THE COURT:  Okay.  All right.  Does the debtor then

14 need a little time to work on that?  Should we do the other

15 orders while --

16         UNIDENTIFIED ATTORNEY:  Yes.

17         THE COURT:  All right.

18                      (Pause)

19         MR. COLLINS:  Your Honor, if I may present the forms

20 of orders for all of the motions that I think we have

21 resolution of.  We are -- we do believe we also have resolution

22 of the employee wage order.  We have been working on that while

23 the other matters have been going forward.  We just need to

24 interlineate one additional change to that form of order, and

25 that might take another minute or two.  But may I present the

1  other forms of order, Your Honor?

2          THE COURT:  Yes.  Thank you.

3          MR. COLLINS:  Your Honor, just for the record, the

4  last form of order in the file that I handed Your Honor is an

5  order shortening the notice period with respect to our sale

6  procedures concerning the Greenwich sale.  I think Your Honor

7  has tentatively approved that, but we did want to have an order

8  on the record, or on the docket, reflecting that it's

9  appropriate for us to go forward on Tuesday.

10         THE COURT:  Yes, I had previously indicated our

11  availability for that, and the order provides that the hearing

12  on bidding procedures will be April 10th at 3:30 and that

13  objections to the sale procedures must be filed by four o'clock

14  on the calendar day immediately preceding the hearing.  That

15  would be April 9th.

16         MR. COLLINS:  And, Your Honor, we would assume that

17  the committee would have the right to be heard at the hearing,

18  obviously.  And I would assume that, Your Honor, if somebody

19  missed that deadline and they had real concerns Your Honor

20  would listen to them as well on Tuesday, but it would be our

21  hope that at least people who can get us written objections, we

22  would like to have them by that date.

23         THE COURT:  And in something of this nature, I would

24  view it exactly that way, yes.

25         MR. COLLINS:  Thank you, Your Honor.

1          THE COURT:  McMahon, do you care to be heard?

2          MR. McMAHON:  To be clear about this point, Your

3 Honor, there would be -- I mean, obviously concerns to the

4 extent of whether or not we should be moving forward with the

5 process on the 10th will be entertained at that time as well.

6          THE COURT:  I will --

7          MR. McMAHON:  Thank you.

8          THE COURT:  Yes.  All right, that order has been

9 signed.

10          UNIDENTIFIED ATTORNEY:  Thank you.

11          THE COURT:  Okay.  What number am I filling in in

12 Paragraph 3 of the joint administration order, docket number,

13 do we know?  Is it the 10416?

14          MR. COLLINS:  Yes, Your Honor.

15                         (Pause)

16          THE COURT:  Okay.  The utility order provides that a

17 final hearing will be held on April 24th at 2:30, which is

18 consistent with what the Court indicated its availability was,

19 and objections to the motion must be filed April 17th at four

20 o'clock.  And there is one other blank.  That's for service of

21 the order.

22          MR. COLLINS:  Your Honor, we can do that within two

23 business days.

24          THE COURT:  Okay.  April 5th?

25          MR. COLLINS:  Yes, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  With that, that order has been

2 signed.  I signed the insurance order.  I've signed the

3 customer obligation order.  That leaves yet for submission on

4 certification the order concerning the appointment of XRoads

5 Case Management.

6          MR. COLLINS:  Your Honor?  If that was included in

7 that file, I apologize, Your Honor.  The --

8          THE COURT:  I did see it.

9          MR. COLLINS:  Okay, yes.  XRoads has been put off.

10          THE COURT:  Yes.  And the pre-petition wage order, et

11 cetera, will be submitted under certification.

12          MS. UHLAND:  Your Honor, actually, we would like to

13 pass that up when we -- after we interlineate it.  We've been

14 discussing it with the United States Trustee so we can make the

15 payroll tomorrow --

16          THE COURT:  Okay.  All right.

17          MS. UHLAND:  -- since it does include pre-petition

18 wages.  And we also are interlineating the cash management

19 order.  While those two are -- interlineations being complete

20 on those, Your Honor, I just wanted to raise a scheduling

21 matter.  As I noted, we expect to be filing tonight yet or

22 first thing in the morning the motion to approve the sale of

23 the servicing business to Carrington, but as the -- and the

24 proposed agreement with them has two deadlines in it.  One,

25 it's proposed that the bid procedures be entered by April 13th,

1  and, second, that the sale order be entered by May 11th, and

2  then we have proposed in the bid procedures -- what we would --

3  contemplating proposing is, frankly, tracking the overbid

4  process together with the overbid process for the Greenwich

5  transaction.

6         In addition, Your Honor, we hope to file a sales

7  procedure motion without a -- without designating a stalking

8  horse for our loan origination business and our other available

9  financial assets.  We are also going to attempt to file that

10 tomorrow or the following day.  And we'd also like to have

11 those bid procedures heard, if we can, late next week.  We

12 would think that it would be the most beneficial, and by this

13 time we will have a committee to discuss it, but our

14 inclination and the advice of Lazard at this juncture is that a

15 single sale process for these related assets probably over a

16 multiple-day period is the best way to realize value here.

17        THE COURT:  Well, the sale hearing on the motion

18 that's been filed tentatively is set for May 7th at 10:00, or

19 will be, assuming -- or if the debtors' proposed schedule moves

20 forward.  Would you propose at least with respect to sale

21 approval that that date would be suitable for the others?

22        MS. UHLAND:  Yes, Your Honor, I believe that date

23 would be suitable.

24        THE COURT:  All right.  I will be out of town the

25 13th through the 18th.

1          MS. UHLAND:  Your Honor, is the April 12th date

2     reasonable?  That gives the committee a little more time to

3     review these procedures than the Greenwich procedures.

4          THE COURT:  Well, April 12th is a trial day, and then

5     afternoon is for various things scheduled at 1:30 and 2:30.

6     Could schedule you at three o'clock on April 12th, but I would

7     approve that timetable with the same understanding as the one

8     I've just approved, and that is, you know, to the extent

9     someone on that hearing date convinces me that the schedule

10     should be extended, I will -- I will be -- I'll consider it.

11          MS. UHLAND:  Thank you, Your Honor.  I understand and

12     thank you for scheduling us.  With respect to the -- so we will

13     go ahead and notice that date out for the bid procedures

14     hearing when we file that motion.

15          THE COURT:  Yes, Mr. McMahon.

16          MR. McMAHON:  Your Honor, with respect to the

17     scheduling point that counsel just raised, again, I presume

18     that there's going to be motions to shorten time and that the

19     rights of parties in interest to weigh in on those will not be

20     prejudiced by, I guess, setting a tentative date for this --

21          THE COURT:  No, they will not be.  That's correct.

22          MR. McMAHON:  Thank you.

23          THE COURT:  And if would better if orders -- motions

24     and orders were submitted.

25          MS. UHLAND:  So we will submit an order -- a motion

1  for an order shortening time on the -- in connection with

2  filing the motion.

3          THE COURT:  Yes.

4          MS. UHLAND:  We'll do that.  Thank you, Your Honor.

5  Are we ready with the wage motion?

6                    (Pause)

7          MR. COLLINS:  May I approach, Your Honor?

8          THE COURT:  You may.

9          MS. UHLAND:  Your Honor, what you have is a two-part

10  black-line -- it's partially computer generated and partially

11  hand generated -- providing for the cap on the independent

12  contractor payments previously stated, the cap on the current

13  payment of the employee obligations and -- until this April

14  10th hearing, as well as any payments under the incentive and

15  retention plans until the April 10th hearing.

16          THE COURT:  Okay.  Now, have those who wish to review

17  the marked-up form of order done so and do they have any

18  comments?

19          MS. UHLAND:  We've reviewed the marked-up form of

20  order with Mr. McMahon from the Office of the United States

21  Trustee, and no other parties in the courtroom has requested to

22  review it.

23                    (Pause)

24          MR. McMAHON:  Your Honor, Joe McMahon for the United

25  States Trustee.  I did review the wage order.  It is acceptable

1  in form.  Excuse me.

2           THE COURT:  All right.

3           MS. UHLAND:  And, Your Honor, may -- I have a

4  somewhat -- a rather cleaner version to bring up to the Court

5  for execution, if I may approach.

6           THE COURT:  Yes.  Okay.  We're trading?  There we go.

7                      (Pause)

8           THE COURT:  Anyone else care to weigh in on the

9  pre-petition wage order?  All right, I hear no response.

10          MS. UHLAND:  Thank you, Your Honor.  If you give us a

11 few minutes, we're working on the cash management.

12          THE COURT:  Okay.

13          MS. UHLAND:  Oh, and, Your Honor, one further

14 scheduling matter while that's going on.  Your Honor had given

15 us April 24th as a holding hearing date.  Would that be an

16 appropriate date for our final DIP hearing?

17          THE COURT:  Yes, April 24th at 2:30.

18          MS. UHLAND:  All right.  Thank you, Your Honor.

19 We'll notice -- we'll include that in our notice.

20          THE COURT:  Very well.

21                      (Pause)

22          THE COURT:  All right.  I'm going to take just a five

23 minute recess, so I'll be back.

24                      (Recess)

25          THE CLERK:  All rise.

1          THE COURT:  All right.  I've reviewed the markups to

2    the proposed order, cash management order, and don't have any

3    questions.  Does anyone care to be heard in connection with the

4    proposed order?  I hear no response.

5          MS. UHLAND:  The late hour provided great

6    collaboration, Your Honor.

7          THE COURT:  Okay.  That order has been signed.  So

8    that leaves only the XRoads order and the DIP order to be

9    submitted under certification.

10         MS. UHLAND:  Yes, Your Honor, and I think we made

11   some great progress with some of the concepts in the cash

12   management order and the DIP order.  When will we be able to

13   get a copy of the signed cash management order?

14         UNIDENTIFIED ATTORNEY:  We have one.

15         UNIDENTIFIED ATTORNEY:  We do?

16         UNIDENTIFIED ATTORNEY:  Not the signed -- it's not

17   signed by the Judge yet.

18         UNIDENTIFIED ATTORNEY:  It'll be on the --

19         THE COURT:  Well, would you like a duplicate

20   original?

21         MS. UHLAND:  Yes, Your Honor.  In the event --

22   sometimes the banks require them in order to allow us to have

23   the funds flow.

24         THE COURT:  All right.  Why don't you give me the

25   copy that we made for you back again, and I can either sign

1 that one or, if you need a blank copy, I'll --

2         UNIDENTIFIED ATTORNEY:  This will be fine --

3         THE COURT:  Okay.  I'll write "duplicate original" on

4 top.  Haven't done this in a while.

5         MS. UHLAND:  I'm sure something will crop up, but

6 this one I know I've had problems with recently, where a banker

7 wanted to see a signed order before they would wire funds.

8         THE COURT:  Okay.  There's that.

9         MS. UHLAND:  Thank you, Your Honor.

10         THE COURT:  All right.  Anything further for today?

11         MS. UHLAND:  I think that's it, Your Honor.  Thank

12 you for the hour and all the time and the consideration and --

13         THE COURT:  To Court staff --

14         MS. UHLAND:  -- thank you to the Court staff in

15 particular.

16         THE COURT:  All right.  Thank you.  That concludes

17 this hearing.  Court's adjourned.

18         MS. UHLAND:  Thank you, Your Honor.

19         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

20                  * * * * *

21

22

23

24

25

C E R T I F I C A T I O N

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.


/s/ Denise M. O'Donnell

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.      Date:  April 11, 2007

**J&J COURT TRANSCRIBERS, INC.**