## EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Proposed Hrg. Date: 4/24/07 @ 2:30 p.m. |
| | : | Proposed Obj. Deadline: 4/23/07 @ 4:00 p.m. |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION
PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER
AUTHORIZING THE ACCESS SALE AND GRANTING RELATED RELIEF**

New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation,

New Century Financial Corporation ("NCF"), a Maryland corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby submit this motion (the "Motion") for the entry of

an order (the "Order") in substantially the form attached hereto pursuant to sections 105 and 363

of Title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code")

and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended from time

to time, the "Bankruptcy Rules"), (a) authorizing New Century TRS to cause a non-debtor

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

wholly-owned subsidiary to enter into and to perform under that certain Asset Purchase

Agreement by and among New Century Warehouse Corporation, a California corporation ("New

Century Warehouse" or the "Seller"), a wholly owned non-debtor subsidiary of New Century

TRS, and Access Holdings Corporation, a Texas corporation (the "Buyer"), substantially in the

form attached hereto as Exhibit 1 (the "Purchase Agreement"), (b) approving the form and

manner of the notice of the Access Sale, (c) waiving the 10-day stay under Bankruptcy Rule

6004(h), and (d) granting such other and further relief as the Court deems necessary and

appropriate.[2] In support of this Motion, the Debtors respectfully represent as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

sections 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. section 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. sections 1408 and 1409.

2.      The basis for the relief requested herein is sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

### BACKGROUND

3.      New Century Financial Corporation, a Maryland corporation ("NCF") and

publicly owned real estate investment trust, is one of the largest specialty mortgage finance

businesses in the United States. Through its subsidiaries and its primary holding company

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and

together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases,

sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending,

or lending to individuals whose borrowing needs were generally not fulfilled by traditional

---

[2] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the Purchase Agreement

financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.     On April 2, 2007 (the "Petition Date"), the Debtors filed their petitions for relief. The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

5     In December 2005, New Century Warehouse, a shell company wholly owned by New Century TRS, entered into an agreement to acquire substantially all of the assets of Access Lending Corporation, a Texas corporation ("Access Lending"). Access Lending was in the business of financing residential mortgage loans originated by a network of mortgage originators and other smaller financial institutions. Access Lending provided financing to these loan originators that was, in turn, used to fund the loans provided to individual borrowers who were customers of the loan originators. Access Lending, in turn, obtained its financing from three warehouse lenders who entered into various receivables purchase agreements, credit agreements and repurchase agreements (collectively, the "Warehouse Loan Facilities").

3

6.     New Century Warehouse completed the acquisition of the assets of Access Lending in February 2006.

7     Since this acquisition, New Century Warehouse has continued the business conducted previously by Access Lending. For example, New Century Warehouse acquired the Access Lending trade name and generally does business as "Access Lending," and either entered into new Warehouse Loan Facilities with its warehouse lenders or assumed Access Lending's obligations under an existing Warehouse Loan Facility. NCF guaranteed Access Lending's obligations under these Warehouse Loan Facilities. New Century Warehouse also entered into an employment agreement with David Fleig, the principal of Access Lending, and an earn out agreement with Access Lending and Access Investments I, L.L.C., a wholly-owned subsidiary of Access Lending at the time that New Century Warehouse completed its acquisition in February 2006  New Century Warehouse did not acquire the membership interests in Access Investments I, L L C. and that entity is not affiliated in any way with New Century Warehouse or the Debtors

8.     Since this acquisition, New Century Warehouse has operated largely independently of the Debtors  However, the Debtors' financial difficulties triggered cross-defaults under New Century Warehouse's Warehouse Loan Agreements.

9.     One of these Warehouse Lenders, Goldman Sachs Mortgage Company ("Goldman") declared an event of default under a Master Repurchase Agreement dated as of February 15, 2006, as amended (the "Goldman-Access Lending Warehouse Loan Agreement") On March 12, 2007, Goldman purported to credit the market value of the mortgage loans that were subject to the Goldman-Access Lending Warehouse Loan Agreement  Goldman notified New Century Warehouse that this credit equaled $74,949,770 as applied to $73,204,427, which

4

was the total amount owed to Goldman under the Goldman-Access Lending Warehouse Loan

Agreement. Notwithstanding that the credited amount exceeded the amount owed on the

Goldman-Access Lending Warehouse Loan Agreement, Goldman asserted that it did not owe

this surplus to New Century Warehouse and asserted that it was able to apply this surplus to

amounts allegedly owed to it by NC Capital Corporation under some unrelated loan sales

completed under a Purchase Price and Terms Agreement dated as of September 14, 2006  To be

clear, this Motion does not seek to affect any claims or rights between New Century Warehouse

or the Debtors, on the one hand, and Goldman, on the other hand  There are a number of open

issues involving these parties, and Deutsche Bank National Trust Company, as custodian for

Goldman  All rights of the parties with respect to these matters are fully reserved and are not

affected by the relief sought in this Motion.

      10.    New Century Warehouse's other Warehouse Lenders were willing to work

with it prior to and after the Petition Date. New Century Warehouse has entered into the

forbearance agreements[3] with Galleon Capital, LLC, State Street Global Markets, LLC and State

Street Bank and Trust Company (collectively, "State Street") and Guaranty Bank  These

forbearance agreements have allowed New Century Warehouse to continue to operate.

However, they expire on April 23, 2007 [4]  If State Street and Guaranty Bank exercise their

remedies, it is likely that there will be no value for any other creditors or shareholders in New

Century Warehouse. Moreover, the employees of New Century Warehouse would be likely to

---

[3] The Amended and Restated Limited Forbearance Agreement dated April 1, 2007 by and among New Century Warehouse, Access Investments II, LLC, Galleon Capital, LLC, State Street Global Markets, LLC and State Street Bank and Trust Company; and the Limited Forbearance Agreement dated April 1, 2007 by and between New Century Warehouse and Guaranty Bank

[4] In light of the immediacy of the expiration of the forbearance agreements, contemporaneously with this Motion the Debtors have filed their request for the Court to shorten notice of this Motion and to consider this Motion at hearing on April 24, 2007

5

quit and New Century Warehouse would cease functioning as an operating business.

11.    Fortunately, New Century Warehouse has reached an agreement to sell substantially all of its assets as a going concern and has reached an accommodation with State Street and Guaranty Bank.

12.    To be clear, this is a transaction between two non-debtors. However, the parties to the transaction have conditioned the closing on approval by this Court, which the Debtors assert is appropriate given that a Debtor, New Century TRS, owns all of the stock of New Century Warehouse. Moreover, the estates will receive direct benefits by way of releases of the claims State Street and Guaranty Bank each have on account of NCF's guarantees of their Warehouse Loans, and by virtue of substantially increasing the prospects that the estates may realize value from New Century TRS's stock in New Century Warehouse.

## RELIEF REQUESTED

13.    Upon authorization by this Court, New Century Warehouse and the Buyer have agreed to enter into the Purchase Agreement, which contemplates that the Buyer will acquire certain assets of the Seller, a non-debtor subsidiary of New Century TRS, as described more fully below, and will assume all of the liabilities to State Street and Guaranty Bank.

### A.    Overview of the Transaction

14.    The transaction is designed to maintain the Access Lending business as a going concern, to eliminate all liabilities under NCF's guarantees, and to allow for a process to maximize recoveries on the Loans that are subject to the State Street and Guaranty Bank Warehouse Loan Facilities. The financing provided by these Warehouse Lenders covered approximately 96% of the amount paid by New Century Warehouse, while the balance (commonly referred to in the industry as the "haircut") was financed from New Century Warehouse's working capital. If State Street and Guaranty Bank were to foreclose on these

6

Loans, it is likely that New Century Warehouse's equity in these Loans (*i e*, the "haircut") would either be lost entirely or would be minimal.

15.     In order to avoid a melt down of New Century Warehouse, Mr. Fleig has created a new company, Access Holdings Corporation (the "Buyer"), that will acquire substantially all of the assets of New Century Warehouse,[5] make employment offers to the employees of the New Century Warehouse, and assume the warehouse loan financing arrangements with State Street and Guaranty Bank. Of greatest importance to New Century Warehouse and the Debtors, the Buyer will pay to New Century Warehouse 60% of the Net Proceeds[6] realized on the sale of these Loans. NCF does not have the resources or the employees to Liquidate the Loans at New Century Warehouse and the Buyer is the only entity appropriately situated to do so.

16.     The Buyer will have incentives to maximize the recoveries on these Loans since it will realize 40% of the Net Proceeds (plus a $100,000 fee). New Century Warehouse believes that the 60% it will receive should equal around $6 million,[7] compared to a likely recovery of nothing, or close to it, if the transaction does not close. In addition, Mr. Fleig will release New Century Warehouse from (i) an employment agreement which provides for base compensation of $317,500 per year, bonus compensation of no less than $100,000, long-term incentive compensation typically equal to base pay and certain other perquisites, and (ii) an earn out agreement that would entitle Access Lending to 22% of New Century Warehouse's pre-tax

---

[5] As noted above, the transaction does not propose to transfer any interest in, or otherwise affect, the Loans financed by Goldman

[6] Net of (i) amounts owed to State Street and Guaranty Bank under their Warehouse Loan Facilities and (ii) amounts owed to the loan originators

[7] Of course, this is only an estimate. Actual realizations are susceptible to numerous factors. But the structure creates an incentive for the Buyer to maximize these recoveries

7

net income for 2006 and 20% for 2007. The Buyer will also free New Century Warehouse of its

obligations on a real estate lease, New Century Warehouse will receive back its lease security

deposit and the Buyer will free New Century Warehouse of obligations to its employees

Moreover, State Street and Guaranty Bank will release their guaranty claims against NCF, a

Debtor. Finally, the Buyer will pay New Century Warehouse $76,058 44 in cash

### B.    The Purchase Agreement

17. Subject to the Court's authorization, the Purchase Agreement

contemplates the following transactions:[8]

a. The Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey and deliver to Buyer, all of the Seller's right, title and interest in and to all of such Seller's assets of any kind, whether tangible or intangible, wherever located, and whether now existing or thereafter acquired prior to the Closing Date, related to, used or held for use in connection with the Business (other than Excluded Assets), including the following:

i. All of the Seller's rights and interests as lessee under the real property lease for the Office, as set forth in the Purchase Agreement, including but not limited to any security deposit or prepaid rent on account of such lease;

ii. All tangible personal property owned by the Seller and used or located at the Office, as described in the Purchase Agreement;

iii. Seller's books, data files and records relating to the Acquired Assets (but excluding corporate minute books and stock records of Seller and originals that Seller is required by Law to retain in its possession) and all Confidential Information associated therewith;

iv. The Pledged Loans listed on the Purchase Agreement, as of the date of Purchase Agreement, and updated as of the Closing Date, and all rights arising from or related thereto;

v. The Seller Contracts, and all rights arising from or related thereto;

---

[8] The following description is intended as a summary only and is subject to and qualified in all respects by the terms of the Purchase Agreement and all related documents Initially capitalized terms shall have the meanings given them in the Purchase Agreement.

vi   To the extent transferable, all Licenses applicable to the Acquired Assets;
     <u>and</u>

vii. The trade names Access Lending and Access Warehouse Lending, and all
     variants thereof using the name "Access."

b.   Seller will retain ownership of all Excluded Assets, as described in the
     Purchase Agreement, including all assets not specifically included within
     the Acquired Assets.

c.   The purchase price (the "Purchase Price") to be paid by the Buyer to the
     Seller at Closing for the Acquired Assets shall be equal to the sum of:
     (a) an amount of $76,058.44, in cash or otherwise immediately available
     funds as set forth in the Purchase Agreement, such amount to be paid at
     the Closing and (b) an amount in cash representing 60% of the Net
     Proceeds received by the Buyer from the sale of any Pledged Loan at any
     time after Closing, as set forth in, and subject to the restrictions in, the
     Purchase Agreement, such amount to be paid within three Business Days
     following the end of each month after the Closing Date, commencing with
     April 2007.

18.   The obligations of the Seller and the Buyer under the Purchase Agreement

are subject to certain conditions including authorization of the Access Sale by this Court.

19.   The Purchase Agreement also provides for representations and warranties

from the Seller to the Buyer, and vice versa, that are reasonable and customary for transactions

of this type, including representations as to the due organization of the parties and their due

authorization to enter into and perform under the Purchase Agreement.

20.   In addition, the Purchase Agreement provides that the Access Sale is an

"AS IS" Transaction and, if the Closing occurs, the Buyer will accept the Acquired Assets and

the Assumed Liabilities on an "AS IS," "WHERE IS" basis, as provided in the Purchase

Agreement.

C.   <u>Notice of the Access Sale</u>

21.   As set forth below, the Debtors have served notice of this Motion,

contemporaneously with the filing hereof, upon the following entities:

9

a.  the Office of the United States Trustee for the District of Delaware;

b.  the Securities and Exchange Commission;

c.  counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' post-petition senior secured lenders;

d.  counsel to the Official Committee of Unsecured Creditors;

e.  the United States Department of Justice;

f.  all persons or entities known to the Debtors that have asserted a Lien on, or security interest in all or any portion of the Debtors' assets, as revealed by relevant Uniform Commercial Code searches in California and Delaware;

g.  all parties who have timely filed requests for notice under Bankruptcy Rule 2002

22.  The terms and conditions of the Access Sale are set forth in the Purchase Agreement, which, along with each schedule and exhibit thereto, is attached hereto as <u>Exhibit 1</u>.

**D.  <u>Waiver of the 10-Day Stay Under Bankruptcy Rule 6004(h)</u>**

23.  Because the Seller and the Buyer wish to close the proposed Access Sale as soon as reasonably practicable, the Debtors respectfully request that the Court waive the ten (10) day stay required pursuant to Bankruptcy Rule 6004(h) to permit the Access Sale to close immediately after the entry of the Order.

**BASES FOR RELIEF**

**A.  <u>The Access Sale is Authorized by Section 363<br>as a Sound Exercise of the Debtors' Business Judgment</u>**

24.  Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a)

10

25    Although section 363 of the Bankruptcy Code does not specify a standard for court authorization of the use, sale or lease of property of the estate, virtually all courts have held that even a sale of substantially all of a debtor's assets outside of the ordinary course and prior to confirmation of a plan of reorganization is appropriate if the court finds that the sale represents a reasonable business judgment on the part of the trustee or debtor in possession. See In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa 1987); In re Lionel Corp., 77 F.2d 1063 (2d Cir 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that elements necessary for approval of a section 363 sale in a chapter 11 case are "that the sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

26.    The "sound business reason" test requires that a trustee or debtor in possession establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business, (2) that accurate and reasonable notice has been provided to interested persons, (3) that the trustee or debtor in possession has obtained a fair and reasonable price, and (4) good faith [9] In re Titusville Country Club, 128 B.R. at 399; In re

---

[9] Lionel's "sound business purpose" test replaces an older rule which held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i e , when the assets to be sold were wasting or perishable  See In re Lionel Corp., 722 F.2d at 1071  The Third Circuit adopted the emergency rule in In re Solar Mfg. Corp., 176 F.2d 493, 494-95 (3d Cir. 1949)  While most bankruptcy courts have determined that the enactment of the Bankruptcy Code and the Third Circuit's own opinion in Abbotts Dairies have replaced the Solar Mfg. Corp. emergency test with Lionel's "sound business purpose" test, (e.g., In re

<u>Sovereign Estates, Ltd.</u>, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); <u>Phoenix Steel Corp.</u>, 82 B.R. at 335-36; <u>see also Stephens Indus.</u>, 789 F.2d at 390; <u>In re Lionel Corp.</u>, 722 F.2d at 1071.

27      Additionally, courts have permitted the sale of all or substantially all of a debtor's assets by a trustee or debtor in possession if such sale is necessary to preserve the value of the assets for the estate, its creditors and its other interest holders.  See <u>In re Abbotts Dairies</u>, 788 F.2d at 143; <u>In re Lionel Corp.</u>, 722 F.2d at 1063.

28.     Although the assets subject to the Access Sale are assets of a non-debtor subsidiary and are thus not property of the estates, the Debtors seek authorization out of an abundance of caution because the Seller is a wholly owned subsidiary of a Debtor. Authorization of the proposed Access Sale satisfies the "sound business purpose" test. The Debtors believe that the prompt sale of the Acquired Assets presents the only viable opportunity to realize the Excess Amounts due under the Warehouse Lines and thus, to realize the maximum value of the Debtors' estates for the benefit of the Debtors' creditors, stakeholders and other parties in interest.

29.     The Debtors submit that the Access Sale is for a fair and reasonable price. The Access Sale provides the only avenue for liquidating the Mortgage Loans and securing a release from the Lenders for the Debtors. The Debtors do not believe that any other transaction with a reasonable likelihood for closing is available.

30.     Finally, the proposed Access Sale satisfies the good faith requirement of <u>Abbots Dairies</u>. The Debtors submit that the Access Sale is and will be the product of good faith, arm's length negotiations with respect to the price and other terms of the Purchase Agreement.

---

<u>Titusville Country Club</u>, 128 B.R. at 399; <u>Industrial Valley</u>, 77 B.R. at 21), some courts have declined to decide which test prevails.  See, <u>e.g.</u>, <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. at 179.

12

**B.**     **The Proposed Notice of the Access Sale Is Appropriate**

31.     Under Bankruptcy Rules 2002(a) and (c)(1), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the terms and conditions of any private sale, and the deadline for filing any objections to such sale. Although the assets sold in the proposed Access Sale are not property of the estates, this Motion, the exhibits to this Motion and the notice hereof, are reasonably calculated to provide timely and adequate notice of the terms and conditions of the Access Sale to the Debtors' creditors and other parties-in-interest consistent with the requirements of Bankruptcy Rule 2002.

**C.**     **Relief from the Ten Day Waiting Period Under Bankruptcy Rule 6004(h) is Appropriate**

32.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the Order be effective immediately by providing that the ten (10) day stay under Bankruptcy Rule 6004(h) is waived.

33.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier on Bankruptcy suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

13

34      The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h) or, in the alternative, if an objection to the Access Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal. Any additional delay in the closing could cause significant harm to Access Lendings' ability to maintain its employees and customers, which in turn will diminish the opportunity for full realization on the liquidation of the Loans.

## NOTICE

35      No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich and CIT, the Debtors' post-petition senior secured lenders; (3) counsel to the Official Committee of General Unsecured Creditors; (4) all persons or entities known to the Debtors that have asserted a Lien on, or security interest in all or any portion of the Debtors' assets, as revealed by relevant Uniform Commercial Code searches in California and Delaware; (5) the Securities and Exchange Commission; (6) the United States Department of Justice; and (7) all parties who have timely filed requests for notice under Rule 2002 of the Bankruptcy Rules. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

36.     No previous motion for the relief sought herein has been made to this or any other Court.

14

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit 2, granting the relief requested herein and such other or further relief as the Court may deem just and proper

Dated: April 13, 2007
Wilmington, Delaware

_Mauro A. Ramos_

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION