IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | **Related Docket No. 70** |
| | : | |

**RESPONSE OF CARRINGTON CAPITAL MANAGEMENT, LLC
AND CARRINGTON MORTGAGE SERVICES, LLC TO OBJECTIONS
TO DEBTORS' EMERGENCY MOTION SEEKING, *INTER ALIA*, AN
ORDER APPROVING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE PROPOSED SALE OF
ASSETS USED IN THEIR LOAN SERVICING BUSINESS**

Carrington Capital Management, LLC ("CCM") and Carrington Mortgage Services, LLC ("CMS", and together with CCM, "Carrington"), by and through their undersigned attorneys, respectfully submit the following response to the Objections (as defined below) to the Debtors' emergency motion seeking approval of, among other things, the bidding procedures and bid protections in connection with the proposed sale of assets used in the Debtors' Servicing Business (the "Motion") [Docket No. 70].[2]

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

[2] Defined terms not expressly defined herein shall have the same meaning given to them in the Motion.

WCSR 3592588v1

## **PRELIMINARY STATEMENT**

As detailed below, Carrington, which in the last three years has undertaken 22 mortgage loan securitizations in the aggregate amount of $23 billion, has ample subprime market knowledge and both the financial and managerial ability to consummate the transactions contemplated in the APA. Bruce Rose, the General Partner of CCM, in fact was instrumental in the founding of not only the Debtor in 1995 but of several of the largest subprime and prime mortgage companies that emerged as leading lending institutions over the last two decades. This is not a transaction that Carrington has undertaken lightly; it has expended enormous amounts of time and money (and has committed to incur additional expense) to ensure that CMS'S proposed acquisition of the Debtors' Servicing Business is a viable transaction that will be poised to close on the accelerated timetable necessary to preserve the value of that business. Due to the state of Debtors' books and records, Carrington has incurred and will continue to incur expenses that are now expected to exceed its original estimate substantially. Since late March, Carrington and its professionals have engaged in literally weeks of negotiations over the terms of the proposed acquisition, first with the Debtors and their legal and professional advisors and more recently with the legal and financial advisors to the Official Committee of Unsecured Creditors (the "Committee") that was appointed on April 9. In short, there can be no dispute that this transaction has been extensively negotiated, at arm's-length, with these fiduciaries of the Debtors' estates.

Carrington and the Debtors originally entered into a definitive agreement for the sale of the Servicing Business on the terms set forth in the Asset Purchase Agreement filed with the Court on April 4, 2007 (the "Original APA"). Carrington believed and continues to believe that the provisions of the Original APA (including the bidding procedures contemplated thereby)

preserved the value of the Debtors' Servicing Business. Moreover, Carrington, after negotiations with the Debtors and the Committee, since has agreed to additional terms (including a variety of material concessions), culminating in an Amended and Restated Asset Purchase Agreement (the "APA") (including revised Bid Protections in the form of the proposed Bidding Procedures Order) anticipated to be filed by the Debtors with the Court today. This agreement not only preserves and enhances the value to the Debtors' estates of the stalking horse agreement for Carrington's purchase of the Debtors' Servicing Business, it also provides the Debtors additional flexibility that will permit them to pursue, on a substantially parallel track, a sale of the Servicing Business and the Debtors' interests in the residual interests in the securitization trusts relating to the New Century Portfolio-related Assets (as such term is defined in the APA) (the "Morgan Stanley Residual Interests"), thereby providing an opportunity for the Debtors to maximize the value of both sets of assets. As a result, the Committee supports Carrington as the stalking horse bidder for the Debtors' Servicing Business pursuant to the provisions of the revised APA and the revised bid procedures. Based on the foregoing, the Court should overrule any remaining objections, as outlined below, and should enter an order approving the Bid Protections (in the form of the proposed Bidding Procedures Order filed with the Court today) and scheduling the Auction and Sale Hearing.

## BACKGROUND

### A.    Carrington's Operations in the Mortgage Loan Market

CCM is the managing partner of Carrington Investment Partners, L.P. (the "Fund"), a fixed income investment partnership headquartered in Greenwich, Connecticut, that was formed in March 2004. The Fund, which currently invests primarily in the residential mortgage credit markets, has a total capitalization in excess of $1 billion. Through Carrington Securities L.P.

("Carrington Securities"), a Delaware limited partnership for which CCM acts as general partner, CCM pools and securitizes residential mortgage loans under mortgage loan purchase agreements with various mortgage loan originators or sellers nationwide. Such originators have included, to date, Residential Funding Corporation, Fremont Investment and Loan Corporation, Option One Mortgage Corporation, and New Century Mortgage Corporation ("NCMC").

CCM and Carrington Securities sponsored their first such mortgage loan securitization in May 2004. In the three years from that issuance to the present, CCM and Carrington Securities have structured 22 securitizations in all, involving mortgage loans totaling more than $23 billion in principal amount. As part of those transactions, the mortgage loans acquired by Carrington Securities have been deposited into various Real Estate Mortgage Investment Conduits, or "REMICs", which hold such residential mortgage loans in trust and have issued various classes of mortgage-backed securities rated by the three major U.S. credit rating agencies. To date, all of the senior classes of such securities have been sold in the capital markets by the underwriters of those transactions; Carrington's underwriters have included Bear Stearns, Citigroup, JP Morgan and Barclays. Typically, the Fund retains some of the most junior classes of the securities and all of the residual interests.

As is readily apparent, such structured financings are extremely capital-intensive. Carrington Securities has funded its acquisitions of the mortgage loans, in part, through several financing facilities it has had in place. Consequently, although Carrington has the financial wherewithal to pay the purchase price for the Servicing Business from capital available to it from the Fund without further accessing the debt or capital markets, Carrington is confident that its investment banking relationships will provide it with ready access to additional financing if the

need were to arise. Consequently, Carrington has never negotiated for any financing contingency in either the Original APA or the APA.

### B. Carrington's Prepetition Relationships with the Debtors

As the Debtors noted in the Motion, a number of the Carrington-sponsored securitizations involved mortgage loans that were originated by New Century entities, and for which NCMC currently acts as servicer. In particular, Carrington Securities entered into a Master Mortgage Loan Purchase and Servicing Agreement, dated as of April 27, 2004 (and amended and restated as of May 25, 2006) with NC Capital Corporation ("NC Capital"), as seller, and NCMC, as originator and servicer, whereby NC Capital agreed to sell pools of mortgage loans originated by NCMC to Carrington Securities from time to time at prevailing market levels and on a completely arm's-length basis. Pursuant to this and other agreements, CCM, Carrington Securities and certain of their affiliates had a primary role in the issuance of, and retain significant interests as investors and certificate holders in, 12 securitization trusts established from 2004-2006 (the "Carrington Securitization Trusts") that hold approximately $8.75 billion current balance of mortgage loans originated by the Debtors.

The Debtors also have a limited liability company membership interest in CCM and a limited partnership interest in the Fund, as the Debtors noted in the Motion. In 2004, New Century Financial Corporation, among others, invested $25 million of "seed money" to assist in the formation of the original Fund. In addition, the Debtors acquired a 36.75% member interest in CCM (the managing partner of the Fund) for a $2 million investment. At present, the Debtors' interests in the Fund amount to approximately 4% of the Fund's overall capitalization. These interests, which have been disclosed publicly in the Debtors' SEC filings since the inception of the Fund, are purely passive investment stakes, and the Debtors have no managerial

control over any Carrington entity.[3] Moreover, it should be noted that the original investment in CCM was returned to the Debtor in the beginning of 2006. The Debtor now enjoys only a passive, non-voting income stream generated from their retained LLC membership interest. Nonetheless, to the extent that CMS's acquisition of the Servicing Business ultimately proves to be a profitable one for the Fund and CCM, the Debtors' estates and their creditors will benefit through their ownership of this LLC membership interest for the duration that the interest is maintained by the Debtor. This benefit is one that only Carrington can furnish.

### C.    Carrington's Negotiations to Acquire the Mortgage Servicing Rights

In February 2007, prior to the occurrence of various events that led to the commencement of the Debtors' chapter 11 cases, the Debtors' investment banker, Lazard Frères & Co. ("Lazard"), approached Carrington about its potential interest in acquiring the MSRs relating to the Carrington Securitization Trusts. Over the subsequent period, CCM pursued discussions with the Debtors that led to discussion of a draft term sheet, which was never executed, in favor of moving directly to documentation of the Original APA, which was approved by New Century Financial Corporation's and NCMC's boards of directors. During those negotiations, CCM did not require that the Debtors be subject to any exclusivity or lock-up provisions, and it instead understood fully that Lazard also was marketing, and would continue to market, those assets for sale to other prospective bidders.

The result of these negotiations has been that Carrington will acquire not just the Carrington-related MSRs, but instead, the entire servicing platform operated by the Debtors; the APA includes, among other things, a commitment by Carrington to make offers of continued

---

[3]    Other than this well-documented investment interest, there are no other financial connections between CCM and the Debtors or any of their insiders. In particular, as CCM already has disclosed to the Debtors and the Creditors Committee, none of the current or former members of senior management or directors of any of the Debtors hold any interest in the Fund or CCM.

employment to substantially all the remaining employees of the Servicing Business on the closing date. Obviously, while Carrington has considerable expertise in the subprime market segment as a result of its participation in the securitization transactions discussed above, it has not previously acted as a servicer for mortgage loans. However, Carrington does act, by virtue of its rights under the various Pooling and Servicing Agreements governing its securitizations, as the primary driver behind default management, loss mitigation and REO disposition, as delineated under the "Rights of the CE Holder" in such agreements. Carrington has, in furtherance of those rights, built substantial infrastructure and skillsets in the management of delinquent and defaulted mortgages. In addition, recognizing the need for a strong management team to be in place well before the closing date, Carrington engaged David Gordon, a twenty-five year industry veteran who most recently was a member of Fremont Investment and Loan Corporation's executive committee and ran that entity's subprime servicing platforms, to serve as CMS's president. Carrington also has entered into employment contracts with highly-experienced and well-qualified individuals to head CMS's information technology and human resources divisions and investor reporting functions.

  The new CMS management team currently is on the ground in California conferring with the Debtors' existing staff to ensure as seamless a transition as possible of the servicing platform at closing. Beyond the typical diligence that is required for a purchase of assets from a bankrupt debtor, Carrington also is spending considerable time and resources to, in essence, carve out and create a stand-alone business that has never previously been an independent division or subsidiary of the Debtors. This process includes negotiating and documenting schedules to the APA setting forth the assets and liabilities of this new stand-alone business; an extensive review of the Debtors' existing servicing and other contractual arrangements; and ongoing forensic

auditing and extensive reconciliations of the accounts involved in the Servicing Business, including all of the various trust and custodial accounts, through the retention of an independent auditing firm at Carrington's expense. In addition, Carrington has retained and engaged a host of legal professionals to complete the transaction, including specialists in the licensing process, to facilitate a smooth transition from the Debtors' servicing licenses to its own.

In light of the foregoing, Carrington believes this Court would be amply justified in finding that Carrington meets the requirements under the Bankruptcy Code to serve as stalking horse bidder under the Original APA and to receive the Bid Protections set forth in the accompanying Bidding Procedures Order. However, as noted above and detailed further below, Carrington recently has agreed not only to changes in the Original APA itself, but also to a fundamental restructuring of the bidding process that provides the Debtors and the Committee with a greater likelihood of maximizing the value of the estate as a result of the opportunity for a joint sale of the Debtors' Servicing Business and the Morgan Stanley Residual Interests, which only bolsters the reasons for this Court to enter the Bidding Procedures Order.

## **RESPONSE TO OBJECTIONS TO THE BID PROCEDURES**

Six parties filed written objections to the Motion prior to this Court's originally scheduled April 12 hearing on the bid procedures. The objecting parties were as follows: (1) the United States Trustee for Region 3 (the "US Trustee"); (2) General Electric Capital Corporation ("GECC"); (3) Deutsche Bank National Trust Co. ("Deutsche"); (4) Citigroup Global Markets Realty Corp. ("Citigroup"); (5) Wells Fargo Bank N.A. ("Wells Fargo"); and (6) Credit-Based Asset Servicing and Securitization LLC ("C-BASS").

At the request of the Committee, Carrington agreed to adjourn the April 12 hearing to allow the Committee and its professionals additional time to review the Original APA and to address any concerns that they might have with respect to the transaction. As alluded to above,

since last Thursday, Carrington has held many hours of conference calls to provide the Committee with the opportunity to resolve any open issues. Those negotiations have led to the following material revisions to the Original APA:

- At the Debtors' and the Committee's election, the Auction for the Servicing Business can be held in conjunction with an auction of the Debtors' interest in the Morgan Stanley Residual Interests, so long as, among other things, the auction of such residuals takes place on an identical timetable to that set forth in the Bidding Procedures Order.

- The Break-Up Fee has been reduced from 3% of the gross Purchase Price (approximately $4 million) in the Original APA to a $2 million flat amount, while the Expense Reimbursement is now capped at $2 million (instead of the original $1.5 million cap). These negotiated changes reduce the net exposure of the estate while recognizing that the Carrington diligence process has been and continues to be a very costly endeavor, the results of which will be to help to induce other qualified bids.

- The Minimum Qualified Bid Amount has been reduced from 110% of the Purchase Price (as required in the Original APA) to an amount equal to the sum of the Purchase Price plus $5,000,000.[4]

- Carrington's rights to assert claims under the APA with respect to the Indemnification Holdback Amount will survive for only nine months following the closing date, instead of for the one-year period in the Original APA.

- Any Lease and Subservicing Agreement that Sellers and Carrington enter into, under which Sellers are performing servicing for Carrington post-closing, will terminate six months after the closing date, rather than one year after the closing as contemplated in the Original APA.

- Carrington has agreed that in the event the Sellers are unable to deliver title to the New Century Portfolio-Related Assets to Carrington, Carrington shall service such assets for the servicing fee set forth in the related Servicing Agreements for a minimum period of three collection periods under a subservicing agreement, and either party shall provide at least 20 days prior written notice of their intent to terminate such subservicing agreement.

- Carrington will provide interim servicing to Greenwich Capital Financial Products, Inc. ("Greenwich"), for up to thirty days after the closing of Greenwich's acquisition of the Debtors' loans, for a servicing fee and upon terms and conditions to be mutually agreed to by Purchaser and Greenwich.

---

[4] This amount is equal to the Break-Up Fee and Expense Reimbursement plus $1,000,000. The APA does provide, however, in the event that a Qualified Bid would result in a shut down of the Sellers' servicing platform (e.g., is for the MSRs only and assumes no other liabilities to the Debtors' employees or lessors), the Minimum Bid Amount shall be determined by taking into account the additional administrative expense liabilities and other claims against the Debtors' estates that such a bid would create.

Based on the foregoing modifications to the definitive agreement, the Committee supports the Debtors' selection of Carrington as the stalking horse bidder and approval of the Bidding Procedures Order and the Bid Protections required under the APA.

### Wells Fargo and C-BASS

Carrington believes that the issues raised in the objections filed by Wells Fargo and C-BASS (each a member of the Committee) have been either resolved or rendered moot by virtue of the agreement that was reached with the Committee. As noted above, Carrington made considerable concessions regarding the proposed bidding procedures, and the revised procedures are more than fair and reasonable. Moreover, the C-BASS objection should be read from the perspective of its author – a potential bidder for the assets that nonetheless became a member of the Committee and was not recused from Committee deliberation and consideration of the sale of the Servicing Business until after Carrington brought C-BASS' inherent conflict of interest to the Committee professionals' attention. However, to the extent that the Wells Fargo and C-BASS objections are not withdrawn or resolved as a result of Carrington's agreement with the Committee, these objections should be overruled.

### US Trustee

The US Trustee raised several issues with respect to the proposed sale and bidding procedures in an objection dated April 11, 2007 (the "UST Objection"). Carrington believes that the US Trustee's concerns regarding the bidding procedures – and specifically her objection to the amount of the overbid and the amount and priority of the Break-Up Fee and Expense Reimbursement – have been addressed by the concessions that Carrington made to the Committee on each of those issues as discussed above. To the extent that those concessions do not resolve the US Trustee's other objections regarding the Bid Protections, such objections should be overruled.

WCSR 3592588v1

In the UST Objection, the US Trustee also stated that she did have enough information to determine whether a privacy ombudsman should be appointed pursuant to Section 363(b)(1) of the Bankruptcy Code. Carrington and the Debtors are confident that no such ombudsman is required in connection with the proposed sale. A privacy ombudsman is required under section 363(b)(1) only if there is a "sale or lease" of personally-identifiable information. However, the sale of the Servicing Business is in no real sense a sale of personally-identifiable information. Although certain personally-identifiable information will likely be transferred to Carrington in connection with the sale of the Servicing Business, the transfer of any such information is only incidental to the sale of the servicing platform.

Even if section 363(b)(1) were to apply to the sale of the Servicing Business, a privacy ombudsman is not required under that section so long as the sale is consistent with the Debtors' privacy policy. *See* 11 U.S.C. § 363(b)(1)(A). Here, Carrington's privacy policy permits personally-identifying information to be disclosed to third parties if such disclosure is "required or permitted by law." Further, Section 6802(e)(1)(C) of the Gramm-Leach-Bliley Act permits the Debtors to disclose nonpublic personal information in connection with "a proposed or actual securitization, secondary market sale (*including sales of servicing rights*), or similar transaction." 15 U.S.C. § 6802(e)(1)(C) (emphasis added). Thus, any transfer of personally-identifiable information to Carrington in connection with the sale of the Servicing Business will be consistent with the Debtors' privacy policy and, consequently, a privacy ombudsman is not required.

Carrington further has agreed with the US Trustee's request to delete the proposed "superpriority" administrative claim status for Carrington's bid protections; under the revised proposed Bidding Procedures Order, such claims are to be entitled only to ordinary administrative claim status under Sections 503 and 507 of the Bankruptcy Code.

WCSR 3592588v1

Finally, with respect to the US Trustee's concerns regarding Section 363(o) of the Bankruptcy Code, the Debtors and Carrington agree to add language to any order approving the sale of the Servicing Business to provide that nothing in the Sale Order will abridge or modify the protections of Section 363(o) (to the extent that it is otherwise applicable). Such an agreement is identical to the agreement on the same issue that was reached in connection with the proposed sale of certain of the Debtors' assets to Greenwich.

### **GECC**

GECC filed an objection to the Bidding Procedures Motion on April 11, 2007 (the "GECC Objection"). However, only one of the issues raised in the GECC Objection actually relates to the Bidding Procedures; the remainder are sale objections that should be addressed, if necessary, at the Sale Hearing.

The only relevant issue for present purposes is GECC's argument that the Bidding Procedures "effectively negate [GECC's] credit bid rights under Section 363(k) of the Bankruptcy Code" by requiring qualifying bids to be for all of the assets to be sold rather than allowing secured creditors to bid on the specific assets against which they hold liens. *See* GECC Objection at 5.[5] However, nothing in the language of Section 363(k) requires a debtor to sell its property in separate lots as GECC contends, and GECC has provided no case law in support of its contention. Section 363(k) expressly provides that the Court may restrict a creditor's right to credit bid "for cause." *See* 11 U.S.C. § 363(k). Here, cause exists to restrict GECC's ability to credit bid because allowing such a credit bid would undermine the sale of the Debtors' Servicing Business as a going concern.

---

[5] Section 363(k) of the Bankruptcy Code provides as follows:
> At a sale under [section 363(b)] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

12

The remaining three issues raised in the GECC Objection relate to the sale itself and not the Bidding Procedures. First, GECC seeks clarification that the Debtors are not seeking approval of the sale prior to the Sale Hearing. Approval of the Bidding Procedures at this time will not prejudice GECC's or any other parties' right to object to the sale, prior to the Sale Hearing, pursuant to the procedures and deadlines established by the Court. Indeed, as set forth in both the Motion and the Debtors' proposed Bidding Procedures Order, the Debtors have requested that the Court set a date for the Sale Hearing and establish a deadline for filing objections to the sale in advance of that hearing.

Second, GECC objects to the Bidding Procedures Motion because the Debtors have not yet filed a schedule identifying the assets to be sold or a list of the contracts that will be assumed and assigned in connection with the sale (the "Assumed Contracts"). The Debtors and Carrington have been working diligently to complete the schedule of the Acquired Assets and will be filing that schedule shortly. Further, the Bidding Procedures Order provides that within two business days after entry of that order, a notice of assumption and assignment, including proposed cure amounts, will be served upon the counterparties to the Assumed Contracts. As a result, GECC will know shortly which of the Debtors' assets will be included in the sale and whether any of GECC's contracts with the Debtors will be assumed and will have sufficient time and ability to address any concerns it might have with respect to the acquired assets or the Assumed Contracts prior to the Sale Hearing.

Third, GECC asserts that the sale process cannot go forward because there is no allocation of the purchase price provided for in the Bidding Procedures Motion or the APA. Purchase price allocation, however, has nothing to do with the proposed Bidding Procedures, but is instead a sale hearing objection.

13

**Deutsche**

Carrington believes that the limited objection filed by Deutsche has been resolved. In its limited objection, Deutsche raised concerns regarding the adequate assurance packages submitted by potential bidders and the ability of non-debtor counterparties to review such adequate assurance packages. To address these concerns, and after consulting with Deutsche's counsel, Carrington has agreed to include the following language in the order approving the Bidding Procedures:

> In addition, in connection with the intended assumption of any servicing agreement, each potential bidder shall provide, on or before the Bid Deadline, to the counterparty to such agreement such information as such potential bidder believes will satisfy the adequate assurances of future performance standard and shall further provide such counterparty with such additional information as such counterparty shall reasonably request.

In its limited objection, Deutsche also requested copies of the schedules to the APA and the ability to attend the auction. Carrington has agreed to provide Deutsche with copies of the schedules as soon as they are completed and filed, and Carrington does not object to Deutsche attending any auction.

**Citigroup**

The Debtors and Carrington have resolved the limited objection filed by Citigroup on April 11, 2007. In that objection, Citigroup sought to confirm that the proceeds of the sale would be used to satisfy all "Obligations" due and owing to Citigroup under the Servicer Advance Facility (as defined in the APA), and not simply principal plus accrued and unpaid interest. In response, the Debtors and Carrington agreed to make certain clarifying changes to the APA. These changes simply clarify that a portion of the proceeds from the Sale will be used to satisfy, in full, all of those Obligations of the Debtors to Citigroup with respect to the Servicer Advance

Facility; these changes do not alter the material business terms of the sale or affect the Purchase Price (as defined in the APA).

## CONCLUSION

WHEREFORE, Carrington respectfully requests that this Court overrule any remaining Objections to approval of the Bid Protections and the other relief sought in the Motion and enter an order, substantially in the form of the proposed Bidding Procedures Order, approving the Bid Protections, scheduling the Auction and Sale Hearing and granting such further relief as may be appropriate under the circumstances.

Dated: April 19, 2007
Wilmington, Delaware

/s/ *Steven K. Kortanek*
Steven K. Kortanek (Del. Bar No. 3106)
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE  19801
Ph: (302) 252-4363
Fax: (302) 661-7728
skortanek@wcsr.com

- and -

MAYER, BROWN, ROWE & MAW LLP
Thomas S. Kiriakos
Sean T. Scott
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Ph: 312-701-8310
Fax: 312-706-8482
tkiriakos@mayerbrownrowe.com
stscott@mayerbrownrowe.com

Counsel to Carrington Mortgage Services, LLC and Carrington Capital Management, LLC