## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | **Hearing Date: May 7, 2007 @ 10:00 a.m.** |
| | : | **Objection Deadline: April 30, 2007 @ 4:00 p.m.** |

### APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF COMPENSATION DESIGN GROUP, INC. AS COMPENSATION SPECIALIST TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO SECTIONS 327(e) AND 328 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2014, 2016 AND 5002

The above-captioned debtors and debtors in possession (the "Debtors") hereby

request the entry of an order pursuant to sections 327(e) and 328 of the United States Bankruptcy

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2014, 2016 and 5002 of the

Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Rule 2016-2 of the Local

Rules of Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), authorizing the employment and retention of Compensation

Design Group, Inc. ("CDG"), as compensation specialist to the Debtors, effective as of the

Petition Date (as defined herein) (the "Application"). In support of this Application, the Debtors

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R E O Corp , a California corporation; New Century R E O. II Corp , a California corporation; New Century R E O III Corp , a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L P , a Delaware limited partnership

rely upon the Affidavit of Frank B. Glassner, Chief Executive Officer of CDG (the "Glassner Affidavit"), a copy of which is attached hereto as Exhibit A, and respectfully represent as follows:

**Jurisdiction**

The Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 327(e) and 328 of the Bankruptcy Code and Rules 2014, 2016 and 5002 of the Bankruptcy Rules.

**General Background**

1.    New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of

mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

2.    On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

3.    On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

4.    These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans

3

originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

5.      As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

6.      Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

7.      During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

8.      The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other

4

assets for the benefit of the Debtors' stakeholders.

       9.    Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

       10.    On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. The Court has entered an order authorizing the joint administration of the Debtors' chapter 11 cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

**Relief Requested**

       11.    By this Application, the Debtors seek the entry of an order, pursuant to sections 327(e) and 328 of the Bankruptcy Code, Bankruptcy Rules 2014, 2016 and 5002 and Local Rule 2016-2, authorizing the Debtors to employ and retain CDG as their compensation specialist effective *nunc pro tunc* as of the Petition Date.

**Retention of CDG as Compensation Specialist to the Debtor**

       12.    CDG performs compensation consulting and is located at 101 California Street, Suite 2820, San Francisco, CA 94111, with additional offices in Chicago, Illinois and New York, New York. CDG's core focus is providing compensation consulting through the design and management of compensation, benefits, and human resource programs. CDG's professionals have particular expertise in working with: (i) executive compensation; (ii) wage and salary determination and administration; (iii) sales and marketing compensation; (iv) incentive compensation and performance management; (v) performance appraisal and

5

development; (vi) surveys on compensation and organizational practices within specialized industries; (vii) studies linking organizational strategy and compensation programs to business strategy and performance objectives; and (viii) public offering, merger and acquisitions defensive and offensive strategies, and capital market assistance. The executive responsible for this engagement is Frank B. Glassner, CEO.

13.    The Debtors have selected CDG based on its experience in providing advice and analysis with respect to a wide range of employment and compensation related issues. Indeed, the professionals at CDG have served as compensation consultants for many years, and have extensive experience in advising major corporations with regard to issues concerning compensation, benefits, healthcare, retirement plans, strategic human resources program, and capital market transactions

14.    On or about March 9, 2007, the Debtors retained CDG as their compensation specialist  for the purpose of providing assistance in connection with total compensation arrangements, including, but not limited to, base salary, annual incentives, long-term incentives, benefits and perquisites provided to the management, employees, and Board of Directors (the "Board") of the Debtors (the "General Compensation Services").

15.    Additionally, by separate engagement agreement, on or about March 9, 2007, the Debtors retained CDG as their compensation specialist for the purpose of providing assistance to the Board, by providing consulting services concerning executive and Board compensation arrangements, as related to the Board's responsibilities set forth in its Charter (the "Executive Compensation Services," and collectively with the General Compensation Services, the "Services").

16.    The terms and conditions of these retentions were memorialized in two

6

separate engagement letters both dated March 9, 2007 (the "Engagement Letters"), copies of
which are attached hereto as Exhibit B.

       17.    Moreover, CDG is familiar with the Debtors' compensation and incentive
program. Since the Petition Date, CDG's professionals have worked closely with the Debtors'
senior management, financial staff, and other professionals and have become well-acquainted
with the Debtors' compensation and incentive programs.

       18.    The Debtors have requested that CDG serve as their compensation
specialist during these chapter 11 cases to perform a broad range of services as CDG and the
Debtors find mutually agreeable and which may include, but shall not be limited to, the
following (all of which constitute services, as defined herein):

    a)    analysis and review of executive pay issues, including, but not limited to
issues relating to compensation of Board members;

    b)    analysis, review, and assistance with unwinding Debtors' long-term
incentive plans;

    c)    analysis and review, as necessary, of all of Debtors' compensation and
benefit plans;

    d)    analysis and review of Debtors' Board of Directors' compensation plans;

    e)    analysis and assistance with disposition of deferred compensation plans,
supplemental executive retirement plans, asset disposition incentive plans,
and other similar plans;

    f)    at the Debtors' request, advise the Debtors with regard to remaining
workforce salary and benefit issues, and key employee incentive and
retention plans (the "Incentive Plans");

    g)    at the Debtors' request, provide truthful and independent expert witness
testimony regarding its analyses, assessments or recommendations;

    h)    at the Debtors' request, create a summary report combining all of the
above work and setting forth its findings, conclusions and
recommendations; and

7

      i)      such other services as are customary in engagements of this type contemplated hereby and as may be reasonably agreed upon by the Debtors and CDG.

19.     It is essential that the Debtors employ a compensation specialist to render the foregoing professional services in order to assist the Debtors with their duties as debtor and debtor in possession and to handle the many issues that may arise in the context of these cases. The Debtors believe that CDG is qualified to serve as their compensation specialist in these chapter 11 cases and that the retention of CDG is in the best interests of their estates and creditors.

20.     The services to be rendered by CDG will not duplicate the services to be rendered by any other professionals retained by the Debtors in these bankruptcy cases.

21.     Pursuant to the Engagement Letters, CDG will receive a $50,000 monthly fee in connection with its performance of the General Compensation Services, and a $10,000 monthly fee in connection with its performance of the Executive Compensation Services. To the extent that CDG is asked to provide assistance outside the scope of the services set forth in the Engagement Letters, CDG's compensation for such additional services shall be based on its normal hourly rates.

22.     The majority of the services contemplated by this retention will be performed by Frank B. Glassner and Jason Taylor, a Senior Principal at CDG. Mssrs. Glassner's and Taylor's hourly rates are set forth below, as well as the hourly rates of other CDG professionals that may render services in connection with this engagement.

| Frank B. Glassner | $700 |
|---|---|
| Jason Taylor | $500 |
| Principal | $225 - $425 |
| Senior Consultant | $200 - $325 |
| Consultant | $150 - $250 |

8

RLF1-3139638-1

Associates          $100 - $200

23.     In addition to the hourly rates set forth above, the Debtors shall reimburse CDG for all reasonable out-of-pocket expenses incurred in connection with this engagement such as travel, lodging, telephone and facsimile charges.

24.     Additionally, CDG will receive an administrative overhead charge equal to 14% of the professional fees to cover expenses, including secretarial assistance, phone, copying and mailing expenses (the "Overhead Charge").

25.     CDG has represented that the amounts paid to CDG as the Overhead Charge will not exceed the cost of providing such expenses. Moreover, the amounts recovered through the Overhead Charge on account of copying charges shall not exceed the amount permitted by Local Rule 2016-2.

26.     To check and clear potential conflicts of interest in these cases, CDG has researched its client database to determine whether CDG has any connection with, among others, the following entities:

    a)      the Debtors;

    b)      the Debtors' officers, directors and principal shareholders;

    c)      the Debtors' secured lenders;

    d)      the Debtors' fifty (50) largest unsecured creditors, and any other parties in interest CDG could readily identify as clients of the firm; and

    e)      the Debtors' proposed professionals.

27.     To the best of the Debtors' knowledge, the principals and professionals of CDG do not have any connection with the Debtors, their creditors, or any other party in interest and do not hold or represent an interest materially adverse to the Debtors or their estates, are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code and

9

represent or hold no interest adverse to the interests of the estates with respect to the matters upon which they are to be employed, except as set forth in the Glassner Affidavit.

        28.    CDG intends to apply to the Court for payment of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines promulgated by the United States Trustee, the Local Rules and any additional procedures that may be or have already been established by the Court in this case.

        29.    Accordingly, the Debtors request that it be authorized to employ and retain CDG to act as the Debtors' compensation specialist, effective as of the Petition Date, in accordance with the terms and conditions set forth in the Engagement Letters, as modified herein.

**Notice**

        30.    Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Official Committee of Unsecured Creditors; (3) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (4) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (5) all parties who have timely filed requests for notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

        31.    The Debtors submit that this Application does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local

District Court Rules"), incorporated by reference into Rule 1001(b) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware, the Debtors respectfully request that the Court set aside the briefing schedule set forth

in Rule 7.1.2(a) of the Local District Court Rules.

**No Prior Request**

32.    No prior request for the relief sought in this Application has been made to

this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in

the form attached hereto as Exhibit C, granting the relief requested herein and such other and

further relief as the Court deems just and proper.


Dated:  April *18*, 2007          Respectfully submitted,
        Wilmington, Delaware

                                  New Century Financial Corporation, and on behalf
                                  of New Century TRS Holdings, Inc., New Century
                                  Mortgage Corporation, NC Capital Corporation,
                                  Home123 Corporation, New Century Credit
                                  Corporation, NC Asset Holding, L.P., NC Residual
                                  III Corporation, NC Residual IV Corporation, New
                                  Century R.E.O. Corp., New Century R.E.O. II
                                  Corp., New Century R.E.O. III Corp., New Century
                                  Mortgage Ventures, LLC, NC Deltex, LLC,
                                  NCoral, L.P., as Debtors and Debtors in Possession

                                  By: _____
                                        Name:  Monika L. McCarthy
                                        Title:    SVP & Assistant General Counsel