# EXHIBIT B



March 9, 2007

Frank B. Glassner
Compensation Design Group, Inc.
101 California Street, Suite 2820
San Francisco, CA 94105

    Re: Engagement Letter for Management Services

Dear Frank:

    This engagement letter (hereinafter, the "**Agreement**") shall confirm the extension of the engagement of Compensation Design Group, Inc., ("**CDG**") as an independent contractor, by New Century Financial Corporation and its affiliates (collectively "**NCFC**"), effective January 1, 2007 (the "**Effective Date**"), to provide certain services to NCFC as described herein.

    Subject to the terms and conditions set forth herein, and for valuable consideration, the sufficiency of which is hereby acknowledged, NCFC and CDG hereby agree as follows:

1.    Services

    1.1.   CDG agrees to provide assistance to NCFC regarding total compensation arrangements, which shall include, but not be limited to, base salary, annual incentives, long-term incentives, benefits and perquisites provided to its management, employees and Board of Directors (collectively referred herein as the "Services"). CDG acknowledges and agrees that the engagement shall be directly with NCFC and that the terms and conditions of this Agreement shall govern and control the rights and obligations of the parties, except that (i) any changes to this Agreement must be approved by NCFC and (ii) CDG shall provide the NCFC Board of Directors, through its Compensation Committee (the "Board"), with regular updates on the Services performed, to the extent consistent with the Board's Charter and upon approval of NCFC's Chief Executive Officer.

    1.2.   CDG may also perform additional services to NCFC, as may be agreed upon by the parties from time-to-time, and the terms and provisions of this Agreement shall govern such additional services. If such additional services pertain to transactional or Capital Markets matters, such additional services shall be provided on an hourly fee basis at the rates set forth in Exhibit A hereto. All additional services that do not pertain to transactional or Capital Markets matters shall be memorialized in a writing signed by authorized representatives of NCFC and CDG to be effective.

    1.3.   At all times hereunder, the relationship of CDG to NCFC shall be that of an independent contractor and not of an employee or agent. As such, CDG shall not be entitled to any pension, bonus, profit-sharing, health or similar benefits, if any, offered by NCFC to

Frank B. Glassner
March 9, 2007
2 of 2

employees or to any rights afforded to NCFC's employees pursuant to NCFC's employee handbook, personnel policies or similar documents, if any. Further, at no time shall CDG enter into any agreements or arrangements that are binding on NCFC, nor make any representations that CDG is engaged by NCFC in any capacity other than as an independent contractor.

    1.4.    CDG represents and warrants to NCFC that (a) all Services shall be performed in a professional manner, with a high degree of business skill and diligence, and in a manner consistent with industry standards; (b) with respect to the performance of the Services, CDG is and shall be in compliance in all material respects with all applicable laws and has all business licenses required for CDG to perform the duties contemplated herein and that CDG bears full responsibility for withholding payment for any and all FICA (Social Security) taxes, state and federal income taxes, state and federal unemployment insurance taxes, state disability insurance taxes and workers' compensation insurance payments applicable to CDG. CDG shall be required to complete and execute an IRS Form W-9, and the total fees paid to CDG during any calendar year will be properly reported by NCFC to appropriate tax authorities; (c) it is under no obligation or restriction, nor will it assume any such obligation or restriction, that does or would in any way interfere or conflict with, or that does or would present a conflict of interest concerning, the Services to be performed by CDG; and (d) it has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of CDG, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and all documents in connection therewith are not in contravention of or in conflict with any agreement or undertaking to which CDG is a party or by which CDG may be bound or affected. The execution and delivery of this Agreement and the performance by CDG of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of CDG.

    1.5.    CDG agrees that all material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, made or discovered by CDG, solely or in collaboration with others, during the period of this Agreement and as a direct result of work performed under this Agreement, which relate in any manner to the business of NCFC that CDG may be directed to undertake, investigate or experiment with, or which CDG may become associated with in the work performed under this Agreement, or as a result of an investigation or experimentation in the line of business of NCFC in performing the Services hereunder (collectively, the "Work"), are the sole property of NCFC. Specifically excluded from the definition of "Work" are all material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, made or discovered by CDG, solely in or collaboration with others, that CDG had in its possession before entering into this Agreement (collectively, "CDG's Prior Work"). CDG's Prior Work shall remain CDG's property, even if used in connection with the Services to be performed in connection with this Agreement. CDG reserves all rights to its intellectual property under all applicable state and federal laws. To the extent that any of CDG's Prior Work is incorporated into any deliverables to NCFC hereunder, CDG grants NCFC a royalty free, perpetual, non-exclusive license to use CDG's Prior Work in such deliverables.

{10383033:1}

Frank B. Glassner
March 9, 2007
3 of 3


2.  Compensation

2.1.  NCFC shall pay CDG a monthly fee of $50,000 for performing the Services. Other than as set forth above in Section 1.2, professional fees for additional services shall be mutually agreed upon by the parties, and the payment terms shall be governed by Sections 2.2 and 2.3 below.

2.2.  In addition to the professional fees, NCFC shall pay CDG an administrative overhead charge equal to 14% of the professional fees to cover expenses, including secretarial assistance, phone, copying and mailing expenses. Out of pocket expenses, including reasonable transportation, accommodations, meals, travel and related expenses, will be billed on an actual cost basis, and are in addition to professional and administrative fees quoted in this Section 2. NCFC's reimbursement of CDG's travel-related expenses shall be limited to the actual cost of air travel (not to exceed the actual cost to CDG to purchase coach rate tickets or other class of ticket if such other class is approved in advance by the Board or NCFC), the actual cost of ground transportation, and entertainment, including but not limited to food and lodging. Each invoice will separately set forth travel expenses (if any) authorized by NCFC for reimbursement. Supporting documentation (such as receipts for air travel, hotels, and rental cars) will be provided upon request.

2.3.  CDG shall submit monthly invoices to the Board and NCFC for professional fees and expenses incurred in performing the Services. Each invoice shall contain a description of the Services performed and an itemization of all expenses incurred for the applicable period with supporting documentation for such expenses. The administrative overhead referenced in Section 2.2 above, shall be billed separately on each monthly invoice. All invoices shall be paid within ten (10) business days after receipt.

3.  Term and Termination

3.1.  The engagement of CDG shall begin on the Effective Date herein, and shall continue thereafter until December 31, 2007, unless sooner terminated pursuant to the provisions of Section 3.2 below.

3.2.  Notwithstanding the foregoing, this Agreement may be terminated by either party for any reason by giving one hundred eighty (180) days' prior written notice to the other party. If CDG is terminated for any reason other than for Cause (as defined herein), CDG will be entitled to compensation for the Services rendered through the termination date, plus reimbursement for any expenses recoverable by CDG under Section 2.2 above.

3.3.  NCFC may immediately terminate this Agreement for Cause. For purposes hereof, Cause ("Cause") shall mean: (a) any willful violation by CDG of any law, rule or regulation applicable to CDG in its professional capacity (including rules and regulations of self-regulatory bodies as well as of governmental agencies), the violation of which could subject CDG to criminal penalties under the laws of any jurisdiction; (b) the occurrence of any of the

{10383033:1}

Frank B. Glassner
March 9, 2007
4 of 4

following events without full cure by CDG within fifteen (15) days of receiving written notice from NCFC requesting cure: CDG's gross neglect of, or willful and continuing refusal to substantially perform, CDG's duties under this Agreement, (c) CDG's perpetration of an intentional and material fraud against NCFC that causes or could cause substantial monetary or reputational damage to NCFC, its employees or the Board, (d) CDG's engagement in willful and material misconduct that demonstrably causes or could cause substantial monetary or reputational damage to NCFC, its employees or the Board, or (e) CDG's conviction of, or plea of guilty or nolo contendere to, any felony involving moral turpitude.

4.    Confidentiality

The parties shall continue to be bound by the terms and provision of the Non-Disclosure Agreement effective as of October 10, 2003.

5.    Indemnification and Limitation of Liability

5.1.    Except as otherwise provided herein, the parties hereby agree and acknowledge that CDG shall not be liable for any action taken or omitted to be taken by CDG in good faith and in the exercise of its own business judgment.

5.2.    Except as provided for in **Section 5.3** below, NCFC shall indemnify and hold harmless CDG, its affiliates, directors, officers, employees and agents to the fullest extent permitted by law against and from any and all claims, demands, causes of action, damages, costs, expenses, losses and liabilities, at law or in equity, of every kind or nature whatsoever, including but not limited to third party claims or actions based upon or arising out of in any manner directly or indirectly the performance of the Services, any previous services rendered by CDG for NCFC, or any additional services performed by CDG; the identification of CDG as compensation consultant to NCFC; or the use of statements or representations regarding NCFC's products or services in materials NCFC has approved. Such indemnification shall include all attorneys' fees, costs and expenses incurred by CDG in defending against any claims, actions, proceedings or investigations that may be threatened, brought or instituted against CDG, and/or incurred in connection with CDG's providing testimony pursuant to subpoena, court order or request of any regulatory or governmental authority. In the event that this Section 5.2 is triggered, it shall be considered a "Third Party Claim". In the event of a Third Party Claim:

(a)    CDG shall give notice to NCFC promptly after gaining actual knowledge of the Third Party Claim as to which indemnity may be sought;

(b)    NCFC shall have the right, upon written notice to CDG within twenty (20) days of receipt of notice from CDG of the commencement of such Third Party Claim, to assume the defense thereof at the expense of NCFC with counsel selected by NCFC and reasonably satisfactory to CDG. If NCFC assumes the defense of such Third Party Claim, CDG shall have the right to employ separate counsel and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the sole expense of

{10383033;1}

CDG; provided that, if in the reasonable opinion of CDG's counsel, there is a conflict of interest between NCFC and CDG, NCFC shall be responsible for the reasonable fees and expenses of counsel selected by CDG in connection with such defense (in such event, NCFC shall make payment directly to CDG's counsel within ten (10) business days after receipt of an invoice for services rendered).

(c) If NCFC does not assume the defense of any Third Party Claim as provided above, CDG may, at NCFC's sole cost and expense, defend against the Third Party Claim with counsel of CDG's choice. In such event, NCFC shall make payment directly to CDG's counsel within ten (10) business days after receipt of an invoice for services rendered.

5.3. NCFC's agreement to indemnify and hold CDG harmless shall not cover any loss, damage or injury arising from CDG's breach of this Agreement or the negligent or wrongful acts by CDG in connection with the performance or non-performance of the Services under this Agreement, as determined by a court of competent jurisdiction in a final, non-appealable decision.

5.4. CDG shall indemnify, defend and hold harmless NCFC and its subsidiaries and affiliated entities, and its directors, officers, employees and agents, from any action, liability, claims, loss, damage or expense of any kind or nature, including reasonable attorneys' fees, caused by or arising out of (1) the breach of any representation, warranty or agreement of CDG hereunder, or (2) the negligence or wrongful acts allegedly resulting in injury to persons or property in connection with the performance or non-performance by CDG or its personnel under this Agreement, and the defense of any such claims or actions.

5.5. With the exception of its indemnification and breach of its confidentiality obligations hereunder, if any, neither party, its affiliates, officers, directors and employees shall be liable to the other party for any consequential, special, indirect, incidental, punitive, or exemplary loss, damages, costs or expenses (including, without limitation, lost profits and opportunity costs).

6. Miscellaneous

6.1. Assignment. Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

6.2. Solicitation. The parties, along with their affiliates, mutually promise and agree that during the term of this Agreement and for a period of one (1) year thereafter, they will not, directly solicit each other's employees to work for their respective businesses or for any other business, individual, partnership, firm, corporation or other entity other than as employees of their current organizations.

Frank B. Glassner
March 9, 2007
6 of 6

6.3. Entire Agreement. This Agreement contains the entire agreement of the parties relating to the subject matter hereof, and replaces and supersedes any and all prior agreements, whether verbal or written, between the parties relating to said subject matter.

6.4. Waiver; Amendment. No provision hereof may be waived except by a written agreement signed by the parties hereto. The waiver of any term or of any condition of this Agreement shall not be deemed to constitute the waiver of any other term or condition. This Agreement may be amended only by a written agreement signed by the parties hereto.

6.5. Severability. If any of the provisions of this Agreement shall be held unenforceable by the final determination of a court of competent jurisdiction and all appeals therefrom shall have failed or the time for such appeals shall have expired, such provision or provisions shall be deemed eliminated from this Agreement but the remaining provisions shall nevertheless be given full effect. In the event this Agreement or any portion hereof is more restrictive than permitted by the law of the jurisdiction in which enforcement is sought, this Agreement or such portion shall be limited in that jurisdiction only to the extent required by the law of that jurisdiction.

6.6. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the state of California without giving effect to any laws that would require the application of the laws of another jurisdiction.

6.7. Arbitration. All disputes controversies and claims between the parties under this Agreement involving its interpretation, the obligations of a party hereto or the breach thereof will be settled by binding arbitration in accordance with the contract dispute arbitration rules of JAMS/ENDISPUTE. There will be one arbitrator mutually selected by the parties within ten (10) business days from the date of notification from JAMS/ENDISPUTE made to one of the parties of the other party's request for arbitration. If the parties fail to agree upon an arbitrator within such ten (10) days, JAMS/ENDISPUTE will promptly appoint the arbitrator in accordance with its rules. The place of the arbitration will be in Los Angeles County, California, United States of America. The arbitrator will have at least ten (10) years experience in contract disputes. The arbitration will commence within thirty (30) business days after appointment of the arbitrator and will continue uninterrupted unless otherwise suspended by the arbitrator for good cause, for not longer than ninety (90) days (including without limitation any discovery permitted by the arbitrator). The arbitrator will, within such ninety (90) day period, render a written decision with findings of fact and conclusions of law and deliver such decision to the parties. The resulting arbitration award will be binding and judgment upon the award rendered by the arbitrator may be enforced in the Superior Court of Los Angeles, California. The prevailing party in such arbitration, and subsequent enforcement thereof, will be entitled to recover from the other party all costs and expenses (including reasonable attorneys' fees and costs) incurred. Notwithstanding the foregoing, nothing contained in this Section 6.7 will prevent or be construed to prevent either party from seeking a temporary restraining order or a preliminary or permanent injunction or any other form of interim, provisional or temporary equitable relief in any court of competent jurisdiction.

{10383033:1}

Frank B. Glassner
March 9, 2007
7 of 7

    6.8. **Notices.** Any and all notices, demands, requests or other communications hereunder shall be in writing and shall be deemed duly given when personally delivered to or transmitted by overnight express delivery or by facsimile to and received by the party to whom such notice is intended (provided the original thereof is sent by mail, in the manner set forth below, on the next business day after the facsimile transmission is sent), or in lieu of such personal delivery or overnight express delivery or facsimile transmission, on receipt when deposited in the United States mail, first-class, certified or registered, postage prepaid, return receipt requested, addressed to NCFC or CDG at the address set forth below such party's signature to this Agreement. The parties may change their respective addresses for the purpose of this **Section 6.8** by giving notice of such change to the other parties in the manner provided in this **Section 6.8**.

    6.9    **Publicity.** Except as required by law or regulation, CDG will not use NCFC'S name, trade mark or service mark or refer to NCFC directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior written consent of the NCFC'S Investor Relations and Legal Departments prior to each such use or release. NCFC will not make any public statements about this Agreement, the Services or its relationship with CDG without CDG'S prior approval. Except as required by law or regulation, NCFC will not use CDG'S name, trademark or service mark or refer to CDG directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior written consent of CDG prior to each such use or release.

    6.10    **Service Marks.**    CDG agrees that it will not, without NCFC'S prior consent, use any of the names, service marks or trademarks of NCFC in any of its advertising or marketing materials. NCFC agrees that it will not, without CDG'S prior consent, use any of the names, services marks or trademarks of CDG in any of its advertising or marketing materials.

{10383033:1}

Frank B. Glassner
March 9, 2007
8 of 8

If you are in agreement with the foregoing, please indicate your acceptance by signing below. Thank you and we look forward to a working relationship with Compensation Design Group, Inc.

Sincerely,

*[signature: Brad G.]*

Brad A. Morrice
New Century Financial Corporation

Address for Notice:
New Century Financial Corporation
18400 Von Karman
Irvine, CA 92612
Attn: Terry Theologides
Phone: (949) 863-7243
Fax: (949) 471-8135

Accepted and agreed this 9th day of March 2007.

COMPENSATION DESIGN GROUP, INC.

By: *[signature]*
Frank B. Glassner, Chief Executive Officer

Address for Notice:
Compensation Design Group, Inc.
101 California Street, Suite 2820
San Francisco, CA 94105
Phone: (415) 618-6060
Fax:   (415) 618-6065

APPROVED AS TO FORM:

COMPENSATION COMMITTEE

By: _____
Donald E. Lange, Chairman

{10383033:1}

Frank B. Glassner
March 9, 2007
8 of 8

If you are in agreement with the foregoing, please indicate your acceptance by signing below. Thank you and we look forward to a working relationship with Compensation Design Group, Inc.

Sincerely,

Brad A. Morrice
New Century Financial Corporation

Address for Notice:
New Century Financial Corporation
18400 Von Karman
Irvine, CA 92612
Attn: Terry Theologides
Phone: (949) 863-7243
Fax: (949) 471-8135

Accepted and agreed this 9th day of March 2007.

**COMPENSATION DESIGN GROUP, INC.**

By: _____
    Frank B. Glassner, Chief Executive Officer

Address for Notice:
Compensation Design Group, Inc.
101 California Street, Suite 2820
San Francisco, CA 94105
Phone: (415) 618-6060
Fax:   (415) 618-6065

APPROVED AS TO FORM:

COMPENSATION COMMITTEE

By: _____
    Donald E. Lange, Chairman
    Fredric J. Forster, Chair

{10383033:1}

Frank B. Glassner
March 9, 2007
9 of 9

### Exhibit A

Professional Fees for Services rendered outside of the monthly fees set forth in Section 2.1:

| | |
|---|---|
| Frank B. Glassner | $650-$750 |
| Senior Principal | $375-$550 |
| Principal | $225-$425 |
| Senior Consultant | $200-$325 |
| Consultant | $150-$250 |
| Associate | $100-$200 |

{10383033;1}

March 9, 2007

Frank B. Glassner
Compensation Design Group, Inc.
101 California Street, Suite 2820
San Francisco, CA 94105



Re: CDG Engagement Letter for NCFC Board of Directors

Dear Frank:

This engagement letter (hereinafter, the "Agreement") shall confirm the extension of the engagement of Compensation Design Group, Inc., ("**CDG**") as an independent contractor, by New Century Financial Corporation and its affiliates (collectively "**NCFC**"), effective January 1, 2007 (the "**Effective Date**"), to provide certain services to NCFC as described herein.

Subject to the terms and conditions set forth herein, and for valuable consideration, the sufficiency of which is hereby acknowledged, NCFC and CDG hereby agree as follows:

1. Services

    1.1. CDG agrees to provide assistance to the NCFC Board of Directors, through its Compensation Committee or the Chairman of the Board of Directors (the "**Board**"), by providing consulting services concerning executive and Board compensation arrangements, as related to the Board's responsibilities set forth in its Charter (collectively referred herein as the "**Services**"). CDG acknowledges and agrees that the engagement shall be directly with the Board. With respect to any Services rendered by CDG to the Board, CDG and the Board acknowledge and agree that (i) any changes to this Agreement must be approved by the Board, (ii) NCFC shall not be a party to such engagement, and (iii) the Board shall assume the rights and obligations of NCFC hereunder and. Nothing herein shall prevent CDG from enforcing its rights under this Agreement against NCFC.

    1.2. CDG may also perform additional services as may be agreed upon by the parties from time-to-time, and the terms and provisions of this Agreement shall govern such additional services. If such additional services pertain to transactional or Capital Markets matters, such additional services shall be provided on an hourly fee basis at the rates set forth in Exhibit A hereto. All additional services that do not pertain to transactional or Capital Markets matters shall be memorialized in a writing signed by authorized representatives of the Board and CDG to be effective.

    1.3. At all times hereunder, the relationship of CDG to NCFC shall be that of an independent contractor and not of an employee or agent. As such, CDG shall not be entitled to any pension, bonus, profit-sharing, health or similar benefits, if any, offered by NCFC to

{10383026:1}

Frank B. Glassner
March 9, 2007
2 of 2

employees or to any rights afforded to NCFC's employees pursuant to NCFC's employee handbook, personnel policies or similar documents, if any. Further, at no time shall CDG enter into any agreements or arrangements that are binding on NCFC, nor make any representations that CDG is engaged by NCFC in any capacity other than as an independent contractor.

    1.4. CDG represents and warrants to NCFC that (a) all Services shall be performed in a professional manner, with a high degree of business skill and diligence, and in a manner consistent with industry standards; (b) with respect to the performance of the Services, CDG is and shall be in compliance in all material respects with all applicable laws and has all business licenses required for CDG to perform the duties contemplated herein and that CDG bears full responsibility for withholding payment for any and all FICA (Social Security) taxes, state and federal income taxes, state and federal unemployment insurance taxes, state disability insurance taxes and workers' compensation insurance payments applicable to CDG. CDG shall be required to complete and execute an IRS Form W-9, and the total fees paid to CDG during any calendar year will be properly reported by NCFC to appropriate tax authorities; (c) it is under no obligation or restriction, nor will it assume any such obligation or restriction, that does or would in any way interfere or conflict with, or that does or would present a conflict of interest concerning, the Services to be performed by CDG; and (d) it has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of CDG, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and all documents in connection therewith are not in contravention of or in conflict with any agreement or undertaking to which CDG is a party or by which CDG may be bound or affected. The execution and delivery of this Agreement and the performance by CDG of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of CDG.

    1.5. CDG agrees that all material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, made or discovered by CDG, solely or in collaboration with others, during the period of this Agreement and as a direct result of work performed under this Agreement, which relate in any manner to the business of NCFC that CDG may be directed to undertake, investigate or experiment with, or which CDG may become associated with in the work performed under this Agreement, or as a result of an investigation or experimentation in the line of business of NCFC in performing the Services hereunder (collectively, the "Work"), are the sole property of NCFC. Specifically excluded from the definition of "Work" are all material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, made or discovered by CDG, solely in or collaboration with others, that CDG had in its possession before entering into this Agreement (collectively, "CDG's Prior Work") CDG's Prior Work shall remain CDG's property, even if used in connection with the Services to be performed in connection with this Agreement. CDG reserves all rights to its intellectual property under all applicable state and federal laws. To the extent that any of CDG's Prior Work is incorporated into any deliverables to NCFC hereunder, CDG grants NCFC a royalty free, perpetual, non-exclusive license to use CDG's Prior Work in such deliverables.

{10383026:1}

Frank B. Glassner
March 9, 2007
3 of 3

2    Compensation

2.1.    NCFC shall pay CDG a monthly retainer fee of $10,000 for performing the Services. Other than as set forth above in Section 1.2, professional fees for additional services shall be mutually agreed upon by the parties, and the payment terms shall be governed by Sections 2.2 and 2.3 below.

2.2.    In addition to the professional fees, NCFC shall pay CDG an administrative overhead charge equal to 14% of the professional fees to cover expenses, including secretarial assistance, phone, copying and mailing expenses. Out of pocket expenses, including reasonable transportation, accommodations, meals, travel and related expenses, will be billed on an actual cost basis, and are in addition to professional and administrative fees quoted in this Section 2. NCFC's reimbursement of CDG's travel-related expenses shall be limited to the actual cost of air travel (not to exceed the actual cost to CDG to purchase coach rate tickets or other class of ticket if such other class is approved in advance by the Board or NCFC), the actual cost of ground transportation, and entertainment, including but not limited to food and lodging. Each invoice will separately set forth travel expenses (if any) authorized by NCFC for reimbursement. Supporting documentation (such as receipts for air travel, hotels, and rental cars) will be provided upon request.

2.3.    CDG shall submit monthly invoices to the Board (i.e., the Chairman of the Compensation Committee and/or the Chairman of the Board) and NCFC for professional fees and expenses incurred in performing the Services. Each invoice shall contain a description of the Services performed and an itemization of all expenses incurred for the applicable period with supporting documentation for such expenses. The administrative overhead referenced in Section 2.2 above, shall be billed separately on each monthly invoice. All invoices shall be paid within ten (10) business days after receipt.

3    Term and Termination

3.1.    The engagement of CDG shall begin on the Effective Date herein, and shall continue thereafter until December 31, 2007, unless sooner terminated pursuant to the provisions of Section 3.2 below.

3.2.    Notwithstanding the foregoing, this Agreement may be terminated by either party for any reason by giving one hundred eighty (180) days' prior written notice to the other party. If CDG is terminated for any reason other than for Cause (as defined herein), CDG will be entitled to compensation for the Services rendered through the termination date, plus reimbursement for any expenses recoverable by CDG under Section 2.2 above.

3.3.    NCFC may immediately terminate this Agreement for Cause. For purposes hereof, Cause ("**Cause**") shall mean: (a) any willful violation by CDG of any law, rule or regulation applicable to CDG in its professional capacity (including rules and regulations of self-regulatory bodies as well as of governmental agencies), the violation of which could subject

{10303026:1}

Frank B. Glassner
March 9, 2007
4 of 4

CDG to criminal penalties under the laws of any jurisdiction; (b) the occurrence of any of the following events without full cure by CDG within fifteen (15) days of receiving written notice from NCFC requesting cure: CDG's gross neglect of, or willful and continuing refusal to substantially perform, CDG's duties under this Agreement, (c) CDG's perpetration of an intentional and material fraud against NCFC that causes or could cause substantial monetary or reputational damage to NCFC, its employees or the Board, (d) CDG's engagement in willful and material misconduct that demonstrably causes or could cause substantial monetary or reputational damage to NCFC, its employees or the Board, or (e) CDG's conviction of, or plea of guilty or nolo contendere to, any felony involving moral turpitude.

4.  Confidentiality

The parties shall continue to be bound by the terms and provision of the Non-Disclosure Agreement effective as of October 10, 2003.

5.  Indemnification and Limitation of Liability

5.1.  Except as otherwise provided herein, the parties hereby agree and acknowledge that CDG shall not be liable for any action taken or omitted to be taken by CDG in good faith and in the exercise of its own business judgment.

5.2  Except as provided for in Section 5.3 below, NCFC shall indemnify and hold harmless CDG, its affiliates, directors, officers, employees and agents to the fullest extent permitted by law against and from any and all claims, demands, causes of action, damages, costs, expenses, losses and liabilities, at law or in equity, of every kind or nature whatsoever, including but not limited to third party claims or actions based upon or arising out of in any manner directly or indirectly the performance of the Services, any previous services rendered by CDG for NCFC, or any additional services performed by CDG; the identification of CDG as compensation consultant to NCFC; or the use of statements or representations regarding NCFC's products or services in materials NCFC has approved. Such indemnification shall include all attorneys' fees, costs and expenses incurred by CDG in defending against any claims, actions, proceedings or investigations that may be threatened, brought or instituted against CDG, and/or incurred in connection with CDG's providing testimony pursuant to subpoena, court order or request of any regulatory or governmental authority. In the event that this Section 5.2 is triggered, it shall be considered a "Third Party Claim". In the event of a Third Party Claim:

(a)  CDG shall give notice to NCFC promptly after gaining actual knowledge of the Third Party Claim as to which indemnity may be sought;

(b)  NCFC shall have the right, upon written notice to CDG within twenty (20) days of receipt of notice from CDG of the commencement of such Third Party Claim, to assume the defense thereof at the expense of NCFC with counsel selected by NCFC and reasonably satisfactory to CDG. If NCFC assumes the defense of such Third Party Claim, CDG shall have the right to employ separate counsel and to participate in the

defense thereof, but the fees and expenses of such counsel shall be at the sole expense of CDG; provided that, if in the reasonable opinion of CDG's counsel, there is a conflict of interest between NCFC and CDG, NCFC shall be responsible for the reasonable fees and expenses of counsel selected by CDG in connection with such defense (in such event, NCFC shall make payment directly to CDG's counsel within ten (10) business days after receipt of an invoice for services rendered).

(c) If NCFC does not assume the defense of any Third Party Claim as provided above, CDG may, at NCFC's sole cost and expense, defend against the Third Party Claim with counsel of CDG's choice. In such event, NCFC shall make payment directly to CDG's counsel within ten (10) business days after receipt of an invoice for services rendered.

5.3. NCFC's agreement to indemnify and hold CDG harmless shall not cover any loss, damage or injury arising from CDG's breach of this Agreement or the negligent or wrongful acts by CDG in connection with the performance or non-performance of the Services under this Agreement, as determined by a court of competent jurisdiction in a final, non-appealable decision.

5.4 CDG shall indemnify, defend and hold harmless NCFC and its subsidiaries and affiliated entities, and its directors, officers, employees and agents, from any action, liability, claims, loss, damage or expense of any kind or nature, including reasonable attorneys' fees, caused by or arising out of (1) the breach of any representation, warranty or agreement of CDG hereunder, or (2) the negligence or wrongful acts allegedly resulting in injury to persons or property in connection with the performance or non-performance by CDG or its personnel under this Agreement, and the defense of any such claims or actions.

5.5. With the exception of its indemnification and breach of its confidentiality obligations hereunder, if any, neither party, its affiliates, officers, directors and employees shall be liable to the other party for any consequential, special, indirect, incidental, punitive, or exemplary loss, damages, costs or expenses (including, without limitation, lost profits and opportunity costs).

6. Miscellaneous

6.1. Assignment. Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

6.2. Solicitation. The parties, along with their affiliates, mutually promise and agree that during the term of this Agreement and for a period of one (1) year thereafter, they will not, directly solicit each other's employees to work for their respective businesses or for any other business, individual, partnership, firm, corporation or other entity other than as employees of their current organizations.

{10383026;1}

Frank B. Glassner
March 9, 2007
6 of 6

    6.3.    <u>Entire Agreement</u>. This Agreement contains the entire agreement of the parties relating to the subject matter hereof, and replaces and supersedes any and all prior agreements, whether verbal or written, between the parties relating to said subject matter.

    6.4.    <u>Waiver; Amendment</u>. No provision hereof may be waived except by a written agreement signed by the parties hereto. The waiver of any term or of any condition of this Agreement shall not be deemed to constitute the waiver of any other term or condition. This Agreement may be amended only by a written agreement signed by the parties hereto.

    6.5.    <u>Severability</u>. If any of the provisions of this Agreement shall be held unenforceable by the final determination of a court of competent jurisdiction and all appeals therefrom shall have failed or the time for such appeals shall have expired, such provision or provisions shall be deemed eliminated from this Agreement but the remaining provisions shall nevertheless be given full effect. In the event this Agreement or any portion hereof is more restrictive than permitted by the law of the jurisdiction in which enforcement is sought, this Agreement or such portion shall be limited in that jurisdiction only to the extent required by the law of that jurisdiction.

    6.6.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the state of California without giving effect to any laws that would require the application of the laws of another jurisdiction.

    6.7.    <u>Arbitration</u>. All disputes controversies and claims between the parties under this Agreement involving its interpretation, the obligations of a party hereto or the breach thereof will be settled by binding arbitration in accordance with the contract dispute arbitration rules of JAMS/ENDISPUTE. There will be one arbitrator mutually selected by the parties within ten (10) business days from the date of notification from JAMS/ENDISPUTE made to one of the parties of the other party's request for arbitration. If the parties fail to agree upon an arbitrator within such ten (10) days, JAMS/ENDISPUTE will promptly appoint the arbitrator in accordance with its rules. The place of the arbitration will be in Los Angeles County, California, United States of America. The arbitrator will have at least ten (10) years experience in contract disputes. The arbitration will commence within thirty (30) business days after appointment of the arbitrator and will continue uninterrupted unless otherwise suspended by the arbitrator for good cause, for not longer than ninety (90) days (including without limitation any discovery permitted by the arbitrator). The arbitrator will, within such ninety (90) day period, render a written decision with findings of fact and conclusions of law and deliver such decision to the parties. The resulting arbitration award will be binding and judgment upon the award rendered by the arbitrator may be enforced in the Superior Court of Los Angeles, California. The prevailing party in such arbitration, and subsequent enforcement thereof, will be entitled to recover from the other party all costs and expenses (including reasonable attorneys' fees and costs) incurred. Notwithstanding the foregoing, nothing contained in this <u>Section 6.7</u> will prevent or be construed to prevent either party from seeking a temporary restraining order or a preliminary or permanent injunction or any other form of interim, provisional or temporary equitable relief in any court of competent jurisdiction.

{10383026:1}

Frank B. Glassner
March 9, 2007
7 of 7

    6.8. **Notices.** Any and all notices, demands, requests or other communications hereunder shall be in writing and shall be deemed duly given when personally delivered to or transmitted by overnight express delivery or by facsimile to and received by the party to whom such notice is intended (provided the original thereof is sent by mail, in the manner set forth below, on the next business day after the facsimile transmission is sent), or in lieu of such personal delivery or overnight express delivery or facsimile transmission, on receipt when deposited in the United States mail, first-class, certified or registered, postage prepaid, return receipt requested, addressed to NCFC or CDG at the address set forth below such party's signature to this Agreement. The parties may change their respective addresses for the purpose of this **Section 6.8** by giving notice of such change to the other parties in the manner provided in this **Section 6.8**.

    6.9. **Publicity.** Except as required by law or regulation, CDG will not refer to NCFC in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior consent of the Board, through the Chairman of the Board's Compensation Committee, or NCFC, through its Chief Executive Officer. NCFC will not make any public statements about this Agreement, the Services or its relationship with CDG without CDG'S prior approval. Except as required by law or regulation, NCFC will not use CDG'S name, trademark or service mark or refer to CDG directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior consent of CDG. The parties acknowledge that NCFC's Chief Executive Officer and the Board's Chairman of the Compensation Committee are scheduled to appear with CDG at a trade conference and expressly acknowledge that such appearance and any disclosure related thereto shall not be considered a violation of this provision.

    6.10 **Service Marks.** CDG agrees that it will not, without the Board's or NCFC's prior consent, through the Chairman of the Board's Compensation Committee or NCFC's Chief Executive Officer respectively, use any of the names, service marks or trademarks of NCFC in any of its advertising or marketing materials. NCFC agrees that it will not, without CDG'S prior consent, use any of the names, services marks or trademarks of CDG in any of its advertising or marketing materials. The parties acknowledge that NCFC's Chief Executive Officer and the Board's Chairman of the Compensation Committee are scheduled to appear with CDG at a trade conference and expressly acknowledge that such appearance and any disclosure related thereto shall not be considered a violation of this provision.

{10383026:1}

Frank B. Glassner
March 9, 2007
8 of 8

If you are in agreement with the foregoing, please indicate your acceptance by signing below. Thank you and we look forward to a working relationship with Compensation Design Group, Inc.

Sincerely,

~~Donald E. Lange~~  Fredric J. Fevster, Chair
~~Chairman, Compensation Committee~~
New Century Financial Corporation

**Address for Notice:**
New Century Financial Corporation
18400 Von Karman
Irvine, CA 92612
Attn: Terry Theologides
Phone: (949) 863-7243
Fax: (949) 471-8135

Accepted and agreed this 9th day of March 2007.

**COMPENSATION DESIGN GROUP, INC.**

By: _____
Frank B. Glassner, Chief Executive Officer

**Address for Notice:**
Compensation Design Group, Inc.
101 California Street, Suite 2820
San Francisco, CA 94105
Phone: (415) 618-6060
Fax:    (415) 618-6065

{10383026;1}

Frank B. Glassner
March 9, 2007
9 of 9

## Exhibit A

Professional Fees for Services rendered outside of the monthly fees set forth in Section 2.1:

| | |
|---|---|
| Frank B. Glassner | $650-$750 |
| Senior Principal | $375-$550 |
| Principal | $225-$425 |
| Senior Consultant | $200-$325 |
| Consultant | $150-$250 |
| Associate | $100-$200 |

{10383026;1}