UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            . Case No. 07-10416-KJC
                                  .
                                  .
  NEW CENTURY TRS HOLDINGS,       .
     INC., et al.,                . 824 Market Street
                                  . Wilmington, DE  19801
                    Debtors.   .
                                  . April 12, 2007
. . . . . . . . . . . . . . . . . 3:09 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                  O'Melveny & Myers LLP
                                  By:  SUZZANNE UHLAND, ESQ.
                                  Embarcadero Center West
                                  275 Battery Street
                                  San Francisco, CA  94111-3305

                                  O'Melveny & Myers LLP
                                  By:  BRIAN METCALF, ESQ.
                                  400 South Hope Street
                                  Los Angeles, CA  90071-2899

For Carrington Capital            Mayer, Brown, Rowe & Maw LLP
Management, LLC &                 By:  THOMAS S. KIRIAKOS, ESQ.
Carrington Mortgage                    SEAN SCOTT, ESQ.
Services, LLC:                    71 S. Wacker
                                  Chicago, Illinois 60606-4637

Audio Operator:                   Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.)

For Carrington Capital          Womble Carlyle Sandridge
Management, LLC &                 & Rice
Carrington Mortgage             By:  JOHN A. THOMSON, JR., ESQ.
Services, LLC:                   One Atlantic Center
                                1201 West Peachtree Street
                                Suite 3500
                                Atlanta, GA  30309

For the Unsecured Creditors     Blank Rome, LLP
Committee:                      By:  BONNIE GLANTZ FATELL, ESQ.
                                Chase Manhattan Centre
                                1201 Market Street
                                Suite 800
                                Wilmington, DE 19801

                                Hahn & Hessen LLP
                                By:  MARK S. INDELICATO, ESQ.
                                     MARK T. POWER, ESQ.
                                488 Madison Avenue
                                14th and 15th Floor
                                New York, NY  10022

For the U.S. Trustee:           Office of the U.S. Trustee
                                By:  JOSEPH McMAHON, ESQ.
                                844 King Street
                                Suite 2313
                                Lockbox 35
                                Wilmington, DE 19801

For Kochak:                     Rosenthal, Monhait, Gross &
                                 Goddess, PA.
                                By:  NORMAN M. MONHAIT, ESQ.
                                919 Market Street
                                Suite 1401
                                P.O. Box 1070
                                Wilmington, DE 19899

For Lehman:                     Weil, Gotshal & Manges LLP
                                By:  BRIAN ROSEN, ESQ.
                                767 Fifth Avenue
                                New York, NY  10153

APPEARANCES (Cont'd.):

For the Debtors:                Hennigan, Bennett & Dorman, LLP
                                By:  BRUCE BENNETT, ESQ.
                                     JOSHUA D. MORSE, ESQ.
                                601 South Figueroa Street
                                Suite 3300
                                Los Angeles, CA  90017

                                Richards, Layton & Finger, P.A.
                                By:  MARCOS A. RAMOS, ESQ.
                                     MARK COLLINS, ESQ.
                                One Rodney Square
                                920 N. King Street
                                P.O. Box 551
                                Wilmington, DE 19899

For CSFB:                       Young Conaway Stargatt & Taylor,
                                 LLP
                                By:  MICHAEL R. NESTOR, ESQ.
                                The Brandywine Building
                                1000 West Street
                                17th Floor
                                P.O. Box 391
                                Wilmington, DE  19899

                                Chadbourne & Parke LLP
                                By:  JOSEPH SMOLINSKY, ESQ.
                                30 Rockefeller Plaza
                                New York, NY  10112

For GECC:                       Gebhardt & Smith LLP
                                By:  DAVID FONTANA, ESQ.
                                401 East Pratt Street
                                Ninth Floor
                                World Trade Center
                                Baltimore, MD  21202

For Greenwich:                  Pachulski, Stang, Ziehl, Young,
                                 Jones & Weintraub, P.C.
                                By:  LAURA DAVIS JONES, ESQ.
                                919 North Market Street
                                17th Floor
                                P.O. Box 8705
                                Wilmington, DE  19899

                                Kirkland & Ellis, LLP
                                By:  SHIRLEY CHO, ESQ.
                                777 South Figueroa Street
                                Los Angeles, CA  90017

APPEARANCES (Cont'd.):

For Deutsche Bank National       Nixon Peabody LLP
Trust Co.:                       By:  MARK N. BERMAN, ESQ.
                                 100 Summer Street
                                 Boston, MA  02110-1832

                                 Nixon Peabody, LLP
                                 By:  DENNIS J. DREBSKY, ESQ.
                                 437 Madison Avenue
                                 New York, NY   10022

                                 Pepper Hamilton, LLP
                                 By:  DAVID B. STRATTON, ESQ.
                                 Hercules Plaza
                                 Suite 5100
                                 1313 Market Street
                                 P.O. Box 1709
                                 Wilmington, DE 19899

For Premier:                     Stevens & Lee
                                 By:  JOSEPH GREY, ESQ.
                                 1105 North Market Street
                                 Wilmington, DE  19801

For Wells Fargo/C-Bass:          Hunton & Williams
                                 By:  PETER S. PARTEE, ESQ.
                                      J.R. SMITH, ESQ.
                                      JASON HARBOUR, ESQ.
                                 Riverfront Plaza
                                 East Tower
                                 951 East Byrd Street
                                 Richmond, VA 23219

                                 Morris, Nichols, Arsht & Tunnell
                                 By:  MICHAEL BUSENKELL, ESQ.
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, DE  19899

For UBS:                         Paul, Hastings, Janofsky & Walker
                                  LLP
                                 By:  RICHARD A. CHESLEY, ESQ.
                                 191 North Wacker Drive 30th Floor
                                 Chicago, Illinois 60606

                                 Paul, Hastings, Janofsky & Walker
                                  LLP
                                 By:  KEITH W. MILLER, ESQ.
                                 75 East 55th Street
                                 New York, New York 10022

APPEARANCES (Cont'd.):

For UBS:                        Ashby & Geddes
                                By:   WILLIAM P. BOWDEN, ESQ.
                                GREGORY ALAN TAYLOR, ESQ.
                                500 Delaware Avenue
                                8th Floor
                                P.O. Box 1150
                                Wilmington, Delaware 19899

For Bank of America, N.A.:      Potter, Anderson & Corroon, LLP
                                By: LAURIE SELBER SILVERSTEIN,
                                      ESQ.
                                Hercules Plaza
                                1313 North Market Street
                                Wilmington, DE 19801

For Countrywide & GMAC CF:      Edwards & Angell, Palmer
                                 & Dodge, LLP
                                By: WILLIAM CHAPMAN, ESQ.
                                919 North Market Street
                                Wilmington, DE  19801

For Citi Corp.:                 Campbell & Levine, LLC
                                By:  MARLA R. ESKIN, ESQ.
                                800 N. King Street
                                Suite 300
                                Wilmington, DE  19801

                                Kirkland & Ellis, LLP
                                By:  JOSHUA SUSSBERG, ESQ.
                                Citigroup Center
                                153 East 53rd Street
                                New York, NY  10022

TELEPHONIC APPEARANCES:

For the State of Ohio:          Ohio Attorney General's Office
                                By:  MICHELLE T. SUTTER, ESQ.
                                (telephonically)

For Squire, Sanders &           Squire, Sanders & Dempsey, L.L.P.
Dempsey:                        By:  JOSEPH RODGERS, ESQ.
                                4900 Key Tower
                                127 Public Square
                                Cleveland, OH  44114

For Deutsche Bank:              Bingham McCutchen, LLP
                                By:  RICHARD AGINS, ESQ.
                                One State Street
                                Hartford, CT 06103

For Bank of America:            Kaye Scholer LLP
                                By:  MARGOT SCHONHOLTZ, ESQ.
                                425 Park Avenue
                                New York, NY  10022

For the Debtor:                 O'Melveny & Myers LLP
                                By:  BEN LOGAN, ESQ.
                                400 South Hope Street
                                Los Angeles, CA  90071-2899

For Greenwich:                  Kirkland & Ellis, LLP
                                By:  RICHARD L. WYNNE, ESQ.
                                777 South Figueroa Street
                                Los Angeles, CA  90017

For CSFB & DL Mortgage          Chadbourne & Parke LLP
Capital, Inc.:                  By:  DOUGLAS DEUTSCHE, ESQ.
                                30 Rockefeller Plaza
                                New York, NY 10112

For Murray Capital              Murray Capital Management, Inc.
Management, Inc.:               By:  MARTI MURRAY

For Union Bank of               Jeffer, Mangels, Butler & Marmaro
California:                      LLP
                                By:  BARRY FREEMAN, ESQ.
                                1900 Avenue of the Stars
                                Seventh Floor
                                Los Angeles, California 90067

TELEPHONIC APPEARANCES (Cont'd.):

For Latigo Partners:              Latigo Partners
                                  By:  STEPHEN BLAUNER

For Debtwire:                     Debtwire
                                  By:  KEN MEEHAN

**INDEX**

| EXHIBIT | I.D. | EVD. |
|---|---|---|
| UST-1 New Century Mortgage Corporation's privacy policy | 33 | 33 |

1          MS. UHLAND:  Good afternoon, Your Honor.  Suzzanne

2 Uhland with O'Melveny and Myers on behalf of the debtors.  The

3 first matter, Your Honor, we'd like to discuss or raise is our

4 continuance of the Carrington bid procedures motion which I

5 believe we've notified chambers we would be continuing before

6 the hearing.

7          THE COURT:  April 19th at 10:00.

8          MS. UHLAND:  And, Your Honor, Carrington's counsel

9 would like to put some matters on the record --

10          THE COURT:  Very well.

11          MS. UHLAND:  -- with respect to that.

12          MR. KIRIAKOS:  Good afternoon, Your Honor.  Tom

13 Kiriakos, Mayer, Brown, Rowe, and Maw, on behalf of Carrington

14 Capital Management, LLC and Carrington Mortgage Services, LLC.

15 Thank you.  We appreciate the admission for purposes of the

16 case and the opportunity to be heard.

17          Under the Carrington asset purchase agreement, Your

18 Honor, today, April 12th, is the deadline for the entry of the

19 bidding procedures order.  My clients have authorized me to

20 agree to a one-week extension only of that deadline in light of

21 the recent selection of the Committee's professionals and the

22 assurances that both the debtors and the Committee that will

23 use -- will work together in the interim period to attempt to

24 assure that we don't lose seven days in terms of preparing

25 documents and getting everything ready, so that we can maintain

1 the existing expected time frame essentially in place.  We, of

2 course, expressly reserve all of our rights under the asset

3 purchase agreement and applicable law.

4        Without belaboring the point, because I know this is

5 not the first mortgage loan origination servicing case you've

6 had, we want to underscore just how important and critical it

7 is to us and we believe to the debtors and to the entire

8 process that we essentially maintain that sale -- that time

9 frame to the expected sale because of the nature of the

10 debtors' business here and the servicing business.

11        Finally, Your Honor, as you could expect, we're

12 extremely interested in and concerned about the fairness of the

13 overall process.  We were particularly -- we are and were

14 particularly troubled that C-Bass, a member of the Creditors

15 Committee here, has declared itself a potential bidder for

16 these assets.  We have requested of the Committee that C-Bass

17 be recused from any deliberations, evaluations, or other

18 actions with respect to any aspect of the sale process relating

19 to the servicing platform, and we understand that C-Bass has so

20 been recused with respect to that.

21        That's everything I have, Your Honor.  Again, thank

22 you for the opportunity to be heard.

23        THE COURT:  You're welcome.

24        MS. FATELL:  Good afternoon, Your Honor.  Bonnie

25 Fatell from Blank Rome on behalf of the Unsecured Creditors

1  Committee, and with me are my co-counsel from Hahn and Hessen,

2  Mark Indelicato and Mark Powers, and Mr. Indelicato would just

3  like to address that one comment about the sale.

4           THE COURT:  Very well.

5           MR. INDELICATO:  Good afternoon.  Mark Indelicato

6  from Hahn and Hessen on behalf of the Committee.  Your Honor,

7  just further to what counsel for Carrington said.  It was

8  brought to our attention last night that there was a concern

9  that one of the Committee members was a potential bidder.  We

10 spoke to that Committee member this morning.  We addressed it

11 on a Committee call which ended just moments ago.  We have

12 expressed to them how we're going to work it.  He is not going

13 to participate in the deliberation or the voting on any matter

14 related to the sale of the servicing platform.  So we've heard

15 the issue, and we have addressed it, Your Honor.

16          THE COURT:  All right.  Thank you.

17          MR. McMAHON:  Your Honor, good afternoon and very

18 briefly, Joe McMahon for the United States Trustee.  Today is

19 the first time we've heard of C-Bass' role as a potential

20 bidder.  It is so noted.  I can't speak right now as to what

21 the United States Trustee's reaction or response might be, but

22 our rights will be reserved with respect to that.

23          THE COURT:  All right.

24          MS. UHLAND:  And, Your Honor, I would underscore what

25 counsel for Carrington expressed as far as the urgency to move

1  that sale process along as we've raised on numerous occasions,

2  the fragility of our servicing business, and the need to

3  maintain those employees engaged.

4          The next matter that's up is the employees -- the

5  continuation of the hearing on the pre-petition wage matters.

6  We were in discussions with the Committee until just before

7  their call.  I don't know whether it makes sense to switch the

8  order.  I'm going to look to Mr. Indelicato and --

9          MR. INDELICATO:  Your Honor, as I said before, the

10 call just ended.  We'd like to push this matter to the end of

11 the calendar, so that we could address it more appropriately.

12         THE COURT:  Very well.

13         MR. INDELICATO:  Thank you, Your Honor.

14         MS. UHLAND:  That brings us, Your Honor, to the

15 motion to approve the Greenwich sale bid procedures.  And, Your

16 Honor, we have been working with respect to that motion to

17 resolve the objections.  We believe we have resolved the

18 objections with the State of Ohio as well as certain of the

19 U.S. Trustee objections with respect to the privacy issues.

20 There are -- and further, Your Honor, we received a limited

21 objection from the Committee last night that we also believe

22 that the matters between Greenwich and the Committee -- they've

23 been working together and have reached a resolution with

24 respect to the breakup fee issue and some other understandings

25 with respect to other matters.  We still --

1          THE COURT:  It was a fairly extensive limited

2 objection, but I appreciate that many or most of the issues

3 have been worked out.

4          MS. UHLAND:  Your Honor, we still have the objection

5 pending from the United States Trustee, and perhaps -- what we

6 proposed is the following.  I'll go ahead, review the motion,

7 read the understanding between the debtors, the Creditors

8 Committee, and Greenwich with respect to the revisions with

9 respect to the breakup fee and the expenses, and then go

10 forward and address the U.S. Trustee's objection to the extent

11 it remains.

12          THE COURT:  Very well.

13          MS. UHLAND:  Your Honor, this -- in connection with

14 this sale was outlined somewhat in the prior hearing with

15 respect to the DIP financing.  This sale includes two types of

16 assets.  It includes approximately 2,000 -- slightly than that

17 -- my partner Ben Logan's favorite acronym, L-N-F-A's, loans

18 not financed anywhere.  These were loans that the company was

19 required to repurchase for some reason, because they either had

20 an early payment default, or there was a breach of a rep and

21 were not otherwise to refinance.

22          There's approximately 170 million face amount of

23 these loans that are being sold.  As it -- in connection with

24 the completion of the schedules we determined that the loans

25 that the debtors had title to in their pool was somewhat less,

1 and that the loans that we identified numerically with the ones

2 that were not -- we do not have title to were actually some of

3 the best loans in the pool, and, as a result, there is now a --

4 been a purchase price adjustment.  There's fewer loans that are

5 going to be sold, and the purchase price is now 47,500,000.

6          In addition, there are two types -- I refer to them

7 both as residual interest, but there are two different items

8 that are sort of the remainders after the debtors secure ties

9 their loans.  There are five what they call NIMS -- another

10 great acronym -- which is net interest margin securitizations.

11 And what a NIM is, is if you have a residual after

12 securitization, sometimes they split that residual in two, and

13 the part that they can quantify as the cash difference between

14 the amount paid by the borrowers in interest and the amount

15 payable to the bond holders, that can be split into a NIM

16 certificate.  And in addition there are I understand two

17 regular what I'll call residual interest and securitizations.

18          These other I'll call them collectively residual

19 interests are also of the lower value in the debtors' basket of

20 assets.  The debtors did sell a number of their interests of

21 this type pre-petition to raise cash, and these were not sold,

22 either because they were missing certificates or because they

23 were near the end of their life and, therefore, within a call

24 period.

25          I'm sorry.  I was just corrected.  The revised

1 purchase price, I was off by somewhat.  It is $47,250,000 not

2 500,000.

3         The -- effectively, the proposal with respect to the

4 bidding procedures and the sale provide that there is a two

5 percent breakup fee.  There was a -- the document originally

6 set out a million dollar breakup fee which was set at two

7 percent, and the parties have now in connection with the

8 agreement with the Creditors Committee agree to ratchet that

9 number down, and I want to confirm that I now have the correct

10 amount.  It should be $945,000 to the breakup fee.  I want to

11 confirm with the Committee and Greenwich.  That's correct.

12         There is an initial bid increment of $500,000 with

13 increments of 100,000 thereafter.  The closing must occur by

14 May 18th, which is one of the reasons we set our current sale

15 hearing for this at May 7th to continue to comply with that

16 provision.

17         With respect to the loans, the LNFAs, or the loans

18 that are to be sold, both the servicing needs to be transferred

19 over, and title needs to be delivered to the buyer.  And in

20 that regard there's a $3 million hold back for approximately 45

21 days following the closing to the extent that there is -- the

22 debtors are unable to transfer the servicing, unable to

23 transfer the loan, or if there are amounts that come in to the

24 debtors that are supposed to be turned over to the buyers in

25 connection with the cutoff date set out in the agreement.

1        There has been some discussion of -- and there is a

2   resolution of the way that the expenses for Greenwich will be

3   handled in connection with both this transaction and the DIP

4   agreement.  The Greenwich APA itself does not provide for any

5   expenses to be reimbursed to the buyer.  That is noted by

6   parties in connection with the DIP motion.  Because of the

7   intertwined nature of the DIP due diligence and the fact that

8   Greenwich is a DIP lender, and the due diligence required for

9   the sale, they were included within the concept of lender

10  expenses that were reimbursable under the DIP.

11       In this regard Greenwich and the Committee have

12  reached an agreement, which the debtors clearly support, to

13  address a cap of those fees.  And again I will ask for

14  confirmation here.  Prior to today those fees under the APA, to

15  the -- the fees that are charged as lender expenses that

16  pertain to the purchase agreement, the APA and purchase-related

17  endeavors, will be capped at $250,000.  Going forward they will

18  be capped at $150,000 subject, however, to the following carve

19  out.  That to the extent litigation is required with respect to

20  sale objections, that those fees would not be capped.

21       MR. INDELICATO:  Your Honor, just to clarify, there

22  were several carve outs of the $150,000 going forward.  We

23  agree that to the extent there were extraordinary expenses

24  related to objections, litigation outside of this court related

25  to the transfer of title or related to the APA, those would be

1  carved out, but we all acknowledge those are going to be

2  extraordinary expenses.  We're not talking about negotiations

3  with the Committee but if there are an excessive amount of

4  objections or there's outside or extraneous litigation.  Did I

5  characterize it correctly?  And we're going to work on the

6  language to get it into the order.

7          MS. UHLAND:  The other item on scheduling has been

8  agreed to between the Committee and Greenwich is that we're

9  going to move the bid deadline to April 30th --

10          MR. INDELICATO:  That's correct.

11          MS. UHLAND:  -- and we're going to move the

12  commencement of that auction to May 2nd --

13          MR. INDELICATO:  That's correct.

14          MS. UHLAND:  -- and retain the sale hearing at May

15  7th.

16          MR. INDELICATO:  That's correct, Your Honor.

17          MS. UHLAND:  In addition, there will be -- the

18  parties will continue to work on language on the order,

19  hopefully, immediately after this hearing, that the parties

20  have agreed in principal -- the Committee, Greenwich, and the

21  debtors -- to clarify that the bidding on the loans and the

22  residuals can bid in lots.  They can be bid separately, but in

23  order to be a higher and better bid, there has to be a

24  combination of bids that exceeds the Greenwich proposal for

25  both.

1        In addition, the Committee's requested some further

2   language in the order which is not controversial to the debtors

3   insuring that the Committee will be consulted in connection

4   with the auction process, which is our intent, and we will

5   include it in this bid procedures order as well as the others

6   that we are going to be presenting to the Court and some

7   further additional concern that they had that other bidders, to

8   the extent there are hold backs, provide escrows for those hold

9   backs.  And, particularly, their concern is there may be some

10  other bidder that may not have the financial wherewithal of the

11  current bidder with respect to the hold back amount.

12       And with those clarifications, Your Honor, and -- I

13  don't know.  I assume the United States Trustee is still

14  pressing his objection on the reasonableness of the breakup

15  fee, but maybe I will ask him if that's the case now that the

16  Committee has reached their agreement.

17       MR. McMAHON:  Your Honor, Joseph McMahon for the

18  United States Trustee.  I received word about this agreement

19  between the Committee and the debtors within the past hour.

20  The people that I would need to communicate regarding whether

21  the new position of the Committee changes what we're doing are

22  out of the office, and I did send an e-mail in an attempt to

23  obtain guidance from this point.  I could perhaps seek to renew

24  my efforts to do that, but in light of our position that was

25  announced in our papers regarding the propriety of giving the

1  breakup fee, in light of Greenwich's status as a DIP lender,

2  and where the -- this -- the way in which this sale is

3  postured, I don't -- I can't say whether or not there is

4  actually going to be a change of position.  So I'm prepared to

5  proceed as the Court would like me to.

6          THE COURT:  Okay.

7          MS. UHLAND:  Your Honor, the debtors believe that --

8  that it is quite clear and they feel quite strongly that these

9  bidders protections are reasonable and consistent with the

10 O'Brien standards, are -- benefit the estate, and will incent

11 bidding, and will maximize value for the estate.

12         THE COURT:  Okay.  Do you have a proffer or a witness

13 to make?

14         MS. UHLAND:  We have a proffer and a witness, Your

15 Honor.

16         THE COURT:  All right.

17         MS. UHLAND:  So with that, Your Honor, I will proceed

18 with the proffer of --

19         THE COURT:  Well, let me -- before you do, let me

20 just ask for the record are there any other objections

21 outstanding in connection with the bidding procedures request?

22         MS. SUTTER:  Your Honor, this is Michelle Sutter from

23 the State of Ohio.

24         THE COURT:  Yes?

25         MS. SUTTER:  It's been indicated that we do have an

1 agreement, and I just wanted to state that we do have one

2 preliminarily.  It's obviously subject to documentation which

3 won't occur except through the sales order, so we reserve the

4 right, you know, if we can't reach an agreement to raise it in

5 connection with the approval of the sales order.

6           THE COURT:  All right, but at this point Ohio has no

7 objection to approval of the bidding procedures as they have

8 been proposed.

9           MS. SUTTER:  Correct.

10          THE COURT:  Okay.  Thank you.

11          MR. POWER:  Thank you, Your Honor.  Mark Power from

12 Hahn and Hessen on behalf of the Committee.  Your Honor, I

13 thought it might be a little helpful for the record to clarify

14 the Committee's position, exactly where we are.  First of all,

15 I should state that the Committee supports the debtor and the

16 debtor's representations to this Court that this is an asset

17 that should be sold on this basis and should be sold relatively

18 quickly.  We think the debtor has exercised reasonable business

19 judgment in that regard, and that this sale should go forward.

20          We are also comfortable with the proposed price as a

21 stalking horse space.  We think it is within the range of

22 reasonableness as a stalking horse.  We are hopeful we'll get

23 additional bidding.

24          With respect to the overall breakup fees, Your Honor

25 can basically understand the Committee's -- where the Committee

1  comes out.  And we have a Committee of a number of financial

2  institutions that are involved heavily in this industry and are

3  fully familiar with what's being sold here.  It's approximately

4  2.8 percent of the entire amount as an all in number if you add

5  the expenses and the breakup fee.  We've been able to separate

6  out the DIP loan expenses to make sure that we're not -- that

7  in essence the bidder isn't getting those expenses through what

8  we call the back door, and we think we've satisfied that.  We

9  are aware of the standards in this court in the range of two to

10  three percent, and we think this fits well within that range as

11  agreed to by the Committee and Greenwich.

12      Lastly, Your Honor, the Committee did do some due

13  diligence and investigation in terms of the efforts done by the

14  buyer in terms of looking at these assets and what they've

15  done.  And we're satisfied that they actually have expended a

16  lot of time and effort to basically make this bid, and, that,

17  therefore, the breakup fee is reflective of that cost.  So for

18  that reason the Committee's supporting that number.

19      I would like to put one reservation on the -- just to

20  reserve the Committee's rights.  We do have issues with the

21  asset purchase agreement, and we relayed those to Greenwich,

22  and Greenwich is well aware of those, but we just don't have

23  time to try to resolve those.  So we reserve the right in the

24  sale hearing to basically raise those issues.  We're hopeful we

25  can get them resolved beforehand, and we will raise those

1 issues with any other bidder.

2         But based on that, and based on the representations

3 made by debtors' counsel, the Committee supports the debtors'

4 application as modified.

5         THE COURT:  All right.  Thank you.  All right, and so

6 that I'm clear, from the U.S. Trustee's standpoint is the only

7 remaining objection that to the propriety of the breakup fee?

8 I mean did all the other like language cleanup and, you know,

9 inclusion of 363(l) language, has that been agreed to or

10 resolved otherwise?

11        MR. McMAHON:  Your Honor, prior to today's hearing,

12 at around 1:00 I forwarded up proposed language to both

13 debtors' counsel and Greenwich, and they can speak to that

14 point.

15        MS. UHLAND:  Your Honor, with respect to the 363(l),

16 our proposal is to put that in the sale order.  My colleague,

17 Mr. Metcalf, is going to address the privacy issues in a

18 moment, but we believe that those are all resolved, that we

19 want to walk through, so that people understand sort of what

20 the practice is.

21        As I understand it, the -- Greenwich is not agreeing

22 to modify the provision in its -- there's two changes requested

23 by the Trustee that have not been agreed to by Greenwich.  One

24 was the request that their breakup -- the U.S. Trustee objected

25 to the super priority nature of the breakup fee and also

1  requested that the breakup fee only be paid in accordance with

2  the bid procedures.  With respect to those matters, Greenwich

3  did not agree, and, you know, the debtors support Greenwich in

4  these regards.

5       With respect to the super priority claim, the

6  position of Greenwich and many other buyers in this instance is

7  since that claim is supposed to be paid out of sale proceeds.

8  It's in effect a secured type of claim or a trust type of

9  claim, and if not paid, it's payments should have the ranking

10 and priorities of a senior claim that is subject to -- you

11 know, like a DIP claim or a failure of adequate protection

12 claim, because that's really viewed as what it is.  It's a

13 replacement for a special bankruptcy type of secured -- post-

14 petition secured claim.

15      THE COURT:  It seems to me that this issue -- well,

16 I've encountered it most frequently when there's a lien holder

17 involved who's assertion of a lien might arguably interfere

18 with the payment of a breakup fee.  I don't get the sense that

19 there's that argument here, so I guess my question is if sale

20 proceeds aren't paid and the breakup fee wouldn't get paid

21 because of that, why should the breakup fee get paid absent the

22 sale proceeds?  I mean that's I think the problem with what the

23 U.S. Trustee raises.  It may not have been articulated that

24 way, but as I think about it, that's what the issue would be.

25 Why would -- if there are sale proceeds, why wouldn't it be

1  paid?

2           MS. UHLAND:  Well, I think that that is the exact

3  evil that the buyer is worried about.  If there are sale

4  proceeds, and they're supposed to have a secured or trust fund

5  type of claim to them or be paid out of them, they want to be

6  treated as a secured type of claim not pro rata with the other

7  administrative claimants in the estate.  Because again in that

8  event there would have been a sale that benefitted the estate,

9  and they are now -- that benefitted all the other

10  administrative claimants, and if they are not paid, and there's

11  some kind of administrative insolvency, that seems inherently

12  unfair given the nature of their claim, which is viewed as --

13           THE COURT:  Yes, but I'm reaching, and maybe it's

14  just my own failure to visualize it.  The circumstances under

15  which they wouldn't be paid, unless someone intentionally acted

16  to defraud them, or is that the evil or one of the imagined

17  evils against what -- which to protect themselves?

18           MS. UHLAND:  I believe that is the imagined evil.

19           THE COURT:  Okay.  The other objection of the U.S.

20  Trustee I mean seem to me to have some merit at least in light

21  of the illustration that the U.S. Trustee used in her

22  objection, which was, okay, let's say the case gets converted,

23  this sale doesn't go through, and later on there's a sale.  Why

24  should they get a breakup fee out of that sale?

25           MS. UHLAND:  There is a -- I think there's two ways

1  to look at that question.  The one question is is what if the

2  debtors -- we call off our auction, and then we have one two

3  weeks later, and the reason that we got the bidding -- the

4  bidders to come in was because of all of the work -- the name

5  associated -- the work that they did before, the diligence,

6  their name on these assets at that price, and, therefore, the

7  buyer does not want to limit understandably -- and when I've

8  represented buyers, I've also had that same concern -- is

9  limiting my breakup fee to this auction.

10       THE COURT:  Well, and the U.S. Trustee -- not to put

11  words in her mouth -- might tend to agree with that position,

12  but, you know, where do we find the place where it rightly

13  ought to be?  And maybe it's somewhere in between, but I happen

14  to agree if the situation we're talking about is the post-

15  conversion sale six months later, I don't think the breakup fee

16  should be paid.  If it's an auction that the debtors' canceled

17  for whatever reason and redoes two weeks later, I agree the

18  breakup fee ought to be paid.

19       MS. UHLAND:  Well, I think, Your Honor, if -- you

20  know, I guess then you get into the question of why wouldn't we

21  be able to close and why wouldn't -- within the time and within

22  the six months, and I think that what -- you know, the way this

23  agreement works -- and maybe this is part of the agreement that

24  we can revisit in connection or maybe -- well, actually, I

25  guess if we're approving the breakup fee terms today, that

1 becomes a little bit tricky.  But if it is -- this fails to

2 close, because they breach, the then estates would have rights

3 against them for breaching and failing to close, and they would

4 -- you know, their concern are all of the -- you know, again

5 it's not a perfectly balanced agreement, but it is not an

6 uncommon buyer agreement that says I don't want to take the

7 risk.  I'm giving you this offer, I'm holding it open, and I

8 want my breakup fee to be paid if you ever sell to someone

9 else.

10          So, you know, their answer to that -- the risk that

11 you address is, well, the only reason we're not going to close

12 is if we breach and you have your rights against us.  That's

13 the -- you know, so that's the -- you know, while not perfect,

14 we are in a Bankruptcy Court that will be considering the

15 rights of the parties at the time and the actions of the

16 parties at the time, and if it's a -- we feel comfortable with

17 the agreement that closing is within -- sufficiently within the

18 debtors' control, and that if -- that we will be able to -- you

19 know, if we delay this closing and resell it, the value

20 would've been generated by the Greenwich proposal, and in these

21 other scenarios where Greenwich causes us not to sell, we have

22 sufficient remedies to address it.

23          THE COURT:  All right.  I hear your argument.  You

24 may proceed.

25          MS. UHLAND:  Your Honor, I'd like to -- as I noted,

1 we believe that these protections for the Greenwich bid are

2 consistent with the <u>O'Brien</u> standards and bring value to our

3 sale process and value to the estate consistent with Section --

4 Bankruptcy Code Section 503.  In that regard I would like to

5 proffer the testimony of Suneel Mandava, who's a Vice President

6 of the Financial Restructuring Group at Lazard, one of the

7 leading -- one of the parties at Lazard leading the engagement,

8 and he is present in the courtroom today.

9        If called to testify, Mr. Mandava would testify that

10 he is a graduate of the Wharton School of Business with honors.

11 That he has for approximately four years served in the

12 Financial Restructuring Group of Lazard where he has worked on

13 several debtor-side assignments and out-of-court

14 restructurings, and he is currently working on the Tower

15 Automotive matter which is also pursuing a 363 sale.

16        He has a year of experience as an executive at USI

17 Holding and Insurance Brokerage, where, among other

18 responsibilities, he headed up the disposition of a non-core

19 subsidiary.  And he has a combined six years of experience in

20 private equity investing in the financial services industry and

21 financial services and mergers and acquisition experience as an

22 analyst in Wall Street.  He is a member of the AIRA, and he has

23 passed the CPA exam.

24        Mr Mandava would testify that he was involved in the

25 pre-petition, marketing, and sale of these assets.  And with

1  respect to the residual assets, for approximately one month

2  prior to the filing, the company attempted to sell its residual

3  interests in both its off balance sheet and on balance sheet

4  securitizations.

5        He would testify that ultimately Lehman Brothers

6  purchased a portion of these residual assets but would not

7  purchase the assets that are the subject of the Greenwich

8  transaction in light of the fact that the company had lost

9  certain certificates evidencing its ownership or that their

10  expiration dates made them less saleable.  He would testify

11  that there were no other parties that provided a commitment to

12  purchase those other interests.

13        With respect to the loans not financed anywhere, he

14  would testify that Lazard aggressively marketed the company's

15  assets generally and discussed selling substantially all of

16  this company's financial assets with at least four buyers and

17  the company's loan inventory with six additional buyers, and no

18  party put forth a commitment letter to purchase those assets.

19        He would further testify that Lazard's view and his

20  view is that by appointing Greenwich as a stalking horse bidder

21  will and has generated substantial additional interest in these

22  assets by the positive signal it sends to market.  Since the

23  petition 18 parties have expressed an interest or renewed their

24  interest in purchasing these assets, a substantial improvement

25  over the interest expressed pre-petition.

1        He would further testify of the reasonableness or to

2   the reasonableness of the proposed buyer protections.  That the

3   one million dollar or $945,000 topping fee is equal to

4   approximately two percent of the purchase price, and based on a

5   data base of precedent breakup topping fees, this is

6   approximately 50 basis points below the average.

7        He would further testify that the minimum initial

8   premium of 500,000 equal to one percent of the purchase price

9   is again reasonable, and further, that the minimum increment

10  thereafter is only $100,000, a point negotiated by the debtors.

11       With respect to the specific O'Brien analysis, he

12  would testify as follows.  First, that the topping fee was

13  necessary to induce the bid by Greenwich.  They had no other

14  commitments to purchase the assets, and the buyer conditioned

15  its proposal on receiving the breakup fee.  He would also

16  testify that the breakup fee and the transaction was not

17  tainted by any self-dealing.  The parties have no relationship,

18  and the negotiations were at arm's length.

19       As an example, he would testify that the parties --

20  that Greenwich initially requested that the breakup fee and

21  determination fee, and the debtors negotiated a way the

22  termination fee and further wanted bidding increments to remain

23  at 500,000 throughout the auction, which the debtors negotiated

24  after the first increment to $100,000.

25       He would further testify that the fee does not hamper

1  or chill bidding.  In fact, it encourages bidding as evidenced

2  by the 18 parties that have emerged as potential bidders.

3  Further, he would testify that the belief of Lazard is that the

4  association of Greenwich's name with the assets, particularly

5  in light of the quality of these assets, makes them more

6  marketable.

7       He would further testify that the Greenwich proposal

8  offers a floor bid on assets that are difficult to sell in the

9  current market environment for sub-prime loans, and that the --

10 further, that this floor bid will also promote bids for the

11 residual interest with the low balances or missing

12 certificates.

13      With respect to whether -- he would testify that the

14 fee preserves value for the estate in two ways.  One, there was

15 uncertainty whether any party would go at the petition date

16 make a commitment to purchase or assign value to these assets,

17 and the Greenwich proposal did that.  Further, by having a sale

18 for these assets, the debtors were able to include these assets

19 in the borrowing base for the debtor in possession financing.

20 Accordingly, having the purchase agreement for these assets in

21 the required breakup fee enable the debtors to obtain liquidity

22 that they would not have otherwise been able to obtain.

23      He would also testify that the breakup fee induced

24 the buyer to do work in diligence on assets that they would not

25 have otherwise done.  While many -- while a certain amount of

1  the diligence expense for these assets was included within the

2  diligence expense for the DIP, there was substantial effort on

3  behalf of Greenwich with respect to the analysis by their

4  business people of the 2000 loan files and evaluation.  These

5  loans consist of, quote/unquote -- this is another great word

6  -- scratch and dent loans for which evaluation cannot be

7  completed without diligence.

8           He would further testify that Greenwich does not

9  specialize in evaluating or trading in scratch and dent loans,

10  and, therefore, there was further effort required in connection

11  with that diligence.

12          Finally, he would testify that the breakup fees are

13  reasonable as stated above.  That the two million -- two

14  percent breakup fee is reasonable and calculated with respect

15  to the loss -- the opportunity costs of the buyers to commit to

16  evaluating these assets versus all other investment

17  opportunities presented to them in this current market which

18  are significant.

19          Finally, with respect to the last O'Brien factor,

20  since this breakup fee is supported by the Creditors Committee,

21  it clearly has now satisfied that last O'Brien factor as well.

22          All right.  That's the conclusion of my proffer of

23  Mr. Mandava.

24          THE COURT:  Thank you.  Would anyone like to examine

25  Mr. Mandava?

1          MR. McMAHON:  Your Honor, I don't have any questions.

2          THE COURT:  All right.  Anyone else?

3                    (No verbal response)

4          THE COURT:  All right.  Thank you.

5          MS. UHLAND:  Your Honor, with that we'd ask the Court

6   to approve our motion subject to I believe submitting an order

7   hopefully later today which includes any agreed language

8   between Greenwich and the Committee.  But first I'd like to ask

9   my colleague, Mr. Metcalf, to briefly address the privacy

10  concern and the -- consumer privacy concern addressed by the

11  Trustee to assure that we've gotten that resolved.

12          THE COURT:  Very well.

13          MR. METCALF:  Good afternoon, Your Honor.  Brian

14  Metcalf on behalf of the debtors.  I have been exchanging e-

15  mails with Mr. McMahon and provided him with a copy of the

16  company's privacy policy.  It is subject to a complaint with

17  the Gramm-Leach-Bliley Act, and this particular transaction

18  falls within an exception to that Act which provides that any

19  consumer loan transaction information can be sold along with

20  the assets in a secondary market transaction, which we believe

21  this constitutes with the Greenwich.  And I provided him with

22  that information, and I believe I've confirmed with him as well

23  that this is a compliant transaction, and all the information

24  that would be provided to Greenwich would be compliance with

25  the Gramm-Leach-Bliley Act, and, therefore, there's not a

1 consumer privacy issue, and we do not believe it's necessary to

2 appoint a privacy ombudsman.

3          MR. McMAHON:  Your Honor, good afternoon.  Joe

4 McMahon for the United States Trustee.  We agree with that

5 assessment.  We do not believe that the privacy policy itself

6 prohibits the sale, and we have specifically noted the

7 exception in the Gramm-Bliley Act which deals with the sale of

8 loans of this type.

9          What I'd like to do, Your Honor, for the record is to

10 make New Century Mortgage Corporation's privacy policy a part

11 of the record and mark that Exhibit U.S. Trustee 1.

12          THE COURT:  Very well.

13          MR. McMAHON:  I assume there's no objection.

14          THE COURT:  Is there any objection?

15                    (No verbal response)

16          THE COURT:  All right.  UST-1 will be admitted into

17 evidence without objection.  All right.  Mr. McMahon, would you

18 like to make any argument in closing with respect to the

19 bidding procedures motion?

20          MR. McMAHON:  I would, Your Honor.

21          THE COURT:  All right.

22          MR. McMAHON:  Your Honor, the United States Trustee

23 objects to the breakup fee and expense reimbursement in this

24 case, and, Your Honor, this is a continuation of basically some

25 of the issues that we raised at the initial first day hearing

1  in connection with this case.  Your Honor, the record that was

2  proffered onto the -- that was proffered today in support of

3  the bid procedures motion we do not believe satisfies the

4  O'Brien factors.  The critical issue here is assessing whether

5  or not against the limited due diligence that Lazard bid, and,

6  in fact, the one thing that's been argued about in favor of the

7  motion -- meaning the fact that 11 parties have come forward

8  after the filing of the motion itself may very well be an

9  indication that the market has not been canvassed adequately

10 insofar as assessing interest in these assets.

11          Your Honor has been provided limited information to

12 date regarding what the value of the assets are, what cash the

13 debtors have received on account of the residuals that are at

14 issue prior to the petition date.  Frankly, I can't say for

15 certainty that based upon what is in the record before this

16 Court whether we're talking about a true floor bid here being

17 submitted by Greenwich for something less than that.  Again,

18 the fact that 11 people come forward after the filing of the

19 Greenwich bidding procedures motion is no cause for -- I guess

20 to conclude or to infer that it is the stalking horse bid that

21 is causing that interest.  Very well, a bare bones motion

22 setting auction procedures for the LNFA loans could've done the

23 same thing.

24          In short, Your Honor, we would expect that the post-

25 petition marketing of this is going to canvass a number of the

1 parties that to date have not been subject to or had the chance

2 to look at the LNFA loan portfolio, but that's an issue to look

3 at going forward.

4        Your Honor, I will say that the debtors have provided

5 us with certain facts regarding the LNFA loan portfolio which,

6 you know, we have reviewed in connection with this motion.  I

7 don't know if debtors' counsel has any objection to my

8 presenting those facts to the Court.

9        MS. UHLAND:  Let me find out which facts those are,

10 Your Honor?

11                    (Pause)

12        MR. McMAHON:  Your Honor, just to give you a better

13 idea as to what the LNFA loan portfolio it is we're talking

14 about.  Your Honor, my understanding is that the total unpaid

15 balance of the loans are prior to the adjustments which

16 debtors' counsel reported this morning was approximately $170

17 million, and of that the first lien/second lien split was about

18 30 percent to 70 percent with respect to those loans.  So, Your

19 Honor, with respect to that, again circling back to our

20 argument, we just -- we don't believe that the marketing

21 process has evolved to the point where we can say that this is

22 truly a floor bid, and that really provides the basis for our

23 objection to the bid procedures motion.

24        Your Honor, with respect to the other issues, I have

25 -- that Your Honor raised, and I wanted to address those

1  briefly.  First with respect to the -- what I'll call the time

2  frame argument which Your Honor raised in debtors' counsel's

3  response, I think there is some room for flexibility there in

4  terms of working out language instead of saying in connection

5  with these bidding procedures to give purchasers some

6  flexibility to the extent that bid protections were to be

7  approved by the Court.  We could set a hard date of say the end

8  of June or something that would be temporarily sufficient to

9  the protect purchaser at the same time insure that a Chapter 7

10  Trustee would not be burdened by whatever breakup fee is being

11  agreed to here.

12          Your Honor, with respect to the super priority point,

13  we believe that that's germane insofar as to the extent that

14  there was a scenario, and the debtors -- as the breakup fee is

15  our objection as it's currently postured, one of the outs is

16  the debtors accepting a higher and better offer.  Now, they say

17  that it would be payable upon closing of a transaction, but I

18  think the critical point is if for some strange reason they --

19  you know, that sale were not to close, and we were to get to

20  some later stage of this proceeding, perhaps a liquidating

21  plan, I don't know.  What treatment is that claim going to

22  receive?  And they are proceeding under O'Brien, and O'Brien

23  does talk about a straight 503(b) administrative expense

24  analysis.  So that was the concern that we raised there.

25          Your Honor, with respect to the 363(o) concern, as an

1 institutional concern, we would like to have the language in

2 the bid procedures order -- to the extent that there is no

3 dispute today that it would apply at the sale order stage, it

4 would simply be an added protection in that regard.  We don't

5 think it's that, you know, much in dispute.

6          THE COURT:  Well, it seems to me that's the

7 equivalent of requesting that, you know, the transfer tax

8 exemption go in the bidding procedures order.  Isn't really the

9 place for it the sale order?

10          MR. McMAHON:  Your Honor, that could very well -- if

11 that's the Court's ruling in that regard, then we'll have to

12 live with it.  I think the point is that we clearly would like

13 to -- we believe that it would be better if it could be in both

14 places, but to the extent that the Court believes that it's

15 appropriately in the sale order only, we understand the Court's

16 position.

17          THE COURT:  All right.  Thank you.

18          MR. McMAHON:  I believe that's all of our concerns.

19 Again with everything but the breakup fee and expense

20 reimbursement issues, Your Honor, they have our proposed

21 language.

22          THE COURT:  All right.  Thank you.  Does anyone else

23 care to be heard in connection with the bidding procedures

24 motion?

25          MS. JONES:  Good afternoon, Your Honor, Laura Davis

1 Jones, Pachulski, Stang, Ziehl, Young, Jones, and Weintraub, on

2 behalf of Greenwich.  Your Honor, I just wanted to address two

3 points that were just raised by Mr. McMahon and some by the

4 Court.

5        First of all, Your Honor, we appreciate the

6 flexibility that Mr. McMahon is suggesting with respect to

7 pushing the time out a little bit, but Greenwich worked hard to

8 step up as the stalking horse.  It performed the service of

9 doing the diligence, setting the floor, and setting a field for

10 others to come play in.  So, Your Honor, from our perspective

11 whether the case converts or there is some passage of time, if

12 the sale is put off past June, what have you, and Greenwich --

13 it's not as a result of Greenwich breaching the contract, in

14 any event, that Greenwich should be entitled to the payment of

15 its breakup fees.

16        Your Honor, it has negotiated and performed the

17 services it had set out to do as a stalking horse.  It's very

18 likely and probably probable that any subsequent sale will have

19 benefitted and been the result of the efforts that Greenwich

20 had made.  So, Your Honor, we think they should be compensated

21 for that.

22        THE COURT:  Gosh, even a real estate agent gives up

23 after a certain period of time.

24        MS. JONES:  Your Honor, I'm not known for giving up

25 too easily.  But, Your Honor, it seems to me that picking just

1 some random -- you know, we're saying a month or two.

2 Certainly, Your Honor, it's unfair to put that at Greenwich's

3 doorstep.  Your Honor, if you were talking a couple-year time

4 frame or something, that would be different, but --

5          THE COURT:  I was thinking more like just post-

6 conversion without prejudice for Greenwich to come in and say,

7 hey, it was because of us that you made this sale.

8          MS. JONES:  And, Your Honor, with respect, my concern

9 is that that then shifts the burden back somehow to Greenwich

10 who have already established, Your Honor, and through the

11 debtor had established that the stalking horse was appropriate.

12 Greenwich had already done -- has already made the effort --

13          THE COURT:  Yes, but the approvals are given in

14 connection with the specific bidding process.  In fact, part of

15 the proofs, as the debtors proffered here, is that it's

16 Greenwich that got the party started.

17          MS. JONES:  Yes, sir, and I think if you're on the

18 other side of it, a Chapter 7, I don't those facts would be any

19 different.

20          THE COURT:  You know, it depends how long the party

21 goes on.  It may change.  You know, look, I don't know why

22 Greenwich is so -- assuming -- well, I don't why you're so hard

23 and fast on that particular point.  I understand the interest,

24 and it's a legitimate one, but at some point that interest

25 becomes where the circumstances may become so remote from what

1  we have here that, as the Trustee suggests, there's a point at

2  which no benefit was conferred upon the estate, and that's the

3  standard we ultimately have to come back to.

4        MS. JONES:  I understand that, Your Honor, and it --

5  and I think from the -- Greenwich's perspective, Your Honor, it

6  should just not be put at their doorstep.  If there is some --

7  if they've carried out their part of the contract, they have

8  not breached, they have provided the services, they were to

9  provide as the stalking horse, and other issues go awry in the

10  case, that that isn't something that they should be bearing the

11  burden of, Your Honor.  Thank you.

12        MR. BERMAN:  Your Honor, I'm Mark Berman from Nixon

13  Peabody.  I represent Deutsche Bank National Trust Company.

14  They're the Trustee of many other securitization trusts.  And I

15  have talked with the debtor and the proposed purchaser about

16  some clarifying language with respect to the sale free and

17  clear of the residual certificates.  That language is being --

18  we're conceptually in agreement on the clarification, and the

19  language is being circulated.  I just wanted to report that to

20  the Court.  And, as with the Creditors Committee, I would

21  expect this language to ultimately be included in the order.

22        THE COURT:  In the sale order or the bidding

23  procedures order?

24        MR. BERMAN:  I believe in the bidding -- I'd ask for

25  it to be in the bidding procedures order, because I don't want

1 a bidder out there to be bidding under a mistaken apprehension

2 as to exactly what free and clear means.

3          THE COURT:  All right.

4          MR. BERMAN:  Okay.  Your Honor, as long as -- if it

5 -- as long as I know that it's going to be the sale order, I'm

6 comfortable, but I wanted parties to be aware that the free and

7 clear was not free and clear of the ultimate securitization

8 documents.

9          THE COURT:  Yes, courts are asked to determine every

10 day what free and clear means.  I don't know if we'll ever get

11 to a final --

12          MR. BERMAN:  Understood.  But I think we're all in

13 agreement.

14          THE COURT:  -- complete and definitive answer.  Okay.

15 You've been satisfied.  That's all I need to hear.  I'm sorry.

16 Anyone else before we go back to the debtor care to be heard?

17                    (No verbal response)

18          THE COURT:  I hear no response.

19          MS. UHLAND:  So, Your Honor, I think where we are

20 with the what's resolved and unresolved and that we -- were

21 seeking from the Court is if there are -- you have certain

22 requests in the United States Trustee's objection that we have

23 agreed to with respect to the Consumer Privacy issues.  I

24 believe that's resolved.  And, as noted, we will put -- in his

25 supplemental request we will put the 363(o) language in the

42

1  sale order.

2          But, Your Honor, we're seeking the Court's approval

3  of the motion over the United States Trustee with respect to

4  the amount of the bid protections, with respect to the super

5  priority nature of the breakup fee, and with respect to the

6  request that it be placed in the -- the point that was

7  addressed by counsel for Greenwich with respect to the -- sort

8  of the -- the breakup fee not being terminated but yet to go

9  forward -- I'm sorry -- to survive termination of the

10  agreement.

11          THE COURT:  Thank you.  Mr. McMahon, is there

12  anything further?

13          MR. McMAHON:  No, Your Honor.

14          THE COURT:  All right.  I'm prepared to make my

15  ruling.  I'm going to approve the request for relief in

16  connection with bidding procedures and will overrule any

17  remaining objections to that.  The breakup fee that's proposed

18  is within I think an acceptable range.  The parties have heeded

19  the Court's I guess caution that was expressed during the first

20  day hearings concerning the quantification of expenses and

21  allocation between DIP expenses and sale expenses and the

22  Committee's resolution with that I think is entirely

23  appropriate.  And I'm pleased that the parties did pursue that.

24          I don't now what for sure, Mr. McMahon, the fact that

25  18 bidders have since come forward or possible parties

43

interested have come forward, but it is apparent from this

record that Greenwich got the party started and has helped

shape the bidding.  And the amount of the breakup fee, in my

view, will not chill the bidding.  So for all of those reasons,

despite having some reservation about the perpetuity of the

arrangement, I find it unlikely under the circumstances that

those will come into play, although in bankruptcy you almost

never say never.  But for those reasons I will approve the

relief that's been requested.

When can I expect to have an order?  And the reason I

ask is that I am going to be out of the office tomorrow through

probably Wednesday of next week.  Now, it's not that I can't be

reached, but if I can, I'd prefer to take care of business

before I leave.

MS. UHLAND:  Yes, Your Honor.  We will -- we do need

to mail the order on Saturday to keep -- because of the timing

on the auction.  I know that the Creditors Committee is going

to provide some language.  I don't know if they've even had a

chance to start that process.

THE COURT:  Well, okay.  Before you turn somersaults,

I'll make you an offer.  If you can have it, you know, on my

desk by say, you know, 8:00 tomorrow morning, I will review it

before traveling down I-95 to Washington.

MS. UHLAND:  That would be -- we will do that, and we

greatly appreciate the Court coming in to look at that order.

1          THE COURT:  All right.

2          MR. McMAHON:  Your Honor, good afternoon.  Just a

3  point of quick clarification.  The Court's ruling is that --

4  overruling our objection to the super priority --

5          THE COURT:  It is.

6          MR. McMAHON:  -- request as well?

7          THE COURT:  It is, because, frankly, I didn't engage

8  on the other end of the discussion, because I've never had an

9  experience where it didn't actually come out of sale proceeds

10  in a sale that actually closed, not to say something couldn't

11  happen.  So again that's a likelihood that I think is remote,

12  that Greenwich is going to have to fall back on that right.

13          MS. UHLAND:  Thank you, Your Honor.  The remaining

14  matter is our continuation of our employee wage motion.  I

15  wonder if it might not make sense to take five minutes to

16  confer with the Committee and hear the results of their call to

17  determine whether -- what we've resolved with respect to that.

18          THE COURT:  All right.  What about the injunctive

19  relief request?  Are we still on for that?

20          MR. BOWDEN:  Your Honor, good afternoon.  Bill Bowden

21  of Ashby and Geddes for UBS Real Estate Securities.  Yes, Your

22  Honor, we're still scheduled to go forward.  I have just been

23  advised that the parties were making progress in connection

24  with a dialogue that has been ongoing and was going to ask for

25  a 15-minute recess, if we might have that.

1           THE COURT:  All right, then let's take a 15-minute

2   recess to hopefully see some movement on those two matters.

3   Anything before we break?

4           MS. UHLAND:  Your Honor, we have pending with the

5   Court right now two matters for order shortening time.  One to

6   which we have an objection, and then one we have not received

7   or haven't received an objection.  The first one is with

8   respect to our auction procedures for our loan origination

9   platform sale.  There are no stalking horse protections.

10  That's simply a date setting in a process -- a motion.  We

11  would request, Your Honor, to have that hearing heard next

12  Thursday at 10:00 a.m. together with the Carrington motion.

13          THE COURT:  I know that the request had been for a

14  date -- a very short date, and I guess my question back again

15  is in the deepest recesses of your heart does it really cause

16  heartburn if I were to set that for the 24th?

17          MS. UHLAND:  Right now I believe we have our -- the

18  process is that we've got bids due I want to say May 3rd or

19  4th, and that's a pretty -- so if we had it on the 24th, that

20  -- if we're mailing out the bid protections and the deadline,

21  that's not really giving people as much time to bid.  I mean,

22  of course, just by filing the motion, that gives us a -- that

23  itself is in some ways an advertisement of the auction, which I

24  realize, but I think that we'll be able to -- well, why don't

25  we put it this way, Your Honor?  If we can resolve all matters

1  with the Creditors Committee with respect to those procedures

2  by Thursday, would the Court be comfortable proceeding with

3  that on Thursday?

4           THE COURT:  Well, it depends in part what the U.S.

5  Trustee might have to say about it as well.

6           MR. INDELICATO:  Your Honor, Mark Indelicato from

7  Hahn and Hessen again.  Your Honor, I hate to do this, but

8  could we put that over to the 15 minutes as well?  It has -- it

9  does involve some of the issues the Committee wants to raise

10  with the debtor regarding the wage motion.  So the two of them,

11  as the Court will find out shortly, are interrelated, so we

12  could probably address that.  The Committee believes that

13  should be heard sooner than later, and we can explain that

14  later.

15           THE COURT:  Okay.

16           MS. UHLAND:  We'll put that over.  And then the other

17  matter, which we can also put over but is pending, is the

18  motion to shorten time to the 24th on our executive incentive

19  plan and key employee incentive retention plan.

20           THE COURT:  To which the U.S. Trustee --

21           MS. UHLAND:  Which the U.S. Trustee has objected.

22           THE COURT:  Okay.  We'll take a 15-minute recess.

23                        (Recess)

24           THE CLERK:  All rise.

25           MR. BOWDEN:  Your Honor, good afternoon.  Again for

**J&J COURT TRANSCRIBERS, INC.**

1 the record, Bill Bowden of Ashby and Geddes on behalf of UBS

2 Real Estate Securities.  Your Honor, I believe we have struck a

3 bargain, and with Your Honor's permission I'd ask my co-

4 counsel, Mr. Chesley of the Paul Hastings firm to address it

5 with Your Honor.  He's been admitted pro hac vice.

6            THE COURT:  Very well.

7            MR. BOWDEN:  Thank you, Your Honor.

8            MR. CHESLEY:  Your Honor, appreciate the Court's

9 extent to the courtesy, so we could wrap this up hopefully

10 today.  If I could, Your Honor, we have reached an agreement

11 with respect to the matter before the Court on the motion for a

12 temporary restraining order.  I could briefly read into the

13 record what the terms of that are.  We'll follow it up with an

14 order before the Court, but, hopefully, this should allow for

15 the resolution of these issues.

16            THE COURT:  All right.

17            MR. CHESLEY:  With respect, Your Honor, to the

18 reconciliation that was requested, the debtors will provide UBS

19 with a reconciliation of the pre-petition amounts by April

20 26th.  At that time they will provide UBS with a basis for any

21 dispute as to the amounts that are owed for pre-petition P&I as

22 well as paid-in-full mortgages.

23            Thereafter, Your Honor, on Monday, May 2nd, any

24 undisputed amounts will be deposited by the debtors into the

25 blocked account pursuant to the terms and conditions of the

1  master repurchase agreement.  I would add, Your Honor, that in

2  the determination of the reconciliation, that amount -- that

3  will be guided by the terms again of the master repurchase

4  agreement.

5          Thereafter, Your Honor, with respect to the amounts

6  post-petition, those are amounts that, as we alluded to in the

7  papers, were to be distributed to Countrywide based upon the

8  transfer of servicing, Your Honor.  That reconciliation will be

9  completed by the debtors by next Friday, the 20th, and,

10 thereafter, all undisputed amounts will be deposited -- will be

11 transferred -- excuse me, Your Honor -- to Countrywide within I

12 believe one business day, Your Honor.  Thereafter, Your Honor,

13 amounts that are sent to the debtors that are -- should be

14 transferred over to Countrywide will be transferred to

15 Countrywide pursuant to the industry standards.

16         In addition, Your Honor, the debtors will commence

17 negotiations with UBS to work toward a potential joint sale of

18 the property in question.  And all we would ask, Your Honor, is

19 that the Court schedule a hearing some time the week of May 2nd

20 to the extent there are any disputes regarding the

21 reconciliations or the transfers that are a subject of this

22 agreement.

23         THE COURT:  Well, there is the sale hearing scheduled

24 for May 7th.

25         MR. CHESLEY:  May 7th?

1          THE COURT:  Yes, will that do?

2          MR. CHESLEY:  That would be fine, Your Honor.

3          THE COURT:  All right.

4          MR. BENNETT:  A clarification.

5          MR. CHESLEY:  Certainly.

6          MR. BENNETT:  My name is Bruce Bennett.  I'm a member

7  of Hennigan, Bennett, and Dorman, and I'm proposed special

8  litigation counsel for the debtors in connection with this

9  litigation.  Three things.  First, I don't want Your Honor to

10 get an incorrect impression.  The debtors have been working on

11 a reconciliation of pre-petition receipts already, and we are

12 committing to complete work that's already in progress by April

13 26th.

14         And as to the reconciliation of post-petition

15 collections, we've been in the process of getting an ordinary

16 course of business process started to do that.  And again we're

17 committing that that process will be fully in force by a week

18 from tomorrow.

19         I only differ with two things that were said and read

20 into the record, and I hope this doesn't create the controversy

21 that we just tried to resolve.  First of all, when we said that

22 we would deposit undisputed amounts, I think the precise words

23 I used then and the precise words I want in the record now is

24 that by two business days or the 1st of May -- excuse -- yes,

25 the 1st of May, after the 26th date, the debtors will deposit

1  those amounts that the debtors do not dispute should be

2  deposited into the blocked account.

3        I do not accept the qualifier that the guideline and

4  the only guideline is the master repurchase agreement.  That's,

5  of course, an important document, but the guideline is the

6  master repurchase agreement and, of course, as that might be

7  affected by applicable law.

8        We have also made clear that if as a result of the

9  reconciliation we see disputes in the reconciliation process on

10  the 26th, we will be sending them a statement which describes

11  exactly what those disputes are and the debtors' reasons for

12  withholding funds based upon those disputes.  If those

13  clarifications are acceptable, we're done.  If not, I'm not

14  sure we really are.

15        MR. CHESLEY:  I believe we are, Your Honor.  We will

16  submit an order to that effect.

17        THE COURT:  Thank you.

18        MR. CHESLEY:  We appreciate the Court's time.

19        THE COURT:  All right.

20        MR. BENNETT:  Thank you, Your Honor.

21        MR. SMOLINSKY:  Your Honor, if I could just be heard

22  for a minute.  My name is Joe Smolinsky.  I'm from Chadbourne

23  and Park.  We represent Credit Suisse First Boston Mortgage

24  Capital, LLC.

25        Credit Suisse stands in the exact same position as

51

1  UBS, and I recognize that I am not a party in interest

2  currently with respect to the adversary proceeding.  I just

3  want to apprise the Court that we have taken a different tact.

4  We've been trying to work with the company towards this

5  reconciliation.  We provided the debtors with substantial

6  information gleaned primarily from reports provided to us from

7  New Century, and we were hoping and continue to hope that the

8  company is going to be able to reconcile our accounts as well

9  and to deposit undisputed amounts into our control accounts.

10        Standing here today I was hoping that the company

11  would agree that they would provide us with the same

12  protections and the same commitment that they have with UBS.  I

13  haven't received that yet, and I may be in court, Your Honor,

14  very soon with a virtually identical complaint.  I was hoping

15  that we could proceed without relying on unnecessary

16  litigation.  I continue to hope that we can resolve this

17  consensually, but I just wanted to apprise the Court that UBS

18  is not the only one similarly situated.

19        THE COURT:  Thank you for sharing your aspirations.

20        MR. SMOLINSKY:  Thank you.

21        THE COURT:  No need to respond.

22        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23        MS. FATELL:  Good afternoon, Your Honor.  Bonnie

24  Fatell for the Creditors Committee.  We have not been involved

25  in this adversary proceeding, and we've basically deferred to

1 the debtor on the argument.  We do want to make sure though

2 that there's transparency, and that the debtors' -- the

3 Committee's professionals are also involved in the

4 reconciliations and sign off on the numbers before monies are

5 transferred with respect to whatever might be disputed.

6         MR. BENNETT:  This is going to net down to being

7 logistics among accountants, and I can't speak for at least

8 ours, that they'll try to make it work.  We've just committed

9 to some relatively aggressive deadlines.  So long as everybody

10 can cooperate and work with the deadlines, I can't imagine that

11 we have an objection.

12         THE COURT:  All right.

13         MS. FATELL:  It won't be a problem with the

14 Committee's professionals.  Thank you.

15         THE COURT:  All right.  Thank you.  All right.  I

16 take it then that that makes at least for now the UBS motion

17 for authority to file the master repurchase agreement under

18 seal moot.

19         MR. BENNETT:  There's actually a good solution to

20 that, too, Your Honor.  The document is actually on Edgar, but

21 the pricing information is deleted.  And what I think I'll

22 propose and work with counsel for UBS to do is to delete the

23 same pricing information that's deleted from the Edgar version,

24 put that exhibit in, and then that will take care of the

25 sealing motion I think.

53

1           THE COURT:  All right.

2           MR. CHESLEY:  That's fine, Your Honor.

3           THE COURT:  All right, then you incorporate that

4  resolution into the injunction resolution.

5           MR. CHESLEY:  We do so, Your Honor.

6           THE COURT:  All right.  Thank you.

7           MR. CHESLEY:  Thank you, Your Honor.  May we be

8  excused?

9           THE COURT:  Yes.

10          MR. CHESLEY:  Thank you.

11          THE COURT:  Okay.  Let's return to the remaining

12  matters.

13          MS. UHLAND:  Your Honor, let's turn next to the

14  balance of the debtors' motion for an order authorizing the

15  debtor to pay pre-petition wages, compensation, and employee

16  benefits.  Your Honor, after the first day hearing two matters

17  remained open in the debtors' motion.  One was to pay -- with

18  respect to the debtors' request to pay the uncapped amount of

19  their pre-petition accrued, unpaid vacation.  In other words,

20  we obtained approval for parties to carry over and use their

21  vacation.  That the cap -- we eliminated cash payments upon

22  termination to the cap amount.

23          In addition, Your Honor, the debtors had developed a

24  business -- people had developed a commission replacement plan

25  for the month of March, and we sought -- for the months of

1  March and April, and we sought authority and are seeking

2  authority today to make those March payments.

3         First with respect to the vacation requests, the

4  debtors have been working with the Creditors Committee

5  reviewing that information as well as all of the information

6  about the debtors' wage request with respect to the way the

7  commission replacement programs worked for the different

8  aspects of the debtors' operations, and as with respect to the

9  vacation issue, I believe we do have an agreement with the

10 Committee that the debtor -- they will agree to the debtors'

11 relief.  Of the course of those discussions and understanding

12 sort of what the -- you know, discussions with the Creditors

13 Committee and sort of, you know, further time since passing of

14 the filing of the broader motion, the debtors agreed and

15 volunteered to pull the eight senior executives out of today's

16 request with respect to their uncapped vacation.  Those are the

17 eight senior executives who are the subject of the debtors'

18 executive incentive plan that's on file.

19        So we are requesting -- our understanding is the

20 Creditors Committee has agreed that we may have our vacation

21 policy continuing without the cap on the cash payment, or

22 they've agreed to our request to seek the approval, and they're

23 not objecting to have it continue with respect to all employees

24 except for the eight senior executives.

25        The other portion of the continued matter was -- and

1  it was somewhat I think maybe addressed summarily -- too

2  summarily in our motion -- is what I'll call the commission

3  replacement plan, what we refer to as the retention plan in our

4  motion.  And, in fact, to discuss what is -- what we are and we

5  are not asking today, our original motion had described two

6  types of plans.  In paragraph 21 the debtors enumerated what

7  were effectively the commission plans for the debtors'

8  employees in their -- what I'll call their loan origination

9  businesses.  Those were the four -- there really were three

10 types of loan origination businesses.  Now there are two

11 remaining.  There is the debtors what we call storefront retail

12 business where someone walks into a store.  There's the

13 debtors' consumer direct business, which is a sort of a call

14 center-operated business.  And then there's the debtors what we

15 refer to as a wholesale business where the debtors are -- I'm

16 sorry -- where the account executives for the debtors are

17 referred loaned by independent mortgage brokers.

18       The debtors plans for commission replacement will --

19 in effect superseded all of the plans described in paragraph 21

20 of the motion.  So the debtors are not seeking any type of --

21 any pre-petition compensation be paid for any amounts under

22 those plans.  The debtors are, however, seeking to have the --

23 effectively the -- what we'll call the March commissions paid

24 with respect to what we refer to as the retention plans in

25 Paragraph 22.

1          What those plans provided was that to the extent

2   these individuals were -- their compensation portion, which was

3   by commission, which was a substantial majority of the

4   compensation for these various employees, that because the

5   debtors were not originating loans, that for the month of March

6   their March monthly payment would be 75 percent of the three-

7   month average prior to that date, and that that commission --

8   that commission replacement payment would be paid in two parts,

9   April 20th and April 30th, and only if those employees remained

10  at the debtors -- remained in employment on those dates.  They

11  have to be working on the date to get the commission portion of

12  their replacement -- that aspect -- any commission payment

13  under this commission replacement plan.

14          In addition, there's a further part of the plan,

15  which I think -- which was not described in our longer motion.

16  There were some manager level individuals who received

17  quarterly commission compensation, and for those quarterly

18  compensated commission portion employees it was, in fact, 75

19  percent of their target bonus not 75 percent of an average.

20  There were some other I believe monthly -- well, I'm going to

21  confirm this.  There may -- hold on one second.  I want to

22  confirm this.

23                          (Pause)

24          MS. UHLAND:  I wanted to confirm there were no target

25  monthly individuals, and there are not.

1          This plan, as we've described in a prior hearing and

2     as we've discussed with the creditors group, was again in

3     effect replacing the compensation on a pure commission basis

4     for these employees.  As we described previously, the wholesale

5     employees, who are the lion's share of the employees in this

6     plan, worked after the loans -- after the debtor ceased being

7     able to originate loans in the second week of March were to

8     reallocate those 27,000 unfunded loans to other brokers or to

9     other lenders and received no commissions in connection with

10    that work for the debtors.

11         So, in fact, what this compensation we're seeking

12    approval for today are the commissions and wages earned by

13    those individuals in the month of March measured on a different

14    framework than they would have been measured if we were able to

15    quantify commissions for them to insure that they were

16    compensated for the work they did for the debtors.

17         The name of the plan suggests that it's a -- you

18    know, and clients title their operational plans without an eye

19    to Section 503 of the Bankruptcy Code.  The debtors described

20    this as the wholesale retention plan instead of the wholesale

21    commission replacement plan.

22         THE COURT:  I've seen some that have made that

23    adjustment already.

24         MS. UHLAND:  And --

25         THE COURT:  Pre-petition.

1            MS. UHLAND:  Yes.  So they -- you know, obviously,

2    things at New Century happened at a very quick time frame, and

3    they were taking this stuff sort of promptly after they ceased

4    originating loans.  We do not believe that this falls within

5    Section 503(c), and in looking at that Code section there is a

6    -- it is not a transfer that was made to these -- to an insider

7    for the purpose of inducing the person to remain with the

8    debtors' business.  We take the position that this was -- I

9    mean certainly you can say if you stop paying somebody, it's

10   going to make it more likely that they will leave.  So, you

11   know, almost any award where you're going to say we're going to

12   continue to pay you for working you could say is an inducement

13   to remain.

14            THE COURT:  Well, are there any insiders covered?

15            MS. UHLAND:  There -- Your Honor, there is -- that is

16   a question.  We do not believe that there are any insiders

17   covered by this plan.

18            THE COURT:  Does anybody dispute that?

19            MS. UHLAND:  Well, there is a -- there is a what I

20   will call some title inflation in our industry, and we do have

21   -- and there are -- we don't have the bylaws for this

22   particular entity.  I'd like to walk through that.  I think

23   that there are neither insiders nor is it a 503 plan, but let

24   me walk through the insider analysis.

25            The parent company is the Maryland REIT parent, and

1  there is a Delaware -- New Century TRS Holding, the lead debtor

2  in our case, is the primary holding company, and beneath that

3  is New Century Mortgage Corporation.  The employees we're

4  talking about today are New Century Mortgage Corporation

5  employees.  There are within New Century Mortgage -- the bylaws

6  of these entities do have broad powers of the Chief Executive

7  Officer to appoint other officers of the corporation or other

8  officers.  We take the position that these officers, regardless

9  of their title, are not functional officers of the corporation,

10 because they do not have the ability to bind the corporation

11 and legal contracts.  They do not have check writing authority,

12 and I have Holly Etlin here in the courtroom who can describe

13 -- and we can proffer her testimony -- what the functional

14 basis of these -- functional roles of these individuals are

15 notwithstanding their title.

16        At New Century Mortgage Corporation there is a

17 President and a division President who are not included in this

18 plan.  There are eight Executive Vice Presidents, 21 Senior

19 Vice Presidents, approximately 70 Vice Presidents, and 35

20 Assistant Vice Presidents.  I am -- I know there is one

21 Executive Vice President in the plan and one Senior Vice

22 President in the plan.  I do not know but I assume that there

23 are many other parties that hold the Vice President title.

24        Since these -- none of the parties in the plan, even

25 the Senior Vice President and the Executive Vice President, is

1  more than an Executive Vice President for -- one of them is the

2  Senior Vice President for the Consumer Direct Division.  The

3  other is the Executive Vice President for the wholesale

4  division.  Again none of them has a -- what we say is a Senior

5  Vice President of the New Century Mortgage Company, because

6  they do not have the power to legally bind the corporation or

7  any check writing, although they do have certain hiring and

8  other employee-related discretion.

9          The bylaws are broad and were broadly worded to

10 create the possibility -- and we don't know as we stand here

11 today whether these people that are holding these titles were

12 actually appointed by the Chief Executive Officer or whether --

13 and whether any kind of appointment of their title was ratified

14 by the Board.  I don't know that as I stand here today.  So but

15 assuming that that may have been the case, that they didn't

16 just sort of get their title from HR, that they got their title

17 through some kind of more formal process, again we don't

18 believe that this would constitute a statutory insider for the

19 purposes of the Bankruptcy Code given their function.

20         Further, to the extent there is a -- this is not much

21 of a resolution.  To the extent that it would assist the Court

22 or the United States Trustee's Office, we are, you know, more

23 than willing to conform the bylaws to the practice to clarify

24 that they're not officers of the corporation notwithstanding

25 their title or make any other appropriate conforming

1  corporation resolution or amendment to the bylaws at this

2  operating subsidiary level.  But again going back to sort of --

3  I think our primary argument here is the reality of what this

4  plan is was a commission replacement plan, and it's really --

5  it's salary and wages.  It was not a plan outside of -- you

6  know, it was on top of someone's salary -- it was not a stay

7  bonus that was enacted on top of the regular compensation

8  provided to these employees.

9          THE COURT:  Well, I guess if there's good news in

10  that, you're saying it's not retention even though that's what

11  it might have been called, but then aren't you faced with the

12  cap issue?

13          MS. UHLAND:  Well, on that, Your Honor, what we would

14  argue is the same argument we made in this motion and before,

15  which is we're seeking the authority to make these payments

16  under 105 is a critical vendor payment to continue to obtain

17  the services of these employees for the benefit of the estate.

18  And we understand that those are, you know, extraordinary

19  amounts.  There are amount -- we have done a calculation.

20  We've reviewed that with the Creditors Committee, so they can

21  assess -- yes, there are amounts being over the cap, and we do

22  believe that the extent the amounts are not over the cap, these

23  would be entitled to priority wage treatment.  But as -- so we

24  make that argument again.  Let me clarify what we are proposing

25  with respect to these issues with the Committee today.

1            THE COURT:  Do you know of any other decision in

2   which employees have gotten critical vendor-type status?  I

3   haven't faced that yet.

4            MS. UHLAND:  Your Honor, there's an extensive -- you

5   know, there's been analysis of it.  I have not, you know, seen

6   it.  You know, there was the, you know, _Ionosphere_ decision

7   which lays out that they believe that this would be an

8   appropriate use of a critical vendor payment.  I've certainly

9   seen other service providers who are in some ways employees in

10  the way that -- in some ways we view our account executives

11  receive critical vendor payments.  I mean that's a pretty

12  common concept.

13           But I think given the nature of the debtors' business

14  and the critical nature of employees to that business, that

15  seeking the extraordinary -- seemingly extraordinary remedy of

16  these over-the-cap payments is justified here for the same --

17  on the same standard that critical vendor payments are made,

18  which is it's a payment made to preserve the value of the

19  enterprise that's critical and necessary and without which the

20  debtors may, you know, have lost substantial value.

21           You know, we are fortunate in our particular Chapter

22  11 case to have both the Court and Creditor Committee

23  professionals who are very familiar with our business model and

24  the necessity as a human capital nature of our business.  I

25  mean there really -- there are no -- we have not yet brought a

1 critical vendor motion.  I'm not going to say I haven't -- I

2 won't have found one.  There really are no other critical

3 suppliers to the debtor other than its key -- its account

4 executives and, you know, other personnel.

5     THE COURT:  In the papers initially filed the

6 indication was that this claim for relief covered about 13

7 hundred employees and involved a magnitude of payments of about

8 $7.3 million.  Is that still about right?

9     MS. UHLAND:  There should be slightly more employees

10 that are covered, by the claim is still 7.3 million.  And let

11 me walk through that.  There were initially approximately 3,000

12 people who would have been part of this plan, you know, this

13 commission replacement, but because the -- when the debtors

14 closed their retail operations on the second day of the case --

15 or the first day of the case, that -- those employees were

16 pulled out.  So it's now approximately -- it's 14 hundred 73

17 people who are part of this plan, 328 of them in our consumer

18 direct business, and 1,145 people in our wholesale group, but

19 the amount of -- the total amount of the 7.3 million is the

20 same amount that we were discussing before payable for -- as I

21 said, for March -- effectively March, or I guess in some

22 quarterly individual's cases January, February, March payments

23 but payable in two installments in April.

24     We are concerned that we are now in the process of

25 selling our wholesale loan platform.  That if we are unable to,

1  you know, comply with our commitments to make these payments to

2  these individuals, that we will most certainly jeopardize our

3  efforts to maintain that loan platform for sale.  And what's --

4  you know, what's ironic here -- not ironic -- which makes it a

5  challenge and why we're going under 105 on this is there are --

6  in the wholesale plan there were approximately 200 people who

7  are over the cap, but one of the reasons those people are over

8  the cap is, because they would've been our most productive

9  individuals.  In other words, our -- some of our most important

10 suppliers, if you will, that we're seeking to have the payments

11 made with respect to.

12        So it isn't -- in this regard I said we believe it's,

13 you know, pre-petition wages we're seeking to pay, and, yes, it

14 is over the cap, and, yes, we do believe we hit the critical

15 vendor standard for those over the cap given their productivity

16 level and the fact that we believe that is what would be

17 attracting a buyer for the wholesale business.

18        Your Honor, I have a -- can -- proffer I think

19 perhaps maybe wait, but we can proffer Ms. Etlin with respect

20 to the components of the plan and the participants of the plan

21 as well as the importance of retaining these individuals.  And

22 again I don't view this as a retention plan, but if somebody

23 is, you know, not paid for their March work, it certainly is

24 going to have the opposite effect of retaining them.

25        THE COURT:  Well, I think most bankruptcy judges

1  would agree that every -- and I've held that, you know, every

2  type of plan involves some retention component, and having some

3  component or motivation to it doesn't bring it to into

4  503(c)(1).  I read that to say if the primary purpose of the

5  plan is retention, it's 503(c)(1).  All right.  We'll need the

6  proffer at a minimum, but before we do, I read the U.S.

7  Trustee's objection.

8        Well, I'll put it this way.  It was styled as a

9  response and basically said, you know, we'll leave the debtors

10  to their burden.  Is there anymore to be said?  And I'm not

11  necessarily inviting you to tell me more, Mr. McMahon.  I just

12  want to make sure that that's the extent of the U.S. Trustee's

13  position with respect to this motion.

14        MR. McMAHON:  Your Honor, good afternoon.  Joseph

15  McMahon.  I'll be more specific.  Obviously, the -- counsel's

16  representation with respect to the Paragraph 21 stuff, the

17  incentive plan, obviously puts that off to the side.  We're not

18  going forward on that today.

19        With respect to what I'll call the KERP, I'll offer

20  the following response in terms of what debtors' counsel said.

21  First, we're talking about a salary/wages substitute, and

22  regardless of how you label what's being paid, I think what we

23  have to do is again go back to the plain language of Section

24  503(c) to see whether it fits, and 503(c) is worded very

25  broadly.  It says, "Notwithstanding subsection (b), there shall

1   be neither allowed nor paid a transfer made to or an obligation

2   incurred for the benefit of an insider of the debtor for the

3   purpose of inducing such person to remain with that debtor's

4   business absent the required findings."

5          Now, I don't think there's any question from what's

6   been represented to the Court today that the primary purpose of

7   this plan was to keep them there.  That's -- I think we're

8   beyond that point.  And that being, Your Honor, then the

9   critical question for us becomes whether or not we're talking

10  about insiders here.  And I would just like to read the

11  relevant section of New Century's bylaws -- New Century

12  Financial Corporation's bylaws.

13         Now, we're -- my understanding is insiders of New

14  Century Financial Corporation are not subject to this plan, but

15  the insiders of New Century Mortgage Corporation are, and the

16  New Century Mortgage Corporation bylaws contain a similar

17  provision.  I just want to read this.

18         "The Chief Executive Officer of the corporation shall

19  have the authority to appoint the following officers if such

20  officers are not elected by the Board of Directors, colon, Vice

21  Presidents, parens, but not including Executive Vice Presidents

22  or Senior Vice Presidents, close parens, semi-colon, Assistant

23  Vice Presidents, semi-colon, Assistant Treasurers, semi-colon,

24  Assistant Secretaries, semi-colon, and other officers junior to

25  Vice President, period.  The Chief Executive Officer shall

1  notify the Board of Directors of the appointment of any such

2  officer or officers at or before the next meeting of the Board

3  of Directors held after the date of such appointment, period."

4          Now, there are a host of people who hold the title

5  that are -- of Vice President, be it Senior or otherwise, that

6  are sought to be paid under this proposal, and notwithstanding

7  any description of what their duties are, what they can or

8  can't do, if the bylaws say that they're officers, and they

9  were appointed as officers pursuant to the corporate bylaws, I

10  don't think there's any question that those persons are

11  insiders for purposes of 101 Section 31 and also for 503(c)

12  here.  I think the -- to the extent that these people were

13  appointed as officers pursuant to that bylaw provision,

14  something similar, I think basically the inquiry is done on

15  that point.

16          THE COURT:  Well, let me ask you this.

17          MR. McMAHON:  Sure.

18          THE COURT:  And what I'm hearing from the debtor is

19  basically -- and this is not in any way meant to disparage any

20  bank officer, but every bank has enumerable Assistant Vice

21  Presidents, Vice Presidents who have very limited authority for

22  many purposes.  And as a matter of statutory interpretation, we

23  start with what the plain meaning of the statute is, and under

24  the plain -- if I were to look at plain meaning and nothing

25  else, I might tend to agree with you.

1          But there's another rule of statutory construction,

2   which says that if reading of the plain meaning leads to an

3   absurd result, then you have to go farther.  And it seems to me

4   that if what the U.S. Trustee is arguing -- and it seems to me

5   you are -- that anybody who has an officer title or an officer-

6   like title gets drawn in to 503(c)(1), it seems to me that

7   might lead -- and although the debtor didn't say it here, I

8   think the debtor is suggesting -- to a result that -- that's

9   just absurd.  Can you respond to that?

10          MR. McMAHON:  Your Honor, again we haven't heard Ms.

11  Etlin's proffer, and I think that perhaps some of the factual

12  context as to how many employees were employed by a mortgage

13  corporation and at the corporate level and how many of these

14  people actually held that title and what that represents is a

15  percentage of the other might be instructive.  But again I

16  don't think that necessarily we need to go to the -- I was

17  going to say that step of absurd results here based upon the

18  facts as they've been made aware to our office.

19          Now, that being said, Your Honor, there are -- I'm

20  illustrating a factual point for the Court meaning that

21  debtors' counsel can't confirm that these people didn't have

22  their name -- I say given a title out of a jar.  In other

23  words, that we don't know factually here today -- at least it's

24  been represented to me --

25          THE COURT:  You don't know the real officers from the

1 faux officers is what you're saying.

2          MR. McMAHON:  Exactly.

3          THE COURT:  Okay.

4          MR. McMAHON:  So I'm kind of left in a bind at that

5 point.  I don't know if we're going to get an answer to that

6 question today.  But beyond that, Your Honor, on the critical

7 vendor point I mean if we determine that 503(c) applies, it

8 says neither allowed nor paid.  Now, we're all aware of the,

9 you know, litany of cases that say that if you want to use

10 Section 105(a), you better have a corresponding Code section to

11 go with it.  I think it would be -- this Court would be hard

12 pressed to find that if 503(c) did apply, that you were going

13 to somehow use 105(a) on a critical vendor theory to compensate

14 employees.

15          THE COURT:  I know after Lamar (phonetic) I now

16 wonder to what use 105 can now be put.  I guess we'll find out.

17          MR. McMAHON:  So that's an elucidation of our

18 position, Your Honor.

19          THE COURT:  All right.  Thank you.  Does anyone else

20 care to be heard preliminarily?

21                    (Pause)

22          MR. McMAHON:  Your Honor, if I just might add

23 something?  For the record, Joe -- to the extent that these

24 questions are going to remain not answered on the record today,

25 certainly, we believe that the preferable course of action will

1  be to carve out the affected persons and to address that issue

2  at a later date when we could get some type of factual

3  clarification with respect to that issue.  Excuse me.

4          MR. INDELICATO:  Your Honor, Mark Indelicato of Hahn

5  and Hessen on behalf of the Committee.  Your Honor, this has

6  been -- and I just wanted the Court to know this has been a

7  very tough couple of days for the Committee.  This has been a

8  very tough issue for them to struggle with.  They were mindful

9  of the issues that the employees are facing, but they also are

10 aware of their responsibilities and fiduciary duties.

11         Your Honor, they have been taking this in pieces as

12 they can based on the information that's provided to us.  What

13 the Committee has agreed to do is allow vacation pay as

14 represented by debtors' counsel and deal with the March

15 payments that are due on April 20th and April 30th.  Clearly,

16 the motion seeks payments for later that are due in May.  The

17 Committee has not made a determination of that.  We consider

18 the payments -- the pre-petition payments different than those

19 payments that may have occurred or may be due in March and

20 April, so we are segregating the two, and from the Committee's

21 perspective this motion will be carried, and we'll continue to

22 reexamine it and address those issues.

23         Since we didn't get an individual employee-by-

24 employee payment, there's an overall cap for us of $7.3 million

25 related to that.  We've also asked for some other things

1  related to our agreement to make the payment that we've

2  discussed with debtors' counsel, and I think we are comfortable

3  at least that -- to answer the Court's question that this

4  really, in our view, related to the rank and file.  I think

5  there will be a motion that will be presented to the Court

6  dealing with the insiders and senior executives.  The Committee

7  may have a very different approach as to how we deal with that.

8  The Court has seen how we dealt with that in other similar

9  cases, but for this we're comfortable that at least the

10 majority, if not all, of the people here are rank and file, and

11 we've agreed at least to the limited amount of payments that

12 we've spoken about.

13        We would ask the Court to put this on next week.  I

14 know we're loading up the Court's calendar, but this flows from

15 a lot of different things, and we're looking to put everything

16 in perspective and go forward.  So this we think, you know, the

17 balance of the motion, should be dealt with next week, and

18 we'll be working with the debtor between now and then to try

19 and see what other information we need and where we get to it

20 from here.

21        THE COURT:  All right.  Would you like to proceed

22 with your proffer?

23        MS. UHLAND:  Thank you, Your Honor.  Ms. Holly Etlin

24 is in the courtroom today and prepared to testify.  And if

25 called to testify would testify as follows with respect to the

1 relief sought.

2      Ms. Etlin has nearly 30 -- sorry -- nearly 30 years

3 of experience providing restructuring and reorganization

4 services to companies and their creditors in retail

5 distribution consumer products and healthcare industries.  Ms.

6 Etlin is currently a partner with AlixPartners and before that

7 was a principal with The Crossroads Solution Group in New York

8 in New York.

9      Ms. Etlin holds a bachelors degree from the

10 University of California at Los Angeles.  She is a certified

11 insolvency and restructuring advisor and certified turnaround

12 professional.  Ms. Etlin has served as a CRO and Acting CEO of

13 Tanner and Haley, one of the largest luxury destination clubs

14 in the United States.  Ms. Etlin stabilized the business and

15 merged it with another destination club within six months

16 saving the business and preserving a significant benefit for

17 club members.

18      Ms. Etlin was the turnaround advisor to Winn Dixie

19 where she assisted management in identifying and executing a

20 strategy to reorganize the company, downsizing the expenses to

21 fit the footprint, and other cost reduction activities.

22      Ms. Etlin also served as a the COO of Impath, which

23 had been plunged into crisis by the discovery of major

24 accounting irregularities.  She worked with management to

25 stabilize the business, improve cash flow, restore customer and

1  employee confidence.

2       Ms. Etlin is currently leading the AlixPartners

3  engagement with respect to New Century, and in that regard has

4  undertaken an operational analysis of the debtors and further

5  has analyzed employee roles and functions as well as their

6  compensation.  In that regard Ms. Etlin has analyzed the

7  debtors' payment -- employee payment plans, both pre- and post-

8  petition.

9       Ms. Etlin has specifically analyzed the compensation

10 for the debtors' employees in their wholesale, consumer direct,

11 and retail loan origination businesses.  She has calculated the

12 amounts owing those employees and totaled the employees that

13 are participating in the plan.  In that regard Ms. Etlin would

14 testify that with respect to the relief sought by the debtors

15 today, that the debtors are seeking a payment of 7.3 million,

16 and that applies to 1,473 employees of the debtors -- who are

17 current employees of the debtors.  But of those numbers 328

18 employees are part of the debtors' consumer direct business,

19 and the remaining 1,145 employees are part of the debtors'

20 wholesale loan origination business, and that no payments are

21 being sought with respect to employees of the debtors',

22 quote/unquote, storefront retail business as that business was

23 subject to the debtors' workforce reduction on the petition

24 date.

25       With respect to the plans, Ms. Etlin would testify

1  that New Century Mortgage Company, which is an operating

2  subsidiary of New Century Financial Corporation, the parent

3  corporation in these cases, that there is one President, one

4  Division President, eight Executive Vice Presidents, 21 Senior

5  Vice Presidents, approximately 70 Vice Presidents,

6  approximately 35 Assistant Vice Presidents.  That the highest -

7  - she would further testify that the highest ranking employees

8  whose payments are proposed to be made as part of the --

9  today's relief are -- there is one Executive Vice President and

10 one of the 21 Senior Vice Presidents.  That the one Executive

11 Vice President is the Executive Vice President responsible for

12 the wholesale loan origination business, and the one Senior

13 Vice President is largely responsible for the debtors' consumer

14 direct business.

15         She would further testify that the officers are the

16 remaining titled individuals in the plans do not have check

17 signing authority for the company and cannot enter into

18 contracts binding the debtors, although certain of the

19 individuals holding titles are in effect store level managers

20 and have an ability to hire and fire.

21         Ms. Etlin would further testify that the compensation

22 that the debtors are seeking to pay today is in a -- is the

23 base compensation of these employees.  That the employees

24 affected by this plan have a substantial portion of their

25 compensation that is based on commissions for loan origination

1  and that upon the debtors ceasing to originate loans, that

2  aspect of their compensation was no longer available to them.

3       She would further testify that the debtors required

4  the services of a substantial number of these individuals to

5  continue their effort to replace the wholesale $27,000 of loans

6  that remained unfunded when the debtor ceased operation and

7  that the debtors' ability to reallocate those loans has enabled

8  them -- was required by the cease and desist orders that were

9  entered into with the various state regulators and furthers the

10  debtors' business interests by aiding them in their regulatory

11  issues.

12       She would further testify that no aspect of the

13  payments being made today is being payment of bonus above any

14  base compensation.  That in effect the compensation today is

15  sought as replacement compensation for the services provided by

16  these employees when the loan origination business ceased.

17       She would further testify, Your Honor, that the -- if

18  these payments are not made that it would have a devastating

19  effect on the employee morale of the company and that the

20  debtors -- further testify that the debtors operate largely a

21  service business, and if they do not have a stable workforce to

22  maintain the business during this process, that the value to

23  any buyers would quickly dissipate.

24       She would further testify that the cost of the

25  obligations in these plans is minimal compared to the risk of

1 these employees leaving and the significant depreciation in the

2 value of the business if these employees were to depart.

3          Further, Your Honor, if -- she would further testify

4 if the terminated -- these employees were not paid the amounts

5 previously promised, that could have a devastating effect not

6 only on the employees in the loan origination business but in

7 the employees throughout the enterprise but including the

8 debtors' servicing business which is not being -- which is not

9 -- compensation for which is not being addressed by this

10 motion.  Your Honor, that's the conclusion of my proffer on Ms.

11 Etlin.

12          THE COURT:  Does anyone wish to examine Ms. Etlin?

13          MR. INDELICATO:  Your Honor, Mark Indelicato.  As I

14 indicated earlier, this part of the relief the Committee has no

15 objection to, but we reserve our right to cross examine Ms.

16 Etlin at any adjourned hearing related to the additional

17 relief.

18          THE COURT:  Very well.

19          MS. UHLAND:  For the purposes of the relief sought

20 today just two clarifications based on our factual record.  For

21 the purposes of the relief sought today, Your Honor, we're

22 assuming that the bylaws for New Century Mortgage Corporation

23 contained the same provisions of those as New Century Financial

24 Corporation.

25          Further, we do not know today whether the individuals

1  holding the titles were, in fact, designated by the Chief

2  Executive Officer as -- when they were given those titles and

3  submitted to the Board or whether those titles were assigned to

4  them by some other employee of the corporation.

5          THE COURT:  All right.

6          MS. UHLAND:  We do not have those facts with us

7  today.

8          THE COURT:  Thank you.

9          MR. McMAHON:  Your Honor, with those two

10 stipulations, no questions for Ms. Etlin.

11         THE COURT:  All right.

12         MS. UHLAND:  Every case provides a new opportunity to

13 try to figure out what should and should not be allowed in the

14 way of employee compensation.  This one presents yet another

15 new question for me.  I do think it's important that the

16 Committee at least to this extent has agreed to the relief that

17 the debtor has requested insofar as today is concerned.  In

18 sale cases usually theirs is the position most at risk and

19 every dollar spent in administration in theory might be said to

20 come from their pocket.

21         I give some weight to the debtors' position supported

22 by the proffer about the I guess true character of the titles

23 that the debtor has given some of its employees, and I think

24 it's probably fair, based on this record, to consider 70 Vice

25 Presidents and the 35 Assistant Vice Presidents to be more in

1  the nature of rank and file employees, even those who might

2  have some store management responsibility.  I do, however,

3  think that it's really a stretch too far to conclude, at least

4  based on this record in any event, that somebody called an

5  Executive Vice President or Senior Vice President is not an

6  insider, and I'm not prepared at this point to approve the

7  relief with respect to those who hold such titles.

8          I deny the relief, however, without prejudice, since

9  this motion is being carried in part to another date.  To the

10 extent the debtor wishes to supplement that evidentiary record

11 in an effort to convince me that I should change my view about

12 that, the debtor will have the opportunity, and in so ruling --

13 and I'll say in any case in which I might deny compensation,

14 it's not in any way a reflection upon any particular employee

15 or employees.  It's simply a function of trying to be as true

16 as I can to the restrictions that Congress has otherwise put on

17 compensation, and I don't think 105 -- and even if I were to

18 accept the debtors' view that these employees should be treated

19 as critical vendors can overcome the express provisions of the

20 statute.  In any event, I'm not sure, even if I were to look at

21 it on a critical basis -- critical vendor basis alone, that

22 again top management or those who hold the titles of

23 individuals who might otherwise be considered top management

24 should fall within this relief.

25          This case came into court as a sale case, and under

1 circumstances which were, for several reasons, some of which we

2 discussed at the first day hearings, less than ideal.  And I do

3 agree with the debtor that retaining its employees and making

4 sure they remain productive, at least through the sale process,

5 is important.  And given the stages where we are with the

6 various proposed sales, I'm unwilling at this point to risk the

7 consequences of the loss of such employees, and I don't think

8 it would be a wise thing to do.

9 So for those reasons I will approve the relief that's

10 been requested at least for purposes of today and will consider

11 on the 19th at the scheduled then whether further relief should

12 be granted to the debtor.  Are there any questions about the

13 ruling?

14 MS. UHLAND:  No, Your Honor.

15 THE COURT:  All right.

16 MS. UHLAND:  We now have our scheduling matters.  Why

17 don't we take first the loan origination scheduling?

18 THE COURT:  Okay.

19 MS. UHLAND:  We believe we would like it to go

20 forward on the 19th because of the timing with respect to

21 noticing and appropriate sale and the expense frankly of

22 maintaining the loan origination platform which is not

23 generating cash for the estate at present.  We understand in

24 setting dates to shorten time -- if a party comes in and, you

25 know, if the U.S. Trustee wants to seek more time on Thursday,

1  we understand that that would be reserved, but we think that

2  there is, under these circumstances, a sufficient showing and

3  clearly a necessity to start the auction process with respect

4  to the platform.  We'd like to get the notices out and the bid

5  procedures out and agreed to, so that we can accelerate that

6  process, and we understand that the Committee is supportive of

7  that -- accelerating that time.

8        MR. INDELICATO:  Your Honor, as I've indicated

9  earlier, these are the tough decisions that the Committee is

10 considering.  Maintaining the origination platform is a huge

11 expense, as the Court -- I think my Committee would agree with

12 you wholeheartedly that the expenses are coming out of their

13 pocket, and they really would like to see the process move --

14 at least this process get started.  We may ultimately say we

15 need more or less time, but we think that the hearing should be

16 next week, so we could at least get the process started.  We'd

17 love to see a bidder come in, so that it would alleviate some

18 of the fears that we have regarding the expenses that we're

19 incurring to keep this platform alive.  So we really would -- I

20 think that it should be done next week.

21       THE COURT:  Let me hear from the U.S. Trustee.

22       MR. McMAHON:  Your Honor, specifically with respect

23 to the loan servicing platform motion, we are not taking a

24 position with respect to the timing of scheduling with respect

25 to that.

1            MS. UHLAND:  This is the loan --

2            THE COURT:  This is the origination platform.

3            MS. UHLAND:  -- origination platform.  This is the

4  one without a stalking horse that we just filed.

5            MR. McMAHON:  Understood.  I know what we're talking

6  about.

7            MS. UHLAND:  Okay.

8            MR. McMAHON:  We did file a written objection to the

9  other matter.  I'll address that in a moment.

10           THE COURT:  Okay.  So I can't twist your arm for the

11  24th I take it.  No need to answer.

12                         (Pause)

13           THE COURT:  All right.  April 19th at 10:00.  The

14  order has been signed.

15           MS. UHLAND:  All right.  Thank you, Your Honor.  And

16  our remaining motion for shortening time is with respect to the

17  employee programs.  These are relating to the eight executives

18  of the parent corporation who we do agree are insiders by 503.

19  We're proposing incentive plans with respect to those.  And

20  then there are approximately 125 give or take employees who are

21  key employees.  That includes employees in our largely

22  intellectual, technology, finance, as well as our servicing

23  businesses.

24           So none of the employees we just spoke about with

25  respect to the loan origination business -- none of the

1  commission-based employees are included in this -- at any level

2  in this other plan.  This is really for the -- what I'll call

3  the back -- infrastructure backbone for both servicing loan

4  origination as well as servicing employees who are not

5  commission based.  We  think it's important, given the timing

6  of the sales, that we be able to have that matter determined by

7  the Court, you know, prior to the proposed sales on those

8  motions.

9          And with respect to both, there's a portion of those

10  -- of the key employees as well as the executive portion -- you

11  know, it's a sales-related incentive plan which is what the

12  structure which we have seen best aligns the executives and the

13  creditors in maximizing value in these cases.  Since the sale

14  process is supposed to start, and now it looks like it'll start

15  as early as May 2nd with the Greenwich auction, that we think

16  it would be, you know, appropriate to have that considered by

17  the Court prior to the beginning of that process.

18          We understand, like everything else in this case,

19  it's a shortened time, and we will work with the Committee and

20  the United States Trustee to provide them all information

21  that's required.  But in the event that all parties are

22  prepared to go forward, we'd like to have the date on the

23  Court's calendar, so that we can address those issues on the

24  24th.

25          THE COURT:  Mr. McMahon?

1          MR. McMAHON:  Your Honor, good evening.  This is a

2    motion that should go out on full notice aside from a -- I'd

3    say a expressed or stated desire to have this matter occur on a

4    shortened basis and -- shortened notice basis.  And, Your

5    Honor, there's a lot of things that are occurring very quickly

6    in these cases.

7          THE COURT:  I noticed that.

8          MR. McMAHON:  We don't believe that there's any

9    reason why this matter couldn't be noticed out on full notice

10   for a date in May that would accommodate everyone's interests.

11   Certainly, we'd like to have a -- the opportunity to take a

12   look at the numbers that are being proposed and the standards

13   criteria.  Like most of these motions are typically filed in

14   this district, Your Honor, they're filed without schedules,

15   and, therefore, it starts to become an I'll call you, you call

16   me type situation.

17          It's something that deserves some thought, and

18   especially, Your Honor, in a case where -- against a backdrop

19   of one like this comes in where you have a pending SEC inquiry.

20   You have a Department of Justice-led investigation where a

21   grand jury subpoena is issued or perhaps serveral.  Certainly,

22   I think that this is one of thsoe important issues in the case

23   that deserves full attention, full thought, and certainly full

24   notice.

25          THE COURT:  Thank you.  Does anyone else care to be

1 heard in connection with the motion to shorten time?

2          MR. POWER:  Your Honor, Mark Power for the Committee.

3 On this issue we've agreed with the debtor that we will not

4 object to a scheduling on the 24th.  We do reserve our right to

5 argue differently as to the characterization of the plan at

6 that time.  I mean our view of this -- and Your Honor's seen

7 these routinely including by this counsel, and I think we would

8 take the view that if we can't reach an agreement, we'll either

9 file an objection and argue it, or we'll end up trying to

10 adjourn it and work it out.  And that's the way we view it.

11          We see no problem in putting it on for the 24th.

12 Quite frankly, it is related to the sales that are pending, and

13 it is related to where we're going, and so our view is we're

14 prepared to work with the debtor and see if we can come to some

15 plan the Committee would endorse understanding that we reserve

16 all rights to object if we can't.

17          THE COURT:  Well, I think because of the relation to

18 the sale and for the reasons that the U.S. Trustee has

19 expressed, that I'm not going to grant the relief that's been

20 requested in this motion.  I am going to schedule it for the

21 May 7th date at 10:00, so that it can be considered in

22 conjunction with the sale hearings.  I didn't count out the

23 days.  Maybe that's technically still a little bit short, but,

24 in any event, I'm prepared to schedule it for that day.  And if

25 someone has a form of order handy -- hold on.  I have it.  I'm,

1 you know, content to just cross out the dates and --

2          MR. COLLINS:  Yes, Your Honor, please.

3          THE COURT:  All right.

4                    (Pause)

5          THE COURT:  Okay.  Objection deadline.

6          MR. McMAHON:  Your Honor, the typical week before the

7 hearing would be our recommendation.

8          THE COURT:  Okay.

9                    (Pause)

10          THE COURT:  All right.  With those markups, I've

11 signed the order scheduling that hearing.  Okay.  Anything

12 further for today?

13          MS. UHLAND:  All right.  We'll submit the second --

14 the relief granted on the second employee motion -- we'll

15 submit that order tomorrow.  We'll try to have -- we'll have it

16 in that same 8:00 pile, because we -- will you have an

17 opportunity to view it in that time?

18          MR. McMAHON:  I'm sorry?

19          MS. UHLAND:  Will you -- if I -- will you have an

20 opportunity to review it tonight?

21          MR. McMAHON:  I will, yes.

22          MS. UHLAND:  Okay.

23          MR. McMAHON:  To be clear about something, Your

24 Honor, in terms of -- I do want to clarify now what that's

25 going to provide for.  Am I clear in understanding that the

1 Executive Vice President and Senior Vice President relief is

2 just being denied without prejudice --

3          THE COURT:  That's correct.

4          MR. McMAHON:  -- with the balance being granted?

5          THE COURT:  That's correct.

6          MR. McMAHON:  Okay.

7          MS. UHLAND:  I think that's it, Your Honor.  We'll

8 submit those two orders.  We'll have them on your desk or --

9          MR. COLLINS:  Your Honor, if I may, Mark Collins for

10 the debtors.  Your Honor, with respect to the bid procedures

11 order, I understand that one exhibit to that order is on its

12 way over, and we just need to interlineate a few words.  So we

13 do think within maybe ten minutes we'd be able to submit that

14 to Your Honor.  So we can either do that within the next ten or

15 15 minutes or simply submit it by certification of counsel and

16 have it to Your Honor's chambers by 8:00 a.m. tomorrow morning.

17          THE COURT:  Well, are we able to docket it tonight,

18 Nancy?

19          NANCY:  I think we can do that.

20          THE COURT:  All right.  If you really mean ten

21 minutes, I'll wait.

22          MR. COLLINS:  Yes, Your Honor, I think we really mean

23 ten minutes.  Let's hope so anyway.

24          THE COURT:  Okay.  All right.  Anything further?

25          MR. COLLINS:  That's all we have, Your Honor.

1        THE COURT:  All right.  Thank you.  Court is

2 adjourned.

3                    * * * * *

4                  **<u>CERTIFICATION</u>**

5        I, PATRICIA C. REPKO, court approved transcriber,

6 certify that the foregoing is a correct transcript from the

7 official electronic sound recording of the proceedings in the

8 above-entitled matter to the best of my ability.

9

10 <u>/s/ Patricia C. Repko</u>          Date:  April 20, 2007
11 PATRICIA C. REPKO
12 J&J COURT TRANSCRIBERS, INC.