## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>New Century TRS Holdings, Inc., et al.<br><br>          Debtors. | Chapter 11<br>Case No. 07-10416 (KJC)<br>(Jointly Administered) |
| DB Structured Products, Inc.,<br><br>          Plaintiff,<br><br>v.<br><br>New Century Mortgage Corporation, New Century Credit Corporation, Home 123 Corporation, NC Capital Corporation, and New Century Financial Corporation,<br><br>          Debtor-Defendants. | Adversary Proceeding<br>Case No. _____ (___) |

## COMPLAINT

Plaintiff DB Structured Products, Inc. ("DBSP"), by and through its undersigned counsel, for its complaint against the defendants New Century Mortgage Corporation, New Century Credit Corporation, Home123 Corporation, NC Capital Corporation, and New Century Financial Corporation (collectively the "Defendants") states and alleges as follows:

### I.    NATURE OF THE ACTION

1.    This is an action for breach of contract, declaratory judgment and conversion, which seeks temporary and permanent injunctive relief, specific performance, conversion damages, an accounting and a constructive trust.

2.      DBSP and the Defendants are parties to two Master Repurchase Agreements and related agreements dated September 2, 2005 and April 17, 2006 (as amended and with all related agreements the "Repurchase Agreements").

3.      Pursuant to the Repurchase Agreements, DBSP purchased mortgage loans from the Defendants, and Defendants were obligated to repurchase those loans from DBSP at a later, agreed upon date.  Additionally, certain of the Defendants agreed to service the mortgage loans purchased by DBSP.  At present, DBSP owns hundreds of millions of dollars worth of mortgage loans that it purchased from the Defendants pursuant to the Repurchase Agreements.

4.      The Defendants' financial and legal problems caused them to default under their agreements with DBSP, and, prior to their bankruptcy filing, DBSP served Defendants with notices of termination and acceleration of Defendants' repurchase and other obligations under the Repurchase Agreements.  Upon default, the Repurchase Agreements allow DBSP to seek specific performance of various obligations of the Defendants, including Defendants' obligations to (a) deliver to DBSP all loan files and servicing records relating to mortgage loans purchased by DBSP that are in Defendants' possession or control; and (b) segregate and pay to DBSP all amounts received by the Defendants on mortgage loans owned by DBSP.

5.      Defendants have not fully cooperated with DBSP in its efforts to recover the mortgage loan files and service records that are in Defendants' possession or control.  Additionally, Defendants have not provided DBSP with an accounting of amounts they have collected on mortgage loans owned by DBSP, so DBSP cannot determine if all amounts collected on those loans have been paid to it as required by the Repurchase Agreements.

2

6.    Defendants have also stated to DBSP their belief that ownership of a group of 235 loans was improperly transferred to DBSP prepetition and have (1) refused to turn over necessary documentation with respect to these loans; and (2) on information and belief, retained for their own benefit funds collected on these loans that rightfully belong to DBSP.

7.    Given the Defendants' insolvency, absent immediate injunctive relief, DBSP will suffer irreparable harm. DBSP must be either given, or allowed immediate access to, the records relating to the mortgage loans owned by DBSP so that DBSP can take possession of those records and transfer the servicing of those loans. Defendants must be required to segregate and ultimately pay to DBSP all funds collected on loans that DBSP owns. DBSP's rights with respect to the 235 disputed loans must be preserved. Finally, an accounting of all amounts paid by the borrowers on loans owned by DBSP is necessary so DBSP can service those loans and determine what, if any, of its funds the Defendants have misappropriated for their own use.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).

10.    Venue is proper pursuant to 28 U.S.C. § 1409.

## III.    THE PARTIES

11.    Plaintiff DB Structured Products, Inc. is a Delaware corporation with a principal place of business at 60 Wall Street, New York, New York 10005.

12.    On information and belief, defendant New Century Mortgage Corporation ("NCMC") is a California corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California 92612.

3

13.    On information and belief, defendant New Century Credit Corporation ("NCCC") is a California corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California 92612.

14.    On information and belief, defendant Home123 Corporation ("Home123") is a California corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California 92612.

15.    On information and belief, defendant NC Capital Corporation ("NC Capital") is a California corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California 92612.

16.    On information and belief, defendant New Century Financial Corporation ("NCFC"), is a Maryland corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California 92612.  On information and belief, the other defendants are under the common control of NCFC.

17.    On April 2, 2007 (the "Petition Date") the Defendants and other of their affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

18.    The Debtors' cases are being jointly administered and the Debtors are currently operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of this date, no trustee or examiner has been appointed in the Debtors' cases.

## IV.    FACTUAL ALLEGATIONS

**A.    The Repurchase Agreements**

19.    On September 2, 2005, DBSP entered into a Master Repurchase Agreement and other related agreements (the "September Repurchase Agreement") with certain of the Defendants.[1]

20.    On April 17, 2006, DBSP entered into a Master Repurchase Agreement and other related agreements (the "April Repurchase Agreement") with certain of the Defendants.[2]

21.    DBSP purchased mortgage loans from the Defendants under both of the Repurchase Agreements. For purposes of this dispute, the key provisions of the Repurchase Agreements are identical.

22.    Pursuant to the Repurchase Agreements, a Defendant would sell to DBSP certain eligible mortgage loans at a price set by the Repurchase Agreements. On a specific date, DBSP also agreed to resell, and the Defendants agreed to repurchase, the mortgage loans at a price in excess of what DBSP paid for the loans. DBSP currently owns hundreds of millions of dollars worth of mortgage loans that it purchased pursuant to the terms of the Repurchase Agreements which have not been repurchased by the Defendants (the "Purchased Loans").

---

[1] Other agreements entered into at the time of each of the Repurchase Agreements include: (1) Custodial Agreements, which concern the parties rights and duties with respect to the custodian designated by the parties to, among other things, hold the documentation relating to the mortgage loans; (2) Fee Letters which set forth certain fees and compensation to be paid under the Repurchase Agreements and contain the definition of certain terms (primarily related to pricing) contained in those agreements; and (3) Guarantee Agreements pursuant to which NCFC guaranteed the obligations of the Defendants under the Repurchase Agreements.

[2] NCMC, NCCC, NC Credit and Home 123 are the debtor parties to the September Repurchase Agreement, these same parties, other than NC Credit, are the debtor parties to the April Repurchase Agreement.

23.     Each time DBSP purchased a group of mortgage loans, the Defendants were required to provide to a third-party custodian agreed to by the parties (the "Custodian") loan files relating to each of the mortgage loans that included, among other things, the original mortgage note, the original mortgage (or a certified copy thereof), the original mortgagee title insurance policy, the assignment of mortgage executed by the applicable Defendant, and any security agreements and other agreements related to the mortgage (the "Asset File").  Repurchase Agreements §§ 3, 10.

24.     After the loans had been purchased by DBSP and the Asset Files were transferred to the Custodian, the Custodian would send to DBSP a "Trust Receipt" indicating that it had the applicable loan files and was holding those documents as the bailee of and custodian for DBSP.

25.     Certain of the Defendants (the "Servicers") were contracted by DBSP to service (i.e., collect monthly payments and other fees) the mortgage loans purchased by DBSP pursuant to the Repurchase Agreements.  Repurchase Agreements § 11(a).  All funds collected with respect to any loans owned by DBSP by the Servicers ("Income") were to be deposited in an account maintained at Union Bank of California, N.A. (the "Collection Account") for DBSP's benefit.  Repurchase Agreements § 11(a).

26.     All Income relating to the Purchased Loans is the property of DBSP. Repurchase Agreement § 12(a).

27.     The Repurchase Agreements also provide that all records relating to or evidencing the servicing of any of the Purchased Loans (the "Servicing Records") are the property of DBSP.  Repurchase Agreements § 11(c).

6

28.    DBSP or its authorized representative has the right, pursuant to the Repurchase Agreements, to inspect and copy any Asset Files, Servicing Records and any other documents, records, agreements, instruments or information relating to the Purchased Loans that are in the possession or control of any of the Defendants, and the Defendants are obligated to permit such an inspection. Repurchase Agreements §§ 16(p), 27.

29.    The Repurchase Agreements each contain provisions specifying various events that constitute "Events of Default" by the Defendants under the Repurchase Agreements. Repurchase Agreements § 7. Upon the occurrence of any Event of Default, DBSP can terminate and accelerate the date the Defendants are to repurchase any or all of the mortgage loans purchased by DBSP. Repurchase Agreements § 8. Upon termination and acceleration, the Defendants are required to "immediately deliver" to DBSP the Asset Files relating to any mortgage loans not repurchased. Repurchase Agreements § 8.

30.    Upon an Event of Default, DBSP can also terminate any Servicer of any of its loans. Repurchase Agreements § 11(a). The Servicers are required to cooperate in good faith with the transfer of servicing as directed by DBSP. Repurchase Agreements § 11(b).

31.    Section 8 of the Repurchase Agreements also provides for, among other things, the following additional remedies upon default:

> [DBSP] may obtain an injunction or an order of specific performance to compel the [Defendants] to fulfill its obligations, if such [Defendant] fails or refuses to perform their obligations as set forth herein.

32.    Pursuant to the express terms of the Repurchase Agreements, each of the Defendants specifically agreed that a failure to comply with DBSP's exercise of its remedies upon a default would "cause irreparable injury" to DBSP for which DBSP would have "no adequate remedy at law" and as a consequence such remedies are "specifically enforceable" against the Defendants. Repurchase Agreement § 8. Each Defendant has "waive[d] and agrees

7

not to assert any defenses against an action for specific performance . . . except for a defense that no Event of Default has occurred under the [Repurchase] Agreement[s]." Repurchase Agreement § 8.

**B.    New Century's Prepetition Financial and Legal Issues**

33.    On February 7, 2007, New Century announced that it would have to restate earnings for the first three quarters of 2006 and postpone the release of its earnings reports for the fourth quarter and year end 2006. The company indicated that the "errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006" and launched an internal audit investigation into the issues giving rise to the company's need to restate its earnings.

34.    On February 28, 2007, New Century received notice that the United States Attorney's Office for the Central District of California was conducting a criminal inquiry under the federal securities laws in connection with trading in the Company's securities, as well as into accounting errors regarding the Company's allowance for repurchase losses.

35.    On or about March 8, 2007, New Century stopped accepting loan applications from new borrowers.

36.    On March 12, 2007, the Securities and Exchange Commission informed New Century that it was conducting a preliminary investigation of the company, and on March 13, 2007, the New York Stock Exchange suspended all trading of New Century's securities.

37.    On information and belief, New Century has either received cease and desist orders, or entered into consent agreements, with numerous states including Massachusetts, New Hampshire, New York, New Jersey, Connecticut, Maryland, Rhode Island, Tennessee, California, Pennsylvania, Florida, Washington, Iowa, Maine, Michigan, Wyoming, Idaho and

Ohio, pursuant to which New Century is restrained from, among other things, taking new applications for mortgage loans in those states and, in certain instances, required to create escrow accounts to hold fees relating to pending mortgage applications.

**C.    DBSP's Margin Call, Additional Purchases, and the Transferred Loans**

38.    Pursuant to Section 9 of the Repurchase Agreements, DBSP had the right, at any time, to require the Defendants to transfer to DBSP mortgage loans or cash equal to the difference between the aggregate value (as determined in accordance with the terms of the Repurchase Agreements) of the loans purchased and owned by DBSP and the aggregate repurchase price that would be payable to DBSP by the Defendants with respect to those loans (a "Margin Call"). Margin Calls were routinely made by DBSP during the term of the Repurchase Agreements.

39.    On March 5, 2007, DBSP made a Margin Call to the Defendants of approximately $14.1 million.

40.    On or about March 6, 2007, Defendants transferred 235 mortgage loans to the DBSP (the "Transferred Loans" and together with the Purchased Loans the "DB Loans"). Defendants indicated that these loans were transferred to satisfy the March 5 Margin Call.

41.    On March 6, 2007, the Custodian issued a Trust Receipt to DBSP, with a copy to the Defendants, indicating that the loan documentation, with certain exceptions, for the Transferred Loans had been delivered to it and that it was holding that documentation as bailee of and custodian for DBSP.

42.    At the same time, the Defendants were requesting that DBSP purchase certain additional mortgage loans from them, including certain "Wet-Ink Loans." Defendants

9

asked that DBSP also consider the transfer of the Transferred Loans as inducement to purchase these loans.

43.    Relying on the fact that the Transferred Loans were transferred to it, on March 6 and March 7, 2007, DBSP purchased additional loans, including Wet-Ink loans, from the Defendants for an aggregate purchase price of approximately $40 million, even though Events of Default under the Repurchase Agreements were in existence and were continuing.

44.    Defendants' defaults under the Repurchase Agreements continued, and on March 14 and March 15, 2007, DBSP sent Defendants notices of termination and acceleration of Defendants' repurchase obligations under each of the Repurchase Agreements. The Defendants have not fulfilled any of their repurchase obligations with respect to the Purchased Loans.

45.    On March 30, the Defendants sent a letter to DBSP in which they set forth their position that the Transferred Loans were wrongfully transferred to DBSP and demanded their return. The Defendants continue to assert that ownership of the Transferred Loans was wrongfully transferred to DBSP and have (1) refused to segregate and turn over funds received by the Defendants in relation to those loans, and (2) refused to transfer servicing records with respect to those loans to DBSP. Defendants have also listed the Transferred Loans on their Intralinks website alongside other loans that they are selling, which could create confusion in the marketplace and harm DBSP.

**D.    Defendants' Failure to Turn Over Records and Account for Funds Relating to the DB Loans**

46.    The Asset Files and Servicing Records for certain of the DB Loans, including the Transferred Loans, remain in the possession and control of the Defendants, and certain of the Defendants are continuing as Servicers for some of the DB Loans. DBSP has repeatedly requested that the Defendants turn over the Asset Files and Servicing Records for any

10

DB Loans that are in their possession. Despite these requests, the Defendants have yet to turn over these records.

47.    The greater the delay in the turnover of these records, the greater the risk that the value of the Purchased Loans will be impaired due to servicing issues, asset management issues as well as an increasing likelihood of defaults and delinquencies.

48.    Certain of the DB Loans consist of mortgage loans that are entitled to be insured or guaranteed by the federal government (the "Government Backed Loans"). In order for these loans to receive government backing, certain documents with respect to such loans must be filed with the federal government. If the submission to the government is not timely, or if the loans become delinquent, government backing could be lost, and the value of the loans would be significantly reduced. On information and belief, the Asset Files and Servicing Files for certain of the Government Backed Loans are still in the possession and custody of the Defendants at their Houston office. DBSP has hired a contractor to work with the Defendants to copy and submit the appropriate documents to the Government; however, this process has not resulted in the transferring of all of the necessary documentation. DBSP needs direct access to the records relating to the Government Backed Loans so that it can make the necessary filings in a timely manner.

49.    Certain other of the DB Loans consist of loans that were returned to the Defendants by other parties, primarily due to early payment defaults, and were purchased by DBSP from the Defendants after they were returned (the "Hospital Loans"). Certain of these Hospital Loans continue to be serviced by the party that initially purchased and returned these loans to the Defendants. DBSP needs the Defendants' cooperation, and the Defendants' books and records relating to these loans, so that it can transfer the servicing of the Hospital Loans. To

11

date, the Defendants have not fully cooperated in DBSP's efforts to obtain these records and transfer the servicing of these loans.

50.     Because they are still servicing certain of the DB Loans, including the Transferred Loans, the Defendants continue to receive payments with respect to those loans. There are discrepancies between the amounts that DBSP has received and the amounts that it believes it should be receiving on account of the DB Loans. Additionally, because it does not have access to the Servicing Records, DBSP is unable to determine whether there have been payments, including prepayments, on any of the DB Loans that have not been remitted to the Collection Account or to DBSP.

51.     DBSP has repeatedly requested that the Defendants provide it with a reconciliation of all amounts collected with respect to the DB Loans. To date, the Defendants have provided no such reconciliation.

### FIRST CAUSE OF ACTION:
### Breach of Contract - Specific Performance

52.     DBSP repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53.     The Repurchase Agreements, and related agreements, constitute valid contracts between DBSP and the Defendants.

54.     The Defendants have committed events of default under, and are in breach of, the Repurchase Agreements and related agreements.

55.     DBSP has performed all of its obligations under the Repurchase Agreements and related agreements and is willing and able to perform its remaining obligations under those agreements.

DB01:2376573.1                                                                                    900002.0001

56.    As a result, DBSP is entitled to immediate access to and possession of (a) all mortgage loans it has purchased from the Defendants, (b) all Income generated by those loans, and (c) the Asset Files, the Servicing Files and all other records necessary for DBSP to transfer servicing of, gain possession and control over, and manage mortgage loans it has purchased from the Defendants.

57.    DBSP has no adequate remedy at law and, per the express terms of the Repurchase Agreements, is entitled to specific performance of Defendants' obligations under the Repurchase Agreements, including their obligation to permit DBSP, or its representative, to inspect all documents, records, agreements, instruments or information relating to the DB Loans in the possession or control of the Defendants; their obligation to immediately deliver to DBSP all Asset Files and Servicing Records with respect to the DB Loans; and their obligation to turn over to DBSP all Income relating to the DB Loans.

## SECOND CAUSE OF ACTION:
### Conversion

58.    DBSP repeats and realleges paragraphs 1 through 57 as if fully set forth herein.

59.    The DB Loans, Income generated by the DB Loans, and Asset Files and Servicing Records with respect to the DB Loans are the property of DBSP.

60.    By the conduct described above, the Defendants have exercised and assumed an unauthorized right of ownership and control over certain of the Asset Files, Servicing Records, and Income relating to the DB Loans.  The Defendants have also taken actions that prohibit DBSP from servicing, selling or otherwise liquidating certain of those loans.

61.    DBSP is entitled to a temporary and permanent injunction directing Defendants to turn over to DBSP the Asset Files, Servicing Records and all Income with respect

DB01:2376573.1                                                                                          900002.0001

to the DB Loans, including the Transferred Loans, and providing such other relief as is necessary to allow DBSP possession and control of the DB Loans and all Income generated by the DB Loans.

62.     By failing or refusing to comply with DBSP's demands that they turn over the Asset Files, Servicing Records and Income relating to the DB Loans, the Defendants have unlawfully converted property owned by DBSP, which has caused injury to DBSP.

### THIRD CAUSE OF ACTION:
### Declaratory Judgment

63.     DBSP repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.     A substantial and actual controversy exists between DBSP and the Defendants in that the Defendants dispute that ownership of the Transferred Loans was properly transferred to DBSP

65.     Pursuant to 28 U.S.C. § 2201, this Court should declare the rights and other legal relations of DBSP and the Defendants concerning the Transferred Loans and grant such other and further relief as may be necessary to enforce these rights and obligations.

### FOURTH CAUSE OF ACTION:
### Accounting

66.     DBSP repeats and realleges paragraphs 1 through 65 as if fully set forth herein.

67.     Pursuant to the Repurchase Agreements, there exists a special, confidential and/or fiduciary relationship between DBSP and each Defendant with respect to, among other things, the Defendants' servicing of the DB Loans, Defendants' collection of Income with respect to the DB Loans, and Defendants' possession or control of records relating to the DB Loans.

14

68.    As the result of the facts and conduct described above, DBSP is entitled to
an accounting with respect to the DB Loans.

### FIFTH CAUSE OF ACTION:
### Constructive Trust

69.    DBSP repeats and realleges paragraphs 1 through 68 as if fully set forth
herein.

70.    Pursuant to the Repurchase Agreements, there exists a special,
confidential and/or fiduciary relationship between DBSP and each Defendant with respect to,
among other things, the Defendants' servicing of the DB Loans, Defendants' collection of
Income with respect to the DB Loans, and Defendants' possession or control of records relating
to the DB Loans.

71.    By retaining possession of Income with respect to the DB Loans that
should have either been deposited into the Collection Account or directly turned over to DBSP,
the Defendants have been unjustly enriched.

72.    Accordingly, DBSP is entitled to the imposition of a constructive trust
over such Income.

### PRAYER FOR RELIEF

WHEREFORE, DBSP respectfully requests that this Court:

1.    Enter a preliminary injunction with respect to the Purchased Loans: (a) giving
DBSP immediate access to all of the Asset Files and Servicing Records with respect to the
Purchased Loans, including direct access to all records relating to the Government Backed
Loans; (b) requiring the Defendants immediately to segregate and turn over to DBSP all Income
relating to the Purchased Loans; (c) requiring the Defendants to assist and cooperate with the
transfer of servicing with respect to the Purchased Loans; (d) requiring the Defendants to

15

perform all other acts necessary to allow DBSP complete possession, control and management of the Purchased Loans.

2.    Enter a preliminary injunction with respect to the Transferred Loans:    (a) enjoining the Defendants from trying to sell, encumber or otherwise take any action to interfere with DBSP's ownership interest in these loans; and (b) requiring the Defendants to segregate and hold in escrow any funds collected with respect to Transferred Loans until a final judgment is entered in this proceeding.

3.    Enter a preliminary injunction requiring the Defendants to provide DBSP with an accounting of all funds relating to the DB Loans.

4.    Enter a judgment in favor of DBSP granting it permanent injunctive relief consistent with paragraph 1 of this prayer with respect to the DB Loans (both the Purchased Loans and the Transferred Loans) and requiring the Defendants to turn over to DBSP all records, Asset Files, Servicing Records and Income with respect to the DB Loans.

5.    Enter judgment in favor of DBSP on all counts of this complaint.

6.    Enter judgment declaring that DBSP owns the Transferred Loans free and clear of any interest of the Defendants in those loans.

7.    Enter judgment imposing a constructive trust over all Income generated by the DB Loans and retained by the Defendants.

8.    Award possession to DBSP of all Asset Files, Servicing Records and Income relating to the DB Loans.

9.    Award DBSP its costs, expenses and attorneys' fees pursuant to applicable agreements and/or applicable law.

10.    Award DBSP such other and further relief as is just and proper.

900002.0001

Dated:  Wilmington, Delaware
April 25, 2007


Respectfully submitted,



Robert S. Brady (No. 2847)
Kenneth J. Enos (No. 4544)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone:  (302) 571-6660
Facsimile (302) 571-1253

-and-

Robert M. Dombroff, Esq.
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022-4689
Telephone:  (212) 705-7000
Facsimile:  (212) 752-5378

-and-

Andrew J. Gallo, Esq.
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, Massachusetts  02110
Telephone:  (617) 951-8000
Facsimile:  (617) 951-8736

*Attorneys for DB Structured Products, Inc.*

900002.0001