## EXHIBIT C

DRAFT 04-26-07

# AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

by and between

## ACCESS HOLDINGS CORPORATION

and

## NEW CENTURY WAREHOUSE CORPORATION

Dated as of

April __, 2007

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement, dated April __, 2007, is entered into by and between Access Holdings Corporation, a Texas corporation ("**Buyer**"), and New Century Warehouse Corporation, a California corporation ("**Seller**"). Buyer and Seller are sometimes referred to herein as the "**Parties**", and each a "**Party**."

### RECITALS

A.     Seller is engaged in the business of providing residential mortgage loan warehouse financing to residential mortgage origination companies (the "**Business**").

B.     Seller desires to sell, and Buyer desires to purchase, certain assets and liabilities related to the Business all on the terms and conditions set forth herein.

C.     Seller and one or more of Buyer's Affiliates are parties to that certain Purchase and Assumption Agreement (the "**Purchase and Assumption Agreement**") dated as of December 21, 2005 by and among Access Lending Corporation, a Texas corporation ("**ALC**"), Access Investments I, L.L.C., a Delaware limited liability company, Access Investments II, LLC, a Delaware limited liability company, the Access Shareholders (as defined therein), and Seller.

D.     The Parties to this Agreement believe the Transactions contemplated herein to be commercially reasonable and that the amount of the Purchase Price equals or exceeds the full and fair value of the Acquired Assets.

E.     Seller and Buyer entered into that certain Asset Purchase Agreement dated as of April 21, 2007 (the "**Original Asset Purchase Agreement**"), and Seller and Buyer desire to, and by this Agreement hereby do, amend, restate and supersede in its entirety the Original Asset Purchase Agreement.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, the Parties agree as follows:

## ARTICLE 1   DEFINITIONS.

"**Acquired Assets**" is defined in Section 2.1.

"**Acquired Office Lease**" is defined in Section 2.1(a).

"**Action**" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding.

"*Affiliate*" means, with respect to any specified Person, a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person.

"*Agreement*" means this Amended and Restated Asset Purchase Agreement, together with all Exhibits and Schedules hereto, as the same may be amended, supplemented, or otherwise modified from time to time in accordance herewith.

"*ALC Financing Facility*" means a funding arrangement pursuant to which ALC or its Affiliates (as Seller's predecessors-in-interest) provided financing to a customer of ALC or its Affiliates to fund Loans made to any Person to whom such customer of ALC or its Affiliates made a residential mortgage loan secured by a one-to-four-family residence, and which funding arrangements were acquired by Seller pursuant to the Purchase and Assumption Agreement.

"*Assignment and Assumption Agreement*" means the Assignment and Assumption Agreement, substantially in the form of Exhibit E.

"*Assignment and Assumption of Lease*" means the Assignment and Assumption Agreement of Lease, substantially in the form of Exhibit A (and including the Consent to Assignment of Lease).

"*Assumed Excess Payroll Liabilities*" is defined in Section 2.3(d).

"*Assumed Liabilities*" is defined in Section 2.3.

*Bankruptcy Code*" means Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended).

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction under the Bankruptcy Code).

"*Bill of Sale*" means the Bill of Sale, substantially in the form of Exhibit F.

"*Business*" is defined in Recital A.

"*Business Day*" means any day other than any Saturday, Sunday or other day on which financial institutions in California or Texas are required or authorized by Law or regulation to close.

"*Buyer*" is defined in the Preamble.

"*Closing*" is defined in Section 4.1.

"*Closing Date*" is defined in Section 4.1.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Committee of Unsecured Creditors*" is defined in Section 7.6.

"***Confidential Information***" means all nonpublic information known, held, possessed or owned by Seller prior to the Closing, in all forms, whether written, oral or visual, relating to (i) the Acquired Assets or (ii) the Excluded Assets and Excluded Liabilities, and shall also include all of the terms of this Agreement and each Transaction Document. Confidential Information does not include information which was or becomes generally available to the public other than as a result of a disclosure by a Party in breach of this Agreement.

"***Consent***" means any approval, consent, ratification, waiver, or other authorization (including any authorization from a Governmental Authority).

"***Consumer Borrower***" means any Person to whom a Seller Customer has made a residential mortgage loan secured by a one-to-four-family residence.

"***Consumer Borrower Loan***" means a Loan made by a Seller Customer to a Consumer Borrower.

"***Contract***" means any contract, agreement, arrangement, commitment, letter of intent, memorandum of understanding, promise, obligation, right, instrument, document, or other similar understanding, whether written or oral.

"***Deutsche Bank***" means Deutsche Bank National Trust Company and its Affiliates.

"***Employee Resignations***" is defined in Section 7.5.

"***Enforceable***," a Contract is "Enforceable" if it is the legal, valid, and binding obligation of the applicable Person enforceable against such Person in accordance with its terms, except as subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or other Laws relating to or affecting the rights of creditors, and general principles of equity.

"***Excluded Assets***" is defined in Section 2.2.

"***Excluded Liabilities***" is defined in Section 2.4.

"***Fannie Mae***" means the government-sponsored entity formerly known as the Federal National Mortgage Association.

"***FHA***" means the United States Federal Housing Administration.

"***Fleig Employment Agreement***" means the Employment Agreement dated December 21, 2005 between David C. Fleig and Seller.

"***Forbearance Agreements***" means, individually and collectively, (i) the Amended and Restated Limited Forbearance Agreement dated April 1, 2007, by and among Seller, Access Investments II, LLC, Galleon Capital, LLC, State Street Global Markets, LLC and State Street Bank and Trust Company, as amended; and (ii) the Limited Forbearance Agreement dated April 1, 2007 by and between Seller and Guaranty Bank, as amended.

"***Freddie Mac***" means the government-sponsored entity formerly known as the Federal Home Loan Mortgage Corporation.

"***FTC***" means the United States Federal Trade Commission.

"***Goldman Sachs***" means Goldman Sachs Mortgage Company and its Affiliates.

"***Governmental Authority***" means any foreign, domestic, federal, territorial, state, or local governmental authority, quasi-governmental authority, instrumentality, court, government, or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing and, for purposes of determining Seller's obligations and Liabilities and Buyer's rights under this Agreement, shall include the rules, regulations and Orders of HUD, FHA, VA, FTC, Fannie Mae and Freddie Mac.

"***HUD***" means the United States Department of Housing and Urban Development.

"***Law***" means any law (statutory, common, or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation, executive order, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Authority, each as amended and now and hereinafter in effect.

"***Liability***" or "***Liable***" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured, conditional or unconditional, latent or patent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"***License***" means any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, filing, accreditation, or other similar authorization required by any Law, Governmental Authority or Contract.

"***LLC2***" means Access Investments II, LLC, a Delaware limited liability company.

"***LLC2 Membership Interests***" means the issued and outstanding membership interests in LLC2.

"***Loan***" means a loan, line of credit, repurchase arrangement or other financing arrangement.

"***Loan Documents***" means each Contract, instrument, or other document evidencing or governing, or executed and delivered by an Obligor in connection with, any Pledged Loan, Seller Financing Facility, or Seller Warehouse Facility.

"***Loan Files***" means, with respect to any Pledged Loan, Seller Financing Facility, or Seller Warehouse Facility, as applicable, any Loan Documents, any books, records, written notes or memoranda, financial statements, credit evaluations and other written documentation maintained by or on behalf of Seller with respect to such Pledged Loan, Seller Financing Facility, or Seller Warehouse Facility, as applicable, the Obligor under the Pledged Loan, Seller

Financing Facility, or Seller Warehouse Facility, as applicable, and any related guarantee or collateral granted by or on behalf of the related Obligor.

"***Management Fee***" is defined in <u>Section 3.3(e)</u>.

"***Minimum Net Proceeds Deficit***" is defined in <u>Section 3.3(f)</u>.

"***Minimum Net Proceeds Payment Amount***" is defined in <u>Section 3.3(f)</u>.

"***Minimum Net Proceeds Payment Date***" is defined in <u>Section 3.3(f)</u>.

"***Natixis***" means Natixis Capital Markets Inc. and its Affiliates.

"***Net Proceeds***" means (1) the actual cash proceeds received from the sale of the Pledged Loans as passed through to Buyer by any lender or purchaser on the applicable Seller Warehouse Facility after such sales proceeds are applied by such lender or purchaser to amounts owing under such Seller Warehouse Facility or retained by such lender or purchaser as security for amounts then or thereafter owing under such Seller Warehouse Facility, minus (2) amounts due to Seller Customers on such loans under Seller Financing Facilities. Notwithstanding the foregoing, for purposes of determining the amounts payable by Buyer to Seller under <u>Sections 3.1</u>, <u>3.2</u> and <u>3.3</u>, the Net Proceeds from sales of Pledged Loans shall be determined on the basis that the actual cash proceeds received from the sale of the Pledged Loans were used (x) to pay off amounts due and outstanding solely in respect of or allocated to the Pledged Loans under the applicable Seller Warehouse Facility and (y) to pay amounts due to Seller Customers on the Pledged Loans under the applicable Seller Financing Facility (or are retained as security as specified above and ultimately so used to pay amounts under clauses (x) and (y)), and not for any other purpose whatsoever, and for the avoidance of doubt, any amounts so retained as security will not be deemed "Net Proceeds" hereunder while so held as security, but will be included in "Net Proceeds" if and when applied for any purpose other than as described in clauses (x) and (y).

"***Obligor***" means each Person who is obligated under a Pledged Loan, Seller Financing Facility, or Seller Warehouse Facility.

"***Office***" means each of the offices of Seller that is described in an Acquired Office Lease.

"***Order***" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Authority, arbitrator, or mediator.

"***Original Asset Purchase Agreement***" is defined in <u>Recital D</u>.

"***Organizational Documents***" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates

executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"*Party*" or "*Parties*" is defined in the Preamble.

"*pdf*" is defined in <u>Section 8.10</u>.

"*Person*" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization, or Governmental Authority.

"*Pledged Loan*" means any Consumer Borrower Loan pledged (which, in the case of a Contract involving a repurchase arrangement, includes any Consumer Borrower Loan that is sold or assigned) to Seller (or to ALC, as Seller's predecessor-in-interest) by a Seller Customer to support advances made to such Seller Customer under an Seller Financing Facility, *provided, however*, Pledged Loan shall not mean or include any Loan financed, pledged, sold or assigned in connection with any warehouse loan facility or similar funding arrangement between Seller and Goldman Sachs. The Pledged Loans are listed on <u>Schedule 2.1(d)</u>. Such <u>Schedule 2.1(d)</u> shall be duly updated by Seller and Buyer as of the Closing Date and all references in this Agreement to <u>Schedule 2.1(d)</u> shall mean such updated schedule as of the Closing Date.

"*Purchase Price*" is defined in <u>Section 3.1</u>.

"*Representative*" means with respect to any Person, any officer, director, principal, attorney, accountant, investment bankers, agent, employee, or other representative.

"*Reserve Period*" is defined in <u>Section 3.3(b)</u>.

"*Reserve Funds*" is defined in <u>Section 3.3(b)</u>.

"*Resigned Employee*" is defined in <u>Section 7.5</u>.

"*Seller*" is defined in the Preamble.

"*Seller Contracts*" means and includes any and all Seller Financing Facilities, Seller Warehouse Facilities and other Contracts as set forth on <u>Schedule 2.3(c)</u>.

"*Seller Customer*" means any Person with whom Seller (or ALC as Seller's predecessor-in-interest) has entered into a Seller Financing Facility. Solely for purposes of clarification, a Seller Customer shall exclude any individuals subject to an enforceable guaranty covering obligations of such Seller Customer under a Seller Financing Facility.

"*Seller Financing Facility*" means an ALC Financing Facility funding arrangement, Contract, master purchase agreements and related personal guarantees entered into with Seller Customers, and all, and any all similar existing arrangements entered into by Seller prior to the Closing Date.

"***Seller Warehouse Facility***" means any funding arrangement pursuant to which one or more lenders, conduit or special purpose vehicles and other financial institutions provide any Seller financing to fund, purchase, originate, sell, carry or maintain Loans or other financial assets (it being understood that any such arrangement with Goldman Sachs shall not be included in this definition).

"***Stock Pledge Agreement***" means the Stock Pledge Agreement, substantially in the form of Exhibit G.

"***Tax***" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs, ad valorem, duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real or personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Returns***" means all reports and returns required to be filed with respect to Taxes.

"***Transaction Documents***" mean, as to any Party hereto, all agreements and instruments to be delivered by such Party under this Agreement and includes this Agreement and the Assignment and Assumption of Lease relating to the Office.

"***Transactions***" means:  (a) the sale of the Acquired Assets by Seller to Buyer and Buyer's delivery of the Purchase Price therefor; (b) the execution, delivery, and performance of the documents, instruments, and agreements to be executed, delivered, and performed in connection with this Agreement and each Transaction Document; and (c) the performance by Buyer and Seller of their respective covenants and obligations (pre- and post-Closing) under this Agreement and each Transaction Document.

"***VA***" means the United States Department of Veterans' Affairs.

## ARTICLE 2  PURCHASE AND SALE OF ASSETS.

2.1    Purchase and Sale of Assets.  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer, all of Seller's right, title and interest in and to the following assets of Seller (collectively, the "***Acquired Assets***"):

(a)    All of Seller's rights and interests as lessee under the real property lease set forth on Schedule 2.1(a) (the "***Acquired Office Lease***") for the Office, including, but not limited to, any security deposit or prepaid rent paid on account on such Acquired Office Lease as set forth on Schedule 3.1(i);

(b)    All tangible personal property owned by the Seller and used or located at the Office (including, without limitation, all owned furniture, fixtures and equipment (none of which personal property is subject to a lease or similar financing arrangement by Seller or any of its Affiliates)), including, but not limited to, the property of the Seller set forth on Schedule 2.1(b);

(c)    Seller's books, data, files, and records relating to the Acquired Assets (but excluding Organizational Documents, corporate minute books and stock records as set forth in Section 2.2(e) and (f) hereof, and originals that Seller is required by Law to retain in its possession) and all Confidential Information associated therewith;

(d)    The Pledged Loans listed on Schedule 2.1(d), as of the date hereof and updated as of the Closing Date, and all rights arising from or related thereto, including, but not limited to, all payments made with respect to such Pledged Loans, the settlement bank account at Guaranty Bank (account number 3940001757) and all funds on deposit therein, the Washington Mutual Bank account (account number 3921914615) and all funds on deposit therein, the Washington Mutual Bank account (account number 3921914623) and all funds on deposit therein, the Washington Mutual Bank account (account number 3921917560) and all funds on deposit therein, and any and all rights to investor take-out commitments related to the Pledged Loans. Each such Schedule shall set forth the amounts owing on each Pledged Loan under the Seller Warehouse Facilities;

(e)    All assets of Seller pledged by Seller to Guaranty or to State Street under the Seller Warehouse Facilities with Guaranty or State Street (that are not otherwise released by Guaranty or State Street at Closing);

(f)    The Seller Contracts, and all rights arising from or related thereto;

(g)    To the extent transferable, all Licenses applicable to the Acquired Assets;

(h)    The LLC2 Membership Interests;

(i)    The trade names Access Lending and Access Warehouse Lending, and all variants thereof using the name "Access;"

(j)    All Seller Customer related deposits (i.e., haircuts and other deposits in the nature of collateral) made by Seller Customers that are held by Seller on behalf of such Seller Customers pursuant to a Seller Financing Facility; and

(k)    All actual or prospective customers, customer relationships, and customer lists of Seller, and any goodwill associated therewith.

2.2    Excluded Assets. Seller will retain ownership of all other assets of Seller, including any and all assets leased by Seller, not specifically included within the Acquired Assets (collectively, the "*Excluded Assets*"), and nothing in this Agreement nor the Transactions contemplated hereby shall be deemed to grant Buyer any right, title or interest in or to any Excluded Assets. For the avoidance of doubt, Excluded Assets shall include, without limitation, the following:

(a)    Any and all claims Seller has or may have against New Century Financial Corporation or any Affiliate of New Century Financial Corporation, *provided however*, that nothing in this subclause (a) shall limit or lessen in any respect the rights, title and interest of Buyer in the Acquired Assets transferred pursuant to Section 2.1 hereof;

(b)      Any and all claims Seller has or may have against Goldman Sachs, Deutsche Bank or Natixis (and Seller shall retain the originals, or a copy, at Seller's option, of all of Seller's books, data, files, and records relating to any Loans or other transactions involving any of Goldman Sachs, Deutsche Bank or Natixis, and to the extent that such materials are acquired by Buyer as Acquired Assets, Buyer agrees to provide Seller full access to all such materials);

(c)      Any and all rights to, or claims for, refunds of Taxes and other governmental charges relating to any period (or portion thereof) prior to and including the Closing Date, or other Tax credits or other Tax attributes of Seller, and all Tax Returns and related work papers of (i) Seller and its Affiliates (other than LLC2) or (ii) for the period prior to and including the Closing Date, LLC2 (provided that, upon the request of Buyer from time to time, Sellers shall make available to Buyer complete and accurate copies of the foregoing);

(d)      All rights and interests in and to all deposit accounts, and all amounts held in any deposit accounts; provided, that Buyer shall have assigned to it (and Seller shall not retain) (i) the settlement bank account at Guaranty Bank (account number 3940001757), Washington Mutual Bank account (account number 3921914615), Washington Mutual Bank account (account number 3921914623), Washington Mutual Bank account (account number 3921917560)), and (ii) all Seller Customer related deposits (i.e., haircuts and other deposits in the nature of collateral) made by Seller Customers that are held by Seller on behalf of such Seller Customers pursuant to a Seller Financing Facility. At Closing, Buyer agrees to provide to Seller a written schedule listing the balances of all bank accounts retained by Seller and a list of all outstanding checks that were issued prior to Closing but which did not clear as of Closing (and such schedule shall be updated as of the Closing). Following the Closing, Seller shall retain cash in amounts sufficient to pay (i) all outstanding checks set forth on the foregoing written schedule provided by Buyer and (ii) the Liabilities as of the Closing as set forth in Section 2.4(b), *provided however*, that, to the extent that immediately after Closing Seller has less cash than the amount sufficient to pay (i) and (ii) hereof, Seller shall have no obligation to obtain any additional cash, and any Liabilities under (ii) hereof that, in the aggregate, exceed Seller's available cash on hand as of immediately after Closing shall be assumed by Buyer pursuant to Section 2.3(d)(i);

(e)      All Organizational Documents, qualifications to do business and taxpayer and other identification documents of Seller and its Affiliates (other than LLC2);

(f)      All minute books and stock or equity interest records of Seller and its Affiliates (other than LLC2), including minutes of all meetings and actions in lieu of meetings of the equity holders or the board of directors or manager, and committees thereof, of Seller and its Affiliates (other than LLC2);

(g)      Any and all rights of Seller under this Agreement, the Transaction Documents or from the consummation of the transactions contemplated hereby or thereby;

(h)      Any and all insurance policies of Seller and all rights of Seller under such policies;

(i)     Any and all assets of any benefit plan of Seller, if any (for purposes of clarification, any 401k plan assets of Resigned Employees will be transferred and assigned to the Resigned Employees);

(j)     Any and all rights, claims, credits, causes of action, rights to indemnification and contribution or rights of setoff against third parties relating to any of the foregoing or to any Excluded Liabilities; and

(k)     All equity interests or other membership interests in Seller or any of its Affiliates (other than the LLC2 Membership Interests).

2.3     <u>Assumed Liabilities</u>. At the Closing, Buyer will assume and agree to timely and fully pay, perform and discharge only the following Liabilities of Seller (collectively, the "***Assumed Liabilities***"):

(a)     All Liabilities relating to the Acquired Office Lease listed on <u>Schedule 2.1(a)</u>;

(b)     All items of expense and Liabilities relating to the Acquired Assets and Assumed Liabilities, including, but not limited to, trade payables, payments of rent, taxes, utilities, operating costs passed through by the landlords and other amounts required to be paid by the tenant or lessee under leases, all personal property taxes applicable to Acquired Assets to be transferred to Buyer hereunder, for any period and all amounts outstanding (including principal, interest and fees and costs related to the Pledged Loans listed on <u>Schedule 2.1(d)</u>);

(c)     All Liabilities related to or arising in connection with any and all Seller Contracts set forth on <u>Schedule 2.3(c)</u>; and

(d)     All Liabilities related to (i) David C. Fleig or the Fleig Employment Agreement which arise at any time (whether before, at or after the Closing Date) and (ii) any Resigned Employee (other than David C. Fleig) which arise or accrue after the earlier of the date of resignation by such Resigned Employee (other than David C. Fleig) or the Closing Date, provided, that (i) with respect to Liabilities for any payroll, wages or bonuses for Resigned Employees (other than David C. Fleig) accrued prior to the Closing Date and any commissions earned and accrued by Resigned Employees (other than David C. Fleig) prior to the Closing Date, Buyer shall assume all such Liabilities that, in the aggregate, exceed Seller's available cash on hand as of immediately after Closing (subject to Buyer's right to be reimbursed for such assumed payroll or wage Liabilities under this <u>Section 2.3(d)(i)</u>) (the "***Assumed Excess Payroll Liabilities***") and (ii) Buyer shall assume all Liabilities related to any vacation accrued by Resigned Employees prior to the Closing Date. Notwithstanding the foregoing, Buyer agrees that Buyer shall assume all Liabilities for any and all payroll, wages, bonuses or commissions (or other amounts) earned or accrued by David C. Fleig whether prior to or after the Closing Date and Buyer further agrees that Assumed Excess Payroll Liabilities shall, for all purposes herein, exclude any such payroll, wages, bonuses or commissions (or other amounts) earned or accrued by David C. Fleig pursuant to terms of the Fleig Employment Agreement or otherwise.

2.4     Excluded Liabilities.  As between Seller and Buyer, the Excluded Liabilities will remain the sole responsibility of and will be retained, paid, performed and discharged as and when due solely by Seller.  However, Buyer acknowledges that (i) as between Buyer, Galleon, State Street Bank and State Street Global (each as hereinafter defined), by executing that certain Assignment and Assumption Agreement with Galleon, State Street Bank and State Street Global, Buyer is assuming all obligations (whether now or hereafter due and owing, known or unknown, absolute or contingent) under the documents referred to therein, and (ii) as between Buyer and Guaranty Bank, Buyer is assuming all obligations (whether now or hereafter due and owing, known or unknown, absolute or contingent) under the documents listed on Schedule 2.3.(c) pertaining to Guaranty Bank.  "***Excluded Liabilities***" means every Liability of Seller, other than the Assumed Liabilities, including, without limitation:

(a)     All interest, fees and costs incurred in connection with any and all Seller Warehouse Facilities that arise or are accrued prior to the Closing Date (other than interests, fees and costs accrued on the Pledged Loans listed on Schedule 2.1(d) and paid out of the proceeds of such Pledged Loans);

(b)     All accrued payroll, wages, bonuses or commissions accrued by Resigned Employees (other than David C. Fleig) prior to the Closing Date up to, but in not to exceed, the amount of Seller's cash on hand immediately after Closing;

(c)     All Liabilities related to claims made by or involving Goldman Sachs, Deutsche Bank, or Natixis, or involving any arrangements or agreements to which any of Goldman Sachs, Deutsche Bank, or Natixis are a party, all of which Liabilities are retained by Seller.  (In the event that any written claim or demand is received by Buyer from Goldman Sachs, Deutsche Bank or Natixis, (i) Buyer shall promptly (and not later than 5 days after such receipt) provide notice to Seller of such claim of demand and the estimated amount of such claim or demand (the "***Claim Notice***"), and (ii) Seller shall have the right to defend Buyer against such claim or demand by appropriate proceedings and shall have the sole power to direct and control such defense, and Seller shall have 10 days from receipt of the Claim Notice to notify Buyer whether or not it desires to so defend Buyer against such claim or demand.  Seller shall have no liability with respect to any expenses incurred by Buyer prior to the time the Claim Notice is delivered to Seller, and if Seller timely elects to assume the defense of such claim or demand, Seller shall not be liable to Buyer for any reasonable legal fees or expenses subsequently incurred by Buyer (and if Buyer desires to participate in, but not control, any such defense it may do so at its sole cost and expense).  Further, Buyer shall not settle, compromise or discharge a claim or demand received from Goldman Sachs, Deutsche Bank or Natixis, or admit to any liability with respect to any such claim or demand, without the prior written consent of Seller; and Seller shall not, without the prior written consent of Buyer, settle, compromise or offer to settle or compromise any such claim or demand on a basis that would result in the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of Buyer or any of its Affiliates.  To the extent that Seller shall direct, control or participate in the defense or settlement of any such claim or demand by Goldman Sachs, Deutsche Bank or Natixis, Buyer will provide Seller and its counsel access to all relevant business records and other documents, and shall use its best efforts to assist, and to cause the employees and counsel of Buyer to assist, in the defense of such claim.  If Seller elects not to assume the defense of Buyer, then Buyer shall have the right to defend the claim or demand by appropriate proceedings and shall have the

-11-

sole power to direct and control such defense, and all reasonable costs and expenses incurred by Buyer in defending such claim or demand shall be considered losses of Buyer for purposes of this Section 2.4(c) that are subject to offset against the amounts otherwise payable pursuant to Section 3.1(ii) and any such offset amounts shall be deemed to reduce dollar for dollar the amount of the Minimum Net Proceeds Payment Amount. In any event, Seller shall have the right to participate in the defense or settlement of any third party claim or demand for which Buyer may be liable hereunder at Seller's own expense.); and

(d)    All Liabilities related to the Excluded Assets.

2.5    Set-off. Except as expressly provided in Section 2.4(c), Section 3.3(c), Section 3.3(d) and in the last sentence of each of Section 3.3(b) and Section 3.3(e), neither the Buyer or any of its Affiliates, on the one hand, nor Seller or any of its Affiliates, on the other hand, shall have any set-off or other similar rights with respect to (1) any of the funds received by such Party pursuant to this Agreement or (2) any other amounts claimed to be owed to the other Party or its Affiliates arising out of this Agreement or any other agreement.

## ARTICLE 3  PURCHASE PRICE.

3.1    Purchase Price. In consideration for the sale, transfer and assignment of the Acquired Assets in accordance with the terms and conditions of this Agreement, and the due and full performance by of each of the Parties of their respective obligations hereunder (including the timely payment and discharge of the Assumed Liabilities), Buyer shall pay to Seller a purchase price for the Acquired Assets (the "**Purchase Price**") equal to (i) an amount of $76,058.44 as set forth on Schedule 3.1(i) in cash or otherwise immediately available funds, plus (ii) subject to Section 3.3, an amount in cash representing sixty percent (60%) of the Net Proceeds received by Buyer from the sale of any Pledged Loan at any time after the Closing (provided, that in determining Net Proceeds received by Buyer, any negative Net Proceeds related to a Pledged Loan shall be netted against the positive Net Proceeds of other Pledged Loans).

3.2    Payment of Purchase Price. Buyer shall pay to Seller the Purchase Price set forth in Section 3.1 as follows:  (i) at the Closing, Buyer shall pay to Seller the amount set forth in Section 3.1(i), and (ii) within three Business Days following the end of each month after the Closing Date, commencing with April 2007, Buyer shall pay to Seller the amounts set forth in Section 3.1(ii). All such amounts shall be payable in cash or in immediately available funds to an account designated in writing by Seller or its assigns to Buyer from time to time.

3.3    Post Closing Sale of Pledged Loans.

(a)    Following the Closing, Buyer agrees to take commercially reasonable steps to sell the Pledged Loans to third parties, and after any such sale, shall cause or permit the related lender or purchaser under any Seller Warehouse Facility to apply the proceeds of the sale to any indebtedness or obligations related to such Pledged Loan under such Seller Warehouse Facility. Within two Business Days following the end of each month after the Closing Date, commencing with April 2007, Buyer shall provide both Seller and the Committee of Unsecured Creditors with a schedule listing each Pledged Loan sold during such month and the Net Proceeds resulting from such sale. In addition, Buyer agrees that following the Closing Date,

Seller and its Representatives shall have reasonable access to the documentation, manuals, files and other information or data relating to the sales of Pledged Loans by Buyer, the calculation and determination of Net Proceeds and the payment of monies to Seller in accordance with this Section 3.3, and such other matters that may be reasonably related thereto (and shall permit such Persons to examine, inspect ,audit and copy such documentation, manuals, files and other information or data), subject, in all cases, to the restrictions and obligations set forth in Section 7.6 hereof.

(b)     From the Closing Date through the period ending as of the last day of the third full calendar month following the Closing Date (the "*Reserve Period*"), Buyer may withhold an amount equal to ten percent (10%) of the Net Proceeds realized each month during the Reserve Period as a reserve for the sole purposes of offsetting any net losses (which shall not include any costs or expenses relating to the operations of Buyer) resulting from the sales of Pledged Loans during the Reserve Period (the "*Reserve Funds*") (which Reserve Funds shall be retained in a segregated bank account). After the expiration of the Reserve Period, no amounts whatsoever shall be withheld from the Net Proceeds as Reserve Funds. On the first Business Day following expiration of the Reserve Period, Buyer shall pay to Seller, an amount equal to sixty percent (60%) of all remaining Reserve Funds existing as of the end of the Reserve Period less any Assumed Excess Payroll Liabilities.

(c)     During the Reserve Period, Buyer shall be entitled to apply the Reserve Funds to pay losses (which shall not include costs or expenses of the operations of Buyer) on the Pledged Loans as set forth in Section 3.3(b) in such priority as reasonably determined by Buyer, the details of which shall be disclosed to Seller within two (2) Business Days following the end of each month.

(d)     After the expiration of the Reserve Period, Buyer shall be entitled to retain forty percent (40%), and Buyer shall pay to Seller sixty percent (60%) (subject to subclause (e) below), of the Net Proceeds of sales of Pledged Loans during such period less, in the case of the portion of the Net Proceeds payable to Seller, any unreimbursed Assumed Excess Payroll Liabilities.

(e)     In consideration of Buyer's efforts to undertake the foregoing and to pay to Seller the foregoing amounts from the proceeds of sales of Pledged Loans, Seller agrees to pay to Buyer a one-time management fee in the amount of $100,000.00 (the "*Management Fee*"). The Management Fee shall be paid solely out of the proceeds of sales of Pledged Loans and not by Seller or its Affiliates. The Management Fee shall be recovered by, and paid to, Buyer through Buyer's withholding from the amounts otherwise payable by Buyer to Seller pursuant to subclauses (b) and (d) above. In no event and under no circumstances shall Buyer's right to withhold amounts in payment of the Management Fee exceed $100,000.00 in the aggregate.

(f)     Notwithstanding anything to the contrary in this Agreement, in no event shall the total amount paid to Seller on account of its 60% share of Net Proceeds and after payment of the Management Fee (and subject to any offset pursuant to Section 2.4(c)) be less than $4.5 million (the "*Minimum Net Proceeds Payment Amount*"). In the event that Seller has received less than the Minimum Net Proceeds Payment Amount (the "*Minimum Net Proceeds Deficit*") by the earlier of (i) the last Business Day of the month in which the last Pledged Loan

is sold or (ii) October 31, 2007 (the earlier of such dates being referred to as the "***Minimum Net Proceeds Payment Date***"), then Buyer shall pay the Minimum Net Proceeds Deficit to Seller within three (3) Business Days after the Minimum Net Proceeds Payment Date. The foregoing payment of the Minimum Net Proceeds Payment as set forth in this Section 3.3(f) shall not limit or adversely affect in any way the amounts otherwise payable to Seller pursuant to Section 3.1(ii). The timely payment of the Minimum Net Proceeds Payment Amount in full to Seller shall be secured by a Stock Pledge Agreement, executed by the shareholder of Buyer in favor of Seller, in the form attached hereto as Exhibit G, that pledges a non-recourse first priority lien in favor of Seller on all the issued and outstanding shares of stock of Buyer. The Stock Pledge Agreement shall be delivered to Seller at the Closing. . In addition, Buyer agrees that, within two Business Days following the end of each month after the Closing Date, commencing with April 2007, Buyer shall provide both Seller and the Committee of Unsecured Creditors with true, correct and complete copies of the monthly income statement and the monthly balance sheet of Buyer.

      3.4    Allocation of Purchase Price. Buyer and Seller agree to allocate the Purchase Price in accordance with IRS Section 1060 and in accordance with IRS form 8594, such allocations to be made at the sole discretion of the Buyer. Seller agrees to cooperate with Buyer's reasonable requests pursuant to the filing of this form by the Buyer.

## ARTICLE 4  CLOSING.

      4.1    The Closing.

        (a)    The closing of the transactions provided for herein (the "***Closing***") shall take place at the offices of Sheppard, Mullin, Richter & Hampton LLP, 650 Town Center Drive, 4th Floor, Costa Mesa, California 92626, or such other location as the Parties shall agree, on the first (1st) Business Day after the conditions set forth in Section 4.3 have been satisfied or waived or such other date as the Parties shall agree (the "***Closing Date***").

        (b)    The sale, assignment, transfer and conveyance to Buyer of the Acquired Assets and the assumption by Buyer of the Assumed Liabilities will be deemed effective as of 11:59 p.m. on the Closing Date.

      4.2    Deliveries at the Closing.

        (a)    At the Closing, Seller will deliver to Buyer:

          (i)    a counterpart (duly executed by Seller) of the Assignment and Assumption of Lease for the Office;

          (ii)    a counterpart (duly executed by Seller) of the Bill of Sale;

          (iii)    a counterpart (duly executed by Seller) of the Assignment and Assumption Agreement;

          (iv)    a fully executed Release, in the form attached hereto as Exhibit B; and

(v)      such other documents as may be necessary or advisable to consummate the transactions contemplated hereby, as Buyer may reasonably request.

(b)      At the Closing, Buyer will deliver to Seller:

(i)      the Purchase Price described in Section 3.1(i), via wire transfer of immediately available funds;

(ii)      a counterpart (duly executed by Buyer) of the Assignment and Assumption of Lease for each Office (it being understood that Buyer shall be solely responsible for securing Landlord's consent to the Consent to Assignment of Lease);

(iii)      a counterpart (duly executed by Buyer) of the Bill of Sale;

(iv)      a counterpart (duly executed by Buyer) of the Assignment and Assumption Agreement;

(v)      a fully executed Release, in the form attached hereto as Exhibit C;

(vi)      fully executed Employee Resignations effective prior to or as of the Closing, for each Person listed on Schedule 7.5;

(vii)      a fully executed Stock Pledge Agreement, in the form attached hereto as Exhibit H, duly executed by the shareholder of Buyer;

(viii)      written evidence satisfactory to Seller, in its sole discretion, of the full and complete release of Seller and its Affiliates (excluding for this purpose, Access Investments II, LLC) from any and all Liabilities and other obligations (other than Excluded Liabilities) related to or arising under or as a result of any existing agreement, guaranty or other instrument with, or in favor of, any of the following Persons: (i) Galleon Capital, LLC ("*Galleon*"), State Street Bank and Trust Company ("*State Street Bank*") and State Street Global Markets, LLC ("*State Street Global*") relating to that certain Receivables Purchase Agreement dated August 1, 2001 (the "*Galleon RPA*"), as amended, between Galleon, State Street Bank, State Street Global and Seller and certain other parties thereto, and such releases to be executed by each of Galleon, State Street Bank and State Street Global; and (ii) Guaranty Bank or its Affiliates (*"Guaranty"*) (including without limitation, that certain Credit Agreement dated February 3, 2006, between Guaranty and Seller and that certain Mortgage Loan Purchase and Sale Agreement dated February 3, 2006, between Guaranty and Seller), and such releases to be executed by Guaranty; and

(ix)      such other documents as may be necessary or advisable to consummate the transactions contemplated hereby, as Seller may reasonably request.

4.3      Closing Conditions

(a)      Buyer's obligation to purchase the Acquired Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to

the Closing, of each of the following conditions (of which, subclause (ii) may be waived by Buyer, in whole or in part):

> (i)     This Agreement and the Transactions contemplated hereby shall have been approved by the Federal Bankruptcy Court in Delaware; and

> (ii)     All of Seller's representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made, except to the extent any breaches of such representations and warranties would not in the aggregate have a material adverse effect.

(b)     Seller's obligation to sell the Acquired Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (of which, subclause (ii) may be waived by Seller, in whole or in part):

> (i)     This Agreement and the Transactions contemplated hereby shall have been approved by the Federal Bankruptcy Court in Delaware; and

> (ii)     All of Buyer's representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made, except to the extent any breaches of such representations and warranties would not in the aggregate have a material adverse effect.

    4.4    <u>Termination</u>. By notice given at or prior to the Closing, this Agreement may be terminated as follows:

(a)     Buyer may terminate this Agreement if any condition in <u>Section 4.3(a)</u> has not been satisfied as of the date specified for Closing or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement), and Buyer has not waived such condition on or before such date;

(b)     Seller may terminate this Agreement if any condition in <u>Section 4.3(b)</u> has not been satisfied as of the date specified for Closing or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement), and Seller has not waived such condition on or before such date;

(c)     Either Buyer or Seller may terminate this Agreement if the Closing has not occurred on or before the later of (i) April 27, 2007, (ii) the date that is 11 days after the Federal Bankruptcy Court in Delaware approves this Agreement and the Transactions, or (iii) such later date upon which the parties may agree; unless, for each of the cases in this <u>Section 4.4(c)</u>, the Party terminating this Agreement was in material breach of this Agreement; or

(d)     By mutual consent of Buyer and Seller.

## ARTICLE 5   REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller that the statements contained in this <u>Article 5</u> are correct and complete as of the date hereof.

5.1    <u>Organization; Authority; Enforceability</u>.  (a) Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Texas.  (b) Buyer has the corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement and the Transaction Documents, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  (c) This Agreement has been duly authorized, executed and delivered by Buyer and (assuming the due authorization, execution and delivery by Seller) constitutes the legal, valid and binding obligations of Buyer Enforceable against Buyer in accordance with its terms.  (d) Each of the Transaction Documents will, when duly authorized, executed and delivered at the Closing by Buyer (and assuming the due authorization, execution and delivery by the other parties thereto), constitute the legal, valid and binding obligations of Buyer Enforceable against Buyer in accordance with its terms. (e) David C. Fleig is the owner, beneficially and of record, of all of the outstanding and issued shares of common stock of Buyer.

5.2    <u>Independent Analysis and Investigation by Buyer</u>.

(a)    Buyer acknowledges that it is a sophisticated purchaser of businesses. Buyer has no knowledge that any representation of the Seller is inaccurate in any material respect.

(b)    Buyer acknowledges that it has been afforded reasonable access to the books and records, facilities and personnel of the Seller for purposes of conducting a due diligence investigation of the Seller, the Acquired Assets and the Business, has conducted a reasonable due diligence investigation of the Seller, the Acquired Assets and the Business and has received answers to all inquiries it has made with respect thereto.  Buyer acknowledges that it has conducted an independent investigation of the Business and the Acquired Assets and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely upon the results of such investigation and the representations, warranties, covenants and agreements of Seller set forth herein.  Buyer further acknowledges that the Seller makes no representations or warranties with respect to any projections, forecasts or forward-looking information provided to Buyer and that there is no assurance that any projected or forecasted results will be achieved, and Buyer further acknowledges and agrees that Buyer is not relying upon any cost estimates, forecasts, projections or other predictions or forward-looking information that may have been provided to Buyer.

(c)    Buyer acknowledges that Seller is selling the Acquired Assets and assigning the Assumed Liabilities on an "AS IS, WHERE IS" basis, and, Seller disclaims all other warranties, representations and guaranties, whether express or implied, and has made no representations or warranties as to merchantability or fitness for any particular purpose and no implied warranties whatsoever.

5.3    Compliance with Document Preservation by Buyer. Buyer understands that Government Authorities have initiated criminal and civil investigations involving the Seller's Affiliates, including but not limited to investigations by the Securities and Exchange Commission and United States Attorney's Office for the Central District of California. Further, Buyer understands that in connection with these investigations, as well as other pending or potential legal proceedings, Seller and its Affiliates are obligated to preserve all business documents, electronic and paper. Buyer agrees that it will continue to preserve all business documents related to Seller's business and transactions, in a manner consistent with the preservation notice provided to New Century Associates dated March 23, 2007, from Terry Theologides, General Counsel (a copy of which is attached hereto as Exhibit D). Seller shall reimburse Buyer for all reasonable expenses and fees incurred by Buyer as a result of Buyer's compliance with this Section 5.3.

## ARTICLE 6  REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller represents and warrants to Buyer that the statements contained in this Agreement are correct and complete as of the date hereof.

6.1    Organization; Authority; Enforceability. Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. (b) Seller has the corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement and the Transaction Documents, to consummate the Transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. (c) This Agreement has been duly authorized, executed and delivered by Seller and (assuming the due authorization, execution and delivery by Buyer) constitutes the legal, valid and binding obligations of Seller Enforceable against Seller in accordance with its terms. (d) Each of the Transaction Documents will, when duly authorized, executed and delivered at the Closing by Seller (assuming the due authorization, execution and delivery by the other parties thereto), constitute the legal, valid and binding obligations of Seller Enforceable against Seller in accordance with its terms.

## ARTICLE 7  POST-CLOSING AND OTHER COVENANTS.

7.1    General. Each Party will use, and cause its Affiliates to use, commercially reasonable efforts to take all actions and do all things necessary, proper, or advisable to consummate, make effective, and comply with all of the terms of this Agreement. In case at any time after the date hereof (including after the Closing), any further action is necessary or reasonably advisable to carry out the purposes of this Agreement, each Party shall take such further action (including executing and delivering such further instruments and documents) as any other Party reasonably may request. If within the period ending not later than six (6) months after the date hereof, the Parties (acting in good faith) identify any assets of Seller which are not transferred to Buyer at Closing and determine such assets to be reasonably necessary or appropriate to operate the business transferred to Buyer or the Acquired Assets, the Parties will cooperate and act in good faith to cause the transfer of such assets to Buyer, *provided however*, notwithstanding the foregoing, the following shall, in all cases, be excluded from, and not subject to, any such post-Closing transfer: (i) any and all assets specifically identified as Excluded Assets in subclauses (a) through (k) of Section 2.2 and (ii) any and all assets of Seller the transfer

of which would be reasonably likely to have a material adverse effect on Seller. Additionally, any and all costs and expenses related to any post-Closing transfer of assets pursuant to the immediately foregoing sentence shall be borne paid solely by Buyer. Without limiting the generality of this Section 7.1, each Party shall reasonably cooperate with the other Party to allow the Parties to comply with the Forbearance Agreements and all agreements related thereto (including, without limitation, the due execution, delivery and performance of assignment and assumption agreements with Galleon Capital, LLC, State Street Global Markets, LLC and State Street Bank and Trust Company, Guaranty Bank, or any of their respective affiliates).

7.2    Bulk Transfer Compliance. Inasmuch as Buyer is to assume the Assumed Liabilities and Seller is to pay, perform and discharge the Excluded Liabilities, Buyer and Seller hereby mutually agree to waive compliance with the provisions of any bulk transfer or sales laws, to the extent applicable to the Transactions and permitted by applicable Law.

7.3    Notices and Consents. Within five (5) Business Days, Buyer shall secure (i) Landlord's consent to the Consent to Assignment of Lease and (ii) the consent of any lender, purchaser or other financing party in order to effectuate the transactions contemplated by this Agreement). The form and content of all notices shall be mutually agreeable to the Parties, acting reasonably.

7.4    Transition. While the Parties intend to consummate the transfer of the Acquired Assets and Assumed Liabilities at the Closing, (a) Buyer agrees to: (i) remove from public access all Excluded Assets then located at the Office, including any signage, letterhead or other materials with the New Century Warehouse Corporation, New Century or any similar or related names (using reasonable care not to cause damage to any Excluded Assets) and (ii) to place all such Excluded Assets in one or more of Seller's other offices or storage facilities. Seller shall be responsible for any costs of moving such materials from the Office to Seller's other offices or storage facilities.

7.5    Employees. Buyer shall deliver to Seller, at the Closing, a duly executed resignation from the employment of Seller from each Person listed on Schedule 7.5 hereto (each such resignation, an **"Employee Resignation"** and collectively the **"Employee Resignations"**), each such Employee Resignation to be effective prior to or as of the Closing and to include a general release of all claims against Seller or any of its Affiliates arising from, occurring during or related in any manner with (i) such Person's hiring by, employment with, and termination or resignation from the Seller and (ii) the sharing or transfer of such Resigned Employee's employment and payroll records with or to Buyer. Each Person listed on Schedule 7.5 who has executed an Employee Resignation shall be a **"Resigned Employee."** Seller shall reasonably cooperate with Buyer in sharing with Buyer or transferring over to Buyer the employment and payroll records of Resigned Employees.

7.6    Confidentiality.

(a)    From and after the Closing, (i) except for Confidential Information related to or otherwise contained in the Excluded Assets and Excluded Liabilities, Seller will not, and will cause its respective Affiliates, representatives, employees and agents not to, use for their own benefit or divulge or convey to any third party, any Confidential Information relating to the

Acquired Assets except as may be permitted by Buyer for its employees, who shall be governed by the applicable policies and procedures of Buyer from time to time in effect; and (ii) Buyer will not, and will cause its respective Affiliates, representatives, employees and agents not to, use for their own benefit or divulge or convey to any third party, Confidential Information contained in or relating to the Excluded Assets and Excluded Liabilities, in each case in (i) and (ii) above except as otherwise required by applicable Law (and as provided in subclause (b) below).

(b)    For purposes of this Agreement, Seller and Buyer shall not be deemed to have violated this Section 7.6 if Seller or Buyer, or any of their respective Affiliates, representatives, employees or agents, (A) receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, criminal or civil investigative demand or order issued by a Governmental Authority or as otherwise required by applicable Law, provided that any such Person, to the extent not inconsistent with such request and to the extent time reasonably allows, (i) promptly notifies the other Party of the existence, terms and circumstances surrounding such request in order that such other Party may (at such other Party's sole expense) seek a protective order or remedy or resist or narrow the scope of such request and (ii) discloses only that portion of such Confidential Information that such Person reasonably believes is required to be disclosed in order to comply with such request and agrees to cooperate (at such other Party's sole expense) with the reasonable requests of the other Party in connection with any efforts of the other Party in seeking that all such Confidential Information that is disclosed will be accorded confidential treatment; or (B) discloses Confidential Information (including that obtained in connection with Section 3.3(a)) to the Official Committee of Unsecured Creditors (or its designated Representatives) appointed in connection with the administratively-consolidated Chapter 11 bankruptcy cases currently pending in the United States Bankruptcy Court of the District of Delaware, entitled *In re New Century TRS Holdings, Inc., a Delaware corporation, et al*, Case No. 07-10416 (KJC) (the "***Committee of Unsecured Creditors***").

7.7    Taxes. Seller will be Liable for and will pay all Taxes (whether assessed or unassessed) applicable to the Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Buyer will be Liable for and will pay all Taxes (whether assessed or unassessed) applicable to the Acquired Assets, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this Section 7.7, any period beginning before and ending after the Closing Date will be treated as two partial periods, one ending on the Closing Date and the other beginning after the Closing Date, except that Taxes (such as property Taxes) imposed on a periodic basis will be allocated on a daily basis. Notwithstanding the foregoing, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax, or similar Tax attributable to the sale or transfer of the Acquired Assets or the Assumed Liabilities will be paid by Buyer. The parties acknowledge that all refunds of Taxes relating to any period (or portion thereof) prior to and including the Closing Date are Excluded Assets and that any such refunds received by Buyer shall promptly be paid over by Buyer to Seller.

7.8    Access to Information. Buyer agrees that following the Closing Date and for a reasonable period thereafter (as determined by Buyer in good faith), Seller and their Representatives shall have reasonable access, during normal business hours and upon reasonable prior written notice to David Fleig, to the documentation, manuals, files and other information or

data specifically relating to the Acquired Assets or Assumed Liabilities during the period prior to the Closing Date or to the Excluded Assets and Excluded Liabilities (and shall permit such Persons to examine and copy such documentation, materials, files and other information or data to the extent reasonably requested by such Party) and to the employees and other personnel of Buyer (including for purposes of appearing at court hearings and the like), subject, in all cases, to the restrictions and obligations set forth in <u>Section 7.6</u> hereof. Seller shall reimburse Buyer for all reasonable expenses and fees incurred by Buyer as a result of Buyer's compliance with this <u>Section 7.8</u> (including, without limitation, all reasonable travel and legal fees and expenses associated with court hearings and the like).

   7.9 <u>Mail</u>. After the Closing and for a reasonable time thereafter, Seller hereby irrevocably authorizes Buyer, with respect to the Acquired Assets or Assumed Liabilities, to receive and open all mail and other communications received by Buyer and addressed or directed to Seller and to act with respect to such communications in such manner as Buyer may elect. If any such communication does not relate to the Acquired Assets or the Assumed Liabilities, Buyer covenants to forward such communication to Seller.

   7.10 <u>Cooperation</u>.

     (a) Following the date hereof, the Parties agree to provide such information and documents as required by any Governmental Authority. Nothing in this Agreement should be construed as precluding any of the Parties to provide substantive responses to any requests for information made by Governmental Authorities as part of a civil or criminal investigation.

     (b) The Parties will cooperate with each other to provide any notices, and to obtain any consents, as may be necessary under applicable Law (including, without limitation, the provisions of the Gramm Leach Bliley Act of 1999 relating to the confidentiality of non-public information of a loan applicant) in order to transfer and assign the Loans, the Seller Contracts and the Loan Files to Buyer in the manner contemplated by this Agreement.

     (c) Buyer and its Affiliates will conduct their respective activities with respect to all Pledged Loans and Seller Contracts in a manner consistent with applicable Law and Buyer's, or its Affiliates, as applicable, policies and procedures.

   7.11 <u>Indemnification</u>. Buyer shall indemnify, defend, and hold harmless the Seller, from and against any and all claims, demands, losses, liabilities, damages, costs, fees and expenses arising from or related to (i) any actions or omissions taken by or on behalf of Buyer or its Affiliates at any time with respect to any Pledged Loan, Seller Financing Facility or Seller Warehouse Facility; (ii) a breach by the Buyer of any of the terms of this Agreement or the Transactions contemplated in this Agreement; (iii) the Acquired Assets or Assumed Liabilities; and (iv) any agreement, guaranty or other instrument with, or in favor of, any of the following Persons: (i) Galleon, (ii) State Street, or (iii) Guaranty.

## ARTICLE 8  MISCELLANEOUS.

   8.1 <u>Schedules</u>. Unless this Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in this Agreement

nor the inclusion of any specific item in any Schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business or constitute a violation of any Law or Order, and no Party shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not in the ordinary course of business for purposes of this Agreement.

      8.2    <u>Entire Agreement</u>. This Agreement, together with the Exhibits and Schedules hereto, and the Transaction Documents, the certificates, documents, instruments and writings that are delivered pursuant hereto, constitute the entire agreement and understanding of the Parties in respect of its subject matters and supersedes all prior understandings, Contract or representations by or between the Parties, whether written or oral, to the extent they relate to the subject matter hereof or the transactions contemplated hereby, including without limitation, the Original Asset Purchase Agreement. There are no third party beneficiaries having rights under or with respect to this Agreement.

      8.3    <u>Successors</u>. All of the terms, agreements, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors, and assigns.

      8.4    <u>Assignment</u>. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party, except that either Party may assign any of its rights, interests, or obligations hereunder to such Party's Affiliates (*provided however*, that no such assignment shall relieve Buyer of any of its duties or obligations hereunder), and Seller may assign any of its rights and interests to receive payments under this Agreement to any Person. Any attempted assignment in violation of the foregoing shall be of no force or effect.

      8.5    <u>Notices</u>.

      All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder will be deemed duly given if (and then three (3) Business Days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

      If to Seller:

      New Century Warehouse Corporation
      18400 Von Karman, Suite 1000
      Irvine, California 92612
      Attn: Arash Mostafavipour, Esq.
      Tel: (949) 255-6870
      Fax: (949) 471-6656

      Copies to (which will not constitute notice):

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, Suite 4800
Los Angeles, California 90071
Attn:   David H. Sands, Esq.
Tel:    (213) 617-5536
Fax:    (213) 443-2743

and

Hahn & Hessen LLP, as counsel to the Committee of Unsecured Creditors
488 Madison Avenue
New York, New York 10022
Attn: Mark Power, Esq.
Tel: (212) 478-7350
Fax: (212) 478-7400

If to Buyer:

Access Holdings Corporation
77 Sugar Creek Center Blvd., Ste 200
Sugar Land, TX 77478
Attn:   David C. Fleig
Tel:    (281) 207-7070
Fax:    (281) 207-7071

Copies to (which will not constitute notice):

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101
Attn: Kevin Alexander
Tel:    (619) 696-6700
Fax:    (619) 696-7124

and

Hahn & Hessen LLP, as counsel to the Committee of Unsecured Creditors
488 Madison Avenue
New York, New York 10022
Attn: Mark Power, Esq.
Tel: (212) 478-7350
Fax: (212) 478-7400

Any Party may send any notice, request, demand, claim, or other communication
hereunder to the intended recipient at the address set forth above using any other means, but no
such notice, request, demand, claim, or other communication will be deemed to have been duly
given unless and until it actually is received by the intended recipient. Any Party may change

the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

8.6    Publicity. From and after the date of this Agreement, neither Buyer, on the one hand, nor Seller, on the other hand, shall make any news or press release or other public announcement concerning the transactions contemplated by this Agreement; provided, however, that the foregoing shall not preclude communications or disclosures of a Party necessary to comply with any applicable Law, Governmental Authority request or Order, accounting or Securities and Exchange Commission disclosure obligations or the rules of any stock exchange or national market system, in which event, prior to such communication or disclosure, the disclosing Party promptly advises the non-disclosing Party concerning the communication or disclosure it proposes to disseminate and furnishes the non-disclosing Party with a copy of such communication or disclosure for review.

8.7    Governing Law; Jurisdiction; Reference to U.S. Dollars. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. All Actions brought, arising out of or related to this Agreement or the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction to determine any and all such Actions, and each Party hereby irrevocably consents and submits to the personal jurisdiction of and venue in the Bankruptcy Court in any such Action. All references in this Agreement to amounts of money expressed in dollars are references to United States dollars.

8.8    Termination of Buyer's and Seller's Representations, and Warranties. All representations and warranties of Seller under Article 6 of this Agreement shall terminate in their entirety as of the Closing Date. All representations and warranties of Buyer under Article 5 of this Agreement shall terminate on the date that is twelve months after the Closing Date. Except as expressly set forth in Article 6 of this Agreement, Seller makes no representations or warranties to Buyer whatsoever. Buyer acknowledges that the Acquired Assets are being purchased on an "AS IS WHERE IS" basis and that Seller disclaims all other warranties, representations and guaranties, whether express or implied, and has made no representations or warranties as to merchantability or fitness for any particular purpose and no implied warranties whatsoever. Except as expressly set forth in Article 5 of this Agreement, Buyer makes no representations or warranties to Seller whatsoever. Except as expressly set forth in this Agreement, the respective covenants of each of the Parties shall survive the Closing indefinitely.

8.9    Counterparts. This Agreement may be executed by the Parties hereto in separate counterparts, including by facsimile and "portable document format" ("*pdf*"), each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or pdf shall be as effective as delivery of a manually executed counterpart of this Agreement.

8.10    Amendments and Waivers. No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same will

be in writing and signed by Buyer and Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

8.11    Severability.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Authority, arbitrator, or mediator not to be enforceable in accordance with its terms, the Parties agree that the Governmental Authority, arbitrator, or mediator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

8.12    Expenses.  Except as otherwise expressly provided in this Agreement, Seller, on the one hand, and Buyer, on the other hand, will each bear its own costs and expenses incurred in connection with the preparation, execution and performance of this Agreement and the Transactions contemplated hereby, including all fees and expenses of its own agents, representatives, legal counsel and accountants.

8.13    Construction.

(a)    The Parties hereto are sophisticated and have been represented by lawyers throughout the transactions contemplated hereto who have carefully negotiated the provisions hereof.  As a consequence, the Parties do not intend that the presumptions of California Civil Code Section 1654 and similar laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and, therefore, the Parties hereby waive their effects.

(b)    The article and Section headings herein are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

8.14    Waiver of Trial by Jury.  Each Party hereby knowingly, voluntarily and intentionally, waives (to the extent permitted by applicable Law) any right it may have to a trial by jury of any dispute arising under or relating to this Agreement and agrees that any such dispute shall be tried before a judge sitting without a jury.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed the day and year first written above.

**ACCESS HOLDINGS CORPORATION**

By: _____
Name:  David Fleig
Title:    President

**NEW CENTURY WAREHOUSE CORPORATION**

By: _____
Name: _____
Title: _____

## Schedules

|    | Schedule Number | Schedule Name |
|----|-----------------|---------------|
| 1. | 2.1(a) | Acquired Office Lease |
| 2. | 2.1(b) | Personal Property |
| 3. | 2.1(d) | Pledged Loans |
| 4. | 2.3(c) | Seller Contracts |
| 5. | 3.1(i) | Purchase Price |
| 6. | 7.5 | Resigned Employees |

## Exhibits

Exhibit A       Form of Assignment and Assumption of Lease (including Landlord's Consent)

Exhibit B       Seller Release

Exhibit C       Buyer Release

Exhibit D       Preservation Notice

Exhibit E       Form of Assignment and Assumption Agreement

Exhibit F       Form of Bill of Sale

Exhibit G       Form of Stock Pledge Agreement

## EXHIBIT A

FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE

## EXHIBIT B

SELLER RELEASE

## EXHIBIT C

### BUYER RELEASE

# **EXHIBIT D**

## PRESERVATION NOTICE

-1-

## EXHIBIT E

<u>FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

## EXHIBIT F

<u>FORM OF BILL OF SALE</u>

## EXHIBIT G

FORM OF STOCK PLEDGE AGREEMENT

Schedule 2.1(a)

Acquired Office Leases

1.    Commercial lease, dated on or about May 5, 2005, as amended, between Seller and Triple Net Properties Realty, Inc., as Agent for the parties identified therein.

Schedule 2.1(b)

Personal Property

Equipment

Dell Dimension 4600 - Accounting
Dell PowerEdge 2600 - WLS Server
UPS Power Supply/Backup Tapes
WLS Conversion Costs
WLS Conversion Costs
MAS 200 -Ascent Bus Solutions
MAS 200 -Ascent Bus Solutions
HP 3300 Scanner Printer (1)
HP 4250TN Printers (2)
HP 4250TN Printer (1) Dallas
Ascent - MAS 200 Modifications
14 New Dell Dimension 3000 & 1 Dell Inspiron 1150, Partial Pmt
Ascent - MICR Check Printing Solution
Card Scan Equipment
14 New Dell Dimension 3000 & 1 Dell Inspiron 1150, Final Pmt
Ascent - MAS 200 A/R Module
ACT! Contact Mgmt Initial Payment
DataVox - Phone System Installment Pmt
DataVox - Phone System Installment Pmt
Act! Contact Mgmt Final Payment
Dell Laptop Mack Mackenzie
DataVox - Phone System Final Installment
DataVox - Cordless Headset
Dell Power Edge 2800 (2)
MS-Exchange Software, Smart UPS
Act! Contact Mgmt Add'l License
Provantage Server Fax Software
Two Point Messenger 8 Network Fax
Dell Laptop Inspirion Media Center
DataVox - 3 Data Vox Phones
3 HP Desktop DC5100
2 IBM ThinkPad T43 2668
Verizon Wireless - 2 Trio Phones
Printer/Fax/Scanner (PMcDade Office)
HP Inkjet Tricolor HP95 (KFarwell Office)
Verizon Wireless - 1 Trio Phone (Amex)
Ascent - MAS Upgrade V4.10
GFI - Spam User Upgrade
NCEN KST Data - SS Laptop
NCEN KST Data - PM Laptop
NCEN KST Data - KF Laptop

GFI Spam 1yr Renewal
Shareit Ticket System Users
Shareit Ticket System Upgrade Users
Officemax Label Printer
Verizon Wireless - 1 Trio Phone (Sally Shaver)
Symantec V11D Backup System
SHI Symantec V10.1 Year Renewal Anti Virus
HP DL360 G3 Server – ALC Web
HP DL 360 G3 Server – ALC Proxy
HP DL 360 G4p Server – AL ACT
Sonic Wall Pro 3060
Cisco Router 1700 Series – ALC Router 1
Cisco Router 1700 Series – ALC Router 2
APC Power Distribution unit – 106-1
APC Power Distribution unit – 106-2
APC Power Distribution unit – 106-3
Catalyst 2950 Series switches – Internal 1
Catalyst 2950 Series switches – Internal 2
Cisco Secure PIX 525 series firewall – Primary
Cisco Secure PIX 525 series firewall – Secondary
Belkins Pro 2 series switch
HP full height server rack


Furniture and Fixtures

2 Fireproof File Cabinets
Display Board for Conf Room
Executive Art Work
Executive Art Work
Fast Signs-Trade Show Display
DF Office Chair
Shredder Executive Offices
Executive Art Work
Fire Proof (1/2 Cost)
Glass Furniture Top - Various Furniture
Training Room Furniture -Tables, Chairs
Fire Proof (1/2 Cost)
Modular Desk (Office Depot - Credit Dept)
Lateral File (R. Wood Office)
Desk (R. Wood Office)
Desk LH Return (R. Wood Office)
Executive Chair (R. Wood Office)
Guest Chair (2) (R. Wood Office)
2 Drawer File -Amex Office Depot (Credit Dept)
Desk, Credenza (S. Shaver Office)
File Combo (S. Shaver Office)

Executive Chair (S. Shaver Office)
Guest Chair (2) (S. Shaver Office)
File Cabinets in File Room - 14
Office desk/credenza/chair combo – 10 offices
War Room desk
War Room chairs
Modular desk and chairs – 15 spots

Leasehold Improvements

Mohledesign Inc - Design Work New Lease
Mohledesign Inc - Design Work New Lease
NNN Sugar Creek - Electrical Work New Lease
Mohledesign Inc - Schematic Phase
Mohledesign Inc - Contract Documents
EBE, Inc - Construction
Mohledesign Inc - Inv#2408001-1
Mohledesign Inc - Inv#2408000-7
Mohledesign Inc - Inv#2408000-8
Mohledesign Inc - Inv#2408001-2
NNN Sugar Creek - Tenet Pay Buildout
EBE Construction
Mohledesign Inc - Inv#2408000-9
Mohledesign Inc - Inv#2408000-10
EBE Construction
General Cabling & Security - Wire Suite 200
Mohledesign Inc - Inv#2408000-11
Mohledesign Inc - Inv#2408002-1
General Cabling & Security - Wire Suite 200
General Cabling & Security - Wire Suite 200
Mohledesign Inc - Inv#25111-00-1
General Cabling & Security - Final Pmt
Audio/Visual Equipment & Installation 70% Pmt
Dish Network Equipment & Installation
Mohledesign Inc - Inv#2511100
Audio/Visual Equipment & Installation 30% Final Pmt
NNN Sugar Creek - Buildout Change Order
General Cabling & Security - Remote Setup Conf Room
Fastsigns - Logo Front Entrance
Fastsigns - Logo Front Entrance
Fastsigns - Logo Front Entrance
Fastsigns - Logo Front Entrance

Schedule 2.1(d)

Pledged Loans

See attached.

-i-

Schedule 2.3(c)

Seller Contracts

Seller Warehouse Facilities:

1.      Letter Agreement dated August 9, 2004 between State Street Global Markets, LLC and Access Lending Corporation.

2.      Receivables Purchase Agreement dated August 1, 2001 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC, and Access Lending Corporation.

3.      First Amendment to Receivables Purchase Agreement dated December 27, 2001 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC, and Access Lending Corporation.

4.      Second Amendment to Receivables Purchase Agreement dated April 4, 2002 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC, and Access Lending Corporation.

5.      Third Amendment to Receivables Purchase Agreement dated August 15, 2003 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC, and Access Lending Corporation.

6.      Fourth Amendment to Receivables Purchase Agreement dated August 10, 2004 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC, and Access Lending Corporation.

7.      Fifth Amendment to Receivables Purchase Agreement dated February 3, 2006 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC and New Century Warehouse Corporation.

8.      Sixth Amendment to Receivables Purchase Agreement dated August 10, 2006 between Access Investments II, LLC, Galleon Capital Corporation, State Street Global Markets, LLC and New Century Warehouse Corporation.

9.      State Street Suspension of Funding Letter dated March 12, 2007.

10.     State Street Event of Default Letter dated March 12, 2007.

11.     State Street Letter of Direction dated March 13, 2007.

12.     State Street Letter of Direction dated March 14, 2007.

13.     Purchase Agreement dated August 1, 2001 between Access Lending Corporation and Access Investments II, LLC.

14.     First Amendment to Purchase Agreement dated February 3, 2006 between New Century Warehouse Corporation, Access Investments II, LLC and Access Lending Corporation.

15.     Amended and Restated Limited Forbearance Agreement dated April 1, 2007, as amended by the First Amendment to Amended and Restated Limited Forbearance Agreement dated April 23, 2007, between Access Investments II, LLC, Galleon Capital, LLC, State Street Global Markets, LLC, State Street Bank and Trust Company and New Century Warehouse Corporation.

16.     Tri-Party Agreement between State Street Capital Markets, LLC, Washington Mutual Bank FA, Access Lending Corporation and Access Investments II, LLC dated August 1, 2001.

17.     Mortgage Loan Custodial Agreement between Access Investments II, LLC, Washington Mutual Bank FA, and Access Lending Corporation dated August 1, 2001.

18.     Any Related Documents (as defined in the Receivables Purchase Agreement set forth in number 2 above) in addition to the Related Documents listed on this Schedule 2.3(c).

19.     Limited Liability Company Agreement of Access Investments II, LLC between Access Lending Corporation, Dana Lease Finance Corporation and Access Investments II, LLC dated July 20, 2001.

20.     First Modification Agreement of the Limited Liability Company Agreement of Access Investments II, LLC between Access Lending Corporation, Dana Lease Finance Corporation and Access Investments II, LLC dated December 28, 2001.

21.     Second Modification Agreement of the Limited Liability Company Agreement of Access Investments II, LLC between Access Lending Corporation, Dana Lease Finance Corporation and Access Investments II, LLC dated November 2002.

22.     Second Modification Agreement dated December 28, 2001 of the Limited Liability Company Agreement of Access Investments I, LLC between Access Lending Corporation, Dana Lease Finance Corporation and Access Investments, LLC.

23.     Third Modification Agreement dated November 2002 of the Limited Liability Company Agreement of Access Investments I, LLC between Access Lending Corporation, Dana Lease Finance and Access Investments I, LLC.

24.     Modification Agreement dated August 1, 2001 of the Limited Liability Company Agreement of Access Investments I, LLC between Access Lending Corporation, Dana Lease Finance Corporation and Access Investments I, LLC.

25.     Credit Agreement dated February 3, 2006 between New Century Warehouse Corporation and Guaranty Bank.

26.     First Amendment to Credit Agreement dated October 10, 2006 between New Century Warehouse Corporation and Guaranty Bank.

27.    Second Amendment to Credit Agreement dated January 22, 2007 between New Century Warehouse Corporation and Guaranty Bank.

28.    Third Amendment to Credit Agreement dated March 12, 2007 between New Century Warehouse Corporation and Guaranty Bank.

29.    Limited Forbearance Agreement dated April 1, 2007, as amended by the First Amendment to Limited Forbearance Agreement dated April 23, 2007, between New Century Warehouse Corporation and Guaranty Bank.

30.    Mortgage Loan Purchase and Sale Agreement dated February 3, 2006 between New Century Warehouse Corporation and Guaranty Bank.

31.    First Amendment to Mortgage Loan Purchase and Sale Agreement dated March 14, 2007 between New Century Warehouse Corporation and Guaranty Bank.

32.    Promissory Note dated February 3, 2006 from New Century Warehouse Corporation to Guaranty Bank.

33.    Amended and Restated Side Letter Agreement to Credit Agreement dated October 10, 2006.

34.    Amendment to Amended and Restated Side Letter Agreement to Credit Agreement dated March 12, 2007.

35.    Side Letter Agreement to Mortgage Loan Purchase and Sale Agreement dated February 3, 2006.

36.    Security Agreement from Borrower dated February 3, 2006.

Seller Financing Facilities ( including, without limitation, master repurchase agreements, personal guarantees, and MERSCORP, Inc. Electronic Tracking Agreements) with the following customers:

| Company Legal Name | City | State |
|---|---|---|
| 800USALEND, Inc. | Foothill Ranch | CA |
| A.W.L.G., INC., dba American West Mortgage | Long Beach | CA |
| Advantage One Mortgage Corporation | Plantation | FL |
| All Finance Mortgage, Inc. | North Bay Village | FL |
| American Benefit Mortgage, Inc. | Aliso Viejo | CA |
| American Heritage Lending Corporation | Aliso Viejo | CA |
| American Lending Group, Inc. | Lexington | KY |
| Amerifund Financial, dba All Fund Mortgage | Tacoma | WA |
| Ameripath Mortgage Corporation | Irvine | CA |
| Apex Lending, Inc. | Clearwater | FL |
| Archer Adams, LLC | Reno | NV |
| Artisan Mortgage, LLC | Metairie | LA |

| Company Legal Name | City | State |
|---|---|---|
| Ascella Mortgage, LLC | Manchester | CT |
| Blue Chip Mortgage Wholesale, LLC | Lantana | FL |
| Capital Funding Solutions, Inc., dba CapMor Credit | Sacramento | CA |
| Cascade Pacific Mortgage Co, Inc., dba C-Pac Mortgage and Home Team Funding | Vancouver | WA |
| CBSK Financial Group, Inc. dba American Home Loans | Irvine | CA |
| Citizens Home Mortgage, LLC | Memphis | TN |
| Clayton Peters & Asoc, Inc. dba CPA Mortgage | Baltimore | MD |
| Clearwater Mortgage, LLC | Eden Prairie | MN |
| Complete Service Lending, Inc. | Las Vegas | NV |
| ConquistAmerica, Inc. | Santa Ana | CA |
| Crestline Funding Corp. | Irvine | CA |
| DCG Home Loans, Inc., dba Sage Credit | Irvine | CA |
| DGG Financial Corp, dba Drexel Lending Group | Rancho Cucamonga | CA |
| Diversified Mortgage, Inc.. | Clearwater | FL |
| DreamScape Mortgage, LLC | Scottsdale | AZ |
| Final Source Corp | Riverside | CA |
| First Alliance Mortgage Corp of Delaware | Hollywood | FL |
| First American Home Loans, Inc. | Orange | CA |
| First Capital Financial Services, Corp., dba Full Compass Lending | Appleton | WI |
| First Choice Funding Group, LTD | Orange | CA |
| First Liberty Financial Group, LLC | Louisville | KY |
| First National Mortgage Banc, Inc. | Dayton | OH |
| Flagship Mortgage Corp, dba Flagship Financial Services | Worthington | OH |
| GD, LLC, dba Greenlight Funding | Webster Groves | MO |
| GMM Mortgage Co | Oxnard | CA |
| Great Horizon's, Inc., dba Great American Mortgage Corp | Troy | MI |
| Hamilton Group Funding, Inc. | Cooper City | FL |
| Home Loan Lending, Inc. | Burbank | CA |
| Home Loan Mortgage Corporation | Hesperia | CA |
| Homefront Mortgage Corporation | Tustin | CA |
| Integrity Financial Service Inc. | Oak Brook | IL |
| Integrity Funding, LLC | Scottsdale | AZ |
| International Lending Solutions, Inc. | Englewood | CO |
| IwayLoan, LP | Houston | TX |
| JFK Financial, Inc., dba Equity Direct Funding | Las Vegas | NV |
| Legacy Financial Group, Inc. | Arlington | TX |
| Lenders Rate Approval.Com | Irvine | CA |
| Maxim Mortgage Corp | Downers Grove | IL |
| Meridian Financial Network, Inc. | Honolulu | HI |
| Mid Atlantic Capital, LLC | Sewell | NJ |
| Monarch Financial Services, Inc. | Gastonia | NC |
| Moneyone, Inc. | Sacramento | CA |

| Company Legal Name | City | State |
|---|---|---|
| Mortgage Capital Corp of America | Woodland Hills | CA |
| Mortgage South, Inc. | Richmond | VA |
| MSM Financial, Inc. | Newport Beach | CA |
| Newkey Financial Corporation, dba Newkey Home Lending | Los Alamitos | CA |
| New York Financial, Inc. | Los Angeles | CA |
| O C M, Inc. dba HelpUFinance.com | Santa Ana | CA |
| OnLine Financial Group | Milpitas | CA |
| Pacific Reverse Mortgage, Inc., dba Financial Heritage | San Diego | CA |
| PenFlo Enterprises, Inc., dba Golden Way Financial | Colton | CA |
| Preferred Home Loan, LTD | Houston | TX |
| Primus Lending Corp | Los Angeles | CA |
| RFG Financial Services, a dba of Nuestra Casa Mortgage | Santa Ana | CA |
| Right-Away Mortgage, Inc. | Cypress | CA |
| Seaforth Mortgage Corporation | Canoga Park | CA |
| Secure Mortgage Co. | Houston | TX |
| Service Mortgage Corporation | Aurora | CO |
| Sierra National Mortgage Company | Sacramento | CA |
| Sky Investments, Inc., dba North Star Lending | Deerfield Beach | FL |
| Solidus Financial Resources LLC | Draper | UT |
| Solstice Capital Group, Inc. | Irvine | CA |
| Southern Fidelity Mortgage, LLC | Las Vegas | NV |
| Sterling Coast to Coast Financial Group, Inc. | Irvine | CA |
| Stonecreek Capital Mortgage Corporation | Glendora | CA |
| Suncap Mortgage, Inc. | Baton Rouge | LA |
| SunnyMtg.com 866-768-CASH, LLC | Fort Lauderdale | FL |
| Sycamore Funding, Inc. | Indianapolis | IN |
| The Carroll Mortgage Group, Inc. | LIttle Rock | AR |
| The Loanleaders of America, Inc. | Irvine | CA |
| The Watermark Group, Inc., dba Watermark Financial | Portland | OR |
| TMG Financial Services, Inc., dba The Mortgage Guild | Anaheim | CA |
| Trimark Funding, Inc. | Anaheim | CA |
| Unified Capital Group, dba California Mortgage Group | San Jose | CA |
| United Funding Mortgage Corp | Alpharetta | GA |
| United Security Financial | Murray | UT |
| USA Home Loans, Inc. | Towson | MD |
| Valley Wide Home Loans, Inc. | Visalia | CA |
| WCS Lending, LLC | Boca Raton | FL |
| Westside Mortgage Corporation | Grand Rapids | MI |
| WJ Capital Corp | Santa Ana | CA |

Other Contracts:

1.    Ascent Business Systems dated July 20, 2005 between Access Lending Corporation and Ascent Business Systems.

2.    Plan Services Agreement dated September 7, 2005 between Securian Financial Services, Inc. and Access Lending Corporation

3.    Lexis-Nexis Risk Management Services Order Form dated 01/26/05.

4.    Linux ISP Dedicated Connectivity Service Agreement dated 01/21/05.

5.    Keystone Consulting Group, Inc. Network Support Contract dated 03/23/04.

6.    Software License, Development and Support Agreement with SRG dated 10/1/01.

7.    Lord Securities Corporation Engagement Letter Agreement dated 07/27/01.

8.    Professional Services Agreement between Next Level Thinking and Access Warehouse Lending.

9.    Image Management Plus Agreements between Ikon Financial Services and Access Lending Corporation dated September 6, 2005 and May 24, 2005.

10.    Office Service Agreement between Executive Business Center, LLC and Access Lending Corporation dated September 22, 2006.

11.    Office Service Agreement between Executive Business Center, LLC and Access Lending Corporation dated March 16, 2006.

Schedule 3.1(i)

Purchase Price

The Purchase Price pursuant to Section 3.1(i) of this Agreement shall be as calculated as follows:

| | |
|---|---|
| FF&E (Schedule 2.1(b)) | $19,000.00, *plus* |
| Security Deposit | $57,058.44, *plus* |
| Total Purchase Price under Section 3.1(i) | $76,058.44 |

Schedule 7.5

Resigned Employees

Arnold, Anita
Clark, Gayla
Cobbin, Marilyn
Cochran-Smith, Gale
Farwell, Karen
Frazee, Eric
Fleig, David
Horton, Sandy
Jefferies, Dana
Johnson, Ruth
McDade, Pauletta
Matto, Sandy
Pham, Vivian
Rea, Michael
Saenz, Maria
Shaver, Sarah
Smith, Vencie
Stagner, Barbara
Staten, Shunda
Turk, Debra
Weeks, Kristina
Wood, Ron
Yates, Nicole
Young, Larry Scott
Zepeda, Desiree

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 DEFINITIONS | | 1 |
| ARTICLE 2 PURCHASE AND SALE OF ASSETS. | | 7 |
| 2.1 | Purchase and Sale of Assets | 7 |
| 2.2 | Excluded Assets | 8 |
| 2.3 | Assumed Liabilities | 10 |
| 2.4 | Excluded Liabilities | 11 |
| 2.5 | Set-off | 12 |
| ARTICLE 3 PURCHASE PRICE. | | 12 |
| 3.1 | Purchase Price | 12 |
| 3.2 | Payment of Purchase Price | 12 |
| 3.3 | Post Closing Sale of Pledged Loans. | 12 |
| 3.4 | Allocation of Purchase Price | 14 |
| ARTICLE 4 CLOSING. | | 14 |
| 4.1 | The Closing. | 14 |
| 4.2 | Deliveries at the Closing. | 14 |
| 4.3 | Closing Conditions | 15 |
| 4.4 | Termination | 16 |
| ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER. | | 17 |
| 5.1 | Organization; Authority; Enforceability | 17 |
| 5.2 | Independent Analysis and Investigation by Buyer. | 17 |
| 5.3 | Compliance with Document Preservation by Buyer | 18 |
| ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF SELLER. | | 18 |
| 6.1 | Organization; Authority; Enforceability | 18 |
| ARTICLE 7 POST-CLOSING AND OTHER COVENANTS. | | 18 |
| 7.1 | General | 18 |
| 7.2 | Bulk Transfer Compliance | 19 |
| 7.3 | Notices and Consents | 19 |
| 7.4 | Transition | 19 |
| 7.5 | Employees | 19 |
| 7.6 | Confidentiality. | 19 |
| 7.7 | Taxes | 20 |
| 7.8 | Access to Information | 20 |
| 7.9 | Mail | 21 |
| 7.10 | Cooperation. | 21 |
| 7.11 | Indemnification | 21 |
| ARTICLE 8 MISCELLANEOUS. | | 21 |
| 8.1 | Schedules | 21 |
| 8.2 | Entire Agreement | 22 |
| 8.3 | Successors | 22 |
| 8.4 | Assignment | 22 |
| 8.5 | Notices. | 22 |
| 8.6 | Publicity | 24 |
| 8.7 | Governing Law; Jurisdiction; Reference to U.S. Dollars | 24 |
| 8.8 | Termination of Buyer's and Seller's Representations, and Warranties | 24 |

| 8.9 | Counterparts | 24 |
| 8.10 | Amendments and Waivers | 24 |
| 8.11 | Severability | 25 |
| 8.12 | Expenses | 25 |
| 8.13 | Construction. | 25 |
| 8.14 | Waiver of Trial by Jury | 25 |