IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | Case No. 07-10416 (KJC) |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Hearing Date: 5/30/07 at 2:30 P.M. |
| | : | Objection Deadline: 5/23/07 at 4:00 P.M. |

## MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105 AND 363 AUTHORIZING THE EMPLOYMENT OF AP SERVICES, LLC AS CRISIS MANAGERS FOR THE DEBTORS *NUNC PRO TUNC* TO APRIL 2, 2007

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors" or the "Company"), by and through their undersigned counsel hereby submit this motion (the "Motion")[2] for an order under sections 105 and 363 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") authorizing the employment of AP Services, LLC ("APS") as

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Engagement Letter (defined below).

their crisis managers nunc pro tunc to April 2, 2005. The Debtors seek to employ APS[3] under

the terms of a certain engagement letter dated March 29, 2007 (the "Engagement Letter"), except

as modified by this Motion, as their crisis managers and to designate Michael G. Tinsley as Vice

President Controller. A copy of the Engagement Letter is attached hereto as Exhibit A. In

support of this Motion, the Debtors rely on the Declaration of Holly Felder Etlin In Support Of

The Motion For An Order Under 11 U.S.C. §§ 105 And 363 (A) Authorizing The Employment

Of AP Services, LLC As Crisis Managers For The Debtors *Nunc Pro Tunc* To April 2, 2007. A

copy of the Holly Felder Etlin Declaration is attached hereto as Exhibit B. In further support of

this Motion, the Debtors respectfully represent as follows:

### BACKGROUND

1.      New Century Financial Corporation, a Maryland corporation ("NCF") and

publicly owned real estate investment trust, is one of the largest specialty mortgage finance

businesses in the United States. Through its subsidiaries and its primary holding company

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and

together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases,

sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending,

or lending to individuals whose borrowing needs were generally not fulfilled by traditional

financial institutions because they did not satisfy the credit, documentation or other underwriting

standards prescribed by conventional mortgage lenders and loan buyers. In September 2005,

NCF through some of its subsidiaries also began offering conventional mortgage loans,

including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration

---

[3] APS specializes in, among other things, supplying senior executives on an interim basis to financially troubled companies.

RLF1-3133844-2
RLF1-3144191-1

("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

2.    On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

3.    On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

4.    These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin

3

calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the

Warehouse Lenders began restricting and ultimately ceased providing funding for loans

originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default

under its credit facility.

      5.     As a result of the defaults, the Warehouse Lenders have exercised

remedies under their agreements with the Debtors, including asserting control of the cash flow

from the loans they financed and in some instances exercising strict foreclosure or commencing

foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further

exacerbated the Debtors' liquidity situation.

      6.     Although the Debtors have not had sufficient resources or access to credit

to originate loans, the Debtors continue to operate their mortgage loan servicing business in

accordance with their historically high standards and comply with their obligations under their

agreements with indenture trustees and other parties to provide servicing for mortgage loans.

Because their financing for servicing advances has also been terminated, the Debtors' liquidity

has been additionally constrained by their being required to provide necessary loan servicing

advances from their own working capital.

      7.     During the weeks leading up to the Petition Date (as defined below), the

Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co.

LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital,

or a sale of their businesses to a strategic or financial investor.

      8.     The Debtors' inability to originate loans and the exercise of remedies by

the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale

of the Debtors' mortgage loan servicing business and loan origination platform, those businesses

RLF1-3133844-2
RLF1-3144191-1

will not be viable and the value will be destroyed.  Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

9.     Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

10.     On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief.  The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only.  The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## RELIEF' REQUESTED

11.     By this Motion, the Debtors seek entry of an order under Bankruptcy Code sections 105 and 363 authorizing the employment of APS as the Debtors' crisis managers under the terms contained in the Engagement Letter, except as modified by this Motion.

## BASIS FOR RELIEF

12.     The Debtors' employment of APS is necessary in these cases.  The Debtors' cases are large and extremely complex.  The Debtors need sophisticated executives who will guide them to a successful resolution of their complex chapter 11 cases, in addition to the completion of impending sales that the Debtors believe will bring substantial value to their chapter 11 estates and creditors.

13.     The Debtors prepetition explored obtaining critical management services

5

after learning of the events that resulted in the filing of these cases. The Debtors decided to hire

a crisis management firm to guide them through bankruptcy, complete the sale of the regulated

businesses, and wind-down of operations and administration of the estate. The Debtors selected

APS because of its vast experience in providing these crisis management services to financially

troubled organizations. APS has recently provided interim management services in a number of

large and mid-size bankruptcy cases, including the following: In re Refco. Inc., Case No. 05-

60006 (Bankr. S.D.N.Y. October 17, 2005), In re RCN Corp., Case No. 04-13638 (Bankr.

S.D.N.Y. July 30, 2004); In re Parmalat USA Corp., Case No 04-11139 (Bankr. S,D.N.Y.

Sept. 2, 2004); In re Acterna Corp., Case No. 03-12837 (Bankr. S.D.N.Y. July 2, 2003); In re

Worldcom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. Sept. 17, 2002); In re Kmart Corp., Case

No. 02-02474 (Bankr. N.D. Ill. May 22, 2002); and In re Exide Technologies, Case No. 02-

11125 (Bankr. D. Del. May 10, 2002).

      14.    On March 29, 2007, the Debtors and APS entered into an agreement (the

"Engagement Letter") for the retention of APS as crisis managers for the Company.

## SUMMARY OF THE TERMS OF THE ENGAGEMENT

      15.    APS will designate Michael G. Tinsley (the "Officer") as the temporary

Vice President, Controller of New Century Financial Corporation. In this capacity, the Officer

will assist the Debtors in their financial and accounting operations and other APS employees will

provide services with an objective of guiding the Debtors through a successful resolution of their

complex chapter 11 cases, completion of impending sales and managing the Debtors' related

efforts, including negotiating with interested parties and coordinating the "working group" of the

Debtors' employees and external professionals who are assisting the Debtors in these efforts.

The following list represents APS' duties in connection with its retention in these cases:

6

(a)     Provide leadership to the financial function through the role of Vice President Controller including, without limitation, assisting the Company in strengthening the core competencies in the finance organization, particularly cash management, planning, general accounting and financial reporting information management.

(b)     Assist with financing issues prior to and during the bankruptcy filing and in conjunction with the sale of assets, wind-down of operations and administration of the estate.

(c)     Assist in negotiations with stakeholders and their representatives.

(d)     Assist in preparing for and filing a bankruptcy petition, coordinating and providing administrative support for the proceeding and developing the wind-down plan and other appropriate case resolution, if necessary.

(e)     Assist in due diligence with potential acquirers of Company assets.

(f)     Assist in managing the "working group" professionals who are assisting the Company in the sale and wind-down of operations and administration process or who are working for the Company's various stakeholders to improve coordination of their effort and individual work product to be consistent with the Company's overall goals.

(g)     Work with the Company and its team to further identify and implement both short-term and long-term liquidity generating initiatives.

(h)     Assist in developing and implementing cash management strategies, tactics and processes.  Work with the Company's treasury department and other professionals and coordinate the activities of the representatives of other constituencies in the cash management process.

(i)     Assist management with the development of the Company's

RLF1-3133844-2
RLF1-3144191-1

revised business plan, and such other related forecasts as may be required by the bank lenders in connection with negotiations or by the Company for other corporate purposes.

(j)    Supervise the preparation of regular reports required by the Bankruptcy Court, including the bankruptcy schedules and statements of financial affairs or those which are customarily issued by the Company's Chief Financial Officer, management of the claim and claim reconciliation processes as well as providing assistance in such areas as testimony before the Bankruptcy Court on matters that are within APS' areas of expertise.

(k)    Assist the Company with its electronic data collection efforts and review of the data.

(l)    Assist management with the organizational and operational structure of the Company and work with the Company regarding potential changes and efficiencies.

(m)    Assist management with reviewing the Company's information systems capabilities. Make recommendations and work with the Company regarding cost savings and downsizing initiatives.

(n)    Assist with such other matters as may be requested that fall within APS' expertise and that are mutually agreeable.

16.    To address and handle the above responsibilities on behalf of the Debtors, the Officer will be accompanied by a staff of other temporary employees provided through APS at various levels, all of whom have a wide range of skills and abilities related to this type of assignment. All APS employees (referred to herein as the "Temporary Employees") will be subject to the agreements in the Engagement Letter with respect to titles, pay rates and other descriptions set forth therein except as modified by this Motion. The Temporary Employees will

8

serve at the direction of Executive Management and/or the Debtors' Board of Directors. The most recent list of Temporary Employees is set forth in Schedule A of the Engagement Letter and lists employee names, titles and rates.

17. Should additional APS employees be added to the engagement (and only upon the express approval of an independent Board of Directors), the fees charged for such other APS professionals will be based on the following hourly rates as set forth in Schedule 1 of the Engagement Letter:[4]

| | |
|---|---|
| Managing Directors | $600 - $750 |
| Directors | $440 - $575 |
| Vice Presidents | $325 - $450 |
| Associates | $260 - $315 |
| Analysts | $210 - $230 |
| Paraprofessionals | $100 - $175 |

APS will file with the Court, with copies to the U.S. Trustee and counsel for any official committee in these cases, a report of staffing after each month of services. The report shall include the name, rate and title of each additional person providing services to the Debtors. Additional staffing will be subject to review by the Court in the event an objection is filed.

18. In addition to the hourly rates set forth above, the Debtors shall reimburse APS for all reasonable out-of-pocket expenses incurred in connection with this engagement such as travel, lodging, telephone and facsimile charges.

19. Further, and in addition to the hourly rates and expenses set forth above, the Debtors have agreed to compensate APS for its efforts by the payment of a contingent success fee (the "Contingent Success Fee"). The Debtors agree that APS is eligible to earn a

---

[4] The hourly rates are in effect until December 31, 2007 and may be increased thereafter in accordance with the normal billing practices of APS.

Contingent Success Fee and that it is an integral part of APS's compensation. Due to the nature

of the engagement at this time, it is unclear precisely how to define important elements of the

Contingent Success Fee criteria. The engagement letter provides for APS and the Debtors to

develop a definition of success and agreed-upon Contingent Success Fee criteria by six weeks

following the beginning of the engagement. When the definition has been developed, APS will

give notice of same to persons on the Core Service List, including the U.S. Trustee and any

statutorily appointed committees. Pursuant to the protocol between APS and the U.S. Trustee,

approval of a Contingent Success Fee is not being sought in this Motion. Such approval will be

sought at such future date when the Contingent Success Fee has been determined.

20.     The Debtors and APS acknowledge that the payment of the Contingent

Success Fee is subject to Court approval after notice to all interested parties and based on a

reasonableness standard.

21.     The Debtors understand and acknowledge that the Contingent Success Fee

is an integral part of APS' compensation. However, APS and the Debtors acknowledge that APS

shall not be entitled to receive a Contingent Success Fee in the event the Debtors' cases are

converted from cases under chapter 11 of the Bankruptcy Code to chapter 7 of the Bankruptcy

Code or where a trustee is appointed or if the cases are dismissed for cause; unless, however, a

trustee appointed after any such conversion ratifies and/or continues the Engagement Letter, or

unless the Contingent Success Fee has been determined and earned prior to the date of

conversion or dismissal.

22.     APS, further, shall not be entitled to receive a Contingent Success Fee to

the extent APS is terminated for actions constituting gross negligence, willful misconduct, bad

faith, self-dealing or breach of fiduciary duty (if any).

RLF1-3133844-2
RLF1-3144191-1

23.     Notwithstanding anything contrary in the Engagement Letter, the Debtors agree to indemnify only those Temporary Employees serving as officers of the Debtors on the same terms as provided to the Debtors' non-APS affiliated officers and directors. The Debtors shall indemnify those Temporary Employees under applicable corporate bylaws and state law, along with insurance coverage under the Debtors' D&O policy.[5]

24.     APS will file monthly invoices with the Debtors and payment is due upon receipt. The Debtors seek authority to pay, in the ordinary course of their business, all reasonable amounts invoiced by APS for fees and expenses in accordance with the Engagement Letter.

25.     Prior to the Petition Date Debtors paid APS a retainer of $1,000,000 under the terms of the Engagement Letter.

26.     Because APS is not being employed as a professional under Bankruptcy Code section 327, it will not be submitting quarterly fee applications under Bankruptcy Code sections 330 and 331. However, approximately, forty-five (45) days after the end of each quarter, APS will file a notice of compensation earned and expenses incurred for the previous quarter with the Court and the U.S. Trustee and serve such notice on counsel for the Debtors and counsel for any official committee in these cases.

27.     In the filed notice, APS shall: (a) summarize the services provided; (b) identify the compensation earned by each executive officer and staff employee provided; and (c) itemize the expenses incurred. The notice shall provide a time period for objection. Further, the notice must detail payments of indemnity, if any. Such compensation and expenses shall be

---

[5] APS and the Debtors agree to strike Paragraph 4 of Section 7 of the General Terms and Conditions of the Engagement Letter.

RLF1-3133844-2
RLF1-3144191-1

subject to Court review in the event an objection is filed and upon the filing of a final report of

compensation by APS. The first quarterly report is due forty-five (45) days from the closing of

the first calendar quarter after the Petition Date. The first report shall cover the period to and

including the last day of the first quarter after the Petition Date. This procedure shall continue in

approximate three-month intervals.

## APPLICABLE AUTHORITY

28. Bankruptcy Code section 105(a) provides in pertinent part that "[t]he court

may issue any order, process, or, judgment that is necessary or appropriate to carry out the

provisions of this title "11 U.S.C. § 105(a).

29. Bankruptcy Code section 363(c) authorizes the Debtors to enter into

certain transactions and use property of their estates in the ordinary course of business. See 11

U.S.C. § 363(c).

30. Arguably, entering into contractual arrangements for the provision of

interim management is within the ordinary course of the Debtors' business as contemplated by

the Bankruptcy Code. Corporations routinely hire and fire senior executives. The absence of

executives capable of achieving successful sales, wind-down and administration of the estate

would severely hinder the Debtors' ability to operate in an efficient and effective manner.

31. Even if this Court finds that Bankruptcy Code section 363(c) does not

apply, the requested relief is warranted under Bankruptcy Code section 363(b). Bankruptcy

Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in

the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). This Court

and courts in other districts have authorized the retention of officers under Bankruptcy Code

section 363, including the following: In re RCN Corp., Case No. 04-13638 (Bankr. S.D.N.Y.

12

July 30, 2004); <u>In re Parmalat USA Corp.</u>, Case No. 04-11139 (Bankr. S.D.N.Y. Sept. 2, 2004);

<u>In re Mirant Corp.</u>, Case No. 03-46590 (Bankr. N.D. Tex. Sept. 29, 2003); and <u>In re Fleming</u>

<u>Cos.</u>, Case No. 03-10945 (Bankr. D. Del. June 25, 2003).

   32. The Debtors request that this Court authorize their employment of APS

and the employment and indemnification of the Officer, and the employment of any other

necessary Temporary Employees, outside the ordinary course of business. Such authorization is

appropriate if the Debtors demonstrate a sound business justification for doing so. <u>See</u> <u>Comm.</u>

<u>of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983);

<u>see</u> <u>also</u> <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. 169, 179 (D. Del. 1991).

   33. Once the Debtors articulate a valid business justification, "the business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action was taken in the

best interests of the company.'" <u>Official Comm. of Subordinated Bondholders v. Integrated</u>

<u>Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van</u>

<u>Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has vitality in chapter 11

cases and shields the Debtors' management from judicial second-guessing. <u>Id.</u>; <u>see</u> <u>also</u> <u>Comm.</u>

<u>of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville</u>

<u>Corp.)</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued

operation of a business by a debtor and a presumption of reasonableness attaches to a debtors'

management decisions.").

   34. Here, a sound business justification exists for the retention of APS as the

Debtors' crisis managers. The Debtors are in bankruptcy and facing almost insurmountable

deadlines and pressures from outside entities not impacted by the automatic stay. The chapter 11

13

cases are large and extremely complex. Further, the Debtors are facing expedited sales that they believe will benefit their estates and creditors. In all, the Debtors believe that APS' services are necessary as the Debtors need an Officer with significant financial experience and other Temporary Employees with significant restructuring experience to guide them through this process. APS has such experience. Indeed, the Officer himself has over sixteen years of such experience and other Temporary Employees also have extensive experience.

35.    The Debtors have reviewed the Engagement Letter and have determined that the terms of the Engagement Letter are within the range of those for senior executive officers employed with companies of comparable size, value and reputation. Accordingly, the Debtors believe that the decision to enter into the Engagement Letter reflects an exercise of the Debtors' sound business judgment.

36.    The Debtors firmly believe that under Bankruptcy Code section 363, the retention of APS as their crisis managers is appropriate and in the best interests of the Debtors and their estates and creditors.

37.    Numerous courts, including this Court, have authorized the retention of officers in bankruptcy cases, see supra ¶ 13, and the Debtors request authorization for their cases.

## MEMORANDUM OF LAW

38.    The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.12 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

14

RLF1-3133844-2
RLF1-3144191-1

## NOTICE

39.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' proposed post-petition senior secured lenders; (3) the 50 largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

40.     No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as Exhibit C: (a) authorizing the employment of APS by the Debtors *nunc pro tunc* to April 2, 2007, under the terms of the Engagement Letter (as modified by this Motion) and (b) granting such further relief as is just and proper.

15

Dated: April 26, 2007

Respectfully submitted,

New Century Financial Corporation, and on behalf
of New Century TRS Holdings, Inc , New Century
Mortgage Corporation, NC Capital Corporation,
Home123 Corporation, New Century Credit
Corporation, NC Asset Holding, L P , NC Residual
III Corporation, NC Residual IV Corporation, New
Century R.E.O. Corp , New Century R.E.O. II
Corp , New Century R.E.O. III Corp , New Century
Mortgage Ventures, LLC, NC Deltex, LLC,
NCoral, L P , as Debtors and Debtors in Possession

By: _____

Monika L. McCarthy
SVP & Assistant General Counsel

16