**EXHIBIT A**



March 22, 2007

Brad Morrice
President and Chief Executive Officer
New Century Financial Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612

Re: Agreement for Interim Management and Restructuring Services

Dear Brad:

This letter, together with the attached Schedule(s), Exhibit and General Terms and Conditions, sets forth the agreement ("**Agreement**") between AP Services, LLC, a Michigan limited liability company ("**APS**"), and New Century Financial Corporation (the "**Company**"), for the engagement of APS to provide certain temporary employees to the Company to assist it in its restructuring as described below.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s), Exhibit and General Terms and Conditions.

Generally, the engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of the Board of Directors of the Company and the direct supervision of its Chief Executive Officer.

---

### OBJECTIVE AND TASKS

---

Holly Etlin will be the Managing Director responsible for the overall engagement, reporting to the Company's Chief Financial Officer and Chief Executive Officer. Holly's objective will be to work collaboratively with the senior management team, the Board of Directors and other Company professionals and assist the Company in evaluating and implementing strategic and tactical options through the restructuring process. She will be assisted by Temporary Staff (as defined below) fulfilling roles which will include working with the Company and its team to do the following:

# AP Services LLC

Brad Morrice
March 22, 2007
Page 2

- Provide leadership to the financial function through the role of Vice President
  Controller including, without limitation, assisting the Company in (i) strengthening the
  core competencies in the finance organization, particularly cash management, planning,
  general accounting and financial reporting information management.

- Assist with financing issues either prior to or during any bankruptcy filing and in
  conjunction with the Plan of Reorganization or which may arise from the Company's
  financing sources outside of the United States.

- Assist in negotiations with stakeholders and their representatives.

- Assist in preparing for and filing a Bankruptcy Petition, coordinating and providing
  administrative support for the proceeding and developing the Company's Plan of
  Reorganization or other appropriate case resolution, if necessary.

- Assist in due diligence with potential acquirers of Company assets.

- Assist in managing the "working group" professionals who are assisting the Company
  in the reorganization process or who are working for the Company's various
  stakeholders to improve coordination of their effort and individual work product to be
  consistent with the Company's overall restructuring goals.

- Work with the Company and its team to further identify and implement both short-term
  and long-term liquidity generating initiatives.

- Assist in developing and implementing cash management strategies, tactics and
  processes. Work with the Company's treasury department and other professionals and
  coordinate the activities of the representatives of other constituencies in the cash
  management process.

- Assist management with the development of the Company's revised business plan, and
  such other related forecasts as may be required by the bank lenders in connection with
  negotiations or by the Company for other corporate purposes.

- Supervise the preparation of regular reports required by the Bankruptcy Court, including
  the bankruptcy schedules and statements of financial affairs or those which are
  customarily issued by the Company's Chief Financial Officer, management of the claim
  and claim reconciliation processes as well as providing assistance in such areas as

APServices LLC

Brad Morrice
March 22, 2007
Page 3

testimony before the Bankruptcy Court on matters that are within APS' areas of expertise.

- Assist the Company with its electronic data collection efforts and review of the data.

- Assist management with the organizational and operational structure of the Company and work with the Company regarding potential changes and efficiencies.

- Assist management with reviewing the Company's information systems capabilities. Make recommendations and work with the Company regarding cost savings and downsizing initiatives.

- Assist with such other matters as may be requested that fall within APS' expertise and that are mutually agreeable.

| STAFFING |
| --- |

APS will provide the Company with the individuals set forth on Exhibit A ("**Temporary Staff**"), subject to the terms and conditions of this Agreement, with the titles, pay rates and other descriptions set forth therein.

The Temporary Staff may be assisted by or replaced by other professionals at various levels, as required, who shall also become Temporary Staff. APS will keep the Company informed as to APS' staffing and will not add additional Temporary Staff to the assignment without first consulting with the Company to obtain Company's written concurrence that such additional resources are required and do not duplicate the activities of other employees or professionals.

If APS finds it desirable to augment its professional staff with independent contractors (an "**I/C**") in this case, (i) APS will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time APS is involved in providing services to the Company.

# ÅPServices LLC

Brad Morrice
March 22, 2007
Page 4

| TIMING, FEES AND RETAINER |
| --- |

APS will commence this engagement on or about March 22, 2007 (the **"Effective Date"**) after receipt of a copy of the Agreement executed by the Company accompanied by the Retainer, as set forth on Schedule 1.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.

\*   \*   \*

In the event the Company seeks protection under the U.S. Bankruptcy Code, the Company will promptly apply to the Bankruptcy Court to obtain approval of APS' retention and Retainer nunc pro tunc to the date of the filing.

The terms and conditions set out in the attached Schedule(s), Exhibit and the General Terms and Conditions form part of the Agreement and are incorporated by reference herein.

If these terms meet with your approval, please sign and return the enclosed copy of the Agreement and wire transfer the amount to establish the Retainer

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

Holly Felder Etlin
Managing Director

Acknowledged and Agreed to:

NEW CENTURY FINANCIAL CORPORATION

By:

Its:         Chief Executive Officer

Dated:       March 29, 2007

**AP Services, LLC**
**Employment by New Century Financial Corporation**

**Exhibit A**

**Temporary Staff**
**Individuals With Executive Officer Positions**

| Name | Description | Hourly Rate | Commitment Full[1] or Part Time |
|------|-------------|-------------|---------------------------------|
| TBD | Vice President Controller | $600-750 | Full |

**Additional Temporary Staff**

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|------|-------------|-------------|------------------------------------|
| Holly Felder Etlin | Engagement leader | $695 | Full |
| Todd Brents | Director – Reporting and Claims | $625 | Full |
| Dan Puscas | Manager – Cost Initiatives | $525 | Full |
| Jamie Lisac | Manager – Cash Management | $525 | Full |
| Stacey Hightower | Manager - Restructuring | $475 | Full |
| Mike Laureno | Manager – Cash Management | $400 | Full |
| Clayton Gring | Manager – Reporting and Claims | $350 | Full |

The parties agree that Exhibit A can be amended by APS from time to time to add or delete staff, and the Monthly Staffing Reports shall be treated by the parties as such amendments; provided, however, that the addition of staff shall be subject to the requirements set forth in the letter, including, without limitation, Company's prior written approval.

---

[1] Full time is defined as substantially full time.

[2] Part time is defined as approximately 2-3 days per week, with some weeks more or less depending on the needs and issues facing the Company at that time.

## SCHEDULE 1

### FEES AND EXPENSES

1.  **Fees:** Except with respect to the Temporary Staff identified in Exhibit A, APS' fees will be based on the hours worked by APS personnel at APS' hourly rates, which are:

| | |
|---|---|
| Managing Directors | $600-750 |
| Directors | $440-575 |
| Vice Presidents | $325-450 |
| Associates | $260-315 |
| Analysts | $210-230 |
| Paraprofessionals | $100-175 |

    APS reviews and revises its billing rates on January 1 of each year and will provide Company with at least thirty (30) days prior written notice of any such changes.

2.  **Success Fee:** In addition to hourly fees, APS will be compensated for its efforts by the payment of a Success Fee. The Company understands and acknowledges that the Success Fee is an integral part of APS' compensation for the engagement.

    The Success Fee shall be computed as follows:

    Because of the nature of this engagement, it is unclear at this time precisely how to define important elements of the Success Fee criteria. Therefore, commencing promptly following the beginning of the engagement, the Company and APS will make a reasonable effort to determine a Success Fee based upon the value that APS is able to provide to the Company. APS and the Company mutually agree to develop a definition of success and agreed-upon Success Fee criteria by six weeks following the beginning of the engagement. Should agreement not be reached by that date due to Company's failure to negotiate in good faith, APS reserves the right to terminate the Agreement upon providing Company with at least thirty (30) days prior written notice.

3.  **Expenses:** In addition to the fees set forth herein, the Company shall pay directly, or reimburse APS within thirty (30) days after receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and postage that have been previously authorized by Company. Company's reimbursement of APS' travel expenses shall be limited to the actual cost of air travel (not to exceed the coach rate), the actual cost of ground transportation (by taxi, reasonable car service, public transportation, or standard size or smaller rental car), and food and lodging (not to exceed $300.00 per person per day). All requests by APS for reimbursement of expenses shall be in writing, and

accompanied by a detailed summary of the charges (receipts to be provided upon written request only) for all items costing in excess of twenty-five U.S. Dollars ($25.00). APS shall be fully responsible for any and all costs for travel, food, lodging and expenses by APS' personnel or agents which are in excess of the levels set forth herein, or which are not accompanied by receipts where required, as well as those costs which have been incurred without Company's prior approval.

4. **Break Fee:** If the Agreement is terminated (a) by the Company prior to (i) either June 30, 2007 or (ii) APS having received in full from the Company the payment of Fees of at least $1,000,000, other than as a result of a material breach by APS, or (b) by APS as a result of a material breach by the Company or any other event of cause, the Company shall pay APS a Break Fee equal to the lesser of (a) the difference between $1,000,000 and the Fees paid through the date of termination, and (b) $500,000.

5. **Retainer:** The Company shall pay APS a retainer of $1,000,000 to be applied against Fees and Expenses as set forth in this Schedule and in accordance with Section 2 of the attached General Terms and Conditions.

## SCHEDULE 2

### DISCLOSURES

APS has caused to be submitted for review, by its conflicts check system, the names of significant parties in interest in this case. APS completed a search of its client database for the past five years to determine whether it has had or has any relationships with the following entities:

a)    The Company and its affiliates;

b)    The Company's current directors and officers and certain of their most significant business affiliations, as provided to APS by the Company;

c)    The Company's largest unsecured creditors, as identified in the lists prepared for the Company's Chapter 11 petitions;

d)    The Company's pre- and post-petition lenders; and,

c)    Various other potential parties in interest, as identified by the Company.

Based on this search, APS knows of no fact or situation that would represent a conflict of interest for APS with regard to the Company. However, APS wishes to disclose the following:

- Pursuant to the Recapitalization Agreement, dated as of August 3, 2006, among AlixPartners Holdings, Inc., AlixPartners, LLC, Jay Alix individually, H&F Astro LLC and those other persons that may become bound thereto, three private equity funds (collectively, "HFCP V") sponsored by Hellman & Friedman, LLC ("H&F LLC") acquired, indirectly through H&F Astro LLC, a controlling stake in AlixPartners, LLC as of October 12, 2006. Hellman & Friedman Investors V, LLC and H&F LLC (collectively, "H&F") control HFCP V.    No material nonpublic information about Debtors has been furnished by AlixPartners to H&F. In conjunction with this transaction AlixPartners, LLC was converted to AlixPartners, LLP, a Delaware limited liability partnership ("AlixPartners"). AlixPartners' conflict checking system has searched the parties to the Recapitalization Agreement against the lists of creditors, shareholders, and other parties in interest in this case that is maintained for purposes of conflict checks, and AlixPartners has determined that there are no disclosures otherwise than as noted herein.

- Two unsecured creditors of the Debtors are current confidential AlixPartners clients in matters unrelated to the Debtors.

- Access Investments is a secured creditor and a debtor party.    Access Investments is an affiliate of Dana Corporation, a current AP Services, LLC ("APS") client in matters unrelated to the Debtors. APS is an affiliate of AlixPartners.

- Accenture, a creditor of the Debtors, was the previous employer of current AlixPartners employees and was creditor of a former AlixPartners and/or APS client in matters unrelated to the Debtors.

- Ameritech, a creditor of the Debtors, was a creditor, lender, vendor to former AlixPartners and/or APS clients in matters unrelated to the Debtors. In addition, Ameritech was a member of a creditor's committee that retained AlixPartners in matters unrelated to the Debtors.

- Aon Corporation, a creditor of the Debtors, is affiliated with entities that are limited partners of a current APS client, clients of AlixPartners in litigated matters unrelated to the Debtors, as well as insurance providers to several current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- AT&T Corp., a creditor of the Debtors, was a creditor, lender and shareholder to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. In addition, an affiliate of AT&T was a former APS client in matters unrelated to the Debtors.

- Bank of New York, a creditor of the Debtors, is a lender, bondholder, creditor and indenture trustee to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. In addition, Bank of New York previously employed a current AlixPartners employee.

- Barclays Bank, a creditor of the Debtors, and affiliated entities, are creditors, significant shareholders, adverse parties, lenders and bondholders of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- The CIT Group and affiliates, creditors of the Debtors, have been lenders, creditors, executory contract counterparties and lessors to former and current AlixPartners and/or APS clients in matters unrelated to the Debtors. In addition, a current AlixPartners employee was previously employed by The CIT Group.

- Citigroup, a creditor of the Debtors, and affiliated entities, are creditors, lenders, bondholders, shareholders, adverse parties, professionals and lessors to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. In addition, an affiliate of Citigroup is a related party to a current AlixPartners client in matters unrelated to the Debtors.

- Cooley Godward, a professional of the Debtors, was opposing counsel and creditor of former AlixPartners clients in matters unrelated to the Debtors. In addition, Cooley Godward was a related party to a former AlixPartners client in matters unrelated to the Debtors.

- Credit Suisse First Boston ("CSFB"), a creditor of the Debtors, is a current and former client of AlixPartners in matters unrelated to the Debtors. Other CSFB affiliated entities are lenders, creditors, bondholders, shareholders, limited partners and professionals of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. CSFB was the previous employer of a current AlixPartners employee.

- Deutsche Bank, a creditor of the Debtors, is affiliated with entities that are shareholders, lenders, adverse parties, indenture trustees, creditors, limited partners and professionals of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Fannie Mae, a creditor of the Debtors, is a related party to a current AlixPartners client in matters unrelated to the Debtors.

- Fidelity National Credit Services, a creditor of the Debtors, and affiliated entities are vendors to AlixPartners. In addition, Fidelity and affiliated entities are also lenders, lessors, adverse parties, director affiliated companies, executory contract counterparties, customers, lessees, bondholders and shareholders of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Grant Thornton, a creditor of the Debtors, is an adverse party and professional of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. Grant Thornton was a previous employer of current AlixPartners employees.

- General Electric and affiliated entities, creditors of the Debtors, are members of a bank group for which AlixPartners performed services, as well as creditors, customers, lenders, lessors and bondholders of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- GMAC Commercial Financial, a creditor of the Debtors, and affiliated entities are creditors, adverse parties, shareholders, customers and lenders to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. General Motors is also a current and former client of AlixPartners in maters unrelated to the Debtors. General Motors was the previous employer of a current AlixPartners employee.

- Goldman Sachs, a creditor of the Debtors, is a former client of AlixPartners as well as a lender, litigant, bondholder and shareholder of current and former AlixPartners and/or APS affiliated entities in matters unrelated to the Debtors. Additionally, Goldman Sachs previously employed several AlixPartners employees.

- Heller Ehrman, a professional of the Debtors, was counsel to former AlixPartners clients in matters unrelated to the Debtors. Heller Ehrman is opposing counsel to a current AlixPartners client in matters unrelated to the Debtors.

- HSBC Bank, a creditor of the Debtors, is a lender, creditor, trustee and related party to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. Additionally, HSBC was a former client of AlixPartners in matters unrelated to the Debtors.

- IOS Capital, a creditor of the Debtors, was a member of a bank group that retained AlixPartners, as well as a creditor of a former AlixPartners client in matters unrelated to the Debtors.

- KPMG, a creditor of the Debtors, is a current client of AlixPartners as well as a professional, adverse party and creditor of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. Additionally, KPMG previously employed several current AlixPartners employees.

- Lazard Freres, a professional of the Debtors, was a creditor, professional and member of a creditor's committee of former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Lehman Brothers, a creditor of the Debtors, was a member of bank group for which AlixPartners performed services in matters unrelated to the Debtors, a client related party, as well as bondholders, shareholders and lenders to current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. Lehman Brothers previously employed a current AlixPartners employee. Lehman Brothers was the investment banker that represented AlixPartners, and affiliated entities, in the Recapitalization Agreement described herein.

- Morgan Stanley, a creditor and shareholder of the Debtors, is a lender, bondholder, creditor, shareholder and professional of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. Morgan Stanley previously employed a current AlixPartners employee.

- O'Melveny & Myers, a professional of the Debtors, was a creditor, professional and member of a creditor's committee of former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- PricewaterhouseCoopers ("PWC"), a creditor of the Debtors, is a professional of current and former AlixPartners clients in matters unrelated to the Debtors. PWC previously employed several current AlixPartners employees. PWC is the auditor for AlixPartners and will provide audit, tax and other consulting services. PWC was opposing professional and creditor of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Richards Layton & Finger, a professional of the Debtors, was counsel to former AlixPartners clients in matters unrelated to the Debtors and was counsel to AlixPartners in matters unrelated to the Debtors. Richards Layton is also a professional of a current AlixPartners client in matters unrelated to the Debtors.

- Ropes & Gray, a creditor of the Debtors, is counsel to former and current AlixPartners clients in matters unrelated to the Debtors. Ropes & Gray is opposing counsel of a current AlixPartners client in matters unrelated to the Debtors.

- Sprint, a creditor of the Debtors, is a creditor, vendor and an executory contract counterparty of current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Sterling Bank, a creditor of the Debtors, was a former client of AlixPartners in matters unrelated to the Debtors. Sterling Bank was a creditor of a former AlixPartners and/or APS client in matters unrelated to the Debtors.

- Sullivan & Cromwell, a professional of the Debtors, was a professional of former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Union Bank Switzerland ("UBS"), a creditor of the Debtors, and affiliated entities are creditors, customers, director affiliated companies, lenders, lessors and bondholders of

current and former AlixPartners and/or APS clients in matters unrelated to the Debtors. A current AlixPartners employee was previously employed by UBS.

- U.S. Bancorp, a creditor of the Debtors, is a related party to a current AlixPartners client in matters unrelated to the Debtors.

- Verizon, a creditor of the Debtors, is a current client of AlixPartners in a litigated matter unrelated to the Debtors. Other Verizon affiliated entities are creditors, executory contract counterparties and vendors to several current and former AlixPartners and/or APS clients in matters unrelated to the Debtors.

- Xroads, a professional of the Debtors, was the previous employer of current AlixPartners employees.

This Schedule 2 may be updated by APS from time to time to disclose additional connections or relationships between APS and the interested parties.

---

# AP SERVICES, LLC
## GENERAL TERMS AND CONDITIONS

---

These General Terms and Conditions ("**Terms**") are incorporated into the letter agreement ("**Agreement**") between the Company and APS to which these Terms are attached

### Section 1. Company Responsibilities

The Company will undertake responsibilities as set forth below:

1    Provide reliable and accurate detailed information, materials, documentation and

2    Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement

APS' delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management, in accordance with the time frames mutually agreed to by the parties  The Company shall be responsible for any delays, additional costs or other deficiencies caused by not completing its responsibilities within the agreed upon time frames

### Section 2. Retainer, Billing and Payments

**Retainer and Billing.**  APS will submit semi-monthly invoices for services rendered and expenses incurred and will offset such invoices against the Retainer  Payment will be due within ten (10) days after receipt of the invoices to replenish the Retainer to the agreed-upon amount  Any unearned portion of the Retainer will be returned to the Company within ten (10) days after the termination of the engagement

**Payments.**  All payments to be made by the Company to APS shall be payable upon receipt of invoice via wire transfer to APS' bank account, as follows:

|  |  |
|---|---|
| Receiving Bank: | Comerica Bank |
|  | ABA #072000096 |
| Receiving Account: | AP Services, LLC |
|  | A/C #1851-765410 |

### Section 3. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by the Agreement  As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business  Of course, neither the Temporary Staff nor APS will be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits  APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business

APS will not assign, or retain on assignment, any person to provide Services for Company that APS knows or has reason to believe has a criminal background  Each person who provides Services for Company must have successfully passed a criminal background check  If any person who will be providing Services for Company has not successfully passed a criminal background check while employed or engaged by APS prior to the Effective Date, APS will (at APS' expense) conduct and complete a criminal background check of such person  APS should complete each such check prior to the person commencing any Services and shall, in any event, ensure that each check is completed no later than 5 days after the person has commenced providing any Services  If any such person does not successfully pass such check, APS will promptly replace such person with a person of equivalent skill, training, and experience

The Company shall not solicit, recruit or hire any employees or agents of APS for a period of two years subsequent to the expiration or termination of the Agreement

### Section 4. Confidentiality

APS shall keep confidential all non-public confidential or proprietary information obtained from the Company during the performance of its services hereunder (the "**Information**"), and neither APS nor the Temporary Staff will disclose any Information to any other person or entity   "Information" includes non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of the Company, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS or the Temporary Staff from disclosure pursuant to a valid subpoena or court order, but neither APS nor the Temporary Staff shall encourage, suggest, invite or request, or assist in securing, any such subpoena or court order; and the Temporary Staff shall promptly give notice of any such subpoena or court order by fax transmission to the Company  APS and the Temporary Staff may make reasonable disclosures of Information to third parties in connection with the performance of APS' obligations and assignments hereunder  In addition, APS will have the right to disclose to others in the normal course of business its involvement with the Company

The Company acknowledges that all information (written or oral), including advice and Work Product (as defined in **Section 5**), generated by APS and the Temporary Staff in connection with this engagement is intended solely for the benefit and use of the Company (limited to its management and its Board of Directors) in connection with the transactions to which it relates  The Company agrees that no such information shall be used for any other purpose or reproduced, disseminated, quoted or referred to with attribution to APS at any time in any manner or for any purpose without APS' prior approval except as required by law

### Section 5. Intellectual Property

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, writings and other intellectual property that APS has created, acquired or developed prior to the Effective Date of this Agreement are, and shall remain, the sole and exclusive property of APS, and the Company shall not acquire any interest therein  APS shall be free to use all methodologies, processes, techniques,

# AP SERVICES, LLC
## GENERAL TERMS AND CONDITIONS

ideas, concepts. know-how, procedures, software, tools, writings and other intellectual property that APS may create or develop in connection with this engagement, subject to its duty of confidentiality and except to the extent that the same contain information or materials furnished to APS by the Company that constitute Information referred to in Section 4 above. Except as provided above, all information, reports, materials, software and other work product that APS creates or develops specifically for the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Information referred to in <u>Section 4</u> above. APS may retain copies of the Work Product subject to its obligations under <u>Section 4</u> above.

### Section 6. Framework of the Engagement

The Company acknowledges that it is retaining APS to provide the Temporary Staff solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

### Section 7. Indemnification and Other Matters

The Company shall indemnify, hold harmless and defend APS and its affiliates and its and their directors, officers, employees, Temporary Staff and agents (collectively, the "indemnitees") from and against all claims, liabilities, losses, expenses and damages to the extent of the most favorable indemnities provided by the Company to any of its directors or officers, provided, however, that to the extent any matter for which indemnification is called for hereunder arises while the Company is under the protection of the Bankruptcy Code, indemnification of APS personnel who are not directors or officers of the Company shall be subject to the approval of the Board of Directors of the Company. The Company shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel and the costs of APS' professional time (APS' professional time will be reimbursed at APS' rates in effect when such future time is required), relating to or arising out of the engagement, including any legal proceeding in which an indemnitee may be required or agree to participate but in which it is not a party. The indemnitees may, but are not required to, engage a single firm of separate counsel of their choice in connection with any of the matters to which this indemnification agreement relates.

The Company shall use its best efforts to specifically include and cover, as a benefit for their protection, Temporary Staff serving as directors or officers of the Company or affiliates from time to time with direct coverage as named insureds under the Company's policy for directors' and officers' ("D&O") insurance. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include Temporary Staff under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., such policy is not reserved based on actions that have been or are expected to be filed against officers and directors alleging prior acts that may give rise to a claim). APS may, at its option, attempt to purchase a separate D&O policy that will cover the Temporary Staff only. The cost of same shall be invoiced to the Company as an out-of-pocket cash expense. If APS is unable to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

APS is not responsible for any third-party products or services. The Company's sole and exclusive rights and remedies with respect to any third party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring the third-party product or service.

APS shall not be liable to the Company except for actual damages resulting from bad faith, self-dealing or intentional misconduct.

Notwithstanding anything contained herein to the contrary, APS shall indemnify, defend, and hold harmless Company (and its directors, officers, and employees) from and against any and all liabilities, losses, costs, expenses (including, without limitation, attorneys' fees), damages, claims, suits, and/or demands, directly or indirectly arising out of, or resulting from, (i) the injury to or death of any person or damage to property caused by or resulting from the negligence or willful misconduct of APS or any of its employees, agents or contractors, (ii) any actual or alleged infringement, misappropriation, or other violation of any proprietary rights or other third party rights or any laws or regulations by APS' performance of the Services, and/or (iii) APS' breach of its confidentiality obligations under <u>Section 4</u> above.

### Section 8. Governing Law

The Agreement is governed by and shall be construed in accordance with the laws of the State of Michigan with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in Southfield, Michigan under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. However, in the event the Company is under the protection of the Bankruptcy Code, the arbitration provisions shall apply only to the extent that the Bankruptcy Court, or the U.S. District Court if the reference is withdrawn, does not retain jurisdiction over a controversy or claim.

### Section 9. Termination and Survival

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any fees and expenses due under the provisions of the Agreement, including Success Fee and Break Fee in accordance with <u>Schedule 1</u>. Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company for Cause (as defined below) or due to circumstances described in the Success Fee provision in the

# AP SERVICES, LLC
## GENERAL TERMS AND CONDITIONS

Agreement. APS shall remain entitled to the Success Fee(s) that otherwise would be payable for the greater of 12 months from the date of termination or the period of time that that has elapsed from the date of the Agreement to the date of termination. Cause shall mean:

(a)   a Temporary Staff member acting on behalf of the Company is convicted of a felony, or

(b)   it is determined in good faith by the Board of Directors of the Company after 30 days notice and opportunity to cure, that either (i) a Temporary Staff member is engaging in misconduct injurious to the Company, or (ii) a Temporary Staff member is breaching any of his or her material obligations under this Agreement, or (iii) a Temporary Staff member is willfully disobeying a lawful direction of the Board of Directors or senior management of the Company

Sections 2, 4. 5, 7, 8, 9 and 10 of these Terms, the provisions of Schedule 2 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement

### Section 10. General

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible

**Entire Agreement.** These Terms, the letter agreement into which they are incorporated and the Schedule(s) and Exhibit to such letter agreement contain the entire understanding of the parties relating to the services to be rendered by APS and the Temporary Staff and may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties. If there is a conflict between these Terms and the balance of the Agreement, these Terms shall govern

**Joint and Several.** If more than one company signs this Agreement, the liability of each company shall be joint and several.

**Notices.** All notices required or permitted to be delivered under this Agreement shall be sent, if to APS, to:

> AP Services, LLC
> 2000 Town Center, Suite 2400
> Southfield, MI 48075
>
> Attention: Mr Melvin R Christiansen

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to the other party. All notices under the Agreement shall be sufficient if delivered by facsimile or overnight mail. Any notice shall be deemed to be given only upon actual receipt

**Miscellaneous.** APS shall not assign, transfer or subcontract any right in or obligation arising under this Agreement without Company's prior express written consent (which consent may be withheld or delayed in Company's sole discretion). Any assignment in violation of this paragraph shall be void. This Agreement shall be binding on and inure to the benefit of each party's heirs, executors, legal representatives, successors and permitted assigns. APS shall (a) prepare and maintain reasonably detailed records to verify its compliance with its obligations hereunder and substantiate the fees and expenses due hereunder, (b) ensure that such records are retained for at least three (3) years after expiration or termination of this Agreement, and (c) make such records available for inspection and copying during APS's normal business hours by Company and its agents and representatives promptly upon notice by Company. Company is an equal opportunity employer. Time is of the essence with respect to APS' performance of the Services. No rule of strict construction will be applied in the interpretation or construction of this Agreement. This Agreement may be executed (a) in counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument, and (b) by facsimile signature and facsimile signatures shall be fully binding and effective for all purposes and shall be given the same effect as original signatures