**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **NEW CENTURY TRS HOLDINGS, INC.,** | **Case No. 07-10416 (KJC)** |
| **a Delaware corporation, <u>et al.</u>,** | **Jointly Administered** |
| **Debtors.** | |

**STIPULATION AND ORDER (1) APPROVING AGREEMENT
FOR THE DISPOSITION OF CERTAIN MORTGAGE LOANS
AND RESIDUAL INTERESTS, AND (2) CONFIRMING, <u>INTER
ALIA,</u> (A) THAT AUCTIONS OF MORTGAGE LOANS AND
RESIDUALS CONDUCTED IN ACCORDANCE WITH
AUCTION PROCEDURES THEREIN ARE COVERED BY
BANKRUPTCY CODE "SAFE HARBOR" PROVISIONS AND
ARE COMMERCIALLY REASONABLE, AND (B) ABSENCE
OF NEED TO SEEK RELIEF FROM AUTOMATIC STAY**

This stipulation and order (the "<u>Stipulation and Order</u>") is entered into by and among (a) New Century TRS Holdings, Inc., and its affiliated debtors and debtors in possession in the above-captioned jointly administered cases (collectively the "<u>Debtors</u>"), (b) Morgan Stanley Mortgage Capital Inc. ("<u>MSMCI</u>"), as Buyer and as Agent for Morgan Stanley REIT II Inc., and each of their respective affiliates, and as Purchaser under the Loan Purchase Agreement (as so defined), and (c) the Official Committee of Unsecured Creditors of the Debtors (the "Committee"; the Committee collectively with MSMCI and the Debtors, the "<u>Parties</u>").

## <u>RECITALS</u>

**WHEREAS,** on April 2, 2007, each of Debtors filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>").

**WHEREAS**, on April 9, 2007, the Committee was appointed in the Debtors' bankruptcy cases.

**WHEREAS**, MSMCI is party to (a) a Master Repurchase Agreement, dated as of December 12, 2005 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "<u>MRA</u>"), by and among (i) NC Capital Corporation ("<u>NC Capital</u>"), New Century Mortgage Corporation, NC Asset Holding, L.P., NC Residual III Corporation, NC Residual IV Corporation, Home123 Corporation, New Century Credit Corporation (the "<u>Sellers</u>"), each of which is a Debtor, (ii) the buyers from time to time parties thereto (the "<u>Buyers</u>"), including MSMCI, and (iii) MSMCI, as agent for the Buyers (the "<u>Agent</u>"); and (b) a related Guaranty, dated December 12, 2005 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "<u>Guaranty</u>") made by debtor New Century Financial Corporation (the "<u>Guarantor</u>" and, collectively with the Sellers, the "<u>NCFC Entities</u>") in favor of the Buyers.

**WHEREAS**, MSMCI and NC Capital are parties to that certain Sixth Amended and Restated Mortgage Loan Purchase and Warranties Agreement (the "<u>Loan Purchase Agreement</u>") dated as of May 1, 2006, pursuant to which MSMCI agreed to purchase from NC Capital, and NC Capital agreed to sell to MSMCI, certain mortgage loans, subject to an obligation (the "<u>EPD Obligation</u>") on the part of NC Capital, at MSMCI's option, to repurchase any such mortgage loan as to which the related mortgagor is delinquent with respect to such mortgage loan's first monthly payment, either (a) after origination of such mortgage loan or (b) after the related closing date for such purchase and sale.

**WHEREAS**, on March 9, 2007, the Agent sent to the NCFC Entities a written "Notice of Event of Default, Acceleration and Exercise of Remedies" in which the Agent, among

other things, stated that (a) Events of Default had occurred and were continuing under the MRA

and (b) the Purchase Price of all then-outstanding Transactions (each as defined in the MRA)

was immediately due and payable, together with other specified amounts.

**WHEREAS**, MSMCI, the NCFC Entities, and the Committee have agreed,

subject to entry of this Stipulation and Order on the docket as "so ordered" by the Bankruptcy

Court, to enter into an Agreement for the Disposition of Certain Mortgage Loans and Residual

Interests in the form attached hereto as Exhibit 1 (the "Agreement"), in order to set forth, among

other things, their mutual understandings and agreements with respect to auction procedures for

the Mortgage Loans and the Residuals (each as defined in the Agreement), the proceeds of which

will be used, inter alia, to pay the MS Estimated Claim (as defined below), subject to the

reservation of rights set forth below.

**NOW, THEREFORE**, IT IS STIPULATED AND AGREED, BY AND

AMONG THE PARTIES, SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT,

THAT:

1.    Agreement.  Upon entry of this Stipulation and Order on the docket as "so

ordered" by the Bankruptcy Court, (a) the terms and conditions of the Agreement shall be

deemed approved in their entirety by the Bankruptcy Court, and the Parties to be party thereto

shall be permitted to (and shall) enter into the Agreement, (b) the Auctions (as defined in the

Agreement) provided for in the Agreement shall be deemed to be covered by the Bankruptcy

Code's "safe harbor" provisions for "repurchase agreements" (as defined in section 101 of the

Bankruptcy Code) and/or "securities contracts" (as defined in section 741 of the Bankruptcy

Code), (c) MSMCI need not seek relief from the automatic stay provided in section 362 of the

Bankruptcy Code to conduct such Auctions in accordance with the Auction Procedures (as

defined in the Agreement) set forth in the Agreement, (d) each Auction that is conducted in

accordance with the Auction Procedures shall be deemed to have been conducted in a

commercially reasonable manner, (e) MSMCI shall be permitted to assert claims for deficiencies

(if any) in the payment of the MS Estimated Claim irrespective of which Qualifying Bidder (as

defined in the Agreement) wins any Auction, (f) subject to the reservation of rights set forth in

clause (g) below, MSMCI may retain all proceeds of each Auction (regardless of whether the

other Auction occurs) up to the maximum amount asserted by MSMCI under the MRA

(including but not limited to all paid-in-full and principal and interest claims, default interest,

costs of transfer of servicing, costs of foreclosure (including repo acceleration and expenses

relating to the Auction process), due diligence costs in addition to the due diligence costs

described in Section 3.2(b)(x) of the Agreement, hedging break costs, and legal expenses) and

the maximum amount of all EPD Obligations asserted by MSMCI under the Loan Purchase

Agreement[1] (collectively as of any applicable date, the "MS Estimated Claim"), and (g) the

Parties reserve all rights and defenses with respect to the amount and validity of MSMCI's

claims and those of its subsidiaries and affiliates against the Debtors (including, without

limitation, the MS Estimated Claim), other than with respect to the Parties' above-described

stipulations as to the commercial reasonableness of the Auctions, and as to the Auctions not

violating the automatic stay of section 362 of the Bankruptcy Code and as to the Auctions

provided for in this Agreement being covered by the Bankruptcy Code's "safe harbor"

provisions for "repurchase agreements" (as defined in section 101 of the Bankruptcy Code)

and/or "securities contracts" (as defined in section 741 of the Bankruptcy Code).

---

[1] It being understood that MSMCI will provide a good faith estimate of the maximum amount of the EPD Obligations under the Loan Purchase Agreement within one month after the last settlement date provided by the Agreement.

2.    <u>Clarification of April 19, 2007 Order.</u>  For the avoidance of doubt, the auction process and procedures for the Residuals and the Mortgage Loans shall not be governed by the Bankruptcy Court's April 19, 2007 Bidding Procedures Order for the Loan-Servicing Business, but shall instead be exclusively governed by the terms of this Stipulation and Order and the Agreement.

3.    <u>Binding Nature.</u>  Upon entry of this Stipulation and Order on the docket as "so ordered" by the Bankruptcy Court by the Approval Deadline (as defined below), (a) this Stipulation and Order and the Agreement shall (i) inure to the benefit of, and (ii) be binding upon, and enforceable by and against, the Parties and their respective affiliates, successors and permitted assigns, and (b) this Stipulation and Order and the Agreement shall be binding upon, and enforceable against, all parties in interest, including, without limitation, any trustee or examiner appointed in the Debtors' bankruptcy cases and all parties bidding for (or submitting letters of interest in respect of) the Mortgage Loans and/or Residuals.

4.    <u>Bankruptcy Court Approval.</u>  This Stipulation and Order and Agreement are expressly subject to and contingent upon their approval by the Bankruptcy Court.  The Debtors will seek to obtain Bankruptcy Court approval of this Stipulation and Order at the omnibus hearing set for April 24, 2007 and will continue to seek to obtain such approval as soon as practicable thereafter, if not approved at such hearing.  If this Stipulation and Order and the Agreement, or any portion hereof or thereof, is not approved by the Bankruptcy Court on or before the Approval Deadline, this Stipulation and Order and the Agreement shall be of no further force and effect, and, in such event, neither this Stipulation and Order nor the Agreement nor any negotiations and writings in connection with this Stipulation and Order or the Agreement shall in any way be construed as or deemed to be evidence of or an admission on behalf of any

- 5 -

Party hereto or any subsidiary or affiliate of MSMCI regarding any claim or right that such

Party, subsidiary or affiliate may have against any other Party hereto or any such subsidiary or

affiliate. For purposes herein, "Approval Deadline" shall mean April 26, 2007 or as soon as

possible thereafter, but in no case later than the close of business of April 27, 2007.

       5.    <u>Non-Severability</u>. The provisions of this Stipulation and Order are

mutually interdependent, indivisible and non-severable.

       6.    <u>Entire Agreement</u>. This Stipulation and Order and the Agreement

constitute the entire agreement between the Parties hereto with respect to the subject matter

hereof and thereof and supersede all prior agreements and understandings, written and oral,

between the Parties with respect to the specific subject matter hereof and thereof. This

Stipulation and Order may not be modified or amended except by a writing signed by all of the

Parties. All representations, warranties, promises, inducements or statements of intention made

by the Parties hereto are embodied in this Stipulation and Order and the Agreement, and no Party

hereto shall be bound by, or liable for, any alleged representation, warranty, inducement or

statement of intention that is not expressly embodied herein or therein. The Parties represent and

warrant that this Stipulation and Order and the Agreement disclose all of the terms of the Parties'

agreement with respect to the subject matter hereof. To the extent there is a conflict between the

terms of this Stipulation and Order and the Agreement, the terms of the Agreement shall control.

The terms and conditions of the Agreement shall be deemed to be incorporated into the

Stipulation and Order as if they have been fully set forth herein in the first instance.

       7.    <u>Effective Date</u>. This Stipulation and Order may be executed in one or

more counterparts and by facsimile, all of which shall be considered one and the same

agreement, and shall become effective when one or more such counterparts have been signed by

each of the Parties and delivered to all Parties, and the Bankruptcy Court has "so ordered" this
Stipulation and Order and entered it on the docket of the Bankruptcy Court.

8.      Authority.  The Parties hereto represent and warrant to each other that: (a)
the signatories to this Stipulation and Order are authorized to execute this Stipulation and Order;
(b) each has full power and authority to enter into this Stipulation and Order; and (c) this
Stipulation and Order is duly executed and delivered, and constitutes a valid and binding
agreement in accordance with its terms.

9.      Governing Law.  This Stipulation and Order shall be governed by, and
construed in accordance with, the Bankruptcy Code and the laws of the State of New York,
without regard to any principles of choice of law thereof which would require the application of
the law of any other jurisdiction.

10.     Retention of Jurisdiction.  The Bankruptcy Court shall retain exclusive
jurisdiction to interpret, implement and enforce the provisions of this Stipulation and Order, and
the Parties hereby consent to exclusive jurisdiction of the Bankruptcy Court with respect thereto.
The Parties waive arguments of lack of personal jurisdiction or forum non-conveniens with
respect to the Bankruptcy Court pertaining to this Stipulation and Order.

11.     No Waiver.  No waiver or indulgence of any breach or series of breaches
of this Stipulation and Order shall be deemed a waiver of any other breach of this Stipulation and
Order, including, without limitation, a subsequent breach of the same provision of this
Stipulation and Order, or any of its other provisions; or shall otherwise affect the enforceability
of any provision of this Stipulation and Order.

12.    Headings.  The descriptive headings of the several sections of this
Stipulation and Order are inserted for convenience of reference only and do not constitute a part
of this Stipulation and Order.

13.    Effectiveness.  This Stipulation and Order shall be effective and
enforceable immediately upon entry on the docket after approval by the Bankruptcy Court, with
no stay of any kind (including, to the extent applicable, Bankruptcy Rule 6004(g)).

Dated: Wilmington, Delaware
       April 27, 2007

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                        Robert J. Dehney (No. 3578)
                                        Gregory W. Werkheiser (No. 3553)
                                        1201 North Market Street
                                        P.O. Box 1347
                                        Wilmington, DE  19899-1347
                                        Telephone:  (302) 658-9200
                                        Facsimile:   (302) 658-3989

                                        And

                                        Luc A. Despins
                                        Wilbur F. Foster, Jr.
                                        MILBANK, TWEED, HADLEY & MCCLOY
                                        LLP
                                        One Chase Manhattan Plaza
                                        New York, New York 10005
                                        Telephone:  (212) 530-5000
                                        Facsimile:   (212) 530-5219

                                        And

                                        Howard R. Hawkins, Jr.
                                        CADWALADER, WICKERSHAM & TAFT LLP
                                        One World Financial Center
                                        New York, New York  10281
                                        Telephone:  (212) 504-6000
                                        Facsimile:   (212) 503-6666

                                        Attorneys for Morgan Stanley Mortgage Capital
                                        Inc.

- 8 -

RICHARDS, LAYTON & FINGER, P.A.

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Chris M. Samis (No. 4909)
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

And

Ben H. Logan
Suzanne S. Uhland
Brian Metcalf
Emily R. Culler
O'MELVENY & MYERS LLP
265 Battery Street
San Francisco, California 94111
(415) 984-8700

Attorneys for the Debtors


BLANK ROME LLP

Bonnie Glantz Fatell (No. 3809)
David W. Carickhoff (No. 3715)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6423
Facsimile: (302) 425-6464

And

Mark T. Power
Mark S. Indelicato
Jeffrey L. Schwartz
HAHN & HESSEN LLP
488 Madison Avenue
14th and 15th Floor
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400

Proposed Co-Counsel for Official
Committee of Unsecured Creditors


SO ORDERED THIS _____ DAY
OF _____ 2007.


_____
HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT 1 – Form of Agreement

Exhibit 1

## AGREEMENT FOR THE DISPOSITION OF
## CERTAIN MORTGAGE LOANS AND RESIDUAL INTERESTS

This AGREEMENT FOR THE DISPOSITION OF CERTAIN MORTGAGE LOANS AND RESIDUAL INTERESTS (the "Agreement") is entered into as of April [__], 2007, by and between (a) each of the NCFC Entities (as defined below), (b) Morgan Stanley Mortgage Capital Inc. ("MSMCI"), as Buyer and as Agent for Morgan Stanley REIT II Inc., and each of their respective affiliates, and as Purchaser under the Loan Purchase Agreement (as so defined), and (c) the Official Committee of Unsecured Creditors of the Debtors (as defined below) (the "Committee"; the Committee together with the MSMCI and the NCFC Entities, the "Parties").

## RECITALS

**WHEREAS,** MSMCI is party to (a) a Master Repurchase Agreement, dated as of December 12, 2005 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "MRA"), by and among (i) NC Capital Corporation ("NC Capital"), New Century Mortgage Corporation, NC Asset Holding, L.P., NC Residual III Corporation, NC Residual IV Corporation, Home123 Corporation, New Century Credit Corporation (the "Sellers"), (ii) the buyers from time to time parties thereto (the "Buyers"), including MSMCI, and (iii) MSMCI, as agent for the Buyers (the "Agent"); and (b) a related Guaranty, dated December 12, 2005 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Guaranty") made by New Century Financial Corporation (the "Guarantor" and, collectively with the Sellers, the "NCFC Entities") in favor of the Buyers. Unless otherwise defined herein, terms defined in the MRA and used herein shall have the meanings assigned to them in the MRA.

**WHEREAS,** MSMCI and NC Capital are parties to that certain Sixth Amended and Restated Mortgage Loan Purchase and Warranties Agreement (the "Loan Purchase Agreement") dated as of May 1, 2006, pursuant to which MSMCI agreed to purchase from NC Capital, and NC Capital agreed to sell to MSMCI, certain mortgage loans, subject to an obligation (the "EPD Obligation") on the part of NC Capital, at MSMCI's option, to repurchase any such mortgage loan as to which the related mortgagor is delinquent with respect to such mortgage loan's first monthly payment, either (a) after origination of such mortgage loan or (b) after the related closing date for such purchase and sale.

**WHEREAS,** on March 9, 2007, the Agent sent to the NCFC Entities a written "Notice of Event of Default, Acceleration and Exercise of Remedies" in which the Agent, among other things, stated that (a) Events of Default had occurred and were continuing under the MRA and (b) the Purchase Price of all then-outstanding Transactions was immediately due and payable, together with other specified amounts.

- 2 -

**WHEREAS**, on April 2, 2007, each of the NCFC Entities, together with certain of their subsidiaries and affiliates, filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>").

**WHEREAS**, on April 9, 2007, the Committee was appointed in the Debtors' bankruptcy cases.

**WHEREAS**, MSMCI, the NCFC Entities, and the Committee have agreed to enter into this Agreement, in order to set forth, among other things, their mutual understandings and agreements with respect to auction procedures for the Mortgage Loans and the Residuals, the proceeds of which will be used, <u>inter alia</u>, to pay the MS Estimated Claim (as defined below), subject to the reservation of rights described in clause (g) of the next following recital.

**WHEREAS**, the Bankruptcy Court on or before April 27, 2007 approved a stipulation and order (the "<u>Stipulation and Order</u>") attaching and approving the form of this Agreement, and confirming that (a) the NCFC Entities are permitted to enter into this Agreement, (b) the Auctions (as defined below) provided for in this Agreement shall be deemed to be covered by the Bankruptcy Code's "safe harbor" provisions for "repurchase agreements" (as defined in section 101 of the Bankruptcy Code) and/or "securities contracts" (as defined in section 741 of the Bankruptcy Code), (c) MSMCI need not seek relief from the automatic stay provided in section 362 of the Bankruptcy Code to conduct such Auctions in accordance with the Auction Procedures (as defined below) set forth in this Agreement, (d) each Auction that is conducted in accordance with the Auction Procedures shall be deemed to have been conducted in a commercially reasonable manner, (e) subject to the reservation of rights described in clause (g) below, MSMCI shall be permitted to assert claims for deficiencies (if any) in the payment of the MS Estimated Claim irrespective of which Qualifying Bidder (as defined below) wins any Auction, (f) subject to the reservation of rights described in clause (g) below, MSMCI may retain all proceeds of each Auction (regardless of whether the other Auction occurs) up to the maximum amount asserted by MSMCI under the MRA (including but not limited to all paid-in-full and principal and interest claims, default interest, costs of transfer of servicing, costs of foreclosure (including repo acceleration and expenses relating to the Auction processes), due diligence costs in addition to the due diligence costs described in Section 3.2(b)(x) of this Agreement, hedging break costs, and legal expenses) and the maximum amount of all EPD Obligations asserted by MSMCI under the Loan Purchase Agreement[1] (collectively as of any applicable date, "<u>MS Estimated Claim</u>"), and (g) MSMCI, the Debtors, and the Committee

---

[1]    MSMCI has provided the NCFC Entities and the Committee Representatives a good faith estimate, as of April 25, 2007, of the MS Estimated Claim which will serve as the MS Estimated Claim until updated by MSMCI, which update may be provided periodically by MSMCI at its discretion. In addition, MSMCI will provide an updated good faith estimate to the NCFC Entities and the Committee Representatives of the maximum amount of the MS Estimated Claim, including the maximum amount of the EPD Obligations under the Loan Purchase Agreement, within one month after the last settlement date provided by this Agreement pursuant to reasonable confidentiality agreements executed between MSMCI and the NCFC Entities and MSMCI and the Committee Representatives, respectively. The Parties hereby acknowledge that all estimates of the MS Estimated Claim (or any component thereof) provided at anytime to the NCFC Entities and the Committee Representatives are good faith estimates that: (i) are non-binding estimates being provided for information purposes only, (ii) shall not bind MSMCI in any manner and (iii)shall not serve to limit the maximum amount of claims that may be asserted by MSMCI.

- 3 -

reserve all rights and defenses with respect to the amount and validity of MSMCI's claims and those of its subsidiaries and affiliates against the Debtors (including, without limitation, the MS Estimated Claim), other than with respect to the above-described stipulations as to the commercial reasonableness of the Auctions, and as to the Auctions not violating the automatic stay of section 362 of the Bankruptcy Code and as to the Auctions provided for in this Agreement being covered by the Bankruptcy Code's "safe harbor" provisions for "repurchase agreements" (as defined in section 101 of the Bankruptcy Code) and/or "securities contracts" (as defined in section 741 of the Bankruptcy Code).

NOW, THEREFORE, in consideration of the foregoing premises and the following promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties hereby agrees as follows:

## ARTICLE I
## DEFINITIONS

Terms defined above and elsewhere in this Agreement shall have the meanings there specified, and the following terms shall have the following meanings:

"Auction" is defined in Section 2.1.

"Auction Date" is defined in Section 3.2.

"Auction Procedures" is defined in Section 3.2(b).

"Back-Up Bidder" is defined in Section 3.3.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Confidentiality Agreement" means a Confidentiality Agreement in the form provided by MSMCI to the NCFC Entities prior to the date hereof.

"Debtors" is defined in the Stipulation and Order.

"Mortgage Loans" means mortgage loans sold to Buyers under the MRA and which the Sellers were obligated to repurchase pursuant to the MRA.

"MS Estimated Claim" is defined in the seventh recital of this Agreement.

"Ohio Mortgage Loans" means all Mortgage Loans secured by real property located in the State of Ohio.

"Purchase Agreement" means a Purchase Agreement in the form provided by MSMCI to the NCFC Entities prior to the date hereof.

- 4 -

"Qualifying Bidder" is defined in Section 3.1.

"REIT Restricted Securities" means NCHELT 2003-6, NCHELT 2004-1, NCHELT 2004-2, NCHELT 2004-3, NCHELT 2004-4, NCHELT 2005-1, NCHELT 2005-2, NCHELT 2005-3, NCHELT 2005-4, NCHELT 2006-1, NCHELT 2006-2, NCHELT 2006-S1, and NCAMLT 2006-ALT1.

"Residuals" means residual interests in the Securitization Trusts, which residual interests were sold to Buyers under the MRA and which the Sellers were obligated to repurchase pursuant to the MRA.

"Securitization Trusts" means NEFNIMT 2004-A, NEFNIMT 2003-3, NCHELT 2003-4 (Class CE, Class P), NEFNIMT 2003-5, NCHELT 2003-6, NCHELT 2004-1, NCHELT 2004-2, NCHELT 2004-3, NCHELT 2004-4, NCHELT 2005-1, NCHELT 2005-2, NCHELT 2005-3, NCHELT 2005-4, NCHELT 2006-1, NCHELT 2006-2, and NCHELT 2006-S1.

"Stipulation and Order" is defined in the seventh recital of this Agreement.

"Successful Bidder" is defined in Section 3.3.

## ARTICLE II
## AUCTION PROCESSES

Section 2.1. Generally. MSMCI shall lead separate auction procedures for auctions (each, an "Auction", with such term to include, where the context so requires, the related bid process contemplated by this Agreement) of the Mortgage Loans and the Residuals, in each case in conjunction with the NCFC Entities and their advisors and the Committee Representatives (as that term is defined below), as follows:

(a)    MSMCI will adjourn and extend the auction procedures for the previous Mortgage Loan auction and pending Residual auction conducted by MSMCI, and will inform all parties having previously expressed interest in purchasing the Mortgage Loans and/or Residuals (as evidenced by such party having previously requested related materials from MSMCI) of the Auctions contemplated by this Agreement.

(b)    The NCFC Entities and the Committee will supplement MSMCI's lists of prospective buyers of the Mortgage Loans and/or Residuals. MSMCI will provide interested bidders with the additional marketing materials contemplated in Article V to be prepared by the NCFC Entities and their advisors.

(c)    MSMCI and the NCFC Entities will contact prospective bidders for the Mortgage Loans and/or Residuals. Each bidder contacted by either MSMCI or the NCFC Entities shall be referred to MSMCI as to all inquiries and the terms of such bidder's potential bid(s).

- 5 -

(d)     The Auction Procedures for the Mortgage Loans and Residuals shall be as set forth in Article III. MSMCI and its subsidiaries and affiliates shall be permitted to bid in the second and final round of each of the Auctions. MSMCI and its subsidiaries and affiliates shall be permitted to credit bid all or a portion of the MS Estimated Claim for the Mortgage Loans and/or Residuals, at their discretion. At each instance when credit bidding the MS Estimated Claim (or a portion thereof), MSMCI shall advise the NCFC Entities and the Committee Representatives of the amount being credit bid and of the aggregate dollar amount of the MS Estimated Claim at the time such credit bid is made pursuant to the confidentiality agreements referenced in footnote 1 herein. For avoidance of doubt, (X) the Parties acknowledge that the total amount of the MS Estimated Claim may vary from time to time and accordingly the maximum amount of the MS Estimated Claim that can be credit bid may fluctuate up to the Auction Date for a specified Auction at which point such amount will remain fixed until the conclusion of such Auction (but which may again vary after the conclusion of such Auction) and (Y) any variation in the MS Estimated Claim after the beginning of an Auction will not impact the amount that MS will be permitted to credit bid in connection with such Auction.

(e)     MSMCI will provide to prospective bidders the non-negotiable Confidentiality Agreement and non-negotiable Purchase Agreement. For avoidance of doubt, the Confidentiality Agreement and Purchase Agreement executed by all bidders must be identical to the forms provided to them, including without limitation, with respect to all representations, warranties, covenants, conditions precedent and other terms and conditions.

(f)     MSMCI will disclose to the NCFC Entities and their respective counsel and financial advisors and the Committee's Representatives each bid received in each round of bidding.

(g)     MSMCI shall select the final round bidders based on the Auction Procedures and after consultation with the NCFC Entities, and shall notify each bidder so selected within one Business Day of the applicable due date for initial bids. The Parties expect but cannot assure that there will be at least three final round bidders for each pool of Mortgage Loans and for the Residuals, as the case may be, in each case in addition to MSMCI and its subsidiaries and affiliates should they wish to bid therefor. The parties expect that any prior final round bidders in the previous Mortgage Loan auction conducted by MSMCI that wish to continue to bid will be included with the final round bidders.

(h)     MSMCI shall select the Successful Bidders and Back-Up Bidders based on the Auction Procedures and after consultation with the NCFC Entities and the Committee Representatives; provided, however, that if MSMCI, on the one hand, and the NCFC Entities and the Committee Representatives, on the other hand, disagree as to what constitutes a highest and best bid and there are final round bids that would in the aggregate amount to 110% or more of the MS Estimated Claim, any such dispute shall be submitted to the Bankruptcy Court. Realizing that time is of the essence in connection with the Auctions, the Parties agree to take all steps necessary to receive an immediate

- 6 -

resolution from the Bankruptcy Court of any such dispute.

      (i)     With the exception of MSMCI's and its affiliates' and subsidiaries' respective abilities to credit bid the MS Estimated Claim  (or a portion thereof) as specified herein, all bids for the Mortgage Loans and all bids for the Residuals must be strictly on a cash basis.

      Section 2.2.  Due Dates for Bids and Settlement Date – Mortgage Loans.  Subject to Section 2.5, (a) initial bids for the Mortgage Loans (which shall consist of bids for two pools of Mortgage Loans, one of which shall comprise performing Mortgage Loans and the other of which shall comprise non-performing Mortgage Loans, in each case, as determined by MSMCI) shall be due on the fifth Business Day following Bankruptcy Court approval of the Stipulation and Order, (b) final bids for the two pools of Mortgage Loans shall be due at the Auction therefor to be held on the 15th Business Day following such approval, and (c) settlement of the Auction of Mortgage Loans shall occur on the 18th Business Day following such approval.

      Section 2.3.  Due Dates for Bids and Settlement Date - Residuals.  Subject to Section 2.5, (a) initial bids for the Residuals shall be due on May 8, 2007, (b) final bids for the Residuals shall be due at the Auction therefor to be held on May 17, 2007, and (c) settlement of Auction of the Residuals shall occur on May 24, 2007; *provided that*, notwithstanding anything to the contrary in the foregoing, in no event shall (i) the sale hearing on the mortgage loan servicing business (the "Servicing Business") be continued on May 21, 2007 to any later date as a result of the Auction of the Residuals or (ii) any purchaser's commitment to acquire the Servicing Business be contingent on the settlement or closing of the Residuals sale.  For the avoidance of doubt, and notwithstanding anything to the contrary herein or the Stipulation, no adjournment or delay, cancellation or change in respect of the auction of the Debtors' mortgage loan servicing business shall have any effect on the initial bid due date, final bid due date (and Auction Date), or settlement date for the Auction of the Residuals or the Auction of Mortgage Loans.  In other words, the Auctions (and related processes and procedures) for the Residuals and the Mortgage Loans contemplated herein shall not be in any manner impacted or altered by any change in circumstance with respect to the auction of the Debtors' mortgage loan servicing business.

      Section 2.4.  Ohio Mortgage Loans.  The NCFC Entities will undertake commercially reasonable good faith efforts to obtain any required approvals to include the Ohio Mortgage Loans in the Auction of Mortgage Loans prior to the beginning of the due diligence periods contemplated in Article IV (and shall continue to undertake such efforts thereafter to the extent that any required approvals have not been obtained).

      Section 2.5.  Delays, Etc.  The respective initial bid due dates, final bid due dates (and Auction Dates), and settlement dates for Auctions of the Mortgage Loans and Residuals shall not be delayed beyond the respective dates set forth in Sections 2.2 and 2.3 without MSMCI's express written consent, such consent not to be unreasonably withheld.  In no event shall settlement for the sale of the Mortgage Loans and Residuals be later than May 24, 2007.  In the event of any such delays, all other provisions of this Agreement herein shall remain in full force and effect.

- 7 -

## ARTICLE III
## AUCTION PROCEDURES

Section 3.1.  Qualifying Bidders.  (a) In order to participate in the Auctions, each bidder must be a financial institution or other entity that has the financial wherewithal to purchase the Mortgage Loans or Residuals, as applicable, at the applicable purchase price in immediately available funds on the date of sale, as determined by MSMCI in its reasonable discretion (each such bidder, a "Qualifying Bidder").

(b)  Each Qualifying Bidder will be required to sign: (i) a non-negotiable Confidentiality Agreement; (ii) attestation that, among other things, such Qualifying Bidder is a "Qualified Institutional Buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, with a minimum net worth of $150,000,000 (aggregating, for such purpose, the net worth of any joint venture bidders); and (iii) a non-negotiable Purchase Agreement committing to purchase at such Qualifying Bidder's bid price.[2]  All bids shall be for purchase in cash subject only to the terms and conditions of the applicable Purchase Agreement and the Confidentiality Agreement.  Initial bids and final bids shall be submitted to MSMCI and disclosed to the NCFC Entities and the Committee's Representatives not later than the dates required for such bids in Article II.

Section 3.2.  Auctions; Auction Procedures.  (a)  In the event that MSMCI timely receives one or more final bids from Qualifying Bidders, MSMCI shall conduct Auctions of the Mortgage Loans or Residuals, as the case may be, on the dates (each, an "Auction Date") and at the times set forth above and to be identified by MSMCI in notices to be provided thereby to the final Qualifying Bidders.

(b)    Auctions of the Residuals and Mortgage Loans will be conducted at the New York City offices of O'Melveny & Myers LLP or at such other location announced by MSMCI, and will be governed by the following procedures ("Auction Procedures"):

(i)    Only representatives of MSMCI, the NCFC Entities, counsel to the NCFC Entities, Lazard Freres & Co. LLC ("Lazard"), Institutional Credit Partners, LLC ("ICP"), Qualifying Bidders, and one of the Co-Chairs of the Committee that is not a Conflicted Person (or, if both Co-Chairs are Conflicted Persons, a replacement individual appointed by such Co-Chairs or the Committee and that is not a Conflicted Person) together with counsel and financial advisors to the Committee, shall be entitled to be present at the Auctions.  For purposes hereof, a Person shall constitute a "Conflicted Person" if (x) the creditor at which such Person is employed or which such Person otherwise represents has or intends to bid (or has participated or intends to participate with any other Person in bidding) for Mortgage Loans and/or Residuals, or (y) such Person would otherwise be subject to a conflict of interest in being present at any

---

[2]    For avoidance of doubt, the Purchase Agreement executed by all bidders must be identical to the forms provided to them, including without limitation, with respect to all representations, warranties, covenants, conditions precedent and other terms and conditions.

- 8 -

Auction. For purposes of this Agreement, the term "Committee Representatives" shall mean (a) counsel and financial advisors to the Committee, and (b) a Co-Chair of the Committee or a replacement individual appointed by such Co-Chair, in either event not a Conflicted Person, selected in accordance with the provisions set forth above at 3.2(b)(i), provided, however, that any person or entity otherwise entitled to be a Committee Representative that has not executed a confidentiality agreement with MSMCI shall not be a Committee Representative until such confidentiality agreement has been executed.

(ii)     Each Qualifying Bidder shall be required to confirm in writing that it has not engaged in any collusion with respect to the bidding or the purchase and sale of Mortgage Loans and/or Residuals, as the case may be. Section 363(n) of the Bankruptcy Code shall apply to all Auctions.

(iii)     Qualifying Bidders shall appear in person at the relevant Auction(s), or through a duly authorized representative, or by telephone.

(iv)     Bidding shall be carried out on an "open outcry" basis and shall commence at the amount of the highest and/or best bid submitted by the Qualifying Bidders prior to the Auctions.

(v)     MSMCI and its subsidiaries and affiliates shall be entitled to bid for and purchase Mortgage Loans and/or Residuals, as the case may be, at the Auctions.

(vi)     Qualifying Bidders may submit successive bids in increments of at least $100,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $100,000 higher than the previous bid.

(vii)     All Qualifying Bidders shall have the right to submit additional bids at the Auctions.

(viii)     The Auctions will be conducted so that each Qualifying Bidder, the NCFC Entities, Lazard, ICP, and the Committee Representatives will be informed of the terms of the previous bid.

(ix)     As provided in Article II, the Auction of the Mortgage Loans will be conducted in two pools, with an additional final round where Qualifying Bidders may seek to top the combined two pool bids with a single bid to purchase both pools of Mortgage Loans.

(x)     Qualifying Bidders for the Mortgage Loans will not be permitted to exclude any Mortgage Loan from any pool for purposes of their bid.

(xi)     Qualifying Bidders for the Residuals will be required to submit bids for either all of the REIT Restricted Securities, all of the Residuals that are not REIT Restricted Securities, or all of the Residuals.

(xii)     Due diligence costs (not to include any legal expenses) incurred by final round Qualifying Bidders (including MSMCI and its subsidiaries and affiliates to the

- 9 -

extent applicable) relating to the Auction for the Mortgage Loans or the prior auction thereof conducted by MSMCI up to an amount of $500,000 per Qualifying Bidder per pool of Mortgage Loans (or $1,000,000 in the aggregate for final round Qualifying Bidders as to both pools of Mortgage Loans) will be reimbursed from the excess proceeds of the Auctions taken as a whole, after MSMCI has retained all proceeds in an amount equal to the amount of the MS Estimated Claim asserted by MSMCI; provided, however, that (1) no more than three Qualifying Bidders per pool of Mortgage Loans having made the highest non-winning bids therefor, in addition to MSMCI its subsidiaries and affiliates, shall be entitled to reimbursement of such costs without the joint agreement of MSMCI and the NCFC Entities, and (2) no Successful Bidder shall be entitled to reimbursement of any such costs relating to the pool(s) of Mortgage Loans won by it.

(xiii)   Successful Bidders for the Mortgage Loans will be required to fund their purchase of Mortgage Loans using Deutsche Bank National Trust Company as custodian. Exception reports with respect to the Mortgage Loans prepared by Deutsche Bank National Trust Company will be made available as part of the due diligence process.

(xiv)   Successful Bidders for the Mortgage Loans or the Residuals, as the case may be, will be required to make certain representations and warranties in a non-negotiable Purchase Agreement, including but not limited to: (1) that the Successful Bidder is a substantial sophisticated investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans or Residuals, as the case may be, and its bid and decision to purchase the Mortgage Loans or Residuals, as the case may be, are based upon its own independent expert evaluations of the Mortgage Loans or Residuals, as the case may be, and the mortgage files and other materials deemed relevant by the Successful Bidder and its agents and (2) that the Successful Bidder has the financial wherewithal to own the Mortgage Loans or Residuals, as the case may be, for an indefinite period of time and to bear the economic risk of an outright purchase of the Mortgage Loans or Residuals, as the case may be, and a total loss of the purchase price for the Mortgage Loans or Residuals, as the case may be.

(xv)   With respect to the Auction of the Residuals, the Successful Bidder for the REIT Restricted Securities will be required to provide an opinion of counsel reasonably acceptable to MSMCI to the effect that such Successful Bidder is a real estate investment trust (a "REIT") or a qualified REIT subsidiary as defined in Section 856(a) or 856(i) of the Internal Revenue Code of 1986, as amended, and to the effect that the purchase of REIT Restricted Securities by such Successful Bidder will not cause any issuer of the related REIT Restricted Securities to be (i) treated as an association taxable as a corporation for federal income tax and relevant state income and franchise tax purposes or (ii) taxable as a "publicly traded partnership" as defined in Treasury Regulation section 1.7704-1 for federal income tax purposes and relevant state franchise or income tax purposes.

(xvi)   The Successful Bidder for the Residuals will be required to provide investment representation letters and other documents required pursuant to the terms of the underlying agreements to register transfers of the Residuals.

- 10 -

(xvii)   None of MSMCI, the NCFC Entities, the Committee or any advisors to any of the foregoing shall make, or be deemed to have made, any representations or warranties as to the Mortgage Loans or Residuals.

Section 3.3.  Determination of Successful Bidders and Back-Up Bidders.  Each Auction shall continue on the applicable Auction Date until there is only one offer that MSMCI determines is the highest and best offer from among Qualifying Bidders submitted at the Auction (the applicable bidder, a "Successful Bidder").  At the time of making such determination, MSMCI shall also determine the next highest or otherwise best offer from among Qualifying Bidders submitted at such Auction (the applicable bidder, a "Back-Up Bidder").  In making such determinations, MSMCI may consider, without limitation, the amount of the purchase price, and/or the likelihood of the applicable Qualifying Bidder's ability to close the applicable purchase of Mortgage Loans or Residuals, as the case may be; provided, however, and notwithstanding anything to the contrary, MSMCI shall be required to accept as the Successful Bidder, either (A) that Qualifying Bidder (which may be MSMCI or any affiliate or subsidiary thereof) who has bid the highest cash purchase price at the Auction or (B) a credit bid by MSMCI or any affiliate or subsidiary, if (and only if) the dollar amount of such credit bid (combined with any cash included in such bid) exceeds the dollar amount of the highest cash bid at the Auction.  MSMCI will provide the NCFC Entities and the Committee Representatives with information demonstrating the basis for MSMCI's determinations of Successful Bidders and Back-Up Bidders.  Purchasers of the Mortgage Loans and/or Residuals must in all events be acceptable to MSMCI in its reasonable discretion.  Bids made after the close of the applicable Auction shall not be considered.  Each Back-Up Bidder shall be required to keep its bid open and irrevocable until the date one Business Day following the proposed settlement date for the purchase and sale of Mortgage Loans or Residuals, as the case may be, of the applicable Successful Bidder.

Section 3.4.  Execution of Purchase and Sale Documentation; Awards to Back-Up Bidders.  Within three Business Days (in the case of Mortgage Loans) or five Business Days (in the case of the Residuals) after the conclusion of the applicable Auction, the applicable Successful Bidder shall be required to complete and execute all agreements, contracts, instruments and other documents necessary to close the purchase and sale of the applicable Mortgage Loans or Residuals.  If such Successful Bidder does not complete such purchase and sale on the settlement date established therefor, such purchase and sale shall be awarded to the applicable Back-Up Bidder, which shall be required to complete and execute all agreements, contracts, instruments and other documents necessary to close such purchase and sale within three Business Days (in the case of Mortgage Loans) or five Business Days (in the case of the Residuals) after such settlement date.

## ARTICLE IV
## DUE DILIGENCE

Section 4.1.  Due Diligence Materials Available to Qualifying Bidders.  Each Qualifying Bidder that has executed a Confidentiality Agreement shall be given the opportunity, commencing on such date of execution until the due date for initial bids for the Mortgage Loans or Residuals, as the case may be, to review the following:

- 11 -

(a)      due diligence materials and a database established by MSMCI;

(b)      additional loan-level documentation related to the loans underlying the Residuals and the Mortgage Loans, to be provided by the NCFC Entities through a separate website if and to the extent possible;

(c)      the additional marketing materials contemplated in Article V to be prepared by the NCFC Entities; and

(d)      available reports prepared by third-party firms at the request of the NCFC Entities with respect to the Mortgage Loans and/or the Residuals, as the case may be.

Section 4.2.  <u>Due Diligence Materials Available to Final Rounds Bidders</u>. Each final round Qualifying Bidder shall have the opportunity to perform further on-site diligence on the Mortgage Loans and/or the Residuals as appropriate. The NCFC Entities shall make their and their affiliates' personnel available as reasonably requested to respond to questions and attempt to provide information not available on the website described in Section 4.1(b), if and to the extent possible, and will make reasonable efforts to cure compliance, documentation, and other issues including loan file/database discrepancies prior to submission of final bids.

## ARTICLE V
## NCFC ENTITIES' ADDITIONAL MARKETING MATERIALS; "AS-IS" SALES

The NCFC Entities shall develop the additional materials described in Exhibit A to assist in the marketing of the Mortgage Loans and the Residuals, any may develop other additional materials to assist in such marketing. All such materials shall make clear that neither MSMCI nor any subsidiary or affiliate thereof, nor any NCFC Entity, nor any advisor to any thereof makes any representations as to the validity of data concerning the Mortgage Loans and/or Residuals and that each Qualifying Bidder is solely responsible for its own valuations of the values of the Mortgage Loans and/or Residuals, including the choices of (a) what assumptions to use for such valuations and (b) what models or methodologies to use for such valuations. It is understood and agreed that neither MSMCI nor any NCFC Entity undertakes to prepare any such additional marketing materials (except as set forth above in the case of the NCFC Entities), and that the Mortgage Loans and the Residuals will be sold "as is, where is, with all faults".

## ARTICLE VI
## MISCELLANEOUS

6.1    <u>Binding Nature</u>. This Agreement shall (a) inure to the benefit of, and (b) be binding upon, and enforceable by and against, the Parties and their respective affiliates, successors and permitted assigns.

6.2    <u>Bankruptcy Court Approval; Effective Date; Counterparts</u>. This Agreement is expressly subject to and contingent upon its approval by the Bankruptcy Court in the Stipulation and Order. This Agreement may be executed in one or more counterparts and by facsimile, all of which shall be considered one and the same agreement, and shall become immediately effective

- 12 -

and enforceable when one or more such counterparts have been signed by each of the Parties and delivered to all Parties, and the Bankruptcy Court has "so ordered" the Stipulation and Order and entered it on the docket of the Bankruptcy Court, with no stay of any kind (including, to the extent applicable, Bankruptcy Rule 6004(g)) being applicable.

6.3     Non-Severability. The provisions of this Agreement are mutually interdependent, indivisible and non-severable.

6.4     Entire Agreement. This Agreement, together with the Stipulation and Order, constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, written and oral, between the Parties with respect to the specific subject matter hereof and thereof. This Agreement may not be modified or amended except by a writing signed by all of the Parties. All representations, warranties, promises, inducements or statements of intention made by the Parties hereto are embodied in the Stipulation and Order or this Agreement, and no Party hereto shall be bound by, or liable for, any alleged representation, warranty, inducement or statement of intention that is not expressly embodied herein or therein. The Parties represent and warrant that this Agreement and the Stipulation and Order disclose all of the terms of the Parties' agreement with respect to the subject matter hereof. To the extent there is a conflict between the terms of this Agreement and the Stipulation and Order, the terms of this Agreement shall control.

6.5     Reserved.

6.6     Authority. The Parties hereto represent and warrant to each other that: (a) the signatories to this Agreement are authorized to execute this Agreement; (b) each has full power and authority to enter into this Agreement; and (c) this Agreement is duly executed and delivered and constitutes a valid and binding agreement in accordance with its terms. For the avoidance of doubt, Morgan Stanley Mortgage Capital Inc. executed this Agreement as Buyer, and as Agent for Morgan Stanley REIT II Inc. ("MSREIT"), and each of their respective affiliates, and as Purchaser under the Loan Purchase Agreement; accordingly MSREIT and each of the affiliates of MSMCI and MSREIT are entitled to the rights and benefits afforded in this Agreement.

6.7     Assignment. No Party may assign this Agreement without the prior written consent of the other Parties. No assignment shall operate to release the obligations of the assigning Party without the prior written consent of the other Parties.

6.8     Governing Law. This Agreement has been made and shall be governed, construed and enforced in accordance with the Bankruptcy Code and laws of the State of New York, without regard to any principles of choice of law thereof which would require the application of the law of any other jurisdiction

6.9     Retention of Jurisdiction. The Bankruptcy Court shall retain exclusive jurisdiction to interpret, implement and enforce the provisions of this Agreement, and the Parties hereby consent to exclusive jurisdiction of the Bankruptcy Court with respect thereto. The Parties waive arguments of lack of personal jurisdiction or forum non-conveniens with respect to the Bankruptcy Court pertaining to this Agreement.

- 13 -

6.10    No Waiver.  No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed a waiver of any other breach of this Agreement, including, without limitation, a subsequent breach of the same provision of this Agreement, or any of its other provisions; or shall otherwise affect the enforceability of any provision of this Agreement.

6.11    Headings.  The descriptive headings of the several sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement

6.12    Consultation with the Committee.  The NCFC Entities will be entitled to consult with the Committee Representatives concerning matters covered by this Agreement.

6.13    Committee Confidentiality.  The Committee Representatives shall not disclose any information obtained or provided to them pursuant to this Agreement to any member of the Committee or any other person or entity.  Further, the Committee Representatives shall not be provided any information pursuant to this Agreement without first having executed the confidentiality agreement referenced in footnote 1 herein.

6.14    Enforceability of Confidentiality Agreements.  All confidentiality agreements executed by and among MSMCI, on the one hand, and the NCFC Parties and/or any Committee Representatives, on the other hand, in connection with the matters set forth herein and in the Stipulation, including those certain confidentiality agreements executed on or about April 26, 2007, shall be valid, binding and enforceable in accordance with their respective terms.

[Signatures follow]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their officers or, in the case of the Committee, its authorized representative, duly authorized as of the day and year first above written.

MORGAN STANLEY MORTGAGE CAPITAL INC.,
as Purchaser under the Loan Purchase Agreement

By: _____
Name:
Title:

MORGAN STANLEY MORTGAGE CAPITAL INC.,
as Buyer, and Agent for Morgan Stanley REIT II Inc.,
and each of their respective affiliates

By: _____
Name:
Title:


NC CAPITAL CORPORATION

By: _____
Name:
Title:

NEW CENTURY MORTGAGE CORPORATION

By: _____
Name:
Title:

NC ASSET HOLDING, L.P.

By: _____
Name:
Title:

NC RESIDUAL III CORPORATION

By: _____
Name:
Title:

- 15 -

NC RESIDUAL IV CORPORATION

By: _____
Name:
Title:

HOME123 CORPORATION

By: _____
Name:
Title:

NEW CENTURY CREDIT CORPORATION

By: _____
Name:
Title:

NEW CENTURY TRS HOLDINGS, INC.
(formerly named New Century Financial Corporation)

By: _____
Name:
Title:

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF NEW CENTURY TRS
HOLDINGS, INC., ET AL.

By: _____
Name:
Title:

## Exhibit A: NCFC Entities' Additional Marketing Materials

- Schedule of all assets and with the following summary information:
    - o Deal summary table, including CUSIP, security name, rating (as applicable), original balance, current balance, collateral balance, collateralization factor, %cur, %30d, %60d, %90+, %fcl, %reo, %bk, 1mo cpr, 3mo cpr, 6mo cpr, 1mo cdr, 3mo cdr, 6mo cdr, cumulative losses to date, projected losses to maturity, current servicer, and owner of call rights.

- Collateral attribute summary:
    - o Detailed loan strats highlighting high risk loan buckets as well as filtering and schedule of individual high risk loans.
    - o Expected pre-payment curves, with deconstruction to show assumptions for each loan type.

- Loss analysis summary:
    - o Expected long-term loss curves and demonstration of validity of assumptions using relevant delinquency roll matrix and other loan level data.
    - o Analyses to include current loan status data, geographic related information (HPA, Bankruptcy and Foreclosure timelines), loan balance, loan-to-value ratio and mortgage insurance coverage.
    - o Determine a more accurate short term loss forecast and blend into a longer term forecast.
    - o Loss curve to date, projected losses using current CPR to date and projected CPR.

- Return performance summary:
    - o Yield scenario analysis using appropriate prepayment and loss curves, along with stresses to triggers, pre-pay penalty recovery and forward curve. Shall reflect a matrix of stresses to projected losses, projected CPRs, and interest rate shocks.
    - o Relevant cash flows to assist in determination of (a) timing of cash returns to investors under different scenarios and (b) gaps in cash flow.
    - o Return summary showing unlevered IRR (reinvestment of cash flow in Tsys) and impact of leverage on IRR (assuming reinvestment of cash flow in Tsys).