IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Hearing Date: May 21, 2007 at 10:00 a.m. |
| | : | Objection Deadline: May 14, 2007 at 4:00 p.m. |

**MOTION FOR ORDER (I) AUTHORIZING THE REINSTATEMENT OR EXTENSION OF CANCELLATION NOTICE PERIOD OF PREPETITION SURETY BONDS, (II) AUTHORIZING POSTING SECURITY FOR SURETY BONDS AND CREDIT, (III) AUTHORIZING THE EXTENSION OF POSTPETITION SECURED SURETY CREDIT, AND (IV) GRANTING POSTPETITION LIENS, JUNIOR SUPER-PRIORITY ADMINISTRATIVE CLAIMS AND ADMINISTRATIVE CLAIMS AND TO SUPPLEMENT ORDER AUTHORIZING THE DEBTORS AND DEBTORS IN POSSESSION TO (I) CONTINUE ALL INSURANCE POLICIES AND AGREEMENTS RELATING THERETO AND (II) CONTINUE CERTAIN PREMIUM FINANCING ARRANGEMENTS RELATING THERETO, AND (III) HONOR CERTAIN OBLIGATIONS IN RESPECT THEREOF PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE**

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby request the entry of an order authorizing the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

RLF1-3144743-1

Debtors to enter into certain post-petition bonding arrangements pursuant to section 105(a) and 364(c) of Title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code") and supplementing the Order (the "First Day Order") Authorizing the Debtors and Debtors-In-Possession to (I) Continue All Insurance Policies and Agreements Relating Thereto, (II) Continue Certain Premium Financing Arrangements Relating Thereto, and (III) Honor Certain Obligations in Respect Thereof Pursuant to 105(a) and 363(b) of the Bankruptcy Code. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b).

2. The bases for the relief requested herein are sections 105(a), 363(b) and 364(c) of the Bankruptcy Code.

## BACKGROUND

3. New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting

2

standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

5. The Debtors commenced these chapter 11 cases to pursue an expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders. The Debtors believe that to maximize the value of the estates the businesses should be sold as a going concern. As a result, the Debtors must keep their businesses operational. To do so, the Debtors must maintain state licenses. Many states require the Debtors to post surety bonds in order to maintain the licenses. Prior to the Petition Date, Hartford Fire Insurance Company, its subsidiaries and affiliated companies, ("The Hartford") issued such surety bonds for the Debtors. However, The Hartford asserts that the relevant agreements allowed The Hartford to terminate these surety bonds, generally on 30 or 60 days notice under the agreements. Shortly

before the Petition Date, The Hartford sent notices of non-renewal or cancellation that purport to cancel these surety bonds generally in late April through mid-May. Additional surety bonds expire by their own terms post-petition.

6. The Debtors' reimbursement obligation in respect of issued and outstanding prepetition surety bonds is governed by the general indemnity agreement (the "Indemnity Agreement") dated August 15, 2000 by and among the Debtors and The Hartford, a copy of which is attached hereto as Exhibit "B". Pursuant to the Indemnity Agreement, the Debtors are obligated to indemnify and reimburse The Hartford for all payments that The Hartford makes in respect of the prepetition surety bonds. The Indemnity Agreement provides, in pertinent part, that the Debtors agree to indemnify and exonerate The Hartford from and against any and all loss and expense of whatever kind, including, but not limited to, interest, court costs, attorney and counsel fees, which The Hartford may incur or sustain as a result of or in connection with (1) the furnishing of any prepetition surety bond and/or (2) the enforcement of the Indemnity Agreement including to (a) promptly reimburse The Hartford for all sums paid on account of such loss and/or (b) to deposit with The Hartford on demand funds sufficient to meet all of The Hartford's liability under the prepetition surety bonds whether or not any payment for such loss has been made. To the best knowledge of the Debtors, there has never been a call on any of these surety bonds.

7. As noted above, The Hartford asserts that the Indemnity Agreement provides that The Hartford may terminate the surety bonds under the Indemnity Agreement for any reason upon notice, which The Hartford provided prepetition. The state licensing agencies take the position that the Debtors' licenses will terminate if the Debtors does not have

4

surety bonds in place.

8.  If these surety bonds were to lapse and the Debtors lose their licenses, the Debtors' efforts to market their loan servicing and wholesale loan origination platforms would be severely negatively impacted. Upon receiving the notes of cancellation from The Hartford, the Debtors analyzed their surety bonding requirements and pared down dramatically the number and amounts of the surety bonds they need in order to pursue going concern sales of their loan servicing and wholesale loan origination businesses. This resulted in decreasing the number of surety bonds the Debtors propose to reinstate from approximately 360 surety bonds with a face amount of approximately $21 million down to 60 surety bonds with a face amount of $6,691,000. The surety bonds are tailored narrowly to cover the minimum surety bonds needed to maintain the Debtors' licenses allowing them to operate their loan servicing and wholesale loan origination businesses pending sale.

9.  The Debtors proposed to The Hartford that this limited number of surety bonds be reinstated and reinstated for a limited period of time -- 120 days after the effective date of a proposed Bond Reinstatement Agreement. This was designed to afford the Debtors a reasonable opportunity to pursue going concern sales and if necessary, provide transition services to buyers who are not presently licensed, so as to ensure that the auction of these businesses attracted as many potential buyers as possible.

10. After substantial give and take, The Hartford agreed to reinstate the surety bonds the Debtors requested subject to the terms and conditions of a Bond Reinstatement Agreement. And very significantly, The Hartford agreed to rescind its cancellation notes for the bonds the Debtors propose to reinstate so that these surety bonds are not cancelled prior to May

21, 2007, which is the date the Debtors propose that this Motion be heard.

11. In order to ensure that the Debtors maintain these licenses, The Hartford insisted that it receive cash collateral of $5,000,000, a postpetition lien and junior superpriority administrative claim to reinstate certain surety bonds post-petition pursuant to the terms set forth in the Bond Reinstatement Agreement (as defined below). The Debtors must secure the surety bonds to maintain the licenses and maximize the value of the estates.

## RELIEF REQUESTED

12. By this Motion, the Debtors seek, *inter alia*, the entry of an order (the "Order") pursuant to sections 105(a), 363(b) and 364(c) of the Bankruptcy Code, the Debtors seek (i) authorization to enter into the Bond Reinstatement Agreement (the "Agreement") substantially in the form attached hereto as Exhibit "A" to reinstate the bonds listed on schedule A of the Agreement (the "Reinstated Bonds"), (ii) authorization to post security for surety bonds and credit, (iii) authorization to extend postpetition secured surety credit and (iv) granting postpetition liens, junior superpriority administrative claims and administrative claims. In the First Day Order, the Court authorized the Debtors to enter into new bonds. It is arguable that entering into the Agreement would be authorized by the First Day Order. But in order to ensure that it receives the benefit of the Agreements, The Hartford understandably requested that the Debtors obtain, by May 21, 2007, an order approving the Agreement.

13. The Agreement is the best way to secure bonds and maintain the Debtors' licenses through the sale of their businesses. Pursuant to the Agreement, The Hartford agrees to (i) rescind the termination of the Reinstated Bonds and (ii) amend the expiration date of those bonds. The Agreement provides that the Reinstated Bonds will have an expiration date of

September 21, 2007.

14. New Century will surrender and/or terminate all other bonds that are not necessary for it to remain licensed to service mortgage loans in those states where a license is required (the "Surrendered Bonds". All such Surrendered Bonds would be cancelled upon the earlier of (i) the execution of a Bond Reinstatement Agreement, and (ii) the cancellation date set forth in cancellation notices previously sent by The Hartford and as shown on Schedule B of the Agreement.

15. New Century's obligations to reimburse The Hartford for any draws under the Reinstated Bonds or the Surrendered Bonds would be (i) a joint and several obligation of all the Debtors in the chapter 11 cases, (ii) entitled to a super administrative priority under Bankruptcy Code section 364(c)(1) with priority over all other administrative priority claims other than the super administrative priority of the DIP lenders, which super administrative claim of the DIP lenders will be senior, and (iii) $5 million of cash collateral which will serve as joint and several collateral for the reimbursement obligations on each Reinstated Bond and Surrendered Bond.

16. Clearly, the Debtors need to maintain the Reinstated Bonds in order to maximize the value of the estates' assets in the proposed going-concern sales. The Debtors negotiated in good faith with The Hartford and believe the Agreement is the best possible outcome for maintaining the going concern value of the Debtors' businesses.

## APPLICABLE AUTHORITY

**A.    The Bonds Are Vital to the Debtors' Business and to the Success of These Chapter 11 Cases**

17.    The Hartford contends that the surety bonds are "financial accommodations" and therefore, pursuant to section 365(c)(2) of the Bankruptcy Code, may not be assumed or assigned. See, e.g., In re Edwards Mobile Home Sales, Inc., 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); In re Wegner Farms, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985). Moreover, the Debtors submit that the reinstatement and/or the extension of the cancellation notice period of the Reinstated Bonds is necessary, even vital, to an effective liquidation of the Debtors' businesses.

18.    There is ample authority for the relief requested herein. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent the abuse of process.

11 U.S.C. § 105(a).

19.    The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy ¶105.01 at 105-6 (15th ed. 1999) (collecting cases). This is consistent with the broad equitable authority of the bankruptcy courts. See, e.g., United States v. Energy

8

Resources Co., Inc., 495 U.S. 545, 549 (1990). The Debtors submit that the relief requested herein is necessary and appropriate to carry out the provisions of the Bankruptcy Code and is within the purview of the bankruptcy court's equitable powers.

20.     The reinstatement and/or the extension of the cancellation notice period of the Reinstated Bonds is vital to the Debtors' success in these Chapter 11 Cases because they will permit the Debtors to comply with the terms of the state licenses as well as certain servicing agreements, the most critical aspect of the Debtors' businesses. At the core of the Debtors' businesses is their loan servicing operations. The Debtors, largely through New Century Mortgage Corporation ("NCMC"), service loans pursuant to various loan servicing agreements (the "Servicing Agreements"). These servicing functions typically include: all aspects of servicing mortgage loans, including payment processing (the collecting and remitting of mortgage loan payments received from consumers nationwide), customer service communications and activities, collections communications, making required advances, accounting for principal and interest, holding escrow or impound funds for payment of taxes and insurance, and if applicable, contacting delinquent borrowers to discuss loss mitigation alternatives, supervising foreclosures and resolution of property dispositions in the event of unremedied defaults. Any loss or disruption of these Servicing Agreements would be extremely detrimental to the business and consequently, to the Debtors' sale process.

21.     The Servicing Agreements require the Debtors to maintain the appropriate licensing in various state. If the Debtors are unable or perceived as being unable to satisfy any of their obligations under the Servicing Agreements in the ordinary course of business during these Chapter 11 Cases, including their ability to issue and maintain the bonds, then the sale process

Resources Co., Inc., 495 U.S. 545, 549 (1990). The Debtors submit that the relief requested herein is necessary and appropriate to carry out the provisions of the Bankruptcy Code and is within the purview of the bankruptcy court's equitable powers.

20.     The reinstatement and/or the extension of the cancellation notice period of the Reinstated Bonds is vital to the Debtors' success in these Chapter 11 Cases because they will permit the Debtors to comply with the terms of the state licenses as well as certain servicing agreements, the most critical aspect of the Debtors' businesses. At the core of the Debtors' businesses is their loan servicing operations. The Debtors, largely through New Century Mortgage Corporation ("NCMC"), service loans pursuant to various loan servicing agreements (the "Servicing Agreements"). These servicing functions typically include: all aspects of servicing mortgage loans, including payment processing (the collecting and remitting of mortgage loan payments received from consumers nationwide), customer service communications and activities, collections communications, making required advances, accounting for principal and interest, holding escrow or impound funds for payment of taxes and insurance, and if applicable, contacting delinquent borrowers to discuss loss mitigation alternatives, supervising foreclosures and resolution of property dispositions in the event of unremedied defaults. Any loss or disruption of these Servicing Agreements would be extremely detrimental to the business and consequently, to the Debtors' sale process.

21.     The Servicing Agreements require the Debtors to maintain the appropriate licensing in various state. If the Debtors are unable or perceived as being unable to satisfy any of their obligations under the Servicing Agreements in the ordinary course of business during these Chapter 11 Cases, including their ability to issue and maintain the bonds, then the sale process

may be threatened. Even the perception among parties to the Servicing Agreements that the Debtors may be unable to satisfy their obligations under the Servicing Agreements by not being able to issue or maintain bonds could jeopardize the Servicing Agreements, the businesses and these Chapter 11 Cases. In short, the adverse consequences to the Debtors of not being able to continue to satisfy all of their obligations under the Servicing Agreements could damage, perhaps irreparably, the Debtors' operations and potentially imperil their sale efforts.

22. This court has previously permitted the postpetition continuation of similar surety bonds as well as the prepetition continuation of letters of credit securing those surety bonds. See, e.g., In re Fleming, et al., Case No. 03-10945 (Bankr. D. Del. July 17, 2003).

### B. Incurrence of Secured Debt Is Permitted Under Bankruptcy Code § 364(c) and (d)

23. Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where Debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit Debtor in possession to exercise their basic business judgment consistent with their fiduciary duties."); See also 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev. 1999).

24. Bankruptcy Code § 364(c) provides, in pertinent part, that:

(c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

10

>   (1)   with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
>   (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
>   (3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

### C. The Debtors Were Unable to Obtain PostPetition The Hartford Credit on More Favorable Terms

25. The Debtors have attempted but have been unable to obtain postpetition credit on an (a) unsecured basis pursuant to sections 364(a) and (b) of the Bankruptcy Code or (b) unsecured superpriority basis pursuant to section 364(c) of the Bankruptcy Code.

26. In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek credit form every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions).

27. The Debtors have attempted to make alternate arrangements in an effort to replace or reinstate the bonds provided by The Hartford, but the Debtors were not able to make any alternate arrangements on as competitive a basis as provided by The Hartford within the

short time frame and on terms required by the Debtors. Moreover, given its long history of transacting with the Debtors and its institutional knowledge of the Business, the Debtors believe that The Hartford is the most efficient and cost effective source of The Hartford credit. Accordingly, the Debtors believe that the arrangements to provide the postpetition credit proposed by The Hartford represent the best available alternative at this time.

28. Additionally, The Hartford has informed the Debtors that it is unwilling to extend postpetition credit unless all claims of The Hartford in respect of amounts owed under or in connection with the bonds and the Indemnity Agreement are entitled to junior and subordinate administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code.

29. The Debtors also request (and The Hartford requires) that the liens and security interests granted to The Hartford pursuant to the Agreement be and at all times and for all purposes remain paramount and superior to any other debt, obligations, interests or liens of any kind or nature asserted against any or all of the postpetition cash (to the extent advanced), whether arising prior to or after the Petition Date, including but not limited to any rights which have been or may hereafter be granted in any cash collateral or financing order in these Chapter 11 Cases.

30. The Debtors believe that maintaining the Reinstated Bonds under the terms and conditions provided by the Agreement clearly is in the best interests of the Debtors, their estate and their creditors. Accordingly, the Debtors seek authority to enter into the Agreement to preserve the Reinstated Bonds.

## NOTICE

31. No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware, (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' post-petition senior secured lenders; (3) the Official Committee of General Unsecured Creditors; (4) The Hartford and (5) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

32. The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NO PRIOR REQUEST

33. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit C, granting the relief requested herein and such other further relief the Court deems just and proper.

13

Dated: April 27, 2007
      Wilmington, Delaware

Respectfully submitted,

*/s/ Christopher M. Samis*

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION