IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Hearing Date: 5/30/07 at 2:30 p.m. |
| | : | Objection Deadline: 5/23/07 at 4:00 p.m. |

### APPLICATION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF ICP CONSULTING LLC, AS SPECIAL ASSET VALUATION AND LIQUIDATION ADVISORS TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO SECTIONS 327(a) AND 328 OF THE BANKRUPTCY CODE

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by and through the undersigned counsel, hereby submit this application (the "Application") for entry of an order pursuant to sections 327(a) and 328 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), authorizing the Debtors to retain and employ ICP Consulting LLC ("ICP"), as special asset valuation and liquidation advisors to the Debtors in these chapter 11 cases *nunc pro tunc* to the Petition Date (as defined herein) (the "Application"). In support of this Application, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc ), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

## Jurisdiction

The Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

1. New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and the other debtor subsidiaries, the "Debtors"), NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

2. On February 7, 2007, NCF announced that it would restate its quarterly financial statements for the first, second, and third quarters of 2006 after the Debtors discovered

that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

3. On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

4. These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. Shortly after the March 2, 2007 announcement, the financial institutions that provide the short term credit facilities that the Debtors need to originate and purchase loans (each a "Warehouse Lender"), commenced exercising remedies against the Debtors, thereby threatening their viability. During the following week, the Warehouse Lenders made margin calls in excess of $150 million, which the Debtors were unable to satisfy fully. Thereafter, the Warehouse Lenders began restricting and ultimately ceased providing funding for loans originated by the Debtors. Each of the Warehouse Lenders has declared the Debtors in default under its credit facility.

5. As a result of the defaults, the Warehouse Lenders have exercised remedies under their agreements with the Debtors, including asserting control of the cash flow from the loans they financed and in some instances exercising strict foreclosure or commencing foreclosure sales of the Debtors' loans. The lack of cash flow from these loans has further exacerbated the Debtors' liquidity situation.

6. Although the Debtors have not had sufficient resources or access to credit to originate loans, the Debtors continue to operate their mortgage loan servicing business in accordance with their historically high standards and comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Because their financing for servicing advances has also been terminated, the Debtors' liquidity has been additionally constrained by their being required to provide necessary loan servicing advances from their own working capital.

7. During the weeks leading up to the Petition Date (as defined below), the Debtors, aided by their professional advisors, including investment bank Lazard Frères & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

8. The Debtors' inability to originate loans and the exercise of remedies by the Warehouse Lenders have left the Debtors in a severe liquidity crisis. Without a prompt sale of the Debtors' mortgage loan servicing business and loan origination platform, those businesses will not be viable and the value will be destroyed. Accordingly, the Debtors have commenced these chapter 11 cases to pursue an expedited sale of these businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

9. Although the Debtors have been unsuccessful in obtaining financing that would permit them to continue originating loans, Debtors were successful in obtaining debtor in possession financing of up to $150 million, which they expect will provide sufficient working capital to maintain and stabilize their businesses through the sale of the Debtors' operating businesses and other assets.

10. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. The Court has entered an order authorizing the joint administration of the

RLF1-3143645-1

Debtors' chapter 11 cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

### Retention of ICP

11. Subject to approval of this Court, the Debtors wish to employ ICP as special asset valuation and liquidation advisors in connection with the sale of certain assets in their chapter 11 cases (the "Chapter 11 Cases") in accordance with the terms of the executed engagement agreement (the "Engagement Agreement") attached hereto as Exhibit A. Pursuant to sections 327(a) and 328 of the Bankruptcy Code, the Debtors request that the Court approve the employment of ICP as their special asset valuation and liquidation advisors to perform the extensive valuation and liquidation services that will be necessary during the Chapter 11 Cases.

12. As indicated by the biographical summaries annexed hereto as Exhibit B, ICP is highly qualified to serve as special asset valuation and liquidation advisors in this case. ICP key personnel have experience in virtually all aspects of the capital markets and specific expertise in valuing the assets being auctioned in connection with the proposed representation. Further, ICP personnel have originated more then two hundred mortgage backed special purpose vehicle securitizations totaling over one and a half billion dollars.

13. ICP has stated its desire and willingness to act in these cases and render the necessary professional services as special advisor for the Debtors.

14. The services of ICP are necessary to enable the Debtors to execute faithfully their duties as debtors in possession. The Debtors propose that ICP be employed in accordance with the terms of the Engagement Agreement to provide the following services as may be required:

> a) advising the Debtors on the value and disposition of REIT (Real Estate Investment Trust) and non-REIT eligible residual securities held by the Debtors; and

5

RLF1-3143645-1

b) advising the Debtors on the value and disposition of its loan origination business and upon request, loan servicing business.

15. To the best of the Debtors' knowledge, the employees of ICP do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest[2], or their respective attorneys, except as set forth herein[3] and in the contemporaneously filed affidavit of Thomas Priore, the President and Chief Executive Officer of ICP (the "Priore Affidavit"), a copy of which is attached hereto as <u>Exhibit C</u>.

16. ICP will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Debtors, subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, propose to pay ICP "benchmark" payments upon application by ICP to the Court after the occurrence of certain events as set forth in the Priore Affidavit. The Debtors submit that these "benchmark" payments are reasonable. ICP will also apply to the Court for allowance of normal travel, lodging, reasonable per diem, extraordinary and other out-of-pocket expenses incurred in the disposition of its duties as special valuation and liquidation advisor to the Debtors.

17. The Debtors have been advised that to have ICP employees record their time and activities as prescribed by Local Rule 2016(d) would be unduly burdensome and time-

---

[2] A list of potential parties in interest (the "Parties in Interest) is attached as Exhibit 1 to the Priore Affidavit.

[3] ICP employees Aamer Abdullah and Michael Flynn were employed approximately eight (8) years ago by Credit Suisse First Boston Corporation ("CSFBC"), a subsidiary of Credit Suisse. Credit Suisse First Boston Mortgage Capital LLC ("CSFBMC"), a different subsidiary of Credit Suisse, is a potential Party in Interest in the Debtors' bankruptcy cases. While neither ICP nor the Debtors believe this presents a conflict of interest given CSFBC and CSFBMC are separate subsidiaries of Credit Suisse, the significant period of time that has passed since Mr. Abdullah and Mr. Flynn were employed by CSFBC and the fact that Mr. Abdullah and Mr. Flynn's actions will be directly supervised by Tom Priore, in an abundance of caution, ICP and Debtors are disclosing this information.

consuming. It is not the general practice of employees of ICP ("ICP Professionals") to keep detailed time records (i.e. increments of one-tenth of an hour (six minutes)) similar to those customarily kept by attorneys who are compensated through the Bankruptcy Court. Further, given the manner in which ICP proposes it be compensated, requiring ICP to comply with Local Rule 2016(d) seems unwarranted.

18. As such, the Debtors respectfully submit that a waiver of the requirements of Local Rule 2016(d) with respect to ICP is appropriate. Accordingly, to the extent necessary based on the foregoing, the Debtors respectfully seek a waiver of the information requirements set forth in Local Rule 2016-2(d) in accordance with Local Rule 2016-2(h).

## Memorandum of Law

19. The Debtors submit that this Application does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Local District Court Rule 7.1.2(a).

## Notice

20. The Debtors have provided notice of this Application to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Official Committee of Unsecured Creditors; (d) those parties timely requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, in accordance with Del. Bankr. L.R. 2002-1(b). The Debtors submit that no other or further notice is necessary or required.

7

RLF1-3143645-1

## No Prior Request

21. No prior request for the relief sought in this Application has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit D, granting the relief requested herein and such other and further relief the Court deems just and proper.

Dated: May 2, 2007
Wilmington, Delaware

Respectfully submitted,

New Century Financial Corporation, and on behalf of New Century TRS Holdings, Inc., New Century Mortgage Corporation, NC Capital Corporation, Home123 Corporation, New Century Credit Corporation, NC Asset Holding, L.P., NC Residual III Corporation, NC Residual IV Corporation, New Century R.E.O. Corp., New Century R.E.O II Corp., New Century R.E.O. III Corp., New Century Mortgage Ventures, LLC, NC Deltex, LLC, NCoral, L.P., as Debtors and Debtors in Possession

By: _____
Name: Monika L. McCarthy
Title: SVP and Assistant General Counsel

9

RLF1-3143645-1