UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, *et al.*,[1] | : | |
| | | Case Number 07-10416 (KJC) |
| Debtors. | : | (Jointly Administered) |

**Hearing Date: May 7, 2007 at 10:00 A.M.**

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF (i) SALE-RELATED INCENTIVE PAY TO SENIOR MANAGEMENT AND (ii) RETENTION AND INCENTIVE PAY TO CERTAIN EMPLOYEES PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c) OF THE BANKRUPTCY CODE**
**(DOCKET ENTRY #s 185, 494)**

In support of her objection to the Debtors' emergency motion for an order authorizing payment of (i) sale-related incentive pay to senior management and (ii) retention and incentive pay to certain employees pursuant to sections 105(a), 363(c)(1) and 503(c)(3) of the Bankruptcy Code, as amended (the "Motion"), Kelly Beaudin Stapleton, United States Trustee for Region 3 ("U.S. Trustee"), by and through her counsel, avers:

---

1 The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a/ Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century REO III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

**PRELIMINARY STATEMENT**

The Debtors bear the burden of demonstrating that the incentive/retention plans do not violate 11 U.S.C. § 503(c). It is unclear whether the incentive plans are disguised retention plans which violate 11 U.S.C. § 503(c)(1). The key employee incentive/retention plan violates 11 U.S.C. § 503(c)(1) because it proposes payments to corporate officers who, by definition, are "insider[s]."

Even if this Court finds that the proposed plans do not violate 11 U.S.C. § 503(c)(1), the plans are "not justified by the facts and circumstances" of these cases and, accordingly, should be rejected under 11 U.S.C. § 503(c)(3) for a number of reasons. First, with regard to certain asset sale categories, participants qualify for sale-related compensation based upon the Debtors' receipt of a floor bid and closing thereon – nothing more. Setting the "vesting" threshold at the receipt of a qualifying bid for certain assets does not provide the plan participants with an incentive to maximize value for the Debtors' estates. Second, the Debtors fail to establish how the sale price for specific assets correlates with the efforts of the plan participants, given that the Debtors have employed a reputable investment banker to lead the sale process. Third, the criteria under which the Debtors may make payments from the proposed critical retention pool of $250,000 render that part of the KEIRP too amorphous and vague to be justified. Finally, the request for approval of the executive incentive plan is premature, given the pending investigations/inquiries into both the Debtors' pre-petition accounting and financial statement irregularities and securities trading by its insiders.

**INTRODUCTION**

1. Under (i) (an) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a) and (ii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion.

2. Under 28 U.S.C. § 586, the U.S. Trustee has an overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that UST has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the UST as a "watchdog").

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion and the issues raised in this objection.

**BACKGROUND**

4. On April 2, 2007 (the "Petition Date"), the Debtors filed the petitions which initiated the above-captioned cases.

*Key Employee Incentive Plan ("KEIP")*

5. The KEIP proposed by the Debtors has thirty-four participants. Four of the KEIP participants are members of the Debtors' executive management team (Anthony Meola, Executive Vice President of Production; Joseph Eckroth, Executive Vice President and Chief Operating Officer of New Century Mortgage Corporation; Robert Lambert, Senior Vice President of Leadership and Organizational Development; and Stergios Theologides, Executive Vice President of Corporate Affairs and General Counsel (collectively, the "Executive Management Participants")). The aggregate amount payable to these individuals if all sales targets are achieved at threshold levels is $400,000.

6. Six of the KEIP participants are employees of the Debtors' Loan Origination Platform who were not included in the plans as initially proposed – one executive vice president and

five senior vice presidents (the “Production Participants”). Four of the six participants will be eligible for incentives under the KEIP only if the liquidation price for the WRO Asset Sales Consideration equals or exceeds the WRO Asset Sales Price (as those capitalized terms are defined in the KEIP). The aggregate targeted incentive for the Production Participants is $473,750.

7. The KEIP also includes twenty-four employees who were previously part of the KEIRP (the “Policy Participants”).

8. The payments under the KEIP are funded from a compensation pool derived from asset sales. Supp. Ex. A. The Debtors describe the KEIP payment formula as follows:

- **Servicing Assets –** Payment under this asset sale category is tied to the ratio of the “net liquidation price” to the principal amount of the loans serviced by the Debtors (ratio = x). If x is less than fifty, the participants will not receive a transfer to their payment pool under this category. If x is equal to fifty, a transfer in the amount of $737,995 will be made to the payment pool. If x is greater than fifty, the transfer increases proportionately.

- **Mortgage Assets (LNFA portfolio/certain residuals) –** Payment under this asset sale category is tied to the sale price. If the sale price is less than $47 million, the participants will not receive a transfer to their payment pool under this category. If the sale price is equal to $47 million, a transfer in the amount of $232,074 will be made to the payment pool. If the sale price is greater than $47 million, a transfer in the amount of $232,074 plus 2% of the difference between the sale price and $47 million will be made to the payment pool.

- **WRO Assets (Wholesale/retail (origination), other assets) –** Payment under this asset sale category is tied to the “Target Price.” If the sale price is less than the Target Price, the participants will not receive a transfer to their payment pool under this category. If the sale price is equal to the Target Price, a transfer of $1,085,751 will be made to the payment pool. If the sale price is greater than the Target Price, a transfer of $1,085,751 plus 2% of the difference between the sale price and the Target Price will be made to the payment pool.

Supp. Ex. A.

*Key Employee Incentive/Retention Program ("KEIRP")*

9. The KEIRP proposed by the Debtors has approximately 92 participants divided into four tiers. Supp. Ex. B. The retention payments proposed under the KEIRP total $1,190,662. *Id.* All participants under the KEIRP are eligible to receive retention payments and critical retention bonuses (discussed below). *Id.* However, only the participants in Tiers I and II will be allowed to receive asset sale-based compensation. *Id.*

10. The sale-related portion of the payments under the KEIRP is funded from a compensation pool derived from asset sales. *Id.* The Debtors describe the KEIRP asset sale-based compensation component for Tiers I and II as follows:

- **Servicing Assets –** Payment under this asset sale category is tied to the ratio of the "net liquidation price" to the principal amount of the loans serviced by the Debtors (ratio = x). If x is less than fifty, the participants will not receive a contribution to their payment pool under this category. If x is equal to fifty, a contribution in the amount of $136,476 will be made to the payment pool. If x is greater than fifty, the contribution increases proportionately.

- **Mortgage Assets (LNFA portfolio/certain residuals)** – Payment under this asset sale category is tied to the sale price. If the sale price is less than $47 million, the participants will not receive a contribution to their payment pool under this category. If the sale price is equal to $47 million, a contribution in the amount of $49,206 will be made to the payment pool. If the sale price is greater than $47 million, a contribution in the amount of $49,206 plus 2% of the difference between the sale price and $47 million will be made to the payment pool.

- **WRO Assets (Wholesale/retail (origination), other assets) –** Payment under this asset sale category is tied to the "Target Price." If the sale price is less than the Target Price, the participants will not receive a contribution to their payment pool under this category. If the sale price is equal to the Target Price, a contribution of $185,682 will be made to the payment pool. If the sale price is greater than the Target Price, a contribution of $185,682 plus 2% of the difference between the sale price and the Target Price will be made to the payment pool.

Supp. Ex. B.

11. In addition to the designated payments under the KEIRP, the Debtors seek authority

to maintain a "Critical Retention Pool" of $250,000. Funds in the Critical Retention Pool are proposed to be "distributed by [New Century Financial Corporation ("New Century")] in its sole discretion, in addition to any Retention Bonuses or Incentive Bonuses, to recognize contributions made by [New Century's] employees receiving such Critical Retention Bonuses toward increasing the liquidation value of [New Century's] assets." Supp. Ex. B.

**GROUNDS/BASIS FOR RELIEF**

12. 11 U.S.C. § 503(c) provides (in part):

> Notwithstanding subsection (b) [allowing the payment of administrative expenses in certain circumstances], there shall neither be allowed, nor paid –
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based upon evidence in the record that –
>
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B) the services provided by the person are essential to the survival of the business; and
>
> (C) either
>
> (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>
> (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred; [or]

* * * * *

> (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of filing of the petition.

*Application of 11 U.S.C. § 503(c)(1) to the KEIP, KEIRP*

13. The Debtors bear the burden of demonstrating that the plans do not run afoul of 11 U.S.C. § 503(c)(1) because they are disguised retention plans. The asset sale target prices which trigger the Debtors' obligation to pay monies to the plan participants appear to reflect no achievement beyond the Debtors' closing on a floor bid for the assets. *Cf. In re Dana Corp.*, 358 B.R. 567, (Bankr. S.D.N.Y. 2006) (court found that benchmarks for the debtors' long-term incentive plan "are difficult targets to reach and are clearly not 'lay-ups.'"); *In re Nobex Corp.*, 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (court approved incentive plan under 11 U.S.C. § 503(c) where payments were tied exclusively to improvement upon "stalking horse" bid; "stalking horse" bid, by itself, did not vest participants with right to payment). In short, the plans offer their participants an opportunity to significantly increase their pay for approximately four months of work, raising the issue of whether the plans are classic retention plans under the "incentive plan" label.

14. Similarly, under the KEIRP, the Debtors propose to make retention payments to persons who were designated as officers under corporate by-laws. These persons are "officers" of one or more of the Debtors and, by extension, are "insider[s]" under 11 U.S.C. § 101(31). *See In re Essential Therapeutics*, 295 B.R. 203, 206 (Bankr. D. Del. 2006) (Walrath, C.J.) (status as an officer under corporate by-laws qualifies employee as "officer"); *see also In re CEP Holdings, LLC*, No. 06-51847, 2006 WL 3422665, at *1 (Bankr. N.D. Ohio Nov. 28, 2006) (suggesting the same).

Accordingly, to the extent that the Debtors seek to make retention payments to corporate officers, this Court should deny the requested relief unless the Court is able to make the requisite findings under 11 U.S.C. § 503(c)(1).

15. In the Motion, the Debtors submit that the exclusive measure of whether a person is an "insider" is the degree of influence or control which the person has over operations. Mot. ¶ 40. This argument is faulty for several reasons. First, the definition of "insider" is non-exclusive and includes both "officer[s]" and "person[s] in control." *See* 11 U.S.C. § 101(31). The plain meaning of the term "officer" includes persons who are appointed as officers under a corporation's by-laws. *See Essential Theraputics*, 295 B.R. at 206. Even if this Court were to disagree with the U.S. Trustee's position that the unambiguous, plain meaning of the term "officer" includes persons appointed as officers under corporate by-laws, no canons of statutory interpretation would permit this Court to interpret 11 U.S.C. § 101(31) in a way which deletes all "insider" statuses other than "person in control."

16. Further, the Debtors misconstrue the authorities which they cite on the "insider" point. Mot. ¶ 40. The Debtors cite *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 523-24 (Bankr. D. Del. 2006), to make the point that the definition of "insider" only includes persons who have a requisite degree of control or influence over the debtor. However, in *Oakwood Homes*, this Court was describing a standard for determining whether a person was an insider in those situations where the statuses specifically identified in 11 U.S.C. § 101(31) did not apply (i.e., when the person at issue was not an "officer"). *See Oakwood Homes*, 340 B.R. at 523 ("In determining whether a transferee qualifies as a non-statutory insider . . ."). Similarly, the case of *NMI Systems, Inc. V. Pillard (In re NMI Systems, Inc.)*, 179 B.R. 357

(Bankr. D. Colo. 1995), involved a person with the title of vice president who was not an officer of the debtor. *See NMI Sys., Inc.*, 179 B.R. at 367 ("The court concludes that Pillard was not an insider unless he was an officer of the company."). In *In re Public Access Technology.com, Inc.*, 307 B.R. 500, 506 (Bankr. E.D. Va. 2004), the executive at issue held the title of executive vice president, but there were "no affidavits, articles of incorporation, corporate minutes, resolutions, or other documents or evidence that show this title makes [the executive] an officer of the corporation." *Id.* at 306. Finally, *In re CEP Holdings, LLC*, No. 06-51847, 2006 WL 3422665 (Bankr. N.D. Ohio Nov. 28, 2006) involved the question of whether persons with titles that were not appointed officers under corporate by-laws were "officer[s]" under 11 U.S.C. § 101(31). *See CEP Holdings*, 2006 WL 3422665 at *1 ("The Court agrees with the Debtors' contention that the titles listed in the Plan's schedules are not determinative of whether an employee is an 'officer' when there is apparently nothing in the company's organizational books and records electing the employee to officer status."). In sum, the cases cited by the Debtors are distinguishable from the situation here – certain persons slated to receive retention payments are, by the Debtors' own admission, officers under corporate by-laws. Supp. at 9 ("Though certain of the KEIRP Participants are titled "officers" under the bylaws of each of NCM and Home123 . . . ").

*Application of 11 U.S.C. § 503(c)(3) to the KEIP, KEIRP*

17. Both the KEIP and the KEIRP propose payments which are outside of the ordinary course of the Debtors' businesses. The sale-related payments are tied to events which are themselves outside of the ordinary course of business – namely, sales of substantially all of the Debtors' core, remaining assets. The retention payments are tied to dates designed to ensure that the employees remain with the Debtors pending the closing of the aforementioned, out-of-the-

ordinary-course sales. Accordingly, to the extent that 11 U.S.C. § 503(c)(1) does not apply to the payments proposed to be made under the KEIP and KEIRP, 11 U.S.C. § 503(c)(3) does apply. *See generally In re Roth American, Inc.*, 975 F.2d 949, 952-53 (3d Cir. 1992) (discussing the "horizontal dimension" and "vertical dimension" tests for determining whether a transaction is in the ordinary course of the debtor's business under 11 U.S.C. § 363).

18. The plain language of 11 U.S.C. § 503(c)(3) indicates that this Court has a "gatekeeper" role to play in determining whether the proposed payments should be authorized. The express language of the statute says that there should be no "transfers or obligations [other than under the circumstances authorized under 11 U.S.C. §§ 503(c)(1, 2)] that are outside the ordinary course of business and not justified by the facts and circumstances of the case . . . ." Contrary to the Debtors' assertion, the language of 11 U.S.C. § 503(c)(3) does not incorporate the "business judgment" standard for reviewing such payments. Mot. ¶¶ 44, 45. Therefore, this Court must determine whether the proposed payments are "justified by the facts and circumstances" present here.

19. There are four key reasons why the KEIP and KEIRP are not justified by the facts and circumstances of these cases. First, with regard to certain asset sale categories, participants qualify for sale-related compensation based upon the Debtors' receipt of a floor bid and closing thereon. As noted previously, the Debtors have not explained why closing on a floor bid constitutes an achievement which justifies the payment of bonuses to managers who, after all, are obligated to assist the Debtors in connection with the sale process absent such payments in exchange for continuing to remain in the Debtors' employ and receiving their salary payments and related benefits.

20. Second, these cases are liquidating cases, and the Debtors have not justified tying the compensation of approximately ninety employees/plan participants to the Debtors' asset sale processes. For example, the Debtors propose that a significant number of managers – nearly all of the KEIP participants and the KEIRP participants in Tiers I and II – receive compensation awards related to the sale of the "Mortgage Assets" (the LNFA portfolio and certain residuals). As a practical matter, how many cooks can be in the kitchen, or how many employees can be involved in supporting the marketing effort for a portfolio of impaired loans? The Debtors have already employed a well-known investment banking firm at a significant cost to spur their asset marketing efforts.[2] Why do the Debtors need to retain the services of what (considering the total cost of the plans) is a second investment banking firm – the plan participants – which does not have Lazard's experience or qualifications in this area?

21. Third, the Debtors' discretion to make payments from the $250,000 critical retention pool under the KEIRP is essentially limitless. There is no per-employee cap on the amount a participant could receive from the critical retention pool – theoretically, the entire amount could go to one, two, or a handful of employees. Such unfettered discretion is not justified.

22. Finally, the pending investigations/inquiries into potential insider trading violations and the Debtors' well-publicized accounting and financial statement irregularities make the requested approval of the plans both premature and untimely. The United States Attorney for

[2] The Debtors' suggestion that they need to pay their employees more to do more does not accurately describe what is occurring here. Mot. ¶ 16. With the possible exception of the Debtors' loan servicing staff, the operational responsibilities of the Debtors' employees have been significantly reduced when compared to their responsibilities during pre-petition period. The Debtors ceased originating loans prior to their bankruptcy filings. Accordingly, there are a host of employees (including senior management) who should have more than ample time to devote to liquidation-related tasks – after all, the Debtors are paying these employees the same base salary they were receiving pre-petition for doing less work related to ordinary-course operations.

the Central District of California has commenced a grand jury investigation relating to insider trading as well as New Century's accounting for repurchase losses. Ex. 99.1 to 3/2/07 Form 8-K. The Securities and Exchange Commission has inquired about issues relating to the Debtors' accounting and financial statement irregularities. *Id.* It would be inappropriate to make payments to management personnel before the conclusion of these investigations/inquiries.[3]

*Filing of Plan Exhibits*

23. The Debtors have not filed the exhibits relating to the plans with this Court. The U.S. Trustee submits that the exhibits should be part of the public record to protect against any future confusion or question which may arise as to the specific relief the Debtors are requesting via the Motion. To the extent that the Debtors move to file the exhibits under seal, the U.S. Trustee reserves the right to object to that request and leaves the Debtors to their burden under 11 U.S.C. § 107(b) to justify such relief.

**[Continued on next page – space intentionally left blank]**

---

[3] While the Debtors have conditioned plan payments upon the results of the Audit Committee's internal investigation (Mot. Exs. A, B), it is presently unclear where the U.S. Attorney's investigation and/or the SEC's inquiry will lead to results which are consistent with the Audit Committee's work. Additionally, the Audit Committee's internal investigation does not appear to encompass insider trading issues. Ex. 99.1 to 3/2/07 Form 8-K.

## CONCLUSION

WHEREFORE the U.S. Trustee requests that this Court issue an order denying the Motion or granting other relief consistent with this objection.

Respectfully submitted,

**KELLY BEAUDIN STAPLETON**
**UNITED STATES TRUSTEE**

**BY:** /s/ Joseph J. McMahon, Jr.

Joseph J. McMahon, Jr., Esquire (# 4819)
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)

Date: May 3, 2007