UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| NEW CENTURY HOLDINGS, INC., a Delaware corporation, et al.[1] | ) ) ) | Case No. 07-10416 (KJC) Jointly Administered |
| Debtor. | ) ) ) | **Relates to Docket No. 307** **Hearing date: May 7, 2007@10:00** |

**REPLY MEMORANDUM OF PLAN BENEFICIARIES TO (1) OBJECTION OF THE UNITED STATES TRUSTEE AND (2) RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE EMERGENCY MOTION FOR AN ORDER DIRECTING THE UNITED STATES TRUSTEE TO APPOINT AN OFFICIAL COMMITTEE OF PLAN BENEFICIARIES PURSUANT TO 11 U.S.C. § 1102(a)(2)**

### *Introduction*

On or about April 17, 2007, former employees Gregory J. Schroeder, Michelle Parker, Martin Warren, Steve Holland, and Nabil Bawa, for themselves and other beneficiaries (collectively herein the "Beneficiaries") of the New Century Financial Corporation Deferred Compensation Plan and/or the New Century Financial Corporation Supplemental Executive Retirement/Savings Plans (collectively, the "Plan") filed an Emergency Motion For An Order Directing The United States Trustee To Appoint An Official Committee Of Plan Beneficiaries Pursuant To 11 U.S.C. § 1102(a)(2) (the "1102

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home 123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company, NCoral, L.P., a Delaware limited partnership.

Motion"). By virtue of the 1102 Motion, the movants seek an additional committee to represent the interests of over 500 Beneficiaries who, without Committee representation, will not be adequately represented in these cases and will likely be unable to represent themselves in any meaningful way as a class. Both the United States Trustee (the "UST") and the Official Committee of Unsecured Creditors (the "OCUC") oppose the 1102 Motion; both oppositions rely on the mistaken assumption that the Beneficiaries are mere unsecured creditors, that the Plan assets are "as a matter of law" property of one or more of the Debtors' bankruptcy estates, and that, accordingly, the interests of the Beneficiaries can be adequately represented by the OCUC. Alternatively, the UST and the OCUC argue that the Court should not appoint an additional committee because such an appointment would be for the "sole protection of a particular interest of one type of general creditor" and that arming that interest with committee status (and professionals paid from estate assets) would be both costly and "burden" or interfere with the smooth operation of the "bankruptcy process" in these cases.

On the issues of importance to the Beneficiaries as a class, the OCUC clearly does not and cannot adequately represent the interests of the Beneficiaries and, therefore, the Court should exercise its discretionary power to order the United States Trustee to appoint an additional committee of Beneficiaries under § 1102(a)(2). The OCUC's contentions that the Beneficiaries are mere unsecured creditors, and that the Plan assets are property of an estate simply assume a "successful" outcome – for the OCUC – of the critical issue in these cases, an outcome unlikely to occur. The OCUC's contentions depend entirely on a determination that the Plan is a "top hat" plan under ERISA and, accordingly, exempt from ERISA's substantive provisions, including, without limitation, the inviolable provision that

2

all employee contributions to a benefit plan are held in trust for the exclusive benefit of the employee participants in the plan and cannot be reached by an employer or its creditors for any purpose. The OCUC has the burden of proof on this issue, a burden it will be unable to meet. If the Plan is not a "top hat" plan—and it is not—ERISA's substantive provisions apply and the Plan assets could not have become (and are not) assets of the estate of any Debtor.

Even if the Plan were found to be a "top hat" plan despite facts and law to the contrary, and even were there no other basis to exclude the Plan assets from any estate[2], the OCUC could still not adequately represent the interests of the Beneficiaries. The rights of any creditors of any Debtor to the Plan assets are governed solely by the language of the applicable trust agreement. Under that trust agreement, as detailed below, should New Century Financial Corporation ("NCFC") become insolvent (or file for relief under the Bankruptcy Code), only the "general creditors" of NCFC could be paid from the assets of the trust on a par with the Beneficiaries, and the assets would otherwise remain in trust for the benefit of the Beneficiaries. "General creditor" as used in the trust does not include secured creditors, even when asserting a deficiency claim. Even if ERISA's protections are absent here, no other creditor of any affiliated Debtor has any claim to be paid from the Plan assets. The OCUC, however, is a fiduciary for all of the creditors holding non-priority unsecured claims against any and all Debtors and is legally and structurally unable to protect the interests of the Beneficiaries against such creditors' claims.

---

[2] The Beneficiaries are not expecting a ruling on this issue and emphasize the "top hat" plan issue only to illustrate the fact that the OCUC cannot represent their interests, given that the Beneficiaries and the OCUC are diametrically opposed on this issue. The Beneficiaries reserve, and intend to utilize all available factual and legal arguments to protect their prior claim to and interest in the Plan assets. Such arguments include, but are not limited to, that the Plan is funded and that the Plan assets have been distributed, as well as that a resulting or constructive trust should be imposed.

The argument that the Beneficiaries are a "particular" or special interest is equally unavailing. <u>Every time</u> an additional committee is appointed, the appointment is to protect the "particular interest" of one class of claimants, yet the courts have often appointed committees of employees, secured creditors, tort claimants, physicians and the like. Section 1102(a)(2) is designed to protect a large class asserting a common interest, which class is not otherwise adequately represented. Appointment of a committee of Beneficiaries in this case is consistent with the history and policy of the Code and will further the process, not burden or inhibit it. The Court is also always empowered to ensure that a truly burdensome additional layer of costs is avoided by appropriate direction to the additional committee and its professionals. Cost alone, especially in a case of this size, is never a justification for denying a § 1102(a)(2) motion. An additional committee of Beneficiaries should be appointed to assure meaningful involvement in these cases by the over 500 Beneficiaries, many of whom are unemployed and in need of the funds in the Plan, as well as the protection of their legitimate interest in such funds, and in the outcome of these cases.[3]

Statement of Facts

Upon information and belief, the Plan was initially established as of January 1, 1999, and then amended and restated on or about July 1, 2004. A copy of the Plan (as amended) is attached hereto as <u>Exhibit A</u>. Since its inception, the Plan has been implemented by the transfer of deferred compensation funds into a separate trust established pursuant to the New Century Financial Corporation Supplemental Benefit and Deferred Compensation Trust Agreement, a copy of which is attached as <u>Exhibit B</u> (the "Trust"). As

---

[3] The Beneficiaries' involvement in the cases would not overlap with the OCUC. As detailed below, however, such involvement need not be limited to two issues. The size of the deficiency claims of warehouse lenders, following the liquidation of their collateral and/or positions, or following offsets, must also be scrutinized, a task that may be difficult for the OCUC, given its composition.

4

between the Plan and the Trust, the provisions of the Trust governs the rights, if any, of creditors of the Debtors with respect to the Plan assets transferred to the Trust. Plan § 14.2 The Trust, as is not atypical for executive deferred compensation plans, purports to be a grantor or "rabbi" trust, with the assets at risk, to some degree, in the event of the insolvency of NCFC. The "at risk" features are designed to create the tax deferral. The OCUC seizes on these "at risk" provisions to support its contentions; however, for reasons noted above and detailed below, these provisions are not operative to place the Plan assets at risk.

According to the Debtors and as set forth on Exhibit C hereto, as of December 31, 2006, not less than 1,134 of the Debtor's employees were eligible to participate in the Plan; for year-end 2007, not less than 1,184 employees were eligible. Again, pursuant to statements by the Debtors contained in Exhibit D hereto, the Debtor had 7,078 employees as of December 31, 2006. According to the Declaration of Ms. Etlin filed in connection with the "first-day motions" in these cases, prior to March 1, 2007 layoffs, the Debtors had, in the aggregate, 6,818 full and part-time employees. Declaration of Holly Etlin at ¶ 26. Thus, in 2006, not less than 16% of the Debtor's total aggregate workforce was eligible to participate in the Plan. For 2007, not less than 17.4% of the Debtor's total aggregate workforce was eligible.[4]

Upon information and belief, the Plan assets are in a separate account in the name of the trustee under the Trust. Under the terms of the Trust, and this Court's existing order, the Plan assets cannot be used or moved without further order of the Court. According to the Debtors, as evidenced by Exhibit E, the Trust holds over $43,000,000.

---

[4] The Beneficiaries expect that discovery will show that these percentages are understated, and that a much higher percentage of the workforce was considered eligible to participate in the Plan.

Discussion of Authority

**THE BENEFICIARIES CONTEND THAT THE PLAN IS NOT A "TOP HAT" PLAN AND HAVE A MORE THAN COLORABLE ARGUMENT FOR EXCLUDING THE PLAN ASSETS FROM ANY ESTATE[5]**

As noted above, the OCUC and the UST argue that certain provisions of the Plan and its accompanying grantor "rabbi trust" operate to expose the Plan assets to the claims of the Debtors' unsecured creditors and reduce the Beneficiaries, as well, to general creditor status. However, as both of the objectors are aware, the provisions they cite—albeit to the exclusion of other more problematic terms of the same documents—are only operative to the extent that the Plan and the accompanying Trust are exempt from ERISA's substantive provisions because the Plan in fact constitutes and has been implemented as a "top hat" plan. The Beneficiaries contend that the evidence already shows, and upon further development will unequivocally establish, that the Plan is not a "top hat" plan.

The Plan is undeniably an "employee benefit plan" under ERISA since it provides for deferred compensation and retirement benefits. 29 U.S.C. §1002(3); Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F. 3d 143, 148 (3d. Cir. 1996)(ERISA definition of "employee benefit plan" extremely broad). As such, unless it falls within an exception granted by ERISA's own provisions, the Plan would be subject to an array of ERISA procedural and substantive requirements and protections designed to protect the interests of the participants in the funds in the Plan and Trust. Among those protections is the "exclusive benefit rule," which provides that all

---

[5] The Beneficiaries agree with the OCUC that whether or not the Plan is or is not a "top hat" plan is not placed at issue by the 1102 Motion and that the Court need not, and should not, decide that issue in connection with the 1102 Motion. The inquiry is fact-intensive and much additional discovery must be undertaken, following the initiation of an appropriate adversary proceeding for, *inter alia*, declaratory judgment. The Beneficiaries raise the issue only to demonstrate that there is more than a colorable issue, indeed that there is a reasonable likelihood that the Beneficiaries will prevail, and that the OCUC accordingly cannot adequately represent the Beneficiaries' interests.

contributions to the plan must be and are held in trust for the exclusive benefit of the plan

participants—the employees, former employees or their designated beneficiaries —and may

not be used or diverted for the benefit of the employer or to satisfy the employer's

obligations. 29 U.S.C. § 1103(c)(1). Indeed the exclusive benefit rule is a "cardinal

principle" of ERISA which is violated if there is any removal of plan assets for the benefit

of the employer or anyone other than plan participants.  Resolution Trust Corp. v. Financial

Institutions Retirement Fund, 71 F. 3d 1553, 1557 (10th Cir. 1995).  The circuit courts have

held that this rule is nearly inviolable and that the protection of the interests of participants

in plan assets is paramount. Id.

In Financial Institutions Retirement Fund, the Tenth Circuit was faced with an

attempt by the receiver of an insolvent financial institution to obtain a portion of plan assets,

in the form of certain credits, where the plan was allegedly over-funded.  The receiver

wanted to use the value of the credits to reduce the obligations of the failed institution.  The

Court inquired whether "the ERISA objective of protecting plan participants and their

beneficiaries [was] more important than RTC's objective of recovering 'assets' of a failed

thrift for the benefit of the public at large" and answered in the affirmative, finding that

"Congress has called for special concern for the beneficiaries of employee funds that

mandates giving this fund precedence here." Id at 1556.

In addition, plan assets are protected by provisions preventing their voluntary or

involuntary transfer or alienation. 29 U.S.C. § 1056(d); Guidry v. Sheet Metal Workers

Nat'l Pension Fund, 493 U.S. 365, 110 S. Ct. 680, 107 L. Ed. 2d 782 (1990).  Under these

and other provisions, assets in an employee benefit plan cannot ever become assets of the

employer's bankruptcy estate, unless an exception contained within ERISA applies.

7

<u>Patterson v. Shumate</u>, 504 U.S. 753, 112 S. Ct. 2242, 119 L. Ed 2d. 519 (1992). As the

Court summarized in <u>In re B.B. Walker Co.</u>:

> As noted earlier, the assets of an ERISA plan are held solely for the benefit
> of the plan participants and their beneficiaries and may not inure to the
> benefit of the employer. When the contribution is made, the trustee and/or
> plan administrator acquires control over the assets and the plan participants
> and their beneficiaries acquire the interest in the assets. A contribution to the
> plan by the employer thus severs and terminates, subject to certain limited
> exceptions under ERISA which are not applicable in this case, any interest in
> or control over the assets that the employer previously possessed.
> Therefore, the plan assets generally cannot be considered property of the
> [employer's] bankruptcy estate.

2002 WL 31770849 (Bankr. M.D.N.C.)(footnotes and internal citations omitted). The

exception for "top hat" plans, if applicable, is such an ERISA exception; that exception,

however, is not available here.

The term "top hat" plan is not found in ERISA, but is rather a colloquial term used

to describe a plan that is "unfunded and maintained by an employer primarily for the

purpose of providing deferred compensation for a select group of management or highly

compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1);  <u>New Valley</u>

<u>Corp.</u>, 89 F.3d at 148. As the Third Circuit has noted:

> The elements of this definition make the top hat category a narrow one. Not
> only must the plan be unfunded and exhibit the required purpose, it must
> also cover a "select group" of employees. This final limitation has both
> quantitative and qualitative restrictions. In number, the plan must cover
> relatively few employees. In character, the plan must cover only high level
> employees. Because of these limitations, top hat plans form a rare sub-
> species of ERISA plans, and Congress created a special regime to cover
> them.

<u>Id.</u> In addition, the "dominant characteristic of the special top hat regime is the near-

complete exemption of top hat plans from ERISA's substantive requirements....[29 U.S.C.]

Section 1101(a)(1) exempts top hat plans "from ERISA's fiduciary responsibility

provisions, including...the need to give control of plan funds to a trustee,...and limitations on transactions and investments." Id. at 148-149.  Congress exempted "top hat" plans from these protections because such plans are supposed to be strictly limited to a select group of employees who possessed the sophistication, economic leverage and individual bargaining power to protect themselves in the selection of benefit and pension plan options. E.g., Guiragoss v. Khoury, 444 F. Supp. 649, 661-662 (E.D.Va. 2006)(collecting authorities). Such was not the case with the Plan.

Determining if a plan is a top-hat plan involves a fact-specific and fact-intensive inquiry.  As the statute requires and consistent with the rationale for the exception, courts look at three distinct elements.  To be designated a "top hat" plan, ERISA requires the court to determine (1) whether the plan is "unfunded";[6] (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees"; and (3) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." Khoury, 444 F. Supp. 2d at 658-659 (emphasis supplied).  See also, Bakri v. Venture Mfg Co., 473 F. 3d 677, 678-680 (6th Cir. 2007) at *9 (three elements cited; court finds plan not a top hat plan);.  Alfa Laval, Inc. v. Nichols, 2007 WL 984111 (E.D. Va.)(citing three-part analysis); Carraba v. Randalls Food Market, Inc. 38 F. Supp. 2d 468, 476-478 (N.D. Tex 1999)(citing 3-part test and finding plan not a top hat plan).  The burden is on the party seeking to establish top hat status to prove all of the elements. E.g., Carabba, 38 F. Supp. 2d at 478; Vista v. Desantis Ent. Inc., 1996 WL 663970 (N.D.N.Y.) at *3.  Moreover, in applying the three-part test, courts must take into account that "ERISA is

---

[6] The Beneficiaries preserve the argument that the Plan in this case was, in fact, "funded" for ERISA purposes.

a remedial statute that should be liberally construed in favor of employee benefit fund participants. To that end, exemptions from … ERISA coverage should be confined to their narrow purpose." E.g., <u>New Valley Corp.</u>, <u>supra</u>; <u>Khoury</u>, 444 F. Supp. 2d at 659.

The operative documents must, of course, be examined. Merely putting in the operative documents language that recites the top hat plan requirements is insufficient, however, as is the employer's sincere intent to create a top hat plan; the actual plan, in its actual implementation, must satisfy all of the top hat requirements. <u>Carraba</u>, 38 F. Supp. 2d at 478; <u>Vista,</u> 1996 WL 663970 at *3.

Analysis of the second requirement—whether the plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees—requires a fact-specific inquiry that examines both quantitative and qualitative factors.   First, the plan must be offered to a "select group." Relevant factors include the percentage of the workforce invited and eligible to join the plan (quantitative) and the "nature of their employment duties, the compensation disparity between the top hat members and non-members, and the actual language of the plan agreement (qualitative factors)." <u>Khoury</u>, 444 F. Supp. 2d. at 660.  Second, the select group must consist only of management or highly compensated individuals, an analysis turning on many of the same qualitative factors noted above. <u>Id</u>.

Existing precedent does not firmly establish when a plan is too large to satisfy the select group requirement; however, a "review of the published cases reflects *that there is no existing authority that affirms top hat status for a plan representing more than 16% of the total workforce.* " <u>Id</u>. (emphasis supplied).  In the reported cases, the percentage of the workforce permitted to enroll in a "top hat" plan has been considerably smaller than 15%.

10

Id. at 660-661. See also, The IT Group, Inc. v. Bookspan (In re the IT Group, Inc.), 305

B.R. 402, 410 (Bankr. D. Del. 2004)("the highest percentage of employees found to have

been a 'top hat' plan, while not a bright line test, has been 15%)). Critically, the analysis

should focus on the percentage of the workforce invited to participate in a potential "top

hat" plan, rather than on the percentage of the workforce that actually enrolled. *E.g.*,

Khoury, 444 F. Supp. 2d at 661, n. 14.

If plan participation is not based upon managerial status or compensation level, the

plan fails as a "top hat" plan regardless of participation rates. Id. at 661; Starr v. JCI Data

Processing, Inc., 757 F. Supp. 390, 394 (D.N.J. 1991). There must be some well-

established and meticulously applied standard for designating plan members as "high level"

employees. *E.g.,* Khoury, 444 F. Supp. 2d at 661. The inclusion of employees whose base

salary is low and who achieve higher earnings only as a result of commission income is a

particular problem. Darden v. Nationwide Mutual Ins. Co., 717 F. Supp. 388 (E.D.N.C.

1989); Plazzo v. Nationwide Ins. Co., 697 F. Supp. 1437 (N.D. Ohio 1988), *rev'd on other*

*grounds*, 892 F. 2d 79 (6th Cir. 1989); Fraver v. North Carolina Farm Bureau Mutual Ins.

Co., 643 F. Supp. 633 (E.C.N.C. 1985), *rev'd on other grounds,* 801 F.2d 675 (4th Cir.

1986). Persons who might be "highly compensated" only if they earn significant

commissions do not fit the characteristics needed for inclusion in a "top hat" plan, since

"less motivated" employees would not be well-compensated: "These are not indicia of a

consistently highly compensated select group of individuals." Plazzo, 697 F. Supp at 1451.

The final requirement, emphasized in DOL advisory opinions, is that the select

group must consist of individuals who are in a position to protect their own interests by

virtue of their favorable bargaining position. The assumption underlying the "top hat"

exception is that "top-level executives are in a favorable bargaining position to negotiate the terms of an agreement and, therefore, do not need a comprehensive regulatory scheme to protect their interests." Khoury, 444 F. Supp. 2d at 662. See also, Kemmerer v. ICI Americas, Inc., 70 F. 3d 281, 286 (3rd Cir. 1995).

Accordingly, the courts have frequently found plans to fail the "top hat" criteria despite the clear intent of employers to create them and documents language creating a grantor trust. Bakri, supra; A.F. Plazzo, supra; R.E. Fraver, supra; Khoury, supra; Carrabba, supra; Virta, supra; Starr, supra.

Under these criteria, the Plan will not qualify for the "top hat" exemption. Under the numbers supplied by the Debtors, as shown on Exhibits C and D, more than 16% of the Debtors' aggregate workforce was eligible for the Plan in 2006 and more than 17% in 2007. In addition, evidence will show that commissioned employees who were clearly not managers and who had base salaries as low as $18,000 were eligible for Plan membership, based solely on projected commission income. Even taking contingent income into account, many participants in the Plan were neither managers nor highly compensated. The Plan was largely imposed upon the employees, not negotiated by senior executives. The Plan will not be exempt from ERISA's substantive provisions, including the "exclusive benefit" rule. The Plan assets are not property of any estate.[7]

---

[7] Contrary to the OCUC's assertions, the IT Group cases do not stand for the proposition that funds in a rabbi trust are always property of the debtor's estate, available for distribution to the estate's creditors. Indeed, the IT Group court recognized that a finding that the plans at issue were not "top hat" plans would have excluded the plan assets from the estate. IT Group, 305 B.R. at 409-411. However, the beneficiaries in those cases simply failed to introduce any evidence contradicting the plan language. Id. at 410 ("In this case, the Accardi Plaintiffs submitted no proof that the Deferred Compensation Plan covered more than a 'select group' of employees."). The Third Circuit also noted the absence of evidence – or even a meaningful argument – on "top hat" status: "...Participants do not challenge [the] court's determination that the Plan was offered only to management and highly compensated employees..." In re IT Group, Inc., 448 F. 3d 661, 667 (3d. Cir. 2006).

**EVEN IF THE PLAN WERE EXEMPT FROM ERISA'S SUBSTANTIVE REQUIREMENTS, UNDER THE CONTROLLING TERMS OF THE TRUST, THE PLAN ASSETS COULD BE USED ONLY TO PAY CERTAIN CREDITORS OF NEW CENTURY FINANCIAL CORPORATION ON A PAR WITH THE BENEFICIARIES.**

The OCUC cites certain sections of the Plan documents and the Trust; however, its citations omit certain critical provisions. Section 4.7 of the Trust provides in pertinent part that:

> Except as provided in this Section 4.7 and in Section 4.2, 13.2, and 16.2, the Company shall have no right or power to direct the Trustee to pay to the Company or to divert to others any of the Trust assets before all payments of benefits have been made to the Participants and their beneficiaries pursuant to the terms of the Plans.

Sections 13.2 and 16.2 deal with exceptions not relevant here. Under section 4.2, only "general creditors" of <u>New Century Financial Corp.</u> alone can be paid from trust assets, on a par with the Beneficiaries, following a determination of insolvency and an order of a court of competent jurisdiction. Otherwise, the assets remain in trust and can be used only to pay benefits to Beneficiaries. Even in the case of a clear "rabbi trust," the language of the trust instrument dictates which creditors may access the trust funds. <u>Bank of America, N.A. v. Moglia</u>, 330 F. 3d 942 (2nd Cir. 2003). Use of the term "general creditor" excludes any creditor holding a lien or security from accessing Plan assets, including as to the assertion of a deficiency claim. <u>Id</u>. Despite the somewhat loose language in the oppositions filed by the OCUC and the UST, the Plan assets would not be available to all of the creditors of all of the Debtors' estates, nor even to all creditors of NCFC, even if ERISA did not exclude them from the estates. The OCUC, of course, does represent all unsecured creditors of all such estates and is unable to take a contrary position in favor of the Beneficiaries should they be creditors with allowed claims.

**THE COURT SHOULD EXERCISE ITS DISCRETION TO APPOINT A COMMITTEE OF BENEFICIARIES BECAUSE THE INTERESTS OF THE BENEFICIARIES ARE NOT AND WILL NOT BE REPRESENTED BY THE OCUC OR ANY OTHER PARTY IN THE CASES**

Despite the contentions of the UST and the OCUC, courts regularly exercise their discretion to appoint additional committees where it is probable that a class of claims or interests has a distinct interest that is not otherwise adequately represented. *See generally*, Peter C. Blain & Diane H. O'Gowa, *Creditor Committees Under Chapter 11 of the United States Bankruptcy Code: Creation, Composition, Powers and Duties*, 73 MARQ. L. REV. 581, 591-592 (1991) ["**Blain & Gowa**"].  The recent "upturn" in appointment of equity committees is an example.  E.g., In re Oneida, Ltd., 2006 WL 1288576 (Bankr. S.D.N.Y.). Such an appointment is critical where the existing constituencies will not be motivated to protect the interest of the movant class. Id. at *3. Most important, even where a member or members of the class could appear individually, a benefit is gained for the class and the bankruptcy process by having the class represented by an official committee, because it takes "on a fiduciary duty to all current [class members] and its compensation is subject to approval of the Court." Id. Accordingly, as Blain and O'Gowa note, courts have appointed additional committees of secured creditors, priority creditors, subordinated note holders, undivided interest holders, property holders, labor representatives, tort claimants, hourly employees, retirees and competitors. Blain & O'Gowa, supra, at notes. 72-83. Such an appointment is compelled here as well.

### The Standard For Appointment Under Section 1102(a)(2).

The Bankruptcy Code provides that, upon "request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security

14

holders." 11 U.S.C. § 1102(a)(2).  Legislative history teaches that Congress intended to

grant the Court the power to appoint additional committees to "counteract the natural

tendency of a debtor in distress to pacify large creditors . . ." Victor v. Edison Brothers

Stores (In re Edison Brothers Stores, Inc.), 1996 WL 534853 (D. Del.)(*quoting* S.Rep. 989,

95th Cong.2d Sess. 10 (1978)); Appeal of the Committee of Non-Insider Equity Security

Holders (In re Evans Products Company), 62 B.R. 579, 581 (S.D. Fla. 1986).  Since section

1102(a)(2) became effective, courts "have appointed numerous types of additional

committees based upon the special needs of each particular case."  In re Dow Corning

Corp., 194 B.R. 121 (Bankr. E.D. Mich. 1996)(*rev'd on other grounds by* In re Dow

Corning Corp., 212 B.R. 258 (E.D. Mich. 1997)).

      The determination of whether an additional committee should be appointed requires

a balancing of interests.  Dow Corning, 194 B.R. at 141.  Specifically, courts must engage

in a two step analysis:

> First, the court must determine whether appointment of an additional
> committee is necessary to assure the movants are adequately represented.
> Second, if the answer to step one is yes, then the court must determine
> whether to exercise discretion by making the appointment.

Id.  The analysis is complete once the court weighs its findings of inadequate representation

against the consequences of exercising its discretionary powers.  Id. at 143.

### *Adequate Representation*

      Unfortunately, the term adequate representation is not defined in the Code.  Stated

generally, however, it is the concept that a "particular group of creditors have a meaningful

voice on the committee *in relation to their posture in the case*."  Dow Corning, 194 B.R. at

141 (emphasis supplied).  For the reasons detailed above, the OCUC is opposed to the

Beneficiaries on virtually all of the issues of importance to the Beneficiaries.

The courts have developed a non-exclusive list of factors to guide their case-by-case determinations of adequate representation (or lack thereof). These factors include "(a) the nature of the case; (b) identification of the various groups of creditors and their interests; (c) the composition of the committee; and (d) the ability of the committee to properly function."[8] Id. at 142. The first prong under the adequate representation analysis recognizes "that in some large and complex cases a single committee could not adequately represent the interests of all creditors." Dow Corning, 194 B.R. at 142. There is no doubt that this case is both large and complex. More than a dozen entities filed Chapter 11 petitions. These cases are being administered jointly and the Debtors are liquidating assets at a frenetic pace, while parties sort out which entities own what assets, including as between the estates and creditors with § 559 rights. The appointment of an additional committee is appropriate in a case which requires immediate and active participation beyond merely voting on a plan from a group seeking to protect its interests. Beker Industries, 55 B.R. at 949. Therefore, the nature of this case is such that appointment of an additional committee of Beneficiaries is appropriate.

With regard to the second prong, the majority in  amount of the claims in this case appear to be held by the warehouse lenders and other financial institutions.[9] To the extent that the lenders hold claims, many will be in the nature of deficiency claims after liquidation of collateral or exercise of rights under section 559 of the Bankruptcy Code. The Beneficiaries, on the other hand, are current and former employees seeking to protect their rights to distributions under the Plan. Most of the Beneficiaries contributed less than $150,000 to the Plan and about half made contributions totaling $60,000 or less. Many of

---

[8] While stated differently, the Dow Corning factors are substantively the same as the factors applied in Delaware. See In re Garden Ridge Corp., 2005 WL 523129, *2 (Bankr. D. Del. 2005).

[9] The size of the claims of such lenders, if any, is unknown at this time.

these employees are now <u>un</u>employed and efforts to protect their interests are severely hampered by their individual financial limitations.

The third prong speaks primarily to whether the class seeking a committee already has a representative on the existing official committee. <u>Dow Corning</u>, 194 B.R. at 142. More than 500 Plan beneficiaries have potential claims against the estate totaling, in the aggregate, more than $43 million. However, not a single Beneficiary was named to the OCUC, despite a request for appointment. Instead, the OCUC is dominated by large, sophisticated financial institutions that willingly made loans and other financial accommodations to the Debtors, and some of which may hold collateral. The OCUC opposes the Beneficiaries' claim that the Plan assets are protected by ERISA and maintain that the Beneficiaries have rights only as general, unsecured creditors. Moreover, while the OCUC will likely seek, or at best be neutral regarding, substantive consolidation of the Debtors, the Beneficiaries would oppose it because <u>only</u> general creditors of <u>only</u> New Century Financial Corp. could possibly hold a claim to the trust assets. The OCUC is also not motivated to limit which creditors would share Plan assets if ERISA does not exclude them; indeed, its response asserts that all of the Debtor's creditors would have access to these funds.

As the final consideration in its determination of adequate representation, some courts examine the "ability of the committee to function." As the <u>Dow Corning</u> court noted, however, this factor is relevant only where the request for an additional committee arises from a complaint by a member of the committee that the committee, as constituted, is dysfunctional. The factor has little or no import where the committee as constituted simply

17

fails, or is unable, to represent the interests of a significant class of creditors or interests in the case:

> The problem is that a committee may function just fine, reaching a consensus on all issues, and still not adequately represent a particular group of creditors.

Dow Corning, 194 B.R. at 142.

Dow Corning is particularly instructional on the subject of additional committees. In that case, the court considered, *inter alia*, a motion to appoint an official physicians' committee in the Chapter 11 case of a breast implant manufacturer. In that case, tort claimants filed actions against the debtor and the physicians for damages arising out of faulty implants. The physicians' claims against the debtor were contingent to the extent that only *if* they were found liable could the physicians assert claims against the estate for indemnification. The physicians might not have had allowable claims against the estate, but were acutely interested in protecting their indemnity rights and the insurance and other assets that might satisfy them if exercised. The official committee was comprised almost entirely of commercial creditors, and the physicians were not represented at all.

After determining "that there is no legal reason why a committee for persons with contingent claims cannot be ordered," the court went on to engage in the adequate representation analysis. Dow Corning, 194 B.R. at 145. The court held that "The commercial claimants' interest is with the Debtor but against the physicians at this point." Id. The unsecured commercial claimants would benefit from preserving as much of the debtor's assets as possible to collect on their claims. The physicians, however, would be looking to those same assets for indemnification in the event that they were found liable for the tort claimants' injuries. Therefore,

18

the physicians will have a collective interest in the estimation and resolution of the claims of the tort claimants and in the formulation of a plan of reorganization. And the [creditor committee] is not at all well situated to defend those interests in that kind of setting.

Id. at 146. The committee, then, could not adequately represent the interests of the physicians.

Dow Corning is on point here. In the event the Beneficiaries establish that their contributions to the Plan are subject to ERISA protections, the Plan assets will be excluded from the estates. If not excluded, the Beneficiaries will seek to limit the creditors with whom they must share, to the exclusion of claims of certain unsecured creditors represented by the OCUC. Therefore, the OCUC cannot possibly adequately represent the Beneficiaries' interests.

The Bankruptcy Court for the Northern District of Ohio considered a similar set of facts in determining whether to appoint an additional committee of employees. In the Matter of Mansfield Ferrous Castings, Inc., 96 B.R. 779 (Bankr. N.D. Ohio 1988). In that case, employees who had contributed to a stock ownership plan sought recognition as an official committee. The court easily found that the employees were in a unique position since, as a group, they represented three different interests; the class members were employees, and possibly creditors and equity security holders. Mansfield Ferrous, 96 B.R. at 781. "When these three roles are combined into one group, it is apparent that the Employees, who number 141 and lack the resources to protect their interests individually, are not adequately represented . . ." Id. Besides finding that the employees' interests were divergent from those of the creditors, the court also noted that the official committee had challenged the status of the employees' claims. "This stance of the Committee hardly indicates that is in a position adequately to represent the interests of the Employees." Id.

19

Similarly, the Beneficiaries cannot be adequately represented by a committee dominated by warehouse lenders seeking to enhance the assets of the estate to the Beneficiaries' detriment

for the benefit of general unsecured creditors.[10]

### *Exercise of Discretion*

Once a court determines that a group of creditors cannot be adequately represented by the official committee, it must then determine whether it should exercise its discretionary power to order the trustee to appoint an additional official committee. Dow Corning, 194 B.R. at 143. The factors guiding this determination are: "(a) the cost associated with appointment; (b) the time of the application; (c) the potential for added complexity; and (d) the presence of other avenues for creditor participation." Id.

Courts have attached an important caveat to the first prong of the discretion analysis. "[T]he court has the ability to restrict the costs incurred by a committee." Id. Indeed, all committees and parties in interest bear the responsibility of working together to avoid duplicative expense and limit the financial strain on the estate. In re Beker Industries Corp., 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985). Accordingly, the party opposing a § 1102(a)(2) motion bears the burden of establishing that the appointment of an additional committee is too costly. Beker Industries, 55 B.R. at 951. This is a difficult burden to meet, given the court's extensive power to ensure that committees limit costs. The Beneficiaries are willing to work with the OCUC to ensure that efforts and expenses are not duplicated. Likewise, the Beneficiaries will work within any reasonable guidelines the Court sets regarding expenses. An official committee of Beneficiaries will not duplicate the OCUC's work.

---

[10] The cases cited by the UST and the OCUC are distinguishable on their facts. In Winn Dixie Stores, upon which both opponents principally rely, the UST was, at the time of the motion, investigating the possibility of adding one or more of the plan participants to the official committee. In re Winn Dixie Stores, Inc., 326 B.R. 853, 897 (Bankr. N.D. Fla. 2005). No such offer has been made here; the UST refused to appoint a Beneficiary to the OCUC. In Mirant, the moving class of creditors had two members on the official committee; Mirant Americas Energy Marketing, L.P. v. The Official Committee of Unsecured Creditors of Enron Corp., 2003 WL 22327118 (S.D.N.Y.). Again, no Beneficiary is a member of the OCUC.

21

Accordingly, the cost of an additional committee should not be determinative in denying this Motion.

The 1102 Motion likewise meets the second factor. The Trustee selected the members of the OCUC on April 9, 2007. By letter dated April 11, 2007, the Beneficiaries requested the UST to appoint a committee of Beneficiaries. On April 17, 2007, after the UST failed to respond to the April 11 letter, and after the Beneficiaries' counsel had contacted the UST expressing a willingness to discuss the request at the UST's convenience (to no avail), the Beneficiaries filed the 1102 Motion with this Court. The Beneficiaries promptly and timely requested the appointment of an additional committee.

Neither will the appointment of an additional committee add complexity to this case. In the words of the Dow Corning Court, "the case is already complex." Dow Corning, 194 B.R. at 146. The addition of a committee to represent the Beneficiaries will, at most, merely add another legitimate interest to an already complex case, and only on a circumscribed set of issues.

Finally, there is no other avenue by which the Beneficiaries can meaningfully participate in these proceedings. In Dow Corning for instance, the court found that, although the physicians seeking indemnity from the estate could individually present their legal arguments in open court, this was not a sufficiently effective avenue of participation.

> They are organized into a consortium and, through the efforts of able counsel, have been effective in presenting their legal positions to the Court. But ten months into the case and after repeated assurances by the Debtor that it would consult with the official committees and the unofficial groups such as the physicians, all parties agree that the physicians have never yet been a party to discussions. Although their legal positions are defended in court, the behind-the-scenes work which is so essential to a successful chapter 11 case is stymied by the physicians' lack of official committee status.

22

Dow Corning, 194 B.R. at 146. Accordingly, that court exercised its power to order the Trustee to appoint an additional committee to represent the physicians. Id.

Fewer alternative avenues are available to the beneficiaries in this case than were available to the physicians in the Dow Corning case. Most of the beneficiaries have relatively small amounts at issue, and many of them are currently unemployed. If a committee is not appointed to represent them, it will be difficult, if not highly improbable, for the Beneficiaries to maintain a significant legal presence in these proceedings, individually or as an ad hoc group. Any action by the Beneficiaries to establish their right to the Plan assets will be opposed by the OCUC, using estate funds, or by much more well-heeled adversaries. The Beneficiaries are precisely the type of class Congress sought to protect when it gave the court the power to order the appointment of an additional committee. If this Court fails to exercise its discretion here, the Beneficiaries face the risk of losing their legitimate interest in the Plan assets without the ability to mount a meaningful challenge.[11]

### Conclusion

The OCUC's interests are clearly adverse to those of the Beneficiaries, and it cannot adequately represent them. No other party in the case is positioned to do so. Appointment of an additional committee will not add material cost or complexity. Accordingly, the Court should exercise its discretion to appoint a committee to represent all of the Beneficiaries

---

[11] The OCUC – somewhat disingenuously – suggests that by appearing through counsel at the formation meeting for the OCUC and by filing their 1102 Motion, the Beneficiaries have established the ability to represent their interests. This is the same argument rejected in Dow Corning. Moreover, the Beneficiaries' witness will testify that the funds assembled to achieve representation to this point are exhausted at that it will be extremely difficult, indeed improbable, for the unemployed Beneficiaries to continue fully funding the costly litigation and other involvement required to protect their interests.

who otherwise most likely will be unable to effectively protect their interests or pursue their claims.

Respectfully submitted,

STEVENS & LEE, P.C.

/s/ Joseph H. Huston, Jr.

Dated : May 4, 2007

JOSEPH H. HUSTON, JR. (NO. 4035)
1105 NORTH MARKET STREET
SUITE 700
WILMINGTON, DE 19801
TELEPHONE: (302) 425-3310
DIRECT FAX: (610) 371-7972
EMAIL: JHH@STEVENSLEE.COM

-and-

BERNSTEIN, SHUR, SAWYER & NELSON

ROBERT J. KEACH
MICHAEL A. FAGONE
100 MIDDLE STREET
P.O. BOX 9729
PORTLAND, ME 04104-5029
TELEPHONE: (207) 774-1200
TELECOPIER: (207) 774-1127
EMAIL: RKEACH@BERNSTEINSHUR.COM
            MFAGONE@BERNSTEINSHUR.COM