# EXHIBIT 1

EXECUTION COPY

# AMENDED & RESTATED

# MASTER
# SERVICES AGREEMENT

## DATED APRIL 28, 2006

## BY AND BETWEEN

## NEW CENTURY MORTGAGE CORPORATION

## AND

## ACS COMMERCIAL SOLUTIONS, INC.

## PRIVATE AND CONFIDENTIAL

          ACS / NCMC Confidential

EXECUTION COPY

# AMENDED & RESTATED
# MASTER SERVICES AGREEMENT

This Amended & Restated Master Services Agreement (this "**Agreement**") is entered into as of this 28th day of April 2006 (the "**Effective Date**") by and between New Century Mortgage Corporation, a California corporation ("**NCMC**" or "**Customer**"), and ACS Commercial Solutions, Inc., a Nevada corporation ("**ACS**"), for purposes of amending and restating the terms and conditions of that certain Conversion Services Agreement, dated as of October 31, 2002 and as previously amended (collectively, the "**Original Services Agreement**"), between the parties.

## RECITALS

WHEREAS, ACS is currently providing certain services to NCMC pursuant to the Original Services Agreement; and

WHEREAS, ACS and NCMC have been engaged in negotiations regarding, among other things, an extension of the contractual relationship between the Parties, ASC' continued performance of services on behalf of NCMC, and ACS' performance of certain services on behalf of entities related to NCMC; and

WHEREAS, NCMC desires to procure from ACS, and ACS desires to provide to NCMC and, where applicable, a related entity, the Services described in this Agreement; and

WHEREAS, NCMC and ACS desire to amend and restate the Original Services Agreement on the terms and conditions specified herein.

## TERMS AND CONDITIONS

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valid consideration, the receipt and sufficiency of which is hereby acknowledged, NCMC and ACS (collectively, the "**Parties**" and each, a "**Party**") hereby agree as follows:

## 1.0    TERM/TERMINATION/TERMINATION ASSISTANCE

**1.01 Amended and Restated Agreement.** ACS is currently providing certain services to NCMC pursuant to the Original Services Agreement. Effective as of 11:59:59 p.m. on the Effective Date, the Original Services Agreement is hereby amended by replacing it, in its current entirety, with the terms and conditions of this Agreement.

**1.01.1 Application of Original Services Agreement.** Notwithstanding anything contained herein to the contrary, NCMC and ACS acknowledge and

          ACS / NCMC Confidential

agree that the terms and conditions of the Original Services Agreement as they existed prior to the Effective Date shall continue to govern and apply to all claims, actual or alleged breaches, duties, obligations, and all other events or circumstances that are related to this Agreement and that arose or occurred prior to the commencement of the Term. From and after the commencement of the Term, NCMC and ACS further acknowledge and agree that all such terms and conditions of the Original Services Agreement shall be void, and shall thereafter be of no further force and effect, with respect to claims, actual or alleged breaches, duties, obligations, and other events or circumstances that arise or occur after such time, all of which, if related to the subject matter of this Agreement, shall be subject to and governed by the terms and conditions set forth herein.

**1.02 Term of Agreement.** The term (**"Term"**) of this Agreement will commence as of 12:00:01 a.m. Pacific Time on the Effective Date, and will remain in force until 11:59:59 p.m. Pacific Time on March 31, 2010 (the **"Expiration Date"**), unless otherwise terminated as provided below, in which case the Term shall end at 11:59:59 p.m. Pacific Time on the effective date of such termination provided however, this Agreement will continue to remain in effect with respect to any SOW's already issued at the time of such termination, until such SOW's are themselves terminated or performance thereunder is completed.

## 1.03    Termination.

### 1.03.1 Termination for Convenience

(a)     NCMC may terminate this Agreement with respect to all or any of the Services for convenience at any time from and after the Effective Date through March 31, 2008 (the **"Initial Termination Period"**) by providing ACS at least ninety (90) days prior written notice designating the termination date. If NCMC elects to terminate the Agreement for convenience during the Initial Termination Period, NCMC shall pay to ACS an early termination fee in an amount equal to Ten Thousand Dollars ($10,000) multiplied by the number of months remaining from the termination date through the end of the Initial Termination Period.

(b)     NCMC may terminate this Agreement with respect to all or any of the Services for convenience at any time after the Initial Termination Period by providing ACS at least ninety (90) days prior written notice designating the termination date. If NCMC elects to terminate on this basis, NCMC shall not be obligated to pay ACS any termination fee, charge or other penalty related to the early termination of the Agreement, it being understood that

          ACS / NCMC Confidential

NCMC's sole obligation shall be to pay ACS for the Services rendered through the termination date.

**1.03.2  Termination for Cause.** Either Party may immediately terminate this Agreement (or any SOW) if the other party commits a material breach of its obligations under this Agreement, which breach is not cured within thirty (30) days after receipt of written notice specifying the basis of such breach.

**1.03.3  Termination for Non-payment.** ACS will have the option, but not the obligation, to terminate a SOW if Customer fails to pay when due undisputed amounts owed to ACS under such SOW and Customer fails to cure such failure within ten (10) business days after receipt of written notice from ACS.

**1.03.4  Termination for Failure to Meet Service Levels.** NCMC shall have the option, but not the obligation, to terminate any SOW if ACS fails to perform in accordance with the minimum Service Levels for the SOW for three (3) consecutive months or during four (4) months in any twelve (12) consecutive month period. For any turn around time Service Level, a monthly failure shall be defined as not meeting the turn around time requirement five (5) times in any calendar month.

**1.03.5  Termination for Bankruptcy.** Either Party may immediately terminate this Agreement by notice to the other Party if the other Party (a) becomes subject to a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, (b) becomes subject to an involuntary petition regarding the foregoing that is not dismissed within 60 days after filing, (c) declares or admits publicly and in writing that it is insolvent or is unable to meets its debts as they mature, or (d) makes an assignment for the benefit of all or substantially all of its creditors. If either Party elects to terminate this Agreement due to the insolvency of the other Party, such termination will be deemed to be a termination for cause hereunder.

**1.04  Termination Assistance Services.** ACS shall provide Termination Assistance Service to NCMC (a) commencing upon written notice from NCMC at least six (6) months prior to the expiration of the Term, or on such earlier date as NCMC may reasonably request, and continuing for up to twelve (12) months after the expiration date of the Term, or (ii) commencing upon any written notice of termination (including notice based upon breach or default by NCMC, breach or default by ACS, or termination for convenience by NCMC, and continuing for up to twelve (12) months following the effective date of such termination. ACS shall provide Termination Assistance Service to NCMC regardless of the reason for the expiration or termination of the Term; provided, if this Agreement is terminated by ACS under Section 1.02.3, ACS may require payment by NCMC in advance of the Termination Assistance Services to be provided by ACS.

          ACS / NCMC Confidential

**1.04.1  Performance.** ACS shall provide all Termination Assistance Services subject to and in accordance with the terms and conditions of this Agreement. ACS shall perform the Termination Assistance Services with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency as it provided and was required to provide for the same or similar Services during the Term.

**1.04.2  Scope of Termination Assistance Service.** As part of the Termination Assistance Services, ACS will timely transfer the control and responsibility for all Services previously performed by or for ACS to NCMC and will execute any documents reasonably necessary to effect such transfers.  Additionally, ACS will use commercially reasonable efforts to provide any and all information and assistance requested by NCMC to allow: (a) systems and processes associated with the Services to operate efficiently; (b) Services to continue without interruption or adverse effect; and (c) the orderly transfer of the Services to NCMC or its designee (the **"Termination Assistance Services"**).  The Termination Assistance Services will include, as requested by NCMC, the Services, functions and responsibilities set forth in the SOW's requested by NCMC.  In addition, in connection with such termination or expiration, ACS will provide the Termination Assistance Services at NCMC's request and direction including general support, software, equipment, ACS subcontracts and third party contracts.

**1.04.3    Subcontracts and Third Party Contracts.** ACS shall use commercially reasonable efforts to make available to NCMC, pursuant to reasonable terms and conditions, any subcontractor or third party services then being utilized by ACS in the performance of the Services.  ACS shall retain the right to utilize any such subcontractor or third party services in connection with the performance of services for any other ACS customer.  NCMC shall retain the right to contract directly with any subcontractor or third party previously utilized by ACS to perform any Services.

**1.04.4  Termination Assistance Services Rates and Charges.**  If NCMC requests that ACS provide or perform Termination Assistance Services in accordance with this Agreement, NCMC shall pay ACS rates and charges specified in each applicable SOW for the ACS Personnel or resources required to perform such Termination Assistance Services.  To the extent rates and charges for such ACS Personnel or resources are not specified in a SOW, NCMC shall pay ACS a reasonably negotiated fee.  Notwithstanding the foregoing, ACS shall use commercially reasonable efforts to provide the Termination Assistance Services requested by NCMC using ACS Personnel then assigned to Customer. To the extent ACS is able to do so; NCMC shall incur no additional charge for such Termination Assistance Services.  If the Termination Assistance Services requested by NCMC cannot be provided by ACS using such ACS Personnel without impacting ACS' ability to meet the Service Levels and/or its other obligations under the Agreement, ACS shall so advise NCMC and NCMC, in its

sole discretion, may forego or delay any work activities or temporarily or permanently adjust the work to be performed by ACS, the schedules associated therewith or the Service Levels to permit the performance of such Termination Assistance Services using such personnel.

## 2.0 SERVICES; STATEMENTS OF WORK; AND SERVICE LEVELS.

**2.01    Services.**  Commencing on the Effective Date, ACS shall provide to NCMC, and the related entities designated in the Statement of Work ("SOW") the services described in the approved and executed Statements of Work (the "Services") listed in **Exhibit 1**.  Except as expressly provided for in this Agreement, ACS shall be responsible for providing all facilities, personnel, equipment, software, technical knowledge, expertise and other resources necessary to provide the Services.

**2.02    Statements of Work.**  Upon mutual agreement of the Parties, ACS shall perform such additional Services as may be set forth in a Statement of Work in substantially the form described below.

**2.02.1  Statement of Work Information.**  Each Statement of Work will contain, at a minimum, (i) a description of the services to be performed by ACS (ii) the time schedule for performance and for delivery of such services, and (iii) the amount and method of payment for such services.

**2.02.2  Other Information.**  In addition, when applicable, a SOW may include (i) provisions for written and/or oral progress reports by ACS, (ii) detailed functional and technical specifications and standards for all Services, including quality standards, (iii) a list of any special equipment to be procured by ACS or provided by NCMC for use in performance of the Services or (iv) such other terms and conditions as may be mutually agreed between the parties.  In the event of a conflict between the terms of this Agreement and the terms of any particular SOW, the terms of the SOW will govern.

**2.02.3  Issuance of Statements of Work.**  SOW's, regardless of whether they relate to the same subject matter as previous SOW's, will become effective upon execution by authorized representatives of both Parties.

**2.03    Service Levels.**  "Service Levels" shall mean the quantitative levels of performance for certain specified Services as set forth in the applicable SOW. With respect to a Service which has an associated Service Level, ACS will provide such Service throughout the Term in a manner which meets or exceeds the associated Service Level.

**2.03.1    Excused Performance Problem.**  "Excused Performance Problem" shall mean any event which causes ACS to fail to achieve a Service Level which will not be included in any calculation of Service Level Credits that

          ACS / NCMC Confidential

may be owed to NCMC.  Examples of Excused Performance Problems include, but are not necessarily limited to: (i) errors or defects in NCMC software or NCMC equipment; (ii) any action or inaction taken by NCMC or a third party service provider of NCMC which causes an adverse affect on ACS' ability to provide the Services, or (iii) a manifestation of a latent defect in third party software or equipment.

### 2.03.2  Failure to Meet Service Levels

(a)    If ACS fails to meet a Service Level for reasons other than those specified in Section (b) below, NCMC will have the option, but not the obligation, to recover as its sole and exclusive monetary remedy for such failure, the applicable amount specified in each applicable SOW ("**Service Level Credit**") as liquidated damages. ACS will deduct the Service Level Credits from the next succeeding invoice.  NCMC may in the alternative, before or after receiving the applicable Service Level Credits, elect to make a claim for damages against ACS arising out of ACS' failure to meet the designated Service Level; provided that payment by ACS of any such damages finally awarded will be reduced by, and to the extent of, any Service Level Credits paid by ACS and associated with the failure to meet the Service Level which is the basis of the claim for damages.

(b)    If a failure is attributable to (i) a Force Majeure event, or (ii) a breach by NCMC of this Agreement, or (iii) any Excused Performance Problem, NCMC will not be entitled to a Service Level Credit.

### 2.03.3  Limitation on Service Level Credits.
The maximum amount of any Service Level Credits for which ACS may be liable in any given monthly billing period is ten percent (10%) of the fees payable during such monthly billing period, less any taxes or other applicable pass through charges.

## 3.0   FACILITIES

### 3.01  Location of Services.
ACS shall provide the Service at or from the facilities described on **Exhibit 2** hereto or in a Statement of Work (the "**Approved ACS Facilities**").  ACS may relocate Services from an Approved ACS Facility in the United States to another ACS Facility in the United States, provided ACS provides notice to NCMC at least sixty (60) days prior to the ACS' planned relocation date. The ACS Facility to which the Services are to be relocated must be comparable or superior in all material respects to the Approved ACS Facility from which such Services had previously been performed. The ACS Facility to which the Services are to be relocated must comply with all relevant requirements and ACS obligations under this Agreement. The ACS Facility to

which the Services are to be relocated must present no greater risk from a disaster recovery or business continuity perspective. ACS will promptly provide NCMC with information and documentation demonstrating that such ACS Facility complies with the criteria specified and provide NCMC with thirty (30) days to independently verify such compliance. ACS will remedy any known non-compliance with the criteria specified by NCMC in writing no less than sixty (60) days prior to ACS' planned relocation date. Insomuch that the facility requirements are not materially different from those in the prior location, ACS agrees to be financially responsible for any additional costs, taxes or expenses related to or resulting from such relocation. Any expenses related to NCMC-required changes to the ACS Facility beyond the prior Facility's requirements will be the responsibility of NCMC.

**3.02    Restrictions on Changes in ACS Facilities.** ACS will not move Services to or between ACS Facilities located outside the United States without NCMC's prior written approval. To the extent Services are provided by ACS Personnel (defined later in this Agreement) from ACS Facilities in different countries, ACS will not change the extent to which such Services are provided by ACS Personnel from each such ACS Facility and country by more than fifteen percent (15%), in the aggregate, without NCMC's prior approval.

## 4.0    CONTRACT ADMINISTRATION AND ACS PERSONNEL

**4.01    Contract Coordinators.** Upon execution of this Agreement, each Party will notify the other Party of the name, business address, and telephone number of the person who will have primary responsibility for interfacing on its behalf with the other Party (the "**Contract Coordinator**"). The Contract Coordinators will be responsible for arranging all meetings, visits, and consultations between the Parties that are of a non-technical nature and monitoring all administrative matters arising under this Agreement.

**4.02    Changes in Coordinators.** Either Party may replace its Contract Coordinator by delivery of written notice of such change, signed by an authorized representative of such Party. The notice will set forth the name, business address and telephone number of such replacement.

**4.03    Personnel.** Except as otherwise expressly set forth in this Agreement, the Parties intend to create an independent contractor relationship and nothing in this Agreement shall operate or be construed as making NCMC and ACS partners, joint venturers, principals, joint employers, agents or employees of or with the other. No officer, director, employee, agent, affiliate, contractor or subcontractor retained by ACS to perform work on NCMC's behalf hereunder shall be deemed to be an officer, director, employee, agent, affiliate, contractor or subcontractor of NCMC for any purpose. ACS, not NCMC, has the right, power, authority and duty to supervise and direct the activities of ACS **Personnel** ("those employees, representatives, contractors, subcontractors and agents of ACS,

subcontractors and ACS affiliates who perform any Services under this Agreement") and to compensate ACS Personnel for any work performed by them on the behalf of NCMC pursuant to this Agreement. ACS, and not NCMC, shall be responsible and therefore solely liable for all acts and omissions of ACS Personnel. No officer, director, employee, agent, affiliate, contractor or subcontractor retained by NCMC to perform work on behalf of NCMC shall be deemed to be an officer, director, employee, agent, affiliate, contractor or subcontractor of ACS for any purpose. NCMC, not ACS, has the right, power, authority and duty to supervise and direct the activities of NCMC Personnel ("the employees, agents, contractors or representatives of NCMC or its affiliates who shall perform NCMC's obligations under this Agreement") and to compensate NCMC Personnel for any work performed by them on the behalf of NCMC. NCMC, and not ACS, shall be responsible and therefore solely liable for all acts and omissions of NCMC Personnel.

**4.04 ACS Personnel**

    (a) ACS will use commercially reasonable efforts to verify that: (i) ACS Personnel are authorized to work in any country in which they are assigned to perform Services; and (ii) ACS Personnel have not been convicted of or accepted responsibility for a felony or a misdemeanor involving a dishonest act (or comparable offense in countries outside the United States);

    (b) To the extent allowed by applicable laws, ACS will perform, or have performed at its expense, a reasonable background check on all ACS Personnel assigned to work hereunder. Such background check shall include at a minimum, for ACS employees employed in the United States, a five (5) year criminal history check for ACS' entry-level employees and a seven (7) year criminal history check for ACS' employees other than entry-level employees. For ACS employees employed outside the United States, ACS will use commercially reasonable efforts to meet the same criteria, subject to general business practices in the respective country and industry, and further subject to reasonable availability of information and documentation.

    (c) All results from background checks applicable to ACS Personnel will be deemed the Confidential Information of ACS. ACS shall not assign ACS Personnel to perform Services who it knows or who the background check reveals to have not met the criteria set forth in the Agreement

**4.05 Code of Conduct.** In the event that ACS Personnel are in a facility or location owned by NCMC, the following shall apply:

        ACS / NCMC Confidential

(a) ACS shall comply with the **NCMC Rules** ("NCMC policies, rules, and regulations applicable to NCMC facilities where the Services may be performed and which have been communicated to ACS in writing"), and reasonable requests of NCMC Personnel pertaining to personal and professional conduct, and otherwise conduct themselves in a businesslike manner;

(b) ACS shall attend workplace training offered by NCMC at NCMC's request and expense;

(c) ACS Personnel will clearly identify themselves as ACS Personnel and not as employees of NCMC. Identification will include any and all communications, whether oral, written or electronic, unless and to the extent authorized by NCMC in connection with the performance of specific Services;

       i. Each ACS Personnel will wear a badge issued by NCMC indicating that he or she is a "contractor" when at a NCMC site or facility.

**4.06 Substance Abuse.**   To the extent permitted by applicable laws, ACS will immediately remove any ACS Personnel who is known to be or reasonably suspected of engaging in substance abuse while at a NCMC facility or site, in a NCMC vehicle or while performing Services. In the case of reasonable suspicion, such removal will be pending completion of the applicable investigation. Substance abuse includes the sale, attempted sale, possession or use of illegal drugs, drug paraphernalia, or, to the extent not permitted on or at a NCMC facility or site, alcohol, or the misuse of prescription or non-prescription drugs. Further, ACS has and will maintain substance abuse policies in conformance with applicable laws, that ACS Personnel will be subject to such policies, and that it will require its subcontractors and affiliates providing Services to have and maintain such policy in conformance with applicable law and to adhere to this provision.

## 5.0   CHANGES TO THE AGREEMENT OR STATEMENTS OF WORK

All change requests with respect to this Agreement, any SOW, or any specification relating to the Services must be requested and/or accepted by both Parties' Contract Coordinators, and will only be effective when changed by a written amendment, signed by the Contract Coordinator of each Party, which specifically refers to the provisions of the Agreement or the SOW's to be modified.   Unless otherwise specified in writing, amendments implemented to any SOW will only apply to that SOW.

          ACS / NCMC Confidential

## 6.0 INVOICING

**6.01  Method of Invoicing.** Amounts and method of payment for all Services will be set forth in each SOW. ACS will submit invoices to NCMC at such time(s) as payment becomes due under each SOW. Invoices are due and payable within thirty (30) days from the date of receipt by NCMC. Interest will accrue on any invoices not paid within this time period at a rate of one and one-half percent (1 ½%) per month, or the maximum amount allowed by law, whichever is less.

**6.02  Travel Expenses.** Each invoice will separately set forth travel expenses (if any) authorized by NCMC for reimbursement. Supporting documentation, if requested, (such as receipts for air travel, hotels, and rental cars) will accompany any such invoice

## 7.0 RECORDS AND AUDIT

**7.01  ACS Records.** During the Term (including the period during which any Termination Assistance Services are being performed) and for two (2) years thereafter (or such longer period as might be required by applicable law) (the "Retention Period"), ACS shall maintain complete and accurate records of and supporting documentation for all transactions, authorizations, changes, implementations, soft document accesses, reports, filings, returns, analyses, procedures, controls, records, data or information created, generated, collected, processed or stored by ACS in the performance of its obligations under this Agreement ("Contract Records"). If, prior to the end of the Retention Period NCMC requests copies of Contract Records, ACS shall make such Contract Records available for reproduction at NCMC's cost and expense. ACS shall maintain such Contract Records in accordance with generally accepted accounting principles and the law for the applicable jurisdiction applied on a consistent basis.

**7.02  Operational Audits.** ACS shall provide to Customer (and internal and external auditors, inspectors, regulators and other representatives that Customer may designate from time to time who are bound by written obligations of confidentiality no less than those contained in this Agreement), at Customer's expense, access during normal business hours to the ACS Facilities where the Services are then being provided and to ACS records, all to the extent relevant to the Services and ACS' obligations under this Agreement. Such access shall be provided for the purpose of performing audits and inspections of ACS, to (i) verify the integrity of NCMC's data, (ii) examine the systems, infrastructure and networks that process, store, support and transmit that data, (iii) examine the controls (e.g., organizational controls, input/output controls, system modification controls, business process controls, system processing controls, system design controls, and access controls) and the security (including examination of security at the applications, database, and operating systems), disaster recovery and back-up practices and procedures; (iv) examine ACS' performance of the Services; (v) verify ACS' reported performance against the applicable Service Levels; and (vi) examine ACS' measurement, monitoring and management tools. ACS shall

ACS / NCMC Confidential

EXECUTION COPY

provide any assistance reasonably requested by NCMC or its designee in conducting any such audit.

    (a)    If the audit reveals an issue that is a material breach of the Agreement and is not cured as provided in section 1.03.2, then ACS shall reimburse NCMC for all reasonable and actual costs of the audit up to a maximum reimbursement from ACS of $20,000 per audit.

    (b)    If the audit reveals an issue that is a material breach of the Agreement and is cured as provided in section 1.03.2, then ACS shall reimburse NCMC for one-half of all reasonable and actual costs of the audit up to a maximum reimbursement from ACS of $10,000 per audit.

    (c)    If the audit reveals no issue that is a material breach of the Agreement, then NCMC shall be responsible for its costs expended for the audit.

**7.03  Financial Audits.** During the Term (including the period during which any Termination Assistance Services are being performed) and for a period of two (2) years thereafter, ACS shall provide to NCMC (and internal and external auditors, inspectors, regulators and other representatives that NCMC may designate from time to time) access during reasonable business hours to the ACS Contract Coordinator and to Contract Records only to the extent reasonably relevant to the performance of ACS' obligations under this Agreement. Such access shall be provided for the purpose of performing audits and inspections to (i) verify the accuracy and completeness of Contract Records, (ii) verify the accuracy and completeness of charges and any expenses, and (iii) examine the financial controls, processes and procedures utilized by ACS with respect to performing the Services. ACS shall provide any assistance reasonably requested by NCMC in conducting any such audit and promptly pay to NCMC the amount of any overcharge revealed by the audit. As between the Parties, NCMC shall be responsible for any auditor's fees and costs associated with such audit, unless the audit reveals an overcharge of more than three percent (3%) of the audited charges, in which case ACS shall promptly reimburse NCMC for the reasonable and actual cost of such audit, including reasonable auditor's fees not to exceed $20,000.

**7.04  General Procedures.** Audits conducted pursuant to this Article 7 shall be subject to the following terms to extent applicable:

    (a)  Notwithstanding the intended breadth of NCMC's audit rights, NCMC shall not be given access to (i) the proprietary information of other ACS customers, (ii) ACS locations that are not related to NCMC

or the Services, or (iii) ACS' internal cost information, except for reimbursable costs, pass through costs and verification of the hours billed at an hourly billing rate.

(b) In performing audits, NCMC shall use best efforts to avoid unnecessary disruption of ACS' operations and unnecessary interference with ACS' ability to perform the Services in accordance with the Service Levels.

(c) Following any audit, NCMC shall conduct (in the case of an internal audit), or request its external auditors or examiners to conduct, an exit conference with ACS to obtain factual concurrence with issues identified in the review.

(d) The financial audit activities described in Section 7.03 shall occur no more frequently than four times annually.

(e) The operational audit activities described in Section 7.02 shall occur no more frequently than once every three (3) months.

(f) NCMC shall provide ACS with at least ten (10) business days prior written notice before commencing any audit activities described herein.

**7.05  Supplier Response.** ACS and NCMC shall meet to review each audit report promptly after the issuance thereof. ACS will respond to each audit report in writing within thirty (30) days from receipt of such written report. ACS and NCMC shall develop and agree upon an action plan to promptly address and resolve any deficiencies, concerns and/or recommendations in such audit report and ACS shall undertake remedial action, with respect to any deficiencies, in accordance with such action plan and the dates specified therein. ACS shall provide NCMC with a report of its completion of such remedial action, together with documentary evidence, promptly after the completion thereof.

**8.0      BENCHMARK**

**8.01  Benchmarking Review.** From time to time during the Term, but in no event earlier than January 1, 2007 or more often than once every twelve (12) months, NCMC may, at its expense, engage the services of an independent third party who is not a direct competitor of ACS (a "**Benchmarker**"), to compare the quality and cost of the Services and the Service Levels against the quality and cost of at least three other well managed tier one service providers performing similar services, with similar volumes, scopes, and markets to ensure that NCMC is obtaining pricing and levels of service that are competitive with market rates, prices and service levels, given the nature, volume and type of Services provided

by ACS hereunder ("**Benchmarking**").    In making this comparison, the Benchmarker shall consider the following factors and adjust the prices as and to the extent appropriate: (i) whether supplier transition charges are paid by the customer as incurred or amortized over the term of the agreement; (ii) the extent to which supplier pricing includes the purchase of the customer's existing assets; (iii) the extent to which supplier pricing includes the cost of acquiring future assets; (iv) the extent to which this Agreement calls for supplier to provide and comply with unique NCMC requirements; (v) whether Service taxes are included in such pricing or stated separately in supplier invoices; (vi) the extent to which ACS' prices are associated with geographic labor markets; (vii) the extent to which ACS' prices are affected by the division of Services among different geographic regions for disaster recovery purposes; (viii) the extent to which service levels are affected by increased charges and/or resources (ix) the extent to which the prices are affected by applicable service levels, (x) the term of the agreement, (xi) the extent to which the prices are affected by any required financial engineering or investments.

**8.02    General.**  Any Benchmarker engaged by NCMC shall execute a non-disclosure agreement reasonable acceptable to ACS.  ACS shall cooperate fully with NCMC and the Benchmarker and shall provide reasonable access to the Benchmarker during such effort.  The Benchmarking shall be conducted so as not to unreasonably disrupt ACS' operations under this Agreement.

**8.03    Result of Benchmarking.**    If the Benchmarker finds that (a) the charges paid by NCMC for all Services in the aggregate are greater than the fifty-fifth percentile of the prices charged by other well managed service providers for work of a similar nature, type or volume, or (b) the Service Levels in the aggregate are less than the fifty-fifth percentile of the service levels guaranteed by other well managed service providers for service levels of a similar nature, type or volume at charges comparable to the charges invoiced hereunder (the "**Benchmark Standard**"), the Benchmarker shall submit a written report setting forth such findings and conclusions, which must contain the information set forth in Section 8.01, above.  The Parties shall then meet and negotiate in good faith as to adjustments in the charges to eliminate any unfavorable variance or modifications to the Service Levels, taking into account any additional charges or resources required to achieve the desired Service Level modification.  If the Parties are unable to agree upon such reductions, NCMC may, at its option, terminate the Services in whole or in part with ninety (90) days written notice, provided that NCMC must pay all applicable early termination charges associated with a termination for convenience pursuant to **Section 1.02** above.  To the extent ACS agrees to eliminate a variance by moving some or all of the impacted ACS personnel or services to ACS facilities in other geographic locations (with no additional cost or expense to NCMC) and NCMC declines to approve such move, ACS will be relieved of further obligation to eliminate such variance and NCMC will not be entitled to terminate on this basis.

        ACS / NCMC Confidential

**8.04  ACS Review and Dispute.**  NCMC shall provide ACS with a copy of the Benchmarker's report and ACS shall have thirty (30) days to review such report and contest the Benchmarker's findings.  If the Parties are unable to agree upon the validity of such findings, the matter shall be resolved pursuant to the dispute resolution procedures set forth in Section 14.10.  Modifications in ACS' charges or the Service Levels shall be implemented effective as of the later of (i) next full billing cycle following the date ACS accepted or contested the Benchmarker's report or (ii) a date mutually agreed by the Parties; provided, however, if a modification to a Service Level would require ACS to allocate significant additional resources, then the modification will be implemented only effective as of a mutually-agreeable date.

**9.0        OWNERSHIP**

**9.01  NCMC Owned Material.**  NCMC shall be the sole and exclusive owner of (a) all intellectual property, software and other materials owned by NCMC or one of its related entities as of the Effective Date, (b) all enhancements and derivative work of such intellectual property, software and other materials, and (c) certain work product, as provided in Section 9.02.

**9.02  NCMC Ownership of Work Product.**  NCMC shall have exclusive ownership of the deliverables listed in any SOW.  Except as may be expressly provided in any SOW, ACS acknowledges and agrees that NCMC shall be the sole and exclusive owner of any software or other original works of authorship first created by ACS pursuant to a SOW for which there is a separate charge under such SOW and which is  paid by NCMC ("**Custom Work Product**").  All Custom Work Product shall be considered works for hire owned by NCMC.  If any Custom Work Product is not considered a work made for hire under applicable law, ACS shall assign to NCMC all of ACS' right, title and interest in and to Custom Work Product.  Custom Work Product shall not include any pre-existing works of authorship of ACS ("**ACS Owned Material**") or a third party ("**Third Party Materials**") and title to and ownership of such pre-existing works will not be deemed to be conveyed to NCMC.   The Parties shall provide for the ownership of ACS Owned Material or Third Party Materials that are embedded in any Custom Work Product in each SOW.  in connection with NCMC's use of the Custom Work Product.  Except as otherwise provided for in a SOW, ACS shall retain a worldwide, perpetual, unrestricted, non-exclusive, royalty-free license to use, practice, copy, distribute and create derivative works of any Custom Work Product to the extent the Custom Work Product does not contain NCMC Owned Materials.

**9.02  Residual Rights.**  Notwithstanding anything to the contrary above, each Party reserves all rights in ideas, concepts, know-how, methodologies, processes and techniques, and no provision of this Agreement shall be construed to transfer

any of such Party's rights in such intellectual property. ACS reserves all rights in and to the tools, utilities and standards developed by ACS prior to or independent of the Services hereunder and used to provide the Services.

## 10.0    CONFIDENTIAL INFORMATION

**10.01** The Mutual Non-Disclosure Agreement between the Parties dated as of April 25, 2005, a copy of which is attached hereto as Exhibit 3 and incorporated herein by reference, shall remain in full force and effect.

## 11.0    INDEMNIFICATION

**11.01  Indemnification by ACS.** ACS shall indemnify, defend and hold harmless NCMC, its affiliates, and their respective officers, directors, employees, agents, successors and assigns, from and against all claims by a third party for losses arising from, in connection with or relating to any of the following:

    (a)    Negligent acts or omissions or willful misconduct of ACS personnel located in any NCMC facility while performing the Services under this Agreement which causes bodily injury or death or physical damage to tangible property;

    (b)    ACS' breach of its obligations with respect to NCMC's Confidential Information;

    (c)    Any theft or other misappropriation of NCMC's property or funds by ACS or any of ACS' employees;

    (d)    Losses, fines, penalties, monetary sanctions or other remedies resulting from ACS' failure to perform the Services in accordance with applicable laws;

    (f)    Supplier's failure to observe or perform its obligations with respect to the use of NCMC Owned Material or Custom Work Product; and

    (g)    Any claim resulting from (i) any violation by ACS of an applicable employment-related law, (ii) any failure of ACS to withhold and pay any applicable taxes.

**11.02  Indemnification by NCMC.** NCMC shall indemnify, defend and hold harmless ACS, its affiliates and their respective officers, directors, employees, agents, successors and assigns, from and against all claims by a third party for losses arising from, in connection with or relating to any of the following:

        ACS / NCMC Confidential

(a) Negligent acts or omissions or willful misconduct of NCMC personnel located in any ACS facility while performing under this Agreement which causes bodily injury or death or physical damage to tangible property;

(b) NCMC's breach of its obligations with respect to ACS' Confidential Information; and

(c) Any claim by a third party asserting rights under this Agreement or relating to the operation of NCMC'S business, except to the extent such claim results from the wrongful or tortuous acts of ACS or the failure of ACS to comply with ACS' obligations under this Agreement.

**11.03  Intellectual Property Indemnification.**

(a) NCMC and ACS each agree to defend the other against any action to the extent that such action is based on a claim that any NCMC developed software, in the case of NCMC, and the ACS developed software or the Services, in the case of ACS, or the Confidential Information provided by the indemnitor, (i) infringes a copyright perfected under applicable law, (ii) infringes a patent granted under applicable law or (iii) constitutes an unlawful disclosure, use or misappropriation of another party's trade secret. The indemnitor will bear the expense of such defense and pay any damages and attorneys' fees that are attributable to such claim finally awarded by a court of competent jurisdiction. If any software or Confidential Information becomes the subject of a claim under this Section, or in the indemnitor's opinion is likely to become the subject of such a claim, then the indemnitor may, at its option, (i) modify the software or Confidential Information to make it non-infringing or cure any claimed misuse of another's trade secret, provided such modification does not adversely affect the functionality of the software, or (ii) procure for the indemnitee the right to continue using the software or Confidential Information pursuant to the applicable Statement of Work, or (iii) replace the software with substantially equivalent software that is non-infringing or that is free of claimed misuse of another's trade secret. Any costs associated with implementing any of the above alternatives shall be borne by the indemnitor.

(b) With respect to any software provided or developed by a Party pursuant to a SOW, such Party shall have no liability to the other Party under such SOW (i) to the extent that any claim of infringement is based upon the use of the software in connection or in combination with equipment, devices or software for which the software was not designed, (ii) for infringements that arise solely

as a result of the implementation by that Party of functionality requirements or specifications presented by the other Party and such infringement would have been avoided had such requirements or specifications not been implemented and (iii) for maintenance, modifications, updates, enhancements and improvements made to the software by any party other than the developer of such software.

## 11.04 Indemnification Procedures.

(a) Promptly after receipt by an indemnitee of any written claim or notice of any action giving rise to a claim for indemnification by the indemnitee, the indemnitee shall so notify the indemnitor and shall provide copies of such claim or any documents relating to the action. No failure to so notify an indemnitor shall relieve the indemnitor of its obligations under this Agreement except to the extent that the failure or delay is prejudicial. Within thirty (30) days following receipt of such written notice, but in any event no later than ten (10) days before the deadline for any responsive pleading, the indemnitor shall notify the indemnitee in writing (a "**Notice of Assumption of Defense**") if the indemnitor elects to assume control of the defense and settlement of such claim or action.

(b) If the indemnitor delivers a Notice of Assumption of Defense with respect to a claim within the required period, the indemnitor shall have sole control over the defense and settlement of such claim; provided, however, that (i) the indemnitee shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim and (ii) the indemnitor shall obtain the prior written approval of the indemnitee before entering into any settlement of such claim or ceasing to defend against such claim. After the indemnitor has delivered a timely Notice of Assumption of Defense relating to any claim, the indemnitor shall not be liable to the indemnitee for any legal expenses incurred by such indemnitee in connection with the defense of such claim; provided, that the indemnitor shall pay for separate counsel for the indemnitee to the extent that conflicts or potential conflicts of interest between the Parties so require. In addition, the indemnitor shall not be required to indemnify the indemnitee for any amount paid by such indemnitee in the settlement of any claim for which the indemnitor has delivered a timely Notice of Assumption of Defense if such amount was agreed to without prior written consent of the indemnitor, which shall not be unreasonably withheld or delayed in the case of monetary claims. An indemnitor may withhold consent to

ACS / NCMC Confidential

settlement of claims of infringement affecting its proprietary rights in its sole discretion.

(c) If the indemnitor does not deliver a Notice of Assumption of Defense relating to a claim within the required notice period, the indemnitee shall have the right to defend the claim in such a manner as it may deem appropriate, at the cost and expense of the indemnitor. The indemnitor shall promptly reimburse the indemnitee for all such costs and expenses upon written request therefore.

**11.05  Subrogation.**  In the event an indemnitor indemnifies an indemnitee pursuant to this Article, the indemnitor shall, upon payment in full of such indemnity, be subrogated to all of the rights of the indemnitee with respect to the claim to which such indemnity relates.

## 12.0  REPRESENTATIONS/LIMITATION OF LIABILITY

**12.01  Representations by ACS.**  ACS makes the following representations for the benefit of NCMC, as a present and ongoing affirmation of facts in existence at all times when this Agreement or any SOW is issued hereunder is in effect:

(a)  <u>No Conflict.</u>  ACS represents that it is under no obligation or restriction, nor will it assume any such obligation or restriction, that does or would in any way interfere or conflict with, or that does or would present a conflict of interest concerning, the work to be performed by ACS under this Agreement and or any particular SOW.

(b)  <u>Performance of Services.</u>  ACS will perform the Services in a workmanlike manner in substantial compliance with the specifications that may be set forth in the applicable SOW's.

(c)  <u>Compliance With Laws.</u>  ACS represents and warrants that, with respect to the provision of the Services, it is and shall be in compliance in all material respects with all laws applicable to the provision of the Services.

**12.02  No Other Warranties.**  EXCEPT AS SET FORTH IN THIS AGREEMENT, ACS DOES NOT MAKE ANY WARRANTIES WITH RESPECT TO THE SERVICES OR OTHER DELIVERABLES PROVIDED UNDER THIS AGREEMENT AND EXPLICITLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A SPECIFIC PURPOSE.

## 13.0   LIMITATIONS ON LIABILITY

**13.01   Limit on Types of Damages Recoverable.**  EXCEPT AS SET FORTH IN THIS SECTION 13.01, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT OR OTHERWISE AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**13.01.1**  The limitation set forth in this Section 13.01 will not apply with respect to: (i) claims for which either Party is obligated to indemnify the other, or (ii) the fraudulent or willful misconduct of either Party.

**13.02   Limit on Amount of Damages Recoverable.**  Except as set forth in this Section 13.02, ACS' cumulative aggregate liability, whether in contract, tort or otherwise, for all damages arising out of or relating to this Agreement will be limited to an amount equal to the lesser of:  (i) actual damages incurred by Customer as a result of the event(s) giving rise to the liability or (ii) the amounts paid for the Services for the twelve (12) month period immediately preceding the month in which the event giving rise to the liability occurred.

**13.02.1**  The limitation set forth in this Section 13.02 will not apply with respect to: (i) ACS obligations with respect to the care and use of Customer's Confidential Information, (ii) claims for which ACS is obligated to indemnify Customer, or (iii) the fraudulent or willful misconduct of ACS in the performance of the Services under any SOW.

## 14.0   MISCELLANEOUS

**14.01   Survival.**   In the event of any termination of this Agreement, any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement will survive and continue in effect and will inure to the benefit of and be binding upon the Parties and their legal representatives, heirs, successors, and assigns.

**14.02   Reference Requirement.**  Unless otherwise directed by NCMC, ACS will use NCMC as a reference at least once each calendar quarter in connection with a business opportunity contemplating similar services.  NCMC's Contract Coordinator will be the contact point for prospective ACS customers and will respond to all inquiries in a timely manner.  ACS agrees that NCMC's Contract Coordinator (or equivalent level of management) may freely discuss all aspects of ACS' performance and NCMC's satisfaction with such performance with prospective ACS customers.  ACS will provide such prospective ACS customers

with appropriate NCMC contact information. Prospective ACS information is ACS Confidential Information.

**14.03  Publicity.**    Except as required by law or regulation, ACS will not use NCMC's name, trade mark or service mark or refer to NCMC directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior written consent of the NCMC's Investor Relations and Legal Departments prior to each such use or release. NCMC will not make any public statements about this Agreement, the Services or its relationship with ACS without ACS's prior approval.  Except as required by law or regulation, NCMC will not use ACS' name, trademark or service mark or refer to ACS directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations, without the prior written consent of ACS prior to each such use or release.

**14.04  Service Marks.**    ACS agrees that it will not, without NCMC's prior consent, use any of the names, service marks or trademarks of NCMC in any of its advertising or marketing materials.  NCMC agrees that it will not, without ACS' prior consent, use any of the names, services marks or trademarks of ACS in any of its advertising or marketing materials.

**14.05  Force Majeure.**  Either Party will be excused from delays in performing or from its failure to perform hereunder to the extent that such delays or failures result from causes beyond the reasonable control of such Party.  The Party whose performance has been delayed or prevented will act diligently to resume performance as soon as reasonably possible.

**14.06  Relationship of Parties.**  Nothing in this Agreement shall be deemed to create a partnership, joint venture or similar relationship between the Parties and, except as otherwise expressly provided herein, no Party shall be deemed to be the agent of the other Party, it being understood and agreed that neither the method of computing compensation nor any other provision contained herein shall be deemed to create any relationship between the Parties hereto other than the relationship of independent parties contracting for services.  Neither Party has or shall hold itself out as having any authority to enter into any contract or create any obligation or liability on behalf of, in the name of, or binding upon the other Party.

**14.07  Multiple Counterparts.**  This Agreement may be executed in several counterparts, all of which taken together will constitute one single Agreement between the Parties.

ACS / NCMC Confidential

EXECUTION COPY

**14.08  Exhibits.**  The exhibits referred to in this Agreement and attached, or to be attached, including all SOW.'s issued from time to time, are incorporated into and made subject to this Agreement.

**14.09  Required Approvals.**  Where agreement, approval, acceptance, or consent by either Party is required by any provision of this Agreement, such action will not be unreasonably conditioned, delayed or withheld, except a otherwise provided for herein.

**14.10  Governing Law/Arbitration.**

(a)  All questions concerning the validity, interpretation and performance of this Agreement shall be governed by and decided in accordance with the laws of the State of New York, exclusive of its conflicts of laws principles.

(b)  All disputes, controversies, or differences arising out of this Agreement or any breach thereof will be finally settled under the Commercial Arbitration Rules established by the American Arbitration Association then in effect.  The arbitration will take place in New York, New York and will apply the governing law of this Agreement.  The decision of the arbitrators will be final and binding and judgment on the award may be entered in any court of competent jurisdiction.  The arbitrators will be instructed to state the reasons for their decisions, including findings of fact and law.  The arbitrators will be bound by the warranties, limitations of liability, and other provisions of this Agreement.  Such arbitration will be a precondition to any application by either Party hereto to any court of competent jurisdiction.  Unless otherwise directed by NCMC in writing, ACS will continue to perform the Services pursuant to this Agreement during arbitration, subject to the provisions of Section 5 above, and NCMC will continue to pay the Fees.  Within ten (10) days after delivery of written notice ("Notice of Dispute") by one Party to the other in accordance with this Section, the Parties each will use good faith efforts to mutually agree upon one (1) arbitrator.  If the Parties are not able to agree upon one (1) arbitrator within such period of time, each of the Parties will within ten (10) days (i) appoint one (1) arbitrator who has at no time ever represented or acted on behalf of either of the Parties hereto, and is not otherwise affiliated with or interested in either of the Parties, and (ii) deliver written notice of the identity of such party and a copy of his or her written acceptance of such appointment to the other Party hereto.  If either Party fails or refuses to appoint an arbitrator within such ten (10) day period, the single arbitrator appointed by the other Party will decide alone the issues set out

ACS / NCMC Confidential

in the Notice of Dispute.  Within ten (10) days after such appointment and notice, such arbitrators will appoint a third arbitrator.  In the event the two arbitrators fail to appoint a third arbitrator within ten (10) days of the appointment of the second arbitrator, either arbitrator or either party may apply for the appointment of a third arbitrator to the American Arbitration Association.  All arbitrators selected pursuant to this Section will be practicing attorneys with at least five (5) years experience in technology law applicable to the Services.   Any such appointment will be binding upon the Parties.  The Parties will use best efforts to set the arbitration within sixty (60) days after selection of the arbitrator or arbitrators, as applicable, but in no event will the arbitration be set more than ninety (90) days after selection of the arbitrator or arbitrators, as applicable. Discovery as permitted by the Federal Rules of Civil Procedure then in effect will be allowed in connection with arbitration to the extent consistent with the purpose of the arbitration and as allowed by the arbitrator or arbitrators, as applicable.  The decision or award of the arbitrator or the majority of the three arbitrators, as applicable, will be rendered within fifteen (15) days after the conclusion of the hearing, in writing, will set forth the basis therefore, and will be final, binding and nonappealable upon the Parties and may be enforced and executed upon in any court having jurisdiction over the Party against whom the enforcement of such decision or award is sought.  Each Party will bear its own arbitration costs and expenses and all other costs and expenses of the arbitration will be divided equally between the Parties; provided, however, the arbitrator or arbitrators, as applicable, may modify the allocation of fees, costs and expenses in the award in those cases where fairness dictates other than such an allocation between the Parties.

**14.11  Assignment.**  This Agreement will be binding on the Parties and their respective successors and assigns.   Notwithstanding the foregoing, neither Party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed.

**14.12   Notices.** Whenever under this Agreement one Party is required or permitted to give notice to the other, such notice will be deemed given when delivered in hand or three (3) business days after the date mailed by United States mail, certified mail, return receipt requested, postage prepaid, or when transmitted via facsimile, and addressed as follows:

In the case of ACS:

ACS Commercial Solutions, Inc.
2432 Fortune Drive, Suite 120
Lexington, KY 40509
Attn: Managing Director for Commercial Solutions
Facsimile:  (859) 389-4039

With copy to:

ACS Commercial Solutions, Inc.
1111 W. Mockingbird Lane
Suite 1500
Dallas, TX 75247
Attn:  Group Counsel for
ACS Commercial Solutions, Inc.

In the case of Customer:

New Century Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612
Facsimile No.: (949) 863-7255
Attn: David Wilson

With a copy to:

New Century Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612
Facsimile No.: (949) 440-7033
Attn: General Counsel

Either Party may change its address for notification purposes by giving the
other three (3) days prior written notice of the new address and the date upon
which it will become effective.

**14.13  Severability.**  In the event any provision of this Agreement is held to be
unenforceable or invalid by any court of competent jurisdiction, the validity and
enforceability of the remaining provisions of this Agreement will not be affected
and, in lieu of such invalid or unenforceable provision, there will be added
automatically as part of this Agreement one or more provisions as similar in terms
as may be valid and enforceable under applicable law.

**14.14  Entire  Agreement.**    This  Agreement,  including  any  attachments,
constitutes the entire agreement between the parties with respect to the subject

matter hereof and supersedes all prior and contemporaneous representations, understandings or agreements, whether oral or written, relating to the subject matter hereof. The terms of this Agreement cannot be changed, released or discharged unless in writing signed by an authorized representative of each Party.

The Parties have caused this Agreement to be executed by the signatures of their respective authorized representatives.

ACCEPTED AND AGREED:

ACS COMMERCIAL
SOLUTIONS, INC.

By: _____

Name: _____
Tom Blodgett

Title: _____
Sr. Managing Director

Date: _____
APR 2 8 2006

ACCEPTED AND AGREED:

NEW        CENTURY        MORTGAGE
CORPORATION

By: _____

Name: _____
David Gibb..

Title: _____
SVP

Date: _____
4/28/06

EXECUTION COPY

## EXHIBIT 1

### Statements of Work

- **SOW #1:** ACS Procedures for NCMC Files
- **SOW #3:** Post Close Audit Application
- **SOW #4:** Broker Files – Backfile Imaging
- **SOW #5:** Transfer of Images to Loan Servicers
- **SOW #6:** GuestPortal Viewer
- **SOW #7:** Servicing Documents
- **SOW #8:** Application Program Interface
- **SOW #9:** FTP File Transfers
- **SOW #10:** Additional Document Types (EVDC)
- **SOW #11:** LIMS Data Feed
- **SOW #15:** NC Imaging Application Enhancements
- **SOW #19:** Home123 File Capture and SLA/Pricing Modifications

## EXHIBIT 2
## (List of Facilities)

- Image Capture Site – 210 Commerce, Irvine CA 92602
- Data Warehouse Site – 2828 North Haskell, Dallas, TX 75204
- Loan File Audit Site – Monterrey, MX

          ACS / NCMC Confidential

## EXHIBIT 3

### MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("Agreement") is entered into as of April 25, 2005 (the "Effective Date") by and between New Century Mortgage Corporation, a California corporation ("NCMC"), and ACS ("Recipient"), in connection with a business transaction that may require the disclosure between one another of certain Confidential Information (as defined hereinafter).

In consideration of the disclosure of Confidential Information pursuant to the terms and conditions hereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Confidential Information.** As used herein, "Confidential Information" shall mean all of a party's confidential, proprietary and trade secret information and materials, whether in written, oral, electronic or another format, including but not limited to, the following:

    (a)  confidential information, non-public personal information (as defined in the Gramm-Leach-Bliley Act and its enabling regulations) and/or trade secrets;

    (b)  proprietary business information, including but not limited to information about products, strategic plans, marketing plans, financial data, research, sales, identities of suppliers or customer lists; or

    (c)  any other proprietary or confidential information, including but not limited to any materials marked "confidential," "proprietary" or similarly marked.

2. **Evaluation Purpose.** The Confidential Information shall be used by the receiving party solely for the authorized purpose for which it is disclosed (the "Purpose") and shall not be used for any other purpose.

3. **No Copies.** Neither party nor any of its employees, officers, representatives, agents or affiliates may copy any Confidential Information, in whole or in part, absent the prior written consent of the other party.

4. **No Disclosure.** Each party acknowledges that the Confidential Information comprises valuable trade secrets and proprietary information belonging to the other party. Therefore, each party and those of its employees, officers, agents and affiliates permitted access hereunder will:

    (a)  not disclose any Confidential Information to persons within its organization who do not have a need to know in order to engage in the Purpose;

    (b)  not disclose any Confidential Information to any person outside of its organization unless such person has a need to know in order to engage in the Purpose, and such person is bound by fiduciary or contractual duties of confidentiality that are at least as stringent as those contained in this Agreement;

    (c)  if reasonably required, cause each of its employees, agents and affiliates who have access to the Confidential Information to sign a non-disclosure agreement, for the benefit of the other party, containing terms at least as stringent as those contained in this Agreement, and, in any

event, advise all of its employees, agents and affiliates of the confidential and proprietary nature of the Confidential Information; and

    (d)  in all instances, exercise at least the same degree of care to maintain the secrecy of the Confidential Information as such party exercises to protect its own trade secrets, but in no case less than reasonable care.

5. **Compelled Disclosure.** In the event that one party (the "Disclosing Party") is requested, required or compelled to disclose Confidential Information provided to it by the other party (the "Affected Party") pursuant to oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process, the Disclosing Party shall provide the Affected Party with prompt written notice of any such request or requirement so that the Affected Party may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Affected Party, the Disclosing Party is nonetheless, in the reasonable opinion of counsel, legally compelled to disclose Confidential Information to any tribunal, the Disclosing Party may, without liability hereunder, disclose to such tribunal only that portion of the Confidential Information which such counsel advises the Disclosing Party is legally required to be disclosed, provided that the Disclosing Party will cooperate with the Affected Party in seeking to preserve the confidentiality of the Confidential Information before such tribunal.

6. **Other Disclosure.** The confidentiality and non-disclosure obligations of the previous sections shall not apply if, and to the extent that: (i) the Confidential Information was known to it prior to its receipt from the other party; (ii) the Confidential Information is or becomes part of the public domain other than by the fault of such party; (iii) the Confidential Information is rightfully disclosed to such party by a third party that, to the knowledge of such party, is legally free to do so; (iv) such party has independently developed such Confidential Information; or (v) where such disclosure is required by applicable law, rule or regulation, including disclosures required in connection with securities, and similar filings.

7. **Similar Information.** The parties shall be allowed to work with a person or entity that has independently developed information or materials similar to the Confidential Information; provided, however, that the parties agree to not disclose the fact that any similarity exists between the Confidential Information and the independently developed information and materials, and each party understands that neither such similarity nor any other fact excuses it from its obligations under this Agreement.

8. **Ownership of Intellectual Property.** The Confidential Information and all intellectual property rights fixed, embodied or otherwise subsisting therein or arising therefrom, are, and will remain the sole and exclusive property of its owner, over which the owner retains all ownership and all

*MUTUAL NON-DISCLOSURE AGREEMENT*

ACS / NCMC Confidential

**EXECUTION COPY**

right, title and interest. Neither anything in this Agreement, nor the furnishing of any Confidential Information hereunder shall be construed as granting any right or license, whether express or implied, under any intellectual property rights to any person or entity.

9. Return of Confidential Information. Within five (5) days of receiving a demand from the other party, each party will, at the other party's option, either return or destroy the Confidential Information and all copies, recordings, summaries or other reproductions of any and all Confidential Information, and all notes and/or other works prepared by it based upon any Confidential Information, regardless of medium. Upon so doing, such party will certify in writing to the other party that it has returned or destroyed all such items as instructed herein.

10. Injunctive Relief. Each party acknowledges that any unauthorized disclosure of the other party's Confidential Information will cause the other party great and irreparable harm, that monetary damages alone will not redress. Each party is entitled to obtain, from any court of competent jurisdiction, immediate injunctive or other equitable relief to stop or prevent the actual or threatened unauthorized disclosure of any of its Confidential Information. Each party hereby waives any bond in excess of $1,000 that may be required in connection with obtaining said injunctive relief.

11. Restrictions on Employee Solicitations. Each party agrees that it will not solicit or induce for employment, or engagement as a consultant or in any similar capacity, any of the current officers or employees of the other party with whom a party has had contact or who was identified to such party by the other party so long as such individuals are employed by the other party.

12. Duration. This Agreement applies to any Confidential Information that may have been provided by either party to the other prior to or after the date hereof, and will continue to govern all disclosures of Confidential Information, until terminated by thirty (30) days written notice by either party to the other, except that each party's obligations relating to Confidential Information disclosed prior to termination will continue for a period of three (3) years thereafter after the date of such disclosure and that each party's obligations relating to the restrictions on employee solicitations will continue for a period of one (1) year thereafter. All sections of this Agreement which are necessary to accomplish this purpose shall survive termination of the Agreement.

13. Restrictions on Publicity. The parties agree not to issue or release any articles, advertising, publicity or other public notices relating to this Agreement, the facts and circumstances pertaining hereto, or any Confidential Information or mentioning or implying the name of the other party, except as may be required by law and then only after providing the other party with an opportunity to review and comment thereon.

14. Miscellaneous. This Agreement may not be assigned by Recipient without the express written consent of NCMC. Notwithstanding anything in this Agreement to the contrary, any or all of the rights of NCMC under this Agreement may be assigned NCMC to any direct or indirect subsidiary of NCMC or in connection with a disposition of all or substantially all of NCMC's assets or the business unit of NCMC which is the subject of this Agreement, whether by merger, sale, reorganization or other form of transaction. This Agreement is binding on the respective parties hereto and will bind their successors and permitted assigns. This Agreement shall be governed by the laws of the State of California without giving effect to that state's choice of law rules. Both parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the state and federal courts located in Orange County, California to hear and adjudicate any and all actions, suits or proceedings arising out of or relating to this Agreement. In the event of any action or proceeding to enforce or interpret any of the provisions of this Agreement, the prevailing party shall be entitled to be reimbursed for the costs of such action or proceeding, including attorneys' fees. If any provision of this Agreement is deemed unenforceable, then such provision will be severed from this Agreement and the remaining provisions will remain in full force and effect. Any waiver by either party of the requirements in this Agreement must be made in writing and should not in any way be deemed a waiver of such party's right to enforce any other requirements or provisions of this Agreement. This Agreement is the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous communications, representations, agreements and promises, written or oral, between NCMC and Recipient, regarding the subject matter of this Agreement. This Agreement may be modified only in writing signed by both parties hereto.

IN WITNESS WHEREOF, each of the parties has duly executed this Agreement as of the Effective Date set forth above.

"NCMC"

NEW CENTURY MORTGAGE CORPORATION

By: [signature]

Title: Stergios Theologides EVP Corporate Admin & General Counsel

"ACS COMMERCIAL SOLUTIONS, INC."

By: [signature]

Title: Vice President, Business Development