## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 07-10416 (KJC) |
| NEW CENTURY TRS HOLDINGS, | : | |
| INC., a Delaware corporation, et al., | : | Jointly Administered |
| Debtors. | : | Re: Docket Nos. 70 and 71 |

Objection Deadline: May 14, 2007 @4:00 PM
Hearing Date: May 18, 2007
      or May 21, 2007 @10:00 AM

*Relates to Docket Nos. 70, 340 and 420*

## DEUTSCHE BANK NATIONAL TRUST COMPANY'S ASSUMPTION AND/OR CURE OBJECTION IN CONNECTION WITH DEBTORS' PROPOSED SALE OF SERVICING BUSINESS

### Introduction

Deutsche Bank National Trust Company, ("DBNTC") hereby files its objection to the (1)

Emergency Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving

Bidding Procedures and Bid Protection in Connection with the Proposed Sale of Assets Used in

their Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain

Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and

(II) An Order (A) Approving the Proposed Sale and (B) Granting Related Relief (the "Servicing

Sale Motion") and in connection therewith, and (2) the Notice of New Century's Intent to

Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with the

Proposed Sale of its Servicing Business and Fixing Cure Costs associated Therewith (the

"Assumption and Cure Notice").[1]  DBNTC objects to the assumption and assignment of the

---

[1]     Terms not otherwise defined in this Objection shall have the meanings ascribed to them in the Servicing Sale Motion and the Assumption and Cure Notice.

servicing contracts that have been entered by and between the Debtors and DBNTC (the "DBNTC Servicing Agreements") on the grounds that:

i)      the assumption and assignment of the DBNTC Servicing Agreements as "Assumed Contracts" on the terms sought under Servicing Sale Motion would result in an impermissible modification of the DBNTC Servicing Agreements and an incomplete assumption of the Debtors' obligations thereunder;

ii)      the Debtors have not cured, or provided adequate assurance that they will promptly cure, all of the existing defaults arising under the DBNTC Servicing Agreements (the "Existing Defaults"); and

iii)      the cure amount of "zero" contained in the Assumption and Cure Notice relative to the DBNTC Servicing Agreements does not represent a good faith estimate of the amount necessary to cure defaults known to the debtors and, in any event, is fails to compensate DBNTC for the pecuniary loss resulting from such Existing Defaults.[2]

In further support of its objection, DBNTC represents the following:

---

[2]      The Assumption and Cure Notice indicates that although objections to (i) the assumption and assignment of an Assumed Contract , or (ii) the amount asserted as the Cure Amount, must be filed no later than May 14, 2007 at 4:00 PM, objections to adequate assurance of future performance under the Assumed Contracts are to be filed no later than May 17, 2007 at 4:00 PM. The division of appropriate subject matter to be included in objections to "assumption" and in objections to "adequate assurance of future performance" is not entirely clear. DBNTC sets forth in this objection its principal objections to (a) assumption and assignment of the servicing contracts under the terms and conditions of the proposed Carrington Agreement and the "Sale Approval Order" that appears as Exhibit "E" thereto, and (b) the amount asserted as the Cure Amount for each of the DBNTC Servicing Agreements. Due to the analytical relationship between "assumption" and "adequate assurances", DBNTC reserves the right to raise additional issues regarding any asset purchase agreement and proposed sale approval order in its subsequent objection relating to adequate assurance of future performance of the DBNTC Servicing Agreements.

## BACKGROUND

### A.    The Assumption and Cure Notice

#### i)    The DBNTC Servicing Agreements

1.    DBNTC is a national banking association which is the main trustee for the mortgage loan securitization transactions that constitute the Debtors' mortgage servicing business.  DBNTC acts as trustee for 23 mortgaged backed securities trusts, which originally contained over $34 billion in principal amount (the "Original Principal Balance") and currently contain approximately $13 billion in principal amount (the "Unpaid Principal Balance") of "subprime" mortgage loans originated and serviced by Debtor entities (the "Seller/Servicer Trusts").  (A list of the Seller/Servicer Trusts is attached hereto as Exhibit A.)  The beneficial owners of these mortgage loans are investors in mortgage backed securities issued by the Seller/Servicer Trusts, who typically include public and private pension funds and other institutional fixed income investors.  Since the mortgage loans are the principal assets of the Seller/Servicer Trusts, the continuous diligent servicing of the loans is crucial to those investors.

2.    The heart of the Servicing Sale Motion is the right to assume and assign the debtors' rights to act as the "Servicer" or "Master Servicer" under the DBNTC Servicing Agreements, as counterparty to DBNTC, as trustee for the Seller/Servicer Trusts.

3.    The Assumption and Cure Notice, a copy of which is attached hereto as Exhibit B, erroneously lists DBNTC as trustee to 16 of the Seller/Servicer Trusts.  The Assumption and Cure Notice misidentifies Wells Fargo Bank, N.A. as the contract counterparty with respect to 7 of the Seller/Servicer Trusts (the "Misidentified Trusts"). The Misidentified Trusts are indicated in Exhibit A hereto.  DBNTC has not, as of the date of this writing, received a corrected

Assumption and Cure Notice, but DBNTC is informed by Debtors that they intend to correct the notice and assume and assign the Misidentified Trusts under the Servicing Sale Motion.[3]

4.      Each Seller/Servicer Trust is formed pursuant to either a "Pooling and Servicing Agreement" or a combination of a "Servicing Agreement" and "Indenture" relative to one of the Seller/Servicer Trusts. Each of these documents are (with some discrepancies as to nomenclature) included in the Debtors' schedule of Assumed Contracts and are referred to herein as a "DBNTC Servicing Agreement," even if the underlying contract consists of a number of integrated documents.

5.      Each DBNTC Servicing Agreement is voluminous (generally 100-200 pages) and complex. Under each DBNTC Servicing Agreement, the Debtor servicing entity has agreed, in its capacity as "Servicer" or "Master Servicer" to perform a series of tasks related to the servicing of the massive portfolios of mortgages owed by the relevant Seller/Servicer Trust and to perform certain other obligations related to the mortgage securities issued thereunder.

---

[3]      Although DBNTC objects that it has not received timely notice of assumption of the Misidentified Trusts, the balance of this Objection will assume that the Misidentified Trusts are included in the Assumed Contracts. In addition to the Seller/Servicer Trusts, DBNTC is trustee for over 100 other trusts containing tens of billions of dollars of loans originated, but not serviced, by Debtors (the "Non-Serviced Trusts"). DBNTC will, in these Chapter 11 proceedings, assert additional claims on behalf of the Serviced Trusts and the Non-Serviced Trusts relating, *inter alia*, to breaches of the representations and warranties made by various debtors in connection with the origination of such loans ("Origination Claims"). The Origination Claims are not claims against Debtors in their capacity as "servicer" under the Assumed Contracts and are, therefore, not the subject of this objection. DBNTC does not believe that Debtors intend the Servicing Sale Motion to effect an assumption and assignment and delegation of any contract rights or duties of any Debtor party to the Assumed Contracts other than those ascribed to the "Servicer" or "Master Servicer" under the Assumed Contracts. To the extent that the Debtors do intend to assume and assign any other contract rights, DBNTC reserves the right to further object both to such assumption and to any related cure amount. DBNTC further notes that the Debtors service a relatively small number of subprime mortgage loans for it as trustee of certain securitization transactions not included in the Assumed Contracts. DBNTC assumes that Debtors intend to reject such contracts, but notes that Debtors are currently obligated by the Motion Of The Debtors And The Debtors In Possession For An Order (A) Authorizing The Continued Use Of The Debtors' Centralized Cash Management System, Including Operation Of Servicer Trust Accounts, (B) Authorizing Maintenance Of The Debtors' Existing Bank Accounts And Business Forms, And (C) Extending The Debtors' Time To Comply With Section 345 Of The Bankruptcy Code (the "Cash Management Order) in this case to service such loans until the Termination Date (as defined therein).

6.      The Debtor servicer's mortgage loan servicing duties (the "Loan Servicing Duties") include, but are not limited to: (a) billing and collecting debt service on the mortgage loans, (b) collecting insurance premiums and taxes from mortgagors, escrowing such funds and remitting them to the appropriate taxing authorities and insurers, (c) enforcing all terms and conditions of the mortgage loans and instituting loss mitigation measures when borrowers fail to pay their loans on time or otherwise violate the terms thereof, (d) foreclosing on the property securing delinquent mortgage loans when a mortgagee fails to timely satisfy his/her obligations under the mortgage loan, (e) making "property protection advances" needed to maintain foreclosed "REO" property, (f) disposing of such REO properties and remitting the net proceeds to the Seller/Servicer Trusts and (g) executing, delivering and recording such documentation as is necessary in connection with the satisfaction and discharge of mortgages.

7.      The Debtor servicer's mortgage securities related duties (the "Securities Duties") include, but are not limited to: (a) providing accurate data on a timely basis to DBNTC, as trustee, so that complex calculations of monthly securities distributions can be made and reported to investors, (b) advancing delinquent principal and interest on mortgage loans to the Seller/Servicer Trusts (pending recovery thereof from relevant borrowers or the collateral) in order to smooth the cash-flows of the trusts, (c) maintaining certain funds and accounts into which mortgage cash flows are deposited pending remittance to investors, (d) reimbursing and indemnifying the Seller/Servicer Trusts for any "prepayment interest shortfall" created by prepayment mortgages during each month and for any miscalculations of variable rate interest on mortgage loans, maintaining certain policies of insurance and fidelity bonds for the benefit of the Seller/Servicer Trusts, paying all costs and expenses of all parties (including DBNTC) of administering the Seller/Servicer Trusts (other than ordinary course transaction processing costs

included in such parties' ordinary fees) and broadly indemnifying such other transaction parties

for all liability, loss, cost and expense arising from or related to the transactions (irrespective of

whether or not such indemnified amounts arose from a breach by the servicer), including all

costs relating to any servicing transfer (the "Indemnity Obligations").

8.      As trustee for each of the Seller/Servicer Trusts, DBNTC is required to act as

"servicer of last resort" and is obligated, on terms and conditions set forth in the DBNTC

Servicing Agreements, to perform the Loan Servicing Duties and the Securities Duties in the

event of certain defaults by the servicer.  Thus, in addition to investors, DBNTC itself has a

critical interest in the proper performance of the servicer's duties under the DBNTC Servicing

Agreements, since it backstops those obligations.

## ii)      Defaults under the DBNTC Servicing Agreements

9.      The Assumption and Cure Notice does not identify any present defaults existing

as a result of the Debtors' prior performance of its obligations under the DBNTC Servicing

Agreements and lists as "zero" the amount necessary to compensate DBNTC, as trustee, and the

Seller/Servicer Trusts for the Debtors' prior and existing defaults.

10.     DBNTC has, in the extremely limited time allowed by these proceedings,

investigated the Debtors' performance of their obligations under the DBNTC Servicing

Agreements.  To date, DBNTC has determined that the defaults listed on Exhibit C hereto

currently exist (the "Known Existing Defaults").

11.     DBNTC believes that the Known Existing Defaults are known to the Debtors and

to bidders for the Debtors servicing business.  Indeed, Schedule 5.13(b)(iii) to the Carrington

Agreement (defined below) contains a list of default and trigger events that have occurred with

respect to the DBNTC Servicing Agreements and other Assumed Contracts, most of which have continued and remain uncured.

12.    Certain Known Existing Defaults have been revealed in SEC filings that the Debtors' were required to make with respect to DBNTC Servicing Agreements entered into in 2006. Under Section 1122 of SEC Regulation AB, servicers of public mortgage backed securities transactions issued on or after January 1, 2006 are required to file an annual "Assessment of Compliance" accompanied by an "Attestation Report" by a registered public accounting firm on such Assessment of Compliance (17 C.F.R.§229.1122) The Debtor's own Assessment of Compliance and the Attestation Report of KPMG LLP for the Debtors' calendar year 2006 servicing activities, filed with the SEC on April 5, 2006. Of particular significance, the Assessment and the Attestation state that the Debtors did not:

> ➤ Initiate, conduct and conclude loss mitigation or recovery actions within time frames or other requirements of the respective transaction agreements;

> ➤ Execute forbearance plans as required by the respective transaction agreements;

> ➤ Execute pre-foreclosure sales or short payoffs resulting from the acceptance of funds in an amount that is less than the total borrower indebtedness as required by the respective transaction agreements; and

> ➤ Execute foreclosures as required by the respective transaction agreements.

13.    Debtors are subject to a large number of governmental investigations and "cease and desist orders" some of which may currently be causing Debtors to breach their servicing obligations. For example, due to allegations of violations of law in the State of Ohio, the Debtors are subject to a cease and desist order requiring them to go through a time-consuming governmental review procedure prior to taking remedial actions on delinquent loans secured by

property in that state. The delay in remedial action caused by this procedure will inevitably

inflict economic losses on the Seller/Servicer Trusts, which owned approximately $280 million

in principal outstanding of loans in that state as of the date the order was imposed. Since these

procedures have only recently gone into effect, the degree of those losses cannot currently be

calculated.

14.    Given the extremely rapid pace of these proceedings, the large size of the affected

Seller/Servicer Trust loan portfolios (over 76,000 loans) and the limited access that DBNTC and

other parties have to Debtors' books and records, it is impossible for DBNTC and other parties to

the DBNTC Servicing Agreements to detect all Existing Defaults, much less prove up accurate

cure amounts, as of the date hereof. Moreover, Debtors' well-publicized and self-admitted

accounting inadequacies make detection and proof of damages in this timeframe even more

difficult.[4] The reality is that proof of damages arising from the Debtors defaults will require

extensive accounting reviews and information that will only be available once a successor

---

[4]    As has been widely reported, the Debtors' accounting policies, including their treatment
of interests retained by them under the Seller/Servicer Trusts, are under investigation by both the
SEC and the U.S. Attorney for the Central District of California. Debtors' own audit committee
has not completed its investigation of these accounting issues. Moreover, KPMG LLP recently
resigned as the Debtors' auditor and it will take some time for parties in interest to get a full
accounting of the Debtors' books and records . Indeed, this past Friday, May 11, Debtors filed
SEC Form 12b-25 revealing that "Due to the [KPMG] resignation, as well as the additional time
required to complete its financial statements to be included in its periodic reports as a result of,
among other things, the complexities of bankruptcy accounting, the process of impairment
testing and estimating the fair value of impaired assets, the determination of the tax provision
together with the evaluation of tax deferred assets and the possible need for valuation
allowances, the Company will not be able to file the Form 10-Q in a timely manner without
unreasonable effort or expense. . . . The Company anticipates that it will not be able to complete
its financial statements and file the Form 10-Q by May 15, 2007 and *the Company is uncertain
as to whether or not it will ever be able to file its financial statements.*" (emphasis added)  As the
Court is aware, the Office of the United States Trustee has also moved for the appointment of a
Chapter 11 trustee in these proceedings based, in part, on the need for better accounting
oversight of the Debtors.

servicer is operating the servicing business and has had an opportunity to review the books and records which it will have acquired from Debtors.

15.    As the Debtors are aware, exercising its monitoring rights under the Cash Management order, DBNTC has engaged a major accounting firm to perform certain agreed upon procedures to assess certain aspects of Debtors' current servicing performance. DBNTC's professionals are still awaiting certain materials necessary to complete this assessment. In connection with this exercise, DBNTC was provided, on Thursday May 10, with certain confidential materials, including the Debtors' internal audit reports regarding its servicing operations that were prepared in 2006. DBNTC will respect the confidential nature of those reports pending discussions with Debtors counsel regarding their disclosure. Nevertheless, in light of the need to file this objection in a timely manner, DBNTC notes for present purposes that such reports contain information that suggests that certain of the breaches revealed in the Assessment and Attestation referred to above, were systemic in nature and not limited to the 2006 Seller/Servicer Trusts that were the subjects of those reports.

### iii)    Cure of Defaults under the DBNTC Servicing Agreements

16.    The Assumption and Cure Notice lists as "zero" the amount of compensation that the Debtors propose to pay to DBNTC in order to compensate the Seller/Servicer Trusts for the pecuniary losses the Seller/Servicer Trusts have suffered as a result of the Existing Defaults. Although, for reasons stated above, DBNTC cannot at this time reasonably be required to accurately state the total damages to the Seller/Servicer Trusts due to the Existing Defaults, DBNTC has already incurred certain fees, costs and expenses directly arising from the Existing Defaults which are required to be paid as damages prior to any assumption in an amount not less than $1,383,200 million as more fully detailed on Exhibit D attached hereto (the "Currently

Determined Damages"). Such damages, which will continue to accrue through the date of any proposed assumption, must be paid in full in order to effect a cure. Moreover, in light of the Known Existing Defaults, it is highly likely that the Seller/Servicer Trusts have suffered additional, but not yet fully detected or determinable, economic damages due to Existing Defaults.[5] Accordingly, (a) DBNTC should be given an opportunity to prove such damages at a later date and (b) a substantial reserve for currently undetected and undetermined matured and contingent damages must be provided for as a condition to assumption of the DBNTC Servicing Agreements.[6]

### B.    The Carrington Agreement

#### i.    Modification and incomplete assumption of the Debtors' Obligations as Servicer under the DBNTC Servicing Agreements

17.    Under Section 2.1 of the Amended and Restated Asset Purchase Agreement dated as of April 19, 2007 between Carrington Capital Management, LLC, Carrington Mortgage Services, LLC (collectively "Carrington") and New Century Financial Corporation and New Century Mortgage Corporation (the "Carrington Agreement"), at the Closing thereof, some but not all of the Debtors' rights and obligations as servicer under the DBNTC Servicing Agreements are being transferred to Carrington. Under the Carrington Agreement, as of the Closing, Carrington will be the Servicer under the DBNTC Servicing Contacts, assuming the servicing rights and obligations to the extent provided therein.

---

[5]    These accounting procedures undertaken by DBNTC's accountants to date are not primarily aimed at a determination of an adequate cure amount, but rather to allow DBNTC to assess certain aspects of the integrity of the Debtors current servicing activities pending transfer. A more extensive review would be required to calculate the cure amount required to compensate for the Currently Known Defaults and as well as defaults which are Existing Defaults but may be unknown to, and not currently detectable or quantifiable by, DBNTC and the Seller/Servicer Trusts.

[6]    DBNTC will address the sizing of such reserve in its "adequate assurances" objection.

18.    The Carrington Agreement provides for an incomplete assumption of the Debtors'
obligations as servicer under the DBNTC Servicing Agreements because it provides for a broad
carve out from the obligations assumed of any liabilities or responsibilities <u>"relating to any
action, event, circumstance or condition occurring or existing on or prior to the Closing Date"</u>.
This carve out, which is contained in the definition of "Retained Liabilities", weaves its way
throughout the document by limiting the scope of the Assumed Liabilities with respect to the
Assumed Contracts, including the DBNTC Servicing Agreements.

19.    Schedule 1.1(c) of the Carrington Agreement, relating to "Assumed Liabilities"
makes this incomplete assumption of servicing obligations painfully clear, stating: "[f]or the
avoidance of doubt, except as otherwise set forth in the Agreement, all Liabilities and obligations
Related to the Business, the Servicing Agreements and the Purchased Assets [which include the
Servicing Rights under the DBNTC Servicing Contacts] that pertain to the period prior to the
Closing Date are Retained Liabilities.

20.    While at first blush, these might seem like reasonable provisions to avoid
assumption of liability for Debtors' pre-assumption defaults, they go far beyond what is needed
to achieve that result and, in essence, turn Carrington's assumption into a virtual *option to
perform* the future obligations of the servicer under DBNTC Servicing Agreements.  This is the
case because a substantial portion of the *future* obligations of the any servicer under the DBNTC
Servicing Agreements will inherently relate to actions, events, circumstances and conditions
occurring or existing on or prior to the Closing Date because the mortgage loan portfolios that
must be serviced already exist and already have significant "pre-existing medical conditions"
(many of which do *not* relate to any servicer breach) that must be addressed in the future.  These
future obligations include, but are not limited to: (i) servicing and taking loss mitigation actions

with respect to the Seller/Servicer Trusts' *currently existing* loan portfolios, (ii) addressing

*currently existing* mortgage loan defaults (which, again, are not defaults of Debtors), (iii) taking

all necessary remedial action to realize upon the Seller/Servicer's mortgage loans

notwithstanding any burden created by predatory lending and other defenses and claims that may

be made asserted by borrowers, (iv) correcting any inadequacies in the Securities Duties, and (v)

performing the Indemnity Obligations with respect to liabilities and costs that will arise in the

*future*, many of which will relate to *past or currently existing* "events" and "conditions" other

than the Existing Defaults.  In essence the successor servicer will need to act as the

Seller/Servicer Trusts' "doctor" in performing the Loan Servicing Duties and the Securities

Duties.  Unfortunately, the broad carve out of "Retained Liabilities" under the Carrington

Agreement makes the proposed assumption about as useful to the Seller/Servicer Trusts as a

doctor who refuses to treat "pre-existing medical conditions."

21.     The incomplete and murky nature of the assumption of Debtors' servicing duties

under the Carrington Agreement is particularly obvious when it comes to the handling of existing

litigation against the Seller/Servicer Trusts.  Section 6.6(d), thereof which provides that:

> Sellers and Purchaser shall cooperate and agree upon mechanics and
> procedures (i) to identify and schedule all litigation (the "Servicing
> Litigation") presently being handled by Sellers as servicer under the
> Servicing Agreements and to arrange for transferring responsibility for such
> litigation to Purchaser, and (ii) to identify and allocate any indemnification
> claims arising under the Servicing Agreements.

22.     While this provision seems to acknowledge tacitly the obligation of the successor

servicer to handle Servicing Litigation, it leaves it to some future exercise between the Debtors'

and Carrington to identify and allocate any indemnification claims arising under the DBNTC

Servicing Agreements.  Since DBTNC and the Seller/Servicer Trusts are among the indemnified

parties under the DBNTC Servicing Agreements, this provision leaves the fate of their claims for

indemnification to a future closed-door negotiation between the Debtors and Carrington, the outcome of which will determine whether those indemnity claims constitute "cure" claims against the Debtors' estates or claims against the non-bankrupt successor servicer. Clearly, DBNTC and the Seller/Servicer Trusts cannot be required to determine any cure amounts related to the Indemnification Obligations, when the Debtors and Carrington have not decided, as between themselves, who will be responsible for such obligations.

23.    The provisions of the DBNTC Servicing Agreements which Carrington is relying upon to effect a succession—which relate to merger, consolidation and sales of all or substantially all of the assets of the servicer--do not permit the carve out of liabilities as provided in the Carrington Agreement. Indeed, these provide that any such successor "shall be the successor of the Master Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding." Any such successor would automatically take on all liabilities of the servicer under the contracts.

24.    In addition, the provisions of the DBNTC Servicing Agreements that Carrington is relying upon to effect a succession require that: (a) any shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; (b) that each rating agency's rating of the securities issued by the Seller/Servicer Trust in effect immediately prior to such transaction will not be qualified, reduced, or withdrawn as a result thereof (as evidenced by a letter to such effect from each rating agency). To the best knowledge of DBNTC, these conditions have not been met because Carrington is not currently a Fannie Mae or Freddie Mac approved servicer and no rating agency has issued a "no-downgrade letter" relating to the proposed succession. Although the Debtors and Carrington assume that these conditions will be met prior to a closing, DBNTC

notes that unless they are met, Carrington would instantaneously be in default, and subject to

termination, under the DBNTC Servicing Agreements.

25.    Finally, under each DBNTC Servicing Agreement, the servicer covenants that:

> [the servicer] is duly authorized and qualified to transact any and all business
> contemplated by this Servicing Agreement to be conducted by the [servicer] in
> any State in which a Mortgaged Property is located or is otherwise not required
> under applicable law to effect such qualification and, in any event, is in
> compliance with the doing business laws of any such State, to the extent
> necessary to ensure its ability to enforce each Mortgage Loan and to service the
> Mortgage Loans in accordance with the terms of this Servicing Agreement.[7]

26.    To the best knowledge of DBNTC, Carrington is not currently licensed in the

various states in which the servicer must perform its duties under the DBNTC Servicing

Agreements and, accordingly, it is not able to serve as servicer until it is licensed to service loans

in each state in which a Mortgaged Property is located.

27.    The Debtors and Carrington propose to solve this deficiency through Section

2.5(e) of the Asset Purchase Agreement which provides that:

> Purchaser shall use all commercially reasonable efforts to obtain all Servicing
> Licenses required in connection with the Business as promptly as possible, and
> Sellers shall cooperate with, and provide assistance to, Purchaser in all such
> efforts.  If and to the extent Purchaser shall not have obtained all such Servicing
> Licenses prior to the Closing, (i) the Company shall perform such activities under
> the Servicing Agreements as are required from time to time to be performed by a
> Person with such Servicing Licenses in compliance with Law, … (ii) Purchaser
> and the Company shall enter into the Lease and Subservicing Agreement, which
> may include a lease back to the Company of any Purchased Assets and Assumed
> Liabilities, including any employees, Servicing Rights, IT Assets or Permits
> required in order to conduct Business in compliance with Law or (iii) Purchaser
> and the Company shall enter into another arrangement mutually satisfactory to
> Purchaser and Sellers. The Lease and Subservicing Agreement or other
> arrangement shall terminate on the six-month anniversary of the Closing Date…

---

[7]    This language is taken from Section 2.01 (i) of the DBNTC Servicing Agreement
between DBNTC as Indenture Trustee, New Century Mortgage Corporation as Master Servicer
and New Century Home Equity Loan Trust 2004-1, as Issuer, dated April 21,2004. The exact
same or similar language is included in each of the DBNTC Servicing Agreements.

The Asset Purchase Agreement also contemplates that the Purchaser may use sub-servicing agreements with allegedly qualified or licensed servicers in those states where it is not properly licensed or qualified.

28.    Although the DBNTC Servicing Agreements allow servicers to engage sub-servicers to perform servicing activities, these provisions do not negate the requirement that the servicer possess necessary licenses to service loans.  Indeed, the DBNTC Servicing Agreements provide that the servicer "may delegate its responsibilities under this Servicing Agreement; provided, however, that no such delegation shall release the [servicer] from the responsibilities or liabilities arising under this Servicing Agreement."[8]

29.    The Servicing Sale Motion also results in an incomplete assumption of the Debtor servicers' obligations under the DBNTC Servicing Agreements because it (a) fails to incorporate the servicers' obligations under certain contracts (such as fee agreements, "owner trust" agreements and insurance agreements) that are integral to those obligations.  For example, DBNTC and the Debtor servicers entered into fee letter agreements with respect to each Seller/Servicer Trust specifying the fees and expenses to be paid to DBNTC by the servicer.  In addition, for tax and other reasons, Debtors structured certain of their transactions to utilize an "owner trust" to be formed to act as issuer of securities and the holder of certain interests.  Under the DBNTC Servicing Agreements, the Debtor servicers undertook certain direct obligations with respect to these owner trusts, including, without limitation, the Indemnity Obligations.  The Cure Notice does not list any of these agreements or purport to give notice of assumption to the

---

[8]    Id. §3.01.  Most of the DBNTC Servicing Agreements also require that the servicer be approved by HUD. Id. §2.01(iv).  DBNTC does not currently know whether Carrington is or plans to become a HUD approved servicer prior to the Closing.  To the extent that it does not do so, DBNTC asserts the same objections as are made above with regard to other approvals and licenses.

necessary counterparties, such as the owner trustees.  To allow assumption of the DBNTC

Servicing Agreements without assuming the servicers' obligations relative to these other

agreements would, in essence, modify the terms of the DBNTC Servicing Agreements and pose

significant financial and operational difficulties for the Seller/Servicer Trusts.

## OBJECTIONS

30.    DBNTC objects to the relief requested in the Servicing Sale Motion and to the

Assumption and Cure Notice on several grounds.  First, the assignment and assumption of the

DBNTC Servicing Agreements under the terms of the Servicing Sale Motion and the

Assumption and Cure Notice would effect an impermissible partial assumption of the Debtor

servicers' obligations under the DBNTC Servicing Agreements.  Such "cherry picking" of

contractual terms is simply impermissible.  Second, DBNTC objects to the Assumption and Cure

Notice to the extent that the Debtors have not proposed to cure the Existing Defaults.  Third,

DBNTC objects to the Assumption and Cure Notice because the Debtors have not proposed to

compensate the Seller/Servicer Trusts for the pecuniary loss that the Seller/Servicer Trusts have

suffered and will continue to suffer as a result of the Existing Defaults.

### A.  The Debtors only can Assume or Reject the Servicing Agreement in its Entirety, and may not Modify the Terms Thereof.

31.    It is black-letter law that an executory contract cannot be assumed in part and

rejected in part.  See 3 COLLIER ON BANKRUPTCY § 365.03 [1] (Lawrence P. King, et al. eds.,

2006).  The Debtor must either assume the entire contract, with all related obligations, or reject

the entire contract, shedding all obligations as well as benefits.  See University Med. Ctr. v.

Sullivan (In re University Med. Ctr.), 973 F.2d 1065, 1076 (3d Cir. 1992) (stating "[a]ssumption

of the executory contract requires the debtor to accept its burdens as well as permitting the debtor

to profit from its benefits"); In re Fleming Cos., Inc., Case No. 03-10945, 2004 Bankr. LEXIS

198 at *4 (Bankr. D. Del. 2004) (stating "[s]ection 365 requires that when a debtor assumes and

assigns a contract the express terms of that contract cannot be modified").

32.     The assumption and assignment of an executory agreement does not give the

debtor or assignee the ability or right to modify the terms of the contract to be assumed and

assigned.  See Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d

Cir. 2001).  In the Medtronic case, the court explained that

> "[a]n assignment does not modify terms of the underlying contract.  It is a
> separate agreement between the assignor and the assignee which merely
> transfers the assignor's contract rights, leaving them in full force and
> effect as to the party changed.  An assignment is intended to change only
> who performs an obligation, not the obligation to be performed."

Id.  See also In re Federal-Mogul Global, Inc., No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9

(3d Cir. 2007) (explaining that debtor is not able to modify obligations in contract assumed and

assigned pursuant to § 365 of the Bankruptcy Code.).

33.     Debtors and Carrington may argue that the carve out of liability for "existing

conditions" described above is permissible because any "existing conditions" represent existing

"defaults" by the servicer Debtors which are susceptible of cure.  That argument would be

wrong.  Many "existing conditions" affecting the *future performance* of the servicer's duties

have nothing at all to do with any breach or default of the Debtor servicers' duties under the

DBNTC Servicing Agreements.  Rather they relate to: (a) the past and current condition of the

Seller/Servicer Trusts' assets that need to be serviced, (b) third party claims and litigation

relating to such assets (including claims arising from breaches by the non-servicer debtor

entities), (c) Indemnity Obligations to the non-servicer transaction parties for *future liabilities

and costs*, which may "relate to" currently existing conditions, but which have not yet arisen

(and therefore cannot represent "defaults" to be cured by the servicer Debtors).[9]  These

Indemnity Obligations include the obligation to indemnify DBNTC for its future costs in

connection with these proceedings, including the cost of proving up claims such as the

Origination Claims (see footnote 3).

34.    Without modification of the DBNTC Servicing Agreements, which Section 365

does not allow, Carrington will automatically be in default of the terms of each DBNTC

Servicing Agreement unless it obtains all necessary licenses, qualifications and approvals prior

to Closing.  DBNTC has not waived any of these contract requirements and objects to the

Servicing Sale Motion to the extent that the relief sought seeks to circumvent them.

### B.    The Debtors have Failed to Cure the Existing Defaults under the DBNTC Servicing Agreements

35.    Section 365(b)(1) of the Bankruptcy Code, 11 U.S.C §365(b)(1) is perfectly clear

in requiring that, in order for a debtor to assume an executory contract under which defaults have

arisen, the debtor must first cure, or provide adequate assurance that it will promptly cure, such

defaults.  The clear and unambiguous language of Section 365(b)(1) is:

> "If there has been a default in an executory contract or unexpired lease of
> the debtor, the trustee may not assume such contact or lease unless, at the
> time of assumption of such contact or lease, the trustee—
>> (A) cures, or provides adequate assurance that the
>> trustee will promptly cure, such default…."[10]

---

[9]    It is established law that indemnification obligations do not arise, and related statutes of limitation generally do not start to run, until the time for performance.  See, e.g., Restatement 1st of Restitution §77.

[10]    BAPCPA amended Section 365(b)(1)(A) in 2005 to ease the burden on the debtor when it seeks to assume a nonresidential real property lease under which there has been a  failure to perform a non-monetary obligation; however, the DBNTC Servicing Agreements are not residential real property leases and, therefore, the debtor is required to cure all defaults including those that are non-monetary in nature.

36.    The Debtors are well aware of the Existing Defaults.  The Debtors identified

deficiencies in their servicing performance constituting "material non-compliance with

applicable servicing criteria" in their filings made pursuant to SEC Regulation AB.  The internal

audit materials furnished by Debtors to DBNTC reveal that such deficiencies continue to exist.

In addition, state regulatory proceedings, such as the Ohio order noted above, have undoubtedly

exacerbated the Debtors' already inadequate loss mitigation efforts.

37.    Yet nowhere in the Servicing Sale Motion, the Asset Purchase Agreement or in

the Assumption and Cure Notice do the Debtors either identify the Existing Defaults or propose

how they will cure the Existing Defaults.

38.    The Asset Purchase Agreement at Section 2.7 does make clear that Carrington is

not assuming any responsibility for the Existing Defaults:

> "Purchaser shall not assume or have any Liability or responsibility with respect to
> any Liability of any nature or kind whatsoever relating to the Business or the
> Purchased Assets that exists, or arises out of the operation or ownership of the
> Purchased Assets or the Business, prior to, at or after, the Closing and that is not
> an Assumed Liability."

As far as DBNTC can determine from its review of the Asset Purchase Agreement and its

discussions with the Debtor and Carrington, if the Servicing Sale Motion is approved in its

current form and without further modification of the Asset Purchase Agreement, Carrington will

not be obligated to address in the future in any way any of the Existing Defaults nor has the

Debtors addressed this issue as required by 11 U.S.C. §365.

39.    The DBNTC Servicing Agreements cannot be assumed by the Debtors nor

assigned to the Successful Purchaser unless and until the Debtors provide that the Existing

Defaults will be cured or DBNTC is provided with adequate assurance that the Debtors will

promptly cure the Existing Defaults by paying all damages occasioned thereby.  Where

appropriate, such adequate assurances could come in the form of a successor servicer affirmatively agreeing to undertake a plan of remedial action.  Unfortunately, by shunning all responsibility for addressing "existing conditions," the Carrington Agreement promises no such mitigation and leaves the estate to shoulder this burden.  DBNTC will elaborate on this issue in its objection to adequate assurances in the event that the Carrington Agreement forms the basis for the Successful Bidder's undertaking.

      **C.**      **The Unliquidated Portion of the Existing Defaults must be Estimated pursuant to 11 U.S.C. 502(c) and the Asset Purchase Agreement and Order Approving the Proposed Sale must include an Assumption of Currently Unknown Defaults**

40.      To the extent that any of the Existing Defaults are non-monetary and/or unliquidated, such defaults must be subject to an estimation hearing before this Court pursuant to § 502(c) of the Bankruptcy Code.  See 11 U.S.C. 502(c).  Moreover, in order for the Debtors and the Successful Purchaser to consummate a sale, all parties must be advised of estimated cure amounts so that a sufficient amount of sale proceeds can be placed in an escrow account pending the resolution of any cure amount or claim disputes.  Therefore, the Debtors must agree to establish adequate reserves to cure all defaults pending an estimation hearing or the sale cannot be approved.

41.      Section 502(c) of the Bankruptcy Code states:

"There shall be estimated for purpose of allowance under this section –

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2)  any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c).  Courts have held that "the Bankruptcy Code requires an estimation in order to prevent undue delay in the administration of the estate."  Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global, Inc.), 330 B.R. 133, 153 (D. Del. 2005) (discussing need to estimate unliquidated claims (citing H.R. Rep. No. 95-595, at 180 (1978), 1978 U.S.C.C.A.N. 5963, 6141).  See also Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 725 (D. Del. 2005) (discussing need to estimate present and future claims against debtor).

      42.     In the instant case, the failure to estimate or establish reserves covering the non-monetary portion of the Existing Defaults is fatal to the contemplated sale.  In order for the Debtors and the Successful Purchaser to consummate the sale, all cure amounts must be liquidated or adequately reserved so that the Debtors place into escrow a sufficient amount of funds to satisfy all of its cure obligations.  Debtors have totally failed to comply with this legislative mandate.  DNBTC will further expand on this and other points in any objection relating to adequate assurance once the Successful Bid and successful Bidder are announced.

     **D.**      **The Debtors have Failed to Compensate DBNTC as Trustee of the Seller/Servicer Trusts for the Damages that Have and Will Flow from the Existing Defaults**

      43.     Section 365(b)(1) of the Bankruptcy Code, also requires that in order for a debtor to assume an executory contract under which a default has arisen, the debtor must first compensate, or provide adequate assurance that it will promptly compensate, the other contracting party for any damages that result from such defaults.  The actual language of Section 365(b)(1) is:

"If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contact or lease unless, at the time of assumption of such contact or lease, the trustee—

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any pecuniary loss to such party resulting from such default; …

44.    Having not identified any of the Existing Defaults, the Debtors have also listed at "zero" the amount of compensation they propose to pay to DBNTC as Trustee of the Seller/Servicer Trusts for the pecuniary losses that will undoubtedly flow from the Existing Defaults.

45.    The listing of cure compensation at zero is disingenuous.  Since the Debtors and Carrington have gone to pains to make it clear that Carrington will not have any obligation in the future regarding the Existing Defaults, and since the Existing Defaults are sure to damage the Seller/Servicer Trusts, the Seller/Servicer Trusts will suffer a pecuniary loss as a result of the Existing Defaults.

46.    The DBNTC Servicing Agreements cannot be assumed by the Debtors nor assigned to the Successful Purchaser unless and until the Debtors compensate, or provide adequate assurance that they will promptly compensate, DBNTC as Trustee of the Seller/Servicer Trusts for the pecuniary losses that will undoubtedly flow from the Existing Defaults.

47.    As previously discussed, due to the limited time given to investigate defaults and quantify damages DBNTC reserves the right to amend and modify this objection to include additional amounts due or which may become due as a result of further investigation.

## **CONCLUSION**

For the reasons set forth above, DBNTC respectfully requests that the Court grant it the following relief:

1.    Deny the relief requested in the Servicing Sale Motion, unless the Court requires that the Debtors first cure all of the Existing Defaults, or provide adequate assurance to DBNTC that they will promptly cure all of the Existing Defaults by establishing adequate reserves, before they may be permitted to assume the DBNTC Servicing Agreements as a predicate to assigning such DBNTC Servicing Agreements to the Successful Bidder.

2.    To the extent the Court is inclined to grant the Servicing Sale Motion, require that the Debtors first compensate DBNTC as Trustee of the Seller/Servicer Trusts in the amount of at least $28,500,000 (plus all additional amounts incurred or accrued prior to closing) for the pecuniary losses that the Seller/Servicer Trusts already has suffered as a result of the Existing Defaults, together with any additional amounts that DBNTC may establish before the Closing Date, before they may be permitted to assume the DBNTC Servicing Agreements as a predicate to assigning such DBNTC Servicing Agreements to the Successful Bidder.

3.    Grant DBNTC such other and further relief as may be just.

Dated:  May 14, 2007

PEPPER HAMILTON, LLP

_____
David B. Stratton (No. 960)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:  (302) 777-6500
Facsimile: (302) 421-8390

NIXON PEABODY LLP

Mark N. Berman
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
Telephone:  (617) 345-6037
Facsimile:  (617) 866-5868

AND

Dennis Drebsky
Nixon Peabody LLP
437  Madison Avenue
New York, NY  10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111