**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| | : | |
| **NEW CENTURY TRS HOLDINGS, INC.,** a Delaware corporation, <u>et al.</u>,[1] | : | Case No. 07-10416 (KJC) |
| | : | |
| | : | Re: Docket No. 70 |
| **Debtors.** | : | |
| | : | Objection Deadline: May 14, 2007 at 4:00 p.m. |
| | : | Hearing Date: May 21, 2007 at 10:00 a.m. |

**OBJECTION OF WELLS FARGO BANK N.A. TO CURE AMOUNTS IN CONNECTION WITH EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE PROPOSED SALE OF THEIR ASSETS USED IN LOAN SERVICING BUSINESS, (B) SCHEDULING HEARING TO CONSIDER PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE AND (B) GRANTING RELATED RELIEF**

Wells Fargo Bank N.A., as trustee, paying agent, registrar, and transfer agent ("*Wells Fargo*") in connection with (i) Carrington Mortgage Loan Trust, Series 2006-NC1 Asset-Backed Pass-Through Certificates; (ii) Carrington Mortgage Loan Trust, Series 2006-NC2 Asset-Backed Pass-Through Certificates; (iii) Carrington Mortgage Loan Trust, Series 2006-NC3 Asset-Backed Pass-Through Certificates; (iv) Carrington Mortgage Loan Trust, Series 2006-NC4

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Asset-Backed Pass-Through Certificates; and (v) Carrington Mortgage Loan Trust, Series 2006-NC5 Asset-Backed Pass-Through Certificates (collectively, the "*Wells Securitization Trusts*"), by counsel, submits the following as its objection (the "*Objection*") to the cure amounts for the assumption and assignment of the executory contracts related to the Wells Securitization Trusts proposed by New Century TRS Holdings, Inc., and its affiliated debtors and debtors in possession (collectively, the "*Debtors*") in connection with the Emergency Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Proposed Sale of Their Assets Used in Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and (II) an Order (A) Approving the Proposed Sale and (B) Granting Related Relief (Docket No. 70) (the "*Motion*"):

**Preliminary Statement**

1.      In connection with the proposed sale of the Debtors' mortgage loan servicing business (the "*Servicing Business*"), the Debtors intend to assume and assign those certain Pooling and Servicing Agreements, listed on the attached Exhibit A (collectively, the "*Pooling and Servicing Agreements*"), governing the Wells Securitization Trusts.[2] Consequently, 11 U.S.C. § 365(b) requires the Debtors to cure all existing defaults regarding the Pooling and Servicing Agreements prior to the assumption and assignment.[3]

---

[2] The Pooling and Servicing Agreements are not attached because they are voluminous and the Debtors have copies of the Pooling and Servicing Agreements.

[3] In addition to the Pooling and Servicing Agreements, the Notice of Assumption and Assignment (as defined herein) identifies Wells Fargo as a party to seven other pooling and servicing agreements related to seven other securitization trusts. To date, Wells Fargo has found no record of having been a party to these seven other pooling and servicing agreements or to any of the other agreements to be assumed and assigned in connection with the Motion other than the Pooling and Servicing Agreements. Wells Fargo expressly reserves the right to object, including without limitation on grounds similar to those raised in this Objection, to the assumption and assignment of any other contracts to be assumed and assigned in

(continued…)

2. The Debtors have submitted that the cure amount regarding each of the Pooling and Servicing Agreements is $0.00. Wells Fargo disputes that the cure amounts regarding each of the Pooling and Servicing Agreements is $0.00. In fact, there are substantial liabilities and obligations outstanding regarding the Pooling and Servicing Agreements. Thus, the Debtors may not assume and assign the Pooling and Servicing Agreements unless all of the outstanding liabilities and obligations under the Pooling and Servicing Agreements are assumed and assigned.

## General Background

3. On April 2, 2007 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "*Bankruptcy Code*").

4. On April 4, 2007, the Debtors filed the Motion. In the Motion, the Debtors requested approval of (i) bidding procedures and overbid protections, including an expedited sale process, and (ii) the sale of the Servicing Business.

5. On April 19, 2007, the Debtors filed that certain Amended and Restated Asset Purchase Agreement between (among others) New Century Financial Corporation and Carrington Capital Management, LLC (the "*APA*").

6. On April 20, 2007, the Court entered the Order (I) Approving Bidding Procedures, Including Break-Up Fee and Expense Reimbursement Payable to Carrington Mortgage Services, LLC for Sale of Debtors' Serving Business; (II) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Notice Thereof; and (III) Approving Procedures

---

connection with the Motion, including those identified in the Notice of Assumption and Assignment, to the extent Wells Fargo determines that it is a party to those agreements.

to Fix Cure Amounts Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Approving Notice Thereof (the "*Procedures Order*").

7.      Among other things, the Procedures Order required the Debtors to provide non-debtor counterparties to contracts to be assumed and assigned with a notice of assumption and assignment (a "*Notice of Assumption and Assignment*") setting forth the Debtors' intent to assume and assign such contracts and the proposed cure amounts for the contracts. A copy of the Notice of Assumption and Assignment, along with Exhibit A thereto which identifies the cure amounts for contracts to be assumed and assigned, is attached as Exhibit B.

8.      The Notice of Assumption and Assignment states, in part, as follows:

> Parties that fail to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert cure amounts different from the Cure Amounts listed on Exhibit A hereto and shall be forever barred and estopped from asserting or claiming against the pertinent Debtor, Carrington, or any assignee of any Assumed Contract that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied, under such Assumed Contract with respect to the period prior to the date of assumption.

Notice of Assumption and Assignment, ¶ 7.

## Securitization Generally

9.      "Securitization" is a process in which income-producing assets such as mortgage loans or accounts receivable are pooled, then sold to a trust or other "bankruptcy remote" special purpose entity that issues non-recourse securities collateralized or otherwise "backed" by the pool of income-producing assets. Payments on the securities are made with income collected on the assets, and the purchase price for the assets is funded with the proceeds from the issuance of such securities.

10.     Frequently, the originator/seller in a securitization retains the right to service the income-producing assets following their sale. Because the originator/seller sells the pool of

4

income-producing assets in a transaction that constitutes a "true sale," however, the originator/seller does not retain an equitable ownership interest in such assets. Accordingly, upon a bankruptcy of the originator/seller, only the originator/seller's retained servicing rights constitute property of the debtor's bankruptcy estate under section 541(a)(1) of the Bankruptcy Code; the equitable ownership interest in the income-producing assets itself is excluded from the bankruptcy estate under section 541(d) of the Bankruptcy Code.

11. Securitization thus isolates the creditworthiness of the income-producing assets from the bankruptcy risk of the originator/seller, enabling nationally recognized statistical credit rating agencies such as Standard & Poor's Ratings Group and Moody's Investor Services, Inc. to assign credit ratings to the securities backed by the income-producing assets based exclusively on the credit quality of the assets themselves without reference to the originator/seller's credit rating. This promotes access to the capital markets at a lower cost of funds.

### The Wells Securitization Trusts

12. Wells Fargo is trustee, *inter alia*, for the Wells Securitization Trusts and as such has a contractual obligation to securityholders of the securities issued by the Wells Securitization Trusts to act on behalf and in the best interest of these securityholders, including by enforcing liabilities and obligations of other parties regarding the Pooling and Servicing Agreements.

13. Pursuant to the Pooling and Servicing Agreements, the Debtors securitized five separate pools of subprime residential mortgage loans (each, a "*Mortgage Loan*"; collectively, the "*Mortgage Loans*") for which Wells Fargo serves as the trustee, paying agent, registrar, and transfer agent. The Debtors either originated or purchased each of the Mortgage Loans prior to securitization.

14. The Debtors effected these securitizations by selling the respective Mortgage Loans to certain entities affiliated with Carrington Capital Management, LLC ("*Carrington*"), which then sold such Mortgage Loans and transferred certain related rights, pursuant to the Pooling and Servicing Agreements, to securitizations trusts for which Wells Fargo acts as trustee.

15. More particularly, under certain mortgage loan purchase agreements listed on the attached Exhibit C (collectively, the "*Wells MLPAs*"),[4] Carrington Securities, LP (the "*Seller*"), an affiliate of Carrington, first sold the respective Mortgage Loans to Stanwich Asset Acceptance Company, L.L.C., another affiliate of Carrington (the "*Depositor*").  Also under the Wells MLPAs, Debtor NC Capital Corporation (the "*Responsible Party*") made certain representations and warranties about the Mortgage Loans.

16. Under the Pooling and Servicing Agreements, the Depositor then sold the Mortgage Loans to Wells Fargo in its capacity as trustee.  In addition, under the Pooling and Servicing Agreements the Depositor assigned its ability to enforce the Mortgage Loan document delivery requirements and the various representations and warranties under the Wells MLPAs to Wells Fargo in its capacity as trustee.  Consequently, Wells Fargo has the right to enforce the Mortgage Loan document delivery requirements and representations and warranties under the Wells MLPAs.

17. Pursuant to each of the Pooling and Servicing Agreements, the related Wells Securitization Trusts issued a series of mortgage-backed securities (collectively, the "*Securities*") to various purchasers (the "*Securityholders*").  The payments due on each series of Securities are

---

[4] The Wells MLPAs are not attached because they are voluminous and the Debtors have copies of the Wells MLPAs.  Wells Fargo will provide copies of the Pooling and Servicing Agreements and the Wells MLPAs to parties upon request.

funded, directly or indirectly, by payments of principal and interest by obligors on the Mortgage Loans.

18.     The Pooling and Servicing Agreements provide that the one of the Debtors, New Century Mortgage Corporation (the "*Servicer*"), retains the right to service the Mortgage Loans. In this capacity, the Servicer collects payments from obligors on the Mortgage Loans, remits payments to Wells Fargo, in its capacity as trustee, provides delinquency and other informational reports, deals with delinquent obligors on the Mortgage Loans and when necessary, forecloses and otherwise enforces the Mortgage Loans on behalf of the Wells Securitization Trusts for the benefit of the Securityholders.  As compensation for servicing, the Servicer receives fees calculated as a percentage of the outstanding balance of the Mortgage Loans and other ancillary income such as late payment charges and assumption fees.

19.     The Pooling and Servicing Agreements also provide that Deutsche Bank National Trust Company will serve as custodian (the "*Custodian*") under related custodial agreements (the "*Custodian Agreements*").  The Custodian holds and safeguards the original documents related to the Mortgage Loans for the benefit of the Trustee and the Securityholders.  In connection with these duties, the Custodian reviews the documents related to the Mortgage Loans and, *inter alia*, analyzes the documents to confirm that it has the documents necessary for each Mortgage Loan, including documents regarding proper perfection of the security interests in the applicable real estate.  Under the Custodian Agreements, the Custodian is to provide a certification that states that the Custodian has all necessary documents regarding each applicable Mortgage Loan and that there are no documentary defects within one year after the closing of the applicable Pooling and Servicing Agreement.  To the extent the Custodian does not have all necessary documents or

there are defects, the Custodian attaches an exception report to the certification which identifies all missing documents and defects (an "*Exception Report*").

20.     The Exception Reports are important because, if the Custodian does not have the required documents evidencing a Mortgage Loan, the Trustee, on behalf of the related Securityholders, may be unable to enforce the Mortgage Loan, and as a result, the value of the Mortgage Loan may be substantially less than was bargained for an agreed upon in connection with the Pooling and Servicing Agreements.  As a result, remedies for the problems identified on the Exception Reports consist of providing missing documents, curing identified document defects, providing appropriate replacement Mortgage Loans with proper documentation (replacement is available of the first two years following the settlement of each Wells Securitization Trust) and/or repurchasing the identified Mortgage Loans.

21.     To date, the Custodian has issued a certification and final Exception Report related to one of the five Pooling and Servicing Agreements.  Upon information and belief, the Debtors and Carrington have received this final Exception Report.  In addition, upon request by Wells Fargo, the Custodian has supplied preliminary Exception Reports regarding the other four Pooling and Servicing Agreements as to which a final Exception Report is not yet required to be delivered.  To the extent the Debtors and Carrington do not have copies of the preliminary Exception Reports, Wells Fargo will provide copies of the preliminary Exception Reports to the Debtors and Carrington upon request.

22.     As indicated above, the Custodian Agreements do not require the Custodian to supply a final Exception Report until one year after the settlement of the related Wells Securitization Trusts.  As a result, the Custodian may not supply its final certifications and

related Exception Reports regarding the Mortgage Loans sold to the Trustee under the other four Pooling and Servicing Agreements until later this year.

23. Nevertheless, the Exception Reports received to date identify numerous deficiencies in the documents related to the Mortgage Loans that the Seller is required to provide under the Pooling and Servicing Agreements. In fact, given the extensive deficiencies identified in the Exception Reports, the Seller may be required to repurchase a substantial number of the Mortgage Loans. Although the dollar amount required to repurchase such Mortgage Loans is not known at present, the aggregate cure amount required to repurchase the Mortgage Loans identified in the final Exception Reports likely will be in excess of $1 billion.[5] Thus, the cure amount for the Pooling and Servicing Agreements may be well in excess of $1 billion.

24. Moreover, the Responsible Party has an obligation in connection with the Wells Securitization Trusts to cure breaches of representations and warranties that it makes in respect to the Mortgage Loans. These representations include that the documents and instruments related to the Mortgage Loans are in generally acceptable forms and that the Mortgage Loans complies with the requirements of the Wells MLPAs. Consequently, the Responsibly Party is obligated to ensure the completeness of the documents regarding the Mortgage Loans.

25. By the Motion, the Debtors seek authority to assume their obligations and to assign all of their servicing rights under the Pooling and Servicing Agreements to the purchaser of the Servicing Business pursuant to section 365 of the Bankruptcy Code. In the Notice of

---

[5] The $1 billion figure is a conservative estimate of the potential re-purchase obligations. Based on the current average of the outstanding balance of the Mortgage Loans in each of the Securitization Trusts and the number of Mortgage Loans identified on the Exception Reports received to date, the aggregate re-purchase obligation would be in excess of $3 billion. As the Custodian has not issued final Exception Reports regarding four of the five Securitization Trusts, and the documents regarding some of the currently identified Mortgage Loans may be found, Wells Fargo identifies the conservative re-purchase obligation estimate of $1 billion.

Assumption and Assignment the Debtors state that the proposed cure amount for each of the Pooling and Servicing Agreements is $0.00.  *See* Notice of Assumption and Assignment, at 10-11.

26. The Debtors' proposed cure amount of $0.00 for each of the Pooling and Servicing Agreements is wholly inadequate to cure the numerous outstanding liabilities and obligations regarding the Pooling and Servicing Agreements.  In fact, the Debtors' proposed cure amount is $1 billion short of being enough to cure the deficiencies identified in the Exception Reports, let alone the other liabilities and obligations related to the Pooling and Servicing Agreements for which the Seller and/or the Responsible Party is required to remedy.

27. Specifically, the known breaches and steps to cure consist of the following:

   a. Under the Wells MLPAs, the Responsible Party made representations and warranties about the Mortgage Loans to the Depositor, including without limitation regarding the documents related to the Mortgage Loans, and under the Pooling and Servicing Agreements the Depositor assigned its rights to enforce these representations and warranties to Wells Fargo. Remedies for curing these breaches consist of remedying the breach, providing an appropriate replacement Mortgage Loan and repurchasing the Mortgage Loan.  The failure to provide an appropriate remedy constitutes a breach;

   b. Under the Wells MLPAs, the Seller has the obligation to deliver documents regarding Mortgage Loans to the Custodian and under the Pooling and Servicing Agreements the Depositor assigned its rights to enforce these obligations to Wells Fargo.  Based on the Exception Reports received to date, the Custodian has advised Wells Fargo that many of these documents have not been delivered.  Remedies for curing the failure to deliver the necessary documents regarding the Mortgage Loans consist of curing the failure, providing an appropriate replacement Mortgage Loan with proper documentation, and repurchasing the Mortgage Loan.  The failure to provide an appropriate remedy constitutes a breach;

   c. Under the Wells MLPAs, the Seller has the obligation to deliver to the Custodian assignments of the Mortgage Loans to Wells Fargo as trustee, and if a triggering event occurs, to record each such assignment in the appropriate recorder office so as to evidence the Wells Fargo's interests in the Mortgage Loans.  Under the Pooling and Servicing Agreements, the Depositor assigned its rights under the MLPAs to Wells Fargo and the

        Pooling and Servicing Agreements repeat the Seller's obligations under the Wells MLPAs regarding the assignments. A triggering event has occurred and Wells Fargo has notified the Seller of the occurrence of the triggering event and has requested that the Seller perform its obligation under the Wells MLPAs to record the assignments of the Mortgage Loans. Consequently, the Seller is obligated to record assignments for each of the Mortgage Loans to Wells Fargo as trustee. To date, the Seller has not responded to or otherwise acknowledged Wells Fargo's request to record the assignments of the Mortgage Loans;

d.     The Wells MLPAs provide that the Seller and the Responsible Party, as applicable, must reimburse the Trustee, as assignee of the Depositor, for any expense incurred by the Trustee in connection with enforcing any obligations of the Seller or the Responsible Party under the Wells MLPAs. Similarly, the Pooling and Servicing Agreements provide that the Servicer must reimburse the Trustee for expenses incurred by the Trustee in connection with any breach by the Servicer; and

e.     The Pooling and Servicing Agreements and the Wells MLPAs identify other liabilities and obligations of the Seller, Responsible Party, Depositor and Servicer, and all such liabilities and obligations should be included (together with the liabilities and obligations identified in (a) - (d), the "_PSA Liabilities_").

## The APA

28.    In addition to the Notice of Assumption and Assignment, the APA itself may attempt to limit the PSA Liabilities. More particularly, under the APA the purchaser (the "_Purchaser_") of the Servicing Business may attempt to limit the PSA Liabilities to the extent they arise prior to the closing of the APA. The APA provides that "Assumed Liabilities" are obligations arising under the Pooling and Servicing Agreements after the assignment to the Purchaser, and that "Retained Liabilities" are any liabilities of the Debtors other than the Assumed Liabilities, including those arising from any deficiency with respect to any existing loan facilities of the Debtors. See APA, at 3, 14. Similarly, the APA states,

> Purchaser shall not assume or have any Liability or responsibility with respect to any Liability of any nature or kind whatsoever relating to the Business or the Purchased Assets that exists, or arises out of the operation or ownership of the Purchased Assets or the Business, prior to, at or after, the Closing and that is not

      an Assumed Liability.  Other than the Assumed Liabilities, Purchaser shall not assume any Liability of any nature or kind whatsoever of Sellers.

APA, § 2.7.

      29.      The APA further provides that all indemnification rights and obligations of the Debtors under the Pooling and Servicing Agreement arising prior to the closing date and relating to the operation of the Servicing Business prior to the closing date shall not be transferred to Purchaser.  APA, at 17.  Accordingly, the Purchaser may attempt to refuse to satisfy the PSA Liabilities to the extent the Purchaser believes they arose prior to the closing of the sale of the Servicing Business.  Thus, despite the purported assumption and assignment of the Pooling and Servicing Agreements, this could leave the Securityholders with no remedy for the material Mortgage Loan document defects or for material breaches of Mortgage Loan representations and warranties.

## Argument

      30.      All defaults under the Pooling and Servicing Agreement including, without limitation, the PSA Liabilities, must be cured for the Debtors to assume and assign the Pooling and Servicing Agreements.  *See* 11 U.S.C. § 365.  In addition, the Pooling and Servicing Agreements may only be assumed and assigned if all of the liabilities and obligations under the Pooling and Servicing Agreements are assumed and assigned.  *See* 11 U.S.C. § 365.  To the extent the Debtors or Carrington seek to eliminate any of the liabilities or obligations under the Pooling and Servicing Agreements, the Motion should be denied and the Debtors should not be permitted to assume and assign the Pooling and Servicing Agreements.

    A.  **The Cure Amount**

      31.      The Debtors' proposed cure amount of $0.00 for each of the Pooling and Servicing Agreements is wholly inadequate to cure the numerous outstanding PSA Liabilities.

Instead, any assumption of the Pooling and Servicing Agreements should include the express assumption of the PSA Liabilities.

32.     Wells Fargo respectfully submits that the Motion must be denied to the extent it seeks to authorize the assumption and assignment of the Pooling and Servicing Agreements with cure amounts for the Pooling and Servicing Agreements of $0.00 as stated in the Notice of Assumption and Assignment.  At this time, because, *inter alia*, the final versions of all of the Exception Reports are not available and current breaches of the agreements may not be known, Wells Fargo has not placed an exact dollar figure on the cure amounts for the assumption and assignment of the Pooling and Servicing Agreements, though the cure amounts for the Pooling and Servicing Agreement may be well in excess of $1 billion.  Thus, instead of using an exact dollar figure for these cure amounts, any order approving such assumption and assignment should provide that all liabilities and obligations are assumed and assigned including, without limitation, PSA Liabilities.

33.     In addition, if Carrington or the Seller or the Depositor (each Carrington affiliates) respond that their obligations under the Wells MLPAs and the Pooling and Servicing Agreements are not required to be assumed, this response is inappropriate. By becoming the stalking-horse bidder for the Servicing Business, Carrington and its related entities have not only subjected themselves to the jurisdiction of this Court, they have requested various forms of relief from this Court in connection with the sale of the Servicing Business.  Consequently, a response by Carrington or its affiliates that they should not be required to promptly comply with all of their obligations under the Pooling and Servicing Agreements and the Wells MLPAs would violate the clean-hands doctrine, which requires parties that seek equitable relief not to violate

equitable principles. *New Valley Corp. v. Corp. Prop. Associates 2 and 3 (In re New Valley Corp.)*, 181 F.3d 517, 524-527 (3rd Cir. 1999).

34. Moreover, at a minimum, any order approving the assumption and assignment of the Pooling and Servicing Agreements should specify that neither such assumption and assignment nor the sale of the Servicing Business to any party will affect in any way the ability of Wells Fargo to enforce Wells Fargo's claims against Carrington or any of its affiliated entities, including without limitation the Seller and the Depositor, under the Wells MLPAs and the Pooling and Servicing Agreements.

### B. The APA

35. To the extent that the APA would permit the Purchaser to refuse to satisfy the PSA Liabilities, if any, that arose prior to the closing of the sale of the Servicing Business (the "*Closing Date*"), the Motion should be denied or the Purchaser should be required to satisfy all of the PSA Liabilities. The APA should not relieve any of the parties to the Pooling and Servicing Agreements of their liabilities thereunder or under related transaction documents. In particular, the APA should not affect any of the liabilities of non-debtor parties to the Pooling and Servicing Agreements or under related transaction documents regardless of when the liabilities arose.

36. Further, at a minimum, if the Purchaser does not assume all of the PSA Liabilities, including any that may have arisen prior to the Closing Date, any order approving the Motion should be conditioned on the Debtors escrowing funds sufficient to satisfy any PSA Liabilities that may have arisen prior to the Closing Date. Based on the current estimate of in excess of $1 billion for the total PSA Liabilities, the escrowed amount should be the lesser of the entire amount received by the Debtors in connection with the sale of the Servicing Business or $1 billion.

## **Reservation of Rights**

37.     Wells Fargo reserves the right to raise additional objections to the sale, sale order, and the APA prior to or at the hearing on the Motion scheduled to be held on May 21, 2007.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Conclusion**

WHEREFORE, Wells Fargo respectfully requests that this Court enter an order (i) denying the Debtors' Motion unless all current defaults under the Pooling and Servicing Agreements, including without limitation any repurchase obligations and obligations arising from representations and warranties under the Pooling and Servicing Agreements or the Wells MLPAs, are cured; (ii) providing that upon the assumption and assignment of the Pooling and Servicing Agreements, all of the outstanding liabilities and obligations under the Pooling and Servicing Agreements, including without limitation any repurchase obligations and obligations arising from representations and warranties under the Pooling and Servicing Agreements or the Wells MLPAs, are assumed and assigned, and that such assumption and assignment does not affect in any way the ability of Wells Fargo to enforce such liabilities and obligations; (iii) requiring Carrington and its affiliated entities, including without limitation the Seller and the Depositor, to promptly comply with their obligations under the Pooling and Servicing Agreements and the Wells MLPAs; and (iv) granting Wells Fargo such further relief as is just and appropriate.

Dated: May 14, 2007

Respectfully submitted,

HUNTON & WILLIAMS LLP

/s/ Jason W. Harbour
Peter S. Partee (PP-0766)
200 Park Avenue, 53rd Floor
New York, New York  10166-0136
(212) 309-1000

and

J.R. Smith (Va. Bar No. 41913)
Jason W. Harbour (DE Bar No. 4176, Va. Bar No. 68220)
Riverfront Plaza, East Tower
951 East Byrd Street

Richmond, Virginia  23219-4074
(804) 788-8200

and

Michael Busenkell (DE Bar No. 3933)
Eckert, Seamans, Cherin & Mellot, LLC.
300 Delaware Avenue
Suite 1210
Wilmington, Delaware  19801

Counsel to *Wells Fargo Bank N.A.*

17