# EXHIBIT A

TWO RIVERWAY

LEASE AGREEMENT

between

COVENTRY FUND X, LTD.

and

NEW CENTURY MORTGAGE CORPORATION

2RW/lbc7776

### NEW CENTURY MORTGAGE CORPORATION (LESSEE)
### TWO RIVERWAY LEASE AGREEMENT
TABLE OF CONTENTS

**SECTION NO.**                    **SECTION HEADINGS**

| | | |
|---|---|---|
| 1. | PREMISES AND CERTAIN DEFINED TERMS | 1 |
| 2. | AUTHORIZED USE | 1 |
| 3. | TERM | 1 |
| 4. | BASE RENT | 2 |
| 5. | ADDITIONAL RENT | 3 |
| 6. | PAYMENT OF RENT | 5 |
| 7. | RENTABLE AREA | 5 |
| 8. | ACTUAL OPERATING EXPENSES | 5 |
| 9. | TAXES | 6 |
| 10. | COMMENCEMENT | 6 |
| 11. | LESSEE DELAY; EARLY ENTRY | 7 |
| 12. | MAINTENANCE AND REPAIR | 7 |
| 13. | LESSOR'S SERVICES | 8 |
| 14. | PAYMENT FOR NON-STANDARD SERVICES | 9 |
| 15. | SERVICES INTERRUPTION | 9 |
| 16. | PROHIBITED USE | 10 |
| 17. | RULES AND REGULATIONS | 10 |
| 18. | COMPLIANCE WITH LAWS AND RESTRICTIONS AND OTHER REGULATIONS; LICENSES IN EFFECT; FINANCIALS | 11 |
| 19. | ALTERATIONS | 12 |
| 20. | LESSEE'S EQUIPMENT AND INSTALLATIONS | 13 |
| 21. | TAXES ON PERSONALTY AND LESSEE IMPROVEMENTS | 13 |
| 22. | LESSOR'S ACCESS | 13 |

23.    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

24.    FIRE OR OTHER CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

25.    WAIVER OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

26.    INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

27.    NON-WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28.    QUIET POSSESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29.    NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

30.    LESSOR'S FAILURE TO PERFORM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

31.    LESSOR'S RIGHT TO PERFORM OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

32.    ACT OF DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

33.    RIGHTS UPON DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

34.    SURRENDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

35.    HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

36.    REMOVAL OF LESSEE'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

37.    LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

38.    ATTORNEY'S FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

39.    ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

40.    LESSOR'S LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

41.    LIGHT AND AIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42.    CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

43.    USE OF NAMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

44.    SUBORDINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

45.    LEGAL INTERPRETATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

46.    ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

47.    LENDER REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

48.    ESTOPPEL LETTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

49.   RIGHT TO RELOCATE LESSEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

50.   KEYS AND LOCKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

51.   GRAPHICS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

52.   PARKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

53.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

54.   BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

55.   DOLLARS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

56.   AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

57.   RECORDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

58.   INCORPORATION BY REFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

59.   MULTIPLE COUNTERPARTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

60.   ACKNOWLEDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

| | |
|---|---|
| EXHIBIT A | WORK LETTER AGREEMENT |
| ATTACHMENT A-1 | BUILDING STANDARD IMPROVEMENTS |
| EXHIBIT B | FLOOR PLAN |
| EXHIBIT B-1 | PROPERTY DESCRIPTION |
| EXHIBIT C | BUILDING RULES AND REGULATIONS |
| EXHIBIT D | PARKING |
| EXHIBIT E | MARKET BASE RENTAL RATE |
| EXHIBIT F | RENEWAL OPTION |
| EXHIBIT G | COMMENCEMENT MEMORANDUM |
| ~~EXHIBIT H~~ | ~~FORM SNDA~~ |

6.28.06

6/29/06

TWO RIVERWAY
LEASE AGREEMENT

This Lease, made and entered into on the 29th day of June ___, 2006 (the "Lease Signing Date"), by and between **COVENTRY FUND X, LTD., a Texas limited partnership** (the "Lessor") and **NEW CENTURY MORTGAGE CORPORATION, a California corporation** (the "Lessee"):

## W I T N E S S E T H :

In consideration of the mutual covenants set forth herein, Lessor and Lessee hereby agree as follows:

1.    **PREMISES AND CERTAIN DEFINED TERMS**

Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, on the terms and for the Rent hereinafter set forth, the Premises indicated by crosshatching on the floor plan drawing attached hereto as Exhibit "B" and made a part hereof for all purposes (the **"Premises"** or **"Leased Premises"**), which Premises are situated on the 6th floor, Suite 600 of the highrise office building presently known as Two Riverway (the **"Building"**), and located at Two Riverway, Houston, Harris County, Texas according to the present system of numbering and naming streets and highways in Houston, Harris County, Texas. References in this Lease to the **"Property"** shall mean the Building, the garage on the Land( the **"Garage"**), the land described on Exhibit "B-1" attached hereto (the **"Land"**), all other buildings, structures, facilities, improvements or areas that are now or hereafter may be constructed or located on or installed in or at the Land, and any or all such other buildings, structures, facilities, improvements or areas included therein or thereat as designated by Lessor from time to time. The number of square feet of Rentable Area (defined in Section 7) initially of the Premises hereunder is stipulated to be 12,818 square feet, and the Rentable Area of the Building is as of the Lease Signing Date stipulated to be 369, 479 square feet.

2.    **AUTHORIZED USE**

Lessee shall have the right to occupy and use the Premises solely for general business office purposes of a lawful nature. Lessee may not use or have access to any portion of the roof of the Building or the mechanical areas, mechanical rooms or mechanical floors of the Building, and Lessee may not use Building shafts, risers, ducts, electrical closets or other similar portions of the common building facilities, without the prior written consent of Lessor in each instance.

3.    **TERM**

Subject to and upon the terms and conditions set forth in this Lease or in any exhibit or addendum hereto, this Lease shall commence on the earlier of (a) the first business day after the weekend following Substantial Completion of the Leasehold Improvements, (b) the date Lessee commences business operations in the Premises, or (c) the date Substantial Completion of the Leasehold Improvements would have occurred but for Lessee Delay, and be in force for a term (the **"Term"**) of 60 months. It is projected that the Lease shall begin on the 1st day of September, 2006 (the **"Scheduled Commencement Date"**) (such Scheduled Commencement Date, subject to adjustment as provided in **Sections 10 and 11** below, being hereinafter called the **"Commencement Date"**) and end on the 31st day of August, 2011 (subject to adjustment with the Commencement Date as provided in **Section 10** below). The terms,

provisions and conditions of this Lease shall begin and be effective as of the Lease Signing Date, and shall continue thereafter during the Lease for (i) the period of time commencing with the Lease Signing Date and ending with the Commencement Date, plus (ii) the Term specified in this **Section 3** commencing with the Commencement Date. From and after the Lease Signing Date, during the period of time described in (i) above, Lessee shall observe and perform all obligations of the Lessee pursuant to this Lease, other than those requiring payment of Base Rent, Lessee's Estimated Additional Rent and Lessee's Additional Rent, until the Commencement Date, whereupon all of which shall commence. Promptly after the Commencement Date, Landlord and Tenant will execute a "Commencement Date Memorandum" in substantially the form of Exhibit "G" to this Lease.

4.    **BASE RENT**

4.01    Commencing on the Commencement Date and continuing thereafter throughout the full Term of this Lease, Lessee hereby agrees to pay the Base Rent as described hereinbelow, plus Lessee's Estimated Additional Rent and Lessee's Additional Rent as described in Section 4 and Section 5. The annual Base Rent together with the annual Lessee's Estimated Additional Rent shall be due and payable in twelve (12) equal monthly installments, in advance, on the first day of each calendar month during the Initial Term of this Lease and any extensions or renewals thereof, and Lessee hereby agrees to pay Rent to Lessor at Lessor's address as provided herein (or at such other address as may be designated by Lessor from time to time) monthly in advance.

Lessee, in consideration for this Lease and the leasing of the Premises, shall pay to Lessor rent ("Base Rent"), which shall be payable in monthly installments throughout the Term as follows:

**RENTAL SCHEDULE:**

(a)    $17,090.67 per month (being equal to a Base Rent rate of $16.00 per square foot of Rentable Area per annum), in advance, beginning with the first (1st) month of the Term and continuing for each successive month thereafter to and including the fourteenth (14th) month of the Term; provided, however, Base Rent in the amount of $17,090.67 per month shall be abated for the first two (2) months of the Term, but the granting of free rent as described herein is contingent upon Lessee's faithful performance of all obligations as described in this Lease, and upon any Act of Default under the Lease, Lessee shall become liable for rental payments on all rent-free months, including those accruing prior to such default, at the monthly Base Rent of $17,090.67 per month, plus any additional rent that would have otherwise accrued, and, further, this Lease shall be construed as if no such period of free rent was provided, this remedy being cumulative and in addition to all of Lessor's other remedies as provided for in this Lease;

(b)    $18,158.83 per month (being equal to a Base Rent rate of $17.00 per square foot of Rentable Area per annum), in advance, beginning with the fifteenth (15th) month of the Term and continuing for each successive month thereafter to and including the twenty-sixth (26th) month of the Term;

(c)    $19,761.08 per month (being equal to a Base Rent rate of $18.50 per square foot of Rentable Area per annum), in advance beginning with the twenty-seventh (27th) month of the Term and continuing for each successive month thereafter to and including the thirty-eighth (38th) month of the Term;

(d)    $20,829.25 per month (being equal to a Base Rent rate of $19.50 per square foot of Rentable Area per annum), in advance, beginning with the thirty-ninth (39th) month of the Term and continuing for each successive month thereafter to and including the fiftieth (50th) month of the Term; and

(e)    $21,897.42 per month (being equal to a Base Rent rate of $20.50 per square foot of Rentable Area per annum), in advance, beginning with the fifty-first (51st) month of the Term and continuing for each successive month thereafter to and including the sixtieth (60th) month of the Term.

4.02    If the Term of this Lease as described above commences on other than the first day of a calendar month or terminates on other than the last day of a calendar month, then the installments of Base Rent and Lessee's Estimated Additional Rent for the applicable partial month shall be paid in advance, and the payment by Lessee for such partial month shall be calculated by multiplying the whole monthly installment of Base Rent and Lessee's Estimated Additional Rent by a fraction, the numerator of which shall be the number of days of the Lease Term occurring during said commencement or termination month, as the case may be, and the denominator of which shall be the total number of days occurring in said commencement or termination month. Also, if the Term of this Lease commences or terminates on other than the first day of a calendar year, the Operating Expense Amount and Lessee's Additional Rent (defined in **Section 5** herein) shall be prorated and calculated for such commencement or termination year, as the case may be, by multiplying each such amount by a fraction, the numerator of which shall be the number of days of the Lease Term during the commencement or termination year, as the case may be, and the denominator of which shall be 365, Lessor and Lessee hereby agreeing that the provisions relating to said calculation shall survive the termination of this Lease. **"Operating Expense Amount"** shall mean the amount of the Actual Operating Expenses for the entire Property (as defined in **Section 8** herein) for a calendar year divided by the number of square feet of Rentable Area included in the Building.

5.    **ADDITIONAL RENT**

(a)    Lessor shall notify Lessee of the amount of Lessee's Estimated Additional Rent (defined below). Commencing in January 2007, Lessee agrees to pay to Lessor Lessee's Estimated Additional Rent in equal monthly installments, in advance, on the first day of each calendar month during the Term of this Lease and any extensions or renewals thereof. As used herein, **"Lessee's Estimated Additional Rent"** shall mean Lessor's reasonable advance estimate of Lessee's Additional Rent (defined in 5(b) below). As used herein, the term **"Lessee's Share"** shall be the proportion that the Rentable Area of the Premises bears to the total Rentable Area of the Building.

(b)    Base Rent per square foot of Rentable Area per annum includes a component (the Operating Expense Amount) for Operating Expenses, such component equal to the Actual Operating Expenses (as defined in **Section 8**) for the Calendar Year 2006 (the **"Base Year"**) divided by the total Rentable Area of the Building. For the purposes of this Lease, the term **"Base Operating Expenses"** shall mean the Actual Operating Expenses for the Calendar Year 2006. It is the intention of Lessor and Lessee that Lessee shall, through payments of Lessee's Additional Rent, pay with respect to the Term Lessee's Share of all increases in Actual Operating Expenses over the Base Operating Expenses. The term **"Lessee's Additional Rent,"** as used herein, shall mean with respect to each year after the Base Year, Lessee's Share of all increases in Actual Operating Expenses over the Base Operating Expenses. On or about April 1 (or as soon thereafter as practicable) of the first calendar year following the Base Year, and on or about April 1st of each calendar year thereafter, Lessor shall provide to Lessee an estimate of the Actual Operating Expenses for such year, based on Lessor's estimate thereof. Lessee shall pay as Lessee's Estimated Additional Rent for such Calendar Year Lessee's Share of the amount, if any, by which such estimated Actual Operating Expenses for such calendar year exceeds the Base Operating Expenses. With respect to that portion of each Calendar Year prior to the date Lessee receives Lessor's statement setting forth the estimated Actual Operating Expenses for such year, Lessee shall pay the Lessee's Estimated Additional Rent for such period within thirty (30) days after Lessee's receipt of Lessor's statement thereof. Lessee's Estimated Additional Rent for each calendar year or partial calendar year during the Term shall be allocated ratably to each month or partial month within such whole or partial calendar year, and the portion of Lessee's Estimated Additional Rent so allocated to each month or partial month shall be payable in advance on the date that the installment of Base Rent attributable to such month or partial month is payable as provided in **Section 4**. If the Commencement Date is not the first day of a calendar year, or the expiration or termination date of this Lease is not the last day of a calendar year, all adjustments hereunder shall be prorated accordingly based on a calendar year. Additionally, adjustments hereunder applicable to any space added to the Premises on

any day other than the first day of a calendar year shall be prorated based on a calendar year. All adjustments to Base Rent in accordance with the provisions of this **Section 5** shall be considered as Rent due Lessor by Lessee and shall be subject to all provisions of this Lease Agreement which are applicable to the payment of Rent. Nothing in this **Section 5** shall be construed at any time to, and nothing shall, reduce the Base Rent, or reduce the monthly installments of Base Rent payable hereunder below the amounts set forth in **Section 4** of this Lease, notwithstanding that Actual Operating Expenses for any period may be equal to or less than Base Operating Expenses.

(c)    Within one hundred fifty (150) days (or as soon thereafter as practicable) after the end of the calendar year in which the Commencement Date occurs and of each calendar year thereafter during the Term of this Lease, or as soon as practicable thereafter, Lessor shall provide Lessee a statement showing the Actual Operating Expenses (as defined in **Section 8** herein) for said calendar year, and a statement prepared by Lessor comparing Lessee's Estimated Additional Rent paid by Lessee with Lessee's Additional Rent. In the event that Lessee's Estimated Additional Rent paid by Lessee exceeds Lessee's Additional Rent for said calendar year, Lessor shall pay Lessee (in the form of a credit against Rent next due or, if no Rent is to become due on account of the expiration of the Term of the Lease, then in the form of a good and sufficient check) an amount equal to such excess. In the event that the Lessee's Additional Rent exceeds Lessee's Estimated Additional Rent paid by Lessee for said calendar year, Lessee shall pay Lessor, in cash, within thirty (30) days of receipt of the statement, an amount equal to such difference. The effect of this reconciliation payment is to ensure that Lessee will pay during the Term Lessee's Share of all Actual Operating Expenses in excess of the Base Operating Expenses. Lessee (or its designee), at its cost, shall have the right to inspect in Lessor's offices during Lessor's usual business hours within the one hundred twenty (120) day period following receipt by Lessee of each statement, but not thereafter, Lessor's records of the Actual Operating Expenses referred to in such statement. If within sixty (60) days after the first to occur of Lessee's inspection or the expiration of such 120-day period, neither party hereto delivers to the other party a notice referring in reasonable detail to one or more errors in such statement, it shall be deemed conclusively that the information set forth in such statement is correct. If the inspection proves that the amount Lessor charged Lessee for Lessee's Additional Rent was greater than the amount this Article 5 obligates Lessee to pay, unless Lessor reasonably contests the results of the inspection, Lessor will refund the excess amount to Lessee within 30 days after Lessor receives a copy of the results. If the inspection report proves that the amount Lessor charged Lessee for Lessee's Additional was less than the amount this Article 5 obligates Lessee to pay, Lessee will pay to Lessor, as Additional Rent, the difference between the amount Lessee paid and the amount determined in the inspection. If Lessee elects to inspect such costs and expenses as provided above and Lessor's statement is found to be in error by more than five percent (5%), then Lessor will pay Lessee's reasonable third party out-of-pocket costs for this inspection, not to exceed $5,000. The provisions of this subparagraph (c) shall survive the expiration of the Term and any renewals thereof.

## 6.    PAYMENT OF RENT

The term "Rent" as used in this Lease shall mean the Base Rent, Lessee's Estimated Additional Rent, Lessee's Additional Rent, Parking Rent and charges, furnishing of supplies and services to and at the request of Lessee not included in Lessor's Services defined in **Section 13**, and all other amounts provided for in this Lease to be paid by Lessee, all of which shall constitute Rent in consideration for this Lease and the leasing of the Premises. The Rent shall be paid at the times and in the amounts provided for herein in legal tender of the United States of America to Lessor at the address shown herein or to such other person or at such other address as Lessor may from time to time designate in writing. The Rent shall be paid without notice, demand, abatement, deduction, counterclaim, or offset except as may be expressly set forth in this Lease. Lessor and Lessee are knowledgeable and experienced in commercial transactions and agree that each and every provision of this Lease for determining charges, amounts and additional rent payable by Lessee are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. **ACCORDINGLY, LESSEE VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF LESSEE UNDER SECTION 93.012 OF**

THE TEXAS PROPERTY CODE, AS SUCH SECTION NOW EXISTS OR AS MAY BE HEREAFTER AMENDED OR SUCCEEDED.

7.    RENTABLE AREA

The term **"Rentable Area"** as used in this Lease shall refer to (i) in the case of single tenancy floor, all floor area measured from the inside surface of the outer glass or finished column or exterior wall of the Building to the inside surface of the opposite exterior wall of the Building, excluding only the areas (**"service areas"**) within the outside walls used for building stairs, fire towers, elevator shafts, flues, vents, stacks, vertical pipe shafts and vertical ducts, but including any such areas which are for use by a lessee, plus an allocation of the square footage of the Building's elevators, mechanical and electrical and elevator machine rooms, Building security or monitoring rooms, ground and basement lobbies, and (ii) in the case of a partial floor or a floor to be occupied by more than one lessee, all floor areas within the inside surface of the outer glass or finished column or exterior wall of the Building enclosing the portion of the Premises on such floor and measured to the mid-point of the walls separating the Premises from other areas on the floor, and including a proportionate part of the areas devoted to corridors, elevator foyers, restrooms, mechanical and electrical and elevator machine rooms, janitor closets, vending areas, public halls and lobbies and other similar facilities for the use or benefit of all lessees (hereinafter sometimes called **"Common Areas"**) on Lessee's partial floor, plus an allocation of the square footage of the Building's elevators, mechanical and electrical and elevator machine rooms, Building security or monitoring rooms, ground and basement lobbies; Lessee's proportionate part of the Common Area on Lessee's partial floor shall be based upon the ratio which Lessee's Rentable Area on such floor bears to the aggregate Rentable Area on such floor. No deductions in calculating Rentable Area are made for columns or projections. The lavatories, hallways and elevator lobbies on floors wholly occupied by a single lessee may, upon designation by Lessor from time to time, be for the exclusive use of such lessee.

8.    ACTUAL OPERATING EXPENSES

The term **"Actual Operating Expenses"** or **"Operating Expenses"** as used in this Lease refers to (subject to the exclusions listed below) the aggregate of all amounts paid, incurred or accrued by Lessor for the ownership, operation, repair, maintenance or security of the Property, and all equipment, fixtures and facilities used in connection therewith (including such additional facilities as may be added to or used in connection with the Property). Actual Operating Expenses shall also include, but not be limited to, the costs of utilities, all costs, charges, and expenses incurred by Lessor in connection with any change of any company providing any utility (including without limitation electricity service) (including, without limitation, maintenance, repair, installation, and service costs associated therewith), cleaning and janitorial services, security, repairs, refurbishing, restoration, Taxes (defined in **Section 9**), all insurance premiums, all labor, supplies, materials, tools, management fees, accounting, legal and other professional costs and expenses, an allocation of Lessor's general and administrative expenses, and all items constituting operating and maintenance and security costs in connection with the Property, according to generally accepted accounting principles as determined by a certified public accountant selected by Lessor. Actual Operating Expenses shall also include amortization, with the actual rate of interest incurred by Lessor, of the cost of installation of capital investment items that are primarily for the purpose of reducing operating costs (provided, however, that the amount amortized and included in the Actual Operating Expenses with respect to any such capital investment item shall not exceed the total actual cost savings realized during a reasonable time as a result of such capital investment items(s)), or that may be required by governmental authority, provided that such costs shall be amortized over the reasonable life of the capital investment items, with the reasonable life and amortization schedule being determined in accordance with generally accepted accounting principles. Notwithstanding any other provision herein to the contrary, it is agreed that in the event the Building is not fully occupied during any year of the Term, Lessor may make an adjustment in computing the Actual Operating Expenses for such year with respect to Lessee so that the Actual Operating Expenses shall be "grossed up" and computed for such year as though the Building had been fully occupied during such year.

Operating Expenses do not include the following: (aa) the cost of capital improvements to the Property, except as provided above; (bb) marketing costs, leasing commissions and tenant expenses Lessor incurs in connection with leasing or procuring tenants or renovating space for new or existing tenants; (cc) legal expenses incident to Lessor's enforcement of any lease; (dd) interest or principal payments on any mortgage of Lessor; (ee) any expense for which Lessor is directly reimbursed by another tenant other than as an Operating Expense; (ff) the cost of any repairs, restoration or other work for which Lessor is directly reimbursed by insurance proceeds or taking awards; (gg) any amount paid for products or services to an entity that is an affiliate of Lessor (except a management fee of 3% of the gross income from the Building), but only if and to the extent such amount exceeds the fair market value of such services and products, except for such management fee ; (hh) the costs of any utilities which are separately metered to the Premises or to another tenant's premises; (ii) any fines or penalties imposed on Lessor for failing to timely perform its obligations under this Lease; (jj) salaries of employees not related to the management, operation, repair or maintenance of the Property; (kk) any ground rent payable under any ground lease now or hereafter affecting the Property; (ll) any bad debt loss, rental loss, or reserves for bad debts or rental loss; (mm) costs of test, survey, cleanup or remediation of Hazardous Materials which are in or on the Property as of the Commencement Date; (nn) any costs which would allow Lessor a "double recovery" of any other costs for which Lessor is directly reimbursed other than as an Operating Expense; (oo) any costs or expenses for which Lessor is or will be reimbursed or indemnified (whether by an insurer, condemnor, tenant or otherwise); (pp) overhead and administrative costs of Lessor not directly incurred in the operation and maintenance of the Building; (qq) depreciation or amortization of the Building or its contents or components; (rr) expenses for the preparation of space or other work which Lessor performs for any tenant or prospective tenant of the Building; (ss) expenses for repairs or other work which is caused by fire, windstorm, casualty or any other insurable occurrence; (tt) interest, amortization or other costs, including legal fees, associated with any mortgage, loan or refinancing of the Building or any common areas, transfer or recordation taxes and other charges in connection with the transfer of ownership in the Building, land trust fees, and rental due under any ground lease relating to the property on which the Building is located; (uu) any interest or penalty incurred due to the late payment of any Operating Expense and/or real estate tax; and (vv) any personal property taxes of the Lessor for equipment or items not used directly in the operation or maintenance of the Building, nor connected therewith.

9.    **TAXES**

The term "**Taxes**" as used in this Lease shall mean all ad valorem taxes, assessments, special assessments, personal property taxes, transit taxes, vault space rentals, water and sewer charges, excises, levies, license and permit fees and all other similar charges, if any, which are levied, assessed, or imposed upon or become due and payable in connection with or a lien upon all or any portion of the Property, the Land, the Garage, the Building or facilities used in connection therewith, and rentals or receipts therefrom and all taxes of whatsoever nature that are imposed in substitution for or in lieu of any of the taxes, assessments or other charges included in this definition of Taxes excluding only franchise, death and income taxes of Lessor (but not excluding such taxes if imposed in the future wholly or partially in lieu of present real estate, ad valorem or similar taxes).

10.    **COMMENCEMENT**

Lessor will use commercially reasonable efforts to achieve Substantial Completion of the Leasehold Improvements on or before the Scheduled Commencement Date. Subject to **Section 11** hereof, if on the Scheduled Commencement Date specified in **Section 3** hereof any of the work described in **Exhibit "A"** that is required to be performed by Lessor to prepare the Premises for occupancy has not been Substantially Completed, or if Lessor is unable to tender possession of the Premises to Lessee on such specified date due to any reason within or beyond the control of Lessor, then the Commencement Date (and commencement of installments of Base Rent and Lessee's Estimated Additional Rent) shall be postponed until such work to be performed in the Premises by Lessor is Substantially Completed or until Lessor is able to tender possession of the Premises to Lessee, as the case may be, and such postponement shall operate to extend the expiration date specified in **Section 3** in order to give full effect to the stated duration of the Term. Such deferment of installments of Rent shall be Lessee's exclusive remedy for any postponement of the Commencement Date, and Lessee shall have no claim against Lessor because of any delay.

Notwithstanding the foregoing, if the Commencement Date has not occurred by November 1, 2006 by reasons within the control of Lessor, and excluding Lessee Delay and force majeure, Tenant shall have the right to terminate this Lease by written notice to Landlord at any time prior to the occurrence of the Commencement Date. If Tenant so terminates the Lease, any amounts previously paid by Tenant to Landlord shall be returned to Tenant and the parties shall have no further obligations hereunder.

As used herein, "**Substantial Completion**" means either (a) the date a Certificate of Occupancy (or all approvals required for the issuance thereof) is obtained for the Premises, or (b) if a Certificate of Occupancy is not required as a condition to Lessee's lawful occupancy of the Premises, the date that the Lessee Improvements are substantially completed (subject to punch list items), as confirmed in writing by Lessor's architect; provided that if either (a) or (b) is delayed or prevented because of work Lessee is responsible for performing in the Premises or due to Lessee Delay, "Substantial Completion" means the date that all of Lessor's work which is necessary for either (a) or (b) to occur has been performed (subject to punch list items) and Lessor has tendered delivery to the Premises to Lessee for the performance of Lessee's work.

Notwithstanding any failure by Lessee or its contractors to complete any work within the Premises and notwithstanding any non-performance by any person, firm or corporation employed by Lessee, delays in receiving materials requiring special ordering, delays in obtaining a moving and transfer service, delays in obtaining phone service, delays in obtaining finish items, or any other delay occasioned by Lessee or any delay beyond the actual control of Lessor, the Commencement Date of the Lease for the payment of Rent thereunder shall nevertheless commence on the Scheduled Commencement Date specified in **Section 3** of the Lease.

If after final completion of the Work described in **Exhibit "A"** attached hereto, Lessor performs or provides any architectural or interior design services, renovation work, modifications or leasehold improvements to the Premises at the request of Lessee, such services, renovation work, modifications, and leasehold improvements shall be performed and provided by Lessor at Lessee's sole cost and expense and Lessee shall, upon written request by Lessor, provide Lessor with adequate assurance or payment of such cost and security therefor in form and amounts satisfactory to Lessor, and Lessee shall pay to Lessor the total cost of all such services, renovation work, modifications and leasehold improvements, together with twelve and one-half percent (12.5%) of such costs for Lessor's overhead, within thirty (30) days after receipt of Lessor's invoice, and such amount shall be considered additional Rent due to Lessor by Lessee and shall be subject to all provisions of the Lease which are applicable to the payment of Rent.

11.   **LESSEE DELAY; EARLY ENTRY**

No delay in the completion of the Premises resulting from delay or failure on the part of Lessee in furnishing information or other matters required in Exhibit "A" or from any Lessee Delay as defined in Exhibit "A", and no delay resulting from the completion of work, if any, relating to Special Leasehold Improvements pursuant to Exhibit "A", shall delay the Commencement Date, expiration date, or commencement of payment of Rent.

If prior to the Commencement Date Lessee shall enter into possession of all or any part of the Premises for purposes of conducting its business, then the Term, the payment of monthly installments of Rent, and all other obligations of Lessee to be performed during the Term shall commence on, and the Commencement Date shall be deemed for all purposes to be, the date of such entry, and the total amount of Rent shall be increased accordingly, provided that no such early entry shall operate to change the expiration date provided for herein. Lessor shall permit Lessee and Lessee's contractors to enter the Premises at least fourteen (13) days prior to the Commencement Date in order that Lessee may perform work and decorations within the Premises, approved in advance in writing by Lessor and in a manner and upon terms and conditions and at times satisfactory to and approved in advance in writing by Lessor. The foregoing license to enter upon the Premises prior to the Commencement Date is conditioned upon Lessee's contractors and workmen working in harmony and not interfering with the labor employed by Lessor, Lessor's mechanics or contractors, and the other lessees of the Property and their contractors, and not in any way delaying Lessor or Lessor's contractors. Such license is further conditioned upon Lessee and its contractors complying with

the insurance requirements set forth in **Section 23** of this Lease. If, at any time, any such entry by Lessee or its contractors shall cause disharmony or interference to Lessor's contractors or other lessees or their contractors for any reason whatsoever, without regard to fault, to include, but without limitation, strikes or other work stoppages, this license may be immediately withdrawn by Lessor upon notice to Lessee. Any such entry by Lessee or its contractors shall be deemed to be under all of the terms, covenants, provisions and conditions of the Lease, other than those requiring payment of Base Rent, Lessee's Estimated Additional Rent and Lessee's Additional Rent. **EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY,** Lessor shall not be liable in any way for any injury, loss or damage which may occur to Lessee, its contractors, employees, agents, invitees, or to any of Lessee's decorations or installations, and Lessor shall not be liable in any way for or because of defective material supplied for leasehold improvements performed by Lessee or Lessee's agents or contractors, the same to be performed solely at Lessee's risk.

## 12. MAINTENANCE AND REPAIR

Lessor shall provide customary routine maintenance and repair of (a) the exterior surfaces of the Building (including, without limitation, the exterior doors, windows and plate glass of the Building), (b) and the structural portions of the Building (including, without limitation, the footings, foundation, slabs, floors, columns, exterior walls and other structural elements of the Building), (c) the roof, and (d) public common areas such as lobbies, stairs, corridors, restrooms, and elevators (including, without limitation, building standard electrical, lighting, mechanical, plumbing, heating and air conditioning systems, fixtures and components serving the Premises and the Building, and building standard light bulbs, tubes and ballasts).

Except to the extent covered by warranties of Lessor's suppliers or contractors in connection with Building Standard Improvements (as Building Standard Improvements are set forth in Attachment A-1 hereto) or any Special Leasehold Improvements (as defined in Exhibit "A" attached hereto) installed by Lessor, Lessor shall not have any obligation to repair or replace any improvements installed by Lessor or Lessee pursuant to the provisions of Exhibit "A" after initial installation and any obligation of Lessor to repair or replace such improvements shall be limited to defects in workmanship or materials with regard to such improvements which are installed by Lessor and as to which written notice of such defects is given to Lessor by Lessee within thirty (30) days after the Commencement Date. Except as otherwise stipulated herein, Lessor shall not be required to make any improvements or repairs of any kind or character to or on the Premises. Except to the extent that Lessor is obligated to furnish maintenance pursuant to this **Section 12** and to repair damage by fire or other casualty pursuant to **Section 24**, Lessee, at its sole cost, shall maintain and repair the Premises and otherwise keep the Premises in good order and repair, but all workmen, artisans and contractors employed for such purposes shall be obtained through or specifically approved by Lessor in writing prior to the commencement of any work on or in the Premises. At Lessee's request and subject to approval by Lessor, Lessor shall provide janitorial services or maintenance for Special Leasehold Improvements (as defined in Exhibit "A" hereto), at Lessee's expense, at a cost equal to the actual costs incurred by Lessor plus seven percent (7%) for overhead; provided, however, Lessor shall be obligated to identify which, if any, of Lessee's Special Leasehold Improvements will require the additional charge for janitorial services at the time Lessor approves the plans therefor, or Lessor shall not charge such overhead therefor. At Lessee's own cost and expense, Lessee shall repair or replace to Lessor's satisfaction any damage or injury done to the Property, or any part thereof, caused by Lessee or Lessee's agents, employees, invitees, contractors, or visitors.

## 13. LESSOR'S SERVICES

Lessor shall furnish to Lessee the following services during the Term of this Lease exclusive of Building Standard Holidays which are New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day and such other days as are determined by Lessor in good faith, provided such other days are also observed as holidays in Comparable Buildings:

(a)     Air-conditioning and central heat in season at such temperatures and in such amounts as are considered to be standard for general office use in Comparable Buildings in Houston, Texas, during normal Building hours, which are 7:00 a.m. to 6:00 p.m. on weekdays and 8:00 a.m. to 12:00 noon on Saturdays, unless otherwise restricted by ordinance, code or law. The term **"Comparable Buildings"** as used in this Lease and any exhibit hereto shall mean comparable (insofar as age, size, quality of construction, and location) high-rise, non-institutional, non-governmental, office buildings in the Galleria area of Houston, Texas at the Lease Signing Date similar to the Building.

(b)     Janitorial services in the Premises and public portions of the Building, five (5) days per week but not on Saturdays, Sundays, and Building Standard Holidays, unless so elected by Lessor. The work of the Building janitor shall not be hindered by Lessee after 5:30 P.M., and such work may also be done at any time when offices are vacant.

(c)     Water (hot and/or cold where currently provided) for drinking, toilet, and lavatory purposes, at those points of supply provided on the floor on which the Premises is located.

(d)     Normal and customary routine maintenance for all public Common Areas, structural, and exterior portions of the Building according to normal and customary standards for Comparable Buildings.

(e)     Electric lighting service for all applicable portions of the Building.

(f)     Automatic passenger elevator service, on a twenty-four (24) hour, seven (7) day-a-week basis, for access to and egress from the floor(s) on which the Premises is located. Elevator service for freight, in common with other lessees, shall be provided during normal Building hours (subject to availability and prior scheduling) and at all other times on reasonable advance request by Lessee but subject to consent by Lessor, by placing pads or other protective devices satisfactory to Lessor in a passenger elevator designated by Lessor.

(g)     Ballast and lamp replacement for Building Standard ceiling mounted fluorescent lighting fixtures located in the Premises.

(h)     Proper facilities so as to enable the appropriate utility company to furnish electric energy that Lessee shall require for normal office equipment such as personal computers, standard business office word processing and photocopying equipment, typewriters, dictation machines, calculators, other machines of similar low electrical consumption, so long as no item of electrical equipment is rated to singly consume more than 0.25 kilowatts per hour at rated capacity or requires a voltage other than 120 volts single phase, and Building Standard lighting in the Premises; all in the aggregate not to exceed Building Standard which is 1.6 watts per square foot of useable area low voltage and 4.0 of useable area high voltage, on a total connected load basis for the entire Premises.

(i)     The obligations of Lessor to provide the services and utilities herein provided for shall be subject to governmental regulation thereof (i.e. rationing, temperature control, etc.) and any such regulation which requires Lessor to provide or not provide such services or utilities other than as herein provided shall not constitute a default hereunder but rather compliance with such regulations shall be deemed to be compliance by Lessor hereunder.

(j)     Lessor shall provide certain monitoring services (of a type and nature from time to time selected by Lessor) to the Building during weekends and after normal Building hours during the week; it being agreed that Lessor, in providing such services, is not a guarantor of the security of the Property or the Premises or safety of Lessee, its employees, agents, licensees or invitees from losses, injuries or damages. Lessee acknowledges and agrees that Lessor shall not have any liability whatsoever for equipment failures of any kind or nature, **EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE**

STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY. Lessee is urged to provide such insurance as it may desire and deem adequate to protect itself from any such loss. Any monitoring services or measures that Lessor shall undertake are for the protection of the Building only and shall not be relied upon by Lessee to protect Lessee, Lessee's property or Lessee's employees, invitees, or guests. Notwithstanding anything to the contrary, Lessor shall not be liable to Lessee in any manner or to Lessee's agents, employees, invitees or guests or their property for any injury or damage to same caused by their own negligence or criminal or willful acts or the negligence or criminal or willful acts of others.

(k)     Subject to Lessee's payment for non-standard services, where applicable, pursuant to Article 14 below, all utility and other services to and for the Premises, including, without limitation, HVAC services, will be available 24 hours a day, 7 days a week.

## 14.    PAYMENT FOR NON-STANDARD SERVICES

Lessee shall pay Lessor, within thirty (30) days after receipt of Lessor's invoice, such amounts disclosed by Lessor to Lessee prior to such work being performed as are necessary for Lessor to recover costs incurred by Lessor in performing or providing special janitorial and maintenance, security or other services or requirements for or requested by Lessee or in performing any services other than those specified in Section 13. Lessee shall pay Lessor, within thirty (30) days after receipt of Lessor's invoice, Lessor's then standard charge or hourly rate for all off-hour and non-standard air-conditioning, heating, and electricity. Overtime HVAC shall be on a minimum of a full floor basis and shall initially be charged at a rate of Fifty and 00/100 Dollars ($50.00) per hour per floor for each event, subject, however, to increase if the utility provider increases rates or if costs to Lessor increase. Such after-hours HVAC charges shall be apportioned pro-rata on a square footage basis based on the square footage to which such service is provided in the event of any other lessee or lessees on the same floor using the same Building facilities request after-hour HVAC for use at the same time as Lessee. If Lessee requests the after-hours HVAC and no other lessees on the applicable floor request to use same during the same period of time, Lessee shall alone pay such costs.

## 15.    SERVICES INTERRUPTION

Lessor shall use all reasonable diligence to restore any failure, slow-down, interruption, stoppage, or defect (collectively called "failure") in the supply or character of services furnished or to be furnished by Lessor under this Lease, but Lessor shall not be liable to Lessee for any such failure and such failure shall not be construed as an eviction, actual or constructive, of Lessee nor shall such failure entitle Lessee to any reduction, abatement, offset, or refund of Rent or to any damages from Lessor, nor shall Lessor be in breach or default under this Lease if Lessor uses reasonable diligence to restore any such failure after Lessor receives written notice thereof from Lessee. Lessee hereby waives and disclaims, and agrees not to claim or assert, all present and future rights to apply any Rent against any obligation of Lessor, howsoever incurred, or to assert that any such obligation of Lessor entitles Lessee to any counterclaim or any reduction, abatement, offset, or refund of Rent. Notwithstanding the foregoing, if there is an interruption in electrical power which is (a) specific to the Building and/or Property (as opposed to an interruption or curtailment in electrical power which extends beyond the Building or Property), (b) causes the Premises to be untenantable, (c) is not caused by an event of Force Majeure, and (d) lasts for more than five consecutive business days or otherwise prevents Lessee from being able to access the Premises for more than five consecutive business days, then Lessee will be entitled to deliver Lessor a notice stating that if the untenantability caused by the interruption is not cured within seven business days, Lessee will be entitled to an abatement of Rent as provided in this Section. If Lessee properly delivers such an abatement notice to Lessor, and the untenantability caused by the interruption in electric power is not remedied within such seven business day period, then Lessee shall thereafter be entitled to an abatement of Rent (in proportion to the portion of the Premises rendered untenantable by the interruption in electrical power) until such electric power is restored.

Lessor has advised Lessee that presently Reliant Energy ("**Electric Service Provider**") is the utility company selected by Lessor to provide electricity service for the Building. Notwithstanding the foregoing, if permitted by

law, Lessor shall have the right at any time and from time to time during the Term to either contract for service from a different company or companies providing electricity service (each such company shall hereinafter be referred to as an "**Alternate Service Provider**") or continue to contract for service from the Electric Service Provider. Lessee shall cooperate with Lessor, the Electric Service Provider, and any Alternate Service Provider at all times and, as reasonably necessary, shall allow Lessor, Electric Service Provider, and any Alternate Service Provider reasonable access to the Building's electric lines, feeders, risers, wiring, and any other machinery within the Premises. **EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 15, EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY,** Lessor shall in no way be liable or responsible for any loss, damage, or expense that Lessee may sustain or incur by reason of any change, failure, interference, disruption, or defect in the supply or character of the electric energy furnished to the Premises, or if the quantity or character of the electric energy supplied by the Electric Service Provider or any Alternate Service Provider is no longer available or suitable for Lessee's requirements, and no such change, failure, defect, unavailability, or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Lessee to any abatement or diminution of rent, or relieve Lessee from any of its obligations under the Lease.

16. **PROHIBITED USE**

Lessee shall not use, or permit any other party to use, all or any part of the Premises for either medical or dental offices or for any purpose not authorized in **Section 2** of this Lease. Lessee shall not do or permit anything to be done in or about the Property, nor bring or keep or permit anything to be brought to or kept therein, which is prohibited by or which will in any way increase the existing rate of or affect any fire or other insurance which Lessor carries upon the Building, or any contents, or cause a cancellation of any insurance policy covering the Building or any part thereof or any contents. Lessee shall not do or permit anything to be done in or about the Property which will in any way obstruct or unreasonably interfere with the rights of other lessees of the Building, or injure or unreasonably disturb them or their employees, agents, invitees, or visitors or use or allow the Premises to be used for any unlawful or objectionable purpose. Lessee shall not cause, maintain or permit any nuisance in, on or about the Property or commit or suffer to be committed any waste or damage to, in, on, or about the Property.

17. **RULES AND REGULATIONS**

Lessee shall perform and comply with, and shall cause its employees, agents, representatives, guests and contractors to perform and comply with the Rules and Regulations set out in <u>Exhibit "C"</u> hereto, as reasonably amended from time to time upon written notice to Lessee, and upon written notice thereof, all reasonable rules and regulations with respect to safety, care, cleanliness, and preservation of good order, operation, and conduct in or on the Property that may be established from time to time by Lessor for lessees of the Building or Property. Lessor shall not have any liability to Lessee for any failure of any lessees of the Building or Property to comply with such Rules and Regulations. Lessor is hereby granted the right to make, from time to time, such rules and regulations as are reasonably necessary or desirable for the proper operation and maintenance of the areas and facilities such as hallways, elevators (other than any elevators reserved for use by a particular lessee), stairways and stairwells, elevator foyers, fire stairs, aisles, walkways, plazas, courts, restrooms, lobbies, landscaped areas, and other common and service areas of the Property, as from time to time designated by Lessor, and Lessor has the right to do and perform such activities therein and with respect thereto as Lessor shall so determine, in Lessor's sole discretion, and Lessor has the right from time to time to designate such areas as stairways and stairwells, elevator foyers, restrooms, lobbies or portions thereof, and the like, for use by a particular lessee or lessees; provided that Lessor exercises such rights in a manner that does not unreasonably interfere with Lessee's access to and use of the Premises. Lessor will apply the rules and regulations against Lessee in a non-discriminatory fashion as such rules and regulations are applied and construed *vis a vis* other tenants and occupants, and Lessor will provide Lessee with reasonable advance written notice of any changes in the rules and regulations.

18. **COMPLIANCE WITH LAWS AND RESTRICTIONS AND OTHER REGULATIONS; LICENSES IN EFFECT; FINANCIALS**

Lessee shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations and requirements and with all covenants and restrictions of record in Harris County, Texas pertaining to Lessee's use, occupancy or alteration of the Premises or the Property, or which may hereafter be in force, and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted, and with any directive or occupancy certificate issued pursuant to any law by any public officer or officers insofar as any thereof relate to or affect the condition, use or occupancy of the Premises. Lessee warrants and represents that it has obtained all licenses and permits required for the conduct of its business and that all such licenses and permits are currently in effect and Lessee is in good standing thereunder, and Lessee covenants that it shall maintain in effect all such licenses and permits (and shall obtain and maintain in effect such additional licenses and permits as may during the Term become required in order to conduct its business) throughout the Term and shall maintain its good standing thereunder.

Lessor has furnished to Lessee the opportunity to review its environmental reports as follows: Final Report of Phase I Environmental Site Assessment dated January 17, 2003 prepared by MACTEC Engineering And Consulting, Inc; and, Asbestos Survey dated July 21, 1995 prepared by 3D/Environmental; and, Phase I Environmental Site Assessment Report Review letter dated December 3, 2004 prepared by Garner & Associates, Inc.; and, Limited Asbestos Testing Consulting Services letter dated December 2, 2004 prepared by Garner & Associates, Inc.; and, Limited Lead Testing Consulting Services letter dated December 3, 2004 prepared by Garner & Associates, Inc.; and, Asbestos Containing Materials letter dated December 8, 2004 prepared by Garner & Associates, Inc.; and, Limited Lead in Drinking Water Testing Consulting Services letter dated December 14, 2004 prepared by Garner & Associates, Inc.; and, Asbestos Containing Pipe Fitting Materials letter dated December 21, 2004 prepared by Garner & Associates, Inc.; and, Limited Asbestos Testing Consulting Services letter dated January 28, 2005 prepared by Garner & Associates, Inc.; and, Two Riverway Asbestos Containing Board (Within Metal Wall Panels) letter dated August 23, 2005 prepared by Garner & Associates, Inc.; and, Completion Report dated August 31, 2005 prepared by Garner & Associates, Inc.; and, Limited Asbestos Survey Consulting Services letter dated October 20, 2005 prepared by Garner & Associates, Inc.; and, Completion Report dated January 26, 2006 prepared by Garner & Associates, Inc.  Other than as disclosed in said environmental report, To Lessor's actual knowledge, without any obligation of inquiry or investigation, Lessor is not aware of any Hazardous Materials which exist or are located in, on or under the Premises, the Building or the Land. Lessee shall, at Lessee's own expense, comply with any presently existing or hereafter enacted laws, including, without limitation, Environmental Laws, affecting Lessee's use, operation, or occupancy of the Premises. The term Environmental Laws includes, without limitation, all laws relative to "hazardous or toxic material". **"Hazardous or toxic material"** means and includes, but is not limited to: (a) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601, et seq.), as amended from time to time and the regulations promulgated thereunder; (b) any hazardous "material and/or substance" as defined under any applicable state statute or regulations promulgated thereunder including, but not limited to, the Texas Solid Waste Disposal Act; Texas Clean Air Act; and Texas Water Quality Control Act; (c) any substance the presence of which is prohibited, controlled, monitored, or requires special handling, collection, storage, treatment or disposal by any federal, state, or local laws, ordinances, statute, code, rule, order, regulation or decree of any governmental authority; (d) asbestos; (e) polychlorinated biphenyls; (f) crude oil and fraction; and (g) flammable explosives. **"Environmental Laws"** also includes, but is not limited to, any federal, state, or local statute, regulation, or ordinance in effect as of the time this Lease is prepared and executed and hereafter enacted which relates to pollution or protection of the environment, including, without limitation, any statutes, regulations, ordinances, or policies relating to emissions, discharges, releases or threatened releases of toxic or hazardous materials into the environment (including without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the treatment, storage, disposal, transport or handling of toxic or hazardous materials, and "Environmental Laws" also includes all orders, decrees, judgments, injunctions, notices or demand letters, issued, entered, promulgated or approved under those environmental laws relating to the Premises, Building, or Property.

Lessee hereby agrees to promptly notify Lessor of any and all demands, notices of violation, claims and correspondence relating to hazardous or toxic material, environmental compliance, or to any hazardous substances release, received or sent by Lessee, and agrees to furnish Lessor with copies thereof. The release of any hazardous or toxic material by Lessee from the Premises, the Building or the Property is an act of default under the Lease. Lessee will not place or permit there to be placed on or about the Premises, or other areas of the Property used or accessed by Lessee, any hazardous or toxic material, whether or not permitted under Environmental Laws (except for those in lawful quantities which are commonly found in office settings).

Lessee's obligations and liabilities under this section and the indemnity in Section 26 as it applies to this section shall continue during the Term of the Lease and thereafter so long as Lessor remains responsible for any hazardous or toxic material placed in or about the Premises, Building, or Property by Lessee, its employees, officers, contractors, agents, subtenants, guests, licensees or invitees.

Lessor will complete the floor(s) on which the Premises are located as well as Lessor's Work in the Premises (as described in Exhibit "A" attached hereto) in compliance applicable building codes and the public accommodations provisions of Title III of the Americans With Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), as interpreted and enforced by the governmental bodies having jurisdiction thereof as of the date of substantial completion thereof. Lessee acknowledges that, to the extent required by reason of: (i) any cause or condition arising out of Lessee's alterations or installations in the Premises, or (ii) Lessee's particular use, manner of use or occupancy of the Premises, or (iii) any breach of any of Lessee's covenants or agreements under this Lease, it will be wholly responsible for any accommodations or alterations which need to be made to the Premises to accommodate disabled employees and invitees of Lessee, including requirements under the Americans with Disabilities Act, after completion of the Work to be performed by Lessor described in Exhibit "A" attached hereto. Any alterations made to the Premises after completion of the Work to be performed by Lessor described in Exhibit "A" attached hereto in order to comply with statutes must be made solely at Lessee's expense and in compliance with all terms and requirements of the Lease. Lessor agrees to make reasonable efforts to ensure that the Common Areas are in compliance with the applicable disability access laws as of the date hereof. If Lessor receives either a private or government complaint regarding disability access to the Common Areas, Lessor reserves the right to mediate, contest, comply with or otherwise respond to such complaint as Lessor deems to be reasonably prudent under the circumstances. If Lessor decides to make alterations to the Common Areas in response to any such complaints or in response to legal requirements Lessor considers to be applicable to the Common Areas, the cost of such alterations shall be included in the Operating Expenses under the Lease. Lessor and Lessee agree that so long as the governmental entity or entities charged with enforcing such statutes have not expressly required Lessor to take specific action to effectuate compliance with such statutes, Lessor shall be conclusively deemed to be in compliance with such statutes. Lessee agrees to provide Lessor with written notice should Lessee become aware of a violation of such statutes with respect to the Common Areas. In the event Lessor is required to take action to effectuate compliance with such statutes, Lessor shall have a reasonable period of time to make the improvements and alterations necessary to effectuate such compliance, which period of time shall be extended by any time necessary to cause any necessary improvements and alterations to be made.

Lessee shall from time to time during the Term provide to Lessor an up to date true and accurate financial statement, balance sheet, and income and expense statement covering Lessee and any guarantor of Lessee's obligations under this Lease, within ten (10) days after request therefor is made by Lessor to Lessee. If Lessee or any guarantor is a publicly traded corporation, Lessee may satisfy it obligation in the first sentence of this paragraph by providing to Lessor, Lessee's or the guarantor's recent annual and quarterly reports.

## 19.   ALTERATIONS

Lessee, at its sole cost and risk, shall have the right to make Special Leasehold Improvements consisting of alterations, installations, additions, or improvements to the interior of the Premises if such alterations, additions, installations or improvements are normal for general office use, do not adversely affect the utility of the Premises for future lessees, are consistent in design and materials with improvements to the Premises constructed or approved

by Lessor, and do not alter the exterior appearance of the Building or impair the structural soundness of the Premises or of the Building, or are not otherwise prohibited herein; provided, however, no such alterations, additions, installations or improvements to the Premises shall be made without the Lessor's prior written consent of the plans and specifications therefor and the contractor therefor, which are subject to Lessor's satisfaction, Lessor's consent not to be unreasonably withheld or delayed. Lessor's approval of plans, specifications and working drawings for the Premises or alterations thereto shall create no responsibility or liability on the part of Lessor for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities. Notwithstanding anything to the contrary herein, without securing Lessor's prior consent, Lessee shall be permitted to hang pictures and shelving and perform other similar minor decorating activities within the Premises (and not visible from outside of the Premises and not affecting other leasable premises or the Common Areas) not exceeding an aggregate of $10,000 during any calendar year, provided that Lessee complies with all applicable laws, pertinent building codes, fire, safety and other such governmental regulations and that Lessee does not take any action which could interfere with the structural, mechanical, electrical, maintenance, HVAC, plumbing or other systems of the Building.

All alterations, installations, additions, or improvements (including but not limited to paneling, partitions and fixtures) made by or for Lessee to the Premises shall remain upon and be surrendered with the Premises and become the property of Lessor at the expiration or termination of this Lease or the termination of Lessee's right to possession of the Premises without any compensation to Lessee therefor; provided, however, Lessor may, by written notice given at the time of its approval of the improvement, require Lessee to remove any or all of such items that are not Building Standard upon the expiration or termination of this Lease or the termination of Lessee's right to possession of the Premises. Lessee shall bear the costs of all such removal and the removal of Lessee's property from the Premises and all resulting repairs to the Premises.

All work performed by Lessee with respect to the Premises shall be performed so as not to adversely affect the structure, safety, systems or services of the Building, shall comply with all building, safety, fire, and other codes and governmental and insurance requirements, shall be performed so as not to result in any usage in excess of Building Standard of water, electricity, gas, heating, ventilating, or air-conditioning (either during or after such work) unless prior written arrangements satisfactory to Lessor are entered into, shall be completed promptly and in a good and workmanlike manner, and shall be performed in such a manner that no valid mechanic's, materialman's or other similar liens attach to Lessee's leasehold estate and in no event shall Lessee permit, or be authorized to permit, any such liens (valid or alleged) or other claims to be asserted against Lessor or any part of the Property or Lessor's rights, estates, and interests with respect to the Property, Land, the Building, the Garage or this Lease.

20.    LESSEE'S EQUIPMENT AND INSTALLATIONS

Except for desk or table mounted typewriters, adding machines, personal computers, office calculators, dictation equipment and other similar desk or table mounted office equipment and standard business office word processing and photocopying equipment, Lessee shall not install within the Premises any fixtures, equipment, facilities or other improvements until the plans and specifications therefor have been approved by Lessor in writing, which approval shall not be unreasonably withheld, conditioned or delayed. Lessee shall not, without the specific written consent of Lessor and Lessee's written agreement to pay all additional costs attributable to the installation and operation thereof (including, without limitation, the full amount of any increase in Operating Expenses caused by or attributable thereto), install or maintain any apparatus or devices within the Premises that will increase the usage of electrical power, heating, air conditioning, or water for the Premises to an amount greater than would be normally required for general office use for space of comparable size in Comparable Buildings. Lessee shall not, without the specific written consent of the Lessor and the Lessee's written agreement to pay additional costs, install any apparatus or device within the Premises, including but without limitation thereto, electronic data processing machines, punch card machines or any other machines that: (i) weigh in excess of 2,500 pounds individually, or which when added to all other live loads (exclusive of partitions) exceed the equivalent of 50 pounds per square foot for the entire structural bay; (ii) use electrical power in excess of 120 volts; or in any way increase demands for electrical power, air conditioning, heating or water in excess of that usually furnished for use in premises of like size

that are used as general office space in Houston, Harris County, Texas in Comparable Buildings. No gas is permitted to be used by Lessee.

## 21.    TAXES ON PERSONALTY AND LESSEE IMPROVEMENTS

Lessee shall pay all ad valorem and similar taxes or assessments levied upon or applicable to all equipment, fixtures, furniture and other property placed by Lessee in the Premises and all license and other fees or charges imposed on the business conducted by Lessee on the Premises. If the Premises do not consist entirely of Building Standard Improvements (as defined in Attachment A-1 hereto) and Lessor shall be required to pay a higher ad valorem tax with respect to the Building than would have been payable had the Premises consisted entirely of Building Standard Improvements, Lessee shall pay to the Lessor, within thirty (30) days after receipt of Lessor's invoice, the amount by which the ad valorem taxes payable by Lessor with respect to the Building for the tax period exceed the amount of ad valorem taxes that otherwise would have been payable by Lessor had the Premises consisted entirely of Building Standard Improvements.

## 22.    LESSOR'S ACCESS

Lessor shall have the right at any time or times during the Term (with reasonable notice to Lessee except when Lessee is in default or in cases of emergency) to enter the Premises to inspect the condition thereof, to show the Premises to prospective lessees, or purchasers or to appraisers or lenders and to perform the services or to make the repairs and restoration that Lessor is obligated or elects to perform or furnish under this Lease, to make repairs to adjoining space, to cure any uncured defaults which Lessee has failed to cure hereunder that Lessor elects to cure, and to remove from the Premises any improvements thereto or property placed therein in violation of this Lease. Lessor will use commercially reasonable efforts to exercise such rights in a manner that does not unreasonably interfere with Lessee's use and enjoyment of the Premises.

## 23.    INSURANCE

Lessee, shall at all times during the Term of this Lease, and at its own cost and expense, procure and continue in force the following insurance coverage: (i) Comprehensive General Liability Insurance including the Broad Form Comprehensive General Liability endorsement or Commercial General Liability Insurance, on an occurrence basis with a combined single limit for bodily injury and property damages of not less than Five Million Dollars ($5,000,000.00), including products liability coverage, and covering the insuring provisions of this Lease and the performance of Lessee of the indemnity agreements set forth herein; and (ii) a policy of standard fire, extended coverage and special extended coverage insurance (all risks), including a vandalism and malicious mischief endorsement, and sprinkler leakage coverage where sprinklers are provided, in an amount equal to the full replacement value new without deduction for depreciation of all fixtures, furniture, and leasehold improvements installed in the Premises by or at the expense of Lessee and non-Building Standard Improvements.

The aforementioned minimum limits of policies shall in no event limit the liability of Lessee hereunder. Such insurance shall name Lessor and, at Lessor's option, Lessor's mortgagee and general partner(s) and property manager, and the officers, directors, and partners of Lessor, its general partner(s) and property manager, as additional insureds and shall be with companies having a rating of not less than A-VII in Best's Insurance Guide. Lessee shall furnish to Lessor, from the insurance companies, or cause the insurance companies to furnish, certificates of coverage. No such policy shall be cancellable or subject to reduction of coverage or other modification or cancellation except after thirty (30) days' prior written notice to Lessor by the insurer. All such policies shall be endorsed to agree that Lessee's policy is primary and that any insurance maintained by Lessor is non-contributing with any insurance requirement hereunder. Lessee shall, prior to occupancy and also at least ten (10) days prior to the expiration of such policies, furnish Lessor with certificates of renewals or binders, with endorsements. Lessee agrees that if Lessee does not take out and maintain such insurance or furnish Lessor with certificates of renewals or binders with endorsements, Lessor may (but shall not be required to) after providing Lessee with at least five (5) days prior written notice procure insurance on Lessee's behalf and charge Lessee the

cost thereof, which amount shall be payable by Lessee upon demand with interest at a rate of the lesser of the maximum interest rate allowed by applicable law or eighteen percent (18%) per annum, from the date such sums are expended. Lessee shall have the right to provide such insurance coverage, pursuant to blanket policies obtained by Lessee, provided such blanket policies expressly afford coverage to the Premises and to Lessee and are as required by this Lease. Lessee shall maintain Worker's Compensation Insurance required by law and shall provide Lessor with evidence of coverage. Said evidence shall be in the form of a certificate of insurance and afford thirty (30) days notice of cancellation to Lessor by the insurer. Lessee agrees to increase the coverages or otherwise comply with the changes in connection with its liability, property damage and Workers' Compensation insurance as Lessor or Lessor's lender may from time to time require if consistent with the amounts and coverages required by landlords or lenders of Comparable Buildings.

Lessor shall, at Lessor's expense, procure and maintain at all times during the Term of this Lease, a policy or policies of insurance covering loss or damage to the Building in the amount of not less than eighty percent (80%) of the lesser of the (i) full insurable value or (ii) the full replacement cost new without deduction for depreciation thereof (exclusive of all lessees' trade fixtures, inventory, personal property and equipment and exclusive of non-Building Standard Improvements), providing protection against all perils included within the classification of fire and extended coverage, vandalism coverage and malicious mischief, sprinkler leakage, water damage, and special extended coverage on Building. Lessor shall carry Bodily Injury and Property Damage Liability Insurance and/or Excess Liability Coverage Insurance in the face amount of at least Five Million Dollars ($5,000,000.00), to the extent obtainable at reasonable cost. Additionally, Lessor may (but shall not be required to) carry: (i) Earthquake and/or Flood Damage Insurance; and (ii) Rental Income Insurance at its election or if required by its lender from time to time during the Term hereof, in such amounts and with such limits as Lessor or its lender may deem appropriate. The costs of all such insurance carried by Lessor and the costs of Lessor complying with the requirements of the insurance underwriters shall be included in Operating Expenses. Lessee agrees to pay Lessor within thirty (30) days after receipt of Lessor's invoice the amount of any increase in premiums, for any of the aforementioned insurance, that may be charged during the Term of this Lease resulting from Lessee carrying any stock of goods or from Lessee doing anything or failing to do anything in or about said Premises or Property that does increase the insurance rates, whether or not Lessor shall have consented to such act on the part of Lessee.

Lessee agrees that it will not at any time, during the Term of this Lease, carry any stock of goods or do anything in or about the Premises that will in any way tend to increase the insurance rates upon the Building. If Lessee installs upon the Premises any electrical equipment which constitutes an overload of electrical lines of the Premises, Lessee shall at its own expense make whatever changes are necessary to comply with requirements of insurance underwriters and any governmental authority having jurisdiction thereover, but nothing herein contained shall be deemed to constitute Lessor's consent to such overloading. Lessee shall, at its own expense, comply with all requirements of the insurance underwriters, and other authorities having jurisdiction, relative to the maintenance of reasonable fire and extended coverage insurance for the Premises, including without limitation thereto, the installation of fire extinguishers or an automatic dry chemical extinguishing system.

If Lessee should desire that its contractors do any work within the Premises or on the Property, Lessee shall in each instance, as a condition to Lessee's performance of any work by, through or under Lessee or Lessee's contractors, obtain the prior written consent and approval of Lessor as to the work to be done, and the contractors to be employed by Lessee. As a condition of any of Lessee's contractors performing any work on the Premises or the Property, Lessee, at its sole expense, shall secure insurance by the Lessee's contractors and shall be responsible for the maintenance of such insurance by the Lessee's contractors until completion and final acceptance of the work, with Certificates of Insurance affording evidence of same to be obtained by Lessee from Lessee's contractors and delivered to Lessor prior to the commencement of any work by the Lessee's contractors, with at least the insurance coverage as that to be as specified by Lessor, and shall include Workers' Compensation and Employer's Liability Insurance, General Liability Insurance on an occurrence basis with endorsements specified by Lessor, Worker's Compensation Insurance, and Business Auto Liability Insurance, all of such insurance to be in such amounts as designated by Lessor, with all insurance (except Workers' Compensation) maintained by Lessee's contractor and its subcontractors to preclude subrogation claims by the insurer against anyone insured thereunder, and with Lessor

to be named as an additional insured on all insurance. A certificate and endorsements affording coverage of such insurance must be delivered to Lessor before Lessee's contractors perform any work at or prepare or deliver materials to the site of construction.

24.    **FIRE OR OTHER CASUALTY**

If the Premises or the Building is damaged or destroyed in whole or in part by fire or other casualty at any time during the Term and if after such damage or destruction Lessee is not able to use the Premises to substantially the same extent and for substantially the same purposes as Lessee used the Premises prior thereto, then as soon as practicable and in any case not more than ninety (90) days after such damage or destruction, Lessor shall give Lessee a written notice setting forth the estimated time required for repair or restoration of the Premises or the portion of the Building necessary for Lessee's occupancy. If such estimated time for such repair or restoration is in excess of one hundred eighty (180) days, Lessor or Lessee may elect, upon written notice to the other party within forty-five (45) days after receipt of Lessor's written notice, to terminate this Lease effective on the date of such damage or destruction. If such damage or destruction occurs, then, unless such damage or destruction is the result of the negligence or fault of Lessee, its agents, employees, invitees, or contractors the Rent shall be proportionately abated to the extent the Premises are untenable from the date of such damage or destruction during the time Lessee is not able to use the Premises to substantially the same extent and for substantially the same purposes as Lessee used the Premises prior thereto. If this Lease is not terminated as provided herein, Lessor shall restore or replace the damaged or destroyed portions of the Building and the leasehold improvements within the Premises to the extent same are Building Standard, or have become or are to become the property of Lessor upon termination hereof and have previously been approved and accepted by Lessor in writing and are fully covered by Lessor's insurance, and this Lease shall continue in full force and effect in accordance with the terms hereof. Such restoration or replacement shall be completed within one hundred eighty (180) days after the date of such damage or destruction, subject to delays arising from any conditions or events beyond the control of Lessor, including, without limitation, acts of God, shortages of labor or materials, war, or other force majeure conditions or events beyond the control of Lessor.

25.    **WAIVER OF CLAIMS**

The parties release each other and their respective authorized representatives from any claims for damage to any person or the Premises, and to the fixtures, personal property, improvements, and alterations of either Lessor or Lessee, in or on the Premises, and the Property, that are caused by or result from risks required to be insured against under <u>Section 23</u>, **EVEN IF THE DAMAGE IS CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSEE OR LESSOR OR ANY LESSOR RELATED PARTY**; provided, however, that the foregoing waiver shall be ineffective against any insurer of Lessor or Lessee to the extent the waiver is prohibited by the laws or insurance regulations of the state in which the Property is located or would invalidate applicable insurance coverage of Lessor or Lessee, and such waiver does not apply to any deductibles on insurance policies carried by Lessor or to any co-insurance penalty which Lessor may sustain. Each party shall cause each insurance policy obtained by it to provide that the insurance company waives all right of recovery by way of subrogation, and if the insurance company will not do so without an additional charge, then the party undertaking to obtain the insurance shall notify the other party of this fact. The other party shall have a period of ten (10) days after receiving the notice either to find a company that is reasonably satisfactory to the other party and that will carry the insurance with a waiver of subrogation, or to agree to pay the additional premium if such a policy is obtainable at additional cost. If the insurance with a waiver of subrogation can be obtained with a company reasonably satisfactory to both parties, then the party undertaking to obtain the insurance will use said company and the other party will pay the additional premium (if any) to have the waiver of subrogation in its favor. If the insurance cannot be obtained, or the party in whose favor a waiver of subrogation is desired refuses to pay the additional premium charged, the other party is relieved of the obligation to obtain a waiver of subrogation rights with respect to the particular insurance involved.

Except for injury or damage, if any, caused by Lessor's gross negligence or willful misconduct not otherwise released by Lessee pursuant to the foregoing provisions of this **Section 25**, Lessor shall not be obligated to repair, maintain, restore or replace or otherwise be liable for the damage or destruction of any of Lessee's fixtures or improvements, or any of Lessee's goods, furniture or other property placed in or incorporated in the Premises, **EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY**. Lessee, as a material part of the consideration to Lessor, hereby assumes all risk of damage to property or injury to or death of persons within the Premises, **EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY**, and Lessee hereby waives all claims in respect thereof against Lessor, except for claims arising out of Lessor's gross negligence or willful misconduct. Lessee hereby covenants that Lessor and Lessor Related Parties shall not be liable or responsible for any injury, loss or damage which may be sustained by Lessee, its contractors, employees, agents, invitees or to any of Lessee's decorations or installations or to any goods, wares, merchandise or property of Lessee, its employees, contractors, agents, invitees or customers, or by any person in the Premises or bodily or personal injury, death, property damage, inconvenience, loss, business interruption, loss of profits or business opportunities, loss of trade secrets, or other direct or consequential damages **EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY (except for claims arising out of Lessor's gross negligence or willful misconduct)**, occasioned by:

(a)     the acts or omissions of any other tenant or such tenant's officers, directors, shareholders, partners, employees, agents, contractors or visitors, or any invitees within, on or about the Property or the Premises,

(b)     repair, malfunction, maintenance, damage, destruction, restoration, or replacement referred to in this Lease, or failure to make repairs,

(c)     fire, act of God, public enemy, injunction, riot, strike, insurance, war, court order, requisition or order of governmental body or authority,

(d)     the construction, use, occupancy or enjoyment of the Premises by Lessee or any person therein or holding under Lessee,

(e)     vandalism, theft, burglary and other criminal acts (other than those committed by Lessor and its employees),

(f)     water leakage or any defect in Premises, the Building, the Building systems, or services provided by Lessor, pipes, air conditioning, heating, or plumbing, or

(g)     the repair, replacement, maintenance, damage, destruction, or relocation of the Premises or failure to repair, replace or maintain.

26.   **INDEMNITY**

Except for the claims that Lessor has released pursuant to **Section 25** hereof, and except to the extent (but only to the extent) that injury, death or property damage is held to be attributed solely to the gross negligence or willful misconduct of Lessor, Lessee shall be liable to Lessor for and hereby agrees to indemnify, protect, defend and hold Lessor and Lessor's property managers, members, partners, lenders, affiliates, venturers, agents, directors, officers, shareholders, employees, successors, assigns, and their respective members, partners, personnel, agents, employees, affiliates, directors, officers, shareholders, representatives, successors and assigns (collectively, the "**Lessor Related Parties**"), harmless of and from any and all claims, causes of action, fines, damages, liabilities, obligations, suits, losses, liens, judgments and expenses (including court costs, reasonable attorneys' fees and costs of investigation) of any kind, nature or description which result or arise or are alleged to result or arise from:

(a)    injury to or death of any person or damage to or loss of property occurring on, in or about the Premises; or

(b)    Lessee's construction of or use, occupancy or enjoyment of the Premises and its facilities or from any activity, work or thing done, permitted or suffered by Lessee and its agents and employees in or about the Premises, or Lessee's use of the Garage, parking areas, drives, service areas and parking spaces or their use by Lessee's personnel, agents, employees, contractors, guests or invitees that violates the terms of this Lease; or

(c)    any breach or violation or non-performance of any covenant of Lessee under this Lease; or

(d)    any willful act, willful omission or negligence of Lessee or any employee, officer, contractor, agent, subtenant, guest, licensee or invitee of Lessee; or

(e)    the activities of Lessee in and around the Premises, Building or Property or the operations or conduct of Lessee's business upon the Premises, Building or Property; or

(f)    any breach, violation or non-performance by Lessee of any law or Environmental Law; or

(g)    any spills or discharges of any hazardous or toxic material or hazardous substance by Lessee or any employee, officer, contractor, agent, subtenant, guest, licensee or invitee of Lessee or which occur at the Premises or other areas of the Building or Property used by Lessee,

(collectively, the "**Claims**"), **EVEN IF SUCH CLAIMS ARE CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY, OR THE SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY.** If any such Claim is made against Lessor or any Lessor Related Party, Lessee shall, at its sole cost and expense, defend such Claim by or through attorneys reasonably satisfactory to Lessor. In resolving or settling any Claim, Lessee shall obtain a release of such Claim made against Lessor or any Lessor Related Parties. The indemnity obligations of Lessee set forth hereinabove are in addition to and cumulative of Lessee's obligations to obtain and maintain insurance as otherwise provided in the Lease. Lessee's indemnity covers all Claims referred to herein (a) arising before the Commencement Date of the Lease or after the expiration of the Term of the Lease due to the acts or omissions of Lessee or any employee, officer, contractor, agent, subtenant, guest, licensee or invitee of Lessee, and (b) during the term of the Lease. **THE FOREGOING INDEMNITY IS INTENDED TO INDEMNIFY LESSOR AGAINST THE CONSEQUENCES OF ITS NEGLIGENCE OR FAULT AND AGAINST THE CONSEQUENCES OF ITS NEGLIGENCE OR FAULT OCCURRING JOINTLY OR CONCURRENTLY WITH THE NEGLIGENCE OR FAULT OF LESSEE OR OF LESSEE'S AGENTS, EMPLOYEES, OFFICERS, SUBTENANTS, LICENSEES, GUESTS, INVITEES OR CONTRACTORS, OR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS.** Except as set forth in the next-succeeding sentence, the indemnities and waivers contained in Sections 25 and 26 apply regardless of the active or passive negligence or sole, joint, concurrent, or comparative negligence of the Lessor Related Parties and regardless of whether liability without fault or strict liability is imposed or sought to be imposed on any of the Lessor Related Parties. If the final judgment of a court of competent jurisdiction establishes, under the principles of comparative negligence in the State of Texas, that the gross negligence or willful misconduct of a Lessor Related Party proximately caused a percentage of the damage suffered by a third party, then, as to such percentage only, the indemnities and waivers contained in Sections 25 and 26 will not apply to such Lessor Related Party, but will apply to any damage in excess of such percentage and to all of the other Lessor Related Parties.

Lessee, at Lessee's expense, shall assume on behalf of the Lessor and Lessor Related Parties and conduct with due diligence and in good faith the defense of all Claims. The defense shall be by counsel satisfactory to Lessor. In the event of failure by Lessee to fully perform in accordance with this indemnification and the other indemnifications contained in this Lease and in the exhibits and addenda hereto, each indemnitee (including Lessor and each of the

Lessor Related Parties), at its option, and without relieving Lessee of its obligations hereunder, may so perform, but all costs and expenses so incurred by an indemnitee in that event shall be reimbursed by Lessee to the indemnitee, together with interest. Interest shall accrue on the amount so expended by an indemnitee from the date any such expense was paid by the indemnitee until reimbursed by Lessee, at the rate of interest provided to be paid on judgments by the law of the State of Texas.

Except for claims that Lessee has released pursuant to **Section 25**, Lessor will, to the fullest extent allowable under the laws, indemnify, protect, defend (with counsel reasonably acceptable to Lessee) and hold harmless Lessee against any claims and actions brought against Lessee by third parties which (a) arise out of any bodily injury, death or property damage occurring to such third parties at the Property (other than within the Premises), (b) are not caused in whole or in part by Lessee, and (c) are caused in whole or in part by Lessor's gross negligence or willful misconduct.

## 27.   NON-WAIVER

No consent or waiver, express or implied, by either party hereto to or of any breach in the performance or observance by the other party of any of its obligations under this Lease shall be construed as or constitute a consent or waiver to or of any other breach in the performance or observance by such other party of such obligation or any other obligation of such other party. Neither the acceptance by Lessor of any Rent or other payment hereunder, whether or not any default hereunder by Lessee is then known to Lessor, nor any custom or practice followed in connection with this Lease shall constitute a waiver of any of Lessee's obligations under this Lease. Failure by either party hereto to complain of any action or non-action on the part of the other party or to declare the other party in default, irrespective of how long such a failure may continue, shall not be deemed to be a waiver by such party of any of its rights hereunder. Time is of the essence with respect to the performance of every obligation of Lessee. Except for the execution by Lessor and delivery of a written agreement expressly accepting surrender of the Premises, no act taken or failed to be taken by Lessor shall be deemed an acceptance of surrender of the Premises.

## 28.   QUIET POSSESSION

Lessee, on paying all sums herein called for and performing and observing all of its covenants and agreements hereunder, shall peaceably and quietly have, hold, and enjoy the Premises during the Term, subject to the provisions and conditions set forth in this Lease, applicable governmental laws, rules and regulations, matters of record, and the rights of mortgagees; it being agreed that Lessor agrees to Lessee's right to such occupancy as against all persons whomsoever lawfully claiming the same or any part thereof, by, through, or under Lessor, but not otherwise, subject to the provisions and conditions set forth in this Lease and all applicable governmental laws, rules, and regulations, matters of record, and the rights of mortgagees.

## 29.   NOTICES

Each notice required or permitted to be given hereunder by one party to the other shall be in writing with a statement therein to the effect that notice is given pursuant to this Lease and the same shall be deemed to have been delivered, served and given on the date of receipt if delivered in person or on the date of posting if sent postage prepaid, by United States registered or certified mail, or courier service, return receipt requested, addressed to such party at the address provided for such party herein.

Any notices to Lessor shall be addressed and/or delivered to Lessor at:

        Coventry Fund X, Ltd.
        4900 Woodway, Suite 1250
        Houston, Texas 77056
        Facsimile:    (713) 621-2853

and with a copy to:

Lawrence B. Chapman, Esq.
Lawrence B. Chapman, Attorney at Law, P.C.
4900 Woodway, Suite 1280
Houston, Texas 77056
Telephone:    (713)522-2226
Facsimile:    (713) 522-2443

Any notices to Lessee shall be addressed and/or delivered to Lessee at:

New Century Mortgage Corporation
3353 Michelson Drive, Suite 100
Irvine, CA 92612
Attention: Corporate Real Estate

with a copy to:

New Century Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA 92612
Attention: General Counsel

The addresses stated above shall be effective for all notices to the respective parties until written notice of a change in address is given pursuant to the provisions hereof.

## 30. LESSOR'S FAILURE TO PERFORM

If Lessor fails to perform any of its obligations under this Lease, Lessor shall not be in default hereunder and Lessee shall not have any rights or remedies growing out of such failure unless Lessee gives Lessor written notice thereof setting forth in reasonable detail the nature and extent of such failure and such failure by Lessor is not cured within the thirty (30) day period following Lessor's receipt of such notice or such longer period therefor provided elsewhere in the Lease. If such failure cannot reasonably be cured within such thirty (30) day period, the length of such period shall be extended for the period reasonably required therefor if Lessor commences curing such failure within such thirty (30) day period and continues the curing thereof with reasonable diligence and continuity.

## 31. LESSOR'S RIGHT TO PERFORM OBLIGATIONS

If Lessee fails to perform any one or more of its obligations hereunder within thirty (30) days after receipt of written notice from Lessor of such failure (or with respect to non-monetary obligations, such longer period as may reasonably be required to perform such obligations if Lessee commences curing such failure within such thirty (30) day period and continues the curing thereof with reasonable diligence and continuity), then, in addition to the other rights of Lessor hereunder or at law or in equity, Lessor shall have the right but not the obligation to perform all or any part of such obligations of Lessee. Within ten (10) days after receipt of a demand therefor from Lessor, Lessee shall reimburse Lessor for (i) the costs to Lessor of performing such obligations and reasonable profit and overhead, plus (ii) interest thereon at the lesser of eighteen percent (18%) per annum or the maximum rate of interest lawful in Texas, from the date such costs are paid by Lessor until Lessee reimburses Lessor. If the obligation so performed by Lessor involves any repair or maintenance, or the removal by Lessor of any improvements not authorized by this Lease, such reasonable profit and overhead shall be deemed to be ten percent (10%) of the cost to Lessor of performing such obligation.

Upon any Act of Default, Lessee shall also pay to Lessor all costs and expenses incurred by Lessor, including court costs and reasonable attorney's fees, in (a) retaking or otherwise obtaining possession of the Premises, (b) removing and storing Lessee's or any other occupant's property, (c) repairing, cleaning, painting, restoring, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, (d) reletting all or any part of the Premises and brokers' fees incurred by Lessor in connection with reletting the whole or any part of the Premises, (e) paying or performing the underlying obligation which Lessee failed to pay or perform, and (f) enforcing any of Lessor's rights, remedies and recourses arising as a consequence of the Act of Default.

32.   **ACT OF DEFAULT**

The term **"Act of Default"** as used in this Lease refers to the occurrence of any one or more of the following:  (i) Lessee fails to pay any installment of Rent or any other obligation under this Lease involving the payment of money and such failure continues for a period of three (3) days after written notice thereof to Lessee; provided, however, that for any twelve (12)-month period during which Lessor has already given Lessee two written notices of the failure to pay an installment of Rent, no further notice will be required (i.e., the event of default will automatically occur on the third day after the date upon which the Rent was due); or (ii) Lessee fails to comply with any provision of this Lease, other than as described in subsection (i) above, and either does not cure such failure within thirty (30) days after written notice thereof to Lessee (provided, however, if such failure cannot reasonably be cured within such thirty (30) day period, the length of such period shall be extended for the period reasonably required therefor if Lessee commences curing such failure within such thirty (30) day period and continues the curing thereof with reasonable diligence and continuity), or cures that particular failure but again fails to comply with the same provision of the Lease within three (3) months after Lessor's written notice; or (iii) Lessee or any guarantor of Lessee's obligations under this Lease becomes insolvent, or makes a transfer in fraud of creditors, or makes an assignment for the benefit of creditors; or (iv) Lessee or any guarantor of Lessee's obligations under this Lease files a petition under any section or chapter of the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof; or Lessee or any guarantor of Lessee's obligations under this Lease is adjudged bankrupt or insolvent in proceedings filed against Lessee or any guarantor of Lessee's obligations under this Lease thereunder; or (v) a receiver or Trustee is appointed for the Premises or for all or substantially all of the assets of Lessee or any guarantor of Lessee's obligation under this Lease; or (vi) without payment of Rent, Lessee deserts or vacates or commences to desert or vacate the Premises or any substantial portion of the Premises or at any time prior to the last month of the Lease term removes or attempts to remove, without the prior written consent of Lessor, all or a substantial amount of Lessee's goods, wares, equipment, fixtures, furniture, or other personal property; or (vii) Lessee does or permits to be done anything which creates a lien upon the Premises or upon all or any part of the Property that is not eliminated within ten (10) days after Lessee's receipt of written notice; or (viii) Lessee makes an anticipatory breach of this Lease. The term **"anticipatory breach"** means either (a) Lessee's repudiation of this Lease in writing, or (b) the combination of (i) Lessee's desertion or vacation or commencement of desertion or vacation of the Premises or removal of all or a substantial amount of Lessee's equipment, fixtures, furniture, or other personal property from the Premises, and (ii) Lessee's failure to pay any Base Rent or Lessee's Additional Rent or Lessee's Estimated Additional Rent or other amounts due under this Lease as and when they are due and payable. Furthermore, for each occasion on which Lessee fails to pay when due any Rent or other amount required to be paid under this Lease within five (5) days after its due date, Lessee shall pay Lessor a late fee equal to five percent (5%) of such Rent or other amount due, unless same is held to be interest, in which event the amount due from Lessee to Lessor shall bear interest at the maximum contract rate of interest from date due until paid, and the said five percent (5%) late fee shall not be applicable, and if previously charged, shall be deemed reduced pursuant to **Section 45** hereof and any excess collected shall be returned to Lessee.

33.   **RIGHTS UPON DEFAULT**

Upon the occurrence of any Act of Default, Lessor may, at Lessor's option and in addition to all other rights, remedies and recourses afforded Lessor hereunder or by law or equity, pursue any one or more of the following:

(a)   Without any further notice or demand whatsoever, Lessor may enter upon and take possession of the Premises and expel or remove Lessee and any other person who may be occupying the Premises or any part of the Premises, by lawful means, without being liable for prosecution or any claim for damages for such action. Such expulsion and removal by Lessor cannot be deemed a termination or forfeiture of this Lease or acceptance of Lessee's surrender of the Premises unless Lessor expressly notifies Lessee in writing that Lessor is terminating or forfeiting this Lease or accepting Lessee's surrender of the Premises. With respect to the provisions of the laws of the State of Texas, if any, which require that a landlord use efforts to mitigate the damages recoverable against a defaulting lessee, then upon Lessee's default and abandonment of the Premises, Lessor and Lessee agree that if Lessor sues Lessee to enforce the Lease and collect rent that has accrued, then Lessor has a duty to mitigate its damages. In any situation in which Lessor is attempting to mitigate its damages, Lessee and Lessor agree that Lessor will have satisfied the duty to mitigate and will have used objectively reasonable efforts to re-lease the Premises if Lessor (A) places the Premises on Lessor's inventory of available space; (B) makes Lessor's inventory of available space available to area brokers; (C) shows the Premises to prospective tenants who request to see it, and (D) lists the Premises with a real estate broker or agent (which may be affiliated with Lessor) and considers all written proposals for such space made by such broker or agent; provided, however, that in no event will Lessor (i) be obligated to meet with a prospective Lessee at any location other than at the Property or at Lessor's principal office, (ii) be obligated to expend monies for finish-out requested by a prospective lessee or provide any other tenant inducements unless Lessor, in its sole discretion, believes that the excess rent Lessor will receive and the credit of the prospective lessee support such a decision, (iii) be required to give preference to the Premises over other spaces in the Property, (iv) be required to agree to allow an existing lessee of the Property to move from their existing space to all or any of the Premises, (v) be obligated to accept any lease proposal whose terms are less advantageous than then-current market terms, or (vi) be required to accept any lease proposal which it, in its sole discretion, deems unacceptable. In attempting to relet or actually reletting the Premises, Lessor will be free to enter into a direct lease with the proposed replacement lessee and will not be acting as Lessee's agent, although the proceeds Lessor actually receives for any time period will be credited against Lessee's obligations for the same time period. Lessee will not be entitled to any additional credit (for example, if Lessor receives amounts during a particular time period in excess of Lessee's obligations for the same time period, Lessor will not be required to credit such excess against Lessee's obligations for any other time period). Until Lessor is able, through such efforts, to relet the Premises, Lessee must pay to Lessor, on or before the first day of each calendar month, in advance, the monthly rents and other charges provided in this Lease. At such time, if any, as Lessor relets the Premises, Lessee must pay to Lessor on the 15th day of each calendar month the difference between the monthly rents and other charges provided in this Lease for such calendar month and the amount actually collected by Lessor for such month from the occupant to whom Lessor has re-let the Premises. If it is necessary for Lessor to bring suit in order to collect any deficiency, Lessor has the right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time. Any such suit cannot prejudice in any way the right of Lessor to bring a similar action for any subsequent deficiency or deficiencies. Lessor may bring action against Lessee to collect amounts due by Lessee on one or more occasions, without the necessity of Lessor's waiting until expiration of the Term. Lessor shall not be liable, nor shall Lessee's obligations hereunder be diminished, because of Lessor's failure to relet the Premises or collect rent due in respect of such reletting. Upon such reletting, Lessee shall immediately be liable to Lessor, in addition to any indebtedness other than Rent due hereunder, for the Costs of Reletting (as defined below). Lessor's inability to relet the Premises or failure to collect all or a portion of the rent upon reletting shall not release or reduce Lessee's liability hereunder except as to any amounts actually received by Lessor. Upon Lessee's default and abandonment of the Premises, Lessor and Lessee agree that if Lessor sues Lessee for damages for breach of the Lease, the measure of damages is the rent set out in the Lease less the fair market rent at the time of the abandonment for the remainder of the Term discounted to its present value. When Lessor sues Lessee for damages for breach of the Lease, there is no duty to mitigate because mitigation is built into the measure of damages.

(b)   Without any further notice or demand whatsoever, Lessor may terminate this Lease by written notice to Lessee, in which event Lessee must immediately surrender the Premises to Lessor, and if Lessee fails to do

so, Lessor may, without prejudice to any other remedy which Lessor may have for possession or arrearages in rent (including any late charge or interest which may have accrued pursuant to **Section 32** of this Lease), enter upon and take possession of the Premises and expel or remove Lessee and any other person who may be occupying the Premises or any part thereof, by force, if necessary (except to the extent prohibited by Texas law), without being liable for prosecution or any claim for damages therefor. If the Act of Default pursuant to which Lessor terminated this Lease was a default under **Section 33(a)** or **Section 32(viii)** above, then to the fullest extent permitted by applicable law, Lessee hereby agrees to pay the difference between the total of all monthly rents and other charges provided in this Lease for the remainder of the term and the reasonable rental value of the Premises for such period, such difference to be discounted to then-present value at a rate equal to the rate of interest which is allowed by law in the State of Texas when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of six percent per annum).

(c)     Without any further notice or demand whatsoever, Lessor may pursue the following remedies for the following specific defaults:

(i) In the event of any default described in **Section 32(ii)** of this Lease, Lessor has the right to enter upon the Premises, by lawful means, without being liable for prosecution or any claim for damages therefor, and do whatever Lessee is obligated to do under the terms of this Lease; and Lessee agrees to reimburse Lessor on demand for any expenses which Lessor may incur in thus effecting compliance with Lessee's obligations under this Lease, and Lessee further agrees that Lessor will not be liable for any damages resulting to the Lessee from such action.

(ii) In the event of any default described in **Section 32(vii)** of this Lease, Lessor may pay or bond around such lien, whether or not contested by Lessee; and in such event Lessee agrees to reimburse Lessor on demand for all costs and expenses incurred in connection with any such action, with Lessee further agreeing that Lessor is in no event liable for any damages or claims resulting from such action.

If Lessor elects to exercise the remedy prescribed in **Section 33(a) or 33(c)** above, this election in no way prejudices Lessor's right at any time thereafter to cancel such election in favor of the remedy prescribed in **Section 33(b)** above, provided that at the time of such cancellation Lessee is still in default. Pursuit of any of the above remedies does not preclude pursuit of any other remedies prescribed in other sections of this Lease and any other remedies provided by law or in equity. Forbearance by Lessor to enforce one or more of the remedies herein provided upon an Act of Default cannot be deemed or construed to constitute a waiver of such default. No agreement to accept a surrender of the Premises and no act or omission by Lessor or Lessor's agent during the term of this Lease will constitute an acceptance of surrender of the Premises unless made in writing and signed by Lessor. Similarly, no reentry or taking of possession of the Premises by Lessor will constitute an election by Lessor to terminate this Lease unless a written notice of such intention, signed by Lessor, is given to Lessee.

It is expressly agreed that in determining "the monthly rents and other charges provided in this Lease," as that term is used in **Section 33** above, there will be added to the Base Rent (as specified in **Section 4.01** of this Lease) a sum equal to Lessee's Additional Rent and Lessee's Estimated Additional Rent and Lessee's parking rent. It is further understood and agreed that the phrase "without any further notice or demand whatsoever," as that term is used in **Section 33** above, incorporates Lessee's full, final, and complete waiver of all demands and notices permitted or required by applicable law, whether statutory or common law, and in equity (including, without limitation, any statutory requirement of prior written notice for filing eviction or damage suits for nonpayment of rent), it being understood and agreed that if any notice is appropriate, it is provided for in **Section 32**.

It is further agreed that, in addition to payments required pursuant to **Section 33** above, Lessee must compensate Lessor for all expenses incurred by Lessor in repossession (including, among other expenses, any increase in insurance premiums caused by the vacancy of the Premises), all expenses incurred by Lessor in reletting (including, among other expenses, repairs, remodeling, replacements, advertisements and brokerage fees), all concessions granted to a new Lessee upon reletting (including, among other concessions, renewal options), all losses incurred

by Lessor as a direct or indirect result of Lessee's default (including, among other losses, any adverse reaction by Lessor's mortgagee or by other lessees or potential lessees of the Property) and a reasonable allowance for Lessor's administrative efforts, salaries and overhead attributable directly or indirectly to Lessee's default and Lessor's pursuing the rights and remedies provided herein and under applicable law.

The remedies of Lessor hereunder are deemed cumulative and not exclusive of each other. If on account of any breach or default by Lessee in its obligations hereunder, Lessor employs an attorney to present, enforce or defend any of Lessor's rights or remedies hereunder, Lessee agrees to pay any reasonable attorney's fees incurred by Lessor in such connection.

In the event of any default described in Subsection (iv) of **Section 32** of this Lease, any assumption and assignment must conform with the requirements of the Bankruptcy Code which provides, in part, that the Lessor must be provided with adequate assurance (i) of the source of rent and other consideration due under this Lease; (ii) that the financial condition and operating performance of any proposed assignee and its guarantors, if any, is similar to the financial condition and operating performance of Lessee and its guarantors, if any, as of the date of execution of this Lease; (iii) that any assumption or assignment is subject to all of the provisions of this Lease (including, but not limited to, restrictions as to use) and will not breach any such provision contained in any other lease, financing agreement or other agreement relating to the Property; and (iv) that any assumption or assignment will not disrupt any Lessee mix or balance in the Property.

(a) In order to provide Lessor with the assurance contemplated by the Bankruptcy Code, Lessee must fulfill the following obligations, in addition to any other reasonable obligations that Lessor may require, before any assumption of this Lease is effective: (i) all defaults under Subsection (a) of **Section 32** of this Lease must be cured within ten (10) days after the date of assumption; (ii) all other defaults under **Section 32** of this Lease other than under Subsection (iv) of **Section 32** must be cured within fifteen (15) days after the date of assumption; (iii) all actual monetary losses incurred by Lessor (including, but not limited to, reasonable attorneys fees) must be paid to Lessor within ten (10) days after the date of assumption; and (iv) Lessor must receive within ten (10) days after the date of assumption a security deposit in the amount of six (6) months Base Rent (using the Base Rent in effect for the first full month immediately following the assumption) and an advance prepayment of Base Rent in the amount of three (3) months Base Rent (using the Base Rent in effect for the first full month immediately following the assumption), both sums to be held by Lessor in accordance with the first grammatical paragraph of **Section 32** above and deemed to be rent under this Lease for the purposes of the Bankruptcy Code as amended and from time to time in effect.

(b) In the event this Lease is assumed in accordance with the requirements of the Bankruptcy Code and this Lease, and is subsequently assigned, then, in addition to any other reasonable obligations that Lessor may require and in order to provide Lessor with the assurances contemplated by the Bankruptcy Code, Lessor must be provided with (i) a financial statement of the proposed assignee prepared in accordance with generally accepted accounting principles consistently applied, though on a cash basis, which reveals a net worth in an amount sufficient, in Lessor's reasonable judgment, to assure the future performance by the proposed assignee of Lessee's obligations under this Lease; or (ii) a written guaranty by one or more guarantors with financial ability sufficient to assure the future performance of Lessee's obligations under this Lease, such guaranty to be in form and content satisfactory to Lessor and to cover the performance of all of Lessee's obligations under this Lease.

The following provisions shall override and control any conflicting provisions of the Texas Property Code, as well as any other statute governing the right of a lessor to change the door locks of commercial lessees. In the event that Lessee fails to pay any rent or other amounts due under this Lease and such failure constitutes an Act of Default, or in the event any one or more provisions of this **Section 33** authorizes Lessor to enter the Premises, Lessor is entitled and is hereby authorized, without any notice to Lessee, to enter upon the Premises by use of a master key, a duplicate key, or other peaceable means, and to change, alter, and/or modify the door locks on all entry doors of the Premises, thereby permanently excluding Lessee, and its officers, principals, agents, employees and

representatives therefrom. (A) In the event that Lessor has either permanently repossessed the Premises pursuant to the foregoing provisions of this Lease [(that is, terminated Lessee's right to possession without terminating this Lease], or has terminated this Lease by reason of Lessee's default, Lessor shall not thereafter be obligated to provide Lessee with a key to the Premises at any time, regardless of any amounts subsequently paid by Lessee; provided, however, that in any such instance, during Lessor's normal business office hours and at the convenience of Lessor within ten (10) business days after Lessor permanently repossessed the Premises or terminated this Lease, and upon receipt of written request from Lessee received by Lessor not later than five (5) business days after Lessor permanently repossessed the Premises or terminated this Lease and accompanied by such written waivers and releases as the Lessor may require, Lessor will either (at Lessor's option) (i) escort Lessee or its authorized personnel to the Premises to retrieve any personal belongings or other property of Lessee as may then be at the Premises not subject to the landlord's lien or security interest described herein, or (ii) obtain a list from Lessee of such personal property as Lessee intends to remove, whereupon Lessor shall remove such property (not subject to the said landlord's lien or security interest) as may then be at the Premises and make it available to Lessee at a time and place designated by Lessor. Upon the expiration of such ten (10) business day period, Lessee will be deemed to have abandoned all personal belongings and other property of Lessee not subject to the landlord's lien or security interest described herein. If Lessor elects option (ii) above, Lessee shall pay, in cash, in advance, all costs and expenses estimated by Lessor to be incurred in removing such property and making it available to Lessee and all such moving and/or storage charges theretofore incurred by Lessor with respect to such property. (B) If Lessor elects to exclude Lessee from the Premises without permanently repossessing the Premises or terminating this Lease pursuant to the foregoing provisions of this Lease, which right Lessor is hereby granted in addition to and cumulative of its other rights and remedies, then Lessor shall not be obligated to provide Lessee a key to reenter the Premises until such time as all delinquent Rent and other amounts due under this Lease have been paid in full and all other defaults, if any, have been completely cured to Lessor's satisfaction (if such cure occurs prior to any actual permanent repossession or termination), and Lessor has been given assurances reasonably satisfactory to Lessor evidencing Lessee's ability to satisfy its remaining obligations under this Lease, and during any such temporary period of exclusion, Lessor will, during Lessor's normal Building hours and at Lessor's convenience, upon receipt of written request from Lessee (accompanied by such written waivers and releases as Lessor may require), escort Lessee or its authorized personnel to the Premises to retrieve personal belongings of Lessee or its employees as may then be at the Premises, as is not subject to the landlord's lien and security interest described herein. This remedy of Lessor shall be in addition to, and not in lieu of, any of its other remedies set forth in this Lease, or otherwise available to Lessor at law or in equity.

No reentry or repossession, repairs, changes, alterations, and additions, reletting, acceptance of keys from Lessee, or any other action or omission by Lessor shall be construed as an election of Lessor to terminate this Lease or Lessee's right to possession, or accept a surrender of the Premises, nor shall the same operate to release the Lessee in whole or in part from any of the Lessee's obligations hereunder, unless express written notice of such intention is sent by Lessor or its agent to Lessee. Lessor may bring suits for amounts owed by Lessee hereunder or any portions thereof, as the same accrue or after the same have accrued, and no suit or recovery of any portion due hereunder shall be deemed a waiver of Lessor's right to collect all amounts to which Lessor is entitled hereunder, nor shall the same serve as any defense to any subsequent suit brought for any amount not theretofore reduced to judgment. Lessor may pursue one or more remedies against Lessee and need not make an election of remedies until judgment is issued by a court of competent jurisdiction. All rent and other consideration paid by any replacement tenants shall be applied, at Lessor's option: first, to the Costs of Reletting, second, to the payment of any indebtedness other than Rent due hereunder, third, to the payment of all costs of enforcing this Lease against Lessee or any guarantor, fourth, to the payment of all interest and service charges accruing hereunder, fifth, to the payment of Rent theretofore accrued, and the residue, if any, shall be held by Lessor and applied to the payment of other obligations of Lessee to Lessor as the same become due (with any remaining residue to be retained by Lessor). In no event shall Lessee be entitled to any excess rents received by Lessor as a result of such reletting. "Costs of Reletting" shall include without limitation, all reasonable costs and expenses incurred by Lessor for any repairs, maintenance, changes, alterations, and improvements to the Premises (whether to prevent damage or to prepare the Premises for reletting); brokerage commissions, advertising costs, attorneys' fees, any economic incentives given to enter leases with replacement tenants, and costs of collecting rent from replacement tenants. Lessor shall be under

no obligation to observe or perform any provision of this Lease on its part to be observed or performed which accrues after the date of any Act of Default by Lessee. The times set forth herein for the curing of violations by Lessee are of the essence of this Lease. Lessee hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease or Lessee's right to possession after this Lease or Lessee's right to possession is terminated based on an Act of Default by Lessee.

Lessee hereby waives any claim arising by reason of issuance of any distress warrant or writ of sequestration and agrees to hold Lessor harmless from any such claims. In no event shall Lessor's exercise of any one or more remedies hereunder granted or otherwise available to it be deemed to be an acceptance of surrender of the Premises by Lessee, whether by agreement or operation of law, it being understood that such surrender can be effected only by the written agreement executed by Lessor and Lessee. In the event Lessor commences any proceedings against Lessee for nonpayment for any of the Rent obligations or other sums due under this Lease, Lessee will not interpose any counterclaim or other claim against Lessor of whatever nature or description in any such proceedings and in addition to any other remedies which Lessor may have, the parties agree that in the event such a counterclaim is so asserted by Lessee, that the same may be severed out by motion of Lessor, and Lessor's claim and any counterclaim of Lessee shall be separately litigated in two lawsuits, at the option of Lessor as aforesaid. Lessor may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Lessee herein without the necessity of proving the inadequacy of any legal remedy or irreparable harm, and the same shall be cumulative of any other rights or remedies of Lessor. The obligation of Lessee to pay all Rent and other sums hereunder constitute independent, unconditional obligations to be performed at all times by Lessee, save and except only when an abatement thereof or reduction therein is expressly provided for in this Lease. All rights and remedies of Lessor shall be cumulative and not exclusive. Lessor shall be entitled to pursue simultaneously multiple or alternative remedies, at any time to abandon or resume pursuit of any remedy, and at any time to pursue additional remedies.

## 34.  SURRENDER

On the last day of the Term or upon the earlier termination of this Lease, Lessee shall peaceably and quietly surrender the Premises to Lessor, broom clean, in good order, repair and condition, excepting only fair wear and tear resulting from normal use. Prior to the surrender of the Premises to Lessor, Lessee at its sole cost and expense shall remove all liens and other encumbrances that may have resulted from the acts or omissions of Lessee. If Lessee fails to do any of the foregoing, Lessor, in addition to other remedies available to it at law or equity, may, without notice, enter upon, reenter, possess and repossess the Premises, by summary proceedings, ejectment or other lawful means, and may dispossess and remove Lessee and all persons and property from the Premises; and Lessee waives any and all damages or claims for damages as a result thereof. Such dispossession and removal of Lessee shall not constitute a waiver by Lessor of any claims by Lessor against Lessee.

## 35.  HOLDING OVER

If Lessee does not surrender possession of the Premises at the end of the Term or upon earlier termination of this Lease, Lessee shall be a tenant-at-sufferance of Lessor and the Base Rent and Parking Rent due during each day of such holdover period shall be one and one-half (1.5) times the sum of one-thirtieth of all installments of Base Rent and Parking Rent payable with respect to the last full calendar month immediately prior to the end of the Term or termination of this Lease. In addition, Lessee shall continue to pay the Lessee's Estimated Additional Rent and Lessee's Additional Rent defined in Section 5 herein. No holding over by Lessee shall operate to extend this Lease, and in the event of any such holding over, Lessee shall, in addition to all other obligations and liabilities of Lessee hereunder (all of which shall remain in full force and effect during the entire period of any such holding over) indemnify, defend, and hold harmless Lessor from and against any and all claims for damages (including, without limitation, consequential damages) by any person or entity, including, without limitation, any other lessee or proposed lessee to whom Lessor may have leased or agreed to lease all or any part of the Premises effective upon the termination of this Lease.

## 36.  REMOVAL OF LESSEE'S PROPERTY

Lessee shall own the movable equipment, furniture and supplies placed in or on the Premises by Lessee and shall have the right to remove such movable equipment, furniture, and supplies prior to termination of this Lease provided that no Act of Default has been committed by Lessee which has not been fully cured in a manner acceptable to Lessor and further provided that Lessee repairs any injury to the Premises or Building resulting from such removal. Unless Lessee has made prior arrangements with Lessor and Lessor has agreed in writing to permit Lessee to leave such equipment, furniture or supplies on the Premises for an agreed period, if Lessee shall neglect to remove Lessee's goods, equipment, personalty, or other property prior to termination of this Lease, and in any event prior to ten (10) business days after Lessor has either permanently repossessed the Premises or terminated this Lease by reason of Lessee's default, Lessor shall have in addition to its other remedies at law or in equity, the right to remove all such property from the Premises and, at the election of Lessor, either (i) cause it to be stored in a public warehouse or elsewhere, or in or on property owned or controlled by Lessor, at the cost of and for the account of Lessee, or (ii) to dispose of said property in a manner being suitable to Lessor; all without service of notice or resort to legal process and without Lessor becoming liable for any loss or damage which may be occasioned thereby, and any proceeds of any disposition of such property shall be retained by Lessor without liability to Lessee, Lessee hereby waiving any interest in such proceeds, and Lessee hereby releasing Lessor from any liability in connection therewith; all of the foregoing provisions of this paragraph overriding and controlling with respect to any conflicting provisions of the Texas Property Code, as well as any other statute governing the right of a lessor to take control of and dispose of the property of a lessee following abandonment of the leased premises by the lessee or the removal from the leased premises of property not in the normal course of the lessee's business or the rights of the lessor to dispose of the property of the lessee following abandonment of the leased premises or removal of the lessee from the leased premises. All alterations or additions to the Premises (including wall-to-wall carpeting, paneling or other wall covering) and improvements and any other article attached or affixed to the Premises, shall become the property of Lessor and shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease by lapse of time or otherwise, Lessee hereby waiving all rights to any payment or compensation therefor. If, however, Lessor so requests in writing at the time of granting its approval to the installation of any such alteration, addition or fixture, Lessee will, prior to termination of this Lease, remove any and all alterations, additions, fixtures, equipment and property placed or installed by it in the Premises and will repair any damage caused by such removal.

37.    **LIENS**

Lessee shall not permit any mechanic's, materialmen's or other liens to be fixed or placed against the Premises or the Property, the Building, the Garage, or the Land and agrees immediately to discharge (either by payment or by filing of the necessary bond, or otherwise) any mechanic's, materialmen's or other lien that is allegedly or in fact fixed or placed against any of the foregoing. In the event of the filing of any such lien, Lessee will, within ten (10) days of receiving notice of such filing, cause the same to be released of record by payment, bonding or otherwise or shall take measures to assure Lessor that the lien will not be enforced against the Premises, Property, Building, Garage or Land. If Lessee shall fail to take such steps within said ten (10) day period, Lessor shall have the right and privilege, at Lessor's option, of paying the same or any portion thereof without inquiry as to the validity thereof, and any amount so paid, including expenses and interest, shall be additional rent hereunder due from Lessee to Lessor and shall be repaid to Lessor within ten (10) days after rendition of a bill therefor. Unpaid amounts shall bear interest at the lesser of (i) eighteen percent (18%) per annum or (ii) the maximum non-usurious contract rate permitted under applicable law, from the date due until so paid.

38.    **ATTORNEY'S FEES**

Should it become necessary for Lessor or Lessee to place the enforcement of this Lease, or any part thereof, in the hands of an attorney, or file suit upon the same, the prevailing party shall be entitled to recover from the other party all reasonable expenses incurred by reason thereof, including but not limited to, reasonable attorneys' fees and court and related costs. Should Lessor place the enforcement of the collection of any Rent due, or to become due, hereunder, or recovery of possession of the Premises, in the hands of an attorney, Lessee shall reimburse Lessor for

all reasonable expenses incurred by Lessor, including but not limited to, reasonable attorney's fees, disbursements of counsel, and court and related costs.

## 39. ASSIGNMENT AND SUBLETTING

Lessor shall have the right to transfer and assign in whole or in part, by operation of law or otherwise, its rights and obligations hereunder whenever Lessor in its sole judgment deems it appropriate without any liability to Lessee and Lessee shall attorn to any party to which Lessor transfers the Building, or this Lease. Upon such transfer or assignment by Lessor and the assignee's acceptance of Lessor's obligations hereunder arising after the effective date of the assignment, no further liability or obligation shall thereafter accrue against Lessor hereunder.

In the event Lessee should desire to assign its interests in this Lease or sublet the Premises or any part thereof, Lessee shall give Lessor written notice of such desire at least thirty (30) days in advance of the date on which Lessee desires to make such assignment or sublease which notice shall specify the proposed sublessee or assignee, the term, the Base Rent and consideration payable or to become payable in respect of such proposed sublease or assignment, the specific portion of the Premises (if less than all) to be so subleased or assigned, the proposed use thereof (which shall not be a use not permitted hereunder), and such other information concerning the proposed sublease or assignment and proposed sublessee or assignee, as Lessor may reasonably request. Lessee shall pay on demand Lessor's attorneys' fees (in an amount not to exceed $1,500.00) in connection with any requested or proposed assignment or subletting. Lessor shall within fifteen (15) days following receipt of such notice, notify Lessee in writing that Lessor elects either (i) to terminate this Lease as to the space so affected as of the date so specified by Lessee, in which event Lessee will be relieved of all further obligation hereunder as to such affected space, or (ii) to permit Lessee to assign or sublet such space (provided, however, if the Base Rent and other consideration agreed upon between Lessee and sublessee or assignee (net of Lessee's reasonable, documented out-of-pocket costs incurred by Lessee in connection with such transfer, including, without limitation, improvement costs, leasing costs and commissions incurred in connection with the transfer) is greater than the Base Rent and Lessee's Additional Rent (defined in Section 5) that Lessee must pay Lessor, then one-half (1/2) of such excess shall be deemed additional Rent owed by Lessee and payable to Lessor in the same manner that Lessee pays the Base Rent as outlined in Section 4), in which event the Lessor's Consent to the assignment (or sublease, as applicable) will be on the form presented by and reasonably acceptable to Lessor and will be signed by Lessor, Lessee and the sublessee (or assignee, as applicable) and if either Lessee or the proposed sublessee or assignee fails or refuses to promptly execute such Lessor's Consent to the assignment (or sublease, as applicable) as is presented by Lessor, then Lessor may refuse to consent to Lessee's assignment or subleasing or revoke any such consent if previously given, or (iii) to refuse to consent to Lessee's assignment or subleasing such space and to continue this Lease in full force and effect as to the entire Premises.

No permitted or unauthorized assignment or subletting by Lessee shall relieve Lessee of any past, present or future obligation or liability under this Lease. All obligations, duties and liabilities of Lessee hereunder shall be fully binding upon and enforceable against any assignee or sublessee of Lessee. Any attempted assignment or sublease by Lessee made in violation of the terms and covenants of this paragraph shall be void. If this Lease is assigned or if the Premises or any part thereof are subleased by Lessee without the permission of Lessor, then Lessor may nevertheless collect Rent from the assignee or sublessee and apply the net amount collected to the Rent payable hereunder, but no such transaction or collection or acceptance of Rent or application thereof by Lessor shall be deemed a waiver of any provision hereof or a release of Lessee from the performance of the obligations of Lessee hereunder. If during the term of any assignment of this Lease or permitted sublease of the Premises or any part thereof, there shall occur any Act of Default, then Lessor shall, in addition to all other rights and remedies available to it, be entitled to collect Rent directly from any sublessee or assignee and give an effective receipt therefor.

Provided that no Act of Default exists under this Lease, Lessee may, without Lessor's consent, assign or sublet all or a portion of this Lease or the Premises to an Affiliate of Lessee if (a) Lessee notifies Lessor at least 15 days prior to such transfer; (b) Lessee delivers to Lessor, at the time of Lessee's notice, current financial statements of Lessee and the proposed transferee that are reasonably acceptable to Lessor; and (c) the transferee assumes and agrees in a writing reasonably acceptable to Lessor to perform Lessee's obligations under this Lease and to observe all terms and

conditions of this Lease. A transfer to an Affiliate does not release Lessee from any liability or obligation under this Lease. Lessor's rights to recapture or share in any profit Lessee receives from a transfer do not apply to any transfer described herein. For purposes hereof, an "**Affiliate**" shall be deemed to mean (i) any other person or entity that, directly or indirectly, controls, is controlled by or is under common control with Lessee; (ii) a corporation or business entity resulting from a merger or consolidation with Lessee; or (iii) any person or entity which acquires substantially all of Lessee's business assets in the State of Texas. For purposes of this definition, "**control**" means possessing the power to direct or cause the direction of the management and policies of Lessee by the ownership of a majority of the voting securities of Lessee.

40.    **LESSOR'S LIABILITY**

Any provisions of this Lease to the contrary notwithstanding, Lessee acknowledges and agrees that the liability of Lessor under this Lease shall be limited to its equity interest in the Building and Land and any judgments rendered against Lessor shall be satisfied solely out of the proceeds of sale of its interest in the Building and Land. No personal judgment shall lie against Lessor upon extinguishment of its rights in the Building and Land and any judgment so rendered shall not give rise to any right of execution or levy against Lessor's assets. No personal liability of any kind or character whatsoever now attaches or at any time hereafter under any conditions shall attach to Lessor's members, shareholders, officers, directors, partners or venturers for payment of any amounts payable under this Lease or the performance of any obligations under this Lease. The provisions hereof shall inure to Lessor's successors and assigns including any Mortgagee. The foregoing provisions are not intended to relieve Lessor from the performance of any of Lessor's obligations under this Lease, but limit the personal liability of Lessor and its members, shareholders, officers, directors, partners and venturers in case of recovery of a judgment against them or any of them. Under no circumstances whatsoever shall Lessor ever be liable for consequential damages or special damages.

If Lessee claims or asserts that Lessor has violated or failed to perform a covenant of Lessor not to unreasonably withhold or delay Lessor's consent or approval, Lessee's sole remedy shall be an action for specific performance, declaratory judgment or injunction and in no event shall Lessee be entitled to any monetary damages for a breach of such covenant and in no event shall Lessee claim or assert any claim for any money damages in any action or by way of setoff, defense or counterclaim and Lessee hereby specifically waives the right to any money damages or other remedies.

Lessor's liability for the performance of its obligations in this Lease will cease on the date of sale or, if applicable, foreclosure of the Building, and Lessee shall look solely to the purchaser for the performance of any obligations hereunder accruing thereafter.

41.    **LIGHT AND AIR**

Neither diminution nor shutting off of light or air or both nor any other affect on the Premises by or of any structure erected or condition now or hereafter existing on lands adjacent to the Building shall affect this Lease, abate or diminish Rent, or impose any liability on Lessor.

42.    **CONDEMNATION**

If all of the Building or if all of the Premises shall be permanently taken by condemnation or as a result of the exercise of the power of eminent domain (other than for temporary use or occupancy), the term of this Lease shall terminate on the date Lessee is deprived of possession thereby (the "**Date of the Taking**"), and subject to a pro rata apportionment of Rent as of the Date of the Taking, no further Rent shall be due hereunder. Lessor may terminate this Lease (effective on the date the condemning authority takes possession of the portion of the Building, Premises or Property taken) in the event any portion of the Building, the Premises or the Property shall be taken as a result of the exercise of the power of eminent domain.

If a part of the Premises shall be permanently taken, then unless Lessor terminates this Lease as provided above, the part so taken shall no longer constitute a part of the Premises but this Lease shall continue in full force and effect as to the part not so taken; provided, however, that Lessee may terminate this Lease if in the good faith judgment of Lessee, the portion of the Premises so taken and the nature of the taking shall be of such an extent and nature as to substantially handicap, impede and impair Lessee's use of the remaining portion of the Premises such that the untaken part of the Premises is insufficient for the economic and feasible operation of the business of Lessee conducted within the Premises. Lessee shall, if permitted under this paragraph to terminate the Lease, give notice to Lessor of its election to terminate the Lease not later than ten (10) business days after notice to Lessee of a permanent taking of part of the Premises, whereupon the term of this Lease shall terminate and, subject to a pro rata apportionment of Rent as of the Date of the Taking, no further Rent shall be due hereunder. As used in this Lease, the "Date of the Taking" shall not occur prior to the date Lessee is deprived of possession.

If all or any part of the Premises shall be temporarily taken by condemnation or as a result of the exercise of the power of eminent domain, this Lease shall remain in full force and effect unless terminated by Lessor. Except only to the extent that Lessee may be prevented from doing so pursuant to the terms of the order of the taking authority, Lessee shall continue to perform and observe all its obligations under this Lease as though the temporary taking had not occurred. Lessee shall be entitled to receive the entire amount of the award awarded to Lessee with respect to the Premises made for the temporary taking, unless the period of temporary use or occupancy shall extend to or beyond the expiration date of the term of this Lease, in which case the award shall be apportioned between Lessor and Lessee as of the date of expiration of the term of this Lease, not taking into account any renewal terms of this Lease unless the condemnation occurs during a renewal term (but in such event no further renewal terms shall be taken into consideration), but Lessor shall in that circumstance receive the entire portion of the award that is attributable to physical damage to the Premises and the restoration thereof to the condition immediately prior to the taking. Lessee's obligation to pay Rent will abate on a proportionate basis with respect to that portion of the Premises remaining after the taking that Lessee is unable to use for the period of time that Lessee is unable to use such portion of the Premises, if Lessee does not receive a condemnation therefor.

Lessee does hereby assign and relinquish to Lessor, on behalf of Lessee and all subtenants and assignees, any and all claim or right to the award and Lessor shall be entitled to receive the entire award in any proceeding or in lieu of such proceeding with respect to any taking (other than for temporary use and occupancy as provided hereinabove), without deduction therefrom for any estate vested in Lessee by this Lease and Lessee shall receive no part of such award, except as hereinafter expressly specified. Lessee shall have the right to make a separate claim with the condemning authority for any moving expenses incurred by Lessee as a result of such condemnation, provided that such separate claim by Lessee shall not reduce or adversely affect the amount of the Lessor's award. Lessee shall not be entitled to the value of the unexpired term of the Lease or Lessee's leasehold interest. Lessee shall have no claim against Lessor by reason of any taking.

## 43.    USE OF NAMES

Lessee shall not have the right to use the name of the Building except in connection with giving the address of Lessee and then such terms cannot be emphasized or displayed with more prominence than the rest of such address unless otherwise agreed in writing by Lessor. Lessor shall have the right to change the name of the Building or the Property of which it is a part whenever Lessor in its sole judgment deems appropriate without any liability to Lessee. Lessor's designation of the name of the Building shall not be deemed or construed as a license or permit for Lessee to use such name, or any derivation or construction of such name on any stationery or in any promotional materials, whether printed or broadcast, without the express prior written consent of Lessor in each instance, except only that Lessee may use the name of the Building in the postal address of the Building during the applicable portion of the Term of this Lease that the Building is so named, and for no other purpose or purposes whatsoever, and Lessee shall enforce the provisions hereof with respect to any of its employees, agents, representatives, contractors, and where assignment or subleasing is expressly permitted by Lessor, Lessee's assignees and subtenants.

## 44.    SUBORDINATION

The rights and interests of Lessee under this Lease and to the Premises shall be subject and subordinate to all deeds of trust, mortgages, rent assignments, and other security instruments and to all renewals, modifications, consolidations, replacements and extensions thereof (the "Security Documents") heretofore or hereafter executed by Lessor or any successor in interest of Lessor covering the Premises, the Property, leases, the Building, the Garage, the Land or any parts thereof or interest therein to the same extent as if the Security Documents had been executed, delivered and recorded prior to the execution of this Lease; provided, however, that at the option of the holder or holders of any Security Documents, evidenced by written notice to such effect from such holder or holders to Lessee, this Lease shall be superior to the Security Documents held by such holder or holders. After the delivery to Lessee of a notice from Lessor that it has entered into one or more Security Documents, and upon request of Lessor, Lessee shall, during the term of such Security Documents, deliver to the holder or holders of all Security Documents a copy of all notices to Lessor and shall grant to such holder or holders the right to cure all defaults, if any, of Lessor hereunder within the same time period provided in this Lease for curing such defaults by Lessor and, except with the prior written consent of the holder of the Security Documents, shall not (i) amend this Lease, (ii) surrender or terminate this Lease except pursuant to a right to terminate expressly set forth in this Lease or (iii) pay any Rent or installment thereof more than one (1) month in advance, except for the payments of the Lessee's Estimated Additional Rent, or pay any Rent or installment thereof or other amounts payable hereunder other than in strict accordance with the terms hereof or of the Security Documents. The provisions of this Section shall be self-operative and shall not require further agreement by Lessee; however, at the request of Lessor, the holder of any Security Document or the successor in interest of Lessor pursuant to such Security Document (whether by foreclosure or conveyance in lieu of foreclosure or otherwise), Lessee shall execute such further documents (including, without limitation, attornment agreements) as may be required or desirable to evidence and set forth for the benefit of the holder of any Security Documents or such successor in interest pursuant thereto the obligations of Lessee hereunder (provided that Lessor shall request that such holder of any Security Document or successor in interest of Lessor accommodate such revisions as Lessee may reasonably request to such documents). At any time and from time to time upon not less than ten (10) business days prior written notice by Lessor, Lessee shall furnish a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications), and stating whether or not to the best knowledge of Lessee, Lessor is in default in the keeping, observance or performance of any covenant, agreement, term, provision or condition contained in this Lease and, if so, specifying each such default of which Lessee may have knowledge, it being intended that any such statement may be relied upon by any prospective purchaser, lessee, mortgagee or assignee of any mortgage or of the Building or Land or Property or Lessor's interest therein.

## 45.   LEGAL INTERPRETATION AND CONSTRUCTION

No oral agreements have been made. This Lease and the rights and obligations of the parties hereto shall be interpreted, construed and enforced in accordance with the laws of the State of Texas. The determination that one or more provisions of this Lease is invalid, void, illegal or unenforceable shall not affect or invalidate the remainder. All obligations of either party requiring any performance after the expiration of the Term shall survive the expiration of the Term and shall be enforceable in accordance with those provisions pertaining thereto. If the rights of the Lessee hereunder are owned by two or more parties, such parties shall be jointly and severally liable for the obligations of Lessee hereunder. Section titles are for convenient reference only and shall not be used to interpret or limit the meaning of any provision of this Lease. If any clause or provision of this Lease is illegal, invalid, or unenforceable, under present or future laws effective during the Term hereof, then it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties that in lieu of each clause or provision that is illegal, invalid or unenforceable, there shall be added as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable. Notwithstanding anything to the contrary, all agreements between Lessee and Lessor are hereby limited so that in no event shall any interest or late charges or other sums paid, or agreed to be paid, to Lessor for the use,

6.29.06

forbearance or detention of money or otherwise under applicable law deemed to be interest exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever, fulfillment of any provision hereof shall involve transcending the limit of validity prescribed by law, then _ipso facto_, the obligation to be fulfilled shall be reduced to the limit of such validity; and all sums paid or agreed to be paid to Lessor for the use, forbearance or detention of money shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of any such indebtedness until payment in full so that the rate of interest on account of such indebtedness is uniform throughout the full term thereof. The parties specifically agree that no provision of this Lease or the Rules and Regulations or any other Exhibit hereto shall be construed in any manner as to violate the Americans with Disabilities Act of 1990 (the "**ADA**"), and neither party has any intent, and disclaims any intent, to violate the ADA, and no activities of the Lessor or Lessee otherwise prohibited by this Lease or the Rules and Regulations or any other Exhibit hereto shall be prohibited to the extent such prohibition is construed as a violation of the ADA.

The parties acknowledge that each party and its counsel have reviewed and revised, or have had an opportunity to review and revise, this Lease and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any amendments or exhibits hereto.

46.    **ENTIRE AGREEMENT**

No oral statements or prior written material not specifically incorporated herein shall be of any force or effect. Lessee agrees that in entering into and taking this Lease, it relies solely upon the representations and agreements contained in this Lease and no others. This Lease includes Exhibit "A" (only if a Work Letter Agreement is attached hereto and signed by Lessor), Attachment A-1, Exhibit "B", Exhibit "B-1", Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F", Exhibit "G" ~~and Exhibit "H"~~ (which are attached and form a part hereof) all of which constitutes the whole agreement of the parties and shall in no way be conditioned, modified or supplemented except by a written agreement executed by both parties.

47.    **LENDER REQUESTS**

If, in connection with any financing or refinancing for the Building or with any ground or underlying lease, the lender, Lessor, or financier shall request reasonable modifications in this Lease, Lessee will not unreasonably withhold, delay, or defer its consent thereto, provided that such modifications do not change the location of the Premises, increase the Rent or other obligations of Lessee hereunder, materially interfere with Lessee's use or occupancy of the Premises or materially adversely affect the leasehold interest hereby created or Lessee's use of the Premises.

48.    **ESTOPPEL LETTERS**

Lessor and Lessee will, at such time or times as either of them request (but in no event later than ten (10) business days after written request), execute and acknowledge a certificate stating the Commencement Date and expiration date, whether this Lease is in full force and effect, whether any amendments or modifications exist, whether there are any defaults hereunder known to the party signing same, and containing such other related information as may be reasonably requested.

49.    **RIGHT TO RELOCATE LESSEE**

At any time after the execution of this Lease, upon at least one hundred twenty (120) days' prior written notice (the "**Relocation Notice**"), Lessor may require Lessee to move from the Premises to a New Premises (as hereafter defined) of comparable size and configuration (and comparable quality improvements) to the Premises in order to permit Lessor to consolidate the Premises or part thereof with other adjoining space leased or to be leased to another party or tenant, in which event Lessor shall substitute for the Premises other premises (the "**New Premises**") in the Building. In such event, this Lease and each and all of the terms, covenants and conditions hereof shall remain in full force and effect and thereupon be deemed applicable to such New Premises, and the New Premises shall be deemed to be the Premises

for all purposes hereunder, provided (a) the Base Rent and Lessee's Estimated Additional Rent payable under this Lease shall remain the same on a per square foot of Rentable Area basis and Lessee's Share shall be appropriately adjusted (except that in no event shall there be an increase in the amount Base Rent and/or Additional Rent payable by Lessee as a result of the relocation to the New Premises); and (b) Lessor shall reimburse Lessee for the cost of the move and all other reasonable, documented out-of-pocket costs Lessee incurs as a result of the relocation including, without limitation, the cost of relocating Lessee's data and telecommunications cabling and up to a six (6) month supply of stationary. Lessee shall move to the New Premises on the date specified in the Relocation Notice. If Lessee shall not desire to so relocate, then Lessee shall so notify Lessor in writing within thirty (30) days after Lessee's receipt of the Relocation Notice, whereupon Lessor may terminate this Agreement effective on the date specified in the Relocation Notice by delivering notice of termination to Lessee. Lessor shall not be liable for any damages which Lessee suffers due to such termination. There shall be no abatement of any Rent payable hereunder on account of Lessee's relocation or any inconvenience or business loss which may be caused to Lessee thereby. As to any relocation of Lessee to the New Premises, such New Premises shall be substantially as suitable as the Premises for the conduct of Lessee's business, and such New Premises and the Premises shall be concurrently available to Lessee as necessary to provide for the continuity in Lessee's business and to permit relocation of Lessee's equipment and facilities with minimum interruption in such business. All reimbursements to Lessee shall be made within thirty (30) days of Lessor's receipt of the invoices therefor.

50.    **KEYS AND LOCKS**

Lessor agrees to furnish to Lessee 76 keys to the Premises and 76 Building access cards at no additional cost or expense.

Additional keys and Building access cards will be furnished at a charge by Lessor on an order signed by Lessee or Lessee's authorized representative, if approved by Lessor. All such keys and Building access cards shall remain the property of Lessor. No additional locks shall be allowed on any exterior door of the Premises without the written permission of Lessor, and Lessee shall not make or permit to be made any duplicate keys of the Premises, except those furnished by Lessor. Upon expiration or termination of this Lease, Lessee shall surrender all keys to the Premises and any other Building areas and all Building access cards and Building access cards, and give to Lessor the explanation of the combination of all locks for safes, safe cabinets, and vault doors, if any, in the Premises.

51.    **GRAPHICS**

Lessor agrees, at its sole cost and expense, to initially provide and install letters or numerals on the entrance door to the Premises, and one (1) directory strip on the Building Directory in the lobby. All such letters and numerals shall be in the Building Standard graphics, and no other shall be permitted on or within the Premises, unless otherwise expressly provided for herein or consented to by Lessor in writing. In no event shall Lessee place any signs of any kind or nature, symbol or identifying mark in the halls, elevators, staircases, entrances or parking areas or anywhere on the Property without the prior written approval of Lessor.

52.    **PARKING**

The Parking Rent shall be as set forth in Exhibit "D". Lessor may employ a system for vehicle identification using stickers, license numbers or any other method Lessor may select, and Lessee understands and agrees that any vehicle parked in the Garage or restricted parking areas and which does not comply with the Lessor's system of vehicle identification then in effect, or which may be located in a designated visitor, special purpose, reserved, or prohibited parking area (within or outside the Garage), or improperly parked (such as, by way of illustration but without limitation, parked in or across more than one designated parking space), shall be subject to removal without prior notice at the expense of the owner thereof.

Lessor may, from time to time, change public parking rates. Lessor may designate the portion or portions of the Garage to be used for public parking. Lessor may install or permit installation of an automatic electronic card or key