reading system or similar system to control access to any portion or portions of the Garage containing the reserved parking spaces for another lessee or lessees. Lessor may physically separate the reserved parking spaces of another lessee or lessees from the spaces located in the Garage and available for use by Lessee and others. In the case of unreserved parking spaces, no specific spaces in the Garage are to be assigned to Lessee, but Lessor may, at Lessor's option, issue to Lessee parking stickers, each of which will authorize the parking in the Garage of a vehicle on which the sticker is displayed, or Lessor may provide a reasonable alternative means of identifying and controlling vehicles authorized to be parked in the Garage. Lessor may reserve or restrict areas of the Garage and space within the Garage to use or access by a particular lessee or lessees or their respective personnel, agents, employees, guests or invitees to the exclusion of Lessee and its personnel, agents, employees, contractors, guests or invitees. Lessee shall comply with all directives of Lessor consistent with the terms of this Lease, and Lessee shall cause and be responsible for compliance by its officers, employees and agents therewith. Lessee understands and agrees that Lessor shall not be liable for any losses sustained by Lessee, its employees, or others, from the theft of, or for damage to, any vehicle or other equipment (including any contents thereof) while located in the Garage or the covered or uncovered parking areas or upon the drives and service areas appurtenant to the Building.

Lessee shall comply and shall use commercially reasonable efforts to cause its employees using the parking spaces subject hereto to comply with all traffic, security, safety and other rules and regulations promulgated from time to time by Lessor and with all laws, statutes, ordinances and other governmental rules, regulations or requirements now or hereafter in force with respect to any use or occupancy of the Garage, the covered or uncovered parking areas, or the drives and service areas appurtenant to the Building. Lessee shall indemnify, defend and hold harmless Lessor, the operator of the Garage, and the owners of the Garage and their respective personnel, agents, employees, contractors and representatives from and against all claims, losses, liabilities, damages, costs and expenses (including, but not limited to, attorneys' fees and court costs) arising or alleged to arise out of Lessee's use of the Garage, parking areas, drives, service areas, and any such parking spaces or their use by Lessee's personnel, agents, employees, or contractors.

**EXCEPT FOR THE CLAIMS, RIGHTS OF RECOVERY AND CAUSES OF ACTION THAT LESSOR HAS RELEASED AND WAIVED PURSUANT TO SECTION 25 HEREOF, AND EXCEPT TO THE EXTENT (BUT ONLY TO THE EXTENT THAT) INJURY, DEATH OR PROPERTY DAMAGE IS HELD TO BE ATTRIBUTED TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LESSOR, THE FOREGOING INDEMNITY IS INTENDED TO INDEMNIFY LESSOR AGAINST THE CONSEQUENCES OF ITS STRICT LIABILITY, OR ITS SOLE OR CONTRIBUTORY OR CONCURRENT NEGLIGENCE,**

53.    **FORCE MAJEURE**

In the event either party shall be delayed, hindered, or prevented from the performance of any act required hereunder (excluding, however, the payment of money) by reason of acts of God, strikes, lock-outs, labor disputes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other cause not within the control of the party, then the performance of such acts shall be excused for the period of delay and the period for performance of any such act shall be extended for a period equivalent to the period of such delay.

54.    **BROKERS**

Lessee and Lessor each warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, except the Broker, if any, who is specifically named below in this paragraph, and each party expressly agrees and covenants to defend and hold the other party harmless from any claims, threatened or asserted, by any broker, finder or agent claiming under or through Lessee or Lessor in connection with the negotiation and execution of the Lease. Any broker or finder specified to be paid by Lessor shall be paid by Lessor only in such amount(s) and at such time(s) as shall be agreed upon in writing by Lessor and such broker or finder. Payment of any broker or finder claiming through Lessee shall, except as set forth in the immediately preceding sentence, be the sole responsibility of Lessee. The brokerage firm(s) involved in this Lease transaction are as follows:

Broker representing Lessor:          Transwestern Commercial Services

1900 Post Oak Blvd., Suite 1300, Houston, Texas 77056

Broker designated by Lessee
as being the sole Broker and
Agent representing Lessee
with respect to this Lease:

CB Richard Ellis
1100 Louisiana, Suite 1600, Houston, Texas 77002

Compensation for the consummation of this Lease is covered by separate agreement(s) with the Lessor and the above mentioned parties, and payment of any such compensation shall be conditioned as set forth in such separate agreement(s).

## 55.   DOLLARS

As used in this Lease, the symbol "$" (or the word "dollars") shall mean United States dollars, the lawful currency of the United States.

## 56.   AUTHORITY

Lessee warrants and represents unto Lessor that (a) Lessee is a duly organized and existing legal entity, in good standing in the state of Texas, and if a corporation, is named as a corporation in the first paragraph of this Lease and on the signature page and is in good standing and duly qualified and registered to do business in Texas, (b) Lessee has full right and authority to execute, deliver and perform this Lease, and (c) the person executing this Lease on behalf of Lessee was authorized to do so.

## 57.   RECORDING

Neither this Lease (including any Exhibit hereto) nor any memorandum hereof shall be recorded without the prior written consent of Lessor.

## 58.   INCORPORATION BY REFERENCE

All Exhibits and written addenda hereto are incorporated herein for any and all purposes.

## 59.   MULTIPLE COUNTERPARTS

This Lease may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one instrument.

## 60.   ACKNOWLEDGMENT

EXCEPT AS OTHERWISE PROVIDED FOR HEREIN, LESSEE ACKNOWLEDGES THAT LESSOR HAS MADE NO WARRANTIES TO LESSEE AS TO THE CONDITION OF THE PREMISES, EITHER EXPRESSED OR IMPLIED, AND LESSOR AND LESSEE EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR LESSEE'S INTENDED COMMERCIAL PURPOSE, AND LESSEE'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LESSOR OF ITS OBLIGATIONS HEREUNDER, AND LESSEE SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, SET OFF, OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LESSOR OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

## 61.   TERMINATION OPTION

Conditioned upon this Lease being in good standing and there occurring no uncured Act of Default by Lessee, Lessee shall have, at its option, to be exercised by written notice (the "**Termination Notice**") delivered to Lessor at least nine (9) months prior to the "Early Termination Date" (as hereinafter defined), the right to terminate this Lease as of the Early Termination Date defined below, further conditioned upon the following:

(a)     Lessee shall have delivered to Lessor on or before nine (9) months prior to the Early Termination Date, (i) written notice of its exercise of its option to terminate this Lease, and such written notice shall be irrevocable once given and (ii) a Termination Payment in cash in the amount specified below in cash accompanying said written notice. The notice will not be effective unless timely given and accompanied by the Termination Payment. Time is of the essence.

(b)     Lessee shall have paid to Lessor on or before the Early Termination Date, (i) all Rent due hereunder accrued through the Early Termination Date, and (ii) the Termination which shall be in an amount equal to the unamortized balance of the Leasehold Improvement costs, legal fees and real estate commissions incurred by Lessor in connection with this Lease, plus three (3) months rent. The calculation of Lessor's then-unamortized costs will made by (a) taking the total of all such costs as of the Commencement Date, (b) fully amortizing such amount at eight percent (8%) interest per annum from the Commencement Date through the scheduled end of the Term to establish a monthly payment therefor, and (c) calculating the remaining principal balance of such amortized amount as of the Early Termination Date. The Termination Payment shall be in the amount specified in the Commencement Date Memorandum.

(c)     The **Early Termination Date** shall be the last day of the 38th month following the Commencement Date of the Lease.

Upon Lessee's timely compliance with the above conditions, all and singular, this Lease shall terminate as if the date originally provided for expiration of the Term had been the Early Termination Date set forth above. Should Lessee fail to timely exercise its option hereunder, this Lease shall continue in full force and effect and Lessee's rights as set forth in this section shall become void. Time is of the essence with respect to the conditions in subsections (a) through (c) above. If Lessee exercises its option and then Lessor does not receive the Termination Payment on or before the Early Termination Date, then Lessor may either refuse to accept the Termination Payment whereupon this Lease shall not terminate under this section, or Lessor may terminate the Lease and bring suit against Lessee for the payment of the Termination Payment and all past due Rent and other charges under this Lease.

If Lessee exercises its right to terminate this Lease as provided for in this section and then Lessor does not receive when due all Rent accrued through the Early Termination Date, then Lessor at its option may elect to either nullify the termination of the Lease whereupon this Lease shall not terminate as provided for under this section, or Lessor may terminate the Lease and bring suit against Lessee for the payment of all such Rent accrued through the Early Termination Date which remains unpaid on the Early Termination Date as well as the Termination Payment, or Lessor may pursue any other or additional remedies provided for in this Lease or under law or in equity.

If Lessee exercises its right to terminate this Lease as provided for in this section, Lessee shall on or before the Early Termination Date vacate the Premises and deliver the Premises to Lessor in the condition provided for under the Lease as if the Early Termination Date was the expiration date of the Term of the Lease, together with all keys and access cards. Lessee acknowledges that time is of the essence hereunder, and if Lessee exercises its option for early termination of this Lease and then fails to timely vacate the Premises and deliver the Premises to Lessor on or before the Early Termination Date, then Lessee shall be deemed to be a holdover tenant hereunder, being a tenant-at-sufferance of Lessor, pursuant to the provisions of Section 35 of the Lease. Lessee shall execute a written acknowledgment of the termination of the Term of the Lease within ten (10) business days after Lessor furnishes the termination acknowledgment to Lessee.

62.    **RIGHT OF FIRST REFUSAL**

Subject to then-existing renewal or expansion options or preferential rights of other tenants, and provided that at least twenty-four (24) months are remaining on the then-existing initial Term or Renewal Term (if the Renewal Option provided for in Exhibit F to this Lease has been timely exercised), and further provided no Act of Default then exists and the Lease is in good standing and Lessee or an Affiliate is in possession and occupancy of the Premises, Lessee shall have the Right of First Refusal to lease the vacant space on Lessee's floor (the "**Offer Space**) which is contiguous to the Premises, in an "**AS-IS**" condition; and in this regard, if and when Lessor intends to enter into a lease of the Offer Space, Lessor will deliver to Lessee a written statement (the "**Offer Notice**") which will reflect Lessor's proposed agreement with the prospective tenant with respect to rent, term, finish allowances, parking rent, a description of the Offer Space and the intended delivery date (the "**ROFR Delivery Date**") of the applicable Offer Space. Lessee shall notify Lessor in writing (the "**Lessee's Acceptance Notice**") whether Lessee elects to lease the entire Offer Space upon the financial terms and for the length of the proposed term of lease set forth in the Offer Notice, within five (5) days after Lessor delivers to Lessee the Offer Notice. The Lessee's Acceptance Notice must be an unconditional acceptance of the terms set forth in the Offer Notice, or the Lessee's Acceptance Notice shall not be effective. Notwithstanding the foregoing, if prior to Lessor's delivery to Lessee of the Offer Notice, Lessor has received an offer to lease all or part of the Offer Space from a third party (a "**Third Party Offer**") and such Third Party Offer includes space in excess of the Offer Space, Lessee must exercise its rights hereunder, if at all, as to all of the space contained in the Third Party Offer. If Lessee timely and effectively elects to lease the Offer Space, then Lessor and Lessee shall promptly (within fifteen days after the receipt by Lessor of the Lessee's Acceptance Notice) execute an amendment to this Lease, effective as of the date the Offer Space is to be included in the Premises, on the same terms as this Lease except as otherwise provided for in the Offer Notice. Failure of Lessee to timely execute and deliver to Lessor the Lease amendment aforesaid shall be an Act of Default by Lessee and shall, at Lessor's option, cumulative and in addition to Lessor's remedies set forth in the Lease and under law and equity, cause the Right of First Refusal of Lessee to be null and void and of no further force or effect.

If Lessee fails or is unable to timely exercise its right hereunder, then such right shall lapse, time being of the essence with respect to the exercise thereof, and Lessor may lease the Offer Space to third parties on such terms as Lessor may elect.

This Lease is hereby executed as of the date first above set forth.

| LESSEE: | LESSOR: |
|---|---|
| **NEW CENTURY MORTGAGE CORPORATION** | **COVENTRY FUND X, LTD., a Texas limited partnership** |
| a California corporation | By: **COVENTRY 2RW, L.L.C., a Texas limited liability company, its general partner** |

By: _____ 6-28-06
Name: Tommaso Trinchieri
Title: AVP, Corporate Real Estate
Corporate Services

By: _____
Name: A.L. DENISON
Title: MANAGER

EXHIBIT A

to

LEASE BETWEEN

**COVENTRY FUND X, LTD.**, as Lessor

and

**NEW CENTURY MORTGAGE CORPORATION**, as Lessee

WORK LETTER AGREEMENT

**COVENTRY FUND X, LTD., a Texas limited partnership** (hereinafter called "**Lessor**") and **NEW CENTURY MORTGAGE CORPORATION** (hereinafter called "**Lessee**") are executing simultaneously with this Work Letter Agreement, a written Lease Agreement (hereinafter called the "**Lease**") covering approximately 12,818 square feet of Rentable Area on the 6th floor (hereinafter called the "**Premises**" or "**Leased Premises**"), in the Building known as Two Riverway (hereinafter called "**the Building**") located in Houston, Harris County, Texas.

In consideration of the mutual covenants hereinafter contained, Lessor and Lessee mutually agree as follows:

1. **THE DESIGN AND CONSTRUCTION OF LEASEHOLD IMPROVEMENTS IN AND ABOUT THE LEASED PREMISES SHALL BE SUBJECT TO AND IN ACCORDANCE WITH:**

    (a)    this Work Letter Agreement; and

    (b)    the Construction Documents; and

    (c)    the Construction Cost Summary; and

    (d)    the Lease.

2. **DEFINITIONS:**

    (a)    <u>Architect</u>. The Architect shall be selected by Lessor, for the preparation of Lessee's Space Plans and Construction Documents. The Architect may be replaced from time to time by Lessor upon written notice to Lessee.

    (b)    <u>Architects' Fees</u>. The Architects' Fees are all costs and expenses charged by or through the Architect and Engineers for the design, Construction Documents, and preparation of all plans, specifications, drawings and cost estimates in connection with, and supervision and review of, the Work, including, without limitation, all reimbursables charged by or through such parties.

    (c)    <u>Building Standard Improvements</u>. Building Standard Improvements are the improvement materials specified on Attachment A-1 to the Lease Agreement.

(d)    <u>Change Order</u>. A Change Order shall be a written order that changes the scope of the Work, that sets forth the total costs or reduction of costs, as the case may be, for the change, the net change in the Contract Sum, which is approved by Lessor and Lessee, all in accordance with Paragraph 4 below.

(e)    <u>Contract Sum</u>. The Contract Sum is the amount set forth in the Construction Cost Summary for completion of the Work (including, without limitation, all sales and similar taxes), subject to adjustments based upon authorized Change Orders, and shall specifically include any and all Architects' Fees (except only any fee charged by the Architect for the Initial Space Plan as provided for in Section 3(a) herein). The Contract Sum shall also include all applicable sales and similar taxes.

(f)    <u>Construction Documents</u>. Construction Documents are all drawings, plans, and specifications signed and agreed upon by Lessor and Lessee, and other items necessary to compose a complete project manual, all in completed detail and in finished form for all Leasehold Improvements and shall include all necessary structural, mechanical, electrical and plumbing documentation, (including without limitation, the documentation necessary for the heating, ventilation and air-conditioning system) and interior design drawings and specifications.

(g)    <u>Engineers</u>. The Engineers are all engineers, consultants, and other advisors hired by, through, or in connection with the Architect for the design, preparation, analysis, testing, and supervision of the Construction Documents preparation and the Work. The Engineers shall be selected by, and may from time to time be replaced by, Lessor.

(h)    <u>Existing or "As Is" Condition</u>. The Existing or "As Is" Condition shall be that condition of the Premises (whether improved or unimproved and regardless of the extent said Premises is improved or unimproved) as exists on the Lease Signing Date.

(i)    <u>General Contractor</u>. The General Contractor is the party selected and contracted by Lessor to perform the Work for the construction and installation of the Leasehold Improvements.

(j)    <u>Leasehold Improvements</u>. The Leasehold Improvements are all improvements and fixtures, as set forth in the Construction Documents, to be located within the Premises and such other improvements and fixtures to be located outside the Premises, if any, but excluding the furniture and moveable personal property of Lessee. The Leasehold Improvements may be changed from time to time by means of a Change Order, if Lessor approves of a change.

(k)    <u>Lessee's Representative</u>. The Lessee's Representative shall be designated by Lessee at or prior to Lease Signing Date as its consultant and authorized representative to coordinate Construction Documents and the installation of Leasehold Improvements with Lessor's Representative. Lessee's Representative may be replaced by Lessee from time to time upon advance written notice to Lessor and Lessor's Representative. Any fees, costs and expenses of Lessee's Representative shall be paid for by Lessee and Lessee shall be responsible for all acts, omissions and delays of Lessee's Representative.

(l)    <u>Lessor's Representative</u>. The Lessor's Representative will be designated by Lessor as its supervisor, consultant and authorized representative to coordinate Construction Documents and the installation of Leasehold Improvements between the Architect and Engineers, General Contractor, Lessee and Lessor. All inquiries or instructions pertaining to the Work shall be

directed to Lessor's Representative. Lessor's Representative may be replaced by Lessor from time to time upon written notice to Lessee.

(m)    <u>Space Plan</u>. Space Plan shall mean the plans and specifications showing (i) the location, size and type of all partitions, (ii) location and types of all doors, and (iii) base Building modifications, if approved by Lessor in Lessor's sole discretion. At Lessee's request, option, and cost, the Space Plan may show additional information, but the same shall not change the obligations of Lessor or cause any delay.

(n)    <u>Special Leasehold Improvements</u>. The Special Leasehold Improvements shall be defined as all improvements and fixtures, specified on the Construction Documents, that are not Building Standard Improvements.

(o)    <u>Work</u>. The Work shall mean and include all labor, materials, equipment, services and other items necessary to complete the Leasehold Improvements. Work shall not include or cover the procurement or installation of furniture or personal property, which shall be the sole responsibility of Lessee.

3.    **PREPARATION OF SPACE PLANS AND CONSTRUCTION DOCUMENTS.**

(a)    Lessor shall designate an Architect responsible for the preparation of Lessee's first Space Plan (the **"Initial Space Plan"**); provided, however, said Initial Space Plan shall include and depict Building Standard Improvements only. The Lessee shall promptly and timely provide the Architect with sufficient information to enable the Architect to prepare the Initial Space Plan on or before three (3) days after the Lease Signing Date. The Architects' Fees incurred for the preparation of said Initial Space Plan shall be borne by Lessor and shall not be included in the Contract Sum for completion of Leasehold Improvements.

(b)    Except as otherwise specified in Section 3(a) herein, all costs, expenses and fees incurred by Lessor pertinent to the preparation of Lessee's Space Plan and revisions thereof and Construction Documents, including, without limitation, revisions and modification to the Initial Space Plan, additional or alternative Space Plans, preparation of architectural, mechanical, electrical and plumbing plans and specifications (including also any changes to the base plans subsequent to Lessee's execution and approval), interior designer fees and other specialists' fees incurred in connection with Leasehold Improvement and Special Leasehold Improvements, and all permits required to commence and complete the installation of Leasehold Improvements and Special Leasehold Improvements, and all sales and similar taxes, shall be deemed a Leasehold Improvement cost and shall be included in the Contract Sum reflecting the total cost to design, construct and complete all Leasehold Improvements. Lessee shall at its expense provide Lessor and the Architect with sufficient instructions and information to enable the Architect to prepare, revise and complete the Space Plan on or before seven (7) days after the Lease Signing Date.

(c)    Lessee shall promptly and without delay provide Lessor's designated Architect all information pertinent to all Building Standard Improvements, in such detail and showing such items as Lessor may require, for the preparation of architectural, electrical and mechanical drawings and specifications including, without limitation, the following:

1.    desired location of partitions

2.    desired location of all doors

-Exhibit A-

3.    desired color of Building Standard carpet or vinyl tile

4.    desired location of light switches

5.    desired location of all Building Standard electrical and telephone outlets

6.    keying schedule for all hardware desired

7.    location of all hardware (locks, closers, etc.)

(d)    In addition to information required for Building Standard Improvements, Lessee shall provide Lessor's designated Architect all information pertinent to Lessee's Special Leasehold Improvements in such detail and showing such items as Lessor may require, for the preparation of Construction Documents; including, without limitation, the following:

1.    all millwork, cabinetry, and moldings

2.    built-in furniture or equipment

3.    special ceiling treatments

4.    internal staircases

5.    special flooring

6.    special window treatments and coverings

7.    reinforced walls for high security areas (e.g., vaults)

8.    kitchen planning, including kitchen equipment specifications

9.    wet bars, sinks and other improvements requiring water supply or drain

10.    executive restrooms

11.    special wallcovering materials

12.    special light fixtures

13.    special electrical outlets and other electrical requirements

14.    security system devices

15.    music or intercom systems

16.    special or auxiliary heating/air conditioning equipment

17.    special sound insulating treatment

-Exhibit A-

Page 4 of  10

18.     special requirements for data processing or communications equipment

19.     glass panels and windows

20.     selection of furniture and accessories

21.     special graphics

(e)     Subject to the conditions set forth herein, Lessor shall coordinate the preparation of Construction Documents and the installation of Leasehold Improvements, with the duties and responsibilities of Lessor's Representative being limited to those set forth on attached Schedule B. Lessee shall pay to Lessor a fee of five percent (5%) of the Contract Sum (the "**Lessor's Coordination Fee**") for the coordination by Lessor's Representative of the construction of the Leasehold Improvements. The Lessor Coordination Fee shall be deemed a Leasehold Improvement cost and shall be included in the Contract Sum reflecting the total cost to design, construct and complete all Leasehold Improvements. Lessor is granted the right to pay the Lessor Coordination Fee from the Leasehold Improvement Allowance.

(f)     All Space Plans and Construction Documents, together with the construction and installation of any and all Leasehold Improvements, are expressly subject to Lessor's prior written approval, provided, however, Lessor reserves the right to employ (as a Leasehold Improvement cost to be included in the Contract Sum) the services of Lessor's designated Architect, space planner, Engineers, consultants and construction contractors to ensure that materials and Work conform to the mechanical, electrical, structural, safety and architectural standards of the Building and Property and meet all local, State and Federal Building Codes applicable to and governing commercial office construction in the city where the Building is located.

Lessor may require such changes to the Construction Documents and installation of the Leasehold Improvements as Lessor determines to be appropriate in order to comply with the provisions of the Lease and with all applicable building and safety codes and other governmental and insurance requirements, or to maintain the quality and character of the Building and the Property, or as Lessor shall otherwise determine in its sole discretion to be appropriate.

(g)     Lessor shall notify Lessee in writing of any objections to the Space Plan, which objection shall be in reasonable detail. Reasonable grounds for objection shall include but not be limited to: (i) failure of the Space Plan to contain the information set forth in Section 2(m) hereof, or (ii) the Leasehold Improvements, if built in accordance with the Space Plan, would (a) violate any laws or regulations pertaining to the Premises or Building, (b) cause an increase in the premiums for or cancellation of any insurance covering the Building, (c) adversely affect or in any way unreasonably interfere with the mechanical, electrical, or plumbing systems of the Building, or the common areas, entrances, appearance or the structural or architectural integrity of the Building, or (d) otherwise violate any provisions of the Lease. Lessee shall satisfy such objections within five (5) days. When the objections of Lessor have been reasonably satisfied, Lessor shall issue its written approval of the Space Plan. The approval of Space Plan shall not be deemed an approval of the Construction Documents.

(h)     After the Space Plan has been approved by Lessor, the Architect shall prepare Construction Documents, which shall be delivered to Lessor and Lessee not more than fourteen (14) days after the first to occur of the Lease Signing Date or the date Lessor issues its written approval of the Space Plan. Lessor shall review the Construction Documents and notify Lessee in writing of any

-Exhibit A-

objections to the Construction Documents, and Lessee shall then have five (5) days to satisfy the objections of Lessor thereto, so that an approved set of Construction Documents can be achieved on or before thirty (30) days after the first to occur of the Lease Signing Date or the date Lessor issued its written approval of the Space Plan. Upon the receipt of the Construction Documents and any revisions thereto, Lessor shall promptly and diligently, using its best efforts, review the same and notify Lessee in writing of any objections thereto, which objections shall be in reasonable detail. Reasonable grounds for objection shall include but not be limited to: (i) a deviation of the Construction Documents from the approved Space Plan, (ii) the failure of the Construction Documents to satisfy the criteria set forth for the approval of the Space Plan, (iii) the failure of the Construction Documents to reflect detail sufficient to allow the Work to be bid or priced and completed in a timely manner, or (iv) the Leasehold Improvements, if built in accordance with the Construction Documents, would (a) violate any laws or regulations pertaining to the Premises or Building, (b) cause an increase in the premiums for or cancellation of any insurance covering the Building, (c) adversely affect or in any way interfere with the mechanical, electrical, or plumbing systems of the Building, or the common areas, entrances, appearance or the structural or architectural integrity of the Building, or (d) otherwise violate any provisions of the Lease. Lessee shall satisfy such objections with five (5) days. When the objections of Lessor have been satisfied, Lessor shall issue its written approval of the Construction Documents. Lessor's approval of plans, specifications, drawings and the Construction Documents shall create no responsibility or liability on the part of Lessor for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities.Lessor shall be obligated to identify which, if any, of Lessee's Special Leasehold Improvements included within the Work under this Exhibit A will require the additional charge for janitorial services, at the time Lessor approves the plans therefor.

(i)    After the Construction Documents have been approved, Lessor shall require that the General Contractor review said Construction Documents and deliver to Lessor and Lessee the Construction Cost Summary stating the Contract Sum to perform the Work specified in said Construction Documents. Lessee will promptly review the same and approve or modify the Leasehold Improvement requirements so that an approved Contract Sum will be achieved on or before seven (7) days after the Lessor or General Contractor sends to Lessee the Construction Cost Summary.

## 4.   COMMENCEMENT AND COMPLETION OF THE WORK.

(a)    Upon Lessor's and Lessee's written approval of the Construction Documents and Contract Sum, Lessor shall cause the General Contractor to commence and complete the Work within or about the Premises in substantial compliance with the Construction Documents, such that on completion of the Work the Premises will be in good operating condition. Neither Lessor nor Lessee shall be responsible for violations of the building code as to the Work, as Lessor and Lessee take the position that such is the responsibility of the Architect and/or General Contractor, since the General Contractor is to obtain the building permit and the certificate of occupancy. Lessee's obligation with regard to maintenance of the Premises shall not include the correction of building code violations, if any, as to the Building or the Premises existing as of the Commencement Date of the Lease.

(b)    Lessee may request changes in the Work both before and during the construction of the same; however, Lessee shall be responsible for all costs relating to such changes, including, without limitation, Architects' Fees, increases in the Contract Sum, and the consequences of any delay

resulting from such changes.  Any and all changes by Lessee must be accomplished through Change Orders.

(c)     All Change Orders must be submitted to and are subject to the approval in writing by Lessor, which approval will not be unreasonably withheld or delayed.  If Lessor fails to give its disapproval of the Change Order (together with specific reasons of the disapproval) within five (5) days following receipt of the requested written Change Order, then Lessor shall be deemed to have waived its right to disapprove the Change Order as submitted.

(d)     Lessee and Lessor agree that the Contract Sum will be increased or decreased by the amount of each Change Order approved by Lessor.

(e)     Unless otherwise specified, Change Orders shall be approved or rejected by Lessor and Lessee, as soon as possible with prompt and diligent attention following receipt.  Either party shall have the right to request an expedited response, in which case the other agrees to use best efforts to accommodate such request.

(f)     Lessee may request the General Contractor to expedite the completion of the Work on an overtime basis, provided Lessee submits an authorization to the Lessor's Representative. Lessee agrees that the Contract Sum will be increased by the amount of, and Lessee shall pay for, all costs and expenses associated with such overtime work.

5.      **LESSOR DELAY AND LESSEE DELAY.**

(a)     If the progress of the Work is delayed at any time by any act, neglect, delay or failure to timely comply herewith by Lessee, any of Lessee's employees, any separate contractor employed by Lessee, or by Change Orders or requested Change Orders in the Work, the delay shall constitute a Lessee Delay.  It is expressly agreed and understood that the Lease Commencement Date and Lessee's obligations under the Lease, including without limitation the obligation to pay Rent, shall not be adjusted, postponed or delayed as a result of a Lessee Delay.  Lessee Delay shall also include, without limitation, a delay in the progress of the Work as a result of Lessee's failure to promptly furnish plans and specifications or information in connection therewith, or Lessee's request for materials, finishes, or installations other than Building Standard Improvements, or any delay in securing same, or Lessee's failure to promptly and timely approve Space Plans, Construction Documents, the Contract Sum or the Construction Cost Summary, or Lessee's changes or requested changes in Space Plans, Construction Documents, or the Work after same have been approved, or any delay as a result of the performance or completion by a party employed by Lessee or its agents or contractors.

(b)     If the General Contractor is delayed at any time in the progress of the Work solely by any act or neglect of Lessor, the Lessor's Representative, or any of Lessor's employees, then the delay shall be deemed Lessor Delay.  Except as specified in Section 10 of the Lease, it is expressly understood and agreed that Lessee's sole remedy, as a result of a Lessor Delay, shall be a corresponding postponement of the Lease Commencement Date, including Lessee's obligation for the payment of Rent, for the number of days the General Contractor was delayed in the progress of the Work thereby, and such postponement shall operate as a corresponding extension of the expiration date of the Term specified in Section 3 of the Lease in order to give full effect to the stated duration of the Term.

(c)    Any claim for a delay shall be made by the claiming party to the other not more than ten (10) days after the commencement of such delay; otherwise it shall be conclusively deemed to be waived. In the event of a continuing delay, only one claim is necessary. In the event a claim for delay is based upon the failure to respond to or approve an item of the Construction Documents, there shall be no claim for delay until five (5) days following written request is made to the other party for a response.

## 6.    LEASEHOLD IMPROVEMENT ALLOWANCE.

For the purpose of calculating the costs of the Work, Lessor does hereby lease, demise and let unto Lessee, and Lessee does hereby lease from Lessor the Premises in its Existing or "As Is" Condition; provided, however, Lessor shall provide Lessee, subject to the provisions herein, a construction allowance (herein referred to as the "**Leasehold Improvement Allowance**") to be applied toward the costs of the Space Plans, Construction Documents, Architects' Fees, Leasehold Improvements, Special Leasehold Improvements, (if any), the Lessor's Coordination Fee, and the Work (hereinafter collectively referred to as the "**Leasehold Improvement Package**"). Said Leasehold Improvement Allowance shall be in an amount not to exceed $25.00 per square foot of Rentable Area comprising the initial Premises or a total Leasehold Improvement Allowance not to exceed $320,450.00. Lessor's sole financial obligation with respect to the Work under this Work Letter is the payment of the "Leasehold Improvement Allowance" as provided for herein. Lessor has not agreed to pay any other fees, costs, disbursements, or sales or other taxes, which, in the aggregate, are in excess of said Leasehold Improvement Allowance. Accordingly, where Lessor has agreed to use its "best efforts" pursuant to the provisions of this Work Letter, the same shall not be construed as requiring Lessor to expend any sums of money or otherwise make any financial commitments. There are no third party beneficiaries hereof, including, without limitation, any contractors, architects, or other third parties.

Notwithstanding anything contained herein to the contrary, Lessor agrees that the Contract Sum approved and accepted by Lessee and Lessor shall not be exceeded by more than ten percent (10%) except as mutually and reasonably agreed by Lessor and Lessee, except to the extent that: (a) Lessee submits a Change Order, (b) overtime labor is required pursuant to Section 4(f) above, or (c) Lessee Delay.

## 7.    LEASEHOLD IMPROVEMENT COSTS EXCEEDING THE LEASEHOLD IMPROVEMENT ALLOWANCE:

Upon Lessor's and Lessee's approval of the Contract Sum for completing the Work requested by Lessee, and prior to Lessor's commencement of construction, Lessee shall be credited with the Leasehold Improvement Allowance to be used as provided for herein.

In the event any revisions, changes, or substitutions are made to the Leasehold Improvement Package at Lessee's request, any and all additional costs which arise in connection with such revisions, changes or substitutions shall be considered to be an "**Over-Allowance Amount**". Within seven (7) business days after Lessor's receipt of any Lessee request for revisions, changes or substitutions to the Leasehold Improvement Package, Lessor shall notify Lessee of the estimated cost for such changes as well as the anticipated delay resulting from such changes. The Over-Allowance Amount plus the attendant Lessor's Coordination Fee relative thereto shall be paid by Lessee to Lessor, as additional Rent, within fifteen (15) days after Lessee's receipt of invoice therefor. The Over-Allowance Amount shall be disbursed by Lessor pursuant to the same procedure as the Leasehold Improvement Allowance. Notwithstanding the foregoing, Lessee may, at its option, elect to amortize up to $64,090.00 (calculated on the basis of $5.00 per Rentable Area of the Premises) of the Over-Allowance Amount on a straight-line basis over fifty-eight (58), which monthly sum shall be paid to Lessor by Lessee as additional Rent with the Monthly Base Rent during the Term without abatement.

## 8.    LESSEE'S ENTRY PRIOR TO LEASE COMMENCEMENT:

Lessor shall permit Lessee and Lessee's contractors to enter the Premises at least fourteen (14) days prior to the Commencement Date under the Lease at the same time that Lessor's contractors are working in the Premises, in order that Lessee may perform work and decorations through Lessee's own contractors, approved in advance in writing by Lessor and in a manner and upon terms and conditions and at times satisfactory to and approved in advance in writing by Lessor. The foregoing license to enter prior to the Commencement Date of the Lease is conditioned upon Lessor first approving the proposed work, decorations and Lessee's contractors, and Lessee's contractors (including subcontractors, workmen and mechanics) working in harmony and not interfering with Lessor's contractors (including subcontractors, workmen and mechanics) or any other tenant or their contractors, and not in any way delaying Lessor or Lessor's contractors.  Such license is further conditioned upon Lessee and its contractors providing and having in force insurance, in amounts and with companies and in form and content satisfactory to Lessor, being provided and at all times maintained by Lessee's contractors engaged in the performance of any work, and certificates of such insurance being furnished to Lessor prior to proceeding with the Work naming Lessor as additional insured. If, at any time, such entry shall cause disharmony or interference to Lessor's contractors or labor for any reason whatsoever, without regard to fault, to include, without limitation, strikes, work stoppages, delay, disturbance, scheduling problems, etc., this license may be immediately withdrawn by Lessor upon notice to Lessee. Such entry shall be deemed to be under all of the terms, covenants, provisions, and conditions of the Lease except as to the covenant to pay Base Rent and Additional Rent. Except to the extent (but only to the extent) that injury, death or property damage is held to be attributed to the gross negligence or willful misconduct of Lessor, Lessee shall be liable to Lessor for and shall indemnify, defend and hold harmless Lessor and Lessor's partners, venturers, agents, directors, officers, employees, invitees, tenants, and contractors, from all claims, losses, costs, damages, and expenses (including but not limited to attorney's fees) resulting or arising or alleged to result or arise from the performance of any work by or on behalf of Lessee or which may arise by reason of any matter collateral thereto, and from and against any and all claims arising from, or claimed to arise from, any negligence, act, or failure to act, or access to or presence on the Property, of Lessee, Lessee's contractors, or their respective contractors, decorators, servants, agents or employees. **EXCEPT AS SPECIFICALLY ABOVE LIMITED, THE FOREGOING INDEMNITY IS INTENDED TO INDEMNIFY LESSOR AND THE OTHER INDEMNITEES NAMED ABOVE AGAINST THE CONSEQUENCES OF THEIR NEGLIGENCE OR FAULT AND AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT OCCURRING JOINTLY OR CONCURRENTLY WITH THE NEGLIGENCE OR FAULT OF THE LESSEE, OR OF THE LESSEE'S AGENTS, EMPLOYEES, GUESTS, INVITEES, OR CONTRACTORS OR THEIR RESPECTIVE AGENTS OR EMPLOYEES OR CONTRACTORS.**

**EVEN IF CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE SOLE OR CONCURRENT NEGLIGENCE OF LESSOR OR ANY LESSOR RELATED PARTY,** during the early entry period Lessor shall not be liable in any way for injury, loss or damage which may occur to Lessee, its employees, agents, invitees, contractors, or to any of Lessee's decorations or installations, and Lessor shall not be liable in any way for or because of defective material supplied by Lessee or for Leasehold Improvements performed by Lessee or Lessee's agents or contractors, the same being solely at Lessee's risk.

9.      **MISCELLANEOUS.**

   (a)     <u>Contractor Compliance</u>.  All parties agree to use best efforts to cause the General Contractor and its subcontractors to comply with this Work Letter and the Construction Documents.  Lessor hereby assigns, without recourse upon Lessor, to Lessee jointly with Lessor the right to enforce against the issuing General Contractor all warranties and guaranties issued to Lessor by the General Contractor relating to the Leasehold Improvements, and Lessor reserves from such assignment the right to also enforce such warranties.  Lessor and Lessee each agree to use commercially reasonable efforts to assist the other in the enforcement of such warranties when necessary. This assignment is in lieu of any warranty by Lessor.

   (b)     <u>Conflicts</u>. To the extent of any irreconcilable conflicts between the terms of this Work Letter, the Lease, and the Construction Documents, the terms of the Lease shall prevail over the terms of the Work Letter, which shall prevail over the terms of the Construction Documents.

(c)      Days.  All references to days are calendar days, not working or business days.

LESSEE:

NEW CENTURY MORTGAGE CORPORATION,
a California corporation


By: _~Tommaso Trinchieri~_ 6.28.06
Name: __Tommaso Trinchieri__
Title: __AVP, Corporate Real Estate__
       Corporate Services

LESSOR:

COVENTRY FUND X, LTD., a Texas limited partnership

By:    COVENTRY 2RW, L.L.C., a Texas limited liability
      company, its general partner

By: _____
Name: __R. DENISSON__
Title: __MANAGER__


Schedule A:     Intentionally Deleted
Schedule B:     Duties of Lessor's Representative

## ATTACHMENT A-1

to

### LEASE BETWEEN

### COVENTRY FUND X, LTD., as Lessor

and

### NEW CENTURY MORTGAGE CORPORATION, as Lessee

### TWO RIVERWAY

### BUILDING STANDARD IMPROVEMENTS

**CEILINGS:** Suspended revealed Acoustical Ceiling Tile, 24" x 24", at 9'0 aff. - Armstrong, Cortgega angled tegular, No. 704A,, White Finish.

**LIGHT FIXTURE:** 2' x 4' Four Bulb Fluorescent Light Fixture with Regressed Aluminum Frame -- Provisions for Return Air - Lithonia, 2GC-44ORW-A12-LP-277V, White Finish with Black Reveal.

**LIGHT SWITCH:** Levitron #54501W 277V White

**DUPLEX OUTLET:** Levitron #5320SW 120V White

**WALL SYSTEM:** Raco, Series 375, with Headtrack and Trim, 2-1/2" Aluminum Studs. Type "A" Demising -- 5/8" Full Height Fire Rated Gypsum Board, Acoustically Insulated, Taped and Floated, Painted on Suite Side. Type "B" Interior Partition -- 5/8" Gypsum Board Taped and Floated, Painted Both Sides.

**DOORS:** Solid Core, 3'-0" x 8'-3/4". Type "A" Entry Door -- Closer and Lockset. Type "B" Interior Door -- Passage Set or Otherwise Specified Hardware.

**DOOR FRAMES:** Raco, Series 375, clear anodized silver aluminum finish, 1-1/2" x 4-1/4" x 3" x 0" x 9' x 0".

**HARDWARE:**
a) Butts - Hager 4.5"x4" Brushed Aluminum Finish.
b) Lock Sets - Corbin/Russwin No. ML2051 CSA with 6 pin cylinder No. 1000-118A02. Brushed Aluminum Finish
c) Closers - Corbin, DC6210 series with brushed aluminum finish.
d) Wall Stops - N/A (bld'g std is floor only)
e) Floor Stops - Half-moon floor stop with brushed aluminum finish and rubber insert.
f) Passage Sets - Corbin/Russwin No. ML2051 CSA with no cylinder, brushed aluminum finish.

**PAINT:** Sherwin Williams, Flat Latex, Two Coats.

**CARPET:** Patcraft "Splash" 26 oz. direct glue graphic loop.

**BASE:** Roppe, 2-1/2" Vinyl Cove Base, w/toe, color black.

**WINDOW COVERING:** Levelor, "Riviera", 1" Mini-Blind with brushed aluminum finish.

**MECHANICAL:** Perimeter Offices -- Air Supply through Agitair 4'-0" Long Continuous Slot Diffuser, Return Air through 2' x 4' Light Fixtures or 24" x 24" Return Air Grills to match Ceiling Diffusers.  Internal Offices -- Air Supply through Metalaire 24" x 24" PCS-CB-6, 8" Diameter TR Round Neck Adapter, White Enamel Finish Ceiling Diffuser, Return Air through 2' x 4' Light Fixture or 24" x 24" Return Air Grills to match Ceiling Diffusers.

**GRAPHICS:** Building Directory -- Touch Screen Directory. Entry Door Graphics -- Building Standard or as otherwise specified and approved.

**LESSOR RESERVES THE RIGHT TO SPECIFY ITEMS OF SIMILAR QUALITY AT ANY TIME, WITHOUT PRIOR NOTICE.**

## SCHEDULE B TO EXHIBIT A

to

### LEASE BETWEEN

### COVENTRY FUND X, LTD. , As Lessor,

and

### NEW CENTURY MORTGAGE CORPORATION, As Lessee

### DUTIES OF LESSOR'S REPRESENTATIVE

The Lessor's Representative will provide the following services:

(a)    The Lessor's Representative will make periodic visits to the Premises to familiarize himself generally with the progress of the Work.

(b)    The Lessor's Representative shall have authority along with Architect to reject any of the Work that in their respective reasonable judgment does not conform to the Construction Documents. To accomplish the foregoing, the rejecting party shall notify the other of such non-conforming Work, together with a reasonably detailed description thereof, and Architect shall not approve such Work until it has been corrected to the reasonable satisfaction of the Architect and the Lessor's Representative.

(c)    In addition to the responsibilities of Lessor's Representative set forth elsewhere in this Work Letter, the administration by Lessor's Representative of the Work hereunder shall include:

2.    Assist in the coordination of the Work between the contractors and with the activities and responsibilities of the Lessor's Representative, Lessor, Lessee, and Architect in an effort to complete the Work in a timely fashion.

3.    Take part in construction and progress meetings to discuss such matters as procedures, progress, problems, and scheduling.

4.    Endeavor to achieve satisfactory performance from all contractors and recommend courses of action to Lessor and Lessee when requirements of a contract are not being fulfilled and the nonperforming party will not take satisfactory corrective action.

5.    Review requests for changes, assist negotiating General Contractor's proposals.

6.    Consult with the Architect, Lessor and Lessee if any contractor requests interpretations of the meaning and intent of the Construction Documents and assist in the resolution of the questions which may arise therefrom.

7.    Assist in overseeing the development of a punch list.

8.    Assist the Architect in conducting final inspections.

9.     Assist the Architect in decisions that pertain to base building modifications.

10.    Assist in the review and approval of all Construction Documents sent to the Lessor.

11.    Assist the coordination between Lessor and Lessee necessary during the pricing of the Work.

12.    Assist in any discussions with the General Contractor, subcontractors, and/or material suppliers for the Leasehold Improvements.

13.    Assist in advising the Lessor and Lessee on key dates and activities that will affect the cost and the time of Work, and assist the Lessor and Lessee in monitoring the proposed dates regarding the selection of separate contractors, materials or otherwise relating to the Premises.

14.    Assist in the orientation of Lessee with the Building operation, management and services.

**EXHIBIT  B**

to

LEASE BETWEEN

**COVENTRY FUND X, LTD.,**
as Lessor

and

**NEW CENTURY MORTGAGE CORPORATION,**
as Lessee


_____ Square Feet Rentable Area
6th  Floor
TWO RIVERWAY
Houston, Texas

# FLOOR 6



N

EXHIBIT "B"

**EXHIBIT B-1**

to

LEASE BETWEEN

COVENTRY FUND X, LTD. , as Lessor

and

**NEW CENTURY MORTGAGE CORPORATION**, as Lessee

**PROPERTY DESCRIPTION**

## LEGAL DESCRIPTION

(TRACT 1)

Description of 5.289 acres (230,390 square feet) of land situated in the William White Survey, Abstract No.836, Harris County, Texas, and being part of Lots 6 and 7, Block D of the LEVY & GAUT SUBDIVISION, according to the plat thereof recorded in Volume 1, Page 29 of the Harris County Map Records, Harris County, Texas, said 5.289 acre tract, being that same, Tract 1, as described in a deed to Shorenstein Riverway Associates, a California Limited Partnership recorded in Harris County Clerk's File No. K870269, and being more particularly described by metes and bounds as follows: (all bearings referenced to the westerly right-of-way line of South Post Oak Lane called North 00  08' 54" West) :

BEGINNING at a 5/8-inch iron rod found at the intersection of the southerly right-of-way line of Woodway Drive (a variable width right-of-way as recorded under Volume 3664, Page 413, of the Harris County Deed Records) with the most easterly cut back line of South Post Oak Lane (a variable width right-of-way as recorded under Harris County Clerk's File No. A123279) ; said beginning point also being in a curve to the left.

THENCE, the following six courses and distances with the said southerly right-of-way line of Woodway Drive:

(1) Along the southerly right-of-way line of said Woodway Drive and along the arc of said curve to the left, having a radius of 852.00 feet, through a central angle of 7  53' 45" (the chord bears North 66  09' 04" East, a distance of 117.32 feet) an arc distance of 117.41 feet to a 5/8-inch iron rod set for the point of compound curvature of a curve to the left;

(2) Continuing along the southerly right-of-way line of said Woodway Drive and along the arc of said curve to the left, having a radius of 567.85 feet, through a central angle of 16  42' 38" (the chord bears, North 53  50' 52" East, a distance of 165.03 feet an arc distance of 165.62 feet to a 5/8-inch iron rod found for the point of tangency;

(3) North 46  41' 15" East, continuing along the southerly right-of-way line of said Woodway Drive, a distance of 81.70 feet to a 5/8-inch iron rod found for corner;

(4) North 45  44' 09" East, continuing along the southerly right-of-way line of said Woodway Drive, a distance of 67.50 feet to a 5/8-inch iron rod found for corner;

(5) North 45  41' 03" East, continuing along the southerly right-of-way line of said Woodway Drive, a distance of 65.55 feet to a 5/8-inch iron rod found for the point of curvature of a curve to the right;

(6) Continuing along the southerly right-of-way line of Woodway Drive and along the arc of said curve to the right, having a radius of 760.00 feet, through a central angle of 10° 52' 30" (the chord bears North 51  07' 18" East, a distance of 144.04 feet) an arc distance of 144.25 feet to a 5/8inch iron rod set for corner in the westerly line of a private roadway as described as Parcel "M" as recorded in Harris County Clerk's File No. K870269;

THENCE, the following six courses and distances with the said westerly line of the private roadway:

(l) South 31  33' 59" East, departing the southerly right-of-way line of said Woodway Drive, a distance of 11.24 feet to a 5/8-inch iron rod found for the point of curvature of a curve to the right;

(2) Along said curve to the right, having a radius of 109.03 feet, through a central angle of 32  00' 00" (the chord bears South 15° 33' 59" East, a distance of 60.11 feet) an arc distance of 60.89 feet to a 5/8-inch iron rod set for the point of reverse curvature of a curve to the left;

(3) Along said curve to the left, having a radius of 170.00 feet, through a central angle of 45° 00' 00" (the chord bears South 22° 03' 59", East, a distance of 130.11 feet) an arc distance of 133.52 feet to a 5/8-inch iron rod found for the point of reverse curvature of a curve to the right;

(4) Along said curve to the right, having a radius of 130.00 feet, through a central angle of 40  00' 00" (the chord bears South 24 33' 59" East, a distance of 88.93 feet; an arc distance of 90.76 feet, to a 5/8-inch iron rod found for the point of tangency;

(5) South 04  33' 59" East, for a distance of 4.00 feet to a 5/8-inch iron rod found for the point of curvature of a curve to the left;

(6) Along said curve to the left, having a radius of 170.00 feet, a central angle of 38  15' 33"(the chord bears South 23  41' 45" East, a distance of 111.42 feet) an arc distance of 113.52 feet, a to a cut "X" set for the most southerly southeast corner of this herein described tract and being the point of curvature of a non tangent curve to the left;

THENCE, the following three courses and distances with the line common to Parcel "H" as recorded in said Clerk's File No. K870269 and a certain 2,135 square foot tract as described in the exchange deed recorded in Harris County Clerk's File No. G889526:

(1) Along said curve to the left, having a radius of 25.00 feet, through a central angle of 40 36' 23" (the chord bears South 74° 14' 25" West, a distance of 17.35 feet) an arc distance of 17.72 feet, and a to a Cut "X" found for corner;

(2) South 53 56' 14" West, a distance of 58.84 feet, to a Cut "X" found for the point of curvature of a curve to the right;

(3) Along said curve to the right, having a radius of 164.00 feet, through a central angle of 00 06' 11" (the chord bears South 53 59' 20" West, a distance of 0.30 feet) an arc distance of 0.30 feet, to a Cut "X" found for corner;

THENCE, the following two courses and distances along the Northerly and Westerly line of a certain 1.5052 acre tract, described as the retained tract shown in Harris County Clerk's File No. R486803:

(1) North 89 35' 05" West, a distance of 125.72 feet to a 5/8-inch iron rod found for the point of curvature of a non-tangent curve to the right;

(2) Along said curve to the right, having a radius of 553.13 feet, through a central angle of 07 59' 44" (the chord bears South 04° 42' 42" East, a distance of 77.13 feet) an arc distance of 77.19 feet, to a Cut "X" found for the point of curvature of a non-tangent curve to the left;

THENCE, the following two courses and distances along the line common to Parcel "F" as recorded in said Clerk's File No. K870269 and a certain 1,338 square foot tract as described in the said exchange deed recorded in Harris County Clerk's File No. G889526:

(1) Along said curve to the left, having a radius of 86.00 feet, trough a central angle of 26 07' 48"(the chord bears South 22 40' 25" West, a distance of 38.88 feet) an arc distance of 39.22 feet, to a 5/8-inch iron rod found for a point of reverse curvature of a curve to the right;

(2) Along said curve to the right, having a radius of 153.00 feet, through a central angle of 21 24' 54" (the chord bears South 20 18' 58" West, a distance of 56.85 feet) an arc distance of 57.19 feet to a cut "X" set for corner;

THENCE, along a Northerly line of a certain 27.3801 acre tract as described in said Harris County Clerk's File No. R486803, South 83° 32' 33" West, a distance of 38.03 feet to a 5/8-inch iron rod found for the point of curvature of a non-tangent curve to the right;

THENCE, the following three courses and distances with the southerly and westerly line of a certain 6,650 square foot tract as described in said exchange deed recorded in Harris County Clerk's File No. G889526:

(1) Along said curve to the right having a radius of 125.00 feet, through a central angle of 41  51' 29" (the chord bears South 62  36' 49" West, a distance of 89.30 feet) an arc distance of 91.32 feet, to a cut "X" found for corner;

(2) South 83  32' 33" West, for a distance of 151.39 feet, to a PK Nail found for corner;

(3)North 06  27' 27" West, for a distance of 31.90 feet, to a 5/8-inch iron rod found for corner;

THENCE, along the North line of a certain 4.7545 acre tract as recorded in Harris County Clerk's File No. R486803 South 83  32' 33" West, for a distance of 191.61 feet to a 5/8-inch iron rod set for the most westerly southwest corner of this herein described tract in the easterly right-of-way line of the aforesaid South Post Oak Lane;

THENCE, North 00  08' 54" West, along the easterly right-of-way line of said South Post Oak Lane, a distance of 18.27 feet to a 5/8-inch iron rod found for corner;

THENCE, continuing along said easterly right-of-way line of South Post Oak Lane, North 06  07' 44" East, a distance of 100.60 feet, to a 5/8-inch iron rod set for corner;

THENCE, continuing along said easterly right-of-way line South Post Oak Lane, North 00  08' 54" West, a distance of 116.07 feet to a 5/8-inch iron rod found for a cutback corner;

THENCE, along the aforementioned cutback line of South Post Oak Lane, North 35  08' 36" East, a distance of 16.32 feet, to the POINT OF BEGINNING; and containing a computed area of 5.289 acres (230,390 square feet) of land.

(TRACT 2)

Description of 1.041 acres (45,340 square feet) of land situated in the William White Survey, Abstract No. 836, Harris County, Texas, and being part of Lots 6 and 7, Block D of the LEVY & GAUT SUBDIVISION, according to the plat thereof recorded in Volume 1, Page 29 of the Harris County Map Records, Harris County, Texas, said 1.041 acre tract, being the same called 0.8594 acre tract, Tract 2, as described in partial Warranty Deeds to Shorenstein Riverway Associates, a California Limited Partnership recorded in Harris County Clerk's File No. K870269, and being more particularly described by metes and bounds as follows: (all bearings referenced to the Westerly right-of-way line of South Post Oak Lane called North 00  08' 54" West) :

BEGINNING at a 5/8-inch iron rod set in the southerly right-of-way line of Woodway Drive (a variable width right-of-way recorded under Volume 3664, Page 413, of the Harris County Deed Records) for the most northerly northeast

corner of this herein described tract and the northwest corner of a certain 6.8631 acre tract described in a deed to WHT Real Estate Limited Partnership as recorded under Harris County Clerk's File No. P776037;

THENCE, South 00 07' 36" West, along the westerly line of said 6.8631 acre tract, a distance of 190.61 feet, to a 5/8-inch iron rod found in the south line of aforesaid Lot 7 and the north line of aforesaid Lot 6;

THENCE, South 89 35' 22" East, along the south line of said Lot 7 and north line of said Lot 6, passing at a distance of 118.52 feet a 5/8-inch iron rod set for reference on the High Bank of Buffalo Bayou, and continuing for a total distance of 240.00 feet to a point in the centerline of Buffalo Bayou;

THENCE, the following two courses and distances with the centerline meanders of Buffalo Bayou, as follows:

(1) South 24 30' 00" West, for a distance of 115.00 feet to a point for corner;

(2) South 46 25' 17" East, for a distance of 103.60 feet to a point for corner;

THENCE, South 63 20' 25" West, departing the centerline of said Buffalo Bayou for a distance of 155.00 feet to a 5/8-inch iron rod found for corner in the easterly line of a private street, Parcel "M" as described in Harris County Clerk's File No. F623211;

THENCE, the following seven courses and distances along said Easterly line of the private street:

(l) North 45 33' 59" West, for a distance of 47.93 feet to a 5/8-inch iron rod found at the point of curvature of a curve to the right;

(2) Along said curve to the right, having a radius of 130.00 feet, through a central angle of 41 00' 00" (the chord bears North 25° 03' 59" West, a distance of 91.02 feet) an arc distance of 93.03 feet, to a 5/8-inch iron rod found for the point of tangency;

(3) North 04 33' 59" West, for a distance of 4.00 feet to a 5/8-inch iron rod found at the point of curvature of a curve to the left;

(4) Along said curve to the left, having a radius of 170.00 feet, through a central angle of 40 00' 00" (the chord bears North 24 33' 59" West, a distance of 116.29 feet) an arc distance of 118.68 feet, to a 5/8-inch iron rod found for the point of reverse curvature of a curve to the right;

(5) Along said curve to the right, having a radius of 130.00 feet, through a central angle of 45 00' 00" (the chord bears North 22 03' 59" West, a distance of 99.50 feet) an arc distance of 102.10 feet, to a point on a cinder block wall for the point of reverse curvature of a curve to the left;

(6) Along said curve to the left, having a radius of 149.03 feet, a central angle of 32 00' 00" (the chord bears North 15 33' 59" West, a distance of 82.16 feet) an arc distance of 83.23 feet, to a 5/8-inch iron rod found for the point of tangency;

(7) North 31 33' 59" West, for a distance of 11.50 feet to a 5/8-inch iron rod found for corner in the south right-of-way line of the aforementioned Woodway Drive, said point being in a curve to the right;

THENCE, along the said South right-of-way line of Woodway Drive, and said curve to the right, having a radius of 760.00 feet, through a central angle of 04 59' 34" (the chord bears North 62 04' 18" East, a distance of 66.21 feet) an arc distance of 66.23 feet, to the POINT OF BEGINNING, containing a computed area of 1.041 acres 45/340 square feet of land.

(TRACT 3)

The easement estates (and all other rights, title, and interests appurtenant thereto) , insofar as such easements inure or purport to inure to the benefit of and pertain or purport to pertain to Tract I, and II created or purported to be created in Private Street Agreement filed under Harris County Clerk's File Number F623211, and amended under Harris County Clerk's File Number(s) G320627, G320629, J823999, J989642, J989643, J989444 and J989645, recorded in the Official Public Records of Real Property of Harris County, Texas, over and across those parcels of land described as Private Roadway Easements parcels D, E, G, L and M, of that Private Street Agreement

# EXHIBIT  C

to

LEASE BETWEEN

## COVENTRY FUND X, LTD. , as Lessor

and

## NEW CENTURY MORTGAGE CORPORATION, as Lessee

## BUILDING RULES AND REGULATIONS

1. Lessee will refer all contractors, contractor's representatives and installation technicians, rendering any service or work on or within the Premises for Lessee, to Lessor for Lessor's approval and supervision before performance of any such service or work. This provision shall apply to all work performed in the Building including installations of telephones, telegraph equipment, electrical devices and attachments and installation of any nature affecting the floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Building.

2. Lessee shall not at any time occupy any part of the Building as sleeping or lodging quarters.

3. Lessee shall not place, install or operate on or within the Premises or in any part of the Building, any engine, stove or machinery, or conduct mechanical operations or cook thereon or therein (other than a coffee machine and microwave), or place or use in or about the Premises any explosives, gasoline, kerosene, oil, acids, caustics or any other flammable, explosive or hazardous material without the prior written consent of Lessor.

4. Lessor will not be responsible for lost or stolen or damaged property, equipment, money or jewelry from Lessee's Premises, the Garage or parking areas, or public areas of the Building regardless of how such loss occurs and regardless of whether the Premises, Garage or Building is locked against entry or not.

5. No birds, fowl, reptiles, or animals shall be brought into or kept in or about the Premises or Building, but nothing herein shall prevent the use of seeing eye dogs or other aids for disabled persons.

6. Lessor will provide and maintain an alphabetical directory board on the ground floor lobby of the Building. No signs, advertisements or notices visible to the public shall be permitted within the Building or on the Property unless first approved in writing by Lessor, and no signs, advertisements, notices or any personal property shall be placed within the Premises which is visible to the public from the hallways of the Building or from the outside of the Building unless first approved in writing by Lessor.

7. Employees of Lessor shall not receive or carry messages or packages or any other material for or to any lessee or other person, nor contract with or render free or paid services to any of Lessee's agents, employees, contractors or invitees, without Lessor's prior written informed consent in each instance.

8. Lessor shall exercise the right of access to Lessee's offices with due regard of the needs, requirements and convenience of Lessee.

9. None of the entries, passages, doors, elevators, hallways or stairways shall be blocked or obstructed by Lessee, and Lessee shall not place, empty or throw any rubbish, litter, trash or material of any nature into these areas,

-Exhibit C-
Page 1 of 3

and Lessee shall not use such areas at any time for any purpose except for access or egress by authorized persons. Lessee's corridor doors, when not in use, shall be kept closed. Lessee shall not allow its employees or personnel, agents, contractors, guests or invitees to use any of the entries, passages, doors, elevators, hallways or stairways, or any part of the Building, for smoking cigarettes, cigars, pipes or smoking of any kind.

10.    The water closets and other water fixtures shall not be used for any purpose other than those for which they were constructed, and all costs incurred by Lessor and any damage resulting to water closets and other water fixtures from misuse, or the defacing or injury of any part of the Building, shall be borne by the lessee whose employee, agent, contractor, guests or invitees occasioned it. No employee, agent, contractor, guest or invitee of Lessee shall waste water by interfering with the faucets or otherwise.

11.    Lessee shall not disturb the occupants of the Building by the use of any musical instruments, the making of unseemly noises or other unreasonable use.

12.    No object shall be thrown out of the windows of the Building, or down the stairways or other passages, by Lessee.

13.    Lessor shall not be liable for any damages from the stoppage of elevators for necessary or desirable repairs or improvements, or delays of any sort or duration in connection with the elevator service.

14.    Lessee shall not alter any lock or install any new or additional locks or any bolts on any doors or windows of the Premises, without the prior written consent of Lessor, and without in each case providing to Lessor keys thereto, and all locks shall be subject to Lessor's key override.

15.    No furniture, freight or equipment of any kind shall be brought into the Building by Lessee without a minimum of twenty-four (24) hours prior notice to Lessor and all moving of the same by Lessee into or out of the Building shall be done at such times and in such a manner as Lessor shall designate. Lessor shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Lessor, stand on supports of such thickness as is necessary to properly distribute the weight, with the cost thereof being borne by Lessee. Lessor will not be responsible for loss of or damage to any such safe or property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of Lessee. All routine deliveries shall be made using the service elevator.

16.    Lessee shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to the Lessor or other occupants of the Building by reason of noise, odors and/or vibrations or interfere in any way with other lessees or those having business therein.

17.    Lessee shall not use any method of heating or air conditioning other than that supplied by Lessor.

18.    During the hours between the Building's Standard Hours of operations, access to the Building, or to the halls, corridors, elevators or stairways in the Building, or to the Premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified. Lessor shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of natural or manmade disaster or casualty, invasion, mob, riot, public excitement or other commotion, Lessor reserves the right to prevent access to the Building during the continuance of same by closing of the doors or otherwise.

-Exhibit C-
Page 2 of 3

19. No vending machines or similar machines shall be installed, maintained or operated within the Premises without prior written consent of Lessor.

20. Lessee shall not disturb, solicit or canvass any occupant of the Building and shall cooperate to prevent same.

21. Lessor shall have the right to control and operate the public portions of the Building, and the public facilities, and heating and air conditioning as well as facilities furnished for the common use of the lessees.

22. Lessor is not responsible to Lessee for the non-observance or violation of the Rules and Regulations by any other lessee.

23. Lessor shall have the right to prohibit advertising by Lessee which, in Lessor's opinion, tends to impair the reputation of the Building or its desirability for offices, and upon written notice from Lessor, Lessee will refrain from or discontinue such advertising. Lessee will not use the name of the Building in connection with its business or in any advertisements, excepting only as a portion of the street address of the Building.

24. Lessee shall give immediate notice to Lessor in case of theft, unauthorized solicitation or accidents in the Premises or in the Building or of defects therein or in any fixtures or equipment, or of any known emergency in the Building.

25. Lessor reserves the right to rescind and amend any Building Rules or Regulations, to add new rules or regulations, and to waive any Building Rules and Regulations with respect to any lessee or lessees.

26. Lessor shall have the right to designate the time of day Building entrances and elevators are to be used for Lessee's moving into and out of the Building. Lessor shall have the right to assign parking space(s) to Lessee, and to relocate such parking spaces now, previously or in the future assigned to Lessee.

27. All requests for overtime air conditioning must be submitted in writing to the management office by 3:00PM on the day desired for weekday requests; by 12:00 noon Friday for weekend requests; and by 12:00 noon on the previous business day for holiday requests. Lessee will be billed the then going rate for overtime air conditioning requests.

28. The building hours of operation are from 7:00AM until 6:00PM Monday through Friday, and 8:00AM to 1:00PM on Saturdays excluding holidays. Access at all other times is provided via the security card access system. Lessee will comply with all security procedures at all times.

29. Lessee shall observe 'No Smoking' in accordance with the Houston City Ordinance, in all public areas, elevators, restrooms and lobbies.

30. These Building Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the other terms, covenants, agreements and conditions of the Lease. To the extent there is any conflict between a Building Rule and Regulation and any express term or provision set forth in the Lease, the terms of the Lease will be controlling.

-Exhibit C-
Page 3 of 3

**EXHIBIT D**

to

LEASE BETWEEN

**COVENTRY FUND X, LTD.**, As Lessor,

and

**NEW CENTURY MORTGAGE CORPORATION**, As Lessee

**PARKING**

Conditioned upon the Lease being and remaining in good standing and Lessee being and remaining in possession and occupancy of the Premises and there occurring no Act of Default by Lessee, Lessor shall provide to Lessee for use (for only automobile parking) by itself or its employees, during the Term of the Lease, two (2) reserved and seventy-four (74) unreserved automobile parking spaces in the parking Garage of Two Riverway (the "Building") located in Houston, Harris County, Texas, and up to thirty-eight (38) of the said seventy-four (74) unreserved spaces may at Lessor's option be located on the top level or levels of the Garage .

Rent for said parking spaces shall be paid to Lessor by Lessee at the following rates:

(a)     $50.00 per reserved space per month for the initial Term of the Lease; and

(b)     $50.00 per unreserved space per month for the initial Term of the Lease; provided, however, parking rent in the amount of $50.00 per unreserved space per month shall be abated for 74 unreserved spaces for the initial Term of the Lease;

all (plus eight percent (8%) or the then applicable tax), payable at the same times and in the same manner as Base Rent is due under the Lease. Lessee agrees to indemnify Lessor against any claim for and Lessee shall pay any tax amount that may be or become payable to any State, Federal or City government with respect to such parking, or demanded by said authorities. Such indemnification shall survive the termination of this Lease. If the Lease Commencement Date occurs on a day other than the first (1st) day of a calendar month, Lessee shall pay Lessor on or before said Commencement Date a pro rata portion of the monthly amount of Parking Rent due for such month and, thereafter, all monthly installments of Parking Rent shall be due and payable in advance and without demand on the first day of each calendar month during the Term of the Lease. Prompt and timely payment by Lessee of the monthly Parking Rent is a condition to use by Lessee and its employees, agents and designees of the Garage. In the event Lessor fails to receive any such payment within five (5) days of the due date, Lessor may assess a late charge against the delinquency in an amount not to exceed the highest lawful rate of interest applicable hereto and, if such failure shall continue for five (5) days after Lessee's receipt of written notice from Lessor, Lessor may (i) refuse Garage access to Lessee, and its employees, and/or (ii) remove Lessee's vehicles from the Garage at the expense of the owner thereof, Lessee hereby agreeing that any one or more of the foregoing remedies may be exercised by Lessor without prior notice and without prejudice to any other rights of Lessor to exercise similar rights in the event of subsequent events of default. Furthermore, in addition to the foregoing, in the event Lessee's Parking Rent becomes delinquent over ten (10) business days, Lessor reserves the right to cancel the Lessee's allocated parking privileges within the Garage without notice and demand and receive from Lessee return of all allocated Garage access cards.

In the event the Lease shall terminate or be cancelled for any reason, Lessee's Parking rights under this Exhibit shall also terminate upon such event.

Lessor shall at all times have the right, in its absolute discretion, to modify, change and relocate the drive and the parking spaces, including the right to expand or reduce the size and number of parking spaces, and to establish, modify, change and relocate driveways, entrances, exits, pedestrian passageways, landscaping and prohibited parking areas; provided that Lessor shall not exercise such rights in a manner that unreasonably interferes with Lessee's access to and use of the number of parking spaces set forth herein.

All rights and obligations of Lessor and Lessee under this Exhibit shall be upon and subject to all of the provisions of the Lease, and any default by Lessee hereunder shall constitute a default under the Lease.  Without limiting the foregoing, default in payment of any Rent hereunder shall be deemed a default in payment of Rent under the Lease.  Lessee may not assign nor sublet its interest or any of its rights to the parking spaces, or any part thereof, without the express, prior written consent of Lessor, except to an Affiliate.

The term "automobile", in addition to its usual and customary meaning, shall be deemed to include pick-up trucks, station wagons, vans, and similar vehicles used primarily for passengers and of no greater height than 6 feet 7 inches and of no greater width than American full-size passenger automobiles.  Expressly excluded from the term "automobile" shall be recreational vehicles such as campers and trucks with cabs or cabins which exceed 6 feet 8 inches in height and 8 feet in width.

**EXHIBIT E**

to

LEASE BETWEEN

**COVENTRY FUND X, LTD. , as Lessor**

and

**NEW CENTURY MORTGAGE CORPORATION, as Lessee**

**MARKET BASE RENTAL RATE**

I.   The Market Base Rental Rate ("Market Base Rental Rate") shall mean the average of the annual rental rates then being charged by Comparable Buildings for space of comparable size and condition to the Premises or other space in the Building for which the Market Base Rental Rate is being determined at the time determined by Lessor in the first sentence of Section II herein. The Market Base Rental Rate shall take into consideration the following factors:

   i)   The factor utilized for computation of Lessee's Share of Operating Expenses or any applicable expense stop, and as applicable to the other office buildings used as comparables must be based on an audit conducted by an independent certified public accountant for the calendar year immediately preceding the year in which the Market Base Rental Rate is to be effective (if available for such year and if not available for such year, then for the immediately preceding year) applicable to each building's actual operating expenses for such calendar year and actual ad valorem/real estate taxes, as calculated under generally accepted accounting principles, consistently applied and reflected on a per Rentable square foot basis, and whether or not an expense stop is included within the Market Base Rental Rate of such other buildings and the amount thereof; and

   ii)  rent concessions or abatement applicable to the comparable premises under consideration and charges for parking, if any; and

   iii) the date the Market Base Rental Rate is to become effective; and

   iv)  the total percentage (the "Add-on Factor") for the purposes of converting usable footage to Rentable Area, such Rentable Area to be the footage on which rental rates are computed (i.e., usable footage + (usable footage x add-on factor) = Rentable Area); and

   v)   leasehold improvement allowances to be provided at no cost or expense to the lessee; and

   vi)  the primary term of the lease under consideration; and

   vii) the nature and extent of services to be provided to the lessee at no cost or expense to the lessee; and

   viii) the location and floor level within the building and the age of the applicable building; and

ix)    the number of garage parking spaces available per one thousand (1,000) square feet of Rentable Area in the building (the "Parking Ratio"), the monthly rate for reserved and unreserved spaces, parking requirements, and any provision whereby the monthly parking rates may be increased; and

x)    the proposed use of the premises; and

xi)    cash payments to be provided the lessee by lessor; and

xii)    the credit standing and financial worth of the applicable Lessee

II.    Within thirty (30) days after receipt by Lessor of Lessee's written notice (Lessee's First Notice") of Lessee's election to exercise any of its renewal, expansion or other rights granted under this Lease where the Market Base Rental Rate is to be determined, Lessor shall notify Lessee of its Proposed Market Base Rental Rate and such Market Base Rental Rate shall be conclusively deemed to be approved by Lessee unless Lessee gives written notice to Lessor to the contrary ("Lessee's Second Notice") within fifteen (15) days after receipt of Lessor's notice. In the event Lessor and Lessee fail to establish a Market Base Rental Rate, through good faith negotiations, within the next thirty (30) days after Lessor receives the said Lessee's Second Notice, then Lessor's Proposed Market Base Rental Rate shall be deemed accepted by Lessee unless Lessee delivers written notice to Lessor within ten (10) days after the expiration of said thirty (30) day period ("Lessee's Third Notice"), whereupon Lessor and Lessee shall each promptly select an MAI appraiser, and each appraiser shall independently determine the Market Base Rental Rate according to the provisions defined herein. If either party shall fail to appoint an appraiser within ten (10) days after the date Lessor receives Lessee's Third Notice, the appraiser appointed by the other party shall appoint a second (2nd) appraiser. With a determination of the Market Base Rental Rate by each appraiser which must be made and delivered to Lessor and Lessee within thirty (30) days of appointment, the applicable Market Base Rental Rate shall be calculated as the mean average of such two (2) appraised amounts; provided, however, that in the event the two (2) appraised amounts shall deviate by more than ten percent (10%), then the two (2) appraisers shall promptly within ten (10) days select a third (3rd) appraiser who shall independently within thirty (30) days of appointment, determine his or her opinion of the Market Base Rental Rate, and the final Market Base Rental Rate shall be calculated as the mean average of those two (2) of the three (3) appraised amounts which differ by the least amount. In the event any such appraiser fails or refuses to deliver to Lessee and Lessor his or her opinion of Market Base Rental Rate within said thirty (30) day period, his or her determination shall not be counted and only the opinion of the remaining appraiser(s) shall be counted. Each appraiser, whether designated by Lessor, Lessee or appraiser(s), shall be members of MAI and shall have at least five (5) years experience in the appraisal of commercial office buildings in Houston, Texas and shall not be affiliated with either Lessor or Lessee. The decision of the appraisal process as to the Market Base Rental Rate shall be binding upon the parties and enforceable by a court of competent jurisdiction.

III.    If the Market Base Rental Rate for any renewal term or with respect to any space (whether pursuant to preferential right, expansion option, renewal option, or otherwise) shall not have been determined as of the commencement of such period or with respect to such space, then such period shall nevertheless commence and continue in effect, and such space shall nevertheless be added to the Premises, and pending resolution and final determination of such Market Base Rental Rate, the Proposed Market Base Rental Rate designated by Lessor shall control, and Base Rent shall be payable in accordance therewith and on the basis thereof as provided in the provisions of this Lease; provided, however, that upon final determination of such Market Base Rental Rate as provided in Section II herein, the amount of any overpayment or underpayment of Base Rent by Lessee pending such resolution and final determination shall promptly be refunded to or paid by Lessee, as the case may be, in either case without interest.

IV.    Whenever in this Lease, or any exhibit hereto, a provision calls for a rental rate to be determined by, or to be adjusted to, or to be based on, the Market Base Rental Rate, Lessee shall nevertheless continue to pay the monthly installments of Lessee's Estimated Additional Rent and Lessee's Additional Rent as provided for in the Lease.

-Exhibit E-

V. The Market Base Rental Rate shall be determined as a "Gross Rate" (i.e. the rate includes a base for Operating Expenses). The base for Operating Expenses included in the Base Rent payable by Lessee during the renewal term or for additional premises (as the case may be), shall be equal to the Operating Expense Amount for the Property for the calendar year immediately preceding the year in which the Market Base Rental Rate is being determined.

VI. All fees and expenses of the designated appraiser(s) shall be borne equally between Lessor and Lessee. Lessor and Lessee shall each bear the costs and expenses associated with their individual determination of the Market Base Rental Rate.

VII. Time is of the essence.

-Exhibit E-

**EXHIBIT F**

to

LEASE BETWEEN

**COVENTRY FUND X, LTD,** as Lessor

and

**NEW CENTURY MORTGAGE CORPORATION,** as Lessee

**RENEWAL OPTION**

I.    Conditioned upon the Lease being and remaining in good standing and Lessee being and remaining in possession and occupancy of the Premises and there occurring no Act of Default by Lessee, Lessee [but not any assignee (except an Affiliate) or subtenant of Lessee] shall have the option to renew and extend this Lease for all the Premises, but not less than all of the Premises, then subject to this Lease for 60 months (the "Renewal Term"), beginning the day after the last day of the Initial Term. Except as otherwise specifically provided herein, the Renewal Term shall be subject to and in accordance with all of the same terms, covenants and conditions of this Lease (including the terms regarding payment of the Lessee's Estimated Additional Rent and Lessee's Additional Rent) except that the Base Rent (and Parking Rent, if any) for such Renewal Term shall be calculated in accordance with the provisions of the Market Base Rental Rate, as defined in Exhibit E to this Lease. The Premises shall be leased by Lessee for the Renewal Term on an "as is" basis, and Lessor shall not be obligated to make any alterations or install or modify any improvements therein, unless otherwise specified by Lessor in Lessor's Proposed Market Base Rental Rate (as defined in Exhibit E to this Lease).

II.    In order to exercise said Renewal Option, Lessee shall deliver to Lessor a written notice ("Lessee's First Notice") of Lessee's desire to renew and extend the Initial Term as aforesaid at least six (6) months, but not more than twelve (12) months, prior to the expiration of the Initial Term, which such Lessee's First Notice shall be the same as Lessee's First Notice under Section II of Exhibit E to this Lease. Failure of Lessee to timely deliver to Lessor "Lessee's First Notice" as aforesaid shall cause the Renewal Option specified herein to be null and void and of no further force and effect.

III.    In the event Lessee timely delivers to Lessor "Lessee's First Notice" (as described in Section II of Exhibit E to this Lease) such written notice shall be conclusively deemed an election by Lessee to exercise its option to renew and extend this Lease and Lessee shall not thereafter be entitled to revoke said election to exercise said Renewal Option. The decision of the appraisal process as to the Market Base Rental Rate shall be binding upon the parties and enforceable by a court of competent jurisdiction.

IV.    Within thirty (30) days from the date a Market Base Rental Rate has been established for the renewal term by either (i) Lessor's Proposed Market Base Rental Rate or Lessor's and Lessee's good faith negotiations (as specified in Section II of Exhibit E to this Lease); or (ii) the decision of the appraisal process as to the Market Base Rental Rate (as specified in Section II of Exhibit E to this Lease), and Lessee's receipt of certain amendments to the Lease specifying the renewal terms, covenants, and conditions, Lessee shall execute and deliver to Lessor said amendments to the Lease for the purpose of extending or renewing the Initial Term for the Renewal Term. Failure of Lessee to timely execute and deliver to Lessor said amendments to this Lease shall be an Act of Default by Lessee and shall,

-Exhibit _F-

at Lessor's option, cumulative and in addition to Lessor's remedies set forth in the Lease and under law and equity, cause the Renewal Option specified herein to be null and void and of no further force or effect.

V.    Lessee shall have no right to renew or extend the Term of this Lease following the expiration of the Renewal Term as defined herein.

VI.    Time is of the essence.

-Exhibit _F-

## EXHIBIT G

## COMMENCEMENT DATE MEMORANDUM

THIS MEMORANDUM is made and entered into as of _____, 2006 by and between Coventry Fund X, Ltd., a Texas limited partnership, as **Lessor**, and New Century Mortgage Corporation, a California corporation, as **Lessee**.

## RECITALS:

A.    Lessor and Lessee are parties to a certain Lease Agreement dated as of _____, 2006 ("**Lease**"), relating to certain premises ("**Premises**") located in the building commonly known as "Two Riverway," located at Two Riverway, Houston, Texas ("**Building**").

B.    All capitalized terms not otherwise defined in this Memorandum have the meanings given them in the Lease.

C.    Lessor and Lessee desire to confirm certain facts regarding the Lease, including the Commencement Date, the size of the Premises and Building, the monthly Base Rent installment amounts, and the date the initial Term of the Lease expires and the notice date(s) and expiration date(s) of any extension or early termination periods provided to Tenant under the Lease.

## ACKNOWLEDGMENTS:

Pursuant to Section 3 of the Lease and in consideration of the facts set forth in the Recitals, Lessor and Lessee acknowledge and agree as follows:

1.    The Commencement Date under the Lease is _____.

2.    The Premises contains _____ square feet of Rentable Area.

3.    Monthly installments of Base Rent during the initial Term are:

(a)    $17,090.67 per month (being equal to a Base Rent rate of $16.00 per square foot of Rentable Area per annum), in advance, beginning with the first (1st) month of the Term and continuing for each successive month thereafter to and including the fourteenth (14th) month of the Term; provided, however, Base Rent in the amount of $17,090.67 per month shall be abated for the first two (2) months of the Term, but the granting of free rent as described herein is contingent upon Lessee's faithful performance of all obligations as described in this Lease, and upon any Act of Default under the Lease, Lessee shall become liable for rental payments on all rent-free months, including those accruing prior to such default, at the monthly Base Rent of $17,090.67 per month, plus any

additional rent that would have otherwise accrued, and, further, this Lease shall be construed as if no such period of free rent was provided, this remedy being cumulative and in addition to all of Lessor's other remedies as provided for in this Lease;

(b)    $18,158.83 per month (being equal to a Base Rent rate of $17.00 per square foot of Rentable Area per annum), in advance, beginning with the fifteenth (15th) month of the Term and continuing for each successive month thereafter to and including the twenty-sixth (26th) month of the Term;

(c)    $19,761.08 per month (being equal to a Base Rent rate of $18.50 per square foot of Rentable Area per annum), in advance beginning with the twenty-seventh (27th) month of the Term and continuing for each successive month thereafter to and including the thirty-eighth (38th) month of the Term;

(d)    $20,829.25 per month (being equal to a Base Rent rate of $19.50 per square foot of Rentable Area per annum), in advance, beginning with the thirty-ninth (39th) month of the Term and continuing for each successive month thereafter to and including the fiftieth (50th) month of the Term; and

(e)    $21,897.42 per month (being equal to a Base Rent rate of $20.50 per square foot of Rentable Area per annum), in advance, beginning with the fifty-first (51st) month of the Term and continuing for each successive month thereafter to and including the sixtieth (60th) month of the Term.

4.    Lessee's Share of Operating Expenses: ___%.

5.    The initial Term of the Lease expires on _____ unless the Lease is sooner terminated in accordance with the terms and conditions of the Lease.

6.    Lessee must exercise its first option to extend the Term, if at all, by notifying Lessor no earlier than _____ and no later than _____, subject to the conditions and limitations set forth in the Lease.

7.    Lessee must exercise it option to terminate the Lease, if at all, by notifying Lessor no earlier than _____ and no later than _____, subject to the conditions and limitations set forth in the Lease.

8.    The amount of the Termination Payment is $_____.

Lessor and Lessee have each caused this Memorandum to be executed and delivered by their duly authorized representatives as of the day and date first written above.  This Memorandum may be executed in counterparts, each of which is an original and all of which constitute one instrument.

**LANDLORD:**

**COVENTRY FUND X, LTD.**, a Texas limited partnership

By: Coventry 2RW, LLC, a Texas limited liability
         company, its general partner

By: _____
Name: _____
Title: _____

**TENANT:**

**NEW CENTURY MORTGAGE CORPORATION**, a
California corporation

By_____
Name:_____
Title:_____