# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

:

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | | |
| NEW CENTURY TRS HOLDINGS, | : | |
| INC., a Delaware corporation, *et al.*,[1] | | Case Number 07-10416 (KJC) |
| | : | Jointly Administered |
| Debtors. | | |
| | : | |

## REPLY OF U.S. TRUSTEE TO OPPOSITIONS TO MOTION SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, AN EXAMINER (RELATED TO DOCKET ENTRY # 278)

Kelly Beaudin Stapleton, the United States Trustee for Region 3 (the "U.S. Trustee"),

submits this response to the oppositions filed by the debtors and the creditors committee to her

motion seeking the appointment of a chapter 11 trustee or, in the alternative, an examiner.

## DISCUSSION

I.    **"Cause" exists for the appointment of a trustee under 11 U.S.C. § 1104(a)(1).**

In their opposition, the debtors present a picture of how these cases have proceeded since

filing that bears little relationship to what has in fact occurred. They tout the "extensive strategic

---

[1]

The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a/ Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century REO III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

planning" of management, and describe the current state of the cases as being a "complex process." In truth, these cases have been pending for little more than a month, and during that period of time the debtors have: 1) sold a portfolio of loans for $58 million; 2) identified a stalking horse bidder for their servicing business; and 3) shuttered their loan origination platform and laid off the vast majority of their employees. They have also successfully sought permission to pay substantial bonuses to employees. But for the expressed misgivings of the U.S. Trustee and the creditors committee, it appears that the debtors would have continued to seek permission to reward top management with large bonuses. The debtors revised the proposed bonus plans in response to objections expressed by the U.S. Trustee and the creditors committee.

The debtors assert in their opposition that they have been open and above-board in responding to the discovery that their financial results for 2006 needed to be restated. In particular, they describe in detail the internal investigation undertaken by the board of directors and their cooperation with ongoing governmental investigations and with the creditors committee. In fact, they seem to rely heavily on the results of the internal investigation to support their position that there was no wrongdoing or mismanagement by the debtors' current senior management. The U.S. Trustee consciously decided not to seek an expedited hearing on her motion based on the debtors' statements that the internal investigation results would be available during the week of April 23, 2007. Motion of U.S. Trustee, Docket no.278, filed April 17, 2007 at 2, FN2. After the U.S. Trustee filed the trustee motion, counsel for the debtors extended an invitation for representatives of the U.S. Trustee to attend in person a presentation to governmental authorities by the persons conducting the internal investigation. The express purpose of the debtors' invitation was to provide the U.S. Trustee with information relevant to this motion. The day before the meeting, the debtors withdrew

their invitation to have U.S. Trustee representatives in attendance. The internal investigation results have not been publicly disclosed, and there is no indication when a report from that investigation might become available.

The debtors seek in their opposition to the motion to lay the entire blame for their accounting irregularities on their former chief financial officer and controller. In doing so, however, they paint a picture of an accounting department that was operating free from any effective oversight by the chief executive officer or the board of directors. Even if one accepts the premise that the direct knowledge of and responsibility for the actual misstatements of earnings stopped with the former chief financial officer, that such misstatements continued unabated for months in a publicly-traded financial services business is incontrovertible evidence of a serious lack of internal controls. While the debtors claim to have fixed the problems by removing the former chief financial officer and controller from any involvement in the debtors' accounting department, the fact remains that the members of entrenched management who were responsible for establishing effective internal controls remain in day-to-day control of the debtors. In fact, the debtors' current chief executive officer certified in connection with each of the now-discredited quarterly reports filed with the SEC in 2006 that effective internal controls were in place, when this clearly was not the case.[2]

---

[2]

Each 10-Q was accompanied by a certificate signed by Brad A. Morrice that stated, in part:

The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over

3

The debtors and the committee incorrectly assert that the U.S. Trustee is seeking to establish a *per se* rule that a trustee must be appointed in every case where a company files for chapter 11 relief after announcing that it needs to restate its earnings from a prior accounting period. To be clear, the U.S. Trustee does not believe that such a rule would be appropriate. But this is not a case of a modest restatement of earnings by a company that also happens to be suffering business reverses. Instead, in this instance material accounting irregularities and the failure of internal controls were so substantial that what was continually and publicly represented to be a solid performer in a troubled industry was in fact suffering from many of the problems that so widely began to plague sub-prime lenders in 2006.

Furthermore, while the debtors make much of the experience of their officers and directors in the sub-prime lending business, the debtors are no longer in that business. The debtors are engaged in a wholesale liquidation. The debtors have retained investment bankers and financial advisors to perform the key tasks involved in completing the liquidation. While it is perhaps understandable that management does not want to release the reins of power, management in a liquidation should not be entitled to the same deference ordinarily afforded to pre-petition

---

financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .

Mr. Morrice signed the first and second quarter financial statements as vice chairman, president, and chief operating officer, and the third quarter financial statement as vice chairman, president and chief executive officer.

management in reorganization proceedings.

The debtors argue that the Court must weigh the benefits of a trustee appointment for cause under 11 U.S.C. § 1104(a)(1) against the possible costs of such an appointment. In support of this proposition, they cite from language in a legislative report accompanying the House version of the Bankruptcy Reform Act of 1978. This source does not stand for the cited proposition. The House Report did in fact state that courts should balance costs and benefits. This is not surprising, as the bill to which it related, H.R. 8200, 95 Cong., 1 Sess. (1977), expressly called for a balancing of costs and benefits.[3] But this bill was never enacted into law. The version of § 1104 ultimately adopted by Congress, which resulted from a compromise between the House and the Senate, contained no balancing test in § 1104(a)(1). The statute unambiguously provides that the appointment of a trustee is mandatory upon the showing of cause.

In any event, the debtors overstate the additional cost and disruption that might be occasioned by the appointment of a chapter 11 trustee in these cases. There is nothing inexpensive about a major chapter 11 case in today's legal environment. These cases are already swarming with professionals, all of whom are billing the estate at significant rates. The appointment of such a trustee will bring real value to the case that will offset any additional costs. The trustee will, of course, retain his or her own professionals. Insofar as those professionals may replace professionals

---

[3]H.R. 8200 § 101 (proposed § 1104):

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may order the appointment of a trustee only if----

   (1) the protection afforded by a trustee is needed; and

   (2) the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.

already employed by the debtors, at most there will be some minor transition time that should not add significant costs to the estate.

In addition to providing value to the estate, the appointment of a trustee can result in the lowering of other administrative costs. Once a trustee is appointed, the creditors committee certainly will not need to be as aggressive in pursuing investigations, as an independent trustee will not require the same degree of oversight as a debtor in possession. Furthermore, the trustee will be able to pursue all estate causes of action without regard to who the defendant is, eliminating the need to divide litigation responsibilities between the estate representative and the committee. In any event, the compensation of a chapter 11 trustee is subject to review for reasonableness under the standards enunciated in 11 U.S.C. § 330(a)(3).

The debtors and the creditors committee also claim that the appointment of a trustee will disrupt the administration of these estates. Of course, because cause exists for the appointment of a trustee under § 1104(a)(1), any inefficiency that such an appointment might cause is simply a consequence of the application of the law. But a trustee appointment need not cause major inefficiencies in case administration. As in many liquidation cases, the parties here plead that the appointment a trustee will upset the pending sale of assets under 11 U.S.C. § 363. This inefficiency should be minimal, however, as existing counsel work with the trustee on the transition. Furthermore, this Court has approved the payment of substantial bonuses to the debtors' mid-level managers and others. A trustee would be able to avoid additional inefficiencies by retaining those persons and other key employees who were not implicated in the actions that led to the trustee's appointment.

Based on the foregoing, the U.S. Trustee requests that the Court determine that cause exists

6

for the appointment of a trustee under 11 U.S.C. § 1104(a)(1) and that the Court direct the U.S. Trustee, after consultation with parties in interest, to appoint as trustee a disinterested person to complete the liquidation of the debtors' estates and to investigate and pursue causes of action that the estates might have against third parties.

## II.    The appointment of an examiner with a broad investigatory scope is mandatory under 11 U.S.C. § 1104(c)(2).

### A.    The $5 million debt threshold of § 1104(c)(2) is met in these cases.

In their opposition, the debtors argue that New Century Capital Trust I and New Century Capital Trust II are "insiders" of the debtors, and that, therefore, the debtors' more than $85,000,000 in unsecured obligations to those trusts should not be considered in determining if the appointment of an examiner is mandatory under 11 U.S.C. § 1104(c)(2).[4] This claim is completely devoid of merit, both as a matter of law and as a matter of fact.

The Capital Trusts were established in the summer and fall of 2006 in connection with two transactions through which the debtors borrowed, albeit indirectly, $85 million in funds from Kodiak Warehouse LLC ("Kodiak"), an entity that clearly is not an insider of the debtors. In analyzing the Capital Trust transactions, there is one overriding and unassailable fact that should be borne in mind – Kodiak, and not these trust vehicles, is the real party in interest to whom the $85 million is ultimately owed, and its non-insider status should govern the § 1104(c)(2) determination.

The Capital Trust transactions were virtually identical. The U.S. Trustee will use the New Century Capital Trust I transaction for purposes of this analysis. The debtor New Century Financial

---

[4]

Even if § 1104(c)(2) were not applicable to this case, grounds for the appointment of an examiner exist under § 1104(c)(1). As is discussed further below, a cogent, thorough report from an independent investigator would be valuable to these estates and shed necessary light on the events and circumstances that led to the debtors' demise.

Corporation (for purposes of this discussion, "New Century") settled a grantor trust ("Capital Trust I") pursuant to Delaware statutory law. Under the Amended and Restated Trust Agreement, New Century purchased $1,545,000 in "common securities" from Capital Trust I. Kodiak Warehouse LLC purchased $50,000,000 in "preferred securities" from Capital Trust I. Wells Fargo Bank, as "Property Trustee" under the trust, then purchased $51,545,000 in junior subordinated notes from New Century pursuant to a Junior Subordinated Debenture between New Century and Wells Fargo Bank as indenture trustee. Interest and principal payments on the notes received by Wells Fargo as indenture trustee were to be distributed to Wells Fargo as Property Trustee of Capital Trust I. Wells Fargo as Property Trustee was to make distributions to the common and preferred securities holders of Capital Trust I. The terms of the notes and the terms of the trust securities are virtually identical, so the trust is best viewed as an entity established as a "pass through" for the funds.

In their opposition, the debtors assert that New Century is "defined as the beneficial owner of the New Century Trusts." Opposition at 18. This is simply not accurate. New Century is the beneficial owner of the common securities, and Kodiak is the beneficial owner of the preferred securities. Under the trust agreement, both common and preferred securities represent an undivided beneficial interest in the assets of the trust. The common securities holder, New Century, therefore, beneficially "owns" only 3 percent of the assets of the trust, with the remaining 97 percent being beneficially owned by Kodiak as the preferred securities holder.

The designation of New Century's interests as common and Kodiak's interests as preferred is potentially misleading, as these terms do not have the same meaning under the trust agreement as they do in ordinary corporate law parlance. Common shareholders of a corporation ultimately control the management of the corporation through their ability to elect the board of directors.

8

Preferred shareholders ordinarily do not have the right to vote their shares, but they have preferred rights to dividends and upon liquidation. Under the trust agreement, however, the holder of the preferred securities, Kodiak, ultimately has virtually complete control over the trust, subject to the rights of Wells Fargo as trustee. New Century, as the holder of the common securities, has no control whatsoever over the administration by the trust of its assets. This stands to reason, because the assets of the trust are notes issued by New Century, 97 percent of which are ultimately payable to Kodiak.

The debtors assert that the Capital Trusts are insiders of the debtors. Other than misstating the extent of the debtors' ownership of the trusts and pointing out that the trust names contain the words "New Century," the debtors give no real explanation for this assertion. Under § 101(31)(B) of the Bankruptcy Code, a person is an insider of a debtor corporation if the person is a director, officer, person in control, partnership in which the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control. The Capital Trusts fit none of these categories. An affiliate of a debtor is also an insider. Under § 101(2) of the Bankruptcy Code, an affiliate means, among other things, a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor. Even if one accepts the doubtful premise that the Capital Trusts are "corporations" as that term is defined in the Code,[5] the debtors control at most 3 percent of the voting securities of

---

[5]

The term "corporation" is defined to include a business trust. 11 U.S.C. § 101(9). The debtors state in their opposition that the Capital Trusts are "business trusts." Opposition at 8. This is not accurate. The two leading Circuit cases considering the definition of the term "business trust" reason that the trust's purpose is of central importance. If the trust was created to conduct business and the trustee has a broad range of authority to do so, the trust is a "business trust." On the other hand, if the trust was created to hold or safeguard the trust res and the trustee's authority is narrowly drawn, the trust is not a business trust. *See Brady-Morris v. Schilling (In re Kenneth Allen Knight Trust)*, 303 F.3d 671 (6th Cir. 2002); *Shawmut Bank Ct. v. First Fidelity Bank (In re Secured Equip. Trust of Eastern Air Lines, Inc.)*, 38 F.3d 86 (2d Cir. 1994) Here, the trust agreements have several sections which are germane. First, section 2.4 of the trust

the Capital Trusts; in fact, the debtors' power to vote and their power to control is virtually non-existent under the trust agreements. The Capital Trusts are not affiliates of the debtors.

The debtors' assertion that the Capital Trusts are insiders of the debtors is, at best, a makeweight argument. Notably, the creditors committee does not itself advance the argument, but instead notes that the debtors have advanced it. Kodiak infused $85,000,000 in capital into the debtors during 2006, and the debtors issued $85,000,000 in notes to Kodiak, albeit indirectly through the use of the preferred trust securities. Because Kodiak is not an insider, the Capital Trusts are not insiders. The debtors' "fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider" therefore exceed $5,000,000.

B.      The appointment of an examiner is mandatory under § 1104(c)(2).

In their opposition, the debtors argue that the appointment of an examiner under 11 U.S.C. § 1104(c)(2) is not mandatory even though the statute clearly states that the court "shall" order the appointment an examiner on the request of a party in interest if the debt threshold is met in a case. They cite four cases for this proposition. In two of the cases, courts denied motions seeking the appointment of an examiner under § 1104(c)(1). See In re Gliatech, 305 B.R. 832 (Bankr. N.D. Ohio 2004); In re Gilman Services, Inc., 46 B.R. 322 (Bankr. D. Mass. 1985). These cases are therefore irrelevant. To the extent that the other two decisions interpreted "shall" in § 1104(c)(2) to be permissive, they were wrongly decided.

It is noteworthy that the debtors cited no appellate decisions supporting their proposition. They are asking this Court to enter an order contrary not only to the language of the statute but to

---

agreements narrowly limits the purpose of the trusts to (i) acquiring the notes, (ii) making distributions, and (iii) entering into transactions incidental to (i) and (ii). Further, sections 2.4 and 2.5 prevent the trustees from taking actions that would cause the trust to become taxable as a corporation for federal income tax purposes. So these trust agreements were drawn specifically to assure that the Capital Trusts did not act as business trusts.

the great weight of authority. *See In re Revco D.S. Inc.*, 898 F.2d 498 (6th Cir.1990); *In re Loral Space & Communications, Ltd.*, 2004 WL 2979785 (S.D.N.Y. ,December 23, 2004) (reversing 313 B.R. 577 (Bankr. S.D.N.Y 2004)); *In re UAL Corp.*, 307 B.R. 80 (Bankr. N.D. Ill. 2004); *In re Mechem Financial of Ohio, Inc.*, 92 B.R. 760 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511 (Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683 (Bankr. D.D.C.1980); and *In re Lenihan*, 4 B.R. 209 (Bankr. D.R.I.1980). The U.S. Supreme Court and the Third Circuit Court of Appeals have repeatedly emphasized that clear and unambiguous statutory language must be followed. *See U.S. Trustee v. Price Waterhouse*, 19 F.3d 138, 141 (3rd Cir. 1994) (citing *Rake v. Wade*, 508 U.S. 464 (1993); *Patterson v. Shumate*, 504 U.S. 753 (1992); *Prisco v. Talty*, 993 F.2d 21, 24 (3rd Cir. 1993); and *Virgin Islands v. Knight*, 989 F.2d 619, 633 (3rd Cir. 1993)). This Court should reject the debtors' flawed argument and hold that the appointment of an examiner under § 1104(c)(2) is mandatory if the debt threshold is met and such an appointment is requested by a party in interest.

C.      *The examiner must be afforded a broad scope of examination.*

The creditors committee asks this court to limit the scope of a mandatory examiner's investigation, largely based on the premise that its nascent investigation preempts the field. To give effect to the mandatory examiner provisions of the Code, the examiner must be permitted to perform a broad investigation, which should specifically include allegations of serious misconduct connected to the debtors' financial reporting.

In considering whether it is appropriate to severely limit the scope of a mandatory examination, this Court should bear in mind the legislative history underlying § 1104(c)(2). The Bankruptcy Reform Act of 1978 resulted from a compromise that ended a legislative impasse

11

between the House of Representatives and the Senate over competing bankruptcy bills. Among the

areas of difference was the question of governance in business reorganization cases. Chapter 11 of

the House bill, H.R. 8200, 95th Cong., 1st Sess. (1977) ("H.R. 8200") took a very flexible approach

to the appointment of a trustee or examiner. The court was called upon to decide if the protection

of a trustee or examiner was needed and to weigh that protection against the costs and expenses of

a trustee and examiner. H.R. 8200 § 101 (proposed § 1104). The House Report for H.R. 8200 stated

that "[a] trustee would not necessarily be needed to investigate misconduct of former management

of the debtor, because an examiner appointed under this section might well be able to serve that

function adequately without displacing the current management." H.R. Rep. No. 595, 95[th] Cong.,

1st Sess. (1977) at 402.

The Securities and Exchange Commission (the "SEC") opposed H.R. 8200 for failing to

protect the investing public. *See* Leonard J. Gumport, *The Bankruptcy Examiner*, 20 Cal. Bankr. J.

71, 88-89 (1992). The SEC instead favored chapter 11 of the Senate bill, S. 2266, 95th Cong., 2d

Sess. (1978) ("S. 2266"), which required the appointment of a trustee for all cases involving a

"public company," which was defined as a debtor with liabilities other than for goods, services, or

taxes exceeding $5,000,000, and with not fewer than 1,000 equity security holders. S. 2266 § 101

(proposed §§ 1101(3), 1104). The Report accompanying the bill said that the mandatory trustee for

public cases was "designed to counteract the natural tendency of a debtor in distress to pacify large

creditors, with whom the debtor would expect to do business, at the expense of small or scattered

investors." S. Rep. No. 989, 95[th] Cong., 2d Sess. (1978) at 10.

The differences between the House and Senate bills were reconciled by a compromise. The

requirement that a trustee be appointed for all public companies was eliminated, but § 1104(b)(2)

12

(now (c)(2)) of the Bankruptcy Code required the appointment of an examiner in cases with more than $5,000,000 in unsecured debts other than for goods, services, or taxes.  The Joint Explanatory Statements of the House and Senate leaders explained that the mandatory examiner appointment in these cases "should adequately represent the needs of public security holders in most cases" and alleviate the need for a trustee.  124 Cong. Rec. S17417 (daily ed. October 6, 1978).  Notably, the compromise did not call for any weighing of the costs and benefits of such an examination.

Under § 1104(c)(2) the Court is required to order the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor.  . . ." Some courts have focused on the statutory phrase "as is appropriate" in concluding that courts have broad discretion in determining the scope of an examination.  *See, e.g., In re Revco D.S., Inc.,* 898 F.2d 498 (6th Cir. 1990);  *In re Bradlees Stores, Inc.,* 209 B.R. 36 (Bankr. S.D.N.Y. 1997); *In re UAL Corp.,* 307 B.R. 80 (Bankr. N.D. Ill. 2004); and *In re Loral Space & Comm., Ltd.,* 2004 WL 2979785 (S.D.N.Y. 2004).

Professors Warren and Westbrook have analyzed how courts have set the scope of examinations, and they concluded that it does not comport with either the language of the statute or the legislative intent:

> The history and structure of [§§ 1104(c) and 1106(b)] make it clear that the examiner is not like the plumber or carpenter who is called in to check for a leak or a rotten board, but an engineer charged with examining the entire structure and making recommendations about what to do about it. The courts have dealt with this provision as if the examiner were a sort of special counsel appointed to do some discrete job rather than to provide a replacement for the investigation and recommendations of a trustee in an appropriate case. The court's job in smaller cases is to determine whether the case is appropriate for that treatment. In a case with more than $5

million in debt, its job is to order appointment of the examiner. In both instances, the court has the further discretion to exclude certain of the examiner's duties under § 1106(a)(3)-(4) or to expand them under § 1107(b), but that is very far from defining those duties starting at zero ·· an approach that has been typical up to now.

Elizabeth Warren & Jay L. Westbrook, *Examining the Examiner*, Am. Bankr. Inst. J., May 2005, at 34, 74.

Under the plain meaning of the statute, a court's discretion to remove from the scope of an examiner's investigation credible allegations of pre-petition or post-petition fraud, dishonesty, incompetence, or mismanagement by the debtor current or former management is quite limited. The statute commands that an examiner perform an appropriate investigation and singles out allegations of fraud and other types of abuse as examples of the type of examination that is appropriate. Furthermore, any report by an examiner filed pursuant to § 1106(b)(4) must include "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor . . . ." If, therefore, a party in interest requests the appointment of an examiner under §1104(c)(2) and points to indicia of debtor fraud or misconduct, a court must permit the examiner to look into those allegations and potential recoveries for creditors and others.

Under the rule of construction set out in § 102(3) of the Bankruptcy Code, the words "includes" and "including" are not limiting; in other words, a list that begins with one of these words is not exhaustive. But while these words are not limiting, they are certainly mandatory. Courts must give effect to the specifications that follow the words "includes" or "including." For example, under § 1112 of the Bankruptcy Code the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" will always constitute cause for conversion or dismissal of a case under 11 U.S.C. § 1112(b)(4)(A). Similarly, "the lack of adequate protection

14

of an interest in property of [a] party in interest" will always constitute cause for relief from the automatic stay under 11 U.S.C. § 362(d)(1).

Section 1104(c) mandates that an examiner's "appropriate" investigation *include* any allegations of fraud, dishonesty incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor. While under § 1106(b) and (a)(3) the courts have discretion to otherwise tailor the scope of an examiner's investigation, that discretion is not unbounded. A court cannot, consistent with § 1104(c), decline to permit an examiner to investigate credible allegations of fraud or other serious management issues by the debtor.[6] The United States Trustee is not aware of any reported or unreported case where an examiner, appointed pursuant to a motion under § 1104(c)(2) that specifically sought an investigation of serious management issues that led to the filing of the case, was not authorized to investigate those management issues. Notably, in none of the cases frequently cited as standing for the proposition that courts have broad discretion to set the scope of an examiner's duties have courts refused to allow an examiner to investigate substantial allegations of pre-petition management misconduct by the debtor. *See, e.g., In re Revco D.S., Inc.,* 898 F.2d 498 (6th Cir. 1990) (examiner was sought only to investigate pre-petition leveraged buyout); *In re Bradlees Stores, Inc.,* 209 B.R. 36 (Bankr. S.D.N.Y. 1997) (examiner was sought only to bring claim on inter-company transfer); *In re UAL Corp.,* 307 B.R. 80 (Bankr. N.D. Ill. 2004) (examiner was sought only to investigate timing of debtor's decision to seek modification of its retiree benefits); *In re Loral Space & Comm., Ltd.,* 2004 WL 2979785 (S.D.N.Y. 2004)

---

6

In a case where substantial doubt exists over whether there is any real need for an investigation, a court might appropriately order an examiner appointed under § 1104(c)(2) to take a preliminary look at the allegations made by the moving party and to report back to the court on whether those allegations warranted further investigation. *See In re UAL Corp.,* 307 B.R. 80, 86-87 (Bankr. N.D. Ill. 2004) In this case, nobody questions that investigations are necessary. The only issue is who should perform them. Accordingly, an investigation to determine if further investigation is needed would not be appropriate in this case.

15

(examiner was sought only to appraise the debtors' assets and liabilities).

The creditors committee asserts that part of its fiduciary duty is to recover assets for the benefit of creditors. It further asserts that it has a duty to conduct a wide ranging investigation into the debtors' acts, conduct, and property. Both of these propositions are questionable. In a chapter 11 case the obligation to recover assets for creditors rests on the debtor in possession or trustee, not on the creditors committee. Furthermore, while committees have the right to investigate the debtor, they do not have the duty to do so. Section 1103(c)(2) states that a committee "may investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . ." The use of the word "may" clearly indicates that the ability to investigate is permissive and not mandatory, and must be contrasted with the mandatory nature of the investigation required of a trustee or examiner under § 1106(a)(3). So the premise that the existence of a creditors committee that is eager to investigate the debtor mandates a sharp limitation on the role of a examiner is faulty.

The investigatory scheme sought by the creditors committee, if put into effect, will almost certainly not yield an examination of the scope envisioned by Congress for cases with public security holders. The construct treats investigations as a zero-sum game – if another party in interest is investigating something, an examiner should not touch it. Where, as here, a creditors committee is aggressive, little or no role will be left for an examiner.

This result gives rise to a paradox that demonstrates the inconsistency of the creditors committee's proposed investigatory scheme with the Bankruptcy Code. In § 1104(c)(2), Congress mandated the appointment of an examiner in a case with large amounts of public debt. Yet it is precisely in such a case that a creditors committee is most likely to be aggressive in pursuing its own investigatory prerogatives under 11 U.S.C. § 1103(c)(2). Accordingly, it is clear that Congress did

not intend to require the appointment of an examiner who would do nothing simply because the creditors committee was very active. If anything, legislative history supports the proposition that concerns over undue influence by major creditors in large reorganization cases underlay efforts by the SEC and others to assure that some meaningful independent investigation took place in such cases. This Court should therefore assure that, without regard to what investigations the committee might have commenced, the examiner has a meaningful scope of investigation in these cases and an adequate budget to perform that investigation.

Both the debtors and the creditors committee complain about the potential cost of an examination. These concerns are overstated, as the creditors committee could certainly cut back on its investigations and instead focus on aiding the debtors with their continuing liquidation and on negotiations toward the formulation of a consensual plan of reorganization. To the extent that the investigations of the examiner and the creditors committee are duplicative, the creditors committee may, and in the absence of unusual circumstances should, curtail its investigations. It does not appear, in any event, that the creditors committee's investigation has to this point proceeded much beyond the service of some initial document requests.

Furthermore, the argument that an examiner's investigation will be costly and will add no value to the estate misses the point of having an independent examination. Unlike either the debtors or the creditors committee, the examiner will have no preconceived bias, and the examiner's duties will not run to any particular constituency. This very independence will enhance the value of the examiner's report. If the examiner concludes that the estate likely has valid claims against third parties, the report can serve as a roadmap for the pursuit of such claims and a possible incentive to encourage early settlement. If, on the other hand, the examiner concludes that such claims are not

17

valid, the report can prevent the costly pursuit of futile litigation. As one court stated:

> The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights. Often, the information that an examiner provides in his or her report serves as a road map for parties in interest as they evaluate and pursue their substantive rights. . . . In essence, an examiner's report paints a picture, his or her image of what happened in the case, and ends with that expert's opinion of what that story means, in legal terms. The report puts the story on paper and provides a context for debate.

*In re Fibermark*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006) (citations omitted).

Finally, the argument that an examiner's report will add no value to the estate also discounts the value of a very public explanation of what happened in these cases. New Century was a big company, and it exhibited hubris in its presentations to the public. Disappointed investors and others are entitled to a cogent, unbiased narrative describing how a company that throughout last year continued to tout itself as "A New Shade of Blue Chip" ended up conducting a chapter 11 fire sale of its assets not six months later. Neither the investigation by the creditors committee nor the debtors' internal investigation is likely to lead to such a narrative.

**[Continued on next page – space intentionally left blank]**

18

## CONCLUSION

Based upon the foregoing, the U.S. Trustee requests that this Court order the appointment

of a chapter 11 trustee for cause pursuant to 11 U.S.C. § 1104(a)(1).  In the alternative, the U.S.

Trustee requests that the Court order the appointment of an examiner pursuant to 11 U.S.C. §

1104(c)(2) with an appropriately broad investigatory mandate.

Respectfully submitted,

**KELLY BEAUDIN STAPLETON**
**UNITED STATES TRUSTEE**

BY: /s/ Joseph J. McMahon, Jr.
Joseph J. McMahon, Jr., Esquire (# 4819)
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207, Lockbox 35
Wilmington, DE  19801
(302) 573-6491
(302) 573-6497 (Fax)

- and-

Walter W. Theus, Jr.
Trial Attorney
Executive Office for United States Trustees
20 Massachusetts Avenue, N.W., Suite 8000
Washington, D.C.  20530
(202) 213-6896
(202) 307-2397 (Fax)

Date: May 14, 2007