UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
NEW CENTURY TRS HOLDINGS, INC.,.    Case No. 07-10416(KJC)
a Delaware corporation, *et al.*,.  (Jointly Administered)
                                .
        Debtors.                .    May 15, 2007 (1:40 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESS: |  |  |  |  |
| Holly Etlin | 17 | 31 |  |  |
|  |  | 35 |  |  |

1          THE CLERK: All rise.  Be seated, please.

2          THE COURT: Good afternoon, all.

3          MS. UHLAND: Good afternoon, Your Honor.  Your

4     Honor, we just have one modification to the calendar that I

5     believe the agenda that was sent to the Court and then we can

6     proceed with today's calendar.  We had listed - We've noted

7     the matters that are to be continued.  We had listed at item

8     2 as an uncontested matter going forward, the motion of the

9     Creditors Committee for entry of an order permitting its

10    members to engage in securities trading.  In fact, we are

11    still working through language on that order with the

12    Committee.  I believe the United States Trustee is also -

13    perhaps had some comments to that order, and we propose to

14    continue that matter to our May 21st hearing at 10:30.  We

15    only have two other motions which we should go ahead and take

16    in order, and so that would mean the next matter is the

17    United States Trustee's motion.

18         THE COURT: All right.  While I have you at the

19    podium, let me just ask from the debtors' standpoint, will

20    there be any witnesses?

21         MS. UHLAND: Yes, we believe we will have a - we'll

22    most likely call a rebuttal witness or a witness in support

23    of our objection, and that will be Ms. Holly Etlin, who is

24    here in the courtroom today.

25         THE COURT: All right, thank you.  Let me turn then

1   to the U.S. Trustee.

2         MS. UHLAND: Your Honor, I did have one housekeeping

3   matter unrelated.  I did want the Court to note that we did

4   receive overbids for the Carrington sale.  I wasn't sure if

5   somebody had notified the Court, so, we will be conducting

6   our auction tomorrow and back on the 21st as opposed to we had

7   a holding date of the 18th for the Carrington sale, but we

8   will instead - the good news is we received bids.  We will be

9   having the auction and be back on the 21st for that matter.

10        THE COURT: Okay.  But there are other things which

11  have been add to the 18th in the interim.

12        MS. UHLAND: Yes, Your Honor.

13        THE COURT: So, I think you'll be visiting anyway,

14  but thank you.

15        MS. UHLAND: You're welcome.

16        MR. McMAHON: Your Honor, good afternoon, Joseph

17  McMahon, and I'd like to introduce my colleague Walter Theus

18  who is with the Executive Office for the United States

19  Trustee.  He's with me today.

20        THE COURT: Welcome.

21        MR. THEUS: Thank you.

22        MR. McMAHON: Your Honor, in terms of proceeding,

23  our understanding is that with respect to a series of

24  documents which I'm about to present to the Court, the

25  debtors do not have an objection to the admissibility of

1    those save two stipulations.  One will be a chart of debtors'

2    current management which will be Exhibit No. 10.  The debtors

3    are stipulating to the admission of that exhibit for purposes

4    of today's hearing only.  With respect to the other two

5    documents, which are items number 15 and 16 in the binder,

6    they are respectively the Committee questionnaires submitted

7    by Wells Fargo Bank n/a as trustee and Kodiak, the Kodiak

8    entities as outlined in that questionnaire.  Your Honor, the

9    way we see the hearing proceeding with the admission of those

10   exhibits, we have two witnesses, one from Wells Fargo and one

11   from Kodiak.  Mr. Theus will be handling the testimony with

12   respect to those, and we would proceed to argument with

13   respect to our motion.

14          THE COURT: How much time do you anticipate in

15   direct examination of those two witnesses?

16          MR. McMAHON: Your Honor, 15 or 20 minutes.

17          THE COURT: Each or together?

18          MR. McMAHON: Total, Your Honor.

19          THE COURT: Okay.  Okay, let me ask if any other

20   party who's filed either a joinder or objection intends to

21   present any live testimony in support of their respective

22   position.  Okay.

23          MR. BOTICA: Your Honor, for Kodiak, Matthew Botica

24   for Kodiak.  We do not intend to present any live witnesses.

25          THE COURT: Okay.

1          MR. MAYORKAS: Your Honor, if I may raise a

2  procedural question?  Good afternoon, Your Honor.  Alijandro

3  Mayorkas on behalf of the debtor.  If I may respectfully

4  propose to the Court there are two issues raised by the

5  Trustee's motion.  One is the appointment of a trustee and

6  the appropriateness and lawfulness of doing so, and the other

7  is the lawfulness and appropriateness of appointing an

8  examiner.  I would respectfully submit, Your Honor, that

9  perhaps we can bifurcate the hearing, address the Trustee's

10  motion for the appointment of a trustee in the first

11  instance, call whatever witness is relevant to that

12  proceeding and whatever argument the Court may wish to

13  consider, and then move on to the discrete issue of the

14  examiner, if that meets with the Court and the parties'

15  approval.

16          THE COURT: Does the U.S. Trustee have any comments?

17          MR. THEUS: Your Honor, Walter Theus with the U.S.

18  Trustee.  It certainly makes sense because the testimony of

19  the two witnesses goes to the examiner issue and not to the

20  trustee issue to perhaps hold the testimony off until such

21  time as the examiner issue is actually being discussed with

22  the Court.  So, I don't believe we have any problem with that

23  -

24          THE COURT: All right.

25          MR. THEUS: - as a matter of proceeding.

1          THE COURT: Okay.  Any other live witnesses?  No?

2     Okay.

3          MR. LOGAN: Your Honor, Ben Logan of O'Melveny &

4     Myers for the debtors also.  Just again, to deal with one of

5     the housekeeping procedural scheduling issues, there was an

6     objection also styled as a joinder filed by DB Structured

7     Products to the motion of the U.S. Trustee to appoint a

8     trustee or an examiner.  That has been resolved, Your Honor,

9     by a stipulation that is signed off on by the debtors, DB

10    Structured Products, and the Creditors Committee that

11    resolves not only their objection but deals more broadly with

12    a number of disputes that the debtors have had with DB

13    Structured Products.  One of the items on the calendar for

14    the 18th, I believe, was their motion for a preliminary

15    injunction.  This will resolve that.  It will resolve that,

16    it's also a preview of something broader that the debtors

17    have been working with the Creditors Committee and the -

18    since this is consensual, I won't call them warehouse

19    lenders.  The parties to master repurchase agreements to try

20    to avoid, quite frankly, some serial litigation, one-off

21    ligation with each one of them over issues like whose

22    property is what property and things of that sort.  We've had

23    a bit of that so far.  The Committee, and the debtors, and I

24    believe, most if not all of the repurchase agreement

25    participants agree that it's better to deal with that in an

1    omnibus fashion, suggest a heads up.  This is referenced in

2    the stipulation with DB Structured Products.  We will be

3    filing, I hope this evening, a motion to establish means of

4    providing adequate protection and reserve on the issues that

5    otherwise undoubtedly would lead to one-off litigation.  We

6    have a final version of the stipulation.  Unfortunately, in

7    the rush to get over here, we don't have signature pages.  So

8    counsel is getting copies of signature pages, and we'd like

9    to hand up an executed copy of that stipulation towards the

10   end of the hearing.

11            THE COURT: All right.

12            MR. INDELICATO: Good afternoon, Your Honor.  Mark

13   Indelicato from Hahn & Hessen on behalf of the Committee.

14   Your Honor, we just wanted to let the Court know, we have

15   negotiated with DB Structured Finance and the debtor the

16   stipulation that's going to be presented to the Court and

17   that we would urge the Court to approve it, and we want to

18   reiterate what Mr. Logan said regarding this is a preview of

19   a motion that's to come.  The Committee was concerned about

20   the, you know, offhand litigation that's coming out by the

21   master repurchase participants, and so we encouraged the

22   debtor to put together a protocol to deal with all of them.

23   That's going to come to the Court's attention.  It's purpose,

24   really, Your Honor, is to keep the status quo of all the

25   participants while all of the parties go through all of the

1    issues to see where the money was, what the issues are, and

2    how we're going to resolve the issues.  So it's a means of

3    stepping back, taking a look at the situation, giving the

4    debtors the opportunity to finish their analysis and their

5    reconciliations, and hold off these motions and these TROs

6    and everything else that's happening.  We've spoken to a lot

7    of the participants, and they're at least agreeable in

8    principal with the procedure, so we hope that will come

9    before the Court.  Thank you.

10          THE COURT: All right, thank you.  All right, let's

11    proceed with the U.S. Trustee's case in chief.

12          MR. McMAHON: Your Honor, the way we would propose

13    to proceed is, I would like to tender the United States

14    Trustee's exhibits to the Court, and I have prepared a

15    summary of the salient facts which we believe are found in

16    the documents and are more than likely well known to the

17    Court at this point.  It supports the request for appointment

18    of a Chapter 11 Trustee, and I would simply propose to move

19    to argument on that point, obviously subject to the tendering

20    of whatever witness the debtor would like to call.

21          THE COURT: All right, well, let's have the

22    exhibits, the documents first.

23          MR. McMAHON: May I approach?

24          THE COURT: Thank you.

25          MR. MAYORKAS: If I might inquire, do those

1   documents include the summary to which was alluded?

2          MR. McMAHON: I'm sorry?

3          MR. MAYORKAS: We don't have a copy of the summary.

4   Thanks.  If I may have a moment, Your Honor?

5          THE COURT: Okay.  All right, now, I've been handed

6   two binders, and the table of contents indicates that there's

7   16 proposed exhibits.  The U.S. Trustee is now moving them

8   into evidence.

9          MR. McMAHON: Your Honor, we are moving Exhibits 1

10  through 14 into evidence.  Ten, subject to the stipulation

11  that I noted on the record earlier that that exhibit will be

12  moved into evidence admitted for purposes of this hearing

13  only.

14          THE COURT: All right.  That's 15 and 16.

15          MR. McMAHON: That's 10, I'm sorry.

16          THE COURT: Ten, okay, I'm sorry.

17          MR. McMAHON: Fifteen and 16 will be dealt with to

18  the extent that we reach the examiner issue.

19          MR. MAYORKAS: And no objection, Your Honor, based

20  on that stipulation.

21          THE COURT: All right, then, items 1 through 14 are

22  admitted with that one condition concerning 10 without

23  objection.

24          MR. McMAHON: Your Honor, with that I am prepared to

25  present the facts which we believe are relevant to

1    consideration of the Court's - of this motion, and with

2    respect to that, Your Honor, in terms of proceeding, I would

3    just suggest that I recite the facts, and to the extent that

4    the debtors wish to put on a witness to, I guess, rebut or to

5    respond to the issues, we would address that at the

6    conclusion of my recitation of the facts.

7            THE COURT: Go ahead.

8            MR. McMAHON: New Century Financial Corporation is a

9    publicly traded real estate investment trust formed in 1994.

10   Prior to April 2nd, 2007, the date on which the debtors filed

11   the petitions which initiated these Chapter 11 cases, New

12   Century and its debtor subsidiaries originated and purchased

13   mortgage loans, sold mortgage loans through whole loan sales

14   and securities agents and serviced loans that they sold or

15   securitzed.  The debtors also retain residual economic

16   interest in the loan securitizations.  New Century's

17   management team, the Board of Directors, the Board's Audit

18   Committee, and executive management personnel is described on

19   U.S. Trustee Exhibit 10.  With the exception of a limited

20   number of changes noted on that exhibit, the debtors'

21   management team today consists of a number of employees that

22   served in the same roles since the beginning of 2006.  On

23   February 7, 2007, the debtors announced that they would be

24   restating their financial results for the first three

25   quarters of 2006.  According to the news release announcing

1    the restatement, during the second and third quarters of

2    2006, the company failed to include the expected discount

3    upon disposition of loans when estimating its allowance for

4    loan repurchase losses.  In other words, the reserve figure

5    reflected the erroneous assumption that the repurchase loans

6    would be sold at a value in excess of the market price for

7    such loans.  The company's accounting for loan repurchase

8    reserves was inconsistent with governing Statement of

9    Accounting Standards No. 140 in this regard.  Additionally,

10   the company underestimated the value of repurchase claims to

11   be included in the repurchase reserve calculation in each of

12   the first three quarters of 2006.  At the time the

13   restatement was announced, New Century reported that it

14   expected to report a pre-tax loss for the fourth quarter and

15   the full year ended December 31st, 2006.  To place that

16   statistic into context, through the third quarter of 2006, as

17   indicated on Exhibit U.S. Trustee 3, the debtors reported a

18   net income of approximately $275.9 million.  Each of the

19   three quarterly reports which are the subject of the

20   restatement have certifications by three persons: Robert

21   Cole, the chairman of the Board; Brad Morres, New Century's

22   chief executive officer; and Patty Dodge, the chief financial

23   officer at the time (all phonetical).  Those certifications

24   include the following representations: First, that the

25   certifying officers are responsible for establishing and

1    maintaining disclosure controls and procedures and internal

2    control over financial reporting.  Second, that the

3    certifying officers designed or supervised the design of

4    internal controls to provide reasonable assurance regarding

5    the reliability of financial reporting and the preparation of

6    financial statements for external purposes in accordance with

7    generally accepted accounting principles.  Third, that the

8    certifying officers evaluated the effectiveness of the

9    company's disclosure controls and procedures and presented in

10   the quarterly report their conclusions regarding the

11   effectiveness of the disclosure controls and procedures as of

12   the end of the reporting period based upon that evaluation.

13   Fourth, that the certifying officers disclosed in a report

14   any changes in New Century's internal control over financial

15   reporting that occurred during New Century's most recent

16   fiscal quarter.  Each of the quarterly reports that is the

17   subject of the restatement contains a representation by the

18   certifying officers that they reviewed the disclosure

19   controls and procedures with respect to the relevant period

20   and that such controls and procedures were effective, that

21   those representations can be found in Exhibit U.S. Trustee 1

22   at page 50, Exhibit U.S. Trustee 2 at 74, and Exhibit U.S.

23   Trustee 3 at 77.  New Century's February 7th announcement gave

24   the company's lenders the right to cut off New Century's

25   financing.  Prior to the petition date, New Century relied on

1    15 short-term repurchase agreements and aggregation credit

2    facilities along with an asset back commercial paper facility

3    that collectively provided the company with approximately $13

4    billion of committed and $4.4 billion of uncommitted

5    borrowing capacity to fund mortgage loan originations and

6    purchases pending the pooling and sale of such mortgage

7    loans.  These financing arrangements generally required New

8    Century to deliver to its lenders timely financial statements

9    prepared in accordance with generally accepted accounting

10   principles.  Each of New Century's lenders had the right to

11   cease providing financing to the company during the pendency

12   of an event of default.  As of March 9, 2007, all of New

13   Century's lenders under its short-term repurchase agreements

14   and aggregation credit facilities had either discontinued

15   their financing of New Century or had notified the company of

16   their intent to discontinue.  On March 8th, 2007, New Century

17   ceased accepting loan applications.  In the wake of the

18   restatement announcement, at least 19 class action lawsuits

19   and 8 derivative complaints have been filed against New

20   Century and/or its directors and officers which center on

21   acts and/or omissions relating to the restatement.

22   Additionally, the United States Attorney for the Central

23   District of California has commenced a Grand Jury

24   investigation related to both restatement related issues and

25   insider trading issues, and the Securities & Exchange

1    Commission has commenced its own inquiry into those same

2    issues.  Your Honor, that completes the factual recitation,

3    and I will wait direction from the Court as to whether to

4    proceed with argument or whether the debtors would like to

5    call testimony in response to those facts.

6            THE COURT: I'd like to get the evidentiary record

7    complete first.

8            MR. McMAHON: We would move for the admission of

9    exhibits in connection with the admission of the Exhibits

10   U.S. Trustee 1 through 14 and that statement, Your Honor,

11   that does complete our case in chief for the Trustee relief.

12           THE COURT: Thank you.

13           MR. MAYORKAS: Your Honor, would the Court wish the

14   debtor to proceed with the examination of Ms. Etlin and to

15   complete the evidentiary record before any argument is

16   considered?

17           THE COURT: Yes.

18           MR. MAYORKAS: Your Honor, may I take 30 seconds to

19   frame the testimony of Ms. Etlin just so the Court

20   understands its context?

21           THE COURT: You may.

22           MR. MAYORKAS: Thank you, Your Honor.

23           Thank you, if I may, Your Honor, I'd like to just

24   briefly characterize, contexturalize the anticipated

25   testimony of Ms. Etlin from whom this Court has previously

1   heard testimony.  Ms. Etlin's anticipated testimony is

2   directed solely and exclusively to the reply brief that was

3   filed yesterday by the Trustee's Office, and we wanted to

4   respond to some of the points that were made in that reply

5   brief because they were never made in the initial moving

6   papers.  So that is just the brief contextualization of Ms.

7   Etlin's anticipated testimony.  I do want to make one

8   procedural motion, Your Honor.  The Trustee submitted to this

9   Court for admission and the Court admitted the two binders of

10  exhibits, one subject to the stipulation.  Mr. McMahon has

11  made a factual recitation.  To the extent that that factual

12  recitation deviates from the documents that have been

13  submitted and comprise the evidentiary record for today's

14  hearing, we would move to strike those factual statements.

15  With that, Your Honor, the debtor is prepared to call Ms.

16  Etlin as a witness.

17          MR. McMAHON: Your Honor, Joseph McMahon.  Before we

18  get to that point and just so the record is clear, we

19  provided the documents to Mr. Mayorkas at his local counsel's

20  office this morning.  If there's a specific objection or a

21  specific fact that the debtors are seeking to strike, I would

22  like that fact that they take exception with identified now

23  so the record is clear.

24          MR. MAYORKAS: I can't do it, Your Honor.

25          THE COURT: Look, Mr. McMahon, unless what you

1    recited is a stipulation of uncontested facts, I mean I take

2    it only as argument.  It may be completely accurate with

3    respect to what the documentary evidence is.  There may be

4    variations, but, you know, evidence is taken a couple of

5    different ways, not normally by argument of counsel.

6              MR. McMAHON: Understood.  I just wanted to make

7    sure that to the extent there is a specific issue it's

8    identified for the record.  Thank you.

9              MR. MAYORKAS: Thank you, Your Honor.  The debtor

10   would call Holly Etlin as its witness.

11             THE COURT: And while Ms. Etlin is taking the stand,

12   I'm still a little confused about U.S. Trustee 15 and 16.

13   Are they going to be offered or only in connection with the

14   examiner issue?

15             UNIDENTIFIED SPEAKER: Your Honor, they relate only

16   to the examiner issue.

17             THE COURT: Okay, thank you.

18             MS. UHLAND: And, Your Honor -

19                        HOLLY ETLIN

20   having been duly sworn testifies as follows:

21             THE CLERK: Please state your full name and spell

22   your last name for the Court.

23             THE WITNESS: Holly Felder Etlin, E-t-l-I-n.

24             MS. UHLAND: Just briefly, Your Honor.  The debtor

25   was familiar with the balance of the documents reviewed.  The

1   only purpose for the debtor not stipulating to them is the

2   debtors haven't had an opportunity or haven't ever seen those

3   final documents before, the other documents that I was

4   familiar with.

5          MR. MAYORKAS: Your Honor, I'm mindful of the fact

6   that Ms. Etlin has testified before this Court previously,

7   and with that in mind, I will cut through some of the

8   ordinary foundational matters.

9          THE COURT: Thank you.

10                      DIRECT EXAMINATION

11  BY MR. MAYORKAS:

12  Q.  Good afternoon, Ms. Etlin.  By whom are you employed?

13  A.  AlixPartners.

14  Q.  And in the course of your employment for AlixPartners are

15  you currently involved in an engagement on the New Century

16  Financial Corporation?

17  A.  Yes, I am.

18  Q.  And, Ms. Etlin, can you please describe your role and

19  your responsibilities in that specific engagement?

20  A.  Certainly.  As I described before this Court, I believe

21  it was last week, I am the managing director from the firm

22  who is responsible for all services that we provide to the

23  debtor, and the scope of our engagement is relatively broad.

24  It includes such things as treasury management, assistance

25  and support to the debtors in the sale process, bankruptcy

1  administration matters, and other issues with management.

2  Q.  And recently, did you accept the appointment of chief

3  restructuring officer on behalf of the company?

4  A.  Yes, I did.

5  Q.  And in the course of your work in the engagement that

6  you've described, do you work with the Board of the company

7  as well as its top management?

8  A.  Yes.  I have attended, I believe, substantially all of

9  the Board meetings that have occurred since our engagement,

10  and I meet on average daily with the entire senior management

11  team as well as individual meetings and working sessions

12  throughout every day.

13  Q.  Would you, Ms. Etlin, provide to the Court your

14  assessment of the level of commitment of the Board on the one

15  hand and top management on the other to maximizing the value

16  of the estate's assets.

17  A.  Certainly.  The Board is very involved, very focused,

18  very committed to maximizing the value of the assets and

19  doing the right thing in these cases as it pertains to the

20  creditors, the company's employees, and other stakeholders.

21  Management is similarly very involved, working very long

22  hours on nights, on weekends, focused on all the myriad of

23  things we need to accomplish very, very quickly in these

24  cases.

25  Q.  And when you speak of management and your assessment of

1   management's efforts in the process, do you also mean to

2   include the Board itself?

3   A.   Yes.

4   Q.   And, Ms. Etlin, have you come to a conclusion in the

5   course of your day-to-day, hour-to-hour, and in fact, minute-

6   to-minute work with the management and Board of New Century,

7   have you come to an assessment of the integrity of management

8   on the one hand and the Board on the other?

9           MR. McMAHON: Objection.

10          THE COURT: Basis.

11          MR. McMAHON: Your Honor, our motion lays out a case

12   for appointment of an examiner under 1104(a)(1) on the

13   standard of cause.  We have alleged that management's - the

14   failure of the debtors, consistent with their accounting and

15   reporting practices to accurately report their financial

16   results during the first three quarters of 2006 as announced

17   on February 7th of 2007 constitutes cause.  Now, the debtors

18   are trying to introduce the testimony of a lay witness on the

19   subject of whether or not management has integrity.  Your

20   Honor, we are addressing a factual issue here with respect to

21   what is before the Court.  I would argue that the testimony

22   isn't relevant and that this Court should not allow testimony

23   by a representative of the debtors on the subject or the view

24   of whether or not they have integrity in that area.

25          THE COURT: Foundation and relevance.  Any response?

1           MR. MAYORKAS: Your Honor, the entire body of case

2      law on this subject speaks to the fact that the integrity of

3      management - and it is only the lack of integrity of

4      management and the considerable lack of integrity of

5      management warrants the drastic and extraordinary remedy that

6      the Trustee seeks to achieve today.  There is not a single

7      case that provides that a mere accounting error, an innocent

8      accounting error, warrants the relief today requested.  And

9      if in fact the integrity of management and the Board is not

10     relevant to the Trustee's motion, then that in and of itself

11     condemns the motion.  All of the cases that have been cited

12     to this Court by the Trustee herself, by the debtor, by the

13     Creditors Committee speaks to the fact that it is the

14     integrity of management and the Board and the ability of this

15     Court to look to management and the Board to direct the

16     debtor in possession through the Chapter 11 process that

17     speaks to the viability of a claim that no longer should that

18     management or should that Board remain in place.  This is the

19     crux of the entire case.

20           THE COURT: Address foundation.

21           MR. MAYORKAS: Your Honor, Ms. Etlin has testified

22     that she works day to day, hour to hour, minute to minute

23     around the clock with the very people that the Trustee is

24     seeking to replace.  She has come to an opinion as an expert

25     having dealt with Chapter 11, Chapter 7, and all sorts of

1  these processes.  She has worked with a panoply, a broad

2  spectrum of people in management and Board positions and

3  assuredly in a spectrum of their credibility, their

4  integrity, and their ethic, and she can speak to that based

5  on her opinion.

6         MR. McMAHON: There's a couple of things here, Your

7  Honor.  Getting back to the point that I raised earlier, as a

8  factual matter, I think it's undisputed that Ms. Etlin was

9  not there for the first three quarters of 2006 and even at

10  the time the restatement was announced.

11         THE COURT: So is it the U.S. Trustee's position

12  that no remedial activity is relevant in connection with such

13  a motion?

14         MR. McMAHON: Well, if we're going to have factual

15  testimony, Your Honor, about steps that the Board has taken

16  subsequent to the February 7th announcement, that's one thing;

17  all right.  Putting Ms. Etlin on the stand as a purported

18  witness in integrity or honesty to testify as to whether or

19  not she thinks that other people, you know, that she's

20  dealing with, have been truthful and/or honest in their

21  business dealings for the purposes of refuting whether or not

22  something occurred during the first three quarters of 2006 or

23  perhaps beyond that is an entirely different issue.

24         THE COURT: Well, actually, what the U.S. Trustee

25  alleges here, really when reduced to its simplest form, is

1   that due to an accounting error, and I won't characterize it

2   in terms of its magnitude, but due to an accounting error, a

3   trustee should be appointed here.

4            MR. McMAHON: Correct.

5            THE COURT: The Trustee's offered no evidence about

6   who the players were, what the motivations were, what the

7   level of competence was, how it happened, why it happened;

8   none of that.  So, the relevance objection is overruled.

9   With respect to foundation, I think it's appropriate to

10  examine this witness with respect to what she has observed

11  that the management and/or the directors or other

12  representatives of the company have done in connection with

13  the issues raised by the U.S. Trustee, and based on that, if

14  you wish to get to the ultimate question of for a view about

15  what that all means, if the U.S. Trustee wants to object

16  again, I'll determine whether a sufficient foundation has

17  been laid.  You may proceed on that basis.

18           MR. MAYORKAS: Thank you, Your Honor, and I won't go

19  beyond just that one question on this discrete subject.  I

20  will say that what comes to mind in hearing the Trustee's

21  argument and I believe that the Court - I anticipate that the

22  Court will want to hear our argument, but if the record that

23  the Trustee is resting on is the fact that accounting errors

24  occurred in the first three quarters of 2006 and that is all

25  and there is no additional evidence of the current

1   responsibility of management and the Board and the current

2   integrity of management and the Board, then the debtor would

3   move for a directed verdict because there's not a single

4   case, there's not a single case cited to this Court or one

5   that we have found that justifies the extraordinary relief

6   with the high burden that the Trustee faces in support of the

7   replacement of the Board and management.

8               THE COURT: Well, why don't you conclude your

9   examination of Ms. Etlin, and then we'll get to argument.

10              MR. MAYORKAS: Very well, Your Honor.

11              THE COURT: Or motions.

12              MR. MAYORKAS: Thank you, Your Honor.

13  BY MR. MAYORKAS:

14  Q.  Ms. Etlin, just in case you don't have the question in

15  mind, in the course of your around-the-clock work with

16  management and the Board of New Century, have you come to an

17  opinion as to the integrity of management, the top level of

18  management of the company and its Board?

19  A.  Yes, I have.

20  Q.  And what opinion do you have?

21  A.  I think they have, among the management teams that I've

22  worked with in the course of my almost 30-year career,

23  including many of whom were engaged in similar kinds of SEC

24  investigations, including both real fraud as well as

25  accounting errors, that they have shown, during the period of

1  time I've been engaged, very high integrity and very good

2  focus on all of their fiduciary duties as I understand them.

3  Q.  Ms. Etlin, I want to draw your attention now to the

4  process that the company is undergoing, the Chapter 11

5  process specifically.  I ask you, the business of New Century

6  Financial Corporation, is it a - how would you characterize

7  that?  Is it a complex business?  Is it a simple business?

8  A.  It's a very complex business.  The industry of the

9  company is - Well, the basic transaction that they engage in,

10 which is the making of a home mortgage loan to an individual

11 consumer borrower is a relatively simple transaction.  The

12 things that follow from that point on are actually quite

13 complex in that the loans are pooled, they're securitized,

14 they are residual interests, there are sales, there is

15 servicing.  From that perspective it is a relatively complex

16 business, both as to operations as well as the actual legal

17 and financial structure of those transactions.

18 Q.  Ms. Etlin, are you aware of the fact that the company

19 sold its portfolio of loans to Ellington in a bidding

20 process?

21 A.  Yes, I am.

22 Q.  And how would you characterize that process, that sales

23 process?  Was that complex or simple in your expert opinion?

24 A.  The process leading up to the actual successful auction

25 and sale of those assets was very extensive and complex given

1    the complicated nature of the financial instruments that were

2    being sold.  On the one hand you had the L&FAs or loans not

3    financed anywhere, a very nice technical term, but what that

4    meant was those loans potentially had some form of defect

5    associated with them that did not allow them to have been put

6    into a pool or sold off or they were loans that had been put

7    back to the debtor because of some initial defect or early

8    payment default post-transaction.  So, just by their nature,

9    those financial instruments - and there were thousands of

10   them, had issues.  We had to compile all the data relating to

11   them to survive a due diligence process of various bidders,

12   make sure that we could not only report as to the actual

13   documentation around the loans but the actual performance of

14   those loans during the period of time that they had existed.

15   And then, of course, there were the residual assets and those

16   are, again, by their very nature, relatively complex

17   financial instruments that involve all sorts of legal

18   documentation, interpretation.  The methodology and the

19   documentation of the residuals in each of the transactions

20   over time had - they weren't done like cooky cutters, is what

21   I mean.  When they were modified over time they weren't done

22   all under the same documents.  There were often issues with

23   locating all of the documents necessary to make sure that all

24   of the bidders had all of the actual certificates and other

25   kinds of things to evidence ownership.  So it was a very

1  complex and time consuming transaction involving thousands

2  and thousands of pages of both hard copy as well as

3  electronic based documents.

4  Q.  Ms. Etlin, are you aware of the fact that the company

5  will commence its efforts to sell its servicing platform

6  tomorrow?

7  A.  Yes, I am.

8  Q.  And how would you characterize the process leading up to

9  tomorrow's efforts to sell that platform in terms of their

10  complexity or simplicity?

11  A.  The servicing platform is equally complex but for a

12  number of different reasons.  The servicing platform is an

13  operating business.  As I've testified before in this Court,

14  there are over 500 employees in that business.  They have

15  been the subject of extremely active recruiting by

16  competitors who have started up servicing operations within a

17  15 minute drive of the locations of the business, and so,

18  we've had the issue, the added issue of not only all the due

19  diligence, all of the reconciliation activities which go on

20  in servicing relating to their normal operations, layering on

21  then the due diligence activities of the various potential

22  buyers for that business, all their data requests, and their

23  data requests are not just about the servicing operations

24  themselves but the actual performance of the loans under

25  those various servicing contracts, and just hundreds of data

1   requests, special reports to be run, et cetera, and then

2   they've, of course, the servicing platform has also had all

3   of the things associated with the various - I forget what

4   we're calling them today.  We're calling them repurchase

5   lenders or warehouse lenders - anyways, the parties with whom

6   the company had various lending arrangements relating to

7   pools of loans prior to the petition date and issues relating

8   to collection and remission of proceeds and the very

9   extensive reconciliation process that went on with those

10  people.  So, it's again been a very complex process for some

11  of the same reasons as the first transaction, but also

12  additional reasons associated with an actual operating,

13  living, breathing business that actually has to collect money

14  and remit money on a daily basis.

15  Q.  How many individuals do you work with from AlixPartners

16  in this process, in this Chapter 11 proceeding in guiding New

17  Century through it?

18  A.  I have a team of approximately - I think I have either 10

19  or 11 people on the ground at this time.  Three of them full

20  time, just in the servicing operation; two people full time

21  in treasury management, one of whom is the vice president and

22  controller, interim vice president controller of the company,

23  running the company's accounting function; a gentleman with

24  pretty extensive expertise in IT and financial services

25  organizations who's helping the IT function; and a couple of

1   people in bankruptcy administration and one in real estate -

2   two people, excuse me, in real estate and contracts

3   management.

4   Q.  And how many people at the company - how many company

5   employees do you and your team work with in this process?

6   A.  Well, as part of the overall bankruptcy, we probably have

7   active day-to-day contact with over 50 employees of which

8   probably 30 are very much focused on the actual sales efforts

9   for the various parts of the business.

10  Q.  Ms. Etlin, do you - How would you characterize the

11  strategic planning that the Board and management have

12  undertaken in an effort to maximize the value of the estate's

13  assets?

14  A.  There's been a pretty extensive process undertaken, a

15  portion of which, frankly, was already formulated prior to

16  our retention in this case.  It was actually - had been

17  decided upon and was being formulated between the Board and

18  Lazard and the senior management team as we walked in the

19  door which was looking at the various assets the company

20  would need to sell as part of the process, looking carefully

21  at which assets were likely to diminish in value quickly.

22  For example, the loan origination platform, the servicing

23  operation, et cetera, and trying to make sure that the

24  various sales processes were teed up in an appropriate and

25  strategic order taking into account all the various risk

1    factors as well as the amount of due diligence that would

2    need to occur, the potential wasting assets issue, et cetera.

3    Q.  Would it be fair to say, Ms. Etlin, that you work very

4    closely with the Board with top level management and with

5    quite a number of people in the company other than those two

6    groups in effecting the efforts to maximize the value of the

7    assets that the estate is trying to sell for the benefit of

8    its creditors?

9    A.  Yes.  The Board's senior management, Lazard, and debtors'

10   counsel have been all very, very extensively involved in a

11   moment-by-moment basis in this process.

12   Q.  And have you yourself worked closely with the employees

13   of New Century in this effort?

14   A.  Yes, I have.

15   Q.  And what do you think the effect would be should the

16   Board and management be displaced by a trustee on the ability

17   to retain those individuals?

18   A.  As I believe I testified before this Court last week, we

19   typically find a week or so after a bankruptcy filing that

20   the mood of the company's employees has calmed down, that

21   they generally understand that their benefits and other

22   issues are now protected by the bankruptcy process.

23   Unfortunately, in this particular case situation, because of

24   the sale process, the fact that the company has announced

25   that it will in effect be consensually selling off portions

1   of the business as well as, frankly, a lot of the adverse

2   publicity that has occurred in the press relating to

3   assertions that have been in various court pleadings, this

4   employee basis is very, very nervous.  We're having a real

5   hard time retaining them even after the incentive plans that

6   were approved by this Court last week, and I believe that

7   were a trustee to be appointed, the turnover would rapidly

8   accelerate, and we would be very quickly left with no one to

9   finish the work.

10          MR. MAYORKAS: I have no further questions, Your

11   Honor.

12          MR. McMAHON: No questions for the witness, Your

13   Honor.

14          THE COURT: Anyone else care to examine this

15   witness?

16          MR. INDELICATO: Yes, Your Honor, I'll be very

17   brief.  I've waited years for this.

18                        CROSS-EXAMINATION

19   BY MR. INDELICATO:

20   Q.  Ms. Etlin, I'm Mark Indelicato from Hahn & Hessen on

21   behalf of the Creditors Committee.  Ms. Etlin, are you aware

22   if there's a Committee in this case?

23   A.  Very definitely, Mr. Indelicato.

24   Q.  Have you been involved with the Committee?

25   A.  Extensively with the Committee and the Committee's

1    professionals, again, on a daily basis since the appointment

2    of the Committee and the hiring of their professionals.

3    Q.   Had the Committee been involved in all of the major

4    decisions that have been made by the debtors since their

5    appointment on April 9th?

6    A.   Absolutely.  The debtor has solicited the Committee's

7    input and support for every major pleading and filing and

8    every major step that's been taken in this case since the

9    appointment of the Committee.

10   Q.   And there ever been occasions in which the debtor and the

11   Committee have not actually seen eye to eye on some of the

12   issues; isn't that correct?

13   A.   That is absolutely correct.

14   Q.   And when that's correct, we've been able to negotiate

15   resolutions which all - neither party may have been happy

16   with, the resolutions we've presented to the Court.

17   A.   That is correct.

18   Q.   You testified before about all the work that needed to be

19   done to consummate the Greenwich/Ellington sale; isn't that

20   correct?

21   A.   Yes.

22   Q.   Okay, and all of that work was done by the employees -

23   management keeping the employees together before the

24   incentive plan was approved.

25   A.   That is correct.

1  Q.  So there was concern between the - by the debtor and its

2  professionals that in fact you are going to be able to keep

3  those employees together to get to the end game with respect

4  to the Carrington sale and the Ellington sale.

5  A.  Yes, there was, and frankly we're not at that end game

6  today because as I testified last week, there is extensive

7  additional documentation yet to happen in order to actually

8  successfully close that sale as well as then hopefully the

9  servicing sale which will be heard before this Court in

10  another week's time.

11  Q.  Are you familiar with the DIP that has been approved by

12  this Court?

13  A.  Yes, I am.

14  Q.  Is it not a condition or an event of default under that

15  DIP if a trustee is appointed in this case?

16  A.  Yes, it is an event of default.

17  Q.  And if that event of default is exercised upon, what will

18  happen?

19  A.  We require funds under the DIP to make it to a successful

20  closing of the servicing sale even taking into account the

21  proceeds that we'll be receiving from the Ellington sale.

22  There is a gap period, and we need the funds to be able to

23  borrow in order to successfully make it through whatever

24  closing process we're going to have under the servicing sale.

25  Q.  So, if in fact the DIP is terminated, there may be an

1   inability of the debtor to continue.

2   A.  It will be very difficult to make it to a successful

3   closing, and obviously, the power and burden shifts pretty

4   dramatically between the debtor and a potential buyer, and of

5   course, we all know then what happens with that and that the

6   buyer ends up with power and we end up with purchase price

7   adjustments.

8   Q.  That was going to be my next question, Ms. Etlin.  Even

9   if in fact the company is able to continue and would have

10  sufficient cash, would not the appointment of a trustee

11  effect the buyers going forward?

12  A.  Yes, I think it would be a significant disruption to the

13  process.  The process would effectively grind to a halt until

14  a trustee were appointed even if they were to be appointed in

15  a day or two.  We have an auction tomorrow.  We have actions

16  going on moment by moment relating to all the sales, and they

17  need to continue uninterrupted.

18  Q.  How would you characterize - let me rephrase.  Would you

19  characterize this as a very active Committee in your

20  experience?

21  A.  Yes.  This is an active Committee and a very active case.

22  I don't think - I've done a number of very large cases over

23  the years, I don't think I've ever had a case in which we

24  were having hearings twice a week for the first 30 days of

25  the case.

1          MR. INDELICATO: Thank you, I have no further

2     questions, Your Honor.

3          THE COURT: Me neither, by the way.  Let me ask if

4     anyone else wants to examine Ms. Etlin before I go to the

5     U.S. Trustee.  I hear no response.  Yes, Mr. McMahon.

6          MR. McMAHON: Your Honor, a question or two for the

7     witness, if I may.

8          THE COURT: Go ahead.

9                         CROSS-EXAMINATION

10    BY MR. McMAHON:

11    Q.  Ms. Etlin, you're employed by - is it AlixPartners;

12    correct?

13    A.  That is correct.

14    Q.  The AlixPartners' personnel that are staffing the

15    engagement for the debtors, who do you report to?

16    A.  I have a dual reporting relationship to the CEO and the

17    Board of Directors of the company.

18    Q.  So, the CEO being Mr. Morres; correct?

19    A.  Mr. Morres, yes.

20    Q.  And anyone in particular you report to on the Board?

21    A.  Our engagement letter says the entire Board of Directors.

22    I would say the person I have the greatest amount of contact

23    with is the chairman of the Board, Fred Forester.

24         MR. McMAHON: No further questions, Your Honor.

25         THE COURT: All right.  Thank you, you may step

1    down.

2          MR. MAYORKAS: I would reinitiate then Your Honor,

3    formally, the debtors' motion for a directed verdict based on

4    the factual record that I believe is complete before this

5    Court.

6          THE COURT: Any response?

7          MR. McMAHON: Your Honor, the motion for a directed

8    verdict should be denied.  We are talking here about acts or

9    omissions which effectively cost this company $275 million in

10    profits during 2006.

11          THE COURT: And what's the evidence of that?

12          MR. McMAHON: Your Honor, that is in the documents,

13    the fact that the company has indicated that the restatement

14    will likely result in a net loss for 2006.

15          THE COURT: Well, what it means is the financial

16    statements will look different but the cause of the

17    accounting error - doesn't mean that the cause of the

18    accounting error caused the company to lose money; does it?

19          MR. McMAHON: Well, that is correct, Your Honor, but

20    clearly it's a - we're not necessarily attempting to

21    establish a cause effect relationship between what the Board

22    did or did not do or what the officers of the company did or

23    did not do in terms of its oversight role, and in the factual

24    recitation which I put on the record, I think it's fairly

25    clear that current management, including the Board chair at

1   the time, including Mr. Morres, including the chief financial

2   officer were charged with review and attestation as to the

3   effectiveness of the internal controls.   At the end of each

4   of the quarters that are relevant to evaluation of the

5   quarterly financials, and what is clear is that, that

6   attestation that we do was made, and -

7         THE COURT: And let's assume it was wrong.   What

8   culpability should the Court ascribe to that in terms of the

9   relief that the U.S. Trustee is requesting here?

10         MR. McMAHON: Your Honor, I don't think that

11   necessarily that the U.S. Trustee in its motion or in its

12   reply papers has gone so far as to suggest that there is an

13   actual fraud based upon the record or culpability -

14         THE COURT: The U.S. Trustee hasn't even come close

15   to that.

16         MR. McMAHON: Understood, but what we are saying,

17   Your Honor, is that under the statutory definition of cause,

18   which encompasses a broad range of conduct, it goes from

19   anywhere - one end of the spectrum from fraud down to

20   incompetence or gross mismanagement and then we find other

21   words in the statute which are germane to surviving the

22   motion for a directed verdict.   There is the additional

23   phrase, Your Honor, in the statute 1104(a)(1) similar cause,

24   and then the Congress expressly carved out only two things

25   that could not form the basis for motion of a trustee, that

1    is, the sheer number of the holders of securities of the

2    debtor or the total amount of the assets and liabilities of

3    the debtor.  So, cause encompasses a broad range of conduct,

4    and we certainly cited sufficient authority in our papers,

5    Your Honor, for the proposition that it's not a matter of

6    assessing of blame in connection with the failure to

7    accurately report.  Certainly those cases dealing with post-

8    petition financial reporting in monthly operating reports

9    instructed here, and even in pre-petition instances where the

10   debtors could not maintain accurate books and records.  If

11   we're dealing with a public company with a problem as large

12   as this one, certainly this - what happened here, the failure

13   to get those financials right in and of itself constitutes

14   cause -

15          THE COURT: Okay, and the U.S. Trustee argues that

16   in her papers, I think pretty clearly.  But from the Court's

17   vantage point, just assuming for the moment, just for sake of

18   this discussion between you and I, I would accept that as a

19   cause, that accounting error.  Are you arguing that because

20   there were a lot of zeros which followed the first numeral

21   that that constitutes cause, but if the monetary result of

22   the error were of a much lessor magnitude that that wouldn't

23   constitute cause?

24          MR. McMAHON: Well, I think where -

25          THE COURT: And the reason I ask that question is,

1   based upon the debtors' argument that the U.S. Trustee's

2   argument if taken to its logical conclusion would have a

3   court find that a trustee should be appointed every time

4   there was an accounting error.

5          MR. McMAHON: Your Honor, I would suggest that the

6   size and magnitude of the accounting error is a factor for

7   the Court to take into account, but it's more germane to

8   understanding and put in the context of the business and what

9   it was that the company didn't get right in order to

10  understand what the significance is to the debtors.  In other

11  words, the number is certainly illustrative, you know,

12  certainly based upon the record before the Court.  The Court

13  is entitled to look at the facts and say, These people - the

14  management of the debtors at the time and currently were

15  running a mortgage loan origination business and also had a

16  sale aspect to that where the nature of the errors disclosed

17  on December 7 and in relation to the magnitude and connecting

18  that with the magnitude of the number it is, let me say,

19  unbelievable -

20         THE COURT: Look, I think -

21         MR. McMAHON:  - that that error could allude a

22  person purportedly financial experts on the Audit Committee

23  that were reviewing these financials not once, not twice -

24  three times.

25         THE COURT: And you know, Mr. McMahon, I would tend

1  to agree with you.  In fact, any person looking objectively

2  at the circumstance without more, and frankly in this record,

3  there isn't any more, would have to say, That looks really

4  bad.  And it does.  But that was then and this is now.  Right

5  now this company is engaged in connection with an incentive

6  plan hearing last week, I think it was last week, as Ms.

7  Etlin says, we've been meeting regularly and the days kind of

8  run together sometimes, is engaged in the most important

9  activity of maximizing - trying to maximize the value of its

10  assets via sales for the estate, and for me, the evidence in

11  this very minimal record from both sides, doesn't tie in.

12  There's no connection between one and the other, and I can't

13  perceive a benefit even in light of something that happened

14  that looks bad to putting in a trustee to finish out the sale

15  process.  I mean, you know, what I will call, not just in

16  this case but in other cases, the recrimination phase will

17  come soon enough, you know.  Some of it started pre-petition,

18  outside of this Court, and some of it may very well continue

19  later after the sales are concluded in this Court, time will

20  tell.  But I just don't see the trigger, I guess is the way

21  to say it, between the bad thing that happened and taking

22  this process, which I think everyone agrees is necessary to

23  its most advantageous conclusion, which won't take that long,

24  I shouldn't think.

25           MR. McMAHON: Well, I appreciate the fact that the

1   Court has practical questions to ask regarding what the U.S.

2   Trustee's position is with respect to the direction of these

3   cases, but let me answer them directly.  First, it's just a

4   pure matter of statutory interpretation.  We're addressing

5   this motion under § 1104(a)(1), and that's a cause argument

6   that we're making, but there's cause for appointment of a

7   trustee.  With respect to cost benefit analyses, those

8   considerations are effectively wrapped in § 1104(a)(2), and

9   we're not moving for a trustee under that section.  The clear

10  present language of § 1104(a)(1) indicates this simple point.

11  Congress says that if we have management that isn't adequate

12  by virtue of events, acts, and omissions that occurred

13  pre-petition or post-petition, we don't want that management

14  left in control of a bankrupt company, period, and it's not

15  an issue for debate from Congress' perspective.  The way the

16  statute is written, that you shall.  They didn't use the word

17  "may" if there's a sale process going on or "may" if there

18  are other equitable considerations that might overcome what

19  is presently known to this Court.  We have - There is at

20  least a $275 million hole in these financials, and there is

21  serious issues regarding management's ability to oversee and

22  run New Century based upon what occurred pre-petition, and

23  Congress' response to that is simply, Your Honor, to say that

24  the appointment of a trustee is warranted notwithstanding

25  those equitable -

1            THE COURT: And -

2            MR. McMAHON:  - and then the second point, Your

3    Honor, if I just may bring up -

4            THE COURT: Go ahead.

5            MR. McMAHON:  - the argument here.  I don't

6    necessarily see the appointment of a Chapter 11 Trustee under

7    these circumstances, Your Honor, to be the, say - let me say,

8    an interruption in the progress of these cases.  While

9    certainly it may take some, you know, few days for the U.S.

10   Trustee to appoint a Chapter 11 Trustee, likely that Chapter

11   11 Trustee will engage professionals and much like the

12   argument which the debtors are advancing here in court today,

13   meaning the presence of a financial advisor, the presence of

14   counsel, all adds a salutary benefit to the case to the

15   extent they bring the restructuring expertise in stabilizing

16   the direction of the case.  There's no doubt that the, you

17   know, the Chapter 11 Trustee would employ appropriate

18   personnel to move the cases forward.  So, those would be, you

19   know, the two responses to the argument, Your Honor.  First,

20   that the plain language of the statute doesn't support the

21   injection of equitable concerns into the equation, but as a

22   second more important and perhaps practical matter, the idea

23   that a Chapter 11 Trustee that the U.S. Trustee would appoint

24   would not be able to assume the reins of these debtors and

25   move the cases forward quickly and expeditiously is

1    incorrect.

2            THE COURT: Does anyone else care to be heard?

3    Other than the debtor.

4            MR. SCHWARTZ: Your Honor, the Creditors Committee

5    joins with the debtor in seeking - Your Honor, Jeffrey

6    Schwartz of Hahn & Hessen on behalf of the Creditors

7    Committee.  We simply join with the debtor in opposition to

8    the U.S. Trustee's motion.  I don't think there's much more

9    to be said.  Our papers, I think, speak for themselves.  The

10   GAO has made it clear that restatements happen all the time.

11   I think they said less than 6 percent happen for fraud.  It

12   would kill this case if a Chapter 11 Trustee was appointed

13   here, Your Honor, because the financing will go away.  We'd

14   lose millions and millions of dollars on sales, and frankly,

15   Your Honor, if a Chapter 11 Trustee was appointed on this

16   showing as a matter of law, there would not be a Chapter 11

17   debtor in a public company context where a Chapter 11

18   Trustee, based on their argument, wouldn't be appropriate or

19   mandated.  And that - We actually had that, Your Honor.  That

20   was called Chapter 10, and I'm actually old enough to

21   remember Chapter 10s because I worked for Bankruptcy Judge

22   Galway (phonetical) in those days.  So, I think Congress put

23   in something called Chapter 11, Arabic, and decided that

24   debtors could remain in possession absent the showing of

25   cause.  Thank you, Your Honor.

1          THE COURT: Anyone else care to be heard?

2          MR. MAYORKAS: Your Honor, I have some prepared

3    remarks.  Is there something of particular concern to the

4    Court that I may focus upon so as to not use the Court's time

5    unnecessarily or should I proceed with my argument.

6          THE COURT: Proceed with your argument.

7          MR. MAYORKAS: I'd like to, if I can, just respond

8    very briefly to a few of the remarks that counsel for the

9    Trustee has made because I take a - I differ.  Counsel speaks

10   of the glaring errors and asks rhetorically, How could anyone

11   miss it?  I think it's important to note that the company had

12   at its side an independent auditor, KPMG.  And so, we are

13   dealing with a complex company with complex accounting

14   issues, and the fact of the matter is that the company,

15   management, and the Board discovered the error, reported the

16   error, and it's remediating the error.

17         THE COURT: By the way, there's no evidence in that

18   record of that.  The debtors' papers and those of others

19   argued that I think quite well, but where's the evidence of

20   that in this record.

21         MR. MAYORKAS: Actually, Your Honor, the

22   announcement of the restatement came from the company itself,

23   and that is a matter, I believe, of record in this

24   proceeding, and so that would be a self-disclosure by the

25   company.  There is no evidence that it came from any other

1  source than the company itself and perhaps, I think, and the

2  Court is - Well, the Court's point is well taken, but I

3  should have referred the Court's direction or should have

4  requested judicial notice of that fact, and I apologize for

5  my shortcoming in that regard.

6        THE COURT: See, one of the struggles I have and

7  maybe it's apparent at this point is, the error happened.

8  The U.S. Trustee argues that by nature of the magnitude of

9  the error alone, that constitutes cause.  I'm not convinced

10  that that's so under these circumstances, not that it could

11  never happen, despite the fact the number is very large,

12  that's obvious.  Where you might naturally expect my

13  curiosity to lie, among other places, would be in the how.

14  How did it  happen?  The U.S. Trustee makes no allegation as

15  to how it happened.  The debtor and no one else makes any

16  allegation of how it happened.  So I don't know how it

17  happened, and it seems to me that that would be something

18  that would be helpful to the Court, and I'm not asking to

19  take a recess and have everyone run out and try to put

20  together a presentation on how.  This is the record, and I'll

21  act upon the record that has been made.

22        MR. MAYORKAS: I understand the Court's point, and I

23  wanted to make a comment in response to something the Court

24  said about the fact that the Court found the record to be

25  minimal on both sides.  It is not the debtors' burden to

1   disprove the appropriateness or the lawfulness of the

2   appointment of a trustee and the replacement of Board and

3   management at this juncture.  It is the Trustee's burden, and

4   that burden is not a light one.  It is a heavy one as the

5   Court's quite clearly enunciated.  It is by clear and

6   convincing evidence.  I also want to remark on the fact that

7   counsel has stated that the appointment of a trustee can be

8   effected without disruption to the company's Chapter 11

9   proceedings in its effort to sell its assets, most notably,

10  starting tomorrow morning.  With all respect to Mr. McMahon,

11  Mr. McMahon's argument is not evidence, and the evidence that

12  this Court has heard with respect to the issue of disruption

13  is uncontroverted and that evidence was introduced through

14  Ms. Etlin.

15       THE COURT: Well, I will say, I've yet to hear a

16  motion for appointment of a trustee in which the responding

17  party or parties doesn't make that same argument.  So, I hear

18  what you say.  It's not always true.  It may be true in this

19  case.

20       MR. MAYORKAS: Understood, and I'll settle for it

21  being true in this case, Your Honor.  Counsel also made a

22  remark that the cost benefit analysis is really not relevant

23  to the determination of cause in the appointment of a

24  trustee, and that flies directly in the face of Third Circuit

25  precedent.  I note for the Court the case of In Re: GI

1   Holdings, Inc., at 385 F.3d 313, a 2004 decision.  And the

2   Court provides as follows - and this was cited in our papers:

3   "As Sharon Steel", another precedent stated, "the party

4   asking for the appointment of a trustee bears the burden of

5   persuasion by clear and convincing evidence.  This burden

6   does not shrink or shift.  Whether the debtor in possession

7   has special expertise and whether the appointment of a

8   trustee would entail substantial costs are relevant factors

9   to be considered in determining whether this burden has been

10  met in a particular case."  There is a line of cases that

11  follow In Re: GI Holdings that speaks to the fact that the

12  cost benefit analysis is quite germane to this Court's

13  evaluation of whether a trustee is appropriate.  And so here

14  we are, Your Honor, we're well along in the liquidation

15  process, and the process has been met with great success thus

16  far.  Management has achieved -

17       THE COURT: Excuse me.  I'm sorry to interrupt.  Let

18  me ask the phone participants, please, to put their

19  telephones on mute.  Thank you.

20       MR. MAYORKAS: Your Honor, management has achieved

21  the sale of its portfolio of loans for an amount 20 percent

22  greater than the amount of the initial bid.  Our debtor-in-

23  possession financing has been increased to a hundred million.

24  Ms. Etlin has recently accepted the appointment of chief

25  restructuring officer.  With our sale of one of our most

1  critical assets, our servicing platform, beginning tomorrow,

2  it is now at this critical juncture that the Trustee comes

3  before this Court while we are well underway in our effort to

4  maximize the value of our assets, comes to this Court and

5  asks for the extraordinary relief of displacing the Board and

6  management and appointing a trustee in their stead.  And it

7  does so, Your Honor, without cause and in complete and utter

8  disregard of the law that controls this issue.  The U.S.

9  Trustee fails to acknowledge and disregards the law that

10  provides that the appointment of a trustee is an

11  extraordinary relief and should be the exception rather than

12  the rule.  That current management is best suited to maximize

13  the value of the assets of the estate for the benefit of

14  creditors, and that the burden that the Trustee has is one

15  that is very high and specifically a clear and convincing

16  one.  And what did they predicate their extraordinary request

17  on?  And that is, the commission of accounting errors in the

18  first three quarters of 2006, errors that management, as I

19  said previously, itself reported.  There is not a single case

20  that the Trustee has cited in support of the relief that it

21  requests on the basis that it presents.  The cases that the

22  Trustee has cited to this Court itself, Your Honor - first

23  off, I should say, where a trustee has been appointed, are

24  cases where funds have been siphoned, false documents have

25  been filed post-petition, funds have been diverted.  There's

1    been a disabling level, I believe the terminology that the

2    cases speak of, a disabling level of animosity between the

3    debtor and the Creditors Committee, and none of those factors

4    are found in this case, and not a shred of evidence is

5    presented despite the high burden that the Trustee carries.

6    I would like to just take a step back for a moment, Your

7    Honor, because nowhere in the moving papers does the Trustee

8    argue and nowhere in the reply brief that we received

9    yesterday does the Trustee explain why it would actually be

10   in the best interests of the estate and the creditors to

11   appoint a trustee.  That is not expounded upon at all, and

12   isn't this Court privileged to insure that the best interests

13   of the estate and the creditors are protected?  Isn't that

14   the mission of this Court?  And more to the point, isn't that

15   the mission of the Trustee's Office?  And isn't that the

16   mission of the Creditors Committee?  I have never - I must

17   say, Your Honor, my experience in Bankruptcy Court is quite

18   limited.  I'm not a bankruptcy lawyer.  I dealt with the

19   Bankruptcy Court when I was an Assistant United States

20   Attorney for nine years and the United States Attorney for

21   almost three, and I have never seen - and I'm stepping away

22   from my argument just for a moment, and it's always a

23   precarious undertaking, but I have never seen a case where

24   the Trustee has acted to such an extent adverse to the

25   Creditors Committee, a Committee that the Trustee herself

1    appointed to insure that the interests of the creditors are

2    well-protected.  I also have to say, Your Honor, in my

3    experience as a prosecutor, that I've never seen a Trustee

4    act so adversely in the interest of the United States

5    Attorney that has a right -

6         THE COURT: You know what, for that - Forgive me for

7    interrupting.  I think you'd have to blame Congress for that.

8    It's clear to me, under these circumstances that had the U.S.

9    Trustee not filed her motion in this case, she would have

10   been subject, perhaps legitimately to criticism.  I mean,

11   based upon the circumstances, if you look at the new standard

12   that's been adopted with respect to bringing up such a

13   motion, I completely understand why this motion was brought.

14   Now, it may be that I may not grant the relief that's been

15   requested based on this record, but this motion is entirely

16   appropriate in my view.

17        MR. MAYORKAS: Very well, Your Honor, I will move on

18   with my argument.  Your Honor, we have identified for this

19   Court and for the Trustee the remedial actions that we have

20   undertaken.  We spoke of our discovery of the accounting

21   errors and our reporting of them.  We spoke of the

22   commencement of the internal investigation.  We spoke of the

23   fact that the Board, before the results of the internal

24   investigation were known, removed individuals who might have

25   been involved in the accounting from supervisorial functions

1    over the financial well-being of the company.  We spoke of

2    the fact that the Board hired AlixPartners to help navigate

3    the Board and the company in its financial reporting to

4    creditors, the reconciliation of amounts owed to warehouse

5    lenders in a whole additional variety of ways.  We spoke of

6    the company's cooperation with the government investigation

7    and the fact that we worked cooperatively with the Creditors

8    Committee.  We've also spoken of the extensive planning and

9    the complexity of the process that management and the Board

10   have embarked upon.  And what we received in reply yesterday

11   is the following and without any evidentiary support: The

12   Trustee challenged the fact that management has engaged in

13   extensive strategic planning and that the process is complex.

14   The Trustee asserts that the process is only one month old,

15   and that all the debtor has done is complete one sale for 58

16   million, try to sell the servicing platform and are

17   otherwise, quote/unquote, shuttering the loan business.  I

18   think Ms. Etlin effectively dismissed the validity of that

19   argument, and I would respectfully submit that the Court

20   should do so as well.  In response to our presentation of our

21   cooperation with the government investigations, the Trustee

22   states that they were dis-invited to the debtors'

23   presentation to the United States Attorney's Office and the

24   Securities & Exchange Commission.  I don't think I have to

25   belabor the chronology of that dis-invitation because it was

1  preceded by the United States Attorney's dis-invitation of

2  the Trustee's Office, and if I -

3       MR. THEUS: Objection, Your Honor, that's not in the

4  record, and that's not accurate.  We don't need to get into

5  that.  It's not in the record.  It's not accurate.

6       THE COURT: There's a lot of argument that's made

7  that's not supported by a factual record.

8       MR. MAYORKAS: Your Honor, if the Court does not

9  find to be salient the Trustee's point with respect to the

10  debtors' cooperation with the government, I will move on.  If

11  the Court does consider it to be a salient point, then I

12  would actually request permission, albeit a bit untimely, and

13  I apologize for that, to make a proffer of evidence and that

14  proffer would be from me.

15       THE COURT: I will not hear a proffer at this point.

16       MR. MAYORKAS: Very well, Your Honor.  Your Honor, I

17  don't believe I need to argue the testimony of Ms. Etlin.

18  The Court has that well in mind.  Ms. Etlin spoke and was

19  uncontroverted in her discussion of the disruption that the

20  appointment of a trustee would have at this juncture.  We

21  have cited to this Court at some length the relevant case law

22  with respect to the burden and with respect to what

23  constitutes cause and the fact that cause has been found by

24  every court that has considered the issue to be far more than

25  what the Trustee has presented to this Court, and unless

1    there are any questions, Your Honor, I would submit on the

2    record before this Court and respectfully argue that there is

3    no basis for the appointment of a trustee, and that would be

4    to the detriment of everything that we have been working for

5    in cooperation with the Creditors Committee.

6           THE COURT: Thank you.

7           MR. MAYORKAS: Thank you.

8           THE COURT: Mr. McMahon, there was some discussion

9    back and forth in the papers about this, but does the U.S.

10   Trustee seriously contend that the standard that the Court is

11   required to apply here is something other than clear and

12   convincing?

13          MR. McMAHON: Your Honor, that is submitted in the

14   papers.  Yes, it is our argument.

15          THE COURT: Tell me why.

16          MR. McMAHON: Your Honor, I want to be clear as to

17   the argument that's made in our papers.  We acknowledge the

18   fact that the Third Circuit has held on a - I would say it's

19   three occasions now, Sharon Steel, Marvel, and in GI Holdings

20   that the evidentiary standard to be applied in deciding

21   whether or not to appoint a trustee is clear and convincing.

22          THE COURT: And normally I only have to hear that

23   once from the Third Circuit.  They don't have to tell me

24   three times.

25          MR. McMAHON: Your Honor, with respect to, however,

1    what we notice that those cases are devoid of acknowledgment

2    of the fact that the <u>Grogan</u> (phonetical) precedent did come

3    down, does have express language in it which suggests that in

4    bankruptcy litigation the standard of proof to be applied is

5    preponderance of the evidence and less, unless there's clear

6    congressional expression to the contrary.  So, that argument

7    has not been directly addressed by the Third Circuit, and we

8    certainly have cited it, and we do believe, Your Honor, that

9    regardless of what the standard is, we've met it.  A couple

10   of other things, Your Honor.  With respect to <u>GI Holdings</u>, I

11   don't think that debtors' counsel correctly cited the germane

12   point from that case.  <u>GI Holdings</u> dealt with the issue of

13   whether or not the language in <u>Marvel</u> which references the

14   presumption against appointing a trustee has any evidentiary

15   implication.  Certainly, if you go to the Third Circuit's

16   opinion in <u>GI Holdings</u>, it didn't say that we can inject a

17   cost benefit analysis into a § 1104(a)(1) motion.  Your

18   Honor, with respect to the question, the issue Your Honor

19   raised about, I guess, understanding why it is that these

20   things happen, I think what's clear is that the three or four

21   cases which we cited, Your Honor, in our motion papers make

22   the point that that question is effectively secondary, that

23   the interest of the estate in having effective management at

24   the helm able to report accurately means that we are able to

25   respond to and the Court should be able to respond to the

1    simple fact that the accurate reporting was not provided.

2    The Macor Hill (phonetical) case specifically at page 1017

3    says that, "However, where a debtor fails to maintain

4    complete and accurate financial records or fails to

5    substantiate undocumented transactions so that there appears

6    to be confusion in the debtor's accounting system, the courts

7    have viewed these facts as gross mismanagement and have

8    directed the appointment of a Chapter 11 Trustee."  And, Your

9    Honor, with respect to that, to the extent that there ever

10   was a confusion with respect to the debtors' accounting

11   system, a debtor's accounting system, clearly I think we have

12   that here based upon the record that's in front of you.

13            THE COURT: Thank you.

14            MR. McMAHON: Thank you.

15            MR. SCHWARTZ: Just a few minor comments, Your

16   Honor.  First of all, I represented a moving party in the

17   Macor Hill case.  I can't remember if it was before or after

18   the trustee was put in, but that was really a fraud case.

19   That was Judge Schwartzberg's decision.  And, Your Honor, you

20   asked the question how, and I think the answer is, financial

21   accounting standards are very complicated, and parties -

22   according to the GAO report, which is attached to our

23   pleading, it shows that companies misstate financials all the

24   time and for a lot of reasons.  Your Honor, just last week,

25   the Wall Street Journal, on May 10th, there was an article

1    that said as to FAS, 133, that, This accounting standard has

2    led to more than 120 restatements of companies in the past

3    two years.  Critics say the standard which is backed by about

4    800 pages of guidance, is simply too complex to follow.  And

5    it said, The companies which have messed up that particular

6    accounting standard include General Electric, Ford, and

7    Fannie Mae, which, of course, is a  government sponsored

8    enterprise.  May 11th, in the American Banker, Fifth Third

9    Bankcorp, which is one of the ten largest banks in the United

10   States, announced a $2 billion restatement on their

11   financials.  Your Honor, the how is just that I think the

12   financing accounting is very complicated.  Thank you.

13        THE COURT: The point is, there is no evidence in

14   this record about the how.  Okay, anyone else care to be

15   heard?  All right.  I'm prepared to make my ruling.  I'm

16   going to deny the U.S. Trustee's request to appoint a Chapter

17   11 Trustee, and this is why, and it's largely for the reasons

18   that were articulated in the questioning that I've made of

19   counsel, but first of all, I am going to apply a clear and

20   convincing standard by which I believe I am currently bound

21   by Third Circuit precedent which both parties have discussed

22   and cited.  I don't take lightly the magnitude of the error

23   that occurred, and nothing in this ruling should be viewed as

24   the Court's thinking that the error was anything other than

25   what it was.  It was not a small error.  But on this record,

1  which tells me only that the error occurred, and based in

2  part upon the debtors un-refuted arguments about what steps

3  it took to remediate the situation, which were extensive, and

4  based upon - All right, I'm going to ask for one last time

5  that all of the phone participants put their phones on mute.

6  If I hear more sound uninvited from the phone participants, I

7  will terminate the telephone connection.  I base my decision

8  also in part on where the Chapter 11 proceeding and company

9  finds itself now - Terminate the phone connection, please.

10 Thank you.  For the record I did that because the noise did

11 not stop, and I find it distracting.  The company's now

12 involved in trying to maximize the value of what's left of

13 this estate for the benefit of its creditors, and while I do

14 not think that the appointment of a Chapter 11 Trustee will

15 always necessarily involve the type of destruction that the

16 debtor and others here say may occur, I find that on this

17 record and based upon my experience with the sale process

18 that's been ongoing since the inception of this case, that

19 present management along with the Committee and their

20 respective financial advisors have managed the process well.

21 And I do not find on this record that cause exists to appoint

22 a trustee.  Now, I'm going to take a short break and we'll

23 take up the next phase of the hearing, but I will say this,

24 because there's nothing in this record about the how, I

25 frankly think that leans very heavily in favor of the

1  appointment of an examiner, and if the parties wish to take

2  an opportunity during the break to see whether it can come to

3  resolution of that, it might be in their best interest to do

4  so.  Court will stand in recess.

5       (Whereupon at 3:08 p.m., a recess was taken in the

6  hearing in this matter.)

7       (Whereupon at 4:25 p.m., the hearing in this matter

8  reconvened and the following proceedings were had:)

9       THE CLERK: All rise.

10      MS. UHLAND: Your Honor, the debtors and the

11 Committee do make the following proposal and offer to the

12 Trustee and to the Court.  The debtors and the Committee are

13 willing to stipulate to the appointment of an examiner under

14 1104©)(1) not ©)(2), to which we're not conceding, but we are

15 willing to stipulate to the appointment of an examiner under

16 1104©)(1) with the following scope: To investigate the

17 accounting errors leading to the announced restatements of

18 the debtors' financial statements for the first three

19 quarters of 2006 including how and why such errors occurred

20 and who was involved in such accounting errors.  The debtors

21 are amenable to the entry of an order appointing an examiner

22 with such a scope today, however, the debtors would like to

23 work through the precise language, the mechanics of the

24 examiner with the United States Trustee and the Committee to

25 present a final order to the Court at Monday's hearing on the

1    21st.  The debtors are concerned that they have the

2    opportunity to work with our clients and the government

3    agencies investigating this, to think through a variety of

4    issues with respect to the mechanics of the examiner

5    including confidentiality issues, privilege issues, the

6    effect of the appointment of the examiner on the debtors'

7    cooperation currently with the SEC and with the U.S.

8    Attorney's Office.  Your Honor, we have made such an offer to

9    the United States Trustee's Office.  It's perhaps a more

10   complicated client.  To the extent we can't reach such an

11   agreement with such a stipulation, the debtors and the

12   Committee would so move for the entry of such an order today

13   effectively mooting the prior relief or possibly mooting the

14   prior relief of the Trustee's Office.

15         THE COURT: Thank you.

16         MR. THEUS: Your Honor, Walter Theus for the U.S.

17   Trustee.  Just to be clear, we have no problem with the

18   proposed scope of examination.  The line which Ms. Uhland

19   used, I do not have in writing, but it sounded basically like

20   what we've sought subject of the right of the U.S. Trustee or

21   someone else to seek an expansion of scope if, you know,

22   based on what they start finding or a change in the scope

23   because as I heard that language it was limited to the first

24   three calendar quarters of 2006 which was the period of the

25   restatement, but it would be a broader period than that.  So

1    the Court understands, I don't practice in Delaware all the

2    time.  This accent should be a dead giveaway of that, but

3    examiners are appointed in this Court quite frequently, and

4    there's pretty basic examiner orders that seem to do the

5    trick and for some reason this case, while we think that an

6    order could be settled fairly quickly that would provide

7    information, you know, the standard terms in an examiner

8    order, what I'm hearing here is concerns about cooperation

9    between the debtor and governmental agencies and how the

10   examiner will coordinate with governmental agencies.  Well,

11   that goes on in every examination in which there are criminal

12   or regulatory investigations ongoing.  It went on in Enron.

13   It went on in Worldcom.  Worldcom, I mean, the examiner was

14   appointed the day after the case was filed just about.  It

15   went on in Revco.  And those are the cases I'm most familiar

16   with.  So these are issues that while they're there,

17   examiners when we appoint them we make them aware of issues

18   like that, and they're able to work it out.  We frankly fail

19   to see why this order needs to be beefed up for this case

20   anymore than any other case where basically an examiner is

21   being appointed to investigate allegations of pre-petition

22   misconduct.  We, frankly, don't care if the relief is entered

23   under (a)(1) or (a)(2) so long as we want it clear on the

24   record that we feel quite strongly about both the issue with

25   respect to whether the capital trust were insiders of the

1    debtor and also with respect to whether once the $5 million

2    threshold is met under ©)(2), whether the appointment of an

3    examiner is in fact mandatory, and we would, no matter

4    whether the order is entered under (a)(1) or (a)(2).  If it's

5    entered under (a)(1) we want to preserve our position with

6    respect to (a)(2) in both of those issues.  Don't want to be

7    seen as having waived that in any way, shape, or form.  I

8    guess the point I'm trying to make to the Court is we worked

9    very hard while the Court was off the bench, but what I'm

10   hearing from both the debtor and the Committee is while there

11   are issues that they're talking about that are legitimate,

12   we're just not sure that they need to be worked into what is

13   basically a standard order that's been used in multiple cases

14   in this district, and so, we're prepared to submit an order

15   today that will provide for the appointment of an examiner

16   and commence the consultation process, which is not an

17   immediate process, you know.  We will go out and we'll talk

18   to the Committee, we'll talk to the debtors, we'll talk to

19   parties in interest and come up with suggestions and, you

20   know, also use the U.S. Trustee's discretion also in

21   determining who the right person to this job might be.  So

22   it's not like we're going to be walking into court with an

23   order with the appointment of an examiner, an order seeking

24   the approval of an appointment of an examiner, but what we

25   fail to see is why there needs to be some interim process in

1   settling an order for what is fairly routine.  I mean some of

2   the provisions, for instance, there was a reference to

3   privilege.  These orders don't say anything about privilege.

4   Everybody's privilege is maintained.  Now, examiners

5   routinely are able to work things out with parties in

6   interest, and if they can't, then the examiner - this order

7   provides that the examiner is a party in interest for

8   purposes of resolving conflicts that might arise as between

9   the examiner and other parties in interest with respect to

10  the examiner's performance of his or her duties.  So they

11  could come back to the Court if there's a privilege issue

12  that arose.  So, I guess, what I'm trying to explain to the

13  Court is while we don't care - we think this case needs an

14  examiner.  They need one under ©)(1).  We moved under ©)(2)

15  because we thought it was easier.  We didn't anticipate the

16  response we got.  So that's really what we want, but we're

17  somewhat puzzled about the concerns about what should be

18  fairly standard terms in an examiner order.  Thank you.

19          THE COURT: Thank you.

20          MS. UHLAND: Your Honor, briefly, we did receive

21  sort of the latter part of our extended break a proposed form

22  of order from the United States Trustee, and we simply, just

23  both the Creditors Committee and the debtor, just need to

24  take the time to look at it and, you know, we've been focused

25  on the trustee issue.  We've been focused on the ©)(2) issue,

1   and we just need to take the time and make sure that we're

2   comfortable, and I do believe that we will be able to work

3   everything out with the United States Trustee.  The reason we

4   think it would be helpful to go ahead and do it on Monday,

5   enter it on Monday, is that there are remaining open issues,

6   we'll be back in court, and we can try and work out any

7   language issues and further that both of us are leaving

8   tonight to go to New York to have the servicing auction that

9   starts tomorrow.  So, we think that, you know, in the

10  interest of moving things forward but setting reasonable

11  expectations on timing to aim to submit the order on Monday

12  it makes good sense.  Briefly, with respect to the ©)(1),

13  ©)(2) issue, the debtors feel equally strongly that the

14  standards for ©)(2) are not met, and we are reserving our

15  rights on that.  I did want to clarify for the record that

16  our position on ©)(2) rests on the basis that the trusts are

17  insiders not on the basis that Kodiak is an insider.  The

18  debtors do not assert that Kodiak is an insider.  With that,

19  Your Honor, again, I do believe that, you know, we do plan to

20  work with the Trustee's Office.  We're just not in a position

21  right now to take the time, review with our clients the

22  proposed form of order.  We commit to working with the

23  Trustee over the next several days to getting an agreed order

24  we can bring to the Court, and if we can't reach agreement,

25  we'll be back in front of the Court on Monday in any event.

1          THE COURT: I see the Committee would like to be

2    heard.

3          MR. INDELICATO: Thank you, Your Honor.  Mark

4    Indelicato again on behalf of the Committee.  Your Honor,

5    we've worked hard.  We heard the Court's suggestion, and we

6    worked hard to come to a resolution on the appointment of a

7    trustee, working through what we thought were the hard

8    issues, the scope and the timing of the issues, but, Your

9    Honor, this is a complicated case.  I know you've heard that

10   time and time again.  You've heard that there are a lot of

11   zeros, and you've heard from the U.S. Trustee that we don't

12   see why it should affect and it may not affect, but, Your

13   Honor, when we do this order we have to do it right.  It

14   could affect claims against third parties.  It could affect

15   assets of this estate, and as counsel to the Committee, Your

16   Honor, we can't make a mistake.  We need to have it reviewed

17   by the appropriate parties.  We need to make sure everything

18   we do, we've done right.  This is not an issue if for example

19   the privilege is waived in some way, shape, or form we may be

20   able to get it back.  This is something that needs to be

21   carefully considered, the coordination between the agencies,

22   the fact that there may be a privilege issue, the fact of the

23   examination.  So, we're agreeing in concept to the relief

24   requested.  What we've suggested is, like we've done in

25   almost every order that's been entered in this case, is we've

1    heard the Court's ruling.  Let's take a step back.  Let's

2    look, let's make sure we get it right so we present the order

3    to the Court, it's what the Court ruled, it's what the

4    parties agreed, and that's all we're asking for in this case,

5    Your Honor, is we've agreed to the appointment of the

6    examiner, but let's step back and make sure the order does

7    what we all expect it to do.  So, we would propose that we

8    work on the order between now and Monday, and then on Monday

9    we can all walk arm and arm to the Court and present a

10   consensual order.  Thank you.

11        THE COURT: All right, does anyone else care to be

12   heard?

13        MR. BOTICA: Good afternoon, Your Honor.  Matthew

14   Botica, Winston and Strawn for Kodiak Funding.  Your Honor,

15   we did file a limited reply.  It is directed at one issue in

16   this case.  We believe from our perspective the stipulation

17   that the debtor has made on the record that Kodiak Funding is

18   not an insider of these debtors coupled with an order which

19   would provide for a finding under 1104©)(1) adequately

20   addresses the issues raised in our reply, so, it will be a

21   satisfactory resolution for Kodiak Funding.

22        THE COURT: Thank you.

23        MR. BOTICA: Thank you.

24        THE COURT: Anyone else care to be heard?  All

25   right.  I waited while the parties talked in the hopes that

1    the matter could be resolved today because sometimes while

2    additional time permits more considered thought about various

3    issues, sometimes it has the effect of having parties move

4    farther away from where they were at the point at which they

5    left the courthouse.  Based on the record that's made, I am

6    in agreement with the U.S. Trustee that an examiner is

7    necessary in this case.  Although I'm not opposed to

8    permitting additional time for the debtor and the Committee

9    to think about things and come up with a considered draft

10   that hopefully the U.S. Trustee will agree to.  If not, I'll

11   resolve it, and I guess what I would ask is that to the

12   extent there isn't a resolution on the terms - agreement on

13   the terms of a form of order, I ask that I have suggested

14   forms from either side, you know, by say 4 o'clock on Friday

15   so I have something to consider prior to the Monday hearing.

16   I'm reluctant to say too much more other than while there may

17   be considerations which should be covered in the order, I

18   tend to agree with the U.S. Trustee at least as far as the

19   scope has been agreed to and as it's been articulated.  It's

20   pretty straightforward, and, of course, it would be without

21   prejudice for a party to come back and ask for a change in

22   that scope as well.  I am amenable to that.  All right.  Any

23   other questions with respect to this matter?

24        MR. LOGAN: Your Honor, just at the outset, I

25   mentioned we had a stipulation that resolved the DB

1  securities objection and also resolves a preliminary

2  injunction hearing on Friday and we didn't have signatures at

3  that time.  We have signatures now, so if I may approach.

4          THE COURT: Yes.  All right, now who has seen this

5  stipulation?

6          MR. LOGAN: Your Honor, it was worked out with the

7  Creditors Committee, DB securities, and the debtors.  Mr.

8  McMahon does not have a copy, but I described it to him.  I'm

9  more than happy to give him a copy.

10          MR. McMAHON: Your Honor, I had a chance to look

11  through the order, and we don't have a position with respect

12  to what's been described in that.

13          THE COURT: Okay.  Well, let me - I'll review it

14  when I get off the bench today, and -

15          MR. LOGAN: That's fine, Your Honor.  It doesn't

16  need to be entered today.

17          THE COURT: But you'll know before Friday whether I

18  have any questions or issues with it.  Okay.  There's one

19  remaining matter on the agenda.

20          MR. MERCHANT: Your Honor, Mike Merchant of

21  Richards, Layton & Finger on behalf of the debtors.  Your

22  Honor, the one remaining matter on the agenda is the debtors'

23  motion for approval of miscellaneous asset sale procedures.

24  There were two objections filed.  We also received comments

25  from the Creditors Committee and from the Office of the U.S.

1    Trustee.  I believe we've reached agreement with all parties

2    on a form of order that's agreeable to all.  Perhaps the best

3    thing to do would be to hand Your Honor a blackline and walk

4    through the changes to the form of order.

5           THE COURT: Thank you.

6           MR. MERCHANT: If I may approach?

7           THE COURT: Yes.

8           MR. MERCHANT: Your Honor, the form of order - the

9    order itself is for the most part what was filed.  Now the

10   procedures are attached as Exhibit A, and most of the changes

11   are reflected in the procedures.  With respect to the order,

12   you'll notice that paragraph (4) is new and that basically

13   reserves the rights that any secured creditor may have under

14   § 363(k) to credit bid pursuant to these procedures.  If Your

15   Honor looks at the procedures which are attached as Exhibit

16   A, in paragraph (1), our authority under the miscellaneous

17   asset sale procedures is limited to the sale of furniture and

18   equipment, however, the debtors can also sell other personal

19   property in accordance with the procedures with the written

20   consent of the Committee.  And if you look at the last

21   sentence on paragraph (1), we make clear that the procedures

22   will not be used to consummate any sales of assets to

23   employees or insiders.  If Your Honor turns to paragraph (2)

24   of the procedures, we make clear that the notice to the DIP

25   lender will only be made so long as amounts remain

1   outstanding under the DIP.  Additionally, at the end of

2   paragraph (2), Your Honor, we've made clear that the debtors

3   will use reasonable best efforts to provide information to

4   and consult with the Creditors Committee before entering into

5   any transactions.  If Your Honor looks at paragraph (3) of

6   the procedures, they relate to the contents of the sale

7   notice, and we've made clear that the notice will include -

8   will identify that the selling debtor - it will list the

9   approximate book value or estimated value of the assets being

10  sold.  It will also include an allocation of the purchase

11  price amongst the assets being sold.  That was one of the

12  requests of one of the objectors, and to the extent that

13  there's a sale agreement, the sale agreement will be

14  attached.  If Your Honor looks at paragraph (4) of the

15  procedures, we've agreed with the Committee that we'll

16  provide them with 10 business days' notice of any sale,

17  however, if Your Honor turns to paragraph (5) you'll see that

18  while we are giving the Committee 10 business days to object,

19  to the extent they consent, we could still consummate any of

20  these sale transactions in less than 10 days but basically

21  between 5 and 10 days.  We'll never consummate anything less

22  than 5 days which is the objection period with respect to all

23  of the other interested parties.  If Your Honor turns to

24  paragraph (8), at the request of the Trustee we've added that

25  the debtors will not sell any interest in which the debtors

1    have a consumer credit - hold on one second, Your Honor.

2    Perhaps it's best if I just read from the order there.  Make

3    clear that debtors will not sell any interest which they may

4    have in consumer credit transactions which are subject to the

5    Truth in Lending Act or any interest in a consumer credit

6    contract.  And in paragraph (9) of the procedures, Your

7    Honor, we make clear that we will not be selling any assets

8    subject to lease agreements absent the consent of the non-

9    debtor parties to such lease agreements.  Those are all the

10   changes to the order, Your Honor.  I don't know whether any

11   of the objecting parties have any additional comments.

12           THE COURT: Let me ask if anyone else would like to

13   be heard.

14           MS. MERSKY: Your Honor, Rachel Mersky on behalf of

15   RBC.  As a result of the changes on the order which have been

16   negotiated, RBC accepts the order.

17           THE COURT: Thank you.

18           MR. FONTANA: Good afternoon, Your Honor.  David

19   Fontana on behalf of General Electric Capital Corporation.

20   Given the changes to the order, that resolves all of our

21   objections to the bidding procedures.

22           THE COURT: Thank you.  Anyone else care to be

23   heard?  I hear no response.  All right, I have no questions.

24           MR. LOGAN: No questions, Your Honor?  Then I have a

25   clean form of the order, if I may approach?

1          THE COURT: Yes.  The order has been signed.

2   Anything further for today?

3          MR. LOGAN: I don't believe there is anything

4   further, Your Honor, thank you.

5          THE COURT: All right, thank you all.  That

6   concludes this hearing.

7          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

8          THE COURT: The Court is adjourned.

9          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

10         (Whereupon at 4:46 a.m., the hearing in this matter

11   was concluded for this date.)

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M.  Ryan                    May 17, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221