## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| | : | |
| In re: | : | Case No. 07-10416 (KJC) |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Jointly Administered |
| INC., a Delaware corporation, <u>et al.</u>, | : | |
| | | Re: Docket Nos. 70 and 71 |
| Debtors. | | |

Objection Deadline: May 17, 2007 @4:00 PM[1]
Hearing Date: May 21, 2007 @10:00 AM

Re: Docket Nos. 70, 71 and 340

## <u>DEUTSCHE BANK NATIONAL TRUST COMPANY'S ADEQUATE ASSURANCE OBJECTION IN CONNECTION WITH DEBTORS' PROPOSED SALE OF SERVICING BUSINESS</u>

Deutsche Bank National Trust Company ("<u>DBNTC</u>") hereby files its objection to the

Emergency Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving

Bidding Procedures and Bid Protection in Connection with the Proposed Sale of Assets Used in

their Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain

Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and

(II) An Order (A) Approving the Proposed Sale and (B) Granting Related Relief (the "<u>Servicing</u>

<u>Sale Motion</u>") and in connection therewith, the Notice of New Century's Intent to Assume and

Assign Certain Executory Contacts and Unexpired Leases in Connection with the Proposed Sale

---

[1]    On May 14, 2007, DBNTC filed with this Court the Deutsche Bank National Trust Company's Assumption and/or Cure Objection in Connection with Debtors' Proposed Sale of Servicing Business (Docket No. 667, the "<u>DBNTC Assumption and Cure Objection</u>"). The Servicing Sale Motion established a separate objection deadline of May 17, 2007, for any objections to adequate assurance of future performance under the Assumed Contracts. Because the Debtors and DBNTC have been making progress towards resolving DBNTC's objections to the Servicing Sale Motion, the Debtors and Carrington (as hereinafter defined) agreed to an extension such deadline to May 18, 2007. While progress continues to be made in resolving the objections stated herein, as of the time of this writing, they have not been resolved. DBNTC incorporates herein by reference the DBNTC Assumption and/or Cure Objection. Terms not otherwise defined in this Objection shall have the meanings ascribed to them in the Assumption and Cure Notice or in the DBNTC Assumption and Cure Objection.

of its Servicing Business and Fixing Cure Costs associated Therewith (the "Assumption and Cure Notice").  DBNTC objects to the assumption and assignment of the servicing contracts between the Debtors and DBNTC (the "DBNTC Servicing Contracts") on the grounds that the Debtors have not provided adequate assurance that Carrington Mortgage Services, L.L.C. ("CMS") can fully perform the obligations that will arise after the closing of the proposed sale of the Debtor's servicing business and specifically those arising under the DBNTC Servicing Contracts.  In further support of its objection, DBNTC represents the following:

## BACKGROUND

**A.**     **The Assumption and Cure Notice**

   **i)**     **The DBNTC Servicing Contracts**

   1.     DBNTC is a national banking association which is the main trustee for the mortgage loan securitization transactions that constitute the Debtors' mortgage servicing business.  DBNTC acts as trustee for 23 mortgaged backed securities trusts, which originally contained over $34 billion in principal amount and currently contain approximately $13 billion in principal amount of "subprime" mortgage loans originated and serviced by Debtor entities (the "Seller/Servicer Trusts").  (A list of the Seller/Servicer Trusts is attached hereto as Exhibit A.) The beneficial owners of these mortgage loans are investors in mortgage backed securities issued by the Seller/Servicer Trusts, who typically include public and private pension funds and other institutional fixed income investors.  Since the mortgage loans are the principal assets of the Seller/Servicer Trusts, the continuous diligent servicing of the loans is crucial to those investors.

   2.     The heart of the Servicing Sale Motion is the right to assume and assign the debtors' rights to act as the "Servicer" or "Master Servicer" under the DBNTC Servicing

Contracts and the assumption and assignment of the servicing contracts related to certain other securitization trusts for which Wells Fargo Bank, N.A. serves as trustee.[2]

3.    Each Seller/Servicer Trust is formed pursuant to either a "Pooling and Servicing Agreement" or a combination of a "Servicing Agreement" and "Indenture" relative to one of the Seller/Servicer Trusts.  Each of these documents, which are (with some discrepancies as to nomenclature) included in the Debtors' schedule of Assumed Contracts, are referred to herein as a "DBNTC Servicing Contract," even if the underlying contract consists of a number of integrated documents.

4.    Each DBNTC Servicing Contract is voluminous (generally 100-200 pages) and complex.  Under each DBNTC Servicing Contract, the Debtors have agreed to perform a series of tasks related to the servicing of the massive portfolios of mortgages owed by the relevant Seller/Servicer Trust and to perform certain other obligations related to the mortgage securities issued thereunder.

5.    The DBNTC Assumption and Cure Objection contains a lengthy description of the extensive duties of the servicer under the DBNTC Servicing Contracts which is incorporated herein.  For present purposes, suffice it to say that such duties include duties with respect to the servicing of loans (the "Loan Servicing Duties") and duties with respect to the mortgaged backed securities transactions for which the loans are serviced (the "Securities Duties"), including advancing delinquent principal and interest on mortgage loans to the Seller/Servicer Trusts (the "Advancing Duties") and broadly indemnifying other transaction parties (including DBNTC) for

---

[2]    The terms and conditions of the DBNTC Servicing Contracts and the "Pooling and Servicing Agreements" under which Wells Fargo serves as trustee are substantially similar in regard to the qualifications of the servicer and of any successor servicer.  Accordingly, DBNTC hereby joins in and adopts each objection stated in the Objection of Wells Fargo Bank, N.A. to Adequate Assurance of Future Performance, filed May 17, 2007 (Docket No. 754) as if each reference therein to the "Wells Securitization Trusts" referred to the Seller/Servicer Trusts, each reference to "Pooling and Servicing Agreements" referred to the DBNTC Servicing Contracts and each reference to the "Wells MLPAs" referred to the mortgage loan purchase agreements associated with each Seller/Servicer Trust.

any liability, loss, cost and expense arising from or related to the transactions (the "Indemnity Obligations").

6.      It is widely recognized that the performance of a servicer for securitization transactions, including the servicer's financial strength, is one of the primary determinants of mortgage pool investment performance.  "The quality and stability of a servicer's operation have a direct impact on its default management capabilities and ultimately on security losses, regardless of product type." (Fitch Ratings, "Impact of Financial Condition on U.S. Residential Mortgage Servicer Ratings", March 26, 2007, attached hereto as Exhibit "B".)  The servicer for such transactions must have sufficient net worth and liquidity to meet the financial demands of the Loan Servicing Duties and the Securities Duties.

7.      As trustee for each of the Seller/Servicer Trusts, DBNTC is required to act as "servicer of last resort" and is obligated, on terms and conditions set forth in the DBNTC Servicing Contracts, to perform the Loan Servicing Duties and the Securities Duties in the event of certain defaults by the servicer.  Thus, in addition to the investors, DBNTC itself has a critical interest in the proper performance of the servicer's duties under the DBNTC Servicing Contracts, since it backstops those obligations.

ii)      **The Auction Process**

8.      In the Servicing Sale Motion, the Debtors requested authority from this Court to proceed with an auction of their servicing business utilizing a "stalking horse" bid provided by Carrington Capital Management, LLC, Carrington Mortgage Services, LLC (collectively "Carrington").  The Debtors, with the assistance of their professionals, determined that three parties had submitted qualified counter-offers and proceeded with an auction conducted in New York City, NY on Wednesday, May 16, 2007.  At the end of the auction, the Debtors determined

that CMS was the Successful Bid apparently on the basis of purchase price alone, despite the fact that another bidder (which came in at a close second) had established beyond any doubt that it could fully perform the DBNTC Servicing Contracts, was well-capitalized and currently operates a fully licensed and highly rated loan servicing businesses.

9.      Also in accordance with the Assumption and Cure Notice, Carrington and each of the qualified bidders were required to provide DBNTC with an Adequate Assurance Package. Two other bidders provided DBNTC with extensive materials demonstrating their operational and financial capabilities, including audited financials, internal audit reviews, rating agency reports and compliance certifications.  In addition, these other bidders provided DBNTC with written answers to questions concerning proposed staffing of servicing functions and concerning remedial action to address certain problems faced by these distressed subprime loan portfolios.

10.      Unfortunately, and notwithstanding the fact that it has had several weeks to do so, CMS provided DBNTC (and, apparently, Wells Fargo as trustee for the Wells Securitization Trusts) with very scanty information consisting of a brief Powerpoint presentation and an informational conference call concerning its future plans.  In particular, CMS did not provide DBNTC with any written materials regarding: (a) the corporate structure of CMS and its relationship to other Carrington entities, (b) the capitalization and balance sheet of newly-formed CMS or any other Carrington entity, and (c) any "keep well", "guaranty" or other credit support that other Carrington entities intended to offer to assure CMS's performance.  Moreover, CMS provided DBNTC with no written business plan demonstrating a viable strategy to stabilize and improve the "fragile" (to use the Debtors' description) state of the New Century servicing platform that it is buying or to demonstrate that it was making the commitment to place additional loans onto the servicing platform, which commitment is essential to ensuring that the platform will remain viable as the loan balances (and hence fee income) from the DBNTC

#8573014 v1

Servicing Contracts and the Wells Fargo Pooling and Servicing decline.  Finally, although CMS

has repeatedly suggested to DBNTC and others that it intends to address DBNTC and investors'

concerns by "wrapping" its servicing obligations with an established mortgage servicer (who

would, in essence, guaranty its performance), there is nothing in the Servicing Sale Motion or the

Carrington Agreement that requires such wrapping.  Indeed, it appears that CMS will not enter

into such a wrapping arrangement unless it is required to do so by Freddie Mac or by credit

rating agencies whose approvals are expressly required under or in connection with a servicing

transfer under the DBNTC Servicing Contracts.

11.    DBNTC notes that after the auction, CMS representatives offered DBNTC

additional information regarding the foregoing matters.  Although the information received to

date is insufficient, it is DBNTC's hope that CMS will cooperate with DBNTC and other parties

in interest and supply them with additional information about many of these issues prior to the

hearing on the Servicing Sale Motion.  It is vital both to DBNTC, securities investors, other

parties in interests and, indeed, the bankruptcy process itself that DBNTC's concerns be fully

addressed so that any court ordered assumption and assignment not result in a future default by

the servicer.


## OBJECTIONS

12.    DBNTC objects to the Servicing Sale Motion and to the Assumption and Cure

Notice on the grounds that the Debtors have not provided adequate assurance of future

performance as required by § 365(f)(2) of the Bankruptcy Code, i.e. that CMS can fully perform

the obligations that will arise after the closing of the proposed sale of the Debtor's servicing

business and specifically those arising under the DBNTC Servicing Contracts.

#8573014 v1

13.     Pursuant to § 365(f)(2) of the Bankruptcy Code, a debtor "may assign an executory contract only if (A) the [debtor] assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2).  The requirement of adequate assurance of performance provides needed protection to the non-debtor party because the assignment relieves the debtor and the bankruptcy estate from liability for breaches arising after the assignment.  See Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001) (citing LRSC Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 299 (3d Cir. 2000)).

14.     The term "adequate assurance of future performance" is not defined in the Bankruptcy Code, but is included in both § 365(b)(1)(C) and § 365(f)(2)(B).  See Cinicola, 248 F.3d at 120 n. 10.  Section 365(b) requires adequate assurance of future performance of an executory contract where a debtor seeks to assume an executory contract on which it has defaulted.  See id.  This protection is also required when a debtor seeks assign an executory contract under § 365(f).  Under either section, the definition of the term "should be generally the same."  Id.  See also Don Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, Minn. L. Rev. 341, 362 (1980).

15.     The Third Circuit adopts the definition of "adequate assurance of future performance" put forth by the Fifth Circuit in Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985).  In Richmond Leasing, the court explains that "'adequate assurance of future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows that they were intended to be given a practical, pragmatic construction."  Richmond, 762 F.2d at 1309.  Under the legislative history to the Bankruptcy Code, "[t]he language is adopted from Uniform Commercial Code § 2-609(1).  What constitutes . . . 'adequate assurance

of future performance' must be determined by consideration of the facts of the proposed assumption.'" Id. Moreover, "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance . . . ." Id. "What constitutes 'adequate assurance' is to be determined by factual conditions." Id.

16.    In many cases, a court will look at the ability of the assignee to perform under the assigned contract in order to determine whether the non-debtor party will be adequately assured of future performance. See In re Bygaph, Inc., 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) (examining ability of assignee to perform under lease, including examination of financial resources); Fulton Air Serv., Inc. v. Fulton County, Ga. (In re Fulton Air Serv., Inc.), 34 B.R. 568, 572 (Bankr. N.D.Ga. 1983) (ordering evidentiary hearing regarding proposed assignee's ability to perform under contract to be assigned); In re Washington Capital Aviation and Leasing, 156 B.R. 167, 173 (Bankr. E.D.Va. 1993) (stating "while an absolute guarantee of future performance is not required . . . more than the debtor's speculative plans are needed" and examining financial ability of proposed assignee to perform under agreement to be assigned) (citing Richmond, 762 F.2d at 1310; In Matter of Silent Partner, Inc., 119 B.R. 95, 98 (E.D. La. 1990); Enfield Trust Associates, Inc. v. World Skating Ctr., Inc. (In re World Skating Ctr., Inc.), 100 B.R. 147, 148-49 (Bankr. D. Conn. 1989)).

17.    In order to perform the Loan Serving Duties and the Securities Duties fully, CMS must not only possess requisite records, personnel and equipment, but also substantial financial wherewithal. While CMS is acquiring a physical plant, records and personnel from the Debtors, it is not acquiring any of the financial wherewithal and, to date, it has demonstrated none on its own.

18.     Three aspects of the Loan Servicing Duties and the Securities Duties impose particular financial demands on servicers and deserve closer scrutiny.

19.     First, although everyday loan processing activities may be undertaken profitably for the monthly servicing fees provided in the transactions, remedial and foreclosure activities require additional cash outlays pending recoveries on the loans.  DBNTC is aware that as the Debtors' finances deteriorated, the loss mitigation staffing of the servicing platform that CMS is inheriting deteriorated to the point that it obtained an "unsatisfactory" rating in internal audit reviews.  These reviews show that critical aspects of the foreclosure process, including acting timely to protect collateral properties, are in need of substantial improvement.  Indeed, the KPMG report on the Debtors' servicing noted that remedial and foreclosure activities were not being performed in compliance with relevant servicing criteria.[3]  To avoid such breaches once it becomes servicer, CMS must possess adequate financial strength to increase loss mitigation staffing immediately.  In addition, CMS must possess sufficient long-term financial strength to continue loss mitigation efforts in the future when the servicing fees for the securitizations (which are based on a percentage of outstanding loan principal) inexorably decrease even as the proportion of distressed assets in the pools increases.

20.     Second, the Advancing Duties impose monthly liquidity demands which CMS has not demonstrated it can meet.  As the Debtors and CMS are aware, the Advancing Obligations on the DBNTC Servicing Contracts currently require the servicer to have an average of approximately $45 million outstanding each month.  On information and belief, this number increases to over $60 million if the Wells Securitizations are taken into account.  The Debtors financed this obligation through the Advance Line with Citibank which is to be repaid with a

portion of the servicing sale proceeds. Indeed, the termination of this facility was one of the events that led up to the filing of the Debtors' Chapter 11 proceeding. CMS should be required to demonstrate that it possesses adequate liquid resources to fund the Advancing Obligations.

21.     Third, the servicer is required to perform the Indemnity Obligations to assure that the other parties to the transaction (who are paid relatively small fees to perform ongoing transaction processing functions) are protected from larger costs that might be imposed on transaction parties. For example, indenture trustees and other transaction parties are frequently named in loan level litigation that is handled by the servicer. The servicer is required to defend and indemnify these parties with respect to such claims. While the parties are often further indemnified by the securitization trusts themselves (as is the servicer in many cases), the failure of the servicer to perform its obligations shifts such costs from the servicer to securities investors.

22.     CMS has asserted to DBNTC that it is not required to furnish any evidence of its financial ability to perform. Instead it asserts that all it needs to do to meet the "adequate assurances" requirement is to satisfy two conditions set forth in Section 5.03 of the DBNTC Servicing Contracts: (a) qualification as a Freddie Mac approved servicer and (b) written evidence that credit rating agencies will not qualify, reduce or withdraw their ratings for the securities issued by the Seller/Servicer Trusts.[4] While DBNTC disagrees that satisfying this contractual requirement disposes of any other "adequate assurances" inquiry under Section 365, DBNTC respectfully requests that the Court include, in any approval order, a specific

---

[3]     DBNTC is further aware that: (1) Debtors have not been timely paying foreclosure attorneys and other professionals, resulting in slowed foreclosure work, (2) foreclosures in Ohio have been slowed by the cease and desist order resulting from the Debtors' alleged violations of law and (3) large numbers of the Seller/Servicer Trust loans will soon reach interest reset dates, which will place additional demands on the servicer to assure that such resets are properly applied and to notify and, in some cases, work with borrowers who may otherwise default.
[4]     DBNTC notes that each Servicing Agreement additionally provides that the Servicer covenants to be a HUD qualified servicer. See, e.g., 2004-1 Servicing Agreement, §2.01(iv). CMS should be required to demonstrate that it will comply with this covenant on and after the Closing Date.

requirement that CMS satisfy each of these contractual requirements prior to the closing of the proposed sale transaction and a statement that nothing in the approval order is intended to modify or supercede any covenant or requirement of the DBNTC Servicing Contracts. Otherwise, CMS will be in breach of the DBNTC Servicing Contracts, and find itself subject to termination, as soon as the transaction closes. Neither securities investors nor the other participants to the securitization transactions should face an imminent risk of a second round of defaults in the wake of these proceedings.

23.     Finally, CMS has admitted that as of the Closing Date, it will not possess requisite licenses to service mortgages in all states where the Seller/Servicer Trusts own loans. Each DBNTC Servicing Agreement requires that the Servicer be:

> duly authorized and qualified to transact any and all business contemplated by this Servicing Agreement to be conducted by the Master Servicer in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each Mortgage Loan and to service the Mortgage Loans in accordance with the terms of this Servicing Agreement

The court should require CMS to demonstrate that, under the proposed transaction structure, the lack of such licenses will not violate these covenants of the DBNTC Servicing Contracts or otherwise impair CMS's ability to perform all of its duties under the DBNTC Servicing Contracts.

## CONCLUSION

For the reasons set forth above, DBNTC respectfully requests that the Court grant it the following relief:

1.     Deny the Servicing Sale Motion relative to the DBNTC Servicing Contracts, and

2.     Grant DBNTC such other and further relief as may be just.

-11-

Dated:  May 17, 2007

PEPPER HAMILTON, LLP

/s/ David B. Stratton
David B. Stratton (No. 960)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:  (302) 777-6500
Facsimile: (302) 421-8390

and

NIXON PEABODY LLP

Mark N. Berman
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110
Telephone:  (617) 345-6037
Facsimile:  (617) 866-5868


NIXON PEABODY LLP

Dennis Drebsky
Joseph Gitto
Nixon Peabody LLP
437  Madison Avenue
New York, NY  10022
Telephone:  (212) 940-3000
Facsimile:  (212) 940-3111