| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NEW CENTURY TRS HOLDINGS, | : Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : |
| | : Re: Docket No. 70 |
| Debtors. | : |
| | : Objection Deadline: May 14, 2007 at 4:00 p.m. |
| | : |
| | : Hearing Date: May 21, 2007 at 10:00 a.m. |

## JOINT REPLY OF DEBTORS AND DEBTORS IN POSSESSION AND OFFICIAL UNSECURED CREDITORS' COMMITTEE TO (1) OBJECTIONS OF WELLS FARGO BANK N.A. TO (A) CURE AMOUNTS AND (B) ADEQUATE ASSURANCE OF FUTURE PERFORMANCE AND (2) OBJECTION OF DEUTSCHE BANK NATIONAL TRUST COMPANY TO ASSUMPTION AND/OR CURE IN CONNECTION WITH SALE OF DEBTORS' SERVICING BUSINESS

New Century Financial Corporation, a Maryland corporation, New Century TRS Holdings, Inc., a Delaware corporation, and their direct and indirect subsidiaries, each as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), together with the Official Unsecured Creditors' Committee (the "Creditors' Committee"), respectfully submit this reply to (1) the objections of Wells Fargo Bank N.A. ("Wells Fargo") to (a) cure amounts (the "Wells Cure Objection") (Docket No. 670) and (b) adequate assurance (the "Wells Adequate Assurance Objection") (Docket No. 754) and (2) the objection of Deutsche Bank National Trust Company ("DBNTC") to assumption and/or cure (the "DBNTC Objection")

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

in connection with the Emergency Motion of Debtors and Debtors in Possession for (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Proposed Sale of their Assets Used in Loan Servicing Business, (B) Scheduling Hearing to Consider Proposed Sale of Certain Assets and Approving Form and Manner of Notice Thereof and (C) Granting Related Relief and (II) an Order (A) Approving the Proposed Sale and (B) Granting Related Relief (the "Sale Motion") (Docket No. 70). (The Wells Cure Objection, the Wells Adequate Assurance Objection and the DB Objection are sometimes referred to as the "Objections."). In support of this reply, the Debtors and the Creditors' Committee respectfully represent as follows:

## INTRODUCTION

1. On April 20, 2007, the Court entered its Order establishing bidding procedures (the "Bidding Procedures Order") (Docket No. 340) governing the sale of the Debtors' mortgage loan servicing business (the "Servicing Business"). Pursuant to the Bidding Procedures Order, the Debtors conducted an auction of the Servicing Business assets on May 16, 2007 (the "Auction").

2. At the conclusion of the Auction, the Debtors determined that Carrington Capital Management, LLC and Carrington Capital Mortgage Services, LLC (collectively, "Carrington") had submitted the highest and best offer for the Servicing Business assets and declared Carrington's bid (which includes approximately $184 million in total cash consideration) as the Successful Bid for such assets. Thus, Carrington was deemed the Successful Bidder at the Auction.

3. As part of the Servicing Business, New Century Mortgage Corporation services pools of loans pursuant to various Pooling and Servicing Agreements (the "Pooling and Servicing Agreements"), including those where Wells Fargo and DBNTC act as indenture trustees to the securitization trusts which hold such loans. The Debtors seek to assume and assign such Pooling and Servicing Agreements to Carrington.

## REPLY TO OBJECTIONS OF DEUTSCHE BANK

4. DBNTC objects to the sale of the Servicing Business on two grounds.

2

First, DBNTC objects to the sale because it believes that the sale does not provide for a full assignment of the Pooling and Servicing Agreements. To resolve that objection, the parties have agreed to add language to the sale order and the Second Amended and Restated Asset Purchase Agreement so as to make clear that Carrington is obligated to perform all servicing obligations under the relevant Pooling and Servicing Agreements from and after the closing of the assumption/assignment. Second, DBNTC objects to the proposed cure amount and claims it is entitled to at least $28,500,000 in cure costs. As DBNTC sets forth no legal basis for its entitlement to damages and no factual support for its claim of $28.5 million, that portion of the DBNTC Objection should be denied.

5. Pursuant to Bankruptcy Code Section 365,

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default . . .

11 U.S.C. § 365(b)(1). Section 365(b) "applies <u>only</u> when there has been a default other than a default relating to bankruptcy of financial condition. <u>If there has been no default, the trustee need not comply with the cure, compensation and adequate assurance requirements of section 365(b).</u>" Collier on Bankruptcy, ¶ 365.05[2], p. 365-53 (15th ed. rev.) (emphasis added). Here, DBNTC has failed to establish that a default has occurred under the Pooling and Servicing Agreements. Consequently, DBNTC is not entitled to any compensation for any alleged pecuniary loss.

6. Rather than prove a default, DBNTC simply claims that such defaults exist and the Debtors are aware of them. Without any evidence, DBNTC asserts that (i) New Century Mortgage Corporation is in material non-compliance with applicable servicing criteria and (ii) informal audit materials furnished by the Debtors "reveal that such deficiencies continue to

3

exist." These bald assertions are insufficient to establish a default under Bankruptcy Code Section 365. The relevant Pooling and Servicing Agreements each contain seven (7) events of default, three of which (iii, iv and v) are unenforceable pursuant to Bankruptcy Code Section 365(e)(1).[2] Thus, in order to require the application of Bankruptcy Code Section 365(b), DBNTC must establish that one of the four remaining defaults has occurred. DBNTC has not done so because no such defaults have occurred.[3] Instead, DBNTC cuts and pastes various clauses from the Pooling and Servicing Agreements and asserts "upon information and belief" that they were, or may have been, violated.[4] It is evident that DBNTC is seeking compensation not for actual monetary damages demonstrably caused by the acts or omissions of New Century Mortgage Corporation, but for hypothetical losses that may or may not occur and may or may not have been caused by it. As Bankruptcy Code Section 365 does not provide for such compensation, the DBNTC objection should be denied.

7. Not only has DBNTC failed to meet the requirements of Bankruptcy Code Section 365, it has also failed to demonstrate any factual support for its claim that it should be awarded at least $28,500,000. DBNTC's objection is based on nothing more than DBNTC's various beliefs and assumptions that its trusts have suffered damages in that amount, not actual facts or evidence showing actual damages, let alone establishing that DBNTC is entitled to be compensated for such damages or that such claims are defaults that must be cured. As DBNTC has failed to demonstrate any damages, let alone damages in the exorbitant amount of $28.5 million, this Court should overrule the DBNTC Objection.[5]

---

[2] The Committee and Debtors have reviewed the Servicing Agreement for the New Century Home Equity Loan Trust 2006-2 ("New Century 2006-2") and the Pooling and Servicing Agreement for the Carrington Mortgage Loan Trust, Series 2004-NC2 Asset Backed Pass-Through Certificates ("Carrington 2004-NC2").

[3] At the hearing on Monday, May 21, 2007, the Debtors will be prepared to present testimony to establish all facts as set forth in this response ("Hearing Testimony").

[4] Notably, DBNTC never informed or notified the Debtors of any default, except with respect to the bankruptcy filing. See Hearing Testimony.

[5] Alternatively, to the extent this Court is reluctant to overrule in whole the DBNTC Objection, the Debtors should only be required to reserve a reasonable amount of funds to satisfy damages if and only if DBNTC is able to (a) prove there has been a default and (b) provide proof of the amount of damages its trusts sustained as a consequence of that default.

8. In Exhibit D to the DBNTC Objection, DBNTC surmises three types of damages that it may have suffered, but only if one were to assume certain facts. First, DBNTC claims that the trusts for which it serves as trustee has been damaged because of "excessive losses suffered on the disposition of delinquent loans." This theory of damages is based solely on DBNTC's various beliefs and assumptions, none of which are based on fact or have any rational relation to the truth. DBNTC asserts that New Century Mortgage Corporation caused excessive losses by (i) failing to work with delinquent borrowers, which could have led to restructured loans rather than foreclosures and (ii) taking six (6) months longer than "necessary or expected" to have resolved 3,544 loans which were liquidated. Not surprisingly, DBNTC offers no support for either claim other than its speculation.[6]

9. What is without question is that New Century Mortgage Corporation's servicing has been regularly examined previously and has consistently received high ratings for its servicing performance.[7] See Hearing Testimony. In particular, New Century Mortgage Corporation has its own internal audit program that is spoken of highly by rating agencies. See Hearing Testimony. It is that internal audit program that catches any mistakes, mistakes which the New Century Mortgage Corporation then corrects, including, where monetary errors are involved, reconciliation through monthly payments to the respective trusts. See Hearing Testimony. In fact, Shanna L. Smith, the president and chief executive officer of the National Fair Housing Alliance (a national organization dedicated to ending housing discrimination) has reviewed the New Century Mortgage Corporation's "loan servicing policies, procedures and

---

[6] DBNTC "believe[s]" that the resolution of the loans took six (6) months longer than necessary, but provide no evidence to support this self-serving belief. Similarly, DBNTC "believe[s]" this delay increases losses by 10%. While DBNTC acknowledges that "the overall residential real estate market has deteriorated," it is apparently unwilling to consider the fact that that declining market may have played a substantial role in both delay, if any, in foreclosures and losses, if any, that were suffered.

[7] Although Moody's and Fitch downgraded and S&P suspended New Century Mortgage Corporation after the bankruptcy filing, those downgrades and suspension were a result of its financial situation, not a reflection of the abilities or performance of the servicing operation.

practices" and concluded that they are in "accordance with industry best practices." See Attached Affidavit of Shanna L. Smith, dated March 21, 2007 ("Smith Affidavit"), ¶ 7.[8] With respect to foreclosures, New Century Mortgage Corporation's timelines are based upon Freddie Mac and Fannie Mae's time guidelines and state regulations, regulations which vary significantly. See Hearing Testimony. For the month end of April 2007, New Century Mortgage Corporation administered loans in foreclosure were within 95.64% of these established timelines. See Hearing Testimony. As New Century Mortgage Corporation is required to abide by state regulations concerning foreclosures, the average days to sale increases as the foreclosure portfolio increases in longer timeline states, such as Michigan, New York or New Jersey. See Hearing Testimony. Similarly, losses are also higher in states such as Ohio and Michigan, where property values have declined significantly due to regional economic conditions and the decreased demand for housing, factors that are outside of a servicer's control. See Hearing Testimony. While there were some minor delays in foreclosures in April because of the bankruptcy, those delays were minimal and did not lead to losses of more than $1 million, far less than $28.5 million of damages. See Hearing Testimony.[9] Lastly, New Century Mortgage Corporation's servicing performance has constantly equaled or performed above expectations when compared to other servicers of sub-prime mortgages. See Hearing Testimony.

10. In addition to the absence of any factual support for each alleged category of damages, DBNTC's claims are internally inconsistent. On one hand, DBNTC claims New Century Mortgage Corporation rushed to foreclosure rather than attempting to restructure delinquent loans, while on the other hand claims that New Century Mortgage Corporation took too long to foreclosure on delinquent loans. According to DBNTC, no matter what action New Century Mortgage Corporation took, it was the wrong one. New Century Mortgage Corporation

---

[8] The Smith Affidavit is attached hereto as Exhibit A.

[9] Those delays occurred because certain attorneys that handled foreclosures were concerned about payment during the pending bankruptcy. As the more experienced law firms knew that administrative claims would be paid, the great majority of foreclosures suffered no delay due to the bankruptcy. As to those attorneys who delayed, the delay was brief. See Hearing Testimony.

6

has a detailed and efficient process in place by which all alternatives to foreclosure are carefully examined so that the right solution is taken. See Hearing Testimony.[10] While all foreclosure alternatives are considered, the great majority of ultimate defaults are due to divorce, death or loss of income, situations which usually lead to the borrower being unable to pay any amount, resulting in foreclosure being the only answer. See Hearing Testimony; Smith Affidavit, ¶ 7 ("New Century's policy undertakes to keep borrowers in their homes as long as possible and proceeds with foreclosures only as a last resort."). Hence, DBNTC's allegations of rushed foreclosures is patently false.

11. Second, DBNTC claims that it suffered damages as "a consequence of the New Century Mortgage Corporation's failure to resolve delinquent loans in a timely manner." In support of this spurious claim, DBNTC "assum[es]" that principal on various delinquent loans should have returned six (6) months earlier and thus those funds would have been invested at 7% leading to $9.6 million in interest. This claim suffers from the same basic flaw as the excessive loss claim – that being sheer speculation. In order to accept this claim for damages, one must believe, solely on DBNTC's word, that (i) every delinquent loan was resolved six (6) months later than it should have been and (ii) if each loan had been resolved six (6) months earlier, that principal could have been invested at a guaranteed 7%. Not only must one be willing to accept DBNTC's beliefs and assumptions, one must also ignore that DBNTC, and its trust, received scheduled interest payments, at the applicable pass-through rates, on the delinquent loans during the six month period at issue. See e.g. Carrington 2004-NC2, § 4.03 (servicer must make interest and principal payments, even when the underlying loans are in default). Hence, this claim for $9.6 million is entirely without merit.

12. In addition to DBNTC's utter failure to provide any factual support for its $28.5 million damage claim, DBNTC also fails to provide any legal support for its asserted entitlement to such damages. Based on a review of the two sample servicing agreements, it is far

---

[10] Additionally, there has been recent pressure from state and federal regulators on sub-prime lenders to exhaust restructuring alternatives, before resorting to foreclose.

7

from clear that DBNTC is entitled to any damages even if the losses were as DBNTC imagines.

13. The servicing agreements provide that the applicable servicer has "full power and authority to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable." New Century 2006-2, § 3.01. Similarly, the agreements provide that the servicer has "discretion, consistent with customary procedures," to address defaults or foreseeable defaults in any way it believes is appropriate so as to "maximize the receipt of principal and interest" and shall use "its best efforts" to foreclose if appropriate. New Century 2006-2, §§ 3.07 & 3.16. Further, a servicer is not liable for "any action taken or for refraining from the taking of any action in good faith . . . or for errors in judgment, provided, however, that this provision shall not protect the Servicer . . . against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith, or negligence in the performance of duties or by reason of reckless disregard of obligations." New Century 2006-2, § 5.03.

14. Thus, even if one were to accept DBNTC's speculative damages, DBNTC has failed to show they are compensable under the applicable servicing agreements. For there to be liability, DBNTC must establish that such damages were caused by "willful misfeasance, bad faith, or negligence in the performance of duties or by reason of reckless disregard of obligations," not actions taken in good faith or errors in judgment. Instead, DBNTC has not even alleged such causes, let alone demonstrated them.

15. In addition to alleged damages for excessive losses and present value of money, DBNTC also believes it is entitled to $1.3 million of legal fees. Although DBNTC failed to explain the basis for recovering legal fees, similar to its failure to explain its basis for being entitled to $28.5 million, DBNTC's claim for legal fees would appear to be based on the servicing agreement's indemnification section. That section permits reasonable legal fees for costs "arising out of, or in connection with, the failure by the Servicer to perform its duties in

8

compliance with this Servicing Agreement . . ."[11] Thus, for DBNTC to be entitled to the $1.3 million of legal fees, it must first establish that these costs arose out of, or were in connection with, the "failure by the Servicer to perform its duties in compliance with this Servicing Agreement" and that said costs were "reasonable." As DBNTC has neither established (i) a failure by the Servicer to perform its duties in compliance with the Servicing Agreement or (ii) reasonable legal fees that arose in connection with that failure, this Court should reject DBNTC's request to be reimbursed for $1.3 million of legal fees.

## REPLY TO OBJECTIONS OF WELLS FARGO

16. Wells Fargo objects to the sale of the Servicing Business and to the assumption and assignment of the Pooling and Servicing Agreements on several grounds, including that (i) there exists astronomical cure claims that purportedly "exceeds $1 billion" that must be paid before the Pooling and Servicing Agreements may be assumed and assigned (notwithstanding that such amounts allegedly owed do not arise under the Pooling and Servicing Agreements and would be due, if at all, under a series of agreements that the Debtors do not seek to assume and assign and also are not even executory contracts), (ii) the Pooling and Servicing Agreements may not by their terms be assumed by the Debtors and assigned to Carrington (i.e., Wells Fargo argues that, notwithstanding the various provisions of the Bankruptcy Code and well established case law invalidating contractual anti-assignment provisions and restrictions on alienation, such provisions in the Pooling and Servicing Agreement should be enforced here) and that (iii) Carrington is unable to provide adequate assurance of future performance under the Pooling and Servicing Agreement. As discussed below, Wells Fargo's objections lack merit and should be overruled.

### A. The Cure Amount Asserted by Wells Fargo is Both Inaccurate and Grossly Overstated and Should Be Overruled.

---

[11] This indemnity section was present in the servicing agreement for New Century Home Equity Loan Trust 2006-2 (see § 5.07), but was not present in the Poling and Servicing Agreement for the Carrington Mortgage Loan Trust, Series 2004-NC2 Asset Backed Pass-Through Certificates.

9

17. Wells Fargo vaguely claims that it may have a cure claim exceeding $1 billion that must be paid in connection with the assumption and assignment of the Pooling and Servicing Agreements[12], although it admits that such amounts allegedly arise under a series of mortgage loan purchase agreements (the "MLPAs") under which Carrington Securities, LP sold loans to Stanwich Asset Acceptance Company, L.L.C. and New Century Financial Corporation is listed as a "responsible party."

18. Wells Fargo apparently confuses these two very separate and distinct agreements. Under the Pooling and Servicing Agreements, New Century Mortgage Corporation services certain pools of loans and Wells Fargo acts as trustee with respect to such loans. In contrast, the MLPAs govern sale of mortgage loans (by an entity distinct from loan servicer New Century Mortgage Corporation) rather than the servicing of loans, and have certain representations regarding the loans that were made to the securitization trusts purchasing them. It is under the MLPAs that Wells Fargo asserts it has claims in excess of "$1 billion," all of which apparently relate to the alleged breach of representations regarding the loans sold and obligations to repurchase such loans that have supposedly been triggered.

19. To be clear, the Debtors do not seek (and have never suggested that they would seek) to assume and assign the MLPAs to any entity. Indeed, the MLPAs have never been part of the assets proposed to be sold as part of the Servicing Business.[13] Nonetheless, Wells Fargo effectively seeks to force the Debtors to repurchase billions of dollars of loans under the MLPAs through a vague assertion that defaults under the MLPAs must be cured before the Debtors may assume and assign the separate and distinct Loan Pooling and Servicing Agreements. Wells Fargo is only entitled to receive cure payments with respect to agreements that may be assumed and assigned by the Debtors in connection with the sale of the Servicing

---

[12] See Wells Cure Objection at ¶ 32.

[13] Moreover, the MLPAs are not executory contracts that are otherwise capable of being assumed and assigned. As Wells Fargo concedes, the MLPAs are merely agreements providing for the purchase and sale of mortgage loans. See Wells Cure Objection at ¶ 15. Consequently, the MLPAs lack material unperformed obligations owing by both contracting parties that must exist for such agreements to remain executory.

10

Business, and cannot compel the payment of amounts purportedly due under separate agreements (which are not even executory contracts). See 11 U.S.C. § 365(b)(1)(A), (f)(2). Indeed, if Wells Fargo believes it has a claim against the Debtors based on purported defaults under the MLPAs (again, which are separate and distinct from the Pooling and Servicing Agreements), then it should proceed in the manner proscribed by the Bankruptcy Code and file a proof of claim to assert these amounts against the estates. See 11 U.S.C. § 501. However, given that none of these amounts arise under the Pooling and Servicing Agreements, they are not defaults that must be cured by the Debtors prior to the assumption and assignment of such contracts.

**B.** **The Asset Purchase Agreement Does Not Seek to Limit Liabilities Other Than in Accordance with Bankruptcy Code Section 365.**

20. Wells Fargo also claims that the Asset Purchase Agreement providing for the sale of the Servicing Business to Carrington "itself may limit" liabilities under the Pooling and Servicing Agreements arising prior to the closing of the sale of the Servicing Business. Wells Cure Objection at ¶ 28. Thus, it asserts that "the Motion should be denied or the Purchase should be required to satisfy all of the PSA Liabilities" - i.e. an amount that "may be well in excess of $1 billion." See Wells Cure Objection ¶¶ 32, 35. Wells Fargo further alleges that, if Carrington does not assume all such liabilities, then the sale of the Servicing Business should be conditioned on the Debtors escrowing "the lesser of the entire amount received by the Debtors in connection with the sale of the Servicing Business or $1 billion." See Wells Cure Objection ¶ 36.

21. The Debtors and Carrington have agreed to modify the Asset Purchase Agreement to provide language substantially similar to the following:

> Nothing contained herein shall be construed to limit Purchaser's obligation to perform the obligations of the Servicer under the Servicing Agreements from and after the [Closing Date] based on the Mortgage Loans' servicing status at that time, provided, however, that nothing contained herein shall be deemed to cause Purchaser to assume any liability for any act or omission of the Debtor Servicer, Originator, Trustee, or any other person arising on

11

or before the [Closing Date].

22. This more than adequately addresses any legitimate concerns of Wells Fargo. To the extent Wells Fargo continues to assert any such objections, it in effect argues (without any supporting legal justification) that this Court has somehow been divested of the authority expressly granted to it by the Bankruptcy Code to order the assumption and assignment of an executory contract that may otherwise be assumed and assigned in accordance with the requirements of Bankruptcy Code Section 365.

C. **Adequate Assurance of Future Performance.**

23. The gravamen of the Wells Adequate Assurance Objection is a concern that "Wells Fargo has no assurance that the Proposed Purchaser will be able to service the Mortgage Loans in accordance with the Pooling and Servicing Agreements and industry standards, which will have a materially adverse effect on the value of the Securities." See Wells Adequate Assurance Objection at ¶ 11. These concerns are misplaced.

24. Wells Fargo misconstrues the Pooling and Servicing Agreements in an attempt to prevent the sale of the Loan Servicing business to a well-capitalized purchaser that will be operating virtually the same business that currently services the loans. Carrington emerged as the Successful Bidder at the Auction and will purchase the Servicing Business as a going concern, acquiring the same highly skilled individuals and business structure of New Century Mortgage Corporation that has managed and continues to manage the servicing of the mortgage loans under the Pooling and Servicing Agreements. As such, it is maintaining the continuity of the Servicing Business that has been operated by New Century Mortgage Corporation under the Pooling and Servicing Agreements and will continue to operate virtually the same business - in other words, Carrington remains as the servicer. The Debtors and the Creditors' Committee are advised that Carrington will be making a showing to the Court with respect to adequate assurance of future performance under the Pooling and Servicing Agreements and are confident that Carrington will satisfy any concerns regarding its ability to perform under such agreements.

25. Wells Fargo also asserts that Carrington is not an appropriate purchaser of the Servicing Business because it does not meet certain eligibility requirements for servicers identified in the Servicing and Pooling Agreements, specifically that the loan servicer (i) is approved as a mortgage loan servicing institution by Fannie Mae or Freddie Mac, (ii) will not cause Ratings Agencies to qualify, reduce or withdraw their ratings regarding the securities collateralizing the securitization trusts, (iii) is licensed and authorized to service mortgage loans under applicable state laws and (iv) will provide evidence of its net worth. See Wells Adequate Assurance Objection ¶ 28.

26. These eligibility requirements do not apply to the assumption and assignment of the Servicing and Pooling Agreements by their own terms. In fact, all of the requirements relate to <u>sub-servicers</u> or the <u>appointment of a successor servicer by the trustee</u>. See e.g. Pooling and Servicing Agreement dated as of December 1, 2006, §§ 3.02 and 3.03 (at pp. 62-63). Here, the sale of the Servicing Business does <u>not</u> contemplate the appointment of either a successor servicer by an indenture trustee or the engagement of sub-servicers working under New Century Mortgage Corporation by agreement amongst the parties. Rather, the sale of the Servicing Business will include the assumption and assignment of the Pooling and Servicing Agreements in their entirety to Carrington pursuant to Bankruptcy Code Section 365 whereby Carrington will remain as the servicer.[14]

## CONCLUSION

27. WHEREFORE, the Debtors and the Creditors' Committee respectfully request that the Court overrule the objections by Wells Fargo and DBNTC in their entirety and enter of an Order approving the sale of the Servicing Business to Carrington, including the

---

[14] Further, although nominally styled as an objection to Carrington's ability to provide adequate assurance of future performance under the Pooling and Servicing Agreements, the thrust of Wells Fargo's argument is that the Pooling and Servicing Agreements may not be assigned because the terms of such contracts do not allow them to be assigned. This directly conflicts with Bankruptcy Code section 365(f) which provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f).

13

assumption and assignment of the Pooling and Servicing Agreements discussed herein.

Dated: May 18, 2007
       Wilmington, Delaware

| | |
|---|---|
| Respectfully submitted,<br><br>*/s/ (signature)*<br>_____<br>Mark D. Collins (No. 2981)<br>Michael J. Merchant (No. 3854)<br>Christopher M. Samis (No. 4909)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, Delaware 19899<br>(302) 651-7700<br><br>-and-<br><br>Suzzanne S. Uhland<br>Ben H. Logan<br>Victoria Newmark<br>Laine Mervis<br>Emily R. Culler<br>O'MELVENY & MYERS LLP<br>275 Battery Street<br>San Francisco, California 94111<br>(415) 984-8700<br><br>ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION | Respectfully submitted,<br><br>/s Bonnie Glantz Fatell<br>_____<br>Bonnie Glantz Fatell (No. 3809)<br>BLANK ROME LLP<br>1201 Market Street, Suite 800<br>Wilmington, Delaware 19801<br>(302) 425-6400<br><br>-and-<br><br>Mark T. Power<br>Mark S. Indelicato<br>Don D. Grubman<br>Edward L. Schnitzer<br>HAHN & HESSEN LLP<br>488 Madison Avenue<br>New York, New York 10022<br>(212) 478-7200<br><br>PROPOSED CO-COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NEW CENTURY TRS HOLDINGS, INC. ET AL. |

RLF1-3153486-1