IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Proposed Hearing Date: 5/30/07 @ 2:30 p.m. |
| | : | Proposed Objection Deadline: 5/29/07 @ 4:00 p.m. |

**MOTION PURSUANT TO SECTIONS 361, 362 AND 363 OF
THE BANKRUPTCY CODE FOR AN ORDER APPROVING THE STIPULATION AND
AGREEMENT AMONG THE DEBTORS AND CITIGROUP GLOBAL MARKETS
REALTY CORP WITH RESPECT TO THE PAYMENT OF CASH COLLATERAL**

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of an order, pursuant to sections 361, 362 and 363(c)(2) of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code") approving the Stipulation and Agreement Among the Debtors and Citigroup Global Markets Realty Corp. ("Citigroup") with Respect to the Payment of Cash Collateral (the "Stipulation"). In support of this Motion, the Debtors

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

RLF1-3154108-1

respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. § 157 and 1134. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2. The bases for the relief requested herein are sections 361 and 363 of the Bankruptcy Code.

## BACKGROUND

3. NCF was one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS, NCF originated, purchased, sold, and serviced mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF, through some of its subsidiaries, also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize

the benefits of home ownership, including many who might not otherwise have been able to do so.

4. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

## INTRODUCTION

5. By this Motion, the Debtors seek an order approving the Stipulation among the Debtors and Citigroup with respect to the payment of certain cash that Citigroup asserts is its cash collateral. New Century Mortgage Corporation ("NCMC" or the "Borrower") and Citigroup are parties to that certain Servicer Advance Financing Facility Agreement, dated as of August 28, 2003 (as amended from time to time, the "Servicer Advance Facility"). In addition, NCF entered into that certain Amended and Restated Guaranty dated as of October 1, 2004 (as amended from time to time, the "Guaranty"), in favor of Citigroup in support of the Servicer Advance Facility. Pursuant to the Servicer Advance Facility, Citigroup agreed to finance certain Advances (as defined below) made by NCMC as part of the Debtor's mortgage servicing platform operations; in exchange, NCMC pledged to Citigroup its right to receive repayment of some or all of those Advances.[2]

6. The Debtors conduct their mortgage servicing business largely through NCMC. The servicing platform remains a profitable part of the Debtors' business and its sale as

---

[2] The scope of Citigroup's lien is in dispute. Citigroup asserts that its lien attached to all Advances, whereas the Debtors and the Official Committee of Unsecured Creditors (the "Committee") assert that Citigroup's lien only attached to certain Advances related to the payment of principal and interest ("P&I Advances") and the payment of taxes, assessment, and maintenance fees and insurance ("T&I Advances"). The Stipulation reserves on this issue as well as other issues related to the validity, priority and extent of Citigroup's liens and claims.

a going concern is the subject of a motion presently before this Court.[3] Loan servicing typically involves collecting and remitting loan payments received from borrowers, making required advances (as defined in the Stipulation, the "Advances") and, in certain circumstances, contacting delinquent borrowers and supervising foreclosure actions and property dispositions following unremedied defaults. The Debtors presently service approximately $19 billion of loans owned by third parties. The Debtors' mortgage servicing rights are generally established in servicing contracts (the "Servicing Contracts") with securitization trusts or third party whole loan purchasers. These Servicing Contracts generally require the servicer to advance principal, interest, and certain "property protection" costs (such as taxes and insurance) with respect to delinquent mortgage loans, unless such amounts are determined to be unrecoverable from the related loans. Advances receive a priority of payment in the securitization trust documents.

7. On March 8, 2007, Citigroup sent to NCMC and NCF a notice of default in accordance with section 9.2 of the Servicer Advance Facility, pursuant to which Citigroup indicated that, in light of various events of default, the aggregate principal amount of $31,928,880.13, together with interest, fees, expenses and other charges as provided in the Servicer Advance Facility and Guarantee, were immediately due and payable. Further, Citigroup indicated that it would no longer entertain requests for funding under the Servicer Advance Facility or otherwise.

---

[3] Indeed, on May 21, 2007, the Court will determine whether to approve the sale of the Debtors' loan servicing business assets to Carrington Capital Management, LLC and Carrington Mortgage Services, LLC (together, "Carrington"). Carrington was the successful bidder at the auction for the Debtors' loan servicing businesses assets, which was held on May 16, 2007. The Amended and Restated Asset and Purchase Agreement by and among Carrington Capital Management, LLC, Carrington Mortgage Services, LLC, New Century Financial Corporation and New Century Mortgage Corporation, dated as of April 19, 2007 (the "APA"), provides that as a condition to the obligation of Carrington to consummate the transactions contemplated in the APA, proceeds from the sale shall be used by the Debtors to pay in full all Obligations (as defined in the Servicer Advance Facility) due and owing under the Servicer Advance Facility and the Servicer Advance Facility shall have terminated and all liens thereunder shall no longer be of any force and effect.

8.   On April 3, 2007 the Court entered its interim order and on May 7, 2007, this Court entered its final order approving the Debtors entry into that certain Debtor-in-Possession Loan and Security Agreement dated as of April 2, 2007 by and among NCMC, as debtor and debtor in possession, certain of its Affiliates, as debtors and debtors in possession, Greenwich Capital Financial Products, Inc., as administrative agent and The CIT Group/Business Credit, Inc., as documentation agent (the "DIP Loan Agreement"). The DIP Loan Agreement contemplated the possible implementation of the Tranche B of that facility, which would be secured by the Advances and would be conditioned on taking out Citigroup. The Debtors and the DIP lenders have negotiated over the possibility of implementing Tranche B and other possible means of expanding the borrowing capacity under the DIP Loan Agreement. At the hearing on May 7, 2007, the Debtors advised the Court that the lenders under the DIP Loan Agreement and the Debtors had agreed to expand the DIP loan facility to $100 million based on an expansion of Tranche A, rather than implementing Tranche B. It is presently unlikely that Tranche B will be implemented, although it is still possible.

9.   In addition, the proposed sale of the Debtors' servicing business provides that the purchaser will acquire the Advances and correspondingly will require that all Obligations (as defined in the Servicer Advance Facility) due and owing to Citigroup under the Servicer Advance Facility be repaid in full. These issues will obviously be dealt with in connection that sale and its closing, which will probably occur in mid June.

10.   Pending the implementation of Tranche B of the DIP Loan Agreement or the sale of the servicing business, the Debtors, Citigroup and the Official Committee of Unsecured Creditors (the "Committee") have been negotiating over the terms of a stipulation concerning the collections on Advances that existed as of the Petition Date.

11.     Citigroup asserts that it is entitled to accrue interest pursuant to section 2.4 of the Servicer Advance Facility at the default interest rate of LIBOR + 4.00%, which is significantly higher than the interest rate on the DIP Loan Agreement of LIBOR + 2.75%. The Debtors and the Committee reserve on whether or not Citigroup is oversecured.

12.     There are a number of other complex issues related to the Citigroup Servicer Advance Facility that will need to be resolved pursuant to agreement or litigation, including the precise scope of Citigroup's cash collateral. Based on negotiations among Citigroup, the Debtors and the Committee, these issues are reserved in the Stipulation.

## THE STIPULATION

13.     In accordance with the terms and conditions of the Stipulation, the Debtors and Citigroup desire to resolve all matters with respect to the use of the collections on Advances in existence on the Petition Date or thereafter, which Citigroup asserts is its cash collateral (as defined in the Stipulation, the "Citigroup Cash Collateral"). The following is a summary of the terms of the Stipulation:[4]

> i.  Within five (5) business days after the Stipulation Effective Date (as defined in the Stipulation) and without further order of the Bankruptcy Court or other action, the Debtors shall pay to Citigroup an amount equal to the collections on all Advances in existence on the Petition Date through and including the Stipulation Effective Date (the "Initial Payment"). The Debtors shall provide written notice to the Committee at least one (1) business day prior to the making of the Initial Payment stating the date the Initial Payment is being made and the amount of the Initial Payment. The

---

[4] The following description is intended only to be a summary of the Stipulation. To the extent that the terms of the

foregoing notice shall be accompanied by appropriate reconciliation/accounting documentation indicating that the Initial Payment represents only collections on postpetition Advances, including information allocating the collections represented by the Initial Payment to Advances pledged to Citigroup under the Servicer Advance Facility.

ii. Following payment of the Citigroup Cash Collateral in accordance with paragraph (i) hereof, and pending repayment in full of all Obligations (as defined in the Servicer Advance Facility) due and owing to Citigroup under the Servicer Advance Facility that are allowed under the Bankruptcy Code and other applicable law, the Debtors shall pay to Citigroup all subsequent collections on Advances in existence on the Petition Date as and when collected on a weekly basis following payment of the Initial Payment, up to an amount equal to (i) the principal balance due and owing under the Servicer Advance Facility as of the Petition Date plus (ii) the amount of unpaid interest that was accrued and owing under the Servicer Advance Facility as of the Petition Date (the "Petition Date P&I Amount"). Such weekly payments shall be due within 5 Business Days of the cutoff for calculating the amount due, such that (absent agreement to the contrary), payments will normally be made each Friday for postpetition collections on Advances received by the Debtors through the prior Friday. Postpetition collections on the Citigroup Cash Collateral received by the Debtors in excess of the Petition Date P&I Amount and up to the amount asserted by

---

Stipulation conflict with anything herein, the terms of the Stipulation shall be controlling

Citigroup as interest computed at the default rate and Citigroup's reasonable estimate of postpetition fees and costs incurred under the Servicer Advance Facility shall be segregated and held by the Debtors pending an agreement or final order of the Bankruptcy Court as to the amount of Citigroup's total allowed claim with respect to the Servicer Advance Facility. No later than one (1) Business Day before each such payment is made pursuant to this paragraph, the Debtors shall provide a written notice to the Committee stating the date such payment is being made and the amount of such payment, including information allocating the collections represented by such payment to particular Advances.

iii. Within five (5) Business Days after the Stipulation Effective Date, the Debtors shall provide Citigroup and the Committee with an accounting of all Advances collected since the Petition Date and the underlying mortgage loans related thereto.

iv. Pursuant to section 13 of the Servicer Advance Facility, Citigroup shall be entitled to engage an independent third party to perform an audit and/or due diligence review with respect to the Collateral on or after June 20, 2007 if (i) the Debtors have not closed the sale on the servicing business assets, as contemplated in this Court's order dated April 20, 2007 [Doc. No. 340], on or prior to June 20, 2007, and (ii) payment in full of all Obligations due and owing to Citigroup under the Servicer Advance Facility has not been made on or before June 20, 2007.

v. The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified upon the occurrence of the Stipulation Effective Date, solely to the extent necessary to permit the Debtors to comply with the terms and conditions of the Stipulation.

vi. Nothing in the Stipulation shall determine or be deemed to be an admission by any party as to the extent, amount, validity, enforceability, perfection or priority of any claim or lien asserted by Citigroup, including any claims to and/or liens on the Citigroup Cash Collateral and/or the Advances. All rights of all parties with respect to such issues are reserved for subsequent challenge. Further, Citigroup's interest in and ability to recover collections on Advances received by the Debtors prior to the Petition Date is expressly reserved. This Court shall retain jurisdiction to determine all such issues.

## RELIEF REQUESTED

14. The Debtors' proposed use of the Citigroup Cash Collateral is appropriate under the circumstances for several reasons. Without the payment of the amounts owed to Citigroup, the Debtors continue to accrue interest on the loans at a rate significantly higher than the DIP Loan Agreement. Failing to approve the Debtors' use of the Citigroup Cash Collateral as contemplated by the Stipulation thus threatens the interests of all stakeholders. The objective of these chapter 11 cases is to preserve and maximize the value of the estates.

## BASES FOR RELIEF REQUESTED

15. Pursuant to section 363(c)(2)(A) of the Bankruptcy Code, a debtor-in possession may use cash collateral provided that each entity that has an interest in such cash collateral consents. Here, Citigroup has formally notified the Debtors that it does not consent to the use of the Citigroup Cash Collateral. The Stipulation, therefore, authorizes the Debtors to

pay to Citigroup the Citigroup Cash Collateral, thereby reducing the amount due and owing to Citigroup under the Servicer Advance Facility and preserving the value of the Debtors' estates.

16. Pursuant to section 363(c)(2)(B) of the Bankruptcy Code, a debtor-in-possession may use cash collateral with court approval after notice and a hearing. See 11 U.S.C. § 363(c)(2)(B). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court "shall prohibit or condition such use as is necessary to provide adequate protection of such interest."[5] 11 U.S.C. § 363(e). Here, the Court should approve the Debtors' proposed Stipulation because Citigroup' interests in the Citigroup Cash Collateral is more than adequately protected by its rights to the reimbursement from the Advances and because payments made to Citigroup under the Stipulation will preserve the value of the Debtors' estate.

17. Adequate protection can be provided by a number of different methods. See e.g. 11 U.S.C. § 361. Pursuant to section 361 of the Bankruptcy Code, adequate protection may be provided by (1) making "a cash payment or periodic cash payments to [an] entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title . . . results in a decrease in the value of [the] entity's interest in such property," (2) "providing to [an] entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of [the] entity's interest in such property" or (3) "granting such other relief . . . as will result in the realization by [an] entity of the indubitable equivalent of [the] entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3).

18. What constitutes adequate protection is determined on a case-by-case basis. See MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F. 2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F. 2d 472 (8th Cir. 1985). However, regardless of how adequate protection is provided, the focus of the requirement is to protect a secured creditor from

---

[5] The debtor bears the burden or proof on the issue of adequate protection of an entity's interest in cash collateral, while "the entity asserting an interest in property has the burden or proof on the issue of the validity, priority or extent of such interest." 11 U.S.C. § 363(o)(2).

diminution in value of its interest in the collateral during the period of use by the debtor. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Ass'n & Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

19. In other words, adequate protection is necessary only to the extent the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."[6] 11 U.S.C. §§ 361, 363(e); see United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" securing the claim). As the court in In re Megan-Racine Assoc., Inc., 202 B.R. 660 (Bankr. N.D.N.Y. 1996) noted:

> Adequate protection . . . is intended to compensate a creditor for any decrease in the value of its security interest in collateral during the pendency of the debtor's reorganization that is due to the imposition of the stay or is traceable to the use of such property.

Id. at 663.

## NOTICE

20. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT"), the Debtors' post-petition senior secured lenders; (3) Citigroup, (4) the Committee, and (5) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

---

[6] Thus, if a secured creditor's interest in the value of its collateral is not diminished by a debtor's use, sale or lease of the collateral, the secured creditor's interest in the collateral is adequately protected.

21. The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NO PRIOR MOTION

22. No prior motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached to the Stipulation attached hereto as Exhibit A, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated: May 22, 2007
       Wilmington, Delaware

Respectfully submitted,

_____
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION