# EXHIBIT A

**EXECUTION COPY**

**FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT**

**Among**

**IXIS REAL ESTATE CAPITAL INC., as Buyer**

**NEW CENTURY MORTGAGE CORPORATION, as Seller**

**NC ASSET HOLDING, L.P., as Seller**

**NC CAPITAL CORPORATION, as Seller**

**NEW CENTURY CREDIT CORPORATION, as Seller**

**and**

**HOME123 CORPORATION, as Seller**

Dated as of November 10, 2006

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | APPLICABILITY | 1 |
| 2. | DEFINITIONS | 1 |
| 3. | INITIATION; TERMINATION | 18 |
| 4. | MARGIN AMOUNT MAINTENANCE | 27 |
| 5. | INCOME PAYMENTS | 27 |
| 6. | REQUIREMENTS OF LAW | 29 |
| 7. | SECURITY INTEREST | 30 |
| 8. | PAYMENT, TRANSFER AND CUSTODY | 31 |
| 9. | HYPOTHECATION OR PLEDGE OF PURCHASED ASSETS | 32 |
| 10. | SELLER'S REPRESENTATIONS | 33 |
| 11. | COVENANTS OF SELLER | 39 |
| 12. | EVENTS OF DEFAULT | 46 |
| 13. | REMEDIES | 49 |
| 14. | INDEMNIFICATION AND EXPENSES | 52 |
| 15. | RECORDING OF COMMUNICATIONS | 53 |
| 16. | SINGLE AGREEMENT | 53 |
| 17. | NOTICES AND OTHER COMMUNICATIONS | 54 |
| 18. | ENTIRE AGREEMENT; SEVERABILITY; MODIFICATIONS | 54 |
| 19. | NON-ASSIGNABILITY | 54 |
| 20. | TERMINABILITY | 55 |
| 21. | GOVERNING LAW | 55 |
| 22. | SUBMISSION TO JURISDICTION; WAIVERS | 55 |
| 23. | NO WAIVERS, ETC. | 56 |
| 24. | SERVICING | 56 |
| 25. | INTENT | 58 |
| 26. | BUYER'S REPRESENTATIONS | 58 |
| 27. | NETTING | 59 |
| 28. | PERIODIC DUE DILIGENCE REVIEW | 60 |
| 29. | BUYER'S APPOINTMENT AS ATTORNEY-IN-FACT | 60 |

| | | |
|---|---|---|
| 30. | MISCELLANEOUS | 62 |
| 31. | CONFIDENTIALITY | 63 |
| 32. | CONFLICTS | 63 |
| 33. | SET-OFF | 63 |
| 34. | OBLIGATIONS JOINT AND SEVERAL | 64 |

EXHIBITS

| | |
|---|---|
| SCHEDULE 1 | Representations and Warranties Re: Mortgage Loans |
| SCHEDULE 2 | [Reserved] |
| SCHEDULE 3 | AVM Vendor Categories |
| EXHIBIT I | Transaction Request |
| EXHIBIT II | Underwriting Guidelines |
| EXHIBIT III | Form of Opinion Letter |
| EXHIBIT IV | UCC Filing Jurisdictions |
| EXHIBIT V | Form of Account Agreement |
| EXHIBIT VI | Form of True Sale Certification |
| EXHIBIT VII-A | Form of Seller's Release Letter |
| EXHIBIT VII-B | Form of Warehouse Lender's Release Letter |
| EXHIBIT VIII | Form of Servicer Notice |
| EXHIBIT IX | Form of Request for Additional Transactions for Excess Margin |
| EXHIBIT X | Form of Compliance Report |
| EXHIBIT XI | Assignee Liability Jurisdictions |

**FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT**

This is a FIFTH AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT, dated as of November 10, 2006, among IXIS REAL ESTATE CAPITAL INC., a New York corporation (the "Buyer") and NEW CENTURY MORTGAGE CORPORATION, a California corporation ("NCMC"), NC ASSET HOLDING, L.P., a Delaware limited partnership ("NCAH")(as successor in interest to NC Residential II Corporation), NC CAPITAL CORPORATION, a California corporation ("NCCC"), NEW CENTURY CREDIT CORPORATION, a California corporation ("New Century") and HOME123 CORPORATION, a California corporation ("Home123", and together with NCMC, NCAH, NCCC and New Century, the "Seller").

WHEREAS, the Seller and the Buyer are parties to that certain Fourth Amended and Restated Master Repurchase Agreement, dated as of October 11, 2005, by and between the Seller and the Buyer (as amended from time to time, the "Existing Repurchase Agreement," and as amended by this Fifth Amended and Restated Master Repurchase Agreement, as may be amended from time to time, the "Repurchase Agreement").

WHEREAS the Seller has requested the Buyer to agree to amend certain provisions of the Fourth Amended and Restated Repurchase Agreement as set forth in this Fifth Amended and Restated Master Repurchase Agreement. The Buyer is willing to agree to such amendments, but only on the terms and subject to the conditions set forth in this Fifth Amended and Restated Master Repurchase Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

1.    **APPLICABILITY**

From time to time the parties hereto may enter into transactions (the "Committed Transactions") in which the Seller agrees to transfer to the Buyer Mortgage Loans against the transfer of funds by the Buyer, with a simultaneous agreement by the Buyer to transfer to the Seller such Mortgage Loans at a date certain not later than 364 days after the date of transfer, against the transfer of funds by the Seller. Additionally, from time to time, the Buyer is prepared to consider entering into additional transactions (the "Uncommitted Transactions") in which the Seller agrees to transfer to the Buyer Mortgage Loans against the transfer of funds by the Buyer, with a simultaneous agreement by the Buyer to transfer to the Seller such Mortgage Loans on demand by the Buyer, against the transfer of funds by the Seller. Each such Committed Transaction and Uncommitted Transaction shall be referred to herein as a "Transaction" and shall be governed by this Agreement, unless otherwise agreed in writing.

2.    **DEFINITIONS**

As used herein, the following terms shall have the following meanings (all terms defined in this Section 2 or in other provisions of this Agreement in the singular to have the same

meanings when used in the plural and vice versa). Terms otherwise not defined herein shall have the meanings assigned thereto in the Custodial and Disbursement Agreement.

"30 Plus Mortgage Loan" shall mean any Mortgage Loan that has been delinquent in its scheduled monthly payments of principal and/or interest for more than 29 calendar days but less than 60 calendar days as of any date of determination.

"40/30 Mortgage Loan" shall mean a Mortgage Loan with a balloon payment feature that requires principal and interest payments sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than 40 years from commencement of amortization.

"50/30 Mortgage Loan" shall mean a Mortgage Loan with a balloon payment feature that requires principal and interest payments sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than 50 years from commencement of amortization.

"Account Agreement" shall mean that certain Amended and Restated Account Agreement, dated as of November 10, 2006, by and among NCCC, NCMC, NCAH, New Century, Home123, the Buyer and the Bank, as the same shall be modified and supplemented and in effect from time to time.

"Act of Insolvency" shall mean, with respect to any Person or any Material Subsidiary, (i) the filing of a petition, commencing, or authorizing the commencement of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, dissolution or similar law relating to the protection of creditors, or suffering any such petition or proceeding to be commenced by another which is consented to, not timely contested or results in entry of an order for relief which is not discharged within forty-five (45) days; (ii) the seeking or consenting to the appointment of a receiver, trustee, custodian or similar official for such Person or any Material Subsidiary or any substantial part of the property of such Person or any Material Subsidiary; (iii) the appointment of a receiver, conservator, or manager for such Person or any Material Subsidiary by any governmental agency or authority having the jurisdiction to do so; (iv) the making or offering by such Person or any Material Subsidiary of a composition with its creditors or a general assignment for the benefit of creditors; (v) the admission by such Person or any Material Subsidiary of its inability to pay its debts or discharge its obligations as they become due or mature; or (vi) that any governmental authority or agency or any person, agency or entity acting or purporting to act under governmental authority shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the property of such Person or any Material Subsidiary, or shall have taken any action to displace the executive officers of such Person or any Material Subsidiary or the ultimate parent of such Person or any Material Subsidiary to curtail its authority in the conduct of the business of such Person or any Material Subsidiary.

"Additional Purchased Assets" shall mean Mortgage Loans or cash provided by the Seller to the Buyer or its designee pursuant to Section 4.

-2-

"Affiliate" shall mean with respect to any Person, any "affiliate" of such Person, as such term is defined in the Bankruptcy Code.

"Agreement" shall mean this Fifth Amended and Restated Master Repurchase Agreement, as the same may be further amended, supplemented or otherwise modified in accordance with the terms hereof.

"ALTA" shall mean the American Land Title Association.

"Appraised Value" shall mean (i) the value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property, or (ii) with respect to any Second Lien Mortgage Loan, the value described pursuant to clause (i) and if no appraisal was made, then the value set forth in the AVM supplied.

"Asset Schedule and Exception Report" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Asset Value" shall have the meaning given thereto in the Letter Agreement.

"Assignment of Mortgage" shall mean, with respect to any Mortgage, an assignment of the Mortgage in blank, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment of the Mortgage to the Buyer.

"AVM" shall mean, solely in connection with a Second Lien Mortgage Loan, an automated valuation model, conducted in accordance with the Underwriting Guidelines provided by the vendors set forth on Schedule 3 and in the categories as set forth on Schedule 3, as may be amended from time to time to add vendors approved by the Buyer in its sole discretion.  The use of AVM's in lieu of appraisals must be strictly in accordance with Underwriting Guidelines approved by the Buyer in its sole discretion.

"AVM Mortgage Loan" shall mean a Second Lien Mortgage Loan subject to an AVM valuation.

"Bank" shall mean Union Bank of California, N.A., a national banking association, and its successors in interest, or such other depository institution as may be acceptable to the Buyer in its sole discretion, and their respective successors in interest.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Business Day" shall mean any day other than (i) a Saturday or Sunday or (ii) a day on which banks in the State of New York (or state in which any of the Custodian, the Disbursement Agent, the Seller or the Buyer is located) are authorized or obligated by law or executive order to be closed.

"Buyer" shall mean IXIS Real Estate Capital Inc., a New York corporation, and its successors in interest and assigns.

-3-

"C Credit Mortgage Loan" shall mean each Mortgage Loan originated in accordance with the Underwriting Guidelines criteria for "C" credit mortgage loans.

"C Minus Credit Mortgage Loans" shall mean each Mortgage Loan originated in accordance with the Underwriting Guidelines criteria for "C-" credit mortgage loans.

"Capital Lease Obligations" shall mean, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash" shall mean all cash and Cash Equivalents, as shown on the balance sheet of the Seller prepared in accordance with GAAP.

"Cash Equivalents" shall mean (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the date of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A2 by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Change of Control" shall mean the occurrence, after the Effective Date, of any of the following circumstances: (a) the Guarantor not owning, directly or indirectly, all of the issued and outstanding capital stock of NCMC; or (b) any Person, or two or more Persons acting in concert, other than the Management Shareholders, acquiring beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended), directly or indirectly, of securities of the Guarantor (or other securities convertible into such securities) representing 35% or more of the combined voting power of all securities of the

-4-

Guarantor entitled to vote in the election of directors; or (c) any Person, or two or more Persons acting in concert, other than the Management Shareholders, acquiring by contract or otherwise, or entering into a contract or arrangement which upon consummation will result in its or their acquisition of and, control over securities of the Guarantor (or other securities convertible into such securities) representing 35% or more of the combined voting power of all securities of the Guarantor entitled to vote in the election of directors.

"Class" shall mean with respect to a Purchased Asset, the designation of such Purchased Asset as one or more of the following: (i) a Mortgage Loan, (ii) a Wet-Ink Mortgage Loan, (iii) a Second Lien Mortgage Loan, (iv) a Jumbo(500) Mortgage Loan, (v) a Jumbo(750) Mortgage Loan, (vi) a Super Jumbo Mortgage Loan, (vii) a C Credit Mortgage Loan, (viii) a C Minus Credit Mortgage Loan, (ix) a Non-owner Occupied Mortgage Loan, (x) a Manufactured Home Mortgage Loan, (xi) a Condominium Mortgage Loan, (xii) a PUD Mortgage Loan, (xiii) a FICO Loan, (xiv) an Interest-Only Loan, (xv) a 40/30 Mortgage Loan, (xvi) a 50/30 Mortgage Loan, (xvii) an AVM Mortgage Loan, (xviii) a Jumbo Mortgage Loan and/or (xix) a 30 Plus Mortgage Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collection Account" shall mean the account established by the Bank subject to an Account Agreement, into which all Income shall be deposited.

"Combined Loan-to-Value Ratio or CLTV" shall mean with respect to any Second Lien Mortgage Loan, the sum of the original principal balance of such Mortgage Loan and the outstanding principal balance of any related first lien as of the date of origination of the Mortgage Loan, divided by the lesser of the Appraised Value of the Mortgage Property as of the Origination Date or the purchase price of the Mortgaged Property if the related Mortgaged Property was purchased within twelve (12) months prior to the Origination Date.

"Committed Transaction" as defined in the recitals hereto.

"Commonly Controlled Entity" shall mean an entity, whether or not incorporated, which is under common control with the Seller within the meaning of Section 4001 of ERISA or is part of a group which includes the Seller and which is treated as a single employer under Section 414 of the Code.

"Condominium Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is a unit in a condominium project.

"Confirmation" shall have the meaning specified in Section 3(c).

"Custodial and Disbursement Agreement" shall mean that certain Amended and Restated Custodial and Disbursement Agreement, dated as of November 10, 2006, by and among the Buyer, NCCC, NCAH, NCMC, New Century, Home123, the Disbursement Agent and the Custodian, as the same shall be modified and supplemented and in effect from time to time.

"<u>Custodial Identification Certificate</u>" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"<u>Custodian</u>" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as the custodian under the Custodial and Disbursement Agreement, and any successor Custodian under the Custodial and Disbursement Agreement.

"<u>Default</u>" shall mean an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"<u>Disbursement Agent</u>" shall mean Deutsche Bank National Trust Company, a national banking association, and its successors in interest, as disbursement agent under the Custodial and Disbursement Agreement, and any successor Disbursement Agent under the Custodial and Disbursement Agreement.

"<u>Dollars</u>" and "<u>$</u>" shall mean lawful money of the United States of America.

"<u>Due Diligence Review</u>" shall mean the performance by the Buyer of any or all of the reviews permitted under Section 27 with respect to any or all of the Mortgage Loans, as desired by the Buyer from time to time.

"<u>Effective Date</u>" shall mean the date upon which the conditions precedent set forth in Section 3(a) shall have been satisfied.

"<u>Electronic Agent</u>" shall mean MERSCORP, INC., and its successors in interest.

"<u>Electronic Tracking Agreement</u>" shall mean the Electronic Tracking Agreement, in a form substantially similar to the form set forth in Annex 19 to the Custodial and Disbursement Agreement, to be entered into among the Buyer, the Seller, the Electronic Agent and MERS, if any, as the same shall be amended, supplemented or otherwise modified from time to time; provided that if no Mortgage Loans are or will be MERS Designated Mortgage Loans, all references herein to the Electronic Tracking Agreement shall be disregarded.

"<u>Electronic Transmission</u>" shall mean the delivery of information in an electronic format acceptable to the applicable recipient thereof. An Electronic Transmission shall be considered written notice for all purposes hereof (except when a request or notice by its terms requires execution). Any document that requires signature that is delivered by Electronic Transmission via email that includes the sender's name shall satisfy such signature requirement.

"<u>Eligible Asset</u>" shall mean a Mortgage Loan, including a Wet-Ink Mortgage Loan, (i) as to which the representations and warranties in <u>Schedule 1</u> attached hereto are true and correct, (ii) which is underwritten strictly in accordance with the Underwriting Guidelines of the Seller, and (iii) which is secured by a Residential Dwelling.

-6-

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which the Seller is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which the Seller is a member.

"Eurodollar Rate" shall mean, with respect to each day a Transaction is outstanding, the rate per annum equal to the rate appearing at page 5 of the Telerate Screen as one-month LIBOR at or about 9:00 a.m., New York time, on such date (and if such date is not a Business Day, the Eurodollar Rate in effect on the Business Day immediately preceding such date), and if such rate shall not be so quoted, the average rate per annum at which three mutually acceptable banks are offered Dollar deposits at or about 9:00 a.m., New York City time, on such date by prime banks in the interbank eurodollar market where the eurodollar and foreign currency exchange operations in respect of its Transactions are then being conducted for delivery on such day for a period of thirty (30) days and in an amount comparable to the amount of the Transactions to be outstanding on such day. The Eurodollar Rate shall be reset by the Buyer as described above and the Buyer's determination of Eurodollar Rate shall be conclusive upon the parties absent manifest error on the part of the Buyer

"Event of Default" has the meaning specified in Section 12.

"Excess Margin" has the meaning specified in Section 3(o).

"Existing Financing Facility" has the meaning specified in Section 10(t).

"Fannie Mae" shall mean the Federal National Mortgage Association, and its successors in interest.

"FICO Loan" shall mean a Mortgage Loan with a FICO score less than 550 and greater than or equal to 500.

"First Lien Mortgage Loan" shall mean an Eligible Asset secured by a first lien on the related Mortgaged Property.

"Foreclosed Loan" shall mean a loan the property securing which has been foreclosed upon by the Seller.

"Freddie Mac" shall mean the Federal Home Loan Mortgage Corporation, and its successors in interest.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"<u>Governmental Authority</u>" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over NCCC, NCAH, NCMC, New Century, Home123, the Guarantor, any of their respective Subsidiaries or any of their properties.

"<u>Guarantee</u>" shall mean, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well another Person, to purchase assets, goods, securities or services, or to agree to a take-or-pay arrangement or otherwise); provided that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the ordinary course of business, or (ii) obligations to make servicing advances for delinquent taxes and insurance, or other obligations in respect of a Mortgaged Property, or other principal and interest advances made in the ordinary course of servicing the Mortgage Loans. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "<u>Guarantee</u>" and "<u>Guaranteed</u>" used as verbs shall have correlative meanings.

"<u>Guarantor</u>" shall mean New Century Financial Corporation, Inc., a Maryland corporation.

"<u>Guaranty</u>" shall mean the Amended and Restated Guarantee, dated as of November 10, 2006, made by the Guarantor in favor of the Buyer.

"<u>Home123</u>" shall mean Home123 Corporation, a California corporation, and its successors in interest.

"<u>Income</u>" shall mean, with respect to any Mortgage Loan at any time, all collections and proceeds on or in respect of the Mortgage Loans, including, without limitation, any principal thereof then payable and all interest or other distributions payable thereon less any related servicing fee(s) charged by the Servicer.

"<u>Indebtedness</u>" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days after the date the respective goods are delivered or the respective services are rendered; (c) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of

such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) obligations of such Person under repurchase agreements, sale/buy-back agreements or like arrangements; (f) Indebtedness of others Guaranteed by such Person; (g) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; and (h) Indebtedness of general partnerships of which such Person is a general partner; and (i) Capital Lease Obligations of such Person; provided, however, that for any period, the aggregate Indebtedness of the Guarantor during such period maintained in accordance with GAAP shall be calculated less the aggregate amount of any such Indebtedness that is reflected on the balance sheet of the Guarantor in respect of obligations incurred pursuant to a securitization transaction, solely to the extent such obligations are secured by the assets securitized thereby and are non-recourse to the Guarantor. In the event that any Indebtedness would be excluded from the calculation of Indebtedness but for the existence of recourse, the Guarantor shall be entitled nonetheless to exclude the amount of such Indebtedness that is not subject to recourse. The amount of any recourse shall be the stated or determinable amount thereof or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the Guarantor in good faith. Any calculations of Indebtedness provided pursuant to this Agreement shall also separately set forth any Indebtedness of the Guarantor excluded from such calculation pursuant to the proviso in the definition thereof.

"Interest-Only Loan" shall mean any Mortgage Loan as to which scheduled payments only include interest for an initial period of not more than 10 years, after which such Mortgage Loan will fully amortize to maturity.

"Interest Rate Protection Agreement" shall mean, with respect to any or all of the Mortgage Loans, any short sale of US Treasury securities, or futures contract, or options related contract, or interest rate swap, cap or collar agreement or similar arrangement providing for protection against fluctuations in interest rates or the exchange of nominal interest obligations, either generally or under specific contingencies and acceptable to the Buyer.

"Interim Funder" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the interim funder pursuant to the MERS Procedures Manual.

"Investor" shall mean, with respect to each MERS Designated Mortgage Loan, the Person named on the MERS® System as the investor pursuant to the MERS Procedures Manual.

"Investment" shall mean with respect to any Person, any direct or indirect purchase or other acquisition by that Person of a beneficial interest in stock or other securities of any other Person, or any direct or indirect loan, advance (other than advances to employees for moving and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by that Person to any other Person, including all Indebtedness and accounts receivable from that other Person which are not

current assets or did not arise from sales to that other Person in the ordinary course of business.

"Jumbo Mortgage Loans" shall mean, collectively, Jumbo(500) Mortgage Loans, Jumbo(750) Mortgage Loans and Super Jumbo Mortgage Loans.

"Jumbo(500) Mortgage Loans" shall mean each Mortgage Loan with a principal balance as of origination of more than $500,000 and less than or equal to $750,000.

"Jumbo(750) Mortgage Loans" shall mean each Mortgage Loan with a principal balance as of origination of more than $750,000.

"Late Payment Fee" has the meaning specified in Section 5(b).

"Letter Agreement" shall mean the Second Amended Pricing Side Letter, dated as of November 10, 2006, by and among the Buyer, NCCC, NCAH, NCMC, New Century and Home123 and acknowledged by the Guarantor.

"Leverage Ratio" shall mean on any date of determination, the ratio of (a) Total Liabilities to (b) Tangible Net Worth.

"Lien" shall mean any mortgage, lien, pledge, charge, security interest or similar encumbrance.

"Loan-to-Value Ratio" or "LTV" means with respect to any Mortgage Loan, the ratio of the original outstanding principal amount of such Mortgage Loan at the time of origination to the lesser of (a) the Appraised Value of the related Mortgaged Property at origination of such Mortgage Loan and (b) if the related Mortgaged Property was purchased within twelve (12) months of the origination of such Mortgage Loan, the purchase price of the related Mortgaged Property.

"Management Shareholders" shall mean Robert K. Cole, Brad A. Morrice, and Edward F. Gotschall.

"Manufactured Home Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is a manufactured home.

"Margin Base" shall mean the aggregate Asset Value of all Purchased Assets which are Eligible Assets.

"Margin Deficit" has the meaning specified in Section 4.

"Market Value" shall mean, as of any date in respect of any Mortgage Loan, the price at which such Mortgage Loan could readily be sold as determined in the Buyer's sole discretion using its reasonable business judgment, which price may be determined to be zero. The Buyer's determination of Market Value shall be conclusive upon the parties absent manifest error on the part of the Buyer.

"Material Adverse Effect" shall mean a material adverse effect on (a) the Property, business, operations, financial condition or prospects of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, (b) the ability of NCCC, NCAH, NCMC, New Century or Home123 to perform its obligations under any of the Repurchase Documents to which it is a party, (c) the validity or enforceability of any of the Repurchase Documents, (d) the rights and remedies of the Buyer under any of the Repurchase Documents, (e) the timely payment of any amounts payable under the Repurchase Documents, (f) the Asset Value of the Purchased Assets or (g) the ability of the Guarantor to perform its obligations under the Guaranty.

"Material Subsidiary" shall mean a "significant subsidiary" as defined in Rule 1-02 of Regulation S-X (17 CFR §210.1-01, et seq), of the Seller or any of its subsidiaries.

"Maximum Amount" shall mean the sum of the Maximum Committed Amount and the Maximum Uncommitted Amount.

"Maximum Committed Amount" shall mean $1,000,000,000.

"Maximum Uncommitted Amount" shall mean $0.

"MERS" shall mean Mortgage Electronic Registration Systems, Inc., and its successors in interest.

"MERS Designated Mortgage Loan" shall mean a Mortgage Loan for which the Seller has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Seller, in accordance with the MERS Procedures Manual.

"MERS Procedures Manual" shall mean the MERS Procedures Manual attached as Exhibit B to the Electronic Tracking Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"MERS Report" shall mean the schedule listing MERS Designated Mortgage Loans and other information prepared by the Electronic Agent pursuant to the Electronic Tracking Agreement.

"MERS® System" shall mean the Electronic Agent's mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

"Minimum Pricing Amount" has the meaning specified in the Letter Agreement.

"Mortgage" shall mean the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien or second lien on a fee simple Residential Dwelling securing the Mortgage Note.

"Mortgage File" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"<u>Mortgage Loan</u>" shall mean a mortgage loan originated in accordance with the Underwriting Guidelines which the Custodian has been instructed to hold for the Buyer pursuant to the Custodial and Disbursement Agreement including any Wet-Ink Mortgage Loan listed on a Transaction Request, and which Mortgage Loan includes, without limitation, (i) a Mortgage Note and the related Mortgage, and (ii) all right, title and interest of the Seller in and to the Mortgaged Property covered by such Mortgage.

"<u>Mortgage Note</u>" shall mean the original executed promissory note or other evidence of the indebtedness of a Mortgagor with respect to a Mortgage Loan.

"<u>Mortgage-backed Security</u>" shall mean a security (including, without limitation, a participation certificate) that is an interest in a pool of Mortgage Loans or is secured by such an interest.

"<u>Mortgaged Property</u>" shall mean a fee simple interest in the real property (including all improvements, buildings, fixtures, building equipment and personal property thereon and all additions, alterations and replacements made at any time with respect to the foregoing) and all other collateral securing repayment of the debt evidenced by a Mortgage Note.

"<u>Mortgagee</u>" shall mean the record holder of a Mortgage Note secured by a Mortgage.

"<u>Mortgagor</u>" shall mean the obligor or obligors on a Mortgage Note, including any person who has assumed or guaranteed the obligations of the obligor thereunder.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by the Seller or any ERISA Affiliate and that is covered by Title IV of ERISA.

"<u>NCAH</u>" shall mean NC Asset Holding, L.P., a Delaware limited partnership, and its successors in interest.

"<u>NCCC</u>" shall mean NC Capital Corporation, a California corporation, and its successors in interest.

"<u>NCMC</u>" shall mean New Century Mortgage Corporation, a California corporation, and its successors in interest.

"<u>Net Income</u>" shall mean, with respect to any Person for any period, the net income of such Person for such period as determined in accordance with GAAP.

"<u>Net Worth</u>" shall mean with respect to any Person, on any date of determination, the net worth of such Person as of such date, determined in accordance with GAAP.

"<u>New Century</u>" shall mean New Century Credit Corporation, a California corporation, and its successors in interest.

"<u>Non-owner Occupied Mortgage Loans</u>" shall mean each Mortgage Loan with respect to which the improvements on the Mortgaged Property are not occupied by the owner of such Mortgaged Property.

"<u>Origination Date</u>" shall mean the date a Mortgage Loan is funded by any originator and the proceeds are disbursed to a borrower under such Mortgage Loan.

"<u>Payment Calculation Date</u>" shall mean the tenth (10th) day of each month.

"<u>Payment Date</u>" shall mean two (2) Business Days after the Payment Calculation Date.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"<u>Periodic Advance Repurchase Payment</u>" has the meaning specified in Section 5(b).

"<u>Person</u>" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"<u>Plan</u>" shall mean an employee benefit or other plan established or maintained by any the Seller or any ERISA Affiliate and covered by Title IV of ERISA, other than a Multiemployer Plan.

"<u>Post-Default Rate</u>" shall mean, in respect of any day a Transaction is outstanding or any other amount under this Agreement or any other Repurchase Document that is not paid when due to the Buyer at the stated Repurchase Date or otherwise when due (a "<u>Post-Default Day</u>"), a rate per annum on a 360 day per year basis during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 4% per annum <u>plus</u> the Eurodollar Rate on such Post-Default Day.

"<u>Price Differential</u>" means, with respect to any Transaction hereunder as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the Repurchase Date (reduced by any amount of such Price Differential previously paid by the Seller to the Buyer with respect to such Transaction).

"<u>Pricing Rate</u>" shall mean a rate per annum equal to the sum of (a) the Eurodollar Rate plus (b) the Pricing Spread.

"<u>Pricing Spread</u>" has the meaning specified in the Letter Agreement.

"<u>Prime Rate</u>" shall mean the prime rate announced to be in effect from time to time, as published as the average rate in <u>The</u> <u>Wall</u> <u>Street</u> <u>Journal</u>.

-13-

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"PUD Mortgage Loan" shall mean an Eligible Asset secured by a Residential Dwelling which is an attached single family dwelling in a planned unit development.

"Purchase Agreement" shall mean any purchase agreement by and between NCCC, NCAH, NCMC, New Century or Home 123 and any third party, including without limitation, any Affiliate of NCCC, NCAH, NCMC, New Century or Home123, pursuant to which NCCC, NCAH, NCMC, New Century or Home123 has purchased assets subsequently sold to the Buyer hereunder.

"Purchase Date" shall mean the date on which Purchased Assets are transferred by the Seller to the Buyer or its designee (including the Custodian).

"Purchase Percentage" has the meaning specified in the Letter Agreement.

"Purchase Price" shall mean on each Purchase Date, the price at which Purchased Assets are transferred by the Seller to the Buyer or its designee (including the Custodian) which shall equal the Asset Value for such Purchased Assets on the Purchase Date.

"Purchased Assets" shall mean the Mortgage Loans sold by the Seller to the Buyer in a Transaction, and any Additional Purchased Assets.

"Purchased Items" has the meaning specified in Section 7.

"Regulations T, U and X" shall mean Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"REIT" shall mean a real estate investment trust, as defined in Section 856(a) of the Code.

"REO Property" shall mean real property acquired by the Seller, including a Mortgaged Property acquired through foreclosure of a Mortgage Loan or by deed in lieu of such foreclosure.

"Reportable Event" shall mean any of the events set forth in Section 4043(b) of ERISA or a successor provision thereof, other than those events as to which the thirty day notice period is waived under subsections .13, .14, .16, .18, .19 or .20 of PBGC Reg. § 2615 or one or more successor provisions thereof.

"Repurchase Date" shall mean the date on which the Seller is to repurchase the Purchased Assets from the Buyer as specified in the related Confirmation, including any date determined by application of the provisions of Sections 3 or 13; which date shall be specified as "open" unless otherwise requested by the Seller and agreed by the Buyer; provided that in no event shall the Repurchase Date be in excess of 364 days after the Purchase Date. If the Transaction is "open", the Repurchase Date shall be one (1)

Business Day after the date upon which either the Buyer (in its sole discretion) or the Seller (in its sole discretion) provides to the other written notice of its intention to sell or repurchase, as applicable, the applicable Mortgage Loans; provided that the Repurchase Date shall not, in any event, exceed 364 days from the date hereof.

"Repurchase Documents" shall mean this Agreement, the Custodial and Disbursement Agreement, the Guaranty, the Electronic Tracking Agreement, the Account Agreement and all other documents or agreements executed in connection therewith.

"Repurchase Obligations" shall have the meaning specified in Section 7(b).

"Repurchase Price" means the price at which Purchased Assets are to be transferred from the Buyer or its designee (including the Custodian) to the Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination, including any amounts paid pursuant to Requests for Additional Transactions for Excess Margin under Section 3(o), decreased by all cash, Income and Periodic Advance Repurchase Payments (including Late Payment Fees, if any) actually received by the Buyer pursuant to Sections 5(a) or 5(b), respectively.

"Requirement of Law" shall mean as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residential Dwelling" shall mean any one of the following: (i) a detached single family dwelling, (ii) a two-to-four family dwelling, (iii) a unit in a condominium project, (iv) a detached single family dwelling in a planned unit development or (v) manufactured housing units. Mortgaged Properties that consist of the following property types are not Residential Dwellings: (a) co-operative units, (b) log homes, (c) earthen homes, (d) underground homes, and (e) any dwelling situated on more than ten acres of property.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, the chief operating officer or an executive vice-president of such Person.

"SEC" shall mean the Securities and Exchange Commission.

"Second Lien Mortgage Loans" shall mean an Eligible Asset secured by a lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property.

"Security Agreement" shall mean with respect to any Mortgage Loan, any contract, instrument or other document related to security for repayment thereof (other than the related Mortgage and Mortgage Note), executed by the Mortgagor and/or others in connection with such Mortgage Loan, including without limitation, any security agreement, guaranty, title insurance policy, hazard insurance policy, chattel mortgage,

letter of credit or certificate of deposit or other pledged accounts, and any other documents and records relating to any of the foregoing.

"Seller" shall mean NCCC, NCAH, NCMC, New Century and Home123.

"Seller Asset Schedule" shall have the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Seller-Related Obligations" shall mean any obligations, representations, warranties and covenants of NCCC, NCAH, NCMC, New Century or Home123 hereunder and under any other arrangement between NCCC, NCAH, NCMC, New Century or Home123 or a Subsidiary of NCCC, NCAH, NCMC, New Century or Home123 on the one hand and the Buyer or an Affiliate of the Buyer on the other hand.

"Servicer" shall have the meaning specified in Section 24.

"Servicer Account" shall mean any account established by the Servicer in connection with the servicing of the Mortgage Loans.

"Servicing Agreement" has the meaning specified in Section 24.

"Servicing Contract" shall mean a contract or agreement purchased by NCCC, NCAH, NCMC, New Century or Home123 or entered into by NCCC, NCAH, NCMC, New Century or Home123 for its own account (and not as nominee or subservicer), whether now existing or hereafter purchased or entered into, pursuant to which NCCC, NCAH, NCMC, New Century or Home123 services Mortgage Loans or Mortgage Loan pools for Persons other than itself or the other Seller.

"Servicing File" means with respect to each Mortgage Loan, the file retained by the Seller consisting of originals of all documents in the Mortgage File which are not delivered to a Custodian and copies of all documents in the Mortgage File set forth in Section 2 of the Custodial and Disbursement Agreement.

"Servicing Records" has the meaning specified in Section 24.

"Settlement Agent" shall mean, with respect to any Transaction, the entity, which may be a title company, escrow company or attorney in accordance with local law and practice in the jurisdiction where the related Wet-Ink Mortgage Loan is being originated, which funds such Mortgage Loan with amounts wired pursuant to the terms of an Existing Financing Facility.

"Sub-Limit Percentage" shall mean the aggregate Asset Value multiplied by a percentage equal to the percentage of all outstanding Transactions which are Committed Transactions or Uncommitted Transactions, as applicable.

"Subordinated Debt" shall mean any Indebtedness of NCCC, NCAH, NCMC, New Century or Home123, now existing or hereafter created, incurred or arising, which is subordinated in right of payment to the payment of all obligations hereunder in a manner

and to an extent that the Buyer has approved in writing prior to the creation of such Indebtedness.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership, limited liability company or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Super Jumbo Mortgage Loans" shall mean each Mortgage Loan with a principal balance as of origination of more than $1,000,000 but less than $1,500,000.

"Tangible Net Worth " shall mean, with respect to any Person, as of any date of determination, the consolidated net worth of such Person and its subsidiaries, less the consolidated net book value of all assets of such Person and its subsidiaries (to the extent reflected as an asset on the balance sheet of such Person or any subsidiary of such Person at such date) which will be treated as intangibles under GAAP, including, without limitation, such items as deferred financing expenses, net leasehold improvements, goodwill, trademarks, trade names, service marks, copyrights, patents, licenses and unamortized debt discount and expense; *provided that* residual securities owned by such Person shall not be treated as intangibles for purposes of this definition.

"Term Purchased Asset" shall mean any Purchased Asset for which the Buyer and the Seller shall have agreed that the Repurchase Date is not "open".

"Termination Date" shall mean the date which is 364 days from the date hereof which shall be November 10, 2007 or such earlier date on which this Agreement shall terminate in accordance with the provisions hereof or by operation of law, as may be extended pursuant to Section 3(m).

"Test Period" has the meaning specified in Section 11(s).

"Total Liabilities" shall mean on any date of determination with respect to any Person, the amount, on a consolidated basis, of the liabilities of such Person and its respective Subsidiaries, determined in accordance with GAAP, minus Subordinated Debt; provided, however, that for any period, the aggregate Total Liabilities of any Person during such period maintained in accordance with GAAP shall be calculated less the aggregate amount of any such Total Liabilities that are reflected on the balance sheet of such Person in respect of obligations incurred pursuant to a securitization transaction, solely to the extent such obligations are secured by the assets securitized thereby and are non-recourse to such Person. In the event that any liabilities would be excluded from the calculation of Total Liabilities but for the existence of recourse, such Person shall be entitled

nonetheless to exclude the amount of such liabilities that are not subject to recourse. The amount of any recourse shall be the stated or determinable amount thereof or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. Any calculations of Total Liabilities provided pursuant to this Agreement shall also separately set forth any liabilities of such Person excluded from such calculation pursuant to the proviso in the definition thereof.

"Transaction" has the meaning specified in Section 1.

"Transaction Request" means a request from the Seller to the Buyer, in the form attached as Exhibit I hereto, to enter into a Transaction, which may be delivered via Electronic Transmission.

"True Sale Certification" shall mean a true sale certification in the form of Exhibit VI attached hereto.

"Trust Receipt" shall mean a trust receipt issued by the Custodian to the Buyer confirming the Custodian's possession of certain Mortgage Files which are held by the Custodian for the benefit of the Buyer or the registered holder of such trust receipt.

"Uncommitted Transaction" has the meaning set forth in the recitals hereto.

"Underwriting Guidelines" shall mean the underwriting guidelines delivered by the Seller to the Buyer on or prior to the Effective Date and as may be modified or supplemented from time to time thereafter as approved by the Buyer in its sole discretion attached hereto as Exhibit II.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection and the priority of the security interest in any Purchased Item is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection and the priority of the security interest.

"Wet-Ink Mortgage Loan" shall mean an Eligible Asset which is sold to the Buyer on the origination date thereof by the Seller, which origination is in accordance with the Underwriting Guidelines and is funded in part or in whole with cash advanced directly to an escrow agent, Settlement Agent, or Warehouse Lender approved by the Buyer in its sole discretion.

3.    **INITIATION; TERMINATION**

(a)    Conditions Precedent to the Effective Date. The Effective Date hereof is subject to the satisfaction, immediately prior to or concurrently therewith, of the conditions precedent that the Buyer shall have received from the Seller any fees and expenses payable hereunder (including, without limitation, the fee required

pursuant to Section 4 of the Letter Agreement), and all of the following documents, each of which shall be satisfactory in form and substance to the Buyer and its counsel:

(1)     <u>Fifth Amended and Restated Master Repurchase Agreement</u>.  This Fifth Amended and Restated Master Repurchase Agreement duly completed and executed by the parties thereto.  In addition, the Seller shall have taken such other action as the Buyer shall have requested in order to perfect the security interests created pursuant to this Agreement;

(2)     <u>Opinions of Counsel</u>.  An opinion or opinions of outside counsel to each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor, substantially in the form of <u>Exhibit III</u>;

(3)     <u>Organizational Documents</u>.  A good standing certificate and certified copies of the charter and by-laws (or equivalent documents) of each of NCCC, NCMC, NCAH, New Century, Home123 and the Guarantor and of all corporate or other authority for NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor, as applicable, with respect to the execution, delivery and performance of the Repurchase Documents to which it is a party and each other document to be delivered by NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor from time to time in connection herewith (and the Buyer may conclusively rely on such certificate until it receives notice in writing from NCCC, NCMC, NCAH, New Century, Home123 or the Guarantor, as applicable, to the contrary); provided that corporate resolutions with respect to the execution, delivery and performance of the Repurchase Documents by the Guarantor may be provided by the Seller to the Buyer within 10 days of the Effective Date;

(4)     <u>Underwriting Guidelines</u>.  A copy of the Seller's current Underwriting Guidelines, and any material changes to the Underwriting Guidelines made since the Underwriting Guidelines were last delivered to the Buyer;

(5)     <u>Servicing Agreement(s)</u>.  Any Servicing Agreement, certified as a true, correct and complete copy of the original;

(6)     <u>Consents and Waivers</u>.  Any and all irrevocable consents and waivers required under the Existing Financing Facilities;

(7)     <u>UCC Amendments and Releases</u>.   Any and all amendments or terminations of UCC financing statements required by the Buyer;

(8)     <u>Other Documents</u>.  Such other documents as the Buyer may reasonably request, in form and substance reasonably acceptable to the Buyer; and

(9)     <u>Custodial and Disbursement Agreement</u>.  The Custodial and Disbursement Agreement duly completed and executed by the parties thereto.

(10)    <u>Letter Agreement</u>.  The Letter Agreement duly completed and executed by the parties thereto.

(11)    <u>Guaranty</u>.  The Guaranty duly completed and executed by the Guarantor.

(12)    <u>Account Agreement</u>.    The Account Agreement duly completed and executed by the parties thereto.

(13)    <u>Electronic Tracking Agreement</u>.  The Electronic Tracking Agreement duly completed and executed by the parties thereto.

(b)    <u>Conditions Precedent to all Transactions</u>. The Buyer's obligation to enter into each Committed Transaction (including the initial Transaction) and, in the event the Buyer chooses, in its sole discretion, to enter into an Uncommitted Transaction pursuant to Section 3(c) below, the Buyer's obligation to enter into each Uncommitted Transaction, is subject to the satisfaction of the following further conditions precedent, both immediately prior to entering into such Transaction and also after giving effect to the consummation thereof and the intended use of the proceeds of the sale:

(1)    the Seller shall have delivered a Transaction Request via Electronic Transmission in accordance with the procedures set forth in Section 3(c);

(2)    no Default or Event of Default shall have occurred and be continuing under the Repurchase Documents;

(3)    after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Maximum Amount;

(4)    both immediately prior to the requested Transaction and also after giving effect thereto and to the intended use thereof, the representations and warranties made by the Seller in Section 10, shall be true, correct and complete on and as of such Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(5)    after giving effect to the requested Transaction, the aggregate outstanding Purchase Price of the Transactions outstanding shall not exceed the Asset Value of all the Purchased Assets subject to outstanding Transactions;

(6)    subject to the Buyer's right to perform one or more Due Diligence Reviews pursuant to Section 28, the Buyer shall have completed its due diligence review of the Mortgage File for each Purchased Asset, and such other documents, records, agreements, instruments, mortgaged properties or information relating to such Purchased Asset as the Buyer in its sole

-20-

discretion deems appropriate to review and such review shall be satisfactory to the Buyer in its sole discretion;

(7)     the Buyer shall have received from the Seller certified copies of any Servicing Agreement relating to the Eligible Assets and the Buyer shall have reviewed and approved each such Servicing Agreement in its sole discretion;

(8)     the Buyer shall have received all fees and expenses of counsel to the Buyer as contemplated by Section 14(b) which amount, at the Buyer's option, may be withheld from the sale proceeds of any Transaction hereunder;

(9)     the Buyer shall have approved, in its sole discretion, all exceptions to the Underwriting Guidelines;

(10)    none of the following shall have occurred and/or be continuing:

(A)     an event or events shall have occurred in the good faith determination of the Buyer resulting in the effective absence of a "repo market" or comparable "lending market" for financing debt obligations secured by mortgage loans or securities or an event or events shall have occurred resulting in the Buyer not being able to finance Purchased Assets through the "repo market" or "lending market" with traditional counterparties at rates which would have been reasonable prior to the occurrence of such event or events; or

(B)     an event or events shall have occurred resulting in the effective absence of a "securities market" for securities backed by mortgage loans or an event or events shall have occurred resulting in the Buyer not being able to sell securities backed by mortgage loans at prices which would have been reasonable prior to such event or events; or

(C)     there shall have occurred a material adverse change in the financial condition of the Buyer which affects (or can reasonably be expected to affect) materially and adversely the ability of the Buyer to fund its obligations under this Agreement;

(11)    with respect to each Eligible Asset, the Buyer shall have received from the Custodian on each Purchase Date an Asset Schedule and Exception Report or Trust Receipt and Basic Status Report, as applicable, dated the Purchase Date, duly completed and with exceptions acceptable to the Buyer in its sole discretion in respect of Eligible Assets to be purchased hereunder on such Business Day;

(12)    the Buyer shall have received from the Seller a Warehouse Lender's Release Letter substantially in the form of <u>Exhibit VII-B</u> hereto (or such other form acceptable to the Buyer) or a Seller's Release Letter

-21-

substantially in the form of <u>Exhibit VII-A</u> hereto (or such other form acceptable to the Buyer) covering each Eligible Asset to be sold to the Buyer;

(13) The aggregate requested Purchase Price of Eligible Assets that are not Wet-Ink Mortgage Loans that the Seller has requested the Buyer purchase pursuant to the Transaction Request is equal to or in excess of $1,000,000;

(14) the Buyer shall not have determined that the introduction of, or a change in, any Requirement of Law or in the interpretation or administration of any Requirement of Law applicable to the Buyer has made it unlawful, and no Governmental Authority shall have asserted that it is unlawful, for the Buyer to enter into Transactions;

(15) The Repurchase Date for such Transaction shall not be later than the Termination Date;

(16) after giving effect to the requested Committed Transaction, the aggregate amount of outstanding Committed Transactions shall not have Purchase Prices in excess of the Maximum Committed Amount;

(17) after giving effect to the requested Uncommitted Transaction, the aggregate amount of outstanding Uncommitted Transactions shall not have Purchase Prices in excess of the Maximum Uncommitted Amount;

(18) to the extent there are any MERS Designated Mortgage Loans, the Buyer shall have received from the Seller a copy of a fully executed Electronic Tracking Agreement; and

(19) the Buyer shall have received from the Seller, with respect to the MERS Designated Mortgage Loans, a MERS Report reflecting the Seller as the Investor and no Person named in the Interim Funder field for each such MERS Designated Mortgage Loan.

(20) None of NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall be in default under any Seller-Related Obligation equal to or in excess of $2,000,000

Each Transaction Request delivered by the Seller hereunder shall constitute a certification by each of NCCC, NCAH, NCMC, New Century and Home123 that all the conditions set forth in this Section 3(b) have been satisfied (both as of the date of such notice or request and as of the date of such purchase) and shall be deemed to be a request for a Committed Transaction; provided that if after giving effect to the requested Committed Transaction, the aggregate amount of outstanding Committed Transactions shall have Purchase Prices in excess of the Maximum Committed Amount, such latest request shall be deemed a request for an Uncommitted Transaction.

Each of NCCC, NCAH, NCMC, New Century and Home123 hereby requests that the Buyer, on each Business Day, convert each Eligible Asset which is a Wet-Ink Mortgage Loan for which the Mortgage File has been received by the Custodian in accordance with the Custodial and Disbursement Agreement to a dry Mortgage Loan and this request shall constitute a certification by each of NCCC, NCAH, NCMC, New Century and Home123 that all the conditions set forth in this Section 3(b) have been satisfied (both as of the date hereof and as of the date of such conversion).

(c)     This Agreement is not a commitment by the Buyer to enter into the Uncommitted Transactions with the Seller but rather sets forth the procedures to be used in connection with periodic requests for the Buyer to enter into the Uncommitted Transactions with the Seller.  The Seller hereby acknowledges that the Buyer is under no obligation to agree to enter into, or to enter into, any Uncommitted Transaction pursuant to this Agreement.  The Seller shall request a Transaction by delivering to the Custodian, the Disbursement Agent and the Buyer via Electronic Transmission a request in the form of Exhibit I attached hereto (a "Transaction Request") in accordance with the timeframe set forth in Section 3(a) of the Custodial and Disbursement Agreement. Such Transaction Request shall describe the Purchased Assets in a Seller Asset Schedule and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, (iv) the Pricing Rate applicable to the Transaction, (v) the applicable Purchase Percentages and (vi) additional terms or conditions not inconsistent with this Agreement.  Each such Transaction Request in respect of Eligible Assets that are not Wet-Ink Mortgage Loans shall be for an aggregate Purchase Price equal to or in excess of $1,000,000.

With respect to any request for an Uncommitted Transaction, unless otherwise agreed in writing, upon receipt of the Transaction request, the Buyer may, in its sole discretion, agree to enter into that portion of the requested Transaction representing a request for an Uncommitted Transaction and such agreement shall be evidenced by a Confirmation to be delivered to the Seller on the Purchase Date as described below.

On each Purchase Date, the Buyer shall forward to the Seller a confirmation (a "Confirmation") by Electronic Transmission setting forth with respect to each Transaction funded on such date, (1) the mortgage loan numbers, (2) the Purchase Price for such Purchased Assets, (3) the Market Value of the related Mortgage Loans as of the date of such Confirmation, (4) the outstanding principal amount of the related Mortgage Loans, (5) the Repurchase Date, (6) the Pricing Rate and (7) the Class designations of such Purchased Assets.  The Buyer shall forward to the Seller a revised Confirmation by Electronic Transmission notifying the Seller as to any changes made by the Buyer in the Pricing Spread, Purchase Percentage or Reduction Amount pursuant to the terms hereof.

On each date that all the documents set forth in Section 2(a)(i) of the Custodial and Disbursement Agreement are received by the Custodian with respect to any Wet-Ink Mortgage Loan, and the Custodian delivers to the Buyer a Trust Receipt attaching an Asset Schedule and Exception Report or Basic Status Report and Exception Report, as applicable, with respect to such Eligible Assets, the Buyer shall forward to the Seller a

new Confirmation by Electronic Transmission setting forth the following information, updated to reflect the revised Pricing Rate, and, if applicable, Market Value as a result of the conversion of such Mortgage Loan, (1) the mortgage loan numbers, (2) the Purchase Price for such Purchased Assets, (3) the Market Value of the related Mortgage Loans, (4) the outstanding principal amount of the related Mortgage Loans, (5) the Repurchase Date, (6) the Pricing Rate and (7) the Class designations of such Purchased Assets.

In the event the Seller disagrees with any terms of the Confirmation, the Seller shall notify the Buyer in writing of such disagreement within one (1) Business Day after receipt of such Confirmation unless a corrected Confirmation is sent by the Buyer. An objection sent by the Seller must state specifically that it is an objection, must specify the provision(s) being objected to by the Seller, must set forth such provision(s) in the manner that the Seller believes they should be stated, and must be received by the Buyer no more than one (1) Business Day after the Confirmation was received by the Seller.

(d)     Any Confirmation by the Buyer shall be deemed to have been received by the Seller on the date actually received by the Seller.

(e)     Except as set forth in Section 3(c), each Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between the Buyer and the Seller with respect to the Transaction to which the Confirmation relates, and the Seller's acceptance of the related proceeds shall constitute the Seller's agreement to the terms of such Confirmation. It is the intention of the parties that each Confirmation shall not be separate from this Agreement but shall be made a part of this Agreement.

(f)     On the Repurchase Date, termination of a Transaction will be effected by transfer to the Seller or its designee of the Purchased Assets (and any Income in respect thereof received by the Buyer not previously credited or transferred to, or applied to the obligations of, the Seller pursuant to Section 5) which amount shall be netted against the simultaneous receipt of the Repurchase Price by the Buyer. To the extent a net amount is owed to one party, the other party shall pay such amount to such party. The Seller is obligated to obtain the Mortgage Files from the Buyer or its designee (including the Custodian) at the Seller's expense on the Repurchase Date.

Any payment made by the Seller to repurchase Purchased Assets shall be first applied to repurchase Purchased Assets under the Uncommitted Transactions until all outstanding Uncommitted Transactions have been terminated; it being understood that it is the intention of the parties hereto that at no time shall there be any outstanding Uncommitted Transactions when the aggregate amount of the Purchase Price with respect to all outstanding Committed Transactions is less than the Maximum Committed Amount.

(g)     Subject to the terms and conditions of this Agreement, during the term of this Agreement, the Seller may sell to the Buyer, repurchase from the Buyer and resell to the Buyer Eligible Assets hereunder.

-24-

(h)    In no event shall a Transaction be entered into when any Default or Event of Default has occurred and is continuing or when the Repurchase Date for such Transaction would be later than the Termination Date.

(i)    With respect to each Eligible Asset that is not a Wet-Ink Mortgage Loan, the Seller shall deliver to the Custodian the Mortgage File pertaining to each Eligible Asset to be purchased by the Buyer no later than the time set forth in the Custodial and Disbursement Agreement.

(j)    With respect to each Eligible Asset that is not a Wet-Ink Mortgage Loan, pursuant to the Custodial and Disbursement Agreement, the Custodian shall deliver to the Buyer and the Seller an Asset Schedule and Exception Report with respect to the Eligible Assets which the Seller has requested the Buyer purchase on such Purchase Date, and no later than 5 p.m., New York City time, on each Purchase Date, the Custodian shall deliver to the Buyer a Trust Receipt in respect of all such Eligible Assets purchased by the Buyer on such Purchase Date.  Subject to the provisions of this Section 3 and Section 11 of the Custodial and Disbursement Agreement, the Purchase Price for each Eligible Asset that is not a Wet-Ink Mortgage Loan will be made available to the Seller by the Disbursement Agent transferring the aggregate amount of such Purchase Price in accordance with the Custodial and Disbursement Agreement.

(k)    With respect to each Eligible Asset that is a Wet-Ink Mortgage Loan, the Seller shall cause the Settlement Agent to send the Custodian a facsimile of the associated Escrow Instruction Letter on each Purchase Date.  Subject to the provisions of this Section 3 and Section 11 of the Custodial and Disbursement Agreement, the Purchase Price for each Eligible Asset which is a Wet-Ink Mortgage Loan will then be made available to the Seller by the Disbursement Agent transferring the aggregate amount of such Purchase Price in accordance with the Custodial and Disbursement Agreement.  The Seller shall deliver the Mortgage File related thereto to the Custodian, for receipt by the Custodian no later than eight (8) Business Days following the Purchase Date of such Wet-Ink Mortgage Loan.

(l)    The Seller may repurchase any individual Purchased Asset without penalty or premium, but subject to the last sentence of this Section 3(l), on any date.  The Repurchase Price payable for the repurchase of any such Purchased Asset shall be reduced as provided in Section 5(d).  If the Seller intends to make such a repurchase, the Seller shall give one (1) Business Day's prior written notice thereof to the Buyer, designating the Purchased Assets to be repurchased.  If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, and, on receipt, such amount shall be applied to the Repurchase Price for the designated Purchased Assets.  The amount of the original Purchase Price of the Purchased Assets thus repurchased shall be available for subsequent Transactions subject to the terms of this Agreement.  If any Term Purchased Asset is repurchased on any date other than the Repurchase Date for such Term Purchased Asset, the Seller shall pay to the Buyer any amount

-25-

determined by the Buyer in its sole discretion, exercised in good faith, as necessary to compensate the Buyer for any additional losses, costs or expenses which it may reasonably incur as a result of such repurchase, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Buyer to fund or maintain such Transaction. The Buyer shall deliver to the Seller an invoice setting forth all such losses, costs or expenses.

(m)     At the request of the Seller made at least 10 days, but in no event earlier than 360 days, prior to the then current Termination Date, the Buyer may in its sole discretion extend the Termination Date for a period of 364 additional days or such other period to be determined by the Buyer in its sole discretion by giving written notice of such extension to the Seller. Any failure by the Buyer to deliver such notice of extension shall be deemed to be the Buyer's determination not to extend the then current Termination Date.

(n)     On the Termination Date, including but not limited to a termination pursuant to Section 20 or otherwise hereunder, the Seller shall pay to the Buyer the Minimum Pricing Amount. All such payments pursuant to this clause (o) shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Buyer at the account set forth in Section 8(a) hereof

(o)     On any day on which the Margin Base for such Mortgage Loans exceeds the aggregate outstanding Purchase Price of all Transactions with respect to such Mortgage Loans, so long as no Default or Event of Default has occurred and is continuing:

(1)     the Seller may prepare a Request for Additional Transactions for Excess Margin in the form of Exhibit IX attached hereto ("Request for Additional Transactions for Excess Margin"), (A) specifying (i) the increase in Purchase Price for all outstanding Transactions and the requested Purchase Date, (ii) the Excess Margin with respect to all outstanding Transactions before giving effect to the requested Transaction, (iii) the remaining Excess Margin after giving effect to the requested Transaction, and (iv) the aggregate outstanding Purchase Price of the Transactions after giving effect to the requested Transaction, and (B) including a certification that, upon the consummation of the additional Transactions, the Margin Base will be equal to or greater than the aggregate outstanding Purchase Price of all Transactions, and the excess of the Margin Base over the aggregate outstanding Purchase Price, after giving effect to the Transaction, shall be the "Excess Margin".

(2)     the Seller shall transmit via Electronic Transmission the Request for Additional Transactions for Excess Margin to the Disbursement Agent and the Buyer prior to 12:00 noon, New York City time, on the requested Purchase Date. Upon confirming that the Request for Additional Transactions for Excess Margin correctly reflects the information set forth

-26-

in Section 3(o)(1) and that, after giving effect to the requested Transaction, the amount of the Margin Base would be equal to or greater than the aggregate outstanding Purchase Prices of all Transactions, the Buyer shall cause the Disbursement Agent to remit the additional Purchase Price in the amount set forth in such Request for Additional Transactions for Excess Margin and send a revised Confirmation with respect to such Purchased Assets.  In the event that the Buyer's assessment of the Margin Base would alter the information set forth in any Request for Additional Transactions for Excess Margin, the Buyer shall promptly notify the Seller in writing of such assessment.

(3)      the Buyer shall not be obligated to cause the Disbursement Agent to remit the additional Purchase Price requested pursuant to a Request for Additional Transactions for Excess Margin which (i) the Buyer reasonably determines is based on erroneous information or would result in a Transaction other than in accordance with the terms of this Agreement, or (ii) does not reflect the Buyer's current determination of Market Value as provided in the definition thereof.

## 4.    MARGIN AMOUNT MAINTENANCE

(a)      If at any time the Margin Base is less than the aggregate Purchase Price for all outstanding Transactions (a "Margin Deficit"), then the Buyer may by notice to the Seller (as such notice is more particularly set forth below, a "Margin Deficit Notice") require the Seller to transfer to the Buyer or its designee (including the Custodian) cash to be applied to reduce the Purchase Price with respect to all outstanding Transactions such that the Margin Base will thereupon equal or exceed the aggregate Purchase Price for all outstanding Transactions.  If the Buyer delivers a Margin Deficit Notice to the Seller on or prior to 6 p.m. (New York time) on any Business Day, then the Seller shall transfer such cash to the Buyer no later than 5 p.m. (New York time) the following Business Day.  In the event the Buyer delivers a Margin Deficit Notice to the Seller after 6 p.m. (New York time) on any Business Day, then such Margin Deficit Notice shall be deemed to have been delivered on the following Business Day and the Seller shall be required to transfer cash no later than 5 p.m. (New York time) on the subsequent Business Day.  All cash transferred to the Buyer pursuant to this Section 4(a) shall be deposited in the account set forth in Section 8(a) hereof.

(b)      the Buyer's election, in its sole discretion, not to deliver a Margin Deficit Notice at any time there is a Margin Deficit shall not in any way limit or impair its right to deliver a Margin Deficit Notice at any time a Margin Deficit exists.

## 5.    INCOME PAYMENTS

(a)      Where a particular Transaction's term extends over an Income payment date on the Purchased Assets subject to that Transaction, such Income shall be the property of the Buyer. The Buyer agrees that until a Default or an Event of

-27-

Default has occurred and the Buyer otherwise directs as contemplated in each Servicer Notice, each Servicer that is not the Seller shall be permitted to continue to remit Income in accordance with the respective Servicing Agreement. In the event that the Seller is the Servicer of any Mortgage Loans, the Buyer agrees that until a Default or an Event of Default has occurred, the Seller shall be permitted to continue to remit or retain Income with respect to such Mortgage Loans in accordance with its current existing business practice. Upon notice of a Default or an Event of Default to the Seller hereunder or to the Servicer pursuant to a Servicer Notice, the Seller shall, and pursuant to the Servicer Notice, the Servicer shall be required to, deposit promptly all Income in a deposit account (the title of which shall indicate that the funds therein are being held in trust for the Buyer) (the "Collection Account") with the Bank and which is subject to the Account Agreement. All funds in the Collection Account may be withdrawn by the Buyer and applied as determined by the Buyer. The Seller may not give any instruction with respect to the Collection Account after a Default or an Event of Default.

(b)     Notwithstanding that the Buyer and the Seller intend that the Transactions hereunder be sales to the Buyer of the Purchased Assets, the Seller shall pay to the Buyer the accreted value of the Price Differential (less any amount of such Price Differential previously paid by the Seller to the Buyer) of each Transaction through but not including the Payment Calculation Date (each such payment, a "Periodic Advance Repurchase Payment") on each Payment Date. The Buyer shall deliver to the Seller, via Electronic Transmission, notice of the required Periodic Advance Repurchase Payment on or prior to the second Business Day preceding each Payment Date. If the Seller fails to make all or part of the Periodic Advance Repurchase Payment by 5:00 p.m., New York City time, on the Payment Date, the Seller shall be obligated to pay to the Buyer (in addition to, and together with, the Periodic Advance Repurchase Payment) interest on the unpaid amount of the Periodic Advance Repurchase Payment at a rate per annum equal to the Post-Default Rate (the "Late Payment Fee") until the overdue Periodic Advance Repurchase Payment is received in full by the Buyer.

(c)     the Seller shall hold or cause to be held for the benefit of, and in trust for, the Buyer all Income, including without limitation all Income received by or on behalf of the Seller with respect to such Purchased Assets. All such Income shall be held in trust for the Buyer, shall constitute the property of the Buyer and shall not be commingled with other property of the Seller, any affiliate of the Seller or the applicable the Servicer except as expressly permitted above in this Section 5. Funds deposited in the Collection Account during any month shall be held therein, in trust for the Buyer.

(d)     the Buyer shall offset against the Repurchase Price of each such Transaction all Income and Periodic Advance Repurchase Payments actually received by the Buyer for such Transaction pursuant to Sections 5(a) and 5(b) as of the applicable Repurchase Date, respectively, excluding any Late Payment Fees paid pursuant to Section 5(b); it being understood that the Late Payment Fees are properties of the Buyer that are not subject to offset against the Repurchase Price.

-28-

6.    **REQUIREMENTS OF LAW**

(a)    If any Requirement of Law (other than with respect to any amendment made to the Buyer's certificate of incorporation and by-laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by the Buyer with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

   (1)    shall subject the Buyer to any tax of any kind whatsoever with respect to this Agreement or any Transaction (excluding net income taxes) or change the basis of taxation of payments to the Buyer in respect thereof;

   (2)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, or other extensions of credit by, or any other acquisition of funds by, any office of the Buyer which is not otherwise included in the determination of the Eurodollar Rate hereunder;

   (3)    shall impose on the Buyer any other condition;

and the result of any of the foregoing is to increase the cost to the Buyer, by an amount which the Buyer deems to be material, of entering, continuing or maintaining any Transaction or to reduce any amount due or owing hereunder in respect thereof, then, in any such case, the Seller shall promptly pay the Buyer such additional amount or amounts as calculated by the Buyer in good faith as will compensate the Buyer for such increased cost or reduced amount receivable.  The Buyer shall deliver to the Seller an invoice setting forth all such increased costs and reduced amounts receivable.

(b)    If the Buyer shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made to the Buyer's certificate of incorporation and by-laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by the Buyer or any corporation controlling the Buyer with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on the Buyer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which the Buyer or such corporation could have achieved but for such adoption, change or compliance (taking into consideration the Buyer's or such corporation's policies with respect to capital adequacy) by an amount deemed by the Buyer to be material, then from time to time, the Seller shall promptly pay to the Buyer such additional amount or amounts calculated by the Buyer in good faith as will compensate the Buyer for such reduction.  The Buyer shall deliver to the Seller an invoice setting forth all such additional amounts.

-29-

(c)     Any payments made by the Seller to the Buyer shall be free and clear of, and without deduction or withholding for, any taxes; provided, however, that if the Seller shall be required by law to deduct or withhold any taxes from any sums payable to the Buyer, then the Seller shall (A) make such deductions or withholdings and pay such amounts to the relevant authority in accordance with applicable law, (B) pay to the Buyer the sum that would have been payable had such deduction or withholding not been made, and (C) at the time the Price Differential is paid, pay to the Buyer all additional amounts as specified by the Buyer in good faith to preserve the after-tax yield the Buyer would have been received had such tax not been imposed.

(d)     If the Buyer becomes entitled to claim any additional amounts pursuant to this Section, (i) it shall promptly notify the Seller of the event by reason of which it has become so entitled and (ii) at the sole option of the Buyer, (x) the Buyer may terminate this Agreement and the Seller shall not be required to pay any Termination Fee or (y) this Agreement shall continue in full force and effect.  A certificate as to any additional amounts payable pursuant to this Section 6(d) submitted by the Buyer to the Seller shall be conclusive in the absence of manifest error.

## 7.    SECURITY INTEREST

(a)     Each of the following items or types of property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, is hereinafter referred to as a "Purchased Item" and all of them are collectively, the "Purchased Items":  all Mortgage Loans, all rights under each Purchase Agreement (but not the obligations thereunder), all Interest Rate Protection Agreements, all Mortgage Files, including without limitation all promissory notes, all Servicing Records relating to the Mortgage Loans (as defined in Section 24(b)), all Servicing Agreements relating to the Mortgage Loans and any other collateral pledged hereunder or otherwise relating to such Mortgage Loans, together with all files, documents, instruments, surveys, certificates, correspondence, appraisals, computer programs, computer storage media, accounting records and other books and records relating thereto, all mortgage guaranties and insurance (issued by governmental agencies or otherwise) and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any Mortgage Loan, all servicing fees to which such Seller is entitled and servicing and other rights relating to the Mortgage Loans, all Servicer Accounts established pursuant to any Servicing Agreement and all amounts on deposit therein, from time to time, all Purchase Agreements or other agreements or contracts relating to, constituting, or otherwise governing, any or all of the foregoing to the extent they relate to the Purchased Assets including the right to receive principal and interest payments with respect to the Purchased Assets and the right to enforce such payments, the Collection Account and all monies from time to time on deposit in the Collection Account, all "general intangibles", "accounts", "chattel paper", "deposit accounts" and "investment property" as defined in the Uniform Commercial Code as in effect from time to time relating to or constituting any and

-30-

all of the foregoing, and any and all replacements, substitutions, distributions on or proceeds of any and all of the foregoing.

(b)     The Buyer and the Seller intend that the Transactions hereunder be sales to the Buyer of the Purchased Assets and not loans from the Buyer to the Seller secured by the Purchased Assets.  However, in order to preserve the Buyer's rights under this Agreement in the event that a court or other forum recharacterizes the Transactions hereunder as loans and as security for the performance by the Seller of all of the Seller's obligations to the Buyer hereunder and the Transactions entered into hereunder ("Repurchase Obligations") and the Seller-Related Obligations, each of NCCC, NCAH, NCMC, New Century and Home123 hereby assigns, pledges and grants a security interest in all of its right, title and interest in, to and under the Purchased Items and Purchased Assets to the Buyer to secure the Repurchase Obligations and the Seller-Related Obligations, including without limitation the repayment of all amounts owing to the Buyer hereunder.  The assignment, pledge and grant of security interest contained herein shall be, and each of NCCC, NCAH, NCMC, New Century  and Home123 hereby represents and warrants to the Buyer that it is, a first priority perfected security interest to the extent such security interest relates to the Mortgage Loans.  Each of NCCC, NCAH, NCMC, New Century and Home123 agrees to mark its computer records and tapes to evidence the interests granted to the Buyer hereunder.  All Purchased Items shall secure the payment of all obligations of the Seller now or hereafter existing under this Agreement, including, without limitation, the Seller's obligation to repurchase Purchased Assets, or if such obligation is so recharacterized as a loan, to repay such loan, for the Repurchase Price and to pay any and all other amounts owing to the Buyer hereunder.

(c)     Pursuant to the Custodial and Disbursement Agreement, the Custodian shall hold the Mortgage Files as exclusive bailee and agent for the Buyer pursuant to the terms of the Custodial and Disbursement Agreement and shall deliver to the Buyer Trust Receipts each to the effect that the Custodian has reviewed such Mortgage Files in the manner and to the extent required by the Custodial and Disbursement Agreement and identifying any deficiencies in such Mortgage Files as so reviewed.

## 8.     PAYMENT, TRANSFER AND CUSTODY

(a)     Unless otherwise mutually agreed in writing, all transfers of funds to be made by the Seller hereunder shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to the Buyer at the following account maintained by the Buyer; Account No. GLA 111569, account name SER, Bank of New York, ABA No. 021000018, Attn:  Eric Seyffer, not later than 3 p.m., New York City time, on the date on which such payment shall become due (and each such payment made after such time shall be deemed to have been made on the next succeeding Business Day).  The Seller acknowledges that it has no rights of withdrawal from the foregoing account.

(b)     On the Purchase Date for each Transaction, ownership of the Purchased Assets shall be transferred to the Buyer or its designee (including the Custodian) against the simultaneous transfer of the Purchase Price to or on behalf of the Seller not later than 6 p.m., New York City time, simultaneously with the delivery to the Custodian of the Purchased Assets relating to each Transaction in accordance with the terms hereof and of the Custodial and Disbursement Agreement. Each of NCCC, NCAH, NCMC, New Century and Home123 hereby sells, transfers, conveys and assigns to the Buyer or its designee (including the Custodian) without recourse, but subject to the terms of this Agreement, all the right, title and interest of NCCC, NCAH, NCMC, New Century and Home123, as applicable, in and to the Purchased Assets together with all right, title and interest in and to the proceeds of any related Purchased Items.

(c)     In connection with such sale, transfer, conveyance and assignment, on or prior to each Purchase Date, the Seller shall deliver or cause to be delivered and released to the Buyer or its designee (including the Custodian) (i) the Custodial Identification Certificate and (ii) the documents identified in the Custodial and Disbursement Agreement.

(d)     Any Mortgage Files not delivered to the Buyer or its designee (including the Custodian) are and shall be held in trust by the Seller or its designee for the benefit of the Buyer as the owner thereof. The Seller or its designee shall maintain a copy of the Mortgage File and the originals of the Mortgage File not delivered to the Buyer or its designee (including the Custodian). The possession of the Mortgage File by the Seller or its designee is at the will of the Buyer for the sole purpose of servicing the related Purchased Asset, and such retention and possession by the Seller or its designee is in a custodial capacity only. Each Mortgage File retained or held by the Seller or its designee shall be segregated on the Seller's books and records from the other assets of the Seller or its designee and the books and records of the Seller or its designee shall be marked appropriately to reflect clearly the sale of the related Purchased Asset to the Buyer. The Seller or its designee shall release its custody of the Mortgage File only in accordance with written instructions from the Buyer, unless such release is required as incidental to the servicing of the Purchased Assets or is in connection with a repurchase of any Purchased Asset by the Seller.

9.     **HYPOTHECATION OR PLEDGE OF PURCHASED ASSETS**

Title to all Purchased Assets and Purchased Items shall pass to the Buyer and the Buyer shall have free and unrestricted use of all Purchased Assets and Purchased Items. Nothing in this Agreement shall preclude the Buyer from engaging in repurchase transactions with the Purchased Assets and Purchased Items or otherwise pledging, repledging, transferring, hypothecating, or rehypothecating the Purchased Assets and Purchased Items, all on terms that the Buyer may determine in its sole discretion. Nothing contained in this Agreement shall obligate the Buyer to segregate any Purchased Assets and Purchased Items delivered to the Buyer by the Seller.

10.    **SELLER'S REPRESENTATIONS**

Each of NCCC, NCAH, NCMC, New Century and Home123 represents and warrants to the Buyer that as of the Purchase Date for the purchase of any Purchased Assets by the Buyer from the Seller and as of the date of this Agreement and any Transaction hereunder and at all times while the Repurchase Documents and any Transaction hereunder are in full force and effect:

(a)    <u>Acting as Principal</u>.  The Seller will engage in such Transactions as principal (or, if agreed in writing in advance of any Transaction by the other party hereto, as agent for a disclosed principal).

(b)    <u>Solvency</u>.  Neither the Repurchase Documents nor any Transaction thereunder are entered into in contemplation of insolvency or with intent to hinder, delay or defraud any of the Seller's creditors.  The transfer of the Mortgage Loans subject hereto and the obligation to repurchase such Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.  The Seller is not insolvent within the meaning of 11 U.S.C. Section 101(32) or any successor provision thereof and the transfer and sale of the Mortgage Loans pursuant hereto and the obligation to repurchase such Mortgage Loan (i) will not cause the Seller to become insolvent, (ii) will not result in the Seller having unreasonably small capital, and (iii) will not result in debts that would be beyond the Seller's ability to pay as the same mature.  The Seller received reasonably equivalent value in exchange for the transfer and sale of the Purchased Assets and Purchased Items subject hereto.

(c)    <u>No Broker</u>.  The Seller has not dealt with any broker, investment banker, agent, or other person, except for the Buyer, who may be entitled to any commission or compensation in connection with the sale of Purchased Assets pursuant to this Agreement.

(d)    <u>Ability to Perform</u>.  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in the Repurchase Documents applicable to it to which it is a party.

(e)    <u>No Defaults</u>.  No Default or Event of Default has occurred and is continuing hereunder.

(f)    <u>Legal Name; Existence</u>.  NCMC's exact legal name is, and for the immediately preceding four months has been, New Century Mortgage Corporation.  NCAH's exact legal name is, and for the immediately preceding four months has been, NC Asset Holding, L.P..  NCCC's exact legal name is, and for the immediately preceding four months has been, NC Capital Corporation.  New Century's exact legal name is, and for the immediately preceding four months has been, New Century Credit Corporation.  Home123's exact legal name is, and for the immediately preceding four months has been, Home123 Corporation.  Each of NCCC, NCMC, NCAH, New Century and Home123 (a) is a corporation duly and

exclusively organized, validly existing and in good standing under the laws of California, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify could not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect.  NCAH (a) is a corporation duly and exclusively organized, validly existing and in good standing under the laws of Delaware, (b) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; and (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify could not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect.

(g)     Financial Condition.  (a) The Seller has heretofore furnished to the Buyer a copy of (a) its consolidated balance sheet for the fiscal year ended December 31, 2005, and the related consolidated statements of income and retained earnings and of cash flows for the Seller and its consolidated Subsidiaries for such fiscal year, each audited by and accompanied by an opinion thereon of KPMG LLP, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Seller and its consolidated Subsidiaries as of the end of, and for, such fiscal year in accordance with GAAP and (b) its consolidated balance sheet and the consolidated balance sheets of its consolidated Subsidiaries for the quarterly fiscal period of the Seller since December 31, 2005 and the related consolidated statements of income and retained earnings and of cash flows for the Seller and its consolidated Subsidiaries for such quarterly fiscal period, setting forth in each case in comparative form the figures for the previous year.  All such financial statements are complete and correct and fairly present, in all material respects, the consolidated financial position of the Seller and its Subsidiaries and the consolidated results of their operations as of such dates and for such fiscal periods, all in accordance with GAAP applied on a consistent basis.  Since the date of the most recently such delivered balance sheet, there has been no material adverse change in the consolidated business, operations or financial condition of the Seller and its consolidated Subsidiaries taken as a whole from that set forth in said financial statements.

(h)     Litigation.  Except as set forth on the compliance report required under Section 11(y), there are no actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are pending or threatened) or other legal or

arbitrable proceedings affecting the Seller or any of its Subsidiaries or affecting any of the Property of any of them before any Governmental Authority which (i) questions or challenges the validity or enforceability of the Repurchase Documents or any action to be taken in connection with the transactions contemplated hereby, (ii) makes a claim or claims in an aggregate amount greater than $5,000,000 (provided such claims or claims shall be required to be set forth on the compliance report referenced above only upon the Buyer's request), or (iii) individually or in the aggregate, if adversely determined, could reasonably be likely to have a Material Adverse Effect.

(i)     No Breach.  Neither (a) the execution and delivery of the Repurchase Documents nor (b) the consummation of the transactions therein contemplated to be entered into by the Seller in compliance with the terms and provisions thereof will conflict with or result in a breach of the organizational documents of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority, or any Servicing Agreement or other material agreement or instrument to which NCCC, NCAH, NCMC, New Century, Home123, the Guarantor or any of their respective Subsidiaries is a party or by which any of them or any of their Property is bound or to which any of them is subject, or constitute a default under any such material agreement or instrument or result in the creation or imposition of any Lien (except for the Liens created pursuant to the Repurchase Documents) upon any Property of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, or any of their respective Subsidiaries pursuant to the terms of any such agreement or instrument, other than a breach or default for which a consent or waiver has been obtained pursuant to Section 3(a)(6).

(j)     Action.  Each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Repurchase Documents to which it is a party, as applicable; the execution, delivery and performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of each of the Repurchase Documents to which it is a party have been duly authorized by all necessary corporate or other action on its part; and each Repurchase Document to which it is  a party has been duly and validly executed and delivered by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, and constitutes a legal, valid and binding obligation of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, enforceable against NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, in accordance with its terms.

(k)     Approvals.  No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery or performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, of the Repurchase Documents to which it is a party or for the legality, validity or enforceability

-35-

thereof, except for filings and recordings in respect of the Liens created pursuant to the Repurchase Documents.

(l)    <u>Margin Regulations</u>.  Neither any Transaction hereunder, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulation T, U or X.

(m)    <u>Taxes</u>.  Each of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and their respective Subsidiaries have filed all Federal income tax returns and all other material tax returns that are required to be filed by them and have paid all taxes due pursuant to such returns or pursuant to any assessment received by it or any of its Subsidiaries, except for any such taxes as are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided.  The charges, accruals and reserves on the books of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and their respective Subsidiaries in respect of taxes and other governmental charges are, in the opinion of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, as applicable, adequate.

(n)    <u>Investment Company Act</u>. None of NCCC, NCAH, NCMC, New Century, Home123, the Guarantor or any of their respective Subsidiaries is an "investment company", or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(o)    <u>Purchased Assets</u>.

    (1)    None of NCCC, NCAH, NCMC, New Century or Home123 has assigned, pledged, or otherwise conveyed or encumbered any Mortgage Loan to any other Person (except as between NCCC, NCAH, NCMC, New Century and Home123), and immediately prior to the sale of such Mortgage Loan to the Buyer, NCCC, NCAH, NCMC, New Century and/or Home123 was the sole legal and beneficial owner of such Mortgage Loan and had good and marketable title thereto, free and clear of all Liens, in each case except for Liens to be released simultaneously with the sale to the Buyer hereunder.  No Mortgage Loan sold to the Buyer hereunder was acquired (by purchase or otherwise) by NCCC, NCAH, NCMC, New Century or Home123 from an Affiliate of NCCC, NCAH, NCMC, New Century or Home123 (except as among NCCC, NCAH, NCMC, New Century and Home123), as applicable.

    (2)    The provisions of this Agreement are effective to either constitute a sale of the Purchased Items to the Buyer or to create in favor of the Buyer a valid and fully perfected first priority security interest in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under the Purchased Items.

(3) Upon receipt by the Custodian of each Mortgage Note, endorsed in blank by a duly authorized officer of NCCC, NCAH, NCMC, New Century or Home123, as applicable, either a purchase shall have been completed by the Buyer of each Mortgage Note or the Buyer shall have a valid and fully perfected first priority security interest in the applicable Mortgage Note and in such Seller's interest in the related Mortgaged Property.

(4) Upon the filing of financing statements on Form UCC-1 naming the Buyer as the "Secured Party", and NCCC, NCAH, NCMC, New Century and Home123 as the "Debtor" and describing the Purchased Items, in the jurisdictions and recording offices listed on <u>Exhibit IV</u> attached hereto, the security interests granted hereunder in the Purchased Items will constitute valid and fully perfected first priority security interests under the Uniform Commercial Code in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under such Purchased Items, which can be perfected by filing under the Uniform Commercial Code.

(5) Upon execution and delivery of the Account Agreement, the Buyer shall either be the owner of, or have a valid and fully perfected first priority security interest in, all deposit accounts comprising Purchased Items.

(6) With respect to each Purchased Asset, each of the representations and warranties on Schedule 1 is true and correct.

(p) <u>Chief Executive Office/Jurisdiction of Organization</u>. On the Effective Date, and during the four months immediately preceding the Effective Date, each of NCCC's, NCAH's, NCMC's, New Century's and Home123's chief executive office, is, and has been located at, 18400 Von Karman, Suite 1000, Irvine, California 92612. On the Effective Date, each of NCCC's, NCMC's, New Century's and Home123's jurisdiction of organization is California and NCAH's jurisdiction of organization is Delaware.

(q) <u>Location of Books and Records</u>. The location where each of NCCC, NCAH, NCMC, New Century and Home123 keeps its books and records, including all computer tapes and records related to the Purchased Items, is its chief executive office.

(r) <u>Reserved</u>.

(s) <u>Servicing Agreements</u>. The Seller has delivered to the Buyer all Servicing Agreements with respect to the Purchased Assets and no default or event of default exists thereunder.

(t) <u>Existing Financing Facilities</u>. No default or event of default exits under any credit facilities established pursuant to loan and security agreements, repurchase agreements, gestation repurchase agreements, and any other agreements establishing warehouse finance facilities involving the Seller, the Guarantor or their respective Material Subsidiaries which are in effect on the date hereof or any

similar arrangements now or hereafter existing, including, without limitation, any arrangements under which the Seller, the Guarantor or their respective Material Subsidiaries are required to repurchase mortgage loans from any lender or other counterparty (the "Existing Financing Facilities"). The Seller shall file with the SEC copies of all non-confidential portions of each new Existing Financing Facility to be entered into.

(u)  True and Complete Disclosure.  (a) The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor to the Buyer in connection with the negotiation, preparation or delivery of this Agreement and the other Repurchase Documents or included herein or therein or delivered pursuant hereto or thereto (other than with respect to the Mortgage Loans), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.  All written information furnished after the date hereof by or on behalf of each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor to the Buyer in connection with this Agreement and the other Repurchase Documents and the transactions contemplated hereby (other than with respect to the Mortgage Loans) and thereby will be true, complete and accurate in every material respect, or (in the case of projections) based on reasonable estimates, on the date as of which such information is stated or certified.  There is no fact known to a Responsible Officer of either NCCC, NCAH, NCMC, New Century or Home123, after due inquiry, that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Repurchase Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Buyer for use in connection with the transactions contemplated hereby or thereby.

(v)  ERISA.  NCCC, NCAH, NCMC, New Century, Home123, the Guarantor and any of their respective ERISA Affiliates are not and will not be in the future, required to contribute to any Plan (including Multiemployer Plans) subject to the applicable provisions of ERISA.

(w)  REIT.  Neither NCAH nor the Guarantor has engaged in any material "prohibited transactions" as defined in Section 857(b)(6)(B)(iii) and (C) of the Code.  Each of NCAH and the Guarantor for their current "tax year" (as defined in the Code) are and for all prior tax years subsequent to their election to be a real estate investment trust have been entitled to a dividends paid deduction under the requirements of Section 857 of the Code with respect to any dividends paid by it with respect to each such year for which it claims a deduction in their Form 1120-REIT filed with the United States Internal Revenue Service for such year.

(x)  No Reliance.  Each of NCMC, NCAH, NCCC, New Century, Home123 and the Guarantor has made its own independent decision to enter into the Repurchase Documents and each Transaction and as to whether such Transaction is

appropriate and proper for it based upon its own judgment and upon advice from such advisors (including without limitation, legal counsel and accountants) as it has deemed necessary. None of NCMC, NCAH, NCCC, New Century, Home123 or the Guarantor is relying upon any advice from the Buyer as to any aspect of the Transactions, including without limitation, the legal, accounting or tax treatment of such Transactions.

(y)     Compliance with Anti-Money Laundering Laws. The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an adequate anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws.

(z)     Other Security Agreements. The Seller has not become bound under Section 9-203(d) of the UCC by a Security Agreement previously entered into by another Person.

## 11.   COVENANTS OF SELLER

On and as of the date of this Agreement and each Purchase Date and until this Agreement is no longer in force with respect to any Transaction, each of NCCC, NCAH, NCMC, New Century and Home123 covenants that it will:

(a)     Financial Statements. The Seller shall deliver to the Buyer:

(1)     as soon as available and in any event within forty-five (45) calendar days after the end of each calendar month, the unaudited consolidated balance sheets of the Guarantor, the Seller and their consolidated Subsidiaries as of the end of such period and the related unaudited consolidated statements of income and retained earnings and of cash flows for the Guarantor, the Seller and their consolidated Subsidiaries for such period and the portion of the fiscal year through the end of such period, accompanied by a certificate of a Responsible Officer of the Guarantor and the Seller, as applicable, which certificate shall state that said consolidated financial statements fairly present in all material respects the consolidated financial condition and results of operations of the Guarantor or the Seller and its consolidated Subsidiaries, as applicable, in accordance with GAAP, consistently applied, as of the end of, and for, such period (subject to normal year-end adjustments);

    (2)    as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Guarantor or the Seller, the consolidated balance sheets of the Guarantor and the Seller and their respective consolidated Subsidiaries as of the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Guarantor and the Seller and their respective consolidated Subsidiaries for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Guarantor and the Seller and their respective consolidated Subsidiaries as of the end of, and for, such fiscal year in accordance with GAAP, and a certificate of such accountants stating that, in making the examination necessary for their opinion, they obtained no knowledge, except as specifically stated, of any Default or Event of Default; and

    (3)    from time to time such other information regarding the financial condition, operations, or business of the Seller as the Buyer may reasonably request.

The Seller shall furnish to the Buyer, at the time the Seller furnishes each set of financial statements pursuant to paragraphs (a) and (b) above, a certificate of a Responsible Officer of the Seller to the effect that, to the best of such Responsible Officer's knowledge, the Seller during such fiscal period or year has observed or performed in all material respects all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Repurchase Documents to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate (and, if any Default or Event of Default has occurred and is continuing, describing the same in reasonable detail and describing the action the Seller has taken or proposes to take with respect thereto).

(b)    <u>Litigation</u>.  The Seller will promptly, and in any event within ten (10) days after service of process on any of the following, give to the Buyer notice of all litigation, actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are threatened or pending) or other legal or arbitrate proceedings affecting the Seller or any of its Subsidiaries or affecting any of the Property of any of them before any Governmental Authority that (i) questions or challenges the validity or enforceability of any of the Repurchase Documents or any action to be taken in connection with the transactions contemplated hereby, (ii) makes a claim or claims in an aggregate amount greater than $5,000,000 (provided notice with respect to such claim or claims shall be required only upon the Buyer's request), or (iii) which, individually or in the aggregate, if adversely determined, could be reasonably likely to have a Material Adverse Effect.