(c)    <u>Existence, etc</u>.  Each of NCCC, NCAH, NCMC, New Century and Home123 shall:

    (1)    preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises necessary for the operation of its business (provided that nothing in this Section 11(c)(1) shall prohibit any transaction expressly permitted under Section 11(d));

    (2)    comply with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities (including, without limitation, all environmental laws) if failure to comply with such requirements could be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

    (3)    keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

    (4)    not (i) cause or permit any change to be made in its name, organizational identification number, identity or corporate structure, each as described in Section 10(f) or (ii) change its jurisdiction of organization, unless it shall have provided the Buyer thirty (30) days' prior written notice of such change and shall have first taken all action required by the Buyer for the purpose of perfecting or protecting the lien and security interest of the Buyer established hereunder;

    (5)    pay and discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained; and

    (6)    permit representatives of the Buyer, upon reasonable notice (unless a Default shall have occurred and is continuing, in which case, no prior notice shall be required), during normal business hours, to examine, copy and make extracts from its books and records, to inspect any of its Properties, and to discuss its business and affairs with its officers, all to the extent reasonably requested by the Buyer.

(d)    <u>Restriction on Fundamental Changes</u>.  None of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets; <u>provided</u>, that the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 may merge or consolidate with (i) any wholly owned subsidiary of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123, as applicable, or (ii) any other Person if the Guarantor, NCCC, NCAH, NCMC, New Century or

Home123 is the surviving corporation; and _provided_, _further,_ that if after giving effect thereto, no Default would exist hereunder,

(e)     Margin Deficit.  If at any time there exists a Margin Deficit, the Seller shall cure the same in accordance with Section 4.

(f)     Notices.  The Seller shall give notice to the Buyer:

   (1)     promptly upon receipt of notice or knowledge of the occurrence of any Default or Event of Default;

   (2)     with respect to any Purchased Asset, promptly upon receipt of any principal prepayment (in full or partial) of such Purchased Asset;

   (3)     with respect to any Purchased Asset hereunder, promptly upon receipt of notice or knowledge that the underlying Mortgaged Property has been damaged by waste, fire, earthquake or earth movement, flood, tornado or other casualty, or otherwise damaged so as to affect adversely the Asset Value of such Purchased Asset (provided that the Seller may satisfy its obligations under this clause (3) by causing the Servicer to notify the Buyer of any such damage);

   (4)     promptly upon receipt of notice or knowledge of (i) any material default related to any Purchased Item, (ii) any Lien or security interest on, or claim asserted against, any Purchased Item (other than the Lien created hereby) or (iii) any event or change in circumstances which could reasonably be expected to have a Material Adverse Effect;

   (5)     promptly upon any material change in the market value of any or all of the Seller's assets which could reasonably be expected to have a Material Adverse Effect;

   (6)     [Reserved]

   (7)     upon the termination of any Existing Financing Facility, if such termination would require the Seller to have to file a Form 8-K with the SEC pursuant to the rules governing such filings; provided, however, this notice requirement shall be deemed satisfied once the Seller files the related Form 8-K with the SEC; and

   (8)     promptly upon the occurrence of any default or event of default under the Existing Financing Facilities.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Seller setting forth details of the occurrence referred to therein and stating what action the Seller has taken or proposes to take with respect thereto.

(g)     Reports.  Within 45 calendar days following the end of each calendar quarter, the Seller shall provide the Buyer with a quarterly report, which report shall include, among other items, (i) a summary of such Seller's delinquency and loss experience with respect to Mortgage Loans serviced by the Seller, any Servicer or any designee of either, operating statements and the occupancy status of such Mortgaged Property and other property level information, including internal quality control reports, (ii) with respect to any MERS Designated Mortgage Loan, MERS Reports, (iii) plus any such additional reports as the Buyer may reasonably request with respect to the Seller or any Servicer's servicing portfolio or pending originations of Mortgage Loans.

(h)     Underwriting Guidelines.  All Eligible Assets will conform with the Underwriting Guidelines.  The Seller shall not make any material change in the Underwriting Guidelines without the prior written consent of the Buyer and shall review the Underwriting Guidelines periodically to confirm that they are being complied with in all material respects and are adequate to meet the Seller's business objectives (and to the extent the Buyer's consent has not yet been obtained, no Mortgage Loan underwritten in accordance with such changed Underwriting Guidelines shall be considered an Eligible Asset).  In the event the Seller makes any amendment or modification to the Underwriting Guidelines, the Seller shall promptly deliver to the Buyer a complete copy of the amended or modified Underwriting Guidelines.

(i)     Transactions with Affiliates.   The Guarantor, NCCC, NCAH, NCMC, New Century and Home123 will not, and will not permit any of their Subsidiaries to, enter into any transaction with an Affiliate of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 (other than another Seller) except transactions in the ordinary course of business on terms no less favorable to the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 than those that would be obtained in an arm's-length transaction.  In no event shall the Seller transfer to the Buyer hereunder any Mortgage Loan acquired by the Seller from an Affiliate of the Seller (other than each other Seller).

(j)     Limitation on Liens.  Immediately upon notice of a Lien or any circumstance which could give rise to a Lien on the Purchased Items to the extent related to the Mortgage Loans, the Seller will defend such Purchased Items against, and will take such other action as is necessary to remove, any Lien, security interest or claim on or to the related Purchased Items (other than any security interest created under this Agreement), and the Seller will defend the right, title and interest of the Buyer in and to any of such Purchased Items against the claims and demands of all persons whomsoever.

(k)     Guarantees.  The Guarantor, NCCC, NCAH, NCMC, New Century and Home123 will not create, incur, assume or suffer to exist any Guarantees of any Person other than an Affiliate without ten (10) days' prior written notice to the Buyer of such Guarantee.

(l)    <u>Limitation on Distributions</u>.  After the occurrence and during the continuation of any Default, none of NCCC, NCAH, NCMC, New Century or Home123 shall make any payment on account of, or set apart assets for, a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of any equity or partnership interest of NCCC, NCAH, NCMC, New Century or Home123, as applicable, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of NCCC, NCAH, NCMC, New Century or Home123, as applicable.

(m)    <u>Maintenance of Tangible Net Worth</u>.  The Guarantor will at all times during each fiscal year maintain Tangible Net Worth of not less than the sum of (1) $750,000,000, and (2) fifty percent (50%) of all increases in shareholders' equity in the Guarantor attributable to issuances of common stock and preferred equity since November 1, 2004[; provided, however, that in the event a redemption, repurchase, repayment or other retirement of such preferred equity results in a decrease in shareholders' equity, then any increase in shareholders' equity resulting from the issuance of such preferred equity shall be offset by the amount of such decrease for the purpose of calculating the Tangible Net Worth requirement].

(n)    <u>Minimum Liquidity</u>.  The Seller shall have at all times, on a consolidated basis, Cash, Cash Equivalents and unused borrowing capacity on unencumbered assets that could be drawn against (taking into account the economic terms of committed Existing Financing Facilities, including, without limitation, any margin or overcollateralization requirements) under committed Existing Financing Facilities in an amount equal to not less than $60,000,000.

(o)    <u>Leverage Ratio</u>.  The Guarantor shall not permit the Leverage Ratio of the Guarantor and its consolidated Subsidiaries at any time to be greater than 15:1.

(p)    <u>Servicer; Servicing Tape</u>.  The Seller shall provide to the Buyer and to the Disbursement Agent via Electronic Transmission, a remittance report on a monthly basis by no later than the 12th day of each month (the "<u>Reporting Date</u>") containing servicing information, including without limitation those fields reasonably requested by the Buyer from time to time, on a loan-by-loan basis and in the aggregate, with respect to the Purchased Assets serviced hereunder by the Seller or any Servicer for the month (or any portion thereof) prior to the Reporting Date (such remittance report, an "<u>Asset Tape</u>").  The Seller shall not cause the Mortgage Loans to be serviced by any servicer other than a servicer expressly approved in writing by the Buyer, which approval shall be deemed granted by the Buyer with respect to the Seller with the execution of this Agreement.

(q)    <u>Required Filings</u>.  The Seller shall promptly provide the Buyer with copies of all documents which NCCC, NCAH, NCMC, New Century or Home123 or any Subsidiary of NCCC, NCAH, NCMC, New Century or Home123 is required to file with any regulatory body in accordance with its regulations other than routine

filings in the ordinary course of business with regulatory bodies (other than the Securities and Exchange Commission (the "<u>SEC</u>")) which related to obtaining or maintaining licenses to do business or corporate qualifications; provided that Seller may satisfy this requirement to provide copies with respect to each such filing with the SEC by sending notice via Electronic Transmission of any filing with the SEC.

(r)    <u>Remittance of Prepayments</u>.  The Seller shall remit or cause to be remitted to the Buyer, with sufficient detail via Electronic Transmission to enable the Buyer to appropriately identify the Mortgage Loan to which any amount remitted applies, all full or partial principal prepayments on any Purchased Asset that the Seller or the Servicer has received on a weekly basis, to be paid on Thursday of the next succeeding week (or the next Business Day).

(s)    <u>Maintenance of Profitability</u>.  The Seller shall not permit, for any two consecutive calendar quarters (each such period, a "<u>Test Period</u>"), Net Income for such Test Period before income taxes for such Test Period and distributions made during such Test Period, to be less than $1.00.

(t)    <u>Independence of Covenants</u>.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default or Default if such action is taken or condition exists.

(u)    <u>Escrow Imbalances</u>.  The Seller will, no later than five (5) Business Days after learning (from any source) of an aggregate imbalance in the escrow accounts equal to or in excess of $1,000,000, fully and completely correct and eliminate such imbalance including, without limitation, depositing its own funds into such account to eliminate any overdrawal or deficit.

(v)    <u>Reserved</u>.

(w)    <u>Custodial and Disbursement Agreement and Account Agreement</u>.  The Seller shall maintain each of the Custodial and Disbursement Agreement and Account Agreement in full force and effect and shall not amend or modify either of the Custodial and Disbursement Agreement or the Account Agreement or waive compliance with any provisions thereunder without the prior written consent of the Buyer.

(x)    <u>Inconsistent Agreements</u>.  The Guarantor, NCMC, NCAH, NCCC, New Century and Home123 will not, and will not permit any of their Subsidiaries to, directly or indirectly, enter into any agreement containing any provision which would be violated or breached by any Transaction hereunder or by the performance by any of the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 of their respective obligations under any Repurchase Document to which it is a party.

-45-

(y)    Compliance Report.  The Seller shall provide the Buyer no later than the thirtieth (30th) calendar day of each month a compliance report, in the form of Exhibit X attached hereto, demonstrating therein the calculations the Seller utilized to determine its compliance with the financial covenants set forth in clauses (m), (n), (o) and (s) of this Section 11 as of the end of the immediately preceding month. Such compliance report shall be delivered by the Seller to the Buyer in accordance with Section 17 and shall also be delivered by the Seller to the Buyer at 9 West 57th Street, New York, NY 10019, Attn: Michael Friedman, Telecopier No.: (212) 891-6143, Telephone No.: (212) 891-6261.

## 12.    EVENTS OF DEFAULT

If any of the following events (each, an "Event of Default") occur, the Seller and the Buyer shall have the rights set forth in Section 13, as applicable:

(a)    the Seller shall default in the payment of any Repurchase Price due or any amount under Section 5 when due (whether at stated maturity, upon acceleration or at mandatory or optional prepayment); or

(b)    the Seller shall default in the payment of any other amount payable by it hereunder or under any other Repurchase Document after notification by the Buyer of such default, and such default shall have continued unremedied for one (1) Business Day; or

(c)    any representation, warranty or certification made or deemed made herein or in any other Repurchase Document by the Seller or any certificate furnished to the Buyer pursuant to the provisions hereof or thereof or any information with respect to the Mortgage Loans furnished in writing by or on behalf of the Seller shall prove to have been false or misleading in any material respect as of the time made or furnished (other than the representations and warranties set forth in Schedule 1, which shall be considered solely for the purpose of determining the Asset Value of the Purchased Assets, unless (i) the Seller shall have made any such representations and warranties with actual knowledge that they were materially false or misleading at the time made; or (ii) any such representations and warranties have been determined in good faith by the Buyer in its sole discretion to be materially false or misleading on a regular basis); or

(d)    the Seller shall fail to comply with the requirements of Section 11(c), Section 11(d), Section 11(e), Section 11(f), Section 11(h) (with respect to the Eligible Assets as a whole and not with respect to any single Eligible Asset) or Sections 11(i) through 11(w); and such default shall continue unremedied for a period of 5 Business Days (30 Business Days in the case of Section 11(h), Section 11(p) and Section 11(r)) from the earlier of (i) a responsible officer of the Seller having knowledge of such default and (ii) the Buyer giving notice to the Seller of such default; or except as otherwise set forth in Sections 12(a), 12(b), 12(c) and 12(d), the Seller shall fail to observe or perform any other covenant or agreement contained in this Agreement or any other Repurchase Document and such failure

-46-

to observe or perform shall continue unremedied for a period of 30 Business Days (10 Business Days in the case of Section 11(a) and Section 11(y)) from the earlier of (i) a responsible officer of the Seller having knowledge of such default and (ii) the Buyer giving notice to the Seller of such default; or

(e)     a final judgment or judgments for the payment of money in excess of $10,000,000 in the aggregate shall be rendered against NCCC, NCAH, NCMC, New Century, Home123 or any of their Affiliates by one or more courts, administrative tribunals or other bodies having jurisdiction and the same shall not be satisfied, discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof; or

(f)     an Act of Insolvency shall have occurred with respect to the Guarantor, NCCC, NCAH, NCMC, New Century or Home123 or any of their Subsidiaries; or

(g)     the Custodial and Disbursement Agreement, the Account Agreement or any Repurchase Document shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by NCCC, NCAH, NCMC, New Century or Home123; or

(h)     NCCC, NCAH, NCMC, New Century or Home123 shall grant, or suffer to exist, any Lien on any Purchased Item (except any Lien in favor of the Buyer); or either the Purchased Items shall not have been sold to the Buyer free and clear of any Liens in favor of any Person other than the Buyer, or the Liens contemplated hereby shall cease or fail to be first priority perfected Liens on any Purchased Items (but not the related Mortgaged Properties) in favor of the Buyer or shall be Liens in favor of any Person other than the Buyer; or

(i)     NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall be in default under (i) any Indebtedness in an amount equal to $10,000,000 or more of NCCC, NCAH, NCMC, New Century or Home123 or of such Material Subsidiary which default (1) involves the failure to pay a matured obligation, or (2) permits the acceleration of the maturity of obligations by any other party to or beneficiary with respect to such Indebtedness, (ii) any other contract to which NCCC, NCAH, NCMC, New Century or Home123 or such Material Subsidiary is a party which default (1) involves the failure to pay a matured obligation in excess of $10,000,000, or (2) permits the acceleration of the maturity of obligations in excess of $10,000,000 by any other party to or beneficiary of such contract, or (iii) any Seller-Related Obligation equal to or in excess of $10,000,000; or

(j)     any material adverse change in the Property, business or financial condition of NCCC, NCAH, NCMC, New Century or Home123 or any of their Material Subsidiaries shall occur, in each case as determined by the Buyer in its sole good faith discretion, or any other condition shall exist which, in the Buyer's sole good faith discretion, constitutes a material impairment of the Seller's ability to

-47-

perform its obligations under this Agreement or any other Repurchase Document; or

(k)    if the Buyer has purchased MERS Designated Mortgage Loans the Electronic Tracking Agreement has for whatever reason been terminated or ceases to be in full force and effect and (1) the Buyer (or the Custodian as its designee) shall not have received an assignment of mortgage with respect to each MERS Designated Mortgage Loan, in blank, in recordable form, but unrecorded within ten (10) days of such termination or (2) a new Electronic Tracking Agreement has not been entered into by the Seller, the Buyer and the Electronic Agent within ten (10) days of such termination; or

(l)    upon any event of default or event which, with the passage of time or expiration of any grace periods, would constitute an event of default under any of the Existing Financing Facilities; or

(m)    a Change of Control shall have occurred; or

(n)    upon the failure of the Guarantor at any time to continue to be (i) qualified as a real estate investment trust as defined in Section 856 of the Code and (ii) entitled to a dividend paid deduction under Section 857 of the Code with respect to dividends paid by it with respect to each taxable year for which it claims a deduction on its Form 1120 – REIT filed with the United States Internal Revenue Service for such year, or the entering into by NCAH or the Guarantor of any material "prohibited transactions" as defined in Sections 857(b) and 856(c) of the Code; or

(o)    upon the failure by the Guarantor to satisfy any of the following asset or income tests:

(1)    At the close of each taxable year, at least 75 percent of such Person's gross income consists of (i) "rents from real property" within the meaning of Section 856(c)(3)(A) of the Code, (ii) interest on obligations secured by mortgages on real property or on interests in real property, within the meaning of Section 856(c)(3)(B) of the Code, (iii) gain from the sale or other disposition of real property (including interests in real property and interests in mortgages on real property) which is not property described in Section 1221(a)(1) of the Code, within the meaning of Section 856(c)(3)(C) of the Code, (iv) dividends or other distributions on, and gain (other than gain from "prohibited transactions" within the meaning of Section 857(b)(6)(B)(iii) of the Code) from the sale or other disposition of, transferable shares (or transferable certificates of beneficial interest) in other qualifying REITs within the meaning of Section 856(d)(3)(D) of the Code, and (v) amounts described in Sections 856(c)(3)(E) through 856(c)(3)(I) of the Code.

(2)     At the close of each taxable year, at least 95 percent of such Person's gross income consists of (i) the items of income described in paragraph 1 hereof (other than those described in Section 856(c)(3)(I) of the Code), (ii) gain realized from the sale or other disposition of stock or securities which are not property described in Section 1221(a)(1) of the Code, (iii) interest, (iv) dividends, and (v) income derived from payments to such Person on interest rate swap or cap agreements, options, futures contracts, forward rate agreements and other similar financial instruments entered into to reduce the interest rate risks with respect to any indebtedness incurred or to be incurred to acquire or carry real estate assets, or gain from the sale or other disposition of such an investment as described in section 856(c)(5)(G), in each case within the meaning of Section 856(c)(2) of the Code.

(3)     At the close of each quarter of such Person's taxable years, at least 75 percent of the value of such Person's total assets (as determined in accordance with Treasury Regulations Section 1.856-2(d)) has consisted of and will consist of real estate assets within the meaning of Sections 856(c)(4) and 856(c)(5)(B) of the Code, cash and cash items (including receivables which arise in the ordinary course of such Person's operations, but not including receivables purchased from another person), and government securities.

(4)     At the close of each quarter of each of such Person's taxable years, (i) not more than 25 percent of such Person's total asset value will be represented by securities (other than those described in paragraph 3), (ii) not more than 20 percent of such Person's total asset value will be represented by securities of one or more taxable REIT subsidiaries, and (iii) (a) not more than 5 percent of the value of such Person's total assets will be represented by securities of any one issuer (other than Government securities and securities of taxable REIT subsidiaries), and (b) such Person will not hold securities possessing more than 10 percent of the total voting power or value of the outstanding securities of any one issuer (other than government securities, securities of taxable REIT subsidiaries, and securities of a qualified REIT subsidiary within the meaning of Section 856(i) of the Code).

## 13.   REMEDIES

(a)     If an Event of Default occurs, the following rights and remedies are available to the Buyer; provided, that an Event of Default shall be deemed to be continuing unless expressly waived by the Buyer in writing.

(1)     At the option of the Buyer, exercised by written notice to the Seller (which option shall be deemed to have been exercised, even if no notice is given, immediately upon the occurrence of an Act of Insolvency of the Seller), the Repurchase Date for each Transaction hereunder, if it has not already

occurred, shall be deemed immediately to occur. The Buyer shall (except upon the occurrence of an Act of Insolvency of the Seller) give notice to the Seller of the exercise of such option as promptly as practicable.

(2)     If the Buyer exercises or is deemed to have exercised the option referred to in subsection (a)(1) of this Section 13,

(A)     (i) the Seller's obligations in such Transactions to repurchase all Purchased Assets, at the Repurchase Price therefor on the Repurchase Date, and to pay all other amounts owed by the Seller hereunder, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the Buyer and applied to the aggregate unpaid Repurchase Prices and any other amounts owed by the Seller hereunder, and (iii) the Seller shall immediately deliver to the Buyer any Purchased Assets subject to such Transactions then in NCCC's, NCAH's, NCMC's, New Century's or Home123's possession or control;

(B)     to the extent permitted by applicable law, the Repurchase Price with respect to each such Transaction shall be increased by the aggregate amount obtained by daily application of, on a 360 day per year basis for the actual number of days during the period from and including the date of the exercise or deemed exercise of such option to but excluding the date of payment of the Repurchase Price, (x) the Post-Default Rate to (y) the Repurchase Price for such Transaction as of the Repurchase Date (decreased as of any day by (i) any amounts actually in the possession of the Buyer pursuant to clause (C) of this subsection, (ii) any proceeds from the sale of Purchased Assets applied to the Repurchase Price pursuant to subsection (a)(4) of this Section 13, and (iii) any amounts applied to the Repurchase Price pursuant to subsection (a)(4) of this Section 13); and

(C)     all Income actually received by the Buyer pursuant to Section 5 (excluding any Late Payment Fees paid pursuant to Section 5(b)) shall be applied to the aggregate unpaid Repurchase Price owed by the Seller.

(3)     Upon the occurrence of one or more Events of Default, the Buyer shall have the right to obtain physical possession of the Servicing Records (subject to the provisions of the Custodial and Disbursement Agreement) and all other files of the Seller relating to the Purchased Assets and all documents relating to the Purchased Assets which are then or may thereafter come in to the possession of the Seller or any third party acting for the Seller and the Seller shall deliver to the Buyer such assignments as the Buyer shall request and the Buyer shall have the right to appoint any Person to act as the Servicer for the Purchased Assets. The Buyer shall be entitled to specific performance of all agreements of the Seller contained in the Repurchase Documents.

-50-

(4)     At any time on the Business Day following notice to the Seller (which notice may be the notice given under subsection (a)(1) of this Section 13), in the event the Seller has not repurchased all Purchased Assets, the Buyer may (A) immediately sell, without demand or further notice of any kind, at a public or private sale and at such price or prices as the Buyer may deem satisfactory any or all Purchased Assets subject to such Transactions hereunder and apply the proceeds thereof to the aggregate unpaid Repurchase Price and any other amounts owing by the Seller hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Assets, to give the Seller credit for such Purchased Assets in an amount equal to the Market Value of the Purchased Assets against the aggregate unpaid Repurchase Price and any other amounts owing by the Seller hereunder.  The proceeds of any disposition of Purchased Assets shall be applied first to the costs and expenses incurred by the Buyer in connection with the Seller's default; second to costs of related covering and/or related hedging transactions; third to the Repurchase Price; and fourth to any other outstanding obligations of the Seller to the Buyer or its Affiliates.  In connection with any sale pursuant to clause (A) of this subsection (a)(4), the Buyer may (i) sell any such Purchased Assets without giving any warranties and (ii) specifically disclaim or modify any warranties of title or the like, and this procedure shall not be considered to adversely affect the commercial reasonableness of any such sale of the Purchased Assets.

(5)     the Seller agrees that the Buyer may obtain an injunction or an order of specific performance to compel the Seller to fulfill its obligations as set forth in Section 24, if the Seller fails or refuses to perform its obligations as set forth therein.

(6)     the Seller shall be liable to the Buyer, payable as and when incurred by the Buyer, for (A) the amount of all actual out-of-pocket expenses, including legal or other expenses incurred by the Buyer in connection with or as a consequence of an Event of Default, and (B) all costs incurred in connection with hedging or covering transactions.

(7)     the Buyer shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

(b)     The Buyer may exercise one or more of the remedies available to the Buyer immediately upon the occurrence of an Event of Default and, except to the extent provided in subsections (a)(1) and (4) of this Section 13, at any time thereafter without notice to the Seller.  All rights and remedies arising under this Agreement as amended from time to time hereunder are cumulative and not exclusive of any other rights or remedies which the Buyer may have.

(c)     the Buyer may enforce its rights and remedies hereunder without prior judicial process or hearing, and the Seller hereby expressly waives any defenses the Seller

-51-

might otherwise have to require the Buyer to enforce its rights by judicial process. The Seller also waives any defense (other than a defense of payment or performance) the Seller might otherwise have arising from the use of nonjudicial process, enforcement and sale of all or any portion of the Purchased Items, or from any other election of remedies.   The Seller recognizes that nonjudicial remedies are consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's-length.

(d)    To the extent permitted by applicable law, the Seller shall be liable to the Buyer for interest on any amounts owing by the Seller hereunder, from the date the Seller becomes liable for such amounts hereunder until such amounts are (i) paid in full by the Seller or (ii) satisfied in full by the exercise of the Buyer's rights hereunder.   Interest on any sum payable by the Seller to the Buyer under this paragraph 13(d) shall be at a rate equal to the Post-Default Rate.

## 14.    INDEMNIFICATION AND EXPENSES

(a)    NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, agree to hold the Buyer and its Affiliates and their present and former respective officers, directors, employees, agents, advisors and other representatives (each an "Indemnified Party") harmless from and indemnify any Indemnified Party against all third party liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (including counsel's fees and disbursements) (collectively, "Costs"), relating to or arising out of this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.   Without limiting the generality of the foregoing, each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Costs with respect to all Mortgage Loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation the federal Truth in Lending Act and/or the federal Real Estate Settlement Procedures Act, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.    In any suit, proceeding or action brought by an Indemnified Party in connection with any Mortgage Loan for any sum owing thereunder, or to enforce any provisions of any Mortgage Loan, each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by NCCC, NCAH, NCMC, New Century or Home123 of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to

-52-

or in favor of such account debtor or obligor or its successors from NCCC, NCAH, NCMC, New Century or Home123. Each of NCCC, NCAH, NCMC, New Century and Home123, jointly and severally, also agrees to reimburse an Indemnified Party as and when billed by such Indemnified Party for all the Indemnified Party's costs and expenses incurred in connection with the enforcement or the preservation of the Buyer's rights under this Agreement, any other Repurchase Document or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel.

(b)     the Seller agrees to pay as and when billed by the Buyer all of the out-of-pocket costs and expenses (including legal fees) incurred by the Buyer in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement, any other Repurchase Document or any other documents prepared in connection herewith or therewith. The Seller agrees to pay as and when billed by the Buyer all of the out-of-pocket costs and expenses incurred in connection with the consummation and administration of the transactions contemplated hereby and thereby including without limitation all fees, disbursements and expenses of counsel to the Buyer which amount shall be deducted from the Purchase Price paid for the first Transaction hereunder. Subject to the limitations set forth in Section 28, the Seller agrees to pay the Buyer all the out of pocket due diligence, inspection, appraisals, testing and review costs and expenses incurred by the Buyer with respect to Mortgage Loans submitted by the Seller for purchase under this Agreement, including, but not limited to, those out of pocket costs and expenses incurred by the Buyer pursuant to Sections 28.

## 15.    RECORDING OF COMMUNICATIONS

The Buyer and the Seller shall have the right (but not the obligation) from time to time to make or cause to be made tape recordings of communications between its employees and those of the other party with respect to Transactions upon notice to the other party of such recording. The Buyer and the Seller consent to the admissibility of such tape recordings in any court, arbitration, or other proceedings. The parties agree that a duly authenticated transcript of such a tape recording shall be deemed to be a writing conclusively evidencing the parties' agreement.

## 16.    SINGLE AGREEMENT

The Buyer and the Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and that each has been entered into in consideration of the other Transactions. Accordingly, each of the Buyer and the Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transaction

hereunder; (iii) that payments, deliveries, and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries, and other transfers may be applied against each other and netted and (iv) to promptly provide notice to the other after any such set off or application.

17.    **NOTICES AND OTHER COMMUNICATIONS**

Except as otherwise expressly permitted by this Agreement, all notices, requests and other communications provided for herein and under the Custodial and Disbursement Agreement (including without limitation any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including without limitation by email, telex or telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof or thereof); or, as to any party, at such other address as shall be designated by such party in a written notice to each other party.  Except as otherwise provided in this Agreement and except for notices given under Section 3 (which shall be effective only upon receipt), all such communications shall be deemed to have been duly given when transmitted by telecopy or personally delivered or, in the case of a mailed notice, upon receipt.

18.    **ENTIRE AGREEMENT; SEVERABILITY; MODIFICATIONS**

This Agreement together with the other Repurchase Documents constitutes the entire understanding between the Buyer and the Seller with respect to the subject matter it covers and shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions involving Purchased Assets.  By acceptance of this Agreement, the Buyer and the Seller acknowledge that they have not made, and are not relying upon, any statements, representations, promises or undertakings not contained in this Agreement.  Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.  No amendment, modification or release from any provision of this Agreement shall be effective unless in writing and executed by or on behalf of the party or parties to be charged therewith and shall be effective only in the specific instance and for the specific purpose for which given.

19.    **NON-ASSIGNABILITY**

The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by the Seller or the Buyer without the prior written consent of the other party, and any attempted assignment without such consent shall be null and void. Notwithstanding the foregoing, the Buyer may assign its rights and remedies under this Agreement and under any Transaction without the consent of the Seller (a) to any Affiliate of the Buyer (with notice to the Seller), and (b) in connection with any pledge, rehypothecation or other right permitted pursuant to Section 9.  Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit

of the parties and their respective successors and assigns. Nothing in this Agreement express or implied, shall give to any person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement.

20.    **TERMINABILITY**

Except as set forth below, this Agreement may be terminated by the Seller upon giving written notice to the Buyer and payment of the Minimum Pricing Amount except that this Agreement shall, notwithstanding such notice, remain applicable to any Transaction then outstanding; provided that the Repurchase Date for any such Transaction outstanding shall be the earlier to occur of (i) the original Repurchase Date pursuant to the applicable Confirmation and (ii) 20 days from the date of such notice of termination. Each representation and warranty made or deemed to be made by entering into a Transaction, herein or pursuant hereto shall survive the making of such representation and warranty, and the Buyer shall not be deemed to have waived any Default that may arise because any such representation or warranty shall have proved to be false or misleading, notwithstanding that the Buyer may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time the Transaction was made. Notwithstanding any such termination or the occurrence of an Event of Default, all of the representations and warranties and covenants hereunder shall continue and survive. The obligations of the Seller under Section 14 shall survive the termination of this Agreement.

21.    **GOVERNING LAW**

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES.**

22.    **SUBMISSION TO JURISDICTION; WAIVERS**

**EACH OF BUYER, NCCC, NCAH, NCMC, NEW CENTURY AND HOME123 HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

**(A)      SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER REPURCHASE DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;**

**(B)      CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO**

THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT VENUE AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(C)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH BUYER SHALL HAVE BEEN NOTIFIED;

(D)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION; AND

(E)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER REPURCHASE DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

23.    **NO WAIVERS, ETC.**

No failure on the part of the Buyer or the Seller to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Repurchase Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Repurchase Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.  An Event of Default shall be deemed to be continuing unless expressly waived by the Buyer in writing.

24.    **SERVICING**

(a)    Each of NCCC, NCAH, NCMC, New Century and Home123 covenants to maintain or cause the servicing of the Mortgage Loans to be maintained in conformity with accepted and prudent servicing practices in the industry for the same type of mortgage loans as the Mortgage Loans and in a manner at least equal in quality to the servicing the Seller provides for mortgage loans which it owns.  In the event that the preceding language is interpreted as constituting one or more servicing contracts, each such servicing contract shall terminate automatically upon the earliest of (i) an Event of Default, (ii) the date on which this Agreement terminates or (iii) the transfer of servicing approved by the Buyer.

(b)    If the Mortgage Loans are serviced by the Seller, the Seller agrees that the Buyer is the owner of all servicing records, including but not limited to any and all

-56-

servicing agreements, files, documents, records, data bases, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records, and any other records relating to or evidencing the servicing of the Mortgage Loans (the "Servicing Records"). The Seller covenants to safeguard such Servicing Records and to deliver them promptly to the Buyer or its designee (including the Custodian) at the Buyer's request.

(c)     If the Mortgage Loans are serviced by a person other than the Seller (such third party the "Servicer"), the Seller (i) shall, in accordance with Section (3)(b)(7), provide a copy of the servicing agreement to the Buyer, which shall be in form and substance acceptable to the Buyer (the "Servicing Agreement"), and shall provide a Servicer Notice to the Buyer substantially in the form of Exhibit VIII hereto, fully executed by the Seller and the Servicer; and (ii) hereby irrevocably assigns to the Buyer and the Buyer's successors and assigns all right, title and interest of the Seller in, to and under, and the benefits of, any Servicing Agreement with respect to the Mortgage Loans. The Seller agrees that no Person shall assume the servicing obligations with respect to the Mortgage Loans as successor to the Servicer unless such successor is approved in writing by the Buyer prior to such assumption of servicing obligations.

(d)     If the servicer of the Mortgage Loans is the Seller, upon the occurrence of an Event of Default, the Buyer shall have the right to terminate the Seller as servicer of the Mortgage Loans and transfer servicing to the Buyer's designated Servicer, at no cost or expense to the Buyer, at any time thereafter. If the Servicer of the Mortgage Loans is not the Seller, the Buyer shall have the right, as contemplated in the applicable Servicer Notice, upon the occurrence of an Event of Default, to terminate any applicable Servicing Agreement and transfer servicing to the Buyer's designated Servicer, at no cost or expense to the Buyer, it being agreed that the Seller will pay any and all fees required to terminate such Servicing Agreement and to effectuate the transfer of servicing to the Buyer's designated Servicer, as well as any servicing fees and expenses payable to such Servicer.

(e)     After the Purchase Date, until the repurchase of any Mortgage Loan, the Seller will have no right to modify or alter the terms of such Mortgage Loan and the Seller will have no obligation or right to repossess such Mortgage Loan or substitute another Mortgage Loan, in each case except as provided in the Custodial and Disbursement Agreement.

(f)     In the event the Seller or its Affiliate is servicing the Mortgage Loans, the Seller shall permit the Buyer to inspect the Seller's or its Affiliate's servicing facilities, as the case may be, for the purpose of satisfying the Buyer that the Seller or its Affiliate, as the case may be, has the ability to service the Mortgage Loans as provided in this Agreement.

25.    **INTENT**

(a)    The parties recognize that each Transaction is a "<u>repurchase agreement</u>" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Purchased Assets subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "<u>securities contract</u>" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of Purchased Assets subject to such Transaction would render such definition inapplicable).

(b)    It is understood that either party's right to liquidate Purchased Assets delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Section 16 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c)    The parties agree and acknowledge that if a party hereto is an "<u>insured depository institution</u>," as such term is defined in the Federal Deposit Insurance Act, as amended ("<u>FDIA</u>"), then each Transaction hereunder is a "<u>qualified financial contract</u>," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of Purchased Assets subject to such Transaction would render such definition inapplicable).

(d)    It is understood that this Agreement constitutes a "<u>netting contract</u>" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("<u>FDICIA</u>") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "<u>covered contractual payment entitlement</u>" or "<u>covered contractual payment obligation</u>", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "<u>financial institution</u>" as that term is defined in FDICIA or regulations promulgated thereunder).

26.    **BUYER'S REPRESENTATIONS**

The Buyer represents and warrants to the Seller that as of the Effective Date and as of the Repurchase Date for the repurchase of any Purchased Assets by the Seller from the Buyer hereunder:

(a)    <u>Action</u>.  The Buyer has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under each of the Repurchase Documents to which it is a party; the execution, delivery and performance by the Buyer of each of the Repurchase Documents to which it is a party have been duly authorized by all necessary corporate or other action on its part; and each Repurchase Document to which it is a party has been duly and validly executed and delivered by the Buyer, and constitutes a legal, valid and binding obligation of the Buyer, enforceable against the Buyer, in accordance with its terms.

(b)     Approvals.   No authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery or performance by the Buyer of the Repurchase Documents to which it is a party or for the legality, validity or enforceability thereof, except for filings and recordings in respect of the Liens created pursuant to the Repurchase Documents.

(c)     No Breach.  Neither (a) the execution and delivery of the Repurchase Documents nor (b) the consummation of the transactions therein contemplated to be entered into by the Buyer in compliance with the terms and provisions thereof will conflict with or result in a breach of the organizational documents of the Buyer, or any applicable law, rule or regulation, or any order, writ, injunction or decree of any Governmental Authority or other material agreement or instrument to which the Buyer or any of its Subsidiaries is a party or by which the Buyer or any of its Property is bound or to which the Buyer is subject, or constitute a default under any such material agreement or instrument or result in the creation or imposition of any Lien upon any Property of the Buyer, or any of its respective Subsidiaries pursuant to the terms of any such agreement or instrument.

(d)     Purchased Assets. Immediately prior to the repurchase of any Purchased Assets by the Seller, the Buyer was the sole owner of such Purchased Assets and had good and marketable title thereto, free and clear of all Liens, in each case except for Liens to be released simultaneously with the repurchase by the Seller hereunder.

## 27.   NETTING

If the Buyer and the Seller are "financial institutions" as now or hereinafter defined in Section 4402 of Title 12 of the United States Code ("Section 4402") and any rules or regulations promulgated thereunder,

(a)     All amounts to be paid or advanced by one party to or on behalf of the other under this Agreement or any Transaction hereunder shall be deemed to be "payment obligations" and all amounts to be received by or on behalf of one party from the other under this Agreement or any Transaction hereunder shall be deemed to be "payment entitlements" within the meaning of Section 4402, and this Agreement shall be deemed to be a "netting contract" as defined in Section 4402.

(b)     The payment obligations and the payment entitlements of the parties hereto pursuant to this Agreement and any Transaction hereunder shall be netted as follows.  In the event that either party (the "Defaulting Party") shall fail to honor any payment obligation under this Agreement or any Transaction hereunder, the other party (the "Nondefaulting Party") shall be entitled to reduce the amount of any payment to be made by the Nondefaulting Party to the Defaulting Party by the amount of the payment obligation that the Defaulting Party failed to honor.

**28.    PERIODIC DUE DILIGENCE REVIEW**

The Seller acknowledges that the Buyer has the right to perform continuing due diligence reviews with respect to the Mortgage Loans, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and the Seller agrees that upon reasonable (but no less than one (1) Business Day's) prior notice unless an Event of Default shall have occurred, in which case no notice is required, to the Seller, the Buyer or its authorized representatives will be permitted during normal business hours to examine, inspect, and make copies and extracts of, the Mortgage Files and any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession or under the control of the Seller and/or the Custodian.  The Seller also shall make available to the Buyer a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Mortgage Files and the Mortgage Loans.  Without limiting the generality of the foregoing, the Seller acknowledges that the Buyer may purchase Mortgage Loans from the Seller based solely upon the information provided by the Seller to the Buyer in the Seller Asset Schedule and the representations, warranties and covenants contained herein, and that the Buyer, at its option, has the right at any time to conduct a partial or complete due diligence review on some or all of the Mortgage Loans purchased in a Transaction, including without limitation ordering new credit reports and new appraisals on the related Mortgaged Properties and otherwise re-generating the information used to originate such Mortgage Loan.  The Buyer may underwrite such Mortgage Loans itself or engage a mutually agreed upon third party underwriter to perform such underwriting.  The Seller agrees to cooperate with the Buyer and any third party underwriter in connection with such underwriting, including, but not limited to, providing the Buyer and any third party underwriter with access to any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession, or under the control, of the Seller. The Buyer shall pay all out-of-pocket costs and expenses incurred by the Buyer in connection with the Buyer's activities pursuant to this Section 28 ("Due Diligence Costs"); provided that, (i) in the event that a Default or an Event of Default shall have occurred or (ii) in the event that the Buyer shall determine the need to confirm compliance with local, state or federal laws concerning the regulation of predatory lending practices, the Seller shall reimburse the Buyer for all Due Diligence Costs for any and all reasonable out-of-pocket costs and expenses incurred by the Buyer in connection with the Buyer's activities pursuant to this Section 28; provided further, that the Buyer shall not be obligated to pay such costs and expenses in any 12-month period in excess of $50,000 unless an Event of Default shall have occurred.

**29.    BUYER'S APPOINTMENT AS ATTORNEY-IN-FACT**

(a)    Each of NCCC, NCAH, NCMC, New Century and Home123 hereby irrevocably constitutes and appoints the Buyer and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Seller and in the name of the Seller or in its own name, from time to time in the Buyer's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which

-60-

may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, the Seller hereby gives the Buyer the power and right, on behalf of the Seller, without assent by, but with notice to, the Seller, to do the following:

(1)     in the name of the Seller, or in its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance with respect to a Purchased Item or with respect to any other Purchased Items and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Buyer for the purpose of collecting any and all such moneys due under any such mortgage insurance with respect to a Purchased Item or with respect to any other Purchased Items whenever payable;

(2)     to pay or discharge taxes and Liens levied or placed on or threatened against the Purchased Items;

(3)     (A) to direct any party liable for any payment under any Purchased Items to make payment of any and all moneys due or to become due thereunder directly to the Buyer or as the Buyer shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Purchased Items; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Purchased Items; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Purchased Items or any proceeds thereof and to enforce any other right in respect of any Purchased Items; (E) to defend any suit, action or proceeding brought against the Seller with respect to any Purchased Items; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Buyer may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Purchased Items as fully and completely as though the Buyer were the absolute owner thereof for all purposes, and to do, at the Buyer's option and the Seller's expense, at any time, and from time to time, all acts and things which the Buyer deems necessary to protect, preserve or realize upon the Purchased Items and the Buyer's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as such the Seller might do;

(4)     after a Default or an Event of Default, to direct the actions of the Custodian with respect to the Purchased Items under the Custodial and Disbursement Agreement; and

(5)     to execute, from time to time, in connection with any sale provided for in Section 13, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Purchased Items.

Each of NCCC, NCAH, NCMC, New Century and Home123 hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable. Until the occurrence of a Default or Event of Default, the Buyer shall not direct a Servicer in its servicing of the Purchased Assets or commence any servicing actions with respect to the Mortgage Loans pursuant to this Section 29(a). Neither the Buyer nor any of its officers, directors, employers or agents shall be responsible to the Seller for any failure to act hereunder prior to a Default or Event of Default.

(b)     The powers conferred on the Buyer hereunder are solely to protect the Buyer's interests in the Purchased Items and Purchased Assets and shall not impose any duty upon it to exercise any such powers. The Buyer shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Seller for any act or failure to act hereunder, except for its or their own gross negligence or willful misconduct.

## 30.    MISCELLANEOUS

(a)     If there is any conflict between the terms of this Agreement or any Transaction entered into hereunder and the Custodial and Disbursement Agreement, this Agreement shall prevail.

(b)     This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

(c)     The captions and headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

(d)     Each of NCCC, NCAH, NCMC, New Century and Home123 hereby acknowledges that:

(1)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Repurchase Documents;

(2)     the Buyer has no fiduciary relationship to the Seller; and

(3)     no joint venture exists between the Buyer and the Seller.

31.    **CONFIDENTIALITY**

Each of the Seller and the Buyer hereby acknowledges and agrees that all information regarding the terms set forth in any of the Repurchase Documents or the Transactions contemplated thereby (the "Confidential Terms") shall be kept confidential and shall not be divulged to any party without the prior written consent of such other party except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies or regulatory bodies or in order to comply with any applicable federal or state laws, (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant, (iii) in the event of a Default or an Event of Default, the Buyer determines such information to be necessary or desirable to disclose in connection with the re-hypothecation or marketing and sales of the Purchased Assets or to enforce or exercise the Buyer's rights hereunder.    The provisions set forth in this Section 31 shall survive the termination of this Agreement for a period of one year following such termination. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Repurchase Document, the parties hereto may disclose to any and all Persons, without limitation of any kind, the federal income tax treatment of the Transactions, any fact relevant to understanding the federal tax treatment of the Transactions, and all materials of any kind (including opinions or other tax analyses) relating to such federal income tax treatment; provided that the Seller may not disclose the name of or identifying information with respect to the Buyer or any pricing terms (including, without limitation, the Pricing Spread, Purchase Percentage and Purchase Price) or other nonpublic business or financial information (including any sublimits and financial covenants) that is unrelated to the purported or claimed federal income tax treatment of the Transactions and is not relevant to understanding the purported or claimed federal income tax treatment of the Transactions, without the prior written consent of the Buyer.    The Buyer acknowledges that this Agreement will be filed with the SEC.

32.    **CONFLICTS**

In the event of any conflict among the terms of this Agreement, any other Repurchase Document and any Confirmation, the documents shall control in the following order of priority:    first, the terms of the Confirmation shall prevail, then the terms of this Agreement shall prevail, and then the terms of the other Repurchase Documents shall prevail.

33.    **SET-OFF**

In addition to any rights and remedies of the Buyer provided by this Agreement and by law, the Buyer shall have the right, without prior notice to the Seller, any such notice being expressly waived by the Seller to the extent permitted by applicable law, upon any amount becoming due and payable by the Seller to the Buyer hereunder or otherwise (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all monies and other property of the Seller, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any and all other credits, indebtedness or claims, in any currency, in each

case whether direct or indirect, absolute or contingent, matured or unmatured, and in each case at any time held or owing by the Buyer or any Affiliate thereof to or for the credit or the account of the Seller.  The Buyer agrees promptly to notify the Seller after any such set-off and application made by the Buyer; provided that the failure to give such notice shall not affect the validity of such set-off and application.

34.    **OBLIGATIONS JOINT AND SEVERAL**

(a)    Each of NCCC, NCAH, NCMC, New Century and Home123 hereby acknowledges and agrees that it shall be jointly and severally liable to the Buyer for all representations, warranties, covenants, obligations and indemnities of the Seller hereunder.

(b)    Each Seller waives any and all notice of the creation, renewal, extension or accrual of any of the Repurchase Obligations and notice of or proof of reliance by the Buyer upon the obligations of such Seller set forth herein or acceptance of such obligations by such Seller hereunder.  Each Seller waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon each other Seller with respect to the Repurchase Obligations.  Each Seller's obligations shall be construed as continuing, absolute and unconditional obligations without regard to  (i) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Seller against the Buyer, or (ii) any other circumstance whatsoever (with or without notice to or knowledge of any Seller) which constitutes, or might be construed to constitute, an equitable or legal discharge of such Seller for the Repurchase Obligations.  Each Seller hereby waives any defense arising by reason of, and any and all right to assert against the Buyer any claim or defense based upon, an election of remedies by the Buyer which in any manner impairs, affects, reduces, releases, destroys and/or extinguishes such Seller's subrogation rights, rights to proceed against such Seller or any other party for reimbursement or contribution, and/or any other rights of such Seller to proceed against any other Seller, against any other guarantor, or against any other person or security.

(c)    The parties intend that each of NCCC's, NCAH's, NCMC's, New Century's and Home 123's Repurchase Obligations are primary obligations and not in the nature of a guaranty or suretyship.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date set forth above.

BUYER:

**IXIS REAL ESTATE CAPITAL INC.**

By: _____
Name:    ANTHONY MALANGA
Title:    MANAGING DIRECTOR

By: _____
Name:    Christopher Hayden
Title:    Managing Director

Address for Notices:
9 West 57th Street
New York, NY 10019
Attn: Ray Sullivan
Telecopier No.: (212) 891-3347
Telephone No.: (212) 891-5815
Email: r.sullivan@ixiscm.com

with a copy to:
9 West 57th Street
New York, NY 10019
Attn: Al Zakes, Esq., General Counsel
Telecopier No.: (212) 891-1922
Telephone No.: (212) 891-6137
Email: albert.zakes@ixiscm.com

and with a copy to:
9 West 57th Street
New York, NY 10019
Attn: Michael Friedman
Telecopier No.: (212) 891-6143
Telephone No.: (212) 891-6261
Email: m.friedman@ixiscm.com

(Ixis-New Century Master Purchase Agreement)

SELLER:

**NEW CENTURY MORTGAGE**
   **CORPORATION**

By: _____
   Name:    KEVIN CLOYD
   Title:     EXECUTIVE VICE PRESIDENT

Address for Notices:
   18400 Von Karman, Suite 1000
   Irvine, California 92612
   Attn: General Counsel
   Telecopier No.: (949) 440-7033
   Telephone No: (949) 225-7808

**NC CAPITAL CORPORATION**

By: _____
   Name:    Kevin Cloyd
   Title:     President

Address for Notices:
   18400 Von Karman, Suite 1000
   Irvine, California 92612
   Attn: General Counsel
   Telecopier No.: (949) 440-7033
   Telephone No: (949) 225-7808

**NC ASSET HOLDING, L.P.**

**By: NC DELTEX, its general partner**

**By: NC CAPITAL CORPORATION, its sole member**

By: _____
    Name:   Kevin Cloyd
    Title:   President

<u>Address for Notices</u>:
    18400 Von Karman, Suite 1000
    Irvine, California 92612
    Attn:  General Counsel
    Telecopier No.:  (949) 440-7033
    Telephone No:  (949) 225-7808

**NEW CENTURY CREDIT CORPORATION**

By: _____
    Name:   Kevin Cloyd
    Title:   President

<u>Address for Notices</u>:
    18400 Von Karman, Suite 1000
    Irvine, California 92612
    Attn:  General Counsel
    Telecopier No.:  (949) 440-7033
    Telephone No:  (949) 225-7808

**HOME123 CORPORATION**

By: _____

    Name:   KEVIN CLOYD
    Title:    EXECUTIVE VICE PRESIDENT

Address for Notices:
    18400 Von Karman, Suite 1000
    Irvine, California 92612
    Attn:  General Counsel
    Telecopier No.:  (949) 440-7033
    Telephone No:  (949) 225-7808

The undersigned guarantor hereby (a) consents and agrees to the foregoing Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "Repurchase Agreement"), and (b) acknowledges that the terms of the Repurchase Agreement shall be covered by the Guaranty, as defined therein:

**NEW CENTURY FINANCIAL CORPORATION**

By: _____

    Name:  KEVIN CLOYD
    Title:   EXECUTIVE VICE PRESIDENT

By: _____

    Name:  Brad A. Morrice
    Title:   President & CEO

SCHEDULE 1

**REPRESENTATIONS AND WARRANTIES RE:  MORTGAGE LOANS**

Part I:  Residential Mortgage Loans

For purposes of this Schedule 1 and the representations and warranties set forth herein, a breach of a representation or warranty shall be deemed to have been cured with respect to a Mortgage Loan if and when the Seller has taken or caused to be taken action such that the event, circumstance or condition that gave rise to such breach no longer adversely affects such Mortgage Loan.

Each of NCCC, NCAH, NCMC, New Century and Home123 represents and warrants to the Buyer, with respect to each Mortgage Loan, that as of the Purchase Date for the purchase of any Purchased Assets by the Buyer from the Seller and as of the date of this Agreement and any Transaction hereunder and at all times while the Repurchase Documents and any Transaction hereunder is in full force and effect:

(1)      Mortgage Loans as Described.  The information set forth in the Seller Asset Schedule is complete, true and correct;

(2)      Payments Current.  All payments required to be made up to the related Purchase Date for the Mortgage Loan under the terms of the Mortgage Note have been made and credited.  No payment required under the Mortgage Loan is delinquent nor has any payment under the Mortgage Loan been delinquent for 30 days or more than once in the 12 months preceding the related Purchase Date.  In no event has a payment been more than 59 days delinquent for such Mortgage Loan.  The first Monthly Payment shall be made, or shall have been made, with respect to the Mortgage Loan on its Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note;

(3)      No Outstanding Charges.  There are no defaults in complying with the terms of the Mortgage securing the Mortgage Loan, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable. Except for (A) payments in the nature of escrow payments and (B) interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is greater to the day which precedes by one month the Due Date of the first installment of principal and interest, including, without limitation, taxes and insurance payments, the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the

Sch. 1-1

Mortgagor, directly or indirectly, for the payment of any amount required under the Mortgage Loan;

(4)     <u>Original Terms Unmodified</u>.  The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by a written instrument which has been recorded, if necessary, to protect the interests of the Buyer and which has been delivered to the Custodian and the terms of which are reflected in the Seller Asset Schedule.  The substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required by the policy, and its terms are reflected on the Seller Asset Schedule.  No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File delivered to the Custodian and the terms of which are reflected in the Seller Asset Schedule;

(5)     <u>No Defenses</u>.  The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at, or subsequent to, the time the Mortgage Loan was originated;

(6)     <u>Hazard Insurance</u>.  Pursuant to the terms of the Mortgage, all buildings or other improvements upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located pursuant to insurance policies conforming to the requirements of Fannie Mae and Freddie Mac in an amount not less than the greater of (i) 100% of the replacement cost of all improvements to the Mortgaged Property or (ii) the outstanding principal balance of the Mortgage Loan, but in any event at least equal to the amount necessary to avoid the operation of any co-insurance provisions with respect to the Mortgaged Property, and consistent with the amount that would have been required as of the date of origination in accordance with the requirement of Fannie Mae and Freddie Mac.  If upon origination of the Mortgage Loan, the Mortgaged Property was in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), a flood insurance policy meeting the requirements of the current guidelines of the Federal Flood Insurance Administration is in effect

Sch. 1-2

which policy conforms to the requirements of Fannie Mae and Freddie Mac.  All individual insurance policies contain a standard mortgagee clause naming the Seller and its successors and assigns as mortgagee, and all premiums thereon have been paid and such policies may not be reduced, terminated or cancelled without 30 days' prior written notice to the mortgagee.  The Mortgage obligates the Mortgagor thereunder to maintain the hazard insurance policy at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Mortgagor's cost and expense, and to seek reimbursement therefor from the Mortgagor. Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering the common facilities of a planned unit development.  The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Buyer upon the consummation of the transactions contemplated by this Agreement.  The Seller has not engaged in, and has no knowledge of the Mortgagor's or any subservicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for therein, or the validity and binding effect of either, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Seller;

(7)    Compliance with Applicable Laws.  Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending, equal credit opportunity and disclosure laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to prepayment penalties, have been complied with, the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations and the Seller shall maintain in its possession, available for the Buyer's inspection, and shall deliver to the Buyer upon demand, evidence of compliance with all such requirements;

(8)    No Satisfaction of Mortgage.  The Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission.  The Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage

Loan to be in default, nor has the Seller waived any default resulting from any action or inaction by the Mortgagor;

(9)     Location and Type of Mortgaged Property.  The Mortgaged Property is a fee simple property located in the state identified in the Seller Asset Schedule, the mortgaged property consists of a single parcel of real property with a detached single family residence erected thereon, or a two-to four-family dwelling, or an individual residential condominium unit in a low-rise condominium project, or an individual unit in a planned unit development, a manufactured home, provided, however, that any condominium unit or planned unit development shall not fall within any of the "Ineligible Projects" of part XII, Section 102 of the Fannie Mae Selling Guide and shall conform with the Underwriting Guidelines.  In the case of any Mortgaged Properties that are manufactured homes (a "Manufactured Home Mortgage Loan"), (i) such Manufactured Home Mortgage Loan conforms with the applicable Fannie Mae or Freddie Mac requirements regarding mortgage loans related to manufactured dwellings, (ii) the related manufactured dwelling is permanently affixed to the land, (iii) the related manufactured dwelling and the related land are subject to a Mortgage properly filed in the appropriate public recording office and naming the Seller (or in the case of MERS Designated Mortgage Loans, MERS) as mortgagee, (iv) the applicable laws of the jurisdiction in which the related Mortgaged Property is located will deem the manufactured dwelling located on such Mortgaged Property to be a part of the real property on which such dwelling is located, (v) such Manufactured Home Mortgage Loan is (x) a qualified mortgage under Section 860G(a)(3) of the Internal Revenue Code of 1986, as amended and (y) secured by manufactured housing treated as a single family residence under Section 25(e)(10) of the Code (i.e., such manufactured home has a minimum of 400 square feet of living space, a minimum width in excess of 102 inches and which is of a kind customarily used at a fixed location) and (vi) as of the origination date of the related Mortgage Loan, the related Mortgagor occupied the related manufactured home as its primary residence.  No portion of the Mortgaged Property is used for commercial purposes; provided, that Mortgaged Properties which contain a home office shall not be considered as being used for commercial purposes as long as the Mortgaged Property has not been altered for commercial purposes and is not storing any chemicals or raw materials other than those commonly used for homeowner repair, maintenance and/or household purposes;

(10)    Valid First or Second Lien.  The Mortgage is a valid, subsisting, enforceable and perfected first or second lien and first or second priority security interest on the Mortgaged Property, including all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any

time with respect to the foregoing.  The lien of the Mortgage is subject only to:

      (A)    the lien of current real property taxes and assessments not yet due and payable;

      (B)    covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and (i) referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan or (ii) which do not adversely affect the appraised value of the Mortgaged Property set forth in such appraisal;

      (C)    other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property; and

      (D)    with respect to each Second Lien Mortgage Loan, a prior mortgage lien on the Mortgaged Property.

Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting and enforceable (A) first lien and first priority perfected security interest with respect to each First Lien Mortgage Loan, or (B) second lien and second priority perfected security interest with respect to each Second Lien Mortgage Loan, in either case on the property described therein and the Seller has full right to sell and assign the same to the Buyer.  The Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(11)    <u>Validity of Mortgage Loan Documents</u>.  The Mortgage Note, the Mortgage and any other agreement executed and delivered by a Mortgagor or guarantor, if applicable, in connection with the Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms.  All parties to the Mortgage Note, the Mortgage and any other related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any other related agreement, and the Mortgage Note, the Mortgage and any other related agreement have been duly and properly executed by such parties.  The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the information and

statements therein not misleading. No fraud, error, negligence, misrepresentation or omission of fact with respect to a Mortgage Loan has taken place on the part of the Seller or the Mortgagor or any other party involved in the origination or servicing of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(12)    Full Disbursement of Proceeds. The Mortgage Loan has been closed and the proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(13)    Ownership. The Seller is the sole owner of record and holder of the Mortgage Loan. The Mortgage Loan is not assigned or pledged, and the Seller has good, indefeasible and marketable title thereto, and has full right to transfer and sell the Mortgage Loan therein to the Buyer free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest, and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan pursuant to this Agreement and following the sale of each Mortgage Loan, the Buyer will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest;

(14)    Doing Business. All parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) organized under the laws of such state, or (3) qualified to do business in such state, or (4) federal savings and loan associations or national banks having principal offices in such state, or (5) not doing business in such state;

(15)    LTV; CLTV; FICO. No First Lien Mortgage Loan has a LTV greater than 100%, and no Second Lien Mortgage Loan has a CLTV, greater than 100%. At origination of the Mortgage Loan, the Mortgagor did not have a FICO score of less than 500.

(16)    Title Insurance. The Mortgage Loan is covered by an ALTA lender's title insurance policy or, with respect to Mortgaged Properties located in

California, a CLTA lender's title insurance policy, or other generally acceptable form of policy of insurance acceptable to Fannie Mae or Freddie Mac, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Seller, its successors and assigns, as to the first or second priority lien of the Mortgage in the original principal amount of the Mortgage Loan, and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment, subject only to the exceptions contained in clauses (A), (B), and (C), and with respect to each Second Lien Mortgage Loan clause (D) of Paragraph (10) of this Schedule I.  Where required by state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of the required mortgage title insurance.  Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein.  The title policy does not contain any special exceptions (other than the standard exclusions) for zoning and uses and has been marked to delete the standard survey exception or to replace the standard survey exception with a specific survey reading.  The Seller, its successors and assigns is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder or servicer of the Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other Person, and no such unlawful items have been received, retained or realized by the Seller;

(17)    <u>No Defaults</u>.  There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor its predecessors have waived any default, breach, violation or event of acceleration.  With respect to each Second Lien Mortgage Loan, (i) the prior mortgage is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such prior mortgage or the related mortgage note, (iii) there is no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the prior mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the Second Lien Mortgage Loan to receive

notice of, and affords such mortgagee an opportunity to cure any default by payment in full or otherwise under the prior mortgage;

(18)  <u>No Mechanics' Liens</u>.  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(19)  <u>Location of Improvements; No Encroachments</u>.  All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property.  No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning and building law, ordinance or regulation;

(20)  <u>Origination:  Payment Terms</u>.  At the time the Mortgage Loan was originated either (a) the originator was a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act or a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a Federal or State authority, or (b) the following requirements have been met with respect to the Mortgage Loan: the Seller meets the requirements set forth in clause (a), and (i) such Mortgage Loan was underwritten in accordance with standards established by the Seller, using application forms and related credit documents approved by the Seller, (ii) the Seller approved each application and the related credit documents before a commitment by the correspondent was issued, and no such commitment was issued until the Seller agreed to fund such Mortgage Loan, (iii) the closing documents for such Mortgage Loan were prepared on forms approved by the Seller, and (iv) such Mortgage Loan was actually funded by the Seller or was purchased by the Seller at closing or soon thereafter.  No Mortgage Loan contains terms or provisions which would result in negative amortization.  Unless such Mortgage Loan is an Interest-Only Loan, principal payments on the Mortgage Loan commenced no more than 60 days after funds were disbursed in connection with the Mortgage Loan.  The Mortgage Interest Rate is adjusted, with respect to adjustable rate Mortgage Loans, on each Interest Rate Adjustment Date to equal the applicable index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Maximum Mortgage Interest Rate.  Unless such Mortgage Loan is an Interest-Only Loan, the Mortgage Note is payable on the first day of each month in equal monthly installments of principal and interest, which installments of interest, with respect to adjustable rate Mortgage Loans, are subject to change due to the adjustments to the Mortgage Interest Rate on each Interest Rate Adjustment Date, with interest calculated and

payable in arrears, sufficient to amortize the Mortgage Loan, unless such Mortgage Loan is an Interest-Only Loan, fully by the stated maturity date, over an original term of not more than 30 years (other than with respect to 40/30 Mortgage Loans or 50/30 Mortgage Loans) from commencement of amortization. The due date of the first payment under the Mortgage Note is no more than 60 days from the date of the Mortgage Note;

(21)    Customary Provisions.  The Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and marketable title to the Mortgaged Property.  There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption;

(22)    Conformance with Underwriting Guidelines and Agency Standards.  The Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time the Mortgage Loan was originated, a copy of which underwriting guidelines are attached as Exhibit II hereto.  The Mortgage Note and the Mortgage are on forms acceptable to Fannie Mae or Freddie Mac and the Seller has not made any representations to a Mortgagor that are inconsistent with the mortgage instruments used;

(23)    Occupancy of the Mortgaged Property.  As of the related Purchase Date, the Mortgaged Property is lawfully occupied under applicable law.  All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities.  The Seller has not received notification from any Governmental Authority that the Mortgaged Property is in material non-compliance with such laws or regulations, is being used, operated or occupied unlawfully or has failed to have or obtain such inspection, licenses or certificates, as the case may be. The Seller has not received notice of any violation or failure to conform with any such law, ordinance, regulation, standard, license or certificate;

(24)    No Additional Collateral.  The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage