and the security interest of any applicable security agreement or chattel mortgage referred to in Paragraph (10) above;

(25)   Deeds of Trust.  In the event the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Custodian or the Buyer to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(26)   Acceptable Investment.  The Mortgagor is not in bankruptcy or insolvent and the Seller has no knowledge of any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan. No Mortgaged Property is located in a state, city, county or other local jurisdiction which the Buyer has determined in its sole good faith discretion would cause the related Mortgage Loan to be ineligible for whole loan sale or securitization in a transaction consistent with the prevailing sale and securitization industry (including, without limitation, the practice of the rating agencies) with respect to substantially similar mortgage loans;

(27)   Delivery of Mortgage Loan Documents.  Other than with respect to the Wet-Ink Mortgage Loans, the Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered by the Seller under this Agreement have been delivered to the Buyer or its Custodian.  The Seller is in possession of a complete, true and accurate Mortgage File in compliance with Section 2 of the Custodial and Disbursement Agreement, except for such documents the originals of which have been delivered to the Buyer or its Custodian;

(28)   Due on Sale.  The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the Mortgagee thereunder;

(29)   Transfer of Mortgage Loans.  The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(30)   No Buydown Provisions; No Graduated Payments or Contingent Interests.  The Mortgage Loan does not contain provisions pursuant to which Monthly Payments are paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor or anyone on

behalf of the Mortgagor, or paid by any source other than the Mortgagor nor does it contain any other similar provisions currently in effect which may constitute a "buydown" provision.  The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(31)    <u>Consolidation of Future Advances</u>.  Any future advances made prior to the related Purchase Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term.   The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae and Freddie Mac.  The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(32)    <u>Mortgaged Property Undamaged</u>.   There is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property.   The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended;

(33)    <u>Collection Practices; Escrow Deposits; Adjustable Rate Mortgage Loan Adjustments</u>.  The origination and collection practices used with respect to the Mortgage Loan have been in accordance with Accepted Servicing Practices and in all respects in compliance with all applicable laws and regulations.  With respect to escrow deposits and Escrow Payments (other than with respect to Second Lien Mortgage Loans for which the mortgagee under the prior mortgage lien is collecting Escrow Payments), all such payments are in the possession of the Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. Each Mortgage Loan is covered by a life of loan tax service contract.  All Escrow Payments have been collected in full compliance with state and federal laws.  An escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every item which remains unpaid and which has been assessed but is not yet due and payable.  No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under the Mortgage or the Mortgage Note.  All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal laws and the terms of the related Mortgage Note.  Any interest required to be paid pursuant to state and local laws has been properly paid and credited;

(34) <u>Appraisal</u>. Except with respect to AVM Mortgage Loans, the Servicing File includes an appraisal of the Mortgaged Property signed prior to the approval of the Mortgage application by an appraiser qualified under Fannie Mae and Freddie Mac guidelines who (i) is licensed in the state where the Mortgaged Property is located, (ii) has no interest, direct or indirect, in the Mortgaged Property or in any Mortgage Loan or the security therefor, and (iii) does not receive compensation that is affected by the approval or disapproval of the Mortgage Loan. The appraisal shall have been made within one hundred and eighty (180) calendar days of the origination of the Mortgage Loan and shall be completed in compliance with the Uniform Standards of Professional Appraisal Practice, and all applicable Federal and state laws and regulations. If the appraisal was made more than one hundred and twenty (120) calendar days before the origination of the Mortgage Loan, the Seller shall have received and included in the Servicing File a recertification of the appraisal;

(35) <u>Servicemembers Civil Relief Act</u>. The Mortgagor has not notified the Seller, and the Seller has no knowledge of, any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act, or any similar state statute;

(36) <u>Environmental Matters</u>. The Mortgaged Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation. There is no pending action or proceeding directly involving any Mortgaged Property of which the Seller is aware in which compliance with any environmental law, rule or regulation is an issue; and to the best of the Seller's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation consisting of a prerequisite to the use and enjoyment of said property;

(37) <u>No Construction Loans.</u> No Mortgage Loan was made in connection with (a) facilitating the trade-in or exchange of a Mortgaged Property or (b) the construction or rehabilitation of a Mortgaged Property, unless the Mortgage Loan is a construction-to-permanent mortgage loan listed on the Seller Asset Schedule which has been fully disbursed, all construction work is complete and a completion certificate has been issued;

(38) <u>No Denial of Insurance</u>. No action, inaction, or event has occurred and no state of fact exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to, coverage under any applicable pool insurance policy, primary mortgage insurance policy, special hazard insurance policy, or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by the Seller or any designee of the Seller or any corporation in

which the Seller or any officer, director, or employee had a financial interest at the time of placement of such insurance;

(39)     Regarding the Mortgagor.  The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts;

(40)     Mortgagor Acknowledgment.  The Mortgagor has received all disclosure materials required by applicable law with respect to the making of Adjustable Rate Mortgage Loans.  The Seller shall maintain such documents in the Mortgage File;

(41)     Predatory Lending Regulations; High Cost Loans.  No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, and no Mortgage Loan originated on or after October 1, 2003 through March 6, 2003 is governed by the Georgia Fair Lending Act..  No Mortgage Loan is covered by the Home Ownership and Equity Protection Act of 1994 and no Mortgage Loan is in violation of any comparable state or local law.  The Mortgaged Property is not located in a jurisdiction where a breach of this representation with respect to the related Mortgage Loan may result in additional assignee liability to the Buyer, as determined by the Buyer in its reasonable discretion and as set forth on Exhibit XI hereto, as such Exhibit may be revised from time to time;

(42)     Qualified Mortgage.  The Mortgage Loan is a "qualified mortgage" within the meaning of Section 860G(a)(3) or any successor provision thereof of the Internal Revenue Code of 1986, as amended;

(43)     Insurance.  The Seller has caused or will cause to be performed any and all acts required to preserve the rights and remedies of the Buyer in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of the Buyer;

(44)     Simple Interest Mortgage Loans.  None of the Mortgage Loans are simple interest Mortgage Loans;

(45)     Prepayment Fee.  With respect to each Mortgage Loan that has a prepayment penalty feature, each such prepayment penalty is enforceable and will be enforced by the Seller for the benefit of the Buyer, and each prepayment penalty is permitted pursuant to federal, state and local law.  Each such prepayment penalty is in an amount not more than the maximum amount permitted under applicable law and no such prepayment penalty may provide for a term in excess of five (5) years with respect to Mortgage Loans originated prior to October, 1, 2002.  With respect to

Mortgage Loans originated on or after October 1, 2002, the duration of the prepayment penalty period shall not exceed three (3) years from the date of the Mortgage Note unless the Mortgage Loan was modified to reduce the prepayment penalty period to no more than three (3) years from the date of the related Mortgage Note and the Mortgagor was notified in writing of such reduction in prepayment penalty period.  With respect to any Mortgage Loan that contains a provision permitting imposition of a prepayment penalty upon a prepayment prior to maturity: (i) the Mortgage Loan provides some benefit to the Mortgagor (e.g., a rate or fee reduction) in exchange for accepting such prepayment penalty, (ii) prior to the Mortgage Loan's origination, the Mortgagor was offered the option of obtaining a mortgage loan that did not require payment of such a penalty and (iii) the prepayment penalty was adequately disclosed to the Mortgagor in the mortgage loan documents pursuant to applicable federal state and local law;

(46)    Flood Certification Contract.  The Seller shall have obtained a life of loan, transferable flood certification contract for each Mortgage Loan and shall assign all such contracts to the Buyer;

(47)    CLTV.  No Second Lien Mortgage Loan has a CLTV in excess of 100%;

(48)    Consent.  Either (a) no consent for the Second Lien Mortgage Loan is required by the holder of the related first lien or (b) such consent has been obtained and is contained in the Mortgage File.

(49)    Wet-Ink Mortgage Loans.  With respect to each Mortgage Loan that is a Wet-Ink Mortgage Loan, the Settlement Agent has been instructed in writing by the Seller to hold the related Mortgage File as agent and bailee for the Buyer or the Buyer's agent and to promptly forward such Mortgage File in accordance with the provisions of the Custodial and Disbursement Agreement and the Escrow Instruction Letter;

(50)    No Equity Participation.  No document relating to the Mortgage Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Mortgaged Property or a sharing in the appreciation of the value of the Mortgaged Property.  The indebtedness evidenced by the Mortgage Note is not convertible to an ownership interest in the Mortgaged Property or the Mortgagor and the Seller has not financed nor does it own directly or indirectly, any equity of any form in the Mortgaged Property or the Mortgagor;

(51)    Origination Date.  The Origination Date is no earlier than ninety (90) days prior to the date the Mortgage Loan is initially purchased by the Buyer;

(52)    No Exception.  The Custodian has not noted any material exceptions on the Seller Asset Schedule and Exception Report, as applicable (as defined

in the Custodial and Disbursement Agreement), with respect to the Mortgage Loan which would materially and adversely affect the Mortgage Loan or the Buyer's ownership of the Mortgage Loan, unless consented to by the Buyer;

(53)    Mortgage Submitted for Recordation.  The Mortgage either has been or will promptly be submitted for recordation in the appropriate governmental recording office of the jurisdiction where the Mortgaged Property is located;

(54)    Endorsements.  Each Mortgage Note has been endorsed by the Seller for its own account and not as a fiduciary, trustee, trustor or beneficiary under a trust agreement;

(55)    Accuracy of Information.  All information provided to Buyer by Seller with respect to the Mortgage Loans is accurate in all material respects;

(56)    Fair Credit Reporting Act.  As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by the Seller to the Buyer, that Seller has full right and authority and is not precluded by law or contract from furnishing such information to the Buyer and the Buyer is not precluded by the terms of the related loan documents from furnishing the same to any subsequent or prospective purchaser of such Mortgage Loan.  The Seller has (or has caused the Servicer to), in its capacity as servicer, for each Mortgage Loan, fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (*e.g.,* favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis;

(57)    [Reserved];

(58)    Accuracy of Information.  All information provided to the Buyer by the Seller with respect to the Mortgage Loans is accurate in all material respects;

(59)    Single-Premium Credit Insurance.  No Mortgagor was required to purchase any single-premium credit insurance policy (e.g., life, disability, accident, unemployment or property insurance policy) or debt cancellation agreement as a condition of obtaining the extension of credit.  No Mortgagor obtained a prepaid single-premium credit insurance policy (e.g., life, disability, accident, unemployment or property insurance policy) in connection with the origination of the Mortgage Loan.  No proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Mortgage Loan

(60)  <u>No Arbitration</u>.  No Mortgagor with respect to any Mortgage Loan originated on or after August 1, 2004 agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction;

(61)  <u>Origination Practices/No Steering</u>.  No Mortgagor was encouraged or required to select a Mortgage Loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Mortgage Loan's origination, such Mortgagor did not qualify taking into account credit history and debt-to-income ratios for a lower-cost credit product then offered by the Mortgage Loan's originator or any affiliate of the Mortgage Loan's originator.  If, at the time of loan application, the Mortgagor may have qualified for a lower-cost credit product then offered by any mortgage lending affiliate of the Mortgage Loan's originator, the Mortgage Loan's originator referred the Mortgagor's application to such affiliate for underwriting consideration;

(62)  <u>Underwriting Methodology</u>.  The methodology used in underwriting the extension of credit for each Mortgage Loan does not rely solely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit.  Such underwriting methodology confirmed that at the time of origination (application/approval) the Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan;

(63)  <u>Points and Fees</u>.  No Mortgagor was charged "points and fees" (whether or not financed) in an amount greater than (i) $1,000, or (ii) 5% of the principal amount of such Mortgage Loan, whichever is greater.  For purposes of this representation, such 5% limitation is calculated in accordance with Fannie Mae's anti-predatory lending requirements as set forth in the Fannie Mae Guides and "points and fees" (x) <u>include</u> origination, underwriting, broker and finder fees and charges that the mortgagee imposed as a condition of making the Mortgage Loan, whether they are paid to the mortgagee or a third party; and (y) <u>exclude</u> bona fide discount points, fees paid for actual services rendered in connection with the origination of the Mortgage Loan (such as attorneys' fees, notaries' fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections), the cost of mortgage insurance or credit-risk price adjustments, the costs of title, hazard, and flood insurance policies, state and local transfer taxes or fees, escrow deposits for the future payment of taxes and insurance premiums, and other miscellaneous fees and charges which miscellaneous fees and charges, in total, do not exceed 0.25% of the principal amount of such Mortgage Loan;

(64)   <u>Fees and Charges</u>.  All fees and charges (including finance charges), whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Mortgage Loan has been disclosed in writing to the Mortgagor in accordance with applicable state and federal law and regulation; and

(65)   <u>Second Lien Mortgage Loans</u>.  With respect to each Second Lien Mortgage Loan: (1) the related First Lien Mortgage Loan does not permit negative amortization; (2) where required or customary in the jurisdiction in which the Mortgaged Property is located, the original lender has filed for record a request for notice of any action by the related senior lienholder, and the Seller has notified such senior lienholder in writing of the existence of the Second Lien Loan and requested notification of any action to be taken against the Mortgagor by such senior lienholder; either (a) no consent for the Second Lien Mortgage Loan is required by the holder of the related First Lien Loan or (b) such consent has been obtained and is contained in the related Mortgage File; (3) to the best of the Seller's knowledge, the related First Lien Loan is in full force and effect, and there is no default, lien, breach, violation or event which would permit acceleration existing under such First Lien Loan or Mortgage Note, and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration under such First Lien Loan; (4) the related first lien Mortgage contains a provision which provides for giving notice of default or breach to the Mortgagee under the Mortgage Loan and allows such Mortgagee to cure any default under the related First Lien Mortgage; and (5) the related Mortgaged Property was the Mortgagor's principal residence at the time of the origination of such Second Lien Loan.

<u>Part II:  Defined Terms</u>

In addition to terms defined elsewhere in the Repurchase Agreement, the following terms shall have the following meanings when used in this <u>Schedule 1</u>:

"<u>Accepted Servicing Practices</u>" shall mean, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loans in the jurisdiction where the related Mortgaged Property is located.

"<u>Adjustable Rate Mortgage Loan</u>" shall mean an adjustable rate Mortgage Loan purchased pursuant to this Agreement.

"<u>Covered Loan</u>" shall mean a Mortgage Loan categorized as Covered pursuant to Appendix E of Standard & Poor's Glossary.

"Due Date" shall mean the day on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Escrow Payments" shall mean with respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water charges, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and other payments as may be required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of any Mortgage Note, Mortgage or any other document.

"First Lien Mortgage Loan" shall mean a Mortgage Loan secured by a first lien Mortgage on the related Mortgaged Property.

"Fixed Rate Mortgage Loan" shall mean a fixed rate Mortgage Loan purchased pursuant to this Repurchase Agreement.

"Gross Margin" shall mean, with respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the index in accordance with the terms of the related Mortgage Note to determine on each Interest Rate Adjustment Date the Mortgage Interest Rate for such Mortgage Loan.

"Ground Lease" shall mean the original executed instrument evidencing a leasehold estate with respect to a Mortgaged Property.

"High Cost Loan" shall mean a Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994, (b) a "high cost home," "threshold," "covered," (excluding New Jersey "Covered Home Loans" as that term is defined in clause (1) of the definition of that term in the New Jersey Home Ownership Security Act of 2002), "high risk home," "predatory" or similar loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) a Mortgage Loan categorized as High Cost pursuant to Appendix E of Standard & Poor's Glossary. For avoidance of doubt, the parties agree that this definition shall apply to any law regardless of whether such law is presently, or in the future becomes, the subject of judicial review or litigation.

"Home Loan" shall mean a Mortgage Loan categorized as a Home Loan pursuant to Appendix E of Standard & Poor's Glossary.

"Interest Rate Adjustment Date" shall mean with respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on the Mortgage Loan is adjusted in accordance with the terms of the Mortgage Note.

"Maximum Mortgage Interest Rate" shall mean with respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Seller Asset Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Interest Rate Adjustment Date.

"Minimum Mortgage Interest Rate" shall mean with respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Seller Asset Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Interest Rate Adjustment Date.

"Monthly Payment" shall mean with respect to any Mortgage Loan, the scheduled combined payment of principal and interest payable by a Mortgagor under the related Mortgage Note on each Due Date.

"Mortgage Interest Rate" shall mean with respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

"Standard & Poor's Glossary" shall mean the Standard & Poor's LEVELS® Glossary, as may be in effect from time to time.

SCHEDULE 2

[Reserved]

SCHEDULE 3

**AVM VENDORS**

C&S Marketing

<u>EXHIBIT I</u>

## FORM OF TRANSACTION REQUEST

[Date]

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019
Attention:

Ladies/Gentlemen:

   This letter is a request for you to purchase from us the Mortgage Loans listed in Appendix I hereto, pursuant to the Fifth Amended and Restated Master Repurchase Agreement governing purchases and sales of Mortgage Loans between us, dated as of November 10, 2006 (the "<u>Agreement</u>"), as follows:

   Requested Purchase Date:

   Eligible Assets requested to be Purchased:  See Appendix I hereto.
   [Appendix I to Transaction Request will list Mortgage Loans]

   Aggregate Principal Amount of Eligible Assets requested to be purchased:

   Purchase Price:

   Pricing Rate:

   Repurchase Date[1]:

   Repurchase Price:

   Purchase Percentage:

---

[1] If marked as "open", the Repurchase Date shall be one (1) Business Day after the date upon which either Buyer (in its sole discretion) or the Seller (in its sole discretion) provides to the other written notice of its intention to sell or repurchase, as applicable, the Mortgage Loans on Appendix I hereto; provided that the Repurchase Date shall not, in any event, exceed 364 days from the date hereof.

Names and addresses for communications:

Buyer:
> IXIS Real Estate Capital Inc.
> 9 West 57th Street
> New York, NY 10019
> Attention: Ray Sullivan
> Email: r.sullivan@ixiscm.com

with copies to:
> John Racy
> Email:  jracy@ixiscm.com

Seller:
> New Century Mortgage Corporation
> 18400 Von Karman
> Suite 1000
> Irvine, California 92612
> Attn:
> Email:

This Transaction Request constitutes certification by the Seller that:

1.      No Default or Event of Default has occurred and is continuing on the date hereof nor will occur after giving effect to such Transaction as a result of such Transaction.

2.      Each of the conditions precedent set forth in Section 3 with respect to the Transaction has been satisfied.

3.      Each of the representations and warranties made by the Seller in or pursuant to the Agreement is true and correct in all material respects on and as of such date and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

4.      The Seller is in compliance with all governmental licenses and authorizations and is qualified to do business and is in good standing in all required jurisdictions.

All capitalized terms used herein shall have the meaning assigned thereto in the Agreement.

EXHIBIT II

**UNDERWRITING GUIDELINES**

EXHIBIT III

FORM OF OPINIONS

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

Dear Sirs and Mesdames:

You have requested our opinion as counsel to New Century Mortgage Corporation ("NCMC") , NC Asset Holding, L.P. ("NCAH"), NC Capital Corporation ("NCCC"), New Century Credit Corporation ("New Century"), Home123 Corporation ("Home123") and New Century Financial Corporation (the "Guarantor"), each a corporation organized and existing under the laws of California, with respect to certain matters in connection with that certain Fifth Amended and Restated Master Repurchase Agreement governing purchases and sales of certain Mortgage Loans, dated as of November 10, 2006 (the "Repurchase Agreement"), by and among NCCC, NCAH, NCMC, New Century, and Home123 and IXIS Real Estate Capital Inc. (the "Buyer"), the Amended and Restated Custodial and Disbursement Agreement, dated as of November 10, 2006, as amended (the "Custodial Agreement"), among NCCC, NCAH, NCMC, New Century, Home123, the Buyer and Deutsche Bank National Trust Company, as custodian and disbursement agent and the Account Agreement, dated as of September 10, 2004, as amended, (the "Account Agreement"), among NCCC, NCAH, NCMC, New Century, Home123, the Buyer and Union Bank of California, N.A..  The Master Repurchase Agreement, the Custodial Agreement and the Account Agreement are hereinafter collectively referred to as the "Governing Agreements."  Capitalized terms not otherwise defined herein have the meanings set forth in the Repurchase Agreement.

[We] [I] have examined the following documents:

1.    the Repurchase Agreement;

2.    the Custodial and Disbursement Agreement;

3.    the Account Agreement;

4.    unfiled copies of the financing statements listed on Schedule 1 (collectively, the "Financing Statements") naming each of NCCC, NCAH, NCMC, New Century and Home123 as Debtor and the Buyer as Secured Party and describing the Purchased Items (as defined in the Master Repurchase Agreement) as to which security interests may be perfected by filing under the Uniform Commercial Code of the States listed on Schedule 1 attached hereto (the "Filing Collateral"), which I understand will be filed in the filing offices listed on Schedule 1 attached hereto (the "Filing Offices");

5.    the reports listed on Schedule 2 as to UCC financing statements (collectively, the "UCC Search Report"); and

Exh. III-1

6.    such other documents, records and papers as we have deemed necessary and relevant as a basis for this opinion.

To the extent [we] [I] have deemed necessary and proper, [we] [I] have relied upon the representations and warranties of NCCC, NCAH, NCMC, New Century and Home123 contained in the Repurchase Agreement. [We] [I] have assumed the authenticity of all documents submitted to me [us] as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents.

Based upon the foregoing, it is [our] [my] opinion that:

1.    Each of NCCC, NCMC, New Century and Home123 is a corporation duly organized, validly existing and in good standing under the laws of the State of California and is qualified to transact business in, and is in good standing under, the laws of the State of California. NCAH is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to transact business in, and is in good standing under, the laws of the State of Delaware.

2.    The Guarantor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to transact business in, and is in good standing under, the laws of the State of Delaware.

3.    The execution, delivery and performance by each of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor of the Governing Agreements to which it is a party, and the sales by NCCC, NCAH, NCMC, New Century and Home123 and the pledge of the Purchased Items under the Repurchase Agreement have been duly authorized by all necessary corporate action on the part of NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor, as applicable. Each of the Governing Agreements to which it is a party have been executed and delivered by NCCC, NCAH, NCMC, New Century, Home123 and the Guarantor and are legal, valid and binding agreements enforceable in accordance with their respective terms against the Seller, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance, none of which will materially interfere with the realization of the benefits provided thereunder or with the Buyer's purchase of the Purchased Assets and/or security interest in the Purchased Assets.

4.    No consent, approval, authorization or order of, and no filing or registration with, any court or governmental agency or regulatory body is required on the part of NCCC, NCMC, New Century, Home123 or the Guarantor for the execution, delivery and performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of the Governing Agreements to which it is a party or for the sales by NCCC, NCAH, NCMC, New Century or Home123 under the Repurchase Agreement or the sale of the Purchased Items to the Buyer and/or granting of a security interest to the Buyer in the Purchased Items, pursuant to the Repurchase Agreement.

5.    The execution, delivery and performance by NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of, and the consummation of the transactions contemplated

Exh. III-2

by the Governing Agreements to which it is a party do not and will not (a) violate any provision of NCCC's, NCAH's, NCMC's, New Century's, Home123's or the Guarantor's, as applicable, charter or by-laws, (b) violate any applicable law, rule or regulation, (c) violate any order, writ, injunction or decree of any court or governmental authority or agency or any arbitral award applicable to NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor of which I [we] have knowledge (after due inquiry) or (d) result in a breach of, constitute a default under, require any consent under, or result in the acceleration or required prepayment of any indebtedness pursuant to the terms of, any agreement or instrument of which I have knowledge (after due inquiry) to which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is a party or by which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is bound or to which NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor is subject, or (except for the Liens created pursuant to the Repurchase Agreement) result in the creation or imposition of any Lien upon any Property of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor pursuant to the terms of any such agreement or instrument.

6.      There is no action, suit, proceeding or investigation pending or, to the best of [our] [my] knowledge, threatened against NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor which, in [our] [my] judgment, either in any one instance or in the aggregate, could be reasonably likely to result in any material adverse effect on (a) the Property, business, operations, financial condition or prospects of NCCC, NCAH, NCMC, New Century, Home123 or the Guarantor, (b) the ability of NCCC, NCAH, NCMC, New Century or Home123 to perform its obligations under any of the Repurchase Documents to which it is a party, (c) the validity or enforceability of any of the Repurchase Documents, (d) the rights and remedies of the Buyer under any of the Repurchase Documents, (e) the timely payment of any amounts payable under the Repurchase Documents, (f) the Asset Value of the Purchased Assets or (g) the ability of the Guarantor to perform its obligations under the Guaranty.

7.      The Repurchase Agreement is effective to create, in favor of the Buyer, either a valid sale of the Purchased Items to the Buyer or a valid security interest under the Uniform Commercial Code in all of the right, title and interest of NCCC, NCAH, NCMC, New Century  and Home123 in, to and under the Purchased Items as collateral security for the payment of NCCC's, NCAH's, NCMC's, New Century's and Home123's obligations under the Repurchase Agreement, except that (a) such security interests will continue in Purchased Items after its sale, exchange or other disposition only to the extent provided in Section 9-306 of the Uniform Commercial Code, (b) the security interests in Purchased Items in which the Seller acquires rights after the commencement of a case under the Bankruptcy Code in respect of NCCC, NCAH, NCMC, New Century or Home123 may be limited by Section 552 of the Bankruptcy Code.

8.      When the Mortgage Notes are delivered to the Custodian, endorsed in blank by a duly authorized officer of NCCC, NCAH, NCMC, New Century or Home123, as applicable, the security interest referred to in Section 7 above in the Mortgage Notes will constitute a fully perfected first priority security interest in all right, title and interest of the Seller therein.

9.      (a)      Upon the filing of financing statements on Form UCC-1 naming the Buyer as "Secured Party" and NCCC, NCAH, NCMC, New Century and Home123 as

Exh. III-3

"Debtor", and describing the Purchased Items, in the jurisdictions and recording offices listed on Schedule 1 attached hereto, the security interests referred to in Section 7 above will constitute fully perfected security interests under the Uniform Commercial Code in all right, title and interest of NCCC, NCAH, NCMC, New Century and Home123 in, to and under such Purchased Items, which can be perfected by filing under the Uniform Commercial Code, or, will demonstrate a completion of the sale of the Mortgage Loans to the Buyer.

(b)    The UCC Search Report sets forth the proper filing offices and the proper debtors necessary to identify those Persons who have on file in the jurisdictions listed on Schedule 1 financing statements covering the Purchased Items as of the dates and times specified on Schedule 2. The UCC Search Report identifies no Person who has filed in any Filing Office a financing statement describing the Purchased Items prior to the effective dates of the UCC Search Report.

10.    None of NCCC, NCAH, NCMC, New Century, Home123 nor the Guarantor is an "investment company", or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

11.    Commencing with NCAH's initial taxable year ended [_____], the Company is organized in conformity with the requirements for qualification as a real estate investment trust (a "REIT") under the Code, and the Company's actual method of operations and its proposed method of operations will enable the Company to meet the requirements for qualification and taxation as a REIT under the Code.

Very truly yours,

Exh. III-4

<u>EXHIBIT IV</u>

UCC FILING JURISDICTIONS

Secretary of State of California
Secretary of State of Delaware

<u>EXHIBIT V</u>

**FORM OF ACCOUNT AGREEMENT**

[date]

New Century Mortgage Corporation, as Seller
NC Capital Corporation, as Seller
18400 Von Karman,
Suite 1000
Irvine, California 92612
Attn: General Counsel

[BANK], as Bank
[ADDRESS]
Attn:

Re:   Collection Account Established by NEW CENTURY MORTGAGE
CORPORATION ("<u>NCMC</u>"), NC ASSET HOLDING, L.P. ("<u>NCAH</u>"),
NC CAPITAL CORPORATION ("<u>NCCC</u>"), NEW CENTURY CREDIT
CORPORATION ("<u>New Century</u>") and HOME123 CORPORATION
("<u>Home123</u>", and together with NCMC, NCAH, NCCC and New Century,
the "Seller") at [BANK] (the "<u>Bank</u>") pursuant to that certain Fifth
Amended and Restated Master Repurchase Agreement (as amended,
supplemented or otherwise modified from time to time, the "Repurchase
Agreement"), dated as of November 10, 2006, among IXIS <u>IXIS Real
Estate Capital Inc.</u> (the "<u>Buyer</u>") and the Seller.

Ladies and Gentlemen:

The Seller has entered into a Repurchase Agreement pursuant to which the Buyer
may from time to time purchase mortgage loans (the "<u>Purchased Assets</u>") secured by, among
other things, the payments made by mortgagors on account of Purchased Assets sold to the
Buyer under the Repurchase Agreement. As a requirement of such transactions, upon a default
or an event of default under the Repurchase Agreement, all such payments are required to be
forwarded daily to the Buyer at the Collection Account identified below within one (1) Business
Day of receipt.

The Seller has established a collection account, Account No. [___], for the
account of the Buyer, with the Bank, ABA# [_____] (the "<u>Collection Account</u>")
which the Bank maintains in the name of, and in trust for, the Buyer as the Bank's customer.
The Seller has granted to the Buyer a security interest in all payments deposited in the Collection
Account with respect to the Purchased Assets sold to the Buyer under the Repurchase
Agreement.

In the event the Bank receives notice from the Buyer that a default or an event of default has occurred and is continuing under the Repurchase Agreement (a "Notice of Event of Default") from the Buyer, the Bank shall in no event (a) transfer funds from the Collection Account to the Seller or any other person other than pursuant to the Buyer's direction, (b) act on the instruction of the Seller or any person other than the Buyer or (c) cause or permit withdrawals from the Collection Account in any manner not approved by the Buyer in writing. Until receipt of a Notice of an Event of Default, the Seller shall be permitted to withdraw funds or cause funds to be transferred from the Collection Account without the Buyer's approval.

The Bank hereby waives any right that the Bank may now or hereafter have to security interest, bank's or other possessory liens, rights to offset or other claims against the funds in the Collection Account.

In addition, the Bank acknowledges that (a) the Seller has granted to the Buyer a security interest in all of the Seller's right, title and interest in and to any funds from time to time on deposit in the Collection Account with respect to the Purchased Assets sold to the Buyer under the Repurchase Agreement, (b) that such funds are received by the Bank in trust for the benefit of the Buyer and, except as provided below, are for application against the Seller's obligations to the Buyer, and (c) that the Bank shall comply with the Buyer's instructions regarding the disposition of funds in the Collection Account in accordance with the Buyer's instructions, without the consent of the Seller until the Bank receives notice from the Buyer that it has released its lien on the Collection Account and all funds deposited therein.

All bank statements in respect to the Collection Account shall be sent to the Buyer at:

> IXIS Real Estate Capital Inc.
> 9 West 57th Street
> New York, NY 10019
> Attention: Ray Sullivan
> Email: r.sullivan@ixiscm.com

with copies to the Seller at:

> [Seller]
> _____
> _____
> Attention:
> Email:

**This account agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.**

Kindly acknowledge your agreement with the terms of this agreement by signing the enclosed copy of this letter and returning it to the undersigned.

Very truly yours,

IXIS REAL ESTATE CAPITAL INC.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Agreed and acknowledged:

NEW CENTURY MORTGAGE CORPORATION

By:_____
Name:
Title:

NC CAPITAL CORPORATION

By:_____
Name:
Title:

NC ASSET HOLDING, L.P.

By:_____
Name:
Title:

NEW CENTURY CREDIT CORPORATION


By:_____
Name:
Title:

HOME123 CORPORATION


By:_____
Name:
Title:


Agreed and acknowledged:

[BANK], as Bank


By:_____
Name:
Title:

[SERVICER]


By: _____
Name:
Title:

EXHIBIT VI

**FORM OF TRUE SALE CERTIFICATION**

**CERTIFICATE OF [NEW CENTURY MORTGAGE CORPORATION]**

           In connection with the transaction pursuant to the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 between IXIS Real Estate Capital Inc., NC Capital Corporation [(the "Purchaser")], New Century Mortgage Corporation [(the "Purchaser")], NC Residential II Corporation [(the "Purchaser")] and New Century Credit Corporation [(the "Purchaser")], the undersigned certifies, on behalf of Purchaser that:

           1.     I personally participated as the _____ of the Purchaser in the transaction (the "Transaction"), pursuant to which [INSERT NAME OF SELLING ENTITY] (the "Seller") sold [DESCRIBE ASSETS] (the "Assets") to the Purchaser. In such capacity, I reviewed the purchase and sale agreement relating to the Transaction dated as of _____ __, 200[_] (the "Purchase and Sale Agreement").

           2.     Due to my close involvement in the Transaction, I can accurately and diligently certify the facts listed herein on behalf of the Purchaser.

           3.     The Seller has shifted all of the risks and burdens which are associated with the ownership of the Assets to the Purchaser.

           4.     The Seller has shifted all of the benefits and rewards which are associated with the Assets to the Purchaser. Subsequent to the consummation of the Transaction, the Seller had no control or other rights with respect to the Assets, and all legal rights and title with respect to the Assets vested in the Purchaser.

           5.     There has been no recourse to the Seller with respect to the performance of the Assets.

           6.     As of the date of the consummation of the Transaction, the Seller received from the Purchaser reasonably equivalent value for the transferred Assets, in the form of [DESCRIBE CONSIDERATION].

           7.     The Purchase and Sale Agreement represented the intention of the Seller and the Purchaser to accomplish a complete and irrevocable sale of the Assets.

           8.     The Seller neither was obligated to repurchase, nor had any "call" rights with respect to, the Assets.

           9.     The Purchaser neither was obligated to sell the Assets back to the Seller, nor had any "put" rights with respect to the Assets.

           10.     The Purchaser's books and records reflect that the Transaction was a purchase of the Assets from the Seller, rather than a secured financing or a loan.

      11.     The Purchaser treated the Transaction as a purchase for accounting and tax purposes.

      12.     The Transaction was duly authorized by the Purchaser's officers and directors, as required by the Purchaser's organizational documents and applicable law.

I have been duly authorized to execute this certificate on behalf of Purchaser.

[NEW CENTURY MORTGAGE CORPORATION]

By:_____

Name:

Title:

## CERTIFICATE OF [NAME OF SELLING ENTITY]

In connection with the transaction pursuant to the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 between IXIS Real Estate Capital Inc., NC Capital Corporation [(the "Purchaser"), New Century Mortgage Corporation [(the "Purchaser")], NC Residential II Corporation [(the "Purchaser")] and New Century Credit Corporation [(the "Purchaser")], the undersigned certifies, on behalf of [NAME OF SELLING ENTITY] (the "Seller") that:

1.      I personally participated as the _____ of the Seller in the transaction (the "Transaction") pursuant to which the Seller sold [DESCRIBE ASSETS] (the "Assets") to the Purchaser.  In such capacity, I reviewed the purchase and sale agreement relating to the Transaction dated as of _____ __, 200[_] (the "Purchase and Sale Agreement").

2.      Due to my close involvement in the Transaction, I can accurately and diligently certify the facts listed herein on behalf of the Seller.

3.      The Seller has shifted all of the risks and burdens which are associated with the ownership of the Assets to the Purchaser.

4.      The Seller has shifted all of the benefits and rewards which are associated with the Assets to the Purchaser.  Subsequent to the consummation of the Transaction, the Seller had no control or other rights with respect to the Assets, and all legal rights and title with respect to the Assets vested in the Purchaser.

5.      There has been no recourse to the Seller with respect to the performance of the Assets.

6.      As of the date of the consummation of the Transaction, the Seller received from the Purchaser reasonably equivalent value for the transferred Assets, in the form of [DESCRIBE CONSIDERATION].

7.      The Purchase and Sale Agreement represented the intention of the Seller and the Purchaser to accomplish a complete and irrevocable sale of the Assets.

8.      The Seller neither was obligated to repurchase, nor had any "call" rights with respect to, the Assets.

9.      The Purchaser neither was obligated to sell the Assets back to the Seller, nor had any "put" rights with respect to the Assets.

10.      The Seller's books and records reflect that the Transaction was a sale of the Assets to the Purchaser, rather than a secured financing or a loan.

11.      The Seller treated the Transaction as a sale for accounting and tax purposes.

12.     The Transaction was duly authorized by the Seller's officers and directors, as required by the Seller's organizational documents and applicable law.

I have been duly authorized to execute this certificate on behalf of **[Insert name of Selling Entity]**.

[INSERT NAME OF SELLING ENTITY]

By: _____
   Name:
   Title:

<u>EXHIBIT VII-A</u>

FORM OF SELLER'S RELEASE LETTER

**[Date]**

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

           Re:    Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "<u>Repurchase Agreement</u>"), by and among New Century Mortgage Corporation ("<u>NCMC</u>"), NC Asset Holding, L.P. ("<u>NCAH</u>"), NC Capital Corporation ("<u>NCCC</u>") and New Century Credit Corporation ("<u>New Century</u>") and Home123 Corporation ("<u>Home123</u>", and together with NCMC, NCAH, NCCC and New Century, the "<u>Seller</u>") and IXIS Real Estate Capital Inc. (the "<u>Buyer</u>").

Ladies and Gentlemen:

        With respect to the mortgage loans described in the attached <u>Schedule A</u> (the "<u>Mortgage Loans</u>") (a) we hereby certify to you that the Mortgage Loans are not subject to a lien of any third party and (b) we hereby release all right, interest or claim of any kind with respect to such Mortgage Loans, such release to be effective automatically without further action by any party upon payment from IXIS Real Estate Capital Inc., of the amount of the Purchase Price contemplated under the Repurchase Agreement (calculated in accordance with the terms thereof) in accordance with the wiring instructions set forth in the Repurchase Agreement.

                            Very truly yours,

                            NEW CENTURY MORTGAGE
                            CORPORATION

                            By: _____
                                Name:
                                Title:

NC ASSET HOLDING, L.P.


By:_____
    Name:
    Title:


NC CAPITAL CORPORATION


By:_____
    Name:
    Title:


NEW CENTURY CREDIT CORPORATION


By:_____
    Name:
    Title:


HOME123 CORPORATION


By:_____
    Name:
    Title:


Exh. VI-2

EXHIBIT VII-B

FORM OF WAREHOUSE LENDER'S RELEASE LETTER

**[Date]**

IXIS Real Estate Capital Inc.
9 West 57th Street
New York, NY 10019

          Re:    Certain Mortgage Loans Identified on <u>Schedule A</u> hereto and owned by [Seller]

        The undersigned hereby releases all right, interest, lien or claim of any kind with respect to the mortgage loan(s) described in the attached <u>Schedule A</u>, such release to be effective automatically without any further action by any party upon payment in one or more installments, in immediately available funds of $_____, in accordance with the following wire instructions:

_____

_____

Very truly yours,

[WAREHOUSE LENDER]

By:  _____
    Name:
    Title:

EXHIBIT VIII

FORM OF SERVICER NOTICE

[_____], 200[_]

[SERVICER], as the Servicer
[ADDRESS]
Attention:

> Re:    Fifth Amended and Restated Master Repurchase Agreement, dated as of
> [_____], 2006 (the "Agreement"), by and between [the Seller]
> (the "Seller") and [the Buyer] (the "Buyer").

Ladies and Gentlemen:

[SERVICER] (the "Servicer") is servicing certain mortgage loans for the Seller pursuant to certain [name servicing agreements] (the "Servicing Agreement") between the Servicer and the Seller.  Pursuant to the Agreement between the Buyer and the Seller, the Servicer is hereby notified that the Seller has sold to the Buyer certain mortgage loans which are serviced by the Servicer.

Upon receipt of a notice (a "Default Notice") from the Buyer in which the Buyer shall (a) represent that a default or an event of default has occurred with respect to the Seller's obligations to the Buyer and (b) identify the mortgage loans which are then owned by the Buyer under the Agreement (the "Mortgage Loans"), the Servicer shall segregate all amounts collected on account of such Mortgage Loans, hold them in trust for the sole and exclusive benefit of the Buyer, and remit such collections in accordance with the Buyer's written instructions.  Following receipt of such Default Notice, the Servicer shall follow the instructions of the Buyer with respect to the Mortgage Loans, and shall deliver to the Buyer any information with respect to the Mortgage Loans reasonably requested by the Buyer.

Upon a receipt of a Default Notice, the Buyer shall have the right to terminate the Servicing Agreement and transfer servicing to its designee, at no cost or expense to the Buyer, and the Seller shall pay any and all fees required to terminate the Servicing Agreement and to effectuate the transfer of servicing to the designee of the Buyer.

Notwithstanding any contrary information which may be delivered to the Servicer by the Seller, the Servicer may conclusively rely on any information or Default Notice delivered by the Buyer, and the Seller shall indemnify and hold the Servicer harmless for any and all claims asserted against it for any actions taken in good faith by the Servicer in connection with the delivery of such information or Default Notice.

Please acknowledge receipt of this instruction letter by signing in the signature block below and forwarding an executed copy to the Buyer promptly upon receipt.  Any notices to the Buyer should be delivered to the following address:  9 West 57th Street, New York, New York  10019, Attention: Ray Sullivan.

Very truly yours,

NEW CENTURY MORTGAGE
    CORPORATION

By:_____
    Name:
    Title:

NC CAPITAL CORPORATION

By:_____
    Name:
    Title:

NC ASSET HOLDING, L.P.

By:_____
    Name:
    Title:

NEW CENTURY CREDIT CORPORATION

By:_____
    Name:
    Title:

HOME123 CORPORATION

By:_____
    Name:
    Title:

Exh. VIII-2

ACKNOWLEDGED AND AGREED:

[SERVICER]
as the Servicer

By:_____

    Name:
    Title:
    Telephone:
    Facsimile:

EXHIBIT IX

FORM OF REQUEST FOR ADDITIONAL TRANSACTIONS FOR EXCESS MARGIN

        Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed thereto in the Fifth Amended and Restated Master Repurchase Agreement dated as of November 10, 2006 between [SELLER] (the "Seller") and IXIS Real Estate Capital Inc. (the "Buyer").

        Pursuant to Section 3(o) of the Repurchase Agreement, the Seller hereby requests the advance of additional Transactions, and in connection with such request provides the following information:

| | |
|---|---|
| Requested Increase in Purchase Price | $_____ |
| Requested Purchase Date | _____ |
| Excess Margin prior to giving effect to Requested Transaction | $_____ |
| Remaining Excess Margin after giving effect to such Transaction | $_____ |
| Aggregate Outstanding Purchase Price of the Transactions as of the Date Hereof after giving effect to the Requested Transaction | $_____ |

        The Seller hereby certifies that, after giving effect to the Transaction requested pursuant hereto, the Margin Base will be equal to or greater than the aggregate Purchase Price of the Transactions.

        This Request For Additional Transactions For Excess Margin is dated _____.

Exh. IX-1

EXHIBIT X

## FORM OF COMPLIANCE CERTIFICATE

### OFFICER'S CERTIFICATE

I, _____, _____ of [SELLER ENTITY], do hereby certify that:

(i)     the Seller is in compliance with all provisions and terms of the Fifth Amended and Restated Master Repurchase Agreement, dated as of November 10, 2006 (the "Repurchase Agreement"), between the Seller and IXIS;

(ii)     the Guarantor has at all times maintained a Tangible Net Worth of not less than the sum of (1) $750,000,000, and (2) fifty percent (50%) of all increases in shareholders' equity in the Guarantor attributable to issuances of common stock and preferred equity since November 1, 2004;

(iii)     the Seller has at all times, on a consolidated basis, Cash, Cash Equivalents and unused borrowing capacity on unencumbered assets that could be drawn against (taking into account the economic terms of committed Existing Financing Facilities, including, without limitation, any margin or overcollateralization requirements) under committed Existing Financing Facilities in an amount equal to not less than $60,000,000;

(iv)     the Leverage Ratio of the Guarantor and its consolidated Subsidiaries at any time has not been greater than 15:1;

(v)     the Seller has not permitted, for any two consecutive calendar quarters (each such period, a "Test Period"), Net Income for such Test Period before income taxes for such Test Period and distributions made during such Test Period, to be less than $1.00;

(vi)     compliance by the Seller or the Guarantor, as applicable, with the financial covenants in paragraphs (ii) through (v) above is accurately calculated on Schedule 1 attached hereto;

(vii)     NCAH is, and has been since _____, organized and operating in conformity with the requirements for qualification and taxation as a real estate investment trust (a "REIT") under the Internal Revenue Code of 1986, as amended ("Code"). Attached hereto as Schedule 1 is a true and correct summary of the calculations for REIT qualification of NCAH;

(viii)     there have not been any material modifications to the Underwriting Guidelines that have not been provided to the Buyer; and

(ix)     all additional modifications to the Underwriting Guidelines since the date of the most recent disclosure to the Buyer of any modification to the Underwriting Guidelines have been provided to the Buyer pursuant to Section 11(h) hereof.

Capitalized terms used herein without definition have the meanings given them in the Repurchase Agreement.]

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, I have executed this certificate on behalf of the Company this [__] day of [_____], 200_.

[_____]

By:_____
    Name:
    Title:

EXHIBIT XI

ASSIGNEE LIABILITY JURISDICTIONS

[none]