IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| NEW CENTURY TRS | : | Chapter 11 |
| HOLDINGS INC., et. al. | : | |
| Debtor(s) | : | Case No. 07-10416(KJC) |
| | : | |
| | : | |

**INDYMAC BANK, F.S.B.'S LIMITED OBJECTION TO THE DEBTORS' MOTION TO PROVIDE ADEQUATE PROTECTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 361, 362 AND 363(B)(1)**

IndyMac Bank, F.S.B. ("IndyMac"), submits this Limited Objection to Debtors' Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) (the "Adequate Protection Motion")[1], and states in support thereof the following:

## INTRODUCTION

The Adequate Protection Motion is the Debtors attempt to stave off the anticipated deluge of claims and actions which have heretofore been and which inevitably will be filed by the various Repurchase Counterparties and Mortgage Loan Purchasers attempting to prevent the further dissipation of their collateral or funds by the Debtors. While the Debtors should be applauded for their proactive efforts in this regard, the Adequate Protection Motion simply does not go far enough to protect the rights of IndyMac and others similarly situated. Further, it is far from clear whether the Adequate Protection Motion provides any real adequate protection to the aggrieved parties.

---

[1] Capitalized terms contained in this Limited Objection without definition shall have the definition contained in the Adequate Protection Motion.

IndyMac is a Mortgage Loan Purchaser. It purchased all of the Debtors' right, title and interest in certain mortgage loans (the "<u>Purchased Mortgage Loans</u>") prior to the Petition Date. After title to the Purchased Mortgage Loans had transferred to IndyMac, the Debtors received some mortgage payments from the mortgagors under the Purchased Mortgage Loans. Instead of fulfilling their contractual and legal obligations to IndyMac by delivering such funds to IndyMac, the Debtors retained such funds, failed to account for them, and presumably either used them for their own benefit or retained them in the Debtors' accounts. Because the funds received by the Debtors under the Purchased Mortgage Loans clearly did not belong to the Debtors, those funds should be returned to IndyMac immediately. It is not enough to offer IndyMac "adequate protection," especially when it is unclear whether the adequate protection is <u>adequate</u>.

IndyMac opposes the Adequate Protection Motion to the extent that it seeks to treat entities that made loans to the Debtors in the same manner as those who bought assets from the Debtors and whose assets have not been delivered to them. Further, IndyMac opposes the Adequate Protection Motion insofar as it fails to disclose the value of the adequate protection which the Debtors propose to provide to the Repurchase Counterparties and the Mortgage Loan Purchasers and fails to indicate the estimated aggregate claims of such parties. Consequently, it is impossible to discern whether the adequate protection being offered is real or ephemeral. Unless these issues are resolved in a manner satisfactory to IndyMac, IndyMac intends to file an action seeking to recover funds received by the Debtors which are IndyMac's property, or alternatively seeking a constructive trust regarding IndyMac's funds which are currently in the possession of the Debtors or which come into the Debtors' possession at some time in the future.

## FACTUAL BACKGROUND

1.    The Debtors filed petitions under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code") on April 2, 2007 (the "Petition Date"). The Debtors' chapter 11 cases were administratively consolidated on April 4, 2007. The Debtors are operating their businesses as debtors-in-possession.

2.    Prior to filing for bankruptcy protection, the Debtors operated a specialty mortgage finance business, specializing in subprime mortgages.

3.    According to the Debtors, there were several different aspects to their business including, without limitation, the origination, purchase and servicing of mortgage loans to individual homeowners.

4.    Typically, the Debtors either (i) sold their mortgage loans outright to a Mortgage Loan Purchaser, such as IndyMac, whereby the Mortgage Loan Purchaser, assumed the risk, with few and very limited exceptions, of non-payment by the individual mortgagor under the loan, or (ii) conditionally sold their mortgage loans under various documents, including Repurchase Agreements to parties (the "Repurchase Counterparties") who had a right to "return" or exchange the loans under various circumstances.

*A.)    The Repurchase Agreements*

5.    According to the Adequate Protection Motion, under the Repurchase Agreements, the Debtors were obliged to repurchase the loans at maturity and to periodically pay the Repurchase Counterparties a Price Differential, which is essentially an interest rate on the overall repurchase obligation. These repurchase facilities were similar in nature to revolving credit facilities because, in addition to requiring the payment of regularly scheduled interest, they were based upon a prescribed borrowing formula. Under various circumstances, and at various

intervals, the Repurchase Counterparties could make a margin call in an amount equal to the difference between the total repurchase obligations and the value of the mortgages at the time.

6. Evidently, certain of the Repurchase Counterparties have exercised remedies under the Repurchase Agreements. The Repurchase Counterparties claim that the Repurchase Agreements mandate the Debtors to hold payments received under the mortgage loans in trust and in segregated accounts, rather than in general corporate accounts with other funds. While not disputing that some of the Repurchase Agreements contained trust language, the Debtors maintain that they historically had the right to and did receive payments made under the mortgage loans, and deposited such funds into their general corporate accounts (rather than into a separate trust account) and remitted to the Repurchase Counterparties only the regularly scheduled principal and/or interest payments, retaining the "spread" for their own ongoing operating needs.

7. Under the Repurchase Agreements, the Debtors would typically continue to provide servicing with respect to the loans at issue by collecting payments due thereunder.

8. Since the Petition Date, certain of the Repurchase Counterparties have initiated adversary proceedings seeking to compel the Debtors to turn over to them funds collected on the mortgage loans subject to their Repurchase Agreements (the "Repurchase Loans"). Rather than handle these matters on a piecemeal basis and knowing that they would soon be deluged with similar demands, the Debtors filed the Adequate Protection Motion, seeking to address the concerns of the Repurchase Counterparties as well as the Mortgage Loan Purchasers by offering what the Debtors characterize as "adequate protection" for the interests of the Repurchase Counterparties and the Mortgage Loan Purchasers in funds heretofore collected by the Debtors under their mortgage loans.

*B.)   The Loan Purchase Agreements*

9.     As part of their business, the Debtors also sold mortgage loans through outright sales. These sales were effectuated by way of loan purchase agreements (the "Loan Purchase Agreements") pursuant to which the Mortgage Loan Purchasers, such as IndyMac, bought mortgage loans and in so doing, assumed the role of mortgagee thereunder.

10.    On October 5, 2006 IndyMac and New Century Mortgage Corporation ("NCMC") entered into that certain Mortgage Loan Purchase and Interim Service Sale Agreement (the "Sale Agreement") pursuant to which IndyMac purchased from NCMC a number of mortgage loan portfolios (the "Mortgage Portfolios") and the related servicing rights attendant thereto. Each Mortgage Portfolio contained numerous individual mortgage loans (the "Purchased Mortgage Loans").

11.    In contrast to the terms of the Repurchase Agreements, the Sale Agreement transferred as of the date of closing (the "Closing Date") "all of the rights, title and interest of [NCMC] in the [Purchased Mortgage Loans], together with the Servicing Rights with respect to such Purchased Mortgage Loans" to IndyMac. Sale Agreement, Sec. 2.01(a). All of NCMC's interest in the Purchased Mortgage Loans ceased as of the Closing Date. Additionally, the Sale Agreement provided that the servicing function which had theretofore been performed by Home 123 on behalf of NCMC was being transferred to IndyMac as of the Closing Date.

12.    Unlike the Repurchase Agreements, the Sale Agreement does not contain any provisions which require the Debtors to repurchase the Purchased Mortgage Loans on a maturity date, pay IndyMac a Price Differential, or satisfy any margin calls. But for very limited and discreet circumstances, the Debtors were under no obligation to repurchase the Purchased Mortgage Loans from IndyMac. There is no question that these sales of mortgage loans were

"true sales". In re Churchill Mortgage Investment Corp., 233 B.R. 61, 67 (Bankr. S.D.N.Y. 1999).

13.     After the Closing Date, IndyMac sent the mortgagors under the IndyMac Loans (the "Borrowers") a transfer notice (the "Transfer Notice"), notifying them that their mortgage had been sold to IndyMac, and directing them to make all future payments (the "Payments") on account of the Purchased Mortgage Loans to IndyMac.

14.     As is customary in these types of mortgage loan sale transactions, it often takes several months until the Borrowers comply with the instructions contained in the Transfer Notices, and oftentimes several Transfer Notices are sent to the same Borrower. Sometimes Borrowers send their payments in advance of receiving the Transfer Notices. Obviously those payments are sent to the seller rather than the purchaser of the loans.

15.     The Sale Agreement takes into account these potential circumstances by requiring the Debtor-seller to promptly remit to IndyMac, in the original form received, any payment received by such Debtor on account of the Purchased Mortgage Loans following the Closing Date. Sale Agreement, Sec. 404(b).

16.     Pursuant to information provided by the Debtors, as of April 6, 2007 the Debtors received Payments on account of the Purchased Mortgage Loans totaling $2,399,140.10 for the month of March 2007 (the "March Payments" and together with any other payments received by the Debtors on account of Purchased Mortgage Loans, the "Received Payments"). IndyMac believes that the Debtors received Received Payments both before and after the Petition Date. Some of the Received Payments were ultimately remitted to IndyMac; however, Received Payments aggregating $224,466.37 were retained by the Debtors, and despite requests from

IndyMac, the Debtors have failed to account for these funds or to advise IndyMac why these funds were not turned over to IndyMac.

17. The amounts that the Debtors have received on account of the Purchased Mortgage Loans which were not remitted to IndyMac are not and never were property of the Debtors' estate. In re Litenda Mortgage Corp., 246 B.R. 185, 194 (Bankr. D.N.J. 2000). Such funds belong to IndyMac, and the Debtors are obligated to turn such funds over to IndyMac. While in possession of such amounts, such funds should be segregated from the Debtors other funds and not utilized in the Debtors' operations.

## OBJECTION TO THE ADEQUATE PROTECTION MOTION

18. IndyMac objects to Adequate Protection Motion insofar as it fails to propose sufficient adequate protection to properly protect IndyMac's interests in the Received Payments. While IndyMac appreciates the Debtors' efforts to afford adequate protection to the Repurchase Counterparties and the Mortgage Loan Purchasers, IndyMac believes that the Mortgage Loan Purchasers are in a different position than the Repurchase Counterparties because it is clear that the Debtors have no interest in the Received Payments. The Received Payments are not property of the Debtors' estate under Section 541 of the Bankruptcy Code, and as such should not be retained by the Debtors. These funds should immediately be segregated and turned over to the parties to whom they belong.

19. Furthermore, the Adequate Protection Motion is silent regarding the value of the adequate protection which is purportedly being bestowed upon the Repurchase Counterparties and the Mortgage Loan Purchasers, and does not even attempt to make out a *prima facie* case as to whether the adequate protection is in an amount sufficient to adequately protect the respective

parties' interests. Thus, the Adequate Protection Motion gives no comfort to IndyMac regarding the adequate protection of its interests.

## ARGUMENT

*A.   Because IndyMac bought the Purchased Mortgage Loans outright and did not make loans to the Debtors, it is entitled to a return of its property being held by the Debtors. If the Debtors converted IndyMac's property, IndyMac is entitled to substitute property of a similar value.*

20.    The Adequate Protection Motion largely focuses on the interests of the Repurchase Counterparties, as lenders, and virtually disregards the interests of the Mortgage Loan Purchasers such as IndyMac. The difference is significant. While the Debtors argue that the Repurchase Agreements were in the nature of revolving credit loans, the Debtors make no similar argument regarding the Purchased Mortgage Loans. Courts have routinely differentiated between "true sales" and "loans" in determining the rights of the various parties in a bankruptcy. In re Ames Dept. Stores, Inc., 144 Fed. Appx. 900 (2d Cir. NY 2005).

21.    In determining whether a transaction is a true sale or a disguised loan, courts will look to the actual business arrangements between parties to determine the status of property at issue. Id.

22.    Among the "hallmarks" of a loan transaction, courts look to see whether there exists a (1) guarantee of repayment; (2) participation by the mortgage loan purchaser which is longer or shorter than the underlying obligation; (3) different payment obligations between the underlying borrower and lender than among the seller and the mortgage loan purchaser; and (4) discrepancy between the interest rate due on the underlying loan and the interest rate specified in the purchase agreement. In re Churchill Mortgage Investment Corp., 233 B.R. 61, 67 (Bankr. S.D. NY 1999). In addition to these factors, courts examine the risk allocation under the transaction. In re Corporate Financing, Inc., 221 B.R. 671, 679 (Bankr. E.D. NY 1998). If a

purchaser does not bear the same risk of loss as the seller, or if the seller has made a guarantee of payment, the transaction is generally considered a loan and not a sale of a mortgage interest. Id.

23. According to the Debtors, the transactions involving Repurchase Agreements were tantamount to revolving credit loans due to the risk allocation between the Debtor-seller and the Repurchase Counterparty-buyer and the other indicia of these transactions. The Debtors did not make the same argument, nor could they, with respect to the transactions involving Purchased Mortgage Loans.

24. The Sale Agreement between IndyMac and NCMC contains none of the "hallmarks" of a disguised loan. By not arguing that these transactions are disguised loans, the Debtors have essentially conceded in the Adequate Protection Motion that the transactions involving Loan Purchase Agreements, such as the one between IndyMac and NCMC, were in fact true sales. Because the IndyMac transaction was a "true sale", upon the closing of the transaction, all payments made on account of Purchased Mortgage Loans became the sole property of IndyMac, and the Sale Agreement requires that NCMC, as seller thereunder, promptly remit to IndyMac any payments received by NCMC on account of the Purchased Mortgage Loans. See 11.U.S.C. §541(d); In re: Litenda Mortgage Corp., 246 B.R. 185, 194 (D.N.J. 2000); In re Cambridge Mortgage Corp., 92 B.R. 145, 150 (Bankr. D.S.C. 1988). Thus, IndyMac is entitled to receive immediately from the Debtors its property, which is all of the Received Payments, or if such payments were converted by the Debtors, the cash equivalent of such Received Payments.

25. The purpose of adequate protection is to insure that a secured creditor of a debtor receives the value it bargained for prior to the debtor filing for bankruptcy protection. In re Swedeland Development Group, Inc., 16 F.3d 552 (3d Cir. 1993). Appropriate adequate

protection is determined on a case-by-case basis. <u>In re Sharon Steel Corporation</u>, 159 B.R. 165 (Bankr. W.D. Pa. 1993). It is up to the bankruptcy court to determine whether the adequate protection measures proposed by the debtor is sufficient based on the facts of a particular case. <u>In re: Matter of DeBoer,</u> 63 B.R. 26 (Bankr. D. Neb. 1986).

26.     The Adequate Protection Motion fails to give IndyMac adequate protection sufficient to protect its interests. In order to protect its bargained for interest, any adequate protection proposed must be of equal value to the interest it proposes to protect. Under the Sale Agreement, the Debtors sold IndyMac all right, title and interest in the Purchased Mortgage Loans. There is no question Received Payments belong to IndyMac and should have been remitted to it upon their receipt by the Debtors. Until such time as the Received Payments (which the Debtors concede they received on account of the Purchased Mortgage Loans) are remitted to IndyMac, IndyMac is entitled to protection which is equivalent in value to the Received Payments. Anything less fails to adequately protect IndyMac's interests.

  B. *Debtors fail to provide sufficient information to determine the adequacy of the proposed Adequate Protection*

27.     The Adequate Protection Motion is completely silent as to the value of the protection being offered to the Repurchase Counterparties and the Mortgage Loan Purchasers. Thus, it is virtually impossible for IndyMac to evaluate whether the protections proposed by the Debtors are sufficient to protect IndyMac's interests.

28.     The Adequate Protection Motion proposes granting the Repurchase Counterparties and Mortgage Loan Purchasers superpriority administrative claims and liens, junior to the superpriority administrative claims and liens held by the DIP Lenders and any existing valid unavoidable liens. It is impossible to determine, without evidence, the value of these superpriority administrative claims and liens, because no facts are laid out which predicts

their value or which advises the parties as to the aggregate amount of the claims of Repurchase Counterparties and Mortgage Loan Purchasers. Thus, it is unknown how large the pie is and who is sharing the pie.

29. The Adequate Protection Motion further states that the Debtors have been working on a reconciliation of the amounts owed to Repurchase Counterparties and Mortgage Loan Purchasers, but does not project when such accounting will be completed. Any offer of adequate protection must include a definitive timeline setting forth a date when IndyMac will receive a comprehensive loan reconciliation of the Received Payments that belong to IndyMac.

30. The Adequate Protection Motion does not provide even basic information about the purported proposed protections being offered by the Debtors. This complete lack of information renders the Adequate Response Motion fatally insufficient.

### Relief Requested

WHEREFORE, IndyMac requests that the Court require the Debtors to provide IndyMac with the following adequate protection:

(a) directing the Debtors to provide IndyMac with an accounting and reconciliation of Received Payments. Such accounting and reconciliation should be provided within ten days of the Order;

(b) directing the Debtors to escrow funds in an amount equivalent to the Received Payments not heretofore turned over to IndyMac.

(c) directing the Debtors to turn over to IndyMac such escrowed funds within ten days of the entry of the Order; and

(d) granting such other and further relief as is just and proper

| | |
|---|---|
| Dated: May 25, 2007<br>Wilmington, Delaware | Respectfully submitted,<br><br>REED SMITH LLP<br><br>By: /s/ Kurt F. Gwynne<br>Kurt F. Gwynne (No. 3951)<br>1201 Market Street, Suite 1500<br>Wilmington, DE 19899<br>Telephone: (302) 778-7500<br>Facsimile: (302) 778-7575<br>Email: kgwynne@reedsmith.com<br><br>Claudia Z. Springer, Esquire<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103-7301<br>Phone: (215) 851-8100<br>Facsimile: (215) 851-1420<br>Email: cspringer@reedsmith.com<br><br>Counsel to IndyMac Bank, F.S.B. |