FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor: New Century TRS Holdings, Inc. | Case Number 07-10416 |
| --- | --- |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): KW Fund II -- 1860 Howe, L.P.<br><br>Name and address where notices should be sent:<br><br>**KW Properties, LTD**<br>**c/o Trainor Fairbrook**<br>**Attention: Nancy Hotchkiss, Esquire**<br>**980 Fulton Avenue**<br>**Sacramento, California 95825**<br>**Telephone number: (916) 929-7000**<br>**Facsimile number: (916) 929-7111**<br>**Email: Nhotchkiss@trainorfairbrook.com** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | |
| --- | --- | --- |
| Account or other number by which creditor identifies debtor: 4530.016 | Check here ☐ replaces<br>if this claim ☐ amends   previously filed claim, dated: _____ | THIS SPACE IS FOR COURT USE ONLY |

| 1.  **Basis for Claim**<br>☐  Goods sold<br>☐  Services performed<br>☐  Money loaned<br>☐  Personal injury/wrongful death<br>☐  Taxes<br>☑  Other: Rejection of lease of commercial real property at 1860 Howe Avenue, Sacramento, California | ☐  Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐  Wages, salaries, and compensation (Fill out below)<br>Last four digits of SS#: _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>        (date)                      (date) |
| --- | --- |

| 2.  **Date debt was incurred: Lease dated 11/8/01** | 3.  **If court judgment, date obtained:** |
| --- | --- |

4.  **Total Amount of Claim at Time Case Filed:**

| $ 135,559.70 | $ 5,383.90 | $ _____ | $ 140,943.60 |
| --- | --- | --- | --- |
| (unsecured) | (secured) | (Priority) | (Total) |

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐  Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5.  **Secured Claim.**<br>☑  Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br>☐ Real Estate      ☐ Motor Vehicle<br>☑ Other: Security Deposit _____<br>Value of Collateral: $5,383.90<br>Amount of arrearage and other charges at time case filed included in secured claim, if any: **$5,383.90**<br><br>6.  **Unsecured Nonpriority Claim.** __$135,559.70__<br><br>☑  Check this box if: a) there is no collateral or lien securing your claim; or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority. | 7.  **Unsecured Priority Claim.**<br>☐  Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4)<br>☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).<br>☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).<br>☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).<br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).<br>*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |
| --- | --- |

| 8.  **Credits:**     The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>9.  **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>10.  **Date-Stamped Copy:**   To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
| --- | --- |

| Date:<br>5/29/07 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):  Trainor Fairbrook, Attorneys for Creditor<br>By: *Nancy Hotchkiss*<br>Nancy Hotchkiss, Esquire |
| --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>New Century TRS Holdings, Inc.<br>Case Number: 07-10416 | PROOF OF CLAIM<br>SUMMARY |
|---|---|

On or about November 8, 2001, New Century Mortgage Corporation, a California corporation, dba Home 123, leased from Claimants' assignor those commercial premises located at 1860 Howe Avenue, Sacramento, California pursuant to a written lease, a copy of which is attached hereto.  Subsequent thereto, Claimant became the assignee of the interest of the landlord therein, and two separate lease amendments were entered into, copies of which are also attached hereto, extending the lease term to October 31, 2011.

Debtor rejected this lease effective April 30, 2007, and at the time of said rejection, abandoned furniture fixtures, and equipment in the premises, foisting onto Claimant the financial burden of removal thereof.  Damages are itemized as follows:

| Rejection Damages | |
|---|---|
| Base rent at $11,249.55 per month x 12 months per §502(b)(6) of lease | $134,994.60 |
| Estimated cost of removal of abandoned personal property | $5,000.00 |
| Attorneys' fees and cost (through 5/7/07 only) per Paragraph 25(s) of lease | $949.00 |
| Total | $140,943.60 |

Claimant holds a security deposit of $5,383.90 as partial credit against the payment of these damages.

4530016.496354.1

[OFFICE – CALIFORNIA]

ORIGINAL

LEASE AGREEMENT

BETWEEN

**WXI/SEN REAL ESTATE LIMITED PARTNERSHIP,**
a Delaware limited partnership

AS LANDLORD,

AND

**NEW CENTURY MORTGAGE CORPORATION,**
a California corporation

AS TENANT

DATED:
November 8, 2001

Howe Avenue Place
1860 Howe Avenue
Sacramento, California 95825

t:\mlh\archon\Howe\doc\NewCenturyLea3                                    11/07/01

## BASIC LEASE INFORMATION                ORIGINAL

| | |
|---|---|
| Lease Date: | November 8, 2001 |
| Landlord: | **WXI/SEN REAL ESTATE LIMITED PARTNERSHIP**, a Delaware limited partnership |
| Tenant: | **NEW CENTURY MORTGAGE CORPORATION**, a California corporation |
| Premises: | Suite 106, containing 3,167 rentable square feet, in the office building commonly known as Howe Avenue Place (the "**Building**"), and whose street address is 1860 Howe Avenue, Sacramento, California 95825. The Premises are outlined on the plan attached to the Lease as Exhibit A. The land on which the Building is located (the "**Land**") is described on Exhibit B. The term "**Project**" shall collectively refer to the Building, the Land and the driveways, parking facilities, and similar improvements and easements associated with the foregoing or the operation thereof. |
| Term: | Approximately 62 months, commencing on the Commencement Date and ending at 5:00 p.m. local time on the last day of the 62nd full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease. |
| Early Termination: | See Section 28 |
| Option to Renew: | Two options for 36 months each |
| Commencement Date: | The earliest of (a) the date on which Tenant occupies any portion of the Premises and begins conducting business therein, (b) the date on which the Work (as defined in Exhibit D hereto) in the Premises is Substantially Completed (as defined in Exhibit D hereto), or (c) the date on which the Work in the Premises would have been Substantially Completed but for the occurrence of any Tenant Delay Days (as defined in Exhibit D hereto). |
| Basic Rent: | Subject to the conditional abatement of Basic Rent contained in Section 27 herein, Basic Rent shall be the following amounts for the following periods of time: |

| Lease Month | Monthly Basic Rent |
|---|---|
| 1-14 | $5,383.90 |
| 15-26 | $5,542.25 |
| 27-38 | $5,700.60 |
| 39-50 | $5,858.95 |
| 51-62 | $6,017.30 |

As used herein, the term "**Lease Month**" shall mean each calendar month during the Term (and if the Commencement Date does not occur on the first day of a calendar month, the period from the Commencement Date to the first day of the next calendar month shall be included in the first Lease Month for purposes of determining the duration of the Term and the monthly Basic Rent rate applicable for such partial month).

| | |
|---|---|
| Security Deposit: | $5,383.90. |
| Rent: | Basic Rent, Tenant's Proportionate Share of Taxes, Tenant's share of Additional Rent, and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease. |

Permitted Use:          General office use.

Tenant's Proportionate Share:

3.16%, which is the percentage obtained by dividing (a) the number of rentable square feet in the Premises as stated above by (b) the 100,258 rentable square feet in the Building. Landlord and Tenant stipulate that the number of rentable square feet in the Premises and in the Building set forth above is conclusive and shall be binding upon them.

Expense Stop:           Operating Costs per rentable square foot in the Building for the calendar year 2002 (grossed up as provided in Section 4(b)(5) of the Lease).

Base Tax Year:          The calendar year 2002.

Initial Liability Insurance Amount:
                        $2,000,000.

Maximum Construction Allowance:
                        N/A; See Exhibit D.

Guarantor:              None

| Tenant's Address: | For all Notices:<br>New Century Mortgage Corporation<br>1840 Von Karman, Suite 1000<br>Irvine, California 92612<br>Attention: Legal Department<br>Telephone: (949) 862-7781<br>Telecopy: (949) 440-7033 | With a copy to:<br>New Century Mortgage Corporation<br>10804 Willow Court, Suite B<br>San Diego, California 92127<br>Attention: Facilities<br>Telephone: (858) 385-8100<br>Telecopy: (858) 385-0682 |
|---|---|---|
| Landlord's Address: | For all Notices:<br>WXI/SEN Real Estate Limited Partnership<br>c/o Transwestern Property Company West L.L.C.<br>1860 Howe Avenue, Suite 210<br>Sacramento, California 95825<br>Attention: Property Manager<br>Telephone: (916) 641-8112<br>Telecopy: (916) 641-0983 | With a copy to:<br>WXI/SEN Real Estate Limited Partnership<br>c/o Archon Group, L.P.<br>Two California Plaza<br>350 S. Grand Avenue, Suite 4600<br>Los Angeles, California 90071<br>Attention: Nancy M. Haag<br>Telephone: (213) 633-5800<br>Telecopy: (213) 633-5870 |

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified above. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

**LANDLORD:**                    **WXI/SEN Real Estate Limited Partnership**, a Delaware limited partnership

By:     WXI/SEN Gen-Par, L.L.C., a Delaware limited
        liability company, General Partner

By:     _____
Name: Nancy M. Haag
Title:   Assistant Vice President

[SIGNATURES CONTINUED ON NEXT PAGE]

TENANT:                         **New Century Mortgage Corporation**, a California
                                corporation

                                By:_____

                                Name:_George Anderson_____

                                Title:__President Retail Division_____


                                By:_____

                                Name:____STEVE KOTT_____

                                Title:_MANAGER, RETAIL DIVISION BRANCH
                                                              SERVICES

                                Tax I.D. No.: 93-1195257

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions and Basic Provisions | 1 |
| 2. | Lease Grant | 1 |
| 3. | Tender of Possession | 1 |
| 4. | Rent | 1 |
| | (a) Payment | 1 |
| | (b) Operating Costs; Taxes | 2 |
| 5. | Delinquent Payment; Handling Charges | 3 |
| 6. | Security Deposit | 4 |
| 7. | Landlord's Obligations | 4 |
| | (a) Services | 4 |
| | (b) Excess Utility Use | 4 |
| | (c) Restoration of Services; Abatement | 5 |
| | (d) Access 24/7 | 5 |
| 8. | Improvements; Alterations; Repairs; Maintenance | 5 |
| | (a) Improvements; Alterations | 5 |
| | (b) Repairs; Maintenance | 5 |
| | (c) Performance of Work | 6 |
| | (d) Mechanic's Liens | 6 |
| 9. | Use | 6 |
| 10. | Assignment and Subletting | 7 |
| | (a) Transfers | 7 |
| | (b) Consent Standards | 7 |
| | (c) Request for Consent | 7 |
| | (d) Conditions to Consent | 7 |
| | (e) Attornment by Subtenants | 8 |
| | (f) Cancellation | 8 |
| | (g) Additional Compensation | 8 |
| | (h) Permitted Transfers | 8 |
| 11. | Insurance; Waivers; Subrogation; Indemnity | 9 |
| | (a) Tenant's Insurance | 9 |
| | (b) Landlord's Insurance | 10 |
| | (c) No Subrogation | 10 |
| | (d) Indemnity | 10 |
| 12. | Subordination; Attornment; Notice to Landlord's Mortgagee | 11 |
| | (a) Subordination | 11 |
| | (b) Attornment | 11 |
| | (c) Notice to Landlord's Mortgagee | 11 |
| | (d) Landlord's Mortgagee's Protection Provisions | 11 |
| 13. | Rules and Regulations | 11 |
| 14. | Condemnation | 12 |
| | (a) Total Taking | 12 |
| | (b) Partial Taking - Tenant's Rights | 12 |
| | (c) Partial Taking - Landlord's Rights | 12 |
| | (d) Award | 12 |
| 15. | Fire or Other Casualty | 12 |
| | (a) Repair Estimate | 12 |
| | (b) Tenant's Rights | 12 |
| | (c) Landlord's Rights | 12 |
| | (d) Repair Obligation | 12 |
| | (e) Waiver of Statutory Provisions | 13 |
| | (f) Abatement of Rent | 13 |
| 16. | Personal Property Taxes | 13 |
| 17. | Events of Default | 13 |
| | (a) Payment Default | 13 |
| | (b) Abandonment | 13 |
| | (c) Estoppel | 13 |

|  |  | (d) | Insurance | 14 |
|  |  | (e) | Mechanic's Liens | 14 |
|  |  | (f) | Other Defaults | 14 |
|  |  | (g) | Insolvency | 14 |
| 18. | Remedies | | | 14 |
|  |  | (a) | Termination of Lease | 14 |
|  |  | (b) | Enforcement of Lease | 15 |
|  |  | (c) | Sublessees of Tenant | 15 |
|  |  | (d) | Efforts to Relet | 15 |
| 19. | Payment by Tenant; Non-Waiver; Cumulative Remedies | | | 15 |
|  |  | (a) | Payment by Tenant | 15 |
|  |  | (b) | No Waiver | 15 |
|  |  | (c) | Cumulative Remedies | 15 |
| 20. | INTENTIONALLY DELETED | | | 15 |
| 21. | Surrender of Premises | | | 15 |
| 22. | Holding Over | | | 16 |
| 23. | Certain Rights Reserved by Landlord | | | 16 |
|  |  | (a) | Building Operations | 16 |
|  |  | (b) | Security | 16 |
|  |  | (c) | Prospective Purchasers and Lenders | 16 |
|  |  | (d) | Prospective Tenants | 16 |
| 24. | Substitution Space | | | 17 |
| 25. | Miscellaneous | | | 17 |
|  |  | (a) | Landlord Transfer | 17 |
|  |  | (b) | Landlord's Liability | 17 |
|  |  | (c) | Force Majeure | 17 |
|  |  | (d) | Brokerage | 17 |
|  |  | (e) | Estoppel Certificates | 17 |
|  |  | (f) | Notices | 18 |
|  |  | (g) | Separability | 18 |
|  |  | (h) | Amendments; and Binding Effect | 18 |
|  |  | (i) | Quiet Enjoyment | 18 |
|  |  | (j) | No Merger | 18 |
|  |  | (k) | No Offer | 18 |
|  |  | (l) | Entire Agreement | 18 |
|  |  | (m) | Waiver of Jury Trial | 18 |
|  |  | (n) | Governing Law | 18 |
|  |  | (o) | Recording | 19 |
|  |  | (p) | Joint and Several Liability | 19 |
|  |  | (q) | Financial Reports | 19 |
|  |  | (r) | Landlord's Fees | 19 |
|  |  | (s) | Attorneys' Fees | 19 |
|  |  | (t) | Telecommunications | 19 |
|  |  | (u) | Confidentiality | 20 |
|  |  | (v) | Authority | 20 |
|  |  | (w) | Hazardous Materials | 20 |
|  |  | (x) | Parking | 20 |
|  |  | (y) | Signage | 20 |
|  |  | (z) | List of Exhibits | 21 |
| 26. | Renewal Option | | | 21 |
|  |  | (a) | Grant of Option | 21 |
|  |  | (b) | Basic Rent | 21 |
|  |  | (c) | Termination of Option | 21 |
| 27. | Rent Abatement | | | 22 |
| 28. | Right of First Offer. | | | 22 |
|  |  | (a) | Grant of Offer | 22 |
|  |  | (b) | Exercise of Offer | 22 |
|  |  | (c) | Termination of Rights | 23 |
| 29. | Early Termination | | | 23 |

## LIST OF DEFINED TERMS

Page

Additional Rent ............................................................................................................. 2
Affiliate ...................................................................................................................... 1
AS-IS............................................................................................................... 22, 1
Base Tax Year .......................................................................................................... iii
Basic Lease Information ............................................................................................ 1
Basic Rent ................................................................................................................ ii
Building ..................................................................................................................... ii
Building's Structure ................................................................................................... 1
Building's Systems..................................................................................................... 1
Casualty ................................................................................................................... 12
Commencement Date ................................................................................................ ii
Damage Notice ........................................................................................................ 12
Default Rate.............................................................................................................. 3
Disabilities Acts......................................................................................................... 7
Estimated Delivery Date............................................................................................ 1
Event of Default ...................................................................................................... 13
Expense Stop ........................................................................................................... iii
Extended Term ........................................................................................................ 21
GAAP........................................................................................................................ 9
Guarantor.................................................................................................................. iii
Hazardous Materials ................................................................................................ 20
HVAC ....................................................................................................................... 4
including..................................................................................................................... 1
Initial Liability Insurance Amount............................................................................... iii
Land .......................................................................................................................... ii
Landlord ................................................................................................................ ii, 1
Landlord's Mortgagee.............................................................................................. 11
Law............................................................................................................................ 1
Laws.......................................................................................................................... 1
Lease ......................................................................................................................... 1
Lease Date ................................................................................................................ ii
Lease Month ............................................................................................................. ii
Loss ......................................................................................................................... 10
Maximum Construction Allowance............................................................................ iii
Mortgage ................................................................................................................. 11
Offer Notice............................................................................................................. 22
Offer Space.............................................................................................................. 22
Operating Costs ........................................................................................................ 2
Operating Costs and Tax Statement........................................................................... 3
Option to Renew....................................................................................................... ii
Parking Area ............................................................................................................ 20
Permitted Transfer .................................................................................................... 8
Permitted Transferee................................................................................................. 8
Permitted Use ........................................................................................................... iii
Premises .................................................................................................................... ii
Prevailing Rental Rate .............................................................................................. 21
Primary Lease........................................................................................................... 11
Project ....................................................................................................................... ii
Punchlist Items .......................................................................................................... 1
Rent ........................................................................................................................... ii
Repair Period ........................................................................................................... 12
Security Deposit ........................................................................................................ ii
Substantial Completion.............................................................................................. 1
Substantially Completed............................................................................................. 1

Taking ........................................................................................................................................... 12
Tangible Net Worth ........................................................................................................................... 9
Taxes ............................................................................................................................................... 3
Telecommunications Services ......................................................................................................... 19
Tenant ................................................................................................................................. ii, 1, 14, 1
Tenant Delay Day .............................................................................................................................. 1
Tenant Party ...................................................................................................................................... 1
Tenant's Off-Premises Equipment ..................................................................................................... 1
Tenant's Proportionate Share ........................................................................................................... iii
Term .................................................................................................................................................. ii
Termination Payment ....................................................................................................................... 23
Third Party Offer ............................................................................................................................. 22
Transfer ............................................................................................................................................. 7
Work .................................................................................................................................................. 1

<u>LEASE</u>

THIS LEASE AGREEMENT (this "**<u>Lease</u>**") is entered into as of November 8, 2001, between **WXI/SEN REAL ESTATE LIMITED PARTNERSHIP**, a Delaware limited partnership ("**<u>Landlord</u>**"), and **NEW CENTURY MORTGAGE CORPORATION**, a California corporation ("**<u>Tenant</u>**").

      1.    **<u>Definitions and Basic Provisions</u>**. The definitions and basic provisions set forth in the Basic Lease Information (the "**<u>Basic Lease Information</u>**") executed by Landlord and Tenant contemporaneously herewith are incorporated herein by reference for all purposes. Additionally, the following terms shall have the following meanings when used in this Lease: "**<u>Affiliate</u>**" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question; "**<u>Building's Structure</u>**" means the Building's exterior walls, roof, elevator shafts, footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams; "**<u>Building's Systems</u>**" means the Building's HVAC, life-safety, plumbing, electrical, and mechanical systems; "**<u>including</u>**" means including, without limitation; "**<u>Laws</u>**" means all federal, state, and local laws, ordinances, rules and regulations, all court orders, governmental directives, and governmental orders and all interpretations of the foregoing, and all restrictive covenants affecting the Project, and "**<u>Law</u>**" shall mean any of the foregoing; "**<u>Tenant's Off-Premises Equipment</u>**" means any of Tenant's equipment or other property that may be located on or about the Project (other than inside the Premises); and "**<u>Tenant Party</u>**" means any of the following persons: Tenant; any assignees claiming by, through, or under Tenant; any subtenants claiming by, through, or under Tenant; and any of their respective agents, contractors, employees, and invitees.

      2.    **<u>Lease Grant</u>**. Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

      3.    **<u>Tender of Possession</u>**. Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease on or about January 1, 2002 (the "**<u>Estimated Delivery Date</u>**"). If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then (a) Tenant's Rent shall be abated until the Commencement Date, as defined in the Basic Lease Information, (b) the validity of this Lease shall not be affected or impaired thereby, (c) Landlord shall not be in default hereunder or be liable for damages therefor, and (d) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant. By occupying the Premises, Tenant shall be deemed to have accepted the Premises in their condition as of the date of such occupancy, subject to the performance of punch-list items that remain to be performed by Landlord, if any. Prior to occupying the Premises, Tenant shall execute and deliver to Landlord a letter substantially in the form of <u>Exhibit E</u> hereto confirming (1) the Commencement Date and the expiration date of the initial Term, (2) that Tenant has accepted the Premises, and (3) that Landlord has performed all of its obligations with respect to the Premises (except for punch-list items specified in such letter); however, the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease. Notwithstanding the foregoing to the contrary, Tenant shall be able to enter the Premises during the week before the Commencement Date for the purpose of installing equipment and moving in furniture and supplies, provided Tenant's access shall not interfere with the completion of the Work by Landlord. Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Basic Rent, Additional Rent and Taxes (each as defined herein).

      4.    **<u>Rent</u>**.

        (a)    **<u>Payment</u>**. Tenant shall timely pay to Landlord Rent, without notice, demand, deduction or set off (except as otherwise expressly provided herein), by good and sufficient check drawn on a national banking association at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes. The obligations of Tenant to pay Basic Rent and other sums to Landlord

and the obligations of Landlord under this Lease are independent obligations. Subject to the conditional abatement of Basic Rent contained in Section 27 herein, Basic Rent, adjusted as herein provided, shall be payable monthly in advance. The first monthly installment of Basic Rent shall be payable contemporaneously with the execution of this Lease; thereafter, Basic Rent shall be payable on the first day of each month beginning on the first day of the fourth full calendar month of the Term. The monthly Basic Rent for any partial month at the beginning of the Term shall equal the product of 1/365 of the annual Basic Rent in effect during the partial month and the number of days in the partial month, and shall be due on the Commencement Date. Payments of Basic Rent for any fractional calendar month at the end of the Term shall be similarly prorated. Tenant shall pay Additional Rent at the same time and in the same manner as Basic Rent.

(b)     **Operating Costs; Taxes**.

(1)     Tenant shall pay to Landlord the amount (per each rentable square foot in the Premises) ("**Additional Rent**") by which the annual Operating Costs (defined below) per rentable square foot in the Building exceed the Expense Stop (per rentable square foot in the Building). Landlord may make a good faith estimate of the Additional Rent to be due by Tenant for any calendar year or part thereof during the Term. During each calendar year or partial calendar year of the Term (after the base year, if the Expense Stop is calculated on a base year basis), Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Basic Rent, an amount equal to the estimated Additional Rent for such calendar year or part thereof divided by the number of months therein. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs are available for each calendar year.

(2)     The term "**Operating Costs**" shall mean all expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Project, determined in accordance with sound accounting principles consistently applied, including the following costs: (A) wages and salaries of all on-site employees at or below the grade of senior building manager engaged in the operation, maintenance or security of the Project (together with Landlord's reasonable allocation of expenses of off-site employees at or below the grade of senior building manager who perform a portion of their services in connection with the operation, maintenance or security of the Project), including taxes, insurance and benefits relating thereto; (B) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Project; (C) costs for improvements made to the Project which, although capital in nature, are expected to reduce the normal operating costs (including all utility costs) of the Project, as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as capital improvements made in order to comply with any Law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion; (D) cost of all utilities, except the cost of other utilities reimbursable to Landlord by the Project's tenants other than pursuant to a provision similar to this Section 4(b); (E) insurance expenses; (F) repairs, replacements, and general maintenance of the Project; (G) fair market rental and other costs with respect to the management office for the Building; and (H) service, maintenance and management contracts with independent contractors for the operation, maintenance, management, repair, replacement, or security of the Project (including alarm service, window cleaning, and elevator maintenance).

Operating Costs shall not include costs for (i) capital improvements made to the Building, other than capital improvements described in Section 4(b)(2)(C) and except for items which are generally considered maintenance and repair items, such as painting of common areas, replacement of carpet in elevator lobbies, and the like; (ii) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (iii) interest,

amortization or other payments on loans to Landlord; (iv) depreciation; (v) leasing commissions; (vi) legal expenses for services, other than those that benefit the Project tenants generally (e.g., tax disputes); (vii) renovating or otherwise improving space for occupants of the Project or vacant space in the Project; (viii) Taxes; and (ix) federal income taxes imposed on or measured by the income of Landlord from the operation of the Project. If the Expense Stop is calculated on a base year basis, Operating Costs for the base year only shall not include market-wide labor-rate increases due to extraordinary circumstances, including boycotts and strikes; utility rate increases due to extraordinary circumstances, including conservation surcharges, boycotts, embargos or other shortages; or amortized costs relating to capital improvements.

(3)     Tenant shall also pay Tenant's Proportionate Share of any increase in Taxes for each year and partial year falling within the Term over the Taxes for the Base Tax Year. Tenant shall pay Tenant's Proportionate Share of Taxes in the same manner as provided above for Tenant's Proportionate Share of Operating Costs. "**Taxes**" shall mean taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of Operating Costs) now or hereafter attributable to the Project (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income (if the present method of taxation changes so that in lieu of or in addition to the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the rents received therefrom or a franchise tax, assessment, or charge based, in whole or in part, upon such rents for the Project, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof). Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Project. For property tax purposes, Tenant waives all rights to protest or appeal the appraised value of the Premises, as well as the Project, and all rights to receive notices of reappraisement.

(4)     By April 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs for the previous year, in each case adjusted as provided in Section 4(b)(5), and of the Taxes for the previous year (the "**Operating Costs and Tax Statement**"). If Tenant's estimated payments of Operating Costs or Taxes under this Section 4(b) for the year covered by the Operating Costs and Tax Statement exceed Tenant's share of such items as indicated in the Operating Costs and Tax Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Operating Costs or Taxes under this Section 4(b) for such year are less than Tenant's share of such items as indicated in the Operating Costs and Tax Statement, then Tenant shall promptly pay Landlord such deficiency.

(5)     With respect to any calendar year or partial calendar year in which the Building is not occupied to the extent of 95% of the rentable area thereof, or Landlord is not supplying services to 95% of the rentable area thereof, the Operating Costs for such period shall, for the purposes hereof, be increased to the amount which would have been incurred had the Building been occupied to the extent of 95% of the rentable area thereof and Landlord had been supplying services to 95% of the rentable area thereof.

5.     **Delinquent Payment; Handling Charges**. All past due payments required of Tenant hereunder shall bear interest from the date due until paid at the lesser of ten percent per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "**Default Rate**"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a fee equal to five percent of the delinquent payment to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency. In no event, however, shall the charges permitted under this Section 5 or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest. Notwithstanding the foregoing, the late fee referenced above shall not be charged with respect to the first two occurrences (but not any subsequent occurrence) during any 12-month period that Tenant fails to make payment when due, until five days after Landlord delivers written notice of such delinquency to Tenant.

6. **Security Deposit**. Contemporaneously with the execution of this Lease, Tenant shall pay to Landlord the Security Deposit, which shall be held by Landlord to secure Tenant's performance of its obligations under this Lease. The Security Deposit is not an advance payment of Rent or a measure or limit of Landlord's damages upon an Event of Default (as defined herein). Landlord may, from time to time following an Event of Default and without prejudice to any other remedy, use all or a part of the Security Deposit to perform any obligation Tenant fails to perform hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. Provided that Tenant has performed all of its obligations hereunder, Landlord shall, within 30 days after the Term ends, return to Tenant the portion of the Security Deposit which was not applied to satisfy Tenant's obligations. The Security Deposit may be commingled with other funds, and no interest shall be paid thereon. If Landlord transfers its interest in the Premises and the transferee assumes Landlord's obligations under this Lease, then Landlord may assign the Security Deposit to the transferee and Landlord thereafter shall have no further liability for the return of the Security Deposit.

7. **Landlord's Obligations**.

(a)   **Services**.  Landlord shall use all reasonable efforts to furnish to Tenant (1) water at those points of supply provided for general use of tenants of the Building; (2) heated and refrigerated air conditioning ("**HVAC**") as appropriate, at such temperatures and in such amounts as are standard for comparable buildings in the vicinity of the Building; (3) janitorial service to the Premises on weekdays, other than holidays, for Building-standard installations and such window washing as may from time to time be reasonably required; (4) elevators for ingress and egress to the floor on which the Premises are located, in common with other tenants, provided that Landlord may reasonably limit the number of operating elevators during non-business hours and holidays; and (5) electrical current during normal business hours for equipment that does not require more than 110 volts and whose electrical energy consumption does not exceed normal office usage. Landlord shall maintain the common areas of the Building in reasonably good order and condition, except for damage caused by a Tenant Party. If Tenant desires any of the services specified in Section 7(a)(2):  (1) at any time other than between 7:00 a.m. and 6:00 p.m. on weekdays (other than holidays), or (2) on Saturday, Sunday or holidays, then such services shall be supplied to Tenant upon the written request of Tenant delivered to Landlord before 3:00 p.m. on the business day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services within 30 days after Landlord has delivered to Tenant an invoice therefor.  The costs incurred by Landlord in providing after-hour HVAC service to Tenant shall include costs for electricity, water, sewage, water treatment, labor, metering, filtering, and maintenance reasonably allocated by Landlord to providing such service.  As of the Commencement Date, Landlord's charge for providing after-hours HVAC service is $25.00 per hour and is subject to change at Landlord's discretion based on market conditions.

(b)   **Excess Utility Use**.  Landlord shall not be required to furnish electrical current for equipment that requires more than 110 volts or other equipment whose electrical energy consumption exceeds normal office usage.  If Tenant's requirements for or consumption of electricity exceed the electricity to be provided by Landlord as described in Section 7(a), Landlord shall, at Tenant's expense, make reasonable efforts to supply such service through the then-existing feeders and risers serving the Building and the Premises, and Tenant shall pay to Landlord the cost of such service within 30 days after Landlord has delivered to Tenant an invoice therefor. Landlord may determine the amount of such additional consumption and potential consumption by any verifiable method, including installation of a separate meter in the Premises installed, maintained, and read by Landlord, at Tenant's expense.  Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld. Tenant shall not install any electrical equipment requiring voltage in excess of Building capacity unless approved in advance by Landlord, which approval may be withheld in Landlord's sole discretion. The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises. Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the

Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expenses, or interfere with or disturb other tenants of the Building. If Tenant uses machines or equipment in the Premises which affect the temperature otherwise maintained by the air conditioning system or otherwise overload any utility, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, shall be paid by Tenant to Landlord within 30 days after Landlord has delivered to Tenant an invoice therefor.

(c)     **Restoration of Services; Abatement**.  Landlord shall use reasonable efforts to restore any service required of it that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or, except as provided in the next sentence, entitle Tenant to any abatement of Tenant's obligations hereunder.  If, however, Tenant is prevented from using the Premises because of the unavailability of any such service for a period of 15 consecutive business days following Landlord's receipt from Tenant of a written notice regarding such unavailability and such unavailability was not caused by a Tenant Party or a governmental directive, then Tenant shall, as its exclusive remedy be entitled to a reasonable abatement of Rent for each consecutive day (after such 15-day period) that Tenant is so prevented from using the Premises.

(d)     **Access 24/7**.  Subject to the Building rules and regulations attached as Exhibit C hereto and the other provisions of the Lease (including Section 7(a) hereof), Tenant will be provided access to the Premises 24 hours per day, seven days per week.  If such access is unavailable due to force majeure or any other reason beyond Landlord's control (including construction performed by parties other than Landlord which prohibits such access), Landlord shall not be in default under this Section.

8.     **Improvements; Alterations; Repairs; Maintenance**.

(a)     **Improvements; Alterations**.  Improvements to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord, which approval shall be governed by the provisions set forth in this Section 8(a).  No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent, which shall not be unreasonably withheld or delayed; however, Landlord may withhold its consent to any alteration or addition that would adversely affect (in the reasonable discretion of Landlord) (1) the Building's Structure or the Building's Systems (including the Building's restrooms or mechanical rooms), (2) the exterior appearance of the Building, (3) the appearance of the Building's common areas or elevator lobby areas, or (4) provision of services to other occupants of the Building.  Tenant shall not paint or install lighting or decorations, signs, window or door lettering, or advertising media of any type visible from the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion.  All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all Laws; Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance.

(b)     **Repairs; Maintenance**.  Tenant shall maintain the Premises in a clean, safe, and operable condition, and shall not permit or allow to remain any waste or damage to any portion of the Premises.  Additionally, Tenant, at its sole expense, shall repair, replace and maintain in good condition and in accordance with all Laws and the equipment manufacturer's suggested service programs, all portions of the Premises, Tenant's Off-Premises Equipment and all areas, improvements and systems exclusively serving the Premises.  Tenant shall repair or replace, subject to Landlord's direction and supervision, any damage to the Building caused by a Tenant Party.  If Tenant fails to make such repairs or replacements within 15 days after the occurrence of such damage, then Landlord may make the same at Tenant's cost.  If any such damage occurs outside of the Premises, then Landlord may elect to repair such damage at Tenant's expense, rather than having Tenant repair such damage.  The cost of all maintenance, repair or replacement work

performed by Landlord under this Section 8 shall be paid by Tenant to Landlord within 30 days after Landlord has invoiced Tenant therefor. Tenant hereby waives and releases its right to make repairs at Landlord's expense under Sections 1941 and 1942 of the California Civil Code or under any similar law, statute, or ordinance now or hereafter in effect.

(c) **Performance of Work**. All work described in this Section 8 shall be performed only by Landlord or by contractors and subcontractors approved in writing by Landlord. Tenant shall cause all contractors and subcontractors to procure and maintain insurance coverage naming Landlord, Landlord's property management company and Landlord's asset management company as additional insureds against such risks, in such amounts, and with such companies as Landlord may reasonably require. Tenant shall provide Landlord with the identities, mailing addresses and telephone numbers of all persons performing work or supplying materials prior to beginning such construction and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Laws. All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems). All such work which may affect the Building's Structure or the Building's Systems must be approved by the Building's engineer of record, at Tenant's expense and, at Landlord's election, must be performed by Landlord's usual contractor for such work. All work affecting the roof of the Building must be performed by Landlord's roofing contractor and no such work will be permitted if it would void or reduce the warranty on the roof.

(d) **Mechanic's Liens**. All work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party shall be deemed authorized and ordered by Tenant only, and Tenant shall not permit any mechanic's liens to be filed against the Premises or the Project in connection therewith. Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work. If such a lien is filed, then Tenant shall, within ten days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises, Project or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either (1) pay the amount of the lien and cause the lien to be released of record, or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within ten days after Landlord has invoiced Tenant therefor. Landlord and Tenant acknowledge and agree that their relationship is and shall be solely that of "landlord-tenant" (thereby excluding a relationship of "owner-contractor," "owner-agent" or other similar relationships). Accordingly, all materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant, any contractor or subcontractor of Tenant or any other Tenant Party for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Premises, Project or Landlord's interest therein due to any work performed by or for Tenant or deemed to give any contractor or subcontractor or materialman any right or interest in any funds held by Landlord to reimburse Tenant for any portion of the cost of such work. Tenant shall defend, protect, indemnify and hold harmless Landlord and its agents and representatives from and against all claims, demands, causes of action, suits, judgments, damages and expenses (including attorneys' fees) in any way arising from or relating to the failure by any Tenant Party to pay for any work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party. This indemnity provision shall survive termination or expiration of this Lease.

9. **Use**. Tenant shall continuously occupy and use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to use that would damage the Premises. The population density within the Premises as a whole shall at no time exceed one person for each 200 rentable square feet in the Premises. Tenant shall not conduct second or third shift operations within the Premises; however, Tenant may use the Premises after normal business hours, so long as Tenant is not generally

conducting business from the Premises after normal business hours. Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant, (a) Tenant shall bear the risk of complying with Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations, and guidelines promulgated under such laws, as amended from time to time (the "**Disabilities Acts**") in the Premises, and (b) Landlord shall bear the risk of complying with the Disabilities Acts in the common areas of the Building, other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any alterations or additions made by Tenant (which risk and responsibility shall be borne by Tenant). The Premises shall not be used for any use which is disreputable, creates extraordinary fire hazards, or results in an increased rate of insurance on the Building or its contents, or for the storage of any Hazardous Materials (other than typical office supplies [e.g., photocopier toner] and then only in compliance with all Laws). Tenant shall not use any substantial portion of the Premises for a "call center," as that term is generally defined. If, because of a Tenant Party's acts or because Tenant vacates the Premises, the rate of insurance on the Building or its contents increases, then such acts shall be an Event of Default, Tenant shall pay to Landlord the amount of such increase on demand, and acceptance of such payment shall not waive any of Landlord's other rights. Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building.

10.    **Assignment and Subletting**.

(a)    **Transfers**. Except as provided in Section 10(h), Tenant shall not, without the prior written consent of Landlord, (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law, (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant, (4) sublet any portion of the Premises, (5) grant any license, concession, or other right of occupancy of any portion of the Premises, or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 10(a)(1) through 10(a)(6) being a "**Transfer**").

(b)    **Consent Standards**. Landlord shall not unreasonably withhold its consent to any assignment or subletting of the Premises, provided that the proposed transferee (1) is creditworthy, (2) has a good reputation in the business community, (3) will use the Premises for the Permitted Use and will not use the Premises in any manner that would conflict with any exclusive use agreement or other similar agreement entered into by Landlord with any other tenant of the Building, (4) will not use the Premises, Building or Project in a manner that would materially increase the pedestrian or vehicular traffic to the Premises, Building or Project, (5) is not a governmental entity, or subdivision or agency thereof, (6) is not another occupant of the Building, and (7) is not a person or entity with whom Landlord is then, or has been within the six-month period prior to the time Tenant seeks to enter into such assignment or subletting, negotiating to lease space in the Building or any Affiliate of any such person or entity; otherwise, Landlord may withhold its consent in its sole discretion.

(c)    **Request for Consent**. If Tenant requests Landlord's consent to a Transfer, then, at least 15 business days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed documentation, and the following information about the proposed transferee: name and address; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial, and other credit information; and general references sufficient to enable Landlord to determine the proposed transferee's creditworthiness and character. Concurrently with Tenant's notice of any request for consent to a Transfer, Tenant shall pay to Landlord a fee of $500 to defray Landlord's expenses in reviewing such request, and Tenant shall also reimburse Landlord immediately upon request for its reasonable attorneys' fees incurred in connection with considering any request for consent to a Transfer.

(d)    **Conditions to Consent**. If Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes

Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer. No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefor. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers. If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent. Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder. Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

(e)     **Attornment by Subtenants**. Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (1) liable for any previous act or omission of Tenant under such sublease, (2) subject to any counterclaim, offset or defense that such subtenant might have against Tenant, (3) bound by any previous modification of such sublease or by any rent or additional rent or advance rent which such subtenant might have paid for more than the current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment, (4) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement, or (5) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Section 10(e). The provisions of this Section 10(e) shall be self-operative, and no further instrument shall be required to give effect to this provision.

(f)     **Cancellation**. Landlord may, within 30 days after submission of Tenant's written request for Landlord's consent to an assignment or subletting, cancel this Lease as to the portion of the Premises proposed to be sublet or assigned as of the date the proposed Transfer is to be effective. If Landlord cancels this Lease as to any portion of the Premises, then this Lease shall cease for such portion of the Premises and Tenant shall pay to Landlord all Rent accrued through the cancellation date relating to the portion of the Premises covered by the proposed Transfer. Thereafter, Landlord may lease such portion of the Premises to the prospective transferee (or to any other person) without liability to Tenant.

(g)     **Additional Compensation**. Tenant shall pay to Landlord, immediately upon receipt thereof, the excess of (1) all compensation received by Tenant for a Transfer less the costs reasonably incurred by Tenant with unaffiliated third parties in connection with such Transfer (i.e., brokerage commissions and tenant finish work) over (2) the Rent allocable to the portion of the Premises covered thereby.

(h)     **Permitted Transfers**. Notwithstanding Section 10(a), Tenant may Transfer all or part of its interest in this Lease or all or part of the Premises (a "**Permitted Transfer**") to the following types of entities (a "**Permitted Transferee**") without the written consent of Landlord:

(1)     an Affiliate of Tenant;

(2)     any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions

governing merger and consolidation of business entities, so long as (A) Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation; and (B) the Tangible Net Worth of the surviving or created entity is not less than the Tangible Net Worth of Tenant as of the date hereof; or

(3)    any corporation, limited partnership, limited liability partnership, limited liability company or other business entity acquiring all or substantially all of Tenant's assets if such entity's Tangible Net Worth after such acquisition is not less than the Tangible Net Worth of Tenant as of the date hereof.

Tenant shall promptly notify Landlord of any such Permitted Transfer. Tenant shall remain liable for the performance of all of the obligations of Tenant hereunder, or if Tenant no longer exists because of a merger, consolidation, or acquisition, the surviving or acquiring entity shall expressly assume in writing the obligations of Tenant hereunder. Additionally, the Permitted Transferee shall comply with all of the terms and conditions of this Lease, including the Permitted Use, and the use of the Premises by the Permitted Transferee may not violate any other agreements affecting the Premises, or the Building, Landlord or other tenants of the Building. No later than 30 days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (A) copies of the instrument effecting any of the foregoing Transfers, (B) documentation establishing Tenant's satisfaction of the requirements set forth above applicable to any such Transfer, and (C) evidence of insurance as required under this Lease with respect to the Permitted Transferee. The occurrence of a Permitted Transfer shall not waive Landlord's rights as to any subsequent Transfers. "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises. Any subsequent Transfer by a Permitted Transferee shall be subject to the terms of this Section 10.

11.    **Insurance; Waivers; Subrogation; Indemnity.**

(a)    **Tenant's Insurance.** Effective as of the earlier of (1) the date Tenant enters or occupies the Premises, or (2) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies: (A) commercial general liability insurance in amounts of $2,000,000 per occurrence or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require (and, if the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy [e.g., the sale, service or consumption of alcoholic beverages], Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter [including liquor liability, if applicable] in such amounts as Landlord may reasonably require), insuring Tenant, and naming Landlord, Landlord's property management company and Landlord's asset management company as additional insureds against all liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises and (without implying any consent by Landlord to the installation thereof) the installation, operation, maintenance, repair or removal of Tenant's Off-Premises Equipment, (B) insurance covering the full value of all alterations and improvements and betterments in the Premises, naming Landlord and Landlord's Mortgagee as additional loss payees as their interests may appear, (C) insurance covering the full value of all furniture, trade fixtures and personal property (including property of Tenant or others) in the Premises or otherwise placed in the Project by or on behalf of a Tenant Party (including Tenant's Off-Premises Equipment), (D) contractual liability insurance sufficient to cover Tenant's indemnity obligations hereunder (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy), and (E) worker's compensation insurance. Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all insurance coverages required hereunder at least ten days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises, and at least 15 days prior to each renewal of said insurance, and Tenant shall obtain a written obligation on the part of each

insurance company to notify Landlord at least 30 days before cancellation or a material change of any such insurance policies. All such insurance policies shall be in form, and issued by companies, reasonably satisfactory to Landlord. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of 10% of such cost.

(b)     **Landlord's Insurance.** Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (1) property insurance for the Building's replacement value (excluding property required to be insured by Tenant), less a commercially-reasonable deductible if Landlord so chooses, and (2) commercial general liability insurance in an amount of not less than $3,000,000. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary. The cost of all insurance carried by Landlord with respect to the Building shall be included in Operating Costs. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

(c)     **No Subrogation.** Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms hereof, regardless of whether the negligence of the other party caused such Loss (defined below). Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

(d)     **Indemnity.**     Subject to Section 11(c), Tenant shall defend, protect, indemnify, and hold harmless Landlord and its representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including attorneys' fees) arising from (1) any injury to or death of any person or the damage to or theft, destruction, loss, or loss of use of any property or inconvenience (a "**Loss**"), arising from any occurrence on the Premises or arising out of the installation, operation, maintenance, repair or removal of any of Tenant's Off-Premises Equipment, or (2) Tenant's failure to perform its obligations under this Lease, in each case even though caused or alleged to be caused by the negligence or fault of Landlord or its agents (other than a Loss arising from the sole or gross negligence of Landlord or its agents), and even though any such claim, cause of action, or suit is based upon or alleged to be based upon the strict liability of Landlord or its agents. This indemnity is intended to indemnify Landlord and its agents against the consequences of their own negligence or fault as provided above when Landlord or its agents are jointly, comparatively, contributively, or concurrently negligent with Tenant. Subject to Section 11(c), Landlord shall defend, protect, indemnify, and hold harmless Tenant and its agents from and against all claims, demands, liabilities, causes of action, suits, judgments, and expenses (including attorneys' fees) for any Loss arising from any occurrence in the Building's common areas, even though caused or alleged to be caused by the negligence or fault of Tenant or its agents (other than a Loss arising from the sole or gross negligence of Tenant or its agents or arising out of the installation, operation, maintenance, repair or removal of any of Tenant's Off-Premises Equipment), and even though any such claim, cause of action, or suit is based upon or alleged to be based upon the strict liability of Tenant or its agents. This indemnity is intended to indemnify Tenant and its agents against the consequences of their own negligence or fault as provided above when Tenant or its agents are jointly, comparatively, contributively, or concurrently negligent with Landlord. The indemnities set forth in this Section 11(d) shall survive termination or expiration of this Lease and shall not terminate or be waived, diminished or affected in any manner by any abatement or apportionment of Rent under any provision of this Lease. If any proceeding is filed for which indemnity is required hereunder, the indemnifying party agrees, upon request therefor, to defend the indemnified party in such proceeding at its sole cost utilizing counsel satisfactory to the indemnified party.

12.    **Subordination; Attornment; Notice to Landlord's Mortgagee**.

(a)    **Subordination**.  This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), or any ground lease, master lease, or primary lease (each, a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lessor under any such Primary Lease is referred to herein as a "**Landlord's Mortgagee**"). Any Landlord's Mortgagee may elect, at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten days after written request therefor such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease (including a subordination, non-disturbance and attornment agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease.

(b)    **Attornment**.  Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

(c)    **Notice to Landlord's Mortgagee**.  Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder.

(d)    **Landlord's Mortgagee's Protection Provisions**.  If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (1) liable for any act or omission of any prior lessor (including Landlord); (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than the current month to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord); and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Building by Landlord's Mortgagee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event.  Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Building. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

13.    **Rules and Regulations**.  Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit C. Landlord may, from time to time, change such rules and regulations for the safety, care, or cleanliness of the Building and related facilities, provided that such changes are applicable to all tenants of the Building, will not unreasonably interfere with Tenant's use of the Premises and are enforced by Landlord in a non-discriminatory manner. Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

14. **Condemnation**.

(a) **Total Taking**. If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking.

(b) **Partial Taking – Tenant's Rights**. If any part of the Building becomes subject to a Taking and such Taking will prevent Tenant from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Taking for a period of more than 120 days, then Tenant may terminate this Lease as of the date of such Taking by giving notice to Landlord within 30 days after the Taking, and Basic Rent and Additional Rent shall be apportioned as of the date of such Taking. If Tenant does not terminate this Lease, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.

(c) **Partial Taking – Landlord's Rights**. If any material portion, but less than all, of the Building becomes subject to a Taking, or if Landlord is required to pay any of the proceeds arising from a Taking to a Landlord's Mortgagee, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within 30 days after such Taking, and Basic Rent and Additional Rent shall be apportioned as of the date of such Taking. If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, Rent shall abate as provided in the last sentence of Section 14(b). Tenant hereby waives any and all rights it might otherwise have pursuant to Section 1265.130 of the California Code of Civil Procedure.

(d) **Award**. If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Land, the Building, and other improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs, and loss of business.

15. **Fire or Other Casualty**.

(a) **Repair Estimate**. If the Premises or the Building are damaged by fire or other casualty (a "**Casualty**"), Landlord shall, within 75 days after such Casualty, deliver to Tenant a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such Casualty.

(b) **Tenant's Rights**. If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within 210 days after the commencement of repairs (the "**Repair Period**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(c) **Landlord's Rights**. If a Casualty damages the Premises or a material portion of the Building and (1) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period, (2) the damage to the Premises exceeds 50% of the replacement cost thereof (excluding foundations and footings), as estimated by Landlord, and such damage occurs during the last two years of the Term, (3) regardless of the extent of damage to the Premises, Landlord makes a good faith determination that restoring the Building would be uneconomical, or (4) Landlord is required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(d) **Repair Obligation**. If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the

Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, Landlord shall not be required to repair or replace any alterations or betterments within the Premises (which shall be promptly and with due diligence repaired and restored by Tenant at Tenant's sole cost and expense) or any furniture, equipment, trade fixtures or personal property of Tenant or others in the Premises or the Building, and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question. If this Lease is terminated under the provisions of this Section 15, Landlord shall be entitled to the full proceeds of the insurance policies providing coverage for all alterations, improvements and betterments in the Premises (and, if Tenant has failed to maintain insurance on such items as required by this Lease, Tenant shall pay Landlord an amount equal to the proceeds Landlord would have received had Tenant maintained insurance on such items as required by this Lease).

(e)    **Waiver of Statutory Provisions**. The provisions of this Lease, including this Section 15, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises or the Building and any statute or regulation of the State of California, including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code, with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises or the Building.

(f)    **Abatement of Rent**. If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

16.    **Personal Property Taxes**. Tenant shall be liable for all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant in the Premises or in or on the Building or Project. If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within 30 days following written request therefor, the part of such taxes for which Tenant is primarily liable hereunder; however, Landlord shall not pay such amount if Tenant notifies Landlord that it will contest the validity or amount of taxes before Landlord makes such payment, and thereafter diligently proceeds with such contest in accordance with Law and if the non-payment thereof does not pose a threat of loss or seizure of the Project or interest of Landlord therein or impose any fee or penalty against Landlord.

17.    **Events of Default**. Each of the following occurrences shall be an "**Event of Default**":

(a)    **Payment Default**. Tenant's failure to pay Rent within five days after Landlord has delivered written notice to Tenant that the same is due (any such notice shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any similar or successor law); however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Tenant fails to pay Rent when due and, during the 12-month interval preceding such failure, Landlord has given Tenant written notice of failure to pay Rent on one or more occasions;

(b)    **Abandonment**. Tenant (1) abandons or vacates the Premises or any substantial portion thereof or (2) fails to continuously operate its business in the Premises;

(c)    **Estoppel**. Tenant fails to provide any estoppel certificate after Landlord's written request therefor pursuant to Section 25(e) and such failure shall continue for five days after Landlord's second written notice thereof to Tenant;

(d)    **Insurance**.    Tenant fails to procure, maintain and deliver to Landlord evidence of the insurance policies and coverages as required under Section 11(a);

(e)    **Mechanic's Liens**.    Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's lien filed against the Premises or the Project for any work performed, materials furnished, or obligations incurred by or at the request of Tenant, within the time and in the manner required by Section 8(d);

(f)    **Other Defaults**.    Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of more than 30 days after Landlord has delivered to Tenant written notice thereof (any such notice shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any similar or successor law); and

(g)    **Insolvency**.    The filing of a petition by or against Tenant (the term "**Tenant**" shall include, for the purpose of this Section 17(g), any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within 90 days after the filing thereof.

18.    **Remedies**.    Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions, each and all of which shall be cumulative and non-exclusive, without notice or demand whatsoever:

(a)    **Termination of Lease**.    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(1)    The worth at the time of award of any unpaid Rent which has been earned at the time of such termination; plus

(2)    The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(3)    The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(4)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(5)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable Law.

The term "Rent" as used in this Section 18(a) shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 18(a)(1) and 18(a)(2) above, the "worth at the time of award" shall be computed by allowing interest at the Interest Rate set forth in Section 5 of this

Lease, but in no case greater than the maximum amount of such interest permitted by Law. As used in Section 18(a)(3) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent.

(b)      **Enforcement of Lease**.  Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).    Accordingly, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

(c)      **Sublessees of Tenant**.  Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Section 18, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

(d)      **Efforts to Relet**.  For the purposes of this Section 18, Tenant's right to possession shall not be deemed to have been terminated by efforts of Landlord to relet the Premises, by its acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interests hereunder.  The foregoing enumeration is not exhaustive, but merely illustrative of acts which may be performed by Landlord without terminating Tenant's right to possession.

### 19.      **Payment by Tenant; Non-Waiver; Cumulative Remedies**.

(a)      **Payment by Tenant**.  Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (1) obtaining possession of the Premises, (2) removing and storing Tenant's or any other occupant's property, (3) repairing, restoring, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant, (4) performing Tenant's obligations which Tenant failed to perform, and (5) enforcing, or advising Landlord of, its rights, remedies, and recourses arising out of the Event of Default.  To the full extent permitted by law, Landlord and Tenant agree the federal and state courts of the state in which the Premises are located shall have exclusive jurisdiction over any matter relating to or arising from this Lease and the parties' rights and obligations under this Lease.

(b)      **No Waiver**.  Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default. No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term.  Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(c)      **Cumulative Remedies**.  Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity, (2) shall be cumulative, and (3) may be pursued successively or concurrently as Landlord may elect.  The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

### 20.      **INTENTIONALLY DELETED**

21.      **Surrender of Premises**.  No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid

t:\mlh\archon\Howe\doc\NewCenturyLea3                                                  11/07/01

unless it is in writing and signed by Landlord. At the expiration or termination of this Lease, Tenant shall deliver to Landlord the Premises with all improvements located therein in good repair and condition, free of Hazardous Materials placed on the Premises during the Term, broom-clean, reasonable wear and tear (and condemnation and Casualty damage not caused by Tenant, as to which Sections 14 and 15 shall control) excepted, and shall deliver to Landlord all keys to the Premises. Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by Tenant (but Tenant may not remove any such item which was paid for, in whole or in part, by Landlord or any wiring or cabling unless Landlord requires such removal). Additionally, at Landlord's option, Tenant shall remove such alterations, additions, improvements, trade fixtures, personal property, equipment, wiring, conduits, cabling, and furniture (including Tenant's Off-Premises Equipment) as Landlord may request; however, Tenant shall not be required to remove any addition or improvement to the Premises or the Project if Landlord has specifically agreed in writing that the improvement or addition in question need not be removed. Tenant shall repair all damage caused by such removal. All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items. The provisions of this Section 21 shall survive the end of the Term.

22.     **Holding Over**.  If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a tenant at sufferance and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over, (a) Tenant shall pay, in addition to the other Rent, Basic Rent equal to the greater of (1) 150% of the Basic Rent payable during the last month of the Term, or (2) 125% of the prevailing rental rate in the Building for similar space, and (b) Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease. The provisions of this Section 22 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom.

23.     **Certain Rights Reserved by Landlord**.  Provided that the exercise of such rights does not unreasonably interfere with Tenant's occupancy of the Premises, Landlord shall have the following rights:

(a)     **Building Operations**.  To decorate and to make inspections, repairs, alterations, additions, changes, or improvements, whether structural or otherwise, in and about the Project, or any part thereof; to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) and, during the continuance of any such work, to temporarily close doors, entryways, public space, and corridors in the Building; to interrupt or temporarily suspend Building services and facilities; to change the name of the Building; and to change the arrangement and location of entrances or passageways, doors, and doorways, corridors, elevators, stairs, restrooms, or other public parts of the Building;

(b)     **Security**.  To take such reasonable measures as Landlord deems advisable for the security of the Building and its occupants; evacuating the Building for cause, suspected cause, or for drill purposes; temporarily denying access to the Building; and closing the Building after normal business hours and on Sundays and holidays, subject, however, to Tenant's right to enter when the Building is closed after normal business hours under such reasonable regulations as Landlord may prescribe from time to time;

(c)     **Prospective Purchasers and Lenders**.  To enter the Premises at all reasonable hours to show the Premises to prospective purchasers or lenders; and

(d)     **Prospective Tenants**.  At any time during the last 12 months of the Term (or earlier if Tenant has notified Landlord in writing that it does not desire to renew the Term) or at

any time following the occurrence of an Event of Default, to enter the Premises at all reasonable hours to show the Premises to prospective tenants.

24.     **Substitution Space**.  Landlord may, at Landlord's expense, relocate Tenant within the Building to space which is comparable in size, utility and condition to the Premises.  If Landlord relocates Tenant, Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment, and supplies from the Premises to the relocation space and for reprinting Tenant's stationery of the same quality and quantity as Tenant's stationery supply on hand immediately before Landlord's notice to Tenant of the exercise of this relocation right.  Upon such relocation, the relocation space shall be deemed to be the Premises and the terms of the Lease shall remain in full force and shall apply to the relocation space.  No amendment or other instrument shall be necessary to effectuate the relocation contemplated by this Section; however, if requested by Landlord, Tenant shall execute an appropriate amendment document within ten business days after Landlord's written request therefor.  If Tenant fails to execute such relocation amendment within such time period, or if Tenant fails to relocate within the time period stated in Landlord's relocation notice to Tenant (or, if such relocation space is not available on the date specified in Landlord's relocation notice, as soon thereafter as the relocation space becomes available and is tendered to Tenant in the condition required by this Lease), then Landlord may terminate this Lease by notifying Tenant in writing thereof at least 60 days prior to the termination date contained in Landlord's termination notice.  Time is of the essence with respect to Tenant's obligations under this Section.

25.     **Miscellaneous**.

(a)     **Landlord Transfer**.  Landlord may transfer any portion of the Building and any of its rights under this Lease.  If Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes Landlord's obligations hereunder in writing.

(b)     **Landlord's Liability**.  The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Building, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency.

(c)     **Force Majeure**.  Other than for Tenant's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the control of such party.

(d)     **Brokerage**.  Neither Landlord nor Tenant has dealt with any broker or agent in connection with the negotiation or execution of this Lease, other than Landlord's broker, Colliers International (K. Partington/R. Thomas), and Tenant's broker, CRESA Partners (R. Gallaway), whose commission shall be paid by Landlord pursuant to a separate written agreement.  Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party.

(e)     **Estoppel Certificates**.  From time to time, Tenant shall furnish to any party designated by Landlord, within ten days after Landlord has made a request therefor, a certificate signed by Tenant confirming and containing such factual certifications and representations as to this Lease as Landlord may reasonably request.  Unless otherwise required by Landlord's Mortgagee or a prospective purchaser or mortgagee of the Building, the initial form of estoppel certificate to be signed by Tenant is attached hereto as Exhibit F.

(f)    **Notices**. All notices and other communications given pursuant to this Lease shall be in writing and shall be (1) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address specified in the Basic Lease Information, (2) hand delivered to the intended addressee, (3) sent by a nationally recognized overnight courier service, or (4) sent by facsimile transmission during normal business hours followed by a confirmatory letter sent in another manner permitted hereunder. All notices shall be effective upon delivery to the address of the addressee. The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

(g)    **Separability**. If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(h)    **Amendments; Binding Effect**. This Lease may not be amended except by instrument in writing signed by Landlord and Tenant. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof. The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided. This Lease is for the sole benefit of Landlord and Tenant, and, other than Landlord's Mortgagee, no third party shall be deemed a third party beneficiary hereof.

(i)    **Quiet Enjoyment**. Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, but not otherwise, subject to the terms and conditions of this Lease.

(j)    **No Merger**. There shall be no merger of the leasehold estate hereby created with the fee estate in the Premises or any part thereof if the same person acquires or holds, directly or indirectly, this Lease or any interest in this Lease and the fee estate in the leasehold Premises or any interest in such fee estate.

(k)    **No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

(l)    **Entire Agreement**. This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith. The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto.

(m)    **Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LITIGATION OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE ARISING OUT OF OR WITH RESPECT TO THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

(n)    **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

(o) **Recording**. Tenant shall not record this Lease or any memorandum of this Lease without the prior written consent of Landlord, which consent may be withheld or denied in the sole and absolute discretion of Landlord, and any recordation by Tenant shall be a material breach of this Lease. Tenant grants to Landlord a power of attorney to execute and record a release releasing any such recorded instrument of record that was recorded without the prior written consent of Landlord.

(p) **Joint and Several Liability**. If Tenant is comprised of more than one party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease. All unperformed obligations of Tenant hereunder not fully performed at the end of the Term shall survive the end of the Term, including payment obligations with respect to Rent and all obligations concerning the condition and repair of the Premises.

(q) **Financial Reports**. Within 15 days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements. If Tenant is a publicly traded corporation, Tenant may satisfy its obligations hereunder by providing to Landlord Tenant's most recent annual and quarterly reports. Tenant will discuss its financial statements with Landlord and, following the occurrence of an Event of Default hereunder, will give Landlord access to Tenant's books and records in order to enable Landlord to verify the financial statements. Landlord will not disclose any aspect of Tenant's financial statements that Tenant designates to Landlord as confidential except (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building, (2) in litigation between Landlord and Tenant, and (3) if required by court order. Tenant shall not be required to deliver the financial statements required under this Section 25(q) more than once in any 12-month period unless requested by Landlord's Mortgagee or a prospective buyer or lender of the Building or an Event of Default occurs.

(r) **Landlord's Fees**. Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable, out-of-pocket costs payable to third parties and incurred by Landlord in reviewing the proposed action or consent, including reasonable attorneys', engineers' or architects' fees, within 30 days after Landlord's delivery to Tenant of a statement of such costs. Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action.

(s) **Attorneys' Fees**. In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein, shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

(t) **Telecommunications**. Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building, for the installation and operation of telecommunications systems, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("**Telecommunications Services**"), for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing to the contrary, Landlord hereby consents to the routine installation and maintenance of typical phone, telecommunications and computer cabling in the Premises by Tenant, but only to the extent such installation and maintenance does not affect the Building's Structure. All providers of Telecommunications Services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building. Tenant acknowledges that Landlord shall not be required to provide or arrange for any Telecommunications Services and that Landlord shall have no liability to any Tenant Party in

connection with the installation, operation or maintenance of Telecommunications Services or any equipment or facilities relating thereto. Tenant, at its cost and for its own account, shall be solely responsible for obtaining all Telecommunications Services.

(u)     **Confidentiality**. Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone (other than Tenant's attorneys, accountants and potential assignees, sublessees, lenders, investors in or purchasers of Tenant who shall agree to keep same confidential, or as required by Law), by any manner or means, directly or indirectly, without Landlord's prior written consent. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

(v)     **Authority**. Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so. Landlord hereby represents and warrants to Tenant that Landlord is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Landlord has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Landlord is authorized to do so.

(w)     **Hazardous Materials**.     The term "**Hazardous Materials**" means any substance, material, or waste which is now or hereafter classified or considered to be hazardous, toxic, or dangerous under any Law relating to pollution or the protection or regulation of human health, natural resources or the environment, or poses or threatens to pose a hazard to the health or safety of persons on the Premises or in the Building. Tenant shall not use, generate, store, or dispose of, or permit the use, generation, storage or disposal of Hazardous Materials on or about the Premises or the Building except in a manner and quantity necessary for the ordinary performance of Tenant's business, and then in compliance with all Laws. If Tenant breaches its obligations under this Section 25(w), Landlord may immediately take any and all action reasonably appropriate to remedy the same, including taking all appropriate action to clean up or remediate any contamination resulting from Tenant's use, generation, storage or disposal of Hazardous Materials. Tenant shall defend, protect, indemnify, and hold harmless Landlord and its representatives and agents from and against any and all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees and cost of clean up and remediation) arising from Tenant's failure to comply with the provisions of this Section 25(w). This indemnity provision shall survive termination or expiration of this Lease.

(x)     **Parking**. Tenant may use up to 11 undesignated parking spaces, and two covered reserved parking spaces, for a total of 13 parking spaces in the parking area associated with the Building (the "**Parking Area**") during the initial Term free of charge subject to such terms, conditions and regulations as are from time to time applicable to patrons of the Parking Area. If, for any reason, Landlord is unable to provide all or any portion of the parking spaces to which Tenant is entitled hereunder, then Tenant's obligation to pay for such spaces shall be abated for so long as Tenant does not have the use thereof; this abatement shall be in full settlement of all claims that Tenant might otherwise have against Landlord because of Landlord's failure or inability to provide Tenant with such parking spaces. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.

(y)     **Signage**. Tenant shall not erect or maintain any temporary or permanent sign on or about the Premises, the Building or the Project or visible from the exterior without obtaining prior written approval from Landlord, which may be granted or withheld in Landlord's sole and absolute discretion. Any request for approval of a sign shall be made in such detail, as Landlord shall request. Landlord, at Landlord's sole cost and expense, shall provide Tenant with Building Standard suite signage on the door to the Premises and one directory strip on the Building lobby directory board. All signs, whether erected by Landlord or Tenant, shall conform to Landlord's building standard signage and to all laws, ordinances, rules, regulations, permits, covenants, conditions, restrictions, and easements pertaining to signs, and shall be at Tenant's expense. In the event of a violation of the foregoing by Tenant, Landlord may remove same without any liability, and may charge the expense incurred in such removal to Tenant. Tenant

shall remove all approved signs, which it has erected upon the termination of the Lease and repair all damage caused by such removal.

(z) **List of Exhibits**.   All exhibits and attachments attached hereto are incorporated herein by this reference.

| | |
|---|---|
| Exhibit A - | Outline of Premises |
| Exhibit B - | Description of the Land |
| Exhibit C - | Building Rules and Regulations |
| Exhibit D - | Tenant Finish-Work |
| Exhibit D-1- | Space Plan |
| Exhibit E - | Form of Confirmation of Commencement Date Letter |
| Exhibit F - | Form of Tenant Estoppel Certificate |
| Exhibit G - | Form of Offer Notice |

26.   **Renewal Options**.

(a) **Grant of Options**.   Provided no Event of Default exists and Tenant is occupying the entire Premises at the time of each election, Tenant may renew this Lease for two additional periods of 36 months each (each, an "**Extended Term**"), by delivering written notice of the exercise of each such option to Landlord not earlier than twelve months nor later than nine months before the expiration of the then Term.

(b) **Basic Rent**.   The Basic Rent payable for each month during each such Extended Term shall be the prevailing rental rate (the "**Prevailing Rental Rate**"), at the commencement of each such Extended Term, for renewals of space in the Building of equivalent quality, size, utility and location, with the length of the Extended Term and the credit standing of Tenant to be taken into account.   Within 30 days after receipt of Tenant's notice to renew for each option period, Landlord shall deliver to Tenant written notice of the Prevailing Rental Rate for such Extended Term and shall advise Tenant of the required adjustment to Basic Rent, if any, and the other terms and conditions offered.   Tenant shall, within ten days after receipt of Landlord's notice, notify Landlord in writing whether Tenant accepts or rejects Landlord's determination of the then Prevailing Rental Rate.   If Tenant timely notifies Landlord that Tenant accepts Landlord's determination of the then Prevailing Rental Rate, then, on or before the commencement date of each Extended Term, Landlord and Tenant shall execute an amendment to this Lease extending the Term on the same terms provided in this Lease, except as follows:

(1) Basic Rent for each Extended Term shall be adjusted to the Prevailing Rental Rate;

(2) After Tenant has exercised both options hereunder, Tenant shall have no further renewal option unless expressly granted by Landlord in writing;

(3) Landlord shall lease to Tenant the Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements; and

(4) Tenant shall pay for the parking spaces which it is entitled to use at the rates from time to time charged to patrons of the Parking Area and/or any other parking area associated with the Building during the Extended Term (plus all applicable taxes).

If Tenant rejects Landlords' determination of the Prevailing Rental Rate for either Extended Term, or fails to timely notify Landlord in writing that Tenant accepts or rejects Landlord's determination of the Prevailing Rental Rate for either Extended Term, time being of the essence with respect thereto, Tenant's rights under this Section 26 shall terminate and Tenant shall have no further right to renew this Lease.

(c) **Termination of Option**.   Tenant's rights under this Section 26 shall terminate if (1) this Lease or Tenant's right to possession of the Premises is terminated, (2) Tenant assigns any of its interest in this Lease or sublets any portion of the Premises, other than

in the event of a Permitted Transfer pursuant to Section 10(h), (3) Tenant fails to timely exercise either of its options under this Section 26, time being of the essence with respect to Tenant's exercise thereof, or (4) Landlord determines, in its sole but reasonable discretion, that Tenant's financial condition or creditworthiness has materially deteriorated since the date of this Lease.

27.    **Rent Abatement**.

(a)    Basic Rent shall be conditionally abated during the second and third full calendar months of the Term. Commencing with the fourth full calendar month of the Term, Tenant shall make Basic Rent payments as otherwise provided in the Lease. Notwithstanding such abatement of Basic Rent (1) all other sums due under this Lease, including Additional Rent and Tenant's Proportionate Share of Taxes shall be payable as provided in this Lease, and (2) any increases in Basic Rent set forth in this Lease shall occur on the dates scheduled therefor.

(b)    The abatement of Basic Rent provided for in this Section is conditioned upon Tenant's full and timely performance of all of its obligations under this Lease. If at any time during the Term an Event of Default by Tenant occurs, then the abatement of Basic Rent provided for in this Section shall immediately become void, and Tenant shall promptly pay to Landlord, in addition to all other amounts due to Landlord under this Lease, the full amount of all Basic Rent herein abated.

28.    **Right of First Offer**.

(a)    **Grant of Offer.**  Subject to then-existing renewal or expansion options of other tenants, and provided no Event of Default then exists, Landlord shall, prior to offering the same to any party (other than the then-current tenant therein), first offer to lease to Tenant Suite 120 (the "**Offer Space**") in an "**AS-IS**" condition; such offer shall be in writing and specify the lease terms for the Offer Space, including the rent to be paid for the Offer Space and the date on which the Offer Space shall be included in the Premises (the "**Offer Notice**"). The Offer Notice shall be substantially similar to the Offer Notice attached hereto as Exhibit G. Tenant shall notify Landlord in writing whether Tenant elects to lease the entire Offer Space on the terms set forth in the Offer Notice, within five business days after Landlord delivers to Tenant the Offer Notice. If Tenant timely elects to lease the Offer Space, then Landlord and Tenant shall execute an amendment to this Lease, effective as of the date the Offer Space is to be included in the Premises, on the terms set forth in the Offer Notice and, to the extent not inconsistent with the Offer Notice terms, the terms of this Lease; however, Tenant shall accept the Offer Space in an "**AS-IS**" condition and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements except as specifically provided in the Offer Notice. Notwithstanding the foregoing, if prior to Landlord's delivery to Tenant of the Offer Notice, Landlord has received an offer to lease all or part of the Offer Space from a third party (a "**Third Party Offer**") and such Third Party Offer includes space in excess of the Offer Space, Tenant must exercise its rights hereunder, if at all, as to all of the space contained in the Third Party Offer.

(b)    **Exercise of Offer.**  If Tenant fails or is unable to timely exercise its right hereunder, then such right shall lapse, time being of the essence with respect to the exercise thereof, and Landlord may lease all or a portion of the Offer Space to third parties on such terms as Landlord may elect. If the Offer Space is leased to a third party, Tenant shall again have a right hereunder for the Offer Space upon the expiration of such third party's lease. Tenant may not exercise its rights under this Section if an Event of Default exists or Tenant is not then occupying the entire Premises. For purposes hereof, if an Offer Notice is delivered for less than all of the Offer Space but such notice provides for an expansion, right of first refusal, or other preferential right to lease some of the remaining portion of the Offer Space, then such remaining portion of the Offer Space shall thereafter be excluded from the provisions of this Section. In no event shall Landlord be obligated to pay a commission with respect to any space leased by Tenant under this Section, and Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party.

(c)    **Termination of Rights.** Tenant's rights under this Section shall terminate if (a) this Lease or Tenant's right to possession of the Premises is terminated, (b) Tenant assigns any of its interest in this Lease or sublets any portion of the Premises, other than in the event of a Permitted Transfer pursuant to Section 10(h), or (c) less than two full calendar years remain in the initial Term of this Lease.

29.    **Early Termination.** Tenant shall have the one time right to terminate this Lease, which termination shall be effective as of the last day of the 38th full calendar month of the Lease Term, exercisable by Tenant's delivery to Landlord, no later than the last day of the 34th full calendar month of the Lease Term, of (i) a written notice of termination and (ii) a cash payment (the "**Termination Payment**") in the amount of (a) the unamortized amount of Basic Rent abated pursuant to Section 27, plus (b) the unamortized amount paid for the Work pursuant to Exhibit D, plus (c) the unamortized leasing commissions paid by Landlord, for the remainder of the initial Lease Term. Within 60 days after the Commencement Date of this Lease, Landlord shall deliver to Tenant a written statement detailing the unamortized amount paid for the Work and the unamortized leasing commissions paid by Landlord that will be required as part of the Termination Payment. In the event Tenant does not timely deliver a termination notice together with the Termination Payment as provided in this Section 29, Tenant's right to terminate the Lease hereunder shall immediately become null and void and shall be of no further force and effect.

LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, DEMAND, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

This Lease is executed on the respective dates set forth below, but for reference purposes, this Lease shall be dated as of the date first above written. If the execution date is left blank, this Lease shall be deemed executed as of the date first written above.

**LANDLORD:**

**WXI/SEN Real Estate Limited Partnership**, a Delaware limited partnership

By:    WXI/SEN Gen-Par, L.L.C., a Delaware
        limited liability company, General Partner

By:_____
Name: Nancy M. Haag
Title:   Assistant Vice President

Execution Date: _11-8/01_____

**TENANT:**

**New Century Mortgage Corporation**, a California corporation

By:_____
Name:  George Anderson
Title:   President Retail Division

Execution Date:  November 7, 2001_____

By:_____
Name:_____STEVE  KELLY_____
Title:_MANAGER, RETAIL DIVISION BRANCH SERVICES

Execution Date:_____11/7/01_____

## EXHIBIT A

## OUTLINE OF PREMISES



## EXHIBIT B

## DESCRIPTION OF THE LAND

PARCEL B OF THAT CERTAIN PARCEL MAP RECORDED IN BOOK 70 OF PARCEL MAPS, AT PAGE 20, RECORDS OF SACRAMENTO COUNTY, CALIFORNIA

EXHIBIT C

RECEIVED

MAR 1 0 2005

## VERIFICATION LETTER

New Century Mortgage Corporation ("**Tenant**") hereby certifies that it has entered into a lease with F & F Howe Associates, LP ("**Landlord**") and verifies the following information as of the 25th day of February, 2005:

| | |
|---|---|
| Address of Premises: | 1860 Howe Avenue, Suite 106 |
| | Sacramento, CA  95825 |
| Rentable Area of Premises: | 3,167 square feet |
| Commencement Date: | February 2, 2002 |
| Expiration Date: | March 31, 2007 |
| Initial Base Rent: | $5,383.90 |

| | | |
|---|---|---|
| 2/01/02 – 3/31/03 | $5,383.90 | per month |
| 4/01/03 – 3/31/04 | $5,542.25 | per month |
| 4/01/04 – 3/31/05 | $5,700.60 | per month |
| 4/01/05 – 3/31/06 | $5,858.95 | per month |
| 4/01/06 – 3/31/07 | $6,017.30 | per month |

| | |
|---|---|
| Billing Address for Tenant: | 18400 Von Karman, Suite 1000 |
| | Irvine, CA  92612 |
| | Attention:   John Tran |
| | Telephone:  (800) 967-7623 |
| Base Year for Utility Expenses: | 2002 |
| Base Year for other Operating Expenses: | 2002 |
| Tenant Improvement Credit Due: | $0.00 |

Tenant acknowledges and agrees that all tenant improvements Landlord is obligated to make to the Premises, if any, have been completed to Tenant's satisfaction, that Tenant has accepted possession of the Premises, and that as of the date hereof, there exist no offsets or defenses to the obligations of Tenant under the Lease.

TENANT:

New Century Mortgage

By: _____

Elise Dickman
Vice President
Corporate Services

Its: _____
(PRINT TITLE)

By: _____
(PRINT NAME)

Its: _____
(PRINT TITLE)

## EXHIBIT C

## BUILDING RULES AND REGULATIONS

The following rules and regulations shall apply to the Premises, the Building, the parking garage associated therewith, and the appurtenances thereto:

1.       Sidewalks, doorways, vestibules, halls, stairways, and other similar areas shall not be obstructed by tenants or used by any tenant for purposes other than ingress and egress to and from their respective leased premises and for going from one to another part of the Building.

2.       Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein. Damage resulting to any such fixtures or appliances from misuse by a tenant or its agents, employees or invitees, shall be paid by such tenant.

3.       No signs, advertisements or notices (other than those that are not visible outside the Premises) shall be painted or affixed on or to any windows or doors or other part of the Building without the prior written consent of Landlord. No nails, hooks or screws (other than those which are necessary to hang paintings, prints, pictures, or other similar items on the Premises' interior walls) shall be driven or inserted in any part of the Building except by Building maintenance personnel. No curtains or other window treatments shall be placed between the glass and the Building standard window treatments.

4.       Landlord shall provide and maintain an alphabetical directory for all tenants in the main lobby of the Building.

5.       Landlord shall provide all door locks in each tenant's leased premises, at the cost of such tenant, and no tenant shall place any additional door locks in its leased premises without Landlord's prior written consent. Landlord shall furnish to each tenant a reasonable number of keys to such tenant's leased premises, at such tenant's cost, and no tenant shall make a duplicate thereof.

6.       Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by tenants of any bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be conducted under Landlord's supervision at such times and in such a manner as Landlord may reasonably require. Each tenant assumes all risks of and shall be liable for all damage to articles moved and injury to persons or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord if damaged or injured as a result of acts in connection with carrying out this service for such tenant.

7.       Landlord may prescribe weight limitations and determine the locations for safes and other heavy equipment or items, which shall in all cases be placed in the Building so as to distribute weight in a manner acceptable to Landlord which may include the use of such supporting devices as Landlord may require. All damages to the Building caused by the installation or removal of any property of a tenant, or done by a tenant's property while in the Building, shall be repaired at the expense of such tenant.

8.       Corridor doors, when not in use, shall be kept closed. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No birds or animals (other than seeing-eye dogs) shall be brought into or kept in, on or about any tenant's leased premises. No portion of any tenant's leased premises shall at any time be used or occupied as sleeping or lodging quarters.

9.       Tenant shall cooperate with Landlord's employees in keeping its leased premises neat and clean. Tenants shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel.

10.       To ensure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to any leased area except by persons approved by Landlord.

11.     Tenant shall not make or permit any vibration or improper, objectionable or unpleasant noises or odors in the Building or otherwise interfere in any way with other tenants or persons having business with them.

12.     No machinery of any kind (other than normal office equipment) shall be operated by any tenant on its leased area without Landlord's prior written consent, nor shall any tenant use or keep in the Building any flammable or explosive fluid or substance (other than typical office supplies [e.g., photocopier toner] used in compliance with all Laws).

13.     Landlord will not be responsible for lost or stolen personal property, money or jewelry from tenant's leased premises or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.

14.     No vending or dispensing machines of any kind may be maintained in any leased premises without the prior written permission of Landlord.

15.     Tenant shall not conduct any activity on or about the Premises or Building which will draw pickets, demonstrators, or the like, other than its normal mortgage lending activities.

16.     All vehicles are to be currently licensed, in good operating condition, parked for business purposes having to do with Tenant's business operated in the Premises, parked within designated parking spaces, one vehicle to each space. No vehicle shall be parked as a "billboard" vehicle in the parking lot. Any vehicle parked improperly may be towed away. Tenant, Tenant's agents, employees, vendors and customers who do not operate or park their vehicles as required shall subject the vehicle to being towed at the expense of the owner or driver. Landlord may place a "boot" on the vehicle to immobilize it and may levy a charge of $50.00 to remove the "boot." Tenant shall indemnify, hold and save harmless Landlord of any liability arising from the towing or booting of any vehicles belonging to a Tenant Party.

17.     No tenant may enter into phone rooms, electrical rooms, mechanical rooms, or other service areas of the Building unless accompanied by Landlord or the Building manager.

18.     Tenant will not permit any Tenant Party to bring onto the Project any handgun, firearm or other weapons of any kind, illegal drugs or, unless expressly permitted by Landlord in writing, alcoholic beverages.

19.     Tenant shall not permit its employees, invitees or guests to smoke in the Premises or the lobbies, passages, corridors, elevators, vending rooms, rest rooms, stairways or any other area shared in common with other tenants in the Building. Nor shall the tenant permit its employees, invitees, or guests to loiter at the Building entrances for the purposes of smoking. Landlord may, but shall not be required to, designate an area for smoking outside the Building.

**EXHIBIT D**

**TENANT FINISH-WORK:  WORK OF LIMITED SCOPE (NO PLANS)**
(Landlord Performs the Work)

1.      **Acceptance of Premises**.  Except as set forth in this Exhibit, Tenant accepts the Premises in their "**AS-IS**" condition on the date that this Lease is entered into.

2.      **Scope of Work**.  Landlord at its expense shall perform the following work in the Premises (the "**Work**"):

    a.      Nonstructural installations for the Premises requested by Tenant, using Building-standard materials and Building-standard quantities selected by Tenant, in accordance with the Space Plan attached hereto as Exhibit D-1.

    b.      Repaint the existing painted walls in the Premises with Frazee Paint, No. CW0066, Picket White, low glow eggshell finish in Building-standard quantities.

    c.      Install Design Weave, Tempest Classic, Blue Bonnet, No. 971-765 carpet, and Burke Sterling Base No. 6633P  in the Premises.

    d.      Install new 2 x 4 ceiling grid with second look tile system and Building-standard lights in the Premises

    e.      Building-standard electrical service to the Premises.

Within three business days after the date of this Lease, Tenant shall select all Building-standard materials to be incorporated into the Work and give written notice of such selection to Landlord.

3.      **Definitions**.  As used herein, a "**Tenant Delay Day**" shall mean each day of delay in the performance of the Work that occurs (a) because of Tenant's failure to timely deliver or approve any required documentation such as any design or space plans, (b) because of any change by Tenant to any design or space plans, (c) because of any specification by Tenant of materials or installations in addition to or other than Landlord's standard finish-out materials, or (d) because a Tenant Party otherwise delays completion of the Work.   As used herein, "**Substantial Completion**," "**Substantially Completed**," and any derivations thereof mean the Work in the Premises is substantially completed (as reasonably determined by Landlord) in, if applicable, substantial accordance with any design or space plans.  Substantial Completion shall have occurred even though minor details of construction, decoration, landscaping and mechanical adjustments remain to be completed by Landlord.

EXHIBIT D-1

**SPACE PLAN**



Phone Backboard

12' - 0"

6' - 6"

PTR

PC

I/O

L/O

27' - 6"

Storage/Break Room

14' - 6"

O/I

L/O

4' - 6"

14' - 6"

L/O

file file file
file file file

5' - 6"

22' - 6"

O/I

L/O

Closing

10' - 0"

24' - 0"

10' - 0"

L/O

O/I

2' - 0"

10' - 0"

L/O

8' - 0"

10' - 0"

Proc

4' H X 5' W windows
with miniblinds

14' - 6"

Lead Proc

Sacramento-
Suite 106
1860 Howe
Ave.

Proc

MGR

copier

12' - 0"

v.2 10/18/01

12' - 0"

11' - 6"

**EXHIBIT E**

**CONFIRMATION OF COMMENCEMENT DATE**

___April 4___, _2002

New Century Mortgage Corporation
1860 Howe Avenue, Suite 106
Sacramento, California 95825

Re:    Lease Agreement (the "**Lease**") dated November 8, 2001, between WXI/SEN Real
Estate Partnership, a Delaware limited partnership ("**Landlord**"), and New
Century Mortgage Corporation, a California corporation ("**Tenant**"). Capitalized
terms used herein but not defined shall be given the meanings assigned to them in
the Lease.

Ladies and Gentlemen:

Landlord and Tenant agree as follows:

1.    **Condition of Premises**. Tenant has accepted possession of the Premises pursuant
to the Lease. Any improvements required by the terms of the Lease to be made by Landlord have
been completed to the full and complete satisfaction of Tenant in all respects except for the
punchlist items described on Exhibit A hereto (the "**Punchlist Items**"), and except for such
Punchlist Items, Landlord has fulfilled all of its duties under the Lease with respect to such initial
tenant improvements. Furthermore, Tenant acknowledges that the Premises are suitable for the
Permitted Use.

2.    **Commencement Date**. The Commencement Date of the Lease is February 2 ,
2002 .

3.    **Expiration Date**. The Term is scheduled to expire on the last day of the 62nd full
calendar month of the Term, which date is ___March 31___, 2007, unless terminated earlier in
accordance with the Lease.

4.    **Contact Person**. Tenant's contact person in the Premises is:

New Century Mortgage Corporation
1860 Howe Avenue, Suite 106
Sacramento, California 95825
Attention: Branch Manager
Telephone: 916 - 568- 1500
Telecopy: 916 - 568- 8279

5.    **Ratification**. Tenant hereby ratifies and confirms its obligations under the Lease,
and represents and warrants to Landlord that it has no defenses thereto. Additionally, Tenant
further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good
standing and in full force and effect, and (b) Tenant has no claims, counterclaims, set-offs or
defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of
any other transaction between Landlord and Tenant.

6.    **Binding Effect; Governing Law**. Except as modified hereby, the Lease shall
remain in full effect and this letter shall be binding upon Landlord and Tenant and their respective
successors and assigns. If any inconsistency exists or arises between the terms of this letter and the
terms of the Lease, the terms of this letter shall prevail. This letter shall be governed by the laws of
the state in which the Premises are located.

Please indicate your agreement to the above matters by signing this letter in the space indicated below and returning an executed original to us.

Sincerely,

**Transwestern Property Company West L.L.C.,** on behalf of Landlord

By: _Debra Kennith Whitaker_
Name: _Debra Kennith Whitaker_
Title: _Property Manager_

Agreed and accepted:

**New Century Mortgage Corporation,** a California corporation

By: _Gllagu_
Name: _G.W. Jaguess_
Title: _VP, Corporate Services_

By: _____
Name: _____
Title: _____

## EXHIBIT A

### PUNCHLIST ITEMS

Please insert any punchlist items that remain to be performed by Landlord.  If no items are listed below by Tenant, none shall be deemed to exist.

**EXHIBIT F**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

The undersigned is the Tenant under the Lease (defined below) between WXI/SEN Real Estate Limited Partnership, a Delaware limited partnership, as Landlord, and the undersigned as Tenant, for the Premises in Suite 106 on the first floor of the office building located at 1860 Howe Avenue, Sacramento, California 95825 and commonly known as Howe Avenue Place, and hereby certifies as follows:

1.      The Lease consists of the original Lease Agreement dated as of November 8, 2001 between Tenant and Landlord *['s predecessor-in-interest]* and the following amendments or modifications thereto (if none, please state "none"):_____

_____
_____

The documents listed above are herein collectively referred to as the "**Lease**" and represent the entire agreement between the parties with respect to the Premises. All capitalized terms used herein but not defined shall be given the meaning assigned to them in the Lease.

2.      The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Section 1 above.

3.      The Term commenced on _____, _____ and the Term expires, excluding any renewal options, on _____, 200__, and Tenant has no option to purchase all or any part of the Premises or the Building or, except as expressly set forth in the Lease, any option to terminate or cancel the Lease.

4.      Tenant currently occupies the Premises described in the Lease and Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows (if none, please state "none"):_____

_____
_____
_____

5.      All monthly installments of Basic Rent, all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____. The current monthly installment of Basic Rent is $_____.

6.      All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder. In addition, Tenant has not delivered any notice to Landlord regarding a default by Landlord thereunder.

7.      As of the date hereof, there are no existing defenses or offsets, or, to the undersigned's knowledge, claims or any basis for a claim, that the undersigned has against Landlord and no event has occurred and no condition exists, which, with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

8.      No rental has been paid more than 30 days in advance and no security deposit has been delivered to Landlord except as provided in the Lease.

9.      If Tenant is a corporation, partnership or other business entity, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

10.      There are no actions pending against Tenant under any bankruptcy or similar laws of the United States or any state.

11.    Other than in compliance with all applicable laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous substances in the Premises.

12.    All tenant improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any tenant improvement work have been paid in full.

Tenant acknowledges that this Estoppel Certificate may be delivered to Landlord, Landlord's Mortgagee or to a prospective mortgagee or prospective purchaser, and their respective successors and assigns, and acknowledges that Landlord, Landlord's Mortgagee and/or such prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in disbursing loan advances or making a new loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of disbursing loan advances or making such loan or acquiring such property.

Executed as of _____, _____.

**TENANT:**

**New Century Mortgage Corporation**, a California corporation

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

## EXHIBIT G

### FORM OF OFFER NOTICE

*[Insert Date of Notice]*

**BY TELECOPY AND FEDERAL EXPRESS**

New Century Mortgage Corporation
1860 Howe Avenue, Suite 106
Sacramento, California 95825

Re:   Lease Agreement (the "**Lease**") dated November 8, 2001, between WXI/SEN Real Estate Limited Partnership, a Delaware limited partnership ("**Landlord**"), and New Century Mortgage Corporation, a California corporation ("**Tenant**"). Capitalized terms used herein but not defined shall be given the meanings assigned to them in the Lease.

Ladies and Gentlemen:

Pursuant to the Right of First Offer attached to the Lease, enclosed please find an Offer Notice on Suite 120. The basic terms and conditions are as follows:

| | |
|---|---|
| **LOCATION:** | 1860 Howe Avenue, Suite 120 |
| **SIZE:** | _____ rentable square feet |
| **BASIC RENT RATE:** | $_____ per month |
| **TERM:** | |
| **IMPROVEMENTS:** | |
| **COMMENCEMENT:** | |
| **OTHER MATERIAL TERMS:** | |

Under the terms of the Right of First Offer, you must exercise your rights, if at all, as to the Offer Space on the depiction attached to this Offer Notice within five business days after Landlord delivers such Offer Notice. Accordingly, you have until 5:00 p.m. local time on _____, 200__ to exercise your rights under the Right of First Offer and accept the terms as contained herein, failing which your rights under the Right of First Offer shall terminate and Landlord shall be free to lease the Offer Space to any third party. If possible, any earlier response would be appreciated. Please note that your acceptance of this Offer Notice shall be irrevocable and may not be rescinded.

Upon receipt of your acceptance herein, Landlord and Tenant shall execute an amendment to the Lease memorializing the terms of this Offer Notice including the inclusion of the Offer Space in the Premises; provided, however, that the failure by Landlord and Tenant to execute such amendment shall not affect the inclusion of such Offer Space in the Premises in accordance with this Offer Notice.

**THE FAILURE TO ACCEPT THIS OFFER NOTICE BY (1) DESIGNATING THE "ACCEPTED" BOX, AND (2) EXECUTING AND RETURNING THIS OFFER NOTICE TO LANDLORD WITHOUT MODIFICATION WITHIN SUCH TIME PERIOD SHALL BE DEEMED A WAIVER OF TENANT'S RIGHTS UNDER THE RIGHT OF FIRST OFFER, AND TENANT SHALL HAVE NO FURTHER RIGHTS TO**

**THE OFFER SPACE. THE FAILURE TO EXECUTE THIS LETTER WITHIN SUCH TIME PERIOD SHALL BE DEEMED A WAIVER OF THIS OFFER NOTICE.**

      Should you have any questions, do not hesitate to call.

Sincerely,

**Transwestern Property Company West L.L.C.**

By: _____
Name: _____
Title: _____

[please check appropriate box]

ACCEPTED _____
REJECTED _____

**New Century Mortgage Corporation,** a
California corporation

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: _____
Title: _____
Date: _____

Enclosure *[attach depiction of Offer Space]*

## FIRST AMENDMENT TO LEASE AGREEMENT
### (EXPANSION)

1860 Howe Avenue, Suite 140
Sacramento, California

This First Amendment to Lease Agreement (Expansion) ("**First Amendment**") is made and entered into as of the 1(?) day of May, 2006, by and between KW FUND II – 1860 HOWE, L.P., a Delaware limited partnership ("**Landlord**"), as successor-in-interest to WXI/SEN Real Estate Limited Partnership, a Delaware limited partnership ("**Predecessor Landlord**") and NEW CENTURY MORTGAGE CORPORATION, a California corporation ("**Tenant**").

### RECITALS

A.     Predecessor Landlord and Tenant are parties to that certain Lease Agreement dated as of November 8, 2001 ("**Original Lease**"), pursuant to which Tenant leased from Predecessor Landlord certain premises in the building commonly known as 1860 Howe Avenue, Sacramento, California (the "**Building**"), such premises commonly known as Suite 106 and consisting of approximately 3,167 rentable square feet ("**Original Premises**"), as more particularly described in the Original Lease.

B.     Landlord has acquired all right, title and interest to the Building.

C.     Landlord and Tenant desire to amend the Original Lease to add certain expansion space to the Original Premises upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the promises contained herein and in the Lease and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Defined Terms</u>. Each capitalized term used, as a defined term in this First Amendment but not otherwise defined in this First Amendment shall have the same meaning ascribed to such term in the Original Lease.

2.     <u>Additional Premises</u>. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord that certain premises (the "Additional Premises") consisting of approximately 2,602 square feet of rentable area located on the first floor of the Building, as shown on Exhibit A attached hereto and known as Suite 140. The Original Lease is hereby amended to add the Additional Premises to the Original Premises as demised and defined in the Original Lease upon the same terms and provisions specified in the Original Lease, except that:

(a)     The monthly Base Rent for the Additional Premises shall be Five Thousand Seventy-Three and 90/100 Dollars ($5,073.90);

(b)     Except as otherwise set forth in the Original Lease, Tenant shall not be entitled to any abatement of Base Rent for the Additional Premises, or any relief from payment of Base Rent for the Additional Premises. Notwithstanding the foregoing, the Base Rent Abatement granted to Tenant in Article 27 of the Original Lease shall not apply to this First Amendment.

(c)     The lease term for the Additional Premises (the "**Additional Premises Lease Term**") shall commence upon the earlier of May 15, 2006 or that date upon which Tenant commences its business operations from the Additional Premises (the "**Commencement Date**"), and end on the October 31, 2006, unless sooner terminated as provided in the Original Lease, as amended hereby.

(d)     The first installment of Base Rent for the Additional Premises shall be due and payable upon Tenant's execution of this First Amendment, with subsequent installments of Base Rent applicable to

NewCenturyLsAmI.doc (05/03/06)

1

the Additional Premises due on the first day of each month thereafter during the Additional Premises Lease Term.

(e)    The term "Tenant's Proportionate Share", as defined and used in the Original Lease, shall mean two and 63/100 percent (2.63%) for the Additional Premises.

(f)    "Base Rent" shall mean all amounts payable by Tenant to Landlord, whether or not denominated as such. Any such amounts due Landlord shall sometimes be referred to as "Rent".

(g)    The Base Rent for the Original Premises, excluding the Additional Premises, is not affected by this First Amendment.

(h)    Tenant confirms that the Additional Premises are and will be used for general and administrative non-medical office purposes and for no other purpose whatsoever, and that no toxic or hazardous materials have been or will be stored, kept or used on the Additional Premises, except for normal quantities of standard office and cleaning supplies.

(i)    Tenant's Parking Stalls for the Additional Premises shall mean eight (8) undesignated parking stalls.

(j)    Landlord acknowledges that Tenant is operating its business from the Original Premises and the Additional Premises as "Home 123". Tenant affirms that Tenant is and shall remain solely responsible for the obligations of Tenant as defined in the Original Lease, as amended hereby.

3.    Definition of Base Year. Anything contained in the Original Lease to the contrary notwithstanding, solely for purposes of calculating Rent Adjustments for the Additional Premises, Tenant's Base Year shall mean the calendar year 2006.

4.    Condition of the Additional Premises; Improvement Allowance. No promises by Landlord to alter, remodel, improve, repair, redecorate or clean the Additional Premises, or any part thereof, have been made, and no representation respecting the condition of the Additional Premises or the Building or with respect to the suitability or fitness of either for any purpose, has been made to Tenant. Execution of this First Amendment shall serve as Tenant's acceptance of the Additional Premises in its "As Is, Where Is Condition, With All Faults", and Tenant shall not be entitled to receive any credit, allowance, or other concession from Landlord in respect to the Additional Premises. Notwithstanding the foregoing, Landlord agrees to clean and vacuum the carpet in the Additional Premises.

5.    Broker. Landlord and Tenant each represent that except for CB Richard Ellis ("CBRE") and Kennedy Wilson Properties, Ltd. ("Kennedy Wilson"), it has not retained, contracted or otherwise dealt with any real estate broker, salesperson or finder in connection with this First Amendment, and no such person initiated or participated in the negotiation of this First Amendment. Landlord and Tenant shall each indemnify and hold the other party and Kennedy Wilson harmless from and against any and all liabilities and claims for commissions and fees arising out of a breach of the foregoing representation. Landlord shall be responsible for the payment of any fees due to CBRE and Kennedy-Wilson resulting from the execution of this First Amendment.

6.    Landlord's and Kennedy-Wilson Properties, Ltd.'s Liability. The liability of Landlord and Kennedy-Wilson Properties, Ltd. (and their partners, shareholders and members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this First Amendment or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Building, and Landlord and Kennedy-Wilson Properties, Ltd. (and their partners, shareholders or members) shall not be personally liable for any deficiency.

NewCenturyLsAm1.doc (05/03/06)

2

7.    Miscellaneous.

7.1    Entire Agreement. This First Amendment contains the entire agreement between the parties hereto with respect to the subject matters hereof. No other agreements not specifically referred to herein, oral or otherwise, shall be deemed to exist or bind any of the parties hereto. Should any provision or provisions of this First Amendment be deemed unenforceable for any reason, the balance shall nonetheless remain in full force and effect. Should any provision be deemed invalid due to its scope or breadth, such provision shall be deemed invalid to the extent of the scope or breadth permitted by law. The defined terms set forth in this First Amendment shall have the same meaning as the defined terms set forth in the Original Lease.

7.2    Modifications and Amendments. No amendment, change of modification of this First Amendment shall be valid unless made in writing and signed by all parties hereto.

7.3    Counterparts. This First Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute together one and the same instrument.

7.4    Lease in Full Force and Effect. Except as amended, modified and/or supplemented by this First Amendment, all of the terms and provisions of the Original Lease shall remain in full force and effect and shall apply in all respects to the Premises and the Additional Premises.

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed and delivered as of the day and year first written above.

TENANT:

NEW CENTURY MORTGAGE CORPORATION,
a California corporation

By: _____
Name:    Elise Luckham
Title:    Vice President, Corporate Services

By: _____    5.17.06
Name:    Tommaso Trinchieri
Title:    AVP, Corporate Real Estate

LANDLORD:

KW FUND II – 1860 HOWE, L.P.,
a Delaware limited partnership

By:    KW Fund II – 1860 Howe General Partner,
LLC, a Delaware limited liability company,
its general partner

By: _____
Name:    John Prisbu
Title:    Vice President

10/16/2006    08:45    19496468430    KENNEDY WILSON    PAGE 04/07

**EXHIBIT A**

**ADDITIONAL PREMISES FLOOR PLAN**

PAGE 05/07                KENNEDY WILSON                19496496430        08:45  10/16/2006

"EXHIBIT A"

1860 HOWE AVE, SACRAMENTO, CA



10/16/2006 08:45 19496468430 KENNEDY WILSON PAGE 07/07



Exhibit "A"

1860 HOWE AVE.
SACRAMENTO, CA
1st FLOOR

**SECOND AMENDMENT TO LEASE AGREEMENT**
**(RENEWAL)**                                                ORIGINAL

1860 Howe Avenue, Suite 106 and Suite 140
Sacramento, California

This Second Amendment to Lease Agreement (Renewal) ("**Second Amendment**") is made and entered into as of the  1  day of November , 2006, by and between KW FUND II – 1860 HOWE, L.P., a Delaware limited partnership ("**Landlord**"), as successor-in-interest to WXI/SEN Real Estate Limited Partnership, a Delaware limited partnership ("**Predecessor Landlord**") and NEW CENTURY MORTGAGE CORPORATION, a California corporation, DBA HOME 123 ("**Tenant**").

RECITALS

A.    Predecessor Landlord and Tenant are parties to that certain Lease Agreement dated as of November 8, 2001 (" **Original Lease**"), pursuant to which Tenant leased from Predecessor Landlord certain premises in the building commonly known as 1860 Howe Avenue, Sacramento, California (the "**Building**"), such premises commonly known as Suite 106 and consisting of approximately 3,167 rentable square feet ("**Original Premises**"), as more particularly described in the Original Lease.

B.    Landlord and Tenant entered into that certain First Amendment to Lease Agreement dated May 18, 2006 (the "**First Amendment**") pursuant to which Tenant leased from Landlord certain expansion space (the "**Additional Premises**") comprised of approximately 2,602 square feet of rentable area located on the first floor of the Building and commonly know as Suite 140.

C.    As used in this Second Amendment, the Original Lease and the First Amendment shall be collectively known as the "**Lease**" unless specific reference is made to a specific document.

D.    As used in this Second Amendment, the Original Premises and the Additional Premises shall be collectively known as the "**Premises**".

E.    Landlord and Tenant desire to renew the term of the Lease for the Premises upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the promises contained herein and in the Lease and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  Each capitalized term used, as a defined term in this Second Amendment but not otherwise defined in this Second Amendment shall have the same meaning ascribed to such term in the Original Lease, as amended by the First Amendment.

2.    First Renewal Term.  Effective as of November 1, 2006 (the "**Commencement Date of the First Renewal Term**") the following terms shall have the following meaning:

(a)    The First Renewal Term shall commence on the Commencement Date of the First Renewal Term and shall expire on October 31, 2011 (the "**First Renewal Term**"), unless earlier terminated pursuant to the terms contained in the Lease and this Second Amendment.

(b) Except as otherwise set forth in the Lease, Tenant shall not be entitled to any abatement of Base Rent for the Premises, or any relief from payment of Base Rent for the Premises.  Notwithstanding the foregoing, the Base Rent Abatement granted to Tenant in Article 27 of the Original Lease shall not apply to this Second Amendment.

NewCenturyLsAm2.doc  (10/23/06)

1

(c)     The term **"Tenant's Proportionate Share"** shall mean 3.16% for the Original Premises and 2.63% for the Additional Premises.

(d)     The first installment of Base Rent for the Premises shall be due and payable on the Commencement Date of the First Renewal Term.

(e)     The Expense Stop and Base Tax Year for the Premises shall mean the calendar year 2007.

(f)     **"Base Rent"** shall mean all amounts payable by Tenant to Landlord, whether or not denominated as such. Any such amounts due Landlord shall sometimes be referred to as "Rent".

(g)     Tenant confirms that the Premises are and will be used for general and administrative non-medical office purposes and for no other purpose whatsoever, and that no toxic or hazardous materials have been or will be stored, kept or used on the Premises, except for normal quantities of standard office and cleaning supplies.

(h)     The Base Rent during the First Renewal Term shall be the following amounts for the applicable periods:

| Months | Monthly Base Rent |
|--------|-------------------|
| 1 – 12 | $11,249.55 |
| 13 – 24 | $11,587.04 |
| 25 – 36 | $11,934.65 |
| 37 – 48 | $12,292.69 |
| 49 – 60 | $12,661.47 |

3.     <u>Termination Option.</u>  Tenant shall have one option (the **"Termination Option"**) to terminate this Lease effective as of October 31, 2009, (the **"Termination Date"**) upon the following terms and conditions:

(a)     Tenant gives Landlord written notice (**"Termination Notice"**) of Tenant's election to exercise the Termination Option on or before April 30, 2009.

(b)     There is no uncured Event of Default by Tenant either on the date Tenant exercises the Termination Option, or on the Termination Date; and

(c)     Tenant pays to Landlord at least thirty (30) days prior to the Termination Date a cancellation fee in an amount equal to the unamortized costs of tenant improvements and leasing commissions that were paid by Landlord pursuant to this Second Amendment (the **"Cancellation Fee"**). Such amortization shall be calculated over a 60 month period with no imputed interest charges. Landlord shall provide Tenant with written notice of the amount of the Cancellation Fee within thirty (30) days after receipt of Tenant's Termination Notice.

In the event Tenant timely and properly exercises the Termination Option, the First Renewal Term shall terminate effective as of the Termination Date.  Rent shall be paid through and apportioned as of the Termination Date, and neither Landlord nor Tenant shall have any rights, estates, liabilities or obligations accruing under the Lease, as amended hereby, after the Termination Date, except such rights and liabilities that, by the terms of the Lease, as amended hereby, are obligations of the Tenant which can survive the expiration of the Lease, as amended hereby.  The Termination Option shall automatically terminate and become null and void upon;  a) the failure of Tenant to timely or properly exercise the Termination Option;  b) the sublease of the Premises, or any part thereof, by Tenant; or c) Tenant's right to possession of the Premises is terminated.

NewCenturyLsAm2.doc (10/23/06)

2

This Termination Option may, however, be exercised by any Permitted Transferee of the Lease, as amended hereby.

4.      Condition of the Premises; Landlord's Work.  No promises by Landlord to alter, remodel, improve, repair, redecorate or clean the Premises, or any part thereof, have been made except as stated in this Paragraph 4, and no representation respecting the condition of the Premises or the Building or with respect to the suitability or fitness of either for any purpose, has been made to Tenant.  Execution of this Second Amendment shall serve as Tenant's acceptance of the Premises in its "As Is, Where Is Condition, With All Faults", and Tenant shall not be entitled to receive any credit, allowance, or other concession from Landlord in respect to the Premises.  Notwithstanding the foregoing, Landlord, at its sole cost and expense, agrees to: (i) install new carpet and carpet base in the Premises and to paint the Premises, all using building standard materials in colors to be chosen by Tenant and approved by Landlord; and (ii) create access from the Original Premises to the Additional Premises per Tenant's requirements ("**Landlord's Work**").  Such Landlord's Work shall commence when Tenant indicates they have made their selections and provides Landlord with Tenant's requirements for access, but in no event shall such selections be made after April 15, 2007.  Landlord agrees to diligently pursue Landlord's Work to completion and conduct Landlord's Work in a manner that reasonably minimizes interference with Tenant's use and occupancy of the Premises.

5.      Renewal Options.  Provided that Tenant shall not be in default of the Lease either at the time the applicable Renewal Option is exercised or at the time of the commencement date of the applicable Renewal Option, and subject to credit approval by Landlord, Tenant shall have the right to renew the Term of the Lease for all of the space then under lease by Tenant at the Building for two (2) consecutive three (3) year periods (each an "**Extension Term**") beginning the day after the expiration date of the First Renewal Term or the existing Extension Term, as applicable.  All of the terms and conditions of the Lease shall remain in effect during such renewal periods except that the Rent, subject to all escalation provisions of the Lease, shall be 100% of the "Prevailing Rental Rate" for similar premises for a similar use for a similar term for a period beginning at approximately the same time as the applicable Extension Term.  Tenant shall deliver written notice ("**Extension Notice**") of its exercise of the applicable renewal option, which shall be personal to Tenant and any Permitted Transferee, to Landlord no later than six (6) months and no earlier than nine (9) months prior to the commencement date of the applicable Extension Term.  Once Tenant has timely exercised a Renewal Option, such exercise may not be rescinded, except as provided in Section 6 below.

6.      Prevailing Rental Rate.  "**Prevailing Rental Rate**" shall mean the total rental then being quoted by landlords for "comparable deals" in the Point West submarket of Sacramento, CA.  "**Comparable deals**" shall mean leases which are approximately as long, and commencing at approximately the same time, as the Renewal Term and are for comparable space in comparable buildings (with occupancy rates similar to the Building) subject to reasonable adjustments for 1) the desirability of the applicable floor or location in the building, and 2) the desirability of the geographic location of the applicable building.  "Comparable deals" shall explicitly exclude from consideration any transactions where the landlord of the subject building is in default of its mortgage or other indebtedness on the building, or is currently, or has within the prior six months, been involved in foreclosure proceedings on the applicable building.  "Comparable deals" shall also exclude transactions whereby the tenant has some form of equity participation in the deal.  Within thirty (30) days after receipt of the Extension Notice, Landlord shall provide Tenant with written notice of the Prevailing Rental Rate  for the applicable Extension Term.  Within ten (10) business days after receipt of such notice, Tenant shall provide Landlord with written notice of Tenant's election to (i) accept Landlord's determination of the Prevailing Rental Rate or (ii) rescind its exercise of the applicable Renewal Option.  If Tenant fails to notify Landlord of its election within such ten (10) business day period, Tenant will be deemed to have rescinded its exercise of the applicable Renewal Option.

7.      Right of First Offer.  Subject to the renewal of tenants that shall occupy the Expansion Space, whether by exercise of option or otherwise, Tenant shall have an ongoing Right of First Offer for any space on the first floor of the Building.  If currently vacant, such right shall commence after the initial lease for such Expansion Space shall have been consummated.  Landlord shall provide Tenant with written notice

NewCenturyLsAm2.doc  (10/23/06)

3

of the availability of all or a portion of the Expansion Space and with Landlord's quotation of the Base Rent for the Expansion Space, which shall be that monthly base rental rate per square foot which Landlord is willing to quote to and accept from a third party for a lease with respect to the Expansion Space, subject to any additional rent or rent escalation provisions and factors which Landlord is willing to quote to and accept from such third party, including but not limited to, such provisions and factors based on increases in operating costs, taxes and the Consumer Price Index (**"Landlord's Expansion Space Rent"**). Within ten (10) business days of such notification, Tenant shall notify Landlord in writing sent certified mail, return receipt requested, with postage prepaid thereon that it elects to exercise its right of first offer for the Expansion Space. If Tenant does not so notify Landlord, Tenant will be deemed to have waived its right of first offer respecting the subject Expansion Space. Once Tenant has exercised a Right of First Offer, such exercise may not be rescinded. The rights granted to Tenant herein are personal and may not be assigned to or exercised by any other party.

       8.     <u>Signage.</u>  Article 25 (y) of the Original Lease is hereby amended with the addition of the following:

> "Tenant shall have the non-exclusive right to install a Building Standard name plaque on the monument sign located at the main driveway entrance to the Building. The cost of the design, fabrication and installation of such monument signage shall be the responsibility of Tenant and shall be subject to the reasonable approval of Landlord and to the approval of all governmental and regulatory agencies having jurisdiction."

       9.     <u>Assignment and Subletting.</u>  Article 10 (g) of the Original Leas is hereby modified to provide that Tenant shall pay to Landlord, immediately upon receipt thereof, fifty per cent (50%) of the compensation received by Tenant for a Transfer (less the documented out-of-pocket costs incurred by Tenant in connection with such Transfer, including, without limitation, tenant improvements and leasing commissions made as part of such Transfer) in excess of the amounts this Lease otherwise requires Tenant to pay. Landlord shall not have the right to recapture the Premises should Tenant request Landlord's approval for a sublease or assignment of Tenant's interest in the Lease.

      10.  <u>Non-Disturbance.</u>  Upon written request from Tenant, and provided that Tenant is not then in default under the Lease, as amended hereby, Landlord agrees to use diligent, commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of the present mortgage encumbering the Building. Such Non-Disturbance Agreement may be embodied in the Mortgagee's customary form of Subordination and Non-Disturbance Agreement. If, after exerting diligent and commercially reasonable efforts, Landlord is unable to obtain a Non-Disturbance Agreement from any such holder, Landlord shall have no further obligation to Tenant with respect to thereto.

      11.  <u>Improvements; Alterations.</u>  Article 8 (a) of the Original Lease shall be modified to provide that, as long as such alterations are made pursuant to the terms and conditions contained in the Original Lease, Tenant shall be allowed to make non-structural alterations to the Premises that do not exceed $20,000.00 per year without Landlord's consent, but with written notice to be given to Landlord prior to commencing such alterations. Such non-structural alterations shall not affect Building systems. Landlord shall have reasonable approval rights with respect to the contractors performing the alterations on behalf of Tenant.

      12.  <u>Review of Landlord's Statement.</u>  Provided that Tenant is not then in default beyond any applicable cure period of its obligations to pay Base Rent, additional rent described in Article 4 (b) of the Original Lease, or any other payments required to be made by it under the Lease, as amended hereby, and provided further that Tenant strictly complies with the provisions of this paragraph, Tenant shall have the right, once each calendar year, to reasonably review supporting data for any portion of a Landlord's Operating Costs and Tax Statement (provided, however, Tenant may not have an audit right to all documentation relating to Building operations as this would far exceed the relevant information necessary to properly document a pass-through billing statement, but real estate tax statements, and information on utilities, repairs, maintenance and insurance will be available), in accordance with the following procedure:

NewCenturyLsAm2.doc  (10/23/06)

(A)  Tenant shall, within one hundred twenty (120) days after any such Landlord's Operating Costs and Tax Statement is delivered, deliver a written notice to Landlord specifying the portions of the Landlord's Statement that are claimed to be incorrect, provided, however that Tenant shall, within twenty (20) business days after any such Landlord's Operating Costs and Tax Statement is delivered, pay to Landlord all amounts due from Tenant to Landlord as specified in the Landlord's Operating Costs and Tax Statement. Except as expressly set forth in subsection (C) below, in no event shall Tenant be entitled to withhold, deduct, or offset any monetary obligation of Tenant to Landlord under the Lease, as amended (including, without limitation, Tenant's obligation to make all payments of Base Rent and all payments of Tenant's Tax and Operating Costs Adjustment) pending the completion of and regardless of the results of any review of records under this paragraph. The right of Tenant under this paragraph may only be exercised once for any Landlord's Operating Costs and Tax Statement, and if Tenant fails to meet any of the above conditions as a prerequisite to the exercise of such right, the right of Tenant under this paragraph for a particular Landlord's Operating Costs and Tax Statement shall be deemed waived.

(B)  Tenant acknowledges that Landlord maintains its records for the Building at Landlord's manager's corporate offices and Tenant agrees that any review of records under this paragraph shall be at the sole expense of Tenant and shall be conducted by an independent firm of certified public accountants and not compensated on a contingency basis. Tenant acknowledges and agrees that any records reviewed under this paragraph constitute confidential information of Landlord, which shall not be disclosed to anyone other than the accountants performing the review and the principals of Tenant who receive the results of the review. The disclosure of such information to any other person, whether or not caused by the conduct of Tenant, shall constitute a material breach of the Lease, as amended.

(C)  Any errors disclosed by the review shall be promptly corrected by Landlord, provided, however, that if Landlord disagrees with any such claimed errors, Landlord shall have the right to cause another review to be made by an independent firm of certified public accountants of Landlord's choice. In the event of a disagreement between the two accounting firms, the review that discloses the least amount of deviation from the Landlord's Operating Costs and Tax Statement shall be deemed to be correct. In the event that the results of the review of records (taking into account, if applicable, the results of any additional review caused by Landlord) reveal that Tenant has overpaid obligations for a preceding period, the amount of such overpayment shall be credited against Tenant's subsequent installment obligations to pay the estimated Tax and Operating Costs Adjustment. In the event that such results show that Tenant has underpaid its obligations for a preceding period, Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days after finalization of the review.

13.  Broker.  Landlord and Tenant each represent that except for CB Richard Ellis ("**CBRE**") and Kennedy Wilson Properties, Ltd. ("**Kennedy Wilson**"), it has not retained, contracted or otherwise dealt with any real estate broker, salesperson or finder in connection with this Second Amendment, and no such person initiated or participated in the negotiation of this Second Amendment. Landlord and Tenant shall each indemnify and hold the other party and Kennedy Wilson harmless from and against any and all liabilities and claims for commissions and fees arising out of a breach of the foregoing representation. Landlord shall be responsible for the payment of any fees due to CBRE and Kennedy-Wilson resulting from the execution of this Second Amendment.

14.  Landlord's and Kennedy-Wilson Properties, Ltd.'s Liability.  The liability of Landlord and Kennedy-Wilson Properties, Ltd. (and their partners, shareholders and members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Second Amendment or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Project, and Landlord and Kennedy-Wilson Properties, Ltd. (and their partners, shareholders or members) shall not be personally liable for any deficiency.

NewCenturyLsAm2.doc (10/23/06)

5

15.    Miscellaneous.

15.1    Entire Agreement.  This Second Amendment contains the entire agreement between the parties hereto with respect to the subject matters hereof.  No other agreements not specifically referred to herein, oral or otherwise, shall be deemed to exist or bind any of the parties hereto.  Should any provision or provisions of this Second Amendment be deemed unenforceable for any reason, the balance shall nonetheless remain in full force and effect.  Should any provision be deemed invalid due to its scope or breadth, such provision shall be deemed invalid to the extent of the scope or breadth permitted by law.  Unless specifically stated otherwise, the defined terms set forth in this Second Amendment shall have the same meaning as the defined terms set forth in the Lease.

15.2    Modifications and Amendments.  No amendment, change of modification of this Second Amendment shall be valid unless made in writing and signed by all parties hereto.

15.3    Counterparts.  This Second Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute together one and the same instrument.

15.4    Lease in Full Force and Effect.  Except as amended, modified and/or supplemented by this Second Amendment, all of the terms and provisions of the Lease, as amended, shall remain in full force and effect and shall apply in all respects to the Premises.

**IN WITNESS WHEREOF,** the parties hereto have caused this Second Amendment to be duly executed and delivered as of the day and year first written above.

**TENANT:**

NEW CENTURY MORTGAGE CORPORATION,
a California corporation,
DBA HOME 123

By: _____
Name: _____  11-1-06
Title:    Elise Luckham
         Vice President
         Corporate Services

By: _____
Name: _____
Title: _____

**LANDLORD:**

KW FUND II – 1860 HOWE, L.P.,
a Delaware limited partnership

By:  KW Fund II – 1860 Howe General Partner,
     LLC, a Delaware limited liability company,
     its general partner

By: _____
Name:    John Proshu
Title:    Vice President