UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 07-10416-KJC
                                .
                                .
  NEW CENTURY TRS HOLDINGS,     .
     INC., et al.,              . 824 Market Street
                                . Wilmington, DE  19801
                    Debtors.  .
                                . May 21, 2007
. . . . . . . . . . . . . . . . 10:09 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                O'Melveny & Myers LLP
                                By:  SUZZANNE UHLAND, ESQ.
                                     BEN LOGAN, ESQ.
                                Embarcadero Center West
                                275 Battery Street
                                San Francisco, CA  94111-3305


For Carrington Capital          Mayer, Brown, Rowe & Maw LLP
Management, LLC &               By:  THOMAS S. KIRIAKOS, ESQ.
Carrington Mortgage                  SEAN SCOTT, ESQ.
Services, LLC:                  71 S. Wacker
                                Chicago, Illinois 60606-4637


For Carrington Capital          Womble Carlyle Sandridge
Management, LLC &                & Rice
Carrington Mortgage             By:  STEVEN K. KORTANEK, ESQ.
Services, LLC:                  222 Delaware Avenue, 15th Floor
                                Wilmington, DE 19801


Audio Operator:                 Brandon McCarthy


 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES (Cont'd.)

For the Unsecured Creditors          Blank Rome, LLP
Committee:                           By:  BONNIE GLANTZ FATELL, ESQ.
                                     Chase Manhattan Centre
                                     1201 Market Street
                                     Suite 800
                                     Wilmington, DE 19801

                                     Blank Rome, LLP
                                     By:  REGINA STANGO KELBAN, ESQ.
                                     One Logan Square
                                     130 North 18th Street
                                     Philadelphia, PA 19103-6998

                                     Hahn & Hessen LLP
                                     By:  MARK T. POWER, ESQ.
                                          MARK INDELICATO, ESQ.
                                          DON GRUBMAN, ESQ.
                                          JAMES LAUGHLIN, ESQ.
                                     488 Madison Avenue
                                     14th and 15th Floor
                                     New York, NY  10022

For the U.S. Trustee:                Office of the U.S. Trustee
                                     By:  JOSEPH McMAHON, ESQ.
                                     844 King Street, Suite 2313
                                     Lockbox 35
                                     Wilmington, DE 19801

For Kochak:                          Rosenthal, Monhait, Gross &
                                      Goddess, PA.
                                     By:  EDWARD ROSENTHAL, ESQ.
                                     919 Market Street
                                     Suite 1401
                                     P.O. Box 1070
                                     Wilmington, DE 19899

                                     Winston & Strawn LLP
                                     By:  MATTHEW BOTICA, ESQ.
                                     35 W. Wacker Drive
                                     Chicago, Illinois 60601-9703

For Fidelity:                        Baker Hostetler
                                     By:  DONALD WORKMAN, ESQ.
                                     Washington Square, Suite 1100
                                     1050 Connecticut Avenue, NW
                                     Washington, DC 20036-5304

APPEARANCES (Cont'd.)

|  | Smith Katzenstein Furlow LLP |
|---|---|
|  | By: KATHLEEN MILLER, ESQ. |
|  | The Corporate Plaza |
|  | 800 Delaware Avenue |
|  | P.O. Box 410 |
|  | Wilmington, DE 19899 |

For the Debtors:                   Richards, Layton & Finger, P.A.
                                   By:  MARCOS A. RAMOS, ESQ.
                                        MICHAEL MERCHANT, ESQ.
                                        CHRISTOPHER M. SAMIS, ESQ.
                                   One Rodney Square
                                   920 N. King Street
                                   P.O. Box 551
                                   Wilmington, DE 19899

For GECC:                          Gebhardt & Smith LLP
                                   By:  MIKE GALLERIZZO, ESQ.
                                   401 East Pratt Street
                                   Ninth Floor
                                   World Trade Center
                                   Baltimore, MD  21202

For Citigroup:                     Kirkland & Ellis, LLP
                                   By:  JOSHUA SUSSBERG, ESQ.
                                   Citigroup Center
                                   153 East 53rd Street
                                   New York, New York 10022-4675

For Greenwich:                     Kirkland & Ellis, LLP
                                   By:  SHIRLEY CHO, ESQ.
                                   777 South Figueroa Street
                                   Los Angeles, CA  90017

For RBC:                           Monzack and Monaco, P.A.
                                   By:  RACHEL B. MERSKY, ESQ.
                                   1201 North Orange Street
                                   Suite 400
                                   Wilmington, DE 19899

For Deutsche Bank National         Nixon Peabody, LLP
Trust Co.:                         By:  DENNIS J. DREBSKY, ESQ.
                                   437 Madison Avenue
                                   New York, NY   10022

APPEARANCES (Cont'd.):

                              Pepper Hamilton, LLP
                              By:  DAVID B. STRATTON, ESQ.
                              Hercules Plaza
                              Suite 5100
                              1313 Market Street
                              P.O. Box 1709
                              Wilmington, DE 19899

For Premier Printing:         Stevens & Lee
                              By:  JOSEPH GREY, ESQ.
                              1105 North Market Street
                              Wilmington, DE  19801

For Wells Fargo/C-Bass:       Hunton & Williams
                              By:  JASON HARBOUR, ESQ.
                                   BENJAMIN ACKERLY, ESQ.
                              Riverfront Plaza
                              East Tower
                              951 East Byrd Street
                              Richmond, VA 23219

For Litton Loan Servicing:    Eckert Seamans
                              By:  SUSAN POPPITI ESQ.
                              300 Delaware Avenue
                              Suite 1210
                              Wilmington, DE  19801

For UBS:                      Ashby & Geddes
                              By:  GREGORY ALAN TAYLOR, ESQ.
                              500 Delaware Avenue
                              8th Floor
                              P.O. Box 1150
                              Wilmington, Delaware 19899

For Countrywide & GMAC CF:    Edwards, Angell, Palmer
                               & Dodge, LLP
                              By: WILLIAM CHAPMAN, ESQ.
                              919 North Market Street
                              Wilmington, DE  19801

For Deutsche Bank:            Bingham McCutchen, LLP
                              By:  RICHARD AGINS, ESQ.
                              One State Street
                              Hartford, CT 06103

APPEARANCES (Cont'd.):

For Bank of America:          Kaye Scholer LLP
                              By:  NICHOLAS CREMONA, ESQ.
                              425 Park Avenue
                              New York, NY  10022


                              Potter, Anderson & Corroon, LLP
                              By:  GABRIEL R. MACCONAILL, ESQ.
                              Hercules Plaza
                              1313 North Market Street
                              Wilmington, DE  19801

For Murray Capital            Murray Capital Management, Inc.
Management, Inc.:             By:  MARTI MURRAY


For Washington Mutual:        Connolly Bove Lodge & Hutz
                              By:  MARC PHILLIPS, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              Wilmington, DE 19899

For NY State Teachers         Lowenstein Sandler PC
Retirement System:            By:  IRA LEVEE, ESQ.
                              65 Livingston Avenue
                              Roseland, New Jersey 07068-1791

For Data-Link/Fiseru:         Phillips, Goldmen & Spence
                              By:  ROBERT GOLDMAN, ESQ.
                              1200 N Broom Street
                              Wilmington, DE 19806-4204

For HSBC:                     Drinker Biddle & Reath
                              By:  ANDREW KASSENER, ESQ.
                              1100 N. Market Street
                              Wilmington, DE

For QKC Maui Owner, LLC:      Heiman Gouge & Kaufman
                              By:  SUSAN KAUFMAN, ESQ.
                              800 King Street
                              Wilmington, DE 19801

APPEARANCES (Cont'd.):

| | |
|---|---|
| For DIP Lenders: | Pachulski Stang Ziehl Young Jones<br> & Weintraub LLP<br>By:  TIMOTHY P. CAIRNS, ESQ.<br>Wilmington, DE Office<br>919 North Market Street,<br>17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 |
| For Oracle USA: | Monzack and Monaco, P.A.<br>By:  KEVIN MANGAN, ESQ.<br>1201 North Orange Street<br>Suite 400<br>Wilmington, DE 19899 |
| For CSFB: | Chadbourne & Parke LLP<br>By:  JOSEPH SMOLINSKY, ESQ.<br>30 Rockefeller Plaza<br>New York, NY 10112<br><br>Young, Conaway, Stargatt<br> & Taylor LLP<br>By:  MICHAEL NESTOR, ESQ.<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19801 |
| For KST Data, Inc.<br>Goldman Sachs: | Klehr, Harrison, Harvey,<br> Branzburg & Ellers, LLP<br>By:  CHRISTOPHER WARD, ESQ.<br>919 Market Street, Suite 1000<br>Wilmington, DE 19801-3062 |
| For Hartford Fire<br>Insurance: | Duane Morris LLP<br>By:  CHRISTOPHER WINTER, ESQ.<br>1100 North Market Street<br>Suite 1200<br>Wilmington, DE 19801-1246 |
| For Regions Bank: | Becker & Becker, P.A.<br>By:  RICHARD BECKER, ESQ.<br>1701 Augustine Cut Off Ofc 535<br>Wilmington, DE 19803 |

APPEARANCES (Cont'd):

For Union Bank of California: Pepper Hamilton LLP
                              By: DAVID FOURNIER, ESQ.
                              Hercules Plaza, Suite 5100
                              1313 Market Street
                              P.O. Box 1709
                              Wilmington, DE 19899-1709

For National City:           Lamm Rubenstone Lesavoy Butz &
                               David LLC
                             By: SHERRY LOWE, ESQ.
                             3600 Horizon Blvd, Suite 200
                             Trevose, PA  19053

TELEPHONIC APPEARANCES:

For Credit Suisse First      Chadbourne & Park, LLP
Boston Mortgage Capital LLC  By: CHRISTY RIVERA, ESQ.
and DLJ Mortgage Capital,
Inc.:

For Deutsche Bank, Inc.:     Bingham McCutchen, LLP
                             By: RICHARD AGINS, ESQ.

For Speedpay, Inc.:          Frank/Gecker LLP
                             By: JEREMY KLEINMAN, ESQ.

For A C S:                   Gerard Singer Levick & Busch
                             By: Michelle Shriro

For Oracle USA, Inc.:        Day Pitney, LLP
                             By: AMISH DOSHI, ESQ.

For United States Trustee:   US Trustee Office of Wilmington
                             By: WALT THEUS, ESQ.

For New Century TRS          Windels, Marx, Lane & Mittendors
Holdings, Inc.:              By: SCOTT MATTHEWS, ESQ.

For Compensation Design      Compensation Design Group
Group:                       By: FRANK GLASSNER

For Bank of America:         Daye Scholer, LLP
                             By: NICHOLAS CREMONA, ESQ.

For Law Offices of David J.  Law Offices of David J. Stern PA
Stern, PA:                   By: FREDERIC DISPIGNA, ESQ.

TELEPHONIC APPEARANCES (Cont.d):

For Union Bank of California: Jeffer Mangels Butler & Marmaro
                              By:  BARRY FREEMAN, ESQ.

For Murray Capital Mgmt.:     Murray Capital Management, Inc.
                              By:  MARTI MURRAY

For UBS Real Estate           Paul Hastings Janofsky & Walker
Securities, Inc.:             By:  KIMBERLY NEWMARCH, ESQ.

For Greenwich Capital         Kirkland & Ellis
Financial Products:           By:  BENNETT SPIEGEL, ESQ.

For Wells Fargo Bank:         Kelley Drye & Warren LLP
                              By:  JONATHAN HOOK, ESQ.

1          THE COURT:  Hello.

2          MS. UHLAND:  Good morning, Your Honor.  Suzanne

3  Uhland of O'Melveny & Myers for New Century.

4          Your Honor, with respect to this morning's agenda, I

5  would like to proceed in order with one exception.  We would

6  like to take on initially the debtors' motion with respect to

7  certain -- the different bond issues because we'd like to get

8  this facilitated quickly because we need to actually get out to

9  certain states today and notify them with respect to the

10  outcome of that proceeding.  Or the proceeding today on that.

11          So if that's acceptable to Your Honor, we'd like to

12  take that matter on first.

13          THE COURT:  Does anyone have an objection to the

14  hearing.  Then let's proceed.

15          MR. LOGAN:  Thank you, Your Honor.  Ben Logan of

16  O'Melveny & Myers.  Let me briefly advise the Court on the

17  status of our resolution of two of the objections that were

18  filed to this motion.

19          First off, Credit Suisse/First Boston filed a limited

20  objection principally related to the first proposal we had from

21  the Hartford.  In discussions with counsel for Credit

22  Suisse/First Boston before the start of Court and based on my

23  representation that we would be going forward, not with the

24  Hartford, but with bond safeguard and also because we filed the

25  adequate protection motion last week, set for hearing on May

1  30th, Credit Suisse withdraws their objection and they

2  authorized me to so advise the Court.

3       In addition, the Unsecured Creditors Committee filed

4  an objection which largely reflected the status of work with

5  the Committee at the time to try to devise a better means for

6  the estate to realize the surety bonds.  And I'm pleased to

7  report that we've -- I think we've gotten there.  And that's

8  will be the subject of the presentation on the motion which

9  I'll turn to now.

10      Your Honor, we will have a proffer to make at the end

11 of this.  But let me first describe the situation.  New Century

12 operates in a regulated industry, several regulated industries.

13 And in order to conduct it's servicing business, which is the

14 subject of the motion to approve the sale later today, it needs

15 licenses.  In order to have those licenses, many, not all, but

16 many states require surety bonds.  The same is also true for

17 the loan origination business.

18      Historically, New Century obtained the surety bonds

19 to operate in the various states through bonds issued by the

20 Hartford Company.  They were unsecured because at the time

21 people thought New Century was a very good, stable credit.

22 They totaled slightly in excess of $20 million.

23      Shortly pre-petition, the Hartford notified New

24 Century that it was terminating all those bonds going forward.

25 And typically, either pursuant to the bond agreement or state

1  law, the Hartford was free to do that for any reason generally

2  on 30 to 60 days notice.  And as a result, shortly after the

3  debtors filed the petitions, they're facing a situation where

4  those bonds would expire generally in late April or early May.

5  It varied from state to state.  But the debtors were facing a

6  crisis.  If those bonds terminated pursuant to the notices, New

7  Century would not have licenses to operate.  Any prospect for a

8  going concern sale, the servicing business would be killed.

9  Any effort to sell the loan origination platform similarly

10  would be killed.  And as a result, the debtors engaged in

11  negotiations with the Hartford over possibly rescinding those

12  notices of termination or reaching an accommodation.

13        After substantial give and take during the middle

14  part of April, a deal was struck.  New Century worked hard to

15  pare down the number of bonds it needed, really looking hard at

16  the state requirements, to maintain a going concern business

17  for the loan origination platform and also the servicing

18  business.

19        The total bonds aggregated about $6.7 million face

20  amount.  And the Hartford was willing to extend those for 120

21  days in return for $5 million cash collateral, cash collateral

22  to secure not on the $6.9 million of reinstated bonds, but also

23  to cash collateralize, cross collateralize Hartford's unsecured

24  obligations for bonds that predated the filing of the

25  petitions.

1        That was the subject of a lot of negotiations.  The

2  debtors pushed hard for a better deal, but the Hartford, quite

3  frankly, had a lot of leverage at the time and they stuck to

4  their guns.  And despite a lot of efforts to negotiate for a

5  lower amount of cash collateral and better terms, the Hartford

6  said, no, it's $5 million.  And they really did look at it.

7  They advised the debtors as having a substantial element of

8  buttressing their position with respect to the pre-petition

9  bonds.

10        Incidentally, the debtors' records indicate that

11  there's never, ever been a call on these bonds.  So it's a

12  contention obligation, but it's an obligation.  And one that

13  was important to the Committee in particular that we strive not

14  to cross collateralize.

15        In any event, on May 3, bids were due on the loan

16  origination platform.  No qualified bids were submitted and as

17  a result, the debtors promptly recalculated their bond needs if

18  one pulled out the bonds which were required only for the loan

19  origination business.  And the result of that was a reduced

20  bonding need down from -- close $7 million down to

21  approximately $3.8 million.

22        The debtors approached the Hartford.  Since the

23  Hartford had insisted on $5 million of cash collateralization

24  for approximately $6.9 million of bonds, new bonds, it was our

25  hope that the Hartford would reduce the cash collateralization

1 requirement.  At least initially, they declined to do so

2 explaining that this was viewed by the Hartford as a package

3 where the cash collateralization was probably more important to

4 them to secure the pre-petition obligations than it was the new

5 bonds, which after all were only going to be in place for 120

6 days and were needed to get us to a close of the sale of the

7 servicing business which will take a while after the Court

8 conducts the hearing today, assuming the Court approves that

9 sale.  And there also are likely to be transition services

10 where the debtors will need to maintain licenses for a period

11 of time until the party that was view -- was the stocking horse

12 at the time and ultimately, you'll hear, was the winning bidder

13 at the auction, until they obtain their licenses.

14          In any event, after the Hartford told the debtors

15 they would not change the proposal, the debtors contacted two

16 brokers who deal in this industry, Willis of Arizona and AON.

17 And they endeavored to find alternative surety bonding

18 companies.  And the debtors, in fact, received two proposals.

19 One from Bond Safeguard Company and that is, indeed, the

20 proposal we are going to suggest, we're going to move to go

21 forward today with.  And another from a company that AON

22 identified, but AON identified them very late in the process.

23          And the debtors' evaluation was that that proposal

24 was economically equivalent to the one from Bond Safeguard and

25 quite frankly, just the logistics are daunting to switch horses

1  on one of these surety companies.  There's a lot of work

2  involved with the states to make sure they're comfortable that

3  the bonds are in place.  The debtors undertook substantial

4  efforts to coordinate with the states and with Bond Safeguard

5  Company in Willis to get the new bonding proposal in place.

6  That took people -- it required people to do extraordinary

7  things.  To switch horses again to go with the AON proposal,

8  which judged by the debtors, just not to be feasible.

9          In any event, the proposal before the Court today is

10 to approve a proposal where Bond Safeguard Company will issue

11 new bonds.  They will have a one-year duration which gives us

12 greater latitude to work on transition services with the

13 winning bidder for the servicing business.

14         The debtors have worked very closely with Committee

15 counsel to scrutinize yet again the quantity of bonds needed.

16 And it's been reduced down to approximately $2.1 million.  And

17 that's based upon some direct one-on-one conversations and

18 written confirmations from the states, giving them exactly what

19 the debtors are going to be doing going forward.  So again, the

20 amount of cash collateral was reduced very substantially.

21         The proposal has no cross collateralization because

22 Bond Safeguard doesn't have any preexisting bonds to

23 collateralize.  That's very attractive for a number of reasons.

24 Obviously, cross collateralization is not preferred if there's

25 any alternative, but beyond that, the debtors are posting this

1  approximately $2.1 million of cash collateralization in order

2  to secure some bonds that will hopefully be outstanding for a

3  fairly limited time period.

4        To the extent those secure obligations also of a

5  short time duration, the debtors prospects or the estate's

6  prospects of getting some of that collateral back as

7  substantially enhanced.  Bond Safeguard has agreed to word with

8  the debtors and to the extent that they get comfortable, that

9  there will be no claims under the bonds, to release back the

10  cash collateral.  No promises, but they will work closely with

11  the debtors.

12        In contrast, if the cash collateral secured some 20

13  some million dollars of bonds for a multitude of different

14  operations in a multitude of different states, it's the

15  debtors' assessment that it will be much more difficult to get

16  those bonds back.

17        In any event, Your Honor, that's the state of

18  affairs.  That's the proposal.  The debtors have worked very

19  closely with the Creditors Committee on this and thanked them

20  for their efforts both to help us pare down the number of bonds

21  required, but to help us evaluate the alternative proposals.

22  Today is a critical date.

23        I should have mentioned the Hartford did extend the

24  expiration of their cancellation notices through today.  And

25  the reason Ms. Uhland asked that we have this heard first is we

1 need to get this order entered as soon as possible, assuming

2 the Court approves it.  And then there are some logistics that

3 people of New Century will undertake to make sure that the new

4 bonds are, in fact, issued and the licenses maintained so the

5 estate can get to a close of the sale of the servicing

6 business.

7          That's my presentation.  I'm prepared to make a

8 proffer unless there are any questions or --

9          THE COURT:  I have a couple questions.

10          MR. LOGAN:  Certainly.

11          THE COURT:  One, does this moot the Hartford response

12 that was filed yesterday?

13          MR. LOGAN:  I'll have to let Hartford respond to

14 that.  Some of the questions they raised the proffer was going

15 to address, Your Honor.  I -- at least from our perspective,

16 the Hartford --

17          THE COURT:  Well, let me ask, is Hartford represented

18 here today?

19          MR. WINTER:  Good afternoon, Your Honor.  Chris

20 Winter with Duane Morris for Hartford Fire Insurance.

21          Your Honor, I believe my co-counsel, Scott Leo, is on

22 the phone this morning.  And Mr. Leo has been admitted pro hoc

23 vitae.

24          THE COURT:  I do not see him on the list.

25          MR. WINTER:  Scott?

1              THE OPERATOR:  Mr. Leo has not dialed in, Your Honor.

2              THE COURT:  Thank you.

3              MR. WINTER:  Okay.  Then Chris Winter for Hartford

4  Fire Insurance, Your Honor.

5                          (Laughter)

6              MR. WINTER:  Your Honor, we filed the response

7  because we believed that there seemed to be some holes in the

8  diligence that the debtor had engaged in.  We also wanted to

9  point out to the Court that we had extended these bonds after

10 reaching an agreement with the debtor.

11             Hartford had significant additional flexibility on

12 issues like cross collateralization, the entire amount of the

13 cash collateral that really weren't explored.  We were a little

14 bit surprised to see Bond Surety brought in.  Frankly, Hartford

15 is a larger bonding company with a higher rating and we just

16 wanted to point these items out to Your Honor.

17             THE COURT:  Okay.  Sounds like a U.S. Trustee

18 objection, actually.  Well, can you answer the question?  And

19 that is at this point, given the debtors change of course, is

20 the reply now moot?  Or is there an outstanding objection?

21             MR. WINTER:  Your Honor, I believe the -- we will

22 have to concede the reply is likely moot.  We would raise the

23 issue and ask the question of whether the debtor is pursuing

24 the best course with respect to meeting its bonding

25 requirements.  And in listening to the upcoming proffer, I

1  would pose the question, is the debtor sure that Bond Surety

2  can meet all of its bonding requirements.  Just as a for

3  instance, I understand that initially the debtor had indicated

4  that it required a bond in the State of Vermont.  Bond Surety

5  is not licensed to issue bonds in the State of Vermont.  I

6  understand that the debtor has now changed its requirements so

7  that it doesn't require a bond in the State of Vermont.

8  Perhaps the debtor can speak to that.

9          THE COURT:  All right.  Does anyone else care to be

10  heard preliminarily?

11          MR. WINTER:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MS. KELBAN:  Good morning, Your Honor.  Regina Stango

14  Kelban from Blank Rome on behalf of the Official Committee of

15  Unsecured Creditors.

16          Your Honor, Mr. Logan has accurately characterized

17  what has transpired.  From our perspective, the Committee was

18  very concerned with the Hartford proposal because, number one,

19  of the cross collateralization and the bootstrapping of pre-

20  petition unsecured claims into super priority claims of

21  potentially 21 million, plus secured claims of potentially 5

22  million.  And we were extremely concerned about that and I --

23  we're actually surprised to see that Hartford is now coming

24  back at the last moment because they showed, in our view, very

25  little flexibility.

1        However, we do view the Bond Safeguard to be a much

2  better proposal for the estate in light of the fact that it's

3  limited to approximately $2.3 million maximum collateral.

4  They're only getting administrative claims for any draws under

5  their bonds.  We believe that the fact that there's no ability

6  to cross collateralize because they weren't a pre-petition

7  surety company, that that will keep it cleaner and neater and

8  we have a much greater chance of getting our collateral back

9  under any liquidating plan for the Unsecured Creditors.

10       So with those, you know, factors, we very much, you

11  know, encouraged in support of this revision.  We worked

12  diligently with debtors' in-house team, their consumer

13  regulatory folks.  Our consumer regulatory folks from Blank

14  Rome have reviewed all their licensing and they've -- we've

15  gotten comfortable that that's one of the reasons the numbers

16  have come down.  That there were excess licenses or excess

17  bonds out there that were just not needed in light of what

18  exactly they were doing in each state.  So -- and Vermont was

19  one of the examples.  We were -- we got more comfortable that

20  that is not required.

21       So I think in light of all this, Your Honor, this is

22  a much better proposal for the estate because it really gives

23  the estate an opportunity to get their collateral back at the

24  end of the day and we're hopeful that no draws will be on the

25  bonds.  Thank you, Your Honor.

1          THE COURT:  Thank you.  All right.  And I have just

2   one other question.  There is reference in the responses to an

3   amended motion.

4          MR. LOGAN:  Yes, sir.

5          THE COURT:  I haven't seen that.

6          MR. LOGAN:  That was filed, I believe last Thursday,

7   Your Honor.

8          THE COURT:  Well, is it -- see, the motion that's in

9   the binder is titled motion, it's not titled amended motion.

10          MR. LOGAN:  We have a -- I'd be more than happy to

11  give you my copy, Your Honor.

12          THE COURT:  Thank you.

13                         (Pause)

14          THE COURT:  Yeah, it wasn't in the binder.

15          MR. LOGAN:  That was filed last Thursday or Friday,

16  Your Honor, and at the time we wanted to maintain flexibility

17  to see if the AON proposal would come through in sufficient

18  time, to see if the Hartford would come back with something

19  that was more attractive to the estates.  It does mention the

20  Bond Safeguard proposal in some detail.

21                         (Pause)

22          THE COURT:  Bear with me for just a minute.

23                         (Pause)

24          THE COURT:  All right.  Thank you.  You may proceed.

25          MR. LOGAN:  Thank you, Your Honor.

1        THE COURT:  Do you need your motion back again to do

2   that?

3        MR. LOGAN:  Pardon?  I'm sorry, I --

4        THE COURT:  Do you need your copy of the motion back

5   to do that?

6        MR. LOGAN:  No, I don't, Your Honor.

7        THE COURT:  All right.

8        MR. LOGAN:  It will lighten my load for you to keep

9   it.

10       Your Honor, just one real brief comment.  We did talk

11  to Hartford on Monday, a week ago, and got a proposal from Mr.

12  Leo on Thursday.  At the time, we did have dialogue and the

13  greatest sticking issue, quite frankly, was the cross

14  collateralization.  If the Hartford were willing to cave on

15  that, we might have been in a different situation.  First I've

16  heard that they had any flexibility on that issue at all.

17       But be that as it may, we've got our proposal now and

18  we just simply don't have time to continue to evaluate

19  alternatives.  It's critically important that we maintain in

20  place these bonds so that we maintain the licenses so we can

21  carry out the going concern sale.  And at some point in time,

22  one needs to just make a decision and get on with life.

23       That then turns me to the proffer.  We have in the

24  court Mr. Marc Loewenthal.  Marc you can sit still.  Marc, stay

25  there, stay there.  Spelled M-a-r-c, L-o-e-w-e-n-t-h-a-l.  Mr.

1 Loewenthal was the senior vice-president for Enterprise Risk

2 Management and chief privacy officer for New Century Financial

3 Corporation.  His responsibilities include the insurance and

4 regulatory affairs of the corporation.  So these bonds are

5 within his jurisdiction.

6          He joined New Century in October of 2002.  At the

7 time he joined, he was president of E-Conduit Corporation which

8 was an entity that the debtors acquired in 2002.  It was a

9 consulting company that provided consulting services to various

10 consumer financial institutions, debtor buyers collection

11 agencies and collection law firms with respect to various

12 regulatory issues.

13          Prior to that, he was with Providian Financial

14 Corporation, again, as senior vice-president for public policy

15 and the chief privacy officer.  And before that, he was a

16 partner at the law firm Arter & Hadden.

17          Mr. Loewenthal would testify that prior to the

18 petition date, the debtors obtained their surety bonds which

19 were critical to maintaining their licenses, from the Hartford

20 Company.  It had -- the debtors had approximately 360 bonds in

21 total with an aggregate face amount of slightly in excess of

22 $20 million.  He would testify that all of those bonds were

23 unsecured.

24          He would testify that prior to the petition date,

25 shortly prior to the petition date, the Hartford sent the

1  debtors cancellation notices for all those bonds that were

2  effective generally in late April or early May.  He would

3  further testify that beginning about the end of the first week

4  of April, the debtors engaged in negotiations with the Hartford

5  about possible extensions or terminations of those cancellation

6  notices.

7          And he will testify after substantial give and take

8  transpiring several weeks, ultimately an agreement was reached

9  that was set forth in the original motion, where the Hartford

10 did agree to extend the cancellation notices until today, which

11 was selective because it was the next omnibus hearing date

12 which could allow this motion to be heard on regular notice for

13 a change.

14         It also provided that the Hartford would receive $5

15 million of cash collateral and that that cash collateral and a

16 super administrative priority would secure both the new bonds,

17 which would be issued for 120 days, and also the pre-petition

18 bonds.

19         He would testify that of the total -- there was

20 approximately $6.7 million that were going to be reinstated

21 under that proposal.  And he would testify that approximately

22 3.8 million of that were designated to support the servicing

23 business and $2.8 million of that total were designated to

24 support the loan origination business.  And he would testify

25 that unfortunately on May 3, bids were due for the loan

1  origination business and no qualified bids were submitted.

2       He would then testify that very shortly thereafter

3  the debtors engaged in further negotiations with the Hartford

4  in an effort to reduce the amount of cash collateral the

5  Hartford would require.  And he would testify that over the

6  course of about a week, the Hartford considered the matter and

7  ultimately concluded that it would not budge from its existing

8  proposal and explain that they viewed the package as a total

9  package and that the cross collateralization was a very

10  important feature for them.  And indeed, they viewed their risk

11  probably as being more attendant to the pre-petition bonds than

12  to the new bonds that would be issued for a short time period.

13       He would testify that at that point, he directed

14  people on his staff to explore any possible alternative, to

15  aggressively scour the marketplace.  And they did so primarily

16  through two brokerage companies, Willis of Arizona and AON.

17  And he would testify that the first company to come back with a

18  proposal was Willis.  Willis identified a bonding company known

19  as Bond Safeguard of Arizona.

20       He would testify that Bond Safeguard has a best

21  rating of A minus and V which is slightly lower than the

22  Hartford's.  But he would testify that members of his staff

23  worked directly with the appropriate regulators of each of the

24  states to insure the debtors that Bond Safeguard was acceptable

25  to the state regulators in each of those states.  And he would

1 testify that the state regulators affirmed that Bond Safeguard

2 was acceptable and therefore bonds issued by Bond Safeguard

3 would be fully effective to achieve the objectives of this

4 motion.

5          He would testify that the proposal from Bond

6 Safeguard was superior to the Hartford proposal in several

7 respects.  First off, that the amount of collateralization

8 would be pegged to whatever the face amount of the bonds was.

9 So if we needed $3.8 million, there'd be $3.8 million of cash

10 collateral.  And if we were able to pare down the list further,

11 the amount of cash collateral would be reduced dollar for

12 dollar.

13          He would testify that their proposal was to issue

14 bonds for one year because that's the period of time they

15 operate under and which gave the debtors greater flexibility to

16 have a longer transition period, if necessary, with the winning

17 bidder on the servicing platform.

18          He would testify that, of course, there was no cross

19 collateralization.  And he would testify that the fees to be

20 charged were approximately -- not approximately, were exactly

21 30 cents per $1,000 of bonds, which as things work out, equates

22 to about $60,000.

23          He would testify that AON located another bonding

24 company, International Fidelity Insurance Company, which was

25 willing to make a very similar proposal, but that that proposal

1  came in so late that it just was adjudged by the debtors not to

2  be realistic to try to switch gears and go with that proposal.

3  Plus it offered no advantages over the Bond Safeguard proposal.

4  So other than trying to maintain flexibility in case Bond

5  Safeguard fell apart for whatever reason, the debtors saw no

6  reason to emphasize that as a primary alternative.

7          He would further testify that members of his staff

8  worked very closely with counsel for the Creditors Committee

9  and directly with state regulators to make absolutely sure that

10  bonds were obtained for every state where the debtors needed

11  bonds to maintain their licenses, and that no bonds were paid

12  for in states where they were unnecessary.  And he would

13  testify that there were direct one-on-one conversations with

14  the state regulators to make sure that the debtors, to the best

15  -- the absolute best of their ability, were obtaining the

16  correct number of bonds, no more, no less.

17          He would testify that the states were quite

18  cooperative in that effort.  They were willing to respond in

19  writing so the debtors have written confirmations from the

20  states that the bonds being obtained are those that are needed.

21  And for states which have been dropped from the proposal, we

22  have written -- the debtors have written confirmations from the

23  states that those bonds are not needed.

24          He would testify that that effort generated the

25  dropping of the State of Vermont, for example, but that's just

1  one example.  And he would testify that as a result, the number

2  of bonds that are needed have a face -- the bonds that are

3  needed have a face amount of $2.096 million.  The order that

4  we're going to present to the Court contains some additional

5  flexibility to go up to $2.3 million.  And he would testify

6  that that's purely based on the belief that it would be prudent

7  to have some level of comfort, just in case something untoward

8  happens today as we implement the bonds.  And he would testify

9  that the Creditors Committee endorses that approach.

10         Finally, he would testify that these bonds are

11  critical to maintaining the licenses necessary to carry out a

12  sale of the servicing business.  He would testify that it's

13  critically important that the order be entered today.  And he

14  would finally testify that based upon all the efforts the

15  debtors made, there is no other surety that would provide bonds

16  on a superior basis.  No surety would provide bonds post-

17  petition on an unsecured basis; that under the standards of

18  364, this is the best collateral package that could be obtained

19  and that it's a fair and reasonable package.  And that's the

20  end of the proffer.

21         THE COURT:  Does anyone care to examine Mr.

22  Loewenthal?  I hear no response.

23         MR. LOGAN:  We do have an order, Your Honor.  May I

24  approach?

25         THE COURT:  Yes.

1                              (Pause)

2              MR. LOGAN:  Your Honor, I was just advised by Ms.

3  Kelban that they would like to make one minor change to the

4  order which is fine with the debtors.  We could probably just

5  interlineate it.  It's in paragraph number 11.

6              THE COURT:  All right.

7              MR. LOGAN:  The next to last line, it starts with the

8  word "filed".  And their proposal is to replace the word

9  "filed" with "served on Bond Safeguard."  So strike the word

10 filed and replace that with served on Bond Safeguard.  Just to

11 save the burden of filing objections with the Court.

12             THE COURT:  All right.  I've made that change.  Does

13 anyone else care to be heard in connection with this motion or

14 the form of order?  Revised form of order that's been

15 presented.

16             No response.  I see that the amount has been reduced

17 to 2.3 million.  Okay, very good.

18             MR. LOGAN:  And Your Honor, if Mr. Loewenthal could

19 be excused, we really do need to call the states and let them

20 know that the order has been signed.

21             THE COURT:  Certainly.

22             MS. KELBAN:  Your Honor, as this matter has been

23 concluded, may I be excused?

24             THE COURT:  You may.

25             MS. KELBAN:  Thank you.

1              THE COURT:  The order has been signed.

2              MS. UHLAND:  Thank you, Your Honor.  We are now, I

3    think, prepared to move forward with the sale hearing today.  I

4    think that --

5              THE COURT:  Let me just say for the record, Ms.

6    Uhland, forgive me for interrupting.  To the extent that the

7    Hartford reply can, in anyway, be considered to be an objection

8    or still outstanding in anyway, I overrule it based on the

9    record that's made here today.

10             MS. UHLAND:  Thank you, Your Honor.

11             THE COURT:  All right.

12             MS. UHLAND:  Your Honor, with respect to the sale

13   hearing, we believe that we've resolved all objections that we

14   are considering today.  We're prepared to go forward.

15             We did -- the Committee and the debtors, just before

16   the hearing, received some minor additional language changes

17   that we may need to finalize which I think we'll be able to do

18   rather quickly at the end of the proceeding.  But I think we

19   propose to go forward.  And I believe, I want to confirm with

20   Mr. McMahon.  Are the U.S. Trustee's language changes to the

21   sale order acceptable or have those been resolved?

22             MR. MCMAHON: Your Honor, good morning.  Joe McMahon

23   for the United States Trustee.  Our language changes were

24   incorporated into the form of order.

25             THE COURT:  Thank you.

1           MS. UHLAND:  With that, Your Honor, I propose to

2 proceed with the presentation and the proffer and then maybe

3 briefly coordinate with Creditors Committee counsel and then we

4 can walk through the various changes to the order.

5           THE COURT:  All right.

6           MR. DOSHI:  Excuse me, Your Honor.

7           THE COURT:  Yes.

8           MR. DOSHI:  My name is Amish Doshi.  I'm an attorney

9 with the firm of Day Pitney and we represent Oracle USA, Inc.

10 in this matter.  Counsel just indicated that she believes that

11 all objections have been resolved.  I'm not sure if this is an

12 appropriate time or if -- I have a few concerns regarding the

13 proposed order which we received this morning.  So I'm not sure

14 if this an appropriate time or if I can be heard at a later

15 date.  Whatever Your Honor wishes, I can proceed in that

16 manner.

17           MS. UHLAND:  Your Honor, I think it may make sense to

18 go through -- as we go through the changes to the proposed

19 order, maybe immediately before that, we can hear Oracle's

20 concerns with respect to the form of order at that time.

21           THE COURT:  All right.  Is that all right with you,

22 Mr. Doshi?

23           MR. DOSHI:  That's is fine, Judge.

24           THE COURT:  Thank you.  Let's proceed then.

25           MR. DOSHI:  Thank you.

1          MS. UHLAND:  Thank you.

2          MR. FREEMAN:  Your Honor, this is Barry Freeman at

3 Jeffer Mangels.  With respect to what was just said on behalf

4 of Oracle I think that it's also true with respect to the Union

5 Bank objection and I have no problem reserve -- speaking later.

6 But I just wanted to make the same statement.

7          THE COURT:  All right.

8          MS. UHLAND:  Thank you, Your Honor.  The assets that

9 the debtor is seeking approval to sell today consists of its,

10 what we refer to as its loan servicing platform.

11          The loan servicing platform includes its mortgage

12 servicing rights.  These are the contractual rights to service

13 the loans.  And in respect to the debtors, it's approximately

14 servicing rights with respect to $18 billion of loans.

15          The servicing advances made with respect to those

16 loans of approximately $63 million.  And in addition, in

17 connection with the Carrington sale, the debtors are also, with

18 respect to the sale to Carrington, selling their servicing

19 business.  In other words, the going concern aspects of the

20 sale including certain -- potentially certain contractual

21 obligations and employees liabilities being assumed by

22 Carrington.

23          As the Court is aware, the court order entered a bid

24 procedures order with respect to the Carrington proposed sale

25 or the servicing proposed sale of April 20th, and thereafter,

1 the debtors scheduled and noticed an auction for May 16th with

2 bids due on May 10th.

3        The original stocking horse bid was, at the time,

4 valued -- because the valuation of the bids depends on -- it

5 was based on a percentage basis on the servicing rights and the

6 servicing advances, we valued as of the commencement of the

7 auction the Carrington original bid at approximately 147

8 million based on the servicing advances and excluding certain

9 other factors such as the crediting and the breakup fee.

10        Immediately prior to the -- I'm sorry, on May 10th,

11 the debtors received approximately three additional qualified

12 bids for the assets.  The additional parties submitting bids

13 included Ellington Management Group, LLC, I'll refer to it as

14 Ellington; Morgan Stanley Mortgage Capital, Inc., Morgan

15 Stanley; and a joint bid by Credit-based Asset Servicing and

16 Securitization LLC, which we'll refer to as C-Bass; and

17 Barclay's Bank, PLC, Barclay's.  And Carrington, based on the

18 Court's prior order, had already been qualified as a bidder for

19 the assets.

20        After the bids were received, the debtors, Lazard

21 (phonetic) and the Creditors Committee met and evaluated and

22 discussed the economic terms of the bids.  They also analyzed

23 different methods by which the different bidders could improve

24 an economic and uneconomic portions of their bid through the

25 process and prior to the auction process.

1          Prior to the auction, the debtors, Lazard and the

2    Creditors Committee determined that the bid from Morgan

3    Stanley, which had submitted a gross qualifying bid of 152

4    million was the highest and best bid.  And on May 16th, when

5    the debtors and the representatives of the debtors, Lazard and

6    the Creditors Committee met to commence the auction, they

7    notified the other parties that the Morgan Stanley bid is the

8    highest and best bid which would be the bid for the other

9    bidders to beat.  We assembled at the offices of O'Melveny

10   Myers in New York at 10 a.m. on May 16th.

11          For the purposes of the auction, the debtors

12   evaluated the bids on a net basis.  In other words, because the

13   servicing advances are currently financed by the Citigroup, the

14   debtors backed out those portions and certain other liabilities

15   from the bids so that we could bid -- compare the bids on an

16   apples to apples basis.  For example, certain of the bidders

17   were bidding only on the mortgage servicing rights whereas

18   other bidders were bidding on the ongoing operations.  And

19   therefore, the debtors together with Lazard and the Creditors

20   Committee, made certain adjustments in the bidding process to

21   take that into account.

22          Over the 10-hour auction, the debtors conducted 18

23   rounds of spirited and competitive bidding, during which time,

24   each bidder would announce their economic and non-economic

25   terms of their bids.

1        Relatively early in the bidding process, Ellington

2   and C-Bass chose not to submit higher and better bids and

3   voluntarily dropped out of the auction.  Thereafter, only

4   Carrington, which was bidding on the platform, the mortgage

5   servicing rights and the advances; and Morgan Stanley bidding

6   only on the mortgage services rights and the advances remained.

7        In the final round of bidding, Morgan Stanley bid a

8   net amount of approximately -- again this is net amount -- of

9   approximately 148 million.  Or gross bid of 185 million.  In

10  connection with that bid, Morgan Stanley indicated it would

11  only make such a bid if it would be the debtors and the

12  Creditors Committee -- or the debtors would, with the Creditors

13  Committee's consent -- use its discretion to relieve Morgan

14  Stanley from its obligation to be a backup bidder.

15       The debtors, after consultation with the Creditors

16  Committee, determined that it would commit to use its

17  discretion to relieve Morgan Stanley from being a backup bidder

18  if it would submit that bid.

19       Thereafter, Carrington bid and that amount of

20  approximately $150 million, or gross bid of approximately $184

21  million.  Morgan Stanley declined to raise its bid.  Thus the

22  debtors declared Carrington's final bid as the highest and best

23  bid at the auction.  Over the course of the auction, Carrington

24  consistently improved the economic and non-economic terms of

25  its bid over the numerous 18 rounds of the auction.

1          In considering the Carrington bid to be the highest

2    and best bid, the debtors considered that -- in a consultation

3    with the Creditors Committee, these following factors.  And

4    some of these I'll walk through later which are changes from

5    the original Carrington APA to the asset purchase agreement

6    we're seeking to approve today.

7          First, the hold-back was reduced -- was the smallest

8    of any bidders and was reduced by Carrington to a fixed amount

9    of $5 million.

10          The Carrington bid, because it was a going concern

11   bid, resulted in the fewest unsecured claims against the

12   estate.

13          Further, Carrington was committed to retaining

14   substantially all relevant, current employees, ensuring

15   continuity of the business and avoided termination charges and

16   other rejection claims.

17          Further, and this is a change from the original

18   Carrington bid, Carrington agreed to pay accrued -- or assume

19   accrued and unpaid vacation time for substantially all relevant

20   employees.

21          Importantly, Carrington modified their bid to assume

22   the cure expenses with all assumed contracts except for the

23   servicing agreements.

24          Based on these modifications, together with the

25   overall price, the debtors determined in consultation with

1  Creditors Committee that the Carrington bid represented the

2  highest and best bid.

3        As a result of these various changes, I'd like to

4  briefly describe some major changes from the Carrington

5  agreement.  And we can, if necessary, go through in more detail

6  in the APA, from the filed agreement to the one seeking to be

7  approved today.

8        With respect to the contract, as I noted, except for

9  the servicing agreements, Carrington is assuming the cure costs

10  with respect to contracts to be assumed.  In light of that

11  modification, the debtors have changed the agreement to provide

12  a 60-day period during which Carrington may determine to assume

13  or reject the contracts that are on the current list of

14  proposed contracts, or proposed to be assumed contracts.

15        Further, the debtors and Carrington have worked out a

16  mechanism where, to the extent there are some subsequently

17  identified contracts, the debtors may seek to assume and assign

18  those contracts if Carrington sur-request on the debtors

19  consent.

20        Further, as I noted, Carrington is assuming

21  liabilities with respect to the paid time off for the employees

22  that it is -- for the servicing employees that it is going to

23  hire.

24        It has reduced the hold-back to a fix $5 million

25  number.

1          It has also agreed to modify a certain document

2   destruction language to accommodate requests from the SCC to

3   assure the documents are not inadvertently or not -- or

4   untimely destroyed to the extent the SCC requires those

5   documents for additional investigation purposes.

6          With respect to the economics of the bids, initially

7   Carrington had bid 50 basis points on the loans that are the

8   subject of the servicing.  Ultimately, they bid 69 basis points

9   to be the winning bidder.  And Carrington had bid 90 percent on

10  the servicing advances.  And in their winning bid, bid 95

11  percent on the servicing advances.

12         Your Honor, there are some detailed further language

13  in the order and in the asset purchase agreement itself to deal

14  with some of the issues with respect to the debtors'

15  obligations that it's going to retain with respect to the

16  servicing agreements.  But in essence, as I noted, Carrington

17  is assuming the cure obligations for all agreements other than

18  the servicing agreements.

19         With respect to the servicing agreements, there are

20  certain, what we refer to as servicing obligations, that are

21  obligations that the servicer, which is, in this case, New

22  Century Mortgage, owes to the indentured trustees under those

23  servicing agreements.  I propose to describe this in more

24  detail when we review the order.

25         With respect to each of the separate trustees, Wells

1  Fargo and Deutsche Bank which are trustees for different of the

2  indentures, the debtors have resolved their objections to the

3  cure amounts in slightly different ways.

4       With respect to Wells Fargo, Wells Fargo's withdrawn

5  its objection on cure and has -- the debtors have agreed to a

6  $150,000 reserve for cure amount for certain legal expenses to

7  be incurred by Wells Fargo.  And as I said, we will -- legal

8  and other expenses.  We will walk through that precise language

9  which creditors committee and the debtors are still refining.

10  But we should be able to do that momentarily.

11       With respect to Deutsche Bank, the parties are in

12  discussions about establishing an appropriate mechanism to

13  again resolve the servicer obligations.  And are in process to

14  resolve the service obligations that arise prior to the closing

15  date that the estate will remain liable for, both in terms of

16  having those obligations reserved for and established to the --

17  satisfactorily to the debtor and the Court.  The debtors cannot

18  agree with the servicer.

19       What I would propose to do now, Your Honor, is

20  perhaps have the purchaser address the issues with respect to

21  the adequate assurance obligations for the Court.  Thereafter,

22  provide the proffer and then walk through the changes to the

23  order.

24       THE COURT:  All right.

25       MR. KIRIAKOS:  Good morning, Your Honor.  Tom

1  Kiriakos, Mayer Brown and Row and Mau on behalf of the

2  Carrington entities that are parties to the asset purchase

3  agreement.

4         As debtors counsel indicated, Wells Fargo and

5  Deutsche, in their capacities as indentured trustees under the

6  pertinent servicing agreements, that the APA contemplates to be

7  assumed and assigned to the purchaser at closing, filed

8  adequate assurances objections.  We have worked with both

9  indentured trustees to resolve those objections.

10        The order that was filed with the Court this morning

11 substantively included those agreements.  The -- since we filed

12 that order, we've had a few additional clarifications that we

13 can take you through when debtors' counsel takes you through

14 the entire order.  But essentially, the substance of the

15 agreement was what we sent over.

16        Essentially, the adequate assurances objections have

17 been resolved entirely assuming that prior the closing date,

18 the conditions and the servicing agreements Section 602 or 502,

19 depending on which of the servicing agreements it is, that have

20 to be satisfied under those agreements for a merger or

21 consolidation which includes a sale substantially of all the

22 assets of the servicing entity have been satisfied.  That's set

23 forth in the order.  And that would resolve the adequate

24 assurances objection.

25        In addition, we have language that makes it clear,

1  and this was read into the record at the auction and has been

2  refined in both the order and the APA.  The language is

3  identical in both.  To the effect that while Carrington is not

4  assuming any pre-petition -- pre-closing liability with respect

5  to what happened to the mortgage loans before the closing date,

6  thereafter Carrington will undertake those obligations.

7          And example I can give you, specific an example is

8  for example, if there was a counterclaim filed against the

9  securitization trust based on something that happened pre-

10  closing, Carrington is obligated to defend that counterclaim,

11  but it's not liable for any claims arising from the

12  counterclaim if they should be adjudicated.  It's that type of

13  post-petition, post-closing performance with respect to pending

14  lawsuits, et cetera.  Or lawsuits that are brought relating to

15  the pre-closing period that really is the focus of that.  And

16  the language has been negotiated with both the indentured

17  trustees and it's identical in both the order and the APA.

18          Also, there is a separate agreement that Carrington

19  has committed to to provide both indentured trustees with

20  updates regarding its state licensing efforts during the post-

21  closing period.  That obligation is to provide monthly reports

22  that summarize the process of the progress of the status of

23  that progress and that are to include a certification to the

24  effect that the information included in those reports is

25  accurate and Carrington is proceeding in good faith with the

1  process.   The obligation to deliver those monthly reports ends

2  on the earlier of the six-month anniversary date of the closing

3  and when we've gotten all of our then necessary state licenses.

4        So that, hopefully, is an accurate summary of the

5  resolution of the adequate assurances objections of the

6  indentured trustees.

7        THE COURT:  Thank you.

8        MR. KIRIAKOS:  Thank you.

9        MR. POWER:  Good morning, Your Honor.  Mark Power

10  from Hahn and Hessen, counsel to the Committee.  I figured I'd

11  jump in here and throw our cents in.

12        Your Honor, today's a terrific day for this estate.

13  We worked really hard over the last week to have a really

14  positive auction.  We have about $50 million more than we had

15  before the auction started in terms of net value to the estate.

16        In addition to that, the contract has been improved

17  substantially.  This buyer is taking the employees and the

18  business operating and it is -- therefore, we don't have all

19  those transitional problems.

20        It is -- the buyer is going to look at all the

21  contracts and decide what it needs to take and what it can take

22  in connection with operating the business.  That will result in

23  significant claim reduction to this estate.

24        In addition to that, as a result of the negotiations

25  that took place at the auction and over the weekend, we think

1 there's significant legal improvements in terms of the

2 documentation and protecting the estate in terms of going

3 forward.

4          So all of the things are tremendous for this estate

5 in our view.  We have worked a lot with the debtor to try to

6 get the best value we could for these assets.  I want to

7 compliment on the record the debtors and the debtors'

8 professionals for doing a terrific job in working with the

9 Committee to maximize the value.  They worked with both counsel

10 for the Committee and the financial advisors to really try to

11 get the best we could for the auction.  And we think we have

12 done that.

13          Your Honor, I can report to you that of all the four

14 bidders that we observed at the auction and negotiated with

15 each one, everyone acted in good faith and there was no

16 evidence of any collusion in connection with the auction.  And

17 the Committee is satisfied and could report, Your Honor, that

18 we thought that all parties acted in good faith.

19          This buyer in particular was tremendous in terms of

20 working with us to try to get through the issues and problems.

21 Even though they had a contract previously, they were in good

22 faith negotiated the changes before the bid procedures order

23 was entered; negotiated subsequent changes during the auction;

24 and proceeded to negotiate acceptable changes over the weekend.

25 Counsel for the buyer worked all weekend to get the indentured

1  trustees satisfied and he deserves a compliment on the record

2  today.

3          Your Honor, the Committee is extremely satisfied with

4  this motion before the Court and we'd ask the Court to approve

5  it and we stand behind it.  I will say that the order is a fast

6  moving target, but it's changed from midnight last night to

7  even today and, actually, even as we speak.  There will be some

8  changes that we'll have to go through that and we'll try to get

9  that done so that we can get it up to Your Honor and signed

10 today.  We're very close to getting that language corrected.

11         But with that, we'd ask that this Court approve this

12 motion.

13         THE COURT:  All right.  Thank you.

14         MS. POPPITI:  Good morning, Your Honor.  Susan

15 Poppiti on behalf of Wells Fargo.  I would like to introduce to

16 the Court my co-counsel, Ben Ackerly.  My office filed a motion

17 for admission pro hoc vitae of Mr. Ackerly.

18         THE COURT:  Welcome.

19         MR. ACKERLY:  Good morning, Your Honor.  I represent

20 Wells Fargo Bank as the trustee under certain of the servicing

21 agreements that are being assumed and assigned.  And I just

22 want to correct a couple of things that Carrington's counsel

23 has said with respect to the cure amount and the adequate

24 assurance issue and that specifically relates to the 6-month

25 period.

1          Under the order, Wells Fargo has agreed to withdraw

2  its objection to the cure amount, but the consideration for

3  that is the debtor providing a reserve amount to cover Wells

4  Fargo's costs in connection with the transfer of the servicing

5  rights from the debtors to Carrington.  And the order as its

6  currently drafted proposes to limit that to a six-month period,

7  but in fact, it's going to take longer than six months to

8  complete the transfer of the licensing that's required to

9  Carrington.

10          Each state probably requires that the servicer be

11 licensed.  And to the extent there are state requirements for

12 licensing, we need a certification that that's been

13 accomplished.  So we have an issue with respect to that which

14 hopefully we can resolve.  It's a small issue.

15          The second issue also relates to the six-month period

16 and that's in paragraph 10 and I've spoken to counsel for the

17 Committee.  But we do not propose that there be any six-month

18 limitation on the rights of the Wells Fargo as trustee.

19          Finally, Your Honor, and I've spoken -- this is just

20 a, I think a real technicality.  Wells Fargo is not an

21 indentured trustee under these documents.  It's simply a

22 trustee, not an indentured trustee.  And I think they've agreed

23 to make those changes.

24          But with those three points in mind, we are okay with

25 the order.

1        MR. KIRIAKOS:  Your Honor, points -- Tom Kiriakos on

2   behalf of Carrington.  Points two and three are the Committee's

3   issues and I don't have a problem with that.  And whatever they

4   can work out is fine.

5        However, on the first point, that was discussed over

6   the weekend.  We have every intention and every expectation of

7   satisfying our licensing requirements within six months.  There

8   is no additional -- that also is the period contemplated on the

9   transition services agreement, contemplated by BAPA.  We expect

10  to be done way before six months.

11       My conversations with counsel's partner over the

12  weekend in no way, shape or form extended beyond a period of

13  six months.  I don't quite know what they're now asking for,

14  but whether it relates to our obligation to provide these

15  monthly reports or not.  But the agreement that we had over the

16  weekend was, you know, the earlier of six months or when we're

17  done with our licensing.  And we do not -- and I want to make

18  it clear on the record, we do not think this process is going

19  to take longer than six months.

20       THE COURT:  Let's do this, so that we keep some

21  momentum going here.  Let's complete the evidentiary record,

22  after which I'll take a break.  And anyone who wishes to

23  discuss issues concerning the form of order will have the

24  opportunity to do that with the parties and I'll give you time

25  to do that.  And then we'll -- then you can take me through the

1 order.  How's that?

2          MR. ACKERLY:  Thank you, Your Honor.

3          MR. DOSHI:  And, Your Honor, I'm sorry to interrupt

4 again.  This is Amish Doshi on behalf of Oracle USA.  When

5 would you like to hear about the concerns that the parties have

6 with respect to this sale motion?

7          THE COURT:  well, if it relates to a substantive

8 matter, I'll hear those before we take a recess.  If it relates

9 to, you know, finalizing language under this moving target of a

10 proposed order, you can do that during the recess.

11          MR. DOSHI:  I think it relates to substantive --

12 although it's something that may or may not be fixed with the

13 order, but I believe it's substantive, Your Honor.

14          THE COURT:  All right.  Well, let me hear the

15 debtors' evidentiary record and we'll see if anyone wants to

16 cross examine any witness.  And then I'll hear substantive

17 objections to the extent any are still outstanding.  Okay?

18          MR. DOSHI:  Thank you, Judge.

19          THE COURT:  You're welcome.

20          MS. UHLAND:  Your Honor, I'd like to proffer the

21 testimony of Ari Nathan Lefkowitz and he's present in the

22 courtroom.

23          Your Honor, if Ari Lefkowitz were called to testify,

24 he would testify as follows:

25          He would testify that he is a director with Lazard

1 Freres & Co. and that he joined Lazard's restructuring group in

2 2002 and has advised on numerous clients through the

3 restructuring process, including Asia Global Crossing, GenTech

4 Kaiser Aluminum, Metro Media Fiber Network, Millichron

5 (phonetic), Spectrasite, Zylog and 360 Netowrds.

6 　　　　　Prior to joining Lazard's restructuring group, Mr.

7 Lefkowitz worked in Larard's technology, media and

8 telecommunications group.

9 　　　　　Mr. Lefkowitz graduated magna cum laude from

10 Dartmouth College with an AB in history and also earned a JD

11 with distinction from Stanford University.

12 　　　　　Called as a witness, Mr. Lefkowitz would further

13 testify as follows:

14 　　　　　In his role as a director with Lazard, Mr. Lefkowitz

15 is a key participant in Lazard's efforts to advise the debtor

16 on a broad range of financial topics and one of his roles was

17 to help oversee the marketing and sale of the debtors'

18 servicing platform and assets.  Mr. Lefkowitz directly

19 participated in that process, including attending and helping

20 conduct the auction of those assets on May 16th, 2007.

21 　　　　　He will testify that in a time prior to and after the

22 Court approved the bidding procedures for the sale of the

23 debtors' servicing related assets, that Lazard had

24 approximately six people devoted to the marketing of the assets

25 and the auction and sale process.  That Lazard conduct --

1  collected diligence materials on the assets and established a

2  data room where prospective bidders could review and evaluate

3  those materials.

4       Lazard also initiated communications with parties

5  previously identified as bidders.  As part of this process,

6  Lazard spoke with approximately 40 interested parties and

7  approximately 30 parties executed non-disclosure agreements and

8  evaluated the assets.

9       He would further testify that the proposed sale and

10  auction of the assets were publically advertised in the

11  national edition of the Wall Street Journal on April 30th,

12  2007.

13       He would testify that Lazard worked closely with the

14  debtors throughout the process of marketing assets for sale and

15  the debtors provided substantial and essential assistance in

16  marketing the assets and bringing the assets to sale including

17  responding to numerous requests for information from potential

18  bidders.

19       He would testify that he believes that the marketing

20  and due diligence process and management of the debtors and

21  Lazard was open thorough and fair to all potential bidders.

22  And following the extensive marketing of the assets and

23  aggressive pursuit of the bids and perspective purchasers, a

24  number -- four bidders submitted qualified bids by the May 10th

25  deadline.

1          Specifically, he would testify that the debtors

2  received three qualified bids for the assets.  The parties in

3  addition to Carrington submitting qualified bids included

4  Ellington Management Group, LLC, Ellington; Morgan Stanley

5  Mortgage Capital, Inc., Morgan Stanley; and a joint bid by

6  Credit-based Asset Servicing and Securitization, LLC, C-Bass;

7  and Barclay's Bank, PLC, Barclay's.

8          He would testify that after the bids were received,

9  the debtors, Lazard and the Creditors Committee and their

10  professionals evaluated and discussed the economic terms of the

11  various bids as well as the terms and conditions of the

12  proposed asset purchase agreements submitted by the bidders.

13  They also analyzed the methods through which, pursuant to the

14  auction process, they could improve both the economic and non-

15  economic aspects of the proposals.

16          After reviewing the various bids, the debtors and

17  Lazard notified Ellington, Morgan Stanley and the joint

18  bidders, C-Bass and Barclay's that they were qualified bidders.

19  The debtors and Lazard also notified all qualified bidders that

20  Morgan Stanley had submitted the highest and best bid for the

21  assets with a qualifying gross bid of 152 million.

22          He would testify that prior to the auction, the

23  debtors, Lazard and the Creditors Committee professional

24  discussed with Morgan Stanley certain terms of its proposed

25  asset purchase agreement to determine if Morgan Stanley would

1 agree to improve the terms of the agreement.  Morgan Stanley

2 agreed to a majority of the proposed modifications.

3         He would testify that on May 16th, representatives of

4 the debtors, Lazard and the Creditors Committee and its

5 advisors, Carrington and the other qualified bidders,

6 Ellington, Morgan Stanley and C-Bass/Barclay's, assembled at

7 the offices of O'Melveny Myers in New York at 10 a.m. for the

8 auction.

9         The debtors thereafter commenced the auction with the

10 Morgan Stanley bid of 152 million and the improved asset

11 purchase agreement terms as the then highest and best bid that

12 competing bidders would have to top.

13         For the purpose of the auction, the debtors evaluated

14 each bid on a net basis.  At the commencement of the auction,

15 the debtors explained to all of the bidders the debtors

16 analysis of the Morgan Stanley's bid and the debtors derivation

17 of the net basis of that bid.  As explained by the debtors to

18 all qualified bidders, Morgan Stanley's gross bid of 152

19 million corresponded to a net bid of 99 million.

20         He would testify that over the next 10 hours, the

21 debtors conducted 18 rounds of spirited and competitive bidding

22 during which bidders would announce the economic and non-

23 economic terms of their bids.  After each round of bidding, the

24 debtors, in consultation with the Creditors Committee, selected

25 the bid they deemed the highest and best which included an

1 analysis of economic and non-economic terms and the net basis

2 of the bid.

3        He would testify that frequently there were breaks

4 between rounds of bidding for parties to consider the economic

5 and non-economic terms offered by the highest and best bid in

6 the previous round.  During these periods, the debtors, Lazard

7 and the Creditor Committee extensively discussed the terms of

8 the bids with the bidders and made suggestions on how the

9 bidders could improve their bids.

10        Over the subsequent rounds of bidding, the purchase

11 price and other terms of the transaction improved significantly

12 and the number of bidders in the auction declined.  Relatively

13 early in the course of the bidding process, both Ellington and

14 C-Bass/Barclay's each chose not to submit a higher bid and

15 voluntarily dropped out of the auction.  Thereafter, only

16 Carrington, bidding on the platform, the MSRs and advances, and

17 Morgan Stanley, bidding only on the MRSs and advances remained.

18        Carrington and Morgan Stanley then engaged in several

19 rounds of head-to-head bidding producing in each such round

20 more economic value for the debtors and their estates.

21        He would further testify that during the course of

22 the bidding, the debtors, using their discretion with regard to

23 bid procedures after consultation with the Committee, accepted

24 a bid from Morgan Stanley pursuant to which the debtors

25 selected not to obligate Morgan Stanley to be the backup

1  bidders.   Thereafter, additional rounds of bidding ensued

2  between Morgan Stanley and Carrington and the net value of the

3  final bidding increased by approximately $6 million.

4       In the final round of bidding, Morgan Stanley bid a

5  net amount of approximately 148 million or a gross amount of

6  185 million.  And Carrington then bid a net amount over the 150

7  -- of over 150 million, a gross bid of approximately 184

8  million.  Morgan Stanley declined to raise its bid, thus the

9  debtors declared Carrington's final bid as the highest and best

10 bid.  At approximately 7:30 p.m. Eastern Standard Time, the

11 auction concluded.

12       In declaring Carrington the highest and best bid, the

13 debtors, Lazard and the Creditors Committee considered several

14 factors including:

15       (1) Carrington offered the highest overall purchase

16 price for the assets in a gross amount of approximately $184

17 million with the corresponding net value to the estate of 150

18 million;

19       (2) the Carrington's proposed hold-back from the

20 gross purchase price was the smallest of any bidders at

21 approximately 5 million, that being $8 million less than the

22 hold-back provided in Carrington's original stocking horse bid;

23       (3) the Carrington's bid resulted in the fewest -- in

24 fewer unsecured claims against the estate;

25       (4) that Carrington was committed to retaining

1 substantially all relevant current employees, thereby ensuring

2 continuity of the business and avoiding potentially costly

3 termination charges;

4          (5) Carrington agreed to pay or assume accrued and

5 unpaid vacation time for substantially all relevant employees;

6          (6) Carrington agreed to assume contract cure costs

7 or contracts other than the servicing agreements; and

8          (7) that Carrington agreed to the modification in the

9 asset -- to the asset purchase agreement and sale orders

10 requested by parties -- certain other parties-in-interest.

11          Further, Mr. Lefkowitz would testify that the

12 auction, which took place over 10 hours and 18 rounds of

13 bidding, involving four qualified bidders, including Carrington

14 as a stocking horse bidders, was well-conducted and open and

15 fair to all participants and caused bidders to submit highly

16 competitive bids in increasing amounts; that the efforts of the

17 debtors, Lazard and the Creditors Committee to encourage

18 bidders to improve the economic and non-economic in the terms

19 of their bids facilitated the auction process and submission of

20 improved and higher bids; and further, that each of the parties

21 and the bidders engaged in hard-thought, arms-length

22 negotiations at all time, participating at all times in good

23 faith.

24          And that would conclude the proffer of Mr. Lefkowitz.

25          THE COURT:  Would anyone like to examine Mr.

1  Lefkowitz?  I hear no response.  Debtors have anything else in

2  support of the motion?

3        MS. UHLAND:  Your Honor, simply to reiterate or to

4  duplicate the comments of the Creditors Committee.  The

5  debtors, as well as their professionals, were extremely pleased

6  with the outcome of the servicing agreement, were appreciative

7  of the conduct of all of the bidders, and in particular of the

8  ultimate purchaser who worked with the debtors in good faith

9  over the course of this weekend to reach an asset purchase

10 agreement that's greatly improved from the prior asset purchase

11 agreement.

12        But in all, Your Honor, we ask the at the Court

13 approve the motion.  Again, we're very pleased with the

14 outcome, the debtors and their employees.

15        THE COURT:  All right.  Can you now walk me through

16 the objections and responses that are listed on the agenda?

17 Tell me what remains or what we're hearing at the cure hearing.

18        MS. UHLAND:  Yes, Your Honor.  Let me frame this

19 briefly on what we -- we sent -- we filed a notice designed to

20 do a couple of matters.

21        In addition to a cure hearing, there were some

22 objections under C-1 and C-2, either as a financial

23 accommodation or raising issues of non-assignability.  In

24 addition to the cure amounts being preserved for that later

25 date, those objections are also to be heard at that later date.

1 We're not seeking to overrule any aspect of those objections

2 today.

3         THE COURT:  June 27th is the date, right?

4         MS. UHLAND:  Yes, our -- their second omnibus in

5 June.

6         So, Your Honor, if we're walking through the

7 objections, my understanding -- I don't have the name on A.

8 I'll have to have someone check that one.  I think this was a

9 bid procedures motion that was resolved.  Let's skip that for a

10 moment.

11         Moving on to B, I understand the U.S. Trustee's

12 objections are resolved.  And as we -- Your Honor, many of

13 these were bid procedure objections, so I think that many of

14 these have been resolved in connection with the bid

15 proceedings.

16         I believe C, the initial C-Bass objection was

17 resolved in connection with the bidding procedures order.

18         D, the objection of Citigroup was resolved by

19 inclusion of language in the asset purchase agreement that was

20 agreed to at the time of the bid procedures order and is

21 unchanged.

22         Item E is -- was the original Wells objection to the

23 bid procedures order that was resolved at that time with

24 respect to bidding issues.

25         MR. SUSSBERG:  Your Honor, Jonathan Sussberg from

1    Kirkland Ellis on behalf of Citigroup.  We just saw a copy of

2    the order today and I know you said we'll deal with that at

3    recess.  But I just wanted to let you know, there's a paragraph

4    in there that deals with Citigroup's claim and I just wanted to

5    speak with debtors' counsel at the recess.

6            THE COURT:  Very well.

7            MR. SUSSBERG:  Thank you.

8            MS. UHLAND:  Oh, Item A, I've just been -- sorry to

9    jump out of order -- is the GECC's objection to the bidding

10   procedures which was resolved.

11           We'll also check, the Item F doesn't have the

12   identity of the objector there.  So I'll skip that momentarily.

13   That was a Duetsche Bank objection to the bid procedures which

14   as to bid procedures I believe was resolved.  That's correct.

15   I just had confirmation of that.

16           The next -- then G is not an objection.

17           Now, in starting in Item H, as we get to the

18   objections to the sale or the assignment, the objection filed,

19   H, is being heard on June 27th, as are I, J, K, L, M and N.  I

20   believe the objection of C-Bass is moot as they are not a -- as

21   Carrington is the prevailing bidder.  P, Q, R, S, T, U and V

22   are being continued to the 27th.

23           Objection W we believe we're resolving today.  X is

24   being continued to the 27th.  Y we are resolving today.  Z, AA,

25   BB, CC, DD are being continued to the 27th.  EE we're resolving

1  today.  That's adequate assurance.  F, with respect to cure

2  matters, we're continuing to the 27th.  With respect to

3  adequate assurance, to the extent that remains, we should be

4  resolving today.  GG we're resolving today.  And HH and II are

5  the debtors and Carrington's and the Committees responses.

6         THE COURT:  All right.  I guess I should ask

7  initially whether any of those who filed the objections or

8  responses that we've just gone through have any disagreement

9  with how the debtor has proposed they be treated.

10        MR. POWER:  Your Honor, Mark Power, counsel to the

11 Committee.  I think because there are people on the phone, we

12 should be very clear exactly what's being done on the cures.

13        Basically, the process today is that to the extent a

14 party was noticed with the original cure amount and did not

15 file an objection or response, that amount is deemed to be the

16 cure amount and the buyer has the option of basically

17 satisfying that cure and taking that contract or not and

18 rejecting it.  And they have 60 days to do that.

19        If a party filed an objection as to cure, that amount

20 that they listed with their own in their objection is now on a

21 schedule that will be attached to this order which is deemed to

22 be the new maximum cure amount which is the maximum amount that

23 party can then assert as a cure under the assumption and

24 assignment of its contract.

25        Carrington has the right over the next 60 days to

1 basically either (1) pay that amount and therefore have the

2 contract assumed and assigned since that will satisfy the cure

3 that the third party says is what's owned, in which case, that

4 -- there will be no reason to have a hearing on the 27th since,

5 obviously, they're getting paid what they're asking for; or

6 have the amount -- have the hearing on the 27th as to a

7 disputed amount and maybe try to litigate that issue as to what

8 exactly is owed so Carrington has the right to get the

9 assumption of that contract if it can prove a lower amount; or

10 simply reject that contract if Carrington doesn't want it and

11 has 60 days to do that as well.

12        So it seems to me the record should be very clear on

13 what's being done.  All the cure claims, so that everyone

14 understands, are being continued to the 27th, but we try to

15 basically say if this is your number that you think you're

16 owed, the buyer has the option of paying that, taking the

17 contract.  Everything else is being reserved.

18        As to all other objections that aren't cure related,

19 that relate to C-1 and C-2, those are also being adjourned to

20 June 27th and that includes Oracle's objection that it has in

21 terms of its software and I think Union has an objection as to

22 financial accommodation contracts.  Those are being adjourned

23 to the 27th and be dealt with with the buyer.

24        So, I just think the record should be very clear as

25 to what's being proposed here and I think that may help

1  streamline some of this.  So the relief being sought today is

2  to deal with the Deutsche and the Wells Fargo Bank objection

3  and to deal with all adequate assurance objections and then fix

4  the maximum cure amounts.  And I think beyond that everything

5  is being adjourned.  And that's really what we're asking the

6  Court today.

7        THE COURT:  All right.  Let me then hear from any of

8  the objectors on the list we've just been through.

9        MR. DOSHI:  Thank you -- excuse me.  Thank you, Your

10 Honor.  Amish Doshi with Day Pitney on behalf of Oracle USA,

11 Inc.  Your Honor, is I may, it's a little bit of background to

12 kind of just set forth the concerns we have and additional

13 concerns which in light of Mr. Power's presentation, an

14 additional concern which I'd like to address as well.

15       By way of background, the asset purchase agreement as

16 amended indicates that one of the items, that's Schedule 5.2,

17 sought to be assumed and assigned is, and I quote, Oracle-

18 database, close quotes.  In other parts of the asset purchase

19 agreement, the debtors are also seeking to assume and assign

20 certain, and I quote, intellectual property licenses,

21 transferred intellectual property, IT assets related to the

22 business and software contracts.  All of these are defined

23 terms in the contract.  That's on the asset purchase agreement

24 side.

25       Oracle, according to its records, has that the Oracle

1   and one or more of the debtors entered into a Oracle license

2   and services agreement along with an ordering document which is

3   -- which has a contract for a technical support which is set to

4   expire, the support portion of it is set to expire on May 27,

5   2007.  I'll get back to the May 27th in a second.

6           In addition to this -- these licenses that were

7   acquired by one or more of the debtors under this agreement,

8   Oracle's records also indicates that one or more of the debtors

9   acquired licenses for other Oracle software prior to this

10  agreement, in January of 2000 and in May of 2000.  So, that's

11  by the way of background in terms of what the debtors seek to

12  assume and assign and what Oracle's records indicate.

13          Based on the description that we -- that was provided

14  in the asset purchase agreement, Oracle has no idea as to what

15  they're seeking to assume and assign.  And the reason that is

16  important is, one, because it relates to cure, and second,

17  relates to the 365(c)(1) objection that Oracle has.  I

18  understand that those two portions are being adjourned to June

19  27th.  However, what the order currently provides is while

20  they're seeking to adjourn this, they're also seeking to fix

21  the cure amount as they have set forth.

22          I don't know what version of the order I have is, but

23  the order I have is the one that was circulated at

24  approximately 8:30 this morning.  It fixes an amount for

25  Oracle.  Granted it's a nominal amount, but that relates to

1  only one particular agreement.

2         We cannot determine which contracts are sought to be

3  assumed and assigned.  If it's one of the other ones that is

4  being sought to assumed or assigned, the cure amount is

5  significantly higher.

6         So, while they're seeking to adjourn certain issues,

7  at the same time, the cure amount is being fixed as well as --

8  and specifically I refer to paragraphs 21 and 34 of the

9  proposed order, where 21 says that no party can -- is -- non-

10  debtor party, I'm sorry, is hereby barred, enjoined or

11  prohibited from asserting a claim against the debtor other than

12  the maximum cure amount.

13         Now, if it's one of the other contracts that's being

14  sought to assumed and assigned, then the cure amount is a lot

15  different.  And by this general description of, quote, Oracle-

16  database, we're not sure which licenses or agreements are being

17  referred to.

18         So that's the first point.  If the debtors are -- and

19  the purchaser are seeking to adjourn every single agreement, no

20  matter what it is, to June 27th, that's a different story.  But

21  based on the Exhibit C to the proposed order, it appears that

22  they want to link it just to the one cure amount that was

23  cited.

24         Secondly, that's -- the amount that was cited, we

25  cited a specific amount, but it was a reservation including I

1  said at least that amount.  In light of the fact that we don't

2  have a description of which contracts are sought to be assumed,

3  we have to include the caveat for at least.

4         With respect to the 60 days that was referenced as

5  well as the March 27th date that I referenced where the current

6  support for certain licenses is going to expire, the debtors

7  want 60 days to make a decision as to which contracts they're

8  going to assume and assign.  However, by May 27th, prior to the

9  hearing as well as prior to the 60-day time period, the cure

10  amounts are going to change again.  So the order as it provides

11  right now does not provide that -- if anything happens during

12  the 60-day period or any additional cure, based on the order,

13  the non-debtor party is bound by this amount even though

14  additional cure amount would accrue during the 60-day period.

15         Now, normally, these licenses are for a year.  So

16  we're not talking about one or two months.  And the amount can

17  be significant.

18         The third point is in -- with respect to while they

19  seek to adjourn matters to June 27th, paragraph 34 of the

20  proposed order states that to the extent that Carrington needs

21  to operate under or use the benefits of any assumed contract

22  before it becomes an accepted contract, and I skip over some

23  language, Carrington shall have a temporary license up to the

24  contract notification deadline at its sole cost and expense to

25  use and operate under such assumed contract.  Provided,

1 however, that the granting of such license shall not be deemed

2 to constitute a defacto assignment or assumption of the assumed

3 contract until such time as the assumed contract becomes an

4 accepted contract.

5         However, for the 60-day period, they are, in fact,

6 assuming and assigning the Oracle contracts which 365(c)(1)

7 does not prohibit unless Oracle consents.  And at this point,

8 they're seeking 60 days to assume it and they're -- that's --

9 we have an objection especially in light of the support having

10 -- is set to expire by the end of this week.

11         MR. KIRIAKOS:  Your Honor, Tom Kiriakos on behalf of

12 Carrington.  I can respond to almost all of that, I think, in a

13 way that hopefully will address almost all of it.

14         First, we have a great deal of empathy for what the

15 APA schedules say or don't say.  They've been a particular area

16 of concentration and trying to get the schedules accurate and

17 right and comprehensible is something we've spent or tried to

18 spend a lot of time on.  So, in that sense, as I said, I have a

19 lot of empathy.

20         With respect to the concern about the $1200 amount

21 binding Oracle in the event that there are these other

22 agreements that they're not focused on, that we weren't focused

23 on in the APA.  I think the simple solution on that is on

24 Exhibit C to the order that we will tender to you, we'll put to

25 be determined, TBD.  Not hold them to the 1200.  And as we work

1  through it with Oracle, we'll get to the right amount.  Or

2  we'll litigate it.  They'll have all their rights to litigate

3  it.  So I think that ought to be responsive to that concern and

4  that ought to address it.

5          With respect to the support agreement that's

6  terminating by its terms on May 27th, that is what it is.  If,

7  in fact, it terminates and it terminates under applicable, non-

8  bankruptcy law, then it doesn't survive, it can't be assumed

9  and we couldn't look to assume it unless Oracle was willing to

10  enter into a new agreement.

11          And finally, I think most importantly, the whole

12  purpose of the 60-day period is to give Carrington an

13  opportunity to work through these agreements relating to the

14  platform and to talk to the non-debtor parties and to try to

15  resolve or get a handle on both the cure amounts and the terms

16  for going forward.  So that's the whole purpose of the 60 days.

17  We had every intention of working with Oracle in terms of

18  whether its intellectual property or software licenses.  It's

19  necessary.  And in that sense, paragraph 34 does not assume or

20  assign it.  It just allows us to, as we operate the business in

21  that post-closing period, not have things grind to a halt

22  because we have -- because of the use of the intellectual

23  property.

24          THE COURT:  Well, it seems to me that the order needs

25  to provide two things, if it doesn't now provide it.  One is

1  that to the extent -- because of the passage of time and the

2  providing of services, cure amounts change, that the counter-

3  parties can't be locked in to a number as of today.

4          And secondly, that to the extent that under

5  applicable bankruptcy or non-bankruptcy law, Carrington would

6  not have the right to use, even temporarily, something which

7  the debtor is now purporting to convey to it.  The Oracle

8  objection is the order can't say to the contrary and I would

9  tend to agree with that.

10          MR. KIRIAKOS:  Your Honor, I can tell you from

11  Carrington's perspective, we would agree to both those changes

12  in the order.  That in particular, into the lead-in of 34, we

13  would say to the extent permissible under applicable non-

14  bankruptcy law and have that be the lead-in to paragraph 34.

15          THE COURT:  All right.

16          UNKNOWN PERSON:  Your Honor, this is --

17          MR. POWER:  Wait a minute.  For one minute if you

18  would, because there's one thing I mentioned -- I missed, which

19  Counsel for Oracle correctly pointed out.  We didn't miss the

20  gap period between -- for the cures.  Basically, the deal is

21  that the buyer is picking up all post-closing obligations that

22  arise under those contracts.  So it's not really a cure amount.

23  It's really just a -- the buyer has an obligation to basically

24  pay those as he operate whether or not that contract's

25  ultimately rejected or assumed for post-closing amounts.

1        We do agree that there may be a situation where today

2   a certain amount is owed and when we enter the -- when we

3   close, there may be another amount owed and we will provided

4   for that gap period to cover that and reserve those rights.

5   But that's, I think, pretty much it.

6        Your Honor, that's, by the way, the administrative

7   the claim which we would have to pay anyway assuming it's an

8   allowed claim.  The cure really relates to what we think, you

9   know, the pre.  But we understand there are some administrative

10  components in that cure amount.  So we did actually try to

11  provide and protect the parties on that regard.

12        THE COURT:  All right.

13        MR. DOSHI:  Your Honor, this is Amish Doshi again on

14  behalf of Oracle USA, Inc.  Just to respond to --

15        THE COURT:  You know what, don't do that at this

16  point.

17        MR. DOSHI:  Oh, sorry.

18        THE COURT:  I now understand what your issue is and

19  I've heard from others.  Use the time during recess to the

20  extent you can to see whether, in fact, Carrington has

21  adequately addressed your concerns.  And if it hasn't, then

22  we'll talk some more.

23        MR. DOSHI:  Sure.  Thank you, Your Honor.

24        MR. GALLERIZZO:  Good morning, Your Honor.  Mike

25  Gallerizzo representing General Electric Capital Corporation.

1  We interpose to objections, one to the notice to assume and

2  assign GE's master security agreement.  The other is to the

3  proposed sale itself.

4          I believe we have resolved the objection to the

5  notice to assume and assign the master security agreement.  I

6  had a discussion this morning with counsel for Carrington and

7  they are willing to remove from the schedule of contracts to be

8  assume our master security agreement and related promissory

9  notes, understanding that it was probably a mistake to include

10 it on there.  And I'll let counsel confirm that.

11         MR. KIRIAKOS:  Your Honor, back to what I said

12 earlier about trying to get the schedules right.  That's

13 correct.  The master security agreement should not have been

14 listed as a contract and we agree and we'll fix that in the

15 schedules.

16         However, just so we're clear, the collateral with

17 respect to that master security agreement is included in the

18 assets that we're acquiring.  So it's moving that portion of

19 GECC's claim from the executory contract bucket to the pre-

20 petition secured claim bucket.  The lien with respect to --

21 which -- with respect to that collateral will attach to the

22 proceeds of the sale.

23         MR. GALLERIZZO:  That brings me to the objection to

24 the sale itself.  Counsel has indicated -- counsel for

25 Carrington has indicated that the sale includes GE's assets.

1 We reviewed the schedules that are appended to the asset

2 purchase agreement and it's not clear that all of the assets in

3 which GE holds a lien are being transferred, whether they are

4 or they're not.  And I brought that to this Court's attention

5 during the bidding procedures hearing.  We supplied copies of

6 our schedules to counsel for the debtor.  And I understand this

7 is moving quickly, Your Honor, and I empathize with all counsel

8 in trying to determine what assets are being sold.

9          I think the debtor has attempted to make -- to deal

10 with this in a couple of ways.  One, by providing that our

11 lien, to the extent we have a lien in the assets that are being

12 sold, will attach to the proceeds of sale.  In addition,

13 they've revised the order and to the extent that under

14 363(f)(5), to the extent that we could be compelled to take a

15 cash payment in satisfaction of our debt, they are trying to

16 have this sale approved over our objection.

17          My only comment would be the following, Your Honor,

18 because once again, we don't know what is being sold, what

19 isn't.  The list merely lists some computers, some IT

20 equipment, no ID numbers.  There are other creditors in this

21 case that have that type of equipment out to this particular

22 debtor.

23          And from our perspective, there are two things, okay.

24 One, we have not consented to this sale because we don't know

25 what is being sold.  Number two, earlier, during bidding

1 procedures, we objected on the basis that there was no

2 allocation of proceeds to the particular assets being sold

3 because we believe that is -- that procedure is just fraught

4 with problems.

5          But lastly, I think the debtor is trying to get

6 around 363(f) by using (f)(5) and I would note for Your Honor,

7 Judge Walrath's opinion in the case of In re Kellstrom

8 Industries which is exactly what the debtor in that particular

9 case did in order to get that sale approved although on

10 significantly different types of facts.  It wasn't a secured

11 creditor.  It was an Article 2 type lien.

12          But in that particular case, the creditor argued, and

13 so would we, that if we're going to approve this sale under

14 (f)(5) that our interest -- GE's interest, to the extent that

15 our assets are being sold, needs to be adequately protected.

16 And in the Kellstrom decision, Judge Walrath ruled that meant

17 that the creditor needed to be paid in full the amount of its

18 claim, i.e. if they're selling all of our assets, whatever

19 we're owed on those assets in which we have liens, they would

20 be required to pay that out of the sales proceeds as adequate

21 protection.

22          And I would quote for Your Honor the Kellstrom

23 decision which is at 282 Bankruptcy 787.  It's a 2002 decision

24 from Judge Walrath.  And maybe this is something that I can

25 discuss with debtors' counsel during the break, but I just

1  raised those objections at this point, Your Honor.

2            THE COURT:  Thank you.

3            MR. GREY:  Your Honor, Joseph Grey from Stevens and

4  Lee.  I represent Premier Print and Services Group.  We filed

5  basically what amounts to a cure objection now.  And I do have

6  one new issue which arises from the papers we received this

7  morning, the new form of order.  It's a minor one, I can talk

8  to counsel.  But basically, I'd like to see something in the

9  order or at least something on the record that makes it clear

10 that nothing in this order is going to impair the rights of

11 creditors to come in and seek immediate assumption or

12 assignment -- assumption or rejection of their contracts.  I

13 don't think the order says that now, but I -- I don't think the

14 order impairs that now, but I just want to make sure.

15           THE COURT:  All right.  Anyone else care to be heard?

16           MR. FREEMAN:  Yes, Your Honor.  Barry Freeman for

17 Union Bank, Jeffer Mangles.  Is it all right to speak now?

18           THE COURT:  Yes.

19           MR. FREEMAN:  Okay.  We have a limited objection

20 which relates to a few issues.  One is identification of the

21 contract which I assume will be worked out with the debtor.

22 There is a servicing contract for -- on these deposit accounts

23 which as of now has no cure.  During the 60-day period, that

24 could change.  So if we could have the similar language that

25 was mentioned through the Oracle position, that would be

1  helpful.

2         And then the primary concern is a reference to assume

3  and assign a security agreement dated as of March 14th which is

4  a security agreement secured by securing a reimbursement

5  obligation under a -- one of several letters of credit that

6  were issued to the debtor.  This one, I -- we believe is form

7  workers comp and it has cash collateralized by about $800,000

8  plus some accrued interest.  And it's not clear exactly, first

9  of all, if it can be assigned.

10         But in getting over that issue, exactly to just

11  assign the security agreement without dealing with the letter

12  of credit and the reimbursement obligation and the cash doesn't

13  make a lot sense and we need to work that out.  And that's

14  something that hopefully the order which reflected the

15  preliminary preference to that was for the Oracle order and

16  nothing under the law would be effected.  If something could be

17  similar for Union Bank, that would be appreciated.

18         THE COURT:  Anyone else care to be heard?

19         MR. POWER:  Your Honor, as to the last objector, my

20  understanding is, based on conversations I had with him

21  yesterday and the debtor and that that contract, the security

22  agreement is going to be taken off the schedule in terms of the

23  letter of credit.

24         MR. FREEMAN:  Well, if that's fine, that resolves the

25  issue, obviously.

1        MR. POWER:  Well, we'll ask purchaser's counsel to

2  confirm that when he has a moment.  I know he's sitting here, a

3  moving target, but I think that one is a financial combination

4  contract from the Committee and debtors' point of view,

5  obviously.  So we'll confirm that and then advise you shortly

6  if that will be taken off.

7        MR. FREEMAN:  All right.  Thank you.  I appreciate

8  that and I appreciate the time, Your Honor.

9        MR. POWER:  Your Honor, we do have a chicken and egg

10  problem in that obviously Wells Fargo and Deutsche had

11  objections outstanding.  And we hope we have dealt with them in

12  the order, although I'm pretty sure we're going to end up

13  slightly changing the language when Your Honor gives us a

14  break.

15        Does Your Honor want to go through what we proposed

16  to resolve those now?  Or simply reserve their objections till

17  after we get the order and discuss it then?  I'm trying to

18  streamline the process.

19        THE COURT:  Well, I guess what I'd like to do is have

20  all of the agreements memorialized.  Or at least subject to

21  preparing the final form of order.  And then after our break,

22  just have you come back to me with whatever differences remain.

23        MR. POWER:  Well, should I -- I've been asked, at

24  least, to put on the record.  Your Honor said, if you have any

25  objections.  Well, those objections are obviously outstanding

1 until Your Honor has the order.  So should I at least describe

2 what I think the resolution is now to preserve the objections?

3 Or do you want me --

4          THE COURT:  No, no.  If those objections have been

5 resolved, I don't need to hear them now.

6          MR. POWER:  Well, there is one --

7          THE COURT:  What I want to know now is -- before I

8 leave, just for the break, is --

9          MR. POWER:  Okay.

10          THE COURT:  -- to hear -- I want to know what's left.

11          MR. POWER:  That's fine, Your Honor.  And if you

12 could just agree that those parties could raise any objections

13 if we can't finally agree to the language.

14          THE COURT:  Yes, yes.  I didn't mean to foreclose

15 that because I'm always hopeful they can be worked out.

16          MR. POWER:  Thank you.

17          MR. DREBSLY:  Very briefly, Your Honor, Dennis

18 Drebsly on behalf of Deutsche Bank National Trust Company.  We

19 have an objection.

20          I want to say first for the record, with the help of

21 the Carrington people working over the weekend and changes

22 they've agreed to, we've resolved the adequate assurance

23 objection.  We've also talked to the debtor and the Committee

24 for a methodology to withdraw -- to come to a resolution as to

25 cure amount and a methodology for ultimately resolving that

1 objection.  I think during the break we'll discuss it further.

2 And either we will come to a cure amount by way of stipulation

3 shortly or we will have another hearing before this Court to

4 set a schedule for that resolution.

5         THE COURT:  All right.  Thank you.  Okay.  So the

6 universe of objections for disposition today has reduced itself

7 to those posed by Oracle, GECC, Premier Print, Union Bank,

8 Deutsche Bank and Wells Fargo.  Does that do the list?

9         Okay.  Seems to me we should break now, see whether

10 remaining issues can be worked out.  And then I'll come back

11 and address whatever hasn't yet been resolved.

12         MS. UHLAND:  And go through the rest of the agenda?

13         THE COURT:  Don't worry, I won't forget.

14         MS. UHLAND:  The -- okay.  How long should we break,

15 Your Honor?

16         THE COURT:  Well, how much time will you need, do you

17 think?

18         MS. UHLAND:  I think there's all the objections.  We

19 could probably get that done in 20 or 30 minutes.  Agreed?

20         MR. KIRIAKOS:  I think we might need up to an hour,

21 but if we can compromise at 40 or 35, I'll come back and talk

22 to you.

23         THE COURT:  Well, no, I -- I had something else I

24 wanted to accomplish today, but I, early this morning, came to

25 the realization that that was not going to happen, so.  I'm

1  yours for the day.  I'm content to take an hour at this point

2  if the parties will put it to good use.

3            MS. UHLAND:  Okay.

4            THE COURT:  Okay.  Anything before we break?

5            MS. UHLAND:  No, Your Honor.

6            THE COURT:  All right.  Court will stand in recess.

7                       (Recess)

8            MS. UHLAND:  Your Honor, I think except for one issue

9  and maybe -- I think we've reached agreement with respect to

10 language with respect to the objectors.  And what we would

11 propose to do with respect to those that we've resolved is walk

12 the Court through the proposed language changes from the draft

13 filed this morning rather than trying to do a -- since parties

14 got a chance to review that.

15           THE COURT:  Okay.

16           MS. UHLAND:  We did not reach agreement with GECC.

17 So we'll have to point out where in the order the debtors

18 believe we've already addressed their concerns.  And then I

19 guess the other question is whether we're done with Oracle and

20 Union Bank.

21           MR. KIRIAKOS:  Tom Kiriakos, Your Honor.  I believe

22 that we're done with Union Bank and we can on the record

23 respond to a concern of Premier Printing.  And I think we have

24 one issue with Oracle remaining that Oracle's counsel is

25 talking to his client about.  And we'll be able to outline --

1  if we have a resolution on that, we can outline the entire

2  resolution.  And if not, we're down to one issue to present to

3  you.

4         MS. UHLAND:  Your Honor, would you like us to walk

5  through the change to the order and discuss the GECC issue

6  after?

7         THE COURT:  Yes.

8         MS. UHLAND:  Okay.  And then some of this language

9  has been worked through by counsel for the Committee.  So on

10  those explanations, he was going to -- we're just going to go

11  through the order in order.  But we may be tag teaming it a

12  bit.

13         THE COURT:  That's fine.

14         MS. UHLAND:  So again, Your Honor, what I'm working

15  from would be the version that was filed this morning.  And our

16  first paragraph to consider is paragraph 3.  And this relates

17  to the Citi Corp issues and the servicer advances.

18         THE COURT:  Okay.

19         MS. UHLAND:  I'm going to read this language into the

20  order -- at the very end of the sentence, it currently provides

21  for payment.  And the last phrase of that paragraph says,

22  "Subject to the debtors' and Creditors Committee's verification

23  of such payment --"

24         THE COURT:  I see it.

25         MS. UHLAND:  And then we're adding as an insert to

1   that or a proviso at the conclusion of that. "Provided,

2   however, nothing herein shall determine or be deemed to be an

3   admission by any party as to the amount, extent, validity,

4   enforceability, perfection or priority of any claim or lien

5   asserted by Citigroup Global Markets Realty Corp with respect

6   to the servicer agreements facility, provided further, however,

7   all rights of all parties with respect to such issues are

8   reserved."

9        The next change is in paragraph 7, the second to last

10  line of the paragraph, paragraph 7.  We'd like to add a

11  clarification with respect to this.  After the defined term,

12  where it says "remaining objection", the sentence goes on "the

13  hearing on the assumption assignment of such assumed contract,"

14  we're adding a parenthetical after "assumed contract" to

15  provide "(which, for the avoidance of doubt, includes any

16  assumed contract to which Oracle USA, Inc. or Union Bank is a

17  party)".

18        With respect to the change -- there are also changes

19  to paragraph 8 and I'm going to defer to -- I'm sorry.  One

20  more sentence on 7.

21        MR. KIRIAKOS:  Your Honor, I'm sorry, Tom Kiriakos.

22  An additional clarifying sentence at the end of 7 consistent

23  with the parenthetical just read into the record will read,

24  "All rights and objections of Oracle USA, Inc. and Union Bank

25  of California concerning the assumed contracts are reserved for

1   resolution at such hearing."  That was a Union Bank request

2   that we're happy to accommodate.  We took for granted it should

3   also extend to Oracle in terms of the reservation.

4           THE COURT:  Very well.

5           MS. UHLAND:  Mr. Power is going to generally

6   describe, we've got substantial changes to paragraph 8 which

7   have been agreed to.  So he will generally describe this.

8           MR. POWER:  Your Honor, Mark Power from Hahn and

9   Hessen, counsel for the Committee.  I think with respect to

10  Wells Fargo and Deutsche, probably it's little quicker if we

11  just explain what we're doing and -- because the language is --

12  unless you want me to the entire paragraph in the record, I

13  think counsel for both sides have agreed to the language.  And

14  we intend on revising it back at the office of the buyers and

15  then submit it under certification.  So I would -- if it's okay

16  with Your Honor, I think the easier way is just to go through

17  the concepts.  And it's obviously subject to the final language

18  that we're going to have.

19          THE COURT:  Go ahead.

20          MR. POWER:  With Wells Fargo, Your Honor, there's a

21  number of changes that were in the prior order submitted this

22  morning as to adequate assurance that Carrington will provide

23  and those aren't changing.

24          There also is a -- I guess we had a little bit of

25  chicken and egg problem with respect to adequate assurance

1 because this buyer isn't technically licensed in every state

2 yet as to do the servicing.  And so, basically, it needs to

3 become a licensed servicer in order to satisfy the criteria

4 under the servicing agreement as well as other things.

5        That requires Wells Fargo to do monitoring in

6 connection with the requirements to satisfy that.  Carrington

7 has agreed to provide written reports giving monthly updates

8 consistent with the order to Wells Fargo in connection with

9 those efforts.  And Wells Fargo is incurring expenses and fees

10 in order to monitor that going forward.  And it's really kind

11 of an adequate assurance type of situation.

12        The estate, in order to facilitate that process,

13 recognizing that not every criteria may be satisfied, but we

14 think it will be very shortly, we've agreed to set aside

15 $150,000 from the sale proceeds to cover reasonable costs and

16 out-of-pocket costs and expenses that Wells Fargo may have in

17 connection with that monitoring.  And that will -- and they'll

18 basically do what Your Honor sees all the time which is submit

19 the invoices or statements.  We have a right to object and

20 we'll basically proceed in that manner.

21        In addition to that, Wells Fargo has agreed to

22 withdraw their cure objections that are in the complaint.  So

23 the order makes clear that basically any cure claims in

24 connection with these agreements are subject to the $150,000

25 carve-out.  And with those changes and the other changes, I

1 think that resolves everything, but the buyer counsel may not,

2 so.

3       MR. KIRIAKOS:   Tom Kiriakos, Your Honor.   Just so

4 it's clear, state licensing is not, and Carrington's position

5 has been consistent with this from the start, state licensing

6 is not a requirement of the referenced sections in the order

7 for the assignment of the servicing agreements.   The 602 and

8 the 502 I've referenced earlier.   I just wanted to make our

9 position on that is clear.

10       We have agreed, as I said earlier, to provide monthly

11 reports to Wells Fargo and Deutsche as to our -- the progress

12 of our state law licensing.   We're happy to do that.   The terms

13 of that and with respect to whatever attorneys' fees and

14 reserves, that's between the Committee and Wells Fargo and

15 we're fine with that.

16       The only change we've agreed to with respect to that

17 requirement, instead of referencing a six -- earlier of six

18 months and when we get the licenses, we're removing the six-

19 month period and we're inserting the phrase "the term of the

20 transition services agreement".   And the transition services

21 agreement is to run for six months.

22       My understanding of Wells Fargo's issue was, well,

23 what if we end up extending the transition services agreement

24 for up to eight months, the six months doesn't work.   And so

25 we've agreed to use the term transition services agreement.   So

1  if it gets extended, the period gets extended.  And we're happy

2  with that.  But that's the only change we've agreed to with

3  respect to data at post-closing date obligation.

4          MR. POWER:  With that clarification, Your Honor, I

5  think that deals with Wells.  Deutsche is the next one.

6          Deutsche Bank, Your Honor, we have a separate

7  resolution.  Deutsche had significant cure claims raised in

8  their objection that, quite frankly, we're not in a position to

9  resolve today.  It requires, in essence, some further

10 investigation into diligence by Deutsche and a time for the

11 debtor and the Committee to respond to that.

12         So what -- we also have not yet agreed today, but we

13 are getting close in the substantial negotiations as to what we

14 will reserve for their cure amount.  To set aside, which will

15 be the maximum cure amount that they may be entitled to assert

16 with respect to this cure dispute under their objection.

17         So there are several things going to happen, Your

18 Honor.  We are going to try to work out a stipulation in the

19 next two days with Deutsche, with the debtor, the Committee and

20 Deutsche which will provide for a protocol, as I think

21 Deutsche's counsel mentioned, and ask -- set up a procedure.

22 They'll have roughly, I think, 75 days or so to finish their

23 investigation analysis of the potential claims.  We'll have

24 time to respond.  And if we can't resolve it, we'll seek a

25 hearing before this Court, similar to a cure cost dispute

1 mechanism resolution that Your Honor sees frequently in these

2 situations.

3        The stipulation will provide for whatever we agree to

4 as a reserve from the purchase price for the cure amounts.

5 There also is a provision in the cash management order, Your

6 Honor, entered previously which Deutsche has certain rights

7 with respect to that order and those will continue and we will

8 basically provide for that in the stip, at least for the

9 closing date.  And basically, that stipulation will come forth.

10        Your Honor, what we would like to do on this one,

11 it's not in the order specifically, is Deutsche wants to

12 protect it's rights.  That if we can't agree to that

13 stipulation in the next few days and submit it on a

14 certification, that we have a hearing backup before the closing

15 because otherwise we haven't fixed the cure amount reserve.  So

16 if it's okay with Your Honor, we'd like to schedule this for

17 the 30th.  We have an omnibus hearing before this Court.

18 Hopefully we'll have it resolved by then and we can submit a

19 stipulation.  But that's a backup holding date that would work.

20        THE COURT:  That's fine.

21        MR. POWER:  Okay.  Subject to that, does that satisfy

22 you?  Let me Deutsche for an assessment.

23        MR. DREBSLY:  Yes, I believe counsel has correctly

24 stated our agreement.  Just one in clarification.  That any

25 reserve amount that we agree to will not be subject to any

1  superior lien.  We don't want to agree to an administrative

2  expense and then have some adequate assurance lien prime us and

3  there's no money in the estate to actually pay that.  So that

4  money would be reserved and given a priority status so that --

5  well, let me say the corpus of that can't be invaded by any

6  subsequent order of the Court relating to giving someone a

7  super priority lien over it.

8           MS. UHLAND:  That's consistent with our

9  understanding, Your Honor.

10          To reflect these discussions, there will be some

11  minor changes as well in paragraph 10.  I'm in 10.  So the next

12  paragraph is, to discuss, is paragraph 18 which is another

13  paragraph that needs to be modified to address the Citigroup

14  issues.  And paragraph 18 will be revised to provide, in the

15  second line where it says clarify instead of to pay off "the"

16  obligations, will pay off "all" obligations.

17          And the balance of the paragraph, we're going to

18  delete all the phrases after where it says "8.3L of the APA",

19  and I'm not going to reread it, but we're going to reinsert the

20  same language that I read earlier that is going to be inserted

21  in paragraph 3, the provided however language.

22          Paragraph 20, Your Honor, we're making a

23  clarification to address the concerns of some of the cure

24  objectors.  The first line of paragraph 20, where it says "The

25  maximum potential liabilities the debtors may have for cure

1  costs," and we're going to add the sentence there, "as of the

2  date of the filing of the objection".

3           THE COURT:  Let me ask the phone participants please

4  to put their phones on mute.  Okay.  I'd like to ask the court

5  call operator to disconnect from the phone call, that person

6  who's typing I can hear.

7           THE OPERATOR:  Yes, Your Honor.

8           THE COURT:  I didn't know we could cut out just one

9  person.  I learned that only recently.

10          MS. UHLAND:  And, Your Honor, at the end of paragraph

11  20, to clarify some of these timing issues with the cures,

12  we're going to insert the following.  "To the extent any cure

13  costs --" and I think I'm going to have Mr. Power read his own

14  writing on this one.  My glasses aren't helping me.

15          MR. POWER:  I don't think glasses would help, Your

16  Honor.  The paragraph will read as follows and this is for

17  people on the phone as well.

18          "To the extent any cure costs accrue on an assigned

19  contract," assigned contracts are all contracts but the

20  servicing agreements of the contract, "after the entry of this

21  sale order, but before the --" actually that's not going to

22  work.  It's "after the date of the filing of the objection,"

23  I'm going to make that change right here on the record, "but

24  before the closing date," which is the date this deal will

25  close hopefully, "such cure costs, to the extent allowed, will

1  be (1) paid by Carrington to the extent such assigned contract

2  becomes an accepted contract; or (2) the debtor -- by the

3  debtors as an allowed administrative claim to the extent it

4  satisfies the administrative priority criteria under 11 USC

5  503(b)(1)."

6          In other words, Your Honor, we've dealt with the gap

7  period between the date the objections were filed and the

8  amounts are fixed and the date of closing, so if anything

9  accrues during that period, either Carrington will pay if they

10 take the contract or the debtor will pay it if they don't take

11 the contract, subject to our rights to object to the allowance

12 of the amount and also whether it's a priority or not.  And

13 that hopefully satisfies that gap period issue that Your Honor

14 raised and the objectors raised.

15         MR. HAZELTINE:  Your Honor, if I may briefly, William

16 Hazeltine on behalf of Wells Postal Solution.  I spoke with

17 debtors counsel during the break.  We have an amount that I

18 think at the time the objection was filed was not in arrears,

19 so it wasn't in default.  I actually can provide him with that

20 amount after the hearing.

21         I also understand that it's on it's way and it should

22 be delivered today.  If it is, then it's not an issue and I can

23 let him know and he can take it off the list.  But I just

24 wanted to raise that.  And as I understand it, this does not

25 include any amounts that have been -- any services that have

1 been provided that haven't been billed yet.  I -- those are, as

2 I understand it, the ones that are being accrued.  Thank you,

3 Your Honor.

4         MS. UHLAND:  Moving on from that, Your Honor, the

5 next -- paragraph 30, Your Honor, and I believe this is to

6 address some of the concerns perhaps of the United States

7 Trustee.  It's to clarify -- it will now read, "To the extent

8 of any inconsistency between the provisions of this sale order

9 and the Carrington agreement, the disposition documents or any

10 documents executed in connection therewith, the provisions

11 contained in this sale order shall govern."

12         In paragraph 34, and I'll just reread this one as

13 well.  This is to address the concerns of the assignability

14 issues of the licenses.

15         "To the extent (1) permitted by applicable law, and

16 (2) Carrington needs to operate under or use the benefits of

17 any assumed contract before it becomes an accepted contract (or

18 as provided in Section 2.5 of the Carrington agreement), the

19 debtor hereby grants Carrington full authority up to the

20 contract notification deadline and at its sole cost and expense

21 to use or operate under such assumed contract necessary for the

22 operating of the servicing business provided, however," and

23 then it continues with the rest of the balance of the contract.

24 Of that provision as previously drafted.

25         In paragraph 40 --

1        UNKNOWN PERSON:  Hello?

2        MS. UHLAND:  -- there's some further, again,

3  clarifications and so I'm going to now read how the first

4  sentence will read and then the balance of the paragraph is

5  stricken.

6        "Nothing contained in the sale order, the Carrington

7  agreement or disposition documents shall be deemed to release,

8  discharge or prejudice claims, if any, Wells Fargo or DB and TC

9  may have against (1) the original or preclosing non-debtor

10 parties to the pertinent securitization documents; (2) debtor

11 entities other than debtor other than debtors who are parties

12 to the assumed contracts; or (3) debtor entities who are party

13 to the assumed contracts for claims that do not arise under or

14 relate to such assumed agreements."  And the balance of that

15 paragraph will then be stricken.

16       MR. DOSHI:  Excuse me, Your Honor?

17       THE COURT:  Yes.

18       MR. DOSHI:  This is Amish Doshi on behalf of Oracle

19 USA, Inc.  Again, I don't want to interrupt counsel, but I just

20 want to note that the changes reference in paragraph 34, we

21 still have an issue and at some point after the presentation I

22 would like to address the issue that we still have outstanding.

23       MS. UHLAND:  That's fine, Your Honor.  I believe that

24 may be what counsel for the purchaser noted at the beginning.

25       THE COURT:  Okay.

1        MR. DOSHI:  Thank you.

2        MS. UHLAND:  Your Honor, with respect to paragraph

3  41, there are two clarifying changes.  So I'm just going to

4  reread the first portion up to the "provided however".

5        "Any claim under the Carrington agreement against the

6  debtors not satisfied pursuant to 11.6(c) of the Carrington

7  agreement shall constitute an allowed administrative claim

8  under 503(b) and 507(a)(1) of the Bankruptcy Code and shall be

9  treated with such priority if the above-captioned bankruptcy

10  cases convert to cases Chapter 7 of the Bankruptcy Code."  And

11  then the balance of that paragraph remains the same.

12        Then, Your Honor, in Exhibit C, we have two

13  modifications.  With respect to CB Richard Ellis, after their

14  cure amount, it should say "as of April 30th, 2007".

15        THE COURT:  Okay.

16        MS. UHLAND:  And with respect to Oracle USA, as

17  previously agreed by the purchaser, I believe a TBD is being

18  inserted in lieu of the $1200.  Is that correct?

19        MR. KIRIAKOS:  That's right, Your Honor, I can

20  confirm that.  And to the extent that Union Bank also should be

21  listed on that Exhibit C and I'm not sure if it is, should be

22  or not, that would also be a TBD although the language we read

23  in earlier about complete reservation ought to address the

24  Union Bank's concerns on that.

25        MS. UHLAND:  To -- we did want to confirm on the

1 record, I believe this was the Premier Printing objection, that

2 the debtors acknowledge that they reserve the right to bring

3 any appropriate motions to compel assumption or assignment.

4 And this order does not circumscribe those rights.

5         Further, Your Honor, as I noted, we were unable to

6 resolve the objection with GECC.  So we can discuss that.  It

7 may make sense to first address the remaining issues with

8 Oracle before going on to the GECC objection.

9         THE COURT:  All right.  Let's do that.

10        MR. DOSHI:  Good afternoon, Your Honor.  Amish Doshi,

11 again, for the record on behalf of Oracle USA, Inc.

12        Specifically, it appears the remaining objection that

13 we have relates to paragraph 34 of the proposed order as --

14 even as revised as read and included.  The point being the

15 language, even as revised, still does not address the concern

16 in light of the fact that the hearing is being adjourned with

17 respect to whether or not they can assume and assign these

18 contracts.  It's being adjourned to July -- I'm sorry, June

19 27th.

20        The fact that they've included the phrase to the

21 extent permitted by non-bankruptcy law or something to that

22 effect still does not change from the fact that a determination

23 of whether or not non-bankruptcy law permits this is not going

24 to occur until June 27th.  So in essence, they're getting the

25 right to use these licenses without satisfying 365(c)(1) and

1  they cannot use these licenses without Oracle's consent.  And a

2  determination is not going to be made until the June 27th

3  hearing.  So the additional language does nothing for the

4  interim period between now and June 27th.

5            MR. KIRIAKOS:  I'm ready to address that.

6            THE COURT:  Go ahead.

7            MR. KIRIAKOS:  But it does in this sense.  There has

8  not yet been a determination that, in fact, the debtor can't

9  grant authority to the purchaser to do this.  That

10  determination has not yet been made yet.  I understand that

11  Oracle has a clear view on it.  But we haven't litigated it and

12  we haven't looked at the licenses.  And as Oracle itself has

13  acknowledged as between Oracle and Carrington, we don't quite

14  know what the universe of the documents is.  So that's the

15  first point.

16            The second point is that in no way, shape or form is

17  Carrington claiming that any damages that Oracle suffers

18  between the closing, whether it happens on June 6th or June

19  16th, June 13th and the hearing date on June 27th, it's not

20  liable for.  On the contrary.  If there's a determination on

21  June 27th that we -- that they can't be assumed, and in

22  addition, as a result of that lack of assumption, the debtor

23  didn't have ability to assume, the debtor didn't have the

24  authority to grant us this authority under applicable non-

25  bankruptcy law, we will stipulate that Oracle has all its

1 rights to assert damages for us with respect to any damages it

2 suffers between the period of the closing date, whenever that

3 is, and June 27th.

4        And I think that does respond to the concerns and

5 adequately addresses them and does everything that needs to be

6 done in the context of this transaction.  Thank you.

7        MR. DOSHI:  Your Honor, if I may just respond.  The

8 question is not about damages at this point.  This is kind of

9 putting the cart before the horse.  The question is whether or

10 not it can be assumed or assigned.  We're not at the stage

11 where determining what damages Oracle may or may not have.  I

12 mean, we're at the stage where we can't even identify what

13 contracts are being sought to be assumed and assigned.  But

14 even if they -- they're seeking to assume and assign contracts

15 that they haven't even identified yet.

16        THE COURT:  Well, it doesn't trouble me to put

17 language in the order that restricts the parties from acting in

18 a way that's inconsistent from state law or applicable non-

19 bankruptcy law.

20        What troubles me is the sense I get that Carrington

21 and the debtor, if Carrington sees the need, are prepared to

22 use the intellectual property without Oracle's consent and

23 worry about the consequences later.  That's not a situation I'm

24 interested in condoning by virtue of the sale order.  But I

25 don't -- I wouldn't mind language like has been suggested which

1  enables the use provided any necessary consent is obtained.  Do

2  you understand what I'm trying to say?

3          MR. DOSHI:  Your Honor, I take it that question was

4  for the debtors and the purchasers?

5          THE COURT:  Well, it was for anyone who thought they

6  might not understand what I was trying to convey.

7          MR. KIRIAKOS:  Your Honor, what I thought you were

8  trying to convey was that the onus on Carrington and the

9  debtors is more than taking a calculated risk that if we don't

10 have it by closing, we'll just resolve it at June 24th rather

11 then onus was on Carrington to come to a conclusion before

12 closing whether or not Oracle's consent under applicable non-

13 bankruptcy law was required in order to even have the authority

14 to use it between closing and the date of the assumption.  And

15 if we -- and then seek that consent from Oracle.

16         THE COURT:  Yeah, what I'm saying is this.  By virtue

17 of the sale order, I don't want to set up the structuring so

18 that, you know, Carrington can move ahead and then shift the

19 burden to Oracle to come running into this Court to say, you

20 know, they're doing something they shouldn't be doing.  I don't

21 know whether you can build in some notice provision or some

22 other process which if there is a dispute and consent is not

23 had, or there is a dispute about whether consent --

24         MR. KIRIAKOS:  Is needed.

25         THE COURT:  -- is required, that the parties can come

1 easily back without -- well, in such a way that Oracle's

2 alleged or asserted rights wouldn't be impaired.

3          MR. KIRIAKOS:  Your Honor, I'm confident we can work

4 on both, a notice feature and a process feature that gets us

5 back in front of you if we can't work it out.

6          THE COURT:  Okay.  Seems to me that that would be the

7 way to be on to it anyway.  How does Oracle feel about that?

8          MR. DOSHI:  I -- conceptually, Your Honor, if the

9 language states that they would need Oracle's consent, you

10 know, in the interim period, I think that would be sufficient.

11 And Your Honor --

12          THE COURT:  I'm not -- I'm not --

13          MR. DOSHI:  -- hit it on the head --

14          THE COURT:  I'm not going to make that determination

15 today.  That's the whole point.  I'm going to leave open for a

16 later determination that issue if the parties can't agree.  I

17 don't want either tie Oracle's hands, but I don't want to do

18 anything that has the aura of condoning the allegedly improper

19 use of Oracle's intellectual property.

20          Well, I think Carrington's counsel got my idea and I

21 would be prepared to bless that kind of arrangement and I'd

22 like you to consult with Oracle and see if you can come up with

23 something that's acceptable.

24          MR. KIRIAKOS:  We will, Your Honor.

25          MR. DOSHI:  I'm happy to discuss it, Your Honor.  I

1  apologize for the confusion.  I did not -- I'm not sure I

2  understand what language is being proposed by Carrington's

3  counsel.

4         THE COURT:  All right.  Well, to the extent it can't

5  be resolved, I'll make a decision.  Okay.

6         MR. DOSHI:  Sure.  I'm happy to discuss this further

7  with both the debtors' counsel and Carrington's counsel if

8  necessary.

9         THE COURT:  All right.  Does that leave us just with

10 GECC?

11        MR. LEVEE:  Ira Levee, Lowenstein Sandler.  I'm here

12 on behalf of AT&T at this point, Your Honor.  While we were

13 sitting here, I received an email from my office, from one of

14 the attorneys in my office who had been notified by AT&T who

15 did not receive any notice about this hearing or the cure

16 amounts and --

17        THE COURT:  But here you are.

18        MR. LEVEE:  Well, I was here on behalf of somebody

19 else and they sent me the email and asked if I could address

20 that.  They said that AT&T didn't receive a notice.  Apparently

21 the notice went to an old address and then finally caught up

22 with AT&T at their new address.  And they would like to reserve

23 their rights with respect to any cure claim.

24        THE COURT:  Debtor have any response?

25        MS. UHLAND:  Your Honor, to the extent they file a

1  late cure objection, I think that we can deal with it under

2  legal standards and obviously we're not trying to prejudge the

3  merits of that today.

4          THE COURT:  Me neither.

5          MR. LEVEE:  Thank you, Your Honor.

6          THE COURT:  Okay.  Anyone else other than GECC?  All

7  right.

8          MR. GALLERIZZO:  One housekeeping matter, Your Honor,

9  and then we can proceed to the objection of the sale itself.  I

10  would request that the debtor and the purchaser be required to

11  follow the amended schedule to the notice of assignment

12  indicating that the master security agreement and the related

13  promissory notes are not being assumed, basically deleting it

14  from that notice.

15          MR. KIRIAKOS:  We certainly commit to do that.  The

16  only question is timing, Your Honor.  We'll absolutely get it

17  done before closing, but I -- we'll commit to that.

18          THE COURT:  All right.

19          MR. GALLERIZZO:  Thank you, Your Honor.  The

20  objection to sale that remains open, Your Honor, we had three

21  specific objections.  We still haven't resolved the issue of

22  what assets of GE -- that GE has liens against are being sold.

23  There is no allocation in this order.  What the debtor has done

24  in order to --

25          THE COURT:  Hold on.

1       MR. GALLERIZZO:  Okay.

2       THE COURT:  Before we get to allocation, even given

3  the pace of the process, debtor hasn't been able to identify

4  that which it is selling?

5       MS. UHLAND:  By category and location, yes, but by

6  serial number, we haven't completed that audit piece yet.

7       THE COURT:  How long will that take?

8       MS. UHLAND:  I'm going to ask Carrington counsel if

9  he has a sense of how long do you think that's going to -- that

10  kind of process will probably take?

11      MR. KIRIAKOS:  Your Honor, I have no idea.  We've

12  been asking and asking and asking.  This is -- as I tried to

13  gently note earlier, this has been a source of frustration for

14  us also.

15      MS. UHLAND:  Certainly, you know, prior to the

16  closing, Your Honor, we'll be, you know, concluding that

17  process.  So I would say probably, to get the correct serial

18  numbers, I think it's probably going to take us two weeks to

19  complete that process.

20      MR. GALLERIZZO:  We have several weeks ago, Your

21  Honor, provided the debtor, right after the bidding procedures

22  hearing, with a listing of the collateral against which we hold

23  liens as well as our leased assets.  So they have that

24  descriptive detail.  It's just a matter of matching up against

25  what they're selling.

1          THE COURT:  I mean, it doesn't seem to me to be an

2   unreasonable request.

3          MS. UHLAND:  I agree, Your Honor, it's certainly not

4   an unreasonable request.  It's just been -- this is the

5   operating business in the midst of operating.  And, as the

6   Court knows, everything else that's been going on.  But I think

7   now, with this closing behind us, that we're -- we'll be able

8   to complete those -- that process.  With this sale approval

9   process behind us.

10          MR. GALLERIZZO:  May I ask counsel when we can expect

11   to see a list?  Do you have a guesstimate one way or another?

12   Before closing, are you saying one day before closing?

13          MS. UHLAND:  Say we will -- we don't have anyone from

14   Alex Partners here to commit, but I will -- we will use our

15   every effort to have it done in two weeks time.

16          THE COURT:  So.

17          MR. GALLERIZZO:  Okay.  That's acceptable, Your

18   Honor, in terms of timing.  But what it does is it leads us

19   into a cart before the horse issue.  Once again, we don't know

20   what's being sold here today, but I think we can get by that if

21   appropriate protections are placed in the order to protect GE

22   and other creditors for that matter, although I'm only here

23   representing GE, obviously.

24          In this particular case, the debtor has not provided

25   an allocation in the order as to how proceeds from this sale

1  will be paid to specific creditors.  They have done so openly

2  and told this Court that they want to wait until after the sale

3  is done before that allocation is provided.  I think that's

4  improper.  Your Honor has given your position on that at the

5  bidding procedures hearing.  You tentatively ruled on that.  We

6  talked about it.

7         THE COURT:  Well, I wasn't going to hold up the

8  bidding procedures for that reason.

9         MR. GALLERIZZO:  Yes, that's correct.  I think it's

10 fraught with problems, as we've said previously.  I think what

11 it does is it just allows for a host of litigation at the end

12 of these proceedings and down the road in terms of what assets

13 are -- what is payable to the specific secured creditors for

14 the assets that are sold.  Some of the assets may be gone, Your

15 Honor.  Those sorts of issues are what we're going to be

16 dealing with down the road.

17        We've talked to the debtor about having an

18 opportunity to physically see the assets and appraise them.

19 The debtor is not responding to that request.  You know, they

20 indicated they would look into it and they have not responded

21 to us.  So we're faced with a situation that closing is around

22 the corner, we don't know what assets are being sold.  We

23 haven't been provided with access to the assets to figure out,

24 you know, what the value of those assets are today.  And the

25 debtor, we have not consented to the sale.  We specifically

1  said so in our objection.  The debtor is attempting to get

2  around the lack of consent under 363(f)(5) and basically

3  alleging that GE can be compelled to take a money satisfaction

4  in connection with this case.  Or in connection with this sale.

5        I think they read that section incorrectly.  That

6  particular section, for GE to be compelled to take a money

7  satisfaction, the debtor would be required, under state law, to

8  pay its claim.  Its claim against these particular assets that

9  we're talking about, the assets that we loaned the money

10  against, because if you remember, Your Honor, we have loans and

11  we have leases.  But if we're talking about the assets we have

12  loaned monies against, we're owed approximately $7.4 million.

13  We have, indeed, filed a motion for relief from stay as to all

14  the assets which are scheduled later in June for hearing.

15        Basically, under the case law that I was alluding to

16  earlier, Your Honor, in the big case, in Delaware's the

17  Kellstrom case, Judge Walrath looked at this decision,

18  although, albeit the creditor in that case was an Article 2

19  creditor and not an Article 9 creditor.  But I think the

20  decision of Kellstrom still is applicable here because in

21  determining that you can do a sale under 363(f)(5) in that

22  particular circumstance and alleviate the Article 2 rights of

23  that particular creditor.  The Judge came to the conclusion,

24  however, that under state law, you could only alleviate those

25  rights if that particular creditor was paid in full.  And the

1  same holds true here.  GE, it's lien, it's claim could only be

2  satisfied by payment in full of its claim under state law.

3        So what I had suggested to the debtor and the

4  Creditors Committee and they refused is that this order provide

5  that we, GE, be provided with adequate protection to the extent

6  that basically from the proceeds of sale are claims against the

7  assets that sold would be paid in full.  But that's the face

8  amount of the claim, not the debtors taking the position that

9  they believe we're only entitled to the fair market value of

10  the assets that are being sold in terms of what we'd be

11  entitled to from the sale.

12        There's another decision that talks about issues of

13  value and that's out of the bankruptcy court in New Jersey.

14  It's In re W.D. Hal LLC (phonetic).  And I'll acknowledge to

15  this Court there's a split of authority over whether value

16  indicates the face amount of claims, or whether value indicates

17  what the value of the collateral is being sold is.  I believe

18  in this particular district, at least, the only case I could

19  find on that issue was Judge Walrath's opinion in Kellstrom.

20  And by -- in discussing 363(f)(3), she indicated that that sale

21  couldn't be approved under that particular section because the

22  proceeds from the sale were not sufficient to satisfy the

23  claims against that particular -- those particular assets which

24  were the claims of the Article 2 creditor and I believe Bank of

25  America had a competing lien also.

1       So, I guess in conclusion, Your Honor, what I'm

2  suggesting and we're asking the Court to do is we don't want to

3  bottle up the sale, but we have to protect our rights.  We

4  don't mind the sale going forward in terms of what the numbers

5  are and what the Creditors Committee has done to get further

6  numbers and what the debtor had done to bring further bidders

7  to the table.  We don't want to stand in the way that.  But for

8  us to not object to this sale would seriously affect our

9  interest.

10      So we've objected on the 363(f).  We believe that the

11 Court could approve the sale, okay, over the objection if we

12 were provided with adequate protection in the form of a

13 provision in the order that said our claim would be paid at

14 closing.  And that's in essence what was provided in the

15 <u>Kellstrom</u> decision.

16      Absent -- and absent that, Your Honor, I think, you

17 know, that the sale cannot be approved over our objection, at

18 least with respect to our particular equipment to the extent

19 it's being sold as part of the sale.

20      THE COURT:  All right.  Adequate protection, the

21 theory of it in bankruptcy has always been tied to the value of

22 the collateral, not the claim amount, wouldn't you agree?

23      MR. GALLERIZZO:  In all instances but under 363(f).

24 Under 363(f), the problem that is when you look into the

25 Legislative history of 363(f), it's clear that the Legislature

1 | intended that to be a protective device for secured creditors

2 | so that they can't --

3 |       THE COURT:  And I know that there's a division of

4 | authority about how you add up, what numbers you use to add

5 | up --

6 |       MR. GALLERIZZO:  Sure.

7 |       THE COURT:  -- to figure out whether a secured party

8 | can block a sale or not.  Well, let me hear from others.

9 |       MR. GALLERIZZO:  Okay.

10 |       THE COURT:  Thank you.

11 |       MS. UHLAND:  Your Honor, a couple of points.  First,

12 | with request to the request for inspection, I think there was

13 | maybe some confusion there, but certainly after we provide a

14 | schedule, we'll continue to dialogue with GECC and work

15 | something out with them with respect to any requested

16 | inspection rights.

17 |       THE COURT:  How many locations are involved?

18 |       MS. UHLAND:  We only have two locations with the

19 | servicing equipment, Indiana and the larger location in

20 | California.  So we're hoping that we can sort of get our focus

21 | on doing inventory starting today and work towards that to

22 | complete the schedules or, you know, add the detail to the

23 | schedules.

24 |       But again, we will work with GECC with respect to the

25 | appropriate inspection rights.  Once we get this schedule

1  produced, we think that will be more helpful for a step over.

2      With respect to the adequate protection and the sale

3  objection, Your Honor, I would just note that as counsel noted,

4  the case he is citing is an Article 2 case.  In respect, it

5  involves -- you know, it involved paying the full purchase

6  price of assets under an Article 2 agreement.  It was not a

7  secured claim Article 9.

8      THE COURT:  Well, it was -- it wasn't technically a

9  lien, the Court noted.  But it had to do with the rights of the

10 seller who hadn't yet delivered goods.

11     MS. UHLAND:  Right.

12     THE COURT:  So I wonder functionally, whether for

13 this purpose, GECC's counsel isn't right.

14     MS. UHLAND:  With respect to a -- I guess my view,

15 Your Honor, is that with respect to -- 363(f) says and it

16 addresses the interest of a debtor -- 363(f) talks about

17 selling free and clear an interest in property.  And in this

18 case, Your Honor, we would pause it that with respect to GECC's

19 secured claim, that there interest in property referred to in

20 363(f) is their secured claim under the Code, not their

21 unsecured claim or their deficiency claim.

22     Accordingly, Your Honor, where we would then assert

23 that for the purposes of creating adequate protection

24 requested, that what we have set forth in paragraph 3 of our

25 order that provides that any lien will attach to the proceeds

1  of the sale with the same validity, priority, force and effect

2  that they now have against the purchases assets.

3          THE COURT:  All right.  And tell me why that is

4  meaningful to GECC.  Or is it?  I mean, tell me what it means.

5  Who are they competing against, if anyone?  Are there proceeds

6  which would be free to satisfy that lien without competing

7  interest?  See, the record doesn't tell me this.

8          MS. UHLAND:  Your Honor, and I can -- let me lay out

9  the facts and then make sure that we've got the appropriate

10  record that is necessary to establish it.

11          The facts are, we have a DIP loan and a servicer

12  advance facility.  Our debtor-in-possession loan is up to a

13  maximum, with a second tranche, of about $50 million after the

14  mandatory prepayment.  And the servicer advance facility had an

15  outstanding amount of $32 million.  Accordingly, the sale

16  proceeds has substantial value in excess -- substantial sale

17  proceeds in excess of the GECC secured claims, even if asserted

18  at their full amount.

19          So as a -- based on the record so far in the case and

20  the DIP loan that's reference in the sale order and the Citi

21  Bank loan for which we've expressly addressed how we're going

22  to deal with those secured creditors in the sale order, there

23  appear to be ample proceeds even if the full amount -- even if

24  the claim is fully secured.

25          THE COURT:  So that the amount of the liens, if you

1 carried the debts, their face value are less than the proceeds.

2          MS. UHLAND:  Yes, that's correct, Your Honor.  So the

3 issue is -- so, yes, so we believe that since there is

4 substantial equity in the sale proceeds, if you will, that

5 their lien is adequately protected pending the determination of

6 the total secured amount of their claim.

7          THE COURT:  And what assurance would GECC have that

8 such proceeds wouldn't be dissipated?

9          MS. UHLAND:  We could confirm, Your Honor, on the

10 record that we maintain in a, you know, a balance in DIP

11 account of that total amount of their claim pending the

12 resolution of their secured claim.

13          MR. KIRIAKOS:  Your Honor, Tom Kiriakos on behalf of

14 Carrington.  From Carrington's perspective, obviously, we

15 wouldn't have any objection to that and we think the fix for

16 GECC in the order, if I could just point you to the language.

17 The language that debtors' counsel read, "Any and all such

18 liens shall attached", we could assert after "liens" in

19 parentheses, including without limitation any adequate

20 protection claims in connection therewith to preserve that

21 issue on the record.  And then at the end we could add, with

22 respect to GECC specifically, that pending the resolution of

23 its claim to the proceeds, the -- an amount of the sale

24 proceeds in the full amount of their claim shall be reserved.

25          And I would think both those changes would address

1  any concern that GECC would have today in order to let the sale

2  be approved and go forward.

3         MR. POWER:  Your Honor, Mark Power from the

4  Committee.  Your Honor, we have one caveat to that proffer by

5  debtor and Carrington on the estate's behalf.

6         GECC's claim, as I understand it, is bifurcated.

7  They have approximately 2 million or so against telephone

8  systems.  It's unclear yet whether some of those systems are

9  being sold as part of this transaction or as part of the

10  origination platform.  So I want to make it clear that what we

11  reserve for out of the sale proceeds is the claim relating to

12  some of the equipment that's being sold here, not the entire

13  claim.  Some of which may not relate to those other assets.  We

14  have to work through that issue as to exactly what's being

15  sold, but we're not reserving for basically assets that aren't

16  being sold.  It really has to be the claim related -- base

17  amount of the claim related to the assets being sold.

18         THE COURT:  Well, I think that's all that's required

19  provided there's a way to make that allocation.  I'm assuming

20  that there is.

21         MR. POWER:  Well, yes, Your Honor, I think there is

22  because as I understand GECC, they have two telephone -- major

23  telephone equipments that are approximately $2 million or so.

24  And then they have a separate master lease with all the various

25  and individual pieces of equipment.  I think we're under that

1  master lease here.

2         So we'll try to work it out, but I just want to be

3  clear that when GECC's counsel got up and said, well, it's $7

4  million, I don't think that's what we're talking about in this

5  sale.  And to the extent we are, we will put $7 million or

6  whatever the claim is.  But to the extent it only relates to

7  the master lease and not the other equipment, then that will

8  not be reserved for.  That's simply -- they're going to get

9  their equipment back unless we can sell it for more.  Thank

10 you.

11         MR. GALLERIZZO:  If I may clarify, Your Honor, this

12 has been going fast.  The master security agreement that was

13 originally in the notice to assume, that is the security

14 agreement that relates to five promissory notes and that master

15 security agreement, we have liens against a host of assets,

16 okay.  I mean, there -- I want to say thousands of computers,

17 et cetera.

18         I don't know what Mr. Carrington and his client are

19 trying to purchase as part of this sale.  I don't think he

20 knows at this point.  And that remains to be decided.

21         The point I was making was those assets, we have a

22 master security agreement, all debt is secured by all assets.

23 So, you know, I don't know how we make that allocation down the

24 road if it's determined that they're buying half of the assets,

25 whether, you know, we decide just to split the debt down the

1 middle.  I just -- I don't know how an allocation can be made

2 and albeit the reason why it's a problem during a sale before

3 you know what's being sold.

4          So I just wanted to make that clear.  And counsel's

5 correct, we do have two leases where it's like -- where it's

6 less than 2 million.  I think it's about a million five or a

7 million four.  It's in our lift stay motion.  But I'm not sure

8 whether Mr. Carrington and his client -- or his client are

9 trying to buy those assets also.  Those are leases.  I would

10 think they'd want to assume those leases, have them assumed by

11 the debtor and assignment.  They haven't done that to date.  So

12 I don't -- and I know they have the right under this order to

13 go out and scoop up miscellaneous contracts that they may want

14 that they decide after the fact.  And maybe we can talk about

15 that.  But I want to make the record clear that we've got those

16 two distinct types of scenarios here.

17          MS. UHLAND:  And I think -- I think what -- the

18 specific promissory notes are secured by a single security

19 agreement.  And we believe today that there's some equipment in

20 the security agreement that, for the purposes of this order,

21 unless you otherwise agree, we'll reserve the amount -- the

22 total amount of all these promissory notes.

23          MR. GALLERIZZO:  Okay.  That's --

24          MS. UHLAND:  until we otherwise agree.

25          MR. GALLERIZZO:  That's acceptable, Your Honor.  I

1  think if they reserve and -- you know, if I could ask for one

2  more thing that I reserve the right or my client reserves the

3  right down the road to make a claim as to the full amount of

4  these proceeds irrespective of this particular order here.  I

5  don't want this order, and I'm asking the Court not to let this

6  order waive our right to make that claim down the road based

7  upon the cases that I've cited to Your Honor.

8          THE COURT:  Well, put it this way.  The sale order

9  isn't meant to be that determination, okay.  But I guess the

10 other side of that coin is I want it understood that there be

11 nothing that would occur later in this proceeding which would,

12 in anyway, give GECC the freedom to attack collaterally the

13 sale order.

14         MR. GALLERIZZO:  Understood.  We're not attempting --

15 what I'm trying to do, Your Honor, is preserve all rights.  And

16 we're not trying to hold up --

17         THE COURT:  And I don't think anybody here is

18 intending to impair them in that way.

19         MR. GALLERIZZO:  So if we could include some language

20 in there that indicates as such, we'd ask that.

21         MR. KIRIAKOS:  Your Honor, I'm not Mr. Carrington and

22 to the extent there is a Mr. Carrington, his last name isn't

23 Carrington, it's Rhodes --

24         THE COURT:  He shares an office with Mr. Duplefex

25 (phonetic), I think.

1        MR. KIRIAKOS:  Yes, thank you.  I think the language

2  that I suggested in terms of specifically referencing the

3  adequate -- including any adequate protection claims in

4  connection with those liens gives GECC everything they need on

5  that reservation.  And whatever their rights are, whatever

6  their claims are, whatever their allocation is they can fully

7  reserve to fight those out later as long as, you know, there's

8  no collateral attack on the sale after it happens.

9        THE COURT:  All right.

10        MS. UHLAND:  And as I understood the reservation,

11  he's not reserving the right to go after all the proceeds.  Is

12  that -- you're reserving to go after the full reserve amount,

13  is that correct?

14        MR. GALLERIZZO:  We're reserving the right to go

15  against the full reserve amount, that's correct.

16        MS. UHLAND:  Okay.

17        MR. GALLERIZZO:  That's correct.

18        THE COURT:  All right.  Does that --

19        MR. POWER:  I'm sorry, I just thought I'd interject.

20  Mark Power, counsel for the Committee.  We are not agreeing --

21  we haven't argued this, so we're not putting language in the

22  order that says that the objection is sustained as to GECC

23  because I personally don't agree with the (f)(5) analysis.  I

24  think it's an (f)(3) analysis.  And I want to make clear that

25  we're not conceding --

1          THE COURT:  I'm not making a determination.

2          MR. POWER:  Okay.  Thank you, Your Honor.

3          THE COURT:  Parties apparently have made an agreement

4 which I am willing to bless.

5          MS. UHLAND:  So, Your Honor, we would then, in

6 accordance with the aforementioned agreement, include to

7 paragraph 3 a clarification with respect to liens that it

8 includes without limitation, adequate protection claims and we

9 will further provide that we will reserve from the proceeds the

10 claim amount of GECC.  The secured claim -- well, the total

11 claim amount as opposed to the lease amount of GECC.

12          MR. GALLERIZZO:  And there will be a reservation of

13 rights provision in there also that we just talked about.

14          MS. UHLAND:  Yes, there will be a reservation of

15 rights.  With that, Your Honor, I would ask that the Court

16 approve the sale.  Then, what we will do is go back and further

17 revise the sale order -- or to make all the changes agreed to

18 on the record today and redistribute it and submit it under

19 certification of counsel.  My expectation is that that will not

20 happen this afternoon, that that will happen sometime tomorrow.

21          THE COURT:  Well, I'll be around all week.  All

22 right.  Let me just ask for the record, does anyone else care

23 to be heard in connection with the sale motion?

24          MR. KIRIAKOS:  Your Honor, one point of

25 clarification.  I think that, one, we have every hope of

1  getting it done this afternoon, so, we're not going to give up

2  on that.  And, two, I think that's an accurate expectation with

3  respect to all the objections except to the extent, although

4  we're going to try, if we can't work out the language with

5  Oracle and Oracle still needs to be heard on that.  So I'm

6  concerned about leaving court on the assumption that we're

7  going to give you a certificate of counsel and then not being

8  able to do it and having that argument heard.

9          THE COURT:  I'll take the matter up with counsel by

10  conference telephone if you are unable to --

11          MR. KIRIAKOS:  Okay.

12          THE COURT:  -- finalize the order.

13          MR. KIRIAKOS:  We appreciate that, Your Honor.

14          MR. CAIRNS:  Good afternoon, Your Honor.  Tim Cairns,

15  Pachulski Stang Ziehl Young Jones and Weintraub on behalf of

16  the DIP lenders.

17          The -- we have been involved in the process of

18  revising the order prior to the hearing.  And because some of

19  the revisions we asked for has specifically been change now,

20  we'd just like to make a reservation on the rights on the

21  record.  I'm sure that the debtors will be circulating the

22  revised order under the certification of counsel to the DIP

23  lenders, but we'd just like to make that reservation on the

24  record.

25          THE COURT:  All right.

1          MS. LOWE:  Good afternoon, Your Honor.  Sherry Lowe,

2  I represent National City.  And we pretty much echo all the

3  objections that have been raised and found by GE.  We also have

4  filed objections, and basically, it still comes to the

5  reoccurring issue of what assets are being sold.  And our

6  position is absolutely the same.  We just can't identify

7  whether or not National City's assets are included in the sale

8  or not.

9          So with respect to any sales order that is proposed

10  to the Court, we really would like to see some language that

11  will provide for when a list will be provided so that we can

12  adequately protect our rights or not.  It's just really

13  difficult to determine that.

14          We have a list of assets that is several pages long

15  which we have attached to our objection.  And, you know, today

16  there's not -- there's nothing to compare it to to make that

17  discernment as to whether or not our assets are included.

18  Thank you, Your Honor.

19          THE COURT:  Well, let me ask this.  Were you in the

20  courtroom for the duration of the hearing today?

21          MS. LOWE:  Yes.

22          THE COURT:  Okay.  Before we broke, I went through a

23  list of the objections that were still outstanding and when I

24  didn't mention National City, you didn't pop up.  And I'm

25  wondering why.

1          MS. LOWE:  I'm not sure if I was here for the part

2  where you listed all the objections that were filed.  We filed

3  them some time ago, Your Honor.  It's nothing that we recently

4  filed.  It's a limited objections to all of the sale motions.

5  And so --

6          THE COURT:  But what I said was, before we broke, I

7  made a list, a very short list of those objections --

8          MS. LOWE:  Then I must have stepped out of the court,

9  Your Honor, when you were go through your list.  I apologize.

10          THE COURT:  See what you might miss when you do that?

11          MS. LOWE:  I apologize, Your Honor.

12          THE COURT:  You got to be careful.  All right.  Does

13  the debtor have any response?

14          MS. LOWE:  Thank you.

15          MS. UHLAND:  Your Honor, my understanding is that

16  National City is a lessor and they're -- it's not the same

17  situation that we just discussed with GECC.  And accordingly,

18  they did file a cure objection.  We did, you know, their cure

19  issue will be reserved over.  And you know, I think we're now

20  in the situation with the modification to the sale where there

21  is the opportunity for the purchaser to take their 60 days to

22  review whether they're going to assume or reject the particular

23  leases.

24          You know, it's just a slightly different situation

25  than the GECC situation.

1          MS. LOWE:  That's not entirely correct, Your Honor.

2  We are a secured creditor and we have five leases, yes.  And

3  the secured creditor portion of our claim is an assignment from

4  GECC.  So -- and that was attached to our limited objections.

5  So that's -- to be accurate on the record, we have both

6  positions in this matter.

7          MS. UHLAND:  That wasn't clear to me, Your Honor.

8  Then I would propose, Your Honor, that the current language

9  that we put in for -- at least with respect to the --

10 preserving the -- you know, we have language that protects them

11 now.  Their lien will attach to the proceeds to the extent they

12 have a valid lien.  And to the extent we are -- we were

13 preparing the same list, the same inventory that -- two weeks,

14 that will be prepared for National City as well.

15         THE COURT:  All right.  And what's the magnitude of

16 what you claim to be owed on your secured debt?

17         MS. LOWE:  It's less than half a million, Your Honor.

18         THE COURT:  All right.  Thank you.

19         MS. LOWE:  Thank you.

20         THE COURT:  Anyone else?  I hear no response.  All

21 right.  Based on this record and the resolution of the

22 objections and hopefully the working out of the appropriate

23 language, I am prepared to approve this sale and will act

24 favorably upon a sale order when presented under certification.

25                    (Pause, announcement)

1          THE COURT:  We're going to take a short recess until

2    they finish this.  Once they start the noise, it will be

3    impossible to conduct business.  So court will stand in recess.

4                         (Recess)

5          THE COURT:  All right.  Are we ready to move to

6    another agenda item?

7          MS. UHLAND:  Your Honor, did you complete your ruling

8    with respect to the -- before the rude interruption?

9          THE COURT:  I did.  I'm content to rest on the

10   proposed findings and conclusions that are contained in the

11   formal order.  I am satisfied that the debtor has met the

12   requisite standards for the relief that has been requested

13   here.

14         MS. UHLAND:  Thank you, Your Honor.  With that, we

15   are prepared to move to the next agenda item which is the

16   finalization of our order regarding the examiner.

17         Your Honor, we --

18                    (Pause, announcement)

19         MS. UHLAND:  Your Honor, as the Court is aware, both

20   the United States Trustee and the debtors and the Creditors

21   Committee separately submitted proposed orders with the Court.

22   We did attempt to work out some agreed language about have a

23   conference call over the weekend.  And -- but were not able to

24   complete really any conclusion on that because we weren't able

25   to, sort of, go beyond sort of a general discussion with the

1  parties from the point of view of the United States Trustee's

2  office.

3          So we did -- the debtors did try to file sort of what

4  was our attempted compromise.  Our understanding is that the

5  Trustee either doesn't or doesn't have authority to agree to

6  that language now.  Mr. Indelicato was going to walk through

7  sort of where we are now.  He's been focused on that as I've

8  been tied up with the sale process for the parties.

9          MR. MCMAHON:  If I may approach, Your Honor.  Joseph

10 McMahon for the United States Trustee.  Your Honor, we

11 submitted a proposed form of order and we are talking about the

12 United States Trustee's motion for appointment of an examiner

13 being granted in some form.

14          In terms of procedure, perhaps it would be helpful

15 for, you know, I guess our office to -- I mean, present our

16 proposed form of order to the Court to walk through the

17 differences that we have with the debtors on critical items.

18 And then for the debtors and Committee to respond given that we

19 were the moving party.

20          THE COURT:  Well, let me ask you this.  Have you

21 reviewed the most recent reiteration of the debtors' and

22 Committee's proposed order?

23          MR. MCMAHON:  Your Honor, we have and we still

24 have a --

25          THE COURT:  They seem to address at least some of the

1 issues that the U.S. Trustee seem to have.

2        MR. MCMAHON:  Your Honor, we did have a discussion

3 with debtors' counsel and Committee's counsel over the weekend.

4 And while they were -- those discussions were helpful in

5 understanding where the parties were coming from, I think we

6 still have some fundamental differences about which form the

7 order should take.

8        THE COURT: All right.  Go ahead.  Now what should I

9 have in front of me, Mr. McMahon.

10        MR. MCMAHON:  Your Honor, if I may, I would like to

11 approach and hand you a copy of the -- our form of order with

12 numbered paragraphs.  And also, the form of order that was

13 submitted by debtors' counsel this morning, which is also

14 numbered.  I think it would be helpful.

15        THE COURT:  I have them.  I have them.

16        MR. MCMAHON:  Okay.  Your Honor, as a general matter,

17 we're concerned about whether the examiner is going to be able

18 to independently carry out its duties or is going to be an

19 entity that's, say, tied down or restricted by specific

20 provisions that are in this proposed form of order.  And let me

21 start, Your Honor, with our first -- I guess our first general

22 objection which is the work plan paragraph which is in, I

23 guess, the fourth ordered paragraph of the debtors and

24 Committee's version.  And is not present in our version at all.

25        Your Honor, we start with the -- our office starts

1  with the general belief that the scope guides the examiner's

2  actions and that in connection with professional retentions,

3  using an analog that this Court sees frequently, the scope of

4  the proposed work to be done by a professional general

5  describes what the professional is authorized to do, doesn't

6  detail every action to be taken pursuant to that authority.

7  And there is, I guess, a tail-end review of whether or not the

8  professional has, in fact, heeded to its scope of work with

9  regard to the fee application process.

10           The order is initially proposed by the debtors and

11 Committee contained a, what we would describe, as a fairly

12 onerous work plan requirement.  It would require that the

13 examiner would not be available even to begin to start working

14 until the debtors and Committee had basically signed off on a

15 work plan that the examiner had proposed.

16           The current version of the order still requires to --

17 the examiner to prepare a work plan and to -- and in our view,

18 Your Honor, it's unclear, first, why this particular provision

19 needs to be there.  As a practical matter, if we define the

20 examiner's scope appropriately, we don't see a need for the

21 examiner to map out in consultation with the debtor's

22 representatives and the Committee's representatives exactly

23 each and every step or how the examiner plans to go about doing

24 the investigation.  Certainly the scope of what the examiner is

25 allowed to do will inform that process.

1       So we have some concern that whether the particular

2  purpose of the work plan is to give parties who may want to

3  restrict the examiner at a later date, and we'll get to

4  concerns specific to that, a hook of some type to do so.

5       The bottom line with that provision, Your Honor, is

6  that we have a defined -- we're going to have a defined scope

7  of examination.  We don't believe that the work plan is -- in

8  its pared down form contained in the debtors and Committee's

9  proposed form of order a necessary provision.  It doesn't

10  inform or assist the process at all.

11       The second general concern that we have, Your Honor,

12  is with respect to the scope provision.  And we have language

13  in our proposed form of order -- we're dealing with the third

14  order paragraph, Your Honor, in both forms of order.  And there

15  is expressed language in there referring to causes of action,

16  meaning that the examiner would report on causes of action to

17  the extent that the examination would identify them.  And the

18  debtors and the Committees have deleted that language from the

19  proposed form of order.

20       And a couple of things, Your Honor.  First, we

21  believe that it -- the central purpose of the examination is

22  linked to the role of the examiner in identifying those causes

23  of action.  In other words, the reason why the examination is

24  being performed is not simply to have and say a historical

25  recitation of what occurred.  Just simply laid out there for

1  the public to see.  Rather that we're in a court of law.  This

2  bankruptcy process does have, I guess, a central purposing

3  conclusion to be met.  That the examiner's role in defining,

4  identifying potential causes of action that might be identified

5  in connection with the examiner's investigation is an important

6  part of the report.  It gives it some essential value.

7        And in that, as a side effect, Your Honor, we note

8  that the examiner approaches the identification of causes of

9  action that may be found in connection with the investigation

10 from a different angle than a party litigant in connection with

11 the bankruptcy process.

12       It very may well have a positive effect on the

13 bankruptcy process to the extent that you have an independent

14 third person who is able to look at causes of action and

15 discern which ones have merit, which ones don't, to

16 conservation of this court and perhaps the resources of other

17 courts.

18       The -- as a side point, on this particular note, Your

19 Honor, we not that neither the debtors nor the Committee are

20 under a obligation, an expressed obligation to investigate.

21 Under Section 1107 of the Bankruptcy Code, the investigatory

22 features of the examiners role are carved out from the debtor-

23 in-possession duties.  I'm referring to the specific provisions

24 of 1106 that govern the examination.  And then the relevant

25 part of the Committee's scope in the Bankruptcy Code, Your

1 Honor, refers to the fact that the Committee may investigate

2 claims and causes of action.

3        So in sum on this point, Your Honor, we believe it's

4 essential that the examiner be allowed to look at what occurred

5 here.  And to the extent that the examiner deems it to be

6 appropriate to comment on, to identify causes of action that

7 have merit.

8        The third point of fundamental disagreement that we

9 have, Your Honor, is with respect to what are called the

10 cooperation provisions.  And these fall into, I guess, what we

11 would call two separate categories.

12        The first deals with what I'll just describe as,

13 referring to the debtors and the Committee's order, as the

14 privilege paragraphs.  We have a general provision in our form

15 of order, paragraph 4, that neatly indicates that exactly how

16 matters are going to proceed under the proposes examination as

17 we see it.  Meaning that the debtors and Committee are -- as

18 the language is in our order, shall fully cooperate with the

19 examiner in the performance of any of the examiner's duties in

20 the investigation.  And the debtors and the Committee shall use

21 their respective best efforts, coordinate with the examiner to

22 avoid unnecessary interference with or duplication of the

23 investigation.

24        The debtors and the Committee, in their proposed form

25 of order take that simple paragraph, I guess break it out into

1  two or three paragraphs based on how you look at it, and then

2  insert a number of provisions that we just do not believe need

3  to be adjudicated at this point.  We're just simply trying to

4  authorize the appointment of an examiner.

5            Paragraph 6 deals with procedures for addressing

6  document requests subject to relevance and privilege

7  objections.  Deals with the issue of the applicability of

8  privilege.

9            Paragraph 7 deals with the -- apparently suggests

10 that the examiner would take documents from the Committee

11 subject to certain confidentiality provisions.  Clearly what

12 the ultimate affect of that would be on the issuance of

13 whatever report of findings that the examiner may have, that's

14 a question for a separate day.

15           And paragraph 8 is basically a provision saying that

16 subject to the cooperation paragraphs, that the debtors and

17 Committee's powers are not otherwise affected.

18           I think our general point here, Your Honor, is that

19 with respect to paragraph 6-8, our question is do we

20 essentially need to address these issues in the context of this

21 order.  We think that whatever the extent that privilege is

22 applied, the Court is well capable of addressing those issues

23 outside of the context of this order.  To the extent that there

24 are issues regarding confidentiality of documents and the like,

25 that this Court can address those issues outside of the context

1  of this order.

2        Our critical concern here, Your Honor, is that that

3  not -- that issue not get addressed in the context, in this

4  particular context.

5        THE COURT:  Why?

6        MR. MCMAHON:  Your Honor, I would suggest that first,

7  it's a preference.  It's a standpoint of the preference of the

8  United States Trustee.  The second point is, Your Honor, that I

9  don't think that we can, you know, I guess fully evaluate what

10  the intended effect of some of this may or may not be on the

11  examiner's work.  In other words, that isn't it a situation

12  where we'd just get the examiner appointed, have the examiner

13  come back and to the extent that issues like this need to be

14  worked out with the debtors and Committee, that those issues

15  could be worked out.

16        THE COURT:  See, it seems to me that with the first

17  two points you made, there is some merit to the U.S. Trustee's

18  argument that the provisions as they've been suggested by the

19  debtor and the Committee might arguably impair the examiner's

20  work, or slow it down in any event.

21        I don't see that in connection with the so-called

22  cooperation provisions that the debtor and the Committee has

23  proposed.

24        MR. MCMAHON:  Your Honor, the part of the concern we

25  have with the so-called cooperation provisions is that there's,

1  I guess, if you take a look at the expressed language of them,

2  the issue that we have is part of, I guess, a package of

3  concerns relating to this order as to whether or not the

4  examiner is an independent party that is going to be doing an

5  investigation.  Or whether the examiner is somehow, I guess, a

6  subservient to what the needs or demands of the debtors and the

7  Committee are in connection with the process.

8         The -- we appreciate the fact that both the debtors

9  and the Committee would have concerns with respect to the

10 conduct of the examination and how information issues are going

11 to be addressed in connection therewith.  How privilege issues

12 are going to be addressed therewith.

13        But with respect to the -- those paragraphs 6-8, we

14 just generally believe that they're issues best left for a day

15 when the examiner is onboard and can speak with the debtors and

16 Committee with respect to those.

17        The -- Your Honor, the -- there's a -- there are,

18 what I call, on the second point of this subpart under

19 cooperation, there's a, I guess, minor differences between our

20 paragraph between cooperation with the federal government and

21 other investigations in connection with what the examiner's

22 doing, meaning that the examiner's required to coordinate with

23 other pending investigations.

24        I don't feel a compelling need to run through the

25 specific language changes, but they're minor and I don't see a

1 significant difference between -- or a significant need to have

2 the debtors' language, which is in paragraph 7, I guess be

3 addressed as opposed to just simply accepting our paragraph 5.

4       The fourth point, Your Honor, has to deal with the

5 report, how it's going to be submitted and timing.  And I'm

6 referring to the debtors and Committee's order paragraph number

7 9, which is at the bottom of page 4 of the version that was

8 filed this morning and our paragraph number 6.  And that's at

9 the top of page 3 of our version.

10       We contemplate an interim report, Your Honor, being

11 submitted to the Court within 90 days.  Certainly we think that

12 there's a bear amount of work and labor that the examiner is

13 going to have to do to get his/her or its arms around what

14 occurred at New Century.  And we believe that at that point,

15 the examiner can come forward to court, report on what the

16 examiner has done to date and identify the additional areas of

17 examination that need to be concluded in order for the scope of

18 the examiner's investigation or mandate to be fulfilled.

19       The debtors and the Committee want essentially, Your

20 Honor, the right to shut down the investigation after 90 days.

21 In other words, there is effectively a provision which allows

22 the parties to walk in at the 90-day point and address whether

23 or not the investigation should go on for a 91st day.

24       Your Honor, give the fact that the Court found that

25 the interest of creditors, equity security holders, the estates

1  were best served by authorizing this investigation, we

2  certainly do not believe that it's appropriate to get involved

3  in setting a horizon on the investigation such that we have a

4  firm date as to when the Court expects this to be over.

5         Rather, we think the more prudent way of approaching

6  this is to allow the examiner to get in there, to begin the

7  work of investigating the matters which the examiner is in

8  charge to investigate pursuant to the form of order.  And then

9  to have an interim report at the 90th day and then allow that

10 process to go forth from there.

11        Certainly, Your Honor, given that the, I believe,

12 that both proposed forms of order contemplate that there will

13 be fee review consistent with what -- which what is done for

14 the debtors and Committee's professionals under Section 330.

15 That it is -- it is that those procedural checks provide the

16 level of comfort and certainty that this Court needs in order

17 to address the examination going forth.

18        So, Your Honor, those, I guess, four -- those are the

19 four key concerns that we have, Your Honor.  I will note that

20 with respect to the preamble of the debtors' order, we had some

21 discussion with debtors' counsel with respect to exactly what

22 it was that procedurally that occurred last Tuesday.  We

23 believe that the Court did grant our motion for the appointment

24 of a trustee.  I'm sorry, for an examiner, excuse me.

25        THE COURT:  Here's what happened.  If I'd ask for a

1  show of hands in the courtroom at the conclusion of the

2  evidentiary record, if anybody thought the Court wasn't going

3  to appoint an examiner, I doubt few, if any, hands would have

4  gone up.  I wouldn't have asked the debtor to vote.

5          So that an examiner was going to be appointed was

6  inevitable.  What I suggested, however, I guess, before I

7  technically made that ruling, and the parties understanding

8  that it was coming, quite sensibly got together and said, okay,

9  we'll consent.  And that's what happened.

10          Now, has the debtors and Committee's recent -- most

11  recent iteration of that satisfied the U.S. Trustee?  Are you

12  okay with how they've now described it?

13          MR. MCMAHON:  Your Honor, if I could just have one

14  moment.

15          THE COURT:  Okay.

16          MR. MCMAHON:  Your Honor, provided that the text of

17  the order would not refer to an amended motion by us -- I mean,

18  we brought a motion for an examiner and right when we were

19  getting ready to put our case on, the debtors did a -- came

20  forward and said they were indicating that they were willing to

21  consent to the employment of an examiner, I think that that

22  would be okay.

23          THE COURT:  Yeah, I think it's -- that there was a

24  concern that it not be a C-2 appointment.  And I think that's

25  what was meant -- that's what I took it, the amendment,

1 reference to an amendment to mean.

2          MR. MCMAHON:  I understand where the Court's coming

3 from.  Thank you.

4          THE COURT:  Okay.

5          MR. MCMAHON:  Those are our critical concerns, Your

6 Honor.  I'd just like the ability to respond to whatever

7 arguments that the debtors and the Committee put on.

8          THE COURT:  All right.  Somebody has an active PDA.

9 Would you turn it off, please, because it does interfere with

10 the sound system.  Thank you.

11          MR. INDELICATO:  Good afternoon, Your Honor.  Mark

12 Indelicato from Hahn and Hessen on behalf of the Committee.

13          Your Honor is correct.  All we were doing in the

14 preamble was trying to grapple with reality and they did not --

15 the U.S. Trustee did not make the motion under C-1, they made

16 it under C-2.  So we were just trying to clarify the record for

17 that purpose.

18          Your Honor, I'll try to walk the Court through what

19 we tried to do in our order.  And quite honestly, Your Honor,

20 what we tried to do is in drafting this order, we took what we

21 thought was a practical approach.  We thought at the conclusion

22 -- or in the context of last week's motion, Ms. Uhland made a

23 statement as to what we believed the scope was going to be and

24 we were trying to get to what the Court's concern as to the

25 what, they why, the where, the how these accounting

1 restatements were happening.  And so that's what we believed

2 the scope was to be and I believe on behalf of the Committee,

3 that's what we consented to.  And I believe that's what the

4 debtor consented to as well.

5        The U.S. Trustee's order, Your Honor, however, I

6 think takes that a little further.  And if you look at the way

7 they look at the scope of it, I guess it's in their third

8 decreed paragraph on page 2, it talks about, in (a),

9 investigate any and all accounting and financial

10 irregularities, which is what we have kept in our revised

11 draft.

12        Then it goes on, after -- for the three-quarters of

13 2006, talks about identifying and evaluating any claims or

14 rights of actions that the estates might have arising from or

15 related to such irregularities or misstatements.  We're not

16 exactly sure what that means, Your Honor.  Is this going to be

17 a public document that's going to evaluate the merits of

18 potential causes of actions that the debtor has before the

19 Committee, who are the ultimate beneficiaries are, have had an

20 opportunity to review it?  Is it -- could it potentially

21 prejudice causes of action?  Are they going to be the ones

22 charged with pursuing the causes of action?

23        None of this was clear, Your Honor.  What we thought

24 we all agreed to is have the examiner go in and do the

25 examination, find out what happened.  And then we can all

1  decide what the next step is going to be.  And if you take that

2  down and you look at (b), Your Honor, then to otherwise perform

3  duties under 1106(a)(3) and (a)(4), well, doesn't that the

4  exception that swallows the rule?  Because if you look at the

5  provisions under (a)(3), it is really the provisions of what a

6  trustee is supposed to be doing.  And to the extent not

7  otherwise ordered by court order, to investigate acts, conduct,

8  liabilities, financial conditions, I mean, that's basically

9  what the debtor -- what the Committee is doing, Your Honor.

10         So there was some concern that adding that provision

11  in, you know, nullifies, in fact, the limited scope in which we

12  thought the examiner was being appointed.  And, Your Honor,

13  there was -- just to be clear, there was a typo in our order.

14  When we referred to in our scope, 1106(a)(3), it really was

15  meant to be (a)(4), just so the record is clear.

16         The next thing, Your Honor --

17         THE COURT:  Well, let me ask you this.

18         MR. INDELICATO:  Sure.

19         THE COURT:  What's the harm in having the person who

20  does the investigation making a suggestion about what claims

21  may exist as a result of information found in the course of the

22  investigation?  Seems to me that follows naturally from having

23  conduct such an investigation.

24         MR. INDELICATO:  Your Honor, it may, in fact, very

25  well may.  But maybe, then, that report should be filed under

1  seal.  Maybe there should be different protections available to

2  both the debtor and the Creditors Committee because there were

3  various investigations going in.

4      We tried not to get into all of that in this context

5  of the order.  And we were hoping we could deal with some of

6  those issues later.  But if there's going to be recommendations

7  about the potential merits of causes of action, I would suggest

8  that that record, at least initially, be filed under seal.

9  Because we would not want, potentially, any potential third-

10 parties to know what the strengths and weaknesses of the

11 debtors' case is before the litigation is commenced.  Or even

12 until the litigation is concluded.

13     Your Honor, the next point that I would like to

14 address is sort of the work plan.  Again, we tried to do this

15 in a sort of constructive, practical approach.  If you look at

16 the way the U.S. Trustee did it, they want to put the onus on

17 the debtor and the Creditors Committee to cooperate with the

18 examiner.  And in essence, in order to do that --

19     THE COURT:  Well, let me put it this way.  Wouldn't

20 you think that's what's expected?

21     MR. INDELICATO:  Well, Your Honor, we don't have a

22 problem sitting down with the examiner, understanding where

23 he's going, telling him where we are going, where we have been,

24 what the debtor has done, and suggest a cause of action.  He

25 doesn't need to follow what we suggested.  And that's why we

1  changed it in our revised order.  What we want to do is we want

2  to have some cooperative effort so that he understands what

3  we've done.  He doesn't have to -- he's free subject to this

4  Court's ruling, subject to all parties' rights to object, free

5  to do what he thinks is appropriate.  But I think to have him

6  not sit down with us, I think, would be foolish.

7            And also, as I understand the way this is done, he's

8  going to go conduct his examination.  He's not going to

9  necessarily be checking in with the debtor and the Creditors

10 Committee.  So we don't know what he has done or what he is

11 doing until he submits his interim report.

12           So what in essence you would be asking the Committee

13 to do is stand down on some of these issues which relates to

14 other things until the examiner is finished with his due

15 diligence.  And I think that would be a mistake.  I think this

16 case is moving quickly enough that the Committee needs to be up

17 and running.  We have a 2004 order that we're working out the

18 language with the debtor and they have begun to provide us with

19 information.  And we intend to exercise our fiduciary duties

20 and examine what has gone on with this case in addition to and

21 aside from the accounting irregularities.

22           So we think that the work plan, again, was just a

23 mechanism that we tried to put in place so that we could

24 cooperate with him or her, whoever it is, and they can

25 cooperate with us.  They're free, once we have this plan, to go

1  and do what they need to do.  But we thought not to have it

2  would be not appropriate and might be a waste of the estate

3  assets.

4        THE COURT:  Well, you wouldn't expect the examiner to

5  ask the Committee to develop a work plan for the examiner's

6  review, would you?

7        MR. INDELICATO:  Well, Your Honor, the difference I

8  think here is the examiner has a very -- not a very narrow

9  focus, but it is investigating the accounting irregularities.

10 And what we had suggested is -- and Your Honor, there were two

11 things the Committee was very concerned about and one of the

12 reasons we objected to the U.S. Trustee's motion.

13       Number one was cost.  The Committee was very

14 concerned about cost.  And if the Court looked at our original

15 order, we had suggested a budget.  What -- we could get away

16 from the budget issue, Your Honor, is we deal with the work

17 plan.  If we understand where they're going, yeah, in broad

18 brush, we tell them what our concerns are.  To the sense they

19 choose not to listen to us, they do so with their own peril and

20 we reserve our rights to object to at a later date.

21       THE COURT:  Well, cost is a concern of the Court as

22 well, but under the circumstances, I really don't think there

23 was an option but for the appointment of an examiner.

24       MR. INDELICATO:  No, and we understand that, Your

25 Honor.  But we just want the Court to understand where our

1 concerns are and what the issues that the Committee has are.

2 So that's what the work plan was and we thought, in the revised

3 version, we address some of those comments.

4        And I think -- and this is the -- you know, let this

5 record be clear as I think I tried to make it the last time.

6 The Committee fully intends to exercise its rights and

7 obligations in investigating the acts, conducts and activities

8 of this debtor.  It's not -- we're not shall.  We are and we

9 are in the process of it and this is a very diligent Committee

10 and they're going to take that role seriously.

11        Your Honor, some of the other issues that the U.S.

12 Trustee was concerned about was the privilege issues, the

13 cooperation issues.  Again, he pointed out the paragraph about

14 the Committee providing him -- the examiner with information

15 subject to whatever confidentiality agreement we have with the

16 debtor.  We put that in in order to be helpful, not to be a

17 hindrance.  Right now we do have a confidentiality provision,

18 at least in principle, working with the debtor to the extent

19 they have provided us with information.  We would like to be

20 able to short-circuit some of the examiner's activities and

21 provide them with a download of whatever information we have.

22 But we can only do that if they're going to take it subject to

23 the same confidentiality provisions we have.

24        With respect to the privilege, Your Honor, this is

25 something that we expressed to the U.S. Trustee at the time we

1  were -- at the hearing last week.  There are issues regarding

2  the various governmental agencies, various documents, various

3  privileges.  And to the extent the examiner requesting

4  documentation that is subject to the privilege, all parties

5  need to reserve their rights.  We don't want later to say that

6  there was a global waiver our of privilege because, in fact,

7  documents had been made available to the examiner.  So that was

8  another way of preserving for the benefit of the estate, at

9  least at this point in time, the debtors' privilege.

10         To the extent that issue comes up and there's a

11 dispute, the Court is quite capable of handling it.  What we

12 were trying to do is short-circuit some of the disputes so that

13 every -- we weren't running to the Court for every little

14 dispute.

15         The next issue that they raised, Your Honor, was --

16 let's see -- was the timing of the report.  Your Honor, I

17 thought what we did there is, again, address the concerns of

18 the U.S. Trustee.  They said, in fact, we need 90 days.  We

19 want it to be an interim report before we go to a 60 days and a

20 final report.  But we said, okay, if that's what you want, we

21 can live with that.  But again, once the examiner issues his

22 report, we wanted to make sure that all parties knew that

23 everybody was reserving their rights.  I'm not saying that

24 we're not going to be 100 percent behind the examiner's report.

25 But to the extent either the costs are out of control, the

1 scope is out of control, or any other things is -- what we

2 wanted to make clear is that the parties are reserving their

3 rights to come into the Court and tell you what we believe

4 about the report.

5          So, again, it's not a matter of impinging or

6 hindering anyway what the examiner is doing, but the Committee

7 wants its rights preserved.  It is concerned about the cost, as

8 I know the Court is.  And that's why those provisions were

9 added to the order.

10          I think Your Honor, again, to some -- the way we

11 looked at this is, and I think the Court -- well, the Court

12 knows it right because you are the Court.  And the fact that

13 the appointment of an examiner was, in fact, ultimately a

14 foregone conclusion, but we did have some issues that we worked

15 out and we did agree on a scope for what we believed the

16 examiner's report would be.  I believe this goes beyond the

17 scope.

18          I think our order does, in fact, address what we

19 believed was the Court's concerns, what was -- the agreement

20 between the debtor, the Committee and the U.S. Trustee's office

21 as to what the scope would be.  I think the scope that they

22 have in the order is over broad.  I believe the provisions that

23 we put in here regarding the work plan or a suggested meeting,

24 however, the Court would like to phrase it, so that we can tell

25 them where we are and to hopefully short-circuit some of it.

1 And I believe the provisions with respect to the privilege

2 subject to the confidentiality to the Committee.  I think

3 that's all another mechanism, Your Honor, of forcing or

4 promoting the free flow of information.

5         So we believe we have addressed in our order that was

6 delivered to Your Honor this morning a lot of the issues of the

7 U.S. Trustee and we would propose that that's the order that

8 the Court signs.  Thank you.

9         THE COURT:  Thank you.  Mr. McMahon, anything

10 briefly.

11         MR. MCMAHON:  Very briefly in response, Your Honor.

12 With respect to causes of action, Your Honor, we believe that

13 our scope is appropriate.  It's laid out in our order.  The

14 issues relating to examiner's with expanded powers to bring

15 causes of action and sealing of the examiner's report are not

16 here before the Court today.

17         THE COURT:  Well, but let me ask this.  I do think

18 it's appropriate that the examiner be in a position to suggest

19 that there may be claims owned by the estate which should be

20 brought against various entities or individuals.  It also seems

21 to me that it may be appropriate to have that portion of a

22 report, if there is a portion of the report devoted to that,

23 filed under seal.

24         You're not suggesting that should be foreclosed.

25 You're just suggesting that the issue should be kept open and

1 left to the discretion of the examiner?

2          MR. MCMAHON:  Your Honor, that is correct.  In other

3 words, if the parties' rights to argue that a portion of the

4 report, or something larger, should be sealed at a later

5 date --

6          THE COURT:  But once it's been filed, it's public

7 information.  Would you be amendable to having a draft report

8 submitted in advance to certain entities?

9          MR. MCMAHON:  Your Honor, could I consult with my

10 colleague, Mr. Berra (phonetic), before responding?

11          THE COURT:  Yes.

12                    (Pause)

13          MR. MCMAHON:  Your Honor, to respond to the Court's

14 question, we're a bit concerned about what providing a copy of

15 the report to other parties-in-interest would have insofar as

16 -- we're concerned about the pre-filing -- I guess a vetting of

17 the report.  I believe what we can -- that what would be

18 appropriate is to the extent that there were certain issues

19 limited to whether or not portions of the report should be

20 filed under seal could be addressed before the examiner were to

21 file an interim or file a report.  That a mechanism to achieve

22 that goal could be worked out.

23          THE COURT:  All right.

24          MR. MCMAHON:  And I believe that they -- the debtors

25 and the Committee added a provision to that affect in the

1  proposed form of order.  They don't ask for more.  They just

2  simply ask for the right to argue that the report should be

3  filed -- portions or all of the report should be filed under

4  seal.  And we acknowledge that they can reserve the rights to

5  do that.

6         On the work plan issue, Your Honor, a couple points

7  here.  First, we obviously anticipate that the examiner's going

8  to be talking to the debtors and the Committee.  Frankly, I

9  don't know how the examiner gets from point A to point B

10  without doing so.  And it just seems like this entire issue of

11  a work plan is designed to -- is formalized in a way that gives

12  other parties-in-interest leverage over the examiner in what we

13  all know the examiner's going to be doing anyway.

14         THE COURT:  Well, I don't know if the word is

15  leverage necessarily.  But it does have the feel of some

16  measure of control.  I agree.

17         MR. MCMAHON:  Well, I think that Committee counsel's

18  argument certainly acknowledges as much where he said that, you

19  know, I want a work plan and I want to be able to refer to that

20  at a later date.

21         THE COURT:  But, you know, the Committee's desire to

22  control costs is well-motivated, at least as far as I can tell

23  and understandable.  And because, you know, we said it before,

24  I think.  I'm sure they feel as if the Court decided to spend a

25  little bit more of their money.

1        MR. MCMAHON:  Your Honor, I understand the

2 Committee's concern with respect to cost and, like the Court,

3 our office shares those concerns generally.  With respect to

4 the cooperation point, Your Honor, I just want to make another

5 point.  Like there's this specter of an entire shutdown of

6 whatever the Committee's doing during the pendency of the

7 examiner's investigation's been raised.  And the paragraph that

8 we have, the way it's worded, refers to cooperation to avoid

9 unnecessary interference with the investigation.

10        And to the extent that the Committee would have

11 discrete areas that it would need to look into, that -- and

12 say, touched upon the examination that required, for example,

13 in connection with a plan process of some other issue that

14 needed to be addressed.  Certainly, with the language that we

15 have in our order, it would be within the Court's province to

16 address whether or not the Committee and the examiner could

17 work on the same time on those issues.

18        The specter of a shutdown, a complete shutdown of the

19 Committee I don't think is warranted by the proposed language

20 that we have in our order.  Certainly, it contemplates

21 cooperation and the unnecessary interference language we

22 believe is entirely appropriate and reasonable.

23        The third point, Your Honor, that I want to raise

24 generally in response is with respect to timing.  And with

25 respect to the report, Your Honor, again, I think what is

1  important here is that setting a 90-day absolute bar on what

2  the examiner's going to do effects how the examiner will be

3  going about his business.

4       THE COURT:  I don't view the Committee's formulation

5  as providing that.  Frankly, I don't think it matters, what we

6  call the first report which could very well be the last report.

7  If somebody has an issue about whether something should go

8  forward or shouldn't go forward, I'm certain it will be

9  expressed.

10      MR. MCMAHON:  I understand, Your Honor.  We just --

11 we're concerned about the -- there being language or a

12 situation there where parties can just stop or attempt to

13 impede the examiner from completing what the examiner is

14 charged with doing.

15      THE COURT:  Look, I understand that the U.S. Trustee

16 says that provision has that feel about it, but as I see the

17 way it would likely develop is that there'll be a report.  And

18 to the extent the Committee comes in screaming, saying the

19 examiner has run amok, it may be that limitations or an end to

20 the examiner's duties would be appropriate.

21      To the extent that the examiner says, I've just hit

22 the tip of the iceberg.  You won't believe what's yet to come

23 and more is required, that, too, would be considered.  And in a

24 way, it almost doesn't matter what that provision in the order

25 says conceptually.  But I understand your concern.

1        MR. MCMAHON:  Your Honor, in some -- we're concerned

2   about the way the debtors and Committee's proposed form of

3   order appears to invite litigation.  It's cumbersome, it's

4   inefficient and it does raise the specter of whether the

5   examiner is going to be subservient to the Committee, debtors

6   or both.  It reverses what the Code contemplates about the

7   examiner's independence.  And for those reasons, Your Honor, we

8   believe that our form of order should be adopted.

9        And I would just note one thing.  Counsel for Kodiak

10  who Your Honor initially met at the last hearing on the

11  Trustee/examiner motion has requested that the debtors'

12  stipulation regarding their belief that Kodiak is not an

13  insider, as that term is defined in the Bankruptcy Code, the

14  incorporated in the proposed form of order, we don't have a

15  problem with that stipulation.  That was given to us today by

16  Kodiak's counsel and I just wanted to note that for the record.

17        THE COURT:  All right.  Thank you.

18        MR. INDELICATO:  Your Honor, just some very short

19  points and I will be brief.  On the first issue, the Court has

20  put your finger on the concern of the Committee.  The

21  Committee's concerns initially and primarily were costs.  And

22  we had in our discussions with the U.S. Trustee's office had

23  initially suggested that there be a reasonable budget put forth

24  by the examiner so that way, the costs could be contained.  We

25  were told that a budget was completely out of the question and

144

1 that we should focus on the scope and other issues.

2        Your Honor, we would be agreeable to taking out the

3 work plan issues if we can get a reasonable budget about what

4 the examiner's fees or charges are going to be for the initial

5 90-day period and then we can revisit them again.  You know,

6 our concern is containing the costs, understanding what's going

7 on.  We thought by doing the work plan and the meeting, at

8 least we could deal with it that way since the idea of the

9 budget, at least we thought, was unacceptable.  It may still be

10 unacceptable to the Committee.  I mean, to the U.S. Trustee.

11 But that was our initial focus and that's initially what we

12 wanted to deal with.

13        Your Honor, the second point is if you listen to Mr.

14 McMahon, when we talked about what the Committee can do going

15 forward, he said -- and I try not to quote because my hearing

16 isn't that great, but he said, to the extent the Committee

17 needs to investigate discrete areas during this period of time,

18 like the negotiation of a plan, they can do that.  Your Honor,

19 what he's saying is that the examiner is taking the place of

20 the Committee in exercising its fiduciary obligations under the

21 Bankruptcy Code.  That's what we are concerned about.  That's

22 what we are looking to prevent.  The examiner is in to do, at

23 least initially, that discrete examination.  The Committee

24 isn't in to do a discrete examination.

25        The other point, Your Honor, is on -- and I

1 understand the Court's concern and I understand the U.S.

2 Trustee's concern about filing the report under seal.  But to

3 the extent the examiner finds things that are actionable

4 relating to the accounting irregularities, Your Honor, that is

5 going to have far-reaching implications in this case.  And

6 without having that filed under seal and having made that a

7 document of public record, we're going to have -- and no matter

8 who the potential defendants are, there's going to be an

9 insurance company involved who is going to be all over that

10 report any which way from Sunday looking for potential defenses

11 on behalf of their client.

12          So we implore the Court and the U.S. Trustee, this

13 document, to the extent it's going to make recommendations

14 about potential causes of action, it needs to be filed under

15 seal or at least there needs to be an agreement that the report

16 will be shared with the Committee prior to its filing so we

17 have an ability to speak to the examiner about those issues.

18          And the final point, Your Honor, is I believe the

19 record was clear on the debtors' position with respect to

20 Kodiak.  One of the issues that we had, and we went to C-1 and

21 not C-2, was the whole issue about the insider and there were

22 some discrepancies.  And, Your Honor, although the Committee

23 hasn't had an opportunity to review it, a finding like that or

24 even a stipulation like that could have far-reaching

25 implications far beyond this motion.  So I think the record,

1  with respect to the debtors' stipulation, speaks to itself and

2  I don't believe that needs to be in the order.  Thank you.

3          THE COURT:  I see there are others stood to be heard.

4          MS. MILLER:  Good afternoon, Your Honor.  Kathy

5  Miller on behalf of Fidelity National Information Services,

6  Inc.  I'm here with my co-counsel, Don Workman, from the firm

7  of Baker and Hostetler.  We did file the motion for pro hoc,

8  but the order's not yet reached Your Honor.  And with Your

9  Honor's permission, they'd like to be heard on this issue.

10          THE COURT:  Very well.

11          MS. MILLER:  Thank you, Your Honor.

12          MR. WORKMAN:  Thank you, Your Honor.  Don Workman

13  from Baker and Hostetler for Fidelity National Information

14  Services.  I'm not going to repeat what our Committee's able

15  counsel and Blank Rome and Hahn and Hessen have done a --

16  represent us very well.

17          I just want to state for the record and my client

18  wants to make it clear.  I guess the first thing he would say

19  is that he certainly agrees with the Court's statement that we

20  were concerned that the Court decided to spend our money.

21          The second point is Fidelity, as the largest trade

22  creditor, is very concerned.  And it's not really -- I heard a

23  lot about control here.  It's a concern for getting out of

24  control.  We don't want to see an examiner run amok and spend

25  our money.  It's not the debtors' money.  It's not the U.S.

1  Trustee's money.

2          While we understand the importance and obviously the

3  concern of the Court, we want to underscore, embolden,

4  italicize and circle with a big red marker the concern that the

5  examiner not be out of control.  To that end, we believe that

6  the language that the Committee and debtor have put together

7  accomplishes that goal of keeping things from getting out of

8  control.

9          Your Honor, as co-chair of the Committee, I would

10 also state that I was somewhat offended of the notion that the

11 examiner is an independent third party and somehow that, by

12 inference, the Committee would not exercise its fiduciary duty

13 as what we see as a pretty independent third party.  We have

14 been diligent, indeed, almost vicious in keeping after the

15 debtors in this case.  We don't need an examiner to help us do

16 our job.

17         I understand the Court's going to order it again.  I

18 emphasize, my client wants to emphasize that the examiner,

19 through the Court's order, be kept from getting out of control.

20 Thank you, Your Honor.  We would ask, as a creditor, the Court

21 enter the order that the Committee has put together.  Thank

22 you.

23         THE COURT:  Thank you.

24         MR. LEVEE:  Good afternoon, Your Honor.  Ira Levee,

25 Lowenstein Sandler for the New York State Teacher's Retirement

1 System.  We filed a statement in support of the United States

2 Trustee's proposed form of order and we're here to state that

3 again on the record.

4 　　　　Now, there was one paragraph that wasn't discussed.

5 It appears in the U.S. Trustee's proposed form of order.  It's

6 the last paragraph.  We had made some suggestions to the U.S.

7 Trustee and he incorporated those in his proposed order, but

8 they were not included in the proposed order by the Committee

9 and the debtors.  And that has to do with the language where it

10 says, "Shall impede the right of the United States Trustee or

11 any other party-in-interest to request any other lawful

12 relief," so on and so forth.  And then later on it says that

13 "if during such investigation other relevant matters are

14 revealed in which the United States Trustee or any other party-

15 in-interest," we believe that that's the appropriate language.

16 　　　　In the order submitted by the Committee and the

17 debtor, the beginning language states "The United States

18 Trustee or any other party."  And then later on, the language

19 is just limited to the debtor, Committee or the United States

20 Trustee and it doesn't include any other party-in-interest.

21 And I feel that to be consistent, those two descriptions of the

22 parties should be the same.  Thank you, Your Honor.

23 　　　　THE COURT:  Thank you.

24 　　　　MR. BOTICA:  Good afternoon, Your Honor.  Matthew

25 Botica, Winston and Strawn for Kodiak Funding.  Your Honor,

1 we're dealing with two forms of orders.  The order proposed by

2 the debtor is silent on the C-2 issue and the fact that we are

3 not proceeding and we do not have any issue with respect to

4 that order if that is the form which the Court adopts.

5       If the Court works off the U.S. Trustee's form, there

6 is a sentence that begins on the last line of page 1 and

7 carries over and states that the -- an examiner under C-1, the

8 failure to deal with C-2 obviated the need for the Court to

9 consider the issues raised under C-2.  If that were the form

10 you were to use, Your Honor, we think it would be appropriate

11 to have a proviso at that point that says, provided the debtors

12 did stipulate on the record that Kodiak Funding is not an

13 insider as such term is defined under the Bankruptcy Code.

14       That is the agreement we reached last Tuesday when we

15 were resolving it.  It was put in the record by Ms. Uhland and

16 we confirmed that on the record.  And just to avoid any doubt

17 going forward as to what that provision means in the U.S.

18 Trustee's order, I would like to have that proviso added.

19       THE COURT:  Well, since this is going to be a C-1

20 appointment, doesn't that render any C-2 issue moot for

21 purposes of this relief?

22       MR. BOTICA:  As I said, if it were totally silent on

23 C-2, I wouldn't have any issue with that.  And the debtors'

24 form of order is.  So once we get into a discussion of C-2, it

25 then troubles me that someone might argue months down the road

1 that somehow we gave up our right with respect to the debtors'

2 stipulation.  If you just instruct that provision, it would be

3 fine.

4          THE COURT:  All right.  I hear your position.

5          MR. BOTICA:  Thank you.

6          THE COURT:  Okay.  What I'm going to do is both forms

7 of order contain provisions that I think are good.  I'm going

8 to draft my own form of order based upon the parties

9 submissions.  I hope taking the best from each.

10          MS. UHLAND:  Your Honor, just to clarify the

11 typographical error in the debtors and the Committee's order.

12 We referred to (a)(3) instead of (a)(4).  We did mean to refer

13 to (a)(4) and we are very concerned that (a)(3) will broaden

14 the scope.

15          THE COURT:  It would -- I agree with you.  Okay.

16 Let's move on.

17          MR. MERCHANT:  Good afternoon, Your Honor.  Mike

18 Merchant of Richards, Layton & Finger on behalf of the debtors.

19          Your Honor, No. 4 on the agenda is the debtors'

20 application to retain Compensation Design Group.  There was an

21 objection filed to that application by the Committee.  The U.S.

22 Trustee also informally raised certain concerns with respect to

23 the application.

24          We believe we've -- in connection with the agreement

25 with CDG, we think we've resolved all pending objections to

1  that application.  And I do have a revised form of order and a

2  blackline, if I may approach.

3         THE COURT:  You may.  Thank you.

4         MR. MERCHANT:  Your Honor, at the request of the

5  United States Trustee, we've changed it from a 327(e) retention

6  to a 327(a) retention because we're not dealing with attorneys.

7         Most of the Committee's concerns related to

8  compensation.  And the way we've addressed that, Your Honor, is

9  CDG will be paid a one-time flat fee of $64,000.  That will

10 compensate them for all fees, all expenses incurred.  It's a

11 one-time payment.  They will file a first and final fee

12 application and the fees will be subject to reasonableness

13 review under Section 330.

14        Your Honor, there's some additional provisions in the

15 order that I would also like to hand out.  We've added the

16 Planet Hollywood indemnification language at the request of the

17 Office of the United States Trustee.  We've also made clear

18 that CDG will not be providing any additional services in the

19 case.  And that was added at the request of the Creditors

20 Committee.  Lastly are --

21        THE COURT:  It struck me that if their work wasn't

22 finished, it had to be close to finished.

23        MR. MERCHANT:  Right.

24        THE COURT:  All right.

25        MR. MERCHANT:  It is finished, Your Honor.  There's

1  also a limited waiver of the local rule with respect to time

2  records.  They will be permitted to -- actually, let me point

3  out the exact provision, Your Honor.  But they'll be able to

4  record their time in half hour increments.  And that is

5  reflected in paragraph 8 of the order, Your Honor.  And I

6  believe those changes address all the pending objections.  We

7  would ask that the application as amended be granted.

8           THE COURT:  Anyone else care to be heard in

9  connection with this application?

10          MR. INDELICATO:  Your Honor, Mark Indelicato on

11  behalf of the Committee.  Based on the statements made by Mr.

12  Merchant and the limitation of $64,000 in compensation and the

13  fact that they've agreed to do no more work and Your Honor

14  would be surprised that, in fact, they did not think their work

15  was concluded which was a concern for the Committee.  But based

16  on those representations, the Committee's objection is

17  resolved.

18          THE COURT:  All right.  Thank you.  The order's been

19  signed.

20          MR. MERCHANT:  Thank you, Your Honor.  Your Honor, I

21  believe No. 5 on the agenda's already been addressed.

22          THE COURT:  Hope so.

23          MR. MERCHANT:  We can move to No. 6 on the agenda

24  which is the debtors' motion to assume and assign certain non-

25  residential real property leases.

1        Your Honor, there were a number of objections filed

2   with respect to that motion, all of which seem to be cure

3   amount objections.  And I believe we've resolved each of those

4   objections.  So I can walk Your Honor through how we've

5   resolved them quickly and then I can pass up an amended form of

6   order.

7        The first objection, Your Honor, was filed by Ryan

8   Ridge in which they contested the proposed cure amount.  They

9   asserted a proposed cure amount of 29 thousand, 370 thousand

10  dollars and 45 cents [sic].  The debtors have agreed to that

11  cure amount and we've revised Exhibit A to the order to reflect

12  that.

13       With respect to the RBC Mortgage/RBC Hold Co.

14  objection, Your Honor, that objection related to three separate

15  leases.  With respect to lease ID CA056, which is the San Diego

16  lease, they asserted a cure amount of $22,851.82.  The debtors

17  have agreed to that cure amount and we've reflected that in

18  Exhibit A to the order.

19       With respect to lease ID HI005, one of the Hawaii

20  leases, the assignment with respect to that lease actually fell

21  through.  So we've pulled that off of the order.  I don't know

22  the current status of that lease, whether we'll be seeking

23  another assignment or whether we'll be rejecting it at this

24  point, but it is not included in this order.

25       The third lease they referenced, Your Honor, is lease

1  ID IL001 which is the Champagne, Illinois lease.  They've

2  asserted a cure amount of $11,050.74, and the debtors have

3  agreed to that cure amount at well and it will be reflected in

4  the amended Exhibit A.

5        They've also requested that the debtors verify that

6  there will be removal and security -- some security of any

7  items covered by personal property leases and I'll make that

8  statement on the record that, yes, we will comply with that,

9  Your Honor.

10        Moving to the next objection is the RJS Properties

11  objection.  That relates to the lease identified by lease ID

12  NB09.  They've asserted a cure amount of $5,460, Your Honor.

13  The debtors have agreed to that and that will also be reflected

14  in the revised Exhibit A to the order.

15        The Fidelity National Information Services objection,

16  Your Honor, that's listed on the agenda was actually an

17  objection to the notice relating to the Carrington sale.  It's

18  not an objection to this motion.

19        And lastly, Your Honor, the OKC Maui Owner LLC lease

20  objection.  That objection actually relates to the same Hawaii

21  release that I referenced earlier where the assignment has

22  fallen through.  So it's no longer listed on Exhibit A to the

23  order.

24        I believe that covers all the changes, Your Honor,

25  and addresses each of the objections.  The one thing I would

1  note is with respect to several of these cure amounts where the

2  debtors have noted zero and now we've agreed to a greater

3  amount, that was just because of some problems with respect to

4  lease payments going through.  And I understand that several of

5  the payments that would be included within these revised

6  amounts are actually -- the checks are actually in the mail.

7  So as they are paid in the ordinary course, they would reduce

8  the amounts owed.

9          THE COURT:  All right.  Does anyone else care to be

10  heard in connection with this motion?  I hear no response.

11          MR. MERCHANT:  May I approach, Your Honor?

12          THE COURT:  You may.  Thank you.

13                     (Pause)

14          THE COURT:  That order has been signed.

15          MR. MERCHANT:  Thank you, Your Honor.  I'm going to

16  cede the podium to Mr. Logan for the last matter on the agenda.

17          THE COURT:  All right.

18          MR. LOGAN:  Down to the few and faithful, Your Honor.

19  Your Honor, the last motion is a motion to establish some

20  procedures for granting relief from the automatic stay to the

21  extent that Porter's, the first lien debt, want to foreclose

22  their first lien debt and wipe out the second lien debt that's

23  owned by the debtors.

24          We did receive some objections and there has been

25  some dialogue.  I want to make one thing very clear at the

1  outset and there was probably confusion in the motion.  That's

2  our fault.

3         This is intended as a voluntary procedure.  If a

4  secured creditor, a first lien creditor, wants to go the old

5  fashion relief from the stay route, that's fine.  We just

6  thought it would be prudent and advisable to save us all money

7  and time and effort to establish some streamline procedures

8  that would let people operate probably at a lower cost to

9  themselves and a lower cost to the estates.

10         THE COURT:  But nobody likes your $1,000 fee.

11         MR. LOGAN:  Nobody like our -- actually, that's not

12  quite true, Your Honor.  Once it was pointed out that the --

13  that that was voluntary, at least one of the objections,

14  Litton, said fine.  They'll evaluate whether that makes sense

15  or not.

16         Most of the objections, I think, were premised on the

17  understandable, but incorrect notion that we were forcing them

18  to pay $1,000.  If they don't want to pay $1,000 and they want

19  to file a motion for relief from the stay and go through the

20  process, that's their call.

21         The $1,000, quite frankly, Your Honor, was designed

22  to make some money for the estates, but also designed to

23  reflect the fact that it would be substantial savings, we

24  think, for most movants and probably much greater than $1,000.

25  So it very simply was designed to have a streamline process and

1  because we would be saving a substantial amount for the moving

2  parties, the quid pro quo from the estate's perspective was to

3  require $1,000.  Not a huge amount of money, not the world's

4  biggest issue, but that was, in fact, the process.  And since

5  it's entirely voluntary, the objections about how there's no

6  authorization in the Code to charge for a relief from the stay,

7  I think they're inappropriate.  If people want to go the old

8  fashion route, they're free to do so.

9        Beyond that, Your Honor, there were a number of

10  objections related to the timing.  A number of the objectors

11  said that 45 days was too long, 30 days would be more

12  appropriate.  We agree.  We have crafted a revised form of

13  order, the one makes it crystal clear that this is a voluntary

14  process.  People are free to go seek relief from the stay if

15  they are so inclined to do so.  And secondly, shorting the time

16  period to 30 days.

17        A number of the other objectors had a concern that

18  some of the information we requested, which we've cribbed from

19  some orders in other cases, would violate some consumer privacy

20  statutes.  And we've again changed the form of the order to the

21  extent it would violate a consumer privacy statute, fine.  The

22  movant does not have to provide that information.

23        And other than that, Your Honor, we do propose we

24  think the procedure is fair and simple.  It ought to save

25  parties' resources.  If they still want to go forward, they're

1 free to do so.  Indeed, there are a number of relief from stay

2 matters that are set for May 30th and then again for the next

3 omnibus in June.  We were hopeful that we could reach

4 resolution with the parties under these procedures.  But if we

5 can't, we made a good effort.

6          THE COURT:  All right.  Well, let me ask whether

7 anyone else cares to be heard in connection with this motion.

8          MR. DISPIGNA:  Yes, Your Honor.  Frederic DiSpigna.

9 I represent -- I'm representing my firm, the Law Office of

10 David J. Stern, but we represent eight different mortgage

11 lenders or servicers and we filed an objection.

12          I've also filed a motion for relief for omnibus stay

13 relief seeking stay relief to proceed with foreclosure with

14 regard to 207 properties which is a possible alternative

15 procedure.  The debtors make the point that this $1,000 is, you

16 know -- I appreciate that they're no longer stating that the

17 procedure is mandatory, but it's not simply an either/or

18 proposition.  Either take the debtors' procedure and pay the

19 $1,000 or go your own separate way and file a motion for relief

20 from stay.

21          There's not to prevent the Court sua sponte from

22 coming up with a procedure for the creditors today, banding

23 together and proposing a procedure to simplify matters for the

24 Court and for the creditors that does not call for this $1,000

25 and it does not call for the documentation that the debtors are

1  seeking.

2          One of the problems I have is that in Florida, there

3  is no right for the debtor to reinstate the mortgage once it's

4  been accelerated by the creditor and foreclosure has begun.

5  The only right a junior lien holder has is to pay the first

6  mortgage off in full.  So I doubt that the debtor is intending

7  to do that in any of these cases.

8          I also feel that the only critical issue that the

9  creditor should have to establish is that its lien is senior

10  and that the mortgagor, the property owner, is not paying the

11  mortgage.  That the mortgage is in default and its properly in

12  foreclosure court.

13          If the debtor wants to propose that there's a

14  sufficient equity cushion, that the movant should be prohibited

15  from proceeding, then the burden should be on the debtor to

16  come forward upon evidence as to the value of the property and

17  why there isn't a protective equity cushion.  Barring that,

18  there's really no reason why we should not be able to go

19  forward with our motion after having established that we are

20  superior and that the mortgage is, in fact, in default.

21          THE COURT:  Thank you.

22          MR. BECKER:  Good afternoon, Your Honor.  Richard

23  Becker for both Regions Bank and I'm local counsel for Mr.

24  DiSpigna who we just heard from, and I would note for the

25  record, who has been admitted pro hoc vice previously.

1          I think I bring a little different perspective than

2    most of the lawyers in this courtroom, Your Honor.  Your

3    Honor's probably not familiar with my face.  Most of my work in

4    dealing with this type of activity is in doing foreclosures

5    here in Delaware and in representing first mortgage holders in

6    consumer affairs, Chapter 13, Chapter 7.  And I think I can

7    state that if the Court approves the debtors' now voluntary

8    proposal, and we appreciate that making it voluntary does

9    change the field a little bit, I think it's unlikely that any

10   of the National lenders are going to take advantage of paying

11   out $1,000.

12         There are guidelines in place between the attorneys

13   that do this work and the mortgage companies.  You have to file

14   a motion for relief real fast.  You can't wait 30 days to see

15   what's going to happen.  The lenders send you weekly or monthly

16   reports telling you that you're in default of your obligations

17   and filing things, if you don't file things right away.  So the

18   Court's still going to get the motions for relief even if

19   particular lenders decide to try to avail themselves of the

20   procedure, it would be duplicative effort, not either/or

21   effort.

22         I also think that it's unlikely that you're going to

23   see any payments of $1,000.  In my experience, it takes a lot

24   longer than 30 days to get $1,000 out of any of these mortgage

25   companies to pay any costs.  It's just they take their time.

1  That's the way the bureaucracies seem to work.  New Century was

2  that way when I did work for New Century five years ago.  It's

3  unfortunately not practical to think that the $1,000 is there.

4        If the Court and if the debtors really want to

5  fashion something that's going to save some administrative

6  costs that's going to prevent the Court from having to address

7  motion after motion after motion for relief, then the $1,000

8  has got to go and there's got to be no payment and it really

9  has to be an administrative cost saving concept and not a

10  revenue raiser.

11        And the only other concept that I wanted to bring to

12  the Court's attention today and it's somewhat addressed in the

13  proposed form of order that I saw earlier today was that some

14  of the lenders mentioned it and I've mentioned it, we do want

15  some sort of a finality if there is a procedure in place that

16  we are going to use.  Merely an open ended, if there's no

17  objection filed or if there's no reinstatement made which is

18  even more out of court, then you have relief from the automatic

19  stay.  That's not going to satisfy a lot of state court judges.

20  And I -- the language I think that was put in was that the

21  moving party can apply to the Court for an order if nothing

22  happens within the now 30 days.  And perhaps it might be

23  changed, that there ought to be some sort of a standard

24  stipulation that can be filed and applied to the Court as an

25  order as opposed to just an individual entity coming in and

1  saying nobody responded.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. KASSENER:  Good afternoon, Your Honor.  Andrew

4  Kassener, Drinker Biddle & Reath for HSBC.  Counsel before me

5  and probably counsel after me will have the same -- stated the

6  same positions.  HSBC has thousands of these mortgages, Your

7  Honor, 120 now in foreclosure.  The cost of just getting this

8  ball rolling would be $120,000 for handling charges.

9  Obviously, HSBC would not be able to participate in what is now

10 called a voluntary program.

11         I think the goal here, Your Honor, is not only the

12 efficient administration and, I guess, revenue raising for the

13 estate, but really the goal is to ease the burden on this Court

14 in dealing with these matters.  That should a primary goal of

15 the debtors.  That's a goal that HSBC is interested in

16 achieving.

17         We are -- we would be happy to sit down with the

18 debtor and talk about those procedures.  Right now, we're being

19 put in a position where we will be forced to do it the old

20 fashion way as it's been called.  But we'll file our omnibus

21 motion for relief with hundreds of motions, comply with local

22 rules and see where we go from there.

23         I would like to ease the burden on this Court.  The

24 $1,000, that's obviously a non-starter, but the concepts of

25 reinstatement --

1          THE COURT:  Well, it's really only 850 because the

2   filing fee's $150, so.  It's only 850.

3          MR. KASSENER:  Well, I guess they're only going to

4   make it up on volume, though, Your Honor.  But the point is,

5   there were three aspects, and putting aside the money, that

6   have been touched upon that really are going to deter us being

7   able to work something through.  And we would like to work

8   something through that is in everyone's best interest.

9          What is this reinstatement concept?  It's vague in

10  the proposed order.  I don't know 3what reinstatement is, Your

11  Honor.  There could be 50 different versions of reinstatement

12  under state law and those should be worked out.

13          The idea of having to put evidence to the debtor is a

14  -- the term "evidence" was used.  Not sure what that means

15  either.  Again, a vague term.  These all could be worked out,

16  but there should be a procedure that deals with these two

17  issues in addition to the fee issue which, again, this should

18  not be used as a revenue enhancement vehicle.  This should be

19  used as a way to ease the administration of this estate.

20          So those are our issues, Your Honor.  We would prefer

21  that we have procedure that will work and not have a procedure

22  that will force a number of lenders, perhaps all of them, to

23  just have to go it the old fashion way.  And I think that's

24  where HSBC is at this point.

25          THE COURT:  Make me feel like I'm back in the Eastern

1  District of Pennsylvania, all those relief from stay motions.

2         MR. KASSENER:  I don't even want to think about what

3  Act 6 -- how Act 6 would be impacted on this one, Your Honor.

4         THE COURT:  All right.  Thank you, Mr. Kassener.

5         MR. KASSENER:  Thank you.

6         MR. CHAPMAN:  Good afternoon, Your Honor.  William

7  Chipman, Edwards Angell Palmer & Dodge on behalf of

8  Countrywide.  Most of our objections have already been talked

9  about.  I'd like to just express for Your Honor our concerns.

10        We have hundreds of these mortgages right now that

11 fall within this category.  We also have identified about six

12 other categories that don't fall within this procedure where we

13 may have to, in our contemplating filing relief stays on

14 different fact patterns, different relationships with the

15 debtor.

16        Your Honor, most of what the debtors changed order

17 does, does address some of our concerns moving the 45 days to

18 30 we think is appropriate and we're agreeable to that.  But

19 more importantly, we think there has to be a procedure in

20 place, otherwise this motion doesn't make any sense.  We don't

21 think anybody's going to volunteer to pay $1,000 and we

22 certainly won't participate in that procedure.  And we do think

23 the primary focus should be relieving the burden on the Court.

24        So the $1,000 fee for us is a non-starter.  It would

25 cost us $320,000 to get the ball rolling under these procedures

1  if we were to bring this -- our 320 some odd mortgages through

2  this procedure.

3        Your Honor, we, too, do not know what reinstatement

4  means.  Is this a deemed assumption?  Who would be reinstating?

5  Would the debtors be paying the mortgage?  Would they be

6  responsible until the property's foreclosed upon?  What happens

7  if, after they reinstate, there's another default.  Then this

8  order should provide for immediate relief from the stay so that

9  we're not constantly back before Your Honor filing notices,

10  waiting another 30 days.

11        Someone alluded to paying the senior lender in full.

12  Again, we don't know what reinstatement means.  Does that mean

13  paying the senior lender in full?

14        There's also the issue of adequate protection while

15  we're waiting for this process to unfold.  If they're going to

16  reinstate, who is going to be paying the first lenders'

17  payments while we're waiting for the foreclosure still to be

18  brought?  By the debtors or someone else?  We're not even sure

19  who would be doing the foreclosure at that point.  If they're

20  reinstated.

21        Your Honor, we do need finality.  What -- if there's

22  no objection currently or there's reinstatement, or no

23  reinstatement, the stay's lifted automatically.  We do need an

24  expedited procedure after that to get an order.  Maybe that can

25  be done by stipulation as one counsel recommended.

1        If there's an objection or litigation, what happens?

2   In other words, if we've -- if they do file some sort of

3   objection or for reinstatement, then what happens?  Do we come

4   back to the Court to figure out what's adequate?  Who's going

5   to be doing what?  Who's going to be making the payments?  And

6   then again, the default issue.  If someone subsequently

7   defaults, what then happens?  These procedures are incomplete.

8        Your Honor, with regard to the notice requirements

9   and what information has to be provided, in our objection we

10  basically just think that whatever we would provide under a

11  Section 362 motion for relief from stay should be the standard

12  here.  It shouldn't be more complex.  If we're trying to

13  streamline this process and make it more efficient, we

14  shouldn't be required to provide more documentation, including

15  documentation that may violate privacy laws.

16       There's a local rule on point, Your Honor, Rule 4001-

17  1 that sets forth the standard for relief from stay motions.

18  And we think that that standard should be in the order.

19       And again, Your Honor, I think the debtors tried to

20  address the privacy issues.  We do not want to be in a position

21  we have to provide information that would violate privacy laws.

22       So in sum, Your Honor, I think all these issues are

23  kind of being said over and over again, but the bottom line is

24  we believe there needs to be a procedure here.  Otherwise we're

25  going to be before Your Honor bringing stay relief motion after

1  stay relief motion.

2          The only other point I'd like to -- some

3  clarification on is the $1,000 fee.  If that is applicable

4  mortgage by mortgage or if we bring one notice for 300

5  foreclosures.  Obviously that wasn't clear in the initial

6  order.  If we could get away with paying $1,000 and getting 300

7  of them heard under one notice, or if we have to pay $300,000.

8  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. PHILLIPS:  Good afternoon, Your Honor.  Marc

11  Phillips for Washington Mutual.  At the risk of being

12  repetitive, we, too, object to the $1,000 payment.  And I echo

13  the sentiments of previous counsel.

14          With regard to the documentation, we also believe

15  that the documents that are requested are going to be overly

16  burdensome and we request that either the applicable title

17  policy or a copy of the recorded mortgage or deed of trust

18  would be sufficient documentation to satisfy the notice

19  requirements that the debtors would require.

20          With regard to orders from relief of stay to satisfy

21  the state courts, we believe that there needs to be some sort

22  of procedure in place or else it could take another 30 days on

23  top of the 30 days that the debtors already have in order to

24  get an appropriate order.  So some sort of omnibus procedure to

25  get these orders approved in batches to streamline the

1 procedures would be appreciated.  Thank you.

2           THE COURT:  Thank you.

3           MR. MCMAHON:  Your Honor, good afternoon.  I'll be

4 very brief.  Joseph McMahon for the United States Trustee.

5 While we did not file papers in connection with this motion, we

6 do -- our office does share some of the concerns voiced by the

7 objectors.  Certainly, the clarification that the procedures

8 are voluntary instead of mandatory is a positive development.

9 But the fee charging and other aspects, the -- in the event the

10 procedures are not mandatory, they are voluntary, we would

11 share, I think, generally the same observation that some of the

12 objectors have which is whether they -- the procedures are

13 reasonably calculated to achieve their goal of preventing -- or

14 at least preventing some of the work building up on this Court.

15 Thank you.

16           THE COURT:  Thank you.

17           MS. POPPITI:  Good afternoon, Your Honor.  Susan

18 Poppiti on behalf of Litton Loan Servicing.  My client did file

19 an objection to this motion, but for the record, Your Honor, I

20 would like to join in the objections with respect to the $1,000

21 fee payment.  Thank you.

22           THE COURT:  No more piling on.  You're up, Mr. Logan.

23           MR. LOGAN:  I couldn't hear that, Your Honor.

24           THE COURT:  No more piling on.  You're up.

25           MR. LOGAN:  Thank you, Your Honor.  Let me address

1 some of the concerns.

2          THE COURT:  Before you do.

3          MR. LOGAN:  Yes, sir.

4          THE COURT:  Let me just give you my overall

5 impression and that is it's almost always a good thing when a

6 -- in a case of any size, there are similar matters of a great

7 volume to be addressed at some procedure be adopted.  I think

8 the concept is a good one.  But I think you have more

9 discussion to do with those who've expressed their views here

10 toward the goal of developing a process that might be better

11 suited to the needs of the constituents.

12          MR. LOGAN:  Your Honor, I understand that.  And let

13 me address some of the concerns because I think they

14 misapprehend some of the facts and some of the law, quite

15 frankly.

16          First off, we've heard a parade of either horribles

17 or great benefits, depending on one's perspective about how

18 many hundreds or thousands of these motions will be filed and

19 how much money we would either make or not make based on the

20 $1,000 fee.

21          Your Honor, New Century has mortgages left, but it's

22 sold off the vast majority of them.  And so we're -- I think we

23 have a misapprehension that this is a problem that's going to

24 occupy a substantial amount of the Court's time or generate

25 huge profits for the company.  Unfortunately, it won't, on the

1   latter.  I guess the first is not unfortunate.  But we just

2   don't have that many mortgages that are left.  By and large,

3   the sale to Ellington disposed of most of the loans not

4   financed anywhere.  There are still some left.  I'm told

5   somewhere in the neighborhood of $20 million worth of loans,

6   but it's just not that huge a volume.  And therefore, I think

7   the parade of horribles we heard about is misguided.

8          New Century still services loans, but it doesn't hold

9   the mortgages in its own name in those cases.  And that's sale

10  will also hopefully close in mid-June or so.  So I just don't

11  think we're talking about that big an issue, quite frankly,

12  either a problem or a benefit.  But I want to return to that in

13  a second.

14          Secondly, I believe it was Mr. Stern who was speaking

15  on behalf of a law firm instead of a national creditor which

16  has its own set of issues as to whether or not he really has

17  standing to raise these concerns.  But leave that aside, his

18  argument focused on a premise that a movant doesn't need to

19  establish that the debtor has no equity in the property.

20  That's not the law.  362(g)(1) says the movant has the burden

21  on that very issue, whether or not the debtor has equity in the

22  property.  In order to get relief from the stay, the movant

23  must show there's no equity in the property and it's not

24  necessary for any effective reorganization.

25          It may well be that a number of the second lien loans

1  that the debtor still have are valuable estate assets.  And if

2  his client wants to get relief from the automatic stay or any

3  of the other parties objecting, if they want to get relief from

4  the stay, it is their burden to establish that the debtors have

5  no equity in those second liens.

6        Which gets me to the next issue which is what kind of

7  evidence do they have to propose.  And I'm going to show -- I'm

8  going to delve into an area with some trepidation because it's

9  the Delaware local rules which I actually do read, as I certify

10 I do.  Local Rule 4001 provides that when a party files a

11 motion, they have to provide a good faith estimate of the value

12 of the property in comparison to their liens.

13       The debtors respond with a good faith estimate.  And

14 if there's a factual dispute, the Court is to have an

15 evidentiary hearing.  And I haven't ever been involved in a

16 relief from stay matter in Delaware or quite frankly any place

17 else in a goodly number of years, but I would assume if that

18 there's a dispute on that issue, that is the factual issue that

19 is at issue.  The movant has the burden of proof according to

20 the statute and it must put on some kind of appraisal or other

21 testimony as to the value of the property.

22       Having said all of that, our only purpose was to get

23 something that would help us assess whether or not this was

24 worth reinstating, which is the next issue I want to get to.

25 Or is it something that we ought to just not fight whatsoever,

1 not spend administrative resources, trying to save a second

2 lien that has no value.  And we would be pleased or willing to

3 adjust the order to comply exactly with the local rules.

4       If the movant comes forward with a good faith

5 estimate of the value of the property and the value of the

6 liens, that will sustain it's burden in the first instance.

7 And if the debtors contest that, we can get off into

8 evidentiary issues if we can't reach resolution.  But we are

9 comfortable with striking the provision that we are seeking

10 that they have to come up with an appraisal, a formal

11 appraisal, a good faith estimate as set forth in the local

12 rules in Delaware would suffice.

13       MR. DISPIGNA:  Your Honor, Frederic DiSpigna, if I

14 may respond.

15       THE COURT:  Let Mr. Logan finish, please, first.

16       MR. LOGAN:  That gets to the issue as to what we

17 meant by reinstatement.  And that probably reflects the fact

18 that I'm from California and reinstatement is a legal concept

19 used in California.  It basically means to cure a default and

20 therefore you're back -- just like reinstatement under the

21 Bankruptcy Code.  That's what we meant and I appreciate that

22 there can be variations from state to state.  And we'd be happy

23 to work out procedures that say the debtors, during this 30-day

24 time period, must take actions under applicable non-bankruptcy

25 law, that would prevent the first lien holder from proceeding

1  with the foreclosure.  And whether that means reinstatement if

2  we got a California mortgage, whether that means paying off the

3  first lien lender in full if it's a state like, apparently,

4  Florida where there is no reinstatement concept, that's fine.

5         We use reinstatement as a generic, both in California

6  and the Bankruptcy Code, the two perhaps leading sources of

7  legal knowledge --

8         THE COURT:  Well, you're at least half right anyway.

9         MR. LOGAN:  Half right.  As to what we meant, but we

10  can work out the concept as it applies to states that are not

11  quite so enlightened.

12         Your Honor, the objectors also had a concern about

13  how one actually gets an order that they can show to their

14  title company and that's -- we can work that out.  Again, the

15  form of the order we proposed seeks to have them file an

16  application to the Court for the entry of an order.  Whatever

17  streamline process is fine.  I don't want to spend the estates'

18  $1,000 if we actually get it on that process, but we're also

19  willing to accommodate their concerns with a piece of paper

20  issue from the Court that they can show parties and whether

21  it's a certification from counsel and an automatic stipulation

22  or an automatic order, I'm sure we can work that part out.

23         Next to last thing.  The finality issue.  A number of

24  the objectors had a concern that the debtors might reinstate

25  and then later default 30 days later.  I can't imagine that the

1  debtors would be quite that stupid, but if they were, again, we

2  have no concern that if the debtors take advantage of this

3  process once and later default, upon a certified motion by the

4  movant that the debtors have defaulted, fine, they can have

5  relief from the stay.  That would give them finality.

6          And that gets me to the $1,000.  Again, back to my

7  first point, there's just not that many mortgages involved.  I

8  don't think we're talking about hundreds of thousands of

9  dollars.  But in order to avoid any concern along those lines,

10 someone asked for a volume discount, in essence.  And I think

11 probably the better way to phrase it is that we are -- we

12 didn't envision this as a huge money-making adventure.  So, we

13 can cap it at $10,000 per motion would be acceptable.  And if

14 somebody has more than 10 properties, fine, they get a volume

15 discount.

16         It was just an effort to try to recognize the fact

17 that filing the motion, whether it's for one property or 270

18 properties and putting on evidence about equity in 270

19 properties has got to be very expensive for the movants.  We do

20 have a desire to streamline the process so we don't burden Your

21 Honor and we don't burden counsel for the debtors, but quite

22 frankly, a lot of this is a freebie for the movants.  And we

23 thought it only appropriate that there be some quid pro quo.

24 And I think the cap at $10,000, and it's purely voluntary,

25 ought to be an appropriate resolution.  If people don't accept

1  that, I guess we'll learn.  And we'll deal with that if and

2  when it happens.

3          THE COURT:  Thank you.  All right.  Mr. DiSpigna, you

4  may respond now, if you'd like.

5          MR. DISPIGNA:  Thank you, Your Honor.  First of all,

6  with regard to the fact that it may not be that big a deal, I'm

7  not exactly certain what mortgages were sold.  I reviewed the

8  schedule that was attached to the motion for sale of various

9  mortgages and compared it to my list of mortgages.  And of my

10  206 mortgages that I'm seeking stay relief on at present, only

11  eight of them were included in the list of mortgage being sold.

12  So for my clients, it's still a big problem of 198 mortgages.

13          Capping it at $10,000 might very well make it doable

14  for my clients and I appreciate that.  But that's only going to

15  be beneficial to firms or lenders that have a significant

16  number and can accumulate them to take advantage of those

17  savings.

18          With regard to 362(g), while 362(g) does say that the

19  burden is on the movant to establish equity in the property, I

20  feel that's only true if equity in the property is an issue.

21  362 gives one basis, 362(d) gives one basis for relief from

22  stay that the debtor has no equity in the property and it's not

23  necessary to an effective reorganization.  That's not the only

24  basis for relief under 362(d).  There's also for cause such as

25  adequate -- lack of adequate protection.  If we're not being

1  paid, we're not being adequately protected.  Also --

2        THE COURT:  Well, maybe, maybe.

3        MR. DISPIGNA:  Also the local rules and the Code

4  really contemplate, with the stay relief, an individual

5  property owner and a foreclosure and not a situation where a

6  senior lien holder is seeking relief against a junior lien

7  holder.  So the issue of the equity in the property is not

8  really the equity in the real estate itself.  It's the equity

9  in the mortgage, the second mortgage, whether or not there's

10 any equity above and beyond the first mortgage that it's going

11 to make it worthwhile for the second mortgage holder to try and

12 hang onto it.

13        That's a decision the debtor needs to make, whether

14 they want to fight the foreclosure or not.  But that should not

15 be an impediment to the first lien holder establishing their

16 right to stay relief.

17        THE COURT:  Thank you.

18        MR. KASSENER:  Your Honor, it is getting late in the

19 day as I'm sure the Court observes.  What I understood from

20 comments to the Bench and then some remarks from debtors'

21 counsel is now a willingness to have a discussion with the

22 objecting parties on some procedures that may be acceptable to

23 all sides and actually ease the burden on the Court.  I suggest

24 those discussions occur now.  They were not occurring before

25 and maybe now they can.  And we would be, from HSBC's point of

1  view, prepared to participate in those discussions to work out

2  a mutually acceptable order.

3        THE COURT:  Yeah, and I do think there is advantage

4  to the perspective movants here to try to work something out

5  with the debtors because if we get down to having -- actually

6  to have a number of evidentiary hearings, based on my prior

7  experience in consumer cases, I'm sure your clients aren't

8  going to want to send appraisers to testify.  If that's a

9  relevant factor.

10        MR. KASSENER:  Could be.  So, from -- again, from

11  HSBC's point of view, we would be prepared to have that

12  dialogue and see if we can get there.  And if we can't, then

13  we'll have to see what happens next.  Thank you, Your Honor.

14        THE COURT:  All right.  Thank you.

15        MR. CHAPMAN:  Your Honor, for the record, William

16  Chapman again on behalf of Countrywide.  Countrywide would also

17  like to participate with the debtors and all the objectors to

18  come up with a fair process, including expanding it beyond

19  maybe just the second lien issue.  Like I said before, we have

20  seven different scenarios where we may have to file motions and

21  we'd like to get a procedure in place that we can file maybe

22  for more than just the second lien scenario.

23        THE COURT:  Yeah.  And the sooner the better because

24  if there are motions on and more coming, the quicker the issue

25  is addressed, as the debtor has recognized, that the better

1 that we'll all be, I think.

2        MR. BECKER:  And one followup point, Your Honor.

3 Again, Richard Becker.  The comment about this isn't going to

4 be a huge issue as loans get sold off.  Unfortunately,

5 assignments don't get recorded at the recorder deeds office

6 very quickly by the buyers and motions are going to get filed

7 for relief on properties that are no longer assets of the

8 estate.  And that will shake out through the process, but if

9 something could be built into this process, it would be

10 helpful.

11        THE COURT:  All right.  Thank you.  All right.  Mr.

12 Logan, I guess my thought is that we would put this matter over

13 to another hearing date.  I'd be willing to put it on as soon

14 as the 30th if you think that that's sufficient time to have

15 discussions.  If not, I'd put it to a date in June.

16        MR. LOGAN:  May 30th --

17        THE COURT:  Yes, May 30th at 2:30.  Stat it to the

18 omnibus hearing date.  Okay.  Anything further for today?

19        MS. UHLAND:  Nothing today, Your Honor, thank you.

20        THE COURT:  All right.  Thank you all.  That

21 concludes this hearing.  Court is adjourned.

22                    * * * * *

23

24

25

179

1                    C E R T I F I C A T I O N

2

3

4          I, Susan Holcomb, court approved transcriber, certify

5  that the foregoing is a correct transcript from the official

6  electronic sound recording of the proceedings in the above-

7  entitled matter.

8

9  /s/ Susan Holcomb                 Date:  May 29, 2007

10  Susan Holcomb  AAERT CET **00273

11  J&J COURT TRANSCRIBERS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25