# EXHIBIT A

5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Proposed Hearing Date: June 27, 2007 at 10:00 a.m. |
| | : | Proposed Objection Deadline: June 20, 2007 at 4:00 p.m. |

**NOTICE OF MOTION AND HEARING**

PLEASE TAKE NOTICE that on June 12, 2007, the above-captioned debtors and debtors in possession (the "Debtors") filed the **Motion of Debtors and Debtors in Possession for an Order (A) Approving Supplement No. 1 to the Asset Purchase Agreement by and Among New Century Financial Corporation and Certain of Its Subsidiaries and Ellington Management Group, L.L.C. on Behalf of Its Client Funds, (B) Authorizing Sale of Certain Loans to Purchaser or Its Designee(s), Free and Clear of All Liens, Claims, Encumbrances and Interests and (C) Granting Related Relief** (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

RLF1-3164426-1

Docket No. 1210
Filed: 6/12/07

PLEASE    TAKE    FURTHER    NOTICE    that    the    Debtors contemporaneously filed a *Motion of Debtors and Debtors in Possession to Shorten Notice and Objection Periods for Motion of Debtors and Debtors in Possession for an Order (A) Approving Supplement No. 1 to the Asset Purchase Agreement by and Among New Century Financial Corporation and Certain of Its Subsidiaries and Ellington Management Group, L.L.C. on Behalf of Its Client Funds, (B) Authorizing Sale of Certain Loans to Purchaser or Its Designee(s), Free and Clear of All Liens, Claims, Encumbrances and Interests and (C) Granting Related Relief* (the "Notice Motion") with the Bankruptcy Court. The proposed hearing date and objection deadline set forth herein are consistent with the dates proposed in the Notice Motion.

PLEASE TAKE FURTHER NOTICE that the Debtors have proposed that any responses or objections to the Motion must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel on or before **4:00 p.m. on June 20, 2007 (EDT)**.

PLEASE TAKE FURTHER NOTICE that if any objections or responses are received the Debtors have proposed that a hearing with respect to the Motion be held on **June 27, 2007 at 10:00 a.m. (EDT)** before the Honorable Kevin J. Carey at the United States Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware 19801.

PLEASE TAKE FURTHER NOTICE that once a hearing date and objection deadline have been established, the Debtors will provide notice of such dates to all parties in interest.

IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: June 12, 2007
      Wilmington, Delaware

Mark D. Collins (Bar No. 2981)
Michael J. Merchant (Bar No. 3854)
Christopher M. Samis (Bar No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -
Ben H. Logan
Suzzanne S. Uhland
Victoria H. Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Hearing Date: June 27, 2007 at 10:00 a.m. |
| | : | (Requested) |
| | : | Objection Deadline: June 20, 2007 at 4:00 p.m. |
| | : | (Requested) |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN
ORDER (A) APPROVING SUPPLEMENT NO. 1 TO THE ASSET
PURCHASE AGREEMENT BY AND AMONG NEW CENTURY FINANCIAL
CORPORATION AND CERTAIN OF ITS SUBSIDIARIES AND ELLINGTON
MANAGEMENT GROUP, L.L.C. ON BEHALF OF ITS CLIENT FUNDS,
(B) AUTHORIZING SALE OF CERTAIN LOANS TO PURCHASER OR ITS
DESIGNEE(S), FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS AND (C) GRANTING RELATED RELIEF**

New Century TRS Holdings, Inc., a Delaware corporation, New Century

Financial Corporation, a Maryland corporation, and their direct and indirect subsidiaries, each as

a debtor and debtor-in-possession (collectively, the "Debtors"), by and through their undersigned

counsel, hereby submit this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11

of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), and Rules 2002,

6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the

entry of (i) an order (a) approving Supplement No. 1 to the Asset Purchase Agreement (the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a

"Supplement") by and among New Century Financial Corporation and certain of its subsidiaries and Ellington Management Group, L.L.C. on behalf of its Client Funds ("Ellington" or the "Purchaser"), (b) authorizing the sale of certain mortgage loans and assets to the Purchaser or its designee(s), free and clear of all liens, claims encumbrances and interests (the "Sale") and (c) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION

1.     This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a). This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a) and 363 and Bankruptcy Rules 2002, 6004 and 9014.

### BACKGROUND

3.     New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, is one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation, NCF originates, purchases, sells, and services mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA").

---

Delaware limited partnership.

2

During the fiscal year ending December 31, 2006, the Debtors originated or purchased

approximately $60 billion of mortgage loans, most of which were sold in the secondary market.

Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans

have helped millions of homebuyers and homeowners across the nation access credit and realize

the benefits of home ownership, including many who might not otherwise have been able to do

so.

        4.      On April 2, 2007 (the "Petition Date"), the Debtors filed the instant

petitions for relief and the Debtors' bankruptcy cases are being jointly administered pursuant to

an order of the Court. The Debtors are operating their business and managing their affairs as

debtors and debtors in possession.

        5.      On the Petition Date, the Debtors filed a motion to approve bidding

procedures and the sale of a pool of approximately 2,200 unencumbered mortgage loans with an

unpaid balance of $173 million and mortgage-backed residual interests in securitization trusts

(the "LNFA") to Greenwich Capital Financial Products, Inc. ("Greenwich") for $50 million.

Prior to the hearing on the sale procedures motion, the Debtors, their investment banker Lazard

Freres & Co. LLC ("Lazard"), the Official Committee of General Unsecured Creditors (the

"Creditors' Committee") and Greenwich continued to discuss the financial terms and other

aspects of the proposed transaction. Among other things, the parties determined that the face

value of the LNFA was $170 million instead of $173 million and therefore, adjusted the purchase

price to $47.25 million. Greenwich further agreed to lower its break up fee to $945,000 and cap

its auction related expenses. Pursuant to an order entered by the Court on April 12, 2007, the

Debtors held an auction of the LNFA in NewYork on May 2, 2007 (the "Auction"). After

extensive marketing of the LNFA and aggressive pursuit of bids and prospective purchasers, five

qualified bidders emerged and attended the Auction. Ellington was the ultimate winner at the

3

Auction, bidding $58 million for the LNFA.  After a hearing arguments and considering the

evidenced proffered in support of the sale, on May 7, 2007, the Court entered an order approving

the sale of the LNFA to Ellington (the "First LNFA Sale") pursuant to the Asset Purchase

Agreement by and among NCF and certain of its subsidiaries and Ellington dated May 16, 2007

(the "Original APA").

      6.     The Debtors now seek to supplement the Original APA to sell an

additional approximately 180 unencumbered loans with an unpaid balance of approximately $17

million and 6 real properties obtained in foreclosures of such mortgage loans (the "LNFA

Mortgage Assets") as set forth in the Supplement which incorporates the terms of the Original

APA.  The Debtors were not able to include the LNFA Mortgage Assets in the First LNFA Sale

because the documents and files related to the LNFA Mortgage Assets were not sufficient or

complete at the time.  After discussions with the Creditors' Committee, the Debtors concluded

that it was in the best interest of estates to try to sell the additional LNFA Mortgage Assets to

Ellington by supplementing the Original APA for the same price on the same terms and

conditions reached after extensive marketing and negotiations at the Auction.

      7.     By order entered on May 23, 2007, the Court authorized the sale of the

Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an

affiliate of Carrington Capital Management, LLC ("Carrington").  At the closing of the

Carrington Sale, Carrington will transfer the sale proceeds to the Debtors and the Debtors will

enter into an agreement with Carrington to transition the servicing business.  The Debtors will

continue operating the servicing business in the ordinary course while it is transitioned to

Carrington.  The Debtors estimate that the transition period could take up to six months but may

be continued upon request from Carrington from time to time.  The Debtors are in the process of

liquidating additional technology and other assets of the estates.

4

## RELIEF REQUESTED

8.    The Debtors hereby request, pursuant to Bankruptcy Code Sections 105
and 363 and Bankruptcy Rule 6004 that the Court enter an order approving the Sale of the LNFA
Mortgage Assets to the Purchaser as set forth in the Supplement and granting related relief.

## THE SUPPLEMENT AND THE LNFA MORTGAGE ASSETS

9.    The Debtors propose to sell the LNFA Mortgage Assets to Ellington (or
such other third party as Ellington may designate) free and clear of all liens, claims and
encumbrances for an aggregate purchase price of $4,446,901.48.[2]  This purchase price will be
paid by satisfying any obligations outstanding under the DIP Financing at the time of the closing,
up to the amount of the purchase price, with the remaining balance (if any) to be paid in cash
(subject to a holdback for certain contingent costs and a potential proportionate deduction in the
event the unpaid principal balance of the LNFA Mortgage Assets as of closing is lower than the
current unpaid principal balance).[3]

10.    The Supplement contains certain minimal representations and warranties
and provides for a $309,625.00 45-day holdback, subject to terms substantially similar to the
holdback provisions of the Original APA, to cover such matters as (i) the Debtors releasing the
borrower on a loan that was sold to Ellington, (ii) material changes in the foreclosure laws of the
state in which the property is located and (iii) the Debtors' failure to transfer servicing of these
loans to a servicer selected by the buyer.  This holdback is subject to proportionate reduction if
the aggregate purchase price is reduced as described above.

---

[2] The proposed sale of the LNFA Mortgage Assets is contingent upon approval by the Board of Directors
and this Court.

[3] The description of the Supplement provided herein is an overview of certain of the significant terms of the
Sale.  The Court and interested parties should refer to the Supplement, substantially in the form attached hereto as
Exhibit A, for complete and detailed terms thereof.  To the extent the description of the sale described in this Motion
is inconsistent in any way from the terms of the Supplement, the terms of the Supplement shall prevail.

LA3:1133695 7
RLF1-3164423-1

11.     The LNFA Mortgage Assets generally consists of mortgage loans and the real property securing mortgage loans as set forth on Schedule 1 of the Supplement. Prior to the Petition Date, the Debtors originated mortgage loans and then generally sold the loans to securitization trusts and whole loan buyers. The pool of LNFA Mortgage Assets include some loans that the Debtors had not yet disposed of prior to the Petition Date. The pool may also consist of some loans sold to securitization trusts or to whole loan buyers but repurchased by the Debtors pursuant to the terms of these agreements when the borrowers on these loans defaulted soon after the disposition occurred.

12.     The Debtors request Court approval to sell the LNFA Mortgage Assets to Ellington free and clear of any liens, claims or interests with any valid liens on the assets sold attaching to the sale proceeds. Ellington has offered to pay $4,446,901.48 for the LNFA Mortgage Assets on the terms and conditions set forth on the Supplement, substantially in the form attached hereto as Exhibit "A". The Debtors believe that the proposed Sale is the highest and best offer obtainable for the LNFA Mortgage Assets.

## APPROVAL OF SALE OF ASSETS

13.     Bankruptcy Code Section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i) and (k) and, if applicable, in accordance with §363(b)(2) of the code." Fed. R. Bankr. P. 6004(a). Essentially, Bankruptcy Rule 2002 requires the Debtors to give all creditors and certain other parties "at least 20 days' notice by mail" of the Sale "unless the court for cause shown shortens the time or directs another method of giving notice". Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he

6

Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

14.     A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code Section 363 where the transaction represents an exercise of the debtor's sound business judgment. See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3rd Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines. Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

15.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith. See Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re United Healthcare Svs., Inc., No. 97-21785, 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

16.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See e.g. In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest

7

price or greatest overall benefit possible for the estate.") (quoting <u>In re Atlanta Packaging</u> <u>Products, Inc.</u>, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

17.    The Debtors submit that the proposed Sale of the LNFA Mortgage Assets to Ellington satisfies the "sound business reason test." The prompt sale of the LNFA presents the best opportunity to maximize the value of the LNFA Mortgage Assets for the estates. The Debtors have already tested the market price for the LNFA Mortgage Assets at the auction held for similar assets on May 2, 2007. Ellington has agreed to purchase the LNFA Mortgage Assets at the same price and on the same terms and conditions as the First LNFA Sale. Selling the LNFA Mortgage Assets without another auction protects the estates from further decline in the value of the LNFA Mortgage Assets due to additional defaults and foreclosures on subprime loans, the inherent risks of selling property at auction and further transaction costs of marketing the assets and holding an auction. The Debtors believe that the Sale is the best method by which it can obtain the best price for the LNFA Mortgage Assets and provide interested persons with accurate and reasonable notice of the Sale.

<b><u>SALE OF ASSETS FREE AND CLEAR OF LIENS AND INTERESTS</u></b>

18.    The Debtors further submit that it is appropriate to sell the LNFA Mortgage Assets free and clear of claims, interests, liens and encumbrances pursuant to Bankruptcy Code Section 363(f), with any such claims, interests, liens and encumbrances attaching to the net sale proceeds of the LNFA Mortgage Assets to the extent applicable.

19.    Bankruptcy Code Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if (i) applicable nonbankruptcy law permits the sale of such property free and clear of such interests, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on

8

such property, (iv) such interest is in bona fide dispute (v) or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

20.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the LNFA Mortgage Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

21.    The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to the Sale of the LNFA Mortgage Assets.  In particular, the Debtors believe that any lienholder will be adequately protected by having their liens, if any, attach to the cash proceeds ultimately attributable to the LNFA Mortgage Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

22.    Although Bankruptcy Code Section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3rd Cir. 2000).  In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3rd Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem

9

interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'" Id. at 289. As determined by the Fourth Circuit in In re Leckie Smokeless Coal

Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third

Circuit in Folger, supra, the scope of Bankruptcy Code Section 363(f) is not limited to in rem

interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell

their assets under § 363(f) free and clear of successor liability that otherwise would have arisen

under federal statute." Folger, 209 F.3d at 258.

       23.    Courts have consistently held that a buyer of a debtor's assets under

Bankruptcy Code Section 363 takes the assets free from successor liability resulting from pre-

existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716,

732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and

clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94

(2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear

under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329

(Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of

Title VII employment discrimination and civil rights claims of debtor's employees); In re

Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); American Living Systems v.

Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); WBO

Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R.

97, 104-05 (Bankr. 22 E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[4]

24.    The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under Bankruptcy Code Section 363(f), the Purchaser is entitled to know that the LNFA Mortgage Assets does not have attached latent claims that will be asserted against them after the Sale is completed.  Accordingly, and consistent with the above-cited case law, the Sale Order should state that the purchaser will not be liable as a successor under any theory of successor liability, for claims that encumber or relate to the LNFA Mortgage Assets.

## FINDING OF GOOD FAITH

25.    Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Seventh Circuit in In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

---

[4] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims nevertheless find that Bankruptcy Code section 105(a) provides such authority.  See In re White Motor Credit Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

11

798 F.2d at 1125 (emphasis omitted) (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978).

      26.    The negotiation and execution of the terms and conditions of the Sale and the Supplement were conducted in good faith and at arm's length. The Sale price and the terms and conditions of the Supplement are nearly identical to the First LNFA Sale and were determined based upon the outcome of the Auction. The Supplement, substantially in the form attached hereto as Exhibit "A", incorporates the terms of the Original APA and replicates the price, terms and conditions of the First LNFA Sale. The Purchaser in no way induced, caused, or required the commencement of the chapter 11 filings of the Debtors and no common identity of directors or controlling stockholders exists between the Purchaser and any of the Debtors. All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser with the Debtors in connection with the Sale have been disclosed. There is no evidence that the Purchaser has violated section 363(n) of the Bankruptcy Code by any action or inaction. Ellington is entering into the Sale in good faith and is a good faith purchaser and is entitled to such finding under Bankruptcy Code Section 363(m).

## FINALITY OF ORDER

      27.    The Debtors further request that, pursuant to Bankruptcy Rule 6004(h), the order approving the Sale not be stayed for any period of time after the entry of such orders.

      28.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Sale of the LNFA Mortgage Assets be effective immediately by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

29.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

30.    The Debtors hereby request that any order approving the sale of the LNFA Mortgage Assets be effective immediately upon entry by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived or, in the alternative, if an objection to the Sale of the LNFA Mortgage Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

### NOTICE

31.    No trustee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Examiner; (3) counsel to Greenwich Capital Financial Products, Inc. and The CIT Group/Business Credit, Inc., the Debtors post-petition senior secured lenders; (4) counsel to the Official Committee of Unsecured Creditors; (5) all of the parties that have filed UCC-1 financing statements against the Debtors; (6) the Internal Revenue Service; and (7) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

13

WHEREFORE, the Debtors request that the Court (i) grant the Motion; (ii) enter an order substantially in the form attached as Exhibit "B" hereto and (iii) grant such other and further relief as is just and appropriate.

14

Dated:  June 12, 2007
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzanne S. Uhland
Ben H. Logan
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

15

# EXHIBIT A

## Supplement No. 1 to Asset Purchase Agreement

**OMM Draft 6/12/07**

SUPPLEMENT NO. 1 TO

ASSET PURCHASE AGREEMENT

between

NEW CENTURY FINANCIAL CORPORATION,

THE SELLING SUBSIDIARIES NAMED HEREIN

and

ELLINGTON MANAGEMENT GROUP, L.L.C.
ON BEHALF OF ITS CLIENT FUNDS

Dated as of June __, 2007

# EXHIBITS AND SCHEDULES

## SCHEDULES

| | |
|---|---|
| SCHEDULE 1 | LNFA Mortgage Schedule |
| SCHEDULE 2 | Residuals Schedule |
| SCHEDULE 3 | Selling Subsidiaries |
| SCHEDULE 4.5 | Litigation Schedule |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | [Reserved] |
| EXHIBIT B | Sale Order |
| EXHIBIT C | Form of Limited Power of Attorney |
| EXHIBIT D | Base Asset Purchase Agreement |
| EXHIBIT E | Side Letter No. 1 |
| EXHIBIT F | Side Letter No. 2 |

## SUPPLEMENT NO. 1 TO ASSET PURCHASE AGREEMENT

This Supplement No. 1 to Asset Purchase Agreement (this "<u>Supplemental Agreement</u>") is made as of June __, 2007, by and among New Century Financial Corporation, a Maryland corporation (the "<u>Company</u>"), the Subsidiaries of the Company owning Additional Purchased Assets (as defined herein), which are named on Schedule 3 hereof (the "<u>Selling Subsidiaries</u>"), and Ellington Management Group, L.L.C., a Delaware limited liability company, on behalf of its client funds (the "<u>Purchaser</u>"). This Supplemental Agreement constitutes a supplement to and not a modification of or amendment to the Asset Purchase Agreement, dated as of May 2, 2007, between the Sellers and the Purchaser, attached hereto as Exhibit D (the "<u>Base Asset Purchase Agreement</u>"), as modified by a letter, dated May 16, 2007, from the Purchaser to the Company and accepted and agreed to by the Company, attached hereto as Exhibit E ("<u>Side Letter No. 1</u>") and a letter, dated May 22, 2007 from the Purchaser to the Company and accepted and agreed to by the Company, attached hereto as Exhibit F ("<u>Side Letter No. 2</u>", and the Base Asset Purchase Agreement, as modified by Side Letter No. 1 and Side Letter No. 2, the "<u>Original Asset Purchase Agreement</u>"). The Company and the Selling Subsidiaries are collectively referred to herein as the "<u>Sellers</u>" and, individually, as a "<u>Seller</u>." The Sellers and the Purchaser are collectively referred to herein as the "<u>Parties</u>" and, individually, as a "<u>Party</u>."

WHEREAS, the Sellers filed Chapter 11 petitions to commence cases under Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on April 2, 2007 in the United States Bankruptcy Court for the District of Delaware  (the "<u>Bankruptcy Court</u>") and are currently operating as debtors and debtors-in-possession under  Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on the terms and subject to the conditions set forth in this Supplemental Agreement, the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell to the Purchaser, the LNFA Mortgage Loans listed on Schedule 1 to this Supplemental Agreement (the "<u>Additional Purchased Assets</u>") in addition to the Purchased Assets purchased pursuant to the Original Asset Purchase Agreement (the "<u>Original Purchased Assets</u>"), in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell to the Purchaser, the Additional Purchased Assets on the same terms as the Purchaser purchased from the Sellers, and the Sellers sold to the Purchaser, the Original Purchased Assets except as the terms of the Original Asset Purchase Agreement are modified hereby;

NOW, THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

1.    <u>Definitions</u>. For purposes of this Supplemental Agreement, the following terms shall have the meanings set forth below notwithstanding any other meaning assigned to such term in the Original Asset Purchase Agreement. All other capitalized terms appearing in this Supplemental Agreement shall have the meanings appearing in the Original Asset Purchase Agreement.

1

"Cut-off Date" shall mean for each LNFA Mortgage Loan, the date listed for each such Loan on the LNFA Mortgage Schedule as the cut-off date, as the same shall be updated as provided herein, such that such date is a date mutually agreeable to the Parties and approximately seven (7) days prior to the Closing Date.

"Holdback" shall mean $309,625.00, which amount shall be reduced by a percentage of $309,625.00 equal to: the Purchase Price adjustment amount, determined pursuant to Section (c) of Paragraph 4 below, divided by $4,446,901.48 multiplied by 100.

"LNFA Mortgage Loan" shall have the same meaning as in the Original Asset Purchase Agreement, except that the phrase ", as the same shall be updated as provided herein," shall be inserted immediately after the phrase "as set forth on Schedule 1 hereto".

The following defined terms and definitions appearing in the Original Asset Purchase Agreement shall be deemed deleted for purposes of this Supplemental Agreement and the purchase and sale of the Additional Purchased Assets pursuant hereto: "Auction", "Bidding Procedures", "Bidding Procedures Order", "First Priority Loans", "GAAP", "Grantor Trust", "Income Tax", "Insurance Policies", "Residuals", "Residuals Schedule", "Second Priority Loans", "Tax Code", "Tax Return", "Treasury Regulation", "Ohio Delinquent Loans", "Ohio Delinquent Loan Transfer Documents" and "Absent Certificates".

2.    Incorporation of Terms of the Original Asset Purchase Agreement. The terms of the Original Asset Purchase Agreement are hereby incorporated into this Supplemental Agreement except as modified herein and shall govern in all respects the purchase and sale of the Additional Purchased Assets contemplated hereby as so modified. For the avoidance of doubt, the Parties shall be required to comply with all of the terms and conditions of the Original Asset Purchase Agreement that are incorporated herein with respect to the sale of the Additional Purchased Assets, notwithstanding their prior compliance with such terms or satisfaction of such conditions, as applicable, in connection with the sale of the Original Purchased Assets. For example, the Bankruptcy Court shall have entered the Sale Order attached to this Supplemental Agreement as Exhibit B, which shall be a Final Order which has not been reversed, modified, rescinded or stayed as of the Closing Date.

3.    Purchased Assets. On the terms and subject to the conditions contained in the Original Asset Purchase Agreement, as modified in this Supplemental Agreement, on the Closing Date, the Sellers will sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser will purchase and take assignment and delivery from the Sellers of all of the legal and beneficial right, title and interest of the Sellers in the Additional Purchased Assets free and clear of any Lien of any kind whatsoever.

4.    Purchase Price. In consideration of the sale of the Additional Purchased Assets from the Sellers to the Purchaser on the Closing Date, the Purchaser agrees to pay the Sellers the amount of $4,446,901.48 (the "Purchase Price"), subject to (a) the amount set forth in the Servicer Expenses Statement delivered to Purchaser prior to Closing, (b) the Holdback, as described in Section 3.2 of the Original Asset Purchase Agreement (as such Section 3.2 is modified hereby) and (c) the adjustments in Purchase Price pursuant to the pricing spreadsheet delivered by Purchaser and agreed to by the Sellers on June 12, 2007, solely in the event the

aggregate unpaid principal balance of the LNFA Mortgage Loans, as of the Cut-off Date mutually agreed to by the Parties that is approximately seven (7) days prior to the Closing Date, listed on the updated Schedule 1 delivered by Sellers is lower than the aggregate unpaid principal balance of the LNFA Mortgage Loans, as of the initial Cut-off Date, listed on Schedule 1 as of the date hereof.

     5.    <u>Additional Deemed Modifications to the Original Asset Purchase Agreement</u>. For all purposes of this Supplemental Agreement:

     (a)    Sections 4.8, 6.11, 6.12, 6.13, 7.4(b) and 7.4(c) of the Original Asset Purchase Agreement shall be deemed deleted in their entirety.

     (b)    the reference to "except with respect to the Ohio Delinquent Loans." in Section 3.2(a)(ii) of the Original Asset Purchase Agreement shall be deemed deleted.

     (c)    the phrase "or as is reasonably modified by the Bankruptcy Court and acceptable to the Purchaser in its reasonable business judgment." shall be deemed added to the end of Section 6.6 of the Original Asset Purchase Agreement.

     (d)    the phrase "For a period of six (6) months after the Closing Date," at the beginning of Section 6.10 of the Original Asset Purchase Agreement shall be deemed to be "For a period beginning on the Closing Date and ending on November 18, 2007,".

     (e)    the reference to "May 18, 2007" in Section 7.1 of the Original Asset Purchase Agreement shall be deemed to be "July 11, 2007".

     (f)    the phrase "Except with respect to the Ohio Delinquent Loans as to which the provisions of Section 6.11 shall apply" and the parenthetical phrases "(including the mortgaged properties that secured an Ohio Delinquent Loan delivered on the Closing Date)" and "(or in the case of Ohio Delinquent Loans no delivered on the Closing Date within 30 days following the date on which the Purchaser elects to take title to any such Ohio Delinquent Loan in accordance with the terms of the Agreement)" in Section 7.2(e) of the Original Asset Purchase Agreement shall be deemed deleted.

     (g)    the phrases "Except with respect to the Ohio Delinquent Loans as to which the provisions of Section 6.11 shall apply" and "certificates duly registered in the Purchaser's name (or as otherwise specified by the Purchaser) representing the Residuals," in Section 7.4(a) of the Original Asset Purchase Agreement shall be deemed deleted.

     (h)    the parenthetical "(and in the case of Residuals, sufficient documentation to permit the transfer agent to register title to the Residuals in the name of the Purchaser and issue a certificate in the Purchaser's name or its designee as set forth in Section 7.2(e))" in Section 7.4(a) of the Original Asset Purchase Agreement shall be deemed deleted.

     (i)    the last sentence in Section 7.4(a) of the Original Asset Purchase Agreement shall be deemed deleted in its entirety.

(j)    the last sentence in Section 7.4(d) of the Original Asset Purchase Agreement shall be deemed deleted in its entirety.

(k)    the parenthetical "(or in the case of Ohio Delinquent Loans at the times set forth in Section 6.11)" in Section 7.4(e) of the Original Asset Purchase Agreement shall be deemed deleted in its entirety.

(l)    The sentence "The Sellers shall deliver an updated Schedule 1 hereto, which shall include information regarding the LNFA Mortgage Loans listed thereon as of a Cut-off Date mutually agreed to by the Parties that is approximately seven (7) days prior to the Closing Date." shall be deemed added as a new Section 7.4(i) in the Original Asset Purchase Agreement.

(m)    the phrase "not to exceed thirty (30) days from the Closing Date," in the second sentence of Section 8.1 of the Original Asset Purchase Agreement shall be deemed to be "not to exceed the earlier of (i) thirty (30) days from the Closing Date or (ii) July 15, 2007,".

(n)    the references to "April 2, 2007" appearing in Section 8.1 of the Original Asset Purchase Agreement shall be deemed to be to the "Cut-off Date".

(o)    the parenthetical phrase "(estimated as $30,000 from April 2, 2007 until April 30, 2007)" in Section 8.1 of the Original Asset Purchase Agreement shall be deemed deleted.

(p)    the date "May 18, 2007" appearing in Section 9.1(e) of the Original Asset Purchase Agreement shall be deemed to be "July 11, 2007".

6.    Schedules and Exhibits.  For all purposes of this Supplemental Agreement, all references to Schedule 1, Schedule 2, Schedule 3 and Schedule 4.5 appearing in the Original Asset Purchase Agreement or herein shall be deemed to be references to Schedule 1, Schedule 2, Schedule 3 and Schedule 4.5 respectively, to this Supplemental Agreement.  For all purposes of this Supplemental Agreement, all references to Exhibit B and Exhibit C appearing in the Original Asset Purchase Agreement or herein shall be deemed to be references to Exhibit B and Exhibit C, respectively, to this Supplemental Agreement.  For all purposes of this Supplemental Agreement, all references to Exhibit 6.11 and Exhibit 6.12 appearing in the Original Asset Purchase Agreement shall be deemed deleted.

7.    This Supplemental Agreement Not to Constitute Amendment to the Original Asset Purchase Agreement.  Notwithstanding anything to the contrary contained herein, this Supplemental Agreement shall not constitute a modification or amendment to the Base Asset Purchase Agreement, Side Letter No. 1 or Side Letter No. 2 as they relate to the purchase and sale of the Original Purchased Assets.  Such Base Asset Purchase Agreement, Side Letter No. 1 and Side Letter No. 2 shall continue in full force and effect with respect to the purchase and sale of the Original Purchased Assets and the other transactions provided for therein.

8.    Governing Law.  All questions concerning the construction, validity and interpretation of this Supplemental Agreement shall be governed by and construed in accordance

with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Sellers and the Purchaser have executed this Supplemental Agreement by their respective authorized officers as of the date first above written.

**BY THE SELLERS**:

NEW CENTURY FINANCIAL CORPORATION

_____

Name:
Title:

**BY THE PURCHASER**:

ELLINGTON MANAGEMENT GROUP, L.L.C.
on behalf of its Client Funds

_____

Name:
Title:

*[Signature Page to Supplemental Agreement]*

## SCHEDULE 1

### LNFA Mortgage Schedule

# LNFA Schedule – New Century

| LOAN ID | LOAN TYPE | CITY | STATE | ZIP CODE | CURRENT | Cutoff Date | LIEN |
|---|---|---|---|---|---|---|---|
| 10698090 | Purchase Money/2nd | SALINAS | CA | 93905 | 2,600.00 | 5/24/2007 | 2 |
| 10504036 | Refinance/2nd | WILLIAMSBURG | VA | 23188 | 8,795.16 | 5/24/2007 | 2 |
| 10522026 | Refinance/2nd | NAMPA | ID | 83687 | 9,093.74 | 5/24/2007 | 2 |
| 10506369 | Refinance/2nd | PHILADELPHIA | PA | 19138 | 10,000.00 | 5/24/2007 | 2 |
| 10716785 | Purchase Money/2nd | SANTA ROSA | CA | 95407 | 11,550.00 | 5/24/2007 | 2 |
| 10716385 | Purchase Money/2nd | SANTA ROSA | CA | 95407 | 12,500.00 | 5/24/2007 | 2 |
| 10685309 | Purchase Money/2nd | CHULA VISTA | CA | 91910 | 15,000.00 | 5/24/2007 | 2 |
| 1006054360 | Purchase Money/2nd | CHILLICOTHE | IL | 61523 | 15,554.70 | 5/24/2007 | 2 |
| 1008243634 | Purchase Money/2nd | DALLAS | TX | 75215 | 15,954.73 | 5/24/2007 | 2 |
| 10675879 | Purchase Money/2nd | HOUSTON | TX | 77095 | 16,835.21 | 5/24/2007 | 2 |
| 1008487363 | Purchase Money/2nd | MEMPHIS | TN | 38116 | 16,840.18 | 5/24/2007 | 2 |
| 10640262 | Refinance/2nd | JEFFERSON CITY | MO | 65109 | 18,651.67 | 5/24/2007 | 2 |
| 1009090459 | Purchase Money/2nd | PRINCETON | MN | 55371 | 18,747.01 | 5/24/2007 | 2 |
| 1007450055 | Purchase Money/2nd | CALIFORNIA | MO | 65018 | 18,861.96 | 5/24/2007 | 2 |
| 1005031841 | Purchase Money/2nd | HOUSTON | TX | 77071 | 19,923.96 | 5/24/2007 | 2 |
| 1006580639 | Purchase Money/2nd | HARRIMAN | TN | 37748 | 19,953.14 | 5/24/2007 | 2 |
| 10601864 | Purchase Money/2nd | RANCHO SAN DIEGO | CA | 92019 | 19,991.94 | 5/24/2007 | 2 |
| 1007549708 | Purchase Money/2nd | CHICAGO | IL | 60649 | 20,389.85 | 5/24/2007 | 2 |
| 1008827291 | Purchase Money/2nd | DEER RIVER | MN | 56636 | 21,109.31 | 5/24/2007 | 2 |
| 1008120213 | Purchase Money/2nd | FRESNO | TX | 77545 | 21,141.17 | 5/24/2007 | 2 |
| 1007884453 | Purchase Money/2nd | GRAND RAPIDS | MI | 49507 | 21,588.76 | 5/24/2007 | 2 |
| 1004684185 | Purchase Money/2nd | ELKHART | IN | 46514 | 21,632.07 | 5/24/2007 | 2 |
| 1007466413 | Refinance/2nd | PALMYRA | PA | 17078 | 21,867.32 | 5/24/2007 | 2 |
| 1002028488 | Purchase Money/2nd | YUKON | OK | 73099 | 22,574.51 | 5/24/2007 | 2 |
| 1008835674 | Purchase Money/2nd | MISSOURI CITY | TX | 77459 | 23,000.00 | 5/24/2007 | 2 |
| 1007674563 | Purchase Money/2nd | GRAND PRAIRIE | TX | 75052 | 23,287.83 | 5/24/2007 | 2 |
| 1007569945 | Purchase Money/2nd | EDGEWOOD | NM | 87015 | 23,570.47 | 5/24/2007 | 2 |
| 1009266322 | Purchase Money/2nd | RICHMOND | TX | 77469 | 24,137.61 | 5/24/2007 | 2 |
| 1007383164 | Purchase Money/2nd | HOUSTON | TX | 77073 | 24,653.82 | 5/24/2007 | 2 |
| 1006814913 | Refinance/2nd | KANSAS CITY | MO | 64119 | 24,769.09 | 5/24/2007 | 2 |
| 1004759522 | Purchase Money/2nd | RALEIGH | NC | 27604 | 24,942.81 | 5/24/2007 | 2 |
| 1005959322 | Purchase Money/2nd | FLINT | MI | 48503 | 26,672.43 | 5/24/2007 | 2 |
| 1009503441 | Purchase Money/2nd | PEARLAND | TX | 77584 | 27,987.07 | 5/24/2007 | 2 |
| 1005905096 | Purchase Money/2nd | ATLANTA | GA | 30318 | 28,956.22 | 5/24/2007 | 2 |
| 1007443689 | Purchase Money/2nd | PHOENIXVILLE | PA | 19460 | 28,964.12 | 5/24/2007 | 2 |
| 10402258 | Purchase Money/2nd | SAUK VILLAGE | IL | 60411 | 29,833.52 | 5/24/2007 | 2 |
| 1006678142 | Purchase Money/2nd | AUSTIN | TX | 78754 | 30,027.36 | 5/24/2007 | 2 |
| 2229897 | Refinance/2nd | CHICAGO | IL | 60628 | 30,843.81 | 5/24/2007 | 2 |
| 1007415923 | Purchase Money/2nd | DESOTO | TX | 75115 | 31,139.51 | 5/24/2007 | 2 |
| 1008766409 | Refinance/2nd | MARSHALL | NC | 28753 | 31,569.44 | 5/24/2007 | 2 |
| 1008034842 | Purchase Money/2nd | SPOKANE | WA | 99212 | 32,697.78 | 5/24/2007 | 2 |
| 1008803583 | Purchase Money/2nd | PROVIDENCE | RI | 02909 | 38,000.00 | 5/24/2007 | 2 |
| 2251817 | Refinance/2nd | CENTENNIAL | CO | 80015 | 39,786.54 | 5/24/2007 | 2 |
| 1008584828 | Purchase Money/2nd | ATLANTA | GA | 30310 | 40,914.96 | 5/24/2007 | 2 |

1

| LOAN ID | LOAN TYPE | CITY | STATE | ZIP CODE | CURRENT | Cutoff Date | LIEN |
|---------|-----------|------|-------|----------|---------|-------------|------|
| 1007704120 | Purchase Money/2nd | NORWALK | CT | 06850 | 41,190.14 | 5/24/2007 | 2 |
| 10712048 | Purchase Money/2nd | MISSOURI CITY | TX | 77459 | 41,961.06 | 5/24/2007 | 2 |
| 1008481270 | Refinance/2nd | SACRAMENTO | CA | 95823 | 41,964.36 | 5/24/2007 | 2 |
| 1008384287 | Purchase Money/2nd | ATLANTA | GA | 30314 | 42,753.29 | 5/24/2007 | 2 |
| 1008958979 | Purchase Money/2nd | DESOTO | TX | 75115 | 42,980.15 | 5/24/2007 | 2 |
| 1008682179 | Purchase Money/2nd | WHEATRIDGE | CO | 80233 | 43,482.71 | 5/24/2007 | 2 |
| 10509256 | Purchase Money/2nd | BIG BEAR LAKE | CA | 92315 | 43,898.36 | 5/24/2007 | 2 |
| 1009663615 | Purchase Money/2nd | ATLANTA | GA | 30318 | 43,988.73 | 5/24/2007 | 2 |
| 10418571 | Purchase Money/2nd | CORONA | CA | 92882 | 44,149.01 | 5/24/2007 | 2 |
| 1008091110 | Purchase Money/2nd | SPANAWAY | WA | 98387 | 44,764.49 | 5/24/2007 | 2 |
| 1008388381 | Purchase Money/2nd | CHICAGO | IL | 60628 | 44,988.22 | 5/24/2007 | 2 |
| 1007924071 | Purchase Money/2nd | BURNSVILLE | MN | 55337 | 45,000.00 | 5/24/2007 | 2 |
| 1007249051 | Purchase Money/2nd | CHICAGO | IL | 60651 | 45,935.61 | 5/24/2007 | 2 |
| 1007405444 | Purchase Money/2nd | VICTORVILLE | CA | 92392 | 47,000.00 | 5/24/2007 | 2 |
| 1007969905 | Purchase Money/2nd | BRADENTON | FL | 34212 | 48,400.00 | 5/24/2007 | 2 |
| 1008642702 | Refinance/2nd | BAKERSFIELD | CA | 93307 | 49,200.00 | 5/24/2007 | 2 |
| 1008048178 | Refinance/2nd | POMPANO BEACH | FL | 33064 | 49,983.49 | 5/24/2007 | 2 |
| 1007346972 | Purchase Money/2nd | BANNING | CA | 92220 | 50,760.71 | 5/24/2007 | 2 |
| 1008157656 | Refinance/2nd | WINDSOR | CT | 06095 | 51,352.38 | 5/24/2007 | 2 |
| 1007076228 | Refinance/2nd | MIAMI | FL | 33147 | 51,969.07 | 5/24/2007 | 2 |
| 1008368768 | Refinance/2nd | HESPERIA | CA | 92345 | 54,000.00 | 5/24/2007 | 2 |
| 1007426617 | Purchase Money/2nd | BAKERSFIELD | CA | 93308 | 55,500.00 | 5/24/2007 | 2 |
| 10513025 | Purchase Money/2nd | GRAND PRAIRIE | TX | 75052 | 58,006.52 | 5/24/2007 | 2 |
| 1007430434 | Purchase Money/2nd | NEWARK | NJ | 07112 | 59,000.00 | 5/24/2007 | 2 |
| 1008678308 | Purchase Money/2nd | LANCASTER | CA | 93534 | 59,922.17 | 5/24/2007 | 2 |
| 1009279942 | Refinance/2nd | MESA | AZ | 85210 | 59,961.46 | 5/24/2007 | 2 |
| 1009165823 | Refinance/2nd | MCALLEN | TX | 78504 | 60,971.84 | 5/24/2007 | 2 |
| 1006232739 | Purchase Money/2nd | ATLANTA | GA | 30310 | 62,840.47 | 5/24/2007 | 2 |
| 1007953075 | Purchase Money/2nd | WEST SACRAMENTO | CA | 95691 | 63,000.00 | 5/24/2007 | 2 |
| 1967748 | Refinance/1st | HOUSTON | TX | 77029 | 63,545.63 | 5/24/2007 | 1 |
| 1008098596 | Purchase Money/2nd | SAN BERNARDINO | CA | 92407 | 63,783.49 | 5/24/2007 | 2 |
| 1006724609 | Purchase Money/2nd | RIALTO | CA | 92376 | 65,500.00 | 5/24/2007 | 2 |
| 1008676015 | Purchase Money/2nd | CLINTON | MD | 20735 | 67,966.91 | 5/24/2007 | 2 |
| 1007083648 | Refinance/2nd | TAMPA | FL | 33611 | 68,886.38 | 5/24/2007 | 2 |
| 1008304881 | Purchase Money/2nd | NAPLES | FL | 34119 | 69,918.52 | 5/24/2007 | 2 |
| 1008565046 | Purchase Money/2nd | FORT LAUDERDALE | FL | 33315 | 69,982.08 | 5/24/2007 | 2 |
| 1007946574 | Purchase Money/2nd | MORENO VALLEY | CA | 92553 | 69,983.06 | 5/24/2007 | 2 |
| 1008230808 | Refinance/2nd | STOCKTON | CA | 95204 | 70,000.00 | 5/24/2007 | 2 |
| 1006980975 | Purchase Money/2nd | MORENO VALLEY | CA | 92553 | 75,859.41 | 5/24/2007 | 2 |
| 2018962 | Refinance/2nd | LAKE VILLA | IL | 60046 | 76,592.77 | 5/24/2007 | 2 |
| 1007350163 | Purchase Money/2nd | LAKE WORTH | FL | 33467 | 77,353.97 | 5/24/2007 | 2 |
| 1008626294 | Purchase Money/2nd | WOODLAND | CA | 95695 | 82,800.00 | 5/24/2007 | 2 |
| 1008419151 | Purchase Money/2nd | LODI | CA | 95240 | 83,000.00 | 5/24/2007 | 2 |
| 1007882561 | Purchase Money/2nd | BRENTWOOD | NY | 11717 | 83,978.50 | 5/24/2007 | 2 |
| 1009156389 | Purchase Money/2nd | WILDOMAR | CA | 92595 | 85,969.67 | 5/24/2007 | 2 |
| 1008908523 | Purchase Money/2nd | BROOKLYN | NY | 11236 | 85,972.51 | 5/24/2007 | 2 |

2

| LOAN ID | LOAN TYPE | CITY | STATE | ZIP CODE | CURRENT | Cutoff Date | LIEN |
|---------|-----------|------|-------|----------|---------|-------------|------|
| 1009243605 | Purchase Money/2nd | SPRINGFIELD GARDENS | NY | 11413 | 86,967.59 | 5/24/2007 | 2 |
| 1007901880 | Purchase Money/2nd | ELMONT | NY | 11003 | 88,971.56 | 5/24/2007 | 2 |
| 2251885 | Refinance/2nd | TEMECULA | CA | 92592 | 89,924.25 | 5/24/2007 | 2 |
| 1009183251 | Purchase Money/2nd | OCEANSIDE | CA | 92057 | 91,000.00 | 5/24/2007 | 2 |
| 1007414489 | Purchase Money/2nd | SOUTH RIDING | VA | 20152 | 92,486.90 | 5/24/2007 | 2 |
| 1008052233 | Purchase Money/2nd | BROOKLYN | NY | 11234 | 93,969.29 | 5/24/2007 | 2 |
| 1008365299 | Purchase Money/2nd | DUARTE | CA | 91010 | 94,342.41 | 5/24/2007 | 2 |
| 1008318910 | Refinance/2nd | ANAHEIM | CA | 92807 | 97,500.00 | 5/24/2007 | 2 |
| 1008480351 | Refinance/2nd | LA PUENTE | CA | 91744 | 98,862.98 | 5/24/2007 | 2 |
| 1003654780 | Purchase Money/2nd | SYLMAR AREA | CA | 91342 | 99,377.49 | 5/24/2007 | 2 |
| 1009599062 | Purchase Money/2nd | VALLEJO | CA | 94591 | 99,964.72 | 5/24/2007 | 2 |
| 1008564715 | Purchase Money/2nd | OAKLAND | CA | 94607 | 99,967.33 | 5/24/2007 | 2 |
| 1008316798 | Purchase Money/2nd | MIAMI | FL | 33133 | 102,000.00 | 5/24/2007 | 2 |
| 1008580476 | Purchase Money/2nd | MONTGOMERY | TX | 77356 | 102,952.45 | 5/24/2007 | 2 |
| 1005902473 | Purchase Money/2nd | LOS ANGELES | CA | 91335 | 103,596.11 | 5/24/2007 | 2 |
| 1007258344 | Purchase Money/2nd | LAS VEGAS | NV | 89118 | 103,973.08 | 5/24/2007 | 2 |
| 1003554932 | Purchase Money/2nd | JAMAICA | NY | 11436 | 108,399.60 | 5/24/2007 | 2 |
| 1010165554 | Refinance/2nd | LA MIRADA | CA | 90638 | 109,000.00 | 5/24/2007 | 2 |
| 1007349452 | Purchase Money/2nd | KISSIMMEE | FL | 34747 | 111,053.08 | 5/24/2007 | 2 |
| 1005476629 | Purchase Money/2nd | BROOKLYN | NY | 11233 | 114,921.99 | 5/24/2007 | 2 |
| 1009341713 | Purchase Money/2nd | BROOKLYN | NY | 11233 | 116,956.42 | 5/24/2007 | 2 |
| 1008412130 | Purchase Money/2nd | SANTA ANA | CA | 92707 | 119,000.00 | 5/24/2007 | 2 |
| 1008392679 | Purchase Money/2nd | SYLMAR | CA | 91342 | 119,800.00 | 5/24/2007 | 2 |
| 1009271520 | Purchase Money/2nd | LAKE ELSINORE | CA | 92532 | 119,938.14 | 5/24/2007 | 2 |
| 1008389326 | Purchase Money/2nd | WILDOMAR | CA | 92595 | 120,000.00 | 5/24/2007 | 2 |
| 1008418198 | Purchase Money/2nd | SANTA MARIA | CA | 93454 | 120,000.00 | 5/24/2007 | 2 |
| 1007952334 | Purchase Money/2nd | PASO ROBLES | CA | 93446 | 122,860.77 | 5/24/2007 | 2 |
| 1009294514 | Purchase Money/2nd | LOS ANGELES | CA | 91306 | 123,000.00 | 5/24/2007 | 2 |
| 1009542532 | Purchase Money/2nd | BRONX | NY | 10465 | 123,710.01 | 5/24/2007 | 2 |
| 1009122745 | Purchase Money/2nd | TEMECULA | CA | 92592 | 125,927.52 | 5/24/2007 | 2 |
| 1009482758 | Purchase Money/2nd | PLANTATION | FL | 33322 | 129,956.11 | 5/24/2007 | 2 |
| 1006787220 | Purchase Money/2nd | SOLEDAD | CA | 93960 | 131,785.09 | 5/24/2007 | 2 |
| 1006062262 | Purchase Money/2nd | BURBANK | CA | 91505 | 139,649.02 | 5/24/2007 | 2 |
| 1006665156 | Purchase Money/2nd | SACRAMENTO | CA | 95834 | 144,074.71 | 5/24/2007 | 2 |
| 1005531640 | Purchase Money/2nd | DOWNEY | CA | 90241 | 147,245.44 | 5/24/2007 | 2 |
| 1008676774 | Purchase Money/2nd | LEESBURG | VA | 20176 | 149,854.80 | 5/24/2007 | 2 |
| 1007543009 | Purchase Money/2nd | WOODSIDE | NY | 11377 | 156,643.32 | 5/24/2007 | 2 |
| 1008902048 | Purchase Money/2nd | VISTA | CA | 92084 | 167,940.09 | 5/24/2007 | 2 |
| 1008699928 | Purchase Money/2nd | RIVERSIDE | CA | 92503 | 168,945.99 | 5/24/2007 | 2 |
| 1008744727 | Purchase Money/2nd | BONITA | CA | 91902 | 169,951.47 | 5/24/2007 | 2 |
| 1008733267 | Purchase Money/2nd | LAKE HAVASU CITY | AZ | 86404 | 170,000.00 | 5/24/2007 | 2 |
| 1008397022 | Purchase Money/2nd | ANTIOCH | CA | 94531 | 175,400.00 | 5/24/2007 | 2 |
| 1009336685 | Purchase Money/2nd | BONITA | CA | 91902 | 185,957.94 | 5/24/2007 | 2 |
| 1008323520 | Purchase Money/2nd | DOWNEY | CA | 90241 | 188,000.00 | 5/24/2007 | 2 |
| 1010120031 | Purchase Money/2nd | TARZANA | CA | 91356 | 189,863.88 | 5/24/2007 | 2 |
| 1009564036 | Purchase Money/2nd | MCKINNEY | TX | 75070 | 189,912.29 | 5/24/2007 | 2 |

| LOAN ID | LOAN TYPE | CITY | STATE | ZIP CODE | CURRENT | Cutoff Date | LIEN |
|---|---|---|---|---|---|---|---|
| 10480702 | Purchase/1st | SALINAS | CA | 93905 | 214,269.19 | 5/24/2007 | 1 |
| 1009193437 | Purchase Money/2nd | ALAMEDA | CA | 94501 | 219,814.69 | 5/24/2007 | 2 |
| 10677750 | Purchase/1st | SANTA ROSA | CA | 95407 | 365,358.99 | 5/24/2007 | 1 |
| 1144447 | Refinance/1st | S SAN FRANCISCO | CA | 94080 | 447,200.00 | 5/24/2007 | 1 |
| 10633208 | Purchase/1st | MARIETTA | GA | 30068 | 552,337.18 | 5/24/2007 | 1 |
| 1564842 | Purchase Money/2nd | ENCINO AREA | CA | 91436 | 142,882.11 | 5/24/2007 | 2 |
| 10448159 | Purchase Money/2nd | SALTON CITY | CA | 92275 | 21,388.82 | 5/24/2007 | 2 |
| 10454732 | Purchase Money/2nd | LAS VEGAS | NV | 89144 | 26,832.35 | 5/24/2007 | 2 |
| 10482362 | Refinance/2nd | SILVERTHORNE | CO | 80498 | 114,995.00 | 5/24/2007 | 2 |
| 10591495 | Refinance/2nd | SACRAMENTO | CA | 95864 | 150,000.00 | 5/24/2007 | 2 |
| 10662485 | Refinance/1st | QUINCY | MA | 02169 | 508,800.00 | 5/24/2007 | 1 |
| 1000240028 | Purchase Money/2nd | ENUMCLAW | WA | 98022 | 96,000.00 | 5/24/2007 | 2 |
| 1000400658 | Purchase/1st | CORONA | CA | 92882 | 560,000.00 | 5/24/2007 | 1 |
| 1002190514 | Refinance/2nd | LAS VEGAS | NV | 89148 | 98,731.09 | 5/24/2007 | 2 |
| 1003067460 | Purchase Money/2nd | SICKLERVILLE | NJ | 08081 | 77,289.90 | 5/24/2007 | 2 |
| 1008499323 | Purchase Money/2nd | HOUSTON | TX | 77080 | 1,838.22 | 5/24/2007 | 2 |
| 1008581787 | Purchase/1st | HOUSTON | TX | 77065 | 15,653.82 | 5/24/2007 | 1 |
| 1011848575 | Refinance/1st | SPARKS | GA | 31647 | 146,515.31 | 5/24/2007 | 1 |
| 10687354 | Refinance/2nd | FLAGSTAFF | AZ | 86004 | - | 5/24/2007 | 2 |
| 10621556 | Refinance/2nd | SAN LORENZO | CA | 94580 | - | 5/24/2007 | 2 |
| 10632421 | Refinance/2nd | ACTON | CA | 93510 | - | 5/24/2007 | 2 |
| 10675178 | Refinance/2nd | ELK GROVE | CA | 95624 | - | 5/24/2007 | 2 |
| 10702422 | Refinance/2nd | BAKERSFIELD | CA | 93314 | - | 5/24/2007 | 2 |
| 10605949 | Refinance/2nd | DENVER | CO | 80210 | - | 5/24/2007 | 2 |
| 10612760 | Refinance/2nd | CALDWELL | ID | 83605 | - | 5/24/2007 | 2 |
| 10687393 | Refinance/2nd | INCLINE VILLAGE | NV | 89431 | - | 5/24/2007 | 2 |
| 10657511 | Refinance/2nd | BEND | OR | 97701 | - | 5/24/2007 | 2 |
| 10566392 | Purchase Money/2nd | PUYALLUP | WA | 98375 | - | 5/24/2007 | 2 |
| 10588269 | Refinance/2nd | LACEY | WA | 98516 | - | 5/24/2007 | 2 |
| 10502806 | Purchase Money/2nd | OLYMPIA | WA | 98513 | - | 5/24/2007 | 2 |
| 10599087 | Refinance/1st | BAKERSFIELD | CA | 93304 | 176,407.10 | 5/23/2007 | 1 |
| 10630278 | Refinance/1st | CORONA | CA | 92882 | 376,872.39 | 5/23/2007 | 1 |
| 10692425 | Refinance/1st | NATICK | MA | 01760 | 260,641.44 | 5/23/2007 | 1 |
| 10620604 | Purchase/1st | ACTON | CA | 93510 | 532,216.70 | 5/23/2007 | 1 |
| 10622120 | Purchase/1st | ORLANDO | FL | 32828 | 215,344.01 | 5/23/2007 | 1 |
| 10628264 | Refinance/1st | JOHNSON CITY | TN | 37604 | 99,939.87 | 5/23/2007 | 1 |
| 1001322740 | Purchase Money/2nd | NEW PARIS | IN | 46553 | 20,030.23 | 5/24/2007 | 2 |
| 1007036192 | Purchase Money/2nd | ROANOKE | AL | 36274 | 23,848.03 | 5/24/2007 | 2 |
| 1757663 | Refinance/2nd | ALLISON PARK | PA | 15101 | 40,738.83 | 5/24/2007 | 2 |
| 1001912210 | Purchase Money/2nd | TOPSHAM | ME | 04086 | 43,474.30 | 5/24/2007 | 2 |
| 10427640 | Purchase/1st | MONROE | GA | 30656 | 113,031.75 | 5/24/2007 | 1 |
| 10429659 | Purchase/1st | SHREVEPORT | LA | 71129 | 123,045.37 | 5/24/2007 | 1 |
| 10484316 | Purchase/1st | STAFFORD | VA | 22556 | 564,364.00 | 5/24/2007 | 1 |
| 10506335 | Refinance/1st | PHILADELPHIA | PA | 19138 | 75,500.00 | 5/24/2007 | 1 |
| 1008641972 | Purchase Money/2nd | DESOTO | TX | 75115 | 51,000.00 | 5/24/2007 | 2 |
| 1007938397 | Purchase Money/2nd | LAKE ELSINORE | CA | 92530 | 56,984.23 | 5/24/2007 | 2 |

| LOAN ID | LOAN TYPE | CITY | STATE | ZIP CODE | CURRENT | Cutoff Date | LIEN |
|---------|-----------|------|-------|----------|---------|-------------|------|
| 1008268787 | Purchase Money/2nd | FALLS CHURCH | VA | 22043 | 105,000.00 | 5/24/2007 | 2 |
| 1008694870 | Purchase Money/2nd | HOLLIS | NY | 11412 | 110,043.34 | 5/24/2007 | 2 |
| 1005570330 | Purchase Money/2nd | MURRIETA | CA | 92563 | 122,668.21 | 5/24/2007 | 2 |
| 1005359444 | Purchase/1st | PEA RIDGE | AR | 72751 | 107,920.00 | 5/24/2007 | 1 |
| 1004983174 | Refinance/1st | JACKSONVILLE | FL | 32210 | 107,929.22 | 5/24/2007 | 1 |
| 1004890835 | Purchase/1st | JACKSONVILLE | FL | 32206 | 160,000.00 | 5/24/2007 | 1 |
| 1006096431 | Purchase/1st | VICTORVILLE | CA | 92395 | 232,000.00 | 5/24/2007 | 1 |
| 1005779384 | Purchase/1st | LOWELL | MA | 01851 | 251,750.00 | 5/24/2007 | 1 |
| 1000386923 | Purchase/1st | LAS VEGAS | NV | 89134 | 321,288.43 | 5/24/2007 | 1 |

191                                                    17,554,475.88

## SCHEDULE 2

### Residuals Schedule

None.

## SCHEDULE 3

### Selling Subsidiaries

NC Capital Corporation

## SCHEDULE 4.5

## Litigation Schedule

New Century Financial Corporation (the "Company") and its subsidiaries are party to the following material litigation:

DOL Investigation. On August 2, 2004, the U.S. Department of Labor, Wage and Hour Division, or DOL, informed New Century Mortgage Corporation ("New Century Mortgage"), an indirect wholly owned subsidiary of New Century Financial Corporation (the "Company"), that it is conducting an investigation to determine whether New Century Mortgage is in compliance with the Fair Labor Standards Act, or FLSA. The DOL narrowed the scope of its investigation to overtime compensation paid to retail loan officers in an Irvine, California operation. New Century Mortgage believes it is in compliance with the FLSA and that it properly pays overtime wages. In April 2005, New Century Mortgage provided requested documents and awaits a response from the DOL.

Rubio. In March 2005, Daniel J. Rubio, a former retail loan officer of New Century Mortgage, filed a class action complaint against New Century Mortgage in the Superior Court of Orange County, California. The complaint alleges failure to pay overtime wages, failure to provide meal and rest periods, and that New Century Mortgage engaged in unfair business practices in violation of the California Labor Code. The complaint seeks recovery of unpaid wages, interest, and attorneys' fees and costs. New Century Mortgage filed a motion to strike and demurrer to the complaint in May 2005. On July 8, 2005, the court overruled the demurrer and granted the motion to strike. A First Amended Complaint was filed in July 2005 and New Century Mortgage filed its answer in August 2005. In December 2005, New Century Mortgage filed a motion to strike portions of the complaint, which was granted in New Century Mortgage's favor, limiting the statute of limitations for plaintiff's meal and rest period claims to one year. The court reconsidered and reversed its ruling in May 2006. A Second Amended Complaint was filed by plaintiff, adding a cause of action for failure to pay overtime in violation of the FLSA. In July 2006, mediation occurred, followed by New Century Mortgage's removal of the case to the United States District Court, Central District of California in August 2006. In September 2006, the court granted New Century Mortgage's motion to strike, limiting the statute of limitations for plaintiff's meal and rest period claims to one year. Plaintiff's Third Amended Complaint was filed in October 2006. In December 2006, the Court granted New Century Mortgage's motion to strike the punitive damages allegations from the plaintiff's Third Amended Complaint and denied New Century Mortgage's motion to dismiss the sixth cause of action for alleged wage statement violations. In December 2006, the parties stipulated to plaintiff filing a Fourth Amended Complaint adding plaintiffs John Hicks and David Vizcarra. Plaintiffs moved for leave to file a fifth amended complaint to add individual management defendants. The Court has placed this matter on inactive status due to New Century's Chapter 11 filing and Plaintiffs have sought relief from the Court's decision.

Bonner. In April 2005, Perrie Bonner and Darrell Bruce filed a class action lawsuit against New Century Mortgage and Home123 Corporation, an indirect wholly owned subsidiary of the Company ("Home123") in the U.S. District Court, Northern District of Indiana, Hammond Division, alleging violations of the Fair Credit Reporting Act, or FCRA, claiming that New Century Mortgage and Home123 accessed consumer credit

reports without authorization because the prescreened offers of credit did not qualify as firm offers of credit. New Century Mortgage and Home 123 filed their answer to the complaint on June 30, 2005. In September 2005, plaintiffs filed a motion for class certification and on November 1, 2005, New Century Mortgage and Home123 filed a motion for judgment on the pleadings. The court never ruled on the motion for judgment on the pleadings. In August 2006, the court granted plaintiffs' motion for class certification. The class size is limited to the Northern District of Indiana. On December 13, 2006, the court heard oral argument in Indiana on the parties' summary judgment motions. On March 9, 2007, the court ruled on the motion for summary judgment that defendants' solicitation did not constitute a "firm offer of credit", and ruled that plaintiff Bonner's claim that the disclosure was not "clear and conspicuous" was moot. On March 12, 2007, this action settled on a class-wide basis (Northern District of Indiana). On March 16, 2007, the parties moved for preliminary approval of the settlement. On April 12, 2007, the Court preliminarily approved the settlement. On May 16, 2007, the Court granted an order to stay the case while New Century Mortgage and Home123 sought creditor committee approval to proceed with the settlement.

Austin. In April 2007, former employees Richard Austin, Lauren Liva, Michael Vandall, Scott Rasmussen and Martha Moreland filed a class action lawsuit against New Century TRS Holdings, Inc. in the U.S. Bankruptcy Court, District of Delaware, on their behalf and on behalf of all other persons similarly situated alleging violations against federal and state WARN statutes, stemming from April 2, 2007 post-Bankruptcy layoffs where less than 60 days of pay and benefits were offered to impacted employees. A first amended complaint was filed by the plaintiffs on April 18, 2007 and New Century TRS Holdings, Inc.'s response to the complaint is due on June 8, 2007.

Securities Class Action Litigation

On February 8, 2007, Avi Gold filed a securities class action complaint in the United States District Court for the Central District of California against the Company and certain of its directors and officers (the "Original Complaint"). The Original Complaint alleges that defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about the Company, which resulted in artificially inflated market prices of the Company's common stock. The purported class period is between April 7, 2006 and February 7, 2007. The Original Complaint seeks money damages in favor of its purported class of purchasers of the Company's securities, the costs and expenses of the action and other relief that may be granted by the court.

The Company has also learned that twenty-two additional purported class actions were filed in the United States District Court for the Central District of California between February 8, 2007 and April 10, 2007. These complaints, some of which the Company has not yet been served with and which name the Company and certain of its officers and directors as defendants, present in large degree the same legal and factual issues as the Original Complaint and allege various class periods, the longest of which is from April 7, 2006 to March 13, 2007. Three of these class actions have been brought on behalf of the holders of the Company's 9.125% Series A Cumulative Redeemable

Preferred Stock ("Series A Preferred Stock") and the holders of the Company's 9.75% Series B Cumulative Redeemable Preferred Stock ("Series B Preferred Stock"). Another of these class actions has been brought on behalf of the holders of the Company's Series B Preferred Stock. The Company anticipates that similar actions on behalf of holders of the Company's common stock, Series A Preferred Stock and Series B Preferred Stock may be filed in the future. These actions have been stayed as to the Company as a result of the Company's Chapter 11 bankruptcy filing.

Shareholder Derivative Complaint

The Company was served with a shareholder derivative complaint on February 27, 2007, filed in the Superior Court of California, County of Orange. The complaint alleges breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of California Corporations Code 25402 and seeks damages for breach, disgorgement, equitable relief, costs and fees. The case is in the preliminary stages.

The Company has also learned that five additional shareholder derivative actions were filed in the Superior Court of California, County of Orange between February 8, 2007 and March 16, 2007 and two additional shareholder derivative actions were filed in the United States District Court for the Central District of California during this same time period. These complaints, some of which the Company has not yet been served with and which name the Company and certain of its officers and directors as defendants, present in large degree the same legal and factual issues as the original shareholder derivative complaint. These actions have been stayed as to the Company as a result of the Company's Chapter 11 bankruptcy filing.

U.S. Attorney's Office Investigation

On February 27, 2007, the Company received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the Company's securities, as well as accounting errors regarding the Company's allowance for repurchase losses.    The Company has subsequently received a grand jury subpoena requesting production of certain documents. The Company intends to cooperate with the requests of the U.S. Attorney's Office.

SEC Investigation

On March 7, 2007, the Company received a letter from the Pacific Regional Office of the Securities and Exchange Commission (the "SEC") requesting that NCFC preserve certain documents. On March 12, 2007, the Company received a letter from the staff of the Pacific Regional Office of the SEC stating that the staff was conducting a preliminary investigation involving the Company and requesting production of certain documents. The staff of the SEC had also previously requested a meeting with the Company to discuss the events leading up to the Company's previous announcement of

the need to restate certain of its historical financial statements.  The Company intends to
cooperate with the requests of the SEC.

State Regulatory Actions

        The Company has been engaged in ongoing discussions with its state regulators
regarding the Company's funding constraints and the appropriate handling of all
consumer loans and loan applications whose progress was suspended at the onset of such
constraints.  The Company advised these regulators that it ceased accepting loan
applications.  The Company has worked cooperatively with these regulators to mitigate
the impact on affected consumers, including the successful transfer of all pending loans
and loan applications to other mortgage lenders.  The Company provided daily reports to
its various regulators regarding the status of loans in process in their states and responded
to ad hoc information requests regarding applications until all loans and applications were
resolved.

        . The Company received cease and desist orders from the States of Massachusetts,
New Hampshire, New Jersey and New York on March 13, 2007 (collectively, the "March
13 Orders").  New Century Mortgage additionally received a Suspension Order from the
state of New York on March 13, 2007 (the "NCMC Suspension Order").  The NCMC
Suspension Order suspends New Century Mortgage's mortgage banking license in the
State of New York for a period not to exceed 30 days, pending investigation.  On March
14 and 15, 2007, the Company received additional cease and desist orders from the States
of Connecticut, Maryland, Rhode Island and Tennessee (collectively, the "March 14-15
Orders").  The March 13 Orders and the March 14-15 Orders contain allegations that
certain of the Company's subsidiaries have engaged in violations of applicable state law,
including, among others, failure to fund mortgage loans after closing.  Additionally, on
March 14, 2007, New Century Mortgage and Home123 entered into a Consent
Agreement and Order with the Commonwealth of Pennsylvania Department of Banking,
Bureau of Supervision and Enforcement (the "Pennsylvania Consent Agreement").

        The March 13 Orders, the March 14-15 Orders and the Pennsylvania Consent
Agreement restrain the Company's subsidiaries from taking certain actions, including,
among others, engaging in alleged violations of state law and taking new applications for
mortgage loans in the relevant jurisdiction.  The March 13 Orders, the March 14-15
Orders and the Pennsylvania Consent Agreement also compel the subsidiaries to
affirmatively take certain actions, including the creation of escrow accounts to hold any
upfront fees collected in connection with pending mortgage applications, the transfer to
other lenders of the outstanding mortgage applications and unfunded mortgage loans held
by the subsidiaries, and the provision of regular information to the state regulators
regarding the subsidiaries' activities in the applicable state, including the status of all
outstanding mortgage applications and unfunded mortgage loans in that state.  The cease
and desist order received from the Rhode Island Department of Business Regulation on
March 14 suspends the licenses of one or more of the Company's subsidiaries and seeks
to assess administrative penalties.

On March 14, 2007, the Attorney General of Ohio and the Ohio Department of Commerce, Division of Financial Institution (together, the "State") filed a lawsuit against the Company, New Century Mortgage and Home123 (collectively, the "Defendants") on March 14, 2007 in Ohio state court (the "Ohio Complaint"). The Ohio Complaint alleges that the Company has engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after closing. Also on March 14, 2007, the court granted the State's motion to enter a temporary restraining order, which was subsequently modified by the court on March 16, 2007, against the Defendants (as modified, the "TRO"). The TRO restrained the Defendants from taking certain actions, including, among others, (i) engaging in violations of state law, (ii) soliciting applicants and taking new applications for mortgage loans in Ohio and (iii) initiating, prosecuting or enforcing foreclosure actions in Ohio. The TRO required the parties to confer with respect to restrictions regarding foreclosure action and the sale, transfer or assignment of loans more than 60 days delinquent. On March 26, 2007, the Defendants filed a Motion for Dissolution of Modified Temporary Restraining Order and Motion for an Emergency Hearing, and Opposition to a Preliminary Injunction. On March 28, 2007, the Defendants and the State reached agreement on a Stipulated Preliminary Injunction effective for 90 days, which was entered by the court. The Stipulated Preliminary Injunction replaces the TRO and provides for a stay of the litigation for 90 days. The Stipulated Preliminary Injunction restrains the Defendants from taking certain actions, including, among others, engaging in alleged violations of state law and taking new applications for mortgage loans. The Stipulated Preliminary Injunction also compels the Defendants to take certain actions, including the transfer to other lenders of any outstanding mortgage applications and unfunded mortgage loans, the placement in escrow of any upfront fees collected in connection with pending mortgage applications, and the provision of regular information to the State regarding the Company's activities in Ohio, including the status of all outstanding mortgage applications and unfunded mortgage loans. The Stipulated Preliminary Injunction also requires the Defendants to submit certain categories of loans (and related information) as to which it intends to foreclose to the State for the State to review. The State may object for cause to the Company proceeding with a particular foreclosure and if the Company is unable to convince the State to permit it to proceed, the foreclosure will not proceed for the duration of the Stipulated Preliminary Injunction. The Stipulated Preliminary Injunction also provides for the State to review and object for cause to the Defendants selling, transferring or assigning certain loans that are more than 60 days delinquent.

In the event that the State or the Defendants believe the other is not acting in good faith, the Stipulated Preliminary Injunction provides that the complaining party should notify the other of such concern and if the concern is not resolved, then either party may notify the other of their intent to file a motion with the court to terminate the Stipulated Preliminary Injunction and request to reschedule the previously canceled preliminary injunction hearing. The Stipulated Preliminary Injunction provides that in such event neither party will object to the scheduling of a prompt preliminary injunction hearing or the termination of the Stipulated Preliminary Injunction at such a preliminary injunction hearing.

On March 16, 2007, the Company received additional cease and desist orders from the State of California (the "California Orders") and certain of the Company's subsidiaries entered into consent agreements with the State of Florida's Office of Financial Regulation and the State of Washington's Department of Financial Institutions, respectively, each dated March 16, 2007 (the "March 16 Agreements" and together with the California Orders, the "March 16 Orders and Consent Agreements").

The March 16 Orders and Consent Agreements contain allegations that certain of the Company's subsidiaries have engaged in violations of state law, including, among others, failure to fund mortgage loans after closing. The March 16 Orders and Consent Agreements restrain the Company's subsidiaries from taking certain actions, including, among others, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction. The March 16 Orders and Consent Agreements also compel the subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold any upfront fees collected in connection with pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

On March 20, 2007, the Company entered into a Combined Statement of Charges and Consent Order with the State of Iowa and a Consent Agreement and Order with the State of Maine Office of Consumer Credit Regulation, Department of Professional and Financial Regulation (together, the "March 20 Orders"). On March 21, 2007, the Company entered into a Consent Order with the State of Michigan, Department of Labor & Economic Growth, Office of Financial and Insurance Services and a Consent Order with the State of Wyoming Banking Commission (the "March 21 Orders"). On March 23, 2007, the Company entered into a Consent Agreement and Order with the State of Idaho Department of Finance (the "March 23 Order"). Similar to the consent agreements described above, the March 20, 21 and 23 Orders contain allegations that certain of the Company's subsidiaries have engaged in violations of state law, including, among others, failure to fund mortgage loans after closing. They restrain the Company's subsidiaries from taking certain actions, including, among others, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction. They also compel the subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold any upfront fees collected in connection with pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

New Century Mortgage Corporation received a Civil Investigative Demand ("CID") from the Commonwealth of Massachusetts Office of the Attorney General on

March 22, 2007. The CID requests the production of documents relating to New Century Mortgage Corporation's mortgage loan origination business.

The Company and its subsidiaries requested hearings on the cease and desist orders issued by regulators in Maryland, Massachusetts, Connecticut and Rhode Island on March 23, 2007, in Tennessee on March 27, 2007 and in New Jersey on March 30, 2007.

In lieu of a hearing, the State of New York Banking Department (the "New York Department") advised New Century Mortgage to submit a letter regarding the NCMC Suspension Order and the New York cease and desist order. On March 29, 2007, New Century Mortgage sent a letter to the New York Department advising the New York Department that New Century Mortgage was making every effort to comply with the New York cease and desist order, but that it was unable to comply with certain provisions of the New York cease and desist order at this time. Therefore, the letter requested that the New York Department modify the cease and desist order to remove those provisions that are impracticable for New Century Mortgage to comply with at this time. The letter further indicates that New Century Mortgage was agreeable to a 30-day extension of the New Century Mortgage Suspension Order as it works to resolve its present liquidity issues.

In lieu of a hearing, the State of California Department of Corporations (the "California Department") advised New Century Mortgage to submit a letter regarding the California Orders. On March 30, 2007, New Century Mortgage sent a letter to the California Department advising the California Department that New Century Mortgage was making every effort to comply with the California Orders, but that it was unable to comply with certain provisions of the California Orders at this time. Therefore, the letter requested that the California Department modify the California Orders to remove those provisions that are impracticable for New Century Mortgage to comply with at this time. By letter dated April 9, 2007, the California Department declined to modify the Orders but agreed not to pursue actions for violations of provisions with which the Company indicated it cannot comply.

On April 11, 2007, New Century Mortgage Corporation requested a hearing on the cease and desist order issued in New Hampshire. On April 13, 2007, the New Hampshire Banking Department issued a notice of hearing to take place on April 23, 2007. New Century Mortgage Corporation filed a motion to continue the hearing for 60 days on April 13, 2007, which reflected the parties' shared desire to enter into a consent agreement. That motion was granted on April 19, 2007.

On April 17, 2007, the Maryland Office of Administrative Hearings issued a notice of hearing to take place on June 4, 2007.

On May 1, 2007, the Company mailed checks reimbursing all consumers in the 18 states in which the above-described regulatory actions are proceeding for upfront fees paid in connection with mortgage loan applications that did not fund as intended.

The Company anticipates that cease and desist orders will continue to be received by the Company and its subsidiaries from additional states in the future and that the Company and its subsidiaries may enter into additional consent agreements similar to those described above.

The Company intends to continue to cooperate with its regulators in order to mitigate the impact on consumers resulting from the Company's funding constraints.

## Exhibit A

[Reserved]

**Exhibit B**

**Sale Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.**[1] | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | Re: Docket No. ____ |
| | : | |
| | : | |

**ORDER APPROVING SUPPLEMENT NO. 1 TO ASSET PURCHASE AGREEMENT
BY AND AMONG ELLINGTON MANAGEMENT GROUP, L.L.C. ON BEHALF OF ITS
CLIENT FUNDS, NEW CENTURY FINANCIAL CORPORATION AND NEW
CENTURY MORTGAGE CORPORATION DATED JUNE ___, 2007**

This matter coming before the Court on the Motion for Order Approving

Supplement No. 1 to Asset Purchase Agreement by and among Ellington Management Group,

L.L.C. on Behalf of Its Client Funds, New Century Financial Corporation and New Century

Mortgage Corporation dated June ___, 2007 (the "Motion"), filed by New Century TRS

Holdings, Inc., New Century Financial Corporation, and New Century Mortgage Corporation

(collectively, "New Century") and their direct and indirect subsidiaries, each as a debtor and

debtor-in possession (collectively, the "Debtors"); and a hearing having been held on June _____,

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT,
Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a
Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate,
New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital
Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com,
Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a
California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership;
NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New
Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New
Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort
Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage,
Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a
Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P, a
Delaware limited partnership.

1

2007, in connection with the Motion (the "<u>Hearing</u>"); and all parties in interest having been heard, or having the opportunity to be heard, regarding Supplement No. 1 to Asset Purchase Agreement by and among Ellington Management Group, L.L.C. on Behalf of Its Client Funds, New Century Financial Corporation and New Century Mortgage Corporation Dated June ___, 2007 (the "Supplement"),[2] a copy of which is attached hereto as <u>Exhibit A</u>, and the transactions contemplated thereby; the Court having considered the Motion and the arguments made and evidence proffered or adduced at the Hearing in support of approval of the Supplement; and objections, if any, to the Motion having been overruled on the merits with prejudice; and it appearing from the affidavits of service filed with the Court that due and sufficient notice of the Motion and the relief granted by this Order have been provided to all parties affected thereby; and it further appearing that no other or further notice hereof is required; and upon the Court record of these cases and of the Hearing; and it appearing that the relief requested in the Motion and approved by this Order is in the best interests of the Debtors, their estates, and all parties in interest; and after due deliberation and good cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Supplement is approved in its entirety and the Debtors are authorized and directed to perform thereunder.

2.      Except as expressly provided herein or in the Supplement, nothing in this Order shall affect the provisions, or the validity, enforceability, or finality, of the (a) Order (A) Approving Asset Purchase Agreement By and Among New Century Financial Corporation and Ellington Management Group, L.L.C. on Behalf of Its Client Funds, (B) Authorizing Sale of

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Supplement, as applicable. If there is any inconsistency, the Supplement shall govern.

2

Certain Loans and Residuals to Purchaser or Its Designee(s), Free and Clear of All Liens, Claims,

Encumbrances and Interests and (C) Granting Related Relief (the "Sale Order"), which was

entered on May 7, 2007, or (b) the Asset Purchase Agreement between certain of the Debtors and

Ellington Management Group, L.L.C., on behalf of its clients funds, dated as of May 2, 2007,

approved by the Sale Order.

      3.     This Order shall be effective immediately upon entry notwithstanding

Bankruptcy Rule 6004(g), to the extent applicable.

Dated June ____, 2007
     Wilmington, Delaware

                 _____

                 UNITED STATES BANKRUPTCY JUDGE

3

**Exhibit C**

**Form of Limited Power of Attorney**

**LIMITED POWER OF ATTORNEY FOR LNFA MORTGAGE LOANS**

KNOW ALL MEN BY THESE PRESENTS, that New Century Financial Corporation and its subsidiary NC Capital Corporation (collectively, the "Sellers") for the exclusive purposes of (i) endorsing and assigning those certain LNFA Mortgage Loans set forth and described in that certain Supplement No. 1 to Asset Purchase Agreement effective June [   ], 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), between the Sellers and Ellington Management Group, L.L.C., on behalf of its client funds (the "Purchaser") and (ii) executing special warranty deeds (or equivalent documents) from the Seller to the Purchaser or its designee with respect to each of the mortgaged properties that secured a LNFA Mortgage Loan that was acquired by the Sellers prior to the Closing Date by foreclosure or by deed in lieu of foreclosure (each such mortgaged property hereinafter referred to as the "REO Property") hereby names, constitutes and appoints Ellington Management Group, L.L.C., Ellington Loan Acquisition 2007-2, LLC, and/or Ellington Loan Mortgage Corporation, or any of their authorized agents, employees or representatives, their duly authorized attorney and agent with limited power and authority to (a) endorse the LNFA Mortgage Notes or any allonge thereto and assign any mortgages and/or deed of trust or real estate conveyances in the Sellers' name (or in the name of any of its affiliates whose assets may be included as financial assets) as its attorney-in-fact; (b) execute any special warranty deeds (or equivalent documents) from the Seller to the Purchaser or its designee with respect to the REO Property in the Sellers' name (or in the name of any of its affiliates whose assets may be included as financial assets) as its attorney-in-fact; (c) complete the relevant information necessary for lost note affidavits or any other acquired instruments to evidence the loss of the LNFA Mortgage Notes; and (d) do these acts incident to such Agreement referenced above, which the undersigned has had or was entitled to exercise as the owner of said LNFA Mortgage Loans and REO Property;.

*[Signature on following page]*

EXECUTED on this the __ day of June, 2007

**NEW CENTURY FINANCIAL CORPORATION**

By: _____

    Name:

    Title:

**NC CAPITAL CORPORATION**

By: _____

    Name:

    Title:

*[Acknowledgment on following page]*

STATE OF _____    )
                             )
COUNTY OF _____       )


On June ___ 2007, before me, _____, Notary Public, personally appeared

_____, personally known to me or proved to me on the basis of satisfactory

evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and

acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),

and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of

which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


_____


[SEAL]

**Exhibit D**

**Base Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

between

NEW CENTURY FINANCIAL CORPORATION,

THE SELLING SUBSIDIARIES NAMED HEREIN

and

ELLINGTON MANAGEMENT GROUP, L.L.C.
ON BEHALF OF ITS CLIENT FUNDS

Dated as of May 2, 2007

# TABLE OF CONTENTS

Page

ARTICLE 1 Definitions..................................................................................................1

ARTICLE 2 Purchased Assets........................................................................................6

ARTICLE 3 Purchase Price............................................................................................6

ARTICLE 4 Representations and Warranties of the Sellers...........................................8

ARTICLE 5 Representations and Warranties of the Purchaser......................................9

ARTICLE 6 Additional Agreements............................................................................10

ARTICLE 7 Closing.....................................................................................................13

ARTICLE 8 Transfer of Servicing...............................................................................18

ARTICLE 9 Termination..............................................................................................22

ARTICLE 10 Survival of Representations and Warranties..........................................23

ARTICLE 11 Notices...................................................................................................23

ARTICLE 12 Miscellaneous........................................................................................24

## SCHEDULES

| | |
|---|---|
| SCHEDULE 1 | LNFA Mortgage Schedule |
| SCHEDULE 2 | Residuals Schedule |
| SCHEDULE 3 | Selling Subsidiaries |
| SCHEDULE 4.5 | Litigation Schedule |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Bidding Procedures Order |
| EXHIBIT B | Sale Order |
| EXHIBIT C | Form of Power of Attorney |
| EXHIBIT 6.11 | Ohio Delinquent Loans |
| EXHIBIT 6.12 | Absent Certificates |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of May 2, 2007, by and among New Century Financial Corporation, a Maryland corporation (the "Company"), the Subsidiaries of the Company owning Purchased Assets (as defined below), which are named on Schedule 3 hereof (the "Selling Subsidiaries"), and Ellington Management Group, L.L.C., a Delaware limited liability company, on behalf of its client funds (the "Purchaser"). The Company and the Selling Subsidiaries are collectively referred to herein as the "Sellers" and, individually, as a "Seller." The Sellers and the Purchaser are collectively referred to herein as the "Parties" and, individually, as a "Party."

WHEREAS, the Sellers have filed Chapter 11 petitions to commence cases (the "Chapter 11 Cases") under Title 11 of the United States Code (the "Bankruptcy Code") on April 2, 2007 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are currently operating as debtors and debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, the Purchaser desires to purchase from the Sellers, and the Sellers desire to sell to the Purchaser, the Purchased Assets, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105 and 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1    For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Accrued and Unpaid Interest" means, with respect to any Loan, as of any date, the interest, fees, premiums, consignment fees, costs, advances and other charges that have accrued on such Loan (whether or not such fees, costs or charges have been billed) but have not been paid by the Obligor on such Loan or otherwise collected by offset, recourse to collateral or otherwise.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" shall have the meaning set forth in the preamble.

"Assignment Deadline" shall have the meaning set forth in Section 6.9(a).

"Auction" means the auction conducted by the Sellers pursuant to the Bidding Procedures Order.

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" shall have the meaning set forth in Section 6.6.

"Bidding Procedures Order" means the order of the Bankruptcy Court attached hereto as Exhibit A.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the States of California, Delaware and New York are authorized or obligated by law or executive order to be closed.

"Chapter 11 Cases" shall have the meaning set forth in the recitals.

"Claim" shall have the meaning as defined in Section 101(5) of the Bankruptcy Code.

"Closing" shall have the meaning set forth in Section 7.1.

"Closing Date" shall have the meaning set forth in Section 7.1.

"Company" shall have the meaning set forth in the preamble.

"Contract" means any contract, license, sublicense, franchise, permit, mortgage, deed to secured debt or deed of trust, purchase order, indenture, loan agreement, note, lease, sublease, agreement, obligation, commitment, understanding, instrument or other arrangement or any commitment to enter into any of the foregoing (in each case, whether written or oral).

"Cut-off Date" shall mean for each LNFA Mortgage Loan, the date listed for each Loan on the LNFA Mortgage Schedule as the cut-off date.

"Designation Rights" shall have the meaning set forth in Section 6.9(a).

"DIP Agreement" means the Debtor-in-Possession Loan and Security Agreement, dated as of April 13, 2007, by and among New Century Financial Corporation, certain of its Affiliates, Greenwich Capital Financial Products, Inc., The CIT Group Business Credit, Inc. and the lenders party thereto.

"Files" means, whether in paper or electronic form, books; records; customer and vendor lists; correspondence; files; advertising, marketing and sales materials; financial records and statements; correspondence, reports and examinations of Governmental Authorities and legal proceedings materials.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Finance Laws" means the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Home Mortgage Disclosure Act, the Consumer Credit Protection Act, the Right to Financial Privacy Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Homeowners Ownership and Equity Protection Act, the Federal Trade Commission Act, the Fair Debt Collection Practices Act and other Laws regulating lending.

"First Priority Loans" means those LNFA Mortgage Loans secured by a first priority Lien in favor of the applicable Seller who is a Party to the Loan or owns by assignment.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Grantor Trust" means a fixed investment trust, as defined in Section 301.7701-4(c) of the Treasury Regulations or any entity or arrangement that has purported to be such a fixed investment trust, irrespective of whether such entity or arrangement qualifies as a fixed investment trust under Section 301.7701-4(c) of the Treasury Regulations.

"Holdback" shall have the meaning set forth in Section 3.2.

"Holdback Period" shall have the meaning set forth in Section 3.2.

"Income Tax" means all federal, state, local, or foreign taxes based upon, measured by, or calculated with respect to (i) gross or net income or gross or net receipts or profits (including, but not limited to, any capital gains, minimum taxes and any taxes on items of tax preference, but not including sales, use, goods and services, real or personal property transfer or other similar taxes); (ii) multiple bases (including, but not limited to, corporate franchise, doing business or occupation taxes) if one or more of the bases upon which such tax may be based upon, measured, or calculated with respect to, is described in clause (i); or (iii) withholding taxes, measured by, or calculated with respect to, any payments or distributions (other than wages).

"Initial Holdback Period" shall have the meaning set forth in Section 3.2(a).

"Insurance Policies" means those policies of insurance which the Sellers maintain with respect to their assets and operations.

"IRS" means the Internal Revenue Service, or any successor agency.

"Lien" means any mortgage, deed to secured debt or deed of trust, pledge, security interest, encumbrance, Claim, tax, equitable interest, participation interest, negative

pledge, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof) or any agreement to file any of the foregoing, any sale of receivables with recourse against the Sellers or any of their Affiliates, any filing or agreement to file a financing statement as debtor under the UCC or any similar statute and all claims (including, but not limited to, all "claims" within the meaning of section 101(5) of the Bankruptcy Code).

"LNFA Mortgage Loans" means all of the Sellers' rights, title, and interest in the mortgage Loans on a servicing-released basis (to one or more third-party servicers) as scheduled on the LNFA Mortgage Schedule, including all legal, credit and servicing files related thereto, and all Seller-collected Accrued and Unpaid Interest, late fees and all other proceeds related thereto, including any proceeds realized by the Sellers in connection with a release and satisfaction of such Loan, received on or after the Cut-Off Date for such Loan as set forth on Schedule 1 hereto and all proceeds of the foregoing.

"LNFA Mortgage Schedule" shall mean Schedule 1 hereto.

"Loans" shall mean all loans, or other extensions of credit, either purchased by a Seller from Third Parties or pursuant to which any of the Sellers have lent money, in each case, which are owned by the Sellers or subject to repurchase by or similar Contract of a Seller, including, but not limited to, (a) loans which have been partially or fully charged off, (b) interests in loan participations and assignments, (c) legally binding commitments and obligations to extend credit (including any unfunded or partially funded revolving loans, lines of credit or similar arrangements).

"Obligor" means, with respect to any Loan, the Person(s) obligated to make payments with respect to such Loan, including, without limitation, the applicable borrower, or any guarantor, co-signer, surety or other obligor therefor.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Organizational Documents" means certificates of incorporation, by-laws, certificates of formation, limited liability company operating agreements, limited liability partnership agreements, partnership or limited partnership agreements or other formation or governing documents of a particular entity.

"Parties" shall have the meaning set forth in the preamble.

"Party" shall have the meaning set forth in the preamble.

"Person" means an individual, a partnership, a limited liability company, a corporation, a cooperative, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Authority.

"Petition Date" shall mean April 2, 2007.

"Post Cut-off Date Collections" shall have the meaning set forth in Section 8.3(d).

"Purchase Price" shall have the meaning set forth in Article 3 hereof.

"Purchased Assets" means the LNFA Mortgage Loans and the Residuals.

"Purchaser" shall have the meaning set forth in the preamble or shall mean Third Party Purchaser, as applicable.

"Residuals" means all of the Sellers' interests, rights, and title to the residuals set forth on the Residuals Schedule, the related securitization clean-up calls (only to the extent the clean-up calls are held by the owner of the Residuals) and all proceeds related to the foregoing received after all their respective distribution dates in March 2007.

"Residuals Schedule" means Schedule 2 attached hereto.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Order" means an order of the Bankruptcy Court, authorizing and approving the sale of the Purchased Assets to the Purchaser under the terms of this Agreement free and clear of any Liens, claims, or other encumbrances of any kind or nature pursuant to section 363 of the Bankruptcy Code substantially in the form of Exhibit B hereof.

"Second Priority Loans" means those LNFA Mortgage Loans secured by a second priority Lien in favor of the applicable Seller who is a Party to the Loan or owns by assignment.

"Sellers" shall have the meaning set forth in the preamble.

"Selling Subsidiaries" shall have the meaning set forth in the preamble.

"Servicer Expenses" shall have the meaning set forth in Section 8.1

"Servicing Transfer Date" shall have the meaning set forth in Section 8.1.

"Tax Code" means the Internal Revenue Code of 1986 as amended from time to time.

"Tax Return" means any return, declaration, report, claim for refund, information return, amended return or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of Taxes of any Person or the administration of any laws, regulations or administrative requirements relating to any Taxes.

"Third Party" means any Person other than the Parties or any of their Affiliates.

"Third Party Purchaser" shall have the meaning set forth in Section 6.9(a).

"Third Party Purchaser Notice" shall have the meaning set forth in Section 6.9(a).

"Transaction Documents" means this Agreement and any other agreement, certificate, consent, waiver, document or instrument to be executed and/or delivered at Closing, including, but not limited to, those agreements, certificates, consents, waivers, documents and other instruments required to be delivered by or on behalf of a Person under Article 7 hereof.

"Treasury Regulation" means a regulation promulgated by the Treasury Department under the Tax Code, including a temporary regulation and a proposed regulation to the extent that, by reason of their actual or proposed effective date, would or could, as of the date of any determination or opinion as to the tax consequences of any action or proposed action or transaction, be applied to the Purchased Assets.

"UCC" means the Uniform Commercial Code.

## ARTICLE 2

## PURCHASED ASSETS

2.1    On the terms and subject to the conditions contained in this Agreement, on the Closing Date, the Sellers will sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser will purchase and take assignment and delivery from the Sellers of all of the legal and beneficial right, title and interest of the Sellers in the Purchased Assets free and clear of any Lien of any kind whatsoever. For the avoidance of doubt, the Purchaser is not assuming any obligation or liability of any of the Sellers (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted) arising out of any transactions entered into at or prior to the date hereof, or any action or inaction at or prior to the date hereof, or any state of facts existing at or prior to the date hereof, whether related to the Purchased Assets or otherwise.

## ARTICLE 3

## PURCHASE PRICE

3.1    Purchase Price.  In consideration of the sale of the Purchased Assets from the Sellers to the Purchaser on the Closing Date, the Purchaser agrees to pay the Sellers the amount of $58,000,000 (the "Purchase Price"), subject to (a) the amount set forth in the Servicer Expenses Statement delivered to Purchaser prior to Closing, and (b) the Holdback, as described in Section 3.2.

3.2    Holdback; Claim and Indemnification Limitations.

(a)    At the Closing, Purchaser shall deposit $3,000,000 (the "Holdback") with a mutually acceptable escrow agent (the "Escrow Agent") by wire transfer of immediately available funds to be paid into escrow and retained therein and disbursed therefrom in accordance with the terms of this Agreement and an escrow agreement, by and among the Purchaser, the Sellers and the Escrow Agent, in a form reasonably acceptable to the Sellers, the Purchaser and the Escrow Agent (the "Escrow Agreement").  The Holdback shall be used by the Purchaser solely (1) to satisfy any amounts payable to the Purchaser to the extent

the Purchaser makes a valid claim under the Agreement and the Escrow Agreement to the Sellers and the Escrow Agent within forty-five (45) days after the Closing Date (the "<u>Initial Holdback Period</u>") that (i) a LNFA Mortgage Loan has been released, satisfied or discharged in whole or in part by the Sellers at any time prior to the transfer of servicing for which (A) the Purchaser has not received the proceeds of such LNFA Mortgage Loan payoff, or (B) the release, satisfaction or discharge of such LNFA Mortgage Loan resulted in proceeds to the Purchaser less than the purchase price for such LNFA Mortgage Loan (the "<u>Loan Purchase Price</u>") (in which case the Purchaser may make a claim against the Holdback for the difference between such Loan Purchase Price and the amount of proceeds received by the Purchaser) or (ii) except with respect to the Ohio Delinquent Loans, the foreclosure process of any state in which a mortgaged property underlying a LNFA Mortgage Loan is situated is materially adversely affected by any law, rule or regulation which was enacted or became effective after March 30, 2007 and prior to the Closing Date (in which case the Purchaser may make a claim against the Holdback for an amount equal to the loss suffered by the Purchaser with respect to any LNFA Mortgage Loan as a result of such law, rule or regulation) or (iii) the servicing of such LNFA Mortgage Loan is not transferred to the third-party servicer designated by the Purchaser as a result of the action or inaction of the Sellers (in which case the Purchaser may make a claim against the Holdback for an amount equal to the loss suffered by the Purchaser pursuant thereto), and (2) to satisfy any amounts payable to the Purchaser to the extent the Purchaser makes a valid claim under the Agreement and the Escrow Agreement to the Sellers and the Escrow Agent within ninety (90) days after the Closing Date (the "<u>Holdback Period</u>") for any damages, indemnification, fees, penalties or other similar payments due to any breach or violation of, or default under, any provision of this Agreement by the Sellers. For purposes of calculating the Holdback deductions pursuant to this Section 3.2(a)(1)(i)(B), (ii) and (iii) and 3.2(a)(2), the Loan Purchase Price in respect of any LNFA Mortgage Loan shall be a predetermined percentage of the unpaid principal balance of such LNFA Mortgage Loan pursuant to a schedule separately provided by the Purchaser to the Sellers, and the deduction for damages with respect to any LNFA Mortgage Loan shall in no event exceed the Loan Purchase Price in respect of such LNFA Mortgage Loan. The balance of the Holdback after deduction of amounts, if any, as described above shall be paid to the Sellers on the first Business Day following the Holdback Period. Purchaser agrees to return promptly to Sellers any documents received on account of any LNFA Mortgage Loan for which a Purchase Price adjustment has been made pursuant to Section 3.2(a)(1)(ii) or (iii), and such LNFA Mortgage Loan shall not be deemed a Purchased Asset upon such Purchase Price adjustment being made.

(b)     Except for the amount available in the Holdback, the Sellers shall not be liable to pay to any Purchaser or any other Person any damages, indemnifications, fees, penalties or other similar payments due to any breach or violation of, or default under, any provision of this Agreement by any Seller, including but not limited to Sellers' representations, warranties, covenants and agreements contained herein.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

As a material inducement to the Purchaser to enter into this Agreement, the Sellers hereby represent and warrant to the Purchaser the following:

4.1     <u>Organization and Power</u>.    The Company is a Maryland corporation duly organized, validly existing and in good standing under the laws of Maryland.  Each of the Sellers is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization (as applicable).  Each of the Sellers is qualified to do business and is in good standing as a corporation or entity (as applicable) in their respective jurisdictions of incorporation or organization, as applicable.  The Sellers have the requisite corporate or other entity power and authority to own the Purchased Assets.

4.2     <u>Corporate Authority</u>.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby to be consummated by the Sellers, have been duly and validly authorized by all necessary corporate or other entity action (as applicable) on the part of each of the Sellers.  This Agreement has been, and each of the Transaction Documents after execution and delivery thereof at the Closing will have been, duly and validly executed and delivered by the Sellers, as applicable, and, subject to any necessary authorization from the Bankruptcy Court, this Agreement constitutes, and each of the Transactions Documents will constitute, its legal, valid and binding obligation, enforceable in accordance with its terms.

4.3     <u>Absence of Conflicts; Required Consents, Approvals and Filings</u>.  Subject to entry of the Sale Order, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby by the Sellers do not and shall not (a) constitute a material breach or violation of or default under any Law, governmental permit or license of the Sellers or to which any of the foregoing is subject, including but not limited to state usury laws, state laws requiring licenses to engage in consumer lending, consumer finance, mortgage lending and the other businesses of the Sellers, or the Finance Laws, which breach, violation or default would prevent or materially delay the Sellers from being able to perform their obligations under this Agreement and the other Transaction Documents to which they are a party, or (b) constitute a breach or violation of or default under the Organizational Documents of the Sellers, which breach, violation or default would prevent or materially delay the Sellers from being able to perform their obligations under this Agreement and the other Transaction Documents to which they are a party.

4.4     <u>Good Title</u>.  Subject to entry of the Sale Order, each Seller has good and valid title to and the power and authority to sell, transfer and assign to the Purchaser the Purchased Assets it is conveying to the Purchaser hereunder, free and clear of all Liens.

4.5     <u>Litigation</u>.  Except as set forth in <u>Schedule 4.5</u> hereto, there is no action, suit, proceeding in equity or at law, arbitration or administrative or other proceeding by or before (or, to the knowledge of the Purchaser, any investigation by) any Person (including, without

limitation, any Governmental Authority) pending or, to the knowledge of the Purchaser, threatened against or affecting the Sellers or the Purchased Assets which, if adversely determined, would prevent the Company or the Sellers from performing their obligations under this Agreement or conveying the Purchased Assets to the Purchaser as contemplated therein.

4.6     Closing Date. All of the representations and warranties contained in this Article 4 and elsewhere in this Agreement are true and correct on the date of this Agreement and shall be true and correct on the Closing Date (in the manner specified in Section 7.2(a)(i)) as though then made and as though the Closing.

4.7     No Consents. None of the Contracts included within the Purchased Assets requires the consent of any party thereto, and the assignment to the Purchaser will not result in a modification of any rights or obligations of any party thereto or would provide any party thereto any remedy (including rescission or liquidated damages) as a result of the consummation of the transactions contemplated hereby.

4.8     Residuals. The Residuals on the Residuals Schedule are the legal, valid and binding interests in the obligors and are enforceable in accordance with their terms, except as such obligations, enforcement and validity may be limited by bankruptcy, insolvency, moratorium or similar laws or principles of equity affecting creditors' rights generally.

4.9     LNFA Mortgage Loans.

(a)     The LNFA Mortgage Schedule is accurate in all material respects with respect to the LNFA Mortgage Loans as of the Cut-off Date.

(b)     The LNFA Mortgage Loans are the legal, valid and binding obligations of the Obligor thereunder and are enforceable in accordance with their terms and the related mortgages are valid and subsisting First Priority Liens or Second Priority Liens on the property described therein, except as such obligations, enforcement and validity may be limited by bankruptcy, insolvency, moratorium or similar laws or principles of equity affecting creditors' rights generally.

(c)     Neither the LNFA Mortgage Loans nor the underlying mortgage has been released, subordinated, satisfied, canceled or rescinded, in whole or in part as of the Cut-off Date and to the extent released, subordinated, satisfied, canceled or rescinded, in whole or in part thereafter, the proceeds thereof have been or shall be remitted to the Purchaser or will be applied pursuant to Section 3.2 hereof.

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby represents and warrants to the Sellers that:

5.1    <u>Corporate Status</u>.  The Purchaser is duly organized and a subsisting legal entity under the laws of the jurisdiction of its formation.

5.2    <u>Corporate Authority</u>.  The execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby to be consummated by the Purchaser, has been duly and validly authorized by all necessary corporate or other entity action (as applicable) on the part of the Purchaser.  This Agreement has been, and each of the Transaction Documents after execution and delivery thereof at the Closing will have been, duly and validly executed and delivered by the Purchaser, and, this Agreement constitutes, and each of the Transaction Documents will constitute, its legal, valid and binding obligation, enforceable in accordance with its terms.

5.3    <u>Closing Date</u>.  All of the representations and warranties contained in this <u>Article 5</u> and elsewhere in this Agreement and all information delivered in any schedule, attachment or exhibit hereto or in any writing delivered by the Purchaser to the Sellers are true and correct on the date of this Agreement and shall be true and correct (in the manner specified in Section 7.3(a)(i)) on the Closing Date as though then made and as through the Closing

## ARTICLE 6

## ADDITIONAL AGREEMENTS

6.1    <u>True Sale</u>.  Each of the Parties acknowledges and agrees that a true sale of the Purchased Assets is intended pursuant to this Agreement, the Purchaser will have legal and equitable title to all Purchased Assets upon payment of the Purchase Price, and there is no intent by any Party to create a lending relationship between the Purchaser and the Sellers.  Upon the sale of the Purchased Assets, the Sellers shall have no legal or equitable title or interest whatsoever in the Purchased Assets or any collections thereunder, and the Sellers shall have no right to redeem any of the Purchased Assets.

6.2    <u>Access to Information and Facilities</u>.  The Sellers shall, upon reasonable prior notice, afford to the Purchaser and the Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources, and other authorized representatives designated by the Purchaser in writing, reasonable access during normal business hours prior to the Closing Date to the books, records, properties, and personnel of the Sellers that pertain to the Purchased Assets and, during such period, shall furnish as promptly as practicable to the Purchaser all such information as the Purchaser reasonably may request pertaining to the Purchased Assets.

6.3    <u>Conduct Prior to Closing</u>.  Except as otherwise expressly contemplated by this Agreement or the DIP Agreement (including without limitation the filing of the Chapter 11 Cases and the solicitation of competing bids from other Persons pursuant to the Bidding Procedures) or with the prior written consent of the Purchaser, prior to the Closing, the Sellers shall not take any action inconsistent with this Agreement or with the consummation of the Closing.

6.4    <u>Restrictions on Certain Actions</u>.  The Sellers shall not, without the prior written consent of the Purchaser:

(a)   mortgage, pledge, assign, grant any participation or security interest in or otherwise further encumber any of the Purchased Assets;

(b)   sell, transfer, liquidate, or otherwise impair the Purchased Assets except as contemplated by this Agreement;

(c)   make any changes in servicing, billing or collection operations or policies as it may affect the LNFA Mortgage Loans, other than changes that could not reasonably be expected to have a material adverse effect on any such LNFA Mortgage Loans or the collectibility of amounts due thereunder.

6.5    Approvals of Third Parties; Satisfaction of Conditions to Closing. Subject to the terms of this Agreement, the Parties will use commercially reasonable efforts to cause the Closing to occur, and will cooperate with one another, to secure any necessary consents, approvals, authorizations and exemptions from Governmental Authorities and other Third Parties. The Parties will use their commercially reasonable efforts to obtain the satisfaction of the conditions specified in Article 7. The Parties shall cooperate in preparing, submitting, filing, updating and publishing (as applicable), as expeditiously as possible, any applications, notifications and other filings as may be required by or may be advisable under applicable Laws with respect to the transactions contemplated by this Agreement, including, without limitation, those of any state or Federal agency with regulatory authority over the Purchased Assets. The Parties shall use their commercially reasonable efforts to make any such filings as promptly as practicable following the date hereof. The Parties will use their commercially reasonable efforts to obtain such approvals and accomplish such actions as expeditiously as possible.

6.6    Bankruptcy Actions.    The Sellers shall obtain entry of the Sale Order in substantially the form attached hereto as Exhibit B.

6.7    Post-Closing Deliverances. If, after the Closing Date, the Company or a Seller (or any other Person acting on its behalf) comes into possession of any additional documentation, books and records relating to the LNFA Mortgage Loan, such additional documentation shall be deemed to have been received and held in trust for the benefit of the Purchaser and promptly shall be delivered to the Purchaser or such other Person as the Purchaser may direct. The Company shall fully cooperate with the Purchaser from and after the Closing to take all other actions necessary or appropriate to effect the transfer of, and vest in the Purchaser, all right, title and interest in and to the Purchased Assets.

6.8    Further Actions. Following the Closing, the Company and the Sellers agree not to take any action in the Chapter 11 Cases, including, but not limited to, any action in connection with proposing or confirming any plan of reorganization that would, in any material respect, limit, impair or alter the Purchaser's rights under this Agreement.

6.9    Designation Rights; Assignment and Transfer of Purchased Assets.

(a)   The Purchaser shall have the right (the "Designation Rights") to assign its rights and obligations hereunder with respect to any Purchased Assets to one or more third parties (each, a "Third Party Purchaser"). The Purchaser may, by one or more notices (each, a "Third Party Purchaser Notice") to

the Sellers, designate one or more Third Party Purchasers and the Purchased Assets to be transferred by the Sellers to each such Third Party Purchaser. The Purchaser may deliver a Third Party Purchaser Notice to a Seller from the date hereof and up to seven (7) Business Days prior to the Sale Hearing (the "Assignment Deadline").

(b)     In order to facilitate the acquisition of Purchased Assets by one or more Third Party Purchasers, the Sellers shall, if requested by the Purchaser, execute one or more necessary transfer documents or amendments to this Agreement (each in a form reasonably acceptable to the Sellers) making such Third Party Purchasers parties hereto in respect of a portion of the Purchased Assets and permitting such Third Party Purchasers to assume all rights, obligations and interests of the Purchaser under this Agreement in respect of such Purchased Assets, and the Third Party Purchaser shall be entitled to all benefits of the Sale Order. The Purchaser shall, if necessary, execute such documents and/or otherwise cause such documents to be executed by such Third Party Purchaser (which shall in any event be consistent with the terms hereof and on terms no less favorable to the Sellers as this Agreement).

(c)     Nothing in this Section 6.9 shall relieve the Purchaser of its obligations hereunder with respect to the payment of the Purchase Price or its obligations with respect to any Purchased Assets that are not transferred to Third Party Purchasers.

6.10    Mail Forwarding. For a period of six (6) months after the Closing Date, the Company and the Sellers shall maintain adequate staff or engage an outside service at their own expense to accept and forward to the Purchaser all mail and other communications received by the Company and the Sellers relating to the Purchased Assets.

6.11    Elective Exemption from Purchased Assets. Notwithstanding anything to the contrary in this Agreement with respect to the Purchased Assets set forth in Exhibit 6.11 hereto (the "Ohio Delinquent Loans"), (i) in the event that the Sellers deliver at Closing the instruments of conveyance and the other documents necessary to convey some or all of the Ohio Delinquent Loans, pursuant to Sections 7.4(e) and (g) hereof (the "Ohio Delinquent Loan Transfer Documents"), then the Purchaser shall pay the Purchase Price allocable to such Ohio Delinquent Loans as set forth in Exhibit 6.11 hereto, provided, however, that the Purchaser may elect not to take title to any of the Ohio Delinquent Loans delivered at Closing, and, notwithstanding the payment by the Purchaser of the Purchase Price allocable to such Ohio Delinquent Loans, such Ohio Delinquent Loans shall remain the property of the Sellers after the Closing; and (ii) in the event that the Sellers do not deliver at Closing the instruments of conveyance and the other documents necessary to convey some or all of the Ohio Delinquent Loans, then (x) such Ohio Delinquent Loans shall remain the property of the Sellers after the Closing, (y) the Purchase Price shall be reduced in an amount equal to the value of such Ohio Delinquent Loans as set forth in Exhibit 6.11 hereto, and (z) for a period of ninety (90) days after the Closing, the Sellers shall have an irrevocable obligation to offer in writing to sell and convey to Purchaser some or all of such Ohio Delinquent Loans pursuant to the Ohio Delinquent Loan Transfer Documents on

the terms set forth in this Agreement and at a price payable by Purchaser equal to the reduction in the Purchase Price that is allocable to such Ohio Delinquent Loans as set forth in Exhibit 6.11 hereto, and Purchaser shall have five (5) Business Days within which to accept or reject such offer, but in any event the Purchaser shall be required to pay to the Sellers the Purchase Price that is allocable to the Ohio Delinquent Loans that are the subject of such offer at the time of such acceptance or rejection. Rejection of the offer shall entitle the Sellers to retain or dispose of the Ohio Delinquent Loans that are the subject of such rejection as they see fit. The Purchaser agrees and acknowledges that (i) foreclosure of any Ohio Delinquent Loan will require a review and approval of such foreclosure by the State of Ohio, (ii) such review and approval process does not constitute any impairment in the Ohio Delinquent Loans, and (iii) Purchaser shall not have any right to make any claim or demand against the Sellers pursuant thereto. For the avoidance of doubt, no actions taken by Sellers in accordance with this Section 6.11 shall constitute a breach or violation of, or default under, any provision of this Agreement.

6.12    Sellers Not Required to Deliver Certain Instruments. Notwithstanding anything to the contrary in this Agreement, with respect to the Purchased Assets represented by certificates NCHELT, Series 1999 – NCA, NCHELT, Series 1999 – NCD and NC Finance Trust, Series 1998-I CE Bonds No. 81 and 82 (the "Absent Certificates"), the Sellers are not required to deliver at Closing any original certificates or other documents or instruments except for those set forth in Exhibit 6.12 hereto. For the avoidance of doubt, no actions taken by Sellers in accordance with this Section 6.12 shall constitute a breach or violation of, or default under, any provision of this Agreement.

6.13    Exemption from Stamp and Similar Taxes. Sellers shall exercise reasonable efforts to obtain a determination under 11 U.S.C. § 1146(a) in the Sale Order that the transfers contemplated herein are exempt from stamp and similar taxes; provided, that nothing in this Section 6.13 shall be a condition to Closing and the failure to obtain such determination shall not be deemed to be a breach of or default under this Agreement.

## ARTICLE 7

## CLOSING

7.1    Closing. Subject to satisfaction or waiver of the conditions contained in this Agreement, the closing (the "Closing") of the purchase and sale of the Purchased Assets shall take place at 10:00 a.m., Eastern Daylight Savings Time at the offices of O'Melveny & Myers, New York, on the first Business Day following the satisfaction or waiver of the conditions of the Parties' obligations set forth in Sections 7.2 and 7.3 hereof, or such other place or time as the Parties may agree to in writing, but in no event later than May 18, 2007 (the "Closing Date").

7.2    Conditions Precedent to the Purchaser's Obligations. The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions as of the Closing Date:

(a)    Representations and Warranties; Covenants; Certificates.

(i)    The representations and warranties of the Sellers contained in this Agreement, and in any agreement, instrument, or document executed and delivered by them in connection with the Closing, shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except as affected by transactions permitted by this Agreement and except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such specified date.

(ii)    The Sellers shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)    The Purchaser shall have received a certificate, dated as of the Closing Date, signed by authorized officers of the Company and the Sellers to the effect that such conditions set forth in Section 7.2 hereof have been satisfied in all material respects.

(b)    <u>Bankruptcy Condition</u>. The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order which has not been reversed, modified, rescinded or stayed as of the Closing Date.

(c)    <u>No Injunction</u>. There shall be in effect no pending injunction, decree or order of, or any other action or proceeding before, any Governmental Authority that (a) prevents the consummation of the transactions contemplated hereby, (b) causes the transactions to be rescinded following the consummation thereof or (c) has a material adverse effect on the Purchased Assets.

(d)    <u>Approvals</u>. All authorizations, permits, licenses, certificates of authority, consents, Orders, filings, notices and approvals necessary to permit the Company and the Sellers to perform the transactions contemplated hereby and required for the Purchaser to own the Purchased Assets shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Purchaser, shall not be subject to the satisfaction of any material condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(e)    <u>Instruments of Conveyance and Transfer; Title</u>. Except with respect to the Ohio Delinquent Loans as to which the provisions of Section 6.11 shall apply, the Sellers shall have delivered to the Purchaser such bills of sale,

deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer in form and substance, reasonably satisfactory to the Purchaser and its counsel, as are necessary to vest in the Purchaser good and marketable title to all of the interest of the Sellers in the Purchased Assets, free and clear of all Liens. With respect to the Residuals, the Purchaser or its designee shall have been made the registered owner of such Residuals pursuant to the terms of the related governing documents. As of the date hereof, to the extent any such original certificate(s) of Residuals are not in the Sellers' possession at the time of Closing, the Sellers shall take all action necessary to have replacement certificates issued before the Closing Date. Notwithstanding anything to the contrary in this Section, with respect to the Purchased Assets represented by the Absent Certificates, the Sellers are not required to deliver at Closing any original certificates or other documents or instruments other than those set forth in Exhibit 6.12 hereto.

(f)     Any condition specified in this Section 7.2 may be waived by the Purchaser; provided, however, that no such waiver shall be effective unless it is set forth in a writing executed by the Purchaser.

7.3     Conditions Precedent to the Sellers' Obligations. The obligation of the Company and the Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions as of the Closing Date:

(a)     Representations and Warranties; Covenants; Certificates.

(i)     The representations and warranties of the Purchaser contained in this Agreement, shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except as affected by transactions permitted by this Agreement and except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such specified date.

(ii)    The Purchaser shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing.

(iii)   The Company and the Sellers shall have received a certificate, dated as of the Closing Date, signed by authorized officers of the Purchaser to the effect that such conditions set forth in Section 7.3 hereof have been satisfied in all respects.

   (iv) The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order which has not been reversed, modified, rescinded or stayed as of the Closing Date.

  (b) <u>Approvals</u>. The authorizations, permits, licenses, certificates of authority, consents, notices, filings, orders and approvals necessary to permit the Purchaser to perform the transactions contemplated hereby and required for the Purchaser to own the Purchased Assets shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Company and the Sellers, shall not be subject to the satisfaction of any material condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

  (c) Any condition specified in this Section 7.3 may be waived by the Company and the Sellers; provided that no such waiver shall be effective against the Sellers unless it is set forth in a writing executed by the Sellers.

  7.4 <u>Closing Deliverables</u>. The closing documents to be delivered on or prior to the Closing Date (the "<u>Closing Documents</u>") shall consist of each of the following:

  (a) Except with respect to the Ohio Delinquent Loans as to which the provisions of Section 6.11 shall apply, the Sellers shall convey all of the Purchased Assets to the Purchaser and shall deliver to the Purchaser such appropriately executed instruments of sale, transfer, assignment, conveyance and delivery, certificates duly registered in the Purchaser's name (or as otherwise specified by the Purchaser) representing the Residuals, and all other instruments of conveyance which are necessary or desirable to effect transfer to the Purchaser of good and marketable title to the Purchased Assets free and clear of all Liens, Claims or encumbrances (and in the case of Residuals, sufficient documentation to permit the transfer agent to register title to the Residuals in the name of the Purchaser and issue a certificate in the Purchaser's name or its designee as set forth in Section 7.2(e)). Notwithstanding anything to the contrary in this Section, with respect to the Purchased Assets represented by the Absent Certificates, the Sellers are not required to deliver at Closing any original certificates or other documents or instruments other than those set forth in <u>Exhibit 6.12</u> hereto.

  (b) The original certificates on account of the Residuals, together with fully executed assignments with medallion signature guaranteed, or if original certificates are not available, an unqualified opinion of counsel or other acceptable equivalent such as the Sale Order in the form attached hereto as <u>Exhibit B</u> with respect to the Purchased Assets represented by the Absent Certificates (the "Residual Title Order"). For the avoidance of doubt,

entry of a Residual Title Order shall satisfy the conditions set forth in section 7.2(e).

(c)    Irrevocable instructions to the trustee or the indenture trustee, as applicable, for the transaction in which the Residuals were issued directing that any rights of the Sellers to receive distributions in respect of the Residuals made after the Closing Date be made to the Purchaser or its designee.

(d)    The Sellers and the Purchaser shall deliver all other Transaction Documents required to be delivered by or on behalf of such Person, as applicable. Notwithstanding anything to the contrary in this Section, with respect to the Purchased Assets represented by the Absent Certificates, the Sellers are not required to deliver at Closing any original certificates or other documents or instruments other than those set forth in Exhibit 6.12 hereto.

(e)    The Company shall deliver, or cause to be delivered, at the Closing (or in the case of Ohio Delinquent Loans at the times set forth in Section 6.11), to the Purchaser or to such Person as the Purchaser may designate (including, without limitation, any custodian(s) appointed by the Purchaser to hold such items) all Files and documentation and other items pertaining to the LNFA Mortgage Loans customarily held in the applicable custodial file, including, without limitation, guarantees, mortgages and other security agreements and all assignments, assumptions, modifications, consolidations and extensions thereof, UCC financing statements, if any, or such other evidence of perfection of a security interest in the applicable collateral in the relevant jurisdictions, powers of attorney, certificates of title, all evidence of title insurance policies and all other credit and origination documentation related to the loan Files associated with the applicable LNFA Mortgage Loan, which shall include final HUD-1s (to the extent such HUD-1s are in the possession of the Seller; provided that if such HUD-1s are not in the possession of Seller, Seller will cooperate until Closing with Purchaser to obtain any missing HUD-1s) and Truth in Lending disclosures, in each case to the extent such documents or instruments are in Sellers' possession, and original notes (with appropriate endorsements) (or if the Company or custodian is not in possession of such original notes, a lost note affidavit, together with a copy of such original notes).

(f)    The Sellers shall execute and deliver to the Purchaser ten (10) originals of a power of attorney in the form attached hereto as Exhibit C (the "Power of Attorney").

(g)    The Sellers will deliver, or cause to be delivered, to the Purchaser's third-party custodian bailee no later than two (2) days prior to the Closing Date, the original mortgage, promissory notes, contracts and certificates that

evidence the LNFA Mortgage Loans with evidence of recording thereon, or if the original mortgage has not yet been returned from the recording office, a true copy of the mortgage which has been delivered for recording in the appropriate recording office of the jurisdiction in which the real property has been delivered, and executed assignments of mortgage showing a complete chain of assignment of mortgage to the Purchaser and endorsements or allonges to the mortgage notes, in each case to the extent such documents are in Sellers' possession; provided that if any LNFA Mortgage Loans are registered on the MERS system, the Parties will mutually agree on the application of this paragraph prior to Closing.

(h)     The Sellers shall deliver certificates executed on behalf of the Sellers by a duly authorized officer certifying as to the incumbency, and authenticating the signatures of, officers executing this Agreement and certificates delivered hereunder on behalf of the Sellers, and certifying as to the adoption and continuing effect of appropriate resolutions authorizing the Sellers' execution, delivery and performance of this Agreement.

## ARTICLE 8

## TRANSFER OF SERVICING

8.1     The LNFA Mortgage Loans are being sold on a servicing released basis. On a date, not to exceed thirty (30) days from the Closing Date, or such other date as the Parties shall agree in writing (the "Servicing Transfer Date"), the Purchaser, or its designee, shall assume all servicing responsibilities related to the LNFA Mortgage Loans. Prior to the Servicing Transfer Date, the LNFA Mortgage Loans shall be serviced by New Century Mortgage Corporation in accordance with its customary and reasonable servicing procedures.   The Purchaser shall reimburse the Sellers for customary and reasonable out-of-pocket third-party expenses (for example, fees and expenses of foreclosure attorneys and property repair contractors) paid by the servicer ("Servicer Expenses") from April 2, 2007 (estimated as $30,000 from April 2, 2007 until April 30, 2007) through the Servicing Transfer Date for each applicable LNFA Mortgage Loan to the extent that such Servicer Expenses are incurred in accordance with standards approved by the Purchaser, including but not limited to, for example, approval for all proposed property liquidations and deed-in-lieu transactions and all proposed servicer advances that would aggregate over $2,500 with respect to any single mortgage loan after the date hereof. For the avoidance of doubt, the Sellers shall remain responsible for the payment of any Servicing Expenses incurred and unpaid up to April 2, 2007. No later than two Business Days prior to Closing, Sellers shall deliver to Purchaser a statement (a "Servicer Expenses Statement") setting forth the amount of Servicer Expenses incurred by Sellers from and including April 2, 2007 to but excluding the date that is two (2) Business Days prior to Closing, specifying in reasonable detail the nature of such Servicer Expenses. The amount set forth in such Servicer Expenses Statement shall be paid to the Sellers by the Purchaser at Closing. No later than two (2) Business Days prior to the Servicing Transfer Date, Sellers shall deliver a Servicer Expenses Statement for the period from and including the date that is two (2) Business Days prior to Closing to and including the Servicing Transfer Date, specifying in reasonable detail the nature of such Servicer Expenses. The amount set forth in such Servicer Expenses Statement shall be paid to the Sellers

by the Purchaser on the Servicing Transfer Date. The Purchaser acknowledges that the Sellers and certain third parties are seeking to sell their servicing business and agrees that if such business is sold prior to the Servicing Transfer Date, the purchaser of the servicing business may provide servicing in accordance with Sellers' obligations under this Section 8.1 for a servicing fee and upon terms and conditions to be mutually agreed upon by such purchaser and Purchaser.

     8.2    The Sellers shall take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related LNFA Mortgage Loans to the Purchaser, or its designee, including, but not limited to the following:

     (a)    <u>Notices to Obligors</u>. Within two (2) Business Days after the Closing Date, the Company shall prepare, and transmit to each Obligor on each Loan that is part of the Purchased Assets, a notice in a form satisfying the requirements, as applicable, of Regulation X of the Department of Housing and Urban Development under the Real Estate Settlement Procedures Act, as well as all other applicable legal requirements, and reasonably acceptable to the Purchaser, to the effect that the Loan and, as applicable, the servicing of the Loan, will be transferred to the Purchaser and directing that payments be made after the Closing Date to the Purchaser at any address of the Purchaser specified by the Purchaser, with the Purchaser's name as payee on any checks or other instruments used to make such payments. With respect to all such Loans on which payment notices or coupon books have been issued, the Purchaser shall have the opportunity to prepare new payment notices or coupon books reflecting the name and address of the Purchaser as the Person to whom and the place at which payments are to be made and to have such new payment notices or coupon books included with the notices prepared and transmitted by the Company.

     (b)    <u>Notice to Taxing Authorities and Insurance Companies</u>. As soon as practicable following the Closing Date, transmit to the applicable taxing authorities and insurance companies (including primary mortgage insurance policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to the Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to the Purchaser from and after the Servicing Transfer Date.

     8.3    The Sellers shall provide or cause to be provided to the Purchaser the following:

     (a)    <u>Delivery of Servicing Records</u>. On the Servicing Transfer Date, the Sellers shall ship via overnight courier to the Purchaser, or its designee, all servicing records, the servicing File and the mortgage File in the possession of Sellers or their agents relating to each related LNFA Mortgage Loan including, if contained in Debtors' records, the appraisal, loan application and underwriting file obtained in connection with the origination of the related LNFA Mortgage Loan, as well as a payment history for the related LNFA Mortgage Loan for the past five (5) years or

in the case of a LNFA Mortgage Loan originated within the past five (5) years, since the origination of such LNFA Mortgage Loan, and all other related documents in the servicing File not transferred to the Purchaser as of the Closing Date including hazard or flood insurance policies, loan applications, closing statements, credit reports, appraisals, surveys, disclosure statements, sales contracts, tax and insurance receipts, verification statements delivered by the borrowers.

(b)     Escrow Payments. No later than five (5) Business Days following the Servicing Transfer Date, provide the Purchaser, or its designee, with an accounting statement of the escrow and other payments, for taxes, governmental assessments, insurance premiums, security deposits, water, sewer and municipal charges, and suspense balances and loss.

(c)     Corporate Advances. On the Servicing Transfer Date, Sellers shall use their commercially reasonable best efforts to provide to Purchaser or its designee, at Purchaser's sole cost and expense, copies of invoices pertaining to corporate advances along with a loan level report, in each case to the extent Sellers have such documents in its possession. In addition, Sellers shall use their commercially reasonable best efforts to forward to Purchaser, at Purchaser's sole cost and expense, any similar information received by Sellers after the Servicing Transfer Date.

(d)     Payments Received After the Cut-off Date and Prior to the Closing Date. All payments received by the Sellers on any LNFA Mortgage Loan from the Cut-off Date through the Closing Date (the "Post Cut-off Date Collections") shall (i) be properly applied by the Sellers to the account of the particular Obligor, and (ii) be held for the benefit of the Purchaser and transferred to the Purchaser on the Servicing Transfer Date. Any unapplied funds and suspense payments shall be transferred to the Purchaser on the Servicing Transfer Date and shall be applied by the Purchaser in accordance with the applicable LNFA Mortgage Loan requirements.

(e)     Payments Received After the Closing Date. The amount of any payments received by the Sellers after the Closing Date with respect to the LNFA Mortgage Loans shall (i) in the case of payments received prior to the Servicing Transfer Date, be properly applied by the Sellers to the account of the related Obligor and forwarded to the Purchaser or its designee on the Servicing Transfer Date and (ii) in the case of payments received within thirty (30) days of the Servicing Transfer Date, be forwarded to the Purchaser by overnight mail or courier on the date of receipt and (iii) in the case of payments received thereafter, be forwarded to the Purchaser on a weekly basis for up to one hundred eighty (180) days following the Servicing Transfer Date (and if such payment is received by the Sellers for the purposes of a full payoff shall be forwarded to the Purchaser by courier or overnight mail within two (2) Business Days of receipt). The

Sellers shall notify the Purchaser of the particulars of such payment, which notification requirements shall be satisfied if the Sellers forward with the payment sufficient information to permit appropriate processing of the payment by the Purchaser and shall provide necessary and appropriate legal application of such payments which shall include, but not be limited to, endorsement of such payment to the Purchaser or equivalent substitute payment with the particulars of the payment such as the account number, dollar amount, date received and any special application instructions.

(f)     <u>Misapplied Payments</u>.    Misapplied payments shall be processed as follows:

    (i)     All parties shall cooperate in correcting misapplication errors; and

    (ii)    The party receiving notice of a misapplied payment occurring prior to the Closing Date shall immediately notify the other party.

(g)     <u>IRS Forms</u>.  Filed as and when required by law, all IRS forms 1099, 1099A, 1098 or 1041 and K-1 in relation to the servicing and ownership of the LNFA Mortgage Loans for the portion of such year the LNFA Mortgage Loans were serviced by a Seller.

(h)     <u>Payment Histories</u>.  On the Servicing Transfer Date, the Sellers shall use their commercially reasonable best efforts at the Purchaser's cost and expense to provide to the Purchaser or its designee an electronic transmission of payment history for each LNFA Mortgage Loan for the past twelve (12) months to the extent that the Sellers have such payment history.

(i)     <u>LNFA Mortgage Loans in Litigation</u>.  On or prior to the Servicing Transfer Date, the Sellers shall use their commercially reasonable best efforts at the Purchaser's cost and expense to:

    (i)     deliver written notification to Purchaser or its designee of the Mortgage Loans in litigation on the Servicing Transfer Date, including the names and addresses of all parties involved in such litigation, and Sellers shall deliver to Purchaser or its designee all documents related to such litigation to the extent that the Sellers have such litigation history;

    (ii)    notify the clerks of the court and all counsel of record involved in such litigation that ownership of the Mortgage Loan in question has been transferred from Sellers to Purchaser; and

    (iii)   through their attorneys, in cooperation with Purchaser or its designee's attorneys, file appropriate pleadings with the courts that will substitute the Purchaser or its designee's attorneys for the

Sellers' attorneys and remove the Sellers as parties to the litigation and substitute Purchaser or its designee as the real party in interest.

(j)     LNFA Mortgage Loans in Bankruptcy.    In accordance with Bankruptcy Rule 3001(e), the Sellers shall use their commercially reasonable best efforts at the Purchaser's cost and expense to take all actions necessary to file, on or prior to the Servicing Transfer Date, proofs of claims in pending bankruptcy cases involving any LNFA Mortgage Loans for which the Sellers have not already filed proofs of claims and evidence of the terms of the purchase of the LNFA Mortgage Loans with the appropriate bankruptcy courts in cases in which the Sellers have filed proofs of claims. The Sellers shall use their commercially reasonable best efforts at the Purchaser's cost and expense to prepare and provide to Purchaser or its designee on the Servicing Transfer Date affidavits and assignments of claim for purposes of Bankruptcy Rule 3001 (as appropriate to comply with applicable recording statutes) for all LNFA Mortgage Loans that are in bankruptcy as of the Servicing Transfer Date.

(k)     Hazard Insurance.    If any mortgaged property securing an LNFA Mortgage Loan is damaged on or after the related Cut-off Date as a result of fire, windstorm, flood, earthquake, natural disaster or other hazard, the proceeds of any such insurance policy relating to such mortgaged property shall be paid to Purchaser or its designee and/or the related mortgagor to be applied as required by the related mortgage note, mortgage or other loan documents.

## ARTICLE 9

## TERMINATION

9.1     Termination Prior to Closing.    This Agreement may be terminated prior to the Closing Date as follows:

(a)     by mutual written agreement of the Purchaser and the Company;

(b)     by the Purchaser or the Company, if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(c)     by the Purchaser (provided that the Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach of any of the representations or warranties of the Sellers or a material breach of any of the covenants set forth in this Agreement on the part of the Sellers, which breach is not cured within ten (10) Business Days following written notice to the Company;

(d)     by the Company (provided that none of the Sellers is then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the Purchaser, which breach is not cured within ten (10) Business Days following written notice to the Purchaser; or

(e)     by the Purchaser, if the Closing has not occurred by May 18, 2007, provided such failure of the Closing to occur is not caused by a breach of this Agreement by the Purchaser.

9.2     <u>Termination</u>. Upon any termination of this Agreement pursuant to Section 9.1, this Agreement shall be void and have no effect, without any liability on the part of any party hereto or any shareholders, directors or officers thereof.

## ARTICLE 10

### SURVIVAL OF REPRESENTATIONS AND WARRANTIES

10.1     <u>Survival of Representations</u>. The respective representations and warranties of the Parties contained herein and in any Transaction Document or in any other agreement, certificate, instrument or other document delivered pursuant thereto or hereto shall survive for a period of ninety (90) days after the Closing Date.

10.2     Except as otherwise provided herein, the respective covenants of the Parties contained in this Agreement, the Transaction Documents or in any other agreement, certificate, instrument or other document delivered pursuant hereto or thereto shall survive the Closing.

## ARTICLE 11

### NOTICES

All demands, notices and communications under this Agreement shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate party hereto at the address set forth below or (ii) transmitted by facsimile transmission or by electronic mail with acknowledgment, to the appropriate party hereto at the facsimile number or the electronic mail address set forth below.  Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt).

(i)     Sellers

New Century Financial Corporation
18400 Von Karman, Suite 1000
Irvine, CA  92612