UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
NEW CENTURY TRS HOLDINGS, INC.,.    Case No. 07-10416(KJC)
a Delaware corporation, *et al.*,.  (Jointly Administered)
                                .
        Debtors.                .    May 30, 2007 (2:36 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.  Please be seated.

2          THE COURT: Good afternoon, all.

3          UNIDENTIFIED SPEAKER: Good afternoon.

4          MR. MERCHANT: Good afternoon, Your Honor.  Mike

5     Merchant of Richards, Layton & Finger on behalf of the

6     debtors.  Your Honor, I believe the first 14 matters on the

7     agenda are all continued to the omnibus hearing date

8     scheduled for June 15th.  Matter number 15 on the agenda is a

9     stay relief motion filed with respect to certain Florida

10    properties, and I'll cede the podium to the movant to present

11    that motion.

12         THE COURT: All right.

13         MR. DiSPIGNA (TELEPHONIC): Should I speak now?

14    This is attorney Frederick DiSpigna.

15         THE COURT: This is number 15 on the agenda.

16         MR. DiSPIGNA (TELEPHONIC): Yes, Your Honor.

17    Frederick DiSpigna.

18         THE COURT: Go ahead.

19         MR. DiSPIGNA (TELEPHONIC): This is, Your Honor, the

20    stay relief motion.  I spoke with debtors' counsel.  We

21    exchanged e-mails earlier today, and we agreed to continue

22    this as well.  Debtors' counsel will - the debtor will advise

23    us if there are any specific properties that there's no

24    objection to, in which case we'll submit an order for relief

25    on those properties.  The debtor has indicated that we have

1   provided sufficient information to make a determination.

2           MR. MERCHANT: Your Honor, if I may interrupt.

3           THE COURT: I'm sorry.

4           MR. MERCHANT: I think he's actually addressing

5   another matter on the agenda.

6           MR. DiSPIGNA (TELEPHONIC): You said Florida

7   properties.

8           MR. MERCHANT: This is two or three Florida

9   properties.  This isn't the omnibus -

10          MR. DiSPIGNA (TELEPHONIC): Okay.  That's Mr.

11  Becker.  I'm sorry, that's Mr. Becker's matter.

12          THE COURT: All right.

13          MR. BECKER: Your Honor, Richard Becker.  I'm sorry

14  for the confusion.  In the back, we couldn't quite hear as

15  well.  This is a motion for relief from automatic stay with

16  regard to junior mortgages held by the debtor on two Florida

17  properties where Regents Bank has the first mortgage.  The

18  debtor has not filed a response and does not oppose the

19  motions at this time.  There were two - the response deadline

20  was extended to last Friday and then a CNO was filed late

21  yesterday.  I don't know if it made it into the CNO binder or

22  not, Your Honor.  Reviewing the CNO form of order which we

23  filed, there's a typographical error contained in the address

24  for one of the two properties.  The typographical error

25  describes the property as Lake May Jess Shore and it's like

1    Mary.  I do have a revised form of order today, Your Honor,

2    if I may hand it forward which has Lake Mary.

3         THE COURT: You may.

4         MR. BECKER: Thank you, Your Honor.

5         THE COURT: Does anyone else care to be heard in

6    connection with this motion?  I hear no response.

7         MR. BECKER: Your Honor, as the motion is unopposed,

8    we would request the Court enter the order.

9         THE COURT: The order's been signed.

10        MR. BECKER: Thank you, Your Honor.

11        MR. MERCHANT: Your Honor, matter number 16 on the

12   agenda is the debtors' second customer programs motion.

13   There have been - There were no objections filed with respect

14   to that motion, however, we did receive certain comments from

15   the Office of the United States Trustee requesting that caps

16   be set forth in the order, and I did work with my client to

17   come up with reasonable caps, and we've circulated a revised

18   order to the U.S. Trustee, and they've approved it.  The caps

19   that we've proposed are with respect to the customer

20   restitution plan, any payments shall not exceed $130,000 in

21   the aggregate, and that's inclusive of the $90,000.  It was

22   approved pursuant to the first day order.  Any customer

23   program payments made on account of refund demands received

24   from FHA and VA shall not exceed $20,000 in the aggregate.

25   Customer program payments made in response to requests for

1    the return of escrow customer hold-backs shall not exceed

2    $60,000 in the aggregate, and we've also agreed that any and

3    all payments made on account of such requests shall be made

4    from amounts being held by the debtors in escrow or from

5    funds that were being held in escrow and have since been

6    released to the debtors by their respective escrow agent and

7    shall not be satisfied from property of the estate.  And

8    lastly, Your Honor, we agreed that any customer program

9    payments made on account of refunds of unallowable fees

10    charged by the debtors to borrowers shall not exceed $80,000

11    in the aggregate.

12            THE COURT: So, how much extra from amounts

13    previously approved does that come to?

14            MR. MERCHANT: Well, Your Honor, I believe only the

15    customer restitution plan payments cover payments that were

16    also approved pursuant to the first day order.  So of the

17    amounts I just discussed, there's a $130,000 cap with respect

18    to those payments, 90,000 of which has already been approved

19    and gone out the door.  So, it's 40,000 in additional

20    payments.  All of the other caps are new amounts that are

21    being sought for the first time pursuant to this motion.

22            THE COURT: All right.  Does anyone else care to be

23    heard in connection with this motion?  I hear no response.

24            MR. MERCHANT: I have a revised order if I may

25    approach?

1          THE COURT: Yes.

2          MR. MERCHANT: Your Honor, I just realized that

3     there's an error on the bottom of the order page, so, we'll

4     submit a revised form under certification of counsel, if

5     that's acceptable.

6          THE COURT: Very well.

7          MR. MERCHANT: Your Honor, for the next matter on

8     the agenda I'm going to turn the podium over to Ben Logan.

9          MR. LOGAN: Thank you, Your Honor.  This is the

10    motion to approve a cash collateral stipulation with

11    Citigroup Real Estate.  I don't have the full name in front

12    of me, but the Citigroup Real Estate group which provided the

13    servicer advance facility.  There are no objections to the

14    motion.  The stipulation was negotiated at length with

15    counsel for the Creditors Committee.  It reflects finally the

16    resolution of something that's been pending for quite awhile.

17    We thought the DIP facility might take out the Citigroup

18    facility.  That never happened, so we decided we needed to

19    bring this to a head and resolve it, and it is resolved in

20    this stipulation which probably will be a fairly short

21    duration because when the Carrington sale closes, which we

22    hope will be within a couple of weeks, that also will take

23    out the Citigroup facility, but nonetheless, in order to make

24    sure this just doesn't languish any further, we negotiated a

25    stipulation, and there are no objections.  I'm happy to

1    answer any questions the Court has or anyone else.

2             THE COURT: I do not have any questions.  Does

3    anyone else care to be heard in connection with this motion?

4             MR. SUSSBERG: Good afternoon, Your Honor.  Joshua

5    Sussberg from Kirkland & Ellis on behalf of Citigroup.  I

6    just want to agree with everything Mr. Logan said.  I

7    appreciate the efforts from the debtors as well as the

8    Creditors Committee in negotiating the stipulation.  We

9    appreciate that proceeds from the sale of the Carrington

10   servicing business asset purchase agreement will repay Citi

11   in full, but the stipulation, you know, will in the short

12   term provide Citi with its cash collateral and all parties'

13   rights are reserved with respect to collections on advances

14   pre-petition.  Thank you, Your Honor.

15            THE COURT: Thank you.

16            MR. LOGAN: And if I may approach, I have one of the

17   world's simplest orders.

18            THE COURT: You may.  Thank you.  That order has

19   been signed, simply.

20            MR. MERCHANT: Mike Merchant again, Your Honor.

21   Matter number 18 on the agenda is the debtors' motion to

22   retain AP Services LLC as crisis managers for the debtors.

23   Your Honor, there were no objections filed with respect to

24   that motion, however, we did receive a number of comments

25   from the Office of the United States Trustee, and we've been

1    working with them to resolve those comments.  There are still

2    a few outstanding issues with respect to the form of order,

3    and I simply haven't had time to run the proposed changes by

4    APS.  So what we would propose to do is continue to work with

5    the U.S. Trustee's Office to resolve their concerns, and if

6    we can reach agreement on an acceptable form of order, we'll

7    submit it under certification of counsel.  If we can't reach

8    agreement, we'll be back before Your Honor on June 15th.

9            THE COURT: Very well.

10            MR. MERCHANT: Thank you, Your Honor.  Your Honor,

11    matter number 19 on the agenda has been continued to June

12    15th.  Matter number 20 on the agenda will be handled by my

13    colleague Christopher Samis, and I'll cede the podium to him.

14            MR. SAMIS: Good afternoon, Your Honor.  Chris Samis

15    on behalf of the debtors.  Let me just say that, number one,

16    this is the first time I think I've ever appeared before Your

17    Honor, so, it's a pleasure.

18            THE COURT: Welcome.

19            MR. SAMIS: I am going to talk briefly about what

20    we've referred to around the office as the omnibus stay

21    relief procedures motion.  You'll recall from the last

22    hearing that there were numerous objections, and I think that

23    we've resolved them largely.  To the extent that we haven't,

24    I'm sure someone will step up to the podium and point out

25    that I'm incorrect, but I would just like to walk Your Honor

1    through the changes if I might.  I have a blackline and an

2    original in this folder.  If I could approach, I -

3            THE COURT: That would be helpful.  Thank you.

4            MR. SAMIS: We had four main considerations, and as

5    I'm sure Your Honor is aware from the previous hearing.  One

6    was the $1,000 payment.  We'll call that the cost

7    consideration.  The other was the production burden that was

8    placed on the movant.  Then there were privacy concerns and

9    there was also a concern as to certainty, as to how there

10   could be some procedure that was established whereby the

11   movant could ascertain and provide evidence that a stay had

12   actually been lifted.  I'll just go paragraph by paragraph.

13   At paragraph (2), you'll note that essentially we've relaxed

14   the informational requirements, essentially to zero in on the

15   documents that are just actually completely and totally

16   necessary for the debtors to kind of determine the

17   appropriate course of action under the procedures.  You'll

18   note that the evidence that's required to be provided now

19   only deals with liens that are senior to the lien of the

20   debtors' estates to the extent known by the moving party, and

21   also you'll note that it only now deals with providing those

22   papers that have been filed - there is court actions that

23   affect the status of the foreclosure and not all papers.

24   Then at paragraph (3) - and, Your Honor, if you have any

25   questions, feel free to stop me at any time - you'll notice

1    that now a single notice can cover multiple parties, that's

2    been clarified at paragraph (3).  So there won't be numerous

3    notices or to the extent that we can eliminate numerous

4    notices, we'll do so.  At paragraph (4) you'll notice that

5    there's now a $10,000 aggregate cap regardless of the number

6    of notices.  This was discussed, I think, last time at the

7    hearing and brought up, and I think that eases a lot of the

8    cost burden that's been placed on the movants.  At paragraph

9    (5), you'll notice that we actually - a lot of the complaints

10   last time focused on the opaque term that we used, a

11   reinstatement.  We've now expanded or we've eliminated the

12   word reinstatement and now we're saying essentially we're

13   calling them the action necessary to the extent permitted by

14   and as provided by applicable non-bankruptcy law to prevent

15   foreclosure rather than just calling it reinstatement.  It

16   has the same effect, but I think it makes everyone more

17   comfortable.  Then at paragraph (6), you'll notice that no

18   action by the debtors after 30 days equals an automatic

19   lifting of the stay, and if the debtors decide to pursue the

20   reinstatement and then default under the note or other

21   security documents, the stay's also automatically lifted

22   unless the debtors object within two days of that notice

23   being filed by the moving party.  And then finally, at

24   paragraph (9), we're actually attempting to limit - this

25   addresses the privacy concern that was raised by a couple of

1    the parties.  We're actually trying to limit disclosure where

2    the disclosure would run afoul of any privacy laws.  So, to

3    the extent that we would be providing the Committee with

4    information that, you know, might run afoul of any applicable

5    federal or state privacy law, we're limiting that.  There is

6    a slight inter-lineation, you'll also note, at paragraph (9)

7    that the Committee suggested just so that it's limited to the

8    extent that the information would actually implicate those

9    privacy rights that we're talking about.  Then, finally, at

10   paragraph (10), and this is the absolute last change,

11   basically this deals with the certainty aspect that

12   essentially if a party files a certification of counsel or an

13   order under a certification of counsel, essentially, you

14   know, stating that the stay has been lifted, the debtors will

15   have three days to respond to that, and if they do not within

16   that time, the order may be granted by the Court, and I think

17   that addresses the concerns about certainty and proof after

18   the fact that the stay has actually been lifted.  So, to the

19   extent that Your Honor has any questions, I'll answer them,

20   but to the extent that you do not, I would ask that you enter

21   the order.

22          THE COURT: So that - I'm trying to think of just

23   mechanically how, normally when a certification of counsel

24   gets filed and the chambers copy is delivered and the Court

25   will act on it right away.

1              MR. SAMIS: Uh-huh.

2              THE COURT: So, how will we insure that I don't act

3      prematurely.

4              MR. SAMIS: Understood.  I guess we could establish

5      a - or we could attempt to establish a procedure whereby

6      maybe it's filed with the debtors and the debtors hold it in

7      escrow before submitting it to the Court.  I guess that could

8      be - but then again -

9              THE COURT: Well, you can file it electronically -

10             MR. SAMIS: Right.

11             THE COURT:  - and simply not deliver the chambers

12     copy until the appropriate time.

13             MR. SAMIS: That's true.  That would also - that

14     would be effective.

15             THE COURT: Because I just love to sign things as

16     soon as they come in and -

17             MR. SAMIS: Your Honor, and I thank you for that.

18     Generally, I'm very pleased with that.

19             THE COURT: All right, well, let me hear from others

20     first, but if we go, I think I prefer to do it that way, and

21     it doesn't have to be embodied in the order so long as

22     everyone understands it.

23             MR. SAMIS: Understood.

24             THE COURT: But, I don't know maybe it needs to be

25     embodied in the order.  Let's think about that.  Okay, do any

1    of the objectors care to be heard?

2         MR. COHEN: Good afternoon, Your Honor.  Howard

3    Cohen, Drinker, Biddle & Reath on behalf of HSBC.  Your

4    Honor, after the last hearing, I reached out to debtors'

5    counsel to try and resolve HSBC's issues.  Based on those

6    discussions and the changes accepted today, HSBC only has a

7    few remaining objections.  First, Your Honor, HSBC continues

8    to maintain that the debtor's not entitled to any fee whether

9    for revenue purposes or otherwise.  I'm not aware of any

10   court in this country that has approved such a fee, and I

11   don't believe that this Court should set the precedent.

12   Second, Your Honor, the debtor has requested that HSBC

13   provide certain papers filed in the foreclosure proceedings

14   even though the debtor already has those papers.  Again, HSBC

15   believes that such a request is burdensome and that that

16   should be stricken also.  Thank you.

17        THE COURT: Okay.  Any of the other objectors care

18   to be heard?

19        MR. CHIPMAN: Your Honor, for the record, William

20   Chipman, Edwards, Angel, Palmer & Dodge on behalf of

21   Countrywide.  The changes are satisfactory to Countrywide,

22   Your Honor.  We have been working with the debtors on the

23   form of order, and I think that this satisfies most of our

24   concerns with regard to loans where we have a senior lien and

25   the debtors have a junior lien.  We'll also be working with

1    counsel for the debtors on other stay relief issues that

2    aren't impacted by this order.

3         THE COURT: All right, so, your objection is either

4    withdrawn or resolved.

5         MR. CHIPMAN: It's resolved.

6         THE COURT: All right, thank you.

7         MR. CHIPMAN: Thank you.

8         THE COURT: Any other objector care to be heard?  I

9    will assume then those who have not stepped forward, their

10   objections have been resolved or abandoned.  Let me ask the

11   debtor to respond briefly to HSBC's remaining comments.

12        MR. SAMIS: Your Honor, I think the main response

13   that we have is it remains that it's a voluntary procedure.

14   To the extent that they don't' want to work within that

15   procedure, you know, we're willing to entertain working with

16   them through the traditional route, filing a motion for

17   relief from stay and then addressing -

18        THE COURT: The Court makes more money when they

19   file motions, that's for sure.

20        MR. SAMIS: That is true, but I think that really

21   encapsulates our response.

22        THE COURT: All right, and with respect to the

23   papers?

24        MR. SAMIS: With respect to the papers, we can

25   address Your Honor's concern and submit it under

1   certification.  I think that's probably the best -

2           THE COURT: No, I'm talking about HSBC's comment

3   that all the estate foreclosure papers must be transmitted.

4   These are papers HSBC says which the debtor already has.

5           MR. SAMIS: And to the extent the debtor - I think

6   that the real reason for including that language is to

7   actually streamline the procedures so that the debtor is not

8   required to go back and dig through its records.

9           THE COURT: I'm sure that's the reason.

10          MR. SAMIS: Yeah, and again, to the extent that they

11  have that concern, I'd say that they're not required to

12  participate.

13          THE COURT: Well, what are they getting for their

14  thousand bucks if they have to give you the papers again?

15          MR. SAMIS: Well, I think they're getting, number

16  one, the certainty, I think, of following the procedure, and,

17  you know, the absolute proof, and again, an economic

18  decision, I think, that everyone of the participants is going

19  to have to make and determine whether or not, you know,

20  following our omnibus procedures is appropriate.

21          THE COURT: All right.  Does anyone else care to be

22  heard?

23          MR. POWER: Yes, Your Honor.  Good afternoon.  Mark

24  Power from Hahn & Hessen, counsel to the Creditors Committee.

25  Your Honor, with respect to the last issue on the papers, the

1    Committee doesn't have those papers, and, quite frankly, the

2    foreclosure complaint and the procedures would have to be

3    filed in connection with the lift stay motion anyway, so it's

4    really no additional burden than what they'd already have to

5    do.  So we would ask that the order as modified be approved,

6    and we support this order.  Thank you.

7         THE COURT: All right.  Anyone else care to be

8    heard?  All right.  I hear your response.  The debtor did

9    exactly what I asked it to do at the last hearing, and I

10   think you've come as far as you need to come in terms of

11   resolving those objections, and with respect to the remaining

12   objections, I agree with the debtor.  This is a voluntary

13   program and HSBC need not participate if it chooses not to,

14   and the amount of the fee, it seems to me either singly or in

15   the aggregate is reasonable and certainly - well, put it this

16   way, not so high that it would dissuade people from in and of

17   itself participating in the program.  If it does, sobeit.

18   Okay, I would like the order to be further revised to

19   specifically contain a certification procedure as I suggested

20   it be amended, but upon submission of that order under

21   certification, I will act favorably upon it.

22        MR. SAMIS: Thank you, Your Honor.

23        MR. POWER: Your Honor, item number 21 is the

24   application to retain my firm as the co-counsel to the

25   Creditors Committee.  We received no formal objections.  The

1    U.S. Trustee did have some issues.  We've addressed those

2    issues, we believe.  Specifically, we filed earlier this

3    morning, Your Honor, and I don't think your chambers would

4    have gotten a copy yet, but a supplemental affidavit which

5    set forth basically three things in addition to the affidavit

6    we had previously submitted.  First, the U.S. Trustee wanted

7    to make sure that we had done the same conflict search that

8    the debtor did with the full list of parties.  We actually

9    had done that full search.  The prior affidavit had just

10   referenced the top fifty creditors, but in fact, we had done

11   the full search.  Second - So we've confirmed that in the

12   supplement.  Second is the U.S. Trustee has asked to confirm

13   which of those entities that we do have conflicts with,

14   revenues from those entities constitute more than one percent

15   of the firm's revenues over three years.  In the affidavit,

16   we've listed those entities where we specifically have

17   represented them in other matters not in this case; all

18   right?  It's a total of six institutions, Your Honor.

19   Finally, the U.S. Trustee has asked us to confirm that the

20   firm did not represent nor has it in the past represented

21   either KPMG, which is the prior auditors of the debtor;

22   Ellington Management, which is the successful purchaser of

23   the notes and the mortgage loans; and Carrington Capital

24   Management, which is the winner of the servicing business.

25              THE COURT: Do you have a copy of the affidavit with

1    you?

2            MR. POWER: I do, Your Honor.

3            THE COURT: May I have it?  Thank you.  Okay.

4            MR. POWER: I believe that satisfies the U.S.

5    Trustee's questions, and we have no - we've received no other

6    objections, Your Honor, so I would ask Your Honor to approve

7    the motion and enter an order.

8            THE COURT: All right.  Does anyone else care to be

9    heard in connection with this application?  I hear no

10   response.  Do you have a form of order with you?

11           MR. POWER: I do, Your Honor.

12           THE COURT: Thank you.  The order has been signed.

13           MR. POWER: Thank you.

14           MR. CARICKHOFF: Good afternoon, Your Honor.  David

15   Carickhoff of Blank Rome on behalf of the Creditors

16   Committee.  The next item on the agenda is the Committee's

17   application to retain Blank Rome.  No formal objections were

18   filed, but we too have received informal comments from the

19   Office of the United States Trustee.  We've been working with

20   Mr. McMahon to resolve those issues.  I believe through a

21   series of telephone conversations, e-mails, and the filing of

22   an amended affidavit, Bonnie Fatell earlier today, and

23   amending a form of order that I can hand up to Your Honor,

24   we've addressed the Office of the United States Trustee's

25   issues.  I have a revised form of order.  I also have the

1    amended affidavit that was filed, if I can approach with

2    those?

3           THE COURT: Yes, please.  Thank you.

4           MR. CARICKHOFF: The amended affidavit was primarily

5    designed to address the original statement that was filed by

6    Ms. Fatell included an incorrect list.  We've amended that to

7    attach the appropriate list that was searched by our firm,

8    and that includes the major parties in these cases, Your

9    Honor, the top fifty, the UCC parties, et cetera.  With

10   respect to the proposed form of order that I handed Your

11   Honor, the Office of the United States Trustee had asked that

12   we add at the beginning of paragraph (3) of that order, the

13   language that says, "subject to Bankruptcy Code § 1103©)".

14          THE COURT: Does anyone else care to be heard in

15   connection with this application?  I hear no response.  That

16   order has been signed.

17          MR. CARICKHOFF: Thank you, Your Honor.  The next

18   item on the agenda is the Committee's application to retain

19   FTI Consulting, and this is another situation where we have

20   been working with the Office of the United States Trustee to

21   resolve their comments.  We believe that we have a revised

22   form of order and a supplemental affidavit that was filed by

23   Mr. Starr to address the U.S. Trustee's concerns, if I may

24   approach?

25          THE COURT: You may.  Thank you.

1          MR. CARICKHOFF: If I could start with the proposed

2    form of order, Your Honor.

3          THE COURT: Okay.

4          MR. CARICKHOFF: The first ordered decretal

5    paragraph indicates as modified herein.  Flipping over to

6    page 2 of the order, the second full paragraph, midway

7    through it, it has a "provided, however", and what that

8    clause does is it allows the Office of the United States

9    Trustee to review the monthly fee arrangement with FTI under

10   § 330 on a reasonableness standard.  The following paragraph,

11   Your Honor, deals with the completion fee that was negotiated

12   between the Committee and FTI.  Essentially, the way it was

13   originally drafted was upon one of three events FTI would be

14   entitled to a completion fee.  One was the confirmation of a

15   plan of liquidation or reorganization.  Two was the sale of

16   substantially all the debtors' assets, and three was upon the

17   conversion of the debtors' cases.  This was revised such that

18   the third item, which was the conversion of the cases, was

19   pulled out of that list and instead of that being automatic,

20   Your Honor, it goes out on notice to parties in interest, and

21   the rights of those parties are reserved to object at an

22   appropriate time.

23          THE COURT: All right.  And what does the

24   supplemental affidavit address?

25          MR. CARICKHOFF: The supplemental affidavit

1    addresses a couple of issues that were raised by the Office

2    of the United States Trustee.  In particular, one of the

3    outside directors of FTI is a partner at the law firm of

4    Kirkland & Ellis, and if Your Honor looks at paragraph (6) of

5    that supplemental affidavit, that's the section that deals

6    with the U.S. Trustee's issues on that, and it essentially

7    describes the ethical law that's been put in place with

8    respect to Mr. Stamus who is a partner at Kirkland & Ellis

9    with respect to these Chapter 11 cases.

10        THE COURT: All right, thank you.  Does anyone else

11   care to be heard in connection with this application?

12        MR. McMAHON: Your Honor, good afternoon, Joseph

13   McMahon.  Just a, I guess, minor point with respect to

14   counsel's comments.  Under the proposed form of order that's

15   been provided to us and that we've agreed to, we have the

16   right to review both the monthly fees and the completion fee

17   under the reasonableness standard.  I think that counsel in

18   his presentation only referenced the monthly fees themselves.

19        THE COURT: All right, thank you.

20        MR. McMAHON: Thank you.

21        THE COURT: Anyone else care to be heard?  I hear no

22   response.  That order has been signed.

23        MR. MERCHANT: Your Honor, Mike Merchant again for

24   the record.  Matter number 24 on the agenda is the omnibus

25   stay relief motion that Mr. DiSpigna was referring to earlier

1    on the phone.  We have reached an agreement to continue that

2    to the June 15th hearing.  In the last few days, Mr. DiSpigna

3    has provided New Century with the information needed to make

4    an assessment as to the stay relief requested.  There just

5    simply hasn't been enough time to make that assessment with

6    respect to 206 loans.  So what we've agreed to do is continue

7    it to the June 15th hearing.  We will work with him in the

8    meantime, try to make a decision on as many of those loans as

9    we can to the extent we consent to some of the stay relief

10   requests, and the Committee consents as well, and Mr.

11   DiSpigna could submit a form of order with respect to those

12   loans under certification of counsel.  We don't have any

13   problem with that, and the balance of his motion that's left

14   over can go forward on June 15th.  We've agreed that we will

15   not challenge the standing of his law firm to pursue the

16   motion, and we won't object to the form of the motion.

17             MR. DiSPIGNA (TELEPHONIC): That is correct, Your

18   Honor.  Frederick DiSpigna.

19             MR. MERCHANT: I believe that's the scope of our

20   agreement.

21             THE COURT: All right.  And I wouldn't want to do

22   anything to upset the possible amicable resolution of that

23   matter.  All I will say is that I would not prefer that

24   others who are contemplating filing such a motion do it

25   through the use of a law firm.  Rather, the Court would

1    prefer, for reasons which are obvious, that parties be named

2    in motions rather than law firms being the movant, and I'll

3    say no more.  Okay, June 15th.

4         MR. MERCHANT: Very well, Your Honor.

5         MR. DiSPIGNA (TELEPHONIC): Thank you, Your Honor.

6         MR. MERCHANT: Matter number 25 on the agenda, I

7    believe, is going to be addressed by Committee counsel.

8         THE COURT: Very well.

9         MR. POWER: Your Honor, Mark Power from Hahn &

10   Hessen, counsel to the Committee.  Your Honor, I have a form

11   of stipulation that we've been able to hammer out with

12   Deutsche Bank National Trust counsel and the debtors'

13   counsel.  May I approach?

14        THE COURT: Yes.  Thank you.

15        MR. POWER: If Your Honor recalls, last week we were

16   before Your Honor on the sale order for the Carrington sale

17   of the servicing business.  One of the claims of the cure

18   objectors was Deutsche Bank who is the trustee for a number

19   of the trusts which are subject to the pooling and service

20   agreements which will be assumed and assigned to Carrington

21   on the closing date.  Deutsche filed an objection both to

22   adequate protection and to the issue of cure.  The adequate

23   protect resolved last week.  The cure issue was not resolved.

24   If Your Honor recalls, we basically put in the order a

25   reservation of rights with an intention of filing a

1   stipulation.  This stipulation embodies the agreement of the

2   parties.  Deutsche filed an objection which laid out

3   basically a potential cure claim based on alleged servicing

4   breaches by the debtor of its servicing obligations under the

5   pooling and servicing agreements.  Deutsche was in the

6   process of having an accountant go through and audit those

7   records and servicing to determine what the extent of that

8   claim is, but the objection indicated the claim could be as

9   high as $27.8 million.  In addition to that - Well, included

10  in that number is also a certain amount of fees and expenses

11  and other costs that Deutsche has asserted the debtor is

12  obligated to pay under the indemnification provisions of the

13  pooling and servicing agreements, and the cash management

14  order that Your Honor entered on the first day provides for

15  the debtor basically to comply with those indemnification

16  obligations under the PSAs.  So, they essentially have two

17  types of claims.  This stipulation basically sets forth a

18  reserve of a certain amount of funds from the Carrington sale

19  to protect Deutsche and the trust in the event those claims

20  are actually allowed ultimately and to set up a protocol or

21  procedure to basically exchange discovery, complete the

22  investigation of the servicing obligations, and then if we

23  need to, if we can't resolve it, litigate them before Your

24  Honor.  What we've decided to do is reserve $10 million of

25  the proceeds from the sale, which would basically be set

1   aside to cover the potential cure claims related to the

2   breaches of the servicing obligations.  This will be separate

3   than the cost and expenses which I mentioned, which are

4   approximately a million three, which will continue to be

5   operated under the cash management order and the indemnity

6   obligations on the PSA.  However, Your Honor, we've added a

7   provision that with respect to those costs and expenses,

8   Deutsche is going to provide that information to us, and we

9   have a right to review it and object to it.  So, there's no

10  decision being made in this stipulation as to whether those

11  claims are valid or should be paid.  It's simply a process to

12  continue to pay them, and the provision of the cash

13  management order shall stay in effect until the closing on

14  the transaction.  With respect to the $10 million, what's

15  envisioned is, Deutsche will have, I think, till July 31, I

16  believe, Your Honor, paragraph (8), to finish the auditing

17  and accounting and produce basically a written summary of

18  what it believes its secured claim damages are.  Then the

19  debtor and the Committee will have 75 days after - I'm sorry,

20  till October 5th to basically analyze that and come up with

21  its own analysis as to what those damages are.  And then we

22  either can try to resolve that through a consensual matter

23  which we'll bring forth a 9019 to Your Honor, or we would

24  schedule an evidentiary hearing to litigate that issue and

25  determine whether there actually is a cure damage claim

1    that's valid and should be allowed.  That's basically the

2    procedures, Your Honor.  The only thing it does do in terms

3    of substantive rights, is it, obviously, sets aside the $10

4    million, and it caps the cure claim as to the potential

5    servicing breaches at the $10 million.  Now I should mention,

6    if Your Honor recalls last week, a lot of the contracting

7    parties had filed cure objections as of the date of the

8    objection deadline, and we had that gap period, what we call

9    it.  That gap period still exists with Deutsche because

10   Deutsche doesn't know, you know, what's going to happen

11   between now and closing.  So the stipulation reserves

12   Deutsche's ability to bring those claims, if it discovers

13   other claims that arose, post-objection deadline.  So the $10

14   million cap applies to pre-objection deadline and the stub

15   period basically they reserve the rights to bring those

16   claims later.  I think there's a 75-day deadline to bring

17   those claims.  That's basically the protocol, Your Honor.  I

18   think it's, you know, somewhat standard in these cure

19   objections.  It's obviously a significant amount of money

20   here.  Truthfully, Deutsche doesn't quite yet know even if

21   there are claims.  It believes there are, but it hasn't yet

22   determined that.  So this process is designed basically to

23   avoid a lot of litigation, streamline the process, and try to

24   come to a, you know, basically get the facts and then figure

25   out whether we have to litigate or not.  In the stipulation

1    there is an outside date for a pretrial conference, which we

2    would seek to be sometime towards the end of the year, Your

3    Honor.  I don't know if Your Honor is able to set that now or

4    would rather us approach the Court when we're done with the

5    discovery process.

6            THE COURT: How far out to your omnibus hearing

7    dates?

8            MR. POWER: Well, I think - our deadline - the

9    debtor and the Committee's deadline is October 5.  So I think

10   we're talking into November, November or December would be a

11   perfect date, Your Honor.

12           THE COURT: And how far out have I set omnibus

13   hearing dates in this case?

14           MR. POWER: I don't believe that far out.  I think

15   only - only through July that I recall, Your Honor.

16           THE COURT: How would you like to have a date in

17   November?

18           MR. POWER: As long as it's not the Wednesday before

19   Thanksgiving -

20           THE COURT: All right.  How about two days before

21   Thanksgiving?

22           MR. POWER: That's fine.  Deutsche's counsel

23   indicates that's fine, Your Honor.

24           THE COURT: All right, Tuesday, November 20th at - Do

25   you think I can set that for 10:30?  Yeah, 10:30.  Now, I do

1   have a question.

2            MR. POWER: Yes, Your Honor.

3            THE COURT: Does this stipulation have the effect,

4   arguably, of taking what's arguably an unsecured claim and

5   making it a secured claim?

6            MR. POWER: No, Your Honor, because these agreements

7   are really the main thing that Carrington's buying, so in

8   order to assume and assign them, the debtor has to basically

9   cure and pay and satisfy all outstanding obligations.

10  Deutsche's arguing that these are breaches under that

11  agreement that are - basically, they're entitled a damage

12  claim for and they have to be compensated.  So, I don't

13  believe they do.  I believe, if they prove to Your Honor's

14  satisfaction that these are allowed claims, they would have

15  to be paid in order to sell this agreement to Carrington and

16  these are the core agreements as part of that sale.

17           THE COURT: Okay.  Does anyone else care to be heard

18  in connection with this matter?  I hear no response.

19           MR. POWER: Your Honor, I have the original which is

20  signed by the parties.

21           THE COURT: Did you fill in that date?

22           MR. POWER: I didn't but I'll do that now.  May I

23  approach, Your Honor?

24           THE COURT: Yes.  Thank you.  All right, I've signed

25  it.

1           MR. LOGAN: Thank you, Your Honor.  Ben Logan again.

2    Turning to item number 26, which is the debtors' motion to

3    provide adequate protection.  Let me give the Court a little

4    bit of a very quick overview and then turn to a scorecard, if

5    you will, of where we stand with various objectors and

6    parties who we've worked with and, therefore, there are no

7    objections.  Your Honor, I don't think anybody, at least of

8    the debtors' side, anticipated when the case was filed that

9    these sort of issues would be anywhere near the way they've

10   turned out to be.  We have a thorny problem, the estates have

11   a thorny problem.  It turns out that various parties, either

12   parties to master repurchase agreements - I'm not going to

13   call them warehouse lenders today - or parties who purchased

14   loans from the debtors had monies that were collected into

15   the debtors' general collection account prior to the petition

16   date.  I want to be very clear, we're not talking about

17   anything post-petition but as of the petition date.  We did

18   not anticipate when the case was filed that there would be

19   any substantial claims for any such funds.  It turns out that

20   there's a limited quantity of money that was in the

21   collection account, about $42.1 million on the petition date,

22   and as one started to work through the process with various

23   claimants to it, the amount being claimed, sometimes with

24   claims that the debtors, quite frankly, think are

25   substantially inflated, but nonetheless claimed, exceeds the

1   amount that was available, the raise, if you will, for

2   various trust fund claimants.  That then led to - well, it

3   threatened litigation and brought litigation.  UBS was the

4   winner of the race to the courthouse.  They brought an

5   adversary proceeding, and as a result of which, we've had

6   various interim resolutions with UBS, but they're interim

7   resolutions, interim only.  Other parties to master

8   repurchase agreements - I'm going to have to come up with

9   some shorthand, "REPO participants" told us that they were

10  concerned that the process ought not to favor the winner, the

11  most litigious among them, and we agreed with that.  A

12  similar situation existed with purchasers of loans who

13  purchased loans from the debtors pre-petition, but monies

14  floated into the general collection account pre-petition

15  because borrowers had not recognized yet that they were

16  supposed to send money to the new servicer, again, commingled

17  in the general collection account, and we also believed it

18  was appropriate to treat those folks on an omnibus fair

19  basis, and as a result, we worked closely with the Creditors

20  Committee and certainly with the major REPO participants to

21  try to resolve or develop a system that would be a fair

22  procedure so that all parties' interest would be protected,

23  including the debtors' and the Creditors Committee's rights

24  to assert that none of these are trust funds or that none of

25  these amounts could withstand an attack under Bankruptcy Code

1  § 544.  The debtors have seven major REPO participants.

2  Three of them did not object to this motion, and that's

3  because, at least I believe, I'm confident, that they were

4  parties to the development of the order and the motion and

5  support it.  Those include Credit Suisse First Boston, Bank

6  of America, and Deutsche Bank.  Indeed, we had a stipulation

7  with Deutsche Bank that was approved by the Court at the last

8  hearing to deal with some ancillary issues involving Deutsche

9  Bank in which they agreed to support this motion.  It was in

10  - I guess it had been filed at that time and the work was in

11  process.  We also have reached an agreement in principal with

12  Morgan Stanley, which did file an objection and a counter

13  motion.  Morgan Stanley is the most substantial, in terms of

14  dollars at issue of our REPO participants and accordingly,

15  I'm quite pleased that we have reached an agreement in

16  principal with Morgan Stanley, which I'll turn to

17  momentarily.  We also had an objection filed by Citigroup

18  Real Estate Group which just wanted a clarification that the

19  adequate protection we were offering would not prime their

20  liens in case their liens were deemed to be valid, not

21  avoidable liens and that's certainly what we intended.  I add

22  a note parenthetically that the stipulation that we presented

23  a few minutes ago fully reserves any claims the Committee

24  could have or the debtor might have to challenge Citigroup's

25  liens.  It's purely if they have non-avoidable, valid,

1    perfected liens.  Nothing we're offering today is intended to

2    prime those.  And that brings me then to the fact that we do

3    have three objections that are outstanding.  I'm not sure if

4    when I explained the Morgan Stanley procedures, which I did

5    before court, at least a preview for several of them, whether

6    those objections will be resolved, but I must assume that

7    they are not.  The motion is unusual, Your Honor.  This is a

8    motion by the debtors to provide adequate protection to

9    people whether they want it or not.  We are -

10           THE COURT: They want protection but not necessarily

11   adequate protection.

12           MR. LOGAN: They want a different form of

13   protection, if you will.  But none of them have a motion

14   pending to seek another form of adequate protection with the

15   possible exception of Morgan Stanley, which filed a cross-

16   motion that if we didn't have agreement with them, I would

17   argue is untimely, et cetera, et cetera, but fortunately, we

18   don't have to get to that.  We tried to be proactive and

19   whether they wanted it or not and with the full reservation

20   of all their rights to argue that it's not adequate, are

21   proposing to give the warehouse lenders and the loan

22   purchasers every ounce of adequate protection we have

23   available.  We're not trying to prime anybody.  We are

24   seeking to give them junior liens on essentially all estate

25   assets, subject, of course, to a carve-out for voiding powers

1   and professional fees and also a super-administrative

2   priority junior to the super-administrative priority granted

3   to the DIP lenders.  So, we're offering to give them

4   essentially everything we've got with the full reservation of

5   rights as to what they're entitled to, both on their part and

6   on the debtors' and the Committee's part.  In the motion, we

7   indicated that as things develop further, we very well could

8   seek to supplement or replace that form of adequate

9   protection with another form of adequate protection, and that

10  really turns me to the agreement with Morgan Stanley which we

11  want to outline briefly and then I'll turn into a little bit

12  more detail as to the issues that really are quite

13  complicated legally or at least they're substantial legal

14  issues and factual issues which the parties are going to have

15  to resolve.  The motion that we are seeking to have the Court

16  approve today is just a first step in a process to an issue

17  that I think will be a very important issue in these cases

18  we'll get resolved, we think, under this kind of framework

19  with a procedure that protects people's rights on a collected

20  basis.  The agreement with Morgan Stanley, which we propose

21  to incorporate into a revised form of order that we'll work

22  on after the hearing, would provide that the debtors will

23  provide to each of the warehouse lenders and the loan

24  purchasers by June 29th, the debtors' reconciliation of

25  various amounts that are claimed by the parties.   That's a

1    drop-dead date.  It's been a painful process to get that work

2    done, and I want to explain why that is in a few minutes, but

3    June 29th would be the drop-dead date.  In addition, when the

4    Carrington sale closes, that's the sale of the servicing

5    business, the debtors will institute a proceeding which we

6    will work out the details of later.  It's probably in the

7    nature of an interpleader action, Your Honor, where the

8    debtors will deposit into an interest bearing account, escrow

9    account maintained somewhere, funds equal to the amount of

10   cash the debtors had on the petition date, which is

11   approximately $42.1 million, in a collection account into

12   which the various alleged trust funds were deposited, as well

13   as some other monies, and then procedures will be developed

14   to litigate over who is entitled to that money, if anyone.

15   It may be an estate asset.  It may be subject to avoidance.

16   But that's the basic agreement with Morgan Stanley, which we

17   are comfortable with, the Committee supports, and that we

18   would propose to include in the form of order.  Let me

19   explain a bit more in detail about the situation, why we are

20   where we are.   The REPO participants typically had

21   agreements that provided - actually it varied a fair amount.

22   They provided that New Century sold, at least ostensibly sold

23   to them various mortgage loans and, in the case of Morgan

24   Stanley, some residual interest, with a concurrent promise or

25   obligation to buy those loans back and in the interim, until

1    they are bought back, pay interest, typically denominated the

2    price differential.  The agreements varied substantially as

3    to what happened with respect to collections on the mortgage

4    loans during the time that the repurchase agreement was still

5    extant.  Some of them had blocked accounts set up, many did

6    not.  Those that had blocked accounts typically did not block

7    them until mid-March.  And almost uniformly the REPO

8    participants understood that regularly scheduled collections

9    of monthly principle and interest from the borrowers went

10   into a general collection account, and monies were settled up

11   monthly after the fact.  And as a result, we have a

12   hodgepodge of legal claims by the repurchase participants

13   that monies either post a declaration of an event of default

14   and the blockage of an account are their monies or their

15   collateral, and we also have issues as to whether or not

16   monies that were collection prior to those exercises of

17   revenues are their property or their collateral.  Loan

18   purchasers typically would buy loans from New Century and at

19   the time they purchased them, instructions were given to

20   transfer the servicing from New Century Mortgage Corporation

21   to the new servicer, and letters and instructions were given

22   to the consumers who were the actual obligors on the

23   underlying mortgage loans to make payment to the new

24   servicer.  Lo and behold, people don't always follow their

25   instructions to the letter of the mail that they get which

1    they often think is junk mail.  In any event, some quantity

2    of money came into the debtors pre-petition that was again

3    deposited in the general collection account and the loan

4    purchasers assert that is trust property held for their

5    benefit.  I have a stop.  Both the repurchase agreements and

6    these agreements for the sale loans have trust language.

7    They have language that the debtors will hold monies in

8    trust.  The truth of the matter is, though, that the practice

9    as understood was that monies were not held in trust.  They

10    were put into a general collection account, which gets me to

11    the first significant legal issue and it's one of tracing.

12    We had $42,136,000 and change in this collection account on

13    the petition date.  The case law is quite clear, including a

14    decision from the Third Circuit, that a party asserting trust

15    bonds - I'm quoting now from City of Farrell vs. Sharon

16    Steel.  Can't read my own handwriting as to what the citation

17    is, but it's a Third Circuit case from 1994.  The Third

18    Circuit held that for a trust claimant to establish that

19    funds are held in trust, it must first off demonstrate a

20    trust relationship and a legal relationship, which I want to

21    return to in a second, and second identify and trace to that

22    trust funds if they've been commingled.  That's our

23    situation.  And the real issue is, how does one trace monies

24    into this collection account because we have, for better or

25    worse, a variety of claimants who are trying to trace monies

1   that add up to a greater total than the amount of money that

2   was there.  The Third Circuit in Sharon Steel and also in

3   Columbia Gas has endorsed the lowest intermediate balance

4   test, which is very common, and that works fine when there's

5   one trust claimant, but when you have multiple trust

6   claimants trying to assert tracing into the same fund and

7   they all could look to the same intermediate balance, it's

8   very likely that the total will add up to more than the

9   raise, and I'm afraid that we're probably going to be

10  striking out on fairly fresh turf as to what happens,

11  assuming that these claimants can establish the basic trust

12  analysis, which is far from certain, but that's the problem

13  we face.  As we have started to develop the facts, it appears

14  that the claimants will aggregate more than the raise that's

15  available to satisfy these various trust arguments.  And I

16  should have noted that the Third Circuit and various other

17  courts have been very clear that the burden is on the

18  claimant to establish this tracing.  So, it's not something

19  that they can just assert.  They have, in fact, a financial

20  burden to establish.  The second substantial legal issue is

21  the interplay with Bankruptcy Code § 544 and 541(d).  There,

22  a number of courts have held and there's legislative history

23  that § 541(d), which basically says, property held in trust

24  isn't property of the estate.  There are a number of cases

25  that hold that that is fine and well and good as long as it

1    is a bona fide true trust arrangement, which is very tough to

2    establish when funds are commingled.  I won't bother the

3    Court with a recitation of some of the authority on that.  I

4    do note, however, that Indymac, which was the one loan

5    purchaser that filed an objection to the motion, cited one of

6    the leading cases, Churchill Mortgage Corporation, but it's a

7    tough showing to establish first off that it's a bona fide

8    trust, which is a thorny issue when funds are coming when

9    people are asserting a constructive trust.  In other words,

10   the documentation written by lawyers who deal with fine

11   points said that thou shall hold it in trust, but the

12   business people implementing it didn't hold it in trust.

13   Ergo, you said you would hold it in trust, if you didn't hold

14   it in trust; is it subject to a constructive trust?  That is

15   an issue we all have to resolve as litigation ensues or

16   resolutions occur consensually.  If in fact it was held in

17   some sort of constructive trust, there's a split of authority

18   as to whether or not Bankruptcy Code § 544 nonetheless can

19   avoid that constructive trust.  There are a variety of Third

20   Circuit - not Third Circuit, Circuit Court of Appeals cases

21   that hold that 544 does avoid a constructive trust.  For

22   example, Belyle vs. Plunkett, it's a case of the Sixth

23   Circuit, but there are about three or four cases like that.

24   Columbia Gas which is a Third Circuit case says that 541(d)

25   says that a constructive trust is not property of the estate

1    but doesn't reach the 544 issue.  Judge Balick has a decision

2    that says 544 does trump a resulting trust, which is

3    generally a stronger trust than a constructive trust.  But

4    again, those are the kind of issues that we're going to have

5    to resolve, again, either consensually or through litigation,

6    and the Unsecured Creditors Committee has been very clear

7    with us that they want to - they need to reserve all their

8    rights to assert that this is unencumbered property available

9    for unsecured creditors.  That gets me to the third legal

10   issue and that's with respect to the repurchase participants.

11   Throughout the proceedings, we've spent a fair amount of time

12   dealing with special provisions of the Bankruptcy Code that

13   exempt repurchase participants from the automatic stay and

14   give other special rights.  Those are generally found in

15   Bankruptcy Code 362(b)(7), which says the automatic stay does

16   not prevent a repurchase participant from setting off claims

17   that it has against the debtor or realizing on property that

18   it holds.  And in § 559, which allows a repurchase

19   participant to liquidate its claims, those are important

20   provisions.  If a party fits within the safe harbor of the

21   definition of a repurchase participant, they get certain very

22   material rights.  But those rights do not include taking

23   property that is held by the estate.  Collier makes this

24   point very clearly at paragraph 559.04 subparagraph (4).  A

25   repurchase participant or another party subject to the

1    special rules adopted by Congress is entitled to self-help

2    rights, as Collier puts it, to liquidate a repurchase

3    agreement or to sell property it holds.  For example, if it

4    holds the mortgage loans and it fits within the parameters of

5    the definition of a repurchase participant, the automatic

6    stay doesn't prevent it from selling the loans, but it

7    doesn't say anywhere in the Bankruptcy Code that a repurchase

8    participant is able to come grab cash that it asserts is held

9    in a constructive trust held by the estates.  There are a

10   variety of cases that deal what exactly are the rights of a

11   repurchase participant?  Barclay cites probably the leading

12   case for the proposition that anything related to a

13   repurchase participant is their property.  It's an absolute

14   true sale, and that's the Granite Partners vs. Bear Sterns

15   case decided by the 7th District of New York.  I've got to

16   work on my handwriting - in the mid-1990s sometime.  And that

17   case came up in the context of whether or not a repurchase

18   participant has an obligation to dispose of mortgage loans in

19   a commercially reasonable manner, which it would if in fact

20   it is a disguised financing, secured financing.  And there

21   the Court said, No, it doesn't.  These are different animals.

22   They are sales.  There's a split of authority on that.

23   There's a case out of New Jersey, Bevill Bresler & Sullivan

24   Asset Management Corporation which was later affirmed by the

25   Third Circuit in a slightly different context, which holds

1    that repurchase agreements for hybrids, as the Third Circuit

2    said, they've got many of the characteristics, in fact, most

3    of the characteristics of the secured financing, and there

4    the Court looked at a variety of factors including whether or

5    not the repurchase participant had to hold the property that

6    was quote, "sold" to it, sold in quotes, or was free to

7    dispose of it.  Basically, this came up on the context of

8    either government securities or Ginnie Maes. I don't remember

9    which, but since those are essentially fungible, the

10   repurchase buyer could trade out those government securities

11   as long as it replaced it with like kind, and the Court said

12   that that was one of the significant factors that would argue

13   in favor of treating this as a true sale.  That's not present

14   in our situation, and there is a serious issue as to whether

15   or not the repurchase agreements are true sales or disguised

16   financings.  The Bankruptcy Code doesn't answer that

17   question.  It says, if you are a repurchase participant,

18   whether it is a true sale or disguised financing, you get

19   certain rights that I enumerated.  It doesn't answer the

20   question of, What are you?  Are you a true sale or are you a

21   disguised secured financing?  That is a thorny issue that

22   will have to be litigated or resolved consensually.  In

23   addition, if it deemed to be a disguised financing, if the

24   repurchase agreements are deemed to be disguised financings,

25   there will be issues as to whether or not then they have

1    collateral.  The repurchase agreements, by and large, say

2    that if and when the Court determines that a repurchase

3    participation agreement, repurchase agreement should be re-

4    characterized as a disguised financing, at that point in

5    time, a lien is granted to the repurchase participant

6    counter-party.  The Ixis (phonetical) agreement which Ixis

7    attach to its motion is a good example.   There's a serious

8    issue as to whether or not that works, post-petition.  It's a

9    springing lien that would be granted post-petition.  Again,

10   these are all issues that I'm sure the loan purchasers will

11   have one very strong view on and the parties to the

12   repurchase agreements will have another various argument on.

13   Under Gap these agreements are treated as financings.  Under

14   tax law, they're treated as financings.  But in any event,

15   what they are an what their rights are is an issue we're

16   going to have to deal with.  So what do we do about all of

17   that?   And what we concluded in working with the Creditors

18   Committee is that we should move pro-actively so that we

19   don't encourage others to act as UBS did to bring litigation

20   to try to win a race to a courthouse and obtain an advantage

21   over others, and as a result, we will offer to give every

22   ounce of adequate protection we have to parties and let the

23   chips fall where they may either through consensual

24   resolution or through litigation.  A number of the objectors

25   raised a question as to how substantial this adequate

1   protection is.  Is it ephemeral?  Is it something that's just

2   a risk or is it real?  Well, Your Honor, as the Court is

3   aware, there are two very major sales that have been approved

4   by the Court recently.  The sale to Ellington of various

5   residuals and L&FA realized net of a hold back for the

6   estate, $54 million.  The Carrington sale, again, net of hold

7   backs will realize about $145 million.  There's a tax

8   receivable that the estate is processing of $111 million

9   under a quick refund procedure established in the Internal

10  Revenue Code.  There's an interest in the Carrington fund

11  itself that's carried on Carrington's books that write at $50

12  million that the estate proposes to sell, and there are a

13  variety of other assets that will be the subject of other

14  auction motions brought before the Court in the near future,

15  and in addition, I think as we all have to acknowledge, there

16  are undoubtedly going to be litigation claims related to the

17  restatement that presumably will yield some recoveries for

18  creditors.  So, Your Honor, the long and short of it is that

19  in working closely with the Creditors Committee and as many

20  of the repurchase participants as we could reach out to, we

21  think we've reached a fair procedure, a procedure that gives

22  them adequate protection notwithstanding the fact that they

23  didn't seek it and has a procedure to monetize that from the

24  sale of the Carrington proceeds which is the agreement that

25  we reached with Morgan Stanley.  It's a pro-active measure.

1    One that with the perfect wisdom and view of hindsight I wish

2    we had done earlier, but none of us knew that we were going

3    to have these sorts of issues, and we think it's incumbent

4    upon a fair administration of the estates that we develop a

5    collective process of this sort.  I also ought to be clear

6    that the motion today does not seek to prejudice any of the

7    loan purchasers or the parties to the repurchase agreements

8    from filing another motion.  They don't have one pending, but

9    if they want to file one or an adversary proceeding they're

10   free to do so.  We'll certainly argue that we've already

11   given them adequate protection, but they're not bound by

12   that.  So it is a - In one sense it's an elegantly simple

13   motion, one that provides a form of adequate protection.

14   We're not asking the Court to determine that it is fully

15   adequate, but we're trying to establish a fair and rational

16   procedure so that parties are not advantaged by being more

17   litigious than others.   That's all I have to say, Your

18   Honor.

19          THE COURT: Thank you.

20          MR. POWER: Good afternoon, Your Honor.  Mark Power

21   from Hahn & Hessen, counsel to the Committee.  Your Honor,

22   for more years than I want to admit of years of practice,

23   I've never represented a committee where we actually got up

24   and supported an adequate protection motion which wasn't

25   brought by the secured creditor.  If Your Honor recalls,

1  initially in the case, this case had approximately $40-some

2  million in cash and there was a DIP loan outstanding.  At the

3  time when we first got involved, about a week later, we did

4  look at whether - the cash position of the estate and what

5  the potential claims were.  We knew that there were potential

6  claims, but I think all information that we were given at the

7  time was that those claims were significantly less and didn't

8  think it would be an issue here.  As we got further into the

9  case a few weeks later, the debtor discovered and then

10  revealed to the Committee its discovery that in fact the

11  claims might be substantially higher than they originally

12  thought.  The debtor did have one centralized account and its

13  money plus all the other collection monies were all put into

14  that account with a kind of an end-of-the-month

15  reconciliation, plus it had also had monies in various

16  subsidiaries that it had moved up pre-petition to try to get

17  ready for the bankruptcy and make sure it had control of all

18  funds, which is one of the things it did in terms of its

19  debtor-in-possession duties to make sure that funds weren't,

20  you know, in places which each couldn't account for.  Because

21  of that and because we were advised, you know, to our

22  surprise that in fact the claims were going to be

23  significantly higher and we weren't sure yet as to parties'

24  rights, as to whose rights these funds were, whether they

25  were other people's money, whether they were cash collateral,

1    or whether they were the debtors' proceeds.  We pushed the

2    debtor and the debtor readily agreed to file this motion,

3    which is very unusual and the reason is because - two

4    reasons, primarily.  One is, Your Honor has said several

5    times before us and we've heard you, I want to make sure that

6    no one is adversely affected while this case is pending.  And

7    this is a debtor where the debtors' inventory is cash,

8    primarily collections of funds and servicing of funds.  It's

9    not a typical case where you know where your secured party is

10   and you know whose property is whom.  This is a case where

11   you have over 20 parties that may have funds involved in the

12   centralized account, and right now, nobody knows exactly

13   whose money that is and what those parties' rights are.  So

14   we were faced with the situation, one, obviously we need to

15   get to the sales and liquidate this estate and do that in an

16   orderly process to maximize the value for everybody including

17   most of the same creditors who are claiming monies in those

18   funds.  We also needed a process to make sure everyone was

19   protected, that we didn't end up in a situation where two

20   months later we say, Oops, we shouldn't have spent this, the

21   debtor shouldn't have done this or that.   This motion is

22   designed, basically, to preserve everybody's rights.  We're

23   highly confident that this estate will have in excess of $200

24   million of unencumbered funds.  I think debtors' counsel did

25   not indicate to Your Honor that the DIP loan balance is

1   currently zero.  The Citibank will be paid in full out of the

2   Carrington sale, and those services and advances are separate

3   money they aren't related to the monies we're talking about.

4   It's a separate account.  So, basically, Citibank's liens are

5   separate to this.  So the proposal is simply, as best we can

6   do - I should say one other thing, Your Honor.  The other

7   issue we're trying to avoid is we envision that within the

8   next few weeks Your Honor would have literally 20 adversary

9   proceedings filed and 20 TROs and 20 emergency motions all

10   seeking basically the exact same thing that UBS and Deutsche

11   have sought in this case.  And so we could see that was going

12   to come down the pike very shortly, and we know where we're

13   going to end up, which is that all the parties are going to

14   claim that they're entitled to these monies that are there,

15   and the debtor and the Committee are going to argue that, No,

16   we think your claims may be unencumbered or some of those

17   funds are the estate funds.  In order to streamline that

18   process, avoid extensive litigation, a lot of time and

19   expense both on the REPO participants and the loan

20   purchasers' part and on the debtor and on the Committee's

21   part, this motion was done pro-actively to cut out that

22   litigation expense and try to preserve the status quo.  So,

23   and, Your Honor, I should mention a few other things in

24   addition to what Mr. Logan mentioned.  The relief sought is

25   retroactive.  In other words, parties are being provided

1     adequate protection as of the petition date.  So, we're

2     trying to make sure that if anybody's rights were affected

3     and they didn't move within the last - since the beginning of

4     this case, they're still protected.  So it's not a situation

5     where the first one who jumped into court is rewarded for

6     that reason.  So, the adequate protection is being sought

7     here basically goes back to the petition date and reserves

8     everybody's rights.

9          THE COURT: When is it expected that the Carrington

10    sale will close?

11         MR. POWER: The outside date is June 15, the

12    proposed date is between the 7th and 13th.  There is a

13    possibility that it will be extended a few weeks depending on

14    regulatory issues or approvals by Fannie Mae and some

15    licensing issues, but I think for sure it will be by the end

16    of June.

17         MR. LOGAN: That's my understanding, Your Honor.

18    There are discussions which I'm not involved in, but what

19    I've heard is that it's mid- to late-June.

20         MR. POWER: I've been involved in those discussions,

21    Your Honor, and I can confirm that.  The solution with Morgan

22    Stanley is, I think I'd like to expand on that a little, Your

23    Honor, so the parties in the room can see where we're going

24    and Your Honor can understand where we're going.  What we

25    envision is once we close the Carrington sale, setting aside

 1   the balance of the cash as of the petition date, in an escrow

 2   account accruing interest, the debtor has promised with the

 3   assistance of the Committee, and I should inform Your Honor

 4   that the Committee's financial advisors, as of a few weeks

 5   ago, have been onsite at the debtors' premises working with

 6   the debtors' financial advisors to go through the

 7   reconciliations and make sure this process is - basically

 8   we're onboard with the entire process, and they're doing that

 9   now.  They've committed to finish the reconciliations by the

10   end of June if not earlier.  Based on the experience we've

11   seen, a number of the REPO participants and mortgage loans

12   will probably have questions either because they're going to

13   have loans where they didn't receive payment and the debtor

14   doesn't reflect any receipt of payment, so there's going to

15   be a certain amount of reconciliation process that's going to

16   have to occur.  But, if Your Honor would envision a process

17   over the next 30 to 60 days where basically the facts would

18   have been resolved here because there should be any issue

19   about whether monies were received or not received and where

20   those monies are.  Once the facts are resolved, we envision,

21   and actually over the next few weeks, envisioning getting the

22   stipulation with all the parties which basically sets up a

23   protocol where we'll basically try to brief these issues and

24   brief the different parties' legal rights, because I can tell

25   you from having talked to a number of the REPO participants,

1    they are not interested in being encumbered in a long and

2    lengthy process which could last a long time over, you know,

3    whether or not this is their money or how much they're

4    entitled to.   The debtor and the Committee are also not

5    interested in that kind of lengthy litigation process, but we

6    have an issue where we probably have between 20 and 25

7    parties who may have rights under certain of these funds.   So

8    we have to set up a system basically somewhat - an omnibus

9    procedure where basically these issues can be brought before

10   the Court.   We can try to resolve them consensually, if

11   possible, and then give notice.   If not, we have Your Honor

12   resolve the issues.   The overriding issue, of course, for the

13   Court and for the creditors is, if there are more claims than

14   there is a pool of funds then it has to be determined how

15   those funds are allocated, and that will be an issue that we

16   either have to resolve consensually or litigate it before

17   Your Honor, but that's what we envision doing over the next

18   few weeks.   We did support and really pushed the debtor to

19   file the motion.   The Committee has basically stepped up its

20   oversight and review of the process and is trying to work

21   through to make sure that in essence that everything that's

22   happened in this case is not adversely affecting anybody's

23   rights and making sure that as they existed as of the day of

24   the filing, they still exist.   And we're confident that this

25   motion does that and preserves all the other issues to be

1  decided later, including the estate's and the Committee's

2  issues as to what the estate's rights are into these funds,

3  and that's basically the motion that's before Your Honor, and

4  the Committee supports that and asks you to approve it.

5       THE COURT: At this point, what if anything, insofar

6  as it can be determined, is left of the $42 million that was

7  in that account at the inception of the 11?

8       MR. POWER: Your Honor, my understanding is the bulk

9  of those funds have been used to support the operations and

10  continuations of the business.  Some have been set aside.

11  Some have been used to maintain the business operations and

12  continue the servicing business in those efforts.  My

13  understanding is it's post-petition, and we've confirmed this

14  to the best we can, all monies collected that any party

15  claims are their monies have been allocated and sent to

16  blocked accounts, so we're not dealing with an issue where

17  it's an ongoing problem.  It's really a petition date issue,

18  but I believe the bulk of the money has been used, I think is

19  fair to say, Your Honor.

20       THE COURT: All right, thank you.

21       MR. RAVAL: Your Honor, Abi Raval from Milbank Tweed

22  on behalf of Morgan Stanley.  I wanted to give a couple of

23  clarifications I think that we've agreed to as to the

24  agreement with Morgan Stanley, the Creditors Committee, and

25  the debtors, but before that, just state for the record that

1    there are a lot of legal arguments and positions set forth by

2    the Committee counsel and debtors' counsel.  Suffice it to

3    say, we reserve our rights to object and disagree and when

4    the appropriate time comes.  With respect to the escrow

5    account, that will be an interest bearing account, and to the

6    extent that one or more of the REPO participants or loan

7    purchasers prevails in collecting monies from that account,

8    the interest bearing on that account would go to that REPO

9    participant or a loan purchaser.  Secondly, we also

10   understand that anyone's rights to seek additional interest,

11   i.e., contract interest, however it may be under the various

12   agreements is reserved with, obviously, the rights of the

13   Committee and the debtors to object to that.  We also

14   understand that the liability of New Century is not capped at

15   the escrow amount, but may exceed that, if that be the case.

16   Lastly, on the interpleader action, I think Morgan Stanley's

17   concern is primarily not to be jeopardized by a first-in-

18   time, first-in-right rule.  So we view the interpleader or

19   the stipulation that Mr. Power was speaking to be binding on

20   all parties to the MRA purchasing agreements such that they

21   would have to come into this Court if their disputes as to

22   how to allocate this pot if we get there.  To the extent, as

23   Mr. Logan had suggested that someone could file a separate

24   motion for adequate protection, we do have an understanding

25   with Mr. Power and Mr. Logan that Morgan Stanley will be able

1    to proceed at the same time that such other party seeks that

2    motion for adequate protection or other such relief with

3    regards to these proceeds.

4             THE COURT: Thank you.

5             MR. SUTTY: Good afternoon, Your Honor.  Eric Sutty

6    of The Bayard Firm appearing for the Natixis Real Estate

7    Capital, Inc.  I would like to move the admission of my co-

8    counsel, Angela Summers of the firm Cadwalader Wickersham &

9    Taft.  She is a member in good standing of the bar of the

10   State of New York.  A motion was filed earlier today.

11            THE COURT: Thank you

12            MS. SOMERS: Good afternoon, Your Honor.

13            THE COURT: Welcome.

14            MS. SOMERS: I was a bit surprised at the debtors'

15   presentation.  I suppose because we had heard as an

16   explanation as to why they needed more time that they had an

17   enormous reconciliation process to engage in.  With respect

18   to Natixis, which is a relatively small claimant and is full

19   of claimants, they're owed about $1.6 million that was held

20   in trust.  Although we are not a large player, our records

21   show that the reconciliation is a two-minute process.  We

22   received some principal payments.  You look at a chart.  You

23   know that there are matching interest payments.  They know

24   that they were received.  You know, a one-page sheet made it

25   clear to me.  With respect to some other payments that we are

1    owed principal, again, they were pre-paid, they have loan

2    numbers, you match the loan number, bingo, you know that

3    money is ours.  The focus of the motion was not give us time

4    to argue that this money is not yours because the trust has

5    been broken and it's property of the estate.  That would have

6    been a more honest way to approach this, and then we would

7    know where we stood.  The long recitation about trust

8    property, et cetera, made that clear to us.  I suppose that

9    they're going to spend this month really developing that

10   argument.  I haven't seen a witness who got up and talked

11   about the enormous process, how it's confusing, how the

12   company's been working around the clock, nothing of that

13   sort.  So, from what we can tell, you know, we have people at

14   Natixis who could come in and have viewing access to the

15   website or the servicer file and determine in very short

16   order what they're owed and what other people are owed.  So

17   there's really no complicated reconciliation process here.

18   They want a month to develop the trust argument, and I guess

19   that's a little bit surprising to me because I saw that as

20   sort of a grey area.  They wanted to hash it out, so, that's

21   issue number one.  Our position is that the document said,

22   whatever money they received is our money.  They're taking

23   this money on behalf of us as buyer.  We own property,

24   they're collecting some monies on it for us.  Whether or not

25   their trust argument holds if there's any way to break this

1   trust, that if the monies didn't flow, if they get to be

2   rewarded now for having, you know, taken it from the blocked

3   account, transferred it to another account, or used it for

4   their general funds, or used it to survive, is a question for

5   another day, I suppose, and in the meantime, they want to

6   offer us adequate protection on all the remaining assets that

7   are available.  That certainly doesn't harm us.  We're not

8   against that.  How much protection is provided is pretty

9   nebulous, but, you know, we'll take it, I suppose.  We're

10  happy to see that a deadline's been put on it.  I think the

11  attorney from Milbank clarified it, it will be in an interest

12  bearing account.  We believe interest accrues on this money

13  under our underlying documents, so we want to continue to

14  have the right to contract interest.  We want to understand

15  how the debtor will use this time, maybe more specifically.

16  We also ask that if there are any reconciliation issues that

17  they are unable to resolve, vis-a-vis, Natixis, that they

18  give Natixis viewing access to the files so that we may help

19  them determine very quickly how much money we are owed.  We

20  think that would clarify the process.  We continue to contend

21  very strongly that we're subject to the safe harbor

22  provisions of the Bankruptcy Code.  To our knowledge, we know

23  of no other sub-prime lending case in which the debtor has

24  tried to grab hold of these funds and use them for their

25  general corporate purposes.  This is an extremely novel

1    argument.  It calls into question the entire, you know, REPO

2    market, the structure of these kinds of financings, and as I

3    said, it's not been tried in any of the other cases, in any

4    of the other cases, the REPO participants' structure was

5    respected and they quickly went in and they exercised their

6    rights under the safe harbor provisions and were able to

7    preserve the rights that they expected to be preserved in

8    bankruptcy.  So, I guess in summary I would say that I am

9    happy to see that there's a timetable as we too requested put

10   on this process, that the money will be in an interest

11   bearing account.  We would like the debtor to let us know if

12   there is any reconciliation issue left outstanding and

13   contact Natixis.  We contacted the debtor several times.  We

14   didn't get any real clarification on the reconciliation.  We

15   tried, you know, really no real information flowed back and

16   forth.  Now we are in possession of the real information.  It

17   was not easy for us to get, and we'd like to proceed with

18   that process and hope that by that point in time, you know,

19   there's no more delays.  We're a little bit confused as to

20   the preservation of people's rights to continue to pursue

21   their remedies, file complaints, et cetera, et cetera, and

22   how this process is really going to slow that down or get

23   that under control.  My understanding is that no party can

24   have access to money as a result of a judgment or something

25   to that effect, but parties can continue to pursue

1   litigation; is that correct?  I don't know.

2          MR. LOGAN: I'm sorry, I wasn't listening.

3          MS. SOMERS: I'm asking if parties will be able - if

4   they're going to be able to continue to pursue litigation on

5   what have you accomplished during this 30-day period other

6   than people cannot get a judgment and access, you know, to

7   debtors' funds to satisfy it.  I'm not exactly sure.  You

8   said that people could continue to file adequate protection

9   motions and to file other, you know, lawsuits or actions

10  against the debtor in an effort to protect their rights.

11  Those were not stayed; is that my understanding?  Is it -

12         MR. LOGAN: Your Honor, we are not waiving any

13  rights we have under the Bankruptcy Code.  If people try to

14  bring actions to foreclose on mortgage loans pledged to them

15  if they think that they're within a safe harbor, just like

16  they have from the start of the case and indeed many have, if

17  people want to bring a motion before this Court, we're not

18  preventing them from bringing a motion before this Court or

19  file an adversary proceeding before this Court with full

20  reservation of all of our rights to defend it including the

21  additional argument we would have that we have already

22  provided adequate protection by virtue of this - I hate to

23  use the word "voluntary" again, but a proactive effort where

24  we've given people all the adequate protect that's available,

25  coupled with the additional procedure that we discussed out

1   of the Carrington proceeds.  That's all I meant by that.

2          THE COURT: And I take it that while the form of

3   order has developed since that which has been filed and which

4   I reviewed, it doesn't say that the REPO parties can't do

5   anything; does it?

6          MR. LOGAN: It does not.  The interpleader action

7   might, Your Honor, but that's down the road.

8          THE COURT: Yeah, okay.

9          MS. SOMERS: So, I suppose, Your Honor, in order to,

10  you know, further protect rights, a REPO party could file an

11  adversary proceeding in relation to these trust fund issues.

12         THE COURT: Well, the form of order that I've seen

13  doesn't preclude that, and I'm being told that the order as

14  it's being revised doesn't preclude it either.

15         MS. SOMERS: Okay, Your Honor, and with that, I'll

16  conclude that any protection provided is welcome so long as

17  it's interest bearing, segregated.  We continue to contend

18  that the money is ours regardless of where it went, and that

19  the debtor should not be rewarded for having sent it to the

20  wrong place and spent it.

21         THE COURT: Well, so that I'm clear about the status

22  of your objection, I take it from what you say that you're

23  amenable to having your client's situation covered by the

24  form of order that's being worked on based upon what's been

25  represented today to the Court will be in it.

1          MS. SOMERS: In part because I just found out that

2     all the money's been spent.

3          THE COURT: And as have I, and I guess my thought

4     is, since the horse is out of the barn, it strikes me that

5     given the concerns that you've expressed, what the debtor is

6     offering is, assuming the Carrington sale closes timely, the

7     best that you could expect under the circumstances.

8          MS. SOMERS: Exactly, Your Honor.

9          THE COURT: Okay, thank you.

10          MS. SOMERS: Thank you.

11          MR. JAFFE: Good afternoon, Your Honor.  May it

12     please the Court, Henry Jaffe.  I'm here for Barclays Bank

13     PLC.  Your Honor, this morning we filed a couple of motions

14     *pro hac vice* for my co-counsel in this case.  Both Ken

15     Coleman who is here as a partner at Allen & Overy is admitted

16     in good standing in the bar of New York, and also his

17     colleague Mr. Dan Guyder.  I'd like to move for their

18     admission and ask for your permission to have them appear

19     today on this matter.

20          THE COURT: Very well, welcome.

21          MR. COLEMAN: Thank you, Your Honor.  Ken Coleman of

22     Allen & Overy on behalf of Barclays Bank PLC.  We filed an

23     objection, and I don't intend to rehash what is in our

24     objection.  Your Honor can read it.

25          THE COURT: I did.

1          MR. COLEMAN: Thank you.  There was no information

2     in the motion, as far as we could discern, to demonstrate

3     that this was cash collateral.  Adequate protection goes with

4     cash collateral.  So you need to have cash collateral before

5     the discussion of adequate protection even becomes relevant.

6     What we did hear is that Barclay's money may have been

7     commingled with Morgan Stanley's money and other -

8          THE COURT: Well, what you're hearing is that it was

9     commingled.

10         MR. COLEMAN: Yeah, but -

11         THE COURT: Not that it might have been.

12         MR. COLEMAN: But that my money is commingled with

13    Morgan Stanley's money doesn't make it the debtors' money;

14    okay?  And I'm not sure - I mean, I did hear that the money's

15    been spent, which kind of forces all our backs to the wall on

16    this and leaves us with very little choice, but I'm not sure

17    if I heard the money was spent only pre-petition or if the

18    money was also spent post-petition, which of course raises a

19    very serious issue.

20         THE COURT: I heard post-petition as it was

21    described.

22         MR. COLEMAN: Now, what's extraordinary about that,

23    Your Honor, is that if you look at these facts in the most

24    charitable form from the debtors' perspective, on a best case

25    basis, this was cash collateral, and the Code says you can't

1   use cash collateral unless you get the consent or your get a

2   court order, and we're hearing about this in virtually June

3   for the first time.  So there was an unauthorized use of cash

4   collateral at best.  It could also be outright conversion of

5   other people's property.  I do agree with the notion that

6   under these circumstances and with a full reservation of

7   rights for everybody, including on the unauthorized use of

8   cash collateral, that there needs to be a collective process.

9   It's the only thing that makes sense here, and we're onboard

10  with the notion.  We're not onboard with the details because

11  they haven't been shared with us yet, and we hope to be

12  involved in that process.  But I would like to point out that

13  the case law on this issue is not, as was described to Your

14  Honor.  I mean, the <u>Bevill Bresler</u> case, which is 20 years

15  ago decided in the District Court of New Jersey held that

16  assets subject to repurchase pursuant to what was then the

17  PSA form, which is now the BMA form, which is what everybody

18  uses, that those assets are truly sold, and once the

19  mortgages are truly sold, it goes without saying that the

20  proceeds from those mortgages are also owned by the purchaser

21  of the mortgage.  So the sort of smoking mirrors effect in

22  the motion and in Mr. Logan's presentation today I think is

23  not representative of the state of law.  There's <u>Bevill</u>

24  <u>Bresler</u>, there's the <u>Drysdale</u> case, <u>SEC v. Drysdale</u>, and

25  there's <u>Granite Partners</u>, and those cases hold that assets

1    held subject to repurchase are truly sold.  There's not one

2    case that I'm aware of which held otherwise and the

3    suggestion that Bevill Bresler somehow was different and that

4    it held something different from what the Court in the

5    Southern District of New York held in Granite Partners is

6    just not accurate.  Now, in terms of process, and we hope to,

7    you know, start being involved in that, but one thing that -

8    you know, I know Mr. Power is a careful lawyer and he was

9    very helpful this morning before court explaining a few of

10   these facts to me, but the one thing that does not give me

11   comfort that he asks the parties to take comfort in is that

12   the Committee who wants all of us to be unsecured is watching

13   over the debtor who thinks we're all unsecured.   So this is

14   not a comforting fact, and I think we need to talk about some

15   procedure whereby we can get comfortable as the purported

16   owners of money that the accounting is appropriate, and I

17   will say, I haven't seen it, but my understanding from my

18   client is that pre-petition in the ordinary course data was

19   provided which made it very simple, I think as Ms. Somers

20   understood as well, which made it readily apparent on a loan

21   level basis what money came in and which counter-party it's

22   attributable to.  We haven't seen that, and that's why in our

23   papers we try to guess at what we think should be turned over

24   to us.  We haven't seen the loan level detail, and we assume

25   that the accounting process and the reconciliation process

1    that's ongoing and is going to produce some data will be at

2    the loan level of information.  So, I guess in short, you

3    know, we have no choice but to go along with a collective

4    process.  We'll take a look at the data.  We'll reserve our

5    rights to object to the data and to the inferences drawn from

6    the data.  We'd like to be involved.  I mean everybody seems

7    to be reasonable people involved in this proceeding.  We

8    would hope that we could agree collectively on a sensible

9    cost-effective process, but we think that the form of the

10   order might take some time to agree among all these parties.

11   So, we ask that no order be entered today on this subject

12   until we all have the ability to review it and comment.

13            THE COURT: Sounds to me like you'll have that

14   opportunity.

15            MR. COLEMAN: Thank you, Your Honor.

16            THE COURT: All right.

17            MR. LOOMIS: Good afternoon, Your Honor.  My name is

18   Gaston Loomis, and I'm with the Wilmington office of Reed

19   Smith.  I would like to move for the admission *pro hac vice*

20   of Claudia Springer who's in our Philadelphia office, the

21   managing partner of our Philadelphia office of Reed Smith.

22   We will file papers if we haven't already done so.

23            THE COURT: All right, thank you.  Welcome.

24            MS. SPRINGER: Good afternoon, Your Honor.  Claudia

25   Springer for Indymac Bank.  I represent the mouse that

1    roared, I guess.  The creditor here that - Well, not the

2    creditor but the entity here that has perhaps the smallest

3    claim but somewhat of a unique situation.  We are not a

4    repurchase participant.  We are a loan purchaser.  The debtor

5    never even made the argument in its papers that our funds

6    were property or ever property of this estate or that they

7    constituted cash collateral, and that's because they did not.

8    The debtor, contrary to the assertions by Mr. Logan

9    customarily, after loans were purchased outright, as my

10   client did, sent the payments that were made by the

11   individual borrowers directly to Indymac Bank in the form

12   that they were received.  The funds were never to be

13   deposited at all.  They were to be turned over.  Why?

14   Because they didn't - the debtor had absolutely no interest

15   in those funds, was never supposed to take possession of

16   them, was never supposed to deposit them in any of their

17   accounts.  What occurred here, I believe, was a conversion of

18   our funds and while we applaud the debtors' efforts and the

19   Committee's efforts to try to come to some sort of resolution

20   of this, at least a temporary one to protect interests of

21   various parties as much as they possibly can, we do want to

22   draw that distinction and certainly may seek to be treated

23   differently than other parties because we view our situation

24   differently.  Having said that, we were a little bit

25   surprised when we came to court today because I have had

1    conversation with Mr. Logan prior to today.  One of the

2    reasons that we did not immediately file a complaint is

3    because we have been trying to work with the debtor to try to

4    do something to resolve this situation.  I might add that we

5    believe that some of the funds that are in question as far as

6    Indymac is concerned, came in post-petition, not pre-

7    petition, and I've already talked to Mr. Logan about setting

8    up a procedure to trace those funds, because we believe that

9    those funds should automatically be turned over to us if in

10   fact they were received by the debtor post-petition.

11   However, we do want to certainly participate in the process

12   of reviewing the form of order.  We want to reserve all of

13   our rights.  We agree with the other parties that to the

14   extent that payments are not made when they should have been

15   made that interest will accrue at the contract rate, and we

16   ask to be included now in the process of reviewing any form

17   of order and passing on any form of order that is presented

18   to Your Honor in connection with this motion.

19           THE COURT: Thank you.

20           MR. CHESELY: Your Honor, Richard Chesely, Paul

21   Hastings on behalf of UBS.  I guess it's somewhat ironic that

22   we're going last because we're certainly the subject of I

23   actually think what transpired with respect to this motion.

24   If I could, Your Honor, I want to seek a little

25   clarification, then just make two quick observations.  First

1    of all, we filed a limited statement really as it relates to

2    UBS because we do have a hearing set.  Yes, we were first in

3    line, and, Your Honor, we're not going to apologize for

4    exercising our rights.  In fact, with what we have heard here

5    today, it was appropriate, it was prudent to do it.  It has

6    put UBS in, I would say, a unique position vis-a-vis some of

7    the other parties today.  There is nothing in the form of

8    order that continues or stays our hearing that is set for

9    June 15th.  We'd like to get some clarification that in fact

10   that is correct because obviously we are pursuing down that

11   path with a number of issues with the debtors and with the

12   Committee's involvement and obviously before we go down that,

13   we'd like that clarification.

14          MR. SUSSBERG: Quick statement, Your Honor.  I

15   actually want to agree with Mr. Logan if what he said is post

16   everyone else.  Josh Sussberg from Kirkland & Ellis on behalf

17   of Citigroup.  We had filed a limited objection just to make

18   it clear that the replacement lien that's being granted is

19   subordinate to Citigroup's lien and the advances, and I

20   believe the form of order will reflect that.  Thank you, Your

21   Honor.

22          THE COURT: All right.

23          MR. CHESELY: Yeah, if you can clarify that.  I

24   didn't hear that, I heard a little bit of that, but I wanted

25   to make sure that we understand where we stand with respect

1    to the hearing on the 15th.

2             MR. LOGAN: Your Honor, there's nothing in this

3    order that says that - effects one way or another of their

4    hearing date.

5             MR. CHESELY: Thank you.

6             THE COURT: Without, I suppose, prejudice to the

7    debtors' position that it ought to, but that's for June 15th.

8             MR. CHESELY: That's for June 15th.

9             THE COURT: Understood.

10            MR. CHESELY: If I could, Your Honor, there is one

11   point I do need to clarify based upon what we heard today and

12   that relates to the issue of the reconciliation, and I think

13   it's important certainly for UBS and it may in fact be for

14   the other participants here that this is not solely about the

15   money.  Yes, that's a significant piece but at least for UBS

16   we have a sense of what that is.  This is about the

17   information as well, and what's important about that, Your

18   Honor, is the history underlying 559 of the Code made clear

19   that Congress intended for counter-parties to repurchase

20   agreements such as UBS to be able to liquidate their property

21   without the delay caused by the insolvency of that other

22   party.  Yet that delay is what is really the driving force

23   behind this, Your Honor, and with respect to the

24   reconciliations, we've heard today now they're look at the

25   end of June to provide this information.  UBS was here in

1    April.  We're supposed to get the information in April, again

2    in May, and now we're hearing that this information - I don't

3    know whether this relates to UBS or not, may not be available

4    until July.  This is information that you've heard from party

5    after party that is routinely provided on an hour basis, not

6    a week basis, and the problem, Your Honor, is that without

7    this basic information, at least UBS is not in a position to

8    liquidate its loans, and without that, Your Honor, there is a

9    status quo.  Unfortunately it is not the status quo that

10   Congress contemplated with respect to § 559, and that's why

11   it's imperative at least for us to proceed before you on the

12   15th.  Thank you.

13          THE COURT: Before we go back to the debtor, let me

14   just ask if anyone else cares to be heard.

15          MS. SCHONHOLTZ (TELEPHONIC): Your Honor, Margot

16   Schonholtz for Bank of America.  I'm with Kaye Scholer.  Just

17   briefly.  Contrary to what we expected today, Mr. Logan

18   argued the merits at length and that was not to be the

19   purpose of today's hearing.  We're also hearing for the first

20   time, as are others, that the money has all been spent.  I

21   don't want to burden today's record with a response, but we

22   can't let it go unanswered either, and we need to reserve all

23   of our rights pursuant to our discussion with the debtors'

24   counsel and Committee counsel and as set forth in the

25   proposed order that we saw last night.  We understand

1    listening today that there will be serious revisions to the

2    order, and our support of this motion is based on our

3    agreement to the revised order.

4              THE COURT: Thank you.

5              MS. SCHONHOLTZ (TELEPHONIC): Thank you.

6              MR. GALLO: Good afternoon, Your Honor.  Andrew

7    Gallo from Bingham McCutchen for DB Structured Products.

8    I'll just echo the same comments that we just heard from the

9    counsel for Bank of America.  We do support the adequate

10   protection motion.  We have not seen the order that's been

11   discussed today that includes the compromised negotiated with

12   Morgan Stanley so we would reserve all of our rights with

13   respect to the arguments made on the record today and to

14   review that particular order.  Thank you, Your Honor.

15             MR. LOGAN: Your Honor, let me address first off

16   again some things the motion and the order do not try to do.

17   Post-petition collections, as counsel for Indymac indicated,

18   to the extent monies have come in post-petition, the debtor

19   certainly has intended and believes has turned over those

20   proceeds to anybody who either is a REPO participant or a

21   loan purchaser.  Indeed, I've been told, that to the extent

22   hard checks have been sent and have been FedEx-ed off the

23   next day.  If there's a problem with that, let us know.  We

24   are not seeking to do anything with respect to post-petition

25   collections.  The second thing we're not trying to do is

1   affect blocked accounts.  To the extent a REPO participant

2   had a blocked account and monies were deposited in that

3   blocked account, by and large, they have taken the money out

4   of the blocked accounts, and sobeit.  What we're talking

5   about is a situation - and I want to illustrate some of the

6   quandary we face by using the Natixis or Ixis as they're

7   commonly called as an example.  Natixis filed with its

8   pleading a copy of its master repurchase agreement, and

9   Section (5)(a) of that agreement provides that the buyer

10  agrees that the debtor can continue to collect monies and

11  deposit them pursuant to its normal procedures until there's

12  an event of default.  I'm paraphrasing here a bit, but that's

13  what it says.  That is fairly commonly used in agreements,

14  and that's why the reconciliation process is one that takes

15  more than just an hour to, and UBS illustrates it.  Mr.

16  Chesley complains mightily that the debtors did not provide a

17  reconciliation to UBS.  The debtors provided a reconciliation

18  to UBS.  UBS didn't agree with it, but that's a different

19  issue, and the principal issue with UBS was what is the

20  status of monies that came in during the first part of March

21  when people make their normal monthly P&I payments, principal

22  and interest payments, and it went not into any blocked

23  account as was past practice.  It went into the general

24  collection account.  UBS thought that the reconciliation the

25  debtors provided was inappropriate because it did not show

1    that those monies went into a blocked account or should have

2    gone into a blocked account.  Debtors don't think that they

3    should have.  We are not opposed to having everyone reserve

4    their rights with respect to issues of that sort or providing

5    that sort of data, but that is the kind of information that

6    no one just doesn't push a button and suddenly the data

7    appear.  I wish that it was a simpler process.  Quite frankly

8    it's taken me a long time to understand, and I probably don't

9    fully understand the complexities.  Like I said at the outset

10   and Barclays is going to illustrate this point, we didn't

11   think that this was a serious issue when the case was filed.

12   Perfect hindsight we would have proceeded far differently.

13   And Barclays really does illustrate that.  Barclays is quite

14   a bit different than the other REPO participants because pre-

15   petition, on March 16th, there's an agreement reached with

16   Barclay's that they reference in their papers as a walkaway

17   agreement, is what it's commonly called, where Barclays

18   agreed that it would take its loans, go off and do with them

19   as it saw fit, and waive any deficiency claims against the

20   debtors.  The *quid pro quo* was that the debtors and Barclays

21   would do an accounting so the collections received of

22   interest on those loans from March 1 to March 16 would be for

23   the debtors' benefit compared to the quote, "price

24   differential", which is the amount that - the proxy for

25   interest under the warehouse loan facility, and whoever owed

1  the other money and it wasn't clear at the time who would

2  whom what and indeed the debtors thought the chances were

3  quite high that Barclays would owe the debtors money, would

4  pay the other.  Barclays now believes that there's, I think,

5  approximately a million six that was owed to them based on

6  that reconciliation, but it's not a current repurchase

7  facility.  It may be a general unsecured claim, given the

8  nature of the walkaway agreement, but again, it illustrates

9  the fact that these are not simple matters.  Getting down to

10  the final point though, Your Honor, we are where we are.  We

11  are offering to give the warehouse - the master repurchase

12  participants every last shred of adequate protection we can

13  give them, the same thing for the loan purchasers.

14          THE COURT: Well, let me ask you about that.

15          MR. LOGAN: Sure.

16          THE COURT: One of the objectors argued that the

17  best position that the estate would have or that the debtors

18  would have would be that these were secured claims rather

19  than someone else's property, and if that were the case, the

20  argument went just now, that you were using cash collateral

21  without either consent or an order of this Court.  Can you

22  respond?

23          MR. LOGAN: Your Honor, the response is, is several

24  fold.  First off, there are serious issues as to whether or

25  not it's cash collateral including the springing lien issue I

1   mentioned.  But, Your Honor, like I said, if we had known

2   that there were claims in excess - if we had known that there

3   were material claims at the outset of the case, we would have

4   proceeded far differently.

5          THE COURT: Well, let me ask you another question.

6   Why shouldn't I make this an inquiry for the examiner?

7          MR. LOGAN: Well, Your Honor, I guess because we

8   will provide to each of the parties that are subject to the

9   motion all the data - We certainly are willing to share that

10  with them.  They are going to have their views on the data.

11  They also are going to have their ability to bring actions if

12  they deem it appropriate.  The parties will have the ability

13  to question - I guess the bottom line, Your Honor, is that we

14  are willing to put into an escrow account the full amount of

15  cash that was there on the petition date.  We're dealing with

16  the situation once it developed.  If the examiner - I don't

17  know what the examiner would add to it, quite frankly, Your

18  Honor.  We have parties whose interests are at stake who are

19  fighting over dollars.  It's an issue over dollars, and I

20  don't know what the examiner would add.

21         THE COURT: Well, given some of the arguments that

22  have been made today, while I would acknowledge that the

23  center of the dispute for the parties may be the dollars, I'm

24  kind of scratching my head from the Court's standpoint in

25  terms of the argument about the unauthorized use of cash

1    collateral.  It troubles me for reasons which I'm sure are

2    obvious to you.  Okay, anyone else care to be heard in

3    connection with this motion?

4            MR. POWER: Your Honor, just one quick point.  I

5    won't belabor the issue.  In connection with the examiner, I

6    will tell you they haven't talked to a number of the parties

7    involved in this.  Everybody wants an expedited and

8    streamlined procedure to try to resolve this.  As soon as the

9    Committee identified this issue, we jumped right on it and

10   today we're here before Your Honor primarily as a result of

11   those efforts.  A lot of the reconciliations have been done

12   and I want to assure the Court and some of the parties that

13   at least the Committee's financial advisors are there and

14   they've been working with AlixPartners to make sure it's

15   done.  The issue is that there's a cutoff date, a shift

16   notice in the middle of March which makes it difficult to

17   reconcile all of the numbers.  I will also tell you basically

18   what I've heard is the debtor believes the numbers are, you

19   know, X, and a lot of these other parties give a Y number.

20   So there's obviously a certain reconciliation process that's

21   going on to resolve those two.  To us and the Committee, the

22   first issue that we'll have to resolve by this Court is the

23   issue of, is the maximum amount of claims the amount of cash

24   that existed in the account as of the petition date, because

25   if it is, then we have a fundamental issue as to how that

1   money is divided among any valid claimants.  If it's not and

2   parties are entitled to a certain more, then it's kind of an

3   individual process that will be determined by individual

4   litigations.  So the way we envision this going forward, is

5   that threshold issue would have to be resolved and we would

6   work out a procedure to do that.  So that's where we're going

7   to end up.  But I want to assure the Court that the Committee

8   is well aware of the issues and is making sure that it is

9   trying to oversee and fulfill its obligations to this Court

10  in making sure this process is done correctly and that

11  nobody's injured.

12          THE COURT: Well, I don't mean in any way to

13  disparage the Committee's efforts in this connection, but

14  while various parties have various duties to the Court, at

15  center you're working for your clients.  The examiner works

16  for me.  So, it offers a little bit of a different

17  perspective, maybe, and that's why I'll tell you now I'm

18  going to consider it.

19          MR. POWER: We understand, Your Honor.  Our view is

20  that since we hope to have the reconciliation done within a

21  few weeks, we'll know very well whether we have significant

22  issues regarding the accounting and what's going on, and that

23  that issue may be better just simply deferred because - to

24  not have an overlap on top of it because I think the

25  Committee wants to get the facts straight, have everyone

1   agree to the facts and basically decide what the legal issues

2   are.

3           THE COURT: All right, thank you.

4           MR. POWER: Thank you.

5           MS. SCHONHOLTZ (TELEPHONIC): Your Honor, Margot

6   Schonholtz for Bank of America, briefly.  I would never

7   quibble with Your Honor's statement that an examiner might or

8   might not be appropriate.  I would only request that whatever

9   Your Honor decides not delay the process for reconciling and

10  distributing funds to parties like BofA and others who have

11  been disadvantaged in part by this process already and are

12  trying hard to get their money in a way that's not litigious

13  and not costing the estate money.

14          THE COURT: All right, thank you.

15          MS. SOMERS: Your Honor, only because we recite as

16  an example, I'd like to clarify one point.  The Natixis

17  agreement regardless of the provision that was read into the

18  record by the debtors' counsel, said that at all times any

19  monies received are property of Natixis, number one.  Number

20  two, in terms of more specifics, we sent a notice of default

21  out in early March.  At that time we sent a notice that said

22  all monies must go into the blocked account.  That notice was

23  violated.  The majority of monies we're seeking to collect

24  were received after that point in time.  The money was not

25  put in the blocked account, and as far as I could tell, it

1   was spent post-petition.  So the facts here are not very good

2   for the debtor.  I'd like to clarify that.  I think under the

3   circumstances, the money should have been put in the blocked

4   account, and we shouldn't be, you know, faced with the

5   dilemma we're faced with today.  With respect to the

6   examiner, I would only say that we're seeking clarity

7   quickly, and we want it in the most cost-effective way and

8   defer to Your Honor as to whether an examiner is an

9   appropriate way or not to do that.

10          THE COURT: Understood.  All right.  Mr. Logan, I

11  take it that what the debtor anticipates doing now is

12  continuing and concluding its discussions with the various

13  parties who are interested in this matter, resulting

14  hopefully in a form of order to which everyone can agree, and

15  that that will be submitted to the Court under certification

16  or do you anticipate further hearing.  Tell me how the debtor

17  mechanically wishes to address this.

18          MR. LOGAN: Well, Your Honor, in the first instance,

19  we would certainly hope it will be a fully consensual order,

20  and we'll endeavor to do that.  If that doesn't prove

21  possible, I guess we'll have to have a further hearing.

22          THE COURT: How long would you anticipate the

23  discussion process will take?

24          MR. LOGAN: I hope not very long.  I may be

25  inappropriately optimistic, but I would hope that we would be

1    able to resolve that by the end of this week or early next

2    week.

3              THE COURT: Well, shall we put this over to the 15th

4    for a status anyway?

5              MR. LOGAN: That's fine.

6              THE COURT: In case something good doesn't happen in

7    the interim?

8              MR. LOGAN: That's fine, Your Honor.

9              THE COURT: Okay.  Shall we move on to the next

10   matter?  Have we in essence addressed the UBS adversary or is

11   there more to be told?

12             MR. CHESELY: Your Honor, Richard Chesely.  There's

13   nothing else for today.  The status conference has been

14   continued.

15             THE COURT: All right.  Okay, let's move on to

16   what's now item 29 on the agenda.  After the hearing on the

17   U.S. Trustee's motion, I received a letter from Mr. McMahon

18   dated May 25th and a response from Mr. Merchant with respect

19   to whether a specific suggestion made by the U.S. Trustee

20   should be added to any form of order which would be signed.

21   So, I wanted to talk with the parties about that today before

22   actually entering an order, and I'll give the first

23   opportunity to the U.S. Trustee to be heard.

24             MR. McMAHON: Your Honor, good afternoon.  Joseph

25   McMahon for the United States Trustee.  After the May 24th

1    announcement by the debtors, I think it's no surprise the

2    reason why our office wrote to Your Honor regarding the

3    subject.  Basically, we have a simple point.  An examination

4    has been authorized.  I think that the concern of the Court,

5    the United States Trustee, and the parties in interest is to

6    insure that the examination be complete as to the concerns

7    and issues that have been raised by the debtors' financial

8    statements and accounting matters.  And with respect to that,

9    Your Honor, there are, I guess, two concerns, one dealing

10   with time frame, the other dealing with scope or substance

11   that we want to insure that the proposed language dealing

12   with scope address.  First, with respect to time frame,

13   certainly the announcement last week by the debtors raises

14   the question of when did this all begin.  We have now heard

15   that the apparent conclusion of the debtors is that the 2005

16   financial statements have been implicated by some of the same

17   issues that led to the need to restate the 2006 financials,

18   and certainly we want the examiner to be able to address

19   these issues, the genesis of them, whether they take us back

20   into - and I'm just hypothetically stating, Your Honor, the

21   third or fourth quarter of 2004.  If the examiner needs to go

22   back that far, if the examiner needs to comment on the

23   integrity of the financials for periods outside of the ones

24   that the debtors have identified to date, then the examiner

25   should have that latitude.  The second, Your Honor, goes to

1   the issue of substance, and certainly the debtors'

2   announcements specifically with respect to the 2006

3   restatement, Your Honor, identified the key issues that led

4   to their belief that there was a need to restate the

5   financials.  We want the - As the proposed language that we

6   submitted to Your Honor in the letter suggests, we want the

7   examiner to have the latitude to comment on any errors, any

8   irregularities in the accounting of the financial statement,

9   and I think it's important to note, Your Honor, now that that

10  latitude should - is necessary because it seems to our office

11  readily apparent that the scope of the period in question is

12  expanding, and we don't know necessarily whether there are

13  new and distinct issues that 2005 present, that, you know,

14  carried over into 2006 or maybe there are similar issues.

15  The bottom line is that the examiner should have the ability

16  both from the standpoint of time frame and from the

17  standpoint of substance to do the work that the examiner

18  needs to do.  We believe that the proposed language that we

19  submitted, Your Honor, which I think simply adjusts the

20  language such that to allow the examiner to do the job that

21  the examiner's being charged with doing is appropriate.  We

22  just added the words, "including but not limited to such

23  irregularities, errors, or misstatements".  We believe that

24  that language will take care of the substance and time frame

25  issues that I identified on the record today, and the

1   inclusion of Romanet II, the reference to the 2005

2   financials, certainly addresses the announcement of last

3   week, and specifically, Your Honor, a third point that was

4   raised in the context of this hearing, our office would fully

5   support the inclusion of issues relating to the alleged

6   dissipation of funds that have been addressed here on the

7   record, and our proposed language gave the - at the outset

8   and the scope that we argued for at the hearing on May 21st,

9   gave the examiner full authority under 1106(a)(3) and (a)(4)

10  to do what the examiner needed to do, and without going back

11  and trying to, I guess, re-craft language that would

12  encompass, you know, concerns that the Court raised here

13  today, perhaps it would be appropriate that that language be

14  left as is and the examiner be given direction as to the

15  Court's concerns with respect to the issues that were raised

16  in connection with the adequate protection motion argued

17  before Your Honor here today.  So, I hope that the Court has

18  a clear understanding as to the reason why we wrote last

19  week.  We fully believe that the - an expansion of the

20  language from what we argued on May 21st is appropriate, and,

21  Your Honor, we would fully support the suggestion that the

22  scope of the examination encompass the matters that Your

23  Honor raised today and would suggest that in response to the

24  concerns of the parties or whether, you know, the practical

25  issue of addressing the bankruptcy issues going forward can

1   go hand in hand with the examination.  We believe they can.

2   In other words, the examiner can look into the issue of why

3   and how while the parties work towards a resolution that

4   addresses their economic issues.  So, unless the Court has

5   specific questions for me, that would conclude our

6   presentation.

7           THE COURT: Thank you.

8           MR. LOGAN: Your Honor, on the scope of the

9   examiner, the debtors also sent a letter to the Court.  We

10  don't have any problem, any concern about including within

11  the examiner's scope or issues related to the 2005

12  financials, and we think that that was already incumbent or

13  inherent in the prior language.  If there's any issue about

14  that, we don't have any concern about making that express.

15  The debtors, as they were investigating the implications of

16  the 2006 restatement concluded that the same issues might

17  affect 2005 and we think, therefore, it's inherent to what

18  the examiner was going to do, but we have no problems with

19  making it express.  About the only other thing I would say,

20  this kind of goes back - it does go back to the other issue

21  we just left.  I would urge the Court to hold in abeyance any

22  expansion of the examiner's scope to look at the issues

23  involving the repurchase participants until we finish that

24  process.  I think you heard them say that slowing down the

25  process would be inappropriate.  If the Court concludes later

1   that it's appropriate to expand the examiner's scope of work

2   *sua sponte* the Court's certainly free to do that or their

3   request.  But on the issue that the Court had on the agenda

4   today, I think it's a word-smithing issue only.  We don't

5   have a conceptual problem.

6           THE COURT: Well, here's my thought about that and

7   it is, I like words to be complete within their four corners,

8   and I think the U.S. Trustee's proposed language does that.

9   The debtors suggest that the order refer to announced errors.

10  Well, they're not, you know, that could be subject to

11  interpretation.  So I'm inclined to go, for that reason, with

12  the U.S. Trustee's language, but before I did I wanted to

13  give the debtor a chance to talk to me.

14          MR. POWER: Your Honor, Mark Power from Hahn &

15  Hesson, Committee counsel.  The only issue that the Committee

16  had with the language, we understood the order to already

17  cover, quite frankly, all the facts that gave rise to the

18  restatements, and that would go to the prior periods.  The

19  problem with the U.S. Trustee's language is that it's rather

20  broad and could be read to basically require an audit, a re-

21  auditing of both the year's financials completely because it

22  basically says that the examiner is charged with basically

23  examining everything in connection with all the financials of

24  '05 and '06, and we didn't understand that basically the

25  Court's decision or the parties' understanding to be that.

1    It really related to the specific issues as to why they're

2    being restated because the expense and cost and delay of

3    basically doing an whole new audit for '05 and '06 would be

4    tremendous and basically of little value to the estate or the

5    Court or even the government to the extent it has an

6    interest.  So our view was that we have no problem with

7    including the language regarding looking at 2005, but we

8    would rather the language not be so broad as to basically be

9    read to basically require a new audit and basically

10   investigate everything that's ever done in connection with

11   two years of financials, which could be interpreted as the

12   way the U.S. Trustee's language is as drafted.

13            THE COURT: All right, thank you.

14            MR. LOGAN: Your Honor, just one brief footnote,

15   also.  In looking at the language the U.S. Trustee proposed

16   and it relates to a slightly different issue that there was

17   colloquy on at the last hearing, and that is the examiner,

18   under their language, would also identify and evaluate claims

19   the creditors might have, and if I remember correctly, there

20   was a lot of dialogue about the appropriateness or

21   inappropriateness of that and certainly keeping under seal

22   anything because you don't want to have a public document

23   that says either a claim is weak or a claim is strong or

24   weighs the pros and cons.  So, just as a footnote, just - we

25   would urge the Court to be cautious.  I think the Court

1   indicated the Court was going to craft its own order by

2   taking language from both, but on that particular point, I

3   think it's important for all of our interests to make sure we

4   don't have a public statement of the strength or weaknesses

5   or causes of action against third parties that might

6   adversely affect those causes of action.

7          THE COURT: Well, I guess we live in a world where

8   anything can happen, but it would be shocking to me if an

9   examiner who thought there were claims, would evaluate them

10  in a public filing.  I find that kind of even beyond remote

11  in terms of a possibility, but I understand the concern.  Mr.

12  McMahon?

13         MR. McMAHON: Your Honor, a couple of things briefly

14  in response to Committee counsel's concern.  Consistent with

15  the idea that the examination will have some focus and that

16  there are costs-related concerns, I don't think that anyone

17  is contemplating the examiner, I guess, redoing the 2005 and

18  2006 financials himself or herself.

19         THE COURT: And I hadn't contemplated that either.

20         MR. McMAHON: So, with regard to the issues raised

21  by debtors' counsel and in response, I would just note that I

22  think we made our point about that pretty clear on May 21st,

23  meaning that, we do believe that the examiner will discharge

24  his duties with respect to evaluating claims and causes of

25  action carefully, and that I do believe that the record is

1   clear that our office even indicated that some type of

2   procedure, you know, in terms of addressing matters with the

3   Committee and the debtors we expect the examiner is going to

4   be conversing with those parties.

5         THE COURT: Let me - There is one other thing that I

6   did want to discuss with the parties and that is the, I

7   guess, I'll call it protocol that was anticipated in the form

8   of order that was submitted by the debtor and the Committee,

9   assuming I enter an order by the end of the week, how long

10  will it take the U.S. Trustee to appoint an examiner?

11        MR. McMAHON: Your Honor, could I just have a moment

12  to consult?

13        THE COURT: Yes.

14        MR. McMAHON: Your Honor, we believe that we'd be

15  able to submit the application within a couple of days.

16        THE COURT: All right, because I tend to agree with

17  the U.S. Trustee that the procedure for outlining what the

18  examiner intended to do was a little bit too controlling, but

19  I thought it might not be a bad idea to require that the

20  parties after appointment meet and confer and discuss those

21  issues, and I just - the question I have for the parties is,

22  would it be helpful for after such a meeting for the parties

23  to come back on a status basis and just tell me what the

24  result of that meeting was and to give the parties whatever

25  aid they might need to have the process move forward as

1   efficiently as possible, and I don't mean to micro manage it,

2   and I don't mean to interfere with what the order will say

3   the examiner should do, but I wanted to ask you whether you

4   thought that would be helpful?

5         MR. LOGAN: Your Honor, absolutely.  I think if the

6   examiner and the Committee and the other parties, the debtors

7   can reach resolution then that's super and pieces broken out,

8   and if not, we can give a status report to the Court, but I

9   think that makes eminent good sense.

10        MR. POWER: Your Honor, the Committee agrees with

11  that.  We think it might be helpful.  We obviously - In

12  connection with the 2004 the Committee's doing, we envision

13  sitting down with the examiner and going through and coming

14  up with some kind of a reasonable arrangement.  So I think

15  having a status report and the U.S. Trustee would want to be

16  involved that, I know the debtor is, we think makes perfect

17  sense.

18        THE COURT: Mr. McMahon?

19        MR. McMAHON: Your Honor, we have no objection to

20  the examiner coming in for, I guess, an initial status

21  conference before the Court.

22        THE COURT: Would that be the - would the June 15th

23  hearing be too soon?

24        MR. McMAHON: This is under the assumption that the

25  order would be entered by this Friday?

1            THE COURT: Yes.

2            MR. McMAHON: I think that would work for our

3    office, Your Honor.

4            THE COURT: Okay.  I'm seeing a nod of assent from

5    Committee counsel and the debtor's okay with it as well.  All

6    right, I'll build that into the order.  Okay.  Does that

7    conclude our agenda items for the day?  All right, I have a

8    couple of things - if it does, I have a couple of things that

9    I'd like to - Court housekeeping matters.  I had asked for

10   recommendations from the parties for a fee auditor, and I

11   received two, and for reasons which should draw no negative

12   inference from anybody, I've decided not to accept either of

13   the recommendations and ask that I receive further

14   recommendations, particularly from the U.S. Trustee, but I'll

15   ask that by Friday of this week, June 1st, if the parties will

16   submit, and you can submit them by e-mail if you prefer to my

17   chambers' e-mail address, the names of at least a couple

18   more, and I emphasize nobody should draw a negative inference

19   from my declining to take the suggestions that have been

20   submitted.  Okay.  The other issue I wanted to cover is, I

21   understand there's been a request for an additional hearing

22   date during the week of June 25th.  We have a hearing set for

23   June 27th already, so, my question is, why isn't that good

24   enough?  Maybe there's a good reason, but this would be an

25   opportunity for you to tell me why in person.

1          MR. LOGAN: Your Honor, since I'm not aware of the

2    request, I'm at a loss.  It could have come from my office,

3    but I'm not aware of it.

4          THE COURT: Nancy, who did we get the call from?

5    Mr. Ramos.

6          MR. LOGAN: Your Honor, I know that there are some

7    sale motions that are coming up and -

8          THE COURT: Scheduled for June 21st at 2, and I

9    understood this further request was as a follow-up to

10   something in connection -

11         MR. LOGAN: We have a status call almost daily, and

12   I heard that June 21st related to the sale motion.  I'm at a

13   loss, Your Honor, as to say I really don't know.  I'd be

14   guessing.

15         (The remainder of this page is intentionally left

16   blank.)

17

18

19

20

21

22

23

24

25

1

2          THE COURT: All right, well, don't guess.  Just have

3    someone get back to Ms. Hunt, please.  If it's a real

4    problem, I'll consider the request, but my preference would

5    be to use the 27th, if you can.  All right, anything further

6    for today?  Thank you, that concludes this hearing.  Court is

7    adjourned.

8          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

9          (Whereupon at 4:51 p.m., the hearing in this matter

10   was concluded for this date.)

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M.  Ryan                        June 4, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221