# EXHIBIT A

06/06/2007 WED 13:44  FAX                                    ☒004/048

# OFFICE LEASE AGREEMENT

## BETWEEN

### VILLAGE AT CAMP BOWIE I, L.P.

## AS LANDLORD

## AND

### HOME123 CORPORATION

## AS TENANT

## DATED

## FEBRUARY ⁄ , 2007

# TABLE OF CONTENTS

1. Definitions and Basic Provisions ................................................................. 4

2. Lease Grant ................................................................................................. 4

3. Tender of Possession .................................................................................. 4

4. Rent ............................................................................................................. 4

5. Delinquent Payment; Handling Charges .................................................... 5

6. Services; Utilities; Common Areas ............................................................ 5
   (a)   Services ............................................................................................... 5
   (b)   Excess Utility Use .............................................................................. 5
   (c)   Common Areas .................................................................................. 6

7. Alterations; Repairs; Maintenance; Signs .................................................. 7
   (a)   Alterations .......................................................................................... 7
   (b)   Repairs; Maintenance ........................................................................ 8
   (c)   Mechanic's Liens ............................................................................... 9
   (d)   Signs ................................................................................................. 10

8. Use ............................................................................................................ 10

9. Assignment and Subletting ....................................................................... 11
   (a)   Transfers ........................................................................................... 11
   (b)   Consent Standards ............................................................................ 11
   (c)   Request for Consent ......................................................................... 11
   (d)   Conditions to Consent ...................................................................... 11
   (e)   Attornment by Subtenants ................................................................ 11
   (f)   Cancellation ...................................................................................... 12
   (g)   Additional Compensation ................................................................ 12

10. Insurance; Waivers; Subrogation; Indemnity ......................................... 12
   (a)   Tenant's Insurance ............................................................................ 12
   (b)   Landlord's Insurance ........................................................................ 13
   (c)   No Subrogation ................................................................................. 13
   (d)   Indemnity .......................................................................................... 14

11. Subordination; Attornment; Notice to Landlord's Mortgagee ................ 14
   (a)   Subordination ................................................................................... 14
   (b)   Attornment ........................................................................................ 14
   (c)   Notice to Landlord's Mortgagee ...................................................... 14
   (d)   Landlord's Mortgagee's Protection Provisions ................................ 15

12. Rules and Regulations ............................................................................. 15

13. Condemnation .......................................................................................... 15
   (a)   Total Taking ...................................................................................... 15
   (b)   Partial Taking - Tenant's Rights ...................................................... 15
   (c)   Partial Taking - Landlord's Rights ................................................... 15
   (d)   Award ................................................................................................ 16

14. Fire or Other Casualty ............................................................................. 16
   (a)   Repair Estimate ................................................................................ 16
   (b)   Tenant's Rights ................................................................................. 16
   (c)   Landlord's Rights ............................................................................. 16
   (d)   Repair Obligation ............................................................................. 16
   (e)   Abatement of Rent ............................................................................ 16

15. Personal Property Taxes .......................................................................... 16

16. Events of Default ..................................................................................... 17

i

|     |     |     |
|-----|-----|-----|
| (a) | Payment Default | 17 |
| (b) | Estoppel/Financial Statement/Commencement Date Letter | 17 |
| (c) | Insurance | 17 |
| (d) | Mechanic's Liens | 17 |
| (e) | Other Defaults | 17 |
| (f) | Insolvency | 17 |

17. Remedies ................................................................................................. 17
    (a)  Termination of Lease .......................................................... 17
    (b)  Termination of Possession ................................................... 17
    (c)  Perform Acts on Behalf of Tenant ...................................... 18
    (d)  Alteration of Locks ............................................................. 18

18. Payment by Tenant; Non-Waiver; Cumulative Remedies ............................. 18
    (a)  Payment by Tenant ............................................................ 18
    (b)  No Waiver ........................................................................... 18
    (c)  Cumulative Remedies ......................................................... 19

19. Surrender of Premises ................................................................................ 19

20. Holding Over .............................................................................................. 19

21. Certain Rights Reserved by Landlord ......................................................... 19
    (a)  Building Operations ............................................................ 19
    (b)  Security ................................................................................ 19
    (c)  Repairs and Maintenance ................................................... 20
    (d)  Prospective Purchasers and Lenders .................................. 20
    (e)  Prospective Tenants ........................................................... 20

22. Substitution Space ..................................................................................... 20

23. Hazardous Materials .................................................................................. 20

24. Miscellaneous ............................................................................................ 22
    (a)  Landlord Transfer .............................................................. 22
    (b)  Landlord's Liability ............................................................ 22
    (c)  Force Majeure .................................................................... 22
    (d)  Brokerage ........................................................................... 22
    (e)  Estoppel Certificates .......................................................... 22
    (f)  Notices ............................................................................... 22
    (g)  Separability ........................................................................ 23
    (h)  Amendments; Binding Effect .............................................. 23
    (i)  Quiet Enjoyment ................................................................ 23
    (j)  No Merger .......................................................................... 23
    (k)  No Offer ............................................................................. 23
    (l)  Entire Agreement ............................................................... 23
    (m)  Waiver of Jury Trial ........................................................... 23
    (n)  Governing Law ................................................................... 23
    (o)  Recording ........................................................................... 23
    (p)  Joint and Several Liability .................................................. 24
    (q)  Financial Reports ............................................................... 24
    (r)  Landlord's Fees .................................................................. 24
    (s)  Telecommunications ........................................................... 24
    (t)  Confidentiality .................................................................... 24
    (u)  Authority ............................................................................. 24
    (v)  List of Exhibits .................................................................. 24
    (w)  Waiver ................................................................................ 25

25. Other Provisions ........................................................................................ 25

## BASIC LEASE INFORMATION

This Basic Lease Information is attached to and incorporated by reference to an Office Lease Agreement between Landlord and Tenant, as defined below.

| | |
|---|---|
| Lease Date: | February *1*, 2007 |
| Landlord: | Village at Camp Bowie I, L.P., a Texas limited partnership |
| Tenant: | Home123 Corporation |
| Guarantor: | New Century Mortgage Corporation |

Premises:    Suite Nos. 250 and 255, hereinafter to be referred to as Suite 250 (the "**Premises**"). The Premises contains 4,685 Rentable Square Feet and 4,074 Useable Square Feet (as those terms are hereinafter defined), in the building commonly known as 6115 Camp Bowie Boulevard, Fort Worth, Texas (the "**Building**"), and whose street address is 6115 Camp Bowie Boulevard. The Premises are outlined on the plan attached to the Lease as Exhibit A. The land on which the Building is located (the "**Land**") is described on Exhibit B. The term "**Project**" shall collectively refer to the Building, the Land and the driveways, parking facilities, and similar improvements and easements associated with the foregoing or the operation thereof, including without limitation the Common Areas (as defined in Section 6(c)). The term "**Complex**" shall collectively refer to the Building and any other buildings which comprise a multi-building Complex owned by Landlord, if applicable. In the event the rentable area of the Premises is determined to be more or less than 4,685 square feet, all provisions of this Lease relating to the number of rentable square feet in the Premises (including without limitation the calculation of Minimum Guaranteed Rental) shall be automatically adjusted to the revised area as determined in such remeasurement by an independent architect. In the event the area of the office portion of the Building is other than 57,613 square feet, Tenant's proportionate share provided herein shall be recalculated utilizing the remeasured area of the office portion of the Building and the Premises. In addition, at the request of either party, both Landlord and Tenant shall execute an amendment to this Lease reflecting the remeasured area of the Premises and/or the office portion of the Building and the modifications of the other provisions of this Lease, which are based upon the rentable area of the Premises and the office portion of the Building.

Term:    Approximately twenty-five (25) months, commencing on the Commencement Date and ending at 5:00 p.m. local time on the last day of the 25th full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease.

Rentable
Square Feet:    The number of Useable Square Feet multiplied by the load factor of 1.15 ("**Rentable Square Feet**").

Useable
Square Feet:    The square footage of the Premises reserved for the exclusive use of Tenant ("**Useable Square Feet**").

Commencement
Date:    The later to occur of (i) March 1, 2007, or (ii) the date Landlord delivers possession of the Premises to Tenant with the Work substantially completed.

Base Rent:    Base Rent shall be the following amounts for the following periods of time:

| Lease Month | Annual Base Rent Rate Per Rentable Square Foot | Monthly Base Rent |
|---|---|---|
| 1 | 0.00 | 0.00 |
| 2-25 | $16.00 | $6,246.67 |

As used herein, the term "__Lease Month__" shall mean each calendar month during the Term (and if the Commencement Date does not occur on the first (1st) day of a calendar month, the period from the Commencement Date to the first (1st) day of the next calendar month shall be included in the first (1st) Lease Month for purposes of determining the duration of the Term and the monthly Base Rent rate applicable for such partial month).

| | |
|---|---|
| Security Deposit/Prepaid Base Rent: | Security Deposit is Waived; Tenant shall pay one full month of Base Rent upon the full execution of this Lease. |
| Rent: | Base Rent, Additional Rent (including electricity), Taxes and Insurance (each as defined in Exhibit C hereto), and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease. |
| Permitted Use: | General office use for a residential mortgage company and other professional uses not prohibited herein, and for no other purpose whatsoever. |
| Tenant's Proportionate Share: | 8.13%, which is the percentage obtained by dividing (a) the number of Rentable Square Feet in the Premises as stated above by (b) the total rentable square feet in the office portion of the Building at the time a respective charge was incurred, which at the time of execution of this Lease is 57,613 rentable square feet. Upon completion of construction of the Premises, Landlord shall have the right, but shall not be obligated, to cause Landlord's architect to remeasure the rentable area of the Premises and the office portion of the Building. In the event Landlord has the Premises and/or the office portion of the Building remeasured, then Landlord shall notify Tenant in writing of the results of such remeasurement. |
| Initial    Liability Insurance Amount: | $1,000,000 |
| Broker/Agent: | For Tenant – CB Richard Ellis |
| | For Landlord – Jennifer Purselley – NAI Stoneleigh Huff Brous |

| | | |
|---|---|---|
| Tenant's Address | For all Notices 3353 Michelson Drive, Suite 100 Irvine, CA 92612 Attention: AVP, Corporate Real Estate Telephone: (949) 517-0427 Telecopy: (949) 471-4859 | With a copy to: Home123 Corporation 18400 Von Karman, Suite 1000 Irvine, CA 92612 Attention: General Counsel Telephone: (949) 724-3392 Telecopy: (949) 471-8271 |
| Landlord's Address | For all Notices: Village at Camp Bowie I, L.P. 6115 Camp Bowie Boulevard Suite 280 Fort Worth, TX 76116 Attention: Property Manager Telephone: (817) 738-5600 Telecopy: (817) 738-5609 | With a copy to: Village at Camp Bowie I, L.P. 8350 N. Central Expressway Suite 1500 Dallas, Texas 75206 Attention: Bo Brownlee Telephone: (214) 361-8880 Telecopy: (214) 361-8168 |

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified above. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

**SIGNATURES ON FOLLOWING PAGE**

LANDLORD:                          VILLAGE AT CAMP BOWIE I, L.P.,
                                   a Texas limited partnership

                                   By:    VCBGP I, LLC
                                          its general partner

                                   By: _Woodrow K. Brownlee_____
                                          Woodrow R. Brownlee
                                          Manager


TENANT:                            HOME123 CORPORATION


                                   By: _Tommaso Trinchieri___ 2·1·07
                                          Tommaso Trinchieri
                                          AVP, Corporate Real Estate

## OFFICE LEASE AGREEMENT

This Office Lease Agreement (this "**Lease**") is entered into as of February __/__, 2007, between VILLAGE AT CAMP BOWIE I, L.P., a Texas limited partnership ("**Landlord**"), and Home123 Corporation, a California corporation ("**Tenant**").

1.        **Definitions and Basic Provisions**. The definitions and basic provisions set forth in the Basic Lease Information (the "**Basic Lease Information**") executed by Landlord and Tenant contemporaneously herewith are incorporated herein by reference for all purposes. Additionally, the following terms shall have the following meanings when used in this Lease: "**Affiliate**" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question; "**Building's Structure**" means the Building's exterior walls, roof, elevator shafts (if any), footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams; "**Building's Systems**" means the Premises' and Building's HVAC, life-safety, plumbing, electrical, and mechanical systems; "**Business Day(s)**" means Monday through Friday of each week, exclusive of Holidays; "**Holidays**" means New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, and any other nationally or regionally recognized holiday; "**including**" means including, without limitation; "**Laws**" means all federal, state, and local laws, ordinances, rules and regulations, all court orders, governmental directives, and governmental orders and all interpretations of the foregoing, and all restrictive covenants affecting the Project, and "**Law**" shall mean any of the foregoing; "**Normal Business Hours**" means 8:00 a.m. to 6:00 p.m. on Business Days and 8:00 a.m. to 5:00 p.m. on Saturdays, exclusive of Holidays; "**Tenant's Off-Premises Equipment**" means any of Tenant's equipment or other property that may be located on or about the Project (other than inside the Premises); and "**Tenant Party**" means any of the following persons: Tenant; any assignees claiming by, through, or under Tenant; any subtenants claiming by, through, or under Tenant; and any of their respective agents, contractors, employees, and invitees.

2.        **Lease Grant**. Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises (as defined in the Basic Lease Information).

3.        **Tender of Possession**. Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease on or about March 1, 2007 (the "**Estimated Delivery Date**"). If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then: (a) the validity of this Lease shall not be affected or impaired thereby; (b) Landlord shall not be in default hereunder or be liable for damages therefor; and (c) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant. By occupying the Premises, Tenant shall be deemed to have accepted the Premises in their condition as of the date of such occupancy, subject to latent defects and the performance of punch-list items that remain to be performed by Landlord, if any. Prior to occupying the Premises, Tenant shall execute and deliver to Landlord a letter substantially in the form of Exhibit F hereto confirming: (1) the Commencement Date (as defined in the Basic Lease Information) and the expiration date of the initial Term (as defined in the Basic Lease Information); (2) that Tenant has accepted the Premises; and (3) that Landlord has performed all of its obligations with respect to the Premises (except for punch-list items specified in such letter); however, the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease. Tenant's failure to execute such document within ten (10) business days of receipt thereof from Landlord shall be an Event of Default (as defined in Section 16) under this Lease and shall be deemed Tenant's agreement to the contents of such document. Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Rent.

4.        **Rent**. Tenant shall timely pay to Landlord Rent (as defined in the Basic Lease Information), including the amounts set forth in Exhibit C hereto, without notice, demand, deduction or set-off (except as otherwise expressly provided herein), by good and sufficient check drawn on a national banking association at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes. The obligations of Tenant to pay Base Rent (as defined in the Basic Lease Information) and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Base Rent, adjusted as herein provided, shall be payable monthly in

4

advance. One full monthly installment of Base Rent shall be payable contemporaneously with the execution of this Lease, which shall be applied to Base Rent for the second full month of Base Rent. Base Rent shall be payable on the first (1st) day of each month; provided, however, Tenant is entitled to one full free month of Base Rent for the first month of the Term. Base Rent shall be payable in advance on the first (1st) day of each month of the Term, with the understanding that (i) no Base Rent is payable for one full month at the beginning of the Term, (ii) Tenant shall prepay one full month of Base Rent to be applied to the second full month of the Term. The monthly Base Rent for any partial month at or near the beginning of the Term shall equal the product of 1/365 (or in the event of a leap year, 1/366) of the annual Base Rent in effect during the partial month and the number of days in the partial month, and shall be due on the Commencement Date. Payments of Base Rent for any fractional calendar month at the end of the Term shall be similarly prorated. Tenant shall pay Additional Rent, Taxes and Insurance (each as defined in **Exhibit C**) at the same time and in the same manner as Base Rent.

    5.    **Delinquent Payment; Handling Charges.**  All payments required of Tenant hereunder that shall bear interest from the date due until paid at the lesser of fifteen percent (15%) per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "**Default Rate**"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a fee equal to ten percent (10%) of any payment not made within five (5) days after the due date to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency.  In no event, however, shall the charges permitted under this **Section 5** or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest.

    6.    **Services; Utilities; Common Areas.**

        (a)    **Services.**  Landlord shall use all reasonable efforts to furnish to Tenant: (i) water at those points of supply provided for general use of tenants of the Building; (ii) heated and refrigerated air conditioning as appropriate, at such temperatures and in such amounts as are required by governmental authority or as Landlord reasonably determines are standard for the Building; (iii) janitorial service to the Premises on weekdays, other than Holidays, for Building-standard installations and such window washing as may from time to time be reasonably required; (iv) elevators for ingress and egress to the floor on which the Premises are located, in common with other tenants, provided that Landlord may limit the number of operating elevators during non-business hours and Holidays; (v) replacement of Building-standard light bulbs and fluorescent tubes, provided that Landlord's standard charge for such bulbs and tubes shall be paid by Tenant; and (6) electrical current during Normal Business Hours for equipment that does not require more than 110 volts and whose electrical energy consumption does not exceed normal office usage. If Tenant desires any of the services specified in **Section 6(a)(ii)** at a time other than Normal Business Hours, then such services shall be supplied to Tenant upon the written request of Tenant delivered to Landlord before 3:00 p.m. on the Business Day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services within thirty (30) days after Landlord has delivered to Tenant an invoice therefor. The costs incurred by Landlord in providing HVAC service to Tenant at a time other than Normal Business Hours, shall include costs for electricity, water, sewage, water treatment, labor, metering, filtering, and maintenance reasonably allocated by Landlord to providing such service. All services to be provided by Landlord and the management and operation of the Building shall be at or above a level consistent with that customarily provided to tenants of comparable office buildings in the Fort Worth, Texas metropolitan area. Subject to Tenant's payment of the additional costs and expenses described herein for excessive usage or usage outside of Normal Business Hours, all utility and other services to and for the Premises, including, without limitation, HVAC services, will be available 24 hours a day, 7 days a week.

        (b)    **Excess Utility Use.**  Landlord shall not be required to furnish electrical current for equipment that requires more than 110 volts or other equipment whose electrical energy consumption exceeds normal office usage. If Tenant's requirements for or consumption of electricity exceed the electricity to be provided by Landlord as described in **Section 6(a)**, Landlord shall, at Tenant's expense, make reasonable efforts to supply such service through the then-existing feeders and risers serving the Building and the Premises, and Tenant shall pay to Landlord the cost of such service within thirty (30) days after Landlord has delivered to Tenant an invoice therefor. Landlord may determine the amount of such additional consumption and potential consumption by any verifiable method, including installation of a separate meter in the Premises installed, maintained, and read by Landlord, at Tenant's expense. Tenant shall not

install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld. Tenant shall not install any electrical equipment requiring voltage in excess of Building capacity unless approved in advance by Landlord, which approval may be withheld in Landlord's sole discretion. The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises. Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expenses, or interfere with or disturb other tenants of the Building. If Tenant uses machines or equipment in the Premises which affect the temperature otherwise maintained by the air conditioning system or otherwise overload any utility, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has delivered to Tenant an invoice therefor. Landlord's obligation to furnish services under Section 6(a) shall be subject to the rules and regulations of the supplier of such services and governmental rules and regulations. Landlord may, upon not less than thirty (30) days' prior written notice to Tenant, discontinue any such service to the Premises, provided Landlord first arranges for a direct connection thereof through the supplier of such service. Tenant shall, however, be responsible for contracting with the supplier of such service and for paying all deposits for, and costs relating to, such service. Landlord shall use reasonable efforts to restore any service required of it that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or entitle Tenant to any abatement of Tenant's obligations hereunder. Notwithstanding the foregoing, if there is an interruption in electrical power which is (a) specific to the Building and/or Project (as opposed to an interruption or curtailment in electrical power which extends beyond the Building or Project), (b) causes the Premises to be untenantable, (c) is not caused by an event of Force Majeure, and (d) lasts for more than five (5) consecutive Business Days or otherwise prevents Tenant from being able to access the Premises for more than five (5) consecutive Business Days, then Tenant will be entitled to deliver Landlord a notice stating that if the untenantability caused by the interruption is not cured within seven (7) Business Days, Tenant will be entitled to an abatement of Base Rent as provided in this Section. If Tenant properly delivers such an abatement notice to Landlord, and the untenantability caused by the interruption in electric power is not remedied within such seven (7) Business Day period, then Tenant shall thereafter be entitled to an abatement of Base Rent (in proportion to the portion of the Premises rendered untenantable by the interruption in electrical power) until such electric power is restored.

(c)   **Common Areas**. The term "**Common Area**" is defined for all purposes of this Lease as that part of the Project and/or Complex intended for the common use of all tenants, including among other facilities (as such may be applicable to the Complex), the ground floor lobby, elevator lobbies and hallways on multi-tenant floors, parking areas, private streets and alleys, landscaping, curbs, loading areas, sidewalks, malls and promenades (enclosed or otherwise), lighting facilities, drinking fountains, meeting rooms, public toilets, the parking garage, and the like, but excluding: (i) space in buildings (now or hereafter existing) designated for rental for commercial purposes, as the same may exist from time to time; (ii) streets and alleys maintained by a public authority; (iii) areas within the Complex which may from time to time not be owned by Landlord (unless subject to a cross-access agreement benefiting the area which includes the Premises); and (iv) areas leased to a single-purpose user where access is restricted. In addition, although the roof(s) of the building(s) in the Complex is not literally part of the Common Area, it will be deemed to be so included for purposes of: (i) Landlord's ability to prescribe rules and regulations regarding same; and (ii) its inclusion for purposes of Operating Costs reimbursements. Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identities, locations and types of any buildings, signs or other improvements in the Complex. For example, and without limiting the generality of the immediately preceding sentence, Landlord may from time to time substitute for any parking area other areas reasonably accessible to the tenants of the Building or Complex, as applicable, which areas may be elevated, surface or underground. Notwithstanding the foregoing, Landlord will not exercise such rights in a manner that unreasonably interferes with Tenant's access to the Premises. Tenant, and its employees and customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the non-exclusive right to use the Common Area (excluding roof(s)) as constituted

6

from time to time, such use to be in common with Landlord, other tenants in the Building and/or Complex, as applicable, and other persons permitted by the Landlord to use the same, and subject to rights of governmental authorities, easements, other restrictions of record, and such reasonable rules and regulations governing use as Landlord may from time to time prescribe. For example, and without limiting the generality of Landlord's ability to establish rules and regulations governing all aspects of the Common Area, Tenant agrees as follows:

(i)     Tenant shall not solicit business within the Common Area nor take any action which would interfere with the rights of other persons to use the Common Area.

(ii)    Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights.

(iii)   With regard to the roof(s) of the building(s) in the Project or Complex, as applicable, use of the roof(s) is reserved to Landlord, or with regard to any tenant demonstrating to Landlord's satisfaction a need to use same, to such tenant after receiving prior written consent from Landlord.

7.      **Alterations; Repairs; Maintenance; Signs.**

(a)     **Alterations**.   Tenant shall not make any alterations, additions or improvements to the Premises (collectively, the "**Alterations**") without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Premises.  Tenant shall furnish complete plans and specifications to Landlord for its approval at the time it requests Landlord's consent to any Alterations if the desired Alterations: (i) will affect the Building's Systems or Building's Structure; or (ii) will require the filing of plans and specifications with any governmental or quasi-governmental agency or authority; or (iii) will cost in excess of Twenty-Five Thousand Dollars ($25,000.00).  Subsequent to obtaining Landlord's consent and prior to commencement of the Alterations, Tenant shall deliver to Landlord any building permit required by applicable Law and a copy of the executed construction contract(s).  Tenant shall reimburse Landlord within ten (10) days after the rendition of a bill for all of Landlord's actual out-of-pocket costs incurred in connection with any Alterations, including all management, engineering, outside consulting, and construction fees incurred by or on behalf of Landlord for the review and approval of Tenant's plans and specifications and for the monitoring of construction of the Alterations.  If Landlord consents to the making of any Alteration, such Alteration shall be made by Tenant at Tenant's sole cost and expense by a contractor approved in writing by Landlord.  Tenant shall require its contractor to maintain insurance in such amounts and in such form as Landlord may require.  Without Landlord's prior written consent, Tenant shall not use any portion of the Common Areas either within or without the Project or Complex, as applicable, in connection with the making of any Alterations.  If the Alterations which Tenant causes to be constructed result in Landlord being required to make any alterations and/or improvements to other portions of the Project or Complex, as applicable, in order to comply with any applicable Laws, then Tenant shall reimburse Landlord within thirty (30) days after receipt of written demand for all costs and expenses incurred by Landlord in making such alterations and/or improvements.  Any Alterations made by Tenant shall become the property of Landlord upon installation and shall remain on and be surrendered with the Premises upon the expiration or sooner termination of this Lease, unless Landlord requires the removal of such Alterations at the time of granting its approval.  If Landlord requires the removal of such Alterations, Tenant shall at its sole cost and expense, forthwith and with all due diligence (but in any event not later than ten (10) days after the expiration or earlier termination of the Lease) remove all or any portion of any Alterations made by Tenant which are designated by Landlord to be removed (including without limitation stairs, bank vaults, and cabling, if applicable) and repair and restore the Premises in a good and workmanlike manner to their original condition, reasonable wear and tear excepted.  All construction work done by Tenant within the Premises shall be performed in a good and workmanlike manner with new materials of first-class quality, lien-free and in compliance with all Laws, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Project or Complex, as applicable.  Tenant agrees to indemnify, defend and hold Landlord harmless against any loss, liability or damage resulting from such work, and Tenant shall, if requested by Landlord, furnish a bond or other security satisfactory to Landlord against any such loss, liability or damage.  The foregoing indemnity shall survive the expiration or earlier termination of this Lease.  Landlord's

consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance. Notwithstanding anything to the contrary herein, without securing Landlord's prior consent, Tenant shall be permitted to hang pictures and shelving inside the Premises and perform other similar minor decorating activities inside the Premises during any calendar year, provided that Tenant complies with all applicable Laws and that Tenant does not take any action which could interfere with the structural, mechanical, electrical, maintenance, HVAC or plumbing systems of the Building.

        (b)      **Repairs; Maintenance.**

        (i)      **By Landlord.** Landlord shall, subject to reimbursement as set forth in Exhibit C, keep and maintain in good repair and working order and make repairs to and perform maintenance upon: (1) Building's Structures; (2) Building's Systems (including HVAC), electrical, plumbing and fire/life safety systems serving the Building generally; (3) Common Areas; (4) the roof of the Building; (5) exterior windows of the Building; and (6) elevators serving the Building. Landlord shall not be liable for any failure to make any such repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant. If any of the foregoing maintenance or repair is necessitated due to the acts or omissions of any Tenant Party, Tenant shall pay the costs of such repairs or maintenance to Landlord within thirty (30) days after receipt of an invoice, together with an administrative charge in an amount equal to fifteen percent (15%) of the cost of the repairs. Landlord shall not be liable to Tenant for any interruption of Tenant's business or inconvenience caused due to any work performed in the Premises or in the Complex pursuant to Landlord's rights and obligations under the Lease. To the extent allowed by law, Tenant waives the right to make repairs at Landlord's expense under any law, statute or ordinance now or hereafter in effect.

        (ii)      **By Tenant.** Tenant shall, at its sole cost and expense, promptly perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and shall keep the Premises in good condition and repair, ordinary wear and tear excepted. Tenant's repair obligations include, without limitation, repairs to: (1) floor covering and/or raised flooring; (2) interior partitions; (3) doors; (4) the interior side of demising walls; (5) electronic, phone and data cabling and related equipment (collectively, "**Cable**") that is installed by or for the benefit of Tenant and located in the Premises or other portions of the Building or Project; (6) supplemental air conditioning units, private showers and kitchens, including hot water heaters, plumbing, dishwashers, ice machines and similar facilities serving Tenant exclusively; (7) phone rooms used exclusively by Tenant; (8) Alterations performed by contractors retained by or on behalf of Tenant, including related HVAC balancing; and (9) all of Tenant's furnishings, trade fixtures, equipment and inventory. Notwithstanding anything contained herein to the contrary, Tenant's obligation with regard to maintenance of the Premises shall not include any costs for complying with directives of the City of Fort Worth for correction of code violations for construction by Landlord; any such correction shall be the responsibility, and performed at the sole cost, of Landlord. If Tenant fails to make any such repairs for more than fifteen (15) days after notice from Landlord, Landlord may perform any of the foregoing maintenance or repair obligations or require that such obligations be performed by a contractor approved by Landlord, all at Tenant's expense. All work shall be performed in accordance with the rules and procedures described in Section 7(a). If Tenant fails to make any repairs to the Premises for more than fifteen (15) days after notice from Landlord (although notice shall not be required if there is an emergency, or if the area to be repaired is visible from the exterior of the Building), Landlord may, in addition to any other remedy available to Landlord, make the repairs, and Tenant shall pay the actual cost of the repairs to Landlord within thirty (30) days after receipt of an invoice, together with an administrative charge in an amount equal to fifteen percent (15%) of the cost of the repairs. At the expiration of this Lease, Tenant shall surrender the Premises in good condition, excepting reasonable wear and tear and losses required to be restored by Landlord. All personal property of Tenant, including goods, wares, merchandise, inventory, trade fixtures and other personal property of Tenant, shall be stored at the sole risk of Tenant. Except to the extent caused by the willful misconduct of Landlord or any of its agents, Landlord or its agents shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Complex or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other places resulting from dampness or any other cause

whatsoever, or from the act or negligence of any other tenant or any officer, agent, employee, contractor or guest of any such tenant. It is generally understood that mold spores are present essentially everywhere and that mold can grow in most any moist location. Emphasis is properly placed on prevention of moisture and on good housekeeping and ventilation practices. Tenant acknowledges the necessity of housekeeping, ventilation, and moisture control (especially in kitchens, janitor's closets, bathrooms, break rooms and around outside walls) for mold prevention. In signing this Lease, Tenant has first inspected the Premises and certifies that it has not observed mold, mildew or moisture within the Premises. Tenant agrees to immediately notify Landlord if it observes mold/mildew and/or moisture conditions (from any source, including leaks), and allow Landlord to evaluate and make recommendations and/or take appropriate corrective action. Tenant relieves Landlord from any liability for any bodily injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the Premises occurring after the Commencement Date. In addition, execution of this Lease constitutes acknowledgement by Tenant that control of moisture and mold prevention are integral to its Lease obligations.

(iii)    **Performance of Work.**  All work described in this Section 7 shall be performed only by contractors and subcontractors approved in writing by Landlord. Tenant shall cause all contractors and subcontractors to procure and maintain insurance coverage naming Landlord, Landlord's property management company (if any), and Landlord's Mortgagee (as hereinafter defined) as additional insureds against such risks, in such amounts, and with such companies as Landlord may reasonably require. Tenant shall provide Landlord with the identities, mailing addresses and telephone numbers of all persons performing work or supplying materials prior to beginning such construction and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Laws. All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems). All such work which may affect the Building's Structure or the Building's Systems, at Landlord's election, must be performed by Landlord's usual contractor for such work. All work affecting the roof of the Building must be performed by Landlord's roofing contractor and no such work will be permitted if it would void or reduce the warranty on the roof.

(c)    **Mechanic's Liens.**    All work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party shall be deemed authorized and ordered by Tenant only, and Tenant shall not permit any mechanic's liens to be filed against the Premises or the Project in connection therewith. Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work. If such a lien is filed, then Tenant shall, within ten (10) days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises, Project or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either: (1) pay the amount of the lien and cause the lien to be released of record; or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within ten (10) days after Landlord has invoiced Tenant therefor. Landlord and Tenant acknowledge and agree that their relationship is and shall be solely that of "landlord-tenant" (thereby excluding a relationship of "owner-contractor," "owner-agent" or other similar relationships). Accordingly, all materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant, any contractor or subcontractor of Tenant or any other Tenant Party for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Premises, Project or Landlord's interest therein due to any work performed by or for Tenant or deemed to give any contractor or subcontractor or materialman any right or interest in any funds held by Landlord to reimburse Tenant for any portion of the cost of such work. Tenant shall indemnify, defend and hold harmless Landlord, its property manager, Landlord's Mortgagee, any subsidiary or affiliate of the foregoing, and their respective officers, directors, shareholders, partners, employees, managers, contractors, attorneys and agents (collectively, the "**Indemnitees**") from and against all claims, demands, causes of action, suits, judgments, damages and expenses (including attorneys' fees) in any way arising from or relating to the failure by any Tenant Party to pay for any work

performed, materials furnished, or obligations incurred by or at the request of a Tenant Party. The foregoing indemnity shall survive termination or expiration of this Lease.

(d)    **Signs.**  Tenant shall not place or permit to be placed any signs upon: (i) the roof of the Building; or (ii) the Common Areas; or (iii) any area visible from the exterior of the Premises without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed provided any proposed sign is placed only in those locations as may be designated by Landlord, and complies with the sign criteria promulgated by Landlord from time to time.   Upon request of Landlord, Tenant shall immediately remove any sign, advertising material or lettering which Tenant has placed or permitted to be placed upon the exterior or interior surface of any door or window or at any point inside the Premises, which in Landlord's reasonable opinion, is of such a nature as to not be in keeping with the standards of the Building, and if Tenant fails to do so, Landlord may without liability remove the same at Tenant's expense. Tenant shall comply with such regulations as may from time to time be promulgated by Landlord governing signs, advertising material or lettering of all tenants in the Project or Complex, as applicable.  The Tenant, upon vacation of the Premises, or the removal or alteration of its sign for any reason, shall be responsible for the repair, painting or replacement of the Building fascia surface or other portion of the Building where signs are attached. If Tenant fails to do so, Landlord may have the sign removed and the cost of removal plus fifteen percent (15%) as an administrative fee shall be payable by Tenant within ten (10) days of invoice.

8.    **Use.**   Tenant shall continuously occupy and use the Premises only for the Permitted Use (as set forth in the Basic Lease Information) and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to use that would damage the Premises. Tenant, at its sole cost and expense, shall obtain and keep in effect during the term, all permits, licenses, and other authorizations necessary to permit Tenant to use and occupy the Premises for the Permitted Use in accordance with applicable Law. Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant: (a) Tenant shall bear the risk of complying with Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations, and guidelines promulgated under such laws, as amended from time to time (the "**Disabilities Acts**") in the Premises; and (b) Landlord shall bear the risk of complying with the Disabilities Acts in the Common Areas (subject to reimbursement as set forth in Exhibit C), other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any alterations or additions made by Tenant (which risk and responsibility shall be borne by Tenant). Notwithstanding the preceding sentence, Tenant shall not be obligated to perform, or be responsible for the cost of, any alterations, modifications or retrofitting of the Premises necessary for it to comply with any local, state and/or federal laws, rules, regulations or directives enacted after the date hereof, unless compliance is required by reason of: (i) any cause or condition arising out of Tenant's alterations or installations in the Premises, or (ii) Tenant's particular use, manner of use or occupancy of the Premises, or (iii) any breach of any of Tenant's covenants or agreements under this Lease. Tenant shall not use any substantial portion of the Premises for a "call center", any other telemarketing use, or any credit processing use. In addition, the Premises shall not be used for any purpose which creates strong, unusual, or offensive odors, fumes, dust or vapors; which emits noise or sounds that are objectionable due to intermittence, beat, frequency, shrillness, or loudness; which is associated with indecent or pornographic matters; or which involves political or moral issues (such as abortion issues). Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building. Tenant shall not knowingly conduct or permit to be conducted in the Premises any activity, or place any equipment in or about the Premises or the Building, which will invalidate the insurance coverage in effect or increase the rate of fire insurance or other insurance on the Premises or the Building. If any invalidation of coverage or increase in the rate of fire insurance or other insurance occurs or is threatened by any insurance company due to activity conducted from the Premises, or any act or omission by Tenant, or its agents, employees, representatives, or contractors, such statement or threat shall be conclusive evidence that the increase in such rate is due to such act of Tenant or the contents or equipment in or about the Premises, and, as a result thereof, Tenant shall be liable for such increase and shall be considered Additional Rent payable with the next monthly installment of Base Rent due under this Lease. In no event shall Tenant introduce or permit to be kept on the Premises or brought into the Building any dangerous, noxious, radioactive or explosive substance.

9.    **Assignment and Subletting.**

(a)    **Transfers.**    Tenant shall not, without the prior written consent of Landlord: (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law; (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization; (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant; (4) sublet any portion of the Premises; (5) grant any license, concession, or other right of occupancy of any portion of the Premises; or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 9(a)(1) through Section 9(a)(6) being a "**Transfer**").

(b)    **Consent Standards.**    Landlord shall not unreasonably withhold, condition or delay its consent to any assignment or subletting of the Premises, provided that Tenant is not then in default under the Lease and the proposed transferee: (1) is creditworthy; (2) has a good reputation in the business community; (3) will use the Premises for the Permitted Use (thus, excluding without limitation, uses for credit processing and telemarketing) and will not use the Premises in any manner that would conflict with any exclusive use agreement or other similar agreement entered into by Landlord with any other tenant of the Project or Complex, as applicable; (4) will not use the Premises, Project or Complex in a manner that would materially increase the pedestrian or vehicular traffic to the Premises, Project or Complex; (5) is not a governmental entity, or subdivision or agency thereof; (6) is not another occupant of the Building or Complex, as applicable; and (7) is not a person or entity with whom Landlord is then, or has been within the six-month period prior to the time Tenant seeks to enter into such assignment or subletting, negotiating to lease space in the Building or Complex, as applicable, or any Affiliate of any such person or entity; otherwise, Landlord may withhold its consent in its sole discretion.

(c)    **Request for Consent.**    If Tenant requests Landlord's consent to a Transfer, then, at least thirty (30) days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed pertinent documentation, and the following information about the proposed transferee: name and address; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial, and other credit information; and general references sufficient to enable Landlord to determine the proposed transferee's creditworthiness and character. Concurrently with Tenant's notice of any request for consent to a Transfer, Tenant shall pay to Landlord a fee of $1,000 to defray Landlord's expenses in reviewing such request, and Tenant shall also reimburse Landlord immediately upon request for its reasonable attorneys' fees incurred in connection with considering any request for consent to a Transfer in an amount not to exceed $2,500.

(d)    **Conditions to Consent.**    If Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer. No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefor. Landlord's consent to any Transfer shall not be deemed consent to any subsequent Transfers. If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent. Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder. Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

(e)    **Attornment by Subtenants.**    Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, either terminate the sublease or take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall

not be: (1) liable for any previous act or omission of Tenant under such sublease; (2) subject to any counterclaim, offset or defense that such subtenant might have against Tenant; (3) bound by any previous modification of such sublease or by any rent or additional rent or advance rent which such subtenant might have paid for more than the current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment; (4) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement; or (5) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Section 9(e). The provisions of this Section 9(e) shall be self-operative, and no further instrument shall be required to give effect to this provision.

(f)    Cancellation. Landlord may, within thirty (30) days after submission of Tenant's written request for Landlord's consent to an assignment or subletting, cancel this Lease as to the portion of the Premises proposed to be sublet or assigned as of the date the proposed Transfer is to be effective. If Landlord cancels this Lease as to any portion of the Premises, then this Lease shall cease for such portion of the Premises, Tenant shall pay to Landlord all Rent accrued through the cancellation date relating to the portion of the Premises covered by the proposed Transfer, and Rent shall be reduced proportionately based on the remaining square footage in the Premises. Thereafter, Landlord may lease such portion of the Premises to the prospective transferee (or to any other person) without liability to Tenant.

(g)    Additional Compensation. Tenant shall pay to Landlord, immediately upon receipt thereof, the excess of all compensation received by Tenant for a Transfer (net of Tenant's reasonable, documented out-of-pocket costs incurred by Tenant in connection with such Transfer, including, without limitation leasing costs and  commissions incurred in connection with the Transfer, so long as such costs are approved by Landlord, such approval not to be unreasonably withheld) over the Rent allocable to the portion of the Premises covered thereby.

(h)    Transfers to Affiliates. Provided that no Event of Default exists under this Lease, Tenant may, without Landlord's consent, assign or sublet all or a portion of this Lease or the Premises to an Affiliate of Tenant if (i) Tenant notifies Landlord at least 15 days prior to such Transfer; (ii) Tenant delivers to Landlord, at the time of Tenant's notice, current financial statements of Tenant and the proposed transferee that are reasonably acceptable to Landlord; and (iii) the transferee assumes and agrees in a writing reasonably acceptable to Landlord to perform Tenant's obligations under this Lease and to observe all terms and conditions of this Lease. A Transfer to an Affiliate does not release Tenant from any liability or obligation under this Lease. Landlord's rights to recapture or share in any profit Tenant receives from a Transfer do not apply to any Transfer this Section 9(h) permits.

10.    Insurance; Waivers; Subrogation; Indemnity.

(a)    Tenant's Insurance. Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies: (A) commercial general liability insurance in amounts of $1,000,000 per occurrence, which shall apply on a per location basis, or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require (and, if the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy [e.g., the sale, service or consumption of alcoholic beverages], Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter [including liquor liability, if applicable] in such amounts as Landlord may reasonably require), insuring Tenant, Landlord, Landlord's property management company and Landlord's Mortgagee as their respective interests may appear against all liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises and (without implying any consent by Landlord to the installation thereof) the installation, operation, maintenance, repair or removal of Tenant's Off-Premises Equipment with an additional insured endorsement in form CG 20206 1185; (B) Automobile Liability covering any owned, non-owned, leased, rented or borrowed vehicles of Tenant with limits no less than $1,000,000 combined single limit for property damage and bodily

12

injury; (C) All Risk Property insurance covering the full value of all Alterations and improvements and betterments in the Premises, naming Landlord and Landlord's Mortgagee (as defined in <u>Section 11(a)</u>) as additional loss payees as their interests may appear; (D) All Risk Property insurance covering the full value of all furniture, trade fixtures and personal property (including property of Tenant or others) in the Premises or otherwise placed in the Project by or on behalf of a Tenant Party (including Tenant's Off-Premises Equipment) it being understood that no lack or inadequacy of insurance by Tenant shall in any event make Landlord subject to any claim by virtue of any theft of or loss or damage to any uninsured or inadequately insured property; (E) contractual liability insurance sufficient to cover Tenant's indemnity obligations hereunder (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy); (F) worker's compensation insurance in amounts not less than statutorily required, and Employers' Liability insurance with limits of not less than One Million Dollars ($1,000,000); (G) Intentionally Omitted; (H) in the event Tenant performs any alterations or repairs in, on, or to the Premises, Builder's Risk Insurance on an All Risk basis (including collapse) on a completed value (non-reporting) form, or by endorsement including such coverage pursuant to <u>Section 10(a)(2)(C)</u> hereinabove, for full replacement value covering all work incorporated in the Building and all materials and equipment in or about the Premises; and (I) such other insurance or any changes or endorsements to the insurance required herein, including increased limits of coverage, as Landlord, or any mortgagee or lessor of Landlord, may reasonably require from time to time. Tenant's insurance shall provide primary coverage to Landlord and shall not require contribution by any insurance maintained by Landlord, when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance, with an additional insured endorsement in form CG 20206 1185, and such other evidence satisfactory to Landlord of the maintenance of all insurance coverages required hereunder at least ten (10) days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises, and at least fifteen (15) days prior to each renewal of said insurance, and Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least thirty (30) days before cancellation or a material change of any such insurance policies. All such insurance policies shall be in form, and issued by companies with a Best's rating of A:VII or better, reasonably satisfactory to Landlord. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein and such failure continues for a period of ten (10) days after Tenant's receipt of written notice, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of such cost. It is expressly understood and agreed that the foregoing minimum limits of insurance coverage shall not limit the liability of Tenant for its acts or omissions as provided in this Lease.

(b)     <u>**Landlord's Insurance**</u>. Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (1) property insurance for the Building's replacement value (excluding property required to be insured by Tenant), less a commercially-reasonable deductible if Landlord so chooses; and (2) commercial general liability insurance in an amount of not less than $1,000,000. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary. Tenant shall pay its Proportionate Share of the cost of all insurance carried by Landlord with respect to the Project or Complex, as applicable, as set forth on <u>Exhibit C</u>. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

(c)     <u>**No Subrogation**</u>. Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms hereof, regardless of whether the negligence of the other party caused such Loss (defined below). Landlord and Tenant each hereby waive any right of subrogation and right of recovery or cause of action for injury including death or disease to respective employees of either as covered by Worker's Compensation (or which would have been covered if Tenant or Landlord as the case may be, was carrying the insurance as required by this lease). Each party shall cause its insurance carrier to

endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

(d)    **Indemnity**. Subject to Section 10(c), Tenant shall indemnify, defend and hold harmless Landlord and the Indemnitees from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including attorneys' fees) and all losses and damages arising from: (1) any injury to or death of any person or the damage to or theft, destruction, loss, or loss of use of any property or inconvenience (a "**Loss**") arising from the use of the Premises or the Common Areas by any Tenant Party, or arising out of the installation, operation, maintenance, repair or removal of any of Tenant's Off-Premises Equipment; or (2) Tenant's failure to perform its obligations under this Lease, IN EACH CASE EVEN THOUGH CAUSED OR ALLEGED TO BE CAUSED BY THE NEGLIGENCE OR FAULT OF LANDLORD OR ITS AGENTS (OTHER THAN A LOSS ARISING FROM THE GROSS NEGLIGENCE OF LANDLORD OR ITS AGENTS), AND EVEN THOUGH ANY SUCH CLAIM, CAUSE OF ACTION, OR SUIT IS BASED UPON OR ALLEGED TO BE BASED UPON THE STRICT LIABILITY OF LANDLORD OR ITS AGENTS. THIS INDEMNITY IS INTENDED TO INDEMNIFY LANDLORD AND ITS AGENTS AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT AS PROVIDED ABOVE WHEN LANDLORD OR ITS AGENTS ARE JOINTLY, COMPARATIVELY, CONTRIBUTIVELY, OR CONCURRENTLY NEGLIGENT WITH TENANT. Subject to Section 10(c), Landlord will, to the fullest extent allowable under the Laws, indemnify, protect, defend and hold harmless Tenant against any claims and actions brought against Tenant by third parties which (a) arise out of any bodily injury, death or property damage occurring to such third parties at the Project (other than within the Premises), (b) are not caused in whole or in part by Tenant, and (c) are wholly caused by Landlord's gross negligence or willful misconduct. The indemnities set forth in this Section 10(d) shall survive termination or expiration of this Lease and shall not terminate or be waived, diminished or affected in any manner by any abatement or apportionment of Rent under any provision of this Lease. If any proceeding is filed for which indemnity is required hereunder, Tenant agrees, upon request therefor, to defend Landlord in such proceeding at its sole cost, utilizing counsel reasonably satisfactory to Landlord.

11.    **Subordination; Attornment; Notice to Landlord's Mortgagee.**

(a)    **Subordination**. This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), or any ground lease, master lease, or primary lease (each, a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lessor under any such Primary Lease is referred to herein as a "**Landlord's Mortgagee**"). Any Landlord's Mortgagee may elect at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten (10) business days after receipt of written request therefor such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease (including a subordination, non-disturbance and attornment agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease. If Tenant is required to subordinate its interests under the Lease to the lien of Landlord's Mortgagee or the Primary Lease, Tenant's obligation to subordinate its interests is conditioned upon any such lienholder providing Tenant with a commercially reasonable non-disturbance agreement which, in substance, agrees that so long as there does not exist and Event of Default under the terms of this Lease, its tenancy for the use and purposes herein described and all rights granted to Tenant hereunder will not be disturbed and will remain in full force and effect throughout the term of this Lease and any extensions thereof.

(b)    **Attornment**. Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

(c)    **Notice to Landlord's Mortgagee**. Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by

14

certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee an additional 30 days after the later of (a) receipt of such notice, or (b) the expiration of Landlord's cure period, within which to cure the default. If the default cannot be cured within that additional 30 day period, then the holder will have such additional time as may be necessary to effect the cure if, within the 30 day period, the holder has commenced and is diligently and continually pursuing the cure.

(d)   **Landlord's Mortgagee's Protection Provisions**.   If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (1) liable for any act or omission of any prior lessor (including Landlord), provided that a. nothing herein shall release Landlord's Mortgagee for any act or omission of any prior lessor (including Landlord) of which Landlord's Mortgagee had written notice of prior to a foreclosure sale by Landlord's Mortgagee, and b. nothing herein shall release Landlord's Mortgagee from any liability as successor landlord for acts or omissions accruing or arising after Landlord's Mortgagee's succession to the position of landlord; (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than one (1) month in advance to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord) , except for such defenses relating to continuing acts or omissions with respect to which Landlord's Mortgagee has received prior written notice and has failed to cure; and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Building by Landlord's Mortgagee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee the opportunity described in subsection (c) above to cure the event giving rise to such offset event. Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Building. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

12.   **Rules and Regulations**.  Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit E.  Landlord may, from time to time, upon reasonable prior notice to Tenant, change such rules and regulations for the safety, care, or cleanliness of the Building and related facilities, provided that such changes are applicable to all tenants of the Building, will not unreasonably interfere with Tenant's use of the Premises and are enforced by Landlord in a non-discriminatory manner.  Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

13.   **Condemnation.**

(a)   **Total Taking**.  If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking.

(b)   **Partial Taking - Tenant's Rights**.  If any part of the Building becomes subject to a Taking and such Taking will prevent Tenant from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Taking for a period of more than one hundred eighty (180) days, then Tenant may terminate this Lease as of the date of such Taking by giving written notice to Landlord within thirty (30) days after the Taking, and Rent shall be apportioned as of the date of such Taking.  If Tenant does not terminate this Lease, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.

(c)   **Partial Taking - Landlord's Rights**.  If any material portion, but less than all, of the Building becomes subject to a Taking, or if Landlord is required to pay any of the proceeds arising from a Taking to a Landlord's Mortgagee, then Landlord may terminate this

15

Lease by delivering written notice thereof to Tenant within thirty (30) days after such Taking, and Rent shall be apportioned as of the date of such Taking. If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, Rent shall abate as provided in the last sentence of <u>Section 13(b)</u>.

(d)      **Award**. If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Land, the Building, and other improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs, loss of business, and other claims it may have.

14.      **Fire or Other Casualty**.

(a)      **Repair Estimate**. If the Premises or the Building are damaged by fire or other casualty (a "**Casualty**"), Landlord shall use good faith efforts to deliver to Tenant within sixty (60) days after such Casualty a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such Casualty.

(b)      **Tenant's Rights**. If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within one hundred eighty (180) days after the commencement of repairs (the "**Repair Period**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Tenant.

(c)      **Landlord's Rights**. If a Casualty damages the Premises or a material portion of the Building and: (1) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period; (2) the damage to the Premises exceeds fifty percent (50%) of the replacement cost thereof (excluding foundations and footings), as estimated by Landlord, and such damage occurs during the last two (2) years of the Term; (3) regardless of the extent of damage to the Premises, Landlord makes a good faith determination that restoring the Building would be uneconomical; or (4) Landlord is required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Tenant.

(d)      **Repair Obligation**. If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, other than building standard leasehold improvements Landlord shall not be required to repair or replace any Alterations or betterments within the Premises (which shall be promptly and with due diligence repaired and restored by Tenant at Tenant's sole cost and expense) or any furniture, equipment, trade fixtures or personal property of Tenant or others in the Premises or the Building, and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question. If this Lease is terminated under the provisions of this <u>Section 14</u>, Landlord shall be entitled to the full proceeds of the insurance policies providing coverage for all Alterations, improvements and betterments in the Premises (and, if Tenant has failed to maintain insurance on such items as required by this Lease, Tenant shall pay Landlord an amount equal to the proceeds Landlord would have received had Tenant maintained insurance on such items as required by this Lease).

(e)      **Abatement of Rent**. If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

15.      **Personal Property Taxes**. Tenant shall be liable for all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant in the Premises or in or on the Building or Project. If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of

Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within thirty (30) days following written request therefor, the part of such taxes for which Tenant is primarily liable hereunder.

16.    **Events of Default**.  Each of the following occurrences shall be an "**Event of Default**":

(a)    **Payment Default**.  Tenant's failure to pay Rent when due and such failure continues for a period of five (5) calendar days after written notice from Landlord to Tenant of such failure to pay Rent;

(b)    **Estoppel/Financial Statement/Commencement Date Letter**.  Tenant fails to provide: (i) any estoppel certificate after Landlord's written request therefor pursuant to Section 24(e); (ii) any financial statement after Landlord's written request therefor pursuant to Section 24(q); or (iii) the Confirmation of Commencement Date in the form of Exhibit F as required by Section 3, and such failure shall continue for five (5) calendar days after Landlord's second (2nd) written notice thereof to Tenant;

(c)    **Insurance**.  Tenant fails to procure, maintain and deliver to Landlord evidence of the insurance policies and coverages as required under Section 10(a) and such failure continues for a period of ten (10) days after Tenant's receipt of Landlord's written notice thereof;

(d)    **Mechanic's Liens**.  Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's lien filed against the Premises or the Project for any work performed, materials furnished, or obligation incurred by or at the request of Tenant, within the time and in the manner required by Section 7(c);

(e)    **Other Defaults**.  Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of thirty (30) calendar days or more after Landlord has delivered to Tenant written notice thereof; provided that if Tenant is not able through the use of commercially reasonable efforts to cure such breach or failure within a 30 day period, Tenant's breach or failure is not an Event of Default if Tenant commences to cure such breach or failure within the 30 day period and thereafter diligently pursues the cure to completion, provided, that such failure or breach must be cured no later than 90 days after the initial breach or failure; and

(f)    **Insolvency**.  The filing of a petition by or against Tenant (the term "**Tenant**" shall include, for the purpose of this Section 16(f), any guarantor of Tenant's obligations hereunder): (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within sixty (60) calendar days after the filing thereof.

17.    **Remedies**.  Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions:

(a)    **Termination of Lease**.  Terminate this Lease by giving Tenant written notice thereof, in which event Tenant shall pay to Landlord the sum of: (1) all Rent accrued hereunder through the date of termination; (2) all amounts due under Section 18(a); and (3) an amount equal to (A) the total Rent that Tenant would have been required to pay for the remainder of the Term discounted to present value at a per annum rate equal to the Prime Rate ("**Prime Rate**" shall be the per annum interest rate publicly announced by a federally insured bank selected by Landlord in the state in which the Premises is located as such bank's prime or base rate) minus one percent (1%), minus (B) the then present fair rental value of the Premises for such period, similarly discounted;

(b)    **Termination of Possession**.  Terminate Tenant's right to possess the Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord: (1) all Rent and other amounts accrued hereunder to the date

17

of termination of possession; (2) all amounts due from time to time under <u>Section 18(a)</u>; and (3) all Rent and other net sums required hereunder to be paid by Tenant during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during such period, after deducting all costs incurred by Landlord in reletting the Premises. If Landlord elects to proceed under this <u>Section 17(b)</u>, Landlord may remove all of Tenant's property from the Premises and store the same in a public warehouse or elsewhere at the cost of, and for the account of, Tenant, without becoming liable for any loss or damage which may be occasioned thereby. Landlord shall use commercially reasonable efforts to relet the Premises on such terms as Landlord in its sole discretion may determine (including a term different from the Term, rental concessions, and alterations to, and improvement of, the Premises); however, Landlord shall not be obligated to expend funds in connection with reletting the Premises, nor to relet the Premises before leasing other portions of the Building or Complex, as applicable, and Landlord shall not be obligated to accept any prospective tenant proposed by Tenant unless such proposed tenant meets all of Landlord's leasing criteria. Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or to collect rent due for such reletting. Tenant shall not be entitled to the excess of any consideration obtained by reletting over the Rent due hereunder. Reentry by Landlord in the Premises shall not affect Tenant's obligations hereunder for the unexpired Term; rather, Landlord may, from time to time, bring an action against Tenant to collect amounts due by Tenant, without the necessity of Landlord's waiting until the expiration of the Term. Unless Landlord delivers written notice to Tenant expressly stating that it has elected to terminate this Lease, all actions taken by Landlord to dispossess or exclude Tenant from the Premises shall be deemed to be taken under this <u>Section 17(b)</u>. If Landlord elects to proceed under this <u>Section 17(b)</u>, it may at any time elect to terminate this Lease under <u>Section 17(a)</u>;

(c)  <u>**Perform Acts on Behalf of Tenant**</u>. Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Premises in connection therewith if necessary) in Tenant's name and on Tenant's behalf, without being liable for any claim for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the Default Rate; or

(d)  <u>**Alteration of Locks**</u>. Additionally, with or without notice, and to the extent permitted by Law, Landlord may alter locks or other security devices at the Premises to deprive Tenant of access thereto, and Landlord shall not be required to provide a new key or right of access to Tenant.

18.    <u>**Payment by Tenant; Non-Waiver; Cumulative Remedies**</u>.

(a)  <u>**Payment by Tenant**</u>. Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in: (1) obtaining possession of the Premises; (2) removing and storing Tenant's or any other occupant's property; (3) repairing, restoring, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant; (4) if Tenant is dispossessed of the Premises and this Lease is not terminated, reletting all or any part of the Premises (including brokerage commissions, cost of tenant finish work, and other costs incidental to such reletting); (5) performing Tenant's obligations which Tenant failed to perform; and (6) enforcing, or advising Landlord of, its rights, remedies, and recourses arising out of the Event of Default. To the full extent permitted by Law, Landlord and Tenant agree the federal and state courts of the state in which the Premises are located shall have exclusive jurisdiction over any matter relating to or arising from this Lease and the parties' rights and obligations under this Lease.

(b)  <u>**No Waiver**</u>. Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default. No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term. Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(c)    **Cumulative Remedies**. Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity; (2) shall be cumulative; and (3) may be pursued successively or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

19.    **Surrender of Premises**. No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. At the expiration or termination of this Lease, Tenant shall deliver to Landlord the Premises with all improvements located therein in good repair and condition, free of Hazardous Materials placed on the Premises during the Term, broom-clean, reasonable wear and tear (and condemnation and Casualty damage, as to which Section 13 and Section 14 shall control) excepted, and shall deliver to Landlord all keys to the Premises. Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by Tenant (but Tenant may not remove any such item which was paid for, in whole or in part, by Landlord or any wiring or cabling unless Landlord requires such removal). Additionally, at Landlord's option, Tenant shall (not later than ten (10) days after the expiration or earlier termination of the Lease) remove such alterations, additions (including stairs and bank vaults), improvements, trade fixtures, personal property, equipment, wiring, conduits, cabling and furniture (including Tenant's Off-Premises Equipment) as Landlord may request in writing at least ninety (90) days prior to the expiration date. Tenant shall repair all damage caused by such removal. All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord at Tenant's cost without notice to Tenant and without any obligation to account for such items. The provisions of this Section 19 shall survive the expiration or earlier termination of the Lease.

20.    **Holding Over**. If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a tenant at sufferance and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over: (a) Tenant shall pay, in addition to the other Rent, Base Rent equal to one hundred fifty percent (150%) of the Base Rent payable during the last month of the Term; and (b) Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease. The provisions of this Section 20 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at Law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom. Notwithstanding the foregoing, if Tenant holds over with Landlord's express written consent, then Tenant shall be a month-to-month tenant and Tenant shall pay, in addition to the other Rent, Base Rent equal to one hundred twenty-five percent (125%) of the Base Rent payable during the last month of the Term.

21.    **Certain Rights Reserved by Landlord**. Landlord shall have the following rights:

(a)    **Building Operations**. To decorate and to make inspections, repairs, alterations, additions, changes, or improvements, whether structural or otherwise, in and about the Project or Complex, as applicable, or any part thereof; to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) and, during the continuance of any such work, to temporarily close doors, entryways, public space, and corridors in the Building; to interrupt or temporarily suspend Building services and facilities; to change the name of the Building; and to change the arrangement and location of entrances or passageways, doors, and doorways, corridors, elevators, stairs, restrooms, or other public parts of the Building. Landlord will use commercially reasonable efforts to exercise such rights in a manner that does not unreasonably interfere with Tenant's use and enjoyment of the Premises;

(b)    **Security**. To take such reasonable security measures as Landlord deems advisable (provided, however, that any such security measures are for Landlord's own protection,

and Tenant acknowledges that Landlord is not a guarantor of the security or safety of any Tenant Party and that such security matters are the responsibility of Tenant); evacuating the Building for cause, suspected cause, or for drill purposes; temporarily denying access to the Building; and closing the Building after Normal Business Hours and on Sundays and Holidays, subject, however, to Tenant's right to enter when the Building is closed after Normal Business Hours under such reasonable regulations as Landlord may prescribe from time to time;

(c)    **Repairs and Maintenance**.  To enter the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) at all reasonable hours to perform Landlord's repair and maintenance obligations and rights under the Lease; and

(d)    **Prospective Purchasers and Lenders**.  To enter the Premises (after giving Tenant reasonable notice thereof, which may be oral notice) at all reasonable hours to show the Premises to prospective purchasers or lenders; and

(e)    **Prospective Tenants**.  At any time during the last twelve (12) months of the Term (or earlier if Tenant has notified Landlord in writing that it does not desire to renew the Term) or at any time following the occurrence of an Event of Default, to enter the Premises (after giving Tenant reasonable notice thereof, which may be oral notice) at all reasonable hours to show the Premises to prospective tenants.

22.    **Substitution Space**.  Landlord may, at Landlord's expense, relocate Tenant within the Building or Complex, as applicable, to space which is comparable in size, utility and condition to the Premises.  If Landlord relocates Tenant, Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment, and supplies from the Premises to the relocation space and for reprinting Tenant's stationery of the same quality and quantity as Tenant's stationery supply on hand immediately before Landlord's notice to Tenant of the exercise of this relocation right as well as all other reasonable out-of-pocket expenses incidental to the substitution of the Premises, including, but not limited to, the cost of removal and installation of cabling of telephone and computer systems.  Upon such relocation, the relocation space shall be deemed to be the Premises and the terms of the Lease shall remain in full force and shall apply to the relocation space.  No amendment or other instrument shall be necessary to effectuate the relocation contemplated by this Section; however, if requested by Landlord, Tenant shall execute an appropriate amendment document within ten (10) Business Days after Landlord's written request therefor.  If Tenant fails to execute such relocation amendment within such time period, or if Tenant fails to relocate within the time period stated in Landlord's relocation notice to Tenant (or, if such relocation space is not available on the date specified in Landlord's relocation notice, as soon thereafter as the relocation space becomes available and is tendered to Tenant in the condition required by this Lease), then Landlord may terminate this Lease by notifying Tenant in writing thereof at least sixty (60) days prior to the termination date contained in Landlord's termination notice.  Time is of the essence with respect to Tenant's obligations under this Section.  As to any relocation of Tenant to new premises, such new premises shall be substantially as suitable as the Premises for the conduct of Tenant's business, and such new premises and the Premises shall be concurrently available to Tenant as necessary to provide for the continuity in Tenant's business and to permit relocation of Tenant's equipment and facilities with minimum interruption in such business.  All reimbursements to Tenant shall be made within thirty (30) days of Landlord's receipt of the invoices therefor.

23.    **Hazardous Materials**.

(a)    During the term of this Lease, Tenant shall comply with all Environmental Laws (as defined in Section 23(i) below) applicable to the operation or use of the Premises, will cause all other persons occupying or using the Premises to comply with all such Environmental Laws, will immediately pay or cause to be paid all costs and expenses incurred by reason of such compliance.

(b)    Tenant shall not generate, use, treat, store, handle, release or dispose of, or permit the generation, use, treatment, storage, handling, release or disposal of Hazardous Materials (as defined in Section 23(i) hereof) on the Premises, or the Complex, or transport or permit the transportation of Hazardous Materials to or from the Premises or the Complex except for limited quantities of household cleaning products and office supplies used or stored at the

Premises and required in connection with the routine operation and maintenance of the Premises, and in compliance with all applicable Environmental Laws.

(c)    At any time and from time to time during the term of this Lease, upon providing Tenant with at least thirty (30) days prior written notice, Landlord may perform, at Landlord's expense, an environmental site assessment report concerning the Premises, prepared by an environmental consulting firm chosen by Landlord.  If such report indicates the presence of Hazardous Materials, and if such presence was caused or permitted by Tenant, Tenant shall be liable to Landlord for the cost of such report and the cost of any compliance, removal or remedial action in connection with any such Hazardous Materials on the Premises.  Landlord will use commercially reasonable efforts to exercise such rights in a manner that does not unreasonably interfere with Tenant's use and enjoyment of the Premises. .

(d)    After receiving actual notice of the same, Tenant will immediately advise Landlord in writing of any of the following: (1) any pending or threatened Environmental Claim (as defined in Section 23(i) below) against Tenant relating to the Premises or the Complex; (2) any condition or occurrence on the Premises or the Complex that (a) results in noncompliance by Tenant with any applicable Environmental Law, or (b) could reasonably be anticipated to form the basis of an Environmental Claim against Landlord or the Premises; (3) any condition or occurrence on the Premises or any property adjoining the Premises caused by Tenant that could reasonably be anticipated to cause the Premises to be subject to any restrictions on the ownership, occupancy, use or transferability of the Premises under any Environmental Law; and (4) the actual or anticipated taking of any removal or remedial action by Tenant in response to the actual or alleged presence of any Hazardous Material on the Premises or the Complex.  All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and Tenant's response thereto.  In addition, Tenant will provide Landlord with copies of all communications regarding the Premises with any governmental agency relating to Environmental Laws, all such communications with any person relating to Environmental Claims, and such detailed reports of any such Environmental Claim as may reasonably be requested by Landlord.

(e)    Tenant will not change or permit to be changed the present use of the Premises.

(f)    Tenant agrees to indemnify, defend and hold harmless the Indemnitees from and against all obligations (including removal and remedial actions), losses, claims, suits, judgments, liabilities, penalties, damages (including consequential and punitive damages), costs and expenses (including reasonable attorneys' and consultants' fees and expenses) of any kind or nature whatsoever that may at any time be incurred by, imposed on or asserted against such Indemnitees directly or indirectly based on, or arising or resulting from (a) the actual or alleged presence of Hazardous Materials on the Complex which is caused by Tenant or a Tenant Party and (b) any Environmental Claim resulting from Tenant's operation or use of the Premises (the "**Hazardous Materials Indemnified Matters**").  The provisions of this Section 23 shall survive the expiration or sooner termination of this Lease.

(g)    To the extent that the undertaking in the preceding paragraph may be unenforceable because it is violative of any law or public policy, Tenant will contribute the maximum portion that it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all Hazardous Materials Indemnified Matters incurred by the Indemnitees.

(h)    All sums paid and costs incurred by Landlord with respect to any Hazardous Materials Indemnified Matter shall bear interest at the Default Rate from the date so paid or incurred until reimbursed by Tenant, and all such sums and costs shall be immediately due and payable on demand.

(i)    "**Hazardous Materials**" means: (i) petroleum or petroleum products, natural or synthetic gas, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, and radon gas; (ii) any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (iii) any other substance exposure which is regulated by any governmental authority; (b) "**Environmental Law**" means any federal, state or local statute, law, rule, regulation, ordinance, code, policy or rule of common law now or hereafter in effect and in each case as amended, and any judicial or

administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, health, safety or Hazardous Materials, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.; the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq.; the Atomic Energy Act, 42 U.S.C. §§ 2011 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq.; (c) "**Environmental Claims**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations, proceedings, consent orders or consent agreements relating in any way to any Environmental Law or any Environmental Permit, including without limitation (i) any and all Environmental Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Environmental Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

    24.    **Miscellaneous.**

        (a)    **Landlord Transfer.**  Landlord may transfer any portion of the Building and any of its rights under this Lease. If Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes Landlord's obligations hereunder in writing.

        (b)    **Landlord's Liability.**  The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building or Complex shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Project and Complex, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency. Additionally, to the extent allowed by Law, Tenant hereby waives any statutory lien it may have against Landlord or its assets, including without limitation, the Building.

        (c)    **Force Majeure.**  Other than for Tenant's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the control of such party.

        (d)    **Brokerage.**  Neither Landlord nor Tenant has dealt with any broker or agent in connection with the negotiation or execution of this Lease, other than as set forth in the Basic Lease Information, whose commission shall be paid by Landlord. Tenant shall indemnify, defend and hold Landlord harmless from and against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any broker or agent, other than as set forth in the Basic Lease Information, claiming the same by, through, or under Tenant. The foregoing indemnity shall survive the expiration or earlier termination of the Lease.

        (e)    **Estoppel Certificates.**  From time to time, Tenant shall furnish to any party designated by Landlord, within ten (10) business days after Tenant's receipt of Landlord's written request therefor, a certificate signed by Tenant confirming and containing such factual certifications and representations as to this Lease as Landlord may reasonably request. Unless otherwise required by Landlord's Mortgagee or a prospective purchaser or mortgagee of the Building, the initial form of estoppel certificate to be signed by Tenant is attached hereto as Exhibit G.

        (f)    **Notices.**  All notices and other communications given pursuant to this Lease shall be in writing and shall be: (1) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address

22

specified in the Basic Lease Information; (2) hand delivered to the intended addressee; (3) sent by a nationally recognized overnight courier service; or (4) sent by facsimile transmission during Normal Business Hours followed by a copy of such notice sent in another manner permitted hereunder. All notices shall be effective upon the earlier to occur of actual receipt, one (1) Business Day following deposit with a nationally recognized overnight courier service, or three (3) days following deposit in the United States mail. The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

(g)    **Separability**. If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(h)    **Amendments; Binding Effect**. This Lease may not be amended except by instrument in writing signed by Landlord and Tenant. No provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing signed by the waiving party, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of either party to insist upon the performance by the other party in strict accordance with the terms hereof. The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided. This Lease is for the sole benefit of Landlord and Tenant, and, other than Landlord's Mortgagee, no third party shall be deemed a third party beneficiary hereof.

(i)    **Quiet Enjoyment**. Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, but not otherwise, subject to the terms and conditions of this Lease.

(j)    **No Merger**. There shall be no merger of the leasehold estate hereby created with the fee estate in the Premises or any part thereof if the same person acquires or holds, directly or indirectly, this Lease or any interest in this Lease and the fee estate in the leasehold Premises or any interest in such fee estate.

(k)    **No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

(l)    **Entire Agreement**. This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith. The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto.

(m)    **Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LITIGATION OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE ARISING OUT OF OR WITH RESPECT TO THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

(n)    **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

(o)    **Recording**. Tenant shall not record this Lease or any memorandum of this Lease without the prior written consent of Landlord, which consent may be withheld or denied in the sole and absolute discretion of Landlord, and any recordation by Tenant shall be a material breach of this Lease. Tenant grants to Landlord a power of attorney to execute and record a release releasing any such recorded instrument of record that was recorded without the

06/06/2007 WED 13:58 FAX

prior written consent of Landlord, which power of attorney is coupled with an interest and is non-revocable during the Term.

(p)    **Joint and Several Liability**.  If Tenant is comprised of more than one (1) party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.  All unperformed obligations of Tenant hereunder not fully performed at the end of the Term shall survive the end of the Term, including payment obligations with respect to Rent and all obligations concerning the condition and repair of the Premises.

(q)    **Financial Reports**.  Within fifteen (15) days after Tenant's receipt of Landlord's written request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements.  If Tenant is a publicly traded corporation, Tenant may satisfy its obligations hereunder by providing to Landlord Tenant's most recent annual and quarterly reports.  Tenant will discuss its financial statements with Landlord.  Landlord will not disclose any aspect of Tenant's financial statements except: (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building; (2) in litigation between Landlord and Tenant; and (3) if required by court order.  Tenant shall not be required to deliver the financial statements required under this Section 24(q) more than once in any twelve (12) month period unless requested by Landlord's Mortgagee or a prospective buyer or lender of the Building or an Event of Default occurs.

(r)    **Landlord's Fees**.  Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable, out-of-pocket costs actually paid to third parties in reviewing the proposed action or consent, including reasonable attorneys', engineers' or architects' fees, in an amount not to exceed $2,500, within thirty (30) days after Landlord's delivery to Tenant of a statement of such costs.  Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action.

(s)    **Telecommunications**.  Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building, for the installation and operation of telecommunications systems, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("**Telecommunications Services**"), for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord agrees to reasonably cooperate with Tenant in the scheduling of access to the Building and the Premises for Tenant and it telecommunication companies.  All providers of Telecommunications Services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building.  Tenant acknowledges that Landlord shall not be required to provide or arrange for any Telecommunications Services and that Landlord shall have no liability to any Tenant Party in connection with the installation, operation or maintenance of Telecommunications Services or any equipment or facilities relating thereto.  Tenant, at its cost and for its own account, shall be solely responsible for obtaining all Telecommunications Services.

(t)    **Confidentiality**.  Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone (other than Tenant's attorneys, accountants, brokers and other representatives), by any manner or means, directly or indirectly, without Landlord's prior written consent.  The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

(u)    **Authority**.  Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so.

(v)    <u>List of Exhibits</u>.    All exhibits and attachments attached hereto are incorporated herein by this reference.

| | |
|---|---|
| Exhibit A - | Outline of Premises |
| Exhibit B - | Description of the Land |
| Exhibit C - | Additional Rent, Taxes and Insurance |
| Exhibit D - | Tenant Finish-Work |
| Exhibit E - | Building Rules and Regulations |
| Exhibit F - | Form of Confirmation of Commencement Date Letter |
| Exhibit G - | Form of Tenant Estoppel Certificate |
| Exhibit H - | Renewal Option |
| Exhibit I - | Guaranty |

(w)    <u>Waiver</u>. Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts and additional rent payable by Tenant are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.002 OF THE TEXAS PROPERTY CODE.

(x)    <u>Guaranty.</u>    The Guaranty attached to this Lease as Exhibit I must be fully executed prior to the effectiveness of Landlord's obligations under this Lease.

25.    <u>Other Provisions.</u>

LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, DEMAND, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

**SIGNATURES ON FOLLOWING PAGE**

This Lease is executed on the respective dates set forth below, but for reference purposes, this Lease shall be dated as of the date first above written. If the execution date is left blank, this Lease shall be deemed executed as of the date first written above.

LANDLORD:                          VILLAGE AT CAMP BOWIE I, L.P.,
                                   a Texas limited partnership

                                   By:    VCBGP, I, LLC,
                                          its general partner

                                          By: _Woodrow K Brownlee_
                                              Woodrow R. Brownlee
                                              Manager

                                   Execution Date: _January 31, 2007_

TENANT:                            HOME123 CORPORATION

                                   By: _Tommaso Trinchieri_
                                       Tommaso Trinchieri
                                       AVP, Corporate Real Estate

                                   Execution Date: _February 1, 2007_

EXHIBIT A

OUTLINE OF PREMISES



6115 Camp Bowie
Upper Level

## EXHIBIT B

## DESCRIPTION OF THE LAND

Part of the LUTHER QUADRANGLE in the City of Fort Worth in Tarrant County, Texas, as said Luther Quadrangle appears upon the map recorded in Volume 1975, Page 283 of the Tarrant County Deed Records. Embracing Tract 1 the 227,443 square feet tract described in the deed to Ridglea One, recorded in Volume 13333 page 359 of the Deed Records Tarrant County, Texas and described by metes and bounds as follows,

BEGINNING at a masonry nail in asphalt for the northwest corner of said Tract I, and for the Northwest corner of said Quadrangle being in the south line of Camp Bowie Boulevard and the east line of Westridge Avenue,

THENCE North 63 degrees of 06 minutes 49 seconds East along the north line of said Tract I, and along the North line of said Quadrangle and the said south line of Camp Bowie Boulevard, 407-59/100 feet to a masonry nail recovered for the Northeast corner of said Tract I,

THENCE South 26 degrees 50 minutes 11 seconds East, 608-93/100 feet to a galvanized spike recovered for the most Easterly Southeast corner of said Tract I,

THENCE South 09 degrees 03 minutes 28 seconds West, 49-84/100 feet to a galvanized spike recovered for most of Southerly Southeast corner of said Tract I, and in the northerly line of Sunset Drive,

THENCE Northwesterly along the Southerly line of said Tract I, and along the said northerly line of Sunset Drive, along a curve to the left with a radius of 105 feet a distance of 40-04/100 feet to a galvanized spike recovered. The chord of said 40-04/100 feet arc is North 79 degrees 44 minutes 34 seconds West 39-80/100 feet,

THENCE South 89 degrees 24 minutes 38 seconds West, continuing along the Southerly line of said Tract I, and the said northerly line of Sunset Drive, a distance of 248-12/100 feet to a mark "Y" on concrete recovered at the beginning of a curve to the left with a radius of 225-19/100 feet,

THENCE along said curve to the left continuing along the said Southerly line of Tract I, and along said northerly line of Sunset Drive a distance of 58-20/100 feet to a mark "Y" recovered at its end, the chord of said 58-20/100 feet arc is South 82 degrees 01 minutes 35 seconds West, 58-04/100 feet,

THENCE South 74 degrees 31 minutes 18 seconds West, continuing along the said southerly line of Tract I, and along the said northerly line of Sunset Drive, 80-87/100 feet to a galvanized spike recovered for the southwest corner of said Tract I, in the said east line of Westridge Avenue,

THENCE Northerly along the west line of said Tract I, and along the said east line of Westridge Avenue along a curve to the left with a radius of 957- 6/10 feet a distance of 142-57/100 feet to a rail road spike recovered at its end, the chord of said 142-57/10 feet arc is North 22 degrees 37 minutes 48 seconds West, 142-42/100 feet,

THENCE North 26 degrees 53 minutes 28 seconds West, continuing along said west line of Tract I, and along said east line of Westridge Avenue, 338-47/100 feet to the PLACE OF BEGINNING containing 227,443 square feet, more or less

## EXHIBIT C

## ADDITIONAL RENT, TAXES, AND INSURANCE

1. **Additional Rent.** Commencing on January 1, 2008, Tenant shall pay to Landlord Tenant's Proportionate Share of the annual Operating Costs (defined below) in the office portion of the Building above Tenant's Expense Stop (defined below) ("**Additional Rent**"). Landlord may make a good faith estimate of the Additional Rent to be due by Tenant for any calendar year after the Base Year or part thereof during the Term. During each calendar year or partial calendar year of the Term after the Base Year, Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Base Rent, an amount equal to the estimated Additional Rent for such calendar year or part thereof divided by the number of months therein. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs are available for each calendar year.

"**Tenant's Expense Stop**" is the quotient achieved by dividing Operating Costs incurred during the calendar year 2007 (hereinafter referred to as the "**Base Year**") by the total Rentable Area of the office portion of the Building.

"**Tenant's Proportionate Share of Operating Costs**" is the amount, if any, by which the product of Tenant's Proportionate Share multiplied by Operating Costs, exceeds the product of Tenant's Expense Stop multiplied by the square feet of Rentable Area of the Premises.

2. **Operating Costs.** The term "**Operating Costs**" shall mean all expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Building, Project, Complex, or office portion of the Building, as applicable, determined in accordance with sound accounting principles consistently applied, including the following costs: (a) wages and salaries of all on-site employees engaged in the management, operation, maintenance, repair or security of the Project or Complex, as applicable (together with Landlord's reasonable allocation of expenses of off-site employees who perform a portion of their services in connection with the operation, maintenance or security of the Building, Project, Complex, or office portion of the Building, as applicable), including taxes, insurance and benefits relating thereto; (b) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Building, Project, Complex, or office portion of the Building, as applicable; (c) costs for improvements made to the Building, Project, Complex, or office portion of the Building, as applicable which, although capital in nature, are (i) expected to reduce the normal operating costs (including all utility costs) of the Building, Project, Complex, or office portion of the Building, as applicable, as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as (ii) capital improvements made in order to comply with any Law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion, as well as (iii) capital improvements made to improve the health, safety and welfare of the Building and its occupants, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion; (d) cost of all utilities for the common areas; (e) repairs, replacements, and general maintenance of the Building, Project, Complex, or office portion of the Building, as applicable; (f) fair market rental and other costs with respect to the management office for the Building, Project, Complex, or office portion of the Building, if any; and (g) service, maintenance and management contracts with independent contractors for the operation, maintenance, management, repair, replacement, or security of the Building, Project, Complex, or office portion of the Building, as applicable. If the Building, or office portion of the Building, as applicable, are part of a Complex, Operating Costs may be prorated among the Project and the other buildings of the Complex, as reasonably determined by Landlord.

Operating Costs shall not include costs for: (1) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (2) interest, amortization or other payments on loans to Landlord; (3) depreciation; (4) leasing commissions; (5) legal expenses for services, other than those that benefit the Building, Project, Complex, or office portion of the Building tenants, as applicable (e.g., tax disputes); (6) renovating or otherwise improving leased premises of the Building, Project, Complex, or office portion of the Building, as applicable or vacant space in the Building, Project, Complex, or office portion of the Building, as applicable; (7) Taxes and Insurance which are paid separately pursuant to <u>Sections 3 and 4</u> below; (8) federal income taxes imposed on or measured by the income of Landlord from the operation of the Building, Project, Complex, or office portion of the Building, as applicable; or (9) electricity for the Premises, as this will be billed separately to Tenant and Tenant will be responsible for the cost of all electricity used within the Premises; (10) the cost of capital improvements to the Project or Complex, except as provided in clause (c) above; (11) marketing costs, leasing commissions and tenant expenses Landlord incurs in connection with leasing or procuring tenants or renovating space for new or existing tenants; (12) legal expenses incident to Landlord's enforcement of any lease other than this Lease; (13) interest or principal payments on any Mortgage of Landlord; (14) any expense for which Landlord is directly reimbursed by another tenant other than as an Operating Cost; (15) the cost of any repairs, restoration or other work for which Landlord is directly reimbursed by insurance proceeds or Taking awards; (16) any amount paid for products or services to an entity that is an Affiliate of Landlord, but only if and to the extent such amount exceeds the fair market value of such services and products; (17) the costs of any utilities which are separately metered to the Premises or to another tenant's premises; (18) any fines or penalties imposed on Landlord for failing to timely perform its obligations under this Lease; (19) salaries of employees not related to the management, operation, repair or maintenance of the Complex; (20) any ground rent payable under any ground lease now or hereafter affecting the Project; (21) any bad debt loss, rental loss, or reserves for bad debts or rental loss; (22) costs of test, survey, cleanup or remediation of Hazardous Materials which are in or on the Project or Complex as of the Effective Date and which are classified as Hazardous Materials under Laws in effect as of the Effective Date; (23) any costs which would allow Landlord a "double recovery" of any other costs for which Landlord is directly reimbursed other than as an Operating Cost; (24) any costs or expenses for which Landlord is or will be indemnified (whether by an insurer, condemnor, tenant or otherwise); (25) overhead and administrative costs of Landlord not directly incurred in the operation and maintenance of the Building; (26) depreciation or amortization of the Building or its contents or components; (27) expenses for the preparation of space or other work which Landlord performs for any other tenant or prospective tenant of the Building; (28) expenses for repairs or other work which is caused by fire, windstorm, casualty or any other insurable occurrence; (29) interest, amortization or other costs, including legal fees, associated with any mortgage, loan or refinancing of the Building or any common areas, transfer or recordation taxes and other charges in connection with the transfer of ownership in the Building, land trust fees, and rental due under any ground lease relating to the property on which the Building is located; (30) accounting and legal fees relating to the leasing, sale of or relating to any litigation in any way involving the Building or any Common Areas; (31) any interest or penalty incurred due to the late payment of any Operating Cost and/or Taxes; or (32) any personal property taxes of the Landlord for equipment or items not used directly in the operation or maintenance of the Building, nor connected therewith.

3.    <u>Electricity</u>. Tenant will be responsible for the cost of all electricity used within the Premises. If the Premises is on a house meter (one that meters the use of multiple spaces), Tenant will be billed for their proportionate share, defined as the Rentable square footage of the Premises as it relates to the Rentable Square Footage being metered on the same house meter. If Tenant chooses to have the Premises sub-metered, Tenant may do this at their sole and absolute cost and then pay the utility provider directly for their utility usage. Electricity usage for the Premises will not be included in Operating Costs or be subject to the Expense Stop.

4.    <u>Taxes</u>. Tenant shall also pay Tenant's Proportionate Share of increases in Taxes over the Base Year, for each year and partial year after the Base Year falling within the Term. Tenant shall pay Tenant's Proportionate Share of Taxes in the same manner as provided above for Tenant's Proportionate Share of Operating Costs. "<u>Taxes</u>" shall mean taxes, charges, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental

assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of Operating Costs) now or hereafter attributable to the Building, Project, or Complex, as applicable (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income (if the present method of taxation changes so that in lieu of or in addition to the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the rents received therefrom or a franchise tax, assessment, or charge based, in whole or in part, upon such rents for the Building, Project, or Complex, as applicable, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof). Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Project. For property tax purposes, to the extent allowed by Law, Tenant waives all rights to protest or appeal the appraised value of the Premises, as well as the Building, Project, and Complex, and all rights to receive notices of reappraisement.

5.    **Insurance**.  Tenant shall pay Tenant's Proportionate Share of increases in Insurance over the Base Year, for each year and partial year after the Base Year falling within the Term.  Tenant shall pay Tenant's Proportionate Share of increases in Insurance in the same manner as provided above for Tenant's Proportionate Share of increases in Operating Costs. "**Insurance**" shall mean property, liability and other insurance coverages carried by Landlord, including without limitation deductibles and risk retention programs and an allocation of a portion of the cost of blanket insurance policies maintained by Landlord and/or its affiliates.

6.    **Operating Costs and Tax and Insurance Statement**.  By April 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs for the previous year, adjusted as provided in Section 6 of this Exhibit, and of the Taxes and Insurance for the previous year (the "**Operating Costs, Tax and Insurance Statement**").  If Tenant's estimated payments of Operating Costs or Taxes or Insurance under this Exhibit C for the year covered by the Operating Costs, Tax and Insurance Statement exceed Tenant's share of such items as indicated in the Operating Costs, Tax and Insurance Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Operating Costs, Taxes or Insurance under this Exhibit C for such year are less than Tenant's share of such items as indicated in the Operating Costs, Tax and Insurance Statement, then Tenant shall within thirty (30) days after receipt of Landlord's Operating Costs, Tax and Insurance Statement pay Landlord such deficiency, notwithstanding that the Term has expired and Tenant has vacated the Premises.

7.    **Tenant's Inspection and Audit Rights**.  If Tenant desires to audit Landlord's determination of the actual amount of Tenant's Proportionate Share of Operating Costs, Taxes and Insurance for any calendar year, Tenant must deliver to Landlord written notice of Tenant's election to audit within 120 days after Landlord's delivery of the Operating Costs, Tax and Insurance Statement.  If such notice is timely delivered, and provided that no Event of Default then exists under this Lease, Tenant may, at Tenant's sole cost and expense, cause a certified public accountant acceptable to Landlord to audit Landlord's records relating to such amounts on a non-contingent basis.  Such audit will take place during regular business hours at a time and place reasonably acceptable to Landlord (which may be the location where Landlord maintains the applicable records).  If the audit report shows that the amount Landlord charged Tenant for Tenant's Proportionate Share of Operating Costs, Taxes and Insurance was greater than the amount this Exhibit C obligates Tenant to pay, unless Landlord reasonably contests the audit, Landlord will refund the excess amount to Tenant within 30 days after Landlord receives a copy of the audit report.  If the audit report shows that the amount Landlord charged Tenant for Tenant's Proportionate Share of Operating Costs, Taxes and Insurance was less than the amount this Exhibit C obligates Tenant to pay, Tenant will pay to Landlord, as Additional Rent, the difference between the amount Tenant paid and the amount determined in the audit.  Pending resolution of any audit under this Section, Tenant will continue to pay to Landlord all estimated amounts of Tenant's Proportionate Share of Operating Costs, Taxes and Insurance in accordance with this Exhibit C.  Tenant must keep all information it obtains in any audit strictly confidential and may only use such information for the limited purpose this Section describes and for Tenant's own account.  If Tenant elects to audit such costs and expenses as provided above and Landlord's Operating Costs, Tax and Insurance Statement is found to be in error by more than five percent (5%), then Landlord will pay Tenant's reasonable third party out-of-pocket costs for this audit, not to exceed $3,000.

06/06/2007 WED 14:01 FAX

## EXHIBIT D

### TENANT FINISH-WORK

1.  **Acceptance of Premises.** Tenant accepts the Premises in their "AS-IS" condition on the date that this Lease is entered into, except that prior to Tenant taking occupancy, Landlord shall provide the following (the "**Work**"):

- Construct an access way through Suite 250 and Suite 255.

- Add a wall in Suite 250 to create hallway, and separation from break room, to pass through to Suite 255.

- Paint all interior walls of Suite 255 using building grade quality. The color may be selected by Tenant and approved by Landlord.

- Carpet the floor of Suite 255 using building grade quality. The color may be selected by Tenant and approved by Landlord.

- Add building grade and quantity electrical drops in Suite 255 for cubicles (Tenant to provide plan to Landlord).

All of the Work shall be agreed to, and signed off on, by both Landlord and Tenant prior to starting construction.

2.  **Tenant's Work.** Tenant will be allowed into Premises prior to commencement, but after lease execution to allow Tenant to do certain fixturing, finishing or other work required by Tenant to make the Premises ready for Tenant's use and occupancy. To gain access to Premises Tenant must coordinate with Landlord's Construction Manager, Glenn Fick.

3.  **Compliance.** All design, construction and installation by Tenant in the Demised Premises shall conform to the requirements of applicable building, fire, plumbing and electrical codes and the requirements of any authority having jurisdiction over or with respect to the Tenants Work. Further all construction work which is done will be bound by the Landlord's construction specifications, rules and regulations for the Building.

4.  **Tenant Improvement Allowance.** Landlord shall, at Landlord's sole cost and expense, build the space according to the description in number one above, which Work will be approved by both Landlord and Tenant prior to start of construction. If there are any change orders requested by the Tenant after the Work has been approved that increase the cost of construction, the cost of all change orders will be at Tenant's sole cost and expense. In addition, if Tenant chooses to upgrade any of the finishes above building standard, those costs will be paid by Tenant at the time of request.

5.  **Miscellaneous.** Tenant shall be responsible for any and all damage caused to the Demised Premises or to the Building as a result of moving into and out of the Demised Premises.

6.  **Landlord's Warranty.** Landlord warrants to Tenant that the Work will be free from defects in material and workmanship (collectively, "**Defects**") for a period of one (1) year from substantial completion of the Work. Landlord shall promptly correct Defects which are identified within such one (1) year period. Such warranty expressly excludes any obligation for the correction of Defects caused by Tenant's abuse, improper or insufficient maintenance or improper operation. In addition, Landlord shall reasonably obtain standard industry warranties and shall allow Tenant to be a beneficiary of any warranties it is able to obtain for the Work from each contractor, builder or manufacturer. Landlord shall deliver to Tenant a copy of all warranties, guarantees, and operating manuals and information relating to the improvements, equipment and systems in the Premises.





## EXHIBIT E

## BUILDING RULES AND REGULATIONS

The following rules and regulations shall apply to the Premises, the Building, the parking garage associated therewith, and the appurtenances thereto:

1.      Sidewalks, doorways, vestibules, halls, stairways, and other similar areas shall not be obstructed by tenants or used by any tenant for purposes other than ingress and egress to and from their respective leased premises and for going from one to another part of the Building.

2.      Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein. Damage resulting to any such fixtures or appliances from misuse by a tenant or its agents, employees or invitees, shall be paid by such tenant.

3.      No signs, advertisements or notices (other than those that are not visible outside the Premises) shall be painted or affixed on or to any windows or doors or other part of the Building without the prior written consent of Landlord.

4.      Landlord shall provide all door locks in each tenant's leased premises, at the cost of such tenant, and no tenant shall place any additional door locks in its leased premises without Landlord's prior written consent. Landlord shall furnish to each tenant a reasonable number of keys to such tenant's leased premises, at such tenant's cost, and no tenant shall make a duplicate thereof.

5.      If the Building is multi-tenant, movement in or out of the Building of furniture or office equipment, or dispatch or receipt by tenants of any bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be conducted under Landlord's supervision at such times and in such a manner as Landlord may reasonably require. Each tenant assumes all risks of and shall be liable for all damage to articles moved and injury to persons or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord if damaged or injured as a result of acts in connection with carrying out this service for such tenant.

6.      Landlord may prescribe weight limitations and determine the locations for safes and other heavy equipment or items, which shall in all cases be placed in the Building so as to distribute weight in a manner acceptable to Landlord which may include the use of such supporting devices as Landlord may require. All damages to the Building caused by the installation or removal of any property of a tenant, or done by a tenant's property while in the Building, shall be repaired at the expense of such tenant.

7.      Corridor doors, when not in use, shall be kept closed. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No birds or animals (other than seeing-eye dogs) shall be brought into or kept in, on or about any tenant's leased premises. No portion of any tenant's leased premises shall at any time be used or occupied as sleeping or lodging quarters.

8.      Tenant shall not make or permit any vibration or improper, objectionable or unpleasant noises or odors in the Building or otherwise interfere in any way with other tenants or persons having business with them.

9.      No machinery of any kind (other than normal office equipment) shall be operated by any tenant on its leased area without Landlord's prior written consent, nor shall any tenant use or keep in the Building any flammable or explosive fluid or substance (other than typical office supplies [e.g., photocopier toner] used in compliance with all Laws).

10.      Landlord will not be responsible for lost or stolen personal property, money or jewelry from tenant's leased premises or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.

11.      No vending or dispensing machines of any kind may be maintained in any leased premises without the prior written permission of Landlord, other than those used for Tenant's employees.

06/06/2007 WED 14:02 FAX                                    @040/048

12.     Other than in connection of Tenant's use of the Premises for the Permitted Use, Tenant shall not conduct any activity on or about the Premises or Building which will draw pickets, demonstrators, or the like.

13.     No tenant may enter into phone rooms, electrical rooms, mechanical rooms, or other service areas of the Building unless accompanied by Landlord or the Building manager.

14.     Tenant shall not permit its employees, invitees or guests to smoke in the Premises or the lobbies, passages, corridors, elevators, vending rooms, rest rooms, stairways or any other area shared in common with other tenants in the Building.  Nor shall the tenant permit its employees, invitees, or guests to loiter at the Building entrances for the purposes of smoking. Landlord may, but shall not be required to, designate an area for smoking outside the Building.

15.     Canvassing, soliciting or peddling in or about the Premises or the Property is prohibited and Tenant shall cooperate to prevent same.

16.     Tenant shall be provided two (2) key cards for after hours' access as part of this Lease.  The cost of any additional cards requested by Tenant shall be at the sole cost of Tenant at Landlords actual expense.

17.     These Building Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the other terms, covenants, agreements and conditions of the Lease.  To the extent there is any conflict between a Building Rule and Regulation and any express term or provision otherwise set forth in the Lease, the terms of the Lease will be controlling.

**EXHIBIT F**

**CONFIRMATION OF COMMENCEMENT DATE**

_____, 200_

_____
_____
_____
_____

Re:   Lease Agreement (the "Lease") dated _____, 200__, between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant"). Capitalized terms used herein but not defined shall be given the meanings assigned to them in the Lease.

Ladies and Gentlemen:

Landlord and Tenant agree as follows:

1.   **Condition of Premises.**  Tenant has accepted possession of the Premises pursuant to the Lease. Any improvements required by the terms of the Lease to be made by Landlord have been completed to the full and complete satisfaction of Tenant in all respects except for the punchlist items described on **Exhibit A** hereto (the "**Punchlist Items**"), and except for such Punchlist Items, Landlord has fulfilled all of its duties under the Lease with respect to such initial tenant improvements. Furthermore, Tenant acknowledges that the Premises are suitable for the Permitted Use.

2.   **Commencement Date.**  The Commencement Date of the Lease is _____, 200__.

3.   **Expiration Date.**  The Term is scheduled to expire on the last day of the ____ full calendar month of the Term, which date is _____, 200__.

4.   **Contact Person.**  Tenant's contact person in the Premises is:

_____
_____
_____
Attention: _____
Telephone: _____
Telecopy: _____

5.   **Ratification.**  Tenant hereby ratifies and confirms its obligations under the Lease, and represents and warrants to Landlord that, to Tenant's knowledge, it has no defenses thereto. Additionally, Tenant further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good standing and in full force and effect, and (b) to Tenant's knowledge, Tenant has no claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of any other transaction between Landlord and Tenant.

6.   **Binding Effect; Governing Law.**  Except as modified hereby, the Lease shall remain in full effect and this letter shall be binding upon Landlord and Tenant and their respective successors and assigns. If any inconsistency exists or arises between the terms of this letter and the terms of the Lease, the terms of this letter shall prevail. This letter shall be governed by the laws of the state in which the Premises are located.

Please indicate your agreement to the above matters by signing this letter in the space indicated below and returning an executed original to us.

Sincerely,

_____, a _____

By:_____
Name:_____
Title:_____

Agreed and accepted:
[TENANT'S SIGNATURE BLOCK],

a _____
By:_____
Name:_____
Title:_____

**EXHIBIT A**

**PUNCHLIST ITEMS**

Please insert any punchlist items that remain to be performed by Landlord. If no items are listed below by Tenant, none shall be deemed to exist.

**EXHIBIT G**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

The undersigned is the Tenant under the Lease (defined below) between _____, a _____, as Landlord, and the undersigned as Tenant, for the Premises on the _____ floor(s) of the industrial building located at _____, _____ and commonly known as _____, and hereby certifies, as of the date hereof, as follows:

1.  The Lease consists of the original Lease Agreement dated as of _____, 200___ between Tenant and Landlord ['s predecessor-in-interest] and the following amendments or modifications thereto (if none, please state "none"): _____

_____

_____

_____.

The documents listed above are herein collectively referred to as the "Lease" and represent the entire agreement between the parties with respect to the Premises. All capitalized terms used herein but not defined shall be given the meaning assigned to them in the Lease.

2.  The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Section 1 above.

3.  The Term commenced on _____, 200___, and the Term expires, excluding any renewal options, on _____, 200___, and Tenant has no option to purchase all or any part of the Premises or the Building or, except as expressly set forth in the Lease, any option to terminate or cancel the Lease.

4.  Tenant currently occupies the Premises described in the Lease and Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows (if none, please state "none"):

_____

_____

_____

5.  All monthly installments of Base Rent, all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____. The current monthly installment of Base Rent is $_____.

6.  To Tenant's knowledge, all conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder. In addition, Tenant has not delivered any notice to Landlord regarding a default by Landlord thereunder.

7.  To Tenant's knowledge, (i) there are no existing defenses or offsets, orclaims or any basis for a claim, that the undersigned has against Landlord and (ii) no event has occurred and no condition exists, which, with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

8.  No rental has been paid more than 30 days in advance and no security deposit has been delivered to Landlord except as provided in the Lease.

9.  If Tenant is a corporation, partnership or other business entity, Tenant represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

10.  There are no actions pending against Tenant under any bankruptcy or similar laws of the United States or any state.

11.    Other than as permitted in the Lease or approved by Landlord in writing and used in compliance with all applicable laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous substances in the Premises.

12.    All tenant improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any tenant improvement work have been paid in full.

Tenant acknowledges that this Estoppel Certificate may be delivered to Landlord, Landlord's Mortgagee or to a prospective mortgagee or prospective purchaser, and their respective successors and assigns, and acknowledges that Landlord, Landlord's Mortgagee and/or such prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in disbursing loan advances or making a new loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of disbursing loan advances or making such loan or acquiring such property.

Executed as of _____, 200__.

TENANT:

_____

A _____

By:_____
Name:_____
Title:_____

**EXHIBIT H**

**RENEWAL OPTION**

Tenant shall have the right to extend the term of this Lease for one (1) additional three (3) year period (the "**Option Term**"), conditioned upon (i) Tenant delivering written notice of exercise of such option at least six (6), but no more than nine (9) months, prior to the commencement of the Option Term, and (ii) Tenant not being in default in the performance of Tenant's obligations under the Lease at the time of exercise of Tenant's option contained in this Section or at the time of the commencement of the Option Term.  During the Option Term, all of the terms and conditions of this Lease shall remain in full force and effect, except that (a) the minimum guaranteed rental shall be the prevailing market rental for the Premises as reasonably determined by Landlord based on rents being obtained by Landlord for similar space within the Complex, but in no event less than the guaranteed minimum guaranteed rental during the last year of the primary term pursuant to this Lease, and (b) Tenant shall have no further rights to extend the term of this Lease after the expiration of the number of Option Terms granted above.  Within fifteen (15) days after Tenant delivers notice of its intent to exercise the option provided in this Section, Landlord shall deliver to Tenant notice of the rental which will be payable during the Option Term. Within fifteen (15) days after receipt of Landlord's notice of this rental so determined by Landlord, Tenant shall have the right to withdraw its exercise of the option to extend the term of this Lease through the Option Term.  In the event Tenant fails to deliver written notice of withdrawal of its exercise of such option within such fifteen (15) day period, then Tenant shall be deemed to have irrevocably exercised its option to extend the term of this Lease through the Option Term.

EXHIBIT I

GUARANTY

As a material inducement to Landlord to enter into the Lease, dated February _/_, 2007 (the "**Lease**"), between HOME123 CORPORATION, (collectively as the "**Tenant**"), and VILLAGE AT CAMP BOWIE I, L.P. ("**Landlord**"), a Texas limited partnership, NEW CENTURY MORTGAGE CORPORATION, a California corporation (hereinafter referred to as the "Guarantor") hereby unconditionally and irrevocably guarantees the complete and timely performance of each obligation of Tenant (and any assignee) under the Lease and any extensions or renewals of and amendments to the Lease. This Guaranty is an absolute, primary, and continuing guaranty of payment and performance and is independent of Tenant's obligations under the Lease. Guarantor (and if this Guaranty is signed by more than one person or entity, each Guarantor hereunder) shall be primarily liable, jointly and severally, with Tenant and any other guarantor of Tenant's obligations. Guarantor waives any right to require Landlord to (a) join Tenant with Guarantor in any suit arising under this Guaranty, (b) proceed against or exhaust any security given to secure Tenant's obligations under the Lease, or (c) pursue or exhaust any other remedy in Landlord's power.

Until all of Tenant's obligations to Landlord have been discharged in full, Guarantor shall have no right of subrogation against Tenant. Landlord may, without notice or demand and without affecting Guarantor's liability hereunder, from time to time, compromise, extend or otherwise modify any or all of the terms of the Lease, or fail to perfect, or fail to continue the perfection of, any security interests granted under the Lease. Without limiting the generality of the foregoing, if Tenant elects to increase the size of the leased premises, extend the lease term, or otherwise expand Tenant's obligations under the Lease, Tenant's execution of such lease documentation shall constitute Guarantor's consent thereto (and such increased obligations of Tenant under the Lease shall constitute a guaranteed obligation hereunder); Guarantor hereby waives any and all rights to consent thereto. Guarantor waives any right to participate in any security now or hereafter held by Landlord. Guarantor hereby waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, dishonor and notices of acceptance of this Guaranty, and waives all notices of existence, creation or incurring of new or additional obligations from Tenant to Landlord. Guarantor further waives all defenses afforded guarantors or based on suretyship or impairment of collateral under applicable Law, other than payment and performance in full of Tenant's obligations under the Lease. The liability of Guarantor under this Guaranty will not be affected by: (1) the release or discharge of Tenant from, or impairment, limitation or modification of, Tenant's obligations under the Lease in any bankruptcy, receivership, or other debtor relief proceeding, whether state or federal and whether voluntary or involuntary; (2) the rejection or disaffirmance of the Lease in any such proceeding; or (3) the cessation from any cause whatsoever of the liability of Tenant under the Lease, except for Landlord's breach of the Lease.

Guarantor shall pay to Landlord all costs incurred by Landlord in enforcing this Guaranty (including, without limitation, reasonable attorneys' fees and expenses). The obligations of Tenant under the Lease to execute and deliver estoppel statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do so and provide the same relative to Guarantor following written request by Landlord in accordance with the terms of the Lease. All notices and other communications given pursuant to, or in connection with, this Guaranty shall be delivered in the same manner required in the Lease. All notices or other communications addressed to Guarantor shall be delivered at the address set forth below. This Guaranty shall be binding upon the heirs, legal representatives, successors and assigns of Guarantor and shall inure to the benefit of Landlord's successors and assigns.

This Guaranty shall be governed by the laws of the state in which the premises covered by the Lease is located.

SIGNATURES ON FOLLOWING PAGE

Executed as of _February 1_, 200 7

NEW CENTURY MORTGAGE CORPORATION

By: _Tommaso Trinchieri_

Name: _____Tommaso Trinchieri_____

Title: _____AVP, Corporate Real Estate_____

Address:3353 Michaelson Drive, Suite 100

Irvine, CA 92612

Attn: AVP, Corporate Real Estate_____

Telephone: _949. 517. 0427_

Telecopy: _949. 471. 4859_