UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 07-10416-KJC
                                .
                                .
  NEW CENTURY TRS HOLDINGS,     .
     INC., et al.,              . 824 Market Street
                                . Wilmington, DE  19801
                   Debtors.  .
                                . April 19, 2007
. . . . . . . . . . . . . . . . 3:09 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              O'Melveny & Myers LLP
                              By:  SUZZANNE UHLAND, ESQ.
                              Embarcadero Center West
                              275 Battery Street
                              San Francisco, CA  94111-3305

                              O'Melveny & Myers LLP
                              By:  BRIAN METCALF, ESQ.
                              400 South Hope Street
                              Los Angeles, CA  90071-2899

For Carrington Capital        Mayer, Brown, Rowe & Maw LLP
Management, LLC &             By:  THOMAS S. KIRIAKOS, ESQ.
Carrington Mortgage                SEAN SCOTT, ESQ.
Services, LLC:                71 S. Wacker
                              Chicago, Illinois 60606-4637

Audio Operator:               Brandon McCarthy

 Proceedings recorded by electronic sound recording, transcript
                 produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.)

For Carrington Capital          Womble Carlyle Sandridge
Management, LLC &                 & Rice
Carrington Mortgage             By:  STEVEN K. KORTANEK, ESQ.
Services, LLC:                   222 Delaware Avenue, 15th Floor
                                Wilmington, DE 19801

For the Unsecured Creditors     Blank Rome, LLP
Committee:                      By:  BONNIE GLANTZ FATELL, ESQ.
                                Chase Manhattan Centre
                                1201 Market Street
                                Suite 800
                                Wilmington, DE 19801

                                Hahn & Hessen LLP
                                By:  MARK T. POWER, ESQ.
                                488 Madison Avenue
                                14th and 15th Floor
                                New York, NY  10022

For the U.S. Trustee:           Office of the U.S. Trustee
                                By:  JOSEPH McMAHON, ESQ.
                                844 King Street
                                Suite 2313
                                Lockbox 35
                                Wilmington, DE 19801

For Kochak:                     Rosenthal, Monhait, Gross &
                                 Goddess, PA.
                                By:  NORMAN M. MONHAIT, ESQ.
                                919 Market Street
                                Suite 1401
                                P.O. Box 1070
                                Wilmington, DE 19899

For Lehman:                     Weil, Gotshal & Manges LLP
                                By:  ROBERT JORDAN, ESQ.
                                     JACQUELINE MARCUS, ESQ.
                                767 Fifth Avenue
                                New York, NY  10153

For the Debtors:                Hennigan, Bennett & Dorman, LLP
                                By:  BRUCE BENNETT, ESQ.
                                     JOSHUA D. MORSE, ESQ.
                                     BRENT TRUITT, ESQ.
                                601 South Figueroa Street
                                Suite 3300
                                Los Angeles, CA  90017

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.)

                              Richards, Layton & Finger, P.A.
                              By:  MARCOS A. RAMOS, ESQ.
                                   MARK COLLINS, ESQ.
                                   CHRISTOPHER M. SAMIS, ESQ.
                              One Rodney Square
                              920 N. King Street
                              P.O. Box 551
                              Wilmington, DE 19899

For GECC:                     Gebhardt & Smith LLP
                              By:  MIKE GALLERIZZO, ESQ.
                              401 East Pratt Street
                              Ninth Floor
                              World Trade Center
                              Baltimore, MD  21202

For Greenwich:                Kirkland & Ellis, LLP
                              By:  SHIRLEY CHO, ESQ.
                              777 South Figueroa Street
                              Los Angeles, CA  90017

For Positive Software:        Munsch Hardt Kopf & Harr
                              By:  MARK RALSTON, ESQ.
                              3800 Lincoln Plaza
                              500 N. Akard Street
                              Dallas, TX 75201-6659

                              Fox Rothschild
                              By:  ANTHONY M. SACCULLO, ESQ.
                              Citizens Bank Center, Suite 1300
                              919 North Market Street
                              Wilmington, DE

For RBC:                      Monzack and Monaco, P.A.
                              By:  RACHEL B. MERSKY, ESQ.
                                   FRANK MONACO, ESQ.
                              1201 North Orange Street
                              Suite 400
                              Wilmington, DE 19899

For Deutsche Bank National    Nixon Peabody, LLP
Trust Co.:                    By:  DENNIS J. DREBSKY, ESQ.
                              437 Madison Avenue
                              New York, NY   10022

APPEARANCES (Cont'd):

```
                              Pepper Hamilton, LLP
                              By:  DAVID B. STRATTON, ESQ.
                              Hercules Plaza
                              Suite 5100
                              1313 Market Street
                              P.O. Box 1709
                              Wilmington, DE 19899

For Premier:                  Stevens & Lee
                              By:  JOSEPH GREY, ESQ.
                                   JOSEPH HUSTON, ESQ.
                              1105 North Market Street
                              Wilmington, DE  19801

                              Bernstein & Shur
                              By:  ROBERT KEACH, ESQ.
                              100 Middle Street
                              West Tower
                              Portland, ME 04101

For Wells Fargo/C-Bass:       Hunton & Williams
                              By:  J.R. SMITH, ESQ.
                              Riverfront Plaza
                              East Tower
                              951 East Byrd Street
                              Richmond, VA 23219

                              Eckert Seamans
                              By:  MICHAEL BUSENKELL, ESQ.
                              300 Delaware Avenue
                              Suite 1210
                              Wilmington, DE  19801

For UBS:                      Ashby & Geddes
                              By:  GREGORY ALAN TAYLOR, ESQ.
                              500 Delaware Avenue
                              8th Floor
                              P.O. Box 1150
                              Wilmington, Delaware 19899

For Bank of America, N.A.:    Potter, Anderson & Corroon, LLP
                              By: LAURIE SELBER SILVERSTEIN,
                                   ESQ.
                              Hercules Plaza
                              1313 North Market Street
                              Wilmington, DE 19801
```

APPEARANCES (Cont'd.):

For Countrywide & GMAC CF:       Edwards & Angell, Palmer
                                   & Dodge, LLP
                                 By: WILLIAM CHAPMAN, ESQ.
                                 919 North Market Street
                                 Wilmington, DE  19801

For Citi Corp.:                  Campbell & Levine, LLC
                                 By:  MARK T. HURFORD, ESQ.
                                 800 N. King Street
                                 Suite 300
                                 Wilmington, DE  19801

For Alaska Seaboard              Klehr, Harrison, Harvey,
Limited Partners:                  Branzburg & Ellers LLP
                                 By:  MICHAEL YURKEWICZ, ESQ.
                                 260 South Broad Street
                                 Philadelphia, PA 19102-5003

For Morgan Stanley Company:      Morris, Nichols, Arsht
                                   & Tunnell LLP
                                 By:  GREGORY W. WERKHEISER, ESQ.
                                 Chase Manhattan Centre,
                                 18th Floor
                                 1201 North Market Street
                                 Wilmington, DE 19899-1347

For Squire, Sanders &            Squire, Sanders & Dempsey, L.L.P.
Dempsey:                         By:  JOSEPH RODGERS, ESQ.
                                 4900 Key Tower
                                 127 Public Square
                                 Cleveland, OH  44114

For Deutsche Bank:               Bingham McCutchen, LLP
                                 By:  RICHARD AGINS, ESQ.
                                 One State Street
                                 Hartford, CT 06103

For Bank of America:             Kaye Scholer LLP
                                 By:  NICHOLAS CREMONA, ESQ.
                                 425 Park Avenue
                                 New York, NY  10022

For Murray Capital               Murray Capital Management, Inc.
Management, Inc.:                 By:  MARTI MURRAY

APPEARANCES (Cont'd.)

For DB Structured Products:     Young, Conaway, Stargatt & Taylor
                                By:  ROBERT BRADY, ESQ.
                                1000 West Street
                                17th Floor
                                Wilmington, DE  19801

For Washington Mutual:          Connolly Bove Lodge & Hutz
                                By:  MARC PHILLIPS, ESQ.
                                The Nemours Building
                                1007 North Orange Street
                                Wilmington, DE 19899

**INDEX**

**WITNESSES**                                                          **PAGE**
DAVID S. KURTZ
        Cross Examination by Mr. Gallerizzo              77
        Cross Examination by Mr. Power                   79

ANTHONY MEOLA
        Cross Examination by the Court                   134
        Redirect Examination by Ms. Uhland              135

**EXHIBIT**                                        **I.D.**      **EVD.**
UST-1      Privacy Policy                        43          44

D-1        New Century Mortgage                 132         133
             Corporation bylaws

1           THE COURT:  Good morning.

2           MR. RAMOS:  Marcos Ramos, Richards Layton & Finger on

3 behalf of the debtor.  Your Honor, with your indulgence, we

4 would like to take one matter from the agenda out of order if

5 we could.  Your Honor has scheduled a status conference in the

6 matter of Alaska Seaboard v. New Century.

7           THE COURT:  Yes.

8           MR. RAMOS:  We thought that it might make some sense

9 to just try to address that matter first if Your Honor allows

10 that.

11          THE COURT:  All right.

12          MR. RAMOS:  Your Honor, I believe our co-counsel, Mr.

13 Brent Truitt of the law firm of Hennigan Bennett might be on

14 the telephone.  That's --

15          MR. TRUITT:  Yes, Your Honor.  This is Brent Truitt

16 of Hennigan Bennett & Dorman.

17          THE COURT:  Good morning.

18          MR. TRUITT:  Morning.

19          MR. RAMOS:  Your Honor, I can give you just a brief

20 status.  Last week the complaint was filed.  There was an

21 application made for temporary restraining order.  The parties

22 have been engaged in discussion since then and I think it would

23 be fair to characterize the discussions as positive.

24 Nonetheless, we understand that counsel for Alaska Seaboard

25 would like to have a hearing schedule, if Your Honor's calendar

1  permits.  And from our perspective, Your Honor, we would ask

2  that any hearing that might be scheduled be scheduled no

3  earlier than next Friday which would be April 27th.  We think

4  that that date would accommodate several interests including

5  the parties continuing discussions as well as the travel

6  schedule for our co-counsel who's located on the west coast.

7  And obviously, also the need to file any responsive pleadings

8  to the application that was filed.

9           And, Your Honor, counsel for Alaska Seaboard is here

10 as well and I'll defer to him at this time.

11           THE COURT:  Very well.

12           MR. YURKEWICZ:  Good morning, Your Honor.  Michael

13 Yurkewicz from Klehr, Harrison, Harvey, Branzburg & Ellers on

14 behalf of Alaska Seaboard Limited Partners.  First of all I'd

15 like to thank the Court for your indulgence of hearing this

16 this morning.  And I also like to thank the debtors for their

17 indulgence of -- and cooperation in accommodating us in some of

18 our scheduling issues.

19           With that being said, we'd also characterize the

20 discussions in this matter towards resolution as positive.  And

21 we're optimistic that a resolution can be had in this case.

22 However, we would like to have a hearing date scheduled in case

23 there is -- discussions do not come to fruition.

24           THE COURT:  Well, rather than creating a new date on

25 the calendar for this case, is there some reason why we can't

1 add it to the April 24th omnibus hearing?

2          MR. YURKEWICZ:  We would have -- that would be next

3 Tuesday, Your Honor?  We would have no opposition to adding it

4 to that date.  We certainly would not want it to slip past next

5 week.  The debtors have expressed to us some concern that --

6 their ability to meet that date.  But from our perspective, the

7 24th would be fine.

8          THE COURT:  Okay.  I do understand there's a lot

9 going on.

10          MR. TRUITT:  Your Honor, this is Brent Truitt.  Is it

11 correct to say that Your Honor is proposing just to put another

12 status conference as opposed to a hearing on the merits for the

13 24th?  And the reason I ask is, obviously, we would have to

14 focus on responding to the motion rather than focusing on these

15 efforts to settle at this point.

16          THE COURT:  Well --

17          MR. YURKEWICZ:  Your Honor, if I may --

18          THE COURT:  -- I would be surprised if activities

19 weren't going on on a parallel track, but I understand that

20 this case has been front loaded and there's a lot going on.

21          All right.  Well, if I schedule it for the 27th, what

22 would the parties propose as a response date?

23          MR. YURKEWICZ:  Your Honor, we would propose perhaps

24 the 25th.

25          MR. TRUITT:  That's fine with the debtors.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  We'll make it April 27th at

2  1:30.  Is that time suitable for the hearing?

3          MR. YURKEWICZ:  Yes, Your Honor.  From our

4  perspective it is.

5          MR. TRUITT:  Yes, Your Honor.

6          THE COURT:  Then the response date will be April 25th

7  at 4:00 we'll say.  Prevailing eastern time.  And with that,

8  the order on the motion to shorten notice has been signed.

9          MR. YURKEWICZ:  Thank you, Your Honor.

10          THE COURT:  You're welcome.

11          MR. TRUITT:  Thank you, Your Honor.

12          MR. YURKEWICZ:  Your Honor, that's the only matter I

13  have before this Court.  I ask to be excused from the hearing?

14          THE COURT:  Very well.

15          MR. YURKEWICZ:  Thank you, Your Honor.

16          MR. TRUITT:  Your Honor, this is Brent Truitt.  May I

17  be excused?

18          THE COURT:  You may.

19          MR. TRUITT:  Thank you.

20          MR. RAMOS:  Thank you very much, Your Honor.  I'll

21  now defer the podium to Ms. Uhland.  Thank you.

22          MS. UHLAND:  Good morning, Your Honor.  Suzanne

23  Uhland of O'Melveny Myers on behalf of New Century.  With the

24  Court's further indulgence, we'd like to do a little more of

25  rearranging of this morning's calendar.  We would like to take

**J&J COURT TRANSCRIBERS, INC.**

1  the -- the first matter we would like to take, Your Honor, is

2  the procedures motion with respect to the servicing -- the sale

3  of the servicing aspects.

4         THE COURT:  Number two on today's agenda.

5         MS. UHLAND:  Number two on today's agenda.  Then,

6  Your Honor, we're -- pending discussions with the Creditors

7  Committee, at this time we expect to come back at the

8  conclusion of the hearing and request that the Court continue

9  the hearing with respect to the loan origination procedures

10 that the Creditors Committee request.

11        THE COURT:  All right.  What remains in the way of

12 objection to loan servicing bidding procedures?  And the reason

13 I ask is, you know, ten minutes before the hearing today, I was

14 handed a stack of papers which I saw for the first time, both

15 in connection with servicing and origination transactions.  And

16 it puts me really at an unacceptable disadvantage when it comes

17 to these things.

18        I'm willing to accommodate the parties' request for

19 shortened notice and hearings and you've experience that.  But

20 I'll do it only under circumstances under which I can come to

21 the bench fully prepared for the matters that are scheduled.

22 And I can't do that on ten minutes notice.

23        MS. UHLAND:  We appreciate that, Your Honor.  I

24 believe that the deadline for the loan origination procedures

25 was the matter that should have been -- that had the objection

**J&J COURT TRANSCRIBERS, INC.**

1  deadline of yesterday.

2          THE COURT:  I was also handed some things in

3  connection with servicing today, too.

4          MS. UHLAND:  Right.  With respect to the servicing

5  matter, Your Honor, we believe that the lion share of those

6  objections are resolved.  There are -- my understanding is the

7  United States Trustee's objection is resolved.  And that we've

8  been working to resolve the objection of Citi Group, Deutsche

9  Bank.

10          And we've been working -- there may be some remaining

11  issues with the Wells Fargo and C-Bass (phonetic) objections,

12  but we don't view them as -- they're procedural matters that we

13  believe we can address with the Court today.

14          And then finally, the objections from General

15  Electric Capital we believe can be deferred.  We can address

16  their bidding procedure and that the balance of their objection

17  is a matter for the sale hearing.

18          THE COURT:  Well, let me ask this.  Am I hearing that

19  if the parties had a little more time now, some of the

20  servicing objections could be resolved?  Or some bigger portion

21  of them could be?

22          MS. UHLAND:  Your Honor, I think that we've taken --

23  we've been working, particular the Creditors Committee and

24  Carrington have been working intensely over the last 36 hours,

25  36 to 48 hours, to reach an agreed order and that the balance

**J&J COURT TRANSCRIBERS, INC.**

1 of the issues that have not been resolved, we've been working

2 to resolve with the parties and we just have some isolated

3 remaining open issues that I don't believe further discussion

4 will assist.  I think we'll have to -- perhaps after the

5 presentations to the Court of those objections, at that point,

6 we may an opportunity for further discussion.

7          But we've been working very hard to resolve all the

8 objections and I think we're at the point now where we should

9 proceed to see what's remaining.

10          THE COURT:  How would the debtors like to proceed

11 today?

12          MS. UHLAND:  Your Honor, what I would propose to do

13 is to make an initial presentation on the motion and then

14 actually have the Creditors Committee counsel walk through the

15 blackline changes to the order since he was in large part the

16 author of those changes.

17          Thereafter, to the extent the objectors -- and we

18 believe -- and walked through hell, we've address the

19 objections in that order.

20          Thereafter, to the extent there are objections

21 remaining after the presentation of that order, we'd like to

22 have those objectors come forward and then have the debtors

23 have an opportunity to respond.

24          THE COURT:  All right.

25          MS. UHLAND:  Your Honor, this motion that we're

**J&J COURT TRANSCRIBERS, INC.**

1  setting forth is for the bid procedures for the proposed sell

2  of our servicing rights and servicing platforms.

3       The debtors loan servicing rights, which are

4  contractual rights, provide them the right to provide the

5  servicing for over 100,000 loans and an unpaid balance of

6  approximately 18 and a half billion dollars.  This portfolio of

7  loans includes both first lien loans and second lien loans.

8  These loans are contained in securitization trusts, 12 of which

9  are controlled by the Carrington entities, they are the

10 proposed -- the bidders here.  And the balance are in separate

11 securitization trusts.

12      The servicing platform in addition to these servicing

13 rights includes other contractor related to the servicing

14 business, a different real property leases, other equipment and

15 files as well as with respect to the proposal by Carrington,

16 the debtors servicing employees.  Carrington has committed to

17 provide opportunities for employment for all the debtors'

18 employees in the servicing business.

19      The key economic bids -- key economic features of the

20 bid are as follows:  50 basis points on the Carrington-related

21 -- the loans in the securitization pools controlled by

22 Carrington.  That's approximately, as of today, because those

23 principal balances vary as they get paid off, the price will

24 vary, is approximately 42.8 million.

25      With respect to the other, there's also 50 basis

1  points on the remaining approximately 10 billion of loans or

2  another approximately 50 million.

3       In addition, as part of the proposal, Carrington is

4  providing purchase price for -- which is effectively refinances

5  our servicing advance line that's been currently provided by

6  Citi Bank and may be refinanced by our DIP.  So they are

7  providing $40 million for advances made a servicer on first

8  lien loans and that's approximately 90 percent -- or it is 90

9  percent of the 44.4 million outstanding today.  And they also

10 are providing 90 percent on any second lien advance amounts

11 which is about 600,000.

12      This results to a net proceeds after the repayment of

13 the amounts financed on the servicing advances of approximately

14 100 and 1.8 million dollars.

15      Other material economic portions of this deal include

16 a provision for a hold-back of the cash purchase price of 10

17 percent related to certain indemnities.  And, of course,

18 certain adjustments, in particular with respect to the floating

19 amount of the purchase price based on the principal amounts of

20 the loans, preimposed closing.

21      Because Carrington does not currently have the

22 necessary licenses to provide for servicing, the parties have

23 included in this -- their agreement with Carrington an ability

24 to have Carrington enter into lease transactions with the

25 debtors so that Carrington may operate under the debtors'

1  licenses pending Carrington obtaining their own licenses, such

2  as those that are required for the servicing business.

3       There are, as we discussed at our first-day hearing,

4  certain states that require licenses similar to the loan,

5  origination licenses, even for loan servicing.  A subset of

6  those that require -- states that require those licenses for

7  loan origination.

8       THE COURT:  Excuse me, I'm hearing noise from the

9  telephone connection.  Everyone on the phone should have their

10 phone on mute.  Thank you.  Go ahead.

11      MS. UHLAND:  The Carrington proposal and agreement

12 that was reached by the debtors and Carrington was the result

13 of a significant pre-petition marketing of these assets by the

14 debtors.  The debtors contacted or had serious conversations

15 with eight parties with respect to these servicing assets and

16 received four offers.  The Carrington offer was the best offer

17 received by the debtors, providing the highest purchase price

18 and was the only proposal that contemplated no diligence or

19 regulatory approval conditions.

20      Carrington provided the most detailed proposal and

21 was furthest along and most likely to move to a signed

22 agreement in the time frame required by the debtors.

23      Further, the Carrington proposal for these assets

24 indicated that Carrington to acquire the entire servicing

25 platform, not just the master servicing -- the mortgage

**J&J COURT TRANSCRIBERS, INC.**

1   servicing rights, relieving the company of potential shut-down

2   liabilities and therefore providing a more beneficial proposal

3   for the debtors' estates collectively.

4        The Carrington proposal included the provision of

5   certain bid protections as did the other proposals that were

6   obtained or bids that were obtained by the debtors from the

7   four bidders prior to the bankruptcy.

8        The debtors believe the bid perceptions pre-petition

9   were reasonable.  Nonetheless, since the entering into the --

10  the debtors entering into this agreement, there have been

11  further modifications to those bid proposals.

12       Briefly, where those bid protections stand now and

13  these procedures can be described in more detail when we walk

14  through the order, is the current proposed break-up fee for

15  Carrington is $2 million, or approximately 1.5 percent, plus an

16  expense reimbursement which is upon some certain termination

17  conditions which is capped at $2 million.  The prior -- that's

18  a collective economic decrease, collectively.  The prior deal

19  was 3 percent and a $1.5 million expense reimbursement.

20       The minimum overbid which had been a 10 percent, or

21  110 percent of the purchase price is reduced as follows.  The

22  minimum topping bid must equal $5 million if the party is not

23  bidding on the servicing platform.  I'm sorry, if the party is

24  bidding on the servicing platform, but it is required to be $10

25  million if a platform shut-down is contemplated by the other

1 bid.  I'm sorry, did I -- okay, well, let me -- to get the

2 record straight, if you can clarify that.

3        MR. POWER:  Your Honor, Mark Power from Hahn &

4 Hessen, counsel for the Committee.  Your Honor, I apologize for

5 the last minute -- literally at three a.m., we were still going

6 through this and that's why you got it today.

7        One of the last issues which counsel for the debtor

8 just mentioned was a last minute negotiation that occurred, I

9 guess, very early this morning.  There -- basically, the bottom

10 line issue is this.  This Carrington bid provides for an

11 acquisition of the servicing platform including the people in

12 the office, potentially -- you know, a lot of the offices and

13 equipment.  Other bidders may be interested in submitting a

14 non-conforming bid, possibly not wanting all the offices, you

15 know, or all the people.  So basically we've agreed --

16 Carrington requested that we agree to a value of $5 million if

17 you don't take the servicing platform with the servicing rights

18 that would be served.

19        We have basically not agreed to that and the

20 mechanism currently provides and the bid procedures provide

21 that the debtor has the right to value any bid received based

22 on the increased or decreased liabilities as a result of that

23 non-conforming bid.  And we'll basically advise the bidder

24 whether or not that bid be some minimal bid amount and whether

25 it's a qualifying bid.  And the Committee and Carrington have

1  reserved the right to object to that.

2         So basically, if the debtor says, well, you haven't

3  assumed these contracts and we think that increases liability

4  by a million, but you hired these additional people and that

5  decreases the number, the debtor will come to a number working

6  with financial advisors, the Committee will work with them, and

7  the bidders will all know exactly how we're pricing the various

8  bids.  And basically, if somebody doesn't agree, particularly

9  Carrington, they have a right to object.  So there is no fixed

10 number as --

11        THE COURT:  Well, when you say object, you mean, at

12 the auction?

13        MR. POWER:  At the sale hearing, Your Honor.  If we

14 go to an auction and basically Carrington doesn't believe that

15 a bidder has submitted a minimum bid, they reserve the right to

16 come back to Your Honor and say, Your Honor, we think the

17 debtor and the -- it's Committee --

18        THE COURT:  Yeah.  I'm assuming it's going to go

19 something like this.  There will be -- assuming there's

20 bidding --

21        MR. POWER:  Yes.

22        THE COURT:  -- there will be a round of bidding.  The

23 bids will be evaluated.  The bidders will be told, usually in

24 writing, how their bids have been evaluated and they may be

25 going to the next round, the next round, next round in similar

1 fashion.  But at some point, the debtor will make a decision

2 and then come to the Court and at the sale hearing, we'll vent

3 whatever objections there are.

4        MR. POWER:  That's correct, Your Honor.  Except for

5 one thing.  Carrington is very concerned that -- obviously they

6 don't want an auction if they think the bid submitted is below

7 the minimum criteria.  So the debtor has to make that

8 assessment based on the initial bid.  And they will do that and

9 parties will have a right to object.  So thank you.

10        MS. UHLAND:  So the more complicated formula is that

11 there's a $5 million incremental bid subject to the parties

12 reviewing it in the process just outlined to determine whether

13 it is a minimum bid that is -- satisfies the auction

14 requirement.  And thereafter, the auction will proceed as the

15 Court just described.

16        THE COURT:  Very well.

17        MS. UHLAND:  Another provision of the revised order

18 which counsel can walk through in detail, I'd like to outline

19 briefly for the Court because it is something that we talked to

20 the Court about before, but not in this context.

21        As the Court may remember from the original -- the

22 initial first-day hearing in this matter, we described the fact

23 that one of the warehouse lenders, Morgan Stanley, had a pledge

24 of certain residual interests of the securitization trust.

25 That pledge or subject -- they're subject to a repurchase

1  agreement as -- we won't get into the UCC nomenclature here,

2  but there are certain interests -- residual interests in the

3  securitization trust that are subject to a master purchase

4  agreement with Morgan Stanley that was entered into in the

5  weeks prior to the bankruptcy filing.

6       Morgan Stanley has publically noticed a proposed

7  foreclosure-type sale of those residual interests which is what

8  their repurchase agreement provides for the disposition of

9  those assets under the repurchase agreement.

10      Those residual interests are the residual interests

11 in a portion of the securitization trust for which we are

12 proposing to sell the master servicing rights in this sale.  So

13 there is a, you know, parties that believe and sometimes that

14 it is -- there are transactions where parties transfer

15 servicing rights with the residual interest in the same trust

16 for which you have servicing rights.

17      Therefore, it was the desire to the extent it can be

18 accomplished, to make an effort to coordinate the Morgan

19 Stanley sale with the sale of the servicing rights.

20      Now, the parties are in discussion with Morgan

21 Stanley about having their proposed sale by Morgan Stanley, the

22 proposed auction of Morgan Stanley of those residual interests,

23 having a coordinated effort with the company.  It is still a

24 Morgan Stanley sale, but having Morgan Stanley look to the

25 debtors or coordinating that sale with the proposed auction

1 process with these master servicing rights.

2          So the bidding proposal, the revised bid order and

3 the details can be walked through, provide that if such an

4 agreement can be reached with Morgan Stanley with respect to

5 the sell of those residual interests, we propose a certain --

6 that they be coordinated in a certain order for the process of

7 those two sales that affect the debtors and the Creditors

8 Committee's process, that they'll be -- will be monitoring or

9 will be managing for the sale of the different servicing

10 assets.

11          And then what we're proposing is then thereafter, if

12 I've got the proposed sequence right, proceeding with the --

13 you know, hopefully the sale by Morgan Stanley with the

14 debtors' input and assistance.

15          THE COURT:  Okay.  But the proposed form of order

16 would not purport to take it, and I haven't seen the blackline,

17 would not propose to give the Court's informate to something

18 over which -- well, which had not been the subject of a motion.

19          MS. UHLAND:  That's correct, Your Honor.

20          THE COURT:  All right.

21          MS. UHLAND:  The sole matter in this procedure, in

22 this motion says that if Morgan Stanley reach an agreement and

23 obtain an appropriate court order at a later date, then with

24 respect to -- we're sort of -- this is really saying what

25 Carrington will agree to with respect to their procedures and

1  that -- and those procedures with respect to Morgan Stanley.

2           THE COURT:  All right.

3           MR. WERKHEISER:  Good morning, Your Honor.  Gregory

4  Werkheiser, Morris Nichols Arsht & Tunnell LLP on behalf of

5  Morgan Stanley Mortgage Capital, Inc.

6           Your Honor, we're co-counsel in this matter with

7  Milbank Tweed and I unfortunately couldn't catch everything

8  that counsel was saying in respect to this matter from the back

9  of the room because of the sound from the forced air.  But we

10 have had some preliminary discussions with the debtor and the

11 Committee on this matter and are amenable, at least, to

12 exploring this issue with them of tracking the sales together.

13 We have not specifically agreed to anything in that regard.  To

14 my knowledge, no one on our side has seen this specific

15 language before today, so I'm not in a position to agree to the

16 specific language that's in paragraph 18 of the order,

17 blackline version, Your Honor.

18          But to the extent it is clear that what is contained

19 in there is subject to the sole and absolute discretion of

20 Morgan Stanley, I'm not per se objecting to the order, but I

21 just want the record to absolutely clear that we are simply at

22 the state of having preliminary discussions and that anything

23 that is contained in paragraph 18 is subject to our discussion

24 and our consent.  Thank you.

25          MS. UHLAND:  That is consistent with the debtors'

1  understanding.  Your Honor, I think it would be helpful to go

2  ahead and have, at this point, counsel for the Creditors

3  Committee walk through the blackline with the Court of the

4  order and thereafter we can determine whether there remain any

5  pending objections to the order that we're prepared to address.

6          THE COURT:  Okay.

7          MS. UHLAND:  Your Honor, may I approach?

8          THE COURT:  Yes.  Thank you.

9          MR. POWER:  Good morning, Your Honor.  Again, Mark

10 Power from Hahn Hessen, co-counsel to the Committee in this

11 case.  First of all, Your Honor, again, thank you for your

12 indulgence for the rush nature of this.

13         This is, we think, in this case the largest asset

14 that currently is for sale and is a significant asset.  The

15 Committee is very excited about this sale as is the debtor.  We

16 think this is a terrific business.

17         The Committee agrees with the debtor that this sale

18 process should go forward and we agree with the debtor that it

19 should be done on a relatively expedited basis.  However, we

20 are seeking to extend the dates and give bidders a little more

21 time to get up to speed.  But within that time frame, we agree

22 with the debtor that this is a sale that should go forward and

23 we are very hopeful that we will have a robust auction.

24         Your Honor, when we last met last week, we adjourned

25 this motion and we have worked very hard with Carrington in

**J&J COURT TRANSCRIBERS, INC.**

1  good faith to try to come out to a deal that we think is

2  acceptable to the Committee and resolves a lot of the other

3  objections in the case.

4         And our goal, basically, here is to come to a level

5  playing field, have an auction that we think is fair to

6  everybody who may bid.  And we think we have succeeded in that

7  with the debtors assistance and Carrington.

8         As counsel to the debtor indicated, just in

9  economics, the original breakup fee and expense reimbursement

10 which, I personally view as the same component on the expense

11 fee estate was approximately 4.1 percent.  We've been able to

12 reduce it and that basically would, we think, be about 5.6

13 million for the breakup -- I'm sorry, 4.1 million for the

14 breakup fee and 1.5 for the expenses which totals 5.6.

15        We now have an agreement to reduce that to $4 million

16 and it may be less if the expenses are less.  And that new

17 percentage on a gross basis of about 2.8 percent, which we

18 think is right within or even slightly below the appropriate

19 procedures in this Court to approve breakup fee and expense

20 reimbursements.  And we are happy to reach that deal and we

21 appreciate Carrington's cooperation on that.

22        The other big issue I think was raised by -- a

23 concern by the Committee and also some bidders was the topping

24 bid which was basically 110 percent of the gross purchase

25 price, although counsel indicated that some of that is really

**J&J COURT TRANSCRIBERS, INC.**

1  to replace some servicer advances which is kind of close to

2  money in our view.

3        Carrington was cooperative on this and we very much

4  appreciate basically coming up with what we think is a very

5  reasonable topping bid which is, in essence, the breakup fee,

6  the expense reimbursement of it's max and $1 million.  So that,

7  in essence, reduces from what could have been and 11 to 14

8  million dollar topping bid down to a basically five million

9  dollar topping bid or roughly 4.5 percent.  And we think that

10  was an extremely reasonable compromise that will help the

11  auction process.

12        The bid increments will stay at $500,000, Your Honor,

13  which is consistent with what the debtor and Carrington had

14  agreed.

15        In connection with deadlines, the -- originally the

16  proposed deadline for bids was April 26th.  The parties have

17  agreed to move that to May 10th.  The auction was originally

18  during the week of April 30th.  The parties have agreed to move

19  that to May 16.

20        The third component, Your Honor, is really subject to

21  Your Honor's discretion, but we would ask some flexibility,

22  assuming Your Honor's calendar can move it.  If Carrington is

23  the only bidder and there are no other bids and Carrington has

24  asked that the sale hearing be scheduled for the 18th of May,

25  which I think is a Friday.  If there are bids, then we'd ask to

**J&J COURT TRANSCRIBERS, INC.**

1  move it to the first part of the next week, which is May 21 or

2  22, with the notion, Your Honor, that the parties would try to

3  close probably in early June and proceed in that manner.

4        We don't yet know, but we're hopeful this auction is

5  a long auction with a lot of value, but we have tried to

6  include enough flexibility so we don't give Your Honor

7  basically something ten minutes before the hearing and we can

8  basically resolve a lot of the issues if they come up.  And we

9  think this schedule works for everybody's benefit to do that.

10        So subject -- we can do that at the end of the

11  hearing, but, Your Honor, if Your Honor -- those are the time

12  frames that we're proposing.

13        Your Honor, I will -- there's a couple other issues.

14  The Morgan Stanley piece, I'll just basically explain, that the

15  Committee felt that these -- there may be bidders who are

16  interested in buying the residuals which are significant,

17  several hundred million dollars, and also obtain the control

18  over the servicing rights.

19        So we fought very hard, and Carrington understandably

20  was somewhat concerned about basically different bids on

21  different assets, because any bidder was concerned about that,

22  but we fought hard to have the right.  If anybody's interested

23  in buying the residuals and having the ability to buy the

24  servicing rights, that we provide that at the auction,

25  understanding that Morgan Stanley, under it's repo, had

1 basically it's it's collateral or it basically owns those

2 residual rights and has to agree to the whole procedure.

3       So all we provided, a very simple mechanism, that if

4 we can agree with Morgan Stanley and they agree to share or

5 piggyback on our auction, we can give a lot which permits the

6 sale of those residuals, subject to Morgan Stanley's approval.

7 And that, at least, gives the bidders the ability to have -- go

8 to the auction knowing they have the ability to get both sets

9 of assets.

10       The one thing that Carrington agreed to which was

11 hard fought, is Carrington agreed that a bidder can condition

12 its bid on the residuals on also being the successful bidder on

13 the servicing assets, on these assets that are currently before

14 Your Honor.

15       So basically, at the end of the auction, we would

16 know if we have one bidder for both or we have basically two

17 different bidders.  The Morgan Stanley piece may not even be

18 before this Court because it may be a separate sale.  It may

19 also be, if we can work that out with Morgan Stanley.

20       THE COURT:  When will I know?

21       MR. POWER:  You -- the deadline is April 30th to

22 enter a bid procedures order to sell the Morgan Stanley piece

23 pursuant to what we're describing to Your Honor.  So one of the

24 things that I was going ask is a placeholder so that we can do

25 that.  It's obviously an expedited motion.

1          We do not believe, given the circumstances, that

2 there should be any objections since Morgan Stanley, in

3 essence, holds these collaterals pursuant to its repo.  And

4 under the current Bankruptcy Code provisions, has a lot of

5 rights to exercise.  So, we are hopeful that if we can agree to

6 proceed with the debtor and Morgan Stanley, that it should be

7 not a contested hearing.  I think.

8          The -- so Carrington agreed, after a lot of

9 negotiations, to link the two bids provided, however, that in

10 no event shall the debtor or the Committee agree to accept any

11 bid on Carrington's lot that is less than the maximum price.

12 In other words, the successful bidder, the highest bidder wins.

13 So we have a situation where we try to take a lower bid because

14 we got more on the residuals.  And we've agreed to that

15 concession.

16          In addition, Your Honor, we've agreed, late last

17 night, to -- the order for the bidding, as counsel said, you

18 bid first on the Carrington piece and close that auction so

19 that there's no further bidding on that piece.  And then on the

20 -- then we go to the residuals and we bid second on the

21 residuals.  And, again, this is all subject to Morgan Stanley's

22 approval.

23          But basically, Your Honor, otherwise these procedures

24 do not change the structure that the Carrington piece is going

25 to approve today and Morgan Stanley will go later on.  So that

**J&J COURT TRANSCRIBERS, INC.**

1  -- you're not asked to do anything with Morgan Stanley today.

2          Your Honor, I've kind of -- and rather than go

3  through the order, I'm just giving you the highlights because I

4  think that's really what's appropriate here.  There were a

5  number of slight changes, I think to deal with, certain issues.

6  And maybe what I'll do is turn to those.  There's also two

7  slight issues which the Committee reserves on which I'll just

8  mention for the record.  But we'll do that at the end.

9          Let me just quickly go through the order.  Your

10 Honor, I guess really the first material change is with respect

11 to Morgan Stanley and on the order, I think it's paragraph 18.

12 That is the provision that provides for the possibility of

13 adding the Morgan Stanley residuals to the auction on a

14 parallel track.  And that's new language that we really --

15 Morgan Stanley's counsel just saw today.  But Carrington and

16 the Committee and the debtor are okay with those procedures.

17         That's pretty much the only change to the order, Your

18 Honor.  In connection with the bid procedures which are

19 attached and were heavily negotiated, I think I've mentioned

20 substantially all the terms.  There are a number of changes

21 which basically, let's say, make the Committee's participation

22 more robust while preserving the debtors' business judgment

23 with respect to the auction.  And I think the parties have

24 agreed to that.

25         In terms of qualified bids, Your Honor, there's

1 basically, in paragraph 7, there's procedures basically where a

2 party becomes a qualified prior to submitting a bid.

3 Carrington and the debtor have reserved -- and the Committee

4 have reserved the ability to basically have their input into

5 that decision.

6          Just going through to see if there's any sustenance

7 so we can streamline this somewhat.  In connection to paragraph

8 9, Your Honor, of the procedures, as I understand it, I wasn't

9 a part of this negotiations, but obviously the trustee to the

10 servicing agreements in connection with these trusts have

11 independent obligations to make sure the loans are being

12 serviced properly.  They want adequate assurance of future

13 performance from any bidder to make sure that bidder is

14 qualified and can perform properly.  They have insisted

15 independent in exercise of their fiduciary duties to make sure

16 that those parties are financially qualified.

17          This new provision in paragraph 9 basically says that

18 if you're a bidder, you have to basically -- you will provide

19 information to the trustee to satisfy that issue prior to

20 coming before Your Honor to approve that party.  Obviously, if

21 we can't agree, Your Honor, we'll have a hearing and we'll see

22 what happens.  But that's basically the mechanism to deal with

23 that type of objection.

24          There's nothing else, I believe, in this procedure

25 that is different than Your Honor sees frequently which is

**J&J COURT TRANSCRIBERS, INC.**

1  providing for parties -- reservation of parties rights to

2  object at the sale hearing on terms of assumptions.  There is a

3  mechanism that if you don't, obviously, file an objection to

4  the cure amounts, you're then deemed to waive it.  But

5  otherwise, it's the standard procedures Your Honor sees in

6  these sales.

7        Paragraph 11, Your Honor, provides the minimum bid

8  requirements that we just discussed.  The last sentence in

9  paragraph 11, which is the redline, deals with the issue that

10 we had a colloquy on a little bit earlier which is basically

11 that the debtor has -- the debtor has agreed that it will do

12 what it always does in these situations, is non-conforming bids

13 will be valued.  And the Committee and Carrington have a right

14 to object to it.  We think that satisfies that criteria.

15       Your Honor, the -- let me just first just look -- I

16 think in terms of anything else, the procedure is basically,

17 are consistent generally with what the Court -- what was filed

18 with the motion.  And those are really the material changes,

19 Your Honor.  I will inform the Court that in addition to the

20 bid procedures, we have also, over the last several days and

21 really last week, negotiated hard with Carrington on the asset

22 purchase agreement to try to clarify -- or they would argue

23 retrade, but basically try to clarify a lot of provisions on

24 the asset purchase.

25       I will inform the Court that they have engaged in

**J&J COURT TRANSCRIBERS, INC.**

1 those discussion in good faith and we are confident that we

2 will have an asset purchase agreement that we think is a very

3 good stocking horse agreement to submit for the sale of these

4 assets.  And I think that will be done today.

5            THE COURT:  I was going to say when.

6            MR. POWER:  Well, I think there's a conference call

7 in a half an hour to go through those -- I think a half an

8 hour, 11:30 to go through those changes.  It's a moving target,

9 but I think the parties would say by this afternoon we will

10 have a final agreement.  I think the debtor and Carrington are

11 working on schedules and they're trying to finalize those.  And

12 so, some -- later on today, we would like to submit on the

13 certification a final order with an APA and schedules.

14            THE COURT:  Okay.

15            MR. POWER:  Let me just check.

16            MR. KIRIAKOS:  Your Honor, tom Kiriakos, Mayer Brown

17 Rowe and Maw LP on behalf of Carrington Capital Management, LLC

18 and Carrington Mortgage Services, LLC.

19            That is certainly as Mr. Power indicated.  That is

20 certainly our -- not only our intent, but something we've been

21 insisting on in terms of this process with the APA and

22 certainly with respect to the schedules, has just gone on much

23 too long from our perspective.  So yes, we have every intention

24 and every insistence that the APA be done today and the

25 schedules be done and an entire agreement be filed with the

**J&J COURT TRANSCRIBERS, INC.**

1  Court.

2          The one caveat of which I'm aware of with respect to

3  that is my understanding is the debtors' view certain of the

4  material on certain of the schedules to be confidential or

5  proprietary.  So in terms of what's filed with the public,

6  those may be redacted.  But in terms of once a potential bidder

7  signs a confidentiality agreement, they would have access to

8  those redacted portions of the schedules.  But yes, I can

9  confirm that.

10          THE COURT:  Thank you.

11          MR. POWER:  Your Honor, I'm about to sit down and be

12  quiet, but there are two issues I just want to alert the Court

13  to that the Committee still haven't resolved just because if we

14  come back before Your Honor, I want to make sure Your Honor's

15  aware of it.

16          Given the lightening speed in which we've been moving

17  in this case, we have been requesting from Carrington

18  financials to make them a qualified bidder.  This order

19  provides that they are financially qualified.  That issue is

20  just reserved.  We're going to, after this hearing, sit down

21  with them and go through that issue and hopefully resolve it.

22  We do reserve the right to raise that if we can't and we'll

23  inform the Court that we have a problem.  We don't anticipate a

24  problem at all, but we're -- we need to reserve that issue.

25          THE COURT:  Well, for resolution before the entry of

**J&J COURT TRANSCRIBERS, INC.**

1 an order?

2          MR. POWER:  Yes, Your Honor.  Because this sort of

3 provides that Carrington is financially qualified.  And the

4 Committee really thinks that will happen.  We want to make

5 sure, so we're asking for a little due diligence.  Truthfully,

6 we've been so busy trying to get the deal done that we just

7 have to turn to that right now.  We have set up a mechanism

8 with the Committee to get a sign-off and we will do that today

9 hopefully.

10          The second issue, just to make it clear I think,

11 there were intimations in some of the objections that this may

12 be an inside deal or an inside transaction.  The Committee has

13 not seen any indication of that and it's had assurances from

14 the debtor and from Carrington that's not the case.  We have

15 requested information from Carrington to just confirm that, you

16 know, in disclosure issues if there's any relatedness.

17          That issue is, to us, a sale issue in terms of good

18 faith.  We don't think there will be any problem, but that

19 issue we reserve the right to raise later on at the sale

20 hearing.

21          THE COURT:  All right.

22          MR. POWER:  Subject to those two reservations, Your

23 Honor, the Committee supports this proposal, thinks it's fair

24 and reasonable.  And we will have a, hopefully, a robust

25 auction in a few weeks.

1            THE COURT:  All right.  Thank you.

2            MR. KIRIAKOS:  Your Honor, Tom Kiriakos again for

3    Carrington.  If I would just make several points with respect

4    to that the Committee counsel has just gone through.

5            First I need to apologize.  Carrington added to that

6    stack of paper you have this morning.  We filed a response

7    which, in addition to laying out the resolution as we

8    understood it, and I believe accurately, and addressing the

9    objections to the extent they still remain, also lays out to

10   Mr. Power's last point, the insider question and the other

11   issues of good faith.  And Carrington lays out much more --

12   lays out information regarding Carrington that's intended to,

13   not only provide that information, but also to clear up any

14   misconceptions or misinformation regarding Carrington that may

15   exist in this case.

16           So, one of the main purposes of what we filed this

17   morning was to do that and it does lay out that this is not an

18   insider deal, and in fact, this is a very honest deal in terms

19   of the negotiations and what's led to this point.

20           The additional points that I want to make very

21   quickly are that while the Committee may be hopeful that we'll

22   be under the $2 million expense reimbursement cap, this process

23   has been extremely expensive because of the debtors -- the

24   state of the debtors' books and records.  And our point in

25   agreeing to the entire package, our point specifically with

1  respect to the expense reimbursement is that we think that

2  we'll be right at 2 million or over 2 million.  It's been a

3  very expensive process.  So I don't want to mislead anybody

4  into thinking that we think it's going to be substantially

5  under 2 million because we don't.

6          Second, with respect to the shutdown of the platform,

7  Your Honor, as Committee counsel indicated, we think the fact

8  that we are taking the platform and taking the operations and

9  hiring the employees is an inherent value added part of our

10  bid.  And conversely, to the extent that someone's just looking

11  to take the servicing rights and use their own employees, that

12  would, in real economic terms, give the estate less because it

13  would create the administrative expenses relating to the

14  shutdown of the platform.

15          As Committee counsel said, we had hoped that we could

16  agree as to what that inherent added value was.  We couldn't

17  reach that number and, in fact, one of the points that counsel

18  to the Committee made was that it may not be all or nothing in

19  terms of complete shutdown versus the Carrington deal.  It may

20  be a 50 percent shutdown or whatever.

21          So we've agreed to the language in the bidding

22  procedures that provides that process for taking that into

23  account.  It's a very important part of the process and we

24  consider it to be a very important part of our bid.

25          With respect to the Morgan Stanley procedures, I just

**J&J COURT TRANSCRIBERS, INC.**

1   want to make sure this is clear on the record.  As we say in

2   our response, we consider this to be a major concession and

3   agreement on Carrington's part.  Among other things, it not

4   only takes our time frame out from what we originally

5   negotiated for and extends the time frame, but it also

6   complicates what we're trying to do by definition in terms of

7   adding another very large moving part.

8           As Committee counsel indicated, we got to an

9   agreement on that.  But just so there's no confusion, one, our

10  agreement and these bidding procedures are not dependent

11  whatsoever on the debtor and/or the Committee being able to

12  reach an agreement with Morgan Stanley.  I mean, they become

13  operative if they do, but if they don't, the rest of the

14  bidding procedures are still enforceable.

15          Second, our willingness to do this is dependent upon

16  the conditions -- the other conditions laid out in paragraph

17  18, one of those being that the servicing platform auction, if

18  one, in fact -- if there is, in fact, a topping bid for our

19  assets and we go to auction which is an important point.  If

20  there's no topping bid, we don't go to auction.  We come to you

21  and seek approval -- the debtor comes see you and seeks

22  approval of our deal.  But if there is the auction, the auction

23  for the servicing platform has to go first.  I mean, that is a

24  material part of our agreement to agree to this.

25          And so, while the order is clear that Morgan Stanley

**J&J COURT TRANSCRIBERS, INC.**

1 has complete discretion over whether it agrees to anything with

2 the debtors and in connection with that agreement, has complete

3 discretion over it's own auction procedures or whatever, it

4 doesn't have the right to reorder the order of the auction or

5 change the other terms that relate to Carrington.  I just want

6 to make sure the record is crystal clear about that.

7 　　　　　THE COURT:  Well, the important thing is that the

8 order is crystal clear.

9 　　　　　MR. KIRIAKOS:  Yes, the order is crystal clear on

10 that, Your Honor.

11 　　　　　THE COURT:  All right.

12 　　　　　MR. KIRIAKOS:  Committee counsel is right, the

13 addition to, I believe, paragraph 9 of the bidding procedures

14 is intended to resolve Duetsche Bank's objection.  And my

15 understanding is the language is what I negotiated yesterday

16 with Duetsche's counsel and does resolve the balance of their

17 objection.

18 　　　　　And finally, Your Honor, we -- as Committee counsel

19 said, we have a structure in place to give the Committee the

20 requisite financial information that they're asking for so

21 there's no question about our status as a qualified bidder.

22 But that issue, of course, needs to be resolved before the

23 order is entered.  Thank you very much, Your Honor.

24 　　　　　THE COURT:  You're welcome.  All right.  Let me

25 canvass those who filed objections and ask where they stand

**J&J COURT TRANSCRIBERS, INC.**

1  with them based on what's been described to the Court so far.

2       MR. MCMAHON:  Your Honor, good morning.  Joseph

3  McMahon for the United States Trustee.  A few points of

4  followup, Your Honor.  With respect to the objection which we

5  had filed to the bidding procedures, there's a few more items

6  that have not been described by counsel to the debtors or to

7  Carrington that we'd like to make part of the record.

8       First, our objection referred to the Consumer Privacy

9  issue which we broached at the last hearing.  And to be clear

10 about this, Your Honor, servicing rights are being transferred

11 pursuant to this sale.  It has been represented to me and

12 consistent with the language in the asset purchase agreement

13 itself, actual interest in mortgage loans are not being

14 transferred.  So we have the initial question here, Your Honor,

15 under 363(b)(1) whether personally identifiable information is

16 actually being sold.

17      But just so that the record is clear on this point,

18 Your Honor, we went through the privacy policy at the last

19 hearing under the Greenwich sale.  That policy provides that --

20 and is communicated by New Century to the persons who it

21 engages in mortgage origination transactions with, that it does

22 not provide personally identifiable information about you to

23 third parties other than its lending parties unless it has the

24 consent of those parties or the disclosure is permitted or

25 required by law.

1        And, Your Honor, the relevant section of the Gramm-

2 Leach-Biley Act, which indicated that the Greenwich sale was

3 authorized by law, also references sales of servicing rights on

4 the secondary market.  So we have satisfied ourselves, Your

5 Honor, that this particular transfer would actually be

6 consistent with the privacy policy to the extent that you could

7 -- the point would be that personally identifiable information

8 was being transferred.

9        And just so that the record is complete on that

10 point, Your Honor, I would like to make a copy of the privacy

11 policy a part of the record if we may do so as Exhibit U.S.

12 Trustee 1.

13        THE COURT:  Very well.  Is there any objection?

14        MS. UHLAND:  No, Your Honor.

15        THE COURT:  All right.  We'll mark it UST-1 which is

16 admitted without objection.

17        MR. MCMAHON:  Thank you, Your Honor.  Consistent with

18 Your Honor's ruling with respect to the 363(o) language, it

19 will be included in the sale order.  I don't believe that the

20 debtors and Carrington have any objection on that point.

21        And the third point, with respect to the expense

22 reimbursement that has been referenced, Carrington has agreed

23 to provide our offices -- office with the invoices for review.

24 And with those three points, Your Honor, we are -- the revised

25 terms that have been represented to you on the record do

**J&J COURT TRANSCRIBERS, INC.**

1  resolve the remaining points of our objection.  Thank you.

2         THE COURT:  Very well, thank you.

3         MR. HURFORD:  Good morning, Your Honor.  Mark Hurford

4  of Campbell Levine on behalf of Citi Group Global Markets

5  Realty Corporation.

6         I recognize Your Honor wasn't -- well, received these

7  filings late, in particular the filing that responds to

8  Carrington Capital Management, but from our point of view, it

9  was appreciated that it was filed.  And at the very end of that

10 filing, there's a heading that reference Citi Group and

11 confirms that the debtors and Carrington have resolved the

12 limited objection filed by Citi Group.

13        There's a short paragraph there that's kind of a high

14 level summary of the resolution, but with that resolution,

15 which was actually confirmed in email with specific language

16 that will be added to the asset purchase agreement, our limited

17 objection is resolved.  Obviously, the only outstanding issue

18 is that we need to see the actual finalized asset purchase

19 agreement.  But we don't have any concerns that the language we

20 agreed to will make it into that asset purchase agreement.  So

21 with that, our objection is resolved.

22        THE COURT:  Thank you.

23        MR. HURFORD:  Thank you.

24        MR. BUSENKELL:  Good morning, Your Honor.  Michael

25 Busenkell of Eckert Seamans here on behalf of C-Bass and Wells

1   Fargo.  With me in the courtroom today is Mr. J.R. Smith from

2   the Hunton & Williams firm.

3         We did file pro hoc papers.  It's my understanding

4   that those have been signed.  It doesn't appear that they have

5   been docketed yet and in an abundance of caution, I'd ask that

6   he'd be permitted to appear on a pro hoc basis.  He's admitted

7   in good standing in the courts of the Commonwealth of Virginia.

8   And with the Court's permission, I'd ask that he be permitted

9   to appear on a pro hoc basis.

10         THE COURT:  Very well.

11         MR. SMITH:  Good morning, Your Honor.  J.R. Smith

12   from Hunton Williams here on behalf, first, of Wells Fargo

13   Bank.  I would note for Your Honor that Mr. Bill Fay (phonetic)

14   from Wells Fargo Bank is here with me in the courtroom this

15   morning.

16         Wells Fargo Bank is the trustee for five of the

17   securitization trusts for which the debtor serve as servicer,

18   the servicing rights are among the assets the debtor is

19   proposing ultimately to sell.

20         Wells Fargo Bank has a fiduciary duty, Your Honor, to

21   insure that, among other things, that the servicer is a

22   qualified servicer as that qualifications are spelled out in

23   the pooling and servicing agreements that created the trust and

24   essentially control the way that it's managed.

25         Wells Fargo's objection stems largely from the fact

**J&J COURT TRANSCRIBERS, INC.**

1  that the propose stocking horse bidder, in Wells Fargo's

2  belief, is not currently a qualified servicer under those

3  pooling and servicing agreements.  And from the fact that the

4  initially proposed bid protections afforded that stocking horse

5  bidder all but insured, in Wells Fargos belief, that the

6  stocking horse bidder had a significant advantage, given the

7  good faith negotiations between the Committee, Carrington, the

8  debtors and Wells Fargo Bank.

9       At this point, Wells Fargo Bank would like to

10 withdraw its objection without prejudice, reserving expressly

11 the right to object at the sale hearing including items as to

12 whether the proposed winning bidder is a qualified servicer

13 under the relevant pooling and servicing agreements and whether

14 that entity can provide adequate assurance to future

15 protection.

16       THE COURT:  Very well.

17       MR. SMITH:  Thank you, Your Honor.

18       THE COURT:  What about C-Bass?

19       MR. SMITH:  In respect to C-Bass, Your Honor, C-Bass

20 is also withdrawing its objection given the good faith

21 negotiations that have occurred.  It would only note, Your

22 Honor, that in connection with the asset purchase agreement

23 that has been proposed, the post-stocking horse bidders are

24 required to undertake an audit that would look at three things.

25 First, it would look at the whole loan balances, essentially,

1 on the loans that will essentially fix the portion of the

2 purchase price.  It will look at the advance facility that has

3 been put in place by Citi Group.  It also will look at the

4 actual advances that have been made by the servicer which

5 ultimately also will form, on a percentage basis, a portion of

6 the purchase price.

7        The results of that audit ultimately will not become

8 available, it's our understanding, until after bids have been

9 submitted.  That creates a little bit of a problem for

10 potential bidders.  Additional, presumably, a part of the

11 expense reimbursement that Carrington would be entitled to as a

12 stocking horse bidder stems from the cost of undertaking such

13 an audit.

14        C-Bass merely would request that, if possible, that

15 audit be taken in a timely fashion and provide -- the results

16 provided to bidders.  If that is not possible, at a minimum,

17 that audit result should be provided to the ultimate winning

18 bidder, whether that's Carrington or a third party.  Thank you,

19 Your Honor.

20        MR. KIRIAKOS:  Your Honor, Tom Kiriakos on behalf of

21 Carrington again.  I won't get into the C-Bass point on the

22 audit at this point unless you'd like me to.  But with respect

23 to Wells Fargo, I would like him -- a clarification.

24        My understanding of Wells Fargo's reservation of its

25 objection goes to the issues of whether, under the pooling and

**J&J COURT TRANSCRIBERS, INC.**

1 servicing agreements, we will be able to be a successor

2 servicer.  And our view of those issues is that they are sale

3 hearing issues and based on my understanding of what Wells

4 Fargo's counsel has just said, that is their view also and we

5 don't have a problem with that.  They can, in connection with

6 the sale hearing, they can -- we think that long before that we

7 will -- we think we frankly have given them enough now to be

8 satisfied that we'll get there by the sale hearing.  But we

9 certainly believe by the sale hearing we will have satisfied

10 them on that point.  But that's a sale hearing issue.  We

11 understand they're reserving that.

12      But my understanding is that's the only thing they're

13 reserving.  They're not reserving the right at the sale hearing

14 to come forward and suddenly raise that -- issues as to the

15 procedures of the bidding process in terms of the amount of the

16 breakup fee or the auction procedure that we've laid out.  So I

17 mean, I would like clarification on that.

18      THE COURT:  Well, I don't need clarification on that

19 because the objection's been withdrawn.

20      MR. KIRIAKOS:  Okay.

21      THE COURT:  And I would certainly hope that once the

22 order's entered, unless there's some irregularity for some

23 reason, but I wouldn't have such objections.

24      MR. KIRIAKOS:  Thank you, Your Honor.

25      THE COURT:  So, sorry to answer for you, but --

1          MR. KIRIAKOS:  Thank you.

2          THE COURT:  We're only going to do this once, I

3 think.

4          MR. SMITH:  Actually, Your Honor did a very good job

5 answering for me.  Thank you.

6          THE COURT:  Thank you.

7          MR. GALLERIZZO:  Good morning, Your Honor.  Mike

8 Gallerizzo on behalf of General Electric Capital Corporation.

9          General Electric has filed an objection to the

10 bidding procedures motion premised upon five grounds which fall

11 under four categories.  The first deals with the breadth of the

12 motion and it may have just been a scribbler's error, but when

13 reading the motion in its entirety, the caption, for example,

14 asked for an approval of an order approving the sale itself.

15          THE COURT:  Yes.  Move to the next one.

16          MR. GALLERIZZO:  Yeah, the next one, okay.  In

17 addition, there were -- the second objection is premised upon

18 the lack of some information.  There's no specificity in

19 regards to the specific assets that are going to be sold, the

20 least assets that are going to be assumed and assigned.  Given

21 the fact that we're moving so quickly, at a minimum, Your

22 Honor, there's no specific time frame within which at least the

23 list of the assets is going to be provided.  I've had

24 discussions with Mr. Ramos, counsel for the debtor.  We had

25 hoped that a list would have been provided before today's

1  hearing.  That is not the case.  The same holds true with

2  respect to the list of least assets that would be assumed and

3  assigned.

4        At a minimum we would ask Your Honor require that

5  those lists be provided within a reasonable time frame, maybe

6  ten days after this hearing, so that secured creditors such as

7  GE, at least creditors such as GE have plenty of time to review

8  those lists.  Some of those lists are massive, Your Honor.

9  They're very extensive and involve thousands of pieces of

10  equipment.

11        In addition, our objection was premised upon the fact

12  that there was no allocation contemplated, at least for the

13  moment, in the particular APA that was filed.  There was

14  reference in the APA to an allocation schedule.  Once again,

15  like the list of assets that are being sold and the list of

16  assets that are to be assumed and assigned, you will find that

17  that list is also missing.

18        There's some additional language in the APA that says

19  that that allocation list must be mutually agreeable between

20  the parties and that mutual agreement must occur within 120

21  days after closing which is vague and ambiguous.  I think this

22  debtor should be required to provide that allocation list

23  substantially prior to the hearing on the sale so that, once

24  again, creditors, such as GE, can make a determination as to

25  whether what's being allocated to their particular assets is

1 fair and reasonable.  Last --

2        THE COURT:  Well, let me -- you know, that's a tough

3 one.  I mean, I don't know what the debtor's prepared to say or

4 not say at this point, but, you know, there's allocation for

5 different purposes obviously.  And the buyer and the seller,

6 the ultimate buyer and seller, are largely concerned, I'm

7 assuming, in tax allocation.  At this point, you're more

8 concerned about value, I understand.  And I -- I guess my

9 thought is it might or might not be an issue at the sale

10 hearing.

11        Then, of course, identifying values prior to the

12 auction might not, from a strategic standpoint, be in the

13 estate's best interest.  But I just mentioned that and we'll

14 hear what the debtor has to say in response, but that's a -- I

15 think that's tougher than requiring, you know, lists of assets.

16        MR. GALLERIZZO:  And I appreciate Your Honor's

17 comments and with sales that move this quickly, they are tough

18 issues.  They're very, very tough issues.  But my client's left

19 in the dark in regards to what's going to happen and the -- I

20 guess the problem with not making that decision early on is it

21 becomes fraught with problems down the road because then there

22 needs to be a determination as to what, you know, the

23 allocation is, how that's going to be determined, you know, in

24 terms of value.  The assets are already gone.  You know,

25 they've already been conveyed to a third party.

**J&J COURT TRANSCRIBERS, INC.**

1        I've been through this, done this before and it's a

2  problem not doing it a head of time.  And it just -- it brings

3  about a lot of litigation.  I'm trying to avoid that and maybe

4  through discussions with the debtor we can do that without

5  impeding the estate's ability to maximize value.

6        THE COURT:  You'll have some time, perhaps, to work

7  that out.

8        MR. GALLERIZZO:  The last point we raise is the fact

9  that the way the credit bidding has been established pursuant

10 to the bidding procedures order or as is proposed in the

11 bidding procedures order effectively negates GE's right to

12 credit bid it's specific assets.  In this particular case, GE

13 has two leases of telephone systems and we have a number of

14 loans that are secured by thousands of computers.  Under the

15 lease, leases, we are approximately owed about a million and a

16 half dollars whereas under the loans, we are approximately owed

17 somewhere in the vicinity of seven and a half million dollars.

18       We have no idea what portion of those loans, what

19 portion of those leases relate to the sale because we don't

20 have a list of what's being sold and what's being assumed and

21 assigned.  But if we just take it in the abstract and presume

22 that half of the assets belong to this sale and half belong to

23 the loan origination sale, there's no -- by allowing a credit

24 -- by allowing bidding in the fashion that the debtors'

25 proposed, there's no way for GE, for example, to bid its three

**J&J COURT TRANSCRIBERS, INC.**

1  and a half million dollars or $3.75 million owed to it on its

2  assets at the sale because the sale contemplates the next bid

3  being a $5 million topping bid over $139 million.

4          As I read 363(k), and I think as the commentators

5  read 363(k), it's specifically requires credit -- or allows

6  credit bidding as to specific assets that a creditor has.  The

7  Third Circuit in <u>Submicron</u> recognized that a creditor such as

8  GE has the right to bid the full amount of its claim

9  irrespective of what the value of its asset is.  And this

10  particular procedure that they've created effectively negates

11  our credit bid rights.  There has been no testimony, no proof

12  that cause justifies doing that.

13          And I suggest, Your Honor, that it doesn't because GE

14  could be left with its credit bid rights and this particular

15  purchaser could top our credit bid rights if they'd like to.

16  And they could overall bid for the sale and the debtor could

17  determine that that was the best bid.  But by doing so, they

18  would effectively preserve our credit bid rights and have the

19  right to set the value of those assets at that point in time,

20  if we decided to go forward with credit bidding.

21          So, we ask -- I think that is a bidding procedures

22  question of serious issue and --

23          THE COURT:  And the debtor would agree with you.  And

24  of course the argument in opposition to that is, but look, all

25  of what you say may be true.  My words are not their's

**J&J COURT TRANSCRIBERS, INC.**

53

1  necessarily.  But there's nothing in the Code which requires us

2  to style -- to structure our bidding process and sale process

3  to benefit you.

4          MR. GALLERIZZO:  But how do you get around --

5          THE COURT:  The sale process is designed to maximize

6  value for the estate.  And the debtors' suggesting here, as are

7  others, that this framework is best suited to maximizing value

8  for the estate.

9          MR. GALLERIZZO:  But when you juxtapose 363, the sale

10  be in 363(k), 363(k), the language, the Legislature drafted it,

11  contemplates a single asset creditor having the right to bid.

12  It -- you know, it contemplates that.

13          THE COURT:  It certainly does.  But it doesn't say,

14  as is being argued, that that must -- well, that that must

15  dictate how every sale is to be structured.  I mean, it's kind

16  of like, my words, not the objectors, the tail wagging the dog.

17  Especially in a sale of this magnitude.

18          MR. GALLERIZZO:  But it's the only way to protect a

19  single asset secured creditor.  And I think the Legislature, in

20  its wisdom, indicated such.  Now, if they can show a chilling

21  effect on the sale, I think maybe they would be able to show

22  cause.  But I don't believe a small creditor such as my client

23  against 150 or 140 million dollar sale, that that is going to

24  chill this sale.

25          THE COURT:  I understand your argument.

**J&J COURT TRANSCRIBERS, INC.**

54

1         MR. GALLERIZZO:  So, based upon these -- what we're

2 asking for, Your Honor, as to the informational requests, we're

3 just asking a time frame be set, a reasonable time frame to

4 provide the lists that are lacking.  And we'd also ask for the

5 allocation lists.  And on the credit bidding, that we be

6 permitted to credit bid to the extent of our debt against our

7 specific assets that we have liens against.

8         THE COURT:  Very well.

9         MR. GALLERIZZO:  Thank you very much.

10         THE COURT:  Let me just ask for the record.  Are

11 there any other objectors or parties who wish to be heard in

12 connection with the proposed bidding procedures?

13         MR. DREBSKY:  Good morning, Your Honor.  Dennis

14 Drebsky from Nixon Peabody on behalf of Georgia Bank National

15 Trust Company.  I could brief vis-a-vis the bidding procedures

16 motion.  Our concerns have been addressed, of course, vis-a-vis

17 the sale.  We reserve all our rights.  But we have resolved our

18 objection.

19         THE COURT:  Very well, thank you.  Anyone else?  I

20 hear no response.  All right.  Would you indulge me for a five-

21 minute recess at this point?

22         MS. UHLAND:  Certainly, Your Honor.

23         THE COURT:  All right.  Thank you.  Just five

24 minutes.

25                         (Recess)

1          MS. UHLAND:  Your Honor, shall I proceed to address

2  the GECC objections?

3          THE COURT:  If you please.

4          MS. UHLAND:  Your Honor, there's three objections

5  sort of remaining of the Court's dialogue that we'd like to

6  address.  The first one is a request that the schedules, I

7  heard, that the schedule of assets be filed within ten days.

8  And that's acceptable to us.

9          THE COURT:  All right.

10          MS. UHLAND:  We'll make that representation.  We, in

11  fact, hope to file those later today as we indicated.

12          With respect to the allocation issue and the debtor's

13  allocation issue between the debtors and Carrington, that is a

14  document that's going to have several purposes between the

15  debtors and Carrington and their tax allocations and other

16  matters.

17          We are not proposing by that allocation to value,

18  under 506, the claims of the secured creditor GE with respect

19  to their secured loans.  And further, our proposed sale

20  provides that their liens, whatever they are to the extent of

21  their value and validity will attach to the proceeds.  So we

22  believe that they -- providing an allocation in advance of when

23  it's required by the APA is unnecessary and further, that they

24  are not prejudice by the failure to receive it ahead of time.

25          THE COURT:  No, I would -- and I wouldn't consider

**J&J COURT TRANSCRIBERS, INC.**

1  them bound by your agreement.

2          MS. UHLAND:  And nor are they bound by our agreement.

3  We would agree with that, Your Honor.

4          THE COURT:  All right.

5          MS. UHLAND:  And finally, with respect to the 363(k)

6  matter and their rights to credit bid.  Your Honor, we believe

7  that there certainly is cause, at least cause to the extent 363

8  could be construed in anyway to rewrite a court's bid

9  procedures that provided the lot on which bids were going to be

10 accepted.  There would be cause to limit those credit bid

11 rights.

12          We do not believe 363(k) dictates that in every case

13 where there's an individual secured creditor, that that

14 creditor is allowed to rewrite the parties in an agreed -- in a

15 court's ordered bid procedures to provide for a going concern

16 sale.

17          We're proposing that the bidding be on, you know, the

18 assets that are the subject, the purchased assets of the

19 Carrington sale and it would certainly damage the debtors and

20 the bid process if the proposed buyers believed that they could

21 end up with a business as a going concern that didn't have a

22 phone system or many of its computers.  So we believe there is

23 cause to the extent 363(k) could be viewed as some kind of over

24 item bid procedures which we don't believe it is.

25          Further, Your Honor, we are not limiting their rights

1  to credit bid.  To the extent GECC desires to bid on the bids -

2  - on the global assets that we're setting forth, we do agree

3  that they have credit bid rights.  If they want to become a

4  proposed bidder, we may need to work with them and with the

5  Committee to allocate the loan -- the loans on the different

6  assets to clarify which portion of their secured bids -- their

7  secured loans apply to the assets that we're actually selling

8  in the servicing business because they knew -- maybe some of

9  the computers that we're not trying to sell as part of this.

10         But we would engage in those discussions to allocate

11  that portion of their loans so they could credit bid in good

12  faith.  But they're -- that -- and they could credit bid a

13  portion of their proposal and we're not proposing that they be

14  estopped from raising that.

15         THE COURT:  And I think that's all, it seems to me,

16  they're asking for really.  So --

17         MS. UHLAND:  That --

18         THE COURT:  -- where's really the point of

19  disagreement?

20         MS. UHLAND:  To the extent that is what they're

21  asking for, we don't disagree, Your Honor.

22         THE COURT:  Okay.

23         MR. GALLERIZZO:  No, Your Honor.  What I was

24  suggesting was that be left with our credit bid rights on our

25  specific assets separately.  That we not be required to bid on

**J&J COURT TRANSCRIBERS, INC.**

1 the entire gambit of assets because by doing that, that

2 effectively negates our credit bid rights.

3       THE COURT:  I'm sorry, I don't -- I didn't hear from

4 the debtor that's what -- I thought the debtor was suggesting

5 -- maybe I'm just misunderstanding.

6       MR. GALLERIZZO:  I think what she's suggested, and if

7 I may paraphrase, is that we would have to make a bid on the

8 entire assets of, I think the number would be 144 million.  Of

9 that 144, let's say we were owed three and a half million on

10 the phone and the computer assets.  That would -- we would be

11 able to credit bid that portion and then would have to pay cash

12 for the remaining amounts.

13       THE COURT:  Ms. Uhland, you weren't suggesting that,

14 were you?

15       MS. UHLAND:  Your Honor, actually I was suggesting

16 that.

17       THE COURT:  And why in the world would you think that

18 would be an appropriate resolution of this objection?

19       MS. UHLAND:  Your Honor, they are preserving their

20 credit bid rights.  We have a bid procedure that provides for

21 the incremental first overbid of 144 or, you know, however it's

22 calculated.  And were any -- and in order to be a qualified

23 bid, you have to provide a minimum overbid on substantially --

24 on the assets that are for sale.  Not an overbid to be a

25 qualified bid to put us to auction on subset of the assets that

**J&J COURT TRANSCRIBERS, INC.**

1 are being -- that we're proposing to sell.

2      So the issue isn't whether there's a portion of debt

3 that can be credit bid.  It is, you know, that we're not

4 willing to rewrite our bid procedures to parse out the separate

5 assets that the debtors are proposing to sell as part of the

6 auction.

7      THE COURT:  But it seems to me, and you've already

8 agreed, to identify those assets which are to be -- proposed to

9 be sold, okay.  So it seems to me that, at least from a

10 practical standpoint, GECC could make a bid individually on its

11 assets.  And I guess my question is, what would be the harm in

12 permitting that?

13      MS. UHLAND:  Your Honor, we would permit that and

14 then we could, of course, consider that and they could make the

15 bid and we would consider it the way that the debtors and the

16 Committee are considering it in determining whether that would

17 be a bid that we would consider sufficient to go forward with

18 the auction or consider as part of the auction process.

19      MR. POWER:  Your Honor, no, the Committee does not

20 agree with that and the harm is very specific, Your Honor.  GE

21 -- there are no -- Your Honor has not approved procedures for

22 the sale of those assets separately.  There is no notice.

23 There is no ability for other parties to bid on those assets.

24 So GECC is proposing to the Court that we set the floor, and we

25 unilaterally got to pick the value, the fair market value of

**J&J COURT TRANSCRIBERS, INC.**

1  those assets, so we come later to this Court and argue what the

2  value of its collateral is, they say we bad and that sets the

3  price.

4           Your Honor, what we are saying to the Court is simply

5  overrule the objection.  GECC is adequately protected in this

6  situation.  The sale proceeds will be escrowed.  They can

7  reserve their rights and they will reserve -- they'll have lien

8  on those sale proceeds to the extent we sell their collateral.

9  Later on, after the sale, we will have a hearing, if we can't

10 resolve it, as to what the fair market value of that collateral

11 is.  GECC can come before your court and say, Your Honor, I

12 would have bid $5 million for that stuff and we'll say, Your

13 Honor, the stuff is worth 3 million and we'll resolve it.

14           THE COURT:  Well, the other thing they might say is

15 that, you know what, we do this all the time.  We have users

16 for that stuff that in the end is going to provide much more

17 economic benefit than that value which the Court or you or

18 anybody ascribes to it.  Now, I don't mean to put words in your

19 mouth, but it strikes me that's a possibility.

20           MR. POWER:  Your Honor, we don't disagree with that.

21 And I think --

22           THE COURT:  And it seems to me that might be one of

23 the reasons that bidding, credit bidding, is generally

24 permitted.

25           MR. POWER:  Your Honor, no.  I would submit to you

**J&J COURT TRANSCRIBERS, INC.**

1 that that is the reason why GECC will take the view that the

2 value of the collateral is worth more.  And they can

3 demonstrate and they have not -- we're not asking for waiver of

4 any right -- to convince this Court that, in fact, those assets

5 are worth more.  But the notion that they can basically set up

6 a bid separately to basically somehow prejudice the estate in

7 creating kind of a somewhat false premise.

8          THE COURT:  Well --

9          MR. POWER:  I mean, those assets aren't permitted.

10 We're not noticing those.  Anybody who's interested in those

11 assets doesn't have the ability -- the auction's not set up

12 that way.  And all we're saying, Your Honor, they have that

13 right.  If they think the assets are worth more because they

14 have a unique buyer, we're not prejudicing that.  They reserve

15 all rights to argue valuation at a later date.  And they're not

16 -- they're adequately protected because the money is sitting

17 there to protect them in the full amount of their claim.

18          So we would ask that the procedures not be modified.

19 And then -- and Your Honor, quite frankly, when you think about

20 it, it really wouldn't work.  I mean, quite frankly, from

21 Carrington's perspective, they're buying a whole business and

22 all the equipment.  GE's bid is obviously the high one.  No one

23 else is bidding on that piece, but we have 150-40 some million

24 dollar bid that's going to win.  It's somewhat of a -- to me

25 anyway, it doesn't work in this auction procedure.  And I don't

**J&J COURT TRANSCRIBERS, INC.**

1  -- GE is protected.  They can simply argue those assets are

2  worth more.  And if we can't resolve it, we'll litigate it.

3              THE COURT:  Thank you.

4              MR. KIRIAKOS:  Your Honor, Tom Kiriakos again for

5  Carrington.  One of the major process of the Bankruptcy Code is

6  to maximize the value of the estate.  And if 363(k) worked the

7  way that counsel's suggesting, it would really undermine the

8  ability ever to have a going concern sale and attain going

9  concern value for a business as a business because various

10 individual secured creditors could unilaterally take their

11 assets and go home, destroying the overall -- the going concern

12 value of the overall whole.  And Congress, in fact, addressed

13 and limited 363(k) offset rights for cause shown.  And that is

14 cause shown.

15             Clearly the whole supposition of this sale is that

16 the whole is worth more to the estate and worth more to any

17 potential purchaser than a sum of its parts.  So that is the

18 statutory argument.

19             In addition, Your Honor, the deal in front of you in

20 terms of what you're being asked to approve with respect to the

21 bidding procedures is for all of these assets.  Carrington has

22 not agreed and it's clear that it hasn't agreed, that the

23 debtor could stand up at the auction and say, while

24 Carrington's agreement is for all these assets, we are now

25 going to offer individual lots for the servicing rights with

**J&J COURT TRANSCRIBERS, INC.**

1  respect to the Carrington securitization separately and then

2  we're going to offer the servicing rights with respect to the

3  Carrington trust separately.

4         I mean, that -- the debtor can't do it under the

5  agreement.  It's not what we bargained for.  It's not what

6  we're asking you to approve.  And so this would just be another

7  variant of that.  And as debtors' counsel pointed out, it's

8  hard to run the servicing business without phones and

9  computers.  So it really would have the effect and the

10 potential, not only in this -- not only with respect to this

11 sale, but all going concern sales of taking it off the table.

12         THE COURT:  Well, although, in today's world, phones

13 and computers, pretty easy to replace.  I mean, I haven't heard

14 anything that tells me there's anything unique about this

15 collateral.

16         MR. KIRIAKOS:  Well, but they're pretty easy to

17 replace, but what does that do to -- as we now bidding -- do we

18 have to know pay less than we're paying because we have to do

19 -- is it just an allocation of the purchase price we're paying?

20 Or is it something else?  I mean, it clearly can't result in

21 our incurring more expense than what we're bargained to incur.

22         THE COURT:  I understand.  All right.  Before we go

23 back to those I've heard from, let me ask if anyone else cares

24 to be heard on this issue.

25         MR. CHAPMAN:  Good morning, Your Honor.  For the

1 record William Chapman, Edwards Angell Palmer and Dodge and I

2 rise merely -- we represent -- merely to get some guidance from

3 Your Honor.

4        We represent GMAC Commercial Finance, LLC,

5 Countrywide Home Loans, Inc., Countrywide Financial Corp.,

6 Countrywide Warehouse Lending, Countrywide Bank and Countrywide

7 Securities Corporation.  I'll collectively refer those to those

8 creditors as Countrywide.

9        Your Honor, we did not object to this particular

10 motion.  We did object, however, to the loan origination

11 platform motion.  And we raised almost identical issues that

12 were raised by GECC.

13        I just want to make sure that my silence on this

14 motion will not preclude my arguing the same issues --

15        THE COURT:  Well, you are a careful guy, counsel.

16        MR. CHAPMAN:  -- on the next motion, Your Honor.

17        THE COURT:  I wouldn't worry about it.

18        MR. CHAPMAN:  And we do support GECC's position here,

19 Your Honor.  And how this is normally dealt with, and Your

20 Honor's seen this numerous times, is you allow parties to come

21 in and if they want to bid on a portion, they do.  And then if

22 there's an aggregate bid greater than the bid for the entire

23 organization, the debtor can consider it.  The debtor doesn't

24 have to consider it.  But it should allow for the ability for

25 secured creditors to credit bid under 363(k).

1          THE COURT:  Well, I see you've drawn me into the next

2    question, so.  Let's say I permit it.  Then what?  I mean,

3    hasn't the buyer bought the excess?  Unless I make some

4    determination that in the context of the overall larger bid,

5    that bid is greater than the credit bid.  And then, see, then

6    you're opening yet another door of perhaps, you know, some

7    problems.

8          MR. CHAPMAN:  I don't think that that's how it

9    normally happens, Your Honor.  The debtors always, with the

10   Committee, have the right to determine what the highest and

11   best bid is.  So if we submitted a bid for $10 million for our

12   assets, hypothetically, and that's the only bid and we credit

13   bid, and they compare that bid to the bid of Carrington for the

14   entire organization, obviously we're not going to win.  But at

15   least we preserved our right to credit bid under 363(k).

16   That's all I'm saying, Your Honor.

17         THE COURT:  But you know -- well, let's put it this

18   way.  Anything can happen, I suppose, at an auction and in a

19   way, we all hope it does.  But the number is always going to be

20   bigger than what GECC proposes.  And, I mean, I -- well, okay,

21   thank you.

22         MR. CHAPMAN:  We don't know that until the auction's

23   over, Your Honor, is my point.  Thank you.

24         THE COURT:  It's bigger now overall.

25         MR. CHAPMAN:  But there may be bidders who want to

**J&J COURT TRANSCRIBERS, INC.**

1  bid on other portions of the business and combined altogether,

2  that's --

3          THE COURT:  And see, and that's -- that's the evil

4  against which the debtor and Carrington here are arguing.  And

5  defeats, really, probably mostly the purpose behind setting

6  bidding procedures.  All right.  Let me hear GECC.  I'll give

7  you the last work.

8          MR. GALLERIZZO:  Thank you.  I just wanted to join in

9  counsel's comments because my suggestion was going to be that

10 we see many sales where the parts are sold, the whole is sold,

11 and then there's an ultimate highest bid that's taken.

12         This bidding procedures could have been set up that

13 way and preserved our credit bidding rights, preserved the

14 right to Carrington to bid for the whole and we wouldn't be

15 arguing this objection.  I don't know why is wasn't done that

16 way, Your Honor.  That's the way you preserve credit bidding

17 without prejudicing GE or the purchaser in this particular

18 case.

19         Leaving our credit bid right in place, I don't see

20 any prejudice to this particular debtor or to the purchaser

21 because we bid whatever amount we bid, they're going to over

22 bid us and that's the end of it.  But we've sat and we

23 protected our credit bid for later on down the road.  That's --

24 the <u>Submicron</u> case says we can kind of set what the value of

25 that collateral is by our bid rights, okay.  We can go in and

**J&J COURT TRANSCRIBERS, INC.**

1  bid right up to the amount of our debt and I want to protect

2  that right.

3       THE COURT:  Well, but see, wouldn't you still be able

4  to protect that as a result of objecting to the sale ultimately

5  when the auction is completed.  You can still come in and

6  argue, wait a minute, I -- you know, for my portion of the

7  assets, the bid isn't high enough.  And then it would be

8  incumbent upon the debtor to demonstrate that the price was

9  adequate, wouldn't it?

10      MR. GALLERIZZO:  Well, except that if <u>Submicron</u> says

11 I can bid the full amount of my debt irrespective of what the

12 value of the equipment is, that sets the price for those

13 assets.  And by taking away those credit bid rights, you've

14 taken away that essential right.  We're a small creditor,

15 that's why it's there.

16      THE COURT:  But see, then you make the argument that

17 the debtor makes, really, that if that were the case here,

18 cause does exist to deny the relief that you're requesting

19 because otherwise, again, has the tail wagging the dog.  And

20 that can't be what's intended when the ultimate overriding goal

21 is to maximize the value of the sale of these assets for the

22 estate.

23      MR. GALLERIZZO:  But by allowing us to credit bid,

24 that's -- we're not going to preclude that from happening, Your

25 Honor.  Your Honor has indicated that the offer that's here is

**J&J COURT TRANSCRIBERS, INC.**

1  going to beat us.

2  THE COURT:  Well, put it this way, it's likely that

3  it will.  But, you know, I've tested -- I'm trying to test both

4  positions here and come to what I think is the appropriate

5  solution.

6  MR. GALLERIZZO:  Sure.

7  THE COURT:  All right.  Anything further in support

8  of your objection?

9  MR. GALLERIZZO:  No, Your Honor.

10  THE COURT:  Thank you.

11  MR. GALLERIZZO:  Thank you very much.

12  THE COURT:  You're welcome.

13  MS. UHLAND:  Your Honor, we would stand by and

14  perhaps I didn't understand the Court's objection before which

15  caused the -- or proposal before.  As I said before, if they --

16  as part of a bid that's consistent with our bid procedures,

17  credit bid a portion --

18  THE COURT:  No, I understood.

19  MS. UHLAND:  -- alternatively, if they can combine

20  with other bidders to prepare a qualified bid, if it's on all

21  assets, they can credit bid their portion.  Basically what

22  these parties were talking about happening sometimes at an

23  auction, if they're able to come up with that part of the

24  auction --

25  THE COURT:  Those's alternatives under these

1  circumstances strike me as being just as unpractical as

2  permitting what GECC has requested frankly.  Not that I don't

3  appreciate your effort.

4          MS. UHLAND:  Then, thereafter, Your Honor, again, to

5  the extent that 363(k) can be viewed as a constraint on the

6  bidding -- the procedures, we do believe that cause does exist

7  to prohibit the credit bid on a portion of the assets

8  inconsistent with our bidding procedures and that, you know,

9  simply a -- the rights under <u>Submicron</u> we realize, you know,

10  that statutory or that case law derived right to establish

11  value is overridden, in effect, by our bidding procedures

12  orders and the cause shown to maximize value in our estate.

13          We believe they still have their full rights under

14  506 to establish the value of their collateral.  And therefore,

15  there is cause and that there's not substantial prejudice to

16  those creditors because of that preservation.  So we would ask

17  the Court to overrule the objection with the commitment on the

18  record, with the ten days, we will insure that the asset

19  schedules are provided.

20          THE COURT:  All right.  Now, let me ask this.  Is it

21  the debtors' position that on the credit bidding issue, that

22  that's a strictly legal matter and that there are no facts

23  which need to offered in support of that?

24          MS. UHLAND:  Your Honor --

25          THE COURT:  I don't have an answer in mind, but

**J&J COURT TRANSCRIBERS, INC.**

1 that's why I'm asking the question.

2        MS. UHLAND:  Your Honor, I believe that on the for

3 cause matter that the facts set forth in the debtors' motion

4 with respect to the necessity to adopt these bidding procedures

5 in order to obtain -- including the breakup fees and the total

6 package of bid procedures was necessary for the debtors to

7 secure the stocking horse bid of Carrington, and in their

8 totality, are in the best interest of the estate.

9        We're prepared to provide evidence of the -- to the

10 extent further evidence is required as a factual matter on the

11 overall necessity for this entire package of bid procedures to

12 be approved in their entirety, if the Court views that cause

13 matter is a factual matter.

14        THE COURT:  Well, let me ask GECC's counsel whether

15 he has a view.

16        MR. GALLERIZZO:  Your Honor, I didn't hear the

17 question.

18        THE COURT:  The question was whether -- I asked the

19 debtor whether the debtor thought that the objection could be

20 resolved strictly on legal grounds or whether there were

21 factual disputes in connection with having to resolve that

22 issue.

23        MR. GALLERIZZO:  I think there is in the necessity,

24 if the Court is going to entertain the issue of cause, for

25 there to be a factual hearing on that issue.

1          THE COURT:  Oh, I'm going to entertain it.

2          MR. GALLERIZZO:  Yeah.  I think there is the

3  necessity, Your Honor, for factual evidence to be placed before

4  this Court to show the harm that has been argued today.

5          THE COURT:  All right.  Well, I'll ask at least for a

6  proffer and we'll se whether GECC wishes to cross examine.

7                    (Pause)

8          MS. UHLAND:  Your Honor, I would like to proffer the

9  testimony of David Kurtz who is the co-head of global

10 restructuring for Lazard Frères and a managing director.  Mr.

11 Kurtz is present in the courtroom.

12         If called to testify, Mr. Kurtz would describe his

13 background and position as follows:  Mr. Kurtz is a managing

14 director in the restructuring group of Lazard and is leading

15 the engagement of Lazard in connection with New Century.

16         Mr. Kurtz joined Lazard from the Chicago office of

17 Skadden Arps Slate Meagher & Flom where he was a senior

18 partner.  And his restructuring assignments at Lazard have

19 included the representation of Adelphia Communications Group,

20 Northwestern Corporation, Excel Energy Corporation, Safety

21 Clean Corp., American National Power, the Creditors Committee

22 of Calpine Corporation, the Creditors Committee of Northwest

23 Airline, United States Air Transportation and Stabilization

24 Board in connection with the U.S. Airways and ATA Airlines.

25         Prior to joining Lazard, while he was at Skadden

1 Arps, he served as lead counsel on several large corporate

2 restructuring including Polaroid Corporation, Washington Group

3 International, Montgomery Ward, Transworld Airlines in their

4 initial Chapter 11, Morrison Knudsen, ICG Communications and

5 Phillips Services.  Mr. Kurtz has over 24 years of

6 restructuring experience.

7 　　　　　Mr. Kurtz would further testify that he was, in

8 connection with his role as lead -- leading the engagement of

9 Lazard with respect to New Century, intimately involved in the

10 negotiations with Carrington with respect to the -- their

11 purchase agreement and bid protections that are the subject of

12 the debtors' motion today.

13 　　　　　Mr. Kurtz would further testify that the bid

14 protections contained in the debtors -- I'm sorry, in

15 connection with the Carrington proposal which included detailed

16 -- a detailed bid procedures order including both the topping

17 fees -- or breakup fees, termination fees, but also the

18 detailed procedures for the bid process including the bidding,

19 qualifications for bidding and the assets subject to bid were

20 part of the negotiations with Carrington and necessary to

21 induce Carrington to provide its overall asset purchase

22 agreement in stocking horse proposal.

23 　　　　　He would further testify that the negotiation of all

24 aspects of the bid protections were the subject of arms length

25 negotiations by Carrington and New Century and that

**J&J COURT TRANSCRIBERS, INC.**

1  negotiations were led by professionals at Lazard and outside

2  counsel on behalf of New Century as well as outside

3  representatives of the -- of Carrington and evidence of

4  substantial give and take by both parties.  These negotiations

5  included negotiations with respect to the various bid

6  procedures.

7          He would further testify that the ultimate procedures

8  and breakup fees were both designed to enhance bidding and

9  maximize value to the estate, that the current proposed

10 procedures that were attached to the notice has evidenced that

11 it did not show any bidding, that over 25 parties have emerged

12 as potential bidders since the debtors filed their motions and

13 proposed procedures motions.  And that the -- further, that the

14 filing with the stocking horse bid on these assets made them

15 more marketable and beyond that, had a stabilizing influence on

16 preserving the ongoing enterprise serving as an important

17 employee retention tool.

18         He would further indicate that the debtors, the

19 Creditors Committee and Carrington have had extensive

20 negotiations and discussions over the past several days with

21 respect to the bidding process and the proposed auction process

22 and the current bid procedures set forth to the Court as a

23 result of the involvement of the professionals of Carrington,

24 but more importantly, of the debtor and the Creditors Committee

25 and that each proposal was concurred by the professionals for

1 the debtors and the Creditors Committee and protection for the

2 investment bankers for the Creditors Committee to structure

3 those -- I'm sorry, the investment bankers for the debtors and

4 the financial advisors for the Creditors Committee to structure

5 those as a method to both best maximize value for the debtors'

6 estate and run an auction that is designed to maximize the

7 value for the debtors' estate.

8          He would further testify that the bidding procedures

9 and others -- the bidding procedures as well as the breakup fee

10 and other expense reimbursement, other provisions, are

11 reasonable.  They are now supported by the Creditors Committee,

12 that they induced the buyer to continue to do work and

13 diligence that it would not have otherwise done, and therefore

14 would satisfy the O'Brien factor set forth in that court's

15 decision.

16          Your Honor, that would conclude proffer of Mr. Kurtz.

17          THE COURT:  Anyone care to examine Mr. Kurtz?  All

18 right.

19          MR. GALLERIZZO:  Just here, Your Honor?

20          THE COURT:  Okay.

21          THE CLERK:  Please raise your right hand, place your

22 left hand on the Bible.

23          DAVID KURTZ, DEBTOR'S WITNESS, SWORN

24          THE CLERK:  Would you please state for the record

25 your entire name and spell your last.

**J&J COURT TRANSCRIBERS, INC.**

1     THE WITNESS:  David Steven, K-u-r-t-z.

2     THE CLERK:  You may be seated.

3     THE WITNESS:  Thank you.

CROSS EXAMINATION

4

5  BY MR. GALLERIZZO:

6  Q    Good morning, Mr. Kurtz.

7  A    Good morning.

8  Q    Can you tell the Court what discussions were had between

9  you, representatives of the debtor and the Carrington Group

10  regarding GE's collateral which would consist of primarily the

11  computer equipment that's at issue in this particular matter?

12  A    I don't recall -- excuse me -- I don't recall

13  participating in any such discussions.

14  Q    Okay.  Do you believe that the Carrington Group would walk

15  away from the offer that they've placed on the table for all

16  the assets if GE were allowed to credit bid just the computer

17  equipment?

18  A    I have no way of knowing what Carrington would either do

19  or not do.

20  Q    Okay.  Do you know why all the assets of this particular

21  loan servicing portfolio were not offered separately and then

22  together as a group?  And then a determination would be made

23  where the highest bid came from?

24  A    Yes.  That would make for a very disorganized, messy sale

25  that, in my view, could ultimately reduce the overall value of

1 the process.  And if we literally had to offer in separate lots

2 this -- the assets securing the claims of every secured

3 creditor, those assets are subject to the sale, I've never seen

4 it done that way in my entire career and if --

5 Q    Well -- okay.

6 A    Can I finish my answer.

7 Q    Sure.

8 A    And I think it would make things needlessly complicated

9 when there is another alternative, another process that I'm

10 personally familiar with in my experience which is everybody's

11 rights attached to the proceeds and those rights are dealt with

12 after we've created a pot of cash, maximized the creation of

13 that cash by conducting the cleanest possible sale and the

14 Judge will determine who's entitled to what and all arguments

15 are preserved.

16 Q    Okay.  Let me just backtrack a little bit on what you just

17 commented on.  Basically, what I suggested was you have an

18 overall sell of the assets.  And you have separate bidding on

19 specific assets.  And it's your believe that that would cause

20 the overall bid to be less than what Carrington offered?

21 A    It absolutely could do that.

22 Q    And why is that again?

23 A    Complexity of having to offer, and I don't know how many

24 different lots we would have to offer as part of this sale, but

25 the more complexity one introduces into the sale, the greater

1 risk that one does not maximize value.

2 Q    How about if you just had one additional lot?  Just GE's

3 lot?  That wouldn't be complex, would it?

4 A    I -- if we had only one, we could probably manage our way

5 through that.

6 Q    Okay.

7        MR. GALLERIZZO:  I have no further questions, Your

8 Honor.

9        THE COURT:  Does anyone else care to cross examine

10 Mr. Kurtz?

11        MR. POWER:  Yes, Your Honor.  Mark Power from Hahn

12 Hessen, counsel for the Committee

13                    CROSS EXAMINATION

14 BY MR. POWER:

15 Q    Mr. Kurtz, during your negotiations with Carrington in

16 this deal, was it your understanding that Carrington was

17 looking to buy the entire servicing platform as an operating

18 business?

19 A    Correct.

20 Q    In your experience, if the bidder -- a very successful

21 bidder, do you think they would be able to close within the

22 time period set forth in the asset purchase agreement and also

23 be able to replace all of the thousands of pieces of equipment

24 that GE has subject to it's lien?

25        MR. GALLERIZZO:  Objection, Your Honor.

1          THE COURT:  Basis?  Basis.

2          MR. GALLERIZZO:  Basis for the answer?  I don't know

3   that he has the basis to answer that.

4          THE COURT:  Foundation is the objection.

5          MR. GALLERIZZO:  Foundation.

6          THE COURT:  Any response?

7          MR. POWER:  Well, Your Honor, I believe it's clear in

8   the proffer that this gentleman is extremely experience both in

9   terms of sales as a counsel for Skadden Arps and also as an

10  investment banker.  He's certainly familiar with the

11  negotiations with Carrington and he understands what it is to

12  sell an operating business and what it would involve to remove

13  pieces of equipment from hundreds of locations across the

14  country.  So I think he's qualified for that issue.

15         THE COURT:  Well, why don't you lay just a little bit

16  of foundation.

17  Q    Mr. Kurtz, in connection with your -- well, let me do it

18  this way.  Are you familiar with the debtors' operations?

19  Generally?

20  A    Yes, I am.

21  Q    Could you briefly describe for the Court exactly how many

22  offices are located in connection with this business and how

23  many pieces of equipment are involved in the sale of the

24  servicing business generally.

25  A    There are two main bases of operation with regard to the

1 servicing business.  The majority, the vast majority of the

2 employees associated with that business are located in Santa

3 Ana, California.  Then there are also a smaller group of

4 employees that are located in Indiana.  As to how many computer

5 terminals they have, I don't know the answer to that question.

6 Q    Well, let me ask this question.  Is it -- you understand

7 the service business?  You're familiar with the service

8 business generally?

9 A    Yes.

10 Q   Is that a technology-based business?

11 A   Yes, very much so.

12 Q   To your knowledge, do those hundreds of employees all

13 utilize computers as part of their performing their --

14 A   I believe most if not all.

15 Q   And is the computers and the telephone system a crucial --

16 in your experience in this business, a crucial element of the

17 sale of that business and the way it operates?

18 A   Yeah, exactly.  It goes to the heart of what these

19 employees do.  I mean, their job is to collect, to process

20 payments that come into the door with respect to the mortgage

21 loans that they're servicing.  And most importantly, to very

22 quickly reach out to delinquent debtors with respect to

23 mortgage loans that have fallen into default.  Experience has

24 proven that the sooner one reaches out to those delinquent

25 debtors, the greater likelihood that one can restore them to

1  good standing.  And so they're -- these employees are highly

2  dependent upon the technology associated with their computers

3  and with their telephones.  They literally couldn't do their

4  jobs without it.

5  Q    Now, in connection with the debtor's operations and the

6  debtor's computer systems, are you aware that the debtor has

7  certain software on those computers that is important for the

8  servicing of those mortgage loans?

9  A    Yes.

10  Q    And now, let's do the scenario which is being proposed to

11  the Court, where basically you would permit a lot which would

12  permit the bulk of that equipment to be sold separately.  Do

13  you think -- and understanding this debtor's business and the

14  bid that Carrington made -- that we'd be able -- the debtor

15  would be able to close on this sale within the time frame of a

16  little -- we're at a month approximately, and also replace all

17  the equipment that GECC would be bidding on?

18  A    I think that would be virtually, if not impossible, if not

19  literally impossible.  I mean, if we couldn't control those

20  assets, it would be extremely harmful to our ability to realize

21  value and close this sale.  When I gave my earlier answer as to

22  whether it could be managed or not, I was assuming that a -- as

23  long as the total bid exceeded the amount of the credit bid for

24  that equipment, we could continue to control those assets.  If

25  this creates and opportunity to lose control of those assets,

1  then we are literally jeopardizing the entire transaction.

2  Q    Now, let's look to the separate lot for GECC.  Has the --

3  is the debtor in position today to notice -- let me --

4        MR. POWER:  Strike that, Your Honor.

5  Q    Has the debtor made an inventory, to your knowledge, of

6  all of its assets that are subject to this sale and is in a

7  position within the next few days to notice separate sales of

8  all that equipment that may be subject to a lien?

9  A    I don't know if we could do that or not.

10 Q    Is your office, which would be running this auction, in a

11 position where it could notice all potential purchasers of all

12 those individual assets that are subject to GECC's lien in

13 order to insure the Court and the creditors that we're getting

14 the maximum bids on that lot?

15 A    Sorry, I don't think I followed.

16 Q    Let me -- under the following scenario where a lot is set

17 up for the GECC collateral involving hundreds of pieces of

18 equipment and telephone systems is sold separately, is your

19 office prepared in the next few days to create a list of all

20 the potential purchasers of those type of assets such that you

21 can insure this Court and creditors that the bids received on

22 that lot at the auction are maximum value for this estate?

23 A    I wouldn't even know how to go about doing that.

24 Q    But it's fair to say that you couldn't do that within the

25 procedures and keeping the Carrington deal in place and also do

1 that within this time frame?

2 A     In a credible way it seems virtually impossible.

3 Q     So in your judgment, based on your experience, GECC's

4 credit bid is not designed to show fair market value for those

5 assets in a open noticed auction?  Was that your opinion, your

6 view?

7           MR. GALLERIZZO:  Objection, Your Honor.

8           THE COURT:  Basis?

9           MR. GALLERIZZO:  Basis is he's asking him for a legal

10 conclusion.

11          THE COURT:  Overruled.  You may answer, sir.

12 A     This doesn't strike me as having anything to do with fair

13 market value.  It seems to me this is all about tactics and

14 leverage.

15 Q     And you said previously in your testimony in response to

16 GECC's counsel that in your view GECC's protected as to the

17 fair market value of its collateral because it's liens will be

18 attached to the proceeds, will succeed the entire debt and the

19 valuation issue can be reserved, isn't that right?

20 A     I actually went one step further than that.  What I said

21 was all of their rights can be protected with regard to those

22 proceeds and ultimately determined by the Bankruptcy Court.

23 Q     So in your view, does the fact that GECC may credit bid in

24 an auction it really hasn't been noticed properly and hasn't

25 been vetted for the best possible values, does that have any

1 reflection on what the fair market value of that collateral may

2 actually be at the end of the day?

3 A    No.

4          MR. POWER:  Your Honor, no further questions.

5          THE COURT:  Anyone else like to examine this witness?

6 Is there any redirect?

7          MS. UHLAND:  No, Your Honor.

8          THE COURT:  Thank you, sir.  You may step down.

9          THE WITNESS:  Thank you.

10          MS. UHLAND:  Your Honor, with that, we would again

11 request the Court overrule the objection and argue that cause

12 is certainly set forth with respect to 363(k) to not permit the

13 credit bidding except as previously described as part of an

14 overall qualified bid.

15          THE COURT:  All right.  Is there anyone who I have

16 not yet heard from who wishes to be heard in connection with

17 this motion?  I hear no response.  All right.

18          This is a circumstance under which permitting the

19 relief that GECC here requests in connection with credit bid I

20 think creates more problems than it solves.  I agree with Mr.

21 Kurtz.  It has the strong potential to create a disorganized

22 sale and potentially to reduce the overall value of the going

23 concern that the debtor here is attempting to capture.  Not

24 only that, but it would make for a destructive transition based

25 upon the testimony of Mr. Kurtz which I find credible.  Yet, on

**J&J COURT TRANSCRIBERS, INC.**

84

the other hand, GECC is fully protected with respect to the
value of its liens which will attach to proceeds.

Under these circumstances, I do find that cause
exists and will not permit the credit bid.  Neither will I
require an allocation prior to the sale as requested by GECC.
The debtor has agreed already to provide the list of assets.
So that part of the objection has become moot and therefore
what remains of the objection is overruled for those reasons.

I find otherwise that with respect to the proposed
bidding procedures, especially in light of support of the
Committee and the resolution of the objection of the U.S.
Trustee and of others that they provide an appropriate basis to
frame the auction.  I conclude that the breakup fee and expense
reimbursements specifically are of value to the estate and meet
the administrative expense priority required by O'Brien and in
part help frame the bidding and auction procedures, all to the
value and benefit of the estate.  So I'm prepared, upon
submission of the appropriate order under certification
accompanied by a final form of APA, to approve the bidding
procedures.

Are there any questions about that ruling?  All
right.  I hear none.  I'm sorry.

MR. GALLERIZZO:  Yes, Your Honor.  On the allocation
issue, we do plan to come back in response to the sale motion
and raise that issue again.  Can I ask the Court to indulge us

1  to raise it once again if I could?

2         THE COURT:  I don't think you need my indulgence.

3  Today's ruling was with respect to bidding procedures only --

4         MR. GALLERIZZO:  Okay.

5         THE COURT:  -- and was not intended to be with

6  prejudice to any ground for objection you might have with

7  respect to the sale.

8         MR. GALLERIZZO:  Yes, Your Honor.

9         THE COURT:  All right.

10        MS. UHLAND:  Your Honor, I think the only remaining

11 matter is one of setting two dates for possible sale hearings.

12 One is if there is an auction and one if there's not.

13        THE COURT:  Okay.  If Carrington is the only bidder,

14 you're requested a hearing of May 21st or 22nd.

15        MS. UHLAND:  No, if there is -- if they're the only

16 bidder, we ask for May 18th.

17        THE COURT:  Eighteenth.

18        MS. UHLAND:  Which I believe is a Friday.

19        THE COURT:  It's Friday.  May 18th at 10:00.  By the

20 way, I did not ask, but I'll do so for the record now.  Does

21 anyone have an objection to structuring the sale hearings in

22 that matter?  I hear no response.  Okay.  I didn't mean to

23 foreclose anyone from commenting on that.

24        MS. UHLAND:  And then we've requested the 21st which

25 should be a Tuesday.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  No, that's a Monday.

2          MS. UHLAND:  It's a Monday?  Okay.  Yes.

3          THE COURT:  Yeah.  And Tuesday the 22nd is booked.

4          MS. UHLAND:  Is Monday the 21st available?

5          THE COURT:  Well, the answer's yes, but I need to be

6  out of here -- I would set the hearing for the morning.  I need

7  to be out of here by 1:00 in the afternoon.

8          MS. UHLAND:  And then if it were -- if we didn't

9  finish then, for some reason, it would be continued to

10  Wednesday or is the --

11          THE COURT:  No, I have four trial days, full trial

12  days scheduled the 22nd through the 25th.  I guess -- well,

13  we'll do one of two things.  We'll either come back later in

14  the day on the 21st or somehow squeeze you in, you know, within

15  the next couple of days after that.

16          MS. UHLAND:  Thank you, Your Honor.

17          THE COURT:  So at 10:00 Monday, May 21st.

18          MS. UHLAND:  All right.  We'll fill those dates in in

19  the order that we're submitting.

20          THE COURT:  All right.

21          MS. UHLAND:  Other -- oh, Your Honor may need to

22  track back the proposed objection deadlines as well.  Double

23  check.  We had May 15th as the proposed objection --

24          THE COURT:  Well, the auction was going to be --

25          MS. UHLAND:  Oh, sorry.

1            THE COURT:  -- April, now it's going to be May 16th.

2 Do I have that correct?

3            MS. UHLAND:  Yes, Your Honor.

4            THE COURT:  And you propose as an objection --

5            MS. UHLAND:  Objections to the sale would be due the

6 day before the auction.

7            THE COURT:  Does that make sense?

8            MS. UHLAND:  What?  Oh, you want to do it earlier?

9            MR. POWER:  Your Honor, could we have one second?

10                         (Pause)

11            MS. UHLAND:  All right, Your Honor, we'd like to

12 revise and have -- and we'll again conform the order, to

13 provide that objections other than those to adequate assurance

14 be due May 14, so it's a little bit earlier.  And that adequate

15 assurance objections due May 17th which would be after the

16 auction.

17            THE COURT:  Yeah.  Say by 4:00?

18            MS. UHLAND:  4:00.

19            THE COURT:  Now, I want to have all the papers in

20 hand prior to the hearing on the 18th, say by 8:30.

21            MS. UHLAND:  We will have that completed, Your Honor.

22 Well, at least from the -- all the papers we can.  If there's

23 no auction and then the hearing is on the 18th, there's a -- at

24 4 p.m. the day before we would still be getting the adequate

25 assurance objections.  So anything other than that we could

**J&J COURT TRANSCRIBERS, INC.**

1 have to the Court by 8:30.

2          THE COURT:  No, I meant 8:30 on the morning of the

3 hearing.

4          MS. UHLAND:  Oh, okay.

5          THE COURT:  I need more than 10 minutes, that's all

6 I'm saying.

7          MS. UHLAND:  We'll make sure that happens.  I think

8 that's it on this matter on the calendar, Your Honor.  Again,

9 we're going to work to submit -- before I speak too quickly,

10 let me make sure that I've covered everything.

11          THE COURT:  Okay.

12          MR. KIRIAKOS:  Your Honor, Tom Kiriakos again on

13 behalf of Carrington.  If I can point out an issue that we

14 have.  The APA's going to have a drop dead date which is pegged

15 in terms of at least clearing a number of days from the entry

16 of the sale order to the expiration of the appeal period.  And

17 if, on May 21st, which is really the hearing date -- May 18th,

18 while hopefully will be perfunctory because we'll be prevailing

19 bidder and there wouldn't have been a topping bid, so there

20 aren't going to be the number of objections, et cetera, you

21 would assume, is probably a workable date and time.

22          If there are -- if there is an auction and competing

23 bids and everything else, May 21 has a much more likely

24 situation for a hearing that goes beyond those days.  So if we

25 could ask that what those additional days might be so we can

**J&J COURT TRANSCRIBERS, INC.**

1  then look at the date we have for the termination date and at

2  least move it out so going in we haven't structured something

3  that doesn't work, I'd be appreciative.  I don't know if I'm

4  making our problem clear enough on the record or not.

5          THE COURT:  Well, no.  Is what I had initially

6  thought was that we squeeze it in sometime before, during,

7  after the trial sessions --

8          MR. POWER:  Right.

9          THE COURT:  -- in the remainder of the week.

10          MR. POWER:  I understand.  I know that's the goal.

11  And we appreciate the accommodation.  But just in the event

12  that we don't get there.

13          THE COURT:  Are you asking me what day the following

14  week I might carry it over to?  Or are you telling me something

15  else?

16          MR. POWER:  No --

17          THE COURT:  Don't be shy.

18          MR. POWER:  No, I'm asking you that, Judge.

19          THE COURT:  Well, it wouldn't be Monday, the 28th.

20          MR. POWER:  Right.

21          THE COURT:  We could do 10:00 on the 29th.

22          MR. POWER:  Thank you, Your Honor.  Very much.

23          MS. UHLAND:  Thank you, Your Honor.  So our proposal

24  would be to bring the agreed order today back to the Court and

25  it will be available to sign that.  We do have an issue of

1  getting our noticing out for this.

2      THE COURT:  Yeah, I have an internal meeting sometime

3  between now and three.  I have the hearing at three.  I'll be

4  here, I'm guessing, at least until four.

5      MS. UHLAND:  All right.

6      THE COURT:  And if you're -- you know, but if you're

7  going to have something in at 4:05, let me know.  I might stay.

8      MS. UHLAND:  All right.  Thank you, Your Honor.  Your

9  Honor, with the balance of the agenda, what we propose to do is

10  continue the hearing on the loan origination platform to next

11  Tuesday at 10 a.m., which is Item 3.

12      THE COURT:  All right.  The 24th at 10.  No, it will

13  be the 24th at 2:30.  All right.

14      MS. UHLAND:  And then the remaining matter for today,

15  Your Honor, is a portion of the employee matter that remains

16  from -- our employee motion that remains from last week with

17  respect to participants in our pre-petition commission, bonus

18  replacement plan with titles of senior vice-president and

19  above.

20      THE COURT:  What's left?

21      MS. UHLAND:  That is left.  Also, Your Honor --

22      THE COURT:  Well, what of that -- what of the relief

23  requested remains?

24      MS. UHLAND:  There's two items, one of which we'd

25  like to continue today.  Or one of them we'd like to proceed

**J&J COURT TRANSCRIBERS, INC.**

1  with as soon as the Court is available.  I don't know whether

2  we want to take a lunch break and go forward, but what remains

3  is with respect to the pre-petition portion that's payable

4  post-petition of what we refer to as our wholesale retention

5  plan for six employees who are paid compensation on a quarterly

6  basis; five with the senior vice-president title and one with

7  an executive vice-president title that were parties to that

8  plan.

9       The debtors would like to come today.  We have a

10 witness here today and more detailed factual basis to walk

11 through two elements; one -- two reasons that they do not fall

12 under 503.  One is the ordinary course basis of their

13 compensation pursuant to this plan.  And second, the absence of

14 insider status by these six individuals notwithstanding their

15 titles.  So we have a further factual showing to make to

16 address the Trustee's objection to our wage motion to require

17 us -- or to object to those payments to the extent prohibited

18 by 503.  The Committee had already agreed to those payments.

19 So that's the balance of that issue.

20      We'd also agreed to put off a second part of our

21 production, that same adoption of that plan, which is the post-

22 petition portion of that plan.  The plan is also in effect for

23 April for those employees for payment in May.  We are --

24 reserve our right with respect to whether Court approval is

25 required for those, what we believe are ordinary course

**J&J COURT TRANSCRIBERS, INC.**

1  compensation.  But we're hoping to continue to work with the

2  Committee so we don't need to litigate that issue and we can

3  just have it pursuant to an agreed order.

4          As of 12/20, my understanding is the Committee's not

5  yet ready to have a resolution?  Oh, Your Honor, may have one

6  moment on that issue.  Oh, and I'm sorry, Your Honor, perhaps

7  we can take a -- we could take a brief break during -- while I

8  confer with Committee counsel.  I understand that the Court

9  requested a scheduling on the motion for the Committee with the

10 deferred compensation claimants and they've asked to be heard

11 ahead, if that's okay with Your Honor.

12          THE COURT:  That's fine.

13          MR. HUSTON:  Good morning, Your Honor.  May it please

14 the Court, Joseph Huston of Stevens Lee on behalf of the

15 movants in Docket Item 307 which is an emergency motion for an

16 order directing the U.S. Trustee to appoint a separate

17 committee for certain deferred compensation claimants.  And we

18 moved -- also move the Court to expedite that limit in

19 shortened notice.  Our requested dates were to try to hook it

20 onto the omnibus date of next -- of April the 24th and chambers

21 called and asked if we would show up today to discuss that.

22          Our co-counsel, Robert Keach, whom I believe Your

23 Honor knows and has granted pro hoc status is on the telephone

24 and I think it's appropriate for him to take the lead assuming,

25 of course, that Your Honor doesn't have -- first have questions

**J&J COURT TRANSCRIBERS, INC.**

1 for us to address.

2          THE COURT:  Not first.

3          MR. HUSTON:  You're first.

4          THE COURT:  I said I do not have questions first.

5          MR. HUSTON:  Oh, okay, fine.  Did you have an idea

6 about -- in terms of scheduling, sir?

7          THE COURT:  Well, let me first ask whether the U.S.

8 Trustee cares to be heard on this request.

9          MR. HUSTON:  And, Your Honor, so it's clear, I think

10 it was in our motion, but we have been talking with the United

11 States Trustee and we wish to continue to talk with the U.S.

12 Trustee and other parties-in-interest.  But just because of the

13 trajectory of this case, we're concerned that if we didn't get

14 something teed up, ready to be moving on now, that we would end

15 up having completely missed the train down the line.

16          THE COURT:  All right.

17          MR. KEACH:  And, Your Honor, Robert Keach, Bernstein

18 Shur.  I am on the phone for the named beneficiaries.

19          THE COURT:  All right.

20          MR. MCMAHON:  Your Honor, good afternoon.  Jim

21 McMahon for the U.S. Trustee.  Your Honor, we do not oppose

22 expedited consideration of the motion.  We just ask that the

23 objection deadline be set at a time, I believe the requested

24 date was the 24th.  To the extent that it will be heard on the

25 24th, we'd like the objection deadlines set perhaps on the 23rd

94

1 at 4 p.m.  I don't know whether the debtors or other parties

2 here have a position with respect to scheduling.

3          MR. HUSTON:  And, Your Honor, that was also our

4 proposed objection deadline, 4:00 on the 23rd.

5          THE COURT:  All right.  Does anyone else care to be

6 heard?

7          MR. POWER:  Yes, Your Honor.  Mark Power for the

8 Committee.  Your Honor, we do object to the expedited hearing

9 on this matter.  Quite frankly, we've gotten some documents in

10 the last couple of days which set forth what we think is the

11 claim or position of the -- in essence, the trustee for this

12 group.  This motion requires some discovery because as far as

13 we can tell, this is really simply one creditor arguing its

14 position in this case as opposed to a group of creditors which

15 need representation as a group.

16          But that issue needs to be vetted factually before we

17 can basically hear by this Court.  So we would ask that the

18 Court not set the hearing for Tuesday because, quite frankly,

19 we're not going to get it done.  But simply set a hearing a

20 little further out, give us some time to have discovery on that

21 issue and we'll try to do that expeditiously.  And quite

22 frankly, the movant here can -- it has the right to be heard

23 and anything that comes up in the next four days, well, the

24 next -- until the hearing is set, that movant can be heard as a

25 creditor of the estate.

**J&J COURT TRANSCRIBERS, INC.**

1          But at this stage, Your Honor, we're just telling you

2    that Tuesday is really productive given the factual issues that

3    are involved in this motion.

4          THE COURT:  What would you suggest in the way of a

5    time frame?

6          MR. POWER:  Well, we were thinking something in the

7    two week range to get documents and basically understand

8    further the parties claimants -- claims and then schedule the

9    hearing in that range.  There is a date of May 7, going off

10   memory, Your Honor, that is in this case.  There's also May 15

11   although that may have to be adjourned.  But something in that

12   range I think would be a fair compromise to give us a chance to

13   look at the facts and at the same time, make sure that this

14   party is not waiting for a long time for the motion to be

15   heard.

16         THE COURT:  Does anyone else care to be heard?

17         MR. KEACH:  Your Honor, Mr. Keach for the

18   beneficiaries.  We have laid out our position in the motion.

19   We do think that, as a number of parties have commented today,

20   this case is proceeding at lightening speed and the

21   beneficiaries do feel as if they will be left at the station on

22   a number of issues if we can't proceed quickly.

23         We're certainly willing to cooperate with the

24   Committee.  I've had one conversation with Committee counsel

25   and supplied any information they wanted about the beneficiary

**J&J COURT TRANSCRIBERS, INC.**

1  group and the statistics relating thereto.  And we certainly

2  would authorize the debtor to provide information in this

3  respect as well.  But waiting until May 7th on this issue seems

4  longer than is necessary to resolve the factual issues that the

5  Committee raises.

6          THE COURT:  Debtor care to be heard?

7          MS. UHLAND:  Your Honor, on this matter we're going

8  to be deferring to the Creditors Committee both as to timing

9  and substance.

10          THE COURT:  All right.

11          MR. HUSTON:  Your Honor, on the one point about that

12  this is only a single creditor.  In the footnote 3 to our -- to

13  the substantive motion, it recites that as of April the 9th, if

14  you will, the primary movant, Mr. Schroeder, had been contacted

15  by over 70 former employees.  There are 570 people potentially

16  going to be affected by this, all under one of two plans that

17  are virtually the same.  So this is not just a one-off issue.

18  It's going to affect a number of people.  So I don't want to

19  minimize the -- minimize or maximize where we are today on

20  this.

21          THE COURT:  Well, how would you describe I guess the

22  overall interest of your clients in connection with the speed

23  with which you'd like the matter to be heard?  I mean, what

24  between now and May 7th would your clients suffer in the way of

25  prejudice if --

1           MR. HUSTON:  I can answer that, but I think I'd defer

2    to Mr. Keach to do that.

3           THE COURT:  All right.  Mr. Keach.

4           MR. KEACH:  Yes, Your Honor.  Robert Keach Bernstein

5    Shur for the beneficiaries.  First, let me just contribute a

6    couple of facts to what Mr. Huston just said.  The -- this has

7    been somewhat of a moving target as the beneficiaries get

8    further information about the case, Your Honor.  But we have

9    actually had email contact with now over 125 potential

10   beneficiaries.  We think that there are approximately 575

11   beneficiaries with total contributions into the deferred comp

12   plans in excess of $40 million.

13          We also understand but have not been able to confirm

14   that the amount of those contributions affect the funds

15   respecting those contributions are in a separate account being

16   managed by the designated trustee under the deferred comp plan,

17   but we don't know that.

18          We also, Your Honor, don't know whether or not the

19   notice contemplated by the Rabbi Trust arrangement which would

20   direct that trustee to hold those claims for others than the

21   beneficiaries has or has not been sent.

22          So one of the things we want to be able to do

23   immediately is move Your Honor for an order either continuing

24   or causing the segregation of those funds so that they cannot

25   be accessed by the debtor or by anyone else during the

1  litigation over these matters.

2          The interest of these beneficiaries is in asserting,

3  Your Honor, that those funds belong to the beneficiaries and

4  they're not available for anyone else.  If we are not able to

5  prevail on that issue, then the beneficiaries as a whole

6  constitute one of the larger creditor groups, at least one of

7  the larger creditor groups with a known non-contingent claim.

8  And we therefore have an interest in maximizing the value of

9  this estate for the benefit of unsecured creditors.  And

10  particularly, maximizing the liquidity of the estate for the

11  benefit of unsecured creditors.

12          And as Your Honor already knows, a lot is happening

13  with respect to the sale of these assets and otherwise during

14  the time frame that we're discussing --

15          THE COURT:  And I'm trying in my mind to connect the

16  necessity to have the hearing on April 24th with what's

17  transpiring.  And I can't make the connection.

18          MR. KEACH:  Well, I think, Your Honor, we have in

19  many respects the same interests as the Committee -- as the

20  Official Committee does, in seeing that the various matters go

21  forward towards the direction of maximizing the estates for the

22  benefit of the unsecureds.  And it's certainly possible that

23  provided that we are informed and can weigh in on an individual

24  basis that we could push this matter beyond the 24th.  And then

25  perhaps, if the Committee's willing to share information with

1  us with respect -- and I think the indications early on were

2  they were -- that we can accommodate their needs to get

3  additional information.

4        And if the 7th is the first day we can get to that,

5  I'm sure, with some accommodations to keep this group in the

6  loop and permit us to have an affective voice, we can probably

7  accommodate that request.

8        THE COURT:  I'm going to set it for May 7th.

9  Frankly, I -- before taking the bench, I had contemplated

10  setting it even later date since there was nothing that told me

11  that -- I haven't heard anything today to say there's something

12  on the verge a bad thing happening that needs to you to be

13  formulated if that's what I ultimately ordered before then.

14  But, you know, I remember when everyone started to use FedEx.

15  All of a sudden we forgot regular mail.  Of course,

16  technology's advanced beyond that.  And I acknowledge that the

17  case is moving quickly.  But that doesn't mean everything has

18  to move with breakneck speed.  And I think May 7th will

19  probably give everyone enough time to sort through some of

20  those issues and maybe come to the necessary accommodations.

21        In any event, I can either mark up the order that's

22  been submitted or you can give me a new one if you like.

23        MR. HUSTON:  At your pleasure, sir.

24        MR. POWER:  Your Honor, may I have one just for the

25  order?

1           THE COURT:  Yes.

2           MR. POWER:  We actually agree with movants on one

3  issue which is that I think may -- in order to avoid litigation

4  and coming back, why don't we consent to a freezing of the

5  status quo with respect to these funds basically until that

6  hearing date.  We're okay with that arrangement assuming

7  movants -- the last thing I want to do is have some kind of a

8  TRO in the pending period.  And we understand that just as long

9  we freeze things where they are today, that we'll basically

10  come to the Court on the 7th and then see what we do with the

11  motion.

12          THE COURT:  All right.  Does the debtor have any

13  problem with that?

14          MS. UHLAND:  No, Your Honor.

15          MR. HUSTON:  Well, Your Honor, do you want us to

16  massage the order a little bit and put that in?

17          THE COURT:  I think so.  And an objection date?

18          MR. HUSTON:  May the 7th, I can't remember.  Is that

19  a 10:00 hearing?  I know it's on only one item, I believe.

20          THE COURT:  It's a 10:00 hearing, 10:00 hearing.

21          MR. HUSTON:  And I don't have my little Gameboy with

22  me.  What day of the week is that, sir?  It would be --

23          THE COURT:  Seventh is a Monday.  It's going to make

24  April 30th the response date?

25          MR. HUSTON:  Very good, sir.  And I would like to

1 thank the Court and all the parties here for letting us hop in

2 and get this disposed of.  And with that, may we be --

3          THE COURT:  Always good to see you, Mr. Huston.

4          MR. KEACH:  Mr. Keach for the beneficiaries, Your

5 Honor.  I pass along similar thanks for the indulgences.

6          THE COURT:  You're welcome.

7          MR. HUSTON:  And may we be excused until --

8          THE COURT:  Yes.

9          MR. HUSTON:  Thank you.

10          MR. KEACH:  Thank you, Your Honor.

11          MR. RALSTON:  Your Honor, may I address the Court

12 briefly?  Mark Ralston of Munsch Hardt Kopf and Harr on behalf

13 of one of the objecting parties to the motion to approve bid

14 procedures as to the loan origination platform.  We filed a

15 substantial objection yesterday afternoon, was not aware that

16 this was going to be continued today.  I understand that now --

17          THE COURT:  Me neither.

18          MR. RALSTON:  Yes.  And that's part of my problem,

19 Your Honor.  The cost and expense to my client having me fly up

20 here for the evening and then just to find out that there's

21 nothing going on substantively is rather upsetting, will be

22 upsetting to my client.

23          We would request that -- I don't know what the

24 Court's agenda is on Tuesday.  I understand Tuesday at 10:00 is

25 the reset hearing date.  We'd just request that the Court

**J&J COURT TRANSCRIBERS, INC.**

1  consider whether there is sufficient time to have this matter

2  heard and if not, maybe suggest an additional date.

3          THE COURT:  It's 2:30.

4          MR. RALSTON:  It's on at 2:30.  And because we have a

5  substantial objection to this and it's going to take some time

6  and I wanted to make sure that the Court was apprized of that

7  for its purposes and to try to limit costs to my client.

8          THE COURT:  Well, I can tell you the courtroom will

9  be in use beginning at it's either 5 or 5:30.

10         MR. RALSTON:  Okay, Your Honor.  Well, that's -- we

11 have three hours.  I think we can get a lot done.  Also, if I

12 would -- I would request that if there's -- if maybe not, Your

13 Honor, maybe we'll work a resolution between now and then, that

14 if there is going to be an additional continuance request so

15 that the hearing doesn't go forward, I would appreciate the

16 courtesy that someone with the debtor or other party contact me

17 before I take the trip up.

18         THE COURT:  I'm certain that every effort will be

19 made to accommodate your situation.

20         MR. RALSTON:  Thank you, sir.  Appreciate it.  May I

21 be excused?

22         THE COURT:  Yes.

23         MS. MERSKY:  Your Honor, Rachel Mersky of Monzack and

24 Monaco on behalf of RBC, also in connection with the loan

25 platform business.  While we're here today and didn't know

**J&J COURT TRANSCRIBERS, INC.**

1  definitively until that would be -- that that would continued

2  until Tuesday, that is not as much our concern as on Tuesday,

3  we understand now that the extent of the assets being sold may

4  be substantially limited such that it might not apply at all to

5  the issues raised by my client.  And we just want to make sure

6  that there is adequate notice if, in fact, the platform

7  business is reduced and will no longer include whole portions

8  of the business, that that be formally noticed with enough time

9  so the parties do not have to unnecessarily appear or have co-

10  counsel appear.

11         MS. UHLAND:  Two things, Your Honor.  First, I do

12  apologize on the timing on the continuance.  The debtors and

13  the Creditors Committee were in discussions until late

14  yesterday on this matter and still trying to resolve those

15  issues.

16         With respect to both of the prior objections, they

17  may be rendered moot to the extent the debtors scaled back what

18  they're proposing to sell.  We will endeavor by, say, 9 a.m.

19  eastern time Monday morning to identify if there's a reduction

20  in the assets for sale, to possibly avoid both of those

21  objections.

22         THE COURT:  All right.  I am going to take a break

23  before we begin the next matter.  Any notion in terms of timing

24  what you anticipate?  How many witnesses do you have and --

25         MS. UHLAND:  One witness and argument and then the

1  United States Trustee objection.  I would like to put on the

2  record the results of my conversations with the Creditors

3  Committee so we can provide the Court with an update on that

4  before we break.  And then I don't know -- I would assume that

5  a half an hour would be adequate for that portion of the

6  hearing.

7          MR. MCMAHON:  Your Honor, I'd be surprised if any

8  cross examination that we would have would take more than three

9  to five minutes.

10         THE COURT:  All right.  Thank you.

11         MS. UHLAND:  Your Honor, with respect to the prior --

12 we sort have sort of a temporal issue with the Creditors

13 Committee and a ranking issue with the United States Trustee

14 with respect to this matter.  And our prior entered order

15 indicated an order with respect to the payments in April for

16 the pre-petition period.  We believe we have an agreement with

17 the Creditors Committee with respect to the April payments, the

18 payments for the April period to be paid in May under certain

19 conditions similar to those that we agreed to with respect to

20 the March payments paid in April.

21         That is part of a global agreement that we're -- or

22 settlement that we're working on them with respect to both the

23 sell of the loan origination platform and with respect to that

24 compensation matter.  We would hope to submit -- we had hoped

25 to submit both agreed orders on the loan origination and

1 employee matter, but if there's pending objections to the loan

2 origination, you know, we'll be submitting, you know, a

3 proposed order and hopefully an agreed order on the employee

4 matter, submitting that probably before the hearing on next

5 Tuesday.

6          THE COURT:  Okay.

7          MS. UHLAND:  Is that accurate?

8          MS. FATELL:  Good afternoon, Your Honor.  Bonnie

9 Fatell for the Creditors Committee.  Just wanted to round that

10 out a little bit.  The piece that is being asked to be paid to

11 the employees goes to the employees who otherwise would have

12 been earning commissions if they could originate loans during

13 this time period.  And we appreciate that it's important to

14 keep those people in place so that we can try and maximize the

15 value for the loan origination platform.  We're also balancing

16 that with the -- all of the costs to run that platform or keep

17 it in place in the event -- until the sale process, but also

18 trying to determine if, in fact, the sale process will be

19 successful and maximize value.

20          So, we're balancing those.  We're trying to tie that

21 together.  Preliminarily the Committee has agreed to the

22 payment subject to our final agreement on all of the bid

23 procedures.

24          THE COURT:  All right.  Anything else before break?

25          MS. UHLAND:  That's it, Your Honor, for now.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  I'm thinking we should reconvene

2  at 1:15?

3          MS. UHLAND:  That sounds appropriate, Your Honor.

4          THE COURT:  All right.  The court will stand in

5  recess.

6                    (Recess)

7          MS. UHLAND:  Good afternoon, Your Honor.  To

8  reiterate the matter we're addressing today with respect to the

9  employee motion is the following.  The debtors had filed a

10 motion at the commencement of the case with respect to their

11 pre-petition wages and in that regard, requested that certain

12 pre-petition wages be paid in accordance with the debtors

13 adopted policy to address the commission replacements program.

14         At the conclusion of the hearing, the Court left open

15 to address at a later date, which we will address today, the

16 payments of those pre-petition wages with respect to, as it

17 turns out, six individuals.  In essence, the Court ruled that

18 those were the title of senior vice-president or higher should

19 be -- we want to -- you know, a further factual showing with

20 respect to the compliance of the debtors' proposal with Section

21 503 of the Bankruptcy Code.

22         THE COURT:  Well, strictly speaking, there were two

23 individuals identified before.  And I don't -- I think what I

24 said was I deny without prejudice, at least the request with

25 respect to those individuals.  So it's not six not two.

1          MS. UHLAND:  Yes.

2          THE COURT:  Okay.

3          MS. UHLAND:  There was the -- we knew for certain

4  that the, quote, unquote, highest ranking were one senior vice-

5  president who is in charge -- the senior vice-president for the

6  debtors' consumer direct business and the executive vice-

7  president in charge of the wholesale production.  In addition,

8  there are four senior vice-presidents who report to the

9  executive vice-president.  So there are a total of six as the

10  total number of senior -- so five senior vice-presidents, one

11  executive vice-president in the program.

12          THE COURT:  Okay.

13          MS. UHLAND:  Your Honor, what we would like to do

14  today is first to discuss the nature of those parties

15  participation of the effect of the current plan, as I said, who

16  named a wholesale retention plan by the debtors' pre-petition,

17  although we do not believe that it is a retention plan.  And to

18  walk through the mechanics as to who those plans apply to the

19  compensation for these six individuals who have paid on a

20  quarterly basis with respect to the payments covered by -- that

21  we are discussing here.

22          And second, walk through the factual showing with

23  respect to what those employees, in fact -- their legal or

24  their assigned duties in the corporation and contract those

25  with the assigned duties and responsibilities of others who we

**J&J COURT TRANSCRIBERS, INC.**

1  admit are officers and insiders of the corporation.

2       THE COURT:  Okay.  Before you do that, let me just

3  reconfirm with the U.S. Trustee the extent of her objection.

4  If I recall correctly, was this a "I'll put the debtor to its

5  proofs" objection or is it more specific than that, Mr.

6  McMahon?

7       MR. MCMAHON:  Your Honor, Joseph McMahon.  Consistent

8  with the position that we talked at the last hearing, we

9  believe that these payments fall within the ambient of 503(c)

10  meaning that they do have primarily a retentive purpose.

11       THE COURT:  So (c)(1)?

12       MR. MCMAHON:  That's correct.  And also, again,

13  consistent with the position that we took at the last hearing,

14  these persons constitute officers and by extension, insiders as

15  such that they would not be eligible to be paid under that

16  subsection.

17       THE COURT:  All right.  Thank you.  All right.  Am I

18  to understand that it's the debtors' position that these are

19  not 503(c)(1) payments?

20       MS. UHLAND:  Yes, our position is they are neither

21  insiders -- the effected individuals are neither insiders nor

22  are they retention payments.

23       THE COURT:  And if I were to find that the payments

24  were subject to the 503(c)(1) standards, is it the debtors'

25  position -- well, I'll say it another way.  I take it it's the

**J&J COURT TRANSCRIBERS, INC.**

1  debtors' position that it could not been those standard?  You

2  haven't said that, but I'm supposing that to be the case.  Or

3  am I wrong about that?

4          MS. UHLAND:  Your Honor, I do not believe we can meet

5  the standards, particularly with respect to all the individuals

6  with respect (c)(1)(A).

7          THE COURT:  Okay.  Proceed.

8          MS. UHLAND:  Your Honor, prior to my proffer, I'd

9  like to walk through, just because I think it helps to frame

10  it, the -- revisit the terms of these plans and then I'll

11  support that in the proffer.

12          The six individuals at issue, as we discussed in

13  prior hearings on this, receive substantial portion of their

14  payment in discretionary or bonus compensation.  Partly, their

15  -- these bonus or quarterly payments that they receive are 4 to

16  500 percent of the base salary that they're paid.

17          With respect to these individuals, their quarterly

18  payment is targeted each quarter and they are paid in recent

19  months, or recent years, have received 90 to approximately 120

20  percent of their target bonus based on discreet performance

21  criteria.

22          In prior quarters, the way that this performance

23  criteria payment was calculated was as follows.  They were

24  established, as I said, fixed criteria based on quantifiable

25  factors prior to the quarter.  And after the close of the

**J&J COURT TRANSCRIBERS, INC.**

1 fiscal quarter, the debtors would finish their financial

2 reconciliations and pay the appropriate amount with a time lag

3 as appropriate for the performance of the prior quarter.

4      When the debtors ceased loan origination in -- on

5 March 10th, they were 10 weeks into their 13 week fiscal

6 quarter.  And the debtors determined with respect to these six

7 individuals, in lieu of a proposal to have the percentage

8 determined after the close of the quarter, since many of the

9 performance criteria were no long applicable, that in

10 accordance with their -- they made a policy determination to

11 fix, for those -- these six individuals, their compensation at

12 75 percent of their target bonus.  This was in effect the

13 temporal proration of the time period where the debtors were

14 originating loans during the fiscal quarter.

15      The payment, timing of the payment based on prior

16 experience was to be consistent.  In other words, the payment

17 was not going to be received for the quarter until after the

18 close of the fiscal quarter.  This has created the issue, and

19 why it was included in our pre-petition motion, is that we were

20 seeking post-petition to pay for wages earned pre-petition.

21      But in essence, again, with respect to these

22 employees, the sole impact of the, quote, unquote, retention

23 plan was an incorporated sentence in there that stated with

24 respect to these quarterly employees -- or the quarterly

25 bonused employees are that they would get this determination of

**J&J COURT TRANSCRIBERS, INC.**

1  the 75 percent in advance of the close of the fiscal quarter.

2           Based on that understanding and factual underpinning

3  of what this policy decision was, we do not believe that this

4  short-term -- if it could be called an incentive plan or policy

5  decision is something that falls within the retention programs

6  that are covered by Section 503.  And we think that Judge's --

7  Judge Gross's decision in Global Home Products, which drew a

8  distinction between 503 plans and ordinary incentive plans or

9  compensation plans that went into the debtors -- by the debtors

10 pre-petition provides guidance here.

11          THE COURT:  But isn't -- I mean, haven't you just

12 described an adjustment that was made out of the ordinary

13 course of business while -- even if everyone were to concede

14 that -- I'm not asking the U.S. Trustee to acknowledge this,

15 but even if we were to concede that such plans could exist in

16 the ordinary course and would not be subject to 503(c) scrutiny

17 or standards, haven't you just described a situation in which

18 it's absolutely outside the ordinary course?

19          MS. UHLAND:  I think setting compensation policy to

20 address performance is not outside the ordinary course of the

21 debtors business.

22          THE COURT:  Not generically.  That's -- we'll concede

23 that point for purposes of this discussion.  But even given

24 that, that's not what happened here.

25          MS. UHLAND:  Well, and then I suppose further, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor, what I would state is if the policies had an existing

2  provision that expressed -- that addressed the proration issue

3  prior to the decision to adopt such a proration -- you know, if

4  the debtors had thought ahead, that that could have been

5  incorporated.  But the plan was silent with respect to what to

6  do if there was an appropriate determination under certain

7  circumstances that, you know, perhaps because of what was going

8  on in the company's business, you should prorate.

9          THE COURT:  Well, let's talk about that for a minute.

10 And I know -- I'm pretty sure at the last hearing we went

11 through this time line and I'm sure it's in the first day

12 affidavits.  But among the pre-petition events, like the

13 company acknowledging it needed to restate earnings and a

14 commencement of an FCC investigation and subpoenaed by the U.S.

15 Attorney's office and the commencement of class actions, give

16 me just the general time frames during which they occurred.

17         MS. UHLAND:  Your Honor, so the compensation we're

18 talking about is for January, February and March.  The debtors

19 announced the restatement on February 7th and that had, you

20 know, some disruption.  That caused civil litigation.  On March

21 2nd, the debtors announced the FCC investigation and the

22 further restatement.  And the debtors, on -- trying to think it

23 was -- I believe it was March 12th is when the debtors ceased

24 originating loans and thereafter again, so 10 weeks into this

25 13-week cycle, it as at that point that the debtors adopted the

**J&J COURT TRANSCRIBERS, INC.**

1 plan with respect to the commission-based account executives

2 that we talked about before, constructing a commission

3 replacement.  But with respect to these employees, again, it

4 was simply a -- in fact, a reduction in fixing other

5 performance targets for the balance of the fiscal quarter.

6            THE COURT:  Now, the restatement was announced on

7 February 7th.  And they're -- understand the question I'm about

8 -- the answer to the question I'm about to ask may have other

9 ramifications.  And if you choose, at least today, not to

10 answer it, I will understand.  But when did the company become

11 aware that it was going to have to restate earnings for those

12 three quarters?

13            MS. UHLAND:  Unfortunately I don't know the answer to

14 that question, so.

15            THE COURT:  It had to be sometime prior to February

16 7th.  Maybe it was a day, maybe it was a month, maybe it was

17 longer.  I don't know.  But I guess my point is, it seems

18 likely to me that during virtually the entire period that this

19 compensation right would have accrued, nothing was in the

20 ordinary course.

21            MS. UHLAND:  Well, Your Honor --

22            THE COURT:  Maybe that's an overstatement, but you

23 understand what I mean by that.

24            MS. UHLAND:  I think that if -- if the debtors

25 restatement was at the financial level which had to do with

1 the, what I'll call the capital markets side of the business,

2 what we're talking about here was a plan to keep the loan

3 origination platform operating and then we're talking about now

4 with these six individuals are the managers of the account

5 executives that deal with the wholesale loan origination

6 platform.

7          So that, you know, one, I mean, these individuals

8 certainly would have had no knowledge of anything with respect

9 to the restatement before February 2nd.  And their -- what

10 their performance criteria was in the loan origination aspect

11 of this with respect to the individual borrowers and brokers

12 with whom they're working are not connected to their

13 performance criteria.

14          THE COURT:  Well --

15          MS. UHLAND:  To the -- in the restatement issues.

16          THE COURT:  That's a factor that might be important

17 to me, but I agree it's different from the issue that I was

18 raising.  And let's assume for the moment it's true.  It

19 doesn't mean the company was operating in the ordinary course.

20 I mean, things developed rapidly as they continue to do.  And I

21 just wonder whether an adjustment that's made or a plan that's

22 adopted, while the things that were going on here were going

23 on, could under these circumstances and maybe not ever under

24 any circumstances be considered ordinary course.  That's my

25 point.

1          MS. UHLAND:  Well, Your Honor, we -- I think that

2    there's two criteria in 503(c).  I don't think it's any

3    transaction outside the ordinary course.  I think the question

4    is in the -- again, in the Global Home Products case, the

5    question is was the compensation, even if different than pre-

6    extraordinary circumstances compensation, was it primarily for

7    retention.  And one of the factors considered, I mean, was it

8    a, quote, unquote, pay to se (phonetic).

9          And I think in this case, even though, as we've

10   discussed, not paying people at all certainly has the opposite

11   of retention effect, a dispelling effect, perhaps, on

12   employees.  That if it is a plan or a policy that is, you know,

13   substantially identical to the plan previously used and adopted

14   and that it was not purely to induce the individuals to remain

15   through the emergence from bankruptcy, or in our situation,

16   through the emergence of their, you know, then -- at the time

17   they didn't think they'd be going into bankruptcy, I mean, just

18   a difficult period -- that it is not one that is within the

19   scope of 503(c).  And that, therefore, because it was simply a

20   modification of their compensation system to address the

21   circumstances they were in, to be fair to the employees in

22   light of the changed business, that that does not propel it

23   into a retention plan.

24          THE COURT:  Well, let me be as precise as I can.  I

25   guess initially what I want to do is press the debtor, well, so

**J&J COURT TRANSCRIBERS, INC.**

1 that I can focus in on what standard I'm suppose to apply.  And

2 that follows from what section provides the basis for the

3 relief that's being requested.  And I guess what I'm, at least

4 preliminarily thinking is that 363 just doesn't get you there

5 because it's outside of the ordinary course.

6      Now, that doesn't mean that it limits you to relief

7 under 503(c)(1) and maybe it's 503(c)(3).  I don't know, but

8 that's -- to be clear, that seems to be the widest path for me

9 right now.

10      MS. UHLAND:  Well, the payments, I mean, I believe

11 that in our initial motion is really made under 105.

12      THE COURT:  Well, it was and I think I expressed some

13 scepticism at the time about that as a basis even given <u>Maurama</u>

14 (phonetic) and what the Supreme Court says 105 can be used for,

15 at least in that context.

16      MS. UHLAND:  Well, I suppose, Your Honor, if 503

17 doesn't apply and Section 363 does apply and it is out of the

18 ordinary course of business, then we would submit that it does

19 meet the standards of 363 because it's within the debtors'

20 business judgment in the -- and we've conferred with the

21 Creditors Committee to make these payments and have their

22 support for making the payments, that it's in the best interest

23 of the estate in order to do so.

24      THE COURT:  Well, it's outside the ordinary course.

25 It doesn't fall into 503(c)(3).  Now, you may argue that, well,

**J&J COURT TRANSCRIBERS, INC.**

1 okay, it doesn't matter because it's business judgment standard

2 at least in your view in any event.  I think maybe it means

3 something different.  Haven't yet come to a view of how much

4 different because in terms of those plans which I've been asked

5 to approve so far under this new provision, you know, I found,

6 at least what I think, was necessary on 503(c)(3) plans to get

7 the relief there.  Or not, as the case may be.

8        But, okay.  I understand your position and I'm

9 prepared to hear whatever else you'd like submit in support of

10 the relief.

11        MS. UHLAND:  Again, Your Honor, I mean, we believe

12 since the 75 percent would be effectively a temporal proration

13 of the amount of time that would be provided by the plan, it

14 was, in effect, with respect to these individuals that -- a

15 policy modification rather than adoption of a plan that we're

16 out of 503(c) and that it -- you know, as a pre-petition plan,

17 would be exempt from 363 if we call it an assumption of a -- or

18 confirmation post-petition of a pre-petition transaction, that

19 we would submit we address also 363.

20        THE COURT:  But see, even if you wanted to, as you

21 said initially when we talked about this, even if you wanted me

22 to use a critical vendor type of analysis, isn't that analysis

23 geared to keep vendors selling to the company?  I mean, isn't

24 that retention?  And if it is, aren't you dragged back into

25 503(c)(1)?  I'm not --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  I mean, I --

2          THE COURT:  I'm not trying to figure out ways not to

3  grant the relief.

4          MS. UHLAND:  It --

5          THE COURT:  I'm trying to be true to what Congress

6  wanted us to do.

7          MS. UHLAND:  It is a -- I think that if we were

8  trying to say that true insiders -- and, like I say, I'm going

9  to go forward and discuss the insider issue -- that, you know,

10  I think that there could be, if someone was trying to piece

11  together 105 and 363 to circumvent with respect to true

12  insiders, I could see, you know, that those -- that

13  intersection of things could be seen as a circumvention.  But

14  here, and it may be primarily in reliance on the second point

15  here, I don't think there is a circumvention.

16          So, like I said, our primary -- and I think this is

17  sort of a -- the focus.  We want -- we raise this issue on the

18  503 last time and again, I think one of our challenges has been

19  the nomenclature associated with the plan that raises the

20  question on the purpose.  But, you know, our primary issue that

21  we wanted to discuss here today was the fact that we do not

22  believe that notwithstanding these titles, that these

23  individuals fall within the definition of insiders with respect

24  to 503(c).

25          We do understand that within the definition of

**J&J COURT TRANSCRIBERS, INC.**

1 insider, it includes a quote, unquote, officer of the debtor.

2 But in the Court's construing that definition, initially with

3 respect to the preference litigation and more recently in the

4 CEP Holdings, LLC case that was cited, it's out of the Northern

5 District of Ohio.  I have a Lexus cite for you.  It's 2006

6 LEXUS 3305.  The court adopted a similar rubric for determining

7 insider status with respect to 503.

8          THE COURT:  Who was the judge, do you know?

9          MS. UHLAND:  It's a three-named judge.

10                    (Pause)

11          MS. UHLAND:  Thanks.  It's Marilyn Shea-Stonum.  In

12 connection with the preference analysis which was the primary

13 focus of the insider statute before the amendments, the courts

14 considered the closeness between the transferee and the debtor

15 and the degree of controller influence that, in that case, the

16 transferee would have exerted over the debtor and whether the

17 transaction was at arms length.

18          In connection with the analysis under 503, and

19 applying that similar rubric, the court in the CEP Holdings

20 matters indicated that to determine whether a person is a

21 person in control of the debtor or an insider should again

22 focus on the specific transaction at issue.  In other words, it

23 should be, at least in part, considered whether the person is

24 in control over this -- the proposed plan, the compensation or

25 the formulation or control or input of the proposed

1 compensation or plan that's at issue here.  And then employees

2 who do not exert such control should not be considered insiders

3 of the debtor.

4 　　　　THE COURT:  Sounds like a very limited definition of

5 insider for this purpose.  Don't you agree?

6 　　　　MS. UHLAND:  I would agree that is limited and I

7 think there are additional factors that should be considered.

8 Clearly, one of the factors that the courts are considered is

9 the title and the bylaws.  But I think in addition to sort of

10 the narrow question of whether they had control of their

11 compensation, or the particular compensation and transaction at

12 issue, is the general control that these individuals have with

13 respect to the overall enterprise.

14 　　　　And we have prepared our proffer today to discuss the

15 roles of these individuals which are really focused on

16 managerial roles with respect to the loan origination platform

17 individuals, that they do not have ability to set corporate

18 policy with respect to New Century Mortgage, they do not

19 control the financial decisions of New Century Mortgage, nor do

20 they control their own compensation decisions.

21 　　　　So the -- I -- you know, our position is consistent

22 with this -- the CEP Holdings case which we're citing for this

23 sort of more comprehensive view of assessing whether a named

24 officer is an insider, citing the NNI Systems case from the

25 District of Columbia, that the considerations include not only

**J&J COURT TRANSCRIBERS, INC.**

1 the bylaws, but the function and responsibility of the

2 individuals with a focus on whether the individual, in

3 addition, had any control over the transaction at issue.

4        So we would propose, in the testimony we're about to

5 proffer, to explain that the individuals that we are seeking

6 the approval for today are not insiders because,

7 notwithstanding their title, and notwithstanding the

8 possibility, although not the certainty, that they were, in

9 effect, board-appointed because we don't have the specific

10 resolutions for them, that we acknowledge it is a possibility

11 that there exists a board resolution appointing them to their

12 title, that they are not insiders by virtue of the limited

13 scope and focus of their job responsibilities in contrast with

14 the individuals that we do put forth as the insiders of

15 Mortgage and are not seeking to have these type of payments or

16 any other type of 503 payments made with respect to in this

17 case.

18        THE COURT:  You may proceed.

19        MS. UHLAND:  Your Honor, I would like to proffer the

20 testimony of Anthony Meola.  Mr. Meola's here in the courtroom.

21        Anthony Meola joined -- if called to testify, would

22 testify as follows.  He'd testify with respect to his current

23 position and background as follows.  That he joined New Century

24 in May 2006 as executive vice-president for production and he

25 serves in that capacity at New Century Financial Corporation

**J&J COURT TRANSCRIBERS, INC.**

and New Century Mortgage Corporation.  That he is responsible

for managing and expanding the company's national production

franchise, increasing productivity to enhance competitions, and

that his job responsibilities include setting policies with

respect to pricing, deployment of capital resources and

developing marketing strategies.

Mr. Meola would further testify that he is an active

participant of the executive management committee of NCF, the

parent company, which consists of the officers of NCF

implementing board policy and managing operating of

subsidiaries.  He also sits on the financial committee, the

asset liability committee and the pricing committee and is a

voting member setting policy and governing.

He is the EVP of wholesale production and the six

individuals that we're going to be discussing, the executive

vice-president in charge of wholesale production reports to Mr.

Meola.  The senior vice-president in charge of consumer direct

reports to Mr. Meola.  And the remaining four division managers

that have the senior vice-president title report to the

executive vice-president of wholesale.

Prior to joining New Century, Mr. Meola was executive

vice-president of Mortgage Banking Production for Washington

Mutual where he was responsible for directing retail, wholesale

and lending operations in the U.S.  Mr. Meola has more than 19

years experience at the senior management level in the mortgage

1 industry.

2          He joined Washington Mutual in 2000 as the head of

3 loan servicing for the home loans, insurance and services

4 group.  Previously, Mr. Meola was the chief operations officer

5 at PMC Mortgage responsible for all customer acquisitions, in

6 addition to marketing and service for all customer acquisition

7 channels.

8          Prior to joining PMC, he spent seven years at Citi

9 Corp Mortgage as a senior vice-president of mortgage

10 operations.

11          Mr. Meola is a member of the Mortgage Banker

12 Association, Residential Board of Governors, Chicago Public

13 Education Fund and has a Bachelor of Science degree from

14 Rutgers University.

15          Mr. Meola testified as follows with respect to the

16 management of New Century Mortgage Corporation.  New Century

17 Mortgage Corporation is a wholly-owned subsidiary of NCF; that

18 it is managed by the executive management committee of NCF

19 which ultimately reports to the Board of Directors.

20          With respect to the compensation of all officers or

21 all individuals with titles of vice-president and above, both

22 at national New Century Mortgage Corporation and NCF, their

23 compensation is ultimately set by the compensation committee of

24 the Board of Directors of NCF.

25          Further, with respect to the loan origination

1 business of New Century Mortgage Corporation, which is one of

2 the businesses of New Century Mortgage Corporation which also

3 includes the servicing business which is not at issue today, he

4 would testify that the following individuals exert primary

5 operating control over the loan origination business:  Brad

6 Morrice who is vice-president of NCF, he is CEO and president

7 of both NCF and New Century Mortgage Corp; Taj Bindra who is

8 executive vice-president and chief financial officer of both

9 New Century Mortgage Corporation and New Century Financial;

10 Robert Lambert who is the senior vice-president of leadership

11 and organizational development, effectively in charge of all

12 human resources matters at both New Century Mortgage

13 Corporation and New Century Financial; Joseph Eckroth,

14 executive vice-president, chief operating officer and chief

15 information officer of both New Century Mortgage Corporation

16 and New Century Financial; as well as himself, Anthony Meula

17 who holds the positions of executive vice-president of

18 production at both New Century Financial and New Century

19 Mortgage Corporation.

20        With respect to the production business, he would

21 note that he is primarily responsible for in addition to -- in

22 essence managing the national franchise, that he is responsible

23 for setting the pricing and policy and deploying the capital

24 and making the expenditure decisions for the wholesale

25 division; and that he is responsible for recommending

1  compensation commissions decisions to the compensation

2  committee of the Board with respect to the individuals, the

3  subject of this plan.

4       With respect to the six individuals that we're

5  discussing today --

6       THE COURT:  And who are they?  Forgive me for the

7  interruption.

8       MS. UHLAND:  They are Steven Lemon, executive vice-

9  president, wholesale production; Ralph Melbourne (phonetic),

10 senior vice-president, consumer direct division; and Rick

11 Gordano (phonetic), Phil Garcia, Steven Holland and John

12 Warnock (phonetic) who hold the titles senior vice-presidents,

13 wholesale, common division managers.

14      He would testify with respect to this group of six

15 individuals that they are paid with a quarterly bonus based on

16 performance that is 4-500 percent of their base salary; that in

17 recent periods, these individuals earned in a range of 95-100

18 percent of the target bonus based on the specific performance

19 matrix and that these performance calculations are typically

20 done and the bonuses paid after the close of the fiscal

21 quarters.

22      Specifically, with respect to the responsibilities of

23 these individuals, he would testify as follows.  With respect

24 to Mr. Steven Lemon, the executive vice-president of wholesale

25 production, that his job would include hiring, evaluating and

1  managing employees in his sales force; that he is responsible

2  for recommending pricing strategies to Mr. Meola and executing

3  marketing other programs as well as their evaluation and

4  measurement and the reporting of the same to senior management

5  through Mr. Meola.

6         He would indicate that prior to the cessation of the

7  loan originations, that the lions share of the compensation was

8  earned through his quarterly bonus and that the amounts earned

9  or weighted 80 percent based on the performance of the

10 wholesale division and a portion based on the performance of

11 New Century Mortgage Corporation as a whole; and that a minimum

12 performance threshold was required to receive and earn the

13 payout.

14        He would further indicate that since the second week

15 of March when the debtor ceased funding loans, that the minimum

16 threshold necessary to calculate the amount for the quarter

17 could not be determined.  The debtors did not have a policy of

18 prorating this compensation and, instead, instituted the

19 formula of the 75 percent for the first quarter to ensure that

20 Mr. Lemon would be paid for the amount he otherwise earned, but

21 for the cessation of the loan origination.

22        He would further indicate that Mr. Lemon does not

23 exercise overall authority with respect to any corporate

24 decision of New Century Mortgage Corporation; that he is not in

25 a position to exert undue influence over the debtor's corporate

1 decision regarding payment of claims or payment of

2 compensation; and that he had no input in or negotiation of the

3 retention plan of the amount of compensation that he would be

4 paid pursuant to the revised policy.

5       With respect to Mr. Ralph Melbourne, the senior vice-

6 president of consumer direct, he would testify that his

7 responsibilities are as follows.  That Mr. Melbourne was in --

8 retained to improve and increase New Century's direct to

9 consumer telephone and internet lending segments; that his

10 responsibilities including preparing business plans to be

11 submitted to Mr. Meola and thereafter the executive committee

12 to increase -- with the goal of increasing market share and

13 loan origination volume through the consumer direct business;

14 that he is responsible for hiring and firing employees in the

15 telephone operation centers as well as executing marketing

16 business development plans.

17       That Mr. Melbourne -- he would further testify that

18 Mr. Melbourne reports directly to Mr. Meola and that he does

19 not have authority to implement strategic directions with

20 respect to business plans, but can make recommendations to the

21 executive management committee through Mr. Meola.

22       He would testify that prior to the second week of

23 March, that the compensation for the bonus component -- or the

24 quarterly component of Mr. Melbourne's compensation, it was

25 rated 70 percent based on the performance of the consumer

1  direct division and 30 percent based on the performance of

2  Mortgage as a whole.

3          He would further testify that when the loan

4  origination ceased in the second week of March, that there was

5  not a way to determine the minimum performance threshold for

6  that quarter and since the debtors did not have a policy for

7  prorating plans, they instituted the policy to set the bonus at

8  75 percent of targets to ensure that employees would be paid

9  the amounts they otherwise would have earned but for the

10  cessation of platform.

11          He would testify that Mr. Melbourne does not have

12  authority to set overall corporate policy -- that he does not

13  exercise overall authority for any corporate decisions; that he

14  does not -- is not in a position to execute -- to exert undue

15  influence over the corporate decision regarding claims; and had

16  no input in the negotiation or the amount of compensation that

17  he would receive in accordance with the changed debtor's

18  policy.

19          With respect to Rick Gordano, Phil Garcia, Steven

20  Holland and John Warnock, they hold the titles of senior vice-

21  president, division managers; their responsibilities are as

22  follows.  The division manage, recommend market prices and

23  strategies and recommend credit exceptions to Mr. Lemon,

24  executive vice-president of the wholesale production.  These

25  individuals report directly to Mr. Lemon, executive vice-

1 president of wholesale production.

2         Each of the division manager is located -- is

3 assigned a territory and in their position, they are located

4 within a field typically operating in the largest operating

5 center in their assigned geographic territory.

6         The division managers do not have final decision

7 making authority with respect to policy changes, but again, can

8 make recommendations to Mr. Lemon who can, in turn, make

9 recommendations to Mr. Meola.

10         The quarterly compensation for these individuals was

11 based on a quantified program that is weighed on -- that

12 weighed a number of factors and tended to measure performance

13 of the wholesale business including volumes of loans, rate

14 sheet deviation, loans funded through operations, payment

15 defaults and pretext profit.

16         When the debtors stopped funding loans at the

17 beginning of March 2007, these minimum performance thresholds

18 necessary to calculate the amounts for the entire quarter,

19 while they could potentially be prorated, the plan did not

20 provide for this, so the amounts could not be determined.

21         At that time, the debtors adopted the policy of

22 prorating those payments to provide for 75 percent of payment

23 of the target for the 10 weeks of the quarter prior to the

24 shutdown of the loan origination platform to ensure that those

25 employees would be paid the amounts they otherwise earned but

1  for the cessation of the platform.

2         With respect to these individuals, Mr. Meola would

3  testify that their compensation is nearly identical to the

4  compensation they would have received had the incentive plans

5  been, or the prior plans with respect to their bonuses been in

6  effect, that the compensation awarded to them is reasonable,

7  typical and common industry and that these division managers

8  are not active in setting overall corporate policy; that these

9  division managers do not exercise overall authority with

10  respect to the debtors corporate decisions; that these division

11  managers are not in a position to exert undue influence over

12  the debtors corporate decision-making regarding payment of

13  claims and that they had no input on the negotiation of the

14  revised policy with respect to their payment or the amount of

15  compensation that they would receive.

16         With respect to all the amounts sought to be paid in

17  connection with the request today, Mr. Meola would testify that

18  the compensation that we're describing for the first quarter

19  combined with the other compensation that's previously been

20  paid to these individuals is reasonable, typical and common in

21  the industry.  And that all payments under the proposed to be

22  made are within market norms.  And that that assessment of

23  market compensation is based on his extensive experience with

24  the mortgage industry.

25         Your Honor, that would conclude my proffer of Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Meola.

2       THE COURT:  Anyone care to examine Mr. Meola?

3       MR. MCMAHON:  Your Honor, can I confer with debtors'

4  counsel for a minute?

5       THE COURT:  Yeah.

6                      (Pause)

7       MS. UHLAND:  Your Honor, in -- at the prior hearing,

8  we did not -- we had only the New Century Financial bylaws.  We

9  now have the New Century Mortgage Corporation bylaws and the

10  U.S. Trustee's asked that we submit those to -- into the

11  record.

12       MR. MCMAHON:  That is correct.

13       MS. UHLAND:  And we are willing to do that.  They --

14  slightly different wording, but a similar provision with

15  respect to officers as the New Century Financial bylaws.

16       These bylaws provide that the corporation may

17  designate officers pursuant to resolutions.  We were not able

18  to locate the resolutions appointing these individuals as

19  officers.  We believe it is corporate policy to periodically

20  provide cleanup annual resolutions that are submitted to the

21  Board of New Century Mortgage Corporation, all of whom are

22  officers of New Century Financial Corporation to submit a

23  cleanup resolution with respect to officer appointments.

24       There are two recent hires, or those -- one about a

25  year and one less than a year, within the individuals

1 described.  We think it is -- we will stipulate, based on our

2 understanding of corporate practice, that there were

3 resolutions appointing the four.  The two recent hires, we were

4 -- we don't know that any resolutions have yet been adopted by

5 the Board of Mortgage to appoint them as officers.

6          THE COURT:  And so which four are we talking about?

7          MS. UHLAND:  Let me confirm with Mr. Meola.

8                    (Pause)

9          MS. UHLAND:  Ralph Melbourne and Rick Gordano.

10         THE COURT:  And they're the ones that don't have

11 resolutions?  Or you don't know where their resolutions are?

12         MS. UHLAND:  That's correct.

13         THE COURT:  Okay.

14         MS. UHLAND:  We will stipulate even though we have

15 not identified that resolutions were likely adopted, or were

16 adopted -- for the purpose of the record today, were adopted

17 for the other four.

18         THE COURT:  Okay.

19         MS. UHLAND:  Should I hand up the --

20         THE COURT:  We'll mark it D-1 which will be admitted

21 without objection.  Thank you.

22                    (Pause)

23         MR. MCMAHON:  Your Honor, with that addition to Mr.

24 Meola's proffer, we do not wish to cross examine.

25         THE COURT:  Does anyone else wish to examine Mr.

1   Meola?  Well, I do.  If you would come forward, sir.

2          THE CLERK:  Would you raise your right hand, please

3   your left on the Bible.

4              ANTHONY MEOLA, DEBTOR'S WITNESS, SWORN

5          THE CLERK:  For the record, please state your full

6   name and spell your last.

7          THE WITNESS:  Anthony Thomas, M-e-o-l-a.

8          THE CLERK:  You may be seated.

9          THE WITNESS:  Thank you.

10                     CROSS EXAMINATION

11  BY THE COURT:

12  Q   Mr. Meola, to the extent you know, how is it determined

13  who is called what in the way of title at the company?  And by

14  that, I mean the combined companies.

15  A    Your Honor, there be two ways that we establish title.

16  One is one that Your Honor is most familiar with in

17  corporations, Section 16, insiders, those types of folks which

18  I would call, you know, executives, director types.

19          In the sales organization, in the field sales

20  organization, there are titles of SVP, senior vice-president,

21  executive vice-president, vice-president that are what are

22  commonly referred to in the business as business card titles so

23  that when they represent the company to clients, they're

24  represented at a fairly high level in the clients' eyes and

25  presented well for the organization.

**J&J COURT TRANSCRIBERS, INC.**

Meola - Redirect/Uhland                    134

1        So there are two basic ways.  There's our sales

2  organization that has a set of titles and then the remainder of

3  the organization that has the more familiar corporate titles.

4        THE COURT:  Anyone like to follow up?

5        MS. UHLAND:  Just briefly, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MS. UHLAND:

8  Q    Would you describe the six individuals we've discussed

9  today as members of the sales organization?

10 A    Yes.

11 Q    And therefore -- and what was the purpose for assigning

12 them the titles that they have?

13 A    As I told the Judge, the purpose there is in the field and

14 for recruiting purposes.  The leaders of those organizations

15 carry those titles in order to attract the top producers, to

16 meet with clients and the like.

17        MS. UHLAND:  Your Honor, I have no further.

18        THE COURT:  All right.  Mr. McMahon, any questions?

19        MR. MCMAHON:  No, Your Honor.

20        THE COURT:  Thank you, sir, you may step down.

21        THE WITNESS:  Thank you.

22                (Witness excused)

23        THE COURT:  All right.  Anything further in support

24 of the motion?

25        MS. UHLAND:  No, Your Honor.

1          THE COURT:  All right.  Mr. McMahon.  Talk to me.

2          MR. MCMAHON:  I will, Your Honor, as best as I can.

3   Your Honor, I guess I should top at the -- start at the top

4   which is this issue of whether even under Section 503(c)(1),

5   which is a point the debtor's counsel raised and you discussed

6   with debtor's counsel, the ordinary course label appears no one

7   -- nowhere in the explicit text of Section 503(c)(1).  And,

8   Your Honor, the distinction between Section 363 and 503(c) is

9   somehow -- one would cover ordinary course things and not

10  ordinary course things isn't always so clear.

11         When you look at 503(b), wages, salaries and

12  commissions for services rendered after the commencement of the

13  case, 503(b)(1)(A)(1), now that's a thing that's typically paid

14  by the debtor in the ordinary course without a court order.

15  Really what we need to focus on here is the plain language in

16  Section 503(c) and the fact that it deals with, broadly,

17  transfers made to or obligations incurred for the benefit of an

18  insider.

19         Now, going back to a topic that we discussed at the

20  last hearing which is how we defined insider.

21         THE COURT:  Well, for the purpose of retention.

22         MR. MCMAHON:  I'm sorry?

23         THE COURT:  For the purpose of retention.

24         MR. MCMAHON:  Correct.

25         THE COURT:  Okay.

1          MR. MCMAHON:  And, Your Honor, Your Honor denied the

2   payments for these individuals without prejudice at the last

3   hearing.  And I appreciate the fact that in argument, debtor's

4   counsel have, I guess, argued that they were incentive payments

5   as opposed to retention payments.

6          In paragraph 22 of the motion, the plans were labeled

7   retention plans.  And, under the circumstances here, Your

8   Honor, they are a salary substitute.

9          Now, I don't think that it's a inference that a -- is

10  an inference that you need to hear evidence about for Your

11  Honor to infer that without this plan in place, these people

12  walk.  That's clear -- we're not here if that's not the case.

13          THE COURT:  Well, here's a question I have about

14  that.  If, in fact, these payments or proposed payments are

15  salary substitutes, one question in my mind is, well, if there

16  had been no bankruptcy and they were paid when they were due,

17  ordinarily quarterly, they wouldn't have been considered

18  retention.  I mean, at least no more than any other salary

19  would be considered retention if, in fact, they're really

20  salary substitutes.

21          So the question -- one question in my mind is, now

22  that we have the bankruptcy, and because of that the payments

23  need to be made now, why would you make them for other than

24  retention purposes?  I mean, I tend to agree with you and I --

25          MR. MCMAHON:  And, Your Honor, to follow up on that

**J&J COURT TRANSCRIBERS, INC.**

1   point, we agree fully.  I mean, the reason why the plan was put

2   in place was because we're not dealing with the ordinary

3   course.  I mean, in fact, it was the shutdown of the

4   origination business, certainly not an ordinary course event,

5   that put us in the position where -- that put the debtors in a

6   position where they needed to implement this plan.

7         Again, I think we need to get away from the words

8   ordinary course.  I think they cause a level of confusion here

9   insofar as how to address the relief that's requested.  But to

10  the extent that it is informative in terms of understanding the

11  reason -- or at least the reason why this is not just the

12  regular incentive payment that goes to an executive when the

13  company is operating, then certainly it's relevant to

14  understand that.

15        THE COURT:  Let's talk about the insiders status for

16  a moment.  And the issue for the Court is -- well, it's

17  statutory construction and line drawing.  At the last hearing,

18  I said, okay, you have a number of individuals who hold the

19  office of vice-president.  They have -- and it was conceded,

20  and I based my decision in part upon the debtors apparently

21  undisputed representation that some may have had some

22  management responsibility with respect to the various stores.

23        But they're officers.  And under the definitions in

24  the Bankruptcy Code, they're insiders.  But I permitted those

25  payments.  And the theory was that whatever Congress intended

1 to implement the language to exclude anyone with an office like

2 that in an organization like this would lead to a result that

3 didn't make sense to me.

4 　　　　The problem is I've crossed a bridge.  I'd like to

5 cross another one on the same theory.  And I don't know -- I'm

6 not sure why, I shouldn't, if the same proofs I find have been

7 offered in support of others who hold different titles.  But in

8 terms of corporate management, no greater responsibilities than

9 those to whom payments were permitted.

10 　　　　MR. MCMAHON:  Yeah.  Well, Your Honor, I think I can

11 understand that and respond to it clearly.  First, our office's

12 position was that if you are an officer under the bylaws, you

13 shouldn't be getting the payments, period.  And I appreciate

14 the question that Your Honor asked me at the last hearing

15 regarding that, leading to absurd results.  But really from our

16 perspective, it's not, you know, an absurdity in terms of --

17 question in terms of statutory construction.  It's a

18 consistency point.

19 　　　　Your Honor is clearly familiar with the cases

20 construing the term under Section 327 when we deal with the

21 definition of officer.  And one I'd like to reference

22 specifically is Judge Walrath in the <u>Essential Therapeutic</u>

23 case.  In that case, Your Honor, there is a law firm that

24 came forward and they had a partner of the law firm that

25 served as an officer pre-petition.  And, you know, our

1 office objected and argued that that officer's status and such

2 should be imputed to the entire law firm, the law firm should

3 be disqualified from being employed under Section 327(a).

4        And so the argument went, the partner was less of an

5 officer, he held the title of corporate secretary, appointed an

6 officer under the bylaws.  He was less of an officer because he

7 just showed up at the Board of Directors' meetings and took

8 notes.  In other words, his tasks were merely administerial,

9 perfunctory.

10       And Judge Walrath rejected that argument out of hand.

11 And she used these words to address the point.  "The words of

12 Section 101.14 are not ambiguous.  They preclude retention if

13 the professional served as an officer of the debtors within two

14 years of the petition date.  Congress did not state that

15 disqualification is mandated only if the officer was an

16 executive or had more than an administerial role.  Therefore,

17 we conclude that we should not inquire into what role the

18 officer had, may have played, but need determine only whether

19 the professional was, in fact, an officer within the prescribed

20 time.  In this case, the debtors concede this fact.  The

21 debtors' bylaws do provide that the secretary is an officer of

22 the debtors."

23       In other words, for this Court, in the 327(a)

24 context, Your Honor, the bylaws were enough.  And on this

25 record, we're clearly in that zone.  And Your Honor's

**J&J COURT TRANSCRIBERS, INC.**

1  specifically referring to the quotation from the Ohio case, <u>CEP</u>

2  <u>Holdings</u>.  We were dealing there with just a straight title

3  case, meaning clearly your -- we're going to give someone a

4  label for the purpose of having -- them having a title.  We

5  were not dealing in that situation with a bylaw officer.

6        Let me read you from that -- a portion from that

7  opinion.  This is on page -- star 4, close quote -- open quote.

8  "The debtor's statement of financial affairs lists only one

9  officer, Mr. Malack (phonetic).  In response to questioning by

10 the Court, debtor's counsel confirmed that only Mr. Malack had

11 been the subject of a directors or managing members' resolution

12 of election of an officer.

13       This leads to question whether the inclusion of

14 officer title such as, 'executive vice-president,

15 customers/sales' and 'VP Purchasing' on the plan schedules

16 automatically confers officer status for the purpose of Section

17 503(c)."

18       That's not the question, Your Honor, that we're

19 dealing with here today.  It's clearly these people are within

20 the bylaw ambit and this Court has held in the Section 327(a)

21 context that those people are officers.  End of discussion.  It

22 doesn't matter whether they -- all they had on their desk was a

23 pencil and pen, they turned off their computer once a week.

24       Certainly, Your Honor, on this record some of the

25 individuals we're talking about had more responsibility than

**J&J COURT TRANSCRIBERS, INC.**

1  that.  The ability to hire and manage employees.  Certainly an

2  important responsibility.  But I think we need to come back to

3  the essential point that once we're talking about corporate

4  officers, end of discussion.  We don't need to get into an

5  argument about who's more important than the next.  And that is

6  the --

7           THE COURT:  Well, so what you're saying --

8           MR. MCMAHON:  -- gravamen of our position.

9           THE COURT:  All right.  So what you're saying is I

10  was in error when I made the last decision with respect to

11  those titled vice-president and I would be in error to award

12  the relief that's requested with respect to these six

13  individuals?

14           MR. MCMAHON:  Your Honor, our position is fairly

15  clear on this point.  Yes, we believe that to extend this

16  further opens up, say, a lot of side consequences that frankly

17  become -- would be even problematic in a Section 327(a)

18  context.  I mean, does that meet -- does this ruling -- if a

19  ruling of granting these people relief today, Your Honor, would

20  that mean that, for example, the executive vice-president or

21  senior vice-president could have a consulting company that did

22  business with the debtor.  And that firm could be employed

23  under Section 327(a).

24           These are not minor questions from our office's

25  perspective.  They're important ones.  So I think that the

1 bright line rule -- the definition of insiders under Section

2 101.31 includes officer.  And under this -- other rulings of

3 this Court, officer means -- if you're an officer under the

4 bylaws, you're an officer.  And the individuals we're talking

5 about today clearly have that status.

6         That's the core of our position, Your Honor.  I don't

7 know how much further I can put it.  But we're definitely

8 concerned about narrowing these definition of insider down to

9 the point where it includes no one, in fact, contradicts the

10 debtors' own corporate actions.

11         THE COURT:  What about the fact that -- well, I'm not

12 going to ask that question.  Okay.  Anything further, Mr.

13 McMahon?

14         MR. MCMAHON:  I don't, Your Honor, thank you.

15         THE COURT:  All right.

16         MS. UHLAND:  With respect to this officer insider

17 issue, I do think there is a difference and the Court has and

18 the Court should continue to draw a distinction, for what

19 transaction we're considering someone to be a corporate

20 officer, an inside, more appropriately of the debtor.  And the

21 327(a) context is different than the type of situation that we

22 have today.  I'm not saying that we wouldn't meet that standard

23 with these individuals as insiders.  But I do not believe that

24 the Court's ruling today with respect to this issue is a

25 construction under 327(a).

1          THE COURT:  See, here's the rub for me.  You know,

2    Congress said, for example, you know, evaluations for different

3    purposes can come out differently.  But there's no distinction

4    in the Code with respect to an insider or an officer.  You

5    know, to the extent there are differences, it's been developed

6    by decisional law.  But it doesn't come from the statutory

7    language itself.

8          MS. UHLAND:  Well, applying -- again, looking at the

9    construction of officer for the rubric that we're suggesting is

10   the one that's been applied to preference statutes and, you

11   know, basically backing into what is an insider and then

12   there's an enumerated officer for that purpose.  And it's the

13   same sort of definition of insider that 503 looks to.  So I

14   don't think by proposing that the insider standard --

15         THE COURT:  But how do I divine that from the

16   statute?  Where is it in the statute that tells me this?  That

17   there ought to be a distinction?

18         MS. UHLAND:  In the definition of insider for

19   officer.

20         THE COURT:  Or in 503?  I mean, we know generally

21   that this section came about because of what were perceived as

22   excesses which occurred in the corporate and bankruptcy world

23   with respect to payments to insiders.

24         MS. UHLAND:  Your Honor, nor does the statute say

25   that the CEO and anyone with a vice-president title is deemed

1 an insider.  It says an officer of the debtor.  And I think the

2 definition of officer is what we're talking today, is what is

3 an officer of the debtor.  Is anyone holding a title, even if

4 the corporation, which I'd like to talk about in a minute, has

5 the bylaws that we have, is the -- is having a title the

6 definition of "officer of the debtor" as intended by Congress.

7 And it is that that I think is ambiguous and that we -- is

8 subject to statutory construction.

9       Because what is an officer of the debtor.  Is an

10 officer of the debtor a senior vice-president-divisional

11 manager.  Is -- you know, I would posit that the officers of

12 the debtor are the aforementioned chief executive officer of

13 the corporation's -- the president of the corporation, the CEO

14 of the corporation.

15       So I think that that is where consistent with the

16 statute and we're not just thwarting the statutory reading, but

17 instead interpreting what it means when we go to the more

18 functional analysis of what is an officer of the debtor.

19       Further, Your Honor, we passed up the bylaws of New

20 Century Mortgage Corporation.  The bylaws provide permissive

21 appointment of different titles by the Board of Directors.  It

22 provides that the Board of Directors can appoint a vice-

23 chairman of the Board.  And then it goes on to say, "one or

24 more vice-presidents, a treasurer, one or more assistant

25 secretaries, one or more assistant treasurers," and it says,

1  "such other officers may be appointed in accordance with

2  Section 3 of this article and one person may hold one or more

3  officers."

4          It then goes on to Section 3 of the article to

5  describe what they call subordinate officers, et cetera.  And

6  says that the "Board of Directors may appoint by resolution and

7  may empower the chairman of the Board, if there is to be such

8  an officer, or the president to appoint such other officers as

9  the business or the corporation may required.  Each of them

10 shall office for such period, have such authority and perform

11 such duties as determined by time to time by resolution of the

12 Board."

13         The provision of these permissive articles that allow

14 a Board of Directors to affect, act on the parties who were

15 given titles for different purposes should not be dispositive

16 that those parties are, in effect, officers of the debtor with

17 the executive authority and functional control of the debtor.

18 Again, we believe that the company at issue here, consistent

19 with these detailed bylaws may have had corporate cleanup

20 resolutions to confirm the appointed, nomenclature for the

21 different individuals in their sales organization.  Mostly this

22 happened with the lag.  It wasn't a Board authorized issue in

23 each effect, but it was probably an after-the-fact confirmation

24 of the title by the Board to be consistent with their own

25 policies set into place.

1          But the fact that they have these provisions in their

2 bylaws should not be dispositive of what creates -- the fact

3 that the Board had the authority to designate the different

4 titles before or after the fact should not be dispositive in

5 determining who is, in effect, an officer of the corporation.

6          In that instance, what is happening is a more

7 elaborate corporate process and a more formal corporate process

8 is causing sort of a proliferation of potential corporate

9 officers which wasn't the -- for the purposes of what the

10 bankruptcy Code was trying to address here certainly not the

11 intent of the business people who formed their own bylaws and

12 designated this own method to govern their own disposition of

13 titles.

14          So for that reason, while yes, the courts do consider

15 the -- the courts have considered in the corporate officer

16 issue what the debtor's bylaws say, where you have permissive

17 bylaws here, I do not believe that that is dispositive nor have

18 the courts who have looked at it view that as a dispositive

19 fact.

20          Now, accordingly, you know, we believe that

21 determining whether someone is an officer of the debtor, we

22 should look to the factors the courts have looked to determine

23 that position in prior transactions which is while -- we're

24 saying while the titles and bylaws are certainly matters to --

25 that can be weighed in that, we take the position that given

1 the facts here, as testified by Mr. Meola, that, one, the large

2 purpose for deriving the titles in this situation was the

3 external factor of providing a sales organization common with

4 the industry of providing those individuals titles both to

5 recruit those individuals into those positions and to insure

6 their ability to recruit other individuals.

7        And further, that the business purpose served with

8 those titles was a client driven purpose, that that factor

9 should also be weighed.

10        And perhaps most importantly, that while these

11 individuals have certain hiring and firing authority, their

12 inability to set corporate policy, including pricing, and their

13 inability to set or influence their own compensation and the

14 compensation plan before the Court is dispositive that with

15 respect to these individuals in these sales -- in the wholesale

16 production plan, that they should not be considered officers of

17 the debtor in accordance with the statute.  And therefore, they

18 should not be considered insiders.

19        THE COURT:  Is there any thing in the record which

20 reflects their annual compensation?

21        MS. UHLAND:  I don't believe there's anything in the

22 record except that it's -- we could probably take a break and

23 obtain that information.  But right now, the compensation

24 information that's in the record is that it's consistent with

25 the additional -- with the payments we're discussing here, that

**J&J COURT TRANSCRIBERS, INC.**

1 it's consistent with industry norms, consistent with their

2 prior period pay and reasonable as Mr. Meola has proffered.

3           THE COURT:  What's the aggregate amount proposed to

4 be paid to these individuals for this quarter that's the

5 subject of request for relief?

6           MS. UHLAND:  I have -- if I may break, I can total

7 that amount up.

8                          (Pause)

9           MS. UHLAND:  The aggregate for the six individuals is

10 approximately $560,000.

11           THE COURT:  I would like to know what the annual, you

12 know, either average or within a range compensation of these

13 individuals are.  And I would take a break for that purpose if

14 you need --

15           MS. UHLAND:  No, I can provide that, Your Honor.

16           THE COURT:  Thank you.

17           MS. UHLAND:  The high end of the range is Mr. Lemon

18 at approximately $1.2 million.  And the division managers of

19 825,000.  That represents based salary plus 4-500 percent of

20 the balances set forth in a target bonus.  So the base salaries

21 range from 200,000 to 150,000.

22           THE COURT:  See, I -- when you start looking behind

23 the expressed language, you know, it's -- there's always a

24 danger in that, especially given the absolute overwhelming push

25 by the Supreme Court and in the Circuit for plain language

**J&J COURT TRANSCRIBERS, INC.**

1  interpretation, along the lines of what the U.S. Trustee's

2  arguing here.

3        But, the debtor convinced me I should look beyond

4  that with respect to the earlier relief that I granted.  But if

5  you take the titles of the six involved here and you take the

6  salary level, compensation level, it seems to me Congress, you

7  know, if you want to try to divine an intent, always a risky

8  enterprise, they would think those compensation levels are a

9  lot of money.

10        I just, on this record and because of the language of

11  the statute, I just can't be pushed over that second bridge.

12  And I said this before, it's not because those involved aren't

13  important to the debtor's business.  It's not because they're

14  not deserving of those compensation levels.  It's simply a

15  matter of trying to be true to implementation of the statute

16  that the Congress -- that I am subject to and that Congress has

17  passed.

18        And under these circumstances, I can't say they're

19  not insiders and I can't say these payments at this stage

20  aren't primarily for the purpose of retention.  I can't say

21  that they're in any sense in the ordinary course.  I'm not

22  going to grant this relief for those reasons.  And I understand

23  that it may cause some anguish, not just for the individuals

24  involved, but for the debtor.  But that's my ruling.  Is there

25  anything else for today?

1          MS. UHLAND:  No, Your Honor.  You know, we may --

2          THE COURT:  I'm not saying there might not be some

3  other way to give value to these individuals.

4          MS. UHLAND:  And I was going to mention, we may be

5  back and may be saying again it's one more emergency, but if we

6  are able to structure something with the Creditors Committee to

7  enable us to come with a proposal with Your Honor, we would

8  probably want to have that heard --

9          THE COURT:  I'm not foreclosing that there may be a

10  way.

11          MS. UHLAND:  Okay.  Thank you, Your Honor.

12          THE COURT:  Mr. McMahon.

13          MR. MCMAHON:  A couple of things, Your Honor.  With

14  respect to whatever proposal the debtors and the Committee may

15  come back to -- with on that point, I just ask that our office

16  get noticed, say, a week before the scheduled hearing such that

17  we would have an opportunity to take a look at whatever's being

18  proposed.  Is that acceptable?

19          MS. UHLAND:  Yes, Your Honor.

20          MR. MCMAHON:  And then second, Your Honor, and this

21  just a housekeeping matter from our office's perspective.  The

22  list of items on for the 24th is rather extensive.  And we have

23  provided the debtor's informal comments with about -- I want to

24  say about eight items, relating to eight items on the agenda.

25          I have a personal commitment to attend a funeral

**J&J COURT TRANSCRIBERS, INC.**

1  tomorrow morning and making the agenda deadline, having

2  objections filed by noon tomorrow was probably going to be a

3  bit difficult.  I'd just ask the Court's indulgence to the

4  extent that we get them filed by midnight tomorrow.  To the

5  extent that the matter's going forward on the 24th, that the

6  Court would entertain those responses or objections.

7              THE COURT:  Is there any objection?

8              MS. UHLAND:  No, Your Honor.

9              THE COURT:  Very well.  That's fine with me, Mr.

10  McMahon.  Let's see, let me look through my list and make sure

11  that I didn't have any housekeeping matters.

12              MS. FATELL:  Your Honor, excuse me, Bonnie Fatell for

13  the Creditors Committee.  I don't have the agenda for the 24th

14  in front of me, but we have been working with the debtor on a

15  number of issues and we would request the same extension from

16  the Court.

17              THE COURT:  Any objection?

18              MS. UHLAND:  No, Your Honor.

19              THE COURT:  All right.  Very well.  Anything further

20  for today?  All right.  Thank you.  That concludes this

21  hearing.  The Court will stand in recess until 3:00.

22                        *  *  *  *  *

23

24

25

152

1                    C E R T I F I C A T I O N

2

3

4              I, Susan Holcomb, court approved transcriber, certify

5  that the foregoing is a correct transcript from the official

6  electronic sound recording of the proceedings in the above-

7  entitled matter.

8

9  /s/ Susan Holcomb                 Date:  April 30, 2007

10 Susan Holcomb  AAERT CET **00273

11 J&J COURT TRANSCRIBERS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25