### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,** | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Related Docket No. 1064** |
| | : | |

**OBJECTION OF CARRINGTON CAPITAL MANAGEMENT, LLC
AND CARRINGTON MORTGAGE  SERVICES, LLC TO MOTION OF THE
DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER (A) APPROVING
THE SALE OF CERTAIN TECHNOLOGY ASSETS, (B) APPROVING AND
ESTABLISHING PROCEDURES RELATED TO THE SALE AND THE ASSUMPTION
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION THEREWITH AND (C) GRANTING RELATED RELIEF**

Carrington Capital Management, LLC ("CCM") and Carrington Mortgage Services, LLC

("CMS", and together with CCM, "Carrington"), by and through their undersigned attorneys,

respectfully submit the following objection (the "Objection") to the Motion Of The Debtors And

Debtors In Possession For An Order (a) Approving The Sale Of Certain Technology Assets, (b)

Approving And Establishing Procedures Related To The Sale And The Assumption Of Certain

Executory Contracts And Unexpired Leases In Connection Therewith And (c) Granting Related

Relief (the "Motion") [Docket No. 1064].[1]

### PRELIMINARY STATEMENT

1.      Carrington is the court-approved purchaser of the Debtors' mortgage loan

servicing business (the "Servicing Business") for a purchase price that the Debtors have

calculated at $188 million.  Presently, that transaction is scheduled to close on June 29, 2007.

---

[1]      Capitalized terms not otherwise defined herein shall have the same meaning given to them in the
Motion.

However, the transaction expressly contemplates that there will be a continuing relationship between the Debtors and Carrington for up to a 90-day period post-closing pursuant to the provisions of a Transition Services Agreement.

2.      On June 1, 2007, the Debtors filed their Motion seeking authority to sell certain Technology Assets used in connection with the Debtors' wholesale loan origination business. The Technology Assets include both soft assets, including "custom proprietary software applications" and "databases containing historical broker performance and quality data," (the "Loan Origination Software") as well as certain hard assets, including the computer equipment and furniture at the Debtors' data centers in California and Illinois (the "Data Center Hardware"). *See* Motion at ¶ 8. The Debtors have not requested Court approval of any bidding procedures in connection with the proposed sale of the Technology Assets but instead have sought to pursue an accelerated sale process pursuant to which the auction of the Technology Assets was originally to take place on June 18, 2007.

3.      This week, the Debtors agreed to adjourn the sale of the Data Center Hardware until late July. However, they have indicated to Carrington that they intend to sell the Loan Origination Software on a separate track, and still on an accelerated timetable, with bids for such assets to be due by June 20, 2007. Carrington objects to the sale of the Technology Assets in this manner first and foremost as the expected purchaser of the Servicing Business. Such a process poses a substantial risk of disrupting the Servicing Business prior to the closing of the sale of the Servicing Business and during the post-closing transition period. This risk exists, in large part, because of the continuing exodus of the Debtors' information technology personnel, and Carrington's concerns are exacerbated by its just having learned that the Debtors' website, the critical portal for all online mortgage loan payments, was not in operation for five days this week

2

because the Debtors did not have the appropriate personnel to re-new a necessary certificate.  As the purchaser expecting to close on a $188 million transaction, Carrington not surprisingly would prefer that the Debtors' efforts be focused on the integrity of the assets Carrington is purchasing, instead of being diverted toward a sale that runs the risk of jeopardizing those assets.

4.      Carrington also believes that a sale of the Loan Origination Software next week, separate and apart from the Data Center Hardware, will generate lesser interest from bidders and will essentially preclude Carrington from making a bid (given the imminent closing of its acquisition of the Servicing Business).

5.      Finally, Carrington objects to the proposed sale as the Debtors have failed to set forth or implement any safeguards to ensure that confidential information will not inadvertently be disclosed, or crucial proprietary information lost, in conjunction with the sale and transfer of the Loan Origination Software.

## BACKGROUND

6.      On April 2, 2007, Carrington and the Debtors entered into a definitive asset purchase agreement for the sale of the assets comprising the Servicing Business.

7.      On May 16, 2007, pursuant to the bidding procedures approved by this Court, the Debtors conducted the auction for the sale of the Servicing Business.  Ultimately, the Debtors and the Committee selected Carrington as the highest and best bidder at the auction.

8.      On May 23, 2007, the Court entered an order approving the sale of the Servicing Business to Carrington (the "Sale Order") [Docket No. 844].

9.      On June 1, 2007, the Debtors filed the Motion, pursuant to which the Debtors initially required that all bids on the Technology Assets be made by June 13, 2007, with an auction to be held on June 18, 2007.    Although the Motion has not been amended,

representatives of the Debtors and the Committee indicated to Carrington on June 13, 2007 that the bid deadline has been extended and no auction will occur on June 18 as originally contemplated.

## OBJECTION

**A.      The Debtors Have Provided No Assurance That The Sale of the Technology Assets Will Not Disrupt The Operations of the Servicing Business**

10.      As a threshold matter, the Debtors have not provided any information regarding how the Technology Assets, and in particular the Loan Original Software, can and will be cleanly separated from the Debtors' existing technology infrastructure and transferred to any ultimate purchaser.   This is of particular concern to Carrington because the information technology supporting the Debtors' loan origination business and the Servicing Business are both housed in the same data center on a variety of integrated and interconnected hard assets.   Among other things, Carrington believes that a number of the servers that run the Loan Origination Software also run the software that supports the Servicing Business.   Consequently, the risk of disruption and harm to the Servicing Business is substantial if the removal and transfer of the Loan Origination Software from the Data Center Hardware were to be mishandled.

11.      In particular, the Servicing Business relies on the constant and efficient operating of its central website and call center to receive and coordinate payments from customers.   Both of these require dedicated servers and other technology that Carrington believes were used in connection with the Debtors' loan origination business.   If the loan servicing website or call center were to go down as a result of mishandling the removal of the Loan Origination Software, the Servicing Business would be unable to accept payments from customers through these two common methods.   Such a loss of service might further the view that some customers already

4

have that because the Debtors are in bankruptcy, they no longer need to make payments on loans originated by the Debtors.

12.    This risk is exacerbated by the fact that many of the Debtors' staff who were responsible for the installation and management of the Loan Origination Software are no longer employed by the Debtors.[2]  Consequently, the Debtors' staff, as currently constituted, may not have the necessary expertise to understand how the origination and servicing applications are integrated.  An accelerated timetable for closing any sale of the Loan Origination Software and carving out that software from the Data Center Hardware only heightens the likelihood of serious mistakes.  If such mistakes were to occur, the Debtors' lack of experienced personnel also increases the risk that they will be unable to diagnose and resolve any interruption to the Servicing Business.  Carrington notes that this risk is not a remote or theoretical one; in fact, Carrington has been informed that the loan servicing website was "down" and not operational for five days this past week  (i.e., June 9-13), because the Debtors have not retained the necessary personnel who are familiar with (and who were instrumental in designing) the certification process relating to security of the website.  Carrington estimates that a complete shut down of the servicing platform could result in losses of $300,000 to $500,000 for each day the platform is not operational.

13.    Based on the foregoing, the Motion should be denied because the Debtors have provided Carrington with no assurance that the process of transferring the Loan Origination Software Assets will not jeopardize the uninterrupted operation of the Servicing Business.  At a minimum, the sale of the Loan Origination Software should be postponed and put on the same track as the sale of the Data Center Hardware.  This would allow Carrington time to work with

---

[2]    For example, Carrington understands that the Debtors' manager currently responsible for overseeing the California data center will be leaving the Debtors' employ as of June 15, 2007.

WCSR 3632440v3

the Debtors, both prior to and following the closing of CMS' acquisition of the Servicing Business, to map out and implement a process for removing and transferring the Loan Origination Software from the Data Center Hardware without diverting valuable resources at this time from the parties' efforts to consummate the sale of the Servicing Business.[3]

**B.     The Bidding Procedures Do Not Provide Adequate Time for Bidders to Assess the Value of the Assets**

14.     Carrington notes that it is a logical potential bidder for some, if not all, of the Loan Origination Software.  However, the Debtors have, without any clear reason, fast-tracked the sale of the Loan Origination Software, making it extremely difficult, if not impossible, for Carrington to evaluate the utility of the Loan Originating Software to its business and to formulate a bid for such software.  In particular, because of the imminent closing of the Servicing Business (which is anticipated to occur on June 29),  Carrington simply is not in a position to evaluate such a purchase fully and carefully in the narrow window for bids.

15.     Even were that not the case, Carrington submits that the sale process has been unnecessarily hurried.  The Debtors are currently proposing to hold the auction for the sale of the Loan Origination Software less than three weeks after the Motion was filed.  This is not a sufficient amount of time for potential bidders to conduct diligence on the assets being offered for sale, mark up the proposed asset purchase agreement, and determine the proper value for such assets.  The proposed timetable is likely to lead to less bidders who will make lowball bids reflecting their incomplete diligence on the assets.  Simply put, this appears to be an expedited

---

[3]     The Debtors and the Committee have indicated to Carrington that the proposed sale is unlikely to create any disruption of the servers or the IT platform because the Debtors will burn or upload the software from the existing servers/computers and provide the software in that form to the buyer. However, Carrington believes even under this scenario, it is quite possible that the Debtors could inadvertently copy the software from one server to another production server where servicing systems are currently running and eliminate its contents.  Consequently, Carrington submits that even if this process were followed, CMS' information technology personnel should be granted access at the time of the transfer of such software to ensure no missteps occur.

WCSR 3632440v3

sale without a compelling reason therefor that will lead to a diminished sale price for the Loan Servicing Software.

16.     Conversely, Carrington submits that postponing the sale of the Loan Servicing Business until late July, to coincide with the sale of the Data Center Hardware, is likely to increase the return to the Debtors' estates and their creditors.  Not only will such time allow bidders to complete their diligence process, it may also increase the return to the estate by allowing potential bidders to bid on both sets of assets at the same time.  In particular,  while Carrington understands that some potential bidders have expressed a desire in only the Loan Origination Software, there are likely to be others, including Carrington, that may be interested in acquiring both the Loan Origination Software and the Data Center Hardware as a whole and thus, the estates may be able to realize more for both assets in such a situation – the whole may well be worth more than the sum of its parts.

17.     Simply put, there appears to be no good reason for the sale of the Loan Servicing Software to proceed at its current accelerated pace and on a separate track from the sale of the Data Center Hardware.  Rather than preserving the value of the Loan Origination Software, proceeding on the Debtors' current timeline will likely depress the sale price of the assets. Accordingly, Carrington submits that the sale should be postponed to coincide with the sale of the Data Center Hardware in late July.

### C.     The Debtors Have Not Provided For Procedures To Ensure Confidential Customer Information And Personally Identifiable Information Is Protected

18.     In the Motion, the Debtors contend that the database information they intend to sell does not contain any confidential customer information or personally identifiable information.  The Debtors also state that if such information is included, they will "exercise

7

caution" to not disclose any consumer information and comply with any applicable policies and regulations.

19.     However, the Debtors' statement that they will exercise caution is insufficient to ensure that such information is properly safe guarded as required by applicable law (including the privacy provisions of the Gramm-Leach-Bliley Act).  This is of particular importance to Carrington because the databases in question contain borrower information related to the Servicing Business.  To the extent that such information were inadvertently or improperly disclosed, it might cause further liability for the Debtors that could have a collateral (reputational) impact on CMS and the Servicing Business.  Lastly, there is a serious risk that key information relating to the borrowers and the Servicing Business could be lost as a result if the Debtors' attempt to remove and transfer data related to the loan origination business is unsuccessful.

20.     Accordingly, the Debtors should be required to provide Carrington with specific and quantifiable assurances that such borrower information will remain confidential and not be included in the information removed and transferred to any potential purchaserps.  Furthermore, the Debtors should be required to provide Carrington with information regarding the procedures that the Debtors intend to follow in the event any borrower information is inadvertently released or any data is lost.  Unless and until that occurs, the sale should not be permitted to go forward.

## CONCLUSION

WHEREFORE, Carrington respectfully requests that this Court deny the Motion and grant such further relief as may be appropriate under the circumstances.

Dated: June 15, 2007
Wilmington, Delaware

/s/ Steven K. Kortanek_____
Steven K. Kortanek (Del. Bar No. 3106)
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE  19801
Ph: (302) 252-4363
Fax: (302) 661-7728
skortanek@wcsr.com

- and -

MAYER, BROWN, ROWE & MAW LLP
Thomas S. Kiriakos
Sean T. Scott
Matthew V. Wargin
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Ph: 312-701-8310
Fax: 312-706-8482
tkiriakos@mayerbrownrowe.com
stscott@mayerbrownrowe.com

Counsel to Carrington Mortgage Services, LLC and
Carrington Capital Management, LLC

WCSR 3632440v3