# EXHIBIT A

# INDUSTRIAL LEASE
(Multi-Tenant; Net)

BETWEEN

THE IRVINE COMPANY

AND

NEW CENTURY FINANCIAL CORPORATION

INDEX TO LEASE

| | | |
|---|---|---|
| ARTICLE I. | BASIC LEASE PROVISIONS | |
| ARTICLE II. | PREMISES | |
| Section 2.1 | Leased Premises | |
| Section 2.2 | Acceptance of Premises | |
| Section 2.3 | Building Name and Address | |
| Section 2.4 | Right of First Refusal | |
| Section 2.5 | Landlord's Responsibilities | |
| ARTICLE III. | TERM | |
| Section 3.1 | General | |
| Section 3.2 | Delay in Possession | |
| Section 3.3 | Right to Extend this Lease | |
| ARTICLE IV | RENT AND OPERATING EXPENSES | |
| Section 4.1 | Basic Rent | |
| Section 4.2 | Operating Expenses | |
| Section 4.3 | Security Deposit | |
| ARTICLE V. | USES | |
| Section 5.1 | Use | |
| Section 5.2 | Signs | |
| Section 5.3 | Hazardous Materials | |
| ARTICLE VI. | COMMON AREAS; SERVICES | |
| Section 6.1 | Utilities and Services | |
| Section 6.2 | Operation and Maintenance of Common Areas | |
| Section 6.3 | Use of Common Areas | |
| Section 6.4 | Parking | |
| Section 6.5 | Changes and Additions by Landlord | |
| ARTICLE VII. | MAINTAINING THE PREMISES | |
| Section 7.1 | Tenant's Maintenance and Repair | |
| Section 7.2 | Landlord's Maintenance and Repair | |
| Section 7.3 | Alterations | |
| Section 7.4 | Mechanic's Liens | |
| Section 7.5 | Entry and Inspection | |
| ARTICLE VIII. | TAXES AND ASSESSMENTS ON TENANT'S PROPERTY | |
| ARTICLE IX. | ASSIGNMENT AND SUBLETTING | |
| Section 9.1 | Rights of Parties | |
| Section 9.2 | Effect of Transfer | |
| Section 9.3 | Sublease Requirements | |
| Section 9.4 | Certain Transfers | |
| ARTICLE X. | INSURANCE AND INDEMNITY | |
| Section 10.1 | Tenant's Insurance | |
| Section 10.2 | Landlord's Insurance | |
| Section 10.3 | Tenant's Indemnity | |
| Section 10.4 | Landlord's Non-liability | |
| Section 10.5 | Waiver of Subrogation | |
| ARTICLE XI. | DAMAGE OR DESTRUCTION | |
| Section 11.1 | Restoration | |
| Section 11.2 | Lease Governs | |
| ARTICLE XII. | EMINENT DOMAIN | |
| Section 12.1 | Total or Partial Taking | |
| Section 12.2 | Temporary Taking | |
| Section 12.3 | Taking of Parking Area | |
| ARTICLE XIII. | SUBORDINATION; ESTOPPEL CERTIFICATE; FINANCIALS | |
| Section 13.1 | Subordination | |
| Section 13.2 | Estoppel Certificate | |
| Section 13.3 | Financials | |

| | |
|---|---|
| ARTICLE XIV. | DEFAULTS AND REMEDIES |
| Section 14.1 | Tenant's Defaults |
| Section 14.2 | Landlord's Remedies |
| Section 14.3 | Late Payments |
| Section 14.4 | Right of Landlord to Perform |
| Section 14.5 | Default by Landlord |
| Section 14.6 | Expenses and Legal Fees |
| Section 14.7 | Waiver of Jury Trial |
| Section 14.8 | Satisfaction of Judgment |
| | |
| ARTICLE XV. | END OF TERM |
| Section 15.1 | Holding Over |
| Section 15.2 | Merger on Termination |
| Section 15.3 | Surrender of Premises; Removal of Property |
| | |
| ARTICLE XVI. | PAYMENTS AND NOTICES |
| | |
| ARTICLE XVII. | RULES AND REGULATIONS |
| | |
| ARTICLE XVIII. | BROKER'S COMMISSION |
| | |
| ARTICLE XIX. | TRANSFER OF LANDLORD'S INTEREST |
| | |
| ARTICLE XX. | INTERPRETATION |
| Section 20.1 | Gender and Number |
| Section 20.2 | Headings |
| Section 20.3 | Joint and Several Liability |
| Section 20.4 | Successors |
| Section 20.5 | Time of Essence |
| Section 20.6 | Controlling Law |
| Section 20.7 | Severability |
| Section 20.8 | Waiver and Cumulative Remedies |
| Section 20.9 | Inability to Perform |
| Section 20.10 | Entire Agreement |
| Section 20.11 | Quiet Enjoyment |
| Section 20.12 | Survival |
| | |
| ARTICLE XXI. | EXECUTION AND RECORDING |
| Section 21.1 | Counterparts |
| Section 21.2 | Corporate and Partnership Authority |
| Section 21.3 | Execution of Lease; No Option or Offer |
| Section 21.4 | Recording |
| Section 21.5 | Amendments |
| Section 21.6 | Executed Copy |
| Section 21.7 | Attachments |
| | |
| ARTICLE XXII | MISCELLANEOUS |
| Section 22.1 | Non-disclosure of Lease Terms |
| Section 22.2 | Guaranty |
| Section 22.3 | Changes Requested by Lender |
| Section 22.4 | Mortgagee Protection |
| Section 22.5 | Covenants and Conditions |
| Section 22.6 | Security Measures |
| Section 22.7 | Jams Arbitration |
| Section 22.8 | Communications Equipment |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Description of Premises |
| Exhibit A-1 | Description of Premises |
| Exhibit A-2 | Right of First Refusal Space |
| Exhibit A-3 | Right of First Refusal Space |
| Exhibit B | Environmental Questionnaire |
| Exhibit C | Landlord's Disclosures |
| Exhibit D | Insurance Requirements |
| Exhibit E | Rules and Regulations |
| Exhibit F | License Agreement |
| Exhibit X | Work Letter |
| Exhibit Y | Project Site Plan |
| Exhibit Y-1 | No Reserved Parking Areas |

## INDUSTRIAL LEASE
(Multi-Tenant; Net)

THIS LEASE is made as of the _____ day of _____, 19___, by and between THE IRVINE COMPANY, hereafter called "Landlord," and NEW CENTURY FINANCIAL CORPORATION, a Delaware corporation, hereinafter called "Tenant."

### ARTICLE I. BASIC LEASE PROVISIONS

Each reference in this Lease to the "Basic Lease Provisions" shall mean and refer to the following collective terms, the application of which shall be governed by the provisions in the remaining Articles of this Lease.

1. Premises: The Premises (more particularly described in Section 2.1) consists of space located in two (2) separate buildings, commonly known as:

    "Building 1" - 340 Commerce, Irvine, California
    "Building 2" - 350 Commerce, Suite 200, Irvine, California

2. Project Description (if applicable): Irvine Technology I & II

3. Use of Premises: General office.

4. Estimated Commencement Date: January 10, 2000

5. Lease Term: Sixty (60) months, plus such additional days as may be required to cause this Lease to terminate on the final day of the calendar month.

6. Basic Rent: One Hundred Seven Thousand Six Hundred Fifty Dollars ($107,650.00) per month, based on $1.60 per rentable square foot.

    Basic Rent is subject to adjustment as follows:

    Commencing twelve (12) months following the Commencement Date, the Basic Rent shall be One Hundred Eleven Thousand Fourteen Dollars ($111,014.00) per month, based on $1.65 per rentable square foot.

    Commencing twenty-four (24) months following the Commencement Date, the Basic Rent shall be One Hundred Fourteen Thousand Three Hundred Seventy-Eight Dollars ($114,378.00) per month, based on $1.70 per rentable square foot.

    Commencing thirty-six (36) months following the Commencement Date, the Basic Rent shall be One Hundred Seventeen Thousand Seven Hundred Forty-Two Dollars ($117,742.00) per month, based on $1.75 per rentable square foot.

    Commencing forty-eight (48) months following the Commencement Date, the Basic Rent shall be One Hundred Twenty-One Thousand One Hundred Six Dollars ($121,106.00) per month, based on $1.80 per rentable square foot.

7. Guarantor(s): None

8. Floor Area of Premises: Approximately 67,281 rentable square feet, broken down as follows:

    340 Commerce Premises - 53,360 rentable square feet
    350 Commerce Premises - 13,921 rentable square feet

9. Security Deposit: $133,217.00

10. Broker(s): Lee & Associates

11. Additional Insureds: Insignia\ESG of California, Inc.

12. Address for Payments and Notices:

| LANDLORD | TENANT |
|---|---|
| INSIGNIA\ESG OF CALIFORNIA, INC.<br>1 Ada, Suite 270<br>Irvine, CA 92618 | NEW CENTURY FINANCIAL CORPORATION<br>18400 Von Karman, Suite 1000<br>Irvine, CA 92612<br>Attention: William J. Dodge |

with a copy of notices to:
IRVINE INDUSTRIAL COMPANY
P.O. Box 6370
Newport Beach, CA 92658-6370
Attn: Vice President, Industrial Operations

13. Tenant's Liability Insurance Requirement: $2,000,000.00

14. Vehicle Parking Spaces: Two Hundred Seventy-Two (272)

15. Plan Approval Date: October 15, 1999

## ARTICLE II. PREMISES

**SECTION 2.1. LEASED PREMISES.** Landlord leases to Tenant and Tenant leases from Landlord: (i) the premises shown on EXHIBIT A attached hereto (the "340 Commerce Premises"), and (ii) the premises shown on EXHIBIT A-1 attached hereto (the "350 Commerce Premises"). Collectively, the 340 Commerce Premises and the 350 Commerce Premises are herein referred to as the "Premises". The Premises contain approximately the "Rentable Square Feet" as set forth in Item 8 of the Basic Lease Provisions. The 340 Commerce Premises are located within a building identified in Item 1 of the Basic Lease Provisions as 340 Commerce ("Building 1"); and the 350 Commerce Premises are located within a building identified in Item 1 of the Basic Lease Provisions as 350 Commerce ("Building 2"). Collectively, Building 1 and Building 2 are herein referred to as the "Buildings"), and individually as a "Building". Building 1 and Building 2 are a portion of the project shown on EXHIBIT Y (the "Project"). Tenant understands that the floor area set forth in Item 8 of the Basic Lease Provisions may include, at Landlord's option, a factor approximating the total square footage of any common lobby or internal common features of the Buildings times the ratio of the actual square footage of the Premises to the total square footage of the Buildings. If, upon completion of the space plans for the Premises, Landlord's architect or space planner determines that the rentable square footage of the Premises differs from that set forth in the Basic Lease Provisions, then Landlord shall so notify Tenant and the Basic Rent (as shown in Item 6 of the Basic Lease Provisions) shall be promptly adjusted in proportion to the change in square footage. Within fifteen (15) days following Landlord's request, the parties shall memorialize the adjustments by executing an amendment to this Lease prepared by Landlord, provided that the failure or refusal by either party to execute the amendment shall not affect its validity. Tenant shall have access to the Premises twenty-four (24) hours per day, seven days per week.

**SECTION 2.2. ACCEPTANCE OF PREMISES.** Except as specifically set forth in this Lease, Tenant acknowledges that neither Landlord nor any representative of Landlord has made any representation or warranty with respect to the Premises or the Buildings or the suitability or fitness of either for any purpose, including, without limitation, any representations or warranties regarding zoning or other land use matters, and that neither Landlord nor any representative of Landlord has made any representations or warranties regarding (i) what other tenants or uses may be permitted or intended in the Buildings and the Project, or (ii) any exclusivity of use by Tenant with respect to its permitted use of the Premises as set forth in Item 3 of the Basic Lease Provisions. Tenant further acknowledges that neither Landlord nor any representative of Landlord has agreed to undertake any alterations or additions or construct any improvements to the Premises except as expressly provided in this Lease. The taking of possession or use of the Premises by Tenant for any purpose other than construction shall conclusively establish that the Premises and the Buildings were in satisfactory condition and in conformity with the provisions of this Lease in all respects, except for: (i) those matters which Tenant shall have brought to Landlord's attention on a written punch list and (ii) Landlord's obligations under Section 2.5 hereof. The list shall be limited to any items required to be accomplished by Landlord under the Work Letter attached as Exhibit X, and shall be delivered to Landlord within sixty (60) days after the term ("Term") of this Lease commences as provided in Article III below. Nothing contained in this Section shall affect the commencement of the Term or the obligation of Tenant to pay rent. Landlord shall diligently complete all punch list items of which it is notified as provided above.

**SECTION 2.3. BUILDING NAME AND ADDRESS.** Tenant shall not utilize any name selected by Landlord from time to time for the Buildings and/or the Project as any part of Tenant's corporate or trade name. Landlord shall have the right to change the name, address, number or designation of the Buildings or Project without liability to Tenant; provided, however, if the address of either of the Buildings and/or the Project is changed by Landlord, Landlord agrees to provide Tenant with no less than ninety (90) days prior written notice and to reimburse Tenant for all expenses reasonably incurred by Tenant in conjunction with such address change (including, without limitation, the cost of changing Tenant's stationery and of notifying Tenant's clients and customers of Tenant's new address), not to exceed Five Thousand Dollars ($5,000.00) in the aggregate.

**SECTION 2.4. RIGHT OF FIRST REFUSAL.** Provided Tenant is not then in default hereunder, Landlord hereby grants Tenant a one-time right of first refusal ("First Refusal Right") to lease: (a) the space on the first floor in Building 2 comprising approximately 12,518 rentable square feet and the space on the second floor of Building 2 comprising approximately 12,759 rentable square feet all as shown on EXHIBIT A-2 attached hereto, and (b) the space located at 330 Commerce comprising approximately 53,360 rentable square feet as shown on EXHIBIT A-3 (collectively, "First Refusal Space") in accordance with and subject to the provisions of this Section 2.4 At any time following receipt by Landlord of a bona fide letter of intent proposal or other written proposal setting forth terms upon which Landlord is willing to lease all or a portion of the First Refusal Space, Landlord shall give Tenant written notice of the term rent, operating expenses and tenant improvement allowance, if any (the "Economic Terms") upon which Landlord has tentatively agreed with such third party to lease the First Refusal Space. It is understood that should Landlord have tentatively agreed to lease other space in addition to the First Refusal Space as part of a single transaction, then Landlord's notice shall so provide and all such space shall collectively be subject to the following provisions. Within five (5) business days after receipt of Landlord's notice, Tenant must give Landlord written notice pursuant to which Tenant shall elect to (i) lease all, but not less than all, of the First Refusal Space specified in Landlord's notice (the "Designated First Refusal Space") upon such Economic Terms and the same non-Economic Terms as set forth in this Lease (except as otherwise hereinafter provided); or (ii) decline to lease the Designated First Refusal Space on such Economic and non-Economic Terms. In the event that Tenant does not so respond in writing to Landlord's notice within said period, Tenant shall be deemed to have elected clause (ii) above. Should Tenant decline, or be deemed to have declined, to lease the Designated First Refusal Space as provided in the foregoing,

Landlord shall be free thereafter to lease the Designated First Refusal Space plus or minus ten percent (10%) thereof to any third party within the one hundred twenty (120) days following the notice of Economic Terms upon material terms which are substantially the same as the Economic Terms. In the event Landlord does not enter into a lease for the Designated First Right Space plus or minus ten percent (10%) thereof within such one hundred twenty (120) day period upon material terms which are substantially the same as the Economic Terms, then prior to leasing such Designated First Right Space to any third party, Landlord shall repeat the procedure of offering such space to Tenant in accordance with the provisions of this Section. Once Landlord has offered any such First Refusal Space to Tenant and then enters into a lease for such Designated First Refusal Space plus or minus ten percent (10%) thereof, within the following one hundred twenty (120) days, Tenant's rights under this Section with respect to the space so leased shall terminate. Should Tenant timely elect to lease the Designated First Refusal Space, Landlord shall promptly prepare and deliver to Tenant an amendment to this Lease consistent with the foregoing, and Tenant shall execute and return same to Landlord within ten (10) business days. Tenant's failure to timely return the amendment shall entitle Landlord to specifically enforce Tenant's commitment to lease the Designated First Refusal Space, to lease such space to a third party, and/or to pursue any other available legal remedy. If Tenant fails to comply with any of the provisions of this paragraph, Tenant's First Refusal Right herein granted shall be thereupon extinguished. Any attempt to assign or transfer any right of interest created by this Section other than in connection with a transfer not requiring Landlord's consent pursuant to Section 9.4 hereof shall be void from its inception.

SECTION 2.5.    LANDLORD'S RESPONSIBILITIES.

(a) Landlord shall correct, repair or replace, at Landlord's sole cost and expense and not as a Project Cost, any non-compliance of the Building(s) or the Premises (other than the Tenant Improvements) and the Common Areas with all applicable building permits and codes in effect as of the Commencement Date, including, without limitation, the provisions of Title III of the Americans With Disabilities Act ("ADA") in effect as of the Commencement Date. Landlord shall correct, repair or replace any non-compliance of the Building or the Premises (other than the Tenant Improvements) and the Common Areas with any laws enacted or effective after the Commencement Date including, without limitation, revisions or amendments to the ADA provided that the amortized cost of such repairs or replacements (amortized over the useful life thereof using a market cost of funds reasonably determined by Landlord) shall be included as Project Costs payable by Tenant. All other ADA compliance issues which pertain to the Premises, including, without limitation, those arising as a result of construction by Tenant of any alterations or other improvements in the Premises (and any resulting ADA compliance requirements in the Common Areas), the Tenant Improvements and those that arise particularly as a result of the operation of Tenant's business and employment practices in the Premises, shall be the responsibility of Tenant at its sole cost and expense. The repairs, corrections or replacements required of Landlord or of Tenant under the foregoing provisions of this Section shall be made promptly following notice of non-compliance from any applicable governmental agency. Tenant shall promptly forward any such notice that Tenant receives to Landlord.

(b) Landlord agrees to repair, at its sole cost and expense and not as an Operating Expense latent defects which arise in the structural components of the roof and Building, including floor/ceiling slabs, columns, beams, walls and the foundations and footings of the Building during the initial Lease Term. If a non-compliance with the foregoing warranty exists, Landlord shall, promptly after receipt of the written notice from Tenant setting forth the nature and extent of such non-compliance, rectify same at Landlord's sole cost and expense.

(c) If Tenant is required to make repairs to any component of the Premises or any of its systems for which Landlord may have obtained a warranty, Landlord shall, upon request by Tenant, use its good faith efforts to pursue its rights under any such warranties for the benefit of Tenant. Landlord shall be under no obligation to incur any expense in connection with asserting rights under such warranties or guaranties against either the contractor or the manufacturer, but shall use reasonable good faith efforts to enforce such warranties and guaranties for Tenant's benefit.

### ARTICLE III.   TERM

SECTION 3.1.    GENERAL. The Term shall be for the period shown in Item 5 of the Basic Lease Provisions. Subject to the provisions of Section 3.2 below, the Term shall commence ("Commencement Date") on the earlier of (a) the date upon which all relevant governmental authorities have approved the Tenant Improvements in accordance with applicable building codes, as evidenced by written approval thereof in accordance with the building permits issued for the Tenant Improvements or issuance of a temporary or final certificate of occupancy for the Premises and Tenant is provided with access to the entire Premises, or (b) the date Tenant commences use of the Premises for the conduct of business operations. Within fifteen (15) days after possession of the Premises is tendered to Tenant, the parties shall memorialize on a form provided by Landlord the actual Commencement Date and the expiration date ("Expiration Date") of this Lease. Tenant's failure to execute that form shall not affect the validity of Landlord's determination of those dates.

SECTION 3.2.    DELAY IN POSSESSION. If Landlord, for any reason whatsoever, cannot deliver possession of the Premises to Tenant on or before the Estimated Commencement Date, this Lease shall not be void or voidable nor shall Landlord be liable to Tenant for any resulting loss or damage. However, Tenant shall not be liable for any rent and the Commencement Date shall not occur until Landlord delivers possession of the Premises and the

Premises are in fact available for Tenant's occupancy with any Tenant Improvements that have been approved as per Section 3.1(a) above, except that if Landlord's failure to so deliver possession on the Estimated Commencement Date is attributable to any action or inaction by Tenant (including, without limitation, any Tenant Delay described in the Work Letter attached to this Lease), then the Commencement Date shall not be advanced to the date on which possession of the Premises is tendered to Tenant, and Landlord shall be entitled to full performance by Tenant (including the payment of rent) from the date Landlord would have been able to deliver the Premises to Tenant but for Tenant's delay(s). If for any reason other than "Tenant Delays" (as defined in the Work Letter) or other matters beyond Landlord's reasonable control, the Commencement Date has not occurred by the date that is ninety (90) days following the Estimated Commencement Date, then Tenant may, by written notice to Landlord given at any time thereafter but prior to the actual occurrence of the Commencement Date, elect to terminate this Lease. Notwithstanding the foregoing, if at any time during the construction period, Landlord reasonably believes that the Commencement Date will not occur on or before ninety (90) days following the Estimated Commencement Date, Landlord shall notify Tenant in writing of such fact and of a new outside date on or before which the Commencement Date will occur, and Tenant must elect within ten (10) days of receipt of such notice to either terminate this Lease or waive its right to terminate this Lease provided the Commencement Date occurs on or prior to the new outside date established by Landlord in such notice to Tenant. Tenant's failure to elect to terminate this Lease within such ten (10) day period shall be deemed Tenant's waiver of its right to terminate this Lease as provided in this paragraph as to the previous outside date, but not as to the new outside date established by said notice.

SECTION 3.3.   RIGHT TO EXTEND THIS LEASE.

(a) Provided that Tenant is not in default under any provision of this Lease beyond the applicable cure period, either at the time of exercise of the extension right granted herein or at the time of the commencement of such extension, and provided further that Tenant is occupying the entire Premises and has not assigned or sublet any of its interest in this Lease (other than in a transaction not requiring Landlord's consent pursuant to Section 9.4 hereof), Tenant may extend the Term of this Lease for one (1) period of sixty (60) months. Tenant shall exercise its right to extend the Term by and only by delivering to Landlord, not less than nine (9) months or more than twelve (12) months prior to the expiration date of the Term, Tenant's irrevocable written notice of its commitment to extend (the "Commitment Notice"). The Basic Rent payable under the Lease during any extension of the Term shall be determined as provided in the following provisions.

If Landlord and Tenant have not by then been able to agree upon the Basic Rent for the extension of the Term, then within one hundred twenty (120) and ninety (90) days prior to the expiration date of the Term, Landlord shall notify Tenant in writing of the Basic Rent that would reflect the prevailing market rental rate for a 60-month renewal of comparable space in the Project, including any subsequent phases of Irvine Technology Center (together with any increases thereof during the extension period) as of the commencement of the extension period ("Landlord's Determination"). Should Tenant disagree with the Landlord's Determination, then Tenant shall, not later than twenty (20) days thereafter, notify Landlord in writing of Tenant's determination of those rental terms ("Tenant's Determination"). Within ten (10) days following delivery of the Tenant's Determination, the parties shall attempt to agree on an appraiser to determine the fair market rental. If the parties are unable to agree in that time, then each party shall designate an appraiser within ten (10) days thereafter. Should either party fail to so designate an appraiser within that time, then the appraiser designated by the other party shall determine the fair market rental. Should each of the parties timely designate an appraiser, then the two appraisers so designated shall appoint a third appraiser who shall, acting alone, determine the fair market rental for the Premises. Any appraiser designated hereunder shall have an MAI certification with not less than five (5) years experience in the valuation of commercial industrial buildings in Orange County, California.

Within thirty (30) days following the selection of the appraiser and such appraiser's receipt of the Landlord's Determination and the Tenant's Determination, the appraiser shall determine whether the rental rate determined by Landlord or by Tenant more accurately reflects the fair market rental rate for the 60-month renewal of the Lease for the Premises, as reasonably extrapolated to the commencement of the extension period. Accordingly, either the Landlord's Determination or the Tenant's Determination shall be selected by the appraiser as the fair market rental rate for the extension period. In making such determination, the appraiser shall consider rental comparables for the Project, including any subsequent phases of Irvine Technology Center (provided that if there are an insufficient number of comparables within the Project, the appraiser shall consider rental comparables for similarly improved space within the vicinity of the Project with appropriate adjustment for location and quality of project), but the appraiser shall not attribute any factor for brokerage commissions in making its determination of the fair market rental rate, but shall consider then current market tenant improvement allowances for lease renewals of comparable term and size. At any time before the decision of the appraiser is rendered, either party may, by written notice to the other party, accept the rental terms submitted by the other party, in which event such terms shall be deemed adopted as the agreed fair market rental. The fees of the appraiser(s) shall be borne entirely by the party whose determination of the fair market rental rate was not accepted by the appraiser.

(b) Notwithstanding the foregoing, at any time during the period between fifteen (15) and twelve (12) months prior to expiration of the Term (but prior to the delivery of a Commitment Notice), Tenant may request from Landlord a rental quote upon which Landlord is willing to lease the Premises for the extension term to Tenant (an "Extension Term Rental Offer"). Tenant shall have the right for a period of ten (10) business days after receipt of the Extension Term Rental Offer to accept that offer by written notice to Landlord which notice would constitute Tenant's exercise of its right to extend the Term upon the terms and conditions of this Lease but at the rental rate set forth in

the Extension Term Rental Offer. If Tenant elects to deliver a Commitment Notice prior to requesting an Extension Term Rental Offer, fails to request an Extension Term Rental Offer or fails to accept the Extension Term Rental Offer within ten (10) business days after receipt thereof, Tenant shall have no further rights under this subparagraph and provisions of subparagraph (a) of this Section shall govern the determination of fair market rental for the extension Term if Tenant elects to extend the Term in accordance with the provisions of this Section.

(c) In the event Tenant elects to extend this Lease pursuant to either subparagraph (a) or (b), within twenty (20) days after the determination of the rent applicable to such extension, Landlord shall prepare an appropriate amendment to this Lease for the extension period, and Tenant shall execute and return same to Landlord within twenty (20) days. Should the fair market rental not be established by the commencement of the extension period, then Tenant shall continue paying rent at the rate in effect during the last month of the initial Term, and a lump sum adjustment shall be made promptly upon the determination of such new rental.

If Tenant fails to timely comply with any of the provisions of this Section, Tenant's right to extend the Term shall be extinguished and the Lease shall automatically terminate as of the expiration date of the Term, without any extension and without any liability to Landlord. Any attempt to assign or transfer any right or interest created by this Section shall be void from its inception other than in connection with a transaction not requiring Landlord's consent pursuant to Section 9.4 hereof. Tenant shall have no other right to extend the Term beyond the single sixty (60) month extension period created by this paragraph. Unless agreed to in a writing signed by Landlord and Tenant, any extension of the Term, whether created by an amendment to this Lease or by a holdover of the Premises by Tenant, or otherwise, shall be deemed a part of, and not in addition to, any duly exercised extension period permitted by this Section.

## ARTICLE IV. RENT AND OPERATING EXPENSES

**SECTION 4.1.** **BASIC RENT.** From and after the Commencement Date, Tenant shall pay to Landlord without deduction or offset, Basic Rent for the Premises in the total amount shown (including subsequent adjustments, if any) in Item 6 of the Basic Lease Provisions. Any rental adjustment shown in Item 6 shall be deemed to occur on the specified monthly anniversary of the Commencement Date, whether or not that date occurs at the end of a calendar month. The rent shall be due and payable in advance commencing on the Commencement Date (as prorated for any partial month) and continuing thereafter on the first day of each successive calendar month of the Term. No demand, notice or invoice shall be required for the payment of Basic Rent. An installment of rent in the amount of one (1) full month's Basic Rent at the initial rate specified in Item 6 of the Basic Lease Provisions shall be delivered to Landlord concurrently with Tenant's execution of this Lease and shall be applied against the Basic Rent first due hereunder.

**SECTION 4.2.** **OPERATING EXPENSES.**

(a) Tenant shall pay to Landlord, as additional rent, Tenant's Share of "Operating Expenses", as defined below, incurred by Landlord in the operation of the Buildings and Project. The term "Tenant's Share" means that portion of an Operating Expense determined by multiplying the cost of such item by a fraction, the numerator of which is the floor area of the Premises and the denominator of which is the total square footage of the floor area, as of the date on which the computation is made, to be charged with such Operating Expense as equitably allocated by Landlord.

(b) Commencing prior to the start of the first full "Expense Recovery Period" (as defined below) of the Lease, and prior to the start of each full or partial Expense Recovery Period thereafter, Landlord shall give Tenant a written estimate of the amount of Tenant's Share of Operating Expenses for the Expense Recovery Period. Tenant shall pay the estimated amounts to Landlord in equal monthly installments, in advance, with Basic Rent. If Landlord has not furnished its written estimate for any Expense Recovery Period by the time set forth above, Tenant shall continue to pay cost reimbursements at the rates established for the prior Expense Recovery Period, if any; provided that when the new estimate is delivered to Tenant, Tenant shall, at the next monthly payment date, pay any accrued cost reimbursements based upon the new estimate. For purposes hereof, "Expense Recovery Period" shall mean every twelve month period during the Term (or portion thereof for the first and last lease years) commencing July 1 and ending June 30.

(c) Within one hundred twenty (120) days after the end of each Expense Recovery Period, Landlord shall furnish to Tenant a statement showing in reasonable detail the actual or prorated Operating Expenses incurred by Landlord during the period, and the parties shall within thirty (30) days thereafter make any payment or allowance necessary to adjust Tenant's estimated payments, if any, to the actual Tenant's Share as shown by the annual statement. Any delay or failure by Landlord in delivering any statement hereunder shall not constitute a waiver of Landlord's right to require Tenant to pay Tenant's Share of Operating Expenses pursuant hereto. Any amount due Tenant shall be credited against installments next coming due under this Section 4.2, and any deficiency shall be paid by Tenant together with the next installment. If Tenant has not made estimated payments during the Expense Recovery Period, any amount owing by Tenant pursuant to subsection (a) above shall be paid to Landlord in accordance with Article XVI. Should Tenant fail to object in writing to Landlord's determination of actual Operating Expenses within one hundred eighty (180) days following delivery of Landlord's expense statement, Landlord's determination of actual Operating Expenses for the applicable Expense Recovery Period shall be conclusive and binding on the parties and any future claims to the contrary shall be barred.

(d) Even though the Lease has terminated and the Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Operating Expenses for the Expense Recovery Period in which the Lease terminates, Tenant shall upon notice pay the entire increase due over the estimated expenses paid. Conversely, any overpayment made in the event expenses decrease shall be rebated by Landlord to Tenant.

(e) If, at any time during any Expense Recovery Period, any one or more of the Operating Expenses are increased to a rate(s) or amount(s) in excess of the rate(s) or amount(s) used in calculating the estimated expenses for the year, then the estimate of Tenant's Share of Operating Expenses shall be increased for the month in which such rate(s) or amount(s) becomes effective and for all succeeding months by an amount equal to Tenant's Share of the increase. Landlord shall give Tenant written notice of the amount or estimated amount of the increase, the month in which the increase will become effective, Tenant's Share thereof and the month for which the payments are due. Tenant shall pay the increase to Landlord as a part of Tenant's monthly payments of estimated expenses as provided in paragraph (b) above, commencing with the month in which effective.

(f) The term "Operating Expenses" shall mean and include all "Project Costs" (as hereafter defined) and "Property Taxes" (as hereafter defined).

(g) The term "Project Costs" shall include all expenses of operation and maintenance of the Buildings and the Project, together with all appurtenant Common Areas (as defined in Section 6.2), and shall include the following charges by way of illustration but not limitation: water and sewer charges; insurance premiums or reasonable premium equivalents should Landlord elect to self-insure any risk that Landlord is authorized to insure hereunder; license, permit, and inspection fees; heat; light; power; janitorial services to any interior Common Areas; air conditioning; supplies; materials; equipment; tools; the cost of any environmental, insurance, tax or other consultant utilized by Landlord in connection with the Buildings and/or Project; establishment of reasonable reserves for replacements and/or repair of the Buildings and/or Common Area improvements, equipment and supplies; costs incurred in connection with compliance of any laws or changes in laws applicable to the Buildings or the Project (except for changes in laws that pertain particularly to Tenant's use of the Premises and/or to the interior of the Premises only which shall be the sole responsibility of Tenant at its cost) as provided in Section 2.5; the cost of any capital repairs or replacements (other than tenant improvements for specific tenants) to the extent of the amortized amount thereof over the useful life of such capital investments calculated at a market cost of funds, all as determined by Landlord, for each such year of useful life during the Term; costs associated with the procurement and maintenance of an air conditioning, heating and ventilation service agreement, and procurement and maintenance of an intrabuilding network cable service agreement for any intrabuilding network cable telecommunications lines within the Project, and any other installation, maintenance, repair and replacement costs associated with such lines; labor; reasonably allocated wages and salaries, fringe benefits, and payroll taxes for administrative and other personnel directly applicable to the Buildings and/or Project, including both Landlord's personnel and outside personnel; any expense incurred pursuant to Sections 6.1, 6.2, 6.4, 7.2, and 10.2; and a reasonable overhead/management fee for the professional operation of the Project. It is understood that Project Costs shall include competitive charges for direct services provided by any subsidiary or division of Landlord.

(h) The term "Property Taxes" as used herein shall include the following: (i) all real estate taxes, as such property taxes may be reassessed from time to time; and (ii) other taxes, charges and assessments which are levied with respect to this Lease or to the Buildings and/or the Project, and any improvements, fixtures and equipment and other property of Landlord located in the Buildings and/or the Project, except that general net income and franchise taxes imposed against Landlord shall be excluded; and (iii) all assessments and fees for public improvements, services, and facilities and impacts thereon, including, without limitation, arising out of any Community Facilities Districts, "Mello Roos" districts, similar assessment districts, and any traffic impact mitigation assessments or fees; (iv) any tax, surcharge or assessment which shall be levied in addition to or in lieu of real estate or personal property taxes, other than taxes covered by Article VIII; and (v) costs and expenses incurred in contesting the amount or validity of any Property Tax by appropriate proceedings.

(i) Notwithstanding the provisions of this Section 4.2 to the contrary, Operating Expenses shall not include any of the following:

(1) Commissions, attorneys' fees, costs, disbursements and other expenses incurred by Landlord or its agents in connection with negotiations for leases with tenants, other occupants or prospective tenants or other occupants of the Project, and similar costs incurred in connection with disputes with and/or enforcement of any lease with tenants, other occupants, or prospective tenants or other occupants of the Project;

(2) "Tenant allowances", "tenant concessions", work letter payments, and other costs or expenses (including permit, license and inspection fees) incurred in completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space for tenants or other occupants of the Project, or vacant, leasable space in the Project, including space planning/interior design fees for same;

(3) Depreciation and other "non-cash" expense items;

(4) Except as specifically authorized in this Lease, costs of a capital nature, including, but not limited to, capital additions, capital improvements, capital alterations, capital replacements, capital equipment and capital tools, and/or capital redesign;

(5) Services, items and benefits for which Tenant or any other tenant or occupant of the Project specifically reimburses Landlord or for which Tenant or any other tenant or occupant of the Project pays third persons;

(6) Costs or expenses (including fines, penalties and legal fees) incurred due to the violation by Landlord of this Lease or of the leases of other tenants in the Project, that would not have been incurred but for such violation.

(7) Penalties for late payment of any Operating Expenses by Landlord, including, without limitation, with respect to Property Taxes, equipment leases, etc.;

(8) Payments in respect of overhead and/or profit to any subsidiary or affiliate of Landlord, as a result of a non-competitive selection process for services (other than the management fee) on or to the Project, or for goods, supplies or other materials, to the extent that the costs of such services, goods, supplies or materials exceed the costs that would have been paid if the services, goods, supplies or materials had been provided by parties unaffiliated with Landlord, of similar skill, competence and experience, on a competitive basis;

(9) Payments of principal, finance charges or interest on debt or amortization on any deed of trust or other debt encumbering the Project, and rental payments (or increases in same) under any ground or underlying lease or leases encumbering the Project (except to the extent the same may be made to pay or reimburse, or may be measured by Property Taxes);

(10) Except for a management fee which is reasonable and commercially competitive for similar projects in the area, costs of Landlord's general overhead and general administrative expenses (individual, partnership or corporate, as the case may be) and wages, salaries and other compensation and benefits (as well as adjustments thereto) for all employees and personnel of Landlord above the level of manager for the Project, which costs would not be chargeable to Operating Expenses in accordance with generally accepted accounting principles, consistently applied;

(11) Rentals and other related expenses, if any, incurred in leasing air conditioning systems or other equipment ordinarily considered to be of a capital nature, except equipment which is used in providing janitorial services and which is not affixed to the Project and equipment which is leased on a temporary basis in emergency situations;

(12) Advertising and promotional expenses;

(13) Costs or expenses for the acquisition of sculpture, paintings or other works of art, but not the reasonable expenses of maintaining, repairing and insuring same;

(14) Costs for which Landlord is compensated through or reimbursed by insurance;

(15) Contributions to political or charitable organizations;

(16) Costs incurred in removing the property of former tenants and/or other occupants of the Project;

(17) The costs of any "tap fees" or one-time lump sum sewer, water or other utility connection fees for the Project; and

(18) "In house" legal and/or accounting fees.

(19) Any costs for the fulfillment of obligations which are specifically allocated to Landlord pursuant to the provisions of this Lease;

(20) Except as set forth in Section 5.3 hereof, any costs related to remediation, cleanup, removal, disposal, neutralization or other treatment of Hazardous Materials.

(21) Costs recovered by Landlord to the extent such cost recovery allows Landlord to recover from tenants of the Building or Project more than 100% of Operating Expenses on account of any Expense Recovery Period.

SECTION 4.3.    SECURITY DEPOSIT.  Concurrently with Tenant's delivery of this Lease, Tenant shall deposit with Landlord the sum, if any, stated in Item 9 of the Basic Lease Provisions, to be held by Landlord as security for the full and faithful performance of Tenant's obligations under this Lease (the "Security Deposit"). Subject to the last sentence of this Section, the Security Deposit shall be understood and agreed to be the property of Landlord upon Landlord's receipt thereof, and may be utilized by Landlord in its discretion towards the payment of all prepaid expenses by Landlord for which Tenant would be required to reimburse Landlord under this Lease, including, without limitation, brokerage commissions and Tenant Improvement costs. Upon any default by Tenant after expiration of the applicable cure period, including specifically Tenant's failure to pay rent or to abide by its obligations under Sections 7.1 and 15.3 below, whether or not Landlord is informed of or has knowledge of the default, the Security Deposit shall be deemed to be automatically and immediately applied, without waiver of any rights Landlord may have under this Lease or at law or in equity as a result of the default, as a setoff for full or partial compensation for that default. If any portion of the Security Deposit is applied after a default by Tenant, Tenant shall within fifteen (15) days after written

demand by Landlord deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. Landlord shall not be required to keep this Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. If Tenant fully performs its obligations under this Lease, the Security Deposit shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest in this Lease) after the expiration of the Term, provided that Landlord may retain the Security Deposit to the extent and until such time as all amounts due from Tenant in accordance with this Lease have been determined and paid in full. The obligation of Landlord to return the unapplied balance of the Security Deposit to Tenant in accordance with the terms of this Lease shall be personal to Landlord and shall survive as an obligation of Landlord notwithstanding any transfer of Landlord's interest in this Lease unless and until such time as Landlord has complied with the provisions of Section 1950.7 of the California Civil Code or any successor statute thereto.

## ARTICLE V. USES

**SECTION 5.1.** USE. Tenant shall use the Premises only for the purposes stated in Item 3 of the Basic Lease Provisions, all in accordance with applicable laws and restrictions (subject to the provisions of Section 2.5) and pursuant to approvals to be obtained by Tenant from all relevant and required governmental agencies and authorities. The parties agree that any contrary use shall be deemed to cause material and irreparable harm to Landlord and shall entitle Landlord to injunctive relief in addition to any other available remedy. Tenant, at its expense, shall procure, maintain and make available for Landlord's inspection throughout the Term, all governmental approvals, licenses and permits required for the proper and lawful conduct of Tenant's permitted use of the Premises. Tenant shall not do or permit anything to be done in or about the Premises which will in any way unreasonably interfere with the rights of other occupants of the Buildings or the Project, or use or allow the Premises to be used for any unlawful purpose, nor shall Tenant permit any nuisance or commit any waste in the Premises or the Project. Tenant shall not perform any work or conduct any business whatsoever in the Project other than inside the Premises. Tenant shall not do or permit to be done anything which will invalidate or increase the cost of any insurance policy(ies) covering the Buildings, the Project and/or their contents (unless Tenant pays any such increase in cost), and shall comply with all applicable insurance underwriters rules and the requirements of the Pacific Fire Rating Bureau or any other organization performing a similar function. Tenant shall comply at its expense with all present and future laws, ordinances, restrictions, regulations, orders, rules and requirements of all governmental authorities that pertain to Tenant or its use of the Premises, including, without limitation, all federal and state occupational health and safety requirements, whether or not Tenant's compliance will necessitate expenditures or interfere with its use and enjoyment of the Premises. Tenant shall comply at its expense with all present and future covenants, conditions, easements or restrictions now or hereafter affecting or encumbering the Buildings and/or Project, and any reasonable amendments or modifications thereto, including, without limitation, the payment by Tenant of any periodic or special dues or assessments charged against the Premises or Tenant which may be allocated to the Premises or Tenant in accordance with the provisions thereof. Tenant shall promptly upon demand reimburse Landlord for any additional insurance premium charged by reason of Tenant's failure to comply with the provisions of this Section, and shall indemnify Landlord from any liability and/or expense resulting from Tenant's noncompliance.

**SECTION 5.2.** SIGNS. Provided Tenant continues to occupy the entire Premises, Tenant shall have the exclusive right to two (2) exterior Building top signs on Building 1, and the nonexclusive right to one (1) exterior eye-brow sign on Building 2. In the event that Tenant, at any time during the Term, shall lease and occupy fifty percent (50%) or more of the floor area of Building 2, Tenant shall have the right to install one (1) non-exclusive building top sign in lieu of and not in addition to the exterior eye brow sign on Building 2, provided building top signage space is then available on Building 2. Except as provided in the foregoing or as otherwise approved in writing by Landlord, in its sole discretion, Tenant shall have no right to maintain identification signs in any location in, on or about the Premises, the Buildings or the Project and shall not place or erect any signs, displays or other advertising materials that are visible from the exterior of the Buildings. The text of Tenant's signs may include one or more of the following names or any combination thereof, provided such entity is in fact conducting its business within the Premises: AnyLoan.com; 1800 AnyLoan.com; New Century; Prime West Funding; Western Capital Mortgage; New Century Mortgage; New Century Mortgage Corporation. The size, design, graphics, material, style, color and other physical aspects of any permitted sign shall be subject to Landlord's written approval prior to installation (which approval may be withheld in Landlord's discretion), all covenants, conditions or restrictions encumbering the Premises, Landlord's signage program for the Project, as in effect from time to time and approved by the City in which the Premises are located ("Signage Criteria"), and any applicable municipal or other governmental permits and approvals. Tenant acknowledges having received and reviewed a copy of the current Signage Criteria for the Project. Tenant shall be responsible for the cost of any permitted sign, including the fabrication, installation, maintenance and removal thereof. If Tenant fails to maintain its sign, or if Tenant fails to remove same upon termination of this Lease and repair any damage caused by such removal, Landlord may do so at Tenant's expense.

**SECTION 5.3.** HAZARDOUS MATERIALS.

(a) For purposes of this Lease, the term "Hazardous Materials" includes (i) any "hazardous materials" as defined in Section 25501(n) of the California Health and Safety Code, (ii) any other substance or matter which results in liability to any person or entity from exposure to such substance or matter under any statutory or common law theory, and (iii) any substance or matter which is in excess of permitted levels set forth in any federal, California or local law or regulation pertaining to any hazardous or toxic substance, material or waste.

(b) Tenant shall not cause or knowingly permit any Hazardous Materials to be brought upon, stored, used, generated, released or disposed of on, under, from or about the Premises (including, without limitation, the soil and groundwater thereunder) without the prior written consent of Landlord. Notwithstanding the foregoing, Tenant shall have the right, without obtaining prior written consent of Landlord, to utilize within the Premises standard office products that may contain Hazardous Materials (such as photocopy toner, "White Out", and the like), provided however, that (i) Tenant shall maintain such products in their original retail packaging, shall follow all instructions on such packaging with respect to the storage, use and disposal of such products, and shall otherwise comply with all applicable laws with respect to such products, and (ii) all of the other terms and provisions of this Section 5.3 shall apply with respect to Tenant's storage, use and disposal of all such products. Landlord may, in its sole discretion, place such conditions as Landlord deems appropriate with respect to any such Hazardous Materials, and may further require that Tenant demonstrate that any such Hazardous Materials are necessary or useful to Tenant's business and will be generated, stored, used and disposed of in a manner that complies with all applicable laws and regulations pertaining thereto and with good business practices. Tenant understands that Landlord may utilize an environmental consultant to assist in determining conditions of approval in connection with the storage, generation, release, disposal or use of Hazardous Materials by Tenant on or about the Premises, and/or to conduct periodic inspections of the storage, generation, use, release and/or disposal of such Hazardous Materials by Tenant on and from the Premises, and Tenant agrees that any reasonable costs incurred by Landlord in connection therewith shall be reimbursed by Tenant to Landlord as additional rent hereunder upon demand if Tenant is in violation of its obligations under this Section.

(c) Prior to the execution of this Lease, Tenant shall complete, execute and deliver to Landlord an Environmental Questionnaire and Disclosure Statement (the "Environmental Questionnaire") in the form of Exhibit B attached hereto. The completed Environmental Questionnaire shall be deemed incorporated into this Lease for all purposes, and Landlord shall be entitled to rely fully on the information contained therein. On each anniversary of the Commencement Date until the expiration or sooner termination of this Lease, Tenant shall disclose to Landlord in writing the names and amounts of all Hazardous Materials which were stored, generated, used, released and/or disposed of on, under or about the Premises for the twelve-month period prior thereto, and which Tenant desires to store, generate, use, release and/or dispose of on, under or about the Premises for the succeeding twelve-month period. In addition, to the extent Tenant is permitted to utilize Hazardous Materials upon the Premises, Tenant shall promptly provide Landlord with complete and legible copies of all the following environmental documents relating thereto: reports filed pursuant to any self-reporting requirements; permit applications, permits, monitoring reports, workplace exposure and community exposure warnings or notices and all other reports, disclosures, plans or documents (even those which may be characterized as confidential) relating to water discharges, air pollution, waste generation or disposal, and underground storage tanks for Hazardous Materials; orders, reports, notices, listings and correspondence (even those which may be considered confidential) of or concerning the release, investigation of, compliance, cleanup, remedial and corrective actions, and abatement of Hazardous Materials; and all complaints, pleadings and other legal documents filed by or against Tenant related to Tenant's use, handling, storage, release and/or disposal of Hazardous Materials.

(d) Landlord and its agents shall have the right, but not the obligation, to inspect, sample and/or monitor the Premises and/or the soil or groundwater thereunder at any time to determine whether Tenant is complying with the terms of this Section 5.3, and in connection therewith Tenant shall provide Landlord with full access to all relevant facilities, records and personnel after reasonable prior notice under the circumstances except in the event of an emergency when no advance notice shall be required. If Tenant is not in compliance with any of the provisions of this Section 5.3, or in the event of a release of any Hazardous Material on, under or about the Premises caused or knowingly permitted by Tenant, its agents, employees, contractors, licensees or invitees, Landlord and its agents shall have the right, but not the obligation, without limitation upon any of Landlord's other rights and remedies under this Lease, to immediately enter upon the Premises without notice and to discharge Tenant's obligations under this Section 5.3 at Tenant's expense, including, without limitation, the taking of emergency or long-term remedial action. Landlord and its agents shall endeavor to minimize interference with Tenant's business in connection therewith, but shall not be liable for any such interference. In addition, Landlord, at Tenant's expense, shall have the right, but not the obligation, to join and participate in any legal proceedings or actions initiated in connection with any claims arising out of the storage, generation, use, release and/or disposal by Tenant or its agents, employees, contractors, licensees or invitees of Hazardous Materials on, under, from or about the Premises.

(e) If the presence of any Hazardous Materials on, under, from or about the Premises or the Project caused or knowingly permitted by Tenant or its agents, employees, contractors, licensees or invitees results in (i) injury to any person, (ii) injury to or any contamination of the Premises or the Project, or (iii) injury to or contamination of any real or personal property wherever situated, Tenant, at its expense, shall promptly take all actions necessary to return the Premises and the Project and any other affected real or personal property owned by Landlord to the condition existing prior to the introduction of such Hazardous Materials and to remedy or repair any such injury or contamination, including without limitation, any cleanup, remediation, removal, disposal, neutralization or other treatment of any such Hazardous Materials. Notwithstanding the foregoing, Tenant shall not, without Landlord's prior written consent, take any remedial action in response to the presence of any Hazardous Materials on, under or about the Premises or the Project or any other affected real or personal property owned by Landlord or enter into any similar agreement, consent, decree or other compromise with any governmental agency with respect to any Hazardous Materials claims; provided however, Landlord's prior written consent shall not be necessary in the event that the presence of Hazardous Materials on, under or about the Premises or the Project or any other affected real or personal property owned by Landlord (i) imposes an immediate threat to the health, safety or welfare of any individual or (ii) is of such a nature that an immediate remedial response is necessary and it is not possible to obtain Landlord's consent before taking such action.

To the fullest extent permitted by law, Tenant shall indemnify, hold harmless, protect and defend (with attorneys acceptable to Landlord) Landlord and any successors to all or any portion of Landlord's interest in the Premises and the Project and any other real or personal property owned by Landlord from and against any and all liabilities, losses, damages, diminution in value, judgments, fines, demands, claims, recoveries, deficiencies, costs and expenses (including, without limitation, attorneys' fees, court costs and other professional expenses), whether foreseeable or unforeseeable, arising directly or indirectly out of the use, generation, storage, treatment, release, on- or off-site disposal or transportation of Hazardous Materials on, into, from, under or about the Premises, the Buildings and the Project and any other real or personal property owned by Landlord caused or knowingly permitted by Tenant, its agents, employees, contractors, licensees or invitees, specifically including, without limitation, the cost of any required or necessary repair, restoration, cleanup or detoxification of the Premises, the Buildings and the Project and any other real or personal property owned by Landlord, and the preparation of any closure or other required plans, whether or not such action is required or necessary during the Term or after the expiration of this Lease. If Landlord at any time discovers that Tenant or its agents, employees, contractors, licensees or invitees may have caused or knowingly permitted the release of a Hazardous Material on, under, from or about the Premises or the Project or any other real or personal property owned by Landlord, Tenant shall, at Landlord's request, immediately prepare and submit to Landlord a comprehensive plan, subject to Landlord's approval, specifying the actions to be taken by Tenant to return the Premises or the Project or any other real or personal property owned by Landlord to the condition existing prior to the introduction of such Hazardous Materials. Upon Landlord's approval of such cleanup plan, Tenant shall, at its expense, and without limitation of any rights and remedies of Landlord under this Lease or at law or in equity, immediately implement such plan and proceed to cleanup such Hazardous Materials in accordance with all applicable laws and as required by such plan and this Lease. The provisions of this subsection (e) shall expressly survive the expiration or sooner termination of this Lease.

(f) Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, certain facts relating to Hazardous Materials at the Project known by Landlord to exist as of the date of this Lease, as more particularly described in Exhibit C attached hereto. Tenant shall have no liability or responsibility with respect to the Hazardous Materials facts described in Exhibit C, nor with respect to any Hazardous Materials which Tenant proves were not caused or knowingly permitted by Tenant, its agents, employees, contractors, licensees or invitees. Notwithstanding the preceding two sentences, Tenant agrees to notify its agents, employees, contractors, licensees, and invitees of any exposure or potential exposure to Hazardous Materials at the Premises that Landlord brings to Tenant's attention.

## ARTICLE VI. COMMON AREAS; SERVICES

SECTION 6.1. UTILITIES AND SERVICES. Tenant shall be responsible for and shall pay promptly, directly to the appropriate supplier, all charges for water, gas, electricity, sewer, heat, light, power, telephone, refuse pickup, janitorial service, interior landscape maintenance and all other utilities, materials and services furnished directly to Tenant or the Premises or used by Tenant in, on or about the Premises during the Term, together with any taxes thereon. If any utilities or services are not separately metered or assessed to Tenant, Landlord shall make a reasonable determination of Tenant's proportionate share of the cost of such utilities and services and Tenant shall pay such amount to Landlord, as an item of additional rent, within fifteen (15) days after receipt of Landlord's statement or invoice therefor. Alternatively, Landlord may elect to include such cost in the definition of Building Costs in which event Tenant shall pay Tenant's proportionate share of such costs in the manner set forth in Section 4.2. Landlord shall not be liable for damages or otherwise for any failure or interruption of any utility or other service furnished to the Premises, and no such failure or interruption shall be deemed an eviction or entitle Tenant to terminate this Lease or withhold or abate any rent due hereunder. Landlord shall at all reasonable times have free access to all electrical and mechanical installations of Landlord. Notwithstanding the foregoing, if as a result of the actions of Landlord, its agents, contractors or employees or the inactions of Landlord if Landlord is required to act under this Lease, for more than three (3) consecutive business days following written notice to Landlord there is no HVAC service or electricity service to all or a portion of the Premises, or such an interruption of other essential utilities and building services, such as fire protection or water, so that all or a portion of the Premises cannot be used by Tenant, then Tenant's obligation to pay Basic Rent and Operating Expenses (or an equitable portion of such Basic Rent and Operating Expenses to the extent that less than all of the Premises are affected) shall thereafter be abated until the Premises are again useable by Tenant; provided, however, that if Landlord is diligently pursuing the repair of such utilities or services and Landlord provides substitute services reasonably suitable for Tenant's purposes, as for example, bringing in portable air-conditioning equipment, then there shall not be an abatement of Basic Rent or Operating Expenses. Any disputes concerning the foregoing shall be resolved by JAMS arbitration pursuant to Section 22.7 of this Lease. The foregoing provisions shall not apply in case of damage to, or destruction of, the Premises, which shall be governed by the provisions of Article XI of the Lease.

SECTION 6.2. OPERATION AND MAINTENANCE OF COMMON AREAS. During the Term, Landlord shall operate, maintain and repair all Common Areas within the Buildings and the Project. The term "Common Areas" shall mean all areas within the exterior boundaries of the Buildings and other buildings in the Project which are not held for exclusive use by persons entitled to occupy space, and all other appurtenant areas and improvements provided by Landlord for the common use of Landlord and tenants and their respective employees and invitees, including, without limitation, parking areas and structures, driveways, sidewalks, landscaped and planted areas, hallways and interior stairwells not located within the premises of any tenant, common electrical rooms and roof access entries, common entrances and lobbies, elevators, and restrooms not located within the premises of any tenant.