**Irvine Technology Center**
THE IRVINE COMPANY   Irvine, California

340 Commerce

FIRST FLOOR
26,680 SF

340 Commerce Premises

120'
223'
30'
20' Typical Bay

FRONT ENTRANCE
LOBBY

BUILDING TABULATION
First Floor:        26,680 s.f.
Second Floor:   28,680 s.f.
Total Area:       55,360 s.f.

0  30  60

EXHIBIT A

# Irvine Technology Center
THE IRVINE COMPANY  Irvine, California

## 350 Commerce

**SECOND FLOOR**
350 Commerce Premises
26,680 SF

Dimensions: 120' × 223'

**BUILDING TABULATION**
First Floor: 26,680 s.f.
Second Floor: 26,680 s.f.
Total Area: 53,360 s.f.

Scale: 0 — 30 — 60

EXHIBIT A-1



EXHIBIT A-2



EXHIBIT A-3

**EXHIBIT B**

**IRVINE INDUSTRIAL COMPANY**
**HAZARDOUS MATERIALS SURVEY FORM**

The purpose of this form is to obtain information regarding the use of hazardous substances on Irvine Industrial Company property. Prospective tenants and contractors should answer the questions in light of their proposed operations on the premises. Existing tenants and contractors should answer the questions as they relate to ongoing operations on the premises and should update any information previously submitted.

If additional space is needed to answer the questions, you may attach separate sheets of paper to this form. When completed, the form should be sent to the following address:

Insignia/ESG of California, Inc.
1 Ada, Suite 270
Irvine, CA 92618

Your cooperation in this matter is appreciated. If you have any questions, please do not hesitate to call [insert name of Property Manager] at [insert phone number] for assistance.

1. **GENERAL INFORMATION**

    Name of Responding Company: _____

    Check all that apply: Tenant ( )   Contractor ( )   Prospective ( )   Existing ( )

    Mailing Address: _____

    Contact Person & Title: _____

    Telephone Number: (____) _____

    Address of Leased Premises: _____
    Length of Lease or Contract Term: _____

    Describe the proposed operations to take place on the property, including principal products manufactured or services to be conducted. Existing tenants and contractors should describe any proposed changes to ongoing operations.

    _____
    _____
    _____

2. **STORAGE OF HAZARDOUS MATERIALS**

    2.1   Will any hazardous materials be used or stored on-site?

    | | | |
    |---|---|---|
    | Wastes | Yes ( ) | No ( ) |
    | Chemical Products | Yes ( ) | No ( ) |
    | Biological Hazards/ | Yes ( ) | No ( ) |
    | Infectious Wastes | Yes ( ) | No ( ) |
    | Radioactive Materials | Yes ( ) | No ( ) |

    2.2   List any hazardous materials to be used or stored, the quantities that will be on-site at any given time, and the location and method of storage (e.g., bottles in storage closet on the premises).

    | Hazardous Materials | Location and Method of Storage | Quantity |
    |---|---|---|
    | _____ | _____ | _____ |
    | _____ | _____ | _____ |
    | _____ | _____ | _____ |

2.3 Is any underground storage of hazardous substances proposed or currently conducted on the premises? Yes ( ) No ( )

If yes, describe the materials to be stored, and the size and construction of the tank. Attach copies of any permits obtained for the underground storage of such substances.

_____
_____

3. **SPILLS**

3.1 During the past year, have any spills occurred on the premises? Yes ( ) No ( )
If so, please describe the spill and attach the results of any testing conducted to determine the extent of such spills.

3.2 Were any agencies notified in connection with such spills? Yes ( ) No ( )
If so, attach copies of any spill reports or other correspondence with regulatory agencies.

3.3 Were any clean-up actions undertaken in connection with the spills? Yes ( ) No ( )
If so, briefly describe the actions taken. Attach copies of any clearance letters obtained from any regulatory agencies involved and the results of any final soil or groundwater sampling done upon completion of the clean-up work.

4. **WASTE MANAGEMENT**

4.1 List the waste, if any, generated or to be generated at the premises, whether it is as hazardous waste, biological or radioactive hazard, its hazard class and the quantity generated on a monthly basis.

| Waste | Hazard Class | Quantity/Month |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

4.2 Describe the method(s) of disposal for each waste. Indicate where and how often disposal will take place. _____
_____
_____

4.3 Is any treatment or processing of hazardous, infectious or radioactive wastes currently conducted or proposed to be conducted at the premises? Yes ( ) No ( )

If yes, please describe any existing or proposed treatment methods. _____
_____
_____

4.4 Attach copies of any hazardous waste permits or licenses issued to your company with respect to its operations on the premises.

5. **WASTEWATER TREATMENT/DISCHARGE**

5.1 Do you discharge industrial wastewater to:

___ storm drain?        ___ sewer?
___ surface water?      ___ no industrial discharge

5.2 Is your industrial wastewater treated before discharge? Yes ( ) No ( )

If yes, describe the type of treatment conducted.

5.3 Attach copies of any wastewater discharge permits issued to your company with respect to its operations on the premises.

6. **AIR DISCHARGES**

6.1 Do you have any air filtration systems or stacks that discharge into the air? Yes ( ) No ( )

6.2 Do you operate any equipment that require air emissions permits? Yes ( ) No ( )

6.3 Attach copies of any air discharge permits pertaining to these operations.

7. **HAZARDOUS MATERIALS DISCLOSURES**

7.1 Does your company handle an aggregate of at least 500 pounds, 55 gallons or 200 cubic feet of hazardous material at any given time? If so, state law requires that you prepare a hazardous materials management plan. Yes ( ) No ( )

7.2 Has your company prepared a hazardous materials management plan ('business plan') pursuant to state and Orange County Fire Department requirements? Yes ( ) No ( ) If so, attach a copy of the business plan.

7.3 Are any of the chemicals used in your operations regulated under Proposition 65? Yes ( ) No ( )

If so, describe the actions taken, or proposed actions to be taken, to comply with Proposition 65 requirements.

7.4 Is your company subject to OSHA Hazard Communication Standard Requirements? Yes ( ) No ( )

If so, describe the procedures followed to comply with these requirements.

8. **ENFORCEMENT ACTIONS, COMPLAINTS**

8.1 Has your company ever been subject to any agency enforcement actions, administrative orders, or consent decrees? Yes ( ) No ( )

If so, describe the actions and any continuing compliance obligations imposed as a result of these actions.

8.2 Has your company ever received requests for information, notice or demand letters, or any other inquiries regarding its operations? Yes ( ) No ( )

8.3 Have there ever been, or are there now pending, any lawsuits against your company regarding any environmental or health and safety concerns? Yes ( ) No ( )

8.4 Has an environmental audit ever been conducted at your company's current facility? Yes ( ) No ( )

If so, discuss the results of the audit.

8.5 Have there been any problems or complaints from neighbors at your company's current facility? Yes ( ) No ( )

_____
_____
_____

By:_____

    Its:_____
    Date:_____


By:_____

    Its:_____
    Date:_____

## EXHIBIT C

## LANDLORD'S DISCLOSURES

## SPECTRUM

The capitalized terms used and not otherwise defined in this Exhibit shall have the same definitions as set forth in the Lease. The provisions of this Exhibit shall supersede any inconsistent or conflicting provisions of the Lease.

1. Landlord has been informed that the El Toro Marine Corps Air Station (MCAS) has been listed as a Federal Superfund site as a result of chemical releases occurring over many years of occupancy. Various chemicals including jet fuel, motor oil and solvents have been discharged in several areas throughout the MCAS site. A regional study conducted by the Orange County Water District has estimated that groundwaters beneath more than 2,900 acres have been impacted by Trichloroethlene (TCE), an industrial solvent. There is a potential that this substance may have migrated into the ground water underlying the Premises. The U.S. Environmental Protection Agency, the Santa Ana Region Quality Control Board, and the Orange County Health Care Agency are overseeing the investigation/cleanup of this contamination. To the Landlord's current actual knowledge, the ground water in this area is used for irrigation purposes only, and there is no practical impediment to the use or occupancy of the Premises due to the El Toro discharges.

## EXHIBIT D

### TENANT'S INSURANCE

The following standards for Tenant's insurance shall be in effect at the Premises. Landlord reserves the right to adopt reasonable nondiscriminatory modifications and additions to those standards. Tenant agrees to obtain and present evidence to Landlord that it has fully complied with the insurance requirements.

1.  Tenant shall, at its sole cost and expense, commencing on the date Tenant is given access to the Premises for any purpose and during the entire Term, procure, pay for and keep in full force and effect: (i) commercial general liability insurance with respect to the Premises and the operations of or on behalf of Tenant in, on or about the Premises, including but not limited to personal injury, owned and nonowned automobile, blanket contractual, independent contractors, broad form property damage (with an exception to any pollution exclusion with respect to damage arising out of heat, smoke or fumes from a hostile fire), fire and water legal liability, products liability (if a product is sold from the Premises), liquor law liability (if alcoholic beverages are sold, served or consumed within the Premises), and severability of interest, which policy(ies) shall be written on an "occurrence" basis and for not less than the amount set forth in Item 13 of the Basic Lease Provisions, with a combined single limit (with a $50,000 minimum limit on fire legal liability) per occurrence for bodily injury, death, and property damage liability, or the current limit of liability carried by Tenant, whichever is greater, and subject to such increases in amounts as Landlord may reasonably determine from time to time; (ii) workers' compensation insurance coverage as required by law, together with employers' liability insurance; (iii) with respect to improvements, alterations, and the like required or permitted to be made by Tenant under this Lease, builder's all-risk insurance, in an amount equal to the replacement cost of the work; (iv) insurance against fire, vandalism, malicious mischief and such other additional perils as may be included in a standard "all risk" form in general use in Orange County, California, insuring Tenant's alterations, improvements, trade fixtures, furnishings, equipment and items of personal property of Tenant located in the Premises, in an amount equal to not less than ninety percent (90%) of their actual replacement cost (with replacement cost endorsement); and (v) business interruption insurance in amounts satisfactory to cover one (1) year of loss. In no event shall the limits of any policy be considered as limiting the liability of Tenant under this Lease.

2.  In the event Landlord consents to Tenant's use, generation or storage of Hazardous Materials on, under or about the Premises pursuant to Section 5.3 of this Lease, Landlord shall have the continuing right to require Tenant, at Tenant's sole cost and expense (provided the same is available for purchase upon commercially reasonable terms), to purchase insurance specified and approved by Landlord, with coverage not less than Five Million Dollars ($5,000,000.00), insuring (i) any Hazardous Materials shall be removed from the Premises, (ii) the Premises shall be restored to a clean, healthy, safe and sanitary condition, and (iii) any liability of Tenant, Landlord and Landlord's officers, directors, shareholders, agents, employees and representatives, arising from such Hazardous Materials.

3.  All policies of insurance required to be carried by Tenant pursuant to this Exhibit D containing a deductible exceeding Ten Thousand Dollars ($10,000.00) per occurrence must be approved in writing by Landlord prior to the issuance of such policy. Tenant shall be solely responsible for the payment of all deductibles under insurance policies carried by Tenant.

4.  All policies of insurance required to be carried by Tenant pursuant to this Exhibit D shall be written by responsible insurance companies authorized to do business in the State of California and with a Best's rating of not less than "A- X" subject to final acceptance and approval by Landlord. Any insurance required of Tenant may be furnished by Tenant under any blanket policy carried by it or under a separate policy, so long as (i) the Premises are specifically covered (by rider, endorsement or otherwise), (ii) the limits of the policy are applicable on a "per location" basis to the Premises and provide for restoration of the aggregate limits, and (iii) the policy otherwise complies with the provisions of this Exhibit D. A true and exact copy of each paid up policy evidencing the insurance (appropriately authenticated by the insurer) or a certificate of insurance, certifying that the policy has been issued, provides the coverage required by this Exhibit D and contains the required provisions, shall be delivered to Landlord prior to the date Tenant is given the right of possession of the Premises. Proper evidence of the renewal of any insurance coverage shall also be delivered to Landlord not less than thirty (30) days prior to the expiration of the coverage.

5.  Each policy evidencing insurance required to be carried by Tenant pursuant to this Exhibit D shall contain the following provisions and/or clauses satisfactory to Landlord: (i) a provision that the policy and the coverage provided shall be primary and that any coverage carried by Landlord shall be noncontributory with respect to any policies carried by Tenant except as to workers' compensation insurance; (ii) a provision including Landlord, the Additional Insureds identified in Item 11 of the Basic Lease Provisions, and any other parties in interest designated by Landlord as an additional insured, except as to workers' compensation insurance; (iii) with respect to the all-risk, business interruption and workers' compensation insurance, a waiver by the insurer of any right to subrogation against Landlord, its agents, employees, contractors and representatives which arises or might arise by reason of any payment under the policy or by reason of any act or omission of Landlord, its agents, employees, contractors or representatives; and (iv) a provision that the insurer will not cancel or change the coverage provided by the policy without first giving Landlord thirty (30) days prior written notice.

6.  In the event that Tenant fails to procure, maintain and/or pay for, at the times and for the durations specified in this Exhibit D, any insurance required by this Exhibit D, or fails to carry insurance required by any governmental authority, Landlord may, after written notice to Tenant, at its election procure that insurance and pay the premiums, in which event Tenant shall repay Landlord all sums paid by Landlord, together with interest at the maximum rate permitted by law and any related costs or expenses incurred by Landlord, within ten (10) days following Landlord's written demand to Tenant.

## EXHIBIT E

## RULES AND REGULATIONS

This Exhibit sets forth the rules and regulations governing Tenant's use of the Premises leased to Tenant pursuant to the terms, covenants and conditions of the Lease to which this Exhibit is attached and therein made part thereof. In the event of any conflict or inconsistency between this Exhibit and the Lease, the Lease shall control.

1. Tenant shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall which may appear unsightly from outside the Premises.

2. The walls, walkways, sidewalks, entrance passages, courts and vestibules shall not be obstructed or used for any purpose other than ingress and egress of pedestrian travel to and from the Premises, and shall not be used for loitering, or to display, store or place any merchandise, equipment or devices, or for any other purpose. The walkways, entrance passageways, courts, vestibules and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the reasonable judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. No tenant or employee or invitee of any tenant shall be permitted upon the roof of the Building.

3. No awnings or other projection shall be attached to the outside walls of the Building. No security bars or gates, curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises without the prior written consent of Landlord. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the express written consent of Landlord.

4. Except for usual and customary mounting or hanging of pictures, signs, white boards or other items of decoration, Tenant shall not mark, nail, paint, drill into, or in any way deface any part of the Premises or the Building. Tenant shall not lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by Landlord in writing. The expense of repairing any damage to wall surfaces or removal of any wall or floor covering shall be borne by Tenant.

5. The toilet rooms, urinals, wash bowls and other plumbing apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, caused it.

6. Landlord shall direct electricians as to the manner and location of any future telephone wiring. No boring or cutting for wires will be allowed without the prior consent of Landlord. The locations of the telephones, call boxes and other office equipment affixed to the Premises shall be subject to the prior written approval of Landlord.

7. The Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the permitted use of the Premises. No exterior storage shall be allowed at any time without the prior written approval of Landlord. The Premises shall not be used for cooking or washing clothes without the prior written consent of Landlord, or for lodging or sleeping or for any immoral or illegal. The foregoing provisions are not intended and shall not be construed to prevent the use of microwave ovens, vending machines, coffee makers and other food preparation appliances as are commonly used in office facilities provided all are used in accordance with the terms of the Lease and applicable law.

8. Tenant shall not make, or permit to be made from within the Premises, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, phonograph, noise, or otherwise. Tenant shall not use, keep or permit to be used, or kept, any foul or obnoxious gas or substance in the Premises or permit or suffer the Premises to be used or occupied in any manner offensive or objectionable to Landlord or other occupants of this or neighboring buildings or premises by reason of any odors, fumes or gases.

9. No animals shall be permitted at any time within the Premises except service animals being used by disabled persons.

10. Tenant shall not use the name of the Building or the Project in connection with or in promoting or advertising the business of Tenant, except as Tenant's address, without the written consent of Landlord. Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Project or its desirability for its intended uses, and upon written notice from Landlord any Tenant shall refrain from or discontinue such advertising.

11. Canvassing, soliciting, peddling, parading, picketing, demonstrating or otherwise engaging in any conduct that unreasonably impairs the value or use of the Premises or the Project are prohibited and each Tenant shall cooperate to prevent the same.

12. No equipment of any type shall be placed on the Premises which in Landlord's opinion exceeds the load limits of the floor or otherwise threatens the soundness of the structure or improvements of the Building.

13. No air conditioning unit or other similar apparatus shall be installed or used by any Tenant without the prior written consent of Landlord.

14. No aerial antenna shall be erected on the roof or exterior walls of the Premises, or on the grounds, without in each instance, the prior written consent of Landlord. Any aerial or antenna so installed without such written consent shall be subject to removal by Landlord at any time without prior notice at the expense of the Tenant, and Tenant shall upon Landlord's demand pay a removal fee to Landlord of not less than $200.00.

15. The entire Premises, including vestibules, entrances, doors, fixtures, windows and plate glass, shall at all times be maintained in a safe, neat and clean condition by Tenant. All trash, refuse and waste materials shall be regularly removed from the Premises by Tenant and placed in the containers at the locations designated by Landlord for refuse collection. All cardboard boxes must be "broken down" prior to being placed in the trash container. All styrofoam chips must be bagged or otherwise contained prior to placement in the trash container, so as not to constitute a nuisance. Pallets may not be disposed of in the trash container or enclosures. The burning of trash, refuse or waste materials is prohibited.

16. Tenant shall use at Tenant's cost a pest extermination contractor as reasonably necessary to keep the Premises free from infestation.

17. All keys for the Premises shall be provided to Tenant by Landlord and Tenant shall return to Landlord any of such keys so provided upon the termination of the Lease. Tenant shall not change locks or install other locks on doors of the Premises, without the prior written consent of Landlord. In the event of loss of any keys furnished by Landlord for Tenant, Tenant shall pay to Landlord the costs thereof.

18. No person shall enter or remain within the Project while intoxicated or under the influence of liquor or drugs. Landlord shall have the right to exclude or expel from the Project any person who, in the absolute discretion of Landlord, is under the influence of liquor or drugs.

Landlord reserves the right to amend or supplement the foregoing Rules and Regulations and to adopt and promulgate additional reasonable and nondiscriminatory rules and regulations applicable to the Premises. Notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to the Tenant.

## EXHIBIT F

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("License") made this _____ day of _____, 199__, by and between The Irvine Company, a Delaware corporation ("Licensor"), and _____ ("Licensee").

### RECITALS

Licensor is the owner of certain real property, located at _____, Irvine, California (the "Building"). Licensor and Licensee have entered into a lease (the "Lease") for space in the Building more particularly described as _____. The parties desire to provide for the use by Licensee of a portion of the roof of the Building as provided below.

### TERMS AND CONDITIONS

1. **Licensed Area**: For valuable consideration, receipt of which is hereby acknowledged and the covenants and conditions to be observed and performed by Licensee, Licensor hereby grants to Licensee a license and permission to enter upon the areas shown on Exhibit A of this License (the " License Area") to install, operate and maintain one satellite dish ("Dish") on the roof of the Building in the location designated by Licensor together with required cabling, wires and conduits as may be required (the Dish and related conduits and cabling are referred to as the "Equipment") in order to serve Tenant in connection with its business activities conducted in Premises. Licensor reserves the right upon reasonable notice to Licensee to require either (a) the relocation of all Equipment installed by Licensee pursuant to this License; or (b) the removal of any or all of such Equipment should Licensor determine that its presence may result in damage to the Building and that Licensee has not made satisfactory arrangements to protect Licensor therefrom.

2. **Term**: The term of this License shall be coterminous with the Lease.

3. **Use**: Licensee shall use the License Areas only for the installation, operation and maintenance of Equipment the height, appearance, installation and maintenance procedures for which have been approved in writing by Licensor. Licensee may have access to the License Area during normal business hours and at other times by providing Licensor with reasonable prior notice and by reimbursing Licensor for any expenses incurred by Licensor in connection therewith.

4. **Rental**. Licensee shall pay no license fee or additional rent for the use and occupancy of the License Area during the initial Term of the Lease.

5. **Licensee's Operations**: During the term of this License, the Licensed Area and all Equipment placed and maintained thereon shall be used by the Licensee for the use specified and for no other use or purpose. Licensee shall not use or permit any other person to use the License Area, or any part thereof, for any improper or offensive use or to constitute a nuisance and Licensee shall at all times conform to and cause all persons using any part of the License Area to comply with all applicable laws, rules and regulations and covenants, conditions and restrictions from time to time applicable thereto and to all operations thereon.

Licensee shall require its employees, when using the License Area, to stay within the immediate confines thereof. In addition, in the event a cable television system or other communication system is operating in the area, Licensee shall at all times during the term of the License conduct its operations so as to ensure that such systems shall not be subjected to harmful interference as a result of such operations by Licensee. Upon notification from Licensor of any such interference, Licensee agrees to immediately take the necessary steps to correct such situation, and Licensee's failure to do so shall be deemed a default under the terms of this License.

During the term of this License, Licensee shall comply with any standards promulgated by applicable governmental authorities or otherwise reasonably established by Licensor regarding the generation of electromagnetic fields. Should Licensor determine in good faith at any time that the Dish poses a health or safety hazard to occupants of the Building, Licensor may require Licensee to remove the Dish or make other arrangements reasonably satisfactory to Licensor. Any claim or liability resulting from the use of the Dish shall be subject to the indemnification obligations set forth in the Paragraph below entitled "Licensor's Nonliability."

6. **Removal**: Upon the expiration or earlier termination of this License, Licensee shall remove the Dish and the other Equipment installed by it and shall restore the License Area to their original condition.

7. **Licensor's Nonliability:** Licensor shall not be liable for any loss, damage or injury of any kind whatsoever to the property of Licensee or the property or person, including death, of any of Licensee's employees, agents or invitees or of any other person whomsoever caused by any use of the License Area or occasioned by the failure on the part of Licensee to maintain said License Area in safe condition, or by any act or omission of Licensee or of any of Licensee's employees, agents or invitees, or arising from any other cause whatsoever; and Licensee, as a material part of the consideration of this License, hereby waives on its behalf all claims and demands against Licensor for any such loss, damage or injury suffered by Licensee, and hereby agrees to indemnify, defend and save Licensor free and harmless from liability for any such loss, damage or injury of third persons, and from all costs, expenses and charges arising therefrom or in connection therewith, including reasonable attorneys' fees. In addition, Licensee agrees to reimburse Licensor for the cost of repairing any damage to the Building caused by the exercise of Licensee's rights hereunder.

8. **Liens:** Licensee shall not permit to be enforced against the License Area any mechanics', materialmen's, contractors' or other liens arising from, or any claims for damage growing out of, any work of installation, repair or alteration as herein authorized or otherwise arising (except from the actions of Licensor) and Licensee shall pay or cause to be paid all of said liens and claims before any action is brought to enforce the same against Licensor or the License Area; and Licensee agrees to indemnify and hold Licensor and the License Area free and harmless from all liability for any and all such liens and claims and all costs and expenses in connection therewith.

9. **Taxes:** During the term of this License, Licensor shall pay all taxes attributable to any Equipment installed in the License Area by or at the request of Licensee.

10. **Assignment:** This License shall not be assignable in whole or in part, and any attempted assignment thereof, without the consent of Licensor, shall immediately terminate this License.

11. **Insurance/Indemnity:** The insurance and indemnity provisions of the Lease shall govern Licensee's use of the License Area. In the event the exercise of Licensee's rights hereunder result in any increase in Licensor's insurance rates on the Building, Licensee shall promptly following demand reimburse Licensor for such additional expenses incurred by Licensor.

12. **Remedies:** Should Licensee default in the performance of or breach any covenant or condition on Licensee's part to be kept and performed under the Lease or this License, then in any such event Licensor may, at its option, without prejudice to any other right or remedy it may have, terminate this License hereunder by giving Licensee written notice of such termination, and upon such termination all rights of Licensee shall cease and end.

13. **Covenants and Conditions:** This License and each and all of the covenants and conditions hereof shall inure to the benefit of and shall bind the successors in interest of Licensor and subject to the restrictions set forth in the above Paragraph entitled "Assignment," the successors and assigns of Licensee.

14. **Notices:** Any notices or other communications between the parties shall be sent in the same manner and to the same persons or entities as set forth in the Lease.

The parties hereto have executed this License as of the date first above written.

LICENSOR:                                          LICENSEE:

_____                    _____

_____                    _____

By:_____                   By:_____
    Name:_____                       Name:_____
    Title:_____                       Title:_____

By:_____                   By:_____
    Name:_____                       Name:_____
    Title:_____                       Title:_____

## EXHIBIT X

## INDUSTRIAL WORK LETTER

## DOLLAR ALLOWANCE

The Tenant Improvement work (herein "Tenant Improvements") shall consist of any work, including work in place as of the date hereof, required to complete the Premises pursuant to the approved Working Drawings and Specifications (as hereinafter defined). All of the Tenant Improvement work shall be performed by a contractor selected by Landlord in accordance with the procedures and requirements set forth below. Landlord shall obtain bids from at least three (3) contractors one of which may be be JLC Construction subject to Landlord's approval after receipt of sufficient background information. When requesting bids, Landlord shall request bid alternates for shortened construction schedules. Landlord shall consult with Tenant regarding its selection of contractor but the final determination shall be up to Landlord. When analyzing bid alternates, Landlord agrees to allow Tenant to apply up to Fifty Cents ($.50) per useable square foot of Landlord's Contribution to expedite construction. Any cost to expedite construction in excess of that amount shall be at Tenant's sole cost and expense. Landlord shall select the lowest qualified bidder taking into consideration not only the price of the work to be performed but also the time for completion. In the event Landlord selects other than the lowest bidder, it shall do so based on commercially reasonable factors which it shall demonstrate to Tenant.

I.   ARCHITECTURAL AND CONSTRUCTION PROCEDURES.

   A.   Tenant and Landlord have approved, or shall approve within the time period set forth below, both (i) a detailed space plan for the Premises, prepared by Landlord's architect, which includes interior partitions, ceilings, interior finishes, interior doors, suite entrance, floor coverings, window coverings, lighting, electrical and telephone outlets, plumbing connections, heavy floor loads and other special requirements ("Preliminary Plan"), and (ii) an estimate, prepared by Landlord's contractor, of the cost for which Landlord will complete or cause to be completed the Tenant Improvements ("Preliminary Cost Estimate"). Tenant shall approve or disapprove each of the Preliminary Plan and the Preliminary Cost Estimate by signing copies of the appropriate instrument and delivering same to Landlord within five (5) days of its receipt by Tenant. If Tenant disapproves any matter, Tenant shall specify in detail the reasons for disapproval and Landlord shall attempt to modify the Preliminary Plan and the Preliminary Cost Estimate to incorporate Tenant's suggested revisions in a mutually satisfactory manner. In no event, however, shall Tenant have the right to make additions to the Preliminary Plan as part of its approval thereof which would increase the improvements to be paid for by "Landlord's Contribution" (as hereinafter defined), it being understood and agreed that the Preliminary Plan submitted by Landlord's architect is intended to include all improvements desired by Tenant using Landlord's "Standards" (as hereinafter defined), whether or not the full amount of Landlord's Contribution would be required to complete construction of the improvements as shown in the Preliminary Plan. Notwithstanding the foregoing, Landlord agrees that Tenant shall have the right to make modifications, additions or Changes to an approved Preliminary Plan or Working Drawings and Specifications, to incorporate additional Standards, and to use up to Fifty Cents ($.50) per rentable square foot of Landlord's Contribution to pay the cost of any such modifications, additions or Changes. In all events, Tenant shall approve in all respects a Preliminary Plan and Preliminary Cost Estimate not later than the date set forth in Item 15 of the Basic Lease Provisions ("Plan Approval Date"), it being understood that Tenant's failure to do so shall constitute a "Tenant Delay" for purposes of this Lease.

   B.   On or before the Plan Approval Date, Tenant shall provide in writing to Landlord or Landlord's architect all specifications and information requested by Landlord for the preparation of final construction documents and costing, including without limitation Tenant's final selection of wall and floor finishes, complete specifications and locations (including load and HVAC requirements) of Tenant's equipment, and details of all "Non-Standard Improvements" (as defined below) to be installed in the Premises (collectively, "Programming Information"). Tenant's failure to provide the Programming Information by the Plan Approval Date shall constitute a Tenant Delay for purposes of this Lease. Tenant understands that final construction documents for the Tenant Improvements shall be predicated on the Programming Information, and accordingly that such information must be accurate and complete.

   C.   Except as specified in the Preliminary Plan or otherwise authorized by Landlord, the Tenant Improvements shall incorporate Landlord's building standard materials and specifications ("Standards"). No deviations from the Standards shall be permitted, provided that Landlord may, in its sole and absolute discretion, authorize in writing one or more of such deviations if requested by Tenant, in which event any excess cost of such deviations shall be part of "Tenant's Contribution" (as hereinafter defined) and Tenant shall be solely responsible for the cost of replacing same with the applicable Standard item(s) upon the expiration or termination of this Lease. Landlord shall in no event be required to approve any deviations from the Standards ("Non-Standard Improvements") if Landlord determines that such improvement (i) is of a lesser quality than the corresponding Standard, (ii) fails to conform to applicable governmental requirements, (iii) requires building services beyond the level normally provided to other tenants, (iv) would delay construction

of the Tenant Improvements beyond the Estimated Commencement Date and Tenant declines to accept such delay in writing as a Tenant Delay, or (v) would have an adverse aesthetic impact from the exterior of the Premises.

D. Upon Tenant's approval of the Preliminary Plan and Preliminary Cost Estimate and delivery of the complete Programming Information, Landlord's architect and engineers shall prepare and deliver to Tenant working drawings and specifications ("Working Drawings and Specifications"), and Landlord's contractor shall prepare a final construction cost estimate ("Final Cost Estimate") for the Tenant Improvements in conformity with the Working Drawings and Specifications. The Final Cost Estimate shall be delivered to Tenant for its approval only if such Estimate exceeds both the approved Preliminary Cost Estimate and the amount of the Landlord's Contribution. Tenant shall have five (5) days from the receipt thereof to approve or disapprove the Working Drawings and Specifications and (if delivered to Tenant) the Final Cost Estimate. Tenant shall not unreasonably withhold or delay its approval, and any disapproval or requested modification shall be limited to items not contained in the approved Preliminary Plan or Preliminary Cost Estimate. Should Tenant disapprove the Working Drawings and Specifications and the Final Cost Estimate, such disapproval shall be accompanied by a detailed list of revisions. Any revision requested by Tenant and accepted by Landlord shall be incorporated into a revised set of Working Drawings and Specifications and Final Cost Estimate, and Tenant shall approve same in writing within five (5) days of receipt without further revision. Tenant's failure to comply in a timely manner with any of the requirements of this paragraph shall constitute a Tenant Delay. Without limiting the rights of Landlord for Tenant Delays as set forth herein, in the event Tenant has not approved both the Working Drawings and Specifications and the Final Cost Estimate within sixty (60) days following the date of this Lease, then Landlord may, at its option, elect to terminate this Lease by written notice to Tenant. In the event Landlord elects to effect such a termination, Tenant shall, within ten (10) days following demand by Landlord, pay to Landlord any costs incurred by Landlord in connection with the preparation or review of plans, construction estimates, price quotations, drawings or specifications under this Work Letter and for all costs incurred in the preparation and execution of this Lease, including any leasing commissions.

E. In the event that Tenant requests in writing a revision in the approved Working Drawings and Specifications ("Change"), Landlord shall advise Tenant by written change order as soon as is practical of any increase in the Completion Cost and/or any Tenant Delay such Change would cause. Tenant shall approve or disapprove such change order in writing within two (2) days following its receipt from Landlord. Tenant's approval of such Change shall be accompanied by Tenant's payment of any increase in the Completion Cost in excess of Landlord's Contribution resulting from such Change. Landlord shall have the right to decline Tenant's request for a Change for any of the reasons set forth in Article II.C above for Landlord's disapproval of a Non-Standard Improvement. It is understood that Landlord shall have no obligation to interrupt or modify the Tenant Improvement work pending Tenant's approval of a change order.

F. Notwithstanding any provision in the Lease to the contrary, if Tenant fails to comply with any of the time periods specified in this Work Letter, fails otherwise to approve or reasonably disapprove any submittal within five (5) days, fails to approve in writing both the Preliminary Plan and Preliminary Cost Estimate for the Tenant Improvements by the Plan Approval Date, fails to provide all of the Programming Information requested by Landlord by the Plan Approval Date, fails to approve in writing the Working Drawings and Specifications or the Final Cost Estimate within the time provided herein; requests any Changes, furnishes inaccurate or erroneous specifications or other information, or otherwise delays in any manner the completion of the Tenant Improvements (including without limitation by specifying materials that are not readily available) or the issuance of an occupancy certificate (any of the foregoing being referred to in this Lease as a "Tenant Delay"), then Tenant shall bear any resulting additional construction cost or other expenses, and the Commencement Date of this Lease shall be deemed to have occurred for all purposes, including Tenant's obligation to pay rent, as of the date Landlord reasonably determines that it would have been able to deliver the Premises to Tenant but for the collective Tenant Delays. In no event, however, shall such date be earlier than the Estimated Commencement Date set forth in the Basic Lease Provisions. Notwithstanding the foregoing, no Tenant Delay shall be deemed to have occurred unless and until Landlord has given Tenant written notice of the act or omission which constitutes the basis for such Tenant Delay and such act or omission is not cured within one (1) complete business day after Tenant's receipt of such notice. Should Landlord determine that the Commencement Date should be advanced in accordance with the foregoing, it shall so notify Tenant in writing. Landlord's determination shall be conclusive unless Tenant notifies Landlord in writing, within fifteen (15) days thereafter, of Tenant's election to contest same by arbitration with JAMS in Orange County, California. Pending the outcome of such arbitration proceedings, Tenant shall make timely payment of all rent due under this Lease based upon the Commencement Date set forth in the aforesaid notice from Landlord.

G. Landlord shall permit Tenant and its agents to enter the Premises prior to the Commencement Date of the Lease in order that Tenant may perform any work to be performed by Tenant hereunder through its own contractors, subject to Landlord's prior written approval, and in a manner and upon terms and conditions and at times satisfactory to Landlord's representative. The foregoing license to enter the Premises prior to the Commencement Date is, however, conditioned upon Tenant's contractors and their subcontractors and employees working in harmony and not interfering with the work being performed by Landlord. If at any time

that entry shall cause disharmony or interfere with the work being performed by Landlord, this license may be withdrawn by Landlord upon twenty-four (24) hours written notice to Tenant. That license is further conditioned upon the compliance by Tenant's contractors with all requirements imposed by Landlord on third party contractors, including without limitation the maintenance by Tenant and its contractors and subcontractors of workers' compensation and public liability and property damage insurance in amounts and with companies and on forms satisfactory to Landlord, with certificates of such insurance being furnished to Landlord prior to proceeding with any such entry. The entry shall be deemed to be under all of the provisions of the Lease except as to the covenants to pay rent. Landlord shall not be liable in any way for any injury, loss or damage which may occur to any such work being performed by Tenant, the same being solely at Tenant's risk. In no event shall the failure of Tenant's contractors to complete any work in the Premises extend the Commencement Date of this Lease beyond the date that Landlord has completed its Tenant Improvement work and tendered the Premises to Tenant.

H.    Tenant hereby designates William Dodge, Telephone No. (949) 224-5714, as its representative, agent and attorney-in-fact for the purpose of receiving notices, approving submittals and issuing requests for Changes, and Landlord shall be entitled to rely upon authorizations and directives of such person(s) as if given directly by Tenant. Tenant may amend the designation of its construction representative(s) at any time upon delivery of written notice to Landlord.

II.    **COST OF TENANT IMPROVEMENTS**

A.    Landlord shall complete, or cause to be completed, the Tenant Improvements, at the construction cost shown in the Final Cost Estimate (subject to the provisions of this Work Letter), in accordance with final Working Drawings and Specifications approved by both Landlord and Tenant. Landlord shall pay towards the final construction costs ("Completion Cost") as incurred a maximum of One Million Five Hundred Thirty Two Thousand Five Hundred Dollars ($1,532,500.00) ("Landlord's Contribution"), based on $25.00 per usable square foot of the Premises, and Tenant shall be fully responsible for the remainder ("Tenant's Contribution"). Landlord's Contribution shall only be used for construction and installation of Standards incorporated into a Preliminary Plan approved by Landlord and for other costs outlined below. Tenant shall have no right to receive any credit, refund or allowance of any kind for any unused portion of the Landlord's Contribution nor shall Tenant be allowed to make revisions to an approved Preliminary Plan, Working Drawings and Specifications or request a Change in an effort to apply any unused portion of Landlord's Contribution.

B.    The Completion Cost shall include all costs of Landlord in completing the Tenant Improvements in accordance with the approved Working Drawings and Specifications, including but not limited to the following: (i) payments made to architects, engineers, contractors, subcontractors and other third party consultants in the performance of the work, (ii) salaries and fringe benefits of persons, if any, in the direct employ of Landlord performing any part of the construction work, (iii) permit fees and other sums paid to governmental agencies, and (iv) costs of all materials incorporated into the work or used in connection with the work. The Completion Cost shall also include an administrative/supervision fee to be paid to Landlord or to Landlord's management agent in the amount of five percent (5%) of all such costs.

C.    Prior to start of construction of the Tenant Improvements, Tenant shall pay to Landlord in full the amount of the Tenant's Contribution set forth in the Final Cost Estimate. If the actual Completion Cost of the Tenant Improvements is less than the Final Cost Estimate, any portion of the Tenant's Contribution paid by Tenant but not expended towards the Completion Cost shall be refunded to Tenant in the form of a check payable to Tenant. If the actual Completion Cost is greater than the Final Cost Estimate because of modifications or extras not reflected on the approved Working Drawings and Specifications which are requested by Tenant, or because of Tenant Delays, then Tenant shall be responsible for all such additional costs. The balance of any sums not otherwise paid by Tenant shall be due and payable on or before the Commencement Date of this Lease. If Tenant defaults in the payment of any sums due under this Work Letter, Landlord shall (in addition to all other remedies) have the same rights as in the case of Tenant's failure to pay rent under the Lease.



EXHIBIT Y



EXHIBIT Y-1

EXHIBIT X-1

INDUSTRIAL WORK LETTER

DOLLAR ALLOWANCE

The Tenant Improvement work (herein "Tenant Improvements") shall consist of any work, including work in place as of the date hereof, required to complete Suites 100 and 250 pursuant to the approved Working Drawings and Specifications (as hereinafter defined). All of the Tenant Improvement work shall be performed by a contractor selected by Landlord in accordance with the procedures and requirements set forth below. Landlord shall obtain bids from at least three (3) contractors. Landlord shall consult with Tenant regarding its selection of contractor but the final determination shall be up to Landlord. Landlord shall select the lowest qualified bidder taking into consideration not only the price of the work to be performed but also the time for completion. In the event Landlord selects other than the lowest bidder, it shall do so based on commercially reasonable factors which it shall demonstrate to Tenant.

I. ARCHITECTURAL AND CONSTRUCTION PROCEDURES.

A. Tenant and Landlord have approved, or shall approve within the time period set forth below, both (i) a detailed space plan for Suites 100 and 250, prepared by Landlord's architect, which includes interior partitions, ceilings, interior finishes, interior doors, suite entrance, floor coverings, window coverings, lighting, electrical and telephone outlets, plumbing connections, heavy floor loads and other special requirements ("Preliminary Plan"), and (ii) an estimate, prepared by Landlord's contractor, of the cost for which Landlord will complete or cause to be completed the Tenant Improvements ("Preliminary Cost Estimate"). Tenant shall approve or disapprove each of the Preliminary Plan and the Preliminary Cost Estimate by signing copies of the appropriate instrument and delivering same to Landlord within five (5) days of its receipt by Tenant. If Tenant disapproves any matter, Tenant shall specify in detail the reasons for disapproval and Landlord shall attempt to modify the Preliminary Plan and the Preliminary Cost Estimate to incorporate Tenant's suggested revisions in a mutually satisfactory manner. In no event, however, shall Tenant have the right to make additions to the Preliminary Plan as part of its approval thereof which would increase the improvements to be paid for by "Landlord's Contribution" (as hereinafter defined), it being understood and agreed that the Preliminary Plan submitted by Landlord's architect is intended to include all improvements desired by Tenant using Landlord's "Standards" (as hereinafter defined), whether or not the full amount of Landlord's Contribution would be required to complete construction of the improvements as shown in the Preliminary Plan. Notwithstanding the foregoing, Landlord agrees that Tenant shall have the right to make modifications, additions or Changes to an approved Preliminary Plan or Working Drawings and Specifications, to incorporate additional Standards, and to use up to Fifty Cents ($.50) per rentable square foot of Landlord's Contribution to pay the cost of any such modifications, additions or Changes. In all events, Tenant shall approve in all respects a Preliminary Plan and Preliminary Cost Estimate not later than April 28, 2000 ("Plan Approval Date"), it being understood that Tenant's failure to do so shall constitute a "Tenant Delay" for purposes of this Lease.

B. On or before the Plan Approval Date, Tenant shall provide in writing to Landlord or Landlord's architect all specifications and information requested by Landlord for the preparation of final construction documents and costing, including without limitation Tenant's final selection of wall and floor finishes, complete specifications and locations (including load and HVAC requirements) of Tenant's equipment, and details of all "Non-Standard Improvements" (as defined below) to be installed in Suites 100 and 250 (collectively, "Programming Information"). Tenant's failure to provide the Programming Information by the Plan Approval Date shall constitute a Tenant Delay for purposes of this Lease. Tenant understands that final construction documents for the Tenant Improvements shall be predicated on the Programming Information, and accordingly that such information must be accurate and complete.

C. Except as specified in the Preliminary Plan or otherwise authorized by Landlord, the Tenant Improvements shall incorporate Landlord's building standard materials and specifications ("Standards"). No deviations from the Standards shall be permitted, provided that Landlord may, in its sole and absolute discretion, authorize in writing one or more of such deviations if requested by Tenant, in which event any excess cost of such deviations shall be part of "Tenant's Contribution" (as hereinafter defined) and Tenant shall be solely responsible for the cost of replacing same with the applicable Standard item(s) upon the expiration or termination of this Lease. Landlord shall in no event be required to approve any deviations from the Standards ("Non-Standard Improvements") if Landlord determines that such improvement (i) is of a lesser quality than the corresponding Standard, (ii) fails to conform to applicable governmental requirements, (iii) requires building services beyond the level normally provided to other tenants, (iv) would delay construction of the Tenant Improvements beyond the Estimated Commencement Date for Suites 100 and 250 and Tenant declines to accept such delay in writing as a Tenant Delay, or (v) would have an adverse aesthetic impact from the exterior of Suites 100 and 250.

D. Upon Tenant's approval of the Preliminary Plan and Preliminary Cost Estimate and delivery of the complete Programming Information, Landlord's architect and engineers shall prepare and deliver to Tenant working drawings and specifications ("Working Drawings and Specifications"), and Landlord's contractor shall prepare a final construction cost estimate ("Final Cost Estimate") for the Tenant Improvements in conformity with the Working Drawings and Specifications. The Final Cost Estimate shall be delivered to Tenant for its approval