```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                    .
IN RE:                              .        Chapter 11
                                    .
New Century TRS Holdings,           .
Inc., et al.,                       .
                                    .
         Debtor(s).                 .    Bankruptcy #07-10416 (KJC)
.......................................................

                           Wilmington, DE
                            May 7, 2007
                            10:00 a.m.

                     TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE KEVIN J. CAREY
                   UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor(s):              Suzzanne S. Uhland, Esq.
                                O'Melveny & Myers, LLP
                                275 Battery Street
                                San Francisco, CA 94111

                                Ben H. Logan, Esq.
                                O'Melveny & Myers, LLP
                                275 Battery Street
                                San Francisco, CA 94111

                                Robert J. Stern, Jr., Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                Wilmington, DE 19801

                                Michael J. Merchant, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                Wilmington, DE 19801

                                Marcos A. Ramos, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                Wilmington, DE 19801
```

```
                                    Christopher M. Samis, Esq.
                                    Richards Layton & Finger, PA
                                    One Rodney Square
                                    Wilmington, DE 19801

For The Official Committee:         Mark Indelicato, Esq.
of Unsecured Creditors              Hahn & Hessen, LLP
                                    488 Madison Ave.
                                    New York, NY 10022

                                    Mark Power, Esq.
                                    Hahn & Hessen, LLP
                                    488 Madison Ave.
                                    New York, NY 10022

                                    Janine M. Cerbone, Esq.
                                    Hahn & Hessen, LLP
                                    488 Madison Ave.
                                    New York, NY 10022

                                    Bonnie Glantz Fatell, Esq.
                                    Blank Rome, LLP
                                    One Logan Sq.
                                    130 N. 18th St.
                                    Philadelphia, PA 19103

                                    Regina S. Kelbon, Esq.
                                    Blank Rome, LLP
                                    One Logan Sq.
                                    130 N. 18th St.
                                    Philadelphia, PA 19103

For UBS:                            Keith W. Miller, Esq.
                                    Paul Hastings
                                    Park Ave. Tower
                                    75 E. 55th St-1st Fl.
                                    New York, NY 10022

                                    Richard Chesley, Esq.
                                    Paul Hastings
                                    191 N. Wacker Drive
                                    Chicago, IL 60606

                                    Gregory A. Taylor, Esq.
                                    Ashby & Geddes
                                    500 Delaware Ave.-8th Fl.
                                    Wilmington, DE 19899
```

```
                              Bruce Bennett, Esq.
                              Hennigan Bennett
                              865 S. Figueroa St-Ste. 2900
                              Los Angeles, CA 90017

For Bank of America:          Laurie S. Silverstein, Esq.
                              Potter Anderson & Corroon, LLP
                              Hercules Plaza
                              1313 N. Market Street
                              Wilmington, DE 19899

For RBC:                      Rachel B. Mersky, Esq.
                              Monzack & Monaco, PA
                              1201 N. Orange Street
                              Wilmington, DE 19899

For Deferred Comp. Claimants: Robert Keach, Esq.
                              Bernstein Shur
                              100 Middle Street
                              Portland, ME 04104

                              Joseph H. Huston, Esq.
                              Stevens & Lee, PC
                              1105 N. Market St., 7th Fl.
                              Wilmington, DE 19801

For Kodiak Funding:           Matthew Botica, Esq.
                              Winston & Strawn, LLP
                              35 W. Wacker Drive
                              Chicago, IL 60601

                              David W. Wirt, Esq.
                              Winston & Strawn, LLP
                              35 W. Wacker Drive
                              Chicago, IL 60601

                              Norman Monhait, Esq.
                              Rosenthal Monhait & Goddess, PA
                              919 Market St.-Ste. 1401
                              Wilmington, DE 19899

For Deutsche Bank Structured: Robert Brady, Esq.
Products                      Young Conaway Stargatt
                              & Taylor, LLP
                              1000 West Street-17th Fl.
                              Wilmington, DE 19899
```

For Ellington Management:      Van Durrer, Esq.
Group                          Skadden Arps Slate Meagher
                               & Flom, LLP
                               300 S. Grand Ave.-Ste. 3400
                               Los Angeles, CA 90071

For Greenwich Capital:         Laura Davis Jones, Esq.
Financial Products             Pachulski Stang Ziehl Young
                               Jones & Weintraub, LLP
                               919 N. Market Street-17th Fl.
                               Wilmington, DE 19899

                               Bennett Spiegel, Esq.
                               Kirkland & Ellis, LLP
                               777 S. Figueroa Street
                               Los Angeles, CA 90017

For Goldman Sachs Mortgage:    Lisa M. Schweitzer, Esq.
Co.                            Cleary Gottlieb Steen
                               & Hamilton, LLP
                               One Liberty Plaza
                               New York, NY 10006

(Via Telephone)

For Deutsche Bank Sructured:   Andrew J. Gallo, Esq.
Products                       Bingham McCutchen, LLP
                               150 Federal Street
                               Boston, MA 02110

                               Richard Agins, Esq.
                               Bingham McCutchen, LLP
                               150 Federal Street
                               Boston, MA 02110

For Bank of America:           Nicholas J. Cremona, Esq.
                               Kaye Scholer, LLP
                               425 Park Ave.
                               New York, NY 10022

For Greenwich Capital          Shirley Cho, Esq.
Financial Products             Kirkland & Ellis, LLP
                               777 S. Figueroa Street
                               Los Angeles, CA 90017

For Credit Suisse First:       Christy Rivera, Esq.
Boston                         Chadbourne & Parke
                               30 Rockefeller Plaza
                               New York, NY 10112

5

For the U.S. Trustee:          Joseph McMahon, Esq.
                               Office of the United States
                               Trustee
                               844 King St.-Ste. 2207
                               Lockbox 35
                               Wilmington, DE 19801

Audio Operator:                Matt Yovino

Transcribing Firm:             Writer's Cramp, Inc.
                               6 Norton Rd.
                               Monmouth Jct., NJ 08852
                               732-329-0191


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

6

                                    Index

                                                        Further
                        Direct Cross Redirect Recross Redirect

Witnesses For The
 Debtor:

   Ms. Etlin
   (by Mr. Stern)        141              198
   (by Mr. Power)             173
   (by Mr. McMahon)          180

   Mr. Glassner
   (Voir Dire)            201

   Mr. Glassner
   (by Mr. Stern)        204              219
   (by Mr. McMahon)          208


Witnesses For The
 Creditor's Committee:

   Mr. Warren
   (by Mr. Power)         82


EXHIBITS:                                    Marked   Received

US Trustee-1   Order Authorizing Retention    211      222


SUMMATION BY:

   Mr. Mr. Stern         222
   Mr. Indelicato        244
   Mr. McMahon           248

   Rebuttal
   Mr. Stern             255

The Court:  Finding

   As To Motion          112
   As To Motion          258

1          THE CLERK:  All rise.  You may be seated.

2          THE COURT:  Good morning all.

3          ALL:  Good morning, Your Honor.

4          MS. UHLAND:  Good morning, Your Honor, Suzanne

5    Uhland of O'Melveny & Myers on behalf of New Century.  We're

6    here this morning on a variety of matters.  Generally we'd like

7    to proceed in the order of the agenda, but we understand that

8    an agreement has been reached with respect to the last matter

9    on the agenda, the UBS motion, and accordingly -- or largely

10   been reached with respect to that matter.  So we would propose

11   to go ahead and proceed with that and have Mr. Bennett explain

12   where the parties are with respect to that --

13         THE COURT:  Very well.

14         MS. UHLAND:  -- if that's okay with the Court.

15         THE COURT:  Yes, that's fine.

16         MR. BENNETT:  Good morning, Your Honor, Bruce Bennett

17   of Hennigan Bennett & Dorman, special -- proposed special

18   litigation counsel.  At least for a little while.  I -- Your

19   Honor, I was not on the telephonic hearing that you conducted

20   on Friday, but I've heard about it, and based upon receiving

21   papers pretty late and not being able to find people on the

22   weekend and wanting to do this in an orderly fashion, what

23   we've agreed to do is escrow $2.67 million into a separate

24   interest bearing account, mechanics to be defined.  And to

25   schedule a hearing on what would be a Preliminary Injunction

1  Motion for, here's our proposal, either June 11th or June 15th

2  were two dates that are about the time frame that would work

3  for the parties.  I don't know what Your Honor's schedule is

4  but we're looking for some advice in that regard.

5       THE COURT:  Nancy, what are our June hearing dates?

6  Do we have any yet?  The 11th I will be out of town.

7       MR. BENNETT:  Okay.

8     (Pause in proceedings)

9       THE COURT:  There's an omnibus set for June 14th at

10  1:30.  Would that suit, counsel?

11       MR. BENNETT:  That's actually a problem for me.  If

12  -- the choices are the 14th at 1:30 or the 27th?

13       THE COURT:  27th at 10.  Well, if the Debtor wanted

14  to move its omnibus from the 14th to the 15th I would do that.

15       MR. BENNETT:  That helps me a lot.  14th is a

16  Thursday, 15th is a Friday.

17       MS. UHLAND:  That's fine, Your Honor.

18       THE COURT:  All right.  Well, we'll move the omnibus

19  hearing that's now set for June 14th at 1:30 to June 15th at 10

20  o'clock.  And we'll schedule the preliminary injunction hearing

21  for the same day and time.

22       MR. BENNETT:  Okay.  I think that's acceptable to all

23  the parties.  There will be an order to follow.

24       THE COURT:  All right.

25       MR. BENNETT:  Thank you, Your Honor.

1           MR. CHESLEY:  Your Honor, Richard Chesley, Paul

2    Hastings, on behalf of UBS.  That is acceptable.  We appreciate

3    the Court's indulgence on the schedule.  Thank you.

4           THE COURT:  Certainly.

5           MR. POWER:  Your Honor, Mark Power from Hahn & Hessen

6    for the Committee.  Your Honor, two things in connection with

7    the adversary.  One is we've been over the weekend working with

8    the Debtor and UBS to try to get to this point and schedule the

9    hearing.  As a part of that the parties have consented to the

10   Committee intervening in the action.  Originally we were

11   stepping -- we were not intervening because it was an

12   accounting matter.  We're now getting into legal issues

13   regarding property rights and secured versus unsecured.  So the

14   Committee has a direct interest in that.  And I think the

15   parties will agree to that and we'll submit that under

16   stipulation to Your Honor.  An Intervention Motion.

17          MR. CHESLEY:  Your Honor, we'll simply include that

18   in the order if that's acceptable to the Court.

19          THE COURT:  It's fine with me.

20          MR. CHESLEY:  That's fine, thank you, Your Honor.

21      (Pause in proceedings)

22          THE COURT:  Let me ask, will the order cover matter

23   #10 on the agenda as well in UBS?

24          MR. CHESLEY:  Excuse me, Your Honor, matter 10 was --

25          THE COURT:  It's UBS's motion to file an exhibit.

1           MR. CHESLEY:  Your Honor, I -- was that granted on --
2  at the hearing on Friday or was it --
3           THE COURT:  Maybe --
4           MR. CHESLEY:  I believe it was.
5           THE COURT:  Okay, maybe I did.
6           MR. CHESLEY:  We can include that in the order just
7  to clarify that because there is no actual order entered if
8  you --
9           THE COURT:  Yes, I remember the supplemental
10  memorandum being a subject of the request but not specifically
11  the exhibit.  But --
12           MR. CHESLEY:  We'll include that in the order, Your
13  Honor.
14           THE COURT:  Very well.
15           MR. CHESLEY:  Thank you.
16           THE COURT:  Thank you.
17           MS. UHLAND:  Your Honor, the next matter on the
18  agenda is the application of the Debtors to employ O'Melveny &
19  Myers as co-counsel for the Debtors.  This was continued from a
20  prior hearing.  We received a request from the United States
21  Trustee for some additional disclosures and additional review
22  of the Debtors -- of O'Melveny's client base to check not only
23  the Parties-In-Interest but also all the potential purchasers
24  of assets.
25      This morning we prepared that supplemental declaration and

1  we've submitted it to the United States Trustee to review, and

2  have filed that supplement declaration this morning.  With that

3  filing my understanding is that the U.S. Trustee's issues are

4  resolved and we're prepared to submit the order.

5       THE COURT:  All right.  I have not seen the filing

6  that was made today.  Does someone have a copy I can take a

7  look at?

8       MS. UHLAND:  Your Honor, I have a copy, if I may?

9       THE COURT:  Thank you.

10     (Pause in proceedings)

11      THE COURT:  All right, I note that in the O'Melveny

12 affidavit that there was $190,000 unbilled prepetition.  Was

13 that amount the subject of a prior request for relief?  To

14 apply it?  Or am I thinking of something else?

15      MS. UHLAND:  In our application we asked to apply the

16 retainer to -- as part of our application we asked Your Honor

17 to the extent something was billed but not yet -- or unbilled

18 at the time of filing that we be allowed upon billing and

19 approve invoice to apply it to the retainer.  That was included

20 in our request.

21      THE COURT:  Okay.  All right, anyone else care to be

22 hear in connection with this matter?

23      ALL:  (No verbal response).

24      THE COURT:  I hear no response.  That was my only

25 question.  Do you have a Form of Order?

1          MS. UHLAND:  Yes, I do, Your Honor.

2          THE COURT:  Thank you.

3      (Pause in proceedings)

4          THE COURT:  That order has been signed.

5          MS. UHLAND:  Thank you, Your Honor.  Your Honor, the

6   next matter is the Debtor's Motion for an Order Authorizing the

7   Payment of Sale Related Incentive Pay to Senior Management and

8   Retention and Incentive Pay to Certain Employees pursuant to

9   section 105, 363 and 503 of the Bankruptcy Code.  Your Honor,

10  we originally filed this motion on April 11th, and we filed an

11  amendment to that motion last Tuesday.

12      What we propose to do at the -- to address the hearing

13  today and the Court's interest in creating a sufficient or

14  hearing testimony to support the Debtor's motion is I will walk

15  through the relief sought by the motion and walk the Court

16  through some of the changes that were made first from the

17  original filing to the amendment, and then some further changes

18  that have been made more recently since -- as a result of

19  further negotiations and discussions with the Creditors

20  Committee.

21          THE COURT:  There been any developments since the

22  hearing on Friday?  Any further developments?

23          MS. UHLAND:  No further developments, Your Honor.

24  The Debtors and the Committee have worked to just document the

25  economic agreement that they had reached previously.

1          THE COURT:  All right.  And the U.S. Trustee is

2   pressing her objection?

3          MR. MCMAHON:  Your Honor, Joseph McMahon.  We are and

4   we haven't seen the documentation of what's before the Court

5   today.  Be nice if we could see a copy of it.

6          THE COURT:  Ms. Uhland, I didn't specifically direct

7   it, but I would have hoped that the U.S. Trustee would have

8   been provided with any documentation prior to today's hearing.

9   I mean one of the arguments that the U.S. Trustee made Friday

10  was, you know, we haven't had time to look at this.

11         MS. UHLAND:  Your Honor --

12         THE COURT:  I would have thought that immediately

13  after having voiced that -- maybe it wasn't ready until this

14  morning.  I don't know.  Explain that if you would.

15         MS. UHLAND:  Yes, Your Honor.  The changes are not

16  very complicated to the economics reached with the Committee.

17  But it did take, Your Honor,'til late last night to run those

18  changes and work out the language through the plans.  So Your

19  Honor, we -- it was, like I said, very late last night with

20  travel and we have blackline changes to the plans that we can

21  walk through.  But given the late hour I determined to simply

22  walk through -- with them with the Court.  But they just simply

23  were not ready.  Previously.

24         THE COURT:  Well, I'm inclined to grant the U.S.

25  Trustee's request then.

1          MS. UHLAND:  Your Honor, what I would propose we do,

2    as I said, the changes are rather straightforward, as perhaps

3    we can provide these changes to the Trustee this morning -- the

4    revised plans.  These would be the revisions from the exhibits

5    to the order that were filed on Tuesday.  I said, they're very

6    minor modifications.  Perhaps we can adjourn this part of the

7    hearing 'til 1 o'clock and the Trustee can have an opportunity

8    to review those minor economic changes.

9          THE COURT:  Mr. McMahon?

10          MR. MCMAHON:  Your Honor, part of this process has

11    been receiving on an employee by employee basis the specific

12    payments which are proposed to be made under the two plans that

13    are issue in the motion.  We started out with a spread sheet

14    that contained roughly 120 people, and after the amended motion

15    was filed last Tuesday we're down to 90.  Now I'm being asked

16    to, I guess, accept information at some point this morning

17    while we have a hearing going on in other matters, and

18    completing some type of review such that I can be informed for

19    an evidentiary hearing this afternoon.

20      On the employee by employee analysis, Your Honor, I can't

21    say that I'm prepared to do that.  And I would agree with Your

22    Honor that the appropriate thing to do is to move this matter

23    to the 15th pending the consideration of the Trustee Examiner

24    Motion.

25          MR. INDELICATO:  Your Honor, Mark Indelicato from

1  Hahn & Hessen on behalf of the Committee.  Your Honor, I

2  sympathize with the U.S. Trustee and I heard the Court's --

3  well, not a direction, suggestion on Friday.  But to be fair to

4  the Debtor, Your Honor, I believe the e-mail was circulated

5  late last night.  We are trying to go through the changes today

6  --

7            THE COURT:  You know, I'm not -- please don't

8  interpret my comments as criticism.

9            MR. INDELICATO:  No, no, I --

10           THE COURT:  I understand that the process, with

11  everything that's going on it moves at a number of different

12  levels and eats up all kinds of resources, both legal and

13  otherwise.  And that's not my issue.  My issue is trying to

14  balance the need for the quick action that the Debtor here is

15  requesting and that the Committee is consenting to against the

16  objector here, who's raised, I think, some very serious

17  objections about the payments.  You know, from officer status

18  to, you know, other things.

19           MR. INDELICATO:  And what I was gonna get to, Your

20  Honor, and I thought what was the Court's suggestion on Friday

21  is, I think there is an essential need that this get resolved

22  today.  I think one way or the other.  I think the Court needs

23  to hear the evidence.

24     What I was suggesting is that I'm not so sure giving

25  Mr. McMahon an hour or two to go through it is going to address

1   his concern on an employee by employee basis.  But that may

2   come out in the testimony that the Court is gonna hear today.

3   The only way you're gonna get that information is from the

4   Debtors.  And instead of unfortunately sitting down with the

5   Debtors maybe we're forced to do it in the evidentiary hearing.

6   Because I think, Your Honor --

7            THE COURT:  But see, if the Committee were the

8   objector here and the Debtor had proposed to proceed in that

9   fashion, you would be objecting.

10           MR. INDELICATO:  I would, Your Honor.  But the

11  difference here is, and what we're hearing from the Debtor and

12  what we're hearing from potential bidders is it's imperative

13  that these employees be kept in place and that this --

14           THE COURT:  I don't dispute that proposition.  You

15  know, and maybe there are -- except for the U.S. Trustee, who

16  has, maybe there are a few others who would.

17           MR. INDELICATO:  Well, Your Honor, what I'm

18  suggesting is that give us an alternative to try and satisfy

19  the U.S. Trustee and the Court, and I think as the Court laid

20  out, if you're not satisfied and the U.S. Trustee is not

21  satisfied at the end of the testimony we could address that

22  issue then.

23           THE COURT:  Well, what I had anticipated was that at

24  the point -- before we came to the hearing today that the U.S.

25  Trustee would have in her hands whatever would be necessary --

1    what the Debtors was proposing today.  And I find out, again

2    understanding the circumstances, I'm not necessarily accusing

3    anyone of moving too slowly.  In fact the opposite might be

4    true, some have said.  It's the fact that the U.S. Trustee is

5    being forced to come to the hearing unprepared.  And what I'm

6    hearing you say is, well, Mr. McMahon can listen to the

7    testimony and --

8            MR. INDELICATO:  You know, Your Honor --

9            THE COURT:  -- that will be good enough.  I had

10   wanted to hear testimony to convince myself that the need for

11   the speed which was being pursued here was real.  And that's

12   really why I didn't grant the Trustee's motion Friday.  I was

13   giving the proponent here a chance to say, okay, here's -- it's

14   real, we need it now, and I wanted evidence of that.  Not just

15   argument of counsel.  But there's an objector here, and it just

16   seems to me to be putting the U.S. Trustee, and the Court

17   perhaps, at an unfair disadvantage with respect to something

18   that may have some serious issues connected with it.

19           MR. INDELICATO:  All I was suggesting, Your Honor, is

20   give us the opportunity, or give the Debtor the opportunity.

21   And then if the U.S. Trustee, if it has not addressed his

22   concerns it's without prejudice for him to renew his Motion to

23   Adjourn, and maybe there's some way that we could balance his

24   issues against the employee issues and come to resolution.

25       I understand it's not a perfect settlement.  It's not a

1  perfect case.  But what I'm just concerned about is just a mere

2  adjournment will send a wrong message to the employees.  So

3  that's what I'm trying to fashion, Your Honor.  I am trying to

4  balance all the issues, and I certainly appreciate what we're

5  asking the U.S. Trustee to do.  But we're trying to balance the

6  issues.

7      THE COURT:  Well, I've said from time to time that I

8  don't view myself as being in the message sending business.

9  More like in the dispute resolution business.  But I understand

10 that sometimes there are consequences to that.

11     MS. UHLAND:  Your Honor, one other point I would --

12 we reviewed the United States Trustee's objection, and the

13 changes that we're talking about from the filed motion go to

14 the economics.  The Trustee's objections raise issues of the

15 insider status, and the -- sort of the incentive nature of the

16 plan, none of which have been changed by the virtue of the

17 changes we've agreed to with the Creditors Committee.  So we

18 are here today prepared to address the United States Trustee's

19 objection with our evidentiary record.

20     The fact that we've made further economic reductions in

21 the plan by virtue of our agreement with the Creditors

22 Committee really does not -- in my mind does not alter at all

23 our response to the U.S. Trustee's objections.  So we're not

24 asking the Trustee to respond in realtime to our proposed --

25 you know, to address the changes.  We're prepared to, in

1  affect, proceed on the record on the motion from last Tuesday,

2  as I said with some minor economic modifications.

3          THE COURT:  Well, here's what I'm going to do.  I

4  will temporarily adjourn the matter to some point this

5  afternoon, and we'll decide what time it is.  I will need to

6  break.  I have a commitment which I entered into before setting

7  this hearing date that I intend to keep.  So we're going to --

8  I don't know how long the rest of the agenda will take, but

9  we're going to break at 12:15 and probably won't come back

10  until about 2:15 in any event.  So we'll push in matter to at

11  least that time.  And then after the U.S. Trustee has had a

12  chance to review the latest iteration of the proposed plans

13  then we'll take up her request again.

14          MR. MCMAHON:  Your Honor, if I could make a request.

15  As I noted for the record, I have yet to see the employee by

16  employee analysis and spread sheet format, and I'm wondering

17  whether the Debtors can provide that this morning before that

18  hearing.

19          THE COURT:  Well, I think they ought to.

20          MS. UHLAND:  Yes, Your Honor, I'll just need to

21  clarify with Mr. McMahon exactly what he's looking for and

22  we'll get it.

23          THE COURT:  All right, thank you.  We'll pass this

24  matter for now.

25          MS. UHLAND:  Your Honor, the next motion is the

1  Debtors -- the final hearing for the D-I-P financing, and Ben

2  Logan will be handling that for us.

3         MR. LOGAN:  Thank you, Your Honor.  We were before

4  the Court on April 3 to have a hearing -- the interim hearing

5  on the Debtor-In-Possession financing.  Since then obviously a

6  committee's been appointed.  We had substantial dialogue with

7  the committee over the terms of the Debtor-In-Possession

8  financing agreement.  And indeed we had a hearing originally

9  set for April 24, was the date initially set for the final

10 hearing on the Debtor-In-Possession credit agreement.  That was

11 continued to today largely to let us continue to pursue issues

12 that the Creditors Committee had raised.  And I'm pleased to

13 report that we have an agreement with the Creditors Committee.

14 There is a revised version of the Final Order, revised from the

15 version that was submitted with the moving papers that reflects

16 the agreements between the Debtor-In-Possession Lenders, the

17 Creditors Committee and the Debtors, which I could hand up to

18 the Court.

19         THE COURT:  If you would.  It's both.

20         MR. LOGAN:  Your Honor, may I approach?

21         THE COURT:  Yes.  Okay, well, does it differ from

22 that one?

23         MR. LOGAN:  Your Honor, many of the changes are just

24 to reflect the fact that it's a Final Order, as opposed to an

25 Interim Order.  But let me just highlight a few examples of

1  things that with were discussed with the Creditors Committee

2  and reflected in a revised verse of the order.

3      One, in paragraph numbered 3 there is an addition that

4  three days notice had to be given to the Creditors Committee of

5  any proposed amendments to the D-I-P credit agreement.  And

6  just let me add parenthetically there, there was one amendment

7  that occurred during this time frame pursuant to the similar

8  provision of the Interim Order which extended the period of

9  time during which the Debtors and the D-I-P Lenders could agree

10  do provide traunch B.  I'm not sure if Your Honor remembers,

11  traunch B was a supplemental facility that would have been used

12  to take out the Citigroup service or advance facility.  So

13  those negotiations continued on longer than was contemplated at

14  the time of the original D-I-P credit agreement.

15      Paragraph 5, the parenthetical added there reflects the

16  agreement on limiting fees that was undertaken in connection

17  with what we used to call the Greenwich sale.  I guess we call

18  it now the Ellington sale.  But that just is a cross reference

19  to bring the two into sync.

20      The Creditors Committee added the paragraph at the bottom

21  that their rights to challenge the cost and expenses for

22  reasonableness are reserved.  That was probably implicit, but

23  it's now explicit.

24      Perhaps most significantly, paragraph 7, and there's some

25  corresponding changes throughout the document, liens on

1   avoiding powers have been stricken.  The original motion

2   contemplated that the D-I-P Lenders would have liens on

3   avoiding powers, not at the time of the interim hearing but

4   they were requesting one at the time of the final hearing.  And

5   Your Honor gave them a heads up at the time of the interim

6   hearing that that was going to be a tough road to hoe, and it's

7   not being hoed.  So that is stricken.

8        There's a corresponding change to carve out from the

9   administrative priority any proceeds from avoiding powers.

10  That's found on paragraph 17, for otherwise not granting any

11  lien on avoiding powers would be a little bit illusory, since

12  if they had an administrative priority they could get to the

13  same result.

14       Paragraph 18, paragraph(b), there's been some

15  clarification as to what the Committee can do with the carve

16  out funds.  They can investigate the extent, validity,

17  perfection, et cetera, the liens and the claims.  There is some

18  language in the original order about preventing, hindering or

19  unreasonably delaying, which the parties agreed was a little

20  bit broad.  I'm not sure how one investigates or does other

21  things the D-I-P Lenders don't like.  So that was clarified.

22       Perhaps the next significant change is found in paragraph

23  #21, where the Committee was successful in clarifying that

24  during -- well, first off, extending the notice period before

25  the Secured Lenders can exercise certain remedies from three

1  business days to five business days, giving us two business

2  days additional time.  And adding the language at the end that

3  during that five business day period the Debtors or the

4  Committee may seek an order from the Court trying to enjoin the

5  D-I-P Lenders from exercising those remedies.

6      And Your Honor, most of the other changes I believe are

7  really just in the nature of clean up.  Oh, excuse me.

8  Paragraph #42 was added at the Committee's request.  This is a

9  joint and several borrowing facility.  It is possible that some

10  of the Debtors may borrow funds under the D-I-P facility and

11  have other Debtors repay those funds.  There is a substantial

12  overlap among the Debtors as to how they're jointly and

13  severally liable on many of the Debtor's credit agreements

14  prepetition, but not entirely.  And the Committee quite

15  properly raised a question as to whether or not if one Debtor

16  borrows the money and another Debtor repays the D-I-P money

17  shouldn't there be a right of contribution that's entitled to

18  an administrative priority?  The Debtors agreed with that.  The

19  D-I-P Lenders didn't care.  And so we added this paragraph to

20  the order.  It really is part and parcel of the same thing that

21  was included in the Cash Management Order at the outset of the

22  case.  To the extent they're intercompany borrowings they're

23  entitled to an administrative priority.

24      And that is it as far as the Committee is concerned.  I

25  should report to the Court that negotiations continue.  In

1  fact, there's a meeting of the D-I-P Lenders Credit Committee

2  this morning about providing additional availability under the

3  Debtor-In-Possession credit facility.  Presently the Debtors

4  have $50 million of availability.  They expect to start using

5  that facility this week.  We are hopeful, optimistic, and if

6  the sun shines on the D-I-P Lenders Creditor -- Credit, not

7  Creditors Committee, Credit Committee, this morning that

8  facility should be expanded.  We think it important that it be

9  expanded in order to allow sufficient liquidity to make sure

10  the Debtors can get to the sale of the servicing business.

11        THE COURT:  Well, the five-day forecast I saw in the

12  news this morning looked pretty good.

13        MR. LOGAN:  Good.  It's beautiful today.  So all I

14  really care about is today, I hope, Your Honor, because

15  hopefully the sun will continue to shine today and we'll get

16  the good news there.  The facility does provide that that can

17  be done.  The Creditors Committee -- Creditors Committee is on

18  board with that.  They understand the process.  And we're

19  hopeful that there will be some additional liquidity opened up.

20        There were two objections we received, Your Honor.

21  They're a little bit old now because this was -- they were

22  filed before the April 24 hearing.  One was an objection filed

23  by Morgan Stanley, and they simply wanted to make sure that

24  some of the very artful language that was put into the Interim

25  Order continued on into the Final Order.  It does.  We provided

1  them a copy of the redline of the Order, and I think that they

2  are satisfied.  They should be satisfied because it's verbatim

3  what was in the old order.

4       Second, Goldman Sachs raised an issue that really doesn't

5  relate to the D-I-P loan.  They had four loans that were

6  financed with New Century Warehouse Corporation, the company

7  also known as Access Lending.  And those loans were shown to

8  New Century Mortgage Corporation, one of the Debtors, as a

9  possible take-out investor, and Goldman Sachs raised a question

10 as to whether or not those loans had been returned to them.

11 They initially had -- New Century Mortgage Corporation decided

12 not to take out the loans, and so the loan papers should have

13 been given back to Deutsche Bank, which is the custodian for

14 Goldman Sachs.

15      Goldman Sachs initially said they couldn't find the loan

16 files for four of them.  By the time of the April 24 hearing

17 they'd found two, so the issue was down to two.  We checked

18 with the folks at Access Lending and they think they sent all

19 four back to Deutsche Bank and sent tracking numbers to Goldman

20 Sachs.  So I think that issue's resolved.  But even if it isn't

21 it doesn't have anything to do with the Debtor-In-Possession

22 facility for -- we're not purporting to grant liens on any of

23 those loans to the Debtor-In-Possession Lenders.

24      So those are the objections.  If the Court prefers, I

25 could make a proffer very similar to the proffer we made at the

1    first hearing.  Mr. Mondava is here again.  About the need for

2    the D-I-P facility, quite frankly, I would suggest, given the

3    absence of any objections to the substance and the Creditors

4    Committee's endorsement of the proposal that we take judicial

5    notice of that prior proffer.  But if the Court or other

6    parties disagree I'm more than happy to go forward.

7            THE COURT:  I see no need to repeat the dramatic

8    reading.  I'll consider that as --

9            MR. LOGAN:  It's scintillating, Your Honor.

10       (Laughter)

11           THE COURT:  I don't know, I was here.

12           MR. LOGAN:  Yes.

13           THE COURT:  I'll consider that as part of this

14   record, but ask whether anyone else cares to be heard?

15           MS. SCHWEITZER:  Your Honor, good morning, I'm Lisa

16   Schweitzer from Cleary Gottlieb Steen & Hamilton for Goldman

17   Sachs Mortgage Company.  I am -- we do not have an objection to

18   the D-I-P Order being entered as it is based on the

19   representation of Mr. Logan on behalf of the Debtors that the

20   two loans in dispute are not being pledged.  But obviously

21   reserve our rights with respect to everything else he said.

22   The tracking numbers and other information were provided to us

23   like midnight going on Saturday.  So we haven't had any time to

24   dig into the facts.  But as long as everyone's clear the loans

25   are not being affected by the D-I-P Order it's not an issue for

1    today's hearing.

2            THE COURT:  All right, thank you.

3            MS. KELBON:  Good morning, Your Honor.  Regina Stango

4    Kelbon from Blank Rome on behalf of the Official Creditors

5    Committee.  Mr. Logan has accurately stated the changes that

6    were made in the order, and the Committee was appreciative of

7    the adjournment of the D-I-P Lender and the Debtors from the

8    April 24th hearing because we did use that time to get

9    comfortable with the facility, the necessity, the fees.  As Mr.

10   Logan mentioned, traunch B was never activated by the deadline.

11   So the only thing remaining for the Debtor is the second half

12   of traunch A, which we are hoping today that the D-I-P Lenders

13   will activate so that the Debtor will have further liquidity.

14   But having said that we are in agreement and in support of the

15   D-I-P financing facility.

16           THE COURT:  Thank you.

17           MS. KELBON:  Thank you, Your Honor.

18           THE COURT:  Does anyone else care to be heard?

19           MR. RILEY:  Yes, Your Honor.

20           THE COURT:  Yes, go ahead.

21           MR. RILEY:  My name is Jack Riley.  I'm the Trustee

22   for the Rose Townson Trust at PO Box 13474, Spokane,

23   Washington, 99203.  99213, excuse me.  My phone number is

24   509-216-6080.  And my fax number is 509-326-4891.  First I'd

25   like to apologize for not being able to find a Delaware

1   attorney on such short notice, as I'm representing myself and

2   the trust.  And I didn't receive a notice of the Court

3   Bankruptcy from my attorney until the 26th of April.

4       I've written out a -- if the Court would allow me to, I've

5   written everything down here as best I can, as I'm not an

6   attorney.  But if I could read it to you.

7           THE COURT:  Well, tell me first whether you are

8   objecting to the entry of the order that's been presented to

9   the Court?

10          MR. RILEY:  Yes, I'm objecting to the order.  The

11  Rose Townson Trust had a prior lien before New Century took out

12  a lien on a piece of property belonging to Darryl Johnson and

13  Sally Arnay at 4223 South Madison Road, Spokane, Washington,

14  99206, and the Rose Townson had an existing lien prior to New

15  Century making a lien to -- making a loan on the property,

16  which their New Century title insurance company failed to

17  notify New Century of the Rose Townson Trust existing lien.

18   New Century has recourse to go back at their title insurance

19  company for the amount of their lien, as far as I can

20  understand.  And on August the 20th -- August the 3rd the

21  Townson Trust filed a request for the determination of summary

22  judgment adding a first priority lien in relation and the real

23  estate of Darryl Johnson and Sally Arnay with Judge Patricia C.

24  Williams, U.S. Bankruptcy Court Judge, Eastern District of

25  Washington, bankruptcy case #05-09692-PCW-13.  Adversary

1  proceeding #06-09692-PCW-13.  Based on the Court's own ruling

2  on the Plaintiff's motion for summary judgment on September

3  22nd, 2006, it is hereby ordered Plaintiff Rose Townson Trust

4  has the first priority lien in the real estate.  On October 6

5  of 2006 attorney Daniel J. Gibbons of law office firm of Paine

6  Hamblin Kaufman Brooke & Miller in Spokane, attorneys for New

7  Century Mortgage.  Their address is 717 West Sprague Avenue,

8  S-P-R-A-G-U-E, Suite 1200, Spokane, Washington, 99201-3505.

9  Phone #509-455-6000.

10     They filed a -- the attorneys -- their attorneys filed a

11  statement of appeal, a notice of appeal, an election from the

12  Bankruptcy Courts order granting the Plaintiff's Motion for

13  Summary Judgment, docket #88, heard by the District Court.

14  Case #05-09692-W-13.  New Century filed a Chapter 13.

15  Adversary proceeding 06-80040.  On October 26th the Rose

16  Townson Trust attorney, Scott R. Smith of Stampa Root Spockman

17  Smith in Spokane, address 720 West Boon Avenue, Suite 200,

18  Spokane, Washington, 9201.  Phone #509-326-4800.  Bankruptcy

19  case #05-09692-W-13.  Adversary proceeding #06-80040.  New

20  Century Mortgage memorandum in support for stay pending appeal

21  for posting supersedes bond in the amount of $612,591.21.

22          THE COURT:  Mr. Riley, excuse me for interrupting,

23  but what I'd like you to tell me is why you are objecting to

24  the entry of the order.

25          MR. RILEY:  Well, we're objecting to the order -- in

1  other words, our lien was priority lien before New Century made

2  the loan to these people.  And they have appealed Judge

3  Williams' ruling that we were allowed the case, and let me read

4  this to you.

5          THE COURT:  No, don't read anything else.

6          MR. RILEY:  Okay.

7          THE COURT:  Let me hear from the Debtor.

8          MR. LOGAN:  Your Honor, nothing in the

9  Debtor-In-Possession financing would adversely or positively or

10  negatively affect anything -- I didn't catch his name, but the

11  person on the phone --

12          THE COURT:  Mr. Riley.

13          MR. LOGAN:  Mr. Riley's talking about.  New Century

14  made various loans.  They may be subject to first liens.  They

15  may be subject to second liens.  They -- the priority may be in

16  dispute.  All the Debtor-In-Possession loan facility does is

17  grant a lien in New Century's loans, whatever priority they may

18  or may not have, to the D-I-P Lenders.  And disputes Mr. Riley

19  may have concerning the priority of a loan New Century made is

20  an interesting issue, but just not relevant to the

21  Debtor-In-Possession financing.

22          THE COURT:  Mr. Riley, do you understand what

23  Debtor's counsel has just said?

24          MR. RILEY:  Yes, but if he let me finish -- it's --

25  Judge Bonnie R. Sucal, United States District Bankruptcy Judge

1   for Eastern District of Washington ordered a stay in the case

2   that says, "Before this Court is the parties joint oral request

3   to stay this case in light of New Century's April 2nd, 2007

4   filing for bankruptcy in the District of Delaware.  Bankruptcy

5   case #07-10416.

6          THE COURT:  I know what the case number is,

7   Mr. Riley.

8          MR. RILEY:  Okay.

9          THE COURT:  But the point --

10          MR. RILEY:  The parties raise --

11          THE COURT:  Mr. Riley?

12          MR. RILEY:  Yes.

13          THE COURT:  The point of it is that if you're

14   involved in litigation outside of this Court which has been

15   stayed by virtue of the bankruptcy filing, two things.  One,

16   there is a method that can be employed to ask this Court for

17   permission to let that litigation proceed.  But secondly, the

18   point -- and I guess what's before me today is the question

19   which you raised of whether the orders I'm being asked to enter

20   with respect to the financing in any way adversely affects the

21   priority dispute that you have, and it does not.  So if that's

22   the basis for the objection, and again, it's an oral objection,

23   I've seen nothing in writing, I will overrule it.

24      Now is there some other ground upon which you think this

25   order should not be entered?

1          MR. RILEY:  Well, according to the -- Judge Sucal it

2    says the Court -- that this litigation cannot forward until the

3    automatic stay of proceedings in bankruptcy -- pending

4    bankruptcy is lifted.  And according --

5          THE COURT:  That may be correct.  And there is a way

6    for you to come to this Court and ask that the stay be lifted.

7          MR. RILEY:  Okay.

8          THE COURT:  But I'll leave that for you to consult

9    counsel about.

10          MR. RILEY:  I see.  But I don't have a Delaware

11   attorney.

12          THE COURT:  Well, you may need to employ one.

13          MR. RILEY:  I can't find one is my problem.  I've

14   tried and they're all tied up with this Chapter 11 case.  It

15   says -- one more thing.  It says, "According to the parties

16   joint motion for stay is granted the case shall remain stayed

17   until such time either party files a motion to lift the stay."

18   Hello?

19          THE COURT:  I'm here.

20          MR. RILEY:  Oh.  And what we're -- what I'm concerned

21   about is that if New Century files -- has a sale of that piece

22   of property or the lien on it, their mortgage, where do we

23   stand as far as our lien is concerned?

24          THE COURT:  Well, again that's something about which

25   you should consult counsel, but the rules would require that if

1   New Century were to undertake a -- or a transaction or request

2   relief from this Court which would affect your interest you

3   would receive notice of that.  But again, under the

4   circumstances I encourage you to consult counsel, and if you

5   wish to move forward with requesting relief from the stay there

6   is a way to do that.  And again, if you're doing so on behalf

7   of the trust you must do so with the aid of counsel.

8           MR. RILEY:  I see.  And would my attorney here in

9   Spokane tell me how I could do that or --

10          THE COURT:  Well, I don't know what your attorney

11  knows about bankruptcy, but I'm sure there are plenty of

12  competent bankruptcy counsel somewhere near you.

13          MR. RILEY:  Okay, now this is -- what is this called

14  again, Your Honor?  It's to lift the stay or --

15          THE COURT:  Yes, you need to file a motion asking for

16  this Court to lift the stay.

17          MR. RILEY:  Ask the Court to lift the stay.

18          THE COURT:  And it may very well be that under the

19  circumstances the Debtor may agree.  Now I'm not saying that it

20  will or it won't.  But it's not unusual to have such disputes

21  resolved outside of this Court.

22          MR. RILEY:  I see.

23          THE COURT:  But that's not for me for here today.

24  Anything further, Mr. Riley?

25          MR. RILEY:  No, that should complete it.

1            THE COURT:  Thank you, sir.

2            MR. RILEY:  Thank you, sir.

3            THE COURT:  Does anyone else care to be heard in

4    connection with the D-I-P Order?

5            ALL:  (No verbal response).

6            THE COURT:  I hear no response.

7            MR. LOGAN:  Your Honor, did I hand up the order?

8            THE COURT:  You did.  And I've signed it.  All right,

9    what's next?

10           MS. UHLAND:  Next, Your Honor, we have the Debtor's

11   motion to approve the sale of their LNFA and certain residual

12   assets.

13           THE COURT:  Which of the objections are still

14   outstanding?

15           MS. UHLAND:  Your Honor, we delivered our proposed

16   language to resolve the State of Ohio objection to the State of

17   Ohio last week.  We have not heard back from them either way.

18   But based on our prior conversations we understand that that

19   resolves their objection.

20       Your Honor, we received -- the objection from the

21   Creditors Committee's resolved.

22       There are objections from the -- objections H and I, which

23   are objections from certain Texas taxing authorities.  We have

24   contacted them and informed them that there's no tangible

25   personal property located in Texas.  That's been transferred so

1   I do not believe they are further pressing those objections.

2        And with respect to the National City objection, we are

3   not transferring any of their -- the property listed in those

4   schedules.

5        The United States Trustee filed earlier objections with

6   respect to the sale at the time of the bid procedures.  We've

7   included some language and now some additional language, and I

8   believe that some of it was being reviewed this morning by the

9   Purchaser.  I'm checking to see whether that had been finally

10  agreed to.  So with those final agreements and language the

11  United States Trustee's objections are also resolved.

12       So my understanding, Your Honor, is that there are no

13  objections being pressed to the sale.

14            THE COURT:  What about Maricopa County filings which

15  just came in?

16            MS. UHLAND:  Your Honor, I'm not sure I saw that

17  objection.

18            THE COURT:  Told they were filed late on Friday

19  night.  Not on the agenda.  I'll hand you my copies if you'd

20  like.

21            MS. UHLAND:  If you would, Your Honor.  I believe

22  since we're not selling any personal -- or tangible personal

23  property, that's I believe in Arizona -- we're selling only

24  loans.  We're not selling any of the foreclosed properties as a

25  result of the loans.  That we could make the same

1  representation that we could to the Texas taxing authorities

2  that no tangible or real personal property in Arizona is being

3  transferred in accordance with the sale.

4         THE COURT:  Okay.  And it seems to me the objection

5  is directed to that issue.  Okay.  Any -- before you proceed,

6  let me just ask our -- would any of the objectors, or prior

7  objectors, care to be heard?

8         MR. POWER:  Your Honor, real briefly, Mark Power for

9  the Creditors Committee.  Your Honor, first of all, we'd be

10  remiss if we didn't complement the Debtor and the professionals

11  in the auction that occurred last week.  It was very smoothly

12  run and highly professional in our view.

13      The Debtor worked well with the Committee and we were able

14  to resolve all the issues we raised in connection with the

15  original Asset Purchase Agreement.  There were a number of

16  provisions that were of concern to us, and the final bidders

17  were able to negotiate in good faith and resolve every one of

18  those issues.  So we can withdraw our objection.

19      Your Honor, I can report to the Court that there was

20  lively bidding at the auction.  It lasted pretty much up to the

21  evening.  And that the Committee was very satisfied that the

22  results of the competitive bidding and the good faith nature of

23  the bidders that the results achieved today represent fair

24  value.  And this is the maximum value for these assets.  So the

25  Committee withdraws its objection and supports the sale.

1          THE COURT:  Thank you.

2          MS. UHLAND:  Thank you, Your Honor.  Your Honor,

3   we're seeking approval today of the sale to the winning bidder,

4   Ellingin -- I'm sorry.  Ellington Management Group, LLC for a

5   purchase price of $58 million.  The purchased assets, as we

6   previously described, consist of approximately 2000 loans owned

7   by the Debtor.  Refer to those as loans not financed anywhere.

8   And certain residual interests and securitization trusts.  Some

9   of these are net interest margin interest, and others are other

10  types of equity residuals.

11         As we described previously at the prior hearing, these

12  assets were difficult for the Debtors to sell prepetition

13  because of the fact that the loans that we're discussing are

14  loans that are frequently lower quality loans.  They've been --

15  either have a documentation issue or for some other reasons

16  have come back into the Debtor's possession.  And with respect

17  to the residual interests that were being sold, some of them

18  are later in life, and also certain of those have documentation

19  issues.

20         Since the Court approved the bidding procedures the

21  Debtors and Lazard engaged in a continuing marketing process,

22  and set the bid deadline pursuant to the procedures as revised

23  as April 30th.  The Debtors received five qualified bids.  They

24  received those qualified bids from Countrywide Home Loans; DB

25  Structured Products, Inc.; Credit Based Asset Servicing and

1  Securitization, LLC, which we refer to as C BASS; Ellington

2  Management Group, LLC; and a joint bid by GMAC Residual Funding

3  Company, LLC, and Oakhill.  After those bids were received the

4  Debtors working with the Creditors Committee analyzed the bids,

5  as well as the proposed forms of asset purchase agreements

6  received by each of those bidders.

7       In connection with that process the Debtors worked closely

8  with the Creditors Committee in an effort to resolve the

9  Creditors Committee's objections and addressed their concerns

10  with respect to the asset purchase agreement.

11       On May 1st the Debtors determined that the Countrywide bid

12  was at that time the highest and best bid.  That was based not

13  only on price but also the fact that the Countrywide bid had

14  several document -- or contract improvements from the Greenwich

15  bid, including the following.

16       First, with respect to the hold back amount, that the hold

17  back would apply not only to the designated items in a --

18  previously identified in the Greenwich purchase agreement would

19  in fact -- but would in fact be applied to all of the reps and

20  warranties contained in the agreements.  That it would clarify

21  that any reduction from the hold back amount, or reduction in

22  purchase price as a result of the breach of reps was only in

23  accordance with the agreed percentage -- or the agreed price

24  reduction percentage that applied to the hold back amounts.  In

25  other words, there could not be -- we were in affect tapping or

1  predetermining the damage amount with respect to any breach of

2  representation.

3       Further, the Debtors made, and Countrywide agreed to make

4  clarifications with respect to the provisions with the certain

5  residual interests where the certificates had been lost.  There

6  was the concern by the Creditors Committee there was some

7  ambiguity that there may be some closing delivery requirements

8  while the Debtors did not believe this to be the case with the

9  Greenwich transaction.  We clarified that so that it was clear

10  that the Debtors, to the extent the certificates were lost,

11  were not required to deliver them to close the sale.

12       With those -- further, instead of a one-year time period

13  on the rep and warranty there is a 90-day period with respect

14  to the effectiveness of the reps and warranties, after which

15  time no claims made on the hold back, the hold back must be

16  returned.

17       On May 2nd, the date of the auction, the Debtors, their

18  representatives, Lazard, the Creditors Committee and its

19  financial advisors all participated at the auction in

20  O'Melveny's offices in New York, commencing approximately

21  11:30.  I will set forth further in a more detailed proffer,

22  but in essence, Your Honor, over the next 11½ hours there were

23  nine rounds of bidding at which each -- and in each round the

24  economic and noneconomic terms of the bids were announced.  And

25  after each round of bidding the Debtors, together with the

1  Creditors Committee, determined which bid would be the lead bid

2  for the next round of bidding.

3      At the conclusion of that process in the final round of

4  bidding only two bidders remained, Ellington and CBASS.  In the

5  final round the Ellington bid was 58 million, and the CBASS bid

6  was 57.4 million.  Thus Ellington was declared the highest and

7  best bidder, and deemed the successful bidder for the assets,

8  and CBASS was declared the back up bidder.

9      The Ellington and the CBASS purchase agreements contain

10  the modifications previously requested by the Debtors and the

11  Creditors Committee, and were agreed to in connection with the

12  Countrywide bid with respect to the escrow, the hold back

13  amount, the Debtor's representations and warranties, and the

14  clarifications with respect to the residual certificates.

15      In addition, Your Honor, Ellington agreed to allow the

16  Debtors to in affect address some of the issues with respect to

17  the Ohio loans that are the subject, or potentially the subject

18  of the injunction, allowing the Debtors to, if they can, place

19  those loans with -- if they can't transfer the loans to put

20  those loans effectively to Ellington during the 90-day period,

21  provided that if Ellington does not desire to take those loans

22  they may decline to do so but without a reduction of purchase

23  price.

24      Your Honor, based on this record on this bidding the

25  Debtors and the Creditors Committee determined for the

1  documentation reasons and overall price that this bid is the

2  highest and best bid and would seek Court approval of that bid

3  today.

4        Proceeding, Your Honor, that an approximately 20% increase

5  over the purchase price, the Debtors will be paying out the

6  break-up fee, or propose to pay out, and the order provides

7  that they pay the break-up fee to Greenwich as previously

8  agreed and set forth in this Court's order.

9        Your Honor, we would propose to submit a -- I'll try to

10  summarize, but brief proffer to provide the appropriate

11  evidence for the findings in the order, and then, Your Honor,

12  walk through the changes to the order to the one originally

13  proposed.

14        THE COURT:  All right.  Can we take just a

15  five-minute break before you proceed?

16        MS. UHLAND:  Yep.

17        THE COURT:  All right, five minutes.

18  (Court in recess)

19        THE CLERK:  All rise.  Be seated please.

20        MR. LOGAN:  Your Honor, just a very brief update on

21  the Debtor-In-Possession financing facility.  The sun did

22  shine.  The facility has been up sized to $100 million.

23        THE COURT:  Very well, thank you.

24        MS. UHLAND:  Some good news today.  Your Honor, I'd

25  like to proffer the testimony of Mr. Blake O'Dowd.  Mr. O'Dowd

1  is in the Courtroom today.  Mr. O'Dowd is a managing director

2  with Lazard Freres.  Mr. -- he's one of the senior members of

3  Lazard's restructuring groups.  Mr. O'Dowd has been involved in

4  the restructuring of troubled companies for over 12 years.  He

5  has been the lead banker on a number of major restructurings,

6  including Fruit of the Loom, Kaiser Aluminum, National Energy

7  Group, and Sun Health Care.

8      He's been involved in several other restructurings in and

9  out of Court, including ATA Airlines, Sellatext, Fox Myer

10  Corp., Marvel Entertainment, Simmons Upholstered Furniture and

11  Wireless One.

12      Mr. O'Dowd has a BA from Duke University and an MBA from

13  New York University.

14      Mr. O'Dowd is one of the managing directors with Lazard

15  leading the engagement, along with Mr. Kurtz in representation

16  of the Debtors.

17      Called to testify Mr. O'Dowd would further testify that

18  since the Court approved the bidding procedures that -- with

19  respect to the Greenwich assets that Lazard had approximately

20  six to eight of its employees devoted to the marketing of the

21  assets and the auction and sale process.  That they collected a

22  diligence materials on the assets and established a data room

23  where perspective bidders could review and evaluate those

24  materials.

25      Lazard always initiated communications with parties they

1 previously identified as potential bidders such that they

2 contacted approximately 75 potentially interested parties,

3 approximately 40 of which executed -- expressed interest, and

4 31 executed nondisclosure agreements with the Debtors with

5 respect to these assets.

6      Following the extensive marketing of the assets, Mr.

7 O'Dowd would testify that the Debtors received five qualified

8 bids for the assets, and that the parties -- by the deadline of

9 the April 30th, and that the parties submitting the qualified

10 bids included Countrywide Home Loans, Inc.; DB Structured

11 Products, Inc.; Credit Based Asset Servicing and

12 Securitization, LLC, or CBASS; Ellington Management Group, LLC;

13 and a joint bid by GMAC Residential Funding Company, LLC, and

14 Oakhill.

15      He would testify that after the bids were received the

16 Debtors, Lazard and the Creditors Committee evaluated and

17 discussed the economic terms of the bids as well as other terms

18 and conditions of the asset purchase agreements by the bidders.

19 They also analyzed the methods in which, pursuant to the

20 auction process, they could improve the terms of the asset

21 purchase agreements in both economic and noneconomic aspects

22 and maximized the value of the assets and the recovery for the

23 Estates.

24      On May 2nd representatives of the Debtors, Lazard and the

25 Creditors Committee and its advisor, FTI, the stalking horse

1  bidder, Greenwich, and the qualified bidders Countrywide,

2  Deutsche Bank, CBASS, Ellington, and GMAC/Oakhill Venture

3  assembled at the offices of O'Melveny & Myers in New York at 10

4  a.m. for the auction.

5       Prior to commencing the auction the Debtors, Lazard and

6  the Creditors Committee discussed with Countrywide its initial

7  bid, which was at the time the highest at approximately $49

8  million, and certain terms of the asset purchase agreement to

9  determine if Countrywide would agree to approve the terms of

10  its agreement.

11       Mr. O'Dowd would further testify that Countrywide did

12  agree to the modifications in the asset purchase agreement,

13  including an agreement to reimburse the Debtors for any

14  servicing expenses commencing on April 2nd and thereafter, a

15  willingness to close without obtaining physical certificates

16  for the lost -- where the residuals -- for those that had been

17  lost.  A put on any loans that may be subject to a preliminary

18  injunction in Ohio.  Capping all liabilities for claims arising

19  under the purchase agreement to the $3 million hold back, and

20  setting the amount of damages for any particular loan that

21  could not be transferred based on the predetermined percentage

22  for the unpaid balance of that loan.  The Debtors thereafter

23  commenced the auction with the Countrywide bid of 49 million

24  and improved asset purchase agreement terms.

25       Mr. O'Dowd would further testify that over the next 11½

1   hours the Debtors conducted nine rounds of spirited and

2   competitive bidding during which the bidders would announce the

3   economic and noneconomic terms of their bid.  After each round

4   of bidding the Debtors in consultation with the Creditors

5   Committee would select the bid they deemed the highest and best

6   bid for the assets.

7       Further, each bidder was given the opportunity to pass

8   during a single round of bidding.  However, if they declined to

9   submit a bid in two consecutive rounds of bidding they were

10  required to withdraw.

11      Mr. O'Dowd would testify that frequently there were breaks

12  between the rounds of biddings for the parties to consider the

13  economic and noneconomic terms offered by the highest and best

14  bid in the previous round and to evaluate the bids they could

15  make for the assets.  During these periods the Debtors, Lazard

16  and the Creditors Committee extensively discussed with the

17  bidders the terms of their bid and made suggestions on how to

18  improve their bids.  These suggestions often included

19  improvements to the asset purchase agreements that the Debtors,

20  Lazard and the Creditors Committee believed to be more

21  favorable to the Estate and greater benefits in addition to

22  maximizing the economic consideration for the assets.

23      Over the subsequent rounds of bidding the purchase price

24  and other terms of the transactions were significantly

25  improved, and as one would expect, the number of bidders

1  willing to continue to increase their bids and remain in the

2  auction gradually declined.

3       He would testify that in the final round of bidding, the

4  9th round, only two bidders remained, Ellington and CBASS.  In

5  the final round of bidding Ellington bid 58 million and CBASS

6  bid 57.4 million for the assets.  Thus Ellington was declared

7  the highest and best bidder and the successful bidder for the

8  assets, and CBASS was declared the back-up bidder.

9       At approximately 9:30 p.m. eastern standard time, or it's

10 actually eastern daylight time, I believe, on May 2nd the

11 auction was concluded.

12      Mr. O'Dowd would further testify in declaring Ellington

13 the highest and best bidders the Debtors, Lazard and the

14 Creditors Committee considered several factors, including that

15 1) Ellington offered the highest overall purchase price of the

16 assets compared to other bidders, 2) the formula and price

17 calculations employed by Ellington resulted in the smallest

18 amount that could be taken from the hold back and effectively

19 deducted from the purchase price, 3) Ellington agreed to the

20 modifications to the asset purchase agreement and the Sale

21 Order requested by the parties which were part of the Estate

22 additional economic and noneconomic benefits.

23      Mr. O'Dowd would further testify that in his opinion

24 throughout the auction and sales process the assets were

25 aggressively and adequately marketed by the Debtor and Lazard,

1   and in his opinion the auction was properly advertised and

2   announced, including a publish of notice of the sale hearing

3   and auction in the Wall Street Journal, and Lazard's

4   independent effort to solicit interest from approximately 75

5   potential buyers.

6        He would further testify that in his opinion the auction

7   that took place over 11½ hours and 9 rounds of bidding

8   involving 5 qualified bidders was well-conducted and caused the

9   bidders to submit highly competitive bids in increasing

10  amounts, and that the efforts of the Debtors, Lazard and the

11  Creditors Committee to encourage bidders to improve their

12  economic terms facilitated the auction process and the

13  submission of improved bids.

14       He would further testify that the parties and the bidders

15  engaged in hard fought and arm's length negotiations at all

16  times, and that at all times the participants in the auction

17  acted in good faith with respect to their bids submitted.

18       Finally, he would submit that in his opinion the Ellington

19  bid is the highest and best bid for the assets, represents the

20  maximum value that could be obtained for the assets under the

21  circumstances, and that a well-conducted sale and auction

22  process took place.

23       He would further testify that the other terms Ellington

24  has agreed to incorporate in the asset purchase agreement

25  provide additional benefits to the Estate and the Creditors and

48

1  further improve the value of the Ellington bid, as opposed to

2  other bidders.

3      That concludes the proffer of Mr. O'Dowd.

4          THE COURT:  Does anyone care to examine Mr. O'Dowd?

5          ALL:  (No verbal response).

6          THE COURT:  I hear no response.  Anything further in

7  support of the sale?

8          MS. UHLAND:  Your Honor, only, Your Honor, to submit

9  the proposed Order and walk the Court briefly through the

10  changes.

11          THE COURT:  Okay.

12      (Pause in proceedings)

13          MS. UHLAND:  Your Honor, let me confirm that the

14  final language is actually in the order that I'm about the hand

15  up.

16      (Pause in proceedings)

17          MS. UHLAND:  Your Honor, I'd like to walk the Court

18  through the changes but we received -- we made some finer

19  modifications in response to some language requests from the

20  United States Trustee's office, so we're gonna need to run

21  those and bring this back this afternoon.  So Your Honor, what

22  I would propose to hand up to you is -- oh, I do have a -- I

23  have a blackline with all of those change -- with all the

24  changes, but I don't have a clean right now.

25          THE COURT:  Okay.

1          MS. UHLAND:  May I approach with the blackline?

2          THE COURT:  Yes.  Thank you.

3      (Pause in proceedings)

4          MS. UHLAND:  Your Honor, the first three pages of --

5  where there's changes simply update to correct to the actual

6  purchaser of the assets is.  On page 4 of the blackline we've

7  included some additional language in paragraph (d) requested by

8  the purchaser.

9          THE COURT:  Well, this is proposed as a -- well, I

10  guess a finding of fact.  What in the record could you point to

11  to support that finding?

12          MS. UHLAND:  Your Honor, we have submitted the signed

13  -- previously connected with the Greenwich asset purchase

14  agreement we have submitted a signed asset purchase agreement

15  where the Debtors have made the representations and represented

16  that they're true and correct.

17          THE COURT:  That doesn't do it for me.

18          MS. UHLAND:  Your Honor, may I -- as I said, this was

19  a request of the purchaser.  Maybe I can have the counsel for

20  the purchaser come so we can come up with some proposed

21  language.

22          MR. DURRER:  Good morning, Your Honor, Van Durrer,

23  Skadden Arps Slate Meagher & Flom on behalf of Ellington

24  Management Group and its client funds.  We had requested that

25  there be a finding as to this reference instead of incorporated

1   -- instead of incorporating certain provisions of the asset

2   purchase agreement in the record.  I believe there was also a

3   declaration submitted in connection with the initial motion

4   that described that the Debtors were willing and able to close

5   the sale.  We didn't had any reps and warranties that weren't

6   in the asset purchase agreement that were material from what

7   was originally submitted.  So I think there is evidentiary

8   record foundation for this finding.

9          THE COURT:  Well, in the absence of objection I think

10  I gave pretty wide latitude to what the parties suggest I

11  should make as findings.  And it may be that they are all true,

12  but I don't think there's anything in this record that supports

13  that.  It's just -- for me it's just a little bit over that

14  line, that's all.

15         (Pause in proceedings)

16         THE COURT:  I'd take a proffer from the Debtor or its

17  representative in support of that.

18         MS. UHLAND:  Right.

19         MR. DURRER:  Yeah, that's what we were actually –

20         MS. UHLAND:  Right.

21         (Pause in proceedings)

22         MS. UHLAND:  Your Honor, the Debtors have in the

23  Courtroom today a Mr. Suni Mondava with Lazard, who is very

24  familiar with the asset purchase agreement and the

25  representations made therein by the Debtor.  So the Debtors

1  could at the conclusion walk you through this order, propose a

2  brief proffer of Mr. Mondava to support that.

3          THE COURT:  Very well, thank you.

4          MS. UHLAND:  Your Honor, proceeding to the next

5  changes at the request of the purchaser, they're located on

6  page 6.  Notably in paragraph (m) representing that its the

7  market value and in paragraph (o), establishing it's not

8  entering into improper fraudulent purpose.

9      Your Honor, on page 8, paragraph (s) is the language we've

10  addressed with the United States Trustee with respect to the

11  Debtor's privacy policies.  Also on page 8 in the operative

12  provisions, paragraph 4 we've agreed to change empowered from

13  directed.  To directed from empowered.  Page 10, paragraph 8 to

14  clarify that persons receiving notice or have actual knowledge

15  are in addition to Creditors of the Debtors requested to take

16  action to release documents as appropriate of the purchase

17  assets.

18      The next -- paragraph 11 on page 11, take a minute to walk

19  through.  This paragraph was included again to clarify the

20  issues with respect to the lost residual interest.  There's two

21  parts of this paragraph.  First, the Debtors are the owners of

22  the certificates of the residual interest, and the -- they are

23  the owners of the record in the registrar's list of holders of

24  the certificates.  The first sentence of this is simply an

25  instruction to the registrar or the indentured Trustee in this

1  case, to recognize the transfer and change the name of the

2  owner.  The second sentence is designed that if -- to provide

3  that if there is a -- the purchaser delivers an acceptable

4  letter of indemnity that's acceptable to the registrar that the

5  registrar or indentured Trustee will issue replacement

6  certificates.  This is not compelling the issuance of the

7  replacement certificates, unless this letter of indemnity or

8  similar insurance is in form and substance satisfactory to the

9  indentured Trustee.

10      On paragraph 15, just a further description with respect

11  to the types of liabilities the buyer is not assuming.

12      On page 13 the superpriority provisions previously

13  afforded Greenwich were eliminated and certainly less relevant

14  in light of the break-up fee issues.

15      And then in paragraph 17 there was some clarifications to

16  this language to respond to concerns by the Creditors Committee

17  that it may be too broad.

18      On page 15 some paragraph -- prior paragraph 22 is deleted

19  because of the -- it's no longer relevant if Greenwich is not

20  the purchaser.

21      And then in what is new paragraph 23 is where we address

22  some of the other objections.

23      Paragraph 23(a) addresses the Trustee's concern that this

24  transfer not be in some way inconsistent with new section

25  363(o) of the Bankruptcy Code.

1       Section -- paragraph, subparagraph (b) is the language

2   that we delivered last week to the State of Ohio to assure the

3   State of Ohio that defaulted or delinquent loans would not be

4   transferred or sold except in accordance with the existing

5   injunction with respect to the State of Ohio, which requires

6   their consent to transfer delinquent loans.

7       Finally, paragraph 3 relates to -- or addresses the

8   concerns of Deutsche Bank as one of the indentured Trustees to

9   be clear that the residual interests remain subject to the

10  servicing agreements.  In other words, we're not stripping away

11  any obligations or rights, frankly, with respect to the --

12  those interests that are being sold.

13      Paragraph 24 is some language we worked out with the D-I-P

14  Lenders to clarify because there's certain mandatory prepayment

15  provisions that apply in connection with the D-I-P agreement

16  and the sale.  There are -- the Debtors, Creditors Committee,

17  D-I-P Lender have worked to clarify that the efforts of the

18  Debtors to calculate the net cash proceeds resulting from the

19  sale and to provide for their payment as appropriate in

20  accordance with the D-I-P credit agreement.

21      And finally, Your Honor, there's a provision directing the

22  Debtors to pay the break-up fee to Greenwich.

23      Two other, just clarifications, or items to put on the

24  record.  The purchaser did want a clarification commitment from

25  the Debtors that to the extent that the Debtors delivered any

1  documentation directing any payments to the D-I-P Lenders

2  directly with respect to these residual interests the Debtors

3  will undertake to correct that and provide a new direction

4  immediately, and we've agreed to do that.

5      Second, Your Honor, in the addition to the changes that I

6  described to -- at a high level to sort of the specific

7  provisions of the asset purchase agreement to address the

8  Creditors Committees and to generally make the bid economically

9  better the Debtors did request and the buyer did agree to

10  include some express document preservation language in the

11  asset purchase agreement that the Debtors have been endeavoring

12  to insure that to the extent there's any regulatory or Federal

13  investigation or any ongoing investigation that we have all

14  documents preserved.

15      Accordingly, Your Honor, what we would propose to do is

16  bring back a clean copy of this this afternoon with the

17  attached executed asset purchase agreement and submit it to the

18  Court at that time.

19          THE COURT:  Very well.

20      (Pause in proceedings)

21          MR. POWER:  Your Honor, sorry for the distraction.

22  We're trying to work through the issue in the, I think (g) in

23  the order regarding the representations.  The investment banker

24  while can certainly testify as to the process and the notice in

25  making sure the highest value was received, cannot testify as

1  to the actual assets being sold.  During the auction there were

2  several issues raised as to what exactly was being sold and the

3  rights associated with the residuals.  Representations were

4  made to this buyer that certain rights were included with those

5  residuals, and the Debtor I think is comfortable with those

6  representations.  The buyer rightfully wants to make sure that

7  those are accurate today.

8      So since the witness for that specific factual evidence is

9  in California we suggest that we submit an affidavit, if nobody

10  objects today, that would provide basically evidence into the

11  record that the Debtor indeed owns those rights as represented

12  at the auction, so then the buyer is satisfied.  And if Your

13  Honor is satisfied we think Your Honor can enter the order as

14  proposed.  That's our current solution.  We recognize the

15  parties can't cross examine, but if nobody objects to that

16  process we think that's appropriate.

17          THE COURT:  Is the witness available by telephone

18  today?

19          MR. POWER:  Yes, Your Honor, we'll make him available

20  today.  If that's acceptable we can do it that way as well.

21          THE COURT:  It's fine with me.  Probably simpler,

22  anyway.

23          MR. POWER:  Okay.  Well, can we get a break on that

24  then, because we --

25          THE COURT:  You'll -- yes, we're going to, as I said,

1  adjourn no later than 12:15 and come back like 2:15 I think.

2          MR. POWER:  Thank you, Your Honor.

3          THE COURT:  Okay.  Does anyone else care to be heard

4  in connection with the proposed sale?

5          ALL:  (No verbal response).

6          THE COURT:  I hear no response.  All right, we'll

7  leave the evidentiary record open only for the purpose of

8  taking that one witness by telephone.

9          MS. UHLAND:  Okay, Your Honor, thank you very much.

10 And we'll bring back the order as well at that time.  I'd like

11 to turn this over to Mr. Merchant from Richards Layton.  He'll

12 be handling the balance of the matters on this morning's

13 agenda.

14         THE COURT:  Very well.

15         MR. MERCHANT:  Good morning, Your Honor, Mike

16 Merchant of Richards Layton on behalf of the Debtors.  Your

17 Honor, matter #6 on the agenda is the Debtor's motion to retain

18 the Hennigan Bennett firm as special litigation counsel.  The

19 Office of United States Trustee raised certain informal

20 concerns with respect to that retention.  We've resolved those

21 concerns through an amended Form of Order.  Perhaps it's best

22 that I approach and hand up the order and I can walk Your Honor

23 through the changes.

24         THE COURT:  All right.

25     (Pause in proceedings)

1          MR. MERCHANT:  First off, Your Honor, we agree with

2    the United States Trustee to change the retention from a 327(e)

3    retention to a 327(a) retention.  The basis for that change is

4    that the firm did not represent the Debtors prior to the

5    petition date.

6          Second, Your Honor, there is now a provision in the order

7    specifically disclosing the matters that the Hennigan firm is

8    working on.  Specifically the UBS adversary proceeding, the DB

9    Structured Products adversary proceeding, the Alaska Seaboard

10   Partners adversary proceeding, and then there is potential for

11   future representations, Your Honor, to the extent that 327(a)

12   counsel is conflicted.  The Hennigan firm has agreed to file

13   every 30 days a disclosure with the Court disclosing all

14   matters that they're working on.

15         Additionally, Your Honor, the order makes clear that the

16   Hennigan firm will be paid in accordance with the applicable

17   rules and any orders of this Court, rather than pursuant to the

18   terms of their engagement letter.

19         And finally, Your Honor, there was some language in the

20   original engagement letter regarding the Debtors giving their

21   consent to the Hennigan firm to work on certain matters in the

22   future.  The order now makes clear at the request of the United

23   States Trustee that the Debtor's right to object to any future

24   representations that haven't been disclosed or that may arise

25   in the future are preserved.

1      I think that summarizes all the changes to the order, Your

2  Honor.  This morning the Hennigan firm did file a supplemental

3  affidavit verifying that they are disinterested and that they

4  will file additional supplemental disclosures based on further

5  conflicts.

6           THE COURT:  Okay.  I read the other affidavit.  Other

7  than saying now because the nature of the representation has

8  been changed to a 327(a) representation and that they are

9  disinterested, is there any additional disclosure or difference

10  between that affidavit and the one previously submitted?

11           MR. MERCHANT:  No, I don't believe there is, Your

12  Honor.  They ran the same conflict check that O'Melveny ran,

13  that Richards Layton ran, but I think they do claim that they

14  attempted to run additional conflict checks based on the

15  various sales going on and notice to the Creditors Committee,

16  and if there are any additional things that need to be

17  disclosed they will file a supplemental disclosure to that

18  affect.

19           THE COURT:  All right.  Does anyone else care to be

20  heard in connection with this application?

21           MR. MCMAHON:  Your Honor, good morning, Joseph

22  McMahon for the United States Trustee.  In connection with the

23  switch of Hennigan Bennett's retention from a section (e) to a

24  section (a) application, it was important to our office to

25  circumscribe the scope of the retention such that Hennigan

1  Bennett will be only performing those matters that exist in

2  327(a) counsel can provide services with respect to.  And in

3  light of that, Your Honor, you know, our rights with respect to

4  existing 327(a) counsel are reserved.  Clearly to the extent

5  that Hennigan Bennett's employment were to expand to a certain

6  degree perhaps our office will be taking a look at issues

7  relating to existing counsel.

8           THE COURT:  Thank you.  Anyone else care to be heard?

9           ALL:  (No verbal response).

10          THE COURT:  I hear no response.  Do you have a Form

11  of Order for me?

12          MR. MERCHANT:  I do, Your Honor, if I may approach?

13          THE COURT:  Yes.

14      (Pause in proceedings)

15          THE COURT:  That order has been signed.

16          MR. MERCHANT:  Thank you, Your Honor.  The next

17  matter on the agenda is the Debtor's motion for approval of

18  certain ordinary course professionals procedures.  There were

19  concerns raised with respect to this motion by both the

20  Creditors Committee and the Office of the United States

21  Trustee.  I believe we've resolved all of those concerns

22  through an amended Form of Order.  If I may approach I'll hand

23  up a blackline for Your Honor.

24          THE COURT:  You may.

25      (Pause in proceedings)

1          MR. MERCHANT:  Your Honor, there are a number of

2    changes to walk through with respect to this order.  Perhaps I

3    can go through them one by one.  First, at the request of the

4    Office of the United States Trustee we've added language that

5    requires all ordinary course professionals to file their

6    affidavits within 30 days of the latter of the entry of this

7    order or the date that they start providing services.

8          Second, we've agreed with the Office of the United States

9    Trustee that all affidavits, including affidavits for the

10    professionals that will be identified on Exhibit-A of the

11    order, will go out on 20 days notice so that the Office of the

12    United States Trustee will have an opportunity to look at the

13    disclosures and determine whether further objection is

14    warranted.

15          Third, Your Honor, as many of the ordinary course

16    professionals are providing foreclosure services relating to

17    underlying mortgage loans we've agreed with the Creditors

18    Committee to add language whereby we'll agree to provide notice

19    to the foreclosure professionals of the sale of any underlying

20    mortgage loans, thereby notifying them that they're no longer

21    providing services for the Debtors, and it will be up to the

22    purchaser of those loans as to whether their services will

23    continue.

24          Fourth point, Your Honor, at the request of the Creditors

25    Committee we've added -- we've agreed to add a cap to the total

1  payments to be made to all foreclosure professionals under this

2  order.  The cap will be $805,000, absent written consent from

3  the Committee to increase that cap or an order of this Court

4  authorizing us to increase that cap.

5      Fifth point, Your Honor, is also at the request of the

6  Creditors Committee.  We've agreed to add an individual cap

7  with respect to the all of the other professionals on the

8  order.  When I say all the other I mean other than the

9  foreclosure professionals.  Each of them will have a $150,000

10  cap for the case, subject to increase with the consent of the

11  Committee, or by further order of the Court.

12      Sixth point, Your Honor, at the request of the Creditors

13  Committee we've added a provision making clear that the terms

14  of this order are subject to any further Sale Orders entered

15  into this case.

16      Your Honor, seventh point is at the request of both the

17  Committee and the Office of the United States Trustee.  We've

18  agreed to remove certain professionals from Exhibit-A to the

19  motion.  I can identify those professionals very quickly.  It's

20  Gibson Dunn & Crutcher; Howry, LLP; Bout & Titis, LLP; Wildman

21  Harrold; Gardeer Winsule; Hanes & Boone; and Sussman Godfrey.

22  We've agreed to remove them, and to the extent necessary we'll

23  file separate applications to retain those professionals.

24      We've also agreed to remove Shapiro Priceman, LLC from

25  Exhibit-A based on a call from their -- from that professional

1  that they're actually a member of Fisher & Shapiro, LLC, which

2  is also listed, and therefore they don't need to be listed

3  twice.

4       Based on negotiations with the Office of the United States

5  Trustee and the Creditors Committee we've also agreed to amend

6  the caps with respect to the certain of the professionals, and

7  these cap amendments will be reflected in the revised Exhibit-A

8  that I'll pass up with the clean order.

9       Those amendments are as follows.  Mayor Brown's cap will

10  be reduced to $25,000.  Rodesal & Anders cap will be reduced to

11  $10,000.  Segrew Mian, PLLC will be reduced to $25,000.  Wolf &

12  Wineman will be reduced to $20,000.  Broad & Castle were

13  reduced to $15,000.  Carlton Desanta & Frudenberger will be

14  reduced to $10,000.  Crane Catin & James also reduced to

15  $10,000.  The Curtis Law Group reduced to $10,000.  Deutsche

16  Carrigan & Styles would be reduced to $10,000.  And Rutan &

17  Tucker will be reduced to $10,000.

18       An additional professional listed on Exhibit-A, Your

19  Honor, is Neil Gerber & Eisenberger.  They did work for the

20  Debtors post petition, but the contact at that firm has since

21  left, and I understand that the Debtors will no longer be using

22  their services.  So while they are listed as an ordinary course

23  professional on Exhibit-A we've represented to the Committee

24  that we will not be using their services any longer.

25       And finally, Your Honor, at the request of the Office of

1  the United States Trustee a form affidavit of disinterestedness

2  is attached to the revised Order as Exhibit-B.  I think that

3  covers all the changes to the order, Your Honor.  I don't know

4  if anybody has any comments, or if Your Honor has any

5  questions.

6          THE COURT:  Anyone else care to be heard in

7  connection with this application -- motion?

8          MR. MCMAHON:  Your Honor, Joseph McMahon for the

9  United States Trustee.  It's my understanding, and I'd just

10 like counsel to confirm for the record that proposed ordinary

11 course professionals in two areas of services, specifically

12 providing representation to the Debtor's directors in

13 connection with certain litigation, securities class action

14 litigation and derivative suits brought against the company

15 prepetition, as well as services relating to the Audit

16 Committee's investigation of the prepetition accounting and

17 financial statement irregularities that have been well

18 publicized with respect to New Century, professionals providing

19 services in those two areas have been removed from the ordinary

20 course professionals list.

21         MR. MERCHANT:  Your Honor, I can respond to that

22 comment.

23         THE COURT:  Go ahead.

24         MR. MERCHANT:  I think there was one professional

25 that was listed on there that falls into those categories.  It

1  was unintentional, by mistake, and has since been removed.

2          THE COURT:  All right, thank you.

3          MS. KELBON:  Regina Stango Kelbon on behalf of the

4  Official Committee.  One other representation that the Debtors

5  have made is that none of the professionals listed on Exhibit-A

6  perform work solely in connection with the mortgage origination

7  platform since that has been shut down and is -- there were no

8  bids received by the bid deadline.  So those also are part of

9  the -- our understanding.  Thank you, Your Honor.

10          MR. MERCHANT:  That is correct, Your Honor.

11          THE COURT:  All right.  Does anyone else care to be

12  heard in connection with this motion?

13          ALL:  (No verbal response).

14          THE COURT:  I hear no response.  Do you have a Form

15  of Order?

16          MR. MERCHANT:  I do, Your Honor.  The revised list of

17  professionals, with the appropriate professionals taken off and

18  the caps revised is Exhibit-A.  Exhibit-B is the form affidavit

19  of disinterestedness.

20          THE COURT:  Thank you.

21          MR. MERCHANT:  Or I should say 327(a) affidavit, Your

22  Honor, not disinterestedness.

23      (Pause in proceedings)

24          THE COURT:  That order has been signed.

25          MR. MERCHANT:  Thank you, Your Honor.

1          MR. HUSTON:  Good morning, Your Honor.  May it please

2     the Court, Joseph Huston of Stevens & Lee on behalf of the

3     Movants in -- on agenda item #8, which is the Emergency Motion

4     of certain deferred compensation Beneficiaries for an order

5     directing the United States Trustee to appoint a separate

6     committee for those Beneficiaries.  With me today is our

7     co-counsel Robert Keach of the Bernstein Shur firm from

8     Portland, Maine who has been admitted pro hac vice.

9          The -- we filed -- the original objection deadline was set

10    at noon on Thursday, and because of the Committee's involvement

11    in the auction process we agreed to extend the Committee's

12    deadline until 4 o'clock that day.  They filed that day.  We

13    filed a response late on Friday, and we had a copy delivered to

14    Chambers.  Did Your Honor get it?

15          THE COURT:  This morning.

16          MR. HUSTON:  Forgive me on that.  We did our best to

17    get it in early enough to hit the agenda, and we were defeated

18    by the technology gremlins, which were hard at work on Friday.

19    That explains the lateness.  And we have additional copies here

20    if there's anyone in the copy that wishes a copy of that.

21    Mr. Keach will handle the presentation, Your Honor.  And as my

22    namesake found no room at the inn, there is no room at the inn

23    today.  So I'll sit back in the gallery, unless Your Honor

24    wants me to do something else.  Thanks.

25          THE COURT:  That's fine.  Thank you, Mr. Huston.

1          MR. KEACH:  Your Honor, Robert Keach from Berstein

2   Shur for Mr. Schroeder, et al., the former employees and plan

3   Beneficiaries, with respect to the New Century Financial Corp.

4   deferred compensation fund.  As Your Honor is aware, we filed

5   our 1102 Motion only after an unsuccessful attempt to seat a

6   Beneficiary on the Official Committee, and then to interface

7   with the U.S. Trustee's office in the hopes that the U.S.

8   Trustee's office would appoint a Special Committee of

9   Beneficiaries without the need for coming to Court.  We

10  certainly don't fault the U.S. Trustee's office.  This case is

11  moving at an incredibly rapid pace.  I think we just ran out of

12  time, I hope, in terms of our exchange.  In any event, Your

13  Honor, I won't summarize our entire motion or our entire reply

14  memorandum.

15      I would start by saying, Your Honor, that we do have one

16  witness present.  I'm prepared to proffer that witness'

17  testimony or to put him on live, whatever the parties prefer.

18  He is Mr. Martin Warren.  He's a former employee of New Century

19  Mortgage, and a plan Beneficiary.

20      Before I get to that proffer, Your Honor, what we have

21  offered both in the original motion and in the reply memorandum

22  is to establish that these Beneficiaries have a more than

23  colorable claim to the plan assets, that notwithstanding the

24  contentions of both of the -- Official Committee of Unsecured

25  Creditors primarily, and the suggestion by the U.S. Trustee's

1  office.

2      This is not an issue where the Estates or un-Estates

3  entitlement to these assets is clear.  We think it will be

4  litigated.  If the Beneficiaries have the capacity to litigate

5  the issue.  Because we believe that this plan is not a

6  so-called top hat plan under ERISA, and that these assets are

7  in fact being held in trust for the exclusive benefit of the

8  Beneficiaries.  We don't expect that the Court is gonna rule on

9  that issue today, of course.  That is a fact intensive inquiry.

10 It will require more discovery than we've taken.  But just on

11 the informal disclosures that we've gotten from the Debtors,

12 and I commend the Debtors on their cooperation in getting as

13 much information out to us as was feasible, given the track of

14 these cases, but based on that information alone it is apparent

15 that there are serious issues as to whether or not this plan is

16 a top hat plan, and serious issues as to whose assets these

17 are.

18     That, however, is not the only issue upon which the

19 Beneficiaries need representation, and we believe need an

20 Official Committee.  Even if the Beneficiaries were to lose

21 that issue, Your Honor, the Official Committee could -- and I

22 would hasten to add I think the obvious, and that is that the

23 Official Committee opposes the Beneficiaries on that issues.

24 We are diametrically opposed on the issue of ownership of the

25 assets.  Even if we were to lose that issue, and we certainly

1  don't expect to, there are serious issues that limit the

2  Official Committee's ability, or any other party's ability to

3  represent these Beneficiaries, all of whom are now former

4  employees after last Thursday.

5      The access of any Creditors to plan assets, even in the

6  case of a top hat plan, and even in a case of a properly

7  functioning rabbi trust is a function of the trust language

8  itself.  This trust language, and we attach copies of the trust

9  to our papers, this trust language says very clearly that the

10  only invasion of the trust assets in the event that insolvency

11  is found and the trust otherwise operates the way it's supposed

12  to operate, is for general Creditors of New Century Financial

13  Corp.

14      I don't think any of us knows sitting here today who those

15  Creditors are, because I certainly haven't seen consolidating

16  statements, as opposed to consolidated statements and 10Qs.  I

17  don't think we know -- I don't specifically know, I'm sure the

18  Debtor may know by now, but we've had no disclosure of what

19  obligations New Century Financial Corp. has as opposed to its

20  affiliates, whether those are contingent or liquidated.  And

21  whether or not they're in the forms of guarantees or otherwise.

22      But it may be that the universe of general Creditors of

23  New Century Financial Corp. is far smaller, and just based on

24  the disclosures and the 10Qs it would apparently -- it'll

25  obviously be far smaller than all of the obligations of all of

1  these affiliates.  Our position is that even if we lost the top

2  hat issue the only Creditors we share with are general

3  Creditors of New Century Financial Corp.  General Creditors has

4  been defined in the Molina decision, in fact as a common

5  definition, to mean only Unsecured Creditors, Your Honor.  And

6  not Secured Creditors with deficiency claims.

7      The Warehouse Lenders, to the extent they have claims

8  against New Century Financial Corp., and again, I don't know

9  that they do, I don't know that anybody other than the Debtor

10  know that at this point, we believe will not share in those

11  assets even if we lose.  That is not an issue upon which the

12  Committee can represent us.  The Committee is a fiduciary for

13  all of the Unsecured Creditors of all of these Estates, given

14  that it is a unified Committee in a multiDebtor case, and it

15  cannot take the position that the assets are limited to a

16  particular group of Creditors.  Your Honor, I think it's

17  obvious the Debtor can't protect us on that position either.

18      For that very same reason there may be issues, for

19  example, like substantive consolidation where we will be

20  diametrically opposed to the Official Committee.

21      With respect to the issue of the Warehouse Lender's claims

22  and who they're against and what they are and what size they

23  are and whether or not they've properly exercised their rights,

24  this is an issue we care very much about to the extent those

25  are Creditors of New Century Financial.  It is an issue that a

1  Creditors Committee dominated by Warehouse Lenders would find

2  very difficult to address it seems to us.  So there are issues

3  that I think make it apparent that the Committee cannot

4  represent us.  And that no other party in the case can

5  represent these interests.

6      If one were to look at the 1102 factors, Your Honor, this

7  is certainly a large, complex case.  I don't think that's

8  necessarily a determinative factor, but I think also in the --

9  when one is looking at nature of the case as a factor, you also

10  have a look at other factors like the velocity of the case.

11  Like whether or not it's a liquidating or reorganizing case.

12  In a liquidating case where you now have over 500 Beneficiaries

13  of this plan, you have well over 3,000 former employees, about

14  2,000 of which I understand were laid off last week, employee

15  interests are substantial.  And in this case if one looks at

16  the declared liquidating unsecured claims from the original top

17  50 list the Beneficiaries with $43 million of contingent

18  potential claims in the aggregate are one of the largest

19  interests in the case.

20      With respect to the factor of groups of Creditors and

21  their interest, Your Honor, you have very different interests

22  between the Beneficiaries, obviously, and the Warehouse Lenders

23  on the Committee, and the other members of the Committee.

24  We've already pointed out the very serious issues of difference

25  with respect to the critical issues to the Beneficiaries.

1      With respect to the composition of the Committee, as the

2  U.S. Trustee's response points out, these are substantially

3  financial institutions, but more importantly, that issue goes

4  to whether or not we're otherwise represented on the Committee.

5  We're not.  And if one looks at virtually every case that was

6  sited by the Official Committee and by the U.S. Trustees's

7  office in opposition the Winn-Dixie case the Enron case, Dana,

8  in Gardenridge, in every one of those cases the moving class

9  already had representatives on the Official Committee.  And the

10  issue was whether or not there were intracommittee conflicts

11  that prevented those Committees from functioning, and the issue

12  was whether or not those parties would be outvoted.  This is an

13  issue where we even get a chance to be outvoted, Your Honor,

14  but not at the table.

15      THE COURT:  Well, are you suggesting that if the U.S.

16  Trustee were to add the Beneficiary representative to the

17  Committee that that would solve your problem?

18      MR. KEACH:  I don't know that it would -- I think it

19  might solve our problem in terms of being at the table.  It

20  might give the existing Committee some serious intracommittee

21  conflicts.  Particularly on the issue of the ownership of the

22  assets.  And I'm not sure, frankly, how a unified -- and with

23  respect to this issue of substantive consolidation, or joint

24  and several liability.  I'm frankly not sure how a unified

25  Committee could effectively deal with those issues.  It would

1  certainly be a very difficult governance problem.

2      I've been involved in cases where with respect to

3  intracompany issues, for example, the Committee has been broken

4  into subcommittees to deal with issues like that.  And we have

5  the Revco example of a Committee being bifurcated when there

6  were problems.  So I'm not suggesting that it is

7  insurmountable.  But it would be difficult.  We do think that a

8  separate Committee of the Beneficiaries is superior, certainly,

9  to the Beneficiaries, and we think probably would operate more

10  smoothly than simply adding us to the Committee.  But being

11  added to the Committee would be better than not being here.

12      The issues that waive to this -- or I should say go to

13  this Court's exercise of discretion, and I'll be brief, because

14  far be it for me to talk to the Court about how to exercise its

15  discretion.

16          THE COURT:  Oh, I get suggestions all the time.

17      (Laughter)

18          MR. KEACH:  Well, let me make a couple, Your Honor.

19  The -- we think this is a case and a situation that does cry

20  out for the exercise of discretion to form a Committee.  There

21  are well over 500 -- our belief is there are 570 Beneficiaries,

22  all of whom are potential Claimants, depending on the outcome

23  of the issue over ownership of the assets.  They are admittedly

24  contingent Claimants with respect to monetary claims, but as

25  Dow Corning teaches us, there is no prohibition on a committee

1  of contingent claims.  And in fact many cases have Committees

2  of that type.

3      The Official Committee, as I've already pointed out, is

4  going to be opposed to the Beneficiaries on critical issues.

5  We filed this motion as timely as possible, as soon as we were

6  aware we were not going to be on the Committee, and as soon as

7  we were not able to get a timely response from the U.S.

8  Trustee's office, and again, I don't mean that by way of

9  criticism, it just didn't happen.

10     There's also no other effective avenue, Your Honor, for

11 these parties to be represented.  It's not at all clear that a

12 503 substantial contribution claim would lie, for example, if

13 the parties were successful in excluding the assets.  I don't

14 say that it wouldn't be, but it's far from clear.

15     The -- it is not at all clear, for example, that a

16 contingent fee arrangement could ever be worked out in a case

17 like this that would be effective.  It is -- and our witness

18 will testify, and I'll go through that proffer in a second, it

19 is not likely that even though we have a very large group of

20 Beneficiaries with a lot of money at stake that they would be

21 able to individually or collectively fund their involvement.

22          THE COURT:  Well, one question I have is, while there

23 are some amounts that were listed in the initial motion, I

24 think --

25          MR. KEACH:  Sure.

1          THE COURT:  -- given the number of -- alleged number

2    of Beneficiaries --

3          MR. KEACH:  Sure.

4          THE COURT:  -- I mean, where do the numbers fall?  I

5    mean, what's -- if that information's in the papers I didn't

6    see it.

7          MR. KEACH:  Sure.  Actually, we did put some numbers

8    in the papers to the extent we were able to get them, Your

9    Honor.  But let me briefly summarize.  The nature of this plan

10   is that it is very top heavy in terms of the large amounts, but

11   the way you get the large numbers like this, and this goes to

12   our top hat issue, there are a large number of Beneficiaries,

13   in the hundreds, who have relatively small amounts here.  I

14   believe, and I -- we need to get some discovery to back this

15   up, but I believe that half of the Beneficiaries of the plan

16   have amounts less -- certainly less than $100,000, and it may

17   be that an extremely large number of numbers of less than

18   $50,000.

19       I would hasten to point out, Your Honor, that the -- the

20   obvious, but the fact that there is money sitting in trust

21   somewhere also doesn't mean that it's in the pockets of these

22   Beneficiaries.  The fact that there is a large amount at stake

23   is not a reflection of their individual liquidity.  As

24   Mr. Warren would testify, based on his efforts in attempting --

25   and the efforts of others in attempting to organize this group

1  of Beneficiaries, they simply don't have the kind of liquidity

2  that would permit them, even collectively, to fund the kind of

3  litigation and involvement in these cases that's necessary for

4  the protection of their interest.

5      Mr. Warren would testify, and I'll go to the whole proffer

6  in a second, that even though he has over $830,000, I believe,

7  in the plan, that he individually could not afford to fund the

8  kind of involvement that would be necessary to protect his

9  interest.

10     It -- you simply are dealing with a large unemployed

11  population in an industry that is at least partially

12  collapsing.  There are not jobs for these people to run to,

13  necessarily.  And the obvious, you know, is occurring.  And

14  that is that they need to ration their assets and their funds

15  in order to get to the next job.

16         THE COURT:  See, the question in my mind -- and we

17  are going to break soon.

18         MR. KEACH:  I understand that, Your Honor.

19         THE COURT:  But to give you something to think about

20  over the break, on one level the argument made by the U.S.

21  Trustee and the Committee that a Court shouldn't appoint this

22  Committee for the purpose of saddling the Estate with the cost

23  of litigation of the whose-money-is-it issue.  And I tend to

24  agree with that.  But that doesn't foreclose in my mind the

25  other reasons that you've stated for approving such a

1   committee.  For example, creating a committee that would be

2   limited in its purpose.  If the Court had authority to do that.

3   And/or saying that fees for certain services would not be

4   compensable by the Estate.  And/or limiting on a monthly basis

5   the Estate's liability for such services.  These are the kinds

6   of things that are going through my mind, and you might want to

7   think about over the break.  And you know, it might be that

8   you've anticipated that as well.

9       MR. KEACH:  Sure.  Your Honor, we certainly will

10  think about them over the break, and I understand we're coming

11  close to the time when Your Honor did indicate that a break

12  would be necessary.

13      Let me only add quickly that I think that, you know, this

14  group, and is our firm to the extent we're chosen to be counsel

15  to this Committee, and approved as such, is willing to be

16  flexible with respect to these issues.  It may be, for example,

17  that the existing retainer funds, as modest as they currently

18  are, could be set aside for the litigation point.  Whereas

19  other services might be compensable out of the Estate upon an

20  appropriate application.  We certainly don't have any problem

21  with submitting budgets or agreeing to reasonable caps.  We

22  have no desire to overlap with all of the functions of the

23  Official Committee.  And while I know there are cases out there

24  that say that additional Committees are supposed to be on a par

25  with other Official Committees, other Courts have been creative

1  and we're certainly willing to be creative with limiting the

2  scope of Committees by limiting the scope of what their

3  appointed professionals are able to do.  We're amenable to

4  that.  We certainly think that's appropriate under the

5  circumstances.

6      I'm happy, Your Honor, to do the proffer now, but I see

7  that we're a couple minutes from the break.  It may be more

8  appropriate for me to just start it when we get back.

9          THE COURT:  I think it would be.  And to the extent

10  the kinds of things that you and I have just discussed might

11  serve the basis for some agreement, you might want to explore

12  them over the break.  If not, we'll have the hearing and I'll

13  make a decision.

14          MR. KEACH:  We're -- we have been willing since we

15  first surfaced, Your Honor, and we remain willing to talk with

16  any constituency here about such issues.

17          THE COURT:  All right.  Anything else before we

18  break?

19          ALL:  (No verbal response).

20          THE COURT:  Okay, Court will stand in recess until

21  2:15.

22      (Court in recess)

23          THE CLERK:  All rise.  Be seated please.

24          THE COURT:  All right.  Where were we?

25          MR. KEACH:  Your Honor, Robert Keach from Bernstein

1  Shur for Mr. Schroeder and colleagues.  I think where we broke,

2  Your Honor, I was about to do the proffer of Mr. Warren.  Let

3  me start by acknowledging that the parties did take the Court's

4  suggestion.  We did have some conversations during the break.

5  Some suggestions I think were made by both sides.  We're not in

6  a position where I can report that we have reached any

7  understanding, but they were constructive exchanges.

8      I do think that we're at the point where there probably is

9  not likely to be movement on either side, despite, I think,

10  good faith.  We're sort of at an impasse, I think.  And it's

11  probably appropriate for us to make the proffer and for the

12  parties to argue the motion.  I am prepared to make some

13  suggestions about containment of cost, along the lines that

14  Your Honor indicated.  And I can do that before or after the

15  proffer, whatever is preferable.

16          THE COURT:  Well, I see that Ms. Fatell is on her

17  feet.

18          MS. FATELL:  Thank you, Your Honor.  Bonnie Fatell

19  from Blank Rome for the Creditors Committee.  Before the

20  proffer is tendered to the Court we'd like to have an offer of

21  proof.  I'm not sure where counsel's taking the testimony, and

22  we think that there are a lot of issues that have been raised

23  in their papers that are not relevant to the hearing today.  So

24  we'd like to hear where -- what's proposed in the proffer if we

25  may.

1          MR. KEACH:  Certainly.  Your Honor, I intended to

2   have Mr. Warren testify if he were called to testify on really

3   on two issues, and they would be short.  The first would be the

4   efforts to pull together the group of Beneficiaries into some

5   kind of Ad Hoc Committee and to fund their involvement in the

6   case, and the specifics of that and the difficulties in doing

7   that, and the prospects based upon Mr. Warren's direct

8   involvement in that effort for that to continue.  That seemed

9   to me to go directly to the issue of their ability to represent

10   themselves.

11         The second point, and I have a feeling this is the point

12   the Committee wants to talk about, was to simply put in some

13   very limited testimony on the way the plan operated and to whom

14   it was extended.  That goes only to this issue that we raised

15   in the papers that there was a bonafide issue on ownership of

16   the assets.  We don't expect that to be litigated today.  We

17   don't expect there to be a decision on that today.  But we did

18   think it was important to establish that there is a bonafide

19   colorable issue with respect to that.  If the Committee wants

20   to stipulate to that, that i.e., that there's an issue then we

21   can dispense with that portion of the proof.

22         THE COURT:  Well, all I'll say on that one is after

23   having read the papers it sure has to look and feel of an

24   issue.  Ms. Fatell?

25         MS. FATELL:  Your Honor, we acknowledge that there's

1  a dispute.  We don't think that this Court needs to hear

2  testimony as to whether it's a {quote}, "bonafide dispute or

3  colorable dispute."  There's a dispute.  It exists.  And so we

4  would object to any testimony as to how the plan's been

5  interpreted or how it's been treated, or any of that because --

6        THE COURT:  And I don't think I have to --

7        MS. FATELL:  -- we think that's inappropriate.

8        THE COURT:  -- reach it -- frankly, I think on that

9  aspect of it I just need to make a determination of some

10  identifiable interest.  And I think the papers demonstrate that

11  pretty clearly.

12        MR. KEACH:  Thank you, Your Honor.  We can dispense

13  with that then.  With respect to the proffer on the other

14  aspects the Beneficiaries' witness is Mr. Martin Warren.

15  Mr. Warren is, as I said, a former employee of New Century

16  Mortgage Corporation.  He has been terminated.  Prior to his

17  termination his last position with New Century Mortgage was

18  that he was in a management position over an office consisting

19  of more than 60 employees.  That during the period of his

20  employment he did make contributions to the deferred

21  compensation plan.  In other words, he is a Beneficiary.  That

22  he has himself approximately $830,000 at risk contributed to

23  the plan and remaining in the plan.  That Mr. Warren has been

24  personally involved in the effort to form an Ad Hoc

25  Beneficiaries Committee, if you will.  That he has been

1  directly in contact with other former employees who are

2  Beneficiaries.

3      He would testify that it has been extremely difficult to

4  pull that group together because of their individual

5  circumstances, the fact that they are far flung geographically,

6  and their own economic limitations.  He would testify that he

7  has been personally involved in the attempt to raise a fund to

8  finance this effort, including litigation over ownership of the

9  assets, as well as participation in these cases on the other

10  issues that are mentioned in our papers.  That to date 98

11  Beneficiaries have contributed enough on an individual basis to

12  form a retainer of just under $38,000.  That those

13  contributions continue at a very modest and declining rate.

14  And that based on his experience that it would be extremely

15  unlikely that funding would continue from individuals with

16  respect to full participation in these cases by the

17  Beneficiaries, and perhaps even with respect to that

18  litigation.

19      He would testify as to his own circumstance, being a party

20  with $830,000 plus or minus at risk, that if there is no

21  collective action either by an Ad Hoc Committee where hundreds,

22  or at least a hundred or more people are making contributions,

23  or an Official Committee that he could not personally fund the

24  kind of participation that would be required to protect his own

25  interest, including litigating the ownership of the assets.

1  That would be his testimony, Your Honor.  We would offer it on

2  the issue of representation.

3           THE COURT:  Does anyone care to examine Mr. Warren?

4           MS. FATELL:  Your Honor, we have a few questions of

5  the witness.

6           THE COURT:  All right.

7           MR. KEACH:  Mr. Warren is here.

8            MARTIN WARREN, CLAIMANT'S WITNESS, SWORN

9           MR. WARREN:  Martin Warren, W-A-R-R-E-N.

10          THE CLERK:  Thank you.

11          MR. WARREN:  Thank you.

12                     DIRECT EXAMINATION

13 BY MR. POWER:

14 Q.  Good afternoon, Mr. Warren.  I'm Mark Power, I represent

15 the Creditors Committee in this case.

16 A.  Hi Mark.

17 Q.  I just have a few questions.

18 A.  Sure.

19 Q.  You personally have approximately 130,000 at stake in this

20 trust?

21 A.  Actually, I have, as of --

22 Q.  I mean, 830,000.

23 A.  Actually as of Saturday I had $942,000 in there.

24 Q.  Are you aware of other individuals who also have similar

25 amounts in the trust?

1  A.  Yes, sir.

2  Q.  And approximately how many people is that?

3  A.  Have this sort of dollar amount in here?

4  Q.  Yes.

5  A.  Oh, probably maybe a dozen or so.

6  Q.  Have you proposed to all those people about contributing

7  towards the -- defense of the trust position in this case?

8  A.  Yes, sir.

9  Q.  And have any of those people contributed?

10  A.  Yes, sir.

11  Q.  Are those all included in the 90 some thousand, that

12  counsel -- I'm sorry.  Of the 90 some people who the counsel

13  mentioned were interested in participating, are those people

14  all involved in that?

15  A.  I don't know if all of them are.  Some of them I guess were

16  laid off on Thursday, so just a matter of communicating with

17  these individuals.

18  Q.  So there's approximately a dozen or so individuals who all

19  have roughly a million dollars give or take --

20  A.  Maybe not that many, but you know, between -- I would say,

21  you know, over 150,000 to -- I think I'm one of the larger

22  contributors at 942,000.

23  Q.  So it's somewhere in that range, and there's at least a

24  dozen in that range.

25  A.  Right.

1  Q.  And your testimony to this Court is that those folks aren't

2  -- don't have the means to be able to support on their own the

3  defense of their position before this Court?

4  A.  Correct.

5  Q.  Okay.  And have you looked at the personal financial

6  situation of everyone in that group?

7  A.  No, I can't say I have, no.

8  Q.  So when you come here and testify to the Court you're

9  talking about yourself personally?

10  A.  Correct.

11  Q.  You're not able to testify as to everyone else's economic

12  situation?

13  A.  No, sir.

14  Q.  Okay.  Let's talk about the steps that you look to in terms

15  of getting the reputation besides paying your attorney full

16  rates.  Have you spoken to any attorneys about doing this on a

17  contingency fee basis?

18  A.  No, sir.

19  Q.  Have you talked to any attorneys about doing this on a

20  class action basis, a class action lawsuit?

21  A.  Well, the Ad Hoc Committee is our, you know, our action,

22  our class --

23  Q.  It's not a formal class -- do you understand what a class

24  action would involve?

25  A.  Yes, yes.

1  Q.  You could form a class, create members and then the

2  attorneys could basically be paid out of any recoveries that

3  class receives.  Are you aware --

4  A.  We did not do that, no.

5  Q.  Are you familiar with the fact that a group of employees

6  who were just laid off in this case filed an action here as on

7  behalf of a class?

8  A.  Yes, sir.

9  Q.  And they are seeking to have their position represented who

10 have similar disputes with this Estate and before this Court as

11 a class action.  Are you familiar with that?

12 A.  Yeah, based on the WARN Act?

13 Q.  Based on the WARN Act --

14 A.  Yes, sir.

15 Q.  -- that's correct.  But in your case you decided not to go

16 that route but instead ask this Court to give you special

17 relief and appoint a Committee so your fees can be paid by this

18 Estate separately, is that --

19           MR. KEACH:  Your Honor, objection.  I think that's

20 testimony and not a question.

21           MR. POWER:  I'm asking is that --

22           MR. KEACH:  There's a question buried in that

23 somewhere but that's not a question.

24           THE COURT:  Maybe you could --

25           MR. KEACH:  A, argumentative and B --

1          MR. POWER:  I could --

2          MR. KEACH:  -- leading --

3          THE COURT:  Rephrase.

4          MR. POWER:  I'll withdraw, Your Honor.

5          THE COURT:  Okay.

6    BY MR. POWER:

7    Q.  You elected not to go by class action, is that correct?

8    A.  Well, you know, Mark, we felt that this was our money.

9    This is the dollars that we individually put into this employee

10   benefit plan.  You know, the dollars came out of our pocket,

11   not out of New Century's pocket.  I can show you paychecks for

12   five years of it coming out of our pocket.  So therefore we

13   felt that it was our money, and you know, unfortunately a lot

14   of these people lost their jobs, including myself.  You know, a

15   lot of those people, including myself, haven't retained or

16   gotten employment, and we want what is rightfully ours.

17   Q.  Sir, I'm not questioning that you're entitled to assert

18   what's rightfully yours.  If the Court decides you're entitled

19   to it you'll get it.

20   A.  You bet.

21   Q.  My question is the different avenues to get to that point.

22   One of the avenues that's very legitimate is a class action

23   suit.  And in fact that's being done currently, and I'm asking

24   you whether -- what steps have you taken to look into that

25   avenue as opposed to the current one?

1          MR. KEACH:  Your Honor, objection to the form of the

2   question.  First --

3          THE COURT:  Sustained.

4   BY MR. POWER:

5   Q.  Let me just -- what steps have you taken to look into class

6   action suits in this case?

7   A.  We have not.

8   Q.  You have not.  Have you spoken to any counsel, and I may

9   have asked this but I'm gonna ask it again, about any

10  contingency fee arrangement as opposed to full fees to counsel

11  to represent the --

12  A.  No, no, sir.

13  Q.  Have you considered whether you might be able to -- strike

14  that.  Are you aware, sir, that there are processes in the

15  Bankruptcy Code which permit you to seek reimbursement for

16  expenses that are pursued that benefit the Estate?  Are you

17  aware of that?

18         MR. KEACH:  Your Honor, objection to the form of the

19  question.  He misstates the actual law relating to that

20  provision.

21         MR. POWER:  Your Honor, I'm generally referring to

22  the --

23         THE COURT:  Overruled.  You may answer, sir, if you

24  are able.

25  A.  Just, you know, I'll be honest, I wasn't familiar with the

1  bankruptcy proceedings and the law because I'd never gone

2  through it.  Obviously being an employee of New Century now I

3  know as much as I do, you know, regrettably so, as I, you know,

4  learn more about it.  I am familiar a little bit about, you

5  know, your question.

6  BY MR. POWER:

7  Q.  But generally speaking, there is a process by which if you

8  take certain actions and it benefits the Estate you can seek to

9  have those expenses reimbursed.

10  A.  Okay.

11  Q.  Did you consider pursuing that as a source of recovery in

12  this case?

13  A.  No.

14  Q.  So basically the only thing that you and the Committee has

15  done is basically the current proposal that's set before the

16  Court, is that correct?

17  A.  Right.  What we've done is we've raised money and we've,

18  you know, retained the employees that have money into the plan

19  to try to get what's rightfully, we feel is ours.

20  Q.  Now, sir, if it's your view that the trust funds that are

21  there that are frozen right now belong to the trust and belong

22  to the Beneficiaries --

23  A.  Yes, sir.

24  Q.  -- would that satisfy the need for the Committee and you

25  wouldn't need the Committee any further, is that correct?

1            MR. KEACH:  Objection to the form of the question,

2    Your Honor.  I don't understand it and I assume --

3    A.  Well, yeah, I mean, we'll take the money and we'll call it

4    a day --

5            THE COURT:  Overruled.

6    A.  -- you know.

7    BY MR. POWER:

8    Q.  So the goal of the Committee is purely to establish its

9    rights to the funds in that trust --

10   A.  Yes, sir.

11   Q.  -- that's --

12   A.  If we --

13   Q.  The only reason you're --

14   A.  Right.

15   Q.  -- here before the Court today?

16   A.  Yes, sir, absolutely.

17   Q.  And it's not really to deal with any other issues in the

18   case?

19   A.  I have nothing to do with -- you know, I -- my office is

20   part of the class action lawsuit, you know, in regard to the

21   WARN Act, but our goal for this Committee is to just get that

22   money back.

23   Q.  And so is it fair to say that your group, the group of

24   employees, is satisfied with the representation of the Official

25   Committee with respect to their unsecured claim, with respect

1  to all of the claims except for the trust fund moneys?

2  A.  Just for the trust fund money, correct.

3  Q.  And that's where you dispute that the Committee does not

4  represent your interest, is that correct?

5  A.  Yes, sir.

6  Q.  Okay.

7           MR. POWER:  Your Honor, can I just have one second?

8           THE COURT:  Yes.

9  BY MR. POWER:

10  Q.  Thank you.

11  A.  Okay, thanks, Mark.

12           MR. POWER:  No further.

13           THE COURT:  Is there any other cross examination?

14           MR. KEACH:  And no redirect either, Your Honor.

15           THE COURT:  All right, thank you, sir, you may step

16  down.

17  A.  Okay, thank you, Your Honor.

18           MR. KEACH:  Your Honor, I'll briefly close.  Because

19  I did -- as I said, we did consider Your Honor's suggestions

20  over the break, and let me say that we -- one of the

21  discussions we had with the U.S. Trustee's office, and I've

22  asked the U.S. Trustee's office if there's a problem disclosing

23  this, and he's indicated it's not so let me throw that out.

24  There was some discussion about expanding the existing Official

25  Committee to add -- and I don't want to suggest this was an

1   offer, but there was a suggestion that the existing Committee

2   be expanded to add a Beneficiary member and one other member to

3   get to nine, as opposed to having an even number.

4        The Committee -- after consideration the Beneficiary's

5   Committee decided that that -- or the Ad Hoc Committee decided

6   that was not a proposal that we wish to pursue.  As we said,

7   that is a -- we think it's a good second choice, but a very

8   poor second choice to the first choice.  Primarily because, as

9   I said earlier, we think it creates more problems than it

10  solves, both for the Official Committee and for the Beneficiary

11  member.

12       Some of those problems are inherent in being a minority

13  member and we don't argue that those are unique to this case,

14  but there are some special issues.  Not the least of which is

15  the employees who would be likely to serve are management and

16  former management employees who are already possessed of

17  information.  It would be very difficult issues in terms of

18  dealing with, for example, confidential information they

19  already possess.

20       That information is, to some degree, to the extent it's

21  not completely confidential, useful in the pursuit of the

22  remedies they wish to pursue here, and it may in fact inhibit

23  the ability of the people to recover the funds, rather than

24  further it.  On top of which we don't think this is a single

25  asset issue.  Or a single issue Committee.  It's a multiple

1  issue Committee along the four issues we talked about.  It is,

2  yes, certainly, first and foremost that they would be able to

3  draw a fence around these funds and have their funds returned

4  to them.  But should that fail, and we don't expect it to, but

5  should that fail there are other issues relating to substantive

6  consolidation, relating to who gets to share, relating to the

7  size of the Warehouse Lender claims that we're particularly

8  interested in and where we don't think that the Official

9  Committee is poised to represent our interests.

10      With respect to cost containment, Your Honor, one set of

11  ideas we had were as follows, and I don't throw these out as

12  absolutes but as suggestions.  First is that the work to date

13  to either get on the Committee or form the Committee would be

14  compensable from the Estate subject to the usual review by

15  filing a fee application, but not be subject to nuc pro tunc

16  analysis.  And secondly, that future work for the Beneficiary's

17  Committee would be compensable in the typical way that fees are

18  requested, other than what we'll call the declaratory judgment

19  litigation work.

20      With respect to the litigation work, the issue Your Honor

21  raised about the Beneficiaries being paid for that work, we

22  would propose that that would be capped.  We would cap the

23  amount that would be taken from the Estate.  We would have --

24  that cap would be a hard cap.  We would take the existing

25  retainer money and also put it towards that effort,

1   particularly towards things like expenses for experts in

2   discovery and the like.  And if that cap were exceeded it would

3   have to be funded either out of funds of the Beneficiaries

4   themselves or we would reserve rights under 503 and under

5   ERISA's attorney's fees provision, although there are potential

6   limitations in both of those circumstances.  But ERISA does

7   have an attorney's fees provision for successful recoveries by

8   participants, and I said that in this interest of full

9   disclosure, where it would be paid from the fund itself.  But

10  again, that only works if you win, and it's subject to its own

11  set of limitations that Courts have to apply in awarding those

12  fees.  But we would reserve those issues -- our suggestion is

13  to have a hard cap on the litigation budget at $250,000.  And

14  if we go above that we're at risk.

15       Those are all conditions under which the Committee could

16  live.  I'm sure we could -- we're open to other suggestions

17  from the Court, and ultimately we'll live with what the Court

18  proposes.  But we do think this is a case that cries out for

19  representation for these former employees.  We don't think

20  they'll be able to represent themselves on this multitude of

21  issues otherwise.  Thank you.

22            THE COURT:  Thank you.

23            MS. FATELL:  Good afternoon, Your Honor.  Again,

24  Bonnie Fatell for the record for the Creditors Committee.

25  First of all, we'd like to say that we recognize we are dealing

1   with former employees.  They have sympathetic claims.  We

2   understand that many of them may not have found work since they

3   were terminated by the Debtor.  But unfortunately, we can't let

4   that cloud the judgment and the law that the Court is supposed

5   to follow in terms of whether in fact the Committee, as

6   constituted, adequately represents their interest.  And if the

7   Court finds that it does then that's the end of the question.

8   If the Court finds that it does not the Court then goes to the

9   second question, which is should the Court exercise its

10  discretion considering all of the facts of the case, the burden

11  to the Estate, and a number of other factors I'll get into, and

12  decide that the U.S. Trustee should be directed to appoint a

13  second committee?

14          THE COURT:  Well, let's talk about the first step in

15  the inquiry.  And there's kind of an odd dynamic in that

16  Committees often have members against whose interest the

17  Committee as a whole chooses to act.  So that in and of itself

18  doesn't strike me as a turning point, except that in these

19  circumstances, and the papers that have been submitted in this

20  connection, clearly reflect that while the Committee may very

21  well have, at least initially, made a determination that the

22  funds that are at issue here are, at least in the Committee's

23  view, clearly property of the Estate, this group of interest

24  that seeks the formation of an Official Committee takes a

25  completely opposite view.

1    So it seems to me that as a practical matter the Unsecured

2  Creditors Committee is going to be acting adversely, completely

3  adversely, to this group of interest.  So while I recognize

4  that there are often conflicting interests among Committee

5  members, or between a member and the Committee as a whole, it

6  seems to me that in this case this Committee is no friend of

7  this group of Beneficiaries.

8    MS. FATELL:  Your Honor, on that narrow issue of

9  whether in fact this fund is subject to the general Creditors'

10  claims or whether it is a trust fund for these individuals, the

11  Court is correct, we are directly adverse.  That is a single

12  issue.

13    As to if in fact they are not entitled to that fund then

14  they're general Unsecured Creditors, just like everybody else

15  that the Committee represents.  And the fact that they may have

16  claims that those funds should not inure to the benefit of all

17  general Unsecured Creditors, and some group may be carved out

18  of that, that's an issue that the Committee, as well as the

19  Debtor, will have to grapple with in terms of proposing a plan

20  of liquidation.

21    In terms of whether in fact there are substantive

22  consolidation issues.  The Committee will deal with that.  They

23  deal with it every day.  In fact, Your Honor, in the amendments

24  that were made to the D-I-P Order that was submitted to the

25  Court earlier today, paragraph 42 was added by the Committee to

1  specifically address the concerns of the other Estates and the

2  Creditors of those Estates in the event that there were moneys

3  going back and forth between the various entities.

4      So the Committee's very sensitive to that issue, and is

5  very active on all the issues that will affect Committee's --

6  the Creditors getting a recovery in this case.  So I don't

7  disagree that on that narrow issue they will be adverse.  But

8  is that sufficient to justify this Estate incurring the

9  expense, the interference, the possible banging heads of

10  different Committees and so many factions breaking up in this

11  case because there's one single issue that this group of Ad Hoc

12  Committee people believe that they're entitled to pursue, and

13  they believe this Estate should fund their right to pursue

14  that?  And that's where --

15          THE COURT:  Well I think the answer --

16          MS. FATELL:  -- we take issue with it, Your Honor.

17          THE COURT:  Yes, and the answer to that question I

18  think depends on step two in the analysis.

19          MS. FATELL:  And we think that in terms of whether

20  they are adequately represented -- all the Committee has done

21  with respect to determining if this is a top hat plan or rabbi

22  trust is look at the documents that have been provided.

23  There's been no discovery.  There's been no even informal

24  discussions or complete production of documents.  So the

25  Committee's going on the face of the documents.  If it turns

1   out that the Committee is wrong then there will be discussions

2   about that, and we're certainly open to looking at what the law

3   is and what the facts are and determining what that issue is.

4   But on its face the Committee has to take the position, because

5   that's what the documents say, that upon insolvency those funds

6   are property of the Estate.

7          THE COURT:  And what if I were to deny the request

8   for the formation of an additional Committee?  What would

9   happen to the funds that apparently now exist in some

10  identifiable form, pending some judicial determination about to

11  whom they belong?

12         MS. FATEL:  Your Honor, we have agreed with the

13  Debtor at the last hearing, and I believe with the Ad Hoc

14  Committee, that those funds would remain in a segregated

15  account.  We certainly would suggest that those funds continue

16  to remain in that segregated account until there's a final

17  resolution.

18         THE COURT:  Is there a temporal limitation on that

19  agreement?  Has it been embodied in an Order?

20         MS. FATEL:  It is.  I believe it is in the Order

21  that raised this emergency hearing.

22         THE COURT:  Okay.

23         MS. FATEL:  And we would agree that that should

24  continue in place with respect to that.

25         THE COURT:  All right.

1           MS. FATEL:  So, we don't think that they're in

2    jeopardy that those funds are going to be dissipated or

3    distributed to all Unsecured Creditors.  Your Honor, there are

4    Unsecured Creditors, as I said, until proven otherwise.  And

5    all Unsecured Creditors in this case have the same goal.  And

6    that's to maximize value.  It's to ensure that there's

7    integrity in the process, that all of the assets are being

8    exposed to good faith negotiations and an auction process, to

9    the extent that's appropriate, to reduce claims so that there's

10   more money available to go around to Creditors.  And we don't

11   think that the Creditors Committee -- it's not aligned with

12   this group of Creditors on all of those issues.  We think that

13   this is a single issue.

14        They argue, and they go through a series of arguments as

15   to why their interests are different.  They say that this is a

16   large and complex case, that it's moving quickly, and that

17   things needed to be sorted out quickly in terms of who wants

18   what and who had claims.  The Creditors Committee has that same

19   concern.  We don't think that that gives any credibility to

20   there having to be a separate committee, because the Unsecured

21   Creditors Committee is addressing all of that.

22        They say that there are various groups of Creditors with

23   different interests, and that these employees are seeking a

24   narrow issue.  We acknowledge that.  That's why we think that

25   they should not have their own separate Committee.  They talk

1   about the composition of the Committee not being sufficiently

2   varied.  The composition of the Committee was created by the

3   Office of the United States Trustee after consideration of all

4   of the questionnaires that were submitted, after interviewing

5   various parties that were at the organizational meeting in an

6   effort to be a participant on the Official Creditors Committee.

7   And in the U.S. Trustee's discretion, they determined that this

8   was a Committee that was representative of all Creditor

9   interests.  Is it representative of somebody that has a $40,000

10  interest?  Yes.  It may not be of the same magnitude that the

11  people have who is on the Committee, but certainly they are

12  representing all Creditors.  And to the extent that something

13  enures to the benefit of those holding larger unsecured claims,

14  it also enures to the benefit of those holding smaller

15  unsecured claims.

16      They talk about the -- one of the issues is the inability

17  of the Committee to function.  There's been no question that

18  this Committee is not functioning appropriately.  There are

19  issues that come up from time to time where there are Committee

20  members that may have a different view than the Committee.

21  There are also some issues that come up where a Committee

22  member has to recuse itself.  That's done all the time.  To the

23  extent that there are issues where there need to be sub-

24  committees formed, again that is done all the time.  It's done

25  in every large case, and it's very effective.

1      On the other hand, to create multiple committees -- and

2  again we just heard that there is a WARN Act Class Action

3  Committee that is acting as an Ad Hoc Committee.  If this Court

4  were to grant this group of employees a Committee, what would

5  be -- there would be no reason for the Ad Hoc Committee for the

6  WARN Act Claimants to come in and argue that they too have a

7  different view, and they're not represented by the Unsecured

8  Creditors Committee.  This case could be burdened with

9  multiple, multiple committees.

10      And it's not unlike any other large case where there are

11  divergent interests and there's one Committee.  And the

12  committee represents all of those Unsecured Creditor interests.

13  So, we wholly dispute that that should be a basis to say that

14  they are not adequately represented.  In fact, Your Honor, it

15  is rare and unusual to have additional Committees.  For the

16  number of cases that they -- there are multiple cases where

17  Committees have been denied.

18      I'd like to just read briefly, if I may, from a Law Review

19  article that, in fact, the Movants cited in their materials.

20  It's from the Marquette Law Review in the summer of 1990,

21  titled "Creditors Committees Under Chapter 11 of the United

22  States Bankruptcy Code, Creation, Composition, Powers and

23  Duties."  And at page 593 and 594, the authors state, "Adequate

24  representation exists through a single Committee, as long as

25  the diverse interests of the various Creditor groups are

1  represented on and have participated in that Committee.  The

2  Court," referring to the Sharon Steel Court, which is a Western

3  District of Pennsylvania Court in this Circuit, "noted that the

4  appointment of separate Committees is an extraordinary remedy,

5  and emphasized its concerns that separate Committees often

6  complicate negotiations, add delay to the reorganization

7  process, and add an additional layer of administrative expense

8  on the Debtor's Estate.  The Sharon Court added that separate

9  Committees and the separate teams of professionals that they

10  entail {quote} 'rarely contribute to the spirit of compromise

11  that is intended as the guiding star of Chapter 11.'" {close

12  quote}.

13      Your Honor, we think that that is particularly relevant to

14  this case.  There will be the potential for multiple

15  Committees.  This particular committee has one focus that they

16  have.  It will create a lot of tension if they are on the

17  Committee, as has been proposed.  Then they are within the

18  Committee.  They can raise the issues that they have concerns

19  with, separate and apart from the one issue we know there will

20  be litigation over.  Any other issues that they have, they're

21  welcome to and encouraged to raise them to the Committee, and

22  the Committee will consider them and take appropriate action.

23      Your Honor, as far as the testimony that we've heard, I

24  beg to differ with counsel's characterization of it, because

25  the witness conceded that they do have a single issue.  That

1  their focus is on getting these funds that they think they are

2  entitled to.  And that they don't have an issue with anything

3  else that the Unsecured Creditors is doing.  Now, I appreciate

4  that the witness is not a lawyer, and his lawyer may have other

5  views, but, Your Honor, this is a single focus.  And this is

6  the goal.  And there is no reason why this Estate should fund

7  this litigation or any other litigation that is adverse to the

8  Estate or to Creditors.  There are a whole host, I'm sure, of

9  issues out there where Creditors are adverse to the Estate.

10 Why shouldn't they come into this Court and say, "I'm not being

11 adequately represented.  I want this Estate to fund my legal

12 fees."  They have raised some money.  The people who they're

13 talking about, are people who are at the higher level of income

14 in this company, both former and present employees.

15    And it seems surprising to me that if they believe that

16 they are correct, and this is not rabbi trust, and they are

17 entitled to those funds and that they are not subject to the

18 general claims of Creditors, then I would think that if they're

19 making income at the level that they are to put in that kind of

20 money into a trust, that they would be able to gather enough

21 resources together to fund litigation.  Alternatively, there

22 are --

23    THE COURT:  I hear in that argument echoes of a D-I-

24 P Lender seeking to limit the amount of investigation costs

25 that a Committee might incur, and be reimbursed for out of its

1  cash collateral or loan proceeds.

2        MS. FATEL:  Your Honor, the point I wanted to add is

3  that they have not pursued other options.  They have not

4  considered coming in for a significant contribution

5  reimbursement.  They have not looked at --

6        THE COURT:  Well --

7        MS. FATEL:  -- class action, et cetera.

8        THE COURT:  -- let me -- let's talk about that for a

9  minute.

10        MS. FATEL:  Okay.

11        THE COURT:  If they win in their position, is it

12  conceivable that the Estate should pay their fees?

13        MS. FATEL:  I don't know why the Estate would pay

14  their fees if they win.

15        THE COURT:  And that's why 503, I think, goes away

16  as a potential source of recovery.

17        MS. FATEL:  If they win, they're gonna get $42

18  million, potentially.  It seems to me that that fund should be

19  able to cover their legal fees.

20        THE COURT:  It may very well.  All I'm saying is

21  that if they win, I don't see how relief under 503 could be

22  granted.  But maybe I'm missing something.

23        MS. FATEL:  Well, no.  The point I wanted to add,

24  Your Honor, is if they don't win, and they have their own

25  Committee --

1                THE COURT:  That's --

2                MS. FATEL:  -- then a) they're duplicative of the

3    Creditors Committee; and b) if they do add value, they have an

4    avenue to come in and ask for reimbursement for their expenses.

5                THE COURT:  The only way they add value to the

6    Estate is by losing, it seems to me, arguably.

7                MS. FATEL:  Well, I think that's where we come out,

8    Your Honor.  And that's what's so troubling about this.  We're

9    asking -- we're being asked by a single group of Creditors to

10   fund litigation that will be adverse to the Estate, and will,

11   if they are correct, enure solely to their benefit.  We just

12   don't see that the law supports that the Court should exercise

13   its discretion and appoint a Committee for that purpose.  Thank

14   you.

15               THE COURT:  Thank you.

16               MR. MCMAHON:  Your Honor, good afternoon, Joseph

17   McMahon for the United States Trustee.  I'd like to step back

18   and just go over some of the procedural steps which occurred up

19   to the point of the plan Beneficiaries filing the instant

20   motion.  Your Honor, we filed -- excuse me -- our office formed

21   an Official Committee of Unsecured Creditors on the first

22   Monday in April.  And as it's noted in the motion, Mr.

23   Schroeder, I believe, submitted a questionnaire on behalf of

24   himself individually, and also on behalf of the Ad Hoc Group,

25   however defined or undefined it was as of that date, for

1   representation on the Committee.

2       They came to the table seeking seats on the Official

3   Committee of Unsecured Creditors.  There's no question about

4   that.  And our office appointed a 7-member Committee.  And

5   neither Mr. Schroeder nor any other Ad Hoc Committee members

6   were appointed to the Committee at that time.

7       A few days later, we received a letter from the plan

8   Beneficiaries through Mr. Keach.  And it's attached as an

9   exhibit to our objection.  And that letter requested

10  appointment of this Committee only.  The idea of getting a seat

11  on the Official Committee of Unsecured Creditors had apparently

12  been abandoned by the plan Beneficiaries.  So as is our typical

13  course of action in these types of circumstances, our office

14  forwarded that correspondence to, and I'll call it, the Court

15  of Constituencies in the case, the Debtors, the Official

16  Committee of Unsecured Creditors, and also the D-I-P Lenders,

17  and offered them an opportunity to respond to the letter by

18  April 20.  I believe that a couple days short of that deadline,

19  the instant motion was filed prior to our having, I guess, the

20  opportunity to review those responses pre-filing.  So, Your

21  Honor, our paper lays out, I think, what our essential position

22  is on the legal issues with respect to adequate representation

23  and whether this Court should exercise its discretion in terms

24  of appointing a Committee.

25      I'd like to address a few points that the Court raised in

1  that regard.  First, there's -- the Court in its comments

2  immediately prior to the break for lunch, suggested that there

3  possibly could be -- draw a distinction between the services

4  that were performed relating to the pursuit of the asserted

5  trust funds, and separate out or to call other case-related

6  services.  It is I think at best unclear at this point, Your

7  Honor, whether there would be such unique division.  There are

8  certainly the -- first, the risk that there would be a

9  collateral litigation initiated by the Committee, if formed,

10 where the bankruptcy case, the main case, could be used as a

11 front with respect to obtaining leverage or addressing issues

12 that really should be addressed in connection with the core is

13 this property of the Estate or not litigation.

14      And issues like substantive consolidation, who gets to

15 share in the proceeds, in the event that there is an adverse

16 ruling, it seems to me, Your Honor, that they really are, as

17 you say, secondary issues to the lead issue of whether or not a

18 Committee should be appointment.  And with recognizing that,

19 Your Honor, given that the Committee is willing to represent

20 today on the record that those funds can remain segregated,

21 presumably pending an up or down ruling on that point, I think

22 that we've really taken care of basically, essentially all the

23 purposes that were going to be served by this Committee that

24 Your Honor had suggested could be compensated, or would be, I

25 guess, potentially proper to be compensated from the Estate,

1  because there's no dissipation risk.  We'll have presumably the

2  litigation on that issue will go forward.  And the chips will

3  fall where they will.

4      The issues of whether the Estate should be substantively

5  consolidated and who gets to share, I mean, I suggest, Your

6  Honor, that in its normal course of operation, the Official

7  Committee of Unsecured Creditors in these large jointly

8  administered cases has a host of representatives from varying

9  Estates, and it routinely deals with the substantive

10  consolidation issue.  Meaning that you will have

11  representatives of one Estate potentially squaring off against

12  the representatives of another Estate, and debate about the

13  issue.  And the Committee formation process deriving, I guess,

14  the representation of multiple Estates can handle that.  That

15  is an issue that the Committee can address as it is

16  constituted.

17      And there's really no suggestion by the plan Beneficiaries

18  that somehow the Committee, as it's presently constituted, is

19  unable to address substantive consolidation issues per se.  And

20  any substantive suggestion simply wouldn't square with the

21  history of practice in this District.

22      So at the end of the day, Your Honor, I think another

23  point to emphasize is that -- is the witness' testimony.  And I

24  found the end of the questioning to be rather illustrative as

25  to really what's going on here and how Your Honor should weigh

1  the so-called -- the other services, or the collateral services

2  in deciding whether or not to exercise its discretion in

3  appointing a Committee.  The witness clearly said that this is

4  about the money.  Meaning whether we get our money or not.

5  And, again, any issues involved on the case with respect to

6  substantive consolidation or who gets to share, simply is

7  secondary to that consideration.

8      So based upon the evidentiary record which was developed

9  on cross examination by counsel for the Official Committee of

10 Unsecured Creditors, I think there's a clear basis for

11 supporting the conclusion that the relief that's requested in

12 the motion can be denied today.

13     Your Honor, one other point.  With respect to the proposal

14 that's been made, my understanding is that the Committee's

15 proposal going forward, to the extent that the Court would

16 grant relief, would encompass fees relating work to getting a

17 Committee appointed.  And, Your Honor, to be clear, we

18 categorically oppose the formation of the Committee that's

19 being requested.

20     But one point I did want to make clear is that if it is --

21 the Committee begins its work when it's appointed.  And it is

22 far from, I guess, a clear conclusion that a Committee that --

23 I'm sorry, the fees that are incurred by a Creditor or

24 Creditors in seeking to have an Official Committee formed,

25 constitutes a substantial contribution under 503(b).  That is

1  just simply a side note that I wanted to make in terms of the

2  proposal which counsel has floated.

3      So, again, I think the core legal issues are laid out well

4  in our papers, Your Honor.  Unless the Court has any specific

5  questions or concerns --

6          THE COURT:  Just one, Mr. McMahon, that I take from

7  Mr. Keach's remarks.  Is the U.S. Trustee still open to adding

8  to the Committee a Beneficiary representative?

9          MR. MCMAHON:  Your Honor, may I have a moment?

10         THE COURT:  Yes, you may.

11     (Pause in proceedings)

12         MR. MCMAHON:  Your Honor, in the to and fro of phone

13 calls during the lunch hour, we did discuss this topic with the

14 Committee's representatives.  We are still open to discussing

15 that possibility.  The problem is we've never got to a point of

16 passing it along to the people that we need to, because it was

17 basically rejected --

18         THE COURT:  I understand.

19         MR. MCMAHON:  -- by the Committee's representatives.

20         THE COURT:  All right.

21         MR. MCMAHON:  But we are open to the possibility.

22         THE COURT:  Thank you.

23         MR. MCMAHON:  Thank you.

24         THE COURT:  All right.  Anyone else?  Before I go

25 back to the Movants here, anyone else care to be heard?  Okay,

1  briefly.

2       MR. KEACH:  Let me just address a few points very

3  quickly.  First, the issue of escrowing the funds, while

4  certainly appreciated by the Beneficiaries -- two points.

5  First, the trust document itself now provides that the funds,

6  even after the point of insolvency, cannot be disbursed without

7  a Court Order -- without the Order of a Court of competent

8  jurisdiction.  So while we're certainly happy to have done that

9  through an Order of this Court into a concession of the various

10  constituencies, it's what the trust provides.

11      And -- but more importantly, it does not put money in the

12  pockets of the Beneficiaries.  And while it's easy to focus on

13  the dozen or so people who have 150,000 up to 8 or 900,000 in

14  the fund, that does not address the dire needs of those people

15  who have, you know, 50,000 or less in the fund and who are now

16  employed -- unemployed, I should say, and now need this money

17  to pay their own mortgages.  So, Your Honor, it's nice to

18  escrow the money, but these are issues that need to be

19  addressed very promptly.

20      On this issue of expense and interference, while we don't

21  suggest that no expense is at issue here, what we did indicate

22  was that we capped the litigation amount at 250.  And certainly

23  we're open on that.  The rest of -- you know, we spent I think

24  in the neighborhood of 50 or $60,000 to get here between both

25  sets of counsel.  And going forward with respect to the non-

1   litigation issues, I expect those fees would be very modest.

2   And with all due respect to my colleagues in the Courtroom, you

3   know, if that all adds up to 3 or $400,000, that's not a good

4   day in these cases -- in some cases.  So, we're not adding huge

5   layers of expense here.  We're talking about fairly modest

6   expense for the benefit of nearly 600 former employees, most of

7   whom desperately need this money.  And the interests of the

8   typical case dealing with conflicting interest don't deal with

9   600 claimants.  When you're dealing with 600 claimants with

10  claims in the aggregate of this size, you're usually dealing

11  with retirees or bondholders or other people that are so

12  diverse that, in fact, additional Committees do get formed.

13      With respect to this issue that this will lead to a

14  floodgate of additional Committees, I think, Your Honor, that's

15  just not likely.  More importantly, to the extent they're

16  concerned about the WARN Act employees, one of the suggestions

17  I thought about making in the papers and withheld because it's

18  not really our prerogative, is that certainly this Committee

19  could be the springboard for a Committee of former employees.

20  They will soon constitute in number one of the largest Claimant

21  classes in this case.  And it would not create an undue

22  conflict for us, for example, to have the WARN Act Claimants

23  joining this Committee.  That's not our prerogative.  That

24  would be something for the U.S. Trustee to consider.  But that

25  doesn't mean there has to be two additional Committees.  That

1  just means this Committee might expand its scope.

2      In closing, Your Honor, I think it's somewhat ironic that

3  we have a -- and I mean no disrespect to the financial

4  institutions involved.  I'm sure they're all wonderful

5  institutions.  But we have a Committee consisting, among

6  others, of Deutsche Bank, Credit Suisse, and Sea Bass, who are

7  financial institutions who unquestionably could afford their

8  own lawyers to finance their interests as deficiency claimants

9  in these cases, arguing that the employees, some of whom have

10 $50,000 or less at stake, should not get any assistance with

11 respect to their legitimate claims in the case.  I don't think

12 that's assisting the process.  I think to some degree that's a

13 perversion of the process.  And that these employees really do

14 need this representation.

15     It's interesting that two -- I think at least two, if not

16 three members of the Committee, either themselves or their

17 affiliates, were bidders at the last auction.  I mean that's

18 not a typical Committee in any circumstances, unless you're in

19 a sub-prime mortgage case.  But these are legitimate interests

20 of legitimate employees who are desperately in need of the

21 money.  I would submit that if you look at the history and

22 policy of this section, this is what Congress had in mind when

23 it gave the Court power to exercise its discretion.  And we

24 would ask the Court to do so.

25             THE COURT:  Thank you.  All right.  I'm prepared to

1  make my ruling now.  In looking at the factors that a Court

2  should consider -- and I don't think the parties disagree about

3  that -- I look at whether the Unsecured Creditors Committee, as

4  presently constituted, can provide adequate representation to

5  this set of Claimants.  There are often disagreements between

6  or among Committee members, and between those members and the

7  Committee as a whole.  This is one of those circumstances in

8  which the Claimants and the Committee are diametrically

9  opposed.  And I don't suppose as the dispute ensues, that

10  that'll change.  And ultimately it may fall to this Court to

11  make a determination about entitlement to those funds.  But the

12  fact that there is this dispute does not, I think as the Code

13  and the law anticipates, mean that within that language, this

14  Committee can't adequately represent the Claimants.

15       Now, even if that were so, even if I concluded that this

16  Committee could not adequately represent the Claimants, I look

17  at other factors.  I look at the cost to the Estate.  I have

18  not changed my initial view -- while there hasn't been much of

19  a record made in the way of how much it would cost to fund this

20  litigation.  I haven't changed my initial view, based upon the

21  submissions and now upon argument of counsel and the testimony

22  given, that I don't think the process was intended to have the

23  Estate fund this litigation issue.  It just -- it doesn't make

24  sense to me that that should occur, even if there is some

25  difficulty involved with many of the Beneficiaries, at least as

1 it's been alleged, in their being able to afford their own

2 representation.  Lots of bankruptcy cases, probably most of

3 them I see, have lots of Claimants who are owed very small

4 amounts.

5      Yes, it might be argued that Unsecured Creditors

6 Committees are more suited or better suited to representing

7 their interests, unlike the situation here.  But that's not

8 enough of a situation here to sway me.  I don't think this

9 case, at least as far as this goes, is particularly complex and

10 requires that there be an added Committee to represent these

11 interests.  Nor do I think, necessarily, that adding it would

12 make the case all that more complex, because of the narrow

13 issue involved.

14      And with respect to the narrow issue involved, the papers

15 are clear that at least right now the issue is entitlement to

16 the funds.  And the witness confirmed this.  And while I

17 appreciate counsel's efforts to say, "Well, there may be other

18 issues which would require a separate Committee," and there may

19 be, the record made today doesn't support the creation of an

20 additional Committee at this time.  There are other

21 alternatives that might be pursued.  And counsel for both sides

22 has discussed them.  It could be that maybe in connection with

23 the WARN Act Claimants there could be a Former Employee

24 Committee which would deal with the narrow issue and others.

25 And that's not necessarily an invitation.  All it is, is the

1  Court's impression and determination that there are other

2  alternatives, including the U.S. Trustee acknowledging that

3  she's still open to adding a member of this constituency to the

4  Committee.  Now, I understand that there may be situations in

5  which that means if one member is added, there may be a number

6  of seven to one votes.  But that's not necessarily unusual in

7  Committees with divergent interests, and certainly not enough,

8  at least on this record, to tell me that that would make this

9  Committee dysfunctional.  So for these reasons, I am going to

10  deny the relief without prejudice and ask that counsel confer

11  and submit an order under certification which provides for this

12  ruling that I made for the reasons I've stated on the record,

13  and to the extent that the Movants wish to have it, to include

14  a provision that indicates the funds should remain segregated

15  until further order of this Court.  Are there any questions

16  about what should go in the order?

17         MR. KEACH:  No, Your Honor, and we certainly would

18  like to continue at the invitation of the other parties the

19  order that segregates the funds until further order.

20         THE COURT:  All right, thank you.  Let's move on to

21  the next matter.  Or let me ask this, at what point did we want

22  to do our telephone witness in connection with the sale?

23         MR. HUSTON:  Pardon me, Your Honor --

24         THE COURT:  Yes, Mr. Huston.

25         MR. HUSTON:  -- Joseph Huston on behalf of the

1   Deferred Comp. Claimants.  There are some -- my folks have some

2   travel connections that they need to make.  At this point, our

3   business is concluded.  May we be excused?

4          THE COURT:  You may.

5          MR. HUSTON:  Thank you very much.

6          MS. UHLAND:  Your Honor, I think we can do --

7   address the Greenwich Sale Order now.  I think we can do that

8   rather quickly.

9          THE COURT:  Okay.

10          MS. UHLAND:  Hold on one second.  All right, Your

11   Honor, we now have the original reflecting the changes we

12   discussed this morning.  I just want to confirm that we have

13   Mr. Kevin Dwyer on the telephone.

14          MR. DWYER:  Yes, I'm on, Suzzanne.

15          MS. UHLAND:  Thank you.

16          THE COURT:  Let me just -- do you know Mr. Dwyer,

17   Ms. Uhland?

18          MS. UHLAND:  Yes, I do.

19          THE COURT:  And can you confirm that you recognize

20   his voice?

21          MS. UHLAND:  I can, Your Honor.

22          THE COURT:  All right, lets have him sworn in then.

23           KEVIN DWYER, DEBTORS' WITNESS, SWORN

24          THE CLERK:  Please state your full name and spell

25   your last name for the Court.

1        MR. DWYER:  Kevin Joseph Dwyer, D-W-Y-E-R.

2        THE CLERK:  Thank you.

3        MS. UHLAND:  Your Honor, to facilitate his

4   testimony, I was going to proffer the contents of his testimony

5   and then make him available for cross and for questions of the

6   Court.

7        THE COURT:  All right, go ahead.

8        MS. UHLAND:  Mr. Dwyer, who's on the phone, if

9   called to testify, would testify that he is a Vice President of

10  New Century Mortgage Corporation and has been since September

11  of 2005, and that he is the Vice President with responsibility

12  for the Debtors' secondary market operations.  He would further

13  testify that he is familiar with the Debtors' activities with

14  respect to the sale of its loans, including its loans not

15  financed anywhere, as well as the Debtors' matters with respect

16  to its residuals and sale of those residuals.

17     Mr. Dwyer would further testify that he was involved in

18  the negotiation and documentation process originally of the

19  Greenwich Asset Purchase Agreement, including in that respect

20  reviewing the representations made by the Debtor in connection

21  with the Asset Purchase Agreement and assisting in and

22  reviewing the schedules to the Asset Purchase Agreement

23  prepared by New Century.  He would further testify that he has

24  reviewed the Asset Purchase Agreement proposed to be entered

25  into between the Debtors and Ellington, including the changes

1  made by Ellington to the representations that had previously --

2  the Debtor had previously made to Greenwich.

3      Mr. Dwyer would further testify that the representations

4  and warranties of the seller set forth in section -- excuse me,

5  Article 4 of those -- of that agreement are true and correct as

6  of the date made.  He would further testify with respect to the

7  purchased assets that the Debtors own the purchased assets

8  identified in the Asset Purchase Agreement as defined therein,

9  which purchased assets include the defined term "residuals,"

10 which means the Debtor's interests, rights and titles to the

11 residuals set forth on the schedule to the Asset Purchase

12 Agreement and the related securitization clean-ups calls to the

13 extent the clean-up calls are held by the owner of the

14 residuals.  And that would conclude Mr. Dwyer's testimony with

15 respect to the accuracy of the representations and warranties.

16      THE COURT:  All right.  Ms. Uhland, the blackline

17 Form of Order that I was shown earlier says, "All of the

18 representations of the sellers in the APA are true and correct

19 as of the date hereof," which is the date of the order.  As I

20 heard from the proffer, Mr. Dwyer would testify that the

21 representations were true and correct as of the date they were

22 made.

23      MS. UHLAND:  Your Honor, I asked -- I did not

24 observe that provision in the order.  Let us -- if we could

25 just confirm with Mr. Dwyer that they are -- I don't know if I

1  can ask a direct question?

2          THE COURT:  Go ahead.

3          MS. UHLAND:  Mr. Dwyer, are the representations and

4  warranties in the agreement true and correct as of today's

5  date?

6          MR. DWYER:  Yes, they are.

7          THE COURT:  All right, thank you.  Does anyone else

8  care to examine Mr. Dwyer?  I hear no response.  Mr. Dwyer,

9  thank you very much.

10          MR. DWYER:  You're welcome, Your Honor, thank you.

11          MS. UHLAND:  Your Honor, I now have the final -- the

12  original of the Asset Purchase Agreement -- I mean, I'm sorry,

13  the Asset Sale Order, if I may pass it up?

14          THE COURT:  Yes, you may.  I assume others have had

15  a chance to review it at this point?

16          MS. UHLAND:  Yes, they have, Your Honor.

17          THE COURT:  All right.  Does anyone care to be heard

18  on the final revised draft of the Form of Order?

19          ALL:  (No verbal response).

20          THE COURT:  I hear no response.  That order has been

21  signed.

22          MS. UHLAND:  Thank you, Your Honor.

23      (Pause in proceedings)

24          MS. UHLAND:  Your Honor, we'd now like to turn to

25  the Retention and Incentive Plan Motion.

1            THE COURT:  All right.  Mr. McMahon?

2            MR. MCMAHON:  Your Honor, good afternoon.  Joseph

3    McMahon again.  Your Honor, we approach today with a hearing on

4    the United States Trustee's Motion to Continue the Hearing on

5    this particular motion, the Incentive Retention Plan Motion,

6    scheduled as per Friday's teleconference.  And Your Honor

7    indicated that he wanted to hear the full evidentiary record

8    developed before ruling on that motion.  The matter which I

9    presume I'm being asked to address right now is the fact that

10   as of the time this Omnibus Hearing started at 10 o'clock a.m.

11   this morning, I had not been presented with the latest

12   documentation relating to the negotiated plans in the form they

13   are being presented to the Court; and my understanding is the

14   Court had not either.

15       Your Honor, I received the employee grid, which breaks

16   down by employee what payments the Debtors are proposing to

17   make to the plan participants around 11:15 this morning, and

18   between being at this hearing and getting back to my desk and

19   doing some type of -- conducting negotiations with the plan

20   Beneficiaries' counsel, I will represent to the Court that I

21   haven't had a detailed opportunity to take a look at the paper

22   that I've been presented with.  Do I generally understand the

23   fact that they -- the negotiations proceeded in a manner that

24   the Committee negotiated some additional changes that are

25   presumably favorable to the Debtors' estates such that the

1  proposal -- the total amount of dollars proposed to be paid out

2  has been reduced?  Yes, I do understand that.  But again, if

3  the question being posed to our office is would we appreciate

4  the additional time to review the plans to discuss them

5  internally, perhaps to communicate with the representatives of

6  the estates regarding the plans, we would.  That's basically

7  where our office stands on this issue.

8          THE COURT:  All right, thank you.

9          MS. UHLAND:  Your Honor, briefly just on that issue,

10  and I don't -- I'll talk about it a little more.  There's two

11  changes that were made to the plans.  One is the continuing

12  negotiations with the Creditors Committee to provide them

13  concessions.  The other reason that the plans were difficult to

14  change is the plan totals decrease as the number of

15  participants decrease, and we are structuring the plans by

16  pools.  The Debtors have continued to lose employees every day,

17  and particularly after last week's events, lost a substantial

18  number of employees, including eight or nine of the plan

19  participants between Wednesday, when we gave the roster to

20  McMahon, to Sunday night.  So keeping that roster updated to

21  keep track of the people who are being lost is the primary

22  reason that we were unable to get the completed revised roster

23  to Mr. McMahon before today.  I'm very concerned that the

24  Debtors, who are in desperate need of their employees, not be

25  punished for the fact that they, you know, are already losing

1   the employees that these plans are intended to retain and --

2   and trying to accurately reflect that, and further that we're

3   making economic concessions with the Creditors Committee,

4   something would seem sort of contrary to sort of the purpose

5   the Debtors and Creditors Committee jointly view, you know, the

6   intended purpose of these plans.  Those are the two main

7   reasons, the economic concessions and the loss of participants

8   that flow through the documents that made the documentation

9   difficult to provide.

10       Your Honor, what we would propose to do today is walk

11   through the plans, which in structure are the plans that we

12   filed with the -- the amended plans we filed with the Court on

13   Tuesday.  Walk through those plans.  And I'd like to provide

14   the Court with some additional exhibits/Cliff Note versions of

15   the plans, it might be more readable, and explain to the Court

16   the economic changes that we've waled through.

17       But the Trustee's primary objections, as we understand

18   them, are to the linking the plans to incent -- to making sure

19   that the plans truly to incent the behavior intended and are

20   not {quote} {unquote} "lay-ups"; that these plans are necessary

21   to the sale process and are properly calibrated.  The Trustee's

22   other primary objection relates to clarifying the insider

23   status of the participants to ensure compliance with 503.  On

24   both of those points, Your Honor, the Debtors again feel that

25   these plans are unchanged from those filed last week, and

1  further, the Debtors intend to make an evidentiary record

2  through direct testimony that Mr. Stern of Richards Layton's

3  going to be handling the witnesses second.  So I'd like to take

4  some time going through the structure of the plans and then

5  presenting both of those issues through the witness testimony.

6  We'll be having Ms. Holly Etlin of Alex Partners testifying on

7  the business need, and Mr. Frank Glassner, who's the Debtors'

8  compensation expert, also testifying on the plan structure.

9          THE COURT:  All right, let's do this.  I'll allow

10  the Debtor to proceed in that manner, and at the conclusion of

11  the evidentiary hearing, I'll hear again from the U.S. Trustee.

12          MS. UHLAND:  Thank you, Your Honor.  Your Honor, to

13  start, I'd propose to hand up and make available to the parties

14  in the Courtroom a brief summary of the terms of the plan as

15  they currently stand.

16      (Pause in proceedings)

17          THE COURT:  Almost on cue.

18          MS. UHLAND:  May I approach, Your Honor?

19          THE COURT:  You may.

20      (The Court receives document)

21          THE COURT:  Thank you.

22      (Pause in proceedings)

23          MS. UHLAND:  Your Honor, when the Debtors originally

24  constructed these plans, they constructed them such that the

25  participants in the plans would by motivated to assist and

1  participate and maximize value in the Debtors' sale process.

2  Further, with respect to the lower level employees that were

3  participants in the plan, the Debtors proposed to make

4  retention payments.  Before getting to these plans that were

5  filed last week, between the time they were originally filed

6  and the time we filed them last week, we made three important

7  changes to the plan.

8      The sale structure and targets were unchanged as far as

9  the thresholds to meet for the sales.  But what the Debtors did

10  do in light of the previous rulings in this case with respect

11  to the scope of insider status is they restructured what was

12  previously their retention plan to leave in the retention plan

13  a limited number of employees and, instead, created a new

14  incentive plan that would include a broader range of what we

15  might call senior employees that the Debtors did not take a

16  position -- or officers -- but based on ruling in this case and

17  in an abundance of caution, the Debtors re-drew the lines on

18  who should be included in the incentive plan.  Further, out of

19  the Debtors' eight executives originally in the incentive plan,

20  only four executives were included in the new Key Employee

21  Incentive Plan.

22      In drawing the line on who was in the incentive plan, the

23  Debtors included all titled employees at the parent company,

24  NCF, and all titled employees with the title of Senior Vice

25  President or Executive Vice President at the mortgage company

1  or other operating companies.  Further, the Debtors did a

2  further review of the Vice Presidents at New Century Mortgage

3  Company to determine if there were any who could arguably be in

4  policy making positions or had any influence over the terms of

5  this plan.  Accordingly, there are certain Vice Presidents in

6  Human Resources and the legal department and finance who were

7  moved, though they had the Vice President title at the

8  operating company, were moved up into the incentive plan to

9  avoid any arguments with respect to their status.

10      Now as constructed, and I'll return back to this -- our

11  term sheet here, we have 33 employees in the incentive plan.

12  This includes six of the individuals who were previously in the

13  wholesale retention plan that this Court approved with respect

14  to the lower level employees for New Century Mortgage.  It also

15  includes, as I had mentioned, four EMC members.  Those four EMC

16  members, as we set out in our papers, include the company's

17  General Counsel, Chief Operating Officer, who's also

18  responsible for the Debtors' intellectual -- the Debtors' IT

19  Department, Mr. Anthony Meola, with whom this Court is familiar

20  as one of the Executive Vice Presidents of the Company, and Mr.

21  Robert Lambert, who's the Debtors' -- leads the Debtors' Human

22  Resources Department.

23      The new revised incentive plan provides for award targets

24  in a range from 10 to 30% of annual base salary.  This is the

25  total amount paid if all three stalking horse bids and targets

1  are met, thresholds are met.  The targets contribute to the --

2  or each sale contributes in a different way, and these

3  percentages have shifted as we've continued to make concessions

4  with the Creditors Committee.  But in essence, the balance of

5  the total incentive payment reflects the difficulty of

6  achieving the desired sale.  Accordingly, looking at this

7  second to last bullet point, for the LNFA transaction that was

8  just approved, that would contribute to the total target at 13%

9  at threshold.  For the servicing, it's sale, 42%, on the other

10  assets, 45%.  The target price for these other assets is 32.5

11  million.  The Debtors did not previously disclose that number

12  because we were still in the process of collecting or

13  soliciting bids for the loan platform origination business, and

14  the financial advisors requested that we not present a price

15  that might be taken by the market one way or the other.

16      Included in these other assets, then, would be the

17  technology that remains that supported our loan origination

18  platform.  To the extent that the sale of the Access business

19  results in proceeds to the Debtors, that would be included in

20  these other assets, the Access transaction that the Court

21  approved on the 24th.  Further, the Debtor has remaining

22  financial assets, including it's membership interests or their

23  partnerships interests in the Carrington funds, that's separate

24  from the Carrington Servicing documentation, which assets may

25  be difficult to sell and they have transferability issues.

1  Expressly not included in these other assets because it's not

2  an asset that's going to be sold under 363 is the Debtors' tax

3  refund claim.  That's not considered a saleable asset for the

4  purposes of these plans.

5      The Debtors' second plan is largely a retention plan,

6  except for the very top tiers of employee who have some portion

7  of their compensation tied as well to incentive in order to

8  align those employees with the Debtors' senior management.  The

9  total target -- and this can be a combination of incentive and

10  retention for those in the top tier, is 10 to 25% of base

11  salary.  And for these top tiers, approximately 40% is a

12  retention payment and 60% based on achieving the performance

13  metrics.

14      For the servicing employees in the plan, the retention

15  date is an earlier date, and there are approximately 20

16  servicing employees out of the 83 in the plan.  Those employees

17  need to remain through June 9th to receive their retention

18  payments, whereas others need to remain through July 9th.

19      The threshold prices work as follows, and it's been,

20  again, another thing that's sort of, I think, complicated the

21  documentation somewhat is the threshold prices are based on

22  formulating a pool that's contributed to the two plans for the

23  incentive payment, and then each participant in a plan gets a

24  set percentage of the amount.  And that percentage will be

25  determined based on when the roster is final, we'll have target

1  numbers in there for the dollar amount of award, and then those

2  will all be converted to percentages.

3      The plan is not a pool plan such that if any of the

4  employees voluntarily terminates prior to the award being made,

5  the pool does not increase or remain the same size for the

6  other employees, so we will -- we set these numbers -- we'll

7  set them as of today, but if there are voluntary terminations

8  or terminations for cause, again, these plans -- the total

9  numbers and the expense to the estate will be altered --

10  reduced.

11      So with respect to the Carrington -- I'm sorry, the

12  Greenwich/Ellington transaction, the plan will provide a total

13  funding in both plans at the stalking horse price of 265,234.

14  And then because of the provision that it would allow 2% of the

15  sale price above 47.25 million, the total contribution at 58

16  million would be -- this is the total, inclusive of the 265 --

17  482-34.  We are not paying amounts -- we are not contributing

18  to the plan and paying to the employees the amounts that are

19  subject to holdback until paid.  Accordingly, before the

20  holdback, only 420-234,000 will be paid.

21      With respect to the servicing transaction, because of the

22  structure of the servicing sale which is based on a basis point

23  as a percentage basis because the number of loans that are

24  subject to the servicing fluctuate and therefore the total

25  proceeds to the Debtor will be determined at the sale price

1  based on the audit.  But when the Debtors are comparing the

2  bids to get a better bid, it's really based on a percentage

3  basis for the loans that are being serviced in connection with

4  the servicing rights.  Accordingly, the Carrington bid is at a

5  50 basis points at present, and so the pool that's contributed

6  for the servicing assets is 829,969.

7       Now, the Carrington bid is currently the subject of a --

8  as currently structured also has a cash holdback, so

9  notwithstanding that it's being priced on a basis point

10  mechanism, if there is a held-back amount, the pool will be --

11  the amount will be reduced based on any amounts held back.  So

12  with a 10% holdback, only 90% of that amount will be paid.

13  Similarly, if we receive a payment -- a bid of 10% greater than

14  the 55 basis points -- I'm sorry, of the bid of 50 basis points

15  -- did I flip my numbers -- 90% will be paid on the current

16  proposal given the Carrington holdback.  If the deal increases

17  on a percentage basis, the starting amount of the 829 will be

18  increased on the same percentage basis.

19       With respect to the other assets, which are the group I

20  described before, largely the loan origination platform

21  technology and the other financial assets, including the

22  membership interests in the Carrington funds, no amounts will

23  be paid until proceeds reach 32.5 million.  As Ms. Etlin will

24  describe, the disposition process of those is just started and

25  has not even started for some of those assets.  Upon reaching

1  that, the pools will be funded at a $908,164.  And in a even

2  more updated economic agreement with the Creditors Committee,

3  we've agreed that the sharing above that amount or the

4  contribution above that amount for the first 5 million -- or

5  it's not quite 5 million -- up to 37.375 million, 2% of the

6  proceeds will go to contribute the fund, and above that sort of

7  second target amount, 6% of the proceeds will go to contribute

8  the funds.

9      As I noted before, no payments will be made to employees

10  who voluntarily terminate or for employees terminated for

11  cause.  Further, no payments will made to any plan participant

12  pending any internal investigation of such participant's

13  conduct.  Now, I note -- I will note briefly here that the

14  United States Trustee noted that provision, but wanted to raise

15  the additional concern about the SEC's investigation with

16  respect to employees.  In that regard, the Debtors provided

17  initially the complete roster to the Securities Exchange

18  Commission and, in fact, made some deletions at the request of

19  the Securities and Exchange Commission.  Accordingly, the

20  revised plan roster is -- we've reviewed with the Securities

21  and Exchange Commission and they've raised no objection.  So

22  that part of the review was done prior to the completion of the

23  roster that we're asking to be approved today.

24      I'd like to pass up one other summary that we've also

25  provided to the United States Trustee that gives a little more

1    detail about the categories of employees that are subject to

2    the plan, if I may hand this up?

3             THE COURT:  Yes.  Thank you.

4             MS. UHLAND:  The totals on this exhibit split out

5    between the two plans the numbers I just described for the

6    asset pools and, in addition, describes by general area the

7    categories -- or participants in the plans.

8        Briefly, because we are going to have discussions or

9    testimony to describe the business purpose of the plans, at a

10   high level, again, the structure was to create a sales related

11   plan on the incentive portion and to create a distribution of

12   proceeds to balance between the efforts required for the

13   different plans and to ensure that there was an incentive

14   structure such that the employees would, you know, on a very

15   successful result receive substantially more payment.  And

16   again, this is why -- one of the reasons that the bulk of the

17   plan is weighted and the incentive plan is weighted toward the

18   other asset categories.  As the Court is aware, that bar, you

19   know, has been raised, even lately, with the fact that the

20   Debtors received no bids for their loan origination platform

21   and are now going to be attempting to achieve that goal based

22   on the sale of their other assets, you know, other remaining

23   assets under 363.

24       Between -- as I noted before, between filing the original

25   plans and this plan, the Debtors made substantial reductions in

1  the economics and made the changes I described above to move

2  anyone who could be, by rule of this case or by the Debtors'

3  own concern on the policy review standard, an insider up into

4  the second plan.

5      Since filing the Tuesday plan, the Debtors engaged in

6  continued and further discussions with the Creditors Committee.

7  And I'd like to walk through briefly what the economic changes

8  were between the filing of the Tuesday plans and the plans

9  today.  Most importantly, and the key economic change -- or

10  there's really two key economic changes made by the Debtors

11  since the Tuesday plan.  First, the target for the other asset

12  pool was reduced by approximately 25%; in other words, the

13  total pool that would be available on distribution of those

14  amounts.  And while the pool was reduced the -- there was sort

15  of to create a more incentive structure, while the initial --

16  the floor pool was reduced for remaining threshold, the sharing

17  on the upside was increased such that instead of a flat 2%

18  above the target of 32.5, it's now the stepped 2.5% and 6% I

19  previously described.

20      Further, and this is another point that should address one

21  of the issues raised by the United States Trustee, the

22  discretionary incentive pool, or critical retention pool, we've

23  used both names, was reduced from $250,000 to $175,000.  And

24  again, I believe this does address the U.S. Trustee's concern

25  on this matter, no individual can be paid more than $40,000 or

1  20% of their base salary without Creditors Committee consent.

2      Also at the Creditors Committee's request, the Debtors and

3  the Creditors Committee clarified the provisions with respect

4  to the holdbacks; in other words, that at the time the sale

5  closes that the pool will be funded net of any held back

6  amount, with the held back amount only to be paid as received.

7  This was a two-fold interest of encouraging the Debtors and

8  their representative to both minimize amounts immediately, you

9  know, held back out of sales and further encourage the

10  employees to maximize the recoveries from any holdbacks or

11  escrows in the asset transactions.

12      And finally, Your Honor, with respect to the delivery of

13  the release, the Creditors Committee requested that we be clear

14  that the release be delivered by the participants prior to

15  payment instead of thereafter, similar to the release

16  provisions that the Debtors and the Creditors Committee worked

17  out in connection with the wholesale retention plan payments

18  that the Court previously approved.

19      Again, Your Honor, those are the modifications, in

20  addition to the loss of employees that have changed since

21  Tuesday.  Notably, we've reduced the total number of employees

22  participating in the plan; I believe that the are 11 fewer

23  employees since Tuesday -- 11 employees who are no longer

24  participating, which is a substantial attrition over the last

25  week.  It's been a very -- last week was a very difficult week

1   with the Debtors with the reduction in force, as well as -- and

2   these were -- these were voluntary terminations, not parties

3   who were RIF'd by the Debtors.  And then further, there was one

4   employee added in to sort of address the fact to compensate in

5   an area where the other employees had been -- were no longer

6   going to be employees of the Debtors.

7       Accordingly, as we now -- if we're looking at the revised

8   detailed schedule, the total cost, if all targets are met,

9   would be -- and the full discretionary pool is paid, would be

10  approximately 3.2 million.  If all targets are met just at

11  target, we expect to -- we can add to that, and we've now

12  calculated the amount that we would receive with the Ellington

13  transaction, so that would amount would increase with the

14  holdback by an approximately another $160,000.  So

15  approximately 3.37 million if we hit every target with the

16  Greenwich overbid and if all employees remain employed and

17  therefore remain entitled to all the payments.

18      Your Honor, I believe on the legal objections, that as

19  we've -- both the restructuring that we did and filed on

20  Tuesday, that we've addressed the issues the United States

21  Trustee raised with respect to 503.  After the conclusion of

22  the testimony we will walked through that issue again.  With

23  respect to the incentive nature of the plans, Your Honor, we

24  believe that's best addressed through the testimony of Ms.

25  Etlin, who can talk about why the plans address -- why the

1  plans are motivating and necessary and are not {quote}

2  {unquote} "lay-ups" as the case law warns us against.  And with

3  respect to the U.S. Trustee's legal objections, we believe as

4  restructured and with the additional information which was

5  presented into the Court today, that the Trustee's concerns

6  about the Securities and Exchange Commission investigations

7  have been addressed, as have the U.S. Trustee's concerns about

8  the payments to be made to individuals in connection with the

9  additional pool.

10      With that, Your Honor, I'd like to turn it over to Mr.

11  Stern to present our evidence.

12          THE COURT:  All right.  Before we do that, let's

13  take a short break, say 10 minutes.  And before the evidentiary

14  presentation, I'd just like -- I would like to hear first

15  briefly from the U.S. Trustee to see what objections, if any,

16  remain.

17          MS. UHLAND:  Thank you, Your Honor.

18          THE COURT:  Court will stand in recess.

19      (Court in recess)

20          MR. MCMAHON:  Your Honor, good afternoon.  Prior to

21  the break, Your Honor asked for a presentation from our office

22  as to whether the plans as revised resolved our objections in

23  any way, and the answer to that question is no.  As our

24  objection notes, there are two concerns under -- having to do

25  with sub-section 503(c)(1), and then four concerns dealing with

1   50C -- 503(c)(3), excuse me.  With respect to 503(c)(1), the

2   two issues are, first, whether this plan as it is currently

3   postured is a disguised retention program.  The second issue is

4   whether the plans seek to make retention payments to insiders.

5   And in that regard, Your Honor, I note that while the Debtors

6   have, I guess, attempted to shift Senior Vice Presidents and

7   Vice Presidents across the company, across various

8   corporations, as a result of our previous consideration of the

9   insider issue in a different context, there are still,

10  admittedly, in the text of the amendment Vice Presidents and

11  Assistant Vice Presidents who are, by definition, corporate

12  officers, they have been appointed officers pursuant to the by-

13  laws, who are slated to receive retention payments under the

14  plans; specifically, the retention plan.

15      With respect to (c)(3), Your Honor, we have argued the

16  plans have to be justified by the facts and circumstances of

17  the cases.  And the first consideration basically mirrors the

18  point about the targets not being real incentives.  The second

19  point is -- has to do with the rational relationship between

20  the incentives and the work performed by the various employees

21  who either were creating a second class of investment bankers

22  who really aren't.  The third has to do with the existence of

23  the critical retention pool, and the fourth has to do with the

24  pending investigations and whether we should be going forward

25  with this issue.  And I guess you could probably collapse out

1   with the consideration of our Motion to Continue.  Unless Your

2   Honor would like me to --

3           THE COURT:  No, thank you, I appreciate that, Mr.

4   McMahon.

5           MR. MCMAHON:  Okay.

6           MR. STERN:  Good afternoon, Your Honor.  May it

7   please the Court, Bob Stern from Richards, Layton & Finger on

8   behalf of the Debtors.  Your Honor, I've been asked to present

9   Debtors' Motion to Approve its Incentive and Retention Plans.

10  Before I do that, however, we filed, I believe it was today or

11  perhaps sometime earlier, a redacted version of the employee

12  roster; in other words, all of the folks who we propose to have

13  receive either incentive or retention pay under these plans,

14  and that roster provides specific information about employee,

15  position, and amounts that they might receive under certain

16  sales or for retention.

17      The U.S. Trustee has asked us to file an unredacted

18  version of that roster, but we feel we can only do so if it is

19  filed under seal, so at the request of the U.S. Trustee this

20  afternoon, we are making now an Oral Motion under Section

21  107(b) to File the Entire List Under Seal, and I'll briefly

22  explain the basis of that motion, but I've added at the end of

23  Ms. Etlin's testimony the facts Your Honor would need in order

24  to grant that motion.  So I'll simply alert the Court that

25  we're making that motion now, give the Court a quick preview of

1  the basis for that motion, and otherwise table it until we

2  finish and Your Honor's had a chance to hear Ms. Etlin's

3  testimony.

4         THE COURT:  Does the U.S. Trustee have a copy of the

5  unredacted list?

6         MR. STERN:  Yes.

7         THE COURT:  All right.

8         MR. STERN:  We're not hiding that from him.  We just

9  don't want it to be part of the public record.

10        THE COURT:  I understand.

11        MR. STERN:  Okay.  The basis, Your Honor, for our

12 Oral Motion under Section 107(b) is that we want to protect the

13 company's confidential information.  Frankly, the data on the

14 amounts that employees could or would receive is competitively

15 sensitive information, among other things.  As Ms. Etlin will

16 testify, such information could be used by competitors to

17 essentially hire away the employees that we have deemed most

18 critical.  All they really need to do is see what we propose to

19 pay them to incentivize them to stick around and top it, and

20 then we are at risk of losing those employees.

21     Moreover, as a general matter, the company does not

22 disclose specific employee compensation information because of

23 a concern that it may cause some dissension among the ranks,

24 frankly; one employee looking at what the other employee's

25 getting and getting disgruntled. So very generally, but

1  probably primarily for the reason of a concern about the

2  ability of competitors to use this data, we would like to keep

3  it confidential.  And Ms. Etlin will

4  provide such testimony, and then I suppose we'll return to the

5  motion under 107(b) at the end of the day.

6       Your Honor, turning to the motions, as the Court is aware,

7  on April 11th, the Debtors filed their Motion Seeking Approval

8  of the Incentive and Retention Plans.  Now, I think it's fair

9  to say a lot has happened since then, and Ms. Uhland has

10  summarized many of the events, and I'll spare everyone a

11  repetition of that summary.  I think suffice to say, we come to

12  Court today with plans that have been modified to address the

13  concerns of the Committee, and in our view, concerns previously

14  expressed by the Court and the U.S. Trustee.  It bears

15  emphasizing, Your Honor, that the Committee, which in essence

16  is writing the checks for these plans, is fully on board with

17  and supports the plans.

18       Your Honor has already heard the general basis for the

19  U.S. Trustee's objections to our plans, and with due respect to

20  the U.S. Trustee, Your Honor, we believe we can refute those

21  objections today as a matter of fact and as a matter of law.

22  We will demonstrate that the incentive plans are indeed true

23  incentive plans.  We will demonstrate that the participants in

24  the retention plan, there's about 28 Vice Presidents and

25  Assistant Vice Presidents among the approximately 90 total

1  participants in that plan, give or take, are not officers as

2  that term is used in the Bankruptcy Code.  And we will

3  demonstrate that the plans themselves represent informed

4  exercises of the Debtors business judgment and are entitled to

5  approval under Section 503(c) -- 503(3)(c), excuse me.  Your

6  Honor, we will, at the end of the day, ask the Court to approve

7  the plans today, as in our view it is critical that the plans

8  be approved today.  Frankly, and you'll hear some of this in

9  the testimony, we simply cannot wait to afford any longer.

10        Now, this afternoon, Your Honor, I'm going to proceed as

11  follows.  First I'm going to call two witnesses.  The first one

12  is Holly Etlin of Alex Partners, the Debtors' financial

13  advisors.  I think in terms of ordering, then it would make

14  sense for me to present Ms. Etlin for cross examination.  Then

15  I'll proceed to Frank Glassner of Compensation Design Group.

16  Mr. Glassner -- or I should say Compensation Design Group are

17  the Debtors' compensation advisors.  Of course, then, if anyone

18  wants to cross examine Mr. Glassner, they'll be free to do so.

19  And then we'll discuss, Your Honor, the applicable legal

20  standards, the application of the facts that have been

21  presented today to those standards, and why the Debtors believe

22  the plans should be approved.  I suspect when I sit down, the

23  Committee and the U.S. Trustee may have some things to say as

24  well.  Your Honor, may I call my first witness?

25        THE COURT:  You may.

1          MR. STERN:  Your Honor, Debtors call Holly Etlin to

2     the stand.

3               HOLLY ETLIN, DEBTORS' WITNESS, SWORN

4          THE CLERK:  Please state your full name and spell

5     your last name for the record.

6          MS. ETLIN:  Holly Felder Etlin, E-T-L-I-N.

7                     DIRECT EXAMINATION

8     BY MR. STERN:

9     Q.  Ms. Etlin, by whom are you employed?

10    A.  Alex Partners.

11    Q.  And what is your position, ma'am?

12    A.  I'm a managing director.

13    Q.  Did you join the firm as a managing director?

14    A.  Yes, I did.

15    Q.  And when was that?

16    A.  In January of this year.

17    Q.  Would you please provide a brief overview of Alex Partners'

18    business?

19    A.  Certainly, Alex Partners is a over 600 person international

20    consulting firm, and while it has multiple lines of business,

21    it is best known as being one of the preeminent crisis and

22    turnaround management consulting firms in the world.

23    Q.  Do officers or employees of Alex Partners occasionally

24    serve as or serve in officer roles at distressed businesses?

25    A.  Yes, we frequently serve as CRO and CEO and often CFO

1  titles, as well.

2  Q.  Okay.  Would you please summarize your responsibilities as

3  a managing director of Alex Partners?

4  A.  Managing director is the highest level of professional

5  within the firm.  We are responsible for directing the cases

6  that the firm has, actually taking those officer roles, as well

7  as selling and marketing work on behalf of the firm.

8  Q.  Ma'am, by whom were you employed before Alex Partners?

9  A.  Crossroads Solutions Group.

10  Q.  Okay, and what is Crossroads Solutions Group?

11  A.  It is also a crisis management and turnaround firm of

12  smaller scale than Alex Partners.

13  Q.  What was your last position at Crossroads?

14  A.  I was a principal, which is the highest title in that firm,

15  and the co-leader of the restructuring practice for the firm.

16  Q.  And how long were you with Crossroads?

17  A.  Four years.

18  Q.  By whom were you employed prior to Crossroads?

19  A.  For 23 years I was with Deloitte Consulting, the last 5 of

20  which I was the national leader of their restructuring

21  practice.

22  Q.  So how many years of experience, ma'am, do you have in

23  providing financial advice in restructuring or reorganization

24  engagements?

25  A.  Slightly in excess of 27 years.

1  Q.  Do you have any professional certifications?

2  A.  Yes, I do.

3  Q.  And what are those?

4  A.  I am a CTP, a Certified Turnaround Professional, and a

5  CIRA, which is Certified Insolvency and Reorganization Advisor.

6  Q.  Are you a member of any professional organizations?

7  A.  Yes, I'm a member of the ABI, the AIA, which is the

8  Association of Insolvency Advisors, the IWIRC, the

9  International Women's Insolvency Reorganization Confederation,

10 INSOL, as well as the Turnaround Management Association.

11 Q.  Have you had any upper level positions with the Turnaround

12 Management Association?

13 A.  Yes, Turnaround Management Association is an 8,000 member

14 professional association, the largest in our business, and I'm

15 the immediate past Chairman of that association.

16 Q.  When was Alex Partners retained by the Debtors?

17 A.  On March 21st of this year.

18 Q.  Are you the lead professional for Alex Partners on the

19 engagement?

20 A.  Yes, I am.

21 Q.  Okay.  What type of services has Alex Partners provided to

22 the Debtors?

23 A.  We have -- we were engaged to provide a variety of crisis

24 management services to the Debtors, including but not limited

25 to management of the treasury and cash forecasting function for

1  the company, assisting the company with the preparation for

2  operating within a Chapter 11 environment, assisting both

3  counsel and management with those issues, assisting the company

4  with stabilizing its servicing operation, and dealing with

5  vendors and others who were disturbed by the company's

6  precipitous decline in financial condition, working with the

7  management team on the various operational issues the company

8  has had, including the reductions in force that have occurred,

9  conversations with vendors, landlords and others pertaining to

10  the current condition the company is in.

11  Q.  Since your engagement by the Debtors in March, have you

12  spent literally 100% of your professional time working for the

13  Debtors?

14  A.  Yes, I have.

15  Q.  Okay.  And as a result of your work for the Debtors, have

16  you become familiar with the Debtors' business operations?

17  A.  Yes.

18  Q.  Okay.  Can you generally describe what the Debtors'

19  business was pre-petition and what's happened to the business

20  since then?

21  A.  Certainly.  The company, as I think has been stated in this

22  Court on several occasions, was the second largest originator

23  of sub-prime mortgage loans in the country last year.  They

24  originated approximately $50 billion in mortgage loans, which

25  at an average of $200,000 apiece is a lot of mortgage loans.

1  Unfortunately, in the early part of March, the company found
2  itself without its warehouse lines of credit, which were lines
3  that it utilized in order to continue to make loans, and found
4  itself unable to make mortgage loans.  Therefore, given that
5  the origination of mortgage loans was a primary source of
6  revenue for the company, the company effectively found itself
7  in early March without any form of revenue.
8  Q.  And what happened next?
9  A.  Well, the company engaged in Lazard to assist them in
10 evaluating a variety of strategic options and attempted to find
11 a buyer or equity investor for the business who would do so
12 outside the context of a Chapter 11 filing.  They had a number
13 of parties who came through the company, who spoke with them,
14 who attempted to look at the company.  Unfortunately, those
15 parties concluded that they were not interested in doing such
16 an investment outside the context of a Chapter 11 filing.
17 Therefore, the company proceeded to prepare for and file itself
18 for protection under Chapter 11.
19     In addition, as part of that process, the management team
20 became convinced that the size the company was at the time was
21 not going to be a size that anyone, even in the context of a
22 Chapter 11 filing, was going to be interested in buying.  And
23 so on the first day of the filing we executed a lay off of
24 approximately 50% of the company's employees.  We downsized the
25 business by over 3,000 people to try to bring the size of the

1   loan origination platform business to a size that the

2   management team thought would ultimately be saleable.  Of

3   course, I think the newspaper accounts and things that happened

4   last week tell the story on that.  Unfortunately, there were no

5   offers for that business and the Debtor executed a further

6   reduction in force last week.  We currently have slightly less

7   than 1,000 employees left at the company, approximately 370 of

8   which are at corporate, and slightly over 500 of which are

9   employed in the servicing operations of the business.

10  Q.  You said there's currently less than 1,000 employees at the

11  company?

12  A.  That is correct.

13  Q.  Just for comparison purposes, how many employees,

14  approximately, were at the company 2 months ago?

15  A.  Almost 6,300.

16  Q.  Okay.  Ma'am, are you involved with the Debtors' sale

17  efforts?

18  A.  Yes, I am.

19  Q.  Okay, and can you describe your involvement just summarily

20  please?

21  A.  Certainly.  Our rule is to assist Lazard and the management

22  team in developing due diligence materials for the process with

23  regard to all of the various sales, working closely with the

24  management team, getting those up on an internet based data

25  site, an interlink site, to facilitate the various bidders due

1  diligence, and also coordinating the various kinds of

2  interviews and on-site visits that occur with regard to the

3  various business operations.

4  Q.  I'll ask you to go into some more detail about the sales

5  processes and the assets being sold and things like that in a

6  moment, but just to give us a starting point, can you briefly

7  identify the categories of assets that are being sold?

8  A.  Certainly.  They're basically the assets that are covered

9  by the plans that are subject to this hearing today, and then

10  there are certain other assets of the Debtors, but those are

11  not subject to a 363 sale process.  So the first is the sale

12  that was just completed this morning, which was the sale of

13  loans not financed anywhere, which are loans that have either

14  been put back to the Debtors or for which the Debtors did not

15  originally securitize them or put them in a securitization

16  facility, as well as certain residual interests that the

17  Debtors owned in assets that were previously securitized and

18  owned by others; so that's sort of the first category.

19       The second category is an operating business, and that is

20  the servicing platform business.  That platform continues to

21  service loans owned by the Debtor, by Carrington, and also by

22  Morgan Stanley.  That's the business that employs slightly more

23  than 500 people today.  It operates in Santa Ana, California,

24  and is continuing to collect money on behalf of those parties,

25  process loans, also perform reconciliations associated with the

1  various activities of the warehouse lenders.  The third

2  category consists of a variety of other assets, which have been

3  previously described in Court.  The interest in the Carrington

4  funds, access lending, which was the subject of a sale hearing

5  previously in this Court.  There's a small title insurance

6  business.  There are -- obviously, we had hoped to sell the

7  loan origination platform and were not successful doing so and

8  unfortunately had to lay off many of those employees, but the

9  company still does hope to sell the actual custom technology

10  that was created for that loan origination platform, as well as

11  certain IT assets and potentially employees who will go with

12  that custom design software and help with training, et cetera,

13  for the buyer of that asset.

14  Q.  Okay.  I'm going to return to each of those three

15  categories and we're going to talk about the steps that have

16  been taken done so far for these sales, and the steps that

17  remain to be taken.  Let's start with, I guess what I'll call

18  the Ellington sale.  Is that the name of the purchaser that was

19  approved today?

20  A.  Yes, it is.

21  Q.  Okay.  What have the Debtors' employees done so far, say

22  through today, in order to support or facilitate the Ellington

23  sale?

24  A.  So the Ellington sale is not simply a single financial

25  asset.  It is a pool of approximately 2,000 loans, and each of

1  those loans has documentation associated with it, performance

2  criteria, past performance criteria that had to be extracted

3  from the Debtors' records and made available to parties, as

4  well as then the residual interests which, again, the Debtor

5  had to be capable of providing documentation that those

6  interests were actually owned and what they consisted of and

7  all of the various documentation that goes along with the

8  performance of the pools of assets to which those residuals

9  might be related.  So that the Debtors management team was

10  involved in a fairly comprehensive process to extract that

11  data, as well as to make it available to potential parties who

12  were interested in buying those assets.

13  Q.  Notwithstanding the fact that the Ellington sale was

14  approved today, is there work yet to be done by the Debtors'

15  employees to consummate the Ellington sale?

16  A.  Yes, very substantial work.  The Ellington sale documents

17  require, specifically, the delivery of all of that

18  documentation successfully to Ellington, and there's actually a

19  holdback that the Debtors would like to ultimately receive

20  that's pending the actual documentation, the receipt of the

21  documentation, and the transfer of all of that data

22  successfully to the buyer.

23  Q.  And how much is that holdback?

24  A.  So I believe it's approximately $3 million.

25  Q.  Now what happens if the Debtors' employees don't perform

1  all this hard work and provide the information to the

2  purchaser?

3  A.  So, well, in one case the deal could not close, potentially

4  not close at all in the most extreme view, and it's -- and in

5  the less extreme view, you could have an issue with actually

6  receiving the full amount of the proceeds under the holdback.

7  Q.  Let's chat for a moment, if we could, about the second

8  category, the Carrington sale, if I can use that to summarize

9  it.  What is the status of the Carrington servicing platform

10 asset sale?

11 A.  No, the Carrington stalking horse agreement was filed, if

12 not at the exact same time, we sought protection under Chapter

13 11, shortly thereafter.  However, because of the speed with

14 which that agreement was put together, Carrington has

15 continued, subsequent to that date through today's date, to do

16 additional due diligence on their own behalf with regard to

17 that transaction.  In addition, they're actively in the

18 servicing platform, have had professionals in the servicing

19 platform making substantial information requests.  My team in

20 the servicing platform, the Alex Partners team, is responsible

21 for helping manage and fulfill those requests so that they

22 don't significantly interfere with the day-to-day operations of

23 the servicing platform.  But the fact of the matter is is that

24 a lot of people and a lot of data have to be involved in making

25 sure that Carrington's requests are satisfied.  Carrington's

1  not the only interested party in this business so there have

2  been other parties doing due diligence, coming on site to have

3  meetings, and doing other kinds of activities with regard to

4  the sale process right through today's date.

5  Q.  I think you've probably answered, in large part, my next

6  question, but I'll ask it anyway to see if you want to add

7  anything to your answer.  What have the Debtors' employees done

8  so far in support of the Carrington sale?

9  A.  There's been very substantial data associated with that.

10  Carrington, as any bidder for this kind of asset, would want to

11  know that the company had adequate systems and people and

12  expertise in place to properly service a long portfolio the

13  size that the company currently services.  They would want to

14  know that the company was complying with the terms and

15  agreements of those servicing contracts, and so there's been a

16  very substantial amount of data gathering associated with that,

17  as well as understanding the company's policies and procedures

18  with regard to the non-performing portions of the loans in

19  those portfolios, given that this is a sub-prime loan

20  portfolio, which requires a lot more hands-on attention and

21  activity than a regular credit rated portfolio of mortgage

22  loans.

23  Q.  And what remains to be done by the Debtors' employees in

24  order to consummate the Carrington sale?

25  A.  Well, the first threshold issue is we're required to retain

1  a minimum number of them in order to close that transaction in

2  the first place.  So the first thing they have to do is at

3  least agree to stick around, which is no small issue.  There is

4  a competitive servicer of loans who opened up a brand new

5  facility and held extensive job fairs in the second week of

6  this case, and who has been actively trying to recruit the

7  company's personnel.  But in addition to that, it's not a fait

8  accompli that Carrington will be the purchaser of those assets,

9  it may be some other party, but if it were to be Carrington,

10 Carrington does not currently have the licenses necessary to

11 actually take over, close and operate a servicing operation.

12 And so we would be obligated, under the terms of a transition

13 services agreement, to continue to assist them in operating

14 those businesses until such time they obtain their own licenses

15 and were able to take over the operation of those servicing

16 businesses.

17      And there's a lot of transition that would occur.  If a

18 buyer were to actually be a current operator of a servicing

19 platform, it would still take approximately 3 to 4 weeks to set

20 up for the actual transfer of the service assets to that buyer,

21 and then there's about a 30 to a 60 day tail whereby you still

22 continue to receive checks from borrowers and other kinds of

23 reconciliation activity that you need to do to support the full

24 and complete transfer of that business over to the successful

25 buyer.

1  Q.  You referenced, I think, a requirement under the Carrington

2  agreement that the Debtors essentially deliver a certain number

3  of employees identified by the purchaser under the agreement,

4  is that right?

5  A.  That is correct.  It's a certain percentage.  If I recall

6  correctly, I think it's 75% of the employees that were in the

7  platform at the time the stalking horse agreement was signed.

8  Q.  And what happens if we don't deliver the 75% of employees?

9  A.  I believe at Carrington's option they have an option of not

10  closing.

11  Q.  Okay.  Now, while all of these things that you've just

12  described have been going on at the servicing business and the

13  related businesses, do the employees still need to run those

14  businesses?

15  A.  Oh, absolutely.  There's a lot of activity going on, not

16  just the running of the actual servicing business, but frankly,

17  we're, as of last week, only 30 days into this case.  And so

18  there are huge amounts of activity that are ongoing in every

19  aspect of the business operation of the company, not only

20  pertaining to the issues with regard to the very rapid

21  downsizing of the business, the need to dispose of properly

22  facilities and leases and assets and those kinds of things, but

23  also all of the ongoing issues associated with the various --

24  the SEC investigation, the various regulatory departments in

25  every state in which the company has done business, there's

1   very active contact with each state, and those are licensing

2   issues.  And again, we have to maintain the licenses in order

3   to be able to transfer an operating business to Carrington or

4   another purchaser on the servicing side, so there are lots of

5   different kinds of activities ongoing at the company, in

6   addition to just supporting the sale process.

7   Q.  Let's talk about the status of the last bucket of assets,

8   which we'll just call "other assets."  What is the status of

9   the sale of the other assets?

10  A.  That process has only just barely commenced with regard to

11  the other assets.  We don't have any stalking horse bids for

12  any of those items other than the Access transaction, which

13  this Court has already heard, but which I think the Court will

14  remember, while there is a nominal value placed on that sale,

15  it is subject to an actual earn-out provision.  And so there

16  are things that need to happen in order to actually ultimately

17  receive those proceeds from Access.

18  Q.  And just so that the Court understands what's going on with

19  this business as well, or these businesses I think I should

20  say, what have the Debtors' employees done so far in support of

21  selling these other assets?

22  A.  So, well, first the Debtors employees had to and have been

23  continuing to identify all of the various kinds of smaller

24  miscellaneous assets that the company has that are not

25  particularly hard assets; you know, they're not tables and

1  chairs, or leases.  Those are the things that are kind of easy

2  to find.  It's the company's investment in Carrington and the

3  issues associated with the potential transferability of that,

4  it's Access, it's -- again, I mentioned the small title

5  insurance company and other kinds of things like this.  And of

6  course we were, until unfortunately last week, very actively

7  marketing the origination platform.  And there were huge

8  activities associated with preparing the materials associated

9  with that sale process, supporting Lazard in the sale process,

10  the demos of the IT component of that operating business, and

11  then, now, the continuing process associated with trying to

12  market and successfully sell just the IT components since the

13  employees have actually been terminated as of last week.

14  Q.  And just to round out the record, although I think you've

15  probably mentioned some of these things already, what remains

16  to be done by the employees to hopefully consummate sales of

17  these other assets?

18  A.  Well, probably the most important issue is that the

19  servicing platform and its IT requirements were not set up to

20  be separate and easily segregable from the normal IT operations

21  of the company.  And many systems are linked together.  We need

22  to figure out what goes with the servicing platform, what is

23  related to the technology sale, and what, frankly, systems and

24  data the ongoing estates need in order to properly perform

25  their function of filing a Plan of Reorganization and winding

1  down the process as it pertains to the remainder of the

2  business.  So that's one example of several activities that are

3  still ongoing and require some fairly substantial technical

4  input of the company's employees.

5  Q.  You mentioned previously that with respect to the other

6  assets, there's no stalking horse.  What's the outlook for the

7  sale of the other assets?

8  A.  Well, it's -- we would hope that it was good, but obviously

9  that component of this plan is much more highly speculative

10 than the other components.  The other components are

11 speculative as to timing and amount.  And certainly, for

12 example, in the case of Carrington, there could be a downward

13 adjustment just as easy as there could be an upward adjustment,

14 based upon the ongoing due diligence efforts.  But at least

15 there is, I think, a sense among the company's employees that

16 that business -- there will be a successful buyer.  The other

17 assets pieces, it's not necessarily known what the sale might

18 bring.  Commensurately, we've tried to structure the incentive

19 compensation to reflect some of the risks that the employees

20 perceive potentially with the successful sale of those assets.

21 Q.  Now, all the work that you've just described in great

22 detail that has been done by the Debtors' employees so far to

23 support and facilitate the asset sales and that remains to be

24 done to support and facilitate the asset sales, could that work

25 be done by the Debtors' investment bankers?

1  A.  No.  Lazard's job is to work with the various buyers in the

2  negotiations.  Lazard works at a much higher level.  And

3  certainly they do not have nearly the kind of detailed

4  knowledge with regard to these assets and businesses that the

5  company's employees do.  And so there is a logical break

6  between the role of the company's employees, frankly our role

7  as advisors to the business, and Lazard's role.

8  Q.  Now, in addition to participate -- and I think you

9  discussed a little bit of this a moment ago.  In addition to

10  participating in the sales processes and otherwise running the

11  various businesses, what other kinds of work have the Debtors'

12  employees been doing?

13  A.  Well, we have just completed -- unfortunately, going from

14  6,300 employees to less than 1,000, so the HR and benefits

15  portion of the company has been completely consumed with just

16  getting the appropriate documentation to people that you would

17  normally deliver to them as part of their termination; the

18  COBRA notification and everything associated with that process,

19  making sure that we get, you know, security passes and lap tops

20  back from people and that we secure the various office sites

21  that have been vacated by the Debtors as the various two rounds

22  of downsizing that have occurred.

23      Now, one round was on April 2nd, the second round was just

24  last week, about 30 days later.  There's a huge amount of

25  follow-on activity associated with all that process.

1  Substantially all of the company's desks and chairs and file

2  cabinets are subject to various forms of equipment financing,

3  equipment leasing arrangements, identifying which are on which

4  agreement, and what the rights or those various lenders or

5  lessors are and how we go about seeing that their rights are

6  protected with regard to these assets and making sure that we

7  maximize the value of these assets, which now constitute, you

8  know, used office furniture.  There's just a whole host of

9  different kinds of activities that are going on.  Of course,

10 the schedules and (indiscern.) preparation is the thing that's

11 now consuming the accounting department, for example.

12 Q.  Let's turn to the plans that are proposed for approval

13 today, the Key Employee Incentive Plan, and the Key Employee

14 Incentive Retention Plan.  Ma'am, are you familiar with those

15 plans?

16 A.  Yes, I am.

17 Q.  Okay, do you know how the plans were developed?

18 A.  Yes.

19 Q.  How were they developed?

20 A.  A joint effort between the compensation committee of the

21 Board of Directors, CDG, O'Melveny, input from me, and then

22 input from the senior management team as to the potential

23 participants in the plans and the basis for the plans.

24 Q.  Okay, and did you personally have a role with the plans?

25 A.  Yes, I'm the individual from Alex Partners who was involved

1  in the discussions around the development of the plans, and

2  also the potential participants in those plans.

3  Q.  Did you assist in identifying employees who should be

4  included to, for example, accomplish the sales in the plans?

5  A.  Yes.  I interacted with every member of the -- what's

6  called the EMC of the company, the Executive Management

7  Committee of the company, the top eight employees who direct

8  all of the significant business units of the company.  And I

9  had direct interactions with each of them with regard to

10 critical employees within their portions of the business and

11 the role they would potentially play as part of this process.

12 Q.  Have the Debtors approved the plans?

13 A.  Yes.

14 Q.  Okay.  And did you advise the Debtors to approve the plans?

15 A.  Yes.

16 Q.  Why did you do that?

17 A.  Because I think it's in the best interests of the estates.

18 I believe that while we don't have as many employees in these

19 plans as we would have probably preferred to have under other

20 circumstances, that the employees that are in these plans are

21 the bare minimum necessary to really see us through the balance

22 of the process without significant disruption.

23 Q.  Is there generally, among the employee ranks, uncertainty

24 regarding the business?

25 A.  Yes, that would be an understatement.

1  Q.  Are there currently high levels of turnover?

2  A.  Yes.  The company has had -- in addition to the downsizes

3  that were planned, the company was experiencing extremely high

4  turnover when I first walked in the door on March 21st, and

5  while that has somewhat slowed, again, I think it has been

6  noted earlier today that when we first filed this plan, there

7  were 11 people in this plan who are no longer with us because

8  since we have been attempting to get this plan approved, they

9  have voluntarily resigned.

10 Q.  Are the employees who the Debtors have identified for

11 inclusion in the two plans easily replaced?

12 A.  No, many of them have either very specific technical

13 knowledge associated with the actual industry that the company

14 is in, or very specific supervisorial or managerial knowledge

15 regarding how the company actually operates that would be very

16 difficult, frankly, to replace if they were to depart.

17 Q.  Is this an easy time for the company to hire replacements?

18 A.  No.  When I'm not here in Court I spend full time at the

19 company in Irvine, California.  And unfortunately, the amount

20 of press that the company has received, the unfortunate

21 derogatory comments that have been made by the U.S. Trustee's

22 Office and others that have then been picked up by the press

23 have really contributed to, frankly, just absolute -- it's

24 almost hard to describe.  People just don't know what's going

25 to happen next.  They don't -- you know, normally we would file

1   a bankruptcy and we would communicate to employees, "Okay,

2   we're in, we've got this approved for you, we've got that

3   approved for you, and we're gonna -- you know, we're gonna have

4   this course of action, and it's going to take about this long,

5   and this is what your expectations could be."  But they

6   continue to read just horrible things being said about the

7   company in the press, and so they don't know what to believe,

8   and particularly with regard to people who are part of the U.S.

9   Government saying some of those things.  They don't know

10  whether that reflects, frankly, the view of Your Honor or

11  something else.

12      These are the kinds of questions I get on a daily basis

13  from people who, normally in my experience, at this point in

14  the case, we would have been able to substantially calm them

15  down, have them focus on the work at hand, and not be worried

16  about maybe next week someone will change their mind and they

17  won't get paid out their vacation or their pay check will

18  bounce or the other kinds of things that you typically have

19  happen with an employee being concerned about in the first 4 or

20  5 days of a case, as opposed to now 30 days into the case still

21  being worried about that.

22  Q.  Are the Debtors asking these plan participants, these

23  identified employees, to take on additional responsibilities

24  and expend significantly more time and energy than contemplated

25  by the normal terms of their employment in order to assist the

1  Debtors in, you know, accomplishing these asset sales?

2  A.  Yes, all of this other stuff comes on top of the things

3  that they need to do day-to-day.  Now, while we no longer have

4  the origination business so people who had a heavy portion of

5  their day-to-day business activity devoted to that have been

6  able to switch over to some of these activities, I think it's

7  fair to say that all of the company's employees are working

8  much longer hours and much more extensively than they're used

9  to doing in the past.

10  Q.  Do the Debtors have authority to honor pre-petition

11  incentive plans for these employees?

12  A.  No, they do not.

13  Q.  And in the past, has a substantial portion of the New

14  Century employees' compensation been incentive and performance

15  based?

16  A.  Yes, in addition to the commission retention program which

17  we talked about early on in the days of these cases, a very

18  large percentage, I think, you know, 25, 30% of the average

19  middle management employee's total compensation package was

20  part of the incentive programs of the company, and that

21  includes the people in the General Counsel's Office, people in

22  Accounting, HR, and other places.  And they're obviously very

23  conscious of the fact that those incentives are no longer in

24  place.

25  Q.  So in essence, because those incentives are no longer in

1  place, are the employees essentially working for a pay cut?

2  A.  So, yes, and I hear about it fairly frequently.

3  Q.  Ma'am, are the employees listed in the plans essential to

4  the successful consummation of the sales of the Debtors'

5  assets?

6  A.  Yes.

7  Q.  And why is that?

8  A.  Because the functions that they're being asked to perform

9  as part of this process are essential to successfully closing

10 those sales and transitioning those assets and businesses to

11 the buyers.

12 Q.  Do the individuals who were identified for participation in

13 the plans have specialized knowledge?

14 A.  Yes, they do.

15 Q.  Okay.  Now, why do the plans provide for incentive pay for

16 consummation of sales of assets for which the Debtor already

17 has or had stalking horse bids?

18 A.  Well, again, I think we previously discussed the fact that,

19 for example, Carrington was subject to substantial additional

20 due diligence, and the price on Carrington could just as easily

21 have gone down rather than up as a result of this continuing

22 due diligence.  In addition, that original Asset Purchase

23 Agreement was signed without all of the schedules to the

24 agreement being fully complete because of the timing under

25 which it was done.  So there are a lot of fine point details,

1  because of the speed with which these sales have needed to be

2  made in order to preserve the most value for the estate that

3  needed follow-on, even after the transaction was initially

4  inked.  And of course, then, all of the competing bidders for

5  those assets had continuing due diligence after that process.

6      Again, sometimes in these sale transactions, in determining

7  a stalking horse, we've had substantial due diligence occur at

8  the company already.  In this case, substantially all the due

9  diligence with regard to the bidders occurred after some of the

10  stalking horse bids were entered into.  There were some parties

11  involved early on, but many more of those involved in the sale

12  process were involved after those bids were filed with the

13  Court.  And then, of course, there's the issue with regard to

14  documentation and transfer of those assets.

15  Q.  And do the stalking horse agreements have closing

16  conditions?

17  A.  Yes, they all have fairly extensive closing conditions.

18  Q.  Now, let me backtrack for just one moment cause I want to

19  address a question to some testimony you gave previously.  We

20  already discussed the fact that pre-petition, the Debtors

21  provided incentive based compensation for their employees,

22  right?

23  A.  Yes.

24  Q.  Okay.  And you'll recall your testimony that the Debtors

25  have not continued post-petition with their pre-petition

1  incentive plans, right?

2  A.  That's correct.

3  Q.  Okay.  Now, at the time the employees were working on the

4  stalking horse bids, do you believe they expected to continue

5  to receive some form of incentive pay?

6  A.  Yes, I do.

7  Q.  Okay, but as things currently stand, they would not receive

8  such incentive pay, would they?

9  A.  That's correct.

10 Q.  Okay.

11 A.  We did not, however, have time or, frankly, have sorted

12 through at the time the ability to say that the employees

13 definitely one way or the other what form of incentives we

14 might be in a position to provide them.  So they continued to

15 work under an assumption that the portions of their

16 compensation that were available to them pre-petition would

17 continue to be available post-petition.

18 Q.  So absent approval of these plans today, those employees

19 would not have, I guess, their beliefs fulfilled, would they?

20 A.  That's correct.

21 Q.  Ma'am, would you describe the consummation of the stalking

22 horse bids as "lay-ups"?

23 A.  No.

24 Q.  And why not?

25 A.  Well, again, I think I've testified that as it pertains to

1  Carrington, they've probably done more extensive due diligence

2  since the signing of the stalking horse bid than after, and

3  we're, you know, continuing to hear feedback from them with

4  regard to that process, as well as the other parties coming

5  through.  The same, by the way, is true, frankly, of the

6  Ellington transaction in that there were very, very extensive

7  documentation issues that have to occur in order for the sale

8  to actually close.  Company's employees in the capital markets

9  area have been working very extensively on making sure that we

10 can actually provide that documentation at the time of closing.

11 Q.  Now, why did the Debtors tie the incentive pay for all of

12 the plan participants to the asset sales?

13 A.  Because of the nature of where the company is today,

14 there's not going to be a Reorganized Debtor, and the thought

15 was that we should pick those things that are most easily

16 identifiable and measurable for the included employee.  The

17 employee knows what the transaction is.  The employee can very

18 clearly identify it, and the amount of the transaction is

19 measurable.

20 Q.  Are the sales essentially the most important activities

21 that the company is currently engaged in?

22 A.  Yes, by far and away they are the activities that will

23 generate the most value for the estates, in addition to the tax

24 return preparation, which will hopefully yield a fairly large

25 income tax receivable.

1   Q.  By using sales as the measure for incentive pay, does it

2   allow the Debtors to keep the plan structure simpler?

3   A.  Yes, again, one of the key issues with an incentive plan,

4   and particularly one in a post-petition environment, is you

5   want the employee to believe that the measurement criteria for

6   the plan are readily identifiable.  You don't want to be

7   measuring them on soft issues.  You want to be measuring them

8   on something very hard and measurable and relatively public.

9   Q.  Is it practical to come up with 100 different incentive

10  plans for 100 different employees?

11  A.  No, it's very impractical, and particularly given all the

12  other things the Debtors are doing, the fact that we even have

13  three different pools is a little more complex than many of the

14  plans that I've put in place in similar cases.

15  Q.  Are all the plan participants in one way or another engaged

16  in activities that support the asset sales?

17  A.  Yes.

18  Q.  Are the plan participants required to waive any other post-

19  petition incentive or retention compensation or claims such as

20  Warn Act claims in order to qualify for payment under the

21  plans?

22  A.  Yes, they are.

23  Q.  Okay.  If a plan participant voluntarily terminates or is

24  terminated with cause, can the participant receive incentive or

25  retention pay?

1  A.  No, they cannot.

2  Q.  If the participant is subject to investigation by the Audit

3  Committee, do the Debtors have the right to delay payment in

4  order to complete the investigation to determine if the

5  employee should be terminated for cause?

6  A.  That's correct.  Any amount that's due that employee under

7  the incentive plan pursuant, for example, to Ellington, since

8  the Ellington transaction has just been approved by the Court,

9  would be escrowed until such time as a determination was made

10  whether or not the employee was eligible to receive that money.

11  Q.  Ma'am, given all you've told us about the plans, do you

12  have a view regarding the reasonableness of the plans?

13  A.  Yes, I do.

14  Q.  What's your view?

15  A.  They're reasonable.

16  Q.  For the reasons you've already discussed in detail?

17  A.  That's correct.

18  Q.  Okay.  Ma'am, do you have a view of what might happen if

19  the plans are not approved?

20  A.  Yes, I do.

21  Q.  And what is your view?

22  A.  We'll continue to have the turnover that we have

23  experienced.  I would suspect that we will rapidly lose some

24  substantial percentage of the employees covered by these

25  retention plans, and more importantly, we've got 371 corporate

1  employees and we've got over 500 servicing employees.  The lack

2  of approval of this plan would send a message to the balance of

3  the company's employees, even if they aren't covered by this

4  plan, that there is some risk with regard to all of their other

5  compensation arrangements.  No matter what I could say to them,

6  at that point they would be -- have sufficient disbelief that,

7  frankly, I think a large portion of them would be out looking

8  for jobs.

9  Q.  Ms. Etlin, if the plans are not approved, and are not

10 approved immediately, do you think that could adversely affect

11 the Debtors' ability to consummate their sales?

12 A.  Yes.

13 Q.  Okay.  Are there currently morale problems at the Debtors?

14 A.  Yeah, I think I've already alluded to the fact that there

15 are very difficult morale problems at the company.

16 Q.  Tell me about what happened with the reduction in force

17 last week?

18 A.  Last week was very, very sad.  Brad Maurice, the CEO of the

19 company, gathered the employees in the corporate headquarters,

20 and I was physically there for that announcement, into a room

21 and announced the fact that the company was unable to find a

22 buyer for the origination platform.  There were substantial

23 tears in the room and a great upset.  After that, frankly, the

24 company emptied out and by approximately 12:30, 1 o'clock in

25 the afternoon, there were very few people left in the company

1  headquarters that day.

2  Q.  Did even people who had not been RIF'd, leave?

3  A.  That's correct.  Almost everyone left and went home for the

4  day.

5  Q.  Has the current delay, and I don't use that word

6  pejoratively, has the delay in getting the plans put into place

7  so far caused any employees who we wanted to stay, who we had

8  originally listed as participants in the plans, to leave?

9  A.  Yes.

10 Q.  And in fact, I think we heard earlier that's why we had to

11 revise the plans, 'cause some of the folks are leaving, aren't

12 they?

13 A.  That's correct, and the fact that -- because the listing --

14 while we couldn't tell employees that we could assure them that

15 the plan would be approved, we did attempt to tell them that

16 they were included individually in the plan, and while we

17 couldn't guarantee them what the amounts might ultimately be

18 because we were negotiating with the Committee and it was

19 subject to Court approval, we did give them an idea of the

20 range of the payments in the plan.  And then they asked when it

21 was we thought it would be approved, and we told them when it

22 was.  And unfortunately in several cases, they didn't believe

23 that they could wait.

24 Q.  Thank you.  Ms. Etlin, I want to ask you just a few more

25 questions.  First, a couple of questions that relate to the

1  U.S. Trustee's position that some of the Vice Presidents and

2  Assistant Vice Presidents are officers and, accordingly,

3  insiders.  Let's discuss some of the plan participants' role at

4  the Debtors.  You're generally familiar with the participants

5  set forth in the Key Employee Incentive Retention Plan.  That's

6  the lower level plan, right?

7  A.  Yes, there are actually many of those employees I work with

8  day to day.

9  Q.  Okay.  And you're aware of the fact that 28 participants in

10 that plan have the title of either Vice President or Assistant

11 Vice President?

12 A.  Yes, I am.

13 Q.  Okay.  Why were those individuals included in the Key

14 Employee Incentive Retention Plan, sorry, the lower level plan,

15 as opposed to the Key Employee Incentive Plan?

16 A.  Because of the nature of their jobs.  Again, I think it's

17 been discussed in Court previously that this is a financial

18 institution, and as such, you know, practically everyone

19 including the janitor has a VP or AVP title.  And so while many

20 of those employees may have that title, the nature of their job

21 function is more supervisorial or middle and lower level

22 management, as opposed to something constituting an actual

23 officer or policy maker of the company.

24 Q.  Is that pretty common in the financial services industry?

25 A.  Yes, it is.

1  Q.  Okay.  And let's just chat about those individuals for

2  another moment.  The 28 participants in the Key Employee

3  Incentive Retention Plan, who have the title of Vice President

4  or Assistant Vice President, are any of them officers of the

5  parent company?

6  A.  No, they're not..

7  Q.  Okay.  Do any of them function in the role of a senior

8  officer with regards to policy making, for instance?

9  A.  No.

10        MR. STERN:  Okay.  Your Honor, I'm now just going to

11  ask a couple of questions about the confidentiality issues that

12  we discussed and then I'll close.

13  BY MR. STERN:

14  Q.  Ms. Etlin, if detailed information about the proposed

15  incentive and retention payments to these participants was

16  publicly disclosed, would that information be useful to the

17  Debtors' competitors?

18  A.  Yes, it would be.

19  Q.  And why's that.

20  A.  Well, it sets the bar for how much of a signing bonus you

21  have to give to somebody you're trying to hire.  If you know

22  that they're subject to an incentive retention plan that could

23  pay a range of let's say 25 to $50,000, all you have to do is

24  include that to up the ante to the extent that you want to

25  recruit them.

1  Q.  So competitors could use that same information to hire away

2  our critical employees?

3  A.  Yes, and in addition, given that you know that the awards

4  are a range of salary, that also gives you a pretty good proxy

5  for what the employee's actually making and disclosing

6  confidential employee compensation information.

7  Q.  So, disclosing this information could, at the end of the

8  day, defeat the purpose of the incentive and retention plans,

9  couldn't it?

10  A.  Yes, well, the other issue obviously is it's a matter of

11  general business practice that people do not disclose inside a

12  company what other employees make.

13  Q.  Is that because it could cause dissension within the ranks?

14  A.  Absolutely.

15  Q.  Thank you, Ms. Etlin, I have no further questions.

16          MR. STERN:  And Your Honor, I tender Ms. Etlin for

17  cross examination.

18          THE COURT:  All right, let me ask, before we go to

19  the U.S. Trustee, anyone else who's in support of the plan to -

20  - who wishes to examine Ms. Etlin to step up now.

21          MR. POWER:  Your Honor, I have a couple of

22  questions.  Give me one second.

23          THE COURT:  All right.

24          MR. POWER:  Your Honor, I'll be brief.

25                          CROSS EXAMINATION

1  BY MR. POWER:

2  Q.  Ms. Etlin, I heard your testimony.  Could you please focus

3  a little bit -- I'd like to focus on the claim side, and these

4  people are part of this plan, and what they will do to assist

5  the estate in terms of dealing with claims.  Are you familiar

6  with the term EPD?

7  A.  Yes, I am.

8  Q.  And what does that term mean to you?

9  A.  So, it's an early payment discount.  The --

10  Q.  Well, early payment default.

11  A.  Default, yes.

12  Q.  And it's actually in connection with the warehouse lenders

13  and their claims, if they find that their loans they put back

14  that they assert are in early payment defaults, the company has

15  to take those back?

16  A.  Yes.

17  Q.  And are you familiar that -- with those potential claims in

18  this estate?

19  A.  Yes.

20  Q.  And do you have a sense of what the volume of those claims

21  might be?  Are they in the tens of millions, hundreds of

22  millions, any sense?

23  A.  I think they're in something that begins with a billion.

24  Q.  A billion, okay.  Is it your understanding that some of the

25  people who are part of this are company people who have

1  knowledge of how those claims work and how the arrangements for

2  warehouse lenders work?

3  A.  Yes, specifically the capital markets, people in the plan,

4  as well as a number of the accounting department people in the

5  plan, are the primary parties with knowledge of refuting those

6  potential claims that would come from the various parties, not

7  only the warehouse lenders, which you mentioned, but the

8  parties of securitizations, which also have those kinds of

9  potential rights, whole loan purchasers, and others.

10  Q.  Now those people are being incentivized to stay and help

11  the company and you yourself work through those claims and try

12  to resolve them so this Court doesn't have a huge amount of

13  litigation to deal with, is that correct?

14  A.  That's correct.

15  Q.  Do you have a view as to what --

16        THE COURT:  You're doing that all for me?

17     (Laughter)

18        MR. POWER:  We're working hard, Your Honor.  I have

19  another reason, though, I'm about to ask.

20        THE COURT:  Okay.

21  BY MR. POWER:

22  Q.  Which is do you have a view of whether it would be less

23  expensive for the estate to retain those people to help resolve

24  those claims or to retain outside professionals, such as

25  accountants and financial advisors, to resolve those claims?

1  A.  Well, it's way less expensive.  It's always way less

2  expensive to retain the people who have the greatest knowledge

3  with regard to the claims, be they a vendor claim, a lender

4  claims, the claims we've been discussing, and others.  And

5  that's the reason that I fought so hard to retain the core

6  group of people that we've retained at the company, so that we

7  can actually have an accelerated claims reconciliation process

8  as part of this case and really get to a timely claims pool for

9  purposes of a plan.

10 Q.  So not only is the plan designed to assist in getting the

11 sales done, it's also designed to cut costs in terms of

12 professionals and get to a plan sooner, is that --

13 A.  Absolutely.  If I ended up with a large amount of turnover

14 on this case, not only would it necessitate hiring of lots of

15 people from organizations like account-temps and others, but I

16 would have to also put a large number of additional Alex

17 Partners people on site, and frankly, it is way more efficient

18 and effective to use the company's own people who have that

19 great accumulated knowledge to do the process.

20 Q.  Thank you.  Let's talk briefly about the origination

21 platform.  I think you described generally the leases and the

22 equipment.  Let's talk about the volume.  Approximately how

23 many leases and locations were part of that platform around the

24 country?  Do you know?

25 A.  300 approximately.

1  Q.  And is the company currently now, because it's shut down,

2  have to work through rejecting those leases, and getting the

3  equipment, and assembling all that information for 300

4  locations throughout the country?

5  A.  Yes, and in addition, to comply with the requests of the

6  SEC and others, all data associated with -- confidential data

7  associated with the actual operations of the loan process in

8  those branches, and all of the IT equipment has to be specially

9  lifted out, secured, categorized, and shipped back to Southern

10 California where it will be retained until such time as we're

11 free to wipe the hard drives and return things and destroy

12 actual paper records.  So there's a very complex process.  It's

13 not just sort of abandoning or selling off the actual furniture

14 in those locations.  It's actually lifting out all of those

15 assets associated with that information gathering process.

16 Q.  And are the Debtors' employees, with the assistance and

17 oversight of Alex Partners, going to try to vacate those places

18 so the leases can be rejected?

19 A.  Yes, we're in the process of trying to do that as quickly

20 as possible now.

21 Q.  And will that help decrease the claims that are asserted

22 against this estate?

23 A.  Yes.

24 Q.  And those are administrative priority claims currently, for

25 the post-petition period?

1  A.  For the post-petition rent as well, yes, and we're having

2  negotiations simultaneously with as many landlords as we can

3  possibly handle in an attempt to also minimize the landlords

4  ultimate claim for the rejection of that lease.

5  Q.  One other area, if you could you briefly describe to the

6  Court where you started with the plan, and I guess through the

7  good faith negotiations, where you're ending up just in terms

8  of gross numbers, so the Court can get a sense of the efforts

9  made by the Debtor in terms of making this plan reasonable, at

10  least in our view?

11  A.  Yeah, I'm trying to remember exactly back to the original

12  plan that was filed with the Court, Mr. Powers, I think --

13  Q.  Wasn't it slightly more than $7 million when you first --

14  A.  Yeah, I think it has been reduced by over half from the

15  original plan that was contemplated.

16  Q.  And the original plan that was contemplated also had senior

17  management involved, including the Chairman and other people,

18  is that correct?

19  A.  Yes, the entire executive management team of the company

20  was originally included in the plan, and as we previously

21  announced, the company and the management team and the Board

22  agreed that a number of them would step aside and voluntarily

23  remove themselves from the plan in order to facilitate the

24  timely approval for the company's employees.

25  Q.  So in addition to basically more than 50% reduction in the

1  dollar amount and the taking out of the senior people, was also

2  the focus of the plan shifted from basically guaranteed

3  payments to incentive based payments based on sales and

4  performance?  Is that fair to characterize it that way?

5  A.  Yes, there were a greater number of people that actually

6  had a retention component to their overall compensation under

7  the plan, and now a greater number of people are in solely the

8  incentive portion.  And only those people who are not officers

9  of the company are down in the portion that has a retention

10  portion.

11  Q.  Just one more question.  Are you aware of certain buyers or

12  potential buyers of the assets expressing concern about

13  retaining employees?

14  A.  Yes, we hear it fairly regularly.

15  Q.  And is that something that they've indicated was a major

16  risk factor in terms of being able to purchase the business?

17  A.  Yes, as I had previously indicated, it's actually

18  documented in the Carrington deal that we must retain a certain

19  minimum percentage of the employees in the servicing platform

20  in order to have them remain committed under the Asset Purchase

21  Agreement.

22          MR. POWER:  Thank you, Your Honor, no further

23  questions.

24          THE COURT:  All right, anyone else on the proponent

25  side?  Okay, U.S. Trustee.

 1                    CROSS EXAMINATION

 2   BY MR. MCMAHON:

 3   Q.   Ms. Etlin, good evening.  You're not an investment banker,

 4   would that be a fair statement?

 5   A.   That's correct, I'm a turnaround and crisis manager.

 6   Q.   And you don't provide executive search consultant services,

 7   is that accurate?

 8   A.   That's accurate.

 9   Q.   You're not an economist, would that be a fair statement?

10   A.   That's correct.

11   Q.   And would it be a fair statement that AP Services, your

12   firm, doesn't provide services in any of the three

13   aforementioned areas which I just mentioned?

14   A.   I believe so, other than temporarily taking officer roles

15   which might fall under the, you know, executive search I guess

16   is how you -- area, I don't believe so.

17   Q.   Well, executive search I would define as assisting

18   executives in becoming employed at other places within a given

19   industry.

20   A.   No, we're not engaged in that business.

21   Q.   Okay.  Now, with respect to the plans that are before the

22   Court today, when did the construction of the plans begin?

23   A.   There was a discussion ongoing with regard to the need for

24   the plans when I walked in the door, you know, on March 21st.

25   I don't know how much earlier that discussion had been

1  occurring, but clearly there was a significant concern on the

2  part of management with regard to the extensive turnover the

3  company was having and expected it would continue to have

4  through this process.

5  Q.  Okay, and do you know when the plans were in the form that

6  they're presented to the Bankruptcy Court with the initial

7  filing of the motion were finalized?

8  A.  I believe they were finalized just very shortly before the

9  actual filing of the motion.

10 Q.  So it would have been in very late March or early April,

11 would that be fair?

12 A.  Oh, no, by before the filing of the motion, I mean within

13 24 to 48 hours before the filing of the motion.

14 Q.  Okay.  Now, prior to the submission to the Bankruptcy

15 Court, were the completed incentive and retention plans

16 presented to senior management for their review?

17 A.  I don't believe that the senior management was, other than

18 the one or two of them that sit on the Compensation Committee,

19 were asked to attend Compensation Committee meetings, were

20 actually involved in the detail review of those plans.  The

21 primary responsibility for the review of those plans rested

22 with the Compensation Committee and the Board of Directors.  I

23 know Mr. Maurice and Mr. Lambert, in their respective

24 positions, were involved extensively in those discussions.

25 Q.  Okay.  At the time the plans were presented to New

1  Century's Compensation Committee, who was on the committee?

2  A.  The Compensation Committee consists of Fred Forester, who's

3  the Chairman of the Board, and Don Lang, who is a member of the

4  Board of Directors.  I also believe Mr. Maurice sits on the

5  committee, and Mr. Lambert does attend some meetings of the

6  committee, but I don't believe, since he is not a director of

7  the business, he sits, I think, at their invitation, because he

8  is the SVP in charge of the compensation benefits and Human

9  Resources area of the company.

10  Q.  Okay.  And the Compensation Committee reviewed and approved

11  those plans, correct?

12  A.  Yes.

13  Q.  Okay.  Were they ever presented to the full Board prior to

14  being filed with the Bankruptcy Court?

15  A.  Yes.

16  Q.  Okay, so the review, if I got the chronology correct, it

17  went to Compensation Committee, the Board subsequently as a

18  whole approved the plans, and then they were filed, correct?

19  A.  That is correct.

20  Q.  And that entire process occurred within, you know, 24 to 48

21  hours before the filing of the motion?

22  A.  That's correct.  The Debtors' Board has been meeting very

23  actively, and I believe at that time were still in the mode of

24  meeting if not every day, every other day.

25  Q.  Okay.  Now, the plans were presented to the Compensation

1  Committee in the form of a proposal, I presume, correct?

2  A.  Yes, the Compensation Committee, I believe, gave a

3  direction to CDG to think through the kinds of provisions that

4  one might include in this kind of a plan and asked for

5  assistance from the company's professionals, O'Melveny and us

6  with regard to the scope or the kinds of people that might be

7  included in such a plan and what kinds of typical provisions

8  there were, those kinds of things.

9  Q.  Okay.  And at the time the plans were initially presented

10  to the Compensation Committee, was it your view that the plans

11  as they were presented then were the bare minimum necessary to

12  achieve the goals you wanted to achieve by implementing the

13  plans?

14  A.  Well, there were multiple revisions, so let me -- I think

15  the first revision, as is often the case -- the first draft, as

16  is often the case, included a lot of people and some fairly

17  substantial amounts of money to be paid to those people.  And

18  part of our role and part of the role of the company's counsel

19  is then to talk through the reasonableness, given the context

20  of the case, and whether that amount is, you know, high, low or

21  otherwise.  So I do not believe that it would be fair to

22  characterize the initial drafts of the plan that I saw as being

23  ones that would be the bare minimum.  I think we certainly are

24  there today.

25  Q.  So your testimony is, then, that even before the plans in

1  the forms that they were filed with the Bankruptcy Court made

2  it to that point, that there were drafts that included more

3  employees, more money, is that correct?

4  A.  Yes.

5  Q.  Okay.  Now, you working in conjunction with CDG, the other

6  professionals, made a -- presented something to the

7  Compensation Committee, the plans in the proposed form,

8  correct?

9  A.  Actually, CDG made the presentation, and we were asked by

10 the Compensation Committee -- I and the other professionals

11 were asked for commentary as the Compensation Committee

12 reviewed those things.  But the plans were actually -- the sort

13 of laboring oar for the development of the plans themselves and

14 the structure of the plans belong to CDG.  The inclusion of the

15 employees was the role of management and myself and others.

16 Q.  Were there any -- was there anything in the plans as they

17 were proposed to the Compensation Committee on the eve of the

18 filing of the motion that was rejected by the Compensation

19 Committee?  Any recommendations that you made, that CDG made,

20 that the Compensation Committee said, "No, can't have this"?

21 A.  Yes.

22 Q.  What?

23 A.  I think there were several revisions to take the plan down,

24 and there was discussion of some of the provisions that

25 ultimately ended up in the plan with regard to the employees

1  who might be subject to investigation by the Audit Committee,

2  that kind of thing.

3  Q.  Okay.  And you turned around and made certain revisions

4  along the lines of what you just described, correct?

5  A.  I made them, management made them, when we went back to

6  certain people within management and said it's really too many

7  people, what can we do; you know, those kinds of things.  It

8  was a very collaborative process with multiple points of input.

9  Q.  Okay.  The presentation to the Board's Compensation

10  Committee, who was present at that presentation of the plans,

11  if you will?

12        MR. STERN:  Excuse me, I'm sorry, objection.  At

13  which time?

14        MR. MCMAHON:  We're talking -- I think we've only

15  referenced one meeting in the testimony.  I'll rephrase to make

16  it clearer.  Thank you.

17  BY MR. MCMAHON:

18  Q.  With respect to the presentation of the plans to the

19  Compensation Committee prior to the filing of the motion with

20  the Bankruptcy Court, there was presentation that you

21  referenced which CDG led, correct?

22  A.  Yes, there were actually multiple meetings, but you're

23  talking about the one just prior to the formal approval,

24  correct?

25  Q.  Correct.

1  A.  Yes.

2  Q.  What date did that occur on?

3  A.  I don't specifically recall.  I believe I've already

4  testified it was within 24 to 48 hours of filing the motion.

5  Q.  Now, who was present at that meeting?

6  A.  I believe the individuals that I previously referenced,

7  either in person or on the phone.  I think the company's

8  General Counsel typically participates, as well.  I know Ms.

9  Uhland was present, Mr. Glassner from CDG, the members of the

10  Comp Committee.

11  Q.  And yourself?

12  A.  I don't recall whether I was present at that particular

13  meeting or the one right before -- I can't specifically say I

14  was specifically present at that final meeting at which that

15  approval was given.

16  Q.  Okay.  Now, at a certain point, the Debtors communicated to

17  the proposed plan participants their status as such, correct?

18  You had to let them know that they were being incentivized or

19  designated to be retained, correct?

20  A.  Yes, there were quiet conversations.  Again, there was no

21  formal written notice because obviously anything we do is

22  subject to approval by the Bankruptcy Court.  So you can't, you

23  know, provide written notice to employees until such time as

24  the plan is approved.  But there were quiet conversations

25  between the members of the EMC and many, if not all, of the

1  employees that were potentially covered by the plans; not right

2  away, but fairly shortly after filing the motion.

3  Q.  Okay.  So in fact, the employees were not informed that

4  they were designated as plan participants until after the

5  motion was filed, is that your testimony?

6  A.  The employees who were actually covered by the ultimate

7  plan that was filed were informed after the plan was filed.

8  However, there was substantial conversation internally at the

9  company, and people wondering about when we were going to file

10  it, and whether or not they were going to be included prior to

11  the filing of that motion.

12  Q.  Okay, now, let's put this in context then.  When did the

13  company retain Lazard?

14  A.  Well, I think it was March 12th, but I'm not entirely sure.

15  It was sometime in that portion of March.

16  Q.  Okay, and Lazard immediately started its work of leading

17  the Debtors' sale efforts, correct?

18  A.  Yes.

19  Q.  Lazard put together offer and sale materials with respect

20  to the sale of what I'll call the LNFA and the residuals

21  portfolio, correct?

22  A.  Yes.

23  Q.  Lazard put together materials to sell the servicing

24  business, correct?

25  A.  Yes, all of those things were in the process when we were

1  hired.  They weren't all complete at the time, for example, I

2  walked in the door.

3  Q.  When did the Debtors enter into a confidentiality agreement

4  with Greenwich Capital with respect to the LNFA residual

5  portfolio?

6  A.  I don't specifically recall.

7  Q.  And when did the Debtors enter into -- begin negotiations

8  over the terms of an Asset Purchase Agreement with respect to

9  the LNFA residuals portfolio with Greenwich?

10  A.  Those conversations were already somewhat under way when I

11  walked in the door, but I don't have a specific recollection of

12  when they commenced.

13  Q.  Okay.  And do you recall when the actual Asset Purchase

14  Agreement with Greenwich was executed?

15  A.  No, I don't.

16  Q.  Basically, would it be fair to say it was at or around the

17  time the Debtors filed for bankruptcy protection?

18  A.  Yes.

19  Q.  You basically walked into Bankruptcy Court with that deal

20  on the table, correct?

21  A.  That is correct.

22  Q.  Let's switch to the servicing business.  Do you have an

23  understanding as to when the Debtors began their negotiate --

24  oh, strike that.  Do you understand as to when Carrington

25  executed a confidentiality agreement with respect to its

1  pursuit of the servicing business?

2  A.  No.

3  Q.  Do you have an understanding as to whether that event

4  occurred before or after you came on board?

5  A.  I do not.

6  Q.  Okay.  Do you have an understanding as to when Carrington

7  began negotiating with the Debtors over the terms of the

8  proposed servicing sale?

9  A.  I do not.

10  Q.  Do you have an understanding as to whether those

11  negotiations commenced prior to the bankruptcy filing or not?

12  A.  Well, I would assume they did, given that we filed with the

13  bankruptcy filing and Asset Purchase Agreement it was filed

14  shortly after the filing, but how much prior I wouldn't know.

15  Q.  Just out of curiosity, in light of some of your testimony,

16  what is your precise role on this engagement for Alex Partners?

17  A.  I believe I've already described that.  Would you like me

18  to repeat it?

19  Q.  Well, sure, I would like to understand specifically what

20  your sale related role is.

21  A.  Certainly.  We are responsible for assisting the company

22  with gathering all of the due diligence materials necessary to

23  support the various sale processes, vetting those between

24  management and Lazard to make sure that they're accurate, and

25  then making those available in an organized form to the various

1  parties.

2  Q.  So the company walks -- the company files for bankruptcy

3  protection, and it almost immediately thereafter filed the

4  Greenwich Sale Motion and the Carrington Sale Motion, correct?

5  A.  That's correct.

6  Q.  All right.  And basically simultaneously, it also filed the

7  Motion Seeking Approval of the plans that are before the

8  Bankruptcy Court today, correct?

9          MR. STERN:  I'm sorry, objection.  Are you asking

10  whether the Plan Motion was filed at the same time as the

11  petitions were filed?  I may have mis-heard.

12          MR. MCMAHON:  No, I'll rephrase the question to make

13  it clearer.

14          THE COURT:  All right.

15  BY MR. MCMAHON:

16  Q.  At or around the same time you filed the Motion to Sell the

17  Servicing Assets and the LNFA residual portfolio, you also

18  filed the Motion to Approve the Incentive and Retention Plans

19  as they existed at that time, correct?

20          MR. STERN:  Sorry, Your Honor, can I object?  I

21  think it's of record the date that the Motion to Approve the

22  Incentive Plans was filed.  I'm not sure if the dates are as

23  close as the U.S. Trustee thinks.  I can say that the motion to

24  -- the original Motion to Approve the Plans, my understanding

25  just based on looking at the motion, as April 11th, if that

Etlin - Cross                          191

1   helps anyone.

2           MR. MCMAHON:  Your Honor, I'll just move on.  I

3   think we can establish this some other way.

4           THE COURT:  Thank you.

5   BY MR. MCMAHON:

6   Q.  Now, from the company's perspective, which representatives

7   of the company actually communicated to the employees that they

8   were going to be plan participants?

9   A.  I think I've already testified that those would have been

10  the responsible members of the Executive Management Committee

11  of the company, the top eight people in the company.  It was

12  their responsibility to communicate as appropriate, quietly

13  with their directly supervised employees their inclusion in the

14  plan.

15  Q.  Okay.  You did not directly participate in any of those

16  discussions, did you?

17  A.  The initial discussion, no.  I've had discussions with a

18  number of employees included in the plan with regard to the

19  context of the plan.  You know, there are questions from

20  employees practically every day about the plan.

21  Q.  All right, but the initial communication of their plans,

22  their status as plan participants was handled by the eight

23  members of that management committee, correct?

24  A.  Yeah, that would be appropriate.  Those are the people --

25  those are the bosses of the people who work at the company.

1   Q.   Okay.  Given your role with the company, did you

2   participate in the process of identifying the sale related

3   performance metrics under the plans?

4   A.   If by sale performance related metrics you mean the

5   potential threshold values and the percentages, I was part of

6   the discussions with regard to what might be appropriate, yes.

7   Q.   Okay.  Which of the Debtors' other representatives or

8   employees were involved in that discussion?

9   A.   Well, the primary party involved in the design of the plans

10  was obviously CDG, Mr. Frank Glassner, who is present in Court

11  today.  And he was sort of the primary party for organizing the

12  thought process around that, but frankly, all of the Debtors'

13  professionals participated in and contributed thoughts and

14  comments with regards to the potential structure of those plans

15  and what might be appropriate incentive based compensation

16  given the circumstances.

17  Q.   Okay.  Were there any persons with investment banking

18  experience involved in that discussion?

19  A.   Yes, Lazard was involved and consulted with regard to the

20  threshold values and some of the asset groupings.

21  Q.   Okay.  And would it be fair to say that -- was it Lazard

22  that actually provided the threshold values, the target numbers

23  that were part of the plans as they were originally filed?

24  A.   I don't know whether they -- it's proper to characterize

25  that they provided them.  I think that they had substantial

1  input.  Frankly, part of them were already documented, and two

2  of them were documented in Asset Purchase Agreements, and the

3  third is an estimate based upon a multi-party discussion, and

4  that's the value attributed to the other asset segment.

5  Q.  Now, in constructing the incentive and retention plans,

6  would it be fair to say that retaining these employees is the

7  primary goal?

8  A.  No, I think it's fair to say that compensating these

9  employees for the extraordinary effort being asked of them to

10 make sure that these sales close successfully is the primary

11 goal.

12 Q.  Okay.  So -- but would retention be one of the goals?

13 A.  Well, as to the employees in the bottom tier plan, there's

14 a specific retention portion, so yes it is one of the goals.

15 Q.  Okay.  And with respect to the incentive plans, your

16 testimony is that retention of these employees, keeping them

17 aboard, is not a goal of the plan?

18          MR. STERN:  Objection, that was not the testimony.

19 The question was is it the primary goal of the incentive plan,

20 and that's what her testimony addressed.

21          THE COURT:  Sustained.

22 BY MR. MCMAHON:

23 Q.  With respect to the incentive plan, is retention one of the

24 goals of the plan?

25 A.  Certainly, it's one of the hoped for outcomes.  If you

1  provide someone with an incentive and tell them that if they

2  voluntarily resign they won't receive it, you certainly want

3  them to stick around.

4  Q.  Okay.  Now during your time of being assigned to this

5  particular engagement, are you generally aware of the -- become

6  generally familiar with the company's operations?

7  A.  Yes, I believe I already asked that question -- answered

8  that question.

9  Q.  All right, and with respect to the designation of employees

10  as plan participants under the plans, you previously identified

11  I guess two considerations which factored into that analysis.

12  The first was their -- any specialized knowledge they had

13  relating to the industry, was that a factor, is that correct?

14  A.  There was a discussion of the importance of the specialized

15  knowledge the employee had with regard to the industry, yes.

16  Q.  And was their importance to completing the proposed sale

17  processes a factor as well?  A factor in determining which plan

18  participants were actually selected for participation?

19  A.  Yes, as I think I previously testified, there was a

20  substantial concern, and frankly, it did occur with regard to

21  the Ellington sale, that the initial stalking horse bid was

22  subsequently reduced because certain assets were determined to

23  not be saleable as part that process.  And the stalking horse

24  bid was reduced from 50 million to 47.25 million as a result of

25  that.  There were similar concerns with regard to the

1   Carrington deal.

2   Q.  Well, were there any other factors that were considered in

3   determining whether to make someone a plan participant, aside

4   from the two factors we just discussed?

5           MR. STERN:  I guess objection, Your Honor,

6   especially at this late hour.  There were a number of things

7   that were discussed earlier in the testimony, and I think now

8   it's just a memory game as to what Ms. Etlin can recall that

9   she testified before.

10          THE COURT:  Any response?

11          MR. MCMAHON:  Your Honor, I believe the witness'

12  testimony was -- there was testimony elicited as to two

13  factors.  I think on cross I'm entitled to confirm whether or

14  not there were any additional factors that played into the

15  determination as to whether these individuals should be plan

16  participants or not.

17          THE COURT:  I'll allow it, but let's not be

18  repetitious.

19          MR. MCMAHON:  Sure.

20  A.  Would you please repeat the question?

21  BY MR. MCMAHON:

22  Q.  Sure.  Aside from the factors we just discussed, are there

23  any other factors that the company considered in determining

24  whether to designate someone as a plan participant?

25  A.  The -- and I'll just go through them from top to bottom, as

1  I can't remember exactly which two factors we've already

2  previously discussed.  Specialized knowledge is one, which is

3  specialized knowledge of the industry.  There's also

4  accumulated historical knowledge with regard to their job

5  function within the company and the transactions and various

6  activities that passed over their desk, where the documents

7  are, how to go about obtaining them from the various systems,

8  et cetera.  There's also the ability to replicate that

9  knowledge; the ease with which we might replicate that

10 knowledge from the outside should that employee choose to take

11 a job elsewhere and the affect that might have on the sale

12 process, both as to timing and potentially as to amount because

13 of the contingencies associated with that.  I think those would

14 be the primary factors.  There may be others.  I can't

15 specifically recall as I sit here today.

16 Q.  All right.  I have a few more questions for you, Ms. Etlin.

17 First, would it be fair to characterize these bankruptcy cases

18 as liquidating Chapter 11 cases, based upon your experience?

19 A.  Yes, we're attempting -- I mean, there's obviously a broad

20 variety of liquidating Chapter 11's.  We're attempting to sell

21 as much as an operating business and to preserve employee jobs

22 as possible, but that certainly falls under that broad

23 category.

24 Q.  Okay.  And the Debtors -- you testified the Debtors have

25 retained Lazard.  They're compensating Lazard, what, some

1  figure north of $5 million for their work in leading the sale

2  processes, is that correct?

3  A.  I guess.  Again, I wasn't a party to Lazard's fee

4  negotiation.  I assume they're going to be compensated for the

5  extensive work they've incurred here.

6  Q.  Okay.  Turning to, specifically, the Vice Presidents and

7  Assistant Vice Presidents that are part of the retention plans,

8  do you have an understanding as to what their base salary

9  ranges were in 2006, say exclusive of bonus compensation?

10  A.  Not that I can specifically recall as I sit here today.

11  Q.  Okay.  Do you know what their total compensation

12  arrangements were, salary plus bonus?

13  A.  No, if I can't recall the first item, I certainly can't

14  recall the second.

15  Q.  Now, in the last version of the plans that were proposed to

16  the Bankruptcy Court, six employees of the wholesale division

17  were added to the plans, correct?

18  A.  That is correct.  Those were the employees that were

19  excluded from participation in the commission guarantee program

20  that the Debtors had put in place prior to the filing.

21  Q.  Okay, so they were the subject of the -- I guess the prior

22  litigation between our office and the Debtors regarding the

23  Wage Motion, correct?

24  A.  Yes, that is correct.

25  Q.  So let me get this straight.  The Debtors come forward to

1  the Bankruptcy Court seeking relief.  We object.  The Court

2  overrules that relief, and then you come back to the Court and

3  you propose that they receive incentive compensation, is that

4  it?  Is that the progression?

5  A.  So -- sir, I was present in the Court that day, and I heard

6  what was said with regard to those employees.  And I, frankly,

7  disagree with your characterization.  It was determined that

8  they were inappropriate to include in the form of the plan that

9  was being approved in conjunction with the First Day Motions,

10 and the Debtor was, I believe in my opinion, encouraged to come

11 back and include them in some form of further retention plan,

12 and the Debtor chose to do so.

13 Q.  Okay.  Now -- so the Debtors added these individuals to the

14 plans.  I presume that their compensation is -- well, strike

15 that.

16            MR. MCMAHON:  I don't have any further questions for

17 this witness.

18            THE COURT:  All right, thank you.  Is there any

19 redirect?

20            MR. STERN:  I think I have just three or four

21 questions, Your Honor.  And they're going to be very general

22 questions, Ms. Etlin.

23                        REDIRECT EXAMINATION

24 BY MR. STERN:

25 Q.  There were a lot of questions asked of you about, I guess,

1   work that Lazard did prior to the petition date.  Do you recall

2   some testimony on that subject?

3   A.   Yes.

4   Q.   Okay.  If Lazard, for instance, was putting packages of

5   information together for providing to potential purchasers,

6   where was Lazard going to get that information?

7   A.   From the company's employees and from us.  As a matter of

8   fact, that was one of our first most specific tasks was to help

9   them with an extraordinary volume of information that needed to

10  be obtained from a variety of company employees where there

11  just wasn't time enough in the day for them to do it.

12  Q.   And I think we addressed this point in your direct, but it

13  may bear repeating.  At the time the employees were working on

14  the sales pre-petition, even if the plans themselves with all

15  their specifics were not yet on file, do you believe that the

16  employees were operating under a belief that they would

17  eventually be provided with some form of incentive pay?

18  A.   Yes, I do.

19  Q.   Okay.  Do you think that we need the employees that have

20  been identified in the incentive and retention plans to get

21  across the finish line on the sales that have been proposed?

22          MR. MCMAHON:  Objection, asked and answered.

23          THE COURT:  Sustained.

24  BY MR. STERN:

25  Q.   One or two questions on the Assistant Vice Presidents and

1  the Vice Presidents.  These are the individuals, as you'll

2  recall, who have been proposed for the retention plan, okay,

3  the retention portion of the plan.  There may or may not be

4  some incentive compensation for some of them, but even though

5  you don't know their exact compensation, all 28 of them, are

6  these Assistant VP's and VP's among the most highly compensated

7  individuals at the Debtors?

8  A.  No.  As a matter of fact, I previously characterized them

9  as the individuals that would often bear, in other companies

10  that I've worked with, the supervisor title.  They're middle

11  management to lower middle management individuals.

12  Q.  If I were to suggest a range of approximately 45,000 to

13  200,000 would that help to refresh your recollection as to

14  approximately the salaries of these individuals?

15         MR. MCMAHON:  Objection.  The witness previously

16  testified she doesn't know.

17         THE COURT:  Overruled.  You may answer if you're

18  able to.

19  A.  That would, for that level of employee -- and again, about

20  a third of them I've actually had personal interaction with at

21  this point, and so, you know, I would expect that that would be

22  sort of the normal compensation range for somebody of that

23  level of the company.  But again, I have -- as I testified

24  previously, I have no specific knowledge of what they actually

25  make.

Glassner - Voir Dire                          201

1          MR. STERN:  No further questions, Your Honor.

2          THE COURT:  Okay.  Is there any recross?

3          MR. MCMAHON:  No, Your Honor.

4          THE COURT:  All right, thank you.  You may step

5    down.  We'll take a 10 minute recess and resume with the next

6    witness.

7       (Court in recess)

8          MR. STERN:  -- appreciate the Court's indulgence.

9    The next witness will be a lot shorter and then we'll hopefully

10   proceed to argument.

11         THE COURT:  Very well.

12         MR. STERN:  Your Honor, Debtor's call Frank

13   Glassner.

14         FRANK B. GLASSNER, DEBTOR'S WITNESS, SWORN

15         THE CLERK:  Could you state your full name and spell

16   your last name for the record.

17         MR. GLASSNER:  My name is Frank B. Glassner, G-L-A-

18   S-S-N-E-R.

19         THE CLERK:  Thank you.

20                         VOIR DIRE

21   BY MR. STERN:

22   Q.  Mr. Glassner by whom are you employed?

23   A.  Compensation Design Group.

24   Q.  If I refer to that entity as CDG, will you know what I'm

25   talking about?

1  A.  Yes, I would.

2  Q.  Okay, what's your position at CDG?

3  A.  I'm the Chief Executive Officer and also the leader of the

4  Executive Pay Practice.

5  Q.  Sir, did you found CDG?

6  A.  Yes, I did.

7  Q.  And when was that?

8  A.  That was 1991.

9  Q.  And you have been with CDG since 1991?

10  A.  Yes, I have.

11  Q.  What does CDG do?

12  A.  Compensation Design Group is a compensation consulting

13  firm.

14  Q.  Does CDG have any areas of specialty?

15  A.  Yes, it does.  In the field of executive pay, incentive

16  pay, wage and salary administration, performance management,

17  performance appraisal as it relates to compensation programs,

18  sales and marketing incentives, and board of directors pay and

19  compensation issues as it relates to a board of directors.

20  Q.  Sir, where were you employed before CDG?

21  A.  At Deloitte & Touche.

22  Q.  How many years were you there?

23  A.  Approximately four.

24  Q.  And what was your last position at Deloitte & Touche?

25  A.  I had a D Firms Global Rewards Practice.

1  Q.  And what was the Deloitte & Touche Global Rewards Practice?

2  A.  It was the compensation practice.

3  Q.  Where were you employed before Deloitte & Touche?

4  A.  KPMG Pete Marwick.

5  Q.  And how many years were you there?

6  A.  Approximately five.

7  Q.  Last position at KPMG?

8  A.  The head of the Western U.S. and Asia Pacific Compensation

9  Practice.

10  Q.  Sir, if my math is correct, you've spent the last 30 plus

11  years working in the field of Compensation and Strategy

12  Consulting, is that correct?

13  A.  Yes, sir.

14  Q.  Do you have experience providing advice on compensation and

15  incentive plans to clients in either bankruptcy proceedings or

16  reorganizations?

17  A.  Yes.

18  Q.  Okay.  And approximately how many engagements, for

19  companies in either bankruptcy proceedings or that were going

20  through reorganizations, have you had?

21  A.  Approximately 25.

22  Q.  Okay.  Has a substantial portion of your consulting

23  experience revolved around developing strategically oriented

24  compensation and incentive plans?

25  A.  Yes.

1  Q.  Do you consider yourself to be an expert in the development

2  of compensation and incentive plans?

3  A.  Yes.

4  Q.  And why is that?

5  A.  I've spent the better part, if not my entire career, doing

6  that.

7  Q.  Okay.  Have you ever been qualified as an expert in your

8  field -- excuse me, have you ever been qualified as an expert

9  in the field of compensation?

10 A.  Yes, I have.

11 Q.  And how many times was that?

12 A.  Twice.

13 Q.  And what court was that in?

14 A.  The State of California Superior Court Family Law Division.

15            MR. STERN:  Your Honor, Debtor's proffer Mr.

16 Glassner as an expert on compensation and incentive plans.

17            THE COURT:  Is there any objection?

18            MR. MCMAHON:  No objection from the U.S. Trustee,

19 Your Honor.

20            THE COURT:  You may proceed.

21            MR. STERN:  Thank you, Your Honor.

22                         DIRECT EXAMINATION

23 BY MR. STERN:

24 Q.  Mr. Glassner, has CDG previously provided compensation

25 consulting services to the Debtors?

1  A.  Yes.

2  Q.  When did you start?

3  A.  Approximately 2003.

4  Q.  And have you, personally, provided compensation -- excuse

5  me, have you personally provided advice to the Debtors since

6  2003?

7  A.  Yes.

8  Q.  Okay.  And what type of advice has CDG provided to the

9  Debtors since 2003?

10  A.  Advice in the field of its executive pay plans, select

11  incentive plans, board of director's pay plans, and

12  compensation issues as it relates to advising the Compensation

13  Committee.

14  Q.  As a result of the work that you've done for the Debtors

15  over the last three plus years, have you become generally

16  familiar with the Debtors and their business operations?

17  A.  Yes.

18  Q.  And are you, generally, familiar with the -- excuse me,

19  compensation structure for the Debtor's employees?

20  A.  Yes.

21  Q.  Are you familiar with the Debtor's Key Employee Incentive

22  Plan and Key Employee Incentive Retention Plan?

23  A.  Yes.

24  Q.  Did you play a role with respect to those plans?

25  A.  Yes.

1  Q.  What was your role?

2  A.  Assisted in the design of those programs.

3  Q.  And when you say you assisted in the design, can you help

4  me with that a bit?

5  A.  Yes, the company, you know, presented the situation of its

6  reorganization to us, as well as a number of metrics,

7  employees, et cetera., and we designed the plans.

8  Q.  So the company provided the goals and the positions

9  involved and you designed the plans around that?

10  A.  Yes.

11  Q.  Okay.  And did you advise the Debtors to adopt the plans?

12  A.  Yes, we did.

13  Q.  Okay.  And did you participate in discussions with other

14  representatives of the Debtors and other folks regarding the

15  plans?

16  A.  Yes.

17  Q.  Who else was involved in the discussions in which you

18  participated?

19  A.  Select senior management and, where appropriate, the Board

20  of Directors, specifically the Compensation Committee.

21  Q.  Okay.  And who are the members of the Compensation

22  Committee?

23  A.  The Compensation Committee would consist of Fred Forrester,

24  who's also the Lead Independent Director and Chairman, Dr.

25  Harold K. Black, Donald Lang, and Michael Sachs.

1  Q.  Was the CEO present for discussions concerning the

2  incentive and retention Plans?

3  A.  Yes, where appropriate.  However, discussions involving the

4  Chief Executive Officer, himself, he was asked to leave the

5  room.

6  Q.  Okay.  And did he do that?

7  A.  Yes, he did.

8  Q.  Okay.  Sir, do you have an opinion as to the reasonableness

9  of the plans?

10 A.  Yes.

11 Q.  And what is your opinion?

12 A.  The plans are reasonable.

13 Q.  Okay.  And why do you believe the plans are reasonable?

14 A.  Given the magnitude of the situation, as well as the

15 devastating effect that, from a situational standpoint, it has

16 on its employees, we believe the plan appropriate, as well as

17 important.

18 Q.  Okay.  Do you have an opinion as to whether the incentives

19 in the plans are likely to motivate employees to meet the

20 objectives of the plans?

21 A.  Yes.

22 Q.  And what's that opinion?

23 A.  They would certainly lead them to achieve the successful

24 disposition of the assets.

25 Q.  And do you have an opinion as to whether the payment

Glassner - Cross                                   208

1  amounts under the plans are conservative?

2  A.  They're reasonable towards the conservative side, yes.

3  Q.  Okay.  Do you have an opinion of what might happen if the

4  plans are not approved?

5  A.  Yes.

6  Q.  And what is your opinion?

7  A.  That that would probably provide another significant

8  incentive for not having a successful disposition of assets

9  and, for that matter, an incentive to leave.

10  Q.  So people would leave and the sales would fail?

11  A.  I don't know to the degree that they would fail, but that

12  would certainly be an incentive, you know, not for the

13  maximization and disposition of assets or possibly could cause

14  it to fail, yes.

15  Q.  Let me ask it this way.  People may leave and the sales may

16  fail?

17  A.  Yes.

18  Q.  Okay.  Thank you Mr. Glassner.  No further questions at

19  this time.

20          THE COURT:  The Committee have any questions?

21          MR. POWER:  One second, Your Honor.  I have no

22  questions, Your Honor.

23          THE COURT:  All right, U.S. Trustee.

24                   CROSS EXAMINATION

25  BY MR. MCMAHON:

1  Q.  Mr. Glassner, good evening.  In how many Chapter 11

2  bankruptcy cases filed after October 17th of 2005 has CDG been

3  retained in?

4  A.  Can you clarify the question?

5  Q.  Sure.  I'm asking for bankruptcy cases that filed for

6  protection, Chapter 11 cases have filed for protection after

7  October 17th of 2005, how many cases has CDG been retained in?

8  A.  Two.

9  Q.  Can you name them?

10 A.  Yes, United Airlines and New Century.

11 Q.  I'll just adjust my hearing aid, I apologize, it was United

12 Airlines?

13 A.  That's correct.

14 Q.  Okay.  Now United Airlines was a reorganizing case,

15 correct?

16 A.  Yes.

17 Q.  So New Century is the only Chapter 11 case which filed

18 after October 17th of 2005 -- strike that.  New Century is the

19 only Chapter 11 case after October 17th, 2005 that CDG has been

20 involved in, which was a liquidation or is a liquidation?

21 A.  I'm not actually sure whether it's a liquidation or a

22 reorganization at this point.

23 Q.  You don't know?

24 A.  I don't.

25 Q.  Okay.  All right, how many clients in the sub-prime

1  mortgage lending industry does CDG have, aside from New

2  Century?

3  A.  Just New Century.

4  Q.  Okay.  We heard your qualifications, sir, you're not an

5  investment banker, is that correct?

6  A.  That's correct.

7  Q.  Right.  You're not an executive search consultant, correct?

8  A.  Absolutely not.

9  Q.  And you're not an economist, either, correct?

10  A.  No.

11  Q.  And CDG doesn't provide services with respect to any of

12  three aforementioned areas, correct?

13  A.  No.

14  Q.  All right.  Given your expertise, sir, are you aware of any

15  empirical studies of liquidating Chapter 11 cases which address

16  the correlation between employee productivity and the prices

17  obtained for the sales of assets?

18  A.  Could you clarify the question, I'm confused?

19  Q.  Sure.  Are you aware, given your expertise, are you aware

20  of any empirical studies of liquidating Chapter 11 cases which

21  address whether there is a correlation between employee

22  productivity on the one hand and the prices obtained for the

23  sale of the company's assets on the other?

24  A.  As I've stated, sir, I'm not an economist and I'm not

25  qualified to draw those conclusions.

1  Q.  Okay.  You're not familiar with any such studies based upon

2  your current position from reading materials in journals and

3  the like?

4  A.  Again, I'm not an economist.  I'm not qualified to draw

5  those conclusions.

6  Q.  Very good.  Now when was CDG retained for the purpose of

7  putting together the compensation plans that are the subject of

8  the present motion?

9  A.  CDG has had retention since 2003.

10  Q.  Let me re-ask my question.  There's a motion on file,

11  correct?

12  A.  To the best of my knowledge, yes.

13  Q.  All right, and CDG was retained to provide services in

14  connection with constructing the plans that were -- are the

15  subject of that motion, correct?

16  A.  Yes.

17  Q.  CDG was retained to provide advice to the Compensation

18  Committee in connection with the plans that are the subject of

19  the motion, correct?

20  A.  Yes.

21          MR. MCMAHON:  I'd like to mark an exhibit, Your

22  Honor.

23          THE COURT:  Certainly.  Thank you.

24      (U.S. Trustee's Exhibit-1 marked for identification)

25  BY MR. MCMAHON:

1  Q.  Sir, I'm gonna ask you to take a look at Exhibit U.S.

2  Trustee-1 and tell me if you recognize the document?

3     (Witness reviews document)

4  A.  Yes, I do.

5  Q.  What is the document?

6  A.  The document is an Application of Debtors and Debtors-in-

7  Possession for Order Authorizing the Retention and Employment

8  of Compensation Design Group, this compensation specialist to

9  the Debtors, nunc pro tunc, to the Petition Date pursuant to

10  Sections 327 Sub (e), and 328 of the Bankruptcy Code and

11  Bankruptcy Rules 2014, 2016, and 5002.

12  Q.  Now if we take a look at Exhibit B to the application,

13  there are two separate engagement letters appended thereto,

14  correct?

15  A.  Can you direct me to them?

16  Q.  Sure it's Exhibit B, I want to say it's in the middle of

17  the document, and the first engagement letter is dated March 9th

18  and it's entitled "Engagement Letter for Management Services."

19  Do you see that?

20  A.  Yes, I do.

21  Q.  Okay.  Now under this first engagement letter here, which

22  is entitled "Engagement Letter for Management Services," the

23  letter indicates there in paragraph 1.1 that the -- you were

24  retained to provide advice regarding {quote} "total

25  compensation arrangements" {end quote} related to the

1  management, the company, and its board of directors, correct?

2  A.  Yes.

3  Q.  Now under the second engagement letter, which is appended

4  at the end of the first, it's entitled "CDG Engagement Letter

5  for NCFC Board of Directors."  Do you have that document in

6  front of you?

7  A.  Yes.

8  Q.  All right, and if you would describe for me, sir, how the

9  services in the second engagement letter differ from the

10  services you're providing in connection with the first?

11  A.  1.1 under this letter states that CDG agrees to provide

12  assistance to the NCFC Board of Directors, through it's

13  Compensation Committee or the Chairman of the Board of

14  Directors, by providing consulting services concerning

15  executive and board compensation arrangements as related to the

16  Board's responsibilities set forth in its charter.  CDG

17  acknowledges and agrees that the engagement shall be directly

18  with the Board.  With respect to any services rendered by CDG

19  to the Board, CDG and the Board acknowledge that any changes to

20  this agreement must be approved by the Board and CFC shall not

21  be a party to such engagement and the Board shall assume the

22  rights and obligations of NCFC hereunder.

23  Q.  Okay.  Now the -- so under the first engagement letter

24  you're constructing a compensation plan, correct?  Would that

25  be fair, you're providing advisory service related to the

1  construction of a compensation plan?

2  A.  No, I think that what would be a fair statement would be

3  that we were advising the company on its total compensation

4  arrangements up to, and including, but not limited to, its base

5  salary arrangements, its incentive pay, its executive pay, et

6  cetera.  And it would be fair to state that under the

7  engagement letter for the NCFC Board of Directors, under best

8  practices, that we would be providing counsel to the NCFC Board

9  of Directors, through its Compensation Committee, to all of

10  their arrangements or things that they had oversight under, as

11  it states under their charter, including the company's total

12  compensation programs, executive pay as it relates to its

13  Section 16 officers, as well as their own pay, as well as their

14  general oversight of the company.

15  Q.  Sir, with respect to the services that are contemplated --

16       MR. STERN:  I'm sorry, I'd like the witness to be

17  able to finish his answer.

18       THE COURT:  I would too.

19  A.  Thank you.

20  BY MR. MCMAHON:

21  Q.  With respect to the services that are --

22  A.  May I finish my answer?

23       THE COURT:  Go ahead.

24  A.  Thank you, Your Honor.  I will restate that as it relates

25  to the Board of Directors, that we provide advisory services to

1  them and the Board of Directors under all things that they have

2  under their charter, including oversight of the company's total

3  compensation programs, executive pay arrangements, and for that

4  matter, total compensation arrangements as it relates,

5  specifically, to Section 16 officers, as well as their own

6  arrangements, the arrangements of the Board of Directors.  So,

7  in general, the Board of Directors, through its charter and

8  best practices, has general oversight of the company's total

9  compensation programs.

10  BY MR. MCMAHON:

11  Q.  And you're providing advice both to management and the

12  Board, with respect to the total compensation arrangements, is

13  that accurate?

14  A.  That is correct.

15  Q.  Okay.  Now paragraph 22 of the application that's before

16  you is Exhibit U.S. Trustee-1 indicates that you and a Mr.

17  Jason Taylor were the CDG employees that were providing the

18  bulk of the services --

19  A.  Can you direct me?

20  Q.  -- under the engagement letters, is that accurate?

21  A.  On what page is that, sir?

22  Q.  It's paragraph 22 of the application.

23  A.  There's many paragraphs here, maybe you can direct me to

24  it, just to save the Court's time.

25  Q.  Page 8.

1   A.   Yes, sir.

2   Q.   Now in preparing your advice and recommendations relating

3   to the compensation plans, did you consult with any employees

4   or professionals of the Debtors on the subject of identifying

5   potential plan participants?

6   A.   I -- can you ask me the first question, you had mentioned

7   someone's name?

8   Q.   Sure, let me break it down.

9   A.   Yes.

10  Q.   Did you provide any advice or recommendation to New

11  Century's management regarding who should be a participant in

12  the compensation plans that are the subject of this motion?

13  A.   Specifically with regard to the Key Employee Incentive

14  Plans?

15  Q.   Correct.

16  A.   Yes.

17  Q.   All right.

18  A.   And I might clarify that, we were presented with the

19  participants of the plan, we did not advise them on the choice

20  of employees.

21  Q.   Okay.  With respect to your advice or recommendations

22  relating to the plans, did you consult with any employees or

23  professionals on the subject of the sale related performance

24  metrics that are embodied in the plan?

25  A.   To the degree that we were advised of those metrics, yes,

1  we were advised of those metrics by company employees, as well

2  as the Board of Directors.

3  Q.  So you did not say -- you did not generate or come up with

4  those metrics, you were learned of them from the company, is

5  that accurate?

6  A.  We were advised of them by the company and the Board of

7  Directors, who I believe were also advised, or I should say,

8  specifically, the Compensation Committee, who reviewed them

9  with the Finance & Audit Committee to assure that those metrics

10  were correct and then we were given those metrics.

11  Q.  Now New Century ultimately acted on your advice and filed

12  the motion that's before the Court, correct?

13          MR. STERN:  I'm sorry, there's a motion that's an

14  exhibit and there's a motion that we're talking about today.

15  I'm sorry to interrupt, I just to make sure I know which motion

16  you're talking about.

17          MR. MCMAHON:  Sure, we're talking about the motion

18  that was filed initially with the Court.

19  A.  I'm still confused.  I'm not sure which motion you're

20  talking about.

21          MR. STERN:  Is it the Retention Application or the

22  Motion to Approve the Plans, I'm sorry, is my question, sir?

23  BY MR. MCMAHON:

24  Q.  Let me back up and rephrase.  What form did the advice

25  which you provided to management take?

1  A.  The advice was on the specific architecture of the plan

2  presented.

3  Q.  Okay.  Did you comment on the plans that were presented in

4  writing or did you have oral communications with the company's

5  management or both?

6  A.  Both.

7  Q.  Did either the Debtors, you know, the company's management

8  or New Century's Board reject any recommendations you made

9  relating to which employees should be designated as

10  participants?

11  A.  We did not state which employees should be in the plan.

12  Q.  You didn't make any recommendations on that subject, one

13  way or the other?

14  A.  No.

15         MR. MCMAHON:  Your Honor, I don't have any further

16  questions for this witness.

17         THE COURT:  All right.

18  BY THE COURT:

19  Q.  Mr. Glassner, without regard to the purpose of either plan,

20  how would you describe to me the similarities and differences

21  between the two?

22  A.  The similarity and differences between the two --

23  Q.  Plans that the Court is being asked to approve today.

24  A.  The similarities between the two of them are both plans,

25  from the standpoint of being an incentive expert, both plans

1  are really incentives for the successful disposition of the

2  assets and the maximization of the disposition of the assets

3  for the Creditors.

4  Q.  What are the differences?  How would you describe the

5  differences?

6  A.  The differences are is that the lower plan, the Key

7  Employee Incentive Retention Plan, has a retention element to

8  it, where appropriate, that would assure, where appropriate,

9  that those employees are retained for a specific period of time

10  with a guaranteed retention portion for the period of time that

11  they stay with the company.

12            THE COURT:  Any redirect?

13            MR. STERN:  I have just, I think, literally one or

14  two questions, Your Honor, and with due respect to Mr. McMahon,

15  I think it was because there was almost a little bit of

16  discovery taken on the retention application and I just want to

17  make sure the record is clear on a couple of points.

18                     REDIRECT EXAMINATION

19  BY MR. STERN:

20  Q.  Sir, you were asked some questions about having two

21  different engagement letters, do you recall being asked

22  questions about them?

23  A.  Yes, I do.

24  Q.  Is having two different engagement letters, one -- and I

25  think was described as being -- and you were providing services

1  to management and the other to the Board of Directors, is that

2  accurate?

3  A.  Yeah, I think it was directed to me, personally, and, no,

4  that is not correct.  Our firm Compensation Design Group

5  provides counsel to the company, both to the Board of Directors

6  and to management.  Generally, in best practices to the degree

7  that advice is given directly to management or based on the

8  company's compensation programs, that is conducted primarily by

9  Jason Taylor with oversight by me, Frank Glassner.  I primarily

10 provide counsel and direction to the Board of Directors with

11 input from Jason and other senior executives.

12 Q.  I guess what I wanted to ask you, is having these, you

13 know, two different engagement letters consistent with best

14 practices?

15 A.  Yes, absolutely.

16 Q.  And are there any studies that support that?

17 A.  Yes, there's a recently completed Blue Ribbon Panel that

18 was put together by Dr. Carolyn Brancato, on behalf of the

19 Conference Board with a panel of experts, as well as input from

20 over 370 public company directors, which basically concluded

21 that there was no evidence that better governance was given by

22 one consulting firm or two consulting firms.  As a matter of

23 fact, you know, quite contrary to it, with regard to Home

24 Depot, Pfizer, the New York Stock Exchange, Global Crossing, et

25 cetera., both companies were represented at the board level and

1  management level by, in fact, two different compensation firms

2  and I think that, without going into depth, the end results of

3  those were obvious.  To the degree that companies use one

4  consulting firm to advise, or I should say a public company

5  using one consulting firm to advise both the board or directors

6  and senior management, that we have stringently followed those

7  guidelines.

8          MR. STERN:  Okay, no further questions, Your Honor.

9          THE COURT:  Any recross?

10          MR. MCMAHON:  No, Your Honor.

11          THE COURT:  Thank you, sir, you may step down.

12  A.  Thank you, Your Honor.

13     (Witness steps down)

14          THE COURT:  All right, does the Debtor have any

15  other evidence in support of its motion?

16          MR. STERN:  I think we're done with our witnesses,

17  Your Honor, and would like to proceed with argument, if that's

18  okay with you.

19          THE COURT:  Well let me ask the U.S. Trustee whether

20  she has any evidence.  I take it there are no witnesses, but is

21  there any other evidence you'd like to offer in support of your

22  objection?

23          MR. MCMAHON:  Your Honor, just to complete the

24  record, I would like to move the admission of Exhibit U.S.

25  Trustee-1 and also have the Court take judicial notice of the

1  Debtor's Application to Employ Lazard in the Retention Order.

2  I have copies here available for the Court.

3          THE COURT:  Right.

4          MR. MCMAHON:  I don't think that's a controversial

5  point.

6          THE COURT:  Is there any objection to either?

7          MR. STERN:  No, I think I'd have a hard time

8  objecting to either, Your Honor.

9          THE COURT:  All right, they're admitted.

10     (U.S. Trustee Exhibit-1 admitted into evidence)

11         THE COURT:  Thank you.  All right, does the

12  Committee have any evidence it wishes to offer?

13         MR. POWER:  No, Your Honor.  The Committee will rely

14  on the record --

15         THE COURT:  All right.

16         MR. POWER:  -- clearly before the Court.

17         THE COURT:  Let's proceed with argument then.

18         MR. STERN:  Okay, Your Honor, you've heard the

19  facts, let's look at the law.  I think it's helpful to go back

20  to the specific bases for the U.S. Trustee's objection because

21  then we can walk through those bases and, respectfully, I hope

22  prove to the Court that those, the objection should be

23  overruled.

24      The U.S. Trustee's arguments essentially fall into -- or

25  objections, Your Honor, essentially fall into three buckets.

1   The first argument is that the Key Employee Incentive Plan may

2   be a disguised retention plan because in the U.S. Trustee's

3   view the goals are too easily met, which makes it more like a

4   retention plan.  And, accordingly, the Key Employee Incentive

5   Plan may violate 503(c)(1) because the participants are

6   insiders.

7        The second argument is that as to the 28 Vice Presidents

8   and Assistant Vice Presidents in the Key Employee Incentive

9   Retention Plan who will receive retention payments, that plan

10  violates 503(c)(1) because these 28 V.P.'s and Assistant

11  V.P.'s, supposedly, are officers and, thus, insiders.

12       And the last argument really, although it's got many sub-

13  parts, is that the plans are not justified by the facts and

14  circumstances of the case.  And, Your Honor, we respectfully

15  submit that the facts that were presented to the Court today,

16  as well as the applicable law, are contrary to the U.S.

17  Trustee's positions.  And let me break those three positions

18  down and address them individually.

19       Let's start out with the Key Employee Incentive Plan.

20  Your Honor, the Key Employee Incentive Plan is just that.  It

21  is an incentive plan.  While every good incentive plan has some

22  retention component because it motivates employees to -- excuse

23  me, because it motivates employees to stay to earn the

24  incentive.  You can't earn the incentive if you leave.  The

25  question is, and as I think Your Honor, himself, has previously

224

1  recognized, what is the primary purpose of the incentive plan?

2  Is it incentive or is it retention?  And based on the evidence

3  that was presented today, Your Honor, it is clear that the

4  primary purpose of the Key Employee Incentive Plan is

5  incentives not retention.  The employees are -- entitlement to

6  payment under that is not based on employment through a

7  specified date.  They can stay on the job forever, quite

8  frankly, Your Honor, but if the business goals aren't

9  accomplished the participants don't get paid their incentive

10  bonus.  Everyone agrees, by the way, that those business goals

11  are beneficial to the Estate.  The testimony that Your Honor

12  heard today was that the business goals are not lay ups and

13  that there accomplishment is not assured.  The participants

14  have important roles to play to achieve those goals.  And, Your

15  Honor, the evidence on those points today is un-rebutted and

16  un-refuted.

17      The U.S. Trustee cites two cases in opposition, one of

18  them is In Re: <u>Dana</u>, where the Court observed that certain

19  EBIDAR targets at issue were not lay ups, and In Re: <u>Nobex</u>,

20  where there was incentive pay based upon achieving a sale price

21  in excess of a very low $3.5 million stalking horse bid and the

22  incentive plan in that case actually expressly recognized

23  specific tiers up to and in excess of $15 million.  In other

24  words, about four times the size of the low stalking horse bid.

25      Now neither of those cases says that you can't use the

1   achievement of a stalking horse bid as a trigger for incentive

2   pay, which is essentially what the U.S. Trustee is arguing

3   today.  In fact, the U.S. Trustee cites no case that says you

4   can't use the achievement of a stalking horse bid as a trigger

5   for incentive pay.  And, Your Honor, that's not surprising

6   because each case turns on it's own facts.  The facts of record

7   here demonstrate that the employees of the Debtors have already

8   engaged in a incredible amount of work in reliance on the

9   belief that they would receive some form of incentive pay and

10  that there is still an incredible amount of work for these

11  employees to do in order to consummate these sales.  Your

12  Honor, selling these assets is not like selling a car, where

13  you simply agree on price and the purchaser drives off.

14       Now a similar incentive plan, to the plans before the

15  Court, Your Honor, was approved by Judge Gross in the Global

16  Home Products case, which we cite in our motion.  And the order

17  in that case reflects the fact that there was some similarity

18  between the plans.  And I'd just like to take a moment and hand

19  up a copy of that order because if walk through it we'll, in

20  fact, see that there was similarities in the plan in that case

21  and the ones that were seeking to have approved today.  Can I

22  hand up the copy of the order, Your Honor?

23            THE COURT:  Yes.

24       (The Court receives document)

25            MR. STERN:  Let's essentially walk through the

1  findings on the second page in this order.  I just want to read

2  a few paragraphs, Your Honor.  There is a great risk at this

3  hour that I may turn into mush mouth, but I'll do my best not

4  to.

5        "It is hereby found, and determined, that the motion

6  involves the creation of a performance based management

7  incentive plan, as such plan has been modified as set forth in

8  the record at the hearing.  Conditioned and payable upon the

9  closing of a going concerned sale of substantially all assets

10  of the Burns Group, Debtors.  Given the financial condition of

11  the Burns Group, Debtors, a prompt sale of substantially all of

12  the assets of the Burns Group is critical to maintaining the

13  going concerned value of such business.  The Debtors have

14  proposed a going concerned sale of substantially all assets of

15  the Burns Group, Debtors, for a purchase price of approximately

16  $33.5 million, subject to certain adjustments.  The modified

17  incentive plan is designed to appropriately compensate the

18  Burns sale employees to ensure that they remain motivated to

19  perform the requisite tasks to effectuate a going concerned

20  sale of the Burns Group, Debtors, given the enormous additional

21  burdens placed on the Burns sale employees from the time of the

22  decision to sell the assets through the approval of the sale

23  procedures, and that will be required of those employees

24  through the closing of the sale."

25        MR. MCMAHON:  Your Honor, Joseph McMahon, just one

1  point.  I would -- and say, object to the Court's acceptance of

2  this document by itself under the record.  I don't know what

3  the point is trying to be made, other than on one day in this

4  district a plan was approved.  But we don't have the underlying

5  motion, we don't know what the metrics are.  I think, at a

6  minimum, it's appropriate to limit whatever notice that the

7  Court is taking with respect to what was just given to you.

8          THE COURT:  Comments are noted.

9          MR. STERN:  Your Honor, I would note, simply, that

10  this order was expressly cited in our motion, so it shouldn't

11  be a surprise that we're discussing it.  But, and in fact, I

12  looked for -- we tried to find a copy of the transcript of this

13  hearing and, apparently, it was never transcribed, so we've got

14  what we got.

15      But anyway, Judge Gross goes on to say "the Debtors have

16  demonstrated a compelling and sound business justification for

17  authorizing the modified incentive plan and the terms of such

18  plan are fair and reasonable, under the circumstances, and

19  provide a substantial benefit to the estates.  And the modified

20  incentive plan is a performance based plan that is not subject

21  to the limitations on retention and severance plans set forth

22  in Section 503(c) of the Bankruptcy Code."

23      I provide this, simply, as an example because when one

24  reads the U.S. Trustee's objection, one would think that the

25  type of plan we are proposing is very unusual.  In fact, it is

1  not.  Every plan depends on the facts and circumstances of the

2  case.  Frankly, if you look at Exhibit A to the order that I've

3  just handed up to the Court in <u>Global Home Products</u>, when you

4  look at the incentives as a percentage of annual salary on the

5  last page, I mean, this plan is rather rich, the plan in <u>Global</u>

6  <u>Home Products</u>, compared to our incentive plans, which typically

7  don't go up that high.

8      And anyway, as here, the incentive pay in <u>Global Home</u> was

9  conditioned on closing of a going concerned sale already in

10  hand.  As here, the incentive pay in <u>Global Home</u> was designed

11  to motivate employees to complete a sale already in hand.  And

12  Judge Gross ruled that the plan was not retention and

13  severance, or severance, and he approved the plan.

14      Now, Your Honor, the point here is there is nothing

15  unusual about our incentive plans.  At the end of the day, once

16  again, it's a matter of what are the facts, what are the

17  circumstances, and, you know, Your Honor's ruling thereon.  And

18  we believe the facts and the circumstances that we've presented

19  to the Court today clearly demonstrate that this is an

20  incentive plan, not a disguised retention plan.

21      Your Honor, the basis of the second objection that the

22  U.S. Trustee has raised -- fair enough, Ms. Uhland reminds me

23  that half of our incentive plan doesn't even have a stalking

24  horse.  Thank you very much.

25      Turn to the second objection, Your Honor.  This has to do

1  with the 28 Vice Presidents and Assistant Vice Presidents who

2  will receive retention payments under the Key Employee

3  Incentive Retention Plan.  And the question is, are they

4  officers, and as a result, insiders, under the Bankruptcy Code?

5  Now the U.S. Trustee says this is a no-brainer, Your Honor.

6  Regardless of the facts and circumstances of the case or the

7  context, if your position is listed as an officer in the

8  bylaws, you are an officer under 10131(b)(ii).  Now I'll pause

9  for a moment to note that that conclusion is not in the statute

10 and it's not in any legislative history cited by the U.S.

11 Trustee.  The U.S. Trustee's position is based, essentially, on

12 a single case, Essential Therapeutics, decided in a different

13 context whether an employee was a disinterested person under

14 Section 10114 for purposes of retention under Section 327(a)

15 and on different facts.  The employee was a corporate

16 secretary, which if you reviewed enough bylaws you know that

17 that position, almost always, is one of the officer positions

18 that's expressly required because the secretary has certain

19 duties at the corporate level.

20     Now certainly the U.S. Trustee, Your Honor, cites no

21 precedential Third Circuit or even District of Delaware case

22 that instructs you that you must conclude that all positions

23 that are listed as officers in the bylaws must be deemed

24 officers and, therefore, insiders under the Bankruptcy Code in

25 all circumstances for every purpose.  I would respectfully

1  submit, Your Honor, that the U.S. Trustee's position is that

2  the Court should ignore the facts and circumstances of the case

3  and just look at the bylaws.  But I'd like --

4          THE COURT:  I think their position is I should read

5  the Bankruptcy Code in it's plain meaning.

6          MR. STERN:  Well the Bankruptcy Code, in its plain

7  meaning, just says "officers," it doesn't tell you who are

8  officers for purposes of the Bankruptcy Code.  It's not in the

9  legislative history, it's not expressly defined in the statute.

10  It just says "officers."  There are analogies to be drawn, and

11  I'll talk about them in a moment, to Securities Law and cases

12  decided where officers' fiduciary duties are at hand.  And in

13  both of those circumstances as well, which I'll get to in a

14  moment, even officers -- and that position is mentioned under

15  the Securities Laws, the Courts engage in a facts and

16  circumstances analysis to determine what is meant by officers

17  for application of a Securities Laws, they don't just look at

18  the bylaws.  And we're gonna come to that in just a minute

19  because I want to talk, first, about the implications of the

20  position the U.S. Trustee is advocating if the Court were to

21  adopt them today.  If you spent any part of your legal career

22  in the traditional corporate practice, which frankly is where I

23  spent the first decade of mine, Your Honor, you'd know where

24  most bylaws come from.  Law firms have form bylaws sitting on

25  their computer systems.  And when a law firm is asked to set up

1   a corporation, they get a call from someone saying we want to

2   set up a corporation, the attorney involved calls up the form

3   bylaws on the computer, inserts the company's name, maybe makes

4   a few other tweaks particular to that company, sends out the

5   bylaws, and they typically get adopted.

6        Now let's assume that the Court were to adopt the U.S.

7   Trustee's argument that the employee positions identified as

8   officers in bylaws are automatically officers and thus,

9   insiders, under the Bankruptcy Code.  Assume that's Your

10  Honor's ruling today.  After the hearing is over, I'm going to

11  walk back to my office, if any of my partners are still there,

12  I'm going to seek out one of my corporate partners, and I'm

13  gonna ask to see my firms form bylaws.  I'm gonna take out my

14  red pen and I'm gonna hack out the reference to Vice Presidents

15  and that's gonna be our new form bylaws.  So a few years from

16  now, when we're back before the Court, perhaps with some

17  unfortunate company that we helped to set up that ultimately

18  they went bankrupt, and that same company is filing a 503

19  motion and there is V.P.'s and Assistant V.P.'s of that company

20  in a retention plan, those same folks won't be officers under

21  the Bankruptcy Code because I struck those positions from the

22  bylaws.  And that would be the case, under the Trustee's

23  analysis, even if those Vice Presidents and Assistant Vice

24  Presidents, in our hypothetical company three years from now,

25  were performing the exact same functions as the Vice

1   Presidents, sorry I'm losing my voice, and the Assistant Vice

2   Presidents who were in the retention plans before the Court

3   today.  Now that result really doesn't make any sense, but that

4   is the natural consequence of the U.S. Trustee's position.

5        It also illustrates why the Court needs to review the

6   facts of the case and not just the bylaws.  I'm not saying

7   they're irrelevant, but they're not dispositive, in order to

8   determine whether these Vice Presidents and Assistant Vice

9   Presidents are officers as that term is used, undefined, in the

10  Bankruptcy Code and, thus, insiders for purposes of 10131 and,

11  ultimately, 503.

12       Now the cases cited in our motion and amended motion

13  essentially tell us precisely this.  In order to determine

14  whether an employee is an officer under the Bankruptcy Code,

15  the Court needs to focus on the facts and circumstances of the

16  case, including whether the employee exercised control or

17  policy making functions.  And the case I was eluding to just a

18  moment ago that dealt with Securities Laws issues and breach of

19  fiduciary duty issues is the NMI case that is cited in our

20  motion, and I think that's particularly instructive.  In the

21  NMI case, which by the way was decided by the Bankruptcy Court

22  in the District of D.C. in 1995, the Court was evaluating

23  insider status for purposes of Section 547.  And the individual

24  Defendant who was involved was a Vice President.  The Court

25  said a couple of things that I believe are helpful.  The Court

1  said {quote} "the definition the company was using of officers

2  may not be the same as the definition of officer under 11

3  U.S.C. Section 10131."  Well that same observation really

4  applies here.  Now, of course, because the Bankruptcy Code does

5  not define the word officer for guidance the Court in the <u>NMI</u>

6  case, looked to cases involving Federal Securities Law and

7  Common Law Fiduciary Duties.  Whereas with the Bankruptcy Code,

8  the law did not specifically define what an officer is, leaving

9  it to a case by case determination and applying by analogy

10 securities and fiduciary duty law, the Bankruptcy Court looked

11 at whether the employee Defendant, the Vice President, was

12 privy to confidential inside information for purposes of

13 analyzing -- or analogizing the securities laws, or was active

14 in setting corporate policy for the fiduciary duty claims.  And

15 in that case, the answer was no.

16     Now one other thing that the <u>NMI</u> Court said, and I think

17 it's noteworthy here and it really helps to encapsulate what

18 the <u>NMI</u> Court was looking at to guide it in it's determination.

19 The Court said the employee's functions and status viewed

20 relative to the statute's goals, in using the term officer,

21 ought to control whether the person is an officer.  Well let's

22 talk about the goals of Section 503.  I wasn't here for the

23 prior hearings, but I've read the transcripts.  Does anyone in

24 this room really think that when Senator Kennedy proposed

25 Section 503, he wanted to net the little fish along with the

1  big ones that he was perturbed about?  I don't think so and

2  there's no evidence in any legislative history that he did.

3  And frankly, I think Your Honor recognized all of this as

4  reflected in prior transcripts, in prior hearings in this case.

5  Your Honor evaluated the facts and circumstances that were

6  presented to you in order to determine whether certain

7  employees were officers and, thus, insiders.  And specifically

8  with respect to the Vice Presidents and Assistant Vice

9  Presidents that were presented to you in prior hearings, Your

10  Honor concluded that they were rank and file and, accordingly,

11  not insiders.  Your Honor concluded that treating them as

12  insiders would lead to an absurd result.  Frankly, I would

13  respectively submit that's law of the case at this point.

14      Now the 28 individuals at issue, the Vice Presidents or

15  Assistant Vice Presidents, the testimony is they're at the

16  subsidiary level.  The, again, un-refuted and un-rebutted

17  testimony establishes that these individuals don't exercise

18  control, they don't participate in policy making functions.

19  Accordingly, Your Honor, under the facts as have been presented

20  to you today, and the case law as we've discussed it, these

21  individuals are not officers under 10131(b)(ii).  Accordingly,

22  they're not insiders under 10131 and, thus, the Key Employee

23  Incentive Retention Plan cannot violate 503(c)(1) because

24  503(c)(1) doesn't apply.

25      Now let's turn to the last issue that's the biggest

1  bucket, the Trustee's position, essentially, that this case,

2  these plans, are not justified, Your Honor, by the facts and

3  circumstances.  To the contrary, Your Honor, we believe the

4  evidence presented to the Court today demonstrates that the

5  facts and circumstances compel the adoption and approval of

6  these plans.

7      Let's just pause for a moment and talk about the standard

8  under Section 503(c)(3).  The U.S. Trustee asserts that Section

9  503(c)(3) does not expressly incorporate the business judgment

10  standard and, therefore, the Court must evaluate the facts and

11  circumstances.  Your Honor, that's really just semantics.  It's

12  clear that the business judgment standard applies under the

13  503(c)(3) facts and circumstances test.  In fact, it's in our

14  motion, it's on page 21 of the original motion, and we cite

15  Judge Walwrath's ruling in <u>Nobex</u> on precisely this point where

16  she says {quote} "Section (c)(3) was meant to provide a

17  standard, albeit not as clear, for any other transfers or

18  obligations outside the ordinary course of business.  I read

19  (c)(3) to be the catch all and the standard under 3(c) for any

20  transfers or obligations made outside the ordinary course of

21  business are those that are justified by the facts and

22  circumstances of the case.  I find it, quite frankly, nothing

23  more than a reiteration of the standard under 363 under which

24  courts have previously authorized transfers outside the

25  ordinary course of business and that are based on the business

1 judgement of the Debtor."  So that's what we're talking about

2 with respect to facts and circumstances, have we demonstrated

3 that they -- that the Debtor properly exercised it's business

4 judgment in approving these plans?  We all know that the

5 business judgment standard is a deferential standard.  It

6 shields the Debtors from second guessing by, among others, the

7 United States Trustee.  But the United States Trustee does,

8 indeed, seek to second guess the Debtor's business judgment.

9 And with due respect to the United States Trustee, because I

10 know it's just doing it's job, the U.S. Trustee simply wants,

11 really at the end of the day, the Court to reject the Debtor's

12 business judgment in favor of the U.S. Trustee's judgment.

13     The U.S. Trustee contends, Your Honor, that the plans are

14 not justified by the facts and circumstances for four reasons.

15 The first of those reasons is that, according to the U.S.

16 Trustee, the Debtors have not explained why closing on the

17 floor bids, to use the U.S. Trustee's terms, constitutes an

18 achievement which justifies payment to employees who are

19 otherwise obligated to assist the Debtor with the sale in

20 exchange for salary and benefits.  Your Honor, her extensive

21 testimony today, the employees have done a lot already.

22 There's still a lot to do.  The incentive targets are not lay

23 ups and without the continuing participation of the employees,

24 and most particularly the identified plan participants, there

25 is a real concern of, by the Debtors and their professionals,

1  and a real risk that these sales will not happen.  That is the

2  un-refuted, un-rebutted testimony Your Honor heard today.

3      Moreover, since a substantial portion of New Century

4  employees pre-petition compensation was incentive based, and

5  those incentives are not currently available to the employees,

6  they're currently working at a substantial pay cut.  Now we're

7  simply trying to restore some form of the incentive base

8  compensation with an eye at the same time towards accomplishing

9  what are, indisputably, the Debtor's most important current

10  business goals.

11      The second reason why the U.S. Trustee asserts that these

12  plans are not justified by the facts and circumstances is the

13  U.S. Trustee contends that the Debtors are not justified in

14  tying compensation to the sale process, especially where these

15  sales are being conducted by an investment banker.  Now with

16  due respect to the U.S. Trustee, that position reflects a

17  fundamental misunderstanding of what the plan participants will

18  be doing.  We are not looking to have 100 auctioneers.  Your

19  Honor has heard substantial testimony today, again, un-

20  rebutted, un-refuted as to what these plan participants need to

21  do to continue to run these businesses, to take the steps that

22  will maximize value and will help complete the sales.  Those

23  steps, those processes, will go on long after the gavel has

24  banged and a winning bidder has been declared.  In the Debtor's

25  business judgment we need participants, not investment bankers,

1   to do this and there is no evidence that the investment bankers

2   could do this.

3       Your Honor, the evidence establishes that, absent the

4   adoption of the incentive and retention plans, it may indeed be

5   difficult for the Debtors to complete their asset sales.  And

6   with due respect to the U.S. Trustee, the U.S. Trustee offers

7   no contrary evidence on that point today.

8       Your Honor, the third point that the U.S. Trustee makes on

9   the facts and circumstances test is the U.S. Trustee complains

10  that the Debtors have, this is really sort of a narrow point,

11  unfeddered discretion on the critical retention pool, that was

12  originally $250,000, you know, when we filed last week as a --

13  you know, even if that was a valid complaint when the U.S.

14  Trustee filed the objection, as a result of agreements reached

15  with the Committee, it's no longer true.  The amount has been

16  reduced to $175,000 and without Committee approval no

17  individual may received more than $40,000 or 20% of his or her

18  salary.

19      The last point the U.S. Trustee raises, Your Honor, and

20  it's, on the one hand an argument in connection with the facts

21  and circumstances test, on the other hand it's a separate

22  motion filed by the U.S. Trustee to continue the hearing, is

23  the U.S. Trustee contends that these plans should be tabled,

24  indefinitely, pending the completion of an investigation by the

25  SEC, by the U.S. Attorney's Office, and any trustee or examiner

1  that the Court may or not choose to appoint a week from now.

2      Your Honor, and, again, with due respect to the U.S.

3  Trustee, if someone asked me to come up with a recipe for

4  disaster for these cases, I would be hard pressed to come up

5  with a better one that what the U.S. Trustee has proposed

6  because let's be clear, Your Honor, the U.S. Trustee's

7  proposal, in effect, means there will be no incentive or

8  retention plans and the Debtor's sale processes will be

9  jeopardized.

10      THE COURT:  Well here's a concern that I share with

11  the U.S. Trustee and it's from the Court's standpoint.  What

12  assurances does this record hold that there would be no

13  incentive payment, of any kind, made to an individual who might

14  have been involved in any of the what's been referred to,

15  generally, as irregularities which were described in the First

16  Day Affidavit?  I mean, other than that, there's been no

17  evidence in any of the series of hearings we've had, and I'm

18  not suggesting there needed to have been, of who did what to

19  whom when.  What assurance can you give the Court that

20  incentive payments won't be made to somebody who for those

21  reasons, arguably, shouldn't get anything else?

22      MR. STERN:   I think I would respond in two ways,

23  Your Honor.  First, there's two pieces of evidence, I think,

24  before Your Honor today to give Your Honor some comfort that

25  it's unlikely that would happen.  One of the pieces of evidence

1  is the fact that the SEC, which as you know is conducting an

2  investigation, has looked at this roster and said okay.  They

3  don't have a problem with the individuals who are included.

4  And the second one is that the company's own Audit Committee,

5  which of course is conducting an investigation as well, has the

6  right, and the ability, that if anyone happens to be in these

7  plans who is under investigation, the Audit Committee has the

8  right to essentially cause that payment not to be made and to

9  be escrowed pending completion of that investigation as to

10  whether the individual should be cleared and as a result paid,

11  or not cleared and as a result terminated with cause, and under

12  the plans they won't get the payment.

13        THE COURT:  Well when will such an investigation

14  being completed?

15        MR. STERN:  By the Audit Committee?  I can't answer

16  that other than to say I'm not sure that we need -- I'm not

17  sure that that's the ultimate determinative point since even if

18  the Investment Committee is simply looking at someone right

19  now, and hasn't completed the investigation, they have the

20  ability to escrow the payment until they're done.

21        THE COURT:  Well payments are to be made --

22        MS. UHLAND:  Let me add one point.  The initial

23  phase of the internal investigation has been completed and an

24  initial report provided to the Audit Committee and the current

25  roster reflects, actually in cases where the current roster, in

1  fact, rather than relying on this particular division,

2  eliminated any individuals that would have been subject to

3  question by the Audit Committee.  So that the initial part of

4  the review has been already undertaken, we still have the fall

5  back provision with respect to escrowing additional payments if

6  there's further individuals investigated.

7            THE COURT:  Well are further individuals being

8  investigated at this point?

9            MR. UHLAND:  My understand is not by the internal --

10 by the Audit Committee their initial phase should be done in

11 light of our -- the fact that we're in Chapter 11 and there's

12 other formal investigations being undertaken.  The plan is not

13 to incur the additional expense of having independent legal

14 counsel continue the investigation.

15           THE COURT:  All right.

16           MR. STERN:  Your Honor, the second point I wanted to

17 make and I think it's -- I mean, we need to be candid with the

18 Court.  Can I stand here and absolutely guarantee to you that

19 there's no chance that one of these hundred and some odd

20 individuals someday will be determined to have engaged in

21 irregularities?  I mean, I can't say that, but I can say that

22 steps have been put in place to make that highly unlikely,

23 which I think is the best we can do.  And in the event that it

24 were to turn out the unlikely event that someone received a

25 payment who engaged in irregularity, we would have to deal with

1  that issue at that time.  But I think the important thing,

2  also, to remember is that not approving these plans because of

3  the possibility that someone may someday have been determined

4  to have engaged in an irregularity, truly, would be to throw

5  the baby out with the bath water because we would run a serious

6  risk, as the un-refuted testimony is today, of undermining

7  these sales without these incentive plans.

8      And frankly, Your Honor, the U.S. Trustee has not provided

9  us -- I certainly understand Your Honor's concerns, but there's

10  certainly no case law that we've seen that suggests delaying an

11  important incentive or retention plan to complete pending

12  investigations.  The U.S. Trustee hasn't offered any other

13  cases that do that.  And, you know, the sales really are, at

14  the end of the day -- I mean we're here for a very important

15  reason, Your Honor saw how concerned Ms. Etlin is.  These sales

16  are probably the most critical events in these cases.  Your

17  Honor heard what's happening at the company with the employees.

18  We need these incentive and retention plans in place now.  I

19  mean that's why we're all here at 7:00, and I apologize for

20  that, in the evening in order to properly motivate the

21  employees over the next few months.  They're already working at

22  a pay cut.  They're already, you know, in I guess I would call

23  an adverse work environment in terms of just how upset people

24  are as to what's been going on.  If these plans are delayed or

25  denied, Your Honor has heard testimony that many more employees

1  are likely to simply leave.  I mean why would they stay?

2      I would also note, Your Honor, that it would be,

3  ultimately, a bad idea to delay implementation of these plans

4  pending completion of investigations, when we truly have no

5  idea when these investigations will be completed.  In the case

6  of any trustee or examiner that Your Honor might appoint in a

7  week, we don't even know when an investigation is gonna start.

8  Every day that these plans are not approved, they lose a bit of

9  their effectiveness, we lose some employees.  It would not be

10  wise, I respectfully submit, Your Honor, to risk further

11  attrition in the employee ranks.

12      I think Your Honor will be happy to hear these words.  In

13  conclusion, the testimony today establishes, Your Honor, that

14  the plans are reasonable.  The business goals triggering the

15  incentives, are important ones.  The incentives aren't paid if

16  the goals aren't met.  The goals, themselves, are not lay ups.

17  The un-rebutted and un-refuted testimony of the Debtor's

18  compensation expert is that the plans are reasonable, and in

19  fact, conservative.  Absent adoption of the plans now, employee

20  moral will be hurt and the Debtor's business goals jeopardized.

21  The Debtors also are obtaining something in return.  You've

22  heard this from Ms. Etlin.  Any participants who are going to

23  receive incentive or retention compensation under the plan are

24  required to forego any other post-petition incentive or

25  retention compensation or WARN Act claims.  These plans, Your

Closing Argument - Mr. Indelicato                244

1   Honor, reflect a classic exercise of the Debtor's business

2   judgment and I would, once again, note importantly are fully

3   supported as you'll hear in a moment by the Committee, the

4   folks who are writing the check.

5        Your Honor, we need the plans, we need them now.

6   Accordingly, we would respectfully request that Your Honor

7   grant the motion.  Thank you.

8        THE COURT:  Thank you.  Let me hear from the

9   Committee.

10        MR. INDELICATO:  Your Honor, Mark Indelicato from

11   Hahn & Hessen on behalf of the Committee.  And I will only

12   repeat two or three words that were said by Debtor's Counsel.

13   The plans, as they exist today, are reasonable.

14        Your Honor, we have gotten to the same point as the Debtor

15   today in supporting the plans by two very different routes.

16   The plan as originally filed, as has been brought to the

17   Court's attention, provided for $7 million in payments.  At

18   that amount, Your Honor, we would have been standing shoulder

19   to shoulder with the U.S. Trustee objecting to the amounts.  We

20   worked diligently with the Debtor in attempts to get a plan in

21   which we thought was reasonable and a plan in which we shifted

22   from retention to incentive, the amounts that would be paid to

23   the various employees.  It was very important to the Committee,

24   Your Honor, that this plan did one thing and one thing only,

25   maximize the value to the Estate from these various sales.  And

1  we had three buckets of sales.  We had the Greenwich Sale,

2  which is now the Ellington Sale, we have the Carrington Sale

3  coming up and we have the sale of the other assets which has no

4  stalking horse bidder yet.

5      Your Honor, as we were negotiating it, events overtook us.

6  So we were negotiating, in fact, on the night that the

7  Greenwich sale with the sale to Ellington was concluded, or at

8  least the bidding process was concluded.  And one thing I will

9  say for the Debtor, Your Honor, at a time when they received an

10 additional $11 million, they didn't try and take another bite

11 at the Committee and say we've achieved success here, we want

12 to increase that piece.  They were, at least, fair on that.

13 And they negotiated in good faith on the basis of the other two

14 portions of the sale.  But what we said to them is you need to

15 take from the minimum bid and we need to push that to,

16 particularly with the rest of the assets, we need to push that

17 to an incentive piece.  So we reduced the amount that they

18 would receive, significantly, with respect as Ms. Etlin

19 testified, 25% on the rest of the assets which have no stalking

20 horse.  You need to reduce that by 20% and we'll work with you

21 to get there, based on the additional value that you receive.

22 And, in fact, those negotiations continued through lunch today

23 until we came to the resolution that's before the Court.

24      With respect to the Carrington Sale and the Greenwich

25 Sale, there were two additional concessions that we got the

1  Debtor to make.  The Debtor, initially, wanted to pay the

2  bonuses on the gross sales price.  We said, no, there are hold

3  backs on that.  We need the employees to stay around to work

4  out those hold backs, that's very important to us.  Between the

5  two sales, without any modifications, that's $14 million, three

6  for the Greenwich and eleven for the Carrington Sale, and we

7  want the employees motivated to get that money in.  So, in

8  fact, we will agree to pay it, but we will agree to pay it as,

9  and when, those retentions -- those hold backs come in.  So

10 that was a significant concession made by the Debtor.

11     Some other changes that were insisted by the Committee,

12 Your Honor, were the releases, and the broad releases, that

13 these employees are gonna be required to sign before they can

14 receive any payment.  It's not gonna be a release if, and when,

15 they can get around to it.  These are releases that they must

16 sign before they're entitled to any of the payments.  So that

17 we know that once we make these payments for the services

18 provided, we're not gonna have further litigation regarding any

19 employment related claim.  So that was another condition that

20 the Committee insisted on.

21     Your Honor, what the Committee was looking for in

22 structuring this plan, is to address a lot of the concerns that

23 the U.S. Trustee had.  And we had those same concerns at the

24 initial stages.  We believe that this is truly an incentive

25 plan.  Now is it a perfect plan, no, but it is the best we

1  could negotiate under the facts and circumstances of this case

2  to maximize the incentive and the value to the Estate.

3     I will not repeat the arguments made by Mr. Stern with

4  respect to the officers and the directors and who they are and

5  who the officers are, but I think to -- suffice it to say is

6  I'll give you how the Committee looked at it.  We looked at it,

7  Your Honor, as this is an industry in which there's title

8  inflation.  And that these Assistant Vice Presidents and Vice

9  Presidents, in reality, are no more than titles to go out to

10  deal with the people they were dealing with in putting on the

11  loans.  So, in fact, do we look at this as giving management,

12  officers and directors, retention bonuses and bonuses, no we

13  don't.  We look at this as a means of compensating the rank and

14  file and an incentive manner to maximize the value to the

15  Estate.  In fact, the original plan contained all eight of the

16  Executive Management Committee.  We cut that down to four in

17  working with the Debtor, so we understood the concerns of the

18  Court, we understood the concerns of the U.S. Trustee, we

19  weren't out to reward the very senior executives who are, in

20  this plan, who are in charge of the company.

21     So, Your Honor, we believe that this was an exercise of

22  the Debtor's business judgments.  After some prodding by the

23  Committee, after some intense negotiation with Alex Partners,

24  we got to a proposal in which the Committee could support and

25  tell the Court that we believe that this was necessary to

1  achieve the maximum value for the Estate.

2      One final thing, Your Honor, because I do want to keep it

3  short is, I know the Court had some concern with respect to the

4  ongoing investigations regarding employees.  And let me state,

5  categorically, that the Committee is not waiving any of its

6  rights to the extent we're conducting our own investigation,

7  assuming the Court enters our 2004 order.  To the extent we

8  determine that anybody who's received any payments that they

9  should not have received it because they were involved in any

10 way, shape or form in any of the activities eluded to by the

11 Court, the Committee fully intends to exercise all of its

12 rights and the powers of the Bankruptcy Code to seek

13 disgorgement of those funds to the extent appropriate.

14     So, Your Honor, the Committee is vigilant in this case.

15 They have worked, and worked diligently, to get this thing --

16 this plan down to an amount which we could support.  We think

17 we have achieved those objectives and based on the skinny down

18 plan that's before the Court today, we believe it's essential

19 to maximize the value of the Estate and we would ask the Court

20 to approve it.

21         THE COURT:  Thank you.

22         MR. MCMAHON:  Your Honor, good evening.  Prior to

23 the taking of testimony and the admission of exhibits, I

24 briefly outlined our, say, six points that are of concern to

25 our office in connection with this motion.  And while I don't

1 want to suggest that the Motion to Continue is of less

2 importance than other elements, it is of significant concern.

3      I'll just follow along the roadmap which Debtor's Counsel

4 followed.

5      THE COURT:  Well let me address that now.  I'm

6 convinced, based on this record, that the U.S. Trustee's Motion

7 to Continue the Hearing on this motion should be denied.  And I

8 will deny it.

9      MR. MCMAHON:  Okay.  Your Honor, the -- there are

10 two 503(c)(1) issues that our office raised in connection with

11 the motion.  And I want to address both of them.

12      The first is that there was -- the incentive plan

13 represents a disguised retention plan and, Your Honor, the

14 primary purpose of the plan has to be retention based upon this

15 record.  Your Honor heard Ms. Etlin's undisputed testimony

16 regarding the time line, which is just critical to

17 understanding exactly what is being proposed by the Debtors.

18 The Debtors went out to market, soliciting bids, obtained the

19 two stalking horse bids at which the target incentive prices

20 are being set, meaning that they are the vesting targets, the

21 amount of those two bids.  And then, after those two sale

22 motions or substantially contemporaneous with the filing of

23 those two sale motions, filed a incentive and retention motion,

24 and then disclosed to the participants that they were going to

25 be a part of the plans that were at issue.  Now that testimony

1    is un-controverted and it's the Debtor's own witness.  And I

2    appreciate the fact that on redirect, Debtor's Counsel got up

3    here and said -- asked Ms. Etlin whether or not there was some

4    generalized expectation that there was gonna be an incentive

5    plan put in place or something, some form of bonus, given to

6    these people for staying around.  And that's fine.  Perhaps the

7    company made that representation, but until these bankruptcy

8    cases were filed, until those communications occurred, by Ms.

9    Etlin's own testimony, they had no idea what the incentive

10   formula was, period.  End of discussion.  How could they be

11   incentivized to do something that they weren't aware of?  I

12   don't understand it.  Forget Dana, forget lay ups, these people

13   didn't even know they were playing basketball.  It's beyond me

14   that the Debtors can stand here and argue that this is not a

15   disguised KERP.  It is, it has to be based upon that testimony.

16   They didn't even know they were in the game.  I don't know

17   what, you know, how you get around that essential fact.  And if

18   there's ever a plan that's gonna be called a disguised KERP,

19   it's one where the employees didn't even know what the

20   incentives were until they had been achieved.  I mean, in other

21   words, until after the facts those bids had been signed on.  It

22   speaks for itself.  That is, that is the elephant in the room.

23   That is what Ms. Etlin's testimony was.  And you didn't even

24   hear Debtor's Counsel try to even address that point because it

25   doesn't help their effort today, Your Honor.  How could you be

1  incentivized to do something, under such circumstances, to up

2  or to maximize the value of the Debtor's assets?  It's beyond

3  me, it really is.  And I think that, if there's one thing that

4  Your Honor can rule for the U.S. Trustee on today, it's that

5  one point.  These are retention plans, based upon the testimony

6  of the Debtor's own witness.

7       With respect to the point, Your Honor, about officers.

8  Your Honor, we reviewed each and every case which the Debtor

9  cited in their papers, and the Debtor's advocacy in those

10  papers I would describe as, as I said, not addressing the

11  central point of the case.  They're rather aggressive

12  interpretations of the cases.  And if Your Honor would take a

13  look at the relevant paragraphs from our objection, which are

14  paragraphs 15 and 16, we go case by case through the

15  authorities that are cited for the proposition that the

16  Debtor's are trying to make here today.  None of them, not one,

17  say that when a -- conclude that when a company appoints a

18  person, as an officer according to its bylaws, that person is

19  not an insider based upon the degree of control that they have.

20  In fact, each and every case as demonstrated by the

21  parentheticals which we cite in paragraph 16, make the clear

22  point that if these persons were, in fact, appointed officers

23  pursuant to the bylaws, then they would be what are called

24  statutory insiders, meaning that they would fall within the

25  enumerated categories of Section 10131.  And the Debtors really

1  are the parties that are seeking to go to legislative history

2  and/or some interpretation that we have to get in to involve an

3  analysis of control or where they fall within the organization.

4  We don't.  We don't have to go there.  We can rest upon the

5  plain meaning of the statute and arrive at the conclusion that

6  when the Debtors said individuals are officers, they're

7  officers, end of discussion.  It's the conclusion that

8  Essential Therapeutics arrives at.  It's the conclusion

9  supported by each and every authority, which they cite in their

10  papers.  That's another point the Debtors don't want to talk

11  about in their closing argument.  I think it's critical to go -

12  - to addressing the issue that's before the Court.

13       The only issue today, Your Honor, is if this Court is

14  gonna look past the plain meaning of the statute.  And it,

15  certainly, is not an observed result, notwithstanding what the

16  Debtors say, for the people who the Debtors consider to be

17  officers to be officers.  Completely irrational conclusion.

18       With respect to our four points under 503(c)(3), Your

19  Honor, with respect to the incentives being real hurdles, I

20  think the testimony of Ms. Etlin, again, addresses that point,

21  which is the following:  How can you be working towards

22  something that you don't even know exists yet?  It's beyond me,

23  frankly, how this structure is designed to incentivize.  They

24  were let known about the incentives after the sale processes

25  were well under way, or virtually done.  And those standards

1  are not incentivizing.

2      With respect to the point about a second class of

3  investment bankers, Your Honor, I think what the testimony

4  today demonstrates, it certainly supports the U.S. Trustee's

5  position in this regard, is that the Debtors didn't need these

6  people to be providing direct interfacing, or services,

7  relating to the sales insofar as directly marketing the assets,

8  directly communicating with the potential bidders.  As Debtor's

9  Counsel, himself, said "We don't a hundred auctioneers."  Well

10 that's fine.  The converse of that, Your Honor, is that what

11 the Debtors did need these people to do is stay where they're

12 at and continue what it was they were doing.  Completely

13 consistent with the U.S. Trustee's interpretation of the record

14 that the primary purpose of this plan is to keep them right

15 where they are.  Again, when you -- I mean, you might as well

16 just, you know, create another metric that is completely

17 unrelated to what they're doing for the company.  These people

18 have no control or ability to drive the sale price upward

19 directly.  What is essential to the company, and what you have

20 heard from the testimony, is that it is essential to keep them

21 there to support that sale effort.  And I just noted, as

22 perhaps a slip, I think before the break Mr. Indelicato got up

23 to the podium, after the break I think Ms. Uhland and or other

24 counsel got up to the podium, and what did they say, "We need

25 to retain these people.  That's the reason why you have to

1  approve this today."  It's retain them, it has nothing to do

2  with driving the sale price north.  Because it's not a

3  reasonable expectation, Your Honor, that no matter how well

4  these people perform their specific functions, that there's no

5  testimony in record, there's no person with investment banking

6  experience to explain how the employees could actually effect,

7  or drive, a sale price north by providing such support

8  services.

9      Third, Your Honor, with respect to the slush fund, or

10  called the bonus pool that's undefined in terms of who

11  participates in it right now, we would suggest that it suffers,

12  essentially, from the same problems that the sale performance

13  metrics do, which is that people don't know whether or not to

14  participate or getting it.  Again, the issue is what's it's

15  purpose, what's it doing for the company?

16      And finally, Your Honor, I will address the -- our Motion

17  to Continue -- strike that, Your Honor.  We do note and share

18  the -- excuse me, Your Honor, I forgot about the prior ruling

19  on that point, but I do want to note that we do share the

20  Court's concern about the progress of the U.S. Attorney's

21  investigation and making sure that these plans do justice to

22  the situation, rather than worsen it.

23      So, when we come back to the critical point that I want to

24  make here, Your Honor, it's the following.  That these plans

25  were not designed to incentivize based upon the testimony of

1  the Debtor's own witness.  And if this plan is not a disguised

2  retention plan, I don't know what is.

3          THE COURT:  Thank you.

4          MR. MCMAHON:  Thank you, Your Honor.

5          THE COURT:  Briefly.

6          MR. STERN:  I'll do my best, Your Honor.  I don't

7  have much of a voice left anyway, so there's not much to worry

8  about.  I just want to make a couple of points, I think, Your

9  Honor.

10     My friend ably argued several points, first addressing the

11  503(c)(1) issues.  It seems that the Trustee's main point in

12  this whole proceeding is that the incentive plans are disguised

13  retention plans.  It focuses on the fact that we want people to

14  stay.  In fact, he calls that the elephant in the room.  To me

15  it's a unicorn, it doesn't exist, but we can call it whatever

16  animal we want.  At the end of the day, it is always the case

17  that -- I mean, there's two things that are, I guess,

18  indisputable here.  If the goals aren't met, the people don't

19  get paid.  You can stay as long as you want, this is with

20  respect to the incentive plan, stay as long as you want, but if

21  the goals don't get met and there's no assurance they will get

22  met as we've heard the un-refuted testimony today, you can't

23  get paid.  That's an incentive plan.  Every good incentive plan

24  has, and Your Honor has recognized this, I know it because I

25  read it in one of the transcripts of the hearings I didn't

1  attend, that every good incentive plan has a retention

2  component.  You can't get the incentive if you don't stay.  The

3  question is what is the primary purpose?  The primary purpose

4  here, clearly, is to incentivize these folks (a) to complete

5  the sales and (b) to get the best sales price.

6       Now there was some questions, or some statements, made

7  about this is clearly a retention plan because how could the

8  employees be acting on an incentive where a plan, essentially,

9  had not yet been filed.  There's really two responses to that.

10  Number one, and again this is the un-refuted testimony to the

11  employees, even though there was not a specific plan out there

12  because there couldn't be at that time, had a general

13  expectation that they would continue to receive some form of

14  incentive pay, as they had in the past.  But let's just ignore

15  that for a moment, let's even forget about everything that's

16  happened in the past.  My friend simply ignores, and never

17  addresses, all the things that the folks that we're trying to

18  incentivize still need to do.  None of these deals can just

19  close.  The un-refuted testimony was that there is still a

20  tremendous amount of work to do.  And let's talk about the

21  other assets for a second, there's not even a stalking horse.

22  Folks just have to take, rather, really for assets that they've

23  had difficulty with so far, these are gonna be difficult sales.

24  I think Ms. Etlin testified they were -- this is the most

25  speculative.  They're really gonna have to work hard if they

1   want to make some money on these sales.

2        And as far as, I think there was a related point made, and

3   I just want to make sure I hit it.  You know, if I can't

4   remember it, it can't be important enough to hit it at 7:30 in

5   the evening, Your Honor.  It's just the fact that these

6   employees still have a lot to do in order to get the sales

7   accomplished.

8        As far as the officers go, I mean, look 503(c) is a pretty

9   new statute.  I mean we can all talk about what the cases do

10  and don't say.  The U.S. Trustee doesn't cite any case that

11  says under 503(c) if you're in the bylaws as an officer, you're

12  an officer.  So we're all just dealing with the case law as it

13  currently exists, really pre-503(c) and we're trying to figure

14  out what did Congress mean when it adopted 503(c).  And we

15  believe the better case law, which we've cited and which I've

16  discussed in detail today, says you have to look at the

17  purposes of the statute and make your own determination, Your

18  Honor, and at some point I suspect there will precedent to

19  guide us.  Right now, there's not a whole not.  There is some

20  precedent in this case, which I respectfully submit law of the

21  case, where Your Honor said Assistant V.P.'s and V.P.'s are not

22  officers for purposes of Section 503.

23       The last thing I think I would say, Your Honor, is that

24  the facts that have been submitted to the record today, our

25  expert has said this is a reasonable plan and it is an

1  incentive plan.  There's no contrary expert testimony.  All the

2  testimony that you've heard today talks about just how critical

3  these plans are and how we need them.

4      And I guess maybe I'll try to finish with a little flare.

5  I remember a sort of a phrase I read in the newspaper a couple

6  of weeks ago, Your Honor.  I don't remember the context, I

7  don't remember who said it, but the statement was "the greatest

8  enemy of a good plan is the dream of a perfect plan."  I don't

9  know that this is a perfect plan.  You know, can people poke

10  and prod at it?  Can the U.S. Trustee complain about pieces of

11  it?  I'm sure that's true, but it is a good plan and that's all

12  that the law requires.  Thank you, Your Honor.

13          THE COURT:  Okay.  Let me start by determining the

14  standard that I'm applying in deciding whether to grant the

15  relief that's been requested.  First, I don't think this is a -

16  - this relief is properly requested under Section 105 or under

17  363.  I will apply a 503(c)(3) standard because, consistent

18  with my prior ruling with respect to those individuals holding

19  the office of Vice President and Assistant Vice President, they

20  are not, under these circumstances, to be considered officers

21  for purposes of 503.  It may be, at some point, there will be a

22  larger body of case law, to which perhaps I'll contribute,

23  which addresses the issue in a more detailed manner.  Frankly,

24  I'd probably prefer that opportunity, but the circumstances

25  here don't permit that.

1    There are a number of issues I'd like to address in terms

2  of how I view this record and, unfortunately, they may come out

3  in no particular order, but I'll begin.

4    First, by addressing an overall concern.  The Trustee

5  complains that the Debtor, after having been rebuffed in early

6  request for relief, has come back and repackaged, in substance,

7  the same request, but in a different form.  Frankly, given a

8  couple of things, one the newness of 503(c) and some black

9  letter rules about how plans should be designed, there have

10  been a number of different plans proposed in this Court, and

11  other courts, that really go a lot of different ways and take a

12  lot of different forms.

13    Secondly, I think it's a good thing that the Debtor went

14  away, tried to rethink and restructure it's plans, consulted

15  and negotiated with the Committee, heard the U.S. Trustee's

16  objections and came up with a revised plan.  And I, frankly,

17  think the Debtor ought to be -- well let's put it this way, I

18  think have might have been necessary for the Debtor to do that,

19  under these circumstances, rather than simply to say there's no

20  way we can package an incentive plan in an acceptable form.

21    The Debtor argues, persuasively, and Ms. Etlin's

22  testimony, I think, was very strong on these points, some of

23  the services yet to be performed are sale related from due

24  diligence to transition and other sale related services, to the

25  requirement of at least one buyer that a certain number of

1   employees be available to continue in the business, other

2   downsizing functions that have to be performed, including the

3   extensive human relations and benefits issues that have to be

4   worked through with respect to the thousands of employees

5   who've been laid off, responding to the SEC investigation,

6   other regulatory interface, later on down the line claim

7   support, lease review.  Right now, with respect to the sales

8   particularly, they are the most important activity of the

9   company at the moment.  The activity, most likely, to produce

10  the most value for the Estate.  And to incentivize employees to

11  achieve those goals and perform those activities, which would

12  not otherwise be within their normal job descriptions, I think

13  is necessary under these circumstances.  These employees,

14  according to Ms. Etlin's testimony, have specific technical or

15  other knowledge about the business or the industry, which is

16  necessary for the conduct of the Debtor's business and for

17  achieving and taking sales to their conclusion.

18      With respect to the criteria that the Debtor has chosen,

19  in a non-liquidating plan you could argue there are lots of

20  other metrics that could be used, like EBIDTA just to name one,

21  increasing cash flows.  Those things can't be used

22  appropriately in this type of case.  It makes no sense and the

23  U.S. Trustee has suggested that there's no viable alternative

24  for the use of criteria.

25      I also note that these employees, as the Debtor has

1  alleged from the beginning even in its earlier iteration of

2  incentive, proposed incentive plans, that the employees

3  compensation, historically, has been based on things other

4  than, in addition to, base salary.  So it's entirely credible

5  for the Debtor to take the position that there is an

6  expectation by these employees that there's -- there would some

7  incentive compensation as a component of their overall

8  compensation, and the fact of the timing of the request for

9  approval and the development of the sales asserted by the

10  Trustee is being a reason alone to deny the relief, I think, is

11  wrong.  I think it's off the mark.  And I think it ignores the

12  situation that these Debtors are facing.

13       There's another element that strikes me, and I mean and it

14  strikes me as an important element, and although it's been

15  mentioned, it hasn't been mentioned in quite the way I look at

16  it, and that is the total amount to be paid is about 3.3

17  million or so, which has already been reduced by over half as a

18  result of negotiations with the Committee.  But this amount is

19  a fraction of the total value to be achieved and preserved by

20  this Estate, and it's a small fraction.  So it seems to me that

21  in the Debtor's business judgment, if it spends this amount of

22  money, it can preserve literally tens of millions of dollars,

23  or potentially more, worth the value for the Estate, it seems

24  to me to be a very small amount of money well spent.

25       So I conclude that these payments are justified under the

1  facts and circumstances of this case and I'm prepared to sign

2  an order awarding the relief that the Debtor has requested.

3      Oh, I also wanted to mention the discretionary fund.  I

4  understand the U.S. Trustee's concern that it could be a

5  {quote} "slush fund," but it seems to me, again, given the very

6  limited amount that's been placed into the fund and with the

7  Committee oversight, that there's very little likelihood, if

8  any, that award of funds from the discretionary fund would be,

9  in any way, abusive or unwarranted.

10     MS. UHLAND:  Thank you very much, Your Honor.  The

11  plans themselves are exhibits to the proposed order that we

12  would like to submit and there is some final language changes

13  we are incorporating in them to reflect the agreements that

14  we've reached with the Committee.  What we would propose to do,

15  Your Honor, is to prepare the revised order with the complete

16  plans and submit it with the Court tomorrow.

17     THE COURT:  All right, and please recite that the

18  relief is being granted for the reasons I've stated on the

19  record today and please also include a denial of the U.S.

20  Trustee's Motion to Continue this hearing based upon my earlier

21  ruling.  Yes, Mr. McMahon?

22     MR. MCMAHON:  Just one question, Your Honor, there

23  is a finding, Letter E, specifically indicating that the

24  Debtor's have demonstrated a compelling and sound business

25  justification for authorizing the restructured plans and I'm

1  wondering whether, in light of Your Court's ruling, would be

2  better to change that to -- that the Court has found that the

3  Debtors have justified plans under the facts and circumstances

4  of the case.

5        THE COURT:  It would be consistent with the

6  statutory language.

7        MS. UHLAND:  Yes, Your Honor, we'll revise that --

8        THE COURT:  All right.

9        MS. UHLAND:  -- paragraph.

10        THE COURT:  Any other questions about the order?

11        MR. MCMAHON:  Not this one, Your Honor.  I believe

12  there's the open matter of the Motion to Seal.

13        THE COURT:  Is there any objection?

14        MR. MCMAHON:  Your Honor, based upon the record that

15  was put before the Court and the Debtor's agreement to leave

16  these, you know, six participants, the six top participants

17  under the plans unsealed.  Their information will be of public

18  record, but we are not taking the position based upon Ms.

19  Etlin's testimony.

20        THE COURT:  Anyone else care to be heard with

21  respect to the oral motion?  I'll grant it.  This is normally

22  the type of information that is, indeed, kept confidential and

23  I do conclude, based on this record, that revealing such

24  information would put the Debtor at a competitive disadvantage

25  at a very critical time.  I guess in it's soon to be over

1  history.  And you should prepare an order to that effect as

2  well.  You can include it in the one order if you like.

3         MS. UHLAND:  Okay, Your Honor, and then we'll be

4  filing that under -- taking appropriate precautions to file the

5  redacted version under seal shortly.

6         THE COURT:  All right.  Any other questions?

7         MS. UHLAND:  No, Your Honor, I just thank you for

8  the Court's and the Court's staff's indulgence to stay this

9  late.

10         THE COURT:  Your welcome.

11         MS. UHLAND:  All right.  Thank you very much.

12         THE COURT:  That concludes this hearing.  Court is

13  adjourned.

14     (Court adjourned)

15

16                    CERTIFICATION
17  I certify that the foregoing is a correct transcript from the
18  electronic sound recording of the proceedings in the above-
19  entitled matter.
20

21  *Lewis Parham*                          5/18/07

22  _____    _____
23  Signature of Transcriber              Date