# EXHIBIT "A"

LEASE

BY AND BETWEEN

BCIA 95 GLASTONBURY BOULEVARD LLC

LANDLORD

AND

NEW CENTURY MORTGAGE CORPORATION (dba Home123)

TENANT

Dated as of March 1, 2005

# LEASE

THIS LEASE made as of the 1st day of March, 2005, by and between **BCIA 95 GLASTONBURY BOULEVARD LLC**, a Delaware limited liability company with an office at c/o CrossHarbor Capital Partners LLC, One Boston Place, Boston, Massachusetts 02108 (the "Landlord"), and **NEW CENTURY MORTGAGE CORPORATION**, a California corporation, dba Home123, having an office at 18400 Von Karman Avenue, Suite 1000, Irvine, California, 92612 (the "Tenant").

1. Demise/Premises/Term.

a)     The Landlord hereby demises and leases to the Tenant, and the Tenant hereby takes and hires from the Landlord, for the term hereinafter stated, for the rent hereinafter reserved, and upon and subject to the covenants, agreements, terms, conditions, limitations, exceptions and reservations of this Lease, those portions of the second (2nd) floor of the Building (as defined in Section 1(b)) shown as hatched and cross-hatched on the floor plan attached hereto as Exhibit A, and comprising approximately Three Thousand Four Hundred Twenty Two (3,422) square feet of rentable area, subject to adjustment as provided for herein, (the "Demised Premises").

b)     The actual rentable area of the Demised Premises shall be determined in accordance with "American National Standard ANSI/BOMA Z65.1-1996: Standard Method for Measuring Floor Area in Office Buildings" issued by the Building Owners and Managers Association International (BOMA Standard) and, in the Landlord's architect's professional opinion, and to the best of his knowledge, information and belief, is in conformance with such standards. In the event that the architect's measurement using the BOMA Standard differs from the rentable area of Demised Premises set forth in Section 1(a) of the Lease, the rentable area of the Demised Premises shall be adjusted appropriately and the parties shall execute an amendment to this Lease reflecting said adjustment, and making the necessary adjustments to Fixed Rent, Tenant's proportionate share, and any other items determined under this Lease based on the rentable square footage of the Demised Premises. The Tenant and the Landlord acknowledge that it is not uncommon for an area calculated from the building plans to differ from the area measured on site. It is also not uncommon for a site measurement and calculation by one party to differ from the same measurement and calculation by another party. The calculation for the Demised Premises, resulting from site measurement by the Landlord shall be deemed accurate if a re-measurement gives result with variance of two percent (2%) or less. If the variance is greater than two percent (2%), the Landlord and the Tenant shall select an unbiased professional third party to assist in resolving the matter, and shall each pay one-half (1/2) of the costs of such third party.

c)     The term "Building" as used in this Lease shall mean the office building located on a parcel of land known as 95 Glastonbury Boulevard, Somerset Square, Glastonbury, Connecticut, which parcel of land is more particularly described on Exhibit B attached hereto and is hereinafter referred to as the "Land."

d)    The term of this Lease and the estate hereby granted (collectively the "Term") shall commence on the later of (i) April 1, 2005; or (ii) the date of Substantial Completion (as defined below) (hereinafter, the "Commencement Date") and shall end on the last day of the calendar month sixty (60) months following the Commencement Date, or such earlier or later date upon which the Term of this Lease may expire, be terminated, or extended pursuant to any of the provisions of this Lease or pursuant to law (the "Expiration Date").e)

Provided that the Tenant is not in default of any of the terms, covenants or conditions of the Lease, following all applicable grace and cure periods, both at the time of exercise and the effective date of the extension, the Tenant shall have one (1) option (the "Renewal Option") to extend the term of the Lease, for an additional period of five (5) years (the "Renewal Term") on the same terms, covenants and conditions contained in the Lease, except as specifically provided herein.

(i)    If the Tenant wishes to exercise the Renewal Option, then the Tenant shall give the Landlord written notice of its election to so exercise no earlier than twelve (12) months and no later than nine (9) months in advance of the Expiration Date.

(ii)    The Rent (as defined below) for the Demised Premises during each year of the Renewal Term (determined on a single occasion for the entire Renewal Term in accordance with this Section 1(d)) shall be equal to the "fair rental value" for the Demised Premises as of the first day of the Renewal Term. For purposes of the foregoing, "fair rental value" shall be the value agreed upon by the Landlord and the Tenant, which agreement shall be in writing, by letter or otherwise, signed by both parties, not more than thirty (30) days following the Landlord's receipt of the Tenant's exercise of the Renewal Option. The fair rental value determination shall be made taking into account the fair market annual rental rate under new and renewal leases and amendments entered into on or about the date on which the fair rental value is being determined for space comparable to the Demised Premises in the Building and other comparable office buildings (in terms of location, age, existing improvements, services provided, and other such relevant factors) in the Hartford County area. The determination of the fair rental value shall take into account any material economic difference between the terms of the Tenant's lease extension and any comparison lease or amendment, such as rent abatements, length of term, tenant improvement costs and other concessions and the manner, if any, in which the landlord under any such lease is reimbursed for expenses and taxes, including the applicable base year.

(iii)    If the Landlord and the Tenant are unable to agree within such thirty (30) day period, the fair rental value shall be determined by appraisal as provided below:

(a) Within sixty (60) days after the Landlord receives notice of Tenant's election to exercise the Renewal Option, the Landlord and the Tenant shall each appoint a real estate broker having at least ten (10) years brokerage experience in the Greater Hartford real estate market (the Landlord and the Tenant agreeing that neither party shall utilize its current broker – in the case of the Landlord such current broker being the current listing broker for the Building (or a broker from the current listing company for the Building), and in the case of the Tenant such current broker being the current broker (or a broker from such company) representing the Tenant or its affiliates in leasing

-2-

transactions in Connecticut), and advise the other party of the identity of its broker. Within thirty (30) days following their appointment, each broker shall render an appraisal of the fair rental value of the Demised Premises for the period in question. The fair rental value shall be the amount determined by the two brokers, whose determination shall be binding and conclusive upon the Landlord and the Tenant. If the two brokers shall not agree, and the larger appraisal is not more than one hundred five percent (105%) of the smaller appraisal, the fair rental value shall be the average of the two appraisals.

(b) If the two brokers shall not agree and the larger appraisal is more than one hundred five percent (105%) of the smaller appraisal, the two brokers shall appoint a mutually agreeable third broker having at least ten (10) years appraisal experience in the Greater Hartford real estate market, within fifteen (15) days following their failure to agree. If the two brokers cannot agree on a third broker, the Landlord and the Tenant agree to request the designation of the third broker by the then current President of the Connecticut Chapter of the Appraisal Institute of New England. Such third broker shall render an appraisal within fifteen (15) days following his/her appointment, in the same manner as the earlier appraisals. If the three brokers are unable to render a majority opinion, the fair rental value shall be the average of the three brokers.

(c) The Landlord and the Tenant shall pay the costs of the broker appointed by each, and shall share equally the cost of the third broker if one is appointed.

(d) If the fair rental value for the Renewal Term is not ascertained prior to the commencement of the Renewal Term, the Rent payable for the term of this Lease shall continue to be payable until the date when the fair rental value for the Renewal Term shall have been ascertained. The Tenant shall within fifteen (15) days after the determination, pay to the Landlord a sum equal to any increase in the Rent from the commencement date of the Renewal Term through the date of determination, and if a credit is due to the Tenant, the Landlord may either pay to the Tenant the sum of such credit, or in the alternative, provide the Tenant with a credit against the next immediately-accruing future installment(s) of Fixed Rent (as defined below).

f) In addition to the Demised Premises, Tenant shall have the right to use, in common with all other tenants of the Building, all portions of the Building not designated for the exclusive use of tenants, including, without limitation, entrances and exits, hallways, stairways, elevators, restrooms, and parking areas (collectively, the "Common Areas").

2. Rent.

a) The rent reserved under this Lease (the "Rent") for the term hereof shall commence to accrue on the Commencement Date and shall be and consist of:

(i) an annual fixed rent (the "Fixed Rent") in the amount of:

-3-

(A)    $19.50 per rentable square foot of the Demised Premises during the period beginning on the Commencement Date, and ending on the day preceding the first anniversary of the Commencement Date;

(B)    $20.00 per rentable square foot of the Demised Premises during the period beginning on the first anniversary of the Commencement Date, and ending on the day preceding the second anniversary of the Commencement Date;

(C)    $20.50 per rentable square foot of the Demised Premises during the period beginning on the second anniversary of the Commencement Date, and ending on the day preceding the third anniversary of the Commencement Date;

(D)    $21.00 per rentable square foot of the Demised Premises during the period beginning on the third anniversary of the Commencement Date, and ending on the day preceding the fourth anniversary of the Commencement Date;

(E)    $21.50 per rentable square foot of the Demised Premises during the period beginning on the fourth anniversary of the Commencement Date, and ending on the last day of the calendar month in which the fifth anniversary of the Commencement Date occurs;  plus

(ii) such other sums of money as shall become due and payable by the Tenant to the Landlord as provided in this Lease, such other sums of money to be deemed to be additional rent whether or not such sums of money are designated as such hereunder.

b)    The Rent shall be paid to the Landlord at its address specified in Section 31, or at such other place as the Landlord may from time to time designate, in lawful money of the United States of America, as and when the same shall become due and payable and without abatement (except as specifically provided for herein) or offset and without notice or demand therefor.

c)    The annual Fixed Rent for each Lease Year shall be payable in equal monthly installments in advance on the first day of each and every calendar month during each Lease Year.

d)    The additional rent shall be payable as hereinafter provided.

e)    If the Tenant fails to pay within five (5) days after the same is due and payable any installment of Fixed Rent or, except as otherwise provided herein, any additional rent to be paid by the Tenant to the Landlord as provided in this Lease, such unpaid amount shall bear interest from the due date thereof to the date of payment at the rate equal to the lesser of (i) twelve percent (12%) per annum, or (ii) the maximum rate permitted by applicable law.  Such interest shall be paid by the Tenant to the Landlord on the earlier to occur of (A) at the time that the Tenant pays to the Landlord the installment of Fixed Rent or the additional rent upon which such interest shall have accrued or (B) ten (10) days after written demand therefor.

f)    As used herein, the term "Lease Year" shall mean the period commencing on the Commencement Date and ending on the last day of the calendar month in which occurs the

day preceding the first anniversary of the Commencement Date, and each period of twelve (12) consecutive calendar months thereafter.

   3.  <u>Additional Rent for Changes in Operating Expenses and Taxes</u>.

     a)  As used herein:

       (i)     "Calendar Year" means each period of twelve (12) consecutive calendar months commencing on January 1 and ending on December 31.

       (ii)     "Base Taxes and Operating Expenses" shall mean the sum paid by Landlord for Taxes and Operating Expenses during the 2005 Calendar Year.

       (iii)     "Escalation Amount" for or in respect of any Calendar Year means the product of (A) the Gross Rentable Area of the Demised Premises times (B) the amount by which the sum of the Operating Expenses and the Taxes per square foot of the Gross Rentable Area of the Building for such Calendar Year exceeds the Base Taxes and Operating Expenses per square foot of the Gross Rentable Area of the Building.

       (iv)     "Gross Rentable Area of the Building" shall mean One Hundred Fifty Thousand Twenty Four (150,024) square feet.

          i.     "Operating Expenses" means (a) all direct costs, fees, dues, assessments, common charges and expenses paid by the Landlord to any condominium association or other entity formed for the purpose of owning and/or maintaining the non-public roadways and other common elements within Somerset Square; (b) all direct costs to the Landlord, reduced by the amounts of any reimbursement or credit received or receivable by the Landlord from fire insurance or condemnation proceeds or otherwise, of the operation and maintenance of the Building and the Land, as determined by generally accepted accounting principles including, without limitation, all utilities, fuel, building supplies, materials, equipment, tools, janitorial services, sanitary control, security control, snow and ice removal, rubbish, garbage and other refuse removal, grounds maintenance, normal maintenance and ordinary and normal repairs, wages of employees who work customarily in and about the Building and the Land and whose duties are connected with its operation, but only in direct proportion to the amount of time worked at the Building, maintenance or repair (including Social Security benefits, worker's compensation insurance, unemployment taxes, and costs of pension, hospitalization and retirement plans), insurance premiums, and other recurring expenses reasonably and customarily incurred by the Landlord in the proper operation and maintenance of the Building and the Land, including an annual management fee equal to not more than five percent (5%) of the gross annual rentals from the Building, <u>but excluding</u> (A) depreciation, interest and amortization payments on any mortgage or rent due on any land lease or other indebtedness of the Landlord; (B) costs incurred in making leasehold alterations, in preparing space and other work in the Building for occupancy by current or prospective tenants; (C) expenses incurred by Landlord for repairs or other work occasioned by insured casualty (except to the extent of the deductible) or condemnation; (D) expenses incurred by Landlord to resolve disputes or enforce or negotiate lease terms with prospective or existing tenants; (E) expenses for the replacement or repair of any item covered under warranty; (F) expenses for any item or

service which Tenant pays directly to a third party or separately reimburses Landlord and expenses incurred by Landlord to the extent the same are reimbursable or reimbursed from any other tenants, occupants of the property, or third parties; (G) expenses for any item or service not provided to Tenant, but provided exclusively to certain other tenants in the Building; and (H) Landlord's costs of electricity and other services and materials furnished to other tenants for which Landlord is entitled to be directly reimbursed by the benefited tenants as an additional charge or rental over and above basic rent payable under the lease with such tenants; (I) overhead and administrative costs of Landlord not directly incurred in the operation and maintenance of the Building; (J) depreciation or amortization of the Building or its contents or components; (K) capital expenditures including rentals and any other related expenses incurred in leasing capital items, except to the extent that such expenditures are for improvements required by any regulatory body having jurisdiction due to a change in any Applicable Law after the Commencement Date of this Lease, or are for improvements intended to reduce the Operating Expenses of the Building (and, in any case, such expenditures will be amortized over the useful life of said improvements), and contributions to Operating Expense reserves; (L) expenses for repairs or other work which is caused by fire, windstorm, casualty or any other insurable occurrence, excluding costs subject to Landlord's insurance deductible; (M) expenses incurred in leasing or obtaining new tenants or retaining existing tenants, including leasing commissions, legal expenses, advertising, entertaining or promotion; (N) interest, amortization or other costs, including legal fees, associated with any mortgage, loan or refinancing of the Building or any common areas, transfer or recordation taxes and other charges in connection with the transfer of ownership in the Building, land trust fees, and rental due under any ground lease relating to the property on which the Building is located; (O) the cost of correcting defects in the construction of the Building or any common areas that are covered by a warranty; provided, however, that repairs resulting from ordinary wear and tear shall not be deemed to be defects; (P) accounting and legal fees relating to the ownership, construction, leasing, sale of or relating to any litigation in any way involving the Building, or any common areas, or to the enforcement of the terms of any lease;(Q) the costs to clean up, contain, abate or remove any environmental or hazardous substances or materials, including asbestos containing materials from the Building or any common areas the presence of which is in violation of environmental laws, or to remedy any other breach or violation of any environmental laws, in either case not caused by the Tenant; (R) any personal property taxes of the Landlord for equipment or items not used directly in the operation or maintenance of the Building, nor connected therewith; (S) any expense that is not specifically enumerated and accounted for as a Building Operating Expense in Landlord's expense statement pertaining to the operation and administration of the Building or any common areas (including payroll and payroll-related expenses associated with administration and clerical personnel, general office expenses, and expenses for travel, entertainment, gifts, dues, subscriptions, memberships, tuition, seminars, errors and omissions insurance, automobile allowances, charitable or political donations and professional fees of any kind); (T) any costs or expenses for sculpture, paintings, or other works of fine art (but not decorative art in common areas), including costs incurred with respect to the purchase, ownership, leasing, repair, and/or maintenance of such works of fine art; (U) all expenses directly resulting from the negligence or willful misconduct of the Landlord, its agents, servants or other employees; (V) all bad debt loss, rent loss, or reserve for bad debt or rent loss; (W) payroll and payroll related expenses for any employees in commercial concessions operated by the Landlord; (X) any expenditures made more than eighteen (18) months prior to the date on which amounts are due; and (Y) any amount

paid to an entity related to Landlord which exceed the amount that would have been paid for comparable goods or services in an arms-length transaction between unrelated parties in said market.

If the entire Building shall not have been occupied for any part of a Calendar Year, Operating Expenses and Taxes for that Calendar Year (including the Base Year) shall be adjusted to reflect the amount of such Operating Expenses and Taxes that would reasonably have been incurred had ninety-five percent (95%) of the Building been occupied  and had the Building been fully tax-assessed throughout the Calendar Year by projection of Operating Expenses actually incurred in those portions of the Building occupied to those portions of the Building which are vacant during part or all of the Calendar Year, and by projection of Taxes.

(v)    "Taxes" means all taxes, assessments, water rates and charges, sewer assessments and charges, and other governmental levies or charges which are assessed or imposed upon the Building and the Land, or any part thereof, and which become payable during the Term of this Lease, including any costs or expenses, including attorney's fees incurred in contesting the validity or amount of the above as provided below, but excluding any amount in respect of any income, profit or revenue tax or any other tax, assessment, charge or levy upon the rents payable by the tenants of the Building unless such amount is levied as a substitution in whole or in part for taxes assessed or imposed by any taxing authority on the Building and the Land, in which case Taxes shall include an amount of money equal to the taxes which would have been payable by the Landlord in the absence of such substitute tax or excise or, if the same cannot be reasonably ascertained, an amount of money equal to the portion of the tax or excise as would be payable by the Landlord if the rents payable by the tenants of the Building, upon which such tax or excise has been imposed, were the sole taxable income of the Landlord for the relevant Calendar Year in question and the tax or excise, so far as ascertainable, relieves the Landlord from the payment of any taxes which it otherwise would be obligated to pay.

If, as a result of any application or proceeding brought by or on behalf of the Landlord for reduction in the assessed valuation of the Building and the Land affecting any tax year commencing after the Base Year, there shall be a decrease in Taxes for any such tax year, the Landlord's next annual statement following such decrease shall include an adjustment for such tax year reflecting the tax decrease, less all reasonable costs and expenses incurred by the Landlord in connection with the application or proceeding to reduce the Taxes for said tax year.

b)    Within ninety (90) days after the expiration of each Calendar Year, the Landlord shall deliver to the Tenant a reasonably detailed statement certified as true and correct by an officer or property manager of Landlord, setting forth the Operating Expenses and Taxes per square foot of Gross Rentable Area of the Building for that Calendar Year, and the excess or decrease of that amount over the Base Taxes and Operating Expenses per square foot of Gross Rentable Area; provided, however, that any delay in the completion and delivery of such calculations and determinations shall not be deemed a waiver of the Landlord's right to collect additional rent hereunder.  Such statement shall be binding and conclusive on both the Landlord and the Tenant absent manifest error, subject to the Tenant's right to audit the Landlord's records and dispute the annual statement, as described in Section 3(e) below.  The Tenant shall pay to the Landlord, as additional rent, within thirty (30) days after the Tenant receives such statement, the

-7-

Escalation Amount for the Calendar Year to which such statement relates, less so much thereof as shall have been paid to the Landlord as provided in Section 3(c).

c)    As an estimate of the Escalation Amount for the then current Calendar Year, the Tenant shall pay to the Landlord, beginning on the first day of January, 2006, and on the first day of each and every subsequent calendar month during the Term of this Lease, an amount equal to one-twelfth (1/12) of the amount from time to time reasonably estimated by the Landlord as the Escalation Amount for the then current Calendar Year. If the amounts paid to the Landlord as provided in this subsection during any Calendar Year shall exceed the actual Escalation Amount for that Calendar Year, then the Landlord shall refund such excess to the Tenant at the same time that the Landlord shall deliver to the Tenant the statement required pursuant to Section 3(b) with respect to that Calendar Year.

d)    The additional rent payable pursuant to this Section for the Calendar Year which commences during the last Lease Year shall be apportioned to reflect the number of days of such Calendar Year within the Term of this Lease.

e)    The Landlord shall maintain books and records of all Operating Expenses and Taxes and shall permit the Tenant to audit the Landlord's books and records of all Operating Expenses and Taxes for any annual period during the twelve (12) month period following the Tenant's receipt of a statement of Operating Expenses and Taxes. If the Tenant elects to audit such books and records, the Landlord shall reasonably cooperate with the Tenant, and any deficiency or overpayment disclosed by such audit (which is not disputed by the Landlord – any such dispute to be resolved by arbitration) shall be promptly paid or refunded as the case may be. Any such information obtained by the Tenant will be treated as confidential unless and until such information has been publicly disclosed by the Landlord; provided, however, that nothing herein contained shall limit or impair the right or obligation of the Tenant to disclose such information when required by law or to appropriate regulatory authorities having jurisdiction over its affairs, or to use the same in connection with the enforcement of the terms and condition of this Lease. In the event that Operating Expenses and/or Taxes are overstated by five percent (5%) or more, the Landlord shall promptly reimburse or credit the Tenant for the reasonable costs of such examination, in addition to refunding all overpayments previously made by the Tenant.

4.    Security Deposit/Letter of Credit.        [Intentionally Omitted]

5.    Landlord's Work

a)    This Lease is "turn-key," meaning that the Landlord shall, at Landlord's sole cost and expense, except as otherwise specifically set forth herein, perform all of the work, construct all of the improvements to the Demised Premises, and make all of the installations in and to the Demised Premises in a good and workmanlike manner, shown, described or referenced on the Tenant's Design Plan dated January 5, 2005 (the "Design Plan") attached hereto as Exhibit C, and on the New Century Building Standards attached hereto as Exhibit D, and in accordance with all Applicable Laws (as defined in Section 12(b)) prior to the Commencement Date. All of the work to be performed by the Landlord on behalf Tenant in accordance with this subsection is referred to as the "Landlord's Work". Immediately upon the execution hereof, Landlord's architect shall prepare working drawings for the Landlord's Work

-8-

(the "Construction Drawings"), and shall deliver them to the Tenant. The Tenant shall promptly review the Construction Drawings and indicate to the Landlord any objections it may have within five (5) business days of its receipt of said Construction Drawings. If necessary, the Landlord's architect shall provide the Tenant with a revised set of drawings and the Tenant shall have a further opportunity to review them and provide any final comments to the Landlord within seven (7) business days of its receipt of said revised set of drawings. When the Construction Drawings are agreed upon, the Landlord and the Tenant shall each sign and date them. The Landlord shall bid out the work relating to Landlord's Work to a minimum of two (2) qualified contractors selected by the Landlord and reasonably approved by Tenant

b) The Tenant may make written requests for changes in the Landlord's Work, and the Landlord shall comply with any such request that in the Landlord's reasonable judgment is not unreasonable, will not increase the cost of such work, and will not delay the completion of Landlord's Work. Any change in the scope of the Landlord's Work which would result from such a request and which (i) would interfere with or delay the work of the Landlord's contractors and subcontractors in the Demised Premises or elsewhere in or about the Building, or (ii) shall not be approved by the Landlord's mortgage lenders, shall be conclusively deemed to be unreasonable. Any increase in the Landlord's cost of construction of the Landlord's Work resulting from such a request shall be acknowledged in writing by the Landlord and the Tenant prior to the performance of the change in the Landlord's Work, and the increase shall be paid to the Landlord by the Tenant at the time of such written acknowledgment.

c) The Tenant shall have access to the Demised Premises commencing at least two (2) weeks prior to the estimated completion date of said improvements for the purpose of installing the Tenant's Property (as hereinafter defined) provided that such installation does not unreasonably interfere with the construction of the Landlord's Work, and that the Tenant shall have the required insurance coverages in place for itself, the Landlord and its agents, employees and contractors. The Landlord shall give the Tenant written notice at least seven (7) days in advance of the commencement of such two (2) week period. Tenant's entry on the Demised Premises for the purpose of such installation shall not be deemed to constitute Tenant's acceptance of any portion of the Demised Premises. The Tenant, by entering into actual possession of the Demised Premises other than as set forth in the preceding sentence, shall be conclusively deemed to have agreed that the Landlord, up to the time of such possession, has performed all of its obligations hereunder with respect to preparation of such part or parts of the Demised Premises for the Tenant's possession with the exception of latent defects and punch-list items.

d) The term date of "Substantial Completion" shall be the date on which all of the following conditions are met:

(i)     All of Landlord's Work has been completed in accordance with the Working Drawings, except for minor punch-list items;

(ii)    A temporary or final certificate of occupancy shall have been issued by the Town of Glastonbury permitting the activities specified in Section 6 to be conducted in the Demised Premises;

-9

(iii)    The contractor engaged by the Landlord has issued a certificate attesting that the Landlord's Work has been substantially completed; and

(iv)    Landlord has delivered possession of the Demised Premises to Tenant.

e)    The Landlord may make such changes in, additions to and deletions from the Building and its appurtenances as the Landlord shall see fit except that the Landlord shall secure the prior written approval of the Tenant in the case of any change, addition or deletion which materially and adversely affects the Tenant's use of the Demised Premises for the purposes set forth in Section 6 or any other rights of the Tenant under this Lease. Unless the Tenant shall notify the Landlord of the Tenant's disapproval of a proposed change in, addition to or deletion from the Building or its appurtenances requiring the Tenant's prior approval as provided in this subsection within fifteen (15) business days after receipt by the Tenant of drawings or specifications showing such change, addition or deletion, the Tenant shall be deemed to have approved such change, addition or deletion.

6.  Use.

The Tenant shall have the right to occupy and use the Demised Premises for general office purposes, and the Tenant shall not use or permit the use of the Demised Premises for any other purpose.

7.  Signs.

At the Landlord's cost and expense, within ten (10) days after the Commencement Date, the Landlord shall provide a listing for Tenant in the Building's directory in the main lobby of the Building and signage in the main lobby of the Building and in the elevator lobby on the second floor (North) of the Building. The Tenant shall be entitled, at its sole cost and expense, to install signage, using the Tenant's standard graphics, at the entry to the Demised Premises (in accordance with standard Building signage and applicable laws). Unless the Landlord shall have given its prior written consent, the Tenant shall not install, paint, inscribe or maintain any lettering, name, sign, business designation, advertising or publicity device on the Land or on any exterior window or on any other interior or exterior portion of the Building. All signage shall be consistent with a comprehensive sign plan for the planned area development known as Somerset Square and is contingent upon approval from all appropriate governmental agencies.

8.  Subordination of Lease.

a)    This Lease and all rights of Tenant hereunder are subject and subordinate to any mortgage or ground or other lease made by Landlord and which affect the Building or the Land and to any and all renewals, modifications, consolidations, replacements and extensions thereof. It is the intention of the parties that this provision be self-operative and that no further instrument shall be required to effect such subordination of this Lease. Tenant shall attorn to any foreclosing mortgagee, purchaser at a foreclosure sale or purchaser by a deed in lieu of foreclosure, and Tenant shall, upon demand at any time or times execute, acknowledge and deliver to Landlord a subordination and attornment agreement in a form reasonably required by the lender, which subordination and attornment agreement shall subordinate this Lease and all of

-10-

the rights of Tenant hereunder to any future mortgages or ground or other lease and shall include, but not be limited to, statements that if the lender succeeds to the interest of Landlord under this Lease, lender shall not be:

(i)    Liable for any act or omission of any prior landlord (including Landlord); or

(ii)    Liable for the return of any security deposit which shall not have been turned over to lender; or

(iii)    Subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord); or

(iv)    Bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or

(v)    Bound by any amendment or modification of this Lease made without its consent.

b)    If, in connection with the procurement, amendment or renewal of any financing of the Building and the Land, the mortgagee shall request reasonable modifications of this Lease as a condition of such financing, the Tenant shall not withhold or delay its consent to such reasonable modifications, provided that they do not increase the obligations of the Tenant under this Lease or materially and adversely affect the rights of the Tenant under this Lease.

c)    If the Tenant is required to subordinate its interests under the Lease to the lien of any mortgage or deed of trust or to any lienholder in the future, the Tenant's obligation to subordinate its interests is conditioned upon any such lienholder or prospective lienholder providing the Tenant with a commercially reasonable non-disturbance agreement in a form reasonably satisfactory to the Tenant which, in substance, agrees that so long as the Tenant is not in default under the terms of this Lease, its tenancy for the use and purposes herein described and all rights granted to the Tenant hereunder will not be disturbed and will remain in full force and effect throughout the term of this Lease and any extensions thereof.

9. Attornment.

Tenant agrees that in the event of a sale, transfer (including, without limitation, a deed in lieu of foreclosure), or assignment of Landlord's interest in the Building, the Demised Premises or any part thereof, or in the event any proceedings are brought for the foreclosure of or for the exercise of any power of sale under any mortgage or deed of trust now or hereafter placed upon or affecting the Building and/or the Demised Premises, to attorn to and to recognize such transferee, purchaser or mortgagee as landlord under this Lease, and no such transfer shall be deemed to operate under any circumstances as a constructive eviction of Tenant. The foregoing provisions of this Paragraph shall be self-operative and no further instrument shall be required to give effect to said provisions. Tenant agrees, however, at the request of the party to whom it has attorned, to execute, acknowledge and deliver without charge, from time to time, instruments acknowledging such attornment providing such does not otherwise affect the obligations or rights of Tenant hereunder. Tenant shall be under no obligation to pay rent to any successor

-11-

landlord until Tenant receives written notification that it has succeeded to the interests of the Landlord under this Lease.

10. Quiet Enjoyment.

The Landlord covenants and agrees that so long as the Tenant pays the Rent and performs the remainder of the Tenant's obligations under this Lease, the Tenant shall peaceably and quietly have, hold and enjoy the Demised Premises without interference by any person claiming by, through or under the Landlord.

11. Assignments and Subleases.

a) Except as otherwise provided in this Section, the Tenant agrees not to assign or in any way encumber this Lease, nor to sublet the Demised Premises, or any part thereof, nor to permit the Demised Premises, or any part thereof, to be used by others, without obtaining the prior written consent of the Landlord in each instance. Any request of the Tenant to assign or sublet shall be accompanied by a detailed description of the terms and conditions of the proposed assignment or sublease together with such information regarding the proposed assignee or subtenant as is reasonably requested by the Landlord. In determining whether to grant consent to Tenant's request to assign or sublet, the Landlord may consider any factors it reasonably deems appropriate in its discretion including, but not limited to, (i) the ability of the proposed assignee or subtenant to perform the obligations of the Tenant to be kept and performed under the Lease; (ii) the credit, business and/or reputation of the proposed assignee or subtenant; (iii) whether the use of the Demised Premises by the proposed assignee or subtenant is in keeping with the standards which the Landlord has established for the Building, or the standard which exists for the Somerset Square planned area development; (iv) whether the use of the Demised Premises by the proposed assignee or subtenant will violate or create any potential violations of any laws, or any violation of the condominium declarations affecting the Building and the Land; (v) whether the proposed assignee or subtenant is a person, firm or entity with whom the Landlord is then negotiating to lease space in any other building owned by the Landlord or an affiliate of the Landlord, or with whom the Landlord or an affiliate has actively negotiated within the six (6) months immediately prior to such request; (vi) the impact such proposed assignment or subletting may have on the utilization of parking areas and other facilities serving the Building; and (vii) the impact which such proposed assignment or subletting may have on the conduct of the Landlord's business regarding other premises situated within the Building. Landlord agrees to approve or disapprove any such request within fifteen (15) days next following its receipt of same together with any such information regarding the proposed transaction as shall be required of the Tenant pursuant to this Section. The consent by Landlord to any assignment or sublease shall not constitute a waiver or consent to any subsequent assignment or sublease.

b) In the event that the Landlord consents to any assignment of this Lease or sublease of any portion of the Demised Premises, as a condition of the Landlord's consent, if the Landlord so elects to consent, the Tenant shall pay to the Landlord fifty percent (50%) of all profit derived by the Tenant from such assignment or sublease, after first deducting the out-of-pocket costs to non-affiliates of the Tenant incurred in such subleasing or assignment, including, but not limited to, rent concessions, brokerage commissions and alteration allowances. The Tenant shall furnish the Landlord with a sworn statement, certified by an officer of Tenant,

-12

setting forth in detail the computation of profit (which computation shall be based upon generally accepted accounting principles and shall reflect reasonable costs for leasing commissions, advertising and redecorating and tenant improvements required to induce such subtenant/assignee). Any rent in excess of that paid by the Tenant hereunder realized by reason of such assignment or subleasing shall be deemed an item of such profit. If a part of the consideration for such assignment or subleasing shall be payable other than in cash, the payment to the Landlord shall be payable in accordance with the foregoing percentage of the cash and other non-cash considerations in such form as is reasonably satisfactory to the Landlord. Such percentage of the Tenant's profits shall be paid to the Landlord promptly by the Tenant upon the Tenant's receipt from time to time of periodic payments from such assignee or subtenant or at such other time as the Tenant shall realize its profits from any such assignment or sublease.

c) Notwithstanding the foregoing provisions of this Section to the contrary, the Tenant may, without the Landlord's consent, assign this Lease, or sublease all or any part of the Demised Premises, to:

(i)     any corporation or business entity which controls, is controlled by or is under common control with the Tenant;

(ii)    any entity at least fifty percent (50%) of whose voting interests is owned by the Tenant or an affiliated company of the Tenant;

(iii)   any entity in which or with which the Tenant, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for merger or consolidation of entities, so long as the liabilities of the entities participating in such merger or consolidation are assumed by the entities surviving such merger or created by such consolidation;

(iv)    any entity acquiring this Lease and a substantial portion of the Tenant's assets; or

(v)     any successor to a successor entity becoming such by either of the methods described in (iii) or (iv), so long as on the completion of such merger, consolidation, acquisition or assumption, the successor has a net worth no less than the Tenant's net worth immediately prior to such merger, consolidation, acquisition or assumption (each a "Permitted Assignee"); provided that (A) the Tenant gives the Landlord prior notice of such assignment or sublease; (B) the Tenant delivers to the Landlord an executed copy of such assignment or sublease promptly upon execution thereof, and (C) the Permitted Assignee agrees in writing to assume and be bound by all terms and conditions of this Lease.

d) No assignment of this Lease or subletting of all or a portion of the Demised Premises shall relieve the Tenant of any of the Tenant's obligations under this Lease.

12. No Nuisance, Compliance with Laws and Requirements of Public Authorities.

a)      The Tenant agrees (i) not to create or permit any nuisance in or about the Demised Premises, the Building or the Land, (ii) to comply with (A) all present and future laws, ordinances, requirements, orders, directives, rules and regulations of the United States of

-13-

America, the State of Connecticut, Town of Glastonbury and all other governmental authorities having jurisdiction over the Building or the appurtenances or any part thereof, and (B) the terms and conditions of the declarations of condominium affecting the Land and the Building (the "Declarations"), so far as the Tenant's use of the Demised Premises may be concerned, and (iii) to save the Landlord harmless from all damages, fines, penalties and costs for violation of or non-compliance by the Tenant or the Tenant's servants, employees, agents, customers, invitees, licensees or visitors with the provisions of this Section.

b) The Landlord agrees (i) to comply with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of federal, state, county and city governments and of all other governmental authorities having jurisdiction over the Building or appurtenances or any part thereof (the "Applicable Laws") and (ii) to comply with the terms and conditions of the Declarations.

13. Insurance.

a) At all times during the Term of this Lease, the Landlord shall insure the Building against loss or damage by fire, and such other casualties as may be included within the extended coverage clauses of policies which are then standard for use in the State of Connecticut, in such amount as the Landlord in its sole reasonable judgment shall deem appropriate.

b) The Tenant shall not commit or actively permit any violation of the policies carried by the Landlord pursuant to subsection a. above, or do or actively permit anything to be done, or keep or actively permit anything to be kept, on or in the Demised Premises, which, in case of any of the foregoing, (i) could result in termination of any of such policies, (ii) could adversely affect the Landlord's right of recovery under any of such policies, or (iii) would result in the refusal by reputable and independent insurance companies to insure the Building or the property of the Landlord therein in amounts reasonably satisfactory to the Landlord. If any such action by the Tenant, or any failure by the Tenant to comply with the requirements of insurance policies with respect to the Building or to perform any of the Tenant's obligations under this Lease, or the use of the Demised Premises by the Tenant, shall result in any increase in the rate of premiums payable with respect to such policies carried by the Landlord, then the Landlord shall notify the Tenant of such activities and if the Tenant does not cease such activities within ten (10) days of such notification, the Tenant shall pay to the Landlord, as additional rent, within twenty (20) days after demand therefor, the resulting additional premiums which shall be paid by the Landlord.

c) At all times during the Term of this Lease, the Tenant shall (i) insure the Tenant's Property (as defined in Section 16) against loss or damage by fire and such other casualties as may be included within the extended coverage clauses of policies which are then standard for use in the State of Connecticut in amounts at all times equal to the full replacement value of the Tenant's Property, and (ii) keep in full force and effect a policy of public liability and property damage insurance with respect to the Demised Premises, the Building and the Land in which the limits initially shall be not less than Two Million Dollars ($2,000,000.00) for each person and Three Million Dollars ($3,000,000.00) for each accident, and in which the limit for property damage initially shall be not less than Five Hundred Thousand Dollars ($500,000.00), such insurance to be written on an "occurrence basis", and such limits to be increased from time

-14-

to time as reasonably specified by the Landlord in accordance with general insurance standards for Class A buildings. In addition, for and during any time when the Tenant shall be constructing or making Tenant's Improvements (as defined below), the Tenant shall keep in full force and effect a policy of completed value builder's risk insurance (or an "installations floater") for the Demised Premises, including building materials in the Demised Premises, covering loss or damage from fire, lightning, extended coverage perils, vandalism and malicious mischief and perils in an amount not less than the final cost, as reasonably estimated by the Tenant, of such Tenant's Improvements.

d) At all times during the Term of this Lease, the Landlord shall keep in full force and effect a policy of public liability and property damage insurance with respect to the Building and the Land in which the limits initially shall be not less than Two Million Dollars ($2,000,000.00) for each person and Three Million Dollars ($3,000,000.00) for each accident, and in which the limit for property damage initially shall be not less than Five Hundred Thousand Dollars ($500,000.00).

e) Each party hereto shall procure an appropriate clause in, or endorsement on, each of its policies for fire or extended coverage insurance covering the Demised Premises, the Tenant's Improvements, the Landlord's Work or the Building or personal property, fixtures or equipment located thereon or therein, pursuant to which the insurance company waives subrogation or consents to a waiver of right of recovery against the other party, and such party hereby agrees that it will not make any claim against or seek to recover from the other for any loss or damage to its property or the property of others covered by such fire or extended coverage insurance; provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by the terms and provisions of the waiver of subrogation clause or endorsement or the clause or endorsement consenting to a waiver of right of recovery and shall be co-extensive therewith.

f) All insurance provided by the Tenant pursuant to this Section shall be effected under valid and enforceable policies in form and substance then standard in the State of Connecticut, issued by insurers of recognized responsibility licensed to do business in the State of Connecticut and reasonably satisfactory to the Landlord. Upon the Commencement Date (and in any event prior to any entry by Tenant or its contractors on or in the Demised Premises), and thereafter not less than fifteen (15) days prior to the expiration dates of expiring policies provided by the Tenant pursuant to this Section, the Tenant shall deliver to the Landlord copies of policies or certificates with respect to the insurance being maintained by the Tenant pursuant to the terms of this Lease. All such policies or certificates shall contain an agreement by the insurers that such policies will not be canceled, amended or otherwise modified without at least ten (10) days prior written notice to Landlord and that Landlord's rights and interests under such policies shall not be subject to cancellation by reason of any act or omission of Tenant. All insurance policies provided by Tenant pursuant to this Section shall name Landlord and Landlord's property manager as additional insureds as their interest may appear.

g) The Tenant shall indemnify and hold the Landlord harmless against and from any liability or expense, including, without limitation, reasonable attorney's fees, on account of (i) any accident or injury to the Landlord, the Landlord's servants, employees, agents, customers, invitees, licensees, or visitors who may be injured or suffer an accident in the Demised Premises

-15

unless the same is caused by the gross negligence or willful act of the Landlord, or the Landlord's servants, agents or employees, and (ii) the Tenant's activities in or use of the Demised Premises or elsewhere on the Land or in the Building.

### 14. Rules and Regulations.

The Tenant and its officers, employees and agents shall conform to and abide by such reasonable rules and regulations, including those Rules and Regulations as are set forth on Exhibit E attached hereto, as shall be reasonably established from time to time by the Landlord in connection with the operation, maintenance, safety and security of the Land and the Building provided such rules and regulations do not adversely affect Tenant's permitted uses. The Landlord shall not be liable to the Tenant for violation of such rules and regulations by other tenants or occupants of the Building, their servants, employees, agents, visitors or licensees, or by other persons. Any rules or regulations the application of which would (a) conflict with any provisions of this Lease or with any rights granted to the Tenant hereunder or (b) have a material adverse impact on Tenant's business operations and/or use of the Demised Premises will be deemed waived as to the Tenant to the extent necessary to protect the Tenant's interests hereunder. Otherwise, the Landlord will not apply the rules and regulations more strictly as against the Tenant as such rules and regulations are enforced vis a vis other tenants and occupants of the Building, and the Landlord will provide the Tenant with reasonable advance written notice of any changes in the rules and regulations.

### 15. Alterations and Improvements.

a) The Tenant shall not make or have made alterations, improvements, decorations, installations and substitutions (collectively called "Tenant's Improvements") in, of, or to the Demised Premises without the prior written consent of the Landlord in each instance; provided, however, that, except as to (i) structural alterations, improvements or additions; (ii) exterior alterations, improvements or additions; (iii) alterations which are prohibited by the Rules and Regulations attached hereto as Exhibit E; and (iv) alterations, improvements or additions which will require unusual expense to readapt the Demised Premises to normal office use upon the termination of the Lease, or will increase the cost of insurance or taxes on the Building, such consent shall not be unreasonably withheld or delayed. Tenant shall provide to Landlord, concurrently with its request for Landlord's consent, plans and specifications for the proposed alterations. The plans and specifications for the proposed alterations to the Demised Premises to be made following the completion of Landlord's Work are attached hereto as Exhibit D. Unless otherwise specified in the consent referred to in this Section, any improvements or alterations in the Demised Premises made by the Tenant (including, without limitation, permanent partitions, wall paneling and lighting fixtures, but excepting the Tenant's Property (as defined in Section 17)) shall be and remain the property of the Landlord and, except as provided in Section 24, shall remain upon and be surrendered with the Demised Premises at the termination of the Term of this Lease. If the Landlord consents to any such alterations, improvements or additions, it may impose such conditions with respect thereto as the Landlord reasonably deems appropriate, including, without limitation, requiring the Tenant to furnish the Landlord with security for the payment of all costs to be incurred in connection with such work, insurance against liabilities which may arise out of such work and permits, plans and specifications necessary for such work. The work necessary to make any alterations,

-16-

improvements or additions to the Demised Premises shall be done at the Tenant's expense by, at the Landlord's option, employees of, or contractors hired by, the Landlord, except to the extent the Landlord gives its prior written consent to the Tenant's hiring employees or contractors, in either of which events Landlord may charge Tenant a construction management fee not to exceed three percent (3%) of the contract cost. The Tenant shall promptly pay to the Landlord or the Tenant's contractors, as the case may be, when due, the cost of all such work and of all repairs to the Building required by reason thereof. Upon completion of such work the Tenant shall deliver to the Landlord, if payment is made directly to contractors, evidence of payment, contractors' affidavits and full and final waivers of all liens for labor, services or materials.

b) Notwithstanding anything to the contrary herein, without securing Landlord's prior consent, Tenant shall be permitted to hang pictures and shelving and perform other similar minor decorating activities and to perform non-structural alterations not exceeding an aggregate of $50,000 during any calendar year, which alterations do not require the acquisition of a building permit, provided that Tenant complies with all pertinent building code, fire, safety and other such governmental regulations and that Tenant does not take any action which could in any way interfere with the structural, mechanical, electrical, maintenance, HVAC, plumbing or other Building systems.

c) The Tenant, at its expense, shall obtain all necessary governmental permits and certificates for the commencement and prosecution of the Tenant's Improvements and for final approval thereof upon completion, and shall cause the Tenant's Improvements to be performed in compliance therewith and with all applicable laws and requirements of public authorities, and in a good and workmanlike manner using only good grades of materials. Tenant and its contractors shall carry workers' compensation insurance in statutory limits in connection with the construction of the Tenant's Improvements.

d) The Tenant's Improvements shall not constitute the basis for a claim against the Landlord, nor a lien or charge upon or against the Land or the Building, and if at any time any such claim, lien or charge shall be filed against the Land or the Building, the Tenant shall cause such claim, lien or charge to be properly released of record or Tenant shall post a bond to assure the payment of said lien with Landlord in an amount and reasonably satisfactory to Landlord within fifteen (15) days after the filing thereof, and if the Tenant shall fail to do so, then the Landlord may discharge the same. The Tenant shall defend, indemnify and save harmless the Landlord from and against any and all such claims, liens and charges, and all costs and expenses, including reasonable attorney's fees, incurred by the Landlord in procuring the discharge of any such claim, lien or charge or in connection with any action or proceeding brought thereon.

e) The Tenant shall pay for all materials constituting Tenant's Improvements, and the Tenant agrees that none of such materials shall be at any time subject to or encumbered by any lien, security interest, encumbrance, charge, installment sales contract or the interest of any other person, firm or corporation whether created voluntarily or involuntarily.

f) Each party authorizes the other to rely in connection with their respective rights and obligations under this Section 16 upon approval and other actions on the party's behalf

-17

by any person designated by such party as its construction representative by notice to the party relying.

### 16. Tenant's Property.

a) Except for Tenant's Improvements and those items furnished or installed by the Landlord as part of the Landlord's Work as provided in Section 6(b), all movable partitions, business machinery and equipment, communications equipment and all other property which is not attached to or built into the Demised Premises and which is installed in the Demised Premises by or for the account of the Tenant at its sole expense, and all furniture, furnishings and other articles of personal property owned by the Tenant and located in the Demised Premises (all of which are collectively called the "Tenant's Property"), shall be and shall remain the property of the Tenant, and may be removed by it at any time during the Term of this Lease and shall be removed by it at the termination of the Term of this Lease. The Tenant shall repair or pay the cost of repairing any damage to the Demised Premises or to the Building resulting from such removal, ordinary wear and tear and casualty events excepted.

b) The Landlord shall not be responsible or liable to the Tenant or any other person for any loss or damage to the Tenant's Property or the Tenant's Improvements, or to any property of any other person, from any cause, including, without limitation, acts of negligence of co-tenants or other occupants of the same building, or of any owners or occupants of adjacent or contiguous property, theft, vandalism, illegal entry, or by steam, gases or electricity, or by water, rain or snow, whether the same may leak into, issue or flow from any part of the Building, or from the pipes or plumbing work of the Building, or from any other place or quarter, unless caused by the gross negligence or willful act of the Landlord, its servants, agents, employees or contractors. Tenant shall give immediate notice to Landlord in case of accidents in the Demised Premises or in the Building or of defects therein or in any fixtures or equipment, of which Tenant has knowledge.

### 17. Tenant's Repairs.

a) Except for the maintenance for which the Landlord is expressly responsible pursuant to the provisions of Section 18, the Tenant agrees that throughout the term of this Lease, the Tenant, at its expense, shall (i) keep the Demised Premises and the Tenant's Improvements in a clean condition and in good order and repair, and (ii) make all necessary repairs and replacements on account of, and (iii) not do or suffer any waste, or damage in or to, the Demised Premises or the Tenant's Improvements.

b) Tenant shall reimburse the Landlord for all costs and expense incurred by the Landlord to repair all such damage to the Demised Premises as shall be required by reason of the fault or neglect of the Tenant, or any of its officers, employees, contractors, agents or invitees, such payment to be made within fifteen (15) days after written demand therefor.

### 18. Landlord's Repairs. Maintenance, Cleaning.

a) Landlord shall keep, maintain and repair the Building and the Land and the fixtures, appurtenances, systems (including those portions of Building systems within the Demised Premises) and facilities, sidewalks and other appurtenances thereto; the exterior

improvements to the Land, including curbs, driveways, parking areas, sidewalks, lighting, exterior signs, ditches, shrubbery, landscaping and fencing, in good working order and condition. The Landlord shall not be required to maintain or repair the Tenant's Improvements.

b) The Landlord shall provide janitorial services within the Demised Premises substantially in accordance with the services delineated in the "Outline of Cleaning Services" attached hereto as Exhibit F. The Landlord shall be entitled to adjust the janitorial service specifications from time to time upon written notice to Tenant, but shall ensure that the Demised Premises and the Building is provided with cleaning services comparable to other suburban office buildings of similar quality and location.

19. Utilities and Services.

a) During the Term of this Lease, the Landlord shall provide hot and cold running water for drinking and lavatory purposes, electricity for normal office use, toilet and supplies and vermin extermination and automatically operated elevator facilities to the Demised Premises on a round-the clock basis. The Landlord, at its expense, shall also provide heat, air-conditioning and ventilation in the Demised Premises and the lobbies of the Building during "regular hours" of each "business day" (which as used in this Lease means 8:00 A.M. to 6:00 P.M. Monday through Friday, and 8:00 A.M. to 1:00 P.M. Saturday, excluding all Sundays and legal holidays) and sufficient to maintain the Demised Premises with proper ventilation at a comfortable temperature level. The Landlord shall also make available heat, air-conditioning and ventilation for the Demised Premises on other days and at other hours provided the Tenant notifies the Landlord: (i) in the case of hours preceding or following the regular hours of a business day Monday through Friday, no later than twenty-four hours prior to the date and time when such additional utilities and services are required; and (ii) in the case of a Saturday, Sunday or legal holiday, no later than twenty-four hours prior to the date and time when such additional utilities and services are required, provided, in any event, that such notice must be delivered on a business day preceding such Saturday, Sunday or holiday. The Tenant shall pay to the Landlord on a monthly basis the additional cost of such after-hours utilities and services as reasonably determined by the Landlord (such additional cost to be the actual cost to the Landlord of such after-hours utilities, and the cost of the overhead required in connection with the provision of such after-hours service, with no additional "profit mark up" to the Landlord). The current cost for after-hours HVAC service is $50.00 per hour.

b) In the event that the Tenant shall install in the Demised Premises computers (other than personal computers, although the Tenant shall pay for any additional equipment required to operate or support such, including Liebert units) or other equipment which in the Landlord's reasonable judgment consumes more electricity than is generally used for normal office use or in the event that the Tenant regularly shall use the Demised Premises for a "second shift" or otherwise during other than regular hours of the business day, then the Landlord may cause a survey to be made by a qualified independent electrical consultant to determine the amount of electricity consumed in the Demised Premises, and if such exceeds normal office usage, the Tenant shall pay to the Landlord on a monthly basis the amount by which the cost of the electricity consumed in the Demised Premises exceeds the cost of the electricity used for normal office use in the Building as reasonably estimated by the Landlord. The Tenant shall reimburse the Landlord within fifteen (15) days of a demand therefor for all costs and expenses

-19-

incurred in connection with such electrical survey if the survey indicates that usage in the Demised Premises exceeds normal office usage.

c)  In the event of any interruption of services and utilities, the Landlord shall use commercially reasonable efforts to promptly restore such services and utilities. If any failure to provide services or utilities continues for more than four (4) consecutive days and materially interferes with the Tenant's conduct of business in or use and operation of the Demised Premises, the Tenant shall be entitled to an equitable abatement of rent for such period of time as the interruption is in effect. If an interruption of services or utilities extends beyond a period of thirty (30) consecutive days, the Tenant shall have the right to terminate this Lease upon sixty (60) days written notice to the Landlord.

d)  Subject to the Tenant's rights set forth in Section 19(c) above, the Landlord shall not be liable for failure to furnish any of the services specified in Section 19(a) above, unless such failure is caused by the willful misconduct of Landlord or its servants, agents, employees or contractors.

e)  Landlord reserves the right to stop any service or utility system when necessary by reason of accident or emergency or until necessary repairs have been completed. Except in case of emergency repairs, Landlord will give Tenant reasonable advance notice of any contemplated stoppage and will use reasonable efforts to avoid unnecessary inconvenience to Tenant by reason thereof.

20. Access to Demised Premises.

a)  During the Term of this Lease the Tenant may use and occupy the Demised Premises for the purposes set forth in Section 7 on such days and hours (regardless of whether they be business days or regular hours) as it may determine, and the Tenant and its officers, employees, agents and visitors at all times shall have access to the Demised Premises by means of doorways, passageways, corridors, stairways, elevators and entrances in the Building affording access to the Demised Premises, subject, however, to the Rules and Regulations attached hereto as Exhibit E and such other reasonable rules and regulations as may be hereinafter adopted by the Landlord, and otherwise subject to the obligations of this Lease. The Landlord may limit the number of points of entry to the Building during hours other than regular hours of business days, provided that reasonably convenient access to all parts of the Demised Premises shall be provided at all times.

b)  The Landlord and the Landlord's agents shall have the right, but not the obligation, to enter and pass through the Demised Premises or any part or parts thereof during business hours upon twenty-four (24) hours notice and at such other times as such entry shall be required by circumstances of emergency affecting the Demised Premises or the remainder of the Building, (i) to examine the Demised Premises and to show them to any mortgagee, prospective mortgagees or purchasers of the Building, which Landlord shall use reasonable efforts to accomplish with minimal disruption to Tenant's use of the Demised Premises, and (ii) for the purpose of performing such maintenance and making such repairs or changes in or to the Demised Premises or in or to the Building or its facilities as may be provided for or permitted by this Lease or as may be mutually agreed upon by the parties or as the Landlord may be required

-20-

to make by laws and requirements of public authorities. The Landlord shall be allowed to take all materials into and upon the Demised Premises that may be required for such repairs, changes or maintenance.

c) During the period of twelve (12) months prior to the Expiration Date, the Landlord may exhibit the Demised Premises to prospective tenants upon reasonable notice to the Tenant.

21. Damage or Destruction.

a) In the event that the Demised Premises (other than Tenant's Improvements), or any part thereof, or access thereto, shall be damaged or destroyed by fire or other insured casualty, but the Tenant shall continue to have reasonably convenient access to the Demised Premises and no portion of the Demised Premises (other than Tenant's Improvements) shall thereby be rendered unfit for use and occupancy by the Tenant for the purposes set forth in Section 7, the Landlord shall promptly repair such damage or destruction (except damage or destruction to Tenant's Property or Tenant's Improvements) with reasonable diligence. During the period when such repair work is being conducted, the Rent shall not be abated or suspended.

b) In the event that the Demised Premises (other than Tenant's Improvements), or any part thereof, or access thereto, shall be so damaged or destroyed by fire or other insured casualty that the Tenant shall not have reasonably convenient access to the Demised Premises, or the Demised Premises shall thereby be otherwise rendered unfit for use and occupancy by the Tenant for the purposes set forth in Section 7, and if in the sole reasonable judgment of the Landlord the damage or destruction may be repaired within one hundred eighty (180) days after the occurrence of the damage or destruction, then the Landlord shall so notify the Tenant within thirty (30) days after the occurrence of the damage or destruction and shall repair such damage or destruction (except damage or destruction to Tenant's Property or Tenant's Improvements) with reasonable diligence. In the event that the Landlord shall not complete such repairs within one hundred eighty (180) days after the occurrence of the damage or destruction, then the Tenant shall have the right to terminate the Term of this Lease by giving written notice of such termination to the Landlord within ten (10) days after the end of such one hundred eighty (180) day period, provided, however, that in the event that the completion of repairs shall be delayed by strikes, governmental regulation, zoning laws, inability to obtain labor or materials, or from any other cause beyond the Landlord's control, the time for completion shall be extended by the period of such delay. If in the sole judgment of the Landlord the Demised Premises (other than Tenant's Improvements), or means of access thereto, cannot be repaired within one hundred eighty (180) days after the occurrence of the damage or destruction and the Landlord does not give the Tenant the notice referred to in this Section 21(b), then either party shall have the right to terminate the Term of this Lease by giving written notice of such termination to the other party at any time following Landlord's failure to give the notice referred to in this Section 21(b). In the event of such termination, this Lease and the Term hereby granted will end as of the date of such damage or destruction and the Rent will be equitably apportioned as of the date of such damage or destruction and any Rent paid in advance beyond such date shall be refunded to Tenant. If neither party gives such notice of intention to terminate the Term of this Lease, then the Landlord shall repair the damage or destruction with reasonable diligence.

-21-

c) In the event that the Tenant shall not have reasonably convenient access to the Demised Premises, or any portion of the Demised Premises (other than Tenant's Improvements) shall be otherwise rendered unfit for use and occupancy by the Tenant for the purposes set forth in Section 7 by reason of such damage or destruction, and if such damage or destruction was not caused by the negligence or willful act or omission of the Tenant or any of its officers, employees, contractors, agents or invitees, then the Rent shall be equitably suspended or abated from the date of such casualty until the Landlord shall have substantially completed the repair of the Demised Premises and/or the means of access thereto.

d) In addition to, and apart from the foregoing provisions of this Section, if (i) the Demised Premises should be damaged or destroyed (A) by fire or other casualty (1) to the extent of twenty-five percent (25%) or more of the cost of replacement, or (2) so that twenty-five percent (25%) or more of the Gross Rentable Area of the Demised Premises shall be rendered untenantable, or (B) by any casualty other than those covered by insurance policies maintained by Landlord (hereinafter "substantially damaged"), or (ii) the Demised Premises shall be damaged in whole or in part during the last two (2) years of the term of this Lease, or (iii) there shall be damage to the Demised Premises of a character as cannot reasonably be expected to be repaired within six (6) months from the date of casualty, or (iv) such restoration involves the demolition of or repair of damage to twenty-five percent (25%) or more of the Demised Premises, or (v) applicable law requires the demolition of the Building or forbids the rebuilding of the damaged portion of the Building, or (vi) such restoration requires repairs in an amount in excess of the insurance proceeds recovered or recoverable, or (vii) Landlord's mortgage shall require that the insurance proceeds from such damage or destruction be applied against the principal balance due on any mortgage, Landlord may, at its option, either terminate this Lease or elect to repair the Demised Premises and Landlord shall notify Tenant as to its election within ninety (90) days after such fire or casualty. If Landlord elects to terminate this Lease, the Term hereof shall end on the date specified in the notice (which shall be the end of a calendar month and not sooner than thirty (30) days after such election was made). If Landlord does not elect to terminate this Lease, then Landlord shall perform the repairs set forth in Section 21(b) hereof, and the Term shall continue without interruption and this Lease shall remain in full force and effect.

e) No damages, compensation or claim shall be payable by the Landlord to the Tenant, or any other person, by reason of inconvenience, loss of business or annoyance arising from any damage or destruction, or any repair thereof, as is referred to in this Section.

## 22. Condemnation.

a) If all of the Building, shall be taken by condemnation or in any other manner for any public or quasi-public use and purpose, then the Term of this Lease shall forthwith terminate as of the date title vests in the taking authority and the Rent shall be apportioned as of such date and any Rent paid in advance beyond such date shall be refunded to the Tenant.

b)     In addition to and apart from the foregoing provisions of Section 22(a), if more than twenty-five percent (25%) of the Gross Rentable Area of the Building shall be so taken, then the Landlord may terminate the Term of this Lease by giving written notice of such termination to the Tenant within thirty (30) days after the date title vests in the taking authority.

-22-

In the event of such termination, this Lease and the Term hereby granted will end as of the date of such taking and the Rent will be equitably apportioned as of the date of such taking and any Rent paid in advance beyond such date shall be refunded to the Tenant.

c)   The Tenant shall have the exclusive right in any proceeding with respect to any taking referred to in this Section to any award payable for the Tenant's moving expenses and the then value of the Tenant's Property, but the Tenant shall have no other right to any award for either a total taking or a partial taking of the Land, the Building or the Demised Premises, including any right for the contract value of this Lease, and any such award shall be retained by the Landlord as the Landlord's sole property.

d)   In the event of any taking which does not result in a termination of the Term of this Lease, the Rent shall be equitably suspended or abated and the Landlord, at its expense, shall proceed with reasonable diligence to repair and restore the remaining part of the Building and the Demised Premises to substantially its former condition to the extent that the same may be feasible, either economically or from a construction standpoint, but only to the extent of any condemnation award actually received by the Landlord. Any suspension or abatement of Rent shall cease upon substantial completion of such repairs or restoration. In the event that less than all of the Demised Premises are restored by the Landlord, the Rent shall be equitably apportioned for the remainder of the Term of this Lease.

### 23. Surrender.

On the Expiration Date, or upon any earlier permissible termination of the Term of this Lease, the Tenant shall quit and surrender the Demised Premises, including Tenant's Improvements, to the Landlord broom clean and in good order, condition and repair, except for (a) ordinary wear and tear, (b) conditions requiring repairs which are not required to be made by the Tenant and (c) damage by casualty not the cause or responsibility of the Tenant. The Tenant shall remove all of the Tenant's Property, and at the Landlord's request, shall remove those portions of Tenant's Improvements as shall be designated by the Landlord for Tenant's removal at the time the Landlord approves the plans therefor, and shall repair any damage to the Demised Premises on account of such removal.

### 24. Default and Damages.

a)      Any of the following occurrences or acts shall constitute an event of default under this Lease: (i) whenever the Tenant shall default in the payment of any Rent or any other charge payable by the Tenant to the Landlord, on any day upon which the same is due, and such default shall continue for five (5) business days after written notice to Tenant from Landlord; or (ii) whenever the Tenant shall fail to perform, whether by action or inaction, any of the Tenant's obligations hereunder, and if such failure shall continue and shall not be remedied by the Tenant within thirty (30) days after the Landlord shall have given to the Tenant a written notice specifying the same, or, in the case of a situation which cannot with due diligence be cured within a period of thirty (30) days if the Tenant shall not (1) within such thirty (30) day period, advise the Landlord of the Tenant's intention duly to institute all steps necessary to remedy such situation, and (2) duly institute within such thirty (30) day period, and thereafter diligently prosecute to completion, all steps necessary to remedy the same (but in any event

within ninety (90) days of receipt of written notice from the Landlord); (iii) whenever the Tenant is dissolved, makes assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or insolvent, files a petition or answer seeking for the Tenant any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest material allegations of a petition filed against the Tenant in any proceeding of this nature, or seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Tenant or of all or any substantial part of the Tenant's properties; or (iv) if within sixty (60) days after the commencement of any proceeding against the Tenant seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law, or regulation, the proceeding has not been dismissed; or if within sixty (60) days after the appointment without the Tenant's consent or acquiescence of a trustee, receiver, or liquidator of the Tenant or of all or any substantial part of the Tenant's properties, the appointment is not vacated or stayed; or if within sixty (60) days after expiration of any such stay, the appointment is not vacated.

b) If an event of default shall have happened and be continuing beyond the expiration of any applicable notice and/or cure period, the Landlord shall have the immediate right at its election (i) to terminate the Term of this Lease by giving the Tenant not less than five (5) days written notice of the Landlord's election to terminate, and (ii) whether or not the Landlord shall have terminated the Term of this Lease pursuant to this subsection, and upon proper court procedure, to re-enter and take possession of the Demised Premises under and by virtue of the provisions of the laws of the state where the Demised Premises are located or by such other proceedings as may be applicable, removing all persons and property therefrom either by summary process proceedings or by other court process, without being liable for any damages therefor.

c) If the Landlord elects to re-enter and take possession of the Demised Premises pursuant to Section 25(b), and whether or not the Landlord shall have terminated the Term of this Lease pursuant to Section 25(b), the Landlord shall use best efforts to (but shall be under no obligation to) re-let the whole or any part of the Demised Premises on behalf of the Tenant for a period equal to, or greater or less than, the remainder of the Term of this Lease, at such rent and upon such terms and conditions as the Landlord shall determine reasonable, to any tenant the Landlord may consider suitable and for any use or purpose the Landlord may deem appropriate in the Demised Premises. The Landlord shall not be liable for failure to re-let the Demised Premises, and the Landlord shall be entitled to receive and retain the rent received upon such reletting, whether or not such rent is in excess of the Rent.

d) If the Landlord elects to re-enter and take possession of the Demised Premises pursuant to Section 25(b), and whether or not the Landlord shall have terminated the Term of this Lease pursuant to Section 25(b), or re-let the Demised Premises pursuant to Section 25(c), the Tenant shall pay to the Landlord, as liquidated damages, within ten (10) days after written demand therefor, the following sums: (i) all unpaid Rent, as of the date of such re-entry, repossession or termination, plus the Fixed Rent and the additional rentals and charges from time to time payable under this Lease until what would have been the end of the Term of this Lease in the absence of such re-entry, repossession or termination; (ii) all reasonable expenses of maintaining the Demised Premises while vacant; (iii) all reasonable expenses, including

-24-

reasonable attorneys' fees, incurred by the Landlord in recovering possession of the Demised Premises, reletting the same and collecting the Rent; (iv) all reasonable costs of repairs and redecoration of the Demised Premises made to facilitate the reletting of the Demised Premises; and (v) all brokerage commissions incurred in the re-letting of the Demised Premises. The Landlord agrees that any rent received pursuant to a reletting shall be applied in mitigation of its damages. The Landlord shall be entitled to recover the amounts referred to in this subsection in one action or at the Landlord's option in several separate actions, and the Tenant agrees that no suit or recovery of any portion due the Landlord hereunder shall be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of the Landlord.

e) Nothing contained in this Lease shall, however, limit or prejudice the right of Landlord to prove and obtain in proceedings for bankruptcy or insolvency by reason of the termination of this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

### 25. Parking.

The Tenant and its employees, guests and invitees shall be entitled to utilize the non-exclusive, unreserved parking areas maintained by the Landlord on the Land, at no cost to the Tenant for the term of this Lease, including any extensions thereof. The Landlord shall ensure that at all times during the Term and the Renewal Term, if applicable, the Tenant and its employees, guests and invitees shall have the use of at least 4 spaces for every 1,000 square feet of rentable square feet within the Demised Premises.

### 26. Unperformed Covenants.

If the Tenant shall default in the performance of any of the Tenant's obligations hereunder, the Landlord, without thereby waiving such default, may, at the Landlord's option, by reason of any default of the Tenant hereunder, following ten (10) days prior written notice to Tenant and Tenant's failure to cure such default within such ten-day period, perform the same for the account of the Tenant. If the Landlord makes any payments or expenditures or incurs any obligations for the payment of money, including attorneys' fees, such sums paid or obligations incurred, together with interest at the Interest Rate, shall be paid by the Tenant to the Landlord on the first day of the calendar month next following the rendition to the Tenant of the Landlord's bill therefor to the Tenant.

### 27. Holding Over.

The Tenant shall pay to the Landlord an amount as Rent equal to one hundred fifty percent (150%) of one twelfth (1/12) of the Rent (including Fixed Rent and additional rent) required to be paid by the Tenant during the previous Lease Year as herein provided for each month or portion thereof for which the Tenant shall retain possession of the Demised Premises, or any part thereof, after the termination of the Term of this Lease, whether by lapse of time or otherwise, and also shall pay all damages sustained by the Landlord, whether direct or

consequential, on account thereof. The Landlord shall notify the Tenant in writing as early as possible in advance of the scheduled expiration of the Lease if the Landlord has committed the Demised Premises to another party or for an alternate use and the date by which the Demised Premises must be vacated following the expiration of the Lease to allow the Landlord to accommodate such other party or alternate use. The provisions of this Section shall not be deemed to limit or constitute a waiver of any other rights or remedies of the Landlord provided herein or at law. Without limiting any rights or remedies of the Landlord resulting by reason of the wrongful holding over by the Tenant, or creating any right in the Tenant to continue in possession of the Demised Premises, all of the Tenant's obligations with respect to the use, occupancy and maintenance of the Demised Premises shall continue during such period of unlawful retention.

### 28. Certain Rights Reserved by the Landlord.

The Landlord shall have the following rights, each of which the Landlord may exercise without notice to the Tenant and without liability to the Tenant for damage or injury to property, person or business on account of the exercise thereof, and the exercise of any such rights shall not be deemed to constitute an eviction or disturbance of the Tenant's use or possession of the Demised Premises and shall not give rise to any claim for set-off or abatement of rent or any other claim, provided that the Landlord agrees that in the exercise of such rights it shall not do or cause to be done anything which is, in any material respect, inconsistent with the operation of the Building as a first-class office building:

a) To change the Building's street address, if required by the U.S. Postal Service, or the Building's name.

b) To install, affix and maintain any and all signs on the exterior and on the interior of the Building.

c) To decorate or to make repairs, alterations, additions or improvements, whether structural or otherwise, in and about the Building, or any part thereof, and for such purposes to enter upon the Demised Premises during business hours upon twenty-four (24) hours prior notice, and during the continuance of any of said work, to close temporarily doors, entrances, public space and corridors in the Building and to interrupt or temporarily suspend services or use of facilities, all without affecting any of the Tenant's obligations hereunder, so long as the Demised Premises are reasonably accessible and usable and the Landlord uses reasonable efforts to minimize the disruption to the Tenant's use of the Demised Premises.

d) To be provided and to retain at all times, and to use in appropriate instances, keys to all doors within and into the Demised Premises. The Tenant agrees to change no locks, and not to affix locks on doors without the prior written consent of the Landlord, which consent shall not be unreasonably withheld or delayed. Notwithstanding the provisions for the Landlord's access to Demised Premises, the Tenant relieves and releases the Landlord of all responsibility arising out of theft, robbery and pilferage. Upon the expiration of the Term of this Lease or otherwise upon the Tenant's right to possession, the Tenant shall return all keys to the Landlord and shall disclose to the Landlord the combination of any safes, cabinets or vaults left in the Demised Premises.

e) To designate and approve all window coverings and lighting fixtures used in the Building to preserve the uniformity of appearance from the outside.

f) To approve the weight, size and location of safes, vaults, files and other heavy equipment and articles in and about the Demised Premises and the Building so as not to exceed the live load per square foot designated by the structural engineers for the Building, and to require all such items and furniture and similar items to be moved into or out of the Building and Demised Premises only at such times and in such manner as the Landlord shall direct in writing. The Tenant shall not install or operate machinery or any mechanical devices of a nature not directly related to the Tenant's ordinary use of the Demised Premises without the prior written consent of the Landlord, which consent shall not be unreasonably withheld or delayed. The Tenant's movements of property into or out of the Building or Demised Premises and within the Building are entirely at the risk and responsibility of the Tenant, and the Landlord reserves the right to require permits before allowing any property to be moved into or out of the Building or the Demised Premises.

g) To from time to time establish uniform controls for all tenants in the Building for the purpose of regulating all property and packages, both personal and otherwise, to be moved into or out of the Building and the Demised Premises and all persons using the Building after normal office hours.

h) To regulate delivery and service of supplies in order to insure the cleanliness and security of the Demised Premises and to avoid congestion of the loading docks, receiving areas and freight elevators.

i) To erect, use and maintain pipes, ducts, wiring and conduits, and appurtenances thereto, in and through the walls and floors within the Demised Premises at reasonable locations; provided that the Landlord shall use reasonable efforts to perform such work in a manner which will minimize the interference with the business being conducted by the Tenant within the Demised Premises.

29.   Waiver of Notice. [Intentionally Omitted]

30. Notices.

Any notice, approval, request, consent, bill, statement or other communication required or permitted to be given, rendered, served or made by either party hereto, shall be in writing and shall be sent by either (i) certified or registered United States Mail, postage prepaid, return receipt requested; or (ii) national overnight delivery carrier, delivery charges prepaid and receipt requested:

Addressed to the Tenant at:

New Century Mortgage Corporation
18400 Von Karman Ave., Suite 1000
Irvine, California 92612
Attention:  Corporate Services

with a copy to:

New Century Mortgage Corporation
18400 Von Karman Ave., Suite 1000
Irvine, California 92612
Attention:  Legal Department

Addressed to the Landlord at:

BCIA 95 GLASTONBURY BOULEVARD LLC
c/o CrossHarbor Capital Partners LLC
One Boston Place, Suite 2100
Boston, MA  02108
Attention: David Wamester

with a copy to

Kroll, McNamara, Evans & Delehanty LLP
29 South Main Street
West Hartford, CT 06107
Attention: Richard R. Rendeiro, Esq.

Notices shall be deemed to have been given on the date of documented delivery or refusal to accept same.  Either party may, from time to time, by written notice to the other, designate a different mailing address for notices, bills, statements or other communications intended for it.

31. Estoppel Certificate.

Landlord and Tenant shall, from time to time, within ten (10) days after the other party's written request, deliver to the requesting party or its designee a written certificate, in recordable form, ratifying this Lease, and stating (a) the Commencement Date, (b) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated), (c) that all conditions under this Lease to be performed by the Landlord have been satisfied or specifying which conditions have not been met, (d) that there are no defenses or offsets against the enforcement of this Lease by the Landlord, or stating those claimed by the Tenant, (e) the amount of advance rental, if any (or none if such is the case), paid by the Tenant, (f) the date to which rental has been paid, (g) the amount of security deposited with the Landlord, and (h) such other matters as the requesting party or its designee may reasonably request provided, however, that Landlord nor Tenant shall be required to make written declarations as to any matters which to its knowledge are inaccurate or not true.  Any

-28-

such certificate may be relied upon by any mortgagee of the Land and the Building, any assignee of such mortgagee, and any prospective purchaser of the Land and the Building, together with its mortgagee.

### 32. Limitation of Liability.

Anything in this Lease to the contrary notwithstanding, the Tenant agrees that it shall look solely to the estate and property of the Landlord in the Land and Building for the collection of any judgment (or other judicial process) requiring the payment of money by the Landlord in the event of any default or breach by the Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed or performed by the Landlord, and no other assets of the Landlord or of any stockholder, officer, director or partner in the Landlord shall be subject to levy, execution or other procedures for the satisfaction of the Tenant's remedies.

### 33. Rights of Landlord; Non-Waiver.

No right or remedy herein conferred upon or reserved to the Landlord is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing. The failure of the Landlord to insist upon the strict performance of any provision hereof or to exercise any option, right, power or remedy contained herein shall not be construed as a waiver or relinquishment thereof for the future. Receipt by the Landlord of any Fixed Rent, any additional rent or any other sum payable hereunder with knowledge of the breach of any provision hereof shall not be deemed a waiver of such breach, and no waiver by the Landlord of any provision hereof shall be deemed to have been made unless expressed in writing and signed by the Landlord. In addition to other remedies provided herein, the Landlord shall be entitled, to the extent not prohibited by law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the provisions hereof, or to a decree compelling performance of any of the provisions hereof, or to any other remedy allowed to the Landlord by law.

### 34. Broker.

Each party hereto warrants and represents to the other party, that it has had no dealings of any kind with any broker, or agent in connection with this Lease, or the Demised Premises, or in connection with the transaction represented by this Lease, other than Cushman & Wakefield of Connecticut, Inc. ("Landlord's Broker") and CB Richard Ellis ("Tenant's Broker"). Landlord and Tenant represent and warrant one to the other that they have not had any dealing with any other real estate brokers or agents in connection with the negotiation of this Lease. The Landlord and the Tenant indemnify and hold each other harmless from and against any and all liability and cost which the Landlord or the Tenant may suffer in connection with any other real estate brokers claiming by, through, or under either party seeking any commission, fee or payment in connection with this Lease. The Landlord shall pay a single commission to Landlord's Broker pursuant to its agreement with Landlord's Broker, and Landlord's Broker will pay a portion of said commission to Tenant's Broker, in accordance with Landlord's Broker's separate agreement with Tenant's Broker.

35. Notice of Lease.

a)  This Lease shall not be recorded in the Glastonbury Land Records.  Upon the request of either party, the other party shall execute a Notice of Lease, in recordable form, satisfying the requirements of Section 47-19 of the Connecticut General Statutes, Rev. 1958, as amended.  The party that requests such Notice of Lease shall pay any and all recordation costs incurred in connection with recordation of the Notice of Lease.

b)  The parties shall also enter into recordable supplementary notices setting forth, among other proper matters, such items as the termination of this Lease.

36. Prior Agreements.

This Lease constitutes the entire agreement by and between the parties hereto affecting the Demised Premises and supersedes any and all previous agreements, written or oral, between the parties and affecting the Demised Premises.

37. Captions: Sections: Gender.

The captions contained herein have been inserted for convenience only and shall not have the effect of modifying, amending or changing the express terms and provisions of this Lease. All references to a "Section" shall refer to a Section of this Lease unless the context otherwise requires.  Whenever used, the singular number shall include the plural, the plural the singular, and use of any gender shall include all genders.

38. Benefit and Burden.

The covenants, conditions, agreements and terms of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

39. Applicable Law.

This Lease shall be governed by and construed in accordance with the laws of the State of Connecticut.

40. Exhibits.

All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Lease.

41. Counterparts.

This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which counterparts together shall be deemed to be one and the same instrument.

## 42. Definition of Landlord.

The term "Landlord" as used in this Lease means only the owner of the Building and the Land, and in the event of any sale or sales of the Building and the Land, then Landlord shall be and hereby is entirely freed and relieved of all its covenants, obligations and liability hereunder except liabilities which accrued prior to such sale.

## 43. Force Majeure.

Landlord shall be excused for the period of any delay in the performance of any obligations hereunder, when prevented from so doing by cause or causes beyond Landlord's control which shall include, without limitation, all labor disputes, civil commotion, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, fire or other casualty, inability to obtain any material, services, or through acts of God. Tenant shall similarly be excused for delay in the performance of obligations hereunder provided:

a) Nothing contained in this Section or elsewhere in this Lease shall be deemed to excuse or permit any delay in the payment of any sums of money required hereunder, or any delay in the cure of any default which may be cured by the payment of money;

b) No reliance by Tenant upon this Section shall limit or restrict in any way Landlord's right of self-help as provided in this Lease; and

c) Tenant shall not be entitled to rely upon this Section unless it shall advise Landlord in writing, of the existence of any force majeure preventing the performance of an obligation of Tenant within ten (10) days after the commencement of the force majeure.

## 44. Mortgagee Protection.

Tenant agrees to give any mortgagees of Landlord, by registered mail, a copy of any notice of default served upon Landlord, provided that prior to such the notice Tenant has been notified, in writing (by way of a notice of Assignment of Rents and Leases, or otherwise), of the address of such mortgagees. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagees shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such thirty (30) days, any mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default, in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

## 45. Relocation of Premises. [Intentionally Omitted]

## 46. Submission not an Offer.

The submission of a draft of this Lease or a summary of some or all of its provisions does not constitute an offer to lease or demise the Demised Premises, it being understood and agreed that neither Landlord nor Tenant shall be legally bound with respect to the leasing of the

-31

Demised Premises unless and until this Lease has been executed by both Landlord and Tenant and a fully executed copy has been delivered to each of them.

47. Authority of Tenant.

Tenant represents and warrants to Landlord (which representations and warranties shall survive the delivery of this Lease) that: (a) Tenant (i) is duly organized, validly existing and in good standing under the laws of its state of organization, (ii) has the corporate power and authority to carry on businesses now being conducted and is qualified to do business in every jurisdiction where such qualification is necessary, and (iii) has the corporate power to execute and deliver and perform its obligations under this Lease, and (b) the execution, delivery and performance by Tenant of its obligations under this Lease have been duly authorized by all requisite corporate action and will not violate any provision of law, any order of any court or other agency of government, certificate of formation, operating agreement, limited liability company agreement, or other operative documents of Tenant or any indenture, agreement, or other instrument to which it is a party or by which it is bound.

48. **PREJUDGMENT REMEDY, REDEMPTION, COUNTER-CLAIM AND JURY TRIAL.**

TENANT, FOR ITSELF AND FOR ALL PERSONS CLAIMING THROUGH OR UNDER IT, HEREBY ACKNOWLEDGES THAT THIS LEASE CONSTITUTES A COMMERCIAL TRANSACTION AS SUCH TERM IS USED AND DEFINED IN SECTION 52-278A OF THE CONNECTICUT GENERAL STATUTES, REVISION OF 1958, AS AMENDED, AND HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS WHICH ARE OR MAY BE CONFERRED UPON TENANT BY SAID ACT TO ANY NOTICE OR HEARING PRIOR TO A PREJUDGMENT REMEDY, AND BY ANY PRESENT OR FUTURE LAW TO REDEEM THE DEMISED PREMISES, OR TO ANY NEW TRIAL IN ANY ACTION OR EJECTION UNDER ANY PROVISIONS OF LAW, AFTER REENTRY THEREUPON, OR UPON ANY PART THEREOF, BY LANDLORD, OR AFTER ANY WARRANT TO DISPOSSESS OR JUDGMENT IN EJECTION. IF LANDLORD SHALL ACQUIRE POSSESSION OF THE DEMISED PREMISES BY SUMMARY PROCEEDINGS, OR IN ANY OTHER LAWFUL MANNER THROUGH JUDICIAL PROCEEDINGS, IT SHALL BE DEEMED A REENTRY WITHIN THE MEANING OF THAT WORD AS USED IN THIS LEASE. IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF RENT OR OTHER CHARGES PROVIDED FOR IN THIS LEASE, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING OR ACTION.

TENANT AND THE LANDLORD BOTH WAIVE A TRIAL BY JURY OF ANY OR ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES HERETO OR THEIR SUCCESSORS, UNDER OR CONNECTED WITH THIS LEASE, OR ANY OF ITS PROVISIONS.

TENANT CONFIRMS THAT IT HAS REVIEWED THESE WAIVERS WITH ITS ATTORNEY AND MAKES THESE WAIVERS FREELY AND VOLUNTARILY.

### 49. Joint and Several Liability.

If there shall be more than one Tenant, the obligations hereunder imposed upon Tenant shall be joint and several. If there shall be a guarantor of Tenant's obligations hereunder, the obligations hereunder imposed upon Tenant shall be the joint and several obligations of Tenant and such guarantor and Landlord need not first proceed against Tenant before proceeding against such guarantor nor shall any such guarantor be released from its guaranty for any reason whatsoever, including without limitation, waivers hereof or failure to give such guarantor any notices hereunder.

### 50. Costs of Collection.

In the event of default by either party in the performance of any of the covenants of this Lease, then the defaulting party agrees to pay any and all costs incurred in the collection and enforcement thereof, including reasonable attorneys' fees.

### 51. Option to Terminate.

The Tenant shall have the one-time right to terminate this Lease effective on the third anniversary of the Commencement Date (the "Termination Date"), upon twelve (12) months' prior written notice to the Landlord ("Termination Option"). If the Tenant exercises the Termination Option, the Tenant shall pay to the Landlord an amount equal to the aggregate of the following transaction costs (the "Transaction Costs"): (i) the unamortized portion of the cost of Landlord's Work as set forth in Section 5 above; (ii) the unamortized portion of brokers' commissions paid to the Brokers by the Landlord in connection with this Lease; (iii) the unamortized portion of all of the Landlord's legal expenses and architects' fees incurred in connection with this Lease; and (iv) $23,954.00. The amortization period shall be five (5) years (straight line, without interest), beginning on the Commencement Date. All of such Transaction Costs shall be determined by the Landlord and set forth in an addendum or amendment hereto to be signed by the parties hereto within one hundred twenty (120) days following the execution of this Lease. The Landlord will provide the Tenant with a statement of the unamortized Transaction Costs (the "Unamortized Transaction Costs") as of the effective Termination Date, within twenty (20) days following its receipt of the Termination Option exercise notice. The Tenant shall pay to the Landlord the amount reflected on the Landlord's statement on or before the date thirty (30) days after its receipt of such statement from Landlord. If the Tenant shall fail to pay the amount reflected on the Landlord's statement within the stated time period, its early termination notice shall be void and of no further force or effect. Upon the effective delivery of the early termination notice, the Tenant shall no longer have any Renewal Option or rights of first offer with respect to space contiguous to the Demised Premises (as defined below).

### 52. Notice of Availability of Contiguous Space.

Provided the Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period, the Landlord shall provide the Tenant with a notice of availability (the "Contiguous Space Notice") of any rentable area(s) contiguous to the Demised Premises that become available for lease, prior to the time the Landlord shall commence marketing or remarketing efforts with respect thereto. In the event the Tenant notifies the

Landlord in writing (the "Tenant's Notice of Interest") within fifteen (15) business days after the date of the Contiguous Space Notice that the Tenant has an interest in leasing such contiguous space, the Landlord agrees that it shall enter into good faith negotiations with the Tenant for the leasing and rental to the Tenant of such contiguous space on terms and conditions acceptable to both the Landlord and the Tenant prior to embarking on the marketing or remarketing efforts with respect to such space. If such good faith negotiations do not result in an agreement between the Landlord and the Tenant within thirty (30) days after the Landlord receive the Tenant's Notice of Interest, the Landlord shall have the right thereafter to commence and pursue its marketing and remarketing efforts with respect to such space. The provisions of this Section 52 are not intended to, and shall not grant to the Tenant, any option or right of first refusal with respect to any space in the Building.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the Landlord and the Tenant have hereunto caused to be set their hands and seals as of the day and year first above written.

WITNESSES:

LANDLORD:
**BCIA 95 GLASTONBURY BOULEVARD LLC**, a Delaware limited liability company

By:  BCIA EQUITY PARTNERS LLC, a Delaware limited liability company, its Managing Member

By:  BOSTON CAPITAL INSTITUTIONAL ADVISORS LLC, a Delaware limited liability company, its Manager

_____
Printed Name:

By:  _____
Printed Name:
Title:

_____
Printed Name:

TENANT:
**NEW CENTURY MORTGAGE CORPORATION**, a California corporation, dba Home123

_____
Printed Name:

By:  _____
Printed Name:
Title:

_____
Printed Name:

-35

## EXHIBIT A

## FLOOR PLAN

[See attached]

# EXHIBIT B

## DESCRIPTION OF THE LAND

Parcel I

ALL THOSE CERTAIN two (2) lots or parcels of land located in the Town on Glastonbury, County of Hartford and State of Connecticut being shown and designated as Lot "7" and Lot "9" on a certain map entitled "Subdivision Plan Somerset Square Subdivision Lots 7 and 9 Prepared for Glastonbury Park Associates II Glastonbury, CT." prepared by Luchs and Beckerman Civil Engineers - Planners - Land Surveyors Glastonbury, Conn. A-84-104-7-9-S, "Map") ( a copy of which Map has been filed in the Office of the Glastonbury Town Clerk), and being more particularly bounded and described as follows:

Lot No. 7:

a)  Beginning at a point on the northerly street line of Glastonbury Boulevard, which point marks the southeast corner of the parcel herein described and the southwest corner of land shown and designated as land now or formerly of Glastonbury Park Associates II on the aforesaid Map; thence S 79°-41-20.7" W for a distance of 275 feet along the northerly street line of Glastonbury Boulevard to a point; thence N 10°-18'-39.3" W for a distance of 433.67 feet to a point; thence N 34°-41'-20.7" E for a distance of 35.36 feet to a point; thence N 79°-41'-20.7" E for a distance of 250.00 feet to a point; thence S 10°-18'-39.3" E for a distance of 458.67 feet to the point and place of beginning, the last four (4) courses being along land now or formerly of Glastonbury Park Associates II.

Lot No. 9:

Beginning at a point on the southerly street line of Connecticut Route 3, which point marks the northeast corner of the parcel herein described and the northwest corner of land shown and designated as land now or formerly of Glastonbury Park Associates II on the aforesaid Map; thence S 10°-18'-39.3" E for a distance of 289.93 feet along land now or formerly of Glastonbury Park Associates II to a point; thence S 79°-41'-20.7" W for a distance of 506.00 feet to a point; thence along a line curving to the right having a radius of 351.02 feet and a delta of 55°-25'-45" for a distance of 339.58 feet to a point; thence N 73°-29'-26" E for a distance of 306.24 feet to the point and place of beginning, the last two (2) courses being along the aforesaid southerly street line of Connecticut Route 3.

Parcel II

TOGETHER WITH AND SUBJECT TO the terms and conditions of that certain Declaration of Somerset Square dated as of October 20, 1988 establishing the Common Interest Community known as Somerset Square and recorded in the Glastonbury Land Records in Volume 461 at Page 1, as amended. (Lot No. 7 described above being the same premises as the premises designated as "Lot C" in the aforesaid Declaration of Somerset Square and Lot No. 9

described above being the same premises as the premises designated as "Lot E" in the aforesaid Declaration of Somerset Square).

AND ALSO TOGETHER WITH AND SUBJECT TO the terms and conditions of that certain Declaration of Somerset Square Northeast Quadrant dated as of November 16, 1988 establishing the Common Interest Community known as Somerset Square Quadrant and recorded in the Glastonbury Land Records in Volume 461 at Page 101, as amended. (Lot No. 7 described above being the same premises as the premises designated as "Lot CC" in the aforesaid Declaration of Somerset Square Northeast Quadrant and Lot No. 9 described above being the same premises as the premises designated as "Lot EE" in the aforesaid Declaration of Somerset Square Northeast Quadrant).

Parcel III

AND ALSO TOGETHER WITH AND SUBJECT TO the rights set forth in an Assignment (the 115 Assignment") dated December 13, 1998 granted by Glastonbury Park Associates II to Fourth Somerset Associates Limited Partnership and recorded in the Glastonbury Land Records in Volume 464 at Page 112, as amended by (i) First Amendment of Quitclaim Deeds dated June 12, 1989 between Glastonbury Park Associates II, Fourth Somerset Associates Limited Partnership and The Guardian Insurance & Annuity Company, Inc. and recorded in the Glastonbury Land Records in Volume 495 at Page 161 and (ii) an unrecorded Amendment of Quitclaim Deeds dated June 12, 1989 between Fourth Somerset Associates Limited Partnership and The Guardian Insurance & Annuity Company, Inc. and (iii) Agreement by and between Glastonbury Park Associates II and Guardian Insurance & Annuity Company, Inc. dated June 12, 198 and recorded in Volume 495, Page 150 of the Glastonbury Land Records.


Subject to all matters of record.

# EXHIBIT C

## LANDLORD'S WORK

**[See attached]**

# EXHIBIT D

# NEW CENTURY MORTGAGE BUILDING STANDARDS
## RETAIL BRANCH

**DATA/TELECOMMUNICATIONS CABLING**
Remove all existing data cabling.
New phone and data cabling to be installed by tenant.
**EQUIPMENT ROOM**
Approximately 5' X 10'
¾" X 4' x 8' painted plywood mounted vertically, 3"AFF.
One dedicated circuit with quad electrical outlets
Refer to "New Century Backboard" Spec.pdf".
Contact IT Project Manager for other requirements
**SECURITY**
Rough-in & power for:
Access panel adjacent to suite entry door.
Contact Security Manager for other requirements.
**SYSTEMS FURNITURE**
One electrical 'J' box with 3 circuits for each six cubicles (for cubicles away from walls or columns,
provide a monument in the floor).
'J' box with conduit/monument and pull string for data cabling at each electrical supply location.

**PRIVATE OFFICE**
Approximately 10' X 13' -- should have two interior windows on 90 degree walls, minimum glass of
4'H X 5'W  - 30" AFF with blinds to match the exterior windows
One 20A circuit for every two offices.
Electrical duplexes on opposite walls.
Data outlet box provided next to each electrical outlet location with conduit in the wall to ceiling height
and a pull string.
**OFFICE EQUIPMENT**
Dedicated 20A circuit with a data outlet at each copier location.
**GENERAL LIGHTING**
Large cell parabolic lens; 50 foot-candles at desk height.
**GENERAL FINISHES**
Paint : Primary Color PT-1 - Benjamin Moore #2126-60 "Gray Cloud" Low VOC TYP or comparable.
Accent color PT-2 -- Benjamin Moore #2118-50 Excaliber Gray; PT-3 -- Benjamin Moore #2122-
30 Cloudy Sky; PT-3 -- Benjamin Moore #2128-40 Oxford Gray.
Carpet: Shaw; Simplicity EW24 #59344 Color Harbouring Desire #40485 Graphic Loop or
comparable.
Base: Burke; Sterling 663P or comparable.

**CLOSING ROOM**
Approximately 9.5' X 10' -- close proximity to suite entrance
Duplex  outlet and cabling coordinated with table configuration and location.
Duplex on every wall. Data outlet box provided next to one electrical outlet location with conduit in the
wall to ceiling height and a pull string.
Door sidelight 30" by door height
**BREAKROOM/STOREROOM**
Approximately 10' X 25' --existing breakroom to remain with no modification to current size.
Existing finishes to remain.  Landlord will strip and wax existing vct floor.  Existing vinyl wallcovering,
base and upper millwork cabinetry, counter-top and sink to remain.
Millwork cabinets (upper & lower): Counter Top - ; Cabinet Base --
Sink  instant-hot unit

Electrical outlets for:
> Full-size refrigerator
> Microwave oven
> Coffee machine
> Water dispenser

**RECEPTION**

One duplex electrical outlet and one data outlet

**CONSTRUCTION DRAWINGS**

Single .dwg file with a layout tab for each construction as-built set sheet. Xref's are bound. Proxy items converted to standard AutoCAD objects.

.pdf with complete set of dimensions for all walls, including  locations of electrical outlets and plumbing

## EXHIBIT E

## RULES AND REGULATIONS
## 95 GLASTONBURY BOULEVARD
## GLASTONBURY, CONNECTICUT

1.      The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors and public parts of the Building shall not be obstructed or encumbered by Tenant or used by Tenant for any purpose other than ingress and egress to and from the premises.

2.      No sign or lettering shall be affixed by Tenant on any part of the outside of the premises, or on any part of the inside of the premises so as to be clearly visible from the outside of the premises, without the prior written consent of Landlord. However, Tenant shall have the right to place its name on any door leading into the premises, the size, color and style thereof to be subject to Landlord's approval, which approval shall not be unreasonably withheld or delayed. Landlord shall place tenant's name on the directory in the lobby of the Building. Tenant shall not have the right to have additional names placed on the directory without Landlord's prior written consent which shall not be unreasonably withheld.

3.      All blinds on exterior windows shall remain down at all times and the windows in the premises shall not be covered or obstructed by Tenant.

4.      Tenant shall not make, or actively permit to be made, unseemly or disturbing noises or interfere with other tenants or those having business with them.

5.      No additional locks or bolts of any kind shall be placed upon any of the doors without prior written consent of Landlord.

6.      The carrying in or out of freight, furniture or bulky matter of any description must take place during such hours as Landlord may from time to time reasonably determine. Elevator cabs must be padded and masonite should be placed on the lobby floors if heavy items are being moved.

7.      Landlord reserves the right to reasonably prescribe the weight and position of all safes, files and other heavy equipment so as to distribute properly the weight thereof and to prevent any unsafe condition from arising. Business machines and other equipment shall be maintained at Tenant's expense in settings sufficient in Landlord's reasonable judgment to absorb and prevent unreasonable vibration, noise and annoyance.

8.      Tenant shall comply with such security regulations as Landlord may from time to time reasonably adopt. Such security regulations may provide for the carrying and/or display of security passes by any occupants of the Building during non-business hours and non-business days and such other days and hours as Landlord may deem necessary or desirable for the orderly management of the Building.

9.      Landlord may designate areas for the Tenant and its employees to park their cars in and Tenant shall supply to Landlord the license numbers of all cars used by it and its

employees and shall observe the parking restrictions established by Landlord. No overnight parking of cars will be permitted.

10.     Tenant shall not put any covering of any type or nature upon the exterior of windows in the Demised Premises. Landlord shall have the right to approve the coverings placed on windows on the interior of the premises, which approval shall not be unreasonably withheld or delayed.

11.     Landlord shall not be responsible to Tenant for the nonobservance or violation of any of these rules and regulations by any other tenants.

12.     No smoking shall be allowed in any common area of the building, including, but not limited to lavatories, common corridors, public lobby areas and inside building entrances.

13.     Landlord will take no responsibility for any automobiles in the parking lot as it relates to vandalism, or for cars "plowed in" during the snow season.

14.     Due to recycling laws issued by the State of Connecticut, effective January 1, 1991, the following items must be recycled: white office paper, newspapers, glass bottles and cans, and corrugated cardboard.

The Landlord will provide receptacles for these items to be separated as required. However, it is the responsibility of the Tenant to flatten all cardboard boxes to allow maintenance to dispose of them properly. It is also the Tenant's responsibility to separate all of the above items and work with their individual employees on doing so.

## EXHIBIT F

## OUTLINE OF CLEANING SERVICES

CLEANING SPECIFICATIONS FOR TENANT OFFICE SPACE

Daily:

1. Empty trash receptacles, replace liners as necessary and damp wipe exterior and interior.

2. Spot clean by damp wiping fingerprints, smears, smudges on doors, frames, light switches, kick and push plates, handles, glass surfaces and walls. Empty, damp clean all ashtrays.

3. Dust all furniture including desks, chairs, tables, shelves, filing cabinets, bookcases, coat racks, etc. NOTE: Telephone and normal desk accessories to be moved and cleaned under.

4. Clean and sanitize all telephones.

5. Spot wash and clean both sides of suite entrance glass doors; dust wooden entrance doors.

6. Low dust to hand height all horizontal surfaces of equipment, ledges, sills and baseboards.

7. Vacuum all carpets wall to wall.

8. Spot clean carpet with approved cleaning agents.

9. Dust mop all hard surface floors with treated dust mop as applicable. Special hard floor surfaces to be treated differently, i.e. marble, etc.

CLEANING SPECIFICATIONS FOR COMMON AREAS

A.    ATRIUM/LOBBIES/COMMON CORRIDORS

Daily:

1. Empty trash receptacles, replace liners as necessary and damp wipe exterior and interior.

2. Empty, damp clean and polish all sand urns making sure no ash haze or fingerprints remain visible.

3. Dust all furniture including desks, chairs, tables, shelves and all other pieces of furniture in the lobby areas. NOTE: telephone and normal desk accessories to be moved and cleaned under.

4.      Clean and sanitize all telephones.

5.      Completely wash and clean all glass entries, including any revolving doors. Damp wipe door frames and handles.

6.      Inspect all signage in lobbies and common areas including directories; clean as necessary. Products used are to be approved of by the Owners.

7.      Vacuum all upholstered furniture, including chairs and couches.

Flooring

a.      Atrium floor specifications will be provided by Building Management.

b.      Vacuum all carpets wall to wall. Using edge or backpack edge carpeting as require paying particular attention to wooden baseboard.

c.      Spot clean carpet with approved cleaning agents.

d.      Dust mop all hard surface floors with treated dust mop as applicable.

NOTE: No art work, or casing of same, is to be touched by cleaning personnel.

B.      PUBLIC RESTROOMS

Daily:

1.      Clean, sanitize and polish all vitreous fixtures including toilet bowls, seats and urinals. Clean, sanitize and polish all sinks using a germicidal detergent solution.

2.      Clean and polish all chrome fittings and bright work including shelves, flushometers and metal dispensers.

3.      Clean and polish all glass and mirrors.

4.      Empty all containers and disposals, replace liners. Waste and refuse will be removed to designated areas.

5.      Refill all dispensers (napkin, soap, tissue, towels, liners in trash receptacles and sanitary napkin containers. Supplies will be furnished by Owner. Owner will collect money monthly.

6.      Dust and spot clean all toilet partitions, tile, walls, dispensers and receptacles.

7.      Wet mop or wash entire floor with a germicidal disinfectant cleaning solution.

8.      Machine scrub floors once each month.

C.    STAIRWELLS

Weekly:

      1.    Police all stairwells for trash and cigarette butts.

      2.    Sweep stairs and landings weekly.

      3.    Spot clean walls as required.

      4.    Damp clean handrails and ledges.

D.    ELEVATORS

Daily:

      1.    Vacuum elevator carpets daily and spot clean same.

      2.    Clean and vacuum all metal entrance and elevator saddles.

      3.    Spot clean walls as required.

      4.    Shampoo elevator carpets weekly - November through April Shampoo elevator carpets monthly - May through October

      5.    Polish elevator saddles monthly.