IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |

**ORDER GRANTING ADEQUATE PROTECTION PURSUANT TO BANKRUPTCY
CODE SECTIONS 105(a), 361, 362 AND 363(b)(1) AND ESTABLISHING
PRELIMINARY PROCEDURES FOR RESOLVING CERTAIN CLAIMS**

This matter coming before the Court on the Debtors' Motion For Order to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) (the "Motion") filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing held before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A); (c) due and sufficient notice of the Motion has been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, and

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

RLF1-3171996-1

other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor;[2]

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is hereby GRANTED to the extent provided for herein.

2. Within 5 days of the entry of this Order, the Debtors shall authorize FISERV to provide to each Affected Repurchase Counterparty and Affected Loan Purchaser (as each of those terms is defined below): (a) mortgage loan level payment histories for each mortgage loan that an Affected Repurchase Counterparty or Affected Loan Purchaser asserts it owns (or owned at the relevant time) and as to which Affected Funds (as that term is defined below) have not been turned over; (b) "Daily Cash Audit Trails" for periods of time specified by each Affected Repurchase Counterparty or Affected Loan Purchaser; and (c) "Investor Cutoff Reports" for periods of time specified by each Affected Repurchase Counterparty or Affected Loan Purchaser. Prior to requesting any information or reports from FISERV, an Affected Repurchase Counterparty or Affected Loan Purchaser that seeks to obtain such information or reports from FISERV shall deliver to the Debtors and the Committee a list of the loans that it asserts it owns (or owned at the relevant time) and for which it seeks this information and shall be entitled to seek such information from FISERV only with respect to loans on such list to which the Debtors or the Committee have not asserted within 5 business days is not (or was not at the relevant time) subject to a transaction with the Affected Repurchase Counterparty or Affected Loan Purchaser. An Affected Repurchase Counterparty or Affected Loan Purchaser that seeks to obtain such information or reports from FISERV shall be responsible for any and all arrangements with FISERV related to the preparation of such requested information and reports. The Debtors will seek to authorize the production of such requested reports and information under their existing

---

[2] Capitalized terms not defined herein shall have the meanings given to them in the Motion.

2

RLF1-3171996-1

agreements with FISERV and will be responsible for the payment of any fees and costs owed to FISERV related to the generation of such information and reports; provided, however, that to the extent that information or a report requested by an Affected Repurchase Counterparty or Affected Loan Purchaser results in fees or charges owed to FISERV in excess of what the Debtors would otherwise owe to FISERV, the Affected Repurchase Counterparty or Affected Loan Purchaser shall be responsible for payment of such incremental fees and charges. The Debtors' responsibilities related to such reports and information shall be limited to giving FISERV the authorization to respond to requests for such information and reports submitted to FISERV by an Affected Repurchase Counterparty or Affected Loan Purchaser and paying the fees and charges owed to FISERV for which the Debtors are responsible as set forth above. Any dispute concerning access to information from FISERV may be submitted to the Court for expedited determination.

3.      The Debtors, after consultation with and review by the Committee, shall complete on or before June 29, 2007 an accounting of all funds received by the Debtors since the last settlement date prior to the Petition Date applicable to each Affected Repurchase Counterparty and Affected Loan Purchaser for principal, interest, paid in full funds, or other payments, as the case may be (the "Accounting Period"), for each mortgage loan subject to Repurchase Agreements of Affected Repurchase Counterparties or mortgage loan sold to Affected Loan Purchasers to the extent such funds have not been turned over by the Debtors to the party claiming an interest in such funds (such funds, the "Affected Funds"). The settlement dates for each Affected Repurchase Counterparty are set forth in Exhibit A hereto. The settlement date for an Affected Loan Purchaser shall be the closing date for the sale of the mortgage loan in question.

4. On or before June 29, 2007, the Debtors shall provide (i) to all known Repurchase Counterparties and Loan Purchasers that claim or may have an interest in any Affected Funds (each an "Affected Repurchase Counterparty" or "Affected Loan Purchaser"; and collectively, the "Affected Repurchase Counterparties and Loan Purchasers"), a report summarizing on a global basis the Debtors' accounting of all such Affected Funds received by the Debtors during the Accounting Period and the identity of each Affected Repurchase Counterparty and Affected Loan Purchaser involved and the amount of each of their respective claims (the "Global Report"), and (ii) to each individual Affected Repurchase Counterparty and Affected Loan Purchaser, an individualized report summarizing the Debtors' accounting, on a loan-by-loan basis (by loan number), of any Affected Funds received by the Debtors during the Accounting Period (each an "Individual Report"). The Individual Reports shall include a copy (in electronic format, if possible) of the base data supplied to the Debtors by FISERV used by the Debtors to generate the Individual Report. The Debtors shall promptly provide the Committee's professionals with copies of the Global Report, all Individual Reports and the FISERV base data supplied with Individual Reports. The Committee's professionals may share the Global Report with members of the Committee but shall not share Individual Reports or the FISERV base data with members of the Committee.

5. On or before July 20, 2007, each Affected Repurchase Counterparty or Affected Loan Purchaser shall (i) advise the Debtors and the Committee that it concurs with the information contained in the Individual Report, or, if it does not concur, (ii) provide the Debtors and the Committee with its alternative accounting in writing (an "Alternative Accounting"). An Alternative Accounting may also dispute whether funds collected prior to the Accounting Period had been properly accounted for and settled, in which case such Alternative Accounting shall

4

identify the specific issue(s) and/or payment(s) (by loan number) that arose prior to the Accounting Period that the Affected Repurchase Counterparty or Affected Loan Purchaser asserts remains unresolved. If any Affected Repurchase Counterparty or Affected Loan Purchaser fails to provide an Alternative Accounting by July 20, 2007, it shall conclusively be deemed to concur with and consent to the information and conclusions contained in the Debtors' Individual Report, including the determination that issues and payments dealt with in prior settlements covering periods prior to the Accounting Period have been properly accounted for and have been settled. In the event that an Affected Repurchase Counterparty or an Affected Loan Purchaser provides an Alternative Accounting, the Debtors and the Committee and such Affected Repurchase Counterparty or Affected Loan Purchaser shall promptly, but in no event later than fifteen (15) days from receipt of such Alternative Accounting, attempt to reconcile the information contained in the Individual Report and the Alternative Accounting and reach a consensus as to the correct information to be included in such Affected Repurchase Counterparty's or Affected Loan Purchaser's Individual Report. In the event an agreement is reached, the Debtors shall then revise the Individual Report to reflect such agreed-to information (a "Corrected Individual Report"). Each Corrected Individual Report shall specify with particularity any and all changes or amendments made to the applicable Individual Report. All disputes with respect to the reconciliation of an Individual Report with an Alternative Accounting (each a "Reconciliation Dispute"), the Escrowed Funds and the Affected Funds shall be addressed in proceedings before the Court that occur after the termination of the Stay Period (as that term is defined below). For avoidance of doubt, no party in interest (including, without limitation, the Debtors, the Committee, the Affected Repurchase Counterparties and the Affected Loan Purchasers) shall take any action with respect to resolving a Reconciliation Dispute or with

5

respect to the Escrowed Funds or the Affected Funds prior to the termination of the Stay Period unless otherwise ordered by the Court following notice to the Debtors, the Committee and all other Affected Repurchase Counterparties and Affected Loan Purchasers.

6. On or before July 23, 2007, the Debtors, after consultation with and review by the Committee, shall deliver to each Affected Repurchase Counterparty and Affected Loan Purchaser, (A) a report (i) identifying the account(s) (other than (x) segregated accounts established for the Affected Repurchase Counterparty or Affected Loan Purchaser from which transfers were made only to the Affected Repurchase Counterparty or Affected Loan Purchaser or to an intended recipient of such funds other than a Debtor or an affiliate of a Debtor (e.g., payments to taxing authorities or insurance carriers from T&I accounts), or (y) zero balance accounts) into which Affected Funds applicable to such Affected Repurchase Counterparty or Affected Loan Purchaser were deposited by the Debtors during the Accounting Period (the "Account(s)"), (ii) listing all debits and credits to the Account(s) during the Accounting Period, and (iii) identifying the daily balance for the Account(s) during the Accounting Period, and (B) schematic charts showing the representative flow of funds collected on mortgage loans in which the Affected Repurchase Counterparties and Affected Loan Purchasers assert an interest from the time of receipt by the Debtors until such funds were either expended or segregated for the benefit of or paid to an Affected Repurchase Counterparty or Affected Loan Purchaser, which charts shall differentiate such funds flows for the times (i) prior to blockage of an existing control account or the establishment of a blocked or custodial account for the benefit of an Affected Repurchase Counterparty or Affected Loan Purchaser (a "Shift Notice"), if any, (ii) on and after a Shift Notice and prior to the Petition Date, and (iii) on and after the Petition Date.

7. The Debtors and the Committee on the one hand, and the Affected Repurchase Counterparties and the Affected Loan Purchasers on the other hand, shall commence on August 6, 2007 a meet and confer period to discuss topics including (i) legal arguments, if any, the Debtors and/or the Committee may have in opposition to the recovery of funds from the Debtors and/or their estates by the Affected Repurchase Counterparties and the Affected Loan Purchasers, (ii) outstanding factual issues, if any (iii) the mechanism of distributing the Escrowed Funds among the Affected Repurchase Parties and the Affected Loan Purchasers, and (iv) a timetable/schedule, to the extent necessary, for litigation/discovery/briefing.

8. The meet and confer period referenced above in paragraph 7 shall conclude at 5:00 p.m. (New York Time) on August 20, 2007, unless extended by consent of all of the Debtors, the Committee, the Affected Repurchase Counterparties and the Affected Loan Purchasers (such time and date, the "Outside Date"). From and after the entry of this Order through the occurrence of the Outside Date (such period of time, the "Stay Period"), all parties in interest, including without limitation, the Debtors, the Committee, the Affected Repurchase Counterparties and the Affected Loan Purchasers shall be barred from taking any action (including, without limitation, taking discovery, filing any adversary proceedings, any motions or otherwise seeking relief before any court of competent jurisdiction) with respect to any of the Affected Funds or any of the Escrowed Funds; provided, however, that nothing in this Order or elsewhere shall prevent (i) the Debtors (or their subservicer) from distributing to an Affected Repurchase Counterparty or Affected Loan Purchaser funds received on or after the Petition Date ("Postpetition Affected Funds") which Postpetition Affected Funds have not been deposited in any of the Debtors' accounts, (ii) the Debtors (or their subservicer) from identifying Postpetition Affected Funds that have been deposited by the Debtors into an account maintained

by the Debtors and, after review by and consultation with the Committee (acting through its financial advisors) distributing such Postpetition Affected Funds to the Affected Repurchase Party or the Affected Loan Purchaser that has an interest in the loan or loans with respect to which such Postpetition Affected Funds were received, or (iii) an Affected Repurchase Counterparty or Affected Loan Purchaser from receiving any funds held in a segregated account established for its benefit (and any institution holding such funds is hereby directed and authorized to deliver them immediately to the Affected Repurchase Counterparty or Affected Loan Purchaser). Upon the earlier of the occurrence of the Outside Date and ten (10) days after the final completion of all Corrected Individual Reports, the Debtors shall prepare and distribute to all Affected Repurchase Counterparties and Loan Purchasers and the Committee an amended Global Report which incorporates all of the changes made by the Corrected Individual Reports. The Debtors shall file in the pending adversary proceedings that are affected by the stay set forth herein appropriate notices of the stay of those proceedings (or the applicable provisions of such adversary proceeding) during the Stay Period.

9. Promptly upon, but not less than two (2) business days after, the closing on the sale of Debtors' servicing business to Carrington Capital Management, LLC and Carrington Mortgage Services, LLC pursuant to the Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007 (the "Carrington Sale"), the Debtors shall place into an interest-bearing escrow account the sum of $39,331,614.71, which sum, together with the amount of $2,670,000 previously placed in escrow by the Debtors pursuant to the Stipulated Scheduling Order Regarding UBS Real Estate Securities Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction, dated as of May 15, 2007 (D.I. No. 36) (the "UBS Order") shall be the "Escrowed Funds" for purposes herein. Such Escrowed Funds will be held

in two escrow accounts established with an institution selected by the Debtors after consultation with the Committee, UBS Real Estate Securities Inc., and the other Affected Repurchase Counterparties and Affected Loan Purchasers (the "Escrow Agent"). One such escrow account shall be established with the Escrow Agent in the amount of $39,331,614.71 from funds deposited by the Debtors from the proceeds of the Carrington Sale and the other escrow account will be funded by transferring to the Escrow Agent the funds in the existing escrow account established pursuant to the UBS Order. Notwithstanding the establishment of two separate escrow accounts, the rights of all parties with respect to all Escrowed Funds are preserved. Escrowed Funds shall be distributed in accordance with, and only after the expiration of five (5) business days after the entry of, a further order of this Court after notice to the Debtors, the Committee and all Affected Repurchase Counterparties and Affected Loan Purchasers.

10. To the extent that an Affected Repurchase Counterparty or an Affected Loan Purchaser is determined (by order of the Court or consent of the Debtors, the Committee and such Affected Repurchase Counterparty or Affected Loan Purchaser) to (i) have a valid, perfected, enforceable and nonavoidable interest in cash or cash equivalents held by the Debtors as of the Petition Date, or (ii) have an otherwise enforceable, nonavoidable interest in law or equity in cash or cash equivalents held by the Debtors as of the Petition Date, and to the extent that the Debtors' postpetition use of such cash or cash equivalents diminished an Affected Repurchase Counterparty's or an Affected Loan Purchaser's interests in such property, such Affected Repurchase Counterparty or Affected Loan Purchaser is granted pursuant to sections 361, 362 and 363 of the Bankruptcy Code, (i) a lien junior only to the liens granted to the lenders under the DIP Orders[3] or the DIP Loan Agreement[4] on all assets of the Debtors and their estates

---

[3] The term "DIP Orders" refers to the Interim Order Approving Debtor-In-Possession Financing entered April 5, 2007, and the Final Order Approving Debtor-In-Possession Financing entered May 7, 2007.

9

other than assets that are "First Lien Collateral" as defined in the DIP Loan Agreement, and (ii) once the Termination Date (as defined in the DIP Loan Agreement) has occurred and all Obligations (as defined in the DIP Loan Agreement) under the DIP Loan Agreement have been satisfied in full, a first priority lien on all assets of the estates, without duplication (the "Adequate Protection Liens"); provided, however, (y) such liens shall not attach to any actions available to the Debtors' estates pursuant to Sections 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or against any former or present directors, officers or professionals of the Debtors or the proceeds thereof (collectively, "Avoidance Actions"), or to the reserves established pursuant to prior orders of the Court, including that certain "Order Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure Approving (i) the Sale of Debtors' Servicing Business to Carrington Capital Management, LLC and Carrington Mortgage Services, LLC Pursuant to the Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007, Free and Clear of Liens, Claims, Encumbrances, and Interests, and (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Carrington as Part of such Sale", dated as of May 23, 2007 (the "Carrington Sale Order"), and that certain Order (A) Approving Asset Purchase Agreement by and among New Century Financial Corporation and Ellington Management Group, L.L.C. on Behalf of its Clients Funds, (B) Authorizing Sale of Certain Loans and Residuals to Purchaser or its Designee(s), Free and Clear of All Liens, Claims, Encumbrances and Interests, and (C) Granting Related Relief (the "Ellington Sale Order"), (z) the attachment of such liens to any claims and/or causes of action of the Debtors' estate shall not vest the lienholder with any rights of control or consent with respect to the litigation, including

without limitation settlement, of such claims or causes of action (assets subject to the Adequate Protection Liens hereinafter referred to as the "Collateral"). Such Adequate Protection Liens shall be (i) in continuation of and in addition to all liens, security interests or property interests, if any, now existing in favor of an Affected Repurchase Counterparty or an Affected Loan Purchaser and not in substitution therefor; (ii) effective as of the Petition Date; and (iii) deemed duly perfected without the necessity of filing in any county or state recorders office or elsewhere, any additional documents or notices to perfect such postpetition liens and security interests. Such Adequate Protection Liens granted pursuant to this Order shall be subject to (x) any prepetition, valid and perfected unavoidable liens, if any, existing as of the Petition Date, including, without limitation, the liens granted to Citigroup Global Markets Realty Inc. ("Citigroup") pursuant to the Servicer Advance Financing Facility Agreement, dated August 28, 2003 (as amended from time to time), between Citigroup and New Century Mortgage Corporation, and (y) the Carve Out.

11. To the extent that an Affected Repurchase Counterparty or an Affected Loan Purchaser is determined (by order of the Court or consent by the Debtors, the Committee, and such Affected Repurchase Counterparty or Affected Loan Purchaser) to (a) have a valid, perfected, enforceable and nonavoidable interest in cash or cash equivalent held by the Debtors as of the Petition Date, or (b) have an otherwise enforceable, nonavoidable interest in law or equity in cash or cash equivalents held by the Debtors as of the Petition Date, and to the extent that the Debtors' postpetition use of such cash or cash equivalents diminished an Affected Repurchase Counterparty's or an Affected Loan Purchaser's interests in such property, such Affected Repurchase Counterparty or Affected Loan Purchaser is granted, effective as of the

---

[4] The term "DIP Agreement" refers to the Debtor-In-Possession Loan and Security Agreement dated as of April 13, 2007, as it may be amended from time to time.

11

Petition Date, the protections afforded by section 507(b) of the Bankruptcy Code (the "Superpriority Claims"); provided, however, that any such Superpriority Claim shall (a) be subject and subordinate only to (i) the superpriority administrative expense claims granted to the lenders under the DIP Orders and (ii) the Carve Out, and (b) not include any proceeds recovered from Avoidance Actions. For the avoidance of doubt, except as expressly set forth in paragraphs 10 and 11 herein, the Adequate Protection Liens and the Superpriority Claims granted to the Affected Repurchase Counterparties and Affected Loan Purchasers shall not be primed by or otherwise made junior to the liens or claims of any other party in interest. Nothing herein shall affect the right of an Affected Repurchase Counterparty or Affected Loan Purchaser to assert that it is entitled to additional liens or administrative priority claims, or the Debtors or the Committee to object to such assertion, all of which rights are reserved.

12. Notwithstanding the foregoing provisions of this Order, the amounts set forth in paragraphs 18(a) and (b) of the Final DIP Order (provided that Priority Professional Expenses shall be calculated for purposes of this Order without regard to the sublimits set forth in paragraph 18 of the Final DIP Order) shall be payable from and chargeable against the Collateral (and prior to the Adequate Protection Liens) (the "Carve-Out") and the provisions of such paragraphs 18(a) and (b) of the Final DIP Order are hereby incorporated by reference into this Order and made applicable to the liens and claims granted herein and shall remain effective notwithstanding the repayment in full of the indebtedness due to the lenders under the DIP Loan Agreement.

13. Nothing contained in this Order shall limit or restrict in any way (a) any legal arguments, theories of recoveries or factual assertions the Debtors, the Committee, any Affected Repurchase Counterparty and/or any Affected Loan Purchaser may assert in connection with

their entitlement to any portion of the Escrowed Funds or otherwise with respect to the subject matter of this Order, or (b) the right of any Affected Repurchase Counterparty or Affected Loan Purchaser to (1) assert claims of any amount (and of any nature) or seek additional adequate protection against the Debtors or their estates and (2) seek interest (in addition to the interest accruing on the Escrowed Funds by virtue of their being in interest bearing accounts) on account of the Affected Funds or the Debtors and the Committee's right to object to the foregoing. The use by the Debtors of any of the Affected Funds on a post-petition basis shall not serve as a defense to any action by any Affected Repurchase Counterparty or any Affected Loan Purchaser instituted with respect to such Affected Funds.

14. To the extent that any lien or super-priority claim granted to a Repurchase Counterparty or an Affected Loan Purchaser pursuant to this Order arising from any one Debtor's having held property as of the Petition Date (a "Funds-Holding Debtor"), and such lien and/or super-priority claim is repaid from and/or satisfied by the assets of any other Debtor (a "Repaying Debtor"), then such Repaying Debtor shall be deemed to have an allowed claim under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code against such Funds-Holding Debtor for the amount of such repayment and/or satisfaction of such lien or super-priority claim, which allowed claim of such Repaying Debtor shall be junior to the super-priority claim granted to the lenders under the DIP Loan Agreement and the DIP Orders, and shall be junior to the super-priority claims granted to the Affected Repurchase Counterparties and the Affected Loan Purchasers pursuant to this Order.

15. Nothing in this Order or the Motion shall in any way prejudice the rights of the Debtors, the Committee or any Affected Repurchase Counterparty or Affected Loan Purchaser with respect to (i) the characterization of the Affected Repurchase Counterparty's and/or

13

Affected Loan Purchaser's agreements with the Debtors or any of their rights thereunder or under applicable law, (ii) whether property in which the Affected Repurchase Counterparties and/or Affected Loan Purchasers claim an interest is property of the Debtors' estates, or (iii) the rights of any Affected Repurchase Counterparty or Affected Loan Purchaser to assert senior liens with respect to any property in which such party claims an interest.

16. All rights of the Debtors, the Committee and any other parties in interest are preserved with respect to the Affected Repurchase Counterparties and Affected Loan Purchasers, including (without limitation) any claims that property held by the Debtors as of the Petition Date is property of the estates or to contest the enforceability, extent, validity, priority or perfection of any and all liens or other interests in property of the Debtors' estates asserted by any party in these cases. All rights of the Repurchase Counterparties, the Loan Purchasers and their successors and assigns under the Repurchase Agreements, all related agreements and under applicable law are preserved with respect to the Debtors, the Committee, their affiliates, all of their successors and assigns, and any other party in these cases. All rights of the Debtors and their affiliates and their successors and assigns under the Repurchase Agreements, all related agreements and under applicable law are preserved with respect to the Repurchase Counterparties and the Loan Purchasers.

17. Except as expressly set forth in paragraphs 5 and 8 above, nothing contained in this Order shall preclude the Affected Repurchase Counterparties and the Affected Loan Purchasers from exercising their respective rights and remedies in accordance with their respective agreements with the Debtors, to the extent that any such exercise or rights and remedies would not implicate or violate the automatic stay of Bankruptcy Code Section 362 or other applicable law. Nothing contained herein is intended to modify or supersede any of the

14

Debtors' obligations arising under the Order Granting Motion of the Debtors And Debtors in Possession (A) Authorizing the Continued Use of the Debtors' Centralized Cash Management System, including Operation of Servicer Trust Accounts, (B) Authorizing Maintenance of Debtors' Existing Bank Accounts And Business Forms, And (C) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code entered on April 11, 2007, which Order remains in full force and effect.

18. Nothing contained herein shall preclude the resolution of issues involving individual Repurchase Counterparties or Loan Purchasers. Except as expressly set forth herein, nothing contained herein or produced pursuant to the terms of this Order shall be deemed an admission by any party.

19. DB Structured Products, Inc. ("DBSP") has commenced Adversary Proceeding No. 0751269 against certain of the Debtors (the "DBSP Adversary Proceeding"). Certain of the claims in the DBSP Adversary Proceeding relate to the ownership of a group of 235 Loans (the "Disputed Loans") that DBSP asserts were transferred by the Debtors to DBSP prior to the Petition Date and that the Debtors assert were not properly transferred to DBSP. Nothing contained herein shall stay the prosecution of any claims relating to the ownership of the Disputed Loans, nor shall any procedures contained herein affect or compromise any rights relating to ownership of the Disputed Loans, all of which are preserved.

20. Granting the Adequate Protection Liens and Superpriority Claims pursuant to the terms of this Order shall not constitute an event of default under the DIP Loan Agreement or the DIP Orders nor be deemed to violate the DIP Loan Agreement or the DIP Orders. Otherwise, the lenders under the DIP Loan Agreement reserve all of their rights and remedies under the DIP Loan Agreement, including, but not limited to, Sections 8 and 9 of the DIP Loan Agreement.

RLF1-3171996-1

21. This Court shall retain jurisdiction over all matters arising from or related to the interpretation or implementation of this Order. In the event of any conflict between the terms of the Motion and this Order, the terms of this Order shall govern.

SO ORDERED,

this 28th day of June, 2007

_____
HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

RLF1-3171996-1