**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

NEW CENTURY FINANCIAL CORPORATION

By: _____

Name:  Holly Etlin
Title: Chief Executive Officer


NEW CENTURY MORTGAGE CORPORATION

By: _____

Name:  Holly Etlin
Title: Chief Executive Officer


*[Signatures continue on following page]*

EQUIFIRST CORPORATION

By:

Name: Robin Allcock
Title:  Executive Vice President & Chief Operating Officer

## EXHIBIT C TO EQUIFIRST AGREEMENT

**(DPA Agreement)**

**BROKER DATA PURCHASE AGREEMENT**

**by and among**

**New Century Financial Corporation**

**New Century Mortgage Corporation**

**and**

**EquiFirst Corporation**

**[_____], 2007**

# TABLE OF CONTENTS

Page

SECTION 1.   SALE OF DATA ........................................................................................... 1

SECTION 2.   PURCHASE PRICE .................................................................................... 2

SECTION 3.   REPRESENTATIONS AND WARRANTIES OF SELLERS ................. 3

SECTION 4.   REPRESENTATIONS OF PURCHASER ................................................. 4

SECTION 5.   AGREEMENTS OF PURCHASER AND SELLER .................................. 5

SECTION 6.   CONDITIONS .............................................................................................. 6

SECTION 7.   CLOSING ..................................................................................................... 7

SECTION 8.   TERMINATION ........................................................................................... 8

SECTION 9.   MISCELLANEOUS ..................................................................................... 9

**TABLE OF CONTENTS**
(continued)

**Page**

<u>SCHEDULES</u>

Schedule 1.2(a)        -        Broker Data

## BROKER DATA PURCHASE AGREEMENT

**THIS BROKER DATA PURCHASE AGREEMENT**, dated as of [_____],
2007 (the "Agreement"), by and among NEW CENTURY FINANCIAL CORPORATION, a
Maryland corporation, as a debtor and debtor-in-possession, NEW CENTURY MORTGAGE
CORPORATION, a California corporation, as a debtor and debtor-in-possession (each, a
"Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation
("Purchaser").

**THE PARTIES TO THIS AGREEMENT** are entering into this Agreement on
the basis of the following facts, intentions and understandings:

**WHEREAS**, on April 2, 2007, Sellers filed petitions for reorganization under
Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United
States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (jointly
administered under Case No. 07-10416) and have continued to operate as debtors-in-possession;

**WHEREAS**, Sellers have filed a motion seeking approval from the Bankruptcy
Court of the sale and assignment of all of the assets and liabilities held by Sellers that were used,
in part, in the Sellers' business of originating non-prime mortgage loans, to the successful bidder
in an Auction for the sale and assignment of certain of such assets conducted on June 22, 2007;

**WHEREAS**, Sellers and Purchaser have entered into that certain Asset Purchase
Agreement, dated June 22, 2007 (along with the schedules and exhibits thereto, the "Asset
Purchase Agreement"), pursuant to which Sellers will sell certain assets, including certain data of
Sellers, to Purchaser;

**WHEREAS**, in accordance with the terms of the Asset Purchase Agreement,
Sellers have elected to sell certain data of Sellers to Purchaser prior to the closing of the other
transactions contemplated by the Asset Purchase Agreement; and

**WHEREAS**, Purchaser desires to purchase from Sellers on a non-exclusive basis
and Sellers desire to make available on a non-exclusive basis to Purchaser, in accordance with
sections 105(a), 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions
of this Agreement certain of the data of Sellers.

**NOW, THEREFORE**, in consideration of the foregoing recitals, and the
representations, warranties, covenants and agreements herein contained, the parties hereto hereby
agree as follows:

## SECTION 1.
## SALE OF DATA

1.1.    Non-exclusive Sale of Data.  Subject to the satisfaction or waiver of the
conditions set forth in this Agreement, including the approval by the Bankruptcy Court of this
Agreement and the transactions contemplated herein, at the Closing and as of the Closing Date
(as such terms are defined in Section 7.1 hereof), Sellers shall disclose and deliver to Purchaser,

and Purchaser shall accept, a full and complete copy of the data of Sellers set forth in <u>Section 1.2</u> below, excluding the Excluded Assets described in <u>Section 1.3</u> hereof (the "<u>Purchased Data</u>").

1.2.    <u>Purchased Data</u>.  The Purchased Data to be purchased by Purchaser at the Closing are limited to one copy of the following: (a) the broker data listed or described on Schedule 1.2(a) (the "<u>Broker Data</u>"); and (b) copies of descriptions of the Broker Data sufficient to permit a person reasonably skilled in the relevant field to retrieve, use and understand such data <u>provided, however</u>, provided, however, that the Purchased Data shall not include any (i) personally identifiable information or other information that Sellers are prohibited from disclosing or transferring to a third party pursuant to any law or regulation, (ii) any attorney-client communications or any other information related to Sellers' bankruptcy cases or any Liabilities not assumed by Purchaser, or (iii) any third-party proprietary information or trade secrets, in each case contained in any form or medium ("<u>Excluded Confidential Information</u>").

1.3.    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, from and after the Closing, Sellers shall not have any obligation to disclose or deliver any data or other assets that are not specifically included within the Purchased Data (collectively, the "<u>Excluded Assets</u>").  In furtherance and not in limitation of the foregoing, there shall be excluded from the disclosure and delivery to Purchaser hereunder, and the Purchased Data shall not include, the following:

(a)    any asset or class of assets excluded from Purchased Data described in <u>Sections 1.2</u> by virtue of not being listed or described on a Schedule to this Agreement;

(b)    all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature;

(c)    any intellectual property rights; and

(d)    Excluded Confidential Information.

1.4.    <u>Non-Exclusivity</u>.  Purchaser acknowledges that, notwithstanding any other provision of this Agreement, the Purchased Data is being made available to Purchaser on a non-exclusive basis, and Purchaser agrees that, at any time on or after the Closing, Sellers may make available other copies of the Purchased Data without restriction to any one or more third persons.

## SECTION 2.
## PURCHASE PRICE

2.1.    <u>Purchase Price</u>.  The aggregate purchase price for the Purchased Data shall be [_____] United States Dollars ($[_____].00), (the "<u>Purchase Price</u>").

2.2.    <u>Payment of Purchase Price</u>.  Subject to <u>Section 7.4</u>, at the Closing the Purchase Price shall be payable by a wire transfer of immediately available federal funds to such bank accounts as shall be designated by Sellers prior to Closing.

2.3.    Sale Order.  Sellers shall seek entry of a Bankruptcy Court order approving the sale of the Purchased Data to Purchaser (the "Sale Order"). The Sale Order shall provide for the non-exclusive sale of a copy of the Purchased Data free and clear of any and all Liens, claims, encumbrances and interests on the following terms and conditions:

(a)    Sellers are authorized to consummate the transaction contemplated under this Agreement.

(b)    The terms of this Agreement are fair and reasonable and provide fair value for the Purchased Data, Purchaser's bid is the best offer for the Purchased Data, and the sale to Purchaser is in the best interests of Sellers, their stockholders and their creditors.

(c)    Except as provided in this Agreement, the Purchased Data shall be sold free and clear of all Liens, with such Liens to attach to the consideration to be received by Sellers in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Purchaser would not enter into this Agreement or purchase the Purchased Data otherwise.

(d)    Purchaser is a good faith purchaser entitled to the protections afforded by Bankruptcy Code section 363(m) such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Purchased Data as contemplated hereunder, negotiations have been fair and arms' length, and no party has engaged in any conduct that would cause the sale to be avoided under Bankruptcy Code section 363(n).

## SECTION 3.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Purchaser that the statements contained in this Section 3 are true and correct as of the date hereof and as of the Closing Date.

3.1.    Corporate Existence.  Except as a result of the commencement of the Bankruptcy Cases, Sellers are corporations duly organized, validly existing and in good standing under the laws of their respective states of incorporation.

3.2.    Corporate Authority.  Subject to entry of the Sale Order, Sellers have the power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and this Agreement has been duly executed and delivered by Sellers and constitutes the valid and binding agreement of Sellers, enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights or subject to general principles of equity.

3.3.    Finders; Brokers.  Other than Lazard Freres & Co. LLC, the fees of which will be paid by Sellers or their affiliates, no broker, finder, consultant or intermediary is entitled to a broker's, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement or upon the consummation of the transactions contemplated hereby, or if the Closing does not occur, as a result of any actions or agreements of Sellers or their agents.

3.4.    <u>Right to Disclose</u>. Subject to entry of the Sale Order, Sellers have the right to disclose the Purchased Data to Purchaser.

3.5.    <u>Consents and Approvals; No Violations</u>. Subject to entry of the Sale Order, no consent of, or declaration, filing or registration with, any federal, state or local court, administrative body or other governmental entity with competent jurisdiction (a "Government Entity") is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated by this Agreement, except for: consents, declarations, filings and registrations the failure to have which, individually or in the aggregate, would not reasonably be excepted to have a Material Adverse Effect.

3.6.    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Section 3</u>, neither Sellers nor any other person makes any other express or implied representation or warranty on behalf of Sellers.

3.7.    <u>Expiration of Representations and Warranties</u>. The representations and warranties made by Sellers to Purchaser herein shall not survive the Closing and shall expire and be of no force and effect whatsoever after the Closing. If any of the foregoing representations and warranties are breached by the Seller prior to Closing, Purchaser's sole remedy shall be to declare a failure of the condition set forth in <u>Section 6.3(a)</u> and refuse to close. Seller shall have no Liability in connection with any such breach.

**SECTION 4.**
**REPRESENTATIONS OF PURCHASER**

Purchaser represents and warrants that the statements contained in this <u>Section 4</u> are true and correct as of the date of this Agreement.

4.1.    <u>Existence</u>. Purchaser is a corporation duly organized and validly existing and in good standing under the laws of the State of North Carolina and has the requisite power and authority to own, lease and operate the Purchased Data. Purchaser is duly authorized, qualified or licensed to do business as a foreign corporation and in good standing in every jurisdiction wherein, by reason of the character of the Purchased Data, the failure to be so qualified would have a Material Adverse Effect on the ability of Purchaser to consummate the transactions contemplated hereby (a "<u>Purchaser Material Adverse Effect</u>").

4.2.    <u>Authority</u>. This Agreement and the consummation of all of the transactions provided for herein have been duly authorized by the Board of Directors of Purchaser and by all requisite corporate, shareholder or other action prior to Closing, and Purchaser has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by Purchaser, and constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms except as enforceability may be (a) limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights, or (b) subject to general principles of equity.

4.3.    <u>No Application of Hart-Scott-Rodino</u>. No filing will be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("<u>HSR</u>") in connection with the acquisition by

- 4 -

Purchaser of the Purchased Data. This representation and warranty shall survive until the twelve (12) month anniversary of the Closing.

    4.4.    <u>Governmental Approvals; Consents; No Conflicts</u>.

        (a)    Purchaser is not subject to any order, judgment or decree that would prevent the consummation of the transactions contemplated hereby. No claim, legal action, suit, arbitration, governmental investigation, action, or other legal or administrative proceeding is pending or, to the knowledge of Purchaser, threatened against Purchaser that would enjoin or delay the transactions contemplated hereby. No consent, approval, order or authorization of, license or permit from, notice to or registration, declaration or filing with, any Governmental Entity, or of any third party, is or has been required on the part of Purchaser in connection with the execution and delivery of this Agreement or any of the transactional documents, or the consummation of the transactions contemplated hereby and thereby except for the approval by the Bankruptcy Court and any such consents, approvals, orders or authorizations of, licenses or permits, filings or notices the failure of which to obtain or make would not have a Purchaser Material Adverse Effect.

        (b)    Neither the execution and delivery of this Agreement or any other agreements and documents to be executed or delivered pursuant hereto, nor the consummation of the transactions contemplated hereby, will (i) violate, or conflict with, any provision of Purchaser's Articles or Certificate of Incorporation or Bylaws or other charter documents or (ii) violate, or conflict with, any order, writ, injunction, arbitral award, judgment or decree of any court, governmental body or arbitrator applicable to Purchaser, except for any such violation, breach or default that would not have a Purchaser Material Adverse Effect.

    4.5.    <u>Finders; Brokers</u>. Purchaser is not a party to any agreement with any finder or broker, or in any way obligated to any finder or broker for any commissions, fees or expenses, in connection with the origin, negotiation, execution or performance of this Agreement.

    4.6.    <u>Financial Capacity</u>. Purchaser is solvent, has adequate capital, and has the financial wherewithal or committed financial resources to meet Purchaser's obligations under this Agreement.

    4.7.    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Section 4</u>, neither Purchaser nor any other person makes any other express or implied representation or warranty on behalf of Purchaser.

**SECTION 5.**
**AGREEMENTS OF PURCHASER AND SELLER**

    5.1.    <u>Mutual Cooperation; No Inconsistent Action</u>.

        (a)    Subject to the terms and conditions hereof, Sellers and Purchaser agree to use their reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including all of the following: (i) obtain prior to Closing all licenses, certificates, permits, approvals, authorizations, qualifications and orders of

- 5 -

Governmental Entities as are necessary for the consummation of the transactions contemplated hereby, including but not limited to such consents and approvals as may be required by the Bankruptcy Court; and (ii) effect any necessary registrations or filings. Sellers and Purchaser shall cooperate fully with each other to the extent reasonable in connection with the foregoing.

(b)     Each of Sellers and Purchaser shall notify and keep the other advised as to (i) any litigation or administrative proceeding pending and known to such party, or to the Purchaser's knowledge or Sellers' knowledge threatened, which challenges the transactions contemplated hereby and (ii) any event or circumstance which would constitute a breach of their respective representations and warranties in this Agreement, provided, that the failure of Sellers or Purchaser to comply with clause (ii) shall not be deemed a breach of a covenant for purposes of Section 6.2(a)(ii), and Section 6.3(a)(ii) hereof, respectively.

5.2.    Public Disclosures.  Prior to the Closing Date, no party to this Agreement will issue any press release or make any other public disclosures concerning this transaction or the contents of this Agreement without the prior written consent of the other party. Notwithstanding the above, nothing in this Section 5.2 will preclude any party from making any disclosures required by law or regulation or necessary or desirable in conjunction with the filing of any tax return or other document required to be filed with any federal, state or local governmental body, authority or agency, including any filings deemed necessary or advisable under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), any disclosures to auditors, or any disclosures necessary or desirable in conjunction with any Bankruptcy Court process or proceeding, including, without limitation, filings or disclosures to creditors, provided that the disclosing party under this Section 5.2 shall, to the extent practicable, provide the non-disclosing party a reasonable opportunity to review any such disclosure that identifies the non-disclosing party by name, before the disclosing party makes any such public disclosure under this Section 5.2.

5.3.    No Resale or Disclosure.  Purchaser shall not, for a period of 12 months from the Closing Date, sell, lease, license, transfer, transmit, convey, disclose or provide access to any Purchased Data to any third person, except to third-parties for use for Purchaser's benefit in the ordinary course of business under obligations of confidentiality.

5.4.    Access to Records.  Purchaser shall preserve for a period of six years after the Closing Date all records relating to the Purchased Data existing prior to the Closing Date. After the Closing Date, where there is a legitimate purpose (including, without limitation, as necessary for the administration of the bankruptcy case), Purchaser shall provide Sellers with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to all information, data and books and records of Purchaser, in any form other than electronic form, but, in each case, only to the extent relating to the Purchased Data prior to the Closing Date, and Sellers and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Purchaser; and provided, further, that such information shall be held by Purchaser in confidence to the extent required by law. In addition, Purchaser shall direct its employees to cooperate reasonably with Sellers for purposes of gaining access to the information, data and books and records pursuant to this Section 5.4. Such records may nevertheless be destroyed by Purchaser if (X) Purchaser sends to

- 6 -

Sellers a written request to destroy records, specifying with particularity the contents of the records to be destroyed, and (Y) Sellers, in their sole discretion, provide their written consent to such request. Such records may then be destroyed after the 30th day after such written consent is provided by Sellers; provided, however, that if such written consent is not provided by Sellers, then Purchaser shall deliver such records to Sellers at Purchaser's sole cost. Sellers agree to use all commercially reasonable efforts not to deliver or disclose to Purchaser any data or information that Sellers are prevented or prohibited from disclosing to Purchaser or any other third party pursuant to any applicable privacy laws or any other law, rule, regulation, ruling, decree, order, injunction, judgment or order that is or has been issued, enacted, approved, promulgated, made or otherwise put into effect by or under the authority of any court of law or governmental authority (including but not limited to any consumer data or employment data). In the event that (a) Sellers notify Purchaser that Sellers inadvertently delivered such data or information to Purchaser (such notice to include a specific description of such data or information) or (b) Purchaser otherwise becomes aware that Sellers have delivered such data, Purchaser shall, (i) in the case of clause (b) above, notify Sellers of such data or information and (ii) use its commercially reasonable efforts to keep such data confidential and, upon Sellers' request and at Sellers' sole cost, Purchaser shall return to Sellers such data and information. Notwithstanding the foregoing, Purchaser shall not be under any affirmative obligation to determine whether any such data or information has been delivered to Purchaser by Sellers as part of the Purchased Data.

5.5.    Privileged Information.

(a)    Notwithstanding any provision in this Agreement to the contrary, any documents subject to the attorney client privilege and/or the work product immunity doctrine shall not constitute Purchased Data. If Purchaser accesses or reviews any Excluded Confidential Information, Purchaser shall notify Sellers and upon Sellers' request either delete or destroy such information or deliver such information to Sellers. Purchaser further agrees not to disclose such Excluded Confidential Information except, subject to and in accordance with the next sentence, to the extent requested or required by law to the securities market on which its securities are listed or qualified for listing (the "Exchange"), if any, the Securities and Exchange Commission (the "SEC") or other regulatory or self regulatory authorities having jurisdiction over the receiving party or its affiliates ("Other Regulators") or a court of competent jurisdiction or other tribunal.

(b)    In the event that Purchaser is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process, but excluding any request by the Exchange or the SEC and Other Regulators) to disclose any of the Excluded Confidential Information, Purchaser shall provide the Sellers with prompt written notice of any such request or requirement so that Sellers may seek a protective order or other appropriate remedy (and if the Sellers seek such an order, the Purchaser shall provide such cooperation as the Sellers reasonably request) and/or, in the Sellers' sole discretion, waive compliance with the provisions of this letter agreement. If, in the absence of a protective order or other remedy or the receipt of a written waiver by the Sellers, the Purchaser is nonetheless legally obligated to disclose the Excluded Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, the Purchaser may, without liability hereunder, disclose to such tribunal only that portion of the Excluded

- 7 -

Confidential Information which such counsel advises the Purchaser is legally obligated to be disclosed (and concurrently provide a copy thereof to the Sellers), provided that Purchaser provides the Sellers with written notice of the Excluded Confidential Information to be disclosed as far in advance as reasonably practicable and exercise its reasonable efforts to preserve the confidentiality of the Excluded Confidential Information, including, without limitation, by cooperating with the Sellers in their efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded to the Excluded Confidential Information. Notwithstanding anything to the contrary contained in this letter agreement, in the event that disclosure of the Excluded Confidential Information is requested by the Exchange and/or the SEC, the Purchaser shall promptly notify the Sellers of such request, and the Purchaser also shall request confidential treatment by the Exchange and the SEC of any Excluded Confidential Information disclosed by Purchaser to the Exchange or the SEC.

## SECTION 6.
## CONDITIONS

6.1.    Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    Regulatory Authorizations. All consents, licenses, approvals, authorizations and orders of Governmental Entities as are necessary in connection with the transfer of the Purchased Data to Purchaser or which if not obtained would be reasonably likely to subject Sellers, or any stockholder, officer, director or agent thereof to civil or criminal Liability or could render such transfer void or voidable (the "Required Consents") shall have been obtained, except as would not reasonably be expected to have a Material Adverse Effect and other than such as have been issued, promulgated, enforced or entered as of the date of this Agreement. The Bankruptcy Court shall also have entered the Sale Order, and such Sale Order shall have become final and non-appealable (a "Final Order"); provided, however, that Sellers and Purchaser may waive the requirement that the Sale Order shall have become a Final Order.

(b)    No Injunction. No injunction, writ or temporary restraining order or any other order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the transactions contemplated hereby may not be consummated as provided herein shall be in effect.

6.2.    Conditions Precedent to Obligation of Sellers. The obligation of Sellers to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)    Accuracy of Purchaser's Representations and Warranties; Covenants of Purchaser. (i) The representations and warranties of Purchaser contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and

warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Purchaser Material Adverse Effect; (ii) Purchaser shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Sellers shall have received a certificate signed by an officer of Purchaser to such effect.

(b)    Deliveries.  Purchaser shall have made the deliveries contemplated by Section 7.2 hereof.

6.3.    Conditions Precedent to Obligation of Purchaser.  The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)    Accuracy of Representations and Warranties of Sellers; Covenants of Sellers. (i) The representations and warranties of Sellers contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect; (ii) Sellers shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Purchaser shall have received certificates signed by an officer of each Seller to such effect.

(b)    Form of Sale Order.  The Sale Order as entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Purchaser.

## SECTION 7.
## CLOSING

7.1.    Closing Date.  Unless this Agreement shall have been terminated and the transactions herein shall have been abandoned pursuant to Section 8 hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, at [_____], on [_____], 2007 (or as soon as practicable thereafter as all of the conditions to the Closing set forth in Section 6 hereof are satisfied or waived), or such other date, time and place as shall be agreed upon by Sellers and Purchaser (the actual date and time being herein called the "Closing Date").

7.2.    Purchaser Deliveries.  At the Closing, Purchaser shall deliver to Sellers:

(a)    the Purchase Price as provided in Section 2.2 hereof;

(b)    a certified copy of Purchaser's Certificate of Incorporation and Bylaws;

(c)    a certificate of good standing of Purchaser, issued not earlier than ten (10) days prior to the Closing Date by the Secretary of State of Purchaser's state of incorporation;

(d)     an incumbency and specimen signature certificate with respect to the officers of Purchaser executing this Agreement, and any other document delivered hereunder, on behalf of Purchaser; and

(e)     such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

7.3.    <u>Seller Deliveries</u>.  At the Closing, Sellers shall deliver to Purchaser:

(a)     incumbency and specimen signature certificates with respect to the officers of Sellers executing this Agreement, and any other document delivered hereunder, on behalf of Sellers;

(b)     via electronic FTP transfer, a copy of the Purchased Data; and

(c)     such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

## SECTION 8.
## TERMINATION

8.1.    <u>Termination Events</u>.  Without prejudice to other remedies which may be available to the parties by law or this Agreement, this Agreement may be terminated and the transactions contemplated herein may be abandoned:

(a)     by mutual written consent of the parties hereto;

(b)     by either party, if there shall be in effect a final order restraining, enjoining or otherwise prohibiting the consummation of the transaction contemplated by this Agreement;

(c)     by either party, if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the other party contained in this Agreement such that the conditions set forth in either <u>Section 6.2(a)</u> or <u>Section 6.3(a)</u>, as applicable, would not be satisfied and which, if curable, shall not have been cured prior to the earlier of (x) thirty (30) days after the giving of written notice of such material breach by the non-breaching party to the breaching party and (y) [_____], 2007; provided, however, that neither Purchaser nor Sellers shall have the right to terminate this Agreement pursuant to this clause (c) if the party giving notice of a material breach is then in material breach of any of its representations, warranties, covenants or agreements set forth in this Agreement such that the conditions set forth in either <u>Section 6.2(a)</u> or <u>Section 6.3(a)</u>, as applicable, would not be satisfied (such breaching party, a "<u>Proximate Cause Party</u>"); or

(d)     by any party by notice to the other party if the Closing shall not have been consummated on or before [_____], 2007, unless extended by mutual written agreement of the parties hereto, so long as the party terminating this Agreement shall not be in default or breach hereunder.

8.2.    Notice of Termination.  In the event of any termination pursuant to Section 8.1 above, written notice thereof setting forth the reasons therefor shall promptly be given to the other parties and the transactions contemplated by this Agreement shall be terminated, without further action by any party.

8.3.    Effect of Termination.  In the event of any termination of the Agreement as provided in Section 8.1 above, this Agreement shall forthwith become wholly void and of no further force and effect and there shall be no Liability on the part of Purchaser or Sellers under this Agreement, except that (i) the confidentiality obligations of Purchaser and Sellers under this Agreement and, for the avoidance of doubt, under the Non-Disclosure Letter Agreement, dated as of May 10, 2007, between New Century Financial Corporation  and Barclays Bank PLC, as currently in effect (the "Confidentiality Letter"), shall remain in full force and effect and (ii) termination shall not preclude either party from suing the other party for breach of this Agreement, subject to Section 3.7 hereof.

## SECTION 9.
## MISCELLANEOUS

9.1.    Notices.  All communications provided for hereunder shall be in writing and shall be deemed to be given when delivered in person or by private courier with receipt, when telefaxed and received, or three (3) days after being deposited in the United States mail, first-class, registered or certified, return receipt requested, with postage paid and,

| | |
|---|---|
| If to Purchaser: | EquiFirst Corporation<br>500 Forest Point Circle<br>Charlotte, NC  28273<br>Attention: Robin Allcock<br>Facsimile: (704) 625-4500 |
| With copies to: | EquiFirst Corporation<br>500 Forest Point Circle<br>Charlotte, NC  28273<br>Attention: Legal Department<br>Facsimile: (704) 625-4500 |
| | Allen & Overy LLP<br>1221 Avenue of the Americas<br>New York, NY  10020<br>Attention:  Eric Shube and Ken Coleman<br>Facsimile:  (212) 610-6399 |
| If to Sellers: | New Century Mortgage Corporation<br>18400 Von Karman Avenue, Suite 1000<br>Irvine, CA 92612<br>Attention:  General Counsel<br>Facsimile:  (949) 440-7033 |

| With a copy to: | O'Melveny & Myers LLP |
| | 275 Battery Street |
| | San Francisco, California 94111 |
| | Attention: Suzzanne Uhland and C. Brophy Christensen |
| | Facsimile: (415) 984-8701 |
| | |
| and | Hahn & Hessen LLP |
| | 488 Madison Avenue |
| | New York, New York 10022 |
| | Attn: Mark Power |
| | Facsimile: (212) 478-7400 |

or to such other address as any such party shall designate by written notice to the other parties hereto.

9.2.    Cooperation.  Purchaser and Sellers agree to furnish or cause their Affiliates to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Purchased Data (including access to books and records) as is reasonably necessary for the filing of all tax returns and other tax filings, the making of any election related to taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any tax return.

9.3.    Expenses.  Sellers and Purchaser shall each pay their respective expenses (such as legal, investment banker and accounting fees) incurred in connection with the origination, negotiation, execution and performance of this Agreement.

9.4.    Non-Assignability.  This Agreement shall inure to the benefit of and be binding on the parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by either party hereto without the express prior written consent of the other party, and any attempted assignment, without such consents, shall be null and void.

9.5.    Amendment; Waiver.  This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the parties hereto. No waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants, or agreements contained herein, and in any documents delivered or to be delivered pursuant to this Agreement and in connection with the Closing hereunder. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

9.6.    "AS IS" Transaction; Representations and Warranties; Schedules and Exhibits.

(a)    Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement or in the schedules hereto prepared by Sellers, Sellers make no representations or warranties whatsoever, express or implied, with respect to the Sellers,

- 12 -

or Purchased Data (including, without limitation, income to be derived from or expenses to be incurred in connection with the Purchased Data, or the value or transferability of the Purchased Data or any portion thereof, or the merchantability or fitness of the Purchased Data). WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT AS TO ANY PORTION OF THE PURCHASED DATA. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the Purchased Data, as Purchaser deemed necessary or appropriate, and that in proceeding with its acquisition of the Purchased Data, Purchaser is doing so based solely upon such independent inspections and investigations, but subject to the satisfaction or waiver of the closing conditions specified herein. Accordingly, if the Closing occurs, Purchaser will accept the Purchased Data at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order.

(b)    Each of Purchaser and Sellers agree neither Sellers nor any of the respective officers, directors, stockholders, employees, affiliates, representatives or agents of Sellers shall have any Liability or responsibility arising out of, or relating to, any information (whether written or oral), documents or materials furnished by Sellers or any of their officers, directors, stockholders, employees, affiliates or any of their respective representatives or agents, and any information, documents or materials made available to Purchaser in certain "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

(c)    All Schedules hereto are hereby incorporated by reference and made a part of this Agreement. Any fact or item which is clearly disclosed on any Schedule to this Agreement in such a way as to make its relevance to a representation or representations made elsewhere in this Agreement or to the information called for by another Schedule or other Schedules to this Agreement readily apparent shall be deemed to be an exception to such representation or representations or to be disclosed on such other Schedule or Schedules, as the case may be, notwithstanding the omission of a reference or cross-reference thereto. Any fact or item disclosed on any Schedule hereto shall not by reason only of such inclusion be deemed to be material and shall not be employed as a point of reference in determining any standard of materiality under this Agreement.

9.7.    Third Parties. This Agreement does not create any rights, claims or benefits inuring to any person that is not a party hereto nor create or establish any third party beneficiary hereto.

9.8.    No Strict Construction. Notwithstanding the fact that this Agreement has been drafted or prepared in all or in part by one of the parties, the parties confirm that both they and their respective counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person.

LA1:1139764 3

9.9.   Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

9.10.   Venue and Jurisdiction. Venue for any action or proceeding pertaining to the construction or enforcement of this Agreement shall be the Bankruptcy Court, and the parties hereto consent to the Bankruptcy Court's exercise of jurisdiction over them with respect to any such action or proceeding.

9.11.   Certain Definitions. For purposes of this Agreement, the term:

(a)   "affiliate" of a person means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned person;

(b)   "Auction" means the auction held in accordance with Bankruptcy Code, which auction included the non-exclusive sale of copies of the Purchased Data;

(c)   "Liability" means any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown, secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due;

(d)   "Lien" means any liens, claims, encumbrances, mortgages, security interests, pledges, claims, equities and other restrictions or charges of any kind or nature whatsoever, including without limitation all "interests" as such term is defined in section 363(f) of the Bankruptcy Code;

(e)   "Material Adverse Effect" means any change, effect, event or circumstance, that, individually or in the aggregate, is materially adverse to the Purchased Data or the ability of Sellers to perform their obligations under this Agreement, except for any change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, (ii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iii) changes in applicable laws after the date hereof, (iv) the fact that Sellers will be operating as a debtors-in-possession under the Bankruptcy Code, or (v) changes in GAAP or regulatory accounting principles after the date hereof;

(f)   "person" shall have the meaning set forth in the Bankruptcy Code; and

(g)   "subsidiary" or "subsidiaries" of Purchaser, Sellers or any other person means any person of which Purchaser, Sellers or such other person, as the case may be (either alone or through or together with any other subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity interests the holder of which is generally entitled to vote for the election of the board of directors or other governing body of such person.

9.12.   Entire Agreement. This Agreement and the Schedules and Exhibits hereto, together with the Asset Purchase Agreement and the Confidentiality Letter, set forth the entire understanding of the parties hereto and no modifications or amendments to this Agreement shall

- 14 -

be binding on the parties unless in writing and signed by the party or parties to be bound by such modification or amendment.

9.13.    Section Headings; Table of Contents.  The section headings contained in this Agreement and the Table of Contents to this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.14.    Severability.  If any provision of this Agreement shall be declared by any court of competent jurisdiction to be illegal, void or unenforceable, all other provisions of this Agreement shall not be affected and shall remain in full force and effect.

9.15.    Counterparts.  This Agreement may be executed in any number of counterparts, including by electronic mail or facsimile, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

*[Remainder of Page Intentionally Left Blank]*

- 15 -

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

NEW CENTURY FINANCIAL CORPORATION

By:    _____
       Name:
       Title:


NEW CENTURY MORTGAGE CORPORATION

By:    _____
       Name:
       Title:


EQUIFIRST CORPORATION

By:    _____
       Name:
       Title:

**Schedule 1.2(a)**
**Broker Data**

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

## DISCLOSURE SCHEDULES

These Disclosure Schedules have been prepared and are being delivered pursuant to that certain Asset Purchase Agreement, dated as of June 22, 2007 (the "Agreement"), by and among New Century Financial Corporation, a Maryland corporation, as a debtor and debtor-in-possession, and New Century Mortgage Corporation, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser"). All capitalized terms which are used but not defined in these Disclosure Schedules shall have the meanings ascribed to such terms in the Agreement, unless the context requires otherwise.

The Section numbers used in these Disclosure Schedules correspond to the Section numbers in the Agreement and are provided for convenience only. Any information set forth in one section of the Disclosure Schedules shall be deemed to apply to each other section or subsection hereof or of the Agreement to which its relevance is readily apparent on its face. Where the terms of a contract, agreement or other disclosure item have been summarized or described in these Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract, agreement or other disclosure item and such summary or description is qualified in its entirety by such contract, agreement or other disclosure item. Moreover, such summaries or descriptions of terms of contracts, agreements or other disclosure items provided in these Disclosure Schedules do not constitute representations, warranties or covenants of Sellers.

Unless otherwise stated, all statements made herein are made as of June 22, 2007. In addition, appendices and exhibits attached hereto and referenced herein form an integral part of the sections of the Disclosure Schedules into which they are incorporated by reference for all purposes as if set forth herein, including for the purposes of cross-application to other sections of the Agreement to which their relevance is readily apparent on its face. No reference to or disclosure of any item or other matter in these Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material, that it could have a Material Adverse Effect on Sellers or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. Except for Schedules 1.2(a) (Assumed Contracts), no reference in these Disclosure Schedules to any agreement or document shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. Furthermore, no reference in these Disclosure Schedules to any agreement or document shall be construed as (i) an admission or indication to or for the benefit of any third party that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document with respect to any third party (ii) an admission or indication of any liability or obligation of either Seller or any of their affiliates to any third party or (iii) an admission against either Seller's or any of their affiliates' interests. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

## SCHEDULE 1.2(a)

## ASSUMED CONTRACTS[*]

1.        iLOG Software License Agreement between New Century Mortgage Corporation and iLOG, Inc., dated September 5, 2003.

> **Service Address**:
> ILOG, Inc.
> 1080 Linda Vista Ave.
> Mountain View, CA 94043

2.        BEA WebLogic End User Software License Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April 28, 2003.

> **Service Address**:
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Office of the General Counsel

3.        Chordiant Software License and Services Agreement between New Century Mortgage Corporation and Chordiant Software Inc., dated June 30, 2004.

> **Service Address**:
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd.,
> Suite 400
> Cupertino, CA 95014
> Attn: Chief Financial Officer/Finance Director

4.        CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004.

> **Service Address**:
> CrownPeak Technology
> 13323 Washington Blvd., Suite 206
> Los Angeles, CA 90066

5.        Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005.

> **Service Address**:
> Ascential Software Corporation
> 50 Washington Street
> Westboro, MA 01581-1021
> Attn: General Counsel
> Tel: (508) 366-3888/Fax: (508) 389-8700

---

[*] Each as amended from time to time and including all exhibits, riders and addendums

If and to the extent that any Assumed Contract listed on this Schedule 1.2(a) requires the consent of a third party for the assignment thereof, and such consent shall not have been provided by the applicable third party on or prior to the Closing Date, then each such Assumed Contract shall be deemed to be part of the Excluded Assets for the purposes of the Agreement.

3

## SCHEDULE 1.2(b)(i)

## DATA

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

"Reference Data" means values such as FICO scores, LTV amounts, LIBOR rates and other data that are retrieved at runtime and used within the logic of the application, generally as variables, which may also appear as input or output data.

"Control Data" means values such as MAX LTV, FICO Band or underwriting rule, which are retrieved at runtime and influence the flow of the logic engine, and which may also appear as input or output data.

"Meta Data" means "data about data," such as a database table descriptions, file layouts, and performance statistics that define the meaning of data contained in or traveling through the system, including, without limitation, "schemas," "attributes," and other technology specific data description lexicons.

"Configuration Data" means values that describe and control the logical linking and physical routing of communications, hardware function, software function and coupling of the preceding, such as "machine config," names.ora" or DNS entries.

"Documentation" means all requirements, analysis, design, inspection, test cases, test input and output data, processes, policies and procedures necessary to understand the intent and function of the relevant system.

## SCHEDULE 1.2(b)(ii)

## LOAN PERFORMANCE DATA

"Loan Performance Data" shall mean the scope of data representing certain attributes derived from Sellers' loan origination process.  The Loan Performance Data includes certain loan specific attributes, borrower attributes and property attributes.  There are approximately 3.2 million records with approximately 871 different attributes for such records.

The Loan Performance Data includes (i) certain pricing information from EDE as it exists in the data format of the Data Warehouse, (ii) certain servicing information for loans serviced by MortgageServ and OCWEN, (iii) certain broker information from BDS, and (iv) certain accounting and human resources information.  Such servicing information includes approximately 1.3 million loan records.

Certain information has been removed from the Loan Performance Data for consumer privacy reasons.

**SCHEDULE 1.2(c)(i)**

**TRADEMARKS AND DOMAIN NAMES**

Trademarks

| mOur Ref | Mark | Serial No. | Filing Date | Reg. No | Reg. Date | Status | Class No | Specification of Goods | Due Date | Due Date Description | Owner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S8368 | FastQual | 78/382,404 | 03/11/04 | 2,940,008 | 04/12/05 | Registered | 36 | Mortgage lending services | 04/12/11 | Affidavit of Use | New Century Mortgage Corporation |
| S8369 | FastQual & Design  | 78/382.408 | 03/11/04 | 3,030.444 | 12/13/05 | Registered | 36 | mortgage lending services | 12/13/11 | Affidavit of Use | New Century Mortgage Corporation |
| S6623 | FASTQUAL YOU JUST CLOSED MORE & Design  | 76/407,466 | 05/02/02 | 2,706.783 | 04/15/03 | Registered | 36 | mortgage lending services | 04/15/09 | Affidavit of Use | New Century Mortgage Corporation |

Domain Names

1.    www.fastqual.com

## SCHEDULE 1.2(c)(iii)

## TECHNOLOGY

| Application | Description of Application | Included Interfaces/Integrations |
|---|---|---|
| 1.  BDS | Broker Database System, predecessor for BRM, utilizing classic ASP with SQL 2000 on the backend, used for managing brokers and broker contacts information | **Internal:** BRM |
| 2.  BDS - OOF (Opt Out) | Opt Out Fax Manager, used by broker services clerks to process right faxes with  opt in/out options from brokers | |
| 3.  BDS FM | .NET application for processing right fax images of signature pages from Online Broker Applications that are stored in database after BDSRightFax service processing | |
| 4.  BDS OBA | Online Broker Application, part of FastQual that allows brokers to submit online applications that are processed later through BDSWF application (see #6) | **Internal:** FastQual |
| 5.  BDS RightFax (NT Service) | .NET service that takes care of processing/saving in database received right fax images of OBA signature pages which are processed by BDSFM | **Internal:** Rightfax |
| 6.  BDS WF | BDS workflow .NET application that allows broker services processors to approve OBA | |
| 7.  BDS WS | Web services, middle tier for OBA and BDSWF | |
| 8.  BRM | Broker Relationship Management - Marketing, Customer Support Agent Desktop and Sales Automation Workforce system to support New Century's relationship with our Wholesale Brokers<br><br>The BRM, as referred to in this Schedule 1.2(c)(iii), will include without limitation the Broker Data as such is stored or incorporated in a relational database in the BRM and all related information (including but not limited to control values). | **Internal:** BDS FastQual Data Warehouse Telemarketing/Campaign Files |

| | | |
|---|---|---|
| 9. BRM - Reporting Service | Microsoft Reporting Services integration to display Broker Sales reports via the BRM application | |
| 10. BRM ETL | Extract Transform Load tool used to transfer, cleanse and aggregate data from several source and target systems | |
| 11. EDE | Enterprise Decisioning Engine that houses Pricing, Underwriting and Eligibility business rules for automated decisions | **Internal:**<br>Empower<br>FastQual |
| 12. EDE - Admin Tool | Administrator tool that allows business users to update pricing changes to EDE | |
| 13. EDE - Certification Tool | Verification tool used to compare EDE results across different rule sets | |
| 14. EDE - Log Viewer | GUI Support tool used to present EDE results | |
| 15. EDE - QA Response Loader | Testing tool that submits and returns EDE requests and results in large batches | |
| 16. EDE - QA Tool | Testing and Support tool that allows a user to submit, modify, and edit EDE XML request files and to view the EDE result file | |
| 17. EDE - Ratesheet Generator | Generates rate sheets that are published to our customers off of the EDE rule sets | |
| 18. Sellers' customizations to the Empower application and database | Sellers' customizations to the Wholesale and Retail Loan Origination System used to process loan applications | **Internal:**<br>Data Warehouse (multiple loan verification)<br>*EDE (loan pricing, underwriting review)<br>*Credit Gateway (credit report information)<br>BRM/BDS (broker validation)<br>Predictive Analytics (Risk Assessment)<br>Branch Licenses (License validation)<br>FastQual (import of application data)<br>Appraiser Database System (appraiser validation)<br>Rightfax (document transmittal)<br>Digital Sender (HW)/Outlook (Appraisal review)<br><br>**External:** |

LAI:1139446 5

| | | |
|---|---|---|
| | | *Flood Integration (Flood report verification)<br>Hansen (property risk score)<br>SwiftSend (secure document transmittal)<br><br>* Required for loan origination |
| 19. FastQual, PrivateLabel | FastQual & Private Label -Wholesale and Correspondent Broker Point of Sale system used to capture applications and pre-qualify borrowers | **Internal:**<br>Credit Services (RC/ACR)<br>BRM<br>Data Warehouse<br>Empower<br>EDE<br>BDS<br>Lounge<br><br>**External:**<br>DiTech<br>Calyx<br>EllieMae (Desktop LOS Controls) |
| 20. Lounge | Wholesale Sales Portal to track Broker submissions and calculate sales commissions | |
| 21. RCS - NCI2MISMO | Redundant Credit Service translator to convert NCI format to MISMO | |
| 22. RCS (Redundant Credit) | Manages credit requests and responses with credit vendors and requesting systems | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>Fidelity (credit vendor)<br>CBC (credit vendor) |
| 23. Broker Credit Reissue | Tool for managing reissue of credit reports and requests | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>LSI<br>Fidelity<br>CBC<br>Kroll<br>Informative Research<br>Landsafe<br>Equifax<br>Credco<br>CBA/Experian |

| | | FiServ/Chase |
|---|---|---|
| 24. Help Desk Console | Support tool to administer credit vendors and troubleshoot credit reporting issues | **Internal:** Broker Credit Reissue Redundant Credit FastQual |
| 25. Data Warehouse | Database system used for collecting and transmitting information from multiple applications mainly for reporting and analytics | **Internal:** BRM Empower FastQual |

**SCHEDULE 1.4(c)**

**CURE FINDINGS**

| Contract Description | Contracting Party Contact Information: | Cure Amount |
|---|---|---|
| iLOG Software License Agreement between iLOG, Inc. and New Century Mortgage Corporation, dated September 5, 2003 | ILOG, Inc. 1080 Linda Vista Avenue Mountain View, CA 94043 | $0.00 |
| BEA WebLogic End User Software License Agreement between BEA Systems, Inc. and New Century Mortgage Corporation, dated April 28, 2003 | BEA Systems, Inc. 2315 North First Street San Jose, CA 95131 Attn: Office of the General Counsel | $0.00 |
| Chordiant Software License and Services Agreement between New Century Mortgage Corporation, dated June 30, 2004 | Chordiant Software Inc. 20400 Stevens Creek Blvd., Suite 400 Cupertino, CA 95014 Attn: Chief Financial Officer/Finance Director | $0.00 |
| CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004 | CrownPeak Technology 13323 Washington Blvd., Suite 206 Los Angeles, CA 90066 | $13,161.28 |
| Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005 | Ascential Software Corporation 50 Washington Street Westboro, MA 01581-1021 Attn: General Counsel | $0.00 |

## SCHEDULE 2.1

## PURCHASE PRICE ALLOCATION

[To be provided by Purchaser]

**SCHEDULE 3.7**

**SUFFICIENCY OF PURCHASED ASSETS**

1.          Agreement of Purchase and Software License between New Century Financial Corporation and Eastern Software Corporation, dated October 21, 2002.

> **Service Address**:
> Eastern Software Corporation
> 50 S. Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

2.          Empower Escrow Agreement between Eastern Software Corporation, New Century Financial Corporation and First National Trust Company, dated October 18, 2002.

> **Service Address**:
> Eastern Software Corporation
> 50 S. Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

> **Escrow Agent**:
> First National Trust Company c/o
> First National Bank of Pennsylvania
> One FNB Boulevard
> Hermitage, PA 16148
> Attn: Amy C. Atkinson, Client Services Specialist

3.          JBoss (Red Hat) Master Agreement between New Century Mortgage Corporation and Jboss, Inc., dated October 30, 2004.

> **Service Address**:
> Jboss, Inc.
> 3340 Peachtree Road NE, Suite 1225
> Atlanta, GA 30326
> Tel:  (404) 467-8555, ext 203/Fax:  (404) 948-1496

4.          Oracle License and Services Agreement between New Century Mortgage Corporation and Oracle, dated May 28, 2005.

> **Service Address:**
> Oracle USA, Inc.
> 500 Oracle Parkway
> Redwood City, CA 94065
> Attn: General Counsel, Legal Department

5.          BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April, 2003.

> **Service Address**:
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

6.          BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April 14, 2004.

> **Service Address**:
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

7.          Chordiant Professional Services Agreement between New Century Mortgage
Corporation and Chordiant Software, Inc., dated October 22, 2004.

> **Service Address**:
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd., Suite 400
> Cupertino, CA 95014

8.          Red Hat Enterprise End User License Agreement between New Century
Mortgage Corporation and Red Hat, Inc.

> **Service Address**:
> Red Hat, Inc.,
> Attn: General Counsel
> 1801 Varsity Drive
> Raleigh, NC 27606
> Fax: (919) 754-3704

9.          Citrix Open License Agreement between New Century Mortgage Corporation and
Citrix Systems, Inc., dated May 6, 2004.

> **Service Address**:
> Citrix Systems, Inc.
> 852 Cypress Creek Road
> Fort Lauderdale, FL 33309

10.        Microsoft Master Services Agreement between New Century Mortgage Corporation and Microsoft Corp., dated February 27, 2003.

> **Service Address:**
> Microsoft Corporation
> Law and Corporate Affairs
> One Microsoft Way
> Redmond, WA 98052
> Attn: Services Attorney
> Fax: (425) 936-7329

11.        Microsoft Business Agreement between New Century Mortgage Corporation and Microsoft Corp., dated May 1, 2005.

> **Service Address**:
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

12.        Microsoft Agreement between New Century Mortgage Corporation and Microsoft Corp., dated May 1, 2005.

> **Service Address**:
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

*        *        *

## SCHEDULE 3.10(c)

## INTELLECTUAL PROPERTY – SOURCE CODE ESCROWS/CUSTODY

None.

## SCHEDULE 5.6(a)

## TECHNOLOGY EMPLOYEES

See attached list of Technology Employees.

Each Technology Employee listed is an active employee and does not have any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.). No target level 2007 bonus amount was set for any listed Technology Employee.

## SCHEDULE 5.6(b)

## PLANS

1.    Service Awards

2.    Education Assistance

3.    ESPP - Employee Stock Purchase Plan

4.    Fitness Club Membership

5.    Rideshare

6.    Scholarship Program

7.    FSA - Flexible Spending Account Plan

8.    Deferred Compensation Plan

9.    Vision Service Plan

10.    Dental Benefits - Indemnity Plan

11.    Dental Benefits - PDP Plan

12.    Medical Choice Plus 100/60 Plan

13.    Medical Choice Plus 90/70 Plan

14.    Medical Out of Area Plan

15.    Long-Term Disability, as amended

16.    Short-Term Disability, as amended

17.    Basic Life Certificate Class 1, as amended

18.    Basic Life Certificate Class 2, as amended

19.    401(k) Profit Sharing Plan

20.    HMSA Medical Plan

21.    Supplemental Life Insurance and AD&D Plan

22.    Wholesale Division and Region Manager Incentive Compensation Plan

23.    Wholesale Executive Management Incentive Compensation Plan

24.    Collateral Analyst Incentive Compensation Bonus Plan

25.    New Century Financial Corporation and Subsidiaries Company Incentive Bonus Plan

26.    Consumer Direct Retention Plan

27.    Wholesale Retention Plan

## DISCLOSURE SCHEDULES

These Disclosure Schedules have been prepared and are being delivered pursuant to that certain Asset Purchase Agreement, dated as of June 22, 2007 (the "Agreement"), by and among New Century Financial Corporation, a Maryland corporation, as a debtor and debtor-in-possession, and New Century Mortgage Corporation, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser"). All capitalized terms which are used but not defined in these Disclosure Schedules shall have the meanings ascribed to such terms in the Agreement, unless the context requires otherwise.

The Section numbers used in these Disclosure Schedules correspond to the Section numbers in the Agreement and are provided for convenience only. Any information set forth in one section of the Disclosure Schedules shall be deemed to apply to each other section or subsection hereof or of the Agreement to which its relevance is readily apparent on its face. Where the terms of a contract, agreement or other disclosure item have been summarized or described in these Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract, agreement or other disclosure item and such summary or description is qualified in its entirety by such contract, agreement or other disclosure item. Moreover, such summaries or descriptions of terms of contracts, agreements or other disclosure items provided in these Disclosure Schedules do not constitute representations, warranties or covenants of Sellers.

Unless otherwise stated, all statements made herein are made as of June 22, 2007. In addition, appendices and exhibits attached hereto and referenced herein form an integral part of the sections of the Disclosure Schedules into which they are incorporated by reference for all purposes as if set forth herein, including for the purposes of cross-application to other sections of the Agreement to which their relevance is readily apparent on its face. No reference to or disclosure of any item or other matter in these Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material, that it could have a Material Adverse Effect on Sellers or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. Except for Schedules 1.2(a) (Assumed Contracts), no reference in these Disclosure Schedules to any agreement or document shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. Furthermore, no reference in these Disclosure Schedules to any agreement or document shall be construed as (i) an admission or indication to or for the benefit of any third party that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document with respect to any third party (ii) an admission or indication of any liability or obligation of either Seller or any of their affiliates to any third party or (iii) an admission against either Seller's or any of their affiliates' interests. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

**SCHEDULE 1.2(a)**

**ASSUMED CONTRACTS**[*]

1.　　　　　iLOG Software License Agreement between New Century Mortgage Corporation and iLOG, Inc., dated September 5, 2003.

> **Service Address:**
> ILOG, Inc.
> 1080 Linda Vista Ave.
> Mountain View, CA 94043

2.　　　　　BEA WebLogic End User Software License Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April 28, 2003.

> **Service Address:**
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Office of the General Counsel

3.　　　　　Chordiant Software License and Services Agreement between New Century Mortgage Corporation and Chordiant Software Inc., dated June 30, 2004.

> **Service Address:**
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd.,
> Suite 400
> Cupertino, CA 95014
> Attn: Chief Financial Officer/Finance Director

4.　　　　　CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004.

> **Service Address:**
> CrownPeak Technology
> 13323 Washington Blvd., Suite 206
> Los Angeles, CA 90066

5.　　　　　Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005.

> **Service Address:**
> Ascential Software Corporation
> 50 Washington Street
> Westboro, MA 01581-1021
> Attn: General Counsel
> Tel: (508) 366-3888/Fax: (508) 389-8700

---

[*] Each as amended from time to time and including all exhibits, riders and addendums.

If and to the extent that any Assumed Contract listed on this Schedule 1.2(a) requires the consent of a third party for the assignment thereof, and such consent shall not have been provided by the applicable third party on or prior to the Closing Date, then each such Assumed Contract shall be deemed to be part of the Excluded Assets for the purposes of the Agreement.

**SCHEDULE 1.2(b)(i)**

**DATA**

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

"Reference Data" means values such as FICO scores, LTV amounts, LIBOR rates and other data that are retrieved at runtime and used within the logic of the application, generally as variables, which may also appear as input or output data.

"Control Data" means values such as MAX LTV, FICO Band or underwriting rule, which are retrieved at runtime and influence the flow of the logic engine, and which may also appear as input or output data.

"Meta Data" means "data about data," such as a database table descriptions, file layouts, and performance statistics that define the meaning of data contained in or traveling through the system, including, without limitation, "schemas," "attributes," and other technology specific data description lexicons.

"Configuration Data" means values that describe and control the logical linking and physical routing of communications, hardware function, software function and coupling of the preceding, such as "machine config," names.ora" or DNS entries.

"Documentation" means all requirements, analysis, design, inspection, test cases, test input and output data, processes, policies and procedures necessary to understand the intent and function of the relevant system.

## SCHEDULE 1.2(b)(ii)

## LOAN PERFORMANCE DATA

"Loan Performance Data" shall mean the scope of data representing certain attributes derived from Sellers' loan origination process.  The Loan Performance Data includes certain loan specific attributes, borrower attributes and property attributes.  There are approximately 3.2 million records with approximately 871 different attributes for such records.

The Loan Performance Data includes (i) certain pricing information from EDE as it exists in the data format of the Data Warehouse, (ii) certain servicing information for loans serviced by MortgageServ and OCWEN, (iii) certain broker information from BDS, and (iv) certain accounting and human resources information.  Such servicing information includes approximately 1.3 million loan records.

Certain information has been removed from the Loan Performance Data for consumer privacy reasons.

## SCHEDULE 1.2(c)(i)

## TRADEMARKS AND DOMAIN NAMES

Trademarks

| mOur Ref | Mark | Serial No. | Filing Date | Reg. No | Reg. Date | Status | Class No | Specification of Goods | Due Date | Due Date Description | Owner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S8368 | FastQual | 78/382,404 | 03/11/04 | 2,940,008 | 04/12/05 | Registered | 36 | Mortgage lending services | 04/12/11 | Affidavit of Use | New Century Mortgage Corporation |
| S8369 | FastQual & Design  | 78/382.408 | 03/11/04 | 3.030,444 | 12/13/05 | Registered | 36 | mortgage lending services | 12/13/11 | Affidavit of Use | New Century Mortgage Corporation |
| S6623 | FASTQUAL YOU JUST CLOSED MORE & Design  | 76/407.466 | 05/02/02 | 2,706,783 | 04/15/03 | Registered | 36 | mortgage lending services | 04/15/09 | Affidavit of Use | New Century Mortgage Corporation |

Domain Names

1.    www.fastqual.com

## SCHEDULE 1.2(c)(iii)

## TECHNOLOGY

| Application | Description of Application | Included Interfaces/Integrations |
|---|---|---|
| 1. BDS | Broker Database System, predecessor for BRM, utilizing classic ASP with SQL 2000 on the backend, used for managing brokers and broker contacts information | **Internal:**<br>BRM |
| 2. BDS - OOF (Opt Out) | Opt Out Fax Manager, used by broker services clerks to process right faxes with opt in/out options from brokers | |
| 3. BDS FM | .NET application for processing right fax images of signature pages from Online Broker Applications that are stored in database after BDSRightFax service processing | |
| 4. BDS OBA | Online Broker Application, part of FastQual that allows brokers to submit online applications that are processed later through BDSWF application (see #6) | **Internal:**<br>FastQual |
| 5. BDS RightFax (NT Service) | .NET service that takes care of processing/saving in database received right fax images of OBA signature pages which are processed by BDSFM | **Internal:**<br>Rightfax |
| 6. BDS WF | BDS workflow .NET application that allows broker services processors to approve OBA | |
| 7. BDS WS | Web services, middle tier for OBA and BDSWF | |
| 8. BRM | Broker Relationship Management - Marketing, Customer Support Agent Desktop and Sales Automation Workforce system to support New Century's relationship with our Wholesale Brokers<br><br>The BRM, as referred to in this Schedule 1.2(c)(iii), will include without limitation the Broker Data as such is stored or incorporated in a relational database in the BRM and all related information (including but not limited to control values). | **Internal:**<br>BDS<br>FastQual<br>Data Warehouse<br>Telemarketing/Campaign Files |

| 9. BRM - Reporting Service | Microsoft Reporting Services integration to display Broker Sales reports via the BRM application | |
|---|---|---|
| 10. BRM ETL | Extract Transform Load tool used to transfer, cleanse and aggregate data from several source and target systems | |
| 11. EDE | Enterprise Decisioning Engine that houses Pricing, Underwriting and Eligibility business rules for automated decisions | **Internal:**<br>Empower<br>FastQual |
| 12. EDE - Admin Tool | Administrator tool that allows business users to update pricing changes to EDE | |
| 13. EDE - Certification Tool | Verification tool used to compare EDE results across different rule sets | |
| 14. EDE - Log Viewer | GUI Support tool used to present EDE results | |
| 15. EDE - QA Response Loader | Testing tool that submits and returns EDE requests and results in large batches | |
| 16. EDE - QA Tool | Testing and Support tool that allows a user to submit, modify, and edit EDE XML request files and to view the EDE result file | |
| 17. EDE - Ratesheet Generator | Generates rate sheets that are published to our customers off of the EDE rule sets | |
| 18. Sellers' customizations to the Empower application and database | Sellers' customizations to the Wholesale and Retail Loan Origination System used to process loan applications | **Internal:**<br>Data Warehouse (multiple loan verification)<br>*EDE (loan pricing, underwriting review)<br>*Credit Gateway (credit report information)<br>BRM/BDS (broker validation)<br>Predictive Analytics (Risk Assessment)<br>Branch Licenses (License validation)<br>FastQual (import of application data)<br>Appraiser Database System (appraiser validation)<br>Rightfax (document transmittal)<br>Digital Sender (HW)/Outlook (Appraisal review)<br><br>**External:** |

| | | *Flood Integration (Flood report verification)<br>Hansen (property risk score)<br>SwiftSend (secure document transmittal)<br><br>* Required for loan origination |
|---|---|---|
| 19. FastQual, PrivateLabel | FastQual & Private Label -Wholesale and Correspondent Broker Point of Sale system used to capture applications and pre-qualify borrowers | **Internal:**<br>Credit Services (RC/ACR)<br>BRM<br>Data Warehouse<br>Empower<br>EDE<br>BDS<br>Lounge<br><br>**External:**<br>DiTech<br>Calyx<br>EllieMae (Desktop LOS Controls) |
| 20. Lounge | Wholesale Sales Portal to track Broker submissions and calculate sales commissions | |
| 21. RCS - NCI2MISMO | Redundant Credit Service translator to convert NCI format to MISMO | |
| 22. RCS (Redundant Credit) | Manages credit requests and responses with credit vendors and requesting systems | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>Fidelity (credit vendor)<br>CBC (credit vendor) |
| 23. Broker Credit Reissue | Tool for managing reissue of credit reports and requests | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>LSI<br>Fidelity<br>CBC<br>Kroll<br>Informative Research<br>Landsafe<br>Equifax<br>Credco<br>CBA/Experian |

LAI:1139446 5

| | | FiServ/Chase |
|---|---|---|
| 24. Help Desk Console | Support tool to administer credit vendors and troubleshoot credit reporting issues | **Internal:**<br>Broker Credit Reissue<br>Redundant Credit<br>FastQual |
| 25. Data Warehouse | Database system used for collecting and transmitting information from multiple applications mainly for reporting and analytics | **Internal:**<br>BRM<br>Empower<br>FastQual |

**SCHEDULE 1.4(c)**

**CURE FINDINGS**

| Contract Description | Contracting Party Contact Information: | Cure Amount |
|---|---|---|
| iLOG Software License Agreement between iLOG, Inc. and New Century Mortgage Corporation, dated September 5, 2003 | ILOG, Inc. 1080 Linda Vista Avenue Mountain View, CA 94043 | $0.00 |
| BEA WebLogic End User Software License Agreement between BEA Systems, Inc. and New Century Mortgage Corporation, dated April 28, 2003 | BEA Systems, Inc. 2315 North First Street San Jose, CA 95131 Attn: Office of the General Counsel | $0.00 |
| Chordiant Software License and Services Agreement between New Century Mortgage Corporation, dated June 30, 2004 | Chordiant Software Inc. 20400 Stevens Creek Blvd., Suite 400 Cupertino, CA 95014 Attn: Chief Financial Officer/Finance Director | $0.00 |
| CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004 | CrownPeak Technology 13323 Washington Blvd., Suite 206 Los Angeles, CA 90066 | $13,161.28 |
| Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005 | Ascential Software Corporation 50 Washington Street Westboro, MA 01581-1021 Attn: General Counsel | $0.00 |

## SCHEDULE 2.1

## PURCHASE PRICE ALLOCATION

[To be provided by Purchaser]

## SCHEDULE 3.7

## SUFFICIENCY OF PURCHASED ASSETS

1.        Agreement of Purchase and Software License between New Century Financial Corporation and Eastern Software Corporation, dated October 21, 2002.

> **Service Address:**
> Eastern Software Corporation
> 50 S. Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

2.        Empower Escrow Agreement between Eastern Software Corporation, New Century Financial Corporation and First National Trust Company, dated October 18, 2002.

> **Service Address:**
> Eastern Software Corporation
> 50 S. Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

> **Escrow Agent:**
> First National Trust Company c/o
> First National Bank of Pennsylvania
> One FNB Boulevard
> Hermitage, PA 16148
> Attn: Amy C. Atkinson, Client Services Specialist

3.        JBoss (Red Hat) Master Agreement between New Century Mortgage Corporation and Jboss, Inc., dated October 30, 2004.

> **Service Address:**
> Jboss, Inc.
> 3340 Peachtree Road NE, Suite 1225
> Atlanta, GA 30326
> Tel:  (404) 467-8555, ext 203/Fax:  (404) 948-1496

4.        Oracle License and Services Agreement between New Century Mortgage Corporation and Oracle, dated May 28, 2005.

> **Service Address:**
> Oracle USA, Inc.
> 500 Oracle Parkway
> Redwood City, CA 94065
> Attn: General Counsel, Legal Department

5.        BEA Consulting Services Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April, 2003.

> **Service Address**:
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

6.        BEA Consulting Services Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April 14, 2004.

> **Service Address**:
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

7.        Chordiant Professional Services Agreement between New Century Mortgage Corporation and Chordiant Software, Inc., dated October 22, 2004.

> **Service Address**:
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd., Suite 400
> Cupertino, CA 95014

8.        Red Hat Enterprise End User License Agreement between New Century Mortgage Corporation and Red Hat, Inc.

> **Service Address:**
> Red Hat, Inc.,
> Attn: General Counsel
> 1801 Varsity Drive
> Raleigh, NC 27606
> Fax: (919) 754-3704

9.        Citrix Open License Agreement between New Century Mortgage Corporation and Citrix Systems, Inc., dated May 6, 2004.

> **Service Address:**
> Citrix Systems, Inc.
> 852 Cypress Creek Road
> Fort Lauderdale, FL 33309

10.         Microsoft Master Services Agreement between New Century Mortgage Corporation and Microsoft Corp., dated February 27, 2003.

> **Service Address:**
> Microsoft Corporation
> Law and Corporate Affairs
> One Microsoft Way
> Redmond, WA 98052
> Attn: Services Attorney
> Fax: (425) 936-7329

11.         Microsoft Business Agreement between New Century Mortgage Corporation and Microsoft Corp., dated May 1, 2005.

> **Service Address**:
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

12.         Microsoft Agreement between New Century Mortgage Corporation and Microsoft Corp., dated May 1, 2005.

> **Service Address**:
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

*     *     *

15

## SCHEDULE 3.10(c)

## INTELLECTUAL PROPERTY – SOURCE CODE ESCROWS/CUSTODY

None.

**SCHEDULE 5.6(a)**

**TECHNOLOGY EMPLOYEES**

See attached list of Technology Employees.

Each Technology Employee listed is an active employee and does not have any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.). No target level 2007 bonus amount was set for any listed Technology Employee.

## SCHEDULE 5.6(b)

## PLANS

1.  Service Awards
2.  Education Assistance
3.  ESPP - Employee Stock Purchase Plan
4.  Fitness Club Membership
5.  Rideshare
6.  Scholarship Program
7.  FSA - Flexible Spending Account Plan
8.  Deferred Compensation Plan
9.  Vision Service Plan
10. Dental Benefits - Indemnity Plan
11. Dental Benefits - PDP Plan
12. Medical Choice Plus 100/60 Plan
13. Medical Choice Plus 90/70 Plan
14. Medical Out of Area Plan
15. Long-Term Disability, as amended
16. Short-Term Disability, as amended
17. Basic Life Certificate Class 1, as amended
18. Basic Life Certificate Class 2, as amended
19. 401(k) Profit Sharing Plan
20. HMSA Medical Plan
21. Supplemental Life Insurance and AD&D Plan
22. Wholesale Division and Region Manager Incentive Compensation Plan
23. Wholesale Executive Management Incentive Compensation Plan
24. Collateral Analyst Incentive Compensation Bonus Plan
25. New Century Financial Corporation and Subsidiaries Company Incentive Bonus Plan
26. Consumer Direct Retention Plan
27. Wholesale Retention Plan