# EXHIBIT A TO SALE ORDER

**(EquiFirst Agreement)**

ASSET PURCHASE AGREEMENT

by and among

New Century Financial Corporation

New Century Mortgage Corporation

and

EquiFirst Corporation

June 22, 2007

LAI:1139211 9
RLF1-3173382-1

# TABLE OF CONTENTS

Page

SECTION 1.    SALE OF ASSETS AND ASSUMPTION OF LIABILITIES ................... ..... 1

1.1.    Sale of Assets ................................................................................ 1

1.2.    Purchased Assets ........................................................................... 2

1.3.    Excluded Assets ............................................................................ 3

1.4.    Assumed Obligations ..................................................................... 4

1.5.    Excluded Liabilities ....................................................................... 6

1.6.    Non-Exclusivity of Broker Data ...................................................... 6

SECTION 2.    PURCHASE PRICE AND ADJUSTMENTS .................................... 6

2.1.    Purchase Price ............................................................................... 6

2.2.    Payment of Purchase Price .............................................................. 7

2.3.    Sale Order ..................................................................................... 7

SECTION 3.    REPRESENTATIONS AND WARRANTIES OF SELLERS ................ 8

3.1.    Corporate Existence ....................................................................... 8

3.2.    Corporate Authority ....................................................................... 8

3.3.    Finders; Brokers ............................................................................ 8

3.4.    Good Title ..................................................................................... 8

3.5.    Consents and Approvals; No Violations ............................................ 8

3.6.    Confidentiality .............................................................................. 9

3.7.    Sufficiency of Purchased Assets ...................................................... 9

3.8.    Cure Amount ................................................................................. 9

3.9.    Assumed Contracts ........................................................................ 9

3.10.    Intellectual Property ..................................................................... 9

3.11.    No Other Representations or Warranties .......................................... 10

3.12.    Expiration of Representations and Warranties .................................. 10

3.13.    Tax Matters ................................................................................ 10

SECTION 4.    REPRESENTATIONS OF PURCHASER ...................................... 10

4.1.    Existence ..................................................................................... 10

4.2.    Authority ..................................................................................... 10

4.3.    No Application of Hart-Scott-Rodino .............................................. 11

4.4.    Governmental Approvals; Consents; No Conflicts ............................. 11

4.5.    Finders; Brokers ........................................................................... 11

RLF1-3173382-1

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 4.6. | Financial Capacity | 11 |
| 4.7. | No Other Representations or Warranties | 11 |
| SECTION 5. | AGREEMENTS OF PURCHASER AND SELLER | 11 |
| 5.1. | No Sale of Purchased Assets | 11 |
| 5.2. | Access to Purchased Assets | 12 |
| 5.3. | Mutual Cooperation; No Inconsistent Action | 12 |
| 5.4. | Public Disclosures | 12 |
| 5.5. | Access to Records | 13 |
| 5.6. | Employees | 13 |
| 5.7. | Financing | 14 |
| 5.8. | Administration of Accounts and Related Matters; Inquiries | 15 |
| 5.9 | Privileged Information | 15 |
| 5.10. | Protection of Purchaser Interests in Purchased Assets | 16 |
| 5.11. | No Resale or Disclosure | 17 |
| SECTION 6. | CONDITIONS | 17 |
| 6.1. | Conditions Precedent to Obligations of Purchaser and Sellers | 17 |
| 6.2. | Conditions Precedent to Obligation of Sellers | 18 |
| 6.3. | Conditions Precedent to Obligation of Purchaser | 19 |
| SECTION 7. | CLOSING | 20 |
| 7.1. | Closing Date | 20 |
| 7.2. | Purchaser Deliveries | 20 |
| 7.3. | Seller Deliveries | 20 |
| 7.4. | Deposit Amount | 20 |
| SECTION 8. | TERMINATION | 21 |
| 8.1. | Termination Events | 21 |
| 8.2. | Notice of Termination | 22 |
| SECTION 9. | [RESERVED] | 22 |
| SECTION 10. | MISCELLANEOUS | 22 |
| 10.1. | Notices | 22 |
| 10.2. | Bulk Transfers | 23 |
| 10.3. | Transaction Taxes | 23 |

RLF1-3173382-1

# TABLE OF CONTENTS
(continued)

Page

10 4    Cooperation ............................................................................ 23

10.5.    Further Assurances; Asset Returns ........................................... 23

10.6    Other Covenants...................................................................... 23

10.7.    Expenses ................................................................................ 24

10.8.    Non-Assignability.................................................................... 24

10.9.    Amendment; Waiver................................................................ 24

10.10.    "AS IS" Transaction; Representations and Warranties; Schedules and
Exhibits ................................................................................ 24

10.11.    Third Parties............................................................................ 25

10.12.    No Strict Construction ............................................................. 25

10.13.    Governing Law ....................................................................... 25

10.14.    Venue and Jurisdiction............................................................. 25

10.15.    Certain Definitions................................................................... 26

10.16.    Entire Agreement.................................................................... 27

10.17.    Section Headings; Table of Contents........................................ 27

10.18    Severability ............................................................................ 27

10.19    Counterparts........................................................................... 27

## TABLE OF CONTENTS
(continued)

Page

<u>EXHIBITS</u>

EXHIBIT A    –    Assumption Agreement
EXHIBIT B    –    Bill of Sale
EXHIBIT C    –    Broker Data Purchase Agreement


<u>SCHEDULES</u>

Schedule 1.2(a)          –    Assumed Contracts
Schedule 1.2(b)(i)       –    Data
Schedule 1.2(b)(ii)      –    Loan Performance Data
Schedule 1.2(c)(i)       –    Trademarks and Domain Names
Schedule 1.2(c)(iii)     –    Technology
Schedule 1.4(c)          –    Cure Findings
Schedule 2.1             –    Purchase Price Allocation
Schedule 3.7             –    Sufficiency of Purchased Assets
Schedule 3.10(c)         –    Intellectual Property - Source Code Escrows/Custody
Schedule 5.6(a)          –    Technology Employees
Schedule 5.6(b)          –    Plans

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of June 22, 2007 (the "Agreement"), by and among NEW CENTURY FINANCIAL CORPORATION, a Maryland corporation, as a debtor and debtor-in-possession, NEW CENTURY MORTGAGE CORPORATION, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser").

**THE PARTIES TO THIS AGREEMENT** are entering into this Agreement on the basis of the following facts, intentions and understandings:

**WHEREAS**, on April 2, 2007, Sellers filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (jointly administered under Case No. 07-10416) and have continued to operate as debtors-in-possession;

**WHEREAS**, Sellers have filed a motion seeking approval from the Bankruptcy Court of the sale and assignment of all of the assets and liabilities held by Sellers that were used, in part, in the Sellers' business of originating non-prime mortgage loans, to the successful bidder in an Auction for the sale and assignment of certain of such assets conducted on June 22, 2007;

**WHEREAS**, Purchaser has been selected as the successful bidder in such Auction; and

**WHEREAS**, Purchaser desires to purchase from Sellers and Sellers desire to sell to Purchaser, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions of this Agreement certain of the assets and obligations of Sellers (such purchase, the "Asset Purchase").

**NOW, THEREFORE**, in consideration of the foregoing recitals, and the representations, warranties, covenants and agreements herein contained, the parties hereto hereby agree as follows:

## SECTION 1.
## SALE OF ASSETS AND ASSUMPTION OF LIABILITIES

1.1.    Sale of Assets. Subject to the satisfaction or waiver of the conditions set forth in this Agreement, including the approval by the Bankruptcy Court of this Agreement and the transactions contemplated herein, at the Closing and as of the Closing Date (as such terms are defined in Section 7.1 hereof), Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase or assume, as the case may be, all of Sellers' right, title, and interest in and to the assets, rights and contracts of Sellers set forth in Section 1.2 below, whether tangible or intangible, and wherever located, other than the Excluded Assets described in Section 1.3 hereof (the "Purchased Assets"). As of the Closing, (a) all of Sellers' right, title and interest in and to the Purchased Assets shall be immediately vested in Purchaser free and clear of any and all Liens, claims, encumbrances and interests, except for Permitted Liens (as

defined in <u>Section 2.3</u>) and (b) risk of loss as to the Purchased Assets shall pass from Sellers to Purchaser.

1.2.    <u>Purchased Assets</u>. The Purchased Assets to be purchased by Purchaser at the Closing are limited to all of Sellers' right, title and interest in and to the following:

(a)    <u>Contracts and Licenses</u>. All contracts and licenses with respect to software that are set forth on <u>Schedule 1.2(a)</u> (the "<u>Assumed Contracts</u>") to which a Seller is a party or by which a Seller is bound as of the Closing Date, to the full extent that such Assumed Contracts are assignable and Purchaser chooses to assume them.

(b)    <u>Data</u>. All Broker Data listed or described on <u>Schedule 1.2(b)(i)</u> (subject to Section 1.6) and, for each technology application listed on <u>Schedule 1.2(c)(iii)</u>, all Reference Data, Control Data, Meta Data, Configuration Data, and Documentation listed or described on <u>Schedule 1.2(b)(i)</u>, excluding the Loan Performance Data listed or described on <u>Schedule 1.2(b)(ii)</u> (collectively, the "<u>Data</u>").

(c)    <u>Intellectual Property</u>. All of the following:

(i)    <u>Trademark Rights</u>: All trademarks, trademark registrations, trademark applications (including all documents or files pertaining thereto), trade names and domain names that are listed or described on <u>Schedule 1.2(c)(i)</u> and all goodwill primarily related thereto;

(ii)    <u>Copyrights</u>: all copyrights, copyright registrations and copyright applications associated with any computer software code or data included in the Purchased Assets; and

(iii)    <u>Technology; Data</u>: Computer software code and all technology, processes or other proprietary information that are listed or described on <u>Schedule 1.2(c)(iii)</u> (the "<u>Technology</u>").

(d)    <u>Causes of Action</u>. All causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature, relating primarily to any Purchased Asset or any Assumed Liability (the "Purchased Claims").

(e)    <u>Purchased Assets Information</u>. Copies of all descriptions of and information primarily related to the Purchased Assets and books, files, records, documents, memoranda and codes primarily related to the Purchased Assets (but not including any email correspondence); <u>provided</u>, <u>however</u>, that the Purchased Assets shall not include any (i) personally identifiable information or other information that Sellers are prohibited from disclosing or transferring to a third party pursuant to any law or regulation, or (ii) any attorney-client communications or any other information related to Sellers' bankruptcy cases or any Liabilities not assumed by Purchaser ("<u>Excluded Confidential Information</u>"). Sellers shall keep such Excluded Confidential Information confidential and shall not permit such information to be used by any person in the loan origination business. To the extent any Excluded Confidential Information is classified as such as a result of a contractual confidentiality obligation, Sellers

- 2 -

shall use their commercially reasonable efforts to seek waivers to permit such information to be transferred to Purchaser as a Purchased Asset. To the extent any Excluded Confidential Information is classified as such because of a claim of attorney-client privilege, Sellers and Purchaser will cooperate in good faith to determine if a joint defense agreement would permit such disclosure, and, if not, Sellers shall waive such privilege if reasonably requested by Purchaser.

1.3.    Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, Sellers shall retain all of their existing right, title and interest in and to any and all assets that are not specifically included within the Purchased Assets (collectively, the "Excluded Assets").  In furtherance and not in limitation of the foregoing,  and there shall be excluded from the sale, conveyance, assignment or transfer to Purchaser hereunder, and the Purchased Assets shall not include, the following:

(a)    any asset or class of assets not designated as a Purchased Asset in Sections 1.2 (a) through (e) or on the related Schedules;

(b)    all cash and cash equivalents, including Sellers' bank accounts;

(c)    all tax returns of Sellers or any of their affiliates and all books and records (including working papers) related thereto, other than copies of any such documents relating exclusively to the Purchased Assets, and any books and records which Sellers are required by law to retain;

(d)    all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature, other than the Purchased Claims;

(e)    the Plans (defined below in Section 5.6(b)) and all rights or Liabilities in connection with assets of the Plans;

(f)    any rights, demands, claims, actions and causes of action constituting avoidance actions of Sellers' estate under Chapter 5 of the Bankruptcy Code, including any and all proceeds of the foregoing;

(g)    all of Sellers' rights and causes of action arising under Section 502 and 503 of the Bankruptcy Code and Rule 3007 thereunder;

(h)    all of the rights and claims of the Sellers available to Sellers under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing;

(i)    any of the rights of Sellers under this Agreement (or any agreements between Sellers, on the one hand, and Purchaser, on the other hand, entered into on or after the date of this Agreement, including but not limited to any Assumption Agreement or Bill of Sale);

- 3 -

(j)     all insurance policies and insurance proceeds that Sellers or any of their affiliates have a right to receive as of the Closing and that relate to events, circumstances or occurrences prior to the Closing;

(k)     all Tax refunds (other than Tax refunds with respect to Taxes paid by Purchaser or treated as paid by Purchaser under this Agreement related to the Purchased Assets with respect to periods after the Closing Date);

(l)     the Purchase Price and any rights Sellers may have pursuant to this Agreement;

(m)     all descriptions, information, books, files and records not specifically described in Section 1.2 (e), including all email correspondence, and all Excluded Confidential Information;

(n)     subject to Section 5.7 below, all credits, prepaid expenses, deferred charges, security deposits, letters of credit, prepaid items and duties whether or not related to a Purchased Asset;

(o)     all assets sold pursuant to that certain Asset Purchase Agreement, dated May 2, 2007, by and among New Century Financial Corporation and certain of its subsidiaries, on the one hand, and Ellington Management Group, L.L.C., a Delaware limited liability company, on behalf of its client funds;

(p)     all assets sold pursuant to that certain Supplement No. 1 to Asset Purchase Agreement, dated on or about June 14, 2007, by and among New Century Financial Corporation and certain of its subsidiaries, on the one hand, and Ellington Management Group, L.L.C., a Delaware limited liability company, on behalf of its client funds;

(q)     all assets sold pursuant to that certain Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007, by and among Carrington, New Century Financial Corporation, and New Century Mortgage Corporation;

(r)     all hardware, machinery, furniture, instruments and equipment of the Sellers;

(s)     the data centers of the Sellers located in Irvine, CA and Itasca, IL, or any other data center owned or leased by the Sellers (collectively, the "Data Center"); and

(t)     all rights, claims and causes of action relating to any Excluded Asset or any Excluded Liability.

1.4.    Assumed Obligations. Subject to the terms and conditions of this Agreement, upon the sale, transfer, assignment and conveyance of the Purchased Assets to Purchaser at Closing, Purchaser shall assume and agree to pay, perform and discharge when due, all debts, Liabilities and obligations of Sellers (or any of Sellers' subsidiaries) (i) arising based on events or factual circumstances attributable to Purchaser that occur after the Closing under the Assumed Contracts described in Schedule 1.2(a) and that are assigned to and assumed by Purchaser and

- 4 -

(ii) that constitute cure payments for all Assumed Contracts that are assigned to and assumed by Purchaser as determined by a Cure Finding (as defined below) for such Assumed Contracts (collectively, items (i) and (ii) shall be the "Assumed Obligations"). The Sale Order (as defined in Section 2.3) shall provide that the assumption and assignment to Purchaser of the Assumed Contracts set forth on Schedules 1.2(a), each as in effect on the date hereof, is approved, subject only to payment by Purchaser of all cures as determined by a Cure Finding. In no event shall Purchaser be required to assume any of the Assumed Contracts listed on Schedule 1.2(a).

(a)    Purchaser shall cooperate with Sellers in providing to the Bankruptcy Court any evidence necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Obligations.

(b)    Purchaser shall be responsible for all costs and expenses incurred after the Closing Date that are necessary in connection with providing adequate assurance of future performance with respect to the Assumed Obligations.

(c)    The term "Cure Finding" as used herein shall mean a finding by the Bankruptcy Court in a Final Order (as defined below in Section 6.1(a)) determining the amount required to be paid to cure any outstanding defaults under an Assumed Contract so that Sellers may assume and assign such Assumed Contract to Purchaser pursuant to section 365 of the Bankruptcy Code. The Sale Order shall include the Cure Findings for each Assumed Contract thereon. Upon objection by the non-debtor party to any such Assumed Contract, Purchaser or, upon prior written request of Purchaser, Sellers shall either settle the objection of such party (subject to approval of the Purchaser of any such settlement that sets a higher Cure Finding than the amount set forth on Schedule 1.4(c)) or shall litigate such objection under such procedures as the Bankruptcy Court shall approve and proscribe. Purchaser shall be responsible for tendering any cure amounts for each Assumed Contract as determined by a Cure Finding for such Assumed Contract, and if the Closing occurs Purchaser shall pay such cure amounts as of the Closing Date. The Sale Order shall provide that Purchaser may take any action and file any motions or other papers with respect to a Cure Finding required to be taken by Sellers pursuant to this Section 1.4(c) in place and in the name of Sellers or that Purchaser shall pay the reasonable costs and expenses of Sellers incurred in taking any such action or filing any such motion or other papers, including but not limited to attorney's fees of Sellers involved in any such settlement or litigation. Purchaser shall indemnify Sellers for any claims pursuant to any Assumed Obligation during such time as the objection of the non-debtor party to such Assumed Obligation is being litigated.

(d)    Sellers shall use commercially reasonable efforts to obtain the consent of any non-debtor party to any Assumed Contract that Purchaser desires to have assumed and assigned pursuant to Section 1.7 but that Sellers may not assume and assign to Purchaser pursuant to section 365(c)(1) of the Bankruptcy Code absent the consent of the non-debtor party thereto as determined by Final Order (a "Restricted Contract") for purposes of sections 363(f) or 365(f) of the Bankruptcy Code. If any non-debtor party to a Restricted Contract objects to the assumption and assignment of such Restricted Contract, Purchaser agrees that if such non-debtor party does not consent to the assignment and assumption of such Restricted Contract before the Closing Date, then such Restricted Contract shall not be and shall not be deemed to be an

- 5 -

Assumed Contract within the meaning of <u>Section 1.2(a)</u> hereto without any adjustment to the Purchase Price.

1.5.    <u>Excluded Liabilities</u>. It is expressly agreed that Sellers will retain any and all Liabilities and obligations not expressly assumed by Purchaser pursuant to <u>Section 1.4</u> above, and Purchaser shall not assume any of such Liabilities and obligations (the "<u>Excluded Liabilities</u>") notwithstanding any other provision hereof. Except as set forth in <u>Section 1.4</u>, Purchaser shall not assume or have any Liability of any nature or kind whatsoever relating to Sellers, the businesses previously operated by Sellers, or the Purchased Assets that exists, or that arises out of the ownership or operation of the Purchased Assets, prior to, at or after the Closing.

1.6.    <u>Non-Exclusivity of Broker Data</u>.

(a)    Purchaser acknowledges that, notwithstanding any other provision of this Agreement, (a) Sellers may retain a copy of the Broker Data herein sold to and made available to Purchaser on a non-exclusive basis, and Purchaser agrees that Sellers may copy and, at any time after the earlier of the consummation of the transactions contemplated (i) by this Agreement or (ii) by the Broker Data Purchase Agreement (as defined below), make available other copies of the Broker Data without restriction to any one or more third persons; and (b) Sellers' obligations under <u>Sections 5.10(d), (e)</u> and <u>(g)</u> shall not apply to any copies of the Broker Data retained by Sellers.

(b)    Purchaser acknowledges that, notwithstanding any other provision of this Agreement, Sellers may elect at any time prior to Closing, in their sole discretion, to consummate the sale to Purchaser of the Broker Data on the terms set forth in the Broker Data Purchase Agreement attached hereto as <u>Exhibit C</u> (the "<u>Broker Data Purchase Agreement</u>"). In no event shall the purchase price for such sale of Broker Data to Purchaser exceed the lesser of (i) the highest amount paid by a third party purchaser for any part of the data or (ii) Five Hundred Thousand Dollars ($500,000).

(c)    Seller shall not provide a copy of or otherwise make the Broker Data available to a third party prior to providing the Broker Data to Purchaser; <u>provided however</u>, if the closing of the transaction contemplated in the Broker Data Purchase Agreement is not consummated primarily due to Purchaser's failure to comply with any closing condition set forth therein, this <u>Section 1.6(c)</u> shall not apply.

1.7.    <u>Assumption of Assumed Contracts</u>. Purchaser shall notify Sellers in writing of its desire to assume any of the Assumed Contracts no later than August 1, 2007. In the event Purchaser does not so notify Sellers of a desire to assume any Assumed Contract, such Assumed Contract shall thereafter be deemed an Excluded Asset pursuant to <u>Section 1.3</u>.

**SECTION 2.**
**PURCHASE PRICE AND ADJUSTMENTS**

2.1.    <u>Purchase Price</u>.

(a)    The aggregate purchase price for the Purchased Assets shall be Eight Million Fifty Thousand United States Dollars ($8,050,000.00) <u>less</u> the amount actually paid by

- 6 -

Purchaser pursuant to the Broker Data Purchase Agreement, if any (the "Purchase Price"). For the avoidance of doubt, the Purchase Price shall not be reduced in the event that Purchaser elects not to assume one or more of the Assumed Contracts or as a result of any cure amounts associated with any Assumed Contracts.

(b)    Purchaser and Sellers agree to allocate the Purchase Price in accordance with the rules under Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations promulgated thereunder. Such Purchase Price allocation is set forth in Schedule 2.1. Purchaser and Sellers recognize that the Purchase Price does not include Purchaser's acquisition expenses and that Purchaser will allocate such expenses appropriately. Sellers and Purchaser agree to act in accordance with the computations and allocations contained in Schedule 2.1 in any relevant tax returns or filings, including any forms or reports required to be filed pursuant to Section 1060 of the Code, the Treasury Regulations promulgated thereunder or any provisions of local, state and foreign law ("1060 Forms"), and to cooperate in the preparation of any 1060 Forms and to file such 1060 Forms in the manner required by applicable law.

(c)    Subject to Section 10.3, all applicable federal, state or local income, profits, franchise, gross receipts, payroll, sales, employment, use, property, real estate, excise, value added, estimated, stamp, alternative or add-on minimum, environmental, withholding and any other taxes, duties or assessments, together with all interest, penalties and additions imposed with respect to such amounts (collectively, "Tax" or "Taxes") on the Purchased Assets for any taxable period commencing prior to the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between Purchaser and Seller as of the Closing Date; provided, however, that Sellers shall not be responsible for any increased assessments on personal property resulting from the transactions contemplated hereby. All such prorations shall be allocated so that items relating to time periods ending on or prior to the Closing Date shall be allocated to Sellers and items relating to time periods beginning after the Closing Date shall be allocated to Purchaser. The amount of all such prorations shall be settled and paid on the Closing Date, provided that final payments with respect to prorations that are not able to be calculated as of the Closing Date shall be calculated and paid as soon as practicable thereafter.

2.2.    Payment of Purchase Price. Subject to Section 7.4, at the Closing the Purchase Price shall be payable by a wire transfer of immediately available federal funds to such bank accounts as shall be designated by Sellers prior to Closing.

2.3.    Sale Order. Sellers shall seek entry of a Bankruptcy Court order approving the sale of the Purchased Assets to Purchaser and the assignment of the Assumed Obligations (the "Sale Order"). The Sale Order shall (a) provide for a sale of the Purchased Assets free and clear of any and all Liens, claims, encumbrances and interests, except Liens in connection with the Assumed Obligations specifically assumed by Purchaser pursuant to Section 1.4 hereof (such Liens, charges and encumbrances are referred to herein as "Permitted Liens"), and (b) authorize the assumption by Sellers and the assignment to Purchaser, effective upon the Closing, of the Assumed Obligations on the following terms and conditions:

(a)    Sellers are authorized to consummate the transaction contemplated under this Agreement.

- 7 -

(b)      The terms of this Agreement are fair and reasonable and provide fair value for the Purchased Assets, Purchaser's bid is the best offer for the Purchased Assets, and the sale to Purchaser is in the best interests of Sellers, their stockholders and their creditors.

(c)      Except as provided in this Agreement, the Purchased Assets shall be sold free and clear of all Liens, with such Liens to attach to the consideration to be received by Sellers in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Purchaser would not enter into this Agreement or purchase the Purchased Assets otherwise.

(d)      The transfer of the Purchased Assets to Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and except as expressly provided in this Agreement, will vest Purchaser with all right, title and interest of Sellers to the Purchased Assets free and clear of all Liens.

(e)      Sellers' assignment and Purchaser's assumption of the Assumed Contracts is approved on the terms provided in this Agreement, and Purchaser has provided adequate assurances of future performance thereunder.

(f)      Purchaser is a good faith purchaser entitled to the protections afforded by Bankruptcy Code section 363(m) such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Purchased Assets as contemplated hereunder, negotiations have been fair and arms' length, and no party has engaged in any conduct that would cause the sale to be avoided under Bankruptcy Code section 363(n).

(g)      Purchaser shall have no obligations with respect to any Liabilities of Sellers other than the Assumed Obligations and its obligations under this Agreement and any collateral agreements.

Notwithstanding anything to the contrary herein, Sellers shall have the unconditional right to terminate or reject in the Bankruptcy Court any leases or contracts not assumed by Purchaser as Assumed Obligations pursuant to this <u>Section 2.3</u>.

## SECTION 3.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Seller Disclosure Schedule, Sellers represent and warrant to Purchaser that the statements contained in this <u>Section 3</u> are true and correct as of the date hereof and as of the Closing Date.

3.1.    <u>Corporate Existence</u>. Except as a result of the commencement of the Bankruptcy Cases, Sellers are corporations duly organized, validly existing and in good standing under the laws of their respective states of incorporation.

3.2.    <u>Corporate Authority</u>. Subject to entry of the Sale Order, Sellers have the power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and this Agreement has been duly executed and delivered by Sellers and constitutes the valid and binding agreement of Sellers, enforceable in accordance with its terms

- 8 -

except as enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights or subject to general principles of equity.

3.3.    Finders; Brokers.    Other than Lazard Freres & Co. LLC, the fees of which will be paid by Sellers or their affiliates, no broker, finder, consultant or intermediary is entitled to a broker's, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement or upon the consummation of the transactions contemplated hereby, or if the Closing does not occur, as a result of any actions or agreements of Sellers or their agents.

3.4.    Good Title.    Subject to entry of the Sale Order, Sellers shall transfer to Purchaser good title to, or a valid lease or license interest in, all of Sellers' right, title and interest in and to the Purchased Assets, free and clear of all Liens.

3.5.    Consents and Approvals; No Violations.    Subject to entry of the Sale Order, no consent of, or declaration, filing or registration with, any federal, state or local court, administrative body or other governmental entity with competent jurisdiction (a "Government Entity") is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated by this Agreement, except for: consents, declarations, filings and registrations the failure to have which, individually or in the aggregate, would not reasonably be excepted to have a Material Adverse Effect.    Subject to entry of an order approving assignment and assumption of the Assumed Contracts, neither the execution and delivery hereof nor the consummation of the transactions contemplated hereby will contravene, conflict with, result in a violation of (or any event that, with notice or lapse of time or both, would constitute a violation of) any of the terms or requirements of, or give any person the right to accelerate, revoke, withdraw, suspend, cancel, terminate or modify, or result in the inability of Purchaser to enjoy the benefits of, such Assumed Contract.

3.6.    Confidentiality.    Sellers have taken all steps reasonably necessary to preserve the confidential nature of all material confidential information (including any trade secrets and other proprietary information) related to the Purchased Assets.    All use, disclosure or appropriation of such material confidential information owned by any Seller by or to a third party has been pursuant to the terms of a written agreement between such Seller and such third party.

3.7.    Sufficiency of Purchased Assets.    Apart from the Purchased Assets, the Assumed Contracts (as such are set forth in Schedule 1.2(a) as of the date hereof) and the contracts set forth on Schedule 3.7 and the software licensed pursuant to such contracts, no software or associated license rights are required to use the Technology and Data as a loan origination platform in a manner substantially similar to Sellers' use of the material functions of the Technology and Data.

3.8.    Cure Amount.    Schedule 1.4(c) sets forth the amount that, to the Company's Knowledge, is required to be paid to cure any outstanding defaults under each Assumed Contract.

3.9.    Assumed Contracts.    Each Assumed Contract is in full force and effect and is enforceable against each party thereto in accordance with its terms, subject only to the payment

- 9 -

of the cure amounts set forth on Schedule 1.4(c). There is no other material dispute pending or threatened under any of the Assumed Contracts.

3.10.    Intellectual Property.

(a)    Sellers have never received any charge, complaint, claim, demand, or notice alleging that any of the Purchased Assets, or any Sellers' use of them, infringes, misappropriates or violates any third-party rights, including any claim that any Seller must license, any intellectual property rights of any third party to use any of the Purchased Assets or refrain from using such Purchased Asset.

(b)    Sellers have not granted any sublicense or similar right with respect to the Purchased Assets.

(c)    No Seller nor any other person acting on their behalf has disclosed, delivered or licensed to any person, or agreed to disclose, deliver or license to any person, any Seller source code included within the Purchased Assets. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, result in the disclosure, delivery or license by any Seller or any person acting on their behalf to any person of any Seller source code. Schedule 3.10(c) identifies each contract pursuant to which any Seller has deposited, or is or may be required to deposit, with an escrowholder or any other person, any Seller source code, and describes whether the execution of this Agreement or any of the transactions contemplated by this Agreement, in and of itself, would reasonably be expected to result in the release from escrow of any Seller source code.

3.11.    No Other Representations or Warranties.   Except for the representations and warranties contained in this Section 3, neither Sellers nor any other person makes any other express or implied representation or warranty on behalf of Sellers.

3.12.    Expiration of Representations and Warranties.   The representations and warranties made by Sellers to Purchaser herein shall not survive the Closing and shall expire and be of no force and effect whatsoever after the Closing. If any of the foregoing representations and warranties are breached by the Seller prior to Closing, Purchaser's sole remedy shall be to declare a failure of the condition set forth in Section 6.3(a) and refuse to close. Sellers shall have no Liability in connection with any such breach.

3.13.    Tax Matters.

(a)    (i) Each Seller has, in respect of the Purchased Assets, timely filed or caused to be timely filed, and with respect to Tax Returns related to the Purchased Assets due between the date of this Agreement and the Closing Date will timely file (taking into account any applicable extensions), all such material Tax Returns required to be filed by the Code or by applicable state, local or foreign Tax Laws, (ii) all such Tax Returns are, or in the case of such Tax Returns not yet filed, will be, true, complete and correct in all material respects, and (iii) all material Taxes with respect to the Purchased Assets payable by Sellers have been timely paid, or in the case of Taxes due between the date of this Agreement and the Closing Date will be timely paid.

- 10 -

(b)    (i) No Tax Return of any Seller with respect to the Business or the Purchased Assets is currently under audit or examination by any taxing authority, and (ii) no notice of such an audit or examination has been received by any Seller.

(c)    Sellers have not waived or been requested to waive any statute of limitations in respect of Taxes associated with the Business or the Purchased Assets.

3.14.    Personally Identifiable Information.  Sellers will use commercially reasonable efforts to ensure the Purchased Assets contain no personally identifiable information of any third party.

## SECTION 4.
## REPRESENTATIONS OF PURCHASER

Purchaser represents and warrants that the statements contained in this Section 4 are true and correct as of the date of this Agreement.

4.1.    Existence.  Purchaser is a corporation duly organized and validly existing and in good standing under the laws of the State of North Carolina and has the requisite power and authority to own, lease and operate the Purchased Assets.  Purchaser is duly authorized, qualified or licensed to do business as a foreign corporation and in good standing in every jurisdiction wherein, by reason of the character of the Purchased Assets, the failure to be so qualified would have a Material Adverse Effect on the ability of Purchaser to consummate the transactions contemplated hereby (a "Purchaser Material Adverse Effect").

4.2.    Authority.  This Agreement and the consummation of all of the transactions provided for herein have been duly authorized by the Board of Directors of Purchaser and by all requisite corporate, shareholder or other action prior to Closing, and Purchaser has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by Purchaser, and constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms except as enforceability may be (a) limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights, or (b) subject to general principles of equity.

4.3.    No Application of Hart-Scott-Rodino.  No filing will be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") in connection with the acquisition by Purchaser of the Purchased Assets. This representation and warranty shall survive until the twelve (12) month anniversary of the Closing.

4.4.    Governmental Approvals; Consents; No Conflicts.

(a)    Purchaser is not subject to any order, judgment or decree that would prevent the consummation of the transactions contemplated hereby. No claim, legal action, suit, arbitration, governmental investigation, action, or other legal or administrative proceeding is pending or, to the knowledge of Purchaser, threatened against Purchaser that would enjoin or delay the transactions contemplated hereby. No consent, approval, order or authorization of, license or permit from, notice to or registration, declaration or filing with, any Governmental Entity, or of any third party, is or has been required on the part of Purchaser in connection with

- 11 -

the execution and delivery of this Agreement or any of the transactional documents, or the consummation of the transactions contemplated hereby and thereby except for the approval by the Bankruptcy Court and any such consents, approvals, orders or authorizations of, licenses or permits, filings or notices the failure of which to obtain or make would not have a Purchaser Material Adverse Effect.

(b)    Neither the execution and delivery of this Agreement or any other agreements and documents to be executed or delivered pursuant hereto, nor the consummation of the transactions contemplated hereby, will (i) violate, or conflict with, any provision of Purchaser's Articles or Certificate of Incorporation or Bylaws or other charter documents or (ii) violate, or conflict with, any order, writ, injunction, arbitral award, judgment or decree of any court, governmental body or arbitrator applicable to Purchaser, except for any such violation, breach or default that would not have a Purchaser Material Adverse Effect.

4.5.    Finders; Brokers.  Purchaser is not a party to any agreement with any finder or broker, or in any way obligated to any finder or broker for any commissions, fees or expenses, in connection with the origin, negotiation, execution or performance of this Agreement.

4.6.    Financial Capacity.  Purchaser is solvent, has adequate capital, and has the financial wherewithal or committed financial resources to meet Purchaser's obligations under this Agreement and to perform the Assumed Obligations.

4.7.    No Other Representations or Warranties.  Except for the representations and warranties contained in this Section 4, neither Purchaser nor any other person makes any other express or implied representation or warranty on behalf of Purchaser.

### SECTION 5.
### AGREEMENTS OF PURCHASER AND SELLER

5.1.    No Sale of Purchased Assets.  From the date of this Agreement until the Closing Date, and subject to the obligations of a debtor in possession and any limitations on operations imposed by the Bankruptcy Court or any state or federal authority, Sellers shall not, without the prior written approval of Purchaser or as otherwise expressly contemplated by this Agreement, sell, transfer, license or otherwise dispose of or encumber any of the Purchased Assets, or agree, whether in writing or otherwise, to do any of the foregoing.  In addition, subject to Section 1.6, Sellers shall use their commercially reasonable efforts to preserve the confidentiality of the intellectual property and data included in the Purchased Assets.

5.2.    Access to Purchased Assets.  Prior to the Closing Date, Sellers will permit Purchaser and its authorized agents or representatives, including its independent accountants, to have reasonable access to the Purchased Assets during business hours and to review information and documentation relating to the Purchased Assets.  Purchaser's representatives will hold in confidence all confidential information obtained from Sellers, their officers, agents, representatives, employees or customers, as the case may be, in accordance with the provisions of the Bankruptcy Code and the provisions of the Non-Disclosure Letter Agreement, dated as of May 10, 2007, between Barclays Bank PLC (including its subsidiaries) and Sellers, as amended and currently in effect (the "Confidentiality Letter").

- 12 -

5.3.    Mutual Cooperation; No Inconsistent Action.

(a)    Subject to the terms and conditions hereof, Sellers and Purchaser agree to use their reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including all of the following: (i) obtain prior to Closing all licenses, certificates, permits, approvals, authorizations, qualifications and orders of Governmental Entities as are necessary for the consummation of the transactions contemplated hereby, including but not limited to such consents and approvals as may be required by the Bankruptcy Court; and (ii) effect any necessary registrations or filings. Sellers and Purchaser shall cooperate fully with each other to the extent reasonable in connection with the foregoing.

(b)    Each of Sellers and Purchaser shall notify and keep the other advised as to (i) any litigation or administrative proceeding pending and known to such party, or to the Purchaser's knowledge or Sellers' knowledge threatened, which challenges the transactions contemplated hereby and (ii) any event or circumstance which would constitute a breach of their respective representations and warranties in this Agreement, provided, that the failure of Sellers or Purchaser to comply with clause (ii) shall not be deemed a breach of a covenant for purposes of Section 6.2(a)(ii), and Section 6.3(a)(ii) hereof, respectively.

5.4.    Public Disclosures. Prior to the Closing Date, no party to this Agreement will issue any press release or make any other public disclosures concerning this transaction or the contents of this Agreement without the prior written consent of the other party. Notwithstanding the above, nothing in this Section 5.4 will preclude any party from making any disclosures required by law or regulation or necessary or desirable in conjunction with the filing of any tax return or other document required to be filed with any federal, state or local governmental body, authority or agency, including any filings deemed necessary or advisable under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), any disclosures to auditors, or any disclosures necessary or desirable in conjunction with any Bankruptcy Court process or proceeding, including, without limitation, filings or disclosures to creditors, provided that the disclosing party under this Section 5.4 shall, to the extent practicable, provide the non-disclosing party a reasonable opportunity to review any such disclosure that identifies the non-disclosing party by name, before the disclosing party makes any such public disclosure under this Section 5.4.

5.5.    Access to Records. Purchaser shall preserve for a period of six years after the Closing Date all records relating to the Purchased Assets existing prior to the Closing Date. After the Closing Date, where there is a legitimate purpose (including, without limitation, as necessary for the administration of the bankruptcy case), Purchaser shall provide Sellers with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to all information, data and books and records of Purchaser, in any form other than electronic form, but, in each case, only to the extent relating to the Purchased Assets prior to the Closing Date, and Sellers and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Purchaser; and provided, further, that such information shall be held by Purchaser in confidence to the extent required by law. In addition, Purchaser shall direct any Transferred Employees to

- 13 -

cooperate reasonably with Sellers for purposes of gaining access to the information, data and books and records pursuant to this Section 5.5. Such records may nevertheless be destroyed by Purchaser if (X) Purchaser sends to Sellers a written request to destroy records, specifying with particularity the contents of the records to be destroyed, and (Y) Sellers, in their sole discretion, provide their written consent to such request. Such records may then be destroyed after the 30th day after such written consent is provided by Sellers; provided, however, that if such written consent is not provided by Sellers, then Purchaser shall deliver such records to Sellers at Purchaser's sole cost. Sellers agree to use all commercially reasonable efforts not to deliver or disclose to Purchaser any data or information that Sellers are prevented or prohibited from disclosing to Purchaser or any other third party pursuant to any applicable privacy laws or any other law, rule, regulation, ruling, decree, order, injunction, judgment or order that is or has been issued, enacted, approved, promulgated, made or otherwise put into effect by or under the authority of any court of law or governmental authority (including but not limited to any consumer data or employment data). In the event that (a) Sellers notify Purchaser that Sellers inadvertently delivered such data or information to Purchaser (such notice to include a specific description of such data or information) or (b) Purchaser otherwise becomes aware that Sellers have delivered such data, Purchaser shall, (i) in the case of clause (b) above, notify Sellers of such data or information and (ii) use its commercially reasonable efforts to keep such data confidential and, upon Sellers' request and at Sellers' sole cost, Purchaser shall return to Sellers such data and information. Notwithstanding the foregoing, Purchaser shall not be under any affirmative obligation to determine whether any such data or information has been delivered to Purchaser by Sellers as part of the Purchased Assets.

    5.6.    Employees.

        (a)    Transferred Employees. With respect to each employee of Sellers whose sole responsibility is to provide services primarily related to the Purchased Assets and each other employee of Sellers identified by Sellers as having significant responsibility primarily related to the Purchased Assets (each a "Technology Employee"), Schedule 5.6(a) lists, to the extent such information is permitted to be disclosed under applicable law: (1) each such person's title or job/position; (2) each such person's job designation (i.e., salaried or hourly); (3) each such person's location of employment; (4) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, PTO, etc.)); (5) each such person's annual base rate of compensation, target level of 2007 bonus amounts and bonuses received in 2006; and (6) if applicable, any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.). Sellers shall cooperate with Purchaser during the period prior to Closing to permit Purchaser during regular business hours and upon reasonable notice (1) to meet with such Technology Employees of Sellers (including managers and supervisors) as Purchaser shall reasonably request and (2) to speak with supervisors regarding those Technology Employees who are being considered for employment by Purchaser; provided, that such access does not unreasonably interfere with the Sellers' business operations and provided, further, that Purchaser shall not, directly or indirectly, prior to the earlier of the Closing or 90 days following the termination of this Agreement, employ any Technology Employee (including any manager or supervisor) of Sellers.

- 14 -

(i)     As soon as reasonably practicable after the Closing Date, Purchaser shall furnish offers of employment to such of the Technology Employees identified on Schedule 5.6(a) as Purchaser may determine in its sole discretion. Each Technology Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser shall be a "Transferred Employee."

(ii)    It is Purchaser's current intention that, if Purchaser makes an offer of employment to any Technology Employee, such offer shall include a competitive, market based package of base compensation and bonus opportunity.

(iii)   Seller shall retain all liability for former employees of Sellers, including employees of Sellers on long-term disability.

(iv)    For a period of six (6) months following the Closing, upon request of Sellers, Purchaser shall provide Sellers with reasonable access to those employees of Purchaser who were former employees of Sellers for purposes of providing operational support to Sellers, and Sellers shall pay Purchaser on a time and materials basis at standard industry rates for such services.

(b)     Employee Benefit Plans. Schedule 5.6(b) sets forth a true, complete and correct list of each material employee benefit plan or arrangement (each, a "Plan") that covers any Technology Employee. Purchaser and its affiliates shall not assume any Plans or any Liabilities under or with respect to the Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its affiliates that is elected by a Transferred Employee under a Plan intended to be qualified under Section 401(a) of the Code). Effective as of the Closing, each Technology Employee shall be 100% fully vested in his benefits under any Plan that is intended to be qualified under Section 401(a) of the Code.

(c)     WARN. Sellers agree to provide any required notice under and to otherwise retain all Liabilities relating to the federal Worker Adjustment and Retraining Notification Act ("WARN"), or any similar state, local or foreign laws, with respect to any event affecting Technology Employees on or prior to the Closing Date. Purchaser agrees to provide any required notice under and to otherwise assume all Liabilities relating to WARN, or any similar state, local or foreign laws, with respect to any event affecting Transferred Employees after the Closing Date.

(d)     Cooperation. Sellers and Purchaser shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable law to carry out their obligations under this Section 5.6.

(e)     No Third Party Rights. No provision of this Agreement confers rights or remedies upon any person, including any Technology Employee or any Transferred Employee, other than the parties to this Agreement.

5.7.    Financing. From and after the Closing, Purchaser shall be responsible for funding all disbursements related to the Purchased Assets and the Assumed Obligations acquired under this Agreement to the extent such disbursements relate to periods from and after the Closing Date. To the extent that Sellers have made any payments related to the Purchased Assets and the

LA1:1139211 9
RLF1-3173382-1

Assumed Obligations for any period that ends after the Closing Date, Purchaser shall reimburse Sellers at Closing on a per diem basis for payments allocable to periods from and after the Closing Date (such reimbursement, the "Financing Adjustment"), subject to a credit in favor of Purchaser to the extent Purchaser has paid the cure amounts set forth on Schedule 1.4(c) that relate to the Assumed Contract in respect of which such payments were made by Sellers. No less than two (2) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a written statement (i) setting forth any amounts to be paid by the Purchaser pursuant to the Financing Adjustment and (ii) describing in reasonable detail the nature of such payments and the basis for the calculation of such amounts.

   5.8.   Administration of Accounts and Related Matters; Inquiries.

      (a)   All payments and reimbursements made in the ordinary course of business by any third party in the name of or to Sellers or any affiliate thereof arising after the Closing Date out of the Purchased Assets or Assumed Obligations, shall be held by such person in trust for the benefit of Purchaser and, promptly upon receipt by such person of any such payment or reimbursement, such person shall pay over to Purchaser the amount of such payment or reimbursement without right of set off.

      (b)   All payments and reimbursements made in the ordinary course of business by any third party in the name of or to Purchaser or any affiliate thereof in connection with or arising out of the Excluded Assets or Excluded Liabilities shall be held by such person in trust for the benefit of Sellers and, promptly upon receipt by such person of any such payment or reimbursement, such person shall pay over to Sellers the amount of such payment or reimbursement without right of set off.

   5.9.   Privileged Information. (a) Notwithstanding any provision in this Agreement to the contrary, any documents of Sellers subject to the attorney client privilege and/or the work product immunity doctrine shall not constitute Purchased Assets. In the event that (a) Sellers notify Purchaser that Sellers inadvertently delivered Excluded Confidential Information to Purchaser or (b) Purchaser otherwise becomes aware that Sellers have delivered any Excluded Confidential Information, Purchaser shall, (i) in the case of clause (b) above, notify Sellers of such Excluded Confidential Information and (ii) upon Sellers' request and at Sellers' sole cost, deliver such information, including all copies thereof, to Sellers. Notwithstanding the foregoing, Purchaser shall not be under any affirmative obligation to determine whether any such Excluded Confidential Information has been delivered to Purchaser by Sellers as part of the Purchased Assets. Purchaser further agrees not to disclose such privileged document or other Excluded Confidential Information except, subject to and in accordance with Section 5.9(b), to the extent requested or required by law to the securities market on which its securities are listed or qualified for listing (the "Exchange"), if any, the Securities and Exchange Commission (the "SEC") or other regulatory or self regulatory authorities having jurisdiction over the receiving party or its affiliates ("Other Regulators") or a court of competent jurisdiction or other tribunal.

      (b)   In the event that Purchaser is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process, but excluding any request by the Exchange or the SEC and Other Regulators) to disclose any of the Excluded Confidential Information, Purchaser

- 16 -

shall provide the Sellers with prompt written notice of any such request or requirement so that Sellers may seek a protective order or other appropriate remedy (and if the Sellers seek such an order, the Purchaser shall provide such cooperation as the Sellers reasonably request) and/or, in the Sellers' sole discretion, waive compliance with the provisions of this Section 5.9(b). If, in the absence of a protective order or other remedy or the receipt of a written waiver by the Sellers, the Purchaser is nonetheless legally obligated to disclose the Excluded Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, the Purchaser may, without liability hereunder, disclose to such tribunal only that portion of the Excluded Confidential Information which such counsel advises the Purchaser is legally obligated to be disclosed (and concurrently provide a copy thereof to the Sellers), provided that Purchaser provides the Sellers with written notice of the Excluded Confidential Information to be disclosed as far in advance as reasonably practicable and exercise its reasonable efforts to preserve the confidentiality of the Excluded Confidential Information, including, without limitation, by cooperating with the Sellers in their efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded to the Excluded Confidential Information. Notwithstanding anything to the contrary contained in this Section 5.9(b), in the event that disclosure of the Excluded Confidential Information is requested by the Exchange and/or the SEC, the Purchaser shall promptly notify the Sellers of such request, and the Purchaser also shall request confidential treatment by the Exchange, the SEC or Other Regulators of any Excluded Confidential Information disclosed by Purchaser to the Exchange, the SEC or Other Regulators.

    5.10.   Protection of Purchaser Interests in Purchased Assets.

       (a)    Prior to Closing, Sellers shall (i) provide Purchaser with supervised access to the Purchased Assets in Sellers' Visual Source Safe ("VSS") repository; (ii) allow Purchaser to assist in electronically packaging up the Purchased Assets (the "Purchased Asset Package") in preparation for transmission via Sellers' file transfer protocol ("FTP") server at the Closing; (iii) allow Purchaser to run virus and malware scans on the Purchased Asset Package; (iv) use commercially reasonable efforts to support Purchaser with respect to such packaging of all such Purchased Assets, and any virus or malware removal, if needed; (v) under the supervision of Purchaser, create a secure, logical, read-only view of the software Purchased Assets in a live, functioning (but not transacting) state accessible only onsite at Seller's Irvine Park Place office (the "Reference Copy"); and (vi) under the supervision of Purchaser, create a secure, logical, read-only view of all other Purchased Assets accessible only onsite at Seller's Irvine Park Place office.

       (b)    Upon Closing, Sellers will continue to maintain, and shall have the right to maintain, access and use, the Purchased Assets (i) as required to meet Sellers' obligations to Purchaser under Section 5.10(h), and (ii) for the limited purposes of Sellers as set forth in Section 5.10(c), in each case in accordance with Sellers' security obligations with respect to the retained copies of any Purchased Assets under Section 5.10(d), and subject to the Purchaser's right to audit and monitor such uses as set forth in Section 5.10(e).

       (c)    Upon Closing, Sellers shall be permitted to use (i) the Purchased Assets solely for the Service Purposes, and (ii) that portion of the Sellers' data warehouse necessary for

- 17 -

the purpose of consummating the sale of any other assets of the Sellers and solely for that purpose.

(d)     As soon as reasonably practicable following the date hereof, Sellers shall cause to be put in place and maintain reasonable physical and logical security precautions designed to prevent unauthorized access to the Purchased Assets within Sellers' possession and control, which precautions shall include, without limitation, (i) physical locks on facilities and areas from which the Purchased Assets can be accessed, (ii) limitation on access to and use of the Purchased Assets only to named users, (iii) limitation on access to and use of the Purchased Assets only from computers within the Sellers' offices, and (iv) controls on the data output format in which the Purchased Assets can be output onto tangible media as necessary to restrict the permitted use of the Purchased Assets to the purposes set forth in Section 5.10(c).  As soon as practicable following the Closing, Sellers shall segregate the Purchased Assets from any assets previously sold to a third party still resident in the Data Center (the "Servicing Assets").  Access from the Servicing Assets or any other assets not still owned and maintained by the Sellers will be restricted using network-based subnet blocking (including but not limited to access via VPN).  From and after the Closing, in order to validate this blocking, Sellers will provide to Purchaser access to the logging and monitoring software in place in the Data Center.  Should Purchaser deem the logging and monitoring software to be insufficient for this purpose, Purchaser will provide and implement, at Purchaser's cost, industry-standard security appliances, software, policies and procedures to insure adequacy of the monitoring and logging solution.  Should the logging and monitoring solution adversely impact Sellers ability to use the Purchased Assets to fulfill the Service Purposes, Purchaser and Sellers will operate in good faith and use commercially reasonable efforts to resolve the performance issue to the satisfaction of both parties.  From and after the date hereof, Sellers shall cause the Purchased Assets to be accessed and used only by (i) employees of Sellers with respect to whom Sellers have given Purchaser advance notice, and (ii) third-party contractors engaged by Sellers under written obligations of confidentiality, with respect to whom Purchaser has provided its advance approval, which approval shall not be unreasonably withheld.

(e)     Purchaser shall have the right (but not the obligation) to monitor all uses of the Purchased Assets under Section 5.10(c).  In addition, Purchasers shall have the right (but not the obligation), at Purchaser's expense, upon reasonable advance notice, to audit, monitor and inspect the security precautions required under Section 5.10(d) at any time that Sellers' maintain any copy of any of the Purchased Assets.  Should any such audit or inspection reveal any non-compliance with the requirements and limitations of this Section 5.10, Sellers shall promptly remedy such non-compliance, at Sellers' cost and expense.

(f)     SELLERS' USE OF THE PURCHASED ASSETS IS AT SELLERS' SOLE RISK, AND PURCHASER ASSUMES NO LIABILITY WITH RESPECT TO ANY SUCH USE.  ANY COPY OF THE PURCHASED ASSETS RETAINED BY SELLER IS MADE AVAILABLE BY PURCHASER ON AN "AS IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO ANY SUCH PURCHASED ASSETS.  PURCHASER EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE WHATSOEVER, WHETHER IMPLIED, STATUTORY OR OTHERWISE, IN CONNECTION WITH ANY SUCH PURCHASED ASSETS, OR THE USE THEREOF,

- 18 -

INCLUDING, WITHOUT LIMITATION, ANY IMPLIED REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT.

(g)    Sellers agree to (i) hold all Purchased Assets retained by the Sellers in confidence; (ii) observe all security precautions set forth in Section 5.10(d) with respect to any Purchased Assets in Sellers' possession or control; (iii) not use or disclose any such Purchased Assets, or authorize any third party to use or disclose any such Purchased Assets, for any purposes other than those permitted under Section 5.10(c); and (iv) within ten (10) days of the date Sellers no longer need to retain any Purchased Assets for any of the purposes set forth in Section 5.10(c), destroy, or deliver to Purchaser, all copies of any Purchased Assets within the Sellers' possession or control, and cause an executive officer of Sellers to certify such destruction or delivery in writing to Purchaser.

(h)    Sellers shall, for a period of four (4) months after the Closing, use commercially reasonable efforts to provide or cause to be provided operational support, maintenance and access to allow Purchaser to reference, access and copy the Purchased Assets from the Sellers' Data Center to facilitate the implementation of the transactions contemplated hereunder. If prior to the expiration of such four-month period, Sellers fail to provide such operational support, maintenance and access, Purchaser shall have the right (but not the obligation) to acquire the Reference Copy at no cost and the hardware upon which such Reference Copy operates at a commercially reasonable price and upon commercially reasonable terms. Purchaser shall pay Sellers for all services provided under this Section 5.10(h) on a time and material basis at standard industry rates.

(i)    As Purchaser's sole and exclusive remedy for breaches by Sellers' of their obligations under Section 5.10, Sellers shall indemnify and hold Purchaser harmless from any and all claims, damages, losses and liabilities incurred by Purchaser as a result of Sellers' breach of their obligations under Section 5.10. Notwithstanding anything contained herein to the contrary, Sellers shall have no liability to Purchaser for any loss of profits or special, indirect, consequential, punitive or exemplary damages of any kind. The Purchaser's right to raise a claim for indemnification under this Section 5.10(i) shall expire upon the later to occur of (i) the delivery to Purchaser or destruction of all copies of the Purchased Assets within Seller's possession or control pursuant to Section 5.10(g) or (ii) the date upon which Seller's obligations with respect to the provision of any Service Purposes expire. In no event shall Sellers' indemnification obligations hereunder exceed the Claims Cap applicable at the time the claim for indemnification is made. The "Claims Cap" shall initially equal the Purchase Price and then shall decrease to zero on a straight line basis during the 18 months following the Closing. In the event that Purchaser has claims against third parties in connection with the event underlying the foregoing indemnification claim, Purchaser shall either (x) assign to Sellers such rights or (y) use good faith efforts to pursue such rights directly and reduce the amounts owed by Sellers in respect of their indemnification obligations hereunder by any amounts recovered by Purchaser from such third parties. If prior to Closing, Purchaser becomes aware of any claim that could result in indemnification hereunder, Purchaser's sole remedy shall be to declare a failure of the condition set forth in Section 6.3(a) and refuse to close. Sellers shall have no Liability in connection with any such breach

- 19 -

(j)    Changes to security access as described in any and all subsections of this Section 5.10 shall not be changed without the prior approval of the Purchaser, which shall not be unreasonably withheld.

5.11.    No Resale or Disclosure.  Purchaser shall not, for a period of 12 months from the Closing Date, sell, lease, license, transfer, transmit, convey, disclose or provide access to any Broker Data to any third person, except to third parties for use for Purchaser's benefit in the ordinary course of business under obligations of confidentiality.

5.12.    Sale of Broker Data.  Upon delivery to Purchaser of written notice that Sellers have elected to sell the Broker Data pursuant to the Broker Data Purchase Agreement, as set forth in Section1.6(b), Purchaser and Sellers shall execute and deliver the Broker Data Purchase Agreement and consummate the transactions contemplated thereby.

## SECTION 6.
## CONDITIONS

6.1.    Conditions Precedent to Obligations of Purchaser and Sellers.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    Regulatory Authorizations.  All consents, licenses, approvals, authorizations and orders of Governmental Entities as are necessary in connection with the transfer of the Purchased Assets to Purchaser or which if not obtained would be reasonably likely to subject Sellers, or any stockholder, officer, director or agent thereof to civil or criminal Liability or could render such transfer void or voidable (the "Required Consents") shall have been obtained, except as would not reasonably be expected to have a Material Adverse Effect and other than such as have been issued, promulgated, enforced or entered as of the date of this Agreement.  The Bankruptcy Court shall also have entered the Sale Order, and such Sale Order shall have become final and non-appealable (a "Final Order"); provided, however, that Sellers and Purchaser may waive the requirement that the Sale Order shall have become a Final Order.

(b)    No Injunction.  No injunction, writ or temporary restraining order or any other order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the transactions contemplated hereby may not be consummated as provided herein shall be in effect.

6.2.    Conditions Precedent to Obligation of Sellers.  The obligation of Sellers to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)    Accuracy of Purchaser's Representations and Warranties; Covenants of Purchaser. (i) The representations and warranties of Purchaser contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and

- 20 -

warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Purchaser Material Adverse Effect; (ii) Purchaser shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Sellers shall have received a certificate signed by an officer of Purchaser to such effect.

(b)     Assumption Agreement. Purchaser shall have executed one or more undertakings (each an "Assumption Agreement") substantially in the form of Exhibit A hereto, pursuant to which Purchaser agrees to assume all of the Assumed Obligations.

(c)     Exemption Certificates. Purchaser shall have executed and delivered to Sellers all certificates required by all relevant taxing authorities that are necessary to support any exemption from the imposition of any Tax on the transfer of the Purchased Assets, including the Purchase Price allocation on Schedule 2.1 hereto.

(d)     Cure Payments. At the Closing, Purchaser shall pay any cure amounts pursuant to Section 1.4 hereof relating to Assumed Contracts that Purchaser has agreed to assume.

6.3.     Conditions Precedent to Obligation of Purchaser. The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)     Accuracy of Representations and Warranties of Sellers; Covenants of Sellers. (i) The representations and warranties of Sellers contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect; (ii) Sellers shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Purchaser shall have received certificates signed by an officer of each Seller to such effect.

(b)     Intellectual Property Assignments. Sellers shall have executed any necessary undertakings pursuant to which Sellers agree to transfer to Purchaser all intellectual property rights described in Section 1.2(c).

(c)     Bill of Sale. With respect to each Purchased Asset, Sellers shall have executed a bill of sale in form and substance reasonably satisfactory to the Purchaser.

(d)     Assignment of Assumed Obligations. Sellers shall have executed any necessary undertakings pursuant to which Sellers agree to assign to Purchaser all Assumed Obligations.

(e)     Form of Sale Order. The Sale Order as entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Purchaser.

- 21 -

(f)    Damage or Destruction. There shall have been no damage to or destruction or loss of any Purchased Asset, whether or not covered by insurance, materially and adversely affecting the continued use and operation thereof.

(g)    Satisfaction Regarding Security Arrangements. Purchaser shall have received verification to its reasonable satisfaction from Sellers that Sellers have implemented all security precautions and completed all other obligations required under Section 5.10 to be completed prior to Closing with respect to any copies of the Purchased Assets retained by the Sellers.

## SECTION 7.
## CLOSING

7.1.    Closing Date. Unless this Agreement shall have been terminated and the transactions herein shall have been abandoned pursuant to Section 8 hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, at 10:00 a.m., Pacific Daylight Time, on August 15, 2007 (or as soon as practicable thereafter as all of the conditions to the Closing set forth in Section 6 hereof are satisfied or waived), or such other date, time and place as shall be agreed upon by Sellers and Purchaser (the actual date and time being herein called the "Closing Date").

7.2    Purchaser Deliveries. At the Closing, Purchaser shall deliver to Sellers:

(a)    the Purchase Price as provided in Section 2.2 hereof and any cure amounts payable by Purchaser pursuant to Section 1.4 hereof;

(b)    the documents described in Section 6.2 hereof,

(c)    a certified copy of Purchaser's Certificate of Incorporation and Bylaws;

(d)    a certificate of good standing of Purchaser, issued not earlier than ten (10) days prior to the Closing Date by the Secretary of State of Purchaser's state of incorporation;

(e)    an incumbency and specimen signature certificate with respect to the officers of Purchaser executing this Agreement, and any other document delivered hereunder, on behalf of Purchaser; and

(f)    such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

7.3.    Seller Deliveries. At the Closing, Sellers shall deliver to Purchaser:

(a)    the documents described in Section 6.3 hereof;

(b)    incumbency and specimen signature certificates with respect to the officers of Sellers executing this Agreement, and any other document delivered hereunder, on behalf of Sellers;

- 22 -

(c)    via electronic FTP transfer, a copy of the Purchased Assets, including the Purchased Asset Package, in an industry standard format; and

(d)    such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

7 4.    Deposit Amount. Purchaser has delivered to a deposit account in the name of the Sellers (the "Deposit Account") $500,000.00 in immediately available funds (such amount, together with any interest accrued thereon prior to the Closing, the "Deposit Amount") to be held by the Sellers in the Deposit Account to serve as an earnest money deposit under this Agreement, and to be released (promptly and with accrued interest thereon) in accordance with the following procedures:

(a)    If the Closing shall occur, Sellers shall retain the Deposit Amount (and such Deposit Amount (plus any accrued interest) shall be applied toward the payment of the Purchase Price).

(b)    If this Agreement is validly terminated by either party pursuant to Section 8.1(d) and Purchaser or any of its Affiliates is a Proximate Cause Party (as defined below) or by Sellers pursuant to Section 8.1(c), Sellers shall retain the Deposit Amount.

(c)    If this Agreement is validly terminated in accordance with the terms and conditions of Section 8.1 other than as set forth in Section 7.4 (b), Sellers shall deliver the Deposit Amount by wire transfer of immediately available funds to an account of Purchaser to be retained by Purchaser.

## SECTION 8.
## TERMINATION

8.1.    Termination Events. Without prejudice to other remedies which may be available to the parties by law or this Agreement, this Agreement may be terminated and the transactions contemplated herein may be abandoned:

(a)    by mutual written consent of the parties hereto;

(b)    by either party, if there shall be in effect a final order restraining, enjoining or otherwise prohibiting the consummation of the transaction contemplated by this Agreement;

(c)    by either party, if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the other party contained in this Agreement such that the conditions set forth in either Section 6.2(a) or Section 6.3(a), as applicable, would not be satisfied and which, if curable, shall not have been cured prior to the earlier of (x) thirty (30) days after the giving of written notice of such material breach by the non-breaching party to the breaching party and (y) August 31, 2007; provided, however, that neither Purchaser nor Sellers shall have the right to terminate this Agreement pursuant to this clause (c) if the party giving notice of a material breach is then in material breach of any of its representations, warranties, covenants or agreements set forth in this Agreement such that the

- 23 -

conditions set forth in either Section 6.2(a) or Section 6.3(a), as applicable, would not be satisfied (such breaching party, a "Proximate Cause Party"); or

      (d)    by any party by notice to the other party if the Closing shall not have been consummated on or before August 31, 2007, unless extended by mutual written agreement of the parties hereto, so long as the party terminating this Agreement shall not be in default or breach hereunder.

    8.2.    Notice of Termination.  In the event of any termination pursuant to Section 8.1 above, written notice thereof setting forth the reasons therefor shall promptly be given to the other parties and the transactions contemplated by this Agreement shall be terminated, without further action by any party.

    8.3.    Effect of Termination.  In the event of any termination of the Agreement as provided in Section 8.1 above, this Agreement shall forthwith become wholly void and of no further force and effect and there shall be no Liability on the part of Purchaser or Sellers, except that (i) the confidentiality obligations of Purchaser and Sellers under this Agreement and, for the avoidance of doubt, under the Confidentiality Letter, and the limitation on Purchaser's ability to employ any Technology Employee pursuant to Section 5.6(a) shall remain in full force and effect in accordance with the provisions thereof and (ii) termination shall not preclude either party from suing the other party for breach of this Agreement, subject to Section 3.12 hereof.

**SECTION 9.**
**[RESERVED]**


**SECTION 10.**
**MISCELLANEOUS**

    10 1.    Notices.  All communications provided for hereunder shall be in writing and shall be deemed to be given when delivered in person or by private courier with receipt, when telefaxed and received, or three (3) days after being deposited in the United States mail, first-class, registered or certified, return receipt requested, with postage paid and,

        If to Purchaser:      EquiFirst Corporation
                             500 Forest Point Circle
                             Charlotte, NC  28273
                             Attention: Robin Allcock
                             Facsimile: (704) 625-4500

        With copies to:      EquiFirst Corporation
                             500 Forest Point Circle
                             Charlotte, NC  28273
                             Attention: Legal Department
                             Facsimile: (704) 625-4500

- 24 -

Allen & Overy LLP
1221 Avenue of the Americas
New York, NY  10020
Attention:  Eric Shube and Ken Coleman
Facsimile:  (212) 610-6399

If to Sellers:    New Century Mortgage Corporation
18400 Von Karman Avenue, Suite 1000
Irvine, CA 92612
Attention:  General Counsel
Facsimile:  (949) 440-7033

With a copy to:    O'Melveny & Myers LLP
275 Battery Street
San Francisco, California 94111
Attention: Suzzanne Uhland and C. Brophy Christensen
Facsimile:  (415) 984-8701

and    Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Attn: Mark Power
Facsimile: (212) 478-7400

or to such other address as any such party shall designate by written notice to the other parties
hereto.

10.2.    Bulk Transfers.  Purchaser waives compliance with the provisions of all
applicable laws relating to bulk transfers in connection with the Asset Purchase.

10.3.    Transaction Taxes.  Unless Sellers have obtained an Order of the Bankruptcy
Court exempting the transactions contemplated by this Agreement from all Transfer Taxes, all
Transfer Taxes attributable to the transfer of the Purchased Assets and any Transfer Taxes
required to effect any recording or filing with respect thereto shall be Excluded Liabilities and
shall be borne by Sellers, and Sellers shall indemnify Purchaser for any such Taxes imposed on
Purchaser.

10.4.    Tax Returns.  Sellers shall prepare or cause to be prepared all Tax Returns
relating to the Purchased Assets for periods ending on or prior to the Closing Date.

10.5.    Treatment of Purchase Price.  Except as otherwise required by applicable law, the
parties agree that any indemnity payments hereunder shall be treated as an adjustment to the
Purchase Price for income Tax purposes.

10.6.    Cooperation.  Purchaser and Sellers agree to furnish or cause their Affiliates to
furnish to each other upon request, as promptly as practicable, such information and assistance
relating to the Purchased Assets (including access to books and records) as is reasonably

- 25 -

necessary for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Purchaser and Sellers shall cooperate, or cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes with respect to the Purchased Assets and each shall execute and deliver such other documents as are necessary to carry out the intent of this Section 10.6. Purchaser and Sellers shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets or the Business for any taxable period for which the other party may have liability under this Agreement. Purchaser and Sellers shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to the Purchased Assets with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

10.7.   Further Assurances; Asset Returns.  Upon request from time to time, Sellers shall to the extent then legally permitted to do so and at the Purchaser's cost and expense, execute and deliver all documents, take all rightful oaths, and use commercially reasonable efforts to do all other acts that may be reasonably necessary or desirable, in the reasonable opinion of counsel for Purchaser, to perfect or record the title of Purchaser, or any successor of Purchaser, to the Purchased Assets transferred or to be transferred under this Agreement.

10.8.   Other Covenants.  To the extent that any consents needed to assign to Purchaser any of the Purchased Assets have not been obtained on or prior to the Closing Date, this Agreement shall not constitute an assignment or attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof.  If any such consent shall not be obtained on or prior to the Closing Date, then Sellers and Purchaser, if required under applicable law, shall use their commercially reasonable efforts in good faith to obtain such consent as promptly as practicable thereafter.

10.9.   Expenses.  Subject to Section 10.3, Sellers and Purchaser shall each pay their respective expenses (such as legal, investment banker and accounting fees) incurred in connection with the origination, negotiation, execution and performance of this Agreement.

10.10.  Non-Assignability.  This Agreement shall inure to the benefit of and be binding on the parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by either party hereto without the express prior written consent of the other party, and any attempted assignment, without such consents, shall be null and void.

10.11.  Amendment; Waiver.  This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the parties hereto. No waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants, or agreements contained herein, and in any documents delivered or to be delivered pursuant to this Agreement and in connection with

- 26 -

the Closing hereunder. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach

10.12. "AS IS" Transaction; Representations and Warranties; Schedules and Exhibits.

(a)     Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement or in the schedules hereto prepared by Sellers, Sellers make no representations or warranties whatsoever, express or implied, with respect to the Sellers, the Purchased Assets or the Assumed Obligations (including, without limitation, income to be derived from or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal or real property comprising a part of the Purchased Assets or which is the subject of any Assumed Obligation to be assumed by Purchaser at the Closing Date, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any assigned lease to be assumed by Purchaser at the Closing Date, the zoning of any such real property or improvements, the value or transferability of the Purchased Assets (or any portion thereof), the terms, amount, validity or enforceability of any Assumed Obligation, or the merchantability or fitness of the Purchased Assets). WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT AS TO ANY PORTION OF THE ASSETS. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the condition of the Purchased Assets, as Purchaser deemed necessary or appropriate, and that in proceeding with its acquisition of the Purchased Assets Purchaser is doing so based solely upon such independent inspections and investigations, but subject to the satisfaction or waiver of the closing conditions specified herein. Accordingly, if the Closing occurs, Purchaser will accept the Purchased Assets at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order.

(b)     Each of Purchaser and Sellers agree neither Sellers nor any of the respective officers, directors, stockholders, employees, affiliates, representatives or agents of Sellers shall have any Liability or responsibility arising out of, or relating to, any information (whether written or oral), documents or materials furnished by Sellers or any of their officers, directors, stockholders, employees, affiliates or any of their respective representatives or agents, and any information, documents or materials made available to Purchaser in certain "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

(c)     All Exhibits and Schedules hereto are hereby incorporated by reference and made a part of this Agreement. Any fact or item which is clearly disclosed on any Schedule or Exhibit to this Agreement in such a way as to make its relevance to a representation or representations made elsewhere in this Agreement or to the information called for by another Schedule or other Schedules (or Exhibit or other Exhibits) to this Agreement readily apparent shall be deemed to be an exception to such representation or representations or to be disclosed on such other Schedule or Schedules (or Exhibit or Exhibits), as the case may be, notwithstanding the omission of a reference or cross-reference thereto. Any fact or item disclosed on any Schedule or Exhibit hereto shall not by reason only of such inclusion be deemed to be material

- 27 -

and shall not be employed as a point of reference in determining any standard of materiality under this Agreement.

10.13. Third Parties. This Agreement does not create any rights, claims or benefits inuring to any person that is not a party hereto nor create or establish any third party beneficiary hereto.

10.14. No Strict Construction. Notwithstanding the fact that this Agreement has been drafted or prepared in all or in part by one of the parties, the parties confirm that both they and their respective counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person.

10.15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

10.16. Venue and Jurisdiction. Venue for any action or proceeding pertaining to the construction or enforcement of this Agreement shall be the Bankruptcy Court, and the parties hereto consent to the Bankruptcy Court's exercise of jurisdiction over them with respect to any such action or proceeding.

10.17. Certain Definitions. For purposes of this Agreement, the term:

(a)     "affiliate" of a person means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned person;

(b)     "Auction" means the auction held in accordance with Bankruptcy Code for the sale and assignment of the Purchased Assets and Assumed Obligations;

(c)     "Carrington" means Carrington Capital Management, LLC and Carrington Mortgage Services, LLC;

(d)     "Carrington Agreement" means that certain Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007, by and among Carrington, New Century Financial Corporation and New Century Mortgage Corporation.

(e)     "Intellectual Property" means the assets described in Section 1.2(c);

(f)     "Liability" means any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown, secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due;

(g)     "Lien" means any liens, claims, encumbrances, mortgages, security interests, pledges, claims, equities and other restrictions or charges of any kind or nature

- 28 -

whatsoever, including without limitation all "interests" as such term is defined in section 363(f) of the Bankruptcy Code;

(h)    "Loan Performance Data" means the data listed or described on Schedule 1.2(b)(ii);

(i)    "Material Adverse Effect" means any change, effect, event or circumstance, that, individually or in the aggregate, is materially adverse to the Purchased Assets or the ability of Sellers to perform their obligations under this Agreement, except for any change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, (ii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iii) changes in applicable laws after the date hereof, (iv) the fact that Sellers will be operating as a debtors-in-possession under the Bankruptcy Code, or (v) changes in GAAP or regulatory accounting principles after the date hereof;

(j)    "person" shall have the meaning set forth in the Bankruptcy Code;

(k)    "Purchased Assets Information" means the assets described in Section 1.2(e), excluding the Excluded Confidential Information;

(l)    "Seller Disclosure Schedule" means the disclosure schedule as provided in this Agreement and required to be delivered by Sellers to Purchaser;

(m)    "Service Purposes" means the purposes of (i) facilitating the transactions contemplated by this Agreement, (ii) enabling each Seller and its affiliates to research, bring, respond to, defend and otherwise handle each and every claim, legal action, suit, arbitration, governmental investigation, action, or other legal or administrative proceeding for the benefit of or against such Seller and its affiliates, whether threatened or otherwise, (iii) enabling each Seller and its affiliates to comply with any requirements with respect to any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, rule or principle of common law, ordinance, code, treaty, rule, regulation, ruling, decree, order, injunction, judgment, consent of or by any governmental authority, requirement, determination, decision or opinion, guidance or interpretation that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any governmental authority or common law, and all litigation, investigation, examination and claim in respect thereof, and (iv) enabling each Seller and its affiliates to wind down the bankruptcy estate;

(n)    "subsidiary" or "subsidiaries" of Purchaser, Sellers or any other person means any person of which Purchaser, Sellers or such other person, as the case may be (either alone or through or together with any other subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity interests the holder of which is generally entitled to vote for the election of the board of directors or other governing body of such person; and

(o)    "Transfer Taxes" means any federal, state, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

- 29 -

10.18. Entire Agreement. The Confidentiality Letter and this Agreement, along with the Schedules and Exhibits hereto, set forth the entire understanding of the parties hereto and no modifications or amendments to this Agreement shall be binding on the parties unless in writing and signed by the party or parties to be bound by such modification or amendment.

10.19. Section Headings; Table of Contents. The section headings contained in this Agreement and the Table of Contents to this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

10.20. Severability. If any provision of this Agreement shall be declared by any court of competent jurisdiction to be illegal, void or unenforceable, all other provisions of this Agreement shall not be affected and shall remain in full force and effect.

10.21. Counterparts. This Agreement may be executed in any number of counterparts, including by electronic mail or facsimile, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

*[Remainder of Page Intentionally Left Blank]*

LAI:1139211 9
RLF1-3173382-1

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

NEW CENTURY FINANCIAL CORPORATION

By: _____

Name:  Holly Etlin
Title: Chief Executive Officer

NEW CENTURY MORTGAGE CORPORATION

By: _____

Name:  Holly Etlin
Title: Chief Executive Officer

*[Signatures continue on following page]*

EQUIFIRST CORPORATION

By:

Name: Robin Allcock
Title:   Executive Vice President & Chief Operating Officer

## EXHIBIT C TO EQUIFIRST AGREEMENT

**(DPA Agreement)**

**BROKER DATA PURCHASE AGREEMENT**

**by and among**

**New Century Financial Corporation**

**New Century Mortgage Corporation**

**and**

**EquiFirst Corporation**


**[_____], 2007**

## TABLE OF CONTENTS

**Page**

SECTION 1.    SALE OF DATA .......................................................................................... 1

SECTION 2.    PURCHASE PRICE ..................................................................................... 2

SECTION 3.    REPRESENTATIONS AND WARRANTIES OF SELLERS........................ 3

SECTION 4.    REPRESENTATIONS OF PURCHASER.................................................... 4

SECTION 5.    AGREEMENTS OF PURCHASER AND SELLER..................................... 5

SECTION 6.    CONDITIONS ............................................................................................. 6

SECTION 7.    CLOSING .................................................................................................... 7

SECTION 8.    TERMINATION ......................................................................................... 8

SECTION 9.    MISCELLANEOUS ................................................................................... 9

## TABLE OF CONTENTS
(continued)

Page

<u>SCHEDULES</u>

Schedule 1.2(a)        -        Broker Data

## BROKER DATA PURCHASE AGREEMENT

**THIS BROKER DATA PURCHASE AGREEMENT**, dated as of [＿＿＿＿＿＿＿], 2007 (the "Agreement"), by and among NEW CENTURY FINANCIAL CORPORATION, a Maryland corporation, as a debtor and debtor-in-possession, NEW CENTURY MORTGAGE CORPORATION, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser").

**THE PARTIES TO THIS AGREEMENT** are entering into this Agreement on the basis of the following facts, intentions and understandings:

**WHEREAS**, on April 2, 2007, Sellers filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (jointly administered under Case No. 07-10416) and have continued to operate as debtors-in-possession;

**WHEREAS**, Sellers have filed a motion seeking approval from the Bankruptcy Court of the sale and assignment of all of the assets and liabilities held by Sellers that were used, in part, in the Sellers' business of originating non-prime mortgage loans, to the successful bidder in an Auction for the sale and assignment of certain of such assets conducted on June 22, 2007;

**WHEREAS**, Sellers and Purchaser have entered into that certain Asset Purchase Agreement, dated June 22, 2007 (along with the schedules and exhibits thereto, the "Asset Purchase Agreement"), pursuant to which Sellers will sell certain assets, including certain data of Sellers, to Purchaser;

**WHEREAS**, in accordance with the terms of the Asset Purchase Agreement, Sellers have elected to sell certain data of Sellers to Purchaser prior to the closing of the other transactions contemplated by the Asset Purchase Agreement; and

**WHEREAS**, Purchaser desires to purchase from Sellers on a non-exclusive basis and Sellers desire to make available on a non-exclusive basis to Purchaser, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions of this Agreement certain of the data of Sellers.

**NOW, THEREFORE**, in consideration of the foregoing recitals, and the representations, warranties, covenants and agreements herein contained, the parties hereto hereby agree as follows:

## SECTION 1.
## SALE OF DATA

1.1.    Non-exclusive Sale of Data.  Subject to the satisfaction or waiver of the conditions set forth in this Agreement, including the approval by the Bankruptcy Court of this Agreement and the transactions contemplated herein, at the Closing and as of the Closing Date (as such terms are defined in Section 7.1 hereof), Sellers shall disclose and deliver to Purchaser,

and Purchaser shall accept, a full and complete copy of the data of Sellers set forth in <u>Section 1.2</u> below, excluding the Excluded Assets described in <u>Section 1.3</u> hereof (the "<u>Purchased Data</u>").

    1.2.   <u>Purchased Data</u>. The Purchased Data to be purchased by Purchaser at the Closing are limited to one copy of the following: (a) the broker data listed or described on Schedule 1.2(a) (the "<u>Broker Data</u>"); and (b) copies of descriptions of the Broker Data sufficient to permit a person reasonably skilled in the relevant field to retrieve, use and understand such data <u>provided</u>, <u>however</u>, provided, however, that the Purchased Data shall not include any (i) personally identifiable information or other information that Sellers are prohibited from disclosing or transferring to a third party pursuant to any law or regulation, (ii) any attorney-client communications or any other information related to Sellers' bankruptcy cases or any Liabilities not assumed by Purchaser, or (iii) any third-party proprietary information or trade secrets, in each case contained in any form or medium ("<u>Excluded Confidential Information</u>").

    1.3.   <u>Excluded Assets</u>. Notwithstanding anything herein to the contrary, from and after the Closing, Sellers shall not have any obligation to disclose or deliver any data or other assets that are not specifically included within the Purchased Data (collectively, the "<u>Excluded Assets</u>"). In furtherance and not in limitation of the foregoing, there shall be excluded from the disclosure and delivery to Purchaser hereunder, and the Purchased Data shall not include, the following:

    (a)   any asset or class of assets excluded from Purchased Data described in Sections 1.2 by virtue of not being listed or described on a Schedule to this Agreement;

    (b)   all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature;

    (c)   any intellectual property rights; and

    (d)   Excluded Confidential Information.

    1.4.   <u>Non-Exclusivity</u>. Purchaser acknowledges that, notwithstanding any other provision of this Agreement, the Purchased Data is being made available to Purchaser on a non-exclusive basis, and Purchaser agrees that, at any time on or after the Closing, Sellers may make available other copies of the Purchased Data without restriction to any one or more third persons.

**SECTION 2.**
**PURCHASE PRICE**

    2.1.   <u>Purchase Price</u>. The aggregate purchase price for the Purchased Data shall be [_____] United States Dollars ($[_____].00), (the "<u>Purchase Price</u>").

    2.2.   <u>Payment of Purchase Price</u>. Subject to <u>Section 7.4</u>, at the Closing the Purchase Price shall be payable by a wire transfer of immediately available federal funds to such bank accounts as shall be designated by Sellers prior to Closing.

- 2 -

2.3.    Sale Order.  Sellers shall seek entry of a Bankruptcy Court order approving the sale of the Purchased Data to Purchaser (the "Sale Order"). The Sale Order shall provide for the non-exclusive sale of a copy of the Purchased Data free and clear of any and all Liens, claims, encumbrances and interests on the following terms and conditions:

(a)    Sellers are authorized to consummate the transaction contemplated under this Agreement.

(b)    The terms of this Agreement are fair and reasonable and provide fair value for the Purchased Data, Purchaser's bid is the best offer for the Purchased Data, and the sale to Purchaser is in the best interests of Sellers, their stockholders and their creditors.

(c)    Except as provided in this Agreement, the Purchased Data shall be sold free and clear of all Liens, with such Liens to attach to the consideration to be received by Sellers in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Purchaser would not enter into this Agreement or purchase the Purchased Data otherwise.

(d)    Purchaser is a good faith purchaser entitled to the protections afforded by Bankruptcy Code section 363(m) such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Purchased Data as contemplated hereunder, negotiations have been fair and arms' length, and no party has engaged in any conduct that would cause the sale to be avoided under Bankruptcy Code section 363(n)

## SECTION 3.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Purchaser that the statements contained in this Section 3 are true and correct as of the date hereof and as of the Closing Date.

3.1.    Corporate Existence.  Except as a result of the commencement of the Bankruptcy Cases, Sellers are corporations duly organized, validly existing and in good standing under the laws of their respective states of incorporation.

3.2.    Corporate Authority.  Subject to entry of the Sale Order, Sellers have the power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and this Agreement has been duly executed and delivered by Sellers and constitutes the valid and binding agreement of Sellers, enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights or subject to general principles of equity.

3.3.    Finders; Brokers.  Other than Lazard Freres & Co. LLC, the fees of which will be paid by Sellers or their affiliates, no broker, finder, consultant or intermediary is entitled to a broker's, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement or upon the consummation of the transactions contemplated hereby, or if the Closing does not occur, as a result of any actions or agreements of Sellers or their agents.

- 3 -

3.4.    Right to Disclose. Subject to entry of the Sale Order, Sellers have the right to disclose the Purchased Data to Purchaser.

3.5.    Consents and Approvals; No Violations. Subject to entry of the Sale Order, no consent of, or declaration, filing or registration with, any federal, state or local court, administrative body or other governmental entity with competent jurisdiction (a "Government Entity") is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated by this Agreement, except for: consents, declarations, filings and registrations the failure to have which, individually or in the aggregate, would not reasonably be excepted to have a Material Adverse Effect.

3.6.    No Other Representations or Warranties. Except for the representations and warranties contained in this Section 3, neither Sellers nor any other person makes any other express or implied representation or warranty on behalf of Sellers.

3.7    Expiration of Representations and Warranties. The representations and warranties made by Sellers to Purchaser herein shall not survive the Closing and shall expire and be of no force and effect whatsoever after the Closing. If any of the foregoing representations and warranties are breached by the Seller prior to Closing, Purchaser's sole remedy shall be to declare a failure of the condition set forth in Section 6.3(a) and refuse to close. Seller shall have no Liability in connection with any such breach.

## SECTION 4.
## REPRESENTATIONS OF PURCHASER

Purchaser represents and warrants that the statements contained in this Section 4 are true and correct as of the date of this Agreement.

4.1.    Existence. Purchaser is a corporation duly organized and validly existing and in good standing under the laws of the State of North Carolina and has the requisite power and authority to own, lease and operate the Purchased Data. Purchaser is duly authorized, qualified or licensed to do business as a foreign corporation and in good standing in every jurisdiction wherein, by reason of the character of the Purchased Data, the failure to be so qualified would have a Material Adverse Effect on the ability of Purchaser to consummate the transactions contemplated hereby (a "Purchaser Material Adverse Effect").

4.2.    Authority. This Agreement and the consummation of all of the transactions provided for herein have been duly authorized by the Board of Directors of Purchaser and by all requisite corporate, shareholder or other action prior to Closing, and Purchaser has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by Purchaser, and constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms except as enforceability may be (a) limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditor's rights, or (b) subject to general principles of equity.

4.3    No Application of Hart-Scott-Rodino. No filing will be required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR") in connection with the acquisition by

- 4 -

Purchaser of the Purchased Data. This representation and warranty shall survive until the twelve (12) month anniversary of the Closing.

    4.4.    <u>Governmental Approvals; Consents; No Conflicts</u>.

        (a)    Purchaser is not subject to any order, judgment or decree that would prevent the consummation of the transactions contemplated hereby. No claim, legal action, suit, arbitration, governmental investigation, action, or other legal or administrative proceeding is pending or, to the knowledge of Purchaser, threatened against Purchaser that would enjoin or delay the transactions contemplated hereby. No consent, approval, order or authorization of, license or permit from, notice to or registration, declaration or filing with, any Governmental Entity, or of any third party, is or has been required on the part of Purchaser in connection with the execution and delivery of this Agreement or any of the transactional documents, or the consummation of the transactions contemplated hereby and thereby except for the approval by the Bankruptcy Court and any such consents, approvals, orders or authorizations of, licenses or permits, filings or notices the failure of which to obtain or make would not have a Purchaser Material Adverse Effect.

        (b)    Neither the execution and delivery of this Agreement or any other agreements and documents to be executed or delivered pursuant hereto, nor the consummation of the transactions contemplated hereby, will (i) violate, or conflict with, any provision of Purchaser's Articles or Certificate of Incorporation or Bylaws or other charter documents or (ii) violate, or conflict with, any order, writ, injunction, arbitral award, judgment or decree of any court, governmental body or arbitrator applicable to Purchaser, except for any such violation, breach or default that would not have a Purchaser Material Adverse Effect.

    4.5.    <u>Finders; Brokers</u>. Purchaser is not a party to any agreement with any finder or broker, or in any way obligated to any finder or broker for any commissions, fees or expenses, in connection with the origin, negotiation, execution or performance of this Agreement.

    4.6.    <u>Financial Capacity</u>. Purchaser is solvent, has adequate capital, and has the financial wherewithal or committed financial resources to meet Purchaser's obligations under this Agreement.

    4.7.    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Section 4</u>, neither Purchaser nor any other person makes any other express or implied representation or warranty on behalf of Purchaser.

**SECTION 5.**
**AGREEMENTS OF PURCHASER AND SELLER**

    5.1.    <u>Mutual Cooperation; No Inconsistent Action</u>.

        (a)    Subject to the terms and conditions hereof, Sellers and Purchaser agree to use their reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including all of the following: (i) obtain prior to Closing all licenses, certificates, permits, approvals, authorizations, qualifications and orders of

- 5 -

Governmental Entities as are necessary for the consummation of the transactions contemplated hereby, including but not limited to such consents and approvals as may be required by the Bankruptcy Court; and (ii) effect any necessary registrations or filings. Sellers and Purchaser shall cooperate fully with each other to the extent reasonable in connection with the foregoing.

(b)     Each of Sellers and Purchaser shall notify and keep the other advised as to (i) any litigation or administrative proceeding pending and known to such party, or to the Purchaser's knowledge or Sellers' knowledge threatened, which challenges the transactions contemplated hereby and (ii) any event or circumstance which would constitute a breach of their respective representations and warranties in this Agreement, provided, that the failure of Sellers or Purchaser to comply with clause (ii) shall not be deemed a breach of a covenant for purposes of Section 6.2(a)(ii), and Section 6.3(a)(ii) hereof, respectively.

5.2.     Public Disclosures. Prior to the Closing Date, no party to this Agreement will issue any press release or make any other public disclosures concerning this transaction or the contents of this Agreement without the prior written consent of the other party. Notwithstanding the above, nothing in this Section 5.2 will preclude any party from making any disclosures required by law or regulation or necessary or desirable in conjunction with the filing of any tax return or other document required to be filed with any federal, state or local governmental body, authority or agency, including any filings deemed necessary or advisable under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), any disclosures to auditors, or any disclosures necessary or desirable in conjunction with any Bankruptcy Court process or proceeding, including, without limitation, filings or disclosures to creditors, provided that the disclosing party under this Section 5.2 shall, to the extent practicable, provide the non-disclosing party a reasonable opportunity to review any such disclosure that identifies the non-disclosing party by name, before the disclosing party makes any such public disclosure under this Section 5.2.

5.3.     No Resale or Disclosure. Purchaser shall not, for a period of 12 months from the Closing Date, sell, lease, license, transfer, transmit, convey, disclose or provide access to any Purchased Data to any third person, except to third-parties for use for Purchaser's benefit in the ordinary course of business under obligations of confidentiality.

5.4.     Access to Records. Purchaser shall preserve for a period of six years after the Closing Date all records relating to the Purchased Data existing prior to the Closing Date. After the Closing Date, where there is a legitimate purpose (including, without limitation, as necessary for the administration of the bankruptcy case), Purchaser shall provide Sellers with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to all information, data and books and records of Purchaser, in any form other than electronic form, but, in each case, only to the extent relating to the Purchased Data prior to the Closing Date, and Sellers and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Purchaser; and provided, further, that such information shall be held by Purchaser in confidence to the extent required by law. In addition, Purchaser shall direct its employees to cooperate reasonably with Sellers for purposes of gaining access to the information, data and books and records pursuant to this Section 5.4. Such records may nevertheless be destroyed by Purchaser if (X) Purchaser sends to

- 6 -

Sellers a written request to destroy records, specifying with particularity the contents of the records to be destroyed, and (Y) Sellers, in their sole discretion, provide their written consent to such request. Such records may then be destroyed after the 30th day after such written consent is provided by Sellers; provided, however, that if such written consent is not provided by Sellers, then Purchaser shall deliver such records to Sellers at Purchaser's sole cost. Sellers agree to use all commercially reasonable efforts not to deliver or disclose to Purchaser any data or information that Sellers are prevented or prohibited from disclosing to Purchaser or any other third party pursuant to any applicable privacy laws or any other law, rule, regulation, ruling, decree, order, injunction, judgment or order that is or has been issued, enacted, approved, promulgated, made or otherwise put into effect by or under the authority of any court of law or governmental authority (including but not limited to any consumer data or employment data). In the event that (a) Sellers notify Purchaser that Sellers inadvertently delivered such data or information to Purchaser (such notice to include a specific description of such data or information) or (b) Purchaser otherwise becomes aware that Sellers have delivered such data, Purchaser shall, (i) in the case of clause (b) above, notify Sellers of such data or information and (ii) use its commercially reasonable efforts to keep such data confidential and, upon Sellers' request and at Sellers' sole cost, Purchaser shall return to Sellers such data and information. Notwithstanding the foregoing, Purchaser shall not be under any affirmative obligation to determine whether any such data or information has been delivered to Purchaser by Sellers as part of the Purchased Data.

5.5.    Privileged Information.

(a)    Notwithstanding any provision in this Agreement to the contrary, any documents subject to the attorney client privilege and/or the work product immunity doctrine shall not constitute Purchased Data. If Purchaser accesses or reviews any Excluded Confidential Information, Purchaser shall notify Sellers and upon Sellers' request either delete or destroy such information or deliver such information to Sellers. Purchaser further agrees not to disclose such Excluded Confidential Information except, subject to and in accordance with the next sentence, to the extent requested or required by law to the securities market on which its securities are listed or qualified for listing (the "Exchange"), if any, the Securities and Exchange Commission (the "SEC") or other regulatory or self regulatory authorities having jurisdiction over the receiving party or its affiliates ("Other Regulators") or a court of competent jurisdiction or other tribunal.

(b)    In the event that Purchaser is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process, but excluding any request by the Exchange or the SEC and Other Regulators) to disclose any of the Excluded Confidential Information, Purchaser shall provide the Sellers with prompt written notice of any such request or requirement so that Sellers may seek a protective order or other appropriate remedy (and if the Sellers seek such an order, the Purchaser shall provide such cooperation as the Sellers reasonably request) and/or, in the Sellers' sole discretion, waive compliance with the provisions of this letter agreement. If, in the absence of a protective order or other remedy or the receipt of a written waiver by the Sellers, the Purchaser is nonetheless legally obligated to disclose the Excluded Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, the Purchaser may, without liability hereunder, disclose to such tribunal only that portion of the Excluded

- 7 -

Confidential Information which such counsel advises the Purchaser is legally obligated to be disclosed (and concurrently provide a copy thereof to the Sellers), provided that Purchaser provides the Sellers with written notice of the Excluded Confidential Information to be disclosed as far in advance as reasonably practicable and exercise its reasonable efforts to preserve the confidentiality of the Excluded Confidential Information, including, without limitation, by cooperating with the Sellers in their efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded to the Excluded Confidential Information. Notwithstanding anything to the contrary contained in this letter agreement, in the event that disclosure of the Excluded Confidential Information is requested by the Exchange and/or the SEC, the Purchaser shall promptly notify the Sellers of such request, and the Purchaser also shall request confidential treatment by the Exchange and the SEC of any Excluded Confidential Information disclosed by Purchaser to the Exchange or the SEC.

## SECTION 6.
## CONDITIONS

6.1.    Conditions Precedent to Obligations of Purchaser and Sellers.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    Regulatory Authorizations. All consents, licenses, approvals, authorizations and orders of Governmental Entities as are necessary in connection with the transfer of the Purchased Data to Purchaser or which if not obtained would be reasonably likely to subject Sellers, or any stockholder, officer, director or agent thereof to civil or criminal Liability or could render such transfer void or voidable (the "Required Consents") shall have been obtained, except as would not reasonably be expected to have a Material Adverse Effect and other than such as have been issued, promulgated, enforced or entered as of the date of this Agreement. The Bankruptcy Court shall also have entered the Sale Order, and such Sale Order shall have become final and non-appealable (a "Final Order"); provided, however, that Sellers and Purchaser may waive the requirement that the Sale Order shall have become a Final Order.

(b)    No Injunction. No injunction, writ or temporary restraining order or any other order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the transactions contemplated hereby may not be consummated as provided herein shall be in effect.

6.2.    Conditions Precedent to Obligation of Sellers. The obligation of Sellers to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)    Accuracy of Purchaser's Representations and Warranties; Covenants of Purchaser. (i) The representations and warranties of Purchaser contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and

- 8 -

warranties speak as of an earlier date, and except to the extent that any such failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Purchaser Material Adverse Effect; (ii) Purchaser shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Sellers shall have received a certificate signed by an officer of Purchaser to such effect.

(b)    Deliveries. Purchaser shall have made the deliveries contemplated by Section 7.2 hereof.

6.3.    Conditions Precedent to Obligation of Purchaser. The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to fulfillment or waiver of each of the following conditions:

(a)    Accuracy of Representations and Warranties of Sellers; Covenants of Sellers. (i) The representations and warranties of Sellers contained in this Agreement (except as affected by the transactions contemplated in this Agreement) shall be true and correct (without regard to any materiality or Material Adverse Effect qualifier contained therein) on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, and except to the extent that any failure of a representation or warranty to be true and correct, individually or in the aggregate, would not have a Material Adverse Effect; (ii) Sellers shall have complied in all material respects with all covenants contained in this Agreement to be performed by it prior to Closing; and (iii) Purchaser shall have received certificates signed by an officer of each Seller to such effect.

(b)    Form of Sale Order. The Sale Order as entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Purchaser.

## SECTION 7.
## CLOSING

7.1.    Closing Date. Unless this Agreement shall have been terminated and the transactions herein shall have been abandoned pursuant to Section 8 hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, at [_____], on [_____], 2007 (or as soon as practicable thereafter as all of the conditions to the Closing set forth in Section 6 hereof are satisfied or waived), or such other date, time and place as shall be agreed upon by Sellers and Purchaser (the actual date and time being herein called the "Closing Date").

7.2.    Purchaser Deliveries. At the Closing, Purchaser shall deliver to Sellers:

(a)    the Purchase Price as provided in Section 2.2 hereof;

(b)    a certified copy of Purchaser's Certificate of Incorporation and Bylaws;

(c)    a certificate of good standing of Purchaser, issued not earlier than ten (10) days prior to the Closing Date by the Secretary of State of Purchaser's state of incorporation;

- 9 -

(d)    an incumbency and specimen signature certificate with respect to the officers of Purchaser executing this Agreement, and any other document delivered hereunder, on behalf of Purchaser; and

(e)    such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

7.3.    Seller Deliveries.  At the Closing, Sellers shall deliver to Purchaser:

(a)    incumbency and specimen signature certificates with respect to the officers of Sellers executing this Agreement, and any other document delivered hereunder, on behalf of Sellers;

(b)    via electronic FTP transfer, a copy of the Purchased Data; and

(c)    such other documents and instruments as counsel for Purchaser and Sellers mutually agree to be reasonably necessary to consummate the transactions described herein.

## SECTION 8.
## TERMINATION

8.1.    Termination Events.  Without prejudice to other remedies which may be available to the parties by law or this Agreement, this Agreement may be terminated and the transactions contemplated herein may be abandoned:

(a)    by mutual written consent of the parties hereto;

(b)    by either party, if there shall be in effect a final order restraining, enjoining or otherwise prohibiting the consummation of the transaction contemplated by this Agreement;

(c)    by either party, if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the other party contained in this Agreement such that the conditions set forth in either Section 6.2(a) or Section 6.3(a), as applicable, would not be satisfied and which, if curable, shall not have been cured prior to the earlier of (x) thirty (30) days after the giving of written notice of such material breach by the non-breaching party to the breaching party and (y) [_____], 2007; provided, however, that neither Purchaser nor Sellers shall have the right to terminate this Agreement pursuant to this clause (c) if the party giving notice of a material breach is then in material breach of any of its representations, warranties, covenants or agreements set forth in this Agreement such that the conditions set forth in either Section 6.2(a) or Section 6.3(a), as applicable, would not be satisfied (such breaching party, a "Proximate Cause Party"); or

(d)    by any party by notice to the other party if the Closing shall not have been consummated on or before [_____], 2007, unless extended by mutual written agreement of the parties hereto, so long as the party terminating this Agreement shall not be in default or breach hereunder.

- 10 -

8.2.    Notice of Termination.  In the event of any termination pursuant to Section 8.1 above, written notice thereof setting forth the reasons therefor shall promptly be given to the other parties and the transactions contemplated by this Agreement shall be terminated, without further action by any party.

8.3.    Effect of Termination.  In the event of any termination of the Agreement as provided in Section 8.1 above, this Agreement shall forthwith become wholly void and of no further force and effect and there shall be no Liability on the part of Purchaser or Sellers under this Agreement, except that (i) the confidentiality obligations of Purchaser and Sellers under this Agreement and, for the avoidance of doubt, under the Non-Disclosure Letter Agreement, dated as of May 10, 2007, between New Century Financial Corporation  and Barclays Bank PLC, as currently in effect (the "Confidentiality Letter"), shall remain in full force and effect and (ii) termination shall not preclude either party from suing the other party for breach of this Agreement, subject to Section 3.7 hereof.

## SECTION 9.
## MISCELLANEOUS

9.1.    Notices.  All communications provided for hereunder shall be in writing and shall be deemed to be given when delivered in person or by private courier with receipt, when telefaxed and received, or three (3) days after being deposited in the United States mail, first-class, registered or certified, return receipt requested, with postage paid and,

| | |
|---|---|
| If to Purchaser: | EquiFirst Corporation |
| | 500 Forest Point Circle |
| | Charlotte, NC  28273 |
| | Attention: Robin Allcock |
| | Facsimile: (704) 625-4500 |
| | |
| With copies to: | EquiFirst Corporation |
| | 500 Forest Point Circle |
| | Charlotte, NC  28273 |
| | Attention: Legal Department |
| | Facsimile: (704) 625-4500 |
| | |
| | Allen & Overy LLP |
| | 1221 Avenue of the Americas |
| | New York, NY  10020 |
| | Attention:  Eric Shube and Ken Coleman |
| | Facsimile:  (212) 610-6399 |
| | |
| If to Sellers: | New Century Mortgage Corporation |
| | 18400 Von Karman Avenue, Suite 1000 |
| | Irvine, CA 92612 |
| | Attention:  General Counsel |
| | Facsimile:  (949) 440-7033 |

- 11 -

With a copy to:      O'Melveny & Myers LLP
                     275 Battery Street
                     San Francisco, California 94111
                     Attention: Suzzanne Uhland and C. Brophy Christensen
                     Facsimile: (415) 984-8701

and                  Hahn & Hessen LLP
                     488 Madison Avenue
                     New York, New York 10022
                     Attn: Mark Power
                     Facsimile: (212) 478-7400

or to such other address as any such party shall designate by written notice to the other parties hereto.

    9.2.   Cooperation.  Purchaser and Sellers agree to furnish or cause their Affiliates to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Purchased Data (including access to books and records) as is reasonably necessary for the filing of all tax returns and other tax filings, the making of any election related to taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any tax return.

    9.3.   Expenses.  Sellers and Purchaser shall each pay their respective expenses (such as legal, investment banker and accounting fees) incurred in connection with the origination, negotiation, execution and performance of this Agreement.

    9.4.   Non-Assignability.  This Agreement shall inure to the benefit of and be binding on the parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by either party hereto without the express prior written consent of the other party, and any attempted assignment, without such consents, shall be null and void.

    9.5.   Amendment; Waiver.  This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by the parties hereto. No waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants, or agreements contained herein, and in any documents delivered or to be delivered pursuant to this Agreement and in connection with the Closing hereunder. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

    9.6.   "AS IS" Transaction; Representations and Warranties; Schedules and Exhibits.

        (a)    Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement or in the schedules hereto prepared by Sellers, Sellers make no representations or warranties whatsoever, express or implied, with respect to the Sellers,

- 12 -

or Purchased Data (including, without limitation, income to be derived from or expenses to be incurred in connection with the Purchased Data, or the value or transferability of the Purchased Data or any portion thereof, or the merchantability or fitness of the Purchased Data). WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT AS TO ANY PORTION OF THE PURCHASED DATA. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the Purchased Data, as Purchaser deemed necessary or appropriate, and that in proceeding with its acquisition of the Purchased Data, Purchaser is doing so based solely upon such independent inspections and investigations, but subject to the satisfaction or waiver of the closing conditions specified herein. Accordingly, if the Closing occurs, Purchaser will accept the Purchased Data at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order.

(b)     Each of Purchaser and Sellers agree neither Sellers nor any of the respective officers, directors, stockholders, employees, affiliates, representatives or agents of Sellers shall have any Liability or responsibility arising out of, or relating to, any information (whether written or oral), documents or materials furnished by Sellers or any of their officers, directors, stockholders, employees, affiliates or any of their respective representatives or agents, and any information, documents or materials made available to Purchaser in certain "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement.

(c)     All Schedules hereto are hereby incorporated by reference and made a part of this Agreement. Any fact or item which is clearly disclosed on any Schedule to this Agreement in such a way as to make its relevance to a representation or representations made elsewhere in this Agreement or to the information called for by another Schedule or other Schedules to this Agreement readily apparent shall be deemed to be an exception to such representation or representations or to be disclosed on such other Schedule or Schedules, as the case may be, notwithstanding the omission of a reference or cross-reference thereto. Any fact or item disclosed on any Schedule hereto shall not by reason only of such inclusion be deemed to be material and shall not be employed as a point of reference in determining any standard of materiality under this Agreement

9.7.     <u>Third Parties</u>.  This Agreement does not create any rights, claims or benefits inuring to any person that is not a party hereto nor create or establish any third party beneficiary hereto.

9.8     <u>No Strict Construction</u>.  Notwithstanding the fact that this Agreement has been drafted or prepared in all or in part by one of the parties, the parties confirm that both they and their respective counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person.

- 13 -

9.9.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

9.10.    Venue and Jurisdiction.  Venue for any action or proceeding pertaining to the construction or enforcement of this Agreement shall be the Bankruptcy Court, and the parties hereto consent to the Bankruptcy Court's exercise of jurisdiction over them with respect to any such action or proceeding.

9.11.    Certain Definitions.  For purposes of this Agreement, the term:

(a)    "affiliate" of a person means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned person;

(b)    "Auction" means the auction held in accordance with Bankruptcy Code, which auction included the non-exclusive sale of copies of the Purchased Data;

(c)    "Liability" means any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown, secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due;

(d)    "Lien" means any liens, claims, encumbrances, mortgages, security interests, pledges, claims, equities and other restrictions or charges of any kind or nature whatsoever, including without limitation all "interests" as such term is defined in section 363(f) of the Bankruptcy Code;

(e)    "Material Adverse Effect" means any change, effect, event or circumstance, that, individually or in the aggregate, is materially adverse to the Purchased Data or the ability of Sellers to perform their obligations under this Agreement, except for any change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, (ii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iii) changes in applicable laws after the date hereof, (iv) the fact that Sellers will be operating as a debtors-in-possession under the Bankruptcy Code, or (v) changes in GAAP or regulatory accounting principles after the date hereof;

(f)    "person" shall have the meaning set forth in the Bankruptcy Code; and

(g)    "subsidiary" or "subsidiaries" of Purchaser, Sellers or any other person means any person of which Purchaser, Sellers or such other person, as the case may be (either alone or through or together with any other subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity interests the holder of which is generally entitled to vote for the election of the board of directors or other governing body of such person.

9.12.    Entire Agreement.  This Agreement and the Schedules and Exhibits hereto, together with the Asset Purchase Agreement and the Confidentiality Letter, set forth the entire understanding of the parties hereto and no modifications or amendments to this Agreement shall

- 14 -

be binding on the parties unless in writing and signed by the party or parties to be bound by such modification or amendment.

9.13.  Section Headings; Table of Contents.  The section headings contained in this Agreement and the Table of Contents to this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.14.  Severability.  If any provision of this Agreement shall be declared by any court of competent jurisdiction to be illegal, void or unenforceable, all other provisions of this Agreement shall not be affected and shall remain in full force and effect.

9.15.  Counterparts.  This Agreement may be executed in any number of counterparts, including by electronic mail or facsimile, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

*[Remainder of Page Intentionally Left Blank]*

- 15 -

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first above written.

NEW CENTURY FINANCIAL CORPORATION

By: _____
　　　　Name:
　　　　Title:


NEW CENTURY MORTGAGE CORPORATION

By: _____
　　　　Name:
　　　　Title:


EQUIFIRST CORPORATION

By: _____
　　　　Name:
　　　　Title:

**Schedule 1.2(a)**
**Broker Data**

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

## DISCLOSURE SCHEDULES

These Disclosure Schedules have been prepared and are being delivered pursuant to that certain Asset Purchase Agreement, dated as of June 22, 2007 (the "Agreement"), by and among New Century Financial Corporation, a Maryland corporation, as a debtor and debtor-in-possession, and New Century Mortgage Corporation, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser"). All capitalized terms which are used but not defined in these Disclosure Schedules shall have the meanings ascribed to such terms in the Agreement, unless the context requires otherwise.

The Section numbers used in these Disclosure Schedules correspond to the Section numbers in the Agreement and are provided for convenience only. Any information set forth in one section of the Disclosure Schedules shall be deemed to apply to each other section or subsection hereof or of the Agreement to which its relevance is readily apparent on its face. Where the terms of a contract, agreement or other disclosure item have been summarized or described in these Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract, agreement or other disclosure item and such summary or description is qualified in its entirety by such contract, agreement or other disclosure item. Moreover, such summaries or descriptions of terms of contracts, agreements or other disclosure items provided in these Disclosure Schedules do not constitute representations, warranties or covenants of Sellers.

Unless otherwise stated, all statements made herein are made as of June 22, 2007. In addition, appendices and exhibits attached hereto and referenced herein form an integral part of the sections of the Disclosure Schedules into which they are incorporated by reference for all purposes as if set forth herein, including for the purposes of cross-application to other sections of the Agreement to which their relevance is readily apparent on its face. No reference to or disclosure of any item or other matter in these Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material, that it could have a Material Adverse Effect on Sellers or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. Except for Schedules 1.2(a) (Assumed Contracts), no reference in these Disclosure Schedules to any agreement or document shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. Furthermore, no reference in these Disclosure Schedules to any agreement or document shall be construed as (i) an admission or indication to or for the benefit of any third party that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document with respect to any third party (ii) an admission or indication of any liability or obligation of either Seller or any of their affiliates to any third party or (iii) an admission against either Seller's or any of their affiliates' interests. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

## SCHEDULE 1.2(a)

## ASSUMED CONTRACTS*

1.        iLOG Software License Agreement between New Century Mortgage Corporation and iLOG, Inc., dated September 5, 2003.

>        **Service Address:**
>        ILOG, Inc.
>        1080 Linda Vista Ave.
>        Mountain View, CA 94043

2.        BEA WebLogic End User Software License Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April 28, 2003.

>        **Service Address:**
>        BEA Systems, Inc.
>        2315 North First Street
>        San Jose, CA 95131
>        Attn: Office of the General Counsel

3.        Chordiant Software License and Services Agreement between New Century Mortgage Corporation and Chordiant Software Inc., dated June 30, 2004.

>        **Service Address:**
>        Chordiant Software Inc.
>        20400 Stevens Creek Blvd.,
>        Suite 400
>        Cupertino, CA 95014
>        Attn: Chief Financial Officer/Finance Director

4.        CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004.

>        **Service Address:**
>        CrownPeak Technology
>        13323 Washington Blvd., Suite 206
>        Los Angeles, CA 90066

5.        Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005.

>        **Service Address:**
>        Ascential Software Corporation
>        50 Washington Street
>        Westboro, MA 01581-1021
>        Attn: General Counsel
>        Tel: (508) 366-3888/Fax: (508) 389-8700

---

* Each as amended from time to time and including all exhibits, riders and addendums

If and to the extent that any Assumed Contract listed on this Schedule 1.2(a) requires the consent of a third party for the assignment thereof, and such consent shall not have been provided by the applicable third party on or prior to the Closing Date, then each such Assumed Contract shall be deemed to be part of the Excluded Assets for the purposes of the Agreement.

## SCHEDULE 1.2(b)(i)

## DATA

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

"Reference Data" means values such as FICO scores, LTV amounts, LIBOR rates and other data that are retrieved at runtime and used within the logic of the application, generally as variables, which may also appear as input or output data

"Control Data" means values such as MAX LTV, FICO Band or underwriting rule, which are retrieved at runtime and influence the flow of the logic engine, and which may also appear as input or output data

"Meta Data" means "data about data," such as a database table descriptions, file layouts, and performance statistics that define the meaning of data contained in or traveling through the system, including, without limitation, "schemas," "attributes," and other technology specific data description lexicons.

"Configuration Data" means values that describe and control the logical linking and physical routing of communications, hardware function, software function and coupling of the preceding, such as "machine config," names.ora" or DNS entries.

"Documentation" means all requirements, analysis, design, inspection, test cases, test input and output data, processes, policies and procedures necessary to understand the intent and function of the relevant system.

## SCHEDULE 1.2(b)(ii)

## LOAN PERFORMANCE DATA

"Loan Performance Data" shall mean the scope of data representing certain attributes derived from Sellers' loan origination process. The Loan Performance Data includes certain loan specific attributes, borrower attributes and property attributes. There are approximately 3.2 million records with approximately 871 different attributes for such records.

The Loan Performance Data includes (i) certain pricing information from EDE as it exists in the data format of the Data Warehouse, (ii) certain servicing information for loans serviced by MortgageServ and OCWEN, (iii) certain broker information from BDS, and (iv) certain accounting and human resources information. Such servicing information includes approximately 1.3 million loan records.

Certain information has been removed from the Loan Performance Data for consumer privacy reasons

## SCHEDULE 1.2(e)(i)

## TRADEMARKS AND DOMAIN NAMES

### Trademarks

| mOur Ref | Mark | Serial No. | Filing Date | Reg. No | Reg. Date | Status | Class No | Specification of Goods | Due Date | Due Date Description | Owner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S8368 | FastQual | 78/382,404 | 03/11/04 | 2,940,008 | 04/12/05 | Registered | 36 | Mortgage lending services | 04/12/11 | Affidavit of Use | New Century Mortgage Corporation |
| S8369 | FastQual & Design *fastQual* | 78/382,408 | 03/11/04 | 3,030,444 | 12/13/05 | Registered | 36 | mortgage lending services | 12/13/11 | Affidavit of Use | New Century Mortgage Corporation |
| S6623 | FASTQUAL YOU JUST CLOSED MORE & Design *fastQual* | 76/407,466 | 05/02/02 | 2,706,783 | 04/15/03 | Registered | 36 | mortgage lending services | 04/15/09 | Affidavit of Use | New Century Mortgage Corporation |

### Domain Names

1.    www.fastqual.com

**SCHEDULE 1.2(c)(iii)**

**TECHNOLOGY**

| Application | Description of Application | Included Interfaces/Integrations |
|---|---|---|
| 1.  BDS | Broker Database System, predecessor for BRM, utilizing classic ASP with SQL 2000 on the backend, used for managing brokers and broker contacts information | **Internal:** BRM |
| 2.  BDS - OOF (Opt Out) | Opt Out Fax Manager, used by broker services clerks to process right faxes with opt in/out options from brokers | |
| 3.  BDS FM | .NET application for processing right fax images of signature pages from Online Broker Applications that are stored in database after BDSRightFax service processing | |
| 4.  BDS OBA | Online Broker Application, part of FastQual that allows brokers to submit online applications that are processed later through BDSWF application (see #6) | **Internal:** FastQual |
| 5.  BDS RightFax (NT Service) | .NET service that takes care of processing/saving in database received right fax images of OBA signature pages which are processed by BDSFM | **Internal:** Rightfax |
| 6.  BDS WF | BDS workflow .NET application that allows broker services processors to approve OBA | |
| 7.  BDS WS | Web services, middle tier for OBA and BDSWF | |
| 8.  BRM | Broker Relationship Management - Marketing, Customer Support Agent Desktop and Sales Automation Workforce system to support New Century's relationship with our Wholesale Brokers<br><br>The BRM, as referred to in this Schedule 1.2(c)(iii), will include without limitation the Broker Data as such is stored or incorporated in a relational database in the BRM and all related information (including but not limited to control values). | **Internal:** BDS FastQual Data Warehouse Telemarketing/Campaign Files |

| | | |
|---|---|---|
| 9. BRM - Reporting Service | Microsoft Reporting Services integration to display Broker Sales reports via the BRM application | |
| 10. BRM ETL | Extract Transform Load tool used to transfer, cleanse and aggregate data from several source and target systems | |
| 11. EDE | Enterprise Decisioning Engine that houses Pricing, Underwriting and Eligibility business rules for automated decisions | **Internal:**<br>Empower<br>FastQual |
| 12. EDE - Admin Tool | Administrator tool that allows business users to update pricing changes to EDE | |
| 13. EDE - Certification Tool | Verification tool used to compare EDE results across different rule sets | |
| 14. EDE - Log Viewer | GUI Support tool used to present EDE results | |
| 15. EDE - QA Response Loader | Testing tool that submits and returns EDE requests and results in large batches | |
| 16. EDE - QA Tool | Testing and Support tool that allows a user to submit, modify, and edit EDE XML request files and to view the EDE result file | |
| 17. EDE - Ratesheet Generator | Generates rate sheets that are published to our customers off of the EDE rule sets | |
| 18. Sellers' customizations to the Empower application and database | Sellers' customizations to the Wholesale and Retail Loan Origination System used to process loan applications | **Internal:**<br>Data Warehouse (multiple loan verification)<br>*EDE (loan pricing, underwriting review)<br>*Credit Gateway (credit report information)<br>BRM/BDS (broker validation)<br>Predictive Analytics (Risk Assessment)<br>Branch Licenses (License validation)<br>FastQual (import of application data)<br>Appraiser Database System (appraiser validation)<br>Rightfax (document transmittal)<br>Digital Sender (HW)/Outlook (Appraisal review)<br><br>**External:** |

| | | *Flood Integration (Flood report verification) Hansen (property risk score) SwiftSend (secure document transmittal) <br><br> * Required for loan origination |
|---|---|---|
| 19. FastQual, PrivateLabel | FastQual & Private Label -Wholesale and Correspondent Broker Point of Sale system used to capture applications and pre-qualify borrowers | **Internal:** <br> Credit Services (RC/ACR) <br> BRM <br> Data Warehouse <br> Empower <br> EDE <br> BDS <br> Lounge <br><br> **External:** <br> DiTech <br> Calyx <br> EllieMae (Desktop LOS Controls) |
| 20. Lounge | Wholesale Sales Portal to track Broker submissions and calculate sales commissions | |
| 21. RCS - NCI2MISMO | Redundant Credit Service translator to convert NCI format to MISMO | |
| 22. RCS (Redundant Credit) | Manages credit requests and responses with credit vendors and requesting systems | **Internal:** <br> FastQual <br> Empower <br><br> **External:** <br> Fidelity (credit vendor) <br> CBC (credit vendor) |
| 23. Broker Credit Reissue | Tool for managing reissue of credit reports and requests | **Internal:** <br> FastQual <br> Empower <br><br> **External:** <br> LSI <br> Fidelity <br> CBC <br> Kroll <br> Informative Research <br> Landsafe <br> Equifax <br> Credco <br> CBA/Experian |

| | | FiServ/Chase |
|---|---|---|
| 24. Help Desk Console | Support tool to administer credit vendors and troubleshoot credit reporting issues | **Internal:** <br> Broker Credit Reissue <br> Redundant Credit <br> FastQual |
| 25. Data Warehouse | Database system used for collecting and transmitting information from multiple applications mainly for reporting and analytics | **Internal:** <br> BRM <br> Empower <br> FastQual |

## SCHEDULE 1.4(c)

## CURE FINDINGS

| Contract Description | Contracting Party Contact Information: | Cure Amount |
|---|---|---|
| iLOG Software License Agreement between iLOG, Inc. and New Century Mortgage Corporation, dated September 5, 2003 | ILOG, Inc. 1080 Linda Vista Avenue Mountain View, CA 94043 | $0.00 |
| BEA WebLogic End User Software License Agreement between BEA Systems, Inc. and New Century Mortgage Corporation, dated April 28, 2003 | BEA Systems, Inc. 2315 North First Street San Jose, CA 95131 Attn: Office of the General Counsel | $0.00 |
| Chordiant Software License and Services Agreement between New Century Mortgage Corporation, dated June 30, 2004 | Chordiant Software Inc. 20400 Stevens Creek Blvd., Suite 400 Cupertino, CA 95014 Attn: Chief Financial Officer/Finance Director | $0.00 |
| CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004 | CrownPeak Technology 13323 Washington Blvd., Suite 206 Los Angeles, CA 90066 | $13,161.28 |
| Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005 | Ascential Software Corporation 50 Washington Street Westboro, MA 01581-1021 Attn: General Counsel | $0.00 |

## SCHEDULE 2.1

## PURCHASE PRICE ALLOCATION

[To be provided by Purchaser]

## SCHEDULE 3.7

## SUFFICIENCY OF PURCHASED ASSETS

1.          Agreement of Purchase and Software License between New Century Financial
Corporation and Eastern Software Corporation, dated October 21, 2002.

> **Service Address:**
> Eastern Software Corporation
> 50 S. Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

2.          Empower Escrow Agreement between Eastern Software Corporation, New
Century Financial Corporation and First National Trust Company, dated October 18, 2002.

> **Service Address:**
> Eastern Software Corporation
> 50 S Water Avenue
> Sharon, PA 16146
> Attn: Joseph P. Delaney
> Fax: (724) 981-4323

> **Escrow Agent:**
> First National Trust Company c/o
> First National Bank of Pennsylvania
> One FNB Boulevard
> Hermitage, PA 16148
> Attn: Amy C. Atkinson, Client Services Specialist

3.          JBoss (Red Hat) Master Agreement between New Century Mortgage Corporation
and Jboss, Inc., dated October 30, 2004.

> **Service Address:**
> Jboss, Inc.
> 3340 Peachtree Road NE, Suite 1225
> Atlanta, GA 30326
> Tel:  (404) 467-8555, ext 203/Fax:  (404) 948-1496

4.          Oracle License and Services Agreement between New Century Mortgage
Corporation and Oracle, dated May 28, 2005.

> **Service Address:**
> Oracle USA, Inc.
> 500 Oracle Parkway
> Redwood City, CA 94065
> Attn: General Counsel, Legal Department

5.        BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April, 2003.

>        **Service Address:**
>        BEA Systems, Inc.
>        2315 North First Street
>        San Jose, CA 95131
>        Attn: Legal Department
>        Tel: (408) 570-8000/Fax: (408) 570-8901

6.        BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April 14, 2004.

>        **Service Address:**
>        BEA Systems, Inc.
>        2315 North First Street
>        San Jose, CA 95131
>        Attn: Legal Department
>        Tel: (408) 570-8000/Fax: (408) 570-8901

7.        Chordiant Professional Services Agreement between New Century Mortgage
Corporation and Chordiant Software, Inc., dated October 22, 2004.

>        **Service Address:**
>        Chordiant Software Inc.
>        20400 Stevens Creek Blvd., Suite 400
>        Cupertino, CA 95014

8.        Red Hat Enterprise End User License Agreement between New Century
Mortgage Corporation and Red Hat, Inc.

>        **Service Address:**
>        Red Hat, Inc.,
>        Attn: General Counsel
>        1801 Varsity Drive
>        Raleigh, NC 27606
>        Fax: (919) 754-3704

9.        Citrix Open License Agreement between New Century Mortgage Corporation and
Citrix Systems, Inc., dated May 6, 2004.

>        **Service Address:**
>        Citrix Systems, Inc.
>        852 Cypress Creek Road
>        Fort Lauderdale, FL 33309

10.        Microsoft Master Services Agreement between New Century Mortgage
Corporation and Microsoft Corp , dated February 27, 2003

> **Service Address:**
> Microsoft Corporation
> Law and Corporate Affairs
> One Microsoft Way
> Redmond, WA 98052
> Attn: Services Attorney
> Fax: (425) 936-7329

11.        Microsoft Business Agreement between New Century Mortgage Corporation and
Microsoft Corp., dated May 1, 2005.

> **Service Address:**
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

12.        Microsoft Agreement between New Century Mortgage Corporation and Microsoft
Corp., dated May 1, 2005.

> **Service Address:**
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

*        *        *

## SCHEDULE 3.10(c)

## INTELLECTUAL PROPERTY – SOURCE CODE ESCROWS/CUSTODY

None.

## SCHEDULE 5.6(a)

## TECHNOLOGY EMPLOYEES

See attached list of Technology Employees.

Each Technology Employee listed is an active employee and does not have any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.). No target level 2007 bonus amount was set for any listed Technology Employee.

## SCHEDULE 5.6(b)

## PLANS

1.   Service Awards
2.   Education Assistance
3.   ESPP - Employee Stock Purchase Plan
4.   Fitness Club Membership
5.   Rideshare
6.   Scholarship Program
7.   FSA - Flexible Spending Account Plan
8.   Deferred Compensation Plan
9    Vision Service Plan
10.   Dental Benefits - Indemnity Plan
11.   Dental Benefits - PDP Plan
12.   Medical Choice Plus 100/60 Plan
13.   Medical Choice Plus 90/70 Plan
14.   Medical Out of Area Plan
15.   Long-Term Disability, as amended
16.   Short-Term Disability, as amended
17.   Basic Life Certificate Class 1, as amended
18.   Basic Life Certificate Class 2, as amended
19.   401(k) Profit Sharing Plan
20.   HMSA Medical Plan
21.   Supplemental Life Insurance and AD&D Plan
22.   Wholesale Division and Region Manager Incentive Compensation Plan
23.   Wholesale Executive Management Incentive Compensation Plan
24.   Collateral Analyst Incentive Compensation Bonus Plan
25.   New Century Financial Corporation and Subsidiaries Company Incentive Bonus Plan
26.   Consumer Direct Retention Plan
27.   Wholesale Retention Plan

LA1:1139446 5                                        18

## DISCLOSURE SCHEDULES

These Disclosure Schedules have been prepared and are being delivered pursuant to that certain Asset Purchase Agreement, dated as of June 22, 2007 (the "Agreement"), by and among New Century Financial Corporation, a Maryland corporation, as a debtor and debtor-in-possession, and New Century Mortgage Corporation, a California corporation, as a debtor and debtor-in-possession (each, a "Seller" and, collectively, the "Sellers"), and EquiFirst Corporation, a North Carolina corporation ("Purchaser"). All capitalized terms which are used but not defined in these Disclosure Schedules shall have the meanings ascribed to such terms in the Agreement, unless the context requires otherwise.

The Section numbers used in these Disclosure Schedules correspond to the Section numbers in the Agreement and are provided for convenience only. Any information set forth in one section of the Disclosure Schedules shall be deemed to apply to each other section or subsection hereof or of the Agreement to which its relevance is readily apparent on its face. Where the terms of a contract, agreement or other disclosure item have been summarized or described in these Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract, agreement or other disclosure item and such summary or description is qualified in its entirety by such contract, agreement or other disclosure item. Moreover, such summaries or descriptions of terms of contracts, agreements or other disclosure items provided in these Disclosure Schedules do not constitute representations, warranties or covenants of Sellers.

Unless otherwise stated, all statements made herein are made as of June 22, 2007. In addition, appendices and exhibits attached hereto and referenced herein form an integral part of the sections of the Disclosure Schedules into which they are incorporated by reference for all purposes as if set forth herein, including for the purposes of cross-application to other sections of the Agreement to which their relevance is readily apparent on its face. No reference to or disclosure of any item or other matter in these Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material, that it could have a Material Adverse Effect on Sellers or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. Except for Schedules 1.2(a) (Assumed Contracts), no reference in these Disclosure Schedules to any agreement or document shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. Furthermore, no reference in these Disclosure Schedules to any agreement or document shall be construed as (i) an admission or indication to or for the benefit of any third party that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document with respect to any third party (ii) an admission or indication of any liability or obligation of either Seller or any of their affiliates to any third party or (iii) an admission against either Seller's or any of their affiliates' interests. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

## SCHEDULE 1.2(a)

## ASSUMED CONTRACTS[*]

1.        iLOG Software License Agreement between New Century Mortgage Corporation and iLOG, Inc., dated September 5, 2003.

> **Service Address:**
> ILOG, Inc.
> 1080 Linda Vista Ave.
> Mountain View, CA 94043

2.        BEA WebLogic End User Software License Agreement between New Century Mortgage Corporation and BEA Systems, Inc., dated April 28, 2003.

> **Service Address:**
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Office of the General Counsel

3.        Chordiant Software License and Services Agreement between New Century Mortgage Corporation and Chordiant Software Inc., dated June 30, 2004.

> **Service Address:**
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd.,
> Suite 400
> Cupertino, CA 95014
> Attn: Chief Financial Officer/Finance Director

4.        CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004.

> **Service Address:**
> CrownPeak Technology
> 13323 Washington Blvd., Suite 206
> Los Angeles, CA 90066

5.        Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005.

> **Service Address:**
> Ascential Software Corporation
> 50 Washington Street
> Westboro, MA 01581-1021
> Attn: General Counsel
> Tel: (508) 366-3888/Fax: (508) 389-8700

---

[*] Each as amended from time to time and including all exhibits, riders and addendums.

If and to the extent that any Assumed Contract listed on this Schedule 1.2(a) requires the consent of a third party for the assignment thereof, and such consent shall not have been provided by the applicable third party on or prior to the Closing Date, then each such Assumed Contract shall be deemed to be part of the Excluded Assets for the purposes of the Agreement.

## SCHEDULE 1.2(b)(i)

## DATA

"Broker Data" shall mean the scope of the Data that represents Sellers' list of broker customers and their respective contact information, including (to the extent such information is available) the contact name, title, address, telephone, facsimile, and electronic mail address. The Broker Data includes certain prospect broker records obtained from industry trade shows and company marketing events. The Broker Data includes approximately 200,000 records with approximately 150 different attributes, including geographical information about the applicable broker shop, loan count and volume performance, as well as solicitation/opt out information, but the Broker Data will be limited to those attributes relating specifically to the applicable broker and will not in any way include information related to the control values in the BRM system. Broker loan count and volume data is aggregated across a variety of key metrics. The Broker Data shall not include the broker agreements executed between Sellers' and broker companies or any rights in connection with such agreements. The Broker Data will be delivered in a Microsoft Excel format or a Comma-Separated Values format.

"Reference Data" means values such as FICO scores, LTV amounts, LIBOR rates and other data that are retrieved at runtime and used within the logic of the application, generally as variables, which may also appear as input or output data.

"Control Data" means values such as MAX LTV, FICO Band or underwriting rule, which are retrieved at runtime and influence the flow of the logic engine, and which may also appear as input or output data.

"Meta Data" means "data about data," such as a database table descriptions, file layouts, and performance statistics that define the meaning of data contained in or traveling through the system, including, without limitation, "schemas," "attributes," and other technology specific data description lexicons.

"Configuration Data" means values that describe and control the logical linking and physical routing of communications, hardware function, software function and coupling of the preceding, such as "machine config," names.ora" or DNS entries

"Documentation" means all requirements, analysis, design, inspection, test cases, test input and output data, processes, policies and procedures necessary to understand the intent and function of the relevant system.

## SCHEDULE 1.2(b)(ii)

## LOAN PERFORMANCE DATA

"Loan Performance Data" shall mean the scope of data representing certain attributes derived from Sellers' loan origination process. The Loan Performance Data includes certain loan specific attributes, borrower attributes and property attributes. There are approximately 3.2 million records with approximately 871 different attributes for such records.

The Loan Performance Data includes (i) certain pricing information from EDE as it exists in the data format of the Data Warehouse, (ii) certain servicing information for loans serviced by MortgageServ and OCWEN, (iii) certain broker information from BDS, and (iv) certain accounting and human resources information. Such servicing information includes approximately 1.3 million loan records.

Certain information has been removed from the Loan Performance Data for consumer privacy reasons.

## SCHEDULE 1.2(c)(i)

## TRADEMARKS AND DOMAIN NAMES

### Trademarks

| mOur Ref | Mark | Serial No. | Filing Date | Reg. No | Reg. Date | Status | Class No | Specification of Goods | Due Date | Due Date Description | Owner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S8368 | FastQual | 78/382,404 | 03/11/04 | 2,940,008 | 04/12/05 | Registered | 36 | Mortgage lending services | 04/12/11 | Affidavit of Use | New Century Mortgage Corporation |
| S8369 | FastQual & Design | 78/382,408 | 03/11/04 | 3,030,444 | 12/13/05 | Registered | 36 | mortgage lending services | 12/13/11 | Affidavit of Use | New Century Mortgage Corporation |
| S6623 | FASTQUAL YOU JUST CLOSED MORE & Design | 76/407,466 | 05/02/02 | 2,706,783 | 04/15/03 | Registered | 36 | mortgage lending services | 04/15/09 | Affidavit of Use | New Century Mortgage Corporation |

### Domain Names

1.    www.fastqual.com

## SCHEDULE 1.2(c)(iii)

## TECHNOLOGY

| Application | Description of Application | Included Interfaces/Integrations |
|---|---|---|
| 1. BDS | Broker Database System, predecessor for BRM, utilizing classic ASP with SQL 2000 on the backend, used for managing brokers and broker contacts information | **Internal:**<br>BRM |
| 2. BDS - OOF (Opt Out) | Opt Out Fax Manager, used by broker services clerks to process right faxes with opt in/out options from brokers | |
| 3. BDS FM | .NET application for processing right fax images of signature pages from Online Broker Applications that are stored in database after BDSRightFax service processing | |
| 4. BDS OBA | Online Broker Application, part of FastQual that allows brokers to submit online applications that are processed later through BDSWF application (see #6) | **Internal:**<br>FastQual |
| 5. BDS RightFax (NT Service) | .NET service that takes care of processing/saving in database received right fax images of OBA signature pages which are processed by BDSFM | **Internal:**<br>Rightfax |
| 6. BDS WF | BDS workflow .NET application that allows broker services processors to approve OBA | |
| 7. BDS WS | Web services, middle tier for OBA and BDSWF | |
| 8. BRM | Broker Relationship Management - Marketing, Customer Support Agent Desktop and Sales Automation Workforce system to support New Century's relationship with our Wholesale Brokers<br><br>The BRM, as referred to in this Schedule 1.2(c)(iii), will include without limitation the Broker Data as such is stored or incorporated in a relational database in the BRM and all related information (including but not limited to control values). | **Internal:**<br>BDS<br>FastQual<br>Data Warehouse<br>Telemarketing/Campaign Files |

| | | |
|---|---|---|
| 9. BRM - Reporting Service | Microsoft Reporting Services integration to display Broker Sales reports via the BRM application | |
| 10. BRM ETL | Extract Transform Load tool used to transfer, cleanse and aggregate data from several source and target systems | |
| 11. EDE | Enterprise Decisioning Engine that houses Pricing, Underwriting and Eligibility business rules for automated decisions | **Internal:** Empower FastQual |
| 12. EDE - Admin Tool | Administrator tool that allows business users to update pricing changes to EDE | |
| 13. EDE - Certification Tool | Verification tool used to compare EDE results across different rule sets | |
| 14. EDE - Log Viewer | GUI Support tool used to present EDE results | |
| 15. EDE - QA Response Loader | Testing tool that submits and returns EDE requests and results in large batches | |
| 16. EDE - QA Tool | Testing and Support tool that allows a user to submit, modify, and edit EDE XML request files and to view the EDE result file | |
| 17. EDE - Ratesheet Generator | Generates rate sheets that are published to our customers off of the EDE rule sets | |
| 18. Sellers' customizations to the Empower application and database | Sellers' customizations to the Wholesale and Retail Loan Origination System used to process loan applications | **Internal:** Data Warehouse (multiple loan verification) *EDE (loan pricing, underwriting review) *Credit Gateway (credit report information) BRM/BDS (broker validation) Predictive Analytics (Risk Assessment) Branch Licenses (License validation) FastQual (import of application data) Appraiser Database System (appraiser validation) Rightfax (document transmittal) Digital Sender (HW)/Outlook (Appraisal review)<br><br>**External:** |

| | | |
|---|---|---|
| | | *Flood Integration (Flood report verification)<br>Hansen (property risk score)<br>SwiftSend (secure document transmittal)<br><br>* Required for loan origination |
| 19. FastQual, PrivateLabel | FastQual & Private Label -Wholesale and Correspondent Broker Point of Sale system used to capture applications and pre-qualify borrowers | **Internal:**<br>Credit Services (RC/ACR)<br>BRM<br>Data Warehouse<br>Empower<br>EDE<br>BDS<br>Lounge<br><br>**External:**<br>DiTech<br>Calyx<br>EllieMae (Desktop LOS Controls) |
| 20. Lounge | Wholesale Sales Portal to track Broker submissions and calculate sales commissions | |
| 21. RCS - NCI2MISMO | Redundant Credit Service translator to convert NCI format to MISMO | |
| 22. RCS (Redundant Credit) | Manages credit requests and responses with credit vendors and requesting systems | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>Fidelity (credit vendor)<br>CBC (credit vendor) |
| 23. Broker Credit Reissue | Tool for managing reissue of credit reports and requests | **Internal:**<br>FastQual<br>Empower<br><br>**External:**<br>LSI<br>Fidelity<br>CBC<br>Kroll<br>Informative Research<br>Landsafe<br>Equifax<br>Credco<br>CBA/Experian |

| | | FiServ/Chase |
|---|---|---|
| 24. Help Desk Console | Support tool to administer credit vendors and troubleshoot credit reporting issues | **Internal:**<br>Broker Credit Reissue<br>Redundant Credit<br>FastQual |
| 25. Data Warehouse | Database system used for collecting and transmitting information from multiple applications mainly for reporting and analytics | **Internal:**<br>BRM<br>Empower<br>FastQual |

**SCHEDULE 1.4(c)**

**CURE FINDINGS**

| Contract Description | Contracting Party Contact Information: | Cure Amount |
| --- | --- | --- |
| iLOG Software License Agreement between iLOG, Inc. and New Century Mortgage Corporation, dated September 5, 2003 | ILOG, Inc. 1080 Linda Vista Avenue Mountain View, CA  94043 | $0.00 |
| BEA WebLogic End User Software License Agreement between BEA Systems, Inc. and New Century Mortgage Corporation, dated April 28, 2003 | BEA Systems, Inc. 2315 North First Street San Jose, CA  95131 Attn:  Office of the General Counsel | $0.00 |
| Chordiant Software License and Services Agreement between New Century Mortgage Corporation, dated June 30, 2004 | Chordiant Software Inc. 20400 Stevens Creek Blvd., Suite 400 Cupertino, CA  95014 Attn:  Chief Financial Officer/Finance Director | $0.00 |
| CrownPeak Services Agreement between New Century Mortgage Corporation and CrownPeak Technology, dated April 12, 2004 | CrownPeak Technology 13323 Washington Blvd., Suite  206 Los Angeles, CA 90066 | $13,161.28 |
| Ascential Software License and Services Agreement between New Century Mortgage Corporation and Ascential Software, dated February 2, 2005 | Ascential Software Corporation 50 Washington Street Westboro, MA  01581-1021 Attn:  General Counsel | $0.00 |

**SCHEDULE 2.1**

**PURCHASE PRICE ALLOCATION**

[To be provided by Purchaser]

**SCHEDULE 3.7**

**SUFFICIENCY OF PURCHASED ASSETS**

1.          Agreement of Purchase and Software License between New Century Financial Corporation and Eastern Software Corporation, dated October 21, 2002.

>    **Service Address:**
>    Eastern Software Corporation
>    50 S. Water Avenue
>    Sharon, PA 16146
>    Attn: Joseph P. Delaney
>    Fax: (724) 981-4323

2.          Empower Escrow Agreement between Eastern Software Corporation, New Century Financial Corporation and First National Trust Company, dated October 18, 2002.

>    **Service Address:**
>    Eastern Software Corporation
>    50 S. Water Avenue
>    Sharon, PA 16146
>    Attn: Joseph P. Delaney
>    Fax: (724) 981-4323

>    **Escrow Agent:**
>    First National Trust Company c/o
>    First National Bank of Pennsylvania
>    One FNB Boulevard
>    Hermitage, PA 16148
>    Attn: Amy C. Atkinson, Client Services Specialist

3.          JBoss (Red Hat) Master Agreement between New Century Mortgage Corporation and Jboss, Inc., dated October 30, 2004.

>    **Service Address:**
>    Jboss, Inc.
>    3340 Peachtree Road NE, Suite 1225
>    Atlanta, GA 30326
>    Tel:  (404) 467-8555, ext 203/Fax:  (404) 948-1496

4.          Oracle License and Services Agreement between New Century Mortgage Corporation and Oracle, dated May 28, 2005.

>    **Service Address:**
>    Oracle USA, Inc.
>    500 Oracle Parkway
>    Redwood City, CA 94065
>    Attn: General Counsel, Legal Department

5.          BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April, 2003.

> **Service Address:**
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

6.          BEA Consulting Services Agreement between New Century Mortgage
Corporation and BEA Systems, Inc., dated April 14, 2004.

> **Service Address:**
> BEA Systems, Inc.
> 2315 North First Street
> San Jose, CA 95131
> Attn: Legal Department
> Tel: (408) 570-8000/Fax: (408) 570-8901

7.          Chordiant Professional Services Agreement between New Century Mortgage
Corporation and Chordiant Software, Inc., dated October 22, 2004.

> **Service Address:**
> Chordiant Software Inc.
> 20400 Stevens Creek Blvd., Suite 400
> Cupertino, CA 95014

8.          Red Hat Enterprise End User License Agreement between New Century
Mortgage Corporation and Red Hat, Inc.

> **Service Address:**
> Red Hat, Inc.,
> Attn: General Counsel
> 1801 Varsity Drive
> Raleigh, NC 27606
> Fax: (919) 754-3704

9.          Citrix Open License Agreement between New Century Mortgage Corporation and
Citrix Systems, Inc., dated May 6, 2004.

> **Service Address:**
> Citrix Systems, Inc.
> 852 Cypress Creek Road
> Fort Lauderdale, FL 33309

10.        Microsoft Master Services Agreement between New Century Mortgage
Corporation and Microsoft Corp., dated February 27, 2003.

> **Service Address:**
> Microsoft Corporation
> Law and Corporate Affairs
> One Microsoft Way
> Redmond, WA 98052
> Attn: Services Attorney
> Fax: (425) 936-7329

11.        Microsoft Business Agreement between New Century Mortgage Corporation and
Microsoft Corp., dated May 1, 2005.

> **Service Address:**
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

12.        Microsoft Agreement between New Century Mortgage Corporation and Microsoft
Corp., dated May 1, 2005.

> **Service Address:**
> Microsoft Licensing, GP
> Dept. 551, Volume Licensing
> 6100 Neil Road, Suite 210
> Reno, NV 89511-1137

*        *        *

<u>**SCHEDULE 3.10(c)**</u>

<u>**INTELLECTUAL PROPERTY – SOURCE CODE ESCROWS/CUSTODY**</u>

None

## SCHEDULE 5.6(a)

## TECHNOLOGY EMPLOYEES

See attached list of Technology Employees.

Each Technology Employee listed is an active employee and does not have any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.). No target level 2007 bonus amount was set for any listed Technology Employee.

## SCHEDULE 5.6(b)

## PLANS

1. Service Awards
2. Education Assistance
3. ESPP - Employee Stock Purchase Plan
4. Fitness Club Membership
5. Rideshare
6. Scholarship Program
7. FSA - Flexible Spending Account Plan
8. Deferred Compensation Plan
9. Vision Service Plan
10. Dental Benefits - Indemnity Plan
11. Dental Benefits - PDP Plan
12. Medical Choice Plus 100/60 Plan
13. Medical Choice Plus 90/70 Plan
14. Medical Out of Area Plan
15. Long-Term Disability, as amended
16. Short-Term Disability, as amended
17. Basic Life Certificate Class 1, as amended
18. Basic Life Certificate Class 2, as amended
19. 401(k) Profit Sharing Plan
20. HMSA Medical Plan
21. Supplemental Life Insurance and AD&D Plan
22. Wholesale Division and Region Manager Incentive Compensation Plan
23. Wholesale Executive Management Incentive Compensation Plan
24. Collateral Analyst Incentive Compensation Bonus Plan
25. New Century Financial Corporation and Subsidiaries Company Incentive Bonus Plan
26. Consumer Direct Retention Plan
27. Wholesale Retention Plan