UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .      Chapter 11
                              .
New Century TRS Holdings,     .
Inc., et al.,                 .
                              .
         Debtor(s).           .      Bankruptcy #07-10416 (KJC)
.....................................................
```

Wilmington, DE
June 27, 2007
10:00 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):            Michael J. Merchant, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

                              Mark D. Collins, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

                              Russell Silberglied, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

                              Emily Culler, Esq.
                              O'Melveny & Myers, LLP
                              275 Battery Street
                              San Francisco, CA 94111

For The Official Committee:   Mark Indelicato, Esq.
of Unsecured Creditors        Hahn & Hessen, LLP
                              488 Madison Ave.
                              New York, NY 10022

```
                                    Mark Power, Esq.
                                    Hahn & Hessen, LLP
                                    488 Madison Ave.
                                    New York, NY 10022

For Ellington Management:           David Hurst, Esq.
Group                               Skadden Arps Slate Meagher
                                    & Flom, LLP
                                    One Rodney Square
                                    Wilmington, DE 19801

For Countrywide and:                William Chipman, Esq.
GMAC CF                             Edwards Angell Palmer
                                    & Dodge, LLP
                                    919 N. Market St., 15th Fl.
                                    Wilmington, DE 19801

For GE Capital:                     David Fontana, Esq.
                                    Gebhardt & Smith, LLP
                                    1 South St.-Ste. 2200
                                    Baltimore, MD 21202

For the New York State:             Michael Etkin, Esq.
Teachers Retirement System          Lowenstein Sandler, PC
                                    65 Livingston Ave.
                                    Roseland, NJ 07068

For Basepoint:                      Richard Bernard, Esq.
                                    Baker & Hostetler, LLP
                                    45 Rockefeller Plaza
                                    New York, NY 10111

For EquiFirst:                      Kenneth Coleman, Esq.
                                    Allen & Overy, LLP
                                    1221 Avenue of the Americas
                                    New York, NY 10020

For Kirkpatrick & Lockhart:         Edward Fox, Esq.
Preston Gates Ellis, LLP            Kirkpatrick & Lockhart Preston
                                    Gates Ellis, LLP
                                    599 Lexington Ave.
                                    New York, NY 10022

For Morgan Stanley Mortgage:        Jeffrey Milton, Esq.
Capital Holdings                    Milbank Tweed Hadley
                                    & McCloy, LLP
                                    1 Chase Manhattan Plaza
                                    New York, NY 10005
```

| | |
|---|---|
| For Deferred Comp.:<br>Claimants | Joseph H. Huston, Esq.<br>Stevens & Lee, PC<br>1105 N. Market St., 7th Fl.<br>Wilmington, DE 19801 |
| For The U.S. Trustee: | Joseph McMahon, Esq.<br>Office of the United States<br>Trustee<br>844 King St.-Ste. 2207<br>Lockbox 35<br>Wilmington, DE 19801 |

(Via Telephone)

| | |
|---|---|
| For The Debtor(s): | Ben H. Logan, Esq.<br>O'Melveny & Myers, LLP<br>275 Battery Street<br>San Francisco, CA 94111 |
| For Deutsche Bank Structured:<br>Products | Andrew J. Gallo, Esq.<br>Bingham McCutchen, LLP<br>150 Federal Street<br>Boston, MA 02110 |
| For Bank of America: | Nicholas J. Cremona, Esq.<br>Kaye Scholer, LLP<br>425 Park Ave.<br>New York, NY 10022 |
| For UBS: | Richard Chesley, Esq.<br>Paul Hastings<br>191 N. Wacker Drive<br>Chicago, IL 60606 |
| For Citadel: | Rachel Strickland, Esq.<br>Wilkie Farr & Gallagher, LLP<br>The Equitable Center<br>787 Seventh Ave.<br>New York, NY 10019 |
| For The Rubio Claimants: | James Trush, Esq.<br>Trush Law Firm<br>1920 Main St.-Ste. 900<br>Irvine, CA 92614 |

4

| For Carrington Capital:<br>Management | Sean Scott, Esq.<br>Mayer Brown Rowe & Maw, LLP<br>71 S. Wacker<br>Chicago, IL 60606 |
| --- | --- |
| For Oracle, USA: | Amish Doshi, Esq.<br>Day Pitney, LLP<br>7 Times Square<br>New York, NY 10036 |
| Audio Operator: | Brandon McCarthy |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1           THE CLERK:  All rise.

2           THE COURT:  Good morning, all.

3           MR. MERCHANT:  Good morning, Your Honor, Michael

4  Merchant of Richards Layton & Finger on behalf of the Debtors.

5  Your Honor, moving through the agenda, items 1 through 6 have

6  been continued, and Certificates of No Objection have been

7  filed on agenda items 7 through 14.  Agenda item 15 -- well, I

8  guess I should back up.  I don't know if Your Honor has any

9  questions regarding the items that CNO's were filed on.

10          THE COURT:  I've entered the orders.

11          MR. MERCHANT:  Okay, terrific.  Agenda item 15 is

12  applications to retain PricewaterhouseCoopers, LLP.  They'll be

13  retained to provide accounting and advisory services to the

14  Debtors in connection with the internal investigation of the

15  repurchase reserve and the residual interest and securitization

16  evaluations.  Your Honor, my understanding is that PWC has

17  reached an agreement with the Office of the United States

18  Trustee on an acceptable Form of Order; however, part of that

19  agreement was that PWC will file a supplemental affidavit with

20  the Court before it submits the order, so that is what we are

21  waiting on.  And once that happens we would propose submitting

22  the order under Certification of Counsel.

23          THE COURT:  Very well.

24          MR. MERCHANT:  If that's acceptable to Your Honor.

25          THE COURT:  It is.

1          MR. MERCHANT:  Your Honor, agenda item #16 is a Stay

2   Relief Motion filed by Midfirst Bank, and I concede the podium

3   to the Movant.

4          THE COURT:  Is Midfirst Bank represented today in

5   connection with its Motion for Relief from Stay, 95 Fairview

6   Avenue, Rochester, New York?  I hear no response.

7          MR. MERCHANT:  Your Honor, we're happy to reach out to

8   them after the hearing --

9          THE COURT:  Very well.

10          MR. MERCHANT:  -- concerning the motion.

11          THE COURT:  I've reviewed the motion and have no

12   questions.

13          MR. MERCHANT:  Agenda item #17 is another Stay Relief

14   Motion that was filed by Rose Townsend Trust.  I don't know if

15   counsel is on the phone or in the Courtroom to address that

16   motion as well.

17          THE COURT:  There was a CNO submitted.  I've signed

18   the order.

19          MR. MERCHANT:  Okay.  Thank you, Your Honor.  Agenda

20   item #18 is the first and final fee application of Compensation

21   Design Group, Inc.  The objection deadline was June 20th.

22   There were no objections filed to the application.  As Your

23   Honor may recall, Compensation Design Group reached an

24   agreement with the Office of the United States Trustee and the

25   Committee regarding a flat fee of $64,000 for the entire case,

1  but part of that agreement was they'd file a final fee -- first

2  and final fee application and fees would be subject to a

3  reasonableness review.  So that's what they've done.  I do have

4  a Form of Order, unless Your Honor has any questions.

5         THE COURT:  Let me first ask if anyone else cares to

6  be heard in connection with this motion -- application?  I hear

7  no response.  I've reviewed it.  I have no questions.

8         MR. MERCHANT:  Thank you, Your Honor.  If I may

9  approach?

10        THE COURT:  You may.  That order has been signed.

11        MR. MERCHANT:  Thank you, Your Honor.  Agenda item #19

12 is the Debtor's second notice of Debtor's intent to assume and

13 assign certain contracts in connection with the sale of their

14 technology assets.  It probably makes sense to handle that

15 matter in connection with agenda item #27, which is the Sale

16 Motion itself.  Agenda item #20 is the Debtor's Motion to

17 Approve Settlement #1 to the APA with Ellington Management

18 Group, LLC, and my colleague, Mark Collins, will be handling

19 that matter.

20        THE COURT:  Very well.

21        MR. COLLINS:  Good morning, Your Honor, for the

22 record, Mark Collins on behalf of the Debtors.  Your Honor,

23 agenda item #20 is our Motion Seeking Approval of Supplement #1

24 to the Asset Purchase Agreement with Ellington.  The motion was

25 filed and served on June 12th, objections were due by noon on

1   June 25.  No objections were filed with the Bankruptcy Court or

2   served upon the Debtors.

3       Your Honor, the Debtors, with the Committee's consent and

4   support, were able to reach agreement with Ellington over the

5   additional acquisition of approximately $17 million of LNFA

6   loans and six real properties.  This portfolio would have been

7   included in the prior auction which led to Ellington's winning

8   bid, but the loan files with respect to this smaller portfolio

9   were not sufficiently complete during that marketing period,

10  which led to the Ellington transaction.  It clearly would have

11  been part of that auction process if those loan files were, in

12  fact, complete and sufficiently in order to present for sale.

13  The auction process relating to the other $170 million of

14  LNFA loans was a lengthy process, and included a Court approved

15  auction process, an open auction, and then a full hearing.  The

16  Court approved the original APA with Ellington, following the

17  hearing held on May 7th.  The Court heard the testimony of

18  Blake O'Dowd of Lazard with respect to the marketing of the

19  LNFA portfolio, the number of bidders contacted, the number of

20  qualified bids submitted by the April 30th deadline, and the

21  result of the full day auction held on May 2 in New York City,

22  which increased the original bid for the LNFA loans portfolio

23  from $47.5 million to $58 million following nine rounds of

24  bidding.

25      The pricing grid that was utilized by the Debtors and

1  Ellington to arrive at that $58 million purchase price was used

2  by the Debtors and Ellington to arrive at the $4.46 million

3  purchase price for the remaining LNFA portfolio.  That pricing

4  grid has four main variables in pricing a particular loan.

5  They include whether the loan is a first or second lien loan

6  and whether the loan is performing or non-performing.

7       This pricing arrangement was agreed to by the Debtors and

8  the Committee following that extensive sale process and

9  vigorous auction process.  That is why the Debtors, and I

10  believe the Committee as well, are extremely pleased to sell

11  this remaining portfolio to Ellington on the same terms and

12  conditions as the prior Asset Purchase Agreement.

13       As set forth in our motion, Your Honor, the Debtors do

14  believe that the terms of the sale of this portfolio, including

15  the purchase price and the proposed holdback, are fair and

16  reasonable to the estates.

17       Finally, Your Honor heard the testimony on May 7th

18  regarding the Debtor's efforts to find a buyer for their LNFA

19  loan portfolio and the reasonableness of the terms and

20  conditions of the Ellington APA.  As the Debtors are selling

21  this much more limited LNFA portfolio on the same terms,

22  condition, and pricing formula, I would ask that the record of

23  the May 7th hearing with respect to the original Ellington APA

24  sale transaction be incorporated into the record of this

25  hearing as it relates to this much more limited motion.

1        THE COURT:  Is there any objection?  I hear no

2  response.

3        MR. COLLINS:  Thank you, Your Honor.  That would

4  conclude my presentation of the motion.  I do have a blackline

5  of the supplemental -- supplement #1 to the APA with very minor

6  changes.  I don't even think I need to walk Your Honor through

7  them, but I will present them to Your Honor if you have any

8  questions regarding them.  And then also, the Office of the

9  U.S. Trustee did provide comments, similar comments to they've

10  had in the past with respect to the consumer privacy issues and

11  concerns that they have.  All of those provisions that Mr.

12  McMahon proposed to us have been included, and Ellington has

13  agreed to their inclusion to the proposed Form of Order.

14        THE COURT:  All right.

15        MR. COLLINS:  So I'll hand up a blackline of both the

16  order and the supplement.

17        THE COURT:  Okay.  Let me ask if anyone else cares to

18  be heard in connection with this motion?  You can walk the

19  order up if you like.

20        MR. POWER:  Thank you, Your Honor.  Mark Power from

21  Hahn & Hessen, counsel to the Committee.  Your Honor, I just

22  want to clarify one thing, although I don't think it makes a

23  difference.  Initially the Debtor did consult in advance with

24  the Committee and discussed the possibility of going to auction

25  with these additional loans or doing a private sale, is what

1  we're really talking about.  And the Committee basically gave

2  the Debtor a green light, I would say.

3       When we went back to the Committee members, they

4  instructed the professionals to actually go out and verify that

5  they were comfortable with two things; one is that the loan

6  portfolio we're talking about is consistent in terms of quality

7  with the loan portfolio that was sold originally as part of the

8  Ellington deal, and two, if the Committee could try to verify

9  out in the market place whether, in fact, they are comfortable

10  that the price proposed by Ellington is a fair and reasonable

11  price.  And under that direction the Committee professionals

12  did go out, and FTI Consulting, our financial advisors, did

13  solicit bids from two other parties who we knew were in this

14  market and actually purchased similar assets in this estate or

15  from some of the repo counter-parties.

16       We can confirm to the Court on the record two things.  One

17  of the bidders -- they both got the tape, they both looked at

18  the loans.  One of the bidders basically responded they could

19  not beat the price that Ellington was offering.  The other

20  bidder responded that while they might be able to beat the

21  price, it would require significant due diligence, extensive

22  period of delay, 30 to 45 days, and a reduction in price based

23  on the results of that due diligence.  Then when we looked at

24  that offer, and we looked at the time and delay and expense of

25  getting through that period, plus the current market

1  conditions, we decided that that offer would not offer material

2  additional benefit to the estate and may, in fact, risk a lower

3  price than what we currently have before the Court.

4      And lastly, our financial advisor did confirm the loan

5  portfolio was consistent with the prior.  So based on all that

6  independent investigation the Committee did, we -- the

7  Committee is comfortable and supports this application by the

8  Debtor.

9      THE COURT:  Thank you.  Does anyone else care to be

10  heard?  I hear no response.

11      MR. COLLINS:  May I approach, Your Honor?

12      THE COURT:  Yes.

13      MR. COLLINS:  Your Honor, I'll also bring to Your

14  Honor's Bench the clean Form of Order as well.

15      THE COURT:  Thank you.

16    (Pause in proceedings)

17      THE COURT:  All right, I've reviewed the blackline.  I

18  don't have any questions.  That order has been signed.

19      MR. COLLINS:  Thank you, Your Honor.

20      MR. HURST:  Good morning, Your Honor, David Hurst from

21  Skadden Arps on behalf of Ellington.  I just wanted to bring a

22  matter to the Court's attention regarding the first sale.  You

23  may recall that under -- the APA there was an escrow

24  established.  Ellington deposited certain amounts into escrow,

25  and then within certain periods had to make a claim against

1  escrow.  There was a 45 day period for certain types of claims,

2  and a 90 day period for other types of claims.  We're coming up

3  on that 45 day period, I think it expires on July 2nd, and

4  Ellington's seeking additional time to determine whether it has

5  valid claims; basically, despite the best efforts of the

6  parties, there just hasn't been enough time to establish

7  whether or not Ellington has these valid sorts of claims to

8  assert against escrow.  In any case, Ellington is talking to

9  the Debtors, and we're talking to the Committee, trying to come

10 to an agreement about an extension, a short extension, of that

11 period.  We're seeking to extend it to a full 90 days, but, you

12 know, the parties are still talking.  So I just wanted to

13 advise the Court of that.  What we would envision is that once

14 we've reached agreement we'd, you know, fill out a stipulation,

15 execute a stipulation and submit it to the Court under a

16 Certification of Counsel.

17        THE COURT: Well, that would be okay with me provided

18 that the certification indicates that all those who initially

19 responded to the Motion to Approve the Sale, whether it be a

20 limited response or an objection or a joinder, be included in

21 those who received notice of the stipulation before it's

22 submitted and that they've signed off on it.  And if there is

23 some objection from one of those parties, we'll need a hearing

24 on it.

25        MR. HURST:  Okay, so you'd want everyone to be noticed

1  even if they didn't object to the holdback period?  This is

2  sort of a narrow --

3          THE COURT:  I understand.  The answer's yes.

4          MR. HURST:  Thank you.

5          THE COURT:  All right.

6          MR. POWER:  Your Honor, Mark Power from the Committee.

7  I'm kind of familiar with this issue, I think.  We got an email

8  last night requesting the extension, and the Committee hasn't

9  had a chance to speak to the Debtor.  We've been having so much

10 go on, so we really haven't reached a determination or

11 decision, either the Debtor or the Committee, as to what we

12 will agree to.  So right now it's a very open issue, but we

13 will negotiate in good faith with Ellington, and we'll see

14 where we'll go.

15         THE COURT:  Thank you.

16         MR. MERCHANT:  Mike Merchant again for the record.

17 Your Honor, agenda item #21 is the Debtor's Motion Relating to

18 the Sale of the Servicing Business.  As Your Honor will recall,

19 Your Honor entered an order back on May 23rd approving the

20 sale, but the hearing with respect to all cure objections was

21 continued to this date.  The status of all the cure objections

22 are noted on the agenda.  Some have been resolved, some have

23 been withdrawn, all others have been continued to the dates

24 indicated on the agenda.  There's one additional objection that

25 was left off of the agenda.  It's not a cure objection, but it

1  was an objection filed by Union Bank that was also continued to

2  this date.  We've spoken with Union Bank and they've agreed to

3  continue that to the July 16th hearing, so nothing going

4  forward today on item #21.

5        THE COURT:  All right.  I would ask that to the extent

6  evidentiary hearings will be required in connection with any of

7  these that you let my Courtroom Deputy know prior to that time.

8        MR. MERCHANT:  We will do that, Your Honor.

9        THE COURT:  Thank you.

10        MR. DOSHI:  Excuse me, Your Honor.  This is Amish

11  Doshi with Day Pitney on behalf of Oracle USA.  May I be heard

12  for one brief moment --

13        THE COURT:  Yes.

14        MR. DOSHI:  -- on item #21?

15        THE COURT:  Yes.

16        MR. DOSHI:  Just clarification, we do not object to

17  the adjourning the Oracle issue to July 16th.  However, just

18  for clarification sake, I just want to make sure there were

19  certain procedures that were set forth in that previous order

20  that was entered relating to Oracle agreements.  I assume that

21  those procedures will apply even though the dates referenced in

22  that order related only up to today's hearing date.  I'm

23  referring specifically to paragraph 34 in that previous order.

24  I just want to make sure that the procedures that were set

25  forth with respect to Oracle agreements will apply, you know,

1  to this adjourned date as well.

2          MR. MERCHANT:  We confirm that, Your Honor.

3          THE COURT:  All right.  Did you hear that response?

4          MR. DOSHI:  Yes, that was the Debtor's counsel, and I

5  assume that's okay with the purchaser's counsel as well?

6          MR. SCOTT:  This is Sean Scott from Mayer Brown,

7  counsel to Carrington, that is acceptable to us as well.

8          MR. DOSHI:  Thank you.

9          MR. SCOTT:  I will confirm that.

10          THE COURT:  All right.

11          MR. DOSHI:  Thank you.

12          MR. MERCHANT:  Your Honor, agenda item #22 is

13  application to retain Allen Matkins Leck Gamble Mallory &

14  Natsis, LLP as special finance counsel to the Debtors.  Your

15  Honor, I think they've resolved most of their concerns with the

16  Committee and the Office of the United States Trustee.  There

17  is one outstanding issue with the Committee regarding an

18  aggregate fee cap going forward.  They have agreed to a $5,000

19  a month fee cap going forward, but the Committee's looking for

20  a case cap going forward.  But I think we've resolved all other

21  issues, subject to the parties signing off on an acceptable

22  Form of Order.  So that's another one that we'd like to submit

23  under Certification of Counsel if we can reach agreement with

24  the Committee on the case cap.  If we can't, we'll obviously

25  be back before Your Honor on July 16th.

1        THE COURT:  Very well.  That's fine with me.

2        MR. MCMAHON:  Your Honor, good morning, Joseph McMahon

3   for the United States Trustee.  One thing I did want to note

4   about the Form of Order that should be submitted, provided that

5   it's acceptable to the Committee, is that the employment will

6   be under 11 USC Section 327(a) as opposed to 327(3).  Our

7   office's position has been that the work in connection with

8   D-I-P financing is not the proper province of special counsel,

9   so we're -- I think in light of disclosures made by Allen

10  Matkins in both the initial affidavit of Mr. Stoner and the

11  supplemental affidavit, we're going to be comfortable with a

12  limited role for Allen Matkins, under section 327(a) however.

13  And that's one thing that Your Honor will see when this is

14  submitted.

15       THE COURT:  Is this an issue?

16       MR. MERCHANT:  I don't believe that's an issue, Your

17  Honor.

18       THE COURT:  All right.

19       MR. MERCHANT:  I spoke with Bob Barnes from Allen

20  Matkins, and he's agreed to that.  Your Honor, agenda item #23

21  is application to retain ICP Consulting, LLC as special asset

22  valuation and liquidation advisors to the Debtors.  Your Honor,

23  ICP has reached agreement with the Committee regarding a

24  reduction of their fees.  They will reduce their total fees by

25  $50,000, bringing them to $200,000.  The U.S. Trustee did file

1  an objection to the application as well, and speaking with Mr.

2  McMahon before the hearing, we think most of those issues have

3  been resolved, but they also need to be documented into a

4  consensual Form of Order.  And I apologize I don't have a lot

5  of these orders today, but a lot of these agreements were cut

6  yesterday and late yesterday, and we've been focusing on the

7  sales.  That's another one we'd like to submit under

8  Certification of Counsel once everybody's signed off on the

9  order.

10        THE COURT:  Very well.

11        MR. MERCHANT:  Your Honor, agenda item #24 is the

12  Motion of Daniel J. Rubio and others for Relief from Stay, and

13  I'm going to cede the podium to my colleague Mr. Silberglied to

14  handle this one.

15        MR. SILBERGLIED:  Good morning, Your Honor, for the

16  record, Russ Silberglied, Richards Layton & Finger.  As the

17  agenda indicates, there was a possibility of a stipulation

18  here, and in fact, we have reached a stipulation, which in some

19  sense is a temporary solution.  What I would propose is to hand

20  the stipulation up to the Court and then walk through what the

21  deal is.

22        THE COURT:  All right.  Thank you.

23        MR. SILBERGLIED:  I will note before I do that walk

24  through that I have also shared this with Mr. Indelicato on

25  behalf of the Committee, who also has agreed to its terms.

1  It's not a signatory to it obviously.

2      Essentially, Your Honor, the Rubio case is a purported

3  class action out in California on wage and hour type claims, as

4  well as some other related claims.  What we have agreed to do

5  in this stipulation is provide for limited relief from the

6  automatic stay solely for the purpose of allowing the purported

7  class to file a Fifth Amended Complaint, which they wanna file

8  now in California, and for no other purpose.  The stay will

9  remain intact for at least 60 days.  We looked at our calendar,

10  and we actually don't have an Omnibus Hearing 60 days out, so

11  we just say in the stipulation the Omnibus Hearing that is at

12  least 60 days from today.  And this matter might be appearing

13  on Your Honor's agenda again, and it might not, consistent with

14  the other terms of this stipulation.

15      What we're going to do in the interim is we are going to

16  put our insurance carriers on notice.  Your Honor might recall

17  from the papers when we thought when we were going forward at

18  the last hearing that there is a dispute as to whether there is

19  insurance that covers this matter or not.  And we figure the

20  best way to find out is to submit it to the carriers and see

21  what they have to say.  So the 60 day period is meant to see if

22  we can get a response from the carriers, and we will do so.

23  And that might guide as to whether we'll be back here in 60

24  days before Your Honor or not.

25      There's the typical non-waiver provisions in here.  The

1  Rubio class is not waiving any relief they could seek before

2  Your Honor.  We're not waiving any rights with respect to the

3  filing of the Fifth Amended Complaint, and importantly, because

4  there are D's and O's that are going to be named for the first

5  time in the Fifth Amended Complaint, the stipulation

6  specifically provides that, not withstanding the fact that non-

7  Debtors are now going to be added to this case, that the Rubio

8  class consents to a co-extensive stay with the stay of the

9  Debtors applying to the newly named Directors and Officers.

10      We also have another provision in here which is at

11  paragraph 7 that is intended to, and does, resolve Rubio's

12  objection to another matter that's on today's agenda, which is

13  the sale of the technology.  You might have seen that Rubio

14  filed a separate objection to that having to do with the

15  preservation of evidence.  So this paragraph 7 resolves that

16  objection, and essentially it says that the Debtors are going

17  to agree to preserve what has been defined as common evidence

18  and some other terms.  We're not undertaking to audit to see

19  whether we have such evidence today, but we're also not selling

20  it or destroying it in this sale.  And that in addition, in the

21  future if we want to either destroy or sell it in some other

22  sale, we will either give 30 days notice in which the Rubio

23  class can come back or purported class can come back and

24  object, or we'll make a copy of such documents.  And then there

25  is related language as well.

1      So that is the substance of the stipulation we have

2   reached with Rubio.  I do confess that we -- the order was a

3   separate document which I didn't realize, and so I thought it

4   was attached to what I had handed up to Your Honor, and it

5   isn't.  I apologize to Your Honor.  There is -- we have an

6   order that is worked out, it's just not in the Courtroom right

7   now.  So we will submit that as under Certification of Counsel

8   as well, and I apologize.

9          THE COURT:  That's fine.  Has the stipulation been e-

10  filed?

11         MR. SILBERGLIED:  It has not been e-filed, but we

12  certainly can do that.

13         THE COURT:  All right.  You should.  Thank you.

14         MR. SILBERGLIED:  Thank you, Your Honor.

15         THE COURT:  Does anyone else care to be heard in

16  connection with this matter?  I hear no response.

17         MR. TRUSH:  Your Honor, James Trush.  I'm on the Court

18  Call --

19         THE COURT:  Yes, go ahead.

20         MR. TRUSH:  -- account.  Good morning, Your Honor,

21  James Trush of the Trush Law Firm, counsel for the Rubio

22  claimants in the District Court in the Central District of

23  California, also appearing here pro hac vice.  My office is the

24  other party to the stipulation and Mr. Silberglied has

25  accurately reflected the terms, and we would just ask that the

1  Court -- respectfully request the Court to enter the order.

2       THE COURT:  All right, thank you.

3       MR. TRUSH:  Thank you, Your Honor.

4       MR. SILBERGLIED:  Your Honor, with that, that was the

5  reason I'm here today, so can I, and as well as Mr. Collins, be

6  excused for the remainder of the hearing, which we'll leave in

7  the able hands of Mr. Merchant?

8       THE COURT:  Your Creditors will thank you.

9    (Laughter)

10      MR. SILBERGLIED:  Thank you, Your Honor.

11      THE COURT:  Yes, you may.

12      MR. MERCHANT:  Your Honor, agenda item #25 is the

13  application to retain Irell & Manella.  The Debtors have

14  reached an agreement with the Committee on this one and have

15  informed Irell & Manella that they will not be representing the

16  Debtors in a going forward basis.  The work that they were

17  doing will be transitioned over to O'Melveny & Myers and

18  Richards Layton.  However, we are going to work out -- if it's

19  acceptable to the Court, we are going to work out a Form of

20  Order with the Committee and the Office of the United States

21  Trustee whereby they will be retained through the date of this

22  hearing and able to file fee applications regarding the

23  services they've provided up to this date.  And obviously those

24  fees and expenses will be subject to a reasonableness review.

25      THE COURT:  And the application will be submitted in

1  connection with the applicable administrative order?

2        MR. MERCHANT:  Yes it will, Your Honor.

3        THE COURT:  All right.  Does anyone else care to be

4  heard in connection with this matter?

5        MR. INDELICATO:  Your Honor, Mark Indelicato from Hahn

6  & Hessen.  As the Court may recall from the last time we were

7  here on these retentions, we did express some concern.  We've

8  worked out our issues with the Debtor, but we did make a

9  commitment to Irell & Manella that to the extent they were

10 providing services for the benefit of the estate, pending the

11 resolution of these issues, the Committee would not oppose them

12 getting paid through the date of this hearing.  So subject to

13 the reasonableness as Mr. Merchant put on the record, we'll

14 have no objection to their retention for that purpose.

15        THE COURT:  Very well, thank you.  Does anyone else

16 care to be heard?

17        UNIDENTIFIED SPEAKER:  (Indiscern.).

18    (Pause in proceedings)

19        MR. MERCHANT:  Your Honor, agenda item #26 is the

20 Debtor's Motion to Provide Adequate Protection pursuant to

21 Bankruptcy Code Sections 105(a), 361, 362, and 363(b)(1).  I

22 believe Mr. Logan from O'Melveny & Myers is on the phone to

23 address this one, as is Mr. Power in the Courtroom.

24        THE COURT:  Very well.

25        MR. LOGAN:  Good morning, Your Honor, Ben Logan of

1  O'Melveny & Myers for the record.

2        THE COURT:  Good morning.

3        MR. POWER:  And Mark Power from Hahn & Hessen, counsel

4  to the Committee, Your Honor, on this one.  Ben, why don't I

5  proceed if that's okay?

6        MR. LOGAN:  That's fine.

7        MR. POWER:  Okay.  Your Honor, if Your Honor recalls

8  on this one, the Debtor made a motion back in early to mid-May

9  to provide adequate protection back to the petition date to

10  various parties who may have a valid claim or interest in some

11  of the cash balances in Debtor's account as of the petition

12  date.  The legal issues hadn't been resolved yet, but the

13  estate and the Committee were working together to try to make

14  sure that all those parties' rights and interests were

15  protected and preserved pending either the parties' agreement

16  or this Court's determination as to the rights in those funds.

17     We have been working -- well, I should say one thing, Your

18  Honor.  There's approximately a dozen or so parties that are

19  involved in this exercise.  They involve really three

20  categories of parties -- or two primarily and one separate.

21  First is the repurchase counter-parties, which are parties to

22  repurchase -- massive repurchase agreements with the Debtor

23  that basically had purchased loans under their lines and funds

24  were to continuing to flow into the Debtor as part of the

25  ordinary course and they got caught up in that process.  Second

25

1   is loan purchasers who had purchased loans pre-petition from

2   the Debtor, third parties, and because of the way these loans

3   work in transitioning the services off of the Debtor's system

4   onto the purchaser's system, or whoever they designate, funds

5   continue to flow through the lock box and into the main

6   account.  So parties had funds basically in these accounts.

7   The third is there are some parties who had funds for other

8   reasons in these accounts who have similar type claims.  So

9   those are basically the three general categories of parties

10  here.

11       We're pleased to report to the Court that we have spent a

12  tremendous amount of time working with counsel for all these

13  parties and trying to work out a consensual order, which I'm

14  pleased to report that I believe we have as of right now.  And

15  I guess what I -- do you have the order?  Your Honor, what I'd

16  like to do is -- maybe what I suggest is submit the order to

17  Your Honor and go through it and explain it.  The order

18  basically has some substantive provisions, but it has a lot of

19  procedural provisions which the parties are trying to resolve,

20  and really try to avoid burdening this Court with a tremendous

21  amount of litigation that could arise from these issues.  So if

22  I could walk through that, I think that's the best way.  Your

23  Honor, may I approach?

24            THE COURT:  Yes.

25       (The Court receives document)

1          THE COURT:  Thank you.

2          MR. POWER:  Your Honor, I can point to certain

3    provisions, but what I suggest I do is just kind of briefly go

4    through what's outlined so Your Honor gets a sense.  We are

5    going to have to revise the order slightly based on discussions

6    in Court today, so we're not going to ask Your Honor to enter

7    this right now, we'll do it under certification.

8          The order, in essence, has two overall themes.  First of

9    all, it provides for the escrowing of funds which the Debtor

10   has represented is the balance of its centralized corporate

11   account as of the petition date, to escrow those funds as soon

12   as we close the Carrington sale.  In addition, I'm pleased to

13   report to the Court that the funds the Court previously ordered

14   for the UBS adversary proceeding, which was approximately $2.6

15   million, will be, while escrowed separately, will be included

16   in this rubric, so that we don't have issues regarding whether

17   UBS is entitled to relief ahead of other parties, at least at

18   this point.  So basically, the total funds escrowed will be

19   approximately $42 million we hope by next week that will be put

20   in an escrow account acceptable to the parties.

21         In addition, the order provides adequate protection to the

22   parties who basically can prove up that they had an interest,

23   you know, perfected, non-avoidable interest in the funds as of

24   the petition date, and the adequate protection liens are in

25   place.  The Committee and Debtor's right to object to those

1  claims and assertions is also preserved.

2      The Debtor has also agreed, basically, to provide a

3  substantial amount of information to all of these parties, and

4  then basically, the parties have agreed to what we call a meet

5  and confer period.  The parties have agreed to a stay of any

6  adversary proceedings or litigation in connection with this

7  issue until we finish the meet and confer period to basically

8  see where we are.  So that's the general theme of the order.

9  Otherwise, everybody's rights are preserved and everything is

10 status quo. And we're not seeking to determine anybody's rights

11 at this point.

12     Briefly in paragraph -- the initial paragraph, Your Honor,

13 the Debtors provided information related to FI Serve or

14 Mortgage Serve, which is the entity that basically directs the

15 payments on various loans.  It's a third party, and the parties

16 -- the Debtors asked for information on that and is a mechanism

17 for that.  I don't think it's really a substantive provision.

18     By June 29, this Friday, the Debtor, in consultation and

19 review by the Committee, will provide two types of reports.

20 One is an individual report which goes to each party that's

21 affected by this order, which basically summarizes on a loan by

22 loan basis the transactions that occurred in connection with

23 their loans or their -- you know, their loans from a certain

24 start point.  And the start points in this analysis vary

25 depending on when the parties either had, you know, settlement

1  date previously, because everybody had different settlement

2  dates, or based on the negotiations.  The Debtor will produce

3  that to the individuals by Friday.  The Debtor has already

4  produced a number of those reports to certain of these

5  individual institutions and have been working through that, so

6  this is not all going to happen on Friday.  It's been an on

7  going process.

8       In addition, by Friday the Debtor will produce a global

9  report, which is really -- summarizes the entire body of claims

10 and what the Debtor believes is the monies that flowed in

11 during this respective period and basically where it believes

12 the claims stand in terms of the funds that were in the account

13 as of the petition date.  All this information is without

14 prejudice to anybody to object to it, and it's not a factual

15 finding, but it's really an information gathering process.

16      The paragraph 5 then provides for a mechanism for the

17 parties, the other parties, the counter-parties and the loan

18 purchasers, to respond to that information by July 20, you

19 know.  And basically, if they have any issues or any problems

20 with information, they're going to come back to the Debtor and,

21 you know, say "What's wrong with this loan?  What about that,

22 what about this?" understanding that we're talking about

23 thousands, tens of thousands of loans, some of which have paid

24 in full, some which have principal payments, some which have

25 interest.  So there's a tremendous amount of account activity

1 that's going on.  But the idea is they will come back by July

2 20, and hopefully by the end of July the parties will have --

3 basically counted for the transactions and hopefully have

4 agreed to what the issues are in terms of the claims or

5 interest that the parties are asserting.  And so that's really

6 what I call the reconciliation in the accounting process.

7      In addition to that, the Debtor has agreed to start the

8 process and provide the counter-parties and the loan purchasers

9 with some information regarding tracing.  Now, the Debtor had a

10 lot of bank accounts and, you know, tremendous activity in all

11 of these accounts.  But the account we're focusing on is the

12 centralized corporate account which was maintained by the

13 Debtor where the Debtor believes substantially all of the

14 monies flowed into.  They, by July 20, in paragraph -- 23rd in

15 paragraph 6 will basically provide some tracing in accounting

16 information related to that account.

17      In addition to that, some of the parties have requested

18 what I'll call a cash flow chart, which shows the basic typical

19 flow of the Debtor's cash through the bank accounts, and

20 they'll provide some bank statements and some balance

21 information in terms of the period we're talking about.  So it

22 at least gets the parties a preliminary analysis of what we

23 think will show some of the tracing issues that may exist in

24 this case and so that people have some sense of what the facts

25 may be.  And the Debtor is undertaking that endeavor as well.

1      Now, this is all without prejudice to the parties' right to

2   seek further information or further inquiry, but we're at least

3   trying to do the process on a voluntary basis and get everybody

4   information as they think it is appropriate.  Your Honor, then

5   we have, starting August 6th, a meet and confer period.  And

6   the concept is that the Committee and the Debtor and

7   individuals will meet, and then we will meet maybe globally and

8   basically try to lay out all of the issues that we see, both

9   individually and globally; and that would include legal issues

10  because the Debtor and Committee have certain positions that it

11  believes a lot of these funds are unencumbered or may not be

12  subject to the repo agreements or may be estate property and

13  not cash collateral.  And the other parties obviously dispute

14  that and have different claims, and there'll be a number of

15  legal issues in connection with that that will be raised, I

16  anticipate.  And there's no -- none of those issues are being

17  decided, but we've agreed to meet and confer in August, and

18  through I think the 20th of August, if I'm not mistaken, and

19  try to have this meet and confer period at which is the outside

20  date of finishing this.

21      The hope is one of two things.  I mean, the ideal world,

22  Your Honor, would be not to burden this Court and come out with

23  a global resolution of all these issues, and hope springs

24  eternal.  If we can't do that, then what we would like to do is

25  come up with some kind of either scheduling proposal or some

1  way of trying to proceed to resolve these issues.

2         THE COURT:  In the context of the main case, or of the

3  respect of adversaries, or this is something that hasn't yet

4  been determined?

5         MR. POWER:  Well, we haven't determined yet.

6  Originally, we had proposed, the Committee and the Debtor,

7  either an inter-pleader or a mediation kind of mechanism, but I

8  think the parties decided let's first find what the facts are,

9  find out what the positions are, and then make that decision as

10  to how we want to proceed.  So we haven't yet figured whether

11  it's inter-pleader or mediation or some other -- or

12  adversaries, you know, that hasn't been resolved.

13         THE COURT:  Okay.

14         MR. POWER:  It does provide for the stay mechanism, as

15  I mentioned, through the outside date, so that basically your

16  Court -- the Court is not burdened with litigation, everyone's

17  protected, and we, you know, at least try to get the facts and

18  resolve the issues in an expeditious manner as avoid -- is

19  really, you know, one off litigations.  This will also -- and I

20  don't know if Mr. Chesley's on the line, but the UBS adversary

21  proceeding will be delayed as well in connection with this, so

22  that will not proceed on that track that was originally

23  proposed.  And Duetsche had filed a adversary proceeding as

24  well, and they are party to this order too.  And that will go

25  on track with this, although I think they actually withdrew

1  there preliminary injunction as a result of the order.  Let me

2  just see if there's anything else.

3       Your Honor, there's a full reservation everybody's rights.

4  There is an adequate protection lien and a super priority

5  claim, to the extent provided in the order, which covers

6  parties to the extent they can prove up their interest or

7  claim.  And that's there to preserve their rights, and we

8  reserve the right to object to those.  That basically is the

9  procedure that's laid out in the order, I think.  Mr. Logan, is

10 there anything that I missed that you think should be

11 mentioned?

12          MR. LOGAN:  Just let me make a couple of observations.

13 One, I want to reiterate what Mr. Power said about the very

14 cooperative and constructive effort that has ensued over the

15 last several weeks.  There are multiple parties with divergent

16 interests, and I think we've seen just a very, very

17 constructive effort to try to work out a process that protects

18 everybody's rights and maintains a collective undertaking.  So

19 let me add my thanks to the spirit with which people approached

20 this.  We've had some very good, very constructive meetings,

21 that result in this order.

22       Second thing I wanted to clarify that there are a couple

23 of provisions to this order that were very important to the

24 repurchase counter-parties that I wanted to make sure were

25 clear to everyone, including Your Honor, because there was some

1  confusion on this which was at least probably in good part my

2  fault.  The order does provide that -- I have to back up.  When

3  the repurchase counter-parties exercised remedies typically

4  about 3 or 4 weeks pre-petition, the Debtors did, in fact,

5  segregate funds in special accounts for them as directed under

6  the demands.  And those funds have been turned over to some of

7  the repurchase counter-parties, some of the repurchase counter-

8  parties were not even aware that those segregated accounts had

9  been set up.  And this order continues the process, and indeed

10  directs any depository institutions where those funds were

11  deposited to turn over the funds to the repurchase counter-

12  parties.  That was very important to the repurchase counter-

13  parties, that was certainly our intent, and I apologize for any

14  confusion on that.

15     Second, the process also continues with any collections

16  post-petition.  To the extent the Debtors receive any funds

17  from borrowers that are subject to the loans that are subject

18  to mastery purchase agreements or loan purchases, again the

19  process continues and those funds are turned over.

20     And finally, just to summarize a lot of what Mr. Power

21  said, I think really the right way to think of this is the

22  month of July will be dedicated -- the month of July and the

23  first few days of August will be dedicated to factual issues;

24  just finding out exactly what the facts are and getting folks

25  hopefully on the same page as to what monies were collected,

1  what monies are in dispute.  Then the month of August is

2  largely dedicated to a settlement effort.

3       And what I would add to Your Honor's question, the answer

4  to Your Honor's question is that the collective wisdom was that

5  instead of trying to answer whether or not this should proceed

6  by way of an adversary proceeding or mediation, let's first see

7  if we can just settle it, period, without any of those.  And if

8  we can, that's great.  If we can't, then we will all put our

9  heads together, and I trust with the same sort of collective

10 spirit, to devise the best, most efficient means of resolving

11 any disputes.

12       MR. POWER:  I think that's right.  One clarification

13 is that the Debtor is going to sell the servicing business to

14 Carrington hopefully this Friday, and we've arranged for the

15 Carrington to continue on with the sub-servicing obligations in

16 terms of transferring the funds received and that may come in

17 post petition that belong to the repo counter-parties.  So it

18 will be either the Debtor or Carrington under the sub-servicing

19 agreement that will perform that function.  I think that's

20 right.

21       There were two changes which Mr. Logan's not aware of that

22 I just want to mention since I've got him on the phone, and

23 make sure, 'cause we want to submit the order this afternoon.

24 Both Countrywide and Natixis -- or Ixis, formerly Natixis, have

25 asked for a start date in the accounting of February 10, which

1  the Committee has no objection to, and I'm assuming that Mr.

2  Logan doesn't, but I just want to confirm.  These are not

3  counter-parties, these are parties who loaned purchasers or had

4  monies in the estate that we understand were caught up in the

5  web.  But they'd asked for that date, just to pick a date.

6       MR. LOGAN:  We probably ought to talk about this off

7  line.  I think we've already gotten Natixis covered, and we

8  ought to talk about what the situation is with Countrywide.

9  But Your Honor, why don't we not burden the record with that.

10      THE COURT:  Okay.  Okay.

11      MR. LOGAN:  We will be submitting an order under

12 certification.

13      MR. POWER:  Okay, that's fine.  I hadn't talked to him

14 yet about that.  Anyway, Your Honor, based on that, we -- the

15 Committee and the Debtor would ask Your Honor to enter the

16 order.  We think it's appropriate and in the best interests of

17 the Creditors and the estate and also the parties that may be

18 affected by this, and I think that lays it out.  I don't know

19 if any of the parties who were involved in negotiations want to

20 be heard.

21      THE COURT:  Does anyone else care to be heard in

22 connection with this motion?

23      MR. CHESLEY:  Your Honor, it's Richard Chesley on

24 behalf of UBS.  The statements of counsel are correct with

25 regard to the UBS litigation as well.

1            THE COURT:  Thank you.

2            MR. GALLO:  Your Honor, Andrew Gallo from Bingham

3  McCutchen for Deutsche Bank Structured Products, DBSP.  Just to

4  clarify two things that Mr. Power said about our pending

5  adversary proceeding.  The first is that we didn't withdraw our

6  preliminary injunction as result of this order.  We entered a

7  prior stipulation with the Debtors that was approved by Your

8  Honor that resolved that PI.  The other point is that the

9  adversary proceeding that we brought addresses the issues

10  regarding the funds that are addressed by this order, and that

11  portion of the adversary proceeding is going to be stayed by

12  this order.  There's another portion of that adversary

13  proceeding that relates to the ownership over certain loans

14  which is not governed by this order, and paragraph 19 of the

15  order specifically carves that dispute out from the stay.  And

16  the Debtors and the Committee in DBSP intend to go forward with

17  the litigation on that matter.

18            MR. POWER:  That's correct, Your Honor, from the

19  Committee.  I stand corrected, thank you.

20            THE COURT:  Anyone else care to be heard?

21            MR. CHIPMAN:  Thank you, Your Honor.  For the record,

22  William Chipman, Edwards Angell Palmer & Dodge, on behalf of

23  Countrywide.  We're late to the party here, Your Honor.  We

24  just realized there was an issue with Countrywide, and I want

25  to take this opportunity to thank Mr. Logan for working with us

1  yesterday to help us understand what was going on, and actually

2  Mr. Power also.  I'd like to thank him for his help in helping

3  us understand the process.

4        Your Honor, we are in support of the entry of this order

5  today.  And again, we didn't file an objection.  We were not

6  aware that we were affected by this at first because we weren't

7  sure whether or not any money had been collected by the Debtors

8  and not turned over.  To put it in perspective, Countrywide

9  purchased outright -- or purchased servicing rights within the

10 6 months prior to the petition date in the amount of about $12

11 billion; that's about 35,000 loans, give or take.  We're still

12 trying to get our arms around whether or not there's money

13 missing.  We do know of a few instances, and we've been assured

14 by Mr. Logan and Mr. Power, that with regard to Countrywide,

15 the amount of money at issue is very small, and we're hopeful

16 that that's the case.

17       Your Honor, given the inability to quantify the risk to

18 Countrywide because it is such a big organization with offices

19 all over the country, we did late last night, I want to make

20 everyone aware, just file a reservation of rights.  And I

21 understand that all of our rights are reserved anyway, but

22 Countrywide wanted to file something just to get it on the

23 record.  And basically what -- we hope we'll never get to that

24 issue, but paragraph 11 of the order gives everybody a super

25 priority claim under 507(b) of the Bankruptcy Code, but it does

1  carve out certain things, proceeds of avoidance actions, for

2  example.  To the extent the $42 million in escrow isn't enough

3  -- we're hopeful it is, and we're assured it is.  To the extent

4  it's not, we want to be able to revisit that issue in the

5  future.

6      Nothing needs to be decided today, Your Honor.  We just

7  wanted to make sure that our rights were reserved on the

8  record, and we do support the order, and we do thank the

9  Debtors and the Committee for working with us.  Thank you.

10          THE COURT:  Thank you.  Does anyone else care to be

11 heard in connection with this motion?

12          MR. LOGAN:  Your Honor, just very briefly in response

13 to Mr. Chipman.

14          THE COURT:  Go ahead.

15          MR. LOGAN:  Again, I thank him for the effort.

16 Countrywide is late to the party, and we're more than happy and

17 really undertake with a lot of diligence the effort to get them

18 up to speed, and so thanks again.  The loan purchasers, of

19 which Countrywide is an example, typically have substantially

20 less money at issue than the repurchase counter-parties, in

21 large part because we're talking about a very brief period of

22 time; typically, between the time that a loan sale closed and

23 the loan buyer set up its own servicing, or the Debtor, even

24 for a couple of week period, would set up special custodial

25 accounts.  So while Countrywide did deal in a large number of

1  transactions, I think they will be pleased to see that their

2  money at issue is quite small.  Nonetheless, we will work

3  diligently with them to make sure that they get comfortable

4  with that, or if we're wrong, they point out the differences.

5       The reservation of rights that Mr. Chipman mentioned, he

6  told me he was going to be filing them.  That's obviously fine.

7  And indeed, right at the end of paragraph 11, there is exactly

8  that reservation of rights already built into the order, so

9  it's -- I think we're already covered in the order itself.

10       But moreover, just one clarification.  To the extent that

11  someone determines that they need adequate protection beyond

12  the $42.1 million that's being escrowed, the order does provide

13  a grant of liens on all of the estates' assets, other than the

14  avoiding power actions, which are very substantial; hopefully

15  hundreds and hundreds of millions of dollars.  So we do think

16  that it's inappropriate to encumber avoiding power actions for

17  all of the reasons the Court went through with the D-I-P

18  lenders in this case and as we're all very familiar with.  But

19  that issue is reserved, and that's reserved for another day.

20  So just with respect to Countrywide, we look forward to working

21  with them as we do with the others in this process.

22       MR. POWER:  Your Honor, I just add I think the order

23  speaks for itself so we think that will -- I'm not quite sure

24  if the order exactly says what Mr. Logan said, but the order I

25  think provides for the appropriate adequate protection and

1  parties right to reserve.  Your Honor, I think with that the

2  Committee and the Debtor would ask that you enter the order.

3  If Your Honor has any questions, we're happy to address them,

4  but we will submit under certification -- it will be a couple -

5  -

6          THE COURT:  I have a couple items I'd like to discuss.

7  First, to the extent that the order affects any of the pending

8  adversaries, it should provide that the Debtor will file what's

9  called a notice in each of the adversaries indicating that it's

10  stayed, or in the case of DB, partially stayed as a consequence

11  of this order.  Secondly, understanding that we're getting to

12  the heart of the summer, to the extent that the parties agree

13  to extend any of the deadlines contained in the order, I'd like

14  that to be only by Court order.  I will consider those items,

15  however, under certification.  And third, I guess I'd like you

16  to address again, given the relief that's being granted in the

17  way of super priority and other lien relief, is additional

18  notice required?

19          MR. POWER:  Uhm --

20          THE COURT:  You've obviously concluded no, but tell me

21  why.  Maybe that's a better way to ask the question.

22          MR. POWER:  I believe the answer, Your Honor, is that

23  the motion originally sought and provided adequate protection

24  in super priority claims retroactive to the petition date for

25  these parties and was noticed on all parties and was served on

1  all the potentially affected parties plus everybody else on the

2  2002 list.

3         THE COURT:  So the relief that would be affected by

4  the entry of this order is no broader than that which the

5  motion had originally proposed?

6         MR. LOGAN:  Your Honor, certainly with respect to the

7  liens and the super administrative priority, that's correct.

8         MR. POWER:  Well, I think from the Committee's point

9  of view, Your Honor, that is correct.  There were some

10 compromise -- I think that is correct.  There were some

11 compromises.  There is a fundamental legal issue which is

12 whether -- are the parties limited to 42.1, which is the cash

13 balance, or are they entitled to claims beyond that.  We didn't

14 resolve that issue.  The Committee's quite strident on that

15 issue.  Having said that, that issue is preserved correctly,

16 and the Committee gave up on this issue and negotiation.  The

17 parties say, "Well, we don't know.  We have no confirmation as

18 to exactly what the account balance was or whether our money is

19 somewhere else."  And we recognize that issue.  So what it

20 provides is that we'll escrow the 42.1, and to the extent the

21 parties can prove that they are entitled to have, you know,

22 interests or unperfected security interests or entitlement or

23 ownership interest in funds beyond the amount they're entitled

24 to under the 42.1, they can assert those claims and we have the

25 right to object that, so --

1          THE COURT:  But those claims can be asserted, you're

2    telling me, only against funds which can be located, as opposed

3    to funds which have been spent?

4          MR. LOGAN:  No.

5          MR. POWER:  Any claims against third parties, if they

6    have any -- no, that is not correct.  Nobody's losing any

7    rights as to go up against any third parties or pursue any

8    claims they believe exist.

9          MR. LOGAN:  Your Honor, with --

10         MR. POWER:  Originally we had thought that we were

11   trying to get it limited to the 42.1, but now, to the extent a

12   party can prove to this Court over our objection that it is

13   entitled to something beyond that, they would be entitled to

14   assert that.  But this order --

15         MR. LOGAN:  Your Honor, one --

16         MR. POWER:  -- doesn't grant that.

17         MR. LOGAN:  Let me see if I can put in context Your

18   Honor's question.  And Mr. Power, I think you're getting a

19   little bit down the road as to things that might happen in the

20   future.  The original motion that we filed in the middle part

21   of May and was broadly noticed sought to grant adequate

22   protection liens of exactly the scope we're talking about here,

23   and sought to grant the super administrative priority of

24   exactly the scope we have here.  In response to that, a couple

25   of the repurchase counter-parties filed responses, Morgan

1  Stanley I think principal among them, saying that we should, in

2  fact, escrow some funds.  What has happened since then had been

3  substantial negotiations over the terms of that escrow

4  arrangement.  But the grant of the super administrative

5  priority and the grant of the liens really haven't changed from

6  the original motion that was noticed broadly.  And beyond that

7  most of the negotiations have focused on process; what sort of

8  reports in what sort of format on what dates would be

9  delivered, and then what procedures would be developed as far

10 as trying to resolve factual disputes, and then after financial

11 disputes, legal disputes.  So I think, Your Honor, I feel at

12 least quite comfortable that the notice that was given with the

13 original motion is quite adequate for purposes of the grant of

14 the adequate protection that's offered in this motion.

15        THE COURT:  All right, that answers my question.

16 Thank you.  Does anyone else care to be heard?

17        MR. POWER:  Your Honor, on the date extension, Your

18 Honor's talking about the outside date, not the individual --

19 if somebody's report is due the 20th and they ask for 2 more

20 days, you're not looking for that?

21        THE COURT:  Outside dates.

22        MR. POWER:  Outside dates, thank you.

23        THE COURT:  All right, thank you.  I'll consider that

24 under certification then.

25        MR. MERCHANT:  Your Honor, agenda item #28 -- or 27,

1  rather, is the Debtor's Motion to Sell certain technology

2  assets.  If I can have one moment, Your Honor.

3       THE COURT:  All right.

4    (Pause in proceedings)

5       MR. MERCHANT:  Thank you, Your Honor.  Again, the

6  motion is to approve the sale of certain technology assets used

7  in connection with the Debtor's loan origination business, and

8  this includes technology developed by the Debtors to be

9  utilized and employed in the wholesale loan origination

10  platform.  Given that the Debtors are no longer operating their

11  loan origination platform and the potential value of the

12  technology assets to prospective buyers that operate a loan

13  origination business, the Debtors determined that it was in

14  their best interests and the best interests of their estate to

15  auction off these assets.

16      The technology assets included in the motion, Your Honor,

17  include custom proprietary software applications, including on-

18  line broker portal providing loan submission, pre-approval and

19  tracking functionality, an internet and intranet portal and

20  repository for sales, an automated underwriting and pricing

21  system, and customer relationship management tools.  They also

22  included data bases containing historical broker performance

23  and quality data, and those are the items that we'll be seeking

24  to sell today.

25      Also included in the technology assets covered in the

1 motion, Your Honor, were fully operational primary and recovery

2 data centers, including hardware for the data centers, hardware

3 used in the operation of the data centers, and office

4 furniture.  Just to be clear, Your Honor, the data centers and

5 those hard assets that were just described are not being sold

6 today in connection with the transaction we're seeking approval

7 of.  The Debtors have agreed to postpone the auction relating

8 to those assets, and the sale hearing relating to those assets

9 to the end of July.

10      As Your Honor will recall, the technology assets were

11 previously marketed as part of the loan origination platform.

12 The process followed here was very similar to the process

13 followed in connection with the marketing of the loan

14 origination platform.  As such, the Debtors determined that

15 there was no need for pre-approved bidding procedures or a

16 stalking horse bidder.  Rather, the Debtors determined that the

17 value for the assets could be maximized through an auction

18 process proceeding directly to a sale hearing.

19      Moreover, the Debtors determine that time was of the

20 essence with respect to the transaction, as the Debtors were

21 obtaining little value from simply holding the assets, and

22 there was the risk the value could decrease with time as

23 critical employees with knowledge to support and operate the

24 technology left the Debtors.

25      As Your Honor will hear shortly, the transaction that we

1  present today is the result of extensive marketing process by

2  the Debtors investment banker, Lazard Freres and Company.  Your

3  Honor, Evan Geller of Lazard is in the Courtroom today, and I

4  intend to proffer his testimony regarding the sale process.

5      As Your Honor will hear, Lazard's marketing efforts

6  resulted in the Debtors receiving three qualified bids for the

7  technology software and data assets, and three other bids

8  exclusively for the data assets.  On June 22, 2007, an auction

9  was held at the offices of O'Melveny & Myers in New York

10  beginning at 10 a.m. and lasting until 8:30 at night.  At the

11  conclusion of that auction, after 15 rounds of spirited and

12  competitive bidding, EquiFirst Corporation, an affiliate of

13  Barclays Bank PLC, was determined to be the successful bidder.

14      Through the auction process, the purchase price for the

15  assets increased from $5 million, which was the initial bid, to

16  8.05 million, providing a net value of 8.55 million to the

17  Debtor's estates.  The second highest bid was submitted by

18  Wachovia Bank NA, who has agreed to serve as the back-up bidder

19  in connection with the transaction.

20      Your Honor, at this point I can either offer Mr. Geller's

21  proffer or I can walk the Court through the objections and

22  where we stand we respect to the objections.

23      THE COURT:  Walk me through the objections if you

24  would.

25      MR. MERCHANT:  Okay, Your Honor.  As a summary, we

1  believe a number of them have been resolved.  We've reached out

2  to everybody.  There still may be some outstanding issues on

3  those, but I imagine that those people are either on the phone

4  or in the Courtroom and will let Your Honor know about that.

5      The first objection is the objection of General Electric

6  Capital Corporation, GECC.  I think this objection is mooted by

7  the assets being sold today.  Barclays is only purchasing the

8  technology software and data assets, they're not purchasing the

9  data centers owned by the Debtors.  They're not purchasing any

10 hardware, machinery, furniture, instruments, or equipment of

11 the sellers -- of the Debtor sellers.  In fact, those assets

12 are defined as excluded assets under the terms of the APA, and

13 I will mention, Your Honor, that the APA is still in

14 negotiations.  It's substantially final, but the sides are

15 still turning comments to the APA, and I don't have a finalized

16 version of the APA to present Your Honor today.

17      THE COURT:  When is it expected the APA will be

18 completed?

19      MR. MERCHANT:  Within the next day or so, but let me

20 confirm that with the Committee counsel.

21      MR. POWER:  Your Honor, Mark Power, I think we're

22 shooting for tomorrow to have the APA finalized.  The parties

23 late last night exchanged drafts.  And hopefully the Sale Order

24 was exchanged last night as well, and we're trying to work

25 through those.  So we're trying to get done before the end of

1  the week, Your Honor.

2       THE COURT:  All right.  This probably is an

3  appropriate time for me to mention that I will be out of the

4  office beginning July 4th through the 11th.  My next day in the

5  office will be July 12th.  So that there are a number of things

6  that are going to be submitted under certification as a result

7  of the disposition of a number of the items on the agenda

8  today.  I ask that you get me these -- well, for those things

9  you think you need an order on before I go away, I ask you to

10 get them to me no later than Monday.

11      MR. MERCHANT:  Understood, Your Honor.

12      THE COURT:  Okay.

13      MR. MERCHANT:  Thank you.  So we think GECC's

14 objection is resolved by the fact that none of their collateral

15 is being sold.  Of course, GECC would probably like to see the

16 APA and assets schedules and confirm that for themselves, and

17 we're happy to include them on the distribution list before

18 it's submitted to the Court for approval.

19      THE COURT:  Well, let me hear from GECC now and

20 confirm that if it turns out that after review of the paperwork

21 it is as the Debtor suggests, that does, at least for the

22 moment, resolve their objection.

23      MR. FONTANA:  Good morning, Your Honor.  David Fontana

24 on behalf of GE Capital.  If the proposed order that will be

25 submitted to the Court would specifically exclude that the

1  technology assets to be sold under the Asset Purchase Agreement

2  shall not include any data centers, hardware, computers or

3  equipment that GE holds a lien against, I think that would

4  resolve our objection to this particular order.  We, of course,

5  if the Debtor comes back and seeks approval to sell the

6  hardware, the computers, any assets that we do hold a lien in,

7  we reserve the right to come back and bring forward the

8  objections that we filed to this particular motion.

9          THE COURT:  Is this acceptable to the Debtor?

10          MR. MERCHANT:  That's acceptable to us, Your Honor.

11          THE COURT:  All right.

12          MR. FONTANA:  Thank you, Your Honor.

13          MR. MERCHANT:  The next objection is the objection of

14  the New York State Teachers Retirement System.  They are

15  seeking a mechanism for preservation of any information or

16  documents that are being restored or included in the technology

17  assets related to ongoing litigation and the examiners

18  investigation.  Your Honor, there -- this is similar to the

19  Rubio objection which Mr. Silberglied reported on to you

20  earlier.  We think this objection gets resolved in two ways,

21  and we forwarded language to opposing counsel yesterday, I just

22  don't know where we currently stand.  But there's language that

23  is gonna be included in section 5.5 of the APA, and that

24  language will essentially require the purchaser to -- I can

25  actually read that to Your Honor -- "preserve for a period of 6

1   years after the closing date all records relating to the

2   purchased assets."  It also provides a mechanism for providing

3   the Debtors with access upon reasonable request to any of that

4   information.  We think that addresses their concerns, and we're

5   also willing to add something to the order similar to what we

6   added to the Rubio stipulation where the Debtors will

7   affirmatively represent to they'll make all efforts to preserve

8   such information.

9        THE COURT:  All right, let me hear from the objector.

10       MR. ETKIN:  Good morning, Your Honor, Michael Etkin,

11  Lowenstein Sandler, on behalf of the New York State Teachers

12  Retirement System.  We did receive an email from Debtor's

13  counsel about 5 o'clock yesterday providing us with the

14  language of proposed section 5.5, as well as some language that

15  they utilized in the Rubio stipulation that was discussed

16  earlier.  We did not have -- I was out of the office.  We did

17  not have an opportunity to get back to counsel after receiving

18  the email, and I apologize for that.  Section 5.5, or proposed

19  section 5.5 is problematic in certain respects, Your Honor,

20  from our perspective.  Although it has the general requirement

21  for preserving documents for 6 years, if you read on in the

22  language that we were provided, it excludes from that

23  preservation requirement electronic data or information in

24  electronic form.  That's a problem.

25       It also has a provision where if the purchaser sends the

1  seller a written notice to destroy any of the records or

2  documents or information, the seller can unilaterally consent,

3  and then the information and documents are destroyed without

4  notice to anyone else.  That's a problem.

5       In addition, there's language in here that talks about

6  other information that they describe as information

7  inadvertently delivered to the purchaser, documents and

8  information.  There's a provision there that upon the seller's

9  request and at purchasers sole cost they can either delete such

10  data or information or deliver it to the seller unilaterally.

11  That's a problem.

12      Backing up for a second, Your Honor, we obviously don't

13  know to what extent any of this information may or may not be

14  relevant, but --

15      THE COURT:  Well, do you -- or to other things that

16  are going on in the case.

17      MR. ETKIN:  Correct.  Absolutely, Your Honor.  So the

18  -- while the language of 5.5 addresses the issue, it does not

19  solve our problem.  Now, getting to the Rubio solution, I think

20  that there's something there to discuss, and I'm hopeful that

21  if we have the opportunity to talk, which we haven't, you know,

22  subsequent to getting the email late yesterday afternoon, we

23  might be able to fashion something, but let me point out what

24  may be a couple of problems.

25      In reading over the Rubio language that was also emailed

1  to us as part of the email that we received yesterday, it

2  appears that the Rubio litigation is somewhat mature.  It went

3  forward pre-petition.  There were Court orders.  There was

4  discovery actually produced, exchanged.  So if you look at the

5  Rubio language, they were able to hone in on specific types and

6  areas of documents and information that were of concern to the

7  Rubio Plaintiffs.  Obviously, the securities litigation is not

8  as mature by any stretch, and my only concern there, which I

9  think we should be able to work through, you know, is defining

10  the universe of what should be maintained.  And, you know, at

11  this juncture, obviously, Your Honor, especially with the

12  examiner just getting his feet wet with respect to the case, we

13  would want to err on the side of over inclusion as opposed to

14  the possibility of losing what may be relevant information

15  whether in paper or electronic form.

16      So given the status of this, Your Honor, and the fact that

17  an order is not gonna be presented to the Court today, and it

18  may take a day or two to finalize the APA, as well as other

19  issues, we certainly would be happy and welcome the usage of

20  that time to resolve this consensually.  I don't see why that

21  shouldn't be able to happen.

22          THE COURT:  All right, thank you.

23          MR. POWER:  Your Honor, Mark Power, from Hahn &

24  Hessen, counsel to the Committee.  I think the simple solution

25  here, quite frankly, is that none of the information I think

1  that New York State Teachers Retirement System is interested in

2  is being sold.  And there's really, in essence, two categories,

3  at least from a Bankruptcy lawyer's perspective.  One is

4  software and source codes related to the operations of the

5  Debtor's software that it used to do the loan origination

6  basis.  That source code data doesn't really relate at all, I

7  think, to what the issues are that counsel is looking for.  The

8  other is data historically relating to the broker network or

9  loan statistical information in terms of the Debtor's loans

10  origination, which is not being sold exclusively and the Debtor

11  is maintaining and is, you'll find out, was gonna seek to sell

12  some of that to other parties.  So that's not being deleted or

13  given to anybody -- given to this purchaser.  The purchaser is

14  getting copies of that information and can use that in

15  connection with the contract, but the Debtor is still

16  maintaining that.  So I think once the facts are clear and we

17  can make clear in this order, it will be very clear that we're

18  not really selling information or historical information,

19  communications documents relating to the operations of the

20  business that I believe that this objector is interested in.

21  But having the understanding that -- it's pretty clear the

22  parties haven't a chance to work through that issue, so I think

23  within a day or two, as counsel said, we'll get that resolved.

24          THE COURT:  Okay.

25          MR. MERCHANT:  Your Honor, the next objection was

1  filed by Basepoint Analytics, LLC.  Their objection relates to

2  assumption of assignment issues and related cure amounts.

3  Basepoint's agreements are not going to be assumed in

4  connection with the transaction.  There'll be a schedule 1.2(a)

5  to the APA that will list contracts that may or may not be

6  assumed in connection with the transactions, and the Basepoint

7  agreements will not be listed on that schedule.  And I believe

8  Mr. Power has also agreed to language in the Sale Order to

9  address some other concerns that they have, but I believe that

10  objection is now resolved.

11        THE COURT:  All right, let me ask if Basepoint wishes

12  to be heard.

13        MR. BERNARD:  Your Honor, Richard Bernard of Baker &

14  Hostetler on behalf of Basepoint.  I believe that's correct in

15  that our objection was for clarity regarding certain IP rights

16  license that were intertwined and integrated into the

17  technology assets.  The clarification is that the -- our rights

18  are not being assumed and assigned through this purchase, then

19  our concern is that since the Debtor's not operating and it's

20  selling the systems to a buyer that the buyer does not get some

21  sort of de facto assignment and use of these intellectual

22  property rights.  We've been in contact with Mr. Power and have

23  -- I've actually seen some language in an order today that

24  seems to have it covered.  Sounds like the order's going to be

25  submitted on notice, so we'll have a chance to thoroughly look

1  at it, but it looked like the language would be sufficient to

2  protect us, as well as preserving our right to subsequently

3  come in and request the Court to order the rejection of our

4  licenses and IP rights.

5      Your Honor, I'm also here on behalf of Fidelity National

6  Information Service, which would be #F, and rather than get up

7  and say, "Ditto," I'd just like to say it now.  I believe it's

8  the same situation, the same type of objection for clarity was

9  filed.  Also those rights are not being assigned through this

10 sale, and Fidelity's -- the language that we're negotiating

11 with the Committee and the Debtor will cover Fidelity as well.

12         THE COURT:  All right.  Thank you.

13         MR. BERNARD:  Thank you, Your Honor.

14         THE COURT:  Can the Debtor confirm that with respect

15 to item F, that's the case?

16         MR. MERCHANT:  That is correct, Your Honor.

17         THE COURT:  All right, thank you.

18         MR. MERCHANT:  Your Honor, the next objection is filed

19 by Carrington Capital Management, LLC.  It is my understanding

20 that this objection is resolved as well through the combination

21 of language that will be added to the APA and some

22 representations that have been asked to be made on the record.

23 I believe Mr. Power's been exchanging emails with Carrington's

24 counsel and probably is the better person to put those

25 statements on the record.

1         THE COURT:  Very well.

2         MR. POWER:  Thank you, Your Honor, Mark Power from

3 Hahn & Hessen for the Committee.  Your Honor, this objection

4 related to two things, just to be clear.  First is Carrington

5 was very concerned because they're in the middle of trying to

6 close this major transaction, and the Debtor has one data

7 center and a redundant data center, and the data center

8 basically performs all the technology for the company, both

9 origination and servicing.  And it's often integrated and some

10 of the servers have combined information, so Carrington was

11 very concerned, rightfully so, that whatever's done in

12 connection with this technology sale that it doesn't interfere

13 with either the sale, the closing of the sale, or the

14 transition that's expected to occur post closing.  And we, the

15 Debtor and the Committee, heard their concerns.  They also

16 complained about the sale of the data center, that it was being

17 done too quickly, and particularly over top of their sale, and

18 that that could disrupt things.  And lastly, they complained

19 because they said, you know, we may be interested in buying

20 these assets too, and we haven't had a chance, basically, to

21 decide whether we could.

22         I think in -- addressing those issues in reverse order,

23 with respect to the buyer, the Debtor made a business judgment

24 in consultation with the Committee that we basically did not go

25 forward with the data center sale or the equipment sale because

1  we did agree that that would -- could present potential

2  problems in terms of transitioning off, and we believe that

3  those assets could be sold for a maximized value later in the

4  summer.  And that also presents a lot of issues regarding the

5  estate, and operating the estate, and maintaining data for the

6  examiner, and the Security and Exchange Commission.  So

7  basically, those were deferred in that motion piece was done,

8  and Carrington was, I think, very pleased to hear that.

9      With respect to the technology, the Debtor made a business

10 judgment that it wanted to go forward with the sale of the

11 software for a number of reasons.  The investment banker had

12 bidders who were interested that they thought were financially

13 qualified and ready to go.  They felt that those parties were

14 highly motivated and really interested in purchasing these

15 assets, and they felt that there was potential risk in terms of

16 business judgment that these assets, while they have

17 proprietary advantages, it is a market place that slowly

18 deteriorates over time.  And so time does not assist in the

19 value of these assets, and the thought is the sooner you go to

20 market, the sooner you sell these assets, the more you'll

21 maximize the value.

22     In addition, I can say it now rather than later, is these

23 assets, the software is tremendously complex and requires a lot

24 of people to run the system.  And those IT people are

25 basically, as Your Honor is aware, are gonna be out of a job in

1  several months, and the Debtor was concerned of maintaining

2  those people and keeping the requisite personnel to assist in

3  the sale process and to assist in the transition process.  And,

4  you know, this is one of the reasons that Your Honor approved

5  the KERP and incentive program and the retention plan is to

6  give the Debtor the ability to incentivize these people to

7  stay.  Carrington was very concerned that those people be in

8  place and assist in this transition.

9       But having said that, the Debtor was concerned that they

10 needed to maximize the value, so what the Debtor did, after

11 consulting with the Committee, is move the data center, let's

12 go forward with the technology sale.  Obviously, the results

13 were very positive, we think, and will show that that judgment

14 seemed to be correct because we did -- we do have good value

15 here.

16      The last two issues we agreed to at the auction, the

17 Debtor and the Committee, were two things.  One is the sale to

18 EquiFirst will not close until August 15, with an outside date

19 of August 31.  And this was pushed back to address specifically

20 Carrington's concern that it not overlap with the sale and the

21 transition of their business, so they have a certain period of

22 time after closing to transition off.  And so the first

23 representation the Debtor and the Committee -- and I know

24 EquiFirst's counsel's here, but I think I can make this

25 representation on his behalf.  We've agreed that we will not

1  close earlier than August 15, 2007, and so that's the first

2  concession that's been agreed to and we're supposed to state on

3  the record.  There is an outside date, and obviously it could

4  go later than that if we can't close for whatever reason.

5      The second issue would be over Carrington's concern that

6  nothing disrupt the transfer of data in their servicing

7  business, and so, again, through a series of emails, the

8  Debtor, the Committee and EquiFirst have agreed that they shall

9  not, as part of this transition period between now and in

10  essence the August 15 closing, delete any code from the servers

11  that are used in the servicing environment in the data centers.

12  What's envisioned, just as a side note, is they're gonna copy

13  the source data from a different repository in the Debtor's

14  systems, and that will be used and transferred.  And the Asset

15  Purchase Agreement will lay this out.

16      But we believe with those two representations, that

17  satisfies Carrington's objection, and they've withdrawn their

18  objection as to not, you know, not being able to participate in

19  the timing of the auction in connection with the technology

20  sale.  And Your Honor, let me give the podium to the purchaser

21  counsel, and then I think Mayer Brown's on the phone for

22  Carrington as well.

23          THE COURT:  Very well.

24          MR. COLEMAN:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1          MR. COLEMAN:  Excuse me, Ken Coleman of Allen & Overy

2     for EquiFirst Corporation.  I believe Mr. Power accurately

3     outlined the agreement we reached, particularly last night

4     concerning the no deletion from any of the servers during this

5     transition period.  I think the only thing I'd like to add is

6     that Carrington was gracious enough to make a corresponding

7     representation to us regarding no deletion of code on their

8     part during this period.  Thank you.

9          THE COURT:  Thank you.  Would Carrington like to be

10    heard?

11         MR. SCOTT:  Yes, Your Honor.  This is Sean Scott on

12    behalf of Carrington.  Mr. Power did accurately reflect our

13    discussions, and we appreciate the accommodations from the

14    Committee, the Debtors and the purchaser.  And Mr. Coleman

15    accurately stated that Carrington has similarly made a

16    commitment that it will not be deleting any code from the

17    servers during the transition period.

18         THE COURT:  All right, thank you.

19         MR. MERCHANT:  Your Honor, the next objection was

20    filed by GMAC.  It was a limited objection/reservation of

21    rights with respect to the right to credit bid.  We have

22    confirmed for them that none of GMAC's collateral is being sold

23    in connection with the transaction, and that includes the loan

24    origination system referred to as Mpower.  That is not being

25    transferred in connection with this transaction.  So I believe

1  that resolves GMAC's objection/reservation of rights.

2          THE COURT:  Would GMAC like to be heard?

3          MR. CHIPMAN:  Good afternoon, Your Honor.  For the

4  record, William Chipman, Edwards Angell Palmer & Dodge, on

5  behalf of GMACCF.  That's correct, so long as our assets are

6  not being sold we're -- our objection and reservation of

7  rights, I guess, is mooted.  The only thing I would ask is that

8  we be noticed of the next auction so we can show up and credit

9  bid, to the extent that we're entitled to under 363(k).

10         MR. POWER:  Your Honor, Mark Power from Hahn & Hessen.

11 I think the Debtor and Committee have no problem with the

12 notice.  We're not conceding that they have a right to credit

13 bid, depending on how that auction is structured, but we'll

14 work with them, you know, we'll see where that goes.  But that

15 right's preserved.  We're not taking the position.

16         THE COURT:  Thank you.

17         MR. CHIPMAN:  Thank you, Your Honor.

18         MR. MERCHANT:  Your Honor, the Fidelity objection has

19 already been addressed.  The next one is the objection filed by

20 Irvine Company.  This objection relates to assumption

21 assignment of their lease.  As with some of the other

22 objections, that lease is not going to be listed on Schedule

23 1.2(a) of the APA, so it will not be assumed and assigned in

24 connection with the transaction.  And that effectively moots

25 their objection.

1          THE COURT:  All right, would Irvine Company care to be

2    heard?  I hear no response.

3          MR. MERCHANT:  Thank you, Your Honor.  The next

4    objection was filed by the Office of the U.S. Trustee.  They're

5    seeking confirmation that no personally identifiable

6    information about an individual sold or -- will be sold or

7    transferred in connection with the sale in violation of the

8    Debtor's privacy policy.  We've confirmed that no such

9    information is going to be transferred in connection with the

10   sale, which I believe moots that objection as well.

11         THE COURT:  All right, thank you.  Would the U.S.

12   Trustee care to be heard?

13         MR. MCMAHON:  Your Honor, good morning, Joseph McMahon

14   for the United States Trustee.  I believe the representation

15   was that no personally identifiable information is going to be

16   transferred, period.  And if that's the case, we don't have a

17   concern.  Thank you.

18         MR. MERCHANT:  That's correct, Your Honor.

19         THE COURT:  That is correct, okay.

20         MR. MERCHANT:  Your Honor, the last objection I have -

21   - and my apologies, I was not aware that Oracle was granted an

22   extension of the objection deadline, but apparently they were

23   and they filed it after the agenda was filed yesterday.  But it

24   is another assumption assignment/cure related objection.  And

25   as with the others, Oracle -- the Oracle agreements are not

1  listed on Schedule 1.2(a) of the APA and therefore are not

2  being assumed and assigned or transferred in connection with

3  this transaction.  And we believe that moots their objection.

4  I understand, however, that their counsel is on the phone and

5  may have something to say.

6       THE COURT:  Does Oracle care to be heard?

7       MR. DOSHI:  Yes, Your Honor.  Good morning, Amish

8  Doshi with Day Pitney on behalf of Oracle USA.  I just want to

9  thank Debtor's counsel for the extension that they had granted.

10      We -- just a couple of points, Your Honor, with respect to

11  the Oracle agreements.  We have not seen the order.  The only

12  order we had seen was the initial one that was filed with the

13  motion.  I was provided with Schedule 1.2 this morning of the

14  assumed contracts, and I understand that both the order and the

15  APA are still being hammered out, so I don't know what some of

16  the other provisions in those documents say.

17      The concern we had was in addition to the motion, the

18  Debtors had filed two notices.  Mainly, there was a notice

19  filed on the same day as the motion, as well as a second

20  notice, both of which listed Oracle Contract as contracts to be

21  assumed and assigned.  So we're looking for some representation

22  in the order to the extent that those documents have already

23  been filed and are on record that, you know, whatever order is

24  being presented kind of supercedes, or to the extent there are

25  inconsistencies between the order being proposed and those

1 previous document files, the order would govern.

2      Again, I -- I'm a little unsure because I can't really say

3 what other points I may have until I see the full version of

4 the order.  So rather than kind of speculate as to what the

5 order might say, I just want to reserve our rights that upon

6 review of the order, if there are any provisions, you know,

7 that deem some contrary to the representation, we want to

8 reserve our rights.  And also we would request that the order

9 provide some sort of a clear and unequivocal language that, you

10 know, none of the Oracle agreements are being assumed and

11 assigned.

12      The other issue that we have is some of the Oracle

13 agreements are also subject to a previous order.  Carrington

14 may be interested in some of this.  So another reason why we

15 need to know, first of all -- I mean, obviously, Oracle's

16 position is if you can't assume it once, you obviously can't

17 assume it to more than one party.  Debtors have filed that they

18 may assume and assign this to Carrington as per the previous

19 order and there's -- and Oracle's rights are reserved to, I

20 believe, the July date.  Now I understand that they're not

21 including it in here, but they want to reserve the right to

22 include it in the sale to EquiFirst, I believe it was.

23      So again, we want to reserve our rights both with respect

24 to that, and we need some language in the order specifically

25 addressing that.  Thank you.

1          MR. MERCHANT:  Again, Your Honor, I'll confirm we're

2   not assuming and assigning it in connection with this

3   transaction.  I've confirmed with Committee counsel language

4   has been added to the order which makes a similar

5   representation that he's looking for with respect to Fidelity

6   and Basepoint, and we are fine including him within that

7   paragraph as well.  We'll circulate the proposed order to him

8   before we submit it under Certification of Counsel.

9          THE COURT:  Very well.  Thank you.

10         MR. DOSHI:  Thank you.

11         MR. MERCHANT:  Your Honor, I believe that addresses

12   all of the objections.  Unless Your Honor has any questions, I

13   can go into Mr. Geller's proffer.

14         THE COURT:  I do not.

15         MR. MERCHANT:  Your Honor, Evan Geller is an associate

16   with Lazard.  Mr. Geller joined Lazard's restructuring group in

17   2005 and has advised numerous clients through the restructuring

18   process, including Collins & Aikman, Armstrong World

19   Industries, SunCom Wireless, Hazelmers and ION Media Networks.

20         Prior to joining Lazard's restructuring group, Mr. Weller

21   -- Mr. Geller worked in Bank of America Securities Leverage

22   Finance Group where he structured high yield debt financing for

23   a wide range of clients pursuing leveraged acquisitions and

24   recapitalizations.  Mr. Geller also worked as an associate for

25   Grove Street Advisors, a multi-billion dollar private equity

1  investment management firm.  He has an AB in Business Economics

2  from Brown University and an MBA from Harvard Business School.

3  He is in the Courtroom today, Your Honor, and if called to

4  testify, Mr. Geller would testify as follows.

5      In his role as an associate with Lazard, Mr. Geller is a

6  key participant in Lazard's efforts to advise the Debtors on a

7  range of financial topics.  One of his roles was to develop

8  help -- was to help oversee the marketing and sale of the

9  Debtor's origination technology software and data assets.  He

10 directly participated in that process, including attending and

11 helping to conduct the auction of those assets on June 22nd.

12     The assets the Debtors are seeking approval to sell

13 consist of the origination technology software applications,

14 historical loan performance data and historical broker data to

15 EquiFirst Corporation, an affiliate of Barclays Bank PLC, which

16 we'll refer to as Barclays going forward.

17     For gross cash proceeds of $8.05 million, the referenced

18 software assets include the Broker Relationship Management

19 System used to support the Debtor's relationships with

20 wholesale brokers; Enterprise Decisioning Engine, which

21 encompasses automated pricing, underwriting and eligibility

22 decisions; FastQual, a broker point of sale system used to

23 capture applications and prequality borrowers; Lounge, the

24 wholesale sales portal to track submissions and calculate sales

25 commissions; and other software applications developed and used

1  by the Debtors to manage the wholesale loan origination

2  business.

3      Lazard had approximately five people devoted to the

4  marketing of the assets and the auction and sale process.

5  Throughout the sale process Lazard worked very closely with the

6  Debtor's management team and technology personnel, O'Melveny &

7  Myers, the Debtor's legal advisors, Alex Partners LLP, the

8  Debtor's crisis managers, as well as Hahn & Hessen LLP and FTI

9  Consulting, the legal and financial advisors to the Official

10 Committee of Unsecured Creditors.

11      Lazard aggressively marketed and solicited interest in the

12 assets.  The Lazard team collected diligence materials on the

13 assets, established a data room where prospective bidders could

14 review and evaluate those materials, prepared the Debtor's

15 technology personnel to host onsite diligence sessions and

16 coordinate the diligence efforts of all interested parties.

17      As part of this process, Lazard initiated communications

18 with and solicited participation for more than 50 parties who

19 had either previously expressed an interest in the assets or

20 were identified as potential purchasers.  Lazard provided 35

21 parties, those that execute -- Lazard provided 35 parties,

22 those that executed non-disclosure agreements with the Debtors,

23 with confidential diligence materials and access to a data

24 room.  Eight of those parties conducted onsite diligence,

25 including meetings with management, product demonstrations and

1    technology review sessions.

2        Following the extensive marketing of the assets and

3    aggressive pursuit of bids and prospective purchasers, in

4    accordance with the proposed bidding procedures, a number of

5    bidders submitted qualified bids by the relevant deadline of

6    June 19th.  Specifically, Lazard and the Debtors received three

7    qualified bids for the technology software and data assets and

8    three other bids exclusively for the data assets.  The parties

9    submitting qualified bids for the software included Barclays,

10   RMC Asset Acquisition LLC, Citadel and Wachovia Bank.

11       After the bids were received, the Debtors, O'Melveny &

12   Myers, Alex Partners, Lazard and advisors to the Official

13   Committee of Unsecured Creditors evaluated and discussed the

14   economic terms of the bids, as well as other terms and

15   conditions of the Asset Purchase Agreements provided by the

16   bidders.  They also analyzed the methods through which,

17   pursuant to the auction process, they could improve the terms

18   of the Asset Purchase Agreements in both economic and non-

19   economic aspects and maximize the value of the assets and the

20   recovery for the estate.

21       It was determined that the three parties that had

22   submitted bids for the software would be allowed to participate

23   in the auction.  Because the Debtor was potentially to be sold

24   on a non-exclusive basis, the Debtors, in consultation with the

25   Committee, determined that those parties interested only in the

1   data assets would not be invited to the auction.

2       Prior to the auction, the Debtors and Lazard notified

3   Barclays, Citadel and Wachovia that they were qualified bidders

4   invited to the auction on June 22nd and informed Barclays that

5   its bid, with a gross value of $5 million, constituted the

6   highest and best bid.

7       Prior to the auction, the Debtors, O'Melveny & Myers,

8   Lazard and the Committee discussed with Barclays certain terms

9   of the Asset Purchase Agreement to determine if Barclays would

10  agree to improve the terms of the agreement.  Barclays agreed

11  to the majority of the proposed modifications to the Asset

12  Purchase Agreement.

13      On June 22nd, representatives of the Debtors, Alex

14  Partners, O'Melveny & Myers, Lazard, the Committee's advisors,

15  and qualified bidders, Barclay, Citadel and Wachovia, assembled

16  at the offices of O'Melveny & Myers in New York for the

17  auction.  The Debtors, thereafter, commenced the auction with

18  the Barclays' bid of $5 million and improved Asset Purchase

19  Agreement terms as the then highest and best bid that competing

20  bidders would have to top.

21      For purposes of the auction the Debtors evaluated each bid

22  on a net basis, and after taking into account the economic

23  impact of certain terms in the respective Asset Purchase

24  Agreements, Barclays gross bid of $5 million corresponded to a

25  net bid of $5.25 million.

1      Over the next several hours the Debtors conducted 15

2  rounds of spirited and competitive bidding, during which the

3  bidders would announce the economic and non-economic terms of

4  the bid.  After each round of bidding the Debtors, in

5  consultation with the Committee, selected the bid that they

6  deemed the highest and best bid, which included an analysis of

7  the economic and non-economic terms of the bid and established

8  the terms that bidders would have to exceed in the subsequent

9  round of bidding.

10      Frequently there were breaks between the rounds of bidding

11  for the parties to consider the economic and non-economic terms

12  offered by the highest and best bid in the previous round and

13  to evaluate the bids they could make for the assets.  During

14  these periods the Debtors, O'Melveny & Myers, Lazard and the

15  Committee extensively discussed the terms of the bid with the

16  bidders and made suggestions on how the bidders could improve

17  their bids.  These suggestions often included improvements to

18  the Asset Purchase Agreement that the Debtors, O'Melveny &

19  Myers, Alex Partners, Lazard and the Committee believe provided

20  more favorable terms to the estate and greater benefits, in

21  addition to maximizing the economic consideration for the

22  assets.  Therefore, the Debtors, Lazard and the Committee

23  expended significant effort to maximize the terms of the

24  transaction and the sale proceeds to be obtained.

25      Over the subsequent rounds of bidding the purchase price

1 and the other terms of the transaction improved significantly,

2 and as to be expected, the number of bidders remaining in the

3 auction declined.  In fact, Citadel dropped out without

4 submitting a revised bid.  Thereafter, only Barclays and

5 Wachovia remained.

6     In the final round of bidding Wachovia bid a net amount of

7 $8.45 million, which was a gross bid of $8.2 million, and

8 Barclays bid a net amount of $8.55 million, which was a gross

9 bid of $8.05 million.  Thus, Barclays was declared the highest

10 and best bidder and was deemed the successful bidder for the

11 asset.  Having previously agreed to such terms, Wachovia was

12 deemed the backup bidder, and at approximately 8:30 p.m.

13 Eastern Standard Time on June 22nd the auction concluded.

14     In declaring Barclays the highest and best bidder the

15 Debtors, O'Melveny & Myers, Lazard and the Committee considered

16 several factors, including that 1) Barclays offered the highest

17 overall net purchase price for the assets at a gross amount of

18 $8.05 million, which was a net bid of $8.55 million as compared

19 to other bidders.  Barclays agreed to assume contract cure

20 costs.  Barclays agreed to the modifications to the Asset

21 Purchase Agreement and Sale Order requested by the parties,

22 which provided the estate with additional economic and non-

23 economic benefits.  Barclays' bid for the data was non-

24 exclusive, meaning the Debtors can realize additional benefit

25 from selling those assets to other parties.  These

1   modifications are reflected in the Asset Purchase Agreement and

2   Sale Order that will be submitted to the Court.

3        Throughout the auction and sale process the assets were

4   aggressively and thoroughly marketed by the Debtors and Lazard.

5   It is also Mr. Geller's opinion that the auction was properly

6   advertised and announced, including through Lazard's

7   independent efforts to solicit interest in the assets from

8   approximately 50 potential buyers, encouraged them to submit

9   bids and to participate in the auction process.

10       In addition, the auction, which took place over 15 rounds

11  of bidding involving three qualified bidders, was well

12  conducted and caused bidders to submit highly competitive bids

13  in increasing amounts.  The efforts of the Debtors, O'Melveny &

14  Myers, Lazard and the Committee to encourage bidders to improve

15  the economic and non-economic terms of the bids facilitated the

16  auction process and a submission of improved and higher bids,

17  and each of the parties and bidders engaged in a hard fought,

18  arms length negotiations at all times.

19       The auction resulted in obtaining the highest and best bid

20  for the assets, and the Barclays bid is indicative of the

21  thoroughness of the marketing of the assets and the auction

22  process.  Through the auction process the purchase price for

23  the assets was increased from a gross amount of $5 million to

24  8.05 million, with a net corresponding amounts of 5.25 million

25  and 8.55 million, respectively, a gross increase of over $3

1 million and a net increase of approximately $3.3 million or

2 over 60% of the initial bid.  In addition, other material terms

3 of the Asset Purchase Agreement were greatly improved, which

4 will provide the estate and Creditors with other benefits.

5       Finally, the Barclays bid is a superior offer for the

6 assets and represents the maximum value that could be obtained

7 for them, taking into consideration the circumstances.  The

8 8.05 million gross purchase price, which was established at a

9 competitive auction, is the highest amount the Debtors have

10 been offered for the assets and represents a fair value for

11 those assets.

12      Further, the other terms that Barclays has agreed to

13 incorporate into the Asset Purchase Agreement provide

14 additional benefits to the estate and creditors that further

15 improves the value of Barclays' bid, as compared to other

16 bidders.

17      In sum, the marketing of the assets was diligent,

18 reasonable and adequate.  The sale process was reasonably

19 designed to maximize the value of the assets.  Notice of the

20 auction was reasonably and properly advertised.  The interest

21 of potential bidders was reasonably and properly solicited.

22 The auction was reasonably and properly conducted.  The parties

23 at all times engaged in highly competitive bidding and arms

24 length negotiations, and the bid submitted by Barclays at

25 auction is the highest and best bid for the assets and

1  represents their fair market value after being tested at an

2  auction.

3      That concludes Mr. Geller's proffer, Your Honor.  I don't

4  know if anybody wishes to cross examine him.

5      THE COURT:  Would anyone like to cross examine Mr.

6  Geller?  I hear no response.  Does anyone else care to be heard

7  in connection with this motion?

8      MR. POWER:  Your Honor, Mark Power from Hahn & Hessen,

9  counsel to the Committee, I'll be brief, I think.  First of

10 all, I think, you know, based on our research the Court should

11 be aware that this is the only sale in material dollars of

12 software for the origination technology in the subprime area,

13 that we're aware of, of all the over a dozen bankruptcy cases

14 that are currently in the country.  So this is a unique sale.

15 I think the Committee has worked very closely with the Debtor

16 and each of the bidders to try to make this auction work and

17 we're very pleased with the results.

18     I think just so Your Honor gets a little flavor, we

19 started out with the bids, basically the initial bids, which

20 were worth less than $5 million and had all the cures being

21 paid by the Debtor and had a number of contracts, including

22 some significant contracts that had significant cure claims --

23 and one of them in particularly, GMAC, asserted a security

24 interest in of -- and it sought about $7 million, that's the

25 Mpower contract.

1      As a result of the good faith negotiations during the

2  auction, and even prior to the auction, the bidders were

3  negotiating in good faith and we were able to basically

4  increase some of the value in the contract, basically get the

5  buyers, and I should say what they've agreed to do, this

6  successful bidder, is picked up the cure to the extent that

7  they elect to assume those contracts.  And they've also agreed,

8  which was part of the negotiations, to take a number of those

9  contracts off the list since these are large organizations

10  which have relationships with a lot of these institutions.  And

11  that, basically, although it's not reflected in the value of

12  this bid, is a tremendous value to this estate and the

13  Creditors because we are not gonna have tremendous litigation

14  about what the value of those contracts were and whether there

15  were significant cure issues and whether, for example, GMAC's

16  security interests and what the value of the Mpower contract

17  associated with the whole asset sale was.

18      All those issues were mooted, thereby saving legal fees

19  and really divided up the proceeds by virtue of the bidders

20  working with us to try to streamline the process.  So there's a

21  lot of hidden value in this deal that I think the Committee and

22  the Debtor recognize and was very -- I thought was very

23  favorable.

24      Your Honor, the other benefit I think to this buyer, from

25  the Committee's point of view, is they were extremely flexible

1  and negotiated in good faith in terms of the closing and

2  working with us to make sure that it doesn't disrupt the

3  Carrington sale, which is obviously crucially important to this

4  estate.

5      We did participate extensively in the auction, and I can

6  report to the Court that every bidder acted in good faith, at

7  least under our observation, and there was competitive bidding.

8  And we believe that the price reflected before Your Honor in

9  the final bid is fair, reasonable value.  As we mentioned, it's

10  really the only sale we're aware of in the country of these

11  type of assets at this range, so we're extremely happy with

12  that.  And by virtue of resolving all of the objections, we

13  would ask Your Honor to approve the sale.

14          THE COURT:  Thank you.

15          MR. POWER:  Your Honor, I -- we do have a Form of

16  Order, but we're going to submit it later.  Do -- I don't --

17  there is one aspect of the sale which we want to alert the

18  Court to.  Should I go through that, the data sale?

19          UNIDENTIFIED SPEAKER:  That's the one thing I want to

20  discuss.

21          MR. POWER:  Your Honor, there is one thing that's a

22  little out of the ordinary from what Your Honor sees in all of

23  the 363 sales, and that's why we want to raise it to you and

24  see what -- we'll tell you what we're asking Your Honor to

25  approve.

1      We received -- the Debtor received three bids with, in

2  essence, the entire package, except EquiFirst's bid didn't ask

3  -- didn't acquire the loan data.  We have three categories of

4  assets.  We have the technology, which is the software, the

5  broker data and the loan data.  As part of the bid process,

6  EquiFirst agreed to basically acquire the broker data on a non-

7  exclusive basis, permitting the estate to sell that or sell the

8  use of that data to other parties.  And we actually -- the

9  Debtor has a offer that its indicated it will accept and the

10 Committee supports with one other buyer.  There are other

11 buyers out there that we would also like to sell or license the

12 use of that data to.  And we're talking values in the low six

13 figures here, not in seven figures; we're talking significantly

14 lower values.

15     The Debtor decided, with the Committee's consultation, not

16 to proceed with the data sale, but we're permitted to sell the

17 loan data and the broker data to other parties.  And so what

18 the proposal and the order is is that we ask Your Honor to

19 authorize the Debtor to go out and with -- at a price agreed to

20 with the Committee to these parties and basically attempt to

21 sell this data to those parties.  There's a Form of Asset

22 Purchase Agreement, or Data Purchase Agreement, which has been

23 circulated that will be used as the template.

24     So we have two ways to proceed, Your Honor.  We could

25 either proceed and seek approval on every one.  We thought the

1  more efficient way to proceed was basically ask for authority

2  within the parameters described from the Court to sell this

3  data on a non-exclusive basis to these parties, basically

4  because it's a relatively modest amount.  It actually falls

5  below the miscellaneous asset sale order amount that Your Honor

6  previously approved, but this is a little different than that.

7  But we think that it will save a lot of expense, time and

8  delay.

9      The other thing I should mention is that EquiFirst has

10  agreed not to resell the broker data that it's acquiring to any

11  other party, any third party, for 12 months.  And we're gonna

12  make that same requirement on the other purchasers so that, in

13  essence, we don't have a competing situation with people who

14  acquire the data and then try to compete with the Debtor in

15  terms of the resale.

16      But with those limitations, this order seeks the Court's

17  authority to authorize the Debtor to enter (indiscern.) and

18  sell that data to third parties pursuant to an agreement to be

19  mutually agreed.  And it does seek the basic standard

20  protections of 363(f) and (m) and (n), based on those

21  representations.

22      I can represent to the Court that each sale will be in the

23  low six figures, that's where we are.  We haven't yet set a

24  price, so that's why we don't have an exact price.  I think

25  there'll be a range, but that's what we were asking.  And I

1  guess we want to see if Your Honor will be okay with that

2  process or would prefer a different method.

3          THE COURT:  Well a couple of questions.  One, would

4  any of the sales involve the sale of personally identifiable

5  information?

6          MR. POWER:  The answer to that is no, Your Honor.

7          THE COURT:  All right.  Secondly, to the extent that

8  you want in any order concerning those individual sales

9  findings by the Court, factual findings by the Court, it seems

10  to me that I can't make them now.  But if after the sales are

11  concluded you wish findings and conclusions, I would consider

12  making them under Certification of Counsel, you know, again,

13  assuming the certification makes the appropriate

14  representations about the particular details of any given

15  individual sale.  But to the extent you want pre-authority to

16  undertake such sales, subject to what others might have to say,

17  at those levels I'm not troubled by it.

18          MR. POWER:  That's fine, Your Honor.  I know the order

19  provides for 363(f), but there's also a good faith finding,

20  there is finding.  So I think that if Your Honor -- we'll go

21  that method, that's fine.  I know -- that's fine, Your Honor,

22  we'll do that.

23          THE COURT:  Okay, does anyone else care to be heard in

24  connection with that issue or in connection with the sale?

25          MS. STRICKLAND:  Yes, Your Honor.  This is Rachel

1 Strickland.  I'm with Wilkie Farr & Gallagher, and we represent

2 Citadel and it's acquisition entity, which is RMC Asset

3 Acquisition.

4      We are going to be one of those data purchasers, and as my

5 client already participated in the auction, and I think as part

6 of the declaration or testimony that was given by proffer

7 earlier, there's already been statements on the record to the

8 fact that my client has participated in good faith, did not

9 collude and engaged in arms length bargaining.  So with respect

10 to my particular client, I would assume that there would not be

11 a need for a later certification and that Your Honor hopefully

12 has enough in the record right now in order to be able to make

13 factual findings required for 363(f), (m), (n), et cetera.  I

14 don't know if anyone --

15      THE COURT:  Well, does anyone have an objection to

16 that?

17      MR. POWER:  No, Your Honor, we can report, the

18 Committee and the Debtor, that indeed that is correct.  Citadel

19 was there, participated and negotiated in good faith, and we

20 did strike a deal, subject to Your Honor's approval, to sell

21 that data as part of the auction process, and we've confirmed

22 that.

23      THE COURT:  All right, then I would be willing to make

24 such findings based on the record that's been made today.

25      MS. STRICKLAND:  Thank you, Your Honor.

1          MR. MERCHANT:  Thank you, Your Honor.  There is one

2    more thing I wanted to point out that Your Honor is probably

3    going to see in the order, and that is the list of contracts

4    that will be attached to the APA and which the Debtors will

5    have authority to assume and assign will list five contracts.

6    Four of those contracts have already been noticed pursuant to

7    the prior notices filed with the Court.  There's one contract

8    in there, the Crown P Technology Contract, has not been noticed

9    out.  So we need to build some mechanism into the order for

10   noticing that party.

11       I think what we'd like to propose is that the order would

12   provide that we'll be authorized to assume and assign that

13   contract subject to us providing proper notice to that party

14   and the passing of an objection deadline.  We'd like to have

15   authority pursuant to this order rather than having to submit a

16   separate order or file a separate motion for that one single

17   contract.

18          THE COURT:  Did that party receive notice of this

19   motion and hearing?

20          MR. MERCHANT:  I don't know the answer to that

21   question.  I don't -- I'm not sure how broad the notice of the

22   Sale Motion was.  I don't believe it went to all Creditors, in

23   which case they probably did not receive notice of the motion.

24   But we could -- I guess what we could do is we could provide

25   them with full and proper notice and, you know, file a notice

1  with the Court and attach a copy of the Sale Order.

2          MR. POWER:  Your Honor, this deal's not going to close

3  'til August 15, so --

4          THE COURT:  So you can build in a timeframe sufficient

5  to address that.  That's fine.

6          MR. MERCHANT:  Okay, thank you, Your Honor.  I believe

7  that's all I have in connection with this motion, Your Honor.

8  We would ask that Your Honor approve the sale, subject to

9  submission of an acceptable Form of Order and an APA.

10         THE COURT:  Based upon the record made today and the

11 resolution, or expected resolution, of the various objections,

12 I am prepared to approve the sale upon submission of a Form of

13 Order under appropriate certification attaching, among other

14 things, a completed APA.

15         MR. MERCHANT:  Thank you, Your Honor.  Your Honor,

16 agenda item 28 is the application of the examiner to retain

17 Kirkpatrick & Lockhart.  I will cede the podium to them to

18 address this matter.

19         THE COURT:  Very well.

20         MR. FOX:  Good morning, Your Honor, Edward Fox from

21 Kirkpatrick & Lockhart Preston Gates Ellis LLP on behalf of the

22 examiner.  {Cough} Forgive me, Your Honor, I came down with a

23 nasty sore throat last evening.

24         THE COURT:  Sorry to hear that.

25         MR. FOX:  Well, hopefully I'll be able to make it

1   through.  Your Honor, we filed our application.  We received

2   two responses to the application; one from a Bank of America

3   N.A. and the other from Morgan Stanley Mortgage Capital

4   Holdings LLC.  And they're not objections per se, but they do

5   suggest that if the investigation apparently -- if we

6   understand them correctly, that if the investigation were to go

7   in a particular direction that perhaps that presents a problem

8   for them.

9       I think there are several sort of relatively easy ways to

10  deal with this.  First and foremost, with respect to Morgan

11  Stanley Mortgage Capital Holdings LLC, we do no work for that

12  entity.  We do some work --

13          THE COURT:  So they are, in ethics parlance, a former

14  client?

15          MR. FOX:  It's not, so far as I know, a client we've

16  ever done work for, that specific legal entity.  We do work for

17  other Morgan Stanley entities, but not that one.  And we are

18  very careful, in our engagement letters and otherwise, to try

19  to ensure that we make clear that when we are engaged by a

20  client it is with that specific entity and not with any other

21  related parties because with a firm our size that's really the

22  only way that we can be sure that we know who we're working for

23  and who we're not.

24      With respect to Bank of America N.A., we do do a

25  relatively minor amount of work for Bank of America N.A.  When

1  we received this response we drilled down on that and

2  determined that we do -- in the year prior to the filing, we

3  had billed fees with respect to matters for Bank of America

4  N.A. of, I believe, approximately $200,000, and we're a firm

5  with a combined fee revenue at December 31, 2006 of in excess

6  of $700 million.  So the -- this is such a de minimis amount.

7  I mean, we think that the amount of work that we did for any of

8  the entities that were listed on Exhibit A to our application,

9  as we indicated, except for one trade creditor, was less than

10  3/10 of 1% of our income.  This one would be a factor of 10

11  smaller than that, and in the scheme of the things, we don't

12  think that anybody could possibly believe that that could have

13  an effect on our ability or judgment to represent the examiner

14  in this matter.

15          THE COURT:  Well, the issues that are raised in the

16  responses have to do with potential conflicts, potential

17  conflicts; neither claims an actual conflict now exists.  It

18  seems to me that those are the types of things that can't be

19  pushed aside by discussion of amounts only.  I mean, it's more

20  like a pregnancy kind of analogy I think, and a little bit is

21  enough.  But neither says there's an actual conflict.  And

22  after having reviewed the papers, at least it didn't strike me

23  initially that the potential of a conflict was sufficient to

24  disqualify the firm from this representation.

25      I do have one other issue I'd like to raise, but on that

1  let me hear -- let me ask if either Bank of America or Morgan

2  Stanley cares to be heard.

3          MR. CREMONA:  Good morning, Your Honor, Nicholas

4  Cremona of Kaye Scholer LLP, appearing on behalf of Bank of

5  America.  May I be heard?

6          THE COURT:  You may.

7          MR. CREMONA:  Thank you, Your Honor.  Your Honor, as

8  set forth in our response, Bank of America, as a counter-party

9  to two repurchase agreements with the Debtors, filed this

10  response in order to clarify the scope of the examiner's

11  investigation and in order to -- and also to clarify the scope

12  of the role of what I'll refer to as K&L Gates to ensure that

13  no present conflict of -- conflicts of interest exist at this

14  time because, as was stated, Bank of America is a current

15  client of K&L Gates, and neither K&L Gates nor the examiner has

16  sought from Bank of America a waiver of these conflicts in

17  connection with this proposed retention herein.

18      Your Honor, as we set forth in our response, Bank of

19  America's understanding of the examiner's investigation is --

20  as it could possibly relate to Bank of America is very limited

21  in scope in that it's our understanding that the examiner's

22  investigation will only include what is authorized by paragraph

23  3(b) of the Examiner Order, which entails the investigation of

24  the Debtor's conducts or acts in connection with the potential

25  unauthorized use of cash collateral.  Now, if that is the -- if

1  that understanding is correct and that is the -- or that is the

2  scope of the examiner's investigation as it relates to B of A

3  and Bank of America's rights, remedies or duties under it's

4  repurchase agreements with the Debtors will not be implicated

5  in any way, then as we said in our papers, we don't believe

6  that a present conflict of interest exists.

7       However, if that role presently includes or is expanded to

8  include in any way a review of our repurchase agreements or in

9  any way implicates the rights of Bank of America, then we do

10  believe that a conflict of interest would arise, regardless of

11  the de minimis amounts or not that may, you know, as part of

12  the firm's revenue.  We believe that that would create a

13  potential conflict of interest.

14       Likewise, if the examiner's -- the scope of the examiner's

15  investigation either presently includes or is subsequently

16  expanded to include the investigation of similarly situated

17  counter-parties, repurchase counter-parties, or their

18  transactions which, you know, could -- again, it's potential,

19  but could potentially create an adverse precedent for Bank of

20  America, then, again, Bank of America would perceive that as a

21  conflict of interest that needs to be addressed.

22       Now, absent understanding fully the scope of the

23  investigation, the examiner's investigation, and the proposed

24  role of K&L Gates in connection with that investigation, you

25  know, I'm unable to say if there is a -- an actual conflict,

1  but we -- absent knowing that, we believe that there are

2  potential conflicts of interest that need to be addressed.

3        THE COURT:  Well, let me say this.  The order, I

4  think, is clear enough, and it seems to me that the scope of

5  the representation of the examiner ought not to go beyond that

6  which the examiner has been expressly authorized to do.  And

7  the order specifically says that the examiner's charge is

8  limited to that which is explicitly stated in the order.  As I

9  read your response and hear your argument, I don't see that an

10 actual conflict is implicated here, and I don't think you're

11 really telling me that.  To the extent that there may, as

12 investigations can develop, be a request for an expansion of

13 the examiner's powers, then I think notice should be given to

14 those who might be affected by it, if such a motion is filed or

15 a request is made, including your client.  Or if for some other

16 reason it seems to me either the examiner or Bank of America

17 has a belief there is a potential conflict, then something

18 needs to be filed with the Court to work through any dispute

19 that may exist as a result of that.  And to the extent you're

20 asking language to that effect be built into the order, I think

21 that's a reasonable request.  Any problem with that?

22        MR. FOX:  What exactly would the -- I mean, we're not

23 -- one of the problems that we have with both of these

24 objections, quite frankly, was that it didn't seem to us that

25 this is the time or the place to either negotiate or argue

1 about the terms of what the Court's order says that was entered

2 authorizing --

3          THE COURT:  And I didn't think anything I just said --

4          MR. FOX:  That's right, Your Honor.  Right.  So --

5          THE COURT:  -- consisted of something like that.

6          MR. FOX:   No, that --

7          THE COURT:  And I don't intend to at this point.

8          MR. FOX:  I appreciate that --

9          THE COURT:  All right.

10          MR. FOX:  -- very much, Your Honor.  So what I think

11 we're talking about is if circumstances change, if we seek to

12 expand the investigation beyond what's presently in the scope

13 of the order, then obviously that would be done on notice and

14 in Open Court, and anybody at that time would have a chance to

15 raise whatever issues they have in that regard.  So we

16 certainly don't have an issue with that.

17          THE COURT:  All right, I didn't think so.  All right,

18 let me hear from Morgan Stanley.

19          MR. MILTON:  Good afternoon, Your Honor, Jeffrey

20 Milton of Milbank Tweed Hadley & McCloy on behalf of Morgan

21 Stanley Mortgage Capital Holdings LLC.  We agree with what Your

22 Honor has said.  We were not trying to assert that there's a

23 conflict of interest now; only to the extent a conflict of

24 interest arises later, we want to preserve our rights to

25 address those issues then.

1      As to counsel's comment with respect to having never done

2  any work for this particular entity, I frankly don't know what

3  the division is at Morgan Stanley, perhaps they share the same

4  legal department.  I think there are issues that we would want

5  to preserve to, you know, to the extent that we do determine

6  that there is a conflict down the road.

7           THE COURT:  All right, well, I'm not making any

8  determination --

9           MR. MILTON:  Sure.

10          THE COURT:  -- concerning that today.

11          MR. MILTON:  Thank you.

12          MR. INDELICATO:  Your Honor, Mark Indelicato from Hahn

13  & Hessen on behalf of the Committee.  Your Honor, we did not

14  file a response and we have no objection to the retention, but

15  there is some -- are issues that have been raised in the Court

16  and in the papers that I think, to a certain extent, we either

17  need to address with the examiners apart from the hearing, but

18  we would like to point them out to the Court as well.

19      The Court heard at length today the presentation by Mr.

20  Logan and Mr. Power regarding the Adequate Protection Motion,

21  and the Adequate Protection Motion is setting up very specific

22  procedures to deal with a lot of the issues that Mr. Cremona

23  raised in his objection related to the counter-parties, their

24  rights, the rights as it relates to the estate, the right it

25  relates to the use of cash collateral.  The way we view the

1  order -- and I understand the Court doesn't necessarily want to

2  interpret its order at this hearing, but we just want to let

3  the Court know our concern.  The way we view the order is the

4  examiner was gonna go in and look at the Debtor's conduct with

5  respect to the use of cash collateral, not necessarily looking

6  at all of the underlying transactions, because then we're going

7  to have --

8       THE COURT:  I dealt specifically with that, I think,

9  in a footnote.  I don't have the order in front of me.  At the

10  -- basically at the request of some of the counter-parties who

11  were afraid, for lack of a better word, the examiner was going

12  to muck up the disposition of the rights that those parties

13  were asserting against the Debtor.  I think that was addressed

14  in the order.

15       MR. INDELICATO:  And that is addressed in the order,

16  Your Honor.  We just wanted to make it clear that that's --

17  that that is what the interpretation is.

18       THE COURT:  All right.  I have one question, one

19  further question.  You would agree, I take it, that the firm

20  must be disinterested within the meaning of the Bankruptcy

21  Code?

22       MR. INDELICATO:  Yes, Your Honor.

23       THE COURT:  Okay.  In looking at the affidavit that

24  accompanied the application, it is disclosed that a paralegal

25  holds a small amount of equity securities of the Debtor.  Tell

1  me, specifically, why this does not make the firm

2  disinterested.

3          MR. INDELICATO:  Well, I --

4          THE COURT:  Or tell me why it doesn't affect the

5  disinterestedness status of the firm?  Maybe that's a better

6  way to ask the question.

7          MR. INDELICATO:  Well, I think the -- probably the

8  best answer, I don't -- there are probably a number of answers.

9  I think the best one is that, particularly with respect to a

10 paralegal, not only will the paralegal have nothing to do with

11 this, but the paralegal has no decision making power or

12 authority with respect to anything that's done with the firm.

13 I mean, as you're well aware, the partners and associates, the

14 actual lawyers in the firm, you know, are the ones making

15 decisions about how to conduct the investigation, in concert

16 with the examiner.  Paralegals, effectively, you know, are

17 gonna carry out ministerial tasks and only under the direction

18 or supervision of lawyers.  They can't practice law, they can't

19 independently make legal decisions, and this particular

20 paralegal is not gonna have anything to do with this matter in

21 any event.

22         THE COURT:  Then why didn't you say in your affidavit

23 that you were disinterested?

24         MR. INDELICATO:  I'm sorry, Your Honor?

25         THE COURT:  Why did you not say in your affidavit,

1  expressly, that you were disinterested?

2        MR. INDELICATO:  I'm sorry, Your Honor, I guess I

3  thought we had.  Maybe I --

4        THE COURT:  Well, you tracked the statutory language

5  and then carefully disclosed, and appropriately disclosed, the

6  interest that the paralegal held.  Well, let me ask it this way

7  --

8        MR. INDELICATO:  Well we -- I mean I think we

9  specifically said, for instance in the application, that --

10 beginning at the bottom of page 6, "Accordingly, for the

11 reasons set forth in the Fox Affidavit, the examiner believes

12 that K&L Gates is disinterested as that term is defined by 11

13 U.S.C. Section 101(14)."

14       THE COURT:  I'm sorry, where are you reading from?

15       MR. INDELICATO:  It's paragraph 18 of the application,

16 Your Honor.

17       THE COURT:  Oh, okay.

18       MR. INDELICATO:  At the bottom of page 6.

19       THE COURT:  But you have to tell me that, too, don't

20 you?

21       MR. INDELICATO:  Well, I'll certainly -- I can either

22 tell you now or I'll submit a separate supplemental affidavit

23 if you'd like.

24       THE COURT:  Well let me ask the question this way.

25 It's your position, I take it, that unlike when a professional,

1  as opposed to a paraprofessional, holds some interest of this

2  nature, that the paraprofessional's interest under governing

3  ethics rules and as the Bankruptcy Code ought to be

4  interpreted, and I know they're not always the same, should not

5  be imputed to the firm?

6           MR. INDELICATO:  I guess that would be my argument,

7  Your Honor.  To a certain extent, I must tell you that it was

8  not a question that I expected to come up, so I might have a

9  different view if I reflected on it further.

10          THE COURT:  Well, Court's are expected to look at

11 these things, and I actually do read them.

12          MR. INDELICATO:  No, I appreciate that, Your Honor.  I

13 just -- it was not something that occurred to me was going to

14 be an issue that would be problematic.

15          THE COURT:  All right, I don't -- look, I don't like

16 to create problems that don't exist.  All right, let me hear

17 from the U.S. Trustee.  Do you have a position on this?

18          MR. MCMAHON:  Your Honor, Joseph McMahon for the

19 United States Trustee.  We did not have a position walking into

20 today's hearing.  In fact, Your Honor, I see a disclosure with

21 respect to Ms. Guyer at the bottom of page 4 at paragraph 9 of

22 the affidavit.  I was wondering if I -- if you would possibly

23 reiterate what -- exactly what paragraph of the affidavit

24 you're referring to?

25          THE COURT:  I'm looking at paragraph 5 of the

1  affidavit on page 2.

2          MR. MCMAHON:  Your Honor, we did not have a position

3  on this particular subject walking into today's hearing.  If

4  Your Honor would like something more specific from the U.S.

5  Trustee, I would be happy to --

6          THE COURT:  Well, let me ask this -- and not to put

7  you on the spot, Mr. McMahon, but did the U.S. Trustee review

8  this specifically and decide it was not a problem?

9          MR. MCMAHON:  Your Honor, again, we did have

10 discussions with the examiner, even prior to the filing of the

11 firm's affidavit, with respect to the connections that the firm

12 had.  I can't say -- speak for other persons in our office with

13 respect to what they may have or have not communicated.  So I

14 don't want to, you know, speak for those individuals.

15 Obviously, there's a few people involved in what I'll call the

16 review process.

17         THE COURT:  All right, let's do this.  I would like

18 you to submit a supplemental affidavit saying that if you

19 believe it to be true that the firm is disinterested, provide

20 it to the U.S. Trustee, and if there is no objection, you may

21 submit a Form of Order under certification so indicating, and I

22 will sign it.

23         MR. FOX:  Thank you, Your Honor.

24         THE COURT:  All right.

25         MR. CREMONA:  Your Honor, this is Nicholas Cremona,

1  again, on behalf of Bank of America.  I apologize, but I -- can

2  I just clarify something for the record?

3         THE COURT:  Go ahead.

4         MR. CREMONA:  I just wanted to go back to something

5  that you said earlier and you referred to your -- the Examiner

6  Order, paragraph 9, and I believe the language you were

7  referring to and we referenced in our response is that the

8  order is not intended to confer upon the examiner any {quote}

9  "Party-In-Interest" {end quote} status for the purposes of

10 intervening or joining in any adversary proceeding or contested

11 matter in connection with disputes involving the non-Debtor

12 counter-parties to repurchase agreements.  And then the

13 footnote you were referring to said that this proviso was

14 included to address the concern expressed by the parties at the

15 May 30, 2000 hearing regarding the Court's expansion of the

16 investigation and that it not delay the disposition of the

17 repurchase parties' rights.

18     I just wanted -- it sounds to me, based on the discussion

19 today, that based on the express language of the order, the

20 present scope of the examiner's investigation would not

21 implicate in any way the rights or remedies or duties of Bank

22 of America under it's repurchase agreements with the Debtors.

23 And if that's the case, we certainly don't have an objection at

24 this point, but would certainly reserve our right to raise

25 issues at a later time to the extent that the examiner's

1  investigation is expanded beyond that, as I think Your Honor

2  indicated.  And I apologize if I'm being redundant.  And then

3  you also indicated that we would -- that I think the parties

4  are amenable to certain language in the proposed Retention

5  Order, which I think would address this.

6         THE COURT:  Yes, I would like the language that I

7  suggested to be included in the order, but despite the second

8  invitation, I respectfully declined to reinterpret my order

9  that I think is clear enough.  I will repeat that nothing that

10 I've heard or read, it seems to me, in either response ought to

11 disqualify the firm based upon the present scope of the

12 examination from retention by the examiner.  And that's all

13 I'll say.

14        MR. CREMONA:  Thank you, Your Honor.

15        MS. CULLER:  Good afternoon, Your Honor.  The final

16 matter on the agenda this afternoon is the Debtor's Claims Bar

17 Date Motion.  The motion is to approve the claims bar date and

18 approving the form, manner and notice thereof.  There are two

19 objections filed to this motion.  One was filed by the Office

20 of the United States Trustee.  That objection has been

21 resolved.  The Trustee's comments have been incorporated into a

22 revised order and the exhibits.

23     The other objection was filed by the Ad Hoc Committee of

24 Beneficiaries of New Century Financial Corporation's Deferred

25 Compensation Plan.  The Ad Hoc Committee requests that the

1 beneficiaries be exempt from the claims bar date, or in the

2 alternative, to allow the Ad Hoc Committee to file a class

3 proof of claim.  The Debtors -- the Ad Hoc Committee filed an

4 adversary proceeding last week based on ERISA actions.  New

5 Century Financial Corporation scheduled the individual members

6 of the Deferred Compensation Plan and the Debtor's would ask

7 that to the extent that the individual members disagree with

8 the amounts that are scheduled that they be required to file a

9 general unsecured proof of claim or a proof of claim.  To the

10 extent that an additional claim arises out of the adversary

11 proceeding, then we would ask that that claim be allowed --

12 they would be allowed to file that claim pursuant to Rule

13 3002(c)(3) within 30 days of the judgement in the adversary

14 proceeding.

15     We were able to address this this morning with counsel to

16 the Committee, and I'm not sure where we are in resolution of

17 this matter.

18         THE COURT:  All right, Counsel, would you state your

19 name for the record please?

20         MS. CULLER:  Emily Culler.

21         THE COURT:  Thank you.

22         MS. CULLER:  Thanks.

23         MR. HUSTON:  Good morning, Your Honor, may it please

24 the Court, Joseph Huston of Stevens & Lee on behalf of the Ad

25 Hoc Committee and the putative representatives of the class of

1  beneficiaries.  Our immediate reaction to this is why do we

2  need this, why does the Debtor need this at this point in time?

3  In a liquidation case like this you would think that the

4  primary beneficiary, which is the Unsecured Creditors

5  Committee, would be the one to have a problem with this, but

6  they don't.  They have some qualifications about the relief

7  that we have requested in the event that we get to file a class

8  claim, but otherwise do not object to what we've proposed.

9      The -- first, we do not have the ability today to

10  communicate with all 570-plus claimants.  We communicate with

11  about 120, and we have a committee which is pretty effective,

12  but there are people out there who have moved, who have found

13  new jobs, who are looking for jobs, and I don't know that we

14  can communicate with them to get them all signed off on this.

15  But be that as it may, why would the Debtors need a bar date on

16  these claims when we have a situation where, first, it's a

17  liquidation.  Second, there is a finite fund that they, the

18  administrator of the plan, know the precise amount of.  It

19  fluctuates a little bit based on investment performance.  We

20  know exactly where it is.  There is an order that says that

21  that money will not go anywhere until a final order of the

22  Court.  So I don't know why it is until the adversary

23  proceeding has been determined, why it is the Debtor cares

24  about this number.

25      For the claimants, if we are -- if we have to submit -- if

1  they have to submit a claim, that's tantamount to conceding the

2  nub of the adversary proceeding in our earlier objection, which

3  is that this is not property of the bankrupt estate.  So if we

4  submit an unsecured claim as to property that we don't think is

5  property of the bankrupt estate, haven't we, in essence,

6  admitted that our action is wrong?

7        THE COURT:  Well, there are all kinds of claims that

8  carry with them all kinds of disclaimers.  The fact that, I

9  guess, potential claimants are being -- well, the general rule

10  is there should be a bar date and that everyone should be

11  subject to it.

12     So it seems to me, Mr. Huston, that what you need to do is

13  convince me that there's a reason that your clients should be

14  accepted from it.  Now, to the extent that the filing of a

15  claim forces the taking of a position, I don't see a problem

16  with that; you've already taking the position.

17        MR. HUSTON:  Well, as -- on behalf of those whom we

18  represent.  But as -- with respect to the people with whom

19  we've had no ability to communicate, they will not -- I

20  virtually guarantee you, they will not understand the niceties

21  of submitting a proof a claim.  They're gonna get a direct

22  communication from the Debtor that says send in your claim.

23        THE COURT:  But what makes them different from any

24  other claimant?

25        MR. HUSTON:  Well, in part, because there is pending

1  an adversary proceeding, which has been brought in their name

2  on their behalf.

3          THE COURT:  Well, let me ask this.  What would a

4  putative class claim say?

5          MR. HUSTON:  That we reserve the rights to our pro

6  rata share of the funds that are segregated as reflected in the

7  books and records of the administrator versus the Debtor.  I

8  don't think the Debtor is the -- is really the person in the

9  best position to say what's in that fund.  It's the

10  administrator who has the record of what has been deposited and

11  is held for the benefit of each of the beneficiaries.

12         But you asked me why should I -- should I persuade you why

13  they shouldn't be subject to the bar date.  I think they

14  should, but I think it ought to be 30 days after -- you know,

15  30 days after the conclusion, favorably or unfavorably, of the

16  adversary proceeding.  And in contrast to the way we're being

17  treated, a finite number of people, finite fund, known amount,

18  segregated, not to be disturbed, that's precisely the way that

19  the claimants -- what we're asking is precisely the thing that

20  is being afforded to rejection claimants.  The Debtor doesn't

21  know all of who they are yet.  They certainly don't know the

22  amount of the rejection claims yet.  And so, I mean, I would

23  think ours is a much easier situation to say, yes, we

24  understand who you are, where you are, where the money is, et

25  cetera.  So 30 days after the conclusion of the adversary

1   proceeding either you have to file your class proof of claim or

2   you -- and, I mean, I guess you could say that the adversary

3   proceeding is itself a de facto proof of claim.

4             THE COURT:  You could.

5             MR. HUSTON:  It's pretty hard to just --

6             THE COURT:  You could.

7             MR. HUSTON:  It's pretty hard to say that there's

8   something out there that they don't understand.

9             THE COURT:  There's decisional law to that effect.

10            MR. HUSTON:  There is, and I think Judge Walsh has

11   recently said that again.  And with respect to filing a proof

12   of claim in the <u>Kaiser Group</u> case that we cite in our papers,

13   Judge Walrath actually approved the filing of a class proof of

14   claim after the passage of the bar date for a class of only 47

15   claimants, finding that, unlike here where we have virtually

16   identical claims -- I think the only difference is amount --

17   virtually identical claims, facts, circumstances, res and 530

18   more claimants than she found adequate for numerosity, she was

19   untroubled by the fact that you could file a class proof of

20   claim even though, as in this case, that claimant had not been

21   formally approved as a class representative.  So -- but I don't

22   think we need to get to that issue.  I think the bigger issue

23   is why does the Debtor -- what is the compelling need of the

24   Debtor -- what is any need of the Debtor to have any proof of

25   claim filed until after the conclusion of the adversary

1  proceeding?  I don't believe that there is a justification.  Is

2  it because they -- it would be nice to know that information?

3  Well, fine, but the rules provide that where there is a suit

4  and the result is a money judgement that you have 30 days

5  within which -- and I would think that that would be

6  dispositive of it.

7          THE COURT:  All right.

8          MR. HUSTON:  And I think the other thing that we're

9  concerned about is that if individuals with whom the Debtor

10  communicates submit claims without proper qualifications when

11  they actually have a proxy, our Committee, trying to defend

12  them and protect them, that if they make admissions or take

13  inconsistent positions or don't understand a fairly simple

14  qualification as being contingent or without prejudice, et

15  cetera, that I think that that would be significantly

16  injurious.  And again, absent a really justifiable claim on

17  behalf of the Debtor, why should we put those individuals at

18  risk?

19          THE COURT:  Thank you.

20          MR. HUSTON:  Thank you.

21          THE COURT:  Let me go back to Debtor's counsel for a

22  moment and ask the question two different ways.  How will the

23  administration of the estate be enhanced by requiring these

24  claimants to be included in the bar date?  And how would it be

25  hampered by accepting them from the bar date order?

1          MS. CULLER:  Sure, I'd like to start, Your Honor, as

2   counsel's mentioned, he hasn't actually been in contact with

3   all of these Creditors.  We've scheduled a claim for the

4   Creditors, and we want to give the Creditors an opportunity,

5   like all other Creditors in this case, to review the scheduled

6   amount and to determine if they believe the scheduled amount is

7   accurate.  We don't really think that's affected by the

8   adversary proceeding.  Rule 3002(c)(3), which he's asking the

9   Court to follow, only allows a Creditor to file a proof of

10  claim after a judgment in adversary proceeding if a claim is

11  found in favor of the claimant.  If the adversary proceeding is

12  not in favor of this class proof of claim, then 3002(c)(3) does

13  not provide a mechanism for allowing these Creditors to then go

14  back and file a proof of claim.

15      So we've scheduled the claims at this point.  Basically,

16  the claims bar date is simply, in this situation, a way to

17  check our numbers and a way for the Creditors to come forward

18  and make sure that our numbers are accurate.

19          THE COURT:  And -- well, how would you expect them to

20  know better than the administrator?

21          MS. CULLER:  Better than the administrator?  I mean, I

22  would assume, Your Honor, that individuals who put money into

23  these accounts either keep track of it; it's either on their

24  pay stubs or they somehow keep track of it.  Maybe they aren't

25  in a better position, but they should at least be given the

1  opportunity to check the numbers if they are keeping track of

2  how much they put into deferred compensation plans.  I know I

3  know where my money goes.  I would assume that people who are

4  using this mechanism do have an idea of how much money they

5  have in the compensation plans.

6        THE COURT:  But you're a lawyer, you know.

7        MS. CULLER:  No.

8        THE COURT:  We tend to track that stuff.  All right,

9  thank you.  Does anyone else care to be heard?

10        MR. HUSTON:  Your Honor, may I just -- one brief

11  point?  What Rule 3002(c)(3) actually says is not that you have

12  to win, but rather it says that if an unsecured claim which

13  arises in favor of an entity or becomes allowable as the result

14  of a judgment, blah, blah, if the judgement is for the recovery

15  of money or property from that entity or denies or avoids the

16  entity's interest in property.  And what we have asserted on

17  behalf of the claimants is that that fund is not an effective

18  top hat plan, and we assert the interest in that property.  So

19  if we were to lose our case, that would be a judgement that

20  would be avoiding {quote} "the entity's interest in the

21  property," and therefore I think we are absolutely squarely

22  within that rule.

23        THE COURT:  Thank you.

24        MR. INDELICATO:  Your Honor, Mark Indelicato from Hahn

25  & Hessen on behalf of the Committee.  Your Honor, Mr. Huston I

1  think accurately reflected the Committee's position in his

2  opening remarks.  The Committee did not have an objection, per

3  se, but we had some conditions.  I'll go through that, and then

4  I'll explain to you what our concerns are.  And I think I can

5  answer in a little more detail the questions you posed to

6  Debtor's counsel.

7       First off, the Committee does not object to what I would

8  call the representative proof of claim being filed on behalf of

9  these putative parties to the rabbi trust.  The question I

10 have, Your Honor, is what does this representative proof of

11 claim mean?  We're not conceding that they are an authorized

12 class.  We're not conceding that, as counsel, they're

13 authorized, or the steering committee, that they're authorized

14 to file.  But we would concede that they can file it on a

15 representative basis, whatever that's worth.

16      What that means, Your Honor, is that we're gonna probably

17 create more confusion than this is worth.  How will that

18 happen?  Well, first off is if in fact they are not certified

19 as a class, as Mr. Huston said, they might have to file

20 something in 30 days.  So they're not gonna be running at the

21 same parameters of the general bar date.  Other people will be

22 getting notices and it may create more confusion.

23      But more importantly, Your Honor, these are all former

24 employees of the Debtor.  They may have other claims against

25 the estate.  The Committee would not concede that to the extent

1 they didn't file proofs of claim with respect to those other

2 actions or other causes of action, that we should wait for

3 those until after this issue with respect to the rabbi trust is

4 resolved.  So you're going to have a situation where they

5 parties may have multiple bar dates.  Talk about confusions,

6 talk about -- and these are sophisticated individuals.  But to

7 the extent they have any other employee- related claims,

8 they're going to have one bar date.  To the extent they have a

9 claim to this rabbi trust, they're gonna have another bar date.

10 The Debtor has indicated they've already scheduled them.  I

11 think they should be required to file their proofs of claim, or

12 if they don't, Your Honor, they fail to file a proof of claim

13 at their own risk.  The Committee is not conceding that they

14 should be exempt for all purposes.  If the Court rules that

15 they should be exempt for purposes of their interest in the

16 rabbi trust, it's only to the extent they have an interest in

17 the rabbi trust and to the extent, ultimately, it's not

18 certified or there is an adverse judgment and they have to file

19 a proof of claim.  To the extent a proof of claim is not filed,

20 they're gonna be out of luck.  We've seen this happen in other

21 cases, Your Honor.  It makes the claims resolution process very

22 confusing.  It's better off when the claimants have filed their

23 own claims so at least, independently of everything else, they

24 know they have their own proof of claim to rely on.

25       We have found situations where people opt out of the class

1 and then they think they can rely on the class proof of claim

2 or the representative proof of claim to assert their rights.

3 And if they haven't filed another proof of claim, they can't.

4 We've had to address those issues as well.  So we believe

5 including them probably, while it might be a little more

6 confusing now, ultimately for the estate administration it's

7 gonna make it a lot easier for both them and the estate later

8 on down the line.

9       So while we don't object to them filing the representative

10 proof of claim, we just put the warning on the record that they

11 do so with their own -- at their own peril, and in fact, they

12 may be waiving certain rights they have to other claims and put

13 themselves in peril.  In fact, there's adverse rulings with

14 respect to this litigation.

15            THE COURT:  Thank you.

16            MR. INDELICATO:  Thank you.

17            THE COURT:  Mr. Huston, when is it anticipated that

18 the Certification Motion will be filed and be teed up for the

19 Court to hear it in the adversary?

20            MR. HUSTON:  I don't -- I can't give you a specific

21 date, but that is being worked on as we speak.  I mean, we have

22 a pretrial conference, that is the initial pretrial conference

23 is scheduled for August the 7th, and I would hope that we would

24 have the motion teed up, filed and ready to be argued no later

25 than that day.

1        THE COURT:  Well, here's my thought.  My thought is to

2   accept, for now, from application of the bar date to claimants

3   for whatever their claim may be, but without prejudice for the

4   Debtor or the Committee to renew the motion after disposition

5   of the Class Certification Motion in the adversary.

6        MR. HUSTON:  I think that's fair.

7        THE COURT:  Except for the concerns that have been

8   expressed, does anyone see any inherent flaw in that process?

9        MR. HUSTON:  And Your Honor, again, picking up where

10  Mr. Indelicato's -- is this solely with respect to these claims

11  or all claims?

12       THE COURT:  All claims, I think otherwise it will be

13  too confusing, if what you tell me is true.

14       MR. HUSTON:  Well -- and my -- what my response -- I'm

15  gonna leave Your Honor's comments right where they are because

16  my response is going to be to Mr. Indelicato, well, they're

17  already going to get that.  They're already gonna have at least

18  two sets of claims because they're gonna have this scheduled

19  claim for their deferred comp claim, which is gonna come out

20  from, we hope, the Debtor, New Century Financial, and then

21  they're gonna get another proof of claim that comes up, for

22  example, from their employer, which is gonna be a separate

23  Debtor.  So they're already are multiple proofs of claims out

24  there.

25       And the other thing, I'm sure this is not escaped you,

1  some of these people are sophisticated, but some of these

2  people were making $16,000 a year in guaranteed salary and they

3  were out selling mortgages.  I mean, maybe they're more

4  sophisticated -- they're definitely more sophisticated than I

5  am because I could not do that, but I don't think that we're --

6  and that's one of the attacks on the plan is it's not truly a

7  top hat plan because they included a lot of people in that.

8  But again, I think your suggestion makes sense.

9          THE COURT:  All right.

10          MR. INDELICATO:  Your Honor, if I can?  I think the

11  problem is is that I would rather at least have them file

12  proofs of claim for the claims they have already, not related

13  to the top hat plan.  I think to the extent we hold certain

14  employees to a different standard than we hold others, we're

15  gonna create all kinds of confusions.  These employees may be

16  involved in other litigation as well.  There is a potential

17  other class out there as well.  There's a lot of different

18  moving parts, Your Honor, and I think to the extent we start

19  segmenting the employees and their potential claims against the

20  estate, we're gonna create more problems than not.  If, in

21  fact, we want to exclude them out just for purposes of the

22  rabbi trust since those claims have already been scheduled, and

23  that's what Mr. Huston represents them on, I don't think we

24  should exclude them for all other purposes.  I think we should

25  have the Debtor send out the proofs of claim, let them file it.

1 If they include this, so be it, if they don't, well they've got

2 that protection.

3     THE COURT:  But then the risk is run, it seems to me,

4 of the danger that Mr. Huston describes that, you know, they'll

5 say something they shouldn't say and later be -- someone will

6 seek to bind them by that statement.

7     MR. INDELICATO:  Your Honor, either -- as I understand

8 the litigation, either they -- I think the Court used the

9 metaphor before, it's like being pregnant, you can't be a

10 little pregnant.  Either they're going to win and it's an ERISA

11 qualified plan and they're -- it's not property of the estate

12 or they're not, and nothing they say in their proof of claim is

13 going to impact on that because it's not going to be for one

14 person or two person, it's ultimately gonna be a question of

15 law for this Court as to whether it's an ERISA qualified plan.

16 So I don't believe that is an issue.  And I think we could all

17 agree that to the extent there is a designation by an

18 individual as to -- in the proof of claim as to what they think

19 their classification is, it's not gonna be held binding on them

20 as an admission because they are unsophisticated in filing out

21 proofs of claim.  But I would rather have them file that proof

22 of claim for ease of administration later than have all of that

23 confusion.

24     THE COURT:  Thank you.

25     MS. CULLER:  Your Honor, I agree with counsel to the

1  Committee.  I think all of the people in the Deferred

2  Compensation Plan are employees, they'll be getting proofs of

3  claim for other types of action -- for other types of claims.

4  And I think it will be mass confusion if we try to take them

5  out of the bar date notice.  They don't get notice, they're

6  gonna wonder why they didn't get notice.  Mr. Huston only

7  represents them with respect to the Deferred Compensation Plan,

8  and I just have real concerns with --

9       THE COURT:  Well, then I think -- okay.  How about

10  this then.  We accept the putative class claimants from the bar

11  date with respect to the claims involved in the adversary, but

12  not other claims.  It seems to me, however, that there must be

13  some specific notice to employees and former employees which

14  tells them there is this separation and described in such a way

15  that they can understand it.  And I think you should consult

16  with Mr. Huston to develop such language for that notice.  How

17  does that strike the parties?

18       MR. INDELICATO:  That's fine with us, Your Honor.

19       MR. HUSTON:  And for the claimants that's fine, Your

20  Honor.

21       THE COURT:  All right.

22       MR. HUSTON:  I think that's a good solution.

23       MS. CULLER:  Yes, Your Honor, I think that would work.

24       THE COURT:  Okay.  Well if you submit any appropriate

25  order under certification, I'll act upon it.

1        MS. CULLER:  Yes, Your Honor, thank you.

2        THE COURT:  I didn't ask, I don't think, whether

3   anyone else cared to be heard in connection with this matter?

4   No response, okay.

5        MR. MERCHANT:  Your Honor, the final matter on the

6   agenda is agenda item 30, it was the Initial Status Conference

7   in the WARN Act Adversary Proceeding.  With the Court's

8   consent, that Initial Status Conference has been continued to

9   the July 16th hearing.

10        THE COURT:  Okay.  And I just think we ought to cover

11   for the record the fact that the notice listed at #19 in the

12   agenda was subsumed into the consideration of item #27 on the

13   agenda.

14        MR. MERCHANT:  That is correct, Your Honor.

15        THE COURT:  All right, anything further for today?

16        MR. MERCHANT:  That is all we have for today, Your

17   Honor.  Thank you for your time.

18        THE COURT:  All right, thank you all.  That concludes

19   this hearing.  Court is adjourned.

20        (Court adjourned)

21

22

23

24

25

```
 1                        CERTIFICATION
 2  I certify that the foregoing is a correct transcript from the
 3  electronic sound recording of the proceedings in the above-
 4  entitled matter.
 5
 6  Lewis Parham                          7/3/07
 7  _____        _____
 8  Signature of Transcriber              Date
 9
10
11
12
```