IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| **NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,**[1] | Case No. 07-10416 (KJC) |
| **Debtors.** | Jointly Administered |
| | Objection Deadline: July 24, 2007 at 4:00 p.m. |
| | Hearing Date: July 31, 2007 at 1:30 p.m. |

### MOTION TO APPROVE STIPULATION FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT ANY SUCH RELIEF IS REQUIRED, TO ENFORCE INSURANCE POLICY IN FAVOR OF INSURED PERSONS RE DIRECTORS AND OFFICERS LIABILITY INSURANCE

New Century Financial Corporation, a Maryland corporation ("NFC"), New Century TRS Holdings, Inc., a Delaware corporation, and their direct and indirect subsidiaries, each as debtor and debtor in possession in the above-captioned chapter 11 cases (collectively, "Debtors"), respectfully file this motion ("Motion") requesting that the Court approve the stipulation ("Stipulation") by and among certain present and former directors and officers of the Debtors (together with all other present and former directors, officers and employees of any of the Debtors who are now, or in the future, named or otherwise required to incur legal and related expenses covered by the Insurance Policies in actions, including without limitation governmental investigations, "Insured Persons"), the Debtors, and the Official Unsecured Creditors'

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Committee ("Creditors' Committee") granting relief from the automatic stay, to the extent any such relief is required, to enforce the Insured Persons' rights and/or receive payments of policy proceeds up to $5 million in the aggregate for all Insured Persons combined under the Debtors' primary directors, officers and corporate liability insurance policy ("Primary Insurance Policy") with American International Specialty Lines Insurance Company and AIG Domestic Claims, Inc. (together, "Primary Insurer"). A copy of the Stipulation is appended hereto at "Exhibit 1." A Copy of the Primary Insurance Policy is appended as "Exhibit A" to the Stipulation.

## I. JURISDICTION

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND FACTS

1. Prior to commencing these chapter 11 cases on April 2, 2007, the Debtors were one of the largest specialty mortgage finance businesses in the United States. The Debtors originated, purchased, sold, and serviced mortgage loans nationwide. The Debtors historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

2. During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

3. On February 7, 2007, NCF announced that it would restate its quarterly

financial statements for the first, second, and third quarters of 2006 after the Debtors discovered that there may be errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The announcement resulted in the filing of various securities class action lawsuits and shareholder derivative suits.

4. On March 2, 2007, NCF announced that it could not timely file its Annual Report on Form 10-K and that KPMG LLP, NCF's independent auditors, could not complete its audit of NCF's 2006 financial statements until after completion of the internal investigation by NCF's audit committee. NCF also announced that the Securities and Exchange Commission had requested a meeting with NCF to discuss these events and that the United States Attorney's Office had commenced a criminal inquiry.

5. These announcements, together with increased borrower defaults that have adversely affected the subprime mortgage market nationwide, had a devastating impact on the Debtors' business. During the weeks leading up to the commencement of these cases, the Debtors sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

6. The Debtors commenced these cases to complete the process started pre-petition to downsize operations and to pursue an expedited sale of their businesses and assets to maximize value for the benefit of stakeholders.

### III. THE INSURANCE POLICIES

7. Pre-petition, the Debtors purchased the Primary Insurance Policy, which provides up to $10 million in coverage, and four excess directors and officers insurance policies, providing an additional $40 million in coverage, specifically for the benefit of the Debtors and the Insured Persons. Under these policies, the Insured Persons are entitled (i) to have certain legal fees and expenses incurred by the Insured Persons in the defense of actions covered by the policies advanced to them, subject to the insurance providers' right to be repaid to the extent any person is not entitled to such payment under the policies, and (ii) to be reimbursed for certain

other losses they may suffer, including types of damages, judgments and settlements, all up to the maximum limits under the policies.

8. As described above, the Debtors' restated financial statements and other circumstances have resulted in the filing of approximately thirty-five complaints commencing securities class action lawsuits and shareholder derivative suits. Certain of the Insured Persons were named as defendants in the suits. In connection with the suits and other actions covered by the insurance policies, certain Insured Persons have made demand under the Primary Insurance Policy to advance defense costs to them.

9. The Primary Insurer has advised that it is ready and willing to advance defense costs to the Insured Persons. However, it has also advised that it cannot risk exposing itself to liability for violating the automatic stay by extending coverage, in the event it is determined that the proceeds are property of the estates. See Stipulation, para. 7. The Insured Persons have advised that they do not believe the proceeds of the policy are property of the estates. The Creditors' Committee has advised, on the other hand, that it believes the proceeds constitute property of the estates. See Stipulation, para. 7.

10. Following negotiations, the parties have entered into the appended Stipulation requesting relief from the automatic stay, to the extent it may apply, to enforce the Insured Persons' rights and/or receive payments of Defense Costs (as that term is defined in the Primary Insurance Policy) under the Primary Insurance Policy, up to $5 million in the aggregate for all Insured Persons combined. See Stipulation, para. A. As such, the Insured Persons will be able to access up to $5 million of coverage out of a total $50 million in coverage under the Debtors' various directors, officers and corporate liability policies.

11. The Debtors believe this is a fair, sensible resolution of the parties' dispute. Further, the Debtors, the Creditors' Committee, and the Insured Persons have entered into the Stipulation with the understanding that this is only an interim resolution, and that the parties will continue their efforts to negotiate a global resolution regarding all of the Debtors'

directors, officers and corporate liability insurance policies. See Stipulation, para. 8. In addition, the Stipulation provides that counsel for the Insured Persons will deliver to the Debtors and the Creditors' Committee quarterly statements setting forth the defense costs paid under the Stipulation and a description of the status of the suits for which the defense costs were advanced. See Stipulation, para. F.

12. The Debtors submit that, under the circumstances, the Court should approve the Stipulation as an Order of the Court.

### IV. LEGAL ARGUMENT

13. Title 11 of the United States Code ("Bankruptcy Code") section 362(a) provides that the commencement of a bankruptcy case operates as an "automatic stay" of any act to obtain property of the debtor's estate. 11 U.S.C. § 362(a). Bankruptcy Code section 541 provides that a debtor's estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

14. In In re Allied Digital Technologies Corp., 306 B.R. 505 (Bankr. D. Del. 2004) this Court examined whether and to what extent the proceeds of directors and officers insurance policies constitute property of the estate. At one end of the spectrum are instances where the policy provides direct, unsubordinated coverage to the debtor corporation. As such, the proceeds of the policy are clearly property of the estate. Allied, 306 B.R. at 512. At the other end of the spectrum are instances where the policy only provides direct coverage to directors and officers and not to the debtor at all, or where it provides only indemnification coverage to the debtor and indemnifications is purely hypothetical or speculative. Under these circumstances, the proceeds of the policy are not property of the estate. Id. In between these two positions are cases where for the policy covers both directors and officers and the debtor. Under these circumstances, "the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." Id.

15. Assuming insurance proceeds are property of the estate, Bankruptcy Code section 362(d) provides that the Court may grant relief from stay where, as here, "cause" exists to grant such relief. See 11 U.S.C. § 362(d)(1). This Court's opinion in <u>Allied</u> provides further instruction. The policy provided direct coverage to directors and officers, and limited coverage to debtor for indemnification for amounts paid to defendants. <u>Allied</u>, 306 B.R. at 513. The Court held the proceeds of the policies were not property of the estate, but that, even if they were, cause existed to grant relief from stay to permit payment to the directors and officers. <u>Id.</u> The Court explained: "It is not uncommon for courts to grant stay relief to allow payment of defense costs or settlement costs to directors and officers…." <u>Id.</u> It further reasoned: "Without funding, the Individual Defendants will be prevented from conducting a meaningful defense to the Trustee's claims and may suffer substantial and irreparable harm. The directors and officers bargained for this coverage." <u>Id.</u> at 514.

16. In <u>In re Arter & Hadden, L.L.P.</u>, the insurance policy covered both debtor and former Executive and Management Committee members, who demanded coverage. <u>Arter</u>, 335 B.R. 666 (Bankr. N.D. Ohio 2005). The Bankruptcy Court held the proceeds were property of the estate. <u>Arter</u>, 335 B.R. at 674. However, it found there was "cause to lift the automatic stay because the Executive and Management Committee members may suffer substantial and irreparable harm if prevented from exercising their rights to defense payments to fund their defense of the Trustee's Complaint." <u>Id.</u>

17. In the instant case, the Debtors have determined in their business judgment, following negotiation with the Creditors' Committee, that the benefit to the estates from paying out proceeds of the Insurance Policies on an ongoing basis on the terms and conditions set forth in the Stipulation warrant lifting the automatic stay, to the extent it may apply, without determining whether or to what extent the proceeds of the policies may constitute property of the estates.

18. The Insured Persons have represented that they may face irreparable harm

6

if they do not receive access to the proceeds of the Insurance Policies. The parties believe that the negotiated Stipulation is fair, reasonable and in the interest of the estates. See In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998); see also Cosoff v. Rodman (In re W. T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (court should only reject negotiated compromise where it falls "below the lowest point in the range of reasonableness.") (citation omitted). Further, it is well established that the "law favors compromise and not litigation for its own sake." In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986). Accordingly, the Debtors request the that the Court approve the Stipulation as an Order of the Court.

## V. NOTICE

19. Notice of this Motion has been provided to: (i) the Office of the United States Trustee, (ii) the Examiner, (iii) the Creditors' Committee, (iv) the Insured Persons identified in the Stipulation, (v) the Debtors' secured lenders, and (vi) other parties entitled to notice. The Debtors submit that no other or further notice is required.

20. The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice of the United States District Court for the District of Delaware, incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a).

## VI. NO PRIOR REQUEST

21. No prior request for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors request entry of an Order substantially in the form attached hereto as "Exhibit 2": (i) approving the Stipulation as the Order of the Court, and (ii) granting such other relief as the Court deems just and proper.

Dated: July 10, 2007
Wilmington, Delaware

Respectfully submitted,

_/s/ Christopher M. Samis_

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION