## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | |
| **INC., a Delaware corporation, et al.,**[1] | : | **Case No. 07-10416 (KJC)** |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

Hearing Date: July 16, 2007, 1:30 p.m.
Response Deadline: July 11, 2007, 4:00 p.m.

**RESPONSE TO LIMITED OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF HELLER EHRMAN LLP AS SPECIAL COUNSEL TO THE AUDIT SUBCOMMITTEE *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO SECTIONS 327(e) AND 1107(b) OF THE BANKRUPTCY CODE**

Heller Ehrman LLP ("Heller Ehrman"), proposed special counsel to the independent

Subcommittee[2] of the Audit Committee of the Board of Directors of New Century Financial

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

[2] Shortly after the investigation described in this Response began, a subcommittee of the Audit Committee was formed to carry on the investigation. For convenience, this Response refers to the Audit Committee as a shorthand for the board committee responsible for the investigation, initially the Audit Committee and then its subsequently formed investigation subcommittee.

Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century

TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and

debtor-in-possession (collectively, the "Debtors"), submits this response to the June 25, 2007

Limited Objection of the United States Trustee ("UST") to the Debtors' May 1, 2007 Application

for Order Authorizing the Retention and Employment of Heller Ehrman LLP As Special Counsel

to the Audit Subcommittee *Nunc Pro Tunc* to the Petition Date pursuant to Sections 327(e) and

1107(b) of the Bankruptcy Code [Docket No. 495] (the "Application"). This Response, and the

concurrently filed declarations of Donald E. Lange ("Lange Decl."), Michael J. Shepard

("Shepard Decl.") and Michaeline H. Correa ("Correa Decl."), correct the UST's misconceptions

about the nature and scope of the services Heller Ehrman has been engaged to and has performed

for the Audit Committee. In particular, this Response demonstrates that (a) Heller Ehrman's

fully disclosed connections with the Debtors' auditor, KPMG LLP, do not cause Heller Ehrman

to "hold [an] interest adverse to the debtor or the estate with respect to the matter on which

[Heller Ehrman] is to be employed," and (b) in the circumstances presented here, Heller

Ehrman's continued retention post-petition to complete the services *of which Heller Ehrman*

*had already completed substantial performance prepetition*, was and is unequivocally in the

best interest of the estate. Accordingly, the Court should overrule the UST's Objection and

approve Heller Ehrman's employment pursuant to Section 327(e) of the Bankruptcy Code as

requested in the Application.

## I.    LIMITED SCOPE OF, AND BASIS FOR, UST'S OBJECTION

The UST does not object to the Debtors' employment of Heller Ehrman as special

counsel to the Audit Committee for purposes of conducting an investigation into stock sales by

the Debtors' insiders. *See* Objection at fn. 3. Also, the UST does not object to the adequacy of

2

Heller Ehrman's disclosures regarding its connections to parties in interest. Rather, the UST's

limited objection relates solely to that portion of the proposed employment concerning Heller

Ehrman's ability to conduct an unbiased independent investigation of "certain accounting

matters in connection with entries on [NCF's] books, records and financial statements, which

includes the issues giving rise to [NCF's] need to restate its 2006 interim financial statements

and [NCF's] residual interests in securitizations." *See* Objection at ¶ 9 and fn. 3.

The UST's limited objection asserts that Heller Ehrman does not satisfy two of the

criteria for employment as special counsel under section 327(e) of the Bankruptcy Code. First,

the UST contends that "[d]ue to its continuing representation with KPMG, Heller Ehrman holds

an interest adverse to the Debtors' estates with respect to the broad matters on which it is to be

employed." Objection at ¶ 13.[3] Second, the UST asserts that "it is not in the best interests of the

Debtors' estates to employ Heller Ehrman due to the firm's connection with KPMG." Objection

at ¶ 14.

Heller Ehrman was engaged pre-petition to conduct an *internal* investigation of "certain

accounting matters in connection with entries on the Company's books, records and financial

statements" including issues relating to the Company's restatement of its 2006 interim financial

statements and residual interests in securitizations, as well as sales of stock by Company insiders

"other than Michael Sachs." *See* Application, Exhibit A. The focus of such an internal

investigation is (and was here), as its name implies, *internal*, and its essential purpose is to

determine whether the Company and its directors, officers and/or employees have engaged in

---

[3] Heller Ehrman does not represent KPMG in these bankruptcy cases, and the UST does not
allege that Heller Ehrman "represents" an interest adverse to the Debtors or their estates under 11 U.S.C.
§327(e). Accordingly, this Response focuses on the UST's assertion that Heller Ehrman "holds" an
interest adverse to the estate by virtue of its relationship to KPMG in other unrelated matters.

improper conduct and, if so, to suggest corrective measures and discipline.[4] Shepard Decl., ¶ 6.
Heller Ehrman began that investigation, which for obvious reasons the Company and the Audit
Committee considered to be extremely urgent, in March 2007. Lange Decl., ¶ 7.

By the time the Debtors filed their Chapter 11 petitions on April 2, 2007, Heller Ehrman
had completed a substantial portion of its internal investigation of the matters relating to NCF's
financial statements. Shepard Decl., ¶¶ 10-11. The work completed pre-petition included
virtually all of the witness interviews concerning one accounting issue (repurchase reserves), and
a substantial majority of the witness interviews regarding the other accounting issue (valuation of
the residual interest in securitizations). Id., ¶ 11-12. Given the inherent urgency of its
engagement and the oft-expressed sense of urgency of the Debtors and other interested parties
(the Securities and Exchange Commission ("SEC"), the Creditors' Committee, and later the
Examiner), Heller Ehrman was asked to press ahead diligently postpetition to interview the few
remaining witnesses with information concerning the financial statement issues, complete its
investigative procedures and document its investigation.[5] Id., ¶ 14; Lange Decl., ¶ 9. Heller
Ehrman's services are now substantially finished, leaving only a number of written memoranda

---

[4] Largely because internal investigators lack subpoena power, in most instances it is difficult or impossible to gather all the facts necessary to make judgments about the conduct of third parties. For this and other reasons, the assessment of damage claims against third parties is not an inherent part of an internal investigation, although there may be instances in which the law firm conducting the internal investigation has been given that portfolio as well, either at the outset or subsequently. See Shepard Decl., ¶ 6. Generally, the reluctance to evaluate claims against third parties is particularly applicable to the company's outside auditor. Companies conducting internal investigations often wait to consider and pursue claims against their outside auditor until after the internal investigation is completed and any corrective financial disclosure is issued; otherwise the company would be concerned about jeopardizing its ability to obtain the auditor's cooperation in signing off on the financial disclosure, which could in turn delay the company's required public reporting, with extremely harmful consequences to the company. Id.

[5] Post-petition, Heller Ehrman also conducted substantially all of the work relating to the insider trading aspect of the investigation (and which comprised the major part of Heller Ehrman's post-petition services), to which the UST does not object. See Shepard Decl., ¶ 13.

of witness interviews to be completed. Shepard Decl., ¶ 15. Throughout the post-petition period, while the Application has been pending, at the Company's direction Heller Ehrman has provided information and made formal presentations concerning its investigation to the Company and to other appropriate interested parties, including the Committee, the SEC and the Examiner. *Id*., ¶ 14. To the best knowledge of the Debtors and of Heller Ehrman, no party – including the SEC, the Examiner or the Committee, each of which has been briefed on and received the benefit of Heller Ehrman's investigation – has expressed the slightest suggestion that Heller Ehrman's investigation has been anything less than objective, diligent, accurate and professional. *Id*., ¶ 15-16. ¶

The UST fails to acknowledge that Heller Ehrman was engaged to conduct an *internal* investigation – an investigation into NCF's own internal conduct and processes. This is a task which Heller Ehrman unquestionably performed expeditiously, appropriately and effectively, including gathering and producing all available facts regarding KPMG's role in the matters under investigation. In the same vein, the UST's objection ignores that, by agreement of the Audit Committee and the Debtors, and consistent with the nature of an internal investigation, the scope of Heller Ehrman's pre-petition engagement – which under the Application continues unchanged post-petition – explicitly excludes evaluation of or advice concerning any potential liability of or possible claims against KPMG, or the pursuit of any such claims. This perhaps explains why the UST makes the unsupported and factually incorrect assertion, which apparently lies at the core of the UST's objection, that "the fact that Heller Ehrman cannot take positions adverse to KPMG means that a second investigator (e.g., the court-appointed Examiner) will likely have to duplicate all or part of Heller Ehrman's investigation to ensure that KPMG's conduct is properly reviewed." Objection at ¶ 14.

The UST's contention betrays a fundamental misunderstanding of the nature of an internal investigation, which does not inherently focus on possible claims against third parties – whether the company's auditors or others – but rather on the company's own conduct, performance, personnel and systems. Equally mistaken is the UST's prediction, made without a shred of evidentiary support and demonstrably contrary to what has actually happened here while the retention process has played out, that Heller Ehrman's relationship to KPMG means that the internal investigation has been a wasted exercise and will have to be substantially redone because Heller Ehrman could not evaluate or pursue claims against KPMG. To the contrary, at the time these bankruptcy cases were filed, Heller Ehrman was unquestionably in the best position to complete the internal investigation, and it did so professionally and effectively, and in a form in which its results can readily be used by others.

Hence, Heller Ehrman's relationship with KPMG in other, unrelated matters, cannot and does not give Heller Ehrman an adverse interest "with respect to the matter on which [Heller Ehrman] is to be employed." 11 USC § 327(e). And Heller Ehrman's retention to complete the investigation it had begun prepetition was and is in the best interest of the Debtors' estates, given the urgency of the task and the significant disruption and likely loss of ability to complete the investigation effectively had the Debtors changed legal horses mid-stream due to the filing of their Chapter 11 petitions.

## II.    FACTUAL BACKGROUND

### A.    Events Leading Up to the Audit Subcommittee's Need to Retain Heller Ehrman.

Before these Chapter 11 cases were filed, NCF, a Maryland corporation and publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New

6

Century TRS, NCF originated, purchased, sold, and serviced mortgage loans nationwide. NCF

historically focused on "subprime" lending, or lending to individuals whose borrowing needs

were generally not fulfilled by traditional financial institutions because they did not satisfy the

credit, documentation or other underwriting standards prescribed by conventional mortgage

lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began

offering conventional mortgage loans. During the fiscal year ending December 31, 2006, the

Debtors originated or purchased approximately $60 billion of mortgage loans, most of which

were sold in the secondary market. Since their inception, the Debtors have issued or enabled

over $220 billion in loans.

On February 7, 2007, NCF announced that it would restate its consolidated financial

results for the quarters ended March 31, June 30 and September 30, 2006, to correct errors it

discovered in its application of generally accepted accounting principles regarding its allowance

for loan repurchase losses. The announcement resulted in the filing of various securities class

action lawsuits and shareholder derivative suits.

On March 2, 2007, NCF announced in a Form 12b-25 that was filed with the SEC that,

among other things, (i) it could not timely file its Annual Report on Form 10-K; (ii) the Audit

Committee, advised by independent counsel (Heller Ehrman) who were assisted by forensic

accountants (PwC), had initiated its own independent investigation into the issues giving rise to

NCF's need to restate its interim financial statements, as well as issues pertaining to its valuation

of residual interests in securitizations in 2006 and prior periods; (iii) the 2006 Form 10-K would

be filed after the investigation was completed; and (iv) KPMG, NCF's independent registered

public accounting firm, informed NCF that, among other matters, it would need to be informed

of the results of the Audit Committee's investigation before completing its audit. NCF also

announced that the SEC had requested a meeting with NCF to discuss these events and that on

February 28, 2007 it received a letter from the United States Attorney's Office for the Central

District of California (the "USAO") indicating that it was conducting a criminal inquiry under

the federal securities and/or other laws in connection with trading in NCF's securities as well as

accounting errors regarding its allowance for loan losses.

These announcements, together with increased borrower defaults that have adversely

affected the subprime mortgage market nationwide, had a devastating impact on the Debtors'

business, as further detailed in the Application.

### B.    The Audit Committee's Pre-Petition Retention of Heller Ehrman.

In connection with NCF's announcement on February 7, 2007, that it would restate its

financial results for three quarters in 2006, the Audit Committee asked Heller Ehrman to direct

an assessment of NCF's internal controls. Lange Decl., ¶ 4; Shepard Decl., ¶ 2. The Audit

Committee's retention of Heller Ehrman was based on Heller Ehrman's long-term and ongoing

representation of the Audit Committee, which first began in late 1998. *Id.* Shortly thereafter,

Heller Ehrman engaged Pricewaterhouse Coopers ("PwC") to perform that assessment under its

direction (together, "the Investigators"). *Id.*

By early March, as reported on Form 12b-25, the Audit Committee decided to expand the

assessment of NCF's internal controls into a full internal investigation, and again asked Heller

Ehrman to conduct the investigation. Lange Decl., ¶ 5; Shepard Decl., ¶ 3. In conversations

with the Audit Committee, Heller Ehrman reiterated its prior disclosure that it represented and

continues to represent KPMG, NCF's outside auditor,[6] on matters unrelated to NCF or the

investigation. Lange Decl., ¶ 6; Shepard Decl., ¶ 3. Heller Ehrman advised the Audit

---

[6] KPMG resigned as NCF's auditors on April 27, 2007.

Committee that, with the consent of KPMG, Heller Ehrman would pursue the investigation and gather facts without regard to its relationship with KPMG. Lange Decl., ¶ 6, 8; Shepard Decl., ¶ 4. The only limitations Heller Ehrman's relationship with KPMG would impose on the investigation were that Heller Ehrman could not, and did not, advise the Audit Committee on whether it had claims against KPMG, or pursue a claim against KPMG. Lange Decl., ¶ 8; Shepard Decl., ¶¶ 3-5. Heller Ehrman provided assurance that its limited relationship with KPMG would not affect the internal investigation, and that as a matter of professionalism and integrity, as well as to protect Heller Ehrman's and its attorneys' reputations, all information from and about KPMG would be diligently and fairly pursued and reported to the Audit Committee. Shepard Decl., ¶ 6. The Audit Committee deliberated behind closed doors about whether to retain Heller Ehrman under these circumstances, and concluded that it was in the best interest of the Company to do so. Lange Decl., ¶ 7; Shepard Decl., ¶ 5. Heller Ehrman's engagement, which described the express limitations stated above, was formalized in a letter dated March 14, 2007 and signed by Mr. Lange on behalf of the Audit Committee (the "Engagement Letter"). Lange Decl., ¶ 8; Shepard Decl. ¶ 7. (A copy of the Engagement Letter is attached to the Application as Exhibit A.)

After the Debtors filed their bankruptcy petitions on April 2, 2007 (the "Petition Date"), the Audit Committee determined that Heller Ehrman should continue the investigation, which Heller Ehrman did (with the assistance of PwC). Lange Decl., ¶ 9. For a number of reasons, Heller Ehrman was in a unique position to continue and complete the investigation it had started the preceding month:

a.    Heller Ehrman had already conducted the vast majority of the witness interviews relating to financial reporting matters before the Petition Date, but only had time to prepare a

9

small number of witness interview memoranda to memorialize those interviews  As a practical matter, only Heller Ehrman was in a position to immediately use the results of those interviews or to transform the notes of the witness interviews it had conducted before the Petition Date into memoranda which could be used by others.

      b.    Given the extensive work Heller Ehrman had already performed for the Audit Committee before the Petition Date, the Investigators had a designated staff that could proceed with the investigation without spending time learning about the issues under investigation, gaining an understanding of NCF and its business operations, or reviewing key documents that had already been reviewed, as might have been the case had another law firm been retained to complete the investigation following the bankruptcy petition.

      c    Because Heller Ehrman attorneys had already been on-site at NCF for weeks prior to the Petition Date, the Investigators had succeeded in establishing a useful working rapport with several key witnesses whose interviews had not yet been completed.

      d.    These circumstances enabled Heller Ehrman to complete the investigation quickly in an environment where working efficiently was essential:  Heller Ehrman performed its work in the midst of a growing crisis environment at the NCF, which grew out of events such as the undisguised and imminent demise of the Company and the resulting anticipated end of the jobs of the people we wanted to interview, as well as the Company's announcement on March 2, 2007, that it had been informed by the USAO that it was conducting a criminal investigation. These events meant that, as time passed, it became more likely that witnesses would be unwilling to cooperate.  Heller Ehrman's existing knowledge, immediate presence at NCF, and access to personnel meant that once the Audit Committee decided on the scope of the post-petition investigation it wished to conduct, Heller Ehrman was able promptly to interview witnesses

before they resigned or were terminated because of the bankruptcy, or before they decided to retain individual counsel, both of which could hinder the ability to conduct an effective investigation. Lange Decl., ¶ 9; Shepard Decl., ¶ 10.

      C.    **The Work Performed by Heller Ehrman.**

As set forth in the Engagement Letter, the Audit Committee engaged Heller Ehrman to conduct an independent investigation of (i) certain accounting matters in connection with entries on NCF's books, records and financial statements, which included the issues giving rise to NCF's need to restate its 2006 interim financial statements and its valuation of residual interests in securitizations, and (ii) sales of stock by NCF insiders other than Michael Sachs (the "Investigation"). Within the scope of the Investigation, Heller Ehrman ultimately examined three issues: accounting for NCF's repurchase reserve with respect to loans it had originated and sold, accounting for the valuation of NCF's residual interest in securitizations, and disclosure/insider trading issues. The initial focus for the Investigators was an analysis of NCF's accounting for its repurchase reserve, an issue that had first been flagged by NCF's new Chief Financial Officer and that had become the basis for NCF's February 7 2007 announcement that it would be restating certain financial results. Virtually all of the witness interviews focused on this topic were completed before the Petition Date, and the vast majority of the witness interview memoranda were completed after the Petition Date. Shepard Decl., ¶ 11.

During March, in the midst of the investigation into the repurchase reserve, KPMG raised a question about the Company's valuation of its residual interest in pre-2003 securitized loans. *Id.*, ¶ 12. At the direction of the Audit Committee, the investigation was expanded to include KPMG's question and eventually an even fuller analysis of the Company's residual interest valuations. Shepard Decl., ¶ 12; Lange Decl., ¶ 5. To explore this issue, the Investigators

conducted numerous interviews of Company personnel involved in the valuation process and

reviewed documents that outlined the valuation methodology, discussed changes to the

methodology, or discussed the resultant value.   Shepard Decl , ¶ 12.  A large majority of the

witness interviews focused on the repurchase reserve question were conducted before the

Petition Date; substantially all of the witness interview memoranda were completed after the

Petition Date. *Id.*

As they investigated the repurchase reserve and residual interest issues, the Investigators

identified several issues about the Company's finances and performance during 2006 and

evaluated whether the Company had made timely and proper disclosures to investors about those

issues. *Id.*, ¶ 13.  In that same vein, the Investigators examined certain sales of stock by insiders

during 2006 to evaluate whether such sales constituted insider trading. *Id*  The majority of this

work occurred after the Petition Date, and did not concern KPMG in any way. *Id*

In response to inquiries by the SEC and the USAO, Heller Ehrman prepared an oral and

visual presentation, lasting approximately three hours, to report what the Investigators had

learned during the investigation. *Id.*, ¶ 14.  Heller Ehrman and PwC made this presentation to

the SEC and USAO on May 1, 2007, to the Creditors Committee on May 30, 2007, and to the

bankruptcy Examiner (and additional representatives of the Creditors Committee) on June 19,

2007. *Id.*  All of these interested parties (and the Company) have expressed a sense of urgency

about the Investigators completing and communicating the results of the internal investigation.

*Id*

Heller Ehrman has now substantially completed its engagement. *Id.*, ¶ 15.  In addition to

the presentations referred to in the preceding paragraph, Heller Ehrman has completed witness

interview memoranda for more than half of the 65 or so witness interviews conducted in the

course of the internal investigation; the completed memoranda have been delivered to the SEC
and the Examiner. *Id.* At the request of the SEC, and with the authorization of the Company,
Heller Ehrman: has prepared a written report describing the process followed in the internal
investigation, addressing such things as the documents reviewed, search terms employed,
witnesses interviewed, dates of interviews, and other process-related matters; and has delivered
that report to the Examiner, and is delivering it to the SEC today. *Id.* Heller Ehrman is also
preparing a chronology of the events it identified in the investigation concerning the insider
trading and disclosure issues and will deliver it to the SEC and the Examiner in the very near
future when completed. *Id.* The SEC also initially made a request that Heller Ehrman prepare a
written report detailing not just the process but the facts learned in the investigation into insider
trading and disclosure issues; the Company has not yet made a decision on this request, and
Heller Ehrman has asked the SEC to hold off on deciding whether to pursue this request until
after it has reviewed the chronology. *Id.* No interested party has requested a written report of
the internal investigation into the repurchase reserve or residual interest issues (indeed, the SEC
expressed the view that it was satisfied with the oral presentation on the subjects described
above), and therefore, Heller Ehrman does not expect that to be authorized or directed by the
Company to prepare such a written report. *Id.*

The Audit Committee and NCF have advised the SEC, the USAO, and the Examiner that
they will do all that they can to cooperate, including by directing Heller Ehrman to answer any
further questions for information developed during the internal investigation. *Id.*, ¶ 17. Heller
Ehrman, in turn, has continued to provide all its work upon completion to these governmental
agencies and the Examiner, as requested by the SEC, the USAO and the Examiner, despite the

UST's objection to Heller Ehrman's retention, which would have the effect of preventing Heller Ehrman from being compensated for at least a part of that effort. *Id.*

D.    **Debtors' Application to Employ Heller Ehrman as Special Counsel.**

On May 1, 2007, the Debtors filed the Application, seeking authority for the Audit Committee to employ and retain Heller Ehrman *nunc pro tunc* to the Petition Date. Again, in the Application and supporting declaration, Heller Ehrman disclosed all of its known connections, including its representation of Michael Sachs and KPMG in matters unrelated to the Debtors' cases.

On May 23, 2007—three weeks after the Debtors filed the Application—the UST transmitted its <u>first</u> informal request for a more specific description of the work Heller Ehrman has performed or continues to performed for KPMG and Mr. Sachs. Correa Decl., ¶ 6 and Exhibit A. By response correspondence dated May 29, 2007, Heller Ehrman supplemented its initial disclosures of its relationships with KPMG and Mr. Sachs. *Id.*, ¶ 7 and Exhibit B. However, it was not until a telephone conversation between Heller Ehrman and the UST on June 12, 2007—after, due to the urgency associated with this Investigation, and the demands from the SEC and the Creditors' Committee, Heller Ehrman had substantially completed the work it had agreed to perform in its capacity as special counsel—that the UST indicated that it had serious concerns about the retention of Heller Ehrman as special counsel. *Id.*, ¶¶ 8-9. As a result, the UST, Heller Ehrman attorneys, and in some cases, the Debtors' counsel participated in a series of follow-up telephone conferences in which Heller Ehrman attempted to informally provide assurances to satisfy the UST's concerns regarding its ability to conduct a fair investigation of NCF's internal accounting and audit controls. *Id.*, ¶¶ 10-11. On June 25, 2007—almost three months after the Petition Date—that the UST filed its formal limited objection to the Debtors'

employment of Heller Ehrman as special counsel to the Audit Subcommittee, after the hearing

on the Application was continued several times to allow the parties to attempt to informally

resolve the UST's concerns.  *Id.*, ¶ 12.

## III.    ARGUMENT

### A.    Introduction:  Heller Ehrman's Retention As Special Counsel to Conduct the Internal Investigation Is Appropriate Under the Controlling Statute – Bankruptcy Code § 327(e).

As the UST acknowledges, Bankruptcy Code § 327(e) controls Heller Ehrman's

proposed engagement as special counsel.  That section authorizes the continued employment of

pre-petition counsel for the debtor for a "specified special purpose, other than to represent the

trustee in conducting the case."  But in arguing that Heller Ehrman's retention runs afoul of two

elements of § 327(e), the UST's objection confuses the requirements for retention as general

counsel under § 327(a) and ignores important distinctions between that provision and § 327(e),

the special counsel provision.

For example, in asserting that Heller Ehrman holds an adverse interest to the estate based

on its relationship with KPMG in unrelated matters, the UST (a) ignores the crucial modifier to

that language found in § 327(e) but not in § 327(a) – language which limits disabling interests to

adverse interests held by proposed counsel "with respect to the matter as to which counsel is to

be employed," and (b) mischaracterizes the "specified special purpose" for which Heller Ehrman

had been engaged pre-petition (and would continue to be employed) by the Audit Committee,

positing in its place a hypothetical engagement which would be materially different and broader

than what Heller Ehrman had in fact been (and would continue to be) engaged to do.

For another thing, retention under § 327(e) does not require special counsel to be

"disinterested" as is required under § 327(a).  Yet the UST attempts to engraft theoretical

"disinterestedness" considerations based on Heller Ehrman's relationship with KPMG into

15

§ 327(e)'s prohibition against holding adverse interests and its requirement that the retention be in the best interest of the estate,[7] while at the same time ignoring the practical considerations that militate overwhelmingly in favor of Heller Ehrman's retention – not least of which is the detriment to the estate which would have resulted from obtaining new counsel to start anew the internal investigation which Heller Ehrman had already begun, and had well under way, when the Chapter 11 petitions were filed.

For the reasons discussed below, neither of the UST's two asserted specifications of non-compliance with § 327(e) withstand analysis. The Court has discretion to approve Heller Ehrman's retention as special counsel with respect to the internal investigation which Heller Ehrman has already largely completed, and it should exercise that discretion, based on a consideration of all relevant factors, to approve Heller Ehrman's retention as requested. *See Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 406 (Bankr. D. Del. 2005) ("court should consider all relevant facts surrounding the debtor's case, including but not limited to, the nature of the debtor's business, all foreseeable employment of special counsel, the history and relationship between the debtor and the proposed special counsel, the expense of replacement counsel, potential conflicts of interest and the role of general counsel.").

---

[7] See, for example, the UST's assertion that Heller Ehrman's relationship with KPMG would preclude Heller Ehrman's employment as the examiner or as counsel for the examiner. Unlike special counsel employed under §327(e), both an examiner and the examiner's counsel must be disinterested persons, so the UST's attempt to equate those positions to this one is not relevant and of limited, if any, persuasive force.

**B.    Heller Ehrman Does Not Hold Any Interest Adverse to the Debtors or Their Estates With Regard to The Internal Investigation.**

Heller Ehrman's continuing relationship with KPMG in matters unrelated to these Chapter 11 cases does not mean that it holds an interest adverse to the Debtors or their the estates with regard to the matter as to which Heller Ehrman is to be retained – the conduct of the internal investigation. The Bankruptcy Code does not expressly define the term "interest adverse to the estate." *In re Star Broadcasting, Inc.*, 81 B.R. 835, 838 (D.N.J. 1988). The reported cases considering this phrase almost all arise in the context of § 327(a), and they frequently also involve failure to disclose relationships, connections or potential conflicts. As a result, the reported decisions offer little assistance in interpreting and applying this language in the context of special counsel retention under § 327(e), particularly when the modifier "with respect to the matter as to which counsel is to be employed" is added to the mix. Indeed, Heller Ehrman has not found any reported decisions which directly address the circumstances presented here, or which come close to providing controlling, or even helpful, authority in interpreting this language.

Some courts have explained that "to hold an interest adverse to the estate" means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate. *See id.; see also United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504 (3d Cir. 1999) (court disqualified proposed § 327(a) counsel because it had received a preferential payment, which created an actual conflict because the estate had a claim against counsel). In analyzing a professional's retention under § 327(a) – inherently a more stringent standard than under § 327(e) – courts (including the Third Circuit) have

17

interpreted sections 327(a) and (c) of the Bankruptcy Code as (1) imposing a per se disqualification of any attorney who has an actual conflict of interest; (2) allowing, within the court's discretion, disqualification of an attorney who has a potential conflict of interest; and (3) precluding disqualification of an attorney on the appearance of conflict alone. *See In re Marvell Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998). One theme that does emerge from the cases, though, is that this is necessarily a fact-driven inquiry, requiring a consideration of all of the relevant facts and circumstances. *See In re Woodworkers Warehouse, Inc.*, supra, 323 B.R. 403, 406; *see also In re Caldor, Inc.*, 193 B.R. 165, 172 (Bankr. S.D.N.Y. 1996) ("Whether an adverse interest exists is best determined on a case-by-case basis.") [decided under §327(a)]; *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621 (2d Cir. 1999) ("When evaluating proposed retention, a bankruptcy court should exercise its discretionary powers over the approval of professionals in a manner which takes into account the particular facts and circumstances surrounding each case and the proposed retention before making a decision.") [§327(a)]; *Pryor v. Ready & Pontisakos (In re Vouzianas)*, 259 F.3d 103, 107 (2d Cir. 2001) ("Relevant considerations are the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding.") [§327(a)].

In an effort to show that Heller Ehrman holds an interest adverse to the estate, the UST argues that in selecting its counsel to lead the investigation into the prepetition accounting and financial statement issues, the Audit Subcommittee *should have chosen* counsel "free to examine the conduct of relevant parties and potential claims against those parties, no matter where the investigation might lead." Objection at ¶ 13. In making this statement, the UST posits a different engagement than the one for which Heller Ehrman was actually employed. Heller

18

Ehrman was engaged to conduct an ***internal*** investigation of *NCF's* conduct, not (as the UST incorrectly asserts) to look for – and certainly not to pursue – claims against third parties. Shepard Decl., ¶¶ 4-7. The explicit exclusion from the scope of Heller Ehrman's engagement of the evaluation or pursuit of possible claims against KPMG [See Engagement Letter, p. 1] is wholly consistent with the inherent scope of an internal investigation. The discussion of KPMG in the Engagement Letter represents formal notice by Heller Ehrman and a formal recognition by the Audit Committee that Heller Ehrman would not be free to undertake a new, expanded engagement – the identification or pursuit of such claims – should the Audit Committee or others wish to hire Heller Ehrman to do so in the future. Thus, it was notification of a *potential future* conflict that might arise should Heller Ehrman be asked to follow up its internal investigation with an analysis or pursuit of possible claims against one particular third party, KPMG.

The Audit Committee, after thorough consideration of the significance of Heller Ehrman's relationship to KPMG[8] and the future limitation on what Heller Ehrman could do, compared with the advantages of engaging Heller Ehrman (and in particular, its lead lawyer on the engagement, Michael J. Shepard) to proceed with the investigation immediately, decided in March 2007 to engage Heller Ehrman. Lange Decl, ¶¶ 7-8. The UST apparently would have preferred for the Audit Committee to make a different decision and instead select counsel who could have been free to pursue claims against KPMG (at whatever cost to the ability to proceed with and conduct the internal investigation promptly and effectively), but that is a matter of business judgment, not the avoidance of conflicts of interest of the kind addressed by the "no adverse interest" requirement of § 327(e).

---

[8] The Audit Committee was informed that KPMG represented less than one per cent of Heller Ehrman's annual revenues in 2006. Lange Decl., ¶ 7. In fact, fees from KPMG fees represented about one half of one per cent of the Firm's revenues for that year. Shepard Decl., ¶ 4.

The UST also hypothesizes, again without support and contrary to reality, that Heller

Ehrman's relationship to KPMG in other matters *might have interfered* with its conduct of the

internal investigation by affecting the determination of documents to be reviewed, witnesses to

be examined, or questions to be asked. That is simply not the case. Heller Ehrman was free to

conduct the internal investigation thoroughly and completely, and to learn and report the facts

found, and it did so. Given the focus of the internal investigation on NCF's decisions, actions,

personnel and processes, and the exclusion (both inherent and explicit) from the scope of the

engagement of possible claims against KPMG, the possibility that Heller Ehrman would pull

punches to protect KPMG did not even arise, *because Heller Ehrman was not engaged to*

*identify or evaluate claims against KPMG*. Heller Ehrman was free to, and did, seek

information from KPMG in all areas which were relevant to its internal investigation of NCF;

but, lacking subpoena powers, it could not compel KPMG to cooperate (just as no other law firm

conducting the internal investigation would have been able to do). Shepard Decl., ¶ 8. And,

because PwC had more expertise in designing requests for information from other accountants,

PwC performed the bulk of the work in identifying the documents and witnesses sought from

KPMG. *Id.* As Mr. Shepard's declaration makes clear, Heller Ehrman's activities in conducting

the internal investigation and finding and reporting the germane facts were unfettered by any

considerations regarding KPMG, and were instead driven by professionalism and the importance

of preserving the Firm's and Mr. Shepard's own reputations. *Id.*, ¶ 6. Significantly, no

interested party that has been briefed on the investigation or its results – including the Audit

Committee, the SEC, the USAO, the Creditors' Committee or the Examiner – has questioned the

objectivity, diligence or competence of Heller Ehrman's internal investigation.

20

Heller Ehrman has already competently, effectively and loyally performed substantially all of the work it had agreed to perform as special counsel to the Audit Subcommittee under the terms of the Engagement Letter. Shepard Decl., ¶ 15-16. Significantly, a substantial portion of the work Heller Ehrman performed involving KPMG, or that could arguably have been impacted by Heller Ehrman's relationship with KPMG (i.e. accounting issues relating to the repurchase reserve and residual interest valuation, described in Section II.C. above), was performed before the Petition Date. And, finally, the vast majority of all post-petition work performed by Heller Ehrman was unrelated to KPMG.

The UST's objection is based on potential or imagined conflicts. She has not provided (and cannot provide) any specifics to establish that Heller Ehrman has any economic interest or bias that equates to holding an interest adverse to the Debtors or their estates with respect to Heller Ehrman's conduct of the internal investigation, for the simple reason that no such specifics exist. The Court should therefore overrule the UST's contention that Heller Ehrman's employment as special counsel to conduct the internal investigation runs afoul of the "hold no adverse interest" provision of § 327(e).

C.    **Heller Ehrman's Employment Is in the Best Interest of the Debtors' Estates.**

The UST objects that Heller Ehrman's employment to continue and complete the internal investigation is not in the best interests of the estate due to the risk that "a second investigator (e.g., the court-appointed Examiner) will likely have to duplicate all or part of [Heller Ehrman's] investigation." The UST's objection is fundamentally misplaced, because no one will need to duplicate Heller Ehrman's fact-gathering which was, by all accounts, done objectively, diligently and competently, and because Heller Ehrman expressly did not take on the job that the UST would not have wanted it to do to evaluate claims against KPMG. Heller Ehrman conducted as thorough an investigation as was appropriate, and has (or soon will have) recorded all of its work

21

in a fashion that will make it readily usable by the SEC, the USAO and the Examiner. Far from

needing to start over, the SEC, the USAO, the Creditors Committee, and the Examiner all

praised the reports they received, and pressed the Heller Ehrman to learn more about what the

Investigators have done for use in their own investigations, including requesting Heller Ehrman's

work product from the investigation.

Furthermore, the circumstances effectively precluded another law firm from re-creating

the investigation post-petition. Shepard Decl., ¶ 16. Given the timing of the witness interviews

regarding the financial statement issues which Heller Ehrman had conducted – almost all of them

pre-petition – and the need to convert witness interview notes post-petition into the usable form

of written interview memoranda – something that as a practical matter could only be done by the

lawyers who conducted the interviews, and given the further fact that the prospect of getting

cooperative voluntary interviews from many of those witnesses in the post-petition environment,

it is simply unrealistic to think that the investigation could have been re-done by a new law firm

starting after the Petition Date.

The UST's "no benefit to the estate" objection completely overlooks the practical

considerations which ought to inform and decide this analysis – factors such as the disruption,

delay, loss of continuity, probable loss of any meaningful opportunity to obtain information from

many of the witnesses on a cooperative basis, and duplicated expense that would have resulted

from shutting down Heller Ehrman's performance of the internal investigation on April 2 when

the Chapter 11 petitions were filed, in order to engage other counsel to start essentially from

scratch. *See Stapleton v. Woodworkers, supra.* Much of the work product that Heller Ehrman

had developed to that point would have been lost, including raw interview notes and the

knowledge assembled from the review of thousands of documents. A new law firm would have

had to try to recreate lines of communication which Heller Ehrman had already established, both

internally at NCF and with officials at the SEC and the USAO. The delays inherent in that

process would likely have meant the complete loss of any meaningful ability to interview and get

information from many NCF employees on a cooperative basis. Shepard Decl., ¶ 16.

Measured against the hypothetical, virtually non-existent risk of duplication of effort are

the very real costs, burdens and other disadvantages that would have resulted from the Audit

Committee having to engage new counsel to start the internal investigation over again. This

analysis compels the conclusion that the retention of Heller Ehrman under § 327(e) to complete

the internal investigation it had already begun pre-petition was and is in the best interest of the

estate.

## IV.    CONCLUSION

Heller Ehrman does not hold an interest adverse to the Debtors or their estates with

regard to the subject matter of Heller Ehrman's retention – the conduct of an internal

investigation for the Audit Committee. The retention of Heller Ehrman as special counsel to the

Audit Committee on the terms set forth in the Application is in the best interests of the Debtors

and their estates. Accordingly, the Debtors and Heller Ehrman respectfully request that the

Court enter an order overruling the UST's limited objection and granting the relief requested in

the Application, and such other and further relief the Court deems just and proper.

Dated: July _11_, 2007                           Respectfully submitted,

                                                 HELLER EHRMAN LLP

                                                 _____
                                                 Peter J. Benvenutti
                                                 Proposed Special Counsel to the Debtors

23