IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: : | Chapter 11 |
| : | |
| NEW CENTURY TRS HOLDINGS, : | |
| INC., a Delaware corporation, et al., : | Case No. 07-10416 (KJC) |
| : | (Jointly Administered) |
| Debtors. : | |
| | Hearing Date: July 16, 2007, 1:30 p.m. |
| | Response Deadline: July 11, 2007, 4:00 p.m. |

**DECLARATION OF MICHAEL J. SHEPARD IN SUPPORT OF DEBTORS' RESPONSE TO LIMITED OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF HELLER EHRMAN LLP AS SPECIAL COUNSEL TO THE AUDIT SUBCOMMITTEE *NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO SECTIONS 327(e) AND 1107(b) OF THE BANKRUPTCY CODE**

Michael J. Shepard declares:

1. I have been a shareholder in the law firm of Heller Ehrman LLP ("Heller Ehrman" or the "Firm") in 1984 and from 1994 to the present. I am an attorney in good standing in California and Illinois. My CV is attached as Exhibit A. As shown on my CV, from 1984 to 1994, I served in a variety of positions in the United States Department of Justice, including as an Assistant United States Attorney and Chief of the Special Prosecutions Division of the United States Attorney's Office for the Northern District of Illinois (Chicago) (with responsibility for major financial frauds and public corruption cases), as Chief of the Public Integrity Section of the Criminal Division in Washington, D.C., and as interim United States Attorney for the Northern District of Illinois. My private practice primarily consists of white collar criminal defense, internal corporate investigations, and criminal and civil trials. I have frequently been retained to conduct internal investigations into accounting irregularities and other potential

violations of federal securities and criminal laws at companies both large and small. In the American Bar Association's book on Internal Corporate Investigations (entitled <u>Internal Corporate Investigations</u>, Brad D. Brian & Barry F. McNeil, editors, American Bar Association, Section of Litigation 2d ed, 2003), I am the author of the chapter on internal investigations into violations of the securities laws. I know the matters stated herein of my own personal knowledge, except for those matters stated on information and belief, and as to those matters, I believe them to be true. I am competent to testify to the matters stated in this declaration if called upon to do so.

2. On information and belief, the current engagement of Heller Ehrman by New Century Financial Corporation ("NCF" or the "Company") dates back to the Firm's ongoing representation of the Audit Committee of the Company, which began in 1998. On information and belief, in connection with the Company's announcement on February 7, 2007, that it would restate its financial results for three quarters in 2006, the Audit Committee asked Heller Ehrman to direct an assessment of the Company's internal controls. Heller Ehrman engaged Pricewaterhouse Coopers LLP ("PwC") to perform that assessment under its direction (together, "the Investigators").

3. My involvement in the representation of the Audit Committee[1] began in early March 2007, when I was informed that the Audit Committee had decided to expand the

---

[1] At the outset of the investigation, the members of the Audit Committee were outside directors Marilyn Alexander, Donald Lange, Richard Zona and Michael Sachs. Mr. Sachs voluntarily and immediately recused himself in light of issues raised about his own sales of stock, and later resigned from the Audit Committee. Ms. Alexander resigned from the Board during the course of the investigation. Shortly after the investigation began, a subcommittee of the Audit Committee was formed to carry on the investigation, originally consisting of Ms. Alexander, Mr. Lange, Mr. Zona, and the company's two other independent directors: Fred Forster and Harold Black. For convenience, this declaration refers to the Audit Committee as a shorthand for the board committee responsible for the investigation, initially the Audit Committee and then its subsequently formed investigation subcommittee.

2

assessment of the Company's internal controls into an internal investigation. In that context, I was asked to lead Heller Ehrman's efforts in the investigation if the Audit Committee decided to retain Heller Ehrman for that purpose. I communicated with members of the Audit Committee several times during the first half of March about the nature and scope of the contemplated internal investigation and the possible retention of Heller Ehrman for that effort. In particular, I discussed with the Audit Committee the fact that Heller Ehrman had in the past represented, and was currently representing, KPMG LLP, NCF's outside auditor at the time,[2] on matters unrelated to the Company or the investigation. I did so in person and in detail on March 14, 2007, at a meeting attended in person by Mr. Forster and Ms. Alexander, and by phone by Messrs. Lange, Zona and (for part of the time) Black. Among other things, I discussed the pros and cons of retaining Heller Ehrman for the internal investigation.

4. In my discussion with the Audit Committee on March 14, I advised the Audit Committee that, assuming we obtained KPMG's consent (which we in fact obtained shortly thereafter), the Firm would be free to conduct the internal investigation and learn the facts without regard to its relationship with KPMG, subject only to the limitation that the Firm could not advise the Audit Committee or the Company on whether it had claims against KPMG, and the Firm could not pursue a claim against KPMG. I also raised with the Audit Committee the possible contention that Heller Ehrman's relationship with KPMG would adversely affect the objectivity of the investigation into issues involving KPMG, or at least the appearance of objectivity on those issues. As we discussed that issue, I gave my personal assurance that the Firm's relationship with KPMG would not affect at all the manner in which I would conduct the investigation, and that I would diligently and fairly pursue and report on all information from and

---

[2] Upon information and belief, KPMG resigned as NCF's auditors on April 27, 2007.

3

about KPMG; I explained that it was a matter of professionalism and integrity and of preserving my reputation as well as that of the Firm. At some point during or immediately after my comments, I recall the Audit Committee asking me to provide the percentage of the Firm's revenues that came from KPMG. Megan Dixon, one of my partners, made a phone call and obtained this information, which we provided to the Audit Committee. While I do not recall the exact figure we provided, I recall the percentage being very small. In preparing this declaration, I had the numbers checked and determined that in 2006, KPMG accounted for about one-half of one percent of the Firm's annual revenues.

5. After that discussion on March 14, the Heller Ehrman attorneys in attendance were excused by the Audit Committee, which then went into closed session. At the conclusion of the closed session I was informed that the Audit Committee had decided that it would engage Heller Ehrman, under my direction, to perform the internal investigation. By express agreement with the Audit Committee, the scope of Heller Ehrman's engagement to conduct the internal investigation was defined to exclude evaluation of, advice with respect to, or the pursuit of any possible claim against KPMG.

6. I was then, and I remain, confident that Heller Ehrman's representation of KPMG in unrelated matters did not and does not impair Heller Ehrman's ability under my direction to conduct a thorough, complete and effective internal investigation on behalf the Audit Committee. My confidence is based in large part on the nature and focus of an internal investigation. The focus of such an investigation is, as its name implies, *internal*, and its essential purpose is to determine whether the client company and its directors, officers and/or employees have engaged in improper conduct and, if so, to suggest corrective measures and discipline. Largely because internal investigators lack subpoena power, in most instances it is difficult or impossible to

gather all the facts necessary to make judgments about the conduct of third parties. For this and other reasons, the assessment of damage claims against third parties is not an inherent part of an internal investigation, although there may be instances in which the law firm conducting the internal investigation has been given that portfolio as well, either at the outset or subsequently. This reluctance to evaluate claims against third parties is particularly applicable to the company's outside auditor: in my experience, companies conducting internal investigations usually wait to consider and pursue claims against their outside auditor until after the internal investigation is completed and any corrective financial disclosure is issued; otherwise the company would be concerned about jeopardizing its ability to obtain the auditor's cooperation in signing off on the financial disclosure, which could in turn delay the company's required public reporting with extremely harmful consequences to the company. In addition, I firmly believe that my own reputation and professional standing depends on conducting each internal investigation with the highest degree of fairness and integrity, calling the shots as best as I see them. I did so in this investigation without regard to the Firm's representation of KPMG.

7. In any event, the scope of Heller Ehrman's engagement by the Audit Committee expressly excluded consideration of possible claims against KPMG. This scope of engagement was formalized in Heller Ehrman's engagement letter dated March 14, 2007 (the "Engagement Letter"), which was executed on behalf of the Audit Committee by Mr. Donald Lange, an independent director and a member of the Audit Committee who chaired the investigation subcommittee when it was formed. The Engagement Letter also confirms in writing the Firm's prior disclosure of its representation of KPMG LLP on matters unrelated to the Company or the investigation.

8. Heller Ehrman's relationship with KPMG did not alter how and to what degree the Investigators pursued information from or about KPMG. The Investigators asked KPMG for a wide range of documents, and asked KPMG for interviews with its audit personnel to gather information, understand the topics under investigation, and determine who was responsible for the accounting issues, just as they would have from any auditor or percipient party. In fact, because PwC, the forensic accountants who were assisting in the investigation, had more expertise in designing requests for information from other accountants, PwC rather than Heller Ehrman performed the bulk of the work in identifying the documents and witnesses sought from KPMG. Heller Ehrman added any additional documents and witnesses we thought appropriate and did all we could in order to encourage KPMG's compliance with all those requests. Despite the Investigators' requests, KPMG declined to provide information to the Investigators. Without subpoena power, the Investigators had no means to compel KPMG to provide the requested information. In addition to pressing KPMG for information to the best of our ability, we pulled no punches in gathering information about KPMG's conduct from percipient witnesses at the Company, obtaining both statements and documents bearing directly on that issue. As just one illustration of this effort, I note that the Trustee's objection at ¶ 13 questions Heller Ehrman's retention based on the announcement, *which resulted from our investigation,* that "certain of the issues which rendered [the Company's] 2006 financial statements unreliable likely render their *audited* 2005 financial statements unreliable as well." Objection ¶ 13 (emphasis added). The Objection uses this fact to suggest that Heller Ehrman was an inappropriate choice to conduct the internal investigation because the investigation might reflect adversely on KPMG's work on the audited 2005 financial statements. To the contrary, I believe this development demonstrates that

6

Heller Ehrman affirmatively gathered and pursued facts no matter what their impact was on KPMG.

9. During the latter part of March 2007, I was made aware of the possibility that the Company would file for bankruptcy, and I raised with the Audit Committee the question of the effect that a bankruptcy filing might have on the scope of the internal investigation. The filing occurred on April 2, 2007 (the "Petition Date"). Within a short time after the Petition Date, the Audit Committee decided to continue the investigation, defined its scope, and defined what it wanted done. Heller Ehrman implemented those directions.

10. At the time the Audit Committee made that decision, Heller Ehrman was in a unique position to continue and complete the investigation it had started the preceding month.

   a. As described in paragraphs 11 and 12 below, we had conducted the vast majority of the witness interviews relating to financial reporting matters before the Petition Date, but as of the Petition Date had time to prepare only a small number of witness interview memoranda to memorialize those interviews. As a practical matter, only Heller Ehrman was in a position to immediately use the results of those interviews or to transform the notes of the witness interviews it had conducted into memoranda that could be used by others.

   b. Given the extensive work Heller Ehrman had already performed for the Audit Committee before the Petition Date, the Investigators had a designated staff that could proceed with the investigation without the need to spend time learning about the issues under investigation, to gain an understanding of NCF and its business operations, or to review key documents that had already been reviewed, as might have been the case had another law firm been retained to complete the

7

    investigation following the bankruptcy petition.

c. Because Heller Ehrman attorneys had already been on-site at NCF for weeks prior to the Petition Date, the Investigators had succeeded in establishing a useful working rapport with several key witnesses whose interviews had not yet been completed.

d. These circumstances allowed Heller Ehrman to complete the investigation quickly in an environment where working efficiently was essential: NCF was in crisis as a result of events such as the undisguised and imminent demise of the Company and the resulting anticipated end of the jobs of the people we wanted to interview, as well as the Company's announcement on March 2, 2007, that it had been informed by the United States Attorney's Office for the Central District of California (the "USAO") that it was conducting a criminal investigation. These events meant that as time passed it became more unlikely that witnesses would be willing to cooperate in the investigation. Heller Ehrman's existing knowledge, immediate presence at NCF, and access to personnel meant that once the Audit Committee decided on the scope of the post-petition investigation it wished to conduct, Heller Ehrman was able promptly to interview witnesses before they resigned or were terminated because of the bankruptcy, or before they decided to retain individual counsel, both of which could hinder the ability to conduct an effective investigation.

11. The investigation ultimately examined three areas: accounting for NCF's repurchase reserve with respect to loans it had originated and sold, accounting for the valuation of NCF's residual interest in securitizations, and disclosure/insider trading issues. The initial

focus for the Investigators was an analysis of the Company's accounting for its repurchase reserve. Virtually all of the witness interviews focused on this topic were completed before the Petition Date, and the vast majority of the memoranda of those interviews were completed after the Petition Date.

12. During March, in the midst of the investigation into the repurchase reserve, KPMG raised a question about the Company's valuation of its residual interest in pre-2003 securitized loans. At the direction of the Audit Committee, the investigation was expanded to include KPMG's question and eventually an even fuller analysis of the Company's residual interest valuations. To explore this issue, the Investigators conducted numerous interviews of Company personnel involved in the valuation process and reviewed documents that outlined the valuation methodology, discussed changes to the methodology, or discussed the resultant value. A large majority of the witness interviews focused on the repurchase reserve question were conducted before the Petition Date; substantially all of the memoranda of those interviews were completed after the Petition Date.

13. As we investigated the repurchase reserve and residual interest issues, the Investigators identified several issues about the Company's finances and performance during 2006 and evaluated whether the Company had made timely and proper disclosures to investors about those issues. In that same vein, the Investigators examined certain sales of stock by insiders during 2006 to evaluate whether such sales constituted insider trading. The majority of this work occurred after the Petition Date and did not concern KPMG in any way.[3]

---

[3] This estimate of time allocation and the ones in paragraphs 11 and 12 are not meant to suggest that there was no overlap between insider trading and disclosure issues on the one hand and repurchase reserve and residual interest on the other. To the contrary, the Company's calculation of its repurchase reserve and its valuation of its residual interests were two potential sources of inside information, and as a result those subjects were inevitably addressed in certain interviews that focused on insider trading

*(Footnote continued)*

9

14.     In response to inquiries by the Securities and Exchange Commission ("SEC") and the USAO, Heller Ehrman prepared an oral and visual presentation, lasting approximately three hours, to report what the Investigators had learned during the investigation. Heller Ehrman and PwC made this presentation to the SEC and USAO on May 1, 2007, to the Creditors Committee on May 30, 2007, and to the bankruptcy Examiner (and additional representatives of the Creditors Committee) on June 19, 2007. All of these interested parties (and the Company) have expressed a sense of urgency about the Investigators completing and communicating the results of the internal investigation.

15.     Heller Ehrman has now substantially completed its engagement. In addition to the presentations referred to in the preceding paragraph, we have completed witness interview memoranda for more than half of the 65 or so witness interviews conducted in the course of the internal investigation; the completed memoranda have been delivered to the SEC and the Examiner. At the request of the SEC, and with the authorization of the Company, we have prepared a written report describing the process followed in the internal investigation, addressing such things as the documents reviewed, search terms employed, witnesses interviewed, dates of interviews, and other process-related matters; a final copy of that report is being completed and will be delivered to the SEC and the Examiner within the next few days. We are also completing a chronology of the events we identified in our investigation into the insider trading and disclosure issues and will deliver it to the SEC and the Examiner in the next few days as well. The SEC also made a request that we prepare a written report detailing not just the process but

---

issues. In preparing this declaration I asked my colleagues who worked with me in conducting the interviews to make a fair estimate of the portion of our interviews that were focused on the repurchase reserve and residual interest issues, both before and after the Petition Date; they have advised me that the description in this declaration – that virtually all of the interviews focused on the repurchase reserve issue and a large majority of the interviews focused on residual interest were conducted pre-petition – is accurate and, if anything, conservative.

the facts learned in the investigation into insider trading and disclosure issues; the Company has not yet made a decision on this request, and I have asked the SEC to hold off on deciding whether to pursue this request until after it has reviewed the chronology. No interested party has requested a written report of the internal investigation into the repurchase reserve or residual interest issues (indeed, the SEC expressed the view that it was satisfied with the oral presentation on these subjects, described in paragraph 14 above), and I therefore do not expect that we will be authorized or directed by the Company to prepare such a written report.

16. I am convinced there is no need to redo any aspect of the internal investigation, as the U. S. Trustee's objection asserts. We conducted as thorough an investigation as was appropriate, and will have recorded all of our work in a fashion that will make it readily usable by the SEC, the USAO and the Examiner. Far from needing to start over, the SEC, the USAO, the Creditors Committee, and the Examiner all praised the reports they received, and pressed the Firm to learn more about what the Investigators have done for use in their own investigations, including requesting Heller Ehrman's work product from the investigation. In any event, I doubt that the SEC, the USAO, the Examiner (or anyone else) would be able to redo our investigation: with the continued liquidation of the Company, they are far less likely to obtain the level of voluntary cooperation that we obtained, and as a result they are likely to use our work (and their subpoena powers) as a basis for taking the investigation further.

17. The Audit Committee and NCF have advised the SEC, the USAO, and the Examiner that it will do all that it can in cooperating with them, including by directing Heller Ehrman to answer any further questions for information developed during the internal investigation. Heller Ehrman, in turn, has continued to provide all its work upon completion to these governmental agencies and the Examiner, as requested by the SEC, the USAO and the Examiner, despite the UST's objection to allowing the Firm to be compensated for at least part of that effort.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on July 11, 2007.

Michael J. Shepard