# EXHIBIT A

Software Subscription Agreement

Agreement Number 1614

Positive Software Systems, Inc., 14881 Quorum Dr., Suite 440, Dallas, Texas 75240 ("Positive"), is entering into this Software License Agreement ("Agreement") with the following organization or individual ("Customer"): New Century Mortgage, 18400 Von Karman, Ste 1000, Irvine, CA 92612.

Customer wishes to subscribe to software products ("Products" as defined below) from Positive subject to the terms and conditions of this Agreement and the terms of any Product Order ("Order" as defined below) that Customer submits to Positive and Positive accepts.

## 1. DEFINITIONS

- A. "Anniversary Date" means the annual recurrence of the Delivery Date of a Product.

- B. "Delivery Date" means the date a Product is received by Customer from Positive.

- C. "Subscription Term" means the period as set forth in section 3 hereof.

- D. "Confidential Information" means any materials delivered to the other party or information disclosed to it under this Agreement, all information that has or could have commercial value or other utility in the business or prospective business of a party or its subsidiaries or affiliates, and all information of which unauthorized disclosure could be detrimental to the interests of a party or its subsidiaries or affiliates whether or not such information is identified as confidential information, except any such information which (I) was rightfully in one party's possession prior to disclosure by the other party; (II) was rightfully obtained by a party from a third party who lawfully developed the information independently of the other party or obtained such information under conditions which did not require that it be held in confidence; (III) was independently developed by a party without use of or reference to any other Confidential Information; or (iv) was, at the time of disclosure or thereafter becomes, through no act or failure to act on the part of a party, generally available to the public.

  By example and without limitation, Confidential Information includes but is not limited to any and all information of the following or similar nature, whether transmitted verbally, electronically or in writing: copyright, service mark and trademark registrations and applications, patents and patent applications, licenses, agreements, unique and special methods, techniques, procedures, processes, routines, formulas, know-how, trade secrets, innovations, inventions, discoveries, improvements, research or development and test results, research papers, specifications, technical data and/or information, software, quality control and manufacturing procedures, formats, plans, sketches, drawings, models, customer lists, customer and supplier identities and characteristics, sales figures, pricing information, marketing plans, strategies, forecasts, financial information and projections, budgets, business plans and objectives, concepts, ideas and any other information or procedures that are treated as or designated secret or confidential by Positive

- E. "Regular Maintenance" means the provision by Positive during the applicable period as stated in Exhibit B and attached hereto, in exchange for payment by Customer of the applicable Regular Maintenance fees as stated in Exhibit A and attached hereto, of (i) reasonable telephone support, (ii) any corrections and/or bug fixes made to a licensed Product, including such maintenance as may be required to ensure that the Product complies with requirements of Section 6(E).

- F. "Other Maintenance" means the provision by Positive during the applicable period as stated in Exhibit B and attached hereto, in exchange for payment by Customer of the applicable Maintenance fees as stated in Exhibit A and attached hereto.

(END OF PAGE)

G. "Installation Services" and "Professional Services" means the provision by Positive as stated in Exhibit C and attached hereto, in exchange for payment by Customer of the applicable Installation/Professional Services fees as stated in Exhibit A and attached hereto.

H. "Orders" for Product licenses may be submitted by Customer in a form reasonably acceptable to Positive. Any Orders shall expressly incorporate the terms and conditions of this Agreement, must be signed by Customer, are subject to acceptance by Positive and upon acceptance shall be attached hereto. The initial Order is attached hereto as Exhibit "A".

I. "License" means a license, which has a term commencing on the Delivery Date of a Product and continuing in perpetuity, subject to the terms of this Agreement.

J. "Product" means a software program product(s) identified in the Order.

K. "Renewal Date" is December 31st of every consecutive year.

L. "User License" means a non-assignable, non-exclusive right and license, without the right to grant sub-licenses, to use the Product, solely for Customer's own internal business purposes, on any Customer owned workstation in North America, which license is granted pursuant to this Agreement and which has a term commencing on the Delivery Date of a Product and continuing for the duration of the Subscription Term, subject to the terms of this Agreement. Each user must have its own license.

M. "Branch" means a remote business unit of Customer (up to 10 employees)

N. "Call-Center" means a business unit of Customer integrated with a dialer equipment and responsible for outbound / inbound telemarketing.

## 2. GRANT

Upon issuance of an Order by Customer and acceptance of the Order by Positive, Positive grants to Customer, and Customer accepts from Positive, a perpetual, non-assignable, non-exclusive right and license, without the right to grant sub-licenses, to use, solely for Customer's own internal business purposes, each Product set forth on each Order, subject to the terms of this Agreement. The Software ordered is identified as either "Server" software or "Client" software. Server Software is defined as software installed on a networked file server that permits access to the software through a local area network, wide area network or other telecommunication channels including the Internet. Client Software is defined as software installed on a personal computer central processing unit which is not a file server. Customer's use of Server Software may be only on a single file server which is accessible only by the number of remote computers identified in the Order. The software shall be deemed "accessible" if it may be executed and called into resident memory by a linked computer, whether or not it is actually so accessed. Client Software may only be used on the single computer central processing unit on which it is installed and may not be used or accessed by other workstations. Customer may reproduce, at no additional charge, for disaster recovery purposes, a reasonable number of copies of the Product. Customer will reproduce all confidentiality and proprietary notices on the Product and maintain an accurate record of the location of each copy of the Product. This license is for the executable code version of the Product only.

## 3. SUBSCRIPTION TERM

Unless otherwise terminated or canceled under the provisions of this Agreement, the term of this Agreement and each User License shall be for a two (2) year period commencing on the date of execution hereof by Positive. This Agreement will automatically be extended for additional one (1) year periods unless terminated with ninety (90) days written notice by the Customer. Any renewal shall be based on the same terms and conditions as set forth herein except for reasonable adjustment for pricing, if necessary, which shall be negotiated by the parties in good faith. Such price adjustment shall not be increased more than five (5%) percent per annum. Any such adjustments must be set forth in writing as an Addendum to this Agreement.

(END OF PAGE)

## 4. MAINTENANCE / UPGRADES

A. Positive will provide Regular Maintenance to Customer based on the same terms and costs outlined by the Software License Agreement(s) previously executed by both parties. Positive will provide Subscription Upgrades to Customer at no additional charge for the Subscription Term for each User License granted hereunder; provided, however, that Positive receives from the Customer all applicable annual Maintenance and Subscription fees by the Renewal Date. Cost for Regular Maintenance for all User Licenses will remain active for renewal under the terms of the previous Software License Agreement(s). Upon payment of a Product Order for Product Subscription, as applicable, Customer will receive the Subscription Upgrades, which shall commence on the first (1st) day after the Delivery Date of the Product and shall end on Renewal Date. Subsequently Product Maintenance and Subscription shall automatically renew annually on the Renewal Date for successive one (1) year terms under the then current fees; provided, however, that Customer may terminate Product Maintenance or Product Subscription for any Product licensed by providing written notification to Positive at least ninety (90) days prior to the next Renewal Date. Upon termination of Product Subscription, all User Licenses to subscribed version(s) of the Product will terminate. Positive may terminate its Product Subscription and Maintenance obligations upon material breach by Customer of any of its obligations; under this Agreement, which remain incurred thirty (30) days after Customer has received written notice from Positive of the breach. If Customer modifies any Product and it is determined by Positive that such modification has caused a malfunction in the Product, Positive shall not be obligated to provide Maintenance for the modified Product. Positive will provide Customer written notice of the maintenance and product subscription fees for any renewal term not less than ninety (90) days prior to the Renewal Date. Additional charges may be applicable if support service is provided as a result of the following: fire, natural disaster, neglect, misuse, abuse, war, unauthorized modifications, non-Product approved hardware or software, changes or failures in the telephony network, desktop or host computer environments; or damage resulting from environmental considerations such as electrical power, heat, cold, or humidity.

(END OF PAGE)

3

5. TERMS OF PAYMENT

    A.    <u>Installation/Professional Service Fees</u>. 50 % of Professional Service Fees will be due upon execution hereof. 50% of Professional Service Fees will be due upon installation.

    B.    <u>Annual Subscription Payments</u>. 100% of Subscription Fee, as defined by Schedule A, will be due upon execution hereof. Subscription payment per each user based on number of licensed users as defined by Schedule A and agreed by this Agreement shall be payable annually of the Subscription Renewal Date; provided however, that no renewal for Subscription Fee shall be due until December 31st, 2001.

    C.    <u>Travel and Expenses Fees</u>. 100% of Travel and Expenses will be due within thirty (30) days from date of receipt of an invoice. Positive agrees to adopt Customer's internal travel policy. Customer agrees to grant Positive flexibility and authority to book full fare air tickets, limited to coach service. Round-Trip air travel must be counted and billed as one consulting man-day per person traveling.

    D.    <u>Service Charges/Taxes</u>. Service charges in the amount of the lesser of the maximum rate permitted by law or one and one-half percent (1-1/2%) per month, may accrue on all accounts past due by more than thirty (30) days. Customer agrees to be responsible for and to pay any sales, personal property, use, VAT, excise, withholding or any other taxes that may be imposed, based on the license, use or possession of any Product licensed hereunder, excluding taxes based upon net income payable by Positive. Customer agrees to make direct payment of such taxes or reimburse Positive for payments it makes on behalf of Customer.

6. LIABILITY/WARRANTY

    A. Positive warrants that it has the right to license any Product licensed hereunder. Positive also warrants that the licensed Product does not infringe on any patent, trademark, trade secret or copyright of a third party arising under the laws of the United States of America and Positive hereby agrees to indemnify, protect, defend, and hold Customer harmless from all claims, suits, actions, losses, damages, judgments, costs and expenses which may be sustained by Customer for an infringement of any such patent, trademark, trade secret, or copyright by Positive; provided that (i) Customer gives prompt written notice of any suit to Positive, and (ii) Positive shall have sole control of the defense of any action or claim and all negotiations for settlement or compromise thereof. Customer may elect to participate in any such action with an attorney of its own choice and at its own expense. In the event Customer is precluded by a court of competent jurisdiction from using a Product as a result of the infringement by Positive of any patent, trademark, trade secret, or copyright of a third party, Positive may, in its reasonable discretion, (i) obtain the right to use the Product for the Customer, or (ii) replace or modify the Product so that it no longer infringes, or (iii) if neither (i) or (ii) above is commercially feasible, in Positive's reasonable discretion, then Positive may terminate the License for the affected Product and issue to Customer a pro-rata refund of the License fees paid by Customer based on a useful life of five (5) years. If Customer does not notify Positive, as required herein, Customer's rights under this Section shall terminate.

    B. Positive warrants that the Product is designed to be used prior to, during and after the calendar year 2000 A.D. and will manage and manipulate data involving dates, including single century formulas and multi-century formulas, or formulas involving any combination of the year 2000 and/or prior dates and/or subsequent dates, and will not cause an abnormally ending scenario within the application or generate incorrect values or invalid results involving such dates, specifically including date data which represents or references different centuries or more than one century.

    C. Customer agrees that, except as provided in Paragraph A and B above, Positive's liability for direct damages, if any, shall not exceed the initial License fees paid to Positive by Customer for use of the Product(s) under this Agreement.

    D. No action, regardless of form, arising out of this Agreement may be brought by either party more than two (2) years after the injured party has knowledge of the occurrence, which gives rise to the cause of action.

(END OF PAGE)

F. THE FOREGOING CONDITIONS AND WARRANTIES ARE IN LIEU OF ALL OTHER CONDITIONS, REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, BY POSITIVE OR ANY OTHER PARTY INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. WITH THE EXCEPTION OF POSITIVE'S LIABILITY AS SET FORTH IN SECTION 6(A) AND 6(B), POSITIVE SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, IN CONNECTION WITH OR ARISING FROM THE FURNISHING, PERFORMANCE, OR USE OF THE PRODUCT (S) OR SERVICES PROVIDED HEREIN, REGARDLESS OF ANY LAW AND/OR REGULATION WHICH STATES OTHERWISE.

7. NONDISCLOSURE

A. Both Parties agree to receive and hold in confidence and not disclose in any manner to third parties (other than consultants under contract with Customer, provided the consultant agrees in writing to be bound by the restrictions on use and disclosure as set forth herein) any Product or any other materials delivered to a party or information disclosed by the other party (collectively the "Confidential Information") by a party under any License. A Party shall use any Confidential Information only internally within its own company in the pursuit of its own internal business interests. A Party shall not sell, lease, license or otherwise transfer, with or without consideration, any Confidential Information to any third party or permit any third party (other than a consultant as set forth above) to reproduce or copy or otherwise use or see any Confidential Information in any form and shall use all reasonable efforts to ensure that no improper or unauthorized use of any Confidential Information is made. In addition, Customer agrees that it will not reverse engineer, decompile or derive the source code of any Product. Customer acknowledges that the Product is considered the Confidential Information of the other party. Positive agrees to escrow the source code of the Product with a mutually agreeable third party to be released to the Customer in the event Positive ceases to maintain the Product or becomes insolvent or subject to a bankruptcy proceeding.

B. Customer shall provide reasonable assistance to Positive in the prosecution of any third parties who violate any of Positive's rights under this Agreement and the Software License Agreement or rights provided by law with respect to any Product licensed hereunder to Customer. Positive shall bear any associated cost and expense provided that such violation is not the result of a breach by Customer of its obligations hereunder. Customer shall not have any obligation to hold any information in confidence if the information was (1) rightfully disclosed to Customer without any obligation to keep such information confidential prior to execution of this Agreement, (2) in the public domain through no fault of Customer, or (3) is developed by Customer independently of any proprietary information contained in the Confidential Information.

C. Customer agrees that all Confidential Information is valuable, confidential and proprietary property of Positive and shall remain the exclusive property of Positive. Nothing in this Agreement shall be construed as granting any rights to Customer, by license or otherwise, to any Confidential Information.

D. In addition to the provisions of Section 13 hereof regarding return of Products upon termination of this Agreement, Customer agrees to return to Positive, or promptly destroy at the direction of Positive, at any time upon request of Positive for any reason, any other Confidential Information, including any source of electronic information and all records, notes, documents, drawings, prototypes, specifications, programs, data, devices and all other materials containing or pertaining to any Confidential Information.

E. In the event that Customer is requested in any proceeding to disclose any Confidential Information, Customer shall give Positive prompt notice of such request so that Positive may seek an appropriate protective order. If, in the absence of a protective order, Customer is nonetheless compelled to disclose such Confidential Information, Customer may disclose such information to the extent compelled to do so in such proceeding without liability hereunder; provided, however, Customer shall give Positive written notice of the information to be disclosed as far in advance of its disclosure as is practicable and use its best efforts to obtain assurances that confidential treatment will be accorded to such information. Customer shall provide reasonable assistance to Positive in the prosecution of any third parties who violate any of Positive's rights under this Agreement or rights provided by law with respect to any Product licensed hereunder to Customer. Positive shall bear any associated cost and expense; provided that such violation is not the result of a breach by Customer of its obligations hereunder.

(END OF PAGE)

F. Customer understands and acknowledges that any disclosure or misappropriation of any Confidential Information in violation of this Agreement may cause Positive irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Positive shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as Company shall deem appropriate. Such right of Positive is to be in addition to the remedies otherwise available to Positive at law or in equity. Customer expressly waives the defense that a remedy in damages will be adequate and any requirement for the posting of a bond by Positive in an action for specific performance or injunction. Customer hereby agrees to indemnify Positive against any and all losses, damages, claims, expenses and attorneys' fees and costs incurred or suffered by Positive as a result of any breach of this Agreement by Customer or in connection with the enforcement of Customer's obligations hereunder. Customer agrees that any violation of any covenant herein shall be deemed an attempt to circumvent Positive, and if Customer is determined to be delinquent hereunder, Customer shall, without recourse, pay to Positive, its assignees or designees, the greater of (a) double the total of all fees and payments which would have been due to Positive under the term of this Agreement, had there been no circumvention, or (b) the sum of United States Dollars two hundred fifty thousand ($US250,000), in addition to all court costs, lawyers fees, travel expenses and any other charges deemed appropriate by the courts or arbitrators appointed thereby.

G. Customer agrees that Positive may use Customer as a reference for the Product and for Positive. Upon reasonable notice, Customer will accept calls and provide references to prospective customers and product reviewers. Customer shall permit five (5) on-site demonstrations of the product per quarter upon request by Positive provided that the site visit is scheduled during regular business hours and is an acceptable time for Customer. Such prospect shall be required to execute a non-disclosure agreement in connection with such demonstration covering such demonstration and any other information learned while on Customer's premises.

## 8. AUDIT

Positive reserves the right to periodically audit Customer to ensure that Customer is not using any Positive Product in violation of this Agreement or any Order. During Customer's standard business hours and upon prior written notice, Positive may visit Customer and request that Customer make available any records pertaining to the Product to Positive. The cost of any requested audit would be solely borne by Positive.

## 9. GOVERNING LAW

This Agreement, including any Order, shall for all purposes be deemed subject to the laws of the State of Texas, USA.

## 10. SEVERABILITY; WAIVER

In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect, such enforceability shall not affect any other provision of this Agreement, and this Agreement shall then be construed as if such unenforceable provision(s) had never been contained herein. No term or provision hereof shall be deemed waived and no breach consented to unless such waiver or consent shall be in writing and signed by both parties.

## 11. ASSIGNMENT

Neither Positive nor Customer may assign this Agreement or any Order or otherwise convey any rights or obligations under this Agreement without the prior consent of the other party which consent shall not be unreasonable withheld. Notwithstanding the foregoing, Town and Country Credit shall have the right to assign to an affiliate or subsidiary without consent from Positive. A reorganization, merger, sale, partnership change, assignment, transfer or hypothecation of any partnership or other ownership interest in Customer shall not be deemed an assignment or sublease under the agreement. Neither the use by, nor subletting to, any subsidiary or affiliate of Customer of all of a portion of this agreement shall be deemed an assignment under the agreement.

## 12. NOTICE

Any notice or other communication required or permitted hereunder shall be given in writing to the other party at such address as shall be given by either party to the other in writing. Such notice shall be deemed to have been given when (i) delivered personally, (ii) sent via certified mail (return receipt requested) (iii) sent via cable, telegram, telex, telecopier, fax (all with confirmation of receipt), or (iv) by recognized air courier service.

6

### 13. TERMS AND TERMINATION

The terms of this Agreement shall commence on the date it is executed by Positive and shall continue in effect until terminated as provided herein. Any License for a Product may be terminated by Positive in the event that Customer is in default under any License hereunder subject to Customer's right to cure under Section 6 hereof. Upon termination of any License hereunder, Customer shall return the Product and any copies made pursuant to Section (2) and all related documentation to Positive. The provisions of Sections 5—12 and 15 shall survive termination of this Agreement or any individual License.

### 14. ATTORNEY FEE'S

If any action at law or in equity is brought to enforce or interpret the provisions of the Agreement, the prevailing party in such action shall be awarded its attorneys' fees and costs incurred, which shall be payable whether or not such action is prosecuted to judgment

### 15. ARBITRATION.

If any of the Parties disagree with respect to whether any of the other Parties have breached any of the terms or conditions of this Agreement, or if the Parties have a controversy, claim or dispute arising out of or related to the terms and conditions of this Agreement, the disagreement shall be settled by binding arbitration in accordance with the Federal Arbitration Act ("FAA"). The Party who demands arbitration will give written notice to the other Party of the claim, controversy, monetary demand, and requested relief at the time of its written notice to the other Party of its intention to invoke arbitration. The Party receiving notice of intention to invoke arbitration will respond in writing to the claim or controversy within thirty (30) days and assert its counterclaims, if any. Upon receipt of the notice of intention to invoke arbitration, the Parties shall work together to agree upon an arbitrator. If within forty-five (45) days of notice of arbitration, the Parties are unable to reach an agreement as to an arbitrator, then the American Arbitration Association ("AAA") shall have the sole authority to appoint an arbitrator. However, the arbitrator shall be an attorney licensed in Texas. The Parties agree that arbitration will take place in Dallas, Texas.
The arbitrator so selected shall then diligently conduct an arbitration proceeding in accordance with the FAA and AAA. The decision of the arbitrator shall be final and conclusive upon the Parties, and a judgment upon the award may be entered in any court having jurisdiction. Each Party expressly acknowledges that the other Party has the right to undertake reasonable, but limited, discovery procedures in connection with the arbitration proceeding in the manner provided by the Texas Rules of Civil Procedure, and that each Party has the right to be represented by legal counsel throughout the arbitration proceeding. All issues regarding discovery procedures and requests shall be decided by the arbitrator. All documents in connection with any arbitration conducted shall be confidential, and shall not be disclosed to any third party, except as may be necessary for enforcement of the arbitration decision or for a proper appeal or except as otherwise required by law. The arbitrator shall determine the rights and obligations of the Parties according to the procedural and substantive law of the State of Texas. The arbitrator shall have the authority to award any remedy or relief that a Texas state court or federal court could order or grant.

(END OF PAGE)

## 16. ENTIRE AGREEMENT

The Agreement and the applicable Order(s) constitute the entire agreement between the parties for a License to use a Product, and will become binding upon Positive when signed by an authorized representative of Positive. Positive shall not be bound by any additional provisions that may appear in Customer's purchase order, acknowledgement of the purchase order, or any other communication between Customer and Positive. There are no understandings, agreements or representations not specified herein or in any Order with respect to a License or a Product licensed hereunder. This Agreement or any Order may not be modified, except by a written addendum signed by duly authorized representatives of both parties.

**BY SIGNING BELOW, BOTH PARTIES AGREE TO ALL THE TERMS AND CONDITIONS SET FORTH HEREIN.**

| For Positive Software Systems, Inc.: | For Customer: |
|---|---|
| By: _____ (Authorized Signature) | By: _____[signed]_____ (Authorized Signature) |
| _____ (Typed Name) | Kirk Redding (Typed Name) |
| _____ (Title)       _____ (Date) | Pres - Retmic Central (Title)   2/5/02 (Date) |

8

EXHIBIT "A"

INITIAL ORDER

Customer orders those items initialed below by Positive and agrees to pay the related amounts:

| Extended Cost | Products (Initial Quantity) | | Initials |
|---|---|---|---|
| $no charge | LoanForce Admin | 5 users | (L) |
| $no charge | Davox OCX | 140 users | (W) |
| (P) ~~$4,725.00~~ | ~~LoanForce Product Subscription 140 users Prorated (October 1st – December 31st 2000)~~ | | |
| (W) ~~$18,900.00~~ | ~~LoanForce Product Subscription 140 users (annual) $135 per user (January 1st – December 31st 2001)~~ | | |
| $_____ | TeleTrend Toolkit | __ users | |

| Extended Cost | Maintenance | | Initials |
|---|---|---|---|
| _____ | DB Star, 1 contact, | | _____ |
| _____ | DB Star / Customize | ____ years | _____ |
| _____ | Silver Maintenance | ____ years | _____ |
| _____ | Gold Maintenance | ____ years | _____ |
| _____ | Regular Maintenance | 1 contact | _____ |

| Extended Cost | Other | | Initials |
|---|---|---|---|
| (P) ~~$33,000.00~~ | ~~Professional Services~~ (W) | | _____ |
| _____ | Extended Professional Services | | _____ |

For Positive Software Systems, Inc.:                For Customer:

By: _____           By: _____
      (Authorized Signature)                                           (Authorized Signature)

_____                    _____
              (Typed Name)                                                      (Typed Name)

_____  _____                 _____  _____
     (Title)                    (Date)                              (Title)                    (Date)

9

## EXHIBIT "B"

## MAINTENANCE

**Maintenance**

As outlined by the previously executed Software License Agreement(s).

# EXHIBIT "C"

## INSTALLATION/PROFESSIONAL SERVICES

### Installation Services

Integration of Existing Components – 11.5 Man Days (billing for 7 man-days)

- Existing Screens - 2
- Campaign Filters - .5
- Disposition Grouping .5
- Import and Suppression Rules - 1
- Export Rules - .5
- OCX Telephony - .5
- Table Definitions (Product, Marketing Source, List) - .5
- Sales Validation Rules Definition - .5
- Reports – 2
- SQL Data Types – 1.5
- DNS Configure - .5
- Credit Bureau - .5
- Scripts – 1

On-Site Installation, Testing and Training                    - 12 man-days
- SQL Server 7 Install and Configure
- SQL Schema and Data Conversion
- OCX Agent Component Install
- Dialing Functionality Testing
- DNS Import and Configure
- Agents Setup
- Credit Bureau Testing
- Training
- Production Testing

### Extended Services

- Develop 4 New User Screens upon customer specifications – 4 man-days
- Schedule Callbacks with Davox integration (requires assistance from Davox) – 2 man-days

### Ongoing Services
Following services may be ordered at any time during the term of the Subscription Agreement for additional cost:

- Screen Development/Modification - $750.00 per screen.
- File Formats Creation/Modification - $500.00 per format.
- Report Development - $1000.00 per report.

Agrcon58