# EXHIBIT B

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR 2 8 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| POSITIVE SOFTWARE SOLUTIONS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:03-CV-0257-N |
| NEW CENTURY MORTGAGE CORPORATION, *et al.*, | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Positive Software Solutions, Inc.'s ("Positive Software") motion for preliminary injunction and impoundment under the Copyright Act and Defendants' motions to compel arbitration. Defendant New Century Mortgage Corporation ("New Century") has recently advised the Court of certain conduct from which it is willing to abstain in the future (although it did not agree to entry of an injunction); the Court grants Positive Software injunctive relief to that extent. The Court also compels arbitration of the balance of Positive Software's claims.

## I. BACKGROUND

New Century is in the mortgage business. It generates business through telephone contacts with prospective borrowers. Positive Software developed a software product called "LoanForce," which provides automated support for that process, in conjunction with other

third-party supplied software. New Century licensed LoanForce from Positive Software (the "Software Subscription Agreement" or "SSA").

The information collected by the users of LoanForce and generated by the operation of Loan Force is collected and saved in an aggregation of data called a database.[1] LoanForce interacts with the database through third party software. LoanForce communicates with the database software through statements written in Structured Query Language ("SQL"). In order for the LoanForce software to interact correctly with the database, a description of the arrangement of the database, i.e., the composition of the various tables and fields and the types of data contained in each field, is included in SQL statements within the LoanForce source code (the "SQL Data Structures").[2]

In late 2002 and early 2003, Positive Software became aware of a new software package that New Century was using called LoanTrack, together with what are apparently

---

[1]A database is not simply a shoe box into which all the information is thrown. It is, rather, a very structured hierarchy of information. For example, a relational database of related information may comprise multiple tables, each of which is divided into multiple rows, each of which is divided into multiple columns or fields, where all the rows in a given table each contain the same collection of fields or columns. For example, a database for mortgage-related telephone contacts might include: a customer table, where each customer is listed on a row with fields for customer ID number, name, etc.; a telephone call table, where each row describes a specific phone call with a customer, with appropriate fields to capture pertinent information regarding that call; a loan table, where each row describes a specific loan to a customer; and so on. If a column for customer ID number is included in every table, then the tables can all relate to each other through that common field. This is obviously not a technical or complete description of a database, but is sufficient for the matters at hand.

[2]In particular, they are SQL Create Table statements.

databases called LFMoon and LTKMoon (collectively, "LoanTrack-1"). Although Positive Software was not aware of the fact at the time, it presently appears that LoanTrack-1 was an interim product that New Century intended to use as it made a transition away from LoanForce to new products called LoanTrack-2 and MLAS, which were developed partly in-house and partly by a contractor called eConduit.[3] New Century currently anticipates LoanTrack-2 and MLAS will be usable by May, 2003. It appears that LoanTrack-1 will not provide all of New Century's business needs without LoanForce and/or its associated database components. It appears that LoanTrack-2 and MLAS will provide all of New Century's business needs without utilizing the LoanForce application software.

The Software Subscription Agreement required annual renewal and payment of license fees. During 2002, New Century told Positive Software that New Century might want to expand its LoanForce license to include all of New Century's branch offices. During that same time, New Century was preparing its transition away from LoanForce with the development of LoanTrack-1 and LoanTrack-2. At the end of 2002, when renewal license fees were due, New Century asked Positive Software to defer full payment of the renewal fee and to consider alternative billing arrangements. Although Positive Software did not know it at the time, New Century did this in order to continue its use of LoanForce until New Century's replacement product was ready, without having to incur the full annual license fee for LoanForce.

---

[3]New Century subsequently acquired eConduit.

Positive Software, unbeknownst to New Century, was investigating New Century's LoanTrack-1 project and had concluded that LoanTrack-1 was making improper use of Positive Software's intellectual property rights in LoanForce. Positive Software thus began to prepare for litigation with New Century. On January 1, 2003, New Century went into default under the Software Subscription Agreement. On January 6, 2003, Positive Software sent New Century demand for payment. New Century never made the payments required under the Software Subscription Agreement. On February 6, 2003, Positive Software declared the Software Subscription Agreement to be terminated. This lawsuit soon followed.

Positive Software seeks injunctive and monetary relief from New Century for breach of the Software Subscription Agreement, copyright infringement, misappropriation of trade secrets, violation of the Digital Millennium Copyright Act of 1998, conversion, fraud and civil conspiracy. Positive Software moved for preliminary injunction relating to LoanTrack-1. The Defendants moved to compel arbitration pursuant to the Software Subscription Agreement. The Court will address those matters in turn.[4]

---

[4]New Century asks the Court in its motion to compel arbitration to exercise its discretion under Rule 65 and defer the question of injunctive relief to the arbitrator in the arbitration proceeding. The Court declines to defer ruling on Positive Software's motion for preliminary injunction and impoundment under the Copyright Act, because New Century agreed in the Software Subscription Agreement, discussed *infra*, that Positive Software could apply to a court for preliminary relief to stop the disclosure or misappropriation of confidential information. Positive Software requests relief to enforce the terms of the Software Subscription Agreement, enjoin further misappropriation of its confidential information, and preserve the status quo between the parties pending arbitration. The issuance of a preliminary injunction, thus, is proper. *See RGI, Inc. v. Tucker & Assoc., Inc.*, 858 F.2d 227 (5th Cir. 1988) (upholding preliminary injunction preserving status quo pending arbitration where such relief was contemplated by the parties.)

## II. POSITIVE SOFTWARE IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST INFRINGEMENT OF THE SQL DATA STRUCTURES IN LOANFORCE

The requirements for issuance of a preliminary injunction are (1) substantial showing of likelihood of success on the merits; (2) substantial threat of irreparable injury; (3) balance of harm weighs in favor of injunction; and (4) injunction will not harm the public interest. *E.g., Walgreen Co. v. Hood*, 275 F.3d 475, 477 (5th Cir. 2001). The Court finds that Positive Software is entitled to injunctive relief on its copyright infringement claim. Because the Court would not consider any greater relief on any of Positive Software's other theories, it is unnecessary to address those theories in this Order.

### A. Likelihood of Success on the Merits

The Court finds that Positive Software owns the rights to LoanForce and holds valid copyright registrations for LoanForce and its component parts. The Court must first consider whether the SQL Data Structures are copyrightable subject matter, then whether that copyright is infringed.

Under the copyright laws, a "computer program" is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. The Court finds that the SQL Data Structures here are a set of statements to be used indirectly in a computer in order to bring about a certain result. Accordingly, the SQL Data Structures are proper subject matter for copyright protection.[5] This is consistent

---

[5]*But cf. Baystate Techs., Inc. v. Bentley Sys., Inc.*, 946 F. Supp. 1079, 1086 (D. Mass. 1996) (finding data structures in CAD program not independently copyrightable). One article has suggested that data structures should not be copyrightable when that monopoly would also

with the overall policy behind copyright law of protecting creative expression.[6]  Although

some discussions in the legal literature give short shrift to the importance of and creative

expression in data structures,[7] the Court finds that the SQL Data Structures here have the

requisite degree of creative expression to be copyrightable.  This result is consistent with the

Fifth Circuit's holding that user interface input/output formats are copyrightable.  *See Eng'g*

*Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335 (5th Cir. 1994).[8]

The Court now considers whether there was actionable copying of the SQL Data

Structures.  Factual copying is usually shown by access and "probative similarity."  *Id.* at

---

give the holder a monopoly over an algorithm that required use of that data structure.  *See* Marci A. Hamilton & Ted Sabety, *Computer Science Concepts in Copyright Cases: The Path to a Coherent Law*, 10 HARV. J.L. & TECH. 239, 259-64 (1997).  The article uses "data structure" there as meaning a generic type of structure, rather than a particular implementation of a database.  Thus, to permit a copyright of the linked list data structure would be impermissible because it would preclude use of an algorithm (such as Quicksort) that requires that type of data structure.  *Id.* at 259-60.  The article does not appear to suggest that a specific database structure used in a specific commercial application is not a proper subject for copyright.  In any event, there is no indication in the record here that copyright of the SQL Data Structures would result in a monopoly in any algorithm.

[6]The Court notes by way of example the extensive academic literature in database design and the flourishing development of XML, a data description "meta-language."  *See* http://www.w3.org/xml.  This level of creative expression goes well beyond "some minimal degree of creativity" or a "minimal creative spark."  *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 362, 363 (1991) (compilation of telephone book white pages not copyrightable).

[7]*E.g., Baystate*, 946 F. Supp. at 1090

[8]Likewise, the Court finds that there are more than one or a few ways to organize the data structures required for programs such as LoanTrack and LoanForce, so the idea here does not merge with the expression.  *E.g., Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 837 (10th Cir. 1993).

1340. Once factual copying is shown, the court must determine whether that was legally actionable by determining substantial similarity. *Id.* at 1341. The Court's analysis of this issue is substantially simplified by the fact that LoanTrack-1 contains substantial verbatim or near-verbatim copying of the SQL Data Structures. The Court finds that New Century had access to the SQL Data Structures and that there is enough probative similarity to find that New Century factually copied the SQL Data Structures.

Substantial similarity is usually determined in the computer software context by the abstraction-filtration-comparison methodology. *Id.* at 1343. Due to the verbatim or near-verbatim copying at issue here, the Court need not undertake the abstraction step of the analysis. In connection with filtering out unprotectable elements from protectable expression, New Century argues that the SQL Data Structures are generic. This is the computer software version of the scenes a faire doctrine. *See* Mitchell Zimmerman, *Baystate: Technical Interfaces Not Copyrightable – On to the First Circuit*, THE COMPUTER LAWYER, April 1997, at 9, 16-17. Certain elements of the SQL Data Structures might be dictated by external market factors. *See Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1262 (5th Cir.), *cert denied*, 484 U.S. 821 (1987); *Eng'g Dynamics*, 26 F.3d at 1346-47. However, there is no evidence in this record that the detailed structure of the SQL Data Structures – the organization of data into tables, the selection of column elements for the tables, the names, data types, and sizes of the column elements – is dictated by external market factors, and the Court finds that structure is not

dictated by external factors. Accordingly, the Court need not "filter out" any of the SQL

Data Structures as unprotectable expression dictated by market factors.[9]

---

[9]A similar argument is sometimes made under this rubric. Some argue that the customer desire for functional compatibility with a copyrighted work is a "market factor" that makes those elements required for compatibility unprotected. *See Baystate*, 946 F. Supp. at 1088-89. This confuses the functional requirements of the application (e.g., to perform word processing) with the commercial desirability of compatibility (e.g., greater market for word processor if it will import Microsoft Word .doc file formats). Although New Century does not make a compatibility argument here, that kind of compatibility issue appears to be factually what motivated New Century – in order to transition away from the LoanForce product, it was more convenient for New Century to copy the SQL Data Structures for awhile.

This commercial compatibility argument is more in the nature of a fair use argument, rather than an argument that certain aspects of the copyrighted work were dictated by market factors and thus were unprotectable. *See* Zimmerman, *supra*, at 17 (*Baystate* analysis "confuses protectability with fair use"). Commercial compatibility does not fare well as a fair use argument, however, because it typically involves depriving the copyright holder of a license fee for the commercial benefit of the infringer. *See* 17 U.S.C. § 107 (factors determining fair use include whether use is commercial and the effect of the use on the market for or value of the copyrighted work); *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) ("every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (same).

The Court confesses some puzzlement with the apparent attractiveness of this commercial compatibility argument in the computer software copyright arena. It is not an argument that would even be attempted in traditional areas of copyright. ("In order to sell colored pieces of cardboard, market factors required that I duplicate the appearance of Pokemon/Yu-Gi-Oh/Magic Cards in order to be compatible.") The persistence of the argument in the computer software copyright context perhaps reflects unease with the fit between computer software and copyright, and a perception that market needs justify a bit of judicial fiddling with the scope of copyright. What the market needs is perhaps better left to the realm of private contract, legislative change, or, in the appropriate case, antitrust law.

---

Finally, the Court turns to comparison. The Court's task here is made somewhat more difficult in that neither party provided complete copies of both works.[10] The record before the Court shows near-verbatim copying of significant portions of the SQL Data Structures. Even given a sliding scale with relatively narrower protection for functional and nonfiction works, *Eng'g Dynamics*, 26 F.3d at 1348, the Court finds that the amount and near verbatim nature of the copying show substantial similarity between LoanTrack-1 and the SQL Data Structures. That copying is therefore legally actionable. Accordingly, the Court holds that Positive Software has shown a substantial likelihood of success on the merits of its claim that LoanTrack-1 (including the associated LFMoon and LTKMoon components) infringe Positive Software's copyrights in LoanForce.

### B. Other Factors Support Injunctive Relief

Although a finding of copyright infringement does not give rise to a presumption of irreparable harm, *Plains Cotton*, 807 F.2d at 1261, a finding of irreparable harm often naturally, if not inevitably, follows from a finding of infringement.[11] Positive Software's copyright is a right of statutory and even constitutional magnitude. Continuing infringement of that right cannot be adequately addressed by damages after the fact. Accordingly, Positive

---

[10]Defendants refused to produce copies of their source code to Positive Software during discovery until directly ordered to do so following the preliminary injunction hearing.

[11]New Century acknowledges the possibility of irreparable harm in the Software Subscription Agreement, paragraph 7F. Although the pro forma contractual recital is certainly not binding on the Court, it is at least *some* evidence that supports the Court's finding on this point.

Software has shown a threat of irreparable harm.[12] The balance of harm analysis is made easier by New Century's recent offer to refrain voluntarily from the conduct covered by the preliminary injunction entered here. The fact that New Century is willing to make that undertaking voluntarily indicates to the Court that any harm to New Century from such an undertaking is minimal and outweighed by the possible harm to Positive Software flowing from continued infringement. Finally, the public interest does not appear implicated here, other than the public interest inherent in enforcing the copyright laws. On balance, and considering all four factors, the Court finds that Positive Software has shown it is entitled to injunctive relief.[13]

### III. POSITIVE SOFTWARE MUST ARBITRATE ITS REMAINING CLAIMS

The Defendants move the Court to compel arbitration of Positive Software's claims. New Century[14] argues the basis for this compulsion is an arbitration clause found in the Software Subscription Agreement entered into by New Century and Positive Software stating:

---

[12]The fact that New Century has recently offered to quit infringing voluntarily does not eliminate that threat, as such a voluntary commitment could be withdrawn as easily as it was given.

[13]The Court declines to grant Positive Software its requested relief of impoundment under the Copyright Act, and the Defendants' objections to the affidavits of Edward Mandel and Judy Sanchez Etchison, filed on April 4, 2003, are overruled.

[14]The remaining Defendants, not parties to the Software Subscription Agreement, contend that Positive Software's claims against them should be compelled to arbitration under the doctrine of equitable estoppel, discussed *infra*.

> If any of the Parties disagree with respect to whether any of the other Parties have breached any of the terms or conditions of this Agreement, or if the Parties have a controversy, claim or dispute arising out of or related to the terms and conditions of this Agreement, the disagreement shall be settled by binding arbitration in accordance with the Federal Arbitration Act ("FAA").

SSA at ¶ 15. Positive Software counters that its claims do not fall within the scope of the arbitration clause because paragraph 7F of the Software Subscription Agreement carves out disputes pertaining to the disclosure of confidential information:

> Customer understands and acknowledges that any disclosure or misappropriation of any Confidential Information in violation of this Agreement may cause Positive irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Positive shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as Company shall deem appropriate. Such right of Positive is to be in addition to the remedies otherwise available to Positive at law or in equity. Customer expressly waives the defense that a remedy in damages will be adequate and any requirement for posting bond by Positive in an action for specific performance or injunction.

SSA at ¶ 7F. The Court finds that Positive Software's claims against New Century fall within the scope of the arbitration clause of the Software Subscription Agreement, because the claims arise out of and relate to the terms and conditions of the Software Subscription Agreement. Paragraph 7F of the Software Subscription Agreement contemplates preliminary relief by a court of competent jurisdiction for claims pertaining to the disclosure or misappropriation of confidential information.

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). Section 2 of the FAA states that a written

arbitration agreement in any contract involving interstate commerce is valid, irrevocable, and enforceable except on grounds that would permit the revocation of a contract in law or equity. 9 U.S.C. § 2.

In deciding whether parties have agreed to arbitrate a particular claim, a court must determine "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Personal Security & Safety Sys., Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (quoting *OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001)). Doubts concerning the scope of coverage of an arbitration clause ordinarily are resolved in favor of arbitration. *Personal Security & Safety Sys.*, 297 F.3d at 392. (internal quotations and citations omitted). A valid agreement to arbitrate, therefore, applies unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation which would cover the dispute at issue. *Id.* Here, the parties do not dispute the validity of the Software Subscription Agreement, rather Positive Software argues that its claims pertain to the disclosure and misappropriation of confidential information and, thus, are carved out of the general arbitration clause and addressed specifically in paragraph 7F of the Software Subscription Agreement. The Court does not agree.

The relevant part of paragraph 7F is one very long sentence stating that New Century acknowledges that any disclosure or misappropriation of confidential information in violation of the Software Subscription Agreement may cause Positive Software irreparable harm, therefore Positive Software has the right to apply to a court for specific performance of the

Software Subscription Agreement or for an order restraining and enjoining any further disclosure of confidential information or breach of the Software Subscription Agreement and for such other relief as Positive Software shall deem appropriate. The Court interprets paragraph 7F to grant Positive Software the right to apply to a court for preliminary relief, as evidenced by the predicate acknowledgment of irreparable harm and subsequent waiver of bond and defense that a remedy in damages is adequate, to stop the disclosure or misappropriation of its confidential information. Though Positive Software argues that the last part of the sentence "and for such other relief as Positive Software shall deem appropriate" gives it the right to bring this suit for damages, the Court does not construe the "other relief" language so broadly. To allow Positive Software to choose between a trial and an arbitration in disputes pertaining to the disclosure or misappropriation of confidential information eviscerates the broad scope of the arbitration clause and is contrary to the context of paragraph 7F and the overall structure of the Software Subscription Agreement. Thus, the court interprets "other relief" to mean other preliminary relief in addition to specific performance and injunction, for example, as Positive Software requests in its motion pending before the Court, impoundment under the Copyright Act. This interpretation of paragraph 7F allows it to be read in harmony with the arbitration clause of the Software Subscription Agreement. Positive Software's claims against New Century, therefore, fall within the scope of the Software Subscription Agreement's arbitration clause, because Positive Software's claims arise out of and relate to the Software Subscription Agreement. Therefore, the Court

grants New Century's motion to compel arbitration and to stay proceedings, and Positive

Software must arbitrate its claims against New Century in the arbitration currently pending.

The remaining Defendants, New Century Corporation, eConduit Corporation, the

AnyLoan Company, Jeff Lemiex and Frank Nese (collectively "Nonsignatory Defendants"),

also move for an order compelling Positive Software to arbitrate its claims against them.

Though the Nonsignatory Defendants are not parties to the Software Subscription

Agreement, which contains the contractual waiver of Positive Software's right to a trial,

these Defendants argue that Positive Software is required to arbitrate its claims against them

in accordance with the doctrine of equitable estoppel. The Court agrees.

Though parties who have not expressly agreed to arbitration generally will not be

compelled to arbitrate claims, federal policy allows a nonsignatory to a contract to compel

arbitration under an equitable estoppel theory. *See Grigson v. Creative Artists Agency,*

*L.L.C.*, 210 F.3d 524 (5th Cir. 2000). Whether to utilize equitable estoppel is within a court's

discretion. *Id.* at 528. The Fifth Circuit, in *Grigson*, adopted the Eleventh Circuit's

"intertwined-claims test" formulated in *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942,

947 (11th Cir. 1999), in which the court held that equitable estoppel allows a nonsignatory

to compel arbitration in two different circumstances:

> First, equitable estoppel applies when the signatory to a written agreement
> containing an arbitration clause must rely on the terms of the written
> agreement in asserting its claims against the nonsignatory. When each of a
> signatory's claims against a nonsignatory makes reference to or presumes the
> existence of the written agreement, the signatory's claims arise out of and
> relate directly to the written agreement, and arbitration is appropriate. Second,
> application of equitable estoppel is warranted when the signatory to the

contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Id.* at 527. Though Positive Software argues, without authority, that both elements of the intertwined-claims test must be present to compel the claims of a nonsignatory, the Court reads *Grigson* to require only one. The language of the opinion itself states that arbitration may be compelled in "two different circumstances" and that equitable estoppel is "much more readily applicable when the case presents both independent bases." *Id.* The Court therefore interprets the intertwined-claims test under *Grigson* to require only one of the two independent bases to be present when compelling arbitration.[15]

Positive Software's claims against the Nonsignatory Defendants stem from the relationship between New Century and Positive Software that was governed by the Software Subscription Agreement. However, not all of Positive Software's claims are dependent upon the Software Subscription Agreement. Positive Software asserts a myriad of claims against

---

[15]This reading of *Grigson* in consonant with the Fifth Circuit's more recent opinion in *Hill v. G.E. Power Systems,* when the court considered both independent bases in determining whether the district court abused its discretion in failing to compel arbitration. 282 F.3d 343 (5th Cir. 2002). If each basis was required to compel arbitration, the court would have ended its analysis when it determined the first basis inapplicable to the facts of the case. Rather, Justice Higginbotham continued on to find that the signatory's claims against the nonsignatory raised allegations of interdependent and concerted misconduct under the second *Grigson* basis. *Id.* at 439. Ultimately, however, the Fifth Circuit upheld the lower court's ruling because its decision was not "premised on an application of the law that is erroneous" or "an assessment of the evidence that is clearly erroneous," and the lower court was "better equipped to make the call" of whether compelling arbitration was appropriate. *Id.*

the Nonsignatory Defendants including copyright infringement, misappropriation of trade secrets and intellectual property, conversion, fraud, violation of the Digital Millennium Copyright Act, and civil conspiracy. While some of these claims, such as misappropriation of trade secrets and intellectual property, may presume the existence of the Software Subscription Agreement, each claim does not rely upon the terms of the Software Subscription Agreement. Therefore, the first independent basis for equitable estoppel is not met.

The second basis, however, is fully applicable to the facts of this case. Positive Software's allegations against the Nonsignatory Defendants all concern their intertwined conduct with New Century. Positive Software generally alleges throughout the First Amended Complaint that the "Defendants" pirated its software, derived source code, and created new software incorporating LoanForce. Moreover, Positive Software claims a civil conspiracy among the Defendants to violate its intellectual property rights. Since all of Positive Software's allegations against the Nonsignatory Defendants concern their interdependent and concerted misconduct with New Century, the second independent basis for equitable estoppel is met. The Court, therefore, grants the Nonsignatory Defendants' motion to compel arbitration.

## CONCLUSION

It is, therefore ORDERED that Defendant New Century Mortgage Corp. and any person acting in active concert with it, upon Positive Software posting security in the amount

ORDER – PAGE 16

of $1000, is forthwith enjoined from any use of the LoanForce software, the LoanForce database, LoanTrack-1, LF_Moon, and LTK_Moon. It is further ORDERED that New Century delete or return all LoanForce software, including application software and the LoanForce database, that New Century has the ability to access (excepting materials produced in discovery for use in this litigation and/or arbitration). It is further ORDERED that all parties proceed to arbitrate all remaining claims in this action immediately. It is further ORDERED that all matters in this action are STAYED pending arbitration, except for that discovery provided by separate Order this day.

SIGNED this _____ day of April, 2003.

David C. Godbey
United States District Judge

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR 2 9 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

POSITIVE SOFTWARE SOLUTIONS,  §
INC.                          §
                              §
        Plaintiff,            §
                              §
v.                            §        Civil Action No. 3:03-CV-0257-N
                              §
NEW CENTURY MORTGAGE          §
CORPORATION, ET AL.,          §
                              §
        Defendants.           §

## ORDER

Although the Plaintiff, Positive Software Solutions, Inc. ("Positive Software")

requested in its motion for preliminary injunction that the Defendants return to Positive

Software any originals or copies of the LoanForce software in their possession, the Court has

been advised that Positive Software no longer seeks this relief. According, the portion of the

Court's Memorandum Opinion and Order, issued on April 28, 2003, that reads: "It is further

ORDERED that New Century delete or return all LoanForce software, including application

software and the LoanForce database, that New Century has the ability to access (excepting

materials produced in discovery for use in this litigation and/or arbitration)" is hereby

VACATED.

ORDER – PAGE 1

SIGNED this 29 day of April, 2003.

David C. Godbey
United States District Judge

ORDER – PAGE 2