IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| **NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,**[1] | Case No. 07-10416 (KJC) |
| | Jointly Administered |
| **Debtors.** | |
| | Hearing Date: August 7, 2007 at 1:30 p.m. |
| | Objection Deadline: July 31, 2007 at 4:00 p.m. |

**DEBTORS' MOTION FOR ORDER (I) AUTHORIZING THE PAYMENT OF THE DEBTORS' WIND-DOWN RETENTION PLAN PAY AND (II) AMENDING THE EXISTING KEY EMPLOYEE INCENTIVE PLAN PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE**

New Century Financial Corporation ("NCF"), a Maryland corporation, New Century TRS Holdings, Inc, ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363(b)(1) and 503(c)(3) of Title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"), (i) authorizing, but not directing, payment of a wind-down retention plan, substantially in the form attached hereto as Exhibit A (the "Wind-down Plan") to its remaining employees and (ii) amending the existing Key Employee Incentive Plan, substantially in the form attached hereto as Exhibit B (the "Amended KEIP", together with the Wind-down Plan, the "Plans"), as described herein.

The Wind-down Plan and the Amended KEIP proposed by the Debtors herein are

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

1

critical to incentivize and reward the performance of the remaining employees for the benefit of the estates. The Debtors strongly believe that implementing the Plans proposed herein is necessary and appropriate to maximize the value of the estates.

In support of the Motion, the Debtors, by and through their undersigned counsel, respectively represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and 1134. Venue is proper under 28 U.S.C. sections 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. section 157(b)(2).

2. The bases for the relief requested herein are sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

## BACKGROUND

3. New Century Financial Corporation, a Maryland corporation ("NCF") and publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS Holdings, Inc., a Delaware corporation, NCF originated, purchased, sold, and serviced mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners

across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4. The Wholesale Division, which was contained within NCMC, originated and purchased loans through a network of independent mortgage brokers and correspondent lenders. As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states and (3) employed approximately 1,087 account executives. The broker's role in this process was to identify the applicant, assist in completing the loan application form, gather necessary information and documents and serve as the Debtors' liaison with the borrower. Correspondent lenders are independent mortgage bankers and financial institutions that sell loans that have already been funded. For 2006, the Wholesale Division was responsible for approximately 85% of the loans originated by the Debtors.

5. The Retail Division, which operated under Home123, originated loans through direct contact with consumers, including through referrals from builders, realtors, and other third parties. As of December 31, 2006, the Retail Division was supported by 262 branch offices and three central telemarketing units employing approximately 1,702 retail loan officers. For 2006, the Retail Division originated approximately 15% of the loans produced by the Debtors.

6. On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief and the Debtors' bankruptcy cases are being jointly administered pursuant to an order of the Court. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

7. Since the Petition Date, the Debtors have been focused on expeditiously liquidating their assets in order to maximize the value of the estates. The Debtors gained Court approval of four asset sales and closed three of those sales within three months of the Petition Date. By order entered on May 7, 2007, the Court authorized the sale of a pool of approximately 2,000 unencumbered mortgage loans with an unpaid balance of $170 million and mortgage-backed residual interests in securitization trusts (the "LNFA") to Ellington Management Group, L.L.C. on

behalf of its Client Funds ("Ellington") pursuant to the Asset Purchase Agreement by and among NCF and certain of its subsidiaries and Ellington dated May 16, 2007. The Court further authorized the sale of a pool of approximately 180 unencumbered mortgage loans with an unpaid balance of approximately $17 million and 6 real properties obtained in foreclosures of such mortgage loans to Ellington by order entered on June 28, 2007 pursuant to Supplement No. 1 to Asset Purchase Agreement by and among NCF and certain of its subsidiaries and Ellington dated June 25, 2007. The two LNFA sales closed in May and June respectively.

8. In addition to the LNFA, the Court authorized the sale of the Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an affiliate of Carrington Capital Management, LLC ("Carrington") by order entered on May 23, 2007 pursuant to the Second Amended and Restated Asset Purchase Agreement dated May 21, 2007. At the closing of the Carrington Sale on June 29, 2007, Carrington transferred the sale proceeds to the Debtors and the Debtors entered into an agreement with Carrington to transition the servicing business. The Debtors will continue operating the servicing business in the ordinary course while it is transitioned to Carrington.

9. The Court further authorized the sale of certain of the Debtors' technology assets to EquiFirst Corporation ("EquiFirst") by order entered on July 3, 2007 pursuant to the Asset Purchase Agreement by and among NCFC, NCMC and EquiFirst dated June 22, 2007 (the "Technology Sale"). The Debtors expect the Technology Sale to close by August 15, 2007.

10. In addition to the asset sales, the Debtors moved quickly to downsize and consolidate their operations. The Debtors have rejected approximately 220 real property leases and approximately 250 executory contracts. The Debtors are in the process of liquidating additional assets and identifying additional leases and contracts for rejection or assumption and assignment. During this wind-down period, it is critical for the Debtors to maintain a minimum work force to assist with liquidating and maximizing the value of the estates.

## RELIEF REQUESTED

11. By this Motion, the Debtors seek entry of an order under Bankruptcy Code sections 105(a), 363(b)(1) and 503(c)(3): (i) approving the Plans as described below, (ii) authorizing the Debtors to implement the Plans, and (iii) allowing all payments thereunder as administrative expenses of the estates.

## BASES FOR RELIEF REQUESTED

12. The Debtors' remaining employees continue to work against the backdrop of uncertainty of their continued employment and without assumed employment or severance agreements. By this Motion, the Debtors seek the authority to provide retention payments to the approximately 200 remaining employees and incentives to those members of senior management and tasked with navigating the Debtors through this challenging period. While the Debtors have made substantial progress in liquidating their assets, critical tasks remain in connection with realizing the full value of those transactions and administering the estates. Importantly, the Debtors seek to analyze, reconcile and minimize the claims filed against them as promptly as possible. These claims include the factually intensive "EPD" and breach claims being asserted against the Debtors by certain purchasers of the loans. These "EPD" and breach claims require expertise the Company's current employees best possess. Further, the Debtors need assistance from their current employees to close the technology assets sale and transition the servicing business to Carrington. The Carrington transaction is expressly conditioned upon the Debtors providing continuing services through a transition period. The Debtors must maintain employees in several areas, including information technology, legal and compliance, to assist with these tasks.

13. To properly and fairly incentivize and reward the performance of critical employees for the benefit of these estates, the board of directors of the Debtors approved the formation of the Wind-down Plan and the Amended KEIP. The Debtors believe the formulation of the Plans appropriately rewards the substantial contribution and performance of these employees and provides a mechanism for the Debtors to retain their workforce during this critical time in a cost-effective manner. Retaining professionals or temporary employees to assist the Debtors with

their liquidation would be more expensive and time-consuming than retaining current employees with institutional knowledge of the Debtors' business. The efforts of these employees have been and will continue to be instrumental in the Debtors' liquidation, including the Debtors' efforts to transition the servicing business to Carrington and transfer other assets in order to provide the maximum return to the Debtors' estates and creditors.

A. **Summary of the Wind-Down Plan**

14. The Wind-down Plan is designed to retain employees (the "Wind-down Plan Participants") who are not members of senior management during the wind-down phase of these bankruptcy cases. The plan is designed to provide certainty to the Debtors' employees regarding the terms of their continued employment while they assist the Debtors with the various tasks needed to liquidate the business including, but not limited to, claims recovery and analysis, the close of the technology asset sale, the sale of additional assets and the transition of the servicing business to Carrington. The Debtors seek the authority to contribute approximately $812,000 to a pool for the Wind-down Plan. The payment amount awarded is based on a formula of the employee's base salary through a target release date for the employees. Under the plan, the Wind-down Plan Participants are entitled to an amount equal to their (a) hourly rate of pay (calculated based on each Plan Participant's annual salary divided by 2,080 hours) multiplied by (b) the sum of 30 hours for the month of August and 40 hours for each succeeding month until such Plan Participant's target release date. Further, through their target release date, the plan provides for salary continuation for employees who are involuntary terminated prior to that date. The targeted release dates range from September 30 through December 31. To the extent an employee voluntarily terminates before his or her target release date, the Wind-down Plan permits the Debtors to reallocate the rewards under the Wind-down Plan by adjusting another employee's release date by mutual agreement as long as the total payout under the Wind-down Plan does not exceed approximately $812,000. In light of the values, size, complexity and need for the experience and knowledge of these key employees during the wind-down phase of these cases, the Debtors keenly believe that the amounts that they

6

seek authority to pay employees herein are reasonable and responsibly targeted towards the objectives that need to be achieved in these cases.

      B.     **Summary of the Amended KEIP**

      15.    By order entered on May 25, 2007, the Court approved the Debtors' Key Employee Incentive Plan (the "KEIP") to provide for incentive payments to certain members of the Debtors' management team to the extent that certain minimum threshold levels for disposition of three separate categories of the Debtors' assets were met. The Debtors now seek to amend the KEIP to add one additional participant and increase the percentage of payment to eight existing KEIP participants if the Debtors meet or exceed the minimum threshold requirement for the "Other Asset" pool (consisting of assets other than the servicing business and the loan sales). By adding one participant and increasing the percentage of the reward for these KEIP participants, the KEIP pool will increase by only approximately $184,000 and only if and when the Debtors realize the target price for such "Other Assets" and only increase if that target is exceeded in accordance with the terms of the KEIP. All other provisions found in the KEIP Plan previously approved by the Court will remain the same.

**THE PROPOSED PLANS SHOULD BE AUTHORIZED
BECAUSE THEY HAVE A SOUND BUSINESS PURPOSE**

I.    **The Plans Should Be Approved Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.**

      16.    The Debtors respectfully submit that the two applicable sections of the Bankruptcy Code under which the Court should consider the Plans are sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

      A.     **Section 363(b) of the Bankruptcy Code**

      17.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it. See In re Lionel Corp., 722

7

LA3:1135857.1
RLF1-3180784-1

F. 2d 1063, 1071 (2nd Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

18.  Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule." The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informal basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A. 2d 858, 872 (Del. 1985)).

19.  The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. See id.; see, e.g., Myers v. Martin (In re Martin), 91 F. 3d 389, 395 (3rd Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under Bankruptcy Code section 363(b) when there is a legitimate business justification); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program, stating that "in determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions").

**B.  The Plans Also Should Be Evaluated Under Section 503(c)(3) of the Bankruptcy Code, Using the Same Standard as Section 363(b).**

20.  Section 503(c), which is applicable in all bankruptcy cases filed after October 2005, provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business." Section 503(c) comprises three sections: (1) a general prohibition of retention plans; (2) limitations on severance payments; and (3) standards governing other transfers to certain employees and consultants, among others, that are outside of the ordinary course. For reasons set forth herein, neither section 503(c)(1) nor section 503(c)(2) are applicable to evaluating the Plans. Thus, to the extent that Plan

8

distributions constitute payments outside the ordinary course of business, they should be evaluated under the standards applicable under section 503(c)(3).

21. To begin with, sections 503(c)(1) and (c)(2) expressly do not apply to the Wind-down Plan because those sections apply only to payments to "insiders". Section 101(31) defines an insider as, in pertinent part, a director, an officer, or a person in control of the debtor. See 11 U.S.C. § 101(31). None of the Wind-down Participants are members of the Debtors' board of directors. In addition, the Wind-down Participants, some of whom have titles of vice president, exercise day to day operations, information technology, capital markets, human resources, legal, finance and related functions.[2] They are not "officers" or "persons in control" of the debtor within the meaning of section 101(31). The legislative history of section 101(31) indicates that "an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.Rep. No. 95-989, 95th Cong.2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5810. In determining whether a party is an insider, courts focus on the closeness between the transferee and the debtor, the degree of control or influence the transferee exerts over the debtor, and whether the transactions were conducted at arm's length. OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corporation), 340 B.R. 510, 523-24 (Bankr. D. Del. 2006) (citing cases). The Wind-down Participants with Vice President titles are in operations positions, not senior management, and do not report directly to the board. In addition, they have not been involved in developing the Plans or other policies affecting their bonus compensation in these cases. The members of the senior management team that are active in developing company policy and who report to the board are not eligible for awards under the Wind-down Plan. As the Wind-down Participants do not set corporate policy or exercise influence over the payments made to them by the Debtors under the Plans, closer scrutiny reserved for non-arms length payments is not warranted. See, e.g., In re NMI Systems,

---

[2] As with the existing plans, the Debtors have excluded (a) officers of New Century Financial Corporation, (b) individuals with titles above "Vice President" and (c) certain Vice Presidents in legal, human resources and finance from the retention plan.

Inc., 179 B.R. 357, 371 (Bankr. D.C. 1995) (employee reporting to senior vice president and not designated as part of the executive management team is not an insider with respect to transfers made to such employee by the debtor); In re Public Access Technology.com, Inc., 307 B.R. 500, 506 (Bankr. E.D. Va. 2004) (same); Accordingly, sections 503(c)(1) and (c)(2) should not apply to the Wind-down Plan.

22. Additionally, as the Court previously found when assessing the KEIP, section 503(c)(1) and (c)(2) do not apply to the Amended KEIP. By the statute's plain language, section 503(c)(1) pertains solely to retention plans and section 503(c)(2) addresses only the requirements for severance plans, and neither provision applies to performance-based incentive plans. See, e.g., In re Nobex Corp., No. 05-20050, 01/12/06 Hearing Tr. at 67 (Bankr. Del. 2006) (MFW); In re Calpine Corp., No. 05-60200, 04/26/2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006) (BRL). Indeed, one court recently held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case. As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

In re Dana Corporation, -- B.R. --, 2006 WL 3479406 at *6 (Bankr. S.D.N.Y. 2006). As with the KEIP, the incentive component of the Amended KEIP is not intended to provide bonuses for retention nor severance pay. In particular, the Amended KEIP is comprised of only targeted incentive payments to management employees who are directly involved in implementing the Carrington, technology and other asset sales. These incentive payments are conditioned on achievement of the asset sales. That requirement ensures that the Amended KEIP Participants continue their efforts not only to maintain the value of the Debtors, but to ensure that the tasks necessary to close the transactions are achieved and at the same time providing significant additional services required by the Carrington agreement and the chapter 11 cases. Consequently,

10

the Amended KEIP is properly characterized as a performance based, sale-related management incentive plan, not a retention plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(1). No member of the Debtors prior Executive Management Committee is a participant in the Amended KEIP.

23. In addition, as the Court previously found with regards to the KEIP, the Amended KEIP does not constitute a severance for insiders subject to the provisions of Bankruptcy Code section 503(c)(2). See 11 U.S.C. § 503(c)(2). The Amended KEIP does not provide benefits to plan participants upon termination of their employment with the Debtors. Under the terms of the Amended KEIP, as with the original KEIP, a plan participant will receive compensation regardless of whether the participant thereafter remains employed by the Debtors. Therefore, the Amended KEIP are incentive plans not a severance plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(2).

24. Therefore, neither section 503(c)(1) nor section 503(c)(2) apply to this motion. Instead, to the extent that distributions under the Plans are payments "outside the ordinary course of business," they should be evaluated under section 503(c)(3). See, e.g., Nobex Corp., No. 05-20050, Hearing Tr. at 67; In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide incentive bonuses under management incentive plan did not violate section 503(c) of the Bankruptcy Code); In re Dana Corporation, 2006 WL 3479406 at *12; In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006) (ordering various relief requested in connection with debtor's incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code).

25. Section 503(c)(3) states, in relevant part, that "there shall be neither allowed nor paid: . . . other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case. . . ." Since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs

11

and the payments thereunder are justified. See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006); In re Nobex Corporation, No. 05-20050 (CSS) (Bankr. D. Del. May 15, 2006 and December 21, 2005); In re Riverstone Networks, Inc., No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); In re Pliant Corporation, No. 06-100001 (MFW) (Bankr. D. Del. March 14, 1006).

    26. Indeed, Judge Walrath, in the Nobex case, stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any other transfers or obligations outside the ordinary course of business. . . . I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case.... I find it quite frankly nothing more than a reiteration of the standard under 363. . . under which courts had previously authorized transfers outside the ordinary course of business and that [are], based on the business judgment of the debtor. . . .

Transcript of January 12, 2006, Hearing at 86-87, In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del.) (an order approving the management incentive plan at issue was entered January 20, 2006). See also In re Dana Corporation, -- B.R. --, 2006 WL 3479406 at *6 (Bankr. S.D.N.Y. 2006) (Judge Lifland agreeing that management incentive programs should be evaluated under the business judgment standard).

    **C. The Plans Have a Sound Business Purpose, and Should Be Authorized by this Court Pursuant to Sections 363(b)(1) and 503(c)(3).**

    27. The Plans satisfy the applicable standards. To begin with, the Plans are precisely calibrated to achieve the desired performance. The Plans are also fair and reasonable in scope and do not discriminate unfairly.

    28. The Debtors have worked to develop a wind-down process designed to reduce cost and overhead as promptly as practicable. In that regards to Debtor have scheduled target release dates for all personnel. If the Debtors are unable to retain those personnel through the targeted dates, however, the Debtors will be forced to engage temporary employees or professionals to perform the needed tasks. The Wind-down Plan applies to all remaining

non-officer employees and is geared to the employees base salary and time spent assisting in the wind-down. In addition, the Wind-down Plan provides relatively modest payments to the Debtors' remaining employees -- an amount substantially less than the anticipated expense associated with utilizing professionals or temporary employees unfamiliar with the Debtors' business to perform needed tasks. Further the amendment to the KEIP will reward participants for their significant efforts to date and their increased responsibilities and burdens over the next few months as a result of closing of the technology transaction and the transition of the Servicing Business to Carrington. Moreover, as outlined above, the Amended KEIP are structured to maximize value for the Debtors' estates and creditors. The Amended KEIP sales incentive bonuses are tied directly to the proceeds received by the Debtors in their asset sales. Thus, the motivations of employees eligible for sales incentives are aligned with the motivations of the Debtors. Accordingly, the Debtors believe that valid business reasons exist for the implementation of the plans and, thus, that they should be approved.

29.    Secondly, the Debtors' ability to preserve the value of their assets and reconcile claims would be substantially hindered if the Debtors are unable to retain the services of employees who retain institutional experience. The fact that the Debtors are in bankruptcy and liquidating their assets makes it extremely difficult for the Debtors to retain employees at this time. Authorization to implement the Plans will provide the Debtors' employees with a greater sense of financial security thereby minimizing the need to seek other employment which would otherwise distract the employees from the necessary tasks they need to perform for the Debtors. Providing incentives to encourage employees to focus on the Debtors' objectives, and to motivate them to provide optimal levels of performance, is necessary to successfully maintain the business.

30.    Third, the overall cost of the Plans -- approximately $812,000 for the Wind-down Plan and an additional approximately $184,000 for the Amended KEIP -- is reasonable, particularly in the context of the wind-down process.

31.    Finally, targeted incentive and retention programs have repeatedly been recognized by this and other courts, in this district and elsewhere, as having particular value in

motivating management teams. See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (approving employee incentive plan providing for cash payments as rewards for attainment of collective operational restructuring goals and personal performance goals in support); In re Global Home Products LLC, Case No. 06-10340 (Gross, J.) (Bankr. D. Del. May 30, 2006) (approving management incentive program provided that plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all of the Debtors' assets); In re Riverstone Networks, Inc., Case No. 06-10110 (Sontchi, J.) (Bankr. D. Del. Apr. 3, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Feb. 21, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals and personal performance goals in support); In re Nobex Corp., Case No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 20, 2006) (approving "sale-related incentive pay" to officers, contingent on a successful sale of the company for a price in excess of that offered by an existing, stalking horse bidder, in connection with the debtor's pursuit of a sale of the company).

## II.    The Plan May Additionally Be Authorized Pursuant to Section 105(a) of the Bankruptcy Code

32.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(1).

33.    As stated, the Debtors strongly and reasonably believe that the Plans are critical to their ability to maximize returns to creditors. With respect to the Amended KEIP, the compensation payments are essential to reward appropriately the Debtors' employees for their efforts to consummate asset sales. Maximizing the value of the estates hinges upon the Debtors' continued operation of the servicing business pending the transition to Carrington and an orderly liquidation of the Debtors' additional assets. Further, the Wind-down Plan is necessary to retain the Debtors' trained and specialized employee base critical to claims analysis and reconciliation during

14

the wind-down period. Accordingly, the Debtors submit that retention payments to the Wind-down Participants of the Debtors are necessary to maximize value for their estates, their creditors, and their shareholders.

34. The Debtors respectfully submit that the post-petition compensation described herein for their employees is an appropriate exercise of the Debtors' business judgment, is necessary and in the best interest of the Debtors, their creditors, and their estates and should be approved under sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code and allowed as administrative expenses under section 503(b) of the Bankruptcy Code.

## **NOTICE**

35. No trustee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) the Examiner; (3) the Committee; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

36. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as Exhibit C, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: July 20, 2007
Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

LA3:1135857.1
RLF1-3180784-1