# EXHIBIT A

**THE QUADRANT**
GREENWOOD VILLAGE, COLORADO

OFFICE LEASE AGREEMENT

BETWEEN

**EOP-QUADRANT, L.L.C., a Delaware limited liability company**
("LANDLORD")

AND

**RBC MORTGAGE COMPANY, an Illinois corporation**
("TENANT")

## TABLE OF CONTENTS

I.      Basic Lease Information..................................................................................................1.

II.     Lease Grant. ..............................................................................................................3..

III.    Adjustment of Commencement Date; Possession.................................................3

IV.     Rent. ..........................................................................................................................3..

V.      Compliance with Laws; Use......................................................................................7.

VI.     Security Deposit........................................................................................................7..

VII.    Services to be Furnished by Landlord......................................................................7

VIII.   Leasehold Improvements..........................................................................................8.

IX.     Repairs and Alterations. ...........................................................................................8.

X.      Use of Electrical Services by Tenant. .......................................................................9

XI.     Entry by Landlord. ...................................................................................................10

XII.    Assignment and Subletting......................................................................................10

XIII.   Liens...........................................................................................................................12

XIV.    Indemnity and Waiver of Claims..............................................................................12

XV.     Insurance. .................................................................................................................12

XVI.    Subrogation...............................................................................................................13

XVII.   Casualty Damage. ....................................................................................................13

XVIII.  Condemnation. .........................................................................................................14

XIX.    Events of Default.......................................................................................................14

XX.     Remedies. .................................................................................................................15

XXI.    Limitation of Liability................................................................................................16

XXII.   No Waiver...................................................................................................................16

XXIII.  Quiet Enjoyment.......................................................................................................16

XXIV.   Relocation. ................................................................................................................16

XXV.    Holding Over..............................................................................................................16

XXVI.   Subordination to Mortgages; Estoppel Certificate................................................17

XXVII.  Attorneys' Fees. .......................................................................................................17

XXVIII. Notice.........................................................................................................................17

XXIX.   Excepted Rights. ......................................................................................................17

XXX.    Surrender of Premises..............................................................................................18

XXXI.   Miscellaneous...........................................................................................................18

XXXII.  Entire Agreement......................................................................................................20

## OFFICE LEASE AGREEMENT

THIS **OFFICE LEASE AGREEMENT** (the "Lease") is made and entered into as of the 13th day of ___November___, 2002, by and between EOP-QUADRANT, L.L.C., a Delaware limited liability company ("Landlord") and **RBC MORTGAGE COMPANY**, an Illinois corporation ("Tenant").

I.      **Basic Lease Information.**

A.      "Building" shall mean the building located at 5445 DTC Parkway, Greenwood Village, Colorado 80111, commonly known as The Quadrant.

B.      "Rentable Square Footage of the Building" is deemed to be **317,218** square feet.

C.      "Premises" shall mean the area shown on **Exhibit A** to this Lease. The Premises are located on the 1st floor and known as suite number 100. The "Rentable Square Footage of the Premises" is deemed to be **13,990** square feet. If the Premises include one or more floors in their entirety, all corridors and restroom facilities located on such full floor(s) shall be considered part of the Premises. Landlord and Tenant stipulate and agree that the Rentable Square Footage of the Building and the Rentable Square Footage of the Premises are correct and shall not be remeasured.

D.      "Base Rent":



| 03/01/03 – 10/31/08 | $6.90 | $96,531.00 | $8,044.25 |

Notwithstanding anything in this Section of the Lease to the contrary, so long as Tenant is not in default under this Lease, Tenant shall be entitled to an abatement of Base Rent in the amount of $8,044.25 per month, and Tenant's Pro Rata Share of Expenses and Taxes for the first 4 consecutive full calendar months of the Term, beginning March 1, 2003 and ending June 30, 2003 (the "Rent Abatement Period"). The total amount of Base Rent abated during the Rent Abatement Period equaling $32,177.00, plus the total amount of Tenant's Pro Rata Share of Expenses and Taxes abated during the Rent Abatement Period, shall collectively be referred to as the "Total Abated Rent". If Tenant defaults at any time during the Term and fails to cure such default within any applicable cure period under the Lease, the Total Abated Rent shall immediately become due and payable. The payment by Tenant of the Total Abated Rent in the event of a default shall not limit or affect any of Landlord's other rights, pursuant to this Lease or at law or in equity. During the Rent Abatement Period, only Base Rent and Tenant's Pro Rata Share of Expenses and Taxes shall be abated, and all Additional Rent and other costs and charges specified in this Lease shall remain as due and payable pursuant to the provisions of this Lease.

E.      "Tenant's Pro Rata Share": 4.4102%.

F.      "Term": A period of 68 months. The Term shall commence on March 1, 2003 (the "Commencement Date") and, unless terminated early in accordance with this Lease, end on October 31, 2008 (the "Termination Date").

G.      Tenant allowance: $128,008.50 as more fully described in **Exhibit D**.

H.      "Security Deposit": $24,564.11 (the "Prior Security Deposit"). Landlord and Tenant acknowledge and agree that Landlord is currently holding the Prior Security Deposit, as a security deposit pursuant to the terms of that certain lease dated, August 27, 1997, as thereafter amended, between Tenant (formerly known as Arbor Mortgage Corporation, a Colorado corporation, d/b/a First City Financial) and Landlord, by which Tenant is occupying approximately 3,578 rentable square feet of the Premises. Upon execution of this Lease, to the extent no portion of the Prior Security Deposit has been applied as permitted thereunder, Landlord shall apply the Prior Security Deposit to the Security Deposit required hereunder. Accordingly, to the extent any portion of the Prior

Security Deposit is so applied, Tenant shall promptly, upon written notice from Landlord, deposit an additional sum with Landlord to bring the Security Deposit to $24,564.11.

I.    "Guarantor(s)": As of the date of this Lease there are no Guarantors.

J.    "Broker(s)": Equity Commercial Real Estate.

K.    "Permitted Use": General office use; provided that in no event shall the Premises be used for the operation of a retail bank that contains banking counters or teller windows for accepting deposits and loan payments and cashing checks for retail banking customers on a walk-in basis or whose primary use is a federally or state chartered retail bank.

L.    "Notice Addresses":

Tenant:

On and after the Commencement Date, notices shall be sent to Tenant at the Premises. Prior to the Commencement Date, notices shall be sent to Tenant at the following address:

| Tenant: | With a copy to: |
|---|---|
| RBC Mortgage Company | RBC Mortgage Company |
| 5445 DTC Parkway, Suite 100 | 440 North Orleans Street |
| Greenwood Village, Colorado 80111 | Chicago, IL 60610 |
| Phone #: _____ | Phone #: 312-494-0020 |
| Fax #: _____ | Fax #: 312-494-0273 |

| Landlord: | With a copy to: |
|---|---|
| EOP-QUADRANT, L.L.C. | Equity Office Properties Trust |
| c/o Equity Office Properties Trust | Two North Riverside Plaza |
| 5445 DTC Parkway, Suite 725 | Suite 2100 |
| Greenwood Village, Colorado 80111 | Chicago, Illinois 60606 |
| Attention: Property Manager | Attention: Regional Counsel - Denver Region |

Rent (defined in Section IV.A) is payable to the order of **Equity Office Properties** at the following address:

Equity Office Properties
DBA The Quadrant, Dept. 10250
PO Box 842469
Dallas, TX 75284-2469

M.    "Business Day(s)" are Monday through Friday of each week, exclusive of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day ("Holidays"). Landlord may designate additional Holidays, provided that the additional Holidays are commonly recognized by other office buildings in the area where the Building is located.

N.    "Landlord Work" means the work that Landlord is obligated to perform in the Premises pursuant to a separate work letter agreement (the "Work Letter") attached as **Exhibit D**.

O.    "Law(s)" means all applicable statutes, codes, ordinances, orders, rules and regulations of any municipal or governmental entity.

P.    "Normal Business Hours" for the Building are 7:00 A.M. to 6:00 P.M. on Business Days and 8:00 A.M. to 1:00 P.M. on Saturdays.

Q.    "Property" means the Building and the parcel(s) of land on which it is located and, at Landlord's discretion, the landscaping, the parking facilities and all other

improvements owned by Landlord and serving the Building and the tenants thereof and the parcel(s) of land on which they are located.

II. **Lease Grant.**

Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord, together with the right in common with others to use any portions of the Property that are designated by Landlord for the common use of tenants and others, such as sidewalks, unreserved parking areas, common corridors, elevator foyers, restrooms, vending areas and lobby areas (the "Common Areas").

III. **Adjustment of Commencement Date; Possession.**

A.  The Landlord Work shall be deemed to be "Substantially Complete" on the date that all Landlord Work has been performed, other than any details of construction, mechanical adjustment or any other similar matter, the noncompletion of which does not materially interfere with Tenant's use of the Premises. However, if Landlord is delayed in the performance of the Landlord Work as a result of any Tenant Delay(s) (defined below), the Landlord Work shall be deemed to be Substantially Complete on the date that Landlord could reasonably have been expected to Substantially Complete the Landlord Work absent any Tenant Delay. "Tenant Delay" means any act or omission of Tenant or its agents, employees, vendors or contractors that actually delays the Substantial Completion of the Landlord Work, including, without limitation: (1) Tenant's failure to furnish information or approvals within any time period specified in this Lease, including the failure to prepare or approve preliminary or final plans by any applicable due date; (2) Tenant's selection of equipment or materials that have long lead times after first being informed by Landlord that the selection may result in a delay; (3) changes requested or made by Tenant to previously approved plans and specifications; (4) performance of work in the Premises by Tenant or Tenant's contractor(s) during the performance of the Landlord Work; or (5) if the performance of any portion of the Landlord Work depends on the prior or simultaneous performance of work by Tenant, a delay by Tenant or Tenant's contractor(s) in the completion of such work.

B.  Subject to Landlord's obligation to perform Landlord Work and Landlord's obligations under Section IX.B., the Premises are accepted by Tenant in "as is" condition and configuration. By taking possession of the Premises, Tenant agrees that the Premises are in good order and satisfactory condition, and that there are no representations or warranties by Landlord regarding the condition of the Premises or the Building. If Landlord is delayed delivering possession of the Premises or any other space due to the holdover or unlawful possession of such space by any party, Landlord shall use reasonable efforts to obtain possession of the space. The Commencement Date and Termination Date shall be determined by Section I.F.

C.  Tenant is in possession of the Premises and such possession shall be subject to the terms and conditions of this Lease and Tenant shall pay Rent (defined in Section IV.A.) to Landlord for each day of possession before the Commencement Date.

IV. **Rent.**

A.  Payments. As consideration for this Lease, Tenant shall pay Landlord, without any setoff or deduction, the total amount of Base Rent and Additional Rent due for the Term. "Additional Rent" means all sums (exclusive of Base Rent) that Tenant is required to pay Landlord. Additional Rent and Base Rent are sometimes collectively referred to as "Rent". Tenant shall pay and be liable for all rental, sales and use taxes (but excluding income taxes), if any, imposed upon or measured by Rent under applicable Law. Base Rent and recurring monthly charges of Additional Rent shall be due and payable in advance on the first day of each calendar month without notice or demand, provided that the installment of Base Rent for the first full calendar month of the Term shall be payable upon the execution of this Lease by Tenant. All other items of Rent shall be due and payable by Tenant on or before 30 days after billing by Landlord. All payments of

Rent shall be by good and sufficient check or by other means (such as automatic debit or electronic transfer) acceptable to Landlord. If Tenant fails to pay any item or installment of Rent when due, Tenant shall pay Landlord an administration fee equal to 5% of the past due Rent, provided that Tenant shall be entitled to a grace period of 5 Business Days after written notice for the first 2 late payments of Rent in a given calendar year. If the Term commences on a day other than the first day of a calendar month or terminates on a day other than the last day of a calendar month, the monthly Base Rent and Tenant's Pro Rata Share of Expenses (defined in Section IV.C.) and Taxes (defined in Section IV.D.) for the month shall be prorated based on the number of days in such calendar month. Landlord's acceptance of less than the correct amount of Rent shall be considered a payment on account of the earliest Rent due. No endorsement or statement on a check or letter accompanying a check or payment shall be considered an accord and satisfaction, and either party may accept the check or payment without prejudice to that party's right to recover the balance or pursue other available remedies. Tenant's covenant to pay Rent is independent of every other covenant in this Lease.

B.  Payment of Tenant's Pro Rata Share of Expenses and Taxes. Tenant shall pay Tenant's Pro Rata Share of the total amount of Expenses (defined in Section IV.C.) and Taxes (defined in Section IV.D) for each calendar year during the Term. Landlord shall provide Tenant with a good faith estimate of the total amount of Expenses and Taxes for each calendar year during the Term. As of the date of this Lease, Landlord's good faith estimate of the Expenses for calendar year 2002 is $9.85 per rentable square foot; however, this is an estimate only and the actual Expenses for calendar year 2002 may vary and any such variance shall be shown on, and accounted for pursuant to, the statement of the actual amount of Expenses and Taxes delivered to Tenant pursuant to the following grammatical paragraph. On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Tenant's Pro Rata Share of Landlord's estimate of the total amount of Expenses and Taxes. If Landlord determines that its good faith estimate was incorrect by a material amount, Landlord may provide Tenant with a revised estimate. After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate. If Landlord does not provide Tenant with an estimate of the total amount of Expenses and Taxes by January 1 of a calendar year, Tenant shall continue to pay monthly installments based on the previous year's estimate until Landlord provides Tenant with the new estimate. Upon delivery of the new estimate, an adjustment shall be made for any month for which Tenant paid monthly installments based on the previous year's estimate. Tenant shall pay Landlord the amount of any underpayment within 30 days after receipt of the new estimate. Any overpayment shall be refunded to Tenant within 30 days or credited against the next due future installment(s) of Additional Rent.

As soon as is practical following the end of each calendar year, Landlord shall furnish Tenant with a statement of the actual amount of Expenses and Taxes for the prior calendar year and Tenant's Pro Rata Share of the actual amount of Expenses and Taxes for the prior calendar year. If the estimated amount of Expenses and Taxes for the prior calendar year is more than the actual amount of Expenses and Taxes for the prior calendar year, Landlord shall apply any overpayment by Tenant against Additional Rent due or next becoming due, provided if the Term expires before the determination of the overpayment, Landlord shall refund any overpayment to Tenant after first deducting the amount of Rent due. If the estimated amount of Expenses and Taxes for the prior calendar year is less than the actual amount of Expenses and Taxes for such prior year, Tenant shall pay Landlord, within 30 days after its receipt of the statement of Expenses and Taxes, any underpayment for the prior calendar year.

C.  Expenses Defined. "Expenses" means all costs and expenses incurred in each calendar year in connection with operating, maintaining, repairing, and managing the Building and the Property, including, but not limited to:

1.  Labor costs, including, wages, salaries, social security and employment taxes, medical and other types of insurance, uniforms, training, and retirement and pension plans.

2.   Management fees, the cost of equipping and maintaining a management office, accounting and bookkeeping services, legal fees not attributable to leasing or collection activity, and other administrative costs. Landlord, by itself or through an affiliate, shall have the right to directly perform or provide any services under this Lease (including management services), provided that the cost of any such services shall not exceed the cost that would have been incurred had Landlord entered into an arms-length contract for such services with an unaffiliated entity of comparable skill and experience.

3.   The cost of services, including amounts paid to service providers and the rental and purchase cost of parts, supplies, tools and equipment.

4.   Premiums and deductibles paid by Landlord for insurance, including workers compensation, fire and extended coverage, earthquake, general liability, rental loss, elevator, boiler and other insurance customarily carried from time to time by owners of comparable office buildings.

5.   Electrical Costs (defined below) and charges for water, gas, steam and sewer, but excluding those charges for which Landlord is reimbursed by tenants. "Electrical Costs" means: (a) charges paid by Landlord for electricity; (b) costs incurred in connection with an energy management program for the Property; and (c) if and to the extent permitted by Law, a fee for the services provided by Landlord in connection with the selection of utility companies and the negotiation and administration of contracts for electricity, provided that such fee shall not exceed 50% of any savings obtained by Landlord. Electrical Costs shall be adjusted as follows: (i) amounts received by Landlord as reimbursement for above standard electrical consumption shall be deducted from Electrical Costs; (ii) the cost of electricity incurred to provide overtime HVAC to specific tenants (as reasonably estimated by Landlord) shall be deducted from Electrical Costs; and (iii) if Tenant is billed directly for the cost of building standard electricity to the Premises as a separate charge in addition to Base Rent, the cost of electricity to individual tenant spaces in the Building shall be deducted from Electrical Costs.

6.   The amortized cost of capital improvements (as distinguished from replacement parts or components installed in the ordinary course of business) made to the Property which are: (a) performed primarily to reduce operating expense costs or otherwise improve the operating efficiency of the Property; or (b) required to comply with any Laws that are enacted, or first interpreted to apply to the Property, after the date of this Lease. The cost of capital improvements shall be amortized by Landlord over the lesser of the Payback Period (defined below) or 5 years. The amortized cost of capital improvements may, at Landlord's option, include actual or imputed interest at the rate that Landlord would reasonably be required to pay to finance the cost of the capital improvement. "Payback Period" means the reasonably estimated period of time that it takes for the cost savings resulting from a capital improvement to equal the total cost of the capital improvement.

7.   All fees, costs, expenses or other amounts payable by Landlord to any association established for the benefit of the Property and/or other properties.

8.   Any fees, costs and expenses relating to operating, managing, owning, repairing and maintaining the parking facilities servicing the Building and the Property, and any fitness center(s), conference center(s) or other amenities in the Property.

If Landlord incurs Expenses for the Property together with one or more other buildings or properties, whether pursuant to a reciprocal easement agreement, common area agreement or otherwise, the shared costs and expenses shall be equitably prorated and apportioned between the Property and the other buildings

or properties. Expenses shall not include: the cost of capital improvements (except as set forth above); depreciation; interest (except as provided above for the amortization of capital improvements); principal payments of mortgage and other non-operating debts of Landlord; the cost of repairs or other work to the extent Landlord is reimbursed by insurance or condemnation proceeds; costs in connection with leasing space in the Building, including brokerage commissions; lease concessions, including rental abatements and construction allowances, granted to specific tenants; costs incurred in connection with the sale, financing or refinancing of the Building; fines, interest and penalties incurred due to the late payment of Taxes (defined in Section IV.D) or Expenses; organizational expenses associated with the creation and operation of the entity which constitutes Landlord; or any penalties or damages that Landlord pays to Tenant under this Lease or to other tenants in the Building under their respective leases. If the Building is not at least 95% occupied during any calendar year or if Landlord is not supplying services to at least 95% of the total Rentable Square Footage of the Building at any time during a calendar year, Expenses shall, at Landlord's option, be determined as if the Building had been 95% occupied and Landlord had been supplying services to 95% of the Rentable Square Footage of the Building during that calendar year. The extrapolation of Expenses under this Section shall be performed by appropriately adjusting the cost of those components of Expenses that are impacted by changes in the occupancy of the Building.

D.    Taxes Defined.    "Taxes" shall mean:    (1) all real estate taxes and other assessments on the Building and/or Property, including, but not limited to, assessments for special improvement districts and building improvement districts, taxes and assessments levied in substitution or supplementation in whole or in part of any such taxes and assessments and the Property's share of any real estate taxes and assessments under any reciprocal easement agreement, common area agreement or similar agreement as to the Property; (2) all personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property; and (3) all costs and fees incurred in connection with seeking reductions in any tax liabilities described in (1) and (2), including, without limitation, any costs incurred by Landlord for compliance, review and appeal of tax liabilities.  Without limitation, Taxes shall not include any income, capital levy, franchise, capital stock, gift, estate or inheritance tax. If an assessment is payable in installments, Taxes for the year shall include the amount of the installment and any interest due and payable during that year. For all other real estate taxes, Taxes for that year shall, at Landlord's election, include either the amount accrued, assessed or otherwise imposed for the year or the amount due and payable for that year, provided that Landlord's election shall be applied consistently throughout the Term.  If a change in Taxes is obtained for any year of the Term, then Taxes for that year will be retroactively adjusted and Landlord shall provide Tenant with a credit, if any, based on the adjustment.

E.    Audit Rights.  Tenant may, within 90 days after receiving Landlord's statement of Expenses, give Landlord written notice ("Review Notice") that Tenant intends to review Landlord's records of the Expenses for that calendar year.  Within a reasonable time after receipt of the Review Notice, Landlord shall make all pertinent records available for inspection that are reasonably necessary for Tenant to conduct its review.  If any records are maintained at a location other than the office of the Building, Tenant may either inspect the records at such other location or pay for the reasonable cost of copying and shipping the records. If Tenant retains an agent to review Landlord's records, the agent must be with a licensed CPA firm. Tenant shall be solely responsible for all costs, expenses and fees incurred for the audit.  Within 60 days after the records are made available to Tenant, Tenant shall have the right to give Landlord written notice (an "Objection Notice") stating in reasonable detail any objection to Landlord's statement of Expenses for that year. If Tenant fails to give Landlord an Objection Notice within the 60 day period or fails to provide Landlord with a Review Notice within the 90 day period described above, Tenant shall be deemed to have approved Landlord's statement of Expenses and shall be barred from raising any claims regarding the Expenses for that year. If Tenant provides Landlord with a timely Objection Notice, Landlord and Tenant shall work together in good faith to

resolve any issues raised in Tenant's Objection Notice. If Landlord and Tenant determine that Expenses for the calendar year are less than reported, Landlord shall provide Tenant with a credit against the next installment of Rent in the amount of the overpayment by Tenant. Likewise, if Landlord and Tenant determine that Expenses for the calendar year are greater than reported, Tenant shall pay Landlord the amount of any underpayment within 30 days. The records obtained by Tenant shall be treated as confidential. In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of Expenses unless Tenant has paid and continues to pay all Rent when due.

### V.    Compliance with Laws; Use.

The Premises shall be used only for the Permitted Use and for no other use whatsoever. Tenant shall not use or permit the use of the Premises for any purpose which is illegal, dangerous to persons or property or which, in Landlord's reasonable opinion, unreasonably disturbs any other tenants of the Building or interferes with the operation of the Building. Tenant shall comply with all Laws, including the Americans with Disabilities Act, regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises. Tenant, within 10 days after receipt, shall provide Landlord with copies of any notices it receives regarding a violation or alleged violation of any Laws. Tenant shall comply with the rules and regulations of the Building attached as **Exhibit B** and such other reasonable rules and regulations adopted by Landlord from time to time. Tenant shall also cause its agents, contractors, subcontractors, employees, customers, and subtenants to comply with all rules and regulations. Landlord shall not knowingly discriminate against Tenant in Landlord's enforcement of the rules and regulations.

### VI.    Security Deposit.

The Security Deposit shall be delivered to Landlord in accordance with the provisions of Section I.H. above and shall be held by Landlord without liability for interest (unless required by Law) as security for the performance of Tenant's obligations. The Security Deposit is not an advance payment of Rent or a measure of Tenant's liability for damages. Landlord may, from time to time, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent or to cure any uncured default by Tenant. If Landlord uses the Security Deposit, Tenant shall on demand restore the Security Deposit to its original amount. Landlord shall return any unapplied portion of the Security Deposit to Tenant within 45 days after the later to occur of: (1) the determination of Tenant's Pro Rata Share of Expenses and Taxes for the final year of the Term; (2) the date Tenant surrenders possession of the Premises to Landlord in accordance with this Lease; or (3) the Termination Date. If Landlord transfers its interest in the Premises, Landlord may assign the Security Deposit to the transferee and, following the assignment, Landlord shall have no further liability for the return of the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from its other accounts.

### VII.    Services to be Furnished by Landlord.

A.    Landlord agrees to furnish Tenant with the following services: (1) Water service for use in the lavatories on each floor on which the Premises are located; (2) Heat and air conditioning in season during Normal Business Hours, at such temperatures and in such amounts as are standard for comparable buildings or as required by governmental authority. Tenant, upon such advance notice as is reasonably required by Landlord, shall have the right to receive HVAC service during hours other than Normal Business Hours. Tenant shall pay Landlord the standard charge for the additional service as reasonably determined by Landlord from time to time; (3) Maintenance and repair of the Property as described in Section IX.B.; (4) Janitor service on Business Days. If Tenant's use, floor covering or other improvements require special services in excess of the standard services for the Building, Tenant shall pay the additional cost attributable to the special services; (5) Elevator service; (6) Electricity to the Premises for general office use, in accordance with and subject to the terms and conditions in Article X; and (7) such other services as Landlord reasonably determines are necessary or appropriate for the Property.

B.    Landlord's failure to furnish, or any interruption or termination of, services due to the application of Laws, the failure of any equipment, the performance of repairs, improvements or alterations, or the occurrence of any event or cause beyond the

reasonable control of Landlord (a "Service Failure") shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement. However, if the Premises, or a material portion of the Premises, is made untenantable for a period in excess of 3 consecutive Business Days as a result of the Service Failure, then Tenant, as its sole remedy, shall be entitled to receive an abatement of Rent payable hereunder during the period beginning on the 4th consecutive Business Day of the Service Failure and ending on the day the service has been restored. If the entire Premises has not been rendered untenantable by the Service Failure, the amount of abatement that Tenant is entitled to receive shall be prorated based upon the percentage of the Premises rendered untenantable and not used by Tenant. In no event, however, shall Landlord be liable to Tenant for any loss or damage, including the theft of Tenant's Property (defined in Article XV), arising out of or in connection with the failure of any security services, personnel or equipment.

## VIII.    Leasehold Improvements.

All improvements to the Premises (collectively, "Leasehold Improvements") shall be owned by Landlord and shall remain upon the Premises without compensation to Tenant. However, Landlord, by written notice to Tenant within 30 days prior to the Termination Date, may require Tenant to remove, at Tenant's expense:  (1) Cable (defined in Section IX.A) installed by or for the exclusive benefit of Tenant and located in the Premises or other portions of the Building; and (2) any Leasehold Improvements that are performed by or for the benefit of Tenant and, in Landlord's reasonable judgment, are of a nature that would require removal and repair costs that are materially in excess of the removal and repair costs associated with standard office improvements (collectively referred to as "Required Removables"). Without limitation, it is agreed that Required Removables include internal stairways, raised floors, personal baths and showers, vaults, rolling file systems and structural alterations and modifications of any type. The Required Removables designated by Landlord shall be removed by Tenant before the Termination Date, provided that upon prior written notice to Landlord, Tenant may remain in the Premises for up to 5 days after the Termination Date for the sole purpose of removing the Required Removables. Tenant's possession of the Premises shall be subject to all of the terms and conditions of this Lease, including the obligation to pay Rent on a per diem basis at the rate in effect for the last month of the Term. Tenant shall repair damage caused by the installation or removal of Required Removables. If Tenant fails to remove any Required Removables or perform related repairs in a timely manner, Landlord, at Tenant's expense, may remove and dispose of the Required Removables and perform the required repairs. Tenant, within 30 days after receipt of an invoice, shall reimburse Landlord for the reasonable costs incurred by Landlord. Notwithstanding the foregoing, Tenant, at the time it requests approval for a proposed Alteration (defined in Section IX.C), may request in writing that Landlord advise Tenant whether the Alteration or any portion of the Alteration will be designated as a Required Removable. Within 10 days after receipt of Tenant's request, Landlord shall advise Tenant in writing as to which portions of the Alteration, if any, will be considered to be Required Removables. Notwithstanding the foregoing, Tenant shall not be required to remove any portion of the Landlord Work shown on the Plans as of the date of this Lease, as such terms are defined in **Exhibit D**. Tenant shall not be required to remove at its expense, cable existing at the time of execution of this Lease, or installed pursuant to the Lease.

## IX.    Repairs and Alterations.

A.    <u>Tenant's Repair Obligations</u>. Tenant shall, at its sole cost and expense, promptly perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and shall keep the Premises in good condition and repair, reasonable wear and tear excepted. Tenant's repair obligations include, without limitation, repairs to: (1) floor covering; (2) interior partitions; (3) doors; (4) the interior side of demising walls; (5) electronic, phone and data cabling and related equipment that is installed by or for the exclusive benefit of Tenant and located in the Premises or other portions of the Building after the Commencement Date (collectively, "Cable"); (6) supplemental air conditioning units, private showers and kitchens, including hot water heaters, plumbing, and similar facilities serving Tenant exclusively; and (7) Alterations performed by contractors retained by Tenant, including related HVAC balancing. All work shall be performed in accordance with the rules and procedures described in Section IX.C. below.  If Tenant fails to make any repairs to the

Premises for more than 15 days after notice from Landlord (although notice shall not be required if there is an emergency), Landlord may make the repairs, and Tenant shall pay the reasonable cost of the repairs to Landlord within 30 days after receipt of an invoice, together with an administrative charge in an amount equal to 8% of the cost of the repairs.

B.    <u>Landlord's Repair Obligations.</u> Landlord shall keep and maintain in good repair and working order and make repairs to and perform maintenance upon: (1) structural elements of the Building; (2) mechanical (including HVAC), electrical, plumbing and fire/life safety systems serving the Building in general; (3) Common Areas; (4) the roof of the Building; (5) exterior windows of the Building; and (6) elevators serving the Building. Landlord shall promptly make repairs (considering the nature and urgency of the repair) for which Landlord is responsible.

C.    <u>Alterations.</u> Tenant shall not make alterations, additions or improvements to the Premises or install any Cable in the Premises or other portions of the Building (collectively referred to as "Alterations") without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed. However, Landlord's consent shall not be required for any Alteration that satisfies all of the following criteria (a "Cosmetic Alteration"): (1) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (2) is not visible from the exterior of the Premises or Building; (3) will not affect the systems or structure of the Building; and (4) does not require work to be performed inside the walls or above the ceiling of the Premises. However, even though consent is not required, the performance of Cosmetic Alterations shall be subject to all the other provisions of this Section IX.C. Prior to starting work, Tenant shall furnish Landlord with plans and specifications reasonably acceptable to Landlord; names of contractors reasonably acceptable to Landlord (provided that Landlord may designate specific contractors with respect to Building systems); copies of contracts; necessary permits and approvals; evidence of contractor's and subcontractor's insurance in amounts reasonably required by Landlord; and any security for performance that is reasonably required by Landlord. Changes to the plans and specifications must also be submitted to Landlord for its approval. Alterations shall be constructed in a good and workmanlike manner using materials of a quality that is at least equal to the quality designated by Landlord as the minimum standard for the Building. Landlord may designate reasonable rules, regulations and procedures for the performance of work in the Building and, to the extent reasonably necessary to avoid disruption to the occupants of the Building, shall have the right to designate the time when Alterations may be performed. Tenant shall reimburse Landlord within 30 days after receipt of an invoice for sums paid by Landlord for third party examination of Tenant's plans for non-Cosmetic Alterations. In addition, within 30 days after receipt of an invoice from Landlord, Tenant shall pay Landlord a fee for Landlord's oversight and coordination of any non-Cosmetic Alterations equal to 8% of the cost of the non-Cosmetic Alterations. Upon completion, Tenant shall furnish "as-built" plans (except for Cosmetic Alterations), completion affidavits, full and final waivers of lien in recordable form, and receipted bills covering all labor and materials. Tenant shall assure that the Alterations comply with all insurance requirements and Laws. Landlord's approval of an Alteration shall not be a representation by Landlord that the Alteration complies with applicable Laws or will be adequate for Tenant's use.

X.    **Use of Electrical Services by Tenant.**

A.    Electricity used by Tenant in the Premises shall, at Landlord's option, be paid for by Tenant either: (1) through inclusion in Expenses (except as provided in Section X.B. for excess usage); (2) by a separate charge payable by Tenant to Landlord within 30 days after billing by Landlord; or (3) by separate charge billed by the applicable utility company and payable directly by Tenant. Electrical service to the Premises may be furnished by one or more companies providing electrical generation, transmission and distribution services, and the cost of electricity may consist of several different components or separate charges for such services, such as generation, distribution and stranded cost charges. Landlord shall have the exclusive right to select any company providing electrical

service to the Premises, to aggregate the electrical service for the Property and Premises with other buildings, to purchase electricity through a broker and/or buyers group and to change the providers and manner of purchasing electricity. Landlord shall be entitled to receive a fee (if permitted by Law) for the selection of utility companies and the negotiation and administration of contracts for electricity, provided that the amount of such fee shall not exceed 50% of any savings obtained by Landlord.

B.  Tenant's use of electrical service shall not exceed, either in voltage, rated capacity, use beyond Normal Business Hours or overall load, that which Landlord deems to be standard for the Building. If Tenant requests permission to consume excess electrical service, Landlord may refuse to consent or may condition consent upon conditions that Landlord reasonably elects (including, without limitation, the installation of utility service upgrades, meters, submeters, air handlers or cooling units), and the additional usage (to the extent permitted by Law), installation and maintenance costs shall be paid by Tenant. Landlord shall have the right to separately meter electrical usage for the Premises and to measure electrical usage by survey or other commonly accepted methods.

XI.  **Entry by Landlord.**

Landlord, its agents, contractors and representatives may enter the Premises to inspect or show the Premises, to clean and make repairs, alterations or additions to the Premises, and to conduct or facilitate repairs, alterations or additions to any portion of the Building, including other tenants' premises. Except in emergencies or to provide janitorial and other Building services after Normal Business Hours, Landlord shall provide Tenant with reasonable prior notice of entry into the Premises, which may be given orally. If reasonably necessary for the protection and safety of Tenant and its employees, Landlord shall have the right to temporarily close all or a portion of the Premises to perform repairs, alterations and additions. However, except in emergencies, Landlord will not close the Premises if the work can reasonably be completed on weekends and after Normal Business Hours. Entry by Landlord shall not constitute constructive eviction or entitle Tenant to an abatement or reduction of Rent. Entry by Landlord shall also be governed by the Landlord's obligations under the Confidentiality Agreement attached as **Exhibit F** hereto.

XII.  **Assignment and Subletting.**

A.  Except in connection with a Permitted Transfer (defined in Section XII.E. below), Tenant shall not assign, sublease, transfer or encumber any interest in this Lease or allow any third party to use any portion of the Premises (collectively or individually, a "Transfer") without the prior written consent of Landlord, which consent shall not be unreasonably withheld if Landlord does not elect to exercise its termination rights under Section XII.B below. Without limitation, it is agreed that Landlord's consent shall not be considered unreasonably withheld if: (1) the proposed transferee's financial condition does not meet the criteria Landlord uses to select Building tenants having similar leasehold obligations; (2) the proposed transferee's business is not suitable for the Building considering the business of the other tenants and the Building's prestige, or would result in a violation of another tenant's rights; (3) the proposed transferee is a governmental agency or occupant of the Building or Property; (4) Tenant is in default after the expiration of the notice and cure periods in this Lease; or (5) any portion of the Building or Premises would likely become subject to additional or different Laws as a consequence of the proposed Transfer. Tenant shall not be entitled to receive monetary damages based upon a claim that Landlord unreasonably withheld its consent to a proposed Transfer and Tenant's sole remedy shall be an action to enforce any such provision through specific performance or declaratory judgment. Any attempted Transfer in violation of this Article shall, at Landlord's option, be void. Consent by Landlord to one or more Transfer(s) shall not operate as a waiver of Landlord's rights to approve any subsequent Transfers. In no event shall any Transfer or Permitted Transfer release or relieve Tenant from any obligation under this Lease.

B.  As part of its request for Landlord's consent to a Transfer, Tenant shall provide Landlord with financial statements for the proposed transferee, a complete copy of the proposed assignment, sublease and other contractual documents and

such other information as Landlord may reasonably request. Landlord shall, by written notice to Tenant within 30 days of its receipt of the required information and documentation, either: (1) consent to the Transfer by the execution of a consent agreement in a form reasonably designated by Landlord or reasonably refuse to consent to the Transfer in writing; or (2) exercise its right to terminate this Lease with respect to the portion of the Premises that Tenant is proposing to assign or sublet. Any such termination shall be effective on the proposed effective date of the Transfer for which Tenant requested consent. Tenant shall pay Landlord a review fee of $1,000.00 for Landlord's review of any Permitted Transfer or requested Transfer, provided if Landlord's actual reasonable costs and expenses (including reasonable attorney's fees) exceed $1,000.00, Tenant shall reimburse Landlord for its actual reasonable costs and expenses in lieu of a fixed review fee.

C.    Tenant shall pay Landlord 50% of all rent and other consideration which Tenant receives as a result of a Transfer that is in excess of the Rent payable to Landlord for the portion of the Premises and Term covered by the Transfer. Tenant shall pay Landlord for Landlord's share of any excess within 30 days after Tenant's receipt of such excess consideration. Tenant may deduct from the excess all reasonable and customary expenses directly incurred by Tenant attributable to the Transfer (other than Landlord's review fee), including brokerage fees, legal fees and construction costs. If Tenant is in Monetary Default (defined in Section XIX.A. below), Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of any payments received (less Landlord's share of any excess).

D.    Except as provided below with respect to a Permitted Transfer, if Tenant is a corporation, limited liability company, partnership, or similar entity, and if the entity which owns or controls a majority of the voting shares/rights at any time changes for any reason (including but not limited to a merger, consolidation or reorganization), such change of ownership or control shall constitute a Transfer. The foregoing shall not apply so long as Tenant is an entity whose outstanding stock is listed on a recognized security exchange, or if at least 80% of its voting stock is owned by another entity, the voting stock of which is so listed.

E.    So long as Tenant is not entering into the Permitted Transfer for the purpose of avoiding or otherwise circumventing the remaining terms of this Article XII, Tenant may assign its entire interest under this Lease, without the consent of Landlord, to (i) an affiliate, subsidiary, or parent of Tenant, or a corporation, partnership or other legal entity wholly owned by Tenant (collectively, an "Affiliated Party"), or (ii) a successor to Tenant by purchase, merger, consolidation or reorganization, provided that all of the following conditions are satisfied (each such Transfer a "Permitted Transfer"): (1) Tenant is not in default under this Lease; (2) the Permitted Use does not allow the Premises to be used for retail purposes; (3) Tenant shall give Landlord written notice at least 30 days prior to the effective date of the proposed Permitted Transfer; (4) with respect to a proposed Permitted Transfer to an Affiliated Party, Tenant continues to have a net worth equal to or greater than Tenant's net worth at the date of this Lease; and (5) with respect to a purchase, merger, consolidation or reorganization or any Permitted Transfer which results in Tenant ceasing to exist as a separate legal entity, (a) Tenant's successor shall own all or substantially all of the assets of Tenant, and (b) Tenant's successor shall have a net worth which is at least equal to the greater of Tenant's net worth at the date of this Lease or Tenant's net worth as of the day prior to the proposed purchase, merger, consolidation or reorganization.    Tenant's notice to Landlord shall include information and documentation showing that each of the above conditions has been satisfied. If requested by Landlord, Tenant's successor shall sign a commercially reasonable form of assumption agreement.    As used herein, (A) "parent" shall mean a company which owns a majority of Tenant's voting equity; (B) "subsidiary" shall mean an entity wholly owned by Tenant or at least 51% of whose voting equity is owned by Tenant; and (C) "affiliate" shall mean an entity controlled by, controlling or under common control with Tenant. Notwithstanding the foregoing, if any parent, affiliate or subsidiary to which this Lease has been assigned or transferred subsequently sells or transfers its voting equity or its interest under this Lease other than to another parent, subsidiary or affiliate of the original

Tenant named hereunder, such sale or transfer shall be deemed to be a Transfer requiring the consent of Landlord hereunder.

## XIII.    Liens.

Tenant shall not permit mechanic's or other liens to be placed upon the Property, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for benefit of Tenant.  If a lien is so placed, Tenant shall, within 10 days of notice from Landlord of the filing of the lien, fully discharge the lien by settling the claim which resulted in the lien or by bonding or insuring over the lien in the manner prescribed by the applicable lien Law.  If Tenant fails to discharge the lien, then, in addition to any other right or remedy of Landlord, Landlord may bond or insure over the lien or otherwise discharge the lien. Tenant shall reimburse Landlord for any amount paid by Landlord to bond or insure over the lien or discharge the lien, including, without limitation, reasonable attorneys' fees (if and to the extent permitted by Law) within 30 days after receipt of an invoice from Landlord.

## XIV.    Indemnity and Waiver of Claims.

A.    Except to the extent caused by the negligence or willful misconduct of Landlord or any Landlord Related Parties (defined below), Tenant shall indemnify, defend and hold Landlord, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, Mortgagee(s) (defined in Article XXVI) and agents ("Landlord Related Parties") harmless against and from all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including, without limitation, reasonable attorneys' fees and other professional fees (if and to the extent permitted by Law), which may be imposed upon, incurred by or asserted against Landlord or any of the Landlord Related Parties and arising out of or in connection with any damage or injury occurring in the Premises or any acts or omissions (including violations of Law) of Tenant, the Tenant Related Parties (defined below) or any of Tenant's transferees, contractors or licensees.

B.    Except to the extent caused by the negligence or willful misconduct of Tenant or any Tenant Related Parties (defined below), Landlord shall indemnify, defend and hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, employees and agents ("Tenant Related Parties") harmless against and from all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including, without limitation, reasonable attorneys' fees and other professional fees (if and to the extent permitted by Law), which may be imposed upon, incurred by or asserted against Tenant or any of the Tenant Related Parties and arising out of or in connection with the acts or omissions (including violations of Law) of Landlord, the Landlord Related Parties or any of Landlord's contractors.

C.    Landlord and the Landlord Related Parties shall not be liable for, and Tenant waives, all claims for loss or damage to Tenant's business or loss, theft or damage to Tenant's Property or the property of any person claiming by, through or under Tenant resulting from: (1) wind or weather; (2) the failure of any sprinkler, heating or air-conditioning equipment, any electric wiring or any gas, water or steam pipes; (3) the backing up of any sewer pipe or downspout; (4) the bursting, leaking or running of any tank, water closet, drain or other pipe; (5) water, snow or ice upon or coming through the roof, skylight, stairs, doorways, windows, walks or any other place upon or near the Building; (6) any act or omission of any party other than Landlord or Landlord Related Parties; and (7) any causes not reasonably within the control of Landlord.  Tenant shall insure itself against such losses under Article XV below.

## XV.    Insurance.

Tenant shall carry and maintain the following insurance ("Tenant's Insurance"), at its sole cost and expense:  (1) Commercial General Liability Insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum combined single limit of $2,000,000.00; (2) All Risk Property/Business Interruption Insurance, including flood and earthquake, written at replacement cost value and with a replacement cost endorsement covering all of Tenant's trade fixtures, equipment, furniture and other personal property within the Premises ("Tenant's Property"); (3) Workers' Compensation Insurance as required by the

state in which the Premises is located and in amounts as may be required by applicable statute; and (4) Employers Liability Coverage of at least $1,000,000.00 per occurrence. Any company writing any of Tenant's Insurance shall have an A.M. Best rating of not less than A-VIII. All Commercial General Liability Insurance policies shall name Tenant as a named insured and Landlord (or any successor), Equity Office Properties Trust, a Maryland real estate investment trust, EOP Operating Limited Partnership, a Delaware limited partnership, and their respective members, principals, beneficiaries, partners, officers, directors, employees, and agents, and other designees of Landlord as the interest of such designees shall appear, as additional insureds. All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall give Landlord and its designees at least 30 days' advance written notice of any change, cancellation, termination or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance evidencing Tenant's Insurance prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises for any reason, and upon renewals at least 15 days prior to the expiration of the insurance coverage. So long as the same is available at commercially reasonable rates, Landlord shall maintain so called All Risk property insurance on the Building at replacement cost value, as reasonably estimated by Landlord. Except as specifically provided to the contrary, the limits of either party's' insurance shall not limit such party's liability under this Lease.

### XVI.   Subrogation.

Notwithstanding anything in this Lease to the contrary, Landlord and Tenant hereby waive and shall cause their respective insurance carriers to waive any and all rights of recovery, claim, action or causes of action against the other and their respective trustees, principals, beneficiaries, partners, officers, directors, agents, and employees, for any loss or damage that may occur to Landlord or Tenant or any party claiming by, through or under Landlord or Tenant, as the case may be, with respect to Tenant's Property, the Building, the Premises, any additions or improvements to the Building or Premises, or any contents thereof, including all rights of recovery, claims, actions or causes of action arising out of the negligence of Landlord or any Landlord Related Parties or the negligence of Tenant or any Tenant Related Parties, which loss or damage is (or would have been, had the insurance required by this Lease been carried) covered by insurance.

### XVII.   Casualty Damage.

A.   If all or any part of the Premises is damaged by fire or other casualty, Tenant shall immediately notify Landlord in writing. During any period of time that all or a material portion of the Premises is rendered untenantable as a result of a fire or other casualty, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant. Landlord shall have the right to terminate this Lease if: (1) the Building shall be damaged so that, in Landlord's reasonable judgment, substantial alteration or reconstruction of the Building shall be required (whether or not the Premises has been damaged); (2) Landlord is not permitted by Law to rebuild the Building in substantially the same form as existed before the fire or casualty; (3) the Premises have been materially damaged and there is less than 2 years of the Term remaining on the date of the casualty; (4) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (5) a material uninsured loss to the Building occurs. Landlord may exercise its right to terminate this Lease by notifying Tenant in writing within 90 days after the date of the casualty. If Landlord does not terminate this Lease, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building and the Leasehold Improvements (excluding any Alterations that were performed by Tenant in violation of this Lease). However, in no event shall Landlord be required to spend more than the insurance proceeds received by Landlord. Landlord shall not be liable for any loss or damage to Tenant's Property or to the business of Tenant resulting in any way from the fire or other casualty or from the repair and restoration of the damage. Landlord and Tenant hereby waive the provisions of any Law relating to the matters addressed in this Article, and agree that their respective rights for damage to or destruction of the Premises shall be those specifically provided in this Lease.

B.   If all or any portion of the Premises shall be made untenantable by fire or other casualty, Landlord shall, with reasonable promptness, cause an architect or general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required to substantially complete the

repair and restoration of the Premises and make the Premises tenantable again, using standard working methods ("Completion Estimate"). If the Completion Estimate indicates that the Premises cannot be made tenantable within 270 days from the date the repair and restoration is started, then regardless of anything in Section XVII.A above to the contrary, either party shall have the right to terminate this Lease by giving written notice to the other of such election within 10 days after receipt of the Completion Estimate. Tenant, however, shall not have the right to terminate this Lease if the fire or casualty was caused by the negligence or intentional misconduct of Tenant, Tenant Related Parties or any of Tenant's transferees, contractors or licensees.

## XVIII. Condemnation.

Either party may terminate this Lease if the whole or any material part of the Premises shall be taken or condemned for any public or quasi-public use under Law, by eminent domain or private purchase in lieu thereof (a "Taking"). Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would leave the remainder of the Building unsuitable for use as an office building in a manner comparable to the Building's use prior to the Taking. In order to exercise its right to terminate the Lease, Landlord or Tenant, as the case may be, must provide written notice of termination to the other within 45 days after the terminating party first receives notice of the Taking. Any such termination shall be effective as of the date the physical taking of the Premises or the portion of the Building or Property occurs. If this Lease is not terminated, the Rentable Square Footage of the Building, the Rentable Square Footage of the Premises and Tenant's Pro Rata Share shall, if applicable, be appropriately adjusted. In addition, Rent for any portion of the Premises taken or condemned shall be abated during the unexpired Term of this Lease effective when the physical taking of the portion of the Premises occurs. All compensation awarded for a Taking, or sale proceeds, shall be the property of Landlord, any right to receive compensation or proceeds being expressly waived by Tenant. However, Tenant may file a separate claim at its sole cost and expense for Tenant's Property and Tenant's reasonable relocation expenses, provided the filing of the claim does not diminish the award which would otherwise be receivable by Landlord.

## XIX.    Events of Default.

Tenant shall be considered to be in default of this Lease upon the occurrence of any of the following events of default:

A.      Tenant's failure to pay when due all or any portion of the Rent, if the failure continues for 5 Business Days after written notice to Tenant ("Monetary Default").

B.      Tenant's failure (other than a Monetary Default) to comply with any term, provision or covenant of this Lease, if the failure is not cured within 10 days after written notice to Tenant. However, if Tenant's failure to comply cannot reasonably be cured within 10 days, Tenant shall be allowed additional time (not to exceed 60 days) as is reasonably necessary to cure the failure so long as: (1) Tenant commences to cure the failure within 10 days, and (2) Tenant diligently pursues a course of action that will cure the failure and bring Tenant back into compliance with the Lease. However, if Tenant's failure to comply creates a hazardous condition, the failure must be cured immediately upon notice to Tenant. In addition, if Landlord provides Tenant with notice of Tenant's failure to comply with any particular term, provision or covenant of the Lease on 3 occasions during any 12 month period, Tenant's subsequent violation of such term, provision or covenant shall, at Landlord's option, be an incurable event of default by Tenant.

C.      Tenant or any Guarantor becomes insolvent, makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts when due.

D.      The leasehold estate is taken by process or operation of Law.

E       In the case of any ground floor or retail Tenant, Tenant does not take possession of, or abandons or vacates all or any portion of the Premises.

F.  Tenant is in default beyond any notice and cure period under any other lease or agreement with Landlord, including, without limitation, any lease or agreement for parking.

XX.  **Remedies.**

A.  Upon any default, Landlord shall have the right without notice or demand (except as provided in Article XIX) to pursue any of its rights and remedies at Law or in equity, including any one or more of the following remedies:

1.  Terminate this Lease, in which case Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may, in compliance with applicable Law and without prejudice to any other right or remedy, enter upon and take possession of the Premises and expel and remove Tenant, Tenant's Property and any party occupying all or any part of the Premises. Tenant shall pay Landlord on demand the amount of all past due Rent and other losses and damages which Landlord may suffer as a result of Tenant's default, whether by Landlord's inability to relet the Premises on satisfactory terms or otherwise, including, without limitation, all Costs of Reletting (defined below) and any deficiency that may arise from reletting or the failure to relet the Premises. "Costs of Reletting" shall include all costs and expenses incurred by Landlord in reletting or attempting to relet the Premises, including, without limitation, reasonable legal fees, brokerage commissions, the cost of alterations and the value of other concessions or allowances granted to a new tenant.

2.  Terminate Tenant's right to possession of the Premises and, in compliance with applicable Law, expel and remove Tenant, Tenant's Property and any parties occupying all or any part of the Premises. Landlord may (but shall not be obligated to) relet all or any part of the Premises, without notice to Tenant, for a term that may be greater or less than the balance of the Term and on such conditions (which may include concessions, free rent and alterations of the Premises) and for such uses as Landlord in its absolute discretion shall determine. Landlord may collect and receive all rents and other income from the reletting. Tenant shall pay Landlord on demand all past due Rent, all Costs of Reletting and any deficiency arising from the reletting or failure to relet the Premises. Landlord shall not be responsible or liable for the failure to relet all or any part of the Premises or for the failure to collect any Rent. The re-entry or taking of possession of the Premises shall not be construed as an election by Landlord to terminate this Lease unless a written notice of termination is given to Tenant.

3.  In lieu of calculating damages under Sections XX.A.1 or XX.A.2 above, Landlord may elect to receive as damages the sum of (a) all Rent accrued through the date of termination of this Lease or Tenant's right to possession, and (b) an amount equal to the total Rent that Tenant would have been required to pay for the remainder of the Term discounted to present value at the Prime Rate (defined in Section XX.B. below) then in effect, minus the then present fair rental value of the Premises for the remainder of the Term, similarly discounted, after deducting all anticipated Costs of Reletting.

B.  Unless expressly provided in this Lease, the repossession or re-entering of all or any part of the Premises shall not relieve Tenant of its liabilities and obligations under the Lease. No right or remedy of Landlord shall be exclusive of any other right or remedy. Each right and remedy shall be cumulative and in addition to any other right and remedy now or subsequently available to Landlord at Law or in equity. If Landlord declares Tenant to be in default, Landlord shall be entitled to receive interest on any unpaid item of Rent at a rate equal to the Prime Rate plus 4%. For purposes hereof, the "Prime Rate" shall be the per annum interest rate publicly announced as its prime or base rate by a federally insured bank selected by Landlord in the state in which the Building is located. Forbearance by

Landlord to enforce one or more remedies shall not constitute a waiver of any default.

## XXI. Limitation of Liability.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, THE LIABILITY OF LANDLORD (AND OF ANY SUCCESSOR LANDLORD) TO TENANT SHALL BE LIMITED TO THE INTEREST OF LANDLORD IN THE PROPERTY. TENANT SHALL LOOK SOLELY TO LANDLORD'S INTEREST IN THE PROPERTY FOR THE RECOVERY OF ANY JUDGMENT OR AWARD AGAINST LANDLORD. NEITHER LANDLORD NOR ANY LANDLORD RELATED PARTY SHALL BE PERSONALLY LIABLE FOR ANY JUDGMENT OR DEFICIENCY. BEFORE FILING SUIT FOR AN ALLEGED DEFAULT BY LANDLORD, TENANT SHALL GIVE LANDLORD AND THE MORTGAGEE(S) (DEFINED IN ARTICLE XXVI BELOW) WHOM TENANT HAS BEEN NOTIFIED HOLD MORTGAGES (DEFINED IN ARTICLE XXVI BELOW) ON THE PROPERTY, BUILDING OR PREMISES, NOTICE AND REASONABLE TIME TO CURE THE ALLEGED DEFAULT.

## XXII. No Waiver.

Either party's failure to declare a default immediately upon its occurrence, or delay in taking action for a default shall not constitute a waiver of the default, nor shall it constitute an estoppel. Either party's failure to enforce its rights for a default shall not constitute a waiver of its rights regarding any subsequent default. Receipt by Landlord of Tenant's keys to the Premises shall not constitute an acceptance or surrender of the Premises.

## XXIII. Quiet Enjoyment.

Tenant shall, and may peacefully have, hold and enjoy the Premises, subject to the terms of this Lease, provided Tenant pays the Rent and fully performs all of its covenants and agreements. This covenant and all other covenants of Landlord shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building, and shall not be a personal covenant of Landlord or the Landlord Related Parties.

## XXIV. Relocation.

Landlord, at its expense, at any time before or during the Term, may relocate Tenant from the Premises to reasonably comparable space ("Relocation Space") within the Building or adjacent buildings within the same project upon 90 days' prior written notice to Tenant. From and after the date of the relocation, "Premises" shall refer to the Relocation Space into which Tenant has been moved and the Base Rent and Tenant's Pro Rata Share shall be adjusted based on the rentable square footage of the Relocation Space. Landlord shall pay Tenant's reasonable costs for moving Tenant's furniture and equipment and printing and distributing notices to Tenant's customers of Tenant's change of address and one month's supply of stationery showing the new address.

## XXV. Holding Over.

Except for any permitted occupancy by Tenant under Article VIII, if Tenant fails to surrender the Premises at the expiration or earlier termination of this Lease, occupancy of the Premises after the termination or expiration shall be that of a tenancy at sufferance. Tenant's occupancy of the Premises during the holdover shall be subject to all the terms and provisions of this Lease and Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to 150% of the greater of: (1) the sum of the Base Rent and Additional Rent due for the period immediately preceding the holdover; or (2) the fair market gross rental for the Premises as reasonably determined by Landlord. No holdover by Tenant or payment by Tenant after the expiration or early termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. In addition to the payment of the amounts provided above, if Landlord is unable to deliver possession of the Premises to a new tenant, or to perform improvements for a new tenant, as a result of Tenant's holdover and Tenant fails to vacate the Premises within 15 days after Landlord notifies Tenant of Landlord's inability to deliver possession, or perform improvements, Tenant shall be liable to Landlord for all damages, including, without limitation, consequential damages, that Landlord suffers from the holdover.

## XXVI. Subordination to Mortgages; Estoppel Certificate.

Tenant accepts this Lease subject and subordinate to any mortgage(s), deed(s) of trust, ground lease(s) or other lien(s) now or subsequently arising upon the Premises, the Building or the Property, and to renewals, modifications, refinancings and extensions thereof (collectively referred to as a "Mortgage"). The party having the benefit of a Mortgage shall be referred to as a "Mortgagee". This clause shall be self-operative, but upon request from a Mortgagee, Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee. In lieu of having the Mortgage be superior to this Lease, a Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease. If requested by a successor-in-interest to all or a part of Landlord's interest in the Lease, Tenant shall, without charge, attorn to the successor-in-interest. Landlord and Tenant shall each, within 10 days after receipt of a written request from the other, execute and deliver an estoppel certificate to those parties as are reasonably requested by the other (including a Mortgagee or prospective purchaser). The estoppel certificate shall include a statement certifying that this Lease is unmodified (except as identified in the estoppel certificate) and in full force and effect, describing the dates to which Rent and other charges have been paid, representing that, to such party's actual knowledge, there is no default (or stating the nature of the alleged default) and indicating other matters with respect to the Lease that may reasonably be requested.

## XXVII. Attorneys' Fees.

If either party institutes a suit against the other for violation of or to enforce any covenant or condition of this Lease, or if either party intervenes in any suit in which the other is a party to enforce or protect its interest or rights, the prevailing party shall be entitled to all of its costs and expenses, including, without limitation, reasonable attorneys' fees.

## XXVIII. Notice.

If a demand, request, approval, consent or notice (collectively referred to as a "notice") shall or may be given to either party by the other, the notice shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested, or sent by overnight or same day courier service at the party's respective Notice Address(es) set forth in Article I, except that if Tenant has vacated the Premises (or if the Notice Address for Tenant is other than the Premises, and Tenant has vacated such address) without providing Landlord a new Notice Address, Landlord may serve notice in any manner described in this Article or in any other manner permitted by Law. Each notice shall be deemed to have been received or given on the earlier to occur of actual delivery or the date on which delivery is refused, or, if Tenant has vacated the Premises or the other Notice Address of Tenant without providing a new Notice Address, 3 days after notice is deposited in the U.S. mail or with a courier service in the manner described above. Either party may, at any time, change its Notice Address (other than to a post office box address) by giving the other party written notice of the new address in the manner described in this Article.

## XXIX. Excepted Rights.

This Lease does not grant any rights to light or air over or about the Building. Landlord excepts and reserves exclusively to itself the use of: (1) roofs, (2) telephone, electrical and janitorial closets, (3) equipment rooms, Building risers or similar areas that are used by Landlord for the provision of Building services, (4) rights to the land and improvements below the floor of the Premises, (5) the improvements and air rights above the Premises, (6) the improvements and air rights outside the demising walls of the Premises, and (7) the areas within the Premises used for the installation of utility lines and other installations serving occupants of the Building. Landlord has the right to change the Building's name or address. Landlord also has the right to make such other changes to the Property and Building as Landlord deems appropriate, provided the changes do not materially affect Tenant's ability to use the Premises for the Permitted Use. Landlord shall also have the right (but not the obligation) to temporarily close the Building if Landlord reasonably determines that there is an imminent danger of significant damage to the Building or of personal injury to Landlord's employees or the occupants of the Building. The circumstances under which Landlord may temporarily close the Building shall include, without limitation, electrical interruptions, hurricanes and civil disturbances. A closure of the Building under such circumstances shall not constitute a constructive eviction nor entitle Tenant to an abatement or reduction of Rent.

### XXX. Surrender of Premises.

At the expiration or earlier termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Property (defined in Article XV) from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear excepted.  Tenant shall also be required to remove the Required Removables in accordance with Article VIII.  If Tenant fails to remove any of Tenant's Property within 2 days after the termination of this Lease or of Tenant's right to possession, Landlord, at Tenant's sole cost and expense, shall be entitled (but not obligated) to remove and store Tenant's Property.  Landlord shall not be responsible for the value, preservation or safekeeping of Tenant's Property.  Tenant shall pay Landlord, upon demand, the expenses and storage charges incurred for Tenant's Property.  In addition, if Tenant fails to remove Tenant's Property from the Premises or storage, as the case may be, within 30 days after written notice, Landlord may deem all or any part of Tenant's Property to be abandoned, and title to Tenant's Property shall be deemed to be immediately vested in Landlord.

### XXXI. Miscellaneous.

A.  This Lease and the rights and obligations of the parties shall be interpreted, construed and enforced in accordance with the Laws of the state in which the Building is located and Landlord and Tenant hereby irrevocably consent to the jurisdiction and proper venue of such state.  If any term or provision of this Lease shall to any extent be invalid or unenforceable, the remainder of this Lease shall not be affected, and each provision of this Lease shall be valid and enforced to the fullest extent permitted by Law.  The headings and titles to the Articles and Sections of this Lease are for convenience only and shall have no effect on the interpretation of any part of the Lease.

B.  Tenant shall not record this Lease or any memorandum without Landlord's prior written consent.

C.  Landlord and Tenant hereby waive any right to trial by jury in any proceeding based upon a breach of this Lease.

D.  Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant, the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, civil disturbances and other causes beyond the reasonable control of the performing party ("Force Majeure").  However, events of Force Majeure shall not extend any period of time for the payment of Rent or other sums payable by either party or any period of time for the written exercise of an option or right by either party.

E.  Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and/or Property referred to herein, and upon such transfer Landlord shall be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations.

F.  Tenant represents that it has dealt directly with and only with the Broker as a broker in connection with this Lease.  Tenant shall indemnify and hold Landlord and the Landlord Related Parties harmless from all claims of any other brokers claiming to have represented Tenant in connection with this Lease.  Landlord agrees to indemnify and hold Tenant and the Tenant Related Parties harmless from all claims of any brokers claiming to have represented Landlord in connection with this Lease.

G.  Tenant covenants, warrants and represents that:  (1) each individual executing, attesting and/or delivering this Lease on behalf of Tenant is authorized to do so on behalf of Tenant; (2) this Lease is binding upon Tenant; and (3) Tenant is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located.  If there is more than one Tenant, or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all the parties and entities.  Notices, payments and agreements given or made by, with or to any

one person or entity shall be deemed to have been given or made by, with and to all of them.

H.    Time is of the essence with respect to Tenant's exercise of any expansion, renewal or extension rights granted to Tenant. This Lease shall create only the relationship of landlord and tenant between the parties, and not a partnership, joint venture or any other relationship. This Lease and the covenants and conditions in this Lease shall inure only to the benefit of and be binding only upon Landlord and Tenant and their permitted successors and assigns.

I.    The expiration of the Term, whether by lapse of time or otherwise, shall not relieve either party of any obligations which accrued prior to or which may continue to accrue after the expiration or early termination of this Lease. Without limiting the scope of the prior sentence, it is agreed that Tenant's obligations under Articles IV, VIII, XIV, XX, XXV and XXX shall survive the expiration or early termination of this Lease.

J.    Landlord has delivered a copy of this Lease to Tenant for Tenant's review only, and the delivery of it does not constitute an offer to Tenant or an option. This Lease shall not be effective against any party hereto until an original copy of this Lease has been signed by such party.

K.    All understandings and agreements previously made between the parties are superseded by this Lease, and neither party is relying upon any warranty, statement or representation not contained in this Lease. This Lease may be modified only by a written agreement signed by Landlord and Tenant.

L.    Tenant, within 15 days after request, shall provide Landlord with a current financial statement and such other information as Landlord may reasonably request in order to create a "business profile" of Tenant and determine Tenant's ability to fulfill its obligations under this Lease. Landlord, however, shall not require Tenant to provide such information unless Landlord is requested to produce the information in connection with a proposed financing or sale of the Building. Upon written request by Tenant, Landlord shall enter into a commercially reasonable confidentiality agreement covering any confidential information that is disclosed by Tenant; such agreement to be in the form attached as Exhibit F hereto.

M.    Subject to the provisions of this Section M, so long as Tenant is not in default under this Lease, and provided Tenant's employees execute Landlord's standard waiver of liability form and pay the applicable one time or monthly fee, if any then Tenant's employees (the "Fitness Center Users") shall be entitled to use the fitness center (the "Fitness Center") in the Building. The use of the Fitness Center shall be subject to the reasonable rules and regulations (including rules regarding hours of use) established from time to time by Landlord for the Fitness Center. Landlord and Tenant acknowledge that the use of the Fitness Center by the Fitness Center Users shall be at their own risk and that the terms and provisions of Section XIV.A of this Lease shall apply to Tenant and the Fitness Center User's use of the Fitness Center. The costs of operating, maintaining and repairing the Fitness Center may be included as part of Expenses. Tenant acknowledges that the provisions of this Section shall not be deemed to be a representation by Landlord that Landlord shall continuously maintain the Fitness Center (or any other fitness facility) throughout the Term of this Lease, and Landlord shall have the right, at Landlord's sole discretion, to expand, contract, eliminate or otherwise modify the Fitness Center. No expansion, contraction, elimination or modification of the Fitness Center, and no termination of Tenant's or the Fitness Center Users' rights to the Fitness Center shall entitle Tenant to an abatement or reduction in Rent, or constitute a constructive eviction, or result in an event of default by Landlord under this Lease.

N.    This Lease shall be subject and subordinate to, and Tenant agrees to perform and comply with, the terms, conditions and provisions of all documents of record now or hereafter entered into affecting the Building and the Property.

**XXXII. Entire Agreement.**

This Lease including the following exhibits and attachments which are hereby incorporated into and made a part of this Lease constitute the entire agreement between the parties and supersede all prior agreements and understandings related to the Premises, including all lease proposals, letters of intent and other documents: **Exhibit A** (Outline and Location of Premises), **Exhibit B** (Building Rules and Regulations), **Exhibit C** (Intentionally Omitted), **Exhibit D** (Work Letter), **Exhibit E** (Additional Provisions), **Exhibit E-1** (Outline and Location of Temporary Space) **Exhibit F** (Confidentiality Agreement), and **Exhibit G** (Outline and Location of the Storage Spaces).

Landlord and Tenant have executed this Lease as of the day and year first above written.

**LANDLORD:**

**EOP-QUADRANT, L.L.C., a Delaware limited liability company**

By: EOP Operating Limited Partnership, a Delaware limited partnership, its sole member

  By: Equity Office Properties Trust, a Maryland real estate investment trust, its general partner

    By: _____
    Name: Kim T. Koehn
    Title: Senior Vice President – Denver Region

**TENANT:**

**RBC MORTGAGE COMPANY, an Illinois corporation**

By: _____
Name: Jamie G. Zelvin
Title: Associate General Counsel

**EXHIBIT A**

**OUTLINE AND LOCATION OF PREMISES**

     This Exhibit is attached to and made a part of the Lease by and between **EOP-QUADRANT, L.L.C., a Delaware limited liability company**("Landlord") and **RBC MORTGAGE COMPANY, an Illinois corporation** ("Tenant") for space in the Building located at 5445 DTC Parkway, Greenwood Village, Colorado 80111, and commonly known as The Quadrant.

Suite No. 100
13,990 rentable square feet



**EXHIBIT B**

**BUILDING RULES AND REGULATIONS**

The following rules and regulations shall apply, where applicable, to the Premises, the Building, the parking garage (if any), the Property and the appurtenances. Capitalized terms have the same meaning as defined in the Lease.

1.      Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises. No rubbish, litter, trash, or material shall be placed, emptied, or thrown in those areas. At no time shall Tenant permit Tenant's employees to loiter in Common Areas or elsewhere about the Building or Property.

2.      Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed in the fixtures or appliances. Damage resulting to fixtures or appliances by Tenant, its agents, employees or invitees, shall be paid for by Tenant, and Landlord shall not be responsible for the damage.

3.      No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Building, except those of such color, size, style and in such places as are first approved in writing by Landlord. All tenant identification and suite numbers at the entrance to the Premises shall be installed by Landlord, at Tenant's cost and expense, using the standard graphics for the Building. Except in connection with the hanging of lightweight pictures and wall decorations, no nails, hooks or screws shall be inserted into any part of the Premises or Building except by the Building maintenance personnel.

4.      Landlord may provide and maintain in the first floor (main lobby) of the Building an alphabetical directory board or other directory device listing tenants, and no other directory shall be permitted unless previously consented to by Landlord in writing.

5.      Tenant shall not place any lock(s) on any door in the Premises or Building without Landlord's prior written consent and Landlord shall have the right to retain at all times and to use keys to all locks within and into the Premises. A reasonable number of keys to the locks on the entry doors in the Premises shall be furnished by Landlord to Tenant at Tenant's cost, and Tenant shall not make any duplicate keys. All keys shall be returned to Landlord at the expiration or early termination of this Lease.

6.      All contractors, contractor's representatives and installation technicians performing work in the Building shall be subject to Landlord's prior approval and shall be required to comply with Landlord's standard rules. regulations, policies and procedures, which may be revised from time to time.

7.      Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of merchandise or materials requiring the use of elevators, stairways, lobby areas or loading dock areas, shall be restricted to hours designated by Landlord. Tenant shall obtain Landlord's prior approval by providing a detailed listing of the activity. If approved by Landlord, the activity shall be under the supervision of Landlord and performed in the manner required by Landlord. Tenant shall assume all risk for damage to articles moved and injury to any persons resulting from the activity. If equipment, property, or personnel of Landlord or of any other party is damaged or injured as a result of or in connection with the activity, Tenant shall be solely liable for any resulting damage or loss.

8.      Landlord shall have the right to approve the weight, size, or location of heavy equipment or articles in and about the Premises. Damage to the Building by the installation, maintenance, operation, existence or removal of Tenant's Property shall be repaired at Tenant's sole expense.

9.      Corridor doors, when not in use, shall be kept closed.

10.     Tenant shall not: (1) make or permit any improper, objectionable or unpleasant noises or odors in the Building, or otherwise interfere in any way with other tenants or persons

having business with them; (2) solicit business or distribute, or cause to be distributed, in any portion of the Building, handbills, promotional materials or other advertising; or (3) conduct or permit other activities in the Building that might, in Landlord's sole opinion, constitute a nuisance.

11.   No animals, except those assisting handicapped persons, shall be brought into the Building or kept in or about the Premises.

12.   No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises, Building or about the Property.   Tenant shall not, without Landlord's prior written consent, use, store, install, spill, remove, release or dispose of, within or about the Premises or any other portion of the Property, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq. or any other applicable environmental Law which may now or later be in effect.   Tenant shall comply with all Laws pertaining to and governing the use of these materials by Tenant, and shall remain solely liable for the costs of abatement and removal.

13.   Tenant shall not use or occupy the Premises in any manner or for any purpose which might injure the reputation or impair the present or future value of the Premises or the Building. Tenant shall not use, or permit any part of the Premises to be used, for lodging, sleeping or for any illegal purpose.

14.   Tenant shall not take any action which would violate Landlord's labor contracts or which would cause a work stoppage, picketing, labor disruption or dispute, or interfere with Landlord's or any other tenant's or occupant's business or with the rights and privileges of any person lawfully in the Building ("Labor Disruption"). Tenant shall take the actions necessary to resolve the Labor Disruption, and shall have pickets removed and, at the request of Landlord, immediately terminate any work in the Premises that gave rise to the Labor Disruption, until Landlord gives its written consent for the work to resume. Tenant shall have no claim for damages against Landlord or any of the Landlord Related Parties, nor shall the Commencement Date of the Term be extended as a result of the above actions.

15.   Tenant shall not install, operate or maintain in the Premises or in any other area of the Building, electrical equipment that would overload the electrical system beyond its capacity for proper, efficient and safe operation as determined solely by Landlord. Tenant shall not furnish cooling or heating to the Premises, including, without limitation, the use of electric or gas heating devices, without Landlord's prior written consent. Tenant shall not use more than its proportionate share of telephone lines and other telecommunication facilities available to service the Building.

16.   Tenant shall not operate or permit to be operated a coin or token operated vending machine or similar device (including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for sale of beverages, foods, candy, cigarettes and other goods), except for machines for the exclusive use of Tenant's employees  and then only if the operation does not violate the lease of any other tenant in the Building.

17.   Bicycles and other vehicles are not permitted inside the Building or on the walkways outside the Building, except in areas designated by Landlord.

18.   Landlord may from time to time adopt systems and procedures for the security and safety of the Building, its occupants, entry, use and contents.  Tenant, its agents, employees, contractors, guests and invitees shall comply with Landlord's systems and procedures.

19.   Landlord shall have the right to prohibit the use of the name of the Building or any other publicity by Tenant that in Landlord's sole opinion may impair the reputation of the Building or its desirability.  Upon written notice from Landlord, Tenant shall refrain from and discontinue such publicity immediately.

20.   Tenant shall not canvass, solicit or peddle in or about the Building or the Property without the prior written consent of Landlord.

21. Neither Tenant nor its agents, employees, contractors, guests or invitees shall smoke or permit smoking in the Common Areas, unless the Common Areas have been declared a designated smoking area by Landlord, nor shall the above parties allow smoke from the Premises to emanate into the Common Areas or any other part of the Building. Landlord shall have the right to designate the Building (including the Premises) as a non-smoking building.

22. Landlord shall have the right to designate and approve standard window coverings for the Premises and to establish rules to assure that the Building presents a uniform exterior appearance. Tenant shall ensure, to the extent reasonably practicable, that window coverings are closed on windows in the Premises while they are exposed to the direct rays of the sun.

23. Deliveries to and from the Premises shall be made only at the times, in the areas and through the entrances and exits designated by Landlord. Tenant shall not make deliveries to or from the Premises in a manner that might interfere with the use by any other tenant of its premises or of the Common Areas, any pedestrian use, or any use which is inconsistent with good business practice.

24. The work of cleaning personnel shall not be hindered by Tenant after 5:30 P.M., and cleaning work may be done at any time when the offices are vacant. Windows, doors and fixtures may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles to prevent unreasonable hardship to the cleaning service.

**EXHIBIT C**

**INTENTIONALLY OMITTED**

**EXHIBIT D**

**WORK LETTER**

This Exhibit is attached to and made a part of the Lease by and between **EOP-QUADRANT, L.L.C., a Delaware limited liability company**("Landlord") and **RBC MORTGAGE COMPANY, an Illinois corporation** ("Tenant") for space in the Building located at 5445 DTC Parkway, Greenwood Village, Colorado 80111, and commonly known as The Quadrant.

As used in this Workletter, the "Premises" shall be deemed to mean the Premises, as initially defined in the attached Lease.

1.  Landlord shall perform improvements to the Premises substantially in accordance with the plans prepared by Waring McLaughlin, Inc., dated October 16, 2002 (the "Plans"). The improvements to be performed by Landlord in accordance with the Plans are hereinafter referred to as the "Landlord Work." Tenant acknowledges and agrees that the time reasonably required for Substantial completion of the Landlord Work will be at least 25 Business Days following the issuance of permits for the Landlord Work. It is agreed that construction of the Landlord Work will be completed at Landlord's sole cost and expense (subject to the Maximum Amount and further subject to the terms of Paragraph4 below) using Building Standard methods, materials and finishes. Landlord and Tenant agree that Landlord's obligation to pay for the cost of Landlord Work (inclusive of the cost of preparing Plans, obtaining permits, a construction management fee equal to 5% of the total construction costs, and other related costs) shall be limited to $128,008.50 (the "Maximum Amount") and that Tenant shall be responsible for the cost of Landlord Work, plus any applicable state sales or use tax, if any, to the extent that it exceeds the Maximum Amount. Landlord shall enter into a direct contract for the Landlord Work with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Landlord Work. Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed a representation by Landlord that such Plans or the revisions thereto comply with applicable insurance requirements, building codes, ordinances, laws or regulations, or that the improvements constructed in accordance with the Plans and any revisions thereto will be adequate for Tenant's use, it being agreed that Tenant shall be responsible for all elements of the design of Tenant's plans (including, without limitation, compliance with law, functionality of design, the structural integrity of the design, the configuration of the premises and the placement of Tenant's furniture, appliances and equipment).

2.  If Landlord's estimate and/or the actual cost of the Landlord Work and the Temporary Space Improvements shall exceed the Maximum Amount, Landlord, prior to commencing any construction of Landlord Work, shall submit to Tenant a written estimate setting forth the anticipated cost of the Landlord Work, including but not limited to labor and materials, contractor's fees and permit fees. Within 3 Business Days thereafter, Tenant shall either notify Landlord in writing of its approval of the cost estimate, or specify its objections thereto and any desired changes to the proposed Landlord Work. If Tenant notifies Landlord of such objections and desired changes, Tenant shall work with Landlord to reach a mutually acceptable alternative cost estimate.

3.  If Landlord's estimate and/or the actual cost of construction shall exceed the Maximum Amount (such amounts exceeding the Maximum Amount being herein referred to as the "Excess Costs"), Tenant shall pay to Landlord such Excess Costs, plus any applicable state sales or use tax thereon, upon demand. The statements of costs submitted to Landlord by Landlord's contractors shall be conclusive for purposes of determining the actual cost of the items described therein. The amounts payable by Tenant hereunder constitute Rent payable pursuant to the Lease, and the failure to timely pay same constitutes an event of default under the Lease.

4.  If Tenant shall request any revisions to the Plans, Landlord shall have such revisions prepared at Tenant's sole cost and expense and Tenant shall reimburse Landlord for the cost of preparing any such revisions to the Plans, plus any applicable state sales or use tax thereon, upon demand. Promptly upon completion of the revisions, Landlord shall notify Tenant in writing of the increased cost in the Landlord Work, if any, resulting from such revisions to the Plans. Tenant, within one Business Day, shall notify Landlord in writing whether it desires to proceed with such revisions. In the absence of such written

authorization, Landlord shall have the option to continue work on the Premises disregarding the requested revision. Tenant shall be responsible for any Tenant Delay in completion of the Premises resulting from any revision to the Plans. If such revisions result in an increase in the cost of Landlord Work, such increased costs, plus any applicable state sales or use tax thereon, shall be payable by Tenant upon demand. Notwithstanding anything herein to the contrary, all revisions to the Plans shall be subject to the approval of Landlord.

5.      Any portion of the Maximum Amount which exceeds the cost of the Landlord Work and the Temporary Space Improvements or is otherwise remaining after April 30, 2003, shall accrue to the sole benefit of Landlord, it being agreed that Tenant shall not be entitled to any credit, offset, abatement or payment with respect thereto.

6.      Tenant acknowledges that the Landlord Work may be performed by Landlord in the Premises during Normal Business Hours subsequent to the Commencement Date. Landlord and Tenant agree to cooperate with each other in order to enable the Landlord Work to be performed in a timely manner and with as little inconvenience to the operation of Tenant's business as is reasonably possible. Notwithstanding anything herein to the contrary, any delay in the completion of the Landlord Work or inconvenience suffered by Tenant during the performance of the Landlord Work shall not delay the Commencement Date, nor shall it subject Landlord to any liability for any loss or damage resulting therefrom or entitle Tenant to any credit, abatement or adjustment of Rent or other sums payable under the Lease.

7.      This Exhibit shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

8.      Landlord and Tenant acknowledge and agree that in addition to the Landlord Work defined in the approved Plans, Landlord, at Landlord's expense (subject to the Maximum Amount defined above) shall perform improvements in the Temporary Space (defined in Section III, of **Exhibit E**) (the "Temporary Space Improvements"). The Temporary Space Improvements shall be limited to the following list only and are not defined in the Plans:

- Painting of the existing painted areas within the Temporary Space utilizing a Building standard color, as needed.

- Recarpeting all interior areas of the Temporary Space with Building-standard materials.

- Strip existing wallcovering and repaint in the reception area and first office closest to the entrance to the Temporary Space only, with Building standard materials.

**EXHIBIT E**

**ADDITIONAL PROVISIONS**

This Exhibit is attached to and made a part of the Lease by and between **EOP-QUADRANT, L.L.C., a Delaware limited liability company**("Landlord") and **RBC MORTGAGE COMPANY, an Illinois corporation** ("Tenant") for space in the Building located at 5445 DTC Parkway, Greenwood Village, Colorado 80111, and commonly known as The Quadrant.

I.    **PARKING.**

    A.    During the initial Term, Tenant shall have the right to lease from Landlord up to a maximum of 45 parking spaces (including the 30 Spaces set forth and discussed in I.B below) (such parking spaces in, or on the roof of the Building garage ["Garage"]) (collectively, the "Spaces"). The Spaces shall be assigned by Landlord upon written notice to Tenant, which notice shall indicate how many of the Spaces are designated as reserved and/or unreserved Spaces. The Spaces shall be located in, or on the roof of, the Building Garage for the use of Tenant and its employees. No deductions or allowances shall be made for days when Tenant or any of its employees does not utilize the parking facilities or for Tenant utilizing less than all of the Spaces. Tenant shall not have the right to lease or otherwise use more than the number of reserved and unreserved Spaces set forth above. If requested by Landlord, Tenant shall execute and deliver to Landlord the standard parking agreement used by Landlord or the operator, if any (the "Parking Agreement") of the Garage for such Spaces.

    B.    Notwithstanding anything to the contrary contained herein, commencing on the Commencement Date of the Lease and ending on the 48th full calendar month of the Term, Tenant shall pay $0.00 for each unreserved parking Space leased by Tenant up to a maximum of 29 unreserved Spaces, and $0.00 for 1 reserved Space leased by Tenant. Thereafter, Tenant shall be required to pay, Landlord, as Additional Rent in accordance with Article IV of the Lease, the sum of $20.00 per month, plus applicable tax thereon, if any, for each and every unreserved Space leased by Tenant hereunder, and the sum of $35.00 per month, plus applicable tax thereon, if any, for each and every reserved Space, as such rates may be adjusted from time-to-time to reflect the then current rate for parking in the Garage.

    C.    Except for particular spaces and areas designated by Landlord for reserved parking, all parking in the Garage and surface parking areas serving the Building shall be on an unreserved, first-come, first-served basis.

    D.    Landlord shall not be responsible for money, jewelry, automobiles or other personal property lost in or stolen from the Garage or the surface parking areas regardless of whether such loss or theft occurs when the Garage or other areas therein are locked or otherwise secured. Except as caused by the negligence or willful misconduct of Landlord and without limiting the terms of the preceding sentence, Landlord shall not be liable for any loss, injury or damage to persons using the Garage or the surface parking areas or automobiles or other property therein, it being agreed that, to the fullest extent permitted by law, the use of the Spaces shall be at the sole risk of Tenant and its employees.

    E.    Landlord shall have the right from time to time to designate the location of the Spaces and to promulgate reasonable rules and regulations regarding the Garage, the surface parking areas, if any, the Spaces and the use thereof, including, but not limited to, rules and regulations controlling the flow of traffic to and from various parking areas, the angle and direction of parking and the like. Tenant shall comply with and cause its employees to comply with all such rules and regulations as well as all reasonable additions and amendments thereto.

    F.    Tenant shall not store or permit its employees to store any automobiles in the Garage or on the surface parking areas without the prior written consent of Landlord. Except for emergency repairs, Tenant and its employees shall not perform any work on any automobiles while located in the Garage or on the Property. If it is necessary for Tenant or its employees to leave an automobile in

the Garage or on the surface parking areas overnight, Tenant shall provide Landlord with prior notice thereof designating the license plate number and model of such automobile.

G.    Landlord shall have the right to temporarily close the Garage or certain areas therein in order to perform necessary repairs, maintenance and improvements to the Garage or the surface parking areas, if any.

H.    Tenant shall not assign or sublease any of the Spaces without the consent of Landlord, other than pursuant to a Permitted Transfer. Landlord shall have the right to terminate this Parking Agreement with respect to any Spaces that Tenant desires to sublet or assign.

I.    Landlord may elect to provide parking cards or keys to control access to the Garage or surface parking areas, if any. In such event, Landlord shall provide Tenant with one card or key for each Space that Tenant is leasing hereunder, provided that Landlord shall have the right to require Tenant or its employees to place a deposit on such access cards or keys and to pay a fee for any lost or damaged cards or keys.

J.    Landlord hereby reserves the right to enter into a management agreement or lease with an entity for the Garage ("Garage Operator"). In such event, Tenant, upon request of Landlord, shall enter into a parking agreement with the Garage Operator and pay the Garage Operator the monthly charge established hereunder, and Landlord shall have no liability for claims arising through acts or omissions of the Garage Operator unless caused by Landlord's negligence or willful misconduct. It is understood and agreed that the identity of the Garage Operator may change from time to time during the Term. In connection therewith, any parking lease or agreement entered into between Tenant and a Garage Operator shall be freely assignable by such Garage Operator or any successors thereto.

## II.    RENEWAL OPTION.

A.    Grant of Option; Conditions. Tenant shall have the right to extend the Term (the "Renewal Option") for one additional period of 3 years commencing on the day following the Termination Date of the Initial Term and ending on the third anniversary of the Termination Date (the "Renewal Term"), if:

1.    Landlord receives notice of exercise ("Initial Renewal Notice") not less than 12 full calendar months prior to the expiration of the Initial Term and not more than 15 full calendar months prior to the expiration of the Initial Term; and

2.    Tenant is not in default under the Lease beyond any applicable cure periods at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Notice (as defined below); and

3.    No part of the Premises is sublet (other than pursuant to a Permitted Transfer, as defined in Article XII of the Lease) at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Notice; and

4.    The Lease has not been assigned (other than pursuant to a Permitted Transfer, as defined in Article XII of the Lease) prior to the date that Tenant delivers its Initial Renewal Notice or prior to the date Tenant delivers its Binding Notice.

B.    Terms Applicable to Premises During Renewal Term.

1.    The initial Base Rent rate per rentable square foot for the Premises during the Renewal Term shall equal the Prevailing Market (hereinafter defined) rate per rentable square foot for the Premises. Base Rent during the Renewal Term shall increase, if at all, in accordance with the increases assumed in the determination of Prevailing Market rate. Base Rent attributable to the Premises shall be payable in monthly installments in

accordance with the terms and conditions of Article IV of the Lease.

2. Tenant shall pay Additional Rent (i.e. Taxes and Expenses) for the Premises during the Renewal Term in accordance with Article IV of the Lease, and the manner and method in which Tenant reimburses Landlord for Tenant's share of Taxes and Expenses and the Base Year, if any, applicable to such matter, shall be some of the factors considered in determining the Prevailing Market rate for the Renewal Term.

C. Procedure for Determining Prevailing Market. Within 30 days after receipt of Tenant's Initial Renewal Notice, Landlord shall advise Tenant of the applicable Base Rent rate for the Premises for the Renewal Term. Tenant, within 20 days after the date on which Landlord advises Tenant of the applicable Base Rent rate for the Renewal Term, shall either (i) give Landlord final binding written notice ("Binding Notice") of Tenant's exercise of its Renewal Option, or (ii) if Tenant disagrees with Landlord's determination, provide Landlord with written notice of rejection (the "Rejection Notice"). If Tenant fails to provide Landlord with either a Binding Notice or Rejection Notice within such 20 day period, Tenant's Renewal Option shall be null and void and of no further force and effect. If Tenant provides Landlord with a Binding Notice, Landlord and Tenant shall enter into the Renewal Amendment (as defined below) upon the terms and conditions set forth herein. If Tenant provides Landlord with a Rejection Notice, Landlord and Tenant shall work together in good faith to agree upon the Prevailing Market rate for the Premises during the Renewal Term. When Landlord and Tenant have agreed upon the Prevailing Market rate for the Premises, such agreement shall be reflected in a written agreement between Landlord and Tenant, whether in a letter or otherwise, and Landlord and Tenant shall enter into the Renewal Amendment in accordance with the terms and conditions hereof. Notwithstanding the foregoing, if Landlord and Tenant are unable to agree upon the Prevailing Market rate for the Premises within 30 days after the date Tenant provides Landlord with the Rejection Notice, Tenant's Renewal Option shall be deemed to be null and void and of no force and effect.

D. Renewal Amendment. If Tenant is entitled to and properly exercises its Renewal Option, Landlord shall prepare an amendment (the "Renewal Amendment") to reflect changes in the Base Rent, Term, Termination Date and other appropriate terms. The Renewal Amendment shall be sent to Tenant within a reasonable time after Landlord's receipt of the Binding Notice or other written agreement by Landlord and Tenant regarding the Prevailing Market rate, and Tenant shall execute and return the Renewal Amendment to Landlord within 15 days after Tenant's receipt of same, but, upon final determination of the Prevailing Market rate applicable during the Renewal Term as described herein, an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed.

E. Definition of Prevailing Market. For purposes of this Renewal Option, "Prevailing Market" shall mean the arms length fair market annual rental rate per rentable square foot under renewal leases and amendments entered into on or about the date on which the Prevailing Market is being determined hereunder for space comparable to the Premises in the Building. The determination of Prevailing Market shall take into account any material economic differences between the terms of this Lease and any comparison lease or amendment, such as rent abatements, construction costs and other concessions and the manner, if any, in which the landlord under any such lease is reimbursed for operating expenses and taxes. The determination of Prevailing Market shall also take into consideration any reasonably anticipated changes in the Prevailing Market rate from the time such Prevailing Market rate is being determined and the time such Prevailing Market rate will become effective under this Lease.

F. Subordination. Notwithstanding anything herein to the contrary, Tenant's Renewal Option is subject and subordinate to the expansion rights (whether such rights are designated as a right of first offer, right of first refusal, expansion option or otherwise) of any tenant of the Building existing on the date hereof.

III.    TEMPORARY SPACE.

A.    Effective as of the day following: (i) the full and final execution of this Lease by Landlord and Tenant; and (ii) delivery of all initial certificates of insurance required by this Lease (which certificates of insurance shall specifically cover both the Temporary Space during the Temporary Space Term, as hereinafter defined, and the Premises), and ending on the earlier to occur of (i) the date of Substantial Completion of the Premises; or (ii) February 28, 2003 (such period being referred to herein as the "Temporary Space Term"), Landlord shall allow Tenant to use approximately **2,110** rentable square feet of space known as Suite No. 240 located on the 2nd floor of the Building as shown on **Exhibit E-1** of this Lease (the "Temporary Space") for the Permitted Use.  During the Temporary Space Term, the Temporary Space shall be deemed the "Premises" for purposes of Article XIV (Indemnity and Waiver of Claims) of the Lease.  Such Temporary Space shall be accepted by Tenant in its "as-is" condition and configuration, it being agreed that Landlord shall be under no obligation to perform any other work in the Temporary Space, other than as specified in **Exhibit D** of this Lease, or to incur any costs in connection with Tenant's move in, move out or occupancy of the Temporary Space.  Tenant acknowledges that it shall be entitled to use and occupy the Temporary Space at its sole cost, expense and risk.  Tenant shall not construct any improvements or make any alterations of any type to the Temporary Space without the prior written consent of Landlord.  Subject to **Exhibit D** of this Lease, all costs in connection with making the Temporary Space ready for occupancy by Tenant shall be the sole responsibility of Tenant.

B.    The Temporary Space shall be subject to all the terms and conditions of the Lease except as expressly modified herein, provided that Base Rent for the Temporary Space during the Temporary Space Term shall be $1,169.29, each month during the Temporary Space Term, payable in accordance with the Lease, with the first installment due on the date Landlord delivers possession of the Temporary Space to Tenant.  If the Temporary Space Term commences on other than the first day of a calendar month or ends on other than the last day of a calendar month, then the monthly Base Rent payable for the Temporary Space for any such partial month shall be prorated to reflect the actual number of days of such partial month falling within the Temporary Space Term. Tenant shall be required to pay Tenant's Pro Rata Share of Expenses and Taxes for the Temporary Space during the Temporary Space Term in accordance with the terms of Article IV of this Lease.  Tenant's Pro Rata Share for the Temporary Space is deemed to mean .6652%.  Tenant shall not be entitled to receive any allowances, abatement or other financial concession in connection with the Temporary Space which was granted with respect to the Premises unless such concessions are expressly provided for herein with respect to the Temporary Space, and the Temporary Space shall not be subject to any renewal or expansion rights of Tenant under the Lease.

C.    Upon termination of the Temporary Space Term, Tenant shall vacate the Temporary Space and deliver the same to Landlord in the same condition that the Temporary Space was delivered to Tenant, ordinary wear and tear excepted.  At the expiration or earlier termination of the Temporary Space Term, Tenant shall remove all debris, all items of Tenant's personalty, and any trade fixtures of Tenant from the Temporary Space.  Tenant shall be fully liable for all damage Tenant or Tenant's agents, employees, contractors, or subcontractors cause to the Temporary Space.  Specifically subject to Article XXV of the Lease, Tenant shall have no right to hold over or otherwise occupy the Temporary Space at any time following the expiration or earlier termination of the Temporary Space Term, and in the event of such holdover, Landlord shall immediately be entitled to institute dispossessory proceedings to recover possession of the Temporary Space, without first providing notice thereof to Tenant.

IV.   **ADDITION OF STORAGE SPACE**

A.   Landlord leases to Tenant and Tenant accepts the spaces comprised of Space #G-3 containing approximately 393.34 usable square feet, and Space #G-12 containing approximately 69.40 usable square feet on the Garden Level of the Building, as shown on **Exhibit G** attached hereto (the "Storage Spaces"), for the term (the "Storage Term") commencing March 1, 2003 ("Storage Commencement Date") and ending March 31, 2003 ("Storage Expiration Date"). The Storage Term shall automatically renew for consecutive periods of 1 month each until terminated by either party with at least 30 days' advance written notice of termination delivered to the other party. Any such termination shall be effective as of the termination date specified in such notice. Notwithstanding anything to the contrary contained herein, if the Lease or Tenant's right to possession of the Premises thereunder terminates prior to the Storage Expiration Date, as same may be extended herein, then the Storage Expiration Date shall be such earlier termination date.

B.   The Storage Spaces shall be used by Tenant for the storage of equipment, inventory or other non-perishable items normally used in Tenant's business, and for no other purpose whatsoever. Tenant agrees to keep the Storage Spaces in a neat and orderly fashion and to keep all stored items in cartons, file cabinets or other suitable containers. Landlord shall have the right to designate the location within the Storage Spaces of any items to be placed therein. All items stored in the Storage Spaces shall be elevated at least 6 inches above the floor on wooden pallets, and shall be at least 18 inches below the bottom of all sprinklers located in the ceiling of the Storage Spaces, if any. Tenant shall not store anything in the Storage Spaces which is unsafe or which otherwise may create a hazardous condition, or which may increase Landlord's insurance rates, or cause a cancellation or modification of Landlord's insurance coverage. Without limitation, Tenant shall not store any flammable, combustible or explosive fluid, chemical or substance nor any perishable food or beverage products, except with Landlord's prior written approval. Landlord reserves the right to adopt and enforce reasonable rules and regulations governing the use of the Storage Spaces from time to time. Upon expiration or earlier termination of Tenant's rights to the Storage Spaces, Tenant shall completely vacate and surrender the Storage Spaces to Landlord in the condition in which it was delivered to Tenant, ordinary wear and tear excepted, broom-clean and empty of all personalty and other items placed therein by or on behalf of Tenant.

C.   Tenant shall pay rent for the Storage Spaces ("Storage Base Rent") as follows:

| Space | Term | Monthly Base Rent |
|---|---|---|
| #G-3 | Storage Commencement Date – Storage Expiration Date | $451.69 |
| #G-12 | Storage Commencement Date – Storage Expiration Date | $61.40 |

All Storage Base Rent shall be payable in the same manner that Base Rent is payable under the Lease. The Storage Base Rent shall be increased by an amount equal to 6% from the Storage Base Rent amount in effect as of the end of the immediately preceding year on the 1st   and each succeeding annual anniversary of the Storage Commencement Date.

D.    All terms and provisions of the Lease shall be applicable to the Storage Spaces, including, without limitation, Article XIV (Indemnity and Waiver of Claims) and Article XV (Insurance), except that Landlord need not supply air-cooling, heat, water, janitorial service, cleaning, passenger or freight elevator service, window washing or electricity to the Storage Spaces and Tenant shall not be entitled to any work allowances, rent credits, expansion rights or renewal rights with respect to the Storage Spaces unless such concessions or rights are specifically provided for herein with respect to the Storage Spaces. Landlord shall not be liable for any theft or damage to any items or materials stored in the Storage Spaces, it being understood that Tenant is using the Storage Spaces at its own risk. Any default by Tenant under this Storage Spaces provision remaining uncured for a period extending beyond the expiration of any applicable cure period described in the "default" section of the Lease shall be a default under the Lease, it being agreed that the provisions of the Lease with respect to Tenant defaults shall apply to any default by Tenant hereunder. The Storage Spaces shall not be included in the determination of Tenant's Pro Rata Share under the Lease nor shall Tenant be required to pay Expenses in connection with the Storage Spaces.

E.    Tenant agrees to accept the Storage Spaces in its condition and "as-built" configuration existing on the earlier of the date Tenant takes possession of the Storage Spaces or the Storage Commencement Date.

F.    At any time and from time to time, Landlord shall have the right to relocate the Storage Spaces to a new location which shall be no smaller than the square footage of the Storage Spaces. Landlord shall pay the direct, out-of-pocket, reasonable expenses of such relocation.

G.    Storage Base Rent is deemed Rent under the Lease.

H.    If Tenant assigns the Lease or sublets all or any part of the Premises, Landlord, at its option, may terminate Tenant's rights to the Storage Spaces effective as of 30 days after notice to Tenant. Additionally, notwithstanding anything set forth in Article XII of the Lease to the contrary, Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion, assign, sublease, transfer or encumber the Storage Spaces or grant any license, concession or other right of occupancy or permit the use of the Storage Spaces by any party other than Tenant.

**EXHIBIT E-1**

**TEMPORARY SPACE**





Partial 2nd Floor Plan



KEY PLAN

●                        ●

**EXHIBIT F**

**CONFIDENTIALITY AGREEMENT**
(EXAMPLE)

_____, 200_

Fill-in Tenant Name
_____
_____

Dear _____:

In connection with the discussions between _____ ("Landlord") and _____ ("Tenant") in the building located at _____ (the "Building") regarding the Tenant's financial condition, you have agreed to deliver to Landlord certain information which is either non-public, confidential or proprietary in nature relating to the business operations of the Tenant (the "Financial Information", and together with Additional Information, defined below, the "Information"). In consideration of your furnishing us with the Information, we agree as follows:

1.    Tenant shall disclose the Information to Landlord so that it may understand and evaluate Tenant's ability to meet its current contractual obligations under that certain lease between the parties dated _____ [*as amended*] at the Building as that document has been amended by the parties (the "Lease"). Landlord shall accept and hold such Information in strict confidence in accordance with the provisions of this letter.

2.    The Information will be kept strictly confidential and, without your prior written consent, Landlord shall not use the Information for any purpose other than in connection with the purpose set forth in paragraph 1 hereof. Landlord also agrees to transmit the Information only to those individuals who are actively and directly participating in the evaluation of the Tenant and who have agreed to comply with the terms of this letter.

3.    The Information shall not be deemed to include information that falls within any of the following categories: (a) information which has come within the public domain through no fault or action of Landlord or its representatives; or (b) information which was known to Landlord on a non-confidential basis prior to its disclosure hereunder; or information which becomes available to Landlord on a non-confidential basis from any third party; or (c) Information that is independently developed by Landlord.

4.    Landlord, when requested by you, shall immediately destroy the Information, including all notes, copies, reproductions, summaries, analyses, or extracts thereof, then in its possession. Such return or destruction shall not abrogate Landlord's continuing obligations under this letter.

5.    The terms of this letter shall inure to the benefit of Landlord, the Tenant and their successors and assigns.

6.    Notwithstanding anything to the contrary contained herein, Landlord shall be entitled to disclose the Information in accordance with the terms of any court order, provided that Landlord provides the Tenant with prior notice of such disclosure.

7.    The terms of this letter shall be governed by and construed in accordance with the laws of the state in which the Building is located.

In addition to the foregoing, for purposes of this letter agreement, the Information may include, without limitation, business and financial information, customer and vendor lists, private customer information, pricing and sales information that may exist at any given time during the Term of the Lease within the Premises ("Additional Information"). Landlord agrees that the Additional Information is owned exclusively by Tenant or its customers and remains the exclusive property of same, and may constitute valuable trade secrets of same. Landlord is granted access to the Premises solely for the purposes specified in the Lease and otherwise to provide services requested and/or required by the Lease and Landlord is specifically prohibited from obtaining or using Additional Information that may be in the Premises for any purpose. In the event Landlord or its agents disclose or use such Additional Information, Tenant shall have available to it all remedies at law and in equity appropriate to provide adequate relief to Tenant for such disclosure or use.

Please indicate your acceptance of the terms of this letter by signing the enclosed copy of the same and returning it to us at the address indicated on the first page of this letter.

Very truly yours,

LANDLORD:_____

By: _____

Acknowledged and Agreed to
this _____ day of _____, 200_

TENANT:_____

By: _____
Name:_____
Title:_____

**EXHIBIT G**

**OUTLINE AND LOCATION OF STORAGE SPACES**



## GARDEN LEVEL

Space G3 = 393.34 usf
Space G12 = 69.40 usf

## FIRST AMENDMENT

THIS FIRST AMENDMENT (the "Amendment") is made and entered into as of the ⎡10th⎤
day of ___April_____, 2003, by and between **CO-QUADRANT, L.L.C., a**
Delaware limited liability company ("Landlord"), and **RBC MORTGAGE COMPANY, an Illinois**
corporation ("Tenant").

### RECITALS

A.    Landlord (formerly known as EOP-Quadrant, L.L.C.) and Tenant are parties to that certain
lease dated November 13, 2002, which lease has not been previously amended (the
"Lease").  Pursuant to the Lease, Landlord has leased to Tenant space currently
containing approximately **13,990** rentable square feet described as Suite No. 100 on the
1st floor and **2,110** rentable square feet described as Suite No. 240 on the 2nd floor and
known as the "Temporary Space", (collectively, the "Premises") in the building commonly
known as The Quadrant located at 5445 DTC Parkway, Greenwood Village, Colorado
80111 (the "Building").

B.    Landlord and Tenant acknowledge and agree that the "Temporary Space Term", as that
term is defined in Section III, "Temporary Space", of Exhibit E to the Lease commenced
November 4, 2002, and was scheduled to expire on February 28, 2003 (the "Prior
Temporary Space Termination Date"); and the parties desire to retroactively extend the
Temporary Space Term, all on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
contained and other good and valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, Landlord and Tenant agree as follows:

I.    <u>Extension.</u>  The Temporary Space Term is hereby retroactively extended for a period of
13 months and shall expire on March 31, 2004 ("Extended Temporary Space Termination
Date"), unless sooner terminated in accordance with the terms of the Lease.  That portion
of the Temporary Space Term commencing the day immediately following the Prior
Temporary Space Termination Date (i.e., March 1, 2003) ("Temporary Space Extension
Date") and ending on the Extended Temporary Space Termination Date shall be referred
to herein as the "Extended Temporary Space Term".

II.    <u>Base Rent.</u>  As of the Temporary Space Extension Date, the schedule of Base Rent
payable with respect to the Temporary Space during the Extended Temporary Space
Term is the following:

| Period | Annual Rate Per Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| March 1, 2003 – March 31, 2004 | $6.88 | $14,516.76 | $1,209.73 |

All such Base Rent shall be payable by Tenant in accordance with the terms of the Lease.

Notwithstanding anything in this Section to the contrary, so long as Tenant is
not in default under the Lease, Tenant shall be entitled to an abatement of Base Rent in
the amount of $1,209.73 per month and Tenant's Pro Rata Share of Expenses and Taxes
for the first consecutive full calendar month of the Extended Temporary Space Term, (the
"Temporary Space Rent Abatement Period").  The total amount of Base Rent abated
during the Base Rent Abatement Period shall equal $1,209.73 and the total amount
Tenant's Pro Rata Share of Expenses and Taxes shall equal the "Total Abated Rent",
which is estimated to be $2,989.17.  If Tenant defaults at any time during the Extended
Temporary Space Term and fails to cure such default within any applicable cure period
under the Lease, the Total Abated Rent shall immediately become due and payable.  The
payment by Tenant of the Total Abated Rent in the event of a default shall not limit or
affect any of Landlord's other rights, pursuant to this Lease or at law or in equity.  During
the Temporary Space Rent Abatement Period, only Base Rent and Tenant's Pro Rata
Share of Expenses and Taxes shall be abated, and all Additional Rent and other costs and
charges specified in the Lease shall remain as due and payable pursuant to the provisions
of the Lease.

III.    <u>Additional Security Deposit.</u>  Upon Tenant's execution hereof, Tenant shall pay
Landlord the sum of **$2,989.17** which is added to and becomes part of the Security

C:\Documents and Settings\JamieZ\Local Settings\Temporary Internet Files\OLKA4\RBC 1A6.doc
Matter Id 6307
April 10, 2003

1

Deposit held by Landlord as provided under Article VI of the Lease as security for payment of Rent and the performance of the other terms and conditions of the Lease by Tenant. Accordingly, simultaneously with the execution hereof, the Security Deposit is increased from $24,564.11 to **$27,553.28**.

IV.     **Expenses and Taxes.** For the period commencing on the Temporary Space Extension Date and ending on the Extended Temporary Space Termination Date, Tenant shall pay for Tenant's Pro Rata Share of Expenses and Taxes in accordance with the terms of the Lease.

V.      **Improvements to Premises.**

      A.     **Condition of Premises.** Tenant is in possession of the Temporary Premises and accepts the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements, except as may be expressly provided otherwise in this Amendment.

      B.     **Responsibility for Improvements to Premises.** Any construction, alterations or improvements to the Premises shall be performed by Tenant at its sole cost and expense using contractors selected by Tenant and approved by Landlord and shall be governed in all by the terms of the Lease.

VI.     **Other Pertinent Provisions.** Landlord and Tenant agree that, effective as of the date of this Amendment (unless a different effective date is specifically referenced in this Section), the Lease shall be amended in the following additional respects:

      A.     The Maximum Amount, as that term is defined in Paragraph 1 of Exhibit D, "Work Letter", to the Lease, is hereby increased by $4,220.00, so that the Maximum Amount shall be $132,228.50 in lieu of $128,008.50.

      B.     **Allowance Available to Tenant.** If Landlord has used the entire Maximum Amount (as provided in Exhibit D of the Lease), then, upon the full execution and transmittal of this Amendment to the parties, Tenant, upon written notice to Landlord, provided it is not in default under the Lease, shall be entitled to an allowance of up to $40,000.00 (the "Tenant Allowance") from Landlord in order to finance the Excess Costs (as that term is defined in Exhibit D of the Lease). The Tenant Allowance, if any, paid on behalf of Tenant shall be repaid to Landlord as Additional Rent in equal monthly installments during the period beginning August 1, 2003 through the Termination Date of the Lease ("Payback Term"), at an interest rate equal to 10% per annum. All other costs incurred by Tenant during the initial construction of the Premises which exceed the Tenant Allowance, shall be Tenant's sole responsibility. If Tenant is in default under this Lease after the expiration of applicable cure periods, the entire unpaid balance of the Additional Allowance paid on behalf of Tenant shall become immediately due and payable and, except to the extent required by applicable Law, shall not be subject to mitigation or reduction in connection with a reletting of the Premises by Landlord.

VII.    **Miscellaneous.**

      A.     This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. Under no circumstances shall Tenant be entitled to any Rent abatement, improvement allowance, leasehold improvements, or other work to the Premises, or any similar economic incentives that may have been provided Tenant in connection with entering into the Lease, unless specifically set forth in this Amendment.

      B.     Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect.

      C.     In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control.

      D.     Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall

not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

E.   The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

F.   Tenant hereby represents to Landlord that Tenant has dealt with no broker, other than Equity Commercial Real Estate ("Tenant's Broker") in connection with this Amendment.   Tenant agrees to indemnify and hold Landlord, its members, principals, beneficiaries, partners, officers, directors, employees, mortgagee(s) and agents, and the respective principals and members of any such agents (collectively, the "Landlord Related Parties") harmless from all claims of any brokers, including Tenant's Broker, claiming to have represented Tenant in connection with this Amendment.   Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Amendment.   Landlord agrees to indemnify and hold Tenant, its members, principals, beneficiaries, partners, officers, directors, employees, and agents, and the respective principals and members of any such agents (collectively, the "Tenant Related Parties") harmless from all claims of any brokers claiming to have represented Landlord in connection with this Amendment.

G.   Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

LANDLORD:

**CO-QUADRANT, L.L.C., a Delaware limited liability company**

By:    Equity Office Management, L.L.C., a Delaware limited liability company, its non-member manager

By: _____
Name: Tym J. Keehn
Title:   Senior Vice President -- Denver Region

TENANT:

**RBC MORTGAGE COMPANY, an Illinois corporation**

By: _____
Name: Jamie G. Calvin
Title:   Associate General Counsel

C:\Documents and Settings\JamieZi\Local Settings\Temporary Internet Files\OLKA4\RBC 1A6.doc
Matter Id 6307
April 10, 2003

3

**SECOND AMENDMENT**

THIS SECOND AMENDMENT (the "Amendment") is made and entered into as of the 30th day of July_____, 2003, by and between **CO-QUADRANT, L.L.C., a Delaware limited liability company** ("Landlord"), and **RBC MORTGAGE COMPANY, an Illinois corporation** ("Tenant").

**RECITALS**

A.    Landlord (formerly known as EOP-Quadrant, L.L.C.) and Tenant are parties to that certain lease dated November 13, 2002, which lease has been previously amended by instrument dated April 17, 2003 (collectively, the "Lease"). Pursuant to the Lease, Landlord has leased to Tenant space currently containing approximately **16,100** rentable square feet (the "Original Premises") described as Suite Nos. 100 and 240 on the 1st and 2nd floors of the building commonly known as The Quadrant located at 5445 DTC Parkway, Greenwood Village, Colorado 80111 (the "Building").

B.    Tenant has requested that additional space containing approximately **1,751** rentable square feet described as Suite No. 530 on the 5th floor of the Building shown on **Exhibit A** hereto (the "Expansion Space") be temporarily added to the Original Premises and that the Lease be appropriately amended and Landlord is willing to do the same on the following terms and conditions.

NOW, **THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

I.    <u>Expansion and Effective Date.</u>  Effective as of the "Expansion Effective Date" (defined below), the Premises, as defined in the Lease, is increased from 16,100 rentable square feet on the 1st and 2nd floors to **17,751** rentable square feet on the 1st, 2nd and 5th floors by the addition of the Expansion Space, and during the Expansion Term (defined below), the Original Premises and the Expansion Space, collectively, shall be deemed the Premises, as defined in the Lease. The Term for the Expansion Space (the "Expansion Term") shall commence on the Expansion Effective Date and end on July 31, 2004 (the "Expansion Expiration Date"). The Expansion Space is subject to all the terms and conditions of the Lease except as expressly modified herein and except that Tenant shall not be entitled to receive any allowances, abatements or other financial concessions granted with respect to the Original Premises unless such concessions are expressly provided for herein with respect to the Expansion Space.

A.    The Expansion Effective Date shall be the earlier to occur of (i) August 1, 2003 ("Target Expansion Effective Date"), and (ii) the date upon which the Landlord Work (as defined in the Work Letter attached as **Exhibit B** hereto) in the Expansion Space has been substantially completed; provided, however, that if Landlord shall be delayed in substantially completing the Landlord Work in the Expansion Space as a result of the occurrence of  a Tenant Delay (defined below), then, for purposes of determining the Expansion Effective Date, the date of substantial completion shall be deemed to be the day that said Landlord Work would have been substantially completed absent any such Tenant Delay(s). A "Tenant Delay" means any act or omission of Tenant or its agents, employees, vendors or contractors that actually delays substantial completion of the Landlord Work, including, without limitation, the following:

1.    Tenant's failure to furnish information or approvals within any time period specified in the Lease or this Amendment, including the failure to prepare or approve preliminary or final plans by any applicable due date;

2.    Tenant's selection of equipment or materials that have long lead times after first being informed by Landlord that the selection may result in a delay;

3.    Changes requested or made by Tenant to previously approved plans and specifications;

4.    The performance of work in the Expansion Space by Tenant or Tenant's contractor(s) during the performance of the Landlord Work; or

5.      If the performance of any portion of the Landlord Work depends on the prior or simultaneous performance of work by Tenant, a delay by Tenant or Tenant's contractor(s) in the completion of such work.

The Expansion Space shall be deemed to be substantially completed on the date that Landlord reasonably determines that all Landlord Work has been performed (or would have been performed absent any Tenant Delays), other than any details of construction, mechanical adjustment or any other matter, the noncompletion of which does not materially interfere with Tenant's use of the Expansion Space.

B.      The Expansion Effective Date shall be delayed to the extent that Landlord fails to deliver possession of the Expansion Space for any other reason (other than Tenant Delays by Tenant), including but not limited to, holding over by prior occupants. Any such delay in the Expansion Effective Date shall not subject Landlord to any liability for any loss or damage resulting therefrom. If the Expansion Effective Date is delayed, neither the Termination Date under the Lease nor the Expansion Expiration Date shall be similarly extended.

II.     **Base Rent.** In addition to Tenant's obligation to pay Base Rent for the Original Premises, Tenant shall pay Landlord Base Rent for the Expansion Space during the Expansion Term as follows:

| Months of Term or Period | Annual Rate Per Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| Expansion Effective Date – Expansion Expiration Date | $6.88 | $12,046.92 | $1,003.91 |

All such Base Rent shall be payable by Tenant in accordance with the terms of the Lease.

Landlord and Tenant acknowledge that the foregoing schedule is based on the assumption that the Expansion Effective Date is the Target Expansion Effective Date. If the Expansion Effective Date is other than the Target Expansion Effective Date, the schedule set forth above with respect to the payment of any installment(s) of Base Rent for the Expansion Space shall be appropriately adjusted on a per diem basis to reflect the actual Expansion Effective Date, and the actual Expansion Effective Date shall be set forth in a confirmation letter to be prepared by Landlord. However, the effective date of any increases or decreases in the Base Rent rate shall not be postponed as a result of an adjustment of the Expansion Effective Date as provided above.

III.    **Additional Security Deposit.** Upon Tenant's execution hereof, Tenant shall pay Landlord the sum of **$2,480.59** which is added to and becomes part of the Security Deposit, if any, held by Landlord as provided under Section 6 of the Lease as security for payment of Rent and the performance of the other terms and conditions of the Lease by Tenant. Accordingly, simultaneously with the execution hereof, the Security Deposit is increased from **$27,553.28** to **$30,033.87.**

IV.     **Tenant's Pro Rata Share.** During the Expansion Term, Tenant's Pro Rata Share for the Expansion Space is **0.5520%.**

V.      **Expenses and Taxes.** For the period commencing with the Expansion Effective Date and ending on the Termination Date, Tenant shall pay for Tenant's Pro Rata Share of Expenses and Taxes applicable to the Expansion Space in accordance with the terms of the Lease.

VI.     **Improvements to Expansion Space.**

A.      **Condition of Expansion Space.** Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements, except as may be expressly provided otherwise in this Amendment.

B. **Responsibility for Improvements to Expansion Space.** Landlord shall perform improvements to the Expansion Space in accordance with the Work Letter attached hereto as **Exhibit B.**

VII. **Early Access to Expansion Space.** During any period that Tenant shall be permitted to enter the Expansion Space prior to the Expansion Effective Date (e.g., to perform alterations or improvements, if any), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Base Rent or Additional Rent as to the Expansion Space. If Tenant takes possession of the Expansion Space prior to the Expansion Effective Date for any reason whatsoever (other than the performance of work in the Expansion Space with Landlord's prior approval), such possession shall be subject to all the terms and conditions of the Lease and this Amendment, and Tenant shall pay Base Rent and Additional Rent as applicable to the Expansion Space to Landlord on a per diem basis for each day of occupancy prior to the Expansion Effective Date.

VIII. **Other Pertinent Provisions.** Landlord and Tenant agree that, effective as of the date of this Amendment, the Lease shall be amended in the following additional respects:

A. **Landlord Address for Notice and Payment of Rent.** Notwithstanding anything to the contrary contained in the Lease, following shall be Landlord's addresses for notice and payment of Rent under the Lease:

Landlord:

CO-Quadrant, L.L.C.
c/o Equity Office Management, L.L.C.
4600 South Ulster Street
Suite 1300
Denver, Colorado 80237
Attention: Quadrant Property Manager

A copy of any notices to Landlord shall be sent to Equity Office, Two North Riverside Plaza, Suite 2100, Chicago, Illinois, 60606, Attn: Denver Regional Counsel.

Rent shall be made payable to the entity, and sent to the address, Landlord designates and shall be made by good and sufficient check or by other means acceptable to Landlord.

IX. **Miscellaneous.**

A. This Amendment and any Exhibit(s) attached hereto, which are incorporated herein and made a part hereof, set forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. Under no circumstances shall Tenant be entitled to any Rent abatement, improvement allowance, leasehold improvements, or other work to the Premises, or any similar economic incentives that may have been provided Tenant in connection with entering into the Lease, unless specifically set forth in this Amendment.

B. Except as herein modified or amended, the provisions, conditions and terms of the Lease shall remain unchanged and in full force and effect.

C. In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control.

D. Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

E. The capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease to the extent that such capitalized terms are defined therein and not redefined in this Amendment.

F. Tenant hereby represents to Landlord that Tenant has dealt with no broker in connection with this Amendment. Tenant agrees to indemnify and hold

Landlord, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, mortgagee(s) and agents, and the respective principals and members of any such agents (collectively, the "Landlord Related Parties") harmless from all claims of any brokers claiming to have represented Tenant in connection with this Amendment. Landlord hereby represents to Tenant that Landlord has dealt with no broker in connection with this Amendment. Landlord agrees to indemnify and hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, employees, and agents, and the respective principals and members of any such agents (collectively, the "Tenant Related Parties") harmless from all claims of any brokers claiming to have represented Landlord in connection with this Amendment.

G.    Each signatory of this Amendment represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

LANDLORD:

**CO-QUADRANT, L.L.C., a Delaware limited liability company**

By:    Equity Office Management, L.L.C., a Delaware limited liability company, its non-member manager

By: _____
Name: Kim J. Koehn
Title:    Senior Vice President – Denver Region


TENANT:

**RBC MORTGAGE COMPANY, an Illinois corporation**

By: _____
Name: Jamie G. Zelvin
Title:    Associate General Counsel

**EXHIBIT A**

**OUTLINE AND LOCATION OF EXPANSION SPACE**



## EXHIBIT B

### WORK LETTER

This Exhibit is attached to and made a part of the Second Amendment by and between **CO-QUADRANT, L.L.C., a Delaware limited liability company** ("Landlord"), and **RBC MORTGAGE COMPANY, an Illinois corporation** ("Tenant") for space in the Building located at 5445 DTC Parkway, Greenwood Village, Colorado 80111.

As used in this Workletter, the "Premises" shall be deemed to mean the Expansion Space, as defined in the attached Second Amendment.

1.  Landlord, at its sole cost and expense (subject to the terms and provisions of Section 2 below) shall perform improvements to the Premises in accordance with the following work list (the "Worklist") using Building standard methods, materials and finishes. The improvements to be performed in accordance with the Worklist are hereinafter referred to as the "Landlord Work". Landlord shall enter into a direct contract for the Landlord Work with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Landlord Work.

### WORK LIST

ITEM

-   paint Expansion Space

2.  All other work and upgrades, subject to Landlord's approval, shall be at Tenant's sole cost and expense, plus any applicable state sales or use tax thereon, payable upon demand as Additional Rent. Tenant shall be responsible for any Tenant Delay in completion of the Premises resulting from any such other work and upgrades requested or performed by Tenant.

3.  Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed to be a representation by Landlord that such work complies with applicable insurance requirements, building codes, ordinances, laws or regulations or that the improvements constructed will be adequate for Tenant's use.

4.  This Exhibit shall not be deemed applicable to any additional space added to the Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.