**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Re: Dkt. No. 1877 |
| | : | |

**DEBTORS' RESPONSE TO THE "MOTION OF POSITIVE SOFTWARE
SOLUTIONS, INC. FOR RELIEF FROM THE STAY REGARDING
COPYRIGHT INFRINGEMENT LITIGATION", AND CROSS-MOTION
FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY**

The above-captioned debtors and debtors-in-possession (the "Debtors" or "New

Century") hereby respond and object (the "Objection") to the motion (the "Motion") of Positive

Software Solutions, Inc. ("Positive Software") "for Relief From the Stay Regarding Copyright

Infringement Litigation" (Dkt. No. 1877). The Debtors also cross-move for sanctions, as Positive

Software has willfully and intentionally violated the automatic stay (the "Cross Motion"). In

support of their Objection and Cross Motion, the Debtors respectfully represent as follows.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (Okla. JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L. P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp , a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

## INTRODUCTION

1.      Positive Software seeks relief from the automatic stay to continue pre-petition copyright infringement litigation in the United States District Court for the Northern District of Texas (the "District Court") in which it seeks an astounding $38 billion in damages over an unpaid license fee of only $86,000. In an incredible "spin" of the long and tortured history of this litigation, Positive Software argues that it has met the "probability of success on the merits" prong of the standard test applied to stay relief motions, citing a preliminary injunction ruling as its evidence. But after that *preliminary* ruling, a AAA arbitrator, having conducted a seven day trial, wrote a eighty six page opinion rejecting Positive Software's claims in their entirety, finding that Positive Software defrauded the Debtors (rather than the other way around), awarding the Debtors damages, and awarding the Debtors over $1.5 million in attorneys fees and costs. Moreover, while Positive Software was able to convince the District Court to vacate the arbitration award, an *en banc* panel of the Fifth Circuit Court of Appeals reversed and the U.S. Supreme Court denied a petition for writ of *certiorari*. Thus, Positive Software's lead argument to vacate an arbitration award -- an extraordinary remedy -- has been rejected and appeal rights on that point have been exhausted. All that is left is a remand where additional theories of vacatur, which were not ruled on previously, will be considered. To say that Positive Software has a "probability of success on the merits" distorts reality.

2.      The Motion should be denied for additional reasons. First, this is *not* the typical motion, like the ones cited in Positive Software's motion, where a piece of pre-petition litigation is on the eve of trial, so the stay should be lifted so as not to lose a trial date and the work already done to prepare for trial. Positive Software will not get a trial unless it obtains yet another vacatur and appeal rights have been exhausted. Second, the proceedings on the motion to vacate -- which include substantial, entirely new allegations that the Debtors have not even had the chance

2

to investigate -- will be costly, require Debtor personnel to investigate, and will distract management from the task at hand (especially given the amount in controversy), which is liquidating assets and formulating a plan of liquidation for the benefit of all creditors. Third, Positive Software's argument that the Debtors will not be harmed because they have commercial insurance fails for two reasons -- the carrier has denied coverage and the Debtors have been required to sue the carrier, and in any event Positive Software seeks $38 *billion*[2] in damages. Obviously, the Debtors never contracted for anywhere near that level of coverage. Fourth, by focusing its arguments on whether this Court or the Texas District Court should try the case, Positive Software conflates *when* the litigation should proceed -- the only issue in a stay relief motion -- with *where* it will proceed once litigation continues. If the Debtors in the future attempt to litigate the case in Delaware, Positive Software may then make all of its arguments about why the case should be litigated in Texas.

        3.      Additionally, without explanation, Positive Software only comes to this Court for stay relief the day *after* filing a renewed and amended motion to vacate in Texas District Court. Worse still, it fails to mention in its Motion that it already has taken this step, apparently hiding this fact because it realizes how serious it is to violate the stay and how this Court views self help. See Ex. A hereto. Not surprisingly, the Motion also fails to mention that Positive Software served subpoenas after it filed the instant Motion for stay relief on (b) Ophelia F. Camina, an associate at Susman and (a) the law firm of Susman Godfrey L.L.P. ("Susman"), the debtor's defense counsel in the Positive Software Litigation (each a "Subpoena" and collectively, the "Subpoenas"), seeking information related to its motion to vacate. See Ex. B and Ex. C hereto, respectively. It could not possibly be more clear (a) that the motion for leave to file the motion to

---

    [2] At the AAA arbitration, Positive Software "dropped" this figure to $500 million because this was the maximum amount under the AAA schedule.

vacate "continues" pre-petition litigation in violation of the stay; (b) Positive Software knew that fact and not only disregarded it, but flaunted the stay; and (c) Positive Software again flaunted the stay by issuing discovery to defense counsel while this very motion was pending. Positive Software's actions cannot be countenanced. Its Motion should be denied and the Cross Motion for sanctions should be granted, sending Positive Software a clear message that the automatic stay is not an "option".

## FACTUAL BACKGROUND

### A.    The Positive Software Litigation.

4.    Positive Software filed suit against certain of the Debtors as well as former officers Jeffrey Lemieux and Frank Nese, and certain non-Debtor affiliates, on or about February 6, 2003. Positive Software's suit alleged that New Century had infringed Positive Software's copyrights, misappropriated its trade secrets and other intellectual property, breached service agreements and other contracts, converted Positive Software's property, committed fraud, and other alleged wrongdoings. Despite the fact that the unpaid amount of the software license at issue was only $87,000, Positive Software asked for an astounding $38 *billion* in damages. The Debtors not only denied these allegations, but counterclaimed for fraud and misrepresentation.

5.    On April 28, 2003, the Texas District Court granted Positive Software's Motion for Preliminary Injunction, as well as the Debtors' motion to compel arbitration. Thus, while the District Court, in ruling on the motion for a preliminary injunction, found that there was a probability of success on the merits of Positive Software's infringement claim, it did not definitively decide the issue; rather, it enforced the parties' prior agreement to arbitrate their disputes, saving the definitive fact finding of a trial for the arbitrator.

6.    Thus, the parties arbitrated this case pursuant to the rules of the American Arbitration Association ("AAA"). The arbitrator first heard and decided eight motions for partial

4

summary judgment. Thereafter, he conducted a seven day trial on January 19-23 and February 3-4, 2007. He then permitted the parties extensive post-trial briefs, admitted evidence into the record, and closed the proceedings on April 13, 2004.

7.    On May 5, 2004, the arbitrator entered an 86 page, comprehensive written opinion constituting his arbitration award (the "Award"). The Award rejected Positive Software's claims *en toto* and awarded it nothing on behalf of such claims. Moreover, he awarded the Debtors $11,500 in actual damages on their counterclaims, as well as $1.5 million in attorneys fees and $1,200 in costs. Thus, far from the "probability of success on the merits" that Positive Software claims in its Motion, the arbitrator who took the time to rule on 8 motions for partial summary judgment, conduct a seven day trial, read post-trial briefing and issue an 86 page opinion not only found that Positive Software's claims had no merit, but awarded more than $1.5 million *against* Positive Software.

8.    Not surprisingly, Positive Software was unhappy with the extent to which its litigation strategy backfired; it must be hard to swallow that your claim for $38 billion turns into an award *against* you for more than $1.5 million. Thus, it set out on a campaign to set aside the arbitration award. Indeed, the parties have now been litigating the validity of the Award for the past three years. On September 24, 2007, the Texas District Court in fact vacated the Award, definitely ruling only on Positive Software's lead argument -- that the arbitrator had an undisclosed conflict of interest. However, after a January 11, 2006 opinion by a panel of three judges of the Fifth Circuit affirmed, on January 17, 2007, the Fifth Circuit Court of Appeals, sitting *en banc*, reversed. The Court held that "the Federal Arbitration Act ... does not mandate the *extreme remedy* of vacatur for nondisclosure of a *trivial past association*, and we reverse the district court's contrary judgment..." Positive Software Solutions, Inc. v. New Century Mortg.

5

Corp., 476 F.3d 278, 279 (5th Cir. 2007) (emphasis supplied). On June 11, 2007, the United States

Supreme Court denied Positive Software's petition for writ of *certiorari*. Thus, Positive

Software's lead argument for the "extreme remedy" of throwing out an 86 page AAA arbitrator's

Award is now legally dead.

9.       Unfortunately, Positive Software does not seem to be deterred. On July 9,

2007 -- one day *before* the instant stay relief Motion was filed -- Positive Software filed in the

Texas District Court  its Motion for Leave to File Second Amended Motion to Vacate Arbitration

Award [and] Brief in Support (the "Amended Motion to Vacate"). Why Positive Software, which

acknowledged in a pleading with this Court on April 11, 2007 that it would "shortly" be filing a

stay relief motion, felt that it could flaunt the automatic stay by filing an Amended Motion to

Vacate and serving the Subpoenas *before* being granted relief from the stay remains a mystery.

The Motion does not even bother to mention these clear violations of the stay, and indeed implies

that Positive Software is taking no action, which obviously is incorrect. See Motion ¶25 ("Further

proceedings before the Texas District Court are currently stayed, however, in accordance with

Bankruptcy Code Section 362 (a)(1)).

10.      The Second Amended Motion to Vacate is extraordinarily broad in its

scope. It raises (a) certain issues that Positive Software previously raised in its original motion to

vacate, but were not definitively ruled on by the District Court previously, (b) issues that Positive

Software attempted to add in its pre-petition first amended motion to vacate, which the Debtors'

opposed as untimely, and (c) brand new factual and legal issues. Addressing Positive Software's

myriad arguments will be burdensome, expensive, and will require significant input from New

Century personnel. These are *not* mere legal issues which lawyers can address. Some require the

6

technical expertise of New Century employees. And of course, due to the Debtors' sale of many operating units, the employees are currently overburdened with other tasks.

**B.    Insurance.**

11.    In the Motion, Positive Software argues that the Debtors might have insurance on the Positive Software claim. Thus, they contend that (a) the Debtors will not be harmed by lifting the automatic stay, and (b) Positive Software requires immediate relief from stay to avoid other creditors recovering first on a limited pool of insurance proceeds. Two facts concerning the Debtors' insurance applicable to the Positive Software litigation are relevant, and not addressed by Positive Software in its Motion.

12.    First, the Debtors D&O insurance carrier has *denied* coverage. Certainly the Debtors disagree with the insurer's position, and indeed have sued the carrier. See *New Century Financial Corporation v. Liberty Surplus Ins. Corp., et al.,* Los Angeles Superior Court (Northeast District) Case No. GC 033678 (the "*Liberty* Action"). It cannot be argued that the Debtors are made whole by the existence of an insurance policy when they are in the process of having to sue the insurance carrier to provide coverage. While Positive Software "guesses" in its Motion that the Debtors' commercial general insurance might provide coverage, in fact it does not, since it does not cover infringement and intellectual property type claims.

13.    Second, Positive Software is seeking $38 *billion* in damages. As far fetched as that number seems, it does not aid Positive Software's "no harm" argument because it will not surprise the Court that the Debtors did not purchase insurance with limits anywhere approaching that sum.

7

C. **The Debtors' Reorganization Efforts.**

14.     On April 2, 2007 (the "Petition Date"), the Debtors filed petitions for relief. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

15.     Since the Petition Date, the Debtors appropriately have been focused on expeditiously liquidating their assets in order to maximize the value of the estates, rather than on pre-petition litigation. Given a case of this size and complexity, those tasks have consumed all of the time of the Debtors' shrinking management and employees.

16.     By way of example, the Debtors gained Court approval of four asset sales and closed three of those sales within three months of the Petition Date. By order entered on May 7, 2007, the Court authorized the sale of a pool of approximately 2,000 unencumbered mortgage loans with an unpaid balance of $170 million and mortgage-backed residual interests in securitization trusts (the "LNFA") to Ellington Management Group, L.L.C. on behalf of its Client Funds ("Ellington") pursuant to the Asset Purchase Agreement by and among NCF and certain of its subsidiaries and Ellington dated May 16, 2007. The Court further authorized the sale of a pool of approximately 180 unencumbered mortgage loans with an unpaid balance of approximately $17 million and 6 real properties obtained in foreclosures of such mortgage loans to Ellington by order entered on June 28, 2007 pursuant to Supplement No. 1 to Asset Purchase Agreement by and among NCF and certain of its subsidiaries and Ellington dated June 25, 2007. The two LNFA sales closed in May and June respectively.

17.     In addition to the LNFA, the Court authorized the sale of the Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an affiliate of Carrington Capital Management, LLC ("Carrington") by order entered on May 23, 2007 pursuant to the Second Amended and Restated Asset Purchase Agreement dated May 21, 2007. At the

8

closing of the Carrington Sale on June 29, 2007, Carrington transferred the sale proceeds to the

Debtors and the Debtors entered into an agreement with Carrington to transition the servicing

business. The Debtors will continue operating the servicing business in the ordinary course while

it is transitioned to Carrington.

18.    The Court further authorized the sale of certain of the Debtors' technology

assets to EquiFirst Corporation ("EquiFirst") by order entered on July 3, 2007 pursuant to the

Asset Purchase Agreement by and among NCFC, NCMC and EquiFirst dated June 22, 2007 (the

"Technology Sale"). The Debtors expect the Technology Sale to close by August 15, 2007.

In addition to the asset sales, the Debtors moved quickly to downsize and consolidate their

operations. The Debtors have rejected approximately 220 real property leases and approximately

250 executory contracts. The Debtors are in the process of liquidating additional assets and

identifying additional leases and contracts for rejection or assumption and assignment.

19.    Notwithstanding the progress made to date, there is still much to do to

maintain the day-to-day administration of these cases. For example, the Debtors only recently

completed and filed their schedules of assets and liabilities and statements of financial affairs

(collectively, the "Schedules") - a task that required significant effort by the Debtors as well as

their professionals and their claims and noticing agent. The Debtors now must assess how the

information contained in the Schedules will impact any plan. The Debtors are also devoting a

substantial amount of time to cooperating with the  investigation of the Examiner that the Court

has appointed to these chapter 11 cases. The initial Examiner's report is due on September 7,

2007.

20.    Further, the Court recently approved the Debtors' motion for the entry of an

order establishing August 31, 2007 as the general bar date and October 2, 2007 as the

9

governmental bar date for filing proofs of claim. It will only be after the claims bar dates have passed that the Debtors will be in a position to begin evaluating the universe of claims against them and, in light of that evaluation and the results of their planning process, develop the plan.

21.     The Debtors believe that the continued efforts to negotiate and finalize the sale of their assets, analysis of any remaining executory contracts and leases, review of claims, cooperation with the examiner's investigation, development of a draft plan and negotiations with their various constituencies regarding the terms of a plan and the related process, together with the day-to-day tasks of operating as chapter 11 debtors in possession, will consume the bulk of their time and efforts in the coming months.

## **ARGUMENT**

22.     "Cause" does not exist to lift the stay for the Positive Software Litigation to proceed in the Texas District Court. Given the extraordinary effort that this litigation has already taken and the amount that it has already taxed the Debtors' personnel, the Motion threatens to disrupt the orderly administration of the estate and diminish estate assets. All of Positive Software's arguments about *where* the litigation should proceed are irrelevant; the issue is *when* the case should proceed, and the answer is not now, while the Debtors are reorganizing. Thus, the harm to the Debtors outweighs the harm to Positive Software in not lifting the stay. Moreover, if Positive Software somehow were to be successful, relief from stay could result in insurance limits being exhausted, which would provide unequal treatment of creditors. As discussed below, this is precisely the scenario that the automatic stay is intended to prevent.

23.     Additionally, cause does not exist because Positive Software cannot show probability of success on the merits, having lost a AAA arbitration and having its lead appeal point rejected. Additionally, Positive Software is in no equitable position to ask for stay relief, given its blatant violation of the stay the day before it filed the Motion.

10

## I.    Bankruptcy Code 362.

24.    Bankruptcy Code section 362(a) stays the commencement or continuation

of litigation against the debtor and stays any attempt to obtain possession of (or control over) estate

assets. See 11 U.S.C. § 362(a).[3] The Code's automatic stay provision "is one of the fundamental

debtor protections provided by the bankruptcy laws." S. Rep. No. 95-989, 95 Cong., 2d Sess.

54-55, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5840-41 (1978). The automatic stay is

designed "to protect the debtor from an uncontrollable scramble for its assets in a number of

uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to

the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable

respite from protracted litigation, during which they may have an opportunity to formulate a plan

of reorganization for the debtor." In re Continental Airlines, 177 B.R. 475, 479 (D. Del. 1993)

(quoting A. H. Robins Co. v. Piccinin, 788 F. 2d 994, 998 (4th Cir.), cert. denied, 479 U.S. 876

(1986)).

25.    Of course, the automatic stay is not absolute. A bankruptcy court may grant

relief from the automatic stay where sufficient "cause" is present. See 11 U.S.C. § 362(d). There

is no rigid test for determining whether sufficient cause exists to modify an automatic stay. Rather,

in resolving motions for relief for "cause" from the automatic stay, this Court, like most

---

[3] Section 362(a) provides, in relevant part:

(a)    Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of —

(1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .

(3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. . . .

11 U.S.C. § 362(a).

bankruptcy courts, generally considers the policies underlying the automatic stay in addition to the competing interests of the debtor and the movant. In re Continental Airlines, Inc., 152 B.R. 420, 424 (D. Del. 1993) (citing Int'l Business Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.), 938 F. 2d 731, 734-37 (7th Cir. 1991)); In re Peregrine Sys., 314 B.R. 31, 47 (Bankr. D. Del. 2004), aff'd in part, rev'd in part on other grounds, AW Treuhand Wirtschaftsprufungsgesellschaft v. Peregrine Sys. (In re Peregrine Sys.), 2005 U.S. Dist. LEXIS 21707 (D. Del. September 29, 2005); In the Matter of Rexene Products Company, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

26.     Sufficient "cause" to grant relief from stay to allow completion of litigation in an alternative forum is typically found where the litigation is prepared for or on the eve of trial, and therefore can be more expeditiously resolved in the alternative forum. See, e.g., Robbins v. Robbins (In re Robbins), 964 F. 2d 342, 345-46 (4th Cir. 1992); Packerland Packing Co., Inc. v. Griffith Brokerage Co. (In re Kemble), 776 F. 2d 802 (9th Cir. 1985); Piombo Corp. v. Castlerock Properties (In re Castlerock Properties), 781 F. 2d 159 (9th Cir. 1986); In re Blan, 237 B.R. 737 (8th Cir. BAP 1999). Similarly, courts have found "cause" justifying relief from stay where the claims subject to litigation are extremely complex and based on specialized, novel or undetermined issues of state law that are best addressed in the alternative forum. See, e.g. Robbins, 964 F.2d at 346.

27.     However, where the alternative forum is unable to efficiently determine the claims subject to litigation (or the bankruptcy court can determine such claims with equal efficiency), or allowing the litigation to proceed in such forum will result in duplicative litigation and interfere with or delay the administration of the bankruptcy case, courts routinely refuse to grant relief from stay. See e.g. Sonnax Industries v. Tri Component Products Corp. (In re Sonnax Industries, Inc.), 97 F. 2d 1280 (2nd Cir. 1990); In re Wintroub, 283 B.R. 743 (Bankr. 8th Cir.

12

2002); In re Eagle Enterprises, Inc., 265 B.R. 671 (Bankr. E.D. Pa. 2001); In re Paxson Electric Co., 242 B.R 67 (Bankr. M.D. Fla. 1999). For example, where the litigation involves claims that will be discharged in the bankruptcy case, it is appropriate to deny relief from stay in order to promote judicial economy and minimize duplicative and unnecessary litigation. See Benedor Corp. v. Conejo Enterprises, Inc. (In re Conejo Enterprises, Inc.), 96 F. 3d 346 (9th Cir. 1996). Likewise, where applicable non-bankruptcy law is not complicated or unsettled with respect to the claim and it can be readily adjudicated by the bankruptcy court, relief from the stay should be denied. See e.g. In re Nexus Communications, Inc., 55 B.R. 596 (Bankr. E.D.N.C. 1985).

28.    Here, the balancing of competing interests and policy considerations weighs against a finding of cause to lift the stay with respect to the Positive Software Litigation.

## II.    The Balance of Competing Interests Weighs Against Granting The Motion.

29.    The balance of competing interests weighs against granting the Motion. In balancing the competing interests of the debtor and the movant, courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probability of success on the merits if the stay is lifted. In the Matter of Rexene Products Company, 141 B.R. at 576. The initial burden of proof is on the movant to establish a prima facie case that the test has been satisfied, which, if established, may be refuted by the debtor. Id. at 577; In the Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713, 720 (Bankr. D. Del. 1996).

### A.    Lifting the Stay Would Seriously Prejudice New Century.

30.    Lifting the stay would seriously prejudice New Century. It would result in the Debtors' immediate need to defend the Amended Motion to Vacate, which raises, *inter alia*, issues not previously raised by Positive Software. These include technical issues that require hands-on work by the Debtors' employees, as well as strategic issues requiring the expertise of in

13

house counsel. And that is only with respect to the Amended Motion to Vacate itself. While the Debtors are confident that they will defeat the Amended Motion to Vacate, of course there can be no assurances. If they are unsuccessful, either further appeals will result or a new trial in front of the AAA, will be conducted or both. It is no overstatement to say that of the hundreds of pre-petition litigation matters in which the Debtors were involved, no single matter occupied more time of the Debtors' own personnel and in house counsel (as well as the expense of outside counsel) than the Positive Software litigation.

31.    New Century's legal department is already stretched thin by the demands of Chapter 11 case administration and asset sales. At this juncture of the chapter 11 case, the company's employees and in house counsel must focus on matters that are critical to *all* stakeholders, including remaining asset sales and the development of a chapter 11 plan. They should not be distracted by continuing to litigate pre-petition cases -- especially one where an arbitrator already found no merit and the U.S. Supreme Court ended the pursuit of the plaintiff's lead appeal point.

32.    The potential existence of insurance does not moot the issue, as coverage is uncertain at best, given that the Debtors have been forced to sue Liberty Surplus in an attempt to obtain coverage. Moreover, given that Positive Software seeks $38 *billion* in damages, potential insurance coverage simply is irrelevant, as New Century never purchased anything close to that level of coverage. Indeed, as set forth below in the "balance of harms" section, the potential size of an adverse judgment (as remote as that possibility is -- but giving credit to Positive Software's own argument, *arguendo*) actually cuts *against* lifting the stay.

33.    Positive Software argues that lifting the stay actually would be in the Debtors' best interests, since the Debtors would be able to cross move to affirm the Award of more

14

than $1.5 million on the Debtors' counterclaim. Admittedly, that sounds like a tempting proposition, and the Debtors have carefully considered it. At the end of the day, as certain as the Debtors are that the Award will be upheld, they have determined, in their business judgment, that now is not the right time to pursue it, for three reasons. First, the potential recovery of $1.5 million is not worth the distraction of employees and in house counsel from the reorganization tasks at hand, as described above. Second, if the Amended Motion to Vacate and prior experience with Positive Software are any indication, the recovery on the Award, net of litigation costs, will not be anywhere close to $1.5 million, because Positive Software will litigate the Award through all appeals it can think of, which will be expensive. Third, there unfortunately exist substantial questions as to the collectibility against Positive Software on more than $1.5 million.

## B.      The Balance of Hardships Weighs Against Granting the Motion.

34.      The balance of hardships weighs against granting the Motion. Simply put, the harm that will be inflicted on the estate if the motion is granted (see Section A, *supra*) outweighs the harm to Positive Software in not being able to seek to vacate the AAA award and, only if successful in that effort, proceed anew to a trial in the AAA to liquidate an unsecured claim for which there may be no available insurance.

35.      Positive Software's primary argument to the contrary is that the case should be tried in Texas rather than Delaware, and Positive Software would be inconvenienced if it was eventually forced to litigate in Delaware. See Motion ¶38. That argument is the classic confusion of *where* the case should proceed with *when* it will be litigated. The Debtors have not yet asked this Court to address the merits of Positive Software's proof of claim, which has not yet been filed. Rather, the Debtors' position is that the Positive Software litigation should not proceed at this time *anywhere*. To be clear, the Debtors very well might object to Positive Software's proof of claim and/or move to estimate it, and ask this Court to adjudicate the merits. See *infra* Section IV. But

15

any such request simply is not before the Court at this time. If and when the Debtors determine to ask this Court to adjudicate the merits of the Positive Software dispute (or the probability of vacatur of the thorough and well reasoned arbitration award on a ground other than the principal one originally argued by Positive Software and rejected by the 5th Circuit) through a claim objection or estimation, Positive Software will be able to make the "where" arguments. But this motion is only a "when" motion; "where" is irrelevant.

36. Positive Software's only other claim of prejudice is that the stay should be lifted to avoid having other claims exhaust a limited pool of insurance. This argument is entirely backward. *No* pre-petition litigation is proceeding; this Court has not lifted the stay for *any* pre-petition litigation. Thus, *no* creditor is proceeding against an insurance policy for pre-petition claims. If this Court lifts the stay, it will be Positive Software that has an unfair advantage in a "race to the courthouse" against other creditors. Moreover, it will do so on a claim that, if successful and if there is insurance, will most assuredly exhaust policy limits, since the claim seeks $38 billion in damages. There would be nothing left for any other creditor with claims against the same policy.

37. Of course, this assumes that there would be any insurance coverage at all. At bottom, Positive Software's "prejudice" argument concerning insurance fails because Liberty Surplus has *denied* coverage, and the Debtors have been forced to sue Liberty Surplus. While the Debtors ultimately believe they will prevail, the result cannot be guaranteed. Should Liberty Surplus prevail in the suit, there will be no insurance coverage on this claim.

38. Balanced against the estate's interest in the orderly administration of the case -- as well as conservation and fair distribution of any insurance proceeds to the extent

16

available -- New Century respectfully submits that the balance of hardships weighs against granting the Motion.

**III.    The Plaintiffs Have Not Demonstrated Probability of Success On the Merits.**

39.    Positive Software has not demonstrated probability of success on the merits. Where, as here, there is no evidence of the slightest possibility of success on the merits, it is inappropriate to lift the stay. See In re Peregrine Sys., 314 B.R. at 47.

40.    Positive Software attempts to meet this prong of the stay relief test by citing to the Texas District Court's *pre-arbitration* finding, in the context of a motion for a *preliminary* injunction, that Positive Software has a probability of success on the merits solely of its infringement claim. But it is black letter law that findings at the preliminary injunction stage are exactly that -- preliminary. See The New Jersey Hosp. Assoc. v. Waldman, 73 F.3d 509, 519 (3d Cir. 1995) ("Pending the district court's final decision on the merits, the findings of fact and conclusions of law made in conjunction with the preliminary injunction are indeed preliminary. As such, they do not foreclose any findings or conclusions to the contrary based on the record as developed at final hearing."); Clark v. K-Mart Corp., 979 F.2d 965, 969 (3d Cir. 1992) ("[B]ecause of the limited nature of the proceedings resulting in the preliminary injunction, any findings of fact and conclusions of law made at the preliminary stage are of no binding effect whatsoever."). The learned AAA arbitrator, after ruling on 8 pre-trial summary judgment motions, conducting a seven day trial, admitting numerous exhibits and reading post-trial briefs, issued an 86 page opinion not only denying Positive Software's claims in their entirety, but granting New Century a substantial award on its counterclaim against Positive Software. It could not be more clear when the arbitrator, after spending countless hours of hard work on the matter and reviewing the credibility of witnesses and probative value of evidence, thinks of Positive Software's "probability of success on the merits".

17

41.     Positive Software argues that the threshold for proving this prong of the stay relief is low.  However, "low" and "non-existent" are two different standards.  Positive Software has not cited a single case where a court has held that a movant has a "probability of success on the merits" where it has lost an arbitration but is moving to vacate, or where it has lost at trial and is appealing.  We are aware of no such case for that counter-intuitive and improbable result, and this case should not become the first.  Indeed, even if such an opinion exists, this would be an inappropriate case to apply it, given that Positive Software already tried and lost its lead argument for vacatur, and the U.S. Supreme Court denied *certiorari*.

## IV.     Other Factors Also Weigh Against A Finding Of "Cause".

42.     Positive Software correctly notes that courts outside of Delaware sometimes look to other factors in addition to the ones outlined above, including:

- whether litigation in another forum would prejudice the interests of other creditors;

- the interests of judicial economy and the expeditious and economical resolution of litigation; and

- whether the parties are ready for trial in the other proceeding.

Motion at p. 15 (citing In re Mid-Atlantic Handling Sys., LLC, 304 B.R. 111, 130 (Bankr. D.N.J. 2003).  These factors also weigh in favor of denying the Motion.

43.     Whether litigation in another forum would prejudice other creditors: this factor favors a denial of the motion because creditors would be prejudiced if the Debtors' management and employees are distracted from the liquidation tasks at hand, and because Positive Software could win a race to the courthouse for insurance proceeds from a limited pot.  As both concepts are explained above, they will not be repeated here.

18

44.    Judicial economy: Judicial economy does not favor unleashing this highly contentious case on the creditor body.  Rather, the Debtors believe that they might, in the future, ask this Court to estimate the claim, or might object to the proof of claim.  In doing so, the Debtors would only be asking this Court to rule on whether Positive Software has met the standard for the "extreme remedy" (in the words of the *en banc* Fifth Circuit) of vacating an 86 page arbitration award, not the underlying merits of infringement claims.  A "specialized tribunal" is not needed for those issues.  This Court would not be called upon to actually try the infringement and related claims, because if it were to agree that vacatur is appropriate (which we doubt would occur), it presumably would set the matter for a new arbitration.  The streamlined estimation process would be particularly appropriate, given that Positive Software presumably will be filing a $38 billion proof of claim that flies in the face of what an arbitrator has already found.

45.    Judicial economy also will be served by denying the Motion because the passage of time, and the bankruptcy process, will make clear that two forms of relief sought by Positive Software in its litigation -- a permanent injunction and specific performance -- will be moot.  Once the Debtors sell or shut down all remaining operations in connection with the liquidation of its assets in this bankruptcy case, it will be even more clear than it already is that an injunction against the Debtors' use of Positive Software's intellectual property is unnecessary (as well as unwarranted).

46.    Whether the parties are ready for trial in the other proceeding.  In order to get to trial, Positive Software must prevail on vacatur and survive appeals.  This matter would not be re-tried for years.

47.    Unclean hands.  While not one of the Mid-Atlantic enumerated factors, the motion should be denied because Positive Software has unclean hands, having violated the

19

automatic stay. See Section V, *infra*. The Supreme Court has long recognized that bankruptcy

courts are equitable tribunals that apply equitable principles in the administration of bankruptcy

proceedings. See Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S. Ct. 695 (1934) ("[C]ourts of

bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in

equity."); Young v. United States, 534 U.S. 43, 50, 122 S. Ct. 1036 (2002) ("[B]ankruptcy courts

… are courts of equity and 'apply the principles and rules of equity jurisprudence.'") (quoting

Pepper v. Litton, 308 U.S. 295, 304, 60 S. Ct. 238 (1939)); United States v. Energy Resources Co.,

495 U.S. 545, 549, 110 S. Ct. 2139 (1990) ("[B]ankruptcy courts, as courts of equity, have broad

authority to modify creditor-debtor relationships."); 11 U.S.C. § 105(a) ("The Court may issue any

order, process or judgment that is necessary or appropriate to carry out the provisions of this

title.").

48.    It is an ancient and established maxim of equity jurisprudence that he who

comes into equity must come with clean hands. The equitable doctrine of clean hands expresses

the principle that where a party comes into equity for relief he or she must show that his or her

conduct has been fair, equitable, and honest as to the particular controversy in issue. Keystone

Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146 (1933); Johnson v. Yellow

Cab Transit 16 Co., 321 U.S. 383, 387, 64 S. Ct. 622 (1944); 27A Am. Jur. 2d Equity § 126. A

complainant will not be permitted to take advantage of his or her own wrong. Bishop v. Bishop,

257 F. 2d 495, 500 (3rd Cir. 1958), cert. denied, 359 U.S. 914, 79 S. Ct. 578; Ohio Oil Co. v. Sharp,

135 F. 2d 303 (10th Cir. 1943). If a party seeks relief in equity, he must be able to show that on his

part there has been honesty and fair dealing. Wheeler v. Sage, 68 U.S. 518, 529, 17 L. Ed. 646

(1863).

20

49.     This maxim is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion" of the court. <u>Keystone Driller v. General Excavator</u>, 290 U.S. at 246, 54 S. Ct. at 148.  Further: "[O]ne's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character.  Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim...." <u>Bishop v. Bishop</u>, 257 F. 2d at 500.

50.     Here, Positive Software's blatant, tactical violation of the automatic stay, which is demonstrated below, shows that it comes to this Court with unclean hands.  This Court should not reward Positive Software by now lifting the automatic stay.

## V.     POSITIVE SOFTWARE SHOULD BE SANCTIONED FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY.

51.     The filing of the Amended Motion to Vacate and the service of the Subpoenas are blatant violations of the automatic stay.  Worse still, Positive Software knows it, even told this Court that it knows it, yet flaunted it.  This conduct cannot be countenanced if the stay is to have any continued vitality.  Positive Software should be sanctioned, and its motion for stay relief should be denied.

52.     As set forth above, the automatic stay prohibits, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).  The Motion for Leave to File the Second Amended Motion to Vacate unquestionably "continues" pre-petition litigation against the Debtor.  It asks the Texas District Court to set aside the Award and order the matter to be arbitrated again.  It is

21

difficult to fathom any action that could be a more blatant "continuation" of a pre-petition "judicial, administrative, or other action," and thus a violation of the stay.

53.    Pursuant to section 362(k) (formerly 362(h)), a debtor injured by a willful violation of the automatic stay "shall recover actual damages, including costs and attorney's fees." 11 U.S.C. § 362(k).  Although section 362(k) refers only to "individuals," the Third Circuit has held that section 362(k) of the Bankruptcy Code also applies to corporate debtors such as the Debtors.  See Atlantic Bus., 901 F.2d at 329 ("Although Section 362(k) refers to an individual, the section has uniformly been held to be applicable to a corporate debtor"); see also Fidelity Mortgage Investors v. Camelia Builders, Inc. (In re Fidelity Mortgage Investors), 550 F.2d 47 (2d Cir. 1976) (bankruptcy court has authority to hold parties in contempt for violating bankruptcy rule).

54.    The Third Circuit repeatedly and definitively has held that the "willfulness" standard embedded in section 362(k) of the Bankruptcy Code requires only that the offending party intend to commit the acts that ultimately are determined to constitute a violation of the automatic stay.  In other words, the "willful violation" requirement does not necessitate a finding that the offending party have a specific intent to violate the automatic stay.  Rather, the statute merely requires that the party knew of the automatic stay and that the party's actions which violated that automatic stay were intentional.  A party's good faith belief that it is not in violation of the automatic stay is not relevant to the determination of whether the act was willful. Atlantic Bus., 901 F.2d at 329 (emphasis added) (quoting In re Bloom, 875 F.2d 224, 227 (9th Cir. 1989)); University Medical Ctr., 973 F.2d at 1087-89 (same); see also In re Lansdale Family Restaurants,

22

Inc., 977 F.2d 826, 829 (3d Cir. 1992) ("a creditor's good faith belief that he is not violating the automatic stay provision is not determinative of willfulness under § 362(h)").[4]

55.     In any event, Positive Software cannot possibly argue that it did not understand that the filing of the Motion for Leave to File Second Amended Motion to Vacate and the service of the two subpoenas violated the automatic stay. In a pleading filed with this Court on April 11 objecting to one of the Debtors' sale motions, Positive Software stated: "Because Positive Software is concerned that its moving for a writ of certiorari may have implicated the automatic stay, it will be seeking the *nunc pro tunc*[5] annulment of the automatic stay from this Court either concurrently herewith or shortly thereafter." See Dkt. 318 at fn. 3, p. 7; see also Motion ¶25 (acknowledging that the case currently is stayed). Almost three months to the day later, on July 9, Positive Software filed a Motion for Leave to File Second Amended Motion to Vacate without having *ever* followed up on its promise to move for the annulment of the automatic stay. Incredibly, on July 20, 2007, Positive Software compounded this unmitigated violation of the stay by serving the Subpoenas while its own Motion for stay relief was pending.   It defies logic to argue that Positive Software understood the automatic stay effected its writ, but not its Motion for Leave to File Second Amended Motion to Vacate or the Subpoenas. And its attempt to "hide" these stay violations from this Court is telling.

56.     Here, the Debtors have suffered actual damages from the motion.   Both defense counsel and bankruptcy counsel have had to scramble to determine the implications of the filing, in violation of the stay, of a motion making very serious allegations against the Debtors. Moreover, the Motion for Leave to File Second Amended Complaint had a return date of July 19,

---

[4] The Third Circuit's pre-BAPCPA reasoning is even more forceful now, given the adoption of new Section 362(k)(2). That subsection limits an award to actual damages if a creditor, in good faith, mistakenly believes that new Section 362(h) applies. No such revision was made to Section 362(k)(1), thereby confirming the lack of a "good faith" exception, other than where Section 362(h) is implicated -- which is not the case here.

23

2007, well before the hearing on the Motion and Cross Motion *sub judice*. Thus, defense counsel was required to brief the Motion for Leave. Further, defense counsel must now object to the clearly inappropriate Subpoenas, served in violation of the stay, by August 3, 2007. Section 362(k)(1) specifically contemplates that "actual damages" may "include[e] attorneys fees," and it cannot be controverted that the Debtors have incurred attorneys fees as a result of Positive Software's violating of the automatic stay. In addition, New Century personnel already have been distracted from the bankruptcy tasks at hand as a result of the Motion for Leave to File Second Amended Motion to Vacate and the Subpoenas.

57.    In addition to authorizing the recovery of actual damages, section 362(k) provides that a debtor may recover punitive damages as a result of a willful violation of the automatic stay. 11 U.S.C. § 362(k)(1); see Solfanelli v. Corestates Bank N.A., 203 F.3d 197 (3d Cir. 2000); Glenshaw Glass Co. v. Ontario Grape Growers' Marketing Board, 67 F.3d 470 (3d Cir. 1995); University Medical Ctr., 973 F.2d at 1085; Atlantic Bus., 901 F.2d at 329.

58.    Given that Positive Software knew about the stay (and even had hired seasoned Delaware bankruptcy attorneys months before violating the stay), promised the Court that it would move for relief from stay, did not, and then filed pleadings to "continue" the litigation in the Texas District Court and served the Subpoenas in the furtherance of such litigation, punitive damages are clearly appropriate here. The purpose of punitive damages is to punish wrongdoing and to deter future conduct. The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior. Memphis Cmty. School Dist. v. Stachura, 477 U.S. 299, 307 n.9 (1986); Mercer v. D.E.F., Inc., 48 B.R. 562, 565 (Bnkr. D. Minn. 1985) ("[t]he purpose of punitive damage is to both punish and deter the offending party" and finding an award of punitive damages appropriate where 11 U.S.C. § 362 violated). If

24

creditors learn that Positive Software was not severely sanctioned under these circumstances, they will be emboldened to ignore the automatic stay, file pleadings in state court, and see if they can catch the Debtors "asleep at the switch" while counsel is still in the process of being retained under Section 327(e) and Debtor personnel is distracted. That is precisely the deterrent effect that the punitive damages portion of Section 362(k)(1) is meant to avoid.

59.    The Debtors thus request an award consisting of their attorneys fees plus punitive damages.

25

## CONCLUSION

For the foregoing reasons, the Debtors respectfully asserts that cause has not been shown to

lift the stay with respect to the Positive Software Litigation and requests that the Motion by denied.

The Debtors further request that their Cross Motion be granted and the Court order Sanctions in the

amount of the Debtors attorneys fees, plus punitive damages.  The Debtors further request such

other and further relief as is just and proper.

Dated: July 31, 2007
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
Victoria A. Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION