## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Proposed Objection Deadline: August 20, 2007 at 12:00 pm** |
| | : | **Proposed Hearing Date: August 21, 2007 at 1:30 pm** |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO BANKRUPTCY RULE 9019 AND SECTIONS 105(a), 361, 363, 502 and 542 OF THE BANKRUPTCY CODE FOR APPROVAL OF SETTLEMENT AGREEMENT WITH DB STRUCTURED PRODUCTS, INC.

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby move for the entry of an order, pursuant to

sections 105(a), 361, 363, 502 and 542 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), approving the Settlement Agreement between the Debtors

and DB Structured Products, Inc. ("DBSP" and, collectively with the Debtors, the "Parties"), a

---

[1]  The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

copy of which is attached hereto as <u>Exhibit A</u> (the "Settlement Agreement"). In support of this motion (the "Motion"), the Debtors respectfully represent to the Court as follows:

## JURISDICTION

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b).

2.    The bases for the relief requested herein are sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

3.    NCF, a publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS, NCF originated, purchased, sold, and serviced mortgage loans nationwide. NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCF through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of

LA3:1136328 4

2

homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.        On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief. The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

5.        The Debtors commenced these chapter 11 cases largely to pursue an expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

A.        **The MRAs**

6.        The Debtors financed the origination of loans through a variety of repurchase agreements, including two such agreements provided by DBSP -- one for prime loans and one for loans of lesser quality, termed "hospital loans." Thus, DBSP and Debtors New Century Mortgage Corporation ("NCMC"), New Century Credit Corporation ("NC Credit"), Home123 Corporation ("Home123"), and NC Capital Corporation ("NC Capital") entered into that certain Master Repurchase Agreement dated as of September 2, 2005 (as amended, the "Prime Repurchase Facility"); and DBSP, NCMC, Home123, and NC Capital entered into that certain Master Repurchase Agreement dated as of April 17, 2006 (as amended, the "Hospital Repurchase Facility" and, together with the Prime Repurchase Facility, the "MRAs"). Pursuant to those certain Guaranty Agreements dated as of September 2, 2005 and April 17, 2006, Debtor New Century Financial Corporation ("NC Financial") guaranteed its subsidiaries' obligations to DBSP under the MRAs.

LA3:1136328 4

3

7.      Because the Prime Repurchase Facility was designed for many of the Debtors' better quality mortgage loans, the purchase price paid by DBSP to NCMC and the repurchase obligation owed by the Debtors to DBSP when these loans were to be repurchased (the "Repurchase Obligation")[2] was often generally quite close to the actual principal balance of the mortgage loans, or sometimes even in excess of the principal amount of the loans (reflecting the comparatively high interest rates owed by the borrowers on the mortgage loans).   In contrast, the purchase and repurchase price set for loans covered by the Hospital Repurchase Facility were set at a significant discount from the stated principal balance owed by the borrower on the mortgage loans that were subject to it.

8.      Typically, DBSP and the Debtors worked together each month to ensure that the Debtors' Repurchase Obligations fit within certain formulae.  If either of the facilities was out of balance, DBSP was entitled to make a margin call on the Debtors.   The starting point was the unpaid principal balance ("UPB") of the mortgage loans subject to the MRA.  DBSP would then set its assessment of the market value of these loans, generally expressed as a percentage of the UPB and termed in the industry as the repo counter party's "Mark."  DBSP also set the amount it was willing to pay for  these loans, expressed in terms of an advance rate applied against the Mark.  That calculation was compared to the amount of the Debtors' Repurchase Obligations  to determine if the facility was in or out of balance.  To the extent that the Repurchase Obligations  exceeded the Mark times the advance rate, DBSP was entitled to make a margin call on the Debtors, which were then either required to pay cash to DBSP or deliver additional mortgage loans to DBSP to bring the MRAs back into balance.  The MRAs

---

[2] The purchase price and the Repurchase Obligation were generally the same amount.

LA3:1136328 4

4

provided that DBSP was entitled to reassess the value of the mortgage loans based on changing

market conditions or factors particular to the loan portfolio (e.g., defaults by the borrowers). In

addition, the assessment of whether the MRAs were in or out of balance took into account a

variety of other factors, including new loans added to the MRAs, loans taken off the MRAs in

order to sell them to securitization trusts and whole loan buyers who paid release prices to

DBSP, the deadlines associated with the Debtors' repurchase obligations under the MRAs, and

early principal payments by the borrowers (including payments in full). This monthly

assessment could lead to the Debtors having unused capacity under its MRAs or owing DBSP a

margin call.

9.    On March 5, 2007, DBSP sent to the Debtors one such loan assessment,

computed as of March 2, 2007. For the Prime Repurchase Facility, DBSP's assessment was:

1.  UPB: $655,487,012

2.  Market value (DBSP's Mark): $634,804,364 (96.84% of UPB, as
    a weighted average determined loan by loan)

3.  Advance rate (98%) times Mark = $621,776,420

4.  Advanced Amount: $637,808,590

5.  Cash Deposited:[3] $1,903,498.30

6.  Market Value Deficit:[4] ($3,004,226).

7.  Margin Deficit:[5] ($14,128,672)

10.    DBSP's assessment for the Hospital Repurchase Facility was:

---

[3] Cash paid by the Debtors to DBSP pursuant to prior margin calls.

[4] Advanced Amount less Mark less Cash Deposited.

1. UPB: $272,901,480.

2. Market Value (DBSP's Mark): $205,567,348 (weighted average of 75.33% of UPB, determined loan by loan)

3. Advance rate (82.57%) times Mark = $170,747,269

4. Advanced Amount: $171,713,537

5. Cash Deposited: $10,510,021.88.

6. Market Value Surplus: $33,663,265

7. Margin Surplus: $9,353,209.

11.     The Debtors believe that, in total, DBSP's March 2, 2007 assessment shows that the market value of the loans subject to the MRAs plus cash that the Debtors had paid to DBSP on prior margin calls, exceeded the Debtors' Repurchase Obligations by over $30 million.[6] However, the MRAs computed the need to satisfy margin calls based on the advance rates, not the Marks, and entitled DBSP to analyze the two facilities separately. Thus, on March 6, 2007, DBSP made a $14.1 million margin call on the Debtors for the Prime Repurchase Facility.

12.     At the time, the Debtors' cash had been badly reduced by paying prior margin  calls made by repo counterparties, plus satisfying demands of loan purchasers for New Century to repurchase sold loans when borrowers defaulted early in the life of the loans.[7] Thus, New Century decided to see if it could work with DBSP to satisfy this margin call by delivering additional loans to DBSP.

---

[5] Advanced Amount less (Advance Rate times Mark) less Cash Deposit.

[6] DBSP disputes this argument both legally and factually

13.    Shortly after this margin call, New Century sent DBSP a tape of information about approximately 235 mortgage loans that NCMC owned and which were not subject to any repurchase facility or otherwise encumbered (the "Disputed Loans").[8]  These LNFA had a principal balance of slightly more than $50 million.  The parties dispute what happened next.  New Century asserts that it delivered this tape to DBSP to start the dialogue about what <u>portion</u> of these loans might be used to satisfy the margin call and the advance rates and Marks that DBSP would give with respect to these loans.  DBSP, on the other hand, asserts that New Century intended to transfer all of the loans on this tape to it in order to satisfy the $14.1 million margin call and to induce DBSP to continue financing loan originations.  Deutsche Bank National Trust Company ("DBNTC") served as the custodian for the original borrower notes and other mortgage loan documents;  transfers of loans to and from repurchase counterparties were effected generally by notations on DBNTC's books.  In early March 2007, DBNTC transferred ownership of the 235 LNFA in question from NCMC to DBSP.  New Century asserts that it never authorized this transfer by DBNTC to  DBSP.  DBSP and DBNTC, in contrast, claim that NCMC authorized this transfer.

14.    On March 14, 2007, DBSP declared an event of default under the Prime Repurchase Facility, terminated this facility and accelerated all repurchase obligations.   The next day, DBSP did the same with respect to the Hospital Repurchase Facility.

15.    Substantially earlier, New Century and DBSP had established a segregated account at Union Bank of California ("UBOC") into which all principal and interest collected on

---

[7] Typically called early payment default ("EPD") put backs.

[8] Under New Century's parlance, such loans were termed loans not financed anywhere or "LNFA."

the mortgage loans subject to the Prime Repurchase Facility were deposited. But prior to mid-March 2007, New Century and DBSP had not established a similar segregated account for collections on the mortgage loans subject to the Hospital Repurchase Facility and DBSP had not negotiated with UBOC a control agreement which would allow it, upon occurrence of an event of default under the MRAs, to block transfers from the existing segregated account to New Century or to cause UBOC to transfer funds in this account to DBSP. On March 19, 2007, DBSP transmitted to New Century and to UBOC a control agreement to govern the deposit and control of collections on the loans subject to the MRAs. New Century executed this agreement when DBSP tendered it and cooperated in establishing this control system. On March 21, 2007, NCMC completed reprogramming the MortgagServ system so that collections on mortgage loans subject to the Hospital Repurchase Facility, as well as the Prime Repurchase Facility, were deposited into this control account. Thereafter, DBSP swept the collections in the UBOC control account and received substantial sums collected on the loans that were subject to its MRAs.[9]

16.    The Debtors commenced these cases on April 2, 2007.

17.    On April 25, 2007, DBSP notified the Debtors that it had elected to credit what it asserted was the market value of the loans as of that date against the Debtors' repurchase obligations under the MRAs. It indicated that DBSP's assessment of the market value of the loans as of April 25, 2007 was $819,302,173, or approximately $51 million less than its

---

[9] The Debtors assert that the DBSP MRAs did not require that the Debtors establish segregated collection systems for these loans prior to an event of default and that the Debtors were free to utilize such funds for general corporate purposes. DBSP, however, contends that the MRAs did not allow the Debtors to utilize funds collected for general corporate purposes. Prior to mid-March 2007, the Debtors generally swept the amounts in the DBSP collection account periodically into NCMC's general corporate operating account. Similarly, the Debtors paid the monthly Price Differential (the financing costs of the MRAs) and settled any principal payments need to keep the MRAs in balance by wires from NCMC's general corporate operating bank account.

assessment delivered to the Debtors on March 5, 2007.[10]   This remedy of crediting the market

value of the loans that DBSP purported to own against the Debtors' repurchase obligations was

set forth in section 8 of both MRAs and is generally referred to in the industry as a loan "buy in."

**B.    The Adversary Proceeding**

18.    Also on April 25, 2007, DBSP filed that certain Complaint (the

"Complaint") commencing an adversary proceeding (the "Adversary Proceeding") captioned as

DB Structured Products Inc., Plaintiff v. New Century Mortgage Corporation, New Century

Credit Corporation, Home 123 Corporation, NC Capital Corporation, and New Century Financial

Corporation, Debtor-Defendants, Adversary Proceeding Case No. 07-51269 (KJC), and its

accompanying Motion for Preliminary Injunction (the "PI Motion").  Among other things, the

Adversary Proceeding sought an adjudication of DBSP's and the Debtors' rights to the 235

Disputed Loans.

19.    DBSP and the Debtors negotiated a procedural standstill with respect to

most of the issues raised in the Adversary Proceeding.  Thus, on May 16, 2007, the Bankruptcy

Court entered an Order approving that certain Stipulation and Order Resolving DB Structured

Products Inc.'s Motion for Preliminary Injunction (the "PI Motion Resolution Stipulation")

pursuant to which, inter alia: (i) DBSP agreed to withdraw, without prejudice, the PI Motion; (ii)

the Debtors agreed to hold in a segregated account all collections on the Disputed Loans pending

resolution of the entitlement to such funds, and (iii) the parties agreed to cooperate in an effort to

develop a consensual means to realize on the Disputed Loans.

---

[10] DBSP's March 5, 2007 transmission set DBSP's Mark for the loans under the facilities at $655,407,012 for the Prime Repurchase Facility and $205,576,368 for the Hospital Repurchase Facility or $860,983,380 in total.

C.    **The Adequate Protection Motion and Order**

20.    On May 16, 2007, the Debtors filed the Debtors' Motion for Order to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) (the "Adequate Protection Motion"), the purpose of which was to provide adequate protection to the parties, including DBSP, claiming an interest in property held by the Debtors on the Petition Date. This motion had been vetted with most of the repurchase counterparties before it was filed and a number of them, including DBSP, supported it. Indeed, DBSP's support of the motion was memorialized in the PI Motion Resolution Stipulation which the Court entered on the same day that the Debtors filed the Adequate Protection Motion. Subsequent to a hearing on May 30, 2007, the Debtors and the repurchase counterparties negotiated the terms of a consensual order and on June 28, 2007, the Bankruptcy Court entered its Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims (the "Adequate Protection Order"). Since the entry of the Adequate Protection Order, the Debtors have funded an escrow account in the amount of $42.1 million, pending the resolution of the rights of parties, including DBSP, asserting an interest in the funds.

21.    The Parties wish to resolve the Adversary Proceeding and resolve all issues related to the MRAs on the terms and conditions set forth herein.

## RELIEF REQUESTED

22.    By this Motion, the Debtors seek authority, pursuant to sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code and Bankruptcy Rule 9019(a), to enter into the Settlement Agreement and thereby settle and resolve all issues pertaining to the MRAs and the

LA3:1136328 4

RLF1-3187561-1

Adversary Proceeding. The Debtors submit that the timely settlement of their disputes with respect to the MRAs and the withdrawal of the Adversary Proceeding will promote judicial economy by allowing the Debtors to proceed economically and expeditiously to advance significant issues in these chapter 11 cases.

23.     The Debtors propose that they be authorized to settle all matters arising out of the MRAs and the Adversary Proceeding on the following terms, as fully set forth in the Settlement Agreement:[11]

A.     **Auction of Disputed Loans; Payment of Proceeds.** (1) The Debtors will promptly file a motion for an order of the Bankruptcy Court authorizing the Debtors to conduct a single auction for the sale of the Disputed Loans pursuant to section 363(f) of the Bankruptcy Code. The Debtors will consult with the Committee and with DBSP in connection with the auction procedures to be approved by the Bankruptcy Court.

(2)     The proceeds of any sale of the Disputed Loans, after deducting any costs and expenses of such sale, including amounts, if any, due to bidders for due diligence expense reimbursement (the "Disputed Loan Proceeds") plus the Disputed Loan Escrow Amounts will be paid as follows: (i) first, to DBSP until DBSP is paid $14,000,000 (the "DBSP Payment"), and (ii) second, to the Debtors' bankruptcy estates, to the extent of any excess proceeds after payment to DBSP of the DBSP Payment in full.

(3)     To partially satisfy the DBSP Payment, the Debtors shall remit to DBSP the Disputed Loan Escrow Amounts on the Effective Date (as defined in the Settlement Agreement). The balance of the DBSP Payment shall be paid to DBSP from the Disputed Loan Proceeds within 48 hours of the closing of the sale of the Disputed Loans, as well as from additional Disputed Loan Escrow Amounts available for distribution at such time, as needed.

---

[11] The following description of the terms of the Settlement Agreement is a summary. The Settlement Agreement should be consulted for a complete description of the terms. All capitalized terms in this description of the terms of the Settlement Agreement that are not otherwise defined in the Motion shall have the meaning ascribed to them in the Settlement Agreement.

(4)     If, upon completion of the auction of the Disputed Loans, the sum of the Disputed Loan Proceeds (net of any holdback from the proceeds of the sale required by the prevailing bidder for the Disputed Loans) plus the Disputed Loan Escrow Amounts, calculated as of such date, is less than $14,000,000, then DBSP may, within 72 hours from the close of bidding, give written notice to the Debtors of its election to purchase the Disputed Loans on the same terms and conditions as the highest bid at auction. If, after 72 hours, DBSP has not notified the Debtors of such election to purchase the Disputed Loans, then the Debtors may sell the Disputed Loans to the highest bidder at auction, with the proceeds of such sale to be distributed pursuant to paragraphs (2) and (3) above.

(5)     The Parties will jointly instruct Deutsche Bank National Trust Company ("DBNTC"), as custodian, to deliver the loan and collateral files for the Disputed Loans to the designated custodian of the winning bidder, which will be delivered pursuant to bailee letters after the auction but before the close of the sale of the Disputed Loans. The Parties will take all reasonable steps to facilitate the transfer of the Disputed Loans to the winning bidder at the close of such sale and upon payment to DBSP of the DBSP Payment, including instructing DBNTC to deliver original loan and collateral files to the winning bidder or its custodian.

The auction, or sale to DBSP, of the Disputed Loans in accordance with foregoing paragraphs (1), (2) or (4), as applicable, and the payment of Disputed Loan Proceeds and the Disputed Loan Escrow Amounts to DBSP pursuant to paragraph (3), shall be in full and final satisfaction of DBSP's alleged property interests and constructive trust claims, and all other claims and interests, with respect to the Disputed Loans.

B.      **Assignment to the Debtors of DBSP's Rights to Adequate Protection.** DBSP will amend its Alternative Accounting submitted pursuant to the Adequate Protection Order to increase it by $346,628.06 (reflecting the Unfunded Amount to be funded by the Debtors pursuant to paragraph 6 hereof). Effective upon the Effective Date, DBSP irrevocably transfers and assigns to the Debtors' bankruptcy estates all rights that DBSP has to adequate protection with respect to any rights or claims of DBSP that are the subject of the Adequate Protection Motion or the Adequate Protection Order, including any rights to property (including cash

LA3:1136328.4

12

RLF1-3187561-1

or cash equivalents) held by the Debtors as of the Petition Date related to collections on DBSP MRA Loans and the adequate protection rights granted to DBSP under paragraphs 10 and 11 of the Adequate Protection Order.

C.  **Allowance of DBSP's Deficiency Claim**.  DBSP shall have a general unsecured claim allowed in the Bankruptcy Case against each of the Debtors relating solely to claims under the Repurchase Agreements and the Guarantees in the amount of $20,000,000 (the "Allowed Repurchase Agreements Deficiency Claim"); provided, however, that the recovery on the Allowed Repurchase Agreements Deficiency Claim shall be limited to such claim's pro rata share (determined in relation to other allowed general unsecured claims against the relevant Debtor), of proceeds distributed from recoveries realized on claims (net of professional fees and other costs of prosecution) arising out of events or circumstances that led to the restatement of the financial statements of the Debtors or such restatement itself, and the Allowed Repurchase Agreements Deficiency Claim shall not be entitled to participate in distributions derived from any other source.  Such Allowed Repurchase Agreements Deficiency Claim shall be deemed to supersede and amend any other claim DBSP may have filed or scheduled in the Bankruptcy Case with respect to the Repurchase Agreements, the Guarantees the Disputed Loans, and the DBSP MRA Loans. Nothing contained in this provision shall be construed in any way to restrict, limit or amend the right of DBSP or any of its affiliated entities to file a claim in the Debtors' estates which does not arise under the Repurchase Agreements, the Guarantees, the Disputed Loans, or the DBSP MRA Loans, or the right of the Debtors to contest the nature or amount of any such other claims.

D.  **Dismissal of the Adversary Proceeding with Prejudice.**  DBSP will promptly dismiss with prejudice the Adversary Proceeding against NCMC, NC Credit, Home123, NC Capital, NC Financial and all other debtor or non-debtor entities or individuals (including any Doe defendants) that have been or could have been named as a defendant with respect to the claims for relief set forth therein.  Provided, however, that notwithstanding anything herein to the contrary, the Debtors shall continue to be bound by paragraph 4 of the PI Motion Resolution Stipulation which concerns the DBSP Ohio Loans (as defined therein), and the Debtors shall continue to be bound by the obligation to fund into the Disputed Loan Escrow Account, pursuant to paragraph 11(e) of the PI Motion Resolution, all collections by the Debtors on the

Disputed Loans from the Petition Date up to the date that the amounts in the Disputed Loan Escrow Account are remitted to DBSP pursuant to the terms of this Settlement Agreement.

**E.**     **Mutual Release.**  The Parties shall exchange mutual releases of claims arising under the MRAs.

24.     The relief sought in this Motion has been developed by the Debtors working closely with the Committee.

## APPLICABLE AUTHORITY

25.     Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  In addition, the issues at hand involve resolution of adequate protection, claims resolution and turnover of property governed by Bankruptcy Code Sections 361, 363, 502 and 542.

26.     Bankruptcy Rule 9019(a) provides as follows:

On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

See Bankruptcy Rule 9019(a).  Courts have interpreted this rule, as well as its predecessor, section 27 of the Bankruptcy Act, as granting the debtor in possession broad authority to settle controversies.

27.     A starting point in analyzing any proposed settlement agreement is the general policy of encouraging settlements and favoring compromises.  See Myers v. Martin (In re Martin), 91 F. 3d 389, 894 (3rd Cir. 1996); In re Coram Healthcare Corp., 315 B.R. 321, 329-30 (Bankr. D. Del. 2004); Florida Trailer and Equip. Co. v. Deal, 284 F. 2d 567, 571 (5th Cir.

1960). The standard by which courts evaluate a proposed compromise and settlement are well established. In bankruptcy, the court should approve a proposed compromise and settlement when it is fair and equitable and in the best interests of the debtor's estate and its creditors. See In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998); In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997); In re Texaco, 84 B.R. 893, 801-02 (Bankr. S.D.N.Y. 1988); Depo v. Chase Lincoln First Bank, N.A. (In re Depo), 77 B.R. 381, 383 (N.D.N.Y. 1987), aff'd, 863 F. 2d 45 (2nd Cir. 1988).[12] In other words, adequate protection is necessary only to the extent the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."[13]

28.    Under the well-established standard for consideration of the merits of a settlement, a settlement should be approved unless it falls below "the lowest point in the range of reasonableness." In re Coram Healthcare Corp., 315 B.R. at 330 (quoting Official Unsecured Creditors' Comm. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa. 1992)); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F. 2d 599, 608 (2nd Cir.), cert. denied, 464 U.S. 822 (1983)) (quoting Newman v. Stein, 464 F. 2d 689, 693 (2nd Cir.), cert. denied sub nom, Benson v. Newman, 409 U.S. 1039 (1972)); see also Am. Reserve Corp., 841 F. 2d at 161; Teltronics Servs., Inc., 762 F. 2d at 187-89.

29.    In determining whether a settlement is within the range of reasonableness,

---

[12] See also In re Energy Coop, Inc., 886 F. 2d 921, 927 (7th Cir. 1989); LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F. 2d 159, 161 (7th Cir. 1987) (a court is not required to resolve the issues of fact and law compromised by a proposed settlement); Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.), 762 F. 2d 185, 187-89 (2nd Cir 1985).

[13]   Thus, if a secured creditor's interest in the value of its collateral is not diminished by a debtor's use, sale or lease of the collateral, the secured creditor's interest in the collateral is adequately protected.

LA3:1136328 4

15

the Court should consider four principal factors:

      (1)    the probability of success in the litigation;

      (2)    difficulties to be encountered in collection;

      (3)    the complexity of the litigation and related expense, inconvenience, and delay; and

      (4)    the interests of the creditors.

Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F. 3d 159, 165 (3rd Cir. 2002); In re Etoys, Inc., 311 B.R. 176, 198 (Bankr. D. Del. 2005); In re Coram Healthcare Corp., 315 B.R. at 330-31; Marvel, 222 B.R. at 249; see also Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119, 123 (D. N.J. 2000); Wallis v. Justice Oaks II, Ltd., (In re Justice Oaks II, Ltd.), 898 F. 2d 1544 (11th Cir.), cert. denied, 498 U.S. 959 (1990); Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Martin v. Kane (In re A&C Props.), 784 F. 2d 1377, 1381 (9th Cir.), cert. denied sub nom, Martin v. Robinson, 479 U.S. 854 (1986). These factors seek to balance the probable benefit and potential cost of pursuing a claim or defense against the costs of the proposed settlement. For the reasons set forth below, the Debtors respectfully submit that the Settlement Agreement meets this standard.

      30.    The Settlement Agreement reflects an integrated compromise of a number of complicated issues. It is an integrated whole, so it would be inappropriate to consider any element in isolation. The elements that comprise the settlement include the following:

      1.    The Disputed Loans are to be sold in an expedited auction that is designed to yield the maximum value for these 235 loans. That auction is the subject of two companion motions that are being

filed contemporaneously herewith.

2.　　The controversy over entitlement to the proceeds of those Disputed Loans will be resolved by a classic compromise. The Debtors assert that there was <u>no</u> legitimate transfer of these loans to DBSP, while DBSP asserts that <u>all</u> of the value of these loans was transferred to it in early March. The settlement "splits the difference" by giving DBSP an amount essentially equal to its March 6, 2007 margin call and giving to the estates all proceeds in excess of that. This will probably result in $14 million of cash for DBSP on a reasonably expedited basis, and based on the indications of interest the Debtors have received, significant cash for the estates as well.

3.　　The Debtors assert that DBSP should not be entitled to any deficiency claim, much less the approximately $50 million deficiency claim that DBSP asserted in its April 27, 2007 "buy in" letter. Bankruptcy Code sections 559 and 562 set forth specific rules for valuing any deficiency claim under a repurchase facility, or conversely determining whether the repo counterparty owes the estate a surplus. In 2005, Congress granted mortgage loan repo counterparties certain special and powerful rights, including among other rights the ability to sell mortgage loans that had been sold under qualified repos without obtaining relief from the automatic

stay. But Congress also passed corollary provisions that make clear that any deficiency claim or surplus is to be measured based on the market value of the mortgage loans determined as of the date that the repo counterparty accelerates and terminates the repo. If a repo counterparty waits to sell the loans in the market or to exercise buy in rights, any market decline is for its account. The rules for valuing a repo counterparty's deficiency claim are set forth in Section 562 of the Bankruptcy Code.[14] Section 562(a)

---

[14] Section 562 of the Bankruptcy Code provides as follows:

§ 562. Timing of damage measurement in connection with swap agreements, securities contracts, forward contracts, commodity contracts, repurchase agreements, and master netting agreements.

(a) If the trustee rejects a swap agreement, securities contract (as defined in section 741), forward contract, commodity contract (as defined in section 761), repurchase agreement, or master netting agreement pursuant to section 365(a), or if a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of --

(1) the date of such rejection; or

(2) the date or dates of such liquidation, termination, or acceleration.

(b) If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.

(c) For the purposes of subsection (b), if damages are not measured as of the date or dates of rejection, liquidation, termination, or acceleration, and the forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant or the trustee objects to the timing of the measurement of damages --

(1) the trustee, in the case of an objection by a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant; or

(2) the forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant, in the case of an objection by the trustee,

has the burden of proving that there were no commercially reasonable determinants of value as of such date or dates.

See 11 U.S.C. § 562.

LA3:1136328 4

18

RLF1-3187561-1

provides in pertinent part that damages of the repo counterparty

shall be measured as of the earlier of (i) rejection of the repo by the

debtor or (ii) "acceleration, termination, or liquidation" of the repo.

See 11 U.S.C. § 562(a). Section 562(b) provides a limited

exception to these rules only if there are no commercially

reasonable determinants of value as of such date, in which case

damages are to be measured on the earliest subsequent date or

dates on which there are commercially reasonable determinants of

value. 11 U.S.C. § 562(b). Thus, repo parties must use the earliest

of the rejection date or the acceleration, termination, or liquidation

date to value damages, except in the limited circumstances where

market information is unavailable. Id. The flip side to Section

562's deficiency rule is Section 559's surplus rule, which provides

that the excess of the market value of a repo asset upon liquidation

of the repo over the contractual repurchase price is property of the

estate. See 11 U.S.C. § 559.[15] On the face of Section 559, the

---

[15]   Section 559 of the Bankruptcy Code provides as follows:

§ 559.  Contractual right to liquidate, terminate, or accelerate a repurchase agreement.

    The exercise of a contractual right of a repo participant or financial participant to cause the liquidation, termination, or acceleration of a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title, unless, where the debtor is a stockbroker or securities clearing agency, such order is authorized under the provisions of the Securities Investor Protection Act of 1970 or any statute administered by the Securities and Exchange Commission. In the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on

LA3:1136328 4

liquidation date must be used to calculate surplus, without

exception -- including if the repo assets are actually disposed of on

a later date. Id. The drafters of Sections 559 and 562 strongly

favored clear and consistent rules in the insolvency arena in order

to stabilize the repo industry.[16] The deficiency rule in Section 562

clarified that, while counterparties to qualified mortgage repos

have relief from the automatic stay to close their positions, they do

not have unbridled discretion to manipulate the measurement date

for valuing claims against the debtor. Id.; see also Taunton

Municipal Lighting Plant v. Enron Corp. (In re Enron), 354 B.R.

652, 659 (S.D.N.Y. 2006) (Section 562 governs the measurement

date damages under specified contracts); H.R. Rep. No. 109-31(I),

109th Cong. 1st Sess. 131 (2005) ("The party determining damages

---

the date of liquidation of such repurchase agreements, at prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to available rights of setoff. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant or by reason of normal business practice.

See 11 U.S.C. § 559.

[16]    See H.R. Rep. No. 109-31(I), 109th Cong. 1st Sess. 131 (2005) (regulation of repurchase agreements and other financial contracts in insolvency situations necessary to avoid "systemic risk" in financial markets); see also Hearings of the Committee on the Judiciary on H.R. 2852 and H.R. 3418 (May 2, 1984) (testimony of drafters of Section 559 and repo industry participants); H.R. Rep. No. 105-688(I), 105th Cong. 2nd Sess. (1998) (accompanying H.R. 4393, the Financial Contract Netting Improvement Act of 1998, one of the several precursor bills seeking enactment of Section 562 and other financial contracts provisions of the Bankruptcy Abuse and Consumer

is given limited discretion to determine the dates as of which damages are to be measured. Its actions are circumscribed unless there are no 'commercially reasonable' determinants of value for it to measure damages on the date or dates of either rejection, or liquidation, termination or acceleration.").

4.   Here the relevant date is March 14 in the case of the Prime Repurchase Facility and March 15 in the case of the Hospital Repurchase Facility. The Debtors maintain that the Marks that DBSP delivered on March 5 are far better indicia of the relevant values than the values DBSP asserted in its buy in letter over 40 days after it accelerated. The market for mortgage loans had declined significantly during that time. And moreover, DBSP had every incentive to be conservative and assign low values to these loans in the Marks it set on March 5, 2007. Since the Debtors are satisfying the margin call by paying DBSP the first $14 million of proceeds of the Disputed Loans, DBSP's March 2, 2007 Marks would show that the Debtors were entitled to receive a surplus of approximately $30 million of cash as of that date.

5.   Needless to say, DBSP disputes this analysis. For example, DBSP asserts that the market value of the loans subject to the MRAs had dropped between March 2, 2007 when it gave New Century its

Protection Act of 2005).

Marks and March 14 -15 when it accelerated and that some of the
information provided by the Debtors concerning the Hospital
Repurchase Facility may have been incomplete or inaccurate
information and that this may have impacted the March 2, 2007
assessment.

6.      The settlement will compromise this issue by giving DBSP a
deficiency claim of $20 million -- 40% of what DBSP claimed in
its "buy in letter" -- and most importantly by providing that this
claim will only share in net proceeds of any recoveries realized by
the estates related to the restatement of the Debtors' financial
statements.  In other words, DBSP will not share with other
unsecured creditors in recoveries from asset sales, tax refunds or
other sources of distributions.

31.      The settlement also resolves the issues involved in the Adequate
Protection Motion by assigning to the estates whatever entitlement DBSP would be entitled to
receive under the Adequate Protection Motion.  Of course, this settlement does not determine
what rights, if any, those are and other repo counterparties and whole loan purchasers will be
afforded a full and fair opportunity to weigh in on that issue.  But this settlement should simplify
the adequate protection matter if for no other reason than one party will drop from the dialogue
and potential litigation.

32.      Finally, the Settlement Agreement ensures the withdrawal with prejudice
of the Adversary Proceeding and the mutual release of claims under the MRAs.  While the

Debtors believe that they have very persuasive arguments with respect to the issues raised by DBSP, the Settlement Agreement provides the Debtors with a satisfactory resolution of the disputes, as well as a withdrawal of the Adversary Proceeding, without the necessity and expense of litigation.

33.    For all of the foregoing reasons, the Debtors respectfully submit that the Settlement Agreement is fair and reasonable and in the best interests of the Debtors and their creditors and estates, and should be approved by the Court.

## NOTICE

34.    No trustee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (1) the Office of the United States Trustee for the District of Delaware, (2) the Official Committee of General Unsecured Creditors; (3) DBSP, (4) all other counterparties to master repurchase agreements; (5) all parties who have timely filed requests for notice under Bankruptcy Rule 2002; and (6) the Examiner appointed in these chapter 11 cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

35.    The Debtors submit that this Motion does not present any novel issues of law requiring briefing.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

LA3:1136328 4

23

## NO PRIOR REQUEST

36.     No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated:  August 8, 2007
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

LA3:1136328 4

24

RLF1-3187561-1