## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | Proposed Bidding Procedures Hearing Date: |
| | : | August 21, 2007 at 1:30 p.m. |
| | : | Proposed Bidding Procedures Objection |
| | : | Deadline:  August 20, 2007 at 12:00 p.m. |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A)
APPROVING BIDDING PROCEDURES IN CONNECTION WITH AUCTION OF
RESIDENTIAL MORTGAGE LOANS, (B) SCHEDULING HEARING TO CONSIDER
PROPOSED SALE OF RESIDENTIAL MORTGAGE LOANS AND APPROVING
FORM AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED
RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE
AND (B) GRANTING RELATED RELIEF**

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"),

hereby submit this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the

United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), and Rules 2002, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry

---

[1]   The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT,
Inc ), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a
Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage
Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital
Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com,
Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a
California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership;
NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New
Century R.E.O. Corp , a California corporation; New Century R.E.O. II Corp , a California corporation; New
Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort
Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage,
Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Stalking Horse Bidders Advantage
Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral,
L.P , a Delaware limited partnership; New Century Warehouse Corporation, a California corporation.

of (i) an order (a) approving procedures in connection with an auction of residential mortgage

loans (the "Loans"), (b) scheduling a hearing to consider approval of the sale of the Loans to

Residential Mortgage Solution L.L.C. or such other prevailing bidder pursuant to the terms and

conditions of that certain letter of intent dated as of August 8, 2007 and approving the form and

manner of notice thereof and (c) granting related relief and (ii) an order (a) approving the sale of

the Loans and (b) granting related relief.  In support of this Motion, the Debtors respectfully state

as follows:

**JURISDICTION**

1.      This Court has jurisdiction over the subject matter of this Motion pursuant

to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought in this Motion are

Bankruptcy Code Sections 105(a) and 363 and Bankruptcy Rules 2002, 6004 and 9014.

**BACKGROUND**

3.      New Century Financial Corporation, a Maryland corporation ("NCF") and

publicly owned real estate investment trust, is one of the largest specialty mortgage finance

businesses in the United States.  Through its subsidiaries and its primary holding company

subsidiary, New Century TRS Holdings, Inc., a Delaware corporation, NCF originates,

purchases, sells, and services mortgage loans nationwide.  NCF historically focused on

"subprime" lending, or lending to individuals whose borrowing needs were generally not

fulfilled by traditional financial institutions because they did not satisfy the credit,

documentation or other underwriting standards prescribed by conventional mortgage lenders and

loan buyers.  In September 2005, NCF through some of its subsidiaries also began offering

conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal

Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA").

During the fiscal year ending December 31, 2006, the Debtors originated or purchased

approximately $60 billion of mortgage loans, most of which were sold in the secondary market.

Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans

have helped millions of homebuyers and homeowners across the nation access credit and realize

the benefits of home ownership, including many who might not otherwise have been able to do

so.

4.    On April 2, 2007 (the "Petition Date"), the Debtors filed the instant

petitions for relief. The Court has entered an order authorizing the joint administration of the

Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their

business and managing their affairs as debtors and debtors in possession.

5.    The Debtors commenced these chapter 11 cases largely to pursue an

expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors'

stakeholders.

**THE SETTLEMENT WITH DEUTSCHE BANK STRUCTURED PRODUCTS**

6.    The Loans the Debtors propose to sell consist of approximately 235 first

lien residential mortgage loans with an aggregate unpaid principal balance of approximately

$49,440,352 that the Debtors owned and which were not subject to any repurchase facility or

otherwise encumbered, and became the subject of a dispute between the Debtors and DB

Structured Products, Inc. ("DBSP").

7.    The Debtors financed the origination of loans through a variety of

repurchase agreements, including two such agreements provided by DBSP - a Master

Repurchase Agreement dated as of September 2, 2005 (as amended, the "Prime Repurchase Facility") and that certain Master Repurchase Agreement dated as of April 17, 2006 (as amended, the "Hospital Repurchase Facility" and, together with the Prime Repurchase Facility, the "MRAs"). Although the MRAs employed different purchase prices paid by DBSP and repurchase obligations owed by the Debtors to DBSP when these loans were to be repurchased (the "Repurchase Obligation"), DBSP and the Debtors typically worked together each month to ensure that the Debtors' Repurchase Obligations fit within certain formulae.

        8.     If either of the MRAs was out of balance based on an assessment of the market value of the loans and other factors, DBSP was entitled to make a margin call on the Debtors. On March 5, 2007, DBSP sent to the Debtors one such loan assessment for both MRAs, computed as of March 2, 2007. This resulted in DBSP making a $14.1 million margin call on the Debtors on March 6, 2007 for the Prime Repurchase Facility. At the time of the margin call, the Debtors' cash had been severely reduced by paying prior margin repurchase agreement counterparties, plus satisfying demands to repurchase sold loans when borrowers defaulted early in the life of the loans. Thus, New Century decided to see if it could work with DBSP to satisfy this margin call by delivering additional loans to DBSP. Shortly after this margin call, the Debtors sent DBSP a tape of information about the Loans.

        9.     The parties dispute what occurred next. The Debtors assert that they never authorized DBSP to take ownership of any of these loans. Instead, they delivered this information to DBSP in order to start a dialogue over what portion of the Loans might be transferred to DBSP in order to satisfy the margin call, and the value and advance rate that DBSP would assign to these loans if the parties reached agreement. In contrast, DBSP asserts that the Debtors authorized Deutsche Bank National Trust Company ("DBNTC") (the custodian for all

loan files) to transfer all of the Loans to DBSP in order to satisfy the margin call and to induce

DBNTC to continue to provide financing. In early March 2007, DBNTC transferred ownership of

the Loans in question to DBSP. The Debtors assert that they never authorized this transfer by

DBNTC to DBSP, while DBSP and DBNTC claim that the Debtors did authorize the transfer.

On March 14, 2007, DBSP declared an event of default under the Prime Repurchase Facility,

terminated the facility and accelerated all repurchase obligations. The next day, DBSP did the

same with respect to the Hospital Repurchase Facility.

10.    The Debtors are proposing to settle these disputes with DBSP pursuant to

a motion filed substantially contemporaneously herewith and a related settlement agreement (the

"DBSP Settlement Agreement"). A key of the DBSP Settlement Agreement is that the Debtors

will auction the Loans and DBSP will receive the first $14 million of sale proceeds (plus

approximately $377,228.76 that the Debtors have collected on the Loans since the Petition Date

and hold in a segregated account established pursuant to the terms of that certain Stipulation and

Order Resolving DB Structured Products Inc.'s Motion for Preliminary Injunction entered on

May 16, 2007).[2] Accordingly, the auction proposed by this Motion is a critical element of

carrying out the proposed settlement with DBSP.

### RELIEF REQUESTED

11.    The Debtors hereby request, pursuant to Bankruptcy Code Sections 105

and 363 and Bankruptcy Rule 6004, that the Court enter orders (a) approving certain procedures

in connection with the auction and sale of the Loans, (b) scheduling a hearing to consider and

---

[2]    Pursuant to this stipulation, among other things (i) DBSP agreed to withdraw, without prejudice, a motion for a preliminary injunction, (ii) the Debtors agreed to hold in a segregated account all collections on the Loans pending resolution of the entitlement to such funds and (iii) the parties agreed to cooperate to develop consensual means to realize the value of the Loans

approve the sale of the Loans and the form and manner of notice of such sale, (c) approving the

sale of the Loans and (d) granting related relief.

### THE LOANS AND PROPOSED AUCTION AND SALE PROCESS

12.    The Loans consist of approximately 235 first lien residential mortgage

loans with an aggregate unpaid principal balance of $49,440,352. On August 3, 2007, the

Debtors and Residential Mortgage Solution L.L.C. (the "Stalking Horse Bidder") entered into a

letter of intent[3] pursuant to which the Stalking Horse Bidder agreed to purchase the Loans on the

terms and conditions set forth therein, subject to execution of a loan purchase agreement (a

"Purchase Agreement") and overbid.

13.    As described above, the Debtors owned the Loans at the start of March

and the Loans were not subject to a repurchase agreement or otherwise encumbered. As the

Debtors and DBSP neared resolution over the terms of the settlement, the Debtors and the

Official Committee of Unsecured Creditors (the "Committee") coordinated regarding obtaining a

possible stalking horse bid for the Loans. The Debtors and the Committee contacted likely

bidders and received indications of interest. The highest and best expression of interest was set

forth in a letter of intent executed by the Debtors and the Stalking Horse Bidder. The letter of

intent states an offer price that would yield approximately $40 million for the Loans, of which

approximately $26 million would be available for the estates in accordance with the terms of the

settlement with DBSP.

14.    To be clear, the letter of intent is just that - a letter of intent. The Stalking

Horse Bidder will be provided a window of opportunity to perform diligence on the Loans and

---

[3]    A copy of the letter of intent is attached hereto as Exhibit B. The exhibit to the letter of intent has been
redacted to remove confidential information for filing purposes.

LA3:1136349 4

6

RLF1-3187564-1

firm up its offer after completing its diligence, with an outside date of August 24, 2007. In order

to facilitate the completion of diligence, the Debtors have engaged a diligence firm and will

make the firm's diligence report (which the Debtors estimate will cost approximately $50,000) to

the Stalking Horse Bidder on an exclusive basis. If the Stalking Horse Bidder submits the

prevailing bid at auction, it will reimburse the Debtors for these diligence costs. The Debtors

also have the right to engage other diligence firms and intend to do so if they conclude that this

would materially assist in soliciting competing bids. In return, the Stalking Horse Bidder has not

required a break up fee, expense reimbursement or any other bid protections that are often sought

in connection with auctions. Rather, the procedures set forth in the letter of intent are standard

and minimal - they include nominal bid increments and a routine set of procedures for

conducting the auction.

      15.    Among other customary terms and conditions, the letter of intent[4] includes

the following principal terms:

- The Stalking Horse Bidder's offer is subject to execution of a Purchase Agreement and completion of due diligence on the Loans, with such due diligence to be completed by no later than August 24, 2007.[5] The Purchase Agreement must also be executed prior to August 24, 2007 or the letter of intent will expire.

- The Stalking Horse Bidder's offer will be subject to a potential auction and overbid by competing bidders submitting higher and better offers as set forth below.

- The letter of intent states a Purchase Price, subject to certain adjustments, determined by multiplying the aggregate unpaid principal balance of the Loans as of the Cut-off Date against a Bid Price of 80.125% (with zero

---

[4]  The following is intended for summary purposes only. To the extent the description in this Motion is inconsistent in any way from the letter of intent, the terms of the letter of intent shall govern. Terms used but not defined herein shall have the meanings ascribed to the in the letter of intent.

[5]  As discussed more fully below, the Debtors will also enter into agreements to engage, at their own cost, certain firms to assist in performing due diligence and preparing due diligence reports for the Loans.

variance of collateral value on a Loan level basis), plus accrued but unpaid interest thereon - e.g , 80.125% of the aggregate principal balance of $49,440,352 of the Loans plus accrued and unpaid interest. In other words, if the parties execute a Purchase Agreement based on the formula set forth in the letter of intent, the Purchase Price will be approximately $40 million.

- The letter of intent contemplates that the Purchase Agreement will provide that the Debtors will indemnify the Stalking Horse Bidder for certain losses, but that indemnification obligation will be the Stalking Horse Bidder's exclusive remedy for claims arising from the transaction and will be limited to an amount equal to five percent (5%) of the Purchase Price. The Stalking Horse Bidder will have a period of ninety (90) days in which to assert indemnity claims.

- The letter of intent also provides that, in the event the Stalking Horse Bidder is the purchaser of the Loans, the transaction is to close within two (2) business days after entry of an order approving the sale.

16.     The letter of intent provides that the Debtors will engage, initially at their own cost, certain firms to assist in performing due diligence and preparing due diligence reports for the Loans in accordance with guidelines to be submitted by the Stalking Horse Bidder. The Debtors will be providing the Buyer with these due diligence reports, but will not provide them to other prospective bidders prior to August 24, 2007 - the date by which the parties must execute a loan purchase agreement or the letter of intent terminates.

17.     In the event the Stalking Horse Bidder and the Debtors execute a loan purchase agreement by August 24 2007, the Debtors will assign the due diligence agreements to the Stalking Horse Bidder - at no cost to the Stalking Horse Bidder - and the Debtors will not provide copies of the due diligence reports to other prospective bidders (unless the loan purchase agreement is terminated for any reason other than a sale to a competing bidder at auction). In the event the Stalking Horse Bidder  purchases the Loans, it will reimburse the Debtors for any amounts the Debtors were required to pay under the due diligence agreements. Except for the

LA3:1136349 4

8

RLF1-3187564-1

foregoing, the Buyer will be responsible for all costs incurred in performing due diligence review.

18.    The Debtors believe that these diligence-related provisions are reasonable and justified under the circumstances for several reasons. First, it is ordinary and proper for the Debtors to engage such diligence firms. Prior to the Petition Date, the Debtors hired diligence firms at their own cost to investigate and audit portfolios of mortgage loans that the Debtors sought to sell in an effort to stave off bankruptcy and subsequently provided diligence reports to prospective buyers. As a result, and in order to be prepared to sell these loans on an expedited basis even if this Motion is not granted (or the Stalking Horse Bidder and the Debtors are unable to reach agreement on terms of a Purchase Agreement), on or about August 7, 2007 the Debtors (with the concurrence and encouragement of the Committee) engaged Global Financial Review to start preparing diligence materials. The Debtors estimate that such diligence will cost approximately $50,000, or 0.125% of the projected Purchase Price for the Loans. Second, if the Stalking Horse Bidder and the Debtors are unable to reach agreement on the terms of a Purchase Agreement by August 24, 2007, the Debtors will be able to provide copies of these due diligence reports to other prospective bidders. In addition, if the Stalking Horse Bidder ultimately purchases the Loans, the Debtors will be fully reimbursed for their costs incurred under the due diligence agreements. Moreover, there is no limitation on the ability of the Debtors to retain other firms to perform due diligence, and the Debtors are not restricted from providing the due diligence reports prepared by such other firms to prospective bidders. Finally, the Debtors will assist prospective bidders in performing their own due diligence on the Loans.

19.    The Debtors also believe that an auction and sale process that is consistent with the following procedures and dates (the "Bidding Procedures") will result in the highest and best offer for the Loans.

    A.    <u>Notice of Auction</u>:

Information relevant to the Loans for evaluation by interested parties, including for due diligence investigation, will be made available to prospective bidders; provided, however, that access to due diligence reports prepared pursuant to the terms of the letter of intent shall be governed by the terms and conditions of the letter of intent. In addition, the Debtors will provide each prospective buyer with the Purchase Agreement or a draft version of a loan purchase agreement for the Loans.

The Debtors will further inform each prospective buyer of the dates set forth herein and the procedures they will employ in connection with the auction, and will continue to market and solicit interest in the Loans through the date by which they will require prospective buyers to submit their bids (as set forth below).

    B.    <u>Bid Deadline and Characteristics of Initial Bids</u>:

In order to attend and bid at the Auction (as defined below), if any, the Debtors will require prospective buyers to submit an initial bid for the Loans by no later than 5:00 p.m. (prevailing Eastern Standard Time) on September 7, 2007 (the "Bid Deadline") to:

    I.    The Debtors:

O'Melveny & Myers LLP
400 S. Hope St.
Los Angeles, CA  90071
Facsimile:  (213) 430-6407
Email:  blogan@omm.com
Attention:    Ben H. Logan, Esq.
               Suzzanne S. Uhland, Esq.
               Erik Nord, Esq.

-and-

Richards, Layton & Finger, P.A.
One Rodney Square

Wilmington, DE  19899
Facsimile:  (302) 651-7701
Email:  ramos@rlf.com
Attention:     Mark D. Collins, Esq.
               Marcos A. Ramos, Esq.

II.      The Committee:

Hahn & Hessen LLP
488 Madison Avenue
New York NY 10022
Facsimile: (212) 478-7400
Email: mpower@hahnhessen.com
Attention:     Mark T. Power, Esq.

-and-

Blank Rome LLP
Chase Manhattan Centre
1201 North Market Street
Suite 800
Wilmington, DE 19801
Facsimile: (302) 425-6464
Email: fatell@blankrome.com
Attention:     Bonnie G. Fatell, Esq.

III.     The Stalking Horse Bidder:

Residential Mortgage Solution L.L.C.
2800 28th Street #102
Santa Monica, CA 90405
Facsimile: (310) 450-7005
Email: kup@residentialms.com
Attention:  Eddy Kup, Managing Director

For a bidder to become a qualified bidder with a qualified bid, such bidder
must submit an initial competing bid constituting a binding written offer to
purchase the Loans that (i) exceeds the purchase price offered by the
Stalking Horse Bidder by not less than $100,000, (ii) states that the bidder,
on its own or together with another bidder, offers to purchase all of the
Loans, (iii) is on substantially the same terms as the proposed transaction
with the Stalking Horse Bidder, (iv) is on terms and conditions which are
not substantially more burdensome to the Debtors than the terms of the
Purchase Agreement, (v) is not be subject to any conditions or
contingencies to closing other than those applicable to the Stalking Horse

Bidder and set forth in the Purchase Agreement, (vi) is accompanied by a clean and marked versions of the Purchase Agreement reflecting any variations from the Purchase Agreement, (vii) states that the bidder is financially capable of consummating the transactions contemplated by the Purchase Agreement or modified Purchase Agreement, (viii) states that the offer is irrevocable until the closing of the purchase of the Loans, (ix) contains such financial and other information that will allow the Debtors to make a reasonable determination of the bidder's financial and other capabilities to consummate the transaction and (x) fully discloses the identity of each entity that will be bidding for the Loans or otherwise participating in connection with such bid, and the complete terms of any participation.

C.    Auction:

In the event that the Debtors receive by the Bid Deadline one or more bids that they deem in their discretion, in consultation with the Committee, to constitute a sufficient and qualified bid or bids for the Loans the Debtors will conduct an auction (the "Auction") with respect to the Loans.

The Auction will commence on September 10, 2007 at the offices of O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, or such other location as designated by the Debtors in a notice to all Qualified Bidders.

The Auction shall be governed by the following procedures: (i) only representatives of the Debtors, qualified bidders and the Committee shall be entitled to be present at the Auction, (ii) only qualified bidders shall be entitled to make bids at the Auction, (iii) each qualified bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, (iv) qualified bidders shall appear in person at the Auction, or through a duly authorized representative, (v) bidding shall commence at the amount of the highest and best qualified Bid submitted by the qualified bidders prior to the Auction, (vi) qualified bidders may then submit successive bids in increments of at least $100,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $100,000 higher than the previous bid, subject to the Debtors' discretion to modify the amount of such increments, (vii) all qualified bidders shall have the right to submit additional bids and make additional modifications to their modified Purchase Agreement at the Auction and (viii) the Auction will be conducted so that each qualified bidder will be informed of the terms of the previous bid.

The Debtors, in consultation with the Committee, may develop additional rules or amend the foregoing rules governing the conduct of the Auction at the time of the Auction, including the amount at which the bidding shall commence, incremental amounts of successive overbids and the method by which each round of bidding will be conducted.

The Auction shall continue until there is only one offer or combination of offers that the Debtors determine, in consultation with the Committee and subject to Court approval, is the highest and best offer for the Loans (the "Successful Bid"). In making this decision, the Debtors, in consultation with the Committee, will have the discretion to weigh multiple considerations including, without limitation, the amount of the purchase price, the form of the consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each bidder and the net benefit to the Debtors' estates.

D.    Back-Up Bidder

If an Auction is conducted, the party with the next highest or otherwise qualified bid at the Auction, as determined by the Debtors, in consultation with the Committee, shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 pm (prevailing Eastern time) on September 20, 2007 or the closing of the sale transaction with the party submitting the Successful Bid (the "Successful Bidder").

Following the Sale Hearing (as defined below), if the Successful Bidder fails to consummate an approved sale of the Loans because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-up Bidder without further order of the Court.

E.    Sale Hearing:

A sale hearing to approve the sale of the Loans to the Stalking Horse Bidder or other highest and best bidder shall be held on September 11, 2007 at 1:30 p.m. (the "Sale Hearing"). At the Sale Hearing, the Debtors will seek the entry of an order approving the sale of the Loans pursuant to the terms and conditions set forth in the Purchase Agreement or other loan purchase agreement.

LA3:1136349 4

RLF1-3187564-1

20.    The Debtors, in consultation with the Committee, reserve the right not to proceed with or at the Auction, or to declare a Successful Bidder or seek to approve the sale of the Loans, if they determine in their sole discretion that no adequate bids or offers have been made for the Loans.  In addition, the Debtors reserve right to modify and amend any of the Bidding Procedures or rules related to the conduct of the Auction, including prior to and at the Auction.

### APPROVAL OF SALE OF ASSETS

21.    Bankruptcy Code Section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l).  Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

22.    A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code Section 363 where the transaction represents an exercise of the debtor's sound business judgment.  See e.g. In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Rv. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines. Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

23.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  See Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix

LA3:1136349 4

14

Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re United Healthcare Svs., Inc., No. 97-21785, 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

       24.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See e.g. In re Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Products, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

       25.    Courts also uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (P JW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26,1997); Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

26.    The Debtors submit that the proposed auction and sale of the Loans will satisfy the "sound business reason test." The auction and sale of the Loans presents the best opportunity to maximize their value and, absent a sale, provide little value for the Debtors because they are no longer operating their businesses and are liquidating their assets. In addition, the Debtors believe that the proposed auction and sale process, backed by the marketing efforts of the Debtors and the Committee, is the best method by which the highest and best offer will be obtained for the Loans and provide interested persons with accurate and reasonable notice of the sale. The Debtors believe it is particularly appropriate to sell the Loans as promptly as possible given current market conditions, the magnitude and increasing number of mortgage loans becoming available for sale and the fact that the sale is an important element of the DBSP settlement. In the event an Auction occurs it will be conducted in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best consideration for the Loans - as well as ensuring a competitive and fair bidding process. Finally, the proposed procedures will allow the Debtors to conduct the Auction in an efficient and expeditious manner, which the Debtors believe is essential to maintaining and maximizing the value of their estates.

**SALE OF ASSETS FREE AND CLEAR OF LIENS AND INTERESTS**

27.    The Debtors further submit that it is appropriate to sell the Loans free and clear of claims, interests, liens and encumbrances pursuant to Bankruptcy Code Section 363(f), with any such claims, interests, liens and encumbrances attaching to the net sale proceeds of the Loans to the extent applicable.

28.     Bankruptcy Code Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interests, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property, (iv) such interest is in bona fide dispute (v) or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

29.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Loans "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

30.     The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to any sale of the Loans. In particular, the Debtors believe that any lienholder will be adequately protected by having its liens, if any, attach to the cash proceeds ultimately attributable to the Loans in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

31.    Although Bankruptcy Code Section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289. As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, supra, the scope of Bankruptcy Code Section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

32.    Courts have consistently held that a buyer of a debtor's assets under Bankruptcy Code Section 363 takes the assets free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of

Title VII employment discrimination and civil rights claims of debtor's employees); In re

Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); American Living Systems v.

Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ

Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R.

97, 104-05 (Bankr. E.D. Va. 1995) (state's right to recapture depreciation is an "interest" as used

in section 363(f)).[6]

      33.     The purpose of an order purporting to authorize the transfer of assets free

and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a

basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under

Bankruptcy Code Section 363(f), a successful bidder is entitled to know that the Loans do not

have attached latent claims that will be asserted after a sale is completed.  Accordingly, and

consistent with the above-cited case law, the sale order should state that the purchaser will not be

liable as a successor under any theory of successor liability, for claims that encumber or relate to

the Loans.

### FINDING OF GOOD FAITH

      34.     Bankruptcy Code Section 363(m) provides:

The reversal or modification on appeal of an authorization under
subsection (b) or (c) of this section of a sale or lease of property
does not affect the validity of a sale or lease under such

---

[6] Even courts concluding that Bankruptcy Code Section 363(f) does not empower them to convey assets free and clear of claims nevertheless find that Bankruptcy Code Section 105(a) provides such authority.  See In re White Motor Credit Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

LA3:1136349 4

RLF1-3187564-1

> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh

Circuit in In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

798 F.2d at 1125 (emphasis omitted) (quoting In re Rock Industries Machinery Corn., 572 F.2d

1195, 1198 (7th Cir. 1978).

   35. The proposed transaction and sale of the Loans to the Stalking Horse

Bidder has been negotiated at arm's-length with all parties involved acting in good faith. The

Debtors will therefore request that the Court make a finding that the Stalking Horse Bidder, if it

is not overbid at the Auction, has acquired the Loans in good faith within the meaning of

Bankruptcy Code Section 363(m). In the event an Auction occurs, the Debtors equally believe

that the competitive bidding environment it will foster will result in a transaction negotiated at

arm's-length between all parties involved acting in good faith. Consequently, if there is a

Successful Bidder other than the Stalking Horse Bidder, the Debtors intend to present evidence

to show that such Successful Bidder is entitled to the same finding under Bankruptcy Code

Section 363(m).

## FINALITY OF ORDER

   36. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless

LA3:1136349 4

RLF1-3187564-1

the court orders otherwise." The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 (15th rev. ed. 2006). Further, it suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

37.     The Debtors request that any order approving the sale of the Loans be effective immediately by providing that the 10-day stay under Bankruptcy Rules 6006(h) is waived or, in the alternative, if an objection to the sale of the Loans is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## NOTICE

38.     No trustee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) the Committee; (3) all parties who are known to possess or assert a secured claim against the Loans; (4) the Internal Revenue Service; (5) contact parties that the Debtors have identified as potential buyers of the Loans; (6) all parties entitled to notice under Local Rule 2002-1(b); and (7) the Examiner appointed in these chapter 11 cases. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

LA3:1136349 4

21

RLF1-3187564-1

WHEREFORE, the Debtors request that the Court (i) grant the Motion; (ii) enter an order substantially in the form attached as Exhibit A hereto and (iii) grant such other and further relief as is just and appropriate.

Dated:  August 8, 2007
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

            -and-

Suzzanne S. Uhland
Ben H. Logan
Brian M. Metcalf
O'MELVENY & MYERS LLP
400 S. Hope St.
Los Angeles, California  90071
(213) 430-6000

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

LA3:1136349 4

RLF1-3187564-1