```
                      UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE

                                        .
IN RE:                                  .      Chapter 11
                                        .
New Century TRS Holdings,               .
Inc., et al.,                           .
                                        .
          Debtor(s).                    .      Bankruptcy #07-10416 (KJC)
.......................................................................

                           Wilmington, DE
                           July 16, 2007
                            1:30 p.m.

                    TRANSCRIPT OF MOTIONS HEARING
                BEFORE THE HONORABLE KEVIN J. CAREY
                   UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor(s):              Michael J. Merchant, Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                Wilmington, DE 19801

                                Robert J. Stern, Jr., Esq.
                                Richards Layton & Finger, PA
                                One Rodney Square
                                Wilmington, DE 19801

                                Christopher M. Samis, Esq.
                                Richards Layton & Finger,PA
                                One Rodney Square
                                Wilmington, DE 19801

                                Peter Benvenutti, Esq.
                                Heller Ehrman, LLP
                                333 Bush Street
                                San Francisco, CA 94104

For The Official Committee:     Mark Power, Esq.
of Unsecured Creditors          Hahn & Hessen, LLP
                                488 Madison Ave.
                                New York, NY 10022
```

For Bank of America:          Gabriel R. MacConaill, Esq.
                              Potter Anderson & Corroon, LLP
                              Hercules Plaza
                              1313 N. Market Street
                              Wilmington, DE 19899

For Kodiak Funding:           Edward B. Rosenthal, Esq.
                              Rosenthal Monhait & Goddess, PA
                              919 Market St.-Ste. 1401
                              Wilmington, DE 19899

For Ryan Desert Ridge:        Etta R. Wolfe, Esq.
                              Smith Katzenstein & Furlow, LLP
                              The Corporate Plaza
                              800 Delaware Avenue
                              Wilmington, DE 19899

For BCIA Glastonbury:         Jeffery R. Waxman, Esq.
Boulevard, LLC                Cozen O'Connor, PC
                              Chase Manhattan Centre
                              1201 North Market Street
                              Wilmington, DE 19801

For JP Morgan:                Matthew B. McGuire, Esq.
                              Landis Rath & Cobb, LLP
                              919 Market Street, Suite 600
                              Wilmington, DE 19801

For Fidelity:                 Donald A. Workman, Esq.
                              Baker & Hostetler, LLP
                              Washington Square
                              1050 Connecticut Avenue
                              Washington, DC 20036

(Via Telephone)

For The Debtors:              Alexandra Diaz-Almaral, Esq.
                              O'Melveny & Myers, LLP
                              275 Battery Street
                              San Francisco, CA 94111

                              Laine Mervis, Esq.
                              O'Melveny & Myers, LLP
                              400 South Hope Street
                              Los Angeles, CA 90071

|  | F. Curt Kirschner, Jr., Esq.<br>Embarcadero Center West<br>275 Battery Street<br>San Francisco, CA 94111 |
|---|---|
| For Deutsche Bank Sructured:<br>Products | Richard Agins, Esq.<br>Bingham McCutchen, LLP<br>150 Federal Street<br>Boston, MA 02110 |
| For Bank of America: | Nicholas J. Cremona, Esq.<br>Kaye Scholer, LLP<br>425 Park Ave.<br>New York, NY 10022 |
| For Credit Suisse First:<br>Boston | Douglas E. Deutsch, Esq.<br>Chadbourne & Parke<br>30 Rockefeller Plaza<br>New York, NY 10112 |
| For Carrington Capital:<br>Management, Inc. | Sean Scott, Esq.<br>Mayer Brown Rowe & Maw, LLP<br>71 S. Wacker<br>Chicago, IL 60606 |
| For Union Bank Of California: | David M. Poitras, Esq.<br>Jeffer Mangels Butler & Marmaro,<br>LLP<br>1900 Avenue of the Stars<br>Los Angeles, CA 90067 |
| For The Creditor: | Mary Elizabeth Olsen, Esq.<br>The Gardner Firm, PC<br>1119 Government Street<br>Mobile, AL 36652 |
| For Ernst & Young: | John A. Simon, Esq.<br>Foley & Lardner, LLP<br>One Detroit Center<br>500 Woodward Avenue, Suite 2700<br>Detroit, MI 48226 |
| For ILOG: | Harvey Strickon, Esq.<br>Paul Hastings Janofsky & Walker,<br>LLP<br>75 East 55th Street<br>New York, NY 10022 |

4

| | |
|---|---|
| For Daniel Rubio: | James R. Trush, Esq.<br>Trush Law Office, APC |
| For UBS: | Kimberly Newmarch, Esq.<br>Paul Hastings Janofsky & Walker,<br>LLP<br>191 North Wacker Drive<br>Chicago, IL 60606 |
| For The U.S. Trustee: | Joseph McMahon, Esq.<br>Office of the United States<br>Trustee<br>844 King St.-Ste. 2207<br>Lockbox 35<br>Wilmington, DE 19801 |
| Audio Operator: | Jason Smith |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

5

Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Shepard | | | | | |
| (by Mr. McMahon) | | 34 | | 45 | |
| (by Mr. Benvenutti) | | | 37 | | |

MOTIONS:

EXHIBITS:                                    <u>Marked</u>    <u>Received</u>

THE COURT:  Finding        57

1          THE CLERK:  All rise.  Be seated.

2          THE COURT:  Good afternoon all.

3          ALL:  Good afternoon, Your Honor.

4          MR. MERCHANT:  Good afternoon, Your Honor, Mike

5     Merchant of Richards Layton & Finger on behalf of the Debtors.

6     Your Honor, if it's amenable to the Court we would like to take

7     a few matters out of order so that we can free up people that

8     are on the phone and hopefully limit some attorney's fees.

9          THE COURT:  That's fine.

10         MR. MERCHANT:  The first matter we'd like to address

11    is agenda item 21 on the agenda, which is initial status

12    conference in the adversary proceedings titled Austin v. New

13    Century.

14         THE COURT:  Yes.

15         MR. MERCHANT:  And I'm gonna cede the podium to my

16    colleague, Bob Stearn, to handle that matter.

17         MR. STEARN:  Good afternoon, Your Honor.  May it

18    please the Court, Bob Stearn from Richards Layton & Finger on

19    behalf of the Debtors.  Your Honor, this is a time for the

20    pretrial conference in Austin v. New Century TRS Holdings, and

21    three other Debtor entities.  It's adversary #07-50970.  My

22    co-counsel in this case originally, Your Honor, was Irell &

23    Manella, but for reasons I suppose of efficiency we recently

24    substituted O'Melveny & Myers, Debtor's regular counsel, as

25    co-counsel.  We filed Motions Pro Hac Vice for three O'Melveny

1    attorneys in connection with this case.  I believe they're all

2    on the phone.  They -- those motions may or may not have made

3    it to Your Honor's Chambers.  They are Curt Kirschner, Laine

4    Mervis and Sasha Diaz-Almaral.  As I said, I believe they're

5    all on the phone.

6         My guess is that Mary Olsen of The Gardner Firm, who is

7    counsel for Plaintiffs, is also on the phone.  One more

8    participant I think I should alert Your Honor to is the

9    Committee would like to intervene in this case, that's not

10   something that the Debtors oppose.  So you may hear a few words

11   from Mr. Power today.

12        THE COURT:  All right, thank you.

13        MR. STEARN:  With respect to the pretrial conference

14   itself, Your Honor, just some brief background on this

15   litigation.  On April 2, 2007, which is the date that the

16   Debtors filed for Chapter 11 protection, the Debtors also laid

17   off several thousand employees.  A class action was brought on

18   behalf of those employees under the Worker Adjustment and

19   Retraining Notification Act, also known as the WARN Act, and

20   its California counterpart.

21        Essentially the Plaintiff alleges that New Century failed

22   to give the Plaintiffs 60 days notice of termination under the

23   WARN Act, and they allege they're entitled to lost wages and

24   certain related benefits in connection therewith.  The

25   Defendants have answered the complaint and denied that the

1 Plaintiffs are entitled to any relief.

2     We held our Rule 26(f) conference last week with

3 Plaintiff's counsel.  It was a very agreeable conference.  The

4 parties were able to reach agreement on all deadlines, subject

5 of course to Your Honor's approval.  And if I may, I'd like to

6 hand up the Proposed Scheduling Order and walk Your Honor

7 through that.

8          THE COURT:  Very well.  Thank you.

9          MR. STEARN:  It's a pretty simple Scheduling Order,

10 Your Honor.  We start out with initial disclosures being due on

11 August 17th, fact discovery deadline of November 30, 2007.

12 Expert reports due just before the end of the year, December

13 28th.  All expert discovery to conclude a month later, January

14 31.  Amendments to the pleadings would be by August 31.

15 Dispositive Motions to be filed no later than February 15,

16 2008.  As you'll see in paragraph 7, the above dates can be

17 modified by consent of the parties without further order of the

18 Court.  Paragraph 8 provides for a status conference to be held

19 at a date to be chosen by Your Honor.  Basically to keep Your

20 Honor apprised of the status of the case and also if necessary

21 to set down the further deadlines that would be required after

22 the conclusion of discovery and Dispositive Motions, i.e.,

23 pretrial disclosures, Motions In Limine, Pretrial Order,

24 setting dates for the pretrial conference and trial, things

25 like that.

1          THE COURT:  And refresh me, did you say -- well, it's

2   a class action?

3          MR. STEARN:  Yes, Sir.

4          THE COURT:  What about class certification?

5          MR. STEARN:  Well, we've have some preliminary

6   discussions with the Plaintiff's counsel, and that it in fact

7   during the Rule 26(f) conference we told them that frankly

8   there may not even oppose class certification and that why

9   didn't they send us a draft motion that they would intend to

10  file, because it may be that we can stipulate to that which

11  they'd like to obtain in terms of class certification.  But

12  we'd need to see it first.  And they said that they would get

13  us that within 30 days.

14         THE COURT:  I see that there's a -- as you pointed

15  out, a provision for status conference.  What timing did the

16  parties anticipate on that?

17         MR. STEARN:  In candor, we didn't.  It was really, I

18  think, in our view more a matter of when the Court would like

19  to be apprised.  If you're asking me what I think, I'd say

20  probably about four months from now, give or take might make

21  sense.

22         THE COURT:  The only thing that I guess strikes me

23  about maybe having something a little sooner is the class

24  aspect --

25         MR. STEARN:  Sure.

1            THE COURT:  -- to the litigation.  And while that,

2    you know, doesn't have to happen necessarily on day one, it

3    seems to me we ought to do it earlier in the process rather

4    than later.  If the parties want the opportunity to make an

5    agreement subject to the Court's review I'm inclined to give

6    them what reasonable time they think they need to work through

7    those issues.  I find that helpful for the Court.  So I'm

8    thinking maybe 60 days or so.

9            MR. STEARN:  That's --

10           THE COURT:  Unless someone tells me that causes too

11   much heartburn for them.

12           MR. STEARN:  That's fine with us, Your Honor.  But

13   the only heartburn it would cause me is I know that 60 days

14   from today I'll be climbing on a plane leaving the country.  So

15   I'm hoping we can pick a slightly different day.

16           THE COURT:  Didn't mean to drive you that far away.

17       (Laughter)

18           THE COURT:  I'll make a suggestion in terms of that

19   general time frame.  But when you'll be around.

20           MR. STEARN:  September 14 would be fine for me, Your

21   Honor, if it's okay with my colleagues who are on the phone.

22           THE COURT:  Well, let's see.

23           MS. OLSEN:  Your Honor, this is Mary Olsen on behalf

24   of punitive class and September 14th works for us.

25           THE COURT:  Well, do you have an omnibus date some

1   time in that neighborhood?

2          MR. STEARN:  I'll have to consult with my colleagues,

3   Your Honor.

4          MR. KIRSCHNER:  This is Curt Kirschner and that date

5   would work for us.

6          THE COURT:  September 11th.

7          MR. STEARN:  That ominous date would work for me,

8   Your Honor.

9          THE COURT:  All right.  Is that okay with everyone

10  else?  September 11th at 1:30.  Combine it with the omnibus

11  hearing already scheduled?

12         MS. OLSEN:  It is, Your Honor, Mary Olsen on behalf

13  of the class.

14         MR. KIRSCHNER:  Curt Kirschner with O'Melveny.  Yes.

15         THE COURT:  All right.  Okay, would anyone else care

16  to be heard?

17         MR. STEARN:  Mr. Power, I believe, would care to be

18  heard, Your Honor.

19         THE COURT:  All right.

20         MR. POWER:  Just briefly, Your Honor.  Good

21  afternoon, Mark Power from Hahn & Hessen, counsel to the

22  Committee.  First of all, Your Honor, the Committee has no

23  objection to the Scheduling Order and we consent to that.

24  Second of all, the Committee does desire to intervene in this

25  action.  It does involve in essence former employees of the

1  Debtor in an action against the Estate, and we believe we

2  should be involved, and also we believe we can lend assistance

3  to getting the matter either litigated or successfully

4  resolved.

5      We have spoken to both Debtor and Debtor's counsel, and

6  also to Plaintiff and Plaintiff's counsel.  My partner Mark

7  Indelicato spoke to them.  And we understand that all the

8  parties -- none of the parties opposed the Committee's

9  intervention into the action.  So assuming Your Honor has no

10  problem with it we anticipate following the stipulation

11  providing for that.

12          THE COURT:  I have no problem with that, provided all

13  are in agreement.

14          MR. POWER:  Thank you, Your Honor.

15          THE COURT:  All right.

16          MR. STEARN:  Your Honor, with that I think I would

17  simply respectfully request that the Court enter the proposed

18  Scheduling Order.

19          THE COURT:  I've done so.

20          MR. STEARN:  Thank you, Your Honor.  At this point my

21  colleagues and I on the phone and I have no further business

22  with the Court.  May we be excused?

23          THE COURT:  Yes.

24          MR. STEARN:  Thank you.

25          MS. OLSEN:  Thank you, Your Honor.

1        THE COURT:  You're welcome.

2        MR. KIRSCHNER:  Thank you.

3        MR. MERCHANT:  Mike Merchant again for the record,

4   Your Honor.  The next item on the agenda we would like to

5   address is agenda item #19, which is the motion of BCIA

6   Glastonbury Boulevard, LLC, for an order compelling the Debtor

7   to immediately assume and assign its lease and cure all

8   defaults.  I will cede the podium in Movant's counsel.

9        MR. WAXMAN:  Good afternoon, Your Honor, Jeff Waxman

10  of Cozen & O'Connor on behalf of BCIA Glastonbury Boulevard.

11  Your Honor, this motion was filed on June 19th that compelling

12  the assumption and assignment of the lease and to cure the

13  defaults under the lease.  Your Honor, before I go through the

14  motion and why the landlord believes it should be granted, I

15  would just like to point out that there was an error in

16  paragraph 5 of the motion, which said that it was $70,151 per

17  month for the use of the premises.  That actually should say

18  per year.

19      Your Honor, the landlord's motion is pretty clear.  The

20  Debtors filed for bankruptcy on April 2nd, and the landlord

21  still has yet to receive any rent post petition.  It's now the

22  middle of July and the Debtors currently owe BCIA $22,874.86.

23  The motion seeks to compel the Debtors to assume and assign the

24  contract to the party that's already in the space and to cure

25  all defaults under the lease, including all expenses, including

1 reasonable attorney's fees.

2     The Debtors filed a response, which doesn't deny that they

3 owe the rent post petition.  In fact they just recently on

4 Friday evening at 11:28 filed a Motion to Assume and Assign the

5 contract which has the same cure amount.  It doesn't dispute

6 the fact that there's a third party in there at this time.  Or

7 that the Debtors have any basis in law or fact for not paying

8 the post petition rent to date.  Nor does it say that there's

9 no basis for allowing the landlord it's expenses and fees.

10     Accordingly, the landlord believes that the motion should

11 be granted today.  I understand that the Debtors want the

12 motion to be adjourned and continued until the 31st when its

13 Motion to Assume and Assign is scheduled to be heard.  But

14 given that more than three months have passed since the

15 petition date my clients -- my client, rather, has still not

16 received any post petition rent.  I don't see any basis or any

17 benefit to adjourning or continuing this matter until the end

18 of July.  It just simply delays the inevitable, and would incur

19 further legal fees and expenses having me come in again, and

20 then seeking that money as one of the defaults under the lease.

21     THE COURT:  Debtor would probably tell you didn't

22 need to make this trip.

23     MR. WAXMAN:  Well, I believe that we do, Your Honor,

24 since at the time that this motion was scheduled we had been

25 promised after a number of calls, and I'm not going to get into

1  all the who-shot-Johns, but this motion, from our

2  understanding, was going to be filed almost a month ago.  And

3  so today we're standing here to make sure that it actually does

4  go forward.

5       There really is no basis that I can see to extending the

6  time.  The response simply said that the Debtors needed more

7  time to follow an orderly and cohesive case strategy.  By

8  filing the motion on Friday it appears that they have decided

9  that part of their cohesive and orderly strategy is to assume

10 and assign the lease and pay the cures thereunder.  So I'm not

11 exactly sure why putting this off until July 31st would be any

12 benefit to anybody other than just simply delaying for two

13 weeks the payment of the admin expense for post petition rent.

14          THE COURT:  Thank you.

15          MR. WAXMAN:  Thank you, Your Honor.

16          MR. MERCHANT:  Your Honor, Mike Merchant again for

17 the record.  Part of the confusion with respect to this

18 particular lease is that the assignment agreement was actually

19 negotiated between the Debtors and an entity referred to as

20 Pinnacle prepetition.  And Pinnacle -- it was right before the

21 petition date.  Pinnacle committed to pick up the rent going

22 forward.  Then you have the filing of the bankruptcy, which

23 sort of complicates things because although Pinnacle is

24 committed to pay the rent, Pinnacle refused to pay the rent

25 directly to the Debtors because they thought they were paying

1  it to a bankrupt Estate and they weren't comfortable with that.

2  They wanted to pay it directly to the landlord.  The landlord,

3  however, didn't want to accept rent from Pinnacle until the

4  assumption and assignment was approved by this Court.  So

5  that's part of the confusion here, and part of the reason that

6  the Debtors have not been paying rent is because Pinnacle

7  committed to do so.

8       The motion seeks to compel assumption and assignment.

9  That's what we've done.  We filed our motion on Friday night.

10  It's scheduled to be heard on the 31st of the month.  Upon

11  assumption and assignment all outstanding rent will be cured by

12  Pinnacle.

13      From the Estate's perspective, that's obviously much more

14  preferable to us than us having to pay those and then chase

15  after Pinnacle.  So we think by just delaying this for two

16  weeks we actually moot a lot of the relief requested in the

17  motion.

18      With respect to the attorney's fees request, we haven't

19  seen any fee statements, any expense statements relating to

20  what those fees and expenses are.  I recognize that paragraph

21  50 of the lease entitles them to some attorney's fees and

22  expenses, but it's not all attorney's fees and expenses.  It

23  needs to relate to pursuing defaults under the lease.  And

24  until we see those fee statements we're not sure that they're

25  entitled to everything it is that they're requesting.  So we

1  think delaying things to the 31st --

2          THE COURT:  Well, it's acknowledged that the Debtor

3  hasn't paid post-petition rent, is that correct?

4          MR. MERCHANT:  That is correct, Your Honor.

5          THE COURT:  That would be a default, don't you think?

6          MR. MERCHANT:  That would be, Your Honor.  To the

7  extent that there -- I concede that.  To the extent that

8  they're seeking recovery of unpaid rent, that would be.  But to

9  the extent it's foreseeing or compelling assumption and

10  assignment perhaps it's not.  Or -- I don't know what all of

11  those fee statements will say until we look at them.  We would

12  propose kicking everything to the July 31st hearing potentially

13  moots most of the motion.  In between they can file an

14  affidavit of fees and costs and we'll have an opportunity to

15  review and object, or maybe we agree and we're not fighting

16  over anything.  That would be the Debtor's position, Your

17  Honor.

18          THE COURT:  All right.  Thank you.  Before we go back

19  to the Movant here, let me ask, does anyone else care to be

20  heard?

21          ALL:  (No verbal response).

22          THE COURT:  All right.

23          MR. WAXMAN:  Your Honor, I have two proposed Forms of

24  Order if Your Honor would like to enter them today.  One of

25  which sets forth the procedure which would tee up the

1    reasonable fees and expenses to be heard at the 31st, if the

2    Debtors do not agree with the amounts that the landlord

3    believes are due and owing under the lease for all expenses and

4    reasonable attorney's fees due to collection efforts under the

5    lease.  If I may approach, Your Honor?

6              THE COURT:  You may.

7              MR. WAXMAN:  And a copy of the order as revised has

8    been provided to the Debtor prior to the hearing today.

9              THE COURT:  Thank you.

10             MR. WAXMAN:  Your Honor, the -- there are a couple

11   small clean ups in the proposed Order, but the second to last

12   decretal paragraph, which starts off, "Order that within 10

13   days" is the new paragraph.  And that sets forth the procedure

14   which would require the landlord to give 10 days -- within 10

15   days provide the Debtors with a statement of the fees and

16   expenses incurred which we believe are due and owing under the

17   lease, and that would give the landlord seven -- I'm sorry, the

18   Debtors seven days to respond.  And if they don't respond they

19   can just simply pay the fees and expenses.  Or we can have this

20   matter heard on the 31st, just with regard to the fees and

21   expenses.

22             MR. MERCHANT:  Your Honor, to the extent the Court's

23   inclined to grant the order the Debtors do have a number of

24   additional concerns with respect to provisions in the order.

25        The first would be in the third so order paragraph that if

1  the Debtor fails to assume or reject the lease within five days

2  of the entry of this order.  Well, we filed our Assumption

3  Motion.  It's scheduled to be heard on the 31st, and just -- I

4  don't know that we can do that in five days.  It's just a due

5  process issue.  We've noticed it out on the 2002, and it would

6  -- you know, we need to wait for the entire notice period.

7       And with respect to the first full paragraph on the second

8  page, the 362 relief, I'm a little confused by that because it

9  seems that they want stay relief to pursue eviction under State

10  law where --

11          THE COURT:  I'm not going to grant --

12          MR. MERCHANT:  Yeah.

13          THE COURT:  -- 362 relief today.  And I'm going to

14  put the motion over to the 31st.  These are the types of things

15  that normally become moot or get resolved.  But I will tell you

16  this.  If the Debtor isn't successful in its request to assume

17  and assign this lease at the hearing on the 31st I might then

18  be inclined to grant relief from the stay.  Unless all the

19  rental payments were by that time brought up to date.  I think

20  in the interim it would behoove the landlord to get to the

21  Debtor as much information as it can, as quickly as it can,

22  concerning the fees and expenses that it wants to be paid for.

23  And may be entitled to be paid for under the lease.  So that if

24  there are issues we're able to resolve them on the 31st.  If

25  there is to be an evidentiary hearing I'd like to ask counsel

1   to inform us ahead of time just so we can be prepared for that.

2   Are there any questions?

3          MR. WAXMAN:  Your Honor, first we'd like to reserve

4   all of our rights to seek all legal fees and expenses,

5   including my appearance here today, and possibly at the 31st if

6   necessary.  We believe that everything that has been done to

7   date has -- falls under the category of a collection effort due

8   to a default by the Debtors, which is the sole reason that

9   we're here today.  And we will provide the Debtors as soon as

10  possible with a statement of all outstanding fees and expenses

11  that we believe are due under paragraph 50.  We would just

12  simply ask that the Debtors pay the rent that is due and owing

13  now that's post-petition.

14         THE COURT:  I'm going -- 15 days from the possible

15  approval of assumption and assignment of this lease I'm not

16  going to ask this Debtor which is a liquidating entity to dig

17  into its pockets and pay the rent.  The amount, while not

18  unimportant to the landlord, is not so large in the scheme of

19  things that I see an immediate necessity for its payment.  But

20  as I said earlier, to the extent the Debtor is unsuccessful,

21  and I don't expect that it would or wouldn't be, but if it's

22  unsuccessful in its efforts on the 31st to obtain the relief

23  that it's requested -- I haven't seen the motion, obviously --

24  then I'll consider further relief for the landlord.

25         MR. WAXMAN:  Thank you, Your Honor.

1          MR. MERCHANT:  Thank you, Your Honor.  Mike Merchant

2    again for the record.  Your Honor, what we'd like to do now is

3    jump back to agenda item #15, which is the Debtor's Motion to

4    Retain Heller Ehrman, special counsel to the Audit Committee.

5    Mr. Benvenutti from Heller Ehrman is in the Courtroom today and

6    can address the U.S. Trustee's outstanding objection.

7          THE COURT:  Very well.

8          MR. BENVENUTTI:  Good afternoon, Your Honor.  I'm

9    Peter Benvenutti from Heller Ehrman, and my partner Michael

10   Shepard, whose declaration I trust you've seen is also with me

11   in the Courtroom --

12         THE COURT:  I have.

13         MR. BENVENUTTI:  -- seated at counsel table.  Your

14   Honor, if it please the Court I'd like to begin with one small

15   correction to Mr. Shepard's declaration.  If the Court will

16   take a look at paragraph 12 of that declaration there's a

17   reference to the repurchase reserve as the subject matter to

18   which that paragraph refers, and that's a typographical error,

19   and it should be a reference to residual interest.  I apologize

20   to the Court and counsel for getting that messed up.

21         THE COURT:  All right.

22         MR. BENVENUTTI:  Your Honor, may I ask how the Court

23   would like to proceed?  Mr. Shepard has submitted that his

24   declaration -- he's available to testify or to be subjected to

25   cross examination if the parties wish, if the Court wishes.  Or

1  we can proceed on the basis that the declaration can be

2  accepted as is.  And I don't want to launch into a long

3  discussion of the facts and the legal issues if that's gonna be

4  redundant or unnecessary to the Court's consideration of the

5  matter.  So I'd ask the Court for guidance on how you'd like to

6  proceed.

7            THE COURT:  Well, let me start by asking a question.

8            MR. BENVENUTTI:  Yes, Your Honor.

9            THE COURT:  I've read the papers.  And I guess the

10  practical way to ask the question that's before me is, you

11  know, ought the firm ought to be paid for its work?  The legal

12  corollary of that is do you hold a represented interest adverse

13  to the Estate?  The U.S. Trustee maintains that you do.  And I

14  know that the engagement letter and the papers espouse the

15  firm's view that claims against KPMG were outside of the scope

16  of the employment of the firm and that within the scope of the

17  employment of the firm there was nothing which could have or in

18  fact did arise which would in any way implicate any interest,

19  or bias, or conflict or other problem with respect to the

20  investigation that, as I understand it from the papers has

21  basically been concluded.

22            MR. BENVENUTTI:  That's about 99% correct, Your

23  Honor, yes.

24            THE COURT:  Okay.  And after having sifted through

25  the submissions I guess the main question I have is even with

1  all of the, I guess care with which the engagement was focused

2  and the exclusion of any duty to bring claims against, or

3  suggest that there might be or investigate claims against KPMG,

4  I say so myself, doesn't an investigation of this nature

5  necessarily involve some inquiry concerning the company's then

6  outside auditors?  I mean, to give you, you know, an

7  oversimplified example, you'd interview a witness who was

8  involved in the process of preparing the financial statements.

9  And you ask the witness, okay, why did you do it this way?  Oh,

10  my outside auditor told me to.  Doesn't that necessarily

11  implicate that relationship?

12        MR. BENVENUTTI:  Your Honor, you're absolutely

13  correct that KPMG's presence was there.  There's no question

14  about that.  The question I think is whether given the inherent

15  nature of the internal investigation, the focus of the internal

16  investigation, the tasks that were undertaken in connection

17  with the internal investigation, the limitations on the

18  internal investigation and the nature of the relationship with

19  KPMG, whether that rises to an actual conflict of interest.

20      I think the facts, and I think the uncontested facts, I

21  don't think the U.S. Trustee will contest these facts, are that

22  the inherent nature of the investigation was focused on

23  internal matters, that the consideration of the auditor's role,

24  while present was not a primary, it was at most a secondary

25  consideration in the focus on the internal investigation, the

1   purpose of the internal investigation and the manner in which

2   it was conducted was to develop the facts, was to find out what

3   happened.  And the evidence that we presented in the form of

4   Mr. Shepard's declaration is that not only did my firm commit

5   to do that, with KPMG's consent, I might add too, which is not

6   an unimportant piece of the picture, my firm committed in

7   advance to do that, and in fact did do that.  That when it

8   conducted the investigation, conducted the factual

9   investigation, interviewed witnesses, looked for documents,

10  that it did so without any sort of favoritism to KPMG, as it

11  had committed to do.

12      Now I've put this in the context of what happens outside

13  of bankruptcy.  And I know that that doesn't completely answer

14  the question, but I think it is instructive.  And I think it's

15  important to put this in the context of the position that the

16  Audit Committee was in when it hired my firm in the first

17  instance prebankruptcy.

18      There the relationship to KPMG was disclosed.  There, as a

19  result to the relationship to KPMG, it was agreed that the

20  investigation would not focus on, would not encompass

21  examination, evaluation, advice with respect to or pursuit of

22  claims against KPMG.  And I would submit that that was

23  appropriate then, and I would submit that it was also

24  appropriate in the context of the post petition milieu because

25  of those various factors.  That is, it's not the primary focus

1  of the investigation.  The purpose was to develop facts.

2  Lawyers in numerous settings take on engagements in which they

3  have some adversity to existing clients.  They do it with the

4  other client's consent, but ultimately the protection for the

5  parties and the system is disclosure and professionalism.  And

6  that's what was done here, and I think that 327(e), in the

7  realm of special counsel approval, and the 3rd Circuit case law

8  that deals with the more rigorous criteria in the realm of

9  327(a) employment, which has the -- under First Jersey and the

10  predecessor cases, actual conflict can't approve, potential

11  conflict discretion of the Court, and appearance is not

12  something which should be disqualifying.  I think that

13  framework applied to our situation instructs that what we have

14  here is at most a potential conflict dealing with the

15  possibility of adversity if things took an additional turn,

16  which they didn't, but that focusing upon what it was that we

17  actually undertook to do and what it was we actually did that

18  the relationship with KPMG and other matters is not holding an

19  adverse interest.  I mean, the real question, Your Honor, is it

20  seems to me as a result of that relationship what's the risk

21  that my firm is gonna pull its punches with regard to KPMG?

22              THE COURT:  I think that's a really good way to

23  articulate the question.  I mean, it's -- what questions don't

24  you ask?  You know, it's things like that.  And frankly, if you

25  were standing here before this all began I think I might be

1  really troubled by it.  But the kind of odd posture in which

2  this now comes to me is, you're basically finished.  So again,

3  on a very practical level, the question is, okay, given that

4  should the Estate pay for your post-petition services?

5          MR. BENVENUTTI:  Let -- Your Honor, if I may, let me

6  add a couple of other things.  First, as the papers make clear,

7  with regard to -- particularly with regard to questions related

8  to the auditors, we had a colleague, we had

9  PricewaterhouseCoopers that was also focused on the -- it was

10  assisting with regard to the internal investigation --

11         THE COURT:  In capacity as a forensic accountant --

12         MR. BENVENUTTI:  Correct.

13         THE COURT:  -- and it seems to me that that does add

14  some layer of assurance about the purity of the process.  I

15  also understand from the papers that KPMG didn't voluntarily

16  agree to cooperate in turning over information in the course of

17  this investigation either.

18         MR. BENVENUTTI:  That's correct, Your Honor.  The

19  information about KPMG that was able to be obtained was that

20  which was available from personnel at the Debtor and other

21  third-party sources and documents.  But nothing internal from

22  KPMG as I understand it was produced, and KPMG made none of its

23  people available for interviews.  So to the extent that that

24  factors into the mix, there weren't any interviews of KPMG

25  people that were in fact conducted.

1       Which I think goes to another part of the analysis, which

2   also makes the situation unusual.  And that is that normally

3   when the Court is asking about authorization of counsel you

4   have to do it prospectively, forward looking.  Here you have to

5   benefit perhaps to -- for us it's not a benefit, it's a

6   detriment that we're standing here after the work has been

7   done.  But the Court has the benefit of hindsight.  And I think

8   the record before the Court is very clear that the work was

9   done in a way that was usable, that there's no evidence that

10  punches were pulled, that in point of fact Mr. Shepard said in

11  his declaration and would testify if the Court wishes to hear

12  from him that he who was in charge of the investigation

13  conducted it and had others conduct it in a manner that was

14  straight down the middle.  And so that is in fact where we are.

15      And I submit to the Court that on that record the kinds of

16  concerns that I understand and that would perhaps cause the

17  Court not to have approved my firm's retention if the

18  investigation were -- if the matter were represented to the

19  Court at the very beginning of the investigation, can be -- I

20  think are satisfactorily responded to by the history that's

21  laid out in the papers.

22          THE COURT:  Thank you.  And I didn't answer your

23  question fully.  Let me hear from the U.S. Trustee, and then

24  we'll decide where to go from there.

25          MR. BENVENUTTI:  Very well, Your Honor.

1          THE COURT:  All right, thank you.

2          MR. MCMAHON:  Your Honor, good afternoon, Joseph

3    McMahon for the United States Trustee.  In terms of proceeding

4    today, Your Honor, just as a procedural matter, Mr. Shepard's

5    declaration has been filed with the Court and tendered.  We do

6    have some limited questions for Mr. Shepard which shouldn't

7    take more than five minutes is my guess, but --

8          THE COURT:  All right.  Any issue with any of the

9    other declarations that have been filed in connection?

10         MR. MCMAHON:  There were two other declarations.  The

11   declaration of Mr. Lang and Ms. Corea.

12         THE COURT:  That's correct.

13         MR. MCMAHON:  In support.  And my understanding is

14   that neither of those individuals are available for cross

15   examination.  I don't know what the Debtors or Heller Ehrman's

16   intentions are with respect to those.  But --

17         MR. BENVENUTTI:  Your Honor, neither one of them is

18   available for cross examination today.  If the Court believes

19   that it's important to have them available for cross

20   examination we're happy to address that.

21         THE COURT:  All right, thank you.

22         MR. BENVENUTTI:  But there is some expense involved,

23   obviously.

24         THE COURT:  All right.  Mr. McMahon.

25         MR. MCMAHON:  So that, Your Honor, in terms of -- I

1  don't know in the Court has any questions regarding our

2  objection or the issues that were raised.  Your Honor, I would

3  just note as a core matter a couple initial observations.

4       First, we don't view conflict analysis in the general

5  sense as trying to make ex post facto judgments about whether

6  or not Heller conducted its work on behalf of the Debtor's

7  bankruptcy Estates with integrity or not.  I think the core

8  purpose of conflict analysis under section 327 and under the

9  Bankruptcy Code generally is not to get involved in the issue

10  of this Court having to judge matters like the risk of whether

11  Heller will pull punches.  In fact, the Code in section 327(a)

12  and (e) reflect the policy decision that the Court shouldn't be

13  put in that position in the first place.  It effectively --

14       THE COURT:  Well, it's not that -- there is

15  decisional law in this Circuit which suggests there are

16  circumstances under which a Court has to determine whether an

17  asserted conflict is actual or whether it's maybe only

18  potential.  And different results can follow from those

19  determinations.  So it's not --

20       MR. MCMAHON:  Your Honor, I appreciate --

21       THE COURT:  -- I mean, there's a little fussiness to

22  the exercise.

23       MR. MCMAHON:  That's as a legal matter.  And I think

24  what I'm referring to is as a factual matter whether this Court

25  is obligated to review the course of work done by professional

1   and to make a factual determination as to whether or not -- if

2   it, you know, it was effected or not by giving relationship.

3   That's what I'm referring to.

4           THE COURT:  Well, actually that's an issue that could

5   sometimes come up in an interim or final fee application.  Even

6   though the professional's employment may have been approved at

7   the outset of a case.

8           MR. MCMAHON:  Correct.  Under 328(c) or other

9   applicable law, you're correct, Your Honor.  But the other, I

10  guess preliminary observation that I would make is both the

11  Debtors and Heller Ehrman have, I guess, used the word internal

12  consistently.  And they continue to emphasize internal

13  investigation, internal investigation, no issue with respect to

14  KPMG here.  We tend -- we disagree, Your Honor, and actually

15  the question which the Court led with is, I guess, reflects our

16  observation regarding how this comes down.  Which is Heller

17  Ehrman has taken a look at two accounting issues in connection

18  with the potential accounting fraud.  That's what going on

19  here.  And along the lines of the types of question which the

20  Court suggested there's only so many directions in which these

21  issues point to.  Even if Heller Ehrman isn't going to be doing

22  the pointing itself, per se, or advising the Debtors.

23  Specifically as to whether claims or causes of action are being

24  brought.

25          Either the company and its employees were responsible for

1   the accounting errors, irregularities, call them what you will,

2   which led to the February 7th announcement and subsequent

3   statements, or they were, I guess, there are third parties,

4   i.e., accounting firms, again, KPMG, which is responsible for

5   putting the Debtors in that position.

6       The arrow only points in so many directions here.  And

7   instead of using terms like internal to somehow qualify the

8   investigation in a manner that would only benefit Heller Ehrman

9   I think the question that this Court is presented with is does

10  KPMG have an interest?  And how -- what the answers are to the

11  questions that are being posed in connection with this

12  supposedly internal investigation.  And I think it's apparently

13  clear to the Court and everyone else in this Courtroom that the

14  answer to that question is yes.  And for our office's purposes,

15  Your Honor, that's where the analysis is focused on and where

16  it should be focused on, and that's where it begins and ends.

17          THE COURT:  Well, you're saying that because KPMG

18  cares that Heller Ehrman should care.  And why does one

19  necessarily follow from the other?

20          MR. MCMAHON:  Well, not necessarily.  What I'm

21  suggesting is that Heller -- that KPMG is an interest adverse

22  to the Estate with respect to this investigation.  Call it

23  internal or call it what you will.  And that Heller presently

24  represents that entity.

25          THE COURT:  So you disagree with the statutory

1  construction that's asserted on the other way that says the

2  adverse interest has to be in connection with the matter in

3  which the professional is proposed to be engaged?

4          MR. MCMAHON:  No, what I'm suggesting is that this

5  Court should not be focused upon distinctions like the use of

6  the word internal in terms of assessing whether or not KPMG is

7  actually implicated here and focus on the substance of what the

8  investigation encompasses.  We're talking about an

9  investigation into accounting issues, issues which the auditor

10  has a distinct interest in.  That's the gravamen of our

11  position, Your Honor.

12          (Pause in proceedings)

13          THE COURT:  Okay.

14          MR. MCMAHON:  And one, you know, observation

15  regarding the use of the word internal.  And we haven't heard

16  from Mr. Shepard yet, but it's interesting that it was

17  important enough for the investigative team to at least

18  communicate with KPMG to see whether or not KPMG would

19  voluntarily participate in the subject matter of its

20  investigation.  And although apparently they were not

21  voluntarily willing to do so, that that's an interesting fact

22  that's noted in the Shepherd declaration.

23          THE COURT:  Mr. McMahon, would you agree with me that

24  if I were to approve the employment of the firm as proposed

25  that to the extent that the U.S. Trustee or anyone else learned

1  of any circumstance or event which implicated the -- I'll use a

2  color word, bias of the firm in conducting its investigation,

3  that the U.S. Trustee or any other party would be precluded

4  from raising such an issue upon application for compensation.

5          MR. MCMAHON:  Just to be clear, would not be

6  precluded?

7          THE COURT:  Would not be precluded.

8          MR. MCMAHON:  Under section 328(c), Your Honor, if

9  that occurred during the scope of its post petition employment

10  I would agree.

11         THE COURT:  Okay.  So that -- well, you've answered

12  my question.

13         MR. MCMAHON:  Thank you, Your Honor.

14         THE COURT:  All right.  Well, let me ask Heller

15  Ehrman whether beyond offering the declaration of Mr. Shepard

16  it wishes to offer any other evidence in support of the

17  Debtor's application for its retention?

18         MR. BENVENUTTI:  Your Honor, we do wish to offer the

19  other two declarations, in particular Mr. Lang's declaration.

20         THE COURT:  Is there any objection?

21         MR. MCMAHON:  Your Honor, we do have some questions

22  relating to, I guess, the scope of the work that the Audit

23  Committee authorized.  What I would suggest is if we could have

24  Mr. Shepard testify briefly, and to the extent that his

25  testimony resolves the question that we have then perhaps we

1  can deal with Mr. Lang's declaration at the tail end of that

2  testimony.

3           THE COURT:  All right.  You okay with that?

4           MR. BENVENUTTI:  That's fine with me, Your Honor.

5           THE COURT:  All right.

6           MR. BENVENUTTI:  Would you like to have Mr. Shepard

7  take the stand?

8           THE COURT:  Yes.

9           MICHAEL J. SHEPARD, DEBTOR'S WITNESS, SWORN

10          THE CLERK:  Please state your name into the

11  microphone spelling your last name for the Court.

12          MR. SHEPARD:  First name is Michael, middle initial

13  J, last name Shepard, S-H-E-P-A-R-D.

14                    CROSS EXAMINATION

15  BY MR. MCMAHON:

16  Q.  Mr. Shepard, good afternoon.

17  A.  Good afternoon.

18  Q.  Do you have an understanding as to the services that Heller

19  is providing or has provided to KPMG during the course of its

20  engagement by New Century's Audit Committee -- subcommittee,

21  excuse me?

22  A.  The services we provide to KPMG?  In the course of our work

23  for New Century?  That is what other engagements we have for

24  KPMG?

25  Q.  That is correct.

1  A.  Okay, sorry, I just didn't understand.  No.

2  Q.  You don't.  Okay.  Paragraph 8 of your declaration

3  indicates that the investigators requested a wide range of

4  documents and asked for KPMG to produce witnesses in connection

5  with the investigator's investigation, is that correct?

6  A.  Correct.

7  Q.  Okay.  You were engaged on or about March 14th, correct?

8  A.  I believe that's correct.

9  Q.  When was the request made of KPMG for their voluntary

10 cooperation with the investigation, do you know?

11 A.  I couldn't tell you with any precision.  I think we started

12 talking to KPMG pretty early in our engagement about what

13 cooperation we'd be able to get from them, but I don't remember

14 an exact date.

15 Q.  Okay.  Was that request made in writing or was it made

16 through telephone calls?

17 A.  I believe the request was oral, at least initially.  There

18 were KPMG people on site sort of shadowing our internal

19 investigation at the outset, which is somewhat typical these

20 days in internal investigations.  And I think we initiated the

21 conversations with the people who were on site.  And I know

22 there was follow up of -- between I think the PWC people and

23 the KPMG engagement partner.  And then ultimately KPMG's

24 lawyers got involved, and there were lawyer-to-lawyer

25 conversations.

1   Q.   Do you know when KPMG declined the investigative team's

2   request to cooperate in connection with the investigation?

3   A.   I don't have an exact date.  And it's probably a somewhat

4   moving target because they started by saying we will give you

5   some material if you agree with us on the follow terms and

6   documents.  And there were discussions about those terms and

7   documents.  And ultimately I think some agreement on them.  And

8   at that point when we started to push further we got different

9   answers and ultimately a statement that they just weren't gonna

10  give us anything.  So it sort of took place over a period of

11  time.

12  Q.   Now in your declaration in paragraph 8 you reference the

13  fact that the investigators were hamstrung in terms of

14  obtaining information from KPMG because you didn't have

15  subpoena power, correct?

16  A.   I don't know that I said hamstrung.  I think I did say we

17  don't have subpoena power.

18  Q.   At a certain point in your employment the Debtors filed for

19  bankruptcy protection, correct?

20  A.   That's correct.

21  Q.   Are you a bankruptcy practitioner by trade, sir?

22  A.   I'm not.

23  Q.   Okay.  Do you know what a Rule 2004 examination is?

24  A.   I've learned about a Rule 2004 examination, yes.

25  Q.   Okay.  Did the Audit Committee consider the possibility of

1  conducting a Rule 2004 examination of KPMG?

2  A.  I don't believe that was discussed.

3  Q.  Okay.  And given that that wasn't discussed, you didn't --

4  your -- Heller Ehrman didn't have the occasion to communicate

5  with KPMG as to whether the use of that process would be

6  prohibited by the restriction that's contained in the March

7  14th engagement letter, is that correct?

8  A.  We did not discuss that with KPMG.

9       MR. MCMAHON:  Your Honor, those are all the questions

10  that I have for the witness.

11       THE COURT:  All right.  Any other cross examination?

12  Any redirect?

13       MR. BENVENUTTI:  Yes, Your Honor.

14                 REDIRECT EXAMINATION

15  BY MR. BENVENUTTI:

16  Q.  Mr. Shepard, were you actively involved in the conduct of

17  the internal investigation?

18  A.  Yes.

19  Q.  What was your level of knowledge of how the investigation

20  was being conducted?

21  A.  I'd like to think that while I was not in each detail or

22  interview I was in the important interviews and I knew the

23  results of all the aspects of the investigation that I was not

24  participating in personally.

25  Q.  And approximately, if you can tell us, how many of the

1   interviews did you participate in yourself?

2   A.   I didn't count them but I'd say roughly half.

3   Q.   Are you aware of any punches being pulled by Heller Ehrman

4   in the manner in which it conducted the internal investigation,

5   as relates to KPMG?

6   A.   We did not pull any punches, as it relates to anybody.

7   Q.   We've made a distinction in the papers which I know you

8   have read, and which Mr. McMahon commented on about the

9   difference between -- or reference to an internal investigation

10  and something that's broader than that.  Would you explain to

11  the Court what you understand the purpose and focus of an

12  internal investigation to be?

13  A.   Well, there's a lot of truly internal stuff, which is the

14  prime focus of one of these investigations.  These

15  investigations are done for the Audit Committee.  So of course

16  their prime concern is has the company issued some financial

17  report that might not be right?  And so a prime focus of these

18  investigations in general, and this one in particular is, was

19  there something wrong with one of their financial statements?

20       And ultimately one of the results of the investigation was,

21  and I can't give you the statement verbatim, but it was

22  essentially that not only was there an issue with the 2006

23  quarterly financial statements that is what prompted the

24  internal investigation to begin with, but also with the 2005

25  statements.  And that's obviously a prime focus of any internal

1  investigation, it was a prime focus of this internal

2  investigation.  Did the company get it right?  Did the company

3  get the financial reporting right?

4       And another prime focus of an internal investigation is if

5  the company didn't get it right who within the company is

6  responsible, and is there discipline that should be

7  appropriate?  Are there changes in procedures that need to take

8  place in order to make sure the company isn't continuing to

9  make errors.  Those are the prime issues that we grapple with

10  in these internal investigations.  And both in general and in

11  this one.

12  Q.  Now Mr. Shepard, where in the range of purposes and focuses

13  of an internal investigation typically would you find the

14  subject of identifying and pursuing claims against the auditor?

15  A.  Typically in my experience not a focus.  And some of that

16  is a practical consideration.  And that is in the typical

17  internal investigation the company is not liquidating.  The

18  company has an ongoing relationship with its auditor.  And

19  ultimately at the end of the internal investigation, coming

20  back to what I mentioned a moment ago and how you need to get

21  the financial reporting correct, not only the company has to be

22  comfortable it got it right, but ultimately the auditing firm

23  has to say it got it right.  And sign off on it.

24       And usually these internal investigations take a fair

25  amount of time, no matter how quickly we try to do them.  And

1  the result is that the company delays the filing of its

2  financial statements.  That's obviously bad for the company.

3  So what they want to do is make sure that when they're done

4  with their investigation and have signed off on the financial

5  statement that the auditor will be willing to do that as well.

6  And in my experience companies are very reluctant to start

7  investigating the auditing firm while that process is ongoing.

8  Whether rightly or wrongly they tend to fear that if they were

9  investigating the auditing firm as part of their investigation

10 process that they might not get the quickest sign off from the

11 auditing firm at the end of the investigation, and they need

12 that sign off in order to get their financial statements on

13 file.

14      So in my experience, especially my recent experience,

15 there isn't a lot of actual investigation of the auditing firm

16 that goes on during these internal investigations.  One gathers

17 the facts as best one can, but the actual are we going after

18 the auditing firm generally not done as part of an internal

19 investigation in my experience.  And also something that's much

20 better done when you have the full range of subpoena powers,

21 and ultimately what we did in this instance was to go to the

22 Government and give them a full report on what we had done and

23 say, "Look, given the number of people who are now not

24 cooperating with us," because these internal investigations are

25 sort of a wasting asset.  You have a certain amount of

1  leverage.  But if the company is dissolving you start to lose

2  your leverage with everybody.  And so we said, "Hey, look,

3  given where we are at this point it might be best if you the

4  Government picked up the ball," and we gave the Government all

5  the information that we could gather.

6  Q.  Let me direct your attention, if I can, Mr. Shepard, to the

7  circumstances that existed at the time that the bankruptcy

8  petitions were filed in early April.  The thrust of the U.S.

9  Trustee's position is that Heller Ehrman should have been

10  terminated and some other accounting -- some other law firm

11  should have been engaged at that point in order to take over

12  the investigation.  Could you outline for the Court the

13  practical consequences -- the practical difficulties that would

14  have confronted a new law firm coming in to take over from

15  Heller Ehrman on April 2nd or April 3rd, if that had occurred?

16  A.  Well, we certainly would have given them whatever help they

17  would have needed or wanted, which would have been a fair

18  amount because there's a big learning curve, obviously, that

19  you have to ramp up in one of these investigations.  At the

20  moment of the filing my best recollection is that we had done a

21  large percentage of the interviews, especially on the

22  accounting related issues.  There were also insider trading

23  related issues.  But on the accounting related issues we had

24  done the vast majority of the interviews, but as is frequently

25  the case in these investigations, the actual formalization in

1    memo form of the witness interviews was not complete in most

2    instances.  So sort of practical issue #1 would have been,

3    okay, we have a whole lot of knowledge of these witness

4    interviews that is not yet, as is typical in the flow of these

5    investigations, formalized in a completed witness interview

6    memorandum.  So that would have been practical issue #1.

7         Practical issue #2 would be, hey, there's a whole lot

8    going on that you're gonna learn as rapidly as you can, and

9    your leverage to conduct this internal investigation is rapidly

10   declining.  Obviously, when you go in these internal

11   investigations say to the people at the company, your essential

12   leverage to get them to talk to you is primarily they want to

13   keep their job.  And so they'll talk to you because they think

14   it's part of their job as it is.  And secondarily to some

15   extent, especially with some people, they'll be saying, hey, I

16   know the SEC and the U.S. Attorney's office are gonna look at

17   this.  And I don't want to be in a position of having said I'm

18   not cooperating.  So that works with some people some of the

19   time.  More frequently you get cooperation because people want

20   to keep their job.

21        As this investigation went forward that primary

22   motivation, that primary leverage that you have as an internal

23   investigator began to decline.  Because it was obvious that the

24   company was headed toward liquidation and nobody was gonna be

25   keeping their jobs, or very few people were gonna be keeping

1  their jobs.

2       So time was of the essence.  It was important to move

3  quickly.  And we were already seeing some witnesses, I think at

4  that time, and if not soon thereafter -- we were seeing some

5  witnesses start to stall with us.  Say, yeah, I'll talk to you,

6  but not right now.  Maybe I'm gonna get a lawyer.  Maybe I'm

7  having trouble scheduling a date.  And so -- and what they're

8  -- having represented a number of those people myself in other

9  investigations, what you're hoping for is that you won't ever

10 have to do it.  Because the job will already have gone away and

11 you won't have to make this difficult choice between, hey, I

12 don't know exactly what went wrong and what they're gonna ask

13 me.  And I don't want to wind up making a statement that could

14 hurt me in the SEC's or U.S. Attorney's office's investigation.

15      So some lawyers in that position, and some potential

16 witnesses will want to stall.  And so we as the investigators

17 have to be going really fast.  We're ready to go.  And so each

18 week or series of weeks that you lose at that point you run the

19 risk of losing access to some really important witnesses.  And

20 obviously that's the life blood of your investigation.  You got

21 the documents, you got the witnesses.  You don't have a great

22 deal of subpoena power, so you're gonna get it from the

23 documents and the witnesses.  You start losing those you don't

24 have much to find.

25 Q.  Mr. Shepard, Mr. McMahon asked you earlier on cross

1  examination about 2004 examinations and the prospect of

2  pursuing investigation or questioning under 2004.  Is there any

3  reason that you're aware of why some other entity, whether it's

4  another law firm for the company, or the Governmental agencies,

5  or somebody else with an interest in the bankruptcy case,

6  cannot use the work product Heller Ehrman has developed without

7  benefit of 2004 examination and use that as a basis for

8  conducting 2004 examinations of KPMG?

9  A.  No.  And I think to the contrary.  What we've tried to do

10 is lay out exactly what we did in a process memorandum that's

11 now been sent to the SEC, the U.S. Attorney's office, the

12 examiner.  We are making continuing progress on the recording

13 of witness interview memoranda and are producing those as well

14 so that people can get the benefit of what we've done.  And

15 that's essentially what we've said starting on May 1st when we

16 went to the SEC and the U.S. Attorney's office and made a

17 presentation of, here's what we've learned.  And suggested to

18 them that given the declining leverage that we had it seemed

19 like it -- from our perspective might be more appropriate for

20 them to pick up the ball, use their subpoena power, not

21 necessarily 2004 power, but their own subpoena power, which is

22 pretty broad.

23     And then we made that some presentation ultimately to the

24 Creditors Committee and to the examiner so that they -- all of

25 those groups had the benefit of what we had found in our

1  investigation and could take it from there with the additional

2  powers that they had available.

3  Q.  The United States Trustee has suggested that there is a

4  risk that some of Heller Ehrman's work is gonna have to be done

5  over again because of our relationship, the firm's relationship

6  with KPMG.  Do you agree with that position?

7  A.  No.  And I would be professionally distraught if our work

8  was not of the kind that anybody would look at and say, you

9  know, that was a good job.  Asked the right questions.

10  Recorded the answers properly.  Followed up on the leads.  I

11  mean, that's my life blood of what I do.

12          MR. BENVENUTTI:  I have no further questions, Your

13  Honor.

14          THE COURT:  Any recross?

15          MR. MCMAHON:  Briefly, Your Honor.

16                    RECROSS EXAMINATION

17  BY MR. MCMAHON:

18  Q.  Mr. Shepard, you testified that you have experience

19  conducting internal investigations generally.  How many of the

20  internal investigations were conducted in the context of or

21  leading to public company bankruptcy cases?

22  A.  Leading to is a little harder because I don't follow -- but

23  in -- you know, I don't follow how the company does afterwards

24  necessarily.  But in answer to your question to sort of take

25  this context, I don't think I had done one in this context

1  where the -- in the middle of it the company declares

2  bankruptcy and liquidates.

3           MR. MCMAHON:  No further questions, Your Honor.

4           THE COURT:  Thank you.  Thank you, sir, you may step

5  down.

6  A.  Thank you.

7           THE COURT:  All right.  I'll hear briefly in closing.

8  Well let's -- I'm sorry.  Let's finish with the evidentiary

9  record first.

10           MR. BENVENUTTI:  Yes, Your Honor, I think we have the

11  issue of Mr. Lang's declaration.  I do wish to have it

12  considered.

13           MR. MCMAHON:  Your Honor --

14           THE COURT:  And Ms. Corea?

15           MR. BENVENUTTI:  I beg your pardon?  Yes, and

16  Ms. Corea's as well, yes.

17           THE COURT:  Okay.  Is there any objection?

18           MR. MCMAHON:  I'm sorry, there's -- Your Honor,

19  there's no objection to the admission of Mr. Lang's

20  declaration.  With respect to Ms. Corea's, let's just say that

21  I take exception with kind of like a discussion as to the

22  limited discussion of the time line as to how we got here

23  today.

24           THE COURT:  I wouldn't consider it very probative of

25  the issues before me in any event.  But if there's no objection

1   to its admission I'll take it.

2        MR. MCMAHON:  We have no objection to letting the

3   declaration come in.

4        THE COURT:  All right.

5        MR. MCMAHON:  Thank you, Your Honor.

6        THE COURT:  Thank you.

7        MR. BENVENUTTI:  From whom would you like to hear,

8   Your Honor?

9        THE COURT:  Let's hear first from the Movant.

10       MR. BENVENUTTI:  I'm going to try not to repeat what

11  I said before.  I want to focus, I think, on just one point.

12  And that was a point that was raised in the colloquy between

13  the Court and Mr. McMahon toward the end of Mr. McMahon's

14  presentation previously.

15    Mr. McMahon said that from the United States Trustee's

16  perspective it was essentially dispositive that Heller Ehrman

17  represents KPMG in other matters, and KPMG has an interest in

18  the internal investigation, and the subject matter of the

19  internal investigation.

20    I think that formulation, as the Court's question I think

21  focused as well, I think that formulation is incomplete.  I

22  think in the context of the statute, which is whether Heller

23  Ehrman holds an interest adverse to the Estate, that is simply

24  one part of the equation.  The other part of the equation,

25  which is what this Court is called upon to decide based on the

1  evidence, is whether that relationship is such as to amount to

2  holding -- as to amount to Heller Ehrman holding an interest

3  adverse to have the Estate.

4      And that's where I think the actual versus potential

5  conflict of interest analysis comes into play.  I confess to

6  the Court that I find the case law under 327(e) less than

7  clear.

8          THE COURT:  It's because every circumstance is so

9  different.  I mean, it's not that there aren't reoccurring

10  themes, but everything is different.  And this situation is --

11  at least in my experience, unique.

12          MR. BENVENUTTI:  Well, I'm actually comforted to hear

13  the Court say that.  Because we tried to look for guidance in

14  the cases when we were briefing this.  But I think what it

15  comes back to, Your Honor, is that in the 327(e) context the

16  reason for 327(e) is to give the Bankruptcy Court discretion to

17  make a facts and circumstances determination when presented

18  with a less than pristine situation.

19      The question is, you have counsel who have been

20  representing the Debtor prepetition.  They are in midstream, as

21  Heller Ehrman was in this case.  And you basically have two

22  choices at that point.  Choice #1 is continue with the

23  representation of the existing counsel, and choice #2 is get

24  somebody new.  And in that situation the Court is called upon

25  to decide, given all of the circumstances I would submit, what

1   makes sense here?  What makes sense here?

2        I think the formulation, particularly where it's hold an

3   adverse interest, that's inherently factual.  That inherently

4   calls on the Court to make an evaluation of the relationship,

5   the connection and the scope of what it is that's being done.

6   And to make a determination, a practical determination about

7   what's in the best interest of the Estate at that point.

8        THE COURT:  Well, not that any Court doesn't want to

9   be practical, but I think the 3rd Circuit in a case involving

10  Pricewaterhouse has said, you've got to be true to the statute

11  and its dictates, and that if the applicant doesn't otherwise

12  meet the eligibility criteria under the Bankruptcy Code

13  requirements, the fact that the investigation couldn't be

14  redone under the circumstances, the fact that there was too

15  great a learning curve with a new professional to make it

16  economically available.  In fact, that was the question, I

17  think, directly before the 3rd Circuit in that case.  The 3rd

18  Circuit said that's not good enough.

19        MR. BENVENUTTI:  I understand that, Your Honor.  And

20  I'm not trying to suggest otherwise.  What I'm saying is that

21  inherent particularly in the question of hold an adverse

22  interest, which is the portion of 327(e) that's at issue here,

23  that is inherently factual.  That is inherently something that

24  requires the Court to look at the facts and circumstances.

25        THE COURT:  Well, as I understand the U.S. Trustee's

1   argument, I think what the U.S. Trustee is asking me to hold as

2   a matter of law is that in a circumstance in which the proposed

3   professional represents the company's -- or has -- represents

4   -- or has represented the company's outside auditors in other

5   matters unrelated to the proposed representation, that that in

6   and of itself constitutes the holding of an interest adverse to

7   the Estate.  That's -- I think that's the end result as a

8   matter of law, and Mr. McMahon will have the chance to tell me

9   I may be wrong about that.  But that's -- seems to me the legal

10  question that's presented to me.

11          MR. BENVENUTTI:  I wish I'd had the foresight to

12  frame it that way, Your Honor, because I think that is exactly

13  what -- the position they're taking.  And it's certainly the

14  logical implication of the position that they're taking.  And

15  on the other side of that, what we have to say is, #1, I don't

16  think the statute dictates that result.  I think the Court is

17  empowered and should look at the circumstances relating to the

18  connection, and relating to the scope of the work that's to be

19  done.  And we wouldn't have any difficulty, I'm sure, positing

20  situations in which it was clear that it wouldn't be possible.

21      But this is one in which the evidence is about what the

22  scope of the investigation was, about the limitations on the

23  investigation, about the nature of the investigation, and about

24  all of the other circumstances that we've addressed already.

25  And my submission to the Court is that the statute,

1   particularly when you're looking at the hold an adverse

2   interest component, requires the Court to make a judgment about

3   whether on the facts and circumstances presented the particular

4   representation in other unrelated matters amounts to holding an

5   adverse interest.  That it's not a matter of law, that it's

6   very much a facts and circumstances kind of issue, and that

7   seen in that context I think that the evidence that we

8   presented makes a compelling case that this was at most a

9   potential conflict of interest, that under the 3rd Circuit

10  analysis it is well within the Court's discretion to make a

11  determination one way or the other.  The Court has to call that

12  as it sees it.  But it does so not as a matter of law but based

13  upon the facts and circumstances presented.  And I won't waste

14  your time by going over the facts and circumstances again

15  because we covered those already.

16          THE COURT:  Thank you.

17          MR. BENVENUTTI:  Thank you.

18          MR. MCMAHON:  Your Honor, again I think we have to

19  reset, because after hearing Heller's counsel's presentation I

20  don't think we're talking about the same thing.  The issue is

21  not whether Heller holds an interest adverse.  It's whether

22  Heller represents an entity that holds an interest adverse to

23  the Debtor or to the Estate. With respect to the matter on

24  which such attorneys is to be employed.

25      Now, we have heard the record here today, and while I

1  don't think there's any real confusion about what Heller Ehrman

2  is charged to do, I would urge the Court to consider the point

3  that I made in the initial presentation regarding getting away

4  from the word internal and focus on really what's at issue

5  here.

6      We have a law firm that's charged to assist the Board of

7  Directors -- their audit subcommittee of the Board of Directors

8  of New Century, in connection with investigating accounting

9  issues.  In a situation where there is fraud, with the

10  possibility of fraud, something clearly went wrong here.  And

11  this company found itself in bankruptcy less than a month after

12  Heller was retained.

13      If the subject matter of the investigation involves

14  addressing those accounting issues, involves asking questions

15  about what happened here, who told you what, anything

16  addressing the -- you know, anything addressing the who, what,

17  where, when, how of that situation, then we submit

18  respectfully, Your Honor, that it's gonna implicate KPMG, the

19  prepetition auditor, no matter how you cut it.  And that is

20  really the argument that's being advanced here.  Nothing to do

21  with Heller holding a prepetition claim.  It's who they

22  represent in unrelated matters.

23      And, Your Honor, with respect to that subsection, while we

24  typically see special counsel engagements where you have a

25  piece of prepetition litigation and counsel is being employed

1  with respect to that litigation, let's take it for granted they

2  can't represent the Plaintiff and the Defendant, if the --

3  states the Plaintiff.  I think that the interpretation that's

4  being advanced by the -- by Heller Ehrman is so narrow as to

5  render 327(e) meaningless or perhaps even superfluous.

6      This isn't a piece of prepetition litigation.  We can

7  start from the base assumption that Heller would not be able to

8  employ -- would not be able to represent a Plaintiff and a

9  Defendant in a piece of prepetition litigation.  But there are

10  some circumstances, Your Honor, under which if the Estate were

11  the Plaintiff and Heller had a significant relationship with

12  the prepetition Defendant such that it was led to, say, a

13  restriction upon the terms under which Heller could take a

14  look, or assist the Debtors in asserting claims against that

15  entity, that this Court could take a look at that situation and

16  say, "That doesn't work here."

17     And we come back to this investigation, Your Honor, and we

18  have a situation where under the March 12th engagement letter

19  Heller has had this restriction imposed upon it by its client,

20  KPMG.  And Heller's own witness here today, Your Honor, even

21  testified that they contemplate that the firms were used in

22  connection with those parties-in-interest going forward that

23  may elect to investigate the possibility of whether third

24  parties, including KPMG, should bear responsibility for the

25  accounting issues that have been well publicized.

1    So the conflict issue has been put squarely before the

2  Court, and the issue is, where does this fall?  And Your Honor,

3  we believe that it falls into a disqualifying category, no

4  matter how you look at it.  It's a serious issue.  And we note

5  in our papers as a footnote, Your Honor, that if we had this

6  issue with respect to a Court appointed examiner that it would

7  probably be a no brainer as to how the Court would view it.

8  The essential question that we ask in putting aside the

9  327(a)(e) distinction, which Heller Ehrman points to, we --

10  that's really not significant.

11    Why does this situation get looked at any differently?

12  There's no good answer to that question on this record from the

13  moving party side, and it's not our office's obligation to

14  provide an answer to that question.  So Your Honor, we believe

15  that under the Code as it's read, and as it applies to the

16  situation, the subject matter of the -- of Heller Ehrman's

17  employment clearly implicated issues of interest to KPMG, that

18  KPMG holds an interest adverse with respect to this

19  investigation, call it internal, put whatever label it is you

20  want on it, and that this Court should not approve the

21  application for that reason.

22         THE COURT:  Thank you.

23         MR. BENVENUTTI:  Your Honor, I realize this is out of

24  ordinary, but may I have two minutes?

25         THE COURT:  Two minutes.

1          MR. BENVENUTTI:  Thank you.  Mr. McMahon said

2     something in his closing which didn't jive with what I had

3     understood the Government's position to be before.  I want to

4     address that just very briefly if I can.

5          Mr. McMahon appears to take the position that the logic is

6     KPMG has an interest adverse to the Estate, Heller Ehrman

7     represents KPMG in other matters, therefore under section

8     327(e) Heller Ehrman holds or represents an interest adverse to

9     the Estate, with respect to the matter as to which Heller

10    Ehrman is to be engaged.

11         There are two problems with that formulation, which I --

12    in all honesty I believe is a new one from what we had

13    understood the Government's position to be before.  The first

14    one is that's not true to the language of the statute.  We

15    couldn't represent KPMG in the case.  I don't think that

16    formulation says anything about representing KPMG someplace

17    else under the represents an adverse interest portion.  So I

18    think it does come back to the question of hold an adverse

19    interest as a result of our relationship with KPMG elsewhere,

20    and that I think gets back into the formulation that I

21    addressed in my closing.

22         THE COURT:  Thank you.

23         MR. MERCHANT:  Your Honor, Mike Merchant for the

24    Debtors.  I just want the record to be clear that the Debtors

25    agree with the legal positions argued here today and in the

1  papers of Heller Ehrman and wholeheartedly support the

2  retention.  Everyone has been focused on transitioning the

3  investigation from the Debtors to the Committee and to the

4  examiner.  And Heller Ehrman has been instrumental in that

5  process.  Again, we'd support their retention.  The Debtors

6  believe we need them to finish their work and to be available

7  on a going forward basis.

8          MR. POWER:  Real quick, Your Honor.  Mark Power from

9  Hahn & Hessen, counsel for the Committee.  Your Honor, the

10  Committee echoes the Debtor's statements just a moment ago.

11  The Committee supports the application, primarily for the

12  practical reason, we have worked with Heller Ehrman in terms of

13  getting download of the work they've done.  They do have

14  extensive notes of interviews and data which we think is very

15  helpful for the Committee in connection with its investigation,

16  its ongoing activities, and ultimately in terms of recoveries

17  of potential claims for this Estate.

18      I will tell Your Honor Mr. McMahon was very diligent in

19  terms of making sure the Committee professionals didn't have a

20  conflict with KPMG.  And in short of that, in connection with

21  our retention.  So when we look at the landscape before Your

22  Honor we don't necessarily, and we never did envision Heller

23  Ehrman would basically ever be getting into these issues about

24  whether these claims, Estate claims, should be pursued.

25      Their work really is a very limited scope, which is

1  basically finishing the work for the Audit Committee, which

2  pretty much is done, transitioning over that work, and then

3  they'll be done in this Estate.  And we take a very practical

4  view and believe there's benefit to the Estate and therefore

5  would support the application.

6          THE COURT:  Thank you.  All right.  I'm prepared to

7  make my ruling.  And I do think the essence of what the U.S.

8  Trustee wants the Court to hold here is that in the

9  circumstance in which a professional is being engaged to

10 conduct an internal audit and the outside auditor of the

11 company is an entity for which the firm provides services in

12 connection with other matters is, as a matter of law,

13 representing or holding an interest adverse to the Estate.  I

14 will not make that holding.  I'm not saying that circumstance

15 couldn't occur.  And it may very well be that had I had been

16 faced with this question at the outset of the investigation for

17 which the firm was employed prepetition and for which it is

18 proposed to be employed post petition, it might have been

19 easier simply to deny the engagement because of all the things

20 which could happen, which might influence the investigation.

21      But here there are circumstances, I think, which warrant

22 the engagement.  There was a forensic accountant directly

23 involved in this investigation.  The investigation is now

24 essentially completed.  What's left to be done is written

25 reports on interviews and other transition services.  There are

1  other investigating bodies and agencies involved here, the U.S.

2  Attorney for the Central District of California, the Securities

3  & Exchange Commission, the examiner appointed by this Court and

4  the Official Committee of Unsecured Creditors.  I mean, this is

5  a situation in which at least for part of the time, and for

6  post hoc review there are other very competent sophisticated

7  entities involved in examining what's been done here by this

8  applicant.

9      And I guess at the end of the day the other comfort the

10  Court is given here is twofold.  One, there's no specific

11  factual evidence that there was any conflict here which

12  actually had any affect on the investigation as it was

13  conducted.  And secondly, all the parties, including the U.S.

14  Trustee, are going to have a second bite of the apple here when

15  it comes time to apply for compensation because all of the

16  issues discussed and raised today can be raised again if it

17  appears as the various investigations progress that there was

18  some flaw in the investigation as a result of some influence,

19  or bias or conflict that the firm -- may be imputed to the firm

20  as a result of its KPMG representation.

21      In any event, for those reasons I am prepared to approve

22  the engagement as it's been proposed.

23          MR. BENVENUTTI:  Thank you, Your Honor.  I don't

24  believe we have an order to present  right now.

25          MR. MERCHANT:  Your Honor, we'll submit a Form of

1  Order under Certification of Counsel.

2          THE COURT:  Okay.

3          MR. BENVENUTTI:  Your Honor, we're done.  May we be

4  excused?

5          THE COURT:  You may.

6          MR. BENVENUTTI:  Thank you.

7          MR. MERCHANT:  Your Honor, Mike Merchant again, for

8  the record.  If we can move back to the beginning of the agenda

9  and go through the remaining matters.

10         THE COURT:  Okay.

11         MR. MERCHANT:  I expect that they'll go fairly

12  quickly.  Agenda items 1 and 2 were continued and are not going

13  forward today.  However, with respect to agenda item 2, the

14  agenda states that the Union Bank objection, which is item

15  2(q), was mooted.  That's not entirely correct.  There were

16  actually three different Union Bank contracts.  One of them is

17  clearly not going to Carrington in connection with the sale.

18  That has been mooted.  With respect to the other two

19  agreements, we've actually agreed to continue the hearing with

20  respect to that cure objection over to August 21st.

21         THE COURT:  Very well.

22         MR. MERCHANT:  Agenda items 3 through 11, Your Honor,

23  there were Certificates of No Objection filed on those.  With

24  respect to agenda item #12 --

25         THE COURT:  Well, before we move beyond those --

1          MR. MERCHANT:  Sure.

2          THE COURT:  -- with respect to items 4, 5, 6, 7, 8,

3   9, 11 and 12, there were no Forms of Orders submitted.  I would

4   have signed them prior to today's hearing had I received them.

5          MR. MERCHANT:  Okay, Your Honor.

6          THE COURT:  They need yet to be submitted.

7          MR. MERCHANT:  Okay.  I don't believe any of those

8   are the Debtor's motions.

9          THE COURT:  No.

10         MR. MERCHANT:  If you'd like we could reach out to

11  the Movants and --

12         THE COURT:  Well, I guess --

13         MR. MERCHANT:  -- just apprise them of the need to do

14  something.

15         THE COURT:  I guess the Debtor can do what it will.

16      (Laughter)

17         MR. MERCHANT:  Okay.

18         THE COURT:  But you know, the Movants here haven't

19  submitted everything they need to get to the end.  Although

20  after having reviewed each of the papers I'm prepared to grant

21  the relief that's been requested.

22         MR. MERCHANT:  Okay.

23         THE COURT:  But I ain't drafting the orders.

24         MR. MERCHANT:  Thank you, Your Honor.

25      (Laughter)

1        MR. MERCHANT:  Your Honor, on agenda item #12, there

2    was a Certificate of No Objection filed on that one as well.

3    The Debtors do not have an objection but just wanted to make a

4    clarifying statement on the record.  With respect to this

5    particular lease, there was an assumption and assignment

6    agreement with National City, and that assumption and

7    assignment fell through.  So we agree with the clarification.

8    The lease has not been assumed and assigned.  We will be moving

9    within the next week to reject that lease.

10        We understand that there's outstanding rent payments.  The

11    Debtors looked back.  There where one or two checks that had

12    been issued for April and May rent.  We've confirmed that those

13    checks have not been cashed.  So I'm reaching out with Movant's

14    counsel.  If they can get us wire information we can wire the

15    outstanding rental payments in the next day or so and resolve

16    that issue.

17        MS. WOLFE:  Good afternoon, Your Honor, Etta Wolf of

18    Smith Katzenstein & Furlow here on behalf of Ryan Desert Ridge.

19    I understand Your Honor to have not received a Form of Order --

20        THE COURT:  That's correct.

21        MS. WOLFE:  -- on #12.  I apologize for that.  I

22    belief that one had been filed.  I have one here if you'd like

23    me to hand that up.

24        THE COURT:  I'm happy to entertain it now.

25        (Pause in proceedings)

1          MS. WOLFE:  Your Honor, Debtor's counsel has asked

2    that they have a chance to review the amounts in the order and

3    we'll just submit it under Certification of Counsel.

4          THE COURT:  Very well.

5          MS. WOLFE:  Thank you.

6          MR. MERCHANT:  Your Honor, agenda item #13 is the

7    Debtor's Motion Seeking Authority for Committee Members to

8    Participate in Securities, Trading, Loan, Sales and other

9    Transactions.  The hearing on that motion is gonna be continued

10   to a later date.

11         Agenda item 14 is the Debtor's motion relating to

12   investment guidelines under section 345 of the Bankruptcy Code.

13   The hearing on that motion has been continued to the July 31st

14   hearing.

15         Moving to agenda item #16 is what we refer to as the

16   Technology Sale Motion.  Your Honor entered an order approving

17   that sale back on July 3rd.  But the order provided a procedure

18   for resolution of the late-filed objection by ILOG.  My

19   understanding is the EquiFirst counsel has been in contact with

20   ILOG.  They're working to see if a resolution can be reached

21   with respect to that objection.  And we'd like to continue that

22   one to the July 31st hearing as well.

23         THE COURT:  That's fine with me.  But my -- one

24   question I have is has the objection, which is a letter, in the

25   form of a letter, been docketed?

1        MR. MERCHANT:  It has not been filed with the Court,

2   Your Honor.  It was sent to Debtor's counsel.  So we feel

3   obligated to include it in the order and set it for hearing.

4        THE COURT:  All right.

5        MR. MERCHANT:  Your Honor, agenda item #17 is the

6   examiner's application to retain Kirkpatrick & Lockhart.  That

7   matter was inadvertently listed on the agenda.  I understand

8   that there's a supplemental submission that will put -- be put

9   together by Kirkpatrick & Lockhart.  And depending on Your

10  Honor's review of this certification there may or may not be a

11  need for a hearing on this motion going forward.  But we'll

12  work with them regarding the scheduling.

13       THE COURT:  Okay.

14       MR. MERCHANT:  Agenda item #18 is the Debtor's

15  application to retain Ernst & Young for tax advisory services

16  to the Debtor.  Your Honor, I believe the office of the United

17  States Trustee has been working directly with Ernst & Young's

18  counsel to resolve there objection.  And I believe Mr. John

19  Simon, counsel for E&Y is on the phone and perhaps can address

20  where we are with respect to that objection.

21       MR. SIMON:  That's right.  This is John Simon at

22  Foley & Lardner for E&Y.  Good afternoon, Your Honor.

23       THE COURT:  Good afternoon.

24       MR. SIMON:  We worked diligently with the United

25  States Trustee.  The U.S.T. filed an objection to E&Y's

1  retention, and we worked with Mr. McMahon to resolve that.

2  We're happy to report we have come to a resolution whereby

3  E&Y's going to submit a supplemental affidavit to address the

4  U.S.T.'s disclosures concerns, and a revised order to address

5  certain concerns the U.S.T. had with respect to limitation of

6  liability, reimbursement of counsel fees and independent

7  contracting.  We have agreed to those forms with the U.S.T.'s

8  office, Your Honor.

9       The Committee also had an informal response, and we got

10  together with the Committee today by phone, and basically the

11  Committee had questions about the scope of E&Y's retention.

12  We've resolved those with the Committee as well.  So we were

13  planning on asking the Debtors to submit under certification a

14  revised order.  I'm happy to walk the Court through any issues

15  on the contents of the supplemental affidavit or the changes to

16  the order as the Court desires.

17           THE COURT:  Well --

18           MR. SIMON:  And of course I leave any comments

19  Mr. McMahon may have, or Committee counsel.

20           THE COURT:  No, I read the objection, and I assume

21  that it will be -- the order are be submitted under

22  certification.  If I have any questions I'll get back to the

23  parties.

24           MR. SIMON:  Thank you very much, Your Honor.

25           MR. MERCHANT:  Mike Merchant again for the record,

1  Your Honor.  Agenda item #20 is the motion of Rubio and others

2  for an order authorizing the filing of a class Proof of Claim.

3  That matter was resolved by stipulation that was submitted last

4  week, and I believe it has been entered by your order.  I think

5  I saw it on the docket late last week.

6          THE COURT:  I signed it.

7          MR. MERCHANT:  And the last remaining matter is

8  agenda item #22, which is the initial status conference in the

9  DB Structured Products adversary proceeding.  And with the

10  Court's consent that initial status conference has been

11  continued to the July 31st hearing.  I believe --

12          THE COURT:  Anything further for today?

13          MR. MERCHANT:  That's all we have for today, Your

14  Honor, thank you.

15          THE COURT:  All right.  Thank you, that concludes

16  this hearing.  Court is adjourned.

17      (Court adjourned)

18

19                          CERTIFICATION
20  I certify that the foregoing is a correct transcript from the
21  electronic sound recording of the proceedings in the above-
22  entitled matter.
23

24  *Lewis Parham*                    7/24/07

25  _____        _____
26  Signature of Transcriber              Date