# EXHIBIT A

BUILDING LEASE

**THIS LEASE** (the "Lease"), made this 26th day of February, 1997, between **Bank One Chicago N.A.** , not personally, but as Trustee under Trust Agreement dated November 21, 1989 and known as Trust No. R-3679 (hereinafter referred to as "Landlord"), and **Prism Mortgage Company, an Illinois corporation** (hereinafter referred to as "Tenant").

## ARTICLE I

### Premises

**Section 1.1.** Landlord, for and in consideration of the rents herein reserved and of the covenants and agreements herein contained on the part of Tenant to be kept, observed and performed, leases to Tenant, and Tenant leases from Landlord, the premises ("Premises") designated on the plan attached hereto as Exhibit A and containing 6,410 square feet in the building ("Improvements") located on the land ("Land") located at 500 Peterson Road, Libertyville, Illinois, together with the exclusive right to use the parking area located on the Land as of the date of this Lease ("Tenant's Parking Area"), together with all present and future additions, improvements and other rights appurtenant to the Premises, all present and future easements affecting the Land, subject to all covenants, conditions, agreements, easements, encumbrances and restrictions affecting the Land, Improvements and the Premises.

## ARTICLE II

### Term

**Section 2.1.** The initial term of this Lease shall commence ("Commencement Date") on the earlier to occur of: (i) the date that Tenant first conducts business from the Premises; or (ii) ninety (90) days after the execution of this Lease, and shall end six (6) years thereafter unless sooner terminated as herein set forth. The initial six (6) year term as so fixed is herein referred to as the "Initial Term", and the Initial Term as may be extended or sooner terminated is hereinafter referred to as the "Term". Notwithstanding the Commencement Date, all provisions of the Lease shall be effective as of the date hereof.

**Section 2.2.** Landlord and Tenant shall execute an instrument fixing the Commencement Date and termination of the Initial Term of this Lease at the request of either Landlord or Tenant.

**Section 2.3.** Tenant shall have the option ("Renewal Option") to renew the Initial Term for all of the Premises and Tenant's Parking Area as of the expiration date of the Initial Term, for one additional period of six (6) years ("Renewal Term") upon the following terms and conditions:

(A) Tenant notifies Landlord in writing of its exercise of the Renewal Option at least one (1) year prior to the expiration of the Initial Term.

(B) Tenant is not in default under this Lease either on the date Tenant notifies Landlord as required under (A) above or at any time thereafter prior to the commencement of the Renewal Term.

(C) All of the terms and provisions of this Lease shall be applicable to the Renewal Term, except that monthly Base Rent for the Renewal Terms shall be as specified on Exhibit B.

**Section 2.4.** Except as otherwise provided herein and pursuant to Exhibit D, Tenant agrees to accept the Premises to be covered by this Lease during the Renewal Term in an "as-is" physical condition and Tenant shall not be entitled to receive any allowance, credit, concession or payment from Landlord for the improvement thereof.

c:\TBC\wpwin\wpdocs\libertyv\prismlen.sc8\02\24\97

**Section 2.5.** The Renewal Option herein granted shall automatically terminate upon the earliest to occur of: (i) the expiration or termination of this Lease; (ii) the termination of Tenant's right to possession of the Premises; (iii) any assignment by Tenant.

**Section 2.6.** Landlord and Tenant acknowledge and agree that no real estate brokerage commission or finder's fee shall be payable by Landlord for any exercise by Tenant of the Renewal Option herein contained.

**Section 2.7.** Landlord reserves for itself the right during the Renewal Term to build additional improvements on the back and side portions of the Land ("Landlord's Expansion Area"). Landlord will not build additional improvements on Tenant's Parking Area unless Landlord provides Tenant with replacement parking on the Land and approximately as close to the Premises as Tenant's Parking Area.

If Tenant exercises its Renewal Option, and if Landlord has decided to build additional improvements on the back or side portion of the Land, Tenant shall continue to maintain the Premises, Tenant's Parking Area and the Improvements as required in this Lease. Notwithstanding the foregoing and if Landlord does build additional improvements on the Land: (i) Tenant shall not be obligated to perform any maintenance on the portion of the Land developed by Landlord; (ii) Tenant shall not be obligated to perform any repairs to the Premises, Tenant's Parking Area or the Improvements which are necessitated by Landlord's construction activities; and (iii) if access to the additional improvements constructed by Landlord is through Tenant's Parking Area, an operator (who may be Landlord) shall assume all maintenance obligations for the Tenant's Parking Area. Tenant shall contribute a pro rata share of the costs incurred by operator in performing these obligations ("Common Area Maintenance Costs"). Tenant's pro rata share of Common Area Maintenance Costs shall be determined by multiplying all Common Area Maintenance Costs by a fraction, the numerator of which is the number of square feet contained in the Premises and the denominator of which if the number of square feet contained in all improvements on the Land. If a specific repair (as opposed to normal maintenance) of the Tenant's Parking Area is required solely by the fault or neglect of Landlord or an occupant of the additional improvements constructed by Landlord, Tenant shall not be required to contribute to the cost of that repair.

## ARTICLE III

### Condition of Premises

**Section 3.1** Landlord agrees prior to the Commencement Date to make the repairs to the parking lot and roof as described on Exhibit D attached hereto ("Landlord's Work"). Except for Landlord's Work, Tenant agrees to accept the Premises in an absolutely "as-is" condition. Tenant acknowledges that Landlord has afforded Tenant the opportunity to inspect the Premises, if and that Landlord, its agents, attorneys, representatives and employees have not and do not make any representations or warranties, express or implied, to Tenant regarding the Premises, including, but not limited: (i) the zoning of the Premises; (ii) the condition of any underground, above ground or surface improvements; (iii) the size, area, use or type of the Premises or the fitness of the Premises for any intended or particular use; (iv) the nature of the soil on and underlying the Premises or its suitability any other use thereof; (v) any financial information pertaining to the operation of the Premises; (vi) the status of any requirements or obligations imposed, implied or to be undertaken by the owner of the Premises pursuant to any zoning, subdivision, development laws or agreements with any governmental entities; or (vii) the presence or absence of any toxic wastes, hazardous materials or structural defects in, on or under the Premises or any improvements thereof, all such representations and warranties, express or implied, being hereby expressly waived by Tenant and disclaimed by Landlord. Tenant waives any claim that may exist for patent and/or latent defects or for mutual or unilateral mistake of fact. Landlord shall cooperate, at no cost to Landlord, with Tenant's efforts to obtain building permits for Tenant's Work (as defined in the following Section).

**Section 3.2.** Prior to the Commencement Date, Tenant shall: replace all of the ceiling tile in the Premises; paint the ceiling grid; provide handicap accessible washrooms in the Premises; make such repairs or installations as

are necessary to have the Premises comply with all governmental regulations, codes, rules or laws; and make other alterations and improvements to the Premises to accommodate Tenant's use (collectively, "Tenant's Work"). Tenant's Work shall be conducted in accordance with Exhibit C. Tenant's entry and installation shall be done in such a manner as not to interfere with Landlord's Work. Such occupancy shall be subject to all the terms and conditions of this Lease, including, without limitation, Articles VIII and IX hereof (except that Tenant shall not be required to pay the Rent provided for in this Lease prior to the Commencement Date ). Notwithstanding such entry and installation, the Initial Term shall begin and Rent shall be payable as herein set forth in this Lease.

**Section 3.3.** Landlord shall tender possession of the Premises to Tenant, including delivering keys to the Premises upon full execution of this Lease.

### ARTICLE IV

### Rent

**Section 4.1.** Tenant agrees to pay Landlord, without offset or deduction, a total Base Rent ("Base Rent") for the Initial Term in accordance with the Base Rent Schedule set forth on Exhibit "B" attached hereto and by this reference made a part hereof, payable monthly in advance in installments commencing on the Commencement Date (prorated for a partial month if the Commencement Date is not the first day of a month) and continuing on the first day of each month thereafter for the balance of the Term of this Lease. In addition to Base Rent, Tenant shall pay such charges as are herein described as Additional Rent. The term "Rent" when used in this Lease shall include all amounts payable under this Section 4.1 as well as the charges herein described as "Additional Rent". All Rent payable hereunder shall be payable to Mr. Nabih Mangoubi, or as Landlord may otherwise from time to time designate in writing and shall be sent to First National Bank and Trust of Evanston, 820 Church, Evanston, Illinois 60201, Attention: Libertyville Building Account. Any installment of Rent accruing under the provisions of this Lease which shall not be paid when due, shall bear interest at the Lease Interest Rate (as defined in Section 33.8 hereof) from the date when the Rent is due until paid. Notwithstanding the foregoing, Landlord will not charge Tenant interest for the first late installment of Rent made in any one calendar year. Thereafter, any late installment of Rent during that calendar year shall bear interest. Tenant further acknowledges that its late payment of any Rent will cause Landlord to incur certain costs and expenses not contemplated under this Lease, the exact amount of which is extremely difficult or impracticable to fix. Such costs and expenses will include, without limitation, loss of use of money, administrative and collection costs and processing and accounting expenses. Therefore, if any installment of monthly Base Rent is not received by Landlord from Tenant by the tenth (10th) day of the month for which such installment is due or any other sum due hereunder is not paid within ten (10) days of its due date, Tenant shall immediately pay to Landlord a late charge equal to five percent (5%) of the unpaid amount. Such late charge is in addition to any interest due pursuant to this Section 4.1. Landlord and Tenant agree that this late charge represents a reasonable estimate of costs and expenses incurred by Landlord from, and is fair compensation to Landlord for, its loss suffered, by such non-payment by Tenant. Acceptance of the late charge shall not constitute a waiver of Tenant's default for such non-payment by Tenant or prevent Landlord from exercising any other rights and remedies available to Landlord under this Lease. Failure to pay the late charge shall constitute a default under this Lease.

**Section 4.2.** Base Rent due hereunder shall be abated in full and shall not be payable by Tenant as shown on Exhibit B. This abatement is based on each of the following conditions being met: (a) Tenant has taken possession of the Premises to carry on its business therein; and (b) Tenant is not in "Default" hereunder (as described in Article 20 hereof) on the date any such installment is due; (c) Tenant has submitted to Landlord the items described in Section C 3 of Exhibit C and those items show that the cost of Tenant's Work has exceeded One Hundred Twenty-eight Thousand and 00/100 DOLLARS ($128,000.00). In calculating the amount of Tenant's Work, Tenant may include built-in furniture, wiring for computers and costs for drawings, permits and demolition. While reviewing the cost of Tenant's Work Landlord may review the latest edition of *Means Building Construction Cost Data* published by McGraw Hill, to ensure that the amount Tenant claims to have spent is reasonable.

Notwithstanding the abatement of Base Rent as provided in this Section, Additional Rent shall continue to be due and payable as provided in this Lease.

## ARTICLE V

### Taxes and Impositions

**Section 5.1** Tenant agrees to pay, before any fine, penalty, interest or cost may be added thereto for the nonpayment thereof, as Additional Rent for the Premises, all "Taxes" (as hereinafter defined) levied, assessed or imposed upon the Premises or any part thereof accruing during the Term of this Lease, notwithstanding that such taxes may not be due and payable until after the expiration of the Term of this Lease. Taxes levied against the Premises shall be prorated between Landlord and Tenant for the first year of the Initial Term hereof as of the date of delivery of possession pursuant to Section 4.2 hereof, and as of the date of expiration of the Term of this Lease for the last year of the Term, all on the basis of the most recent ascertainable taxes as applied to the most recent assessed valuation of the Premises. Tenant shall be responsible for all increases in Taxes based upon Tenant's occupancy of the Premises. After the expiration of the Term hereof, including any extensions thereof, Tenant hereby agrees to reprorate Taxes. If the Taxes reflected on the proration made upon the expiration of the Term of this Lease increase, Tenant agrees to immediately pay to Landlord such sums as reflected by such reproration. Benefit may be taken by Tenant of the provisions of any statute or ordinance permitting any special assessment to be paid over a period of years; provided, however, Tenant shall pay all installments of special assessments due during the Term hereof. Tenant shall, in addition to the foregoing, pay any new Tax of a nature not presently in effect but which may hereafter be levied, assessed or imposed upon Landlord or upon the Premises, if such Tax shall be based upon or arise out of the ownership, use or operation of the Premises; provided, however, that for the purpose of computing Tenant's liability for such new type of Tax, the Premises shall be deemed the only property of Landlord. Tenant's obligation to pay such Additional Rent shall survive the Term.

If Landlord deems any real estate tax excessive or illegal, Landlord may contest its validity. If Landlord is successful in such a contest, the remission or refund shall be paid out: first, to Landlord for all fees for consultants and attorneys and all other costs incurred by Landlord in seeking to obtain a reduction of, or a limit on the increase; and next to Landlord and Tenant (in the same proportion as they paid the taxes being refunded), as a refund of any overpayment of real estate tax, penalties or interest.

As used herein, the term "Taxes" or "Tax" shall mean, collectively or individually as the context requires, real estate taxes, assessments, sewer rents, rates and charges, permit and license fees, transit taxes, taxes based upon the receipt of rent, and any other federal, state or local governmental charge, general, special, ordinary or extraordinary, which may now or hereafter be assessed against the Premises or any portion thereof in any year during the Term hereof, and shall also include any personal property taxes (attributable to the year in which paid) imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances used for the operation of the Premises.

Nothing contained herein shall be construed to require Tenant to pay any franchise, inheritance, estate, succession or transfer tax of Landlord or any income or excess profits tax assessed upon or regarding all income of Landlord or chargeable to or required to be paid by Landlord unless such tax shall be specifically levied against the rental income of Landlord derived hereunder (as opposed to a general income tax), which tax shall be paid by Tenant as part of Taxes hereunder provided the rental income shall be considered as the sole income of Landlord.

If Landlord sells the Premises and as a result thereof the Premises are reassessed, Tenant shall not be required to pay any increased Taxes. Instead, Tenant shall be obligated to pay Taxes based upon the most recent ascertainable tax rate applied to the assessed valuation of the Premises immediately preceding the reassessment. The new owner of the Premises shall then pay the difference between Tenant's contribution and the actual tax bill. In

subsequent years the assessment used to calculate Tenant's contribution shall increase in the same percentage as the assessments for surrounding properties increase because of a general reassessment.

**Section 5.2.** Tenant shall arrange for all utility service to the Premises and shall pay for the use of the utilities directly to the utility company supplying the service to the Premises. Tenant shall be billed directly by such utility company and Tenant agrees to pay each bill promptly in accordance with its terms. Tenant's payments for utility service shall be considered Additional Rent for the Premises. Tenant further agrees to pay as Additional Rent for the Premises all other impositions, ordinary and extraordinary, of every kind and nature whatsoever, which may be levied, assessed or imposed upon the Premises or any part thereof accruing or becoming due and payable during the Term of this Lease.

**Section 5.3.** As security for the obligations contained in Section 5.1 hereof, Tenant shall deposit monthly with Landlord, or such other entity as Landlord may designate, on the first day of every month of the Term, a sum equal to 1/12th of Landlord's estimate of the current amount of Taxes levied for the Premises, which monthly deposits need not be kept separate and apart by Landlord and shall be held by Landlord in such account or accounts as may be authorized by the then current state or federal banking laws, rules or regulations and which monthly deposits shall be used as a fund to be applied, to the extent thereof, to the payment of Taxes as they become due and payable. The existence of this fund shall not limit or alter Tenant's obligation to pay the Taxes for which the fund was created. Tenant shall not be entitled to interest on this fund.

**Section 5.4.** On or prior to the Commencement Date, Landlord shall advise Tenant of Landlord's estimate of the monthly deposits that will be required for the period commencing on the Commencement Date and ending on the December 31 immediately thereafter. As soon as reasonably feasible after the expiration of each calendar year during the Term (hereinafter referred to as a "Lease Year"), Landlord will furnish Tenant a statement ("adjustment statement") showing the following:

(i) Actual Taxes for the Lease Year last ended and the amount of Taxes payable by Tenant for such Lease Year;

(ii) The amount of Additional Rent due Landlord for the Lease Year last ended, less credits for monthly deposits paid, if any; and

(iii) the monthly deposits due in the current Lease Year.

**Section 5.5.** Within thirty (30) days after Tenant's receipt of each adjustment statement, Tenant shall pay to Landlord:

(i) The amount of Additional Rent shown on the adjustment statement to be due Landlord for the Lease Year last ended; plus

(ii) The amount, which when added to the monthly deposits previously paid in the current Lease Year would provide that Landlord has then received such portion of the monthly deposits as would have previously been paid to Landlord had Tenant paid one twelfth (1/12) of the monthly deposits, for the current Lease Year, to Landlord monthly on the first day of each month of such Lease Year.

During the last Lease Year, Landlord may include in the monthly deposits its estimate of the Additional Rent which may not be finally determined until after the expiration of the Term.

**Section 5.6.** Tenant's payment of the monthly deposits for each Lease Year shall be credited against the Additional Rent for such Lease Year. If the monthly deposits paid by Tenant for any Lease Year exceed the Additional Rent due for such Lease Year, then Landlord shall give a credit to Tenant in an amount equal to such

excess against the Additional Rent due for the next succeeding Lease Year, except that if any such excess relates to the last Lease Year of the Term, then, provided that no default of Tenant exists hereunder, Landlord shall refund such excess to Tenant.

**Section 5.7.** Landlord shall, at its option, have the right, without notice to Tenant, at all times during the Term to pay any such Taxes not timely paid by Tenant, and the amounts so paid, including reasonable expenses, shall be Additional Rent due at the next rent day after any such payments, with interest at the Lease Interest Rate from the date of payment thereof.

**Section 5.8.** Tenant shall not be required to pay any Tax, Tax lien or other imposition or charge upon or against the Premises or any part thereof so long as Tenant, in good faith and with due diligence, contests the Tax or other imposition or the validity thereof by appropriate legal proceedings which shall have the effect of preventing the collection of the Tax, Tax lien or other imposition or charge so contested, provided that on or before the due date of any such Tax, Tax lien or other imposition or charge, Tenant shall deposit with Landlord an amount equal to one hundred twenty (120%) percent of the amount of such Tax, Tax lien, imposition or charge so contested, which amount, together with all interest earned thereon, shall be held by Landlord as security to insure payment of the amount of the Tax, Tax lien or other imposition or charge, and all interest and penalties thereon. The amount so deposited and all interest earned thereon shall be held by Landlord in a separate account at a federally insured banking institution until final resolution of such contest. Landlord shall at Tenant's sole expense cooperate with Tenant in any such contest.

**Section 5.9.** If Tenant at any time sues to recover any Tax, Tax lien or other imposition or charge paid by Tenant under protest in Landlord's name, Tenant shall have the right, at its sole expense, to institute and prosecute such suit or suits in Landlord's name, in which event Tenant covenants and agrees to indemnify Landlord and save it harmless from and against all costs, charges or liabilities in connection with any such suit. All funds received as a result of any such suit shall belong to Tenant unless any such recovery relates to a period of time which is not part · of the Term, and in such case shall be paid to Landlord.

**Section 5.10.** Tenant further agrees to reimburse Landlord as Additional Rent for the Premises any charges or impositions for water or sewer service to the Premises which are billed to and paid by Landlord during the Term. This reimbursement shall be due within ten (10) days after Tenant receives an invoice for the amount.

## ARTICLE VI

### Use

**Section 6.1.** The Premises shall be used for general office purposes only for Tenant's mortgage business, and for no other purpose. Tenant shall not use or occupy the Premises or permit the Premises to be used or occupied contrary to any statute, rule, order, ordinance, requirement, regulation or restrictive covenant applicable thereto or in any manner which would violate any certificate of occupancy affecting the Premises or which would render the insurance thereon void or the insurance risk more hazardous, or which would cause structural injury to the Improvements or cause the value or usefulness of the Premises or any part thereof to diminish or which would constitute a public or private nuisance or waste, and Tenant agrees that it will, promptly upon discovery of any such use, immediately notify Landlord and take all necessary steps to compel the discontinuance of such use.

**Section 6.2.** Tenant shall not permit the Premises, or any portion thereof, to be used in such manner which impairs Landlord's right, title or interest in the Premises or any portion thereof, or in such manner which gives rise to a claim or claims of adverse possession or of a dedication of the Premises, or any portion thereof, for public use.

## ARTICLE VII

### Maintenance of Premises

**Section 7.1.** Tenant agrees to take good care of the Premises, the Improvements and the Tenant's Parking Area, and keep the Premises, the Tenant's Parking Area and the Improvements and all parts thereof, including, without limitation, the entire exterior and interior, parking areas, driveways (including any driveways located on adjacent property which provide access to and from the Land), sidewalks and appurtenances thereto together with all alterations and additions thereto, in good order, condition and repair, suffering no waste or injury. Tenant agrees to maintain the Landlord's Expansion Area and keep the Area clean. Tenant's obligation to maintain the Landlord's Expansion Area shall expire immediately upon notice from Landlord that it will construct improvements on the Landlord's Expansion Area. Subject to Section 7.6, Tenant shall, at its sole cost and expense, promptly make all necessary repairs and replacements, ordinary as well as extraordinary, foreseen as well as unforeseen, in and to the Premises, the Improvements, the Tenant's Parking Area, or equipment now or hereafter located upon the Land, including, without limitation, the heating, ventilating and air conditioning equipment ("HVAC"), sidewalks, parking areas, driveways, water, sewer, gas and electricity connections, pipes, mains and all other fixtures, fire and security alarm systems, machinery, apparatus, equipment and appurtenances now or hereafter belonging to, connected with or used in conjunction with the Premises. Tenant's obligations for the Tenant's Parking Area shall include properly maintaining and repairing the Parking Area and returning the Parking Area to Landlord in the same condition as when received (ordinary wear and tear excepted). Notwithstanding the foregoing, Tenant shall not be required to apply a new seal coat to the parking area during the last six months of the Term, unless Tenant has exercised its Renewal Option and the Tenant's Parking Area should be seal coated. Tenant shall perform all repairs and replacements not specifically identified as Landlord's obligation in Section 7.6. All such repairs and replacements shall be of first class quality and sufficient for the proper maintenance and operation of the Premises. Tenant shall keep and maintain the Premises, the Improvements, the Tenant's Parking Area and all sidewalks, parking areas, driveways and areas adjacent thereto, safe, secure and clean, specifically including, but not by way of limitation, snow and ice clearance, landscaping and removal of waste and refuse matter. Tenant shall obtain from and maintain with a licensed Illinois heating and air conditioning contractor an annual HVAC maintenance contract in form and substance and with a firm reasonably satisfactory to Landlord, which will provide for regular inspections of the HVAC and cleaning, oiling, changing of filters and seasonal "start-ups." Tenant shall not permit anything to be done upon the Premises (and shall perform all maintenance and repairs thereto so as not) to invalidate, in whole or in part, or prevent the procurement of any insurance policies which may, at any time, be required under the provisions of this Lease. Tenant shall not obstruct or permit the obstruction of any parking area, driveway, adjoining street or sidewalk.

**Section 7.2.** Tenant shall not create any openings in the roof or exterior walls of the Improvements, without the prior written consent of Landlord, nor shall Tenant make any Alterations (as defined in Sections 12.1) except as permitted by Section 12.1 hereof, without the prior written consent of Landlord. All Alterations (except "Tenant's Equipment", as defined in Section 19.2 hereof), put in at the expense of Tenant shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, unless Landlord, as part of its approval of the alteration, addition or improvement has notified Tenant that Landlord will require Tenant to remove such Alterations and restore the Premises to its original condition. No Alterations shall be commenced until Tenant has first satisfied the requirements set forth in Section 12.1 hereof.

**Section 7.3.** Tenant at its own cost and expense shall promptly comply with all governmental requirements affecting the Premises or any part thereof, extraordinary as well as ordinary, relating to non structural changes to the Premises.

**Section 7.4.** Subject to Section 7.6, Landlord shall not be required to furnish any services or facilities whatsoever to the Premises. Tenant hereby assumes full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises. Landlord shall not be responsible for any loss or damage to the person or property of Tenant, any guests or invitees, any persons using or

c:\TBC\wpwin\wpdocs\libertyv\prismlea.se8\02\24\97          7

working on the Premises, or any persons claiming by, through or under, or any agents, employees, heirs, legal representatives, successors or assigns of, any of the foregoing.

Section 7.5. Tenant covenants and agrees to defend and hold Landlord (if Landlord is a trustee, the term "Landlord" for the purpose of this Section 7.5 shall include the trustee and all beneficiaries of such trust and the respective partners, shareholders, officers, directors, members, managers, agents and employees of such trustee and beneficiaries and their respective successors and assigns) and its partners, shareholders, officers, directors, members, managers, agents, employees and their respective successors and assigns harmless and indemnified at all times against any loss, liability, claim, damage, cost or expense, including reasonable attorneys' fees, because of any accident, loss or damage resulting to persons or property from any use which may be made of the Premises or of any equipment at any time situated thereon, or because of or growing out of any act or thing done or omitted to be done upon the Premises or in any equipment at any time situated thereon. Tenant further agrees that it will keep Landlord and the Premises free and clear of and from any and all loss, liabilities, damage, costs or expenses, including reasonable attorneys' fees, arising out of any damage which may be sustained by adjoining owners or other persons or property from any maintenance, remodeling, altering or repairing of any improvements or the erection of any new improvements on the Land.

Section 7.6. Landlord shall at Landlord's cost maintain, repair or replace all structural members, the roof, masonry, curbs, loadbearing walls, and foundations for the Improvements. Landlord shall replace the roof over the Improvements and the paving in Tenant's Parking Area as necessary. Landlord shall not be obligated to perform these obligations and these obligations shall instead become Tenant's if the necessity for the repair, maintenance or replacement is caused by the fault or neglect of Tenant, its employees, agents, contractors or invitees. Landlord shall, at its sole cost, replace each HVAC unit, if necessary, once during the Term. This obligation to replace the HVAC is subject to the following conditions: (a) Tenant keeps the maintenance policy for the HVAC in force (as required in Section 7.1); and (b) the necessity for the replacement is not caused by the fault or neglect of Tenant, its employees, agents or invitees. If it is not the Landlord's responsibility to replace the HVAC under the preceding two sentences, then it shall be the Tenant's responsibility to replace the HVAC it its sole cost. After Landlord has replaced the HVAC units once, for any subsequent replacement of the HVAC (not covered by warranty), Tenant shall reimburse Landlord as Additional Rent annually, an amount equal to the annual depreciation (on a straight line basis over the life of the improvement) of any such subsequent replacement HVAC units installed by Landlord during the Term. After Landlord performs the work described in Exhibit D at the beginning of the Term, for any replacement of the paving (not covered by warranty), Tenant shall reimburse Landlord as Additional Rent annually, an amount equal to the annual depreciation (on a straight line basis over the life of the improvement) of any such replacement installed by Landlord during the Term. Tenant shall also reimburse Landlord as Additional Rent the cost of the maintenance for the roof. Any reimbursement under this Section 7 shall be due within ten (10) days after Tenant receives an invoice for the amount.

Each year during the Initial Term Landlord shall obtain bids from three reputable contractors for the cost of maintaining the roof. If at any time two of the three contractors recommend replacing the roof, Landlord shall notify Tenant in writing. Landlord and Tenant shall each select a licensed roofer to inspect the roof. The two roofers selected shall select a third licensed roofer. If the roofers (or the roofers appointed as hereinafter provided) fail to agree upon a third roofer, the third roofer shall be drawn by lot from a list of three roofers (who must be licensed) selected by Landlord at random. If either party fails to appoint a roofer within a period of ten (10) days after written notice from the other party to make such an appointment, then the party who has selected a roofer may follow the procedure from the preceding sentence to select three roofers at random from the telephone directory and draw one by lot. The two roofers so appointed shall appoint a third roofer within ten (10) days after the appointment of the second roofer. The roofers shall each independently render their opinion of whether the roof needs to be replaced that year. The majority decision of the roofers shall determine the issue.

If the roof requires replacement during the first thirty-six months after Landlord delivers possession of the Premises, Landlord shall replace the roof at its sole cost and expense. If the roof requires replacement after that time

during the Term or at any time during the Renewal Term, Landlord shall replace the roof and Tenant shall reimburse Landlord as Additional Rent annually, an amount equal to the annual depreciation (on a straight line basis over the life of the improvement) of the replacement roof. If the necessity for the replacement of the roof is caused by the fault or neglect of Tenant, its employees, agents, contractors or invitees Tenant shall reimburse Landlord as Additional Rent the entire cost of replacing the roof regardless of when the roof is replaced.

## ARTICLE VIII

### Liability Insurance

**Section 8.1.** Tenant further agrees that it will at all times during the Term hereof, at its sole cost and expense, carry and maintain, for the benefit of Landlord, Landlord's agents and beneficiaries and Tenant, comprehensive general public liability insurance against claims for personal injury, sickness or disease, including death and property damage, including Scaffolding Act coverage, in, on or about the Premises, or in, on or about the streets, sidewalks, driveways or premises adjacent to the Premises, such insurance to afford protection in such amounts as Landlord may, from time to time, require, but not less than $1,000,000.00, for each person, and to the limit of not less than $2,000,000.00 for any one occurrence causing bodily injury, personal injury or death, and to the limit of not less than $500,000.00 for property damage, and will also carry, for the mutual benefit of Landlord and of Tenant, if any is required, steam boiler insurance on all steam boilers, pressure vessels and other such apparatus, including piping, in such amounts as Landlord may from time to time reasonably require.

**Section 8.2.** If the Premises are owned by a trust, Tenant shall maintain all insurance required pursuant to this Lease in the name of the trust, as well as the agents and beneficiaries thereof, as their respective interests may appear. At Landlord's written request, Tenant shall cause any lender of Landlord secured in whole or in part to be a named insured under any policy of insurance required to be maintained by Tenant under this Lease.

**Section 8.3.** Tenant shall furnish Landlord with certified copies or duplicate originals of all insurance policies required to be procured by Tenant under this Lease. All such insurance shall be procured from financially sound company or companies rated A+ in the then current edition of Best's Insurance Reports published by A.M. Best Company and authorized to do business in the state where the Premises are located and may, with Landlord's prior written consent, be obtained by Tenant by endorsement on its blanket insurance policies. All policies of insurance required to be procured of Tenant under this Lease shall provide that they may not be canceled or altered except upon thirty (30) days' prior written notice to Landlord and Landlord's mortgagee, if any.

## ARTICLE IX

### Hazard Insurance

**Section 9.1.** Landlord shall purchase insurance on all Improvements covering loss by fire and lightning, the risks covered by what is commonly known as extended coverage, malicious mischief and vandalism, breakage of all plate glass used in the Improvements and all other risks of direct physical loss, in an amount equal to the full replacement value on the replacement form basis, of the Improvements. The policy or policies evidencing such insurance shall be written by a company or companies authorized to do business in the state of Illinois, shall name Landlord as the insured thereunder, and shall provide that losses shall be paid to Landlord.

**Section 9.2.** Landlord may obtain insurance against loss of Rents due to the occurrence of any casualty or hazard in the amount of all Base Rent payments, taxes, assessments and insurance premiums required hereunder for a twelve (12) month period.

**Section 9.3.** Landlord and Tenant hereby waive all claims for recovery from the other party for any loss or damage (whether or not such loss or damage is caused by negligence of the other party and, notwithstanding any

provision or provisions contained in the Lease to the contrary) to any person or property insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance, subject to the limitation that this waiver shall apply only when it is permitted by the applicable policy of insurance.

**Section 9.4** Tenant agrees to reimburse Landlord within ten (10) days of its receipt of an invoice, as Additional Rent for the Premises, the premiums for the insurance to be maintained by Landlord under this Article IX("Premiums"). Premiums for the first year of the Initial Term hereof as the date of delivery of possession pursuant to Section 4.2 hereof, and as of the date of expiration of the Term of this Lease for the last year of the Term shall be prorated.

**Section 9.5** Landlord agrees that as the insurance to be maintained by Landlord under this Article expires, Tenant may solicit competitive bids for the renewal policies to assure the reasonableness of the premium. These bids must be solicited from financially sound companies rated A+ in the then current edition of Best's Insurance Reports published by A.M. Best Company. For Landlord to consider any such bids Tenant must provide the bids to Landlord at least ninety (90) days before the current policy expires.

**Section 9.6** Tenant shall purchase and maintain insurance during the entire Term for the benefit of Tenant and Landlord (as their interest may appear) with terms, coverages and in companies reasonably satisfactory to Landlord, Physical Damage Insurance covering the Tenant's Work (as defined in Exhibit C) and all other tenant improvements in the Premises, office furniture, trade fixtures, office equipment and all other items of Tenant's property on the Premises, which insurance shall, for the Tenant's Work and other tenant improvements, name Landlord, Landlord's beneficiary and any mortgagees designated by Landlord. Such insurance shall be written on an "all risks" of physical loss or damage basis, for the full replacement cost value of the covered items and in amounts that meet any coinsurance clause of the policies of insurance and shall contain a commercially reasonable deductible amount.

## ARTICLE X

### Damage or Destruction

**Section 10.1.** Tenant shall notify Landlord and the insurance companies in writing within two (2) business days after the occurrence of any casualty, accident, damage, destruction or similar occurrence in or about the Premises, the Land, Tenant's Parking Area or the Improvements of which Tenant has knowledge. If the Premises or the Improvements (including machinery or equipment used in their operation) shall be damaged by fire or other casualty and if such damage does not cause a termination of this Lease as described in the following sentences, then Landlord shall repair and restore them with reasonable promptness, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control, but Landlord shall not be obligated to expend therefor an amount exceeding the proceeds of insurance recovered for the casualty. If in Landlord's estimate the Premises cannot be restored within two hundred and ten (210) days from the date of such fire or casualty, then Landlord shall notify Tenant of such estimate within sixty (60) days after the fire or casualty. Tenant may elect in writing within sixty (60) days following the date of such notice from Landlord to terminate this Lease effective as of the date of Tenant's notice. If any such damage occurs within the last two Lease Years, Landlord shall have the right to terminate this Lease as of the date of such damage by notifying Tenant in writing at any time within sixty (60) days after the date of such damage. Landlord shall have no liability to Tenant, and Tenant shall not be entitled to terminate this Lease, because of any delays in completion of such repairs and restoration. Rent, however, shall abate on those portions of the Premises as are, from time to time, untenantable as a result of such damage.

**Section 10.2.** Notwithstanding anything to the contrary herein set forth, Landlord shall have no duty pursuant to this Article 10 to repair or restore any portion of Tenant's Work or any other Alterations in the Premises or the decorations thereto except to the extent that the proceeds of the insurance carried by Tenant are timely

received by Landlord. If Tenant desires any other or additional repairs or restoration, and if Landlord consents thereto, the same shall be done at Tenant's sole cost and expense subject to all of the provisions of this Lease. Tenant acknowledges that Landlord shall be entitled to the full proceeds of any insurance coverage, whether carried by Landlord or Tenant, for damage to the Premises, the Improvements, Tenant's Work or any other alterations, additions, installations, improvements or decorations (but excluding Tenant's Equipment) which would become Landlord's property upon the termination of this Lease.

## ARTICLE XI

### LIENS

**SECTION 11.1.** Tenant shall not do any act which shall in any way encumber the title of Landlord in and to the Premises, nor shall any interest or estate of Landlord in the Premises be in any way subject to any claim by way of lien or encumbrance, whether by operation of law or because of any express or implied contract by Tenant, and any claim to or lien upon the Premises arising from any act or omission of Tenant shall accrue only against the leasehold estate of Tenant and shall in all respects be subject and subordinate to the paramount title and rights of Landlord in and to the Premises. Tenant will not permit the Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor or material furnished to Tenant or claimed to have been furnished to Tenant for work of any character performed or claimed to have been performed on the Premises by or at the direction or sufferance of Tenant; provided, however that Tenant shall have the right to contest in good faith and with reasonable diligence, the validity of any such lien or claimed lien if Tenant shall first give to Landlord an amount equal to one hundred twenty (120%) percent of the amount of the lien or claimed lien which, together with interest earned thereon, shall be held by Landlord as security to insure payment thereof and to prevent any sale, foreclosure or forfeiture of the Premises because of non-payment thereof. The amount so deposited with Landlord shall be held by Landlord in an account established at a federally insured banking institution until satisfactory removal of the lien or claim of lien. On any final determination of the lien or claim of lien, Tenant will immediately pay any judgment rendered, with all proper costs and charges, and will, at its own expense, have the lien released and any judgment satisfied. If Tenant fails to diligently contest and pursue such lien contest, Landlord may, at its option, use the sums so deposited to discharge any such lien and reimburse Landlord for all fees and costs incurred by Landlord. Upon the removal of such lien or encumbrance, Landlord shall pay all such sums remaining on deposit to Tenant.

**Section 11.2.** If Tenant fails to contest the validity of any lien or claimed lien or fail to give security to Landlord to insure payment thereof, or fails to prosecute such contest with diligence, or fails to have the lien or claim for lien released and satisfy any judgment rendered thereon, then Landlord may, at its election (but shall not be so required) remove or discharge such lien or claim for lien (with the right, in its discretion, to settle or compromise the lien or claim for lien), and any amounts advanced by Landlord, including reasonable attorneys' fees, for such purposes shall be Additional Rent due from Tenant to Landlord at the next rent date after any such payment, with interest thereon at the Lease Interest Rate from the date so advanced.

## ARTICLE XII

### Alterations and Improvements

**Section 12.1.** Tenant shall not at any time during the Term of this Lease make any alteration, addition or improvement to the Premises or any portion thereof collectively "Alterations") without in each instance, the prior written consent of Landlord. Landlord shall not unreasonably withhold or delay its consent to minor, non-structural Alterations made by Tenant, provided the costs of such Alterations shall not exceed $5,000.00.Tenant may make Alterations to the Premises without obtaining Landlord's prior written consent provided that the aggregate value of the proposed Alterations together with the value of the other Alterations made by Tenant during that calendar year does not exceed $5,000.00. Tenant may also paint and install carpeting in the Premises without obtaining

Landlord's prior written consent. Tenant may not remodel or alter the Premises more than once every six months without Landlord's prior consent. No Alteration to the Premises shall be commenced by Tenant until Tenant has furnished Landlord with a satisfactory certificate or certificates from an insurance company acceptable to Landlord, evidencing worker's compensation coverage, and insurance coverage in amounts satisfactory to Landlord and protecting Landlord against public liability and property damage to any person or property, on or off the Premises, arising out of and during the making of such Alterations. Any Alteration by Tenant hereunder shall be done in a good and workmanlike manner in compliance with Exhibit C and any applicable governmental law, statute, ordinance or regulation.

Section 12.2. Tenant may, at its sole cost and expense, place signs on the monument sign at the front of the Land and on the front of the Improvements. Tenant may also, place a temporary sign at the front of the Land facing Peterson Road. All such signs must comply with all governmental rules and regulation. If Landlord develops the back or side portion of the Land during the Renewal Term, Landlord may require Tenant to remove any temporary sign.

Section 12.3. Tenant hereby agrees to defend, indemnify and hold the Landlord and its beneficiaries and each of their respective shareholders, officers, directors, managers, partners and members and all of their respective agents, employees, successors and assigns harmless from any and all liabilities of every kind and description which may arise out of or be connected in any way with any Alterations. Any mechanic's lien filed against the Premises for work claimed to have been furnished to Tenant shall be discharged of record by Tenant within ten (10) days thereafter, at Tenant's expense. Upon completing any Alterations, Tenant shall furnish Landlord with contractors' affidavits and full and final waivers of lien and receipted bills covering all labor and materials expended and used. All Alterations shall comply with all insurance requirements and with all ordinances and regulations of any pertinent governmental authority. All Alterations shall be constructed in good and workmanlike manner and only first class grades of materials shall be used.

## ARTICLE XIII

### Condemnation

Section 13.1. If the whole of the Premises shall be taken as a result of the exercise of the power of eminent domain or condemned for a public or quasi-public use or purpose by any competent authority or sold to the condemning authority under threat of condemnation, or if a portion of the Premises shall be taken or sold as a result of such event, and as a result thereof the balance of the Premises cannot be used for the same purpose as before such taking, sale or condemnation, then the Term of this Lease shall terminate as of the date of vesting of title pursuant to such proceeding or sale. The total award, compensation or damages (except for any sums payable for Tenant's Equipment) received from such proceeding or sale (hereinafter collectively called the "Award"), shall be paid to and be the property of Landlord, whether the Award shall be made as compensation for diminution of the value of the leasehold or the fee of the Premises or otherwise, and Tenant hereby assigns to Landlord, all of Tenant's right, title and interest in and to the Award. Tenant shall execute, immediately upon demand of Landlord, such documents as may be necessary to facilitate collection by Landlord of any such Award. Tenant may apply for a separate award for its loss of business caused by any condemnation, and the full amount of the Tenant's award shall belong to Tenant so long as it does not reduce the award payable to Landlord.

Section 13.2. If only a part of the Premises shall be taken as a result of the exercise of the power of eminent domain or condemned for a public or quasi-public use or purpose by any competent authority or sold to the condemning authority under threat of condemnation, and as a result thereof the balance of the Premises can be used for the same purpose as before such taking, sale or condemnation, this Lease shall not terminate and Landlord, at its sole cost and expense, shall promptly repair and restore the Premises to an architecturally complete unit. Landlord shall not be required to repair or replace Tenant's fixtures, trade fixtures, personal property, furniture, furnishings and equipment. Any Award paid as a consequence of such taking, sale, or condemnation, shall be paid to Landlord

Any sums not so disbursed shall be retained by Landlord. Promptly following such repair, Tenant shall, at Tenant's expense, perform any work required to place the Premises in the condition necessary to operate its business within the Premises, and Tenant shall repair or replace its trade fixtures, personal property, furniture, furnishings, and equipment.

## ARTICLE XIV

### Rent Absolute

**Section 14.1.** Except as otherwise provided, this Lease shall be deemed and construed to be a "net lease" and Tenant agrees to pay all costs and expenses of every kind and nature whatsoever, ordinary and extraordinary, arising out of or for the ownership, maintenance, repair, replacement, use and occupancy of the Premises during the Term of this Lease, which, except for the execution and delivery hereof, would otherwise have been payable by Landlord. If the use of the Premises for any purpose should, at any time during the Term of this Lease, be prohibited by law or ordinance or governmental regulation, or prevented by injunction, this Lease shall not be thereby terminated nor shall Tenant be entitled to surrender the Premises, or to any abatement or reduction in Rent, nor shall the respective obligations of the parties hereto be otherwise affected.

## ARTICLE XV

### Assignment-Subletting by Tenant

**Section 15.1.** Tenant shall not assign this Lease or any interest hereunder, nor shall Tenant sublet or permit the use or occupancy of the Premises or any part thereof by anyone other than Tenant, without the express prior written consent of Landlord. Landlord's consent will not be unreasonably withheld or delayed. Consent by Landlord pursuant to this Article XV shall not be deemed, construed or held to be consent to any additional assignment or subletting, but each successive act shall require similar consent of Landlord. Landlord shall be reimbursed by Tenant for any reasonable costs or expenses incurred pursuant to any request by Tenant for consent to any such assignment or subletting. In the granting or denying of consent, Landlord may, at its option, take into consideration: (i) the business reputation and credit worthiness of the proposed subtenant or assignee; (ii) any required alteration of the Premises; (iii) the intended use of the Premises by the proposed subtenant or assignee; and (iv) any other factors which Landlord shall deem relevant.

**Section 15.2.** Tenant shall not allow or permit any transfer of this Lease, or any interest hereunder, by operation of law, or convey, mortgage, pledge or encumber this Lease or any interest hereunder.

**Section 15.3.** If Tenant shall, with Landlord's prior consent as herein required, sublet the Premises, an amount equal to one hundred (100%) percent of the rental in excess of the Base Rent and any Additional Rent ("Sublease Profits") herein provided to be paid shall be for the benefit of Landlord and shall be paid to Landlord promptly when due under any such subletting as Additional Rent due hereunder. In calculating Sublease profits, Tenant may subtract: (i) brokerage fees, actually paid to a licensed real estate broker so long as they are at or below the prevailing rate; (ii) costs of Alterations for the subtenant which are verified according to the same procedure specified in Section 4.2; and the costs and expenses reimbursed to Landlord pursuant to Section 15.1 above.

**Section 15.4.** Tenant may, without Landlord's consent, assign this Lease to any subsidiary, a related entity or any corporation resulting from a merger or consolidation of Tenant, provided that the total assets and the total net worth of such assignee, related entity or successor after such consolidation or merger shall be more than that of Tenant immediately prior to such assignment, consolidation or merger, and provided that Tenant is not at such time in default hereunder, and provided further that such successor shall execute an instrument in writing fully assuming all of the obligations and liabilities imposed upon Tenant hereunder and deliver it to Landlord.

**Section 15.5.** Tenant may, without Landlord's consent, sublet no more than twenty percent of the Premises for a term not to exceed one year. Any such sublease may not contain an option for renewal or extension. For any sublease under this Section 15.5, the provisions of Section 15.3 shall apply.

**Section 15.6.** In addition to withholding its consent Landlord shall have the right to terminate this Lease as to that portion of the Premises which Tenant seeks to assign or sublet, whether by requesting Landlord's consent thereto or otherwise. Landlord may exercise such right to terminate by notifying Tenant at any time prior to Landlord's written consent to such assignment or sublease. If Landlord exercises such right to terminate, Landlord shall be entitled to recover possession of and Tenant shall surrender such portion of the Premises on the later of (i) the proposed date for possession by such assignee or subtenant, or (ii) ninety (90) days after the date of Landlord's notice of termination to Tenant.

**Section 15.7.** For any assignment or subletting, Tenant shall submit to Landlord on or before the effective date of the sublease or assignment copies of final executed documentation. No assignment or subletting shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal and not as a guarantor or surety, to the same extent as though no assignment or sublease had been made, unless specifically provided to the contrary in Landlord's consent.

## ARTICLE XVI

### Annual Statements

**Section 16.1** Tenant agrees to furnish Landlord annually, within thirty (30) days of the end of such fiscal year, with a copy of its unaudited financial statements. Tenant agrees to furnish Landlord annually, within ninety (90) days of the end of such fiscal year, with a copy of its annual audited financial statements and agrees that Landlord may deliver such statements in confidence to any mortgagee, prospective mortgagee or prospective purchaser of the Premises.

## ARTICLE XVII

### Estoppel Certificates

**Section 17.1** Tenant agrees that at any time and from time to time, upon not less than ten (10) days' prior written request by Landlord, it will execute, acknowledge and deliver to Landlord, or Landlord's mortgagee, a statement in writing certifying that: (i) this Lease is unmodified and in full force(of if there have been modifications, that this Lease is in full force as modified, and stating the modifications), (ii) Landlord is not in default under any term or condition of this Lease and there are no existing circumstances that with the giving of notice or the passage of time or both would give rise to such a default (or if any default exists Tenant will specify), (iii) the date to which the rent and other charges have been paid in advance, if any, (iv) Tenant has unconditionally accepted the Premises, (v) the Premises are acceptable to Tenant as is, and Tenant agrees not to look to Landlord to remedy or cure any faults therein, including, without limitation, latent defects, (vi) there are no set-offs or defenses to the enforcement of any or all of the terms, conditions and covenants contained in the Lease, (vii) the date that the Lease terminates, (viii) there are no obligations of Landlord to reduce any future rent payable under the Lease or construct any improvements to the Premises or make any monetary payments to such Tenant, and (ix) such other matters as Landlord, any prospective purchaser or any mortgagee may reasonably request, it being intended that any such statement delivered pursuant to this Section 17.1 may be relied upon by any prospective purchaser of the fee, or mortgagee or assignee of any mortgage upon the fee, of the Premises. If Tenant fails to execute, acknowledge and deliver such statement within ten (10) days after Landlord's request therefor, in addition to and not in limitation of any other rights or remedies available to Landlord under this Lease, at law or in equity, Tenant hereby appoints Landlord as attorney-in-fact for Tenant with full power and authority to execute, acknowledge and deliver any such statement in the name of, and so as to legally bind Tenant.

## ARTICLE XVIII

### Inspection of Premises

**Section 18.1.** Tenant agrees to permit Landlord and any authorized representatives of Landlord, to enter the Premises at all reasonable times on reasonable advance notice, except in the case of emergency, to inspect the Premises. Any such inspections shall be solely for Landlord's purposes and may not be relied upon by Tenant or any other person. Any such inspection shall be conducted in a manner that does not unreasonably interfere with Tenant's business operations.

**Section 18.2.** Tenant agrees to permit Landlord and any authorized representative of Landlord to enter the Premises at all reasonable times during business hours on reasonable advance notice to exhibit the Premises for the purpose of sale, mortgage or lease. During the final year of the Term hereof, or any extension thereof, Landlord may display on the Premises customary "For Sale" or "For Rent" signs. Any "For Sale" sign shall specify that it is the building that is for sale and not Tenant's business and shall be in keeping with similar "For Sale" signs erected at comparable buildings in the market.

## ARTICLE XIX

### Fixtures

**Section 19.1.** All Improvements and all plumbing, heating, lighting, electrical and air-conditioning fixtures and equipment, and other articles of personal property used in the operation of the Premises (as distinguished from operations incident to the business of Tenant), whether or not attached or affixed to the Premises (hereinafter referred to as "Building Fixtures"), shall be and remain a part of the Premises and shall constitute the property of Landlord.

**Section 19.2.** All of Tenant's trade fixtures and all personal property, fixtures, apparatus, machinery and equipment now or hereafter located upon the Premises, other than Building Fixtures, shall be and remain the personal property of Tenant, and they are herein referred to as "Tenant's Equipment."

**Section 19.3.** Tenant's Equipment may be removed from time to time by Tenant; provided, however, that if such removal injures or damages the Premises, Tenant shall repair the damage and place the Premises in the same condition as it would have been if Tenant's Equipment had not been installed.

## ARTICLE XX

### Default

**Section 20.1.** Tenant agrees that any one or more of the following events shall be considered "Events of Default" as that term is used herein:

(a) If an order, judgment or decree shall be entered by any court adjudicating Tenant a bankrupt or insolvent, or approving a petition seeking reorganization of Tenant or appointing a receiver, trustee or liquidator of Tenant, or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days; or

(b) Tenant shall file an answer admitting the material allegations of a petition filed against Tenant in any bankruptcy, reorganization or insolvency proceeding or under any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangements, composition or extension; or

(c) Tenant shall make any assignment for the benefit of creditors or shall apply for or consent to the appointment of a receiver, trustee or liquidator of Tenant, or any of the assets of Tenant; or

(d) Tenant shall file a voluntary petition in bankruptcy, or shall admit in writing its inability to pay its debts as they come due, or shall file a petition or an answer seeking reorganization or arrangement with creditors or take advantage of any insolvency law; or

(e) A decree or order appointing a receiver of the property of Tenant shall be made and such decree or order shall not have been vacated within sixty (60) days from the date of entry or granting thereof; or

(f) Tenant shall vacate or abandon the Premises and cease paying Rent during the Term hereof; or

(g) Tenant shall default in making any payment of Rent or other payment required to be made by Tenant hereunder when due as herein provided; or

(h) If Tenant does not immediately cure a default involving a hazardous condition upon written notice to Tenant; or

(i) Tenant shall be in default in the performance of or compliance with any of the agreements, terms, covenants or conditions in this Lease other than those referred to in the foregoing subparagraphs (a) through (g) of this Section 20.1 for a period ten (10) days after notice from Landlord to Tenant specifying the items in default, or in the case of a default which cannot, with due diligence, be cured within the ten (10) day period, Tenant fails to proceed within the ten (10) day period to cure the default and thereafter to prosecute the curing of such default with due diligence (it being intended for a default not susceptible of being cured with due diligence within the ten (10) day period that the time of Tenant within which to cure the default shall be extended for such period as may be necessary to cure the default with all due diligence).

If an Event of Default occurs, Landlord may at its election terminate this Lease or terminate Tenant's right to possession only, without terminating this Lease.

Upon termination of this Lease or of Tenant's right to possession, Tenant shall immediately surrender possession and vacate the Premises, and deliver possession thereof to Landlord, and Landlord or Landlord's agents may immediately or any time thereafter without notice, reenter the Premises and remove all persons and all or any property therefrom, either by any suitable action or proceeding at law or equity or by force or otherwise, without being liable for trespass or damages therefor, and repossess and enjoy the Premises, together with the right to receive all income of, and from, the Premises. Landlord shall take reasonable measures to the extent required by law, to relet the Premises for the account of Tenant, for such rent and upon such terms as shall be reasonably satisfactory to Landlord. For such reletting, Landlord is authorized to decorate, repair, remodel or alter the Premises and to relet the Premises at such rental rate (which may be higher than the rental rate then applicable under this Lease), as Landlord reasonably determines to be necessary to maximize the effective rent on reletting. If Landlord fails to relet the Premises, Tenant shall pay to Landlord as damages the Present Value of the Rent reserved in this Lease for the balance of the Term as due thereunder. The rate of interest used to calculate the Present Value of the Rent shall be the six month Certificate of Deposit rate announced by The First National Bank of Chicago (or any successor). If the Premises are relet and a sufficient sum shall not be realized from such reletting after paying all of the costs and expenses of all decoration, repairs, remodeling, alterations, installations and additions and the expenses of such reletting (including all allowances, abatements and other tenant concessions required under then-existing market conditions), to satisfy the Rent provided for in this Lease, Tenant shall satisfy and pay the shortage upon demand therefor from time to time. Tenant shall not be entitled to any rents received by Landlord in excess of the Rent provided for in this Lease. Tenant agrees that Landlord may file suit to recover any sums falling

due under the terms of this Section 20.1 from time to time and that no suit or recovery of any portion due Landlord hereunder shall be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord.

Upon termination of this Lease, Landlord shall be entitled to recover as liquidated damages, because the parties hereto recognize that as of the date hereof actual damages are not ascertainable and are of imprecise calculation and not as a penalty, in addition to any other sums or damages for which Tenant may be liable to Landlord, a sum of money equal to the greater of: (i) the excess of the present value of the Rent provided to be paid by Tenant for the balance of the Term (disregarding any unexpired period of initial Rent abatement) over the present value of the anticipated fair market rent for the Premises (computed based upon the yield on U.S. Treasury obligations having a maturity closest to the Termination Date) that could be achieved for the period, after deduction of all anticipated expenses of reletting including all allowances, abatements and other tenant concessions likely to be required under then-existing market conditions; or (ii) the unamortized portion of any rent abatements, construction allowances or other costs incurred by Landlord for this Lease, as amortized on a straight-line basis without interest over the portion of the Initial Term during which Base Rent is payable. Should the present value of the anticipated fair market rent for the Premises, after deduction of all anticipated expenses of reletting, that could be achieved for the balance of the Term exceed the present value of the Rent provided to be paid by Tenant for the balance of the Term, Landlord shall have no obligation to pay to Tenant the excess or any part thereof or to credit such excess or any part thereof against any other sums or damages for which Tenant may be liable to Landlord.

**Section 20.2.** Tenant hereby expressly waives, so far as permitted by law, the service of any notice of intention to regarding-enter provided for in any statute, and except as herein otherwise provided. Tenant for and on behalf of itself and all persons claiming through or under Tenant, also waives all rights or redemption or regarding-entry or repossession if Tenant shall be dispossessed by a judgment or by warrant of any court or judge or if Landlord reenters or repossesses the Premises or if this Lease expires or terminates. The terms "enter," "regarding-enter," "entry" or "regarding-entry" as used in this Lease are not restricted to their technical legal meanings.

## ARTICLE XXI

### Landlord's Performance of Tenant's Covenants

**Section 21.1.** If Tenant at any time fails to pay any sum or act as required under the provisions of this Lease (following such notice and opportunity to cure as is provided in the Section giving rise to the default), Landlord, at its option, may (but shall not be required to) do perform the act or pay the sum. The amounts paid and expenses incurred by Landlord under this Section shall be Additional Rent due on the next rent date after such payment, together with interest at the Lease Interest Rate from the date of payment.

## ARTICLE XXII

### Exercise of Remedies

**Section 22.1.** No remedy contained herein or otherwise conferred upon or reserved to Landlord, shall be considered exclusive of any other remedy, but shall be cumulative and shall be in addition to every other remedy given herein, now or hereafter existing at law or in equity or by statute, and every power and remedy given by this Lease to Landlord may be exercised from time to time and as often as occasion may arise or as may be deemed expedient. No delay or omission of Landlord to exercise any right or power arising from any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.

**Section 22.2.** No waiver of any breach of any of the covenants of this Lease shall be construed, taken or held to be a waiver of any other breach, or a waiver, acquiescence in or consent to any further or succeeding breach of the same covenant. The acceptance by Landlord of any payment of Rent or other sums payable hereunder after

c:\TBC\wpwin\wpdocs\libertyv\prismlea.se8\02\24\97          17

the termination by Landlord of this Lease or of Tenant's right to possession hereunder shall not, in the absence of agreement in writing to the contrary by Landlord, be deemed to restore this Lease or Tenant's right to possession hereunder, as the case may be, but shall be construed as a payment on account and not in satisfaction of damages due from Tenant to Landlord. Receipt of Rent by Landlord, with knowledge of any breach of this Lease by Tenant or of any default by Tenant in the observance or performance of any of the conditions or covenants of this Lease, shall not be deemed to be a waiver of any provision of this Lease.

Section 22.3. If Tenant breaches or threatens to breach any of the agreements, terms, covenants or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise as though regarding-entry, summary proceedings and other remedies were not provided for in this Lease.

## ARTICLE XXIII

### Subordination to Mortgages

Section 23.1. Landlord may execute and deliver a mortgage or trust deed in the nature of a mortgage (both sometimes hereinafter referred to as "Mortgage") against the Premises or any portion thereof. This Lease and the rights of Tenant hereunder shall automatically, and without the requirement of the execution of any further documents, be and are hereby made expressly subject and subordinate at all times to the lien of any Mortgage now or hereafter encumbering any portion of the Improvements, and to all advances made or hereafter to be made upon the security thereof. Notwithstanding the foregoing, Tenant agrees to execute and deliver such instruments subordinating this Lease to the lien of any such Mortgage as may be requested in writing by Landlord from time to time. Notwithstanding anything to the contrary contained herein, any mortgagee under a Mortgage may, by notice in writing to the Tenant, subordinate its Mortgage to this Lease. In return for Tenant subordinating this Lease to the Mortgage, any mortgagee agrees to deliver to Tenant a non-disturbance agreement reasonably acceptable to Tenant.

Section 23.2. Tenant agrees to simultaneously give the holder of any Mortgage, a copy of any notice of default served upon Landlord by Tenant. This obligation of Tenant shall arise provided that prior to such notice Tenant has received the address of such mortgagee and a request for copies of notices. Any such notice shall be sent in the manner provided for notices in Section 28.1. Tenant further agrees that Landlord and Mortgagee shall have forty-five (45) days after receipt of notice thereof within which to cure such default or, if such default cannot be cured within that time, then such additional time as may be necessary, if, within such forty-five (45) days, Tenant or Mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure). Mortgagee's and Tenant's cure periods will run concurrently. Such period of time shall be extended by any period within which such Mortgagee is prevented from commencing or pursuing such foreclosure proceedings because of Landlord's bankruptcy. Until the time allowed for the Landlord or Mortgagee to cure such defaults has expired without cure, Tenant shall have no right to, and shall not, terminate this Lease on account of such default. This Lease may not be modified or amended so as to reduce the Rent or shorten the Term, or so as to adversely affect in any other respect to any material extent the rights of the Landlord, nor shall this Lease be canceled or surrendered, without the prior written consent, in each instance, of the Mortgagee. If Landlord or Mortgagee fails to promptly perform the obligations in Section 7.6, after being given the notice by Tenant, and time to cure as provided in this paragraph, Tenant shall have the right to perform the obligations. If Tenant is notifying Landlord of the necessity of repairs to the masonry, curbs, loadbearing walls and foundations, Tenant must include with its initial notice a certificate from a licensed architect or licensed engineer that the work is necessary.

## ARTICLE XXIV

### Indemnity and Waiver

**Section 24.1.** Tenant will defend, protect, indemnify and save Landlord, its partners, shareholders, officers, directors, members, managers, agents employees and their respective successors and assigns harmless (if Landlord is a trustee, the term "Landlord" for the purposes of this Article XXIV only, shall include the trustee and all beneficiaries of the trust and the respective partners, shareholders, officers, directors, members, managers, agents and employees of such trustee and beneficiaries and their respective successors and assigns (all of the foregoing indemnified parties are referred to herein collectively as "Landlord Indemnitees")) from and against all liabilities, obligations, claims, damages; penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) imposed upon, incurred by or asserted against Landlord Indemnitees because of: (a) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Premises, or any part thereof, or the adjoining properties, sidewalks, curbs, streets or ways, or resulting from an act or omission of Tenant or anyone claiming by, through or under Tenant; (b) any failure on the part of Tenant to perform or comply with any of the terms of this Lease or any other agreements affecting the Premises; (c) the use, occupation, condition, or operation of the Premises or any part thereof; and (d) performance of any labor or services or the furnishing of any materials or other property for the Premises, or any part thereof. If any action, suit or proceeding is brought against Landlord Indemnitees because of any such occurrence, Tenant will, at Tenant's sole expense, resist and defend such action, suit or proceeding, or cause the action, suit or proceeding to be resisted and defended.

**Section 24.2.** Tenant waives all claims it may have against Landlord Indemnitees for damage or injury to person or property sustained by Tenant or any persons claiming through Tenant or by any occupant of the Premises, or by any other person, resulting from any part of the Premises becoming out of repair, or resulting from any accident on or about the Premises or resulting directly or indirectly from any act or neglect of any person, including Landlord to the extent permitted by law, unless caused by Landlord's acts or omissions. This Section 24.3 shall include, but not by way of limitation, damage caused by water, snow, frost, steam, excessive heat or cold, sewage, gas, odors, or noise, or caused by bursting or leaking pipes or plumbing fixtures, and shall apply equally whether any such damage results from the act or neglect of Tenant or of any other person, including Landlord to the extent permitted by law, and whether such damage is caused or result from any thing or circumstance above mentioned or referred to, or to any other thing or circumstance whether of a like nature or of a wholly different nature. All Tenant's Equipment and other personal property belonging to Tenant or any occupant of the Premises that is in or on any part of the Premises shall be there at the risk of Tenant or of such other person only, and Landlord shall not be liable for any damage thereto or for the theft or misappropriation thereof.

## ARTICLE XXV

### Surrender

**Section 25.1.** When this Lease terminates whether by forfeiture, lapse of time or otherwise, or when Tenant's right to possession of the Premises terminates , Tenant will at once surrender and deliver up the Premises to Landlord, broom clean, in good order, condition and repair, reasonable wear and tear excepted. "Broom clean" means free from all debris, dirt, rubbish, personal property of Tenant, oil, grease, tire tracks or other substances, inside and outside of the Improvements and on the grounds comprising the Premises. Any damage caused by removal of Tenant from the Premises including any damages caused by removal of Tenant's Equipment as herein defined, shall be repaired and paid for by Tenant.

All additions, hardware, alterations and improvements, temporary or permanent, excluding Tenant's Equipment, in or upon the Premises placed there by Tenant, shall become Landlord's property and shall remain upon the Premises upon such termination of this Lease by lapse of time or otherwise, without compensation or allowance or credit to Tenant, unless Landlord requests their removal. As part of its review process under Exhibit D, Landlord shall notify Tenant of the alterations or improvements that Landlord will require the Tenant to remove under this Section. If Landlord so requests removal of the additions, hardware, alterations or improvements and Tenant does not make such removal by the termination of this Lease, or within ten (10) days after such request,

whichever, is later, Landlord may remove them and deliver them to any other place of business of Tenant or store them, and Tenant shall pay the cost of such removal, delivery and warehousing to Landlord on demand.

**Section 25.2.** When this Lease terminates by lapse of time, or otherwise, Tenant may remove Tenant's Equipment, provided, however, that Tenant shall repair any injury or damage to the Premises which may result from such removal. If Tenant does not remove Tenant's Equipment from the Premises prior to the end of the Term, however ended, Landlord may, at its option, remove Tenant's Equipment and deliver it to any other place of business of Tenant or warehouse the Tenant's Equipment, and Tenant shall pay the cost of such removal (including the repair of any injury or damage to the Premises resulting from such removal), delivery and warehousing to Landlord on demand, or Landlord may treat Tenant's Equipment as having been conveyed to Landlord with this Lease as a Bill of Sale, without further payment or credit by Landlord to Tenant.

**Section 25.3** If Tenant retains possession of the Premises, or any part thereof, after the termination of the Term, by lapse of time or otherwise, then Tenant shall pay to Landlord monthly rent, at double the rate payable for the month immediately preceding the holding over (including increases for Additional Rent which Landlord may reasonably estimate), computed on a per-month basis, for each month or part thereof (without reduction for any such partial month) that Tenant thus remains in possession, and in addition thereto, Tenant shall pay Landlord all damages, consequential as well as direct, sustained because of Tenant's retention of possession. Alternatively, at the election of Landlord expressed in a written notice to Tenant and not otherwise, if Tenant has retained possession of the Premises for more than forty-five (45) days after the termination of the Term, such retention of possession shall constitute a renewal of this Lease for one (1) year, at a rental equal to one hundred twenty percent (120%) of the Rent during the previous year, and in addition thereto, Tenant shall pay Landlord all damages, consequential as well as direct, sustained because of Tenant's retention of possession. . The provisions of this paragraph do not exclude the Landlord's rights of reentry or any other rights hereunder. Any such extension or renewal shall be subject to all other terms and conditions herein contained. Nothing in this paragraph shall be construed as creating any right for the Tenant to retain possession of the Premises after the termination of the Term.

## ARTICLE XXVI

### Covenant of Quiet Enjoyment

**Section 26.1.** Landlord covenants that Tenant, on paying Base Rent, Additional Rent and all other charges payable by Tenant hereunder, and on keeping, observing and performing all the other terms, covenants, conditions, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, all of which obligations of Tenant are independent of Landlord's obligations hereunder, shall, during the Term, peaceably and quietly have, hold and enjoy the Premises subject to the terms, covenants, conditions, provisions and agreements hereof free from hindrance by Landlord or any person claiming by, through or under Landlord.

## ARTICLE XXVII

### Short Form Lease

**Section 27.1.** This Lease shall not be recorded, but the parties agree, at the request of either of them, to execute a Short Form Lease for recording, containing the names of the parties, the legal description and the Term of this Lease.

## ARTICLE XXVIII

### Notices

Section 28.1. All notices, consents, approvals to or demands upon or by Landlord or Tenant desired or required to be given under the provisions hereof, shall be in writing. Any notices or demands from one party to the other shall be deemed to have been duly and sufficiently given if a copy thereof has been personally served, forwarded by expedited messenger or recognized overnight courier service with evidence of delivery or mailed by United States registered or certified mail, return receipt requested, in an envelope properly stamped and addressed: (a) if to Tenant, at the Premises, with a copy to Terry A. Markus, Esq., 350 West Hubbard Street, Suite 222, Chicago, Illinois 60610, or at such other address as Tenant may theretofore have furnished by written notice to Landlord; and (b) if to Landlord, Bank One Chicago, N.A., 800 Davis Street, Evanston Illinois 60201, Attention Trust Department, with a copy to Mr. Nabih Mangoubi, 3638 Pebble Beach, Northbrook, Illinois 60062 or at such other address as Landlord may furnish by written notice to Tenant. The effective date of such notice shall be the date of actual delivery, except that if delivery is refused, the effective date of notice shall be the date delivery is refused.

## ARTICLE XXIX

### Covenants Run with Land

Section 29.1. All of the covenants, agreements, conditions and undertakings in this Lease contained shall extend and inure to and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto, the same as if they were in every case specifically named, and shall be construed as covenants running with the land, and wherever in this Lease reference is made to either of the parties hereto, it shall be held to include and apply to, wherever applicable, the heirs, executors, administrators, successors and assigns of such party. Nothing herein contained shall be construed to grant or confer upon any person or persons, firm, corporation or governmental authority, other than the parties hereto, their heirs, executors, administrators, successors and assigns, any right, claim or privilege because of any covenant, agreement, condition or undertaking in this Lease contained.

Section 29.2. The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of the fee of the Premises. If title to such fee is transferred, the Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically relieved, from the date of such transfer or conveyance, of all personal liability to perform any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed; provided that any funds in the hands of such Landlord or the then grantor at the time of such transfer, in which Tenant has an interest, shall be turned over to the grantee, and any amount then due and payable to Tenant by Landlord or the then grantor under any provisions of this Lease, shall be paid to Tenant and the grantee assumes this Lease.

## ARTICLE XXX

### Environmental Matters

Section 30.1. Tenant agrees that it will not use, handle, generate, treat, store or dispose of, or permit the use, handling, generation, treatment, storage or disposal of any Hazardous Materials (as hereinafter defined) in, on, under, around or above the Premises now or at any future time and will indemnify, defend and save Landlord Indemnitees harmless from any and all actions, proceedings, claims, costs, expenses and losses of any kind, including, but not limited to, those arising from injury to any person, including death, damage to or loss of use or value of real or personal property, and costs of investigation and cleanup or other environmental remedial work, which may arise from the existence of Hazardous Materials on the Premises during the Term hereof. The term "Hazardous Materials," when used herein, shall include, but shall not be limited to, any substances, materials or wastes that are regulated by any local governmental authority, the state where the Premises is located, or the United States of America because of toxic, flammable, explosive, corrosive, reactive, radioactive or other properties that

may be hazardous to human health or the environment, including, without limitation, above or underground storage tanks, flammables, explosives, radioactive materials, radon, compounds, hydrocarbons or like substances and their additives or constituents, pesticides and toxic or hazardous substances or materials of any kind, including, without limitation, substances now or hereafter defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the following statutes, as amended: the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601, et seq., "CERCLA"); the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. §9671, et seq., "SARA"); the Hazardous Materials Transportation Act (49 U.S.C. §1801, et seq., "HMTA"); the Toxic Substances Control Act (15 U.S.C. §2601, et seq., "TSCA"); the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq., "RCRA"); the Clean Air Act (42 U.S.C. §7401, et seq., "CAA"); the Clean Water Act (33 U.S.C. §1251, et seq., "CWA"); the Rivers and Harbors Act (33 U.S.C. §401, et seq., "RHA"); and any so-called "Superlien law"; and in the regulations promulgated pursuant thereto, and any other applicable federal, state or local law, common law, code, rule, regulation, order, policy or ordinance, presently in effect or hereafter enacted, promulgated or implemented, or any other applicable governmental regulation imposing liability or standards of conduct concerning any hazardous, toxic or dangerous substances, waste or materials, now or hereafter in effect.

Section 30.2. Tenant agrees to indemnify, defend and hold harmless Landlord Indemnitees from all fines, suits, procedures, claims, liabilities, damages (including consequential damages) and actions of every kind, and all costs associated therewith (including reasonable attorneys', experts' and consultants' fees and costs of testing) arising out of or in any way connected with any deposit, spill, discharge or other release of Hazardous Materials that occurs during the Term of this Lease, at or from the Premises, or which arises at any time from: (i) Tenant's failure to provide all information, make all submissions, and take all steps required by all applicable governmental authorities; (ii) any Hazardous Materials on, in, under or affecting all or any portion of the Premises or the groundwater as a result of events that took place during the Term of this Lease or as a result of the construction of the Improvements by Tenant; (iii) any violation by Tenant or claim of a violation by Tenant of any governmental law, statute, rule, regulation, ordinance, requirement, decree, order or judgment now or hereafter in effect relating to public health, safety, protection of the environment or any Hazardous Materials; (iv) the imposition of any lien for damages caused by, or the recovery of any costs for, the remediation or cleanup of Hazardous Materials as a result of events that took place during the Term of this Lease or as a result of the construction or alteration of the Improvements by Tenant; (v) cost of removal of all Hazardous Materials from any portion of the Premises, which Hazardous Materials were placed on the Premises during the Term of this Lease or as a result of the construction of the Improvements; (vi) costs incurred to comply, for any portion of the Premises, with all governmental regulations regarding to Hazardous Materials on, in, under or affecting the Premises, which Hazardous Materials were placed on the Premises by Tenant during the Term of this Lease or as a result of the construction of the Improvements; and (vii) any spills, discharges, leaks, escapes, releases, dumping, transportation, storage, treatment or disposal of any Hazardous Materials which occur during the Term of this Lease or as a result of the construction of the Improvements, but only to the extent that such Hazardous Materials originated from or were or are located on the Premises. Tenant's obligations and liabilities under this Section 30.2 shall survive the expiration or earlier termination, of this Lease.

Section 30.3. Landlord represents that to the best of Landlord's knowledge, Landlord is not aware of any Hazardous Materials existing in the Premises or on the Land as of the date of this Lease and further that Landlord has not received actual notice of any Hazardous Material existing in the Premises or on the Land as of the date of this Lease.

## ARTICLE XXXI

### Security Deposit

Section 31.1. Concurrently with the execution of this Lease, Tenant agrees to deposit with Landlord, a Letter of Credit ("LC") in form and substance reasonably acceptable to Landlord and containing draw provisions as

specified in Exhibit E. The LC shall have an expiry date of the first anniversary date of the Commencement Date and shall be for Sixty-Four Thousand One Hundred and 00/100 DOLLARS ($64,100.00). At least sixty (60) days before the expiry date of the LC, Tenant shall replace the LC with a new LC with an expiry date of the first day of the eighteenth month following the Commencement Date. At least three (3) and not more than seven (7) days before the expiry date of the second LC, Tenant shall deposit ("Cash Deposit") with Landlord Fifteen Thousand Two Hundred Twenty-three and 75/100 DOLLARS ($15,223.75). Provided that Tenant has made the Cash Deposit, Landlord agrees to cancel the LC. If Tenant exercises its option to renew the Term as provided in Section 2.3, on the first day of the Renewal Term, Tenant shall increase the Cash Deposit to Nineteen Thousand Three Hundred Sixty-Three and 54/100 DOLLARS ($19,363.54). The LC's and the Cash Deposit shall be security for the full and faithful performance by Tenant of every term, provision, covenant and condition of this Lease. If Tenant defaults in respect to any of the terms, provisions, covenants and conditions of this Lease including, but not limited to, payment of Base Rent, Additional Rent or any other sums required to be paid by Tenant hereunder, Landlord may use, apply or retain the whole or any part of the security so deposited for the payment of such rent in default, for any sum which Landlord may expend or be required to expend because of Tenant's default including, without limitation, any damages or deficiency in the reletting of the Premises, whether such damages or deficiency shall have accrued before or after reentry by Landlord. If any of the security deposit shall be so used, applied, drawn or retained by Landlord at any time or from time to time, Tenant shall promptly, in each such instance, on written demand therefor by Landlord, pay to Landlord such additional sums as may be necessary to restore the security deposit to its original amount or replace the LC if it was drawn upon. If Tenant shall fully and faithfully comply with all the terms, provisions, covenants and conditions of this Lease, the security deposit, or the balance thereof, shall be returned to Tenant after the following: (a) the time fixed as the expiration of the Term of this Lease; (b) the removal of Tenant from the Premises; (c) the surrender of the Premises by Tenant to Landlord in accordance with this Lease; and (d) final determination of all amounts payable by Tenant hereunder and payment of same. Except as otherwise required by law, Tenant shall not be entitled to any interest on the security deposit. In the absence of evidence satisfactory to Landlord of an assignment of the right to receive the security deposit or the remaining balance thereof, Landlord may return the security deposit to the original Tenant, regardless of one or more assignments of this Lease.

## ARTICLE XXXII

### Net Worth

**Section 32.1.** Tenant shall at all times during the Term maintain a net worth according to its latest audited financial statements of at least One Million Dollars.

## ARTICLE XXXIII

### Miscellaneous

**Section 33.1.** The captions of this Lease are for convenience only and are not to be construed as part of this Lease and shall not be construed as defining or limiting in any way the scope or intent of the provisions hereof.

**Section 33.2.** If any covenant, agreement or condition of this Lease or the application thereof to any person, firm or corporation or to any circumstances, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such covenant, agreement or condition to persons, firms or corporations or to circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each covenant, agreement or condition of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**Section 33.3.** This Lease shall be construed and enforced under the laws of the state of Illinois.

**Section 33.4.** None of the covenants, terms or conditions of this Lease, to be kept and performed by either party, shall in any manner be altered, waived, modified, changed or abandoned, except by a written instrument, duly signed, acknowledged and delivered by the other party.

**Section 33.5.** Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership, or of joint venture by the parties hereto, it being understood and agreed that no provision contained in this Lease nor any acts of the parties hereto shall be deemed to create any relationship other than the relationship of Landlord and Tenant.

**Section 33.6.** Tenant warrants that it has no dealings with any real estate broker or agent for this Lease other than Golub & Company, and Tenant covenants to pay, hold harmless and indemnify Landlord from and against any and all cost, expense or liability for any compensation, commissions and charges claimed by any other broker or other agent for this Lease or the negotiation thereof arising out of any acts of Tenant. Landlord agrees to pay Golub & Company a leasing commission equal Nineteen Thousand Two Hundred and 00/100 DOLLARS on the Commencement Date.

**Section 33.7.** No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Base Rent herein stipulated and Additional Rent due hereunder shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other right or remedy provided in this Lease, at law or in equity.

**Section 33.8.** The term "Lease Interest Rate," when used herein, shall be defined as being an annual interest rate equal to three (3%) percent per annum over and above the corporate base rate of interest published from time to time by The First National Bank of Chicago (or any successor), as such rate may change from time to time.

**Section 33.9.** The preparation of this Lease has been a joint effort of the parties hereto and the resulting documents shall not, solely as a matter of judicial construction, be construed more severely against one of the parties than the other.

**Section 33.10.** Time is of the essence of this Lease, and all provisions herein relating thereto shall be strictly construed.

**Section 33.11.** Submission of the Lease for examination shall not bind Landlord in any manner, and no Lease or obligations of the Landlord shall arise until this instrument is signed by both Landlord and Tenant and delivery is made to each.

**Section 33.12.** Tenant shall pay upon demand all of Landlord's reasonable costs, charges and expenses including the reasonable fees and out-of-pocket expenses of counsel, agents and others retained by Landlord awarded by the court and incurred in successfully enforcing Tenant's obligations hereunder. Landlord shall pay upon demand all of Tenant's reasonable costs, charges and expenses including the reasonable fees and out-of-pocket expenses of counsel, agents and others retained by Tenant awarded by the court and incurred in successfully enforcing Landlord's obligations hereunder.

**Section 33.13.** Notwithstanding anything to the contrary herein contained, there shall be absolutely no personal liability asserted or enforceable against Landlord or on any person, firms or entities who constitute Landlord for any of the terms, covenants, conditions and provisions of this Lease, and Tenant shall, subject to the rights of any mortgagee, look solely to the interest of Landlord, its successors and assigns in the Premises for the satisfaction of every remedy of Tenant if Landlord defaults hereunder, such exculpation of personal liability is absolute and without any exception whatsoever. If the entity constituting Landlord is a partnership or a limited

liability company, Tenant agrees that the deficit capital account of any such partner or member, as the case may be, shall not be deemed an asset or property of the partnership or limited liability company, respectively.

**Section 33.14.** This Agreement is executed by **Bank One Chicago N.A.**, not personally, but as Trustee under Trust Agreement dated November 21, 1989 and known as Trust No. R-3679 in the exercise of the power and authority conferred upon and vested in it as such Trustee. All the terms, provisions, stipulations, covenants and conditions to be performed by **Bank One Chicago N.A.**, are undertaken by it solely as Trustee, as aforesaid, and not individually, and all statements herein made are made on information and belief and are to be construed accordingly, and no personal liability shall be asserted or be enforceable against **Bank One Chicago N.A.**, because of any of the terms, provisions, stipulations, covenants and/or statements contained in this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Lease on the day and year first above written.

**LANDLORD:**

**Bank One Chicago N.A.**, not personally, but as Trustee under Trust Agreement dated November 21, 1989 and known as Trust No. R-3679

By: _____
Its: _____
Attest: _____
Its: _____

**TENANT:**

**Prism Mortgage Company**
an Illinois corporation

By: _____
Its: _____
Attest: _____
Its: _____

## EXHIBIT "A"

### PLAN SHOWING PREMISES

c:\TBC\wpwin\wpdocs\libertyv\prismlea.se8\02\24\97



EXHIBIT A

EXHIBIT "B"

BASE RENT SCHEDULE

| INITIAL TERM | ANNUAL | MONTHLY | ABATEMENT |
|---|---|---|---|
| YEAR ONE | $83,330.00 | $6,944.17 | Base Rent for months one through nine abated; Base Rent for month ten shall be $5,341.70 |
| YEAR TWO | $86,535.00 | $7,211.25 | No abatement |
| YEAR THREE | $89,740.00 | $7,478.33 | No abatement |
| YEAR FOUR | $92,945.00 | $7,745.42 | No abatement |
| YEAR FIVE | $96,150.00 | $8,012.50 | No abatement |
| YEAR SIX | $99,355.00 | $8,279.58 | No abatement |
| RENEWAL TERM | | | |
| YEAR ONE | $104,162.50 | $8,680.21 | No abatement |
| YEAR TWO | $108,970.00 | $9,080.83 | No abatement |
| YEAR THREE | $113,777.50 | $9,481.46 | No abatement |
| YEAR FOUR | $118,585.00 | $9,882.08 | No abatement |
| YEAR FIVE | $123,392.50 | $10,282.71 | No abatement |
| YEAR SIX | $128,200.00 | $10,683.33 | No abatement |

c:\TBC\wpwin\wpdocs\libertyv\prism\lea.se8\02\24\97

## EXHIBIT "C"

### TENANT WORK PERFORMANCE STANDARDS

**A. Tenant Improvements**. Tenant shall, at Tenant's own cost and expense, perform all work, improvements, alterations, and additions permitted in the Premises pursuant to the Lease (collectively, the "Tenant's Work"), in accordance with plans and specifications approved in advance by Landlord and subject to the other terms and conditions of this Exhibit. Landlord will not unreasonably withhold or delay its approval.

**B. Standards of Performance**. All Tenant's Work done in or upon the Premises by Tenant shall be done according to the standards set forth in this Paragraph, except as they may be modified on plans and specifications approved by or on behalf of Landlord.

1. All design and construction shall comply with the terms of the Lease and all applicable statutes, ordinances, regulations, laws and codes, including, but not limited to, requirements of Landlord's fire insurance underwriters. By approving Tenant's plans for the Tenant's Work, Landlord shall not be liable or responsible in any manner whatsoever for the adequacy, form, content, completeness, design sufficiency or compliance of the work with all applicable legal and insurance requirements applicable to the Tenant's Work described therein.

2. Tenant shall, at its own cost and expense, obtain all required licenses, permits and approvals necessary for the performance of the Tenant's Work. The Commencement Date shall not be delayed, and the obligations of Tenant under the Lease shall not be affected, because of Tenant's failure to obtain such licenses, permits and approvals.

3. All contractors and subcontractors engaged by or on behalf of Tenant for the Premises shall be subject to Landlord's reasonable approval, and shall be licensed contractors, possessing good labor relations, capable of performing quality workmanship and working in harmony with other contractors and subcontractors on the job site. All plans and specifications shall be prepared by licensed architects and engineers.

4. Landlord shall have the right, but not the obligation, to perform, on behalf of and for the account of Tenant, subject to reimbursement by Tenant, any of Tenant's Work which Landlord determines shall be so performed, provided such work shall be that which: (i) Landlord reasonably deems necessary to be done on an emergency basis; (ii) pertains to structural components or the general utility systems for the Land or the Improvements; or (iii) pertains to the erection of temporary safety barricades or signs during construction.

5. The Tenant's Work shall be subject, at all times, to the inspection of Landlord, Landlord's architects and Landlord's contractors.

6. Tenant will take all precautionary steps to protect its facilities and the facilities of others affected by the Tenant's Work and to properly police the area. Construction equipment and materials are to be located in confined areas and delivery and loading of equipment and materials shall be done in a careful manner.

7. Landlord shall have the right to order Tenant or any of Tenant's contractors or subcontractors who willfully violate the requirements hereof to cease work and remove himself or itself and his or its equipment and employees from the Premises.

8. Tenant shall submit to Landlord not less than five (5) days prior to commencement of the Tenant's Work, the following information and items:

a. The names and addresses of the general, mechanical and electrical contractors, subcontractors and sub-subcontractors (collectively, "Tenant's Contractors") Tenant intends to employ in the construction of the Tenant's Work.

b. The scheduled commencement date of construction and the estimated date of completion of the Tenant's Work.

c. Certified copies of insurance policies or certificates of insurance as hereinafter described. Tenant shall not permit Tenant's Contractors to commence work until the required insurance has been obtained and certified copies of policies or certificates have been delivered to Landlord.

9. Tenant shall secure, pay for and maintain or cause Tenant's Contractors to secure, pay for and maintain during the continuance of the Tenant's Work within the Premises, insurance in the following minimum coverages and limits of liability:

a. Worker's Compensation, Employer's Liability Insurance with limits of not less than $500,000.00 and as required by any Employee Benefit Acts or other statutes applicable where the Tenant's Work is to be performed.

b. Commercial General Liability Insurance (including Contractors' Protective Liability) in an amount not less than $1,000,000.00 per occurrence, whether involving bodily injury liability (or death resulting therefrom) or property damage liability or a combination thereof with a minimum aggregate limit of $2,000,000.00. Such insurance shall provide for explosion and collapse, completed operations coverage and broad form blanket contractual liability coverage and shall insure Tenant's Contractors against any and all claims for bodily injury, including death resulting therefrom and damage to the property of others and arising from its operations under the contracts whether such operations are performed by Tenant's Contractors, or by anyone directly or indirectly employed by any of them.

c. Comprehensive Automobile Liability Insurance, including the ownership, maintenance and operation of any automotive equipment, owned, hired, or non-owned in an amount not less than $500,000.00 for each person in one accident, and $1,000,000.00 for injuries sustained by two or more persons in any one accident and property damage liability in an amount not less than $1,000,000.00 for each accident. Such insurance shall insure Tenant's Contractors against all claims for bodily injury, including death resulting therefrom, and damage to the property of others arising from its operations under the contracts, whether such operations are performed by Tenant's Contractors, or by anyone directly or indirectly employed by any of them.

All policies (except the worker's compensation policy) shall be endorsed to include as additional insured parties Landlord and Landlord's beneficiaries and their respective agents, employees, heirs, executors, administrators, successors, assigns, Landlord's lenders and such additional persons as Landlord may designate (collectively, the "Additional Insureds"). The endorsement shall also provide that all Additional Insureds shall be given thirty (30) days' prior written notice of any reduction, cancellation or non-renewal of coverage and shall provide that the insurance coverage afforded to the Additional Insureds thereunder shall be primary to any insurance carried independently by the Additional Insureds.

Tenant agrees to indemnify, defend and hold harmless the Additional Insureds from and against all claims, liabilities, losses, damages and expenses of whatever nature including, without limitation, the cost of any repairs to the Premises necessitated by activities of Tenant's Contractors, bodily injury to persons or damage to the property of Tenant, its employees, agents, invitees, licensees or others arising out of or in conjunction with the performance of

the Tenant's Work, it being understood and agreed that the foregoing indemnity shall be in addition to the insurance requirements set forth above and shall not be in discharge of or in substitution for same.

10. Utility costs or charges incurred for the Tenant's Work shall be the responsibility of Tenant.

11. At no cost to Tenant, Tenant shall permit access to the Premises and the Tenant's Work shall be subject to the inspection of Landlord, Landlord's architect or contractors or other representatives of Landlord, from time to time during the period in which the Tenant's Work is being constructed and installed and following completion thereof.

12. Tenant shall pay for the Tenant's Work and shall not permit the Premises to become subject to any lien on account of labor, material or services furnished to or on behalf of Tenant. The terms of Article XI of the Lease shall apply for any such lien claim that arises pursuant hereto.

### C. Drawings; Completion of Tenant's Work.

1. Tenant shall submit plans and specifications and working drawings for the Tenant's Work to Landlord for approval before construction begins. Except as otherwise provided herein, all plans, specifications and drawings shall be at Tenant's sole cost and expense. Approvals or disapprovals, on behalf of Landlord may be given by Landlord, its agent, architect or other representative as any of such persons may from time to time be designated by Landlord. Landlord shall give general reasons for any disapproval. Tenant shall not change the approved plans, specifications, and drawings without first obtaining Landlord's prior written consent. As part of its review and approval of Tenant's plans, Landlord shall identify the alterations, additions or improvements that Landlord will require Tenant to remove when this Lease terminates.

2. Tenant shall notify Landlord following Tenant's completion of the Tenant's Work.

3. Upon completion of the Tenant's Work, Tenant shall furnish Landlord with sworn statements, final waivers of liens, contractors' affidavits, and such other documentation, certificates or Tenant or contractor undertakings in such form as may be required by Landlord, Landlord's title insurance company or lender, from Tenant and all parties performing labor or supplying materials or services for the Tenant's Work showing that all of the parties have been compensated in full and waiving all liens for the Premises.

4. If the Tenant's Work, as constructed, differs from the plans, specifications and working drawings previously submitted to and approved by Landlord, Tenant shall have furnished to Landlord "as-built" drawings of the Tenant's Work.

5. Anything herein to the contrary notwithstanding, the authority herein conferred upon Landlord and any act or omission by Landlord or its agents, employees, architects or contractors ("Landlord Group") in making any approvals or inspections pursuant hereto are for the sole protection of the Landlord Group, it being expressly agreed that the Landlord Group shall not be deemed to have assumed any responsibility to Tenant or any other person or entity and shall have no liability to any of them for any such act or omission by any of them for the Tenant's Work including, without limitation, the proper construction and equipping of the Tenant's Work, the maintenance of insurance and the prevention of claims for mechanic's liens. To the extent that Landlord may have acquiesced (whether intentionally or unintentionally) in Tenant's failure to comply with and satisfy any term, covenant or condition hereunder, such acquiescence shall not constitute a waiver by Landlord of any such term, covenant or condition, and Landlord may at any time thereafter require Tenant to comply with and satisfy all terms, covenants and conditions in this Exhibit.

JAN-21-1997   14:34        GOLUB & COMPANY

Phone 312-539-0595


WE COVER CHICAGO

# PINE ROOFING CO., Inc.

5426 N. KEDZIE AVENUE
CHICAGO, ILLINOIS 60625-3922

Fax 312-539-1500

January 21, 1997

Mr. Nabih Mangoubi
515 Davis Street
Evanston, IL 60201

RE:    500 Peterson
       Libertyville, IL

SUBJECT:    Roof Inspection and Recommendations

Dear Mr. Mangoubi:

Both sewer manhole cover areas surrounding the sewer are depressed.  There is minor caulking that needs to be repaired at the south elevation stone facade joints. The roof has two York air conditioning units: minor repairs have been made on the south unit, and there are open flashings at the north York unit. The roof consists of a built-up gravel system with three internal drains.  It seems as if a satellite dish was removed from the north elevation.  The roof is in serviceable condition with the need for re-coating of all projections and perimeter flashings.

We propose to furnish the necessary material, labor, truck and supervision to perform the initial roof repairs for the sum of THREE THOUSAND FIVE HUNDRED ($3,500.00) DOLLARS.

NOTE: This type of roofing system requires yearly maintenance.  Upon completion of the initial restoration process, we recommend that you budget ONE THOUSAND ($1,000.00) DOLLARS per year in your Pro Forma to maintain the present system for the next 5 years with possible replacement at that time.

Respectfully submitted,
PINE ROOFING COMPANY, INC.

*Jay E. Pine*

Jay E. Pine

cc:  Billie Mass

EXHIBIT D-1

*THREE GENERATIONS OF ROOFING SERVICE*

Nabih Mangoubi
RE: 500 Peterson

January 21, 1997
Page 3

Acceptance _____
　　　　**Initial Repairs**
　　　Date _____

STATE OF ILLINOIS
ROOFING CONTRACTOR'S
REG. #104-000224.

Acceptance _____
　　　　**Annual Maintenance Program**
　　　Date _____

JEP/klph
P/Prop/Nabih Mangoubi

TOTAL P.03

TOTAL P.03



To:     Nabih Magoubi
        515 Davis Street
        Evanston, Illinois 60201

From:   Steven Salinas

Date:   January 21, 1997

Re:     500 Peterson Avenue
        Libertyville

Dear Nabih,

We hereby propose to furnish the materials and perform the labor
necessary for the completion of the following work:

A.    **ASPHALT PATCHING** (Approx. 330 Sq. Ft.)

      1. Remove and replace deteriorated asphalt in areas indicated
         with 3" of compacted lifts, using the specifications below:
         - Repair area to be sawcut to right angles.
         - Defective asphalt removed and hauled away.
         - Base to be repaired and reinforced with CA-6 stone
           where needed, regraded, and recompacted.
         - Surface stone base with 1 3/4" of binder bituminous
           mix and roll to a compacted depth of 1 1/2".
         - Surface final lift of asphalt with 1 3/4" of surface
           bituminous mix and roll to a compacted depth of 1 1/2",
           matching existing grades.

B.    **CRACKFILLING** (Approx. 850 Lin. Ft.)

      - Cracks and joints 1/8" to 1/2" to be filled.
      - Cracks and joints over 3/8" will be routed with wire
        grazer.
      - Cracks will be cleaned with compressed air to remove
        debris, dust, loose material, and moisture.
      - Cleaned cracks will be sealed with rubberized crackfill.
      - Sealed cracks will be squeegeed to provide a neat uniform
        band approximately 2" wide.


                         EXHIBIT D-2

C.   **SEALCOATING** (Approx. 19,339 Sq. Ft.)

- Sealcoating areas to be securely barricaded.
- Areas to be sealcoated shall be cleaned with brushes and blowers to insure that all debris is removed
- Oil spots will be thoroughly cleaned and treated
- All areas will be sealed using AMGUARD S250 coal tar emulsion sealer, which contains 3 lbs. of silica sand per gallon of S250, creating a slurry coat.
- AMGUARD S250 is designed to be diluted with water at a rate of 25 to 30 gallons per 100 gallons of S250.
- AMGUARD S250 meets or exceeds Federal Specification R-P-355e June 19, 1987, American Society for Testing and Materials Specification D3320-74T and D490 governing coke-oven tars, FAA Item P-625 and Engineering Brief No. 46.

D.   **STRIPING**

- Surface shall be cleaned from all dust and debris.
- Layout and mark parking lot.
- Pavement markings will be placed using airless spray equipment insuring uniform line width, clean edges, and proper paint coverage rates.
- Stripes to be painted with OSHA approved, acrylic copolymer latex, safety yellow traffic paint.

E.   **SEWER REPAIRS**

- Adjust or repair (2) catch basins to proper grade for positive drainage.

**COSTS OF ABOVE SERVICES:**

| | |
|---|---|
| A. ASPHALT PATCHING: | $ 1,072.50 |
| B. CRACKFILLING: | $   425.00 |
| C. SEALCOATING: | $ 1,257.04 |
| D. STRIPING: | $   250.00 |
| E. SEWER REPAIRS: | $ 1,250.00 |
| TOTAL COST | $ 4,254.54 |

All material is guaranteed to be as specified, and above to be performed in accordance with the drawings and specifications submitted for above work and completed in substantial workmanlike manner. Work may be completed in accord with dates that are available and fit into your completion schedule.

Net balance is due upon completion of work.

01/29/1991  23:89   4498254

If you have any further questions, please contact our office at
(708)449-8253.  We look forward to working with you in the near
future.

Sincerely,

Steven Salinas
Park Services, USA

Any alteration or deviation from above specifications involving
extra costs will be executed only upon written orders, and will
become an extra charge over and above the original estimate. All
agreements contingent upon strikes, accidents or delays beyond
our control. Owner to carry fire, tornado and other necessary
insurance upon work. Workmen's Compensation and Public Liability
Insurance on above work to be taken out by Park Services, USA.

Note - This proposal may be withdrawn without verbal or written notice
if not accepted within 90 days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory
and are hereby accepted. You are authorized to do the work as
specified. Payment will be made as outlined above.

ACCEPTED AND AGREED TO BY:

By: _____ _____         Park Services, USA

Title: _____             By: _____

Date: _____             Date: ____1/21/97____

TOTAL P.04

## EXHIBIT "E"

### LETTER OF CREDIT DRAW PROVISIONS

The letter of credit shall designate Landlord as the sole beneficiary and provide that it may be drawn upon by presentment, accompanied by an affidavit signed by the beneficiary of Landlord stating one of the following:

> (1)    Tenant has failed to renew this letter of credit at least sixty (60) days prior to its initial expiration date and as a result is in violation of Article XXXI of the Lease, or

> (2)    Tenant is in default of its of its obligations under the lease between Landlord and Tenant and all rights to cure have expired.

c:\TBC\wpwin\wpdocs\libertyv\prismlea.se8\02\24\97

| **ACORD** | | **CERTIFICATE OF LIABILITY INSURANCE** | | | | | Date |
|---|---|---|---|---|---|---|---|

| Producer | Rosenthal Bros., Inc.<br>740 Waukegan Road<br>P.O. Box 700<br>Deerfield, IL 60015<br>Phone:847-940-4300 Fax:847-940-4315 | This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below. |
|---|---|---|

**Insurers Affording Coverage**

| | | Company A | St. Paul Travelers Insurance Company |
|---|---|---|---|
| Insured | Lakeview Terrace Condo Association<br>2000 N. Racine, Suite 4400 | Company B | |
| | Chicago, IL 60614<br>Contact: c/o Kass Management | Company C | |
| | | Company D | |

**Coverages**

This is to certify that the policies of insurance listed below have been issued to the insured named above for the policy period indicated, notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. Limits shown may have been reduced by paid claims.

| Insr Ltr | Type Of Insurance | Policy Number | Policy Effective Date(MMDDYY) | Policy Expiration Date(MMDDYY) | Limits | |
|---|---|---|---|---|---|---|
| A | **General Liability**<br>X Commercial General Claims Made<br>X Occurrence<br>X Aggregate Policy<br>Aggregate Project<br>Aggregate Loc | 6808080C338 | 12/24/2006 | 12/24/2007 | Each Occurrence<br>Fire Damage(Any one fire)<br>Medical Expense<br>Personal & Adv. Injury<br>General Aggregate<br>Products - Comp/Op Agg | 1,000,000<br>300,000<br>5,000<br>2,000,000<br>1,000,000<br>2,000,000 |
| | **Automobile Liability**<br>Any Auto<br>All Owned Autos<br>Scheduled Autos<br>Hired Autos<br>Non-Owned Autos | | | | Combined Single Limit<br>Bodily Injury (Person)<br>Bodily Injury (Accident)<br>Property Damage<br>(Per accident) | |
| | **Garage Liability**<br>Any Auto | | | | Auto Only (Accident)<br>Other Than Auto Only:<br>Each Accident<br>Aggregate | |
| A | **Excess Liability**<br>X Occur<br>Claims Made<br>Deductible<br>Retention | CUP5303Y691 | 12/24/2006 | 12/24/2007 | Each Occurrence<br>Aggregate | 3,000,000<br>3,000,000 |
| | **Workers' Compensation** | | | | WC Statutory Limits<br>Other<br>EL Each Accident<br>EL Disease - Policy Limit<br>EL Disease - Ea Employee | |
| | **Other Coverages** | | | | | |
| A<br>A<br>A | Building<br>D&O Liability<br>Fidelity | 6808080C338<br>Pending<br>6808080C338 | 12/24/2006<br>12/24/2006<br>12/24/2006 | 12/24/2007<br>12/24/2007<br>12/24/2007 | $10,600,000 RC Plus $1,000 Ded.<br>D&O $1,000,000<br>$200,000 | |

**Description of Operation/Locations/Special/Etc.**

, IL

| Certificate Holder | Cancellation |
|---|---|
| <br><br><br>IL<br>Loan Number: | Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail 30 days written notice to the certificate holder named to the left, but failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agents or representatives.<br><br>AUTHORIZED REPRESENTATIVE<br>*Bennett J. Rosenthal, CPCU* |

| Acord 25-S (7/97) | Acord Corporation 1988 |
|---|---|