UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .       Chapter 11
                              .
New Century TRS Holdings,     .
Inc., et al.,                 .
                              .
        Debtor(s).            .    Bankruptcy #07-10416 (KJC)
...........................................................
```

Wilmington, DE
August 7, 2007
1:30 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor(s):            Suzzanne S. Uhland, Esq.
                              O'Melveny & Myers, LLP
                              275 Battery Street
                              San Francisco, CA 94111

                              Gary Tell, Esq.
                              O'Melveny & Myers, LLP
                              1625 Eye St., N.W.
                              Washington, DC 20006

                              Robert J. Stearn, Jr., Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

                              Michael J. Merchant, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

                              Russell Silberglied, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

```
For The Official Committee:     Mark Indelicato, Esq.
of Unsecured Creditors          Hahn & Hessen, LLP
                                488 Madison Ave.
                                New York, NY 10022

                                John McCahey, Esq.
                                Hahn & Hessen, LLP
                                488 Madison Ave.
                                New York, NY 10022

                                Bonnie Glantz Fatell, Esq.
                                Blank Rome, LLP
                                One Logan Sq.
                                130 N. 18th St.
                                Philadelphia, PA 19103

For Bank of America:            Gabriel MacConaill, Esq.
                                Potter Anderson & Corroon, LLP
                                Hercules Plaza
                                1313 N. Market Street
                                Wilmington, DE 19899

For Kodiak Funding:             Edward Rosenthal, Esq.
                                Rosenthal Monhait & Goddess, PA
                                919 Market St.-Ste. 1401
                                Wilmington, DE 19899

For JP Morgan Chase:            John Strock, Esq.
                                Landis Rath & Cobb, LLP
                                919 Market St.-Ste. 600
                                Wilmington, DE 19801

For KPMG:                       Guy Neal, Esq.
                                Sidley Austin, LLP
                                1501 K Street, N.W.
                                Washington, DC 20005

                                Mark Hurford, Esq.
                                Campbell & Levine, LLC
                                800 N. King St.-Ste. 300
                                Wilmington, DE 19801

For Wells Fargo &:              Christopher Ward, Esq.
Goldman Sachs                   Klehr Harrison Harvey Branzburg
                                & Ellers, LLP
                                Mellon Bank Center
                                919 Market St.-Ste. 1000
                                Wilmington, DE 19801
```

| | |
|---|---|
| For the Ad Hoc Committee/:<br>& Schroeder v. N.C. | Robert Keach, Esq.<br>Bernstein Shur<br>100 Middle Street<br>Portland, ME 04104 |
| | Joseph H. Huston, Esq.<br>Stevens & Lee, PC<br>1105 N. Market St., 7th Fl.<br>Wilmington, DE 19801 |
| For Positive Software: | Carl Neff, Esq.<br>Fox Rothschild, LLP<br>Citizens Bank Center<br>919 N. Market St.-Ste. 1300<br>Wilmington, DE 19801 |
| | Mark Ralston, Esq.<br>Mark Ralston Law Firm |
| For NY State Teacher:<br>Retirement System | Ira Levee, Esq.<br>Lowenstein Sandler, PC<br>65 Livingston Ave.<br>Roseland, NJ 17068 |
| For The Examiner: | Mark Minuti, Esq.<br>Saul Ewing, LLP<br>222 Delaware Ave.-Ste. 1200<br>Wilmington, DE 19801 |
| | Edward Fox, Esq.<br>K&L Gates<br>599 Lexington Ave.<br>New York, NY 10022 |
| For The U.S. Trustee: | William Harrington, Esq.<br>Office of the United States<br>Trustee<br>844 King St.-Ste. 2207<br>Lockbox 35<br>Wilmington, DE 19801 |

(Via Telephone)

| | |
|---|---|
| For The Examiner: | Stephen Topetzes, Esq.<br>K&L Gates<br>1601 K Street, N.W.<br>Washington, DC 10006 |

For UBS:                          Kimberly Newmarch, Esq.
                                 Paul Hastings Janofsky
                                 & Walker, LLP
                                 191 N. Wacker Drive
                                 Chicago, IL 60606

For Harold A. Black, et al.:     Paul Blankenstein, Esq.
                                 Gibson Dunn & Crutcher, LLP
                                 1050 Connecticut Ave., N.W.
                                 Washington, DC 20036

For Credit Suisse:               Douglas Deutsch, Esq.
                                 Chadbourne & Parke
                                 30 Rockefeller Plaza
                                 New York, NY 10112

For DB Structured Products:      Richard Agins, Esq.
                                 Bingham McCutchen, LLP
                                 150 Federal Street
                                 Boston, MA 02110

For Bank of America:             Nicholas Cremona, Esq.
                                 Kaye Scholer, LLP
                                 425 Park Ave.
                                 New York, NY 10022

For Union Bank of:               David M. Poitras, Esq.
California                       Jeffer Mangels Butler
                                 & Marmaro, LLP
                                 1900 Avenue of the Stars
                                 7th Floor
                                 Los Angeles, CA 90067

Audio Operator:                  Jason Smith

Transcribing Firm:               Writer's Cramp, Inc.
                                 6 Norton Rd.
                                 Monmouth Jct., NJ 08852
                                 732-329-0191


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE CLERK:  All rise.  Please be seated.

2          THE COURT:  Good afternoon.

3          ALL:  Good afternoon, Your Honor.

4          MR. MERCHANT:  Good afternoon, Your Honor, Mike

5    Merchant of Richards Layton & Finger on behalf of the Debtors.

6    Your Honor, if it's acceptable to the Court, we'd like to take

7    the agenda a little bit out of order today.  We'd like to take

8    agenda item #16 first, which is the pre-trial conference in the

9    Schroeder vs. The Debtors matter, just so we can free up some

10   counsel that are in the Courtroom solely for that status

11   conference.

12         THE COURT:  Okay.

13         MR. MERCHANT:  If that's acceptable, Your Honor, I'll

14   turn it over to Plaintiffs' counsel.

15         THE COURT:  Very well.

16         MR. KEACH:  Thank you, Your Honor, Robert Keach for

17   the Schroeder Plaintiffs.  I'm pleased to note, Your Honor,

18   that counsel have had an opportunity to discuss scheduling

19   matters.  We had one full telephone conference last week, and

20   we've since had a number of exchanges, both over the phone and

21   by email.  And we have substantially arrived at an agreed Form

22   of Scheduling Order.  If I may approach, I'll hand one up.

23         THE COURT:  You may.  Thank you.

24         MR. KEACH:  If Your Honor wishes, I'll go through it

25   briefly, and then we have one continuing point of disagreement,

1 and I can highlight that.  And I'll allow the Debtor or the

2 Committee to speak with respect to that point.

3      Very quickly, Your Honor, the first point was to extend

4 the time for the Plaintiffs to respond to the what are now

5 Motions to Dismiss.  The Committee, either having filed or was

6 about to file a joinder in the Motion to Dismiss filed by the

7 Debtors.  We would -- the Plaintiffs would respond August 20th.

8 Any reply briefs would be on September 6th, and the

9 contemplation, with the Court's indulgence, is that any oral

10 argument would be held in connection with the omnibus date on

11 September 11th.  Obviously if the Court should decide that

12 without oral argument, that wouldn't be necessary.  We then

13 provided for responsive pleadings to essentially be prepared by

14 the Court's decision on the Motion to Dismiss, with responsive

15 pleadings being 14 days after the entry of an order on the

16 Motions to Dismiss, assuming, of course, that that motion is

17 not fully dispositive of the adversary proceeding.

18      With respect to the issue of the pending Motion to Certify

19 the class and to appoint class counsel, again, in paragraph v,

20 the order keys responses to that off the entry of an order on

21 the Motions to Dismiss and provides for a somewhat lengthier

22 briefing schedule with respect to that than is typically

23 allowed under the local rule.  The reason for that is that the

24 Committee and the Debtors wish to preserve the possibility that

25 -- to the extent that the possibility or the need for it is not

1  mooted by your Court's order, but they wanted to preserve the

2  possibility of taking limited depositions of the prospective

3  class representatives on the issue as to whether or not they're

4  appropriate representatives.  And we've provided time to do

5  that should that remain necessary following the Court's ruling.

6      Other motions would simply go in accordance with the local

7  rules.  With respect to the discovery planning conference,

8  again, that's triggered by a time period after the responsive

9  pleadings are filed, as are initial disclosures.

10     The parties have agreed, Your Honor, on a discovery period

11  for fact discovery, which is thankfully, from our standpoint,

12  relatively brief and condensed; it's 120 days from the first

13  answer date.  We then have a short period of expert discovery

14  90 days after that, and then a period of time for dispositive

15  motions.  And then paragraphs 11, 12 and 13, Your Honor,

16  largely track the Court's form of order with respect to issues

17  on settlement deadlines and the service and the Scheduling

18  Order.

19     With respect to the one issue that remains, the issue

20  arises out of our proposed paragraph 10, and this paragraph has

21  gone back and forth a few times.  What we have finally proposed

22  and as to which there's some disagreement is that following the

23  discovery closure date, we would simply notify the Court of

24  that fact and ask for a trial setting and the establishment of

25  a final pre-trial conference, with the final pre-trail to be

1  conducted in accordance with 7016-2 of the local rules.  From

2  our standpoint, we would like to get to trial as quickly as

3  possible after the closing of discovery.  As I've said in this

4  Court before, we have a number of people who need this money

5  and for whom this is a matter of some urgency, and we would

6  like this to be on as quick a track as possible.

7      We are also frankly concerned -- and to their credit I

8  think Debtor's counsel appreciates the concern.  But we are

9  very concerned about the fact that this Debtor is liquidating,

10  that we need to preserve documents, including electronic

11  documents, and that witnesses on very critical issues involving

12  the Debtors' human resources practices, this plan, are moving

13  and are relocating and will be difficult to find.  So there is

14  every reason to me to move this expeditiously.  Thus, our

15  proposal.

16      To briefly summarize the Debtors' and the Committee's

17  position, and then I'll let them speak for themselves.  Their

18  approach is to be somewhat more open-ended than that and to

19  simply provide for a status conference to be scheduled

20  following the closure of discovery, at which point at the

21  status conference we'd then provide for the rest of the

22  proceeding.  Our view is that anybody can ask for a status

23  conference at any time if they think it's appropriate but that

24  the parties here, the Plaintiffs in particular, need to see a

25  clear path to trial once discovery is complete.

1    That I think is the only remaining issue, but I'll yield

2    the podium to Committee counsel and Debtors' counsel.

3            MR. STEARN:  May it please the Court, good afternoon,

4    Your Honor, Bob Stearn from Richards Layton & Finger on behalf

5    of the Debtors.  I'd like to take just a moment to introduce

6    our co-counsel in this particular proceeding.  It's Gary Tell

7    of O'Melveny & Myers from their D.C. office.  Your Honor, has

8    already granted our Motion to Admit Mr. Tell Pro Hac Vice; he's

9    involved in this case because he essentially has expertise in

10   ERISA litigation.

11   I think I can focus the discussion, Your Honor, on this

12   disagreement with respect to paragraph 10.  We were, after

13   discussions with Mr. Keach -- and they were friendly and

14   productive discussions -- able to resolve any disagreements

15   with respect to any of the other provisions.  And I think it

16   would be helpful, Your Honor, if I started out by handing up

17   the Debtors' and the Committee's proposed form of orders so we

18   can talk about the differences in paragraph 10.  May I

19   approach, Your Honor?

20           THE COURT:  You may.

21   (The Court receives document)

22           MR. STEARN:  Your Honor, our paragraph 10 provides as

23   follows, and I'll just read it quickly, "The Court shall

24   conduct a status conference on {blank date}" -- to be inserted

25   by Your Honor -- "or on such other date to be determined by the

1  Court, which status conference shall be for the purpose of A)

2  setting deadlines for additional filings, including without

3  limitation pre-trial disclosures, Motions in Limine and the

4  pre-trial order, B) setting dates for the pre-trial conference

5  and trial and/or C) addressing such other issues as the Court

6  or the parties deem necessary and appropriate."  Now, we

7  proposed that language because frankly, from our perspective,

8  in non-preference cases such as this one, it's fairly typical

9  language -- in fact, approximately 2 or 3 weeks ago I was

10 before Your Honor in another class action in the New Century

11 bankruptcy.  This was the one involving the WARN Act.  And

12 we've presented an agreed upon Scheduling Order to Your Honor

13 that was also agreed upon with the Plaintiffs that had a

14 provision that's almost word for word with this provision.  And

15 just to refresh the Court's recollection, I'd like to hand up a

16 copy of that order if it's okay.

17          THE COURT:  Okay.

18     (The Court receives document)

19          MR. STEARN:  And if Your Honor turns to paragraph 8 of

20 the Scheduling Order that Your Honor entered in the Austin

21 litigation, the WARN Act case, you'll see that paragraph 8 is

22 almost word for word identical to paragraph 10 that the Debtors

23 and the Committee are proposing in this case.  As I mentioned,

24 at least in our experience, it's fairly typical, especially in

25 non-preference actions, to have provisions like this in the

1   Scheduling Order, especially at the outset of the case.

2        Now, our proposed Scheduling Order, Your Honor -- if we

3   take a moment to examine what it is that the Plaintiffs are

4   looking for, which is the opportunity to request a prompt trial

5   date, our proposed scheduling order gives them exactly that,

6   which is that at the status conference the Court shall

7   entertain requests for, among other things, setting dates for

8   the pre-trial conference and the trial.  So we're not, frankly,

9   quite sure why the Plaintiff is opposed to proceeding in this

10  fashion.

11       It also, presumably, Your Honor, gives the Court precisely

12  what it wants; an opportunity to learn about the status of the

13  case at that time, whether dispositive motions have been or

14  will be filed, and how to factor that information into the

15  question of whether trial should be scheduled and when.  In our

16  view, again, it just makes sense to proceed in this fashion,

17  and it's typical.

18       And there are several reasons why we objected to the

19  Plaintiffs proposed Form of Order, and I'd like to take a

20  moment just to summarize them, Your Honor.  Under Plaintiffs'

21  proposed paragraph 10, it essentially gives them the -- on it's

22  face, the unilateral opportunity to request a trial date

23  without a Court hearing or a conference to discuss the

24  propriety of the request, defense counsel's availability, or

25  even Plaintiff's counsel's availability on particular dates,

1  the length of the trial, the impact of dispositive motion

2  practice on the proposed trial dates, or matters one typically

3  would discuss when scheduling a trial date.  At least in my

4  experience, a provision of that nature in a Scheduling Order is

5  unprecedented; at least I don't recall being a party to a case

6  where a Scheduling Order had that provision.  And with due

7  respect to my adversaries, in our view it really makes no

8  sense, Your Honor.  It's much more sensible to conduct the

9  status conference and the raise the issues that I've just

10  outlined with respect to trial.

11      And frankly, from the perspective the Plaintiffs, I can

12  understand their desire to get to trial, but this does not

13  impose any delay whatsoever on their opportunity to request a

14  trial date.  Plaintiffs can conduct the status conference that

15  we propose at essentially the same time that they would have

16  submitted their request that the Court enter dates for a trial

17  in a pre-trial conference.  Under their proposed order, Your

18  Honor wouldn't even be receiving that request until sometime

19  after fact discovery was over.  And that -- I'll just outline

20  for you when I think that's likely to be, with certain

21  assumptions.

22      This case was filed on June 20, so right now it's about a

23  month and a half old.  We filed our Motion to Dismiss promptly,

24  there's a hearing on the Motion to Dismiss if Your Honor

25  decides to entertain argument on September 11, 2007.  I don't

1 think any of us know at this point whether Your Honor would

2 rule from the Bench or take some time to write an opinion, but

3 just because it helps me round out my dates, let's assume that

4 on or about September 20, or 30 days, I think that is, from the

5 time of the filing of the complaint Your Honor rules.  Then the

6 remainder of the dates kick in as agreed to by the parties.  If

7 you add up all of the time that's built in for answering the

8 complaint, fact discovery, expert discovery, and then reach the

9 {quote} {unquote} "discovery closure date," by my count that's,

10 I think, 228 days after Your Honor would rule on the Motion to

11 Dismiss, if you denied it.  And again, with my assumption that

12 Your Honor would rule on or about September 20, that takes us

13 out to early to mid-May of 2008; and again, that's what the

14 parties have agreed to so far.

15      So there wouldn't be a request for trial, even with my

16 somewhat aggressive assumption as to when Your Honor would rule

17 on the Motions to Dismiss, until at the earliest mid -- early

18 to mid-May of 2008.  And again, we can hold this status

19 conference promptly at that time, at the same time that my

20 friends would have simply submitted a written request for a

21 trial.  And then Your Honor can hear, frankly, the facts that

22 Your Honor wants to hear with respect to when should the trial

23 be conducted, what types of motions may be filed that would

24 impact the trail, how long should the trial be, and Your Honor

25 will get an opportunity to hear from both sides as to what they

1  think about that, and what is the Court's and the parties'

2  schedules.  And because what we're proposing allows Your Honor

3  to hold that status conference at the same time that the

4  Plaintiff would have submitted its written request for a trial

5  date, there really can't be any prejudice to the Plaintiff

6  whatsoever from proceeding in this fashion.

7      So we would respectfully request that -- or excuse me,

8  respectfully submit that our proposed Form of Order, including

9  paragraph 10, makes the most sense and would respectfully

10  request that the Court enter it.  And unless Your Honor has any

11  further questions of me, I'd like to turn the podium over to

12  Committee counsel, who I believe supports this Form of Order as

13  well.

14      THE COURT:  All right.

15      MR. STEARN:  Thank you, Your Honor.

16      MR. INDELICATO:  Your Honor, Mark Indelicato from Hahn

17  & Hessen.  Your Honor, since I thought this was the easy one

18  this afternoon, I'm going to be very brief.  I agree with Mr.

19  Stern, I think it makes perfect sense to come before Your

20  Honor, if for no other reason than to not try and arrange a

21  trial schedule vis-a-vis telephone calls and scheduling, the

22  Court's schedules.  I think it makes sense to be before Your

23  Honor.  We'll have that status conference, and that way

24  there'll be no confusion.  So we would support the inclusion of

25  that in the pre-trial order.

1          THE COURT:  All right, thank you.  Let me just say

2   what normally happens, in my experience, in a litigation of any

3   magnitude in which the parties are aggressively at odds, and

4   that is it doesn't matter what I call this conference, if

5   somebody wants a trial date, they're going to ask for it.  If

6   someone wants to file a Motion in Limine, they're going to file

7   it.  If somebody wants some other pre-trial relief, they're

8   going to ask for it so -- and of course I would not, in this

9   type of order this early in an adversary proceeding, tie my own

10  hands in terms of how I would administer the adversary or

11  otherwise, put it this way, limit my discretion in case

12  management, at least not at this point.  So that having been

13  said, I mean, with respect to counsel and the it sounds like

14  extensive discussions they've had, I don't think it really

15  matters.

16          MR. KEACH:  Your Honor let me propose a -- having

17  heard the Debtor out a bit, I happen to -- first of all, I'm

18  not going to presume what the Court's thinking and what it's

19  going to be thinking in 6 months about it wants to hear, but I

20  do think this is all about process.  If what I heard the Debtor

21  say, which is they're happy to have this status conference

22  occur, you know, essentially at the end of our calculated

23  period -- and we could quibble over whether there's, you know,

24  an extra 10 or 20 days in there, I really don't care.  But our

25  goal here is to do this efficiently and with some speed.  So if

1  we could -- if the status conference is going to be at the end

2  of the period that Debtors' counsel just calculated, then it

3  really just becomes a matter of whether we're asking or whether

4  we're all asking together on the phone, and that's not a point

5  worth fighting about.  We just want to get to the point of

6  asking as quickly as we can and have the next stage of this

7  process be done.

8       So if the fill in the blank date here is May 15 or May 20

9  or as close to that as we can, I think we could probably live

10  with the language because I don't disagree with Debtors'

11  counsel that that's when we'll be asking.  Our issue here is

12  doing this with some speed and some efficiency.

13       I think the other thing that might be worthwhile, again,

14  because I think everybody in the Courtroom knows how this

15  litigation is being funded, is that since we will be back

16  shortly thereafter for a final pre-trial conference, if this

17  status conference can be conducted telephonically, that would

18  make a great deal of sense.  But with those two tweaks, I think

19  we could agree on the language.

20       THE COURT:  Let's do this.  I'm content to pick a date

21  in May of next year.  I'm pretty open at this point.  To the

22  extent that -- whether I will conduct it by telephone or not

23  will depend on what's going on, I guess, at the time.  So let's

24  leave that decision --

25       MR. KEACH:  That makes sense.

1         THE COURT:  -- open.  But it is open for someone to

2  say let's do it by telephone instead of requiring in person

3  attendance.

4         MR. STEARN:  All that makes perfect sense to me, Your

5  Honor, I simply have one request, if it's okay.  Just because

6  in the middle week of May it happens to be my anniversary,

7  which is a time I usually take my wife away, if we can avoid

8  that week, I would be grateful.

9         THE COURT:  What's it worth to you?

10     (Laughter)

11        MR. KEACH:  I have a feeling --

12        THE COURT:  What price marital harmony?

13        MR. KEACH:  Why do I have a feeling that the

14  calculation that was just done was precisely done to land on

15  this date?

16        MR. STEARN:  Actually, I had forgotten until I looked

17  at my calendar.

18        THE COURT:  Suggest a week.

19        MR. STEARN:  We can do the week of the 19th, Your

20  Honor.  That's the week afterwards.

21        THE COURT:  All right.

22        MR. KEACH:  How's the middle of the week, Your Honor,

23  the 21st?

24        THE COURT:  May 21st at 10 o'clock.

25        MR. STEARN:  Thank you, Your Honor.

1          MR. KEACH:  Thank you, Your Honor.

2          THE COURT:  All right, you're welcome.  I've filled

3    that in.  Before you -- before we leave this matter -- and I

4    will sign that order with that addition.  Although it's not

5    required under our standing order, let me ask about mediation.

6          MR. KEACH:  Your Honor, we actually gave this some

7    thought, and Mr. Huston and I were talking about it this

8    morning.  Again, consistent with the remarks that I just made,

9    we're not opposed to engaging in some form of mediation, as

10   long as we can do so on a parallel basis with proceeding with

11   the litigation.  My usual concern about ADR in matters such as

12   this and other Courts that I've practiced before is that the

13   litigation comes to a halt while the parties engage in ADR, and

14   then at the end of what is sometimes not a fruitful process,

15   then the schedule starts.  Because of the needs of the

16   Plaintiffs here, and I -- by which I mean the entire Plaintiffs

17   class, I would not want a process where ADR stopped the case.

18   But so long as we can do it on a parallel track basis, we're

19   certainly amendable to some form of mediation.

20         THE COURT:  Well, it seems to me in terms of timing

21   that sometime after disposition of the Motion to Dismiss and --

22         MR. KEACH:  That's what I was going to suggest.

23         THE COURT:  -- no later than the conclusion of

24   discovery, the parties consider mediation.

25         MR. KEACH:  We're happy to talk to the other parties

1  about setting that up, Your Honor.

2        THE COURT:  Okay, let's do this.  Work on it, report

3  to me whether the parties wish to undertake it or not.  My

4  preference is that you would.  Just don't come to me at our

5  status conference next May and say, "Gee, we never really

6  decided that."

7        MR. KEACH:  Yes, we certainly are not inclined to do

8  that.  If we're going to do it, we want to do it soon, Your

9  Honor.

10        THE COURT:  okay.

11        MR. STEARN:  Thank you, Your Honor.

12        THE COURT:  Thank you.

13        MR. KEACH:  Your Honor, we'll submit a revised form of

14  order to the Court.  Or did you just --

15        THE COURT:  I filled in the date and signed it.

16        MR. KEACH:  In which case, Your Honor, if I could be

17  excused, I would appreciate it.

18        THE COURT:  You may.

19        MR. KEACH:  Thank you.

20        MR. STEARN:  And Your Honor, I was going to ask that I

21  and Mr. Tell be excused as well.

22        THE COURT:  Nobody wants to hang around?  That would

23  be fine.

24        MR. STEARN:  Thank you, Your Honor.

25        MR. MERCHANT:  Mike Merchant again for the record,

1  Your Honor.  If acceptable to the Court, we would like to

2  handle the New Century Warehouse First Day matters next before

3  returning to the beginning of the agenda.  They're matters 17

4  and 18 on the amended hearing agenda.

5           THE COURT:  Very well.

6           MR. MERCHANT:  And Ms. Uhland will be providing the

7  Court with the background on the filing.

8           THE COURT:  Okay.

9           MS. UHLAND:  Good afternoon, Your Honor.  We also have

10  Ms. Holly Etland in the Courtroom today, to the extent the

11  Court has any questions for her about this particular matter.

12  But as the Court may recall, early in the case, approximately

13  April, we had a Sale Order for the sale of the assets of New

14  Century Warehouse.  New Century Warehouse is a wholly owned

15  subsidiary of one of the Debtor entities, and New Century

16  Warehouse is not a mortgage loan originator or servicer, it

17  was, in fact, a warehouse loan operation.  And what it did was

18  it was in effect an aggregator for other smaller mortgage

19  lenders, and it had independent warehouse financing lines from

20  several banks, but three of whom, Galliant Capital and State

21  Street Global Markets and State Street Bank and Trust, were

22  continuing to provide it with warehouse financing,

23  notwithstanding many of the other defaults and issues that

24  warehouse lenders had with other New Century entities.

25           At the time, the founder of New Century Warehouse and the

1  individual from whom the Debtors had acquired New Century

2  Warehouse had made a proposal to buy -- to form a company and

3  buy back the New Century Warehouse business, but could only

4  affect that purchase if the warehouse financing was

5  uninterrupted and that company continued to operate,

6  notwithstanding New Century's Chapter 11.  For this reason, the

7  Debtors and the parent companies did not include New Century

8  Warehouse in their original filing in April 2nd, but instead

9  entered into forbearance agreements with the warehouse lenders

10 -- or New Century Warehouse entered into forbearance agreements

11 with its lenders so that they would continue to provide

12 financing, and this Court approved the sale I believe

13 approximately the third week of April.

14      Since that time, the New Century Warehouse -- I'm sorry,

15 the buyer, whose name is Access Holding Corp., has been

16 complying with the terms of the purchase agreement, which

17 provides that 60% of certain net proceeds of loans collected

18 and sold by the buyer, Access Holdings Corporation, would be

19 paid over to New Century Warehouse.  And so far the Debtors

20 have collected approximately $2 million in this process from

21 the sale of New Century -- the assets of New Century Warehouse.

22      We waited until this time to file the Debtor for a couple

23 of reasons; one, obviously, we couldn't complete the sale --

24 this was also the Debtor -- because we needed to maintain the

25 warehouse financing arrangements.  And second, they wanted to

1  ensure that the completion of the closing of the transaction

2  would take place.  But at all times, New Century Warehouse and

3  the other Debtors have been providing that the funds from the

4  sale of the assets are flowing into a bank account of New

5  Century Warehouse.  They have not been upstreamed to the

6  Debtors, they've been maintained at New Century Warehouse to be

7  used for New Century Warehouse's expenses.

8      So at this time, to facilitate the distribution of

9  proceeds of the sale to any of New Century Warehouse's

10  remaining Creditors and to facilitate the administration of the

11  global Debtors and their affiliates, the administration and

12  wind-down of all their estates, we determined it is the

13  appropriate time to complete that process by filing and

14  including this Debtor in our joint administration with the

15  other estates.

16      We expect to be -- we will need a short period of time to

17  extend -- we'll be filing a Motion to Extend the time to file

18  schedules, but not a long extension because while we believe

19  that almost all the liabilities were assumed in connection with

20  the sale transaction, we still want to be able to schedule

21  potential liabilities and make sure everything's covered.  So

22  while it should be very simple -- ultimately a very simple

23  assets and liabilities, there will be some time required for

24  the (indiscern.) and schedules.  So it should be a very -- from

25  the procedural point of view going forward, a very simple

1 administration of allocating the asset, which is just the cash

2 flow from the sale.

3    Your Honor, I think we have simply two motions that are

4 being heard today; one is the joint administration and the

5 other is our Cash Management Motion.  And then Mr. Merchant has

6 those orders to hand up to the Court.

7        THE COURT:  Does anyone else care to be heard in

8 connection with either motion?

9        ALL:  (No verbal response).

10        THE COURT:  I hear no response.  I've read them and

11 have no questions.

12        MS. UHLAND:  Right, Your Honor.  Again, briefly, we've

13 -- we're moving for joint administration, and we are moving for

14 the cash management open -- Cash Management Order.  Our

15 understanding is that the bank account is fully compliant with

16 345, but we would like to retain that bank account open.  It is

17 the account where the proceeds are being collected from the

18 sale.  If I may, Your Honor, may I hand up the orders?

19        THE COURT:  Yes.

20    (The Court receives document)

21        THE COURT:  Thank you.

22    (Pause in proceedings)

23        THE COURT:  Those orders have been signed.

24        MS. UHLAND:  Thank you, Your Honor.

25        MR. MERCHANT:  Your Honor, Mike Merchant again for the

1  record.  If we can go back to agenda item #10, which is the

2  Debtors' Motion for an Order Approving Investment Guidelines

3  pursuant to section 345 of the Bankruptcy Code.  Your Honor,

4  I'm pleased to report that the Debtors' bank accounts now are

5  in complaint with Section 345 of the Bankruptcy Code, and we've

6  entered into what I believe is an agreed order with the Office

7  of the United States Trustee, which extended our time to come

8  into compliance from the petition date through August 1st.  And

9  as of August 2nd we were in compliance, so no further order

10  will be necessary, but we wanted to have this order in place

11  just so we were covered during the period it took us to come

12  into compliance.  I have a revised Form of Order, if I may

13  approach?

14        THE COURT:  You may.  Does anyone else care to be

15  heard in connection with this matter?

16        MR. HARRINGTON:  Good afternoon, Your Honor, for the

17  record, William Harrington from the Office of the United States

18  Trustee.  I just wanted to confirm that we have agreed to this

19  order.  The only difference I did notice in the order was that

20  there was a provision that said the Debtors' and Union Bank's

21  compliance.  I'm not sure "and Union Bank" is necessary, but I

22  don't think it changes -- I mean, it's the Debtor who's

23  obligated under 345, so we have no further comments.

24        THE COURT:  Very well.  Anyone else?  I hear no

25  response.  I've signed that order.

1          MR. MERCHANT:  Thank you, Your Honor.  I'm going to

2     turn the podium back over to Ms. Uhland to handle matter #11 on

3     the agenda.

4          THE COURT:  Okay.

5          MS. UHLAND:  Thank you, Your Honor.  Your Honor, in

6     this Incentive Plan Motion or wind-down -- well, it's both a

7     Retention and an Incentive Plan Motion, the Debtors have

8     developed a plan -- there will be some modifications I'll

9     discussed in a minute, but they developed this plan in

10    consultation with the Creditors Committee to provide both an

11    incentive for the remaining more senior employees, as well as

12    the retention plan for their remaining employees.

13         The Debtors have gone from approximately 6,000 employees

14    when we started this case in April.  We're down to now

15    approximately 200 employees, which are -- each of which is

16    necessary to achieve what we need to achieve in the remaining

17    portion of this year.  The Debtors have developed a plan to

18    continue to, if you will, shrink our overhead and have target

19    roll-off dates of the employees between now and the end of the

20    year, with approximately anticipating to have 40 to 50

21    employees remaining at the end of the year.  And we will be

22    working with the Creditors Committee to come up with

23    appropriate employment arrangements for that remaining core

24    team as the case develops.

25         In essence, what the Debtors are providing for their rank

1   and file employees is two parts of the commitment; one is

2   provide these employees certainty that we will need them

3   through a certain date and assure them that we're not going to

4   lay them off ahead of the date that we've agreed to.  And we've

5   set target dates ranging from September 30th through December

6   31, target termination dates.  And what the Debtors have is a

7   formula for the retention portion where the employee will earn,

8   in effect, calculated like a vacation pay would be calculated

9   on hours worked, 30 hours for August and then 40 hours per

10  month after that.  So that someone whose target is in December

11  31 has approximately 150 hours of time.  It does -- it is a

12  plan that we're being providing to the remaining group of

13  employees, every single person, to provide sort of the

14  necessary and much needed sort of morale, support, and as I

15  said, certainty with respect to their go-forward plans.

16      With respect to this particular plan, the retention plan,

17  we did want to clarify -- and I'll be handing up a Court order

18  to clarify that -- one item that we intended that may not have

19  been clear from the terms of the order in the plan.  The

20  Debtors did want the flexibility with this plan to the extent

21  an employee voluntarily terminates and therefore there would be

22  more funds, say, freed up from our original pool, the ability

23  to alter, with the agreement of the employee, another

24  employee's stay date.  In other words, we have, for example, 30

25  IT employees.  If someone we slotted to stay through December

1  31 leaves early, we may need -- we may want to ask one of the

2  other employees to stay longer.  We wanted to clarify and we

3  have clarified in the order that while -- if funds are freed

4  up, we can't use those amounts in a discretionary way, we use

5  our same formula of hours to enhance the retention bonus for

6  whatever employee has agreed to stay longer.

7          THE COURT:  Without increasing the pool.

8          MS. UHLAND:  Without increasing the pool.

9          THE COURT:  Yes, I read it that way.

10          MS. UHLAND:  But -- or increasing the terms, I guess,

11  is the concern.  They're not increasing the terms of the bonus

12  for the employee that's staying longer.  Second, the other part

13  of this is to address the more senior members who are

14  remaining, and I say more senior because these are, in effect,

15  what would have been the sort of second level of management who

16  are our remaining eight most senior individuals.  These

17  individuals consist of seven individuals who, because they had

18  a -- were either in legal or human resources with the Vice

19  President title or had a senior Vice President title, we

20  previously included in the KEIP in the incentive plan portion.

21  None of these continuing employees were part of the Debtors'

22  Executive Management Committee, none of them was a direct

23  report to the Board or a Section 16(b) Officer.

24      But consistent with the structure of the prior plans, in

25  accordance with this Court's prior rulings, we have included --

1  what we have done with respect to those, there's eight

2  individuals, including one individual who was previously in the

3  retention plan but has been elevated to Senior Vice President

4  level, so that other individual -- so we have eight total --

5  what we have done is we have amended the KEIP and slightly

6  increased the percentage that those individuals would recover

7  from the other assets pool.  In other words, the Court may

8  recall with respect to the KEIP, we had three pools of assets,

9  the LNFA pool, which is closed, the Carrington pool, which is

10 closed except for the holdback in the transition services, and

11 then the other assets pool which for which the Debtors have not

12 yet even met the target price.  So we have greater sharing with

13 respect to the other assets pool for these eight individuals.

14     The portion that has changed since filing the plan,

15 pursuant to our discussions with the Committee, is that the

16 total amount -- the aggregate amount that's increased in the

17 other assets pool for these eight is in lieu of the I believe

18 it was approximately 180,000 described in the motion, it's now

19 127,000.  So that -- at the target that amount has been

20 reduced.

21     Procedurally, Your Honor, what I would like to do is hand

22 up the blackline, which I have shared with the Creditors

23 Committee and the Office of the United States Trustee, of the

24 order.  But then what we would like to do, as we did

25 previously, is file -- because we'd like to file the plan with

1  the final versions of the plans themselves where we've been

2  working on the language, as well as the detail exhibits that

3  the -- of the plan participants in a redacted form, what we'd

4  like to do is I'd like to take that back, prepare the final

5  orders, and submit it under Certification of Counsel.

6      I'd also like to make and I will make now an oral Motion

7  to Seal the unredacted form of the exhibit of the participants

8  and their amounts.  As you may recall, the United States

9  Trustee's Office does want an unredacted portion of that

10 exhibit made as part of the Court record.  We've worked -- we

11 discussed with the Trustee, they do not object to our making

12 this oral motion now to file that as a separate submission in a

13 sealed manner.

14     So I don't know whether the Court's ready for met to go

15 ahead and walk through the order now or you want to hear from

16 the other parties.

17          THE COURT:  Let me ask if anyone else cares to be

18 heard either in connection with the underlying motion or with

19 the oral Motion to Seal.

20          MR. INDELICATO:  Your Honor, Mark Indelicato from Hahn

21 & Hessen on behalf of the Committee, and I am going to try and

22 make this brief, Your Honor.  The Committee -- this was a tough

23 decision for the Committee.  As we have made known to the Court

24 on a number of occasions, the Committee is very concerned about

25 the costs associated with continuing operation of the Debtor in

1  this case.  We have spoken to the Debtor, and this was not the

2  first plan that we received.  It has been substantially reduced

3  based on the comments of the Committee.  We were comfortable

4  that the people that were being retained were necessary to

5  continue the operations, including claims resolution and other

6  liquidations.  We worked with the Debtor regarding the timeline

7  to make sure that we felt the timeline was appropriate so that

8  everything that can be done will be done.  As I have been

9  warned by my Committee, this is the last time they're going to

10  consider such a plan for the employees, don't come back and ask

11  us again.  So we worked very closely with the Debtor to get the

12  timeline right.  For a number of reasons, the year end is the

13  timeline, the outside timeline, and there are various timelines

14  along the way.  We also worked with the Debtor, to the extent

15  they felt was appropriate, to extend certain individuals, that

16  there would be money available if other people voluntarily left

17  before, but we weren't increasing the cap.  So based on all of

18  the concessions we received from the Debtor, we believe this is

19  appropriate to incentivize the people that exist today to get

20  the job done so that we can get to a plan confirmation and

21  close this case.  So in that regard, Your Honor, we do support

22  the motion.  But I will stress again it was no an easy decision

23  for the Committee, and we would support Ms. Uhland's oral

24  Motion to Seal the record as it relates to the individuals and

25  the amounts of their compensation.  We believe that's only

1  appropriate and fair given the nature of this case.  So based

2  on that, Your Honor, we support both motions made by the

3  Debtor.

4          THE COURT:  Thank you.  Does anyone else care to be

5  heard?  I hear no response.  Let me see the blackline.

6      (The Court receives document)

7          THE COURT:  All right, I don't have any questions

8  about the blackline.

9          MS. UHLAND:  Thank you, Your Honor, and we will be

10 submitting it under Certification of Counsel with the other

11 documents.

12         THE COURT:  Okay.  And do you want to build into this

13 order --

14         MS. UHLAND:  Oh, the seal issue?

15         THE COURT:  Yes.

16         MS. UHLAND:  I will do that.  All right, thank you,

17 Your Honor.  And may Ms. Etland be excused from the Courtroom

18 at this time?

19         THE COURT:  Certainly.

20         MS. UHLAND:  Thank you.

21         MR. MERCHANT:  Your Honor, Mike Merchant again for the

22 record.  Agenda item #12 is the outstanding ILOG objection to

23 the technology sale.  Your Honor, with respect to that

24 objection, my understanding is EquiFirst is communicating

25 directly with ILOG regarding their objection.  They believe

1  they're close to resolving it.  Closing is anticipated to be

2  August 15th.  If they're able to reach a resolution prior to

3  closing, the Sale Order provides that the agreement can be

4  assumed and assigned without further order of the Court.  In

5  the event that they're unable to reach resolution, the matter's

6  been continued to the August 21st hearing, and we'll be back

7  before Your Honor.  Agenda item #13 is the Positive Software

8  Stay Relief Motion.  My colleague Russ Silberglied will be

9  handling that matter on behalf of the Debtors, but I'll turn

10  the podium over to Movant's counsel at this time.

11       THE COURT:  All right.  Well, let me ask this.  I

12  assume that we'll now need to spend some time on the remaining

13  agenda matters.  If that's so, let me take a 10 minute break

14  before we start them up.

15       MR. MERCHANT:  Okay.

16       THE COURT:  All right, Court will stand in recess.

17       (Court in recess)

18       THE CLERK:  All rise.

19       THE COURT:  All right, let's take up Positive

20  Software.

21       MR. NEFF:  Good afternoon, Your Honor, Carl Neff from

22  Fox Rothschild on behalf of Positive Software Solutions,

23  Incorporated.  I'd like to introduce you to my co-counsel, Mark

24  Ralston.

25       MR. RALSTON:  Thank you, Your Honor, it's good to be

1 here again.

2          THE COURT:  Good to see you.

3          MR. RALSTON:  Your Honor, if I may approach, I have an

4 exhibit binder --

5          THE COURT:  You may.

6          MR. RALSTON:  -- of the exhibits.

7          THE COURT:  Thank you.

8          MR. RALSTON:  Just to try to save a little bit of

9 tree, we left out the arbitration award that we submitted under

10 seal last night, but I know that the exhibit binder of Mr.

11 Silberglied contains that award as well.

12     Your Honor, I guess there are two matters that are going

13 before the Court today, and Mr. Silberglied and I have agreed

14 to go forward based on the record of the District Court action.

15 As part of his exhibits, he has also included a pleading from

16 the California Insurance litigation, in which I understand the

17 Debtors are suing certain insurance providers regarding

18 commercial liability coverage.  I haven't had a chance to

19 confirm the accuracy of that pleading or -- but I assume it's

20 accurate and certainly for purposes of this hearing today, I'm

21 willing to stipulate to its accuracy.

22     We have two matters, Your Honor.  One is Positive Software

23 Solutions' request that the automatic stay be modified so that

24 we may go forward and liquidate our claims against certain of

25 the Debtors that is pending in a lawsuit in Federal District

1  lawsuit in Dallas, and a Cross Motion by the Debtors for

2  Sanctions for alleged violations to the automatic stay.

3  Although it's their motion, because it's interrelated to our

4  motion, I'm gonna try to address it.  It'll speed things along

5  and I think it makes sense.  I presume my opponent has no

6  problem with that.

7           MR. SILBERGLIED:  No objection, Your Honor.

8           THE COURT:  I wouldn't have let you leave the podium

9  anyway without addressing that issue.

10          MR. RALSTON:  Yes, Your Honor.  Your Honor, this is

11  what we want.  We want to go forward and be able to liquidate

12  our claims against the New Century Debtors that have been

13  pending since 2003 in the Texas litigation, and we'd like to be

14  permitted to proceed on any judgment that we obtain against any

15  insurance proceeds that -- any insurance that may be available,

16  and we understand there's a dispute about that, but certainly

17  that's not been ruled out, and to the extent we can't obtain

18  satisfaction of any judgment that we obtain, to file, you know,

19  to have a proof of claim for the liquidated amount treated as

20  any other Creditor would be of our class, which would

21  presumably be a General Unsecured Creditor.

22      We don't seek by our motion to be able to jump ahead of

23  other Creditors or otherwise gain an unfair advantage over any

24  other Party-In-Interest.  And Your Honor, we truly believe that

25  what we're asking for today is not going to disrupt the

1 Debtors' liquidation efforts.  And Your Honor, whether you

2 characterize it as a reorganization or liquidation, you know,

3 by the use of the words, it appears to us to be a liquidation

4 effort by the Debtors.

5     Finally, Your Honor, we firmly believe that the Debtors'

6 Cross Motion for Sanctions should be denied because the actions

7 that we have taken recently in the Texas District Court

8 litigation are purely defensive, purely go to the award against

9 -- that was made by the original arbitrator against Positive

10 Software for over $1.5 million.  We have requested no form of

11 monetary or other affirmative relief against any of the

12 Debtors.

13     THE COURT:  Well, am I mistaken or are you seeking to

14 vacate the arbitration award?

15     MR. RALSTON:  Yes, Your Honor, and that's --

16     THE COURT:  Okay, wouldn't you consider that, at least

17 in a general sense, relief against the Debtor?

18     MR. RALSTON:  Your Honor, I think the 3rd Circuit in

19 Maritime Electric made the distinction that we believe we are

20 well within today, which is that even where a non-Debtor party

21 is the initial Plaintiff in an underlying action and as to

22 cross claims, it may defend itself in that such defense is not

23 in violation of the automatic stay.  Now, it's not for us to

24 tell -- one, we don't believe -- by the way, Your Honor, if the

25 Court does grant the relief we request, we assume that it would

1  moot the issues that have been raised by the Debtors.

2       But be that as it may, taking that aside, we believe that

3  what we have done is essentially seeking to amend a previous

4  Motion to Vacate taken pre-petition in the context of an award

5  rendered by an arbitrator that has not been set to judgment is

6  truly within -- is truly defensive.  We're not seeking any

7  relief.  We're not seeking to go forward.  We've not requested

8  that the District Court go forward on our affirmative claims at

9  this time.  And certainly we filed the motion that is before

10  the Court today seeking relief from the stay so that we may do

11  that in anticipation that the arbitration award will, in fact,

12  be vacated.

13       THE COURT:  Well, let's analyze this a little bit.

14  And I will tell you, I find it difficult every time I jump into

15  the 3rd Circuit's law on what violates the stay or not when it

16  comes to this kind of scenario because if you look at the

17  handful of the major decisions, most of which are of some age

18  at this point, you have to undertake a multi-layered analysis.

19  And the first step, as Maritime teaches us, is to look at the

20  caption.  And here, the Debtor is on the bottom side of the

21  caption, so there can be a stay violation.  Then you look at

22  the other layers of what's happening within the lawsuit to

23  determine who's seeking what from whom.  And it seems to me, at

24  least this early, there are a couple of different ways to look

25  at this, neither of which I don't think are in your favor.  One

37

1   of them is is this attempt to vacate the award in favor of the

2   Debtors an action against the Debtors and it seems to me a

3   continuation of a pre-petition action against the Debtors, and

4   it seems to me that it is.  Another way -- that's under (a)(1),

5   362(a)(1).

6        Then you could look at it, although nobody argues this,

7   possibly as an (a)(3) matter, and that is the arbitration award

8   might be considered an asset of the estate, and your action, in

9   substance, is to divest the Debtor of this asset.  I understand

10  your underlying argument is it's wrong, or there are other

11  reasons why it shouldn't be allowed to stand that we didn't

12  argue the first time around or the Court didn't rule on the

13  first time around.  But either way, understanding that you knew

14  there was a bankruptcy pending, it seems to me that this is a

15  stay violation on at least one level.  Tell me why I'm wrong.

16        MR. RALSTON:  Well, Your Honor, I think I'll -- if I

17  may address in reverse order the (a)(3) and -- (a)(1) and

18  (a)(3) points that you raised.  On the (a)(3) level, the

19  property of the estate, the question would be you have an

20  arbitrator issue an award.  That award had not been confirmed

21  into a judgment.  Now, that was a pending motion by the Debtors

22  or the Debtor Defendants to have that award confirmed.

23        THE COURT:  So that you're saying that if the Debtor

24  has a claim that hasn't been reduced to judgment it's not an

25  asset?

1          MR. RALSTON:  Well, Your Honor, that -- yes, Your

2     Honor, essentially that.  It's just a claim.  It's not

3     property.  It is still a claim.  And in fact, unless that claim

4     in our mind had actually become final, it remains, at least

5     under the analysis I believe that the 3rd Circuit has espoused

6     and which is still good law I believe, is essentially not an

7     asset of the estate and a defensive measure to prevent it

8     becoming an asset of the estate by having that award --

9     arbitration award rendered into a judgment that then becomes

10    final is permitted.

11         Now, of course as a practical matter, I may be reading

12    into concerns that the Court doesn't have, but if a Debtor was

13    truly worried that there would be some disruption in continuing

14    litigation, even where it is essentially the Plaintiff, because

15    of an award rendered on counter claims in a pre-petition

16    lawsuit, nothing prevents that Debtor from coming before this

17    Court and asking for an injunction under 105.  The standards

18    are slightly higher and it's not automatic, but that happens --

19    well, it happens certainly with third parties who may be part

20    and parcel of the underlying litigation where the automatic

21    stay technically does not apply.  So if there's true disruption

22    it's, I believe, incumbent on the Debtors to come forward,

23    present evidence, bear the burden of proof as to the typical

24    elements of injunctive relief and are paying such injunctive

25    relief.

1          THE COURT:  What precipitated the timing of the Motion

2  to Vacate?

3          MR. RALSTON:  The -- well, let me make sure that I

4  understand.  We have a series of events.  We have --

5          THE COURT:  Motion to Amend the Motion to Vacate.

6          MR. RALSTON:  The case was back before Texas District

7  Court, and because of the reversal and remand by the 5th

8  Circuit Enbanc Court, essentially activating the Motion to

9  Confirm the award by the Debtors.  So that motion, because of

10  the 5th Circuit's reversal essentially is reactivated.  Because

11  as part of the order vacating the arbitration award, part of

12  that order was a denial of the Debtors' Motion to Reduce the

13  award to judgment.  So you have an active live pleading, you

14  have our motion, my client's Motion to Vacate based on grounds

15  that had been rejected by the 5th Circuit.  You had, subsequent

16  to that, the first Motion for Leave to Amend the Motion to

17  Vacate asserting additional grounds, which were essentially

18  that motion was denied as moot by the District Court in Texas

19  when it ruled to vacate on the first grounds alleged.

20          THE COURT:  Well, let me ask the question this way.

21  What would have happened had you done nothing?

22          MR. RALSTON:  Well, there's two issues.  One,

23  technically, Your Honor, we would risk having as our only

24  grounds or our only substantial grounds to have the award not

25  reduced to a judgment, essentially, having been -- we would

1  really have an empty Motion to Vacate, because the central

2  grounds for that motion had been rejected by the 5th Circuit,

3  rightly or wrongly.  We obviously disagree with the holding,

4  but essentially we have what could be characterized as an empty

5  defensive motion to a live pleading that had been filed by the

6  Debtors.

7       As a practical matter, I think the concern -- and I am not

8  the litigation counsel for Positive Software, but you also have

9  an issue that was raised in -- by the Debtors on the first

10 Motion for Leave to Amend the Motion to Vacate to assert fraud

11 as a basis for vacating the arbitration award.  And in the

12 Debtors response to that, they raised the issue of timeliness;

13 that the timing of the Motion to Amend -- this was the first

14 Motion to Amend that was filed pre-petition --  was untimely.

15 And I think my colleagues representing Positive Software in the

16 underlying litigation were concerned that the longer you wait,

17 the more ammunition you give the Debtor and non-Debtor

18 Defendants, because there are certain individuals who also are

19 parties to this who also have the same issues, more time to --

20 or a better argument as to the timeliness issue.

21       THE COURT:  Well, other than -- and I'm trying to get

22 my own head around this.  Other than the passage of time, what

23 in the process that was pending outside of this forum required

24 that the motion that you filed be filed?

25       MR. RALSTON:  Your Honor, in fact it was basically a -

1  - as I understand it, it was an understanding that it did not

2  violate the automatic stay, either under the laws of this

3  Circuit or under the laws of the 5th Circuit, and it was fairly

4  clear to us that it didn't, and that it was essentially a

5  prophylactic that we have a motion that requests that we be

6  permitted leave to amend a prior pre-petition pleading to

7  assert additional defensive measures.

8          THE COURT:  Well, I'm trying to follow up on your

9  position that what you did was defensive in nature.  Was there

10  a motion pending that had an answer deadline, or was there a

11  process ongoing which required your filing to protect your

12  client's position?  What -- and I don't get the sense there was

13  anything specifically pending at the time this motion was

14  filed.

15         MR. RALSTON:  Well, because the matter was -- because

16  the matter was back before the District Court, because the 5th

17  Circuit had overruled the District Court and remanded, based on

18  the 5th Circuit's decision, what was actually before the

19  District Court was the Debtors' Motion to Confirm the

20  arbitration award --

21         THE COURT:  And was it your understanding that that

22  process was going to move forward without further hearing or

23  without further submissions?

24         MR. RALSTON:  Your Honor, I don't know -- I'm not

25  aware of any -- there's nothing in the District Court docket,

1  to be perfectly candid, that indicated that there was any

2  Scheduling Order.  It certainly was out there though.

3        THE COURT:  And -- well, you've answered my question.

4        MR. RALSTON:  Thank you, Your Honor.  Your Honor, I

5  believe I'll just get to why we believe that it's appropriate

6  at this time that the litigation go forward.

7        First, the parties have already prepared for trial.

8  There's already been one trial in the matter, and the Debtors

9  are in the process of and appear to have retained their pre-

10 petition counsel in the matter.  The case is over 4 years old,

11 and with further delay grows the risk that evidence will be

12 lost and witnesses will become unavailable.

13       Third, Your Honor, we believe that the claims at issue

14 cannot disrupt the Debtors' ongoing operations because the

15 Positive Software Solutions software system, which was licensed

16 to the Debtors, was used in their loan origination platform,

17 and that platform, as we understand it, has ceased operating.

18       There was at least -- fourth, Your Honor, there is at least

19 a real prospect that the claims that Positive Software has

20 asserted, if we obtained a judgment on those claims, can be

21 satisfied in whole or in part by insurance.

22       And fifth, Your Honor, based on the District Court's

23 preliminary injunction ruling, Positive Software's claims have

24 found to have a substantial likelihood of success.  Your Honor,

25 I guess there are two issues here.  Apart from why --

1          THE COURT:  Do you think subsequent developments might

2    cast some doubt on that?

3          MR. RALSTON:  The Debtors, in their response papers,

4    obviously indicate that they believe that the arbitration award

5    supplants the District Court's preliminary injunction rulings

6    as far as the chance of success on the merits.  One, Your

7    Honor, I think that as indicated by the District Court itself,

8    that Court has grave concerns with the propriety of the

9    arbitration award, including the arbitrators' rulings that were

10   contrary to rulings made by the District Court as part of the

11   preliminary injunction process, and that is contained -- I

12   mean, the Court went so far as to include those concerns as

13   part of his Order to Vacate.  So we think that at least between

14   the two, the weight of the evidence would support the

15   evaluation of the Texas District Court over the arbitration

16   award.

17         THE COURT:  But, I mean, does that standard fit

18   anywhere in the ultimate disposition of the underlying claims?

19         MR. RALSTON:  I -- Your Honor, the -- well, the Texas

20   District Court made very specific findings as part of its

21   preliminary injunction ruling that the software being developed

22   by the Debtors pre-petition had been essentially copied from

23   Positive Software's software.  We think -- and based upon that

24   evidence issued a very strong preliminary injunction enjoining

25   the Debtors --

1          THE COURT:  But the arbitrator had a trial.

2          MR. RALSTON:  And Your Honor -- well, Your Honor, I

3    guess we have to get to the point as to whether the arbitration

4    award is gonna stand in the first place or not.  The District

5    Court, which we think is unusual and which we think shows the

6    degree of concern that the Court had for the manner in which

7    the award was procured, has indicated as part of his Motion to

8    Vacate that had he not vacated the award on the issue of non-

9    disclosure, that he was likely -- and since he never got to it,

10   he never made a firm ruling, but he stated explicitly in that

11   order vacating the award that he would be likely to have

12   granted Positive Software's Motion for Leave to Amend to assert

13   the fraud basis for vacating the award.  And two, that he was

14   likely -- he would be likely to grant the Motion to Vacate on

15   those independent grounds.

16       So Your Honor, we obviously don't believe that the award

17   should be of any weight, or if any weight, it should be

18   tempered by the fact that the District Court was concerned with

19   the propriety of that award for various reasons and had made

20   findings as part of his -- independent findings after

21   evidentiary hearing that there was a substantial likelihood of

22   success on Positive Software's claims.

23       And Your Honor, one of the issues that the Debtors have

24   raised in their response papers is what forum would be the best

25   place to decide the issue.  And we think it's clear that with

1  much respect for this Court, that given the history that the

2  Texas District Court has with this case, and given the

3  specialized nature of Positive Software's claims involving

4  intellectual property rights, and given the fact that there are

5  -- there's pending litigation with pending -- with injunction

6  rulings that are still in effect issued by that Court, that the

7  appropriate place to have this matter overseen would be the

8  Texas District Court.

9        Finally, Your Honor, adding to that, the counsel for both

10 parties are based in Texas.  And certainly Positive Software,

11 to the extent that any witnesses would need to appear on behalf

12 of Positive Software in any second trial, Dallas is probably as

13 easy or easier to get to from California as Delaware.

14       THE COURT:  Isn't the Debtor really saying, "We're not

15 arguing about where now, we're arguing about when"?

16       MR. RALSTON:  I think the Debtor argues both.  To be

17 candid, I think that when is probably the bigger issue.  I

18 think where is probably less of an issue, at least in our mind.

19 The problem that we have is that we have invited the Debtors to

20 give us a scenario as to when we could proceed.  We're ready.

21 We would like to get --

22       MR. SILBERGLIED:  Objection, Your Honor, he is trying

23 to get into more of a settlement communication.

24       MR. RALSTON:  Well, I don't think it's a settlement --

25 it's a settlement communication to the extent we can come to an

1  agreement.

2      THE COURT:  Well --

3      MR. RALSTON:  The problem with -- let me restate it,

4  Your Honor, and I'll reverse that.  The Debtors -- one problem

5  that we have, Your Honor, is that the Debtors, in their

6  response papers, offer no timeline or no specific set of

7  circumstances under which they believe it would be appropriate

8  to proceed.  We understand the Debtors are stretched, Your

9  Honor, but it's probably not gonna change.  I've been here.

10  This is the second time here, the second time I'm hearing

11  issues raised about how stretched this estate is.  Generally,

12  Your Honor, my experience is that it doesn't get any better as

13  the case goes along.  Usually, you lose people.  In fact, it's

14  the Debtors' decision on a business judgment test, but it's

15  also my experience that they're gonna lose people as the

16  process goes along; people with institutional knowledge of this

17  case.  And it will make it more difficult, if anything, for the

18  Debtors to retry this with time.  We don't see -- in fact, we

19  think that the Debtors might be better off addressing these

20  issues now.  They have counsel in place.  That counsel knows

21  the issues, knows the facts, discovery has been taken,

22  essentially without little -- with little preparatory effort.

23  And assuming that the award does get vacated as we anticipate,

24  this should not be an arduous process.  And that's why we think

25  we ought to be able to go forward now.  We don't think anyone

1   gets harmed.  We think that these claims need to be liquidated

2   at some point in time, and that it's probably easier for

3   everyone to get it done today.

4          THE COURT:  Thank you.

5          MR. RALSTON:  Thank you, Your Honor.

6          MR. SILBERGLIED:  Good afternoon, Your Honor.  For the

7   record, Russ Silberglied, Richards, Layton & Finger, on behalf

8   of the Debtors.  I also have an exhibit binder that was also

9   agreed to by the parties, if I may approach?

10         THE COURT:  You may.

11     (The Court receives document)

12         MR. SILBERGLIED:  And Your Honor, one of the documents

13  in here, item #4, is the arbitration award which was filed

14  under seal in Texas.  Positive Software wants it to continue to

15  be under seal and has filed a motion, and the Debtors don't

16  have an objection to that.

17         THE COURT:  All Right.

18         MR. SILBERGLIED:  Your Honor, I prepared some more

19  detailed remarks based upon Your Honor's questioning.  I

20  obviously can see that you've read the papers, so if Your Honor

21  will bear with me, I'll try to cut through at least some of it.

22  Does Your Honor have a preference whether we refer to sanctions

23  first or the Motion to Lift Stay first?

24         THE COURT:  No.

25         MR. SILBERGLIED:  I'll proceed with the Motion to Lift

1  Stay first then.  Let's start with probability of success on

2  the merits.  There was some discussion about this, and Your

3  Honor did ask questions; I think it's the right questions.  We

4  admit that there aren't that many cases that deny Stay Relief

5  Motions on the third prong, the so-called third prong or the

6  Rexene test, probability of success on the merits.  The prong

7  has to mean something.  If it didn't mean something, it

8  wouldn't be part of the test, it wouldn't be repeated by every

9  Court that analyzes it.  And we would respectfully submit that

10  if this case demonstrates probability of success on the merits,

11  you might as well write it right out of the test because what

12  you have here is you have an 86 page arbitration award that's

13  before Your Honor in tab #4 that was issued after a 7 day trial

14  before an arbitrator that itself was only issued after ruling

15  on -- I forget the number -- 8 Partial Summary Judgment

16  Motions, lots and lots of documents into evidence, 19 witnesses

17  that the arbitrator addressed credibility on.  And not only did

18  he categorically reject each and every claim by Positive

19  Software, but he granted $1.5-plus million against Positive

20  Software.

21      Not only that, but their lead argument on appeal, or on a

22  Motion to Vacate, was taken all the way up to the United States

23  Supreme Court and rejected.  Now, they have other arguments, if

24  they didn't we wouldn't be here today.  But if that's

25  probability of success on the merits, I don't know why we have

1  that prong in the test.  We would respectfully suggest that

2  that is reason enough to deny the motion.

3      Indeed, we did substantial research at Richards, Layton &

4  Finger.  We could not find a single case that said that a

5  Movant had met the probability of success on the merits test

6  when they were moving to vacate an arbitration award against

7  them or an analogous circumstance where they had lost at a

8  trial Court and were -- you know, had appeal rights still, no

9  cases have ever so held, at least none that we could find after

10 looking hard for it.  We think that that's telling.

11     Their only real argument, as you heard today, is that the

12 District Court had granted a Motion for a Preliminary

13 Injunction before the arbitrator ruled, and in so doing, had to

14 obviously say something about probability of success on the

15 merits.  But of course that's a preliminary ruling on a

16 preliminary and an incomplete record, and, you know, you can

17 get into niceties about whether the arbitrator's award

18 supercedes or doesn't supercede.  They've given us a technical

19 legal argument that it doesn't supercede.  I don't really think

20 that that's the point about whether it actually supercedes the

21 District Court as a matter of law.  What is important is that

22 the trier of fact, who wrote an 86 page opinion after seeing 19

23 witnesses over 7 trial days, thought that there was no

24 probability of success.  And here, probability of success would

25 be defined as both vacating that award, going back to trial,

1  and winning at trial a second time, even though unsuccessful

2  the first time; high hurdle overcome.

3      The next prong of Rexene or a second prong of Rexene is

4  whether Positive Software will be harmed if the stay is not

5  lifted.  Their lead argument is that they will be prejudiced if

6  the case proceeds here instead of Texas.  I'm not gonna belabor

7  this one because Your Honor mentioned exactly what we were

8  arguing.  A Motion of Stay Relief is a when test, not a where

9  test.

10      THE COURT:  Well, that having been said, I mean, it

11  seems to me that the Movant here is probably right about the

12  where.  And if you assume for the purpose of the question I'm

13  about to ask that that's true, then when?

14      MR. SILBERGLIED:  Fair questions, Your Honor.  The

15  first is that we're not gonna concede that first point, but if

16  Your Honor wants me to take that as a hypothetical, I will.  I

17  will note, for example, that the Creditors Committee has filed

18  an objection to this Stay Relief Motion.  I think you're gonna

19  hear from Mr. Indelicato that he's got very grave concerns too,

20  and obviously if this case is tried in Texas, much more

21  difficult for the Creditors Committee to be a participant as

22  opposed to part of the bankruptcy process.  But I will take

23  Your Honor's hypothetical and go from there.

24      The answer is I don't have a specific date that I can give

25  you, but what I do know is that at a minimum, what needs to

1  happen first is we need to have a bar date come in, we need to

2  do claims analysis, not just of Positive Software but lots of

3  claims.  We need to start plan negotiations, and we need to

4  figure out what the plan is in this case.  So again, a precise

5  date I don't know, but this is still pretty early on in a case

6  this size.  The petition date was March or April?  The petition

7  case was April 2nd, Your Honor, so we're only a couple of

8  months in.  There has been no other Motion for Relief from Stay

9  that has been granted, even though this company has hundreds of

10  other lawsuits against it.

11         THE COURT:  Although given the pace at which the case

12  has proceeded, I wonder if we should look at the time as kind

13  of in dog years.  It's really been a lot more than a few

14  months.

15         MR. SILBERGLIED:  It does seem that way to everybody

16  that's in the Courtroom, I'm sure, Your Honor, but the reality

17  is that Positive Software has only had to wait a few months,

18  and it actually hasn't had to wait for even half of that amount

19  of time because the United States Supreme Court actually denied

20  cert during the pendency of this case.  So I believe that it's

21  only been about a month that Positive Software has been {quote}

22  {unquote} "waiting."

23     We believe that what we want our management -- not we

24  believe, we know that what we want our management and our

25  employees to be doing at this point is to be focused in on the

1  reorganization efforts now.  They make a point that this is a

2  liquidation case and it's not a true -- that's a distinction

3  without a difference.  In this Circuit, of course, a plan of

4  liquidation is a reorganization, and the paramount interests of

5  Creditors here is to be proceeding towards a plan process.  We

6  need to get several of the typical bankruptcy steps down the

7  road before we can be proceeding to a plan process.

8       We do have, as Mr. Ralston alluded to, less staff today

9  than we did at a certain point.  And while I understand his

10 arguments that maybe we'd be better off at our trial against

11 Positive Software if we had other employees, the fact of the

12 matter is that because we have less staff today than we once

13 did, we need that staff to be focused like a laser beam towards

14 the plan of liquidation.  So again, I don't have a precise date

15 for Your Honor in answer to the question, but there certainly

16 needs to be a series of steps, and we're not there yet.

17            THE COURT:  What's the present exclusivity deadline?

18            MR. SILBERGLIED:  May I have a moment, Your Honor?

19            THE COURT:  You may.

20      (Counsel confer)

21            MR. SILBERGLIED:  I think Ms. Uhland believes that may

22 be 6 months from the date of filing, which I guess would mean

23 that it's in October.

24            THE COURT:  Does that anticipate that an extension

25 will be requested?  I know that's a long way away in bankruptcy

1  timing, and I'm not asking for a commitment.

2      MS. UHLAND:  Your Honor, our claims bar date is -- for

3  non-governmental entities is the August 31st date.  We are --

4  if we can get through an initial claims analysis, we are trying

5  to get a plan on file within our first exclusivity period.

6      THE COURT:  Okay.

7      MR. SILBERGLIED:  Your Honor, moving to the -- unless

8  Your Honor has questions on that fact, moving to other

9  arguments, Positive Software also argues that without stay

10  relief a limited pot of insurance will be used up.  That's what

11  they argued in their motion until we pointed out in our

12  answering brief that either this argument has it entirely

13  backward or it's simply unsupported.  So they have a different

14  position in their reply.  But first to spell out what I mean,

15  if we had insurance, the argument would be entirely backward

16  because if you lifted the stay on this case where they want $38

17  billion in damages and don't lift the stay with respect to all

18  other claims against an insurance pot, Positive Software wins

19  an unfair race to the Courthouse that an automatic stay was

20  supposed to prevent.  Obviously, we don't have $38 billion of

21  insurance under anybody's stretch of the imagination.

22      The reality of the situation, though, is we have no

23  insurance.  And Your Honor has in your binder both the

24  complaint in California, where we are suing the D&O insurer.

25  We of course believe that the D&O insurer should be insuring

1  this case, but they aren't, so we've sued them.  In fact, Your

2  Honor has a 327(e) Motion in front of you to retain the law

3  firm of -- I'm not even sure if I'm pronouncing it right --

4  Boudy & Titus to be our counsel to prosecute that cause of

5  action precisely because the insurer is refusing to pick up the

6  defense.

7         THE COURT:  And what's the posture of that case?

8         MR. SILBERGLIED:  The case is fairly old.  It was

9  filed in -- I don't have the complaint in front of me, it's #1

10  in Your Honor's binder, I think in 2005.  But it's not on track

11  for an imminent trial.

12         THE COURT:  Well, are you suggesting that relief from

13  stay, if it's ever appropriate, should not be granted until

14  after resolution of that lawsuit?

15         MR. SILBERGLIED:  No, Your Honor, and that's the

16  position that they retreat to in their reply is they say, well,

17  we haven't proved that there is no insurance, and that they

18  should be able to go forward instead.  My only point was they

19  were using insurance as a reason why they should get the stay

20  lifted, and they haven't proved that there is insurance; in

21  fact, we have now submitted evidence that there is -- that

22  there certainly currently is no insurance, and what there

23  really certainly is not is there is no prejudice to Positive

24  Software in not being able to try to tap that policy.  Because

25  even if they had a judgment against New Century today, the

1  insurer does not agree to pay it, and that is the relevance of

2  the fact that that lawsuit is pending for the purposes of this

3  Stay Relief Motion.

4       Obviously, the other relevance is that New Century will be

5  harmed because we're not getting defense costs fronted, but

6  Your Honor's question goes to that second point.  The first

7  point, though, undoubtedly is the case.  There's no prejudice

8  to Positive Software because they're not getting insurance

9  proceeds on an as current basis regardless.  There also is no

10 commercial insurance as they would allege.  We've submitted the

11 insurance policy in the binder.  There's an express exclusion

12 for intellectual property type of issues with respect to the

13 commercial policy, and as a result, that carrier has refused to

14 cover it as well.

15      The harm to New Century if the stay is lifted, we've got

16 the floodgates argument that I alluded to before, the fact that

17 there are, you know, hundreds of other suits against New

18 Century.  Your Honor hears that one every time so I'm not gonna

19 belabor it.  And we already talked about the fact that we need

20 our people to focus on the road ahead and the plan of

21 liquidation.

22      So with that, Your Honor, unless you have questions, I'd

23 move on to the Sanctions Cross Motion.

24           THE COURT:  Go ahead.

25           MR. SILBERGLIED:  I wanna talk about three things.

1 First, the statute -- what the statute and the case law

2 provide.  Second, the facts and why it's important to award

3 sanctions here, and third, briefly, what the sanctions should

4 be.

5      First for the law, the Debtor is -- if the Debtor is

6 {quote} "injured by a willful violation of the automatic stay"

7 {end quote} it {quote} "shall recover actual damages including

8 costs and attorneys fees and in appropriate circumstances may

9 recover punitive damages" {end quote}.  So we start with the

10 word "shall."  Obviously, Congress didn't intend for this to be

11 optional.  And the only limiting factors are whether it's

12 willful and whether there were any damages, but the incurrence

13 of attorneys fees are statutorily defined as being part of

14 those damages.

15      So in this case, this is not a situation where a party did

16 not know that there was an automatic stay in place.  On April

17 11, Positive Software filed a pleading in this Court that

18 contained a footnote that said it was concerned about the

19 automatic stay in connection with the United States Supreme

20 Court's consideration of a petition for Writ of Certiorari, and

21 that as a result, it would promptly, if not simultaneously,

22 file a request for relief in front of Your Honor.  That was

23 April 11.  We didn't get such a request until July.

24      The actions that they took, the Motion for Leave to file a

25 Motion to Vacate, the whole point of that motion is to ask the

1   District Court to kick-start the litigation.  The ultimate

2   relief requested in the motion is a new trial, so it is clearly

3   a continuation of pre-petition litigation.  Positive Software

4   argues that it's not a stay violation because it's trying to

5   slice and dice between what is a claim and what is a counter

6   claim, but there is one motion to vacate, not two.  That motion

7   asks for the entirety of the arbitration judgment to be thrown

8   out, claims and counter claims.  I will guarantee you that if

9   you ask Positive Software, well, is your position that if your

10  motion for -- Motion to Vacate is granted, the only motion you

11  have on file, you will not present a claim against New Century,

12  you will only get the $1.5 million counter claim against you

13  thrown out, the answer, of course, will be no.

14       In any event, all Your Honor has to do is look at the last

15  sentence of the proposed pleading, which is attached to the

16  Debtors' objection, which we would ask the Court to take

17  judicial notice of.  And in that Positive Software's request

18  for relief states as follows, {quote} "Positive Software asks

19  the Court, for the reasons previously stated and herein, to

20  vacate the award and grant Positive Software a new trial" {end

21  quote}.  It most definitely is not limiting it's request to

22  throwing out the award on the counter claims.  It wants a new

23  trial on the claims, the affirmative claims, to one and the

24  same pleading.       Moreover, Positive Software's attempt to

25  parse out what goes to the claim and what goes to the counter

1  claim was actually considered and rejected by the arbitrator in

2  a very related context.  What is the 1.5 million?  The 1.5

3  million against Positive Software in the Debtors' favor is

4  actually our attorneys fees.  We had damages of something like

5  $11,000, plus an award of 1.5 million of attorneys fees.  So

6  the arbitrator was called upon by Positive Software to parse

7  out the $1.5 million of fees that our counsel, Sussman Godfrey,

8  had expended;  maybe some of the 1.5 million went to claims,

9  maybe some went to counter claims.  And the arbitrator declined

10  to do so stating {quote} -- and this is page 85 of the award,

11  which is at tab 4 of your binder.  He states, {quote} "All

12  parties and all issues were intertwined and the facts

13  respecting the same overlapping" {end quote}.  On that basis,

14  he awarded all of Sussman Godfrey's fees.  That's the same

15  thing here.  You could attempt to artificially say, well, some

16  things are claims and some things are counter claims, but it's

17  all the same issue.  In the words of the arbitrator, they're

18  all intertwined.  It was the flip of the same coin.

19      The attempts to parse also don't work if you look at this

20  in another way.  Let's take the newest theory that Positive

21  Software advances for vacature, that the arbitrator committed

22  fraud by not disclosing alleged conflicts.  Was he committing

23  fraud only with respect to ruling on the claims?  Was he

24  committing fraud only with respect to ruling on the counter

25  claims, some of both?  Obviously, Positive Software would

1  contend both.  Certainly the Motion to Vacate does not ask the

2  Texas Court, "Please rule that the arbitrator defrauded us in

3  ruling without telling us about its contacts on the counter

4  claims, but it was perfectly fine for him to rule on the

5  claims."  Obviously, that's not what it says.  So it's

6  nonsensical to talk about trying to parse this out with respect

7  to the claims and the counter claims when the theories to

8  vacate themselves go to both.

9        There was a lot of discussion in Mr. Ralston's opening

10 about the defensive nature of his motion, and one of the things

11 he -- I think Your Honor was absolutely correct.  There was

12 nothing that required them to take this bull by its horns and

13 file pleadings now.  He cites to the fact that we had a motion

14 on file.  We filed that motion, Your Honor, in the year 2004.

15 It was 3 years pre-petition.  There was no clock that had

16 something that was imminent.  And to the extent there really

17 was confusion, Your Honor -- I think this is a key point --

18 there was no telephone call to us saying, well, we're confused

19 as to whether the automatic stay applies or doesn't apply.  Do

20 we really need to file a pleading now.  There wasn't even a

21 notice of stay that was filed by Positive Software saying, hey,

22 you know, there's some argument that maybe we should be filing

23 our papers, but we're not gonna do it because of the stay.  All

24 they did was they --

25          THE COURT:  I'm sorry to interrupt.  I'm hearing noise

1  from one of the telephone participants.  Let me ask that

2  everyone be certain that their phone is on mute.  I'm sorry for

3  the interruption.  Go ahead.

4        MR. SILBERGLIED:  Thank you, Your Honor.  If they

5  really had those kinds of concerns, there were many, many ways

6  to address them without filing a pleading that we were forced

7  to respond to, and you have that response in your binder.  We

8  have actually had to respond.

9        They also argue in their reply brief, and again today,

10 that there's some inconsistency because we stated the matter is

11 stayed, and yet we also say that some of their arguments are

12 untimely.  There's no inconsistency, Your Honor.  We argue that

13 their arguments were untimely because they weren't asserted in

14 the year 2004, 3 years pre-petition.  There's no -- I mean, if

15 the stay is lifted today or 6 months from now or a year from

16 now, they're not gonna become more untimely.  They're either as

17 a matter of statute, the Federal Arbitration Act, they're

18 either untimely in the year 2004 or they weren't.  So there's

19 absolutely no inconsistency there at all.

20       That's only one act to violate the stay.  That was the day

21 before they filed their Motion for Stay Relief.  After they

22 filed the Motion for Stay Relief they violated the stay again.

23 They served subpoenas in aid of their stay violating motion.

24 They served them on the Sussman Godfrey law firm and on one

25 it's attorneys, Ophelia Commeanya, asking for documents,

1  documents in aid of a motion that violated the stay.

2      They make a point that, well, we didn't ask for documents

3  from the Debtors.  That argument is a farce, Your Honor.  First

4  of all, they made it -- first of all, there is no distinction

5  in the law between seeking documents from a third party in a

6  stayed case and seeking documents from the Debtor in a stayed

7  case, that simply is not part of the automatic stay case law.

8  But in any event, to say that that's a thinly veiled attempt at

9  an end run is an understatement.  They essentially asked for

10  the Debtors' documents, and instead of directing them to the

11  Debtor, they directed them to the Debtors' trial counsel, and

12  they asked for all documents concerning communications that are

13  attorney and client.  I mean, it's privileged on top of it, but

14  besides that obvious point, it's just an attempt at an end run

15  around the stay, and one that doesn't even work as a matter of

16  law anyway.

17      There's no question that the filing of these pleadings

18  violated the stay.  There's no question that under the 3rd

19  Circuit case law it is a willful violation of the stay because

20  the 3rd Circuit case law that we spelled out in our brief, and

21  I won't belabor it here, makes clear that willful violation of

22  the stay does not mean I intended to violate the stay.  It

23  means I -- there was no accident in me filing that pleading.  I

24  meant to file the pleading, and thereafter, it turns out that

25  that pleading violated the stay.  That's what the 3rd Circuit

1  had said.  That clearly is the case here.

2      So on to damages, and I'll just do damages very briefly.

3  Under 362(k)(1), we get damages in the amount of our attorneys

4  fees and any other damages.  We certainly have incurred

5  attorneys fees.  We incurred attorneys fees in filing the

6  objection to the Motion to Vacate that is in Your Honor's

7  brief.  We incurred further attorneys fees in objecting to the

8  subpoenas on Sussman Godfrey.  That is not in your binder

9  because it was just recently filed, but it has been filed and

10  we did expend those fees.  We further expended fees of

11  bankruptcy counsel, of my firm, in having to file this cross

12  motion in an attempt to get them to stop violating the stay.

13  So what we would ask for in that respect is to put -- to be --

14  for a finding of Your Honor that these are compensable damages

15  in an amount to be determined when we put in an affidavit.

16      We also would ask Your Honor for sanctions which are

17  permissible under 362(k)(1) for a willful violation of the

18  automatic stay because as I said before, we think this case is

19  cut and dry.  They had bankruptcy counsel.  We're not blaming

20  bankruptcy counsel, the bankruptcy counsel didn't violate the

21  stay, obviously the counsel on the merits did.  But they had

22  Bankruptcy counsel and they still violated this stay.  They

23  told this Court they were gonna file a Motion for Stay Relief,

24  they didn't do it, and then they violated the stay, and then

25  they violated a second time.  This is a perfect case to deter

1  future conduct by the award of punitive damages.  Thank you,

2  Your Honor.

3          THE COURT:  Thank you.

4          MR. INDELICATO:  Your Honor, Mark Indelicato on behalf

5  of the Committee.  I'm sorry I don't have a binder to hand up

6  with exhibits, but I think we'll get along without it.

7          THE COURT:  I'm not sorry.

8          MR. INDELICATO:  Your Honor, I think we should first

9  point out that the Committee adopts the presentation made by

10  Mr. Silberglied.  And when you look at it from the Committee's

11  perspective, I think that the thing that sort of sticks out in

12  my mind in his presentation is under the arbitration award,

13  they got 11,500 and change in damages, and $1.5 million in

14  award in attorneys fees.  Your Honor, when you look at it, and

15  we're only up here to stress the prejudice to the Debtor and

16  the lack of prejudice to Positive Software, if they have a

17  claim, they have an unsecured claim.  And unfortunately in this

18  case, there's a lot of them.  And unfortunately in this case,

19  they're in the tens of millions of dollars.  So the fact that

20  they have a $38 million claim, if that's what they have, that

21  will be decided at some point in the future.  And I won't

22  concede the where, nor will I concede to the when.

23       But Your Honor, what we're concerned about from the

24  Committee's perspective is if we go back and go to seek to

25  confirm this arbitration award and have to go back and litigate

1  the issues about whether the arbitration award should be

2  vacated, and then go back to the trial, so now I have

3  potentially another million and a half dollars in legal fees --

4  say it's not a million and a half, say it's a million, say it's

5  two million, say it's half a million.  Whatever it is, those

6  are hundred cent dollars that I'm paying to deal with an

7  unsecured claim.  We'll deal with the claim when the

8  appropriate time exists, but now is not the time.  We think the

9  stay should not be lifted.  We believe that this is an

10 unsecured claim.  If and when it's appropriate to deal with it,

11 we will deal with it.            And Your Honor, as I started

12 with, this is, you know, a very small award with respect to

13 attorneys -- with respect to damages, and a large with respect

14 to attorneys fees.  So obviously this is a litigious group, let

15 us just say, so we wanna stop that.  We wanna stop the

16 litigation going forward.  If Your Honor will recall, when we

17 had the primary counsel retained with respect to the Positive

18 Software litigation, I got up before Your Honor and I said,

19 "Your Honor, they're being retained but we're putting severe

20 caps in.  We're monitoring this.  We don't want the litigation

21 to get over-broad."  We're back here again saying the same

22 thing.

23      We think this is a litigation that if the stay were

24 lifted, I'm not so sure how much better Positive Software will

25 be because they will still have an unsecured claim that we will

1 have to determine the magnitude of it in some way, shape, or

2 form.  And whether or not we intend to confirm the arbitration

3 award, we're gonna need to look at that very carefully to

4 determine the strengths and weaknesses of that case before we

5 embark on that litigation and throw good money potentially

6 after bad.

7       So Your Honor, we believe that the stay should not be

8 lifted and we support the Debtor that there should be award of

9 some damages related to the willful violation of the stay.

10 Thank you.

11           THE COURT:  Thank you.  Briefly.

12           MR. RALSTON:  Thank you, Your Honor.  Getting to the

13 parsing allegations, Your Honor, as far as the allegation we

14 violated a stay, the arbitration award finds against my client

15 for over $1.5 million.  How that cannot be a claim against my

16 client which we're permitted to defend by responding to a live

17 pleading is beyond me.  Now, it may be an aggressive act, but

18 it's not in violation of the automatic stay as interpreted by

19 the 3rd Circuit in <u>Maritime Electric</u>, and we're very firm about

20 that, Your Honor.

21       As for our new trial, Your Honor, I promise you my client

22 will not be going forward unless and until this Court says it's

23 okay to do so on a --

24           THE COURT:  Well, what have you asked in the District

25 Court in Texas?

1          MR. RALSTON:  Your Honor, I will have to review that

2   pleading, and unfortunately, I don't have it before me.  If it

3   was put in there, it is an oversight.  I am stating on the

4   record that -- before this Court, we will not move forward on

5   any claims before this Court rules and permits us to do so.

6   And if we need to file something in the Texas District Court

7   action to essentially remove that request for relief, which I

8   presume is one line at the end of the conclusion, we will do

9   so.

10         THE COURT:  Well, is that document in evidence

11  somewhere?

12         MR. SILBERGLIED:  Yes, Your Honor.

13         THE COURT:  Where is it?

14         MR. SILBERGLIED:  It is attached as one of the

15  exhibits to our objection and cross motion.

16         THE COURT:  All right, which exhibit?

17         MR. SILBERGLIED:  Bear with me, Your Honor.

18         THE COURT:  All right.  Exhibit 1?

19         MR. SILBERGLIED:  I think it is.

20         THE COURT:  Well, that's what it says.  "Positive

21  Software asks the Court for the reasons stated previously

22  herein and to vacate the award and grant Positive Software a

23  new trial."

24         MR. RALSTON:  Again, Your Honor, our intent was

25  defensive.  That's an unfortunate statement in there, and I

1  will inform trial counsel, and we will remedy that immediately.

2  I promise you that, Your Honor.

3      Your Honor, again, while certainly we feel strongly that

4  we did nothing to violate the stay, as far as any sanctions,

5  our intent in filing a Motion for Leave to Amend a prior Motion

6  to Vacate was made because of our concern that there was a live

7  pleading out there, and that there were issues regarding timing

8  --

9      THE COURT:  You don't disagree with the Debtor,

10  though, that the pleading was 3 years old, 4 years old?

11      MR. RALSTON:  The pleading -- essentially, Your Honor,

12  the reason it was --

13      THE COURT:  Well, answer my question.

14      MR. RALSTON:  The original -- I'm going through the

15  time, Your Honor.  It's approximately 4 years old, yes, Your

16  Honor -- 3 years old.  It was filed in 2004.  That was our

17  Motion to Vacate.  And -- but the reason for the aging was the

18  fact that the District Court granted that motion.  That motion

19  went up to an appeal before a 5th Circuit panel which affirmed

20  the District Court that we were correct -- that the District

21  Court was correct in vacating the motion based on the failure

22  to disclose contacts of the arbitrator and that it then

23  proceeded to the 5th District Enbanc, which in a split decision

24  reversed, and, we believe, asserting a new basis in law.  So

25  the reason --

1        THE COURT:  You know, Enbanc, if there was one more

2    vote against you than there was for you, that ends it.

3        MR. RALSTON:  Your Honor, you're right.  And the

4    appeal on that legal grounds was put to bed when the Supreme

5    Court denied certiorari on those grounds.  And it is what it

6    is, Your Honor.  The problem that we face, as I explained

7    earlier, was that we faced a live pleading without the

8    additional grounds that the District Court had declined to rule

9    upon earlier because he was granting on the first grounds that

10   we raised.  He granted the Motion to Vacate on the original

11   grounds.  So Your Honor, we raised essentially the same grounds

12   in our leave to amend as had previously been issued, and

13   there's no surprise there.

14       Now Your Honor, as far as the wording of 362(k), you know,

15   it's interesting that "shall" has to mean "shall" in that

16   provision, but "individual" can mean anyone.  And we would

17   stress, Your Honor, that in a case where you have this type of

18   situation, the Court has discretion if it does determine that

19   we were in technical violation of the automatic stay in

20   awarding any damages.  And Your Honor, we certainly don't think

21   that our conduct would be such that any punitive damages would

22   be merited.

23       In fact, Your Honor, I'd like to get back to my Motion for

24   Relief from the Automatic Stay.  I think the Court raises an

25   issue that we would like; essentially, what kind of timeline we

1 can expect if the stay is not gonna be lifted now, if there's

2 any way that we can get some guidance as to when  at least we

3 can re-urge that position or when the Debtors would be made to

4 come before this Court to basically show cause why it should

5 not be lifted so that we can go forward.

6     There may be a lot of Creditors out there, but this is a

7 complex case.  It's ready for trial.  It's already been tried

8 once, and it's gonna have to happen sometime.  And again, I

9 think it's in the best interests of Positive Software that it

10 happens soon, and we don't see any prejudice to the Debtors

11 that it happens soon.  They've got their counsel in place.

12 Counsel is well versed in the facts and the issues, and the

13 parties ought to be able to proceed.  Thank you, Your Honor.

14         THE COURT:  Thank you.  All right, I am prepared to

15 rule on the motion and I will, as we typically do here, apply

16 the Rexene Product standard.  I am going to deny the Motion for

17 Relief from Stay without prejudice, and we'll talk about timing

18 in response to counsel's question in a moment, for the reasons

19 that the Debtor here has asserted.  And I agree, it's not usual

20 that the probability of success prong factors prominently in

21 this analysis.  I don't think the Movant here has demonstrated

22 probability of success on the merits.  I don't see harm in some

23 delay.  I do see harm to the estate for the reasons that have

24 been asserted here, the cost of defense, although I acknowledge

25 that at some point the claim, absent some agreement, will have

1  to be liquidated.  I think the absence of insurance is also a

2  factor of some moment.

3      I don't think the question -- well, let's put it this way.

4  There will come a time when this claim will have to be

5  liquidated, and I won't speculate because sometimes issues come

6  to me in contexts that I wouldn't necessarily anticipate.  But

7  let me just say it this way.  If the issues are at some time in

8  the future what they are now, it strikes me -- it makes much

9  more sense from an efficiency standpoint for this matter to be

10  tried in the forum where it's been pending.  But I'm not going

11  to make that ruling now because the issue strictly isn't before

12  me.  And when it comes before me, it may be framed differently.

13  And to further respond to counsel's question, what I normally

14  tell Debtors is at some point you'll have to liquidate this

15  claim.  And, you know, the moving party isn't going to be made

16  to wait forever.  One logical time when it might be appropriate

17  for the motion to be renewed would be at or about the time that

18  a plan is filed so that you can see what treatment has been

19  proposed for the litigation.  Sometimes that frame's a little

20  bit the issue of the where, but beyond that I can say no more

21  at this point.

22      With respect to the Debtors' Cross Motion for Violation of

23  Relief from Stay, and after reviewing the facts as they've been

24  presented in the pleadings and in the exhibits that have been

25  presented and taken into evidence, and after review of

1  applicable 3rd Circuit law, it's clear to me that there was a

2  stay violation here.  The Debtor is the Defendant in this

3  litigation.  Despite counsel's best efforts to paint the

4  picture that there's a live motion to which a response was

5  necessary at this time to protect its position in a defensive

6  manner, I do not agree.  This was a motion seeking to set aside

7  an arbitration award in favor of the Debtor and to ask for a

8  new trial.  The context in which it occurred was a highly

9  contested dispute which went to the Supreme Court, or Positive

10  Software tried to get to the Supreme Court.  And by the way, I

11  never begrudge a party who wishes to avail itself of its legal

12  rights to the fullest extent, but it tells me what the Debtor

13  has and the Committee has asserted here, and that this is a

14  dispute that's being aggressively litigated, and it's exactly

15  that type of situation that the automatic stay was intended to

16  prevent. And it's exactly that situation which the provision in

17  the Code that says parties should be sanctioned for violating

18  the stay is meant to prevent, and if not to prevent, then to

19  punish.

20     I will not decide today specifically, and I don't think

21  the Debtor was asking or anticipated that I would, what amount

22  of damages there should be.  I think that should be the subject

23  of a separate pleading.  We'll bring it up for hearing,

24  evidentiary hearing if necessary, if the parties can't agree.

25  I am inclined to award attorneys fees and costs incurred, both

1 in the Bankruptcy Court and in the District Court, which arose

2 as a result of the stay violation, which includes not just the

3 filing of the motion, but the issuance of subpoenas.

4      On this record, I do not find any grounds to impose

5 punitive damages or additional sanctions, but I leave that to

6 whatever evidentiary hearing may follow in support of the

7 request for costs and attorneys fees.  So I'd like counsel to

8 confer, embody those rulings in one or two orders, refer to in

9 general terms, but not set forth specifically the reasons I

10 stated on the record today.  Are there any questions about what

11 should go in an order or orders?

12          MR. SILBERGLIED:  Not from the Debtors, Your Honor.

13          THE COURT:  All right.

14          MR. RALSTON:  No, Your Honor.

15          THE COURT:  Thank you.

16          MR. SILBERGLIED:  Your Honor, may I speak on behalf of

17 Mr. Ralston and myself and ask for both of us to be excused?

18          THE COURT:  You may.

19          MR. SILBERGLIED:  Thank you, Your Honor.

20          MR. RALSTON:  Thank you, Your Honor.

21          THE COURT:  All right, let's take up the matters

22 concerning KPMG.

23          MR. MCCAHEY:  Good afternoon, Your Honor, my name is

24 John McCahey, and I'm with Hahn & Hessen, and I'm appearing

25 today on behalf of the Creditors Committee in support of their

1 Motion for an Order in relation to KPMG under Bankruptcy Rules

2 2004 and 9016.

3      I'll start out, Your Honor, by saying Congress vested a

4 Creditors Committee with a broad investigative mandate to

5 investigate the acts, conduct, assets, liabilities and

6 financial condition of a Debtor.  That authority has been

7 acknowledged by both the Courts and commentators as being very

8 broad.  And the primary tool available to a Committee to

9 exercise that duty or fulfill that duty is Bankruptcy Rule

10 2004.

11      KPMG was the principal accountants of New Century from the

12 mid-90's.  They audited the financial statements, they provided

13 tax services, and they provided numerous other services on

14 behalf of that.  The information that KPMG possesses, the

15 services that are provided, fall squarely within the ambit or

16 the scope intended by Congress under 1103(c)(2) with that.

17      In fact, KPMG does not mention such section in its

18 opposition papers, nor do they dispute that they are in

19 possession of knowledge that is particularly relevant to the

20 matter at hand.  Rather, they argue that disclosure is barred

21 from that because there is an arbitration provision in their

22 engagement letter with the Debtors and that that arbitration

23 provision gives them the right to insist that any formal

24 discovery from them be governed by an arbitrator.

25           THE COURT:  Well, let me stop you there and ask Mr.

1  Neal whether KPMG is still pressing that position.

2          MR. NEAL:  Good afternoon, Your Honor, Guy Neal for

3  KPMG, LLP.  Yes, Your Honor, we are still pressing that

4  position.  We did not press it last week with respect to the

5  Examiner.  We treat the Examiner as a different functionary, in

6  essence, than the Committee, but today we will be pressing that

7  argument.

8          THE COURT:  Well, in preparation for last week's

9  hearing, it struck me that unless there is actually an

10 arbitration proceeding, there would be no arbitrator to

11 regulate discovery, which is really what the agreement

12 provides, does it not?

13         MR. NEAL:  The agreement provides for several things,

14 Your Honor.  I mean, one, there would be an arbitrator that

15 would regulate discovery.  Certainly, there would be the

16 arbitrator to regulate any claim or dispute.  Second, it

17 provides for strict confidentiality provisions.  And in

18 addition, there is a different test for the documents.  Perhaps

19 that goes back to the first point, and that is the substantial

20 need test with respect to the discovery of information.

21         So for the reason why we're pressing the argument today is

22 it's really the horse is out of the barn to the extent we turn

23 over every paper in our files, including electronic data

24 relating to New Century to the Committee.  In that instance,

25 your eviscerating, we would respectfully submit, the

1  limitations on discovery that are provided within our

2  engagement letters.

3          THE COURT:  Well, you raise an interesting question,

4  and it has actually several facets to it.  And one of them is

5  because KPMG was not hired post-petition, it didn't lose the

6  benefit of its arbitration clause, which it otherwise would

7  have had it sought engagement in this Court in connection with

8  the bankruptcy.  So procedurally, you got that benefit, but it

9  seems to me procedurally that unless there is an arbitration

10 actually pending, and there isn't here, at least no one's told

11 me that there is, assuming that nothing that's happened changes

12 your right to an arbitration -- I'm not ruling, I'm just saying

13 for purposes of this issue that none is pending, it seems to me

14 there is no arbitrator to regulate discovery.  And therefore,

15 the arbitration clause, by its language, doesn't cover this

16 type of request.

17      Now, that's apart from the objections that have been

18 raised about scope and confidentiality and use of the

19 information obtained, but the argument that because the very

20 existence of the arbitration clause prevents the Committee's

21 2004 request, I think, is a loser.

22          MR. NEAL:  If I may, Your Honor, I can address it now

23 or I can address it when I am at the lectern.  I do think what

24 makes this case very different from, one, the Daisy Tech case,

25 which we certainly cite in our favor, or two, the Freedman's

1  case is, as Your Honor is certainly well aware and we were

2  before you last week and before you again, here we have an

3  Examiner conducting the very same examination that the

4  Committee seeks to conduct with respect to KPMG.

5      So our second argument -- and I can come back to the

6  arbitration and the <u>Daisy Tech</u> and the <u>Freedman</u> issue.  The

7  second argument is in light of the arbitration agreement that

8  we have, should there not be a balanced and measured approach

9  where on the one hand we have the Examiner being able to

10  conduct an examination of KPMG of the same documents -- both

11  parties are seeking the same documents from KPMG -- as to any

12  and all claims and causes of action both parties, the Examiner

13  and the Committee, are seeking to assess, analyze and determine

14  causes of action, is it not more appropriate to have the

15  Examiner go first?  In which case, one of our arguments would

16  be deny this motion, with prejudice is our principle argument,

17  or without prejudice to the Committee coming back after the

18  Examiner has issued his report.  That way you preserve the

19  discovery restrictions or limitations, whatever word you would

20  like to use, in our agreement.

21      So rather than have an estate representative get all of

22  the documents that it would not otherwise be entitled to get in

23  arbitration through a 2004 procedure, here you have a measured

24  approach.  If the Examiner's report comes back, finds no basis,

25  no cause to go forward with any claims against KPMG, then we do

1  not have to go through this exercise and largely dilute KPMG's

2  rights in its engagement letter.

3       THE COURT:  Mr. Neal, I tend to agree with a lot of

4  what you suggest, and that is just taking a step back.  I think

5  -- and I maybe gave some hint of this last week, but I'll be

6  more specific.  The Committee, or some version of it as a

7  successor, assuming that a plan is confirmed in this case, is

8  the entity that is likely -- and KPMG, I know, believes --

9  well, I'm supposing believes this, to pursue such claims.

10  Okay.  They may or may not agree with what the Examiner thinks.

11  The Court may or may not agree with what anybody thinks,

12  although that's always risky with so much high priced talent

13  out there.

14       So to answer your question directly, my thought is, yes,

15  there ought to be coordination.  It ought to be in such a way

16  that the Committee shouldn't be required to stand down while

17  the Examiner is doing what the Examiner was asked to do by the

18  Court, ordered to do by the Court, because it has a current

19  interest in learning what's happening and will have a future

20  interest that goes beyond what the Examiner will do when his

21  responsibilities are finished.

22       So no, I don't think the Committee should need to catch up

23  later.  I think that -- I don't think, on the other hand, that

24  KPMG should be required to respond to duplicate or parallel

25  demands.  I think the demands should be coordinated in such a

1  way that the burden on your client is minimized.  But as I know

2  you know, your faced with the situation; it's not going to go

3  away.  These documents, as we discussed last week I think it

4  was, have been and will have to be produced in connection with

5  other investigations, at least in part anyway.

6      So I'd prefer, frankly, to talk about scope, how the

7  coordination should exist, and then what level of

8  confidentiality should exist, at least until some further

9  decision by this Court about what should be done with it.  I am

10  adamant in my view that what information is garnered by the

11  Examiner should be preserved for the benefit of the estate.

12  And standing at the podium as either the estate representative

13  or the predecessor to the estate representative who's going to

14  be pursuing any claims -- and there may be no claims.

15      MR. NEAL:  There may be no claims, Your Honor, but

16  we're dealing with, as Your Honor is more familiar than I am,

17  with a sub-prime lender that seemingly collapsed overnight in

18  which we've already heard Mr. Indelicato and others with

19  respect to the number of unsecured claims or the amount of

20  unsecured claims on file.  And from my cursory review of

21  schedules and the like, it appears that principle recoveries

22  for Unsecured Creditors will be through litigation.  And it is

23  for that reason why we are holding firm with respect to both

24  our Daisy Tech argument and, Your Honor, with respect to the

25  cumulative and duplicative nature of the proceedings.  But I'm

1  going back to my argument.

2      Let me just state that in the past week we have agreed --

3  KPMG agrees in light of its protective order discussion last

4  week that certainly the Examiner holds the documents and

5  preserves any and all KPMG documents pending further order of

6  this Court.  And so I just come back to the point, Your Honor,

7  whereas we're not dealing with statutes of limitation running

8  their course or what have you.  To allow the Examiner to

9  proceed first, hold and preserve documents and issue his report

10  is the more cost effective and measured approach that KPMG

11  would ask this Court to undertake.

12      The Examiner's report date, I imagine, will be extended,

13  but his first initial reporting date is the beginning of

14  September.  Be it beginning of September, beginning of October

15  or November, there is not that much time between now and then

16  for the Examiner to do his job with the cooperation of KPMG

17  before the potential adversary comes into the mix.

18          MR. MCCAHEY:  Your Honor, if I just may be heard and

19  without getting to the merit, the Committee is mindful of what

20  you've said, and we have coordinated with the Examiner the

21  document (indiscern.).  And what we've told the Examiner and

22  what we've told KPMG is as follows, give us the documents at

23  the same time you give them to the Examiner with that.  We will

24  hold back any depositions, we won't interfere with the

25  Examiner's point, as you noted, so they could focus on what

1   they're dealing with the Examiner.

2       And with respect to we have requested it go beyond the

3   Examiner, after you're done with the Examiner we will sit down

4   and work with you to try to address your issues and concerns.

5   What we've met here is total shutdown, no documents.  And what

6   KPMG doesn't understand is that the Committee needs these

7   documents, not only for purposes of coordinating its interest

8   in any potential claims that may exist against KPMG, but in

9   terms of doing its overall investigation of the Debtor here in

10  identifying other claims.  This -- it was a complex business.

11  The accounting people are gone now.  These papers, these work

12  papers -- and putting aside any issue of claims against KPMG --

13  are very valuable and very helpful to the Committee's

14  professionals in reconstructing and understanding what the

15  business of New Century and what was going on.  It would be

16  very helpful to discharge its duties under the Bankruptcy Code,

17  under 1103(c)(2).

18      I think, Your Honor, you've addressed -- if there's

19  anything I've set forth -- we set forth in our response papers

20  our arguments, and instead of just standing here and repeating

21  them, if there is any questions you have of me, Your Honor, I'd

22  be glad to answer them.

23          THE COURT:  I don't at this point.  Thank you.

24          MR. MCCAHEY:  Thank you very much, Your Honor.

25          MR. NEAL:  I believe I have given my arguments, Your

1  Honor, so I will take perhaps only 5 minutes of your Court's

2  time and, of course, be responsive to any of the Court's

3  questions.

4      What Daisy Tech instructs us and what we submit what 3rd

5  Circuit law compels is the full respect for arbitration

6  agreements and the future enforcement of those arbitration

7  agreements in a party's contractual undertaking, in this case

8  the engagement letters between KPMG and New Century.

9      The Daisy Court did not elevate form over substance.  It

10 looked at Rule 2004 as a discovery mechanism, as a rule under

11 the Federal Rules of Bankruptcy Procedure that give way to

12 controlling statutory provisions, just like the bankruptcy

13 rules give way to the Bankruptcy Code.  And Daisy Tech looked

14 at what, in that instance, the post-confirmation entity --

15 looked at the purpose of the examination.  And one of the

16 principal purposes that that entity was seeking information

17 from Ernst & Young, was to assess, analyze claims and potential

18 causes of action against Ernst & Young.

19     Now, we know from the Examiner's appointment order that

20 the Examiner is empowered to do that here.  So by fully

21 respecting the reasoning in Daisy Tech, Your Honor would not be

22 shutting down a process by this estate, so to speak.  Yes,

23 you'd be holding back, and I would submit holding back

24 temporarily, an Unsecured Creditors Committee, which as Your

25 Honor aptly noted is the entity that more likely than not,

1  either in its current form or in its capacity as counsel to a

2  litigation or liquidating trust, would be bringing causes of

3  action against, among others, potentially KPMG.

4       Here we have an Examiner that is undertaking the same

5  function.  And before I get to burdensomeness, cost and

6  duplication of effort, again, what is lacking in Daisy Tech and

7  what is lacking in the Freedman case, which goes andn rules

8  opposite Daisy Tech, neither of those cases did you have an

9  Examiner performing the same function that those entities in

10 Daisy Tech and those entities in Freedman's were trying to

11 perform.

12      So we are not shutting down a process.  We are not

13 shutting down an investigatory function.  We are not saying

14 that we, KPMG, are not entitled to be subject to an

15 examination.  To the contrary, I stood up before you in this

16 Court last week, one week ago on Tuesday, and said we are here

17 to fully cooperate with the Examiner.  Yes, we have our

18 disagreement on scope, which we will turn to next, but we are

19 here to cooperate with the Examiner because we recognize the

20 Examiner has a job to do.  And the job of that Examiner is

21 carefully articulated in the June 1 appointment order, and in

22 specific, the Examiner is to, among other things, identify and

23 evaluate any claims or rights of action that the estates might

24 have arising from or relating to such irregularities, errors or

25 misstatements in the Debtor's financials.

1      So again, there is no prejudice to these estates by not

2  allowing a cumulative, concurrent, coextensive or more broad

3  investigation certainly initially that the Committee was

4  seeking against KPMG.  There will be an examination.  It'll be

5  done by the Examiner, and it'll be done with the cooperation of

6  KPMG.  But it is largely dilutive, if that's an appropriate

7  word, of KPMG's engagement letter and its arbitration

8  agreements to allow the Committee to have open and free access

9  to any and all the documents that are in that subpoena, which

10 again, I will state now and I will state again in the context

11 of the Examiner's continued request, would require KPMG to

12 produce any and all documents relating to New Century from

13 upwards to 280 to 300 recordkeepers and billing partners and

14 associates at KPMG.

15     So in any Rule 2004 Examination, yes, it's often called a

16 fishing expedition.  Yes, it often allows parties to

17 investigate any and all aspects relating to the Debtors and

18 financial affairs.  In most cases, you see the Court striking a

19 balance.  In most cases, you see the Court striking a balance

20 between Rule 2004 and the Federal Rules of Civil Procedure.  Do

21 they apply, does Rule 26 standards apply in terms of relevancy?

22 Do Rule 33, 34 apply?  Do the deposition rules, do the subpoena

23 power rules of Rule 45, do they apply?  That's often the

24 balancing test.

25     Here, in light of the arbitration agreement, we would

1 submit the balancing test should be, in the first instance, to

2 allow the Examiner to proceed with KPMG's cooperation and to

3 issue his report.  And then to determine, without prejudice to

4 the Committee's rights to, one, gain access to those documents

5 or, two, conduct its own examination.  That's my first

6 argument.

7      My second, I'll do this in 2 minutes I hope, the second is

8 the duplicative nature of the examination.  I've already

9 touched upon it, but the Committee is seeking the same

10 documents the Examiner is seeking.  They are not targeted, they

11 are not focused to any particular area that the Examiner

12 perhaps is not seeking.  To say that that reflects coordination

13 largely proves too much for the Committee because, yes, it is

14 coordination.  It's not coordination, it's duplication

15 entirely, to look at the same documents, to investigate the

16 same causes of action that may relate or arise from information

17 that may be reflected in those documents.

18      Again, the motion -- the Committee's motion can be denied

19 without prejudice, allow the Examiner to proceed with his

20 examination with the cooperation of KPMG.  The Examiner will

21 issue a report in the near future, 30, 60 or 90 days out.  Then

22 we can revisit the issue of whether the Committee needs to

23 conduct the same examination by interviewing the same people,

24 by reviewing the same documents.  That is our argument with

25 respect to the Committee, Your Honor.

1          THE COURT:  While you're there, Mr. Neal --

2          MR. NEAL:  Yes.

3          THE COURT:  -- let's talk about the Examiner for the

4    moment.

5          MR. NEAL:  Yes.

6          THE COURT:  What further agreements, if any, have been

7    made with respect to the Examiner?  I signed the one order

8    permitting the discovery to be issued, I take it it's been

9    issued.  Tell me where you stand with that.

10          MR. NEAL:  Yes, Your Honor.  There are a couple of

11   matters I can discuss.  In the first instance -- if you'll

12   allow me one second.  Last week, Your Honor, two concerns were

13   raised, in part by Your Honor, in part by Mr. Indelicato, and

14   in part by Mr. McMahon of the U.S. Trustee's Office, with

15   respect to the proposed protective order.  We have agreed to

16   make changes to ameliorate those concerns.  One, we've agreed

17   to modify the protective order --

18          THE COURT:  More importantly --

19          MR. NEAL:  Yes?

20          THE COURT:  -- has the Examiner agreed?

21          MR. NEAL:  Yes, I believe subject to some tweaks, but

22   we'll talk.

23          MR. FOX:  Edward Fox, Your Honor, from Kirkpatrick &

24   Lockhart Preston Gates Ellis, LLP on behalf of the Examiner.

25   And my partner, Stephen Topetzes, couldn't be here in person,

1  but he's also on the phone.  But the main sticking point --

2  well, there are two issues, I think, primarily with respect to

3  the protective order.  One is it's drafted in the form of a

4  stipulation, and we would prefer that it be in the form of a

5  straight order, subject to our being satisfied with its

6  contents.  And the other significant problem is the Examiner is

7  -- doesn't really -- doesn't want to have a dog in the hunt

8  between KPMG on the one hand and the Committee on the other as

9  to whether the Committee can or cannot get the documents.  And

10  the form of order that, you know, is being put in front of us

11  continually, you know, primarily goes to the issue of whether

12  or not the Committee is gonna have access to the documents.

13  And that's just not something that we're comfortable or believe

14  is appropriate for the Examiner to weigh in on.  So we need the

15  Court's decision on that point.

16          THE COURT:  The Committee is going to have access to

17  the documents.  I mean, it's that simple.

18          MR. FOX:  In real time or --

19          THE COURT:  In real time.

20          MR. FOX:  -- or some time in the future?

21          THE COURT:  I'm not going to make them wait.

22          MR. FOX:  Okay, that's fine.  Then I think I'm -- that

23  being the case, we can probably put together a form of order

24  that we can all agree on.

25          THE COURT:  Okay.  Now, you've agreed on scope with

1  the Examiner?

2        MR. NEAL:  No, we have not, Your Honor.  We need -- I

3  would submit there are perhaps three dating issues to be

4  decided, although there are a series of objections that we

5  filed to the subpoena.  I think if we have the understanding of

6  Your Honor's ruling with respect to two or three matters, that

7  would largely address the objections of KPMG.

8      But if I can finish on just the protective order real

9  quick.  The U.S. Trustee raised a concern about the Examiner's

10  ability to cooperate with governmental agencies.  We have

11  drafted language that is acceptable to the United States

12  Trustee to allow the Examiner to use or disclose the KPMG

13  documents in cooperating with governmental agencies.

14      Your Honor raised the point about the destruction of

15  documents upon the conclusion of the examination.  KPMG has

16  agreed that the Examiner shall hold and preserve KPMG's

17  documents, subject to further order of a Court and after a

18  notice and a hearing.

19      If I can turn to scope, I'll frame the issues, Your Honor.

20        THE COURT:  If you would, please.

21        MR. NEAL:  On Friday mid-morning, in advance of the

22  hearing binders being submitted to Your Honor, we filed

23  objections to the subpoena that was issued upon us the

24  Wednesday after our last Tuesday hearing.

25      The first issue.  The first issue concerns year 2004, as

1  opposed to Rule 2004.  The Examiner's motion, and I believe now

2  the Committee's, I would just refer to it non-pejoratively as

3  the "Tag Along Motion," now is wanting to have the scope

4  include not only 2006 and not only 2005, but 2004.  Our read of

5  the order appointing the Examiner June 1, our read of the

6  various pleadings, and our read of the various hearing

7  transcripts relating to the appointment of the order and his

8  scope is that the focus of the Examiner is to, I'll just read

9  directly from the order, "Investigate any and all accounting

10 and financial statement irregularities, errors or

11 misstatements, including but not limited to such

12 irregularities, errors or misstatements that (i) gave rise to

13 the announced need to restate the Debtor's financial statements

14 for the first three quarters of 2006 and/or (ii) lead the

15 Debtors' management and the Audit Committee to conclude that it

16 was more likely than not that pretax earnings in the 2005

17 financial statements were materially overstated."

18      At the initial hearing, which I believe was May 5th,

19 although it may have been May 15th, the scope was to be the

20 three quarters of 2006.  Subsequent to that hearing, when that

21 appointment order was reduced to writing, there were letter

22 exchanges between the parties, as Your Honor may recall, and

23 there was a subsequent hearing on May 30th in which Your Honor

24 addressed the various proposed orders that were before Your

25 Honor.

1     The United States Trustee, upon reviewing an 8K filing in

2  the middle of May, requested that the order -- the scope be

3  extended to include 2005, and that was because of the

4  statements in the Form 8K in which the Debtor said, after

5  consulting with -- in connection with the Audit Committee

6  review of the Debtors' financials and on advice of its

7  independent counsel that they -- excuse me, I'm just -- I'm

8  losing my place.  Based on -- I'm going to read directly from

9  the 8K.  "Based on recent communications with members of the

10 investigative team, the Audit Committee has determined that

11 there were errors in the company's previously filed annual

12 financial statements for its fiscal year ended December 31,

13 2005 with respect to both the accounting and reporting of loan

14 repurchase losses and the company's valuation of certain

15 residual interests in securitizations."

16     That is what gave rise to the U.S. Trustee's letter to

17 this Court seeking to expand the scope of the examination into

18 2005.  The Debtor responded and said, well, our order which

19 allowed the Examiner to focus on 2006, you can read that to

20 allowing the Examiner to go back to 2005 because to the extent

21 there were errors in '06 that may have been caused by errors in

22 '05, the Examiner can look into that.  At no time was there

23 ever any mention of year 2004 --

24          THE COURT:  Mr. Neal --

25          MR. NEAL:  Yes.

1          THE COURT:  -- I mean, I appreciate your efforts to

2    continue to -- I'm trying to not use a color word --

3          MR. NEAL:  That is fine, Your Honor, I can take it.

4          THE COURT:  -- define and confine the scope of what

5    may be sought from KPMG to as small a universe as possible.

6    And I appreciate KPMG's sensitivity to that which is in the air

7    here.  But it must be obvious to you and to your client, as I

8    think it is to others involved in this proceeding, that at

9    least two dynamics exist.  One, the situation may very well

10   continue to develop beyond that which was been initially

11   disclosed by the company.  Secondly, what happens in the year

12   2004 may very well be relevant to what happened in '05 and '06,

13   but until the information is seen by others other than KPMG, no

14   one can make that determination.

15       Now, I don't suggest that there should be no limitations,

16   but I think -- well, I don't know.  And you don't have to

17   answer this, but I suppose you understand that the exercise

18   here in Bankruptcy Court is to find out as much information as

19   possible, rather than to protect parties from having to provide

20   it.  Now, subject to certain things which you've suggested, and

21   I think appropriately in the way of confidentiality, but I

22   think you have to have a reality check here in terms of what

23   the Court is going to order ultimately.

24       Now, I thought I saw somewhere in the Committee's papers

25   that they wanted things from 2001 on, I don't know if I read

1 that correctly or not.

2        MR. MCCAHEY:  You did, Your Honor.  We did that.

3 We've asked for the year 2001, 2002 --

4        THE COURT:  Okay.

5        MR. MCCAHEY:  And what we've said with respect to

6 that, Your Honor, is we would defer that request until he deals

7 with the joint request that the Committee and then work with

8 KPMG.

9        THE COURT:  And I think that's appropriate.  And I

10 think what ought to happen here is that the Examiner should be

11 permitted to turn over to the Committee whatever he obtains.  I

12 don't think the request to go to the year '04 is at all

13 unreasonable, in fact it's rather modest.  That's not to say

14 there won't be further requests, but you'll have the chance to

15 have your say if there are.

16        MR. NEAL:  Very good.  If I -- I'm sorry.

17        THE COURT:  And I think the Committee's suggestion

18 that it simply take what's given the Examiner and wait to do

19 anything else, at least to the point of the Examiner's report

20 or at least to the initial point deadline, I don't know that

21 the deadline will be extended, no one has asked it, at least as

22 of this time so far as I know that it be extended, before

23 deciding where to go.  That's where I come out.

24        MR. NEAL:  Very good.

25        THE COURT:  And I don't think any of that runs afoul

1  of the arbitration provision in --

2       MR. NEAL:  On that, we're not suggesting that year

3  issue be a running afoul of the arbitration issue.  That's

4  simply a burden in scope issue.

5     If I can turn to the next bucket, I think there are really

6  three buckets.  We've already addressed the year 2004 bucket.

7  The second one concerns -- and we've laid this out in our

8  objections, it concerns sequencing and staging of this

9  production, Your Honor.  We've been unable to reach a meeting

10 of the minds with the Examiner on issues relating to sequencing

11 and staging.  And let me back up and say what I mean by that is

12 at least with respect to 2005 and 2006, there were

13 approximately 300 individuals that billed time on New Century

14 matters at KPMG.

15     What we have here are official work papers for the first

16 three quarters of '06 and incomplete work papers for '06,

17 because we never finished the year end audit.  We have official

18 work papers for 2005, we have official work papers for 2004.

19 Those documents are largely segregated and can be -- I don't

20 want to overstate it, but can be readily pulled, reviewed and

21 produced.

22     We also have different buckets of documents.  We have hard

23 copied desk files of these individuals, 300 at least for 2

24 years, perhaps there's some overlap, but pick a round number,

25 400 individuals from 2004 to the present, located across the

1  country, mostly in California in different offices, different

2  floors, hard copies.  And then we have electronic documents,

3  both on the KPMG servers, and we have electronic documents on

4  hard drives in these 400 individual parties.

5      We have proposed to roll out the official work papers for

6  '05, and we will do so for '04, and the official work papers

7  for the first three quarters of '06 and the incomplete work

8  papers for '06, and then work with the Examiner in terms of

9  identifying appropriate custodians; in other words, winnowing

10  down the 400 custodians down to a manageable number, and then

11  identifying appropriate search terms for documents that may be

12  both on hard drives, file cabinets or servers.  That way we can

13  produce the documents that the Examiner requests that are

14  relevant to his examination.

15      I would submit there is no other way of doing it in an

16  orderly manner, Your Honor, other than absolutely turning over

17  every piece of paper relating to New Century, the cost and the

18  time -- the cost of which would run upwards to close to $2

19  million and the time would take many weeks, if not months.  But

20  we are prepared to work with the Examiner on search terms to

21  identify the appropriate documents.

22      To the extent the parties have any disagreement, which we

23  will try to minimize, we come back before this Court at any

24  omnibus hearing, and the Examiner can say we're not getting the

25  cooperation of KPMG or we think it should be approached a

1  different way.  But there really is no other way of doing this

2  process in an orderly and less burdensome manner than working

3  with the Examiner on search terms.  And we've yet to be able to

4  reach an agreement with an Examiner on that.

5     My last bucket of objections, there are specific

6  objections, I'm not sure if the Examiner is gonna press today

7  on them, in which we indicated that we are not going to produce

8  certain documents based on the fact that they are a proprietary

9  or they would run afoul of our obligation to the Federal

10  Government with respect to responding to grand jury subpoenas

11  and the like.  But I can respond to that, to the extent Mr. Fox

12  wants to press forward.

13     So we have your ruling on 2004, and with respect to the

14  other two issues, the sequencing and staging, and then the

15  specific objections, I can respond after Mr. Fox speaks.

16          THE COURT:  All right, thank you.

17          MR. FOX:  If Mr. Topetzes is on the line, I think he

18  may be in a better position to respond.  If he --

19          MR. TOPETZES:  I am on the line, Your Honor.  This is

20  Steve Topetzes from K&L Gates on behalf of the Examiner.

21          THE COURT:  All right.

22          MR. TOPETZES:  Your Honor, the Examiner and his

23  professionals have been traveling a long and circuitous road

24  with KPMG and its counsel respecting our efforts to obtain

25  documents and information that are relevant to the review being

1 conducted by the Examiner.  I'm mindful of the fact that this

2 has been a long hearing, but -- and I'm happy to review the

3 back and forth in greater deal, but I would -- I guess I would

4 characterize the state of play a little bit differently than

5 Mr. Neal described a moment ago.

6      Let me say as an introductory matter, we have made good

7 faith efforts throughout, prior to filing the Rule 2004 Motion,

8 subsequent to filing the Rule 2004 Motion, and before last

9 week's hearing, and then subsequent to last weeks hearing, to

10 reach agreements with KPMG and its counsel to facilitate

11 voluntary production of the documents and information requested

12 by the Examiner.  We have demonstrated and communicated a

13 willingness to work with KPMG to narrow the requests to address

14 questions with respect to burden, related costs, and in an

15 effort to achieve efficiencies for everyone concerned under the

16 circumstances of this proceeding.

17      Unfortunately, notwithstanding statements by KPMG and its

18 counsel that it intends to cooperate fully, we have been unable

19 to reach agreement.  Now, none of the concerns the Examiner has

20 regarding these matters are directed at Mr. Neal or his

21 colleagues, the individuals with whom we've dealt on behalf of

22 KPMG.  I'll echo something that I told the Court last week, I

23 think the dialog has been, at all times, cordial and it has

24 been productive on a number of fronts.  However, it has not

25 been nearly productive enough from our perspective.

1    KPMG continues to respond to the Examiner with the same

2  refrain; a piece of that refrain has already been addressed

3  this afternoon by the Court, and that relates to the Examiner's

4  requests concerning matters that occurred in calendar year

5  2004.  And we appreciate the ruling by the Court with respect

6  to those matters and Mr. Neal's statements that KPMG will

7  produce documents to the Examiner related to 2004.

8    We continue to have a couple of baseline issues that

9  permeate the objections and the resistence by KPMG, and I'd

10  like to outline those for the Court, and we believe the Court's

11  direction would be essential to facilitate a productive dialog

12  and ultimately production by KPMG on those issues.  I would

13  characterize three buckets, as well, but they would be a little

14  different, and I would put sequencing separately.  With respect

15  to sequencing, what KPMG has told us repeatedly after it agreed

16  to provide work papers for 2005 and 2006 is it would like to

17  produce those documents and then, after the Examiner has had an

18  opportunity to review those materials, entertain requests by

19  the Examiner.  Where the Examiner can demonstrate or articulate

20  a particular need for additional documents, KPMG would then

21  entertain those additional requests.

22    From the Examiner's perspective, Your Honor, we don't

23  believe that arrangement is workable or efficient.  We

24  understand that a production of a large amount of data

25  necessarily will occur on a rolling basis, and we're certainly

1  agreeable to that.  What we feel would be horribly inefficient

2  in terms of the Examiner's efforts to perform this review, to

3  conduct appropriate witness interviews, et cetera, is to have

4  KPMG produce in the first instance only the work papers or a

5  commit to produce in the first instance only the work papers

6  while reserving its rights to deny the Examiner access to

7  additional materials and agreeing only to entertain additional

8  requests for the Examiner based upon an articulated or

9  demonstrated precise need by the Examiner for those additional

10 data.  We don't think that's workable.  We respectfully submit

11 that is not what is contemplated by the Court in its June 1

12 order, and so we would ask for guidance from the Court

13 concerning that element of the sequencing.  From our

14 perspective that's where the dispute lies.  We're happy to work

15 with KPMG to try to narrow requests.

16      Mr. Neal is fond of mentioning and KPMG is fond of

17 mentioning the fact that there are nearly 400 timekeepers

18 apparently.  We had no idea, Your Honor, when we made our

19 request that the number was that large, and as we've

20 communicated repeatedly to KPMG and certainly communicated it

21 in advance of last week's hearing, we don't intend to ask KPMG

22 or to cause KPMG to gather documents and information from each

23 of those timekeepers.  Rather, what we have suggested is that

24 we start by gathering documents and information, desk files,

25 relevant electronic communications, internal emails, et cetera,

1 for the key players on the KPMG team, and we believe that would

2 be a relatively small subset of the 400 or so KPMG timekeepers

3 described generally by KPMG's counsel.

4        THE COURT:  Well, whatever has been said outside of

5 the Courtroom, all I can tell you is what I've just heard from

6 each of you, it seems to me, is not inconsistent.

7        MR. NEAL:  If I may address that real briefly, Your

8 Honor.  Maybe a specific example would be helpful to Your

9 Honor.  And I think we're not -- I think we're speaking past

10 each other, regrettably.  And there have been negotiations back

11 and forth in which different positions have been articulated by

12 both sides.  But let's deal with the position that's in our

13 objection to the subpoena.

14     There was a -- 32 requests by the Examiner, and they've

15 never been reduced, never been modified, it's the same requests

16 we've had from day one.  Here we are, request #6 in the

17 subpoena, and its page 12 of our objection, "For all

18 individuals identified in response to item #4" -- and that's

19 the individuals who worked on the New Century engagement --

20 "provide copies of all employee desk files relating to the

21 Debtors."  We have -- and I've checked my papers, we have 392

22 employees between 2004 and 2006, so for the 3 years, 392

23 employees.  Here's what our response is.

24     Our response is we are going to be producing, as I said to

25 Your Honor today, all of our work papers and quarterly review

1  work papers, and then we will then provide the Examiner a list

2  that identifies our engagements, audit and non-audit related, I

3  believe there are about 33 separate engagements that we've had

4  with New Century.  And here's what we say, and this is why

5  we're not speaking past each other, "We agree to meet and

6  confer in good faith to discuss an appropriate scope of KPMG's

7  production of documents related to these other engagements.

8  KPMG is further prepared to cooperate with the Examiner and to

9  meet and confer to agree upon a narrowed list of individuals

10  for whom KPMG will search for relevant documents, which list

11  will be based upon those individuals who provided services to

12  New Century on the matters that relate to New Century's

13  announced plans to restate its financial statements for '05 and

14  '06.  KPMG also will meet and confer upon a set of appropriate

15  search terms that relate to New Century's announced plans to

16  restate its financials for '05 and '06" -- now including '04 of

17  course -- "that can be applied to electronic data to help

18  identify relevant documents."

19      So I think we're saying the same thing.  We agree on

20  custodians, they give us the search terms, we run the searches

21  and we produce the documents.

22      MR. TOPETZES:  Your Honor, again, this is Steve

23  Topetzes from K&L Gates.  If I may respond briefly, it's part

24  of that response, and that response is repeated throughout the

25  responses and objections served by KPMG, that relates to the

1    other bucket of dispute here, and it's the clause that begins

2    "which list will be based on those individuals who provided

3    services to New Century on the matters that relate to New

4    Century's announced plans to restate its financial statements

5    for 2005 and 2006."

6        A fundamental area, Your Honor, of disagreement relates to

7    KPMG's position, which, in part, is that is seeks to limit its

8    production to documents and information that relate to the

9    matters that form the subject of the public announcements by

10   New Century concerning the restatement of its financial

11   statements.  Those issues relate to the calculation of loan

12   repurchase reserves and the company's valuation of residual

13   interests with respect to certain securitizations.

14       In its earlier opposition papers, KPMG also made

15   statements to the effect that those matters already have been

16   reviewed by the Special Investigation Committee of the

17   company's Board of Directors or its Audit Committee.  So KPMG

18   earlier asserted or suggested that any review of these matters

19   by the Examiner was either inappropriate or implicated its

20   bargain for arbitration rights.

21       The Examiner, and this is where the disagreement has

22   centered, takes strong exception to any suggestion by KPMG that

23   the review conducted by the Special Investigation Committee

24   should operate to limit related requests by the Examiner to

25   KPMG.  Any such position by KPMG is a little curious for

1  several reasons, including the fact that by all reports KPMG

2  was decidedly uncooperative with the review by the Special

3  Investigative Committee.  The work performed by the committee

4  is helpful, but it is not a substitute for data produced by

5  KPMG.  So the Examiner wants documents and information from

6  KPMG related to those items.

7      We do not believe beyond that, to go specifically to

8  KPMG's objections, that the Examiner should be limited in

9  obtaining information from KPMG to documents that touch upon

10 the two issues addressed by the Special Investigation Committee

11 and covered by the statements or related public announcements

12 by the company.  We do not understand the Examiner to be

13 confined to those issues.  We believe KPMG's apparent position,

14 as embodied in its objections, and this is interwoven in

15 response to many of the requests, is inconsistent with the

16 Court's June 1 order.  The Examiner believes he needs to review

17 documents and information concerning other aspects of the

18 relationship between the Debtors and KPMG.

19     And here again, Your Honor, we respectfully request that

20 the Court direct that KPMG is produced -- is to produce

21 documents and information beyond materials that relate only to

22 the two issues publically announced previously by the Debtors.

23     MR. NEAL:  I have a proposed fix, Your Honor, that

24 would shorten this process.  There has to be, in our view, some

25 semblance of relevancy to the Examiner's mandate and we can

1  substitute in every instance in which we say, "which list will

2  be based on those -- on matters that relate to New Century's

3  announced plans to restate its financial statements for 2005

4  and 2006," we can substitute, "consistent with the June 1

5  appointment order."

6      We will produce the documents, to the extent there is a

7  further dispute -- and I would like to think there will not be

8  one, we've been trying to get them documents for weeks now,

9  subject to a protective order -- that we can proceed.  And the

10  parties will know the rules of engagement and will know the

11  signs on the road, especially from Your Honor's ruling today.

12  That's the best we can do.  But otherwise, the alternative is

13  to produce every document in our files.

14      MR. FOX:  Your Honor, this is Edward Fox.  I think

15  what ought to be clear here is that the issue is not about the

16  numbers of people involved, it's about the documents relating

17  to whatever number we agree on KPMG is prepared to turn over.

18  And it's easy for Mr. Neal to say, well, okay, instead of

19  saying what I said in the objection or in the motion, we'll say

20  that we'll limit it to what's in the order, but he's had the

21  order for months.  And it's very clear -- and only today, as he

22  now, you know, conceded, that okay 2004 goes as well.  We can -

23  -

24      THE COURT:  Well --

25      MR. NEAL:  The Court ruled --

1        THE COURT:  -- he didn't concede it, I --

2        MR. FOX:  Well, okay.

3        THE COURT:  I made him do it.

4        MR. FOX:  There you go.  And that I think is really

5   the point.

6        THE COURT:  And you can go back and tell your client

7   that, Mr. Neal.

8        MR. NEAL:  Thank you, Your Honor.

9        MR. FOX:  If there are -- we can discuss with Mr. Neal

10  which timekeepers we think are the most relevant if we have a

11  slightly forthcoming conversation about that with KPMG and with

12  Mr. Neal.  Where we need to have some clarity here today, I

13  think, is with respect to the limitation on the requested

14  documents that KPMG is seeking once we've determined who the

15  timekeepers are.  So that if we say Timekeeper A, we want all

16  the things set forth in the subpoena, what we need to know from

17  Mr. Neal is is he going to give us everything set forth in the

18  subpoena with respect to Timekeeper A, or does he have some

19  argument about what should be produced.  And if he does, we

20  need to know today what the argument is and have Your Honor

21  rule on it.  Because that's where we're having the problem.

22       MR. NEAL:  I agree that's where we're having the

23  problem.  The subpoena has 32 requests.  It would require us to

24  turn over every piece of paper.  We are prepared to produce

25  documents, '05, '06 and now '04, that are consistent with the

1  June 1 appointment order, and to the extent there's a

2  disagreement down the road, we come back before Your Honor.  It

3  should not be that we have to produce every document.

4        THE COURT:  I don't necessarily disagree with that.

5  Let me offer a comment.  The rules do not permit a Bankruptcy

6  Court to appoint a discovery master, which is, it seems to me,

7  might be one solution to this problem.  So you're looking at

8  your discovery master.

9      I also find that undertaking that exercise in this context

10  is horribly inefficient.  Frankly, if the parties cannot agree

11  -- and I will tell you, what counsel for the Examiner is

12  telling me rings true, and that is the relations with you and

13  your colleagues, Mr. Neal, is cordial and productive and

14  professional and as it should be, and your client, for reasons

15  which I can understand, may be a little less cooperative than

16  may be required under the circumstances, let me just say it

17  that way.  And we need to break that log jam.

18      One thought I have is -- I don't think today it's going to

19  happen, but sometime within the next week or so to sit down

20  with counsel and anyone who needs to be involved in the

21  process, either by phone or in person, and just work through

22  the requests one by one.  I am willing to do that if that's

23  what it will take to get things where they need to be.  And I

24  say that without criticizing anybody, except to the extent I

25  already have.

1        MR. NEAL:  Your Honor, we're more than willing to

2   meet.  In fact, that's what our response to the subpoena

3   outlines, a meet and confer process to limit the number of

4   custodians and to develop search terms; no more, no less.

5        MR. TOPETZES:  Your Honor, this is Steve Topetzes

6   again.  We're certainly willing to meet.  We have undertaken to

7   do that with KPMG or its counsel several times already, and the

8   success, as I described earlier, has been limited, in part

9   because they've made detailed discussions regarding certain

10  issues contingent or conditional on the protective order being

11  in place.  But also in part because we seem to be having the

12  same conversation over and over again --

13       THE COURT:  And it strikes me --

14       MR. TOPETZES:  -- and that's why --

15       THE COURT:  Yes, it strikes me that you are.  It may

16  sound a little different, but the result's the same.  Okay.

17  When can we all meet?

18       MR. NEAL:  And I'm sorry, Your Honor, were you

19  proposing to be involved in the initial meeting, Your Honor, or

20  do we come back after having an initial meeting?

21       THE COURT:  Here's what I'm going to do.  I'm going to

22  set a date, and unfortunately because of my schedule, it cannot

23  be this week.  I have a hearing and a call which I was going to

24  have this afternoon and I postponed until tomorrow, which I

25  think is going to consume my day.  I'm out at ABI Thursday and

1  Friday, which puts me into next week.  So we'll pick a time, I

2  hope, next week when we can all gather and/or talk.  But I also

3  allow that in the interim, understanding that you are all going

4  to have to sit down with me, that maybe some of the issues will

5  be resolved.  If not, I will resolve them.

6          MR. NEAL:  Very good, Your Honor.

7          THE COURT:  Does that answer your question?

8          MR. NEAL:  Yes, it does.

9          THE COURT:  Okay.

10         MR. NEAL:  In the first instance, I will be

11 unavailable next week, but there is -- I have colleagues that

12 are certainly well versed and can step into my shoes and

13 participate fully on this exercise.

14         THE COURT:  Big shoes to fill.

15         MR. NEAL:  So they will be available next week.  I do

16 not have their schedules in front of me.  Would it be possible

17 to contact Chambers in the morning after we've discussed our

18 respective schedules and see what the Court's calendar is like?

19         THE COURT:  All right, well, let's start by asking the

20 question how much time do you think the exercise will consume?

21         MR. TOPETZES:  Your Honor, this is Steve Topetzes.  I

22 think the exercise probably would consume in the neighborhood

23 of an hour because I think the broad contour question, for

24 example, whether the Examiner is entitled to receive documents

25 and information that go beyond the two issues already described

1  by the company or that formed the subject of its restatement

2  and related announcements, if the Court determines that the

3  Examiner is entitled to information beyond those two areas, I

4  think that will address many of the concerns that seep into a

5  number of the individual requests.

6          THE COURT:  All right, well --

7          MR. NEAL:  I would say 90 minutes, Your Honor, maybe

8  even 2 hours in the -- just in the event we run over which --

9          THE COURT:  All right.

10          MR. NEAL:  -- surely is a possibility.

11          THE COURT:  Well, I'm open Monday, August 13th.  I'll

12  devote a morning or an afternoon.

13          MR. FOX:  That's fine, Your Honor.

14          THE COURT:  Nancy, what about -- should I be leaving

15  Tuesday alone?

16          THE CLERK  (Indiscern.).

17          THE COURT:  Okay, so maybe Tuesday morning is a

18  possibility.  Maybe the morning of Tuesday the 14th, we'll know

19  more tomorrow.  Wednesday and Thursday and Friday are no good.

20  So let's see if we can do something during one of those two

21  times.

22          MR. NEAL:  Very good, Your Honor, and if we could

23  reach out to Ms. -- in the morning and advise what time works

24  and I will coordinate with Mr. Fox and others.  Your Honor, I'm

25  assuming the Committee will be involved in that process as

1  well.

2          THE COURT:  Yes, and I would -- my preference is to

3  have people who are on the front lines of dealing with these

4  issues present.  To the extent that creates an undue

5  inconvenience, we'll hook you up on the phone here.  But these

6  exercises typically work better eyeball-to-eyeball, I find.

7          MR. NEAL:  Very good, Your Honor.

8          MR. FOX:  Thank you, Your Honor.

9          THE COURT:  All right.

10          MR. TOPETZES:  Thank you, Your Honor.

11          THE COURT:  All right.  And that's with respect to the

12  Examiner Motion.  With respect to the Committee Motion, I think

13  I've addressed the issues that need to be addressed.  I think

14  the Committee has, with its suggestion, solved many of the

15  problems which might otherwise exist.  Mr. Neal, do you

16  disagree with that?

17          MR. NEAL:  I -- in terms of your ruling, Your Honor,

18  we would move for a stay of that ruling pending appeal, Your

19  Honor.  I can provide it orally now or in writing --

20          THE COURT:  I'm not going to be in a position to enter

21  that order until we firm up the Examiner order because the

22  Committee, I would intend, would be parallel to what I order --

23  I enter on the Examiner.  And I'll address that issue at that

24  time.

25          MR. NEAL:  Okay, very good.

1          THE COURT:  Okay.  Anything else for today?

2          MR. MERCHANT:  Your Honor, that's all we have on

3  today's agenda.  If I could ask one clarifying question.  With

4  respect to next week's meeting, is that something that you --

5  it's not a hearing, but is that something that you'd look for a

6  hearing agenda on?

7          THE COURT:  No, I don't need a hearing agenda on it.

8  I'll hang on to the binders that the parties have submitted

9  today.  To the extent that the parties think I need additional

10  writings before the meeting they can submit them, but I'm

11  thinking probably not.  And no, I don't need an agenda.  And

12  what I would anticipate doing in the way of an exercise is

13  meeting off the record somewhere and try to work through these

14  issues, and then going on the record to memorialize the result

15  of the exercise and to hear whatever any other party might want

16  to put on the record as a result of the exercise and/or the

17  Court's ruling or rulings in connection with those disputes.

18          MR. MCCAHEY:  Your Honor, I just have one question.

19  With respect to the front line people you're talking about

20  being present, are you talking about the financial advisors,

21  the accountants who will be reviewing these work papers, or are

22  you just thinking about attorneys and principals?

23          THE COURT:  What I'm thinking about is having present

24  anyone who needs to have input in order for me to be able to

25  make meaningful decisions on the requests the Examiner is

1  making and the objections that KPMG is raising.

2        MR. MCCAHEY:  Yes, Your Honor.  Okay, thank you, Your

3  Honor.

4        MR. HARRINGTON:  Your Honor, can I ask one clarifying

5  question?  Certainly if our office intends to monitor, we'll

6  have someone present, but I know Mr. McMahon is out of the

7  office next week and he would be our primary person.  And so he

8  may want to participate by phone.  And it sounds as if -- if

9  part of its going to be off the record, will there be an option

10  to participate in the off the record --

11        THE COURT:  Yes.

12        MR. HARRINGTON:  -- by phone?

13        THE COURT:  Yes.

14        MR. HARRINGTON:  So if that's necessary, I guess I'm

15  asking now for that request.

16        THE COURT:  That will probably be the more

17  important --

18        MR. HARRINGTON:  I thought it might be, Your Honor.

19        THE COURT:  -- part of the proceeding.

20        MR. HARRINGTON:  Thank you, Your Honor.

21        THE COURT:  All right.  Anything further for today

22  folks?

23        MR. MERCHANT:  No, Your Honor.

24        THE COURT:  All right, thank you.  That concludes this

25  hearing.  Court is adjourned.

1            ALL:  Thank you, Your Honor.

2        (Court adjourned)

3

4                    CERTIFICATION
5    I certify that the foregoing is a correct transcript from the
6    electronic sound recording of the proceedings in the above-
7    entitled matter.
8

9    *Lewis Parham*                         8/16/07
10   _____     _____
11   Signature of Transcriber                Date