1  - as I understand it, it was an understanding that it did not
2  violate the automatic stay, either under the laws of this
3  Circuit or under the laws of the 5th Circuit, and it was fairly
4  clear to us that it didn't, and that it was essentially a
5  prophylactic that we have a motion that requests that we be
6  permitted leave to amend a prior pre-petition pleading to
7  assert additional defensive measures.

8          THE COURT:  Well, I'm trying to follow up on your
9  position that what you did was defensive in nature.  Was there
10 a motion pending that had an answer deadline, or was there a
11 process ongoing which required your filing to protect your
12 client's position?  What -- and I don't get the sense there was
13 anything specifically pending at the time this motion was
14 filed.

15         MR. RALSTON:  Well, because the matter was -- because
16 the matter was back before the District Court, because the 5th
17 Circuit had overruled the District Court and remanded, based on
18 the 5th Circuit's decision, what was actually before the
19 District Court was the Debtors' Motion to Confirm the
20 arbitration award --

21         THE COURT:  And was it your understanding that that
22 process was going to move forward without further hearing or
23 without further submissions?

24         MR. RALSTON:  Your Honor, I don't know -- I'm not
25 aware of any -- there's nothing in the District Court docket,

1  to be perfectly candid, that indicated that there was any

2  Scheduling Order.  It certainly was out there though.

3          THE COURT:  And -- well, you've answered my question.

4          MR. RALSTON:  Thank you, Your Honor.  Your Honor, I

5  believe I'll just get to why we believe that it's appropriate

6  at this time that the litigation go forward.

7      First, the parties have already prepared for trial.

8  There's already been one trial in the matter, and the Debtors

9  are in the process of and appear to have retained their pre-

10  petition counsel in the matter.  The case is over 4 years old,

11  and with further delay grows the risk that evidence will be

12  lost and witnesses will become unavailable.

13      Third, Your Honor, we believe that the claims at issue

14  cannot disrupt the Debtors' ongoing operations because the

15  Positive Software Solutions software system, which was licensed

16  to the Debtors, was used in their loan origination platform,

17  and that platform, as we understand it, has ceased operating.

18      There was at least -- fourth, Your Honor, there is at least

19  a real prospect that the claims that Positive Software has

20  asserted, if we obtained a judgment on those claims, can be

21  satisfied in whole or in part by insurance.

22      And fifth, Your Honor, based on the District Court's

23  preliminary injunction ruling, Positive Software's claims have

24  found to have a substantial likelihood of success.  Your Honor,

25  I guess there are two issues here.  Apart from why --

1          THE COURT:  Do you think subsequent developments might

2     cast some doubt on that?

3          MR. RALSTON:  The Debtors, in their response papers,

4     obviously indicate that they believe that the arbitration award

5     supplants the District Court's preliminary injunction rulings

6     as far as the chance of success on the merits.  One, Your

7     Honor, I think that as indicated by the District Court itself,

8     that Court has grave concerns with the propriety of the

9     arbitration award, including the arbitrators' rulings that were

10    contrary to rulings made by the District Court as part of the

11    preliminary injunction process, and that is contained -- I

12    mean, the Court went so far as to include those concerns as

13    part of his Order to Vacate.  So we think that at least between

14    the two, the weight of the evidence would support the

15    evaluation of the Texas District Court over the arbitration

16    award.

17          THE COURT:  But, I mean, does that standard fit

18    anywhere in the ultimate disposition of the underlying claims?

19          MR. RALSTON:  I -- Your Honor, the -- well, the Texas

20    District Court made very specific findings as part of its

21    preliminary injunction ruling that the software being developed

22    by the Debtors pre-petition had been essentially copied from

23    Positive Software's software.  We think -- and based upon that

24    evidence issued a very strong preliminary injunction enjoining

25    the Debtors --

1           THE COURT:   But the arbitrator had a trial.

2           MR. RALSTON:   And Your Honor -- well, Your Honor, I
3    guess we have to get to the point as to whether the arbitration
4    award is gonna stand in the first place or not.   The District
5    Court, which we think is unusual and which we think shows the
6    degree of concern that the Court had for the manner in which
7    the award was procured, has indicated as part of his Motion to
8    Vacate that had he not vacated the award on the issue of non-
9    disclosure, that he was likely -- and since he never got to it,
10   he never made a firm ruling, but he stated explicitly in that
11   order vacating the award that he would be likely to have
12   granted Positive Software's Motion for Leave to Amend to assert
13   the fraud basis for vacating the award.   And two, that he was
14   likely -- he would be likely to grant the Motion to Vacate on
15   those independent grounds.

16          So Your Honor, we obviously don't believe that the award
17   should be of any weight, or if any weight, it should be
18   tempered by the fact that the District Court was concerned with
19   the propriety of that award for various reasons and had made
20   findings as part of his -- independent findings after
21   evidentiary hearing that there was a substantial likelihood of
22   success on Positive Software's claims.

23          And Your Honor, one of the issues that the Debtors have
24   raised in their response papers is what forum would be the best
25   place to decide the issue.   And we think it's clear that with

1  much respect for this Court, that given the history that the

2  Texas District Court has with this case, and given the

3  specialized nature of Positive Software's claims involving

4  intellectual property rights, and given the fact that there are

5  -- there's pending litigation with pending -- with injunction

6  rulings that are still in effect issued by that Court, that the

7  appropriate place to have this matter overseen would be the

8  Texas District Court.

9       Finally, Your Honor, adding to that, the counsel for both

10 parties are based in Texas.  And certainly Positive Software,

11 to the extent that any witnesses would need to appear on behalf

12 of Positive Software in any second trial, Dallas is probably as

13 easy or easier to get to from California as Delaware.

14      THE COURT:  Isn't the Debtor really saying, "We're not

15 arguing about where now, we're arguing about when"?

16      MR. RALSTON:  I think the Debtor argues both.  To be

17 candid, I think that when is probably the bigger issue.  I

18 think where is probably less of an issue, at least in our mind.

19 The problem that we have is that we have invited the Debtors to

20 give us a scenario as to when we could proceed.  We're ready.

21 We would like to get --

22      MR. SILBERGLIED:  Objection, Your Honor, he is trying

23 to get into more of a settlement communication.

24      MR. RALSTON:  Well, I don't think it's a settlement --

25 it's a settlement communication to the extent we can come to an

1  agreement.

2          THE COURT:  Well --

3          MR. RALSTON:  The problem with -- let me restate it,

4  Your Honor, and I'll reverse that.  The Debtors -- one problem

5  that we have, Your Honor, is that the Debtors, in their

6  response papers, offer no timeline or no specific set of

7  circumstances under which they believe it would be appropriate

8  to proceed.  We understand the Debtors are stretched, Your

9  Honor, but it's probably not gonna change.  I've been here.

10  This is the second time here, the second time I'm hearing

11  issues raised about how stretched this estate is.  Generally,

12  Your Honor, my experience is that it doesn't get any better as

13  the case goes along.  Usually, you lose people.  In fact, it's

14  the Debtors' decision on a business judgment test, but it's

15  also my experience that they're gonna lose people as the

16  process goes along; people with institutional knowledge of this

17  case.  And it will make it more difficult, if anything, for the

18  Debtors to retry this with time.  We don't see -- in fact, we

19  think that the Debtors might be better off addressing these

20  issues now.  They have counsel in place.  That counsel knows

21  the issues, knows the facts, discovery has been taken,

22  essentially without little -- with little preparatory effort.

23  And assuming that the award does get vacated as we anticipate,

24  this should not be an arduous process.  And that's why we think

25  we ought to be able to go forward now.  We don't think anyone

47

1  gets harmed.  We think that these claims need to be liquidated

2  at some point in time, and that it's probably easier for

3  everyone to get it done today.

4           THE COURT:  Thank you.

5           MR. RALSTON:  Thank you, Your Honor.

6           MR. SILBERGLIED:  Good afternoon, Your Honor.  For the

7  record, Russ Silberglied, Richards, Layton & Finger, on behalf

8  of the Debtors.  I also have an exhibit binder that was also

9  agreed to by the parties, if I may approach?

10          THE COURT:  You may.

11     (The Court receives document)

12          MR. SILBERGLIED:  And Your Honor, one of the documents

13 in here, item #4, is the arbitration award which was filed

14 under seal in Texas.  Positive Software wants it to continue to

15 be under seal and has filed a motion, and the Debtors don't

16 have an objection to that.

17          THE COURT:  All Right.

18          MR. SILBERGLIED:  Your Honor, I prepared some more

19 detailed remarks based upon Your Honor's questioning.  I

20 obviously can see that you've read the papers, so if Your Honor

21 will bear with me, I'll try to cut through at least some of it.

22 Does Your Honor have a preference whether we refer to sanctions

23 first or the Motion to Lift Stay first?

24          THE COURT:  No.

25          MR. SILBERGLIED:  I'll proceed with the Motion to Lift

48

1  Stay first then.  Let's start with probability of success on
2  the merits.  There was some discussion about this, and Your
3  Honor did ask questions; I think it's the right questions.  We
4  admit that there aren't that many cases that deny Stay Relief
5  Motions on the third prong, the so-called third prong or the
6  Rexene test, probability of success on the merits.  The prong
7  has to mean something.  If it didn't mean something, it
8  wouldn't be part of the test, it wouldn't be repeated by every
9  Court that analyzes it.  And we would respectfully submit that
10  if this case demonstrates probability of success on the merits,
11  you might as well write it right out of the test because what
12  you have here is you have an 86 page arbitration award that's
13  before Your Honor in tab #4 that was issued after a 7 day trial
14  before an arbitrator that itself was only issued after ruling
15  on -- I forget the number -- 8 Partial Summary Judgment
16  Motions, lots and lots of documents into evidence, 19 witnesses
17  that the arbitrator addressed credibility on.  And not only did
18  he categorically reject each and every claim by Positive
19  Software, but he granted $1.5-plus million against Positive
20  Software.

21       Not only that, but their lead argument on appeal, or on a
22  Motion to Vacate, was taken all the way up to the United States
23  Supreme Court and rejected.  Now, they have other arguments, if
24  they didn't we wouldn't be here today.  But if that's
25  probability of success on the merits, I don't know why we have

1  that prong in the test.  We would respectfully suggest that

2  that is reason enough to deny the motion.

3       Indeed, we did substantial research at Richards, Layton &

4  Finger.  We could not find a single case that said that a

5  Movant had met the probability of success on the merits test

6  when they were moving to vacate an arbitration award against

7  them or an analogous circumstance where they had lost at a

8  trial Court and were -- you know, had appeal rights still, no

9  cases have ever so held, at least none that we could find after

10 looking hard for it.  We think that that's telling.

11      Their only real argument, as you heard today, is that the

12 District Court had granted a Motion for a Preliminary

13 Injunction before the arbitrator ruled, and in so doing, had to

14 obviously say something about probability of success on the

15 merits.  But of course that's a preliminary ruling on a

16 preliminary and an incomplete record, and, you know, you can

17 get into niceties about whether the arbitrator's award

18 supercedes or doesn't supercede.  They've given us a technical

19 legal argument that it doesn't supercede.  I don't really think

20 that that's the point about whether it actually supercedes the

21 District Court as a matter of law.  What is important is that

22 the trier of fact, who wrote an 86 page opinion after seeing 19

23 witnesses over 7 trial days, thought that there was no

24 probability of success.  And here, probability of success would

25 be defined as both vacating that award, going back to trial,

50

1  and winning at trial a second time, even though unsuccessful
2  the first time; high hurdle overcome.

3       The next prong of Rexene or a second prong of Rexene is
4  whether Positive Software will be harmed if the stay is not
5  lifted.   Their lead argument is that they will be prejudiced if
6  the case proceeds here instead of Texas.   I'm not gonna belabor
7  this one because Your Honor mentioned exactly what we were
8  arguing.   A Motion of Stay Relief is a when test, not a where
9  test.

10      THE COURT:   Well, that having been said, I mean, it
11 seems to me that the Movant here is probably right about the
12 where.   And if you assume for the purpose of the question I'm
13 about to ask that that's true, then when?

14      MR. SILBERGLIED:   Fair questions, Your Honor.   The
15 first is that we're not gonna concede that first point, but if
16 Your Honor wants me to take that as a hypothetical, I will.   I
17 will note, for example, that the Creditors Committee has filed
18 an objection to this Stay Relief Motion.   I think you're gonna
19 hear from Mr. Indelicato that he's got very grave concerns too,
20 and obviously if this case is tried in Texas, much more
21 difficult for the Creditors Committee to be a participant as
22 opposed to part of the bankruptcy process.   But I will take
23 Your Honor's hypothetical and go from there.

24      The answer is I don't have a specific date that I can give
25 you, but what I do know is that at a minimum, what needs to

1  happen first is we need to have a bar date come in, we need to
2  do claims analysis, not just of Positive Software but lots of
3  claims.  We need to start plan negotiations, and we need to
4  figure out what the plan is in this case.  So again, a precise
5  date I don't know, but this is still pretty early on in a case
6  this size.  The petition date was March or April?  The petition
7  case was April 2nd, Your Honor, so we're only a couple of
8  months in.  There has been no other Motion for Relief from Stay
9  that has been granted, even though this company has hundreds of
10 other lawsuits against it.

11        THE COURT:  Although given the pace at which the case
12 has proceeded, I wonder if we should look at the time as kind
13 of in dog years.  It's really been a lot more than a few
14 months.

15        MR. SILBERGLIED:  It does seem that way to everybody
16 that's in the Courtroom, I'm sure, Your Honor, but the reality
17 is that Positive Software has only had to wait a few months,
18 and it actually hasn't had to wait for even half of that amount
19 of time because the United States Supreme Court actually denied
20 cert during the pendency of this case.  So I believe that it's
21 only been about a month that Positive Software has been {quote}
22 {unquote} "waiting."

23        We believe that what we want our management -- not we
24 believe, we know that what we want our management and our
25 employees to be doing at this point is to be focused in on the

1  reorganization efforts now.  They make a point that this is a
2  liquidation case and it's not a true -- that's a distinction
3  without a difference.  In this Circuit, of course, a plan of
4  liquidation is a reorganization, and the paramount interests of
5  Creditors here is to be proceeding towards a plan process.  We
6  need to get several of the typical bankruptcy steps down the
7  road before we can be proceeding to a plan process.

8       We do have, as Mr. Ralston alluded to, less staff today
9  than we did at a certain point.  And while I understand his
10 arguments that maybe we'd be better off at our trial against
11 Positive Software if we had other employees, the fact of the
12 matter is that because we have less staff today than we once
13 did, we need that staff to be focused like a laser beam towards
14 the plan of liquidation.  So again, I don't have a precise date
15 for Your Honor in answer to the question, but there certainly
16 needs to be a series of steps, and we're not there yet.

17              THE COURT:  What's the present exclusivity deadline?
18              MR. SILBERGLIED:  May I have a moment, Your Honor?
19              THE COURT:  You may.

20       (Counsel confer)

21              MR. SILBERGLIED:  I think Ms. Uhland believes that may
22 be 6 months from the date of filing, which I guess would mean
23 that it's in October.

24              THE COURT:  Does that anticipate that an extension
25 will be requested?  I know that's a long way away in bankruptcy

1  timing, and I'm not asking for a commitment.

2           MS. UHLAND:  Your Honor, our claims bar date is -- for

3  non-governmental entities is the August 31st date.  We are --

4  if we can get through an initial claims analysis, we are trying

5  to get a plan on file within our first exclusivity period.

6           THE COURT:  Okay.

7           MR. SILBERGLIED:  Your Honor, moving to the -- unless

8  Your Honor has questions on that fact, moving to other

9  arguments, Positive Software also argues that without stay

10 relief a limited pot of insurance will be used up.  That's what

11 they argued in their motion until we pointed out in our

12 answering brief that either this argument has it entirely

13 backward or it's simply unsupported.  So they have a different

14 position in their reply.  But first to spell out what I mean,

15 if we had insurance, the argument would be entirely backward

16 because if you lifted the stay on this case where they want $38

17 billion in damages and don't lift the stay with respect to all

18 other claims against an insurance pot, Positive Software wins

19 an unfair race to the Courthouse that an automatic stay was

20 supposed to prevent.  Obviously, we don't have $38 billion of

21 insurance under anybody's stretch of the imagination.

22          The reality of the situation, though, is we have no

23 insurance.  And Your Honor has in your binder both the

24 complaint in California, where we are suing the D&O insurer.

25 We of course believe that the D&O insurer should be insuring

1 this case, but they aren't, so we've sued them.  In fact, Your
2 Honor has a 327(e) Motion in front of you to retain the law
3 firm of -- I'm not even sure if I'm pronouncing it right --
4 Boudy & Titus to be our counsel to prosecute that cause of
5 action precisely because the insurer is refusing to pick up the
6 defense.

7          THE COURT:  And what's the posture of that case?
8          MR. SILBERGLIED:  The case is fairly old.  It was
9 filed in -- I don't have the complaint in front of me, it's #1
10 in Your Honor's binder, I think in 2005.  But it's not on track
11 for an imminent trial.

12          THE COURT:  Well, are you suggesting that relief from
13 stay, if it's ever appropriate, should not be granted until
14 after resolution of that lawsuit?

15          MR. SILBERGLIED:  No, Your Honor, and that's the
16 position that they retreat to in their reply is they say, well,
17 we haven't proved that there is no insurance, and that they
18 should be able to go forward instead.  My only point was they
19 were using insurance as a reason why they should get the stay
20 lifted, and they haven't proved that there is insurance; in
21 fact, we have now submitted evidence that there is -- that
22 there certainly currently is no insurance, and what there
23 really certainly is not is there is no prejudice to Positive
24 Software in not being able to try to tap that policy.  Because
25 even if they had a judgment against New Century today, the

1  insurer does not agree to pay it, and that is the relevance of

2  the fact that that lawsuit is pending for the purposes of this

3  Stay Relief Motion.

4      Obviously, the other relevance is that New Century will be

5  harmed because we're not getting defense costs fronted, but

6  Your Honor's question goes to that second point.  The first

7  point, though, undoubtedly is the case.  There's no prejudice

8  to Positive Software because they're not getting insurance

9  proceeds on an as current basis regardless.  There also is no

10  commercial insurance as they would allege.  We've submitted the

11  insurance policy in the binder.  There's an express exclusion

12  for intellectual property type of issues with respect to the

13  commercial policy, and as a result, that carrier has refused to

14  cover it as well.

15      The harm to New Century if the stay is lifted, we've got

16  the floodgates argument that I alluded to before, the fact that

17  there are, you know, hundreds of other suits against New

18  Century.  Your Honor hears that one every time so I'm not gonna

19  belabor it.  And we already talked about the fact that we need

20  our people to focus on the road ahead and the plan of

21  liquidation.

22      So with that, Your Honor, unless you have questions, I'd

23  move on to the Sanctions Cross Motion.

24          THE COURT:  Go ahead.

25          MR. SILBERGLIED:  I wanna talk about three things.

56

1  First, the statute -- what the statute and the case law
2  provide.  Second, the facts and why it's important to award
3  sanctions here, and third, briefly, what the sanctions should
4  be.

5       First for the law, the Debtor is -- if the Debtor is
6  {quote} "injured by a willful violation of the automatic stay"
7  {end quote} it {quote} "shall recover actual damages including
8  costs and attorneys fees and in appropriate circumstances may
9  recover punitive damages" {end quote}.  So we start with the
10 word "shall."  Obviously, Congress didn't intend for this to be
11 optional.  And the only limiting factors are whether it's
12 willful and whether there were any damages, but the incurrence
13 of attorneys fees are statutorily defined as being part of
14 those damages.

15      So in this case, this is not a situation where a party did
16 not know that there was an automatic stay in place.  On April
17 11, Positive Software filed a pleading in this Court that
18 contained a footnote that said it was concerned about the
19 automatic stay in connection with the United States Supreme
20 Court's consideration of a petition for Writ of Certiorari, and
21 that as a result, it would promptly, if not simultaneously,
22 file a request for relief in front of Your Honor.  That was
23 April 11.  We didn't get such a request until July.

24      The actions that they took, the Motion for Leave to file a
25 Motion to Vacate, the whole point of that motion is to ask the

1  District Court to kick-start the litigation.  The ultimate

2  relief requested in the motion is a new trial, so it is clearly

3  a continuation of pre-petition litigation.  Positive Software

4  argues that it's not a stay violation because it's trying to

5  slice and dice between what is a claim and what is a counter

6  claim, but there is one motion to vacate, not two.  That motion

7  asks for the entirety of the arbitration judgment to be thrown

8  out, claims and counter claims.  I will guarantee you that if

9  you ask Positive Software, well, is your position that if your

10 motion for -- Motion to Vacate is granted, the only motion you

11 have on file, you will not present a claim against New Century,

12 you will only get the $1.5 million counter claim against you

13 thrown out, the answer, of course, will be no.

14      In any event, all Your Honor has to do is look at the last

15 sentence of the proposed pleading, which is attached to the

16 Debtors' objection, which we would ask the Court to take

17 judicial notice of.  And in that Positive Software's request

18 for relief states as follows, {quote} "Positive Software asks

19 the Court, for the reasons previously stated and herein, to

20 vacate the award and grant Positive Software a new trial" {end

21 quote}.  It most definitely is not limiting it's request to

22 throwing out the award on the counter claims.  It wants a new

23 trial on the claims, the affirmative claims, to one and the

24 same pleading.         Moreover, Positive Software's attempt to

25 parse out what goes to the claim and what goes to the counter

1  claim was actually considered and rejected by the arbitrator in
2  a very related context.   What is the 1.5 million?   The 1.5
3  million against Positive Software in the Debtors' favor is
4  actually our attorneys fees.   We had damages of something like
5  $11,000, plus an award of 1.5 million of attorneys fees.   So
6  the arbitrator was called upon by Positive Software to parse
7  out the $1.5 million of fees that our counsel, Sussman Godfrey,
8  had expended;   maybe some of the 1.5 million went to claims,
9  maybe some went to counter claims.   And the arbitrator declined
10 to do so stating {quote} -- and this is page 85 of the award,
11 which is at tab 4 of your binder.   He states, {quote} "All
12 parties and all issues were intertwined and the facts
13 respecting the same overlapping" {end quote}.   On that basis,
14 he awarded all of Sussman Godfrey's fees.   That's the same
15 thing here.   You could attempt to artificially say, well, some
16 things are claims and some things are counter claims, but it's
17 all the same issue.   In the words of the arbitrator, they're
18 all intertwined.   It was the flip of the same coin.

19      The attempts to parse also don't work if you look at this
20 in another way.   Let's take the newest theory that Positive
21 Software advances for vacature, that the arbitrator committed
22 fraud by not disclosing alleged conflicts.   Was he committing
23 fraud only with respect to ruling on the claims?   Was he
24 committing fraud only with respect to ruling on the counter
25 claims, some of both?   Obviously, Positive Software would

1   contend both.  Certainly the Motion to Vacate does not ask the
2   Texas Court, "Please rule that the arbitrator defrauded us in
3   ruling without telling us about its contacts on the counter
4   claims, but it was perfectly fine for him to rule on the
5   claims."  Obviously, that's not what it says.  So it's
6   nonsensical to talk about trying to parse this out with respect
7   to the claims and the counter claims when the theories to
8   vacate themselves go to both.

9       There was a lot of discussion in Mr. Ralston's opening
10  about the defensive nature of his motion, and one of the things
11  he -- I think Your Honor was absolutely correct.  There was
12  nothing that required them to take this bull by its horns and
13  file pleadings now.  He cites to the fact that we had a motion
14  on file.  We filed that motion, Your Honor, in the year 2004.
15  It was 3 years pre-petition.  There was no clock that had
16  something that was imminent.  And to the extent there really
17  was confusion, Your Honor -- I think this is a key point --
18  there was no telephone call to us saying, well, we're confused
19  as to whether the automatic stay applies or doesn't apply.  Do
20  we really need to file a pleading now.  There wasn't even a
21  notice of stay that was filed by Positive Software saying, hey,
22  you know, there's some argument that maybe we should be filing
23  our papers, but we're not gonna do it because of the stay.  All
24  they did was they --

25            THE COURT:  I'm sorry to interrupt.  I'm hearing noise

1  from one of the telephone participants.  Let me ask that
2  everyone be certain that their phone is on mute.  I'm sorry for
3  the interruption.  Go ahead.

4         MR. SILBERGLIED:  Thank you, Your Honor.  If they
5  really had those kinds of concerns, there were many, many ways
6  to address them without filing a pleading that we were forced
7  to respond to, and you have that response in your binder.  We
8  have actually had to respond.

9         They also argue in their reply brief, and again today,
10  that there's some inconsistency because we stated the matter is
11  stayed, and yet we also say that some of their arguments are
12  untimely.  There's no inconsistency, Your Honor.  We argue that
13  their arguments were untimely because they weren't asserted in
14  the year 2004, 3 years pre-petition.  There's no -- I mean, if
15  the stay is lifted today or 6 months from now or a year from
16  now, they're not gonna become more untimely.  They're either as
17  a matter of statute, the Federal Arbitration Act, they're
18  either untimely in the year 2004 or they weren't.  So there's
19  absolutely no inconsistency there at all.

20         That's only one act to violate the stay.  That was the day
21  before they filed their Motion for Stay Relief.  After they
22  filed the Motion for Stay Relief they violated the stay again.
23  They served subpoenas in aid of their stay violating motion.
24  They served them on the Sussman Godfrey law firm and on one
25  it's attorneys, Ophelia Commeanya, asking for documents,

1  documents in aid of a motion that violated the stay.

2      They make a point that, well, we didn't ask for documents
3  from the Debtors.  That argument is a farce, Your Honor.  First
4  of all, they made it -- first of all, there is no distinction
5  in the law between seeking documents from a third party in a
6  stayed case and seeking documents from the Debtor in a stayed
7  case, that simply is not part of the automatic stay case law.
8  But in any event, to say that that's a thinly veiled attempt at
9  an end run is an understatement.  They essentially asked for
10 the Debtors' documents, and instead of directing them to the
11 Debtor, they directed them to the Debtors' trial counsel, and
12 they asked for all documents concerning communications that are
13 attorney and client.  I mean, it's privileged on top of it, but
14 besides that obvious point, it's just an attempt at an end run
15 around the stay, and one that doesn't even work as a matter of
16 law anyway.

17     There's no question that the filing of these pleadings
18 violated the stay.  There's no question that under the 3rd
19 Circuit case law it is a willful violation of the stay because
20 the 3rd Circuit case law that we spelled out in our brief, and
21 I won't belabor it here, makes clear that willful violation of
22 the stay does not mean I intended to violate the stay.  It
23 means I -- there was no accident in me filing that pleading.  I
24 meant to file the pleading, and thereafter, it turns out that
25 that pleading violated the stay.  That's what the 3rd Circuit

1  had said.   That clearly is the case here.

2      So on to damages, and I'll just do damages very briefly.

3  Under 362(k)(1), we get damages in the amount of our attorneys

4  fees and any other damages.   We certainly have incurred

5  attorneys fees.   We incurred attorneys fees in filing the

6  objection to the Motion to Vacate that is in Your Honor's

7  brief.   We incurred further attorneys fees in objecting to the

8  subpoenas on Sussman Godfrey.   That is not in your binder

9  because it was just recently filed, but it has been filed and

10  we did expend those fees.   We further expended fees of

11  bankruptcy counsel, of my firm, in having to file this cross

12  motion in an attempt to get them to stop violating the stay.

13  So what we would ask for in that respect is to put -- to be --

14  for a finding of Your Honor that these are compensable damages

15  in an amount to be determined when we put in an affidavit.

16      We also would ask Your Honor for sanctions which are

17  permissible under 362(k)(1) for a willful violation of the

18  automatic stay because as I said before, we think this case is

19  cut and dry.   They had bankruptcy counsel.   We're not blaming

20  bankruptcy counsel, the bankruptcy counsel didn't violate the

21  stay, obviously the counsel on the merits did.   But they had

22  Bankruptcy counsel and they still violated this stay.   They

23  told this Court they were gonna file a Motion for Stay Relief,

24  they didn't do it, and then they violated the stay, and then

25  they violated a second time.   This is a perfect case to deter

1  future conduct by the award of punitive damages.  Thank you,
2  Your Honor.

3          THE COURT:  Thank you.

4          MR. INDELICATO:  Your Honor, Mark Indelicato on behalf
5  of the Committee.  I'm sorry I don't have a binder to hand up
6  with exhibits, but I think we'll get along without it.

7          THE COURT:  I'm not sorry.

8          MR. INDELICATO:  Your Honor, I think we should first
9  point out that the Committee adopts the presentation made by
10 Mr. Silberglied.  And when you look at it from the Committee's
11 perspective, I think that the thing that sort of sticks out in
12 my mind in his presentation is under the arbitration award,
13 they got 11,500 and change in damages, and $1.5 million in
14 award in attorneys fees.  Your Honor, when you look at it, and
15 we're only up here to stress the prejudice to the Debtor and
16 the lack of prejudice to Positive Software, if they have a
17 claim, they have an unsecured claim.  And unfortunately in this
18 case, there's a lot of them.  And unfortunately in this case,
19 they're in the tens of millions of dollars.  So the fact that
20 they have a $38 million claim, if that's what they have, that
21 will be decided at some point in the future.  And I won't
22 concede the where, nor will I concede to the when.

23         But Your Honor, what we're concerned about from the
24 Committee's perspective is if we go back and go to seek to
25 confirm this arbitration award and have to go back and litigate

1 the issues about whether the arbitration award should be

2 vacated, and then go back to the trial, so now I have

3 potentially another million and a half dollars in legal fees --

4 say it's not a million and a half, say it's a million, say it's

5 two million, say it's half a million.  Whatever it is, those

6 are hundred cent dollars that I'm paying to deal with an

7 unsecured claim.  We'll deal with the claim when the

8 appropriate time exists, but now is not the time.  We think the

9 stay should not be lifted.  We believe that this is an

10 unsecured claim.  If and when it's appropriate to deal with it,

11 we will deal with it.                And Your Honor, as I started

12 with, this is, you know, a very small award with respect to

13 attorneys -- with respect to damages, and a large with respect

14 to attorneys fees.  So obviously this is a litigious group, let

15 us just say, so we wanna stop that.  We wanna stop the

16 litigation going forward.  If Your Honor will recall, when we

17 had the primary counsel retained with respect to the Positive

18 Software litigation, I got up before Your Honor and I said,

19 "Your Honor, they're being retained but we're putting severe

20 caps in.  We're monitoring this.  We don't want the litigation

21 to get over-broad."  We're back here again saying the same

22 thing.

23        We think this is a litigation that if the stay were

24 lifted, I'm not so sure how much better Positive Software will

25 be because they will still have an unsecured claim that we will

1  have to determine the magnitude of it in some way, shape, or
2  form.   And whether or not we intend to confirm the arbitration
3  award, we're gonna need to look at that very carefully to
4  determine the strengths and weaknesses of that case before we
5  embark on that litigation and throw good money potentially
6  after bad.

7       So Your Honor, we believe that the stay should not be
8  lifted and we support the Debtor that there should be award of
9  some damages related to the willful violation of the stay.
10 Thank you.

11          THE COURT:   Thank you.   Briefly.

12          MR. RALSTON:   Thank you, Your Honor.   Getting to the
13 parsing allegations, Your Honor, as far as the allegation we
14 violated a stay, the arbitration award finds against my client
15 for over $1.5 million.   How that cannot be a claim against my
16 client which we're permitted to defend by responding to a live
17 pleading is beyond me.   Now, it may be an aggressive act, but
18 it's not in violation of the automatic stay as interpreted by
19 the 3rd Circuit in <u>Maritime Electric</u>, and we're very firm about
20 that, Your Honor.

21      As for our new trial, Your Honor, I promise you my client
22 will not be going forward unless and until this Court says it's
23 okay to do so on a --

24          THE COURT:   Well, what have you asked in the District
25 Court in Texas?

1           MR. RALSTON:  Your Honor, I will have to review that
2  pleading, and unfortunately, I don't have it before me.  If it
3  was put in there, it is an oversight.  I am stating on the
4  record that -- before this Court, we will not move forward on
5  any claims before this Court rules and permits us to do so.
6  And if we need to file something in the Texas District Court
7  action to essentially remove that request for relief, which I
8  presume is one line at the end of the conclusion, we will do
9  so.

10          THE COURT:  Well, is that document in evidence
11  somewhere?

12          MR. SILBERGLIED:  Yes, Your Honor.

13          THE COURT:  Where is it?

14          MR. SILBERGLIED:  It is attached as one of the
15  exhibits to our objection and cross motion.

16          THE COURT:  All right, which exhibit?

17          MR. SILBERGLIED:  Bear with me, Your Honor.

18          THE COURT:  All right.  Exhibit 1?

19          MR. SILBERGLIED:  I think it is.

20          THE COURT:  Well, that's what it says.  "Positive
21  Software asks the Court for the reasons stated previously
22  herein and to vacate the award and grant Positive Software a
23  new trial."

24          MR. RALSTON:  Again, Your Honor, our intent was
25  defensive.  That's an unfortunate statement in there, and I

1  will inform trial counsel, and we will remedy that immediately.

2  I promise you that, Your Honor.

3      Your Honor, again, while certainly we feel strongly that

4  we did nothing to violate the stay, as far as any sanctions,

5  our intent in filing a Motion for Leave to Amend a prior Motion

6  to Vacate was made because of our concern that there was a live

7  pleading out there, and that there were issues regarding timing

8  --

9      THE COURT:  You don't disagree with the Debtor,

10  though, that the pleading was 3 years old, 4 years old?

11      MR. RALSTON:  The pleading -- essentially, Your Honor,

12  the reason it was --

13      THE COURT:  Well, answer my question.

14      MR. RALSTON:  The original -- I'm going through the

15  time, Your Honor.  It's approximately 4 years old, yes, Your

16  Honor -- 3 years old.  It was filed in 2004.  That was our

17  Motion to Vacate.  And -- but the reason for the aging was the

18  fact that the District Court granted that motion.  That motion

19  went up to an appeal before a 5th Circuit panel which affirmed

20  the District Court that we were correct -- that the District

21  Court was correct in vacating the motion based on the failure

22  to disclose contacts of the arbitrator and that it then

23  proceeded to the 5th District Enbanc, which in a split decision

24  reversed, and, we believe, asserting a new basis in law.  So

25  the reason --

1            THE COURT:   You know, Enbanc, if there was one more
2   vote against you than there was for you, that ends it.

3            MR. RALSTON:   Your Honor, you're right.  And the
4   appeal on that legal grounds was put to bed when the Supreme
5   Court denied certiorari on those grounds.  And it is what it
6   is, Your Honor.  The problem that we face, as I explained
7   earlier, was that we faced a live pleading without the
8   additional grounds that the District Court had declined to rule
9   upon earlier because he was granting on the first grounds that
10  we raised.  He granted the Motion to Vacate on the original
11  grounds.  So Your Honor, we raised essentially the same grounds
12  in our leave to amend as had previously been issued, and
13  there's no surprise there.

14       Now Your Honor, as far as the wording of 362(k), you know,
15  it's interesting that "shall" has to mean "shall" in that
16  provision, but "individual" can mean anyone.  And we would
17  stress, Your Honor, that in a case where you have this type of
18  situation, the Court has discretion if it does determine that
19  we were in technical violation of the automatic stay in
20  awarding any damages.  And Your Honor, we certainly don't think
21  that our conduct would be such that any punitive damages would
22  be merited.

23       In fact, Your Honor, I'd like to get back to my Motion for
24  Relief from the Automatic Stay.  I think the Court raises an
25  issue that we would like; essentially, what kind of timeline we

1  can expect if the stay is not gonna be lifted now, if there's

2  any way that we can get some guidance as to when  at least we

3  can re-urge that position or when the Debtors would be made to

4  come before this Court to basically show cause why it should

5  not be lifted so that we can go forward.

6       There may be a lot of Creditors out there, but this is a

7  complex case.  It's ready for trial.  It's already been tried

8  once, and it's gonna have to happen sometime.  And again, I

9  think it's in the best interests of Positive Software that it

10 happens soon, and we don't see any prejudice to the Debtors

11 that it happens soon.  They've got their counsel in place.

12 Counsel is well versed in the facts and the issues, and the

13 parties ought to be able to proceed.  Thank you, Your Honor.

14            THE COURT:  Thank you.  All right, I am prepared to

15 rule on the motion and I will, as we typically do here, apply

16 the Rexene Product standard.  I am going to deny the Motion for

17 Relief from Stay without prejudice, and we'll talk about timing

18 in response to counsel's question in a moment, for the reasons

19 that the Debtor here has asserted.  And I agree, it's not usual

20 that the probability of success prong factors prominently in

21 this analysis.  I don't think the Movant here has demonstrated

22 probability of success on the merits.  I don't see harm in some

23 delay.  I do see harm to the estate for the reasons that have

24 been asserted here, the cost of defense, although I acknowledge

25 that at some point the claim, absent some agreement, will have

1  to be liquidated.  I think the absence of insurance is also a

2  factor of some moment.

3       I don't think the question -- well, let's put it this way.

4  There will come a time when this claim will have to be

5  liquidated, and I won't speculate because sometimes issues come

6  to me in contexts that I wouldn't necessarily anticipate.  But

7  let me just say it this way.  If the issues are at some time in

8  the future what they are now, it strikes me -- it makes much

9  more sense from an efficiency standpoint for this matter to be

10  tried in the forum where it's been pending.  But I'm not going

11  to make that ruling now because the issue strictly isn't before

12  me.  And when it comes before me, it may be framed differently.

13  And to further respond to counsel's question, what I normally

14  tell Debtors is at some point you'll have to liquidate this

15  claim.  And, you know, the moving party isn't going to be made

16  to wait forever.  One logical time when it might be appropriate

17  for the motion to be renewed would be at or about the time that

18  a plan is filed so that you can see what treatment has been

19  proposed for the litigation.  Sometimes that frame's a little

20  bit the issue of the where, but beyond that I can say no more

21  at this point.

22       With respect to the Debtors' Cross Motion for Violation of

23  Relief from Stay, and after reviewing the facts as they've been

24  presented in the pleadings and in the exhibits that have been

25  presented and taken into evidence, and after review of

1   applicable 3rd Circuit law, it's clear to me that there was a

2   stay violation here.  The Debtor is the Defendant in this

3   litigation.  Despite counsel's best efforts to paint the

4   picture that there's a live motion to which a response was

5   necessary at this time to protect its position in a defensive

6   manner, I do not agree.  This was a motion seeking to set aside

7   an arbitration award in favor of the Debtor and to ask for a

8   new trial.  The context in which it occurred was a highly

9   contested dispute which went to the Supreme Court, or Positive

10  Software tried to get to the Supreme Court.  And by the way, I

11  never begrudge a party who wishes to avail itself of its legal

12  rights to the fullest extent, but it tells me what the Debtor

13  has and the Committee has asserted here, and that this is a

14  dispute that's being aggressively litigated, and it's exactly

15  that type of situation that the automatic stay was intended to

16  prevent. And it's exactly that situation which the provision in

17  the Code that says parties should be sanctioned for violating

18  the stay is meant to prevent, and if not to prevent, then to

19  punish.

20      I will not decide today specifically, and I don't think

21  the Debtor was asking or anticipated that I would, what amount

22  of damages there should be.  I think that should be the subject

23  of a separate pleading.  We'll bring it up for hearing,

24  evidentiary hearing if necessary, if the parties can't agree.

25  I am inclined to award attorneys fees and costs incurred, both

1  in the Bankruptcy Court and in the District Court, which arose

2  as a result of the stay violation, which includes not just the

3  filing of the motion, but the issuance of subpoenas.

4       On this record, I do not find any grounds to impose

5  punitive damages or additional sanctions, but I leave that to

6  whatever evidentiary hearing may follow in support of the

7  request for costs and attorneys fees. So I'd like counsel to

8  confer, embody those rulings in one or two orders, refer to in

9  general terms, but not set forth specifically the reasons I

10  stated on the record today. Are there any questions about what

11  should go in an order or orders?

12           MR. SILBERGLIED:  Not from the Debtors, Your Honor.

13           THE COURT:  All right.

14           MR. RALSTON:  No, Your Honor.

15           THE COURT:  Thank you.

16           MR. SILBERGLIED:  Your Honor, may I speak on behalf of

17  Mr. Ralston and myself and ask for both of us to be excused?

18           THE COURT:  You may.

19           MR. SILBERGLIED:  Thank you, Your Honor.

20           MR. RALSTON:  Thank you, Your Honor.

21           THE COURT:  All right, let's take up the matters

22  concerning KPMG.

23           MR. MCCAHEY:  Good afternoon, Your Honor, my name is

24  John McCahey, and I'm with Hahn & Hessen, and I'm appearing

25  today on behalf of the Creditors Committee in support of their

1  Motion for an Order in relation to KPMG under Bankruptcy Rules

2  2004 and 9016.

3      I'll start out, Your Honor, by saying Congress vested a

4  Creditors Committee with a broad investigative mandate to

5  investigate the acts, conduct, assets, liabilities and

6  financial condition of a Debtor.  That authority has been

7  acknowledged by both the Courts and commentators as being very

8  broad.  And the primary tool available to a Committee to

9  exercise that duty or fulfill that duty is Bankruptcy Rule

10  2004.

11      KPMG was the principal accountants of New Century from the

12  mid-90's.  They audited the financial statements, they provided

13  tax services, and they provided numerous other services on

14  behalf of that.  The information that KPMG possesses, the

15  services that are provided, fall squarely within the ambit or

16  the scope intended by Congress under 1103(c)(2) with that.

17      In fact, KPMG does not mention such section in its

18  opposition papers, nor do they dispute that they are in

19  possession of knowledge that is particularly relevant to the

20  matter at hand.  Rather, they argue that disclosure is barred

21  from that because there is an arbitration provision in their

22  engagement letter with the Debtors and that that arbitration

23  provision gives them the right to insist that any formal

24  discovery from them be governed by an arbitrator.

25          THE COURT:  Well, let me stop you there and ask Mr.

1  Neal whether KPMG is still pressing that position.

2          MR. NEAL:  Good afternoon, Your Honor, Guy Neal for

3  KPMG, LLP.  Yes, Your Honor, we are still pressing that

4  position.  We did not press it last week with respect to the

5  Examiner.  We treat the Examiner as a different functionary, in

6  essence, than the Committee, but today we will be pressing that

7  argument.

8          THE COURT:  Well, in preparation for last week's

9  hearing, it struck me that unless there is actually an

10  arbitration proceeding, there would be no arbitrator to

11  regulate discovery, which is really what the agreement

12  provides, does it not?

13          MR. NEAL:  The agreement provides for several things,

14  Your Honor.  I mean, one, there would be an arbitrator that

15  would regulate discovery.  Certainly, there would be the

16  arbitrator to regulate any claim or dispute.  Second, it

17  provides for strict confidentiality provisions.  And in

18  addition, there is a different test for the documents.  Perhaps

19  that goes back to the first point, and that is the substantial

20  need test with respect to the discovery of information.

21      So for the reason why we're pressing the argument today is

22  it's really the horse is out of the barn to the extent we turn

23  over every paper in our files, including electronic data

24  relating to New Century to the Committee.  In that instance,

25  your eviscerating, we would respectfully submit, the

1  limitations on discovery that are provided within our

2  engagement letters.

3          THE COURT:  Well, you raise an interesting question,

4  and it has actually several facets to it.  And one of them is

5  because KPMG was not hired post-petition, it didn't lose the

6  benefit of its arbitration clause, which it otherwise would

7  have had it sought engagement in this Court in connection with

8  the bankruptcy.  So procedurally, you got that benefit, but it

9  seems to me procedurally that unless there is an arbitration

10  actually pending, and there isn't here, at least no one's told

11  me that there is, assuming that nothing that's happened changes

12  your right to an arbitration -- I'm not ruling, I'm just saying

13  for purposes of this issue that none is pending, it seems to me

14  there is no arbitrator to regulate discovery.  And therefore,

15  the arbitration clause, by its language, doesn't cover this

16  type of request.

17          Now, that's apart from the objections that have been

18  raised about scope and confidentiality and use of the

19  information obtained, but the argument that because the very

20  existence of the arbitration clause prevents the Committee's

21  2004 request, I think, is a loser.

22          MR. NEAL:  If I may, Your Honor, I can address it now

23  or I can address it when I am at the lectern.  I do think what

24  makes this case very different from, one, the Daisy Tech case,

25  which we certainly cite in our favor, or two, the Freedman's

1  case is, as Your Honor is certainly well aware and we were

2  before you last week and before you again, here we have an

3  Examiner conducting the very same examination that the

4  Committee seeks to conduct with respect to KPMG.

5      So our second argument -- and I can come back to the

6  arbitration and the Daisy Tech and the Freedman issue.  The

7  second argument is in light of the arbitration agreement that

8  we have, should there not be a balanced and measured approach

9  where on the one hand we have the Examiner being able to

10  conduct an examination of KPMG of the same documents -- both

11  parties are seeking the same documents from KPMG -- as to any

12  and all claims and causes of action both parties, the Examiner

13  and the Committee, are seeking to assess, analyze and determine

14  causes of action, is it not more appropriate to have the

15  Examiner go first?  In which case, one of our arguments would

16  be deny this motion, with prejudice is our principle argument,

17  or without prejudice to the Committee coming back after the

18  Examiner has issued his report.  That way you preserve the

19  discovery restrictions or limitations, whatever word you would

20  like to use, in our agreement.

21      So rather than have an estate representative get all of

22  the documents that it would not otherwise be entitled to get in

23  arbitration through a 2004 procedure, here you have a measured

24  approach.  If the Examiner's report comes back, finds no basis,

25  no cause to go forward with any claims against KPMG, then we do

1   not have to go through this exercise and largely dilute KPMG's

2   rights in its engagement letter.

3            THE COURT:  Mr. Neal, I tend to agree with a lot of

4   what you suggest, and that is just taking a step back.  I think

5   -- and I maybe gave some hint of this last week, but I'll be

6   more specific.  The Committee, or some version of it as a

7   successor, assuming that a plan is confirmed in this case, is

8   the entity that is likely -- and KPMG, I know, believes --

9   well, I'm supposing believes this, to pursue such claims.

10  Okay.  They may or may not agree with what the Examiner thinks.

11  The Court may or may not agree with what anybody thinks,

12  although that's always risky with so much high priced talent

13  out there.

14           So to answer your question directly, my thought is, yes,

15  there ought to be coordination.  It ought to be in such a way

16  that the Committee shouldn't be required to stand down while

17  the Examiner is doing what the Examiner was asked to do by the

18  Court, ordered to do by the Court, because it has a current

19  interest in learning what's happening and will have a future

20  interest that goes beyond what the Examiner will do when his

21  responsibilities are finished.

22           So no, I don't think the Committee should need to catch up

23  later.  I think that -- I don't think, on the other hand, that

24  KPMG should be required to respond to duplicate or parallel

25  demands.  I think the demands should be coordinated in such a

1   way that the burden on your client is minimized.  But as I know

2   you know, your faced with the situation; it's not going to go

3   away.  These documents, as we discussed last week I think it

4   was, have been and will have to be produced in connection with

5   other investigations, at least in part anyway.

6       So I'd prefer, frankly, to talk about scope, how the

7   coordination should exist, and then what level of

8   confidentiality should exist, at least until some further

9   decision by this Court about what should be done with it.  I am

10  adamant in my view that what information is garnered by the

11  Examiner should be preserved for the benefit of the estate.

12  And standing at the podium as either the estate representative

13  or the predecessor to the estate representative who's going to

14  be pursuing any claims -- and there may be no claims.

15      MR. NEAL:  There may be no claims, Your Honor, but

16  we're dealing with, as Your Honor is more familiar than I am,

17  with a sub-prime lender that seemingly collapsed overnight in

18  which we've already heard Mr. Indelicato and others with

19  respect to the number of unsecured claims or the amount of

20  unsecured claims on file.  And from my cursory review of

21  schedules and the like, it appears that principle recoveries

22  for Unsecured Creditors will be through litigation.  And it is

23  for that reason why we are holding firm with respect to both

24  our Daisy Tech argument and, Your Honor, with respect to the

25  cumulative and duplicative nature of the proceedings.  But I'm

1  going back to my argument.

2      Let me just state that in the past week we have agreed --
3  KPMG agrees in light of its protective order discussion last
4  week that certainly the Examiner holds the documents and
5  preserves any and all KPMG documents pending further order of
6  this Court.  And so I just come back to the point, Your Honor,
7  whereas we're not dealing with statutes of limitation running
8  their course or what have you.  To allow the Examiner to
9  proceed first, hold and preserve documents and issue his report
10  is the more cost effective and measured approach that KPMG
11  would ask this Court to undertake.

12      The Examiner's report date, I imagine, will be extended,
13  but his first initial reporting date is the beginning of
14  September.  Be it beginning of September, beginning of October
15  or November, there is not that much time between now and then
16  for the Examiner to do his job with the cooperation of KPMG
17  before the potential adversary comes into the mix.

18          MR. MCCAHEY:  Your Honor, if I just may be heard and
19  without getting to the merit, the Committee is mindful of what
20  you've said, and we have coordinated with the Examiner the
21  document (indiscern.).  And what we've told the Examiner and
22  what we've told KPMG is as follows, give us the documents at
23  the same time you give them to the Examiner with that.  We will
24  hold back any depositions, we won't interfere with the
25  Examiner's point, as you noted, so they could focus on what