1  they're dealing with the Examiner.

2      And with respect to we have requested it go beyond the

3  Examiner, after you're done with the Examiner we will sit down

4  and work with you to try to address your issues and concerns.

5  What we've met here is total shutdown, no documents.  And what

6  KPMG doesn't understand is that the Committee needs these

7  documents, not only for purposes of coordinating its interest

8  in any potential claims that may exist against KPMG, but in

9  terms of doing its overall investigation of the Debtor here in

10  identifying other claims.  This -- it was a complex business.

11  The accounting people are gone now.  These papers, these work

12  papers -- and putting aside any issue of claims against KPMG --

13  are very valuable and very helpful to the Committee's

14  professionals in reconstructing and understanding what the

15  business of New Century and what was going on.  It would be

16  very helpful to discharge its duties under the Bankruptcy Code,

17  under 1103(c)(2).

18      I think, Your Honor, you've addressed -- if there's

19  anything I've set forth -- we set forth in our response papers

20  our arguments, and instead of just standing here and repeating

21  them, if there is any questions you have of me, Your Honor, I'd

22  be glad to answer them.

23          THE COURT:  I don't at this point.  Thank you.

24          MR. MCCAHEY:  Thank you very much, Your Honor.

25          MR. NEAL:  I believe I have given my arguments, Your

1  Honor, so I will take perhaps only 5 minutes of your Court's

2  time and, of course, be responsive to any of the Court's

3  questions.

4      What Daisy Tech instructs us and what we submit what 3rd

5  Circuit law compels is the full respect for arbitration

6  agreements and the future enforcement of those arbitration

7  agreements in a party's contractual undertaking, in this case

8  the engagement letters between KPMG and New Century.

9      The Daisy Court did not elevate form over substance.  It

10  looked at Rule 2004 as a discovery mechanism, as a rule under

11  the Federal Rules of Bankruptcy Procedure that give way to

12  controlling statutory provisions, just like the bankruptcy

13  rules give way to the Bankruptcy Code.  And Daisy Tech looked

14  at what, in that instance, the post-confirmation entity --

15  looked at the purpose of the examination.  And one of the

16  principal purposes that that entity was seeking information

17  from Ernst & Young, was to assess, analyze claims and potential

18  causes of action against Ernst & Young.

19      Now, we know from the Examiner's appointment order that

20  the Examiner is empowered to do that here.  So by fully

21  respecting the reasoning in Daisy Tech, Your Honor would not be

22  shutting down a process by this estate, so to speak.  Yes,

23  you'd be holding back, and I would submit holding back

24  temporarily, an Unsecured Creditors Committee, which as Your

25  Honor aptly noted is the entity that more likely than not,

1 either in its current form or in its capacity as counsel to a

2 litigation or liquidating trust, would be bringing causes of

3 action against, among others, potentially KPMG.

4      Here we have an Examiner that is undertaking the same

5 function.  And before I get to burdensomeness, cost and

6 duplication of effort, again, what is lacking in <u>Daisy Tech</u> and

7 what is lacking in the <u>Freedman</u> case, which goes andn rules

8 opposite <u>Daisy Tech</u>, neither of those cases did you have an

9 Examiner performing the same function that those entities in

10 <u>Daisy Tech</u> and those entities in <u>Freedman's</u> were trying to

11 perform.

12      So we are not shutting down a process.  We are not

13 shutting down an investigatory function.  We are not saying

14 that we, KPMG, are not entitled to be subject to an

15 examination.  To the contrary, I stood up before you in this

16 Court last week, one week ago on Tuesday, and said we are here

17 to fully cooperate with the Examiner.  Yes, we have our

18 disagreement on scope, which we will turn to next, but we are

19 here to cooperate with the Examiner because we recognize the

20 Examiner has a job to do.  And the job of that Examiner is

21 carefully articulated in the June 1 appointment order, and in

22 specific, the Examiner is to, among other things, identify and

23 evaluate any claims or rights of action that the estates might

24 have arising from or relating to such irregularities, errors or

25 misstatements in the Debtor's financials.

1       So again, there is no prejudice to these estates by not

2   allowing a cumulative, concurrent, coextensive or more broad

3   investigation certainly initially that the Committee was

4   seeking against KPMG.  There will be an examination.  It'll be

5   done by the Examiner, and it'll be done with the cooperation of

6   KPMG.  But it is largely dilutive, if that's an appropriate

7   word, of KPMG's engagement letter and its arbitration

8   agreements to allow the Committee to have open and free access

9   to any and all the documents that are in that subpoena, which

10  again, I will state now and I will state again in the context

11  of the Examiner's continued request, would require KPMG to

12  produce any and all documents relating to New Century from

13  upwards to 280 to 300 recordkeepers and billing partners and

14  associates at KPMG.

15      So in any Rule 2004 Examination, yes, it's often called a

16  fishing expedition.  Yes, it often allows parties to

17  investigate any and all aspects relating to the Debtors and

18  financial affairs.  In most cases, you see the Court striking a

19  balance.  In most cases, you see the Court striking a balance

20  between Rule 2004 and the Federal Rules of Civil Procedure.  Do

21  they apply, does Rule 26 standards apply in terms of relevancy?

22  Do Rule 33, 34 apply?  Do the deposition rules, do the subpoena

23  power rules of Rule 45, do they apply?  That's often the

24  balancing test.

25      Here, in light of the arbitration agreement, we would

1 submit the balancing test should be, in the first instance, to

2 allow the Examiner to proceed with KPMG's cooperation and to

3 issue his report.  And then to determine, without prejudice to

4 the Committee's rights to, one, gain access to those documents

5 or, two, conduct its own examination.  That's my first

6 argument.

7      My second, I'll do this in 2 minutes I hope, the second is

8 the duplicative nature of the examination.  I've already

9 touched upon it, but the Committee is seeking the same

10 documents the Examiner is seeking.  They are not targeted, they

11 are not focused to any particular area that the Examiner

12 perhaps is not seeking.  To say that that reflects coordination

13 largely proves too much for the Committee because, yes, it is

14 coordination.  It's not coordination, it's duplication

15 entirely, to look at the same documents, to investigate the

16 same causes of action that may relate or arise from information

17 that may be reflected in those documents.

18      Again, the motion -- the Committee's motion can be denied

19 without prejudice, allow the Examiner to proceed with his

20 examination with the cooperation of KPMG.  The Examiner will

21 issue a report in the near future, 30, 60 or 90 days out.  Then

22 we can revisit the issue of whether the Committee needs to

23 conduct the same examination by interviewing the same people,

24 by reviewing the same documents.  That is our argument with

25 respect to the Committee, Your Honor.

1          THE COURT:   While you're there, Mr. Neal --

2          MR. NEAL:   Yes.

3          THE COURT:   -- let's talk about the Examiner for the

4    moment.

5          MR. NEAL:   Yes.

6          THE COURT:   What further agreements, if any, have been

7    made with respect to the Examiner?   I signed the one order

8    permitting the discovery to be issued, I take it it's been

9    issued.   Tell me where you stand with that.

10         MR. NEAL:   Yes, Your Honor.   There are a couple of

11   matters I can discuss.   In the first instance -- if you'll

12   allow me one second.   Last week, Your Honor, two concerns were

13   raised, in part by Your Honor, in part by Mr. Indelicato, and

14   in part by Mr. McMahon of the U.S. Trustee's Office, with

15   respect to the proposed protective order.   We have agreed to

16   make changes to ameliorate those concerns.   One, we've agreed

17   to modify the protective order --

18         THE COURT:   More importantly --

19         MR. NEAL:   Yes?

20         THE COURT:   -- has the Examiner agreed?

21         MR. NEAL:   Yes, I believe subject to some tweaks, but

22   we'll talk.

23         MR. FOX:   Edward Fox, Your Honor, from Kirkpatrick &

24   Lockhart Preston Gates Ellis, LLP on behalf of the Examiner.

25   And my partner, Stephen Topetzes, couldn't be here in person,

1  but he's also on the phone.  But the main sticking point --
2  well, there are two issues, I think, primarily with respect to
3  the protective order.  One is it's drafted in the form of a
4  stipulation, and we would prefer that it be in the form of a
5  straight order, subject to our being satisfied with its
6  contents.  And the other significant problem is the Examiner is
7  -- doesn't really -- doesn't want to have a dog in the hunt
8  between KPMG on the one hand and the Committee on the other as
9  to whether the Committee can or cannot get the documents.  And
10 the form of order that, you know, is being put in front of us
11 continually, you know, primarily goes to the issue of whether
12 or not the Committee is gonna have access to the documents.
13 And that's just not something that we're comfortable or believe
14 is appropriate for the Examiner to weigh in on.  So we need the
15 Court's decision on that point.

16         THE COURT:  The Committee is going to have access to
17 the documents.  I mean, it's that simple.

18         MR. FOX:  In real time or --

19         THE COURT:  In real time.

20         MR. FOX:  -- or some time in the future?

21         THE COURT:  I'm not going to make them wait.

22         MR. FOX:  Okay, that's fine.  Then I think I'm -- that
23 being the case, we can probably put together a form of order
24 that we can all agree on.

25         THE COURT:  Okay.  Now, you've agreed on scope with

1  the Examiner?

2       MR. NEAL:  No, we have not, Your Honor.  We need -- I

3  would submit there are perhaps three dating issues to be

4  decided, although there are a series of objections that we

5  filed to the subpoena.  I think if we have the understanding of

6  Your Honor's ruling with respect to two or three matters, that

7  would largely address the objections of KPMG.

8       But if I can finish on just the protective order real

9  quick.  The U.S. Trustee raised a concern about the Examiner's

10  ability to cooperate with governmental agencies.  We have

11  drafted language that is acceptable to the United States

12  Trustee to allow the Examiner to use or disclose the KPMG

13  documents in cooperating with governmental agencies.

14       Your Honor raised the point about the destruction of

15  documents upon the conclusion of the examination.  KPMG has

16  agreed that the Examiner shall hold and preserve KPMG's

17  documents, subject to further order of a Court and after a

18  notice and a hearing.

19       If I can turn to scope, I'll frame the issues, Your Honor.

20       THE COURT:  If you would, please.

21       MR. NEAL:  On Friday mid-morning, in advance of the

22  hearing binders being submitted to Your Honor, we filed

23  objections to the subpoena that was issued upon us the

24  Wednesday after our last Tuesday hearing.

25       The first issue.  The first issue concerns year 2004, as

1   opposed to Rule 2004.  The Examiner's motion, and I believe now

2   the Committee's, I would just refer to it non-pejoratively as

3   the "Tag Along Motion," now is wanting to have the scope

4   include not only 2006 and not only 2005, but 2004.  Our read of

5   the order appointing the Examiner June 1, our read of the

6   various pleadings, and our read of the various hearing

7   transcripts relating to the appointment of the order and his

8   scope is that the focus of the Examiner is to, I'll just read

9   directly from the order, "Investigate any and all accounting

10  and financial statement irregularities, errors or

11  misstatements, including but not limited to such

12  irregularities, errors or misstatements that (i) gave rise to

13  the announced need to restate the Debtor's financial statements

14  for the first three quarters of 2006 and/or (ii) lead the

15  Debtors' management and the Audit Committee to conclude that it

16  was more likely than not that pretax earnings in the 2005

17  financial statements were materially overstated."

18      At the initial hearing, which I believe was May 5th,

19  although it may have been May 15th, the scope was to be the

20  three quarters of 2006.  Subsequent to that hearing, when that

21  appointment order was reduced to writing, there were letter

22  exchanges between the parties, as Your Honor may recall, and

23  there was a subsequent hearing on May 30th in which Your Honor

24  addressed the various proposed orders that were before Your

25  Honor.

1        The United States Trustee, upon reviewing an 8K filing in

2   the middle of May, requested that the order -- the scope be

3   extended to include 2005, and that was because of the

4   statements in the Form 8K in which the Debtor said, after

5   consulting with -- in connection with the Audit Committee

6   review of the Debtors' financials and on advice of its

7   independent counsel that they -- excuse me, I'm just -- I'm

8   losing my place.  Based on -- I'm going to read directly from

9   the 8K.  "Based on recent communications with members of the

10  investigative team, the Audit Committee has determined that

11  there were errors in the company's previously filed annual

12  financial statements for its fiscal year ended December 31,

13  2005 with respect to both the accounting and reporting of loan

14  repurchase losses and the company's valuation of certain

15  residual interests in securitizations."

16       That is what gave rise to the U.S. Trustee's letter to

17  this Court seeking to expand the scope of the examination into

18  2005.  The Debtor responded and said, well, our order which

19  allowed the Examiner to focus on 2006, you can read that to

20  allowing the Examiner to go back to 2005 because to the extent

21  there were errors in '06 that may have been caused by errors in

22  '05, the Examiner can look into that.  At no time was there

23  ever any mention of year 2004 --

24            THE COURT:  Mr. Neal --

25            MR. NEAL:  Yes.

1            THE COURT:  -- I mean, I appreciate your efforts to
2   continue to -- I'm trying to not use a color word --
3            MR. NEAL:  That is fine, Your Honor, I can take it.
4            THE COURT:  -- define and confine the scope of what
5   may be sought from KPMG to as small a universe as possible.
6   And I appreciate KPMG's sensitivity to that which is in the air
7   here.  But it must be obvious to you and to your client, as I
8   think it is to others involved in this proceeding, that at
9   least two dynamics exist.  One, the situation may very well
10  continue to develop beyond that which was been initially
11  disclosed by the company.  Secondly, what happens in the year
12  2004 may very well be relevant to what happened in '05 and '06,
13  but until the information is seen by others other than KPMG, no
14  one can make that determination.

15       Now, I don't suggest that there should be no limitations,
16  but I think -- well, I don't know.  And you don't have to
17  answer this, but I suppose you understand that the exercise
18  here in Bankruptcy Court is to find out as much information as
19  possible, rather than to protect parties from having to provide
20  it.  Now, subject to certain things which you've suggested, and
21  I think appropriately in the way of confidentiality, but I
22  think you have to have a reality check here in terms of what
23  the Court is going to order ultimately.

24       Now, I thought I saw somewhere in the Committee's papers
25  that they wanted things from 2001 on, I don't know if I read

1   that correctly or not.

2           MR. MCCAHEY:  You did, Your Honor.  We did that.

3   We've asked for the year 2001, 2002 --

4           THE COURT:  Okay.

5           MR. MCCAHEY:  And what we've said with respect to

6   that, Your Honor, is we would defer that request until he deals

7   with the joint request that the Committee and then work with

8   KPMG.

9           THE COURT:  And I think that's appropriate.  And I

10  think what ought to happen here is that the Examiner should be

11  permitted to turn over to the Committee whatever he obtains.  I

12  don't think the request to go to the year '04 is at all

13  unreasonable, in fact it's rather modest.  That's not to say

14  there won't be further requests, but you'll have the chance to

15  have your say if there are.

16          MR. NEAL:  Very good.  If I -- I'm sorry.

17          THE COURT:  And I think the Committee's suggestion

18  that it simply take what's given the Examiner and wait to do

19  anything else, at least to the point of the Examiner's report

20  or at least to the initial point deadline, I don't know that

21  the deadline will be extended, no one has asked it, at least as

22  of this time so far as I know that it be extended, before

23  deciding where to go.  That's where I come out.

24          MR. NEAL:  Very good.

25          THE COURT:  And I don't think any of that runs afoul

1  of the arbitration provision in --

2          MR. NEAL:  On that, we're not suggesting that year

3  issue be a running afoul of the arbitration issue.  That's

4  simply a burden in scope issue.

5      If I can turn to the next bucket, I think there are really

6  three buckets.  We've already addressed the year 2004 bucket.

7  The second one concerns -- and we've laid this out in our

8  objections, it concerns sequencing and staging of this

9  production, Your Honor.  We've been unable to reach a meeting

10 of the minds with the Examiner on issues relating to sequencing

11 and staging.  And let me back up and say what I mean by that is

12 at least with respect to 2005 and 2006, there were

13 approximately 300 individuals that billed time on New Century

14 matters at KPMG.

15     What we have here are official work papers for the first

16 three quarters of '06 and incomplete work papers for '06,

17 because we never finished the year end audit.  We have official

18 work papers for 2005, we have official work papers for 2004.

19 Those documents are largely segregated and can be -- I don't

20 want to overstate it, but can be readily pulled, reviewed and

21 produced.

22     We also have different buckets of documents.  We have hard

23 copied desk files of these individuals, 300 at least for 2

24 years, perhaps there's some overlap, but pick a round number,

25 400 individuals from 2004 to the present, located across the

1  country, mostly in California in different offices, different

2  floors, hard copies.  And then we have electronic documents,

3  both on the KPMG servers, and we have electronic documents on

4  hard drives in these 400 individual parties.

5      We have proposed to roll out the official work papers for

6  '05, and we will do so for '04, and the official work papers

7  for the first three quarters of '06 and the incomplete work

8  papers for '06, and then work with the Examiner in terms of

9  identifying appropriate custodians; in other words, winnowing

10  down the 400 custodians down to a manageable number, and then

11  identifying appropriate search terms for documents that may be

12  both on hard drives, file cabinets or servers.  That way we can

13  produce the documents that the Examiner requests that are

14  relevant to his examination.

15      I would submit there is no other way of doing it in an

16  orderly manner, Your Honor, other than absolutely turning over

17  every piece of paper relating to New Century, the cost and the

18  time -- the cost of which would run upwards to close to $2

19  million and the time would take many weeks, if not months.  But

20  we are prepared to work with the Examiner on search terms to

21  identify the appropriate documents.

22      To the extent the parties have any disagreement, which we

23  will try to minimize, we come back before this Court at any

24  omnibus hearing, and the Examiner can say we're not getting the

25  cooperation of KPMG or we think it should be approached a

1  different way.  But there really is no other way of doing this

2  process in an orderly and less burdensome manner than working

3  with the Examiner on search terms.  And we've yet to be able to

4  reach an agreement with an Examiner on that.

5     My last bucket of objections, there are specific

6  objections, I'm not sure if the Examiner is gonna press today

7  on them, in which we indicated that we are not going to produce

8  certain documents based on the fact that they are a proprietary

9  or they would run afoul of our obligation to the Federal

10  Government with respect to responding to grand jury subpoenas

11  and the like.  But I can respond to that, to the extent Mr. Fox

12  wants to press forward.

13     So we have your ruling on 2004, and with respect to the

14  other two issues, the sequencing and staging, and then the

15  specific objections, I can respond after Mr. Fox speaks.

16         THE COURT:  All right, thank you.

17         MR. FOX:  If Mr. Topetzes is on the line, I think he

18  may be in a better position to respond.  If he --

19         MR. TOPETZES:  I am on the line, Your Honor.  This is

20  Steve Topetzes from K&L Gates on behalf of the Examiner.

21         THE COURT:  All right.

22         MR. TOPETZES:  Your Honor, the Examiner and his

23  professionals have been traveling a long and circuitous road

24  with KPMG and its counsel respecting our efforts to obtain

25  documents and information that are relevant to the review being

1  conducted by the Examiner.  I'm mindful of the fact that this
2  has been a long hearing, but -- and I'm happy to review the
3  back and forth in greater deal, but I would -- I guess I would
4  characterize the state of play a little bit differently than
5  Mr. Neal described a moment ago.

6      Let me say as an introductory matter, we have made good
7  faith efforts throughout, prior to filing the Rule 2004 Motion,
8  subsequent to filing the Rule 2004 Motion, and before last
9  week's hearing, and then subsequent to last weeks hearing, to
10 reach agreements with KPMG and its counsel to facilitate
11 voluntary production of the documents and information requested
12 by the Examiner.  We have demonstrated and communicated a
13 willingness to work with KPMG to narrow the requests to address
14 questions with respect to burden, related costs, and in an
15 effort to achieve efficiencies for everyone concerned under the
16 circumstances of this proceeding.

17     Unfortunately, notwithstanding statements by KPMG and its
18 counsel that it intends to cooperate fully, we have been unable
19 to reach agreement.  Now, none of the concerns the Examiner has
20 regarding these matters are directed at Mr. Neal or his
21 colleagues, the individuals with whom we've dealt on behalf of
22 KPMG.  I'll echo something that I told the Court last week, I
23 think the dialog has been, at all times, cordial and it has
24 been productive on a number of fronts.  However, it has not
25 been nearly productive enough from our perspective.

1          KPMG continues to respond to the Examiner with the same
2   refrain; a piece of that refrain has already been addressed
3   this afternoon by the Court, and that relates to the Examiner's
4   requests concerning matters that occurred in calendar year
5   2004.   And we appreciate the ruling by the Court with respect
6   to those matters and Mr. Neal's statements that KPMG will
7   produce documents to the Examiner related to 2004.

8          We continue to have a couple of baseline issues that
9   permeate the objections and the resistence by KPMG, and I'd
10  like to outline those for the Court, and we believe the Court's
11  direction would be essential to facilitate a productive dialog
12  and ultimately production by KPMG on those issues.   I would
13  characterize three buckets, as well, but they would be a little
14  different, and I would put sequencing separately.   With respect
15  to sequencing, what KPMG has told us repeatedly after it agreed
16  to provide work papers for 2005 and 2006 is it would like to
17  produce those documents and then, after the Examiner has had an
18  opportunity to review those materials, entertain requests by
19  the Examiner.   Where the Examiner can demonstrate or articulate
20  a particular need for additional documents, KPMG would then
21  entertain those additional requests.

22         From the Examiner's perspective, Your Honor, we don't
23  believe that arrangement is workable or efficient.   We
24  understand that a production of a large amount of data
25  necessarily will occur on a rolling basis, and we're certainly

1  agreeable to that.  What we feel would be horribly inefficient

2  in terms of the Examiner's efforts to perform this review, to

3  conduct appropriate witness interviews, et cetera, is to have

4  KPMG produce in the first instance only the work papers or a

5  commit to produce in the first instance only the work papers

6  while reserving its rights to deny the Examiner access to

7  additional materials and agreeing only to entertain additional

8  requests for the Examiner based upon an articulated or

9  demonstrated precise need by the Examiner for those additional

10 data.  We don't think that's workable.  We respectfully submit

11 that is not what is contemplated by the Court in its June 1

12 order, and so we would ask for guidance from the Court

13 concerning that element of the sequencing.  From our

14 perspective that's where the dispute lies.  We're happy to work

15 with KPMG to try to narrow requests.

16      Mr. Neal is fond of mentioning and KPMG is fond of

17 mentioning the fact that there are nearly 400 timekeepers

18 apparently.  We had no idea, Your Honor, when we made our

19 request that the number was that large, and as we've

20 communicated repeatedly to KPMG and certainly communicated it

21 in advance of last week's hearing, we don't intend to ask KPMG

22 or to cause KPMG to gather documents and information from each

23 of those timekeepers.  Rather, what we have suggested is that

24 we start by gathering documents and information, desk files,

25 relevant electronic communications, internal emails, et cetera,

1  for the key players on the KPMG team, and we believe that would

2  be a relatively small subset of the 400 or so KPMG timekeepers

3  described generally by KPMG's counsel.

4         THE COURT:  Well, whatever has been said outside of

5  the Courtroom, all I can tell you is what I've just heard from

6  each of you, it seems to me, is not inconsistent.

7         MR. NEAL:  If I may address that real briefly, Your

8  Honor.  Maybe a specific example would be helpful to Your

9  Honor.  And I think we're not -- I think we're speaking past

10  each other, regrettably.  And there have been negotiations back

11  and forth in which different positions have been articulated by

12  both sides.  But let's deal with the position that's in our

13  objection to the subpoena.

14         There was a -- 32 requests by the Examiner, and they've

15  never been reduced, never been modified, it's the same requests

16  we've had from day one.  Here we are, request #6 in the

17  subpoena, and its page 12 of our objection, "For all

18  individuals identified in response to item #4" -- and that's

19  the individuals who worked on the New Century engagement --

20  "provide copies of all employee desk files relating to the

21  Debtors."  We have -- and I've checked my papers, we have 392

22  employees between 2004 and 2006, so for the 3 years, 392

23  employees.  Here's what our response is.

24         Our response is we are going to be producing, as I said to

25  Your Honor today, all of our work papers and quarterly review

1  work papers, and then we will then provide the Examiner a list

2  that identifies our engagements, audit and non-audit related, I

3  believe there are about 33 separate engagements that we've had

4  with New Century.  And here's what we say, and this is why

5  we're not speaking past each other, "We agree to meet and

6  confer in good faith to discuss an appropriate scope of KPMG's

7  production of documents related to these other engagements.

8  KPMG is further prepared to cooperate with the Examiner and to

9  meet and confer to agree upon a narrowed list of individuals

10 for whom KPMG will search for relevant documents, which list

11 will be based upon those individuals who provided services to

12 New Century on the matters that relate to New Century's

13 announced plans to restate its financial statements for '05 and

14 '06.  KPMG also will meet and confer upon a set of appropriate

15 search terms that relate to New Century's announced plans to

16 restate its financials for '05 and '06" -- now including '04 of

17 course -- "that can be applied to electronic data to help

18 identify relevant documents."

19     So I think we're saying the same thing.  We agree on

20 custodians, they give us the search terms, we run the searches

21 and we produce the documents.

22          MR. TOPETZES:  Your Honor, again, this is Steve

23 Topetzes from K&L Gates.  If I may respond briefly, it's part

24 of that response, and that response is repeated throughout the

25 responses and objections served by KPMG, that relates to the

1  other bucket of dispute here, and it's the clause that begins

2  "which list will be based on those individuals who provided

3  services to New Century on the matters that relate to New

4  Century's announced plans to restate its financial statements

5  for 2005 and 2006."

6       A fundamental area, Your Honor, of disagreement relates to

7  KPMG's position, which, in part, is that is seeks to limit its

8  production to documents and information that relate to the

9  matters that form the subject of the public announcements by

10 New Century concerning the restatement of its financial

11 statements.  Those issues relate to the calculation of loan

12 repurchase reserves and the company's valuation of residual

13 interests with respect to certain securitizations.

14      In its earlier opposition papers, KPMG also made

15 statements to the effect that those matters already have been

16 reviewed by the Special Investigation Committee of the

17 company's Board of Directors or its Audit Committee.  So KPMG

18 earlier asserted or suggested that any review of these matters

19 by the Examiner was either inappropriate or implicated its

20 bargain for arbitration rights.

21      The Examiner, and this is where the disagreement has

22 centered, takes strong exception to any suggestion by KPMG that

23 the review conducted by the Special Investigation Committee

24 should operate to limit related requests by the Examiner to

25 KPMG.  Any such position by KPMG is a little curious for

1  several reasons, including the fact that by all reports KPMG
2  was decidedly uncooperative with the review by the Special
3  Investigative Committee.  The work performed by the committee
4  is helpful, but it is not a substitute for data produced by
5  KPMG.  So the Examiner wants documents and information from
6  KPMG related to those items.

7       We do not believe beyond that, to go specifically to
8  KPMG's objections, that the Examiner should be limited in
9  obtaining information from KPMG to documents that touch upon
10 the two issues addressed by the Special Investigation Committee
11 and covered by the statements or related public announcements
12 by the company.  We do not understand the Examiner to be
13 confined to those issues.  We believe KPMG's apparent position,
14 as embodied in its objections, and this is interwoven in
15 response to many of the requests, is inconsistent with the
16 Court's June 1 order.  The Examiner believes he needs to review
17 documents and information concerning other aspects of the
18 relationship between the Debtors and KPMG.

19      And here again, Your Honor, we respectfully request that
20 the Court direct that KPMG is produced -- is to produce
21 documents and information beyond materials that relate only to
22 the two issues publically announced previously by the Debtors.

23           MR. NEAL:  I have a proposed fix, Your Honor, that
24 would shorten this process.  There has to be, in our view, some
25 semblance of relevancy to the Examiner's mandate and we can

1  substitute in every instance in which we say, "which list will
2  be based on those -- on matters that relate to New Century's
3  announced plans to restate its financial statements for 2005
4  and 2006," we can substitute, "consistent with the June 1
5  appointment order."

6       We will produce the documents, to the extent there is a
7  further dispute -- and I would like to think there will not be
8  one, we've been trying to get them documents for weeks now,
9  subject to a protective order -- that we can proceed.  And the
10  parties will know the rules of engagement and will know the
11  signs on the road, especially from Your Honor's ruling today.
12  That's the best we can do.  But otherwise, the alternative is
13  to produce every document in our files.

14       MR. FOX:  Your Honor, this is Edward Fox.  I think
15  what ought to be clear here is that the issue is not about the
16  numbers of people involved, it's about the documents relating
17  to whatever number we agree on KPMG is prepared to turn over.
18  And it's easy for Mr. Neal to say, well, okay, instead of
19  saying what I said in the objection or in the motion, we'll say
20  that we'll limit it to what's in the order, but he's had the
21  order for months.  And it's very clear -- and only today, as he
22  now, you know, conceded, that okay 2004 goes as well.  We can -
23  -

24       THE COURT:  Well --
25       MR. NEAL:  The Court ruled --

1          THE COURT:  -- he didn't concede it, I --

2          MR. FOX:  Well, okay.

3          THE COURT:  I made him do it.

4          MR. FOX:  There you go.  And that I think is really

5   the point.

6          THE COURT:  And you can go back and tell your client

7   that, Mr. Neal.

8          MR. NEAL:  Thank you, Your Honor.

9          MR. FOX:  If there are -- we can discuss with Mr. Neal

10  which timekeepers we think are the most relevant if we have a

11  slightly forthcoming conversation about that with KPMG and with

12  Mr. Neal.  Where we need to have some clarity here today, I

13  think, is with respect to the limitation on the requested

14  documents that KPMG is seeking once we've determined who the

15  timekeepers are.  So that if we say Timekeeper A, we want all

16  the things set forth in the subpoena, what we need to know from

17  Mr. Neal is is he going to give us everything set forth in the

18  subpoena with respect to Timekeeper A, or does he have some

19  argument about what should be produced.  And if he does, we

20  need to know today what the argument is and have Your Honor

21  rule on it.  Because that's where we're having the problem.

22         MR. NEAL:  I agree that's where we're having the

23  problem.  The subpoena has 32 requests.  It would require us to

24  turn over every piece of paper.  We are prepared to produce

25  documents, '05, '06 and now '04, that are consistent with the

1  June 1 appointment order, and to the extent there's a

2  disagreement down the road, we come back before Your Honor.  It

3  should not be that we have to produce every document.

4          THE COURT:  I don't necessarily disagree with that.

5  Let me offer a comment.  The rules do not permit a Bankruptcy

6  Court to appoint a discovery master, which is, it seems to me,

7  might be one solution to this problem.  So you're looking at

8  your discovery master.

9      I also find that undertaking that exercise in this context

10  is horribly inefficient.  Frankly, if the parties cannot agree

11  -- and I will tell you, what counsel for the Examiner is

12  telling me rings true, and that is the relations with you and

13  your colleagues, Mr. Neal, is cordial and productive and

14  professional and as it should be, and your client, for reasons

15  which I can understand, may be a little less cooperative than

16  may be required under the circumstances, let me just say it

17  that way.  And we need to break that log jam.

18      One thought I have is -- I don't think today it's going to

19  happen, but sometime within the next week or so to sit down

20  with counsel and anyone who needs to be involved in the

21  process, either by phone or in person, and just work through

22  the requests one by one.  I am willing to do that if that's

23  what it will take to get things where they need to be.  And I

24  say that without criticizing anybody, except to the extent I

25  already have.

1           MR. NEAL:  Your Honor, we're more than willing to

2   meet.  In fact, that's what our response to the subpoena

3   outlines, a meet and confer process to limit the number of

4   custodians and to develop search terms; no more, no less.

5           MR. TOPETZES:  Your Honor, this is Steve Topetzes

6   again.  We're certainly willing to meet.  We have undertaken to

7   do that with KPMG or its counsel several times already, and the

8   success, as I described earlier, has been limited, in part

9   because they've made detailed discussions regarding certain

10  issues contingent or conditional on the protective order being

11  in place.  But also in part because we seem to be having the

12  same conversation over and over again --

13          THE COURT:  And it strikes me --

14          MR. TOPETZES:  -- and that's why --

15          THE COURT:  Yes, it strikes me that you are.  It may

16  sound a little different, but the result's the same.  Okay.

17  When can we all meet?

18          MR. NEAL:  And I'm sorry, Your Honor, were you

19  proposing to be involved in the initial meeting, Your Honor, or

20  do we come back after having an initial meeting?

21          THE COURT:  Here's what I'm going to do.  I'm going to

22  set a date, and unfortunately because of my schedule, it cannot

23  be this week.  I have a hearing and a call which I was going to

24  have this afternoon and I postponed until tomorrow, which I

25  think is going to consume my day.  I'm out at ABI Thursday and

1  Friday, which puts me into next week.  So we'll pick a time, I

2  hope, next week when we can all gather and/or talk.  But I also

3  allow that in the interim, understanding that you are all going

4  to have to sit down with me, that maybe some of the issues will

5  be resolved.  If not, I will resolve them.

6           MR. NEAL:  Very good, Your Honor.

7           THE COURT:  Does that answer your question?

8           MR. NEAL:  Yes, it does.

9           THE COURT:  Okay.

10          MR. NEAL:  In the first instance, I will be

11  unavailable next week, but there is -- I have colleagues that

12  are certainly well versed and can step into my shoes and

13  participate fully on this exercise.

14          THE COURT:  Big shoes to fill.

15          MR. NEAL:  So they will be available next week.  I do

16  not have their schedules in front of me.  Would it be possible

17  to contact Chambers in the morning after we've discussed our

18  respective schedules and see what the Court's calendar is like?

19          THE COURT:  All right, well, let's start by asking the

20  question how much time do you think the exercise will consume?

21          MR. TOPETZES:  Your Honor, this is Steve Topetzes.  I

22  think the exercise probably would consume in the neighborhood

23  of an hour because I think the broad contour question, for

24  example, whether the Examiner is entitled to receive documents

25  and information that go beyond the two issues already described

1  by the company or that formed the subject of its restatement

2  and related announcements, if the Court determines that the

3  Examiner is entitled to information beyond those two areas, I

4  think that will address many of the concerns that seep into a

5  number of the individual requests.

6          THE COURT:  All right, well --

7          MR. NEAL:  I would say 90 minutes, Your Honor, maybe

8  even 2 hours in the -- just in the event we run over which --

9          THE COURT:  All right.

10          MR. NEAL:  -- surely is a possibility.

11          THE COURT:  Well, I'm open Monday, August 13th.  I'll

12  devote a morning or an afternoon.

13          MR. FOX:  That's fine, Your Honor.

14          THE COURT:  Nancy, what about -- should I be leaving

15  Tuesday alone?

16          THE CLERK  (Indiscern.).

17          THE COURT:  Okay, so maybe Tuesday morning is a

18  possibility.  Maybe the morning of Tuesday the 14th, we'll know

19  more tomorrow.  Wednesday and Thursday and Friday are no good.

20  So let's see if we can do something during one of those two

21  times.

22          MR. NEAL:  Very good, Your Honor, and if we could

23  reach out to Ms. -- in the morning and advise what time works

24  and I will coordinate with Mr. Fox and others.  Your Honor, I'm

25  assuming the Committee will be involved in that process as

1  well.

2         THE COURT:  Yes, and I would -- my preference is to

3  have people who are on the front lines of dealing with these

4  issues present.  To the extent that creates an undue

5  inconvenience, we'll hook you up on the phone here.  But these

6  exercises typically work better eyeball-to-eyeball, I find.

7         MR. NEAL:  Very good, Your Honor.

8         MR. FOX:  Thank you, Your Honor.

9         THE COURT:  All right.

10         MR. TOPETZES:  Thank you, Your Honor.

11         THE COURT:  All right.  And that's with respect to the

12  Examiner Motion.  With respect to the Committee Motion, I think

13  I've addressed the issues that need to be addressed.  I think

14  the Committee has, with its suggestion, solved many of the

15  problems which might otherwise exist.  Mr. Neal, do you

16  disagree with that?

17         MR. NEAL:  I -- in terms of your ruling, Your Honor,

18  we would move for a stay of that ruling pending appeal, Your

19  Honor.  I can provide it orally now or in writing --

20         THE COURT:  I'm not going to be in a position to enter

21  that order until we firm up the Examiner order because the

22  Committee, I would intend, would be parallel to what I order --

23  I enter on the Examiner.  And I'll address that issue at that

24  time.

25         MR. NEAL:  Okay, very good.

1           THE COURT:  Okay.  Anything else for today?

2           MR. MERCHANT:  Your Honor, that's all we have on

3   today's agenda.  If I could ask one clarifying question.  With

4   respect to next week's meeting, is that something that you --

5   it's not a hearing, but is that something that you'd look for a

6   hearing agenda on?

7           THE COURT:  No, I don't need a hearing agenda on it.

8   I'll hang on to the binders that the parties have submitted

9   today.  To the extent that the parties think I need additional

10  writings before the meeting they can submit them, but I'm

11  thinking probably not.  And no, I don't need an agenda.  And

12  what I would anticipate doing in the way of an exercise is

13  meeting off the record somewhere and try to work through these

14  issues, and then going on the record to memorialize the result

15  of the exercise and to hear whatever any other party might want

16  to put on the record as a result of the exercise and/or the

17  Court's ruling or rulings in connection with those disputes.

18          MR. MCCAHEY:  Your Honor, I just have one question.

19  With respect to the front line people you're talking about

20  being present, are you talking about the financial advisors,

21  the accountants who will be reviewing these work papers, or are

22  you just thinking about attorneys and principals?

23          THE COURT:  What I'm thinking about is having present

24  anyone who needs to have input in order for me to be able to

25  make meaningful decisions on the requests the Examiner is

1  making and the objections that KPMG is raising.

2          MR. MCCAHEY:  Yes, Your Honor.  Okay, thank you, Your

3  Honor.

4          MR. HARRINGTON:  Your Honor, can I ask one clarifying

5  question?  Certainly if our office intends to monitor, we'll

6  have someone present, but I know Mr. McMahon is out of the

7  office next week and he would be our primary person.  And so he

8  may want to participate by phone.  And it sounds as if -- if

9  part of its going to be off the record, will there be an option

10  to participate in the off the record --

11          THE COURT:  Yes.

12          MR. HARRINGTON:  -- by phone?

13          THE COURT:  Yes.

14          MR. HARRINGTON:  So if that's necessary, I guess I'm

15  asking now for that request.

16          THE COURT:  That will probably be the more

17  important --

18          MR. HARRINGTON:  I thought it might be, Your Honor.

19          THE COURT:  -- part of the proceeding.

20          MR. HARRINGTON:  Thank you, Your Honor.

21          THE COURT:  All right.  Anything further for today

22  folks?

23          MR. MERCHANT:  No, Your Honor.

24          THE COURT:  All right, thank you.  That concludes this

25  hearing.  Court is adjourned.

111

1          ALL:   Thank you, Your Honor.

2        (Court adjourned)

3

4                    CERTIFICATION
5   I certify that the foregoing is a correct transcript from the
6   electronic sound recording of the proceedings in the above-
7   entitled matter.
8

9   *Lewis Parham*                    8/16/07

10  _____          _____
11  Signature of Transcriber              Date