UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .      Case No.  07-10416(KJC)
                            .
                            .
NEW CENTURY TRS HOLDINGS,.
INC., a Delaware            .      824 Market Street
corporation, et al.,        .      Wilmington, Delaware 19801
                            .
            Debtor.         .      August 21, 2007
. . . . . . . . . . . . ..          1:30 p.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             Richards, Layton & Finger, P.A.
                            By:  MICHAEL J. MERCHANT, ESQ.
                                 ROBERT J. STEARN, JR., ESQ.
                            One Rodney Square
                            920 N. King Street, P.O. Box 551
                            Wilmington, DE  19899-0551

                            O'Melveny & Myers, LLP
                            By:  SUZZANNE S. UHLAND, ESQ.
                            Embarcadero Center West
                            275 Battery Street
                            San Francisco, CA  94111-3305

                            O'Melveny & Myers, LLP
                            By:  BEN LOGAN, ESQ.
                            400 South Hope Street
                            Los Angeles, CA  90071-2899
                            (Telephonic Appearance)

Audio Operator:             Nickita Barksdale


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**
**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (cont'd):

| | |
|---|---|
| For the Creditor, Class of Former Employers: | The Gardner Firm, P.C. By:  MARY ELIZABETH OLSEN, ESQ. 1119 Government Street, P.O. Box 3103 Mobile, AL  36652 (Telephonic Appearance) |
| For the Committee: | Hahn & Hessen, LLP By:  MARK T. POWER, ESQ. MARK S. INDELICATO, ESQ. MARIA A. ARNOTT, ESQ. 488 Madison Avenue, 14th & 15th Floors New York, NY  10022 |
| For DB Structured Products: | Bingham McCutchen, LLP By:  ANDREW J. GALLO, ESQ. 150 Federal Street Boston, MA  02110 |
| For the U.S. Trustee: | Office of the United States Trustee By:  JOSEPH P. McMAHON, JR., ESQ. |
| For Aaron Celious: | By:  AARON CELIOUS, PRO SE |
| For the Examiner: | Kirkpatrick and Lockhart Preston Gates Ellis, LLP By:  EDWARD M. FOX, ESQ. 599 Lexington Avenue New York, NY  10022-6030 |
| For KPMG, LLP: | Sidley Austin, LLP By:  GUY S. NEAL, ESQ. 1501 K Street, N.W. Washington, DC  20005 |
| | Sidley Austin, LLP By:  MICHAEL C. KELLEY, ESQ. 555 West Fifth Street Los Angeles, CA  90013 (Telephonic Appearance) |
| | Campbell & Levine, LLC By:  MARK T. HURFORD, ESQ. 800 N. King Street, Suite 300 Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

3

APPEARANCES (cont'd):

| | |
|---|---|
| For the Treasurer of<br>Maricopa County,<br>Arizona: | Gust Rosenfeld, PLC<br>By:  MADELEINE C. WANSLEE, ESQ.<br>201 E. Washington Street, Suite 800<br>Phoenix, AZ  85004-2327<br>(Telephonic Appearance) |
| For Nabih & Esther<br>Mangoubi and Town<br>Park Renaissance,<br>LLC: | William D. Sullivan, LLC<br>By:  ELIHU E. ALLINSIN, III, ESQ.<br>4 East 8th Street, Suite 400<br>Wilmington, DE  19801 |

4

1           THE CLERK:  All rise.

2           THE COURT:  Good afternoon.

3           MR. MERCHANT:  Good afternoon, Your Honor, Mike

4  Merchant of Richards, Layton and Finger on behalf of the

5  debtors.  Your Honor, turning to the agenda, if acceptable to

6  the Court, we'd like to take the status conference, which is

7  listed as Agenda Item 14 first.

8           THE COURT:  All right.

9           MR. MERCHANT:  And I'll cede the podium to my

10 colleague, Robert Stearn.

11          MR. STEARN:  Good afternoon, Your Honor.  May it

12 please the Court, Bob Stearn from Richards, Layton and Finger

13 on behalf of the debtors.  Your Honor, this was a recently

14 ordered status conference in the warrant action, which is

15 Adversary Number 07-50970.  The Court previously had

16 established a status conference on September 11 in this case

17 for purposes of seeing where we were on class certification

18 issues as Your Honor will recall.  On August 15th, the

19 plaintiffs filed a motion for class certification together with

20 a motion to shorten and a request for a hearing on the motion

21 for class cert by the end of August.

22          As for the motion to shorten, although we -- the

23 defendants think we have pretty good arguments in opposition

24 thereto, we're not really going to need to reach that, Your

25 Honor, because of an agreement reached among counsel.  Frankly,

1  with respect to the class certification issue, we're probably

2  going to end up stipulating to something.  It's just we're

3  still in discussions with plaintiff's counsel about things like

4  class definition, possibly subclasses, things like that.  I

5  think we'll get across the finish line on that pretty soon.

6          But, for the time being, instead of conducting kind

7  of a little mini fire drill with respect to the motion to

8  shorten, what we've agreed to do in order to give the plaintiff

9  some comfort is essentially if we end up contesting class

10  certification and if the Court were to deny class

11  certification, then with respect to any of the folks who were

12  terminated on April 2nd and thereafter, essentially the folks

13  who would have been members of the class, we'll establish a

14  supplemental bar date, we'll send them notice and we'll give

15  them 60 days in order to respond thereto.  And I think that

16  takes care of the primary concern that plaintiff's counsel had

17  and as a result thereof, I think we have reached an agreement

18  and the Court won't need to address the motion to shorten.

19          And with that I believe plaintiff counsel is on the

20  phone.  And unless Your Honor has any questions of me, I'll

21  allow plaintiff's counsel to hopefully confirm everything I

22  just said.

23          THE COURT:  Let me hear from plaintiff's counsel.

24          MS. OLSEN:  Your Honor, this is Mary Olsen and, yes,

25  we agree with what Mr. Stearn told you.  We would just like to

1  clarify that we will continue to have the September 11 setting

2  for hearing on the class issues if we're not able to reach a

3  stipulation.

4          THE COURT:  Very well.

5          MS. OLSEN:  Okay, great.  Thank you.

6          THE COURT:  Will the parties be submitting a

7  stipulation or order?

8          MR. STEARN:  I think that makes sense.  The

9  stipulation probably should address, number one, the motion to

10  shorten, and I think it can just be denied.  And, number two,

11  that which we just described on the record.  So, we'll do that,

12  Your Honor.

13          THE COURT:  Very well.

14          MR. STEARN:  Thank you.  Your Honor, may I be

15  excused?

16          THE COURT:  Yes.

17          MR. STEARN:  Thank you.

18          MS. OLSEN:  Bye-bye.

19          MR. MERCHANT:  Your Honor, Mike Merchant again for

20  the record.  If we can turn back to the beginning of the

21  agenda, Agenda Items 1 and 2 have been continued to the

22  September 11th and October 2nd hearings respectively.  With

23  respect to Item 2, it's the GECC stay relief motion, the

24  debtors intend to enter into another stipulation with GECC that

25  will among other things continue the hearing to the October 2nd

1 omnibus hearing.  It will also provide for the payment of an

2 advance on their secured claim out of the Carrington sale

3 proceeds in the amount of $100,000.  We have yet to see a draft

4 of that stipulation.  We know it's coming.  And we would

5 propose just submitting it under certification of counsel.

6           THE COURT:  Very well.

7           MR. MERCHANT:  Thank you, Your Honor.  Agenda Item 3,

8 that motion will -- if it has not been already, it will be

9 withdrawn.  Agenda Item 4 was the motion of Brandywine

10 Operating Partnership, LP to compel payments under Section

11 365(d)(3) of the Bankruptcy Code.  We did resolve that motion

12 by stipulation.  A stipulation and a proposed form of order

13 were submitted under certification of counsel.  I don't know

14 whether Your Honor had any questions regarding that

15 stipulation.  And I do have a copy with me.

16           THE COURT:  I don't recall having seen the

17 stipulation yet.

18           MR. MERCHANT:  I have a copy of the certification and

19 the proposed form of order, if I may approach.

20           THE COURT:  You may.

21           MR. MERCHANT:  The stipulation provides, among other

22 things, that the debtor shall pay Brandywine $40,507.04.  There

23 will be stay relief with respect to Brandywine's ability to

24 setoff any security deposit, and the parties each granted each

25 other a full release.

1          THE COURT:  All right.  Let me take this and just

2  make sure that I didn't already sign off on it.

3          MR. MERCHANT:  Okay.

4          THE COURT:  But, if I didn't, I'll act right away on

5  it.

6          MR. MERCHANT:  Thank you, Your Honor.  Agenda Item

7  Number 5 is the motion of Coremetrics, Inc. to compel payments

8  under Section 365(d)(3) of the Bankruptcy Code.  We've resolved

9  that motion by stipulation as well.  The stipulation provides

10  that the debtor shall pay Coremetrics in the amount of $8,827

11  in full and final satisfaction of their claims.  There's a full

12  release on both sides.  Again, I have a stipulation signed by

13  both parties and a proposed form of order approving the

14  stipulation.

15          THE COURT:  You may hand it up.  Does anyone else

16  care to be heard on this matter?

17                    (No verbal response)

18          THE COURT:  I hear no response.  That order has been

19  signed.

20          MR. MERCHANT:  Thank you, Your Honor.  Agenda Item

21  Number 6 is the motion to approve a settlement agreement with

22  DB Structured Products, Inc.  And I'll cede the podium to Ms.

23  Uhland to handle that matter.

24          THE COURT:  All right.

25          MS. UHLAND:  Although this is an uncontested

1 settlement, it's efficiently complex.  I didn't want to take

2 the time to walk through it.  And in addition, there have been

3 some changes to the form of the order to address concerns of

4 various parties, including the parties to the settlement as

5 well as some of the other parties to the protection orders that

6 we're going to be talking about later today.  Nothing in this

7 case seems particularly straightforward or simple.  So, let me

8 just take a minute to talk about the relationship between

9 Deutsche Bank Structured Products and the debtors that brought

10 us here.

11          Deutsche Bank Structured Products and the debtors

12 were parties to two separate warehouse loan agreements or

13 master repurchase agreements, one which we refer to as the

14 prime facility and the other as the hospital line.  This

15 industry is great for their industry terminology.

16          THE COURT:  So I'm learning.

17          MS. UHLAND:  Yes.  The hospital line were generally

18 lesser quality loans, often loans like our -- typically LNFA of

19 higher quality which were then put out on a second financing

20 and financed pursuant to the hospital line.  Customarily, the

21 debtors and Deutsche Bank Structured Products would each month

22 enter into a reconciliation to determine in effect whether the

23 obligations under the repurchase agreements were what I'll say

24 were imbalanced.  And in that regard, they would compare the

25 debtor's obligation under the repurchase agreements to what

1 they refer to as the mark of the other party to the repurchase

2 agreement multiplied by their advance rate.  In other words,

3 it's in effect a collateral balancing.  Although these aren't

4 collateral, this is for purchase obligations.

5        To the extent there was a deficiency, if you will --

6 again, I'm using loan terms loosely in these repurchase

7 structures -- then the debtor would either provide additional

8 collateral in the form of additional loans, put them on the

9 repurchase lines, or the other party to the repurchase

10 agreement was entitled to make a margin call on the debtors in

11 cash.  In connection with the March calculation of

12 reconciliation of the prime line and the hospital line, the

13 parties determined or Deutsche Bank determined based on its

14 mark and its advance rate that there were certain amounts owing

15 or that under -- there weren't amounts owing, but that it was

16 entitled to make a margin call of approximately 14.1 million

17 dollars.

18        The debtors took the position or based on the values

19 while the two facilities combined may not have required such a

20 margin call, under the documents the Deutsche Bank Structured

21 Products was entitled to calculate the marks and their advance

22 rate separately under each of the different facilities.  So,

23 that if there was a -- they weren't required to cross-

24 collateralize their own separate facilities.  And Deutsche Bank

25 took the position again that it was entitled to make a margin

1  call under the prime line of 14.1 million dollars.

2          As described in the motion, what happened next is the

3  subject of the factual dispute of the parties that gave rise to

4  this.  The debtors took the position that they transferred to

5  Deutsche Bank for review and further discussion approximately

6  50 million dollars of face amount of loans that the debtors

7  owned.  Deutsche Bank Structured Products took the position

8  that the debtors authorized them to in effect transfer those

9  loans to Deutsche Bank Structured Products.  Accordingly, then

10 that is the core of the dispute.  It's 50 million dollars or 14

11 million dollars on the margin call.

12          Further, to provide a little more background on what

13 happens in the settlement agreement, with respect to both the

14 prime line that Deutsche Bank had previously long before this

15 March period established an appropriate control so that there

16 were custodial accounts being -- with funds being directed in

17 accordance with those accounts, shortly by March 21st at the

18 request of Deutsche Bank, New Century setup similar accounts

19 with respect to the hospital line.  After filing the

20 petitioner, Deutsche Bank filed its motion for preliminary

21 injunction seeking declaratory relief on this issue, and as

22 part of that structure the parties in effect setup a similar

23 escrow which had the function of the custodial accounts with

24 respect to these 50 million of disputed loans.  We refer to

25 those accounts as the disputed loan escrow accounts, but what

1  they are is in effect similar principal and interest accounts

2  and tax and insurance accounts for these 50 million dollars of

3  the disputed loans.

4          As part of -- well, stepping back to -- Deutsche Bank

5  Structured Products is among the parties that became a party to

6  the debtor's discussions with respect to the adequate

7  protection stipulation.  The reason this was -- that Deutsche

8  Bank was a party was in addition to this disputed loan

9  accounts, because of the -- you know, the hospital loan

10 custodial accounts and the prime custodial accounts, they have

11 similar questions or issues with respect to reconciliations as

12 all of the other warehouse lenders.  So, Deutsche Bank with

13 respect to those two existing master repurchase agreements is a

14 party to the adequate protection stipulation and supported the

15 adequate protection stipulation and asserted -- and has

16 asserted an interest in the funds in the amount of, you know,

17 their disputed amounts resulting from the custodial account

18 operation by the debtors and tracking of the funds.

19         Also because of those existing master repurchase

20 agreements, Deutsche Bank ultimately took action on April 25th

21 to buy or credit or buy in is the industry term the loans on

22 those lines such that Deutsche Bank takes the position that it

23 has a deficiency claim.  In other words, it sent its notice of

24 termination of the lines pre-petition, but on April 25th took

25 the position that it had taken the loans on the line.  So, we

1  have with Deutsche Bank issues with respect to the amount, if

2  any, of their deficiency claim, the amount, if any, of the

3  funds that they say that they're entitled to with respect to

4  the adequate protection stipulation, as well as the 50 million

5  dollars of disputed loans.

6       There is a fourth issue that's less -- that's set out

7  in the settlement agreement that I also think is resolved

8  pursuant to the settlement agreement that may not be as fully

9  flushed out in the motion.  And that is with respect to

10 approximately $350,000 of unfunded manufactured housing loans.

11 The debtors came in on their first day to get permission to

12 fund up to two million of those manufacturing housing loans,

13 which loans were funded and sold during the early days of the

14 case.  Approximately 350,000 remain to be funded on certain

15 loans, and this is above the two million that was previously

16 authorized by the Court for funding such loans.

17      And what the parties -- and all of those loans were

18 initially financed by Deutsche Bank.  So, what the parties have

19 agreed to do in connection with this settlement agreement is

20 that the debtors will fund that balance of the 350,000 and that

21 amount Deutsche Bank will increase its amount its seeking from

22 the adequate protection order in the amount that's funded by

23 the debtors with respect to those loans.

24      With respect to the deficiency claims, there's a

25 legal issue that the debtors and Deutsche Bank are seeking to

1 resolve and do resolve in this motion, and that is clearly on

2 how any such deficiency claim should be calculated.  The debtor

3 is taking the position that under Bankruptcy Code Section 562,

4 the amount of the market value of the loans needs to be

5 determined as of the date of the termination of the repurchase

6 agreement which happened in March, whereas Deutsche Bank was

7 taking the position that the value of the loan subject to the

8 master repurchase agreements for these purchases of calculating

9 the deficiency should be the later date, April 25th.

10       Again, this settlement seeks to resolve all of the

11 legal issues as well as all of the -- it's a compromising

12 settlement without determination of all of these legal issues,

13 the title to the loans, the amount of the deficiencies and the

14 resolution with respect to these manufactured housing loans.

15 Accordingly, what the settlement provides is the following.

16 The settlement provides that the debtors will auction the 50

17 million dollars of disputed loans and that Deutsche Bank will

18 be paid from those proceeds 14 million plus the amount in the

19 disputed loan escrow.

20       In addition, Deutsche Bank will have a 20 million

21 dollar deficiency claim calculated at 20 million dollars, which

22 is a substantial compromise from the 50 million dollars

23 asserted based on the April 25th value.  Further, that

24 deficiency claim is payable from only from the assets of the

25 estate recovering -- resulting from recoveries from any causes

**J&J COURT TRANSCRIBERS, INC.**

1 of action of the debtor's restatements.  In other words, it

2 will not collect from any of the tax refunds or asset sales.

3 Further, Deutsche Bank will assign to the debtors its interest

4 in the adequate protection fund to be increased by the $346,000

5 for the additional funding of the manufactured housing loans.

6 The debtors commit that they will make -- are obligated to fund

7 those loans as part of the settlement.

8       There is also a provision which hopefully will not be

9 relevant that to the extent the debtors are unable to obtain 14

10 million dollars for the loans, that Deutsche Bank has the right

11 to bid as a result of the auction to credit bid those amounts

12 -- at 72 hours after the close of the auction to credit bid

13 those amounts.  Since filing the motion, there have been a

14 couple of amendments to the order and modifications, one that

15 has to do with the Deutsche Bank -- between Deutsche Bank and

16 the debtors -- and we've reviewed all of this with the

17 committee -- and the other, some other additional language that

18 we wanted to include in the order to provide assurance to the

19 other parties to the adequate protection stipulation that by

20 entering into this Deutsche Bank stipulation, we're not

21 altering their rights.

22       I realize I have a black line but it is -- the order

23 submitted with the settlement agreement is very simple.  My

24 black line I now realize is not a complete black line from the

25 filing.  So, I think it might be easier if you just work with

1   -- if I could hand up the clean order and walk through the

2   concepts, I'll just walk though the entire order.

3           THE COURT:  All right.

4           MS. UHLAND:  If I may approach?

5           THE COURT:  Yes, thank you.

6                       (Pause)

7           MS. UHLAND:  The first expansion of the order that's

8   a clarification is in Paragraph 4, which it was the parties --

9   the debtor's committees intent at the request of other parties

10  to the adequate protection order to make it clear that this --

11  by allowing the debtors to participate or be assigned the

12  Deutsche Bank claim they were not affecting the rights of any

13  other parties -- that any other parties may have that it will

14  not affect the escrowed funds available for distributions

15  pursuant to the order.

16          In Paragraph 5, this is another -- this one is

17  actually a modification to the order that is a -- reflects a,

18  you know, sort of an expansion of the discussion by the debtors

19  and Deutsche Bank.

20          THE COURT:  It looks like it's new.

21          MS. UHLAND:  Yes, this is new.  And what this

22  provides that if at some point the debtors can't, you know,

23  sort of continue their auction -- and we'll talk about the

24  auction subsequently -- the debtors can't continue the auction

25  forever, that there is some outside date by which they would

1 have to sell the loans.  And our outside date is what I'll call

2 a soft outside date of November 30th.  That we have until

3 November 30th but we can extend it to December 14th if we have

4 a binding offer from a qualified bidder by November 30th.  This

5 provides the debtor the flexibility that they need to adjust

6 the auction date if necessary, but providing an outside date

7 for the benefit of Deutsche Bank.

8          Paragraph 6 simply reaffirms the arrangement in the

9 -- that Paragraph 5 does not alter the existing ability for

10 them to credit if we obtain a price less than the amount set

11 forth in Paragraph 2.  Paragraph 7 is a further expanded -- an

12 expansion to clarify that we may if in the event we are

13 transferring the loans to Deutsche Bank that this settlement

14 order will constitute in effect a sale order and provide them

15 the adequate legal authority to affect the sale that maybe the

16 result of these other provisions.  With that, the debtors would

17 request that the Court approve the settlement.  Again, we think

18 it's a very beneficial settlement to the estate.  As we'll be

19 discussing momentarily, we have an indication of interest of

20 these loans at 40 million.  So that, the compromise of 14

21 million should provide substantial value to the debtors.

22          THE COURT:  Yes, the letter of intent --

23          MS. UHLAND:  The letter of intent.

24          THE COURT:  That's the subject of the next agenda

25 item.  Let me ask this.  Is it -- well, has this revised order

1  been designed so there is no inconsistency between it and that

2  which would be ordered if the relief in the next agenda item is

3  granted?

4          MS. UHLAND:  Your Honor, we're going to be submitting

5  the next agenda item.  Mr. Power and the U.S. Trustee and I are

6  going to probably go -- revise that order and submit that order

7  under certification of counsel to address more expressly the

8  possibility of the auction is postponed, how will that be done

9  and on notice.

10         THE COURT:  Okay.

11         MS. UHLAND:  So, we plan to -- this order is complete

12  and prepared.  We plan to conform the other order to submit it

13  appropriately.

14         THE COURT:  All right.  Does anyone else care to be

15  heard in connection with this motion?

16         MR. POWER:  Thank you, Your Honor, Mark Power from

17  Hahn and Hessen, counsel to the committee -- co-counsel to the

18  committee.  Your Honor, I can confirm to the Court that the

19  committee was involved and worked with the debtor extensively

20  in both structuring the settlement and negotiating it and

21  working out the details.  I think there's one quite -- one

22  clarification I think is I understand the deal, at least the

23  deal that I signed off on, was Deutsche gets the first 14

24  million.  That includes the money that's in the disputed

25  accounts.  It's not in addition to.  So, in other words,

1 there's several hundred thousand dollars of principal and

2 interest payments that are in that account, so --

3          THE COURT:  Three hundred something thousand.

4          MR. POWER:  Yes, three hundred -- they'll get that

5 and then they'll get the 14 million less that.  I don't think

6 it's in addition.  And then, of course, the debtors agreed to

7 fund the construction loans that Ms. Uhland mentioned that were

8 -- the debtor received the money pre-petition but they were not

9 funded and they had to be funded now.  So, that's another three

10 hundred and some thousand.  So, that's the transaction as I

11 understand it, just to clarify the record.  But, the committee

12 supports the settlement and asks Your Honor to approve it.

13          MS. UHLAND:  I will confer Mr. Power's clarification

14 on that.  I misspoke on that portion.

15          THE COURT:  All right.  Does anyone else care to be

16 heard?

17          MR. GALLO:  Your Honor, Andrew Gallo from Bingham

18 McCutchen for DB Structured Products.  I will also confirm that

19 it's the amount in escrow plus the -- it's not in addition to

20 the 14 million.  It adds up to equal the 14 million.  Just to

21 clarify a couple of points that Ms. Uhland didn't go over, this

22 settlement is of all of Deutsche Bank's claims relating to the

23 disputed loans and its repo agreements.  It does have other

24 agreements with the debtor that are separate and apart from the

25 repo agreements.  Most notably, there are some whole loans

1  sales, and we will be filing separate proofs of claims on those

2  sales.  And all parties have reserved all of the claims and

3  defenses with respect to those matters.

4           I just note that with respect to any order approving

5  bid procedures on the disputed loans, that's what Paragraph 6

6  of this order is meant to accomplish, Your Honor, is that the

7  way the deal works, if the sale is for more than 14, great, we

8  get the first 14.  The estates keep the rest.  If the sale is

9  for less than 14, essentially we have a right of first refusal

10 in which we can either take the cash or take the loans.  And

11 Paragraph 6 is meant to say that whatever bid procedures are

12 approved by the Court, that right to essentially credit bid up

13 to 14 million or whatever the balance that is owed to DB would

14 apply in any bid procedures going forward.  We either beat the

15 ones today or if that auction is taken off the board and

16 there's a new auction, the same thing.

17          THE COURT:  Thank you.

18          MR. GALLO:  Thank you, Your Honor.

19          THE COURT:  Does anyone else care to be heard?

20                 (No verbal response)

21          THE COURT:  All right.  I've reviewed the papers and

22 agree with the proponents of the settlement here that the

23 standard for approval of settlement have indeed been met.  This

24 circumstance presents several different levels of legitimate

25 dispute.  I'll put it that way.  And the debtor goes into great

1  detail in connection with that in the motion.  And it seems to

2  me that this resolution basically gives DB the slice of the

3  cake that the debtor says it should have and no more.  It

4  creates value for the estate without having to go through what

5  I'm certain would be long and complex litigation.  So, I'm

6  prepared to grant the relief that's been requested.  That order

7  has been signed.

8      MS. UHLAND:  Thank you, Your Honor.  Your Honor, our

9  next matter is the bid procedures motion.  And as I indicated,

10  we are trying to go back and make some clarifications that

11  we'll review with the creditor's committee and the United

12  States Trustee.  The creditor's committee again being very

13  intimately involved in this entire settlement process, and the

14  financial advisors for the creditor's committee also being very

15  involved in helping us solicit the bids for this particular

16  sale.

17      In these bid procedures, this is a somewhat different

18  bid procedures with respect to the way the stalking horse works

19  here.  Approximately 50 million dollars of the disputed loans

20  that are for sale consist of 235 first lien loans, unlike some

21  of the other loans that the debtors have sold at the beginning

22  of this case.  What the debtors have right now is a letter of

23  intent, and the letter of intent provides for approximately 80

24  percent but subject to diligence review -- 80 percent of the

25  principal balance but subject to certain diligence review that

1  would really calibrate what the dollars would be that the

2  debtors would get based on the quality of the loan.

3       THE COURT:  Yes, diligence review by the debtor.

4       MS. UHLAND:  In effect.  Well, diligence of the facts

5  to the debtor for the lender to then calculate what the

6  appropriate pricing would be or, I'm sorry, the buyer to

7  calculate the appropriate pricing.  As we noted, at the 80

8  percent level, that would provide with the Deutsche Bank

9  settlement approximately 26 million for the estate.  The

10 protections for the bidder are very modest here, if any.  In

11 effect, the debtors have agreed to pay for $50,000 for a

12 diligence report for them.  And provided that we reach an

13 agreement, a binding agreement with Residential Mortgage

14 Solution, LLC by August 24th, the debtors will provide that

15 diligence report to Residential Mortgage Solution, LLC

16 exclusively.  And further provide that if they are the winning

17 bidder, they will pay us back the $50,000 of the expense of it.

18      The terms of the LOI again are very favorable both in

19 the pricing as well as a minimal hold back, a five percent hold

20 back and a 90-day period of review.  What the -- and provided

21 that we reach the executed agreement on the 24th, the debtors

22 would agree to then proceed to have other bids to notice out

23 the bid procedures on that day.  Three days after entry of the

24 order, bids would be due September 7th with the auction

25 September 10th and the sale hearing September 11th.  The only

1  protection in effect for the stalking horse bidder is this

2  exclusive right to the diligence as well as an agreement that

3  bidding increments would be $100,000.

4          Now, the debtors are free to hire other diligence

5  companies and have been looking.  And I believe I have already

6  one other diligence company in place to the extent that they

7  can -- so they can provide other potential bidders similar

8  information to encourage further bidding.  So, while we have an

9  exclusive on this particular entity that we hired, we can hire

10 other experts to do the similar loan level review of the files.

11 Currently, the debtors and the creditor's committee believing

12 that moving forward with this proposal in this time frame now

13 is in the best interest of the estate.  While we're seeking the

14 procedures to be approved in a short time frame, we think the

15 market is very sophisticated, becoming more sophisticated in

16 buying these loans.  We believe that the timing of the auction,

17 the delay is not favorable given market conditions, and that I

18 said giving additional time for diligence we don't think is

19 necessary given the parties' familiarity with this process and

20 the other bids that we've had.

21         So, we would request that the Court approve the

22 motion as filed.  In addition, what we would like to make clear

23 -- and this is the part of the order that we want to go back

24 and work through with the U.S. Trustee -- is that in the event

25 we don't get the purchase agreement signed, the debtors can

1  push -- postpone the auction.  And that in the event we don't

2  get the -- if we don't get the agreement signed with

3  Residential Mortgage Solution, LLC that we can proceed to an

4  open auction on notice to the parties appropriately.

5  Residential Mortgage Solution, LLC will lose the benefits of

6  its exclusive diligence arrangement because it will not have

7  executed its binding agreement by the 24th.  It must do that to

8  get that benefit.  But, if that doesn't happen, we'd still like

9  the Court to approve our ability to notice out that auction.

10 We would have to modify both maybe the timing of the auction

11 possibly.  But, what we would need to clarify in the filed

12 forms of notices and bids procedures is it would no longer be

13 announced as a stalking horse auction.  It would be an open

14 auction.

15         What we propose to do is add some language into the

16 order that allows us to do that.  And then what we would do is

17 we would file the revised notices.  In the event we go that way

18 at any point, we would file the revised notice with the Court

19 and serve a revised notice on the parties altering the terms

20 from a stalking horse auction and any changes to the dates of

21 the auction terms.  The other terms of the auction would all be

22 as set forth in the mocino.  And we believe this is -- we will

23 -- we can draft that such a bid procedures order is expressly

24 intended not to be inconsistent with the Deutsche Bank

25 settlement order just approved.  So, with that, Your Honor,

1  again what we would propose is that the Court approve these

2  procedures and then we work with and submit under certification

3  of counsel a revised order hopefully later today.

4           THE COURT:  Does anyone care to be heard in

5  connection with this motion?

6           MR. McMAHON:  Your Honor, good afternoon, Joseph

7  McMahon.  Your Honor's comment regarding the debtor's finding

8  for the due diligence is the point I want to address.  In our

9  office's typical review of these types of things under the

10  standard articulated by the Third Circuit in O'Brien, we want

11  to be sensitive to preapproval of expense reimbursements.  That

12  being said, in this rather unique circumstance, putting aside

13  the amount which I really don't think is I guess a concern per

14  se, but the cow is effectively out of the barn before we get to

15  court for the hearing on this motion.  In other words, the

16  debtors have effectively paid and given, you know, a certain

17  period of exclusivity to the proposed stalking horse.  With

18  this information, how do you address that circumstance sitting

19  here today at the bid procedures hearing?  Perhaps we can have

20  a dialogue with the debtors going forward as to how to I guess

21  address these types of concerns to the extent there will be

22  more motions postured in this vein, but --

23           THE COURT:  Afraid of the floodgates opening up, are

24  we?

25           MR. McMAHON:  I just wanted to note that concern for

1 the Court.

2         THE COURT:  Well, you know, my concern isn't so much

3 the exclusivity part of it.  The concern I have is that given

4 the compressed time frame within which the debtor presently

5 proposes to conclude the auction, that this particular

6 arrangement may give the, and will call it almost the stalking

7 horse bidder, an advantage, an unwarranted advantage, put it

8 that way, over others who might be interested given the

9 compressed time frame.  So, while the debtor has indicated in

10 its papers in here that, well, if there's somebody else who

11 comes along who is really serious who wants the same

12 arrangement with respect to due diligence, we'll give it to

13 them.

14         You know, I guess if it's $50,000 a pop, you know,

15 looking at the overall amount of the proposed transaction, I

16 agree with the U.S. Trustee that the number in and of itself

17 doesn't -- it's not much of a blip on the radar screen.  But,

18 the question in my mind is for the debtor to address now --

19 and, I don't know, maybe there will be further discussions --

20 is why is it that that arrangement doesn't unduly disadvantage

21 others who might be interested?  And that question having been

22 asked, I am fully aware -- and, you know, this isn't the only

23 case in which I'm facing the same issue with two days -- of the

24 market volatility with respect to sales of these types of

25 assets.  So, the compressed time frame in and of itself may

1   very well be warranted by -- I need to be convinced that in the

2   overall bidding situation, it's good for the process and it

3   doesn't really close the door on others who might be

4   interested.

5           MS. UHLAND:  Your Honor, as I indicated, the debtors

6   -- I mean, sorry, the committee's financial advisor has been

7   much closer to the bidder of the -- as Mr. Power had addressed,

8   but both the current -- he's a little a closer to the thoughts

9   on the timing as well as sort of the exact current status of

10  information that's being developed for other bidders.

11          THE COURT:  All right.

12          MR. POWER:  Thank you, Your Honor, Mark Power from

13  Hahn and Hessen.  Your Honor, as Ms. Uhland said, the committee

14  has really been involved.  And, in fact, this is a bidder that

15  we brought to the table.  In conjunction with the debtor, we

16  worked with them.  I guess, Your Honor, there are a lot of

17  conflicting things going on here and the reason we're acting in

18  this matter.  Obviously, the committee and the debtor are both

19  working to maximize value.

20          First of all, with respect to the due diligence

21  issues, obviously we know what the ordinary course was here.

22  The debtor and the committee had to make a decision what the

23  best way to proceed given the volatility in the market and to

24  bring these things to auction.  And the thought was that the

25  due diligence given the modest amount and the fact that it had

J&J COURT TRANSCRIBERS, INC.

1  to be done quickly, that the debtor could engage it.  Quite

2  frankly, I will represent to the Court that given the number of

3  transactions that are available to bidders in the market

4  currently, you pretty much need to provide some due diligence

5  expense reimbursement to get people to come and look at

6  transactions.  That's just the marketplace that it currently

7  exists.  And one of the reasons it's being setup this way is to

8  satisfy that.  And I will tell you from across the board, we're

9  seeing that in a number of transactions.

10         In connection with this deal specifically, Your Honor

11  has hit the nail on the head.  And we debated extensively

12  exactly how comfortable we would be in getting the thing to

13  market and getting it to auction and closing versus giving

14  enough time for other bidders to come in.  So, here is exactly

15  what we did.  This bidder basically would not firm up an offer

16  until it completed due diligence.  And so, we setup a time

17  table to complete the due diligence.  The due diligence has

18  three criteria:  compliance checks, credit checks and

19  appraisals.  The compliance and credit checks are primarily

20  loan portfolio, loan folder analysis where you can have an

21  independent firm come in and analyze the 200 and some loan

22  folders and verify that the compliance is there and also verify

23  the credit records.

24         The appraisals is a much more proprietary type of due

25  diligence in this circumstance.  And we have found that most

1  bidders when they look at appraisals, they do what is called a

2  broker estimated value for the underlying property.  That is a

3  lot of propriety information.  The bidders want to make sure

4  that the brokers are looking at things that they care about

5  mostly because that's -- it's very important what the

6  underlying properties are worth here and what the bidders think

7  they're worth.  So, in this situation what the debtor has done

8  in conjunction with the committee is RMS has its due diligence

9  and it's doing all three of those criteria with a separate

10 firm, which is already engaged.  They finished two-thirds of it

11 and they're almost on the appraisals.

12        The debtor has engaged a separate well-known

13 reputable firm that has done the compliance and the credit

14 checks, and that will be completed and made available to all

15 other bidders.  And when we went out to the market to test what

16 other bidders would rely on, obviously some bidders would be a

17 little reluctant to rely on the debtor's own due diligence

18 versus their own.  We felt that there was sufficient interest

19 -- they felt sufficiently comfortable relying on the credit and

20 the compliance check.  However, every single bidder wanted

21 their own appraisal analysis.

22        So, when we looked at the time frame between in

23 essence the day we go -- the day the contingencies in RMS's bid

24 falls away and the day of the auction there's roughly two

25 weeks.  And the debtor and the committee's financial advisors

1 believe that's sufficient time for any other bidder who is

2 interested in these assets to basically complete the appraisal

3 analysis, which should take a few days to a week, and be able

4 to get a bid in in sufficient time to do that.  So, the auction

5 before Your Honor is designed to do three things:  deal with

6 the volatility, get a good stalking horse offer, which we hope

7 to have by the end of the week, get this to auction as soon as

8 we can, and also work within the Court's calendar, because we

9 had a hearing for the 11th.

10          And so, we believe I think the debtor and the

11 committee after a lot of discussion that this is sufficient.

12 And we can represent to the Court that based on the business

13 judgment of everybody involved, we think that this -- the

14 process as proposed will work and will generate the maximum

15 value.  So, that's basically where we are, Your Honor.

16          THE COURT:  All right.  That addresses my question,

17 thank you.  Does anyone else care to be heard?

18                    (No verbal response)

19          THE COURT:  All right.  When can I expect the

20 submission of an order?

21          MS. UHLAND:  Your Honor, given that it's an afternoon

22 hearing, first thing tomorrow morning.

23          THE COURT:  Okay.  I just say that because I do not

24 plan to be in the office Friday, and I will not be sitting next

25 week but I will be around.

1          MS. UHLAND:  Okay.

2          THE COURT:  All right.

3          MS. UHLAND:  Thank you, Your Honor.

4          THE COURT:  Well, at least I don't plan to sit next

5    week, let's put it that way.

6          MR. MERCHANT:  Your Honor, Mike Merchant again for

7    the record.  Turning to Agenda Item Number 8 are the debtor's

8    outstanding objections to the sale of the debtor's servicing

9    business.  I believe that there was only one objection noted on

10   the agenda as potentially going forward and that was the Oracle

11   objection.  We've confirmed with Carrington that they are -- no

12   longer wish for the Oracle agreement to be assumed and assigned

13   to them in connection with the transaction.  So, we now view

14   that objection as moot and we'll take it off future agendas.

15         THE COURT:  All right.

16         MR. MERCHANT:  Agenda Item Number 9 is the motion of

17   the committee for an order authorizing members to engage in

18   securities training, loan sales and other transactions.  And

19   I'll cede the podium to committee counsel to handle that

20   matter.

21         THE COURT:  Okay.  Before you begin, let me ask

22   whether there has been any progress in resolving U.S. Trustee's

23   objection.

24         MR. POWER:  No, Your Honor.  We have -- the U.S.

25   Trustee has provided language which we reviewed and reviewed

1  with committee members in the attempts to resolve it, but we

2  still have fundamental issues with the construct of the

3  language.  So, we haven't been able to bridge that gap.

4        THE COURT:  Okay.  Well, I wanted before you began to

5  tell you that while I have not had occasion to enter such an

6  order, I am familiar with the topic and the issues involved.

7  And I am fundamentally in agreement with the position that the

8  U.S. Trustee here has taken.  I don't feel as strongly about

9  how ex officio members ought to be treated.  The blocking

10 procedures as proposed and as historically most of the courts

11 that have addressed this issue, including in this district,

12 have approved in agreement with.  The things beyond that I have

13 the most problems with are what I would consider an expansion

14 of the typical trading order to permit involvement in asset

15 sales.  And I have I think a problem with the nunc pro tunc

16 relief given the extensive passage of time since the motion was

17 filed.

18        So, those are my issues.  I don't know whether at

19 this point you wish to press forward, you wish to talk a little

20 more to the U.S. Trustee before you come back to me.  I leave

21 it to you.

22        MR. POWER:  Thank you, Your Honor.  I guess what I

23 would ask is, can we table the motion and put it to the end of

24 the day's calendar and give me a chance just to speak to my

25 partner, maybe the U.S. Trustee, and then figure out where we

1  want to go?  I thank you very much for the preview.

2          THE COURT:  Yes.  I mean, I always like to have

3  people have their say before, but because I've had an

4  opportunity to explore this issue not in connection with the

5  case before, I have had a chance to form those beliefs.  Now,

6  I'm not saying you don't have a chance to disabuse me of them,

7  but I thought I would give you the preview.

8          MR. POWER:  Well, I mean, Your Honor, just one issue.

9  I mean, the motion that was just before Your Honor for the

10 public sale of the loans where we're basically soliciting in

11 every major institution and buyer in the world, if an affiliate

12 or a member of the committee, which wouldn't be the people who

13 are involved on the committee but some other group -- and these

14 are extremely complex from the large -- wants to participate in

15 that auction to buy those loans, and it's a relatively modest

16 asset in this context of this case, I mean, that -- we end up

17 in a situation where they don't know what to do, whether to bid

18 or to resign or -- and it's very clear that there's nothing --

19 there's no inside information or secret.  It's just there's --

20 it's a competitive auction open to everybody and they're

21 bidding like everybody else.  Why should they be disadvantaged?

22         THE COURT:  Well, let me tell you -- well, I'll give

23 you one view that might be of help to that person in terms of

24 what the U.S. Trustee has -- I don't want to say threatened but

25 the right that she purports to reserve to herself.  And it's

1  come up before me I don't think in this case but in another

2  case since the new committee composition provision has been in

3  effect.  And that is, I do not agree with the U.S. Trustee's

4  position that she unilaterally has the right to remove a

5  member.  Now, I know that's a prerogative that she's asserted

6  in this Court on at least one prior occasion.  The matter ended

7  up being resolved, so I didn't have to rule on it.

8          My present view is is that the purpose of the new

9  provision, among other things, is to put the Court in a

10 position expressly to resolve issues about committee

11 composition should they arise after a committee has been

12 constituted.  Now, I know the U.S. Trustee doesn't agree with

13 that, unless she's changed her mind since our last hearing.

14         MR. POWER:  Except for motion.

15         THE COURT:  But, I will be willing -- and put it this

16 way, I would be unwilling to sign the form of order that the

17 U.S. Trustee has provided, that part of it that speaks

18 expressly to the right of the trustee to remove a member.  So,

19 to the extent that's meaningful in answering your question, I

20 would be willing to go that far.  But, I mean, typically, we've

21 been trading orders cover -- trading insecurities.  One court

22 said, you can't do commodities.  And other things are perhaps

23 problematic, and I think asset sales maybe one of them.  I'm

24 not saying there isn't something that you might not be able to

25 design to give everybody including the U.S. Trustee some

1  comfort.  But, to go beyond what courts traditionally have

2  permitted, you'll need to do some convincing.

3          MR. POWER:  Okay.  Your Honor, if we could just table

4  the motion until the end of the day, I'll advise the Court

5  where we are.

6          THE COURT:  Okay.

7          MR. POWER:  Thank you.

8                          (Pause)

9          THE COURT:  Okay.

10          MS. UHLAND:  Your Honor, the next matter on calendar

11  is the motion for relief from stay filed by Aaron Celious.  The

12  debtors did receive -- I don't know if it was filed -- a

13  further pleading from Mr. Celious last night styled, motion for

14  relief from stay by movant Aaron Celious.  I don't know if the

15  Court has received that pleading or would like me to hand up a

16  copy.

17          THE COURT:  I do not have it.

18          MS. UHLAND:  All right.  So, it doesn't appear that

19  it was filed.  Would you like me to hand up a copy?

20          THE COURT:  Yes, if would you, please.

21          MS. UHLAND:  Further, Your Honor, the debtors did

22  file a notice with the Court attaching a copy of a state court

23  action, a state court complaint filed against New Century on

24  July 2nd.

25          THE COURT:  I did see that.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  Your Honor, I don't know the best way to

2     proceed.   It's obviously Mr. Celious' motion.

3          THE COURT:  Well, let's kind of recap.  This was

4     scheduled for hearing on a prior date, July 31st I think,

5     recently.

6          MS. UHLAND:  Yes.

7          THE COURT:  And I think at that point, we had -- I

8     considered that a preliminary hearing and adjourned the matter

9     today for a final hearing to permit I think the debtor to

10    review what was then called a statement of facts, which had

11    been filed but not served, so that the debtor might be in a

12    better position to respond to the motion.  The debtor has since

13    responded.  I think I also indicated at the time to Mr.

14    Celious, who I see has signed up for the hearing today.  Mr.

15    Celious, are you with us?

16         MR. CELIOUS:  I am, Your Honor.

17         THE COURT:  All right.  That I was not inclined to

18    take his testimony by telephone if it was his intention to give

19    it.  And I think that recaps where we last were.  If anyone has

20    anything to add or correct, I'm open to hearing that now.

21                    (No verbal response)

22         THE COURT:  Okay, I hear no response.  Let me first

23    address and ask the debtor to address the notice of filing that

24    you submitted to the Court, which appears to be a copy of a

25    complaint filed in state court in Georgia by Mr. Celious on

1  July 2nd of this year.

2          MS. UHLAND:  Yes, Your Honor.  Since the last

3  hearing, and I was attending by telephone the last hearing, so

4  I recall the way it proceeded, the debtors sought to review the

5  statement of facts and tried to understand the background to

6  the extent they could, and in the process of that investigation

7  found the attached -- or counsel for the debtors found the

8  attached complaint that was filed after the first motion for

9  relief from stay was filed but before our hearing.  The

10 complaint relates to the -- and there was some confusion I

11 think, at least on my part, in the first hearing on the matter

12 what exactly the complaint was going to relate to since it

13 seemed to -- the issue seemed to be relating to a sale whereas

14 New Century had provided mortgages and had not been the seller.

15         So, Your Honor, I know -- so, there was a complaint

16 filed.  I do not know if it has been served against New

17 Century.  It was not served on either Richard Seiten or Melvin

18 Emyers as counsel for New Century, but I do not know if it's

19 been served but obviously it's been filed in violation of the

20 automatic stay against New Century.  We're not seeking -- you

21 know, this is a pro se plaintiff.  And unlike our last hearing

22 where we had a very sophisticated litigant commencing actions

23 while they're motion for relief from stay was pending, we're

24 not seeking any type of sanction against Mr. Celious in

25 connection with this, but certainly believe that this matter,

1 you know, is stayed, that he did file and we ought to take

2 appropriate action to correct the matter.

3          What we have in reviewing the complaint, the state

4 court complaint before we received this motion for a relief

5 from stay last night explained the story a little bit better

6 than the statement of facts, at least Mr. Celious' allegations

7 a little bit better than the prior statement of facts filed

8 with the Court.  And it appears that Mr. Celious bought some

9 property.  His action alleges that New Century and an account

10 representative assisted the individuals seeking to --

11 individuals and entities seeking to cause him to buy a property

12 at an inflated price because they had, you know, provided

13 appraisals which were too high, for lack of a better further

14 detail on inadequate appraisals, and that that was sort of New

15 Century's role in this.

16          But, New Century was not the seller of the property,

17 but as alleged New Century participated through its account

18 executive in providing appraisals in connection with that sale.

19 New Century -- just to clarify the record, New Century no

20 longer owned the first lien.  That's Homecoming Financial has

21 the first lien.  New Century does still own the second lien.

22 This makes it very -- one of the handful that we have not sold.

23 So, we are in -- we do have that second lien.  So, there is now

24 filed a recission and damage action relating to the underlying

25 sale of the property naming New Century and one of its account

1  executives.  And again, this action filed post-petition in

2  violation of the stay.

3        With respect to the other matter, Your Honor, it

4  appears that there seems to be continuing -- or there seems to

5  be some confusion when I read that motion that I just handed up

6  to you with respect to the fact that this is a pre-petition

7  claim that is entitled to a percentage distribution as opposed

8  or any whatever distribution for unsecured creditors as opposed

9  to a claim that would otherwise be recoverable for its full

10 value.  And in -- and there appears to be some -- and again

11 maybe a misunderstanding that the only purpose that the Court

12 could seek relief or provide relief from stay would be to

13 liquidate the claim as opposed to allowing a collection against

14 the claim against New Century.

15       So, the arguments that Mr. Celious is making that he

16 should be entitled to get relief from stay so that he can be

17 paid more quickly because of the damage to his credit rating

18 and just financial hardship, while they do create hardship -- I

19 mean, that is not the result that would be afforded by the

20 Court in seeking relief from a stay.  So, in essence, Your

21 Honor, while Mr. Celious has a sympathetic position, or

22 arguably if he was defrauded in the sale of the home and he is

23 now being -- you know, there is now a subject of foreclosure

24 actions and collection actions, affording him relief from the

25 stay in this Court does not seem to do anything to relieve what

1 he is claiming the hardship in this particular case to be

2 because, one, it only would provide for the liquidation of a

3 pre-petition claim.

4          And, more importantly -- or not perhaps more

5 importantly but more directly to what I sensed the Court was

6 concerned about last week, allowing him to proceed in his

7 action -- his recission action on the sale would not affect at

8 all the foreclosure actions that are currently pending against

9 him by the third party that's now holding the first lien,

10 Homecoming Financial if such a foreclosure action is commenced,

11 which we don't know if and when it will be commenced, an order

12 that Mr. Celious explain how providing him relief from stay to

13 pursue his state court action would have any impact at all on

14 that first lien.

15          New Century is willing and we will believe this

16 relief from stay should be denied without prejudice if he comes

17 up with a more clear theory on why it should be granted.  New

18 Century is willing, however, to agree that it will not proceed

19 to foreclosure on its second lien.  If part of the -- if his

20 motion is denied, we would allow -- the Court in that order

21 that we would not seek foreclosure of our second lien position.

22 But, I do think there is just some confusion about the type --

23 the effect that granting his relief would have and the relief

24 that he's actually seeking.

25          It would be very prejudicial to the estates to have

1  this relief granted.  We would have to -- in fact, from Mr.

2  Indelicato's speech last week spent hundred percent dollars on

3  a not a hundred percent dollars in Georgia raising, you know,

4  collateral issues.  And again, what I think weighs into the

5  calculus here is even if that were the case and we're seeking

6  -- you know, he's still -- I think Mr. Celious may not realize

7  that he's still just getting a claim liquidated, a dischargable

8  claim liquidated as opposed to dollars in his hundred cent

9  dollars or a faster resolution of the matter.  So, accordingly,

10 Your Honor, we would request that you deny this motion, and as

11 part of that denial, Your Honor, we will agree not to proceed

12 to foreclosure on our second lien.

13          THE COURT:  All right, thank you.  Mr. Celious?

14          MR. CELIOUS:  Yes.

15          THE COURT:  Is there anything you would like to tell

16 me?

17          MR. CELIOUS:  I had actually sent in the motion to

18 Your Honor and to the trustees and to all the attorneys, and it

19 was my understanding that you received it but you have not.  I

20 guess from my vantage point, there maybe some misunderstanding.

21 It was my understanding that given the participation New

22 Century played and through their account executive in allowing

23 the fraudulent transaction to take place, at least from my

24 vantage point, that not allowing these civil procedures to take

25 place would put me at a great hardship because they ultimately

1   are the ones who originated both the first and second loans.

2           The Homecoming Financial who assumes the first loan

3   now definitely has a defense in their favor that they were not

4   the originator of the loans and thus, they were not

5   participating in any fraud.  The just assumed the loan.  So --

6           THE COURT:  Well, let me stop you there.  I can't be

7   your lawyer.

8           MR. CELIOUS:  Right, I understand.

9           THE COURT:  And while I don't have such cases before

10  me in this district, I had a number of cases before me in which

11  borrowers were claiming wrongdoing by lenders in connection

12  with consumer loan transactions.  And there are some

13  circumstances under which successors to loans are insulated

14  from liability and others in which they are not.  So, I hear

15  what you're saying.  And perhaps with respect to your

16  particular matter, I expect you would know a lot more than the

17  Court knows.  And again, I'm not here to rule one way or

18  another ultimately on the merits of what you're claiming.

19          MR. CELIOUS:  Okay.

20          THE COURT:  Okay?

21          MR. CELIOUS:  I'm sorry.  Did I cut you off?

22          THE COURT:  No, I cut you off.  You may continue.

23          MR. CELIOUS:  Okay.  Well, since you did not receive

24  the updated form that I sent in, my argument basically states

25  that based on the three-prong test that we had discussed last

1 time that there would be no great prejudice to the bankruptcy

2 estates if this motion were to go forward.  As each motion is

3 dealt with on a case-by-case basis, there are common

4 individuals and likely not other individuals like myself

5 attempting to request such relief from stay.  There is no

6 hardship to the debtor that could be measured by the hardship

7 to myself as an individual attempting to seek relief in this

8 matter.  And I believe that the merits of the case suggest that

9 there is a very strong likelihood that I would be able to

10 prevail on those merits.

11         THE COURT:  All right.  Anything further in support

12 of your motion?

13         MR. CELIOUS:  Not at this time, nothing more than

14 what I've already submitted and apparently the Court did not

15 receive.

16         THE COURT:  Well, but it sounds to me -- put it this

17 way, there's nothing new in what you filed in your motion,

18 which I do have in front of me now, which I take it you didn't

19 intend as a separate motion but you intended to be something --

20 a supplement to that which you had already filed in connection

21 with this matter.  Is that right?

22         MR. CELIOUS:  That's correct.  It's just a more

23 concise statement as the previous one was not.

24         THE COURT:  Okay, all right.  I'm going to deny the

25 motion.  I will deny it without prejudice.  I will accept the

1 debtor's offer of inclusion in such a motion, its agreement

2 that it will not foreclose on its second lien position.  And I

3 deny the motion for a couple of reasons.  First of all, I'm not

4 convinced when you look at the the three-part test that you're

5 likely to prevail on the merits.  While you've said certain

6 things, I don't think they've really -- I can tell you they

7 haven't gone to the point where I can make that finding.

8        The problem with weighing the prejudice is is while

9 acknowledging that the hardship to you maybe real, given the

10 size of this estate -- and, frankly, this is the second issue

11 I've dealt with in two weeks or so -- there maybe more of these

12 coming.  And I've already suggested to the debtor that it has

13 to find a way in connection with the proposed plan of

14 addressing these lawsuits.  For now, you're relegated to filing

15 a proof of claim in this Court.  The order -- or an adversary

16 proceeding depending upon what precisely you wish to claim, but

17 I can't advise you about which avenue to choose.  I will ask

18 the debtor to put in the form of order that you are perfectly

19 free to pursue in any forum rights against others, and in this

20 forum only for now any claims you may have against the debtor.

21        Now, with respect to the action that you've

22 apparently filed in state court in Georgia, the debtor is

23 correct that if this matter has in fact been filed, you have

24 violated a provision of the Bankruptcy Code which prevents such

25 filings after the bankruptcy has been filed.  You heard Ms.

1 Uhland, the attorney for the debtor today, say that assuming --

2 and my words, I'm paraphrasing her words -- assuming that you

3 didn't realize the import of what you were doing, the debtor is

4 not now seeking sanctions against you for having violated the

5 stay by naming the debtor or I think two debtor entities as a

6 defendant -- as defendants in the state court action.

7            But, you will need to take whatever steps are

8 necessary to be certain that that suit without this Court's

9 permission is not continued against the debtors.  Now, that

10 doesn't in and of itself prevent you from having named other

11 employees of the debtor, which may or may not be an issue that

12 comes before me later.  And what I will ask Ms. Uhland to do is

13 to have someone from her office contact you directly to see

14 whether something can be amicably arranged.  If not, I'm sure

15 the debtor will be back to this Court.  Do you understand that,

16 sir?

17            MR. CELIOUS:  I do understand that, Your Honor.

18            THE COURT:  All right.  Do you have any other

19 questions?

20            MR. CELIOUS:  No, I just -- how can I get a copy of

21 the statement by the debtor's counsel that they will not be

22 then seeking to foreclose on the second?

23            THE COURT:  What the debtor will do is draft an

24 order, and before it's submitted to the Court, they will send

25 you a copy if they know how and where to reach you.  And, Ms.

**J&J COURT TRANSCRIBERS, INC.**

1  Uhland, let me ask, do you have contact information?

2         MR. UHLAND:  Yes, Mr. -- we do.

3         THE COURT:  Okay.  I'm told the debtor does have your

4  contact information.  You'll receive a copy of that order.

5  Before it's submitted to the Court, you'll have an opportunity

6  to comment on what the debtor has drafted.  And if there is a

7  dispute about what should be in the order, I will have a

8  conference telephone with you and debtor's counsel to resolve

9  that dispute.  Okay?

10        MR. CELIOUS:  Okay.  The only thing I would like to

11 add is if it's impossible given that they can't move forward on

12 this proceeding that no action or deleterious action to my

13 credit is then taken by the debtor as well by reporting that I,

14 you know -- and it's basically anything that could be negative

15 and damaging to my credit.

16        THE COURT:  I understand your concern but I will

17 leave that to discussion between you and the debtor --

18        MR. CELIOUS:  Okay.

19        THE COURT:  -- outside of the courtroom.  Okay.

20 Anything further on this matter?

21        MS. UHLAND:  No, Your Honor, thank you very much.

22        THE COURT:  All right, thank you.  Mr. Celious,

23 you're welcome to remain on the phone or if you would like you

24 may drop off at this point, or maybe he's gone already.  Okay.

25        MR. FOX:  Good afternoon, Your Honor, Edward Fox from

**J&J COURT TRANSCRIBERS, INC.**

1  Kirkpatrick and Lockhart Preston Gates Ellis on behalf of the

2  examiner.  Mr. Neal is here, too.  Your Honor, this is a

3  continuation of a conference related to the discovery issues

4  that we discussed on August 8th -- August 7th.  And I'm pleased

5  to report that I think we've pretty much resolved everything

6  ourselves.  With respect to the issues raised by KPMG in

7  connection with the subpoena served by the examiner, we have

8  resolved those issues and are prepared to move forward.  We

9  also have a form of protective order that Mr. Neal is going to

10 hand up which will resolve that issue as well.  And once the

11 protective order is signed, we'll look forward to receiving the

12 documents as we have agreed with KPMG.

13         I would just add that in certain circumstances or in

14 certain instances with respect to the requests set forth in the

15 subpoena, we have agreed with KPMG to move those issues down

16 the road.  And if we need to revisit them at some point in the

17 future, the parties have reserved their rights.  If, for

18 instance, we've agreed to wait with respect to a particular

19 request and decide later if we need to deal with that or not,

20 we've reserved -- each party has reserved its rights.  We'll

21 either discuss it again in the future and reach some agreement

22 or if not, at that point we would then come back to the Court.

23         So, not everything has been concluded completely.  We

24 may see you again or ask you again in the future to address

25 issues.  But, for the time being, we don't need to do that and

1  we do appreciate your willingness to have accommodated us in
2  that regard.
3          THE COURT:  all right.
4          MR. FOX:  One point that I also wanted to make with
5  respect to the protective order which we have discussed with
6  KPMG, you know, it's not unusual in the course of examinations,
7  depositions, whatever or in the course of a case that it's
8  necessary to show documents subject to a confidentiality order
9  or protective order to various parties.  And in this case, in
10 addition, we have the ability to provide the documents to the
11 committee as well.  KPMG requested and the order provides that
12 to the extent we do disclose documents to other parties as
13 provided for in the protective order, that any person who
14 receives what's defined as KPMG's confidential information will
15 be bound by the provisions of the protective order.
16          And the point that we wanted to put on the record is
17 that the -- the examiner has no obligation to somehow police
18 other parties who receive or see this information.  We're bound
19 by the agreement.  If KPMG wants to deal with that, that's
20 fine.  But, the examiner is not undertaking or is not, by
21 virtue of this language being in the protective order, being
22 required to somehow police what other parties do to the extent
23 they receive or review confidential information received from
24 KPMG.
25          THE COURT:  All right.

1              MR. NEAL:  Good afternoon, Your Honor, Guy Neal,

2    Sidley Austin, LLP, here today with Mark Hurford of Campbell

3    and Levine.  And my partner, Michael Kelly, is on the phone,

4    Your Honor.  I agree with all the statements made by Mr. Fox on

5    the record.  KPMG also appreciates Your Honor's willingness and

6    availability to sit in on what was termed a Court-sponsored or

7    Court-supervised meet and confer.  Knowing that was out there,

8    Your Honor, and perhaps still will be out there in the future,

9    I was able to lead us to a resolution of many of our issues and

10   the deferral on some for now.  If I may, Your Honor, approach

11   and hand you a copy of the form of protective order?  It is

12   only a tad bit over four pages.

13             THE COURT:  Thank you.

14             MR. NEAL:  Would Your Honor like a brief opportunity

15   to page through it?

16             THE COURT:  I'll tell you what, yes, I would.  And

17   why don't I just take a five minute recess to do that and I

18   shall be back.

19             MR. NEAL:  Thank you.  I will represent that we

20   provided a copy of this form of order early this morning to

21   committee counsel, counsel for U.S. Trustee and counsel for the

22   debtors.

23             THE COURT:  Yes.  And while it's not on the agenda, I

24   would like after this to take up the committee's motion which I

25   had deferred consideration of pending how this was going to

1 come out.

2          MR. NEAL:  Understood and we're prepared to address
3 that.

4          THE COURT:  Okay, thank you.

5          MR. NEAL:  Thank you.

6                    (Recess)

7          THE CLERK:  All rise.

8          THE COURT:  Okay.  I have reviewed the proposed
9 protective order and have no questions.

10          MR. NEAL:  Thank you, Your Honor.  With respect to
11 the committee motion and the committee order, I'm happy to
12 speak to that or allow the committee to speak first and I can
13 address any concerns that I have after that.

14          THE COURT:  Well, here's what my thought was.  As I
15 indicated during I think the most recent hearing, the committee
16 should have real time access to the discovery that's being
17 given to the examiner.  This protective order provides for
18 that.  Now, it doesn't require that the examiner share the
19 information that he gets, but it allows him to without
20 consequence.  And my thought was that was sufficient for the
21 committee at this time.  And it strikes me that it wouldn't be
22 really ripe until a later time to decide what, if any, use the
23 committee could make of this discovery.

24          And I understand what that does do is it defers the
25 issue that even the case that you rely on most heavily

1 addresses but doesn't resolve, and that is, you know, at some

2 point having to fish our way through that which the committee

3 might have a right to bring which doesn't emanate from the

4 debtor and wouldn't be subject to the pre-petition arbitration

5 agreement and that which would be covered by it.

6         MR. NEAL:  Thank you, Your Honor.  I very much

7 appreciate those comments, Your Honor.  I think we are of like

8 mind.  I believe it is more of a mechanical issue at this stage

9 and not a substantive one.  We would have crafted an almost

10 identical or substantially identical protective order for the

11 committee had the committee's order had been entered.  And

12 simply a matter of having the committee's order be entered and

13 the committee itself would be subject to its own freestanding

14 protective order, that would not differ in any material

15 respects consistent with your comments today on the record.  It

16 would simply substitute the committee for the examiner in this

17 four-page protective order.  And at that stage, Your Honor, the

18 document production can start flowing almost immediately.

19         THE COURT:  Okay.  Let me hear from the committee.

20         MR. INDELICATO:  Your Honor, Mark Indelicato from

21 Hahn and Hessen.  Your Honor, I appreciate the efforts that

22 have been made and we have been involved in the process with

23 the protective order.  And we are -- given the fact that the

24 committee has access to the documents, or at least that the

25 examiner has the ability to share the documents with the

1  committee, we were okay with the entry of the order -- of the

2  protective order as it's presented to the Court today.  And we

3  fully expect if in fact our 2004 order is ever entered or the

4  Court renders a decision regarding the arguments that we had at

5  the hearing, that we would in fact enter into a similar

6  protective order if KPMG felt it were necessary or expand this

7  one to include us in any greater detail that he thought was

8  appropriate.

9       I'm a little confused, Your Honor, quite frankly as

10 to the comments the Court made.  I understand that the examiner

11 has the ability but is not directed to give us the documents.

12 I also understand that the Court desire that we have real time

13 access.  But, the 2004 order is not going to be entered today

14 but maybe entered at some time in the future?

15      THE COURT:  No, I'm prepared to enter an order again

16 consistent with my view that the committee should have real

17 time access to the discovery that the examiner gets from KPMG.

18 I think the request that the information be subject to the same

19 protective order is a reasonably one.  I frankly would be -- I

20 think what Mr. Neal was saying they would agree to, is the

21 entry of the committee's order accompanied by a similar

22 protective order.  Am I correct about that?

23      MR. NEAL:  Yes, Your Honor.  We don't -- I mean, we

24 certainly oppose -- have opposed the committee's motion but we

25 think the process would be the entry of the order.  And the

1  order would provide that the motion is granted as modified by

2  the statements on the record on the August 7th hearing.  And

3  then a similar if not identical protective order is entered and

4  the committee will be real time access to the documents.

5          THE COURT:  I'm prepared to enter --

6          MR. INDELICATO:  And we have no problem with that

7  process, Your Honor.  We will enter into a similar protective

8  order.

9          THE COURT:  Okay.  Then you can submit that along

10 with the order.  Well, you can put it in with this -- combine

11 the order granting the motion as conditioned in the protective

12 order or you can give me two separate orders, either way.

13 Submit them under certification and I'll sign off on them.

14         MR. INDELICATO:  We will do that, Your Honor.

15         THE COURT:  Okay.

16         MS. ARNOTT:  Your Honor, Maria Arnott from Hahn and

17 Hessen for the committee.  Just one other point.  We have never

18 received the list of engagements or the list of timekeepers

19 from KPMG, which the examiner has received.  And based upon

20 that, he's decided which timekeepers and documents he needs to

21 fulfill his requests.  We -- I had spoken with KPMG's counsel.

22 He's advised us that he will give us those lists, but we would

23 like to reserve our rights as to any other additional

24 timekeepers or engagements that we may need information on.

25         MR. NEAL:  I only add, Your Honor, that the committee

1  at this point is about a half a step behind the examiner.  We

2  endeavor to keep them equal going forward.  And we will provide

3  the information that Mrs. Arnott has requested now that we

4  understand that the order will be entered as well as the

5  protective order for the committee will be entered as well.

6           THE COURT:  All right.

7           MS. ARNOTT:  Thank you.

8           THE COURT:  Okay.

9           MR. NEAL:  We maybe excused, Your Honor?

10          THE COURT:  Yes.

11          MR. NEAL:  Thank you.

12          MR. MERCHANT:  Your Honor, Agenda Item Number 12 is

13 the debtor's application to retain Susman Godfrey, a special

14 litigation counsel in connection with the Positive Software

15 matter.  Susman Godfrey and the Office of the United States

16 Trustee are still working out certain disclosure issues.  So,

17 we'd like to give them a little bit more time to do that.  And

18 then if we can reach an acceptable form of order, we'll submit

19 it under certification of counsel?

20          THE COURT:  That's fine.  I only ask that when you do

21 that to accompany it with whatever supplemental --

22          MR. MERCHANT:  Declaration or affidavit.

23          THE COURT:  -- disclosures are filed.

24          MR. MERCHANT:  Absolutely, Your Honor.

25          THE COURT:  All right, thank you.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. MERCHANT:  Your Honor, Agenda Item Number 13 is

2   the debtor's motion to amend the scope of the miscellaneous

3   asset sale procedures order.  The motion seeks to do a couple

4   of things with the existing procedures.  First, it seeks to

5   raise the dollar limit to permit the debtors to consummate

6   sales up to $400,000 in cash consideration.  Second, it seeks

7   to authorize the debtors to use procedures to sell Internet

8   domain names and other intangible property.  It also seeks to

9   authorize the debtors to sell certain personal property

10  formerly subject to lease agreements.  Where the debtors have

11  properly rejected the leases, the lessor has failed to timely

12  recover the property post-rejection.

13          THE COURT:  Or stated another way, permission to sell

14  the property of others.

15          MR. MERCHANT:  That is correct, Your Honor.

16          THE COURT:  All right.

17          MR. MERCHANT:  We're really just trying to deal with

18  a problem.

19          THE COURT:  I understand.

20          MR. MERCHANT:  And lastly would be to authorize the

21  debtors to sell unencumbered mortgage loans and real properties

22  obtained through foreclosures.  There were four objections

23  filed with respect to the motion which we've attempted to

24  resolve.  There maybe some outstanding objections, but I

25  believe those are parties are either in the courtroom or on the

1  phone and can let the Court know.  The first objection was

2  filed by Maricopa County Treasurer.  And basically to the

3  extent that the county has liens on leased property, they want

4  those liens satisfied before proceeds are turned over to the

5  lessor, and that's when we're talking about formerly leased

6  property.

7        We believe we have built in certain protections into

8  the form of order that addresses their concerns.  They will be

9  a noticed party with respect to any proposed sale notices.  To

10  the extent that a lessor requests turn over of the proceeded

11  from the sale, they will be a noticed party with respect to

12  that notice as well, which would give them a complete

13  opportunity to file any objection that they may have with

14  respect to the turn over of the proceeds.  It's really -- the

15  debtors don't want to be caught in the middle of a dispute

16  between a lessor of property and the taxing authority regarding

17  who is entitled to the proceeds.

18        So, we believe the best result is for everybody to

19  have notice if they want to file any kind of objection or

20  reserve their rights, and it can be determined either by this

21  Court or the appropriate court as to who the proceeds should go

22  to.  We believe that fully resolves their objection.  I don't

23  know if they have any other concerns that they would like to

24  voice today.

25        MS. WANSLEE:  Yes, on the line, Your Honor, good

1 afternoon.  This is Madeleine Wanslee of Gust Rosenfeld on

2 behalf of the Treasurer of Maricopa County, Arizona.

3        THE COURT:  Good afternoon.

4        MS. WANSLEE:  Good afternoon.  Thank you for allowing

5 me appear telephonically.  We have worked with the movants in

6 trying to resolve and craft a form of order and we just have

7 one remaining concern.  I think there is no problem in the

8 event where the debtor sells the property and the lessor and

9 Maricopa County agree as to the distribution of proceeds.  And

10 there certainly is no problem when the parties disagree and we

11 come into the Court and ask the Court to resolve the issue.

12 The problem that remains is the situation where the debtor

13 sells property, has received funds.  The lessor has not come in

14 and asked for the disbursement.  In that instance, the debtor

15 wishes to retain those funds and not make a disbursement until

16 plan confirmation.

17        And our position is is that we are a secured

18 creditor.  We should be paid from the sale proceeds at the time

19 of the sale.  Under Section 511, interest does continue to

20 accrue at the statutory rate of 16 percent.  So, we think it's

21 beneficial to the estate for our claim to be paid at the time

22 of sale, which is certainly the custom and practice for a

23 secured creditor to be paid at the time its collateral is sold.

24 The request is really quite simple.  It's just in the event

25 where the county has a lien on property that's liquidated and

1  our lien is on the cash of the proceeds, we ask the Court to

2  allow us to be paid from those proceeds.

3          THE COURT:  Well, you're a secured creditor of whom?

4          MS. WANSLEE:  The various debtors and the property --

5  if we have an interest in the subject of secured -- personal

6  property that's being sold, our lien does attach to that

7  property and to the sale proceeds.  And one of the problems in

8  this case is that, of course, there's a lot of property and one

9  of the concerns we had was that any future motions for sales

10 specifically identify the property that's being sold so that we

11 can then assert the claim and that claim -- or that concern has

12 been alleviated.  So, it will be identified in the future.  We

13 can identify the nature and extent of our lien claim and then

14 assert the right to those sale proceeds.

15         THE COURT:  Well, what if the property that's being

16 sold isn't property of any of the debtors?

17         MS. WANSLEE:  Well, as a secured creditor, we would

18 still be entitled to those proceeds since our lien attaches.

19         THE COURT:  Well, not as a matter of bankruptcy law,

20 maybe as a matter of applicable nonbankruptcy law.

21         MS. WANSLEE:  And that's true under -- I mean, under

22 -- there are many cases out there and certainly there is a

23 statutory law upon the liquidation or sale of property in which

24 our lien is attached, we are to be paid from the sale proceeds.

25 And I don't think we're talking about large sums of money here,

1  which is probably yet another reason why the amount should be

2  paid sooner rather than later rather than having to continue to

3  trail the docket and follow-up and analyze the plan of

4  reorganization and participate in the disclosure statement

5  process.

6          I'm just talking about the situation where we can

7  clearly identify our lien on certain property which has sold,

8  and we are the only entity making a claim as to those proceeds.

9  If there is a dispute, we agree that we would come before the

10 Court and have the Court resolve the dispute.  We're talking

11 about a situation where nobody has made a claim to those

12 proceeds and yet we can tell that we have an interest.

13         MR. MERCHANT:  Your Honor, our concern is that if

14 they're -- it's proceeds of leased property.  It's not the

15 debtor's property.

16         THE COURT:  That's my concern, too.  Let's -- I have

17 no problem in a case in which the debtor is selling its own

18 property and in which the lien interest is not disputed, that

19 payments be made prior to confirmation out of the proceeds.

20 But, let's go through the rest of the objections because I

21 think we need to find another way to address the selling of

22 property of others.  It troubles me.  But, I recognize the

23 solution that the debtor here has proposed as one that grows

24 out of practical considerations.  Let's see if we can find a

25 solution, but let's go through the rest of the objections.

1          MR. MERCHANT:  Okay, Your Honor.  The next objection

2    was filed by the New York State Teachers' Retirement System.

3    It's a protective objection making sure the debtors are not

4    selling or destroying information relative to their securities

5    litigation.  But, we've resolved that objection by language to

6    the amended form of order which will simply -- simply provides

7    that the debtors will comply with their protocol providing for

8    the backup and storage of all information stored on the

9    debtor's computers and the suspension of the debtor's document

10   deletion policy.

11          THE COURT:  Very well.

12          MR. MERCHANT:  Your Honor, the next two objections

13   are landlord objections.  And well, I suppose I don't really

14   view them as objections to the miscellaneous asset sale

15   procedures motion.  We have made an effort to resolve each of

16   these objections, but I'm not sure if we're quite there yet.

17   First of all, we can make the representation with respect to

18   both of those properties that the debtors will not be using the

19   miscellaneous asset sale procedures to sell any property

20   located at either of those facilities while the property is

21   located on the facilities.  If we remove the property from the

22   facilities, the debtor certainly may take advantage of the

23   miscellaneous asset sales procedures later.

24          With respect to the Mangoubi objection, which is the

25   Libertyville, Illinois property, we made certain

1  representations to the landlord that -- landlord's counsel

2  which we said we would put on the record here today, the first

3  of which is we'll be sending a moving company to remove the

4  computers, water coolers and coffee machines still existing at

5  the premises on or before the end of this month.  We've also

6  agreed to attempt to remove the old paint cans, toner

7  cartridges and the refrigerator.  We'll make an effort to

8  remove those.  But, to the extent that they're not removed, I

9  think the agreement is that the failure to remove that stuff

10 will not affect the effective date of rejection with respect to

11 the lease.  We've also agreed that we'll pay an admin claim on

12 the pro rata basis through the date that the computers, water

13 coolers and coffee machines are removed, and that is per the

14 agreement that we've struck with the landlord with respect to

15 that objection.

16         THE COURT:  After all, you did protect your water

17 cooler.

18         MR. MERCHANT:  We did protect that water cooler.  I

19 think those are sort of the deal points.  I think that there is

20 disagreement as to how we document those deal points.  We view

21 this as a miscellaneous asset sale procedures motion.  We don't

22 want to muddy up that order with all kinds of agreement with

23 the landlord relating to rejection of the lease.

24         THE COURT:  Well, it seems to me that once you've

25 agreed that you will not implement the sales procedures that

1  have been proposed with property at either location that you've

2  met whatever legitimate interest the landlord might have with

3  respect to sale procedures.  And it would not foreclose either

4  landlord from asserting other rights that it says it may have.

5  Neither of them -- well, one was just a joinder, but it doesn't

6  seem to me that either landlord is asserting a direct interest

7  in any of the property that the debtor intends to dispose of.

8  So, absent something like that, I think what you suggest

9  resolves the objections.  But, let me ask if either landlord is

10 represented here today and wishes to be heard?

11         MR. MERCHANT:  Your Honor, the only thing I would

12 note is that there are certain representations with respect to

13 the other lease as well.  And we're not really trying to be

14 difficult.  We're fine making the representation on the record.

15 If the landlord wants to draft a stipulation, we'll be fine

16 reviewing that and entering into it.  We just don't want to

17 muddy up this form of order.

18         THE COURT:  All right.

19         MR. ALLINSIN:  Good afternoon, Your Honor, Elihu

20 Allinsin on behalf of Nabih and Esther Mangoubi, who are the

21 sole beneficiaries of Illinois Land Trust Number R3679.  This

22 is the debtor's property referred to or at least property

23 referred to as IL008, and Town Park Renaissance, LLC, which is

24 Property GA006.  The former located in Illinois, the latter in

25 Georgia.  I appreciate Mr. Merchant's comments about putting

1    the representation that he did on the record, and they go

2    almost as far as I believe we had agreed in discussions last

3    night and earlier this morning with regard to the resolution of

4    these two objections.

5          There are two points that I would like to raise in

6    addition to those representations.  One would be that with

7    regard to the Mangoubie residence where lease rejection

8    wouldn't occur until the leased personal property was removed

9    therefrom.  That that be accomplished by August 29th and that

10   the landlord be provided at least 24 hours notice, preferably

11   48 hours, and that as proposed in the form of order, anything

12   left thereafter is abandoned.

13         And as to Town Park, the only additional

14   representation that we are seeking is that there is no leased

15   personal property remaining on that premise.  The debtors have

16   represented that they're not seeking to implement this

17   expansion motion sales at that location, but we are seeking a

18   further representation that there's no leased personal property

19   there, and that that lease is rejected effective July 31st.

20   And with those additional representations, if the debtors are

21   in a position to confirm them, we would be happy to enter into

22   a stipulation memorializing them.

23         MR. MERCHANT:  Your Honor, I can confirm that each of

24   the points that Mr. Allinsin stated on the record are the terms

25   that the debtors had agreed to.

1          THE COURT:  Very well.

2          MR. MERCHANT:  And we can work out a form of

3     stipulation.

4          THE COURT:  Okay.  Does anyone else care to be heard

5     in connection with this motion?

6          MR. INDELICATO:  Your Honor, Mark Indelicato again

7     from Hahn and Hessen.  Your Honor, when we initially saw the

8     debtor's motion to modify the miscellaneous asset procedures,

9     we had some questions.  We questioned the need for the increase

10    in the amount.  We questioned what kind of mortgages they would

11    --

12         THE COURT:  Can I stop you there?  I mean, why -- the

13    motion says, look, there are some situations where it's up to

14    $400,000.  But, how many of those are there and can we make it

15    the cap $200,000 and, if so, what kind of heartburn does that

16    create?

17         MR. INDELICATO:  Your Honor, we asked those questions

18    and the response we got -- and I'll defer to Mr. Merchant -- is

19    that we didn't -- they didn't believe that there were many that

20    were in the above the 200, maybe 250, but there were some.

21    And, you know, since they were going to be passing them by the

22    committee and they were going to be working with us -- and they

23    have been working with us on all of the miscellaneous asset

24    sales.  They respond to all of our questions and that of our

25    financial advisors.  If they wanted to create a limit that was

1 a realistic limit so that if in fact there were any others that

2 were creeping up to the $400,000 range, that at least we would

3 have a procedure without having to go with separate motions or

4 having to do this motion yet again.  So, with that response and

5 given the cooperation they had given us in the past, we were

6 comfortable with the amount.

7        The next issue we raised, Your Honor, which was an

8 issue that the Court raised and we were concerned about is

9 selling other people's property.

10        THE COURT:  Yes, I mean, what -- that has to be --

11 that has to ultimately rest on some right.

12        MR. INDELICATO:  Your Honor, the way we looked at it

13 -- and sometimes from the committee we tend to be a little too

14 pragmatic, but we looked at it as a practical approach.  These

15 are not people that the debtor is saying that these are assets

16 that belong to a third party and I'm selling them because I

17 want to sell them.  They're saying, this is assets that belong

18 to third parties.  We've notified them we have them.  We've

19 notified them the second time that we have them.  They have not

20 responded.  Here, we're still storing the equipment.

21 Ultimately, it's inuring to their benefit and to the detriment

22 of the creditors.  We have to liquidate this in some way, shape

23 or form or just abandon it.  And I don't think we have the

24 right to abandon.

25        So, what they're saying is the most efficient way to

1  do this is we'll get a market price for it.  We'll segregate

2  the money in an interest-bearing account.  When they come to

3  get it, they come to get it.  But, otherwise, we're going to

4  have a warehouse full of this stuff that nobody wants to claim,

5  because quite honestly, Your Honor, there apparently is a

6  gluten to stuff on the market.  So, what they've come up with

7  is a practical approach.  It did give us some pause for

8  concern, but given the fact that they've notified these people

9  a number of times, we believe that these people, to the extent

10  they have rights and they are not responding, they have waived

11  their rights, or at least have waived their rights to object to

12  the sales as conducted by the debtor.

13        The third issue we raise, Your Honor, is again we

14  were concerned given our level of involvement with the sale of

15  the mortgages in this case is, what mortgages do we want to

16  sell without coming before the Court?  And that again was

17  explained to us.  And what we've put in there -- and I think

18  the order is going to be modified to say that there will be no

19  mortgages sold without the written consent of the committee.

20  So that, we're sure that the appropriate processes have been

21  taken care of.  So --

22        THE COURT:  Well, how much real estate is there at

23  this point?

24        MR. INDELICATO:  I don't believe there's many but --

25  I can defer to them, but that was the procedure we put in

1 place.

2          MS. UHLAND:  Your Honor, there is a small amount of

3 real estate.  And as we set forth in the order, what occurred

4 prior to the bankruptcy is that New Century would end up

5 sometimes as part of the resolution of breach claims or EPD

6 claims ending -- end up with title yet again of the property

7 after it had started a foreclosure process.  And typically, New

8 Century's own -- the small percentage that was actually owned

9 by New Century would be sold by the New Century servicing arm

10 and the -- because as part of the servicing process for the

11 benefit of the securitization trust, that property was

12 typically marketed.  There was a website, etcetera.

13          So, there is a small fraction that it appears is

14 actually as title by New Century.  And what we propose to do is

15 to continue to -- as part of our transition services agreement

16 with the -- Carrington is during the next several months or few

17 months have Carrington continue to liquidate that as they have,

18 you know, as New Century was doing pursuant to the websites and

19 the brokers retained and work through that process.  But, it is

20 -- you know, we've identified some property on our schedule

21 that we filed with the Court and we're going back and reviewing

22 that to make sure it's all titled.  But, there's this sort of

23 unusual litigation circumstance where occasionally the company

24 would buy back the loan and, therefore, get the properties

25 through a litigation.

1          THE COURT:  How many locations did these sales

2   involved?

3          MS. UHLAND:  The miscellaneous asset sale locations?

4   You know, originally -- you know, effectively the -- several

5   lease locations, I want to say over 300 lease locations is what

6   we've put in our -- most of which now we've cleared out of

7   those locations.  What we're -- and we're trying to -- now,

8   what we're doing is we're -- and one of the reasons for

9   increasing the number is we're trying to get out of now not

10  just the -- what we'll call the branch offices from the retail

11  division, but now there are some larger facilities with more

12  hardware in them that we're trying to dispose of.  So, there's,

13  you know, fewer location.

14          But, in large part, what happened was we -- because

15  of working out the issues on the document retention, we were

16  selling off the FFNE, the future on site.  But, because of our

17  document retention, we had to pull back all the actual

18  computers.  And those are sitting now in storage facilities as

19  we now are -- to the extent they are leased, we're rejecting

20  the leases.  We can't get people to come and pick them up.

21  But, there might be some opportunity in either sort of -- I

22  don't want to -- there's some other sort of data centers and

23  larger facilities that have more equipment in them that we

24  might want to sell as a block.

25          The other things that's developed since we filed our

1  first motion to now is we've now developed and worked with the

2  SEC a protocol for backing up the computer hardware.  So, when

3  we first came to the Court, we were only seeking to sell --

4  really, we were only selling furniture.  And now that we've got

5  a mechanism that we've worked through with the parties to

6  provide for appropriate backing up of the servers and other

7  memory-type documents, we're now sort of moving up the food

8  chain a bit on the types of assets we're trying to sell.  Those

9  are largely financed, not leased.  So, this isn't really

10  addressing the leased portion but on the financed portion.

11  That's the primary reason for the increase is we're trying to

12  sell things like servers now as opposed to simply furniture.

13          THE COURT:  Does anyone else care to be heard?

14          MR. McMAHON:  Your Honor, good afternoon, Joseph

15  McMahon.  One point that has not been discussed yet is the

16  363(b) and (o) issues relating to the relief that's being

17  requested.  The debtors have agreed to incorporate appropriate

18  language in the form of order with respect to 363(b).  We would

19  respectfully request that the record with respect to either the

20  LNFA or the servicing sale be incorporated into this record

21  insofar as it reflects the debtor's privacy policy, the fact

22  that it does not restrict the transfer of personally

23  identifiable information.  Second, Your Honor, the same 363(o)

24  reiteration is going to appear in this form of order, and I

25  believe the debtors have agreed to that.

1          THE COURT:  Does anyone else care to be heard?

2                       (No verbal response)

3          THE COURT:  Okay.  I know that the -- this is one of

4   those cases where the numbers are all big.  But, despite the --

5   you know, the obvious close and good supervision that the

6   committee has given here, I'm not inclined to improve a cap at

7   $400,000.  I think 250 is about as far as I'm willing to go

8   without your having to come back to me.  With respect to the

9   sale of property of others, the only thing -- put it this way,

10  there's been no state law right asserted in support of the

11  relief requested.  So, it seems to me the only arguable basis

12  for this Court granting that relief is under 105 as an adjunct

13  to 363 in disposing of this property.  And on that basis, I'd

14  be willing to authorize it in the absence of any objection,

15  particularly from any of those whose property might be

16  involved.  And maybe the explanation is they don't care.  I

17  don't know.

18          With respect to the sale of property of others, the

19  order I think ought to provide that all of those proceeds

20  whether subject to a lien or not be separately escrowed.  And

21  the debtor should make some provision under its plan, or

22  whoever the plan sponsor here is going to be, for final

23  disposition of those proceeds.  That way there will be yet

24  another round of notice given and an opportunity for someone to

25  come and lay a claim to proceeds.

1          With respect to the sale of property of the debtors

2    to the extent that Maricopa County has an undisputed valid text

3    lien, I'll authorize the payment to that lien out of the

4    proceeds of any such property in resolution of that objection.

5    The New York State Teachers' Retirement System, that objection

6    has been resolved.  And I think the remaining two objections,

7    landlord objections, have been resolved as well based on what

8    I've heard on the record here today.  And beyond that, I have

9    no other comments.  Is the debtor content to live with those

10   conditions?

11          MR. MERCHANT:  Yes, Your Honor.  We'll work on a

12   revised form of order.

13          THE COURT:  All right.  Anything further in

14   connection with that matter?

15          MR. ALLINSIN:  Your Honor, just for point of

16   clarification, will the final revised form of order reflect

17   that the landlords' objections have been resolved pursuant to

18   stipulations that are to be entered into by the parties?  I

19   would request that the order so reflect.

20          THE COURT:  Debtor okay with that?

21          MR. MERCHANT:  We're fine with that, Your Honor.

22          THE COURT:  All right.

23          MR. MERCHANT:  Your Honor, I believe the only

24   remaining matter on the agenda is Agenda Item 15, which was a

25   matter that we added as a housekeeping matter to the amended

1    agenda, and it relates to the debtor's request for a

2    supplemental order with respect to the Court's June 29th

3    adequate protection order.  We filed the proposed form of order

4    under certification of counsel early this morning.  I don't

5    know whether Your Honor has had an opportunity to review it.

6                THE COURT:  I have.

7                MR. MERCHANT:  Mr. --

8                THE COURT:  Now, all I need to do is read it.

9                MR. MERCHANT:  Okay.  We have extra copies if you

10   need one, Your Honor.

11               THE COURT:  I have it.

12               MR. MERCHANT:  And I believe Mr. Logan from O'Melveny

13   and Myers is on the phone to address this request.

14               THE COURT:  All right.  Mr. Logan?

15               MR. LOGAN:  Thank you, Your Honor.  I just had to

16   turn the mute off.  Can Your Honor here?

17               THE COURT:  I can.

18               MR. LOGAN:  All right.  Your Honor, this is the

19   result of ongoing meet and confer discussions among the parties

20   to the adequate protection order.  We met in New York in fact

21   last week.  I took stock of where we stood.  I addressed a

22   number of factual and legal issues that are still outstanding.

23   I think we made progress if nothing else identifying with

24   greater clarity the points of disagreement among the parties

25   and hopefully some points of agreement and worked out an

1 ongoing protocol to how best to try to move this to an ultimate

2 resolution.

3          The order is a consensual order that was negotiated

4 among all of the affected repurchase counter-parties and also

5 the affected loan purchasers.  It reflects input that we

6 received from that meeting and they circulated an order.  And

7 so, I'd be happy to address any questions Your Honor has.  Just

8 the point I'd like to make is that the progress is being made

9 what's -- that I think we would all like, but these are issues

10 that are complex both factually and legally, and we are making

11 I think good progress.

12          THE COURT:  All right.  The supplement seems largely

13 designed to further stretch out some of the time frames that

14 had been earlier ordered, but it doesn't really seem to do much

15 violence to them.  The parties do seem to be working along.  Is

16 there anything else specifically that would be considered

17 material that you should direct me to?

18          MR. LOGAN:  Your Honor, no.  About the only addition

19 -- and it really does deal with more of the time frames -- is

20 the addition that we actually required the debtors and the

21 committee to make settlement proposals, which I think was

22 implicit before but now we've made explicit and we have a time

23 deadline by which those are to be made.

24          THE COURT:  All right.  Does anyone else care to be

25 heard in connection with this matter?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. POWER:  Mark Power from Hahn and Hessen, counsel

2     to the committee, Your Honor.  The committee supports the

3     order.  We've been working with the debtor and -- in terms of

4     this issue.  I guess the only other thing I would mention is

5     that the order does provide for an extension of the bar date

6     which Your Honor entered into at the end of August for another

7     month.  The parties will provide a good faith estimate of the

8     claims in connection with the settlement process.  It's the

9     debtor and the committee's view that if we're able to reach

10    some major settlements here, we do it in a more global context

11    than simply this issue.  So, that's the construct that we're

12    trying to deal with.  So, there is that what I would -- it's

13    not really a substantiative issue but certainly is a little

14    different than what was previously before the Court in the

15    prior order.

16          THE COURT:  All right, thank you.  Does anyone else

17    care to be heard?

18                    (No verbal response)

19          THE COURT:  I hear no response.  That order has been

20    signed.  All right.  Shall we return to the committee's motion?

21          MR. LOGAN:  Your Honor, Ben Logan.  Might I be

22    excused?

23          THE COURT:  You may.

24          MR. LOGAN:  Thank you, Your Honor, bye-bye.

25          MR. POWER:  Your Honor, what we've decided to we've

1  met with Mr. McMahon and we're going to, if okay with the

2  Court, adjourn the motion to the next omnibus hearing and we'll

3  take another run at trying to resolve some of the issues with

4  Mr. McMahon and see if we can consensually resolve it rather

5  than argue it at this point.

6           THE COURT:  Okay.

7           MR. POWER:  Okay?  Thank you, Your Honor.

8           THE COURT:  Thank you.  Anything further for today?

9           MR. MERCHANT:  Your Honor, there's one additional

10 that Mr. Indelicato reminded me of, with respect to the Susman

11 Godfrey retention application.  It's come to our attention in

12 the last day or so that following the last hearing and Your

13 Honor's ruling on the Positive Software matter, Positive

14 Software has actually filed a new complaint in Texas.  They

15 have not named the debtor as a defendant.  However, they have

16 named Susman Godfrey as a defendant.  So, we're still working

17 through that issue.  But, to the extent that that poses a new

18 wrinkle to the relationship between the debtors and Susman

19 Godfrey with respect to the retention, I just wanted to bring

20 it to the Court's attention and we'll work with the Office of

21 the United States Trustee with respect to whatever disclosure

22 needs to be made in connection with that issue.

23          MR. McMAHON:  Your Honor, good afternoon, Joseph

24 McMahon for the United States Trustee.  I don't want my silence

25 sitting there to be an indication that there might be not some

1  larger issue beyond disclosure.  So, why don't we just -- if

2  the debtors are okay with this -- tabling this issue to the

3  next omnibus hearing.  And to the extent that we could work out

4  concerns in the interim, we will.

5        THE COURT:  Well, let's put it on for hearing so that

6  even if differences have been worked out, at least you'll be

7  here to dialogue with me concerning that situation.  Okay?

8        MR. McMAHON:  That's fine, Your Honor.

9        THE COURT:  All right.  Anything further for today?

10              (No verbal response)

11        THE COURT:  Then that concludes this hearing.  Court

12  is adjourned.

13        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

14              *  *  *  *  *

15

16

17                    **CERTIFICATION**

18        I, CARLA M. OAKLEY, certify that the foregoing is a

19  correct transcript to the best of my ability, from the

20  electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23  /s/ Carla M. Oakley            Date:  August 29, 2007

24  CARLA M. OAKLEY

25  J&J COURT TRANSCRIBERS, INC.


                    **J&J COURT TRANSCRIBERS, INC.**