DEED OF LEASE

by and between

PLAZA AMERICA OFFICE DEVELOPMENT, LLC

("Landlord")

and

NEW CENTURY MORTGAGE CORPORATION and

HOME123 CORPORATION

("Tenant")

at

Plaza America Tower I
11700 Plaza America Drive
Reston, Virginia 20190

# TABLE OF CONTENTS

**Section**          **Page**

1. TERMS ............................................................................................................... 1
    1.1 PREMISES ................................................................................................. 1
    1.2 TENANT'S SHARE ..................................................................................... 1
    1.3 LEASE TERM ............................................................................................. 1
        1.3.1 Initial Term ..................................................................................... 1
        1.3.2 Extension Term ............................................................................... 1
    1.4 COMMENCEMENT AND RENT COMMENCEMENT DATES ................... 2
    1.5 BASE RENT ............................................................................................... 3
    1.6 ADDITIONAL RENT ................................................................................. 3
    1.7 NOTICE AND PAYMENT ADDRESSES ...................................................... 3
    1.8 RENT PAYMENT ADDRESS ..................................................................... 4
    1.9 LEASE YEAR ............................................................................................. 4
    1.10 DEED OF LEASE ....................................................................................... 4
2. PAYMENT OF BASE RENT & ADDITIONAL RENT .............................. 4
3. ADVANCE DEPOSIT ..................................................................................... 4
4. USES; TENANT COVENANTS .................................................................... 4
    4.1 PERMITTED USES ..................................................................................... 4
    4.2 OTHER GENERAL USE COVENANTS ....................................................... 5
5. ENVIRONMENTAL PROVISIONS; RECYCLING .................................... 5
    5.1 ENVIRONMENTAL PROTECTION ............................................................. 5
    5.2 RECYCLING REGULATIONS ..................................................................... 5
    5.3 HAZARDOUS MATERIALS ....................................................................... 5
6. LATE CHARGES; INTEREST ..................................................................... 6
7. REPAIRS AND MAINTENANCE ................................................................. 6
    7.1 LANDLORD'S OBLIGATIONS ................................................................... 6
    7.2 TENANT'S OBLIGATIONS ........................................................................ 6
8. UTILITIES AND SERVICES ........................................................................ 6
    8.1 SERVICES ................................................................................................. 6
    8.2 ADDITIONAL SERVICES .......................................................................... 7
    8.3 EXCESS UTILITY CONSUMPTION ........................................................... 7
    8.4 ADDITIONAL PROVISIONS ...................................................................... 7
9. OPERATING COSTS ..................................................................................... 8
    9.1 DEFINED ................................................................................................... 8
    9.2 ESTIMATED PAYMENTS .......................................................................... 8
    9.3 ANNUAL RECONCILIATION ..................................................................... 8
    9.4 OPERATING COSTS .................................................................................. 8
    9.5 FURTHER ADJUSTMENT .......................................................................... 9
    9.6 COMPLEX OPERATING COSTS ................................................................ 9
    9.7 EXCLUSIONS ............................................................................................ 9
    9.8 AUDIT ....................................................................................................... 10
10. REAL ESTATE TAXES ................................................................................. 10
    10.1 DEFINED ................................................................................................... 10
    10.2 ESTIMATED PAYMENT ............................................................................ 11
    10.3 REAL ESTATE TAXES .............................................................................. 11
    10.4 ANNUAL RECONCILIATION ..................................................................... 11
11. ADDITIONAL PROVISIONS; OPERATING COSTS AND REAL ESTATE TAXES ..................... 11
    11.1 PARTIAL YEAR; END OF TERM ............................................................... 11
    11.2 OTHER TAXES .......................................................................................... 12
    11.3 COVENANT REGARDING TIMELY PAYMENT OF OPERATING COSTS AND REAL ESTATE TAXES ................ 12
    11.4 CONTESTING REAL ESTATE TAXES ....................................................... 12
12. TENANT'S INSURANCE .............................................................................. 12
    12.1 COVERAGE REQUIREMENTS ................................................................... 12
    12.2 RATING; CERTIFICATES; CANCELLATION .............................................. 13
    12.3 OTHER ...................................................................................................... 13
    12.4 LANDLORD'S INSURANCE ....................................................................... 13
        12.4.1 Coverage ........................................................................................ 13
        12.4.2 Rating; Certificates; Cancellation .................................................. 13
13. WAIVER OF SUBROGATION ..................................................................... 13

| Section | | Page |
|---|---|---|
| 14. | DAMAGE OR DESTRUCTION | 14 |
| 14.1 | Damage Repair | 14 |
| 14.2 | Termination for Material or Uninsured Damages | 14 |
| 14.3 | Business Interruption | 14 |
| 14.4 | Repairs | 14 |
| 14.5 | End of Term Casualty | 14 |
| 14.6 | Relocation to Interim Space | 14 |
| 14.7 | Tenant's Right to Terminate | 15 |
| 15. | MACHINERY AND EQUIPMENT; ALTERATIONS AND ADDITIONS; REMOVAL OF FIXTURES | 15 |
| 16. | ACCEPTANCE OF PREMISES | 16 |
| 17. | CONSTRUCTION ALLOWANCE | 16 |
| 18. | ACCESS | 16 |
| 19. | PARKING | 17 |
| 20. | INDEMNIFICATION | 17 |
| 21. | ASSIGNMENT AND SUBLETTING | 18 |
| 21.1 | Consent | 18 |
| 21.2 | Corporate Transfer | 18 |
| 21.3 | Intentionally Deleted | 18 |
| 21.4 | Intentionally Deleted | 19 |
| 21.5 | Required Information | 19 |
| 21.6 | Fees; Documents | 19 |
| 21.7 | No Release | 19 |
| 21.8 | Tenant Liability | 19 |
| 21.9 | Profit | 19 |
| 21.10 | Home 123 Corporation | 20 |
| 22. | ADVERTISING | 20 |
| 23. | LIENS | 20 |
| 24. | DEFAULT | 20 |
| 24.1 | Tenant's Default | 20 |
| 24.2 | Remedies | 21 |
| 25. | SUBORDINATION | 22 |
| 26. | SURRENDER OF POSSESSION | 23 |
| 27. | NON-WAIVER | 23 |
| 28. | HOLDOVER | 23 |
| 29. | CONDEMNATION | 24 |
| 29.1 | Definitions | 24 |
| 29.2 | Taking | 24 |
| 29.3 | Award | 24 |
| 30. | NOTICES | 24 |
| 31. | MORTGAGEE PROTECTION | 25 |
| 32. | COSTS AND ATTORNEYS' FEES | 25 |
| 33. | BROKERS | 25 |
| 34. | LANDLORD'S LIABILITY | 25 |
| 35. | ESTOPPEL CERTIFICATES | 25 |
| 36. | FINANCIAL INFORMATION | 26 |
| 37. | TRANSFER OF LANDLORD'S INTEREST | 26 |
| 38. | RIGHT TO PERFORM | 26 |
| 39. | COMMON AREAS | 26 |
| 39.1 | Definition | 26 |
| 39.2 | Landlord's Control | 26 |
| 40. | SALES AND AUCTIONS; SIGNAGE | 27 |
| 41. | INTENTIONALLY DELETED | 27 |
| 42. | ACCESS; SECURITY | 27 |

| Section | | Page |
|---|---|---|
| 43. | AUTHORITY | 27 |
| 44. | NO ACCORD OR SATISFACTION | 27 |
| 45. | GENERAL PROVISIONS | 28 |
| 45.1 | ACCEPTANCE | 28 |
| 45.2 | MARGINAL HEADINGS, ETC. | 28 |
| 45.3 | CHOICE OF LAW | 28 |
| 45.4 | SUCCESSORS AND ASSIGNS | 28 |
| 45.5 | RECORDATION | 28 |
| 45.6 | QUIET POSSESSION | 28 |
| 45.7 | INABILITY TO PERFORM; FORCE MAJEURE | 28 |
| 45.8 | PARTIAL INVALIDITY | 28 |
| 45.9 | CUMULATIVE REMEDIES | 28 |
| 45.10 | ENTIRE AGREEMENT | 28 |
| 45.11 | SURVIVAL | 28 |
| 45.12 | TIME | 28 |
| 45.13 | SUCCESSORS | 28 |
| 45.14 | NO PARTNERSHIP | 28 |
| 45.15 | JOINT AND SEVERAL | 28 |
| 45.16 | EXHIBITS | 29 |
| 45.17 | PRONOUNS | 29 |
| 45.18 | CAPTIONS | 29 |
| 45.19 | COUNTERPARTS | 29 |
| 45.20 | EXAMINATION OF LEASE | 29 |
| 45.21 | INTERPRETATION | 29 |
| 45.22 | INTENTIONALLY DELETED | 29 |
| 45.23 | RESIDENT AGENT | 29 |
| 46. | RULES AND REGULATIONS | 29 |
| 47. | WAIVER OF COUNTERCLAIM AND TRIAL BY JURY | 29 |
| 48. | OPTION TO TERMINATE | 29 |

### EXHIBITS

| Exhibit A | Floor Plan |
| Exhibit B | Site Plan |
| Exhibit C | Intentionally Deleted |
| Exhibit D | Rules and Regulations |
| Exhibit E | Declaration of Lease Commencement |
| Exhibit F | Form of Estoppel Certificate |
| Exhibit G | Cleaning Specifications |
| Exhibit H | Non-Disturbance Agreement |

## DEED OF LEASE

THIS DEED OF LEASE ("Lease") is made as of the _14th_ day of _April_, 2005, by and between **PLAZA AMERICA OFFICE DEVELOPMENT, LLC**, a Delaware limited liability company ("Landlord"), and **NEW CENTURY MORTGAGE CORPORATION**, a California corporation and **HOME123 CORPORATION**, a California corporation (collectively, "Tenant").

### RECITALS:

A. Landlord, for and in consideration of the rents and all other charges and payments hereunder and of the covenants, agreements, terms, provisions and conditions to be kept and performed hereunder by Tenant, grants and conveys to Tenant, and Tenant hereby hires and takes from Landlord, a leasehold interest in the premises described below, subject to all matters hereinafter set forth and upon and subject to the covenants, agreements, terms, provisions and conditions of this Lease for the term hereinafter stated.

NOW THEREFORE Landlord and Tenant hereby agree to the following:

1. **TERMS.**

   1.1 **Premises.** The premises demised by this Lease will consist of approximately 23,096 rentable square feet of space (the "Premises") measured in accordance with the ANSI/BOMA Z65.1-1996 Method of Measurement, located on the second (2nd) floor of that building located at 11700 Plaza America Drive, Reston, Fairfax County, Virginia (the "Building"). New Century Mortgage Corporation intends to occupy Suite 200 and Home123 Corporation intends to occupy Suite 250. Tenant shall have the right to use four (4) parking permits for each 1,000 square feet of rentable area of the Premises at no charge to Tenant throughout the initial Lease Term and the "Extension Term" (as defined below), if applicable, located or to be located in the adjacent parking structure, and the non-exclusive use of various "Common Areas" (as defined in Section 39 hereof) as more particularly set forth herein. The land upon which the Building is situated, which is generally depicted on the diagram attached hereto as Exhibit "B" (the "Site Plan") and incorporated herein by reference, shall be referred to hereinafter as the "Land". The Land, the Building, the Common Areas, and the adjacent parking garage are collectively referred to herein as the "Project". The location and dimensions of the Premises are shown on the conceptual floor plan attached hereto as Exhibit "A" and incorporated herein by reference. No easement for light or air, is incorporated in or intended to be conveyed with the Premises.

   1.2 **Tenant's Share.** "Tenant's Share" shall mean a fraction, the numerator of which is the total rentable square footage of the Premises as determined in accordance with Section 1.1 hereof, and the denominator of which is the total rentable square footage of the Building (i.e., 223,913 rentable square feet). No adjustment shall be made for space within the Project occupied by any building engineers or similar on-site property management or operational personnel, provided any such space will be located within a core area location to be determined within the reasonable judgment of Landlord. Based upon the square footage of the Building and the Premises as set forth above, the Tenant's share shall be 10.31%.

   1.3 **Term.**

   1.3.1 **Initial Term.** The term of this Lease (the "Term" or "Lease Term") shall commence on the "Commencement Date" (as defined in Section 1.4 below), and shall expire one hundred twenty three (123) months thereafter (the "Lease Expiration Date"); provided that if the Commencement Date is a date other than the first day of a calendar month, the Lease Term shall run for the number of months set forth above from the first day of the calendar month following the Commencement Date.

   1.3.2 **Extension Term.**

   (a) Provided (i) that the Lease shall be in full force and effect; and (ii) that no "Default" (as defined in Section 24.1 below) then exists, then, and only in such event, Tenant shall have the right, at Tenant's sole option, to extend the term of the Lease for one (1) additional period of five (5) years (the "Extension Term"). Such extension option shall be

exercisable by Tenant giving written notice of the exercise of such extension option to Landlord no later than three hundred sixty-five (365) days prior to the expiration of the Lease Term; provided, however, in the event Tenant fails to exercise such option to extend during the aforesaid time period, such extension option shall become null and void and all rights with respect thereto shall automatically terminate and expire. The Extension Term shall be upon the terms, covenants and conditions as set forth herein with respect to the Term, except that (x) the "Base Year" (as defined below) shall be adjusted to the calendar year in which the Extension Term commences, and (y) Base Rent shall be adjusted for the Extension Term to the fair market rental for the Premises [after taking into account (a) all market concessions then being offered for comparable buildings in Reston, Virginia and (b) that a new Base Year will be applicable during the Extension Term] (the "Current Market Rate"). The Current Market Rate shall be the bona fide rates, terms and conditions then being paid by tenants in "arm's length" transactions for comparable space in comparable buildings in the same geographic submarket as the Building. In the event that the parties do not, within thirty (30) days after the date that Tenant exercises its extension option, agree upon the fair market rent for the Premises and enter into an amendment of the Lease setting forth the Base Rent payable during the Extension Term, then Tenant shall have ten (10) days thereafter within which to withdraw its extension notice or to notify Landlord of its desire to arbitrate the Current Market Rate. If Tenant fails to notify Landlord of its election within the 10-day period, Tenant shall be deemed to have elected to arbitrate as of the last day of the 10-day period, and the determination of Current Market Rate shall be settled by arbitration in accordance with the provision below. Landlord and Tenant shall employ the procedure and the timetable described below for the purpose of computing the Current Market Rate and the Base Rent properly payable during the Extension Term.

        (b)    In the event of a continuing dispute concerning Current Market Rate, Tenant and Landlord shall each appoint a local appraiser who is a member of the American Institute of Real Estate Appraisers, or if it shall not then be in existence, a member of the most nearly comparable organization, and who has a minimum of five (5) years experience in the Reston, Virginia commercial office leasing market, who is licensed by the Commonwealth of Virginia, and who is not affiliated with either party or involved in an active transaction in which either party is also involved. Each party shall notify the other as to the name and address of the appraiser selected within ten (10) days after the arbitration election date. Each appraiser shall, during the next fifteen (15) days, calculate the Current Market Rate and notify both parties of said determination of Current Market Rate. If the two appraisers agree upon a Current Market Rate, such determination shall be final and binding on the parties. If the difference between the rate calculated by each appraiser is One Dollar ($1.00) per rentable square foot or less, the rates calculated by the two appraisers will be averaged and the resulting figure will be the agreed upon Current Market Rate. If the difference between the rates calculated by each appraiser is more than One Dollar ($1.00) per rentable square foot, the two appraisers shall select a third appraiser, who shall satisfy the same professional qualification requirements set forth above, and the appraisers will then notify Landlord and Tenant of such appraiser's name, address and selection within ten (10) days following the failure of the parties to agree upon the Current Market Rate. The third appraiser will select one or the other of the two calculations of Current Market Rate submitted by the other two appraisers and will notify the parties and the appraisers within ten (10) days of being selected to make the Current Market Rate determination. The determination of the third appraiser shall be final and binding on Landlord and Tenant.

        1.4    <u>Commencement and Rent Commencement Dates</u>. The "Commencement Date", shall be the date Landlord delivers possession of the Premises to Tenant. Landlord and Tenant hereby agree to execute a declaration, in the form attached hereto as <u>Exhibit "E"</u> (the "Declaration") to confirm the Commencement Date. Tenant's failure to execute said Declaration shall not affect the Commencement Date, or the Lease Expiration Date, as the same may be determined by the terms of this Lease. Notwithstanding anything herein to the contrary (without regard to any force majeure event), in the event Landlord has not delivered the Premises to Tenant within five (5) business days after the date hereof, Tenant shall have the right, exercisable upon written notice to Landlord on or before the date which is ten (10) business days after the date hereof, to terminate this Lease. In the event Tenant timely exercises such termination option, all amounts previously paid by Tenant to Landlord under this Lease shall be returned to Tenant, and the parties shall have no further obligations hereunder. In the event Tenant does not timely exercise its termination right, then Tenant shall be deemed to have irrevocably waived its right to terminate the Lease pursuant to Section 1.4 of the Lease.

1.4.1 The "Rent Commencement Date" shall be the date that occurs ninety (90) days after the Commencement Date.

1.5   Base Rent.   The base rent payable by Tenant hereunder ("Base Rent") is set forth in this Section 1.5.1, below. The Base Rent is in addition to (and not to be reduced by) any payment of Additional Rent (as hereinafter defined) hereunder. Base Rent shall be payable monthly for the period commencing on the Rent Commencement Date, in equal monthly installments, in advance, on the first day of each calendar month of the Term, without prior notice, demand, deduction or offset.

1.5.1 The annual Base Rent for the Premises (monthly installments of which may be referred to herein as "Monthly Base Rent") for the initial Lease Year of the Term shall be Twenty Eight and 00/100 Dollars ($28.00) per square foot of the Premises. The annual Base Rent for each of the second and third Lease Years of the Term shall be Twenty Eight and 00/100 Dollars ($28.00) per square foot of the Premises, per Lease Year. The annual Base Rent for the fourth, fifth and sixth Lease Years of the Term shall be Thirty Two and 00/100 Dollars ($32.00) per square foot of the Premises, per Lease Year. The annual Base Rent for each of the seventh, eighth, ninth and tenth Lease Years of the Term shall be Thirty Five and 00/100 Dollars ($35.00) per square foot of the Premises, per Lease Year.

1.6   Additional Rent.   Tenant's Share (as hereinafter defined) of Increases in Real Estate Taxes (as defined in Section 10), Increases in Operating Costs (as defined in Section 9) and any other sum owed or reimbursable by Tenant to Landlord under this Lease (excluding Base Rent) shall be considered additional rent hereunder (collectively "Additional Rent"), and except for the items of Additional Rent for which demand is required pursuant to the express terms of the Lease, shall be payable without demand, set-off or deduction. Estimates of those items of Additional Rent described in Section 9 and Section 10 of this Lease shall be payable monthly, in advance, on the first day of each calendar month of the Term commencing on the first day of the Second Lease Year, together with Tenant's monthly payment of Base Rent, without demand, set-off or deduction.

1.7   Notice and Payment Addresses.   Any notices under this Lease shall be governed by the terms of Section 30, below. The notice addresses of the parties are as follows:

| | |
|---|---|
| If to Landlord: | Tamares Real Estate Investments<br>1500 Broadway, 24th Floor<br>New York, NY 10036<br>Attention: General Counsel |
| and: | Atlantic Realty Companies<br>8150 Leesburg Pike<br>Suite 1100<br>Vienna, Virginia 22182<br>Attention: Mr. David Ross |
| with a copy to: | Shulman, Rogers, Gandal, Pordy & Ecker, P.A.<br>11921 Rockville Pike<br>Third Floor<br>Rockville, Maryland 20852<br>Attention: Douglas K. Hirsch, Esquire |
| If to Tenant: | New Century Mortgage Corporation<br>18400 Von Karman Avenue, Suite 1000<br>Irvine, California 92612<br>Attention: Corperation Services<br>Corporate |
| with a copy to: | New Century Mortgage Corporation<br>18400 Von Karman Avenue, Suite 1000<br>Irvine, California 92612<br>Attention: Legal Department |

Either party may, by ten (10) days' prior written notice to the other, designate a new address to which all notices hereunder shall be directed.

1.8     Rent Payment Address. Tenant shall send payments of Base Rent and Additional Rent hereunder to Landlord at the following address, or to such other address of which Landlord may advise Tenant in writing:

>   c/o ARC Management, LLC
>   8150 Leesburg Pike
>   Suite 1100
>   Vienna, Virginia 22182

1.9     Lease Year. Each twelve (12) month period within the Lease Term shall be referred to herein as a "Lease Year." The first Lease Year shall commence on the Rent Commencement Date and terminate on the last day of the twelfth full calendar month after the Rent Commencement Date. Each subsequent Lease Year shall commence on the date immediately following the last day of the preceding Lease Year and shall continue for a period of twelve (12) full calendar months, except that the last Lease Year of the Lease Term shall terminate on the date this Lease expires or is otherwise terminated.

1.10    Deed of Lease. To the extent required under applicable law to make this Lease legally effective, this Lease shall constitute a deed of lease.

2.      PAYMENT OF BASE RENT & ADDITIONAL RENT.

Commencing as of the Rent Commencement Date, and continuing on the first (1st) day of each month thereafter, Tenant shall pay Landlord the Base Rent due under this Lease, both without prior notice, demand, deduction or offset, in lawful money of the United States. Base Rent and Additional Rent shall be paid at the address noted in Section 1.8, or to such other party or at such other place as Landlord may hereafter from time to time designate in writing. Base Rent and Additional Rent under this Lease for any partial month at the beginning or end of the Lease Term shall be prorated. Except for monthly installments of estimated Additional Rent as set forth in Sections 9 and 10 of this Lease, or as otherwise provided in this Lease, all payments of Additional Rent shall be paid no later than thirty (30) days after the date Landlord notifies Tenant in writing of the amount thereof. In the event of any dispute concerning the computation of the amount of any Additional Rent due, Tenant shall pay the amount specified by Landlord pending the resolution of the dispute, and, subject to Section 9.4 hereof, such payment shall be without prejudice to Tenant's right to continue to challenge the disputed computation.

3.      ADVANCE DEPOSIT.

3.1     Simultaneously with the execution of this Lease by Tenant, Tenant shall deposit with Landlord the sum of Fifty-Three Thousand Eight Hundred Ninety and 67/100 Dollars ($53,890.67), as a deposit of the first month's Rent (the "Advance Deposit"), which shall be applied by Landlord on behalf of Tenant to the payment of the first month's Rent when due and payable. The Advance Deposit, prior to its being applied to the payment of Monthly Base Rent, shall constitute security for the payment and performance by Tenant of all of Tenant's obligations, covenants, conditions and agreements under this Lease, but shall not be deemed liquidated damages, but shall be applied in reduction of Tenant's total obligation(s) to Landlord. Landlord shall not be obligated to hold the Advance Deposit in a separate account from other Building or Project funds or to pay or accrue any interest thereon for the benefit of Tenant.

4.      USES; TENANT COVENANTS.

4.1     Permitted Uses. The Premises are to be used for general office use and all related lawful functions as reasonably related to Tenant's general office uses, and as approved by Landlord, and for no other use or purpose whatsoever. In no event shall Tenant use or permit any party to use the Premises for any of the following purposes: (i) training facility; (ii) classroom; (iii) data center; or (iv) conference facility. Despite the foregoing, Tenant may use the following limited portions of the Premises for the following uses: (a) up to three thousand (3,000) square feet of rentable area may be used as a training facility which supports Tenant's business at the Premises; (b) up to three thousand (3,000) square feet of rentable area may be used for classroom purposes which supports Tenant's business at the Premises; (c) up to one thousand (1,000) square feet of rentable area may be used as a data center which supports Tenant's business at the Premises; and (d) up to three thousand (3,000) square feet of rentable area may be used for conference facilities which supports Tenant's business at the Premises.

4.2 <u>Other General Use Covenants</u>. Tenant shall not commit or allow to be committed any waste upon the Premises, or any public or private nuisance. Tenant, at its expense, shall comply with all laws relating to its use and occupancy of the Premises (as opposed to those required in connection with the entirety of the Building), except for any requiring any capital improvements to be made to the Premises (as opposed to those required in connection with the entirety of the Building), prior to the Rent Commencement Date. Tenant shall observe the Rules and Regulations attached hereto as <u>Exhibit "D"</u>, provided the same are not inconsistent with the terms of the Lease. Landlord shall not enforce the Rules and Regulations against Tenant in a manner which discriminates against Tenant. No act shall be done in or about the Premises that is unlawful, or which will increase the existing rate of insurance on the Building. In the event of a breach of the covenant set forth in the immediately preceding sentence regarding insurance rates, Tenant shall cease the activity giving rise to such increase, and provided that the Landlord has delivered timely notice to Tenant and Tenant has failed to cease any such conduct or activity, and further provided that the increased insurance premiums were in fact paid by Landlord as a result of such activity, Tenant shall pay to Landlord any and all such increases in insurance premiums resulting from such breach so long as Tenant continues to pay such increases in premiums, and provided that the activity giving rise to such increased premiums is an activity permitted under Section 4.1, above, the continuation of such activity by Tenant shall not be prohibited or constitute a breach of this Lease.

5. ENVIRONMENTAL PROVISIONS; RECYCLING.

5.1 <u>Environmental Protection</u>. Except for reasonable amounts of customary office supplies that are used, stored, and disposed of by Tenant in accordance with the "Act" (as defined below), Tenant and Tenant's employees, contractors and agents shall not dispose of or generate, manufacture, store, treat or use any oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous waste or hazardous substance including, without limitation, asbestos (hereinafter collectively referred to as "hazardous waste"), as those terms are used in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or in any other federal, state or local law governing hazardous substances (hereinafter collectively referred to as the "Act"), as such laws may be amended from time to time at, upon, under or within the Premises or the Project, or into the plumbing or sewer or water system servicing the Premises or the Project, nor shall Tenant, its employees, contractors or agents cause or permit the discharge, spillage, uncontrolled loss, seepage or filtration of any hazardous waste at, upon, under or within the Premises or the Project or into the plumbing or sewer or water system servicing the same. Tenant shall comply with all applicable requirements of the Act and related regulations, and shall notify Landlord immediately in the event of its discovery of any hazardous waste not in compliance with the Act at, upon, under or within the Premises or the Project, or of any notice by a governmental authority or private party alleging that a disposal of hazardous waste on or near the Premises may have occurred. Tenant further agrees to provide Landlord full access to any documents or information in Tenant's possession relevant to the question of the generation, treatment, storage or disposal of hazardous waste on or near the Premises or the Project. Tenant shall indemnify Landlord against all costs, expenses, liabilities, losses, damages, injunctions, suits, fines, penalties, claims, and demands, including, without limitation, remediation and clean-up costs, reasonable attorneys' fees, arising out of any violation of or default in the covenants of this Section 5.1. The provisions of Section 5.1 shall survive the expiration of the Lease Term.

5.2 <u>Recycling Regulations</u>. Tenant shall be solely responsible for compliance with all orders, requirements and conditions now or hereafter imposed by any ordinances, laws, orders and/or regulations (hereinafter collectively called "regulations") of any governmental body having jurisdiction over the Premises or the Building regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash (hereinafter collectively called "waste products"), provided, however, Tenant shall have no liability in connection with Landlord's failure to comply with the regulations in connection with the collection, sorting, separation and recycling of waste products.

5.3 <u>Hazardous Materials</u>. Landlord represents and warrants to the best of its current knowledge as of the date of execution of this Lease, the Land and the Premises does not contain any Hazardous Materials in violation of the Act. Landlord hereby indemnifies and holds Tenant harmless from any damage, liability, claims, fines, penalties and costs (including reasonable attorneys' fees and costs of litigation) arising out of a breach by Landlord of the foregoing representation and warranty.

6. LATE CHARGES; INTEREST.

6.1   Tenant hereby acknowledges that late payment to Landlord of Base Rent or Additional Rent will cause Landlord to incur administrative costs and loss of income not contemplated by this Lease, the exact amount of which will be difficult to ascertain. If any Base Rent or Additional Rent due from Tenant is not received by Landlord or Landlord's designated agent within five (5) days after the date due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charges represent a fair and reasonable estimate of the administrative cost that Landlord will incur by reason of Tenant's late payment. Landlord's acceptance of such late charges shall not constitute a waiver of Tenant's Default with respect to such overdue amount or otherwise estop Landlord from exercising any of the other rights and remedies granted hereunder.

6.2   In addition to the administrative late charge provided for under Section 6.1, above, if any Base Rent or Additional Rent or any other sum due hereunder from Tenant to Landlord is not paid as and when due under this Lease and such amount remains unpaid five (5) days after such due date, then the unpaid amount shall bear interest from the date originally due until the date paid at an annual rate of interest equal to the sum of (a) the "prime rate" of interest as published in the Wall Street Journal (or, if not published, as established by the then largest national banking association in the United States of America) from time to time (the "Prime Rate") *plus* (b) five percent (5%) (the "Default Rate").

7. REPAIRS AND MAINTENANCE.

7.1   Landlord's Obligations. Landlord shall maintain, repair, replace and keep in good operating condition, comparable to similar properties in the Reston, Virginia area, the Common Areas (as defined in Section 39 below), the roofs, foundations, load-bearing elements, conduits and structural walls and other structural elements of the Building, the underground utility and sewer pipes of the Building, all base building mechanical, electrical, HVAC, plumbing and life safety systems (including the portions of those Base Building systems within the Premises), and the adjacent parking structure and connector, the cost of which shall be included within Operating Costs except to the extent set forth in Section 9.7, hereof; provided that, to the extent the need for any such repairs or replacements arise as a result of the gross negligence or willful misconduct of Tenant [or Tenant's agents, employees, contractors, invitees (while within the Premises), assignees or sub-tenants] and the same is not covered under the policies of casualty insurance which are required to be carried by the parties pursuant to this Lease (in which case the proceeds of such insurance will be utilized to satisfy the cost thereof), the cost of such repairs or replacements shall be reimbursable by Tenant to Landlord as Additional Rent under this Lease, and such reimbursement shall be due not later than thirty (30) days after Landlord's written demand therefor.

7.2   Repair Standards. All repairs and maintenance required of Landlord pursuant to this Section or elsewhere in this Lease shall be performed in accordance with standards applicable to comparable buildings in Reston, Virginia, the applicable building and governmental codes, and performed in a timely and diligent fashion. Landlord agrees to diligently attend to any routine repairs or maintenance needs brought to its attention by Tenant as soon as reasonably practicable and in a manner calculated to minimize to the extent possible disruption of Tenant's business activities.

7.3   Tenant's Obligations. Subject to (i) the provisions of Sections 7.1 and 13 below, and (ii) Landlord's right of access pursuant to Section 18, Tenant shall be exclusively responsible for the maintenance and repair of the interior non-structural portions of the Premises. Tenant shall promptly report in writing to Landlord any defective condition in the Premises known to Tenant which Landlord is required to repair. Landlord's obligation to make repairs shall be limited to the express obligations stated herein. Subject to the provisions of Section 13 below, the costs of repairs or replacements arising as a result of the negligence or misconduct of Tenant, its agents, employees, contractors, invitees, assigns or subtenants shall be reimbursed by Tenant to Landlord as Additional Rent.

8. UTILITIES AND SERVICES.

8.1   Services. Landlord shall furnish Tenant with the following services and facilities: (i) hot and cold running water in any public lavatory facilities located within the Common

Areas; (ii) public lavatory facilities and supplies within the Common Areas (but not within the Premises); (iii) cleaning and janitorial services consistent with Landlord's cleaning specifications for the Building as established from time to time Monday through Friday, excluding holidays; (iv) heating and/or air conditioning during business hours, excluding Sundays and holidays; (v) access to the Building and adjacent parking structure and parking areas 24 hours a day, 365 days a year, including holidays; and (vi) replacement of Building standard light bulbs and tubes for Building standard light fixtures; the cost of all of which shall be deemed an Operating Cost hereunder unless otherwise provided above. Attached hereto as Exhibit "G" are the current cleaning specifications for the Building. In the event Landlord changes the cleaning specifications for the Building in the future, such cleaning specifications shall be commensurate with how owners of other similar first class office buildings in Reston, Virginia provide such cleaning services. For purposes hereof, "holidays" shall be defined as: New Year's Day, Presidents' Day, Memorial Day, July 4th, Labor Day, Thanksgiving, and Christmas, and "business hours" shall be 7:00 a.m. to 6:00 p.m. Monday through Friday, excluding holidays, and 9:00 a.m. to 2:00p.m. on Saturdays, excluding holidays (provided that Tenant shall have access to the Premises 24 hours per day, 7 days per week). Tenant shall be responsible for any and all security required for the Premises and Tenant's business to be conducted therein. Subject to all applicable governmental laws, codes, orders, rules, regulations and statutes, and subject to Landlord's prior written approval, Tenant shall be permitted to maintain a security system for the Premises.

        8.2     Additional Services. If Tenant requires services on weekends or holidays, Landlord shall make reasonable efforts to provide such additional service after reasonable prior written request therefor from Tenant, and Tenant shall reimburse Landlord for such additional service, as Additional Rent, within ten (10) days of request therefore, at the then prevailing rate established by Landlord. As of the date hereof, the cost of providing heat and air conditioning at times other than business hours ("After Hours HVAC") is Fifty Dollars ($50.00) per hour, per floor for the first hour of After Hours HVAC, and Thirty-Five Dollars ($35.00) per hour, per floor, for each additional consecutive hour thereafter that such services are being supplied. Future increases in the cost of providing After Hours HVAC shall be based upon Landlord's reasonable cost of providing the same, including reasonable costs of depreciation, personnel and administration.

        8.3     Excess Utility Consumption. No tenant will install or operate in the space demised to such tenant any electrically operated equipment or other machinery, other than a reasonable number of electric typewriters, adding machines, radios, televisions, tape recorders, dictaphones, bookkeeping machines, copying machines, clocks, word processors, personal computers, security systems, copiers and related replication devices, fax machines, servers, PC's/laptops/typewriters, personal printers, scanners, CD burners, mail machines, shredders, binding equipment, label machines, pencil sharpeners and calculators, without first obtaining the prior written consent of Landlord, who may condition such consent upon payment by Tenant of additional rent as compensation for additional consumption of utilities as determined at the discretion of Landlord and for the cost of separate metering or additional wiring as may be occasioned by the operation of said equipment or machinery. Landlord reserves the right to separately meter any utility consumption in the Premises.

        8.4     Additional Provisions. Except as specifically and expressly set forth hereinbelow, in no event shall Landlord be liable to Tenant for (a) any damage to the Premises, or (b) any loss, damage or injury to any property therein or thereon, or (c) any claims for the interruption of or loss to Tenant's business or for any damages or consequential losses occasioned by bursting, rupture, leakage or overflow of any plumbing or other pipes or other similar cause in, above, upon or about the Premises or the Building, or (d) any interruption in any utility or other services to the Premises. If any governmental body with jurisdiction shall require Landlord or Tenant to restrict the consumption of any utility or reduce any service to the Premises or the Building, Landlord and Tenant shall comply with such requirements, without any abatement or reduction of the Base Rent, Additional Rent or other sums payable by Tenant hereunder. Notwithstanding the foregoing, if any failure to provide essential services or utilities (i.e., electricity, at least one operating elevator, and/or HVAC service) continues for more than three (3) business days and materially interferes with Tenant's conduct of business in or use and operation of the Premises (and Tenant does not, during such period, use the Premises for office purposes), then Tenant shall be entitled to an equitable abatement of rent for the period of interruption commencing as of the fourth (4th) business day of such interruption and continuing thereafter for such period of time as such interruption is in effect.

9. OPERATING COSTS.

9.1 Defined. Commencing with the first annual anniversary of the Commencement Date and continuing thereafter during each calendar year or portion thereof during the Term, Tenant shall pay as Additional Rent to Landlord, without diminution, set-off or deduction, Tenant's Share of "Increases in Operating Costs" for each calendar year. For purposes hereof, Tenant's Share of Increases in Operating Costs shall mean Tenant's Share of the amount by which all Operating Costs for the year in question exceed Operating Costs incurred in calendar year 2005 (calendar year 2005 being herein referred to as the "Base Year").

9.2 Estimated Payments. Commencing as of the first day of the second Lease Year, Tenant shall make monthly installment payments toward Tenant's Share of Increases in Operating Costs on an estimated basis, based on Landlord's reasonable estimate of Operating Costs for such calendar year. Tenant shall pay Landlord, as Additional Rent, commencing on the first day of the Term and on the first day of each month thereafter throughout the Term (and any extension thereof), one-twelfth (1/12th) of Landlord's estimate of Tenant's Share of Increases in Operating Costs for the then-current calendar year. If at any time or times during such calendar year it appears to Landlord that Tenant's Share of Increases in Operating Costs for such calendar year will materially vary from Landlord's estimate, Landlord may, by written notice to Tenant, reasonably revise its estimate for such calendar year and Tenant's estimated payments hereunder for such calendar year shall thereupon be based on such revised estimate.

9.3 Annual Reconciliation. Landlord shall provide to Tenant within a reasonable time after the end of each calendar year (Landlord agreeing to endeavor so to do within 120 days after the end of the applicable year, provided that such shall not be a condition of Tenant's obligations arising as a result thereof or based thereon), a detailed itemized statement (the "Expense Statement"), calculated in accordance with Section 9.1, above, setting forth the total actual Operating Costs for such calendar year and Tenant's Share of Increases in Operating Costs. Landlord shall respond to any inquiries and requests for invoices or other information with respect to Operating Costs within thirty (30) days of any written request therefore by Tenant. Within thirty (30) days after the delivery of such Expense Statement, Tenant shall pay to Landlord the amount of any shortfall in the amount of estimated payments made to Landlord pursuant to Section 9.2 on account of Tenant's Share of Increases in Operating Costs for such calendar year, and the actual amount shown as Tenant's Share of Increases in Operating Costs for such calendar year. In the event the Expense Statement reflects an overpayment of Tenant's Share of Increases in Operating Costs for such year, such overpayment shall be credited against the next due Base Rent hereunder, except if Tenant's Lease is no longer in effect then Landlord shall refund such amount to Tenant within thirty (30) days.

9.4 Operating Costs. The term "Operating Costs" shall mean all reasonable expenses incurred by Landlord in connection with the operation, management, maintenance and repair of the Project, subject to the qualifications set forth below. All Operating Costs shall be determined in accordance with generally accepted accounting principles which shall be consistently applied. Operating Costs include, but are not limited to, the following items: (a) the cost of the personal property used in conjunction with the operation, management, maintenance and repair of the Project; (b) costs to repair and maintain the Project; (c) all expenses paid or incurred by Landlord for water, gas, electric, sewer and oil services for the Project; (d) the costs and expenses incurred in connection with the provision of the services set forth in Section 8, above and any other services provided by Landlord to the Project from time to time; (e) building supplies and materials used in connection with repairs to the Project; (f) cleaning and janitorial services in or about the Premises and the Project; (g) window glass replacement, repair and cleaning; (h) repair, replacement and maintenance of the grounds, including costs of landscaping, lighting, Project and Building signage, gardening and planting, including service or management contracts with independent contractors, including but not limited to security and energy management services and costs; (i) operational costs to achieve compliance with any governmental laws, rules, orders or regulations, and excluding capital expenses associated therewith except to the extent specifically set forth below; (j) utility taxes; (k) compensation (including employment taxes, fringe benefits, salaries, wages, medical, surgical, and general welfare benefits (including health, accident and group life insurance), pension payments, payroll taxes for all personnel employed by Landlord or its management company who perform duties in connection with the operation, management, maintenance and repair of the Project (allocated among all properties served by such employees as determined by Landlord in its reasonable discretion, if such employees are utilized by more than one property) plus the salary and benefits of the property

manager specifically assigned to the Project; (l) any (i) capital expenditures incurred to reduce Operating Costs, to the extent of such reduction (and with any amount remaining unrecovered by virtue of such limitation to carry forward to subsequent calendar years, to the extent of any continuing reduction achieved in each such subsequent calendar year, until recovered in full), (ii) capital expenditures incurred to comply with any governmental law, order, regulation or other requirement which is enacted or becomes effective after the Commencement Date, and (iii) capital expenditures made for the replacement of items (the repair of which would be includable within Operating Costs) in lieu of repairs thereto, provided (A) replacement of the item in lieu of repair is either less costly on an annual basis than repair of the item in question, or is necessary given the non-functioning condition of the item in question, as determined by Landlord in good faith, (B) this provision shall not apply to general renovations, as opposed to needed repairs, of the Building or any elements therein, and (C) such expenditure shall be recoverable only over the useful life of the item in question by amortizing such expenditure over such useful life (in accordance with applicable federal income tax guidelines) at an annual interest rate equal to the Prime Rate at the time of such expenditure, and only the sum of all amortization payments payable during the year in question shall be includable in Operating Costs in each year during such recovery period; (m) cost of premiums for casualty and liability insurance policies required to be maintained by Landlord hereunder and any other insurance carried by Landlord with respect to the Project; (n) license, permit and inspection fees; (o) management fees; (p) consulting fees in connection with the provision of common area maintenance services; (q) personal property and BPOL taxes; (r) trash removal, including all costs incurred in connection with waste product recycling; (s) snow and ice removal or prevention; (t) maintenance, repair and striping of all parking areas used by tenants of the Building, and any other cost or assessment payable in connection with the maintaining of such parking areas; (u) uniforms and dry cleaning; (v) telephone, cellular phone, paging, telegraph, postage, stationery supplies and other materials and expenses required for the routine operation of the Building; (w) association and other assessments for maintenance of offsite improvements serving or benefiting the Project; (x) costs and expenses relating to compliance with any ongoing existing proffer obligations applicable to the Project; (y) the cost of acquisition, repair, maintenance and replacement of seasonal Building decoration; (z) the cost of operating, maintaining, repairing and replacing conduits and other electrical fixtures, fire protection, alarm and sprinkler systems, Building and Project plumbing and storm and sanitary sewer systems, (aa) other association assessments for common area services provided to owners in the Plaza America complex, and (bb) costs and fees charged and/or assessed in connection with any transportation district fee or assessment that is applicable to the Project. Notwithstanding anything in this Lease to the contrary, the preceding list is for definitional purposes only and shall not impose any obligation upon Landlord to incur such expenses or provide such services.

9.5    Further Adjustment.  Operating Costs for the initial Lease Year shall be adjusted to include all costs, expenses and disbursements which vary by occupancy or not otherwise provided to all tenants that Landlord reasonably determines would have been incurred if Landlord had provided all utilities and services within the definition of Operating Costs to tenants and occupants in the Building had the Building been ninety-five percent (95%) occupied throughout such year.  Such costs shall include costs which would have been incurred as ordinary maintenance and repair but which were covered as a part of any warranty in place for the benefit of Landlord or the Building.

9.6    Complex Operating Costs.  The Project is a part of a larger project or development which contains other office buildings, a retail development and land (collectively, the "Complex"), and as such, Landlord shall have the right (but not the obligation) to allocate to the Project an appropriate portion of those operating costs which are incurred with respect to two or more buildings (or the land upon which such buildings are located) of the Complex.

9.7    Exclusions.  Notwithstanding anything to the contrary provided in this Lease, Operating Costs shall not include any of the following:  (1) capital expenditures, except those specifically set forth above; (2) costs of any special services rendered to individual tenants (including Tenant), for which a special, separate charge shall be made directly to such tenant (and which charge shall be payable within thirty (30) days of written demand); (3) painting, redecorating or other work which Landlord performs for specific tenants, the expenses of which are paid by such tenants; (4) Real Estate Taxes (as defined in Section 10); (5) depreciation or amortization of costs required to be capitalized in accordance with generally accepted accounting practices (except as set forth in Section 9.4, above); (6) interest and amortization of funds borrowed by Landlord; (7) leasing commissions, and advertising, legal, space planning and

construction expenses incurred in procuring tenants for the Building; (8) salaries, wages, or other compensation paid to officers or executives of Landlord or its property management company in their capacities as officers and executives; (9) any other expenses for which Landlord actually receives direct reimbursement from insurance, condemnation awards, warranties, other tenants or any other source, but excluding general payments of Operating Costs pursuant to this Section 9 by Tenant and other tenants of the Building; (10) net basic rents under ground leases; (11) all costs incurred in the initial construction of the Project; (12) costs directly resulting from the gross negligence or willful misconduct of Landlord, its employees, agents, contractors or employees; (13) legal fees and other expenses incurred by Landlord except in administering, contracting for services which are a part of, and disputing Operating Costs; (14) costs of fees relating to the defense of Landlord's title or interest in the Land; (15) costs incurred due to violation by Landlord of the terms and conditions of this Lease; (16) renovation of the Project made necessary by casualty or the exercise of eminent domain; (17) costs arising from the presence of Hazardous Materials in, about or below the Project; (18) costs incurred for any items to the extent of Landlord's recovery under a manufacturer's, materialmen's, vendor's or contractor's warranty (except to the extent of costs incurred in such recovery); (19) income, excess profits, franchise taxes or other such taxes imposed on or measured by the net income of Landlord from the operation of the Building (other than business professional occupational license tax); (20) reserves for repairs, maintenance and replacements; (21) Landlord's general overhead expenses; (22) costs incurred to achieve compliance with any governmental laws, ordinances, rules, regulations or orders, except to the extent recoverable under Section 9.4(i) and 9.4(l), above; (23) any penalties or interest expenses incurred because of Landlord's failure timely to pay any Operating Costs (unless the same is the result of Tenant's failure to timely make any payment in respect thereof required hereunder); (24) accounting fees other than those attributable to reviewing and preparing operating statements for the Building; (25) except for office equipment, rental or similar payments made in connection with the leasing of any equipment deemed to be capital in nature except to the extent the acquisition of such item would have been recoverable under Section 9.4(l), above, and (26) overhead and administrative costs of Landlord not directly incurred in the operation and maintenance of the Project; (27) expenses incurred for any necessary replacement of any item to the extent that it is covered under warranty; and (28) accounting and legal fees relating to the ownership, construction, leasing or sale of the Building, or in connection with any litigation with respect to the enforcement of the terms of any lease.

     9.8    Audit. Landlord shall, upon Tenant's written request which shall be made no later than one hundred eighty (180) days after receipt of the Expense Statement, permit Tenant's certified public accountant to inspect such of its records as are reasonably necessary to certify that the calculation of increases in Operating Costs set forth in such Expense Statement was made in accordance with the applicable provisions of this Lease; provided, however, that Tenant shall not be entitled to delay any payment under this Lease during the pendency of any such inspection. Despite the foregoing, as an express condition of Tenant's certified public accountant conducting such inspection, Tenant shall certify in writing to Landlord that such certified public accountant (i) is being compensated by Tenant on an hourly basis to conduct such audit, and (ii) is not being compensated, in whole or in part, on a contingency basis or a percentage of savings basis. Except as provided below, Tenant shall bear all costs of any such inspection. Tenant shall keep the results of any such audit confidential, except to the extent (x) reasonably required to be revealed in any legal action between Landlord and Tenant relating to operating expenses, or (y) as may be required by law. Despite the foregoing, in the event it is determined that Landlord has overstated (i) the increase in Operating Costs that is payable by Tenant during any calendar year, Landlord shall, within thirty (30) days thereafter, refund such overpayment to Tenant, and (ii) the amount of Operating Costs by more than five percent (5%) during any calendar year, then Landlord shall reimburse Tenant for its reasonable and actual out-of-pocket costs of conducting such audit, provided in no event shall such reimbursement exceed the sum of Five Thousand and 00/100 Dollars ($5,000.00).

10.    REAL ESTATE TAXES.

     10.1    Defined. Commencing with the first day of the second Lease Year and continuing during each calendar year or portion thereof during the Term, Tenant shall pay as Additional Rent to Landlord, without diminution, set-off or deduction, Tenant's Share of Increases in "Real Estate Taxes" (as defined in Section 10.3, below) paid in such calendar year. For purposes hereof, Tenant's Share of Increases in Real Estate Taxes shall mean Tenant's Share of the amount by which all Real Estate Taxes for the year in question exceed Real Estate Taxes for the