UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 07-10416-KJC |
| | ) | Chapter 11 |
| NEW CENTURY TRS HOLDINGS INC.,) | | |
| | ) | Courtroom No. 5 |
| | ) | 824 Market Street |
| Debtor. | ) | Wilmington, Delaware 19801 |
| | ) | |
| | ) | September 11, 2007 |
| | ) | 1:35 P.M. |

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Richards Layton & Finger, PA
                          By:  ROBERT STEARN, ESQ.
                               CHRIS SAMIS, ESQ.
                               MIKE MERCHANT, ESQ.
                               RUSSELL SILBERGLIED, ESQ.
                          One Rodney Square, P.O. Box 551
                          Wilmington, Delaware 19899

                          O'Melveny & Myers LLP
                          By:  ALEJANDRO MAYORKAS, ESQ.
                               BRIAN METCALF, ESQ.
                               BEN LOGAN, ESQ.
                               SUZZANNE UHLAND, ESQ.
                          400 South Hope Street
                          Los Angeles, California 90071

For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  JOSEPH J. McMAHON, JR., ESQ.
                          844 King Street
                          Wilmington, Delaware 19899

ECRO:                     Nickita Barksdale

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

_____

# TRANSCRIPTS PLUS

435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

215-862-1115    (FAX) 215-862-6639

Appearances:
(Continued)


For Bank of America:          Potter Anderson & Corroon, LLP
                              By: LAURIE SELBER SILVERSTEIN, ESQ.
                              Hercules Plaza, P.O. Box 951
                              1313 N. Market Street
                              Wilmington, Delaware 19899-0951

                              Kaye Scholer
                              By:  NICHOLAS CREMONA, ESQ.
                              425 Park Avenue
                              New York, New York 10022-3598

For Deutsche Bank             Bingham McCutchen LLP
Structured Products:          By:  ANDREW GALLO, ESQ.
                                   RICHARD AGINS, ESQ.
                              One State Street
                              Hartford, Connecticut 06103-3178

For Examiner,                 Saul Ewing, LLP
Mike Missal:                  By:  MARK MINUTI, ESQ.
                              222 Delaware Avenue, Suite 1200
                              P.O. Box 1266
                              Wilmington, Delaware 19899

                              Kirkpatrick & Lockhart Preston
                              Gates Ellis LLP
                              By:  EDWARD FOX, ESQ.
                                   STEVE TOPETZES, ESQ.
                              1601 K Street, NW
                              Washington, DC 20006-1600


For Securities Lead           Lowenstein Sandler PC
Plaintiff:                    By:  S. JASON TEELE, ESQ.
                              65 Livingston Avenue
                              Roseland, New Jersey 07068

For W. Barry Rank:            W. BARRY BANK, Pro Se


For Approved Financial        Connolly Bove Lodge & Hutz, LLP
Corp:                         By:  MARC PHILLIPS, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              P.O. Box 2207
                              Wilmington, Delaware 19899

Appearances:
(Continued)


For the Committee:          Blank Rome, LLP
                            By:  BONNIE FATELL, ESQ.
                            Chase Manhattan Centre
                            1201 Market Street, Suite 800
                            Wilmington, Delaware 19801

                            Hahn & Hessen LLP
                            By:  MARK POWER, ESQ.
                                 MARK INDELICATO, ESQ.
                            488 Madison Avenue
                            14th and 15th Floors
                            New York, New York 10022

For UBS Real Estate         Paul Hastings Janofsky & Walker
Securities, Inc.:           By:  KIMBERLY NEWMARCH, ESQ.
                            191 N. Wacker Drive
                            30th Floor
                            Chicago, Illinois

For Credit Suisse           Chadbourne & Park, LLP
First Boston, et al:        By:  DOUGLAS E. DEUTSCHE, ESQ.
                            30 Rockefeller Plaza
                            New York, New York 10112

For Ellington               Skadden Arps Slate Meagher & Flom
Management:                 By:  D. HURST, ESQ.
                            One Rodney Square, P.O. Box 636
                            Wilmington, Delaware 19899-0636

For Positive Software:      Fox Rothschild LLP
                            By:  CARL NEFF, ESQ.
                            Mellon Bank Center,
                            919 North Market Street, Suite 1400
                            14th Floor
                            Wilmington, Delaware 19801-3046

                            Mark Ralston Law Firm
                            By:  MARK RALSTON, ESQ.
                                 MICHAEL SHORE, ESQ.

                            Shore Chan Bragalone
                            By:  MICHAEL SHORE, ESQ.
                            Republic Center
                            325 N. St. Paul Street, Suite 4450
                            Dallas, Texas 75201

**Appearances:**
**(Continued)**


| | |
|---|---|
| **For KPMG:** | **Campbell & Levine**<br>**By:  MARK T. HURFORD, ESQ.**<br>**1201 Market Street, 15th Floor**<br>**Wilmington, Delaware 19801** |
| | **Sidley Austin**<br>**By:  GUY S. NEAL, ESQ.**<br>**1501 K Street, N.W.**<br>**Washington, D.C. 20005** |
| **For Nabih and Ester**<br>**Mangoubi, Town Park**<br>**Renaissance, LLC:** | **William D. Sullivan LLC**<br>**By:  ELIHU E. ALLINSON, III, ESQ.**<br>**4 East 8th Street, Suite 400**<br>**Wilmington, Delaware 19801** |
| **For Former Employees:** | **The Gardner Firm, P.C.**<br>**By:  MARY OLSEN, ESQ.**<br>**     MICHAEL McCRARY, ESQ.**<br>**1119 Government Street, P.O. Box 3103**<br>**Mobile, Alabama 36652** |

INDEX

| AGENDA ITEMS | | PAGE |
|---|---|---|
| Item 30 | Austin adversary | 6 |
| Items 1 through 4 | | 21* |
| Items 5 through 20 | | 21 |
| Item 21 | Debtors' sale motion | 22 |
| Item 22 | Stay relief motion by HSBC Bank U.S.A. | 38 |
| Item 23 | Motion for relief | 38 |
| Item 24 | Motion for relief | 38 |
| Item 25 | Motion of Nabih and Ester Mangoubi | 40 |
| Item 26 | Motion of Town Park Renaissance | 41 |
| Item 27 | Examiner's motion to extend time | 42 |
| Item 28 | Official Committee of Unsecured Creditors' Motion for an order permitting its members to engage in securities trading, loan sales and other transactions | 67* |
| Item 29 | Debtors' motion for additional sanctions against Positive Software | 69 |
| Item 31 | | 104* |

| EVIDENCE | ID | EVID |
|---|---|---|
| Exhibits 1 through 3 | 104 | 104 |

*Continued

1          THE COURT:  Good afternoon.

2          MULTIPLE SPEAKERS:  Good afternoon.

3          MR. MERCHANT:  Good afternoon, Your Honor.  Mike

4  Merchant of Richards, Layton and Finger on behalf of the

5  debtor.

6          Your Honor, if it's acceptable to the Court, the

7  debtors would like to address Agenda Item Number 30 first,

8  it's the Austin adversary, and their motion for class

9  certification.

10          THE COURT:  All right.

11          MR. MERCHANT:  My colleague, Bob Stearn, will be

12  handling that for the debtors.

13          THE COURT:  Okay.

14          MR. STEARN:  Good afternoon, Your Honor.  May it

15  please the Court, Bob Stearn from Richards Layton and Finger on

16  behalf of the debtors.

17          I am, as my colleague, Mr. Merchant, said here, Your

18  Honor, on Agenda Item 30, which is the Austin litigation,

19  that's Adversary Number 07-50970.

20          That is, Your Honor, class action litigation pursuant

21  to which the plaintiffs seek relief on behalf of a class under

22  the Federal WARN Act, and its California counterpart.

23          Your Honor, we're here today on the plaintiff's

24  motion for a class certification which was filed on August

25  15th.  The defendants were not opposed in principle to the idea

7

1   of class certification.  We just needed to work out with the

2   plaintiffs precisely what the class would look like.  And, in

3   particular, whether subclasses might be appropriate.

4         And I'm happy to say that we were, in fact, able to

5   reach agreement with plaintiffs on that issue.

6         We have a proposed order that I'd like to hand up to

7   Your Honor and walk through that addresses the issues like

8   subclasses and things like that.

9         So, may I approach, Your Honor?

10        THE COURT:  You may.

11                        (Pause)

12        MR. STEARN:  Now, I'll go through it sort of section-

13  by-section, Your Honor, since, in fairness to Your Honor, there

14  were no proposed orders provided previously.  So, I want to

15  give Your Honor an opportunity to understand these various

16  sections of the order.

17        Of course we start out with the traditional

18  introductory language that Your Honor has considered these

19  matters.

20        Paragraph 1 then defines a class consisting of two

21  subclasses.  The first subclass is essentially all former

22  employees of the named defendants, who are defined, of course,

23  as defendants, who were terminated without cause from the

24  defendants' facilities, which are defined in the footnote,

25  during the period April 2, 2007 through May 1, 2007.

1      Now, I'll come back to that subclass definition with

2 respect to dates in a moment, Your Honor, so you can understand

3 why we -- we carved it up.

4      As part of, or as the reasonably expected

5 consequences of the mass layoff were plant closing, as

6 identified in the WARN Act, and its California counterpart, at

7 the defendants' facilities who have not validly released their

8 WARN Act claims, and I'll come back to that piece in a moment,

9 as well, and who did not timely request to opt out of the

10 class.  And because this is a proposed (b)(3) class, there are

11 opt out rights.  I'll come back to that momentarily, as well.

12      The other -- and that's defined as Subclass 1, Your

13 Honor.

14      Subclass 2 is identical except for the dates of

15 termination.  Now the dates of termination are May 2, or

16 thereafter.  And let's just chat for a moment why the

17 defendants requested subclasses, and the plaintiffs were kind

18 enough to agree.

19      The defendants, Your Honor, have raised certain

20 defenses in their answer.  Among those defenses are the

21 Liquidating Fiduciary Doctrine, the Faltering Company Doctrine,

22 unforeseen business circumstances.  In our view, the

23 application of those defenses may differ, depending on the time

24 that people were terminated.

25      And since the idea of a class action is to be able to

1 treat people categorically because it's much more efficient, it

2 seemed to us to be very efficient to at least provide for

3 certain categories in terms of the time that people were

4 terminated because certain defenses may or may not apply in a

5 wholesale fashion to these subclasses.

6        Now, you'll also note that there's some language in

7 each subclass definition, Your Honor, concerning people who

8 have not validly released their WARN Act claims.  That language

9 is in there because the defendants believe that some employees

10 may have released these claims in exchange for certain

11 benefits.  An example might be, for instance, folks who

12 received retention or incentive bonuses, things like that.

13        And then finally to round out Paragraph 1, the class

14 described above meets the requirements of Rule 23(a).

15        Subparagraph 2 identifies the specific provision of

16 Rule 23(b) that the class is being certified pursuant to.  It's

17 a (b)(3) class, traditionally known as the damages/opt out

18 class, as I'm sure Your Honor is familiar.

19        And the finding that's set forth in Paragraph 2

20 literally parrots the language of Rule 23(b)(3).

21        Paragraph 3 provides that the named plaintiffs are

22 appointed class representatives of Subclass 1.

23        Paragraph 3 goes on to provide that within 30 days of

24 the date of the entry of the order, the plaintiffs will name a

25 proposed representative for Subclass 2.  And that if defendants

1  don't object to that person within five days, that person would

2  become class representative for Subclass 2.

3         Frankly, the reason we're dealing with it this way,

4  Your Honor, is when the complaint was originally filed,

5  everyone who was named was terminated during Subclass 1 time

6  period.  And it was at our request that the plaintiffs agreed

7  to Subclass 2, and they just need to make sure that they find

8  an adequate person for purposes of Subclass 2.

9         Paragraph 4 appoints the law firms involved on behalf

10 of the plaintiffs as the class counsel.

11        Paragraph 5 addresses the notice to the class, and

12 I'll walk through that with Your Honor in a moment because it's

13 attached to the proposed order.  But it simply provides that

14 notice and compliance with the order is found to be the best

15 notice practicable and meets the requirements of Rule 23.

16        The remaining paragraphs of this order, Your Honor,

17 simply deal with how the notice will be provided.  In other

18 words, it will mailed first class, postage prepaid which, in my

19 experience, is a fairly typical way to provide notice to class

20 members.  That after notice is provided, plaintiffs' counsel

21 will file a statement affirming that they provided notice.  And

22 that after another ten-day period, and folks either have or

23 have not opted out of their respective subclasses, the

24 plaintiffs will file a document which indicate persons who have

25 timely opted out of the class.

1          Unless Your Honor has any questions about this order,

2   I would propose to next address the notice.

3          THE COURT:  No, not at this point.

4          MR. STEARN:  Your Honor, the notice is fairly

5   straightforward, and also reflects essentially a negotiated

6   document between the parties.  It's, of course, addressed to

7   essentially the folks who are members of either Subclass 1 or

8   Subclass 2.  The subject refers to their right to participate

9   in the lawsuit under the WARN Act and the California

10  counterpart, which are collectively defined, for purposes of

11  later discussion in the notice as the WARN Act.

12         The nature of the action simply describes who filed

13  the action, what their claim is, that they and other former

14  employees who were terminated without cause from their

15  employment at the facilities, that they claim the defendants

16  violated the WARN Act by failing to give the required notice,

17  and that they're entitled to damages for 60 days' wages and

18  benefits under the WARN Act.

19         The issues and defenses summarily describes what the

20  claims are and what some of the principal defenses are.  The

21  principals -- well, among others, are the ones that I've

22  already described to Your Honor.  That the defendants weren't

23  required to do that which the WARN Act specifies because, among

24  other things, the defendants were liquidating fiduciaries.

25  They were a faltering company, and because terminations were

1  precipitated by unforeseen business circumstances.  Defendants

2  also assert certain other defenses, which are described

3  therein.

4        The notice describes, in summary fashion, as notices

5  do, the consequences if the class action is successful.

6        The definition of the class, Your Honor, largely

7  parrots the definition that you've seen in the order.  The only

8  real difference is that some of the defined terms were defined

9  previously and thus don't need to be specified in the class

10  definitions.

11        Class counsel and class representatives are then

12  identified.  And then the potential members of the class are

13  given specific instructions as to what to do, essentially speak

14  now or forever be members of the class because you don't opt

15  out.

16        And, again, in my experience, Your Honor, it's a

17  fairly standard form of class action notification.

18        And unless Your Honor has any questions about either

19  the order or the notice, I would respectfully request that the

20  Court enter the proposed order granting class certification.

21        THE COURT:  I'll give others the opportunity to be

22  heard in a minute, if they wish.

23        But I have some, I guess, overall adversary matter

24  questions to ask.  And that is is this -- and I don't have the

25  complaint in front of me.  Is it a two-count complaint?

1          MS. OLSEN:  No, Your Honor.  This --

2          MR. STEARN:  Mike -- Mike --

3          MS. OLSEN:  -- is Mary Olsen on behalf of the

4  plaintiffs.

5          THE COURT:  I'm sorry.  Counsel on the phone, you

6  need to speak up.

7          MS. OLSEN:  This is Mary Olsen on behalf of the

8  plaintiffs.  And it is not a -- are you asking whether it

9  addresses the two subclasses in the complaint?

10          THE COURT:  No.  I'm asking how many counts are in

11  the complaint.  The recitation indicates there's a Federal WARN

12  Act claim and a -- and a California version WARN Act claim.

13  Are there any other claims in the complaint?

14          MS. OLSEN:  No, Your Honor.

15          THE COURT:  Okay.

16          MS. OLSEN:  Those are the only ones.

17          MR. STEARN:  And they're not, I was about to say,

18  divided out separately by counts.  They're simply discussed

19  together --

20          THE COURT:  Okay.

21          MR. STEARN:  -- under the claim for relief.

22          THE COURT:  All right.  Is -- is -- how are -- how

23  are both claims to be characterized?  Are they core?  Are they

24  noncore?  Have counsel discussed this?

25          MS. OLSEN:  We have characterized them as both core

1    proceeding.

2            MR. STEARN:  Your Honor, I, frankly, would have to

3    look at our answer to see whether we agree with that

4    characterization or not.  I don't recall it off the top of my

5    head.

6                            (Pause)

7            MR. STEARN:  I'm almost there, Your Honor.

8            THE COURT:  All right.  I'm not going anywhere.

9                            (Pause)

10           MR. STEARN:  Well, in good defendants' fashion, we

11   first averred that we don't need to respond because they're

12   mere legal conclusions.  And then we said to the extent that a

13   response is required, we admit the allegations in Paragraph 2,

14   which are the core/noncore.

15           So, we -- I think we punted and then kind of

16   unpunted.

17           THE COURT:  Well, let me ask it this way.  Is there

18   an agreement that these claims are core?

19           MR. STEARN:  We've not specifically had a discussion

20   about that.  But based on our answer to the complaint, I would

21   have to say we agree with that.

22           THE COURT:  Okay.  And it's something I like to get

23   cleared up at the beginning of the adversary.  So, in part, I

24   know where we're headed for trial at the end of the day or what

25   I'm able to do at the end of the day.

1          The other thing I wanted to mention in connection

2   with that question is the last time -- well, maybe it wasn't

3   the last time.  But in a time not too long ago, in a decision

4   that I rendered, not on this subject, but which was affirmed by

5   the District Court and overturned by the 3rd Circuit, and in

6   which I had noted in a footnote that the parties agreed that

7   the particular proceeding at issue was core, the 3rd Circuit

8   was -- well, took efforts to remind me that it didn't matter

9   that to which the parties had agreed, it mattered whether it

10  was really core or noncore.  Now, that turned out not to be an

11  issue in the case.

12          But having said that, and being sensitive to the view

13  of at least this one panel, let me ask this.  Why do you think

14  the claims are core?

15          MR. STEARN:  I wasn't prepared, frankly, to address

16  that today, Your Honor.  And if it's okay with Your Honor, I'd

17  like to address that at the next omnibus hearing.

18          THE COURT:  That's fine with me.  And I don't mean to

19  put you in a difficult spot, but I want to make sure I put the

20  Court in the right spot for going forward.

21          Is there a right to a jury trial?  If so, has one

22  been demanded?

23          MR. STEARN:  Mary?

24          MS. OLSEN:  We have not demanded a jury trial in this

25  matter, Your Honor.

1           THE COURT:  Okay.  Is it your intention to do so?

2           MS. OLSEN:  No.

3           THE COURT:  Okay.

4           MR. STEARN:  You can be fairly comfortable that the

5    defendants don't intend to request a jury trial, Your Honor.

6           THE COURT:  Okay.  All right.  Well, then that

7    obviates the need to ask my next question, which would be what

8    would be the effect, if any, if and when these plaintiffs file

9    proofs of claim in the bankruptcy.

10           Okay.  What next then in the way of scheduling?

11           MR. STEARN:  Well, our -- we have a scheduling order,

12    Your Honor, and we're proceeding pursuant to that scheduling

13    order.  Let me find it real quick, and just to remind you of

14    some of the -- some of the dates.

15           Fact discovery deadline, November 30;

16           Expert reports due December 28th;

17           Expert discovery concluding January 31;

18           Dispositive motions, February 15th;

19           And today was also the date that the Court should

20    conduct a status conference on such issues as setting deadlines

21    for additional filings, et cetera.

22           But I think at this time, we're not really prepared

23    to present any other deadlines to Your Honor.

24           THE COURT:  Okay.

25           MR. STEARN:  I think the Court -- we had initially

1  proposed with respect to that deadline that it perhaps be --

2  Your Honor entered this scheduling order on July 16.  And at

3  that time, I think we had proposed that this status conference

4  be approximately four months out.

5           And I apologize, I should have listed or had listed

6  on the agenda the reference to this status conference, I

7  forgot.

8           THE COURT:  The order's in the binder, I took a look

9  at it.

10          MR. STEARN:  Pardon me?

11          THE COURT:  The order -- a copy of the order is in

12  the binder, I think, the hearing binder.

13          MR. STEARN:  Yes.  Thanks for letting me out of that.

14  And I know at the time when we were originally proposing this

15  scheduling order, we had in mind a status conference

16  approximately four months out because we thought at that time

17  period we'd be in a better position to speak knowledgeably to

18  Your Honor about where we might be going next.  So, we're not

19  quite ready at this time to speak to Your Honor about where

20  we're going next.

21          THE COURT:  Okay.  Anything else from the plaintiff?

22          MS. OLSEN:  No, Your Honor.

23          THE COURT:  All right.  Anyone else care to be heard

24  in connection with this matter?

25          MR. INDELICATO:  Your Honor, Mark Indelicato from

1  Hahn and Hessen on behalf of the Committee.

2          Your Honor, we've been involved in the process.
3  We've looked at the classes as they were scheduled.  They took
4  our comments.  We're happy with the order as entered.

5          With respect to the matter going forward, and we will
6  be bringing this to the Court's attention later.  We have dealt
7  with these WARN matters in a number of bankruptcies.  What we
8  have found to be most helpful is -- and we'll deal with this
9  later, but that we get to see where the case is going.
10  Obviously it's imperative to know where the case is going
11  before you really can settle a claim.  I try not to spend --
12  have the estate spend too much money on the litigation before
13  we know what to distribute.

14          So, what I would suggest, and that if all parties
15  work together, we get some of the initial discovery done that
16  needs to be done, but then we sort of maybe have to put it in a
17  holding pattern until we know what's going on.  But we can work
18  that with the -- with the parties at the appropriate time.

19          But that we found to be a much more efficient way of
20  resolving the dispute.  I'd rather use the estate money to pay
21  the employees than to pay the lawyers, and that way we save
22  overall expenses going forward.

23          Thank you, Your Honor.

24          UNIDENTIFIED ATTORNEY:  May I have one moment, Your
25  Honor?

1                          **(Pause)**

2              **UNIDENTIFIED ATTORNEY:  Thank you.**

3              **MR. STEARN:  Your Honor, there is one housekeeping**

4  **matter with respect to this adversary that I wanted to bring to**

5  **Your Honor's attention.  As you will likely recall, at the time**

6  **that the plaintiffs filed their motion for class certification**

7  **on August 15, they also filed a motion to shorten, to have that**

8  **motion for class certification heard more promptly than the**

9  **normal schedule because they were concerned about an upcoming**

10 **bar date at the end of August, and they wanted to have the**

11 **class certification issue addressed beforehand.**

12             **Your Honor, rather than granting or denying the**

13 **motion to shorten at that time, said let's have a status**

14 **conference about this.**

15             **THE COURT:  I know I did something really mushy,**

16 **didn't I?**

17                         **(Laughter)**

18             **MR. STEARN:  No, it was very helpful actually because**

19 **it got us across the finish line.**

20             **And we had agreed prior to that conference that what**

21 **we would present to Your Honor, we being the parties, was our**

22 **agreement that if class certification was denied, a**

23 **supplemental bar date would be established for the,**

24 **quote/unquote, "would be members of the class."  And we were**

25 **going to put that in an order and present it to Your Honor,**

1  frankly, before this hearing and submit it under certification

2  of counsel.  And I suppose on the one hand, we were so focused

3  on the class certification issue that that became our primary

4  area of, I guess, time spent in negotiations with the

5  plaintiffs.

6          And, frankly, we didn't -- we didn't resolve or wrap

7  up what that stipulation would look precisely, I think we were

8  pretty close.  But I was going to suggest the parties' view is

9  that given the resolution of the class certification issue,

10  events have essentially surpassed or perhaps mooted the need

11  for such an order, and at this point, unless Your Honor wants

12  to enter that order, we would propose not to trouble you with

13  it at this point.

14          THE COURT:  I -- I don't see a need for it.

15          MR. STEARN:  And there was one other thing that order

16  would have addressed, it would have essentially because

17  currently on the docket, there's a motion by the plaintiffs to

18  shorten with nothing on the docket that specifically addresses,

19  other than providing for the status conference, what would

20  become of that motion to shorten.  And the order we would have

21  given to Your Honor would have addressed that.  It would have

22  said essentially that the -- that motion to shorten was moot.

23          And in lieu thereof, and, again, rather than

24  bothering Your Honor, the plaintiffs are simply going to file a

25  short document that says the motion to shorten is withdrawn.

1          THE COURT:  Very well.

2          MR. STEARN:  So that the record is clear.

3          THE COURT:  All right.  Thank you.

4          MR. STEARN:  Your Honor, that's all I have, and

5   that's also all the business I have before the Court today.

6   So, if it's okay with Your Honor, may I be excused?

7          THE COURT:  Yes.

8          MR. STEARN:  Thank you, Your Honor.

9          MS. OLSEN:  Thank you, Your Honor.

10         MR. MERCHANT:  Mike Merchant again for the record,

11  Your Honor.

12         Returning to the beginning of the agenda, Items 1

13  through 4 have been continued.

14         And with respect to Agenda Items 5 through 20, CNOs

15  have been filed, and I believe orders have been entered on all

16  of those matters, except for Item 19.  I don't know whether

17  Your Honor had any questions with respect to Agenda Item Number

18  19.

19         THE COURT:  Well, no, except that when I -- I think

20  went through the CNO binder, there was no CNO there.  I think

21  that's the only reason I didn't sign that order.  I think.

22                         (Pause)

23         THE COURT:  There is a CNO that was filed on the 6th.

24  But there's no --

25         MR. MERCHANT:  Your Honor, to the extent we

1   inadvertently failed to include that in the binder, we can send

2   it over after the hearing.

3           THE COURT:  No, it's there.  And I think I need a --

4   I think I need a one-sided order is what I need.

5           MR. MERCHANT:  Okay.  It's not the debtors' motion,

6   but we'll reach out to the movant and make sure somebody

7   submits that to the Court.

8           MR. PHILLIPS:  Good afternoon, Your Honor.  Marc

9   Phillips for Approved Financial.

10          I have a copy of the order, if you would like me to

11  hand that up.

12          THE COURT:  Go ahead.

13                       (Pause)

14          THE COURT:  That order has been signed.

15          MR. MERCHANT:  Thank you, Your Honor.  Agenda Item

16  Number 21 is the debtors' sale motion with respect to certain

17  residential mortgage loans.  Brian Metcalf from O'Melveny and

18  Myers is here to address that matter, Your Honor.

19          THE COURT:  Very well.

20          MR. METCALF:  Good afternoon, Your Honor.  Brian

21  Metcalf of O'Melveny and Myers on behalf of the debtors.

22          As indicated by Mr. Merchant, I am here on Agenda

23  Item 21 seeking court approval of the sale of certain mortgage

24  loans pursuant to bidding procedures approved by the Court

25  approximately two weeks ago.  And these were also the same

1  loans that were returned to the debtors in connection with the

2  Deutsche Bank Structured Products settlement.

3       I will briefly explain to you the terms of the

4  transaction with the proposed purchaser who is Residential

5  Mortgage Solution, LLC, who is also our stalking horse bidder,

6  and prevailing bidder at the auction.

7       These are 214 first lien loans, as I indicated

8  earlier, that were obtained from the Deutsche Bank settlement.

9  They are in the principal amount of $41.64 million.  RMS has

10 offered 51.89 percent of the unpaid principal balance amount

11 for those loans for a net purchase price of $23.33 million.

12      They have also agreed to eliminate any holdback.  And

13 they have also agreed to reimburse the estate for its diligence

14 expenses.

15      I have Mr. Robert Lent (phonetic) in the courtroom

16 today who would testify on behalf of New Century in support of

17 this motion.  And I would like to offer his testimony by way of

18 proffer, if that is acceptable?

19      THE COURT:  Go ahead.

20      MR. METCALF:  Okay.  Mr. Lent is a Vice President of

21 Secondary Marketing in New Century, has been employed by New

22 Century for the last ten years, and has approximately 12 years

23 of experience in the mortgage lending industry.

24      In his role of Vice President of Secondary Marketing,

25 Mr. Lent oversaw 45 to 50 individuals that handled due

1  diligence and related materials for New Century's loan sales

2  and the sale of securitized loans.

3          In addition, he oversaw and handled New Century's

4  trades and sales of so-called scratch and dent loans, and has

5  significant experience in handling loan sale transactions.

6          Mr. Lent has a bachelors degree in business

7  administration from the California State University at

8  Fullerton.

9          If called as a witness, Mr. Lent would testify as

10  follows:

11          He would testify that he was directly involved in the

12  marketing and sale of the debtors' loans that are commonly

13  called loans not financed anywhere, or LNFA loans, including

14  attending the auction for those loans on September 10th, 2007,

15  or yesterday.

16          He would testify that the assets the debtors are

17  seeking approval to sell consist of approximately 214 first

18  lien LNFA loans that were obtained from the Deutsche Bank

19  settlement.  He would testify that, as with other LNFA loans

20  that the debtors have sought to sell in the past, they believe

21  it would be difficult to sell this assets in the current

22  environment for several reasons because the current volume of

23  the loans offered for sale, the level of buyer interest in such

24  loans, and other general market conditions.

25          He would further testify that as a result of these

1   conditions, prior to and after court approved the bidding

2   procedures for the LNFA loans, he worked with other New Century

3   personnel, as well as the Creditors' Committee to identify and

4   solicit maximum interest in these loans from multiple potential

5   bidders under the circumstances.

6         These potential bidders were identified from a list

7   submitted by the Creditors' Committee, as well as the list of

8   individuals and institutions that it historically purchased

9   loans from, or engaged in transaction with New Century.

10        Mr. Lent would testify that at least eight to ten

11  different potential bidders were contacted and solicited to

12  submit bids for the LNFA loans, including the stalking horse

13  bidder, Residential Mortgage Solutions, LLC, or RMS, who

14  ultimately signed a letter of intent and executed a mortgage

15  loan purchase agreement on or about August 24th, 2007, subject

16  to overbid at auction.

17        These potential bidders were provided materials with

18  respect to these loans, including stratification reports,

19  showing the general makeup and characteristics of the loans in

20  the pool in an offering memorandum with regard to these loans.

21        He would testify that five potential bidders also

22  executed confidentiality agreements and were, thus, provided

23  due diligence materials and data files with respect to the

24  loans.  These due diligence materials provided -- included

25  credit and compliance review materials prepared by the Bohan

1  Group on behalf of the debtors.

2          Mr. Lent would testify that following this marketing

3  and solicitation period, and in accordance with the bidding

4  procedures approved by the Court, on September 7th, the debtors

5  received initial bids from three different entities consisting

6  of GRP Financial Services Corp., or GRP, Ellington Management

7  Group, LLC, or Ellington, and 19 Asset Management Holdings,

8  LLC.

9          Mr. Lent would testify that if these bids were

10  received, and prior to the scheduled auction on September 10th,

11  the debtors and the Creditors' Committee evaluated and

12  discussed these bids that were received from the bidders and

13  the economic terms of those bids, and the other conditions that

14  they might have put in the asset purchase agreements that were

15  provided to them.

16          They also analyzed the methods in which, pursuant to

17  the auction process, they could improve the terms of the asset

18  purchase agreement in both economic and non-economic aspects,

19  and maximize the value of these assets and the recovery for the

20  estates.

21          Mr. Lent would testify that prior to the scheduled

22  auction on September 10th, the debtors notified GRP and

23  Ellington that they were both qualified bidders, and would be

24  invited to the auction the following day because their bids

25  exceeded the stalking horse bid submitted by RMS in accordance

1  with the written procedures, and also informed RMS that the

2  auction would occur.

3        The debtors also contacted 19 Asset Management

4  Holdings, LLC regarding its bid, which was substantially below

5  the stalking horse bid submitted by RMS, and indicated that 19

6  Asset Management Holdings, LLC could become a qualified bidder,

7  provided that it increased its bid to exceed that of RMS, as

8  required by the bidding procedures.

9        He would testify that on September 10th,

10 representative is of the debtors, the Creditors' Committee, and

11 its advisor, FTI, the stalking horse bidder, RMS, and qualified

12 bidders, GRP and Ellington, assembled at the offices of

13 O'Melveny and Myers in New York at ten A.M. for the auction.

14       19 Asset Management Holdings, LLC, however, did not

15 increase its initial bid and did not attend the auction.

16       Mr. Lent would testify that prior to commencing the

17 auction, the debtors and the Creditors' Committee discussed

18 with RMS, GRP and Ellington the terms of their initial bids and

19 certain terms of the mortgage loan purchase agreement to

20 determine if the parties would agree to improve and equalize

21 the terms of their agreements and the transactions.

22       From this process, the debtors agreed to make two

23 modifications to the mortgage loan purchase agreements that

24 would apply to all parties:

25       First, they agreed to pay to the buyer certain

1 accrued interest on the loans that would otherwise customarily

2 be paid to the buyer in similar transactions.  And in addition,

3 each of the bidding parties agreed to acquire all 214 loans,

4 including those loans that were, or at one time were, subject

5 to the terms of a preliminary injunction in Ohio.

6        He would further testify that the debtors thereafter

7 commenced the auction, with the bid submitted by GRP as the

8 then highest and best bid, the competing bidders would have to

9 top.

10        The bid by GRP was for all 214 loans at a purchase

11 price of approximately $23.06 million, and a holdback equal to

12 five percent of the purchase price, or approximately $1.15

13 million, for a total bid value of approximately 21.91 million.

14        Mr. Lent would testify that over the next two hours,

15 the debtors conducted 15 rounds of spirited and competitive

16 bidding, during which the debtors would announce the terms of

17 their bids.

18        After each round of bidding, the debtors and the

19 Creditors' Committee identified the highest and best bid for

20 the assets, which included an analysis of an economic and non-

21 economic terms of the bid, in this case, largely economic

22 terms, and established the terms that bidders would have to top

23 in subsequent rounds of bidding.

24        In addition, each bidder was given the opportunity to

25 pass during a single round of bidding.  However, if they

1  declined to submit a bid in two consecutive rounds, or declined

2  to submit bids on three occasions in total, they were required

3  to withdraw from the auction.

4        He would testify that there were breaks between the

5  rounds of bidding for the parties to consider the economic

6  terms offered by the highest and best bid in the prior round

7  and to evaluate the bids they could make for the assets.

8        During these periods, the debtors and the Creditors'

9  Committee and their advisor, FTI, would occasionally discuss

10  with the bidders the terms of their bids, and respond to any

11  questions they raised.

12        These discussions resulted in improvement to the

13  bids, provided more favorable terms to the estate, and

14  maximized the economic consideration received for the loans.

15        Mr. Lent would testify that over the subsequent

16  rounds of bidding, the purchase price and other terms of the

17  transaction were improved.  And the number of bidders willing

18  to continue to increase their bids, or remain in the auction,

19  gradually declined.

20        In addition, the bidders began to adjust components

21  of their bids, other than the amount of the purchase price, by

22  reducing the amount of the holdback or offering to eliminate it

23  altogether.

24        As the bidding was down to two bidders, and it

25  appeared that the bidders were nearing the limits of what they

1 would be willing to offer for the loans, to maximize the value

2 of the loans, the debtors even reduced the minimum bid

3 increments to $50,000 and required bidders to increase their

4 gross bid amount by the minimum bid increment.

5        He would testify that in the final round of bidding,

6 the 15th round, there were two bidders that remained, Ellington

7 and RMS.

8        During the final round of bidding, RMS's bid included

9 a purchase price of 23.33 million, representing 51.89 percent

10 of the unpaid principal balance of the loans, and no holdback

11 amount whatsoever.

12        While Ellington's bid was for a purchase price of

13 approximately 23.8 million, representing 52.94 percent of the

14 unpaid principal balance of the loans, but with a holdback of

15 520,000.

16        Because RMS's elimination of the holdback amount

17 resulted in a total bid value of 23.33 million, while

18 Ellington's $520,000 holdback resulted in a total bid value to

19 22.28 million, RMS was declared the highest and best bidder,

20 and was deemed the successful bidder for the assets.  And

21 Ellington was declared the backup bidder when the auction

22 concluded.

23        Mr. Lent would testify that in declaring RMS the

24 highest and best bidder, the debtors and the Creditors'

25 Committee considered the RMS bid resulted in the highest net

1  consideration to the estate, as compared to the other bidders.

2          Mr. Lent would testify that in his opinion, in light

3  of the circumstances throughout the auction and the sale

4  process, the assets were adequately marketed by the debtors,

5  with the assistance of the Creditors' Committee.

6          It is also his opinion that the auction was properly

7  announced, including through publishing notice of the sale

8  hearing and auction in the Wall Street Journal and the

9  independent efforts of the debtors and Creditors' Committee to

10 solicit interest in the assets.

11         Mr. Lent would further testify that in his opinion,

12 the auction, which was conducted over 15 rounds of bidding with

13 two qualified bidders, RMS as the stalking horse bidder, was

14 well conducted and resulted in bidders submitting competitive

15 bids in increasing amounts.

16         He would further testify that he believes the auction

17 resulted in obtaining the highest and best bid for the assets

18 under the circumstances and in consideration of current market

19 conditions.

20         Through the auction process, the net purchase price

21 for the assets was increased from approximately 21.82 million

22 to 23.33 million and other material terms of the asset purchase

23 agreements were improved.

24         Mr. Lent would testify that given current market

25 conditions, the marketing efforts of the debtors and the

1  Creditors' Committee and the competitive auction process, that

2  the prevailing bid submitted by RMS represents a fair value for

3  the LNFA loans that are -- that we seek approval to sell today.

4          In sum, Mr. Lent would testify that it's his opinion

5  that the marketing of the assets was reasonable and adequate.

6  That the sale process was reasonably designed to maximize the

7  value of the assets.  That notice of the auction reasonably and

8  properly advertised.  That the interest of potential bidders

9  was reasonably and properly solicited.  That the auction was

10  reasonably and properly conducted.  And that the parties, at

11  all times, engaged in highly competitive bidding and arm's

12  length negotiations.  And that the bid submitted by RMS at the

13  end of the day is the highest and best bid for the assets and

14  represents a fair market value.

15          THE COURT:  Anyone care to examine Mr. Lent?

16                  (No audible response heard)

17          THE COURT:  I hear no response.  Does anyone else

18  care to be heard in connection with this motion?

19          MR. GALLO:  Your Honor, it's Andrew Gallo from

20  Bingham McCutchen on behalf of Deutsche Bank Structured

21  Products.

22          As you know, this motion relates to the approval of

23  the sale of loans that were part of a settlement between the

24  debtors and my client.

25          One portion of that settlement was that certain

1  collections with respect to the loans would be held in escrow,

2  and then paid to us as part of a settlement amount.   I

3  understand from the presentation that I just heard that there

4  may have been some arrangement with the purchaser in this

5  instance.   That they would be given certain amounts.

6         My understanding from e-mails that I've had with

7  debtors' counsel and the Committee's counsel is that it's the

8  intent of the debtor to pay the balance due to my client on the

9  -- of the settlement out of the proceeds of the sale minus

10  whatever payments we've received already.   And provided that is

11  the intent, we have no objection to the disposition of the

12  interest or any collection on the loans in a manner that is

13  inconsistent with our settlement, provided that we reach our

14  $14 million settlement amount.

15         MR. POWER:   Your Honor, this is Mark Power.   The

16  provision that was referred to was a provision of the contract

17  that provided that, in essence, the -- if the buyer ultimately

18  received interest in connection with -- of foreclosure of the

19  house, that the interest that accrued for the period pre-cutoff

20  date would be returned to the debtor.

21         And that provision was struck by a number of the

22  bidders.   So, I don't think it really impacts at all the

23  purchase price, it's just a -- a -- it was a commitment to turn

24  over future interest, if they ever recovered it.   Every bidder

25  basically objected to that as being non-market, and basically

1  very difficult to try to trace down the road if you're

2  foreclosing on these homes, or trying to collect these

3  defaulted loans.

4         So, I don't think it affects the transaction between

5  Deutsche Bank and the debtor with the Committee at all.

6         MR. METCALF:  And the debtor can confirm that, as

7  well, as our intent to perform in accordance with the terms of

8  the Deutsche Bank settlement agreement.

9         MR. POWER:  Your Honor, Mark Power from Hahn and

10  Hessen, counsel to the Committee.

11         I can confirm what debtors' counsel has said to the

12  Court.  If Your Honor recalls, we were before you a few weeks

13  ago and Your Honor had a question at the end, how do I know

14  that the parties will have enough time to bid, and this is the

15  best price.  And we explained that we had really -- given the

16  market conditions, we were very concerned about trying to bring

17  these to market and get the best price we could in a very short

18  time period over, in essence, Labor Day weekend.

19         I want to compliment on the record.  Mr. Lent and Mr.

20  Kevin Cloyd (phonetic) from the company, who oversaw the

21  process and worked very hard to try to get this done and get

22  these auctions, they pretty much ran the marketing and sales

23  efforts, worked through the diligence with the buyers and

24  worked with every bidder to make sure they were comfortable.

25  And they deserve our compliments for bringing the value.

1          When we first got this deal, Your Honor, we were
2    talking about a price, roughly 44 percent, and a breakup fee of
3    a half a million dollar range.

4          And through further negotiations and finding other
5    buyers, we were able to get, you know, in essence a stalking
6    horse at 51, now we're at 54, with a -- no breakup fee, and
7    roughly a $53,000 expense reimbursement component, which we're
8    going to get back from this buyer.

9          So, we were significantly -- we were really able to
10   improve this deal both going in, and then ultimately.  The
11   Committee is very satisfied, that given the competitive
12   bidding, and given that we had three financially qualified and
13   capable bidders, all who bid to the maximum extent they could,
14   that this represents a fair and reasonable price to the estate.

15         A couple of things, Your Honor, I think we should
16   mention.  The -- the unpaid principal balance was actually
17   slightly higher than what was on the record.  The actual
18   balance was roughly 44.9 million because 3.3 million were added
19   in to increase it.  That's why the percentages work out.

20         In addition to that, the Ohio loans were included.
21   If Your Honor recalls, the debtor was enjoined from selling any
22   Ohio loans.  An order was entered in August which permits the
23   debtor to basically proceed in the sale of these loans, so long
24   as the buyer is subject to certain conditions to offer the
25   homeowners certain workout options in lieu of foreclosure.  And

1  the buyer in this case has agreed to be subject to that Ohio

2  State Court order.  So, everybody was taking subject to that

3  order.

4        This represents the -- I believe the final sale of

5  the debtors' mortgage loans that are on its platform that it

6  currently has.  So, it won't have any continuing obligation to

7  sell these loans.

8        The last thing I should mention is that if Your Honor

9  recalls, originally the Deutsche face amount was about 50

10  million.  The debtor has collected about 2.6 million through

11  payment in fulls and principal in interest payments.  That

12  money has already been paid over to Deutsche.

13        And so total recovery to the estate is roughly about

14  60 percent of the principal balance, which we think is a very

15  fair price overall.

16        And Deutsche will get 14, and the estate will get the

17  balance.

18        So, under those circumstances, Your Honor, the

19  Committee supports the sale and asks you to enter the order.

20        THE COURT:  Thank you.  Does anyone else care to be

21  heard in connection with this motion?

22              (No audible response heard)

23        THE COURT:  I hear no response.

24        MR. METCALF:  Your Honor, I have a proposed form of

25  order, may I approach?

1          THE COURT:  Yes.

2                    (Pause)

3          THE COURT:  Thank you.

4          MR. LOGAN:  Your Honor, Ben Logan.  Just one very

5  minor clarification, and this relates to the Ohio loans.  There

6  are some Ohio loans that were not part of the Deutsche Bank

7  settlement where we've recently reached an agreement with Ohio

8  as to how to proceed.  It's incorporated in part in the order

9  that Your Honor has.

10         When Mr. Power said that we are done with selling

11 loans, that's not quite true.  There are a few loans that were

12 not part of the Deutsche Bank settlement that are in Ohio that

13 we'll now have to market subject to the agreement recently

14 reached with the Ohio State regulators.

15         THE COURT:  Thank you.

16                   (Pause)

17         MR. METCALF:  One additional matter, Your Honor.  We

18 -- we are still negotiating the final terms of the mortgage

19 loan purchase agreement with the buyer.  And we will be

20 submitting that later under certification of counsel, after

21 passing it by both the United States Trustee and the Creditors'

22 Committee, once we have a final version.

23         THE COURT:  Well, once I receive that, I will act on

24 the order.  When is it expected that will be submitted?

25         MR. METCALF:  I beg your pardon, Your Honor?

1           THE COURT:  When is it expected that will be

2   submitted?

3           MR. METCALF:  I would expect it probably within 24 to

4   48 hours, I would imagine.

5           THE COURT:  All right.  I'll act on the order when I

6   receive that and I'm inclined to approve the sale.

7           MR. METCALF:  Thank you, Your Honor.

8           MR. MERCHANT:  Your Honor, Mike Merchant again for

9   the record.

10          Moving to Agenda Item 22, it's a stay relief motion

11  filed by HSBC Bank U.S.A.  They did file a CNO.  I believe the

12  CNO was filed after the agenda was filed.  So, it was not noted

13  in the agenda.

14          But I believe that CNO and order have been submitted

15  to the Court for approval.

16          THE COURT:  It was signed.

17          MR. MERCHANT:  Thank you, Your Honor.

18          Agenda Items 23 and 24 are two additional stay relief

19  matters.  The debtors do not have objections to either of those

20  motions.  However, I don't believe CNOs have been filed.  So,

21  I'm not --

22          THE COURT:  They weren't.  I also needed -- I also

23  need appropriate forms of order to be submitted.  They were

24  two-sided forms of order.  I need one-sided orders.

25          MR. MERCHANT:  Okay, Your Honor.  I don't know if

1 counsel is in the courtroom today.  If not, we can follow-up

2 with them as far as what they need to submit.

3          THE COURT:  Is anyone here on behalf of New Falls

4 Corporation?

5                    (No audible response heard)

6          THE COURT:  I hear no response.  Is anyone here on

7 behalf of W. Barry Rank?

8          MR. RANK:  Yes, Your Honor.

9          THE COURT:  Come forward, sir.

10                         (Pause)

11          MR. RANK:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.  Bear with me for just

13 one moment, let me get to your papers.

14                         (Pause)

15          THE COURT:  Okay.  You're representing yourself in

16 this matter.

17          MR. RANK:  Yes, Your Honor.  I'm an attorney in New

18 Jersey, but I'm the plaintiff in this matter.  I'm appearing

19 pro se.

20          THE COURT:  Okay.

21          MR. RANK:  I had requested counsel for the debtor to

22 sign a consent order before I filed a motion.  He was going to

23 get in touch with his client.  He never got back to me.  But I

24 note that no objection was filed.

25          THE COURT:  No, and I'm prepared to approve the

 1  relief that's been requested, I just need a form of order that

 2  has typed face on one side of the page.  Every form of order --

 3  I think there were two actually in here, but they had things on

 4  the other side of them.  Do you understand what I'm telling

 5  you?

 6          MR. RANK:  Yeah, I don't -- but I think we submitted

 7  an order.  And I didn't think it was --

 8          THE COURT:  Well, on the one form of order, it's on

 9  the back side of --

10          MR. RANK:  I have a copy of the order with me.

11          THE COURT:  Why don't you hand it up?

12                      (Pause)

13          MR. RANK:  May I approach the bench?

14          THE COURT:  You may.  Thank you.

15                      (Pause)

16          THE COURT:  The order has been signed.

17          MR. MERCHANT:  Your Honor, moving on to Agenda Item

18  Number 25, was the motion to compel filed by the Mangoubis.

19  There was some back and forth on this.  We were, however,

20  fortunately able to resolve it this morning, in advance of the

21  hearing, and have an agreed stipulation that we can hand up to

22  the Court for approval.

23          THE COURT:  Uh, so it's really resolved you mean this

24  time?

25          MR. MERCHANT:  It is now resolved, Your Honor.  If I

1  may approach?

2           THE COURT:  You may.

3                    (Pause)

4        MR. MERCHANT:  The stipulation provides, among other

5  things, for an August 31st, 2007 agreed rejection date, an

6  administrative claim of $31,173.81 to be paid within five days

7  of entry of the order.  And it, of course, resolves the pending

8  motion.

9                    (Pause)

10          THE COURT:  Well, what, if anything, will be left to

11  a -- all right.  I see.  My question's answered.  That order's

12  been signed.

13          MR. MERCHANT:  Thank you, Your Honor.  Your Honor,

14  we're also very close to resolving Agenda Item Number 26.  I

15  guess there's a -- the stipulation will provide the same thing

16  as the stipulation that I just submitted.

17             However, there's a minor disagreement as to the

18  amount of the administrative claim that will be agreed to

19  pursuant to that stipulation.  We're very close in dollar

20  figures.  We would propose just working it out between the

21  parties after the hearing and submitting something under

22  certification of counsel.

23          MR. ALLINSON:  Elihu Allinson on the -- on behalf of

24  Town Park Renaissance, LLC.

25             I agree with Mr. Merchant's characterization.  We are

1  extremely close and I'm confident that we will be able to reach

2  agreement on the number after the hearing.

3            THE COURT:  I'm delighted.  Thank you.

4            MR. ALLINSON:  Thank you.  May I be excused, Your

5  Honor?

6            THE COURT:  You may.

7            MR. FOX:  Good afternoon, Your Honor.  Edward Fox

8  from Kirkpatrick and Lockhart Preston Gates Ellis on behalf of

9  Michael Missal, as examiner.

10           Your Honor, we're here on the examiner's motion to

11  extend the time for him to complete the examination for

12  approximately another six months.

13           The order initially directing the appointment of an

14  examiner, which was entered -- I believe it was May 30, set an

15  initial time period of approximately three months, Your Honor,

16  with the option for the examiner, if necessary, to come back

17  and ask the Court for additional time.

18           As Your Honor is, no doubt, aware, the examination

19  basically is -- we bifurcate it into -- into two separate

20  areas:

21           One is the issue relating to cash collateral;

22           And the other is the issue relating to the accounting

23  investigation.

24           And my partner, Steven Topetzes, is here, as well, to

25  assist and provide further information to the extent the Court

1   wishes it with respect to the accounting investigation.

2            But let me start there.  I'm not sure that anybody

3   really thought that the accounting investigation would be

4   started and finished within the first 90-day period.  These are

5   substantial issues that need to be looked into, there are

6   substantial amounts of documents to be gathered, witnesses to

7   be interviewed, and then conclusions to be reached and

8   presented to the Court in an appropriate report.

9            The Creditors' Committee has raised some issues or

10  concerns given the, you know, cost involved and the scope of

11  the investigation.  So, what I want to do is give you some

12  background on that so that you're aware of what the status of

13  things are.

14           The initial approach to the examiner at the outset of

15  the investigation upon his appointment was to gain whatever

16  factual background information was publicly available to put a

17  team together, understand as best as possible at that time what

18  the issues were that needed to be addressed.

19           We then -- we did have the meet and confer with the

20  debtors on June 14th.  We moved forward from there, formulating

21  document requests to the debtors.  And as you're certainly well

22  aware, seeking to obtain documents from KPMG, primarily their

23  work papers for 2004, 2005, 2006, as well as a variety of

24  additional documents relating to specific time keepers who are

25  most heavily involved in their work for New Century.

1           As we indicate in the papers, and Mr. Topetzes can

2   amplify on, as well, in the course of the investigation so far,

3   and in the course of our work so far, we have certainly

4   received a substantial number of pages of documents.  And there

5   may have seemed to be a bit of a discrepancy between what we

6   indicated of receiving, 1.2 million pages of documents, I

7   think, and 1.2 million files, and the debtors' comment that

8   they have provided something in the order of eight million

9   pages.

10          The 1.2 million files, plus the 1.2 million pages add

11  up to roughly the eight million pages that the debtor was

12  referring to.  So, I don't think there's that discrepancy.

13          We are waiting, however, -- I think we have recently

14  gotten some -- some of the e-mails that we've requested, as we

15  indicated, but we're still waiting for substantial numbers of

16  e-mails.  And as we understand it, the company has certainly

17  transacted a significant portion of its business primarily

18  through e-mail.

19          So, there have been -- you know, we've been waiting

20  to receive -- or did wait to receive documents from the Special

21  Investigative Committee because the debtor wanted to review

22  those first.  We now have them.  We're waiting for an overlay

23  so that we can compare them to what's in the -- in the database

24  and what we have from other sources.

25          We are waiting for additional e-mails, primarily from

1    the debtors, and certain other documents.

2         We have received the work papers from KPMG for, I
3    believe it's 2005 and 2006.  And I think we just recently
4    received the 2004 work papers.

5         The additional documents, the e-mails and those sorts
6    of things, we have not yet received any of those yet.
7    Obviously we're waiting for those.

8         We obviously, as we get the documents, we -- we put
9    them into a database so that they're in some manageable form
10   that the team can work with and we'll begin reviewing those
11   documents which, in and of itself, is a significant task.

12        We have also begun to take some preliminary -- have
13   some preliminary interviews and are working to schedule more,
14   primarily through the debtors.  To the extent that people are
15   no longer with the company or, in some cases, are not quite as
16   inclined to cooperate with the examiner as we might hope, it
17   may be necessary for us to seek 2004 authority to subpoena
18   them.  So far, we're trying to schedule interviews because, you
19   know, generally if we can get people to cooperate, we find we
20   get better information that way.

21        And -- and just on the issue of the 2004 exams, we
22   may be coming and asking Your Honor for, in essence, omnibus
23   authority to -- to have subpoena power.  And then if people
24   have an issue with subpoenas, they can then just come back and
25   contest those.  So, we're discussing that and may be bringing

1  that before Your Honor shortly so that to the extent we need

2  it, we'll be able to move forward expeditiously.

3       We expect, once we get the -- because we want to

4  continue moving forward in any event, we are starting to

5  schedule interviews starting -- we've had some preliminary

6  interviews on the issues relating to the accounting area, and

7  expect to continue scheduling those and conducting those

8  interviews.

9       To the extent we can do it, having more of the

10  documents available rather than fewer, then that makes the

11  interviews that much more complete.  So, there's always a

12  balancing act between waiting until we have every last piece of

13  paper before they schedule interviews versus, you know,

14  stretching this thing out forever, which is obviously nothing

15  that anybody wants to have happen.

16       So, we are moving forward.  The debtor has, in

17  response to our papers, pledged to, you know, re-double their

18  efforts to get us the documents and to cooperate with us, and

19  we appreciate that.  And we look forward to, you know, their

20  prompt cooperation in providing us the additional documents

21  that we're waiting for, and anything further that we -- that we

22  seek.

23       With respect to the cash collateral piece of the

24  investigation, Your Honor, as we indicated, we were --

25  essentially, we thought, prepared to file at least an interim

1  report that would have covered that issue.

2        In the course of that investigation, we -- I don't

3  want to inflame things at this point because I think we've been

4  through it with the debtor and, you know, we have some

5  difference on that.  But they understand us, and we've heard

6  what they have to say.

7        In essence, as we indicated in the papers, at the

8  outset of the investigation, we were led to believe that they

9  had a particular point of view that informed their -- that

10  informed the issue of what, if anything, they did with respect

11  to funds that might be cash collateral.

12        As the investigation went on -- and as a result of

13  that initial information that we received as to the debtors'

14  view, and basically an indication that they had, in essence,

15  missed the issue, we investigated to see whether it was

16  possible for them to have missed the issue, whether there were

17  red flags out there, et cetera, that should have indicated to,

18  in essence, the bankruptcy professionals, if you will, that

19  there was an issue that had to be addressed.

20        We concluded that there were some of those red flags,

21  went back to the debtor and then, you know, reached certain

22  conclusions based on that.

23        We then wanted to give the debtor a last opportunity

24  to hear what our preliminary conclusions were, provide us any

25  further information that they might have, et cetera, and at

1  that point, we then received on the -- in our meetings on the

2  31st, in essence, a different story or a different -- I'm not

3  sure how to best to say this.  I don't want to be pejorative to

4  the -- to the debtors at this point.  But they basically

5  indicated to us at that point that they would provide us with

6  some privileged information which indicated that they had, in

7  fact -- or they indicated that, in fact, they had an entirely

8  different legal view of the issue than they had indicated to us

9  at the outset of the investigation.

10         So, had we known at the end what -- or at the

11 beginning what they told us at the end, the investigation

12 probably would have been substantially shorter, less expensive,

13 et cetera.

14         But because we were given a version at the beginning

15 that was different than what they told us they ultimately had

16 believed all along, we were required to go on a bit of a

17 treasure hunt before we came back to getting the initial view

18 of it.

19         There's one point that I wanted to address in the

20 Committee's limited objection, and that --

21         THE COURT:  Before we -- oh, on cash collateral?

22         MR. FOX:  Yes.

23         THE COURT:  Go ahead.

24         MR. FOX:  Well -- yes.  The -- the Committee had

25 indicated that their reading of the paper seemed to indicate

1  that we had incurred a substantial -- that the debtors' estate

2  will be charged for hundreds of thousands of dollars in fees

3  for services performed, either by the examiner's counsel, that

4  have appeared to have provided little, if any, benefit to the

5  estates.  I think there are two answers there:

6        The examiner -- the debtors' obligation is to examine

7  the issues, according to the Court's mandate and report back to

8  the Court on his findings.  Whether those are, in effect, a

9  benefit to the estate or not is really not the issue of the

10 question.

11       If there's an implication in that quote that I read

12 that somehow the examiner, you know, incurred lots of fees that

13 somehow we need not have incurred in that investigation, we

14 would have to disagree with the Committee on that particular

15 point.

16       So, at this point, we think a -- on the cash

17 collateral issue, we're waiting -- we have asked the debtor if

18 they can provide us with any documentation which would

19 corroborate the statements that they made to us on August 31st.

20 And then at that point, we could then complete that portion of

21 the investigation.

22       As to the accounting investigation, we think a

23 reasonable amount of time in which we can move forward and

24 hopefully complete the investigation would be in approximately

25 six months.  But, you know, as we get into it, it may turn out

1  to be shorter or longer, depending on what we find in the, you

2  know, millions of pages of documents and the interviews that we

3  have with the various witnesses.

4          THE COURT:  All right.  Now, before this motion was

5  filed, we received an inquiry from counsel asking whether, upon

6  completion of the cash collateral portion of the examination,

7  the examiner should file a partial report, or interim report,

8  as you say, with respect to that issue alone.  And the response

9  which I had conveyed back was, no, I wanted to discuss that

10 subject with you here before saying to go ahead.

11         But my inclination is to tell you that when that part

12 of the investigation is completed to file such a report, unless

13 you think there'd be any reason not to.

14         MR. FOX:  No, we -- we can certainly do that.  As I

15 said, that had been our intention or our expectation.  Then we

16 did ask Mr. Minuti to make inquiry with the Court if you had

17 particular issue -- uh -- uh -- interest one way or the other

18 on that.

19         I think the inquiry was made before the 31st.  Then

20 we had the meeting with the 31st, and felt at that point that

21 we should delay, in any event, because we wanted to try to

22 corroborate the things that we were being told then.  And as

23 soon as -- you know, if we're able to do that, then -- or not,

24 then I think we can probably complete that portion of the

25 report because that had been our expectation was to at least

1  file an initial report to indicate to the Court where we were

2  generally, as well as where we were on that particular subject.

3          THE COURT:  All right.  Does anyone else care to be

4  heard in connection with this motion?

5          MR. MAYORKAS:  Good afternoon, Your Honor.  Alejandro

6  Mayorkas on behalf of the debtor, of O'Melveny and Myers.

7          We just wanted to underscore to the Court that we

8  very well understood the Court's June 1st directive to

9  cooperate fully with the examiner.  We have complied with that,

10  both in letter and in spirit, and we fully intend to do so.

11          I think there was some suggestions in the examiner's

12  moving papers that perhaps we have fallen short of the mark.

13  And I know in court today, counsel indicated that we have

14  committed to re-doubling our efforts.  I don't know that we can

15  actually physically work harder than we already have.  In the

16  three months that we have been committed to this undertaking,

17  we have produced approximately nine million pages of documents.

18  We have escorted the examiner's team, seven attorneys,

19  throughout the debtors' facilities so that they could identify

20  any additional hard copy documents that we had not already

21  produced.  They identified more than 200 boxes of documents.

22  The great majority of which we retrieved, collected, reviewed

23  and produced.  We've produced more than 700,000 pages of hard

24  copy documents.  We've facilitated interviews of current

25  employees, more are scheduled.  We are facilitating, to the

1  extent possible, interviews of former employees over whom we no

2  longer exercise control.

3          We very well understand the limitations on our

4  obligation to produce privilege documents with the consent and

5  at the behest of the Creditors' Committee.  We have been

6  producing privilege documents as to certain subject matters,

7  but we have not been as to other discreet subject matters in

8  order to preserve the value of the assets of the estate.

9          The privilege review that is attendant in that

10  undertaking is time consuming.  We have dedicated more than 12

11  people to expedite that review.  And we wanted to assure the

12  Court that our cooperation with the examiner and the examiner's

13  team is fulsome and will certainly continue to be so.

14          THE COURT:  Thank you.  Does anyone else care to be

15  heard?

16          MR. LOGAN:  Your Honor, Ben Logan of O'Melveny and

17  Myers.

18          Let me address briefly the cash collateral issue.

19  Like Mr. Mayorkas said to the Court, I just wanted to reiterate

20  to the Court and to the examiner that debtors take extremely

21  seriously our obligation to cooperate with the examiner and to

22  try to help the examiner understand the situation.

23          For better or worse, whether it's through -- was

24  through mis-communication on our part, or mis-hearing or

25  misunderstanding on their part, the outset of the cash

1  collateral would be what apparently got the examiner off on a

2  tangent.   It's something that we're sorry happened.   It

3  happened.   We don't think that we caused that, but I don't want

4  to get pejorative, just like the examiner doesn't want to

5  reopen -- reopen wounds there.

6          We are dedicated to working with the examiner to make

7  sure the examiner has a full understanding of the issues.

8          When the examiner presented his preliminary findings

9  to us, the debtors, through their CEO, and counsel, decided

10 that we had to at least engage in a limited waiver of privilege

11 materials because otherwise the examiner would have operated

12 under a bad misunderstanding.

13         The examiners asked for additional privilege

14 materials.   As Mr. Mayorkas said, disclosing privilege

15 materials as consequences for the estates.   There are things

16 that are said in privilege materials about strengths and

17 weaknesses of positions vis-a-vis third parties, that it's

18 incumbent upon us to make sure we review carefully with our

19 client so they make an informed decision, and with the

20 Creditors' Committee so they understand the pros and cons

21 before a decision has been made.

22         What I can pledge to the Court, and to the examiner,

23 is that we will do our utmost to make sure the examiner

24 understands fully the position on cash collateral that the

25 debtors took, and our legal understandings of the issues.

1          I do have a process yet ahead of us -- or we have a

2   process yet ahead of us where we will involve counsel advising

3   the Board of Directors of the company about disclosure of any

4   additional privilege materials.  We are moving that as fast as

5   humanly possible.  Hopefully that will lead to a resolution

6   that fully satisfies the examiner, but I can't promise that

7   that will be the result.

8          In any event, we will undertake to do the most we

9   possibly can, consistent with our duties to the estates on

10  privilege -- privilege materials to make sure the examiner and

11  we are on the same page as to at least what the facts are.

12  They can reach whatever conclusions they believe are

13  appropriate from that.

14          That's all I have, Your Honor.

15          THE COURT:  Thank you.  Anyone else care to be heard?

16          MR. INDELICATO:  Your Honor, Mark Indelicato from

17  Hahn and Hessen on behalf of the Committee.

18          Your Honor, first I'd like to address the comment

19  made by the examiner's counsel quoting our objection.  And just

20  to sort of clarify the record, we met nothing pejorative by the

21  statements regarding the expenses being incurred and the cash

22  collateral provided no benefit to the estate.  We did not take

23  a view as to any fault.

24          All we were doing was really mimicking what the

25  examiner had said in his papers was that, as a result of -- and

1  ai think he said it today, as a result of a miscommunication,

2  and whatever that miscommunication occurred, there was

3  significant additional expenses that need not to have been

4  incurred.

5          And ultimately at the end of the day, Your Honor,

6  those are expenses that are incurred at the -- at the expense

7  of our constituency, the unsecured creditors.

8          Your Honor, we filed this objection to really focus

9  the Court's attention on some of the issues we raised initially

10  and we respected the Court's decision to appoint the examiner.

11  We understand the Court wanted these issues examined.

12          But, Your Honor, there comes a point where we need to

13  understand under which -- in what -- in where we are going.

14  And at what cost are we going there.

15          Your Honor, there are various ways of getting --

16          THE COURT:  Let me stop you there.

17          MR. INDELICATO:  Yeah.

18          THE COURT:  What objection?

19          MR. INDELICATO:  Our objection -- we have -- we filed

20  an objection, Your Honor.  The limited objection of the

21  Committee.

22          THE COURT:  I haven't seen it.

23          MR. INDELICATO:  It was filed yesterday, Your Honor.

24          THE COURT:  I have not seen it.

25          MR. INDELICATO:  Well, Your Honor, I think as the

1  order said, we could do oral objections.  If you want, I could

2  explain to you what's in here, or I can give you an opportunity

3  to read our objection.  Whatever the Court --

4            THE COURT:  Tell me what it's all about.

5            MR. INDELICATO:  Okay.  Your Honor, what we -- what

6  we laid out in our objection is our concern about the mounting

7  expenses of the examiner's investigation.  We understand that

8  the examination needs to be incurred, but we -- we're concerned

9  about the level of expenses.

10            Your Honor, not before Your Honor yet is the fee

11  application to the examiner.  But they were filed for the two

12  months, which is roughly either the first 60 or the first 51

13  days of their examination, and they presently exceed $2

14  million.  We're assuming at a like rate for the month of

15  August, which would put the examiner as of September 1st at

16  approximately $3 million.

17            If you carry that out for their six-month extension,

18  Your Honor, this could be an examination report that will

19  exceed $10 million.

20            Your Honor, the Committee is concerned that these

21  expenses are beginning to overshadow the issues being examined.

22  And that, in fact, there is not going to be a corresponding

23  benefit to the estate.  We understand there are issues that

24  need to be examined, and we understand there are ways that they

25  need to be examined, but, Your Honor, we think that unless this

1 **examination has some boundaries, and we're not looking to in**

2 **any way impede the authority of the examiner, the order that**

3 **entered by this Court.  But first of all, Your Honor, we think**

4 **they can finish the cash collateral piece, and we think that**

5 **can be done relatively quickly once they get the documents from**

6 **the debtor that they're looking for, at minimal cost.**

7 **With respect to the continuing investigation of the**

8 **accounting issues, Your Honor, they've been in the matter for**

9 **three months.  What we would suggest is before the Court made a**

10 **determination of any length of time for this examination, that**

11 **we get from the examiner where they expect to be going, how**

12 **long they expect to get there, and what they expect it to cost.**

13 **The examiner made a comment, Your Honor -- and,**

14 **again, not questioning what they've done, but that nobody**

15 **expected this to be done in three months.**

16 **Well, Your Honor, if you look at their fee**

17 **application, over the -- just the first 20 days -- the first**

18 **two months, they had 20 partners billing over 2,000 hours, and**

19 **they had 27 associates billing at seventeen hundred hours.**

20 **Now, I understand they have a finite mandate.  And I**

21 **-- and I appreciate the effort they put in to get it done.  But**

22 **if that's going to be the pace of this case for the next six**

23 **months, Your Honor, it is an $11 million analysis, maybe more.**

24 **And we're not even sure at the end of the day we're going to**

25 **have a report that's going to be complete, that's going to --**

1  that's going to give the potential next part, whoever brings

2  the cause of action, the appropriate road map, if any cause of

3  action exists.

4          So, we would suggest, Your Honor, that if there is an

5  extension, that it be coupled with some -- some analysis, some

6  budget, something so that we understand the scope, and we

7  understand the potential cost.  And I'm not suggesting that it

8  be a finite budget that they be held to.  But I'm suggesting

9  what we've done in a lot of the other professionals that the

10  debtor has retained, there be budgets and once they're

11  approaching those budgets, they either come back to the

12  Committee or they come back to the Court.  But we need some --

13  some mechanism in place, Your Honor, to monitor these costs.

14  It's $3 million already and counting, and we need to see some

15  end.

16          Thank you.

17          THE COURT:  Before you leave --

18          MR. INDELICATO:  Sure.

19          THE COURT:  -- let me ask this.  The examiner is

20  asking up until March 7th --

21          MR. INDELICATO:  that's correct, Your Honor.

22          THE COURT:  -- to file his report.  Without

23  disclosing whatever confidential discussions may have taken

24  place, I am curious, though, about what effect, if any, the

25  timing of the extension bears to the proposal of a plan.

1            MR. INDELICATO:  Well --

2            THE COURT:  Or the -- or the development and --

3            MR. INDELICATO:  Your Honor, it is our hope that a

4  plan will be on file before that.  I mean we have been working

5  to get -- to get a plan in place, I believe, by year end.  So,

6  it is our hope that we will be well within the process before

7  March 7th.

8            THE COURT:  Okay.  So, you don't anticipate that any

9  extension would delay in any way the development and proposal

10 of a plan?

11            MR. INDELICATO:  Well, Your Honor, it, in fact, may.

12 When we put together the time table of the plan, we had

13 expected that the examiner's report, if not finished in

14 September, would be finished shortly thereafter.  We have not

15 spoken with the debtors about what will need to happen if, in

16 fact, the extension is granted til March 7th, and how that

17 could effect the implications of the plan.

18            So, that -- it could ultimately render an affect,

19 Your Honor, we haven't focused on that yet.

20            THE COURT:  So, tell me specifically, as part of any

21 order granting the extension, what would you like the Court to

22 direct?

23            MR. INDELICATO:  Your Honor, what we would like to

24 direct is that the examiner, either with the debtor or to the

25 Court, sit -- I mean with the Committee or the Court, sit down

1  and explain to us where they're going.  Explain to us how they

2  expect to get there and what the cost is going to be.

3         And that we have some give and take with them, as we

4  had suggested at the inception of this so that we understand

5  where they're going and what the cost is, and that we can

6  express to them our concerns as to the level of expenses.

7         Your Honor, there are a lot of ways to get -- to get

8  to someplace.  You can take a taxi, you can take a limo, you

9  can take a Rolls-Royce.  They're all going to get you to the

10 same place.

11        THE COURT:  I noticed that in some expense requests

12 that have been submitted.

13        MR. INDELICATO:  Yes.  So, Your Honor, so our feeling

14 is that, you know, we may all need to get to the same place.

15 We may have different views of how to get there.  And we'd like

16 the opportunity to work with the examiner to get there in a way

17 that we -- we keep the expenses down to a minimum.

18        So, we would like something in the order that

19 basically requires the examiner to sit down with the Committee,

20 to have a dialogue with the Committee and to sort of come up

21 with a plan to go forward with this investigation.

22        THE COURT:  All right.  Before I go -- thank you.

23 Before I go back to the examiner, let me ask if there's anyone

24 else who has not yet been heard who wishes to be heard?

25               (No audible response heard)

1          THE COURT:  All right.  I hear no response.

2          MR. TOPETZES:  Good afternoon, Your Honor.  Steve

3  Topetzes from Kirkpatrick and Lockhart Preston Gates Ellis on

4  behalf of the examiner.

5          Very briefly, just to address some of the points that

6  were made by counsel for the debtors and counsel for the

7  Committee, and to reiterate the reasons the examiner is seeking

8  the six-month extension of time.  There are two reasons:

9          First of all, Your Honor, the scope and complexity of

10  the issues as outlined by the Court in the June 1, 2007 order

11  are such that no examiner reasonably could conduct an

12  appropriate investigation within 90 days of the approval of his

13  appointment.

14          New Century was a fast growing public company with a

15  complicated business.  The financial reporting, accounting and

16  other issues identified generally by the Court are very

17  complex.  The volume of relevant data is substantial.

18          To address Mr. Indelicato's point about modes of

19  transportation and the relative expenses, let me say, as we've

20  said to the Court previously, the examiner has undertaken to

21  conduct an efficient investigation.  We have sought to narrow

22  appropriately the time period covered by our review.  We have

23  endeavored to be thoughtful in shaping and sequencing our

24  requests.  We're mindful of the burdens imposed on the relevant

25  players here.

1        This is a complicated drama.  It's complicated by the

2   underlying circumstances.  It's complicated by the existence of

3   ongoing governmental and prosecutorial regulatory

4   investigations.  It's complicated by private litigation.  We're

5   mindful of that.

6        The Committee has expressed concerns about the

7   relative costs.  We acknowledge those concerns.  We are not

8   unmindful of a collective desire to conserve resources here.

9   And we have sought to conduct this investigation in an

10   efficient and thoughtful way.

11        That said, even under the best circumstances, and

12   I'll address in a moment why these have not been the best

13   circumstances, but even under the best circumstances, we do not

14   believe that given the complexity of the issues, given the

15   scope of the relevant data, this ground could be covered

16   appropriately to report to the Court in the manner contemplated

17   by Your Honor's order of June 1 within 90 days.

18        We've requested six months because we believe that's

19   a good faith estimate of the time required to complete an

20   appropriate review, and to do so efficiently.  We've had issues

21   with respect to cooperation, and I won't burden the record here

22   with details, unless the Court wants them.  I've heard what

23   counsel for the debtor has to say about those issues.

24        Let me say that we respectfully disagree on certain

25   points, certain things that they would characterize as

1  miscommunication, a misapprehension of one type or another, we

2  would characterize otherwise.

3      We've sought to work with the debtors to prioritize

4  our requests.  We've been respectful of the privilege.

5      We have contended with a vacillating and expending

6  assertion of the privilege by the debtors.  That's the debtor's

7  right.  But it has imposed inefficiencies on our process.

8  That's a reality with which we deal, but it's a reality that

9  causes us, in part, to ask for this additional time.

10     We're not seeking to drive a Rolls-Royce, Your Honor.

11 We're seeking to get to the place as contemplated and outlined

12 by the Court in an appropriate way, and to tackle these

13 difficult issues under difficult circumstances in a manner that

14 discharges the mandate Your Honor prescribed for the examiner.

15     THE COURT:  Let me ask this.  While it might not be

16 welcome, it seems to me that it might be possible without the

17 examiner surrendering any of his prerogatives to address the

18 Committee's concern in a meeting and just to give some notion

19 of costs, at least as they can reasonably be projected at this

20 point, for the duration of the extension that the examiner has

21 requested.  What do you think?

22     MR. TOPETZES:  Yes.

23     THE COURT:  Okay.  That having been conceded, does

24 the Committee feel it's necessary to embody that in an order?

25     MR. INDELICATO:  No, Your Honor.  We'll take their

1  representation that they will sit down with us in good faith

2  and work that out, and we don't need it in the order.

3          THE COURT:  Okay.

4          MR. INDELICATO:  The only point I guess we would

5  further raise, Your Honor, it is -- while we would sit down

6  with it, maybe we could do the extension in two phases?  Giving

7  them a three-month extension, and we'll see where we are at the

8  end of three months.  And then if they need a further

9  extension, we could revisit the issue?  We think that might be

10  a more appropriate way of dealing with our issues, not only

11  sitting down with them and understanding where they're going,

12  make it a shorter extension at first, and then coming back, if

13  more time is needed.

14          MR. FOX:  Your Honor, Edward Fox, for the record.  I

15  initially rose to hand up the order.  But -- as -- as Mr.

16  Topetzes says, we're more than happy to meet with the

17  Committee.  We certainly have been in communication with them

18  on a variety of issues, and I think have worked fairly well

19  with them so far, and to good end, particularly with respect to

20  the KPMG issues, for instance.

21          Whatever your view is with respect to bifurcating or

22  just having a single extensions is fine.  We may want to think

23  about -- well, we'll have to consider, particularly if we're

24  going to bifurcate, whether we need anything in the order

25  because there are some confidentiality issues raised in the

1  original order appointing the examiner that I'm not sure if

2  we'll have an issue with in terms of having discussions with

3  the Committee.  But we can presumably deal with those in some

4  fashion.

5      THE COURT:  Well, I tend to agree with the Committee

6  that granting, in a blanket way, the full extension that's been

7  requested right now is not necessary.  It may be -- and that's

8  not in any way to suggest that the examiner's assessment of

9  what it will take to the end is inaccurate.  I would just feel

10  better, as a matter of case administration, to be able to

11  revisit the issue at some interim period.

12      I think the order also should provide what we talked

13  about at the outset of this hearing.  And that is for the

14  filing of the portion concerning cash collateral, whenever

15  that's completed.

16      MR. FOX:  Okay.

17      THE COURT:  And then, you know, picking some interim

18  time and -- it seems to me -- I don't care whether it's in

19  December of January, but that's the time frame I'm thinking of,

20  to revisit.  And if -- after confirming the parties can't agree

21  on a form of order, we'll address it on October 2nd.

22      MR. FOX:  Okay.  That will be fine, Your Honor.  I'm

23  sure we can come up with a form of order that will be

24  acceptable to the examiner and the Committee --

25      THE COURT:  Okay.

1          MR. FOX:  -- on that score.  And I -- I'm not sure

2   that we need anything in the interim, although the initial -- I

3   don't know if we need any kind of an interim order or bridge

4   order given the --

5          THE COURT:  Well, the local rules provide that you

6   don't, but --

7          MR. FOX:  Okay.

8          THE COURT:  -- in --

9          MR. FOX:  No, that's fine.

10         THE COURT:  -- in the event you'd like the comfort,

11  I'll order from the bench that the time for filing the report

12  is temporarily extended pending the memorialization of the

13  extension and a form of order to be submitted to the Court.

14         MR. FOX:  Thank you, Your Honor.  That way we could

15  keep working.

16         THE COURT:  All right.

17         MR. FOX:  Thank you.  And, Your Honor, if we might be

18  excused.

19         THE COURT:  You may.  Don't take a limo.

20                    (Laughter)

21         THE COURT:  I'm just -- I'm just kidding.

22         MR. MAYORKAS:  Your Honor, pardon me.  May I be

23  excused, as well?

24         THE COURT:  You may.

25         MR. MERCHANT:  Your Honor, Mike Merchant again for

1 the agenda.

2          Agenda Item Number 28 is the Committee's is the

3 Committees' trading motion.  I've been informed that that

4 motion will be continued again to the October 2nd hearing.

5          THE COURT:  I was hoping by the seating arrangement

6 that maybe it would have been resolved by now, but that's not a

7 criticism.

8          MR. MERCHANT:  Thank you, Your Honor.

9          THE COURT:  I'm happy to carry it to the 2nd.

10          MR. MERCHANT:  Agenda Item Number 29 is the debtors'

11 motion for additional sanctions against Positive Software.  My

12 colleague, Russ Silberglied, will be handling that matter.

13          THE COURT:  All right.  Before we -- assuming for the

14 moment that that matter's not resolved --

15          MR. SILBERGLIED:  That matter is not resolved, Your

16 Honor.

17          THE COURT:  Okay.  Let's take a short break and then

18 we'll pick up with that.

19          MR. SILBERGLIED:  Certainly.

20          THE COURT:  Court will stand in recess.

21              (Recess 2:56 P.M./Reconvene 3:14 P.M.)

22          MR. LOGAN:  Your Honor, Ben Logan of O'Melveny and

23 Myers for the debtors.

24          If Your Honor is willing, we'd like to take one thing

25 slightly out of calendar -- out of order from the calendar.

1  Last night -- and this relates to the adequate protection

2  order.  Last night, an order was submitted under certification

3  of counsel dealing with some of the dates set forth in our

4  efforts to try to resolve all the adequate protection issues.

5         After we entered -- we had the Court enter -- after

6  the Court entered the last order, a number of people focused on

7  the fact that the day when we needed to present settlement

8  proposals, and a variety of other reports fell in the middle of

9  the Jewish holidays.  And all of the parties involved have

10  agreed to a one-week extension so we avoid problems there.

11         And that's all the order does is give a one-week

12  extension to some dates that otherwise would come up this

13  Friday.

14         In the meantime, we are moving at a pace, and quite

15  frankly, maybe I'm Polly Anne-ishly optimistic, but I'm -- I'm

16  actually fairly excited about the prospect for some settlements

17  and some good solid settlement discussions yet ahead.

18         THE COURT:  Optimism is always welcome.  Not always

19  warranted, but always welcome.

20         MR. LOGAN:  True enough.  And I have a copy of the

21  order, if I could approach?

22         THE COURT:  I have it, and I simply held it because I

23  knew we had the hearing scheduled for today, and ask whether

24  anyone had any to add or wished to be heard in connection with

25  the stipulation.  If not, I'm prepared to sign off on it.

1          MR. LOGAN:  May I approach, Your Honor?

2          THE COURT:  I have it in front of me.

3          MR. LOGAN:  Okay.  Very good.

4          THE COURT:  thank you.

5          MR. LOGAN:  Thank you.  If it pleases the Court, may

6  I be excused at this point?

7          THE COURT:  You may.

8          MR. LOGAN:  Thank you.

9          MR. SILBERGLIED:  Good afternoon, Your Honor.  For

10  the record, Russ Silberglied, Richards, Layton and Finger in

11  connection with the Positive Software motion that's on the

12  agenda.

13          Before I start, Your Honor, I do have a binder with

14  four documents that I'll be referring to, perhaps it would be

15  more efficient if I could approach and just hand that up now?

16          THE COURT:  All right.

17          MR. SILBERGLIED:  Thank you, Your Honor.

18                    (Pause)

19          THE COURT:  Thank you.

20          MR. SILBERGLIED:  For the record, I've handed a copy

21  to counsel for the Creditors' Committee and counsel to Positive

22  Software, as well.

23          Your Honor, given the late hour, I'm just going to

24  skip right to the heart of the matter.  I know that some of

25  these issues are probably fresh in Your Honor's mind from the

1  last hearing.

2       The issue the Positive Software has raised in its

3  objection to our motion for further sanctions is that in

4  Positive Software's view, it could not have violated the

5  automatic stay because New Century does not appear in the

6  caption of the new filed complaint, and damages are not sought

7  from New Century.

8       This afternoon I'm going to take that contention head

9  on, both on the facts and on the law.  Because we all know

10  where the equities lie here.  Six days after Your Honor issued

11  your last order saying that Positive Software couldn't raise

12  the allegations they were raising, they raised them again in

13  the very same court in Texas.  We all know that that is, at a

14  very minimum, close to the line.  And I will address why it's

15  over the line.

16       Positive Software cites opinions holding that a case

17  is not stayed against a guarantor, a co-obligor a joint tort

18  feasor or the like.  But New Century's role in this allegedly

19  new suit is not at all like those types of parties.  There are

20  two essentially and, frankly, I think relatively obvious

21  reasons:

22       One of those two Positive Software tries to finesse,

23  and the other one it simply ignores.

24       First the one it finesses:  We argue in our motion

25  that the allegations here are identical to what is in the first

1    suit.  So, in a way of finessing this, Positive Software

2    responds at Paragraph 13 of its motion, as well as at a

3    footnote at the back of its -- I said its motion.  Paragraph 13

4    of its objection, as well as a footnote in the back of its

5    objection, that the new complaint alleges actions that happened

6    during the course of the first lawsuit, not in the complaint of

7    the first lawsuit.  And that there is a disconnect from a

8    temporal standpoint.

9         Your Honor, we don't dispute that fact.  It's

10   obviously factually correct and it's also completely

11   irrelevant.

12        The point is not that the allegations in the two

13   complaints are the same.  But the allegations in the new

14   complaint are identical to the allegations in the motion to

15   vacate also filed in the first lawsuit.  And that motion to

16   vacate, of course, is the very thing that Your Honor found last

17   month violated the automatic stay.  And it's all that's left of

18   the first lawsuit.  Absent the motion to vacate, that first

19   suit is over.

20        So, instead of just taking my word for it, that the

21   allegations in the complaint -- the new complaint are nearly

22   identical to the motion to vacate, I thought what I would do is

23   prepare a chart.  So, that's in Your Honor's binder at Tab 4,

24   but just for the record, the documents that it compares are

25   behind Tabs 2 and 3.

1        So, Tab 2 is the new complaint that is before this

2   Court for sanctions.

3        Tab 3 is the document that got sanctioned last time.

4        Tab 4 is the chart that compares the two.

5        And while it may not be efficient, given the length

6   of this chart, which speaks in and of itself, to read through

7   five pages worth not, suffice to say that we have divided this

8   up into five Roman numerals of categories where the allegations

9   between Tabs 2 and 3 are either literally word-for-word the

10  same, or substantially identical, comprising 20 separate sells.

11       And what Your Honor, I'm confident, will conclude is

12  that these are the exact same allegations.

13       Your Honor, in the face of what this chart shows,

14  there simply is no ability for Positive Software to run from

15  the reality that less than a week after this Court told

16  Positive Software not to litigate this -- these issues, it is

17  litigating these issues.

18       In any event, the paragraph, the temporal disconnect

19  paragraph that I'm referring to in Positive Software's

20  objection, Paragraph 13, actually begs the question, halfway

21  through Paragraph 13 of its objection, Positive Software says,

22  quote, "The claims against Susman," and now All Ellipse, "all

23  arise from actions committed by Susman and others after

24  Positive Software had commenced the District Court action."

25       And others is the key words there.  That has only one

1  possible meaning:  The debtors.  And therein lies the segue to

2  the point that Positive Software simply ignores in its motion.

3        We pointed out in our brief, or our motion, that no

4  less than four times in this new complaint Positive Software

5  alleges that the debtors, as well as defendants, committed

6  fraud, misrepresentations, withheld documents, whatever tort

7  they want to talk about.  Four times in their complaint, they

8  seek a finding that the debtors committed those acts.  They can

9  say all they want that they're not seeking relief against the

10 debtors, but the fact is that they are asking a Federal

11 District Court to make findings against the debtors.

12       And what they want to do with those findings is

13 obvious.  They want to use those findings in an attempt to

14 vacate the arbitration award once the stay is lifted.  After

15 all, a finding is a finding.

16       And remember that award doesn't simply eliminate the

17 claims against the debtors.  That award grants us one point

18 five plus million dollars.  That is an asset of the estate,

19 just as surely as a bank account would be an asset of the

20 estate.  A disputed one, like sometimes a bank account might be

21 a disputed one, but an asset of the estate.

22       And I'll come back to, when we get into the legal

23 analysis of 362(a)(1) and (3) that Positive Software has raised

24 why that has importance.

25       And it isn't even true that Positive Software is not

1  seeking monetary relief against the debtors on these theories

2  for this alleged plot.  Your Honor, on August 24, Positive

3  Software submitted a proof of claim.  Your Honor, that proof of

4  claim is Tab 1 at the binder that I handed up.  And the proof

5  of claim, in addition to the standard form, has some

6  attachments wherein Positive Software explains its claim.  The

7  very last paragraph of it, which reads as follows:

8       "Positive Software also has claims for damages

9  against the debtor defendants, improper conduct in which the

10  debtor defendants and/or their legal counsel engaged in the

11  course of the arbitration and the District Court action," et

12  cetera, et cetera.

13       So, in the proof of claim filed in this very case,

14  just a couple of weeks ago, they, again, raise these very same

15  allegations.  Yet they would have Your Honor believe that

16  they're not seeking any relief against the debtors on these

17  actions.

18       We also point out in our motion, and I would do so

19  again now, that without New Century involved, certain of the

20  allegations in this new complaint don't even make sense.  For

21  example, and it's only an example, conspiracy.  I assume that

22  Positive Software is not going to go into a Texas court and

23  argue that Susman Godfrey conspired with Susman Godfrey.  It's

24  obviously going to argue that Susman Godfrey conspired with the

25  debtors, and yet it would do so with the debtors not present in

1  the case.

2         Then there's the damages that Positive Software

3  seeks, and this might be the most telling portion of it all.

4  I'm going to quote from the ad damnum clause of the new

5  complaint, Positive Software asks, quote, "Judgment be entered

6  for plaintiffs for the damages they would have been awarded in

7  the arbitration, absent such fraud, to the fullest extent

8  permitted by law," end quote.

9         There is only one way I can think of where they can

10 attempt to prove that damage -- their entitlement to that

11 damages calculation, and that is asking the Federal District

12 Court Judge in Texas to hold a trial within a trial, to retry

13 the arbitration case in Case Number 1 in the context of Case

14 Number 2, in an attempt to get those damages.

15        That's why I said in the motion, and I stand by it

16 now, this isn't merely similar to the old claims, it is the old

17 claims.

18        So, the new complaint is an obvious attempt to end

19 run this Court's prior order.  That end run should not be

20 permitted for multiple reasons:

21        First, it seems obvious to me, in any event, given

22 the allegations that the debtors committed these torts, that

23 the debtors are necessary or indispensable parties in this new

24 complaint.  But in Positive Software's haste to just do

25 something, in light of this Court's prior order, it would have

1    the Texas court make findings against New Century without New

2    Century even being present in that case.

3         Your Honor, that is why we cited in our papers

4    McCartney versus Integra Bank, the 3rd Circuit opinion.  In

5    that suit, the 3rd Circuit ruled that a suit was automatically

6    stayed as to a non-debtor by Section 362 itself, not an

7    extension of the automatic stay, if the debtor would be a

8    necessary or indispensable party to the suit.  Exactly what we

9    have here.

10         Second reason why the case shouldn't be allowed to go

11   forward, and in additional grounds, the -- the claims -- under

12   Texas law, Your Honor, as we pointed out in our motion, claims

13   against your opposition in litigations lawyers simply don't

14   exist when we're talking about litigation.  So, if you lose in

15   a lawsuit, you can't sue your opponent's lawyers as a matter of

16   settled Texas law.

17         In fact, we found at least two Texas cases where

18   Texas courts considered or granted sanctions.  When -- for

19   being frivolous when somebody attempted to do this.  One of

20   those we cited in our papers, and ironically Positive Software

21   cited the other one in its papers.

22         The cases that Positive Software cites in its papers

23   clearly don't prove their point.  And in one of them, Alpert

24   versus Crane, cited by Positive Software, the plaintiff was

25   sanctioned under the Texas equivalent of Section 1927 for

1  raising these types of claims.  I don't know why they would

2  cite this case.

3        The other two cases they cite are two different lines

4  of Texas cases that have nothing to do with this -- this case

5  law.  One of those says that under Texas law, you can sue the

6  lawyers for your counterparty to a transaction for fraud, but

7  those cases actually say right in them that has nothing to do

8  with the Texas law with respect to litigation.

9        And then there's a line of Texas cases that they cite

10  that talk about whether a beneficiary to a trust can sue the

11  Trustee's lawyers on some kind of privity or fiduciary duty

12  theory, which obviously has nothing to do with these facts at

13  all.

14        Now, I say this not because I want Your Honor to

15  ultimately decide issues of Texas law, like what Positive

16  Software says we're trying to do.  Rather merely to show Your

17  Honor that on its face, this suit has no more merit under Texas

18  law than it does under automatic stay law.  And it merely was

19  an excuse to evade the automatic stay.

20        Positive Software argues that this Court would be

21  extending the stay, rather than applying it.  That is not

22  correct under the case law, as well as the facts that I

23  underline -- outlined above.

24        As we quoted in our papers, Judge Farnan in the in

25  the <u>Kaiser</u> case held, quote, "The scope of this protection,"

1   the automatic stay, "is not determined solely by whom a party

2   chose to name in the proceeding, but rather by who the party

3   with the real interest in the litigation," end quote.

4           In addition to being a case from this District

5   directly on point, <u>Kaiser</u> makes sense.  Plaintiffs want deep

6   pockets.  They don't usually care about a debtor who may be

7   giving out, I don't know, a penny, ten cents.  It depends on

8   the case obviously.

9           If it were so easy to file a proof of claim against

10  the debtor, which was done here, see Exhibit 1, and then carve

11  the debtor out of the existing suit and thereby get around the

12  automatic stay, that's what everybody would do.  But that's not

13  what the law is.

14          And <u>Kaiser</u>, of course, isn't the only case for this

15  point.  We pointed in our papers to the 6th Circuit <u>Amedysis</u>

16  decision, quote, "The fact that the Louisiana action did not

17  name NCFE," which was the debtor, "as a defendant, does not

18  render enforcement of the automatic stay improper," end quote.

19          Within this Circuit, we cited the <u>Maaco</u> case from the

20  Eastern District of Pennsylvania.

21          So, Positive Software denigrates our choice of the

22  word replete in our motion as in the case law is replete on

23  this point, seeing to suggest that there are not other

24  opinions.  Well, Your Honor, we simply didn't think that a

25  string cite (sic) would have been all that helpful to the

1  Court.  But lest the Court believed that these are the only

2  cases, another five minutes of research demonstrated Judge

3  Fitzgerald had an opinion in the <u>Global Ocean</u> case, 303 B.R.

4  753 at 760 which says, quote, "The fact that this action does

5  name the debtor is not dispositive," end quote.

6         So, Positive Software instead tries to distinguish

7  this body of case law as being applicable only in the 362(a)(3)

8  context, not 362(a)(1), I have several responses:

9         First, the <u>Maaco</u> decision.  Positive Software says

10 that <u>Maaco</u>, the Eastern District of Pennsylvania, did not

11 specify which subsection of 362(a) it was relying on, and that

12 it must have been relying on (a)(3).  That's simply not

13 correct.

14         As a matter of fact, right under the header Roman 2

15 in that opinion, the Court quotes from 362(a)(1), and never

16 mentions 362(a)(3).

17         So, Positive Software's spin of that holding is

18 contrary to what the opinion actually says.

19         Then there's <u>Amedysis</u>.  Now, I don't disagree that in

20 the 6th Circuit's <u>Amedysis</u> opinion 362(a)(3) played a portion

21 in the Court's opinion.  But that case remains quite similar to

22 the case at bar for a number reasons.  At Page 572 of <u>Amedysis</u>,

23 the Court notes, quote, "Amedysis's claims in the Louisiana

24 action were virtually identical to those in the Ohio action,

25 save for the omission of NCFE and its subsidiaries as

1  defendants in the Louisiana action," end quote.  Exactly what

2  we have here.

3          Then at Page 575, the 6th Circuit agrees with the

4  lower court's holding that, quote, "The Louisiana complaint,

5  though naming non-debtor J.P. Morgan as a defendant, seeks a

6  determination that the money in the debtor's bank account

7  belongs to Amedysis."  End quote.  I.e., not the debtor's.

8          The only difference here is that rather than Positive

9  Software trying to assert control over a bank account, they're

10  trying to get actual findings against the debtor in both cases

11  without the debtor present.

12          So, I don't believe that the distinction between

13  (a)(1) and (a)(3), while interesting, is dispositive.  While

14  Positive Software isn't trying to seize a bank account, they

15  are trying to get these judicial findings.  And the effect of

16  those judicial findings would be taking it back to the other

17  suit pending before the same court, and possibly the same judge

18  in Texas and vacating an arbitration award which is currently

19  an asset of this estate because it is one point five plus

20  million dollars awarded in our favor against Positive Software.

21          What I would call the overriding teaching of these

22  cases that we have cited is not some distinction between

23  362(a)(1) and (a)(3) that is not even in the cases themselves,

24  it's that the automatic stay applies where the debtor is the

25  real party in interest.  In other words, Judge Farnan's

1  formulation in <u>Kaiser</u>.  And that clearly is the case here for

2  the reasons that I have been talking about.

3       In addition, this case has an additional feature

4  demonstrating that 362(a)(1) applies.  And that's, as I said,

5  the fact that the damages formulation that Positive Software

6  supports seeks a trial within a trial.  Seeks to actually

7  litigate the arbitration proceedings of Case Number 1 within

8  the confines of Case Number 2 to testify a damages award.  That

9  is a literal, quote, "continuation," end quote of pre-petition

10 litigation.

11      And, of course, continuation of pre-petition

12 litigation is exactly what you can't do under 362(a)(1).

13      With that, Your Honor, I would move to damages.  At

14 this juncture, we believe that punitive damages may be the only

15 thing that stops Positive Software.  The timing simply can't be

16 ignored.  Six days after Your Honor's prior order is when this

17 new complaint was filed.  If one order of compensatory only

18 damages wasn't enough, there's no reason to believe that two

19 orders of compensatory only damages will be enough.

20      Positive Software argues that punitive damages are

21 not available to corporation.  I was quite surprised to see

22 that argument.  As Positive Software acknowledges, the 3rd

23 Circuit has taken this head on and ruled to the contrary in the

24 <u>Atlantic Business and Community Corp</u> case.  The argument that

25 by silence on the point, BAPCPA intended to change <u>Atlantic</u>

1 **Business and Community Corp is exactly to the contrary of**

2 **decades of United States Supreme Court opinions to the effect**

3 **that if prior bankruptcy practice is to be changed by a**

4 **revision to the Bankruptcy Code, there has to be something very**

5 **concrete in those changes.  For example, Cohen versus De La**

6 **Cruz, a 1998 Supreme Court opinion, 523 U.S. 2313.  There's**

7 **also Dewsnup versus Timm, 502 U.S. 410, 419.  It flies in the**

8 **face of any number of U.S. Supreme Court opinions interpreting**

9 **bankruptcy cases and changes to the Bankruptcy Code.**

10 **Positive Software's other argument is that it didn't**

11 **know it was violating the automatic stay.  We already crossed**

12 **that bridge at the last argument.  That's legally irrelevant as**

13 **a matter of settled 3rd Circuit law.  Here, though, it's worse.**

14 **To the extent that Positive Software had some belief that it**

15 **could get away with what it was doing, it had to, at a minimum,**

16 **know that it was treading close to the line.**

17 **And, Your Honor, if you live close to the line, you**

18 **have to accept the consequences of being close to the line.**

19 **Here, those consequences should be a clear message to Positive**

20 **Software that this conduct has to stop.**

21 **Unless Your Honor has any questions, I would respond**

22 **to any arguments that Positive Software makes.**

23 **THE COURT:  I have one question.  Is there any**

24 **controlling law in this Circuit in which a court has applied**

25 **the automatic stay to non-debtor entities absent the**

1   commencement of an adversary proceeding?

2           MR. SILBERGLIED:  We -- yes, Judge Farnan's opinion

3   in <u>Kaiser</u>.

4           THE COURT:  Well, in a -- in a multi district judge

5   district, I don't consider that there is a law of the District.

6   That having been said, I would normally give deference to any

7   decision by any of the district judges in this District.

8           MR. SILBERGLIED:  Understood, Your Honor.  There is

9   no Delaware District Court Appellate opinion or 3rd Circuit

10  opinion that is controlling.  There is the 3rd Circuit's

11  holding in <u>McCartney versus Integra</u> that I talked about before,

12  which while it comes up in a different context, and it is not a

13  sanctions opinion, does clearly hold that the automatic stay

14  applies to a non-debtor.

15          And then as I said, you know, perhaps it's not

16  controlling, but Judge Farnan's opinion in <u>Kaiser</u>, as well as

17  opinions from outside of this District.

18          THE COURT:  Thank you.

19          MR. SILBERGLIED:  Thank you, Your Honor.

20          MR. RALSTON:  Good afternoon, Your Honor.  Mark

21  Ralston on behalf of Positive Software.  With me today is Carl

22  Neff, our local counsel of the Fox Rothschild firm.

23          Also with me is Mr. Michael Shore of the Shore Chan

24  Bragalone firm.  Mr. Shore's firm represents Positive Software

25  in the underlying litigation against Susman Godfrey, as well as

1 the litigation commenced against the debtors and other

2 defendants.

3        This may be a bit unusual, Your Honor, but the

4 debtors have ascribed a lot of intent, bad intent, nefarious

5 intent to Positive Software, and by implication, its counsel.

6        I think that they have misconstrued, for their own

7 purposes, the intent that we have in bringing this Susman

8 lawsuit and the effect that we intend to have that lawsuit in

9 the original litigation commenced against the debtors.

10        If the Court would grant us a favor to have Mr. Shore

11 speak briefly about the underlying litigation, and then permit

12 me to speak about addressing the legal points regarding the

13 automatic stay, we would like to present our argument that way.

14        THE COURT:  All right.  Proceed.

15        MR. RALSTON:  Thank you, Your Honor.  Mr. Shore will

16 step up to the podium.

17        MR. SHORE:  Your Honor, thank you for accommodating

18 this slightly unorthodox method of argument.

19        I've been practicing law almost two decades in

20 Federal Courts all over the United States, Appellate Courts,

21 District Courts.  I have never had a motion for sanctions or

22 punitive damages filed against me in any Federal Court without

23 the other side having the courtesy of calling me to discuss the

24 situation and what was going on.

25        Had I received that phone call, had I received the

1  courtesy of that phone call before being accused of

2  disrespecting a Federal Court, I think a few things would have

3  been clear.

4         There's a few things I want to address to the Court

5  in -- directly in response to what you just heard:

6         First of all, we have absolutely no intention of

7  seeking any collateral estoppel against the debtor in the

8  Susman Godfrey lawsuit.  We will stipulate to that.  We would

9  have stipulated to that.  We will stipulate to that in the

10 court in Texas, if it ever becomes an issue.  I will stipulate

11 to that right now.  We seek no collateral estoppel, we never

12 would seek a collateral estoppel, there is no need for it.

13        Second, the allegations, as counsel said, in the

14 Susman Godfrey lawsuit are identical, they said, to the

15 allegations in the motion to vacate.  Now, they've not

16 obviously identical to the allegations in the underlying

17 lawsuit against the debtor because the underlying lawsuit

18 against the debtor is the Federal Copyright Act, the Digital

19 Millennium Copyright Act, Breach of Contract, none of those are

20 addressed in the Susman Godfrey lawsuit.  They are not

21 identical in any way, shape, form or fashion.  As a matter of

22 fact, they are -- none of the claims in the Susman Godfrey

23 lawsuit even existed at the time the underlying lawsuit against

24 the debtor was filed.

25        So, then their next claim or the statement that was

1    made to the Court is that it's identical to the allegations in

2    the motion to vacate.  The motion to vacate does not seek any

3    affirmative relief against the debtor, none.  And I was not

4    here for the last hearing, but there's a -- and I respect the

5    decision of the Court, and we're going through a different

6    process there, but there's a couple of things I think the Court

7    -- I would like for the Court to understand that I don't

8    believe has been brought to the Court's attention.

9            THE COURT:  Well, don't retry --

10           MR. SHORE:  I'm not --

11           THE COURT:  Don't retry a motion that's already been

12   heard.

13           MR. SHORE:  I'm absolutely not going to retry the

14   other issue.

15           But the simple fact of the matter is when the hearing

16   came down en banc from the 5th Circuit, the debtor at that time

17   was already in bankruptcy.  The debtor did not ask the District

18   Court not to address the motion for judgment.

19           So, we -- we had filed previously a motion to vacate

20   that had been denied as moot because they vacated on other

21   grounds.

22           The directive from the 5th Circuit was to take up the

23   remaining issues.  Since the motion to vacate for fraud had

24   been denied as moot, that was no longer an issue.  All we were

25   doing was putting the thing back in the position it was.

1          That is not what is going on in the Susman Godfrey

2   lawsuit.   In the Susman Godfrey lawsuit, we have a situation --

3   and I think it's very interesting, and I think a Texas court

4   would find it very interesting that they're claiming that a

5   lawyer, who knowingly puts on perjured testimony is immune from

6   the person to whom he knowingly puts on the perjured testimony.

7          I think it would be interesting to a Texas court than

8   to argue that a lawyer who knowingly defrauds and participates

9   in a fraud upon another party with the client is immune from

10  suit.  And, as a matter of fact, we cited cases in our papers,

11  and we don't need to go into that.  But if that's what they

12  believed, it would seem like a 12(b)(6) motion in the Texas

13  court would sort of moot everything, and we wouldn't need to

14  worry about anything because this thing would get thrown out.

15         What they've done in the Texas court, for Your

16  Honor's information, is they've asked the Texas court to delay

17  their response so they don't have to respond to the Texas court

18  at all in the hope that you're going to stay the case and put

19  off the 12(b)(6) motion, I suppose on this frivolous case.

20         What it comes down to -- and another thing that

21  counsel for the debtor said was that the motion to vacate is

22  all that's left of the underlying case.  Once the motion --

23  when we moved to ultimately lift stay, and I don't understand,

24  frankly, why they don't want their motion for judgment heard to

25  find out if they have a $1.5 million claim.  I would think the

1    creditors would want to know, do we have $1.5 million in
2    assets.

3         The reason why they don't want it ruled on is because
4    they know it will be vacated for fraud.  And when it's vacated
5    for fraud, that will initiate or support the lawsuit against
6    Susman Godfrey.  The debtors have no money to pay this claim.
7    Susman Godfrey and the others are absolutely the target of the
8    lawsuit in Texas, not the debtor.

9         We have a $500 million unsecured claim in the
10   bankruptcy against New Century.  That will go through the
11   arbitration process again, or maybe the District Court in Texas
12   will hear it because New Century doesn't have the money to pay
13   an arbitrator a quarter of a million dollars to hear it again.
14   I don't know.  But that $500 million claim will be liquidated,
15   it won't be paid in full.  And ultimately Susman Godfrey, who
16   participated, actively participated in a major fraud at a time
17   when New Century had over a billion dollars in cash and could
18   have paid a judgment, and now they can't, that is a case and
19   cause of action that is against Susman Godfrey, it will be
20   fully litigated against Susman Godfrey, we don't want
21   collateral estoppel against New Century because we don't need
22   it.  It's not the same claim.

23        The other -- quickly, the other thing I wanted to
24   tell you is the debtor in Texas, under Texas law, is not an
25   indispensable party to a fraud claim.  A debtor is not an

1  indispensable party to a civil conspiracy claim.  And as a

2  matter of fact, they said who could they have conspired with?

3  Susman Godfrey, who we know of, based upon the documents we've

4  seen, conspired with Frank Niece, John Norman and Mr. Lemeux

5  (phonetic).  And one thing that I think is important for the

6  Court to understand is that the District Courts in Texas, on

7  two different occasions, has found that Susman Godfrey

8  defrauded the Court.  They've already found a crime fraud

9  exception to the attorney/client privilege.  So, for them to

10 say in their papers that Susman Godfrey really has no interest

11 in this, Mr. Barnett is here today.

12         On two different occasions, the Federal Court in

13 Texas has found that he defrauded a Federal Court one time

14 resulting in the crime fraud exception to the attorney/client

15 privilege.

16         So, I'll let our bankruptcy counsel to address the

17 more technical bankruptcy issues because, frankly, they're

18 beyond me.

19         But I wanted this Court to understand -- to take away

20 from this three things:

21         Number one, we are not seeking collateral estoppel

22 against the debtor.  We will disclaim any collateral estoppel

23 against the debtor.  We never have -- we don't have any

24 intention of ever bringing this particular claim against the

25 debtor.  Why it's in the proof of claim, I guess that's

something -- belts and suspenders things bankruptcy lawyers do.
But I can assure you that my client, Positive Software, has no
intent to assert any claims against the debtor that were not in
the underlying lawsuit based upon Copyright, the Digital
Millennium Copyright Act, and the Contract.

Number two, this case will go forward against Susman
Godfrey in Texas, and the other conspirators, none of whom are
employees of New Century, none of them are officers of New
Century.  None of them are participating in the reorganization
of New Century.  Whether it goes forward if you extend the
stay, or for some reason, it -- ultimately this case is going
to be litigated in the court in Texas because it doesn't deal
with the debtor, and it deals with a new and independent cause
of action.

Third, when they talk about litigating the suit
within the suit, remember this case has already been fully
litigated in arbitration, and it's been fully litigated in the
District Court through a preliminary injunction in which
Positive Software prevailed on the preliminary injunction.  All
the discovery has been done to win the underlying suit.  All
the -- every -- I mean we won in the -- in the Federal District
Court and we will win, I'm absolutely certain, on the motion to
vacate because a Federal District Court already put in the
footnote he would grant the motion to vacate on fraud grounds
if he had granted it on the other grounds.

1          So, this is not something that's going to involve a

2  great deal of work, and hardly any of the debtors' time,

3  trouble or efforts.   This is simply -- and I would bet Susman

4  Godfrey is the one who actually drafted this motion, but I

5  don't know that.   But I can tell from the pejorative language

6  it's a Susman Godfrey document.   But Susman Godfrey is trying

7  to use this Court to shield it from liability for fraud.

8          And I would hope that this Court wouldn't do that

9  based upon the law of the Bankruptcy Court, and also simply the

10 facts of the case.   They're not what have been explained to the

11 Court.

12          And if the Court has any questions about the

13 underlying lawsuit or what's really going on, I'd be happy to

14 answer it.

15          THE COURT:   I do not.   Thank you.

16          MR. RALSTON:   Again, thank you, Your Honor, for

17 permitting us to proceed this -- in the manner we're

18 proceeding.

19          Your Honor, I'll try to be brief.   Again, the motion

20 filed by the debtors raises one issue:   Whether Positive

21 Software violated Section 362(a)(1) by seeking -- by filing an

22 action against various entities that did not include the

23 debtors, that did not include a claim for relief against the

24 debtors, even going beyond Section 362(a)(1) to the Section

25 362(a)(3), which wasn't raised, doesn't seek recovery against

1  property of the debtors.  And, in fact, yes, we did file a

2  proof of claim.  And as the bankruptcy attorney, I am

3  interested in belts and suspenders.  To the extent the same

4  identical claim against the debtor, we asserted it as part of

5  the claims process.

6        Again, Susman, not a debtor, we asserted it in the

7  form of a lawsuit.

8        Your Honor, it troubles me that -- again, that intent

9  has been subscribed to us.  I, like Mr. Shore, have been

10  practicing law many years.  I have never once been accused of

11  trying to do an end run around any court that I have practiced

12  before, and it certainly wasn't the case here.

13        We relied on the black letter of 362(a)(1).  We

14  relied on the case law that interprets that.  That basically

15  finds that the stay applies to debtors.  Identical claims.  And

16  this is 3rd Circuit case law, Maritime Electric, the McCartney

17  decision, and interpretations of other courts within this

18  Circuit interpreting those decisions.  Clearly states that

19  claims against non-debtors are not stayed under 362(a)(1).  If

20  a debtor believes that unusual circumstances, and that's the

21  quote, the unusual circumstances test, exists to extend a stay,

22  then they are free to bring that.  The Court raised an issue.

23  How does one bring that?  Can it be by motion?  Or can it be by

24  adversary proceeding?

25        Your Honor, I haven't done extensive research in it.

1  There -- I think the majority of the case law indicates that it

2  has to be done by adversary proceeding.  But regardless of

3  whether it can be done through a contested matter, or by an

4  adversary proceeding, it has not been done by the debtors.  The

5  debtors have not sought that.

6       I believe that Mr. Shore, in stipulating that

7  Positive Software would not seek collateral estoppel against

8  the debtors to establish any claim, or even to have the

9  underlying arbitration award vacated, should give the debtor

10  some comfort that this suit will not prejudice them.

11       Certainly if they still believe that, they can come

12  to us, they can see if we can work something out.  And if they

13  still aren't convinced -- if they still have some sense that

14  this lawsuit against Susman Godfrey and other non-debtors is

15  going to interfere with their reorganization efforts, then they

16  can bring a 105 adversary proceeding or a contested matter.

17       I think as far as the cases relied upon to debtors,

18  that we address those -- and we stand by our interpretation of

19  those cases.  None of those cases, I think, as this Court

20  noted, provide that damages are awardable against an entity

21  that's alleged to have violated the automatic stay when the

22  action was against non-debtors.

23       And certainly there's been no allegation by the

24  debtors that there's been a Section 362(a)(3) violation with

25  the Susman action.

94

1          Again, regarding the 3rd Circuit case, the <u>McCartney</u>

2   case, I just want to reiterate, it's a very interesting case,

3   very interesting and specific fact pattern.  Interestingly

4   enough, and the irony of the <u>McCartney</u> decision is that an

5   entity refrained from taking action against a non -- against a

6   debtor guarantor, and against the underlying borrower because a

7   non-guarantor was a necessary party.

8          The debtor subsequently tried to have the bank's

9   claim expunged on limitations grounds.  That a deficient -- a

10  State Court deficiency action had not been commenced within the

11  time provided under Pennsylvania law.

12          So, you see you have a -- a situation where -- excuse

13  my language, Your Honor -- that the creditor's darned if he

14  does, darned if he doesn't.  If he doesn't bring an action,

15  then there's limitations question raised.

16          And if he does bring an action, then alleged

17  violations of the stay are level.

18          Your Honor, the <u>Kaiser</u> case is another -- another

19  case in point.  That case involved insurance premiums.  The

20  Court noted that the non-debtor defendant had absolutely no

21  economic stake in the outcome.  That certainly cannot be the

22  case here, Your Honor.

23          If a judgment is found against Susman Godfrey, they

24  are the ones that are going to have to pay it, not the debtors.

25          Your Honor, one of the problems that the debtors

1 have, or that the debtors raise, is what kind of law they would

2 have this Court make.  If -- in a situation where there were

3 debtor and non-debtor's parties to a lawsuit, what the debtors

4 propose is that the plaintiff try to guess as to how a court

5 would interpret the action to determine whether there's a

6 violation of the stay.  That's not the way the law is written.

7 And that's not the way it's been interpreted by the Courts.

8 There are similar facts, even identical facts.  But

9 the facts aren't the issue.  362(a)(1) looks at who the claims

10 are brought against.  Who recovery is sought from.  And in this

11 case, Positive Software seeks recovery from Susman Godfrey, and

12 from the individual non-debtor defendants to that action.

13 Your Honor, as to damages, -- well, first given --

14 and we hesitate to even argue this because we think it's so

15 clear that there's been no violation of the automatic stay in

16 this case.  But given that there has been no violation there

17 are, of course, no damages.

18 If this Court were, as we view it, to expand the law

19 as previously -- as written and as held by courts in this

20 Circuit and other Circuits, to essentially send retroactively

21 the automatic stay to non-debtor parties, then we would point

22 this Court to the 3rd Circuit's decision in <u>University Medical</u>

23 <u>Center</u>.  Where that panel declined to award any damages based

24 on similar facts.  In that case, the party alleged to have

25 violated the stay relayed (sic) on a lease certain case law

1  that provided for setoffs.  The 3rd Circuit found that that --

2  at least in the 3rd Circuit was a violation of the stay.

3      However, the 3rd Circuit in that case declined to

4  award damages for that reason.  Essentially, although there was

5  knowledge that the bankruptcy had been commenced, although the

6  conduct was purposeful, it was a reliance -- good faith

7  reliance on the case law and on the statutes with regard to the

8  actions that were at issue.

9      Your Honor, there's been no violation of the

10 automatic stay.  There's been no violation of any order issued

11 by this Court, including the Court's prior order.  Therefore,

12 the debtors' motion should be denied.

13     Thank you, Your Honor.

14     THE COURT:  Thank you.

15     MR. SILBERGLIED:  A few things, Your Honor:

16     I have to start with this, and I really wish I

17 didn't.  Considering that we have been blasted by two different

18 attorneys for not picking up a telephone and calling, I would

19 have to point out that, in fact, we did pick up the telephone

20 and called.  I called Mr. Ralston -- and as an officer of this

21 Court, I will represent that I called Mr. Ralston -- when he

22 wrote a letter to the Judge in the first case, which is

23 attached to their motion, I believe, as Exhibit B, and it --

24 that letter says that they're going to proceed in that case

25 against the nondebtors.

1          I called up Mr. Ralston on a Friday as I was driving

2    to the beach, I remember it distinctly, and said, you're not

3    really going to make me three days later move the Court to

4    extend the stay, are you?   He said he would get back to me.

5    And within days, we got the new complaint that we're here about

6    today.   We took that as an answer loud and clear and took

7    appropriate action.   There is a reason why we're here today,

8    Your Honor.

9          Your Honor, I think the biggest thing that I have to

10   respond to, though, is this proposal at a stipulation

11   concerning collateral estoppel.   I have no idea how that would

12   work, and I would argue that it is not workable.

13          THE COURT:   Well, I don't either, but the idea

14   intrigues me, I will confess.

15          MR. SILBERGLIED:   Your Honor --

16          THE COURT:   Because normally if this had come -- if

17   this had come to me in the context of an adversary in which the

18   debtor was seeking to enjoin action against non-debtor parties,

19   collateral estoppel would be one of the big three reasons

20   typically, aside from indemnification issues, and thirdly

21   interference with reorganization issues that are asserted by

22   debtors for such relief.

23          And it seems to me that, at least based on what I've

24   seen on the papers, neither of the other two are applicable, at

25   least as I can see it initially anyway.   And it's the

1  collateral estoppel issue, it seems to me, about which the

2  debtor might be most concerned.

3         MR. SILBERGLIED:  Well, I would respond this way,

4  Your Honor:  I do believe that there would be interference of

5  the reorganization efforts.  But I think really I'll address

6  head on what Your Honor's real concern is.  And the collateral

7  estoppel issue is that point.

8         Whether something is technically collateral estoppel

9  or something else or something akin to it is sometimes a very

10  difficult legal question.  Whether you're in privity with the

11  party.  Sometimes, frankly, under the case law that has

12  extended the stay, that's not even so easy to see.  But here,

13  what we're talking about our own lawyers being the subject of

14  the suit, it's a lot easier to see.  In a conspiracy claim

15  where it might be alleged that we are the coconspirators, it is

16  easy to see.

17         But the most telling aspect, Your Honor, how is it

18  not collateral estoppel or something akin to it, or some

19  finding that could be used against us, no matter what you call

20  it, whether it's collateral estoppel or something else, when

21  the allegation is, quote, "New Century and the defendants did

22  the following," et cetera, et cetera.  New Century and the

23  defendants committed fraud.

24         I don't know what he's suggesting.  I don't know if

25  he's suggesting that he's striking those allegations, that he's

1   not going to seek any findings.  But they took the action, Your

2   Honor.  That's what violated the stay.  If they -- if now

3   they're cowering from their own allegations, that's their

4   issue.  But those are their allegations and our papers say no

5   less than four times.  I actually found one that I missed

6   that's no less than five times in their papers they made that

7   allegation.

8           So, they may say that now that they've gotten called

9   on their action.  But I don't think it's workable.

10           Your Honor, a few other points that I'll raise.  With

11   respect to whether the debtors are an indispensable party, and

12   they say under Texas law they may -- you know, a company may

13   not be an indispensable party to a fraud action.  I haven't

14   seen those cases.  They clearly didn't brief them.  But I find

15   it hard to believe that that's the law where the allegation is

16   that the debtors committed fraud.

17           It may be the case where the debtors may be alleged

18   to have played some part of it.  But where the allegation is

19   the debtors committed the fraud, together with Susman Godfrey,

20   I find that hard to believe that the debtors wouldn't be an

21   indispensable party.

22           They stand up and they say they don't know why the

23   proof of claim says what it is, but one of their lawyers says

24   that they assure us that they're not making a claim against New

25   Century.  And the other lawyer says they assure us that they

1  are making a claim against New Century for this.  I don't know

2  what to make of that.  But the same allegation is made against

3  both.

4          They say that you'd have to guess what the law is if

5  Your Honor were to render such an opinion.  Your Honor, I don't

6  agree with that under any facts, but certainly not under these

7  facts.  They had the opportunity to ask Your Honor.  They knew

8  this was close to the edge, and they had the opportunity to ask

9  Your Honor.  Six days passed between Your Honor's order and

10  when they took their action.

11          Your Honor, they also argued that they'd be between a

12  rock and a hard place because of <u>McCartney versus Integra</u>, the

13  3rd Circuit decision because the facts of that case showed that

14  somebody might allege that if they did not sue Susman Godfrey,

15  that that would have been a Statute of Limitations issue.  I

16  guess anybody could allege anything, but that's exactly the

17  proposition that <u>McCartney versus Integra Bank</u> avoids.

18  <u>McCartney versus Integra Bank</u> held that the Statute of

19  Limitations was not tripped precisely because a complaint

20  didn't need to be filed where the debtor would have been an

21  indispensable party.

22          Finally, Your Honor, I would note that the statement

23  at the end about damages and <u>University Medical Center</u> and the

24  law being unclear and, therefore, not applying sanctions.

25  <u>University Medical Center</u> can potentially be read to say that.

1   There are also three 3rd Circuit opinions that are cited and

2   quoted at Paragraph 15 of our motion:  <u>Atlantic Business</u>,

3   <u>Landsdale Family</u>, and <u>In RE: Bloom</u> is a 9th Circuit opinion,

4   not a 3rd Circuit opinion, they come out to the contrary, all

5   within the 3rd Circuit.  And <u>University Medical Center</u> is not

6   the last word of the three of them.

7           The 3rd Circuit has, more often than not, stated that

8   misconstruing bankruptcy law is not an excuse and does not have

9   you avoid sanctions for violation of the automatic stay.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.  Well, after having reviewed

12   the submission of the parties and heard argument, I will tell

13   you that I am uncertain what the result of the debtors' motion

14   should be, and I'm not going to decide it from the bench today.

15   But I'm going to offer some comments, and then a suggestion.

16          I am resisting the temptation, which isn't all that

17   difficult, to follow my most recent ruling in connection with

18   the dispute between these parties with a knee jerk reaction,

19   which I think may be the debtors' -- might have been hoping

20   for.

21          This presents a situation in which procedurally, as I

22   indicated by my question to the debtor earlier, I'm not

23   convinced has been teed up for the relief that the debtor wants

24   to have.

25          On the other hand, as is so often the case, this is a

business in which the Court has to figure out where to draw the
line.  I agree with the debtor, this is on the edge.  But that
doesn't mean it's on the wrong side of the edge.  It's clearly
an attempt to get at something -- a recovery another way.

Now, in <u>Kaiser</u>, what Judge Farnan focused on was
whose economic interest was at stake.  And here the debtor is
arguing an (a)(3) violation because, in essence, the actions of
Positive Software are geared to get to its arbitration award.
I think that's a stretch, frankly.

I think it really rests in an (a)(1) scenario, if
anywhere.  But I have a certain reluctance to find a violation
in a case in which there's been no expressed determination by
this Court that the stay ought to apply.

And the debtors have come in, and I think been asked
for relief in a -- in a roundabout way around that question.
Now, you've today argued it directly.  So, that's not to be
taken as a criticism.

I am intrigued, as I've said, by the notion that
there might be some protection which could be offered to the
debtor which would obviate its concern.

Now, I know there may be nothing which can eliminate
the debtors' concern that in a lawsuit somewhere, somebody is
saying bad things about the debtor.  But that notwithstanding,
there may be a way legally to insulate it from liability as a
result of what may be going forward in the new lawsuit.  So,

1  what I'd like to ask the parties to do is to explore whether

2  there is some stipulation that can be fashioned which would

3  provide such insulation to the debtor.  And to report back to

4  me at one of our upcoming omnibus hearings.  The next one is, I

5  think, October 2nd.  But if the parties want more time, I'll

6  afford it to them.

7         And if the parties can't resolve it, I will make a

8  ruling.  I won't promise it will be on October 2nd, but I'll

9  take the matter under advisement and issue a decision in due

10  course.

11         But I say to both parties each has a reason to reach

12  a resolution because the outcome, based upon the record that's

13  been made so far, is not so clear to me.

14         Are there any questions?

15         MR. RALSTON:  No, Your Honor.

16         MR. SILBERGLIED:  No, Your Honor.

17         THE COURT:  All right.

18         MR. SILBERGLIED:  Your Honor, I guess the one thing I

19  should have done before I leave here is I realize -- I'm not

20  even sure it's necessary because I think Exhibits 1 through 3

21  in my binder are all things that can be taken judicial notice

22  of, but I would move them into evidence just to make sure.

23         THE COURT:  1 through 3?

24         MR. SILBERGLIED:  Yes, Your Honor.  Item 4 is a

25  summary, a Rule 1006 summary.

1       THE COURT:  All right.  Is there any objection?

2       MR. SHORE:  No, Your Honor.  May I --

3       THE COURT:  You may.  All right.  So, no objection to

4  the admission of 1, 2 and 3?  All right.  They're admitted

5  without objection.

6       MR. SHORE:  This is sort of a housekeeping point, not

7  directly for you, but for the Court in Texas.  The defendants

8  in the court in Texas have moved for a 14-day extension to

9  their answer date.  I guess based upon the idea -- well, I know

10  it was because they said it in their pleadings, based on the

11  idea that they expected this Court to enter a finding that

12  there had been a violation of the stay and that they were, in

13  effect, subject to the stay.

14       THE COURT:  And ultimately that's still a

15  possibility.  I'm just not making that ruling today.

16       MR. SHORE:  Correct.  And what I'd like -- I want to

17  make sure I report back to the Court in Texas that's not going

18  to happen within 14 days, or is it?  Or is -- because I want to

19  --

20       THE COURT:  It's not going to happen before October

21  2nd.

22       MR. SHORE:  That's all I need to know, Your Honor.

23       MR. MERCHANT:  Your Honor, Mike Merchant again for

24  the record.  We've already addressed Agenda Item Number 30.

25       And Agenda Item Number 31 has been continued to the

1  October 2nd hearing pursuant to the Court's teleconference
2  yesterday.

3              I believe that's all we have for today.

4              THE COURT:  Okay.  I have one additional item.  And
5  that is some time ago, I had solicited recommendations from
6  parties for appointment of a fee auditor in this case.  I came
7  back and asked for a second round of recommendations.  And for
8  reasons that I don't feel like I need to explain at this point,
9  it's taken me some time to decide what to do with respect to
10  appointment of a fee auditor.

11             And I've determined recently to change my mind and to
12  appoint Warren Smith as the fee auditor in this case.  But
13  because of my previous statements, I just wanted to explain
14  that to the parties on the record today, and to see whether
15  anyone had any objection to that?
16                          (Pause)
17             MR. POWER:  Your Honor, I think he was in the first
18  round of names --
19             THE COURT:  He was.
20             MR. POWER:  Yeah, that we -- yes, we have no
21  objection, Your Honor.
22             MR. MERCHANT:  Neither do the debtors.
23             THE COURT:  All right.  Thank you.  Then what I
24  intend to do is phone Mr. Smith and let him know he should be
25  in contact with debtors' counsel to formulate a form of order

1  for his appointment.

2          MR. MERCHANT:  Okay, Your Honor.

3          THE COURT:  Okay.  Anything further for today?

4          MR. MERCHANT:  I don't think so.

5          THE COURT:  Thank you.  That concludes this hearing.

6  Court is adjourned.

7          MULTIPLE SPEAKERS:  Thank you, Your Honor.

8              (Proceedings Adjourn at 4:11 P.M.)

9

10

11                  **C E R T I F I C A T I O N**

12

13          I, Karen Hartmann, certify that the foregoing is a

14  correct transcript to the best of my ability, from the

15  electronic sound recording of the proceedings in the above-

16  entitled matter.

17

18   /s/  *Karen Hartmann*                    Date:  September 13, 2007

19  TRANSCRIPTS PLUS

20

21

22

23

24

25