# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: DELPHI CORPORATION
SECURITIES, DERIVATIVE &
"ERISA" LITIGATION

_____/

MDL No. 1725
Master Case No. 05-md-1725
Hon. Gerald E. Rosen

This Opinion and Order
Relates to 06-10026

OPINION AND ORDER REGARDING
LEAD PLAINTIFFS' MOTION FOR PARTIAL
MODIFICATION OF PSLRA DISCOVERY STAY

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 15, 2007_____

PRESENT: Honorable Gerald E. Rosen
United States District Judge

I. INTRODUCTION

This matter is presently before the Court on the Motion filed by the Securities Fraud Lead Plaintiffs to lift the PSLRA's discovery stay to allow them to obtain, through discovery, copies of certain documents that Delphi Corporation and certain other named Defendants and third-parties have already produced to federal authorities and others in connection with investigations conducted by Delphi, the SEC, the Department of Justice, the FBI and the U.S. Postal Inspectors. The Defendants have responded and oppose this Motion, and the Lead Plaintiffs have replied.

Having reviewed and considered the parties' briefs and the applicable law, the

Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

On March 3, 2005, Delphi Corporation, one of the largest suppliers of automotive parts in the world, announced the findings of a six-month long internal investigation which revealed accounting improprieties dating back to Delphi's birth as an independent publicly traded company and warned investors that its financial statements for 2001 and beyond were unreliable. Thereafter, on June 30, 2005, the Company restated five years of financial statements -- all of the financial statements it had issued since becoming a public company. Delphi's revelations rocked the U.S. automotive industry and its investors, and ultimately led to the Company filing for bankruptcy.

Within days of Delphi's announcement of the findings of its internal investigation, Delphi investors commenced litigation. The first Delphi securities fraud class action complaint was filed in Southern District of New York on March 7, 2005. Six more securities fraud complaints were filed in the Southern District of New York on March 8, 10, 15, 29, April 1 and May 6, 2005. These complaints were subsequently consolidated and the consolidated action was re-titled "*In re Delphi Corp. Securities Litigation.*"[1]

---

[1] Additional securities fraud actions were also filed in the Southern District of Florida and the Eastern District of Michigan. The plaintiffs in the Michigan cases subsequently voluntarily dismissed their complaints, opting instead to prosecute their securities claims in the consolidated New York action. All of the securities fraud cases

Thereafter, on September 30, 2005, the Lead Plaintiffs filed a Consolidated Class Action Securities Fraud Complaint against Delphi, certain officers and directors, Delphi's auditors and underwriters, and several outside parties. It was barely a week later, on October 8, 2005, when Delphi and substantially all of its active U.S. subsidiaries, filed for Chapter 11 bankruptcy.[2]

At the same time that Delphi was conducting its internal investigation, the United States Securities and Exchange Commission was conducting its own investigation into certain Delphi transactions. In connection with its investigation, the SEC subpoenaed records from Delphi, its former parent, General Motors, and several current and former Delphi executives and mid-level employees. Several Delphi executives were also subpoenaed to appear and testify before the Commission. The FBI, the U.S. Postal Inspector and the Department of Justice also launched criminal investigations into the conduct at issue in this litigation.

According to media reports of these various investigations, Delphi produced "hundreds of thousands of pages" of records to the federal agencies,[3] and SEC

---

were subsequently consolidated with ERISA class actions and derivative actions also arising out of the Delphi accounting improprieties and transferred to this Court by the Judicial Panel on Multi-District Litigation.

[2] Lead Plaintiffs are creditors, equity holders and parties-in-interest in the bankruptcy proceeding.

[3] Delphi, Delphi employees, GM, EDS, Bank One, Deloitte & Touche and BBK all produced documents to the SEC and the FBI pursuant to the federal investigations.

investigators and the FBI conducted "more than a dozen interviews with current and former [Delphi] employees." See "Feds Expand Delphi Probe," The Detroit News, David Shepardson, June 30, 2005.

The SEC investigation culminated in the filing of a civil action on October 30, 2006 against Delphi, nine of its former executives, and four employees of outside firms for their alleged involvement in Delphi's accounting fraud. See SEC v. Delphi Corporation, E.D. Mich. No. 06-14891.[4] Many of the defendants in the SEC action are also named as Defendants in the instant action. Consent judgments have since been entered in the SEC case against Delphi and six of the charged individuals, including at least two of the named Defendants in this action.[5] However, as to a number of other individuals who are named as defendants in both the SEC case and the instant action -- notably J.T. Battenberg, III, Delphi's former president, CEO and chairman of the board of directors; Paul Free, former chief accounting officer and controller of the Company; and John Blahnik, former company treasurer and vice president of treasury -- the SEC case is still ongoing.[6] (A few of the individuals named as defendants in the SEC action have not

---

[4] No criminal charges have yet been brought against any of the parties.

[5] In addition to agreeing to a permanent injunction, Defendant Alan Dawes, Delphi's former vice chairman and CFO, consented to a Judgment against him for $687,000. Defendant B.N. Bahadur founder, sole owner and principal of Defendant BBK, Ltd., consented to a Judgment against him in the amount of $569,257.

[6] On November 22, 2006, Delphi filed a motion in the bankruptcy action requesting the bankruptcy court to authorize its decision to not advance legal fees and costs to certain former Delphi officers, including Paul Free and John Blahnik, stating that

4

yet been served with process. Presumably, once all defendants are served, discovery will commence in the case.)[7]

Meanwhile, early on in the bankruptcy action, on November 15, 2005, the Lead Plaintiffs in the instant action filed a Motion for a Limited Modification of the Automatic Bankruptcy Stay. In that motion, Lead Plaintiffs sought permission to obtain from Delphi copies of all documents and materials that the Company produced or provided to its internal investigators, the DOJ and the SEC. The Bankruptcy Court refused to grant the relief requested.[8]

Although Lead Plaintiffs have been denied discovery in the bankruptcy proceeding, the Unsecured Creditors Committee (the "UCC") was provided access to the records Lead Plaintiffs had requested. On March 29, 2006, Delphi agreed to provide the UCC with the documents the Company produced to the SEC, the DOJ and the U.S.

---

"it could not in good faith pay advancements to former employees whose actions the Audit Committee found were linked to the [financial] restatement and all related negative consequences."

[7] With respect to the criminal investigations, although media reports indicated that the U.S. Attorney would decide whether to file criminal charges by January 2007, no action has yet been taken in this regard.

[8] Judge Drain, instead, directed Lead Plaintiffs to first seek relief from the PSLRA stay in this Court, and stated that if this Court granted Lead Plaintiffs relief from the PSLRA stay, they could then return to the Bankruptcy Court and renew their motion to lift the bankruptcy stay. See Order Modifying Automatic Stay, Lead Plaintiffs' Ex. E.

Postal Inspector.[9] After reviewing those records, on July 27, 2006, the UCC filed a Motion in the bankruptcy court for an order authorizing the Committee to prosecute claims against General Motors and certain of Delphi's former officers, i.e., some of the same individuals named as Defendants in this action. In its Motion, the UCC confirmed that

> In researching and preparing the [proposed adversary] Complaint,[10] the Committee used, and the Complaint and Demand Letter contain, information produced by the Debtors [i.e., Delphi and its subsidiaries] relating to ongoing investigations of the Debtors including investigations by the Securities and Exchange Commission.

See S.D.N.Y. Bankr. Ct. No. 05-44481, 7/27/06 Ex-Parte Motion of the Official Committee of Unsecured Creditors, ¶ 5.[11]

In the Affidavit filed in support of its Motion, counsel for the UCC stated that one reason the Committee filed its motion is because extensive settlement negotiations are currently taking place between GM and Delphi, and the Unsecured Creditors want a "seat at the table in negotiations." See Affidavit of Mark A. Broude, counsel for the UCC, ¶

---

[9] According to the Affidavit of Mark A. Broude, counsel for the UCC, Delphi provided the Committee with the information pursuant to a confidentiality agreement. See Broude Affidavit, ¶ 6.

[10] The adversary complaint was submitted to the bankruptcy court under seal.

[11] On September 5, 2006, Delphi's Equity Committee filed an objection to the UCC's motion. In its objection Delphi's Equity Committee stated that it, too, had received access to the same documents that Delphi produced to the UCC.

5.[12]

Based upon the foregoing developments, Lead Plaintiffs now ask the Court to lift the PSLRA discovery stay for the limited purpose of allowing them (1) to serve Defendants (other than Delphi) and certain third parties with discovery requests and (2) to return to Judge Drain in the bankruptcy proceeding to seek permission to serve Delphi with discovery requests to produce the following evidence that has already been produced to federal authorities:

    a.    A copy of all documents produced in conjunction with the internal investigation conducted by the Delphi Audit Committee of its Board of Directors, represented by Wilmer Cutler, outside counsel, and PriceWaterhouseCooper, forensic accountants, including, but not limited to (a) all e-mails and any other documents gathered and/or produced during the course of this investigation; and (b) all documents relating to Delphi's Restatement of June 30, 2005; [and]

    b.    A copy of all documents produced in conjunction with the SEC, U.S. Postal Inspectors, DOJ and/or FBI investigations, including but not limited to: (a) records turned over to federal authorities by GM relating to transactions with Delphi; (b) the results of Delphi's internal investigation turned over to the SEC in June 2005; (c) the database created by Delphi containing more than a million company e-mails, created by "imaging" or copying the hard drives of computes of top executives; (d) the results of the searches of the

---

[12] Earlier in the bankruptcy proceeding, Delphi filed a Motion to Implement a Key Employee Compensation Program ("KECP"). Lead Plaintiffs objected to that Motion. In conjunction with the KECP Objection, Delphi requested documents from Lead Plaintiffs going to Lead Plaintiffs' securities fraud claims, and Lead Plaintiffs complied by producing all non-privileged documents sought by Delphi. However, when Lead Plaintiffs in turn put the identical requests to Delphi, the Company invoked the PSLRA discovery stay.

aforementioned database for specific phrases, including, but not limited to searches for the terms "fraud" and "accounting" or "jail" and "accounting"; (e) any other records produced by Delphi or any present or former Delphi employee to federal authorities; (f) documents produced in connection with and leading up to the DOJ's issuance of a "target letter" to a former mid-level Delphi executive, meaning that the government has "substantial evidence" linking him or her to the commission of a crime; (g) records produced by EDS either voluntarily or pursuant to a subpoena by the SEC for records connected to a rebate transaction between EDS and Delphi; and (h) any and all documents produced by GM, EDS, BBK, Deloitte & Touche, and Bank One to federal authorities.[13]

### III. DISCUSSION

A.   THE PSLRA DISCOVERY STAY

The PSLRA provides for a stay of discovery during the pendency of any motion to dismiss a private securities fraud action:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u-4(b)(3)(B).

---

[13] Lead Plaintiffs also requested "any and all documents previously or to be produced in the consolidated ERISA Actions pending in this Court." The Court notes, however, that on the same date that Lead Plaintiffs filed their Motion for Relief from the PSLRA Discovery Stay, Defendants (with the exception of Delphi, against whom the action is stayed pursuant to the Bankruptcy Code) reached an agreement with the ERISA Lead Plaintiffs to stay all discovery in the ERISA action during the pendency of the motions to dismiss, allowing only for the informal provision of a very limited set of ERISA plan-specific documents. [See Memorandum of Law filed by Delphi and Certain Delphi Officer and Director Defendants, p. 4.]

The legislative history of the PSLRA indicates that Congress enacted the discovery stay to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that the corporate defendants will settle those actions rather than bear the high costs of discovery, *see* H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 736, or that the plaintiffs will find during discovery some sustainable claim not alleged in the complaint, *see* S. Rep. No. 104-98 at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 693. *See also In re Worldcom, Inc. Securities Litigation*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (noting that the rationale underlying the PSLRA's discovery stay is to prevent plaintiffs from filing a complaint to initiate a "fishing expedition" in search of sustainable claims and to prevent plaintiffs from forcing defendants to settle an otherwise frivolous class action.)

As the House and Senate managers noted in their Joint Explanatory Statement of the Committee of Conference:

> The cost of discovery often forces innocent parties to settle frivolous securities class actions. According to the general counsel of an investment bank, "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." In addition, the threat that the time of key employees will be spent responding to discovery requests, including providing deposition testimony, often forces coercive settlements.

1995 U.S.C.C.A.N. at 736.

Congress, however, did not impose an absolute stay on discovery. Rather, it expressly provided courts with discretion to allow limited discovery during the stay "upon the motion of any party that particularized discovery is necessary to preserve

evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). Lead Plaintiffs maintain that their request meets the requirements of the statutory stay's exception.

B.   PARTICULARITY

As an initial matter, the Court must determine whether the limited discovery sought by Lead Plaintiffs is sufficiently particularized. Lead Plaintiffs contend that they meet this requirement because they seek only "the closed universe of materials that Delphi and third parties have already assembled and produced to other entities in the course of the ongoing investigations." [Plaintiffs' Brief at 16.] Defendants counter that the particularity requirement is not met here because the request sweeps too broadly and targets "a voluminous set of privileged and non-privileged materials." [Certain Defendants' Brief at 15.]

These arguments are substantially similar to the arguments of the parties in *In re Ahold, N.V. Securities & ERISA Litig.*, 220 F.R.D. 246 (D. Md. 2004). In that case the plaintiffs argued that a request for documents previously produced in connection with internal and external investigations was particularlized within the meaning of the PSLRA. The defendants countered that a set of documents consisting of more than one million pages is not "particularized" simply because it is "identifiable." The Court found no merit in the defendants' argument:

> [I]f "particularlized" is not synonymous with "identifiable," neither does it necessarily mean "small." The meaning of the phrase in any particular case

>   must take into account the nature of the underlying litigation, and in this case the complaint alone extends for 430 pages and alleges multibillion dollar accounting errors by a firm with operations on at least four continents. The volume of requested documents is not unreasonable in light of this background. Moreover, unlike cases rejecting virtually unlimited discovery requests, the motion at issue here describes a "clearly defined universe of documents," and the burden of producing the materials should be slight, considering that the defendants have previously produced them to other entities.[14] Thus, under the circumstances, the plaintiffs' request satisfies the threshold requirement of particularity.

220 F.R.D. at 250 (citations omitted).

Similarly, in *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp.2d 301 (S.D.N.Y. 2002), the court was satisfied that the lead plaintiffs' requested discovery was sufficiently particularized where, as in this case, the plaintiffs sought to obtain copies of certain documents and materials which Worldcom had produced to the U.S. House of Representatives Committee on Energy and Commerce, the House Committee on Financial Services, the DOJ, and the SEC, as well as documents and materials that WorldCom had produced to counsel representing its internal Special Investigative Committee. *Id.* at 302. The court found that, because the plaintiffs' request "involve[d] a clearly defined universe of documents," and because the plaintiffs "[were] not in any sense engaged in a fishing expedition or an abusive strike suit and . . . thereby not act[ing] in contravention of the fundamental rationales underlying the PSLRA discovery

---

[14] Although the court recognized in a footnote that the defendants might need to review the documents for privilege, it rejected the defendants' argument of undue burden because "the larger task of compiling the materials should already be complete." 220 F.R.D. at 250 n. 11.

11

stay... the defendants [could] not call upon the ambiguous notion of 'particularlized' discovery to bend Section 78u-4(b)(3)(B) to a purpose for which it was not intended." *Id.* at 306. *See also In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2002 WL 31845114 (S.D. Tex. 2002) (Particularity requirement met where plaintiff sought production of "all documents and materials produced by [Enron] related to any inquiry or investigation by any legislative branch committee, the executive branch, including the Department of Justice and the Securities and Exchange Commission, and all transcripts of witness interviews and or depositions related to those inquiries.")

As in the above cases, Lead Plaintiffs' request here is sufficiently particularized to satisfy the PSLRA's requirement. As the court in *In re Royal Ahold* noted, the meaning of "particularized" in any specific case must "take into account the nature of the underlying litigation." 220 F.R.D. at 250. Here, the Lead Plaintiffs' Consolidated Class Action Complaint is more than 250 pages long and alleges hundreds of millions of dollars worth of sham transactions and accounting irregularities which inflicted billions of dollars of losses on investors. The fraud was allegedly perpetrated by Delphi, six of its officers, 15 members of the Company's board of directors, the Company's outside auditors, and three "third-party" defendants who allegedly participated in transactions with Delphi that were intended to manipulate the Company's financial statements. The alleged fraudulent activities span a period of more than five years. Given the breadth of these allegations, the volume of requested documents is not unreasonable.

Furthermore, Lead Plaintiffs have adequately specified the target of the requested discovery: They only request the production of materials that have already been assembled and produced to Delphi's internal investigators and the federal authorities. Under these circumstances, the Court finds that Lead Plaintiffs' request satisfies the particularity requirement.

C.  NECESSARY TO PRESERVE EVIDENCE OR TO PREVENT UNDUE PREJUDICE

Once the particularity requirement is satisfied, the Court must then determine whether the requested discovery "is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).

1.  The Relief Requested by Lead Plaintiffs Is Not Necessary to Preserve Evidence

Lead Plaintiffs first argue that the corporate reorganization that Delphi is undertaking through its bankruptcy filing, coupled with the departure of several key executives from the Company, creates a reasonable concern that documents may be lost.[15] Therefore, they argue that the discovery they have requested is necessary to preserve evidence. The Court is not persuaded by this argument. Such speculative allegations of possible loss of documents is wholly insufficient to justify lifting the PSLRA stay. *See e.g., Sarantakis v. Gruttaduaria*, 2002 WL 1803750 at *2 (N.D. Ill. 2005) (plaintiff must

---

[15] This argument, of course, does not apply to Lead Plaintiffs' request for production of documents produced to federal authorities by GM, EDS, BBK, Deloitte & Touche, and Bank One.

13

present more than "mere generalizations of fading memories and allegations of possible loss or destruction" of documents to lift PSLRA stay); *In re CFS-Related Sec. Fraud Litig.*, 179 F. Supp. 2d 1260, 1265 (N.D. Okla. 2001) (denying request to lift PSLRA stay noting that "during any stay of discovery recollections fade and the risk of inadvertent loss of evidence is marginally increased."); *Selbst v. McDonald Corp.*, 2006 WL 566450 at *3 (N.D. Ill. 2006) ("To lift the PSLRA stay based on such generalized concerns would open a loophole in the stay that would undermine the statutory scheme enacted by Congress.")

Furthermore, Lead Plaintiffs have failed to show any ongoing record keeping violations, nor have they demonstrated that any relevant existing records are at risk of being destroyed. Plaintiffs are "required to make a specific showing that the loss of evidence is imminent as opposed to merely speculative." *Sarantakis, supra.* Indeed, because Plaintiffs seek documents that have already been produced and are in the custody of the federal authorities, "the risk that evidence will be lost is negligible," at best. *In re Lantronix, Inc. Sec. Litig.*, 2003 WL 22462393 at *1 (C.D. Calif. 2003).

2.  Undue Prejudice

The Court, however, is persuaded by Lead Plaintiffs' undue prejudice argument. "Undue prejudice" has been defined as "improper or unfair treatment rising to a level somewhat less than irreparable harm." *See Faulkner v. Verizon Communications, Inc.*, 156 F. Supp. 2d 384, 404-405 (S.D.N.Y. 2001); *see also In re CFS-Related Sec. Fraud*

*Litig., supra*, 179 F. Supp. 2d at 1265. Lead Plaintiffs here argue that without discovery of documents already made available to other litigants and the federal authorities, they will be unfairly disadvantaged in pursuing litigation and settlement strategies.

Courts that have addressed whether the PSLRA allows for a partial lift of the discovery stay when the material sought have already been disclosed to government agencies have reached contrary conclusions. *Compare In re WorldCom, supra; In re Enron, supra; In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541 (N.D. Ohio 2004); *Singer v. Nicor, Inc.*, 2003 WL 22013905 (N.D. Ill. 2003) (all partially lifting discovery stay when documents had already been given to governmental entities) with *In re AOL Time Warner, Inc. Sec. Litig.*, 2003 WL 21729842 (S.D.N.Y. 2003); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 129 (S.D.N.Y. 2003); *In re Fannie Mae Sec. Litig.*, 362 F. Supp. 2d 37 (D.D.C. 2005); *In re Lantronix, supra* (all declining to lift discovery stay although documents had already been given to governmental entities).

In *In re WorldCom*, a case upon which Lead Plaintiffs here heavily rely, the court found that a partial lifting of the discovery stay was warranted because the lead plaintiff

> would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape. It would essentially be the only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings.

234 F. Supp. 2d at 305. *See also In re FirstEnergy, supra*, 229 F.R.D. at 545 (holding that "[w]ithout discovery of documents already made available to government entities,

15

Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement strategies."); *In re Enron, supra* (granting motion for partial relief from the PSLRA stay to allow discovery of documents already made available to and reviewed by numerous governmental entities and others noting that the PSLRA stay "was not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case." 2002 WL 31845114 at *1.)

Defendants, by contrast, argue that Plaintiffs will suffer no prejudice because no settlement of this case is imminent. This was the basis for the courts' refusal to lift the stays in *In re AOL Time Warner* and *In re Vivendi*. Defendants, however, overlook the fact that settlements have already occurred in the SEC case and settlement discussions are ongoing in the bankruptcy action. It was precisely because the defendants in *Enron* and *WorldCom* were bankrupt and subject to other civil lawsuits that a partial lifting of the PSLRA stay was necessary "to prevent the securities plaintiffs from being left with nothing if their litigation did not keep pace with the bankruptcy and other proceedings." *See Singer v. Nicor, Inc., supra*, 2003 WL 22013905 at *2.

Lead Plaintiffs here, too, face "being left with nothing" if this litigation does not keep pace with the bankruptcy and the SEC action. Given that several of the Defendants in this case have already consented to substantial money judgments in the SEC case, Lead Plaintiffs here already face the prospect that they may not be able to recover from those Defendants in this action because of the substantial consent judgments they have

taken in the SEC case. Furthermore, in the bankruptcy action, the Unsecured Creditors Committee and Delphi's Equity Committee -- two groups of claimants who are vying for substantially the same pool of funds as our Lead Plaintiffs and the Class they represent -- have already been given copies of the same records which Lead Plaintiffs seek in this action. Armed with those documents, the UCC intends to press for participation in the settlement negotiations which have already begun between Delphi and GM. Lead Plaintiffs, however, are not being given the same opportunity in this case. As the court found in *WorldCom*, under these circumstances, the Class that Lead Plaintiffs represent "faces the very real risk that it will be left to pursue its action against defendants who no longer have anything or at least as much to offer." *In re WorldCom*, 234 F. Supp. 2d at 306.

Based upon the foregoing, the Court finds that Lead Plaintiffs have adequately demonstrated that the discovery they are seeking is necessary to prevent undue prejudice. Without discovery of documents already made available to federal authorities and to interested parties in the Delphi bankruptcy action, Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement strategy. Furthermore, maintaining the discovery stay as to materials already provided to the federal authorities and to the Unsecured Creditors Committee does not further the policies behind the PSLRA. As indicated above, in enacting the PSLRA stay, Congress was motivated by a belief that "the cost of discovery often forces innocent parties to settle frivolous securities class

actions." See H.R. Conf. Rep. No. 104-369, *supra*, at 37. The fact that the SEC brought an action predicated upon the very same accounting irregularities alleged in the Consolidated Class Action Complaint and named as defendants in that action many of the same Delphi officers and directors and third parties named in this suit, coupled with the fact that Defendants are consenting to judgment in that action, demonstrates that this is not a "frivolous securities class action" brought against innocent parties.[16]

## CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Lead Plaintiffs' request for a partial modification of the discovery stay. Subject to any claims of privilege or attorney work-product,[17] Lead Plaintiffs may obtain discovery (1) from the named Defendants and

---

[16] Although the Court finds that this is not a "frivolous" securities class action, this should not be viewed as reflecting any view of the Court as to the merits of Defendants' Motions to Dismiss.

[17] As indicated by the Court at the February 8, 2006 Status Conference, as to any documents upon which there is a claim of privilege, Defendants shall submit to the Court and opposing counsel, a privilege log, along with a description to the Court of all material issues upon which the privilege is claimed that are contained in the document. Defendants shall also produce for *in camera* inspection along with the description in the privilege log copies of the documents themselves or of relevant portions of the documents. [*See* 2/8/06 Tr. pp. 56-57.]

Before proceeding with this ponderous and time-consuming process, however, the Court urges the parties themselves to alleviate -- or at least mitigate -- any privilege concerns by utilizing any, or all, of the various techniques suggested in the recent amendments to the Federal Rules of Civil Procedure, including a "sneak-peek" (or "quick-peek") preview protocol and "claw back agreements," (*see* Fed. R. Civ. P. 26 Advisory Committee Note, 2006 Amendment to Subdivision (f)), and the procedure set forth in new Rule 26(b)(5)(B).

third-parties GM and EDS, limited to materials already produced to the SEC, DOJ, FBI, and U.S. Postal Inspector; and (2) of materials produced by any of the Defendants in conjunction with the internal investigation conducted by the Delphi Audit Committee of its Board of Directors, represented by Wilmer Cutler, outside counsel, and PriceWaterhouseCooper, forensic accountants.

        s/Gerald E. Rosen
        Gerald E. Rosen
        United States District Judge

Dated: February 15, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 15, 2007, by electronic and/or ordinary mail.

        s/LaShawn R. Saulsberry
        Case Manager