IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Re: Dkt. No. 2566 |
| | : | |

Hearing Date: 10/23/07 at 1:30 p.m..

### DEBTORS' SUPPLEMENT TO "MOTION FOR ADDITIONAL SANCTIONS AGAINST POSITIVE SOFTWARE SOLUTIONS, INC. FOR FURTHER VIOLATION OF THE AUTOMATIC STAY"

The above-captioned debtors and debtors-in-possession (the "Debtors" or "New Century") hereby supplement (the "Supplement") their motion (the "Motion") for additional sanctions against Positive Software Solutions, Inc. ("Positive Software"). In support of thereof, the Debtors respectfully represent as follows.

### INTRODUCTION

1.     At the September 11, 2007 hearing on the Motion (the "Hearing"), the Court stated that "[t]his presents a situation in which procedurally ... I'm not convinced has been teed up for the relief that the debtor wants to have." See Tr. at 101. The Debtors understood this

---

[1]  The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (Okla. JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L. P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp , a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

comment to mean that, in their Motion, the Debtors only asked the Court to find that the automatic stay applied by its own terms and was violated by Positive Software, and did not ask for alternative relief of the Court extending the stay, should it find that the stay did not apply by its own terms. The Debtors continue to believe that the automatic stay of Section 362(a) applies and has been violated by Positive Software. However, so that the record is clear, the Debtors do request that, in the alternative, the Court extend the stay to cover each and every defendant named in the New Complaint.[2]

2.    At the Hearing, Positive Software suggested that extending the stay would be unnecessary because the main prejudice that the Debtors had noted up to that point -- that if the New Complaint were prosecuted, findings of fact and conclusions of law could be used against the Debtors even though they were not present -- would be mooted by Positive Software's unilateral agreement not to use such findings against the Debtors. This Supplement will demonstrate that Positive Software's offer does not stem the harm that will befall the Debtors if the New Complaint is prosecuted.

## ARGUMENT

## I.    The Debtors Seek the Alternative Relief of Extension of the Stay.

3.    The Debtors continue to contend that the New Complaint is such a transparent end run around this Court's order on the Cross Motion that the New Complaint itself violates the automatic stay and subjects Positive Software to further sanctions. Indeed, the New Complaint seeks actual findings against the Debtors no less than five times. Positive Software refuses to amend its New Complaint to remove these allegations; it only promises the Court that it

---

[2] Capitalized terms not otherwise defined herein are intended to have the meaning set forth in the Motion.

2

will not use such findings against the Debtors in later litigation. This does not vitiate the stay violation in seeking findings against Debtors.

4.      However, should the Court disagree, then the Debtors request the alternative relief of extending the stay to cover all defendants named in the New Complaint, essentially closing the "loophole" that Positive Software believes that it has found in filing a new suit which names everyone except the Debtors. As set forth in Section II below, extending the stay is the only other relief (besides granting sanctions for violation of the stay) that will rectify the harm that will be caused to the Debtors if Positive Software's New Complaint goes forward.

5.      This Court and the Delaware District Court have extended the automatic stay numerous times to cover a debtor's directors and officers (the former positions held by three of the defendants named in the New Complaint) or others with a close relationship with the Debtors. See, e.g., American Film Technologies, Inc. v. Taritero (In re American Film Technologies, Inc.), 175 B.R. 847 (Bankr. D. Del. 1994); Gillman v. Continental Airlines, Inc. (In re Continental Airlines), 177 B.R. 475 (D. Del. 1993); In re Cveo Corp., 2002 WL 32332005 (Bankr. D. Del. Feb. 8, 2002); PHP Healthcare Corp. v. HIP Found., Inc. (In re PHP), Adv. No. A99-18 (MFW) (Bankr. D. Del. Mar. 31, 1999); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 2004 WL 954772 (Bankr. D. Del. 2004) ("Chakarian I"); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 315 B.R. 353 (Bankr. D. Del. 2004) ("Chakarian II"); Williams v. Reliance Acceptance Corp. (In re Reliance Acceptance Group, Inc.), 2000 WL 33712305 (Bankr. D. Del. Dec. 6, 2000) (staying suit against debtor's insurer). See also Loewen Group Int'l v. Gilligan, 2001 WL 1819995 (Bankr. D. Del. 2001)(denying motion to dismiss a complaint for an injunction extending the automatic stay). Even the Third Circuit Court of Appeals has weighed in

on the issue (albeit in a slightly different procedural context)[3] and supported the concept of extending the stay to co-defendants on grounds very similar to those set forth below. Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.), 115 Fed. Appx. 565 (3d Cir. 2004)

6.    While these cases and others look to a variety of factors in determining whether to extend the stay, their touchstone is whether continuation of the litigation against the non-debtors would adversely impact the Debtors' estates. As set forth below, that is precisely the case here. Indeed, the Debtors would be no less harmed if the New Complaint goes forward against their own lawyers as well as their co-defendants in the original suit against the Debtors (the "Original Suit") than if the stay were to be lifted on the Original Suit altogether -- which the Court already has held it should not be.

## II.    Positive Software's Offer on Collateral Estoppel is Insufficient.

### A.    This Court Routinely Stays Cases Against Non-Debtors Due to the Collateral Estoppel Risk to the Debtors.

7.    At the Hearing, Positive Software attempted to blunt the Debtors' argument that the New Complaint violated the stay in expressly seeking findings against the Debtors. Positive Software's offer was to refrain from using any finding made by the Texas District Court in litigation involving the New Complaint (the "2007 Litigation") against the Debtors, either in this Court or in the Original Suit. Undoubtedly, it made this offer because this District has a long history of extending the stay where permitting a case to go forward against other defendants, while the case is automatically stayed against the debtor, risks an adverse holding against the non-debtor defendants that could be the basis of a finding of collateral estoppel, vicarious liability or *respondeat superior* in subsequent proceedings against the debtor. See, e.g., American Film

---

[3] Gerard involved an application to lift an injunction that already had been granted, so the burden of proof was on the movant rather than the debtor. Other than that procedural wrinkle, it presents the same issue as the remaining cases cited in this Supplement.

4

Technologies, 175 B.R. at 850 (citing collateral estoppel and vicarious liability as grounds for enjoining state court action against the debtor's officers and directors); Loewen Group Int'l., 2001 WL 1819995, at *4 ("[e]xpanding the scope of the automatic stay is warranted in 'unusual circumstances' where collateral estoppel may prevent a corporate debtor from re-litigating issues determined against its employees and agents in a prior suit if the corporate debtor is found to be a controlling party"). What is important is the possibility that collateral estoppel or related theories might be invoked; the debtor need not prove that, in fact, it would be collaterally estopped by an adverse judgment against the other defendants. See, e.g., Gerard, 115 Fed. Appx. at 569 (confirming that "Plaintiff's counsel's theory that under a principal/agent analysis the absence of Grace [the debtor] would protect it from collateral estoppel should not be tested, at Grace's peril. It is more supposition than certainty at this juncture"). This concern is heightened by this Court's recent opinion in Kaiser Group Int'l v. Nova Hut a.s. (In re Kaiser Group Int'l), 2007 WL 2681713 (Bankr. D. Del. Sept. 7, 2007). In Kaiser Group, this Court held that a case proceeding against a non-debtor could be collateral estoppel against a debtor, even though the debtor was not a party, if the debtor and non-debtor were in privity.

8.      Positive Software's promise not to use actual finding against the Debtors (even though it expressly continues to seek such findings) does not solve the problem. No matter what Positive Software agrees, it is less than clear whether the Texas District Court would be bound by such an agreement; it might have the duty to rule *sua sponte* that collateral estoppel applies, just as it would on questions of subject matter jurisdiction. This risk "should not be tested, at [the Debtor's] peril". Gerard, 115 Fed. Appx. at 569.

5

9.      Moreover, as set forth in the remainder of this Supplement, the risk of collateral estoppel is not the only adverse consequence that the Debtors face if the 2007 Litigation proceeds, and it should be halted on these other grounds as well.

**B.      The Debtors Would Be Unable to Control the Attorney Client Privilege**.

10.      In a nutshell, the New Complaint concerns an alleged conspiracy between Susman and the Debtors and/or former officers of the Debtors (acting *qua* officers) to commit perjury, illicitly withhold documents from discovery, and otherwise "cheat" in the Arbitration. It is beyond dispute that a significant percentage of the documents that Positive Software will seek in discovery to prove these theories are communications between attorney and client. At the Debtors' direction, and since the Debtors hold the privilege, Susman will withhold these documents on the basis of the attorney client privilege. Positive Software has informed the Debtors that it will move to compel production on grounds of, *inter alia*, the "crime/fraud" exception to the attorney client privilege.

11.      It is hornbook law that the attorney client privilege belongs to the client, not to the lawyer. See, e.g., Haines v. Liggett Group, Inc., 975 F.2d 81, 90 (3d Cir. 1992); In re Impounded Case (Law Firm), 879 F.2d 1211, 1213 (3d Cir. 1989); Klitzman, Klitzman & Gallagher v. Krut, 744 F.2d 955, 960 (3d Cir. 1984). It is patently unfair and prejudicial to the Debtors to have disputes over the attorney client privilege -- including serious allegations like the crime/fraud exception -- tried in the 2007 Litigation, where the Debtors will not be present and will not be able to protect their own privilege.

12.      The Debtors expect Positive Software to argue that the Debtors will not be prejudiced by any adverse privilege ruling because Positive Software will stipulate that any findings made by the Texas District Court on privilege issues shall not be used against the Debtors

in subsequent proceedings. Any such stipulation is insufficient. First, since the *sine qua non* of attorney client privilege is the intent to keep the communication confidential (see Teleglobe Communications Corp. v. BCE, Inc. (In re Teleglobe Comm. Corp.), 493 F.3d 345, 361 (3d Cir. 2007) ("A communication is only privileged if it is made "in confidence.")), if production is mandated in the 2007 Litigation and Positive Software actually obtains the documents, it is far from clear that the Debtors would be able to claim privilege in the Original Suit even if Positive Software did *not* attempt to argue collateral estoppel.

13.    Perhaps more importantly, at the point of disclosure of privileged documents, "the cat is ... out of the bag." Kelly v. Ford Motor Co. (In re Ford Motor Co.), 110 F.3d 954, 964 (3d Cir. 1997). Thus, in a similar context, the Third Circuit has held that a party that loses a motion to compel production of privileged documents has the right to an immediate appeal under the "collateral order doctrine", because appellate review after trial would be ineffective once the litigation adversary already has viewed the privileged documents:

> [O]nce putatively protected material is disclosed, the very "right sought to be protected" has been destroyed. Bogosian, 738 F.2d at 591. That is so because, as we noted previously, underlying the attorney-client privilege is the policy of encouraging full and frank communications between an attorney and client, without the fear of disclosure, so as to aid in the administration of justice. See, e.g., Westinghouse, 951 F.2d at 1423

Id. at 963.

14.    Here, the issue would not be appellate review but something very similar -- review a second time by the same District Court in Texas, allegedly without considering collateral estoppel, of a ruling that the Debtors would have played no part in shaping. Even if that second review were possible, "the cat [would be] out of the bag", the Debtors' privileged documents would already be in their litigation adversary's hands, and the "right sought to be protected" by the attorney client privilege would have "been destroyed." Id. Given that the 2007 Litigation cannot

7

proceed very far without a privilege fight, since documents over which the Debtors assert privilege will constitute a significant percentage of the documents that Positive Software will seek, the case should be stayed.

C.     **Positive Software Would Subpoena the Debtors.**

15.     Positive Software cannot seriously contend that the Debtors would not have any involvement in the 2007 Litigation.  Given the nature of the allegations -- that the Debtors conspired with Susman -- it is clear that if the case goes forward, Positive Software will seek the production of documents and deposition testimony from the Debtors.  This is not a case where the Debtors are a tangential third party to litigation; they are the centerpiece of the meritless allegations and by necessity will have to be the focus of discovery.

16.     Presumably, to obtain this discovery, Positive Software is going to be required to come back before this Court on yet another motion for relief from stay.  See In re Commercial Fin. Servs., Inc., 247 B.R. 828, 843 (Bankr. N.D. Okla. 2000) ("To the extent a party to the District Court Litigation or any other outside litigation seeks information and documents from [the debtor], the party must request, in this Court, relief from the automatic stay.").  After all, "Information and documents possessed by a corporate debtor, and intangible rights related to corporate information and documents, are property of a corporate debtor's estate [under] 11 U.S.C. § 541(a)."  Id. at 843 fn.15.  Thus, the Court is going to have to decide at some point whether to shut down Positive Software's attempt to end run the stay -- either now, or on the motion that undoubtedly would be coming soon for stay relief to serve subpoenas on the Debtors.  The Court should consider the matter now and extend the stay before the Debtors expend any efforts on discovery.  See Gerard, 115 Fed. Appx. at 569 ("At the same time that Plaintiffs asserted that Grace would not be impacted, they acknowledged that they would need discovery from Grace");

8

Reliance Acceptance Corp., 2000 WL 33712305, at *5 ("The discovery in the litigation will therefore directly implicate Reliance and interfere with its ability to conclude the consummation of its Plan"); In re Rickel Home Centers, Inc., 199 B.R. 498, 501 (Bankr. D. Del. 1996) (finding that there would be irreparable harm to the debtor absent an injunction, because the discovery would impose significant burdens on the debtor's employees and would interfere with reorganization efforts).

17.    In addition, it is very likely that the ex-officer defendants also would subpoena the Debtors, given that, as ex-officers with no further role at New Century, they are unlikely to have any of their own documents relevant to their defense and certainly do not have access to their New Century e-mail account.  Thus, it is not only the plaintiff but certain of the defendants that will focus discovery on the Debtors.  Under the holdings of Gerard, Reliance and Rickel, this further supports extending the stay.

**D.    Positive Software Will Seek The Debtors' Documents In Susman's Possession.**

18.    Positive Software also will seek discovery of documents from Susman Godfrey of documents in Susman's own possession.  Not surprisingly, since Susman was the Debtors' counsel, Susman has custody of many of the Debtors' own documents.  Thus, arguably every time Positive Software serves a document request on Susman, that document request will violate 11 U.S.C. § 362(a)(3) because it will be seeking possession of a property right of the Debtors -- the Debtors' documents.  Because this scenario is not hypothetical but inevitable, and the litigation cannot proceed without it, the Court should stay the 2007 Litigation now, rather than waiting for the stay violation to occur and putting the onus on the Debtors to monitor the case and file a sanctions motion when it does occur.

**E.    The Case against the Former D&O's Will Create Indemnification Claims and Risks Implicating the Debtors' Insurance Policies.**

19.    While Positive Software uses the rhetorical device of referring to the 2007 Litigation as the "Susman Suit", Positive Software has sued more than just Susman. It also named three individuals who are former Debtor officers and/or employees. The Debtors will be monetarily effected by litigation costs incurred by, or judgments against, the D&Os in connection with the 2007 Litigation under two separate theories -- (1) indemnification by operation of law, or (2) by and through the partial exhaustion of the Debtors' insurance.

**1.    Indemnification by Operation of Law**

20.    Pursuant to New Century's by-laws (the "By-Laws"),[4] to the maximum extent permitted under applicable state law, the Debtors must indemnify and pay/reimburse reasonable expenses to any current or former officer who is made (or threatened to be made) a party to litigation by reason of his or her service in his or her capacity as an officer. Thus, every dollar spent by the D&Os in settlement, judgment, or defense costs may either add to the pool of the Debtors' claims or be paid by the Debtors, thereby depleting their assets. In either case, the result would have a direct impact on the bankruptcy estate. As the District Court held in Continental Airlines, "[i]n the absence of insurance, Continental will be forced to shoulder these indemnity obligations itself, thereby directly impacting Continental's assets [or liabilities.]"

---

[4] The By-Laws provide, in relevant part:

> Indemnification. To the maximum extent permitted by applicable law in effect from time to time, the Corporation shall indemnify and, without requiring a preliminary determination of the ultimate entitlement to indemnification, shall pay or reimburse reasonable expenses in advance of a final disposition of a proceeding to (a) any individual who is a present or former director or officer of the Corporation and who is made a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, whether or not by or in the right of the Corporation, and whether civil, criminal, administrative, investigative or otherwise, by reason of his or her service in that capacity . . . .

See By-Laws at Article VII, ¶ 7.1.

10

RLF1-3209392-3

Continental Airlines, 177 B.R. at 481, n.5. See also Cveo Corp., 2002 WL 32332005, at *2 (threat of indemnification liability sufficient ground to enjoin suits against D&O defendants); American Film Technologies, 175 B.R. at 855 (same); Chakarian I, 2004 WL 954772, at *4 (same). The Court should prevent this result by extending the stay.

### 2.    **Proceeds of Insurance Policies**

21.    In the alternative, the Debtors' insurance policy might pay all defense costs and judgments to D&Os that otherwise would be indemnified, or under "Side B," might reimburse the Debtors for their indemnification of the D&Os.[5] The potential partial exhaustion of the policy supports extending the stay because the Debtors' insurance polices are property of the estate. In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 421 (Bankr. E.D. Pa. 1995) (proceeds of corporate liability policy are an asset of the estate); The Minoco Group of Companies v. First State Underwriters Agency of New England Reinsurance Corp. (In re The Minoco Group of Companies), 799 F.2d 517, 519 (9th Cir. 1986) (noting that the weight of authority provides that insurance contracts constitute property of the estate). Accordingly, any proceeds flowing from a policy on which the Debtors are a named insured may be subject to the automatic stay pursuant to section 362(a)(3), or an extension thereof. See A. H. Robins Co. v. Piccinin, 788 F.2d 994, 1008 (4th Cir. 1986) (injunction appropriate to effectuate section 362(a)(3) where the non-debtor co-defendants are co-insureds).

22.    The Debtors have a primary Directors, Officers and Corporate Liability/General Partners and Limited Partnership Liability Insurance Policy, Policy No. 672-43-85, as amended and modified, from time to time, with American International Specialty

---

[5] While the insurer denied coverage for the Original Suit, it did so on grounds that the tender was untimely -- a rationale that the Debtors are contesting in litigation with the insurer -- not because the type of action does not constitute a covered claim. The Debtors timely tendered the New Complaint and believe they are entitled to insurance coverage thereon.

Lines Company and AIG Domestic Claims, Inc. (the "AIG Policy"). In addition, the Debtors have several excess liability policies which "follow form" with the AIG Policy (the "Excess Policies," and collectively with the AIG Policy, the "D&O Policies").

23.     The Debtors' primary AIG Policy provides for a limit of liability of $10,000,000 (the "Liability Limit"). The Liability Limit represents aggregate[6] coverage for three types of coverage -- A, B, and C categories. Generally speaking, these categories are for D&Os directly, for New Century in the event New Century must indemnify a director or officer, as well as for New Century directly. The Liability Limit also is inclusive of defense costs. The $10 million aggregate limit is for sides A, B and C collectively.

24.     Here, any judgment, settlement, or defenses costs incurred by the D&Os would be paid from the total Liability Limit and, consequently, would reduce the total amount of insurance available to the Debtors under the AIG Policy and the Excess Policies. Any such reduction in the amount of coverage available would result in the diminution of assets of the estate -- the entity level insurance coverage -- to the detriment of the Debtors' estate and creditors. See, e.g., PHP Healthcare Corp. v. HIP Found., Inc. (In re PHP), Adv. No. A99-18 (MFW), slip op. at 7 (Bankr. D. Del. Mar. 31, 1999) (the "Actions should be stayed to prevent the dissipation of the Policy proceeds through the accrual of indemnification claims for defense costs"); A.H. Robins, 788 F.2d at 1008 (continuation of the litigation would result in a preferential dissipation of liability insurance proceeds to the detriment of other creditors); In re Circle K Corp., 121 B.R. 257, 261

---

[6] The AIG Policy provides that:

> The Limit of Liability stated in Item 4 of the Declarations is the limit of the insurer's liability for all Loss, under Coverages A and B *combined*, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable)....

See AIG Policy at ¶ 5. Additionally, the AIG Policy provides that "[d]efense costs are not payable by the insurer in addition to the limit of liability. Defense Costs are part of the loss and as such are subject to the Limit of Liability for Loss." See id.

(Bankr. D. Ariz. 1990) (continuation of litigation would diminish debtor's insurance policy proceeds and increase debtor's exposure to other litigation).

**F.      The Debtors' Management, Robbed of the Advice of Outside Counsel, Will Have to be Involved if the Case Proceeds.**

25.      This Court has often extended the stay the ground that management personnel needed for the reorganization will be distracted from that task if litigation continues. See, e.g., Continental Airlines, 177 B.R. at 481 (debtor's participation in the litigation against the D&O defendants would substantially detract from the debtor's reorganization efforts); Rickel Home Centers, Inc., 199 B.R. at 501 (continuation of a securities class action would impose significant burdens on the debtor and its employees, and would interfere with the debtor's reorganization efforts); Chakarian II, 315 B.R. at 360 ("At this juncture in its bankruptcy case [the debtor] can ill afford the time and resources required to protect its interests with respect to the MVC litigation"). See also In re Zenith Laboratories, Inc., 104 B.R. 659, 665-66 (D. N.J. 1989) (same).

26.      Here, the Debtors' shrinking in-house legal department, already strapped with, *inter alia*, the Examiner's investigation, SEC and other regulatory inquiries and the Plan process, will need to be more involved in the 2007 Litigation than for typical pre-petition litigation. Unfortunately, Positive Software's decision to sue Susman has caused interests to diverge, to a certain extent, between the Debtors and their own counsel, Susman. The Debtors have not hired new counsel yet to deal with such issues. Moreover, the cost to hire new counsel and bring them up to speed on a case that has been pending since 2003 would be expensive and further distracting to the estate's management. Thus, in-house counsel will have to deal with these issues directly. As just the tip of the iceberg, Positive Software recently requested that Susman agree to allow Positive Software's three new experts to review unspecified documents marked

13

confidential in the Original Suit. Susman did not object but contacted the Debtors for their position, because the Debtors, not Susman, were the other party to the confidentiality agreement. No outside counsel could advise the Debtors on the subject, and in-house counsel had to consider the issue itself. As the issues described *supra* play out in the 2007 Litigation (attorney client privilege, who owns documents, etc.), this will happen repeatedly.

27.    Moreover, as set forth above, inevitably if the 2007 Litigation goes forward, the Debtors will face subpoenas from both the plaintiff and defendants, requesting significant document production and a detailed privilege review. Additionally, the insurance carrier itself is likely to demand the production of documents to make a coverage determination. The Debtors cannot afford to tie up their in-house counsel on such matters, which provide no benefit to the estate, at this time.

14

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that their Motion be granted and the Court order sanctions in the amount of the Debtors attorneys fees, plus punitive damages. In the alternative, the Debtors request that the Court extend the stay to cover all defendants named in the New Complaint. The Debtors further request such other and further relief as is just and proper.

Dated: October 9, 2007
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

15

RLF1-3209392-3