UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .        Chapter 11
                              .
New Century TRS Holdings,     .
Inc., et al.,                 .
                              .
          Debtor(s).          .        Bankruptcy #07-10416 (KJC)
...........................................................
```

Wilmington, DE
October 2, 2007
1:30 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):                Suzzanne S. Uhland, Esq.
                                  O'Melveny & Myers, LLP
                                  275 Battery Street
                                  San Francisco, CA 94111

                                  Gary Tell, Esq.
                                  O'Melveny & Myers, LLP
                                  1625 Eye St., N.W.
                                  Washington, DC 20006

                                  Shannon Lowry Nagle, Esq.
                                  O'Melveny & Myers, LLP
                                  Times Square Tower
                                  7 Times Square
                                  New York, NY 10036

                                  Robert J. Stearn, Jr., Esq.
                                  Richards Layton & Finger, PA
                                  One Rodney Square
                                  Wilmington, DE 19801

```
                                    Michael J. Merchant, Esq.
                                    Richards Layton & Finger, PA
                                    One Rodney Square
                                    Wilmington, DE 19801

                                    Russell Silberglied, Esq.
                                    Richards Layton & Finger, PA
                                    One Rodney Square
                                    Wilmington, DE 19801

For The Official Committee:         Mark Indelicato, Esq.
of Unsecured Creditors              Hahn & Hessen, LLP
                                    488 Madison Ave.
                                    New York, NY 10022

                                    Bonnie Glantz Fatell, Esq.
                                    Blank Rome, LLP
                                    One Logan Sq.
                                    130 N. 18th St.
                                    Philadelphia, PA 19103

                                    Arthur Bachman, Esq.
                                    Blank Rome, LLP
                                    One Logan Sq.
                                    130 N. 18th St.
                                    Philadelphia, PA 19103

For Bank of America:                Gabriel MacConaill, Esq.
                                    Potter Anderson & Corroon, LLP
                                    Hercules Plaza
                                    1313 N. Market Street
                                    Wilmington, DE 19899

For JP Morgan Chase:                Matthew McGuire, Esq.
                                    Landis Rath & Cobb, LLP
                                    919 Market St.-Ste. 600
                                    Wilmington, DE 19801

For Wells Fargo &:                  Christopher Ward, Esq.
Goldman Sachs                       Klehr Harrison Harvey Branzburg
                                    & Ellers, LLP
                                    Mellon Bank Center
                                    919 Market St.-Ste. 1000
                                    Wilmington, DE 19801

                                    Andrew Nicely, Esq.
                                    Mayer Brown, LLP
                                    1909 K St., NW
                                    Washington, DC 20006
```

```
For the Plaintiffs,:          Robert Keach, Esq.
Schroeder, et al., v. N.C.    Bernstein Shur
                              100 Middle Street
                              Portland, ME 04104

                              Joseph H. Huston, Esq.
                              Stevens & Lee, PC
                              1105 N. Market St., 7th Fl.
                              Wilmington, DE 19801

For NY State Teacher:         Michael Etkin, Esq.
Retirement System             Lowenstein Sandler, PC
                              65 Livingston Ave.
                              Roseland, NJ 17068

                              Kevin Mann, Esq.
                              Cross & Simon, LLP
                              913 N. Market St., 11th Fl.
                              Wilmington, DE 19801

For The Examiner:             Mark Minuti, Esq.
                              Saul Ewing, LLP
                              222 Delaware Ave.-Ste. 1200
                              Wilmington, DE 19801

For Plaza America:            William Taylor, Esq.
                              McCarter English, LLP
                              Renaissance Centre
                              405 N. King St., 8th Fl.
                              Wilmington, DE 19801

                              Charles Malloy, Esq.
                              Arnold & Porter, LLP
                              555 Twelfth St., NW
                              Washington, DC 20004

For Constance Esposito:       Seth Niederman, Esq.
                              Fox Rothschild, LLP
                              Citizens Bank Center
                              919 N. Market St.-Ste. 1300
                              Wilmington, DE 19801

For Several Movants:          Adam Hiller, Esq.
Seeking Relief from Stay      Draper & Goldberg, PLLC
                              803 Sylocin Rd.-St. 301
                              Leesburg, VA 20175
```

4

For The U.S. Trustee:          Joseph McMahon, Esq.
                               Office of the United States
                               Trustee
                               844 King St.-Ste. 2207
                               Lockbox 35
                               Wilmington, DE 19801

(Via Telephone)

For Credit Suisse:             Douglas Deutsch, Esq.
                               Chadbourne & Parke
                               30 Rockefeller Plaza
                               New York, NY 10112

For DB Structured Products:    Richard Agins, Esq.
                               Bingham McCutchen, LLP
                               150 Federal Street
                               Boston, MA 02110

For Bank of America:           Nicholas Cremona, Esq.
                               Kaye Scholer, LLP
                               425 Park Ave.
                               New York, NY 10022

For Class of Former:           Michael McCrary, Esq.
Employees                      The Gardner Law Firm, PC
                               1119 Government St.
                               Mobile, AL 36652

                               Mary Olsen, Esq.
                               The Gardner Law Firm, PC
                               1119 Government St.
                               Mobile, AL 36652

Audio Operator:                Leslie Murin

Transcribing Firm:             Writer's Cramp, Inc.
                               6 Norton Rd.
                               Monmouth Jct., NJ 08852
                               732-329-0191


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Johnson | | | 39 | 46 | |
| Mr. Wagner | 71 | 76 | | | |
| | | | | | |
| **Witnesses For Plaza America:** | | | | | |
| Ms. Baker | 63 | 69 | 70 | | |

MOTIONS:

| EXHIBITS: | | <u>Marked</u> | <u>Received</u> |
|---|---|---|---|
| D-1 | Plaza America Motion | 74 | 78 |

SUMMATION BY:

THE COURT: Finding

1         THE CLERK:  All rise.

2         THE COURT:  Good afternoon all.

3         MR. MERCHANT:  Good afternoon, Your Honor, Mike

4  Merchant of Richards Layton & Finger on behalf of the Debtors.

5  Your Honor, moving through the agenda, agenda items 1 through 3

6  have been continued and orders have been entered on agenda

7  items 4 through 12.  Agenda item #13 is continued to the

8  October 23 Omnibus Hearing.  With respect to agenda items 14

9  through 16, CNOs were filed after the original agenda was due.

10  I believe we've included them on the amended agenda and copies

11  were sent over to Chambers.  I don't know if Your Honor has any

12  questions regarding those matters.

13        THE COURT:  I haven't had an opportunity to review

14  them yet, so I will review them in the normal course.

15        MR. MERCHANT:  Thank you, Your Honor.  Agenda item #17

16  is the Esposito stay relief matter.  Your Honor, we've entered

17  into a stipulation with the Movant resolving that motion.  The

18  stipulation provides for, among other things, stay relief to

19  allow Movant to bring the Nevada action to final judgment,

20  provides that any recovery against the Debtors will be limited

21  to available insurance proceeds less any self insured retention

22  or deductible up to the policy limits, and also provides that

23  they will not seek recovery of any amount above the policy

24  limits from the Debtor's estates.  I have a signed stipulation

25  and a proposed form of order, if I may approach.

1         THE COURT:  You may.

2         MR. NIEDERMAN:  Good afternoon, Your Honor.  Seth

3  Niederman, on behalf of the Movant, from Fox Rothschild.  We

4  agree with everything that was said and would ask that the

5  stipulation be approved.

6         THE COURT:  All right.  The order has been signed.

7         MR. MERCHANT:  Thank you, Your Honor.  Moving to

8  agenda item #18, the application to expand the scope of

9  Richards Layton & Finger's retention to include representation

10 of New Century Warehouse.  There have been no objections to

11 that application; however, we did file a supplemental affidavit

12 last week disclosing our discovery with respect to the source

13 of our retainer.  It was from actually one of the existing

14 Debtors as opposed to New Century Warehouse, and that was just

15 recently brought to our attention.

16        THE COURT:  I did read the supplemental affidavit.

17 Does anyone else care to be heard in connection with this

18 matter?  I hear no response.

19        MR. MERCHANT:  Your Honor, I will note that we

20 discussed this application, or at least the supplemental

21 affidavit, with the Committee this morning, and we agreed that

22 we will file something with the Court seeking approval of the

23 payments that have already been drawn down by Richards Layton &

24 Finger.  With respect to the balance of the retainer, we will

25 hold that through the duration of the case and not release it

8

1    until further order of the Court.

2          THE COURT:  All right.

3          MR. MERCHANT:  I don't believe the form of order has

4    changed on that.  I do have a copy, if I may approach.

5          THE COURT:  If you would.  Thank you.  The order has

6    been signed.

7          MR. MERCHANT:  Thank you, Your Honor.  Your Honor,

8    agenda item #19 is the balance of the cure objections with

9    respect to the Carrington Sale Motion.  All objections have

10   either been moot by the fact that the agreements are not going

11   in connection with the transaction, except for one, and that

12   one pending objection has been continued to the October 23rd

13   hearing.

14      Your Honor, agenda item #20 is General Electric Capital

15   Corporation's Stay Relief Motion.  The parties have entered

16   into a third stipulation which provides for, among other

17   things, a $100,000 payment to GECC from the secured claims

18   reserve escrow resulting from the Carrington sale, and it

19   provides for a continuation of the hearing on the motion until

20   the November 6th Omnibus Hearing.  I believe we did file that

21   stipulation under certification to counsel, but we're happy to

22   answer any questions that Your Honor has regarding this

23   stipulation.

24         THE COURT:  I have it here.  Give me a moment.

25         MR. MERCHANT:  Sure.

1        (Pause in proceedings)

2            THE COURT:  Okay, what are the payments that this

3    stipulation calls for?

4            MS. NAGLE:  Good afternoon, Your Honor, Shannon Nagle

5    on behalf of the Debtors.  Good to see you again.  The payment

6    is $100,000, and it has been the payments that we've been

7    making all along, and we take them out of the Carrington escrow

8    and pay them over to GE Capital.

9            THE COURT:  That order has been signed.

10           MR. MERCHANT:  Thank you, Your Honor.  Your Honor,

11   agenda items 21 and 23 are the Positive Software matters.

12   First of all, my firm would like to apologize for the tardiness

13   of the amended agenda getting over to Chambers.  There was a

14   miscommunication on our end and we thought it was going over by

15   lunch time, and there was a delay and that's unacceptable.  I

16   realize Your Honor was preparing for the evidentiary hearing on

17   those matters.

18           THE COURT:  Well, and stayed late last night to do so.

19   And I will tell you that given the snafu's with binders and

20   missing or misplaced matters within the binders and late

21   submissions, you've, with this last situation, pushed me to my

22   limit.  And I warn you now that if there are further violations

23   of the Chambers procedures it is my intention to sanction your

24   firm for future lapses because it's, especially this time,

25   caused me to devote a substantial amount of preparation time

1  for something that's been postponed.

2          MR. MERCHANT:  I understand, Your Honor.

3          MR. SILBERGLIED:  Your Honor, may I just add something

4  to the record?  This is Russ Silberglied of Richards Layton &

5  Finger.  I absolutely echo Mr. Merchant's apologies to the

6  Court.  It was a miscommunication and we apologize.  The

7  reason, just so Your Honor knows, that this matter, #21 the

8  evidentiary hearing, was continued was after we reached a

9  decision with Positive Software's counsel on #23 to continue

10  it, Positive Software's counsel asked us -- we were ready to go

11  forward on #21.  Positive Software's counsel asked us if we

12  would agree to continue it to the same hearing so that they

13  didn't have to fly in here a second time, and we accommodated

14  that.  We, of course, should have notified the Court, and we

15  apologize for that.

16          THE COURT:  Well, and I will tell you the fact that,

17  you know, when my Courtroom Deputy inquired about -- or first

18  learned of this and inquired what happened, was told by someone

19  from the firm that, well, you know, we filed the amended agenda

20  late yesterday.  It was 3 o'clock something, 3 something

21  o'clock it was filed.  And the answer to us from your firm was,

22  well, and your Chambers were closed so we couldn't bring

23  something over.  I was here until after 5:30 last night.  We

24  didn't close and all the staff was here to the normal time.

25  So, you know, it's not a matter of a miscommunication.  I mean,

1  it's a matter really that virtually in my mind borders on

2  dishonesty with the Court, and it will not be tolerated.

3         MR. SILBERGLIED:  Your Honor, Mr. Merchant and I will

4  personally take care of the matter.

5         THE COURT:  I hope so.  Thank you.

6         MR. MERCHANT:  Your Honor, agenda item #22 is the New

7  York State Teachers Retirement System Stay Relief Motion.  I

8  will cede the podium to Movant's counsel.

9         THE COURT:  All right.

10        MS. UHLAND:  One item, Your Honor, we -- for the -- in

11  connection with the opposition, Your Honor, we do intend to

12  proffer testimony just from a process of ordering if you want

13  to -- I don't know which order you want to take that in.  I

14  wanted to make you sort of aware that we would like to proffer

15  testimony and have a witness here today.

16        THE COURT:  Well, I'd like to hear from the Movant

17  first.

18        MS. UHLAND:  Okay, thank you, Your Honor.

19        THE COURT:  Thank you.

20        MR. ETKIN:  Thank you, Your Honor.  Michael Etkin,

21  Lowenstein Sandler, on behalf of the New York State Teachers

22  Retirement System individually and as Lead Plaintiff in the

23  pending consolidated securities litigation in the Federal Court

24  in California.  Your Honor, as should be clear from our motion,

25  we are asking for limited relief from the automatic stay in

1  connection with documents that have already been produced by

2  the Debtor to multiple federal agencies, as well as the

3  Committee and the Examiner.  We are not asking for any

4  independent discovery.

5      What should also be clear from our motion, Your Honor, is

6  that we understand, and has been the case in all situations

7  like this that I've been involved in and am aware of since the

8  enactment of the Private Securities Litigation Reform Act, that

9  we can't do anything or get anything ultimately until the

10 District Court makes a determination that the stay imposed by

11 that statute should be modified.

12     So to the extent that this Court should grant our motion

13 or provide some relief with respect to our motion, it's not as

14 if the Debtor would then have to drop everything and comply

15 with the requests that we've made in connection with the

16 documents that have already been produced to these agencies,

17 the Committee, and the Examiner.  We obviously don't know when

18 the District Court would make such a determination, but we

19 certainly need relief from both Courts ultimately.  We have

20 chosen to come to this Court first.

21         THE COURT:  Well, I think as you must.

22         MR. ETKIN:  As we must.  Bankruptcy Courts have, in

23 cases that I have been involved in similar to this Your Honor,

24 have taken one of two approaches that I'm aware of.  The first

25 approach would be to grant the relief or as much relief as the

1   Bankruptcy Court was prepared to grant, but make that

2   determination subject to an ultimate determination by the

3   District Court with respect to the PSLRA stay.  That was the

4   case with Judge Gonzalez in both the <u>Enron</u> and <u>WorldCom</u>

5   matters.

6        Judge Drain, more recently -- and we did append a copy of

7   the <u>Delphi</u> decision from Judge Rosen to our reply papers, which

8   I think is an extremely well reasoned, and if I do say so

9   myself, approach to this issue.  But Judge Drain had a

10  different approach.  Judge Drain indicated in connection with a

11  motion such as this that he wanted the Lead Plaintiff to go to

12  the District Court first, and Judge Drain granted limited

13  relief from the stay to allow the motion to be made before the

14  District Court with respect to the PSLRA stay.  And then, to

15  the extent that that motion was granted, to come back to the

16  Bankruptcy Court thereafter because Judge Drain anticipated

17  that there would be somewhat of a change in landscape between

18  the time we first appeared before him and the time that the

19  District Court rendered a decision.  And as you know, the

20  District Court did grant the motion.

21       Ultimately, the matter was resolved with the Debtor, so

22  Judge Drain never had to reach a decision going back to him in

23  connection with the automatic stay.  And there's a reason for

24  that, and that reason underscores both the decisions by Judge

25  Gonzalez and Judge Drain.  And those decisions were echoed by

1  both of those Courts in making their determinations with

2  respect to this motion, this type of motion, that they both

3  felt, and I think it's actually set forth in the transcript

4  that we appended to our original motion papers from the

5  WorldCom hearing in front of Judge Gonzalez, that the granting

6  of relief from the PSLRA stay would be tantamount to cause or

7  almost tantamount to cause to satisfy whatever requirements

8  there may be under 362(d) to thereafter modify the automatic

9  stay.  So the Debtor, in their opposition, spent considerable

10  time arguing the merits of a PSLRA Stay Relief Motion.

11      We think that any Federal District Judge who follows the

12  reasoning in <u>WorldCom</u> and <u>Delphi</u> will ultimately grant us

13  relief from the PSLRA stay, but that's premature, and the

14  Debtor's argument is speculative at best.  Under any set of

15  circumstances here, this Court has the opportunity and should

16  await a decision of the District Court, an actual decision on

17  the merits from the District Court with respect to ultimately

18  granting stay relief, whether by virtue of issuing a

19  conditional order as Judge Gonzalez did or issuing limited stay

20  relief and requesting that the parties come back after the

21  District Court makes its determination.  So this Court need not

22  speculate as to what a District Court could or should do.  I

23  believe at the very least that the District Court should be

24  allowed to make that determination and that this Court should

25  take that determination into consideration ultimately, again,

1   either by virtue of issuing a conditional order or requesting

2   that the parties come back; either one of the two approaches

3   that I suggested earlier.

4       Your Honor, the Debtor makes it very clear in their

5   opposition papers that they really have no skin in the game

6   here.  I think they go a little overboard in connection with

7   their argument that we're only subordinated claimants in the

8   bankruptcy proceeding and likely not entitled to any

9   distribution.  Ultimately, when a Plan of Liquidation is filed,

10  that might very well be.  But what that does is two things.  It

11  number one, underscores the propriety of the relief that we're

12  requesting here, and it ignores the fact that whether we as

13  Creditors or Parties-In-Interest or are going to receive a

14  distribution in the case is irrelevant to whether we are

15  Parties-In-Interest for purposes of the kind of relief we're

16  seeking before the Court today.

17      The Debtor takes the argument to the absurd by indicating

18  that whatever they might have to spend -- and we urge that it

19  would not be much, but whatever they would have to spend in

20  terms of dissembling these documents ultimately would be as if

21  they were giving a distribution by virtue of attorney time or

22  effort or whatever kind of currency they're talking about to

23  subordinated Creditors.  That's really not the issue.  The

24  issue is ultimate entitlement to these documents, which for

25  certain we would be, and the issue is whether we're Parties-In-

1  Interest entitled to come before the Court and requesting this

2  type of relief.

3       THE COURT:  Well, there're two, if I look at the big

4  picture, dynamics at play here, I think -- well, at least two

5  anyway.  One is, as you say, your ultimate entitlement to at

6  least some of the documents.  And the question in my mind is,

7  you know, what's the urgency about it?  That's number one.

8  And then number two, it's not irrelevant that it may be that

9  there'll be no distribution for you in this bankruptcy because

10 I think one of the things the Bankruptcy Court has to keep in

11 mind in determining whether to grant relief that's been

12 requested is, is it important to the case and/or what affect is

13 it -- would it have on the case.  And I think the Debtor argues

14 persuasively that granting the relief doesn't advance anything

15 of benefit to the estate.

16      Now, that's not to say that there aren't rights that your

17 clients have, and that was point one I made; they have rights.

18 The issue in my mind is, you know, when should they be

19 vindicated.  And what's the urgency?  Maybe you could address

20 that.

21      MR. ETKIN:  Let me address that, Your Honor, because

22 there's a common thread to the issue of urgency which I think

23 ties into the issue of prejudice that both Bankruptcy Courts

24 and District Courts have dealt with in their respective

25 determinations of whether stay relief is appropriate either

1  under 362 or under the PSLRA stay.  And that common thread,

2  which you see in the recent <u>Delphi</u> decision, you saw with

3  respect to Judge Gonzalez, you saw with respect to the District

4  Court's determination in <u>WorldCom</u>, is that there are parties

5  who now have access to these documents who are potentially and

6  clearly, in our view, going to be asserting claims against

7  common Defendants that are Defendants in the securities

8  litigation.

9      I mean, I find -- I obviously found it interesting with

10 respect to the Creditors Committee's joinder in the opposition.

11 Again, the argument is made that it's not the Debtor who really

12 is at economic risk with respect to our claims on the merits

13 because more than likely, those claims are subordinated and

14 there will be no recovery with respect to those claims in the

15 bankruptcy proceeding.  But clearly the Committee is looking at

16 all of these documents that it's had possession of for quite

17 some time, is looking to assert claims ultimately in connection

18 with their review of those documents or in connection with

19 whatever report the Examiner ultimately files with the Court.

20 And those will be clearly competing claims against common

21 Defendants.  And one thing that the Courts have looked at in

22 these decisions is that it would be inappropriate, and indeed

23 prejudicial, that another constituency is denied access to

24 these documents while other constituencies, whether they be

25 Governmental entities or a Creditors Committee, have full

1  access to these documents, planning litigation strategy,

2  looking at claims and gaining a leg up in connection with

3  whatever litigation they ultimately intend to bring.

4      THE COURT:  Let's pursue that for a moment.  How would

5  other parties be advantaged over your clients?  Be specific.

6      MR. ETKIN:  Your Honor, specifically, they would be

7  advantaged because they would have access to these fundamental

8  documents relevant to the issues that are common issues in

9  these cases in order to frame litigation strategy, frame

10  potential settlement discussions, frame their claims and causes

11  of action, where we would not have access to those same

12  documents.  And they would be getting a leg up clearly with

13  respect to pursuing their particular claims.

14      THE COURT:  In this bankruptcy?

15      MR. ETKIN:  Anywhere, whether it be in this bankruptcy

16  or whether it be against non-Debtor third parties outside of

17  this bankruptcy proceeding.

18      THE COURT:  But isn't the Court's primary focus, or

19  shouldn't it be legitimately upon, to put it in your framework,

20  whether Creditors or Parties-In-Interest are disadvantaged with

21  respect to rights against the estate?

22      MR. ETKIN:  I don't think so, Your Honor.  I don't

23  think so.  I don't think it should be this Court's province --

24  and this issue has cropped up in connection with requests for

25  105 injunctions where committees or Debtors have sought to shut

1  down litigation outside of the bankruptcy so that they could

2  pursue their own litigation against those same Defendants or

3  certain of those same Defendants in the bankruptcy proceeding.

4  And ultimately, I know in this District, there have been

5  decisions that say that the estate has no greater rights to

6  pursue claims against non-Debtors than non-Debtors who have

7  similar claims against those same non-Debtor Defendants, and I

8  would argue that that same logic would apply here.

9       To deny the relief that we're seeking would be to

10  advantage those who have access to those documents and over the

11  rights of non-Debtors who are Parties-In-Interest in this

12  bankruptcy proceeding to pursue their own rights against those

13  same third parties.

14       THE COURT:  Well, unless I misconstrue the orders that

15  I've entered in this case, nobody in this bankruptcy is in a

16  position to do anything with the information, at least until

17  the time that the Examiner files his report.  Am I wrong about

18  that?

19       MR. ETKIN:  Your Honor, off the top of my head, I

20  would defer to Your Honor's recollection of your orders.  I

21  wouldn't argue that to the contrary.

22       THE COURT:  Yes, I mean, it's not like, at least at

23  this time, anybody's really got a head start on you in terms of

24  actually causing some disadvantage.

25       MR. ETKIN:  Well, respectfully, Your Honor, I would

1  disagree.  I mean, there's a learning curve.  There's the

2  ability to review these documents, have these documents

3  available, plan strategy, plan with respect to those particular

4  non-Debtors that might be the targets of litigation.  The fact

5  that they can't implement that at this particular time I don't

6  think precludes a determination that there's a distinct

7  advantage with respect to those who would be pursuing competing

8  claims would have access to information and documents that

9  someone else pursuing similar claims or competing claims

10  against those third parties based upon the same overall facts

11  and circumstances would not have a similar access.

12      And Your Honor, again, we're not taught from a timing

13  perspective.  Nothing can happen.  We can't have access.  We

14  can't have access until the District Court makes a

15  determination, and that could very well be several or more

16  months from now.

17      Reading tea leaves, Your Honor, I understand that the

18  Court has some concerns over the prospect of providing some

19  immediate relief and access to these documents, but I would

20  say, Your Honor, that at the very least, we should certainly

21  have the opportunity to go before the District Court, plead our

22  case there, determine, you know -- we'll be able to determine

23  how long that's gonna take, because we wouldn't be able to come

24  back here until that's played itself out.  And the landscape

25  could very well be different at that point in time, as well as

1   the Court having the benefit of the determination by a District

2   Court that the PSLRA stay should be modified and that there is

3   some prejudice sufficient to meet the standards of the PSLRA to

4   modify that stay.

5       So this Court has an option other than a straight denial

6   of the motion, and I would urge that at the very least, limited

7   relief from the stay should be granted so as to allow us to

8   make our motion before the District Court.  If this Court is

9   not prepared and not convinced at this stage that the approach

10  taken by Judge Gonzalez is appropriate, which would simply be

11  to condition stay relief on the determination by the District

12  Court, I think at the very least we need to see what the

13  District Court would have to say concerning the issue.  And we

14  need to see what the landscape would look like 2, 3 months from

15  now, when that determination would be in hand.  A denial by the

16  District Court would render it moot.  Granting the motion by

17  the District Court would certainly change the landscape as well

18  as whatever else might occur within that time period.  As I

19  understand it, the Examiner has been given a 90 day extension.

20  It may very well take that 90 days or more to get the

21  determination by the District Court.

22      So Your Honor, we strongly believe that the approach taken

23  by Judge Gonzalez was an appropriate approach.  There are no

24  distinctions between this case and that case in our view.  The

25  parade of horribles that the Debtor has indicated in terms of

1  reviewing the documents for confidentiality privilege, I think
2  we've basically taken care of that in our reply.  We can enter
3  into the same confidentiality or similar confidentiality
4  agreements as any other party who's had access to those
5  documents has, and there can be a claw-back provision with
6  respect to any inadvertent production of privileged
7  information.  I think the discoverability or irrelevancy
8  argument is a red herring, but as far as any privilege concerns
9  or any confidentiality concerns, they can simply be easily
10 dealt with.
11      This is all lawyer driven time.  It'll be lawyer driven
12 now, it'll be lawyer driven 6 months from now or 8 months from
13 now.  So to the extent is the cost attributable to that, that's
14 a cost that would be incurred with respect to a bonafide right
15 of a Party-In-Interest to obtain some discovery or documents
16 from the Debtor.  So it's just the timing of the cost that
17 would be at issue.  It is not in the nature of a distribution
18 to a subordinated Creditor.
19      So with that, Your Honor, I'll reserve some time to reply
20 if that's okay with the Court, but I'll rest on our papers for
21 the balance.
22          THE COURT:  Thank you.
23          MS. UHLAND:  As I mentioned, Your Honor, I do have a
24 witness and do intend to proffer testimony.  Would the Court
25 like me to proceed with that proffer or proceed with argument

1    first?

2           THE COURT:  Argument first, I think.

3           MS. UHLAND:  All right.  Your Honor, this case is

4    distinguishable from the other cases before you for a few

5    simple reasons, and I think the first one and the most

6    important one is simply that the balancing test that one

7    undertakes in connection with the Stay Motion here it just

8    simply tilts differently when we balance the hardships here.

9    The Plaintiffs have stated effectively no hardship.  All of the

10   evidence here is being protected.  All of the evidence produced

11   -- the Debtors have been under a document retention program

12   with the SEC and are undertaking to great extents -- taking

13   great lengths to protect all information, nor do the Plaintiffs

14   allege that there's any risk to them with respect to any

15   destruction of evidence.

16        Further, they argue that there's some potential litigation

17   advantage to having information sooner.  They don't really

18   explain that.  And to the extent they are saying there may be

19   an unfair litigation advantage, what they're stating is that

20   there may be an unfair litigation advantage against the very

21   parties Your Honor is seeking to protect; that is, the Debtors

22   estates and the causes of actions that they may be bringing.

23        In their reply Your Honor, the Plaintiffs state who are the

24   Debtors trying to protect, and I think in your questions you

25   focused on this as well.  The Debtors are trying to protect the

1   estates.  Not necessarily they've been dropped as Defendants in

2   the litigation, although the Plaintiffs did file proofs of

3   claim in the estate.  But most importantly, what the Debtors

4   are trying to preserve for the benefit of all their Creditors

5   and collectively with the Creditors Committee working very hard

6   to preserve is all of the information that they may need to

7   proceed and preserve causes of action for the benefit of the

8   Debtor's estates for the benefit of all of the Debtor's

9   Creditors.

10       For this reason, the Debtors have been very careful to

11   preserve the privileged information that they have been

12   producing.  And stepping back for a moment, Your Honor, I want

13   to discuss briefly the privilege issue that's raised in the

14   Debtor's -- I'm sorry, in the Plaintiff's reply.  First, two of

15   the categories of documents, those produced to the Creditors

16   Committee and those reviewed by the company's special

17   investigation committee, are documents that have been disclosed

18   to an entity with a common interest of the Debtors or, in the

19   case of the special investigation committee, to an entity that

20   is the Debtor.  The reason it doesn't implicate privilege is

21   because the Debtor doesn't waive privilege by sharing with

22   those entities.  The Debtor has a common interest with them,

23   and with respect to the special investigation committee, it is

24   the Debtor with respect to the committee.  They share a common

25   interest, and further, the parties have executed a common

1    interest agreement.

2          THE COURT:  But, see, these are all issues about scope

3    at least in the first instance ultimately it seems to me the

4    District Court at some point will frame.  From the Debtors

5    standpoint what nags at me is, what is it you intend to do with

6    this litigation?  I mean, at some point -- and I've been told

7    the plan is coming sometime in the near future.  Either the

8    plan or apart from the plan probably at or before confirmation,

9    the Debtor's going to have to take the position of what happens

10   with this litigation.  Where's the Debtor headed with this?

11         MS. UHLAND:  With the securities litigation?

12         THE COURT:  Yes.

13         MS. UHLAND:  Your Honor, the PSLRA provides a limited

14   stay once the securities litigation gets to a certain plain in

15   their process.  My expectation is that after that process

16   concludes that we will hear from them and we will have instead

17   of a broad production or request for everything produced to the

18   Examiner to its own Creditors Committee, hopefully a third

19   party subpoena on the Debtors, and we'll be able to address

20   that third party subpoena in this Court with respect to

21   burdensome, and in the District Court with respect to the scope

22   and breadth and the privilege protection that's warranted.

23         THE COURT:  And why shouldn't the Movants be permitted

24   now to go forward in the District Court to obtain that

25   determination?

1          MS. UHLAND:  Your Honor, while the counsel for the

2   Movant stated that the interests and the concerns to the PSLRA

3   that the stay -- the PSLRA stay and the 362 are essentially the

4   same.  I don't think that is correct.  The PSLRA stay is

5   designed to, you know, address issues in connection with

6   securities litigation.  The automatic stay is to protect the

7   Debtors.  The Debtors are, in effect, at this juncture, as has

8   has been admitted, almost third party Defendants with respect

9   to that litigation.  And it is this Court's purview to protect

10  the Debtors from -- in connection with a third party litigant

11  looking to get relief from the stay, to determine whether in

12  balancing the hardships the prejudice to the other party

13  outweighs the prejudice to the Debtors.  And in this case, at

14  this juncture in this case, which in all decisions for relief

15  from stay are made at the time presented, it would be

16  exceedingly burdensome for the Debtors in this case,

17  considering the Debtor's interests, to be responding to this

18  discovery and starting to do this higher level privilege,

19  confidentiality and other review that would be necessitated by

20  the discovery in the securities litigation, which is you're

21  proceeding, you know, on path -- on a separate path.

22          THE COURT:  Well, I have a couple of questions, and

23  based in part, I think, on what one of the solutions Movant's

24  counsel was suggesting.  If I were to grant limited relief to

25  permit the District Court process to move forward, at least

1 just with respect to PSLRA stay, reserving the right once that

2 was framed by the District Court to determine what further

3 should be required of the estate, wouldn't that serve both

4 interests at the same time?

5        MS. UHLAND:  Your Honor, that would require the

6 Debtors then to go and defend possibly litigation, depending on

7 what positions were taken in the District Court with respect to

8 the lift of the stay.

9        THE COURT:  Well, you're going to have to do that

10 sooner or later anyway, aren't you?

11        MS. UHLAND:  Well, it may be at a point of -- well,

12 there's a couple of issues there.  Sooner or later is different

13 than today.  In the middle of trying to deal with the Examiner

14 process and our efforts to, in the interests of Creditors,

15 produce those documents as quickly as possible just to sort of

16 shorten the duration, where our goal here is to shorten the

17 duration of the Chapter 11 and move as quickly to plan

18 confirmation and reducing the structure of this, to get through

19 the Examiner's process as promptly as possible, with the intent

20 that if we're able to move even this large process as quickly

21 as possible to that end, it will inevitably be the most cost

22 effective way to do it, even if it's requiring a lot of work at

23 this time.  We've used speed as one of the critical elements of

24 our -- sort of this case strategy in this endeavor with the

25 Examiner process and moving toward a plan.  So I think that,

1 yes, maybe we'll have to do it eventually.  Maybe there will be

2 some narrowing of the process that occurs between now and then,

3 maybe some narrowing of the information.  But at this juncture,

4 the scope of requests -- and you can maybe hear about this

5 later from the Creditors Committee counsel who's been working

6 with the examiner -- certainly turning over wholesale Examiner

7 information and just even addressing discovery from a third

8 party with respect to that, those types of concerns and

9 addressing those issues today would take an enormous amount of

10 time.  and the hope is that if we move forward 6 months from

11 now, there may not even be a stay in the Federal securities

12 action at that point, so that we would avoid the litigation.

13 The Federal Securities action stay is a temporary stay.  It's

14 not a permanent stay.  We may avoid that litigation and the

15 Debtors -- from the Debtor's point of view, addressing these

16 issues tomorrow is much better for the estates than addressing

17 them today.

18          THE COURT:  Thank you.  You may make your proffer now

19 if you like.

20          MR. INDELICATO:  Your Honor, before we go through the

21 proffer could you hear from the Creditors committee on the

22 argument side?

23          THE COURT:  All right.

24          MR. INDELICATO:  Thank you, Your Honor.  Just a couple

25 of points, and I think what I want to emphasize first to the

1  Court is I agree with the Court and Plaintiff's counsel, it's a

2  timing issue.  But to say that the timing in this case doesn't

3  matter and it's going to have to be dealt with sooner or later

4  I think creates an undue burden on the estate.

5      Let me address the question I think the Court asked is how

6  are we going to deal with this, and I can't tell the Court how

7  we're going to deal with it in this case, but I can make

8  reference with how I've dealt with it in other cases.  The

9  securities claimants may or not be Creditors of this estate.

10 They may be subordinated Creditors, that's yet to be

11 determined.  But where we've had securities type litigation in

12 other cases, whether it was pursuant to a plan where there was

13 a Liquidating Trustee or whether it was pursuant to large

14 liquidating Chapter 7s, what we've done after the plan process

15 has begun or the liquidation has begun is we've set up sort of

16 a repository of the documents where this claimant and others

17 will have access to unlimited access to documents.  So that way

18 there's one repository, they'll have the access to the

19 documents.  They may not be the only Plaintiffs.  This issue

20 may occur in different contexts with different parties who

21 either believe as a group they've been fraudulently induced by

22 stock, individually, whether it's homeowners who claim issues

23 related to mortgages or the like.  So that can be dealt with in

24 the context of a plan in an expeditious fashion.

25     Our concern, Your Honor, is -- and you'll hear a little

1 from me later when we just update the Court as to where we are

2 on the Examiner.  One of the most troubling parts about the

3 case is juggling not only the Examiner pieces, but the

4 Department of Justice investigation, the SEC investigation, the

5 production to the Creditors Committee.  And first let me

6 indicate something that I've said to this Court many times.

7 The Creditors Committee in its investigation, in accordance

8 with our dictates to the Court, we have said we are taking a

9 step back.  We are letting the Examiner do its job.  We are

10 getting access to the documents.  We are reviewing them, but we

11 are working in tandem with them.  They are getting the

12 documents.  They are doing the intense investigation, and we

13 are following suit.  So while we do have access to a lot of

14 documents they don't have, I don't believe that in any sense we

15 have an unfair litigation advantage.

16      And with respect to the unfair litigation advantage, it's

17 different causes of action, Your Honor, different roles that we

18 play.  We are fiduciaries.  We are looking at the broader

19 pictures the Court pointed out with respect to how it affects

20 the estate.  We're looking at single isolated litigation as

21 they are.  So I think the Committee's access to the documents I

22 think is much different than their access to the documents

23 would be.

24      But what I could tell this Court, and what I think the

25 Examiner expressed to us in our meeting yesterday, is that the

1  production of documents is the single greatest impediment to

2  him completing his report, and that is because of the multiple

3  parties that are receiving these documents.  To layer on

4  another level of people that see these documents who are not a

5  Creditors Committee who share a common interest, who are not a

6  Court appointed Examiner who reports to this Court and no one

7  else, who are not an investigatory arm of the Government, who

8  is an individual private Plaintiff I think would unduly burden

9  this estate and increase the cost of not only the Debtor's

10  production, but the Examiner's investigation, the Creditors

11  Committee's cost associated with that investigation many fold.

12      Your Honor, the costs, and we'll talk about that later,

13  are astronomical.  And to increase that cost yet again for the

14  benefit of a private litigant who ultimately may not have any

15  interest in this estate, but to force the estate to incur the

16  costs associated with its discovery when there may be a cheaper

17  more streamlined mechanism if we wait several months I think is

18  an unfair burden to this estate.  And I think Plaintiffs

19  conceded in their papers that to the extent the cost associated

20  with the production or the production itself will interfere

21  with the bankruptcy, they should not be entitled to relief from

22  the stay.

23      Your Honor, I believe, and I think the proffer would

24  indicate, that allowing this discovery to go forward will, in

25  fact, have a significant affect on the bankruptcy, interfere

1  with the bankruptcy, and increase the costs many fold.

2      Your Honor, the problem I have with allowing the District

3  Court proceeding to go forward, at least to find whether or not

4  you should -- relief from the stay there is -- and the Court

5  ultimately will make its own determination, but if I heard

6  Plaintiff's counsel correctly, they are asserting that relief

7  in the District Court is tantamount to relief in this Court

8  would, in essence, is almost in my mind, and I'm sure not in

9  the Court's mind, but an implication that, well, if we get

10  relief from the stay there, relief from the stay should be

11  automatic in this Court, so we've won there, we've won here, we

12  can go forward with our discovery.

13          THE COURT:  I anticipate that argument would be made.

14          MR. INDELICATO:  So that, obviously, is one of our

15  concerns.  Your Honor, it seems to me that the advantage here

16  is not the Creditors Committee.  It's not the estate.  The

17  advantage here that's being sought is the advantage of the

18  private Plaintiffs.  What they see here, Your Honor, is an

19  opportunity to ride the coat tails of a Court appointed

20  Examiner and other parties who have different roles and have

21  done extensive discovery, and they've not isolated their

22  discovery.  And this argument does go to the scope, but it also

23  goes to the advantage.  What they're saying is give me the

24  world.  Give me everything you've got --

25          THE COURT:  There is merit, I think, to the argument

1  that you can't -- that the Court and other parties can't assume

2  that the right to discovery by these Plaintiffs is coextensive

3  with the discovery and information that's been produced to the

4  Examiner and other parties.  I'd buy that argument.

5        MR. INDELICATO:  Okay, Your Honor.  I won't press that

6  point.  I guess in concluding what I wanna say is, and I think

7  what they pointed out in the Plaintiff's paper and in arguments

8  is that I think he called the Debtor's concerns regarding the

9  harm to the estate, I think he called it an absurdity.  In

10 fact, it's not an absurdity, Your Honor, it's a reality.  And

11 that unless we in some way, shape or form begin to get controls

12 on the different aspects of the case and start coordinating

13 them, we are working towards the plan, we are meeting with the

14 Debtors very shortly to begin that process.  The Committee's

15 goal, as we've expressed to this Court before, is to get a plan

16 on file very quickly so we can begin the streamlining of

17 process, reduce as much as we can the administrative burden on

18 this estate.  And just layering that production at this point,

19 at this time, I think, would be a significant burden to the

20 estate.  I think it fairly weighs granting the stay.  They are

21 free to come back, you know, at plan time or shortly

22 thereafter, renew their request or it will be dealt with in the

23 plan.  But I think at this point, Your Honor, the costs

24 associated with that will be significant and really will be

25 detrimental to the estate.  For those reasons, we ask that the

1  motion be denied in its entirety.

2          THE COURT:  Thank you.

3          MS. UHLAND:  Your Honor, before proceeding with my

4  proffer, I just wanted to make just one minor point that I

5  omitted.  With respect to the privilege issues, in their reply

6  brief, the Movants indicated that they believe that the Debtors

7  have waived privilege by virtue of their prior productions.

8  And as I will set forth in one of the things the proffer will

9  detail, the Debtors do not believe they've waived privilege

10 under certain agreements and Federal statutes, and the law of

11 privilege waiver, if any, would be determined by the Court in

12 California that's proceeding in that securities litigation.

13 That's not -- you know, the 10th Circuit case cited by them is

14 not necessarily applicable law there, and that issue is not

15 before here, and the Debtors intent to assert and protect their

16 privileges on behalf of themselves and the estate throughout

17 this process.

18      Further, I would also note that in the WorldCom and Enron

19 orders attached, and in fact, in the Plaintiff's own proposed

20 form of order, those types of productions that have been

21 allowed have always been subject to a privilege review.  And

22 perhaps in those other cases it may not have been as burdensome

23 as the proposition.

24      With those notes, Your Honor, I'd like to proceed with my

25 proffer.  Your Honor, I would like to proffer the testimony of

1  Alan Johnson, who is an attorney with O'Melveny & Myers.  Mr.

2  Johnson is in the Courtroom today.  If called to testify, Alan

3  Johnson would testify as follows.  Mr. Johnson is counsel with

4  the law firm of O'Melveny & Myers, LLP, counsel for New Century

5  Financial Corporation and their direct and indirect

6  subsidiaries, the Debtors in these cases.  He is a litigator

7  and a member of O'Melveny's Global Enforcement and Criminal

8  Defense Practice Group, as well as electronic discovery and

9  document retention practice.  He has written articles and is a

10  regular speaker regarding these subjects.

11      Mr. Johnson is involved in and is familiar with

12  O'Melveny's efforts on behalf of the Debtors to review,

13  collect, and produce documents in response to requests and

14  subpoenas by the United States Department of Justice, the

15  United States Securities and Exchange Commission, and the

16  Court's own appointed Examiner, as well as the Official

17  Committee of Unsecured Creditors.  These document productions

18  are being conducted as part of the Debtor's objective to fully

19  cooperate with the ongoing investigations of these

20  investigative bodies.

21      As of September 17, 2007, the Debtors have produced over

22  10 million pages of documents and have made available a data

23  base containing over 2 million electronic files in response to

24  the SEC's, DOJ's, Examiner's, and Creditors Committee's

25  document requests.  The Debtors desire to cooperate fully with

1 the investigations, coupled with the immense time constraints

2 imposed by the examiner and the SEC to produce documents, force

3 the Debtors to produce documents without a detailed review for

4 relevant responsiveness or the propriety of other confidential

5 and protected information.  Instead the Debtor's attorneys

6 conducted a streamlined review of a subset of documents solely

7 for the purposes of identifying withholding documents that are

8 protected by their attorney/client privilege, or attorney work

9 product doctrines.

10     Also, in the interest of time, the Debtors granted the

11 Examiner access to a data base that contains email, attachment,

12 and other items from approximately 80 custodians, i.e.,

13 employees' email accounts.  That data base contains over 2

14 million electronic documents.  The Debtors did not review these

15 documents for relevance or discoverability either in connection

16 with the investigations or anticipation of civil litigation.

17     More recently, the Debtors have copied hundreds of

18 gigabytes of data from various network shared drives, data

19 bases, and applications to respond to requests by the SEC and

20 Examiner.  Much of this data is being produced contains

21 protected consumer and proprietary information and may contain

22 attorney/client privileged information.  The time constraints

23 imposed by the SEC and examiner will not permit the Debtor's

24 attorneys to conduct a detailed review of this information

25 before production, which would require hundreds or thousands of

1  attorney hours to complete.

2      In producing documents to the SEC, DOJ, the Examiner, and

3  the Creditors Committee, the Debtors relied on the protections

4  afforded under Federal Rule of Criminal Procedures 6(e)

5  governing secrecy and Grand Jury proceeding, 17 CFR, Section

6  200.83 governing confidential treatment procedures with the

7  SEC, the common interest agreement with the Creditors, and this

8  Court's order specifically prohibiting any disclosure

9  concerning the performance of the Examiner's duties until he

10 submits his report, and the fact that the special investigation

11 committee is a committee of the Board of Directors of the

12 Debtors, and therefore shares all of the Debtor's privileges.

13     The Debtor's streamlined document review and accelerated

14 production is currently ongoing, with the additional document

15 request that the Debtors continue to receive from the SEC and

16 Examiner could require several additional months to complete.

17 The scope of documents produced to the SEC, DOJ, and Examiner

18 and Creditors Committee exceed what the security's Plaintiffs

19 would be entitled in the securities litigation.  In particular,

20 the scope of the Examiner's document request is very broad and

21 has included, among other things, a recent request for consumer

22 level detail on over 2 million loan applications and fundings

23 from 2003 to 2007.

24     Before any documents could be produced to the securities

25 Plaintiffs, the Debtors would have to undertake a detailed

1 review of a substantial portion of the documents for

2 discoverability to identify any proprietary, private or

3 otherwise confidential information.  For example, some of the

4 documents produced by the Debtor may contain legally protected

5 consumer information of borrowers or loan applicants such as

6 social security numbers, banking information, and credit

7 histories.  Identifying these documents would likely require a

8 detailed review of a substantial proportion of the 10 million

9 pages produced to date.  Many documents would also have to be

10 reviewed for privilege because the Debtors have, in some

11 instances, produced privileged or potentially privileged

12 information pursuant to agreements protecting privileges, a

13 shared common interest, or this Court's order further

14 protecting privilege.

15      Further, certain documents already produced are subject to

16 confidentiality arrangements with purchasers of the Debtors,

17 loan and broker data and may not be producible to third parties

18 without notifying those parties and those parties having a

19 right to intervene.

20      If the Debtors were forced to conduct a document review

21 for the securities Plaintiffs, substantial resources would be

22 required and diverted away from the efforts to expedite

23 production of documents to the SEC, DOJ, Examiner and

24 Creditor's Committee.  Even the ongoing streamlined document

25 review described above has required dozens of attorneys and is

Johnson - Cross                                    39

1  costing the Debtors several hundreds of thousands of dollars

2  each month.  To avoid further delay -- further delaying of

3  production of documents to the Government, Examiner, Creditors

4  Committee, the Debtors would be forced to engage dozens of

5  additional attorneys to review documents for the securities

6  Plaintiffs, which would undoubtedly cost hundreds of thousands

7  of dollars per month in additional legal expenses.

8       Further, the process of ongoing productions to those

9  parties would be made more time consuming and more expensive by

10 the Debtor's need to undertake a document level review, as well

11 as a screen for confidential and consumer data, as would be

12 necessary to anticipate production to civil parties.  This

13 would necessarily add further expense and slow the current

14 document productions.  That's the conclusion of my proffer.

15          THE COURT:  Does anyone care to examine Mr. Johnson?

16          MR. ETKIN:  I do briefly, Your Honor.

17          THE COURT:  All right, if you would come forward, sir,

18 please.

19           ALAN JOHNSON, DEBTOR'S WITNESS, SWORN

20          MR. JOHNSON:  Alan Johnson, J-O-H-N-S-O-N.

21          THE COURT:  You may be seated.

22          MR. JOHNSON:  Thank you.

23                    CROSS EXAMINATION

24 BY MR. ETKIN:

25 Q.  Good afternoon, Mr. Johnson.  You just heard the proffer

1 provided by counsel, is that correct?

2 A.  Yes.

3 Q.  And you heard her mention that your firm has undergone only

4 a streamlined review, I think it was the way it was mentioned,

5 of this documents?

6 A.  That's what we've been calling it.

7 Q.  Okay.  You also heard her indicate that hundreds of

8 thousands of dollars are being spent monthly in connection with

9 this streamlined reviewed?

10 A.  That's correct.

11 Q.  Could you further explain what exactly is being done with

12 respect to these documents for the hundreds of thousands of

13 dollars that it is costing the estate every month?

14 A.  We have several attorneys reviewing a subset of documents

15 for privilege only, and if the document is privileged, we are

16 withholding it, and if it is not, we are producing it.

17 Q.  So all of the documents that are being produced are being

18 reviewed for privilege purposes?

19 A.  No.

20 Q.  What documents are not being reviewed for privilege?

21 A.  Well, there are some documents -- many, I should say, that

22 we did not put an attorney eye on because we ran what we've

23 been calling a privilege filter.  So in order to further speed

24 up the production, especially to the SEC, we have applied

25 search terms to the population of documents, and the search

1  terms mostly are attorney names, of known attorneys who have

2  worked on New Century matters, and if the document hits one of

3  those filtered names, it goes into a subset of documents that

4  we are reviewing.  If it does not hit one of those filters,

5  it's been produced.

6  Q.  So the intention is through either the search terms or the

7  filter to identify as best the firm can all potentially

8  filtered documents?

9  A.  That is the goal.

10 Q.  And could you explain to me whether and how copies of the

11 documents are being kept that are being produced to the various

12 Governmental agencies, as well as the Committee and the

13 Examiner?

14 A.  Copies kept by us?

15 Q.  By you or the Debtor?

16 A.  Yes, I mean, there have been several different ways that

17 we've produced.  If we've produced to various parties on disk,

18 then we are sure to maintain in-house at O'Melveny a copy on a

19 server of that information, and if it came out of various email

20 and electronic sources, we have an electronic discovery vendor

21 named SPI that has been handling that complicated procedure,

22 and they are the ones hosting that data, and they are

23 maintaining copies of what is produced and what has been

24 reviewed, not reviewed, et cetera.

25 Q.  So in other words, if someone were to -- internally were to

1  ask for the documents that have been produced to the SEC, you'd

2  be able to identify rather quickly the disks containing the

3  documents that have been produced to the SEC?

4  A.  Well, it guess depends on what you say quickly, but yes, we

5  could put our hands on it.

6  Q.  And is there a further drill down with respect to

7  independent requests by the SEC; in other words, if the SEC

8  requested a particular subset of documents in June of '07, and

9  then another subset of documents in August of '07, they would

10  be kept separately and would not be lumped together?

11  A.  In some what I would call small cases, what you said is

12  true.  If there are specific requests by either the SEC or DOJ

13  or Examiner or the Creditors Committee that we can tie down to

14  a specific request, in many cases we've been able to track

15  those collections, but that's a very, very small number of the

16  total population that we've been talking about here.  The vast

17  majority are email and attachments and electronic data

18  collected from a wide group of the company, from the lots and

19  lots of different current and former employees.  And as to

20  those we could not tie down what, if any, particular request

21  documents are responsive to.  When I say requests, I mean SEC

22  requests or Examiner requests.  We've been producing anything

23  that's not privileged.

24  Q.  Are there any indexes maintained in connection with the

25  documents that you've produced to the various agencies of the

1 Examiner and the Committee?

2 A.  With the caveat of what I just said, yes, we have an index

3 that shows, to the extent that we know, the requests that, you

4 know,  match to base ranges, but it's -- the vast majority are

5 not indexed.

6 Q.  And in terms of the confidentiality issue, what's being

7 done in your screening process with respect to issues of

8 confidentiality or proprietary documents of the Debtor?

9 A.  We have not been reviewing for those purposes.

10 Q.  And is the reason for that the fact that you've entered

11 into agreements maintaining the confidentiality of those

12 documents?

13 A.  Yes, and also, you know, for much of the information, we

14 know we're producing it to the SEC, which is itself a

15 Governmental body, and it has its own obligations to maintain

16 that information.  So we have been producing to these limited

17 parties with that in mind.

18 Q.  But there have been confidentiality agreements that have

19 been entered into by the Debtor in connection with documents?

20 A.  Yes, broadly, yes.

21 Q.  Now, in connection with your proffer, counsel indicated

22 that the documents that have been produced to the various

23 agencies and the Committee and the Examiner thus far, and I

24 think these are her words or ultimately your words, would

25 exceed what the securities Plaintiffs would be entitled to in

1  the securities litigation.  Do you recall that part of your

2  proffer?

3  A.  Yes.

4  Q.  Okay.  On what basis did you make that determination?

5  A.  The determination is based on the fact that I know for the

6  vast majority of the documents we -- documents, especially

7  electronic documents and data that we have collected and

8  produced to these other entities, it has been without regard to

9  relevance to particular issues.  And, you know, in the

10  securities litigation, as in any other type of private

11  litigation, there are, you know -- what is discoverable is

12  dictated by what are the allegations.  And what we've been

13  producing has been without regard to your client's allegations

14  in the securities litigation.

15  Q.  But I assume no Court has made any determination regarding

16  what would or would not be relevant in connection with the

17  securities litigation as far as the Debtor's documents?

18  A.  Not that I'm aware of.

19  Q.  In your proffer, I believe a distinction was made between

20  the terms "relevance" and "discoverability."  What would be the

21  distinction, from your perspective, if we could explore that

22  for a second?

23  A.  I'm not sure I --

24        MR. SILBERGLIED:  Objection to the --

25  A.  If it's in the --

1          THE COURT:  Just a moment.

2          MR. SILBERGLIED:  Objection to the extent that that's

3    attempting to call for a legal conclusion.

4          THE COURT:  Any response?

5          MR. ETKIN:  Your Honor, that was his testimony, and to

6    the extent that he was testifying and providing a conclusion as

7    to what was relevant or discoverable, I think I'm entitled to

8    explore what he meant by that.

9          THE COURT:  Sustained.

10          MR. ETKIN:  Your Honor, I have no further questions.

11          THE COURT:  All right.  Is there any other cross

12    examination?

13          MR. MINUTI:  Your Honor, Mark Minuti for the Examiner.

14    I just wanted to make a statement, and depending on how Your

15    Honor reacts, I may or may not have to ask any questions.  The

16    Examiner, of course, takes no position on the motion that's

17    before the Court today, but in connection with the proffer, the

18    witness did testify about what was given to the Examiner and

19    the process.  I personally haven't been involved in that, and

20    therefore, I'm not in a position to know whether that was

21    correct or not.  I simply wanted Your Honor not to construe my

22    silence as saying I agree or disagree.  I just don't know.  So

23    I just wanted to put that on the record.

24          THE COURT:  Thank you.

25          MR. MINUTI:  Thank you, Your Honor.

1          THE COURT:  Any cross examination?  Redirect.

2          MR. SILBERGLIED:  Thank you, Your Honor.  For the

3    record again, Russ Silberglied, Richards Layton & Finger, on

4    behalf of the Debtors.

5                    REDIRECT EXAMINATION

6    BY MR. SILBERGLIED:

7    Q.  Mr. Johnson, you were asked some questions about the

8    attorneys that are staffing this at O'Melveny & Myers.  I

9    believe your direct words were that several attorneys were

10   reviewing for privilege?

11   A.  Yes.

12   Q.  Can you give the Court an indication of what several means?

13   A.  I believe the current count is around 30, 30 or so

14   attorneys that have been working.  And the last count that --

15   just to add, the last count that I did a few weeks ago was that

16   it was roughly the equivalent of 20 full time attorneys

17   working.

18   Q.  You were asked a question about whether the process you

19   identified was -- and I believe I'm quoting now -- "as best the

20   firm can," that was a quote, to identify privileged documents.

21   Do you remember roughly that questioning?

22   A.  Vaguely.  That was counsel's words, not mine --

23   Q.  Correct.

24   A.  -- you're quoting?

25   Q.  Correct.

1 A.  Vaguely, yes.

2 Q.  The process that you walked through to identify privilege,

3 is that the process that O'Melveny & Myers would utilize if

4 O'Melveny & Myers had unlimited time to review documents for

5 privilege?

6 A.  No, if we had unlimited time, it would be different.

7 Q.  And more detailed?

8 A.  Yes.

9 Q.  You were asked several questions about whether you can

10 identify the documents provided to the SEC.  Do you remember

11 that line of questioning?

12 A.  Yes.

13 Q.  Can you quickly identify what documents that were provided

14 to the SEC might be confidential?

15 A.  No.

16 Q.  And that line of questioning was only about the SEC.  Let's

17 switch to, a minute, for the documents that were provided to

18 the SLC, the special -- or the SC, the Special Committee.  Can

19 you quickly identify which of those documents were privileged?

20 A.  I'm not sure.

21 Q.  And what about to the Creditors Committee, can you quickly

22 identify privileged documents provided to the Committee?

23 A.  I don't know.

24         MR. SILBERGLIED:  Nothing further, Your Honor.

25         THE COURT:  Any recross?

1          MR. ETKIN:  No, Your Honor.

2          THE COURT:  All right.  Thank you, you may step down.

3          MR. JOHNSON:  Thank you.

4      (Witness steps down)

5          MR. ETKIN:  I know this is taking a long time Your

6   Honor, but just, with your permission, a few words --

7          THE COURT:  Briefly.

8          MR. ETKIN:  -- in response to some of the Court's

9   questions, as well as some of the argument that was made by the

10  Debtor and the Committee.  I don't think I ever said, and if I

11  did, let me clarify that the standards for relief from the

12  PSLRA stay and standards for relief from the automatic stay

13  under 362 are the same.  They are not.  However, and as the

14  Court noted, Courts that have considered this question in the

15  past have looked to a determination -- Bankruptcy Courts have

16  looked to a determination by the District Court as at the very

17  least providing some evidence of some undue prejudice and some

18  evidence that's relevant to the determination of whether the

19  automatic stay should be lifted in the wake of the granting of

20  relief from the PSLRA stay, and that's the only point that I

21  made previously, and just want to clarify that.

22      I think, what was most telling from counsel for the

23  Debtor's presentation is the emphasis on protecting the

24  estate's causes of action, Your Honor.  And I think that goes

25  back to the discussion that we had earlier as to whether the

1 estate is afforded, by virtue of the fact that they are a

2 Chapter 11 Debtor, some built in advantage in terms of pursuing

3 claims against common Defendants.

4          THE COURT:  Well, I took that argument, in part, to

5 mean something more in the nature of, listen we have a

6 different lens through which we're looking at this information

7 which differs from that which the Plaintiffs are seeking, and

8 so therefore, a wholesale turnover information would be

9 appropriate.  Maybe it meant more than that, but that's what I

10 took it largely to mean.

11          MR. ETKIN:  Well, I understand that, Your Honor,

12 and --

13          THE COURT:  Let's put it this way.  Articulated that

14 way, I consider that to be a position of greater merit than the

15 one you were about to attack.

16          MR. ETKIN:  Okay, then I'll leave that alone.

17          THE COURT:  Okay.

18          MR. ETKIN:  Your Honor, again, you know, I -- having -

19 - you know, having done this more than once, you know, I

20 consider myself somewhat adept at reading the tea leaves here,

21 and Your Honor posed the question that I raised earlier, which

22 is to avoid dealing with the issue of production now, and

23 everybody seems to concede that in varying degrees this is

24 somewhat of a timing question, what would be the problem with

25 granting limited relief from the automatic stay so as to allow

1  the New York State Teachers Retirement System to file a motion

2  with the District Court seeking relief from the PSLRA stay.

3  That does not implicate any production of any documents at this

4  time.

5       THE COURT:  Well, what would such an order say?  Not

6  my order, but the District Court's order ultimately?

7       MR. ETKIN:  I don't know what the District Court's

8  order of opinion would say.  I would hope it would be helpful

9  when I came back to Your Honor, if necessary, to pursue

10  modification of the automatic stay, but I can't read tea leaves

11  that well.  I can tell you what I hope it would say, and

12  certainly, because there are distinctions between relief from

13  the automatic stay under the Bankruptcy Code and relief from

14  the PSLRA stay, I would presume that somewhat of a different

15  argument would be made.  But it would be argument, Your Honor,

16  for the most part, it would not involve any discovery with

17  respect to that motion.  It's a motion and an opposition and a

18  reply.  Interestingly enough, the Debtor's not a party to the

19  Federal securities litigation.  The Debtor need not even take

20  the position with respect to that.  One would presume that the

21  individual Defendants in that case, or other Defendants and

22  non-Debtor Defendants in that case, will take up the gauntlet

23  with respect to opposing any attempt for relief from the

24  automatic stay.  But if the Debtor desires to put in papers and

25  sets forth its position, I don't really look at that as any

1 undue burden.  That's lawyer driven, and I think that they've

2 made most of their arguments already.  And to the extent that

3 there are differences or nuances, I leave it to them to make

4 them.  But they are not a party to that case, and they need not

5 respond to that motion.

6     I do think, Your Honor, that you know, the statement was

7 made, well, why would it be any different 6 months from now.

8 The advantage that's being gained by those who have possession

9 of these documents and are able to review these documents and

10 frame a litigation strategy by virtue of having possession of

11 these documents, that can only get worse.  It can't get better,

12 regardless of what anyone thinks as to the degree of prejudices

13 as I'm standing in front of you today.  But it certainly can't

14 get any better.  I think that no one's ox is gored by virtue of

15 being able to go forward to the District Court.  I think the

16 landscape may change between now and then.  The Examiner's

17 report may come out between now and then.  A lot may happen

18 between now and then, and I think having the benefit of a

19 determination by the District Court with respect to the PSLRA

20 stay would be helpful to the extent that this Court is called

21 upon to make an ultimate determination when that landscape has

22 changed.

23     So again, Your Honor, I think that that is more than a

24 Solomon-like approach to deal with the real issues that we've

25 brought before the Court, the real concerns we have; concerns

1 that have not been swept aside by other Courts when asked to

2 consider them regarding the level playing field that we're

3 looking for.

4        THE COURT:  How far into the various bankruptcy

5 proceedings that you've been involved in and in which you rely

6 for seeking similar relief in this Court, how long were the

7 bankruptcy proceedings pending before relief was granted,

8 conditional or otherwise?

9        MR. ETKIN:  Well, it would be probably months, Your

10 Honor; in certain cases, maybe more.  Also bearing in mind that

11 the relief that was granted, whether it was conditioned on

12 ultimate relief from the District Court or whether it was

13 reserved pending ultimate relief from the District Court,

14 required time to get from point A to point B.  Again, the

15 making of the motion in the District Court and an ultimate

16 determination by the District Court in order to effectuate any

17 conditional order or to satisfy a requirement that that

18 determination be made before coming back.  It was certainly

19 well in advance of any plan considerations.  Here, you know,

20 again, we do have a straight liquidation; that was not the case

21 in WorldCom, nor was it the case in Delphi.  But it certainly -

22 - these motions certainly came on the heels of requests by

23 other parties for these types of documents and the production

24 of these types of documents to other parties.

25        THE COURT:  Well, we're at our 6 month anniversary

1  today.  Any notion of, in the other cases, whether that relief

2  was granted before or after 6 months?  I'm guessing it came

3  later.

4          MR. ETKIN:  If it did come later, Your Honor, it

5  didn't come much later, and I don't think that the issue of how

6  long the case was pending really came into or was relevant to

7  the consideration of the decisions that were made.  I think it

8  was just a review of the landscape, which is similar in this

9  case, as with the other cases, where there's an SEC

10 investigation, a Department of Justice investigation,

11 production of documents that have been made to a committee, to

12 the agencies, in this case, to an Examiner.

13      Your Honor, you know, in the interest of candor, the Revco

14 case was cited.  Of course, that case was cited, not the Delphi

15 case, by Debtor's counsel.  But in the Revco case, Judge Lynch,

16 for his reasons, did not grant relief from the PSLRA stay.  So

17 that ended the inquiry at that juncture.  That did not stop the

18 Bankruptcy Court, you know, from making that same determination

19 initially that go ahead and make your motion in the District

20 Court and then come back to me, if necessary, when that

21 motion's been decided.

22          THE COURT:  Well, I don't know.  Maybe there were

23 other differences, but it Revco the massive fraud was, I think,

24 apparent from nearly the beginning, wasn't it?

25          MR. ETKIN:  Well, in that case, Your Honor, I think

1  that it was, if you can characterize fraud as more apparent in

2  that case, maybe that would be a fair assessment by virtue of

3  the criminal proceedings that were pending and that had been

4  brought.  But I don't think that in the grand scheme of things

5  I think this case crosses well over the threshold of the

6  apparency of some significant problems and fraud in connection

7  with the operation of this company pre-petition.

8        THE COURT:  All right.  Thank you.  I see something in

9  your eyes, Ms. Uhland, and --

10        MS. UHLAND:  I'll be very brief, Your Honor.  I think

11  that in this case, you know, the question -- I get back to the

12  balancing of the hardships, and the Movants really have not --

13  we've established in the balancing of hardship a number -- a

14  substantial amount of prejudice, both in just dollars of re-

15  reviewing, disruption of our process.  And the prejudice

16  claimed or the hardship claimed by the Movants is just simply

17  not very compelling.  There's none even listed in their

18  original motion.

19        In the other cases that we've looked at there were

20  discussions of moving towards settlement agreements or other

21  competing civil litigants who have the information.  And here

22  it just seems like such a conceptual prejudice to them that,

23  you know, the Debtor entities have information, and I'll

24  include the Creditors Committee in that, is, you know, the

25  Debtor's -- the company's side of this always has the

1 information to pursue their causes of action.  I don't know how

2 the Debtors and the Creditor's Committee, like I said, joined

3 as the estates being in possession of certain information that

4 other litigants don't at this juncture.  It creates undue

5 prejudice to the Movants.  And I think at this point, they just

6 have not met their case on the burden of their prejudice to

7 warrant the relief they're seeking.

8             THE COURT:  All right.  What's the date the Examiner's

9 report is now due?  If you don't know, Mr. Minuti, do you know?

10            MS. UHLAND:  We filled in, I think, in our draft order

11 June -- January --

12            MR. INDELICATO:  Yeah, Your Honor, the order that's

13 gonna -- is being circulated, which I don't believe is

14 completed yet, it's January 15th.

15            THE COURT:  Okay.  Thank you.

16            MS. UHLAND:  Thank you, Your Honor.

17            THE COURT:  All right.  I'm prepared to make my

18 ruling.  I have some sympathy for the Movant's position here

19 that one alternative available to this Court is to grant

20 limited relief, which, in counsel's words, is largely lawyer

21 driven.  I tend to agree with that.  But I think on this record

22 cause has not been established for a modification of the stay.

23      The record does not demonstrate to me that there's

24 prejudice to the Movants here.  All the documents being

25 collected will be preserved.  If there is an advantage to

1 certain parties in the estate for having had these documents

2 and the opportunity to review them over time, it certain hasn't

3 been demonstrated that it's any material or undue advantage to

4 those who are receiving them.

5      And when I weigh the balance of the hardships, I think it

6 favors, clearly, the Debtor's position here, given the amount

7 of time and professional and company effort that's being

8 expended at this point.  And I think to grant the relief that's

9 been requested now begins a process which would unjustifiably

10 deflect the efforts and increase the cost of administration of

11 this estate.

12      I'd like the parties to confer and submit a form of order

13 that embodies this ruling, but it should include the following

14 -- and it follows my view that sooner or later the Debtor and

15 the Committee or their successors are going to have to address

16 this.  And so the motion will be denied, but with leave to

17 renew it upon the earlier of the filing of a report by the

18 Examiner or plan confirmation.  Are there any questions about

19 what should go in the order?

20      MS. UHLAND:  Your Honor, only to clarify that it

21 should be the -- there are two -- there's likely to be an

22 interim report on the cash collateral issue, and I assume

23 you're referring to the Examiner's report with respect to the

24 accounting issues?

25      THE COURT:  January 15th.

1        MS. UHLAND:  Yes, thank you, Your Honor.

2        MR. ETKIN:  Your Honor, I'd like to try to make one

3  request with respect to the order.  To the -- I don't know what

4  may happen between now and January 15th, but to the extent --

5        THE COURT:  There is a change in circumstances, you

6  may put that in as a trigger.

7        MR. ETKIN:  Thank you, Your Honor.

8        THE COURT:  Fair request.  All right, anything further

9  on this matter?  Okay.

10       MR. SILBERGLIED:  Your Honor, may Mr. Johnson and I

11  both be excused?  Thank you, Your Honor.

12       MR. MERCHANT:  Your Honor, Mike Merchant again for the

13  record.  Agenda item 24 was the Examiner's Motion for an

14  Extension of Time to file his report.  It was heard at the last

15  hearing.  The agenda indicates that the parties are working on

16  a form of order.  We are still working on a form of order.

17  Several versions were exchanged yesterday and today.  We

18  believe we're fairly close.  If we can reach agreement with

19  Examiner's counsel and the U.S. Trustee, we'd like to submit it

20  under certification of counsel.

21       THE COURT:  Okay.

22       MR. MERCHANT:  Excuse me, Your Honor.

23       MR. INDELICATO:  I'm assuming the agreement of the

24  Creditors Committee was just an inadvertent slip by Mr.

25  Merchant, he fully intends to submit a copy to us.

1     But the reason I rise, Your Honor, is because I just

2 wanted to inform the Court of something and maybe get some

3 direction, maybe not.  We had a very good meeting, I think,

4 yesterday with the Examiner.  The Examiner has been very

5 forthright with us and explained to us what he's been doing,

6 what he intends to do, and much as we had expressed in our

7 objection to the extension of his time, and where he intends to

8 go.

9     Your Honor, the Examiner is looking at his role and is

10 taking it very seriously and is doing a very thorough job.  I

11 won't go through my analysis that I used the last time, but the

12 Committee, also doing its job, has a concern that this is

13 costing an awful lot of money.  And as you heard today in the

14 testimony in the prior matter, O'Melveny has 30 people looking

15 at documents on a regular basis for privilege.  The Examiner's

16 fees, just on the applications that already have been filed

17 with their accountants, are exceeding $4 million.  The

18 projections we've gotten, Your Honor, are multiple of that to

19 bring this thing to a conclusion.

20     What we would suggest to the Court, maybe it is

21 appropriate to have a conference with Your Honor to explain

22 where the various parties are so the Court could understand the

23 magnitude that's being undertaken with respect to the

24 Examiner's report.  And maybe we can do it in pieces, maybe

25 there's some way we can get a handle on the costs and expenses,

1 but I think it's taken on a life even greater than the

2 Creditors Committee ever had anticipated.  We do not want to be

3 put in a position where we're fighting about fees later on

4 because of work that has already been done in good faith based

5 on an interpretation of an order.  And that's why we're

6 bringing it to the Court's attention today.

7         We think, at least from the Creditors Committee's

8 perspective, we understand the Examiner's need to do an

9 examination.  We understand the Court's desire to appoint him.

10 But we do want to sort of, if we can, at least sort of reign in

11 the expenses.

12        To be fair to the Examiner, we had a committee meeting

13 right after his meeting, so I alerted Mr. Minuti that I was

14 going to be making these statements today.  We haven't told

15 them.  And obviously it's subject to their convenience or the

16 Court's convenience.  We would like to have that discussion.

17 But we really do believe, given the magnitude of what this

18 examination will cost and from all sides, and with potential

19 recovery for Creditors could be here, it's gonna be a

20 significant portion of the estate.  And we're just looking for

21 some direction, and we think it might be appropriate at this

22 stage, to address that with the Court, if the Court would be so

23 inclined.

24             THE COURT:  Well, I'm open to the notion.  Is this

25 something that the parties are requesting be held off the

1  record?

2        MR. INDELICATO:  I think, Your Honor, I think it would

3  only be appropriate.  The Examiner was forthright with us, and

4  I think he would want to be as forthright with the Court as to

5  issues that he's uncovered and may be exploring.  And I think

6  that would be appropriate to be off the record.

7        THE COURT:  All right.  Well, I would say talk to the

8  necessary constituents and reach out to the Court and we'll try

9  to schedule something.

10        MR. INDELICATO:  Thank you, Your Honor.

11        MR. MCMAHON:  Your Honor, good afternoon, Joseph

12  McMahon.  May I be excused?

13        THE COURT:  You may.

14        MR. MCMAHON:  Thank you.

15        MR. MERCHANT:  Your Honor, agenda item #25 is Plaza

16  America Office Development, LLC's motion.  I will cede the

17  podium to them.  Ms. Nagle will be handling this matter on

18  behalf of the Debtors.

19        THE COURT:  Very well.

20        MR. TAYLOR:  Good afternoon, Your Honor, William

21  Taylor, McCarter & English here in Delaware, for Plaza America.

22  With me today is Charles Malloy of Arnold & Porter.   On

23  September 27th I filed a pro hac admission that Your Honor

24  granted, I don't know exactly the date, but it was granted last

25  week.  If it's all right with you, I'd like to cede the podium

1  to Mr. Malloy.

2          THE COURT:  Very well.

3          MR. MALLOY:  Good afternoon, Your Honor, Charles

4  Malloy from Arnold & Porter.  I represent the Movant, and it's

5  a pleasure to be before the Court.

6      As an administrative matter, the Movant has a witness here

7  today, Ms. Ghadir Baker, whose declaration was attached to the

8  motion as an exhibit.  I would like to call Ms. Baker to

9  supplement some of the matters in her declaration, as well as

10 to respond to some of the factual assertions made in the

11 Debtor's objection to the motion.  As an administrative matter,

12 would the Court prefer that I call her now or proceed with

13 opening statements, argument --

14         THE COURT:  Let me ask, how much time would you

15 anticipate direct examination would consume?

16         MR. MALLOY:  It shouldn't take more than about 10

17 minutes, Your Honor.

18         THE COURT:  All right.  No, we'll proceed with the

19 testimony.  Let's take a 10 minute recess and then we'll take

20 her.

21         MR. MALLOY:  Thank you, Your Honor.

22     (Court in recess)

23         THE CLERK  All rise.

24         THE COURT:  All right, let's proceed with the Plaza

25 America motion.

1          MR. MALLOY:  Thank you, Your Honor.  If I may, I'd

2  like to make a brief opening statement and then --

3          THE COURT:  Go ahead.

4          MR. MALLOY:  -- call Ms. Baker.  Your Honor, this

5  claim turns on the Debtor's lease rejection procedures and

6  their failure to comply with them with respect to their

7  attempted rejection of the lease at Plaza America Office

8  Development, which is a office complex in Reston, Virginia.

9  Two of the Debtors, New Century Mortgage Corporation and

10 Home123 Corporation, leased an office suite from the landlord

11 and purported to reject the lease by a notice dated on or about

12 June 20, 2007.

13         THE COURT:  I did -- so you know, I did read the

14 papers.

15         MR. MALLOY:  Okay, thank you, Your Honor.  As you

16 know, the landlord is seeking post-petition rent for July,

17 August and September based on the position that the lease

18 wasn't properly rejected pursuant to the procedures.  Since

19 Your Honor has read the papers, at this point I'd call Ms.

20 Baker.

21         GHADIR BAKER, PLAZA AMERICA'S WITNESS, SWORN

22         THE CLERK:  For the record, please state your full

23 name, spelling your last name.

24         MS. BAKER:  Ghadir Baker, B-A-K-E-R.

25         THE COURT:  You may be seated.

1                     DIRECT EXAMINATION

2  BY MR. MALLOY:

3  Q.  Good afternoon, Ms. Baker.

4  A.  Hi.  Good afternoon.

5  Q.  Could you state, for the record, your occupation?

6  A.  I'm Vice President of Property Management for Atlantic

7  Realty Companies.

8          THE COURT:  Would you move yourself closer to the

9  microphone?

10  A.  I'm Vice President of Property Management --

11          THE COURT:  There you go.  Thank you.

12  A.  -- for Atlantic Realty Companies.

13  BY MR. MALLOY:

14  Q.  And how long have you been in that position?

15  A.  I've worked for Atlantic for 9 years, Vice President for a

16  year and a half.

17  Q.  And is your work specific to a certain location or

18  property?

19  A.  Yes, it is.

20  Q.  And what property is that?

21  A.  Plaza America.

22  Q.  And can you describe, generally, what your responsibilities

23  are?

24  A.  Generally, oversight, operations of the entire project.

25  Q.  And in particular, are you involved with leasing or

1  marketing the premises to tenants?

2  A.   I review leases and show space, yes.

3  Q.   And could you also describe, very generally, the layout at

4  Plaza America and what kind of property it is?

5  A.   Yeah, it's a commercial complex made out of four office

6  buildings and a shopping center, totaling 1.2 million square

7  feet; 9.7 is office space and the remainder is the shopping

8  center.

9  Q.   And with respect to New Century, when did New Century move

10 into the premises?

11 A.   Around July of 2005.

12 Q.   And can you describe the physical location and layout of

13 the premises that are leased by New Century?

14 A.   Yeah, they have the entire second floor of 11700 Plaza

15 America Drive.

16 Q.   And how are those premises laid out within the second

17 floor?

18 A.   It's segregated two offices; one was by New Century

19 Mortgage and one occupied by Home123, but they shared a single

20 entrance and the reception area.

21 Q.   And how many entrances and exits are there at the premises?

22 A.   Well, there's one entrance and three exits.

23 Q.   And the distinction between the entrance and exits, can you

24 expand on that a little bit?

25 A.   Yeah, the entrance is right off the main elevator lobby and

1 the exits are towards the back of the building through the back

2 hallway, the exits.

3 Q.  And did New Century install its own security system at the

4 premises?

5 A.  Yes, they did.

6 Q.  And when did it -- when did they do that?

7 A.  Around the same time they did their build-out.

8 Q.  Oh, so that was towards the beginning when they took

9 possession?

10 A.  Around -- yeah, June, July of '05, yeah.

11 Q.  And did they give a reason for installing their own

12 security system?

13 A.  No, they don't.  We approved it through the -- our approval

14 of the construction documents.

15 Q.  And is that something that tenants typically will do?

16 A.  Yes.

17 Q.  Who's the security vendor for New Century's --

18 A.  ADT.

19 Q.  Okay.  And does Plaza America have a separate security

20 vendor --

21 A.  Yes, we do.

22 Q.  -- the landlord?

23 A.  Yes, we do.  Datawatch Systems.

24 Q.  Okay.  Is a security system something that you would

25 typically leave in place after one tenant vacates and another

1 tenant wants to lease the premises?

2 A.  Not really because all the independent, kind of --

3 individual tenants have individual requirements.

4 Q.  With respect to the security system, did New Century

5 provide the landlord with access cards for the security system?

6 A.  They didn't give us access cards, but their system was

7 compatible with the cards that we had, so they activated our

8 cards onto their system.

9 Q.  And was that at the inception of the lease?

10 A.  Yes.

11 Q.  At some point in time did the landlord's cards no longer

12 work with New Century's security system?

13 A.  Yeah, they ceased to operate right after they laid

14 everybody off that worked in that building.

15 Q.  What approximate time period was that?

16 A.  May 4th of '07.

17 Q.  And subsequent to that, did the landlord -- or did New

18 Century provide the landlord with an access card or cards?

19 A.  Yes, they did.  They gave us a single card to allow their

20 contractors and vendors in the space.

21 Q.  And did New Century ever send the landlord a letter stating

22 that it was surrendering the premises?

23 A.  I never received them, but I knew that there was one sent.

24 Q.  Did you ever see such a letter or sign it?

25 A.  I don't recall seeing it and I didn't -- definitely didn't

1 sign one.

2 Q.  Are you aware of anyone, any representative of the

3 landlord, signing the letter?

4 A.  No, I'm not aware of that.

5 Q.  Returning to the security system, can you describe,

6 generally and with a little more specificity I guess where the

7 security system that New Century installed is located and sort

8 of how it works?

9 A.  It's on all their doors and entrance doors and exit doors

10 and it's a card reader.  You put a card against it and it gives

11 a signal to the door and the door unlocks.

12 Q.  Is it -- has it been necessary since New Century left the

13 premises for you to enter the premises?

14 A.  Yes.

15 Q.  And what reasons for you to enter the premises?

16 A.  Multiple reasons.  Either showing the space or provide

17 access to contractors that are doing construction for other

18 occupants of the building, run wiring for other tenants in the

19 building for their vendors.

20 Q.  And when it's necessary for you to access the premises,

21 what steps are necessary?  What do you have to do?

22 A.  Well, we either use a manual key to the back doors, which

23 sets off the alarm and we'll have to listen to the alarm, or

24 I'd send an engineer ahead of me, he'd unlock -- he'd go

25 through the back and then go to the front of the space, unlock

1  it for me, we'll go in, wait for him to go back around and

2  unlock the space leading to either the Home123 or the New

3  Century Mortgage side.

4  Q.  And why wouldn't you just use the access card that New

5  Century provided?

6  A.  Because there's 11 of us and it could be with any one of us

7  at any one given time; it's not always in a specific location.

8  Somebody could have used it, left it on their desk or is still

9  on their person, so --

10  Q.  Have you been marketing the premises since New Century

11  left?

12  A.  Yes, we have.

13  Q.  And have you had any inquiries from prospective new

14  tenants?

15  A.  Yes, we have.

16  Q.  And have you shown the premises to any prospective new

17  tenants?

18  A.  Yes, we have.

19  Q.  And has the security system affected your ability to show

20  the premises to new tenants?

21  A.  We have -- it has because it's a Class A facility and it's

22  not Class A to take a tenant through an alarm system, a

23  prospective tenant through an alarm system, or to have to wait

24  in a specific location for somebody to go and unlock the door

25  for you.

Baker - Cross                        69

1  Q.  Now with respect to ADT, the security vendor, New Century's

2  security vendor, since the time that the landlord filed this

3  motion for administrative rent, has the property manager or any

4  representative of the landlord contacted ADT regarding the

5  security access system?

6  A.  Well, we recently contacted them to relinquish control of

7  the system, yes.

8  Q.  And you did ask them to disable or remove the system?

9  A.  Yes, we did.

10  Q.  And what was ADT's response?

11  A.  They have to get New Century's approval to do so.

12  Q.  And as we stand here today, has the security system been

13  disabled?

14  A.  As of this morning, no.

15          MR. MALLOY:  Okay.  I don't have any further questions

16  at this point.

17          THE COURT:  Cross examination?

18          MS. NAGLE:  Thank you, Your Honor.  For the record,

19  Shannon Nagle on behalf of the Debtors.

20                        CROSS EXAMINATION

21  BY MS. NAGLE:

22  Q.  Good afternoon.  How are you?

23  A.  Hi.

24  Q.  Is the access card that you are referring to, would you

25  consider that to be equivalent to a key to a door?

1 A.  No.

2 Q.  Does it work in the same way as a key?

3 A.  No.  No, it's a card.

4 Q.  Well, I know it's a card.  It's a piece of plastic,

5 presumably, but is there any other way to get in the front door

6 besides --

7 A.  No.

8 Q.  -- using the card?

9 A.  No.

10 Q.  So in that way it works like a key --

11 A.  Uhm-hum.

12 Q.  -- to get in the front door?

13 A.  Uhm-hum.

14        MS. NAGLE:  I have no further questions.

15        THE COURT:  Any other cross examination?  Any

16 redirect?

17        MR. MALLOY:  Just one question, Your Honor.

18              REDIRECT EXAMINATION

19 BY MR. MALLOY:

20 Q.  Ms. Baker, you testified that there is no other way to get

21 through the front door other than to use the access card, is

22 that correct?

23 A.  Yes, there is no other way.

24        MR. MALLOY:  No further questions, Your Honor.

25        THE COURT:  Thank you.  You may step down.

Wagner - Direct                          71

1            MS. BAKER:  Thank you.

2      (Witness steps down)

3            MR. MALLOY:  Your Honor, may Ms. Baker be excused from

4  the Courtroom?

5            THE COURT:  Is there any objection?

6            MS. NAGLE:  No, Your Honor.

7            THE COURT:  All right.  Yes, she may.  Anything else

8  in support of the motion besides arguments?

9            MR. MALLOY:  Not from the Movant, Your Honor.

10            THE COURT:  All right.

11            MS. NAGLE:  Good afternoon, Your Honor, Shannon Nagle

12  on behalf of the Debtors.  We also have a witness, and I can

13  either make argument or I can go ahead and call the witness,

14  whatever you prefer.

15            THE COURT:  No, let's complete the evidentiary record.

16            MS. NAGLE:  Okay.  Your Honor, we'd like to call

17  Andrew Wagner to the stand please.

18            ANDREW WAGNER, DEBTOR'S WITNESS, SWORN

19            THE CLERK:  For the record, could you please spell

20  your last name and repeat your name?

21            MR. WAGNER:  Sure.  Andrew Wagner, W-A-G-N-E-R.

22                        DIRECT EXAMINATION

23  BY MS. NAGLE:

24  Q.  Good afternoon.  Can you please tell the Court your

25  position currently, who you work for, and what you're currently

1 doing with respect to the case?

2 A.  Sure.  I'm a consultant with Alex Partners.  We are the I

3 guess you'd say turnaround consulting firm to New Century

4 responsible for the wind-down operations.

5 Q.  And you personally, what aspect are you involved in in the

6 case?

7 A.  I'm personally involved with real property lease

8 rejections, as well as other executory contract rejections.

9 Q.  And about how many leases has the Debtor rejected pursuant

10 to the Court approved procedures thus far?

11 A.  Probably over 300.

12 Q.  Okay.  And to your knowledge, is this the first landlord

13 issue that we've had to come before the Court with respect to

14 the access or alarm systems?

15 A.  This is the first one that I'm aware of.

16 Q.  And are there similar access and alarm systems in all the

17 locations you referred to earlier?

18 A.  It's my --

19      MR. MALLOY:  Objection, Your Honor, on the basis of

20 relevance.

21      THE COURT:  Any response?

22      MS. NAGLE:  Your Honor, he is going to discuss the

23 mechanism in which the Debtor rejected the leases, and we think

24 it is relevant in this particular case because the

25 communications between the Debtor and ADT and the landlords is

1 what's an issue here.

2          THE COURT:  Overruled.  You may answer.

3          MS. NAGLE:  You want to read back the question so he

4 answers the right one?

5          THE COURT:  We can replay it for you.

6          MS. NAGLE:  Oh.

7      (Pause in proceedings)

8          THE COURT:  Well, in theory we can replay it for you.

9      (Question replayed for witness)

10 A.  It's my understanding that each branch location had it's

11 own ADT system.

12 BY MS. NAGLE:

13 Q.  And is that for security or access?

14 A.  Some had security, some had access, some had a closed-

15 circuit TV.

16 Q.  Okay.  And are you familiar with the Reston, Virginia lease

17 space that is the subject of this particular motion?

18 A.  Yes, I am.

19 Q.  And are you familiar with the motion that the landlord

20 filed?

21 A.  I have actually read it, yes.

22          MS. NAGLE:  Your Honor, at this time I'd like to give

23 the witness a copy of the motion because there are exhibits

24 attached.

25          THE COURT:  All right, has it been marked?

1          MS. NAGLE:  No.

2          THE COURT:  All right, let's have it marked --

3          MS. NAGLE:  All right.

4          THE COURT:  -- D-1.

5          MS. NAGLE:  Okay.

6     (Debtor's Exhibit-1 marked for identification)

7          MS. NAGLE:  May I approach?

8          THE COURT:  Yes.

9     (Counsel approaches witness)

10         MS. NAGLE:  Do you have a copy, Your Honor?

11         THE COURT:  I'll follow along with my binder copy.

12         MS. NAGLE:  Okay.

13   BY MS. NAGLE:

14   Q.  Okay.  On -- just a couple of questions, first, before we

15   get to the exhibits in the motion.  What date was this lease

16   rejected?

17   A.  I believe the lease was rejected effective June 30th.

18   Q.  And do you know what date and pursuant to what procedure

19   the Debtor rejected this lease?

20   A.  The notice procedures that were approved by the Court, I

21   believe it was April 24th.

22   Q.  Okay.  With respect to ADT, the security system company,

23   did you contact them with respect to this particular lease?

24   A.  There was a, I believe it was a FedEx, as well as an email,

25   that was sent to ADT requesting the cancellation of several ADT

1  contracts -- or several ADT access cards, burglar alarms for

2  various locations, of which Reston, Virginia was contained on

3  that letter.

4  Q.  Okay.  And do you know the approximate date that letter was

5  sent?

6  A.  I believe it was May 23rd.

7  Q.  Okay.  And do you know the approximate date the Debtors

8  evacuated or moved out of the premises that are subject to this

9  dispute?

10 A.  I would guess prior to June 30th.

11 Q.  Okay.  All right.  If you could turn to the lease, which is

12 attached as Exhibit B to the motion, the Debtor's motion -- I

13 mean, yeah, the landlord's motion, and there is an Exhibit D to

14 the lease called Rules and Regulations.

15 A.  Okay.

16         MS. NAGLE:  Your Honor, there're no pages on the --

17         THE COURT:  I have it.

18         MS. NAGLE:  Oh, you do?  Okay.

19 BY MS. NAGLE:

20 Q.  All right.  And do you see what's marked as paragraph 6?

21 A.  Yes.

22 Q.  And can you read that please?

23     (Witness reviews document)

24 A.  Okay.

25 Q.  Okay.  And what is your understanding of what paragraph 6

1 says?

2 A.  Basically, it would appear to say that the tenant shall

3 provide the landlord with a key for anything that is installed,

4 basically, on their own.

5 Q.  How many?

6 A.  It says a key.

7 Q.  Does that imply one?

8 A.  To me it would.

9 Q.  Okay.  To your knowledge, did the landlord have a key to

10 the premises?

11 A.  Yes.

12 Q.  Did they have an access card to the premises?

13 A.  It's my understanding they did.

14 Q.  Okay.

15         MS. NAGLE:  Your Honor, I have nothing further.

16         THE COURT:  Cross examination.

17         MR. MALLOY:  Thank you, Your Honor.

18                   CROSS EXAMINATION

19 BY MR. MALLOY:

20 Q.  Good afternoon, Mr. Wagner.  Just a couple of questions for

21 you.  Do you have direct knowledge of the security system

22 that's in place at the Reston premises?  And by that, I mean

23 have you observed it?  Have you seen it?

24 A.  I have never physically seen the system.

25 Q.  Are you familiar with the layout of the premises in Reston?

1 A.  From the motion as well as blueprints that I've seen and

2 sort of the general layout.

3 Q.  But you've never physically been to the premises?

4 A.  Correct.

5 Q.  Did you ever receive confirmation from ADT that the

6 security system was turned off or disabled?

7 A.  No, nor have I ever received any confirmation from any

8 cancellation of any other contract.

9 Q.  Have you ever sought confirmation from ADT that the request

10 to cancel services was completed or followed through on?

11 A.  Due to the sheer volume of contracts and other issues with

12 the wind-down of the operations, no.

13        MR. MALLOY:  I don't have any further questions, Your

14 Honor.

15        THE COURT:  Any redirect?

16        MR. NAGLE:  No, Your Honor.

17        THE COURT:  All right.  Thank you, sir.  You may step

18 down.

19        MR. WAGNER:  Thank you.

20    (Witness steps down)

21        THE COURT:  All right.  Does the Debtor have any --

22 well, does the Debtor wish to move the admission of D-1?

23        MS. NAGLE:  Yes, we do, Your Honor.

24        THE COURT:  Is there any objection?

25        MR. MALLOY:  No objection.

1        THE COURT:  All right, D-1's admitted without

2  objection.  Does the Debtor have any other evidence in

3  opposition to the motion?

4      (Debtor's Exhibit-1 admitted into evidence)

5        MS. NAGLE:  No, just argument, Your Honor.

6        THE COURT:  All right.  Am I correct that when --

7  between the papers and the record -- well, that the landlord's

8  argument boils down to we only got one access card and that

9  wasn't enough?  It effectively kept us from taking back the

10 premises?

11       MR. MALLOY:  Effectively, Your Honor.  Yes, the

12 argument is that we have one access card, that the procedures

13 contemplate that when the Debtor rejects a lease it is to

14 unequivocally relinquish possession of the premises.  When you

15 have an access card that's monitored and run and controlled by

16 a third party which has no direct obligations to the landlord,

17 that being ADT, and that has a security system in place that

18 controls access to the premises, that that is not unequivocally

19 relinquishing possession of the premises.  That's maintaining a

20 control and impediment to the landlord's ability to freely

21 access the premises, as I think Ms. Baker's testimony

22 established.

23       THE COURT:  No, I think the essence of your client's

24 position is because there were so many people who needed to

25 enter the premises after the Debtor vacated, and there seems to

1 be no dispute that the Debtor vacated the premises on a timely

2 basis, that one card wasn't enough.

3          MR. MALLOY:  Yeah, I think that's the nub of it, Your

4 Honor, is one access card is not enough to permit a landlord

5 who's got Class A office space trying to lease it to new

6 tenants who needs to access those premises.  And honestly, one

7 card is, you know, a card that -- if it was the landlord's

8 security vendor they could call 'em up and say can we have 50

9 cards?  It's not, it's ADT, and ADT has told my client that

10 they need New Century's permission to turn the system off.

11          THE COURT:  Sure, and any security company, it seems

12 to me, would be stubborn in that respect.

13          MR. MALLOY:  Certainly, I would expect.

14          THE COURT:  Well, let me ask this.  The record before

15 me indicates that ADT was contacted, but only recently, but no

16 date was given to that by your witness with respect to that

17 problem.  What efforts, if any, did the landlord make to convey

18 to the Debtor that there was an issue here?

19          MR. MALLOY:  Your Honor, as attached to our motion

20 were two exhibits.  There was initially a letter dated July 19,

21 2007, which is attached to the motion as an exhibit wherein we

22 raised this issue with the Debtor, told them that we did not

23 consider their rejection effective because the security system

24 was still in place, asking them , A , to take some action to

25 disable the security system, and B, informing them that, you

1 know, absent doing that the landlord would assert all of its

2 rights, including its rights under the 365(d)(3).  That was on

3 July 19th.

4        Subsequent to that, on August 28th, we sent the Debtor

5 another letter basically renewing our request, saying that it

6 had been 6 weeks and we hadn't seen any action taken, asking

7 them to disable the security system and, again, reserving our

8 rights under 365(d)(3).

9        Subsequent to both of those letters, I did have some

10 conversations with counsel to the Debtor.  She instructed me

11 that my clients should contact ADT directly.  I received

12 written authorization to do that from the Debtor.  My client

13 did contact ADT, at which point ADT informed my client that

14 they needed New Century's permission to disable the security

15 system.

16        So this was not a case, Your Honor, of my client, the

17 landlord, laying in wait to spring a 3 month rent claim on this

18 Debtor.  It was an issue where we pursued this, trying to get

19 them to resolve the issue.  We did it in July when it was

20 arguably only a $53,000 issue.  We did it again in August when

21 it was a $100,000 issue, and now it's a $200,000 issue and the

22 Debtor still hasn't resolved it.  So we have made efforts.

23        THE COURT:  Thank you.

24        MR. MALLOY:  Thank you, Your Honor.  If I may just

25 make a few more points --

1          THE COURT:  Go ahead.

2          MR. MALLOY:  -- by way of argument.  The other point,

3   Your Honor, that I'd like to raise is that the landlord here --

4   this is a bankruptcy situation.  The landlord shouldn't be put

5   in the position of having to exercise self-help remedies.

6   There's an automatic stay in place.  Whether or not the

7   rejection was effective wasn't a clear issue, and to the extent

8   that the Debtor would argue, well, the landlord should have

9   just, you know, jimmied the lock or unplugged the security

10  system, I'd submit that that's an inappropriate action for a

11  landlord to take in the bankruptcy context.

12         THE COURT:  I didn't hear that suggestion or read it.

13         MR. MALLOY:  The only other points that I would make

14  are, again, with respect to the letter that the Debtor sent to

15  ADT.  Again, the testimony from their witness was that they

16  never received any confirmation from ADT that the system had

17  been disabled.  Apparently, they never followed up with ADT,

18  even after we contacted them, to get the system disabled.  And,

19  you know, apparently to this day ADT hasn't turned the system

20  off.

21         And the only other point I'd raise is with respect to the

22  June 29th letter purportedly surrendering the premises that the

23  Debtor attached to their objection.  I'd state that the letter

24  simply is not effective.  It was never agreed to or

25  acknowledged by any representative of the landlord.  And

1 regardless of what they say in the letter, if they're

2 maintaining a security system that's restricting access, the

3 letter's just not effective.  It doesn't alter the realities of

4 the situation.  The Movant doesn't have anything further.

5 Thank you, Your Honor.

6          THE COURT:  Thank you.

7          MS. NAGLE:  Your Honor, just briefly.  We did, upon

8 receiving the letters that were attached to counsel's -- or to

9 the landlord's motion, investigate and respond.  The

10 declaration -- or the motion itself refers to the fact that

11 there was correspondence between counsel and they were informed

12 that the alarm system was not an alarm; it's not like the

13 police would come, that it was merely an access system and that

14 we believed them that they possessed a key card, which they

15 admit they had.

16      We submit that the notice procedures approved by this

17 Court specifically say that the rejection is effective 10 days

18 after the notice is filed or when we relinquish the premises.

19 We think in this case we did both.  Obviously, 10 days passed

20 from the notice of rejection being filed on June 20th, and also

21 we surrendered the premises, not only in -- pursuant to the

22 terms of the lease itself, which the testimony shows, the

23 landlord did have a key -- actually two keys; one to the back

24 door and one to the front door.  And we did notify them by a

25 letter, regardless of whether they signed it and sent it back,

1  that we were out of the premises.  So we believe the rejection

2  was effective on June 30th, and we request that the motion be

3  denied.

4         THE COURT:  Well, what efforts did the Debtor

5  undertake, if any, with ADT after it was advised that there was

6  a problem?  Or did the Debtor think, well --

7         MS. NAGLE:  We, Your Honor, we -- when we got the

8  letter from counsel we -- Mr. Wagner investigated what type of

9  system was in place at the specific property.  And as he

10  testified, there are over, you know, 340 leases that we were in

11  the process of vacating at the time, and we had moving trucks

12  all over the country and were -- and he was running this

13  effort, along with some others at New Century.  And we were,

14  you know, dealing with landlord issues and surrendering of

15  premises on a daily basis for a couple of months, plus trying

16  to reject leases as new months rolled around so that the estate

17  would not incur further administrative rent obligations.

18      When he realized that there was a claim by the landlord

19  that this particular alarm system was still activated, he

20  verified internally that the -- it was not an alarm system, it

21  wasn't hooked up to the police department, that it was an

22  access system, that the landlord did have an access card. And

23  he also verified that ADT had been contacted to cut down or

24  terminate the services at this particular location.  He

25  conveyed that information to me and I conveyed that information

1 to landlord's counsel.  We did not hear from them about

2 contacting ADT or getting our permission to ADT to disconnect

3 the services until after the motion was filed and our objection

4 deadline was approaching.

5      THE COURT:  All right, thank you.  I will tell you

6 this record demonstrates that neither side was as diligent as

7 it should have been, I think, in addressing the situation.

8      On the one hand, I can understand the landlord's concern

9 that whether it was accessing the premises for -- and it did

10 have access for purposes of the space itself and maintenance or

11 other issues or prospective tenants, that they have to do so

12 with the alarm going on because they only had one card to

13 access seems to me to have unnecessarily increased the

14 inconvenience to the landlord.

15      On the other hand, ADT was the Debtor's vendor and once

16 made aware of the problem should have corrected it immediately.

17 And to the extent ADT did not comply with instructions, with

18 which it should have complied, then the Debtor may have certain

19 rights against ADT.  But as I said, neither side, I think, was

20 as diligent as it should have been.

21      What I will do, however, is permit an administrative claim

22 through July of 2007, but not thereafter.  At the same time, I

23 will order, to the extent that the system is still live with

24 ADT, that the Debtor immediately, without waiting for the

25 signed order -- I order from the Bench today take whatever

1 steps are required to have the system shut off.  I'd like

2 counsel to confer and submit a form of order that embodies that

3 ruling.  Are there any questions?

4          MR. NAGLE:  Your Honor, the landlord did request in

5 the motion late fees and interest, and I guess when you say

6 that he's entitled to an administrative claim through July,

7 would that just be base rent?

8          THE COURT:  Well, it would be that to which the law

9 would entitle the landlord.  If after conferring with the

10 landlord there is a dispute about which of the elements of the

11 claim are allowed or not, come back to me and I'll resolve

12 them.

13          MS. NAGLE:  Thank you, Your Honor.

14          MR. MALLOY:  We'll confer with the Debtors.  Thank

15 you, Your Honor.

16          THE COURT:  Thank you.

17          MS. NAGLE:  Your Honor, this is the last issue that I

18 had for today.  May I be excused?

19          THE COURT:  You may.

20          MS. NAGLE:  Thank you.  And Mr. Wagner too, may he be

21 excused, the witness?

22          THE COURT:  Certainly.

23          MR. STEARN:  Good afternoon, Your Honor, may it please

24 the Court, Bob Stearn from Richards, Layton & Finger on behalf

25 of the Debtors.  Your Honor, I'm here for agenda item 26.

1 We've now turned to the final two matters listed under

2 adversary matters.

3        This is a brief, and I emphasize brief, status conference

4 in the WARN Act litigation; again, agenda item 26.  Your Honor,

5 you will recall at the status conference we had on September 11

6 in the WARN Action, and it was in particular on class

7 certification, Your Honor asked me towards the end of that

8 status conference whether the underlying claims were core or

9 non-core and why.  I was able to point out that the Plaintiffs

10 alleged that their claims were core and that we admitted that

11 allegation, but I was not able to address Your Honor's question

12 about why.  Your Honor was kind enough to give me, I suppose, a

13 mulligan on that one at the September 11 hearing and to allow

14 me to address that question at today's hearing.  So I'm going

15 to address the why today.

16        Your Honor, the Debtors would respectfully submit that the

17 WARN Act claims are, indeed, core.  We believe they fall under

18 Section 157(b)(2)(b), the allowance or disallowance of claims

19 against the estate and probably other provisions of Section

20 157(b)(2), as well.  Our research, Your Honor, uncovered at

21 least five cases which held that WARN Act claims were core

22 claims.  Our research turned up no cases in which WARN Act

23 claims were determined to be non-core claims.  I'd like to just

24 very quickly walk Your Honor through a few of the cases, if I

25 may.  May I approach, Your Honor?

1        THE COURT:  Go ahead.

2     (The Court receives documents)

3        THE COURT:  Thank you.

4     MR. STERN:  Your Honor, to try to speed up our

5  discussion, you'll see I've done a little bit of highlighting

6  and tabbing, just to make things move more quickly.

7     The first case in your stack, Your Honor, is In Re:

8  Preston Trucking Company, Inc.  It's a decision out of the

9  Bankruptcy Court in the District of Maryland.  For the record,

10 it's at 333 Bankruptcy Reporter 315.  This was a decision after

11 trial concerning the validity of the assignment of WARN Act

12 claims.  The Court's first conclusion of law is found on page

13 327 of the opinion, which I have again tabbed for everyone's

14 convenience.  The Bankruptcy Court concluded that the WARN Act

15 claims were core.  Among other things, the Court goes on to

16 state in the highlighted language that the WARN Act claims

17 concern the allowance or disallowance of claims against the

18 estate under Section 157(b)(2)(b).  The Court also cited

19 several other provisions of Section 157.

20       THE COURT:  Okay.  Not to cut you short, but I see in

21 paging through that the Courts consistently hold that such

22 claims are core claims within the meaning of 157(b)(2)(b).

23       MR. STERN:  Yeah.

24       THE COURT:  Other subsections are sometimes mentioned.

25 In one opinion, it doesn't look like much was missed.  But I'm

1 satisfied, at least for present purposes, on that.

2          MR. STERN:  Okay.  Thank you, Your Honor.  And as you

3 know, there's no, actually, motion or request for relief before

4 the Court.  You simply wanted some comfort.  There may be time

5 for us to put that in a motion, but I think we've addressed

6 Your Honor's concern.

7          THE COURT:  Thank you.

8          MR. STERN:  Thank you, Your Honor.  The last item on

9 the agenda today, #27, is the Motions to Dismiss in the

10 Schroeder Litigation, that's the ERISA litigation.  Your Honor,

11 on behalf of the Debtors, I'm going to cede the podium to my

12 colleague, Gary Tell, from O'Melveny's Washington, D.C. office.

13 Before Mr. Tell starts, it may be appropriate, since I think

14 pretty much everyone or most folks in the Courtroom will be

15 ceding the podia, podium, to their colleagues from out of town,

16 perhaps for introductions to be made first before the argument

17 starts.

18          THE COURT:  All right, that's fine.  Thank you.

19          MR. STERN:  Thank you, Your Honor.

20          THE COURT:  Well, before we --

21          MR. HUSTON:  Well, Your Honor, Mr. Keach has already

22 been introduced to the Court.  I see no reason to do it again.

23          THE COURT:  Okay.  Well then, if we're not to have

24 introductions, let me -- before we start argument, let me ask a

25 question and then make some comments.  And the question is, I

1  have read the papers.  Are there any agreements, stipulations,

2  further developments with respect to the arguments made or

3  claims asserted?  Any change since the submission of the

4  papers?

5          MR. TELL:  No, Your Honor.

6          THE COURT:  No.  Okay.  I have reviewed them, and it's

7  the first time I've, I think I indicated to the parties, I've

8  had this issue.  It is an interesting one and, in this case,

9  somewhat challenging.  But I have some preliminary thoughts and

10 I thought I'd share them with the parties so that you could

11 better focus and narrow the arguments that you have to make.

12 And I'm about to give, I think, each of you a chance to

13 disagree with me.

14     It seems to me pretty clear in this Circuit the two-prong

15 test is what is applicable.  And the 3rd Circuit, as recently

16 as last summer, reiterated this in its decision in the IT

17 Group.  So the three-prong test I think that at least one other

18 Circuit has adopted is not one that I should be applying here.

19     It seems fairly clear to me that we have a plan that's

20 unfunded, at least under the cases as they describe the

21 different factors.  However, I do think that a real question

22 has been raised here about whether either the quantitative or

23 qualitative parts of the second prong of the test can be met

24 here.

25     I note that except for the Bankruptcy Court's decision in

1  IT, I think most of the important cases were decided either
2  after full evidentiary hearings or on summary judgment, meaning
3  that there is a much better development of a factual record,
4  which at least as I read the papers and sit here at this moment
5  think we probably need.  But that having been said, counsel,
6  the floor is yours.
7          MR. TELL:  Thank you, Your Honor.  Again, I'm Gary
8  Tell with O'Melveny & Myers for the Debtor.  As I -- I'm an
9  ERISA litigator and top hat plans and rabbi trusts are not
10 every day's affairs, even for ERISA litigators.  So as I set
11 down my thoughts for the argument in the sequence of arguments,
12 I put together just a short one-page outline that would be
13 helpful to me and perhaps may be helpful to you, and a one-page
14 Q&A, what is a top hat plan and what is a rabbi trust.  I've
15 circulated it to the parties, and if I may approach the Bench,
16 provide it to you.
17         THE COURT:  Certainly.
18     (The Court receives documents)
19         MR. TELL:  So what I'd like to do is start with just
20 general background, which is reflected on the second page, and
21 then discuss the top-hat plan issues that you've just addressed
22 and then discuss the technical ERISA issues because our
23 position is even if you don't agree at this stage that the plan
24 is a top-hat plan, Plaintiff's ERISA claims are fatally flawed;
25 that's Section 3 of the outline.  And then Section 4 is we

1 think there is serious limitations issues here, as well, in

2 this case.

3       Starting with general background and page 2, what is a top

4 hat plan.  It's a form of a deferred compensation agreement

5 where employees contract with their employers to set aside sums

6 of money and defer tax to a later tax year.  But there's a

7 tradeoff, and the tradeoff is, insolvency risk; the risk of

8 bankruptcy.  In order to have that tax benefit it has to be

9 uncertain that the employees will receive the money later.  As

10 you just stated, Your Honor, ERISA defines a top hat plan as a

11 plan which is unfunded and is maintained by an employer

12 primarily for the purpose of providing deferred compensation

13 for a select group of management or highly compensated

14 employees.  Top hat plans are exempt from several of ERISA's

15 key provisions:  vesting, funding, participation and, of

16 course, the fiduciary responsibility rules which are at issue

17 here.

18       So how does that work with respect to a rabbi trust?  How

19 do they fit together?  Well, rabbi trusts are designed to

20 provide some protection from a change of control.  So year

21 after year after year I set aside -- I defer some of my income.

22 I don't pay taxes on it and there's a change of control and new

23 management comes to me and says, I'm sorry, Mr. Tell, you're

24 out of luck.  We're terminating the plan.  We're not keen on

25 unfunded obligations here at this company.

1      So the rabbi trust sits side by side, in this case, with

2  the deferred compensation plan and affords me some modicum of

3  protection from that event.  But what it doesn't do is obviate

4  the necessity to have the claims of the General Creditors apply

5  to that rabbi trust.  Otherwise, I don't get the tax benefits.

6  If there is no uncertainty, if there is no insolvency risk, the

7  -- I pay taxes immediately on monies that are deferred, even

8  though I may not see it for 10 or 20 years hence.  Rabbi trusts

9  are taxable to the employer and I think those are the key

10 features of the rabbi trust and the top hat plan and how they

11 fit together.

12      So how does this apply in this case?  And as you know,

13 Your Honor, on one side of the ledger the Debtors -- the

14 Creditors Committee have joined and Wells Fargo, as Trustee of

15 the rabbi trust, have moved to dismiss, and on the other side

16 of the ledger the Plaintiffs have resisted.  Yet nonetheless,

17 the Plaintiffs for over 7 years benefitted from this favorable

18 tax treatment.  They paid no tax on monies that were set aside

19 in return for this exchange, this risk that they have to

20 assume.  And now they've reversed course immediately after the

21 bankruptcy.  They're seeking the exclusive right to the assets

22 of the rabbi trust free and clear of the claims of the General

23 Creditors.

24      Now, as Your Honor pointed out, this was not the first

25 time this Court has been posed with this issue before.  Judge

1 Walrath had a very similar case in <u>IT Group</u>.  She dismissed it

2 on a Motion to Dismiss and it was affirmed in the 3rd Circuit.

3 The 3rd Circuit noted it's more than a little disingenuous to

4 take advantage of those tax benefits, to not pay taxes year

5 after year after year when the company's solvent, and then

6 reverse course when the day of bankruptcy arrives.  And we urge

7 this Court --

8          THE COURT:  It was only --

9          MR. TELL:  -- to reach the same result.

10          THE COURT:  It was only in a footnote, though.  It

11 wasn't in bold print or anything.

12          MR. TELL:  Fair enough, although it is for us.  Let me

13 move on in the outline -- move down the outline now to point 2,

14 which is whether this is a top hat plan or not.  I don't need

15 to touch on the unfunded plan issue, I don't think, element one

16 of the test.  So I'll move on to the second.

17     We say that the plan was designed for a select group of

18 highly compensated employees.  Employees were eligible if their

19 total compensation was $125,000.  Judge Walrath, in the <u>IT</u>

20 <u>Group</u> case, held that $100,000 is sufficient to be highly

21 compensated.

22     Well, Plaintiffs have two main arguments attacking this

23 plan design.  First, they say it was improper to include

24 commissions.  And we think this is wrong for several reasons.

25 First and foremost, there's not one case that holds that

1  commissions cannot count towards that $125,000 threshold.

2          THE COURT:  No, Courts don't seem to like them

3  calculated that way, but they haven't knocked it out for that

4  reason, you're right.

5          MR. TELL:  The <u>Darden</u> case, cited by the Plaintiffs,

6  actually holds just the opposite, that commissions were counted

7  in the Court's analysis.

8      Secondly, it would undercut the ability of companies that

9  have commission-based compensation structures, like broker-

10  dealers, to have a top hat plan at all.

11     And thirdly, Your Honor, the <u>IT Group</u> case itself is

12  instructive.  The <u>IT Group</u> plan was attached to the complaint

13  and posted on the ECF System.  I have the plan here.  I've

14  provided it to Plaintiffs yesterday explaining what I intended

15  to show with it.  And the language in the <u>IT Group</u> plan case is

16  very similar to the New Century Deferred Compensation Plan, it

17  includes commissions.  And if I may approach the Bench, I'm

18  happy to provide it.

19          THE COURT:  You may, but keep in mind -- and the

20  parties, in a way, have briefed this issue as if it's a Summary

21  Judgment Motion and it's not.  The issue here is, simply

22  stated, did the Plaintiffs here say the right thing in the

23  complaint.  Did they say enough and did they say it the right

24  way to survive a Motion to Dismiss.  And it normally doesn't

25  take very much to get by that.  And it's not the type of motion

1 that we can turn into a Summary Judgment Motion, and even if I

2 had the discretion to do that, I probably wouldn't.  But

3 approach.  I'd just say keep that in mind as you're making

4 these arguments.

5     (The Court receives document)

6         THE COURT:  Thank you.

7         MR. KEACH:  Your Honor, I don't want to interrupt

8 argument, other than just to interpose an objection to the use

9 of this document for anything other than, I suppose, its

10 intended purpose, which is to show that a plan in one reported

11 case had certain elements in it.  I don't think is relevant to

12 this inquiry at all and I don't think it's relevant or even

13 proper to consider on a Motion to Dismiss.

14         MR. TELL:  Yeah, we're not taking the position that

15 it's evidence, Your Honor, of course.  We just want to show you

16 what Judge Walrath was looking at in a very similar case on a

17 Motion to Dismiss.  But maybe -- let me move to the second

18 element because there are facts that are alleged in the

19 complaint that are quite precise.

20     Plaintiffs allege that 16% or 17% of the workforce had the

21 opportunity to participate in this plan.  That, to us, is

22 extremely close to the Demery case in the 2nd Circuit where

23 15.34% of the workforce was offered the plan and the Court

24 concluded that it's a proper top hat plan.  So as I see it,

25 what Plaintiffs are saying is a difference of one or two

1 percentage points is outcome determinative.  But they don't

2 cite to a single case that supports that position.

3        THE COURT:  Well, I think what they argue and what the

4 cases say is that the determination is fact sensitive.  And the

5 Plaintiffs here are saying that this is based on information

6 that was given to us.  It could be more.  The percentage could

7 be higher.

8        MR. TELL:  Fair enough, but where they're specific,

9 Your Honor, they've plead themselves out of Courts where they

10 make conclusory statements, the cart isn't required to credit

11 them.

12        The cases that they cite in support of their position --

13 they cite the Gorragoss case in the Eastern District of

14 Virginia repeatedly in their answer and brief, as well as

15 Carrabba; let essentially all of the employees into the plan.

16 Carrabba was all salaried employees.  Gorragoss, it was a small

17 jewelry store in the Tyson's Corner Mall.  Three of the four

18 employees were allowed in the plan.  We don't think that that's

19 particularly helpful in this inquiry where we're saying that 16

20 or 17% of the case is extremely close to the Demery case at

21 15.35%.

22        But let me move on then to our next point, which is point

23 3 on the outline.  Even if you're not inclined to agree at this

24 stage -- at the Motion to Dismiss stage that the plan is a top

25 hat plan, the Plaintiff's ERISA claims are fatally flawed for a

1  variety of reasons.

2      First, Plaintiffs invoke ERISA's civil enforcement

3  provision, Section 502(a)(3), which authorizes a participant to

4  seek appropriate equitable relief.  But the relief that they're

5  seeking is neither appropriate nor equitable under Supreme

6  Court authority.  They seek a distribution of the trust assets;

7  it's crystal clear in the complaint and the request for relief

8  in paragraphs 6 through 8.  Obviously, that's a claim for

9  benefits.  And if it is a claim for benefits, Your Honor,

10  they're duty bound to invoke a separate civil enforcement

11  provision in ERISA, Section 502(a)(1)(b), which enables them to

12  bring a claim for benefits.  The Varity case says that you

13  can't do both.  You have to bring it as a 502(a)(1)(b) claim.

14  They'll cite a case or two that says, well, that's a bit harsh,

15  but the fact of the matter is the majority of the cases have

16  held this.

17      In addition, Your Honor, their claim for equitable relief

18  is flawed to the extent that they're seeking money, monetary

19  damages.  And that's set out in our brief and our discussion of

20  the Great West case.  You can't dress up a claim for monetary

21  damages as some form of equitable relief and call it equitable

22  under ERISA Supreme Court jurisprudence.

23      Next, even if the relief is {quote} {unquote}

24  "appropriate", which we contend it's not, count #2 is fatally

25  flawed, that's the count that seeks a constructive trust, and

1 here's why.  It's axiomatic when you seek a constructive trust

2 that assets have to be in the possession of the Defendant.  And

3 my clients, the Debtors, Your Honor, don't have those assets.

4 It's indisputable that this case is all about the assets of the

5 rabbi trust, which is in possession of Wells Fargo.  So Count 2

6 is fatally flawed with respect to the Debtors for that reason.

7        Count 3 is also fatally flawed, that's their claim for

8 reformation.  In order to achieve reformation, they have to at

9 least plead that there was a mistake, some fraud, that the plan

10 document or the trust agreement didn't reflect the intents of

11 the parties.  They haven't plead that, Your Honor.  So as a

12 consequence, that claim, count 3, is fatally flawed.

13        And finally, Your Honor, even if you don't agree with all

14 of that, their claims are time barred.  As we say, this is

15 obviously a claim for benefits.  They're seeking the money.  If

16 that's the case, for all non-fiduciary duty breached claims the

17 3rd Circuit has held that Delaware Statute 8111 supplies the

18 statute of limitations, that's a one year statute of

19 limitations.  So what's the effect of that?  If Plaintiffs knew

20 or should have known, imputed knowledge, of their limited

21 rights to the trust corpus before June 26, 2006, that's 1 year

22 before the filing of the complaint, their claims are time

23 barred.

24        On the other hand, Plaintiffs cast this as this is not a

25 claim for benefits, Your Honor, it's a breach of fiduciary duty

1 claim.  Well, if they want to go that route, at least with

2 respect to my clients, the Debtor, we ought to be dismissed

3 because in order to have a breach of fiduciary duty, you gotta

4 have a fiduciary.  And they didn't plead that the Debtors were

5 a fiduciary, nor could they because the plan document is

6 crystal clear that there was a committee here, who are named

7 Defendants, that were the fiduciary.  So for all of those

8 reasons, Your Honor, we urge this Court to dismiss the

9 complaint.

10          THE COURT:  Thank you.

11          MR. TELL:  Thank you.  May I reserve a bit of time for

12 rebuttal?

13          THE COURT:  Yes.

14          MR. TELL:  Thanks.

15          MR. KEACH:  Your Honor, Robert Keach for the

16 Plaintiffs.  I think the Court was spot on in reminding the

17 parties, and I was actually going to open this way, exactly

18 where we are in the procedural status of the case.  This is the

19 pleading stage of these cases.  And let me specifically address

20 Your Honor's three points.  First, with respect to the issue of

21 unfunded or not, I think the case law with respect to rabbi

22 trust is as Your Honor has read the cases.  We don't disagree

23 with that.

24      With respect to the issue of the two-pronged test, I might

25 respectfully disagree as to whether or not the 3rd Circuit has

1 clearly adopted the two-prong versus the three-prong test, but

2 Your Honor, I actually think it's a distinction without a

3 difference and to some degree a red herring as to whether one

4 applies three prongs or two.  That is because the third prong,

5 which is actually supplied in the DOL regulations not made up

6 by the Courts and has been adopted by the Courts from the DOL

7 regulations, I think in reality is simply a perspective that

8 informs the application of the first two prongs.

9        THE COURT:  And the 3rd Circuit in IT referred to

10 them.

11        MR. KEACH:  I think that's right, and the case that

12 the Defendants are so fond of, Demery, actually does the same

13 thing.  And that is because the reason the regime exists the

14 way it exists is precisely because of the risks that the

15 Defendants have pointed out.

16      The ERISA regime is such that employee benefit plans like

17 this, and everybody admits this is an employee benefit plan,

18 are presumptively within all of ERISA's substantive fiduciary

19 protections unless the plan is within a very specific

20 exception.  And the top hat exception is one such exception,

21 but the Courts and the DOL and everyone else require strict

22 observance of the elements of the exception.  The 3rd Circuit

23 in the New Valley case referred to the top hat plan as a rare

24 species of plan.

25      More importantly, as Judge Walrath pointed out in IT

1  Group, if a plan is not a top hat plan despite a -- you know,

2  the employer's attempt to create one, then it is the case.  It

3  follows as a matter of law and ERISA that the assets are in

4  trust for the exclusive benefit of the employees under the

5  ERISA substantive provisions, which would then apply.  And as

6  importantly, as the IT Group case points out and as all of the

7  cases point out, the burden of establishing that a plan is a

8  top hat plan is on the proponent of the plan.  They have to

9  prove it is a top hat plan, we don't have to prove that it's

10  not.

11      But more importantly, what's important with respect to the

12  issue of is this plan limited to a select group of management

13  or highly compensated employees, we have pled in detail with

14  respect to that element that it is not.  And we have supplied

15  as much detail as any party not having had discovery could

16  supply.  It's important to note that phrase as the case -- as

17  the cases do, Your Honor, a plan that included all management

18  and all highly compensated employees would fail the top hat

19  test.  In other words, the plan has to apply only to a subset

20  of management and a subset of highly compensated employees.

21      Well, we've alleged in the complaint very clearly, and I

22  won't go through the complaint because I know Your Honor has

23  read it, but we have alleged that it was not limited to a

24  select group of management employees or a select group of

25  highly compensated employees.  We have given specific examples,

1 and we have said that, in fact, perhaps the majority of the

2 employees to which this plan was subject were neither

3 management nor highly compensated.

4      One of the examples we gave on the issue of highly

5 compensated was that the plan actually applied to people making

6 as little as $18,000 who may have been included in the plan

7 based on projected bonus or commission income that they never

8 actually received.  And in fact that perhaps even -- that a

9 significant number, if not a majority, of people earning under

10 the announced threshold of $125,000 were included within the

11 plan.  We've alleged specifically that people who had no

12 management responsibilities whatsoever were eligible to be in

13 the plan.  So if we're looking at this from a pleading

14 standpoint on that issue, on the issue of the qualitative and

15 quantitative factors, we have pled more than is sufficient

16 under Rule 12(b)(6).

17      A quick note on the case most relied upon by the

18 Defendants, which is the Demery case, Demery was a summary

19 judgment case.  And we've all tossed around this, you know, 15%

20 issue as if it were a bright line.  We tried to make clear in

21 the briefs, Your Honor, it's not a bright line.  We haven't

22 argued that because they're over 15% that they are per se in

23 violation of the top hat restrictions.  What we have said is

24 because they are over 15%, there is a genuine factual issue as

25 to whether or not they can qualify.  And in fact, that's

1 precisely what <u>Demery</u> said.  What <u>Demery</u> said is it's 15%.

2 That's a really high number.  That's -- that has to be near the

3 ceiling for a permissible plan.

4     Accordingly, we need to look at a whole bunch of other

5 facts that had been developed in that case to determine whether

6 or not this is in or outside of the exception.  And they then

7 proceeded to go through the exhibits, the affidavits, and all

8 of the facts that have been developed in that case to arrive at

9 a determination.  They looked at the job descriptions of the

10 employees, in particular whether they had management

11 responsibilities or not.  It looked at their compensation

12 relative to the overall compensation of the employees.  It

13 looked at a lot facts we haven't had a chance to develop in

14 this case.  But we have alleged that we -- that we believe

15 those facts will be developed based on what we already know.

16     It's important to note that in that case, the Plaintiffs

17 in fact had agreed to summary judgment on those terms and, in

18 fact, had allowed the discovery period to pass without taking

19 discovery.  So the only reason they were not permitted to take

20 discovery is because they had actually chose to forgo it.  The

21 -- but there's no question that the Court was there, was

22 dealing with a full factual record there to the extent that the

23 Plaintiffs wanted to develop it.

24     The <u>IT Group</u> case is the only case cited where it wasn't a

25 summary judgment or a case after trial.  Important to note in

1 IT is that Judge Walrath specifically found that the Plaintiffs

2 had not alleged that the plan was not limited to management

3 employees.  She gave the Plaintiffs an opportunity to amend and

4 they came back and said that the plan was not limited to

5 {quote} "executives."  And she quite properly pointed out that

6 allegation was not sufficient.  That's not our allegation.  We

7 have alleged specifically that this was not limited to

8 management and not limited to highly compensated individuals,

9 and we've given the examples that the facts permit us to give

10 based on the information we've been supplied.

11      With respect to the so-called fatal flaws under ERISA, in

12 fact the Supreme Court cases support, specifically support, the

13 relief we're seeking.  We do not -- and I'll state it

14 categorically -- we do not seek nor does the complaint suggest

15 that we seek a current distribution of funds.  We have asked

16 the Court to declare that this plan is not a top hat plan

17 because if that declaration occurs, under IT Group and under

18 Judge Walrath's other cases, it will be true as a matter of law

19 that these funds are held in trust for the sole benefit of

20 these employees.  And if the Court gets that far, it doesn't

21 need to go on to the other counts, with the possible exception

22 of the attorneys fees count.

23      What we have then alleged in the alternative is that if

24 the Court doesn't find, as we think the cases clearly provide,

25 that finding that this is not a top hat plan imbues these funds

1  with an exclusive trust, that the Court is nonetheless in the

2  alternative empowered as a matter of equitable relief to either

3  impose a trust, as Judge Walrath indicated in the <u>Lenox</u>

4  <u>Healthcare</u> case, or to reform the plan and trust to provide

5  that the funds are held for the exclusive benefit of the

6  employees.

7            THE COURT:  Well, here's what --

8            MR. KEACH:  Both of those are forms of equitable

9  relief.

10            THE COURT:  The documents that have been submitted

11  indicate, at least clearly to me, in unequivocal terms that in

12  accordance with the magic language that the ERISA cases say

13  should be used say that the funds are subject to the claims of

14  General Creditors.  And as a matter of contract right, why

15  would that call for either reformation or imposition of a

16  trust?

17            MR. KEACH:  Well, specifically because if this plan

18  was not implemented as a top hat plan, those provisions violate

19  ERISA.

20            THE COURT:  Ah, so is that what ERISA says should be

21  the remedy?

22            MR. KEACH:  ERISA specifically provides that that

23  remedy would occur, in fact that those provisions could not be

24  enforced and as the 3rd Circuit did in <u>Spang and Company</u>.  When

25  you have provision in a plan or trust document that runs afoul

1  of ERISA, the Court can in fact reform the documents to remove

2  the offending provision.  That's what the 3rd Circuit permitted

3  in Spang.  It didn't require mistake or fraud, it found a

4  violation of ERISA and it addressed it by reformation.  And

5  that authority I think is binding.  It in fact held that

6  reformation was possible to redress in a violation of ERISA,

7  nothing more.

8      But let me point out, Your Honor, that, again, if the

9  Court gives us the declaratory relief we seek and nothing in

10  any of the papers suggest that declaratory relief is not

11  appropriate equitable relief under ERISA, then the Court need

12  not go any farther, I believe, under the Delaware cases.  What

13  we've asked that the Court find it's not a top hat plan, and

14  accordingly, under IT and under Lenox, that -- find that the

15  funds have been held exclusively for the benefit of the

16  beneficiaries.  If the Court grants relief on that count, it

17  needn't go any farther.

18      But with respect to the alternative counts, let me take

19  them one at a time.  With respect to the issue of constructive

20  trust.  First, let me deal with Verity for a second.  They've

21  made the argument the Supreme Court's opinion in Verity somehow

22  bars the claim.  First, that depends upon our claim being a

23  benefits claim.  And this is all ERISA shorthand, Your Honor.

24  First, they're talking about --- we're talking about A1 versus

25  A3 claims.  And as the 1st Circuit pointed out and as the 3rd

1 Circuit has agreed, a benefits claim is one which is dependent

2 upon the administrator's interpretation of the plan documents

3 and a disagreement over whether or not a beneficiary is

4 entitled to benefits under the terms of the plan.  A1 in fact

5 says that it only refers to claims under the terms of the plan.

6 We admit that under the terms of this plan as written, if this

7 plan were a top hat plan and under the terms of the plan as

8 written, these funds would be held for the benefit of the

9 beneficiaries and the Unsecured Creditors.  There's no dispute

10 about that.  What we have argued is you can't apply this plan

11 as written because this wasn't implemented as a top hat plan

12 and those provisions are unenforceable.

13     We're not seeking benefits under the plan, we're not --

14 this is not a benefits claim.  As the 1st Circuit pointed out,

15 when the unambiguous language of the plan specifically prevents

16 the assertion of a claim for benefits, clearly Plaintiffs are

17 going under and must go under A3, and what -- and that's in

18 fact what Verity says, that when an A1 claim is barred by the

19 very specific language of the plan, your remedy is under A3.

20 That's where we're going, that's all we seek.

21     To the extent that there is a misunderstanding that we're

22 seeking an immediate distribution, we are not.  To the extent

23 that we've referred to a distribution in the complaint, all we

24 have ever said is that if and when money is ever distributed

25 that it be treated as if it were exclusively for the benefit of

1 the employees.  The -- in fact individual beneficiaries would

2 have to seek distributions under the plan and trust as

3 reformed.  People who are currently employees would be treated

4 different than people who are terminated employees, and we

5 don't profess to prejudge any of those issues.  But there's no

6 question that we're not barred under Verity because we're only

7 seeking A3 equitable relief and it is appropriate equitable

8 relief.

9     First, there's no doubt, nobody's argued that declaratory

10 judgment relief is not equitable relief.  Secondly, their only

11 argument on constructive trust has been to cite the Knudsen and

12 Serabauf decisions, which I will note as an aside, Your Honor,

13 arguably don't even apply here because in both cases those

14 involved plans trying to seek money back from beneficiaries

15 that they had distributed.  And there's considerable debate in

16 the case law as to whether they even apply in the opposite

17 situation that is before the Court.  But even if they do apply,

18 all Serabauf and Knudsen provide is that something akin to what

19 Judge Walrath went through in the Lenox case is a process the

20 Court should go through.  Something akin to traditional

21 constructive trust analysis, and that is is there a traceable

22 fund, a fund traceable to the Plaintiff's claim of right, that

23 is identified in the hands of a Defendant.  And there's no

24 question that the Trustee is here and the Trustee is a

25 Defendant and the money is held in trust.  And so we have

1  satisfied <u>Serabauf</u>.  There's no question that the trust itself

2  designates those monies as the monies that were going to be

3  used to fund the benefits claims.  And in fact, the trust

4  provides that, in the absence of insolvency, they can only be

5  used for that purpose.  So there is a definite nexus to those

6  funds.

7      I think the committee has said, and perhaps even the

8  Debtor, well, wait a second, the trust provisions provide that

9  they're subject to the claims of General Creditors, they're

10  really just parts of the assets of the Debtors, and therefore,

11  they're somehow deemed not segregated for that reason.  Well,

12  there're two problems with that.  First, in a Motion to

13  Dismiss, you have to treat the allegations of the complaint as

14  true, and we have alleged that those provisions are not

15  enforceable for the reasons we've alleged, so you can't use

16  those provisions to prevent segregation.

17      Secondly, <u>Serabauf</u> isn't talking about legal claims, it's

18  talking about reality.  Is the -- are the funds somewhere in an

19  account where you can see them and are they, in fact,

20  separated.  And that's the case here.  So <u>Serabauf</u> and <u>Knudsen</u>

21  in fact support the relief on constructive trust here as

22  opposed to preventing it.

23      Lastly, Your Honor, with respect to reformation, and I'll

24  be very brief, we've cited a number of cases including <u>Spang</u>

25  <u>and Company</u>, a 3rd Circuit case, that provide in the ERISA

1  context that reformation is an appropriate remedy to remedy a

2  violation of ERISA's fiduciary provisions.  You don't need to

3  allege fraud or mistake.  All of the cases cited by my

4  opponents are non-ERISA cases.  Not surprisingly, those cases

5  hold as the -- do the -- as is true under the common law, that

6  mistake and fraud are required, but not in ERISA.  And we've

7  alleged violations of ERISA, Your Honor.

8          Very quickly with respect to the issue of the time bar.

9  First, as we've cited in our brief, it is very clear in the

10 context of a Motion to Dismiss that for an affirmative defense

11 to be granted in the context of Motion to Dismiss, the four

12 corners of the complaint under the Delaware cases and any other

13 permissible materials that the Court can look at, must

14 establish with certainty that the action is time barred.  The

15 Court can't look beyond that.  There is nothing in this record

16 that establishes with certainty that this case is time barred,

17 even if you were to adopt the erroneous view of the Defendants

18 that the 1-year statute applies.  Because even they admit that

19 if you were erroneously applying the 1-year state statute,

20 you'd have to find that the beneficiaries had actual knowledge

21 of a potential cause of action within the 1-year period.  There

22 is nothing in this record to suggest whatsoever that the

23 beneficiaries had anything approaching that level of actual

24 knowledge.

25          The fact that the summary plan description indicates that

1 there is the potential claims of Unsecured Creditors to the

2 funds does not suggest any violation of ERISA or any

3 impropriety.  We don't disagree that they were trying to create

4 a top hat plan, and that creating top hat plans is legal.

5 Anybody to know about a cause of action would have to know much

6 more than that.  They'd have to know how they implemented the

7 plan, they'd have to know that implementation of the plan had

8 stretched to the point where top hat status was an issue.  And

9 even then, you'd have to find an extremely knowledgeable

10 beneficiary to get to that point.  None of that's in this

11 record.

12      More importantly, Your Honor, because as I've said, we're

13 not seeking money, this is not a claim for damages, it is

14 solely pled as a claim for equitable relief, the 3-year statute

15 of -- or 6-year statute, in the alternative, of ERISA applies.

16 As the 3rd Circuit has said under the 3-year statute a high

17 level of actual knowledge is required for the same reason

18 that's not in this record.  In fact, the plan was not even

19 effective until inside of 3 years.  And we would submit, Your

20 Honor, there's nothing in the record to support a time bar.

21      Unless the Court has other questions for me, Your Honor, we

22 would submit that the Motions to Dismiss must be denied.  Let

23 me make one very quick point because this goes to this issue of

24 why Defendants are in the case.  I mean, the Debtors have said

25 we're not plan fiduciaries, therefore this whole case has to be

1 dismissed as against us.  We admit that the plan administrators

2 are the fiduciaries here, the Debtors are what are known as

3 plan sponsors. and they have certain responsibilities.  But

4 given the declaratory nature of the case, different Defendants

5 are here for different purposes.  The Debtors, as fiduciaries

6 of the estates, have made it clear that they are making claims

7 on behalf of the estates and the estate's Creditors to these

8 funds.  Therefore, they were named in the declaratory judgement

9 action because they are making a claim to the money and to

10 adjudicate fully those rights, they would need to be named.

11 We're not claiming that they're fiduciaries.  That's why the

12 Trustee and the plan administrators have been named.  The plan

13 administrators, I would point out, have not sought to dismiss

14 this case in any way, shape or form.

15      More importantly, Your Honor, if you then move on to the

16 Trustee, why is the Trustee here?  The Trustee is here because

17 the Trustee's holding the money.  If you're going to impose a

18 constructive trust or reform the trust or find as we have

19 asked, then the Trustee has to be here as a Defendant.

20 Similarly, the Creditors Committee.  The Committee is here --

21 Creditors Committee is here for one reason.  As a fiduciary for

22 Trade Creditors, they have made claim to the funds.  If you're

23 going to afford broad-based declaratory relief, they need to be

24 named.  If they want us to proceed without them, to get an

25 adjudication of rights just as between us and the fiduciaries,

1 and they're happy to be absent from the proceeding, then I

2 guess they could be.  But it seems to me for a full

3 adjudication of rights, they need to be here.

4          THE COURT:  Well, I haven't focused on the Committee

5 issue, but with respect to the Trustee issue, it strikes me

6 that if you were to receive the appropriate agreement you'd be

7 happy to let them out.  Is that what I'm hearing?

8          MR. KEACH:  As to the Trustee -- well, as to the -- we

9 made that issue as -- we discussed that issue with respect to

10 the plan administrator and the Trustees, Your Honor.  From our

11 standpoint, the Trustees are nominal parties, and they're

12 simply holding the money, and they are to sit there and hold

13 the money until this Court tells them how to -- what to do with

14 it.

15          THE COURT:  And if they agree to be bound by such a

16 judgment, would you agree to their dismissal on that basis?

17          MR. KEACH:  We would so long as the other parties,

18 Your Honor, agree that their absence did not prevent us from

19 seeking any of the forms of relief we seek, such as, for

20 example, reformation or constructive trust.

21          THE COURT:  Okay.

22          MR. KEACH:  Thank you, Your Honor.

23          THE COURT:  Well, let me ask one more question.

24          MR. KEACH:  Sure.

25          THE COURT:  It seems to me that any way you look at

1  it, a determination on the status of the plan as top hat or not

2  implicates what I should do with respect to the remaining

3  claims either way, in the view of one or both parties.  Does it

4  make sense for me to defer a ruling on the remaining counts

5  until such time as the -- if I were deny the Motion to Dismiss

6  with respect to the declaration of whether it's top hat or not

7  until such time as that were teed up in a Summary Judgment

8  Motion, for example?

9        MR. KEACH:  Well, Your Honor, I think the -- one, I

10 don't think they've asserted legal defenses, for example, under

11 the so-called <u>Serabauf</u> defenses or the <u>Verity</u> defenses.  I just

12 think those have -- those should be denied.  Now, they could

13 certainly be denied without prejudice to the extent that

14 factual development reenergizes them, but as a matter of

15 pleading, we just haven't pled what they've said we've pled and

16 I think those defenses go away.  I think the better and

17 procedurally cleaner approach would be to deny the Motions to

18 Dismiss without prejudice, let us take discovery, let us

19 develop a full factual record.  If they think they should file

20 a Motion for Summary Judgment at that point, or if we think we

21 should based on the development, we could do so.  I think

22 that's procedurally cleaner than sort of leaving bits of the

23 Motion to Dismiss hanging out there.  They can certainly bring

24 them back and the briefing is certainly done.  But we think

25 that the Motions to Dismiss simply are not subject to being

1 granted in any way, shape or form.  They should be denied at

2 least without prejudice and we should go forward with

3 discovery.

4          THE COURT:  Thank you.

5          MR. TELL:  Your Honor, Gary Tell again for the

6 Debtors.  Plaintiffs are the master of their own complaint, and

7 looking at the Request for Relief on Page 16 of the complaint,

8 it says, "We're requesting an order of distribution of the

9 plan's assets to the beneficiaries consistent with ERISA

10 substantive provisions."

11          THE COURT:  Okay, let's say you're right.  At this

12 stage in the proceedings, what would a Court normally do if it

13 found a flaw in the pleadings?

14          MR. TELL:  You would dismiss the complaint, Your

15 Honor.  They would have a right to pursue a claim for benefits

16 under the proper civil enforcement provision.  Counsel's

17 correct, they may well not prevail but that is not -- it's not

18 supposed to be a guarantee, it's just a right.

19          THE COURT:  Now, what I'd normally do is permit time

20 to amend the complaint.  I mean, it's a rare situation when I

21 wouldn't do that.  I mean, is that -- that doesn't surprise

22 you, does it?

23          MR. TELL:  Well, it -- because there's an

24 administrative exhaustion process with this -- embedded in this

25 plan, Your Honor, they would have to exhaust their

1 administrative remedies first, and if they're dissatisfied with

2 the result, invoke the Courts.

3          THE COURT:  All right.

4          MR. TELL:  Let me just touch on the time bar point

5 because there was a purported concession that just wasn't made.

6 Under Delaware Statute 8111, it isn't an actual knowledge

7 standard, it's a should know or know standard.  And we contend

8 that they knew and they knew a long time ago because under the

9 plan document, in order to enroll in the plan, you had to fill

10 out a deferred compensation agreement and attach to it -- we've

11 attached it to the Motion to Dismiss with an affidavit.  It

12 says there are Q's and A's that describe how the rabbi trust

13 works and how the claims of the General Creditors would apply

14 to the rabbi trust.  With respect to -- with respect to the

15 conduct in this case it strains credulity.  The petition I

16 think was filed April 2nd.  I think on April 17th the

17 Plaintiffs were in here seeking status as a committee under

18 1102.  And if you look at the April 17 moving papers, they

19 mention the IT Group case, they mention these issues, that it's

20 not a top hat plan.  How is it before discovery we didn't know

21 enough of the terms of the plan, we didn't know that perhaps

22 there weren't management people or highly compensated people.

23 It just strains credulity, Your Honor.  I think there is enough

24 in that complaint with the attached documents to dismiss the

25 case on the time bar.

1        THE COURT:  Well, I don't know what argument would be

2   made in opposition to that assertion, but I can think of one

3   immediately and that is the company's troubles were publicly

4   reported for some extended period of time before the bankruptcy

5   was actually file.  And in fact, I think in some part of the

6   world was kind of waiting for that other shoe to drop.  So

7   there was time for people to be concerned about money that they

8   thought had been set aside for them.

9        MR. TELL:  But the material facts, Your Honor, are do

10  you know who was in this plan, do you know that it's a

11  commission based structure, do you know your own base

12  compensation, do you know how much you made in commissions.

13  Does that make you suspicious to whether this is a proper top

14  hat plan or not.  Those are the material facts that counsel

15  contends are necessary to determine the time bar argument.

16       THE COURT:  Well, you know, there's some -- one thing

17  that occurs to me about that argument and that is you're

18  saying, well, the Plaintiffs here should have known it was

19  wrong from the beginning.  What does that say about the

20  company?

21       MR. TELL:  If they're correct.  We contend they're

22  absolutely, flat-out wrong.

23       THE COURT:  All right.  Anything further?

24       MR. TELL:  What -- back on the  ERISA argument.  Much

25  was made about a case called Spang controlling legal precedent

1  in the 3rd Circuit that provides reformation or provides the

2  equitable relief they're seeking but that's -- Spang bears no

3  relation to this case.  There was a union negotiating with

4  management, they struck a deal, they had a pension agreement,

5  and then one of the parties and I believe management left out

6  certain key provisions and the union came screaming into Court

7  and said slow down.  That is not reflecting the four corners of

8  the agreement.  No one in this case is disputing that the plan

9  document and the trust agreement doesn't reflect the intent of

10  the parties.  Plaintiffs certainly (indiscern.).  I just don't

11  think that that case is germane.

12      With respect to whether management people are in the plan

13  or not, and this is my last point, Your Honor, there's a very

14  important disjunctive "or" in the top hat plan test.  It says

15  primarily for select group of management or highly compensated

16  employees.  We have said that the plan covered people --

17  allowed people in who made $125,000 a year.  Compared to what

18  Judge Walrath said in IT Group that's decidedly highly

19  compensated.  I have nothing further, Your Honor, and I'll cede

20  the podium to, I believe, Wells Fargo.

21          THE COURT:  Before you do, I have one final question

22  for you and that is normally wouldn't whether a statute of

23  limitations was missed be pled as an affirmative defense?

24          MR. TELL:  Yes, Your Honor.

25          THE COURT:  Isn't it a little early to be considering

1  that?

2        MR. TELL:  But if it's -- if the four corners of the

3  complaint -- and remember they attached the plan document and

4  the trust agreement, they brought the deferred compensation

5  agreement itself into play.  When all that's at play, Your

6  Honor, it works.  But fair enough, normally it's an affirmative

7  defense.  I concede that.

8        THE COURT:  All right.  Thank you.

9        MR. NICELY:  Good afternoon, Your Honor, my name is

10  Andrew Nicely and I represent Defendant Wells Fargo in this

11  proceeding.  And our view, Your Honor, is that the complaint

12  either intended to state a cause of action of some sort against

13  Wells Fargo and failed to do so, or it named us as a Defendant

14  on the mistaken belief that we were necessary -- a necessary

15  party or a nominal party.  But we're neither of those things.

16  So in either case, the complaint against Wells Fargo should be

17  dismissed.  There's no need for us to participate unless there

18  are claims to be stated against us, and no claims have been

19  stated against us.  There's no allegation in the complaint that

20  Wells Fargo breached any contract, that it defrauded anybody,

21  that it omitted to do any thing that it was required to do or

22  did something that it was not permitted to do.  Instead, as far

23  as the complaint suggests, we at all times did exactly what was

24  required of us; nothing more, nothing less.

25        To the extent that the Court has concerns about standing

1  I'd be happy to address those.

2         THE COURT:  I don't.  I mean, it seems to me perfectly

3  natural, to state it simply, that a Plaintiff who is seeking

4  recovery of funds name as a party he who holds them.

5         MR. NICELY:  Well, two response to that, Your Honor.

6  One is that the assets in the rabbi trust for which we're the

7  Trustee are property of New Century, and my understanding of

8  bankruptcy procedure --

9         THE COURT:  Well, unavailable to the company, while

10  arguably available if New Century prevails in its argument, to

11  the General Creditors of the estate.

12         MR. NICELY:  That is true, but it's my understanding

13  that the Court entered an order in May of 2007 directing that

14  nobody should distribute any of the contents of the rabbi trust

15  to anyone pending further order from the Court.  So -- and

16  furthermore, there's a provision in the trust agreement to

17  which we're a party which says that in the event of a

18  bankruptcy by New Century, we are not to distribute the trust

19  assets to anybody until directed to do so by a Court of

20  competent jurisdiction.

21         THE COURT:  And assuming that I am a Court, perhaps

22  among others, that fit that description --

23         MR. NICELY:  I'll stipulate to that.

24         THE COURT:  -- and enter an order directing you to do

25  something with the funds, would you do that?

1      MR. NICELY:  Absolutely, Your Honor, but there's no

2  need for us to be a Defendant in the case in order for us to

3  follow an order from the Court.

4      THE COURT:  Okay.  I mean, I tend to agree with you,

5  but it seems to me that that position ought to be memorialized

6  as a condition of letting you out of the litigation if I decide

7  that's appropriate.

8      MR. NICELY:  I would also like to address, Your Honor,

9  what I believe is the misapprehension on the Plaintiff's part

10  that money was deducted from the Plaintiff's paychecks and

11  simply transferred into the rabbi trust so that the rabbi trust

12  contains what is actually the Plaintiff's money, their deferred

13  compensation.  That simply isn't the case.  New Century, under

14  the trust agreement, had the right but not the obligation to

15  fund that trust at all.  And indeed, the Court is probably

16  familiar with cases that involve rabbi trusts that were never

17  funded.  Now, if there's a change in control by New Century, at

18  that point there isn't an obligation for New Century to fund

19  the rabbi trust, but that didn't happen here, there's no

20  allegation that it did, so there is no obligation for Wells --

21  or for New Century to fund the rabbi trust.  And conversely,

22  there's no obligation on New Century's part to use the assets

23  in the rabbi trust to pay benefits.  It can pay benefits out of

24  its own operating funds, and it doesn't have to come out of the

25  rabbi trust.  So to say that our paychecks were debited and the

1 money went into the rabbi trust and now Wells Fargo is holding

2 our money, that's simply incorrect.  It's contrary to the

3 agreement.

4          THE COURT:  But again, we're here as a matter of

5 pleading.  And for purposes of the Motion to Dismiss, I must

6 assume that what is pled is true and draw favorable inferences

7 from that for the benefit of the Plaintiff.

8          MR. NICELY:  Well, at this stage in the proceeding,

9 Your Honor, there is a -- what we take to be a concession in

10 the Plaintiff's answering brief that the rabbi trust is not a

11 plan asset.  If it were a plan asset, then the Plaintiffs would

12 take the position that a plan asset has to be kept for the

13 exclusive benefit of the employees, the Plaintiffs.  But if the

14 rabbi trust is not a plan asset, then the ERISA exclusive

15 benefit rule simply doesn't apply.  And so -- and we've

16 attached, as you've seen from our brief, a copy of a Department

17 of Labor letter opinion ruling which states that a rabbi trust

18 set up in conjunction with a plan which was admittedly and

19 intentionally from the outset not a top hat plan is not a plan

20 asset attached to that plan, it's separate.  And for it to be

21 separate, certain requirements have to be met.  It has to be

22 the property of the grantor, the company that created it, it

23 has to be accessible to General Creditors in the event of

24 bankruptcy, and -- I apologize, Your Honor.  And the employer

25 must pay all taxes on the income in the trust, and the

1  employees are not taxed on the income in the trust.  And if

2  those requirements are met, then it's a valid rabbi trust, and

3  it is not a plan asset.  And that's the circumstance here.  So

4  this is not the employees' money.  It is not --

5       THE COURT:  It seems to me that I -- you know, I leave

6  it to the parties to talk about, but it seems to me that you

7  might be able to win your release without Court interference or

8  delay by entering into the appropriate agreement with the

9  Plaintiffs here.  But I leave that to you to pursue if you

10 wish.

11      MR. NICELY:  Well, we did approach the Plaintiffs on

12 that front, Your Honor, and it was -- it did not lead to an

13 agreement, let us say that.  So basically, we'd like to know

14 where we stand in this case.  If there is a cause of action to

15 be stated against us, and I understand from what I've heard so

16 far today that there is no claim intended to be asserted

17 against Wells Fargo, if that's the case, then we would like to

18 be out of the case.  And we're happy to comply, obviously, with

19 any orders of the Court, but we don't want to be looking over

20 our shoulder wondering, well, is somebody stating a claim

21 against us.  Because if they are, we'd like to hear what it is

22 now and we'd like to defend against it.

23      THE COURT:  Thank you.

24      MR. NICELY:  Thank you, Your Honor.

25      MS. FATELL:  Good afternoon, Your Honor, Bonnie Fatell

1  from Blank Rome on behalf of the Creditor's Committee.  Your

2  Honor, I think we need to redirect the approach to this dispute

3  a little bit.  The Court raised the question that doesn't the

4  Court need more facts to determine the second prong of the test

5  as to whether this is a quantitative or qualitative plan.  In

6  other words, were the right number of people in it, were the

7  right salaries in it, were the right types of employees in the

8  plan.

9      Your Honor, respectfully, I think the answer to that is it

10 doesn't really matter.  If there's been a violation of this

11 plan and it is not truly a top hat plan, then the participants

12 have claims against the company for whatever damages or

13 whatever claims they have that the company did not comply with

14 ERISA and either didn't properly set up the top hat plan or

15 didn't properly set up an ERISA-qualified plan.  But it doesn't

16 lead to the conclusion then that the funds in the trust belong

17 to those employees.  And I don't -- I think they make a leap

18 and they're guiding the Court to make a leap that there's no

19 connection there.

20     And I think, Your Honor, if we look at their pleadings, if

21 we look at the plan documents, if we look at the trust document

22 it is all clear.  And Your Honor, the Court itself pointed out

23 that in the trust agreement itself it says that -- and if we

24 look at all the various whereas clauses on the first page, that

25 it was established as a trust for the purpose of providing a

1  funding source for this new benefit plan.  That the company

2  wishes to establish an irrevocable trust, but the trust may not

3  necessarily hold sufficient assets to satisfy all the benefits

4  under the plan; in other words, the company itself had that

5  primary obligation.  That the company wishes to contribute to

6  the trust to serve as a source of funds to assists the company

7  in meeting its obligations and liabilities under the plan and

8  that the -- that it would be subject to the claims of the

9  Creditors in the event the company became insolvent.  And that

10 is repeated throughout the trust and throughout the plan.

11      And Your Honor, that's exactly where we are.  The company

12 is insolvent.  The funds in the trust are subject to the claims

13 of the General Creditors.  It's also subject to the claims of

14 the participants as General Creditors.

15        THE COURT:  But the Plaintiffs here saying, well, if

16 it's not a top hat plan, and -- it loses its -- it loses the

17 protections from coverage under various substantive provisions

18 of ERISA, and that gives them special rights, above and beyond

19 General Unsecured Creditors.  And it doesn't matter, they say,

20 under ERISA what the plan says.

21        MS. FATELL:  Your Honor, I am not an ERISA guru, but I

22 have one with me.  And I have consulted my ERISA guru both

23 before and during the hearing, and we are not aware of any

24 provisions in ERISA that say that if a plan is not a top hat

25 plan that the result of that is that the trust becomes their

1 assets.  We are not aware of any provision in ERISA that says

2 that, so --

3        THE COURT:  Well, what do you think the result is,

4 then?  It's --

5        MS. FATELL:  Your Honor, we think the result is --

6        THE COURT:  -- just that it's available for all who

7 have claims?

8        MS. FATELL:  That ths trust is a general asset of the

9 Debtors.  It is no different, Your Honor, than any other

10 property of the Debtor's estate.  The Debtor put money from its

11 estate, from its property, into a separate account, no

12 different than a bank account, and it said I'm going to use

13 those funds, or maybe I won't, when it comes time to pay the

14 participants under the top hat plan.  And if I become

15 insolvent, just like all my other assets, it continues to be an

16 asset of the estate.  And for the participants to point to that

17 particular asset is really no different than the participant

18 saying, well, why don't I get the money in that bank account,

19 or why don't I have you liquidate this particular piece of

20 property and that should be my asset.  The Court should set up

21 a fund for me, the participants, because the plan was not a

22 proper qualified plan under ERISA.

23    And Your Honor, we just don't think that the law reaches

24 that conclusion.  We don't think the facts -- we don't think

25 there need to be any more facts in the pleading to reach that

1 conclusion that they're seeking.  We think the facts are, in

2 essence, irrelevant, Your Honor.  If it is not a properly

3 established top hat plan, fine, then they have claims.  And

4 again, to say it's not a properly established plan, we've

5 received all the benefits from this plan for all these years,

6 but some people may not properly have been in the plan.  Why is

7 the result that we undo the entire plan and all of the people,

8 even those who were properly qualified to be under that plan,

9 should now have this separate fund set up for themselves?  They

10 bought into the plan and the concept that if, in fact, the

11 company became insolvent that the funds in the trust would be

12 available for General Creditors of the estate.  So they're

13 really asking not only for the Court to reform the plan but to

14 rewrite the whole plan, rewrite the trust, rewrite everything

15 without really a valid basis for that.

16      And Your Honor, if we look at the IT case, the Court there

17 -- and admittedly that was not a funded plan, but the Court

18 said even if the trust were funded, the participants' legal

19 rights to its assets and to the assets of the corporation as a

20 whole are no greater than those of the corporation's General

21 Unsecured Creditors.  Moreover, the trust document

22 unequivocally establishes that trust assets are subject to

23 Creditors' claims in the event of insolvency and that such

24 claims were on par with those of plan participants.

25      Your Honor, the Court looked at the documents.  It looked

1  at the language in the trust, and it concluded that it was

2  unequivocal that the trust assets were subject to all

3  Creditors' claims in the event of insolvency.  And I submit

4  that that is the same language that is in the trust agreement

5  in this case.

6         THE COURT:  It is, but that was a case in which the

7  plan was determined to be a top hat plan.

8         MS. FATELL:  But Your Honor, what I'm focusing on is -

9  - because it says even if the trust were unfunded, the funds in

10 that trust were still available to the General Unsecured

11 Creditors in the event of insolvency.

12        THE COURT:  I --

13        MS. FATELL:  The distinction I'm making, Your Honor,

14 is that the Court looked at the plan and it separately looked

15 at the trust, and that the language of the trust was clear that

16 those funds were funds of the Debtor, that they were set up in

17 the trust for the beneficiaries if the Debtor decided to use

18 those funds to pay the beneficiaries.  But in the event of

19 insolvency, they because available to all Creditors.

20        THE COURT:  I agree that that's what it said.

21        MS. FATELL:  And I submit that the 3rd Circuit said

22 you can look at the language of the trust and rely on that.

23        THE COURT:  Well, there is this discussion of the

24 applicability of Federal common law, and I will tell you, even

25 after having read the papers and heard argument today, I'm

1  unsure where that fits in.  And I think the Plaintiffs are

2  telling me that it doesn't really under these circumstances.

3       MS. FATELL:  Your Honor, one other point that I wanted

4  to respond to.  The Plaintiffs relied on the <u>Serabauf</u> case,

5  which is a Supreme Court case decided in 2006, and argued that

6  that case establishes that there is a nexus between the funds

7  in the trust and the claims of the Plaintiffs, and therefore,

8  the Court can set up a constructive trust.  And Your Honor, I

9  don't think anybody disputes the fact or the principle that

10 there has to be a nexus between those assets in order for the

11 Court to impose a constructive trust.

12      Your Honor, <u>Serabauf</u> was a very different case.  There it

13 was essentially a subrogation claim.  The Court in <u>Serabauf</u>

14 didn't find that the funds that had been paid to the employees

15 needed to paid back.  There was something referred to as an ax

16 of third parties provision in that particular set of documents.

17 In other words, the beneficiaries, the employees, received

18 payments from third parties.  They received reimbursement of

19 their claims from third parties, and so as a matter of law, the

20 Court concluded that that property was not theirs under the

21 language of the documents, and therefore, the Court could

22 impose a constructive trust on that money received from third

23 parties.

24      Those are not the facts in this case.  There are no third

25 parties here, Your Honor.  The funds that were placed into this

1  trust were placed into the trust by the company and they remain

2  the company's -- it's our position that they remain the

3  company's assets.

4        THE COURT:  Thank you.

5        MS. FATELL:  Thank you.

6        MR. KEACH:  Briefly, Your Honor?  First, with respect

7  to the Committee's idea that even if this is not a top hat plan

8  we just have claims against the estate, that frankly just runs

9  afoul of ERISA directly.

10        THE COURT:  You know, I -- it surprises me -- and I

11  was not an ERISA lawyer in practice -- that this is an issue

12  that hasn't been determined with some clarity because the

13  situation strikes me as one that might not be uncommon.

14        MR. KEACH:  Well, I think, Your Honor, I think it's

15  clear under the statute, because what the statute says is

16  everything's under the substantive provisions unless they're

17  out.  So unless you're in the exception, you're under the

18  substantive provision.

19        And in fact, Judge Walrath said precisely that in the IT

20  Group case.  She framed the issue perfectly.  What she said was

21  that if the plans were not top hat plans, then the trusts were

22  excluded from the Debtor's bankruptcy estate, period, citing

23  Patterson v. Schumate.  She then went on to say that, however,

24  if they are top hat plans, then they're out.  Now, I would add,

25  and I'll add quickly, that this decision was before the

1  541(b)(7) amendments to BABSEPA, and I don't want to address

2  that just very briefly.  But she's framed the issue properly

3  and that's the issue before the Court.  If these are factually

4  not top hat plans, the substantive provisions apply.  We cited

5  two cases, Your Honor -- and there are others, but we cited two

6  cases that -- the May Department Stores case and another case,

7  that make it very clear that when ERISA applies, when the

8  substantive provisions apply, the substantive protections are

9  actually imbued within the documents, that the exclusive trust

10  provisions are imported into documents that even don't contain

11  them.  And that's precisely what Judge Walrath was saying in IT

12  Group.

13      There is not question that if these are not top hat plans,

14  those monies have been imbued with a trust from the moment they

15  were not paid -- when they were earned and not paid to the

16  employees, they were subject to the trust.  There's no

17  question, nobody has contested that we're talking about money

18  that was earned by these employees through their labors and

19  that but for this scheme they would have been paid that money

20  as compensation.  That's why it's called deferred compensation.

21          THE COURT:  But it was not withheld from their wages,

22  was it?

23          MR. KEACH:  I -- well, Your Honor, I think that's a

24  matter of fact and it may go -- we may be talking sophistry.  I

25  mean, in fact, even if we were talking about typical wages in a

1 401K plan, things aren't actually withheld.  It's all an

2 accounting entry.  I don't give you the money and take back a

3 piece.  What happened here is what happens in every case of a

4 deferred -- of an employee benefits plan.  They employees get

5 paid the net amount, and there's an accounting entry as to the

6 difference between the net and the gross amount.  And this is

7 no different here.

8      But more importantly, it's not even necessary that there

9 be a true withholding, if you want to call it that, for there

10 to be a nexus.  As Judge Walrath held in the -- in <u>Lenox</u> and in

11 the <u>Chow</u> case in <u>Lexington Health Care</u>, what she said is such a

12 nexus can be established as some funds to pay benefits are

13 merely set aside in an account to pay benefits, {quote} "There

14 is no requirement that the funds placed in escrow be actual

15 funds withheld from employees."  There's no question here, the

16 trust specifically provides that the monies that are put in the

17 trust are there for the sole purpose of paying benefits.  The

18 only exception to that is if there's an insolvency.

19           THE COURT:  Oops, and here we are.

20           MR. KEACH:  And, we argue, because this was not a top

21 hat plan, those insolvency provisions cannot be enforced, and

22 that's the factual issue that we need to develop.  Thank you,

23 Your Honor.

24           THE COURT:  All right, thank you.

25           MR. NICELY:  Just three quick points, Your Honor.

1  We've looked at the Plaintiff's cases very carefully and we're

2  not aware of any case cited by the Plaintiff or others

3  uncovered in our research in which the Court concluded that a

4  plan was not a top hat plan, and so therefore, the rabbi trust

5  was not a rabbi trust and had to be unwound.  If there is such

6  a case, we just haven't seen it, Your Honor.

7       Second, I'd like to renew my request or invitation in the

8  brief that if for any reason the Court is not inclined to

9  dismiss Wells Fargo from the case, then allow us to transfer

10 the trust assets into the Court's registry or into another

11 account designated by the Court and let us out.  And you'll

12 have the assets then at that point.  The Court can distribute

13 them as it sees fit, and we won't be heard from again.

14       THE COURT:  Well --

15       MR. NICELY:  And finally --

16       THE COURT:  -- if I were inclined to tell you to send

17 them somewhere else, I promise you it would not be here.

18       (Laughter)

19       MR. NICELY:  And finally, Your Honor, that would

20 actually be good for the Court if we can get out now because

21 there is a provision in the trust agreement that allows Wells

22 Fargo to request its attorneys fees in connection with any

23 defense of the trust or any legal proceedings in which Wells

24 Fargo is named as a party.  So those assets eventually would

25 come out of the bankruptcy estate or out of the trust, and so

1  the sooner we get out the better as far as the estate is

2  concerned.

3          THE COURT:  Isn't there something we can do to help

4  Wells Fargo here?

5          MR. KEACH:  Your Honor, yeah, let me be heard.  First,

6  as I said, and as I said when we were speaking to Wells Fargo a

7  long time ago, if -- we're perfectly happy that provided all of

8  the parties stipulate that they're not being a party, that

9  they're simply a nominal party , they're simply a stakeholder,

10 then if all of the parties stipulate that their absence from

11 the case does not curtail any relief we could seek, we are

12 happy to have them out of the case.  Because they are, in fact,

13 as we argued in our brief --

14         THE COURT:  You mean, relief against others.

15         MR. KEACH:  Yeah, exactly, relief against others or

16 against the funds themselves that they're holding, because they

17 are a mere stakeholder and we've always taken that position.

18 This issue abut the separateness of the trust in the plan we

19 think is a red herring.  The trust itself incorporates the

20 entire plan by reference.

21         THE COURT:  Well, let me, I mean --

22         MR. KEACH:  They're on in the same document.

23         THE COURT:  Okay, let's -- well, they're two different

24 documents, but one transaction, both intended to work together

25 obviously.  Does it make sense to place the funds elsewhere?

1      MR. KEACH:  You know, we're talking about a lot of

2 money, Your Honor, and I'm happy to have it be any place that's

3 safe and insured and in the right place.  And again, so long as

4 we have a stipulation that moving the money, that dismissing

5 the Trustee does not affect the rights we have against others

6 or the funds themselves or with respect to reformation of the

7 trust and the plan, then we're perfectly happy to let them

8 free.  Our point was to capture the assets before the Court so

9 that the Court could adjudicate title to the assets, that's all

10 I'm saying.

11      THE COURT:  Does the Committee have a --

12      MR. KEACH:  And I think they were a necessary party

13 and they'd have to be let out by stipulation.

14      THE COURT:  All right, does the Committee have a view

15 about that?

16      MR. INDELICATO:  I can't believe, Your Honor, I'm

17 getting up to say this, but, Your Honor, I understand that

18 Wells Fargo may be entitled to fees, but while we view these as

19 two separate agreements, I don't believe they are integrated.

20 And maybe the facts -- because I think as someone said earlier

21 today, I'm reading the tea leaves, but I think the facts will

22 have to come out.  This is a two party agreement, Your Honor,

23 between the Debtor and Wells Fargo as Trustee.  The funds were

24 deposited under those terms and conditions.  I don't think we

25 could just dismiss Wells Fargo and say, here, now the funds are

1 going to be deposited with the Court because I believe we're

2 conceding a valid argument of the Debtor that this is not an

3 integrated agreement, and in fact, those funds are governed by

4 that two party agreement and have nothing to do with the top

5 hat plan.  So Your Honor, unfortunately, I think Wells Fargo

6 needs to stay in.  I think they're the ones who negotiated or

7 are a party to the agreement with the Debtor.  I think they are

8 necessary as to what the intent -- if it gets to a factual

9 determination, Your Honor, there are rights and obligations.

10 And in fact, if this Court determines that this is an ERISA

11 qualified plan, I'm not sure how you'd deal with the funds

12 someplace else.  I think Wells Fargo is the party who is

13 holding the funds as Trustee.  I think it's a two-party

14 agreement with the Debtor.  I think until this issue is

15 decided, I think the funds need to stay with Wells Fargo.

16         THE COURT:  I can't believe you're making that

17 argument either.

18         MR. INDELICATO:  I can't believe it either, Your

19 Honor, but I believe that's the appropriate argument to make in

20 --

21         THE COURT:  You'd have more for the Examiner if you

22 saved the fees from Wells Fargo.  All right.

23     (Laughter)

24         MR. INDELICATO:  Thank you, Your Honor.

25         THE COURT:  Well, I actually, believe it or not, did

1  have some notion I might make a decision from the Bench today,

2  but that's not possible; not in any organized, meaningful,

3  articulate way.  So I will take the matter under advisement and

4  render a decision in due course.  But I will ask that the

5  parties, notwithstanding the positions expressed today,

6  particularly just now by the Committee, that they confer and

7  see whether there can't be something worked out that gets Wells

8  Fargo out but in any way does not impair any claim that's being

9  made by the Debtor and the Committee in this instance.  I'm

10 going to leave it at that.  I don't know when the next Omnibus

11 Hearing is but --

12        MS. UHLAND:  It's October 23rd, Your Honor.

13        THE COURT:  Okay, report to me back by then, if you

14 would.  I can tell you there will not be a decision by then.  I

15 have a que, and I understand the importance of this matter, but

16 it'll be a little bit before I get to a decision.

17        MS. FATELL:  Your Honor, if I may, and while we've

18 submitted a lot of briefs and I don't necessarily want to

19 burden the Court with more, it seems to me there's a very

20 narrow legal question that was raised today that I don't think

21 was addressed by all sides, and that is if this is not a top

22 hat plan, is there something in ERISA or the law that says

23 therefore that the trust funds become -- are no longer subject

24 to the rabbi trust.  And I don't think's that's been adequately

25 briefed, and I would ask the Court for indulgence and give us

1  some time on all sides to present that.  Because I heard

2  statements that that's what ERISA says, and we're not aware of

3  that.

4          THE COURT:  Well, is there any objection to that?

5          MR. KEACH:  Your Honor, we did brief that, and we

6  cited a number of cases for the precise holding we're seeking,

7  and that is if it's a top hat then it's (indiscern.).  IT says

8  that, there are other case we cited that we specifically

9  briefed it --

10         THE COURT:  All right, let's do this --

11         MR. KEACH:  If the Committee missed it, I'm sorry --

12         THE COURT:  I'll permit a supplemental brief by the

13  Committee if it wishes.  Tell me a timeframe, if you would, Ms.

14  Fatell.  And as I said, there's no hurry.

15         MS. FATELL:  Your Honor, if we decide to submit

16  something, we'll submit it within the next 10 days, if that's

17  acceptable.

18         THE COURT:  Okay, that's fine.  10 days.  And then

19  others involved may respond to that if they like within the 10

20  days following the submission of that brief.  And then -- okay,

21  then let's just put this matter down for status on the 23rd to

22  follow up on whether a brief's been filed and whether the

23  parties have been able to reach an accommodation concerning

24  Wells' participation.  Okay, anything more on this matter?

25         MR. KEACH:  Nothing from us, Your Honor.

1          THE COURT:  Anything more under the agenda?

2          MR. MERCHANT:  Your Honor, I believe that's all for

3    the agenda.  We just wanted to alert that Court that we did

4    work out a proposed form of order with Warren Smith regarding

5    his appointment as fee examiner.

6          THE COURT:  I have it in front of me, and I have one

7    question, that is has Mr. Smith filed a disinterestedness

8    affidavit?  The certification did not refer to one in the

9    order.

10          MR. MERCHANT:  I do not believe he has, at least I

11   haven't seen one.  I can follow up on that.

12          THE COURT:  Yes, if you would and once that's been --

13   I'm assuming that he's run his conflict check and that he's

14   okay because we spoke before I said I was going to appoint him.

15   But I think as a matter of completeness we need to have the

16   affidavit.

17          MR. MERCHANT:  Understood.

18          THE COURT:  Okay, anything further for today?

19          MR. MERCHANT:  I don't believe so, Your Honor.

20          THE COURT:  All right, thank you all, that concludes

21   this hearing.  Court is adjourned.

22          ALL:  Thank you, Your Honor.

23      (Court adjourned)

24

25

1                              CERTIFICATION
2 I certify that the foregoing is a correct transcript from the
3 electronic sound recording of the proceedings in the above-
4 entitled matter.
5
6 *Lewis Parham*                              10/9/07
7 _____        _____
8 Signature of Transcriber                Date