# EXHIBIT A

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT

**ACCOUNT NUMBER  68311015182599**

| | | |
|---|---|---|
| **Borrower:** | MARSHA D PELZER<br>28 WILLOW OAK LANE<br>DAWSONVILLE, GA 30534-6917 | **Lender:**  Bank of America, N.A.<br>100 North Tryon Street<br>Charlotte, NC 28255 |

**CREDIT LIMIT: $295,000.00**                                    **DATE OF AGREEMENT:  June 15, 2005**

**Introduction.** This Bank of America Equity Maximizer Agreement and Disclosure Statement ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through Bank of America, N.A.. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Bank of America, N.A.. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay Bank of America, N.A., or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Security Deed" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until June 15, 2030 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of North Carolina, following the expiration of the right to cancel, the perfection of the Security Deed, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: 120 months. You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: up to 180 months depending on the payment schedule set forth below. You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.**

**During the Draw Period.** The "Total Minimum Payment Due" is equal to the Variable Rate Balance Minimum Payment (below), the payment due, if any, for any outstanding Fixed Rate Option and any past due amounts  from prior billing periods.  (Some Fixed Rate Options may have a different due date and are not figured in the calculation of the Total Minimum Payment Due.)  At any time you may pay more than the Total Minimum Payment Due, make additional payments or pay in full or in part the Outstanding Balance.  The "Outstanding Balance" is the new balance of the Credit Line (which, if applicable, includes principal, accrued interest on the outstanding principal, fees and charges, Property Expenses [defined as any expense which we incur because you do not fulfill all obligations of this Agreement or if you or another party does not fulfill all obligations of the security instrument for the property which secures this Agreement] and any voluntary insurance or Borrowers Protection TM Plan.)  We reserve the right to apply payments in any manner we choose, without notice. Your "Variable Rate Balance" is all of your Outstanding Balance that is not part of a Fixed Rate Option.

You may choose any of the following monthly and quarterly Draw Period payment options.  Your billing statement will reflect the option you have chosen.  You may also change your Draw Period payment option at a later time.

Variable Rate Balance Minimum Payment - Depending on what payment schedule option you choose for the Draw Period, the Variable Rate Balance Minimum Payment may vary.  The Variable Rate Balance Minimum Payment will not be less than the amount of accrued interest and any voluntary insurance, plus any unpaid fees.

**Monthly Payment Options:**

Interest Only (Plus Insurance) Option - The Minimum Payment will be the amount of accrued interest, plus any voluntary insurance and unpaid fees.

1.5% of Variable Rate Outstanding Balance Option - The Minimum Payment will be one and one half percent (1.5%) of the Variable Rate Outstanding Balance plus any unpaid fees, or fifty dollars ($50), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

Fixed Payment Option - The Minimum Payment will be at least one and one half percent (1.5%) of the Credit Line plus any unpaid fees, or fifty dollars ($50), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**Quarterly Payment Options:**

Interest Only Option - The Minimum Payment will be the amount of accrued interest and unpaid fees.

4.5% of Variable Rate Outstanding Balance Option - The Minimum Payment will be four and one half percent (4.5%) of the Variable Rate Outstanding Balance plus any unpaid fees, or one hundred fifty dollars ($150), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

Fixed Payment Option - The Minimum Payment will be at least four and one half percent (4.5%) of the Credit Line plus any unpaid fees, or one hundred fifty dollars ($150), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**During the Repayment Period.** The payment frequency you select for the Draw Period is the same for the repayment period. The length of the repayment period will vary depending on the Outstanding Balance at the beginning of the repayment period, if any Property Expenses are incurred during the repayment period and if you have any Fixed Rate Options. The amount of the Total Minimum Payment Due may vary due to increases or decreases in the Index or if there are any Fixed Rate Options that remain unpaid at the beginning of the repayment period.

You may choose either the following monthly or quarterly repayment period payment option.  Your billing statement will reflect the option you have chosen.  You may also change your repayment period payment option at a later time.

Monthly Payment Option - The Total Minimum Payment Due will be an amount equal to the greater of five hundred fifty-five thousandths of one percent (0.555%) or one one hundred and eightieth (1/180) of the Variable Rate Principal Balance remaining on the last day of the Draw Period, plus accrued interest, unpaid fees, unpaid Property Expenses and any voluntary insurance, or fifty dollars ($50). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Option payments previously established will continue to be billed.

## BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599                              (Continued)                                          Page 2

Quarterly Payment Option - The Total Minimum Payment Due will be an amount equal to the greater of one and six hundred sixty-six thousandths of one percent (1.666%) or one sixtieth (1/60th) of the Variable Rate Principal Balance remaining on the last day of the Draw Period, plus accrued interest, unpaid fees and unpaid Property Expenses, or one hundred fifty dollars ($150). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Option payments previously established will continue to be billed.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to FINANCE CHARGES, other charges and fees, and principal in any order we choose without notice.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 2:00 P.M. at the location specified, or a payment made at one of our banking centers in the state of our address first described above, by 2:00 P.M. (Business days are Monday through Friday, exclusive of legal holidays. If the due date falls on a Saturday, Sunday or legal holiday, the due date will not be extended.) on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Two Hundred Ninety-five Thousand & 00/100 Dollars ($295,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Security Deed covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Security Deed or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Security Deed for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Special Convenience Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

**ATM Access.** Using your "Bank of America ATM card or Bank of America Check Card or Account Access Card" at any of our designated ATM locations.

**Account Access.** Using the Account Access Card as described in this Agreement.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Special Convenience Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Special Convenience Check.

**Post-dated Checks.** Your Special Convenience Check is post-dated. If a post-dated Special Convenience Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Special Convenience Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Special Convenience Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Special Convenience Check.

**Other Restriction.** Other Limitations. (1) You may not make a payment on the Account with a Special Convenience Check. (2) You notify us that you wish to stop payment of a Special Convenience Check; however you will not hold us liable if we try to stop payment of Special Convenience Check and we are unable to do so. You may try to stop payment on a Special Convenience Check by notifying Customer Service at the number listed on your statement. Your stop payment order will remain in effect for six (6) months unless renewed.

If we pay any Special Convenience Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Special Convenience Check. The Special Convenience Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as described in this Agreement is not wrongful dishonor. We may choose not to return Special Convenience Checks along with your periodic billing statements; however, your use of each Special Convenience Check will be reflected on your periodic statement as a credit advance. We do not "certify" Special Convenience Checks drawn on your Credit Line.

**Limitations on the Use of ATM Cards.** We reserve the right not to honor Bank of America ATM card or Bank of America Check Card or Account Access Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Bank of America ATM card or Bank of America Check Card or Account Access Card charge.

**Stolen ATM Cards.** Your Bank of America ATM card or Bank of America Check Card or Account Access Cards have been reported lost or stolen.

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599 (Continued) Page 3

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

If we pay any advance requested by use of the Bank of America ATM card or Bank of America Check Card or Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Bank of America ATM card or Bank of America Check Card or Account Access Card will be reflected on your periodic statement as a credit advance.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Account Access Limitations.** The following transaction limitations will apply to your Credit Line and accessing by other methods.

**Other Transaction Requirements.** Based on state law, we may not be able to provide you with a Bank of America ATM card or Bank of America Check Card or an Account Access card. We reserve the right not to honor Account access linked to this Credit Line in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Account access transaction.

**Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.

**Unauthorized Signatures.** Your Account Access Card is not used by a Borrower who has been issued one.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in the Agreement or could be if we paid the Account access transaction.

If we pay any advance requested by use of an Account access transaction under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

**Liability for Unauthorized Account Access Card Transactions.** You are not liable for unauthorized use of your Account Access Card, just notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions. We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions.

**Visa is a registered trademark of Visa International Service Association.**

Lender's liability, if any, for wrongful dishonor of an advance request is limited to Borrower's actual damages. Lender shall not be liable if any merchant, financial institution or ATM refuses to honor the Account Access Card.

**Credit Line Special Convenience Check, Telephone Request, In Person Request and ATM Access Limitations.** There are no transaction limitations for the writing of Special Convenience Checks, requesting an advance by telephone, requesting an advance in person or using an Automated Transaction Machine ("ATM") access card.

**Authorized Signers.** The words "Authorized Signer" on Special Convenience Checks and Bank of America ATM card or Bank of America Check Card or Account Access Cards as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Special Convenience Checks and Bank of America ATM card or Bank of America Check Card or Account Access Cards.** If you lose your Special Convenience Checks or Bank of America ATM card or Bank of America Check Card or Account Access Cards or if someone is using them without your permission, you agree to let us know immediately. You can notify us at our address shown at the beginning of this Agreement.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Security Deed dated June 15, 2005, to us on real property located in DAWSON County, State of Georgia.

**Existing Indebtedness.** You agree not to request additional funds or credit advances from any creditor which may hold a prior lien that contains a "dragnet," "future advance" or similar clause in any deed to secure debt or mortgage upon the Property securing this Agreement.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Security Deed, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**HOW THE BALANCE ON WHICH THE FINANCE CHARGE IS CALCULATED IS DETERMINED.** The cost of the credit through the Credit Line is disclosed as a Finance Charge. Except for some closing costs (indicated in this Agreement), interest will not accrue until a credit advance is made. You will pay interest on each credit advance until it is fully paid off. We will determine the FINANCE CHARGE for each monthly billing period by using the following simple interest rate calculation. A FINANCE CHARGE is calculated daily for that portion of the principal balance that is not payable under a Fixed Rate Option ("Variable Rate Principal Balance") by multiplying the daily periodic rate (as indicated in "How The Rate Used To Calculate The Finance Charge Is Determined ") by the daily Variable Rate Principal Balance. To get the daily Variable Rate Principal Balance we (i) take the beginning Variable Rate Principal Balance for that day (ii) add to that amount all credit advances and sums advanced by us to fulfill any obligations under a security instrument (such as a mortgage, deed of trust, or security agreement), if any, for that

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599                    (Continued)                                          Page 4

day, then (iii) subtract all principal balance payments and credits for the Variable Rate Principal Balance for that day. All of the daily Variable Rate Principal Balance FINANCE CHARGES for the monthly billing cycle are added to get the total Variable Rate Principal Balance FINANCE CHARGE for the monthly billing cycle. Transaction charges, including but not limited to Fixed Rate Option conversion fees, are added to the Variable Rate Principal Balance FINANCE CHARGE to get the total FINANCE CHARGE for the monthly billing cycle. For Fixed Rate Option balances, the estimated FINANCE CHARGE is calculated at the establishment of the Fixed Rate Option and is included in the fixed payment amount.

HOW THE RATE USED TO CALCULATE THE FINANCE CHARGE IS DETERMINED. The initial Variable Rate Principal Balance daily periodic rate used to compute the Variable Rate Principal Balance FINANCE CHARGE is 1/365 of the initial Variable Rate Principal Balance ANNUAL PERCENTAGE RATE (as indicated under "Periodic Rate and Corresponding Annual Percentage Rate"). The Variable Rate Principal Balance ANNUAL PERCENTAGE RATE is a variable rate involving both an index and a margin, both described under "Periodic Rate and Corresponding Annual Percentage Rate". Finance Charges will accrue on an actual 365 day year basis (366 day year basis for leap year). If, however, you participate in a relationship account with a Bank of America Corporation affiliate (as offered from time to time), the Variable Rate Principal Balance Daily Periodic Rate and the Variable Rate Principal Annual Percentage Rate may be reduced below the rates stated in this Agreement. The addition of a fee may cause the actual Variable Rate Principal Balance Annual Percentage Rate for the monthly billing cycle to exceed the Variable Rate Principal Balance Annual Percentage Rate stated in this Agreement.

If the Index is unavailable for any monthly billing cycle, we will use the Index for the most recently preceding monthly billing cycle in which the Index was available. If the Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will be a historical movement substantially similar to the Index, and the substitute index and margin will result in an Annual Percentage Rate at the time it is substituted that is substantially similar to the rate in effect at the time the Index became unavailable.

There is no limitation on the size of any interest rate adjustment or the number of interest rate adjustments that may be made on the Credit Line so long as the maximum Annual Percentage Rate is not exceeded. Any increase or decrease in the Index that occurs would cause a corresponding increase or decrease in the Daily Periodic Rate, Annual Percentage Rate, Finance Charges and possibly the Total Minimum Payment Due. You understand that adjustments based on an Index change will be applied automatically to the Credit Line and you will not receive advance notice of that adjustment.

The Finance Charge on a Fixed Rate Option is determined on a simple interest basis. If you make a Fixed Rate Option payment(s) before or after any date, either the amount of your originally scheduled final payment may be lower or higher than the amount initially established or additional payment(s) may be required.

Under some circumstances, your payment will not cover the Finance Charges that accrue and negative amortization will occur. Negative amortization will increase the total amount you may pay us and reduce the equity in the Property.

Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE. We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime Rate as published daily in the "Money Rates" table of The Wall Street Journal. When a range of rates has been published, the higher of the rates will be used. Changes in the Annual Percentage Rate will be based on the rate published the last business day prior to the first day of the next monthly billing cycle, plus the Margin, and will be effective on the first day of the next monthly billing cycle (the "Index"). We will use the most recent Index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Second Payment Stream. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 24.000% or the maximum rate allowed by applicable law. Today the Index is 6.000% per annum, and therefore the initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

### Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.250% | 6.250% | 0.01712% |

### Current Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.250% | 6.250% | 0.01712% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

Forgo Rate Increases. If we forgo an ANNUAL PERCENTAGE RATE increase, at the time of a later adjustment we may return to the full Index value plus margin.

Conditions Under Which Other Charges May Be Imposed. You agree to pay all the other fees and charges related to your Credit Line as set forth below:

Scheduled Fee Changes. To the extent allowed by applicable law, we may increase any or all of the fees and charges described in this Agreement by 20% of the existing fee each calendar year.

Other Charges. Your Credit Line Account may be charged the following other charges: Miscellaneous Charges. The amount of this other

## BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599                        (Continued)                        Page 5

charge is: To the extent allowed by applicable law, any other amount incident to the application for and the opening, administration and termination of the Credit Line Account, including, but not limited to, reinstatement of Credit Line account privileges, processing of nonconforming payments, processing and additional expense if a Credit Line advance occurs in a foreign country, express courier charges, taxes and any penalties or interest thereon, imposed on this Agreement or on any transaction effected pursuant to this Agreement. We may advance any such cost or tax and any penalty or interest.

**Miscellaneous Photocopying** - If you request a copy of any document, we may charge your Credit Line Account $0.00 per copy, plus applicable sales tax for the time it takes us to locate, copy, and mail the document to you. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.

**Returned Special Convenience Check Charge** - $20.00

**Returned Payment Charge** - $20.00

**Conversion Fee** - There is a $0.00 conversion fee charged for the establishment of each Fixed Rate Loan Option.

**Annual Fee** - $0.00 will be charged to the Equity Maximizer Account on or after each anniversary date.

**Late Charge** - If we do not receive the amount of your minimum monthly payment in full within ten (10) days after your payment due date, you will pay us a late charge equal to the greater of $10.00 or five percent (5%) of the unpaid portion of your minimum monthly payment.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees, if any sums owing under this Agreement are collected by or through an attorney at law, whether or not there is a lawsuit, and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable **ANNUAL PERCENTAGE RATE** under this Agreement to 24.000 percent per annum. The **ANNUAL PERCENTAGE RATE** will not exceed the maximum rate permitted by applicable law. If we do not increase the **ANNUAL PERCENTAGE RATE** upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Special Convenience Checks and any other access devices. Any use of Special Convenience Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Special Convenience Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address and return all Special Convenience Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this

## BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599                          (Continued)                          Page 6

Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time, without penalty. However, we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any checks or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to us at the address shown on your statement.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Security Deed. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Use of the Credit Line.** There are some additional rules about how Borrower uses the Credit Line:

**A. Legal Transactions.** Borrower agrees that Borrower will only use the Credit Line for transactions that are legal where Borrower resides. For example, Internet gambling transactions may be illegal in Borrower's state. Display by an on-line merchant of either Lender's logo or a Card Company's logo does not mean that an Internet transaction is legal where Borrower resides. Lender will not be liable if Borrower engages in an illegal transaction.

**B. Authorizations.** Some transactions require Lender's prior authorization. For security purposes, Lender may from time to time place or change limits on the number or amounts of transactions Borrower makes in a day at ATMs or point of sale terminals. Such limitations may not be the same at every ATM or point of sale terminal. The limitations placed on a "Bank of America ATM Card" or "Bank of America Check Card" when using an ATM or point of sale terminal may not be the same as the limitations placed on an Account Access Card used at the same ATM or point of sale terminal. No such limits are placed on the number or amounts of transactions Borrower makes: at Lender's banking centers, by writing a Special Convenience Check, by conducting an Overdraft Protection transaction (subject to the ATM limits, above), or by telephone. In addition, Lender may deny authorization to any method of accessing the Credit Line if the Credit Line has been suspended or terminated or if Lender suspects fraudulent activity. Lender shall not be liable for any failure to authorize a transaction for any of these reasons. However, Borrower is liable for any transaction Lender authorizes even if Lender should not have authorized it because Borrower is or would be in default as a result of the transaction.

**C. No Security Interest on Purchases.** This Agreement does not grant Lender a security interest in purchases Borrower charges to the Credit Line.

**D. Transactions With Merchants.** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", or "all sales final", or similar language, Borrower will be bound by that policy when Borrower uses the Credit Line to buy goods or services from that merchant. (b) When using the Credit Line to make travel or lodging reservations, Borrower must obtain the merchant's cancellation policy and follow it if Borrower cancels. If Borrower cancels, Borrower must obtain the cancellation number that the merchant is required to give Borrower. The merchant may charge Borrower for a cancelled transaction unless Borrower can provide Lender with a correct cancellation number. If Borrower makes reservations or purchases of any kind, such as a lodging reservation for several nights stay or a mail order purchase, the Credit Line may be immediately charged for the full amount of the reservation or purchase, regardless whether Borrower has received the goods or services requested at the time the Credit Line is charged. (c) If Borrower authorizes a merchant to charge the Credit Line for repeat transactions without the Account Access Card, then Borrower must notify the merchant when Borrower wants to discontinue the repeat transactions or if the Credit Line is closed or if a new Credit Line or Account Access Card number is issued by Lender. Otherwise, Borrower will be responsible to Lender for the amount of all such repeat transactions. (d) If Borrower disagrees with a transaction on Borrower's statement or has a dispute with a merchant as a result of a transaction, Borrower will provide Lender with information or assistance Lender reasonably requests. Otherwise, Borrower will pay Lender for any resulting loss Lender has, unless Lender is prohibited by applicable law from holding Borrower liable for Lender's loss. (e) If the Borrower makes a transaction in a currency other than U.S. dollars, VISA will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using VISA currency conversion procedures that are disclosed to institutions issuing VISA cards. The conversion rate on the processing date may differ from the rate on the date of the Borrower's transaction. Currently, VISA uses a currency conversion rate of either: (1) a rate selected by VISA from a range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives or (2) the government mandated rate in effect for the central processing date. In each case, VISA uses the rate in effect one day before the conversion date. In the event VISA chooses to change the currency conversion rate, or the day on which the currency conversion rate is determined, then transactions on the Credit Line made in a foreign currency and processed after the change will reflect the change.

**E. Special Rule for Account Access Card Purchases.** If the Borrower has a problem with the quality of goods or services that Borrower purchased with an Account Access Card, and Borrower has tried in good faith to correct the problem with the merchant, Borrower may not have to pay the remaining amount due on the goods or services. Borrower has this protection only when the purchase price was more than $50 and the purchase was made in Borrower's home state or within 100 miles of Borrower's mailing address. (If Lender owns or operate the merchant, or if Lender mailed Borrower the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.).

**Overdraft Protection and Linked Accounts.** If the Credit Line Account is not blocked, suspended or terminated, you may request that the Credit Line Account be set up to provide overdraft protection for an associated checking or Money Market Savings account. If the total amount of

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT

Loan No: 68311015182599                                    (Continued)                                    Page 7

checks, debit card or ATM transactions or other debits for a business day exceeds the available associated account balance, then an advance will be made from the Credit Line Account ("Overdraft Protection"). If the Credit Line Account is used for Overdraft Protection, the minimum transfer amount is one hundred dollars ($100) and incremental transfer amounts will be in multiples of one hundred dollars ($100). However, if there is not $100 available, but the available Credit Line amount can cover the overdraft transaction, then the amount of the available Credit Line will be advanced to cover the overdraft. For Idaho and Washington, the incremental advance is $25. If the available credit on your creditline will not allow a $25 increment to be advanced, no transfer will be made. If the associated account is closed or blocked, Overdraft Protection will stop. If you request that the Credit Line Account be connected to or "linked" to another Bank of America product, you understand and agree that a user on the "linked" account can make a transaction that exceeds the available balance on the "linked" account and cause an advance to be made. Also, if an ATM access card is given to a user on the "linked" account, that user when using the ATM access card may access the Credit Line Account and obtain an advance without making a transaction directly on the "linked" account. That user may or may not be a party obligated for this Agreement.

**Skip Payment Feature.** At our discretion, from time to time we may offer a feature that will allow you to skip one or more payments. FINANCE CHARGES will continue to accrue on the principal balance at the applicable interest rate. At the end of the skip payment period, the payment terms of this Agreement will be reinstated automatically without further notice.

**Automatic Payment and Reservation of Rights.** If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

If you have authorized a payment above then the following shall apply:

You hereby authorize us to draft the described account for your loan payments. You agree to the Recurring Automatic Payment Authorization Terms and Conditions which will be enclosed with your Automatic Payment Confirmation notice, unless otherwise notified by us.

If you choose to establish automatic payment to draft your designated Bank of America account, the authorization will remain in full force and effect until we have received written or verbal notification from you of its termination in such time and in such a manner as to afford us a reasonable opportunity to act on it. If at any time you elect to terminate your automatic payment, your Margin will increase by one quarter of one percent (.25%).

**Additional Suspension or Reduction Information.** Notwithstanding the notice of default provision contained in section (3) in the Suspension or Reduction section above, our suspension of Credit Line Account privileges will be effective immediately. Written notice will be mailed to you within three (3) business days after the suspension of privileges.

**Miscellaneous.** If this Note or Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation. You agree that if this Note or Agreement is in default, including the failure to make the Minimum Payment by the due date, you will accept calls regarding the collection of this Note or Agreement at any residence or place of employment. The calls can be automatically dialed and a recorded message may be played. You agree such calls will not be "unsolicited" calls for purposes of any federal, state or local law. To improve customer service and security, telephone communications with you may be monitored and recorded. You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed. You authorize us, our parent company, Bank of America Corporation (or any successor company) and Bank of America Corporation's affiliates and subsidiaries ("Affiliates") to: (a) obtain other information deemed necessary concerning the granting and maintaining of this Note or Credit Line Account, including the obtaining of credit bureau and other reports concerning your credit experience and other information from credit reporting agencies, creditors, any department of motor vehicles or similar state agency, your employer (past, present and future) and other persons (and all such entities may release and/or verify such information to us at any time without notification to you or without your consent), and (b) share information with our Affiliates, except to the extent that you have opted out of such sharing as provided in our Privacy Policy for Consumers. This Note or Agreement constitutes the entire understanding and agreement between the parties as to the matters set forth in this Note or Agreement and supercedes all prior understandings and correspondence, oral or written, with respect to the subject matter hereof. We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for any such deferment or delay. A court decree for divorce or separation or a non-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Note or Credit Line balance if we are not a party to the decree or agreement. Notwithstanding any other provision contained in the Note or this Agreement, we do not intend to charge, and you shall not be required to pay, any amount of finance charge or fee more than the maximum permitted by applicable law. Any payment in excess of the maximum shall be refunded to you or credited against principal, at our option. If this Note or CreditLine Agreement is a renewal of a prior Note or CreditLine Agreement, then it is the intent of the parties that the Note or CreditLine Agreement evidencing the original extension of credit not be extinguished by the renewal. It is further the intent of the parties that no novation shall occur by the renewal of such extension of credit. Our records shall be evidence of whether this Note or CreditLine Agreement is a renewal. The word "you" shall also mean Borrower. The word "we" shall also mean Lender.

**Request to Issue Account Access Card and PIN and Other Instructions.** This section shall not apply if issuance of an account access card is prohibited by law, or if the property securing this Agreement is located in the states of Texas, New York, or Connecticut (in which case, all references in this Agreement to an "Account Access Card" are deleted). Account Access Card is applicable in this agreement only in states where available. During the Draw Period, any one Borrower may request Lender to issue a card as described in this section, enabling access to the Account, and an associated Personal Identification Number (PIN). Any Borrower may request that such cards be provided to as many as, but no more than, the first three Borrowers listed at the top of this Agreement or who may be later added as a Borrower, or to fewer Borrowers, and to any other person who may be later added as a Borrower (provided that no more than the first three Borrowers may have such cards). Each Borrower is liable for all transactions made with such cards.

Any Borrower may give Lender any other directions with regard to such cards, including, but not limited to, terminating all of them.

All requests or directions, at Lender's option, may be made verbally or in writing. Borrower(s) agree that the cards will be used only as described in this Agreement. Borrower(s) further agree that the cards may be issued by Lender through an arrangement Lender may have from time to time with a card company (the "Card Company"), such as Visa. All references in this Agreement to an "Account Access Card" shall mean the card or cards described in this paragraph.

**Borrowers Protection Plan.** (Borrowers Protection Plan is a registered trademark of Bank of America Corporation) Fixed Rate Loan Options may be protected by the Borrowers Protection Plan. Protection options include Disability, Involuntary Unemployment, and Accidental Death; or

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
Loan No: 68311015182599                              (Continued)                          Page 8

Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Two Borrowers may purchase Protection for each Fixed Rate Loan Option, but they must select the same coverage option, and there may be restrictions on which Borrowers may apply. To qualify, you must meet all requirements as set forth in the Addendum for the Borrowers Protection Plan.

The Borrowers Protection Plan is optional and not required to obtain a new Fixed Rate Loan Option. For each Fixed Rate Loan Option, you must specifically request the Borrowers Protection Plan, and you must sign a separate Addendum to this Agreement, even if you obtained the Borrowers Protection Plan for a prior Fixed Rate Loan Option.

Fees for the Borrowers Protection Plan are based on and payable with the regularly scheduled monthly payment of the Fixed Rate Loan Option. Fixed Rate Loan Options with quarterly payments are not eligible for the Borrowers Protection Plan. Interest is not charged on the fees for Borrowers Protection Plan.

The maximum term of the Borrowers Protection Plan is the shorter of the Fixed Rate Loan Option term or 120 months.

We may allow you to exceed the Credit Limit temporarily and from time to time, to accommodate the fees for Borrowers Protection Plan.

**Fixed Rate Loan Option Payment Information.** A Fixed Rate Loan Option, which may also be referred to as a Fixed Rate Option in this Agreement, has a fixed interest rate and fixed term and is payable monthly. You may convert part or all of the Variable Rate Principal Balance, along with accrued interest, fees, the Fixed Rate Loan Option conversion fee and any voluntary insurance charge to a Fixed Rate Loan Option at any time during the Draw Period or the repayment period. We will help you establish the amount of principal and interest sufficient to amortize the Fixed Rate Loan Option over the term you select. The maximum term of any Fixed Rate Loan Option may not exceed the repayment period maturity date of this Credit Line. The minimum amount for a Fixed Rate Loan Option is $5,000. You may have up to three (3) Fixed Rate Loan Options open at any one time, but may not have more than four (4) Fixed Rate Loan Options open during any one statement period. You may convert all or part of the Variable Rate Balance, plus any applicable Fixed Rate Loan Option conversion fee to a Fixed Rate Loan Option unless you are in default or if your credit advance privileges are suspended or terminated. If you request a Fixed Rate Loan Option, but the Variable Rate Balance is less than the amount requested, we will hold your request at the fixed interest rate offered to you for up to five (5) business days. If by the end of the fifth day the Variable Rate Balance is still less than the amount of your request, it will not be processed. There may be a conversion fee charged for the establishment of each Fixed Rate Loan Option. Please refer to "Conditions Under Which Other Charges May Be Imposed" elsewhere in this Agreement for information about the conversion fee. The Fixed Rate Loan Option ANNUAL PERCENTAGE RATE is the Prime Rate plus the Fixed Rate Loan Option margin of 8.00%. However, we may make lower Fixed Rate Loan Option rates available from time to time. Please contact your Banking Center or Customer Service for the Fixed Rate Loan Option rate currently offered. Your payment will be a fixed dollar amount to be determined at the opening of the Fixed Rate Loan Option. You may arrange a different payment date for each Fixed Rate Loan Option. Fixed Rate Loan Option payments will be billed separately from your Regular Payment in accordance with the schedule you have arranged. For the Fixed Rate Loan Option, you will receive a separate bill. However, the Variable Rate Balance statement will show all activity, including payments.

**Miscellaneous.** The Mortgage or Deed of Trust and all other documents held or maintained by Lender in connection with the Mortgage or Deed of Trust (and any prior renewal/extension/modification/consolidation thereof) have been properly perfected and are fully enforceable in strict accordance with the terms thereof. Any consent to jurisdiction previously executed by Grantor shall unconditionally be fully effective and fully extend to this Modification and any document executed in conjunction herewith. To the extent that any provision of this Modification conflicts with any term or condition set forth in the Mortgage or Deed of Trust, or any agreement or security document executed in conjunction herewith, the provision of this Modification shall supercede and control. Grantor acknowledges and agrees that, as of the date of this Modification, the Mortgage or Deed of Trust is fully enforceable in strict accordance with the terms thereof, and there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to enforcement of the Mortgage or Deed of Trust or the Note or Credit Agreement. This Modification has been duly executed by Grantor under seal. Grantor acknowledges receiving a full and completed copy of this Modification (regardless whether Grantor's signature appears on the copy). "Grantor" means, jointly and severally, each person who executed or executes the Mortgage or Mortgage Modification or Deed of Trust or Deed of Trust Modification. Any litigation arising out of or relating to this Modification or the Note or Credit Agreement shall be commenced and conducted in the courts and in the States as specified in the Mortgage or Deed of Trust. Grantor hereby waives the right to trial by jury in any action brought on this Modification or on any other matter arising in connection with this Modification or the Note or Credit Agreement.

**Governing Law.** In addition to applicable federal law, this Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Georgia, except for matters related to the exportation of interest (as defined by federal law) which will be governed by and interpreted in accordance with the laws of the State of North Carolina. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by the Credit Agreement and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by us in the State of North Carolina.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Security Deed, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Security Deed or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," given with the application.

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT

Loan No: 68311015182599                                     (Continued)                                          Page 9

This Agreement is dated June 15, 2005.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X_____(Seal)
   MARSHA D PELZER

Effective Disbursement Date: _____

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT

Loan No: 68311015182599                                         (Continued)                                         Page 10

---

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### Notify us in case of errors or questions about your bill.

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

> Your name and account number.

> The dollar amount of the suspected error.

> Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

### Your rights and our responsibilities after we receive your written notice.

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

---

LASER PRO Lending, Ver. 5.24.10.102  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - GA/NC  C:\CFI\CFI\LPL\D20.FC  TR-20001001  PR-MAXHEL

# EXHIBIT B

WHEN RECORDED MAIL TO:

Record and Return To:
Integrated Loan Services
27 Inwood Road
Pelzer, Marsha D          Rocky Hill, CT 06067

GEORGIA, DAWSON COUNTY
INTANGIBLE TAX
PAID $ 885.00
DATE 7-27-05

_July McCord_

BECKY McCORD, CLERK
26=
911.=

GEORGIA, DAWSON COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED FOR RECORD
AT 11:15 A.M. 7-20-05
Recorded in Deed Book 680 Page 403-411
This 27 day of July 20 05
_July McCord_ , Clerk

L /PW Reff 44602307001
172

### SECURITY DEED

THIS SECURITY DEED dated June 15, 2005, is made and executed between MARSHA D PELZER, AN UNMARRIED PERSON (referred to below as "Grantor") and Bank of America, N.A., whose address is 100 North Tryon Street, Charlotte, NC 28255 (referred to below as "Lender").

GRANT OF SECURITY DEED. FOR AND IN CONSIDERATION of the financial accommodations to Grantor by Lender resulting in the obligation which is hereinafter more particularly described, and in order to secure that obligation, Grantor hereby grants, bargains, conveys, transfers, assigns and sells to Lender all of Grantor's right, title, and interest in and to the following described real property: **The Real Property is located in DAWSON County, State of Georgia and is described as follows:**

   **See Exhibit A, which is attached to this Security Deed and made a part of this Security Deed as if fully set forth herein.**

TOGETHER WITH ANY AND ALL of the following: (i) all buildings, structures and improvements now or hereafter located on the real property or on any part or parcel thereof and all fixtures affixed or attached, actually or constructively, thereto; (ii) all and singular the tenements, hereditaments, easements and appurtenances belonging thereunto or in any wise appertaining thereto and the reversion and reversions, remainder or remainders thereof; (iii) all Rents accruing therefrom, whether now or hereafter due; (iv) all accounts and contract rights now or hereafter arising in connection with any part or parcel thereof or any buildings, structures or improvements now or hereafter located thereon, including without limitation all accounts and contract rights in and to all leases or undertakings to lease now or hereafter affecting the land or any buildings, structures, or improvements thereon; (v) all minerals, flowers, crops, trees, timber, shrubbery and other emblements now or hereafter located thereon or thereunder or on or under any part or parcel thereof; (vi) all estates, rights, title and interest therein, or in any part or parcel thereof; (vii) all equipment, machinery, apparatus, fittings, fixtures, furniture, furnishings, mobile homes, modular homes and all personal property of every kind or description whatsoever now or hereafter located thereon, or in or on the buildings, structures and improvements thereon, and used in connection with the operation and maintenance thereof, and all additions thereto and replacements thereof; and (viii) all building materials, supplies, goods and equipment delivered thereto and placed thereon for the purpose of being affixed to or installed or incorporated or otherwise used in the buildings, structures or other improvements now or hereafter located thereon or any part or parcel thereof.

**The Real Property or its address is commonly known as   28 WILLOW OAK LANE, DAWSONVILLE, GA 30534-6917.**

REVOLVING LINE OF CREDIT. This Security Deed secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Grantor up to the maximum principal indebtedness of $295,000.00 so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Security Deed secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Security Deed and any intermediate balance. The maturity date of the Credit Agreement is June 15, 2030.

THIS SECURITY DEED, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS SECURITY DEED. IT IS THE INTENTION OF GRANTOR AND LENDER TO CREATE A PERPETUAL OR INDEFINITE SECURITY INTEREST IN THE REAL PROPERTY DESCRIBED IN THIS SECURITY DEED PURSUANT TO O.C.G.A. 44-14-80 AND TO AGREE THAT TITLE SHALL NOT REVERT TO GRANTOR FOR A PERIOD OF SEVEN (7) YEARS FROM THE MATURITY DATE OF THE DEBT OR DEBTS SECURED BY THIS SECURITY DEED. HOWEVER, NOTHING IN THIS PARAGRAPH WILL IMPAIR LENDER'S RIGHTS TO COLLECTION OF THE INDEBTEDNESS AND FORECLOSURE OF THE SECURITY INTEREST IF THE INDEBTEDNESS IS NOT REPAID WHEN DUE. THIS SECURITY DEED IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Security Deed, Grantor shall pay to Lender all amounts secured by this Security Deed as they become due and shall strictly perform all of Grantor's obligations under this Security Deed and the Related

Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Security Deed. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Security Deed or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Security Deed, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Security Deed and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

Nuisance, Waste. Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

Removal of Improvements. Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

Lender's Right to Enter. Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Security Deed.

Compliance with Governmental Requirements. Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

Duty to Protect. Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Security Deed upon the sale or transfer, without Lender's prior written consent, of all or any part of the Property, or any interest in the Property. A "sale or transfer" means the conveyance of Property or any right, title or interest in the Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Property, or by any other method of conveyance of an interest in the Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Georgia law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Security Deed:

Payment. Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Security Deed, except for those liens specifically agreed to in writing by

**SECURITY DEED**
**(Continued)**

Loan No: 68311015182599                                                                                   Page 3

Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Security Deed:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Security Deed. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Security Deed, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, or (C) to make repairs to the Property then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Security Deed also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Security Deed:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Security Deed, and (b) Grantor has the full right, power, and authority to execute and deliver this Security Deed to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Security Deed, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of

# SECURITY DEED
## (Continued)

Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Security Deed shall survive the execution and delivery of this Security Deed, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Security Deed:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable attorneys' fees and costs and expenses, including court costs that are incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Security Deed:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Security Deed and take whatever other action is requested by Lender to perfect and continue Lender's security interest on the Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Security Deed, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Security Deed.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Security Deed or upon all or any part of the Indebtedness secured by this Security Deed; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Security Deed; (3) a tax on this type of Security Deed chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Security Deed, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Security Deed as a security agreement are a part of this Security Deed:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Security Deed in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Security Deed as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Security Deed may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Security Deed.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Security Deed:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Security Deed, and the Related Documents, and (2) the liens and security interests created by this Security Deed as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**SECURITY DEED**

**(Continued)**

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Security Deed, Lender shall execute and deliver to Grantor a suitable satisfaction of this Security Deed and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Security Deed if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**LENDER'S REMEDIES AND POWER OF SALE.** Upon the occurrence of an Event of Default, Lender shall have the following rights, powers, and remedies:

**Accelerate Indebtedness.** Lender, at Lender's option and election and without notice to Grantor, may declare all or any portion of the Indebtedness to be immediately due and payable, whereupon the same shall be and shall become due and payable forthwith without presentment demand, protest or notice of any kind, all of which are expressly waived by Grantor.

**Entry and Possession.** Lender may enter upon the Property, or any part thereof, and take possession of the Property, excluding therefrom Grantor and all agents, employees and representatives of Grantor; employ a manager of the Property or any part thereof; hold, store, use, operate, manage, control, maintain and lease the Property or any part thereof; conduct business thereon; make all necessary and appropriate repairs, renewals, and replacements; keep the Property insured; and carry out or enter into agreements of any kind with respect to the Property.

**Collection of Rents.** Lender may collect and receive all Rents from the Property and apply the same to the Indebtedness, after deducting therefrom all costs, charges, and expenses of taking, holding, managing, and operating the Property, including the fees and expenses of Lender's attorneys, and agents.

**Payments.** Lender may pay any sum or sums deemed necessary or appropriate by Lender to protect the Property or any part of the Property or Lender's interest in the Property.

**Other Remedies.** Lender may exercise all rights and remedies contained in any Related Document, heretofore, concurrently herewith or in the future executed by Grantor in favor of Lender in connection with the transactions resulting in the Indebtedness or any part thereof.

**Appointment of Receiver.** Lender may make application to any court and be entitled to the appointment of a receiver to take charge of the Property or any part thereof without alleging or proving, or having any consideration given to, the insolvency of Grantor, the value of the Property as security for the Indebtedness, or any other matter usually incident to the appointment of a receiver.

**UCC Remedies.** With respect to the Personal Property in which a security interest is herein granted, Lender may exercise any or all of the rights accruing to a secured party under this Security Deed, the Uniform Commercial Code (Sections 11-9-101 et. seq. of the Ga. Code Annotated) and any other applicable law. Grantor shall, if Lender requests, assemble all such Personal Property and make it available to Lender at a place or places to be designated by Lender, which shall be reasonably convenient to Grantor and Lender. Any notice required to be given by Lender of a public or private sale, lease or other disposition of the Personal Property or any other intended action by Lender may be delivered personally to Grantor or may be deposited in the United States mail with postage prepaid duly addressed to Grantor at the address of Grantor last known to Lender at least five (5) business days prior to such proposed action, and shall constitute reasonable and fair notice to Grantor of any such action.

**Power of Sale.** Lender may sell the Property, or any part thereof or any interest therein, separately, at Lender's discretion, with or without taking possession thereof, at public sale before the courthouse door of the county in which the Property, or any part thereof, is located, to the highest bidder for cash, after first giving notice of the time, place and terms of such sale by advertisement, published once a week for four weeks (without regard for the number of days) in a newspaper in which advertisements of sheriff's sales are published in such county. The advertisement so published shall be notice to Grantor, and Grantor hereby waives all other notices. Lender may bid and purchase at any such sale, and Lender may execute and deliver to the purchaser or purchasers at any such sale a sufficient conveyance of the Property, or the part thereof or interest therein sold. Lender's conveyance may contain recitals as to the occurrence of an Event of Default, under this Security Deed, which recitals shall be presumptive evidence that all preliminary acts prerequisite to such sale and conveyance were in all things duly complied with. The recitals made by Lender shall be binding and conclusive upon Grantor, and the sale and conveyance made by Lender shall divest Grantor of all right, title, interest and equity that Grantor may have had in, to and under the Property, or the part thereof or interest therein sold, and shall vest the same in the purchaser or purchasers at such sale. Lender may hold one or more sales hereunder until the Indebtedness has been satisfied in full. Grantor hereby constitutes and appoints Lender as Grantor's agent and attorney-in-fact to make such sale, to execute and deliver such conveyance and to make such recitals, and Grantor hereby ratifies and confirms all of the acts and doings of Lender as Grantor's agent and attorney-in-fact hereunder. Lender's agency and power as attorney-in-fact hereunder are coupled with an interest, cannot be revoked by insolvency, incompetency, death or otherwise, and shall not be exhausted until the Indebtedness has been satisfied in

**SECURITY DEED**

**(Continued)**

full. The proceeds of each sale by Lender hereunder shall be applied first to the costs and expenses of the sale and of all proceedings in connection therewith, including attorneys' fees if applicable, then to payment of the Indebtedness, and the remainder, if any, shall be paid to Grantor. If the proceeds of any sale are not sufficient to pay the Indebtedness in full, Lender shall determine, at Lender's option and in Lender's discretion, the portions of the Indebtedness to which the proceeds (after deducting therefrom the costs and expenses of the sale and all proceedings in connection therewith) shall be applied and in what order the proceeds shall be so applied. Grantor covenants and agrees that, in the event of any sale pursuant to the agency and power herein granted, Grantor shall be and become a tenant holding over and shall deliver possession of the Property, or the part thereof or interest therein sold, to the purchaser or purchasers at the sale or be summarily dispossessed in accordance with the provisions of law applicable to tenants holding over. All of Lender's rights and remedies will be cumulative and may be exercised alone or together.

**Attorneys' Fees; Expenses.**  If any part of the Indebtedness is collected by or with any assistance from or consultation with an attorney at law, Grantor shall pay to Lender as Lender's attorneys' fees, fifteen percent (15%) of such amount collected. Whether or not any court action is involved, and to the extent not prohibited by law, all attorneys' fees and all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.**  Any notice required to be given under this Security Deed, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Security Deed. All copies of notices of foreclosure from the holder of any prior security interest which has priority over this Security Deed shall be sent to Lender's address, as shown near the beginning of this Security Deed. Any person may change his or her address for notices under this Security Deed by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**NONTITLED SPOUSES AND NON-BORROWER GRANTORS.**  Any Grantor or Trustor who signs this Deed of Trust, Mortgage or Modification ("Security Instrument") but does not execute the Note or Credit Agreement ("Non-borrower Grantor or Trustor"): (a) is signing only to grant, bargain, sell and convey such Non-borrower Grantor's or Trustor's interest in the Property under the terms of this Security Instrument; (b) is not by signing becoming personally obligated to pay the Note or Credit Agreement; and (c) agrees that without such Non-borrower Grantor's or Trustor's consent, Lender and any other Grantor or Trustor may agree to renew, extend, modify, forbear or make any accommodations with regard to the terms of all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the obligation evidenced by the Note or the Credit Agreement ("Related Document").

Any spouse of a Grantor or Trustor who is not in title to the Property and who signs this Security Instrument: (a) is signing only to grant, bargain, sell and convey any marital and homestead rights of such spouse in the Property; (b) is not by signing becoming personally obligated to pay the Note or Credit Agreement; and (c) agrees that without such spouse's consent, Lender and any other Grantor or Trustor may agree to renew, extend, modify, forbear or make any accommodations with regard to the terms of any Related Document.

Neither of the two foregoing sentences limit the liability of any Non-borrower Grantor or Trustor or signing spouse of a Grantor or Trustor, as applicable, under any guaranty agreement or other agreement by such person, whereby such person becomes liable for the Indebtedness in whole or in part; both such sentences apply notwithstanding any language to the contrary in this Security Instrument or any of the Related Documents and apply only to the extent permitted by applicable law.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Security Deed:

**Amendments.**  What is written in this Security Deed and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Security Deed. To be effective, any change or amendment to this Security Deed must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.**  Caption headings in this Security Deed are for convenience purposes only and are not to be used to interpret or define the provisions of this Security Deed.

**Governing Law.**  In addition to applicable federal law, this Security Deed will be governed by and interpreted in accordance with federal law and the laws of the State of Georgia, except for matters related to the exportation of interest (as defined by federal law) which will be governed by and interpreted in accordance with the laws of the State of North Carolina. However, if there ever is a question about whether any provision of this Security Deed is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by the Credit Agreement and this Security Deed has been approved, made, and funded, and all necessary loan documents have been accepted by Lender in the State of North Carolina.

**No Waiver by Lender.**  Grantor understands Lender will not give up any of Lender's rights under this Security Deed unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender

**SECURITY DEED**
**(Continued)**

does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Security Deed. Grantor also understands that if Lender does consent to a request, that does not mean that Lender will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Security Deed is not valid or should not be enforced, that fact by itself will not mean that the rest of this Security Deed will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Security Deed even if a provision of this Security Deed may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Security Deed with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Security Deed on transfer of Grantor's interest, this Security Deed shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Security Deed and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Security Deed or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Security Deed.

**Waiver of Notice and Hearing and Homestead Exemption.** Grantor expressly waives: (1) any right Grantor may have under the Constitution of the State of Georgia or the Constitution of the United States of America to notice or to a judicial hearing prior to the exercise of any right or remedy provided to Lender by this Security Deed and Grantor waives Grantor's rights, if any, to set aside or invalidate any sale under power duly consummated in accordance with the provisions of this Security Deed on the ground (if such be the case) that the sale was consummated without prior notice or judicial hearing or both; and (2) all homestead exemption rights, if any, which Grantor or Grantor's family may have pursuant to the Constitution and laws of the United States, the State of Georgia or any other State of the United States, in and to the Property as against the collection of the Indebtedness, or any part of the Indebtedness. All waivers by Grantor in this provision have been made voluntarily, intelligently and knowingly by Grantor, after Grantor has been afforded an opportunity to be informed by counsel of Grantor's choice as to possible alternative rights. Grantor's execution of this Security Deed shall be conclusive evidence of the making of such waivers and that such waivers have been voluntarily, intelligently and knowingly made.

**DEFINITIONS.** The following words shall have the following meanings when used in this Security Deed:

**Borrower.** The word "Borrower" means MARSHA D PELZER and includes all co-signers and co-makers signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated June 15, 2005, with credit limit of $295,000.00 from Grantor to Lender, together with all renewals, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Credit Agreement is June 15, 2030. NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Security Deed in the events of default section of this Security Deed.

**Grantor.** The word "Grantor" means MARSHA D PELZER.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Security Deed, together with any amounts expended to preserve and protect the Property and together with interest on such amounts as provided in this Security Deed.

**Lender.** The word "Lender" means Bank of America, N.A., its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, mobile homes, modular homes, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached, affixed to the Real Property excluding only that

**SECURITY DEED
(Continued)**

Loan No: 68311015182599

Page 8

property which by operation of law is Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Security Deed less and except the Personal Property.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Security Deed.** The words "Security Deed" mean this Security Deed between Grantor and Lender, and includes without limitation all assignments and security interest provision relating to the Personal Property and the Rents.

IN WITNESS WHEREOF, THIS SECURITY DEED HAS BEEN SIGNED BY THE UNDERSIGNED, WHO ACKNOWLEDGES A COMPLETED COPY HEREOF. THIS SECURITY DEED IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS SECURITY DEED IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

Signed, Sealed and Delivered in the presence of:

X _____
Unofficial Witness

_____
Notary Public, _____ County

(NOTARY SEAL)

My Commission expires: _____

GRANTOR:

X _____ (Seal)
MARSHA D PELZER

SHIRLEY S. LAWSON
NOTARY PUBLIC, HALL COUNTY, GEORGIA
MY COMMISSION EXPIRES AUGUST 7, 2006

PAY TO THE ORDER OF

_____

WITHOUT RECOURSE
Bank of America  N.A.

BY _____
JOHN E. MACK
SR. VICE PRESIDENT

SCHEDULE A

F1718950

THE FOLLOWING DESCRIBED LOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING THE COUNTY OF DAWSON, STATE OF GEORGIA, TO WIT:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 200, 218, 219 AND 258 OF THE SOUTH HALF OF THE 13TH DISTRICT, 1ST SECTION OF DAWSON COUNTY, GEORGIA. BEING LOT 136 OF OAK FOREST, UNIT ONE, AS PER PLAT RECORDED IN PLAT BOOK 54, PAGE 173, 175, 177 AND 179, DAWSON COUNTY RECORDS, WHICH PLAT IS INCORPORATED HEREIN BY REFERENCE.

THIS DEED IS GIVEN SUBJECT TO ALL EASEMENTS AND RESTRICTIONS OF RECORD, IF ANY.