## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| | : | |
| Debtors. | : | <u>Requested Dates:</u> |
| | : | Hearing Date: December 12, 2007 @ 2:00 p.m. |
| | : | Objection Deadline: December 11, 2007 @ 12:00 p.m. |
| | : | |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE, (I) APPROVING AGREEMENT BETWEEN DEBTORS AND SPECIAL COUNSEL, INC. AND (II) AUTHORIZING THE DEBTORS TO EMPLOY SPECIAL COUNSEL, INC. TO PROVIDE EMPLOYEE STAFFING <u>SERVICES IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT</u>

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors" or the

"Company"), by and through their undersigned counsel, hereby submit this motion (the

"Motion") for an order, pursuant to sections 105 and 363 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (i) approving the agreement between the Debtors

and Special Counsel, Inc. ("Special Counsel"), dated November 30, 2007, a copy of which is

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

attached hereto as Exhibit A (the "Agreement"), and (ii) authorizing the Debtors to employ Special Counsel to provide employee staffing services in accordance with the terms of the Agreement.    In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

### A.    The April 2nd Debtors

1.    New Century Financial Corporation ("NCFC"), a publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States. Through its subsidiaries and its primary holding company subsidiary, New Century TRS, NCFC originated, purchased, sold, and serviced mortgage loans nationwide. NCFC historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. In September 2005, NCFC through some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market. Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans have helped millions of homebuyers and homeowners across the nation access credit and realize

the benefits of home ownership, including many who might not otherwise have been able to do so.

2.    The Wholesale Division, which was contained within New Century Mortgage Corporation ("NCMC"), a California corporation, originated and purchased loans through a network of independent mortgage brokers and correspondent lenders. As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states and (3) employed approximately 1,087 account executives. The broker's role in this process was to identify the applicant, assist in completing the loan application form, gather necessary information and documents and serve as the Debtors' liaison with the borrower. Correspondent lenders are independent mortgage bankers and financial institutions that sell loans that have already been funded. For 2006, the Wholesale Division was responsible for approximately 85% of the loans originated by the Debtors.

3.    The Retail Division, which operated under Home123 Corporation, originated loans through direct contact with consumers, including through referrals from builders, realtors, and other third parties. As of December 31, 2006, the Retail Division was supported by 262 branch offices and three central telemarketing units employing approximately 1,702 retail loan officers. For 2006, the Retail Division originated approximately 15% of the loans produced by the Debtors.

4.    On April 2, 2007 (the "Petition Date"), the Debtors, other than New Century Warehouse Corporation (the "April Debtors"), filed chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. The Court subsequently ordered the chapter 11 cases of the April Debtors to be jointly administered. Since the Petition Date, the

-3-

April Debtors have operated their business and managed their affairs as debtors and debtors in possession.

       5.     Since the Petition Date, the April Debtors have been focused on expeditiously liquidating their assets in order to maximize the value of the estates. The April Debtors gained Court approval of four asset sales and closed three of those sales within three months of the Petition Date. By order entered on May 7, 2007, the Court authorized the sale of a pool of approximately 2,000 unencumbered mortgage loans with an unpaid balance of $170 million and mortgage-backed residual interests in securitization trusts (the "LNFA") to Ellington Management Group, L.L.C. on behalf of its Client Funds ("Ellington") pursuant to the Asset Purchase Agreement by and among NCFC and certain of its subsidiaries and Ellington dated May 16, 2007. The Court further authorized the sale of a pool of approximately 180 unencumbered mortgage loans with an unpaid balance of approximately $17 million and 6 real properties obtained in foreclosures of such mortgage loans to Ellington by order entered on June 28, 2007 pursuant to Supplement No. 1 to Asset Purchase Agreement by and among NCFC and certain of its subsidiaries and Ellington dated June 25, 2007. The two LNFA sales closed in May and June respectively.

       6.     In addition to the LNFA, the Court authorized the sale of the April Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an affiliate of Carrington Capital Management, LLC ("Carrington") by order entered on May 23, 2007 pursuant to the Second Amended and Restated Asset Purchase Agreement dated May 21, 2007. At the closing of the Carrington Sale on June 29, 2007, Carrington transferred the sale proceeds to the April Debtors, and the April Debtors entered into an agreement with Carrington to transition the servicing business. The April Debtors continued operating the servicing

business in the ordinary course while it was transitioned to Carrington. The transition to Carrington is now complete.

7.    The Court further authorized the sale of certain of the April Debtors' technology assets to EquiFirst Corporation ("EquiFirst") by order entered on July 3, 2007 pursuant to the Asset Purchase Agreement by and among NCFC, NCMC and EquiFirst dated June 22, 2007 (the "Technology Sale"). The Technology Sale closed in July, 2007.

8.    In addition to the asset sales, the April Debtors moved quickly to downsize and consolidate their operations. The April Debtors have rejected approximately 300 real property leases and approximately 250 executory contracts. The April Debtors are in the process of liquidating additional assets and identifying additional leases and contracts for rejection or assumption and assignment.

**B.    New Century Warehouse**

9.    New Century Warehouse Corporation ("New Century Warehouse"), a California corporation that is wholly owned by New Century TRS, financed residential mortgage loans originated by a network of mortgage originators and other smaller financial institutions. New Century Warehouse, doing business as "Access Lending," provided financing to these loan originators that was, in turn, used to fund the loans provided to individual borrowers who were customers of the loan originators. New Century Warehouse, in turn, obtained its financing from three warehouse lenders who entered into various receivables purchase agreements, credit agreements and repurchase agreements (collectively, the "Warehouse Loan Facilities").

10.    New Century Warehouse operated largely independently of the April Debtors. However, the April Debtors' financial difficulties triggered cross-defaults under New

Century Warehouse's Warehouse Loan Agreements. One of these Warehouse Lenders, Goldman Sachs Mortgage Company ("Goldman"), declared an event of default under a Master Repurchase Agreement dated as of February 15, 2006, as amended (the "Goldman-Access Lending Warehouse Loan Agreement"). On March 12, 2007, Goldman purported to credit the market value of the mortgage loans that were subject to the Goldman-Access Lending Warehouse Loan Agreement.

11.    New Century Warehouse's other Warehouse Lenders were willing to work with it prior to and after the April 2nd petition date. New Century Warehouse entered into forbearance agreements with Galleon Capital, LLC, State Street Global Markets, LLC and State Street Bank and Trust Company (collectively, "State Street") and Guaranty Bank. These forbearance agreements allowed New Century Warehouse to continue to operate while it liquidated substantially all of its assets.

12.    Pursuant to the Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 Authorizing the Access Sale and Granting Related Relief, New Century Warehouse sold substantially all of its assets as a going concern (the "Sale") to Access Holdings Corporation (the "Buyer") pursuant to that certain Amended and Restated Asset Purchase Agreement by and between Access Holdings Corporation and New Century Warehouse Corporation dated as of April 26, 2007 (the "APA"). The Buyer acquired substantially all of the assets of New Century Warehouse, made employment offers to the employees of the New Century Warehouse, and assumed the warehouse loan financing arrangements with State Street and Guaranty Bank. The transaction maintained the business as a going concern and allowed for a process to maximize recoveries on the loans that are subject to the State Street and Guaranty Bank Warehouse Loan Facilities. The financing provided by

-6-

these Warehouse Lenders covered approximately 96% of the amount paid by New Century

Warehouse, while the balance (commonly referred to in the industry as the "haircut") was

financed from New Century Warehouse's working capital. Pursuant to the APA, the Buyer is

liquidating certain loans (the "Loans") and is paying New Century Warehouse 60% of the Net

Proceeds[2] realized on the Loans.   The Sale closed on April 27, 2007 and the Buyer has been

making payments to New Century Warehouse for the sale of Loans pursuant to the APA.

13.    On August 3, 2007 (the "NCW Petition Date"), New Century Warehouse

filed a petition for chapter 11 relief. New Century Warehouse is operating its business and

managing its affairs as a debtor and debtor in possession. On August 7, 2007, the Court entered

an order authorizing the joint administration of New Century Warehouse's chapter 11 case with

the chapter 11 cases of the April Debtors. The April Debtors and New Century Warehouse are

collectively referenced herein as the "Debtors."

## SPECIFIC BACKGROUND

14.    As of the Petition Date, the Debtors provided their employees with a

variety of health benefit plans and programs that were designed to assist their employees and the

employees' eligible dependents in meeting certain financial burdens, including those that arise

from illness, disability and death. The Debtors continue to provide these health benefits to their

employees. The majority of the Debtors' health benefit plans are self-funded, with the Debtors

having a stop loss insurance policy to protect against major dollar medical claims.

15.    During the chapter 11 cases, the Debtors, working closely with their

financial advisor APS Services, LLC ("APS"), have taken appropriate steps to reduce employee

related expenses and obligations while maintaining ongoing business operations through the

---

[2] Net of (i) amounts owed to State Street and Guaranty Bank under their Warehouse Loan Facilities and (ii) amounts owed to the loan originators

transactions discussed above. Most notably, the Debtors have implemented significant layoffs in their work force in an effort to limit staffing to those personnel essential to the wind-down of the Debtors' businesses and the conclusion of these chapter 11 cases. The Debtors' remaining workforce consists of approximately fifteen employees, in addition to the employees of APS currently providing services to the Debtors. These remaining employees consist of information technology, human resource, accounting and in-house counsel personnel.[3]

16.    The self-funded nature of the Debtors' health benefit plans makes them extremely costly for the Debtors' estates. Given the limited personnel remaining in the Debtors employ, the Debtors have determined that it is cost prohibitive to continue providing these health benefits. Accordingly, the Debtors have spent many months pursuing other available options for providing health coverage to their employees. After approaching nearly every major health plan carrier in the country, the Debtors have concluded that it is simply too costly to continue to provide their employees with their current health benefits.

17.    In an effort to prevent the anticipated attrition caused by the Debtors' decision to terminate health coverage, the Debtors have entered into the Agreement with Special Counsel and believe that it presents the best available alternative for providing requisite health coverage to the Debtors' remaining personnel. Pursuant to the Agreement, the Debtors' employees will become employees of Special Counsel. As employees of Special Counsel, the Debtors' employees will be able to take advantage of the health benefit plans offered by Special Counsel. Through the Debtors' retention of Special Counsel, however, such employees will

---

[3] Certain of the Debtors' current employees that will be employed through Special Counsel are in-house counsel or accounting professionals. The Debtors do not believe that these current employees constitute professionals that need to be retained under section 327 of the Bankruptcy Code. However, in the event that the Court determines that such retention is necessary, the Debtors hereby move to retain such employees under section 327(e) of the Bankruptcy Code and submit the affidavit of Special Counsel in support of such retention, a copy of which is attached hereto as Exhibit B.

-8-

continue providing services to the Debtors' on a going-forward basis. This arrangement will allow the Debtors' to maintain their existing workforce as needed for these chapter 11 cases, while ensuring that the employees' health coverage will continue uninterrupted.

18.    Pursuant to the Agreement, Special Counsel shall invoice the Debtors for the services provided by its employees on an hourly basis. The Debtors and Special Counsel have agreed on a set of hourly rates intended to compensate the employees in an amount commensurate with their current salaries, plus an additional overhead amount to be provided to Special Counsel. The Debtors anticipate that the total amount to be paid to Special Counsel on a weekly basis will be approximately $70,000. Special Counsel is also requiring that a two-week security deposit (approximately $140,000) be paid upon Court approval of this Motion in advance of the Debtors' employees becoming employees of Special Counsel on December 17, 2007.

## RELIEF REQUESTED

19.    By this Motion, the Debtors seek entry of an order, pursuant to sections 105 and 363 of the Bankruptcy Code, (i) approving the Agreement, (ii) authorizing the employment of Special Counsel to provide employee staffing services in accordance with the terms of the Agreement and (iii) granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

20.    Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or, judgment that is necessary or appropriate to carry out the provisions of this title "11 U.S.C. § 105(a). Moreover, section 363(c) of the Bankruptcy Code authorizes the Debtors to enter into certain transactions and use property of their estates in

the ordinary course of business.  See 11 U.S.C. § 363(c).  Arguably, entering into contractual

arrangements for the provision of temporary employees is within the ordinary course of the

Debtors' business as contemplated by the Bankruptcy Code.  Corporations routinely hire and fire

temporary employees as necessary to meet their staffing needs.

        21.      Assuming *arguendo* that the Court finds that section 363(c) of the

Bankruptcy Code does not apply, the relief requested is warranted under section 363(b) of the

Bankruptcy Code.  Section 363(b) of the Bankruptcy Code permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  The Debtors request that the Court authorize the employment of Special

Counsel and any employees of Special Counsel under section 363(b) of the Bankruptcy Code.

Such authorization is appropriate if the Debtors demonstrate a sound business justification for

doing so.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F 2d

1063, 1071 (2d Cir. 1983); see also In re Del. & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del.

1991).  Once the Debtors articulate a valid business justification, "the business judgment rule 'is

a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was taken in the best

interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)).  The business judgment rule has vitality in chapter 11

cases and shields the Debtors' management from judicial second-guessing.  See id.; see also

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-

Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued

operation of a business by a debtor and a presumption of reasonableness attaches to a debtors'

management decisions.").

22.      The Debtors submit that a sound business justification exists for the employment of Special Counsel. As discussed above, the Debtors are simply unable to bear the economic burden of providing health coverage to their employees on a going-forward basis. Accordingly, the Debtors have no choice but to terminate their self-insured health plans as of the end of this calendar year. The lack of health care coverage would obviously harm the Debtors' employees and may cause them to seek other employment. The arrangement with special counsel will enable the Debtors' employees to continue to receive important health insurance coverage while providing critical ongoing services to the Debtors.

23.      While the overhead component of the amount being paid to Special Counsel will make the total amounts greater than the salary currently being paid to the Debtors' employees, the total savings to the Debtors' estates will more than account for such difference. First, as discussed above, the Debtors will not have to bear the cost of providing health care coverage to their employees. Second, the Debtors will not have to provide Continuation Health Coverage (COBRA) under section 4980B of the Internal Revenue Code (see 26 U.S.C. § 4980B) to such employees. Finally, the cost of replacing these employees with outside consultants and/or attorneys would far exceed the amounts being charged by Special Counsel. The hourly rates being charged by Special Counsel range between $51.45 per hour and $230.23 per hour. It is extremely unlikely that competent professionals could be brought in to provide the necessary services at these rates. Moreover, the replacement of the Debtors' current staff would result in the loss of invaluable institutional knowledge garnered from years of working in the Debtors' employ. For the foregoing reasons, the Debtors submit that the requested relief is supported by a sound business justification and should be approved pursuant to section 363(b) of the

-11-

Bankruptcy Code.

## REQUEST FOR EXPEDITED RELIEF

24.    The Debtors respectfully request that the Motion be heard at the hearing scheduled by the Court for December 12, 2007 at 2:00 p.m. The existing health care coverage offered to the Debtors' employees will be terminated as of the end of this calendar year. The Debtors have been advised by Special Counsel that employees must be employed by Special Counsel as of December 17, 2007 in order to be eligible for benefits as of January 1, 2008. Accordingly, it is necessary that the Motion be heard prior to December 17, 2007 to avoid a lapse in health care coverage to the Debtors' employees.

## MEMORANDUM OF LAW

25.    The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.12 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NOTICE

26.    No trustee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Official Committee of Unsecured Creditors appointed in these chapter 11 cases; (3) the examiner appointed in these chapter 11 cases; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the

-12-

Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

27.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as Exhibit C, (a) approving the Agreement, (b) authorizing the Debtors to employ Special Counsel to provide employee staffing services in accordance with the Agreement and (c) granting such further relief as is just and proper.

Dated:  November 30, 2007
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION