# **EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | <u>Requested Dates:</u> |
| | : | Hearing Date:  December 12, 2007 @ 2:00 p.m. |
| | : | Objection Deadline:  December 11, 2007 @ 12:00 p.m. |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE, (I) APPROVING AGREEMENT BETWEEN DEBTORS AND SPECIAL COUNSEL, INC. AND (II) AUTHORIZING THE DEBTORS TO EMPLOY SPECIAL COUNSEL, INC. TO PROVIDE EMPLOYEE STAFFING <u>SERVICES IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT</u>

New Century Financial Corporation ("NCF"), a Maryland corporation, New

Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors" or the

"Company"), by and through their undersigned counsel, hereby submit this motion (the

"Motion") for an order, pursuant to sections 105 and 363 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (i) approving the agreement between the Debtors

and Special Counsel, Inc. ("Special Counsel"), dated November 30, 2007, a copy of which is

---

[1] The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

attached hereto as Exhibit A (the "Agreement"), and (ii) authorizing the Debtors to employ

Special Counsel to provide employee staffing services in accordance with the terms of the

Agreement.   In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

### A.    The April 2nd Debtors

1.    New Century Financial Corporation ("NCFC"), a publicly owned real

estate investment trust, was one of the largest specialty mortgage finance businesses in the

United States. Through its subsidiaries and its primary holding company subsidiary, New

Century TRS, NCFC originated, purchased, sold, and serviced mortgage loans nationwide.

NCFC historically focused on "subprime" lending, or lending to individuals whose borrowing

needs were generally not fulfilled by traditional financial institutions because they did not satisfy

the credit, documentation or other underwriting standards prescribed by conventional mortgage

lenders and loan buyers. In September 2005, NCFC through some of its subsidiaries also began

offering conventional mortgage loans, including: "Alt-A" mortgage loans, loans insured by the

Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration

("VA"). During the fiscal year ending December 31, 2006, the Debtors originated or purchased

approximately $60 billion of mortgage loans, most of which were sold in the secondary market.

Since their inception, the Debtors have issued or enabled over $220 billion in loans. These loans

have helped millions of homebuyers and homeowners across the nation access credit and realize

the benefits of home ownership, including many who might not otherwise have been able to do so.

2.     The Wholesale Division, which was contained within New Century Mortgage Corporation ("NCMC"), a California corporation, originated and purchased loans through a network of independent mortgage brokers and correspondent lenders. As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states and (3) employed approximately 1,087 account executives. The broker's role in this process was to identify the applicant, assist in completing the loan application form, gather necessary information and documents and serve as the Debtors' liaison with the borrower. Correspondent lenders are independent mortgage bankers and financial institutions that sell loans that have already been funded. For 2006, the Wholesale Division was responsible for approximately 85% of the loans originated by the Debtors.

3.     The Retail Division, which operated under Home123 Corporation, originated loans through direct contact with consumers, including through referrals from builders, realtors, and other third parties. As of December 31, 2006, the Retail Division was supported by 262 branch offices and three central telemarketing units employing approximately 1,702 retail loan officers. For 2006, the Retail Division originated approximately 15% of the loans produced by the Debtors.

4.     On April 2, 2007 (the "Petition Date"), the Debtors, other than New Century Warehouse Corporation (the "April Debtors"), filed chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. The Court subsequently ordered the chapter 11 cases of the April Debtors to be jointly administered. Since the Petition Date, the

-3-

April Debtors have operated their business and managed their affairs as debtors and debtors in possession.

5.    Since the Petition Date, the April Debtors have been focused on expeditiously liquidating their assets in order to maximize the value of the estates. The April Debtors gained Court approval of four asset sales and closed three of those sales within three months of the Petition Date. By order entered on May 7, 2007, the Court authorized the sale of a pool of approximately 2,000 unencumbered mortgage loans with an unpaid balance of $170 million and mortgage-backed residual interests in securitization trusts (the "LNFA") to Ellington Management Group, L.L.C. on behalf of its Client Funds ("Ellington") pursuant to the Asset Purchase Agreement by and among NCFC and certain of its subsidiaries and Ellington dated May 16, 2007. The Court further authorized the sale of a pool of approximately 180 unencumbered mortgage loans with an unpaid balance of approximately $17 million and 6 real properties obtained in foreclosures of such mortgage loans to Ellington by order entered on June 28, 2007 pursuant to Supplement No. 1 to Asset Purchase Agreement by and among NCFC and certain of its subsidiaries and Ellington dated June 25, 2007. The two LNFA sales closed in May and June respectively.

6.    In addition to the LNFA, the Court authorized the sale of the April Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an affiliate of Carrington Capital Management, LLC ("Carrington") by order entered on May 23, 2007 pursuant to the Second Amended and Restated Asset Purchase Agreement dated May 21, 2007. At the closing of the Carrington Sale on June 29, 2007, Carrington transferred the sale proceeds to the April Debtors, and the April Debtors entered into an agreement with Carrington to transition the servicing business. The April Debtors continued operating the servicing

-4-

business in the ordinary course while it was transitioned to Carrington. The transition to Carrington is now complete.

7.     The Court further authorized the sale of certain of the April Debtors' technology assets to EquiFirst Corporation ("EquiFirst") by order entered on July 3, 2007 pursuant to the Asset Purchase Agreement by and among NCFC, NCMC and EquiFirst dated June 22, 2007 (the "Technology Sale"). The Technology Sale closed in July, 2007.

8.     In addition to the asset sales, the April Debtors moved quickly to downsize and consolidate their operations. The April Debtors have rejected approximately 300 real property leases and approximately 250 executory contracts. The April Debtors are in the process of liquidating additional assets and identifying additional leases and contracts for rejection or assumption and assignment.

**B.     New Century Warehouse**

9.     New Century Warehouse Corporation ("New Century Warehouse"), a California corporation that is wholly owned by New Century TRS, financed residential mortgage loans originated by a network of mortgage originators and other smaller financial institutions. New Century Warehouse, doing business as "Access Lending," provided financing to these loan originators that was, in turn, used to fund the loans provided to individual borrowers who were customers of the loan originators. New Century Warehouse, in turn, obtained its financing from three warehouse lenders who entered into various receivables purchase agreements, credit agreements and repurchase agreements (collectively, the "Warehouse Loan Facilities").

10.     New Century Warehouse operated largely independently of the April Debtors. However, the April Debtors' financial difficulties triggered cross-defaults under New

Century Warehouse's Warehouse Loan Agreements. One of these Warehouse Lenders,
Goldman Sachs Mortgage Company ("Goldman"), declared an event of default under a Master
Repurchase Agreement dated as of February 15, 2006, as amended (the "Goldman-Access
Lending Warehouse Loan Agreement"). On March 12, 2007, Goldman purported to credit the
market value of the mortgage loans that were subject to the Goldman-Access Lending
Warehouse Loan Agreement.

   11. New Century Warehouse's other Warehouse Lenders were willing to work
with it prior to and after the April 2nd petition date. New Century Warehouse entered into
forbearance agreements with Galleon Capital, LLC, State Street Global Markets, LLC and State
Street Bank and Trust Company (collectively, "State Street") and Guaranty Bank. These
forbearance agreements allowed New Century Warehouse to continue to operate while it
liquidated substantially all of its assets.

   12. Pursuant to the Order Pursuant to Sections 105 and 363 of the Bankruptcy
Code and Bankruptcy Rules 2002 and 6004 Authorizing the Access Sale and Granting Related
Relief, New Century Warehouse sold substantially all of its assets as a going concern (the
"Sale") to Access Holdings Corporation (the "Buyer") pursuant to that certain Amended and
Restated Asset Purchase Agreement by and between Access Holdings Corporation and New
Century Warehouse Corporation dated as of April 26, 2007 (the "APA"). The Buyer acquired
substantially all of the assets of New Century Warehouse, made employment offers to the
employees of the New Century Warehouse, and assumed the warehouse loan financing
arrangements with State Street and Guaranty Bank. The transaction maintained the business as
a going concern and allowed for a process to maximize recoveries on the loans that are subject
to the State Street and Guaranty Bank Warehouse Loan Facilities. The financing provided by

-6-

these Warehouse Lenders covered approximately 96% of the amount paid by New Century Warehouse, while the balance (commonly referred to in the industry as the "haircut") was financed from New Century Warehouse's working capital. Pursuant to the APA, the Buyer is liquidating certain loans (the "Loans") and is paying New Century Warehouse 60% of the Net Proceeds[2] realized on the Loans. The Sale closed on April 27, 2007 and the Buyer has been making payments to New Century Warehouse for the sale of Loans pursuant to the APA.

13.    On August 3, 2007 (the "NCW Petition Date"), New Century Warehouse filed a petition for chapter 11 relief. New Century Warehouse is operating its business and managing its affairs as a debtor and debtor in possession. On August 7, 2007, the Court entered an order authorizing the joint administration of New Century Warehouse's chapter 11 case with the chapter 11 cases of the April Debtors. The April Debtors and New Century Warehouse are collectively referenced herein as the "Debtors."

## SPECIFIC BACKGROUND

14.    As of the Petition Date, the Debtors provided their employees with a variety of health benefit plans and programs that were designed to assist their employees and the employees' eligible dependents in meeting certain financial burdens, including those that arise from illness, disability and death. The Debtors continue to provide these health benefits to their employees. The majority of the Debtors' health benefit plans are self-funded, with the Debtors having a stop loss insurance policy to protect against major dollar medical claims.

15.    During the chapter 11 cases, the Debtors, working closely with their financial advisor APS Services, LLC ("APS"), have taken appropriate steps to reduce employee related expenses and obligations while maintaining ongoing business operations through the

---

[2] Net of (i) amounts owed to State Street and Guaranty Bank under their Warehouse Loan Facilities and (ii) amounts owed to the loan originators

transactions discussed above. Most notably, the Debtors have implemented significant layoffs in their work force in an effort to limit staffing to those personnel essential to the wind-down of the Debtors' businesses and the conclusion of these chapter 11 cases. The Debtors' remaining workforce consists of approximately fifteen employees, in addition to the employees of APS currently providing services to the Debtors. These remaining employees consist of information technology, human resource, accounting and in-house counsel personnel.[3]

16.    The self-funded nature of the Debtors' health benefit plans makes them extremely costly for the Debtors' estates. Given the limited personnel remaining in the Debtors employ, the Debtors have determined that it is cost prohibitive to continue providing these health benefits. Accordingly, the Debtors have spent many months pursuing other available options for providing health coverage to their employees. After approaching nearly every major health plan carrier in the country, the Debtors have concluded that it is simply too costly to continue to provide their employees with their current health benefits.

17.    In an effort to prevent the anticipated attrition caused by the Debtors' decision to terminate health coverage, the Debtors have entered into the Agreement with Special Counsel and believe that it presents the best available alternative for providing requisite health coverage to the Debtors' remaining personnel. Pursuant to the Agreement, the Debtors' employees will become employees of Special Counsel. As employees of Special Counsel, the Debtors' employees will be able to take advantage of the health benefit plans offered by Special Counsel. Through the Debtors' retention of Special Counsel, however, such employees will

---

[3] Certain of the Debtors' current employees that will be employed through Special Counsel are in-house counsel or accounting professionals. The Debtors do not believe that these current employees constitute professionals that need to be retained under section 327 of the Bankruptcy Code. However, in the event that the Court determines that such retention is necessary, the Debtors hereby move to retain such employees under section 327(e) of the Bankruptcy Code and submit the affidavit of Special Counsel in support of such retention, a copy of which is attached hereto as Exhibit B.

-8-

continue providing services to the Debtors' on a going-forward basis. This arrangement will allow the Debtors' to maintain their existing workforce as needed for these chapter 11 cases, while ensuring that the employees' health coverage will continue uninterrupted.

18.    Pursuant to the Agreement, Special Counsel shall invoice the Debtors for the services provided by its employees on an hourly basis. The Debtors and Special Counsel have agreed on a set of hourly rates intended to compensate the employees in an amount commensurate with their current salaries, plus an additional overhead amount to be provided to Special Counsel. The Debtors anticipate that the total amount to be paid to Special Counsel on a weekly basis will be approximately $70,000. Special Counsel is also requiring that a two-week security deposit (approximately $140,000) be paid upon Court approval of this Motion in advance of the Debtors' employees becoming employees of Special Counsel on December 17, 2007.

### RELIEF REQUESTED

19.    By this Motion, the Debtors seek entry of an order, pursuant to sections 105 and 363 of the Bankruptcy Code, (i) approving the Agreement, (ii) authorizing the employment of Special Counsel to provide employee staffing services in accordance with the terms of the Agreement and (iii) granting such other and further relief as the Court deems just and proper.

### BASIS FOR RELIEF

20.    Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or, judgment that is necessary or appropriate to carry out the provisions of this title "11 U.S.C. § 105(a). Moreover, section 363(c) of the Bankruptcy Code authorizes the Debtors to enter into certain transactions and use property of their estates in

-9-

the ordinary course of business. See 11 U.S.C. § 363(c). Arguably, entering into contractual arrangements for the provision of temporary employees is within the ordinary course of the Debtors' business as contemplated by the Bankruptcy Code. Corporations routinely hire and fire temporary employees as necessary to meet their staffing needs.

21.    Assuming *arguendo* that the Court finds that section 363(c) of the Bankruptcy Code does not apply, the relief requested is warranted under section 363(b) of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). The Debtors request that the Court authorize the employment of Special Counsel and any employees of Special Counsel under section 363(b) of the Bankruptcy Code. Such authorization is appropriate if the Debtors demonstrate a sound business justification for doing so. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also In re Del. & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991). Once the Debtors articulate a valid business justification, "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has vitality in chapter 11 cases and shields the Debtors' management from judicial second-guessing. See id.; see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtors'

-10-

management decisions.").

22.     The Debtors submit that a sound business justification exists for the employment of Special Counsel. As discussed above, the Debtors are simply unable to bear the economic burden of providing health coverage to their employees on a going-forward basis. Accordingly, the Debtors have no choice but to terminate their self-insured health plans as of the end of this calendar year. The lack of health care coverage would obviously harm the Debtors' employees and may cause them to seek other employment. The arrangement with special counsel will enable the Debtors' employees to continue to receive important health insurance coverage while providing critical ongoing services to the Debtors.

23.     While the overhead component of the amount being paid to Special Counsel will make the total amounts greater than the salary currently being paid to the Debtors' employees, the total savings to the Debtors' estates will more than account for such difference. First, as discussed above, the Debtors will not have to bear the cost of providing health care coverage to their employees. Second, the Debtors will not have to provide Continuation Health Coverage (COBRA) under section 4980B of the Internal Revenue Code (see 26 U.S.C. § 4980B) to such employees. Finally, the cost of replacing these employees with outside consultants and/or attorneys would far exceed the amounts being charged by Special Counsel. The hourly rates being charged by Special Counsel range between $51.45 per hour and $230.23 per hour. It is extremely unlikely that competent professionals could be brought in to provide the necessary services at these rates. Moreover, the replacement of the Debtors' current staff would result in the loss of invaluable institutional knowledge garnered from years of working in the Debtors' employ. For the foregoing reasons, the Debtors submit that the requested relief is supported by a sound business justification and should be approved pursuant to section 363(b) of the

-11-

Bankruptcy Code.

## REQUEST FOR EXPEDITED RELIEF

24.     The Debtors respectfully request that the Motion be heard at the hearing scheduled by the Court for December 12, 2007 at 2:00 p.m. The existing health care coverage offered to the Debtors' employees will be terminated as of the end of this calendar year. The Debtors have been advised by Special Counsel that employees must be employed by Special Counsel as of December 17, 2007 in order to be eligible for benefits as of January 1, 2008. Accordingly, it is necessary that the Motion be heard prior to December 17, 2007 to avoid a lapse in health care coverage to the Debtors' employees.

## MEMORANDUM OF LAW

25.     The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.12 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

## NOTICE

26.     No trustee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Official Committee of Unsecured Creditors appointed in these chapter 11 cases; (3) the examiner appointed in these chapter 11 cases; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In light of the nature of the relief requested herein, the

-12-

Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

27.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as Exhibit C, (a) approving the Agreement, (b) authorizing the Debtors to employ Special Counsel to provide employee staffing services in accordance with the Agreement and (c) granting such further relief as is just and proper.

Dated:  November 30, 2007
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzanne S. Uhland
Ben H. Logan
Victoria Newmark
Emily R. Culler
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

-13-

## EXHIBIT A

(Agreement with Special Counsel)



**SPECIAL COUNSEL**

### TERMS OF SERVICE (California)

As used in this document, the term "Company" refers to Special Counsel, Inc., and the term "Client" refers to New Century Financial Corporation for which Company provides temporary, temp to hire and/or direct hire services pursuant to the terms and conditions set forth herein. These Terms of Service shall be effective as of (Insert Date).

Client is currently in the process of closing operations, downsizing its workforce, and liquidating assets following a Chapter 11 Bankruptcy proceeding filing on April 2, 2007. Client desires to retain Company to provide certain personnel and services as set forth herein.

1. **Payment and Invoicing.**  Company professionals will complete weekly time records to be signed by a representative of Client. Company will invoice Client regularly (no less frequently than monthly) for services performed and Client shall pay for all hours worked at agreed upon rates, plus approved overtime compensation where required by applicable federal or state law, and for reimbursement of approved travel related and other expenses. For those Company professionals who are working in non-attorney positions (i.e. paralegal, support staff, legal nurse or other similar positions), and for those Company attorneys who are not paid on a salaried basis: (a) the quoted rates shall apply for the first eight (8) hours of work per day and forty (40) hours of work per workweek; and (b) compensation shall be at (i) one and one-half (1 ½) times the rate for work in excess of eight (8) hours per day, for work in excess of forty (40) hours per workweek, and for the first eight (8) hours on a seventh consecutive day of work in a workweek, and (ii) two (2) times the rate for work in excess of twelve (12) hours per day and for work in excess of eight (8) hours on a seventh consecutive day for work in a workweek, or as otherwise prescribed by law. Client shall pay invoices upon receipt and shall be considered in default thirty (30) days from issuance of Company invoice, after which time a default charge will be imposed at one and one-half percent (1 ½ %) per month on unpaid balances (annual percentage rate of eighteen percent (18%)) or the maximum legal interest rate, whichever is lower. Client agrees to pay all necessary collection costs of amounts past due, including reasonable attorney's fees and costs. Company reserves the right, at its option following a default by Client in the payment of any amounts due hereunder, to discontinue any extension of credit. Client shall remain responsible for the payment of all applicable federal or state sales or use taxes, or related levies, attributable to the services rendered hereunder. This Agreement shall be deemed to have been made in Duval County, Florida. As part of the consideration for this Agreement, the parties agree that any action or proceeding for default in payment of charges shall be litigated only in state or federal courts having situs in and venue in any such court. Client has the right to request the removal of a Company professional at any time without cause

(subject to any applicable local, state and federal laws and Bar rules).

2. **Relationship of Parties.**
(a)  The parties agree that the relationship between them is that of independent contractor and that neither party shall have any authority to represent or bind the other and that neither party shall hold itself out or have any authority as an agent of the other for any purpose whatsoever. Nothing herein shall be construed as creating a principal and agent, joint venture, or any other type of relationship besides independent contractor between Client and Company.

(b)  Company and Client shall each remain solely responsible for the payment of all wages and benefits for each of their own respective employees, and neither party shall be responsible for the withholding or payment of any payroll deductions or taxes, or the provision of workers' compensation or unemployment insurance coverage, for or on behalf of employees of the other party or for any payment or expense in respect of claims arising under the other party's employee benefit plans. As between Company and Client, Company shall remain specifically responsible for any applicable federal, state or local withholding or income taxes, paying Social Security taxes, and providing unemployment compensation and workers' compensation insurance or coverage for its employees and contractors providing services hereunder. Client will not pay any of Company's employees directly or advance any funds for them.

(c)  Company is not engaged in the practice of law and has not been retained to provide legal advice or services. Services which constitute the practice of law are performed only by the legal practitioners licensed and authorized to practice law in the jurisdictions where such licenses are required and only under the supervision and control of duly authorized or licensed legal professionals under Client's direction or control. Company does not have the ability to conduct conflict checks, and Client agrees and understands that Company has not and will not conduct any such check. Client shall not request or allow a Special Counsel employee to sign or certify any paper, statement or return, pertaining to underwriting, tax, SEC or other related matters.

(d)  Client will direct the performance of all services performed by Company's legal personnel (i.e. attorneys, paralegals and legal nurses) during the tenure of their assignment. Accordingly, Client waives (on behalf of itself and its insurance companies to the extent any such losses may be covered by insurance) any right of recovery against Company for any losses, costs, expenses or damages incurred by Client arising out of the work product or services provided or not provided, including any claims of negligence or malpractice, arising from legal services or advice by



# SPECIAL COUNSEL

Company's employees assigned to Client and, further, will indemnify, defend and hold Company harmless from any claims arising out of the foregoing rules.

**3. Direct Hire Services.** Client shall notify Company if it desires to retain, employ, associate, compensate, use or enter into a relationship with any Company employee other than through Company. In such event, Company shall be entitled to (a) (25%) of any attorney's first year's gross compensation; (b) (20%) of a paralegal's or legal nurse's first year's gross compensation; or (c) (15%) of the first year gross compensation of a legal secretary, receptionist, or any other support level legal professional.

**4. Non-Hire and Conversion Fees for Temp and Temp to Hire Services.** Without Company's written consent, during the period that Company is providing services to Client and for one (1) year thereafter and except through Company, Client shall refrain from soliciting, hiring or accepting services or work, directly or indirectly, from any person who is proposed to Client by Company or who at any time provided services through or on behalf of Company, except upon payment of a "Release Fee" equal to the applicable percentage set forth in Section 3 of the employee's first year's gross compensation which shall be discounted as follows: For attorneys, the Release Fee shall be reduced by 25% for each 500 hours the Company is fully compensated by Client for work performed by the attorney for Client within the preceding 12 months; For paralegals, legal nurses or legal librarians, the Release Fee shall be reduced by 25% for each 250 hours in the preceding 6 months; For legal support staff and clerical personnel the Release Fee shall be reduced by 25% for each 140 hours in the preceding 13 weeks.

**5. Limits of Liability.**
(a)    COMPANY EXCLUDES AND DISCLAIMS ALL WARRANTIES WHATSOEVER, INCLUDING ANY WARRANTY OF NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

(b)    NEITHER PARTY SHALL BE LIABLE TO THE OTHER WHATSOEVER FOR ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS, LOST DATA, LOSS OF USE OF DATA, OR LOST OPPORTUNITY, WHETHER OR NOT PLACED ON NOTICE OF ANY SUCH ALLEGED DAMAGES AND REGARDLESS OF THE FORM OF ACTION IN WHICH SUCH DAMAGES MAY BE SOUGHT

**6. Indemnification** Each party (the "Indemnifying Party") will indemnify, defend and hold harmless the other party (the "Indemnified Party") from and against all claims, demands, suits and expenses (including reasonable attorneys' fees)

brought by any person or party for real or tangible property damage and/or bodily injury (including death) arising from the negligent or illegal act or omission of the Indemnifying Party or any of its employees and contractors in the performance of services hereunder, except to the extent of the negligent or illegal act or omission of the Indemnified Party of its employees and contractors.

**7. Confidentiality and Inventions.** Company shall use reasonable efforts to maintain the confidentiality of information or trade secrets provided to or obtained by Company as a result of performing services to Client which are either identified as confidential or trade secrets or which a reasonable person would know or reasonably should know is confidential. Upon written request, Company shall cause each employee or contractor assigned to provide services to Client to enter into a confidentiality and invention agreement in such form as Client may reasonably request.

**8. Assignment.** Neither party shall assign any of its rights or obligations under these Terms of Service without the prior written consent of the other party, which consent shall not unreasonably be withheld. The only exception is that either party may assign its rights and obligations hereunder to an affiliate, successor or assign in a change of corporate control that does not materially affect the duties of the other party hereunder. Nothing in these Terms of Service, whether express or implied, is intended to confer any rights or remedies on any other person or party other than the parties hereto and their respective successors and assigns.

**9. Survival.** The parties' obligations under these Terms of Service, which by their nature continue beyond termination, cancellation or expiration of these Terms of Service, shall survive termination, cancellation or expiration of these Terms of Service

**10. Arbitration.** The parties agree that any dispute between them arising out of this Agreement and the services hereunder shall be resolved by binding arbitration conducted under the Commercial Arbitration Rules of the American Arbitration Association in effect as of the date any such action thereunder is initiated. A single arbitrator will make a determination and render an award within thirty (30) days of the close of evidence in such arbitration proceeding but will have no authority to award costs or punitive damages unless the parties so agree in writing. The parties waive right to jury trial and agree that the arbitration award will be final and binding and that judgment will be entered thereon in any court of competent jurisdiction Notwithstanding the foregoing, any party may seek immediate judicial intervention to prevent any unauthorized use or disclosure of the confidential or proprietary information of the party (or those to whom it owes a duty of confidentiality) bringing any such action.


# SPECIAL COUNSEL

**11. Entire Agreement.** These Terms of Service represent the entire agreement between the parties and supersede any prior understandings or agreements whether written or oral between the parties respecting the subject matter herein. These Terms of Service may only be amended in a writing specifically referencing this provision and executed by both parties. These Terms of Service shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns, subject to the limitations contained herein. The unenforceability, invalidity or illegality of any provision of these Terms of Service shall not render any other provision unenforceable, invalid or illegal and shall be subject to reformation to the extent possible to best express the original intent of the parties.

**12. Termination.** Client may terminate this Agreement at any time and for any reason, without penalty or costs, upon written notice to Company. Notwithstanding anything to the contrary, Company acknowledges and agrees that this Agreement does not constitute any guaranteed term of services. Upon any termination of this Agreement, Company shall only be entitled to the compensation as provided herein. There shall be no additional compensation paid to Company for any termination of the Agreement in accordance with its terms. If company is terminated for any reason, Company will be entitled to compensation for the rates and charges applicable to the services rendered up to the termination date.

**By accepting the services of Company, Client understands and agrees that these Terms of Service shall govern the provision of services by Company to Client.**

*JPS.*

# EXHIBIT B

(327(e) Affidavit)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |

## AFFIDAVIT OF SPECIAL COUNSEL, INC. UNDER 11 U.S.C. § 327(e)

| | |
|---|---|
| STATE OF FLORIDA | : |
| | : |
| COUNTY OF DUVAL | : |

Beth A. Palmer, being duly sworn, upon her oath, deposes and says:

1.     I am a Regional Vice President with Special Counsel, Inc., located at 1 Independent Drive, Jacksonville, Florida 32202 ("Special Counsel").

2.     As set forth in detail in the Emergency Motion of Debtors and Debtors in Possession for an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code, (I) Approving Agreement Between Debtors and Special Counsel, Inc. and (II) Authorizing the Debtors to Employ Special Counsel, Inc. to Provide Employee Staffing Services In Accordance with the Terms of the Agreement (the "Motion"), the above-captioned debtors and debtors in

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

possession (the "Debtors") are seeking to employ Special Counsel pursuant to the terms of the

certain agreement between the Debtors and Special Counsel, dated November 30, 2007, a copy

of which is attached to the Motion as Exhibit A (the "Agreement"). More specifically, effective

as of December 17, 2007, approximately fifteen of the Debtors' remaining employees will

become employees of Special Counsel. The Debtors will retain Special Counsel so that such

employees will continue providing services to the Debtors' on a going-forward basis in

accordance with the terms of the Agreement. As employees of Special Counsel, the Debtors'

employees will be able to take advantage of the health benefit plans offered by Special Counsel.

I understand that the Debtors have determined that it is simply cost prohibitive to continue

providing the existing health coverage benefits to their employees on a going-forward basis.

This arrangement will allow the Debtors' employees to continue to receive important health

insurance coverage while providing critical ongoing services to the Debtors.

       3.      Certain of the Debtors' employees that will be employed through Special

Counsel are in-house counsel and accounting professionals of the Debtors. Accordingly, Special

Counsel is filing this affidavit out of an abundance of caution in the event that the Court

determines that these employees constitute professionals that need to be retained under section

327(e) of the United States Bankruptcy Code.

       4.      Given the nature of the services provided by Special Counsel, Special

Counsel does not have the ability to conduct conflict checks. Special Counsel provides

temporary, temp to hire and/or direct hire services to various firms and companies throughout the

country. Special Counsel does not have the ability to track the matters that such employees,

firms or companies may be involved in. I can confirm that to the best of my knowledge,

understanding and belief, Special Counsel does not have any relationship with any person, their

-2-

attorneys, or accountants that would be adverse to the Debtors or their estates in connection with these chapter 11 cases.

     5.    Neither I nor any principal of or professional employed by Special Counsel has agreed to share or will share any portion of the compensation to be received from the Debtors with any other person other than the principals and employees of Special Counsel.

     6.    Special Counsel provided the Debtors with similar staffing services prior to the filing of the Debtors' chapter 11 cases. Special Counsel, however, was not owed any pre-petition amounts and did not file a proof of claim against the Debtors' estates. However, as detailed herein and in the Motion, Special Counsel will be employing approximately 15 of the Debtors' former employees, including several in-house counsel and accounting personnel. I understand that these employees provided pre-petition services to the Debtors in substantially the same capacity as they will under the terms of the Agreement. As long-standing employees of the Debtors, I understand that some of these employees do hold pre-petition claims against the Debtors' estates. These claims consist primarily of unpaid wage, bonus and severance obligations under their pre-petition employment contracts. Special Counsel is unaware of the specifics or magnitude of these claims.

Name: Beth A. Palmer

I Declare under penalty of Perjury under State and Federal Law that the foregoing is true and correct and was executed by me on before me this 30th day of __November__, 2007 in San Francisco, California.

Beth A. Palmer
Regional Vice President
Special Counsel

-3-

RLF1-3228942-1

## EXHIBIT C

**(Proposed Order)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |

## ORDER UNDER 11. U.S.C. § 105 AND 363 (I) APPROVING AGREEMENT BETWEEN DEBTORS AND SPECIAL COUNSEL, INC. AND (II) AUTHORIZING THE DEBTORS TO EMPLOY SPECIAL COUNSEL, INC. TO PROVIDE EMPLOYEE STAFFING SERVICES IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT

Upon the motion (the "Motion")[2] of New Century Financial Corporation, a Maryland corporation, New Century TRS Holdings, Inc., a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor in possession (collectively, the "Debtors"), for an order under sections 101 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (i) approving the agreement between the Debtors and Special Counsel, Inc. ("Special Counsel"), dated November 30, 2007, a copy of which is attached hereto as Exhibit A (the "Agreement") and (ii) authorizing the Debtors to employ Special Counsel to provide employee staffing services in accordance with the terms of the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Motion.

Agreement; and the Court having reviewed the Motion; and the Court having held a hearing on the Motion and the Court having determined that the relief requested in the Motion is necessary and in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and it appearing that Special Counsel does not hold or represent any interest adverse to the Debtors' estates and this Court having determined that the employment of Special Counsel in the best interests of the Debtors' estates; and it appearing that notice of the Motion was good and sufficient under the particular circumstances and that no other or further notice need be given; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby

ORDERED, ADJUDGED AND DECREED that

1.   The Motion is GRANTED.

2.   The Agreement, a copy of which is attached hereto as Exhibit A, is APPROVED.

3.   The Debtors are authorized to employ and retain Special Counsel to provide employee staffing services in accordance with the terms of the Agreement.

4.   To the extent accrued, Special Counsel shall receive Special Counsel's hourly compensation as specified in the Agreement, which in each case shall not hereafter be subject to challenge except under the reasonableness standard in section 330 of the Bankruptcy Code.

5.   The Debtors are authorized to pay Special Counsel a two-week security deposit in the amount of $140,000.

RLF1-3228852-1

6.   This Court will retain jurisdiction to continue and enforce the terms of this Order.

Dated: December ___, 2007
          Wilmington, Delaware


                                        _____
                                        THE HONORABLE KEVIN J. CAREY
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**(Agreement with Special Counsel)**



**SPECIAL COUNSEL**

### TERMS OF SERVICE (California)

As used in this document, the term "Company" refers to Special Counsel, Inc., and the term "Client" refers to New Century Financial Corporation for which Company provides temporary, temp to hire and/or direct hire services pursuant to the terms and conditions set forth herein. These Terms of Service shall be effective as of (Insert Date).

Client is currently in the process of closing operations, downsizing its workforce, and liquidating assets following a Chapter 11 Bankruptcy proceeding filing on April 2, 2007. Client desires to retain Company to provide certain personnel and services as set forth herein.

**1. Payment and Invoicing.** Company professionals will complete weekly time records to be signed by a representative of Client. Company will invoice Client regularly (no less frequently than monthly) for services performed and Client shall pay for all hours worked at agreed upon rates, plus approved overtime compensation where required by applicable federal or state law, and for reimbursement of approved travel related and other expenses. For those Company professionals who are working in non-attorney positions (i.e. paralegal, support staff, legal nurse or other similar positions), and for those Company attorneys who are not paid on a salaried basis: (a) the quoted rates shall apply for the first eight (8) hours of work per day and forty (40) hours of work per workweek; and (b) compensation shall be at (i) one and one-half (1 ½) times the rate for work in excess of eight (8) hours per day, for work in excess of forty (40) hours per workweek, and for the first eight (8) hours on a seventh consecutive day of work in a workweek, and (ii) two (2) times the rate for work in excess of twelve (12) hours per day and for work in excess of eight (8) hours on a seventh consecutive day for work in a workweek, or as otherwise prescribed by law. Client shall pay invoices upon receipt and shall be considered in default thirty (30) days from issuance of Company invoice, after which time a default charge will be imposed at one and one-half percent (1 ½ %) per month on unpaid balances (annual percentage rate of eighteen percent (18%)) or the maximum legal interest rate, whichever is lower. Client agrees to pay all necessary collection costs of amounts past due, including reasonable attorney's fees and costs. Company reserves the right, at its option following a default by Client in the payment of any amounts due hereunder, to discontinue any extension of credit. Client shall remain responsible for the payment of all applicable federal or state sales or use taxes, or related levies, attributable to the services rendered hereunder. This Agreement shall be deemed to have been made in Duval County, Florida. As part of the consideration for this Agreement, the parties agree that any action or proceeding for default in payment of charges shall be litigated only in state or federal courts having situs in and venue in any such court. Client has the right to request the removal of a Company professional at any time without cause

(subject to any applicable local, state and federal laws and Bar rules).

**2. Relationship of Parties.**

(a) The parties agree that the relationship between them is that of independent contractor and that neither party shall have any authority to represent or bind the other and that neither party shall hold itself out or have any authority as an agent of the other for any purpose whatsoever. Nothing herein shall be construed as creating a principal and agent, joint venture, or any other type of relationship besides independent contractor between Client and Company.

(b) Company and Client shall each remain solely responsible for the payment of all wages and benefits for each of their own respective employees, and neither party shall be responsible for the withholding or payment of any payroll deductions or taxes, or the provision of workers' compensation or unemployment insurance coverage, for or on behalf of employees of the other party or for any payment or expense in respect of claims arising under the other party's employee benefit plans. As between Company and Client, Company shall remain specifically responsible for any applicable federal, state or local withholding or income taxes, paying Social Security taxes, and providing unemployment compensation and workers' compensation insurance or coverage for its employees and contractors providing services hereunder. Client will not pay any of Company's employees directly or advance any funds for them.

(c) Company is not engaged in the practice of law and has not been retained to provide legal advice or services. Services which constitute the practice of law are performed only by the legal practitioners licensed and authorized to practice law in the jurisdictions where such licenses are required and only under the supervision and control of duly authorized or licensed legal professionals under Client's direction or control. Company does not have the ability to conduct conflict checks, and Client agrees and understands that Company has not and will not conduct any such check. Client shall not request or allow a Special Counsel employee to sign or certify any paper, statement or return, pertaining to underwriting, tax, SEC or other related matters.

(d) Client will direct the performance of all services performed by Company's legal personnel (i.e. attorneys, paralegals and legal nurses) during the tenure of their assignment. Accordingly, Client waives (on behalf of itself and its insurance companies to the extent any such losses may be covered by insurance) any right of recovery against Company for any losses, costs, expenses or damages incurred by Client arising out of the work product or services provided or not provided, including any claims of negligence or malpractice, arising from legal services or advice by


SPECIAL
COUNSEL

Company's employees assigned to Client and, further, will indemnify, defend and hold Company harmless from any claims arising out of the foregoing rules.

3. **Direct Hire Services.** Client shall notify Company if it desires to retain, employ, associate, compensate, use or enter into a relationship with any Company employee other than through Company. In such event, Company shall be entitled to (a) (25%) of any attorney's first year's gross compensation; (b) (20%) of a paralegal's or legal nurse's first year's gross compensation; or (c) (15%) of the first year gross compensation of a legal secretary, receptionist, or any other support level legal professional.

4. **Non-Hire and Conversion Fees for Temp and Temp to Hire Services.** Without Company's written consent, during the period that Company is providing services to Client and for one (1) year thereafter and except through Company, Client shall refrain from soliciting, hiring or accepting services or work, directly or indirectly, from any person who is proposed to Client by Company or who at any time provided services through or on behalf of Company, except upon payment of a "Release Fee" equal to the applicable percentage set forth in Section 3 of the employee's first year's gross compensation which shall be discounted as follows: For attorneys, the Release Fee shall be reduced by 25% for each 500 hours the Company is fully compensated by Client for work performed by the attorney for Client within the preceding 12 months; For paralegals, legal nurses or legal librarians, the Release Fee shall be reduced by 25% for each 250 hours in the preceding 6 months; For legal support staff and clerical personnel the Release Fee shall be reduced by 25% for each 140 hours in the preceding 13 weeks.

5. **Limits of Liability.**
(a)   COMPANY EXCLUDES AND DISCLAIMS ALL WARRANTIES WHATSOEVER, INCLUDING ANY WARRANTY OF NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

(b)   NEITHER PARTY SHALL BE LIABLE TO THE OTHER WHATSOEVER FOR ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS, LOST DATA, LOSS OF USE OF DATA, OR LOST OPPORTUNITY, WHETHER OR NOT PLACED ON NOTICE OF ANY SUCH ALLEGED DAMAGES AND REGARDLESS OF THE FORM OF ACTION IN WHICH SUCH DAMAGES MAY BE SOUGHT.

6. **Indemnification.** Each party (the "Indemnifying Party") will indemnify, defend and hold harmless the other party (the "Indemnified Party") from and against all claims, demands, suits and expenses (including reasonable attorneys' fees)

brought by any person or party for real or tangible property damage and/or bodily injury (including death) arising from the negligent or illegal act or omission of the Indemnifying Party or any of its employees and contractors in the performance of services hereunder, except to the extent of the negligent or illegal act or omission of the Indemnified Party of its employees and contractors.

7. **Confidentiality and Inventions.** Company shall use reasonable efforts to maintain the confidentiality of information or trade secrets provided to or obtained by Company as a result of performing services to Client which are either identified as confidential or trade secrets or which a reasonable person would know or reasonably should know is confidential. Upon written request, Company shall cause each employee or contractor assigned to provide services to Client to enter into a confidentiality and invention agreement in such form as Client may reasonably request.

8. **Assignment.** Neither party shall assign any of its rights or obligations under these Terms of Service without the prior written consent of the other party, which consent shall not unreasonably be withheld. The only exception is that either party may assign its rights and obligations hereunder to an affiliate, successor or assign in a change of corporate control that does not materially affect the duties of the other party hereunder. Nothing in these Terms of Service, whether express or implied, is intended to confer any rights or remedies on any other person or party other than the parties hereto and their respective successors and assigns.

9. **Survival.** The parties' obligations under these Terms of Service, which by their nature continue beyond termination, cancellation or expiration of these Terms of Service, shall survive termination, cancellation or expiration of these Terms of Service.

10. **Arbitration.** The parties agree that any dispute between them arising out of this Agreement and the services hereunder shall be resolved by binding arbitration conducted under the Commercial Arbitration Rules of the American Arbitration Association in effect as of the date any such action thereunder is initiated. A single arbitrator will make a determination and render an award within thirty (30) days of the close of evidence in such arbitration proceeding but will have no authority to award costs or punitive damages unless the parties so agree in writing. The parties waive right to jury trial and agree that the arbitration award will be final and binding and that judgment will be entered thereon in any court of competent jurisdiction. Notwithstanding the foregoing, any party may seek immediate judicial intervention to prevent any unauthorized use or disclosure of the confidential or proprietary information of the party (or those to whom it owes a duty of confidentiality) bringing any such action.



**11.  Entire Agreement**.  These Terms of Service represent the entire agreement between the parties and supersede any prior understandings or agreements whether written or oral between the parties respecting the subject matter herein.  These Terms of Service may only be amended in a writing specifically referencing this provision and executed by both parties.  These Terms of Service shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns, subject to the limitations contained herein.  The unenforceability, invalidity or illegality of any provision of these Terms of Service shall not render any other provision unenforceable, invalid or illegal and shall be subject to reformation to the extent possible to best express the original intent of the parties.

**12.  Termination**.  Client may terminate this Agreement at any time and for any reason, without penalty or costs, upon written notice to Company.  Notwithstanding anything to the contrary, Company acknowledges and agrees that this Agreement does not constitute any guaranteed term of services.  Upon any termination of this Agreement, Company shall only be entitled to the compensation as provided herein. There shall be no additional compensation paid to Company for any termination of the Agreement in accordance with its terms.  If company is terminated for any reason, Company will be entitled to compensation for the rates and charges applicable to the services rendered up to the termination date.

**By accepting the services of Company, Client understands and agrees that these Terms of Service shall govern the provision of services by Company to Client.**

*JPS*.