## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Objection Deadline: January 2, 2008 at 4:00 p.m. |
| | : | Hearing Date: January 9, 2008 at 1:30 p.m. |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER DIRECTING THE CLERK OF THE COURT TO MAINTAIN THE FIRST INTERIM REPORT OF MICHAEL J. MISSAL, EXAMINER, UNDER SEAL

New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation,

New Century Financial Corporation ("NCFC"), a Maryland corporation, and their direct and

indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby file their motion (the "Motion") for the entry of an

order, substantially in the form of the proposed order attached as Exhibit A hereto, directing the

Clerk of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") to maintain the "First Interim Report of Michael J. Missal, Examiner" filed on

November 21, 2007 (the "Cash Collateral Report") under seal on the grounds that the Cash

Collateral Report contains and reveals information that is subject to the attorney-client and

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California Corporation.

attorney work product privileges.  In support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding as defined in 28 U.S.C. §§\ 157(b)(2).

2.      The bases for the relief requested herein are section 105 of title 11 of the United States Code (the "Bankruptcy Code"), the "Order Denying in Part and Granting in Part Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner" (the "Examiner Order") entered by the Bankruptcy Court on June 1, 2007, the "Order (I) Supplementing June 1, 2007 Order Directing the Appointment of an Examiner and (II) Granting Motion of Michael J. Missal, Examiner for an Extension of Time to File His Report with the Court" (the "Supplemental Examiner Order") entered by the Bankruptcy Court on October 10, 2007, and the attorney-client and attorney work product privileges.

**BACKGROUND**

**A.**      **The Chapter 11 Filings**

3.      On April 2, 2007 (the "Petition Date"), the Debtors, except for New Century Warehouse Corporation ("NCW"),[2] filed chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Bankruptcy Court subsequently ordered the chapter 11 cases of the Debtors to be jointly administered.  Since the

---

[2] NCW filed its chapter 11 petition on August 3, 2007.  By order dated August 7, 2007, the Bankruptcy Court ordered NCW chapter 11 case to be jointly administered along with the chapter 11 cases of the other Debtors.

2

Petition Date, the Debtors have operated their business and managed their affairs as debtors and debtors in possession.

### B.    The Examiner Order

4.    On April 17, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") filed the "Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee or, in the Alternative, an Examiner" (the "Trustee Motion"), pursuant to which the U.S. Trustee requested that the Bankruptcy Court appoint (a) a chapter 11 trustee for cause under 11 U.S.C. § 1104(a)(1), or, (b) in the alternative, an examiner under section 1104(c)(1) of the Bankruptcy Code.  The Debtors and the Committee of Unsecured Creditors (the "Committee") opposed the Trustee Motion.

5.    Thereafter, on June 1, 2007, the Bankruptcy Court entered the Examiner Order, by which the Bankruptcy Court denied the U.S. Trustee's request for appointment of a chapter 11 trustee but granted the U.S. Trustee's request to appoint an examiner (the "Examiner") under section 1104(c)(1) of the Bankruptcy Code.  Addressing one of the Debtors' chief concerns, the Examiner Order did not require the Debtors to produce any privileged materials to the Examiner.  Specifically, with respect to the Debtors' cooperation in the Investigation[3] and the preservation of the Debtors' privileges in so doing, the Examiner Order provides:

---

[3] The Examiner Order defines the Investigation to include an investigation related to the announced need to restate the Debtors' financial statements for the first three quarters of 2006, and also to include (a) an investigation of any and all accounting and financial statement irregularities, errors or misstatements that led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the Debtors 2005 financial statements were materially overstated , (b) an investigation of any possible post-petition unauthorized use of cash collateral by the Debtors, and (c) other duties of an examiner as set forth in sections 1106(a)(3) (as limited by the Examiner Order) and 1106(a)(4) of the Bankruptcy Code.

3

> The Debtors and all of the Debtors' affiliates, subsidiaries and other companies under their under control and the Examiner shall mutually coordinate and cooperate in connection with the performance of any of the Examiner's duties. The Debtors shall provide to the Examiner all <u>non-privileged</u> documents and information relevant to the Investigation that the Examiner requests.... If the Examiner seeks the disclosure of documents or information as to which any of the Debtors assert a claim of privilege or have objected and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution. <u>The Debtors' privileges, including, but not limited to, the attorney-client privilege and attorney work product privilege, remain and are not deemed waived or in any way impaired by the parties' stipulation referenced above or by this Order.</u>

Examiner Order, June 1, 2007 ¶11 (emphasis supplied).

6.      Subsequently, on June 7, 2007, the Bankruptcy Court entered an order approving the U.S. Trustee's appointment of Michael J. Missal of Kirkpatrick & Lockhart Preston Gates Ellis LLP ("K&L Gates") as the Examiner.

### C.      The Supplemental Examiner Order

7.      Given the broad scope of the Investigation and the voluminous amount of documents produced by the Debtors, on September 6, 2007, the Examiner moved for an extension of time to submit his initial report to the Bankruptcy Court.   On October 10, 2007, following a hearing on the matter and negotiations among the parties, the Bankruptcy Court entered the Supplemental Examiner Order.

8.      As with the Examiner Order, in negotiating the terms of the Supplemental Examiner Order, the Debtors were focused on ensuring that they could cooperate fully with the Investigation but at the same time safeguard the estates with respect to privileged documents and information.   After substantial negotiations among the Debtors, the Committee, and the Examiner, the parties agreed on the following language contained in the Supplemental Examiner Order:

4

ORDERED, that the delivery of any documents or information to the Examiner by the Debtors, counsel or other professionals engaged by the Debtors, the Debtors' Board of Directors, or any of the Debtors' affiliates, subsidiaries or other companies or entities under their control, <u>does not constitute a wavier of the attorney-client</u> <u>privilege, the work product doctrine, or any other applicable privilege or protection</u> <u>held by the Debtors,</u> and that the delivery of such documents or information to the Examiner shall not be the basis for any third party to assert that the Debtors have waived any protections or privileges with respect to such documents or information. <u>Notwithstanding anything to the contrary herein, the Debtors are not obligated or</u> <u>required to deliver any documents or information to the Examiner that are protected</u> <u>by the attorney-client privilege, the work product doctrine or any similar privilege</u> <u>or protection held by the Debtors.</u>

Supplemental Examiner Order, October 10, 2007, at 2 (emphasis supplied).

9.    To safeguard any privileged information or documents delivered to the

Examiner, the Supplemental Examiner Order also provides that any report filed by the Examiner

shall be filed initially under seal with copies delivered to the Debtors, the Creditors' Committee,

and the U.S. Trustee and that

> [t]o the extent that a Report contains or reveals information that is or may be protected by 11 U.S.C. § 107(b), the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection, the Examiner's submission of such Report to the Court or his provision of a copy of such report to the Creditors' Committee or the UST shall not constitute a wavier of such privileges or protections and any reference or inclusion of any privileged or protected documents in such Report shall not be the basis for any third party to assert that the Debtors have waived any protections or privileges with respect to such documents or information.

Supplemental Examiner Order at 4.

A public disclosure of privileged materials delivered to the Examiner

would very likely waive the privilege and could damage the estates.  Thus, to ensure that

privileged material is not disclosed publicly, the Supplemental Examiner Order further

provides:

> Within ten (10) days of the filing of a Report, the Debtors, the Committee or another interested party may file a motion with the Court seeking to maintain any

5

portion or portions of such Report under seal (with the movant bearing the burden) because, inter alia, such portion or portions contain or reveal information that is protected by 11 U.S.C. § 107(b), the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

Supplemental Examiner Order at 4.

10.     In sum, the Supplemental Examiner Order provides that if, in their discretion, the Debtors produce privileged materials to the Examiner, the Debtors do not waive any applicable privileges and to the extent that the Examiner files a report that contains privileged materials, such report is to remain under seal.

### D.     The Investigation Generally

11.     Since the appointment of the Examiner and the initiation of the Investigation, NCFC's Board of Directors has consistently instructed the company and its professionals to cooperate fully with the Examiner.  The Debtors and their professionals have strictly followed this mandate, and continue to do so.

12.     In their effort to  cooperate fully with the Examiner and thereby both facilitate and expedite the Investigation, the Debtors have had to balance their obligation and desire to cooperate with the Examiner against their duty to maximize the value of their estates for the benefit of creditors.  Specifically, the Debtors have dedicated substantial resources to ensuring that they are not producing to the Examiner privileged documents, the disclosure of which could jeopardize the estates' claims and defenses in connection with certain key disputes. Accordingly, with respect to certain subject matters, the Debtors, after consultation with the Committee, have not produced privileged documents.  With respect to other topics, however, the Debtors have produced privileged documents and information to the Examiner in reliance on the privilege-related provisions of the Examiner Order and the Supplemental Examiner Order,

6

including the provisions that provide that any portion of the Examiner's report that discloses privileged information will be kept under seal.

13.     Absent such Bankruptcy Court orders, the Debtors would not have delivered any privileged documents or information to the Examiner because the waiver of the privileges and protections attaching to such documents and information would have a real and likely substantial detrimental economic impact on the estates: third parties with whom the Debtors are involved in disputes would be entitled to obtain and make use of documents and information that otherwise would be unavailable to them in prosecuting claims against the estates and/or defending against claims brought against them by the estates.

E.      **The Privileged Information**

14.     The Debtors, in consultation with the Committee, initially elected not to provide to the Examiner privileged communications regarding the legal analysis of the strengths and weaknesses of the various positions that the Debtors could possibly take in connection with disputes with counterparties to master repurchase agreements (the "MRA Counterparties"). This decision was driven by the fact that the Debtors and the Committee were, and, indeed, still are engaged in highly sensitive negotiations with the MRA Counterparties.

15.     At a meeting held on August 31, 2007, however, the Examiner explained to the Debtors that he believed that the legal advice given by the Debtors' counsel to the Debtors with respect to and the Debtors' legal position on certain issues involving the MRA Counterparties were gating issues to the cash collateral portion of the Investigation. The Examiner then explained his understanding of such issues. The Examiner's inferences that certain advice necessarily must have been given to the Debtors by their counsel was incorrect,

7

and, in fact, the Debtors were very surprised to learn that the Examiner believed that the legal advice given to the Debtors by their counsel would determine the scope of the Examiner's inquiry. Under the circumstances, the Debtors decided that they had no real alternative but to disclose certain attorney-client privileged information to the Examiner. Thus, the Debtors disclosed to the Examiner legal advice given to the Debtors by their counsel with respect to issues regarding the MRA Counterparties and explained to the Examiner how such advice shaped the Debtors' strategy and course of action with respect to the MRA Counterparties (the "Privileged Information").

### F.    The Cash Collateral Report

16.    Having completed his investigation of the Debtors' postpetition use of cash collateral, the Examiner filed the Cash Collateral Report under seal on November 21, 2007. In his Cash Collateral Report, the Examiner details a meeting he had with the Debtors' counsel and CEO on August 31, 2007. He explains his understanding of the Debtors' legal position with respect to the MRAs and then reports that the Debtors' advised him it was wrong. While the Examiner does not quote the Privileged Information disclosed to him, it follows inexorably that it must be the opposite of the Examiner's prior incorrect understanding that is detailed in the Cash Collateral Report. Even a cursory reading of the Cash Collateral Report will reveal to any reader the substance of the privileged legal advice that counsel for the Debtors gave to their clients. This Privileged Information, which pertains to one of the central and still pending legal disputes in this case, is inexorably intertwined in essentially all of the substantive portions of the Cash Collateral Report.

8

17.     The Debtors strongly disagree with a large portion of the Cash Collateral Report. Accordingly, the Debtors feel compelled to and will file a substantive response to the Cash Collateral Report in the near future. And like the Cash Collateral Report, that reply will be filed under seal since it necessarily will center on privileged legal advice and analysis.

### RELIEF REQUESTED

18.     By this Motion, the Debtors seek the entry of an order directing the Clerk of the Bankruptcy Court to maintain the Cash Collateral Report under seal on the grounds that attorney-client privileged information permeates the Cash Collateral Report. As discussed herein, the Debtors considered requesting that only certain portions of the Cash Collateral Report be maintained under seal, but the degree to which the Privileged Information infuses nearly all substantive portions of the Cash Collateral Report requires the Debtors to request that the entire Cash Collateral Report be maintained under seal.

### BASIS FOR RELIEF

A.     **The Attorney-Client Privilege Merits Great Deference.**

19.     Even before the Examiner was appointed, the Debtors understood that maintaining the privileged status of attorney-client communications was a prerequisite for full and complete cooperation with the Examiner, and justifiably so. As the "oldest of the common-law privileges," the attorney-client privilege is "integral to the functioning of our legal system." Teleglobe USA Inc. v. BCE, Inc (In re Teleglobe Communications Corp.), 493 F.3d 345, 359, n. 13 (3d Cir. 2007). As explained by the Supreme Court, the purpose of the attorney-client privilege

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and

9

> administration of justice.  The privilege recognizes that sound legal advice or
> advocacy serves public ends and that such advice or advocacy depends upon the
> lawyer's being fully informed by the client.

Upjohn v. Unites States, 449 U.S. 383, 389, 101 S. Ct. 677 (1981).  Furthermore, as noted by the

Third Circuit Court of Appeals, "It is essential that parties be able to determine in advance with a

high degree of certainty whether communications will be protected by the privilege." Teleglobe,

493 F.3d at 360.  Ultimately, the attorney-client privilege plays a crucial role of "encouraging

attorney-client communication to enhance compliance with the law and facilitating the

administration of justice."  Id.

      20.     In order for a communication between an attorney and a client to

privileged, and therefore protected from compelled disclosure, the communication must be "(1) a

communication (2) made between privileged persons (3) in confidence (4) for the purpose of

obtaining or providing legal assistance for the client."  Id. (internal quotation omitted).

Privileged persons "include the client, the attorney(s), and any of their agents that help facilitate

attorney-client communications or the legal representation." Id. at 359.  In turn, a

communication is not made in confidence and the privilege does not attach if persons other than

the client, its attorney, or their agents are present when the communication is made.  Id. at 361.

Similarly, if the privileged communication is subsequently disclosed, "then it is no longer

confidential, and the privilege ceases to protect it."  Id.  In other words, the privilege typically is

waived upon disclosure of the communication to a non-privileged person.

10

**B.**      **The Cash Collateral Report Should Be Maintained Under Seal Because Attorney-Client Privileged Information Permeates the Cash Collateral Report.**

21.      It is a long-standing practice in the federal courts for relevant evidence to be received at trial *in camera,* so as to protect the non-public character of qualified material while allowing the Court to perform its adjudicative functions. See Standard & Poor's Corp. v. Commodity Exch., Inc., 541 F. Supp. 1273 (S.D. N.Y. 1982) (closure of part of trial may be ordered to preserve trade secret confidentiality and avoid irreparable harm). See, e.g., John T. Lloyd Lab., Inc. v. Lloyd Bros. Pharmacists, Inc., 131 F.2d 703, 707 (6th Cir. 1942) (trial court ordered to receive evidence in trade secret litigation *in camera*). Whether to allow or deny access is a decision "best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon v. Warner Communications, Inc., 435 U.S. 589, 599 (1978); see also In re Phar-Mor, Inc., 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995) (11 U.S.C. § 107 "codified the Supreme Court's *Nixon* decision in the bankruptcy setting"); In re Ionosphere Clubs Inc., 156 B.R. 414, 434 (S.D. N.Y. 1993). If a party can demonstrate sufficient need for limitations upon public access to court filings, the Court may craft a sealing order that narrowly addresses the disclosure concerns. See e.g., Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984); Bank of America Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 344 (3d Cir. 1986).

22.      Where, as here, a bankruptcy court order preserves the privileges and protections attached to documents and information delivered to an examiner, an examiner's report should be sealed to the extent it contains or reveals such privileged documents or information. In re Fibermark, Inc., 330 B.R. 480 (Bankr. D. Vt. 2005) is instructive on this

11

point.  In <u>Fibermark</u>, shortly after the bankruptcy court appointed an examiner, the creditors'

committee filed a motion seeking guidance from the bankruptcy court with respect to a document

request that the examiner had made upon the creditors' committee.  330 B.R. at 491.  In

particular, half of the members of the creditors' committee did not want to comply with the

document production request because in doing so, they would be waiving any privileges that

applied to the documents produced.  <u>Id.</u>  In ruling on the motion, the bankruptcy court ordered

the creditors' committee to deliver all requested documents to the examiner, provided however,

that the "production of Documents to the Examiner shall not be deemed to constitute a waiver of

any privilege, doctrine, right, or immunity pertaining to such Documents... with respect to any

third party."  <u>Id.</u> at 492.

      23.     After the examiner filed his report under seal, certain parties moved to

unseal the report.  <u>Id.</u> at 493.  The motion was vigorously opposed by certain members of the

creditors' committee and the committee's counsel, which argued, in relevant part, that portions

of the examiner's report should remain sealed because the report contained information protected

from disclosure by the work product doctrine and the attorney-client privilege and that such

protections had been preserved by the court's order notwithstanding the provision of this

information to the examiner.  <u>Id.</u> at 494-95.  The bankruptcy court found that the proper course

of analysis was to determine whether the examiner's report disclosed materials protected by the

attorney-client privilege or the work product doctrine, whether the party invoking the privilege

had met its burden of proof, and, finally, whether unsealing the report would eviscerate the

protection granted by the bankruptcy court with respect to third parties.  <u>Id.</u>  The court then

proceeded to analyze the privilege log that had been submitted by the committee's counsel and

12

redact those portions of the examiner's report that contained attorney-client privileged information or information that met the definition of attorney work product. Id. at 500-03.

24.     Here, the Bankruptcy Court has already entered orders that make clear that privileged documents and information that the Debtors opted to provide the Examiner are to be protected against public dissemination by ensuring that the Examiner's report be maintained under seal to the full extent needed to avoid broad disclosures of privileged information shared with the Examiner. The Debtors relied on the Bankruptcy Court's orders in providing a host of privileged information to the Examiner, some of the most sensitive of which is revealed in the Cash Collateral Report.

25.     In the spirit of their good faith cooperation in the Investigation, the Debtors considered, and indeed would have preferred, taking a surgical approach (like that in Fibermark) to prevent the disclosure of the Privileged Information by seeking to have only select portions of the Cash Collateral Report maintained under seal. The Privileged Information, however, permeates the Cash Collateral Report except for the introductory paragraph (found on page 1), Section I (found on pages 2 and 3) and Section III.5 (found on pages 22 and 23). On balance, the Debtors believe that the better approach is to keep the entire Cash Collateral Report under seal, as opposed to unsealing these minor sections that would be difficult to comprehend in the abstract, and, therefore, are so moving.

26.     To decline the Debtors' request to maintain the Cash Collateral Report under seal, would not only be inequitable in light of the Bankruptcy Court's orders that explicitly preserve the privileges attached to information provided to the Examiner, but would also

13

prejudice the Debtors and their estates.  Any person (including an MRA Counterparty) reading the Cash Collateral Report will clearly understand the substance of the Privileged Information.

27.    If the seal is lifted, parties whose interests are adverse to the estates will have the benefit of information that, by virtue of being attorney-client privileged, courts deem "worthy of the maximum legal protection."  Rhone-Poulenc Rorer, Inc. v. City Ins. Co. (In re Rorer), 32 F.3d 851, 862 (3d. Cir. 1994).

28.    Accordingly, the Debtors respectfully submit that the relief requested herein should be granted.

### No Prior Request

29.    No previous motion for the relief sought herein has been made to this or any other Court.

### Notice

30.    Notice of this Motion has been provided to:  (1) the Office of the United States Trustee for the District of Delaware; (2) the Examiner; (3) the Committee; and (4) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, for all of the foregoing reasons, the Debtors pray (i) for the entry of an Order, substantially in the form attached hereto as Exhibit A, directing the Clerk of the Bankruptcy Court to maintain the Cash Collateral Report under seal; and (ii) for such other and further relief as this Court deems just.

14

Dated:  December 3, 2007

Wilmington, Delaware

Respectfully submitted,

_____

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
Andrew M. Parlen
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California  90071
(213) 430-7704

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

15