## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS, INC., a** | : | **Case No. 07-10416 (KJC)** |
| **Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | **Objection Deadline: 1/2/08 at 4:00 p.m.** |
| | | **Hearing Date: 1/9/08 at 1:30 p.m.** |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH AUCTION OF CERTAIN ASSETS, (B) SCHEDULING HEARING TO CONSIDER PROPOSED SALE OF CERTAIN ASSETS AND APPROVING FORM AND MANNER OF NOTICE THEREOF AND (C) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE AND (B) GRANTING RELATED RELIEF

New Century TRS Holdings, Inc. ("TRS Holdings"), a Delaware corporation, New

Century Financial Corporation ("NCF"), a Maryland corporation, and their direct and indirect

subsidiaries, each as a debtor and debtor-in-possession (collectively, the "Debtors" or "New

Century"), by and through their undersigned counsel, hereby submit this motion (the "Motion")

pursuant to sections 105(a), 363, 503 and 507 of Title 11 of the United States Code, 11 U.S.C. §§

101 - 1532 (as amended from time to time, the "Bankruptcy Code"), and Rules 2002, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

"Bankruptcy Rules"), for the entry of (i) an order (a) approving bidding procedures and bid protections in connection with an auction of certain assets, (b) scheduling a hearing (the "Sale Hearing") to consider approval of a proposed sale of certain assets (the "Sale") to GRP Loan, LLC (the "Purchaser" or the "Stalking Horse Bidder"), or such other prevailing bidder, pursuant to the terms and conditions of that certain Asset Purchase Agreement dated as of December 19, 2007, and approving the form and manner of notice thereof (the "Sale Notice") and (c) granting certain related relief (the "Bidding Procedures Order") and (ii) an order approving the Sale and granting related relief (the "Sale Order").  In support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION**

1.       This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. § 1409(a).  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2.       The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a), 363, 503 and 507 and Bankruptcy Rules 2002, 6004 and 9014.

**BACKGROUND**

3.       NCF, and a publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States.  Through its subsidiaries and its primary holding company subsidiary, New Century TRS, NCF originated, purchased, sold, and serviced mortgage loans nationwide.  NCF historically focused on "subprime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.  In September 2005, NCF through

some of its subsidiaries also began offering conventional mortgage loans, including: "Alt-A"

mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans

guaranteed by the Veterans Administration ("VA"). During the fiscal year ending December 31,

2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of

which were sold in the secondary market. Since their inception, the Debtors have issued or

enabled over $220 billion in loans. These loans have helped millions of homebuyers and

homeowners across the nation access credit and realize the benefits of home ownership, including

many who might not otherwise have been able to do so.

4.      On April 2, 2007 (the "Petition Date"), the Debtors filed the instant

petitions for relief. The Court has entered an order authorizing the joint administration of the

Debtors' bankruptcy cases for procedural purposes only. The Debtors are operating their business

and managing their affairs as debtors and debtors in possession.

5.      The Debtors commenced these chapter 11 cases largely to pursue an

expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors'

stakeholders.

## RELIEF REQUESTED

6.      The Debtors hereby request, pursuant to Bankruptcy Code Sections 105,

363, 503 and 507 and Bankruptcy Rule 6004, that the Court enter orders facilitating the prompt

auction of certain of their assets. Specifically, the Debtors seek the entry of the Bidding

Procedures Order that approves bidding procedures and stalking horse bid protections in

connection with an auction of certain of their assets, sets a Sale Hearing to consider approval of the

Sale and the Sale Notice and grants related relief. In addition, the Debtors seek the entry of the

Sale Order that authorizes and approves the Sale and grants related relief.

## THE LOANS AND PROPOSED AUCTION AND SALE PROCESS

7.      This Motion is for the sale of 46 mortgage loans owned by New Century (the "Mortgage Loans"). The Mortgage Loans have not been financed through repurchase agreements or otherwise encumbered, and several of the Mortgage Loans are secured by a second position mortgage.

8.      Of the 46 Mortgage Loans, fifteen are secured by property within the State of Ohio (the "Ohio Loans") and subject to a stipulated preliminary injunction that, inter alia, prohibits the sale of the subject mortgage loans (the "SPI"). Through negotiation with the Ohio Attorney General and the Ohio Department of Commerce, the Debtors have been permitted to sell the Ohio Loans pursuant to that certain Agreed Entry for Release of Twelve (12) Loans and Sale of Fifteen (15) Loans dated November 30, 2007 entered in that certain action pending in the Court of Common Pleas in Cuyahoga County, Ohio and captioned as State of Ohio, Ex Rel., et al., v. New Century Financial Corp., et al., Case No. CV 07 618660. Of the fifteen Ohio Loans, three remain subject to the SPI which mandates, among other things, that the lender engage in certain workout efforts in the event of a default under the loan and, in some instances, to disclose certain information to the State of Ohio.

9.      As the Debtors neared resolution over the release of the Ohio Loans, the Debtors contacted several likely bidders of the Mortgage Loans. New Century first approached Ellington Capital Management ("Ellington") who indicated that it was not interested in the Mortgage Loans. New Century then approached the following parties: GRP Financial Services Corp. ("GRP"), Midwest First Financial, Eastern Savings Bank, UBS, Goldman Sachs, Credit Suisse First Boston, Bayview Financial, Bear Stearns/EMC and Citi Financial. GRP, Midwest

Financial and Bayview Financial were the only parties to submit bids. GRP's bid on behalf of the Stalking Horse Bidder was the highest and for the entire pool of Mortgage Loans.

10.     The Debtors have concluded that GRP's bid establishes a reasonable floor for an auction and, accordingly, on December 19, 2007, the Debtors entered into an Asset Purchase Agreement (the "Purchase Agreement") with the Stalking Horse Bidder whereby the Stalking Horse Bidder agrees to purchase the Mortgage Loans pursuant to Bankruptcy Code Section 363. The Stalking Horse Bidder's bid price will be based on a sliding scale that is dependent on the decline in value of collateral associated with the Mortgage Loans since the Mortgage Loans were originally issued. New Century and GRP expect that there will be approximately a 30% decline in collateral value, in which case GRP has offered to pay a purchase price equivalent to 30% of the outstanding principal balance of the Mortgage Loans as of a cut-off date which will be five business days prior to the closing of the proposed transaction. This would result in a purchase price of approximately $1.8 million for the Mortgage Loans.

11.     Among other customary terms and conditions, the Purchase Agreement[2] includes the following principal terms:

- The Stalking Horse Bidder's offer will be subject to a potential auction and overbid by competing bidders submitting higher and better offers as set forth below.

- The Purchase Agreement states a Purchase Price determined by multiplying the aggregate unpaid principal balance of the Mortgage Loans as of the Cut-Off Date against a Bid Price that is based on the decline in value of the collateral associated with the Mortgage Loans equal to the following:

    (i)     0% decline in collateral value = 44.00%
    (ii)    10% decline in collateral value = 39.00%
    (iii)   20% decline in collateral value = 35.00%
    (iv)    30% decline in collateral value = 30.00%

---

[2] The following is intended for summary purposes only. To the extent the description in this Motion is inconsistent in any way from the Purchase Agreement, the terms of the Purchase Agreement shall govern. Terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

(v)    More than 30% decline in collateral value, the parties will negotiate a mutually acceptable Bid Price

In calculating the aggregate Bid Price, the Bid Price for any individual Mortgage Loan shall first be proposed by the Stalking Horse Bidder and the Debtors shall have an opportunity to refute Stalking Horse Bidder's findings of decline in value of the collateral and Stalking Horse Bidder and the Debtors shall have an opportunity to negotiate a reasonable, mutually satisfactory agreement regarding the Bid Price.

- The Purchase Agreement provides that, in the event the Stalking Horse Bidder is the purchaser of the Mortgage Loans, the transaction is to close within two business days after entry of an order approving the sale.

- In the event that a third party bidder other than the Stalking Horse Bidder is the Successful Bidder (as defined below) at the proposed auction, the Stalking Horse Bidder is entitled to a Break-Up Fee (as defined below) in the amount of $40,000 and a Reimbursement Fee (as defined below) in the amount of $16,100.

- If the Debtors and the Stalking Horse Bidder are unable to agree upon a Bid Price within three business days of delivery of the Stalking Horse Bidder's pricing schedule, then the Purchase Agreement shall terminate. In that event, the Debtors shall pay to the Stalking Horse Bidder the Reimbursement Fee, and the Stalking Horse Bidder shall deliver immediately to the Debtors copies of their due diligence with respect to the Mortgage Loans including, but not limited to, broker price opinions, tax and lien searches and Mortgage File review reports.

12.    The Debtors also believe that an auction and sale process that is consistent with the following procedures and dates (the "Bidding Procedures") will result in the highest and best offer for the Mortgage Loans:[3]

A.    Notice of Auction:

Information relevant to the Mortgage Loans for evaluation by interested parties, including for due diligence investigation, will be made available to prospective bidders. In addition, the Debtors will provide each prospective buyer with the Purchase Agreement or a draft version of a loan purchase agreement for the Mortgage Loans.

---

[3] The following is intended for summary purposes only. To the extent the description in this Motion is inconsistent in any way from the Bidding Procedures, the terms of the Bidding Procedures shall govern.

The Debtors will further inform each prospective buyer of the dates set forth herein and the procedures they will employ in connection with the auction, and will continue to market and solicit interest in the Mortgage Loans through the date by which they will require prospective buyers to submit their bids (as set forth below).

B.    Bid Deadline and Characteristics of Initial Bids:

In order to attend and bid at the Auction (as defined below), if any, the Debtors will require prospective buyers to submit an initial bid for the Mortgage Loans by no later than 12:00 p.m. (prevailing Eastern time) on January 18, 2008 (the "Bid Deadline") to:

I.    The Debtors:

O'Melveny & Myers LLP
275 Battery Street, Suite 2600
San Francisco, CA  94111
Facsimile:  (415) 984-8701
Email:  blogan@omm.com
         bchristensen@omm.com
Attention:  Ben Logan
            Brophy Christensen

II.    Official Committee of Unsecured Creditors

Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022
Facsimile:  (212) 478-7400
Email:  mpower@hahnhessen.com
Attention:  Mark Power

For a bidder to become a qualified bidder with a qualified bid (a "Qualifying Bidder"), such bidder must submit an initial bid constituting a binding written offer to purchase the Mortgage Loans that:

I.    Exceeds the purchase price offered by the Stalking Horse Bidder by not less than $100,000;

II.    States that the bidder, on its own or together with another bidder, offers to purchase all of the Mortgage Loans;

III.    Is on substantially the same terms as the proposed transaction with the Stalking Horse Bidder;

IV.     Is accompanied by a clean and duly executed asset purchase agreement (a "Modified Purchase Agreement") and a marked Modified Purchase Agreement reflecting the variations from the Purchase Agreement executed by the Stalking Horse Bidder;

V.      States that the bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement;

VI.     States that the offer is irrevocable until the closing of the purchase of the Mortgage Loans;

VII.    Contains such financial and other information that will allow the Debtors to make a reasonable determination of the bidder's financial and other capabilities to consummate the transaction;

VIII.   Does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;

IX.     Fully discloses the identity of each entity that will be bidding for the Mortgage Loans or otherwise participating in connection with such bid, and the complete terms of any participation; and

X.      Does not contain any due diligence or financing contingencies of any kind, and does contain evidence that the bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Mortgage Loans, which evidence is reasonably satisfactory to the Debtors.

C.      <u>Auction</u>:

In the event that the Debtors receive by the Bid Deadline one or more bids that they deem in their discretion, in consultation with the Official Committee of Unsecured Creditors (the "Creditors' Committee"), to constitute Qualifying Bids, the Debtors shall conduct an auction (the "Auction") with respect to the Mortgage Loans.

The Auction will start on January 22, 2008 at a time selected by the Debtors. The Auction will be conducted by telephone conference or

over the internet or in such other manner as determined by the Debtors with notice to the Qualifying Bidders.

The Auction shall be governed by the following procedures:

I.     Only representatives of the Debtors, the Stalking Horse Bidder, Qualifying Bidders and the Creditors' Committee shall participate at the Auction;

II.    Only the Stalking Horse Bidder and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

III.   Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

IV.    The Stalking Horse Bidder and the Qualifying Bidders shall participate in person in the Auction, or through a duly authorized representative;

V.     Bidding shall commence at the amount of the highest and/or best Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

VI.    Qualifying Bidders may then submit successive bids in increments of at least $50,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $50,000 higher than the previous bid;

VII.   All Qualifying Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Modified Purchase Agreement, as applicable, at the Auction; and

VIII.  The Auction will be conducted so that each Qualifying Bidder will be informed of the terms of the previous bid.

The Debtors, in consultation with the Creditors' Committee, may develop additional rules or amend the foregoing rules governing the conduct of the Auction at the time of the Auction, including the amount at which the bidding shall commence, incremental amounts of successive overbids and the method by which each round of bidding will be conducted

The Auction shall continue until there is only one offer or combination of offers that the Debtors determine, in consultation with the Creditors' Committee and subject to Court approval, is the highest and best offer for the Mortgage Loans (the "Successful Bid"). In making this decision, the Debtors, in consultation with the Creditors' Committee, will have the discretion to weigh multiple considerations including, without limitation, the amount of the purchase price, the form of the consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each bidder, and the net benefit to the Debtors' estates.

The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Purchase Agreement. For purposes of determining the Successful Bid, any overbid submitted by the Stalking Horse Bidder shall be deemed to include the full amount of the Break-Up Fee (as defined below) and the Reimbursement Fee (as defined below). Within three days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Court.

D.    Back-Up Bidder

If an Auction is conducted, the party with the next highest or otherwise Qualifying Bid at the Auction (including for this purpose the Stalking Horse Bidder), as determined by the Debtors, in consultation with the Creditors' Committee, shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern time) on January 29, 2008 or the closing of the sale transaction with the Successful Bidder.

Following the Sale Hearing (as defined below), if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court.

H.    Break-Up Fee and Reimbursement Fee:

In the event that the Mortgage Loans are sold to a third party other
than the Stalking Horse Bidder the Debtors shall pay the Stalking
Horse Bidder from the proceeds of sale the amounts of (i) $40,000
(the "Break-Up Fee") and (ii) $16,100 (the "Reimbursement Fee").

I.    Sale Hearing:

A sale hearing to approve the sale of the Mortgage Loans to the
Stalking Horse Bidder or other highest and best bidder (the "Sale
Hearing"). At the Sale Hearing, the Debtors will seek the entry of
any order approving the sale of the Mortgage Loans pursuant to the
terms and conditions set forth in the Purchase Agreement or other
loan purchase agreement.

## THE SALE HEARING AND NOTICE THEREOF

13.    The Debtors request that the Court schedule a Sale Hearing on or about
January 23, 2008 to consider approval of the sale of the Mortgage Loans to the Stalking Horse
Bidder or other Qualifying Bidder, as applicable, pursuant to the terms and conditions set forth in
the Purchase Agreement or the Modified Purchase Agreement, as the case may be.

14.    Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or
lease of property, other than cash collateral, not in the ordinary course of business shall be given
pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2)
of the code." Fed. R. Bankr. P. 6004(a). Essentially, Bankruptcy Rule 2002 requires the Debtors
to give all creditors and certain parties "at least 20 days' notice by mail" of the Sale. Bankruptcy
Rule 6004 also provides that objections to the proposed Sale "shall be filed and served not less
than five days before the proposed action or within the time fixed by the court." Fed. R. Bankr. P.
6004(b).

15.    The timing of the auction and sale process and the proposed date for the
Sale Hearing requested by the Debtor is well within the notice procedures mandated by the

Bankruptcy Rules as they will be providing at least twenty days notice required by the Bankruptcy Rules. Moreover, scheduling the Sale Hearing for on or about January 23, 2008 is necessary as the failure to close the Sale by January 28, 2008, may be an event of default under the Purchase Agreement. It is also reasonable given the marketing performed by the Debtors and the Creditors' Committee.

16.     Accordingly, the Debtors request that the Sale Hearing to approve the sale of the Mortgage Loans and to consider any properly submitted objections be held on January 23, 2008. The Debtors intend to provide notice of the Sale Hearing by service and publication of the notice attached hereto as Exhibit C. The Debtors also intend to publish notice of the Sale Hearing in the National Edition of *The Wall Street Journal*, prior to the Sale Hearing.

17.     The Debtors further request that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, at least five days prior to the Sale Hearing and (d) with a copy served on and received by:  (i) counsel for the Debtors, O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA  90071, Attention:  Suzanne Uhland, Esq., Ben H. Logan, Esq., and Victoria A. Newmark, Esq.; (ii) counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899, Attention:  Marc D. Collins, Esq.; (iii) GRP Loan, LLC, 445 Hamilton Avenue, 8th Floor, White Plains, NY 10601, Attention:  Andrew Waldman; (iv) counsel to the Official Committee of Unsecured Creditors, Hahn & Hessen, LLP, 488 Madison Avenue, New York, NY  10022,

Attention:  Mark Power; and (v) the Office of the United States Trustee, 844 King Street, Suite

2207, Lockbox 35, Wilmington, Delaware  19801.

## APPROVAL OF BREAK-UP FEE AND EXPENSE REIMBURSEMENT

18.    As noted above, pursuant to the Purchase Agreement, the Stalking Horse

Bidder shall be entitled to a Break-Up Fee of $40,000 and Reimbursement Fee of $16,100 in the

event the Debtors consummate a sale of all or a material portion of the Mortgage Loans to a third

party other than the Stalking Horse Bidder, or in the case of the Reimbursement Fee only in the

event that the Debtors and the Stalking Horse Bidder are unable to agree upon a Bid Price.  The

Break-Up Fee and the Reimbursement Fee are to be paid in cash as an administrative expense with

priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b)

of the Bankruptcy Code.

19.    Bidding incentives, such as the Break-Up Fee and the Reimbursement Fee,

encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a

debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets,

despite the inherent risks and uncertainties of the chapter 11 process.  "Agreements to provide

breakup fees or reimbursement of fees and expenses are meant to compensate the potential

acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."  In re

S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Associates

L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to

convince a white knight to enter the bidding by providing some form of compensation for the risks

it is undertaking") (citation omitted).

20.    Proposed bidding incentives, such as the Break-Up Fee and Reimbursement

Fee, should be approved when it is in the best interests of the estate.  S.N.A. Nut. Co., 186 B.R. at

104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp

Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding

incentives provide some benefit to the debtor's estate. Calpine Corporation v. O'Brien

Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F. 3d 527, 533 (3rd

Cir. 1999) (holding even though bidding incentives are measured against a business judgment

standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy

Code Section 503(b) govern in the bankruptcy context).

21.    Here, the Break-Up Fee is clearly market and provides a benefit to the

estate. The Break-Up Fee, a topping fee that constitutes 2.2% of the overall anticipated purchase

price offered by the Stalking Horse Bidder for the Mortgage Loans, will only be paid if the

Mortgage Loans are sold to a higher bidder - meaning that the Debtors, following an auction

process, would have to determine that such other bid is higher and better than the Stalking Horse

Bidder's offer for the Mortgage Loans, including factoring into the competing bid the cost of the

Break-Up Fee. If this occurs, the Debtors will effectively net at least the amount offered by the

Stalking Horse Bidder, as payment of the Break-Up Fee will come exclusively from any overbid

and will not reduce the amount paid to the estates. The Debtors have the ability to consider bids for

less than all of the Mortgage Loans if the Debtors are able to combine a collection of other bids

into a bid that tops the Stalking Horse Bidder's highest offer.

22.    The Reimbursement Fee is also reasonable and benefits the estate. The

Reimbursement Fee, intended to cover the Stalking Horse Bidder's out-of-pocket expenses

incurred in connection with due diligence, would be paid only if one of the following

circumstances occurs: (i) the Mortgage Loans are sold to a higher bidder other than the Stalking

Horse Bidder following an auction process, or (ii) the Purchase Agreement terminates because the

Stalking Horse Bidder and the Debtors are unable to agree on a Bid Price. In the former instance, the Debtors, following an auction process, would have to determine that a competing bid is higher and better than the Stalking Horse Bidder's offer for the Mortgage Loans, including factoring into the competing bid the cost of the Reimbursement Fee. If this occurs, as with the Break-Up Fee, the Debtors will effectively net at least the amount offered by the Stalking Horse Bidder, as payment of the Reimbursement Fee will come exclusively from any overbid and will not reduce the amount paid to the estates. In the latter instance, if the Stalking Horse Bidder and the Debtors are unable to agree upon a Bid Price and the Reimbursement Fee comes due for this reason, the Stalking Horse Bidder is required to deliver to the Debtors the Stalking Horse Bidder's due diligence. Accordingly, the Debtors will be able to share the Stalking Horse Bidder's due diligence with other potential bidders in that event.

23.     "The usual rule is that if the break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." In re Integrated Resources, Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992). Approving the Break-Up Fee and the Reimbursement Fee will commit the Stalking Horse Bidder to serve as the stalking horse bidder under the Purchase Agreement with a bid that starts any additional bidding or auction for the Mortgage Loans at a fair and reasonable purchase price, all to the benefit of the estates. The Debtors believe that the Break-Up Fee and the Reimbursement Fee will encourage bidding by serving "any of three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow: or (3) to attract additional bidders." Id. at 662. In other words, if the Mortgage Loans are sold to a competing bidder, it will - in all likelihood - be because of the Stalking Horse Bidder's crucial role as a stalking horse.

24.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. In the context of this case, the proposed transaction is relatively small, and the Break-Up Fee and Reimbursement Fee are on a commensurate scale. The Break-Up Fee and the Reimbursement Fee combined total only $56,100 and constitute 3.2% of the overall purchase price offered by the Stalking Horse Bidder of approximately $1.8 million. It is within the percentage range approved in the bankruptcy setting generally, see, e.g., Consumer News & Business Channel Partnership v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F. 2d 165, 167 (2nd Cir. 1992) (noting that the transaction at issue provided for a break up fee of $8.2 million on a $149.3 million transaction); Integrated Resources, 147 B.R. at 662 (approving a $7.5 million break-up fee on a $565 million transaction); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved break-up fee of 2.75%, or $3 million, in connection with $110 million sale of real estate), and is a relatively small potential estate expense in light of the commensurate benefits.

25.     For these reasons, and given the benefits provided by the Purchase Agreement, the Debtors urge the Court to approve the Break-Up Fee and the Reimbursement Fee.

## APPROVAL OF AUCTION PROCESS AND SALE OF ASSETS

26.     Bankruptcy Code Section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Section 105(a) of the Bankruptcy Code provides in pertinent part

that "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

27.    A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code Section 363 where the transaction represents an exercise of the debtor's sound business judgment. See, e.g., In re Martin (Myers v. Martin), 91 F. 3d 389, 395 (3rd Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines. Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

28.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith. See Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re United Healthcare Svs., Inc., No. 97-21785, 1997 U.S. Dist LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

29.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See e.g. In re Abbotts Dairies of Pennsylvania, 788 F. 2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F. 2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F. 3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy

law that the ... [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Products, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

30.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Financial New Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankruptcy estates").

31.    The Debtors submit that the proposed transaction with the Stalking Horse Bidder or other Successful Bidder satisfies the "sound business reason test." The Debtors submit that a prompt sale of the Mortgage Loans present the best opportunity to maximize the value of the Mortgage Loans for the estates. The Debtors believe that, absent a prompt sale, the value of the Mortgage Loans will substantially decline. In addition, the Debtors believe that the Bidding Procedures and Sale Notice are the best method by which it can obtain the best price for the Mortgage Loans and provide interested persons with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Mortgage Loans by helping ensure a competitive and fair

bidding process. They also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their assets. Finally, the Debtors submit that the price offered by the Stalking Horse Bidder for the Mortgage Loans is fair and reasonable. The Debtors and the Creditors' Committee thoroughly marketed the Mortgage Loans, and the offer made by the Stalking Horse Bidder was determined by the Debtors in their business judgment to be the best available offer for the Mortgage Loans.

## SALE FREE AND CLEAR OF LIENS AND INTERESTS

32. The Debtors further submit that it is appropriate to sell the Mortgage Loans free and clear of claims, interests, liens and encumbrances pursuant to Bankruptcy Code Section 363(f), with any such claims, interests, liens and encumbrances attaching to the net sale proceeds of the Mortgage Loans to the extent applicable.

33. Bankruptcy Code Section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interests, (ii) such entity consents, (iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property, (iv) such interest is in bona fide dispute (v) or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

34. Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Mortgage Loans "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); In re Wolverine Radio

Co., 930 F. 2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

35.    The Debtors believe that one or more of the tests of Bankruptcy Code Section 363(f) are easily satisfied with respect to any Sale involving the Mortgage Loans. In particular, the Debtors believe that any lienholder will be adequately protected by having their liens, if any, in each instance against the Debtors or their estates, attach to the cash proceeds ultimately attributable to the Mortgage Loans in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

36.    Although Bankruptcy Code Section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F. 3d 252, 257 (3rd Cir. 2000). In the case of In re Trans World Airlines, Inc., 322 F. 3d 283, 288-89 (3rd Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289. As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F. 3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, supra, the scope of Bankruptcy Code Section 363(f) is not limited to in rem interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under §

363(f) free and clear of successor liability that otherwise would have arisen under federal statute."
Folger, 209 F. 3d at 258.

37.     Courts have consistently held that a buyer of a debtor's assets under
Bankruptcy Code Section 363 takes the assets free from successor liability resulting from
pre-existing claims.  See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R.
716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free
and clear of any interest that could be brought against the bankruptcy estate during the
bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.
2d 89, 93-94 (2nd Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free
and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323,
329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear
of Title VII employment discrimination and civil rights claims of debtor's employees); In re
Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any
interest permissible even though the estate had unpaid taxes); American Living Systems v.
Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product
liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ
Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership), 189 B.R.
97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is
an "interest" as used in section 363(f)).[4]

38.     The purpose of an order purporting to authorize the sale of assets free and
clear of all "interests" would be frustrated if claimants could thereafter use the sale as a basis to

---

[4] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims nevertheless find that Bankruptcy Code section 105(a) provides such authority.  See In re White Motor Credit Corp., 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

assert claims against the purchaser arising from the Debtors' pre-sale conduct. Under Bankruptcy

Code Section 363(f), the Stalking Horse Bidder or a Successful Bidder, as the case may be, is

entitled to know that the Mortgage Loans do not have attached latent claims that will be asserted

against them after the Sale is completed. Accordingly, and consistent with the above-cited case

law, the Sale Order should state that the purchaser will not be liable, as a successor under any

theory of successor liability or otherwise, for claims that encumber or relate to the Mortgage

Loans.

### FINDING OF GOOD FAITH

39.    Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Seventh

Circuit in In re Andy Frain Services, Inc., 798 F. 2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings. Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

798 F.2d at 1125 (emphasis omitted) (quoting In re Rock Industries Machinery Corn., 572 F. 2d

1195, 1198 (7th Cir. 1978).

40.    The Purchase Agreement was negotiated at arm's-length with all parties

involved acting in good faith. The Debtors therefore request that the Court make a finding that the

Stalking Horse Bidder, if it is not overbid at the Auction, has acquired the Mortgage Loans in good

faith within the meaning of Bankruptcy Code Section 363(m). In the event there is a Successful

Bidder other than the Stalking Horse Bidder, the Debtors intend to present evidence to show that

the Successful Bidder is entitled to the same finding under Bankruptcy Code Section 363(m).

### COMPLIANCE WITH SECTION 363(b)(1)(A)

41.    The Debtors' privacy policy relating to consumer information does not

prohibit the proposed sale of the Mortgage Loans. Accordingly, the sale satisfies Bankruptcy

Code Section 363(b)(1)(A), and there is no need for the appointment of a consumer privacy

ombudsman pursuant to Bankruptcy Code Sections 332 and 363(b)(1)(B).

### FINALITY OF ORDER

42.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise." The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for

an objecting party to appeal before an order can be implemented. See Advisory Committee Notes

to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day

stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be

eliminated to allow a sale or other transaction to close immediately "where there has been no

objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 (15th rev. ed. 2006). Further, it

suggests that if an objection is filed and overruled, and the objecting party informs the court of its

intent to appeal, the stay may be reduced to the amount of time actually necessary to file such

appeal. Id.

43.    The Debtors hereby request that any order approving the sale of the

Mortgage Loans be effective immediately upon entry by providing that the 10-day stay under

Bankruptcy Rule 6004(h) is waived or, in the alternative, if an objection to the sale of the

Mortgage Loans is filed, reduce the stay period to the minimum amount of time needed by the

objecting party to file its appeal.

## NOTICE

44.     No trustee has been appointed in these chapter 11 cases.  Notice of this

Motion has been provided to:  (1) the Office of the United States Trustee for the District of

Delaware; (2) counsel to GRP; (3) counsel to the Creditors' Committee; (4) all parties who are

known to possess or assert a secured claim against the Mortgage Loans; (5) the Internal Revenue

Service; (6) all applicable state and local taxing authorities; (7) relevant entities that have issued a

license or permit to the Sellers; (8) contact parties that the Debtors have identified as potential

buyers of the Mortgage Loans; (9) all parties entitled to notice under Local Rule 2002-1(b); and

(10) the Examiner appointed in these chapter 11 cases.  In light of the nature of the relief requested

herein, the Debtors submit that no other or further notice is required.

45.     No previous motion for the relief sought herein has been made to this or any

other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: December 21, 2007              Respectfully submitted,
      Wilmington, Delaware


                                      Mark D. Collins (No. 2981)
                                      Michael J. Merchant (No. 3854)
                                      Christopher M. Samis (No. 4909)
                                      RICHARDS, LAYTON & FINGER, P.A.
                                      One Rodney Square
                                      P.O. Box 551
                                      Wilmington, Delaware 19899
                                      (302) 651-7700

                                      -and-

                                      Ben H. Logan
                                      Suzzanne S. Uhland
                                      Victoria A. Newmark
                                      O'MELVENY & MYERS LLP
                                      275 Battery Street
                                      San Francisco, California 94111
                                      (415) 984-8700

                                      ATTORNEYS FOR DEBTORS
                                      AND DEBTORS IN POSSESSION