# **EXHIBIT 1**

## **(Stipulation)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | Case No. 07-10416 (KJC) |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

## STIPULATION RE. RELEASE OF FUNDS IN SECURED CLAIM RESERVE TO GENERAL ELECTRIC CAPITAL CORPORATION

This Stipulation is entered into by and between New Century Financial Corporation, a Maryland corporation, New Century TRS Holdings, Inc., a Delaware corporation, and their direct and indirect subsidiaries, each as debtor and debtor in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), on the one hand, and General Electric Capital Corporation ("GECC"), on the other hand, by and through their respective counsel, and is based on the following recitals:

## RECITALS

A.    The Debtors commenced these cases by filing voluntary chapter 11 bankruptcy petitions on April 2, 2007.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

B.      Pre-petition, GECC extended financing to the Debtors evidenced by promissory notes and purportedly secured by first priority liens in certain personal property equipment owned by the Debtors.  GECC has filed Proofs of Claim asserting that it is owed $7,515,537.78 under these various secured financing transactions and that the claims are secured in an "unknown" amount (the "GECC Equipment Proof of Claim").

C.      On May 23, 2007, the Court entered its Order Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure Approving (i) the Sale of the Debtors' Servicing Business to Carrington Capital Management, LLC and Carrington Mortgage Services. LLC Pursuant to the Second Amended and Restated Asset Purchase Agreement, Dated as of May 2, 2007, Free and Clear of Liens, Claims, Encumbrances, and Interests, and (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Carrington As Part of Such Sale (the "Carrington Sale Order") (Court's Docket No. 844 and attached hereto at "Exhibit 1").  The Carrington Sale Order provided, among other things, for the approval of the sale of a portion of the Debtors' businesses, including a portion of GECC's collateral and for the establishment of a "Secured Claim Reserve" which included $7,558,887.80 of sale proceeds related to GECC's lien and against which GECC's lien attached to be subsequently dispersed by agreement of the parties or subsequent Court Order.

D.      The Debtors and GECC have entered into four stipulations with respect to GECC's motion for relief from the automatic stay (the "Stay Relief Motion") (Docket No. 630) pursuant to which:  (i) the Court has modified the automatic stay for the limited purpose of permitting GECC to recover portions of GECC's collateral totaling $90,000 in value; (ii) the Debtors have paid $300,000 to GECC from the Secured Claim Reserve as an advance toward the distribution to GECC on account of its secured claim as ultimately allowed by the Court; and (iii) the hearing on the Relief Stay Motion was continued until January 9, 2008.  (These stipulations appear on the Court's Docket at Nos. 1979, 2134, 2534 and 3204.)

Following discussions amongst representatives for the Debtors and GECC, and in consultation with the Creditors' Committee, the parties have agreed to release a portion of the Secured Claim Reserve on the following terms, based on the mutual promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged.

## STIPULATION

1.      On or before December 28, 2007 at 5:00 p.m. ET, the Debtors will pay to GECC from the Secured Claim Reserve the total sum of $1,800,000. This payment, in addition to the $300,000 in payments previously made by the Debtors to GECC and $90,000 worth of collateral previously returned by the Debtors to GECC, shall be, subject to GECC's right to assert and receive distributions from the Debtors and their bankruptcy estates on account of the "GECC General Unsecured Deficiency Claim" referenced below, to the extent allowed, in full, final and complete satisfaction of all secured claims asserted by GECC in these cases arising out of the various secured financing transactions and promissory notes entered into between the parties as well as any claims for adequate protection (the "GECC Secured Claim"), so that the GECC Secured Claim is in the total amount of $2,190,000.00 and, subject to payment of the $1,800,000 to GECC, shall be deemed satisfied and discharged.

2.      GECC agrees that upon its receipt of the $1,800,000 payment, its lien and security interest in and to any collateral in the Debtors' possession shall be deemed released.

3.      Upon GECC's receipt of the $1,800,000.00 payment called for above GECC thereafter will deliver such UCC-3 termination statements to the Debtors as are deemed necessary to release any and all security interests granted in favor of GECC securing the GECC Secured Claim.

4.      Upon GECC's receipt of the $1,800,000.00 payment called for above, GECC shall withdraw the Stay Relief Motion.

5.      The remaining amount in the Secured Claim Reserve attributable to GECC

3

of $5,458,887.80, plus any accrued interest earned thereon, shall be released to the Debtors free and clear of any claim of GECC. The amount of $559,611.88, plus any accrued interest earned thereon, will remain in the Secured Claim Reserve as provided for in the Carrington Sale Order in respect of the claims asserted by National City.

   6. Upon GECC's receipt of the $1,800,000.00 payment called for above, the GECC Equipment Proof of Claim shall be deemed amended to assert only a general unsecured claim in the amount of $5,325,527.78 ("GECC General Unsecured Deficiency Claim") upon which distributions to GECC shall be made to the extent the GECC General Unsecured Deficiency Claim is allowed. This settlement shall not affect the unsecured lease rejection claims filed by GECC and all rights GECC has with respect to distributions thereon or the Debtors' or the Committee's right to object to all or part of same. The terms of this Stipulation and the settlement agreement described herein shall be binding upon the Debtors, the Creditors' Committee and any trustee hereafter appointed in any of the Debtors' bankruptcy cases, whether chapter 11 or chapter 7.

   7. The parties hereto shall promptly negotiate and file with the Court on or before January 8, 2008, a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Motion") requesting, among other things, the following:

    (a) The GECC General Unsecured Deficiency Claim shall be allowed ("GECC Allowed Unsecured Deficiency Claim") against the Debtors that (i) are liable for GECC's debt as more particularly set forth in the GECC Equipment Proof of Claim, and (ii) against which GECC filed the GECC Equipment Proof of Claim, and GECC shall be entitled to distributions on such claim as set forth in a plan of reorganization to be filed in these cases at a later time.

    (b) To the extent that GECC has previously hereto taken possession of any assets of the Debtors which purportedly secured GECC's

claims against the Debtors, GECC shall be entitled to retain such assets without further credit to the Debtors or their bankruptcy estates. Within ten (10) days of the entry of a court order granting the Motion, the Debtors will provide to GECC a Bill of Sale conveying fee simple title to such assets to GECC. GECC shall be obligated to pay any taxes or costs associated with such Bill of Sale. The Debtors will retain, free and clear of GECC's liens and security interests, all other equipment and property that is or was the subject of GECC's security interests and liens.

(c)     The Debtors and the Creditors' Committee shall, for themselves and their successors and assigns, jointly and severally release, acquit, exonerate and forever discharge GECC, its affiliates, parent corporations and subsidiaries, and all of GECC's past, present and future directors, officers, employees, agents and attorneys (collectively, the "GECC Released Parties") from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which the Debtors or the Creditors' Committee jointly or severally ever had, now have or hereinafter may have against any or all of the GECC Released Parties that arise from or relate to the GECC Secured Claim, the GECC General Unsecured Deficiency Claim and/or the GECC Allowed Unsecured Deficiency Claim, including, without limitation, any claims or causes of action arising under 11 U.S.C. §§ 544, 547, 548 or 549; and (ii) GECC shall release, acquit, exonerate and forever discharge the Debtors, the Creditors' Committee and their successors and assigns from any and all claims, cause of action,

5

suits and damages (including claims for attorneys' fees) which GECC ever had, now has or hereinafter may have against the Debtors, the Creditors' Committee or any of their successors and assigns arising out of the GECC Secured Claim, other than as set forth in this Stipulation and specifically excluding the GECC General Unsecured Deficiency Claim, GECC Allowed Unsecured Deficiency Claim and the unsecured lease rejection claims referenced above.

8.     Enforceability of the terms and provisions of paragraph 7 herein shall be subject to and conditioned upon the entry of a final order of the Bankruptcy Court approving the Motion. In the event the Bankruptcy Court does not approve the Motion, the terms and provisions of paragraph 7 herein shall be unenforceable.

9.     Any notice, request, instruction, or demand to be given under this Stipulation shall be in writing and shall be deemed to have been duly given when delivered personally, delivered by the use of a recognized overnight courier service, delivered by first class mail to the address of the party set forth below, or to such other address as the party may designate by written notice.

10.     GECC represents and warrants that it has not assigned, transferred or sold to a third party all or a portion of the GECC Secured Claim or the GECC Equipment Proofs of Claim and that it is the owner of all such claims.

Dated: December **26**, 2007.

6

**STIPULATED AND AGREED:**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzanne S. Uhland
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

Shannon Lowry Nagle
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

AND

Michael G. Gallerizzo
Eric Schuster
GEBHARDT & SMITH LLP
One South Street, Ste. 2200
Baltimore, Maryland 21202-3281
(410) 385-5048

ATTORNEYS FOR GENERAL ELECTRIC
CAPITAL CORPORATION

**CONSENTED TO:**

Mark T. Power
Mark S. Indelicato
HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

8

## EXHIBIT 1 TO STIPULATION

**(Carrington Sale Order)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEW CENTURY TRS HOLDINGS,<br>INC., a Delaware corporation, et al.,[1] | Case No. 07-10416 (KJC) |
| Debtors. | Jointly Administered |
| | Related Docket Nos. 70, 340 |

ORDER PURSUANT TO SECTIONS 105, 363 AND 365
OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006
AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
APPROVING (i) THE SALE OF DEBTORS' SERVICING BUSINESS
TO CARRINGTON CAPITAL MANAGEMENT, LLC AND CARRINGTON
MORTGAGE SERVICES, LLC PURSUANT TO THE SECOND AMENDED AND
RESTATED ASSET PURCHASE AGREEMENT, DATED AS OF MAY 21, 2007, FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (ii)
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO CARRINGTON AS PART OF SUCH SALE

Upon the motion, dated April 4, 2007 (the "Motion"), of New Century Financial

Corporation ("New Century") and its affiliated debtors and debtors-in-possession (collectively,

the "Debtors"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for approval of (i) the sale of New Century's mortgage loan

---

[1] The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Date filed: 5/23/07<br>Docket #: 844

servicing business (the "Servicing Business")[2] to Carrington Capital Management, LLC ("CCM") and Carrington Mortgage Services, LLC ("CMS" and, together with CCM, "Carrington") under the terms of the Asset Purchase Agreement, originally dated April 2, 2007, as amended and restated pursuant to an Amended and Restated Asset Purchase Agreement dated as of April 19, 2007, between New Century Financial Corporation and New Century Mortgage Corporation, as Sellers, and Carrington, as Purchaser (as so amended and restated, the "Original APA"), or to a successful bidder through an alternate transaction, free and clear of liens, claims, encumbrances, and interests (except for the Surviving Permitted Encumbrances (as such term is defined in the APA)), (ii) the institution of bidding procedures (the "Bidding Procedures"), including a break-up fee (as such term is defined in the APA, the "Break-Up Fee") and expense reimbursement (as such term is defined in the APA, the "Expense Reimbursement") payable to Carrington, and (iii) the assumption and assignment of certain executory contracts and unexpired leases of the Debtors (the "Assumed Contracts") to Carrington or alternatively to the successful bidder for the Servicing Business as part of such sale; and the Court having entered an order on April 20, 2007 (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures with respect to the sale of the Servicing Business and notice thereof; and pursuant to the Bidding Procedures, the Debtors' having received what they determined, after consultation with the official committee of unsecured creditors (the "Committee") and after certain clarifying changes to such bids, to be three Qualified Topping Bids for the Servicing Business, from Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley"), Ellington Management Group, L.L.C. ("Ellington"), and Credit-Based Asset Servicing and Securitization LLC and Barclays Bank PLC ("C-BASS/Barclays" and, collectively, with Morgan Stanley and Ellington, the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Carrington Agreement (as defined herein).

"Other Bidders") respectively, each of which constituted a higher and better bid for the Servicing Business than that represented by the Original APA; and New Century, on behalf of the Debtors and after consultation with its professionals and the Committee and its professionals, having determined that the bid of Morgan Stanley was the highest and best Qualified Topping Bid and having advised the Qualified Bidders of that determination on May 14, 2007 pursuant to the Bidding Procedures; and New Century, on behalf of the Debtors, having then conducted the Auction on May 16, 2007 as required pursuant to the Bidding Procedures; and Ellington and C-BASS/Barclays each having withdrawn its or their respective bids during the course of the Auction, with Morgan Stanley and Carrington having remained in the Auction through multiple rounds of bidding; and the Debtors (after consultation with the Committee) having agreed during such rounds of bidding at the Auction, in order to induce further bidding from Morgan Stanley, to exercise their discretion, pursuant to Paragraph 24 of the Bidding Procedures, not to require Morgan Stanley to close as the Runner-Up Bidder in the event that the Carrington Agreement does not close; and Carrington subsequently having prevailed at the Auction as ultimately having the highest and otherwise best bid for the Servicing Business, determined by the Debtors, after consultation with their investment banking firm, Lazard Freres & Co. and the Committee, including total cash consideration to the Debtors' estates of approximately $184 million, plus a $4 million credit for its Breakup Fee and Expense Reimbursement, based on the APA as amended and restated pursuant to the Second Amended and Restated Asset Purchase Agreement, dated as of May 21, 2007 (as so amended and restated together with the exhibits and schedules thereto and incorporated by reference therein, the "Carrington Agreement"), a copy of which is attached hereto, exclusive of exhibits and certain schedules, as Exhibit A, which Carrington Agreement, with all exhibits and schedules, is incorporated by reference herein; and a hearing

3

having been held on May 21, 2007 (the "Hearing") to consider approval of the sale of the

Servicing Business to Carrington pursuant to the terms and conditions of the Carrington

Agreement; and it appearing that notice of the Motion was good and sufficient under the

circumstances and that no other or further notice need be given; and the Court having reviewed

the Motion and all objections thereto, and having heard the statements in support of the relief

requested therein at the Hearing; and it appearing that entry of this Order is in the best interests

of the Debtors, their estates, and all parties in interest; and upon the Motion and the record of the

Hearing and all other proceedings had before the Court, at which, among other things, the

withdrawal or resolution of all objections to the Motion, as approved by this Order, was

confirmed; and after due deliberation and good cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Time is of the essence in consummating the transactions contemplated by

the Carrington Agreement and a sale of the Servicing Business within the time constraints set

forth in the Motion is in the best interests of the Debtors and their estates. The terms of the

Carrington Agreement are the best terms that have been offered for sale of the Servicing

Business. (Each subsequent reference in this Sale Order to "Servicing Business" or "Servicing

Business Assets" in relation to Carrington and/or the Carrington Agreement shall be deemed to

be a reference to the Purchased Assets).

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

C.     Upon the closing of the Carrington Agreement, the assets to be sold and the interests to be assigned will have been acquired by Carrington in good faith and as the result of arm's-length negotiations.

D.     The sale of the Servicing Business is necessary to the consummation of any chapter 11 plan of reorganization or liquidation that may be proposed by the Debtors and confirmed by the Court.

E.     Reasonable notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion as it pertains to the sale of the Servicing Business has been afforded to all interested persons and entities, including, but not limited to: (i) the United States Trustee for the District of Delaware, (ii) the attorneys for the Debtors, (iii) the attorneys for the Committee, (iv) the attorneys for Carrington, (v) any party, who, in the past three months, expressed in writing to New Century an interest in acquiring the Servicing Business, and who New Century and its representatives reasonably and in good faith determined potentially to have the financial wherewithal to effectuate the transaction contemplated in the Original APA, (vi) all parties who are known to possess or assert a Lien against, or control over, any assets of the Servicing Business, (vii) the Internal Revenue Service, (viii) all applicable state attorneys general, local realty enforcement agencies, and local regulatory authorities, (ix) all applicable state and local taxing authorities, and (x) all other parties who have timely filed requests for notice under Bankruptcy Rule 2002.

F.     Notice, as specified in the preceding paragraph and as evidenced by the affidavits of service and affidavits of publication filed with the Bankruptcy Court, has been in the form and manner specified in the Motion and required by the Bidding Procedures Order, and such notice is reasonable and adequate.

5

G.      No consents or approvals are required for the Debtors to consummate the sale of the Servicing Business other than the consent and approval of this Court and those set forth in the Carrington Agreement. Neither the execution of the Carrington Agreement nor the consummation of the sale of the Servicing Business in accordance with its terms will constitute a violation of any provision of the organizational documents of any Debtor or any other instrument, law, regulation or ordinance by which any Debtor is bound.

H.      The Bidding Procedures have been complied with in all material respects by New Century, on behalf of the Sellers, and Carrington.

I.      Upon entry of this Order (the "Sale Order"), the Debtors shall have full power and authority to consummate the sale contemplated by the Carrington Agreement. The Carrington Agreement and the sale have been duly and validly authorized by all necessary action of the Debtors and no shareholder vote, board resolution or other corporate action is required of the Debtors for the Debtors to consummate such sale or the other transactions contemplated in the Carrington Agreement.

J.      This Sale Order and the consummation of the contemplated transactions are supported by good business reasons, and will serve the best interests of the Debtors, their estates and creditors by maximizing the values to be obtained from the Servicing Business.

K.      The Carrington Agreement was negotiated, proposed and entered into by Carrington without collusion, in good faith and from an arm's-length bargaining position. The relations, if any, of affiliates of Carrington and the Debtors and the Debtors' former or current officers and directors have been fully disclosed, and do not affect the findings of good faith and no collusion contained in this Sale Order. The Debtors and Carrington have not engaged in any

6

conduct that would cause or permit the Carrington Agreement to be avoided under section 363(n) of the Bankruptcy Code.

   L. Carrington is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) Carrington recognized that the Debtors were free to deal with any other party interested in acquiring the Debtors' Servicing Business; (b) Carrington agreed to provisions in the Carrington Agreement that would enable the Debtors to accept a higher and better offer for the Servicing Business, that in fact produced three other Qualified Bids for the Servicing Business, and that provided for the Auction ultimately resulting in a substantially higher and better bid for the Servicing Business than that represented by the Original APA; (c) other than with respect to conditions contained in the agreement requiring the commencement of this case, Carrington in no way induced or caused the chapter 11 filing of the Debtors; (d) Carrington made the highest and best bid for the Servicing Business at the Auction conducted pursuant to the provisions of the Bidding Procedures; (e) all payments to be made by Carrington and other agreements or arrangements entered into by Carrington in connection with the transactions have been disclosed; and (f) the negotiation and execution of the Carrington Agreement and any other agreements or instruments related thereto was in good faith and an arm's-length transaction between Carrington and the Debtors and/or the Committee.

   M. The consideration to be provided by Carrington pursuant to the Carrington Agreement: (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Servicing Business; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the Uniform Fraudulent Conveyance Act (7A part II, U.L.A. 2 (1999)) or

7

the Uniform Fraudulent Transfer Act (7A part II, U.L.A. 66 (1999)) or any similar laws of any state or other jurisdiction whose law is applicable to the contemplated transactions.

N. The approval of the Carrington Agreement and the contemplated transactions is fair and reasonable.

O. The Carrington Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

P. The consummation of the sale pursuant to the Carrington Agreement will be a legal, valid, and effective sale of the Purchased Assets to Carrington, and, in the case of the assets of the Debtors, vests or will vest Carrington with all right, title, and interest in and to those Purchased Assets free and clear of Liens in accordance with section 363(f) of the Bankruptcy Code because one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All parties with Liens against the Purchased Assets of the Debtors, if any, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code, and all parties with Liens against the Purchased Assets of the Debtors who objected to the Motion, but who did not withdraw any such objection can be compelled to accept a monetary satisfaction of their Liens within the meaning of section 363(f)(5) of the Bankruptcy Code, and, in each case, are enjoined from taking any action against Carrington, Carrington's affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against New Century, any of the other Debtors, or any of their respective affiliates (except that the payment in full of all Obligations (as such term is defined in the Servicer Advance Facility) owed under the Servicer Advance Facility at closing is a condition of the Carrington

8

Agreement and New Century is hereby authorized to make such payment, subject to the verification of such amount by the Debtors and the Committee). Failure to sell the Purchased Assets of the Debtors free and clear of Liens and the Retained Liabilities would be substantially less benefit to, and would adversely affect, the Debtors' estates.

Q.    By virtue of the Carrington Agreement or otherwise, Carrington will not acquire any liabilities of the Debtors, other than the Assumed Liabilities and the Carrying Costs and Cure Amounts relating to each Assigned Contract (collectively, hereinafter referred to as the "Carrington Assumed Liabilities").

R.    Without limiting the generality of the foregoing, other than any Carrington Assumed Liabilities, Carrington would not have entered into the Carrington Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the sale of the Purchased Assets to Carrington and the assignment of the Assumed Contracts to Carrington were not, except the Carrington Assumed Liabilities, free and clear of all claims, liens, or interests of any kind or nature whatsoever, or if Carrington would or in the future could, be liable for any of claims, liens, or interests including, but not limited to (1) any employment or labor agreements; (2) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of any Debtor; (3) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation claims that might otherwise arise under or pursuant to (A) the Employee Retirement, Income, Security Act of 1974, as amended, (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Worker Adjustment and Retraining Act of 1988,

9

(G) the Age Discrimination and Employee Act of 1967, or (H) the Consolidated Omnibus Budget Reconciliation Act of 1985; (4) any products liability or similar claims, whether pursuant to any state or federal laws or otherwise, including without limitation, asbestos claims; (5) environmental claims or liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* or similar state statute (except solely to the extent of any liability to any governmental entity under police, regulatory, or other statutory requirements to which any entity would be subject as the owner or operator of property constituting part of the Purchased Assets after the Closing unless and to the extent previously compromised), (6) any bulk sales or similar law and (7) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended.

S.      The Carrington Agreement is a valid and binding commitment by Carrington to purchase the Purchased Assets, and is enforceable according to its terms.

T.      Subject to Paragraph 7, to the extent an Assigned Contract becomes an Accepted Contract pursuant to section 2.7 of the Carrington Agreement, such Accepted Contracts shall automatically be deemed, if and when the Cure Amount is paid by Carrington to the counterparty to such Accepted Contract, to have been assumed and assigned by the respective Debtor to Carrington as of the date of such payment (or, if the Cure Amount is zero, as of the date of the Contract Notification Deadline or such earlier date as Carrington provides written notice of such assumption and assignment to the Debtors and to the counterparty to such Accepted Contract) without further order of this Court. The Cure Amounts are deemed the

10

amounts necessary to "cure" (within the meaning of section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assumed Contracts.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is granted and approved in all respects (other than with respect to matters already addressed by the Bidding Procedures Order or as modified by the terms of this Order).

2.     Pursuant to sections 363 and 365 of the Bankruptcy Code, the sale, conveyance and assignment of the Purchased Assets of and by the Debtors, including the assumption and assignment of the Assumed Contracts of the Debtors, pursuant to the Carrington Agreement (the "Sale"), is approved, and each Debtor is authorized and directed to execute any and all documents, instruments and papers and to take all actions necessary and appropriate to effectuate, implement and consummate the transactions contemplated by the Carrington Agreement in consideration of the purchase price specified therein, including assigning and transferring to Carrington or its designees all of the Debtors' right, title and interest (including common law rights) in and to all of the Debtors' tangible and intangible property included among the Purchased Assets except as otherwise explicitly provided by the Carrington Agreement. Following consummation of the Sale, Purchaser shall be authorized, to the extent permitted by applicable non-bankruptcy law, including without limitation, to the extent permitted by the state statutes listed on Exhibit B attached hereto, to service the mortgage loans that are the subject of the Servicing Agreements as the agent and thus, person acting as fiduciary or representative or in a similar capacity of or for the nondebtor parties to such Servicing

11

Agreements, with the specific duties and obligations of Purchaser to be as set forth in such agreements. Without limiting the foregoing, each of the Debtors is authorized and directed to close and consummate the Carrington Agreement and all other agreements and documents related to and contemplated thereby (collectively, the "Disposition Documents"), which Disposition Documents, to the extent they have been consented to by the Committee (such consent not to be unreasonably withheld), hereby are authorized and approved in all respects.

3.    The transfer(s) of the Purchased Assets of and by the Debtors to Carrington or one or more of its designees are legal, valid and effective transfers and shall vest Carrington or its designees with all right, title and interest of the Debtors in and to the Purchased Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for the Carrington Assumed Liabilities and except as set forth in Paragraph 37, of any and all liens, security interests, pledges, hypothecations, encumbrances or other interests or claims (including but not limited to any and all "claims" as defined in section 101(5) of the Bankruptcy Code, including any and all warranty claims and any and all of the other Retained Liabilities, including those described in Paragraph R of this Sale Order) and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether arising before, on or after the date on which this chapter 11 case was commenced, whether known or unknown, including Liens of any of the creditors, vendors, suppliers, employees, or lessors of any of the Debtors or any other third party. Any and all such Liens (including, without limitation, any adequate protection liens, claims, or rights in connection therewith) shall attach to the proceeds of the Sale, with the same priority, validity, force and effect as they now have against the Purchased Assets (except that the payment in full of all Obligations (as such term is defined in the Servicer Advance Facility) under the Servicer

12

Advance Facility at Closing is a condition of the Carrington Agreement and New Century is hereby authorized to make such payment (subject to the Debtors' and Committee's verification of the amount of such payment); provided, however, that nothing herein shall determine, or be deemed to be an admission by any party as to, the amount, extent, validity, enforceability, perfection or priority of any claim or lien asserted by Citigroup Global Markets Realty Corp. ("Citigroup") with respect to the Servicer Advance Facility, and all rights of all parties with respect to such issues are reserved. The Debtors further shall reserve from the proceeds of the sale (i) the outstanding balance as of the Petition Date due to General Electric Capital Corporation ("GECC") under the Master Security Agreement and related promissory notes relating to the Purchased Assets, which balance as of the petition date totaled $7,558,887.80 and (ii) $559,611.88 with respect to amounts that may be due to National City Commercial Capital Company LLC ("National City") in respect of its asserted secured claim relating to the Purchased Assets (collectively, the "Secured Claim Reserve"). The aforementioned asserted secured claims (and the amounts reserved therefor) are separate and distinct from the lease cure amounts, if any, owing to GECC or National City. Consistent with the foregoing, the Liens of GECC and National City against the Purchased Assets (including, without limitation, any adequate protection liens, claims, or rights in connection therewith) shall also attach to the Secured Claim Reserve with the same priority, validity, force and effect as they now have against the Purchased Assets. Such Secured Claim Reserve shall otherwise remain free and clear of all other Liens, and shall not be the subject of any distributions, pending agreement of the Debtors, the Committee and GECC or National City, as may be applicable, or further order of the Court. GECC and National City reserve their respective rights to assert claims against the Secured Claim Reserve up to the full amount of such reserve allocable to their respective claims

13

(i.e., $7,558,887.80 as to GECC and $559,611.88 as to National City), and neither the entry of this Sale Order, nor anything contained herein shall preclude GECC or National City from asserting and pursuing claims against the Secured Claim Reserve up to the full amount of such reserve allocable to their respective claims (i.e., $7,558,887.80 as to GECC and $559,611.88 as to National City). The Debtors and the Committee reserve all rights (i) to object to or dispute the claims and liens of GECC and National City and their entitlement to any portion of the Secured Claim Reserve or (ii) to seek to reduce the amount of the Secured Claim Reserve either by agreement of the parties or further order of the Court, provided that GECC and National City each shall have the right to contest any such reduction to the extent not based upon an agreement of the parties.

4.     The Sale pursuant to this Sale Order and the Disposition Documents shall be binding upon the Debtors, Carrington, all creditors, members, and owners of the Debtors, all persons having or asserting a claim or Lien against, or an interest in, the Debtors or the Purchased Assets of the Debtors, and all parties to any actions or proceedings that directly or indirectly contest the power or authority of the Debtors to sell, assign and convey the Purchased Assets or that seek to enjoin any such sale, assignment or conveyance.

5.     Any party having the right to consent to the assumption or assignment of the Assumed Contracts and the Accepted Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code; *provided* that with the exception of the Servicing Agreements (to the extent any is or would be deemed an Assumed Contract), the assumption and assignment of each Assumed Contract is subject to and conditioned upon such Assumed Contract becoming an Accepted Contract on or before the Contract Notification Deadline

14

pursuant to section 2.7(b) of the Carrington Agreement, including, without limitation, the payment by Carrington of the Cure Amount due with respect to such Accepted Contract to the counterparty to such Accepted Contract (which Cure Amount, if any, shall be the amount set forth by the Debtors in the Cure Notice or other notification of proposed cure amounts to such counterparty with respect to such counterparty).

6.    With respect to all Assumed Contracts (other than Servicing Agreements to the extent any are or would be deemed an Assumed Contract) for which the counter-party to such Assumed Contract was served with and filed an objection to the proposed cure amount scheduled by the Debtors in their Notice of New Century's Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection With the Proposed Sale of Its Servicing Business and the Fixing of Cure Costs Associated Therewith (the "Cure Notice"), the assumption and assignment of such Assumed Contract shall be subject to and conditioned upon such Assumed Contract becoming an Accepted Contract on or before the Contract Notification Deadline for such contract pursuant to section 2.7 of the Carrington Agreement, including, without limitation, the payment by Carrington of the Cure Amount due (if the Cure Amount is greater than $0) with respect to such Assumed Contract to the counterparty to such Accepted Contract.

7.    With respect to all Assumed Contracts (other than Servicing Agreements to the extent any are or would be deemed an Assumed Contract) for which the counter-party to such Assumed Contract was served with the Cure Notice and timely filed (a) an objection to the proposed assumption and assignment of such Assumed Contract on grounds relating to the proposed cure amount scheduled by the Debtors in the notice or (b) an objection to the effect that the pertinent executory contract or unexpired lease cannot be assigned to Carrington by virtue of

15

section 365(c)(1) or section 365(c)(2) of the Bankruptcy Code because applicable law excuses the nondebtor party from accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession and the nondebtor party in fact has not consented to the proposed assignment to Carrington (each, a "Remaining Objection"), the hearing on the assumption and assignment of such Assumed Contract (which shall include any Assumed Contract and any other agreement, contract or license to which Oracle USA, Inc. ("Oracle") or Union Bank of California ("UBOC") is a party) and the Remaining Objection is hereby adjourned to June 27, 2007 at 10:00 a.m. For the avoidance of doubt, all rights and objections of Oracle and UBOC concerning the Assumed Contracts, including, without limitation, the assumability thereof and the amount of claims owing in connection therewith, are reserved for resolution at such hearing, to the extent they are not resolved by agreement of the Debtors, the Committee, Carrington and Oracle or UBOC, as applicable, or further order of the Court prior to such hearing. AT&T Inc. and its affiliates ("AT&T") reserve all of their rights to challenge whether service of the Motion or Cure Notice on AT&T was proper and with respect to any effects resulting from such improper service, if such challenge is sustained by this Court.

8.      With respect to the objection filed by Wells Fargo Bank, N.A. ("Wells Fargo") to the Cure Amount relating to the Servicing Agreements under which Well Fargo serves as trustee, in consideration for Wells Fargo withdrawing its objection to such Cure Amount, the Debtors shall hold in reserve from the Purchase Price the sum of $150,000, which represents the maximum potential liability the Debtors may have (i) for the Cure Amount and (ii) to pay Wells Fargo's reasonable out-of-pocket costs and expenses incurred during the period through the end of the term of the Transition Services Agreement in connection with the assumption and assignment of the Servicing Agreements to which it is a party (the "Wells Fargo

16

Reserve"). Wells Fargo shall be entitled to seek reimbursement for its reasonable out-of-pocket costs and expenses as trustee in connection with the assumption and assignment of the Servicing Agreements to which it is a party from the Wells Fargo Reserve, and the Debtors and the Committee reserve the right to object to such reimbursement claim. Nothing shall be paid out of the Wells Fargo Reserve absent (a) the agreement of Wells Fargo, the Debtors, and the Committee, or (b) entry of a order of this Court. With respect to the objection filed by Deutsche Bank National Trust Company ("DBNTC") as to the cure amounts, if any, owing to it in its capacity as indenture trustee, the Debtor shall hold a reserve in an amount either agreed by the parties or determined Court order, which amount shall be deemed to be the maximum Cure Amount with respect to DBNTC's objection.

        9.     Adequate assurance of future performance has been demonstrated by or on behalf of Carrington with respect to Servicing Agreements that are Assumed Contracts. Consequently, the Purchaser shall be entitled to have the Debtors assume such Servicing Agreements, pursuant to Section 365 of the Bankruptcy Code, on the Closing and have such Servicing Agreements assigned to Carrington on such Closing, provided that the conditions set forth in Section 5.02 or Section 6.02 (as applicable) of the respective Servicing Agreement relating to merger or consolidation of the servicer party thereto shall have been satisfied on or before the Closing. The Wells Fargo Reserve and the maximum Cure Amount with respect to DBNTC (either as designated by agreement of the parties or by order of the Court) related to the Servicing Agreements shall be the sole responsibility of the Debtors and shall be reserved by the Debtors out of the Purchase Price. The assumption by Debtors and assignment to Carrington of any Ancillary Servicing-Related Agreements shall be effective without further order of the Court upon the agreement of the parties thereto. Absent such agreement, the procedure for the

17

assumption and assignment shall be in accordance with section 2.7(e) of the Carrington Agreement. Without limiting the generality of the foregoing, Carrington shall have no liability to pay any cure amounts, and shall have no other monetary obligations, relating to such Servicing Agreements (or any Ancillary Servicing-Related Agreements) arising during the period prior to the Closing Date.

10.    Carrington has agreed to provide to each of Wells Fargo and DBNTC, in their respective capacity as trustee or indenture trustee, monthly written reports regarding the status of Carrington's state licensing progress, with the first such report to be delivered within one calendar month of the Closing and such obligation to terminate upon the earlier of (i) the end of the term of the Transition Services Agreement and (ii) Carrington's having obtained all then necessary state licenses. Such monthly reports shall include a certification by Carrington to the effect that the information provided in such report is accurate and that Carrington continues to proceed in good faith to obtain any remaining necessary state licenses.

11.    Adequate assurance of future performance has been demonstrated by or on behalf of Carrington with respect to the Assigned Contracts, and the Purchaser shall be entitled to have the Debtors assume such Assigned Contracts, pursuant to section 365 of the Bankruptcy Code, and to have such Assigned Contracts assigned to Carrington upon satisfaction of the conditions for such Assigned Contract to become an Accepted Contract on or before the Contract Notification Deadline pursuant to section 2.7 of the Carrington Agreement.

12.    There shall be no rent accelerations, assignment fees, increases or any other fees charged to Carrington or its affiliates or designees as a result of the assumption or assignment by the Debtors to Carrington or its designees of the Assumed Contracts, and the validity of such assumption or assignment shall not be affected by any dispute between any of

18

the Debtors or any of their respective affiliates and any counterparty to any Assumed Contract

and the Assumed Contracts, upon assignment to Carrington or its designees, shall be deemed

valid and binding and in full force and effect in accordance with their terms.

13.    Without limiting the generality of the provisions of the Carrington

Agreement or the other provisions of this Sale Order, Carrington shall not be deemed to have

assumed any liability under, or otherwise be deemed liable in any manner whatsoever with

respect to any, contract or lease of any Debtor that is not explicitly designated as an Assumed

Contract, absent Carrington's written agreement as to the subsequent inclusion of any

specifically identified contract or lease as an Assumed Contract and the satisfaction of the

requirements of section 365 of the Bankruptcy Code with respect to any such contract or lease.

Specifically, other than as set forth in section 3.1(d) of the Carrington Agreement and solely to

the extent that the PTO liability thereunder could be deemed to constitute part of a Benefit Plan,

Carrington shall assume no liability whatsoever under or otherwise with respect to any

Collective Bargaining Agreements or Benefit Plans, the rejection of which being an express

condition precedent to Carrington's obligations to perform under the Carrington Agreement.

14.    Nothing contained herein shall be construed to limit Carrington's

obligation to perform the obligations of the servicer under the Servicing Agreements from and

after the Closing Date based on the status of the Mortgage Loans at that time, although such

performance obligation shall not deemed to cause Carrington to assume any liability for any act

or omission of the Debtors (whether as originator, servicer or otherwise), the trustees or

indenture trustees or any other person arising on or before the Closing Date with respect to such

Servicing Agreements; provided, however, and for the avoidance of doubt, nothing contained in

19

this sentence is intended to relieve Carrington from its indemnification obligations under the Servicer Indemnity arising after the Closing Date.

15.    The contemplated transactions have been undertaken by Carrington and the Sellers at arm's-length, without collusion, and Carrington will acquire the Purchased Assets pursuant to the Carrington Agreement and the Disposition Documents, in good faith, within the meaning of section 363(m) of the Bankruptcy Code and is, and shall be, entitled to all of the protections in accordance therewith.

16.    The consideration provided by Carrington for the Purchased Assets under the Carrington Agreement is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

17.    To the extent any payment is required of any outstanding Obligations owed under the Debtor-in-Possession Loan and Security Agreement dated as of April 13, 2007 (the "DIP Financing Agreement") by and among Debtor New Century Financial Corporation, Certain of its Affiliates, and the Lenders Party thereto (the "DIP Lenders"), the Debtors are hereby directed to comply with section 2.06(d) thereof. Without limiting the generality of the foregoing, the Debtors shall use commercially reasonable efforts to calculate the Net Cash Proceeds (as defined in the DIP Financing Agreement) resulting from the sale to Carrington, whenever received, and shall promptly pay any such Net Cash Proceeds to the Administrative Agent under the DIP Financing Agreement as and in the manner required by section 2.06(d) of the DIP Financing Agreement to the extent any payment is required of any outstanding Obligations owed under the DIP Financing Agreement.

18.    Notwithstanding anything to the contrary in this Sale Order or the Carrington Agreement, the proceeds of the Sale will be used, in part, to pay off all Obligations

20

(as defined in the Servicer Advance Facility) due and owing under the Servicer Advance Facility as set forth on Schedule 8.3(l) to the APA; provided, however, that nothing herein shall determine, or be deemed to be an admission by any party as to, the amount, extent, validity, enforceability, perfection or priority of any claim or lien asserted by Citigroup with respect to the Servicer Advance Facility, and all rights of all parties with respect to such issues are reserved. For the purpose of clarity, the payment of all Obligations (as defined in the Servicer Advance Facility) to Citigroup shall be deemed to have been made from the sale proceeds attributable to the First Lien Advances Amount, but in any event, all Obligations (as defined in the Servicer Advance Facility) to Citigroup shall be paid at Closing.

19.    After the payment or reservation of the Cure Amounts, if any, by (i) Carrington, with respect to the Assigned Contracts and (ii) the Debtors, with respect to the Servicing Agreements and any Ancillary Servicing-Related Agreements, the Debtors are not and will not be in default in any of their obligations under the Assumed Contracts with the possible exception of defaults identified in section 365(b)(2) of the Bankruptcy Code, which defaults, if any, are null and void and without effect.

20.    The maximum potential liability the Debtors may have for cure costs as of May 14, 2007 (the "Maximum Cure Amounts") with respect to each Assigned Contract is either the amount as set forth on the Cure Notice or, with respect those counter-parties that filed objections to or otherwise served on the Debtors a statement asserting a cure amount different from that listed in the Cure Notice prior to the Sale Hearing, the amount set forth on Exhibit C (provided that such Maximum Cure Amounts are with respect to certain counterparties as specified on Exhibit C only for the period through such earlier date as specifically identified therein). Carrington has agreed to pay the cure costs related to the Assigned Contracts in

21

accordance with and pursuant to section 2.7 of the Carrington Agreement, to the extent Carrington elects to have such contract assumed and assigned to it. In accordance with the terms of section 2.7 of the Carrington Agreement, and on the Contract Determination Date, Carrington shall pay the Maximum Cure Amount to each counter-party to an Accepted Contract (or such lesser amounts as agreed to by the parties or ordered by the Court) (collectively, the "Final Cure Amounts"). To the extent that any Cure Amount accrues on any Assigned Contract after May 14, 2007 (or, if applicable, after the date through which its respective Maximum Cure Amount has accrued as identified on Exhibit C) but before the Closing Date, such Cure Amount, to the extent allowed, will be paid (i) if such Assigned Contract becomes an Accepted Contract, by Carrington or (ii) if such Assumed Contract does not become an Accepted Contract, by the Debtors as an allowed administrative claim, to the extent it satisfies conditions for administrative priority in accordance with section 503(b)(1) of the Bankruptcy Code. The Debtors shall have no liability or obligation to pay cure amounts to any other party or have any other monetary obligation to non-debtor parties to Accepted Contracts arising for the period before the Closing Date, and except for Carrington's obligation to pay the Final Cure Amounts, Carrington shall have no liability or obligation to pay cure amounts to any other party or have any other monetary obligation to non-debtor parties to Assumed Contracts arising for the period before the Closing Date.

21.     Any non-debtor party to an Assumed Contract is hereby barred, enjoined and prohibited from asserting any Claim or Debt against the Debtors or their property or estates other than the Maximum Cure Amount or from offsetting, seeking to offset, recoup, deduct or set-off any Claims such party may have against the Debtors from any amounts that may be or may become due in the future to Carrington under such Assumed Contract.

22

22.     The failure of the Debtors or Carrington to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Carrington's rights to enforce every term and condition of the Assumed Contracts.

23.     Compliance with the so-called "bulk-sale" laws in all applicable jurisdictions are waived or such laws are inapplicable as to the contemplated transactions and the transactions contemplated in the Carrington Agreement are hereby deemed to be under or in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code.

24.     The provisions of this Sale Order are nonseverable and mutually dependent.

25.     This Sale Order and all provisions of the Disposition Documents shall be binding upon any successors and assigns of the Debtors, including without limitation, any trustee appointed for any of the Debtors in its chapter 11 case or in any superseding proceeding under chapter 7 of the Bankruptcy Code.

26.     Nothing contained in any chapter 11 plan confirmed in the chapter 11 case of any Debtor or any order of this Court confirming such plan or any other order entered in these chapter 11 cases shall conflict with or derogate from the provisions of the Carrington Agreement, to the extent modified by this Sale Order, or the terms of this Sale Order.

27.     The Carrington Agreement, the Disposition Documents, or other instruments relating thereto may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that (i) the Committee shall have consented in writing thereto (such

23

consent not to be unreasonably withheld), and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors or their estates.

28.    From and after the date hereof, each Debtor shall act in accordance with the terms of the Carrington Agreement, and each Debtor, to the extent it already has not done so, shall execute the Carrington Agreement (or any related agreement or instrument) at or prior to Closing.

29.    The failure specifically to include any particular provisions of the Carrington Agreement or the Disposition Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Carrington Agreement and the Disposition Documents be authorized and approved in their entirety.

30.    To the extent of any inconsistency between the provisions of this Sale Order and the Carrington Agreement, the Disposition Documents or any documents executed in connection therewith, the provisions contained in this Sale Order shall govern.

31.    Other than the Remaining Objections, all objections to the entry of this Sale Order, to the extent not waived or resolved, are overruled.

32.    Without limiting in any manner the effect of the other provisions of this Order (including, without limitation, the effect of the provisions of Paragraph 3 of this Order), any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing or otherwise asserting a Lien in, to, or against the Purchased Assets shall be, and hereby is, directed to deliver to the Debtors prior to Closing, in proper form for filing after Closing and executed by the appropriate parties, termination statements, instruments of satisfaction, mortgage or deed of trust releases, or similar instruments as appropriate to cause the release of any such Lien as of record, and, in the event that any such

24

person or entity fails to comply with the direction set forth in this Paragraph, then, at the option of Carrington, Carrington either may seek to have such person or entity held in contempt of this Court or shall be hereby authorized without the requirement of any further action (including any further Order of this Court) either to execute and file or record such statements, instruments, releases, and other documents on behalf of such person or entity releasing such asserted Lien in, to, or against the Purchased Assets or to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the termination or release of any such Lien in, to, or against the Purchased Assets.

33.    Consistent with, but not in limitation of, the foregoing, each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated with Carrington Agreement and the Disposition Agreements.

34.    So long as otherwise permitted by applicable nonbankruptcy law, to the extent Carrington needs to operate under or use the benefits of any Assumed Contract before it becomes an Accepted Contract (or as provided in section 2.5 of the Carrington Agreement), the Debtors hereby grant Carrington full authority, up to the Contract Notification Deadline and at Carrington's sole cost and expense, to use or operate under such Assumed Contract necessary for operating the Servicing Business; provided, however, that the granting of such license shall not be deemed to constitute an de facto assignment or assumption of such Assumed Contract until such time as such Assumed Contract becomes an Accepted Contract. Notwithstanding the foregoing, and specifically with respect to Oracle, Carrington shall undertake to work with Oracle (and the Debtors shall be ordered and directed to reasonably cooperate with such efforts), in advance of the Closing Date, to identify the pertinent Oracle leases and contracts, to then

25

determine whether Carrington seeks to treat such leases and contracts as Assigned Contracts and/or to use the underlying intellectual property pending determination of such assumption and assignment, and to attempt to reach a consensual resolution of such matters with Oracle. In the event Carrington intends to use the underlying intellectual property after the Closing Date in the absence of any such consensual resolution, Carrington shall notify Oracle in writing of such intent at least three (3) Business Days prior to the Closing Date and Oracle shall be entitled to an emergency hearing on any objection without the necessity of filing of any motion or further objection on no less than 24 hours' notice to Carrington, with such hearing to be conducted, if necessary, by teleconference. In the event that the Court's calendar will not permit such hearing to occur and be resolved prior to Closing, and if agreement to extend the Closing Date cannot be reached with the Debtors and the Committee to permit the hearing to be conducted prior to the Closing, Carrington will not use the subject intellectual property after Closing without the written consent of Oracle pending the resolution of such hearing.

35.     All persons or entities who or that are in possession of some or all of the Purchased Assets of the Debtors on the Closing are hereby directed to surrender possession of those Purchased Assets to Carrington at the Closing.

36.     Without limiting the generality of the other provisions of this Sale Order, and except solely to the extent provided by other U.S. federal law, Carrington under no circumstances shall be deemed to be a successor of the Debtors (and Carrington expressly has disclaimed in the Carrington Agreement any such liability with respect to the Debtors). Accordingly, Carrington shall have no successor or vicarious liabilities of any kind or character with respect to the Purchased Assets or otherwise with respect to the Servicing Business except

26

solely to the extent provided by superseding U.S. federal law, and all persons and entities shall be hereby enjoined from asserting any such claims against Carrington.

37.    Notwithstanding anything to the contrary in this Order or the Carrington Agreement, to the extent any of the Purchased Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), Carrington shall remain subject to the same claims and defenses that are related to such consumer credit transaction or such consumer credit contract to the same extent as Carrington would be subject to such claims and defenses of the consumer if such interest had not been purchased pursuant to section 363, as provided for in section 363(o) of the Bankruptcy Code.

38.    The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe and enforce the provisions of the Carrington Agreement, the Disposition Documents, and the Sale Order in all respects and, further, to hear and determine any and all disputes between any Debtor and/or Carrington, as the case may be, and any non-seller party to, among other things, any Assumed Contracts, concerning _inter alia,_ assignment thereof by the pertinent Debtor to Carrington or its designees under the Carrington Agreement, and any claims against any Debtor or any creditor or other third party arising under any agreements relating to Retained Liabilities and any dispute between Carrington and any Debtor as to their respective obligations with respect to any asset or liability of or claim against any Debtor or otherwise arising hereunder.

39.    The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or

27

obligations under the Carrington Agreement, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

40.    Nothing contained in this Sale Order, the Carrington Agreement or the Disposition Documents shall be deemed to release, discharge or prejudice claims, if any, Wells Fargo or DBNTC may have against (i) the original or pre-Closing non-Debtor parties to the pertinent securitization documents, (ii) Debtor entities other than the Debtors who are party to the Assumed Contracts, or (iii) Debtor entities who are party to the Assumed Contracts for claims that do not arise under such Assumed Contracts.

41.    Any claim under the Carrington Agreement against the Debtors not satisfied pursuant to section 11.6(c) of the Carrington Agreement shall constitute an allowed administrative claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be treated with such priority if the above-captioned bankruptcy cases convert to cases under chapter 7 of the Bankruptcy Code; provided, however, if any such claim is not known by Carrington as of the time of confirmation of any plan of reorganization for any Debtor, such claim shall not be discharged pursuant to the confirmation of any such plan of reorganization but instead shall continue as a liability of the reorganized entity, subject in all respects to the time limitations on any such claim set forth in the Carrington Agreement.

42.    This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6006(d), 7062 or otherwise.

Dated: **Mar 23**, 2007
       Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

28

**Exhibit A**

## Carrington Agreement

RLF1-3154880-1

EXECUTION COPY

# SECOND AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

### by and among

## CARRINGTON CAPITAL MANAGEMENT, LLC,

## CARRINGTON MORTGAGE SERVICES, LLC,

## NEW CENTURY FINANCIAL CORPORATION

### and

## NEW CENTURY MORTGAGE CORPORATION

### dated as of

### May 21, 2007

## TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND INTERPRETATION ........................................................ 2
    Section 1.1        Definitions.................................................................................... 2
    Section 1.2        Interpretation............................................................................... 20
ARTICLE II       PURCHASE AND SALE OF ASSETS ............................................... 21
    Section 2.1        Purchase and Sale of Assets........................................................ 21
    Section 2.2        Excluded Assets .......................................................................... 22
    Section 2.3        Post-Closing Asset Deliveries.................................................... 23
    Section 2.4        Conveyance of Assets by Affiliates of Sellers.......................... 23
    Section 2.5        Non-Assignable Permits and Contracts; Servicing Licenses.......... 23
    Section 2.6        Shared Contracts ........................................................................ 25
    Section 2.7        Assumption of Certain Liabilities ............................................. 26
    Section 2.8        Retained Liabilities .................................................................... 29
    Section 2.9        Closing ........................................................................................ 29
    Section 2.10       Ancillary Agreements ................................................................ 29
    Section 2.11       Deliveries by Purchaser ............................................................. 29
    Section 2.12       Deliveries by Sellers .................................................................. 30
    Section 2.13       Limited Representations ............................................................. 30
ARTICLE III      TRANSFERRED EMPLOYEES........................................................ 30
    Section 3.1        Transferred Employees ............................................................... 30
    Section 3.2        Employee Benefit Plans.............................................................. 31
    Section 3.3        COBRA......................................................................................... 31
    Section 3.4        WARN .......................................................................................... 32
    Section 3.5        Cooperation.................................................................................. 32
    Section 3.6        No Third Party Rights.................................................................. 32
ARTICLE IV       PURCHASE PRICE; ADJUSTMENT; ALLOCATION ................................ 32
    Section 4.1        Purchase Price.............................................................................. 32
    Section 4.2        Purchase Price Adjustments........................................................ 32
    Section 4.3        Post-Closing Adjustments........................................................... 34
    Section 4.4        Deposit Amount ........................................................................... 35
    Section 4.5        Allocation of the Purchase Price................................................. 35

5165824.3 06146040

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE SELLER | | 36 |
| Section 5.1 | Authorization; Validity of Agreement; Seller Action | | 36 |
| Section 5.2 | Capitalization | | 37 |
| Section 5.3 | Organization and Good Standing | | 37 |
| Section 5.4 | Consents and Approvals; No Violations | | 37 |
| Section 5.5 | [Reserved.] | | 37 |
| Section 5.6 | Absence of Certain Changes | | 37 |
| Section 5.7 | Confidentiality | | 38 |
| Section 5.8 | Title to Assets and Properties; Liens | | 38 |
| Section 5.9 | Sufficiency of Purchased Assets | | 38 |
| Section 5.10 | Real Property | | 38 |
| Section 5.11 | Leases | | 38 |
| Section 5.12 | Environmental Matters | | 38 |
| Section 5.13 | Description of Mortgage Servicing Portfolio; Servicing Agreements; Mortgage Loans | | 39 |
| Section 5.14 | Contracts and Commitments | | 40 |
| Section 5.15 | Litigation and Claim | | 42 |
| Section 5.16 | Compliance with Laws; Regulatory Approvals | | 42 |
| Section 5.17 | Permits | | 42 |
| Section 5.18 | Employee Benefit Plans | | 42 |
| Section 5.19 | Tax Matters | | 42 |
| Section 5.20 | Intellectual Property | | 43 |
| Section 5.21 | Brokers or Finders | | 45 |
| Section 5.22 | Affiliate Transactions | | 45 |
| Section 5.23 | Operation of the Business | | 45 |
| Section 5.24 | PTO Liability | | 46 |
| ARTICLE VI | COVENANTS | | 46 |
| Section 6.1 | Interim Operations of Seller | | 46 |
| Section 6.2 | Access | | 47 |
| Section 6.3 | Cooperation; Efforts and Actions to Cause Closing | | 48 |

## TABLE OF CONTENTS
### (continued)

Page

Section 6.4        Confidentiality .................................................................................. 49
Section 6.5        Subsequent Actions.......................................................................... 49
Section 6.6        Procedures for Transfer of Servicing................................................ 50
Section 6.7        Bankruptcy Actions .......................................................................... 51
Section 6.8        Maintenance of Insurance ................................................................ 52
Section 6.9        Schedules and Exhibits .................................................................... 52
Section 6.10       Orders............................................................................................... 52
Section 6.11       Servicing .......................................................................................... 52
ARTICLE VII     TAX MATTERS.................................................................................. 52
Section 7.1        Transfer Taxes ................................................................................. 52
Section 7.2        Liability for Taxes and Related Matters ............................................ 53
Section 7.3        Cooperation...................................................................................... 53
Section 7.4        Tax Benefits...................................................................................... 54
ARTICLE VIII    CONDITIONS ..................................................................................... 54
Section 8.1        Conditions to Obligations of Purchaser and Sellers ......................... 54
Section 8.2        Conditions to Obligations of Sellers.................................................. 55
Section 8.3        Conditions to Obligations of Purchaser ............................................ 55
ARTICLE IX      TERMINATION................................................................................... 57
Section 9.1        Termination....................................................................................... 57
Section 9.2        Break-Up Fee; Expense Reimbursement........................................... 59
Section 9.3        Procedure and Effect of Termination................................................ 59
ARTICLE X       BIDDING PROCEDURES .................................................................. 60
Section 10.1       Bidding Procedures........................................................................... 60
ARTICLE XI      INDEMNIFICATION........................................................................... 60
Section 11.1       Survival ............................................................................................ 60
Section 11.2       Sellers' Agreement to Indemnify...................................................... 60
Section 11.3       Limitations on Sellers' Agreements to Indemnify............................. 61
Section 11.4       Purchaser's Agreement to Indemnify ............................................... 61
Section 11.5       Limitations on Purchaser's Agreement to Indemnify......................... 62

51658243 06146040

# TABLE OF CONTENTS
## (continued)

Page

Section 11.6      Other Limitations on and Treatment of Certain Claims for Indemnification ............................................................................................ 63

Section 11.7      Claims ..................................................................................................... 63

Section 11.8      Third Party Indemnification.................................................................. 64

Section 11.9      Set Off Against Indemnification Holdback Amount ........................... 65

Section 11.10     Release of Indemnification Holdback Amount..................................... 65

Section 11.11     Purchase Price Adjustments.................................................................. 65

ARTICLE XII     REPRESENTATIONS AND WARRANTIES OF PURCHASER ............... 66

Section 12.1      Legal Power; Organization; Qualification of Purchaser..................... 66

Section 12.2      Binding Agreement............................................................................... 66

Section 12.3      No Conflict or Default ......................................................................... 66

Section 12.4      Brokers.................................................................................................. 66

ARTICLE XIII    MISCELLANEOUS ...................................................................................... 67

Section 13.1      Fees and Expenses ............................................................................... 67

Section 13.2      Amendment; Waiver............................................................................. 67

Section 13.3      Publicity ............................................................................................... 67

Section 13.4      Notices ................................................................................................. 67

Section 13.5      Counterparts.......................................................................................... 69

Section 13.6      Entire Agreement; No Third Party Beneficiaries.................................. 69

Section 13.7      Severability .......................................................................................... 69

Section 13.8      Governing Law ..................................................................................... 69

Section 13.9      Venue and Retention of Jurisdiction..................................................... 69

Section 13.10     Time of Essence.................................................................................... 70

Section 13.11     No Consequential Damages.................................................................. 70

Section 13.12     Assignment .......................................................................................... 70

Section 13.13     Fulfillment of Obligations.................................................................... 70

Section 13.14     Specific Performance ........................................................................... 70

Section 13.15     Waiver of Bulk Transfer Laws ............................................................. 70

Section 13.16     Personal Liability.................................................................................. 70

Section 13.17     No Right of Setoff................................................................................. 70

-iv-

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Knowledge of Sellers |
| Schedule 1.1(b) | Assigned Leases |
| Schedule 1.1(c) | Assumed Liabilities |
| Schedule 1.1(d) | Leased Real Property |
| Schedule 1.1(e) | Servicing Licenses |
| Schedule 1.1(f) | Filing Subsidiaries |
| Schedule 1.1(g) | Computer Equipment |
| Schedule 1.1(h) | Software Contracts |
| Schedule 1.1(i) | Servicing Agreements |
| Schedule 2.1(c) | Assumed Contracts |
| Schedule 2.1(m) | Permits |
| Schedule 2.6(a) | Separation Shared Contracts |
| Schedule 2.6(b) | Transferred Shared Contracts |
| Schedule 2.7(e) | Ancillary Servicing-Related Agreements |
| Schedule 2.7(g) | Servicing Agreement Indemnification Sections |
| Schedule 3.1 | Business Employees |
| Schedule 3.2 | Plans |
| Schedule 4.5(a) | Allocation Schedule |
| Schedule 5.6 | Absence of Certain Changes |
| Schedule 5.8 | Title to Assets and Properties; Liens |
| Schedule 5.9 | Sufficiency of Purchased Assets |
| Schedule 5.11 | Leases |
| Schedule 5.13(a) | Mortgage Loan Schedule |
| Schedule 5.13(b) | Servicing Agreements Exceptions |
| Schedule 5.13(d) | Advances |
| Schedule 5.14 | Contracts |
| Schedule 5.14(c) | Contracts Related to the Business |
| Schedule 5.15 | Litigation |
| Schedule 5.16 | Compliance with Laws; Regulatory Approvals |
| Schedule 5.17 | Permits |
| Schedule 5.20(a) | IT Assets |
| Schedule 5.20(b) | Transferred Intellectual Property |
| Schedule 5.22 | Affiliate Transactions |
| Schedule 5.23 | Operation of the Business |
| Schedule 6.1(e)(i) | Employment Matters |
| Schedule 6.1(e)(ii) | Conduct of Business |
| Schedule 6.7(d) | [Reserved.] |
| Schedule 8.3(i) | Other Consents |
| Schedule 8.3(l) | Amounts Owing Under Service Advance Facility |

## EXHIBITS

Exhibit A    Bidding Procedures Order
Exhibit B    Form of Assignment and Assumption Agreement
Exhibit C    Form of Assignment and Assumption of Lease Agreements
Exhibit D    Form of Escrow Agreement
Exhibit E    Form of Sale Approval Order
Exhibit F    Form of Copyright Assignment
Exhibit G    Form of Bill of Sale
Exhibit H    Deposit Escrow Agreement

## SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Second Amended and Restated Asset Purchase Agreement (this "Agreement"), dated as of May 21, 2007, is entered into by and among CARRINGTON CAPITAL MANAGEMENT, LLC, a Delaware limited liability company ("Carrington"), CARRINGTON MORTGAGE SERVICES, LLC, a Delaware limited liability company ("Purchaser"), NEW CENTURY FINANCIAL CORPORATION, a Maryland corporation, as a debtor and debtor-in-possession ("Parent"), and NEW CENTURY MORTGAGE CORPORATION, a California corporation, as a debtor and debtor-in-possession (the "Company" and together with Parent, the "Sellers").

WHEREAS, Sellers are engaged in the Business (as hereinafter defined).

WHEREAS, Sellers are also engaged in the business of originating Mortgage Loans (as hereinafter defined) and other businesses and, together with certain of its Affiliates, the business of reselling Mortgage Loans (the "Origination Business").

WHEREAS, on April 2, 2007 (the "Petition Date"), the Filing Subsidiaries (as hereinafter defined) filed voluntary petitions ("Petitions") for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction under the Bankruptcy Code, the "Bankruptcy Court").

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, all of the Purchased Assets (as hereinafter defined), and Purchaser is willing to assume all of the Assumed Liabilities (as hereinafter defined), relating to or used in connection with the Business (as hereinafter defined).

WHEREAS, Sellers, as debtors and debtors-in-possession, have continued in the possession of their respective assets and in the management of the Business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, on April 2, 2007, Carrington, Purchaser, Parent and the Company entered into that certain Asset Purchase Agreement (the "Original Agreement") and on April 19, 2007, Carrington, Purchaser, Parent and the Company agreed to amend and restate the Original Agreement and, accordingly, entered into that certain Amended and Restated Asset Purchase Agreement dated as of April 19, 2007 (the "First Amended and Restated Agreement").

WHEREAS, Section 13.2 of the First Amended and Restated Agreement provides that the First Amended and Restated Agreement may be amended, modified and supplemented, but only by a written instrument signed by all of the parties thereto.

WHEREAS, Carrington, Purchaser, Parent and the Company have agreed to amend and restate the First Amended and Restated Agreement as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions. As used in this Agreement, the following terms have the meanings set forth below:

"Accepted Contract" has the meaning specified in Section 2.7(b) hereof.

"Accepted Contracts" has the meaning specified in Section 2.7(b) hereof.

"Additional Contract" has the meaning specified in Section 2.7(d) hereof.

"Additional Contracts" has the meaning specified in Section 2.7(d) hereof.

"Advances" means, with respect to each Servicing Agreement, the aggregate outstanding amount that as of any date of determination has been advanced directly by Sellers from their own funds or funds borrowed by Sellers or its Affiliates from a third party (but not with funds borrowed from any custodial or other accounts under a Servicing Agreement) in connection with servicing the Mortgage Loans in accordance with the terms of such Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums and other advances made pursuant to the applicable Servicing Agreement.

"Advances Amount" means the First Lien Advances Amount and the Second Lien Advances Amount.

"Advances Amount Difference" has the meaning specified in Section 4.3(a) hereof.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings. For purposes of this Agreement, neither Carrington nor Purchaser shall be considered an Affiliate of either Seller.

"Affiliate Purchased Assets" has the meaning specified in Section 2.4 hereof.

"Affiliate Seller" has the meaning specified in Section 2.4 hereof.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the schedules and exhibits hereto.

"Allocation Schedule" has the meaning specified in Section 4.5(a) hereof.

"Alternative Bidder" has the meaning specified in the Bidding Procedures Order.

"Alternative Transaction" has the meaning specified in Section 9.2(a) hereof.

"Ancillary Agreements" has the meaning specified in Section 2.10 hereof.

"Ancillary Income" means any and all income, revenue, fees, expenses, charges or other moneys that Sellers are entitled to receive, collect or retain as servicer pursuant to the Servicing Agreements (other than servicing fees).

"Ancillary Servicing-Related Agreements" means the ancillary Contracts designated by Purchaser, in its sole discretion, as set forth on Schedule 2.7(e) that are related to, and were entered into by Sellers and various non-debtor counterparties in connection with, the Servicing Agreements.

"Applicable Requirements" means, with respect to each Seller all applicable requirements of Law relating to servicing, insuring or filing of claims in connection with Mortgage Loans, and all contractual obligations of Sellers.

"Arbitrating Accountants" has the meaning specified in Section 4.2(d) hereof.

"Assigned Contracts" means the Assumed Contracts (other than the Servicing Agreements).

"Assigned Leases" means those Leases used or leased by the Business owned by Persons (other than Sellers or any of their Affiliates) engaged primarily in the Business and listed on Schedule 1.1(b).

"Assignment and Assumption Agreement" means the assignment and assumption agreement to be executed by Sellers in favor of Purchaser in respect of the Assumed Liabilities, in substantially the form set forth in Exhibit B hereto.

"Assignment and Assumption of Lease Agreements" means the assignment and assumption of lease agreements to be executed by Sellers in favor of Purchaser in respect of the Real Property Leases, in substantially the form set forth in Exhibit C hereto.

"Assumed Contracts" has the meaning set forth in Section 2.1(c) hereof.

"Assumed Liabilities" means the obligations arising under (i) any Servicing Agreement, Assigned Lease or Assumed Contract after the assignment to Purchaser of the Liabilities of Sellers set forth on Schedule 1.1(c) and (ii) Section 3.1(d) with respect to the PTO for the Transferred Employees.

"Assumed Rights and Claims" has the meaning specified in Section 2.1(k) hereof.

"Auction" has the meaning specified in the Bidding Procedures Order.

"Audit Reports" has the meaning specified in Section 4.2(c) hereof.

"Balance Sheet" means the consolidated balance sheet of the Parent dated as of December 31, 2005 and included in the Financial Statements.

"Bankruptcy Cases" has the meaning specified in the Recitals.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Basket Amount" has the meaning specified in Section 11.6 hereof.

"Bidding Procedures" has the meaning specified in the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court (including all schedules thereto) entered by the Bankruptcy Court on April 20, 2007, a copy of which is attached as Exhibit A.

"Bills of Sale" means the bills of sale to be executed by Sellers in favor of Purchaser in respect of the Purchased Assets, substantially in the form set forth in Exhibit G.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) Related to the Business.

"Break-Up Fee" has the meaning specified in Section 9.2(a) hereof.

"Business" means the business (whether existing now or existing at or before the Closing, direct or indirect) of providing servicing (including master servicing, subservicing, special servicing and property management servicing) for residential real estate Mortgage Loans underlying the RMBS Transactions, and shall not include the Excluded Businesses.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of California, Delaware or Connecticut are authorized or obligated to close.

"Business Employee" means each employee of Sellers whose sole responsibility is to provide services Related to the Business and each other employee of Sellers identified by Sellers as having significant responsibility Related to the Business, including as set forth on Schedule 3.1.

"Business Portion" has the meaning specified in Section 2.6(a) hereof.

"Carrington" has the meaning specified in the preamble.

"Carrington-Related Assets" means the RMBS Transactions numbered 1 through 12 in the definition thereof.

"Carrying Costs" has the meaning specified in Section 2.7(b) hereof.

"Cash Purchase Price" means an amount equal to (i) the Purchase Price, as adjusted, minus (ii) $32,300,000.

"Claims" means, with respect to the period prior to the Closing Date, any right to payment from Sellers, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Seller, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Closing" has the meaning specified in Section 2.9 hereof.

"Closing Adjustment Difference" has the meaning specified in Section 4.3(a) hereof.

"Closing Carrington-Related Assets Amount" means an amount equal to the product of (i) the scheduled principal balance of the Mortgage Loans under the applicable Servicing Agreements for the Carrington-Related Assets as of the close of business on the Closing Date, after application of all scheduled payments due on such date, whether or not received, multiplied by (ii) 0.69%.

"Closing Date" means the date upon which the Closing occurs.

"Closing Date Audit Report" has the meaning specified in Section 4.2(c) hereof.

"Closing Date Mortgage Loan Schedule" has the meaning specified in Section 5.13(a) hereof.

"Closing Date Purchase Price" has the meaning specified in Section 4.1(a) hereof.

"Closing First Lien Advances Amount" means, as of the Closing Date with respect to the Servicing Agreements, an amount equal to 95% of the aggregate amount of Advances relating to Mortgage Loans under the Servicing Agreements secured by first liens on the Mortgaged Property, which amount shall be determined pursuant to the audit described in Section 4.2(c).

"Closing New Century Portfolio-Related Assets Amount" means an amount equal to the product of (i) the scheduled principal balance of the Mortgage Loans under the applicable Servicing Agreements for the New Century Portfolio-Related Assets as of the close of business on the Closing Date, after application of all scheduled payments due on such date, whether or not received, multiplied by (ii) 0.69%.

"Closing Servicing Agreement Amount" means the Closing Carrington-Related Assets Amount and the Closing New Century Portfolio-Related Assets Amount.

"COBRA" means the U.S. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or any similar State or Local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Computer Equipment" means all equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools) used by Sellers in the

conduct of the Business, including Sellers' rights under all related warranties.  As of the date hereof, the Computer Equipment consists of all items listed in Schedule 1.1(g).

"Confidentiality Agreement" has the meaning specified in Section 9.3 hereof.

"Consent" means any consent, approval, license, waiver or authorization.

"Contract Determination Date" means: (i) for each Assigned Contract that is designated by Purchaser as an Accepted Contract pursuant to Section 2.7, the date upon which such Contract is assigned to Purchaser, provided that the Cure Amounts for such contract shall have been paid and performed when due; and (ii) for each Assigned Contract that is an Excluded Contract pursuant to Section 2.7, the earlier of (A) the date that Sellers' rejection of such Contract is effective as set forth in an Order of the Bankruptcy Court; or (B) 15 Business Days after the earlier of (x) the date on which Purchaser shall have delivered notice to Sellers of its determination that such Contract shall be an Excluded Contract pursuant to Section 2.7 or (y) the Contract Notification Deadline for such Contract; provided, that Purchaser shall no longer be in possession of the premises or property subject to a lease or otherwise accepting the performance of the non-debtor party to the Contract after such date; and provided, further, that Purchaser shall be entitled to (and/or Sellers shall, at Purchaser's cost and direction) seek entry of an Order of the type described in clause (A) rejecting any Excluded Contract effective retroactively to the Petition Date or such later date as Purchaser may deem appropriate.

"Contract Notification Deadline" has the meaning specified in Section 2.7(b) hereof.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, commitments and licenses (other than this Agreement and the Ancillary Agreements) that are Related to the Business as of the Closing, or to which any of the Purchased Assets are subject, whether written or oral, including the Software Contracts, except to the extent included in Excluded Assets.

"Copyright Assignments" means the copyright assignments to be executed by Sellers in favor of Purchaser in respect of the Copyrights, in substantially the form set forth in Exhibit F hereto.

"Copyrights" has the meaning specified in the "Intellectual Property" definition.

"Cure Amount" has the meaning specified in Section 2.7(f) hereof.

"Cure Finding" has the meaning specified in Section 2.7(f) hereof.

"Cut-Off Carrington-Related Assets Amount" means an amount equal to the product of (i) the scheduled principal balance of the Mortgage Loans under the applicable Servicing Agreements for the Carrington-Related Assets as of the Cut-Off Date, after application of all scheduled payments due on the Cut-Off Date, whether or not received, multiplied by (ii) 0.69%.

"Cut-Off Date" means the first day of the calendar month in which the Closing occurs, or such other date as shall be agreed by Sellers and Purchaser.

"Cut-Off Date Audit Report" has the meaning specified in Section 4.2(c) hereof.

"Cut-Off Date Mortgage Loan Schedule" has the meaning specified in Section 5.13(a) hereof.

"Cut-Off First Lien Advances Amount" means, as of the Cut-Off Date with respect to the Servicing Agreements, an amount equal to 95% of the aggregate amount of Advances relating to Mortgage Loans under the Servicing Agreements secured by first liens on the Mortgaged Property, which amount shall be determined pursuant to the audit described in Section 4.2(c).

"Cut-Off New Century Portfolio-Related Assets Amount" means an amount equal to the product of (i) the scheduled principal balance of the Mortgage Loans under the applicable Servicing Agreements for the New Century Portfolio-Related Assets as of the Cut-Off Date, after application of all scheduled payments due on the Cut-Off Date, whether or not received, multiplied by (ii) 0.69%.

"Cut-Off Servicing Agreement Amount" means the Cut-Off Carrington-Related Assets Amount and the Cut-Off New Century Portfolio-Related Assets Amount.

"Deposit Amount" has the meaning specified in Section 4.4 hereof.

"Deposit Escrow Agreement" means that certain Deposit Escrow Agreement dated as of May 10, 2007, by and among Purchaser, Parent, the Company and JPMorgan Chase Bank, N.A., as escrow agent, a copy of which is attached as Exhibit H.

"Deposit Escrow Agent" means JPMorgan Chase Bank, N.A.

"DIP Financing Agreement" means the Debtor-in-Possession Loan and Security Agreement, dated as of April 13, 2007, by and among New Century Financial Corporation, certain of its Affiliates, Greenwich Capital Financial Products, Inc., The CIT Group/Business Credit, Inc. and the lenders party thereto, as amended.

"Enforceability Exceptions" has the meaning specified in Section 5.1 hereof.

"Environmental Claim" means any claim, action, cause of action, investigation or notice (written or oral) by any Person alleging actual or potential Liability for investigatory, cleanup or governmental response costs, or natural resources or property damages, or personal injuries, attorney's fees or penalties relating to (i) the presence, or release into the environment, of any Materials of Environmental Concern, now or in the past, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"Environmental Law" means each federal, state, local and foreign Law and regulation relating to pollution, protection or preservation of human health or the environment, including ambient air, surface water, ground water, land surface or subsurface strata, and natural resources, and including each Law and regulation relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacturing, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, or the

preservation of the environment or mitigation of adverse effects thereon and each Law and regulation with regard to record keeping, notification, disclosure and reporting requirements respecting Materials of Environmental Concern.

"Equal Credit Opportunity Act" means the Equal Opportunity Act promulgated under Chapter 41 of Title 15, U.S.C. Subchapter IV.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or Section 414 of the Code.

"Escrow Agent" means the escrow agent under the Escrow Agreement, as mutually agreed by Sellers and Purchaser.

"Escrow Agreement" means the escrow agreement to be entered into by and between Purchaser, Parent, the Company and an escrow agent, substantially in the form set forth in Exhibit D.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning specified in Section 2.2 hereof.

"Excluded Businesses" means the businesses (whether existing now or existing at or before the Closing, direct or indirect) of providing servicing for residential real estate mortgage loans, other than in connection with or relating to the RMBS Transactions, and any other businesses of Sellers other than the Business. Excluded Businesses shall include any Origination Business or forced placed business or title insurance business.

"Excluded Contract" has the meaning specified in Section 2.7(b) hereof; provided, that no Servicing Agreement shall be an Excluded Contract.

"Excluded Contracts" has the meaning specified in Section 2.7(b) hereof; provided, that none of the Servicing Agreements shall be Excluded Contracts.

"Expense Reimbursement" has the meaning specified in Section 9.2(b) hereof.

"Fair Housing Act" means the Fair Housing Act promulgated under Title VIII of the Civil Rights Act of 1968.

"Filing Subsidiaries" means Parent and the Company and the Affiliates of the Company set forth on Schedule 1.1(f).

"Final Determination" means (i) with respect to federal income Taxes, a "determination" as defined in Section 1313(a) of the Code or execution of an Internal Revenue Service Form 870AD, and (ii) with respect to other Taxes, any final determination of liability in respect of a

Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended returns or appeals from adverse determinations).

"Final Determination Date" means the date upon which (i) the parties mutually agree upon the Audit Reports prepared pursuant to Section 4.2(c) or (ii) the Arbitrating Accountants enter into their final and binding decision regarding the audit report pursuant to Section 4.2(d).

"Final Disclosure Schedules" means the disclosure schedules as provided in this Agreement and required to be delivered by Sellers to Purchaser as set forth in Section 6.9.

"Final Order" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"Financial Statements" means the audited consolidated balance sheets of the Parent as of December 31, 2005, together with the consolidated statements of income, shareholders' equity and cash flow for the year then ended.

"First Amended and Restated Agreement" has the meaning set forth in the Recitals.

"First Lien Advances Amount" means, as of any date with respect to the Servicing Agreements, an amount equal to 95% of the aggregate amount of Advances relating to Mortgage Loans under the Servicing Agreements secured by first liens on the Mortgaged Property, which amount shall be determined pursuant to the audit described in Section 4.2(c).

"Fixtures and Equipment" means all furniture, furnishings, vehicles, equipment, Computer Equipment, tools and other tangible personal property Related to the Business, wherever located, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals related to the Business and issued by or obtained from a Government Entity.

"Government Entity" means any federal, state or local court, administrative body or other governmental or quasi-governmental entity with competent jurisdiction, including the

Department of Housing and Urban Development, the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation and the Federal Trade Commission.

"Government Requirements" has the meaning specified in Section 5.4 hereof.

"Holdback Release Amount" has the meaning specified in Section 11.10(a) hereof.

"Holdback Release Date" has the meaning specified in Section 11.10(a) hereof.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Indebtedness" means (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade Liabilities incurred in the Ordinary Course of Business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (iii) all obligations under financing leases, (iv) all obligations in respect of acceptances issued or created, (v) all Liabilities secured by any lien on any property and (vi) all guarantee obligations.

"Indemnification Holdback Amount" means an amount initially equal to $5,000,000.

"Indemnitee" means the Person or Persons entitled to, or claiming a right to, indemnification under Article XI hereof.

"Indemnitor" means the Person or Persons claimed by the Indemnitee to be obligated to provide indemnification.

"Independent Accounting Firm" has the meaning specified in Section 4.5(a) hereof.

"Intellectual Property" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing, including all renewals of same (collectively, "Trademarks"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"); (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "Trade Secrets"); (iv) published and unpublished works of authorship, whether copyrightable or not (including without limitation databases and other compilations of information), including mask rights and IT Inventories, copyrights therein and thereto, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (v) any other intellectual property or proprietary rights.

"Intellectual Property License" means a license or other right to use any Intellectual Property set forth on Schedule 5.20(a)(v).

"IRS" means the Internal Revenue Service.

"IT Assets" means IT Inventories, Technical Documentation, Software Contracts and Computer Equipment, in each case Related to the Business.

"IT Inventories" means (i) computer software code (in all media) and materials, including all software programs; (ii) computer software documentation, including user materials; and (iii) all other unused or reusable materials, stores, and supplies related to computer software, in each case to the extent used in, relating to, or arising out of the Business, as set forth on Schedule 5.20(a).

"Knowledge of Sellers" concerning a particular subject, area or aspect of the Business or the affairs of Seller, means the actual (and not constructive or imputed) knowledge of any individual listed on Schedule 1.1(a).

"Law" means any Law, statute, ordinance, rule, regulation, code, order, judgment, writ, injunction, decree, enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Lease" means each lease or other Contract pursuant to which Seller leases any Real Property or personal property, either as lessor or lessee.

"Lease and Subservicing Agreement" means a Lease and Subservicing Agreement, to be dated as of the Closing Date, between Purchaser and the Company, in form and substance acceptable to Sellers and Purchaser.

"Leased Real Property" means all real property, including leasehold improvements, that is the subject of the Assigned Leases, as set forth on Schedule 1.1(d).

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any contract or tort based on negligence or strict Liability) and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Lien" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all losses, liabilities, costs, claims, damages, penalties and expenses (including all reasonable attorneys' fees and expenses and costs of investigation, enforcement and litigation).

"Material Adverse Effect" means any change, effect, event or circumstance, that, individually or in the aggregate, is materially adverse to the Purchased Assets, the Business or the ability of Sellers to perform their obligations under this Agreement, except for any change, effect, event, or circumstance relating to (i) the economy or the financial markets in general, (ii)

the industry in which the Business operate in general and not specifically relating to the Business, (iii) the announcement of this Agreement or the transaction contemplated hereby or the identity of Purchaser, (iv) changes in applicable Laws after the date hereof; (v) the fact that Sellers will be operating as a debtors-in-possession under the Bankruptcy Code, (vi) changes in GAAP or regulatory accounting principles after the date hereof, or (vii) changes in the value of the Mortgage Loans or the securities issued in the RMBS Transactions.

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, wastes, toxic or hazardous substances, materials and wastes, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead and lead-based paints and materials, and radon.

"Mortgage Loans" means any residential mortgage loan or other extension of credit secured by a Lien on real property of a borrower originated or purchased by Sellers or any of their Affiliates or purchased by Sellers or their Affiliates and included in or relating to the RMBS Transactions, including the related REO Properties.

"Mortgage Loan Documents" means, for each Mortgage Loan, all documents pertaining to such Mortgage Loan, including the Mortgage Note, the mortgage or deed of trust and all assignments of the mortgage or deed of trust, all endorsements and allonges to the Mortgage Note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, any account agreements, and any assignments, assumptions, modifications, continuations or amendments to any of the foregoing.

"Mortgage Loan Schedule" has the meaning specified in Section 5.13(a) hereof.

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Mortgage Loan secured by a mortgage or mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgaged Property" means a fee simple property (or such other estate in real property as is commonly accepted as collateral for Mortgage Loans that are subject to secondary mortgage sales or securitizations) that secures a Mortgage Note and that is subject to a mortgage.

"Multiemployer Plan" means any plan that is a "multiemployer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA, which is maintained or contributed to for employees of Seller or any ERISA Affiliate or with respect to which Sellers or any ERISA Affiliate has any Liability or reasonable expectation of Liability.

"New Century Portfolio-Related Assets" means the RMBS Transactions numbered 13 through 28 in the definition thereof.

"New Century Portfolio-Related Assets Deduction" has the meaning specified in Section 4.2 hereof.

"Non-Business Portion" has the meaning specified in Section 2.6(a) hereof.

"Non-Competition Covenants" has the meaning specified in Section 6.9(c) hereof.

"Non-Governmental Authorizations" means all licenses, permits, certificates and other authorizations and approvals other than Governmental Authorizations that are (i) held by Seller or any of their Affiliates and (ii) related to the Business.

"Non-Transferred Asset" has the meaning specified in Section 2.5(a) hereof.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"Ordinary Course of Business" means the ordinary course of business of the Business, consistent with past custom and practice of the Business.

"Organizational Documents" means, with respect to a limited partnership, the certificate of limited partnership, limited partnership agreement and subscription agreements with such partnership's partners then in effect; with respect to a limited liability company, the certificate of formation, limited liability company agreement and subscription agreements with such company's members then in effect; with respect to a corporation, the articles or certificate of incorporation and by-laws of such corporation then in effect; and, with respect to any other entity, comparable organizational documents of such entity, in each case, as then in effect.

"Original Agreement" has the meaning specified in the Recitals.

"Origination Business" has the meaning specified in the Recitals.

"Parent" has the meaning specified in the preamble.

"Patents" has the meaning specified in the "Intellectual Property" definition.

"Pending Claims" has the meaning specified in the Escrow Agreement.

"Permits" means permits, concessions, grants, franchises, licenses and other authorizations and approvals required or issued by any Government Entity and primarily used or held for use in connection with the Business.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petition" has the meaning specified in the Recitals.

"Petition Date" has the meaning specified in the Recitals.

"Plan" means each deferred compensation and each bonus, retention, incentive compensation, stock purchase, stock option, restricted stock, phantom stock and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other

"pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, consulting, retention, change in control, termination or severance agreement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or by any ERISA Affiliate, or to which Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any director, employee or former employee of Seller or any Seller Subsidiary, or with respect to which Sellers or any ERISA Affiliate otherwise has Liability or reasonable expectation of Liability.

"Post-Closing Purchase Price Adjustment" has the meaning specified in **Section 4.3(b)** hereof.

"Post-Petition Contracts" means the Contracts of the Filing Subsidiaries entered into by the Filing Subsidiaries, other than in the Ordinary Course of Business or approved by the Bankruptcy Court, in either case after April 2, 2007 and prior to or on the date of the delivery of the Final Disclosure Schedules.

"Pre-Closing Audit Report" has the meaning specified in **Section 4.2(c)**.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or before the close of business on the Closing Date.

"Proximate Cause Party" has the meaning specified in Section 9.1(b) hereof.

"PTO" has the meaning specified in Section 3.1(d) hereof.

"PTO Policy" has the meaning specified in Section 3.1(d) hereof.

"Purchased Asset" has the meaning specified in Section 2.1 hereof.

"Purchase Price" has the meaning specified in Section 4.1(b) hereof.

"Purchase Price Adjustment Statement" has the meaning specified in Section 4.3(a) hereof.

"Purchaser" has the meaning specified in the preamble.

"Purchaser Damages" has the meaning specified in Section 11.2 hereof.

"Purchaser Indemnified Parties" means Purchaser and each of its Affiliates.

"Qualified Topping Bid" has the meaning specified in the Bidding Procedures Order.

"Real Property" means all real property that is leased or owned by Sellers or that is reflected as an asset of the Company (or the Parent, as the case may be) on the Balance Sheet and used primarily in connection with the Business.

"Real Property Leases" means the leases described in **Schedule 1.1(b)** pursuant to which a Seller occupies the Leased Real Property.

"Regulatory Approvals" means any and all certificates, permits, licenses, franchises, concessions, grants, consents, approvals, orders, registrations, authorizations, waivers, variances or clearances from, or filings or registrations with, a Government Entity.

"Related to the Business" means required for, or primarily used in connection with, the Business as conducted by Sellers prior to the Closing.

"REO Property" means a Mortgaged Property acquired under a Servicing Agreement through foreclosure, acceptance of a deed in lieu of foreclosure or otherwise in connection with the default or imminent default of a Mortgage Loan.

"Representatives" means, with respect to any Person, the directors, officers, employees, accountants, agents, counsel, insurance brokers, insurance companies, lenders and other financing sources and other representatives of such Person.

"Retained Liabilities" means any and all Claims and Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates other than the Assumed Liabilities, including, any Claims and Liabilities (i) arising from any early payment default claims with respect to any Mortgage Loans or from any deficiency with respect to any existing loan facilities of Sellers, (ii) any Claims or Liabilities relating to any and all Plans, Multiemployer Plans or Title IV Plans (except as set forth in Section 3.1(d) with respect to certain PTO of Transferred Employees), or (iii) relating to any action, event, circumstance or condition occurring or existing on or prior to the Closing Date, including (a) any Claims and Liabilities arising under WARN, COBRA or any other Law pertaining to current and former employees (or their beneficiaries) generally, (b) any employee severance Claims or Liabilities relating to the employment or termination of employment by Sellers of any employees of Sellers, (c) any Claims and Liabilities relating to any Liens on the Purchased Assets, (d) any Liabilities and obligations arising under Contracts between Sellers, on the one hand, and any of their Affiliates, on the other hand, (e) any and all Claims and Liabilities for or resulting from any and all lawsuits or governmental examinations, audits or investigations pertaining to the period prior to the Closing Date, (f) any and all Claims and Liabilities for or resulting from Taxes attributable to the Purchased Assets for any Pre-Closing Period or the income or operations of the Business for any Pre-Closing Period, (g) any and all Transfer Taxes in connection with the Closing of the transactions contemplated hereby, (h) any and all Liabilities for or resulting from Environmental Claims or under any Environmental Laws, and (i) any and all Liabilities for or resulting from any action, suit, proceeding or investigation brought against a Seller or any of its Affiliates by any Government Entity based upon a Seller's or any of its Affiliate's conduct of the Business prior to the Closing Date or a Seller's or any of its Affiliate's failure, or alleged failure, to comply with all applicable Laws prior to the Closing Date.

"RMBS Transactions" mean the following residential mortgage-backed securities transactions:

1. Carrington Mortgage Loan Trust, Series 2004-NC1
2. Carrington Mortgage Loan Trust, Series 2004-NC2
3. Carrington Mortgage Loan Trust, Series 2005-NC1
4. Carrington Mortgage Loan Trust, Series 2005-NC2

5.  Carrington Mortgage Loan Trust, Series 2005-NC3
6.  Carrington Home Equity Loan Trust, Series 2005-NC4
7.  Carrington Mortgage Loan Trust, Series 2005-NC5
8.  Carrington Mortgage Loan Trust, Series 2006-NC1
9.  Carrington Mortgage Loan Trust, Series 2006-NC2
10. Carrington Mortgage Loan Trust, Series 2006-NC3
11. Carrington Mortgage Loan Trust, Series 2006-NC4
12. Carrington Mortgage Loan Trust, Series 2006-NC5
13. New Century Home Equity Loan Trust, Series 2003-2
14. New Century Home Equity Loan Trust, Series 2003-3
15. New Century Home Equity Loan Trust, Series 2003-4
16. New Century Home Equity Loan Trust, Series 2003-5
17. New Century Home Equity Loan Trust, Series 2003-6
18. New Century Home Equity Loan Trust, Series 2004-1
19. New Century Home Equity Loan Trust, Series 2004-2
20. New Century Home Equity Loan Trust, Series 2004-3
21. New Century Home Equity Loan Trust, Series 2004-4
22. New Century Home Equity Loan Trust, Series 2005-1
23. New Century Home Equity Loan Trust, Series 2005-2
24. New Century Home Equity Loan Trust, Series 2005-3
25. New Century Home Equity Loan Trust, Series 2005-4
26. New Century Home Equity Loan Trust, Series 2006-1
27. New Century Home Equity Loan Trust, Series 2006-2
28. New Century Home Equity Loan Trust, Series 2006-S1

"Sale" means the sale of the Purchased Assets in accordance with the Bidding Procedures Order.

"Sale Approval Order" means an Order or Orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code, substantially in the form set forth in Exhibit E.

"Sale Hearing" has the meaning specified in the Bidding Procedures Order.

"Sale Motion" means the motion filed by Parent with the Bankruptcy Court for the approval of the Sale Approval Order in the form of a Final Order.

"SEC" means the U.S. Securities and Exchange Commission.

"Second Lien Advances Amount" means, as of any date, an amount equal to (i) 95% of the aggregate amount of Advances relating to Mortgage Loans under the Servicing Agreements secured by second liens on the Mortgaged Property, which amount shall be determined pursuant to the audit described in Section 4.2(c), minus (ii) any amounts previously collected and paid pursuant to Section 4.1(b) to Sellers in a previous collection period under the Servicing Agreements after the Closing Date.

"Second Lien Advances Purchase Price" has the meaning specified in Section 4.1(b) hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Damages" has the meaning specified in Section 11.4 hereof.

"Seller Indemnified Parties" means Sellers and each of their Affiliates.

"Sellers" has the meaning specified in the preamble.

"Separation Shared Contracts" means those Shared Contracts set forth on Schedule 2.6(a).

"Servicer" means the "Servicer" or "Master Servicer" as defined in any Servicing Agreement.

"Servicer Advance Facility" means the Servicer Advance Financing Facility Agreement, dated as of August 28, 2003, by and between Citigroup Global Markets Realty Corp., a New York corporation, and the Company.

"Servicer Advance Facility Amount" means all Obligations (as defined in the Servicer Advance Facility) due and owing under the Servicer Advance Facility as of the Closing Date, as determined and agreed to by Citigroup Global Markets Realty Corp. or by the Bankruptcy Court and set forth on the Servicer Advance Facility Schedule or all Obligations (as such term is defined in the DIP Financing Agreement) that are due and owing under Tranche B of the DIP Financing Agreement on the Closing Date, as applicable.

"Servicer Advance Facility Schedule" means the schedule setting forth the Servicer Advance Facility Amount and delivered by Sellers pursuant to Section 8.3(d).

"Servicer Indemnity" means the Servicer's express indemnity obligations under the sections of the Servicing Agreements set forth on Schedule 2.7(e).

"Servicing Agreements" means the servicing agreements, pooling and servicing agreements, subservicing agreements, master servicing agreements, interim servicing agreements and related agreements which are identified on Schedule 1.1(i), including all documents attached as an exhibit or schedule to or incorporated by reference into any Servicing Agreement.

"Servicing Fees" means the sum of (i) the servicing fees (excluding any Ancillary Income) paid to a Seller as set forth in a Servicing Agreement and (ii) any Ancillary Income.

"Servicing File" means, for each Mortgage Loan, copies of the Mortgage Loan Documents and all other documents, files and other items related thereto required to be maintained by the servicer pursuant to the applicable Servicing Agreement, and, if not specifically set forth in the applicable Servicing Agreement, pursuant to the applicable servicing standard.

"Servicing Licenses" means the licenses required by Law or a Government Entity in order to engage in the Business, including the licenses listed on Schedule 1.1(e).

"Servicing Litigation" has the meaning specified in Section 6.6(d) hereof.

"Servicing Rights" means all right, title and interest of Sellers in and to: (i) the right to service the Mortgage Loans under the Servicing Agreements, including the right to receive the Servicing Fees and Ancillary Income; (ii) the related master servicing and/or servicing obligations as specified in each Servicing Agreement, including the obligations to administer and collect the payments of or relating to the Mortgage Loans, and to remit all amounts and provide information reporting to others in accordance with the Servicing Agreements; (iii) the right of ownership, possession, control and use of any and all Servicing Files and Mortgage Loan Documents pertaining to the servicing of the Mortgage Loans as provided in the Servicing Agreements; (iv) the rights with respect to, and obligations to make, any advances required pursuant to any Servicing Agreement, including obligations to reimburse funds borrowed from any custodial or other accounts under a Servicing Agreement; (v) the "clean-up call" right, if any, to purchase the related Mortgage Loans upon the aggregate principal balance thereof being reduced below a specified amount to the extent provided for in the Servicing Agreement; and (vi) all other rights, powers and privileges of Sellers as the master servicer, servicers or subservicer under the Servicing Agreements as expressly set forth therein; provided, that all indemnification rights and obligations of Sellers under the Servicing Agreements arising prior to the Closing Date and relating to the operation of the Business prior to the Closing Date, shall not be transferred to Purchaser.

"Shared Contract" means any Contract or arrangement (i) that is set forth on Schedule 2.6(a) and 2.6(b) and (ii) under which (A) the Business and (B) at least one other business unit of Sellers or their Affiliates purchase or sell goods or services or otherwise have rights or obligations.

"Software Contracts" means all Contracts, agreements, licenses, and other commitments and arrangements, with the exception of generally available or off-the-shelf shrink wrap licenses acquired for under $5,000, with any person or entity respecting the ownership, license, acquisition, design, development, distribution, marketing, development, use, outsourcing or maintenance of computer program code, related technical or user documentation, and databases, in each case relating to or arising out of the Business, other than such of the foregoing as are identified in the Excluded Assets. As of the date hereof, the Software Contracts consist of the items set forth on Schedule 1.1(h) as (i) licenses from third parties (development and/or marketing); (ii) licenses from third parties (internal use only); (iii) development contracts, work-for-hire agreements, information technology outsourcing agreements, and consulting and employment agreements; (iv) distributorships, dealerships, franchises, and manufacturer's representative contracts; (v) licenses and sublicenses to others; and (vi) maintenance, support, or enhancement agreements.

"Straddle Period" has the meaning specified in Section 7.2(b) hereof.

"Straddle Period Taxes" has the meaning specified in Section 7.2(b) hereof.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person and/or by any one or more of its

Subsidiaries, or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Supplemental Motion" has the meaning specified in Section 2.7(d) hereof.

"Supplemental Order" has the meaning specified in Section 2.7(d) hereof.

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of taxes, including, in each case, any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto, and including any amendment thereof.

"Technical Documentation" means all technical and descriptive materials (other than Inventory) relating to the acquisition, design, development, use, or maintenance of computer code, program documentation, Computer Equipment and materials in Sellers' Business.

"Third Party Claim" has the meaning specified in Section 11.8(a) hereof.

"Title IV Plan" means a plan that is subject to Section 302 or Title IV of ERISA or Section 412 of the Code.

"Trademarks" has the meaning specified in the "Intellectual Property" definition.

"Trade Secrets" has the meaning specified in the "Intellectual Property" definition.

"Transfer Instructions" means the transfer instructions agreed by Sellers and Purchaser pursuant to Section 6.6(a).

"Transfer Taxes" means any federal, state, county, local, foreign and other sales, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transferred Employee" has the meaning specified in Section 3.1(b) hereof.

"Transferred Intellectual Property" means all the Intellectual Property Related to the Business owned by, or licensed to, Sellers or their Affiliates, including all invoices, shipping

documents, purchase orders and other preprinted business forms that have any Trademark thereon, and as set forth on Schedule 5.20(b).

"Transferred Shared Contract" means those Shared Contracts that are set forth on Schedule 2.6(b).

"Transition Services Agreement" means a transition services agreement to be dated as of the Closing Date, between Purchaser and the Company, in form and substance acceptable to Sellers and Purchaser.

"TRS" has the meaning specified in Section 5.2 hereof.

"Unresolved Portion" has the meaning specified in Section 11.10(a) hereof.

"WARN" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended or any similar state or local Law (including, for the avoidance of doubt, the California Worker Adjustment and Retraining Notification Act, as amended).

Section 1.2    Interpretation. When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include" "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.