# UNITED STATES BANKRUPTCY COURT OF DELAWARE

| | | |
|---|---|---|
| **Pierre Richard Augustin, PRO SE** | ) | |
| **Consumer Creditor and Party In Interest** | ) | |
| | ) | |
| **v.** | ) | **07-10416-KJC** |
| | ) | |
| **New Century Mortgage Corporation Et Al,** | ) | |
| **Debtors.** | ) | |

## MOTION OF EVIDENCES IN SUPPORT OF MOTION TO REOPEN CASE PURSUANT TO RULE 5010

Statistical evidence of targeting can be sufficient to raise a factual dispute of intentional discrimination. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-308 (1977) (when "gross statistical disparities can be shown, they alone may in a proper case constitute a prima facie proof of a pattern or practice of discrimination."); International Bhd. of Teamsters v. United States, 431 U.S. 324, 340 n.20 (1977) ("In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination.") as outlined in the enclosed article.

In 2004, African-American homeowners who received subprime mortgage loans from Defendants were over 30% more likely to be issued a higher-rate loan than Caucasian borrowers *with the same qualifications*. In 2006, the Center for Responsible Lending, a non-profit research organization, found that even when income and credit risk were accounted for, African-Americans were *still* 31% to 34% more likely to receive higher rate subprime loans, and that the disparities between them and Caucasians with the same risk factors were "large and statistically significant".

1

The lending industry has a long history of engaging in racial discrimination in connection with mortgage loans made to African-Americans, with products and terms that are drastically worse than those given to their Caucasian counterparts. Recently, the Federal Reserve Board concluded that African-Americans were more likely to pay higher prices for mortgages than their Caucasian counterparts.

The United States Inspector General cited that report as showing "significant" differences, making it "clear" that African-Americans were "much more likely to get higher-priced loans" than Caucasians. In addition to carrying higher interest rates, subprime loans to African-Americans are typically laden with improperly disclosed fees, including excessive prepayment penalties which effectively prohibit borrowers from refinancing at a fairer rate.

The Center for Responsible Lending estimates that families lose $2.3 billion each year from their home equity wealth because of prepayment penalties in subprime mortgage loans. African-Americans are more than three times as likely as Caucasians to be put into one of these equity-draining subprime loans. These statistical disparities are not mere happenstance, but instead result from a systematic and predatory targeting of African-Americans. African-American and Caucasian borrowers with the same qualifications should be treated equally.

**Pressure at Mortgage Firm Led To Mass Approval of Bad Loans**
By David Cho

2

Washington Post Staff Writer

Monday, May 7, 2007; A01

Maggie Hardiman cringed as she heard the salesmen knocking the sides of desks with a baseball

bat as they walked through her office. *Bang! Bang!*

" 'You cut my [expletive] deal!' " she recalls one man yelling at her. " 'You can't do that.' " *Bang!*

The bat whacked the top of her desk. As an appraiser for a company called New Century

Financial, Hardiman was supposed to weed out bad mortgage applications. Most of the mortgage

applications Hardiman reviewed had problems, she said.

But "you didn't want to turn away a loan because all hell would break loose," she recounted in

interviews. When she did, her bosses often overruled her and found another appraiser to sign off

on it.

*Hardiman's account is one of several from former employees of **New Century** that shed fresh*

*light on an unfolding disaster in the mortgage industry, one that could cost as many as 2 million*

*American families their homes and threatens to spill over into the broader economy.*

**New Century** has become the premier example of a group of companies that grew rapidly during

the housing boom, selling working-class Americans with questionable credit huge numbers of

"subprime" loans with "teaser" rates that typically rose after the first two years. This business

transformed the once-tiny **New Century** into a lending powerhouse that was held up as a model

of the mortgage industry's success.

But now, with home values falling and adjustable loan rates rising, record numbers of

homeowners are failing to make their payments. And a detailed inquiry into the situation at **New**

**Century** and other subprime lenders suggests that in the feeding frenzy for housing loans, basic

3

quality controls were ignored in the mortgage business, while the big Wall Street investment banks that backed these firms looked the other way.

**New Century**, which filed for bankruptcy protection last month, has admitted that it underreported the number of bad loans it made in its financial reports for the first three quarters of 2006. *Hardiman and other former employees of* **New Century** *interviewed said there was intense pressure from bosses to approve loans, even those with obviously inflated housing appraisals **or exaggerated homeowner incomes.***

"The stress in that place was ungodly. It was like selling your soul," said Hardiman, who worked for New Century in 2004 and 2005. "There was instant notification to everyone as soon as you rejected a loan. And you dreaded doing it because you paid for it. Two guys would come with a bat, and they were all [ticked] off because you cut their deals."

**New Century** officials would not publicly respond to the ex-employees' allegations. A senior executive, who spoke on condition of anonymity because of state and federal investigations into the company, acknowledged that the atmosphere in some branches might have been intense at times. But he said the firm had safeguards to make sure workers did not feel pressure to approve questionable loans.

Hearing what Hardiman went through, he said, was "upsetting" and "not representative of our offices."

"In an organization with this size . . . I'm not naive to think that [such behavior] didn't happen," the executive said. "But I find it highly implausible over the last 10 years that something systemic was going on and somehow it was disguised. . . . There were pressures, especially in a declining market, and those pressures became more robust. But we turned up our controls and our vigilance

4

at the very same time."

## As Industry Grew, Standards Loosened

Once a little-used lending tool, subprime loans made up 20 percent, or about $600 billion, of all mortgages issued in the country last year. These loans carry a high risk of default because they generally are made to home buyers with questionable credit. But because they require borrowers to pay high interest rates, they have been a gold mine for lenders in recent years, accounting for 30 percent of all profits made in the mortgage business, according to Mercer Oliver Wyman, a consulting firm.

Lenders also made a fortune selling subprime loans to Wall Street. Investment banks charged huge fees for packaging them into massive bonds called mortgage-backed securities. Investors received high returns for buying and selling these bonds.

But there is growing evidence that along this chain, the filters that were supposed to catch bad loans did not work.

*Salespeople were supposed to be the "first line of defense" against fraud and bad loans,* said Steve Krystofiak, president of the Mortgage Broker Association for Responsible Lending, a group that is trying to retool practices in the industry.

But salespeople worked on commission -- meaning the more loans they sold, the more bonus money they received. "That's a bad business model. It's absolutely contradictory," Krystofiak said, adding that he has witnessed salespeople tweak numbers in mortgage applications to ensure that the loans would be approved.

*Automated underwriting software that searches for irregularities and possible fraud was also supposed to stop bad loans. But industry professionals say such programs were easily*

5

*manipulated.* Meanwhile, some appraisers and underwriters, who examine housing values and other claims made on loan applications, say they felt pressure from bosses to let questionable loans through.

*New Century and other lenders sold their mortgages through auctions to investment banks. Once a bid was accepted, the investment banks performed their own detailed review and could return any loans deemed questionable without paying for them.*

Several investment banks, including Merrill Lynch, Morgan Stanley and Goldman Sachs said they rigorously examined the subprime mortgages they had bid on. Morgan Stanley, for instance, said it reviewed every loan appraisal and the credit histories of about 25 percent of borrowers. Traders familiar with the bidding process said competition for mortgages from New Century began to heat up in 2005. Mortgage-backed securities based on **New Century** loans had been performing better for investors than those from other subprime lenders, in some cases producing two or three times the return of a U.S. Treasury bond. Many banks felt they had to loosen their standards and agree to return fewer bad loans in order to win the auctions, the traders said.

The head of a large Wall Street bank's mortgage group contended that his firm regularly lost out on **New Century's** business because its due diligence process was stringent and it had been returning a high number of loans. **New Century** wanted the bank to ease its standards, and the issue became a source of friction between the companies.

*"The entire industry, over time, became more lax," he said, speaking on condition of anonymity because he was not authorized to talk about his company's inner workings. "The more [loans] you accepted, the better relationship and the better price you would have. The name of the game was definitely volume."*

6

*A New Century spokeswoman said negotiating with banks to reduce both their due diligence and the number of loans they returned was a "generally accepted practice" that was "always a matter of discussion."*

There was little downside for banks to push paper through the pipeline, said Kevin Beyers, a forensic accountant at Parkside Associates in Atlanta who specializes in the mortgage industry. Besides returning loans, these firms could require a lender to buy back loans that had cleared the banks' reviews but later turned out to be bad.

"Loose underwriting was not a secret," Beyers said. "[Investment] banks had to have known what was going on. They just have too much information and sophistication at their fingertips. And they knew the lenders pretty well."

**Firm Unravels With Market's Slump**

To address the problem of bad loans, **New Century** said since 2000 it has been reducing the compensation of branch managers if they approved loans that were later determined to bad. Underwriters have always been paid on the quality of their work rather than the volume of loans approved. **New Century** said it always had monitored the performance of employees and last year implemented a statistical program that tracked whether they were approving a high number of bad loans.

A spokeswoman said these moves helped the firm reject or reduce the appraisal value of 20 percent of the loan applications it received in the Northeast last year. The firm's comments are difficult to square with accounts from rank-and-file workers. These employees worked at five different branches that handled subprime loans all over the country. *All except Hardiman spoke on condition of anonymity, citing recent e-mails from the firm telling them not to comment*

7

*publicly, although the company said that is standard corporate media policy. Hardiman said she*
*was fired for refusing to approve weak loans. Others said they left because they were pressured*
*to pump loans through the system. A few were interviewed while they were worked at **New***
***Century** but then lost their jobs after the firm filed for bankruptcy.*

Although there were variations in their descriptions of the atmosphere in their offices, most said
they were pushed to approve questionable loans. Several of the interviewed employees said they
faced "unofficial quotas" of loans that had to be approved each day. The pressure to meet these
expectations was so unrelenting that a worker in Foxboro, Mass., collapsed from stress and was
taken to the hospital, two employees said. In the firm's Long Island branch, the atmosphere
resembled a fraternity, largely because the average age was 23, an appraiser there said.

A veteran appraiser who worked in Pearl River, N.Y., said he joined **New Century** because he
had heard the pay was good. That turned out to be true, but he quickly discovered that the place
was a pressure cooker. He said he often was encouraged "to make loans work." His boss
generally supported him when he wanted to reject a questionable loan, he said. But other office
managers "were all about the numbers just so they got their bonuses." Still, the veteran appraiser
didn't blame them. "They were pressured to make loans, that's how you do business," said the
man. "They were trying to do more and more business. That's essentially what Wall Street
wanted." For years, the volume strategy worked.

Shares in the Irvine, Calif., company rose from $5 in early 2001 to $66 at the end of 2004,
cementing its status as a Wall Street favorite. Last year it issued $51.6 billion in loans, more than
any other specialized subprime mortgage lender. When times were good, the company showered
lavish gifts on its salespeople, treating them to vacations in Europe and Caribbean cruises hosted

8

by sports celebrities. As recently as March, a few weeks before it filed for bankruptcy, the
company had a trip to Ireland scheduled, employees said.

*The boom continued for **New Century** until 2006, when mortgage payment default rates spiked.
That happened because homeowners who bought houses last year generally saw their values
drop. And, in a declining housing market, many homeowners, especially those who are poor,
choose to let their mortgages fall into delinquency rather than try to keep up with the payments,
analysts said.*

At first, it appeared the cumulative effect of these defaults would have only a moderate effect on
New Century's earnings. Then, in February, the company said it would need to revise its financial
results for the first three quarters of 2006. A few weeks later, it acknowledged that federal
investigators had launched probes into the timing of the stock sales of some of its executives.
The company declined to comment on the investigations.

The announcements rattled the markets because the firm was so well regarded. The stock price
plummeted 90 percent, and the firm was delisted from the New York Stock Exchange. (Shares
now trade under a dollar on an obscure exchange.) **New Century** filed for bankruptcy April 2 but
said current customers would be unaffected and could continue making their mortgage payments.
The appraiser in the Pearl River branch said he considered himself a loyal employee and planned
to stick by the company through its struggles. But he was fired the day after the bankruptcy filing,
along with 3,200 employees, or half the firm's workforce. Most of those interviewed said they
were offered two weeks of pay at rates lower than their salary. A few said they did not receive
any severance.

**New Century** announced Thursday that it is laying off 2,000 more associates. The firm is left

9

with about 750 employees, a company spokeswoman said.  Hardiman, the former **New Century**

appraiser, said she was not surprised by the company's downfall. Few at the company seemed to

be thinking long-term when she was there. *The message she heard constantly from headquarters,*

*which was broadcast at work conferences and in e-mails, was to approve more loans.*

"We were constantly told, 'If you look the other way and let an additional three to four loans in a

day that would mean millions more in revenue for **New Century** over the course of the week,' "

Hardiman said. She added that it seemed "no one, from the top levels down to the lower levels of

the office, didn't want those loans to go through."

10

**UNITED STATES BANKRUPTCY COURT OF DELAWARE** FILED

2008 JAN -2  AM 9: 31

U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **Pierre Richard Augustin, PRO SE** ) | |
| **Consumer Creditor and Party In Interest** ) | |
| ) | |
| **v.** ) | **07-10416-KJC** |
| ) | |
| **New Century Mortgage Corporation Et Al,** ) | |
| **Debtors.** ) | |

## NOTICE OF MOTION TO REOPEN CASE
## PURSUANT TO RULE 5010

Consumer Creditor and a Party In Interest (Pierre Richard Augustin, Pro Se) as well as an

outsider of courtroom litigation ponders and reflects on the following oath that every federal

judge takes to uphold the Constitution of the United States:


*"I, _____, do solemnly swear (or affirm) that I will administer justice without respect to*

*persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially*

*discharge and perform all the duties incumbent upon me as _____    under the*

*Constitution and laws of the United States. So help me God."*


Likewise, "parties appearing pro se are allowed greater latitude with respect to reasonableness of

their legal theories (Patterson V. Aiker, 111 F.R.D. 354, 358 [N.D. GA 1986])".  Also, the court

is supposed to judge the case based on its merits even if procedural errors are made.  Thus, the

Court must give this Creditor and Party of Interest, "every favorable inference arising from his

pro se status" (Hall v. Dworkin, 829 F. Supp. 1403, 1409 (ND NY 1993)).

Your Honor, the public has an interest in the orderly administration of justice.  Public policy favors the proper adjudication of claims.  (See U.S. v. Premises and Real Prop. At 4492 S. Livonia Rd., F. 2d 1258, 1263 (2d Cir. 1989), see also U.S. v. All Assets of Statewide Auto Parts, Inc., 971 F. 2d 896, 902 (2d Cir. 1992) (a claimant's interest in his home merits special constitutional protection).

The Consumer Creditor and a Party In Interest's claim against Debtors that has arisen before the filing of bankruptcy petition has been held to be an administrative expense entitled to priority (11USC 503(b)(1)); see In re Charlesbank Laundry, Inc., 755 F.2d 200 (1st Cir. 1985) (civil fine based on debtor's post petition conduct granted administrative expense status); In re Friendship College Inc., 737 F.2d 430 (4th Cir. 1987) (the term "estate" as used in 503(b)(1)(B)(i ) implies post-petition liabilities); see also Reading Co. v. Brown, 391 U.S. 471, 482, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968) (post-petition tort claim is administrative expense); In re Boston Post Road Ltd. P'ship, 21 F.3d 477 (2d Cir. 1994) (tenants who are owed security deposits have administrative claims which are entitled to priority); In re Cantonwood Associates Ltd. P'ship, 138 B.R. 648 (Bankr. D. Mass. 1992).

**PLEASE TAKE NOTICE**, that Consumer Creditor and a Party In Interest (Pierre Richard Augustin, Pro Se) in the above name bankruptcy proceeding moves this Court before the Honorable  Kevin J. Carey for an Order classifying Consumer Creditor and a Party In Interest's 'mortgage fraud claim' as a consumer priority or post-petition priority claims as part of the administrative expenses of the bankruptcy estate by:

1. Granting the Consumer Creditor and a Party In Interest the right to reopen the debtors'
   Chapter 11 pursuant to Rule 5010 of the Federal Rules of Bankruptcy Procedure;

2. Extend the expiration dates of the orders' in order to permit the Consumer Creditor and a
   Party In Interest to exercise his rights to file his proof of post-petition priority claim after the
   current expiration dates of the Orders that were issued to close the 11 USC 523(c) cases
   against the creditors;

3. Allow the Consumer Creditor and a Party In Interest to exercise his rights to declare the
   enclosed consumer post-petition mortgage fraud priority claim ('administrative') non-
   dischargeable (11 USC 523 (c)(1)) that had accrued on April 15, 2004 which was discovered
   in February 28, 2006. Consumer Creditor and a Party In Interest is basing his late claim
   filing (see attached Form B10(official form 10)) on the excusable neglect standard, Fed. R.
   Bank. P. 3003(c)(3) & (9006)(b)(1).

4. The Supreme Court has defined excusable neglect fairly liberally, to include inadvertence,
   mistake, or carelessness, in the context of filing a late claim in a Chapter 11 case (Pioneer
   Inv. Services Co. v. Brunswick Associates, 507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed. 2d 74
   (1993); see Maressa v. A.H. Robins Co., 839 F.2d 220 (4th Cir. 1988); In re Int'l Horizons,
   Inc. 751 F.2d 1213 (11th Cir. 1985); In re Pigott, 674 F.2d 1011(3rd Cir. 1982); see also In re
   Pioneer Inv. Services Co., 943 F.2d 673 (6th Cir. 1991)(late claims allowable in chapter 11
   based on excusable neglect standard), aff'd, 507 U.S. 380 (1993). Also, the Supreme Court
   has held that punitive or multiple damages which arise from such fraud are not dischargeable
   (Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212, 130 L. Ed. 2d 341 (1998)).

Consumer Creditor and a Party In Interest states that the Debtor (New Century Mortgage),

committed fraud in connection with his mortgage transaction on April 15, 2004 which was

discovered by Consumer Creditor and a Party In Interest in February 28, 2006. Also, there is

strong irrefutable evidence of Civil Conspiracy in committing FRAUD because Consumer

Creditor and a Party In Interest suffered injury of fact since:

1. Allied Home Mortgage that acted as a finder for the Debtors fraudulently (see analogous case in In re McFarland, 84 F.3d 943, 947 (7th Cir.) (entire debt no dischargeable based on false financial statement related to refinancing); (entire amount of loan, not just amount extended after false financial statement, was no dischargeable) manipulated the facts on the mortgage application by

2. Approving the mortgage on Consumer Creditor and a Party In Interest's wife name despite her holding a temporary, seasonal and on call part-time employment of $80 per day that resulted in the stripping of Consumer Creditor and a Party In Interest 's equity,

3. The causal connection of Allied Home Mortgage fraudulent mortgage resulted in the civil conspiracy of amongst Allied and the Debtor in benefiting from the refinance transactions while Consumer Creditor and a Party In Interest 's debt liability surpassed his asset that contributed to Consumer Creditor and a Party In Interest 's financial dilemma. (See United States v. Western Pacific Railroad, 352 U.S. 59, 71-73, 1 L. Ed. 2d 126, 77 S. Ct. 161 (1956); Heck v. Rodgers, 457 F. 2d 303, 307-08 (7th Cir. 1972).

The elements of civil conspiracy of Mortgage Fraud are the formation and operation of the conspiracy

and damage resulting to Consumer Creditor and a Party In Interest from the act or acts done in

furtherance of the common design. "In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." (Doctors' Co. v. Superior Court (1989) 49 Cal.3d 44, citing Mox Incorporated v. Woods (1927) 202 Cal. 675, 677-78.)' (Id. at 511.)).


The act of Civil Conspiracy of Mortgage Fraud amongst Commonwealth (based on the preliminary/commitment of the title report on 3/29/2004), Allied Home Mortgage (acting as a finder for the Debtor) & Debtor added Consumer Creditor and a Party In Interest 's wife on the mortgage by making:

1.  A false representation,

2.  The person or entity who made that false statement made it knowingly to conceal it

3.  The receiver of that statement meaning all parties involved in the refinancing of his property believed that the title was indeed *'clear'* especially Consumer Creditor and a Party In Interest  since he was later affected by the civil conspiracy to defrauded him, and Debtor's underwriter and Lawyer, Samuel P. Reef covered up the fact that Consumer Creditor and a Party In Interest's wife true temporary and on call part-time work status.

4.  Based on that false and fraudulent statement, the Debtor's underwriter was part of the civil conspiracy or acted upon it which stripped away all the equity in Consumer Creditor and a Party In Interest 's property that led to the over financing of his property and all the parties benefited financially from the fraud,

5.  Consumer Creditor and a Party In Interest trusted and believed that all the parties involved in the refinancing of his property had a **fiduciary responsibility** not to deceive him by assuring that the transaction would not be to his detrimental as it turned out to be (In re Rockefeller Ctr. Props., Inc.

Secs. Litig., 311 F. 3d 198, 216 (3d Cir. 2002)).

Therefore, if each participant cited above may not know the exact details of the conspiracy to still be legally liable, then by implication it is even much less required that the victim (Consumer Creditor and a Party In Interest) know the exact details of a conspiracy which is intentionally, continuously and fraudulently concealed from him. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence of the existence of joint action. (Magna v. Commonwealth of N. Mariana Islands, 107 F.3d, 1447 (9th Cir. 1997)).

To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy as described above in falsifying documents to stuck Consumer Creditor and a Party In Interest with a high-cost mortgage. (Phelps Dodge v. United Steel Workers of America, 865 F.2d, 1541 (9th Cir. AZ, 1989), cert. denied 493 U.S. 809). Thus, the Debtor did not follow its standard practices as in evaluating creditworthiness or customs of the credit industry by conducting reasonable investigation of employment whereby a "red flag" would have alerted the debtor that the mortgage broker acting as a finder for the Debtor presented statement that were inaccurate and misrepresented (In re Cohn, 54 F.3d 1108 (3d Cir. 1995).

This mortgage fraud claim as described above is also based on fraud and false pretenses, fraud as a fiduciary, larceny, willful & malicious injury, defalcation (see In re Baylis, 313 F. 3d 9 (1st Cir. 2002) (defalcation requires some degree of fault, closer to fraud, without necessity of meeting a strict specific intent requirement)(11 USC 523(a)(4) and related damages as outlined in the Massachusetts Unfair and Deceptive Acts and Practices (UDAP) laws (see In re Stokes, 955 F.2d

76 (5th Cir. 1993) (damages under the Texas consumer protection act found no dischargeable based on both 11 USC 523(a)2(A) and 523(a)(6) as outline above.


## Conclusion

The Supreme Court held that 11 USC 523(a)(2)(A) prevents the discharge of all liability arising from fraud and that an award of treble damages therefore falls within the scope of the exception (Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212, 130 L. Ed. 2d 341 (1998). In effect, the Court extends protection from discharge not just to multiple and punitive damages, but also to claims for litigation fees and costs and to other foreseeable consequential damages of fraud.


## Consumer Creditor and a Party In Interest's Requested Relief

In support of the instant motion and the relief requested herein the above named Consumer Creditor and a Party In Interest hereby request the Court to grant the instant motion. Consumer Creditor and a Party In Interest is not looking for sympathy. Consumer Creditor and a Party In Interest is not looking to be rewarded. Consumer Creditor and a Party In Interest is not seeking the punishment of the Debtor. However, Consumer Creditor and a Party In Interest is only asking the Court to allowed him to preserve his mortgage fraud claim('administrative') or as the Court deems just and proper as nondischargeable.

**WHEREFORE,** Consumer Creditor and a Party In Interest respectfully request that the Court order that:

1. Consumer Creditor and a Party In Interest's post-petition mortgage fraud priority claim ('administrative') is not dischargeable;

2. Designating the post-petition mortgage of mortgage fraud priority claim as an 'administrative expense'.

**Respectfully Submitted,**

*Pierre R. Augustin*

**Pierre R. Augustin, Pro Se**
Consumer Creditor and a Party In Interest
3941 Persimmon Drive, #102, Fairfax, VA 22031 (617)202-8069

**Attorneys and Parties Served**

| Counsel to the Debtors | Co-Counsel to the Debtors |
|---|---|
| Suzzanne S. Uhland, Esq., Ben H. Logan, Esq. Victoria Newmark, Esq., Emily R. Culler, Esq. O'Melveny & Myers LLP 275 Battery Street San Francisco, CA 94111 T: (415) 984-8700, F: (415) 984-8701 http://www.omm.com | Mark D. Collins, Esq., Michael J. Merchant, Esq. Richards, Layton & Finger, P.A. One Rodney Square, P.O. Box 551 Wilmington, DE 19899 T: (302) 651-7700 http://www.rlf.com |
| **Officer of the Corporation** **New Century TRS Holdings, Inc.,** *et al.* **3121 Michelson Drive** **Suite 600** **Irvine, CA 92612** | Joseph J. McMahon, Jr., Esquire United States Department of Justice Office of the United States Trustee J. Caleb Boggs Federal Building 844 King Street, Suite 2207, Lockbox 35 Wilmington, DE 19801, Courtesy copy |
| United States Bankruptcy Court District of Delaware 824 Market Street, 3rd Floor Wilmington, DE 19801 T: (302) 252-2900 | A. Michelle Hart McCalla Raymenr Llc 1544 Old Alabama Rd. Roswell, GA 30076, 770-643-7363 |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this motion was mailed to the 1) Attorneys for Debtors, 2)

Debtor, 3) Creditors, 4) U.S. Attorneys and 5) to the U.S. District Bankruptcy Court of Delaware.

X _*Pierre R. Augustin*_ Pierre R. Augustin, 3941 Persimmon Drive, #102
Fairfax, VA 22031, Tel: 617-202-8069

## VERIFICATION

I, Pierre R. Augustin, hereby depose and state as follows:

1. I am Pierre R. Augustin, represented by self.

2. I have read the foregoing Motion filed herein and knowing the contents thereof have found

that the allegations of fact set forth therein are true of my own personal knowledge, except as to

those allegations based on information and belief which I believe to be true.

Signed under the penalties of perjury this _27_ day of _December_ 2007.

X _*Pierre R. Augustin*_

STATE OF _Virginia_            COUNTY OF _Prince William_

On this _27_ day of _Dec._ , 2007, before me, the undersigned notary

public, personally appeared _Pierre R Augustin_ , proved to me

through satisfactory evidence of identification, which was
_VA DL B660 3994 0_ , to be the person whose name is

signed on the preceding or attached document, and acknowledged to me that s/he signed it

voluntarily for its stated purpose.

_Donna L Tatum_
Notary Public
My Commission Expires:
(SEAL)    _Feb 29, 2008_

DONNA L. TATUM
Notary Public
Commonwealth of Virginia
Reg. #352677
My Commission Exps. Feb. 29, 2008

## UNITED STATES BANKRUPTCY COURT OF DELAWARE

| | | |
|---|---|---|
| Pierre Richard Augustin, PRO SE | ) | |
| Consumer Creditor and Party In Interest | ) | |
| | ) | |
| v. | ) | 07-10416-KJC |
| | ) | |
| New Century Mortgage Corporation Et Al, | ) | |
| Debtors. | ) | |

### AFFIDAVIT / AFFIRMATION

I, Pierre-Richard Augustin, affirm the following under penalty of perjury, being duly sworn, deposes and says:

1) I am the Consumer Creditor and a Party In Interest in this action, and I respectfully submit this affidavit/affirmation.

2) The Motion should be granted because of the facts and circumstances outlined.

3) I have personal knowledge of facts which bear on this motion. In view of the foregoing, it is respectfully submitted that the motion should be denied.

I declare under penalty of perjury that the foregoing is true and correct, except as to those allegations based on information and belief which I believe to be true.

Dated: _12-27-07_          _Pierre R. Augustin_

Pierre-Richard Augustin, Pro Se,  Consumer Creditor and a Party In Interest

3941 Persimmon Drive, #102, Fairfax, VA 22031 (617) 202-8069

STATE OF _Virginia_          COUNTY OF _Prince William_

On this _27_ day of _Dec_, 2007, before me, the undersigned notary public, personally appeared _Pierre R Augustin_, proved to me through satisfactory evidence of identification, which was _VA DL B66 03 9940_, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that s/he signed it voluntarily for its stated purpose.

_Donna L Tatum_

Notary Public

My Commission Expires:

(SEAL)

_Feb 29, 2008_

DONNA L. TATUM
Notary Public
Commonwealth of Virginia
Reg. #352677
My Commission Exps. Feb. 29, 2008

Case 1:06-cv-10368-NMG    Document 4-4    Filed 03/08/2006    Page 1 of 2

**FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT**

For use with Adjustable Rate Mortgage Loans    Date: **April 15, 2004**    Loan# **0001455240**

**(N) NEW CENTURY**
MORTGAGE CORPORATION

Borrowers: **BRIGET NGAMPA**
**PIERRE R. AUGUSTIN**

| Exhibit 2 |
|---|

Property
tion: **28 CEDAR STREET**

**LOWELL, MA 01852**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.558 % | $ 423,656.82 | $ 276,608.18 | $ 700,264.00 |

☐ Preliminary    ☐ Re-Disclosure    ☒ Final

Your payment schedule will be:

| No. of Payments | Amount of Payments ** | When Payments are Due |
|---|---|---|
| 360 | $ 1,945.18 | Monthly, beginning June 1, 2004 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

☐ This obligation has a demand feature.

**This is a variable-rate Loan. Disclosures were provided to you earlier.**

Filing Fees $    318.00    Non-Filing Insurance $    N/A

Security: You are giving a security interest in the property located at
☒ **28 CEDAR STREET**    **LOWELL, MA 01852**

Late Charge: If payment is **15 days** late, you will be charged **3.00** % of the payment.

Prepayment: If you pay off early, you
☒ may    ☐ will not    have to pay a penalty.
☐ may    ☒ will not    be entitled to a refund of part of the finance charge.

Assumption: Someone buying your home
☒ cannot assume the remainder of the mortgage on the original terms.
☐ may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

* means an estimate

PROPERTY INSURANCE: ☒ Property hazard insurance to replace the cost of improvements with a loss payable clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender.
Hazard insurance ☐ is ☒ is not available through the lender at an estimated cost of    for a    year term.