IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                                      :
                                                            :   Chapter 11
NEW CENTURY TRS HOLDINGS, INC.,                             :
a Delaware Corporation, et al.,[1]                          :   Case No. 07-10416 (KJC)
                                                            :
                    Debtors.                                :   Jointly Administered
                                                            :
                                                            :   **Hearing Date: February 6, 2008 @ 1:30 p.m.**
                                                            :   **Objection Deadline: January 30, 2008 @ 4:00 p.m.**
                                                            :
------------------------------------------------------------x

## MOTION OF MICHAEL J. MISSAL, EXAMINER, FOR A
## SECOND EXTENSION OF TIME TO FILE HIS REPORT WITH THE COURT

Michael J. Missal, the Examiner appointed in the above-captioned jointly administered Chapter 11 cases, by and through his undersigned counsel, hereby moves, pursuant to 11 U.S.C. § 105(a), Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure and Rule 9006-2 of the Local Rules of this Court, for a second extension of time until March 17, 2008, to submit the Report required to be filed pursuant to this Court's June 1, 2007 Order Denying in Part and Granting in Part the Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner (the "June 1 Order") and this Court's October 10, 2007 Order (I) Supplementing June 1, 2007 Order Directing the Appointment of an

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a/ Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century REO III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Examiner and (II) Granting Motion of Michael J. Missal for an Extension of Time to File his Report with the Court (the "October 10 Order").

As described in detail below, the Examiner has encountered significant delays in obtaining information primarily from the Debtors and KPMG LLP, the Debtors' former independent auditors. In addition, several former senior employees of the Debtors who previously had refused to be interviewed by the Examiner, despite being subpoenaed, have now agreed to be interviewed in January 2008. These delays, as well as the substantial complexity of the issues, make it impossible to finalize the Report by January 15, 2008, the date established in the October 10 Order. While the Examiner and his professionals[2] have made substantial progress toward completing the fact gathering phase of the investigation, additional time is needed to review documents, conduct interviews, analyze the facts and issues and finalize the Report. Much of the remaining work will be completed by a smaller team of professionals and thus it is expected that the fees and expenses needed to finish the investigation will be substantially reduced from the previous phase of the investigation. If an extension is granted until March 17, 2008, the Examiner's investigation will have taken only approximately nine months, which is a relatively short time period for an investigation of this scope and complexity. The Examiner does not believe that this extension will prejudice any party in interest.

In support of this Motion, the Examiner respectfully states as follows:

### JURISDICTION AND VENUE

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] The Examiner engaged Kirkpatrick & Lockhart Preston Gates Ellis LLP ("K&L Gates") and Saul Ewing LLP as his counsel, and BDO Seidman LLP as his accounting experts and financial advisor.

## BACKGROUND

2. On June 1, 2007, this Court directed the United States Trustee to appoint an Examiner to:

> (a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated, and identify and evaluate any claims or rights of action that the estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible post-petition unauthorized use of cash collateral by the Debtor, and (c) otherwise perform the duties of an examiner set forth in section 1106(a)(3) (as limited by [the Court]) and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation").

June 1 Order at 2-3 (footnote omitted).

3. The Court directed the Debtors and "all of the Debtors' affiliates, subsidiaries and other companies under their control" and the Examiner to "mutually coordinate and cooperate in connection with the performance of any of the Examiner's duties." *Id.* at 5.

4. The Court also directed the Examiner to "prepare and file a report, as required by 11 U.S.C. § 1106(a)(4), within 90 days of the date of appointment, unless such time shall be extended by order of the Court, . . . ." *Id.* at 3.

5. On June 5, 2007, the United States Trustee appointed Michael J. Missal to be the Examiner. The Court approved that appointment on June 7, 2007.

6. On September 5, 2007, the Examiner filed a Motion for an Extension of Time to File a Report. On October 10, 2007, this Court extended the deadline for the Examiner to file his report "through and including January 15, 2008, unless such time is extended by further order of the Court...." October 10 Order at 3.

7. On November 21, 2007, the Examiner filed his First Interim Report related to the possible unauthorized post-petition use of cash collateral by the Debtors as required by the June 1 and October 10 Orders. That Report was filed under seal pursuant to the October 10 Order. On December 19, 2007 the Debtors filed under seal a Reply to the Examiner's First Interim Report and on January 4, 2008, the Examiner filed a Limited Response to the Debtors' December 19 Reply.

## The Investigative Process

8. Since the Court issued the October 10 Order, the Examiner and his professionals have continued the investigation concerning the circumstances that gave rise to New Century's announcements in the spring of 2007 that it needed to restate its financial statements for the first three quarters of 2006 and that it may need to restate its 2005 financial statements. The Examiner and his professionals have also gathered information about other accounting, financial reporting and internal control issues that bear upon the matters identified by the Court in the June 1 Order. The Examiner intends to assess each of these issues in a thorough, objective, fair and responsible manner.

9. As required by the June 1 Order, the Examiner and his counsel met and conferred on June 14, 2007 with representatives of the Debtors, the Official Committee of Unsecured Creditors ("Committee"), and the Office of the United States Trustee before commencing the investigation. During this "meet and confer" session, the Debtors told the Examiner, among other things, that he would have complete access to documents and information that had been gathered by the Debtors with respect to an investigation by the Special Investigation Committee of the Debtors' Board of Directors (the "SIC").

10. Given that the mandate of the Examiner is broader than that of the SIC, the Examiner and his professionals sought access to additional documents and information from the Debtors, certain of its present and former officers, directors and employees, as well as from KPMG. Following the initial "meet and confer" session, the Examiner made a number of requests for documents, information and interviews. Some of these requests currently remain outstanding.

11. Furthermore, some former employees of New Century refused to cooperate voluntarily with the Examiner, requiring the Examiner to seek on October 4, 2007, pursuant to Rule 2004, authority to serve subpoenas on persons who might have relevant information. The Court granted such authority on October 16, 2007. Some of the Debtors' former senior employees who were subpoenaed refused initially to be interviewed by the Examiner. However, the Examiner was informed in December 2007 that these former senior employees will agree to be interviewed and they are scheduled for January 2008.

12. The Examiner also requested documents and information from KPMG. As the Court is aware, KPMG refused to cooperate and produce voluntarily any documents or information to the Examiner. This refusal compelled the Examiner to seek, pursuant to Rule 2004, authority to serve one or more subpoenas on KPMG and its present or former personnel. On August 1, 2007, after the Court granted the Examiner's Rule 2004 Motion, the Examiner served a subpoena on KPMG. KPMG then objected to the scope of the subpoena. Once KPMG's objections were resolved in late August 2007, KPMG began providing information to the Examiner on a rolling basis, and began to make former and current KPMG personnel available for interviews. However, KPMG has not completed its document production and at least one interview of a KPMG employee is scheduled for January 2008.

13. The Examiner has attempted to conduct his investigation in the most efficient manner possible. Where appropriate, he has sought to rely upon the prior or contemporaneous document collection and analytical efforts of others who reviewed the Debtors' conduct during the periods leading up to its bankruptcy filings. The Examiner and his professionals have made significant progress over the past few months, and have conducted numerous interviews and reviewed thousands of pages of documents. Nonetheless, the difficulties the Examiner has encountered in attempting to obtain relevant information are such that it has not been possible for the Examiner to complete the investigation and prepare the Report pursuant to the June 1 Order by January 15, 2008.

14. Even though the delays in obtaining documents and other information could serve as the basis for an extension, these delays should be considered in connection with the complexity of the accounting and financial reporting issues being investigated by the Examiner. Many of these issues involve subjective judgments and interpretations of intricate accounting principles. Even after the relevant documents are reviewed and the necessary interviews are conducted, time is needed to assess and analyze the accounting and financial reporting issues.

**Delays in the Production of Documents and Other Information by the Debtors**

15. The Examiner has made considerable efforts to be reasonable in his requests of the Debtors regarding the production of documents and information. The Examiner is cognizant of the burdens and costs associated with the production of a large volume of data. He also understands that there are ongoing governmental inquiries and private lawsuits that involve one or more issues relevant to his investigation. Consistent with his mandate, the Examiner has taken into consideration these circumstances in his dealings with the Debtors and in his shaping, sequencing and prioritizing of requests for data.

16. The Examiner acknowledges that the Debtors have produced a large number of documents. However, even recognizing the various demands on the Debtors, some requests that have been made by the Examiner for potentially significant information took a longer period of time to satisfy than seems reasonable. In fact, many of the Examiner's requests for relevant documents and information remained outstanding for an extended period of time.

17. A significant portion of the documents provided by the Debtors to the Examiner were not produced until after September 1. Some documents most important to the Examiner's investigation were not produced by the Debtors until after the October 10 Order was entered.

18. A review of the Debtors' production of e-mails illustrates the numerous frustrations encountered by the Examiner. At the "meet and confer" session on June 14, 2007, the Debtors informed the Examiner that he was going to be given access to the entire database of approximately two million e-mails created by the Debtors around the time of the SIC investigation. E-mails are a particularly important source of information as they are prepared contemporaneously with relevant events. Furthermore, the Examiner was informed at the outset of his investigation that the Debtors' personnel relied heavily upon e-mail to share and store documents. While the Debtors stated at the "meet and confer" session that they intended to produce privileged documents to the Examiner, they did raise a concern that production of privileged e-mails may constitute a waiver of the attorney-client and attorney work product privileges. A straightforward solution to this concern was discussed at the June 14 meeting in which the Debtors could seek an Order from this Court confirming that production of any privileged e-mails to the Examiner would not constitute such a waiver. The Debtors appeared agreeable to this approach.

19.     In late June 2007, however, the Debtors informed the Examiner that they would not seek such an Order from the Court and would instead exclude from production potentially privileged e-mails. The Examiner understands that the Debtors then ran search term filters through the e-mail database and withheld as "potentially privileged" approximately 700,000 e-mails, or roughly 40 percent of the total. This seemed to be an extremely large number of potentially privileged e-mails, particularly because the Examiner was told by counsel for the Debtors that New Century would not be withholding privileged information regarding any accounting or financial reporting issues. The only privileged information being withheld was related to the narrow and discrete issues of cash collateral and two pending employment litigation matters.

20.     The Examiner immediately raised a concern that the Debtors were withholding a large volume of potentially important information. The Debtors consequently agreed in late July 2007 to run more limited search term filters in an effort to reduce the number of e-mails that were withheld. However, the more limited search terms were not run until August 15, 2007. At that time, the Debtors also informed the Examiner that they were also withholding from production any privileged e-mails related to governmental investigations and the Debtors' decision to declare bankruptcy.

21.     As a result of running the more limited filters, the Debtors produced on August 31 and September 4 only approximately 100,000 more e-mails dated prior to February 7, 2007, the date of the Debtors' restatement announcement. The Debtors still withheld more than 600,000 e-mails as potentially privileged. The Debtors also informed the Examiner that they were going to review individually for privilege the approximately 130,000 withheld e-mails that were dated after February 6, 2007, but could not give a timetable when that review would be completed.

The Debtors further indicated that they were going to continue to withhold the approximately 500,000 e-mails dated prior to February 7, 2007 and had not established a process to review those e-mails. When the Examiner requested e-mails for additional persons and time periods in early August 2007, the e-mails gathered by the Debtors were also run through filters. This resulted in a large number of additional e-mails being withheld.

22. After the October 10 Order was entered, the Debtors produced on October 25, 2007 the approximately 500,000 withheld e-mails dated prior to February 7, 2007 from the original database, as well as some of the e-mails requested in early August 2007. The Debtors continued to review for privilege the e-mails dated after February 6, 2007 and produced approximately 90,000 e-mails between December 6, 2007 and December 19, 2007. Despite numerous requests by the Examiner for the number of e-mails withheld pursuant to a privilege, the Debtors never provided such information to the Examiner, nor have they produced a privilege log.

23. Thus, the Debtors have unreasonably extended the process of producing e-mails by more than four months. Had the Debtors fulfilled the representations that they made at the June 14, 2007 "meet and confer" session to produce e-mails expeditiously, the Examiner's investigation could have been conducted more quickly and cost efficiently.

24. Aside from e-mails, there are other sources of information that the Debtors failed to produce promptly. For example, employees in several of the Debtors' departments that are most relevant to this investigation used shared document servers (called the "shared drives") to store electronic documents. The Examiner learned in early September 2007 that documents significant to his investigation were maintained in the shared drives and promptly requested the production of documents from that source. Production of these documents should have been

fairly straightforward as they generally did not implicate privilege concerns and merely required the transferring of data to hard drives. However, the Debtors did not begin to produce this data until October 15, 2007. Moreover, the Capital Markets shared drive, which contained information related to the models used to value the hundreds of millions of dollars of residual interests on the Debtors' balance sheets and other documents important to the Examiner's investigation, was not produced and accessible until December 18, 2007. The valuation of residual interests was one of the problematic accounting issues publicly identified by the Debtors in the spring of 2007. A number of other requests, including requests for documents that were readily available to the Company, have similarly taken more time to fulfill than seems reasonable.

### Interview Delays and Related Issues

25. In an effort to expedite the investigation, the Examiner began the interview process of the Debtors' former employees even though all relevant documents had not been produced and analyzed. This made the interviews that much more difficult to conduct and also caused inefficiencies in the document review.

26. Some former employees refused to cooperate voluntarily with the Examiner, and it was necessary to seek to compel their testimony through Rule 2004 subpoenas as discussed above. Moreover, several former senior employees who had refused initially to be interviewed despite being subpoenaed informed the Examiner in December 2007 that they would agree to be interviewed in January 2008. Interviews for these former senior employees have been scheduled for dates in January 2008 and their interviews are likely to reveal important information.

27. A number of the Debtors' former employees whom the Examiner sought to interview engaged separate counsel. Several of these counsel informed the Examiner that they

needed to postpone interviews of those former employees because they encountered delays in getting documents from the Debtors.

28. The Examiner's investigation was further delayed by the time spent on the cash collateral issue. The Examiner's First Interim Report details why most, if not all, of that portion of the investigation was unnecessary.

### Delays in Production of Documents and Interviews by KPMG

29. As noted previously, KPMG refused to cooperate voluntarily with the Examiner's investigation and the Examiner was required to issue a subpoena for KPMG's relevant workpapers, e-mails and other documents. Production of e-mails for KPMG personnel did not begin until mid-October 2007. KPMG has produced documents on a rolling basis, including approximately 400,000 pages on January 3, 2008, which constituted approximately one-third of KPMG's total production to date. Additional documents remain to be produced by KPMG.

30. The delays in producing documents by KPMG also negatively impacted the scheduling of interviews of current and former KPMG employees. Nevertheless, to move the investigation forward, the Examiner conducted interviews before all documents relevant to particular interviewees were produced and analyzed. A number of interviews of key KPMG employees did not occur until December 2007 and it was necessary to schedule at least one interview of a KPMG witness in January 2008. Accordingly, the Examiner has not had sufficient time to analyze the information received from KPMG.

### Fees and Expenses

31. The Examiner is sensitive to the costs involved in this investigation. Given that considerable progress has been made on the fact finding portion of the investigation, a smaller team of professionals will be involved in the remaining fact finding, the analysis of the

information and the finalizing of the Report. Thus, the Examiner believes that the remaining fees and expenses will be substantially reduced from the previous phase of the investigation.

## Conclusion

32. An extension until March 17, 2008 should not be prejudicial to any party in interest.

33. The Examiner believes the requested extension of time to March 17, 2008 is reasonable and necessary. The Examiner needs the additional time to complete the document productions and remaining interviews, further assess and analyze the information obtained, and finalize the Report. Given the difficulties in obtaining documents and scheduling interviews, and the complexity of the accounting and financial reporting issues, it is not possible for the Examiner to complete his Report by January 15, 2008. The Examiner does not anticipate making any further requests for an extension of time to file his Report, but reserves the right to do so if circumstances change in a material manner.

**WHEREFORE**, the Examiner respectfully requests that this Court enter an Order (i) extending the time period for the Examiner to prepare and file a report, as required by 11 U.S.C. § 1106(a)(4), up to and including March 17, 2008, unless such time is further extended by order of the Court, and (ii) granting the Examiner such other and further relief as is just and proper.

Dated: Wilmington, Delaware
January 8, 2008

**SAUL EWING LLP**

By: /s/ Mark Minuti

Mark Minuti (DE No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6840

and

**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
Edward M. Fox, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

Stephen G. Topetzes, Esq.
Stavroula E. Lambrakopoulos, Esq.
1601 K Street, NW
Washington, DC 20006
(202) 778-9328

Attorneys for Michael J. Missal, Examiner