UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
NEW CENTURY TRS HOLDINGS, INC.,.    Case No. 07-10416(KJC)
a Delaware corporation, *et al.*,.    (Jointly Administered)
                                    .
        Debtors.                    .    Jan.9, 2008 (1:34 p.m.)
                                    .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: All rise.  Please be seated.

2           THE COURT: Good afternoon, all.

3           ALL: Good afternoon, Your Honor.

4           MR. SAMIS: Good afternoon, Your Honor.  Your Honor,

5    for the record, Chris Samis of Richards, Layton & Finger,

6    here today on behalf of the debtors.  Your Honor, just to

7    start off, we'd like to take the agenda in pretty much agenda

8    order today with the exception of the omnibus objections

9    which we'd like to move to the end, if possible.  I'll just

10   walk through the agenda briefly.  Item number 1 is continued.

11   Items numbers 2 through 12 are uncontested matters with CNOs,

12   however, it appears number 13, irrespective of the fact there

13   was a CNO filed, I believe the Court may have questions.

14   This was the bid procedures motion that was on for today.

15   Mr. Logan from O'Melveny & Myers will be handling that.

16          THE COURT: No, I don't have any questions,

17   actually, and I was okay with it, but because we were close

18   to the hearing date and because of the nature of the motion,

19   I thought I'd just hold it until the hearing and simply ask

20   if anyone wishes to be heard in connection with that motion.

21   Okay, hearing no response, I'm prepared to grant the relief

22   that's been requested.

23          MR. SAMIS: Your Honor, I would also add that there

24   have been minor changes which Mr. Logan may want walk

25   through.  We have a blackline and a final form of order here

1   today in court.

2           THE COURT: All right.

3           MR. LOGAN: Thank you, Your Honor.  I'll be very

4   brief.  These are just some clarifying changes to make

5   explicit some things that were implicit in the motion, and

6   that is, if the debtors and the leading bidder cannot reach

7   agreement on a price, that has to happen in the next day or

8   two, the motion is clear that the leading bidder does get

9   $16,100 as expense reimbursement and the estates get the

10  product of all the diligence that the leading bidder did.  It

11  did not go on and say something that we want to make explicit

12  which is, the debtors are free then to use that and go

13  forward with the auction with any potential other bidders.

14  Everybody understood that, and in addition if that occurs,

15  there's no possible breakup fee that would be owed to the

16  leading bidder who turned out to fall out of the wayside

17  because they couldn't reach an agreement on price.  So, it's

18  just purely clarifying those two matters, and that's what's

19  set forth in the blackline.  I showed Mr. McMahon the

20  blackline.  I'm prepared to hand up to the Court a blackline

21  and the revised final version.

22          THE COURT: Go ahead.  All right, I've reviewed the

23  blackline and don't have any questions.  Does anyone care to

24  be  heard on the proposed changes to the form of order?  I

25  hear no response.  That order has been signed.

1          MR. SAMIS: Thank you, Your Honor.  Your Honor,

2     agenda items 14 and 15 are both stay relief motions.  I don't

3     think CNOs have been filed on them yet, but the debtor is not

4     opposing them.

5          THE COURT: Yeah, I - And that's the reason I didn't

6     sign any orders because there were no CNOs, but I didn't have

7     any questions or problems with the relief requested in the

8     motion.

9          MR. SAMIS: Understood, thank you, Your Honor.

10          THE COURT: Let me see whether forms of order were

11     here.  The orders are incomplete.  They don't have an Exhibit

12     A attached to the order.  If you contact counsel for the

13     movant and let him or her know that I need complete orders,

14     they can submit them under certification.

15          MR. SAMIS: I'll certainly do so, Your Honor.

16          THE COURT: Thank you.

17          MR. SAMIS: The next substantive item on the agenda,

18     Your Honor, would be agenda item 18, which is the argument

19     that's scheduled today on a jurisdictional dispute with

20     respect to the motion of the debtors to enforce the stay

21     against the IRS.  At this point I'd like to cede the podium

22     - I'm not exactly sure how we're taking it, in what order

23     we're taking it.  Oh - Mr. Collins will be taking that, Your

24     Honor.

25          THE COURT: All right.

1          MR. COLLINS: Good afternoon, Your Honor.  For the

2   record, Mark Collins of Richards, Layton & Finger on behalf

3   of the debtors.  Your Honor, before I begin, I'd like to

4   introduce to the Court and move the admission *pro hac vice* of

5   Mr. Robert Carney of the law firm of O'Melveny & Myers.  Mr.

6   Carney is a tax lawyer, and I asked him to be here today

7   because there may be issues that are of a nature so tax-

8   driven that I may not be competent to answer them, so I

9   thought it might be helpful to have Mr. Carney here should we

10  go into that area.

11          THE COURT: All right, thank you.

12          MR. COLLINS: Your Honor, the issue presented today

13  to the Court, we believe is quite simple and straightforward.

14  It is whether or not this Court, following the filing of a

15  proof of claim by the IRS for 2004 corporate income tax

16  liabilities has the jurisdiction to review the IRS's decision

17  to deny the debtors' request for a tentative refund of 2004

18  corporate income taxes.

19          THE COURT: Mr. Collins, may I stop you right there?

20          MR. COLLINS: Yes.

21          THE COURT: It seems to me anything but simple, and

22  I don't know because I've done bankruptcy law all my career,

23  sometimes bankruptcy law seems maybe a little bit simpler to

24  me and to us than it does to others, but the Tax Code seems

25  positively labyrinthian to me in its nature.

1           MR. COLLINS: Uh-huh.

2           THE COURT: I think the issues raised - Well, the

3   dispute raises, I think, a number of issues ranging from

4   jurisdiction to reactive effective statutes and regulations

5   and stay violations and, you know, it was a proof of claim

6   that hasn't yet been objected to, a pending action so that

7   it's covered by 362(b)(26), you know, is the claim for refund

8   arise out of the same transaction?  Is that covered by the

9   proof of claim?  I mean there's all kinds of, actually, what

10  I find to be very interesting questions.  But, as I sit here

11  and I think about the specific issues, and I think about the

12  competing policies involved, you know, the right of the

13  government on behalf of all of us to make sure it collects

14  the taxes and keeps the taxes that are due against the right

15  of the debtor to a refund if in fact it's legitimately due to

16  the interest of all who, I think, benefit from the

17  entitlement to the benefits of the automatic stay.  Having

18  articulated all of those things, it also, in my experience,

19  normally comes down to a function of the parties sitting down

20  and simply reconciling the numbers.  Now, I don't see

21  anything in the submissions, in the written submissions, that

22  tells me that's not something that could be done here, and I

23  also get the overwhelming impression from the written

24  submissions that this is a situation in which the parties on

25  either side of this dispute are standing on principle.  I'm

1    not saying there aren't principles that shouldn't be

2    defended, but explain to me before we proceed further, why

3    without anyone giving up their statutorily or

4    constitutionally given prerogatives, the parties within a

5    reasonably brief period of time couldn't sit down and work

6    their way through the process.

7         MR. COLLINS: Well, Your Honor, I do know from our

8    perspective, we have tried on a number of occasions to meet

9    with, discuss these issues with the IRS.  We do believe the

10   statute provides clearly that we are entitled to a $66

11   million tentative refund.  We believe that is very clear and

12   very straightforward.  Nevertheless, we wanted to work

13   through the more substantive issues with the IRS over their

14   2004, 2005 proofs of claim, with respect to the audit

15   associated with those tax years, and also now, we're moving

16   to 2006 issues as well.  From our perspective, though, we

17   have not been strung along, but it has been a long time in

18   which an audit has been pending of these tax periods, and we

19   don't see any conclusion in sight in the near term, and that

20   is exactly why Tax Code 6411 exists, is to allow the taxpayer

21   to obtain a tentative refund when it has the ability to

22   assert one and it properly completes the form, and then, you

23   can litigate all of the audit issues, all of the very

24   complicated tax issues later.  Congress in 6411 presumes that

25   the taxpayer -

1          THE COURT:   Well, might you understand the

2    government's reluctance to write a $66 million check to an

3    entity that's largely been liquidated at this point?

4          MR. COLLINS: I certainly do, Your Honor.  I think

5    we all realize that why would the IRS want to turn over a

6    tentative refund for $66 million -

7          THE COURT: Well, in any event, but I mean, and it's

8    nice that the debtor takes the position that the IRS later

9    can always come back -

10          MR. COLLINS: That's right.

11          THE COURT:  - and ask for it back again, but, I

12    mean, my understanding is that what's happening in this case

13    is ultimately there will be no debtor of any kind and

14    distributions will be made to creditors, and I think while

15    the IRS doesn't say this as a reason for withholding the

16    funds as a reason, I have to think that some consideration

17    has been given to the fact that, you know, the money may not

18    be there when it comes time to come back, if that should ever

19    be the case.

20          MR. COLLINS: I understand that that's a pragmatic

21    concern, one that I don't think has been lost on anybody, but

22    when you look at the way the Tax Code is structured, this is

23    exactly what we are entitled to.  A company that has losses

24    in a particular tax year is able to carry back those loses to

25    a prior year within, I think, a two-year time period, for

1    taxes that it in fact has paid.  So, in 2004 the debtors paid

2    a substantial amount of taxes.  In 2006 we believe we had

3    substantial losses.  Under the Tax Code we are entitled to

4    carry back that loss to 2004 and get back monies that we

5    overpaid in 2004.  That is how the Tax Code is drafted.  The

6    only way that the IRS can freeze a refund is under

7    362(b)(26).  They need to have an assessed liability.  The

8    amount has to be determined, and we are not there yet, Your

9    Honor, and it may take many months if not longer to get to

10   that end result, the actual liquidated amount of the claim,

11   but under the law, under the Tax Code and the Bankruptcy

12   Code, we do not believe they have the ability to simply

13   withhold this tentative refund because they may be

14   uncomfortable that they may not get it back in the future.

15   In fact, the history of the carry-back deductions are really

16   meant to assist a troubled company, a company that is

17   obviously dealing with losses and has the ability to gain a

18   refund because of very recently paid taxes in a positive

19   sense.  So, you know, that's why we're here.  I do not by any

20   stretch disagree with Your Honor that these are complicated

21   issues that will arise in the future with respect to the

22   retroactivity of regulations, with respect to a whole host of

23   issues.  The issue that - and why I started with it's quite

24   simple is just simply whether or not this Court has

25   jurisdiction to begin the process over what we believe was an

1    inappropriate exercise of a statutory obligation of the IRS.

2              THE COURT: Right, so that if I decide that I have

3    jurisdiction to make a determination about whether the

4    government abused its discretion in declining to make the

5    quicky refund, what would then ensue?  You would anticipate

6    an evidentiary hearing of some kind?

7              MR. COLLINS: Yes, Your Honor.  The process that we

8    have agreed to with the IRS is that they would file a

9    pleading within six days of Your Honor's determination of the

10   issue today, whether or not Your Honor has jurisdiction to go

11   forward.  They would file a pleading that would set forth all

12   of the reasons why they believe we are not entitled to the

13   refund on the real substance of it, whether it be that they,

14   in fact, followed the statute under 6411 in properly denying

15   the quicky refund or whether or not even after the Court

16   reverses that decision whether they have the ability to still

17   withhold it for any number of reasons, and the debtors would

18   then file a brief in response to that, and we would be back

19   to Your Honor on an evidentiary hearing to go into those

20   issues.  And the focus of today's argument was really whether

21   or not the debtors have the ability to bring to Your Honor's

22   attention and to have Your Honor determine whether or not the

23   IRS properly exercised its obligations in denying the quicky

24   refund.  We believe under the plain reading of 6411 the

25   review is quite limited.  It is simply to look at a two-page

1    form 1139 application, determine if there are mathematical

2    errors in the two or three columns, if there are no

3    mathematical errors or material omissions on what is required

4    to be filled in, they are required under the statute to

5    provide that refund.  They say that they have a whole host of

6    reasons as to why there are material omissions or

7    mathematical errors that relate to a whole host of really

8    audit type issues in 2006, and in any event, Your Honor has

9    no ability to review their decision.  In fact, no court in

10   the land has the ability to review this administrative

11   agency's decision to deny our application.  We think that is

12   fundamentally wrong.  We think it violates Supreme Court

13   precedent.  We believe that the presumption is that a court

14   of competent jurisdiction can review an agency's decision,

15   and we believe that Your Honor does have jurisdiction by the

16   filing of the 2004 tax claim by the IRS.   This refund

17   request goes directly to 2004 corporate income taxes paid.

18   So, we think we have a complete melding of the 2004 tax year.

19   We believe we have a statute that is clear on its face and

20   gives very limited discretion to the IRS.  We believe they

21   violated their obligations in reviewing this application.

22   They went well beyond the scope of their rights in 6411 to

23   come up with all hosts of audit issues in 2006 to deny this

24   application, which we think eviscerates the very purpose of

25   § 6411 of the Tax Code which is presumption in favor of the

1    taxpayer when it comes from asserted loss carry-back

2    deduction.

3            THE COURT: A truly unique feature of the tax law.

4            MR. COLLINS: It is.  It is.  And it really, I

5    think, boils down to whether or not, when you have a

6    contested situation like this, maybe a contested situation,

7    who is the one entitled to hold the refund?  Is it the IRS?

8    Or is it the taxpayer?  And Congress in 6411 has determined

9    that it is the taxpayer.

10           THE COURT: Thank you.

11           MR. COLLINS: I don't know if Your Honor would -

12   again, there's a whole host of other issues that permeate the

13   papers, but I think in sum and substance, that is the heart

14   of this, and we are simply asking to get to the next hearing

15   where we can put on our case that they violated 6411, and

16   there is nothing and this, I'm sure, will be part of the

17   IRS's argument, there is nothing in 6411 that says their

18   decision to deny a tentative tax refund is un-reviewable by

19   any court.  It is simply not in that statute.  It does say

20   that the Secretary of the IRS can deny a form 1139

21   application, quote/unquote, "without further action".  They

22   use that hook to say, "without further action" means, no

23   court, no tribunal, no judicial entity can review their

24   decision.  That we believe is just utterly wrong.  We believe

25   the words "without further action" means that the Secretary

1   can simply look at this two-page application, view it as

2   having mathematical errors and deny it and do nothing more.

3   They do not need to reach out to the taxpayer and ask to

4   clarify issues.  They do not have an affirmative obligation

5   to try to correct any mathematical errors that are in the

6   application.  They can simply stamp it denied.  That's what

7   we think 6411 says.  The Treasury regulations that arise out

8   of 6411 can clearly not take away the Court's jurisdiction.

9   Those are obviously regulations adopted by the Treasury

10  Department, and we believe that § 6411 and § 106(b) give Your

11  Honor jurisdiction to deal with this matter, to review the

12  IRS's actions, and the IRS cannot hang its hat on a Treasury

13  regulation, which I don't think is clear on its face in any

14  event to somehow divest this Court of jurisdiction to review

15  the IRS's actions, especially when you have Supreme Court

16  precedent and a long history of case law that says the

17  presumption is to review administrative agencies' decisions.

18          THE COURT: All right, thank you.

19          MR. COLLINS: You're welcome.

20          THE COURT: The Committee has joined in the debtors'

21  request.  Let me ask if the Committee wishes to be heard at

22  this time.

23          MR. INDELICATO: Thank you, Your Honor.  Mark

24  Indelicato from Hahn & Hessen on behalf the Committee.  Your

25  Honor, I left taxes many years ago and hope never to return,

1   but unfortunately, every once in awhile, we must.

2        THE COURT: They keep pulling you back in.

3        MR. INDELICATO: Yes.  I think, not to belabor the

4   point, we adopt many of the arguments made by the debtor.  I

5   think where we see the fundamental flaw in the IRS's argument

6   is if you buy their argument, they would in essence, for a

7   bankrupt company, write 6411 out of the Code, and they

8   basically would say, All we need to do is look at them and if

9   we have any issues with respect to an audit, we can raise

10  them in the context of a defense as to 6411, and they're not

11  entitled to their quicky refund.  And if that becomes the

12  practice, Your Honor, and as the point the Court raised

13  earlier and it's not an insignificant point is, why would the

14  IRS write a $66 million check to New Century that they may

15  not get back.  Well, Your Honor, with all due respect, New

16  Century is a large case and $66 million is a large number,

17  but you can take that to any case and the economics may make

18  the same point.  You may have a smaller case where a $50,000

19  quicky refund may be the same issue, so, if you start

20  imposing those requirements, what I would submit, Your Honor,

21  is that we are now in our Bankruptcy Court modifying the

22  Internal Revenue Code.  It may be a good thing, but I'm not

23  sure it's a proper thing.  Your Honor, I believe the debtor

24  makes a compelling argument that this Court has jurisdiction

25  to determine whether or not at least the IRS has implemented

1   6411 as 6411 was meant to be implemented.  I think Mr.

2   Collins makes a good point.  Congress has made a

3   determination that good, bad, or indifferent, the benefit

4   goes with the taxpayer in this one instance and probably this

5   one instance is alone, that they be the ones that have been

6   determined that should hold the tax refund.  If that should

7   be changed, I think it's a congressional change that needs to

8   be made.  I think this needs to get to the next step, Your

9   Honor.  I think clearly the IRS has submitted to the

10  jurisdiction of the Court with respect to some of these

11  issues that they've filed proofs of claim.  They would have

12  this Court determine when we owe them money, but when they

13  owe us money, they want to raise the specter of sovereign

14  immunity and say that this Court cannot dictate as to what

15  the issues are.  So I think Mr. Collins made a very

16  compelling argument that this Court does have jurisdiction.

17  We should get to the next issue, and I think once we do that,

18  the debtor will demonstrate very clearly that the IRS in

19  their exercise of denial under 6411 have gone beyond what the

20  statute was intended, and that in fact the debtor should be

21  entitled to its refund.  Thank you, Your Honor.

22          THE COURT: Thank you.

23          MR. GEHT: Good afternoon, Your Honor.  Jan Geht for

24  the United States.  Let me start off with the equitable

25  concerns that Your Honor raised and then proceed to the

1    actual technical merits of our argument.  It's not the

2    position of the United States that this Court will never be

3    able to review the net operating loss carried back that the

4    debtors have requested.  We merely ask that they comply with

5    the statutory requirements for a formal claim for a refund.

6    At that point, Your Honor will be vested with jurisdiction

7    under § 505 to actually hear all the factual issues

8    underlying their claim.

9          THE COURT: And tell me what that process involves

10    and how long you anticipate it would take to work its way

11    through in this case.

12          MR. GEHT: Well, Your Honor, under § 505 as soon as

13    they file a formal claim, 120 days later you will have

14    jurisdiction, and as we pointed out in our brief, if there's

15    - nothing had precluded them from filing it, filing a formal

16    proof of claim at the same time as they filed the Form 1139.

17    Had they done so, at this point Your Honor would have

18    jurisdiction.  The statute provides it's the earlier of 120

19    days or whenever it gets the service that allows the claim.

20    As for the merits of the argument, a lot has been said about

21    how our position about 6411 is completely wrong, completely

22    inconsistent with the statute and the Supreme Court

23    precedent, but merely point out, Your Honor, that the

24    Treasury regulations follow verbatim the language in the

25    legislative history from 1945 saying, The Commissioner's

1   action in disallowing the application under 6411 cannot be

2   reviewed in any court.  Furthermore, although Mr. Collins has

3   argued that the Treasury regulations are just Treasury

4   regulations, Your Honor doesn't have to follow them.  That is

5   actually not the standard.  The Treasury regulations, final

6   Treasury regulations issued by the Department of the

7   Treasury, are entitled to at least a show on deference if not

8   higher because the Secretary under the Internal Revenue Code

9   is specifically authorized to issue regulations to assist in

10  the collection of the Internal Revenue Laws.  So it's not

11  just a Treasury Department employee issuing a decision.

12  Treasury regulations are published for public comment, and

13  they are then finalized in the Federal Register, and should

14  the language of the statute "without further action", should

15  the Treasury regulations themselves, should the legislative

16  history be unclear, the courts that we've cited in our brief

17  have unanimously stated that the decision of the Secretary is

18  not re-viewable.  I would also point out that we have invited

19  - essentially invited the debtors in our brief to find a

20  single case in the history of § 6411 which has been in

21  existence since 1945, so 63 years, to find a single case that

22  holds that a court of any jurisdiction has authority to

23  review the services of termination.  They have not come forth

24  with any such case nor is the service aware of any such case.

25  Your Honor has -

1        THE COURT: But the service is willing to put its

2    unblemished record on the line in this case, I take it.

3        MR. GEHT: Your Honor, it is a very serious - Yes,

4    it is a very serious matter, and once again, I understand the

5    debtors' point that there are things in the statute that says

6    what the service is supposed to do.  As the tax court has

7    recognized several times, it is interesting that the statute

8    doesn't provide for a remedy, and it has observed that in the

9    services failure to act on 6411 applications, but the tax

10   court in both cases went on to say, We're not going to create

11   a remedy where none was designed by Congress.  Congress,

12   recognizing the tentative nature of this application, has

13   said, If the service after conducting a limited examination

14   determines that there are computational errors which it

15   cannot correct in 90 days or material admissions, it may

16   disallow the application.  The taxpayer, or the debtors in

17   this case, are free to file a formal claim for refund, and

18   this matter will then be in front of the service for a final

19   agency determination which will then be ripe for your court's

20   review.  As far as the 106(b) argument, the Third Circuit has

21   repeatedly stated that 106(b) does not waive all other

22   jurisdictional requirements in tax-related cases.  For

23   example, in cases where the statute of limitation has run on

24   claims for refund, the Third Circuit said, We're sorry,

25   106(b) doesn't get you in the door, and 106(b) is a general

1    waiver of jurisdiction which under clearly set precedent,

2    takes second seat to a more explicit refusal to consent to

3    jurisdiction, and in cases of taxes, as we cite in our case,

4    § 505, § 7422 govern the refunds, the tax refunds.  And I

5    understand the debtors' point in the reply brief that they're

6    not applying for formal refund, but I would point out that

7    6411, by expressly stating that no court shall have

8    jurisdiction, overrules 106(b) more general waiver of

9    sovereign immunity.  And finally, as we point out at the very

10   end of our brief, 106(b) waiver of sovereign immunity is a

11   compulsory counterclaim.  A compulsory counterclaim

12   presupposes that all years - that all the claims have to be

13   tried at the same time, that is not what the debtors have

14   requested.  What the debtors have requested is that Your

15   Honor review the application for a quicky refund, presumably

16   with the hope that you would find that they're entitled to

17   $66 million, cut if off there.  They get their $66 million,

18   then later on, we'll get to the issues involved in the

19   service's proof of claim.  That's not what a compulsory

20   counterclaim is.  A compulsory counterclaim says everything

21   gets tried at the same time.  They have not yet objected to

22   our proof of claim, making it completely inappropriate to

23   first review the service's decision.

24          THE COURT: Thank you.

25          MR. GEHT: Thank you, Your Honor.

1           THE COURT: Briefly.

2           MR. COLLINS: Yes, Your Honor.  Your Honor, Mr. Geht

3    started his argument by saying that the way we should proceed

4    is to go down the process of submitting a claim refund and

5    litigate those issues.  In the meantime, they would hold the

6    asserted refund.  We're talking applies and oranges, Your

7    Honor.  That is true.  To get to the ultimate merits of the

8    dispute, you do go through a process of asserting a claim

9    refund, go through an audit process, litigation, and ultimate

10   decision as to whether or not the IRS can recapture some or

11   all of the refund.  6411 is not a claim for a refund.  It is

12   a process by which the taxpayer, as I stated earlier, is able

13   to obtain a tentative refund while the parties litigate the

14   dispute.  We have that right under the Tax Code.  We are a

15   taxpayer, and we believe we are entitled to those protections

16   to that right to that refund under 6411, and then the

17   parties, if they cannot resolve it consensually on the merits

18   of the tax dispute, will litigate that process.

19           THE COURT: Why hasn't the debtor filed a claim for

20   refund?

21           MR. COLLINS: Well, Your Honor, we very well may do

22   that.  We have been hopeful that the information we have

23   provided to the IRS agent regarding 2004/2005 would satisfy

24   them, that this would be resolved absent going through a very

25   costly, time consuming litigation.  So, if we are unable to

1   resolve these more substantive matters, we may very well do

2   that, and it may take a year or more to litigate those

3   issues, but while this process is ongoing, while they're

4   conducting audits and asking for additional information and

5   we're responding, 6411 says we're entitled to that quicky tax

6   refund while this process happens unless there are

7   mathematical errors in our application.  We believe - and

8   they have cited to no mathematical errors in our application,

9   instead they cite to all of these audit issues in 2006.

10          THE COURT: Topics, they're topics.

11          MR. COLLINS: Topics that will take a long time to

12   investigate, which is exactly what the audit process is for.

13   Again, apples and oranges between 6411 and the claim refund

14   process.  With respect to his statement that you have all of

15   this case law that says 6411 decisions are not reviewable.  I

16   read every single one of those cases they cited, Your Honor.

17   They do not stand for that proposition.  What they do is in

18   dicta or whatever else, they simply say what the Treasury reg

19   says and nothing more.  It's not part of a holding.  There's

20   no analysis as to whether or not a court has the ability,

21   assuming that they have jurisdiction to get over the

22   sovereign immunity issue, the court has jurisdiction to

23   review 6411 decisions.  None of those cases go to that at

24   all.  So I don't believe that there's all of this precedent

25   out there that says 6411, their decision is not reviewable.

1    If Your Honor would read those cases, I think you would come

2    to the same conclusion.

3         THE COURT: In the debtors' view, what is it that I

4    have to decide in order to get to the next step?

5         MR. COLLINS: I think Your Honor would have to

6    decide two things: The first is that 106(b) is applicable,

7    and we believe it is abundantly clear that 106(b) is

8    applicable.  106(b) - and Mr. Geht talked about how the proof

9    of claim and then the responding action by the debtor needs

10   to be akin to a counterclaim.  We believe it's even stronger

11   here.  In order to determine 2004 tax liability itself, you

12   need to look at both income earned by the company and the

13   deductions associated with that tax year.  That is exactly

14   what we have here, Your Honor.  The form 1139 application

15   talks about a 2004 tax deduction offset tax liability, which

16   is exactly what the IRS is seeking in their 2004 proof of

17   claim.  You cannot determine their proof of claim without

18   first determining what are the valid deductions.  So it's

19   even better than a compulsory counterclaim, and if Your Honor

20   would look at the Supreme Court case, Lewis v. Reynold, it

21   talks about how once you bring an action for a refund for

22   2004, you are then to look at all tax issues, tax

23   liabilities, transactions associated with that tax for that

24   particular year, and that's exactly what we have between the

25   proof of claim and our Form 1139 application.  So we think we

1    have met the requirements of 106(b).  Your Honor then has

2    jurisdiction, sovereign immunity has been waived.  The next

3    step then is to actually look at § 6411 and determine whether

4    or not the IRS is correct that their decision under that

5    statute is unreviewable by any court for any reason.  The

6    case law says that in order to override the presumption of

7    judicial review of administrative agency decisions, you must

8    have very specific statutory exceptions to that general rule.

9    6411 does not contain any such specific language.  It talks

10   simply about without further action.  We don't think those

11   words are so clear as to override the general presumption.

12   The Treasury regulations themselves, again, cannot - no

13   matter how helpful the Treasury regulations are, they simply

14   cannot take away jurisdiction that is otherwise afforded to a

15   court by statute, and those statutes again, 106(b) and 6411.

16   If Your Honor believes that the statute of 6411 does not

17   provide this specific exception for any judicial review

18   whatsoever, then we have the ability to present our case, to

19   argue that the IRS violated its statutory obligations to the

20   debtor in its review of our Form 1139 application.  By going

21   outside the two-page form of the application, the

22   quote/unquote, "limited review" that they are required to

23   take under the statute to determine if there are material

24   omissions or computational errors, once they go outside of

25   that review, which they have done, we believe they have

1   violated that statute, violated their obligations to New

2   Century as a taxpayer, and we have the ability to seek

3   redress before Your Honor.

4            THE COURT: Thank you.

5            MR. COLLINS: Thank you, Your Honor.

6            THE COURT: Briefly, very briefly, yes.

7            MR. GEHT: I just have three points: The first one,

8   our brief did not intend to represent nor do I believe it

9   represented that it was the holdings of those cases that

10  there's no review of 6411 determinations.  Our brief said

11  those courts stated repeatedly, which they did state

12  repeatedly, we did not mean to mislead the Court, which is

13  why we didn't classify them as holdings.  Second argument, we

14  do not dispute that there is a logical relationship between

15  2004/2005 years and the 2006 years.  Compulsory counterclaim

16  doesn't require that all of those be tried at the same time,

17  and as I pointed out before, the debtors don't want to try

18  all of them at the same time.  They're trying very hard to

19  keep 2004 and 2005 out of this process.  And finally,

20  although the service continues to insist that our rationale

21  should have absolutely no bearing on the question of

22  jurisdiction, I'd simply like to point out that mathematical

23  accuracy is just one of the things that the Court - that the

24  service is allowed to under the statute and under the

25  legislative history - If I may, and just citing from the

1    legislative history, Your Honor, it says, "The Commissioner

2    accordingly may correct any mathematical errors appearing on

3    application, and he may likewise correct any adjustments

4    required by law and incorrectly made by the taxpayer."  The

5    legislative history recognizes that there could be other

6    problems other than mathematical errors which is why the

7    statute expressly provided not just for computational errors,

8    which could be verified through mathematical accuracy

9    calculation, but also for material omissions.  In this case,

10   once again, although we do not believe that this should have

11   any bearing on your decision as to whether or not you have

12   jurisdiction, it was the opinion of the revenue agent that

13   there were material omissions because the debtors improperly

14   valued their inventory based on events that were occurring in

15   the marketplace known to the revenue agent, but if Your Honor

16   overrules the service and finds that it has jurisdiction,

17   we'll address that in greater detail at subsequent briefing.

18   Unless Your Honor has any questions?

19         THE COURT: No, it just struck me actually as you

20   said that for the first time that, the experts I now seeing

21   in my mortgage cases can't put a figure on what's happening

22   in the marketplace.  I'm curious to know how an IRS revenue

23   agent could - but maybe he can.

24         MR. GEHT: May I respond?

25         THE COURT: Yes.

1          MR. GEHT: It was the position of the revenue agent

2     that the subprime market did not - the meltdown did not begin

3     until after December 31st, 2006.  He asked for a simple

4     supporting calculation from the debtors and received a

5     schedule that dated inventory as of February 2007, that's

6     what started the whole process.

7          THE COURT: All right, thank you.

8          MR. GEHT: Thank you.

9          THE COURT: All right, the principles involved here,

10    I agree, are important.  I'm not going to render a decision

11    from the bench.  I'm going to write on it.  I will tell you

12    this opinion will not be first in the queue.  There are other

13    things in line right now.  I don't say that to dissuade

14    anybody, but maybe to encourage you to continue talking, if

15    you're able to do that.  Okay.  I'll render a decision in due

16    course.

17         MR. COLLINS: Thank you, Your Honor.

18         MR. SAMIS: Your Honor, the next items on the agenda

19    are agenda items number 23 and number 24.  They are the

20    debtors' motion to maintain the first interim examiner's

21    report under seal and maintain the debtors' reply thereto

22    also under seal.  I believe they'll be taken together by Mr.

23    Logan.

24         MR. LOGAN: Thank you, Your Honor.  Your Honor, I

25    think we need to go back to the order appointing the examiner

1    and the follow-on supplemental order designating certain

2    procedures for the examiner's investigation.  The order Your

3    Honor entered on June 1, 2007 in paragraph (11) is quite

4    clear that the debtors had no obligation to disclose any

5    privileged materials to the examiner.  That's the starting

6    point.  At our first meet-and-confer session with the

7    examiner, the examiner pressed us hard to try to figure out a

8    way to disclose privileged materials to the examiner, and

9    substantial negotiations ensued that culminated in the

10   supplemental order that was entered on October 1st - excuse

11   me, October 10, 2007, and it provides in there that the

12   debtors may - they're not obligated to, but they may disclose

13   certain privileged materials to the examiner.  If they did

14   so, that would not constitute a waiver of the attorney/client

15   privilege, and in order to protect against subsequent waivers

16   of the attorney/client privilege the order goes on to say

17   that the examiner's report will be filed under seal, and

18   there will be a period of time, ten days, where the debtors

19   or others may seek to have the report maintained under seal

20   or portions of it maintained under seal.  After that order

21   was entered, we, the debtors, engaged in substantial

22   deliberations with the Creditors Committee as to whether or

23   not all privileged attorney/client communications would be

24   disclosed to the examiner or whether, notwithstanding, the

25   protections set forth in the supplemental order, certain

1   materials would be withheld.  By and large, attorney/client

2   privileged materials were disclosed to the examiner.  There

3   were several exceptions, and they principally related to

4   ongoing present disputes such as the so-called cash

5   collateral dispute or the adequate protection dispute.  The

6   debtors, supported by the Committee, decided that that was a

7   subject that was sufficiently active, is probably the right

8   way to put it, that it would be inappropriate to disclose

9   attorney/client materials to the examiner.  Inevitably,

10  despite the best efforts of the examiner, we and the

11  Committee feared that attorney/client privileged

12  communications that were disclosed to the examiner on that

13  subject and a number of others, such as the WARN Act

14  litigation and some other issues would find their way into a

15  report and would force us to go through the exercise of

16  trying to keep materials under seal.  I'm not going to get

17  into the substance of the - I don't think I can in open

18  court, get into the substance of the attorney/client

19  communications that ultimately the debtors decided to

20  disclose, after consulting again with the Committee, to the

21  examiner and which we felt compelled to do so given some of

22  the conclusions, preliminary conclusions the examiner

23  reached.  The examiner's first interim report discusses that

24  process, and as like as we would to carefully parse that

25  report and excise the privileged portions, and indeed, I've

1   undertaken that exercise, Your Honor, but once you undertake

2   that exercise, the result is so disjointed that it's almost

3   impossible to make head or tails out of the examiner's

4   report.  We felt compelled to file a response, which we did

5   so.  It likewise gets into the privileged attorney/client

6   communications we disclosed to the examiner on August 31st and

7   thereafter, and again, we filed a motion to keep that under

8   seal largely for the same reasons, for essentially the same

9   reasons.  Again, one could go through our report and try to

10  cull out the materials that are privileged, and I've

11  undertaken that exercise.  Major parts would have to be cut.

12  The report would not be a cohesive whole if we did so, and

13  accordingly, we concluded that the appropriate step was to

14  seek to have both reports maintained under seal.  Now, I want

15  to be clear, we're not seeking to have those reports

16  maintained under seal in perpetuity.  Before I get to that,

17  there's one final issue that's not before the Court today,

18  but just so we have the full lay of the land before us, the

19  examiner a few days ago filed a limited reply to our

20  response, and again filed a motion to keep that report under

21  seal.  That is set for hearing on the 23rd of January.  Same

22  exact situation.  We could go through that and try to parse

23  out the portions which deal with privileged communications

24  from those that don't, and again, we would have a very

25  disjointed report.  Your Honor, I think by far, by far the

1   best approach is to adopt what the Creditors Committee

2   suggested in its response, and that is, set a period of time

3   - the Creditors Committee set four months, I'm not waiting

4   four months, Your Honor, but set a period of time where we're

5   back before the Court to consider whether or not, given the

6   state of affairs with the adequate protection parties, and I

7   want to return to that in just a minute, or with the plan of

8   reorganization, it is appropriate to open up all reports,

9   make them available fully to the public, and at the

10  appropriate time, I don't think it's very far off, we will

11  strongly recommend to our client - It's not my decision to

12  make, but we will strongly recommend to our client - I would

13  personally hope our client endorses this, may call these

14  documents public.  It's not our interest, not our purpose to

15  try to keep things hidden from the public.  To the extent

16  people feel that they're relevant, they can certainly look at

17  them at the time.  This, however, is not the moment, which

18  gets me to the adequate protection parties.  As we alluded to

19  in our reply, we are on the cusp of bringing to Your Honor a

20  settlement which we think will be quite beneficial to the

21  estates with the adequate protection parties of a global

22  settlement.  Mr. Power and I have been working with those

23  parties.  We are unaware of any substantive issue, drafts

24  have been circulated, quite frankly, the holidays were the

25  main impediment to getting something before Your Honor.  I

1   was hoping we would have something on file.  Indeed, at one

2   point I was optimistic it would be heard at the hearing

3   today, but I am confident that it will be before the Court

4   soon, and I think soon, whether it's at the time that hearing

5   occurs or as we go farther down the process with the plan of

6   reorganization, it will be appropriate to revisit the

7   question about whether or not the examiner's report should be

8   kept under seal, our reply kept under seal, and the

9   examiner's limited reply.  So, Your Honor, just to be very,

10  very clear, our motion - our two motions would seek to keep

11  the reports under seal but without prejudice to revisiting

12  that question at some point in time, whether it's 60 days

13  from now, 30 days from now, 4 months from now, I don't think

14  it makes that much difference.  There would be a checkpoint

15  to assess the situation at the time and make sure that our

16  felt need to disclosure attorney/client privileged

17  information to the examiner doesn't prejudice the estates.

18  That's it, Your Honor.

19          THE COURT: Thank you.  Let me hear from the

20  Committee next.

21          MR. INDELICATO: Good afternoon, Your Honor.  Marc

22  Indelicato on behalf of the Committee.  Your Honor, I do want

23  to go back to where Mr. Logan started the hearings with

24  respect to the motion to appoint the examiner or

25  trustee/examiner, and if the Court will recall, when the

1  decision had been made, it was strongly suggested by the

2  Court that we work out a methodology for the appointment of

3  an examiner.  One of the Committee's primary concerns at that

4  point in time was that information be kept under seal because

5  at least at that point in time, the primary focus was an

6  investigation of the potential disclosures or the disclosure

7  about the restating of the financial information, and our

8  point to the Court at that point in time was, this could

9  potentially, the investigation could lead to third-party

10  actions against third parties which could be a significant

11  asset of the estate, and to the extent that that report was

12  disclosed to the public, it could impede the estate's ability

13  to recover on those causes of action.  When the examiner's

14  order was ultimately entered, it included an examination of

15  the issues related to, quote/unquote, "the cash collateral

16  issues", and I believe, if I'm quoting the Court correctly,

17  the Court was concerned about those issues about cash

18  collateral and stated that the Court needed that

19  investigation to be concluded, and so the examiner was

20  appointed with a two-prong test: the cash collateral issues

21  and the financial disclosures.  The Committee was very

22  adamant in its position that the attorney/client privilege

23  not be disclosed as it - not be waived as it related to

24  potential causes of action against the estate or in which the

25  estate would have an interest as a potential asset, and Mr.

1   Logan mentioned a few of them being the WARN Act, the

2   deferred comp, and there were others.  So, we were vigilant

3   with the debtor in trying to preserve that attorney/client

4   privilege.  Fast forwarding now, Your Honor, to the

5   examiner's first report, and it was a little difficult

6   drafting the response because I think we are constrained as

7   to what we can say in public pleadings as a result of the

8   reports being filed under seal.  But the Committee's point

9   was very simply, we are at a very critical stage of the

10  negotiations and the plan process.  It's taken us a lot of

11  time, effort, and money to get there, and we believe that all

12  of the issues raised by the U.S. Trustee will be no different

13  now than they will be in four months from now, and we believe

14  it's in the estate's best interest to keep this report under

15  seal.  As the Court has seen, this is a report in which is

16  engendered a reply and for lack of a better word, let's call

17  it a sur-reply to the examiner's report, and to a certain

18  degree, the Committee stands there in our white and black

19  striped suit being the referee between the debtor and the

20  examiner as to what facts actually did occur, may have been

21  misinterpreted, may have been misconstrued, but I don't

22  believe that that is appropriate, Your Honor, yet to be

23  played out before the examiner finishes his final report and

24  we get a better understanding of it.  There were parties

25  working, as Mr. Logan indicated, to resolve which may be a

1    fundamental purpose beyond the initial report, and that's the

2    cash collateral issue, and hopefully that will be before Your

3    Honor.  So we truly believe, Your Honor, that under 107(b)

4    that this report should and could be kept under seal for a

5    limited period of time, and we picked four months, not

6    arbitrarily, Your Honor.  We tried to pick the shortest

7    period of time in which we believed we would be able to get

8    from point A to point B and point B being hopefully

9    confirmation of a plan or at least substantially close to a

10   confirmation of a plan.  Our suggestion was that we at least

11   keep it under seal for that period of time and that we

12   revisit the issue at that point in time at a specific date

13   and time so that all parties know this issue is going to be

14   readdressed and how it will be readdressed, and we reexamine

15   it, where we are in the case at that point in time and then

16   see whether or not disclosure is appropriate.  We understood

17   what the U.S. Trustee said, and we understand what the Court

18   has told us previously that they were reluctant to keep these

19   documents under seal, that to the extent there was

20   attorney/client privilege information, it could be excised

21   from the report.  This is a little bit of a unique situation,

22   Your Honor, where you have a report that's been replied to

23   and sur-replied, and I'm not so sure that works as easily,

24   and I think the public interest may be served by waiting the

25   four months and the time that we can disclose it in its

1  entirety.  Your Honor, I'm not sure the Committee would feel

2  the exact same with the examiner's next report, as I

3  indicated previously, because that may be a report that needs

4  to be kept under seal a lot longer.  We haven't seen it yet,

5  but that could theoretically set the groundwork for potential

6  causes of action by a liquidating trustee, and I think that

7  could be potentially very detrimental to the estate if that

8  were prematurely disclosed.  Your Honor, we have - and I

9  don't think, and I've said this so many times I'm beginning

10  to sound like a broken record, we cannot forget the costs

11  that the estate has incurred with respect to the examiner's

12  report, and you will hear a lot from the Committee on that in

13  weeks to come, but we are approaching $12, $14, $15 million

14  that this report has cost, and that's just with respect to

15  the examiner itself.  That's not including any of the fees of

16  the debtors or the Committee's professionals related to it.

17  The examiner has also requested an additional period of time

18  of filing a motion very close to the deadline, and we're

19  having a hearing in February, at least according to their

20  schedule.  The Committee may be before Your Honor much sooner

21  than that because we believe at least that the 15th was going

22  to be a real date and a report would be filed, although the

23  examiner told us he didn't think it would be possible.  But,

24  Your Honor, my point in raising all of this is that there are

25  - and I think the Court raised the issue before, there are

1   principles worth defending, but this estate has incurred an

2   enormous expense to get these reports before Your Honor.   I

3   believe we have satisfied, at least hopefully to the Court's

4   satisfaction, the first prong of it and at least the Court

5   has gotten the benefit of the cash collateral report.   It has

6   been shared with the Creditors Committee.   It's been shared

7   with the U.S. Trustee's Office.   I do believe there is a

8   public interest of having it disclosed at some point in the

9   future.   I don't believe this point is that point.   I think

10  that would be detrimental to the estate, and we will make the

11  same arguments, Your Honor, when the examiner finally files

12  his other report.   Again, at an enormous expense to this

13  estate, a report has been filed, and I think the estate

14  should get the benefit to the extent one exists of that

15  report, and I don't think you can do that by having that

16  played out in the public as subject to public disclosure.

17  Ultimately, as in other cases, there will become a point in

18  time when it is for the public to understand what happened,

19  but I don't think we should do it at the cost to this estate.

20  They've spent an enormous amount of money having these

21  reports prepared, and we believe they should be kept under

22  seal, and as I said, initially, this is not a normal report,

23  this first one.   This is a report that there may be some

24  inaccuracies, there may be some misinterpretations, there may

25  be some misapplications, but - and I don't think until we've

1    sorted all of that out, it's appropriate to have it

2    disclosed, Your Honor.  So, with all of that said, we believe

3    these reports should be kept confidential for a short period

4    of time.  We believe four months is an appropriate period of

5    time to adjourn this hearing, hopefully we will be at a point

6    in time at that hearing that we can welcome its disclosure to

7    the public, Your Honor, and revisit it in a four-month

8    period.  Thank you.

9         THE COURT: Thank you.  Let me hear from the U.S.

10   Trustee.

11        MR. McMAHON: Your Honor, good afternoon.  Joseph

12   McMahon for the United States Trustee.  In the course of my

13   presentation, I'm going to refer to the examiner's initial

14   report as the "report" and the debtors' response thereto as

15   the "reply".  Your Honor, there's only a single issue

16   presented before the Court today and that is, which portions,

17   if any, of the report and the reply disclose attorney/client

18   privileged communications.  I'm going to put that issue aside

19   for a second and address the issues raised by the Committee's

20   response and the debtors' joinder to that response first,

21   because I think that's the appropriate way to address this

22   issue.  Under the common law, there is an established

23   presumption of access to judicial records, but it's a

24   presumption.  It's not an absolute right, and courts have

25   exercised the jurisdiction to curtail access where compelling

1   reasons justified that relief.  So under the common law, the

2   analysis goes, Is it a judicial record.  Second, there's a

3   balancing of the public interest versus the privacy interest.

4   That's the common law.  Section 107 of the Bankruptcy Code

5   was enacted in 1978, and it provides that the Bankruptcy Code

6   must protect an entity or person under the circumstances that

7   are delineated in that statute.  So, under § 107 the analysis

8   changes any paper that's filed with the Court is a public

9   record unless it falls within one of the defined categories

10  in § 107(b), and significant for our purposes today, Your

11  Honor, § 107 supplants the common law in determining the

12  motion before this Court, and referring to the papers we

13  filed, Your Honor, the First Circuit's decision in Getto

14  Global (phonetical) contains a good analysis of the

15  distinction between 107 and the common law, and while the

16  common law analysis in this area required the Court to engage

17  in a balancing of the equities, § 107 does not afford

18  Bankruptcy Courts that latitude.  The only issue that's

19  before this Court today is, is there a statutory exception to

20  public access under 107(b) that applies.  That's the only

21  question, notwithstanding the Committee's and the debtors'

22  attempts to try to take this issue down a different road.  In

23  paragraph (9) of its response, the Committee requested both

24  the report and the reply remain under seal for approximately

25  four months, now is the period of time it's being latched

1   onto, at which point there would be another hearing to

2   determine which portions of the report and reply should be

3   unsealed at that point in time, depending on what the

4   Committee calls the status of the case.  And in paragraph

5   (10) of its response, the Committee indicates that it

6   believes keeping the report and reply under seal per its

7   proposal will be in the best interest of the estates.

8   Nowhere in paragraph (10) of the response or anywhere in the

9   response for that matter and in the debtors' presentation

10  today have we heard either of those parties cite a single

11  authority let alone a persuasive one which holds that post-

12  enactment of § 107, this Court has the discretion to seal

13  papers that have been filed with the Court based upon a

14  weighing of the equities.  At paragraph (13) of its response,

15  the Committee indicates that it believes that § 105(a)

16  justifies this Court in taking the position that it can

17  ignore § 107 for some defined period of time.  And as the

18  Third Circuit recognized in one of its Heckinger decision,

19  298 F.3d 219, § 105 does not authorize relief that's

20  inconsistent with more specific law, and here we have, Your

21  Honor, § 107(a), which says that the documents are public

22  records unless there's a specific exception.  Now, getting to

23  the specific issues that the Committee raises, information

24  which the Committee perceives will be unwelcomed or

25  information which the Committee, the debtors, name the party,

1   believes if released may lead to an increased estate cost is

2   not the type of information that falls within categories

3   appearing in § 107(b)(1), and the fact that the report is the

4   first of two instalments does not justify keeping the report

5   under seal for another four months, nor is the fact that

6   there are conflicting versions of events in the report and

7   the reply grounds for relief under § 107(b)(1).  We find that

8   nowhere in the statute, although the Committee would like us

9   to believe differently.  Now, while the Committee's argument

10  that this Court may ignore the plain language of the statute

11  to address its fear that from its standpoint disclosure may

12  have negative consequences, that argument has no legal merit

13  in our view.  A few points should be made.  First, at bottom,

14  the point that the Committee is making that disclosure may

15  affect the Committee's negotiation posture, vis-a-vis, the

16  repo counter parties or potentially other third parties, has

17  already been rejected by this Court in the Altera Healthcare

18  Corporation case.  It's 353 Bankruptcy Reporter 66, Judge

19  Walrath's decision where the debtors requested that certain

20  tort settlements remain under seal on the theory that

21  disclosure would give other parties in interest some

22  information, and this Court rejected that argument because

23  the information it issued didn't constitute commercial

24  information, confidential commercial information, that is,

25  that would have assisted business competitors of the debtors.

1    The second point, Your Honor, is that we believe that there's

2    information in the examiner's report that should be included

3    in the disclosure statement in some form accompanying any

4    plan solicitation, and this entire idea that we can separate

5    this critical function of this Court in appointing the

6    examiner from the remainder of the bankruptcy case and just

7    let the rest of the process go forward, I don't think gives

8    appropriate weight and substance to the importance of the

9    examiner and the examiner's role within the process.  So,

10   going back to the June 1st order, which Mr. Logan referenced,

11   I think we should remind ourselves that there was a best

12   interest finding in that order, meaning that, the debtors and

13   the Committee stipulated and this Court found that having the

14   examination was in the best interest of these estates, the

15   creditors, equity security holders, parties in interest, and

16   the examiner's appointment is based upon a recognition that

17   both pre- and post-petition, certain things occurred that

18   warranted further exploration and review, and the fruits of

19   the examiner's work, Your Honor, should be disclosed to the

20   extent required by law to serve this Court, those parties in

21   interest, and the process itself.  And in terms of

22   proceeding, Your Honor, I'm happy to go page by page or what

23   have you in terms of addressing our position as to why all or

24   parts of the information should be disclosed, but I just

25   believe that the debtors' blanket assertion that both

1    documents should remain under seal for, you know, an

2    indefinite period of time is flatly incorrect on its face.

3    They haven't met their burden of establishing that the

4    attorney/client privilege pervades both documents to the

5    extent that it should remain under seal indefinitely, and I'm

6    happy to take up that discussion with the Court on a more

7    detailed basis.  I think that probably because, Your Honor,

8    of the existing orders that we have that protect that

9    information, I would want to vet that issue procedurally with

10   the Court before we get to that point.

11          THE COURT: Well, let's just put that on hold for

12   the moment.

13          MR. McMAHON: Thank you.

14          THE COURT: All right.  Does the examiner wish to be

15   heard?

16          MR. FOX: Your Honor, Edward Fox from Kirkpatrick &

17   Lockhart Preston Gates Ellis LLP on behalf of the examiner.

18   Your Honor, the examiner is not taking a position or arguing

19   one way or the other with respect to this issue.  I think a

20   couple of factual issues, however, might be worthwhile to be

21   said on the record.  First, we filed a very brief reply with

22   respect to the debtors' response which addressed the notion

23   that the debtors assert that the examiner pressed hard with

24   respect to the privilege.  So, I won't repeat that here.

25          THE COURT: I've read it.

1          MR. FOX: Thank you.  We assumed you would.  The

2    privileged information that was revealed to us, I would just

3    point out, was revealed on August 31 which was before the

4    October supplemental order was entered.  The report itself

5    does not disclose what we were told.  We felt free to

6    disclose it if the examiner so desired.   The debtors asked

7    us not to.  We made no commitment one way or the other, but

8    nevertheless, the examiner chose not to include the specific

9    statements in the report that was filed.  The other point

10   that I would make, the Committee's response seems to expect

11   that the examiner in his final report will be including a

12   significant response or any kind of a response, quite

13   frankly, to the debtors' 59-page response to the report.  It

14   is not the examiner's understanding of his mandate that he is

15   to do that.  If the Committee would like to ask the Court to

16   do that and the Court so orders, the examiner will be happy

17   to undertake that -

18          THE COURT: I doubt very much whether I would order

19   that.

20          MR. FOX: Well, it is - but just so everybody and

21   the Committee is clear, it's not the examiner's intention in

22   the final report to revisit this issue or the debtors'

23   response.  If there are any other questions you have, I'll be

24   happy to answer them.

25          THE COURT: Yes.  When we had our last chambers

1   conference, the examiner indicated it was his intention to

2   meet the January 15th deadline.  Tell me what's happened.

3           MR. FOX: I was not present at that conference.  I

4   have been told of that conference.  So I don't know exactly

5   what was said at that time.

6           THE COURT: What was said was what I just told you

7   was said.

8           MR. FOX: Thank you, Your Honor.  The examiner's

9   been endeavoring to complete this within the January 15th time

10  frame.  As we indicated in the motion that was filed and we

11  can amplify on, the investigation has taken longer than we

12  expected because witness interviews have been pushed off, and

13  we have continued to get information from the debtors later

14  than we anticipated, and I believe in some cases we are still

15  awaiting information.  Nevertheless, the examiner pressed

16  ahead with interviews even though we didn't have complete

17  documentary information that we were hoping and expecting to

18  receive.  At this point, and I believe some of the KPMG

19  witnesses pushed off their interviews into January.  For the

20  most part the examination - the factual investigation portion

21  of the examination is winding down with certain exceptions as

22  I've indicated to a certain extent.  So it's now a question

23  of gathering the information and writing the report which,

24  you know, is something that the examiner and the team have

25  been working on as quickly as they can, but the examiner

1    concluded that given how the examination itself got delayed

2    due to factors beyond the examiner's control, that the

3    examiner could not put together a report in the form and the

4    fashion that he would want to provide to the Court to make it

5    be as useful and appropriate as possible by the 15th of

6    January.

7            THE COURT: What's the extension that's requested?

8            MR. FOX: The requested extension, I believe, is

9    through March 17th, and that would be primarily relating to

10   drafting and finalizing the report.  As I say, for the most

11   part, although with certain exceptions, the factual

12   investigation, the fact gathering is substantially although

13   not completely complete.

14           THE COURT: I am extremely disappointed to hear

15   that, especially in light of the Committee's continuing

16   expression of concern about the mounting expense involved in

17   this.

18           MR. FOX: The examiner is aware of those concerns

19   and is taking steps to contain that, and we expect that the

20   cost of the final steps of drafting the report will be lower

21   certainly than the monthly costs while the investigation was

22   ongoing.

23           THE COURT: All right, well, let me offer this

24   advice.  When is the motion scheduled for hearing?

25           MR. FOX: February 6.

1          THE COURT: That the examiner come to that hearing

2    prepared to reduce his request for time to the extent humanly

3    possible and with a proposed budget for what will be involved

4    in work beyond that date.

5          MR. FOX: I'll advise the examiner, Your Honor.

6          THE COURT: All right, thank you.

7          MR. INDELICATO: Your Honor, given where we are in

8    the proceeding, Your Honor, we would have no objection to the

9    Court shortening the time to the 23rd.  We would actually

10   even, if appropriate, make an oral motion to have that heard

11   on the 23rd.  Every week Your Honor is hundreds of thousands

12   of dollars and we really would like to have that issue

13   addressed.  The Committee is very concerned, and you know, we

14   had made some alternatives - this is not the appropriate

15   forum, to the examiner in which if he thought he needed more

16   time we could deal with it, but we really would like to have

17   that motion heard as quickly as possible.

18         THE COURT: Is there any objection to hearing it on

19   the 23rd?

20         MR. FOX: No, Your Honor.

21         THE COURT: Anyone else?  Schedule it for the 23rd.

22   I'll order that from the bench.

23         MR. INDELICATO: Thank you, Your Honor.

24         THE COURT: Set for hearing on January 23rd at 1:30.

25         MR. LOGAN: Your Honor, I'll be uncharacteristically

1    brief.  One thing that Mr. Fox said gives me great heart, and

2    that is, they don't intend to file a sur-sur-reply or

3    whatever label we want to attach to it.  We also have no

4    intention to weight down the record any further with give and

5    take on the so-called cash collateral adequate protection

6    issue.

7           THE COURT: That's good because I will tell you, I

8    was singularly unimpressed with the substance of the debtors'

9    response.

10          MR. LOGAN: I'm sorry to hear that, Your Honor.  In

11   any event, as far as keeping materials under seal, our

12   concern, we think that the arguments made by the U.S.

13   Trustee, which are premised on 107(b) which has to do with

14   defamatory material or commercial material that needs to be

15   protected missed the mark.  The last paragraph in Your

16   Honor's October 10 order listed that as among the bases for

17   keeping materials under seal, also any attorney/client

18   privilege materials, any attorney work product, any other

19   materials of that sort, any applicable privilege or

20   protection, and on that basis, Your Honor, we do think that

21   the grounds are that the examiner's report and our reply,

22   impressive or unimpressive, necessarily get into some

23   attorney/client privilege communications that were disclosed

24   to the examiner.  The examiner's report sets up a premise

25   that the examiner assumed that certain legal positions were

1   taken.  It was told they were not.  While he doesn't say what

2   the advice was, it follows like the night to day what our

3   response must have been.  As the U.S. Trustee said, we could

4   go through chapter and verse with the examiner's report and

5   our reply.  Doing that inherently in open court, I think,

6   would disclose the attorney/client privileged information,

7   and I think it's inappropriate.  I do think the right step is

8   to weigh out all of these reports before the public, but not

9   today because the need to protect attorney/client privileged

10  materials presumably will pass shortly.  The estates will not

11  be harmed if we adopt the suggestion made by the Committee

12  and have a holding date, whether it be the four months or

13  some shorter period of time, quite frankly, the debtors don't

14  care.  That's it, Your Honor.

15          THE COURT: Thank you.  Well, I will tell you, it is

16  my distinct impression from having read the papers, including

17  those filed under seal, that the debtors' main motivation

18  here is to prevent the embarrassment over - among other

19  things, having giving allegedly misleading information to the

20  examiner, and I believe in some large part the assertion of

21  attorney/client privilege is a smokescreen, and I can't help

22  but conclude, at least without actually ever hearing any

23  evidence, that it demonstrates a bunker mentality into which

24  the debtor has fallen.  There may be good reason for that,

25  but I will tell you, I tend to agree with the U.S. Trustee

1   that parts of this report can certainly be released to the

2   public and ought to be.  I have some - The Committee's

3   argument that especially since it's on the verge of making

4   settlement with the adequate protection parties, I think

5   ought to be a relevant factor, and it is in my mind.  When I

6   took the bench today, I had initially - I was unaware that

7   the examiner had filed a motion for more time.  I had been

8   proceeding on the assumption, based on the representation

9   that had been made at our last chambers meeting on this

10  topic, that that deadline would be met, and my initial

11  inclination was that there would likely be the same types of

12  issues raised with the final report, and it had been my

13  preference, it was my preference, to address all those issues

14  at the same time rather than to do them in pieces, but I

15  think given the timing now of filing the final report,

16  whenever that will end up being, I think that would delay

17  things too much.  I had advised the debtor at the last

18  chambers meeting that it should be much more tailored in its

19  request for sealing.  I'm pleased to hear that the exercise

20  was undertaken, disappointed to hear the debtor did not feel

21  it could do so without impinging on attorney/client

22  privilege.  I disagree with that.   So, my inclination,

23  frankly, is to give the parties a little more time to sit

24  down among themselves and to try to work it out especially

25  with the U.S. Trustee in terms of what ought to come out and

1    what not.  To the extent that cannot be agreed, I'll have a

2    closed session, and I'll make a decision about what should be

3    released.  My inclination is to bring you back on that topic

4    either on February 6th or February 20th, and I'm open to views

5    about giving your schedules how much time you'll need to work

6    through that.

7            MR. POWER: Your Honor, Mark Power.  That's to

8    review the report to determine what we think would be the

9    least amount that should be under seal?

10           THE COURT: That's correct.  You know, I'd like to

11   give the parties the chance first to sit down among

12   themselves and try to work something out by agreement.  I

13   reserve the right to disagree even if there is agreement, but

14   I'd at least like to have you go through that exercise, given

15   the views I've expressed today.  How much time do you need to

16   do it and can you be prepared to come back on the 6th of

17   February with that or do you think you need more time?

18           MR. POWER: Can we just -

19           THE COURT: Think a minute, if you need it.

20           MR. POWER: Sorry, Your Honor.  The Committee and

21   the debtor will be fine with the 6th.  We were proposing that

22   we take a crack and try to modify the report and really limit

23   what we think should be under seal.  Hopefully, we'll be done

24   - we'll have a settlement done also with the adequate

25   protection parties by then.  I know Ben and I are trying -

1    and then we can adjourn this till then and come before the

2    Court if there are any issues and if we haven't made

3    progress.  If we make progress then we can the Court for a

4    short adjournment to get it done or we may be done by then.

5    Mr. McMahon thinks it should be earlier, so I'll give him the

6    podium.

7         MR. McMAHON: Your Honor, Joseph McMahon for the

8    U.S. Trustee.  While the U.S. Trustee is respectful of the

9    Court's desire to have us interact with the parties in a way

10   to try to attempt to resolve these issues, I think that the

11   time frame on which this occurs should be reflective of the

12   fact, consistent with the Court's observation, that

13   essentially at the last chambers conference, the debtors and

14   Committee were put on notice of the fact that the Court

15   wanted to see something prior to this hearing on that point,

16   and it was met with silence.  In light of that, Your Honor,

17   we would suggest that the hearing occur - or this issue be

18   addressed at the earliest possible time, and I don't know

19   whether that means from the Court's standpoint, the next

20   omnibus hearing on the 23rd or at some earlier date because

21   consistent with our position, Your Honor, every day that this

22   information remains from public view it represents some - an

23   issue for us to address.

24        THE COURT: Well, but I don't see the timing as

25   between now and February 6 as being critical to any event.

1    At least I haven't heard anything to that effect.  While I

2    don't necessarily disagree with the U.S. Trustee's position

3    in substance, I don't - the timing doesn't strike me as an

4    issue that militates urgently in favor of disclosure,

5    particularly, I think, in light of the Committee's position,

6    vis-a-vis, settlement with the adequate protection parties.

7    And I do, by the way, think Altera's a little bit different.

8    That was a situation in which the sealing was intended to

9    keep other tort claimants from advantaging themselves in

10   connection with settlements that were being made, and the

11   Court said, Nah, that's not enough.  This is a little bit

12   different from that, and I wonder too whether, even if you're

13   right about the 107(b) argument, and I always hesitate to

14   rely on 105 for reasons which are obvious, I think, to

15   everyone in the courtroom, but it seems to me that in

16   furtherance of the Court's expressed powers to charge the

17   examiner with certain responsibilities, that it might be used

18   in support of, for appropriate reasons, keeping certain

19   information confidential.  So, I don't see an issue with

20   asking the parties to come back on February 6th and address it

21   then but would ask that they proceed diligently to try to

22   work something out.

23          MR. McMAHON: Your Honor, just for the record, with

24   respect to Mr. Logan's reply to my argument.  We didn't see

25   the supplemental examiner order as identifying any categories

1   of information that would not be protected under 107(b) in

2   the first instance, to the extent there's a suggestion by the

3   debtors that it creates some type of different right, the

4   sealing, we disagree, but I just want to note our position

5   for the record, Your Honor.

6           THE COURT: It's noted, but you raise something that

7   I guess I haven't expressly addressed and that is, really,

8   what the parties ought to be doing is working on all three of

9   those filings since the parties have requested respectively

10  that all three of those documents be kept under seal. It

11  seems to me you ought to deal with them all at once.

12          MR. LOGAN: I assumed as much, Your Honor.

13          THE COURT: All right, just so we're clear on that.

14  Anything further on this motion or on these motions?  All

15  right, we'll carry them to the 6th then.

16          MR. SAMIS: Your Honor, the next motion on for

17  hearing for today is the motion of Wells Fargo Bank for

18  allowance and payment of administrative expense claim.  I'll

19  turn that over to counsel for Wells Fargo.

20          MR. NICELY: Good afternoon, Your Honor.  Andrew

21  Nicely appearing on behalf of Wells Fargo.  This comes on our

22  motion for approval of an administrative claim for the legal

23  fees and expenses that Wells Fargo has incurred in performing

24  its duties under the trust agreement that it signed with the

25  debtors.  The trust agreement is attached as Exhibit A to our

1    motion.  It was also attached as Exhibit C to the plaintiff's

2    complaint in the adversary proceeding.  Under § 6.1(e) of the

3    trust agreement, Wells Fargo is directed to defend suits and

4    represent the trust and the trust fund in all suits or legal

5    proceedings.  And in § 6.1(h) of the agreement, Wells Fargo

6    is permitted to retain legal counsel to represent the trust

7    and the trust fund.  § 8.2 of the trust agreement entitles

8    Wells Fargo to recover all reasonable expenses incurred by

9    Wells Fargo in the performance of its duties under the trust

10   agreement, and "expenses" is defined in § 8.2 to include

11   legal expenses and attorney's fees.  Now, as the debtors

12   point out in their limited objection to the motion, the trust

13   agreement expressly contemplates that Wells Fargo will be

14   made whole for any legal fees it incurs in performing its

15   duties under the trust agreement.  Now, § 8.2 provides that

16   Wells Fargo should first look to the debtor directly or to a

17   special fee account to recover its expenses including

18   attorney's fees, but if there is no fee account, as there is

19   not here, or if the fee account is underfunded, then Wells

20   Fargo may look directly to the trust for payment of its fees

21   and expenses.  I think it's stipulated or it's understood

22   amongst the parties that there is no fee account.  However,

23   as the debtors point out in their limited objection, and I

24   think there's been no dispute raised about the question, the

25   trust is currently over-funded by more than $2.5 million

1  after an insurance loan is repaid and assuming that the

2  plaintiffs or the beneficiaries who filed the adversary

3  proceeding are paid in full on their claims.  After those

4  payments are made there would still be a surplus in excess of

5  2.5 million in the trust fund.  Now in their limited

6  objection, the debtors assert that it's unnecessary for the

7  Court to resolve whether Wells Fargo is entitled to

8  administrative priority and said it's simply sufficient for

9  the Court to allow Wells Fargo permission to take its legal

10  fees and expenses directly out of the trust account, and the

11  debtors state in their papers that Wells Fargo is entitled to

12  that relief.  It is entitled to recover its legal expenses

13  and other fees.  Wells Fargo having reviewed the debtors'

14  position, agrees that it is based on a plain reading of the

15  trust agreement, in other words, the trust agreement allows

16  Wells Fargo to recover its fees and expenses directly from

17  the trust if the debtor does not pay them and/or there is no

18  fee account.  And because there is a surplus of more than 2.5

19  million in the trust account, our view is that the plaintiffs

20  and the beneficiaries have no standing to object to the

21  payment of our fees from the trust account because there's

22  sufficient funds in the trust account to fully satisfy their

23  claims.  So if the Court is prepared to accept the solution

24  proposed by the debtors, which is to allow us to recover our

25  fees from the trust account, I believe that I could sit down,

1    Your Honor, but if the Court is not persuaded by that

2    solution, I'm happy to address our position and why we are

3    entitled to an administrative claim.

4         THE COURT: Let me suggest that you sit down now,

5    but after I hear from others you'll have the opportunity to

6    speak again if you wish.

7         MR. NICELY: Thank you, Your Honor.

8         MR. HUSTON: Good afternoon, Your Honor.  May it

9    please the Court, Joseph Huston of Stevens & Lee on behalf of

10   the plaintiffs and the beneficiaries of the deferred

11   compensation plan.  We set out in our papers, I think, pretty

12   clearly and the debtor has set out in its papers even more

13   clearly why Wells Fargo is not entitled to an administrative

14   expense.  It simply is not.  It doesn't qualify, and I

15   wonder, in light of what's just recently been said, whether

16   the debtors have actually thought through their proposal

17   because we are not - or rather, Wells Fargo is not the only

18   party to an agreement in this case where there is an

19   attorney's fees provision and there may be surplus funds

20   available to pay the attorney's fees.  There are indenture

21   trustees, there are other parties out there, and it would

22   seem to me that the debtors having sort of thrown us under

23   the bus here saying, Don't get the money out of the estate,

24   get the money from these folks, may set a bad precedent for,

25   say, inviting other parties with similar provisions to say,

1    Oh, well, we have money in our accounts, we'll just take it

2    out of there.  The only way that there could be the payment

3    of either - and I will also say that we found it somewhat

4    interesting that there was no response from the Creditors

5    Committee because to the extent that there are excess funds

6    in the beneficiaries' accounts, that is money that would re-

7    down to the benefit of the estate and the creditors of the

8    estate.

9          THE COURT: I'm going to address that with the

10   Committee.

11         MR. HUSTON: In addition, if the funds constitute

12   property of the bankrupt estate, then I believe that the only

13   way that Wells Fargo could get paid a hundred cents on the

14   dollar would be if it had an administrative claim.  The cases

15   are, although not a hundred percent clear, the cases say that

16   - and generally an unsecured creditor does not get paid

17   attorney's fees.  Now, the Supreme Court last year in the

18   Travelers case said, Well, we're going to send this back to

19   the Bankruptcy Court to - or District Court and then

20   Bankruptcy Court to determine the issue about whether non-

21   bankruptcy law would provide for those fees, but in that

22   case, it was simply whether that party, Travelers, had an

23   unsecured claim to be treated as an unsecured claim with all

24   other unsecured creditors to be paid pursuant to a plan of

25   reorganization.  The Supreme Court specifically reserved,

1   because the argument had not been raised below, specifically

2   declined to address the argument that you must be a secured

3   creditor with an equity cushion before you get attorney's

4   fees in a bankruptcy case under § 506(b).  Now with that as

5   background, let's address - and I know Your Honor's read the

6   papers, an important issue here and I must clarify our

7   objection.  An important issue here is why Wells Fargo came

8   off the bench all guns blazing, all flags flying and jumped

9   in, feet first, on all of the issues which ostensibly the

10  debtors and the Committee have already adequately addressed,

11  except perhaps, with respect to the issues unique to Wells

12  Fargo.  In our objection we said that, paragraph (6),

13  "Pursuant to an agreed scheduling order entered by the Court,

14  the debtors filed a motion to dismiss the adversary

15  proceeding on July 25th."  That's inaccurate.  The debtors

16  filed a motion to dismiss the complaint on July 25th.  On that

17  same day, Wells Fargo and we, the plaintiffs, entered into a

18  stipulation giving them additional time within which to, in

19  their words, "answer, plead, or otherwise move in response to

20  the complaint".  Now, why do I care about that?  On the 25th,

21  we entered that stipulation.  On August the 1st, having not

22  heard anything from the Court, we reached out to Wells

23  Fargo's counsel to say, What's up?  They called chambers and

24  found out that they had submitted the stipulation with a So

25  Ordered provision as opposed to Your Honor's directive of an

 1   actual order, and so, they resubmitted it, and the fact that

 2   that stipulation, which was agreed to on July the 24th, wasn't

 3   entered until the day before the scheduling order, is simply

 4   the result of an administrative misstep.  The only purpose

 5   behind the scheduling order and the fact that it was

 6   basically intended as a standstill agreement was for the very

 7   purpose that the significant issues, the top-hat plan, all

 8   the rest of those plans, had been teed up by the debtors'

 9   motion to dismiss, and although the language of the

10   scheduling order could have been, perhaps, clearer when it

11   said - It says, Answers and responsive pleadings, debtors

12   shall answer the - Excuse me, defendants shall answer the

13   plaintiff's complaint and file any other responsive pleadings

14   within 14 business days after the entry of this Court's order

15   with respect to the motions to dismiss unless that order

16   results in a final dismissal without leave to amend of the

17   adversary proceeding in which event, no further pleading is

18   required.  Now, Wells Fargo says, Well, a 12(b)(6) motion

19   isn't a pleading, and I think, technically, that's correct,

20   but it's clear that the whole intent of the scheduling order

21   was to bring the case, pencils up, as they say, let the Court

22   determine the debtors' motions to dismiss.  If we were kicked

23   out of Court, game over, we go home.  Nothing else is

24   required.  Instead, a couple of weeks later, and I will say

25   to my surprise and that of Mr. Keech, Wells Fargo filed this

1   extensive motion taking substantive positions both that the

2   debtors and the Committee had already taken up, and then also

3   taking substantive positions with respect to its own position

4   in the litigation, and on whether or not this is an

5   administrative expense or somehow was a benefit to the

6   estate, we need only look to the positions that, well, we

7   have said on the record, that they are basically a

8   stakeholder.  The Court's order from back in May basically

9   put these funds in custodial legus (phonetical).  Nothing

10  could have happened to them until further order of the Court.

11  There was no reason for Wells Fargo to jump into the fray

12  especially the way that it did.

13        THE COURT: Well, if you represented a client that

14  was on the bottom side of the caption in a lawsuit -

15        MR. HUSTON: Yep.

16        THE COURT:  - you wouldn't standby; would you?

17        MR. HUSTON: If I had no duty to respond until

18  sometime after this Court had decided the issue, I would have

19  actually, and I will also suggest that there are other ways

20  of doing that, especially if I am to be - If I am the

21  trustee, the administrative agent under a trust like this

22  where I would be spending other people's money.  There are

23  other ways to raise everyone of the defenses that they raised

24  in their motion to dismiss without spending $185,000 in

25  litigation expenses.  One thing to do would be, just answer

1   the complaint.  They could have preserved every position with

2   just answering the complaint.  The scheduling order also

3   says, dispositive motions could be filed anytime up until 30

4   days after the discovery deadline.  So, even taking their

5   interpretation of the order, the scheduling order as correct,

6   which I do not, they still have the right to a file

7   dispositive motion at any time they wanted.  I don't think

8   that it took that sort of level of effort at this stage in

9   the case, and we are only at the pleading stage where many of

10  their issues are fact based, as I think we've demonstrated.

11  It just makes no sense, but their suggestion that this has

12  somehow benefitted the estate and that they should somehow be

13  paid in hundred cent dollars as opposed to other dollars, is

14  belied in their rather remarkable response to our little

15  supplement that we put in advising the Court where Wells

16  Fargo says, Plaintiffs are thus mistaken when they suggest

17  that this Fenwick (phonetical) case somehow bolsters their

18  opposition to Wells Fargo's motion to dismiss.  Wells Fargo

19  was not defending the assets of the estate or doing anything

20  for the benefit of the debtors.  Wells Fargo was in the

21  business, understandably so, of having the complaint

22  dismissed as to it.  It's also remarkable that the person who

23  not only functionally, but again, as a result of your order

24  and their duties under the trust agreement, is a mere

25  stakeholder and should have been content to sit on the

1   sidelines, let the real actors, the debtors and the real

2   parties in interest, the Committee, slug out the issues of

3   the substance.  Is there a bonafide deferred compensation

4   plan with a qualifying rabbi trust or is there not.  Now,

5   Wells Fargo in their papers, said, Oh, but we're more than

6   that.  We actually have this grand duty to defend the trust,

7   and I suggest to you, first, there were already people out

8   there doing that, and second, again in their response to our

9   little supplement, they state, "Wells Fargo, however, is not

10  the fiduciary of the plan because it does not administer the

11  plan in any way but only pays out benefits as directed by the

12  plan administrator."  And the plan administrator is the

13  Compensation Committee who tellingly is also a defendant and

14  by agreement has had to do nothing in this case until the

15  Court decides the debtors' and the Committee's motions to

16  dismiss.  If we prevail and this is, indeed, not a bonafide

17  deferred compensation plan, and in fact, is an ERISA plan - I

18  should say by the way, we have no objection to Wells Fargo's

19  being paid, what I'll call, their ordinary course-of-business

20  expenses in doing whatever it is they do to administer the

21  plan day to day, but it makes absolutely no sense that we

22  would consent that they could use our money or the estate's

23  money to fight us.  They would be the only other party - only

24  other un-retained professional party in the case to be paid

25  out of estate funds, if the debtor is correct, or to be paid

1    to fight with us over our rights and to take positions

2    directly adverse to our rights under the plan, which

3    ultimately may be vindicated that they would then be entitled

4    to fund their defense of our claims out of our money.  It is

5    interesting that Wells Fargo now takes the position that the

6    plan is over-funded because in their initial response to the

7    debtors' motion under 345 to do something different with the

8    funds and pay it down, they were concerned that nobody really

9    knows whether the plan is unfunded or not, and initially was

10    unfunded by, I believe it was - it's now down to 2.5 as a

11    result of making a payment of an insurance policy, to which

12    we consented, but that's getting to be a relatively slim

13    margin, and I don't think that we, today, can say, Just take

14    the money.  It's dust.  The final thing, Your Honor, is - I

15    mentioned before the concept of spending other people's money

16    and Exhibit B to Wells Fargo's motion demonstrates how easy

17    it is to spend other people's money.  This is their redacted

18    detailed time entries, the bills to Wells Fargo.  They had no

19    fewer than seven people working on the case.  By the time

20    entries that ended July the 31st, and this is one week after

21    they had been sued and they made contact with us, they had

22    spent $30,000 in fees.  Hours and hours of research.  We see

23    that in August, and I'm looking at a page, it's page 3 of the

24    August invoice, the dates of August 10th through 14th there are

25    numerous people conducting research at seven and a half hours

1   a day, nine and a half hours a day.  Some - the lowest hourly

2   rate, I could calculate was $340 an hour to do research, time

3   we can, over the course of about three days spent 24 hours.

4   There were a number of day on which Ms. Grotberg, Ms. O'Mera,

5   and Ms. Obsignic (all phonetical) engaged in three-way

6   conferences which they charged us somewhere between five and

7   seven hours apiece to talk to one another about the identical

8   issues in the case.  We get to the end of the period, the

9   bill dated August the 31st, and we are up, again, at this

10  point we have a stipulation, a scheduling order, and we have

11  their motion to dismiss.  We are now at $90,000, and it goes

12  on from there to the point where by November, we're at

13  $162,000 and climbing.

14       THE COURT: I know, which is why in my next life I'm

15  coming back as a trial lawyer.

16       MR. HUSTON: My point is, Your Honor, that this,

17  even assuming that they have some right to payment, and we do

18  not concede that, if they have anything, they have an

19  unsecured claim to participate in the assets of the estate

20  like any other creditor based on a pre-petition obligation

21  which is the trust agreement and to the extent it's

22  incorporated in the plan.  But in any event, these fees need

23  to be significantly pared down, and I will tell you that for

24  them to get to this point is about $20,000 north of what

25  Bernstein, Shore and Sevens & Lee have into the entire

1    litigation, not the entire case, but the entire litigation,

2    and we're being paid by the participants themselves.  So, if

3    nothing else, we need to have a justification by Wells Fargo

4    how each of these is a truly compensable item, and if we go

5    through the time entries, Your Honor, they're looking at

6    issues about the withholding requirements in the event the

7    trust is avoided.  Well, that's a little premature.  Even

8    back in July, they were doing research on a motion for the

9    allowance of administrative expenses, and there's just so

10   much inappropriate wheel spinning and piling on that went on

11   here, that that is simply an indefensible number.  We would

12   never permit that to be paid out of the assets once it is

13   established that that's our money, and I just can't believe

14   that the debtors and the Committee would agree that that

15   issue be paid out of money otherwise available to the

16   creditors of the estate.

17            THE COURT: Thank you.

18            MR. HUSTON: Thank you.

19            MS. UHLAND: Your Honor, Wells Fargo has conceded

20   the primary concern that we raised that this is indeed, you

21   know, amounts that should be payable under an indemnification

22   provision because they relate to pre-petition actions, and

23   they've been brought in -

24            THE COURT: I don't think they conceded that.  I

25   think they said if they would -

1          MS. UHLAND: They said they would sit down, if you

2    would agree.

3          THE COURT:  - agree with the debtor, they were

4    entitled at least to that.

5          MS. UHLAND: Yes.

6          THE COURT: Okay.

7          MS. UHLAND: But, let me then rephrase.  Our primary

8    focus of our position is that this is not an administrative

9    expense claim.  They're not doing this at the request of the

10   debtors or to benefit the debtors.  They are a co-defendant

11   with the debtors in the litigation and are defending

12   themselves.  While the litigation positions of the Committee

13   and the debtors and the trustee are consistent, they're not

14   providing a particular service to the debtors by

15   participating in the litigation, and the fact that the

16   debtors and the Committee are concerned about their legal

17   rights in this litigation by permitting or we are

18   considering, have not yet agreed to, a dismissal of Wells

19   Fargo because our concern is that we'll be taking a position

20   with respect to which parties are necessary that we are not

21   prepared to take at this time.  So the fact that they are in

22   as a co-defendant and that the Committee and the debtors have

23   been not willing to arrange for their dismissal, does not

24   translate into the fact that they are participating in the

25   litigation for the benefit of the estate or at the request of

1    the estate.  They are, as you noted, named on the bottom half

2    of the caption and are in this matter defending themselves.

3    We do agree, and looking at 1710, that there is an

4    indemnification provision in our trust agreement that allows

5    the trustee, when named, to seek indemnification.  I would

6    note, we did not go into this in our opposition, but I would

7    note in partial response to the plaintiffs and perhaps in the

8    Court in fashioning some relief today or the next step, that

9    only, you know, to the extent that legal fees are

10   reimbursable, it does provide in indemnification reasonable

11   attorney's fees and costs of defense are what is provided.

12   The debtors did not address that.  The reasonableness issue,

13   and I do think - I don't, by failing to address it in our

14   opposition, seek to concede that on behalf of the plaintiffs

15   who are - if anything, they are the creditors but based on

16   our position of the trust agreement, the plaintiffs are the

17   creditors of NCFC - are substantial creditors of NCFC for

18   whom we believe the benefits of this trust are now in fact

19   payable - I'll get to that in a minute.  But there is a

20   reasonableness requirement with respect to the fees that I

21   would alert the Court to, but the debtors, our position is,

22   that these are costs for which they should be properly

23   indemnified.  And now the next question is, is that pre-

24   petition indemnification claim chargeable against the trust

25   assets in this case?  I have seen more clear trust language

1    with respect to the ability to charge such fees against a

2    trust agreement, but we believe, based on the workings of the

3    trust, that 8.2 and 8.3 of our trust agreement do provide

4    that these amounts owing Wells Fargo are in effect chargeable

5    to the trust and taken, if you will, off the top of our trust

6    assets.  That's also consistent with the requirements of the

7    trust that 110 percent of over-funding be maintained at all

8    times under the terms of the trust.  We believe that that

9    requirement was provided to insure that these types of

10   expenses by the trustee and other expenses will remain and be

11   available to pay those types of claims in all situations to

12   the extent expenses arise.  The debtors' view with respect to

13   the trust is that the trust assets, now that we are

14   insolvent, that the trust assets were always the assets of

15   NCFC.  This was established by NCFC, one of the debtors, a

16   public company parent, to make sure that it has the funds

17   available to pay it's obligations and that the trust assets

18   provide that in the event of a bankruptcy of NCFC that these

19   funds that were, in effect, reserved by NCFC are to be

20   available to the unsecured creditors of NCFC, and the debtors

21   do believe that, they do believe that these trust assets

22   which are for the benefit of the creditors of NCFC at this

23   point, all creditors of NCFC, not only the deferred

24   compensation participants, are subject to these claims, this

25   type of indemnification claim of the trustee by virtue of 8.3

1    of the trust agreement.  Now, currently, we are under a

2    freeze order, if you will, by the Court such that no payments

3    from these trust assets are being paid and that was by, I

4    believe, stipulation of the parties.  The debtors have filed

5    a motion, the Court has agreed, the parties have agreed to

6    repay an insurance loan within the trust to avoid that

7    interest and to move the investments within the trust to the

8    most conservative vehicle available to us, but we have not -

9    we are keeping the trust structure in place.  There are no

10   further contributions being made to the plan, as the Court

11   would expect, but we're holding this in status quo.  The

12   debtors, given the magnitude of the claims, are prepared,

13   subject to Court order, to, you know, consistent with our

14   status quo order by obtaining an order to allow the Wells

15   Fargo payments to be made at this time, but they don't - We

16   don't feel that we are obligated, necessarily, to do so.  We

17   have the trust assets are there.  We believe this is a claim

18   that's ultimately payable by trust assets to the extent of

19   the reasonable fees incurred by the trustee.  So, that is our

20   position on the trust, is they are payable, they are senior,

21   if you will, to the - if the payment's out of the trust back

22   to the estate's creditors, but they are subject to the

23   reasonableness requirement.

24            THE COURT: Thank you.

25            MR. INDELICATO: Good afternoon, again, Your Honor.

1    Mark Indelicato from Hahn & Hessen on behalf of the

2    Committee.  First, let me apologize to the Court for the

3    Court not hearing from the Committee, but if the Court may

4    recall -

5           THE COURT: Oh, I had plenty to read already.

6           MR. INDELICATO: This is one of those instances

7    where I sort of did stick my foot in my mouth, if the Court

8    will recall, and at one of our hearings in which Wells Fargo

9    wanted to be dismissed from the litigation, and I said to the

10   Court, Funny I should find myself saying this, but to the

11   extent they are entitled to fees under the terms of the

12   agreement, they should be paid, but we believe that they

13   should not be dismissed from the litigation.  And I think Ms.

14   Uhland has correctly stated, at least as we review the trust

15   agreement, I think it's under 8.2 and 8.3, they are entitled

16   to their fees from the trust.  Reasonableness - I don't

17   necessarily have a view on that at this point, but I think

18   they are entitled to their fees.  Your Honor, as much as I

19   hate to do this, I think we have to back up again as we've

20   done before and unfortunately today people are using

21   colloquialisms which are sort of making the hair stand up on

22   the back of neck.  People have referred to this fund several

23   times as being over-funded, and over-funded is a term used

24   under ERISA to indicate amounts in excess of what parties are

25   entitled to under the ERISA law, and at least from the

1   Committee's perspective, Your Honor, that could be nothing

2   further from the truth in this case.  This is a bilateral

3   contract between the debtor and Wells Fargo as trustee.  It's

4   money the debtor put aside if in fact it was necessary to

5   fund obligations that it was required to pay later on, but

6   they were not required to put this down - I know we're going

7   over ground already covered, but I think it's important for

8   the Court to understand why we, at least, believe Wells Fargo

9   is needed in the litigation and why it was necessary for them

10  to take the actions they did take.  So, as I said, this is a

11  bilateral agreement between the trust and the debtor - I

12  mean, between Wells Fargo and the debtor in creating a

13  grantor trust.  Why is that important?  Well, Your Honor, in

14  creating the grantor trust, there were certain provisions in

15  the trust agreement.  You can't overlook the relief that the

16  plaintiffs are seeking when you look and you analyze Wells

17  Fargo's reaction to it.  What they're saying in their

18  pleadings is that this is not a top-hat plan.  As a result

19  it's an ERISA qualified plan because it doesn't need an

20  exception, and as a result of it being an ERISA qualified

21  plan there is either - it's either an ERISA qualified trust

22  or there's a constructive trust imposed upon those assets.

23  Your Honor, those can create significantly different

24  obligations for Wells Fargo as trustee, and I think they made

25  that point clear to Your Honor in their initial pleadings.

1    They were defending themselves against being an involuntary

2    trustee in an ERISA qualified plan, which could impose

3    additional burdens upon them that I'm not even sure, not

4    being an ERISA lawyer what they are, but I'm sure it's in

5    excess of what they would be under the terms of this trust

6    agreement as a simple grantor trust with the debtor as their

7    client.  So, Your Honor, we believe that one of the

8    fundamental defenses on the issues that the Committee has

9    raised is that we have issues here with respect to a top-hat

10   plan, whether it is or is not a top-hat plan, and if it is or

11   it isn't, there may be claims or defenses or whatever, but

12   this is a separate bilateral contract between the debtor and

13   Wells Fargo establishing this grantor trust.  The two have

14   been intertwined and as we have said from the very beginning,

15   we don't believe they should be intertwined.  We believe the

16   trust is property of the estate.  We believe the trust

17   clearly indicates that it's property of the estate.  We

18   believe the beneficiaries knew that, and we believe Wells

19   Fargo was coming in, defending their position that this was a

20   bilateral contract, and they merely a trustee as set forth in

21   the agreement and not subject as a trustee might be imposed

22   as a result of the allegations made by the plaintiffs.  So we

23   believe, as we've said before, that to the extent they are

24   entitled to the fees under the documents, they should be

25   paid, that we believe that the document does provide that

1  they can be paid out of the trust assets.  That was the

2  agreement they entered into, and we believe they're entitled

3  to be paid.

4            THE COURT: Thank you.  All right.  Let me offer

5  some thoughts.  I am not now going to decide Wells Fargo's

6  entitlement to the payment of any fees.  I do think there is

7  some merit, maybe a lot of merit, to the notion that they

8  should be paid out of trust assets, and I think arguably

9  there's some merit, arguably, to administrative expense

10  status.  Either way, ultimately, for one or more bases, it

11  seems as if, depending upon how the rights ultimately are

12  disposed of between the - I'll call the non-stakeholder

13  parties.  These fees will be paid dollar for dollar.

14  Frankly, I think the Committee and the debtor ought to

15  reconsider their unwillingness to allow Wells Fargo out of

16  the litigation.  I think the request here today is one very

17  good reason for that, but I can't force it, and I won't.  I

18  am working on a decision on the motions to dismiss.  I expect

19  to have that out relatively shortly.  It's number two in my

20  queue.  So at least that will be decided.  I don't think that

21  until the rights of the parties to the litigation ultimately

22  are determined, it's appropriate to consider the reasonable

23  value of the services that Wells Fargo will have provided.

24  So I intend to deny the motion and will deny the motion, but

25  without prejudice to Wells Fargo to make an application at

1   some appropriate point in the future, and if the parties will

2   confer and submit a form of order under certification which

3   provides for that, I'll sign it.  Any questions about what

4   should be in the order?

5         MR. NICELY: Your Honor, I've not had an opportunity

6   to do a rebuttal.  I'm happy to save that for the next time

7   that the motion's presented.  I just wanted to make sure -

8         THE COURT: Yeah, I didn't mean to cut you off, but

9   it wouldn't matter what you told me.

10        MR. NICELY:  - those arguments are not waived.

11        THE COURT: Yeah, understood, understood.  Okay.

12        MR. HUSTON: Your Honor, may it please the Court.

13   That's the only matter that I have and as scintillating as

14   the omnibus objections, I'm sure will be, I wonder if I might

15   be excused.

16        THE COURT: You may.

17        MR. HUSTON: Thank you, Your Honor.

18        MR. NICELY: May I as well, Your Honor?

19        THE COURT: Yes.

20        MR. SAMIS: Your Honor, I disagree.  I think these

21   are going to be electrifying.

22        THE COURT: Well, it's a good thing I'm sitting

23   down.

24        MR. SAMIS: Your Honor, I also - before I begin, I

25   think I noted today that you had a 3 o'clock engagement,

1    unless I'm mistaken on the calendar, but if I am - I just

2    wanted to ask if I was causing any significant problem by

3    proceeding or -

4         THE COURT: Well, not for me.  Perhaps for others.

5    How much time do you anticipate concluding the matters

6    scheduled would take?

7         MR. SAMIS: Most of the omnibus objections, Your

8    Honor, have been resolved by virtue of the fact that we

9    continued claims or the objection has been withdrawn to

10   various claimants.  There's really only one contested matter

11   on.

12        THE COURT: Okay, let's proceed then.

13        MR. SAMIS: Your Honor, agenda items 16, 17, 19, 20,

14   21, and 22 are the omnibus objections on for today.  As I

15   indicated, for the most part, they're uncontested by virtue

16   of the fact that we've continued claims or we've withdrawn

17   our objection to various claims.  For the most part, most of

18   the continued claims are claims of taxing authorities, and

19   we're continuing to work with them to resolve them.  We're in

20   the latter stages of an information exchange, and they're

21   being - and the taxing authorities are in possession of what

22   we produced, they're just working on getting back to us and

23   hammering out final figures.  The Silver Key claim that's

24   listed on the second omnibus objection to claims has been

25   settled, and a settlement stipulation has been circulated to

1    the appropriate parties.  We're just waiting to get

2    signatures on that, and we intend to submit it under

3    certification of counsel.  I should also note, Your Honor,

4    that the debtors have continued the hearing with respect to

5    the claims of Hillsbury County Tax Collector.  They were

6    listed on the seventh omnibus objection to claims.  Their

7    counsel actually contacted me yesterday.  He had been on

8    vacation, but the debtors agreed to grant him an extension to

9    respond based on the holiday season.  Their relevant claims

10   were 3411, 3412, 3414, 3415, and 3416.  And that leaves only

11   a group of contested claims today.  They all arise from the

12   same factual scenario though.  They are on the first and

13   second omnibus objection to claims.  The claims that are

14   listed on the first are actually just duplicate claims, but

15   we decided to continue them along with the one claim that we

16   actually had a substantive dispute on because we wanted to

17   have them adjudicated as a whole and we didn't want to offend

18   the claimant in any way.  Your Honor, these claims are - and

19   particularly claim number 60, which was filed in the amount

20   of $28,100 unsecured and $21,900 priority by Leslie K. Hill

21   doing business as Farallon Enterprises, are basically on

22   account of services that the claimant allegedly performed for

23   the debtors.  Initially the debtors believed that a portion

24   of the claim number 60, specifically a $30,000 unsecured

25   amount, which represented placement - two $15,000 placement

1  fees for two sales managers were valid, and we thought that

2  $30,000 amount was valid, and we sought only to reduce the

3  claim to a $30,000 unsecured amount, based upon our analysis.

4  The debtors' analysis had assumed that the invoices that were

5  signed by Mr. Richard Austin that are attached to the claim

6  were predicated on a signed employment agreement, as was the

7  policy of the company.  All recruiters that were employed by

8  the company were governed by the terms of a master employment

9  contract, and then they billed under that master employment

10  contract.  The debtors objected, however, to the inclusion of

11  two $10,000 placement fees that were also included in the

12  claim for senior loan officers that were allegedly based on

13  an additional contractual relationship, that the debtors

14  couldn't substantiate, we couldn't find any documentation

15  with respect to that.  The debtors also further objected to

16  the claimant's contention that any of the amounts were

17  entitled to priority, given the claimant's failure to

18  establish that more of 75 percent of Farallon's income was

19  earned by the debtors - was earned from the debtors, rather,

20  a year in advance of the petition date pursuant to

21  507(a)(4)(b).  The debtors contacted the claimant.  We

22  continued the hearing several times in an attempt to resolve

23  the claims essentially, but during the course of these

24  negotiations, the claimant's assertions regarding the

25  debtors' business relationship with the claimant prompted a

1  deeper investigation of the claim at issue.  This

2  investigation actually yielded some surprising information.

3  Specifically, the investigation showed that no employment

4  contract ever existed between the debtors and the claimant,

5  and moreover, the investigation -

6          THE COURT: No written agreement.

7          MR. SAMIS: No written agreement, yes.  I should

8  specify that.  The claimant - I don't know if Your Honor has

9  actually seen it, the claimant as late as last night, at

10  about 6:30 file an additional response which I can pass up

11  now.  It hit the docket, but it didn't make it to the agenda.

12          THE COURT: Let me see it.

13          MR. SAMIS: Sure.

14          THE COURT: I have reviewed the other papers

15  submitted in connection with this objection.

16          MR. SAMIS: This is it here, Your Honor, may I

17  approach?

18          THE COURT: Yes.

19          MR. SAMIS: And I'll get to that in a moment, Your

20  Honor.  It actually plays into my argument a little bit, but

21  the investigation also revealed that Richard Austin, the

22  individual who had authorized the invoices that were attached

23  to the claim, actually did not have authority to bind the

24  debtors for the debtors' internal policies and procedures.

25  The claimant actually appears to have recruited individuals

1  to work for the debtors essentially without a mandate or the

2  protection of an employment contract, a written employment

3  contract, and so, it appears at most, that the claimant had

4  an oral arrangement with Richard Austin, rather, to provide

5  these services at a discounted rate, $15,000 per sales

6  manager, and this was apparently based on a reduced

7  historical rate with predecessor entities that were not

8  controlled by the debtors.  Richard Austin did not have the

9  authority to authorize the work or the payment of the

10  invoices on behalf of the debtors, and the claimant - at

11  least by virtue of some email communications appears to be

12  aware of that fact.  Now, Your Honor, I realize that I did

13  intend today to have a witness here, but at the last - to

14  support some of the debtors' internal policies and

15  procedures, but that witness became unavailable.  I think I

16  can still make the case without that witness here.

17        THE COURT: Well, let me ask.

18        MR. SAMIS: Sure.

19        THE COURT: The sign-in sheets do not indicate that

20  Ms. Hill is either present or by telephone.  Let me ask for

21  the record, is Leslie Hill present or on the telephone line

22  or is anyone here or on the telephone line on her behalf?  I

23  hear no response.  I've read the papers, and typically what I

24  do in these circumstances in which individuals respond to

25  claims objections and make filings but don't appear is, I

1    sustain the objection for the failure of the claimant to

2    appear in support of his or her response, and I have read her

3    submissions, and I have some sympathy for her position which

4    she describes in some detail in her filings, but she needs to

5    - I mean, typically claimants need to appear in some form to

6    tell me their story, and it seems to me also that in light of

7    the absence of a written agreement, if it's her position, and

8    it seems to be, that she had an oral agreement that her

9    credibility would be at issue, and normally that's testimony

10   I would hear only in person despite the inconvenience that

11   that might pose to the claimant, but there's just no other

12   way, I think, for a court to legitimately and meaningfully to

13   resolve a dispute of that nature.  I mean, other than that,

14   other than proceeding in that fashion, you know, I think I'm

15   compelled to sustain the objection.

16          MR. SAMIS: Your Honor, I would ask, just add one

17   additional point.

18          THE COURT: Go ahead.

19          MR. SAMIS: Given the fact that the debtors turned

20   up further information in their investigation of the claim,

21   although this was a substantive objection, the debtors would

22   like to reserve their right to object to the remainder of the

23   claim at some future date if that's okay with the Court.

24          THE COURT: No, typically the forms of order provide

25   that, but I will tell you I haven't specifically reviewed the

1  forms of order presented in connection with a claims

2  objection, so I read the underlying objections and any

3  responses that had been filed.

4          MR. SAMIS: Understood.

5          THE COURT: All right.

6          MR. SAMIS: Your Honor, at this point then I would

7  like to hand up the proposed forms of order.

8          THE COURT: Very well.  Let me ask for the record,

9  does anyone else care to be heard in connection with any of

10  the objections?  I hear no response.  All right, thank you.

11  All right, in light of the time, let me consider these after

12  I leave the bench today or first thing tomorrow, if that's

13  okay with you?

14          MR. SAMIS: Very well, Your Honor.

15          THE COURT: All right.  Anything else remaining for

16  today?

17          MR. SAMIS: I don't believe so, Your Honor.

18          THE COURT: All right then, we'll conclude this

19  hearing.  I'll recess briefly in order to permit time for the

20          (The remainder of this page is intentionally left

21  blank.)

22

23

24

25

1    next hearing to be set up.

2              MR. SAMIS: Thank you very much, Your Honor.

3              THE COURT: All right.

4              (Whereupon at 3:43 p.m., the hearing in this matter

5    was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18              I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                    January 14, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221