IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| Debtors. | : | **Jointly Administered** |

**DEBTORS' REPLY TO FIRST INTERIM REPORT OF
MICHAEL J. MISSAL, EXAMINER**

Ben H. Logan
Suzzanne S. Uhland
Andrew M. Parlen
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
(213) 430-7704

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Counsel to the Debtors and Debtors in Possession

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California Corporation.

On November 21, 2007, Michael J. Missal, the Examiner appointed in these chapter 11 cases, filed his "First Interim Report" dealing with the so-called cash collateral issues (the "Examiner's Cash Collateral Report"). The Examiner concluded "that the Debtors did not act unreasonably in not segregating funds as potential cash collateral as of the Petition Date." Cash Collateral Report at 18. The Debtors agree with that conclusion. In reaching it, however, the Examiner engages in a lengthy discussion of the process of his investigation and describes some supposedly misleading statements made by the Debtors that the Examiner believes caused him to engage in a pointless exercise. The nature of these allegations against the Debtors and their professionals compels a substantive response, despite the absence of any disagreement with his ultimate conclusion that the Debtors acted reasonably in not segregating cash prior to the time that the Debtors escrowed $42.1 million pursuant to their May 16, 2007 "Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Section 105, 361, 362 and 363(b)(1)" (the "Adequate Protection Motion") (Docket No. 736). To clear the air, the Debtors will need to provide a complete history of this issue and do so in Section III of this Reply. The Debtors also deal with the Examiner's allegation that he was misled in Section II of this Reply. Before turning to the specifics, a few key points bear emphasis.

I.    OVERVIEW.

A.    The Debtors Fully Cooperated with the Examiner's Cash Collateral Investigation.

The Debtors cooperated fully with the Examiner in his cash collateral investigation. They promptly arranged for the interview of every person the Examiner requested. The Examiner points out that he interviewed 17 people.[2] The Examiner typically had four lawyers (some times more) attend each of these interviews. The Debtors made cooperation with the

---

[2] Several were interviewed multiple times

1

Examiner a top priority, even though the resulting work constituted a significant distraction for

the New Century and Alix Partners personnel involved in reconciling accountings and funds

flows with the counterparties to repurchase agreements and the whole loan purchasers as they

strived to resolve the Adequate Protection Motion. The Debtors are unaware of any complaint

from the Examiner regarding the scheduling of these interviews. The Debtors also promptly

supplied every document the Examiner requested in his cash collateral investigation. As the

Examiner states, the Debtors "produced a significant amount of documents related to this issue."

Cash Collateral Report at 19. The Debtors are unaware of any instance in which the Examiner

considered the Debtors to be unresponsive to his document requests on cash collateral issues.

Indeed, throughout this investigation, counsel for the Examiner was complimentary regarding the

cooperation given by the Debtors in scheduling interviews and producing documents.

> B.    The Debtors' Statements as to Whether the Master Repurchase Agreements
> Could Be Recharacterized as Financings Were Completely Accurate. The
> Examiner, However, Made an Incorrect Assumption Concerning the Debtors'
> Legal Position on This Issue and Then Compounded the Significance of This
> Mistake by Concluding That the Debtors' Legal Position on the Prospects for
> Recharacterization Dictated Whether Any Investigation Was Warranted.

The Debtors informed the Examiner at their first meetings, held on June 14 and 25, 2007,

that they would not disclose privileged attorney-client communications pertaining to the cash

collateral issue because they were engaged in active decisions with parties to the Adequate

Protection Motion and could not risk prejudicing these negotiations or possible litigation with the

parties to that motion. The Examiner understood this and affirms in his report that he "respects

the right of the Debtors to maintain any applicable privileges." Cash Collateral Report at 17-18.[3]

But the Examiner nonetheless complains that he was somehow misled concerning the Debtors'

---

[3] The Debtors consulted with the Official Committee of Creditors' Committee (the "Committee")
concerning which privileged matters should not be disclosed to the Examiner

2

legal position regarding the nature of the Master Repurchase Agreements ("MRAs") – i.e., could they be recharacterized as disguised financings or were they repurchase agreements as defined in Bankruptcy Code §101(47) entitled to the safe harbor protections Congress passed in 2005.

The Debtors are emphatic that they made no misleading statements, much less misstatements, to the Examiner on this or any other topic. To the extent that the Examiner's dissatisfaction is the result of a misunderstanding between him and the Debtors for which the Debtors share some responsibility, they regret this misunderstanding and extend their apologies to the Examiner and to the Court. However, the Debtors believe that the Examiner's criticisms are the result of his failure to understand completely some highly complex factual and legal issues, replete with subtle, but important, distinctions.[4]

Specifically, the Examiner asserts that he was misled concerning the Debtors' legal position concerning whether the MRAs could be recharacterized as financings. At the August 31, 2007 meeting that the Examiner highlights in his report, he started by stating his understanding that "New Century had taken the position as of the Petition Date that the Repurchase Counterparties were secured lenders and that the repurchase transactions were financings as opposed to true sales of residential mortgage loans." Cash Collateral Report at 15. He then explained that he viewed this as the gating issue to his investigation – if the Debtors had taken the legal position that the MRAs were repos, for purposes of the Bankruptcy Code §101(47), there would be no "cash collateral" issue and there would be no need for a cash

---

[4] In this Reply, the Debtors will resist the temptation to refute factually the Examiner's recitation of statements supposedly made in interviews. In many instances, the Debtors believe that the statements attributed in the Cash Collateral Report to their representatives are either misstated or taken out of context. The Examiner was faced with a difficult task in delving into a complex factual area with no background or familiarity with this industry and may have misheard or misunderstood what he was told. The Debtors see no point in a statement-by-statement refutation of statements attributed to representatives of the Debtors that they believe the Examiner got wrong in his report, for these issues are peripheral to the matters at hand. But the Debtors need to be clear that they do not agree with many of the Examiner's characterizations of their statements.

collateral investigation. In that situation, the Examiner believed that there might be an issue as to whether the MRA counterparties or the estates were entitled to the cash collected on the mortgage loans underlying the MRAs, but he believed that analyzing the rights of the estates and the MRA counterparties to any such cash was beyond the scope of his assignment. Conversely, if the Debtors had taken the position that the MRAs could be recharacterized as financings, the Examiner believed that his investigation was appropriate.

The Debtors were shocked when the Examiner advised them of his narrow view of the scope of his assignment – i.e., there was an "off-on" switch, such that if the Debtors took the legal position that the MRAs were legally financings, there was a cash collateral issue he was to investigate, but if the Debtors did not take that legal position, there was nothing for him to investigate. Three aspects of the Examiners position were (and remain) problematic. First the Debtors did not previously understand that the Examiner viewed this legal distinction between repos and financings to be the determining issue as to whether any investigation on this topic was warranted. The Debtors had thought the Examiner was investigating whether there was an arguably improper expenditure of funds irrespective of which way this particular legal issue was determined.[5] Second, even if one were to accept the premise that the repo/financing issue was the gating determinant as to whether the Examiner needed to investigate these matters, it was illogical that the Debtors' view on the topic should control that gate – other parties in the case could well have (and did have) different views. Third, the Debtors do not understand how the Examiner felt he could conclude that this was the Debtors' legal position when the Debtors had

---

[5] After all, as the Examiner states in his Cash Collateral Report, no matter how one comes down on this topic, the expenditure of these funds was "properly before the Court." Cash Collateral Report at 6. The disputes brought to a head in the Adequate Protection Motion involved a multitude of legal issues, many of which were of greater moment than this possibility of recharacterizing the MRAs. Moreover, the Debtors had been supplying the Examiner information (often at the Debtors' initiative) that would only have been relevant if the MRAs were true repurchase agreements

4

never commenced any litigation to recharacterize the MRAs as financings and had not previously disclosed any privileged attorney-client communications concerning the advice counsel had given to the Debtors on this topic.

The Examiner's incorrect assumption about the Debtors' legal analysis caused the Examiner to have an equally flawed view of the facts that transpired. After the Examiner disclosed his premise, the Debtors' representatives caucused and determined that they had no real choice but to disclose privileged information that they had every right to withhold and to advise the Examiner that his understanding of the Debtors' legal position concerning recharacterizing the MRAs was wrong. While there were legitimate arguments on both sides, the legal advice of counsel to the Debtors was not to bring such litigation. When they advised the Examiner of this on August 31, 2007 and pointed out that the Debtors had never brought any such litigation, the Examiner stated that if he had known this from the outset he could have shortened his investigation substantially and could have avoided the factual inquiries his team had pursued over the prior months. His Cash Collateral Report similarly states that if he had known that this was counsel's legal advice at the outset, "the cash collateral portion of the investigation might never have been ordered by the Court, and certainly would have been vastly reduced in scope." Cash Collateral Report at 9. According to the Examiner, given the Debtors' legal position concerning the MRAs, his expenditures pursuing cash collateral matters "were largely unnecessary." Cash Collateral Report at 19.

Before the August 31 meeting, the Debtors had no reason to believe that the Examiner viewed his charge as investigating these issues _only_ if the Debtors had taken the legal position that the MRAs were disguised financings. Whether they can be recharacterized is a relevant issue and it does have certain implications (described below), but the Debtors did not view it as

the central issue, much less the <u>sine qua non</u> of this investigation. For this reason, the Debtors

had been supplying the Examiner with information that buttressed their legal position (supported

by the Committee) that the funds in their general corporate operating account on the Petition

Date were estate property even assuming that the MRAs were "repurchase agreements" as

defined in Bankruptcy Code § 101(47).

Towards the end of the August 31 meeting, after the Debtors had advised the Examiner

that counsel's advice had been against trying to recharacterize the MRAs as disguised financings,

one of the attorneys from the Examiner asked how then the Debtors planned to deal with the

property-of-the estate arguments made by the MRA counterparties. Counsel to the Debtors was

taken aback because this very matter had been addressed with the Examiner's counsel many

times previously (since the Debtors assumed that the Examiner was investigating the possibility

that funds were spent improperly irrespective of whether the MRAs could be recharacterized).

Debtors' counsel responded by starting to enumerate the host of legal and factual matters that

support the conclusion that the entire $42.1 million held in the corporate operating account on

the Petition Date was estate property even though the MRAs likely fit the definition of

"repurchase agreements" under the Bankruptcy Code. At this point, the Examiner cut off the

explanation and insisted that these were issues outside the scope of his report and were between

the Debtors, the Committee and the MRA counterparties. None of these legal or factual matters

are discussed in the Examiner's Cash Collateral Report.

      C.     <u>The History of the Adequate Protection Dispute.</u>

In Section III.C.3 of his report, the Examiner opines that even though there were no cash

collateral funds improperly expended, the Debtors may have expended some monies that may

have been the property of counterparties to MRAs. The Examiner does not believe that these

6

issues were within the scope of his assignment, but nonetheless he states that these funds <u>may</u> not have been estate property and the Debtors' expenditure of some unspecified portion of them <u>may</u> have been improper.[6] This serious allegation is sketched in a mere two pages of text. Cash Collateral Report at 19-21. It contains no meaningful legal or factual analysis. Despite its cursory treatment in the report, the Debtors feel compelled to rebut an erroneous charge. These issues are addressed in Section III of this Reply, which describes the history of the issues that came to a head in the Adequate Protection Motion. A few key points now:

1.    First and foremost, as of the Petition Date, the Debtors' insolvency professionals understood that the Debtors had deposited into segregated accounts all money required to be deposited into such accounts by the MRAs. Later factual investigations revealed that (i) from the date of the last settlement with the MRA counterparties[7] to the Petition Date, the Debtors had transmitted over $66 million of collections on the loans subject to the MRAs to the MRA counterparties, either through deposits into collection accounts that the MRA counterparties swept or direct wires to the MRA counterparties, and (ii) subject to certain relatively minor exceptions (related to brief delays in establishing in mid-March a more rigorous collection system), the Debtors had in fact transmitted to the MRA counterparties all funds collected on these loans after the exercise of remedies.

2.    The MRAs and ancillary agreements allowed the Debtors to utilize all funds collected on the loans financed through the MRAs prior to the counterparties exercising

---

[6] The Cash Collateral Report states that "the Examiner was not asked to reach conclusions with respect to the rights between the Debtors and the Repurchase Counterparties to funds that the Debtors collected on loans prior to the Petition Date." Nonetheless, the Examiner offers (without any support) that the "Debtors' expenditure of at least <u>some</u> of the PIF and P&I monies deposited in Account 4025 appears to have been inappropriate." (emphasis supplied) Cash Collateral Report at 19.

[7] The MRAs were generally settled up monthly, so for most of the MRA counterparties this last settlement occurred during late February 2007. The Debtors filed for bankruptcy protection on Monday, April 2, 2007. Thus, the vast majority of the funds at issue relate to loan activity during March 2007.

remedies. Prior to the Petition Date and prior to the exercise of remedies, the Debtors had been

free to spend these collections. As a result, the Debtors had spent pre-bankruptcy much of the

money at issue in the Adequate Protection Motion. This money was spent for such matters as

paying rent, payroll and utilities, satisfying margin calls to the MRA counterparties and paying

EPD and breach claims asserted by whole loan buyers. Later investigations, forensic accounting,

and application of the Third Circuit law on tracing funds, showed that many of these funds

legally were gone by the Petition Date and the counterparties could not trace them into any of the

Debtors' accounts as of the Petition Date.

        3.     The Debtors turned over to the MRA counterparties all funds held on the

Petition Date (or received post-petition) in the collection accounts established for the MRA

counterparties. This led, post-petition, to pleasant surprises for some of the MRA counterparties

whose MRAs did not require segregated collection accounts and had not even been aware that

the Debtors had established such accounts for their benefit. For example, after the Petition Date,

(i) the Debtors turned over to Bank of America ("BofA") in July 2007 approximately $4.966

million that New Century had deposited in a segregated account the Debtors had established at

Union Bank of California for BofA's benefit that BofA did not even know existed prior to the

first substantive discussions among the parties to the Adequate Protection Motion, (ii) also in

July 2007, the Debtors turned over $3.956 million to Morgan Stanley that New Century had

deposited in a segregated account at Union Bank of California for the benefit of Morgan Stanley

of which Morgan Stanley was previously unaware, (iii) in July 2007, the Debtors caused Union

Bank of California to release $1.15 million to Credit Suisse First Boston ("CSFB") that New

Century had deposited into a segregated account established for CSFB and which CSFB was

having difficulty getting Union Bank to release, and (iv) in October 2007, the Debtors turned

over to Morgan Stanley $9.65 million that was held in two custodial accounts at Union Bank of

California for the benefit of Morgan Stanley – it took the Debtors' and Morgan Stanley's

business people until October 2007 to realize that approximately $10 million of Morgan

Stanley's claim related to a whole loan sale to Morgan Stanley that Morgan Stanley later

securitized and that the funds were held in segregated accounts.[8]

        4.      The dispute with the parties to the Adequate Protection Motion centered

on whether they could trace any sums collected on loans subject to their MRAs into the Debtors'

general corporate operating account – Account 2110104025 maintained by New Century

Mortgage Corporation with Union Bank of California ("Account 4025"). Hundreds of millions

of dollars typically flowed in and out of this account monthly, most of which had nothing to do

with collections on loans subject to MRAs or collections on loans sold to whole loan buyers.

Later investigations revealed that during March 2007 more than $190 million flowed into this

account as a result of New Century's servicing fees, its profit on loan sales, funds from joint

ventures in which it was a partner and other sources that have nothing to do with any of the

claimants to funds involved in the Adequate Protection Motion. On the Petition Date, Account

4025 held $42.1 million. This was substantially lower than normal balances. It had been

severely depleted by virtue of payments to the MRA counterparties to satisfy margin calls[9] –

---

[8] The transfers to BofA, CSFB and Morgan Stanley during July 2007 – which total $10.07 million – were authorized pursuant to this court's "Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims," dated June 28, 2007 (the "Adequate Protection Order) (Docket No. 1729). Paragraph 8 of the Adequate Protection Order allowed the Debtors to turn over to the MRA counterparties any such segregated funds. The $9.65 million distributed to Morgan Stanley in October 2007 was authorized by this Court's "Order Approving Stipulation Regarding Release of Segregated Funds to Morgan Stanley Mortgage Capital Holdings LLC" entered on October 23, 2007 (Docket No. 3401).

[9] The MRAs allowed the MRA counterparties to demand a margin call from New Century whenever their assessments of the market value of the loans subject to the MRA dropped. Thus, these margin calls were generally the result of perceptions of declining market values, as opposed to collections from borrowers, and were designed to keep the MRAs in "balance."

more than $59 million in March 2007 – and to satisfy early payment default ("EPD") loan put-

backs asserted by loan purchasers. As of the Petition Date, the Debtors' insolvency professionals

understood that the funds in Account 4025 were unencumbered and were estate property.[10]

        5.      On April 5, 2007, UBS Real Estate Securities Inc. ("UBS") filed an

adversary proceeding in which it asserted that the Debtors had failed to turn over some

unspecified funds collected on loans subject to its MRA. UBS sought a preliminary injunction,

establishment of a constructive trust and an accounting. The Debtors opposed this action both on

the facts and the law. At a hearing held on April 12, 2007, the parties resolved UBS' request for

a TRO by the Debtors agreeing to deliver an accounting by April 26, 2007 and to deposit into an

escrow account any amount that the Debtors did not dispute was UBS's property. On April 26,

2007, the Debtors delivered to UBS an accounting that showed that the collection account turned

over to UBS had been <u>over</u> funded by $229,881.29, which was not surprising to the Debtors

since New Century had been depositing all principal collected on loans subject to the UBS MRA

into that segregated collection account for quite some time, UBS had been sweeping that account

daily since early March 2007, and UBS had seized this account on March 12, 2007. UBS

responded that this accounting was "wrong" and asserted that approximately $2.7 million of

collections on loans subject to its MRA had not been turned over to it. The Debtors strongly

disagreed, both legally and factually. But in order to provide an opportunity to investigate these

matters further, the Debtors agreed to deposit $2.7 million into an escrow account, and did so. It

later turned out that UBS's complaint primarily related to regularly scheduled borrower interest

---

[10] This is not say to that the MRA counterparties might not assert that they were owed some amount of money related to collections on loans subject to MRAs, but that is a far different question than tracing such collections into Account 4025, as opposed to determining that they had been spent pre-petition as allowed by the MRAs (for example, to pay basic operating costs or to satisfy the MRA counterparties' margin calls) or were held in segregated accounts, such as the $20 million held in segregated accounts that were identified and turned over to BofA, Morgan Stanley and CSFB described above.

10

that had been received during the first few days of March before UBS declared a default and at a time when the Debtors were permitted by the MRA to spend or use the funds in this account for any general corporate purpose. The Debtors disputed then, and dispute now after seven months of factual investigations, whether New Century held $2.7 million (or any other amount) of UBS's money.[11]

6.    On April 26, 2007, Deutsche Bank Structured Products, Inc. ("DBSP") filed an adversary proceeding. The heart of the complaint related to 235 loans with a principal balance of $50 million, the ownership of which DBSP and the Debtors disputed. This dispute had nothing to do with the issues addressed in the Adequate Protection Motion or the Examiner's Cash Collateral Report. However, at the end of the complaint, DBSP also asserted that the Debtors had collected some principal and interest on loans subject to its MRA and sought imposition of a constructive trust and an accounting.

7.    During the second half of April 2007, the Debtors' accounting and financial staff was working on reconciliations for all the MRA counterparties. Although only UBS (and later DBSP) had filed litigation seeking an accounting, the Debtors had informed each of the MRA counterparties that they would prepare such reconciliations. The preliminary work completed in early May 2007 showed that if one were to accept UBS's legal and factual assertions (which the Debtors still consider to be invalid), the amount at issue was substantial. That work also showed that whole loan buyers might assert up to $9.3 million of trust fund claims. At the time, the Debtors and their professionals did not purport to have a full appreciation of the facts and had not yet started the forensic accounting required to determine if

---

[11] That issue is being compromised as part of the global Adequate Protection Settlement described in Section I.D below

11

any or some of these funds were in segregated accounts, could be traced to Account 4025 or had been spent prior to the Petition Date. At the time, the Debtors and their professionals knew that substantial factual and legal analysis lay ahead. The last seven months demonstrate the extreme complexity of these matters and that even as of end of May 2007 the parties underestimated the tasks ahead.

        8.     The Debtors immediately brought this situation to the attention of the Committee's professionals. The Debtors and the Committee decided jointly to reach out to the MRA counterparties and to attempt to negotiate a consensual procedure for resolving these issues fairly and even-handedly. Drafts of a motion and order were circulated and negotiated over the first two weeks of May 2007. This work resulted in the Adequate Protection Motion filed on May 16, 2007. Thereafter, the Debtors escrowed the full $42.1 million that was at issue, pursuant to the agreed Cash Collateral Order.

The Debtors have consistently maintained that the cash in Account 4025 on the Petition Date was estate property. The reasons why are explained in Section III. But what is key now is that (i) on the Petition Date the Debtors reasonably believed that they had properly complied with the MRAs and that the funds in the general corporate operating account were unencumbered estate property, (ii) on the Petition Date substantial funds had been segregated for the MRA counterparties and were later turned over to them, and (iii) the Debtors (working with the Committee and the major MRA counterparties) developed a procedure to allow the detailed forensic accounting and legal analysis to proceed without prejudicing any party, and (iv) that process is on the cusp of bearing fruit. The Debtor explained this history to the Examiner and why they believed that the funds in Account 4025 were unencumbered estate assets. Yet, none of this appears in the Cash Collateral Report.

12

D.    Settlement of this Dispute by the Parties with an Economic Stake.

At the August 31, 2007 meeting, the Examiner stated that he believed that these property-of-the-estate issues were properly between the Debtors and the MRA counterparties. The Debtors, the Committee and the MRA counterparties have spent approximately seven months analyzing the legal and factual issues involved in this dispute, including detailed accounting reconciliations and exploration of complex, and in some cases, untested legal theories and analyses. The MRA counterparties, the whole loan purchasers, the Committee and the Debtors are in the process of finalizing a settlement agreement that should result in approximately $12-14 million of the money in dispute being released to the estates. The Debtors expect to file a motion to approve this settlement very shortly. Needless to say the MRA counterparties and whole loan purchasers disagree with the legal positions advanced by the Debtors and some of the factual issues still remain unresolved. These differences give rise to a settlement, rather than a victory for either side. When an agreement in principle regarding this settlement was reached, the Debtors advised counsel to the Examiner of this and offered to brief him. Counsel for the Examiner congratulated the Debtors, but disavowed any interest in learning the substance.

E.    The Debtors Agree With Some of Examiner's Conclusions.

The Debtors agree with some of the Examiner's other conclusions. For example, the Debtors concur with the Examiner's conclusion that it was reasonable for New Century to rely on the advice of its counsel concerning whether litigation should be brought to attempt to recharacterize the repurchase agreements as secured financings. Cash Collateral Report at 18-19. The members of the Debtors' board of directors and management of the Debtors prior to the Petition Date were experienced in operating a mortgage business. They knew that they were not insolvency experts and reached out to experienced insolvency professionals, both legal and

13

financial, for advice on issues with which they were not familiar. Moreover, as the Examiner is now aware, they confirmed the advice they received from the Debtors' lead outside insolvency counsel with other outside counsel and other experienced insolvency advisors. It was entirely appropriate for them to rely on this advice.

In addition, the Debtors concur with the Examiner's conclusion that the approximately $9.3 million related to whole loan sales involved in the adequate protection dispute do not present cash collateral issues. Cash Collateral Report at 22-23. The Examiner concludes that any disputes on this matter are outside the scope of his report, but because it relates to some of the property-of-the-estate issues and is important to an understanding of the overall context of the matters that have unfolded over the last seven months, this issue is discussed briefly in Section III of this Reply.

II.    SUPPOSEDLY MISLEADING STATEMENTS

The Examiner believes that it was misleading for the Debtors to state in the Adequate Protection Motion that there "could be serious issues" as to whether the MRAs could be recharacterized as secured financings, instead of repurchase facilities. Cash Collateral Report at 4. The Debtors stand by that statement. There were (and are) serious issues on this topic. Indeed, one of the whole loan purchasers made exactly that argument in pleadings filed in response to the Adequate Protection Motion.

This recharacterization issue is relevant to a few of the matters at hand, but the Debtors never considered, as they later learned the Examiner did, that it was the central issue as to whether he was to do any investigation at all.

The Examiner also questions the statement made in the May 16, 2007 Adequate Protection Motion that there was a "growing realization that the issues involved are more

14

complex and the amounts involved are significantly greater than the Debtors appreciated when these cases were filed." Cash Collateral Report at 4. Again, the Debtors stand by that statement.

With respect to this second issue, the Examiner muddles the distinction between an analysis as to whether the MRAs could be recharacterized as financings and the factual issue of whether specific cash can be traced to Account 4025. The first is a legal analysis. The second involves tracing funds flows involving an enormous business that engaged in transactions involving billions of dollars and managed over 350 bank accounts. Even if New Century's accounting systems had been perfect, they were not designed to analyze these issues since matters such as whether Account 4025 held trust funds had no relevance to New Century's normal business where all debts were paid whether or not they were trust fund claims. Determining which, if any, funds could be traced to Account 4025 but which arguably should have been deposited in a segregated account has been an enormous undertaking. The Debtors' professionals did not have a complete understanding of these issues (nor could they) when the bankruptcy petition was filed or when the Adequate Protection Motion was heard. Indeed, the last seven months have shown that there may never be definitive answers to these questions, even if one were to ignore the overlay of the disputed legal issues as to whether these funds are estate property or trust funds. As soon as the Debtors' factual investigations identified that the funds at issue were significantly greater than previously anticipated, the Debtors brought this to the Committee's attention, proactively negotiated with the major MRA counterparties and timely filed the Adequate Protection Motion.

A.    Possible Recharacterization of the MRAs.

As to the first supposed misleading statement – that there "could be serious issues" as to whether the MRAs could be recharacterized as financings – the Examiner does not support his

15

contention that this is not a true statement.  There **are** numerous serious legal issues surrounding this matter.

Counsel for the Debtors analyzed these issues because successfully recharacterizing the MRAs as financings could have realized enormous benefits for the estates.  That is also why it would have been improper for the Debtors to have conceded that the MRAs fit the definition of "repurchase agreements" in Bankruptcy Code §101(47), certainly without involving the parties who would have benefited from recharacterization and seeking a court order.

For example, if the Debtors had brought successful litigation to recharacterize the MRAs as financings, cash collected on loans subject to MRAs post-petition would have been cash collateral.  Such cash collateral would have been estate property subject to possible use under Bankruptcy Code §363.  In excess of $9.4 billion of mortgage loans and residual interests in securitization trusts were subject to the MRAs as of the Petition Date.  Cash collected on these mortgage loans and residual interests generated hundreds of millions of dollars per month.  If these collections were deemed cash collateral, the Debtors could have sought to use that cash to fund these cases, even assuming that the MRA counterparties had valid liens.  This would have obviated the need for any DIP financing, for example.

Moreover, if the MRAs were recharacterized as financings, as opposed to repurchase facilities, it is likely that they would not have been secured.  The operative language in the MRAs provided uniformly that the MRA counterparties were granted a lien only if a court

16

recharacterized the facilities as secured financings.[12] No court had done so as of the Petition Date. Thus, if this Court (or any other court) recharacterized the MRAs as secured financings, the automatic stay of Bankruptcy Code §362 would prohibit the granting of any lien. The amounts that could have been realized for the estates were enormous and would have made any claims to the balance in Account 4025 on the Petition Date pale in comparison.

In addition, if the MRAs were recharacterized by a court as financings, presumably the over $9.4 billion of mortgage loans and residual interests in securitization trusts could not have been realized upon by the MRA counterparties without first obtaining relief from the automatic stay, assuming that their obligations were secured. The Debtors could have opposed relief from the stay and might have tried to reorganize around these assets or at least sell them in a coordinated fashion designed to maximize value. Moreover, if the MRAs were unsecured, recharacterizing the MRAs as financings would have resulted in the estates being entitled to unencumbered assets with a face value of more than $9.4 billion. Finally, if the MRAs were legally recharacterized as financings, the many millions of dollars New Century paid in margin calls to the MRA counterparties during the 90 days prior to the Petition Date could probably have been recovered as preferences, since they would not be shielded by the "safe harbor" protections for mortgage loan repos.

Counsel for the Debtors analyzed these legal issues before the Petition Date and advised the Debtors of their conclusions in privileged and confidential attorney-client communications. It was entirely proper that the Debtors did not disclose this advice to the Examiner until they

---

[12] By way of example, Section 14 of the Master Repurchase Agreement dated as of September 2, 2005 with DB Structured Products, Inc. ("DBSP") provides in pertinent part that "in the event that any Transaction hereunder is deemed not to constitute a purchase and sale, (a) each Seller hereby pledges to the applicable Buyer and grants to such Buyer a security interest in, the following property, whether now or existing or hereafter acquired: [a list of collateral consisting principally of the loans that were subject to the MRA and collections on them]" (Emphasis supplied). The other MRAs have essentially identical language.

17

essentially were forced to do so on August 31, 2007. The Court's order appointing the Examiner was clear that the Debtors had no obligation to disclose privileged attorney-client communications to the Examiner.[13] Most important for present purposes, the fact that counsel advised the Debtors not to pursue litigation seeking to recharacterize the MRAs does not render the statement that there "could be serious issues" surrounding this matter incorrect, much less misleading.

The Examiner negotiated hard for the Debtors to waive their attorney-client privilege. The Debtors consulted with the Committee and concluded that many privileged materials related to the Examiner's other investigations could and would be produced to the Examiner. But with respect to a limited number of sensitive topics, the Debtors should not disclose such materials to the Examiner. These limited topics included the matters the Examiner investigated related to the so-called cash collateral issues. After all, these were the subject of sensitive negotiations with MRA counterparties and the other trust fund claimants, and the Committee and the Debtors quite understandably concluded that disclosing such privileged communications to the Examiner would be inappropriate and could potentially harm the estates. Moreover, the Debtors had no comprehension that the Examiner viewed privileged legal advice as to whether the MRAs could be recharacterized to be the central issue in his assignment. Thus, the Debtors were clear with the Examiner from the outset that they would not be disclosing privileged attorney-client

---

[13] Paragraph 11 of this Court's June 1, 2007 "Order Denying in Part and Granting in Part Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner" provides that the "Debtors shall provide to the Examiner all non-privileged documents and information relevant to the Investigation that the Examiner requests . . . . . If the Examiner seeks a disclosure of documents or information as to which any of the Debtors assert a claim of privilege or have objected and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms these documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution. The Debtors' privileges, including, but not limited to, the attorney-client privilege and attorney-work product privilege, remain and are not deemed waived or in any way impaired by the parties' stipulation referenced above or by this Order." Order at ¶ 11 (Docket No. 1023)

18

communications concerning the matters that were the subject of the Examiner's cash collateral investigation.

That situation changed radically on August 31, 2007 when the Examiner advised the Debtors that his preliminary conclusions flowed from his premise that "New Century had taken the position as of the Petition Date that the Repurchase Counterparties were secured lenders and that the repurchase transactions were financings as opposed to true sales of residential mortgage loans." Cash Collateral Report at 15. That premise was false. In fact, the Debtors have never sought to recharacterize these facilities. The Debtors quite properly did not publicly concede that the MRAs were repurchase agreements as defined under Bankruptcy Code §101(47) for that would only have emboldened the MRA counterparties and would have prejudiced the interests of others who might take a contrary view. The Examiner's contrary understanding was based upon the Examiner's incorrect <u>assumption</u> as to what counsel for the Debtors must have advised their clients and what actions were taken by the Debtors (or, more accurately, not taken) in reliance on that ostensible advice. Thus, the Debtors felt compelled to disclose to the Examiner the substance of the actual legal advice. As is transparent from the Cash Collateral Report, that advice was not to attempt to recharacterize the MRAs as secured financings.

The Debtors do not understand how the Examiner could have assumed that outside insolvency counsel's legal advice to the Debtors had been that the Debtors should attempt to recharacterize the MRAs as financings. Until August 31, 2007, no such privileged and confidential attorney-client communications had been disclosed to the Examiner. Moreover, on July 25, 2007, the Examiner's counsel interviewed two of the Debtors' in-house counsel who were directly involved in negotiating the MRAs. They stated unequivocally that legally these were sale and repurchase facilities, not disguised financings. When the Examiner's counsel

interviewed New Century's general counsel on August 3, 2007, they asked him when New Century had taken the legal position that these were not true sales, but disguised financings. New Century's general counsel responded that to the best of his knowledge New Century had never taken that position. And at an interview on August 14, 2007, counsel for the Examiner asked the Debtors' CEO if the company had ever taken the legal position that the MRAs were financings as opposed to sales. She responded that to the best of her knowledge the Debtors had never taken that position. Moreover, the Debtors had never commenced any such litigation. If one really thought that the Debtors took the legal position that the MRAs could be recharacterized, surely one would expect that the Debtors would have <u>acted</u> on that position.

When counsel for the Debtors analyzed these issues, they concluded that the MRAs had essentially all the hallmarks of revolving asset-based loans. The MRA counterparties established borrowing bases keyed off of the loans "sold" to them, charged interest (termed "Price Differential")[14] based upon the amounts they paid to the Debtors to purchase these loans, the MRA counterparties had absolute rights to resell the loans to the Debtors for that same purchase price plus the accrued Price Differential, the MRA counterparties were entitled to make margin calls if the market value of these mortgage loans times an advance rate was less than the repurchase obligations that would be owed by the Debtors on repurchase, and if the MRA counterparties realized on these loans, the Debtors were liable for any deficiency. For accounting and tax purposes these facilities are treated as secured financings.[15] They may be repurchase facilities, but they are also financings. Indeed, in the common parlance of the

---

[14] The Price Differential for each MRA was specified in a pricing side letter and was a floating interest rate, usually computed as LIBOR plus a small spread.

[15] This is acknowledged in each of the MRAs. For example, the MRA with DBSP provides that it "is the intention of the parties to this Agreement that the Transactions entered into hereunder be considered purchases and
(Continued)

industry they are referred to as warehouse loans and the MRA counterparties are commonly known as warehouse lenders. Some of the MRAs use this terminology.[16] Many of the MRA counterparties delivered to New Century borrowing base reports that refer to the sale price as the amount "financed" by the repo counterparty, use asset-based lending terminology such as "advance rate", refer to these facilities as "warehouse financings" and refer to the mortgage loans and other securities subject to the MRA as "collateral." Not surprisingly, the business personnel at New Century refer to them as warehouse loans and think of them as financings. The Examiner confirmed this through a great number of interviews with mid-level and senior New Century finance, cash management and capital markets business personnel. Referring to these facilities as "financings" reflects the practical reality that in most senses that is exactly what they are. But attaching a label is not the same thing as legal analysis. Referring to the institutions that provided this funding as "MRA counterparties" no more dictates that they are "repo participants" as defined in Bankruptcy Code §101(46), than referring to them as "warehouse lenders" dictates that the financings they provided can be recharacterized to bring them out of the repo safe harbor adopted in the 2005 amendments to the Bankruptcy Code.

Determining whether these MRAs could <u>legally</u> be recharacterized as financings for purposes of the Bankruptcy Code, so as to bring them outside the protections of the "safe harbor" provisions for repurchase facilities and, thereby, realize the enormous benefits mentioned above, involves more rigorous analysis. That issue was explored by counsel for the Debtors prior to the Petition Date. The privileged advice given was not based on a conclusion that these facilities

---

sales of the related Purchased Assets <u>notwithstanding their treatment for certain accounting and tax purposes as financing transactions</u>." DBSP MRA at Section 14.A. (Emphasis supplied).

[16] For example, the MRA with UBS dated as of June 23, 2006, defines "Warehouse Lender" as "any lender, including without limitation, [UBS], providing financing to any Seller in any fractional amount for the purpose of originating or purchasing Mortgage Loans . . ." UBS MRA at § 1.01.

21

functioned as true sales, as opposed to financings. They do not. Nor was it based on a

conclusion that there would be any difficulty in recharacterizing them as financings if established

law applicable to such matters as equipment financings applied. They could have been. Rather,

the advice was predicated largely on the 2005 amendments to the Bankruptcy Code establishing

safe harbors for repurchase facilities of mortgage loans. Effective for cases filed on or after

October 17, 2005, §101(47) of the Bankruptcy Code defines a repurchase agreement to include

an agreement which "provides for the transfer" of one or more mortgage loans. There is no

requirement that the transfer be a true sale. The 2005 House Report states that the intent was to

"eliminate any inquiry … as to whether a repurchase or reverse repurchase transaction is a

purchase and sale transaction or a secured financing". H.R. Rep. No. 109-31 Pt. 1, 109[th] Cong.,

1st Sess. (2005) at 119. In addition, there is a substantial body of prior case law that holds that

repos are not secured financings subject to the foreclosure requirements of Article 9 of the UCC,

based in part on the importance of traditional repos involving treasuries and other short-term

fungible securities to the Federal Reserve Board and to the banking system.[17] In addition,

recharacterizing them as financings would need to overcome the fact that they were documented

as sales and the MRAs contain strong statements that the partners intended them to be sales. It is

for those and other legal and practical reasons that counsel for the Debtors advised the Debtors

not to commence litigation attempting to recharacterize these facilities as financings.

But that is a far cry from concluding that there is no legitimate contrary argument. There

are virtually no reported cases deciding any of the relevant issues under the 2005 amendments to

the Bankruptcy Code. In addition, a number of the pre-2005 decisions raise the possibility that

repurchase facilities involving mortgage loans might be different than traditional repos of

---

[17] See, e.g., Granite Partners v. Bear, Stearns, 17 F Supp 2d 275 (S D N Y 1998).

22

fungible securities such as treasuries. Unlike repos of treasuries or other fungible securities, the "buyer" in a mortgage loan repo is generally not free to trade in and out of the mortgage loans subject to the MRA. Instead a repo counterparty for mortgage loans typically resells exactly the same pool of mortgage loans to the originator on the maturity date. Some courts have concluded that the fungibility of treasuries and the ability of the buyer to resell a different pool of securities is a critical element that renders most typical repos a true sale. See, e.g. In re Bevill, Bresler & Schulman Asset Management Corp., 67 B.R. 557, 597 (D.N.J. 1986); In re Legel, Braswell Government Securities Corp., 648 F.2d 321, 325 (5th Cir. 1981). One commentator concluded that this was the key element distinguishing a repo from a secured financing. J. Schroeder, "Repo Madness, the Characterization of Repurchase Agreements under the Bankruptcy Code and the UCC," 46 Syracuse L.Rev. 999 (1996). The court in Criimi Mae concurred and held that when a master repurchase agreement did not allow the repo counterparty to substitute equivalent securities it was a disguised financing. In re Criimi Mae, Inc., 251 B.R. 796 (Bankr. D.Md. 2000).

Indeed, in a May 25, 2007 response to the Adequate Protection Motion, one of the whole loan purchasers made these arguments. IndyMac Bank, F.S.B. ("IndyMac") argued that the MRAs were disguised loans, citing a number of cases for the proposition that they could be recharacterized. IndyMac contended that the transactions involving the MRAs were tantamount to revolving credit lines.[18] It was in IndyMac's interest to distinguish its purchases of mortgage loans in whole loan sales, which everyone agreed were true sales, from the repo facilities, since IndyMac concluded that this would advantage it in competition with the MRA counterparties for scarce funds.

23

When counsel for the Debtors discussed these issues at the May 30, 2007 hearing on the

Adequate Protection Motion, he indicated that IndyMac had raised these issues and referenced

the <u>Churchill Mortgage Corporation</u> case[19] cited by IndyMac for the proposition that the MRAs

might be recharacterized as secured financings. Counsel for the Debtors also indicated that the

contrary position had been briefed by some of the MRA counterparties, including Barclays,

which had cited the <u>Granite Partners</u> case mentioned above.[20] Counsel for the Debtors

summarized that "again, these are all issues that I'm sure the loan purchasers will have one very

strong view on and the parties to the repurchase agreements will have another various argument

on."[21]

Particularly in light of the fact that there were disagreements on these issues and that at

least one significant participant with an economic stake — IndyMac — had made the argument

that the MRAs should be recharacterized, it would have been imprudent for counsel for the

Debtors to have taken a position that there was no prospect for recharacterization. That might

have damaged the estates and prejudiced the rights of parties such as IndyMac and the unsecured

creditors represented by the Committee. Indeed, if the Debtors had decided to disagree with

their counsel's advice and had decided to file recharacterization litigation, counsel could

properly have prosecuted it for that position can be advanced in good faith. Privileged and

confidential advice against undertaking such litigation does not change the fact that there were

---

[18] IndyMac Bank, F S B 's Limited Objection to the Debtors' Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105(A), 361, 362 and 363(B)(1), May 25, 2007 at 8-10 (Docket No. 889)

[19] <u>In re Churchill Mortgage Investment Corp.</u>, 233 B R. 61, 67 (Bankr. S D N Y 1999); <u>see</u> transcript of May 30, 2007 hearing ("Tr") at 38 (Docket No. 1232) in which counsel for the Debtors specifically referenced IndyMac's brief on this point.

[20] See note 17, <u>supra</u>.

[21] May 30, 2007 Tr at 42. Docket No. 1232.

(and remain) serious issues as to whether or not these transactions could have been recharacterized as financings.

Perhaps the Examiner's confusion emanates from the fact that the Examiner was advised by the Debtors that the MRA facilities work and act like financings. They do. That is exactly how the business people think of them and parties often use financing terminology to describe them. They have the hallmarks of a financing. But for the 2005 amendments to the Bankruptcy Code and cases such as Granite Partners, counsel might well have recommended engaging in litigation on this issue.

Moreover, no matter where one comes out on the legal issue of whether they could be recharacterized as financings for purposes of the Bankruptcy Code, they were extended by financial institutions to allow New Century to finance its business and were commonly referred to as financings. Much of the Examiner's investigation consisted of his counsel's efforts to try to attach precise legal meaning to emails and interviews, despite the fact that this terminology can mean different things in different contexts and is often used generically.

B.   Investigating the Factual Issues Understandably Took Substantial Time.

The second supposed misrepresentation asserted by the Examiner is based on his understanding that the Debtors professionals "missed" the cash collateral issue until several weeks after the petitions were filed. He contends that this is inconsistent with the August 31, 2007 disclosure of the privileged attorney-client advice not to commence recharacterization litigation. In so doing, the Examiner conflates two very different issues — (i) the legal analysis as to whether the MRAs could be recharacterized as financings, as opposed to repurchase transactions, and (ii) whether as a factual and legal matter funds collected on the mortgage loans subject to MRAs could be traced to Account 4025. Counsel for the Debtors did analyze the first

25

issue prior to the Petition Date and provided legal advice to their client, as described above. In contrast, the factual tracing and cash flow issues required forensic accounting and analysis of complex factual and legal issues, all of which has consumed much of the last seven months. This led to a "growing realization that the issues involved are more complex and the amounts involved are significantly greater than the Debtors' appreciated when these cases were filed." Adequate Protection Motion at 2. That statement was true when it was made on May 16, 2007 and the Debtors stand behind it today.

This part of the history is developed more fully in Section III of this Reply since it is intertwined with the legal and factual issues as to whether the balance in Account 4025 on the Petition Date is property of the estates or trust property held for others. But a few factors that affected the timing of these investigations are directly related to the Examiner's charges of supposedly misleading statements.

The timing of such factual investigations was complicated by several factors. To begin with, New Century was an enormous enterprise. During 2006 alone, it originated and sold over $60 billion of mortgage loans. It directly employed over 7,000 people and had contracts with over 37,000 independent mortgage brokers. It operated over 350 bank accounts, including many custodial accounts and other operating accounts, through which hundreds of millions of dollars flowed monthly. On February 7, 2007, New Century announced that its prior financial statements could not be relied upon and that it would not be able to file its annual report on time. New Century launched its own investigation as to what had happened, and during February through April much of its accounting staff was occupied in attempting to restate its financials. During February and March 2007, New Century was hit with hundreds of millions of dollars of margin calls from its MRA counterparties and demands from loan purchasers to repurchase

26

loans. New Century worked with these parties and during February 2007 was able to negotiate waivers with each of its MRA counterparties. At the same time, New Century was faced with state regulatory actions that threatened to, and ultimately did, cause it to stop originating mortgage loans. New Century worked with the state regulators in an effort to develop workable procedures, including finding replacement lenders for the approximately 26,400 loan applications totaling $5.9 billion that New Century had accepted and were in the pipeline, so as to minimize any problems for consumers. These efforts were entirely successful and all the pipeline loans were placed with other lenders. New Century's announcement of a financial restatement also precipitated investigations by a special independent committee of New Century's board, the SEC and the U.S. Attorney, plus the filing of class action litigation. In addition, New Century was forced to lay off massive numbers of employees – approximately 3,000 on the Petition Date for example.

As is the case with many debtors, New Century attempted to ride out this storm through an out-of-court process, which made particular sense here given the "safe harbor" protections afforded to the MRA counterparties under the 2005 Bankruptcy Code Amendments – bankruptcy afforded New Century far fewer benefits than it would a normal business. Thus, during March 2007, the Debtors' investment bankers, counsel and senior executives were involved in extraordinary efforts to try to save the company, including intense negotiations with three major potential investors/acquirers of New Century's loan portfolios subject to the MRAs. New Century's executive offices were swamped with teams doing diligence. At the same time, the company was attempting to put out innumerable fires.

Restructuring counsel was hired in early March 2007, while the crisis management team that ultimately supplied the Debtors' CEO was hired late in the day on March 21, 2007. At the

27

same time, New Century and its professionals strived to obtain debtor-in-possession financing and stalking horse bids for its key businesses in case it needed to file bankruptcy. It was essential that these building blocks be in place prior to filing a chapter 11 petition or there would be little point in filing bankruptcy, particularly given the extremely fragile nature of the financial service businesses in which New Century was engaged and the 2005 amendments to the Bankruptcy Code. Agreements in principle were not reached with the DIP lenders or stalking horse bidders until March 29-30, 2007. The Debtors' professionals worked tirelessly to finalize and document these agreements and filed the chapter 11 petitions on Monday April 2, 2007.

The MRA facilities were one piece of this puzzle. The forensic accounting completed over the last seven months was complicated by variations among the MRAs. For example, some did not require special cash control or the use of segregated accounts until and unless the counterparty declared an event of default. Others required the establishment of segregated collection accounts into which principal paid on the mortgage loans was deposited. Some MRA counterparties negotiated control account agreements with a depository institution — either Union Bank of California or Deutsche Bank. Even those facilities that required control accounts provided that until and unless there was an event of default and a "shift notice" delivered to the depository bank, the Debtors were free to withdraw funds from these segregated accounts and to spend that money for any corporate purpose. As provided in these MRAs, prior to the Petition Date, the Debtors had established segregated accounts into which principal (and sometimes interest) collected on the mortgage loans was deposited and segregated. Beginning in early March 2007, some of the more aggressive MRA counterparties demanded that they be allowed to sweep these accounts daily, even though the MRAs did not give them this right and required them to await either the declaration of an event of default or the monthly settlement that was

28

provided for in their facilities. Nonetheless, the Debtors generally cooperated and turned over these funds. Beginning in about mid-March 2007, the MRA counterparties began declaring events of default.

Upon receiving the first of notices of default, New Century decided to establish segregated collection accounts for all MRA counterparties including those that had not declared an event of default and those whose MRAs did not require the establishment of collection accounts. New Century did this voluntarily in an effort to deal even-handedly with the MRA counterparties. Opening new segregated collection accounts for the MRA counterparties who did not previously have them was relatively simple. Reprogramming MortgagServ[22] to direct all collections on loans subject to MRAs, was more difficult and involved many thousands of daily transactions.[23] New Century accomplished all of this by mid-March 2007, did not withdraw funds from these segregated accounts from that point forward and has never asserted that funds in these collection accounts were property of the estates. In fact, two of the MRA counterparties — Morgan Stanley and BofA — were pleasantly surprised when the Debtors advised them post-petition (in the course of the adequate protection negotiations) that custodial accounts had been established for them and turned over approximately $20 million to them.

Tracing the flow of funds that preceded the establishment of several new segregated accounts, the reprogramming of the cash flow system and the declaration of events of default has been an enormous undertaking. Over the last seven months, the Debtors' accounting

---

[22] The third party software that directs thousands of daily receipts to one of over 350 bank accounts

[23] Prior to mid-March 2007, MortgageServ directed collections of principal and interest collected from borrowers to collection accounts established by some MRA counterparties, directed principal (but not interest) collected on mortgage loans to collection accounts established for other MRA counterparties and other MRA counterparties did not require MortgagServ to direct these collections to a segregated account. This system had been operating for years without complaint from the MRA counterparties.

29

professionals and financial advisors have worked closely with the MRA counterparties and whole loan purchasers to reconcile the facts. They have exchanged multiple spread sheets and have struggled to ferret out transactions involving many tens of thousands of loans. Still after all that effort they are over $6 million apart. The MRA counterparties proposed that the effort to reconcile these factual differences halt and that all agree to use the Debtors' estimates in fashioning the settlement that the Debtors expect to present to the Court shortly.

It is extremely doubtful that such factual matters could have been probed adequately pre-petition, particularly given the chaos that reigned at New Century at the time.

Post-petition, the Debtors' accounting staff and financial advisors investigated these matters. When the preliminary conclusion was reached in early May 2007 that the amounts at issue were substantially in excess of those previously understood and might be traced to Account 4025, the Debtors concluded that a proactive approach was called for. The Debtors could have waited for the MRA counterparties to bring adversary proceedings, which, as is pointed in Section III of this Reply, would have been procedurally proper. But that also would have given an advantage to the most litigious among the MRA counterparties and would have rewarded the winners of the race to the courthouse.

The Debtors maintained then, and maintain now, that the funds in Account 4025 on the Petition Date were estate property. But in order to avoid multiple disjointed adversary proceedings, to deal even-handedly with all of the claimants, and to ensure that these matters were brought into the open, the Debtors immediately contacted the Committee's professionals and then promptly reached out to the major MRA counterparties. The development of the Adequate Protection Motion took several weeks. Drafts were circulated to the major MRA counterparties and most of their comments were accepted. Many agreed to support it. Others

30

reserved their rights and continued to negotiate up to the eve of the May 30 hearing (and some thereafter). But in any event, the Debtors filed the Adequate Protection on May 16, offered to and did grant liens on all estate assets to secure any legitimate trust fund claims that the MRA counterparties and the whole loan purchasers could assert and escrowed the full amount that had been in Account 4025 on the Petition Date.

Accordingly, the Examiner's conclusion that the Debtors had misled the Court when the Debtors referred to their "growing realization" that the amounts at issue were greater than they previously understood, is completely erroneous. While as discussed above, the Debtors' were aware of the legal issues involved in potentially recharacterizing the MRAs as financings, the Debtors' realization of the magnitude and scope of the factual dispute concerning funds that might be traced to Account 4025 evolved as the facts and the positions taken by various MRA counterparties became known and as the forensic accounting progressed. It was anything but misleading to describe this as a "growing realization."

C.    The August 31, 2007 Forced Disclosure of Privileged Legal Advice.

Had the Debtors known prior to August 31, 2007 that privileged advice concerning attempting to recharacterize the MRAs were the be-all and end-all for the Examiner, the Debtors undoubtedly would have consulted with the Committee and very likely would have disclosed this privileged advice sooner. When the Examiner revealed his thesis at the August 31, 2007 meeting, the Debtors were shocked. They advised the Examiner that his assumption regarding their legal position was wrong and ignored the fact that the Debtors had not brought any such litigation. Thereafter, the Debtors consulted with the Committee's professional concerning whether the Debtors should turn over privileged documents evidencing this legal advice. In the course of those discussions, Committee counsel stated that they too were surprised that the

31

Examiner believed counsel's privileged advice, or even the Debtors' view of this issue, was the gating determinant as to whether an examination should go forward. Given the Examiner's newly revealed premise, and in order to avoid the Examiner filing a report that would have been materially incorrect on a fundamental point, the Debtors disclosed these confidential attorney-client communications. The Examiner subsequently confirmed that this was counsel's advice on this topic by reviewing documents and conducting follow up interviews. Cash Collateral Report at 18. The Debtors offered to arrange other interviews and to waive the attorney-client privilege if the Examiner had any doubt that Debtors' counsel had advised against attempting to recharacterize the MRAs. The Examiner reported that this was not necessary since he had received sufficient corroborating evidence.

III.    THE DEBTORS QUITE PROPERLY MAINTAIN THAT THE $42.1 MILLION ON DEPOSIT IN ACCOUNT 4025 ON THE PETITION DATE WAS PROPERTY OF THE ESTATES

The Examiner points out that when two parties assert ownership to property, both cannot be right. It is either estate property or property of the claimant. Thus, these are not cash collateral issues. Cash Collateral Report at 6. Even though he did not believe this matter was within his scope, the Examiner made a number of derogatory comments regarding the Debtors' professionals. The Cash Collateral Report does not discuss any of the complex issues surrounding the determination of the rights to the funds in Account 4025 as of the Petition Date, even though the Examiner was advised of these matters during his investigation. So that the Court will be fully informed concerning these issues, and to amplify on some of the reasons why the Debtors approached these issues in the way that they did, the Debtors will attempt to summarize this analysis. However, before turning to the substance, it is critical not to lose sight of the fact that the factual discussions in this Reply are the product of an arduous 7-month

32

investigation by the Debtors and negotiations with the parties with a significant economic stake, very little of which was known on the Petition Date by the insolvency professionals involved.

A.    The Nature of the Debtors' Relationship with the MRA Counterparties.

During March 2007, New Century used nine repurchase facilities to fund the origination of mortgage loans.[24] As of the Petition Date, New Century financed over $9.4 billion of mortgage loans and mortgage-related securities through these facilities and New Century's "repurchase obligations" to the MRA counterparties totaled approximately $8.5 billion.[25]

There were many similarities among the MRAs. There were also, however, important differences. Some required that all funds collected on the mortgage loans subject to an MRA be deposited in a segregated account. Others required such a segregated account only at the counterparty's election after an event of default was declared. All of them, however, permitted the Debtors to use the funds collected for any purpose the Debtors chose (including paying operating costs) so long as the counterparty had not declared an event of default. In other words, even those MRAs that required a segregated account permitted the Debtors to withdraw funds

---

[24] The nine MRAs are: (i) a Master Repurchase Agreement with Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley") dated as of December 12, 2005, (ii) an Amended and Restated Master Repurchase Agreement with Credit Suisse, First Boston Mortgage Capital, LLC ("CSFB") dated as of January 31, 2007, (iii) a Master Repurchase Agreement with DB Structure Products, Inc. ("DBSP") dated as of September 2, 2005 which New Century used to finance prime mortgage loans, (iv) a Master Repurchase Agreement with DBSP dated as of April 17, 2006 which New Century used to finance so-called "hospital loans," (v) a Master Repurchase Agreement with Barclays Bank PLC ("Barclays") dated as of November 12, 2004, (vi) a Master Repurchase Agreement with UBS Real Estate Securities Inc. ("UBS") dated as of June 23, 2006, (vii) a Fifth Amended and Restated Master Repurchase Agreement with IXIS Real Estate Capital Inc. ("IXIS") dated as of November 10, 2006, (viii) a Third Amended and Restated Master Repurchase Agreement with Bank of America, N.A. ("BofA"), as Amended and Restated as of September 7, 2006 which New Century used to finance the origination of sub-prime mortgage loans, and (ix) a Master Repurchase Agreement with BofA dated as of September 28, 2006, which New Century used to finance the origination of prime mortgage loans.

[25] The $900 million spread between the amount financed and the principal balance of these loans reflected the difference between the face amount of the loans and what the MRA counterparties were willing to advance against them.

33

and use them in their business for any reason whatsoever prior to the MRA counterparty

exercising remedies.[26]

There were sound business reasons why the counterparties permitted the Debtors free

access to the funds collected on the underlying mortgage loans prior to the exercise of remedies.

The Price Differential payments the Debtors were required to pay the MRA counterparties were

unrelated to the interest collected from borrowers on the underlying mortgage loans, and as a

matter of business practice and competition for New Century's business, the MRA counterparties

structured the MRAs to allow New Century to utilize principal, as well as interest, collected on

loans and to rely on New Century's credit to settle up monthly. Accordingly, the business

arrangements required New Century to make monthly payments to the counterparties at the rates

specified in the MRAs and also permitted New Century to use the funds received from borrowers

---

[26] For example, the MRA with DBSP for prime loans provided that all collections on loans financed through this MRA were to be deposited into a collection account maintained with Union Bank of California. New Century had established such a collection account — Union Bank of California Account No. 7930002156. This account was labeled "New Century Mortgage Corporation ITF [in trust for] Deutsche Bank N.A., Warehouse Finance." During all relevant times, including substantially prior to March 2007, New Century deposited all principal and interest collected on the mortgage loans financed through the DBSP prime loan facility into this collection account. The DBSP MRA was also clear that New Century was entitled to take monies from this collection account absent an event of default. Indeed, Section 12 of the DBSP MRA establishes a waterfall for the application of collections deposited in this collection account. The first application was to pay New Century's fees. Thereafter, New Century was free to take and use such funds so long as no Price Differential or margin call payment was then due to DBSP and so long as DBSP had not declared an event of default. DBSP had not required a control account with Union Bank. In mid-March, DBSP asked New Century to help it negotiate a 3-way control agreement with Union Bank of California. New Century did so and on March 19, 2007, Union Bank of California, DBSP and New Century executed a control agreement for the benefit of DBSP. DBSP had earlier declared an event of default — on March 15, 2007 — and, accordingly, pursuant to this agreement, account 7930002156 was immediately blocked. Some of the other MRA counterparties had earlier negotiated control agreements with the depository banks. For example, Barclays had a control agreement governing Union Bank of California Account 2110106273 into which New Century deposited all principal and interest collected on loans subject to the Barclays MRA. UBS had negotiated a control agreement governing a collection account with Deutsche Bank into which all principal collected on loans subject to the UBS MRA were deposited. Other MRA counterparties — BofA and Morgan Stanley — were more lax in their documentation and did not require collections on the mortgage loans they financed to be segregated from New Century's general operating funds, at least not prior to an event of default. Even those MRA counterparties who had negotiated blocked account agreements and established collection accounts allowed New Century to withdraw funds from those accounts prior to the declaration of an event of default and notice given to the depository bank.

on the underlying mortgage loans. To do otherwise would have required New Century, in substance, to double pay for their financing arrangements.

In addition to different cash management requirements, some of the MRAs involved unique circumstances.

For example, the MRA with Morgan Stanley was the only one that New Century used on the Petition Date to finance securities issued by securitization trusts, as opposed to mortgage loans. In early March 2007, Morgan Stanley agreed to expand its existing MRA to take out a prior MRA that had been provided by Citigroup. In connection with that take-out, these residual interests in securitization trusts were delivered to Morgan Stanley in return for which Morgan Stanley advanced $265 million — i.e., the remaining "equity" in these residual interests was approximately $90 million. Morgan Stanley structured this transaction so that this $90 million of equity supported not only the $265 million Morgan Stanley advanced against these residual interests, but also all other repurchase obligations owed by New Century. This was documented in Amendment No. 8 to the Morgan Stanley MRA, dated as of March 8, 2007. This was viewed as a lifeline by New Century that would allow it to pursue the M&A transactions discussed above. The next day, however, Morgan Stanley declared a default. Since New Century is a public reporting company, this default was disclosed publicly and Morgan Stanley's action precipitated actions by others.

The MRA with Barclays was also different. It was terminated on March 16, 2007 pursuant to an agreement between New Century and Barclays, commonly referred to as the "walkaway agreement." New Century entered into this termination agreement because it concluded that it was very unlikely that there was equity in the mortgage loans that had been financed through the Barclays MRA. The parties agreed to cooperate in transferring servicing of

the loans covered by this MRA, along with all the relevant loan files. In addition, the parties

agreed to a fairly complex formula for the netting of certain payments that accrued from March 1

through March 16, 2007 – Barclays received the benefit of the "Price Differential" payments it

charged to New Century, New Century got the benefit of interest accruals owed by borrowers

(which substantially exceeded the amount of the Price Differential) and New Century was to

ensure that all principal collections on these loans through March 16, which were to be deposited

in a Barclays custodial account pursuant to the MRA, were in fact turned over to Barclays. In

return, Barclays waived any deficiency claim it could have asserted under the MRA. The

reconciliations that have been painstakingly performed from July to December 2007 indicate that

New Century overpaid Barclays by approximately $2 million under this walkaway agreement.

This was the result of the fact that Barclays had been sweeping on a daily basis amounts

deposited into the Union Bank collection account established for the Barclays MRA — Union

Bank Account 211016273. When the walkaway agreement closed on March 18, 2007, New

Century's accounting system automatically attempted to transfer approximately $2 million from

collection account 211016273 established for Barclays as an MRA counterparty to a separate

custodial account established for Barclays as a whole loan purchaser — Union Bank account

7930002431. Since account 211016273 had been swept to zero a few days earlier by Barclays,

the New Century accounting system drew $2 million from its general corporate operating funds,

in effect paying Barclays twice for this $2 million. Because of the complexities of the wire

transfers and funds flows, it took until October 2007 for New Century to reconcile this matter.

Barclays, in contrast, asserted that New Century owed it slightly over $2 million under the

walkaway agreement and is a party to the Adequate Protection Motion and related negotiations.

36

B.    The History of the Account 4025 Dispute.

Beginning in the middle part of March, 2007, the MRA counterparties started to exercise remedies. Morgan Stanley declared an event of default on March 9, 2007, although it opted not to exercise any other remedies of that time. Beginning in early March 2007, UBS and Barclays began sweeping the money in their collection accounts daily, even though they had not declared an event of default and had no right under their MRAs to sweep these accounts. On March 12, 2007, UBS and Barclays declared an event of default and sent "shift" notices to Deutsche Bank and to Union Bank of California, respectively, so that from that point forward New Century was unable to withdraw any funds from these accounts (and did not do so).

New Century decided to deal with these financial institutions even-handedly and began the arduous process of reprogramming the MortgagServ software so that all collections on all loans subject to MRAs were deposited into collection accounts established for the MRA counterparties. New Century also voluntarily opened collection accounts for those MRA counterparties (BofA and Morgan Stanley) which had not previously required them.

The dispute at hand centers on whether some funds that the MRA counterparties and certain whole loan purchasers assert are their property can be traced to New Century Mortgage Corporation's general corporate operating account with Union Bank of California — the 4025 Account. In approaching this question, it is critical to understand the context. New Century had over 350 bank accounts, including a multitude of collection accounts such as those established for the MRA counterparties, custodial accounts established for securitization trusts and whole loan buyers for whom New Century acted as servicer, escrow accounts in which tax and insurance proceeds were held for the benefit of taxing authorities and insurance carriers, payroll accounts, disbursement accounts, and a variety of other bank accounts, including Account 4025.

The complexity of the system is illustrated by the fact that it took several months after the Petition Date to map it out for the benefit of counsel for the Debtors, the MRA counterparties and whole loan buyers. New Century delivered this schematic to the MRA counterparties on July 23, 2007. A copy was also delivered at that time to the Examiner. It is attached hereto as Exhibit A.

Most of the funds going in and out of the 4025 Account had nothing to do with MRA counterparties or collections on loans sold to whole loan buyers. Hundreds of millions of dollars flowed in and out of this account on a monthly basis. For example, New Century realized substantial income by way of servicing fees, its profit on loan sales, funds from joint ventures in which it was a partner, and other sources unrelated to any of the claims at issue here. In the course of addressing these matters with the adequate protection parties, New Century undertook an extensive effort to quantify the flows in and out of Account 4025. The materials delivered to the parties to the Adequate Protection Motion and to the Examiner on July 23, 2007 demonstrated that over $190 million flowed into Account 4025 during March 2007 that had nothing to do with the MRA counterparties or collections on loans sold to whole loan buyers.

On the Petition Date, the balance in Account 4025 was $42.1 million. This was substantially lower than normal — balances were generally in the range of several hundred million dollars. This account was badly depleted on the Petition Date because during the prior months New Century had made substantial payments to the MRA counterparties to satisfy margin calls and had made substantial payments to whole loan buyers to satisfy early payment default ("EPD") and other repurchase claims. During March 2007, New Century paid approximately $59 million to the MRA counterparties in satisfaction of margin calls. Again, this was determined post-petition in the accountings developed in connection with negotiating with

38

the adequate protection parties. New Century delivered these materials to the adequate protection parties and to the Examiner on July 23, 2007.

During the last two weeks of March, New Century's management and professionals were engaged in a full-court press first to determine if a non-bankruptcy sale could be accomplished and alternatively to prepare the case for a possible bankruptcy filing, including around-the-clock work to arrange DIP financing and stalking horse bids for very fragile service businesses. New Century filed for bankruptcy protection on April 2, 2007. At the time, New Century's insolvency professionals understood that the funds in Account 4025 were unencumbered and that all funds that the MRAs required New Century to have segregated into collection accounts had been segregated.

Ultimately, the MRA counterparties asserted that they were among the Debtors' largest unsecured creditors. In addition, they asserted that collections on loans subject to MRAs prior to the exercise of remedies might be traced to Account 4025. The focus on Account 4025 was entirely a post-petition phenomenon. When UBS and others first made demands, they simply asserted that they had not received some collections on loans subject to their MRAs. They did not know nor did they specify which account might hold these funds. Similarly, as of the Petition Date, the Debtors had not undertaken the sort of forensic accounting necessary to determine if the MRA counterparties could trace funds that they legitimately could assert were theirs to any particular account, much less to Account 4025. The Debtors continue to assert that collections on loans subject to MRAs had largely been spent pre-petition (as allowed by the MRAs) or were held in segregated collection accounts, and that the MRA counterparties are not legally entitled to the funds held in Account 4025 on the Petition Date. It is critical to remember that MRA counterparties asserting that they were owed for some collections on loans does not

39

mean that these funds were held by the Debtors on the Petition Date, that the MRA

counterparties could establish that any such money was legally held in trust for them or that the

MRA counterparties could trace them to any account other than their collection accounts.

On April 5, 2007, UBS filed an adversary proceeding (Adv. Pro. No. 07-50875) (Docket

No. 3) asserting, among other things, that New Century had collected funds on loans that were

financed under its MRA and which had not been turned over to UBS. UBS sought an injunction,

establishment of a constructive trust and an accounting. New Century disputed these

allegations,[27] but agreed to provide UBS an accounting.[28]  On April 26, 2007, New Century

delivered that accounting to UBS. It indicated that the collection account turned over to UBS

had been <u>over</u> funded by $229,881.29, which was not surprising to New Century since UBS had

been sweeping this collection account since early March, had delivered a shift notice to Deutsche

Bank on March 12, 2007, and had emptied that account shortly after delivery of the shift notice.

UBS responded that this accounting was "wrong" and that approximately $2.7 million had not

been deposited into the collection account, but should have been. New Century disagreed, but in

an effort to resolve this matter, the parties entered into a stipulation pursuant to which New

Century deposited $2.7 million into an escrow account, which was to be held while the parties

tried to resolve the factual and legal issues. "Stipulated Scheduling Order Regarding UBS Real

Estate Securities Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction,"

May 15, 2007 (Docket No. 36). UBS initially asserted that New Century had collected, but

failed to turn over, some payments in full ("PIFs")[29] received from borrowers on loans subject to

---

[27] "Memorandum in Support of Defendants' Opposition to Motion for Temporary Restraining Order,"
April 10, 2007. (Docket No. 17)

[28] See Transcript of April 12, 2007 hearing at 49-50 (Docket No. 377).

[29] A payment in full or PIF is simply a full repayment by the borrower. It usually was the result of a
refinancing and, therefore, was not part of regular cash flows.

40

the UBS MRA. But subsequent reconciliations between UBS and New Century revealed that UBS's allegations focused almost entirely on regularly scheduled borrower interest paid during the first few days of March <u>before</u> UBS started to sweep the collection account and <u>before</u> it declared an event of default or sent a shift notice to Deutsche Bank. This was at the heart of whether New Century's original accounting was "right" or "wrong."

On April 25, 2007, DBSP filed an adversary proceeding (Docket No. 402). This complaint centered on a dispute between New Century and DBSP concerning whether New Century had "delivered" to DBSP on March 6, 2007 235 mortgage loans with principal balances of approximately $50 million in order to satisfy a $14.1 million margin call or had merely sent information concerning these loans to DBSP for review and possible negotiations over what portion of these loans might later be delivered by New Century to DBSP in satisfaction of this margin call. This dispute does not relate at all to the Adequate Protection Motion or to the Examiner's cash collateral investigation. Although it was not the gravamen of the complaint, DBSP asserted, in a fashion similar to UBS, that some collections on loans subject to its MRA had not been deposited in the collection account with Union Bank of California and sought establishment of a constructive trust. New Century and DBSP were able to reach a procedural agreement quickly and entered into a stipulation to allow them to deal with these issues in a non-crisis environment. "Stipulation and Order Resolving DB Structure Products, Inc.'s Motion for Preliminary Injunction," May 15, 2007. ([Docket No. 709). This stipulation detailed the procedure for dealing with the $50 million of disputed loans. Ultimately, the parties were able to reach an agreement pursuant to which the estates realized approximately $10 million from the sale of these disputed loans and DBSP received $14.1 million. DBSP never required that an escrow account be established to deal with its allegations concerning funds collected on loans

41

that were subject to the MRA that might be traced to Account 4025 and affirmatively supported the Adequate Protection Motion. In addition, in the settlement with DBSP, DBSP assigned to the estates whatever rights it might have with respect to moneys held in the escrow established pursuant to the Adequate Protection Order. "Order Approving Settlement Agreement with DB Structured Products, Inc. Pursuant to Bankruptcy Rule 9019 and Sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code," August 21, 2007. (Docket No. 2369).

During April 2007, New Century's professionals were engaged in numerous discussions with counsel for the MRA counterparties. These include confidential settlement discussions with a number of them. The Debtors have no intention of breaching these confidences. Some of these resulted in tangible, public results — e.g., the DBSP settlement mentioned above and the auction of the residual interests and mortgage loans subject to the Morgan Stanley MRA conducted in conjunction with the auction of the Debtors' servicing business (including servicing rights related to the residual interests sold at Morgan Stanley auction), which the Court approved on April 27, 2007. "Stipulation and Order (1) Approving Agreement for the Disposition of Certain Mortgage Loans and Residual Interests, and (2) Confirming, Inter Alia, (A) That Auctions Mortgage Loans and Residuals conducted in Accordance with Auction Procedures Therein are Covered by Bankruptcy Code 'Safe Harbor' Provisions and are Commercially Reasonable and (B) Absence of Need to Seek Relief from Automatic Stay," April 26, 2007. (Docket No. 439).

In early May 2007, New Century's accounting personnel completed a preliminary reconciliation involving all of the MRA counterparties. It indicated that if one were to assume that UBS was correct that collections on mortgage loans prior to the exercise of remedies, particularly with respect to regularly scheduled borrower interest (an assumption the Debtors

42

disputed at the time and still dispute), are nonetheless the counterparty's property, the amounts at issue were far greater than previously anticipated. In addition, this exercise illustrated that New Century had not turned over to whole loan purchasers $9.3 million of collections on loans that were to have been sold to whole loan purchasers and which were trapped on the Petition Date. The Debtors' professionals promptly brought this news to the attention of counsel for the Committee. The Debtors and the Committee quickly concluded that this should also be brought to the attention of the MRA counterparties and the whole loan purchasers and that proactive action be taken to deal fairly with each of them. The form of the Adequate Protection Motion and the order were negotiated extensively with the MRA counterparties over the course of the first two weeks of May. The motion was then filed on May 16, 2007 (Docket No. 736), heard on May 30, 2007, and after further substantial negotiations, an agreed order was entered on June 28, 2007 (Docket No. 1729) (the "Adequate Protection Order").

C.    The Property-of-the Estate Issues Addressed in the Adequate Protection Process.

The Adequate Protection Order provided for the sharing of detailed accounting information, established procedures for reconciliation of these factual issues and then established a protocol for negotiations over the legal implications. That process has consumed a substantial period of time. Many facts that were assumed in May and June, when the order was negotiated, turned out to be incorrect. Often the facts were more favorable to the estates than the Debtors had previously realized. The legal analysis also was complex and engendered substantial disagreement, particularly over issues that were created by the 2005 amendments to the Bankruptcy Code and which have not yet been tested in the courts.

The Debtors briefed the Examiner on all of these issues. In his Cash Collateral Report, the Examiner concludes that these issues are not within the scope of his assignment but

43

nonetheless condemns the Debtors' professionals based in part of the MRA counterparties' views of the facts and legal analysis. As the Debtors explained to the Examiner, they strongly disagree with the MRA counterparties on these issues. In order to frame the debate, there are seven key issues that should be brought to the Court's attention. The Debtors mention them not to litigate over the merits, but to illustrate that it would not have been a proper discharge of their fiduciary duties to have accepted the claims of the MRA counterparties at face value. As can be seen from a review of the issues below, in the Debtors' view, the amounts the MRA counterparties asserted were often overstated and their legal analysis often did not hold water.

       1.     <u>Sections 559 and 562 of the Bankruptcy Code</u>.

Bankruptcy Code §§ 559 and 562 provide that if a repo participant liquidates, terminates or accelerates a repurchase agreement, the earliest of those dates sets the measurement date for determining whether a surplus or deficiency exists under the MRA facility. Section 559 provides that in "the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to the repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (<u>or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotations from such a source</u>) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements <u>shall be deemed property of the estate</u>, subject to available rights of setoff." (Emphasis supplied.) Section 562 similarly provides that any damages owed to a repo participant are to be measured on the earlier of liquidation, termination or acceleration of the repo facility. These sections of the Bankruptcy

44

Code were adopted as part of the 2005 amendments and are a logical corollary to the safe-harbor provisions that were adopted then for the benefit of repo participants. In 2005, Congress granted mortgage loan repo counterparties certain special and powerful rights, including the ability to sell mortgage loans that had been financed under qualified repos without obtaining relief from the automatic stay. It was logical, therefore, for Congress also to provide that any deficiency claim or surplus is to be measured based on the market value of the mortgage loans determined as of the date that the repo counterparty accelerates and terminates the repo. If a repo counterparty chooses to delay in disposing of the loans, any market decline should be for its account.

The drafters of §§ 559 and 562 favored clear and consistent rules in order to stabilize the repo industry. H.R. Rep. No. 109-31(I), 109th Cong. 1st Sess. 131 (2005). The rules established in §§ 559 and 562 provide that while counterparties to qualified mortgage repurchase agreements have relief from the automatic stay to close out their positions, they do not have unbridled discretion to manipulate the measurement date for valuing claims against, or amounts owed to, the estate. See also Taunton Municipal Lighting Plant v. Enron Corp. (In re Enron, 354 B.R. 652, 659 (S.D.N.Y. 2006) (Section 562 governs the measurement date for determining damages under specified contracts); H.R. Rep. No. 109-31(I), 109th Cong. 1st Sess. 131 (2005) ("The party determining damages is given limited discretion to determine the dates as of which damages are to be measured. Its actions are circumscribed unless there are no 'commercially reasonable' determinants of value for it to measure damages on the date or dates of either rejection, or liquidation, termination or acceleration.").

Each of the MRA counterparties accelerated and terminated its MRA pre-petition — generally in mid-March. The MRA counterparties also, with one exception (CSFB), regularly delivered to the Debtors reports that compared the Debtors' repurchase obligations under the

45

MRA to the calculations that were used to determine whether the Debtors were in balance or owed a margin payment. The starting point was the unpaid principal balance ("UPB") of the mortgage loans subject to the MRA. The MRA counterparties provided New Century their assessments of the market value of these loans, generally expressed as a percentage of the UPB and termed in the industry as the repo counterparty's "mark." The repo counterparties then set the amount they were willing to advance against these loans expressed in terms of an advance rate applied against the mark. The MRA counterparties set forth their assessments of the market value of the mortgage loans (and in the case of Morgan Stanley, also the residual interests) that were subject to their MRAs by delivering these marks to New Century regularly. The marks that the MRA counterparties sent New Century on the date they accelerated and terminated their MRAs, or in a few cases shortly before, established substantial <u>surpluses</u> over New Century's total repurchase obligations. In the aggregate, these surpluses totaled <u>$260 million</u>. The Debtors, joined by the Committee, argued in the adequate protection negotiations that this meant that none of the MRA counterparties had any claim against the estates, much less to monies in Account 4025 as of the Petition Date. Rather, pursuant to Bankruptcy Code §559, they owed the estates approximately $260 million.

This issue was one of the most hotly contested and thoroughly addressed matters in the adequate protection negotiations. In addition, it was one of the central bases for resolving the dispute with DBSP. It was briefed in the motion to approve the settlement with DBSP and is one factor that resulted in DBSP assigning to the estates any right that DBSP might have to assert that a portion of the $42.1 million held in Account 4025 on the Petition Date was its trust property. "Motion of Debtors and Debtors-in-Possession Pursuant to Bankruptcy Rule 9019 and Sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code For Approval of Settlement

46

Agreement with DB Structured Products, Inc.," August 8, 2007 at 4-6, 12, 17-22. (Docket No. 2214).

All of this was shared with the Examiner during his investigation. The Debtors delivered to the Examiner electronic copies of these marks and explained the legal analysis. In fact, at an interview conducted on August 2, 2007, the New Century business person who undertook much of this factual analysis walked the Examiner's counsel through the marks utilizing the laptop computer of counsel for the Debtors — the four lawyers representing the Examiner at this interview huddled around the laptop computer of counsel for the Debtors (who was the only lawyer for the Debtors attending the interview) while the interviewee explained the analysis. If the Examiner's extraordinarily limited view of the scope of his investigation is correct, all this was irrelevant. Bankruptcy Code §§ 559 and 562 are only applicable if the MRAs are repurchase agreements under Bankruptcy Code §101(47). Thus, in hindsight, the Debtors are forced to surmise that the Examiner must have viewed this as an interesting but irrelevant side note to his "cash collateral" inquiry. This analysis certainly is not irrelevant, however, to a determination as to whether the MRA counterparties can bring a claim to a portion of the funds in Account 4025 if the MRAs are repos, as the counterparties contend. The Examiner's investigation on this point is quite strange given that he later revealed that he did not believe that any of this mattered to his analysis given his limited view of the scope of his assignment.

    2.    <u>The MRAs Permitted the Debtors to Use the Funds Collected on the Mortgage Loans</u>.

As detailed above, the vast majority of the funds claimed by the MRA counterparties were for collections received from consumers prior to the declaration of an event of default or the exercise of remedies under the MRAs. The MRAs and control agreements (for those MRA counterparties who had negotiated control agreements) allowed the Debtors free access to these funds prior to the declaration of an event or default. As a result, the Debtors maintain that as a

legal matter the MRA counterparties relinquished any claim to ownership of these funds prior to the declaration of an event of default. The Debtors contend that it is fundamentally inconsistent for the MRAs to allow the Debtors to spend this money or to commingle it with other funds and for the MRA counterparties to assert that this is their money held in "trust," at least to the extent that the Debtors spent the funds or commingled them as allowed.

        3.     <u>The Debtors' Arguments are Particularly Strong with Respect to Borrower Interest Payments</u>.

A substantial portion of the collections on loans subject to MRAs received by New Century prior to the exercise of remedies consisted of regularly scheduled interest payments made by consumers. Such interest payments were typically made on the first of the month (here March 1) and were at high rates of interest reflecting the fact that these were sub-prime consumer loans. In contrast, the "interest" (termed "Price Differential") owed by New Century to the MRA counterparties was set at substantially lower amounts (usually LIBOR plus a small margin) reflecting the investment grade quality of New Century at the time the MRAs were negotiated, and were paid at different times than collections of borrower interest.[30] Thus, there was no connection between the amount of interest collected from borrowers by New Century and the amount or timing of "Price Differential" interest that New Century owed to the MRA counterparties. This is one of the main reasons why most of the MRA counterparties did not ensure that borrower interest payments were deposited into collection accounts. During the periods of time at issue in the adequate protection dispute, the Debtors paid substantial Price Differential payments to the MRA counterparties — <u>$21.5 million</u> in total. In the course of these negotiations, the Debtors (joined by the Committee) argued that regularly scheduled collections of borrower interest do not give rise to trust fund claims, particularly to the extent that the MRA

---

[30] For example, the MRAs provided that DBSP received Price Differential payments on the 10th day of each month, BofA on the 25th day of each month, IXIS on the 12th day of each month, Barclays on the 15th of each month, and CSFB on the 5th day of each month, while UBS and Morgan Stanley were paid Price Differential amounts 30 days after the loans were placed on the MRA facility (the so-called "roll date").

counterparties received Price Differential payments. Otherwise the MRA counterparties would get a double count.

> 4.    The MRA Counterparties Have Already Been Paid More From Account 4025 Than the Collections from Borrowers That Might be Traced to Account 4025.

The MRA counterparties received substantial margin payments from the Debtors during March 2007. As described above, prior to the exercise of remedies, the MRA counterparties allowed the Debtors to spend or to transfer the funds in their cash collection accounts, or did not require the segregation of collections on loans subject to their MRA. Despite the freedom they afforded New Century, they assert that they have a trust fund claim against Account 4025. During the relevant time periods, the Debtors paid $58.8 million to the MRA counterparties from Account 4025 as margin calls. In the course of the adequate protection negotiations, the Debtors (joined by the Committee) argued that these margin payments should properly be credited against any trust fund claims that might otherwise be asserted, for whether the MRA counterparties applied these payments to satisfy margin calls or any other obligation owed under the MRAs does not change the more basic fact that the amount of money paid out of Account 4025 to the MRA counterparties during this time ($58.8 million) exceeds the collections on mortgage loans subject to the MRAs that might conceivably be traced into Account 4025.

> 5.    Neither the MRA Counterparties nor the Whole Loan Buyers can Trace Funds to Account 4025. Under Third Circuit Law the Funds were Largely Spent Prior to the Petition Date.

The law in the Third Circuit is clear that any party asserting a trust fund claim has the burden of proof, which is a substantial burden particularly when funds are commingled. A party asserting a trust fund claim must "(1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust fund funds if they are commingled." City of Farrell v. Sharon Steel (In re Sharon Steel), 41 F.3d 92 (3d Cir. 1994). The law is also clear that the

49

burden is on the claimant. See, e.g., In re Columbia Gas Systems Inc., 997 F.2d 1039, 1063 (3d Cir. 1993).

When a party attempts to trace funds to a commingled account, most courts, including the Third Circuit Court of Appeals, endorse the lowest intermediate balance test. Id. at 1063-1064; In re Sharon Steel, 41 F.3d at 102. This means that a party attempting to trace funds into a commingled account is capped at the lowest subsequent balance after the asserted trust funds are deposited into the commingled account.

The present situation is complicated by the fact that multiple parties are trying to trace into a single commingled account. While this situation is unusual, the Third Circuit has suggested that in this situation each trust fund claimant that can satisfy its burden is entitled to share pro rata. Goldberg v. New Jersey Lawyers' Fund for Client Protection, 932 F.2d 273, 280 (3rd Cir. 1991). Here that means that each MRA counterparty would have to trace collections on the loans subject to its MRA or whole loan sale into Account 4025, and all of these claimants combined would be capped at the lowest subsequent balance in Account 4025; they would share in this fund pro rata. To the extent that the balance in Account 4025 was higher at a previous point in time, legally that higher amount will be deemed spent. And any funds that were deposited into Account 4025 subsequent to the deposit of the traced trust funds (for example, receipts of New Century's servicing fees) could not be claimed as trust funds.

Forensic accounting completed post-petition showed that most of the borrower collections at issue were received by New Century in early March – representing regularly scheduled interest and principal paid on March 1, 2007 before the exercise of remedies by the

50

MRA counterparties.[31] That analysis also showed that the balance in Account 4025 was

approximately $4.7 million on March 2, 3 and 4, 2007. It grew to 25.4 million in March 5, 2007,

dipped to $17.1 million on March 6, 2007 and from that point until the Petition Date fluctuated

up and down, settling at $42.1 million on the Petition Date. This means that the vast majority of

the funds that the MRA counterparties and whole loan purchasers might try to trace to Account

4025 are, at best, capped at around $4.7 million in the aggregate. That assumes that they could

establish legally and factually their entitlement to these funds, which as explained above and

below, the Debtors dispute.

The results of this tracing rule are only fair since much of the outflow from Account 4025

during March went to pay the MRA counterparties' margin calls and the whole loan buyers'

EPD claims, and most of the inflow into Account 4025 that month was clearly New Century's

property (e.g., servicing fees) and had nothing to do with claims asserted by the MRA

counterparties and the whole loan buyers.

As with the other matters discussed herein, the Debtors shared the results of this forensic

accounting and this analysis with the Examiner. In hindsight, he must have thought that the

Debtors were trying to keep him abreast of the negotiations with the adequate protection parties,

perhaps as a courtesy. But at the time, he seemed quite interested in it and even questioned a

number of interviewees on this topic.

      6.   The Whole Loan Purchasers do not Have Valid Trust Fund Claims.

The adequate protection dispute included a number of whole loan purchasers who

asserted that approximately $9.3 million of their money can be traced to Account 4025. The

---

[31] Some of the claims asserted by the MRA counterparties related to borrower payments made in February and some of the claims asserted by the whole loan purchases related to collections received earlier than that – some dating back to 2006 and one dating to 2004  Such older claims have an even greater difficulty in tracing

investigations conducted during the adequate protection negotiations revealed that most of these funds related to collections on loans received by the Debtors after the information cut-off date established on loan purchase agreements, but prior to the closing of the actual loan sale to the whole loan purchasers. Thus, these are not trust fund claims, but rather general unsecured claims for purchase price adjustments. Typically, the collections were on loans that were identified on a schedule to the loan sale agreement but which the borrowers refinanced with another lender before the closing of the loan sale. Thus, these mortgage loans did not even exist at the time of closing the loan sale and were not, and could not, be sold to the whole loan purchasers.

### 7.    Constructive Trusts Are Disfavored in Bankruptcy.

Since the alleged trust funds were commingled in Account 4025, rather than held in an express trust, the MRA counterparties and whole loan purchasers have to assert that a constructive trust should be established for them. A constructive trust is a remedy, as opposed to a true trust. Such constructive trust arguments are strongly disfavored in bankruptcy. Most courts have held that the avoiding powers of Bankruptcy Code §544 trump any such constructive trust remedies. IndyMac cited one of these cases in its reply to the Adequate Protection Motion — In re Churchill Mortgage Investment Corp., 233 B.R. 61 (Bankr. S.D.N.Y. 1999). There are many others. See, e.g., In re Omega Group, Inc., 16 F.3d 1443 (6th Cir. 1994); Belisle v. Plunkett, 877 F.2d 512 (7th Cir. 1989); In re Tleel, 876 F.2d 769 (9th Cir. 1989); In re Paul Paradise & Associates, Inc., 249 B.R. 360 (Bankr. D. Del. 2000).[32]

### D.    The Examiner's Supposed "Red Flags".

The Examiner refers to three "red flags" that he contends should have caused the Debtors to segregate funds for the benefit of the MRA counterparties. Cash Collateral Report at 20.

---

[32] However, see contra, Universal Bonding Insurance Co. v. Gittens, 960 F.2d 366; (3d Cir. 1992)

These are (a) a March 27, 2007 letter from Morgan Stanley; (b) an email from UBS and (c) a $4.8 million amount that was identified for possible payment to a counterparty prior to the filing of the petition. None of these supposed "red flags" alter the analysis above or reasonably could be seen to require the Debtors to segregate funds from Account 4025.

The Examiner cites a March 27, 2007 letter from Morgan Stanley in which Morgan Stanley asserted that New Century should have turned over approximately $15 million to it. Morgan Stanley was one of the MRA counterparties whose mark was substantially in excess of the Debtors' repurchase obligations. On March 9, 2007 Morgan Stanley delivered the Debtors both a notice of default and a mark that showed that the market value of the mortgage loans and residuals under its MRA exceeded New Century's repurchase obligations by over $176 million. This was not surprising, since the prior day Morgan Stanley had taken out Citigroup and had received residuals with a value of $350 million against which it advanced $265 million. Thus, the Debtors assert that Morgan Stanley owes the estates money instead of vice versa.[33] Later investigations revealed that Morgan Stanley's allegations included a claim for approximately $14 million held in two separate custodial accounts that were never commingled with Account 4025 and which the Debtors turned over to Morgan Stanley in July and October when these matters were reconciled. (Docket No. 3401). This fact highlights a critical point that the Examiner obscures -- a claim by an MRA counterparty that it is owed money on account of collections from borrower is a far cry from tracing these collections to Account 4025. Here, essentially all the money Morgan Stanley asserted it was owed in its March 27 letter was ultimately traced to segregated funds that were turned over to Morgan Stanley. Moreover, the Debtors' professionals

---

[33] Attempting to realize the equity on the loans and residuals subject to the Morgan Stanley MRA was a central part of the effort to negotiate a joint sale of these loans and residuals with the Debtors' sale of their servicing business

engaged in settlement negotiations with counsel for Morgan Stanley both shortly before and many times after the Petition Date. The Debtors are not prepared to disclose the substance of those discussions. But the record reflects that Morgan Stanley did not file an adversary proceeding and at the May 30 hearing supported the Adequate Protection Motion.

The second supposed red flag relates to the demand by UBS that New Century segregate some asserted PIFs for its benefit. As mentioned above, the email that the Examiner quotes relates to the fact that the collection account UBS established at Deutsche Bank could not accept ACH transfers. As a result, when New Century attempted to deposit the funds collected on mortgages subject to the UBS MRA into this segregated account, the ACH transfers bounced and had to be batched and wired manually. As a result, UBS and New Century had difficulty identifying the appropriate amounts that were due to UBS and the amounts that had already been deposited into the UBS segregated account. The UBS adversary proceeding resulted in the parties quickly agreeing to escrow $2.7 million. Most importantly, it is now clear that the amounts at issue mainly related to borrower interest paid in early March some two weeks prior to UBS declaring an event of default, not the PIFs that are discussed in this letter. And even more basic, it is disputed even now whether UBS was entitled to demand that the Debtors segregate such funds based on the legal issues identified above.

The third supposed red flag is that personnel in the New Century accounting department identified $4.8 million for possible payment to a MRA counterparty on March 20, 2007. The Examiner does not mention whether this payment was in fact made — many such payments were made — or more importantly whether it should have been paid legally, given the number of issues that impact this matter.

54

E.    The Procedural Context.

The Examiner's thesis is apparently that New Century should have paid over, or at least escrowed, every amount claimed by an MRA counterparty even though the Examiner concludes that these funds were not cash collateral. The Examiner points out that when two parties both assert ownership to property, both cannot be right. The funds in dispute here are either estate property or property of the claimant. Thus, these are not cash collateral issues. Cash Collateral Report at 6.

The Debtors do not contend that this ends the dispute for there still remains an issue as to who is entitled to the property. But since it is not "cash collateral" the procedural context is different and, as the Examiner points out, since the Debtors asserted the money at issue was estate property, the Debtors were under no obligation to segregate funds absent an adverse ruling in litigation brought by the claimants.

The Third Circuit's decisions in <u>Sharon Steel</u> and <u>Columbia Gas</u> point out that if a claimant believes that a debtor holds its property, the burden is on it to prosecute this action and to trace the funds. That procedural context is important, for it means that if one of the MRA counterparties or whole loan purchasers wanted to litigate these matters, the proper procedure was for it to file an action rather than simply assuming that the Debtors would look out for its interests, particularly when the Debtors assert that the property in question is an estate asset. This is exactly what UBS and DBSP did. The Debtors have no quarrel with the procedures they followed. Indeed, this very same issue — whether collections on mortgage loan repurchase agreements are estate property or held in constructive trust for the repurchase counterparty — has been contested in the <u>American Home Mortgage</u> chapter 11 case. There also, the procedural context was a series of adversary proceedings brought by the repurchase counterparties. <u>Morgan</u>

55

Stanley Mortgage Capital Holdings, LLC v. American Home Mortgage Corp., Adv. Proc. No. 07-51690(CSS), Chapter 11 Case No. 07-11047; Bear Stearns Mortgage Capital Corp. v. American Home Mortgage Corp., et al., Adv. Proc. No. 07-51701(CSS), Chapter 11 Case No. 07-11047. This is also how such disputes arose in WorldCom, which is the Examiner's prior foray into the bankruptcy arena. For example, almost at the same time as the examiner was appointed in WorldCom, EDS filed a motion seeking the turnover of $15 million that it asserted was its property to be held in trust, but which WorldCom had commingled. EDS sought as an alternative remedy the imposition of a constructive trust. "Motion of Electronic Data Systems Corporation and EDS Information Services, L.L.C. for an Order, Pursuant to 11 U.S.C. §§ 105(a) and 541, Compelling Turnover of Certain Assets or Imposing a Constructive Trust," September 6, 2002, In re WorldCom, Inc., et al., Bankr. S.D.N.Y. Case No. 02-13533 (Docket No. 914). WorldCom and the committee denied that the $15 million in question was EDS's property, asserted that these funds, commingled with other cash, were estate property, and argued that constructive trusts are disfavored in bankruptcy. "WorldCom, Inc.'s Memorandum in Opposition to Motion by Electronic Data Systems Corporation and EDS Information Services, L.L.C. for an Order Pursuant to U.S.C. §§ 105(a) and 541, Compelling Turnover of Certain Assets or Imposing a Constructed Trust," In re WorldCom, Inc., et al., Bankr. S.D.N.Y., No. 02-13533 (Docket No. 1349); "Joinder of the Official Committee of Unsecured Creditors of WorldCom, Inc., et al. to Debtors' Memorandum in Opposition to Motion by Electronic Data Systems Corporation and EDS Information Services, L.L.C. for an Order Turnover of Certain Assets or Imposing a Constructive Trust," September 26, 2002, In re WorldCom, Inc. et al., Bankr. S.D.N.Y., No. 02-13533 (Docket No. 1354). Although the issues are virtually the same as presented here, no one asserted that the debtor had an affirmative obligation to segregate funds

56

that it asserted were property of the estate prior to this litigation being brought. The burden is on

the claimant. And like the dispute here, most of these disputes in <u>American Home</u> and

<u>WorldCom</u> were resolved via settlement.

The Debtors could have dealt with these issues piecemeal by defending adversary

proceedings seriatim. Instead, the Debtors, in consultation with the Committee, decided to be

proactive, bring these matters to the attention of all the parties, in the course of so doing alerting

many whole loan purchasers of this issue even though it had previously escaped their ken,

notifying Morgan Stanley and BofA that segregated accounts had been established for their

benefit, and developing a procedure that insured fairness among competing claimants. It also has

resulted in an agreement for a settlement that the Debtors expect shortly to present to this Court

and which they expect will realize approximately $12-14 million for the estates. Surely, it would

have been improper for the Debtors to have taken at face value allegations by MRA

counterparties that sums in Account 4025 were their property without undertaking a thorough

legal and factual analysis. That work has taken about seven months, reflecting the enormous

scale and complexity of New Century's business, a less than perfect accounting system (certainly

not an accounting system designed to deal with issues that would never arise outside of a

bankruptcy filing), and untested legal issues emanating from the 2005 amendments to the

Bankruptcy Code. The Debtors respectfully submit that the Examiner's Cash Collateral Report

sets forth a very incomplete analysis of these matters.

IV.    CONCLUSION

The Debtors stand behind their statements made to the Court and to the Examiner. There

were serious issues as to whether the funds held in Account 4025 on the Petition Date were

either cash collateral or trust fund property. From the Petition Date through the May 30, 2007

RLF1-3236897-1

hearing, there was a growing realization that the issues involved were more complex and the amounts were significantly greater than the Debtors appreciated when the cases were filed. The following months illustrated that even as of May 30, 2007 the parties did not have even close to a full appreciation of the factual and legal issues at hand.

When the Examiner explained to the Debtors on August 31, 2007 that he had premised his investigation on a fundamentally incorrect understanding of the Debtors' legal position and a substantially narrower view of the scope of his assignment than the Debtors had appreciated, the Debtors were shocked. They also concluded that they could not let the Examiner file a report based upon such a basic misunderstanding. This forced the Debtors to reveal attorney-client privileged communications.

The Examiner's Cash Collateral Report suggests that he was misled by the Debtors into engaging in a wild goose chase. The Debtors never provided the Examiner false information nor did they ever intentionally or even negligently mislead him. To the contrary they spent substantial time trying to educate the Examiner on the key issues that formed the heart of the debate between the MRA counterparties, the whole loan purchasers, the Committee and the Debtors. With perfectly proper motives, and for sound legal reasons, the Debtors chose to protect privileged attorney-client advice on one aspect of that dispute until faced on August 31, 2007 with an impossible dilemma. No doubt, if the Debtors had been able to forecast how far-fetched an assumption the Examiner would make about counsel's legal advice and his extraordinary view of the nature of his assignment, they would have considered attempting to avert this odyssey by giving up their right to protect attorney-client confidences sooner. But that lack of foresight does not render inappropriate any of the Debtors' statements, all of which were true.

58

This entire exercise has been unfortunate. The Debtors are doing their utmost to deliver

the best possible recoveries for creditors. Particularly since the parties with an economic interest

in the matter have reached an agreement in principle, it is time to put this "cash collateral" issue

to bed. That is why the Debtors advised the Examiner on November 16, 2007 that they did not

believe any purpose would be served by protracting this process. The Debtors have previously

made efforts to brief the Examiner on the issues discussed herein and do not think it would be

wise to cause the Examiner to expend yet more estate resources in an effort to refocus the

Examiner on these matters, particularly given the magnitude of the fees charged by the Examiner

on this and his other investigations.[34]

Dated:    December _19_, 2007
          Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

- and -

Ben H. Logan
Suzanne S. Uhland
Andrew M. Parlen
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
(213) 430-7704

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

---

[34] The Examiner has submitted fee applications covering periods through the end of October 2007 totaling over $10 million, most of which relate to his investigations unrelated to cash collateral. These include the fees and costs for the Examiner, K&L Gates, Saul Ewing, and BDO Seidman through October 31, 2007. No November fees or costs for the Examiner or any of his professionals have yet been billed.

RLF1-3236897-1