UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| In re: | § | Chapter 11 |
|---|---|---|
| | § | |
| **NEW CENTURY TRS HOLDINGS, INC.,** a Delaware Corporation, et al, | § | **Case No. 07-10416 (KJC)** |
| | § | |
| | § | **Jointly Administered** |
| | § | |
| | § | |
| | § | |
| Debtors. | | |

---

## FIRST INTERIM REPORT OF
## MICHAEL J. MISSAL, EXAMINER

### November 21, 2007

KIRKPATRICK & LOCKHART
PRESTON GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 778-9000
(202) 778-9100 (fax)

SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6840
(302) 421-5873 (fax)

*Counsel to Michael J. Missal,
Examiner*

In re:                                           :    **Chapter 11**
                                                 :
**NEW CENTURY TRS HOLDINGS, INC.,**              :    **Case No. 07-10416 (KJC)**
**a Delaware Corporation, et al.,** [1]          :
                                                 :    **Jointly Administered**
                          **Debtors.**           :
                                                 :
                                                 :
                                                 :


## FIRST INTERIM REPORT OF MICHAEL J. MISSAL, EXAMINER

Michael J. Missal, the Examiner appointed in the above-captioned jointly administered

Chapter 11 cases, by and through his undersigned counsel, hereby submits this First Interim

Report pursuant to this Court's June 1, 2007 Order Denying in Part and Granting in Part the

Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11

Trustee, or in the Alternative, an Examiner (the "June 1 Order") and this Court's October 10,

2007 Order (I) Supplementing June 1, 2007 Order Directing the Appointment of an Examiner

and (II) Granting Motion of Michael J. Missal, Examiner for an Extension of Time to File his

Report with the Court (the "October 10 Order"). The June 1 Order directed the Examiner to

investigate, among other issues, "... any possible post-petition unauthorized use of cash

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a/ Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century REO III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited partnership. The Debtors are referred to collectively below as "New Century."

collateral by the Debtor . . . ."[2]  The Examiner has completed the cash collateral portion of his investigation[3] and files this First Interim Report related to his findings on that issue.  Consistent with the October 10 Order, this Report is being filed under seal.[4]

## I.    BACKGROUND

On June 1, 2007, this Court directed the United States Trustee to appoint an examiner to:

> (a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated, and identify and evaluate any claims or rights of action that the estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible post-petition unauthorized use of cash collateral by the Debtor, and (c) otherwise perform the duties of an examiner set forth in section 1106(a)(3) (as limited by [the Court]) and 1106(a)(4) of the Bankruptcy Code.[5]

The Court also directed the Examiner to "prepare and file a report, as required by 11 U.S.C. § 1106(a)(4), within 90 days of the date of appointment, unless such time shall be extended by order of the Court, . . . ."[6]  On June 5, 2007, the United States Trustee appointed Michael J. Missal to be the Examiner.  The Court approved that appointment on June 7, 2007. On September 5, 2007, the Examiner filed a Motion for an Extension of Time to File His Report With the Court.  That Motion was granted on October 10, 2007, and the Court extended the time

---

[2]  June 1 Order at 2.

[3]  The Debtors recently provided e-mails and other documents to the Examiner that had been requested months ago. If any significant new information is contained in these new e-mails and documents, the Examiner will supplement this First Interim Report.

[4]  October 10 Order at 3-4.

[5]  June 1 Order at 2-3 (footnote omitted).

[6]  *Id.* at 3.

to file a report to January 15, 2008. However, the October 10 Order required the Examiner to file a report on the potential post-petition unauthorized use of cash collateral upon completion of that part of the investigation.[7]

## II.   EXECUTIVE SUMMARY

Section 363(a) of the Bankruptcy Code defines "cash collateral" to include cash in which the estate and an entity other than the estate both have an interest.[8]   Any monies held in the Debtors' bank accounts as of April 2, 2007 (the "Petition Date") were potentially cash collateral to the extent that both the Debtors and a third party, such as a counterparty to one of New Century's master repurchase agreements ("Repurchase Counterparties"),[9] had an interest in those funds. If any of the Debtors' funds constituted cash collateral, the Debtors could not use such funds absent consent of the other interested party or approval of the Bankruptcy Court.[10] Further, absent such consent or approval to spend such funds, the Debtors were required by the Bankruptcy Code to "segregate and account for any cash collateral in the [Debtors'] possession, custody or control."[11]

The Debtors filed their bankruptcy petitions on April 2, 2007. At the First Day Hearing on April 3, 2007, the Debtors represented that they had approximately $62.8 million in cash available for their operations. Of this amount, approximately $42.1 million was held in Account 2110104025, New Century's general operating account at Union Bank of California ("Account 4025"), and additional monies were held in one or more other bank accounts. New Century did

---

[7] October 10 Order at 3.

[8] 11 U.S.C. § 363(a).

[9] New Century relied on a number of commercial and investment banks as its primary source of financing to originate and purchase residential mortgage loans. New Century entered into master repurchase agreements with each of these entities.

[10] 11 U.S.C. § 363(c)(2).

[11] *Id.* § 363(c)(4).

not indicate at the First Day Hearing that there might be any restrictions on the use of those monies or that any other entity might have an interest in those funds. Representatives of many of the Repurchase Counterparties and purchasers of residential mortgage loans ("Loan Purchasers") without accompanying repurchase commitments ("Whole Loan Sales") were present at the First Day Hearing, but none of these entities raised any issues concerning the possibility of any restrictions on New Century's use of those monies. However, within three days of the Petition Date, Repurchase Counterparties and Loan Purchasers began to file adversary proceedings alleging that New Century had failed to turn over, and was using for its own benefit, monies owned by those other entities.

This issue was brought to the Court's attention on May 16, 2007, when New Century filed the Debtors' Motion for Order to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363(b)(1) (the "Adequate Protection Motion" or "Motion"). New Century noted in the Motion that it was taking this action because there was a "growing realization that the issues involved are more complex and the amounts involved are significantly greater than the Debtors appreciated when these cases were filed."[12] In their Motion, the Debtors further advised the Court that there might be a cash collateral issue, stating:

> With respect to collections on mortgage loans that the Debtors received prior to the Petition Date, there could be serious issues as to whether these amounts, particularly collections of regular monthly principal and interest payments prior to the blockage of accounts, *are either cash collateral or property of the estates.*[13]

At a hearing on the Motion on May 30, 2007, the Debtors' outside counsel reinforced that "[w]e did not anticipate when the case was filed that there would be any substantial claims for

---

[12] Motion at 2.

[13] *Id.* at 8 (underlining in original; italics added).

any such funds."[14]    However, counsel for one of the Repurchase Counterparties raised the

possibility at the hearing that the Debtors had used funds without proper authorization:

> Now, what's extraordinary about that, your Honor, is that if you
> look at these facts in the most charitable form from the debtors'
> perspective, on the best case basis, this was cash collateral, and the
> [Bankruptcy] Code says you can't use cash collateral unless you
> get the consent or your [sic] get a court order, and we're hearing
> about this in virtually June for the first time.  So, there was
> unauthorized use of cash collateral at best.  It could also be
> outright conversion of other people's property.[15]

In response to a follow up question by the Court regarding whether the Debtors were

using cash collateral without either consent or an order of the Court, Debtors' outside counsel

responded:

> Your Honor, the response is several fold.  First off, there are
> serious issues as to whether or not it's cash collateral including the
> springing lien issue I mentioned.  Your Honor, like I said, if we
> had known that there were claims in excess – if we had known that
> there were material claims at the outset of the case, we would have
> proceeded far differently.[16]

As a consequence of the various statements at the hearing, the Court directed the

Examiner in the June 1 Order to investigate and report regarding whether the Debtors had used

cash collateral post-petition without authorization.  The Court did not ask the Examiner to

investigate the legal rights of any party with interests affected by the Adequate Protection

Motion, including whether New Century's repurchase transactions were true sales of mortgage

loans or were financings.  While the Examiner is therefore not making any such findings with

respect to whether the repurchase transactions were true sales or financings, it should be noted

---

[14] May 30 Tr. at 29.  This statement is difficult to understand since the Debtors had received claims prior to the Petition Date of more than $20 million from Repurchase Counterparties.

[15] *Id.* at 60-61.

[16] *Id.* at 72-73.  Debtors' counsel had stated earlier "there is a serious issue as to whether or not the repurchase agreements are true sales or disguised financings." *Id.* at 41-42.

- 5 -

that if the Court ultimately determines that the repurchase transactions were financings, then there would be cash collateral issues presented because both the Debtors and the Repurchase Counterparties would have an ownership interest in those funds. If, however, the Court determines that the repurchase transactions were true sales and the monies collected were held in trust by New Century for the benefit of the Repurchase Counterparties, then no cash collateral issue would be presented because the Debtors would not have an interest in those funds. Such funds would likely be the property solely of the Repurchase Counterparties. Under either circumstance, the Debtors' decision to spend those monies raises issues that are properly before the Court.

The Examiner conducted his initial investigation of the cash collateral issue over a period of two and a half months -- from June 14 through August 30, 2007. The Debtors raised the possibility that cash collateral existed through their statements in the Adequate Protection Motion and at the May 30 hearing on the Motion, as well as through the numerous statements made by the Debtors and their outside counsel during the Examiner's investigation that they believed that the repurchase transactions were financings. The Debtors and their outside counsel reinforced this position by repeatedly informing the Examiner until mid-August that any potential cash collateral essentially had been missed prior to the Petition Date as a result of the chaotic environment that existed at New Century at the time of the bankruptcy filing. Accordingly, the focus of the Examiner's investigation was to determine whether there were sufficient red flags that should have put the Debtors on notice that there was potential cash collateral as of the Petition Date.

On August 14, 2007, certain of the information previously provided to the Examiner by the Debtors and their outside counsel changed. At the August 14 interview of the Debtors'

- 6 -

current CEO, the Examiner was advised for the first time that the Debtors had in fact identified pre-petition likely cash collateral. Specifically, the CEO informed the Examiner that the Debtors estimated that $5-6 million in loan prepayments collected by the Debtors prior to the Petition Date was likely cash collateral. The CEO stated that because the Debtors concluded that this amount was essentially *de minimis,* that it did not need to be addressed either in Court, at the First Day Hearing or directly with the affected Repurchase Counterparties. The CEO added that no attempt was made at the time to investigate whether the $5-6 million estimate was reliable.

Based on the investigation conducted through the middle of August, the Examiner reached the preliminary conclusion that there were sufficient red flags that cash collateral may have existed and that the Debtors had not acted reasonably in failing to obtain consent or Court approval to use the potential cash collateral. The Examiner based this preliminary conclusion on the numerous and consistent statements by the Debtors and their counsel that the repurchase agreements were likely financings, that significant claims to funds held or received by the Debtors had been made prior to the Petition Date by Repurchase Counterparties, and that the Debtors had identified at least $5-6 million in funds that they believed could be cash collateral.

The Examiner met with the Debtors' current CEO and outside counsel on August 31, 2007 to apprise them of his preliminary findings. The Examiner orally set forth such findings in considerable detail. In response, the CEO and the Debtors' outside counsel revealed for the first time privileged information that was not consistent with statements repeatedly made by them during the investigation.[17] First, the Debtors' lead outside counsel on cash collateral matters disclosed the legal advice provided by his law firm prior to the Petition Date that explained why they concluded that no cash collateral issue was presented with respect to the monies at issue

---

[17] At the request of the Debtors, the Examiner is not including in this Report the details of such legal advice in order to avoid disclosing privileged information.

between the Debtors and the Repurchase Counterparties. Second, the CEO informed the Examiner that the Debtors' management had relied on such legal advice in not seeking consent or Court approval to use cash which the Debtors had on hand as of the Petition Date or thereafter. The Debtors' lead outside counsel on cash collateral matters noted that the privileged information was not disclosed earlier to the Examiner because of the ongoing negotiations between the Debtors and the Repurchase Counterparties with respect to the adversary proceedings that were the subject of the Adequate Protection Motion.

Based on the Debtors' disclosure of privileged information at the August 31 meeting, which the Examiner has since been able to corroborate, the Examiner concludes that the Debtors were provided with legal advice regarding this issue prior to the Petition Date and that as a result the Debtors did not segregate any funds as potential cash collateral. Whether or not that legal advice was correct, it was not unreasonable for the Debtors to rely on that advice. The Examiner finds, however, that the privileged information disclosed at the August 31 meeting rendered the previous statements made by the Debtors and their counsel during the cash collateral investigation misleading at a minimum. Throughout the investigation, the Debtors and their outside counsel informed the Examiner that they believed the repurchase transactions were financings and not true sales. The Examiner was further told repeatedly until August 14 that the Debtors simply missed the cash collateral issue pre-petition and that no legal analysis on the issue was done at that time. These statements were consistent with the representations made to the Court in the Adequate Protection Motion, as well as with the statements by the Debtors' outside counsel at the hearing on the Motion on May 30, 2007, which led the Court to order the cash collateral investigation. Ultimately, however, these statements turned out to be inaccurate because the issue had not been missed and because of the legal advice provided by outside

- 8 -

counsel prior to the Petition Date, which resulted in the Debtors not segregating any funds as cash collateral.

The Examiner recognizes the chaotic and pressured environment that existed at New Century prior to the Petition Date. However, even in that environment, the Debtors and their outside counsel had focused on potential cash collateral prior to the Petition Date. Had the Debtors and their outside counsel been forthright with the Court and the Examiner from the inception of the investigation, the cash collateral portion of the investigation might never have been ordered by the Court, and certainly could have been vastly reduced in scope. Instead, the Debtors' and their counsel's conduct resulted in unnecessary legal fees and expenses to the estates incurred by the Examiner of more than $800,000, as well as the additional fees and expenses incurred by Debtors' counsel and others involved in this issue.

It is beyond the scope of the Examiner's mandate to investigate the legal issues between the Debtors and the Repurchase Counterparties with respect to the millions of dollars of claims that these entities have made. Nonetheless, the Examiner does observe that the Debtors were aware prior to the Petition Date of significant claims made by the Repurchase Counterparties with respect to funds in Account 4025. As a result, the Debtors may have improperly spent funds after the Petition Date either because (i) such funds were cash collateral and the Debtors did not get the consents of the Repurchase Counterparties or the approval of the Court; or (ii) such funds were owned by the Repurchase Counterparties, and not property of the Debtors' estates.

## III.    THE CASH COLLATERAL INVESTIGATION

### A.    The Initial Investigation: June 14 – August 30

Pursuant to the June 1 Order, the Examiner met with representatives of New Century, the Committee of Unsecured Creditors and the United States Trustee on June 14, 2007 for a "meet

- 9 -

and confer" session.[18]  The cash collateral issue was discussed briefly during that session.  The Debtors' current CEO stated that New Century's repurchase agreements with the Repurchase Counterparties were actually asset based loans.  She further stated that the cash collateral issue involved payments in full ("PIFs") on mortgage loans funded through repurchase agreements by the Repurchase Counterparties.  The CEO did not say whether she knew of this information prior to the Petition Date or whether New Century had specifically focused on any potential cash collateral issue prior to the Petition Date.

The Examiner's counsel began interviews on the cash collateral issue on June 25, 2007, starting with an initial interview of the Debtors' current CEO.  The Debtors' outside counsel was present at this and most of the other interviews conducted by the Examiner.  Outside counsel discussed at length on June 25 his and the Debtors' view that the repurchase transactions were financings and not true sales.  This was consistent with the representations made by New Century in its Adequate Protection Motion and at the May 30 Hearing.  Moreover, the CEO, and to a greater extent outside counsel, commented at the June 25 interview that the Debtors had not realized pre-petition that there was a potential cash collateral issue and that cash collateral did not get as much attention as it might have deserved.  Outside counsel further stated that the PIF monies collected before default notices were the Debtors' money.  Outside counsel agreed, however, that the funds in Account 4025 had been spent not because of any such analysis, but because the Debtors had not focused pre-petition on the fact that there were PIF monies in that account.  The assertion by the Debtors' CEO and outside counsel that the Debtors had not realized there were PIF monies in the 4025 Account was consistent with representations made by

---

[18] June 1 Order at 3.

- 10 -

the Debtors in the Adequate Protection Motion and at the May 30 Hearing that the Debtors simply had not focused pre-petition on the potential cash collateral issue.[19]

As a result of the information provided by the Debtors' CEO and counsel at the June 25 interview, the Examiner focused his post-June 25 investigation on events in the months leading up to the bankruptcy filing that might have put New Century on notice that a cash collateral issue existed.[20]  The Examiner determined from interviews[21] and the review of e-mails and other documents that various Repurchase Counterparties and Loan Purchasers had complained prior to the Petition Date about how New Century handled and accounted for regular principal and interest ("P&I") and PIF payments made by borrowers on mortgages owned, held and/or funded by these entities.

The New Century interviewees explained that New Century normally used PIFs collected on loans funded by Repurchase Counterparties as part of its general operating funds, remitting amounts equal to PIF payments to Repurchase Counterparties on a periodic basis, usually once per month. In addition, the interviewees insisted that P&I payments were New Century's money and that the Repurchase Counterparties did not have an interest in them.  Many of the New

---

[19] Outside counsel consistently stated throughout the investigation that the cash collateral issue was missed prior to the Petition Date.  For example, during a break in a July 24 interview, Debtors' outside counsel stated that while claims made by Repurchase Counterparties were considered pre-petition, no real attention had been given to whether the money at issue was cash collateral or property that may have been owned by the Repurchase Counterparties.

[20] In communications to the Repurchase Counterparties in March 2007, New Century had raised the possibility that the Counterparties were "lenders" and "secured parties," thus necessarily raising the issue that some or all of the Repurchase Counterparties had perfected security interests in monies that New Century had collected and placed in Account 4025.  The fact that such monies may have been commingled with other monies did not mean that there was no perfected security interest since UCC § 9-315(b)(2) expressly provides for the possibility that a perfected security interest continues in commingled accounts.

[21] The Examiner conducted interviews in Orange County, Los Angeles and New York on July 12-13 (four people), July 24-25 (six people), August 1-3 (three people) and August 14-17 (four people).  The Examiner also conducted a follow-up telephone interview on August 8 and a further interview in New York on August 22.  The focus of the interviews was to determine whether it was reasonable for the Debtors to have missed the cash collateral issue prior to the Petition Date.  These interviews would have been largely or completely unnecessary if the Debtors and their counsel had been more forthright.

- 11 -

Century representatives further explained that New Century always treated its dealings with Repurchase Counterparties as secured lending transactions rather than true sales of loans to third parties. The interviewees stated that New Century believed that the P&I and PIF payments were its money to use so long as New Century reconciled the principal balance with each Repurchase Counterparty each month and made periodic interest payments to the Repurchase Counterparties. All such collected payments thus were deposited routinely by New Century into Account 4025 and were used by New Century to pay for its day-to-day operations. New Century had last reconciled its accounts with Repurchase Counterparties in late February and early March 2007. Between such reconciliations and the time blocked accounts were set up for Repurchase Counterparties in mid-March 2007, millions of dollars in P&I and PIF payments were deposited into Account 4025.

The Examiner also learned from the interviews that with respect to Whole Loan Sales, New Century would typically collect PIF payments between the time the loan sale was arranged and the time of the closing of the sale. Normally, New Century would pay over the PIF payments to the Loan Purchasers or otherwise reconcile with them after the sales closed, thus compensating the Loan Purchasers for loans that had been paid in full. Not all of the necessary reconciliations with Loan Purchasers, however, took place prior to the Petition Date. Consequently, upon a review of information provided by New Century, the Examiner determined that approximately $9 million that had been deposited in Debtors' Account 4025 were PIF payments related to unreconciled Whole Loan Sales.

Until late July 2007, the Examiner was told repeatedly by the New Century representatives that potential cash collateral issues related to the Repurchase Counterparties and Loan Purchasers had not been identified or analyzed prior to the Petition Date. However, on July

25, an AlixPartners LLP interviewee, who had been responsible for New Century's treasury function just prior to the Petition Date, stated that he had asked the current CEO prior to the Petition Date whether any cash collateral issue might be present. He added that he was told that there was no cash collateral issue that needed to be addressed in the anticipated New Century bankruptcy proceeding. Thereafter, in an August 3 interview, a senior New Century in-house attorney said he was present at a meeting held prior to the Petition Date at which New Century's current CEO commented that no entity had a security interest in the funds on deposit in New Century's Account 4025. Debtors' outside counsel did not allow the interviewee to provide details about this conversation based on the attorney-client privilege. Nonetheless, given that the information from these interviews might be in conflict with the previous statements that the cash collateral issue had not been analyzed prior to the Petition Date, the Examiner re-interviewed New Century's CEO.

On August 14, 2007, the CEO stated that she had learned prior to the Petition Date that between the last PIF reconciliation dates for Repurchase Counterparties in February or early March 2007, and the dates in mid-March 2007 when blocked accounts were established for each existing Repurchase Counterparty, New Century had collected PIF payments on loans funded by Repurchase Counterparties but had not remitted those payments to the Repurchase Counterparties. Rather, those PIF payments had been placed in Account 4025. The CEO told the Examiner's representatives that she determined prior to the Petition Date that such unremitted PIF payments might be cash collateral. She said she was told by New Century representatives that the amount of such PIF payments was likely "a few million dollars," which she took to mean $5-6 million and certainly less than $10 million. She said that she did not take any steps to verify this information due to the chaotic conditions at New Century, including the

- 13 -

impending layoff of over 3,000 employees. She also advised the Examiner that she had discussed with outside counsel prior to the Petition Date the possibility that the repurchase agreements constituted financings rather than true sales.

The CEO further advised the Examiner that she had concluded that New Century did not need to take action pertaining to funds that might be cash collateral because she felt that there would always be sufficient cash in Account 4025 such that the $5-6 million of potential cash collateral would not be used by New Century before any issues were resolved. She learned after the Petition Date that the actual amount of such non-remitted PIFs was much larger than her initial assumption, although she could not be precise as to how much larger, other than to say that it was greater than $10 million. She also could not explain why New Century personnel had been so far off the mark in their statements that there were "a few million dollars" of PIF monies in Account 4025.

With respect to the P&I payments in Account 4025, the CEO stated that New Century had always considered these to be New Century's monies and that therefore, she and outside counsel concluded there was no cash collateral issue with respect to these monies. Outside counsel for the Debtors then asserted the attorney-client privilege and refused to allow the Examiner to probe further into the reasoning underlying this and other conclusions.

On August 17, 2007, the Examiner's counsel asked New Century's lead outside counsel on cash collateral matters if he could reconcile the remarks made by the CEO at the August 14 interview that New Century determined prior to the Petition Date that cash collateral may have existed but did not need to be addressed, with the many previous statements from various New Century representatives and outside counsel that New Century had not focused on or missed the

- 14 -

cash collateral issue prior to the Petition Date. Outside counsel declined to offer any explanation at that time, citing the need to consult with his client.

### B.    The August 31 Meeting

Before finalizing the cash collateral portion of the investigation, the Examiner requested a meeting with the Debtors and their outside counsel. The purpose of the meeting was to preview the Examiner's preliminary findings and conclusions to ensure their accuracy and fairness. The meeting also served to give the Debtors the opportunity to provide any additional information that they might wish to proffer regarding the cash collateral issue.[22]

The meeting took place in New York City on August 31 and lasted approximately four hours. The Debtors were represented by their current CEO and two of their outside counsel. The Examiner began the meeting by framing the basic issue as whether New Century had acted reasonably as of the Petition Date in failing to take any action to segregate, or seek consents or Court approval to use, monies that might constitute cash collateral. One of the Examiner's counsel then proceeded to summarize the Examiner's preliminary findings and conclusions, including the following:

> New Century knew as of the Petition Date that Repurchase Counterparties had made claims in excess of $20 million dollars, representing a substantial portion of the $62 million in cash that New Century had on hand as of the Petition Date.
>
> New Century had taken the position as of the Petition Date that the Repurchase Counterparties were secured lenders and that the repurchase transactions were financings as opposed to true sales of residential mortgage loans.
>
> Given New Century's position that the Repurchase Counterparties were secured lenders, New Century had an obligation to investigate whether the Repurchase Counterparties had perfected

---

[22] The Examiner had no obligation under the June 1 Order or otherwise to meet with the Debtors about his preliminary findings and conclusions. The Examiner will decide on a case-by-case basis in the future whether to conduct similar meetings prior to submission of any future report to the Court.

security interests in any of the monies that New Century had
available as of the Petition Date.

The Examiner's counsel added that New Century interviewees had provided two different

explanations pertaining to the cash collateral issue:

New Century and its bankruptcy professionals simply missed the potential cash
collateral issue prior to the Petition Date, which is what the Examiner had been
told many times prior to August 14; or

New Century had identified a cash collateral issue, as the CEO stated on August
14, but decided that the amounts potentially at issue ($5-6 million) were
sufficiently small so that no action was needed to be taken.

The Examiner's counsel then stated the following conclusions:

New Century knew or should have known that a potential cash collateral issue
was present, given: (i) the significant claims that had been made by Repurchase
Counterparties prior to the Petition Date; (ii) that New Century was taking the
position that these transactions were financings; and (iii) the belief that $5-6
million in cash collateral funds had been identified.

New Century had an obligation under 11 U.S.C. § 363(c)(4) to segregate cash
collateral but had not done so. The Examiner expressed the view that there is no
de minimis exception to the segregation requirement under Section 363 and noted
that New Century's outside counsel stated at the First Day Hearing (at transcript
pages 109-111) that New Century would spend all monies in its bank accounts,
including the monies that might constitute cash collateral, before drawing on any
debtor-in-possession financing.

The $5-6 million estimate of PIF monies in Account 4025 was significantly
understated. New Century failed to make an effort to obtain a more precise
estimate of the amount of money that might constitute cash collateral. New
Century also failed to include P&I collections as part of its cash collateral
investigation prior to the Petition Date.

It was likely, given that the $5-6 million estimate turned out to be too low and that
the balance in Account 4025 fell to as low as $11 million in April 2007, that New
Century had spent funds that constituted potential cash collateral without proper
authorization.

The Loan Purchasers' claims did not present cash collateral issues because in
Whole Loan Sales, the Loan Purchasers and New Century did not both have an
interest in the PIFs at issue.

- 16 -

After the foregoing summary was provided, the New Century representatives asked to confer privately and did so for almost an hour. The meeting then reconvened and the New Century representatives spoke for almost an hour.

The New Century representatives informed the Examiner that while they were not waiving the attorney-client privilege, they wanted to disclose privileged information to the Examiner and his counsel. Debtors' lead outside counsel on cash collateral matters then proceeded to describe in detail legal advice provided by his law firm to Debtors' management prior to the Petition Date that explained why New Century concluded that no cash collateral issue was presented in connection with the repurchase agreements with the Repurchase Counterparties. Thereafter, New Century's CEO confirmed that New Century's management had relied on this legal advice pertaining to the Repurchase Counterparties' claims.

The Examiner and his counsel expressed their astonishment about these disclosures to the CEO and outside counsel. The legal conclusions revealed on August 31 and the Debtors' reliance thereon had never been disclosed in the more than two months that the Examiner had investigated the cash collateral issue and no satisfactory explanation was given why this information was not provided sooner. Significantly, the Debtors' disclosures made previous information provided by the Debtors and their outside counsel in the course of the Examiner's cash collateral examination misleading at a minimum. Indeed, the CEO commented on August 31 that "we weren't forthright in telling [the Examiner's representatives] the [legal] advice I had received." Debtors' lead outside counsel on cash collateral issues added that the privileged information provided at the August 31 meeting was not disclosed earlier to the Examiner because of the ongoing negotiations with the Repurchase Counterparties. While the Examiner respects

the right of the Debtors to maintain any applicable privileges, they could have done so without providing misleading information.

The Examiner asked the Debtors on September 1 to provide information to corroborate the disclosures made at the August 31 meeting. On October 15, the Debtors provided selected documentary information which they claimed demonstrated the legal advice that they relied upon prior to the Petition Date. The Examiner's counsel and the Examiner then had a telephone call on October 16 with Debtors' outside counsel concerning such documents. This information was also confirmed through an interview with a former New Century outside director.

On November 16, 2007, the Examiner informed the Debtors' CEO and outside counsel in a conference call of the findings and conclusions contained in this First Interim Report. The Examiner gave the Debtors and their outside counsel the opportunity to provide any additional information on this issue or to correct any information that they believed was incorrect or accurate. The CEO and their outside counsel did not provide any further information at that time. On November 20, outside counsel sent an e-mail to the Examiner stating that they "strongly disagree with some of your conclusions," but did not believe that it "would be productive to prolong this process by further dialogue at this point."

## C.  The Examiner's Conclusions

### 1.  The Debtors Did Not Act Unreasonably In Not Segregating Cash Collateral Funds As Of The Petition Date

Based on the privileged information provided at the August 31 meeting and thereafter corroborated, the Examiner concludes that the Debtors did not act unreasonably in not segregating funds as potential cash collateral as of the Petition Date. As a result of the legal advice provided to the Debtors prior to the Petition Date, they did not segregate any funds as potential cash collateral. Whether or not that legal advice was correct, it was not unreasonable

- 18 -

for the Debtors to rely on that legal advice. As discussed more fully below, however, the Examiner finds that it may have been improper for the Debtors to expend certain PIF and P&I monies on deposit in Account 4025.

### 2. The Conduct of the Debtors and Their Counsel in the Course of the Examiner's Investigation Harmed the Debtors' Estates

Because the Debtors and their counsel were not forthright with the Examiner prior to the August 31 meeting, the Examiner conducted an investigation that was far more extensive than would have been necessary had the Debtors provided the Examiner earlier with the information the Debtors finally disclosed on August 31, 2007. These actions by the Debtors and their outside counsel caused the Debtors' estates to incur unnecessary fees and expenses by the Examiner of more than $800,000. In addition, the Debtors incurred significant legal fees with respect to this issue because the Debtors produced a significant amount of documents related to this issue and Debtors' counsel attended virtually all of the Examiner's interviews. Counsel for other parties also incurred fees and expenses on this issue. These significant expenditures were largely unnecessary had the Debtors been forthright.

### 3. The Debtors May Have Improperly Expended Funds

As previously noted, the Examiner was not asked to reach conclusions with respect to the rights between the Debtors and the Repurchase Counterparties to funds that the Debtors collected on loans prior to the Petition Date. Whether the repurchase agreements between the Debtors and the Repurchase Counterparties are determined to be true sales or financings, the Debtors' expenditure of at least some of the PIF and P&I monies deposited in Account 4025 appears to have been inappropriate.

Debtors were on notice prior to the Petition Date that various Repurchase Counterparties claimed that New Century had collected monies that were owned by and owed to them. For

example, on March 27, 2007, Morgan Stanley wrote to New Century and demanded payment of

more than $15 million, stating:

> We have been informed that notwithstanding our March 9, 2007 Notice of Default and
> the requirements of Sections 2.05(d), 4.06 and 9.01 of the MRA, Sellers have failed to
> remit all proceeds of the Purchased Loans to the Buyers as required by the MRA and by
> reason of the Notice of Default. At this time, we understand that the Sellers have failed
> to remit the amount of $15,060,429.16 in paid in full monies and proceeds of third party
> sales of Purchased Loans.
>
> MSMCI accordingly demands that Sellers immediately and continuously segregate all
> proceeds of the Purchased Loans received, and forthwith remit the same to the following
> account maintained by the Agent for the account of the Buyers: . . . .
>
> The failure by the Sellers to remit to the Buyers all proceeds of the Purchased Loans that
> constitutes the property of the Buyers constitutes not only a breach of the MRA, but also
> a conversion of the Buyers' funds.[23]
>
> Other Repurchase Counterparties similarly made written demands for payments pre-

petition. For example, UBS Real Estate Securities wrote to New Century on March 21, 2007 as

follows:

> Buyer hereby demands a written reconciliation of all such payments received by New
> Century against the amount of such deposits and that any undeposited amounts be
> deposited immediately [in the UBS blocked account]. Sellers have determined that at
> least $2,064,000 of such Income payments due to the Buyer represents payments in full
> by the respective mortgagors.

Further, the Examiner became aware of other significant amounts claimed by Repurchase

Counterparties prior to the Petition Date where payments apparently never were made. For

example, on March 20, 13 days before the Petition Date, certain members of the New Century

finance department proposed a $4.8 million payment to a Repurchase Counterparty for PIFs that

had been collected by New Century.

---

[23] Outside counsel for Debtors informed the Examiner that the Debtors did not agree with this claim and were
engaged in discussions with Morgan Stanley and other Repurchase Counterparties as of the Petition Date.

The Examiner finds that New Century received prior to the Petition Date demands in excess of $20 million from Repurchase Counterparties for funds allegedly owed to them. There does not appear to be a basis for New Century to have expended properly such funds. If New Century believed or had reason to believe that such funds might constitute cash collateral, i.e., monies as to which both it and the Repurchase Counterparties had an interest, then New Century could not expend such funds without consent or Court order and was required to segregate those monies.[24] If New Century believed or had reason to believe that those funds were owned by the Repurchase Counterparties, i.e., the repurchase transactions were true sales and the monies collected by New Century were held for the benefit of the Repurchase Counterparties, then New Century could not spend the funds owned by others and would need to segregate them.

### 4.    The Subsequent Addition of Other Funds May Not Excuse the Expenditure of Funds Held for the Repurchase Counterparties

New Century's current CEO and outside counsel asserted during the Examiner's investigation that it did not matter if the Debtors expended the funds in Account 4025 after the Petition Date because the Debtors would be adding sufficient funds to cover any such expenditures. Specifically, they asserted that there was an additional $20 million in a REIT Account and approximately $50 million of additional liquidity available from the debtor-in-possession financing which the Debtors had arranged. They noted that the Debtors also expected to receive significant additional sums of cash upon the completion of asset sales that were expected. To the extent PIFs and P&I payments were commingled with the Debtors' own funds and/or trust funds or collateral proceeds belonging to multiple Repurchase Counterparties, however, the Debtors' expenditure of funds from Account 4025 would appear to make a

---

[24] 11 U.S.C. §§ 363(c)(2), 363(c)(4).

significant difference to the Repurchase Counterparties because they may only be able to assert rights in funds that can be traced and identified in Account 4025.

The 4025 Account is the only account into which the Repurchase Counterparties are likely to be permitted to trace their funds and, then, only with respect to those funds which remained on deposit at the time the lowest intermediate balance was reached in that account.[25] The fact that additional funds may have been available in other accounts, or may have been added to the 4025 Account after the account reached it lowest intermediate balance, would not appear to assist the Repurchase Counterparties in recovering the funds which the Debtors may have been required to hold for them in trust.

###### 5.    Whole Loan Sales Do Not Present Cash Collateral Issues

In the case of Whole Loan Sales, Loan Purchasers sometimes paid for loans that were identified for sale as of a "cutoff date," but were then paid off by the underlying borrower before the Whole Loan Sale actually closed. In the normal course, New Century would repay the Loan Purchasers when PIFs were received by New Century between the cutoff date and the closing date. However, some of these payments were not made prior to the Petition Date.

The Examiner understands that the Loan Purchasers have asserted claims against New Century amounting to approximately $9.3 million. Whole Loan Sales do not involve a cash collateral issue because the Loan Purchasers entered into straightforward loan purchase agreements with New Century, without the creation of security interests. Thus, both New Century and the Loan Purchasers would not have had an interest in the funds at issue.

---

[25] *In re Columbia Gas Systems*, 997 F.2d 1039, 1063 (3rd Cir. 1993).

Accordingly, while Loan Purchasers may have claims against New Century, they do not involve

a cash collateral issue within the scope of the June 1 Order.

Respectfully submitted,

Michael J. Missal
Examiner

**SAUL EWING LLP**

By:

Mark Minuti (DE No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6840

and

**KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP**
Edward M. Fox, Esq.
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

Stephen G. Topetzes, Esq.
1601 K Street, NW
Washington, DC 20006
(202) 778-9328

Attorneys for Michael J. Missal, Examiner

Dated: November 21, 2007