## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | Re: Dkt. No. 4354 |
| | : | |

### DEBTORS' (A) RESPONSE TO THE "SECOND MOTION OF POSITIVE SOFTWARE SOLUTIONS, INC. FOR RELIEF FROM THE STAY REGARDING COPYRIGHT INFRINGEMENT LITIGATION," (B) CROSS-MOTION TO DISALLOW OR ESTIMATE POSITIVE SOFTWARE'S PROOFS OF CLAIM, AND (C) OBJECTION TO PROOFS OF CLAIM

The above-captioned debtors and debtors-in-possession (the "Debtors" or "New Century") hereby respond and object (the "Objection") to the "Second Motion of Positive Software Solutions, Inc. ["PSSI" or "Positive Software"] for Relief From the Stay Regarding Copyright Infringement Litigation" (the "Motion"; Dkt. No. 1877). The Debtors also object to Positive Software's four Proofs of Claim (as defined below) and cross-move to disallow those Proofs of Claim or estimate them in the amount of $0 (the "Cross Motion"). In support of their Objection and Cross Motion, the Debtors respectfully represent as follows.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (Okla. JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L. P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp , a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; New Century Warehouse Corporation, a California corporation.

## INTRODUCTION

1.        As PSSI notes in its Motion, this Court denied PSSI's first stay relief motion (the "First Motion") at a hearing held on August 7, 2007 (the "August 7 Hearing") and granted the Debtors' cross motion for sanctions because Positive Software had already willfully violated the automatic stay even while seeking relief. In its ruling, the Court noted that "at some point you'll have to liquidate this claim". (Tr. at 70). PSSI argues in the Motion that the time is now. The Debtors agree. The question is what forum should liquidate the claim.

2.        PSSI has filed proofs of claim against four separate Debtors, each seeking a whopping $580 million. That makes the amount asserted by this litigation claimant one of the largest claims that have not been compromised in this case. But the Debtors do not believe that the claims have any merit. Indeed, a AAA arbitrator, having conducted a seven day trial, wrote an eighty-six page opinion rejecting Positive Software's claims in their entirety, finding that Positive Software defrauded the Debtors (rather than the other way around), awarding the Debtors $11,500 actual damages plus more than $1.5 million in attorneys fees plus costs.

3.        Given that the Debtors will imminently be filing a Plan and Disclosure Statement, the Debtors agree that they now must liquidate alleged claims of this magnitude. Otherwise, the very bargains of the proposed Plan (described below) might be called into question. Moreover, if the proposed Plan is confirmed, the Debtors would have to hold back a very significant portion of the amounts available for distribution to unsecured creditors, to the detriment of the approximately seven thousand other general unsecured creditors of the case. Thus, a prompt liquidation of the claim is important not just to Positive Software, but to all of the creditors of this estate.

2

4.     This Court is best suited to conduct the prompt liquidation of the claim. As explained in more detail below, lifting the stay could promptly liquidate the claim only if the Debtors win in Texas on their motion to confirm the arbitration award and defeat PSSI's motion to vacate it. In that case, the claim would be liquidated at $0. However, if PSSI wins its motion to vacate the arbitration award, as PSSI contends it will, there will be another appeal to the Fifth Circuit, and if the Debtors were to lose that appeal, a brand new arbitration would have to commence. In that scenario, the claim would not be liquidated for years, and the approximately seven thousand unsecured creditors of this estate will suffer as a consequence while the bulk of their distributions are held back.

5.     Accordingly, the Debtors ask that the Court deny the Motion, keep the stay in place, and instead liquidate the Proofs of Claim in this Court, either in the context of an objection to the Proofs of Claim or an estimation thereof. In the alternative, the Debtors ask the Court to lift the stay only to allow proceedings on the cross motions to confirm and vacate the arbitration award in the Texas District Court and any appeal thereof to the Fifth Circuit, and for this Court to estimate the claim immediately after a ruling by the Fifth Circuit.

6.     The Debtors are cognizant of this Court's stated inclination at the August 7 Hearing that it could be more efficient for the Texas District Court to liquidate PSSI's claim, as well as the Court's observation that it was making no ruling on that issue at that time "[a]nd when it comes before me, it may be framed differently." This pleading attempts to explain why things are, indeed, different today than they were at the August 7 Hearing. As set forth in more detail below, if the Court simply defers to the Texas courts to hear this matter rather than disallowing or estimating the Proofs of Claim, then even assuming a Plan is confirmed, the Debtors will be forced to maintain a reserve for a $580 million claim in four of their cases for years. That means that the

3

other approximately seven thousand creditors' distributions will be significantly reduced for years while they wait for a decision from Texas. This Court can and should avoid that result to eliminate prejudice to the other creditors.

## FACTUAL BACKGROUND

### A.    The Positive Software Litigation.

7.      Positive Software filed suit against certain of the Debtors as well as former officers Jeffrey Lemieux and Frank Nese, and certain non-Debtor affiliates, on or about February 6, 2003. Positive Software's suit alleged that New Century had infringed Positive Software's copyrights, misappropriated its trade secrets and other intellectual property, breached service agreements and other contracts, converted Positive Software's property, committed fraud, and other alleged wrongdoings. Despite the fact that the unpaid amount of the software license at issue was only $87,000, Positive Software asked for an astounding $38 billion in damages. The Debtors not only denied these allegations, but counterclaimed for fraud and misrepresentation.

8.      On April 28, 2003, the Texas District Court granted the Debtors' motion to compel arbitration. Thus, the parties arbitrated this case pursuant to the rules of the American Arbitration Association ("AAA"). The arbitrator first heard and decided eight motions for partial summary judgment. Thereafter, he conducted a seven day trial on January 19-23 and February 3-4, 2004. He then permitted the parties extensive post-trial briefs, admitted evidence into the record, and closed the proceedings on April 13, 2004. In other words, this was not some quick determination by the arbitrator; he spent an extraordinary amount of time considering the parties' factual and legal arguments.

4

9.      On May 5, 2004, the arbitrator entered an 86-page, comprehensive written opinion constituting his arbitration award (the "Award" or the "Arbitration Award").[2] The Award rejected Positive Software's claims *en toto* and awarded it nothing on behalf of such claims. Moreover, the arbitrator awarded the Debtors $11,500 in actual damages on their counterclaims, as well as $1.5 million in attorneys fees and $1,200 in costs.[3]

10.     Not surprisingly, Positive Software was unhappy with the extent to which its litigation strategy backfired; it must be hard to swallow that your claim for $38 billion turns into an award against you for more than $1.5 million. Thus, it set out on a campaign to set aside the Award (the "Motion to Vacate"). Indeed, the parties, and others,[4] have now been litigating the validity of the Award for the past four years. On September 28, 2004, the Texas District Court in fact vacated the Award, ruling only on Positive Software's lead argument -- that the arbitrator had an undisclosed conflict of interest based on his being co-counsel with a lawyer from Susman Godfrey (the Debtors' Texas defense counsel) a decade earlier. However, on January 17, 2007, the Fifth Circuit Court of Appeals, sitting *en banc*, reversed. The Court held that "the Federal Arbitration Act ... does not mandate the *extreme remedy* of vacatur for nondisclosure of a *trivial past associatio*n, and we reverse the district court's contrary judgment". <u>Positive Software Solutions, Inc. v. New Century Mortg. Corp.</u>, 476 F.3d 278, 279 (5th Cir. 2007) (emphasis

---

[2] Because the Arbitration Award has been designated confidential under a confidentiality order of the Texas District Court, the Debtors are moving simultaneously herewith for leave to file it under seal so that the Court can review it in ruling on the claim objection, yet maintain the Debtors' confidentiality obligations.

[3] The $1.5 million represented the Debtors' fees only through the date of the arbitration. The Debtors have incurred significantly more fees since then. If the Debtors ultimately are successful in getting the Award confirmed, they intend to seek those additional fees because the fee shifting provision of the underlying contract, upon which fees were awarded, has no limitation on awarding fees only through the date of an arbitration. The Debtors also will press for, *inter alia*, four years worth of post-arbitration Award interest, which will be significant.

[4] As the Court might recall from other contested matters it has heard, one week after this Court sanctioned PSSI for violating the automatic stay, PSSI took an end run around the stay and filed a new suit against the non-Debtor defendants in the original suit and against the Debtors' lawyers. The new suit seeks damages for the very same alleged conduct giving rise to the Amended Motion to Vacate the arbitration award. All defendants have moved to dismiss that case and the District Court judge stayed discovery pending ruling on the motion to dismiss.

5

supplied).  However, it remanded "for consideration of [PSSI's] other objections to the arbitral award", which had not been definitively ruled on in the District Court.  Id. at 279.  On June 11, 2007, the United States Supreme Court denied Positive Software's petition for writ of *certiorari*. Thus, Positive Software's lead argument for the "extreme remedy" of throwing out an 86-page AAA arbitrator's Award is now legally dead.

11.    Unfortunately, Positive Software was not deterred.  On July 9, 2007, Positive Software filed in the Texas District Court its Motion for Leave to File ("Motion for Leave") Second Amended Motion to Vacate Arbitration Award [and] Brief in Support (the "Amended Motion to Vacate").  This Court previously held that the filing of the Motion for Leave violated the automatic stay and sanctioned PSSI for it.  Thus, proceedings on the Motion for Leave and, obviously, on the Amended Motion to Vacate have not yet commenced.  When and if they do, PSSI apparently intends to raise, as grounds for vacating the Arbitration Award, two primary arguments, one from its original Motion to Vacate and one from its proposed Amended Motion to Vacate, which was attached to the Motion for Leave to File in violation of the stay:  (a) the arbitrator committed "manifest error" -- an extraordinarily high  standard which no Fifth Circuit panel has *ever* held has been met, and (b) that the Arbitration Award was procured by fraud or malfeasance of various types and flavors. The Debtors will oppose PSSI's ability to even raise the second of these theories, as it was untimely even before the imposition of the automatic stay.  Lest there be any ambiguity, the Debtors also vigorously deny that they or their attorneys committed any wrongdoing in the discovery stages of the Arbitration, and will defend on the merits of the motion to vacate if any Court allows this untimely argument to proceed.

6

**B.**    **The Proofs of Claim.**

12.    On August 29, 2007, PSSI filed four separate proofs of claim: one each against Debtors New Century Mortgage Company, New Century TRS Holdings, Inc., New Century Financial Corp. and Home 123 Corp. (the "Proofs of Claim", copies of which are together attached hereto as Ex. A). Each Proof of Claim is asserted in the amount of "$580,000,000 (est.)". The attachments to the Proofs of Claim specify that the bases for the Proofs of Claim are the allegations in Positive Software's complaint, and the calculation is based upon its expert witness's damages report in the case.

**C.**    **The Mediation.**

13.    In an attempt to resolve the Proofs of Claim so that Court intervention would be unnecessary, the Debtors and the Committee agreed to mediate with PSSI. David Stratton, Esq. of Pepper Hamilton acted as the mediator and worked with the parties for two days of mediation and approximately two weeks thereafter (including after PSSI filed its Motion). Unfortunately, no settlement was reached.

**D.**    **The Plan.**

14.    The Debtors and the Creditors' Committee have been working diligently to formulate a joint chapter 11 plan of liquidation (the "Plan") that they believe will resolve the primary intercreditor issues facing the Debtors' estates and, in so doing, maximize the value of the estates while fairly and equitably allocating the estates' assets among the estates' diverse creditor body. Indeed, the Debtors and the Creditors' Committee intend to file the Plan, which is nearly complete, shortly. The Plan, as currently drafted, attempts to maximize value to creditors through a series of interrelated settlement agreements between and among the various classes of creditors. In order to achieve this result, substantial concessions and compromises were negotiated among

7

the parties to avoid protracted and costly litigation. PSSI's assertion of $580 million Proofs of Claim against four separate Debtors threatens to jeopardize these concessions and artificially depress creditor recoveries for years, as shown in this section. While filed claims in this case approximate $35 billion, after giving effect to the protocols and compromises in the proposed Plan, the Debtors project that the amounts of the claims for distribution purposes will be substantially reduced.

15.    The proposed Plan essentially divides the Debtors into three main groups: the Holding Company Debtors, the Operating Company Debtors and Access Lending (collectively, the "Debtor Groups"). Assets and claims are then divided among the Debtor Groups with each claim allocated within a Debtor Group depending on the basis of the claim, the Debtor(s) against which the claim was filed and/or scheduled and the Plan's proposed treatment of such claim. All claims within a Debtor Group will share in the distributions to be made from the assets of that particular Debtor Group. Negotiation of this Plan structure involved, among other things, a percentage allocation among the creditors in the Holding Company and Operating Company Debtor Groups of recoveries arising out of potential litigation against third parties.

16.    Additionally, the proposed Plan provides that certain general unsecured claims are subject to various claims protocols that may impact the allowed amount of such claim and/or the ultimate distributions on such claims. More specifically, the proposed Plan's Multi-Debtor Claim Protocol provides that each holder of an allowed general unsecured claim for which multiple Debtors in a Debtor Group are jointly liable, will only receive a single distribution from that Debtor Group. Next, through the Intercompany Claim Protocol, the proposed Plan effects a settlement of the Debtors' intercompany claims by canceling such claims within each Debtor Group and providing that the intercompany claims of the Holding Company Debtors

8

against the Operating Debtors are reduced by 50%.   Lastly, the proposed Plan assigns a

Determined Distribution Amount to general unsecured classified claims by assigning percentages

to classes within a Debtor Group.  By way of example, while two classes of general unsecured

claims within the same Debtor Group will receive distributions from the same pool of assets, one

class may be assigned a Determined Distribution Amount of 50% such that it will only receive

distributions on 50% of its allowed claim amount.  These protocols were developed in order to

recognize and give effect to the true allocation of assets and liabilities by and among the Debtor

Groups.

17.    The proposed Plan also contains a protocol to develop a methodology for

resolving the billions of dollars of EPD and breach claims that were filed in these cases.  The

Debtors and the Creditors' Committee, after substantial negotiations with the various parties, have

developed a formulaic approach to value these claims based on certain specified factors, which

ultimately result in allowed claims in amounts significantly less than the amounts in which the

claims were filed against the estates.  Because these claims, as filed, comprise the large majority of

the creditor pool, the affected parties were willing to accept an allowed claim in a reduced amount

on the basis that the other claimants were equally accepting reduced claims pursuant to the

protocol.  This settlement is crucial to confirmation of the plan and necessary to eliminate

substantial litigation costs associated with resolving each claim individually.

18.    If this Court does not either adjudicate the validity of Positive Software's

$580 million claim against four of the Debtors' estates or conduct an estimation proceeding for

both Plan voting and distribution purposes, this carefully crafted Plan may have its confirmation

delayed and potentially forestalled as a result of the litigation tactics of Positive Software.  While

Positive Software exercises those litigation strategies, the Debtors and their approximately 7,000

9

other creditors could potentially be irreparably harmed.  The harm will accrue not only as a result

of the increased costs associated with any delay in confirmation, but also from putting in jeopardy

confirmation of the very Plan that was designed to maximize value to creditors.

## ARGUMENT

## I.    OBJECTION TO PSSI'S PROOFS OF CLAIM.

19.    The Debtors object to and seek to disallow each of the four Proofs of

Claim on the basis that they are litigation claims that have no merit.  The best evidence of the lack

of merit in these claims is the learned AAA arbitrator's Award.  After becoming intimately

familiar with the facts -- ruling on 8 pre-trial summary judgment motions, conducting a seven day

trial in which he assessed the credibility of witnesses and probative value of numerous exhibits that

he admitted into evidence, and reading post-trial briefs -- the arbitrator issued an 86-page opinion

not only denying Positive Software's claims in their entirety, but granting New Century a

substantial award on its counterclaim against Positive Software.

20.    It is true that a proof of claim is *prima facie* evidence of the existence of a

claim.  See Fed. R. Bankr. Proc. 3001(f).  But that does not mean that the *prima facie* evidence

cannot be rebutted; the law, of course, is simply that the burden then shifts to the debtor to produce

evidence sufficient to negate the *prima facie* validity of the claim.  In re Finova Capital Corp., 356

B.R. 609, 623 (Bankr. D. Del. 2006); In re Pinnacle Brands, Inc., 259 B.R. 46, 49-50 (Bankr. D.

Del. 2001).  "If the objecting party overcomes the *prima facie* validity of the claim, then the burden

shifts to the claimant to prove its claim by a preponderance of the evidence."  Finova, 356 B.R. at

623 (internal quotation omitted).  "The amount of evidence which a debtor is required to submit in

order to shift the burden back to a claimant is slight.  Indeed, the objecting party need only

introduce the equivalent amount of admissible evidence sufficient to defeat a motion for summary

10

judgment." Id. (citing Patrick A. Jackson, "Conceptualizing Claim Objections (Part I: The Fed. R. Civ. P. 56 Analogy)," ABI Journal, Vol. XXV, No. 5, p. 42 (June 2006)).

21.    Here, the Debtors have produced much more than the equivalent amount of admissible evidence sufficient to defeat a motion for summary judgment; the Debtors have submitted an 86-page Arbitration Award that completely vindicates the Debtors and shows that the claim should be disallowed altogether, for all of the reasons detailed in the Award itself. Thus, there is no question that under the standard set forth in Finova, the burden of proof has shifted to PSSI. It cannot meet that burden because the evidence far exceeds the amount necessary to defeat a summary judgment motion. Indeed, there is a final decision by an arbitrator.

22.    To be sure, the Debtors recognize that PSSI contends that the Arbitration Award should be vacated. If the Court determines to hear this matter as a claim objection, the Debtors do not object to PSSI being granted leave to brief its Motion for Leave in this Court and for the Debtors to respond, and thereafter for PSSI to brief its Motion to Vacate (as well as the Amended Motion to Vacate only if the Court has held that it believes the Motion for Leave would be granted), and the Debtors to respond. The Debtors are prepared to do so on whatever schedule the Court suggests. Cf. ¶ 33, *infra*.

23.    The Debtors also seek to disallow the Proofs of Claim filed in the Home 123 and New Century TRS Holdings cases on the grounds that Positive Software's Complaint does not name those two entities as defendants. See Ex. B hereto. Because the proposed Plan does not provide for substantive consolidation *per se*, this makes a difference. Accordingly, at a minimum the Court should disallow those claims, rather than permitting PSSI to maintain exorbitant claims against Debtors it never even sued.

11

## II.    MOTION TO ESTIMATE PSSI'S CLAIMS.

24.     In the alternative, the Debtors request that the Court estimate PSSI's Proofs of claim pursuant to 11 U.S.C. § 502(c) at $0 all for purposes including allowance and distribution, again relying on the Arbitration Award.

25.     Section 502(c) of the Bankruptcy Code provides:

There shall be estimated for purpose of allowance under this section -

(1)     any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2)     any right to payment arising from a right to an equitable remedy for breach of performance.

26.     Courts in this Circuit and elsewhere have recognized that the long delays associated with the liquidation of contingent or unliquidated claims in large chapter 11 cases constitute "undue delay" as that term is used in section 502(c)(1). See, e.g., Bittner v. Borne, 691 F.2d 134 (3d Cir. 1982); In re Stone & Webster, Inc., 279 B.R. 748, 810 (D. Del. 2002); Official Committee of Asbestos Claimants v. Green (In re Federal Mogul Global, Inc.), 330 B.R. 133, 154 (D. Del. 2005); In re Armstrong World Indus. Inc., et al., 348 B.R. 111, 123 (D. Del. 2006); In re A.H. Robins Co., 880 F.2d 694, 698, 700 (4th Cir. 1989); In re Brints Cotton Mktg., Inc., 737 F.2d 1338, 1340-41 (5th Cir. 1984). Indeed, some courts have suggested that Section 502(c) estimation is mandatory if undue delay otherwise will result. See Federal Mogul, 330 B.R. at 154 (noting split of authority but stating "it is apparent that the Bankruptcy Code requires an estimation in order to prevent undue delay in the administration of the estate.") Otherwise, "relief for the debtor is incomplete, and those creditors are not given an opportunity to collect in the case on their claims." Id. (quoting H.R. Rep. No. 95-595, at 180 (1978)).

27.     Here, the Debtors respectfully submit that even if the Court is not willing to determine, on a final basis, that the Proofs of Claim should be disallowed on the bases set forth

12

in the Arbitration Award given PSSI's allegations contained in the Motion to Vacate, the Court should, at a minimum, estimate the claims at $0 for voting and distribution purposes on such grounds. The basis for this request is the undue delay on the administration of the case that will be suffered if the claim is not liquidated, as explained below.

28.    Unless PSSI wants to concede that these disputed liquidation claims are "liquidated" in the amount of $0 by virtue of the Award -- in which case the claims should be disallowed altogether -- it must instead concede that the $580 million Proofs of Claim are "unliquidated" within the meaning of Sections 502(c). The problem here is that the Proofs of Claim cannot possibly become liquidated in any amount other than $0 for several years. The following schedule demonstrates the point. Even if the litigation started today, it will be a matter of years, not months before resolution. Proceedings before the District Court could take 4-6 months before any ruling is made.[5] But such a ruling would not liquidate the claim unless the Debtors win and the Award is confirmed (resulting in a liquidation at $0); otherwise, it merely would be an order to arbitrate again. Of course, another appeal of such an extreme order -- throwing out an 86-page arbitration Award -- would ensue to the Fifth Circuit, which would likely take an additional year for briefing and decision. And if the result of the Fifth Circuit appeal is vacatur, then the arbitration would start anew, likely taking an additional 6-8 months. Thereafter, if experience is any guidepost of the future, there would be motions to vacate or confirm that award. Thus, it is exceedingly unlikely that, left to its own devices, these Proofs of Claim will be liquidated in anything less than three years unless they are liquidated in the amount of $0.

---

[5] It could be even longer if PSSI insists on attempting to take discovery in aid of the Amended Motion to Vacate, which is impermissible as a matter of law (vacatur is limited to motion practice) and could require the Court's intervention. It is not conjecture that PSSI will seek such discovery; PSSI actually served some of it months ago -- which this Court found violated the automatic stay. See Ex. C hereto.

29.     If the Plan is approved in its current form, administration of the case would be substantially delayed unless the Court estimates the Proofs of Claim. Otherwise, the Debtors would have to maintain a reserve for a $580M claim in up to four of their estates before making distributions. As set forth in the previous paragraph, those reserves likely would have to be maintained for years. A reserve that high would drastically reduce distributions that the Debtors would be able to make to their other approximately 7,000 unsecured creditors for years.

30.     Given that a AAA Arbitrator valued the claim at $0 (actually negative dollars, since he awarded damages *against* PSSI), it would be unjust to the other approximately 7,000 creditors to have the bulk of their distributions wait for years while PSSI continues its scorched earth litigation tactics. See In re Roman Catholic Archbishop of Portland, Oregon, 2007 Bankr. LEXIS 1318, No. 04-37154 (Bankr. D. Or. Mar. 28, 2007) (estimating at $0 claims of tort plaintiffs who were appealing dismissal of their claims in state court, because "it would be inappropriate for me to disturb the state court's jurisprudence on the issues the state court has decided.").

31.     This is not about whether a litigant should have its day in court (a strange argument for PSSI to make anyway, given that it was the entity that drafted a contract with an arbitration clause). It is about whether approximately 7,000 innocent creditors, who already will be taking a significant haircut on their claims, should be made to wait for years to get their distributions while PSSI avails itself of every last forum to litigate its claims. That is what Section 502(c) was designed to eliminate. See, e.g., In re Genesis Health Ventures, Inc., 272 B.R. 558, 562 (Bankr. D. Del. 2002) ("The debtors have reserved the claimants' proof of claim, in the amount of $324 million, thus precluding full distribution to Class G-4 unsecured creditors under the Plan. It was determined that the claim would be estimated under 11 U.S.C. § 502(c) to fix the amount of

14

the allowed claim, and to permit distribution to be made to allowed claims in accordance with the confirmed Plan."); Bittner, 691 F.2d at 137 (noting that litigation creditors' claims were "uncertain at best" and without estimation they "might well have acquired a significant, if not controlling, voice in the reorganization proceedings. The interests of those creditors with liquidated claims would have been subject to the [litigants'] interests, despite the fact that the state court might ultimately decide against those interests after the reorganization."); Federal Mogul, 330 B.R. at 154 ("Estimation helps the court avoid the need to await resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions.... The object of such a proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan.") (internal quotation omitted); Stone & Webster, 279 B.R. at 810 ("An estimation proceeding expedites the bankruptcy process so that key steps in a reorganization that depend on the fixing of the value may proceed.... In essence, an estimation proceeding is a procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long time to allow courts to quickly and flexibly estimate the amount of an as yet to be liquidated claim.").

32.     Instead of the years of litigation which the Texas process promises, the Debtors suggest a much more streamlined procedure for estimation. After all, Section 502(c) does not prescribe any method for estimating a claim, and the procedures for estimation are therefore committed to the reasonable discretion of the Court. See Bittner, 691 F.2d at 135. In estimating a claim, the Court should use "whatever method is best suited to the particular contingencies at issue." Id. Indeed, other than applying the underlying substantive law, "there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions pursuant to the Code." Id.

15

33.     The Debtors propose that this Court set a prompt briefing schedule on the legal issues of why the Arbitration Award would or would not be set aside. That, in turn, requires briefing on two sets of issues: the Motion for Leave and the Motion to Vacate. The Debtors propose that, to serve judicial economy and the parties' own resources, the Court first set a briefing schedule for the issues raised by the Motion for Leave. For example, an appropriate schedule might provide that PSSI's opening brief would be due in two weeks, the Debtors' answering brief would be due two weeks after that and PSSI's reply brief would be due one week after the answering brief, with no discovery and with oral argument only if the Court believes it necessary. Then, the parties would brief the issues raised in the Motion to Vacate and if the Court has ruled in PSSI's favor on the Motion for Leave issue, also the Amended Motion to Vacate. The Debtors propose the same briefing schedule for that round of briefs. If the Court rules that there was no basis to set aside the Arbitration Award, the Proofs of Claim would immediately be estimated at $0. If the Court rules that the Arbitration Award likely would have been set aside, the Court should promptly schedule and conduct a three day evidentiary hearing on the merits (not the seven days taken by the AAA arbitrator -- estimation is supposed to be a streamlined procedure),[6] with each side getting half the time to present its case. The Court's decision after that evidentiary hearing would be its estimation for all purposes, including voting and distribution.

34.     PSSI likely will complain that if the Debtors needed a prompt ruling to avoid undue delay to the administration of the case, the Debtors should not have fought stay relief in July. That argument fails for three reasons. First, because the liquidation of PSSI's claims would not occur for years in Texas, the only six months that have passed between the hearing on

---

[6] See Bittner, 691 F.2d at 135 ("It is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate evaluation of the claims.... Such methods, however, usually would run counter to the efficient administration of the bankrupt's estate and where there is

16

the First Motion and now would not have made a difference -- even if the parties started the process six months ago, we still would be nowhere near having this claim liquidated today unless it is liquidated at $0 by the District Court judge in denying the Motion to Vacate. Second, there is no inconsistency in the Debtors' position -- we desperately needed the breathing space afforded by Section 362(a), a concept which the Court agreed with; we availed ourselves of that breathing space by liquidating assets and negotiating and filing a plan in a very timely manner given the size and complexity of these chapter 11 cases; and now we are ready to liquidate the Proofs of Claim but must do so quickly so as to avoid prejudicing the other creditors. Third, the Debtors have only sought to disallow or estimate this claim after making significant efforts to settle it -- a two day mediation with David Stratton, Esquire and more than a week of subsequent follow up settlement communications, that unfortunately failed. See Motion at ¶¶ 15-16. The Creditors Committee also provided significant input into those settlement negotiations and played an integral role at the mediation. Thus, it is not as if the Debtors used the six months to forget that PSSI existed; we attempted to deal with the Proofs of Claim in a responsible manner, and it was only after settlement negotiations came to an impasse that the Debtors determined that they had no choice but to seek disallowance or estimation to avoid the prejudice to creditors.

---

sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value.").

III.    **THE STAY SHOULD NOT BE LIFTED.**

35.     Bankruptcy Code section 362(a) stays the commencement or continuation of litigation against the debtor and stays any attempt to obtain possession of (or control over) estate assets. <u>See</u> 11 U.S.C. § 362(a).[7]  The Code's automatic stay provision "is one of the fundamental debtor protections provided by the bankruptcy laws." S. Rep. No. 95-989, 95 Cong., 2d Sess. 54-55, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5840-41 (1978).  The automatic stay is designed "to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor." <u>In re Continental Airlines</u>, 177 B.R. 475, 479 (D. Del. 1993) (quoting <u>A. H. Robins Co. v. Piccinin</u>, 788 F. 2d 994, 998 (4th Cir.), <u>cert.</u> <u>denied</u>, 479 U.S. 876 (1986)).

36.     Of course, the automatic stay is not absolute.  A bankruptcy court may grant relief from the automatic stay where sufficient "cause" is present. <u>See</u> 11 U.S.C. § 362(d). There is no rigid test for determining whether sufficient cause exists to modify an automatic stay. Rather, in resolving motions for relief from the automatic stay for "cause," this Court, like most

---

[7]  Section 362(a) provides, in relevant part:

(a)     Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of –

(1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .

(3)     any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. . . .

11 U.S.C. § 362(a).

bankruptcy courts, generally considers the policies underlying the automatic stay in addition to the competing interests of the debtor and the movant. In re Continental Airlines, Inc., 152 B.R. 420, 424 (D. Del. 1993) (citing Int'l Business Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.), 938 F. 2d 731, 734-37 (7th Cir. 1991)); In re Peregrine Sys., 314 B.R. 31, 47 (Bankr. D. Del. 2004), aff'd in part, rev'd in part on other grounds, AW Treuhand Wirtschaftsprufungsgesellschaft v. Peregrine Sys. (In re Peregrine Sys.), 2005 U.S. Dist. LEXIS 21707 (D. Del. September 29, 2005); In the Matter of Rexene Products Company, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

37.    For example, where the alternative forum is unable to efficiently determine the claims subject to litigation (or the bankruptcy court can determine such claims with equal efficiency), or allowing the litigation to proceed in such forum will result in duplicative litigation and interfere with or delay the administration of the bankruptcy case, courts routinely refuse to grant relief from stay. See e.g. Sonnax Industries v. Tri Component Products Corp. (In re Sonnax Industries, Inc.), 907 F. 2d 1280 (2nd Cir. 1990); In re Wintroub, 283 B.R. 743 (Bankr. 8th Cir. 2002); In re Eagle Enterprises, Inc., 265 B.R. 671 (Bankr. E.D. Pa. 2001); In re Paxson Electric Co., 242 B.R 67 (Bankr. M.D. Fla. 1999). See also Benedor Corp. v. Conejo Enterprises, Inc. (In re Conejo Enterprises, Inc.), 96 F. 3d 346 (9th Cir. 1996) (where the litigation involves claims that will be discharged in the bankruptcy case, it is appropriate to deny relief from stay in order to promote judicial economy and minimize duplicative and unnecessary litigation). Likewise, where applicable non-bankruptcy law is not complicated or unsettled with respect to the claim and it can be readily adjudicated by the bankruptcy court,[8] relief from the stay should be denied. See e.g. In re Nexus Communications, Inc., 55 B.R. 596 (Bankr. E.D.N.C. 1985).

---

[8]    See Section IV, *infra*.

38.     That is the reality here. We are aware that this Court, at the August 7

Hearing, stated (expressly without ruling on the issue) that "it strikes me -- it makes much more

sense from an efficiency standpoint for this matter to be tried in the forum where it's been

pending." Tr. at 70. However, the Court noted that if and when the time comes to consider this

issue again, "it may be framed differently." Id. And indeed, that is the case. The Court's

comments at the August 7 Hearing were without knowing (a) that less than a month later, PSSI

would file four separate $580 million proofs of claim; (b) that it will take three years to liquidate

the claims in Texas at any number other than $0; and (c) how the combination of (a) and (b) would

effect the Plan process and distributions under any confirmed plan to the approximately seven

thousand unsecured creditors. Given these facts, it is in the best interest of the estates and,

significantly, their creditors to liquidate the PSSI claims in this Court, either through claims

objection procedures or estimation, as outlined above. Assuming the Court agrees, lifting the stay

would simply result in dual tracked, duplicative and wasteful litigation. See, e.g., In re

Mid-Atlantic Handling Sys., LLC, 304 B.R. 111, 130 (Bankr. D.N.J. 2003) (courts should deny

stay relief which would result in duplicative litigation).

39.     Moreover, the typical Rexene Products factors weigh against granting the

Motion. In balancing the competing interests of the debtor and the movant, this Court considers

three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of

the hardships facing the parties; and (3) the probability of success on the merits if the stay is lifted.

In the Matter of Rexene Products Company, 141 B.R. at 576; Tr. at 69. The initial burden of proof

is on the movant to establish a *prima facie* case that the test has been satisfied, which, if

established, may be refuted by the debtor. Rexene Products, 141 B.R. at 577; In the Matter of

Pursuit Athletic Footwear, Inc., 193 B.R. 713, 720 (Bankr. D. Del. 1996).

20

40.     Here, the most important of these factors is the balance of the hardships. Lifting the stay would mean that the Court either declined to estimate the Proofs of Claim or agreed to dual tracked litigation.  Both would impact very negatively on the estates and their approximately seven thousand unsecured creditors.  The effect on the Plan process of determining not to estimate the Proofs of Claim and, as well as the effect of forcing the Debtors to reserve for claims of $580 million in four estates, is set forth in detail above.  See supra Section D.  The Debtors hardly need proof that the estates and their creditors will be prejudiced by the other possibility of dual tracking the liquidation or estimation of the claim with litigating in Texas courts; it is a tautology that such a course will be significantly more expensive in this matter where both parties have already paid their lawyers several million dollars.[9]  Thus, it is clear that lifting the stay will  prejudice the Debtors and their creditors.

41.     Positive Software's arguments that it will be the party that is prejudiced all focus on the prejudice to it if the case cannot be liquidated now.  Those "when" arguments are moot, because the Debtors, by their Cross Motion, are agreeing to liquidate the claim now; the question is where and in what procedural posture.  Accordingly, no argument set forth in the Motion outweighs the harm to the Debtors in lifting the stay within the meaning of Rexene Products.

42.     PSSI did make "where" arguments in the First Motion.  There, its primary argument was that the case should be tried in Texas rather than Delaware because PSSI would be inconvenienced if it was forced to litigate in Delaware.  See Motion ¶ 38.  Certainly, that is one factor, but it does not outweigh the prejudice to approximately seven thousand creditors of holding

---

[9] Additionally, given the fact that the Debtors have no remaining employees and only 20 former employees retained as consultants (only one of which formerly was in house counsel, Ms. McCarthy), dual tracking the litigation would be highly prejudicial to the Debtors' ability to present their case competently.  The lawyers can only do so

up their distributions for years. Accordingly, balanced against the estates' interest in the orderly administration of the cases, the Debtors respectfully submit that the balance of hardships weighs against granting the Motion.

43.     Finally, the Debtors also incorporate by reference the argument they made in response to the First Motion that PSSI cannot meet the "probability of success on the merits" prong of Rexene Products given the Arbitrator's Award in the Debtors' favor. See Dkt. 2101 at 17. The Court credited that argument at the last hearing. See Tr. 69 ("I don't think the movant here has demonstrated probability of success on the merits"). We take great issue with PSSI's characterization (see Motion at 8) that the facts have changed since this Court's prior holding because a "show cause" order was issued against the Debtors' defense counsel about counsel's conduct -- which counsel has now responded to and shown that they did nothing wrong. The show cause order against the Debtors' defense attorneys has no impact on whether the Award will be vacated and whether PSSI has demonstrated a probability of success on the merits. It continues to be PSSI's burden of proof, which it has not met, and it continues to be the case that there is not a single opinion of which the Debtors are aware that holds that a lift stay movant has demonstrated a probability of success on the merits because it has a pending appeal or motion to vacate an arbitration award against it.

## IV.    **THIS COURT NEED NOT ABSTAIN.**

44.     PSSI argues that this Court cannot hear the dispute because it would be forced to abstain. PSSI is wrong. Mandatory withdrawal of the reference pursuant to 28 U.S.C. § 157(d) only is required when the consideration of federal laws outside the Bankruptcy Code is "necessary to resolve the case or proceeding" and that consideration is "substantial and material."

much; they need to consult with their client. Dual tracking litigation and estimation would likely mean that counsel would not have sufficient access to Ms. McCarthy to be effective.

I.R.S. v. CM Holdings, Inc., 221 B.R. 715, 721 (D. Del. 1998). The "substantial and material"
prong of this test has been interpreted as "distinguish[ing] between meaningful consideration of
federal law outside of the Bankruptcy Code and … a simple application of well-settled law." Id.
(emphasis supplied). This is a copyright infringement suit. When it was fully litigated previously,
no one seriously argued for a complex interpretation of the copyright statute; the case turned on the
application of well-settled law to the facts. Moreover, the Debtors contend that on a Motion to
Vacate, no consideration should be given to copyright law, but only to whether PSSI somehow can
set aside on an arbitration award.

46. In any event, if the Court agrees with PSSI on this point, the reference
may be withdrawn. Several of the cases cited in Section II above dealt with the Delaware District
Court's estimation, in the first instance, pursuant to Section 502(c). See Stone & Webster, 279
B.R. at 748; Federal Mogul, 330 B.R. at 133; Armstrong, 348 B.R. 111. See also Owens Corning
v. Credit Suisse First Boston, 322 B.R. 719 (D. Del. 2005) (same). Indeed, this is exactly what was
done in the Mariner cases that were pending in this Court. See In re Mariner Post-Acute Network
and In re Mariner Health Group, Inc., No. 03-1028(JJF) (D. Del. Oct. 31, 2004) (ORDER; copy
attached as Ex. D) (estimating personal injury claims after the reference was withdrawn on the
debtors' motion to estimate).

46. Alternatively, if the Court believes it cannot hear a copyright claim
objection, this could be the "rare and unusual case" where an arbitrator should estimate the claim.
See Bittner, 691 F.2d at 135.

## V.    PROCEDURAL POSTURE.

47. The Debtors recognize that their Cross Motion does not give PSSI 30 days
notice of a claim objection in accordance with Fed. R. Bankr. Proc. 3007. Nonetheless, the very

23

basis for the Debtors' objection to the Motion is that this Court should conduct proceedings to either disallow or estimate the Proofs of Claim. Accordingly, the Debtors have filed this pleading, including the Cross Motion, so that the entirety of it may be considered at the hearing on PSSI's Motion.

48.     If the Court denies PSSI's Motion, the Debtors are not asking the Court to disallow the Proofs of Claim or estimate them at that same February hearing. Rather, the February hearing essentially should be used as a preliminary hearing to determine (a) whether the Court will hear an objection to the Proofs of Claim or, instead, a motion to estimate, and (b) how and on what schedule the proceedings to liquidate the Proofs of Claim will be heard.

49.     In the alternative, should the Court determine, over the Debtors' objection, to grant the stay relief Motion on the grounds that the Texas District Court is familiar with the case, the Debtors ask that the Court (a) only grant limited relief from the stay, permitting the Texas District Court to rule on the pending Motion to Vacate and motion to confirm (and no other motion) and any appeal from such proceedings, but requiring that the stay remain intact for all other purposes, including any new arbitration that the Texas courts require, without prejudice to a new request for stay relief at that time; and (b) hold that if the Texas District Court and the Fifth Circuit order a new arbitration, this Court will then estimate the claim to prevent prejudice to the estates for all of the reasons outlined above.

24

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court deny the

Motion, grant the Cross Motion, and disallow the Proofs of Claim in their entirety or estimate them

for purposes of voting, distribution and otherwise at $0. The Debtors further request such other

and further relief as is just and proper.

Dated:  January 30, 2008
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne S. Uhland
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION