# EXHIBIT B



ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 27 2003

CLERK, U.S. DISTRICT COURT
By_____
Deputy

POSITIVE SOFTWARE SOLUTIONS,
INC.,

    *Plaintiff,*

v.

NEW CENTURY MORTGAGE
CORPORATION;
NEW CENTURY FINANCIAL
CORPORATION;
eCONDUIT CORPORATION;
THE ANYLOAN COMPANY;
JEFF LEMIEUX;
FRANK NESE,

    *Defendants.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 303-CV-0257-N

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Plaintiff, Positive Software Systems, Inc., d/b/a Positive Software Solutions, Inc. ("PSSI") files this First Amended Complaint against the above-named Defendants for, among other things, copyright infringement, misappropriation of trade secrets, misappropriation of intellectual property, conversion, breach of contract, civil conspiracy, and fraud. The Defendants pirated Plaintiff's software, violated license agreements, derived PSSI's source code, and created new products incorporating the functions, processes, and source code of PSSI's product. As a result, PSSI has suffered and will continue to suffer millions of dollars in damages and an ongoing diminution in the value of its core product. In support of this First Amended Complaint and the causes of actions, PSSI respectfully alleges the following:

## I.

## JURISDICTION AND VENUE

1.     This is an action for copyright infringement arising under the Copyright Act of 1976, 17

U.S.C. §§ 101 *et seq.*, as well as for misappropriation of trade secrets, illegal misappropriation of

intellectual property, breach of contract, specific performance, conversion, declaratory judgment,

fraud, violation of the Digital Millennium Copyright Act, and civil conspiracy.  Plaintiff seeks

both damages and equitable relief herein, including injunctive relief and an order of specific

performance.

2.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1332, 1338(a) and (b),

and this Court's pendent jurisdiction.

3.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a).

## II.

## PARTIES

4.     PSSI is a Texas corporation with its principal place of business in Dallas, Texas.

5.     Defendant New Century Mortgage Corporation ("NC Mortgage") is a California

corporation with its principal place of business at 18400 Von Karmen Avenue, Suite 1000,

Irvine, California 92612.  NC Mortgage is doing business in the State of Texas, may be found in

the State of Texas, and has agents doing business in the State of Texas.  NC Mortgage is licensed

to do business in the State of Texas, and may be served with process by serving its registered

agent, Paracorp Incorporated, at its registered office, 800 Brazos Street, Suite 1100, Austin,

Texas 78701.

6.     New Century Financial Corporation ("NC Financial") is a Delaware corporation with its

principal place of business at 18400 Von Karmen Avenue, Suite 1000, Irvine, California 92612.

NC Financial is doing business in the State of Texas, may be found in the State of Texas, and has agents, including NC Mortgage, doing business in the State of Texas. NC Mortgage is a wholly-owned subsidiary of NC Financial.

7.     eConduit Corporation ("eConduit") is a California corporation with its principal place of business at 17701 Cowan, Suite D, Irvine, California 92614. eConduit is a subsidiary or affiliate of NC Financial. eConduit is licensed to do business in the State of Texas, and may be served with process by serving its registered agent, Paracorp Incorporated, at its registered office, 800 Brazos Street, Suite 1100, Austin, Texas 78701.

8.     The AnyLoan Company ("AnyLoan") is a California corporation with its principal place of business at 340 Commerce, Suite 100, Irvine, California 92618. AnyLoan is a subsidiary or affiliate of NC Mortgage or NC Financial. PSSI will amend this complaint to allege the exact relationship between the Defendants once it is ascertained.

9.     Jeff Lemieux is the Chief Operating Officer of Defendant eConduit and currently in charge of the illegal activity by the Defendants. He may served at 17701 Cowen, Suite D, Irvine California, 92614.

10.     Frank Nese is a senior manager at Defendant NC Mortgage and ordered the illegal activity that is the subject of this lawsuit. He may be served at 340 Commerce, Suite 100, Irvine California, 92602.

### III.
### BACKGROUND FACTS

**A.     PSSI and LoanForce Software System**

11.     PSSI is primarily engaged in the business of developing, marketing, and manufacturing computer software products used in the mortgage industry. Edward Mandel, who has a degree

in computer science and a MBA from the University of Texas at Dallas, founded PSSI in 1995. When he founded the company, Mr. Mandel already had eight years experience in designing and implanting customer databases.

12. Before 1999, PSSI had two divisions — software and consulting. PSSI's consulting company designed custom, in-house marketing solutions for its clients.

13. FirstPlus Financial ("FirstPlus") was one of PSSI's first and largest clients. PSSI developed a product called TeleTrend that was used by FirstPlus. TeleTrend is a system to generate and manage customer interactions in telemarketing call centers and retail divisions. At FirstPlus, TeleTrend was designed to manage customer interaction in the mortgage banking industry. Under the agreement with FirstPlus, PSSI retained the rights to all intellectual property developed during the project, including the system and the underlying source code for TeleTrend.

14. The TeleTrend system manages customer interaction workflow among telemarketers, customer service representatives, and loan officers across the enterprise. TeleTrend also interfaces with predictive dialers that generate calls to customers campaigned by TeleTrend.

15. TeleTrend was unique in its concept and in its ability to potentially generate huge revenue for mortgage companies. The bottleneck in a mortgage company's call center is the number of people who can make calls. For the outbound activities of a call center — calling prospective customers — TeleTrend uses a proprietary database to determine which prospects are most likely to refinance their home or consolidate their existing debts into a mortgage loan. TeleTrend can sort through certain criteria such as the size of the current loan, the interest rate on the current loan, and the prospect's credit history. TeleTrend analyzes this data to determine the best prospects to call and the products they are most likely to be interested in purchasing.

---

16.     TeleTrend can transfer customer records dynamically from telemarketers to loan officers in specific branch locations or a central loan office, thus generating a sale with one phone call. This process dramatically increases the sales ratio. If the prospect picks up the phone or generates an inbound call, the TeleTrend system automatically matches the customer record to a telemarketer, customer service representative, or loan officer who then receives the call, and the information about the prospect immediately appears on the telemarketer's screen. The on-screen information includes the prospect's contact information, his or her credit history, the value of the prospect's house, the amount of the mortgage, and all previous contacts, including notes from previous calls, with this prospect. This allows for a selective, targeting marketing approach that has proven extremely effective and efficient.

17.     TeleTrend generated huge revenue for FirstPlus. FirstPlus was a "subprime lender" that targeted homeowners with less than perfect credit. As a result of TeleTrend, FirstPlus was able to grow from a 200 employee company to one with 4,000, placing billions of dollars in loans. Unfortunately, the default rate on those loans started to rise, and when banks began refusing to warehouse FirstPlus's loans, it collapsed. By that time, however, PSSI had several new customers who realized the huge potential of TeleTrend, including Federated Department Stores, Town & Country Home Finance, and the Defendant, NC Mortgage.

18.     PSSI's first sale to NC Mortgage was in 1998. That year a company called Prime West Funding, a subsidiary of NC Financial, bought thirty licenses. Soon thereafter, NC Financial saw the potential for TeleTrend to generate loans. NC Mortgage, therefore, bought an additional 110 licenses that year for a total of 140.

19.     In 2000, PSSI introduced a new product called LoanForce 2000 ("LoanForce"). LoanForce is an "enterprise prospect marketing solution" software package for the consumer

---

lending/mortgage banking vertical market. LoanForce has all of the important features of TeleTrend plus additional features tailored specifically to the mortgage business, such as built-in loan applications, Fannie Mae Standards, and mortgage tools. There is currently no other enterprise prospect marketing solution like LoanForce on the market designed for the mortgage banking industry.

20. PSSI sells licenses for the LoanForce software, for which customers pay specified license fees. All of PSSI's license agreements for its LoanForce software contain express nondisclosure provisions with respect to the LoanForce software. Specifically, these license agreements expressly provide that the customer may not sell, lease, license, or otherwise communicate the LoanForce software to any other person, and that the customer may not reverse engineer, decompile, or derive the source code of the LoanForce software. Since the LoanForce software was originally developed, PSSI has expended substantial amounts for research and development in order to improve and update the LoanForce software. The LoanForce software that is the subject of this litigation presently accounts for a substantial percentage of PSSI's total revenues.

21. The LoanForce software contains a substantial amount of material wholly original with PSSI and is copyrightable subject matter under the laws of the United States. PSSI has complied in all respects with the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and all other laws governing copyright, has three registered copyrights and several additional pending copyright applications for the LoanForce software.

22. Since PSSI developed the LoanForce software, PSSI has placed a copyright notice on all copies of the LoanForce software that it has produced or licensed. Any copies of the LoanForce software published by PSSI, or under PSSI's authority or license, have been published in strict conformity with the provisions of the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and all

---

other laws governing copyright. Since the development of the LoanForce software, PSSI has been and still is the sole proprietor of all of its rights, title, and interest in and to the copyrights in the LoanForce software.

23.     PARAGRAPH PREVIOUSLY FILED UNDER SEAL

24.     PARAGRAPH PREVIOUSLY FILED UNDER SEAL

25.     PARAGRAPH PREVIOUSLY FILED UNDER SEAL

26.     The retail price for the complete suite of LoanForce is at least $5,500.00 per user license. Retail Upgrade price for LoanForce from TeleTrend is at least $3,500.00 per user license. Annual Subscription for the complete suite of LoanForce is at least 35% of retail list price ($5,500.00) or $1,925.00 per user license. The subscription price covers the full suite user licenses, including future upgrades and minor enhancements to the product. Annual Regular Maintenance Subscription for the full suite LoanForce product is at least 18% of retail list price ($5,500.00) or $990.00 per user license.

**B.     New Century and the Unscrupulous Copying of LoanForce**

27.     According to its own press releases, NC Financial is a "leading nationwide specialty mortgage banking company that, through its subsidiaries, originates, purchases, sells, and services residential mortgage loans secured primarily by first mortgages on single-family residences." In that line of business, an enterprise prospect marketing solution like LoanForce is critical. When PSSI debuted LoanForce, NC Mortgage, one of the subsidiaries through which NC Financial markets, wanted the upgrade.

28.     In November 2000, PSSI proposed the following to NC Mortgage: instead of paying an upgrade price of $3,500 per user license and annual subscription of $1,925, PSSI offered a

renewable annual subscription agreement for a nominal fee ($135 per user) to upgrade their 140 TeleTrend user licenses to LoanForce. PSSI also agreed to charge only this nominal fee in exchange for a favorable reference. However, the subscription for the LoanForce upgrade would remain active only if NC Mortgage continued to pay the annual regular maintenance subscription fees for the TeleTrend product. This proposal represented a substantial discount and was a professional courtesy offered to NC Mortgage because they were one of PSSI's first customers. NC Mortgage accepted this offer and upgraded to LoanForce.

29.     Rick Welding is Vice President of Sales and Marketing for PSSI. Mr. Mandel and Mr. Welding called or visited both Kirk Redding and Frank Nese, senior managers at NC Mortgage, once every two months from 2000 to mid-2002 to ask about company growth plans and needs for additional user licenses. At every such meeting, Mr. Redding and Mr. Nese would tell them that NC Mortgage did not need any additional licenses. They claimed that NC Mortgage's growth was coming from other divisions, particularly the wholesale division and retail branches.

30.     In November 2001, Mr. Redding and Mr. Nese approached PSSI to discuss the potential purchase of an additional 600 licenses for their retail branches. PSSI offered them a very low promotional price of $500 per user license plus $175.00 for both silver support and upgrade annual subscription. PSSI offered this special price as a professional courtesy because NC Mortgage was PSSI's second customer, and PSSI believed that it had a good business relationship with Mr. Nese and Mr. Redding and that they would give PSSI an excellent reference.

31.     Two weeks after PSSI's proposal, Mr. Redding called PSSI and claimed that Pat Rank, Executive Vice President of Retail for NC Financial, and Mr. Nese rejected the offer because of budgetary reasons. That same month, the Defendants cut-off PSSI's remote access to NC

---

FIRST AMENDED COMPLAINT                                                      8.

Mortgage's LoanForce system. There was now no way for PSSI to monitor NC Mortgage's use of the software or to provide the highest quality software support remotely.

32.     Also in November 2001, there was a high-level meeting in Mr. Redding's office. Present at the meeting were Mr. Redding, Mr. Nese, Anne Breuer, and an NC Mortgage attorney named "Theo." Mr. Nese wanted to discuss the technical and legal feasibility of simply copying LoanForce by deriving its source code. It was explained to him by others present in the room that it was technically feasible. Attorney Seo, though acknowledging that such activities would be a violation of the license agreements and illegal, said, "Go for it."

33.     Bill Chan, Thuy Cure, and John Shepard conducted the illegal activities of deriving LoanForce's code, pirating licenses, and instructing people in NC Mortgage's IT department to begin replicating LoanForce. This process began in earnest in November 2001. There were specific instructions from Frank Nese that no one was to tell anyone from PSSI about the new system.

34.     Oblivious to the plot hatched by Mr. Nese to replicate LoanForce, Mr. Mandel continued his efforts to sell additional licenses to NC Mortgage. The need was clearly there. It was obvious to everyone at PSSI that NC Mortgage was growing and needed more licenses. In January 2002, Mr. Mandel and Mr. Welding met again with Mr. Redding. They explained to Mr. Redding that under the current 140 license agreements, the retail branches could not access the LoanForce database without purchasing new user licenses. Mr. Mandel called Mr. Nese and Mr. Rank immediately after talking to Mr. Redding. They both said that they needed to evaluate the value of LoanForce at NC Mortgage branches and assigned Bill Chan, a consultant to NC Mortgage, to evaluate LoanForce and other applications. From January 2002, Mr. Mandel and Mr. Welding visited Mr. Chan regularly, and Mr. Chan consistently requested information about

---

LoanForce. PSSI had no idea that Mr. Chan was asking these questions to help in the development of a new program to allow unauthorized access to LoanForce and eventually copy LoanForce.

35. In March 2002, Mr. Chan told Mr. Mandel that NC Mortgage decided to use a new third-party Loan Origination System (LOS) in retail branches for marketing and would not need LoanForce. This seemed odd because LOS systems are generally designed for processing loans, not sales and marketing like LoanForce. Yet PSSI still did not suspect any foul play.

36. On December 18, 2002, Mr. Mandel and Mr. Welding visited Mr. Nese to discuss 2003 budget and needs for additional user licenses. Mr. Nese replied that NC Mortgage did not anticipate much growth in his area of business and the current 140 licenses would be plenty for his central operation. Mr. Nese also referred Mr. Mandel and Mr. Welding to Jeff Lemieux, currently COO of eConduit.com, a company NC Financial acquired in the beginning of 2002. Mr. Lemiex is currently in charge of purchasing technology. Mr. Nese said all future license purchases must go through Mr. Lemieux.

37. On December 18, 2002, Mr. Mandel and Mr. Welding visited with Rick Cervantes, Manager of Telemarketing for NC Mortgage, and asked him about growth in his department. Mr. Cervantes told Mr. Mandel and Mr. Welding that the department has plans to grow by fifty users *per month* in 2003. Mr. Mandel and Mr. Welding asked Frank Nese to confirm this. Mr. Nese denied it. The trust between the individuals was breaking down.

38. On December 19, 2002, Mr. Mandel visited with Mr. Lemieux for the first time. Mr. Mandel explained to Mr. Lemieux the current situation with LoanForce and the current count of purchased licenses. Mr. Mandel then asked Mr. Lemieux about the growth and potential need for more licenses. Mr. Lemieux replied that he would like to see a more centralized environment

at NC Mortgage and that LoanForce could be a great fit. He said that since Mr. Redding was no longer in the company, there would be no more opposition to centralization of operations within one central system and that the central system would likely be LoanForce. Mr. Lemieux asked PSSI to send him the copies of the contract and more product documentation, which PSSI did. Mr. Lemieux also asked if PSSI could make an exception to the regular practice of annual subscription prices and let NC Mortgage pay twenty percent of the current subscription for 2003 by the end of 2002 and the rest by January 20, 2003. Although Mr. Mandel agreed, PSSI never received either of those two payments. As of January 1, 2003, NC Mortgage is in default of payment for current subscription for 2003 (140 licenses). Despite an additional thirty day demand for payment sent January 6, 2003, PSSI has received no payments.

39.     NC Financial is a NASDAQ 100 Financial Company based in California with $700,000,000 market capitalization. Since 1998 NC Mortgage has grown almost eight-fold, but it has never purchased additional user licenses. Just in 2002 alone, NC Mortgage's revenue grew 400% and the stock price rose by 350% going from $10 to $35. The Retail lending division that uses LoanForce originated at least *$14 billion* in loans in 2002. NC Financial and NC Mortgage are enjoying their success and are now housed in a large glass building in Irvine, California.



NC Financial and NC Mortgage clearly did not achieve this level of success with just 140 telemarketers. PSSI saw the huge increase in the level of loans and the swelling in the ranks of NC Mortgage's telemarketers, customer service representatives, and loan officers. Something was definitely going on, and in December 2002, PSSI discovered what it was.

**C.     PSSI Discovers LoanTrack**

40.     PARAGRAPH PREVIOUSLY FILED UNDER SEAL

41.     PARAGRAPH PREVIOUSLY FILED UNDER SEAL

42.     On January 17, 2003, the results of runs from the USERACTIONS table were sent to PSSI. The results of these runs further confirmed that at least 380 concurrent users logged into the system. Concurrent users are users who use the same computer to log in. The LoanForce licenses are strictly a *non-concurrent* user licenses. These concurrent users had 528 distinct user transactions.

43.     And while the number of user names is clearly in excess of the 140 licenses, the actual number of users is actually much higher still. There is one user name, "central," that generated approximately 15,000 transactions during a six-week period. That is more than twenty times the average number of transactions for a given username and indicates that multiple people are logging on using this username. There are about twenty usernames with the same characteristics as "central," indicating that the actual number of users is far higher than the number of usernames. The license agreements with NC Mortgage are on a per user basis. Thus, PSSI is informed and believes that NC Mortgage has and is pirating upward of *1,000 user licenses*. At full retail price, that comes to $5.5 million in initial license fees alone. And since all of the pirated licenses have benefited from the subscription agreement, the additional annual cost of the

subscription for these licenses totals $1.925 million. Finally, the cost of support, which the Defendants have received, is 18% of the license fees, or $990,000 per year.

44. PARAGRAPH PREVIOUSLY FILED UNDER SEAL

45. PARAGRAPH PREVIOUSLY FILED UNDER SEAL

**D.      mLOS — Planned Replacement of LoanForce with a Pirated System**

46. The final step for complete piracy of LoanForce is the development of a system like Loan Track that can interact with a dialer. Mr. Lemieux and his team at Defendant eConduit have been and still are building such a system in conjunction with a dialer vendor to replace LoanForce system in Telemarketing and customer service representative ("CSR") divisions. The Defendants call this system mLOS, which stands for "Marketing Loan Origination System" or mLAS, which stands for "Marketing Loan Acquisition System." They are building mLOS by deriving LoanForce's features and database code.

47. In January 2003, Mr. Lemieux presented a demo of MLOS to several NC Mortgage employees. That demonstration showed that the user interface of MLOS is identical to LoanForce's interface.

**E.      Lemeiux and Nese Stall for Time — January 28, 2003 Teleconference**

48. On January 28, 2003, Mr. Mandel and Mr. Welding from PSSI conducted a conference call with Mr. Lemieux and Mr. Nese. In order to stall the cancellation of the LoanForce license agreements before mLOS was ready, Mr. Lemieux proposed to evaluate LoanForce and/or TeleTrend for eConduit's thirty-agent call center. eConduit is an outsourced collections agency and wholly owned subsidiary of NC Financial. eConduit also manages information technology for NC Financial and its subsidiaries in the Point of Sale (POS) area. eConduit, therefore, is intimately involved in the development of applications integrating to LoanForce.

---

49.     During this call, Ed Mandel asked Frank Nese point blank what LoanTrack was and how it operated. In response to this question, Mr. Nese simply lied. He stated that LoanTrack was just a graphical user interface for POS between loan officers and "Uniform," which was NC Mortgage's old Loan Origination System ("LOS"). He said that it "had nothing to do with LoanForce."

50.     Mr. Nese further added that LoanForce is still used in Central Retail by loan officers, but that it is not used in the branch network. Based on the queries sent to PSSI, however, it is obvious that both Central and the branches use LoanTrack to access LoanForce.

51.     Mr. Nese explained that there are currently 100 Loan officers in Central and 420 in the branches. He then explained that "branches are in stone age, without any technology." Amazingly, he claimed that all reports for the branches are done using the LOS. The queries make it obvious that the NC Mortgage collects data in LoanForce via LoanTrack to report for the branches. Furthermore, Mr. Nese and Mr. Redding instructed developers to design the LoanTrack graphical user interface to match the LoanForce interface so that loan officers in the branches "would not be confused." The loan officers in the branches are clearly familiar with LoanForce though pirated use of the program.

52.     The expansion of LoanForce into the branches and eConduit was the "carrot" held out to PSSI to get PSSI to extend the 140 LoanForce licenses until mLOS can be completed. Jeff Lemieux, who is actually heading up the effort to replace LoanForce, told Ed Mandel during the conference call that he recommended that NC Financial "look into using LoanForce in the branches."

53.     Frank Nese stated that there are now two divisions at NC Mortgage — Central Retail and the branches. Mr. Nese further stated that Carl Vernon, who now runs the Central Retail division

and some of the branches "does not even understand technology and has never seen anything like LoanForce." The lies during this teleconference were absolutely unbelievable to Ed Mandel and Rick Welding who had the results of the queries right in front of them.

54. Ed Mandel then asked how the loan officers in the branches received leads. Frank Nese replied that Telemarketers transfer leads to Loan Officers in the branches over an e-mail system built by Anne Breuer called LeadExpress. LeadExpress, as explained by Mr. Nese, takes information from LoanForce and automatically creates an e-mail. The Telemarketer then sends the e-mail to a Loan Officer and transfers the phone call. He claimed that Loan Officers in the branches never access the LoanForce database, just receive the emails. The results of the queries, however, clearly demonstrate that this was a blatant lie. Furthermore, even if it did work just as explained by Mr. Nese, that would still be a violation of the license agreements since the automatically generated emails were effectively allowing someone else to access the information in LoanForce. When Mr. Mandel asked Mr. Nese to clarify how this all worked exactly, he stated, "I don't know how the God damn thing works."

55. Ed Mandel then asked how LoanTrack interacts with Lead Express. Mr. Nese reiterated that LoanTrack is really just an interface between Loan Officers and Uniform, the current POS system. Mr. Lemieux admitted that LoanForce is critical to NC Mortgage. Mr. Lemieux claimed that he wanted to find out if LoanForce could "fill the gap" between TeleMarketers and Loan Officers in the branches. Mr. Lemieux, of course, knew that it was already filling the gap with the help of LoanTrack.

56. After Mr. Lemieux's attempt to mollify PSSI with talk about other potential business, the conversation finally turned to the late subscription payments. The subscription payments are paid annually, and NC Mortgage currently owes for the entire year of 2003. Mr. Nese and Mr.

Lemieux plan, however, to replace LoanForce with mLOS in late March or April. They therefore wanted to stall PSSI without having to pay for the entire year.

57.    To solve their problem, Mr. Nese and Mr. Lemieux claimed that once they evaluated their requirements, they would likely need many additional licenses. They therefore claimed that it was best that they just make a partial or monthly payment on their current licenses until they could evaluate their current needs. This makes no sense if their true plans were to buy *more* licenses, as a full year's payment for the current licenses would be part of any service expansion. Their true plans are to replace LoanForce with pirated software.

**F.    Summary of Factual Allegations**

58.    Between November 2001 and the present, NC Mortgage has had users far in excess of the 140 allowed under its agreements with PSSI, without the knowledge or consent of PSSI.

59.    NC Mortgage, in conjunction with eConduit and other Defendants, has unlawfully used, reverse engineered, and copied the LoanForce software to develop its own product or products that NC Mortgage would attempt to use in lieu of PSSI products. NC Mortgage's copied software systems are known as LoanTrack and mLOS and, upon information and belief, are virtually identical to Loan Force.

60.    NC Mortgage, in conjunction with eConduit and other Defendants, knowingly and willfully reverse-engineered and copied PSSI's LoanForce software. The Defendants did this with the specific purpose of duplicating this operating system and infringing PSSI's copyrights relating to the LoanForce software.

61.    By copying PSSI's LoanForce software, NC Mortgage, in conjunction with eConduit and other Defendants, has developed, or is in the process of developing, one or more products or

portions thereof which are identical or substantially similar to PSSI's LoanForce software in their underlying logic, structure, organization and sequence, as well as in various other respects.

62. By copying PSSI's LoanForce software, NC Mortgage, eConduit, and other Defendants replicated code, programs, or portions thereof, that are identical or substantially similar to significant elements of LoanForce, including LoanForce's underlying logic, structure, organization, and sequence.

63. NC Financial controlled, directed, and supervised their subsidiary NC Mortgage during the relevant time period, and was responsible during that period for NC Mortgage's actions.

64. The natural, probable, and foreseeable result of Defendants' conduct has been and will continue to be to deprive PSSI of business and the licensing of its LoanForce software, to deprive PSSI of goodwill, to injure PSSI's relations with prospective customers, and to impose substantial expenses on PSSI to counteract the aforesaid conduct.

65. PSSI has lost or will lose license revenues for its LoanForce software, and has sustained or will sustain damages as a result of the Defendants' wrongful conduct and their use and any marketing of any infringing products. The Defendants' wrongful conduct has also deprived and will continue to deprive PSSI of opportunities for expanding its goodwill.

66. Because NC Mortgage has not incurred the substantial research and development costs and other overhead expenses associated with developing and improving the LoanForce software, NC Mortgage will be able to market, if it chooses to do so, its infringing products at lower license fees than those PSSI must charge for its LoanForce software. As a result, the marketing of any infringing products will artificially erode the price that potential customers will be willing to pay for the LoanForce software.

---

67. Defendants have been unjustly enriched by their copying, use, and marketing of the LoanForce software and works derived from the LoanForce software.

68. PSSI is informed and believes and based thereon alleges that unless enjoined by this Court, Defendants intend to continue their course of conduct, and to wrongfully use, infringe upon, and otherwise profit from, as well as perhaps selling or licensing, PSSI's LoanForce software and works derived therefrom. As a direct and proximate result of the acts of the Defendants alleged above, PSSI has already suffered irreparable damage and has sustained lost profits. PSSI has no adequate remedy at law to redress all of the injuries the Defendants have caused and intend to cause by their conduct. PSSI will continue to suffer irreparable damage and to sustain lost profits unless and until this Court enjoins the Defendants' actions alleged above.

## IV.
## CAUSES OF ACTION

**A.   FIRST CAUSE OF ACTION -- COPYRIGHT INFRINGEMENT**
**17 U.S.C. § 101, *et seq.***

69. PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

70. By means of the actions complained of herein, Defendants have infringed and will continue to infringe PSSI's copyrights in and relating to the LoanForce software, by producing and using the LoanTrack and mLOS software which was copied from PSSI's copyrighted LoanForce software. Also by means of the actions complained of herein, Defendants have infringed and will continue to infringe PSSI'S copyrights in and relating to the LoanForce software, by having users far in excess of the number allowed under their agreements with PSSI.

71. PSSI is entitled to an injunction restraining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in further such acts in violation of the copyright laws.

72. PSSI is further entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged. The amount of actual damages cannot be determined at this time, but are believed to be in excess of $10 million just due to the unauthorized users of the LoanForce system. PSSI is further entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged. These amounts include any points or origination fees earned by loan officers from making loans to prospects generated through LoanTrack and other illegal uses of LoanForce. PSSI at present is unable to ascertain the full extent of these gains, profits, and advantages Defendants have obtained by reason of their acts of copyright infringement, but believes that those gains, profits, and advantages are hundreds of millions of dollars. PSSI is further entitled to recover its attorneys' fees for the bringing of this action under the Copyright Act of 1976.

## B. SECOND CLAIM FOR RELIEF --- MISAPPROPRIATION OF TRADE SECRETS

73. PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

74. Because PSSI's LoanForce software contains information which is novel and which is not generally known to PSSI's competitors or the public or to other persons who can obtain economic value from its disclosure or use, is the subject of efforts by PSSI to maintain its

---

secrecy, and derives independent economic value and affords PSSI an economic advantage because it is not generally known, such information constitutes "trade secrets" under Texas law.

75.     NC Mortgage, in conjunction with eConduit and other Defendants, and without authorization from PSSI, misappropriated PSSI'S trade secrets in its LoanForce software by acquiring and misusing those trade secrets when it owed a contractual duty to PSSI to maintain the secrecy of PSSI's trade secrets or to limit their use.

76.     By reason of the foregoing acts and conduct of the Defendants, PSSI will suffer great and irreparable harm and damage, which will be difficult to ascertain, and PSSI will be without an adequate remedy at law.

77.     PSSI is entitled to an injunction restraining the Defendants, their officers, agents, employees, and all persons acting in concert with them, from engaging in further such unlawful acts and from reaping any additional commercial advantage from their misappropriation of PSSI's trade secrets.

78.     PSSI is further entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged. The amount of such damages cannot be determined at this time, but are believed to be in excess of $10 million just due to the unauthorized users of the LoanForce system.  PSSI is further entitled to recover from Defendants the gains, profits and advantages they have obtained as a result of their wrongful acts as hereinabove alleged. PSSI at present is unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their misappropriation of trade secrets, but believes that those gains, profits, and advantages are hundreds of millions of dollars.

---

79. Defendants' acts of misappropriation were both willful and malicious, and therefore PSSI is entitled to enhanced and exemplary damages against each such Defendant.

## C. THIRD CLAIM FOR RELIEF --- ILLEGAL MISAPPROPRIATION OF INTELLECTUAL PROPERTY

80. PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

81. PSSI'S LoanForce software contains information which is novel and which is not generally known to PSSI's competitors, the public, or to other persons who can obtain economic value from its disclosure or use, is the subject of efforts by PSSI to maintain its secrecy, and derives independent economic value from not being generally known.

82. NC Mortgage acquired PSSI's intellectual property under license agreements with PSSI. These agreements specifically provide for the confidentiality of such intellectual property. Despite express agreement to keep such intellectual property confidential, NC Mortgage, in conjunction with eConduit and other Defendants, adopted and made use of PSSI's intellectual property in developing and using the LoanTrack and mLOS systems. Upon information and belief, NC Mortgage has disclosed PSSI's proprietary, confidential source code to third parties who aided and continue to aid NC Mortgage in the duplication of PSSI's software.

83. PSSI is entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged. The amount of such damages cannot be determined at this time, but are believed to be in excess of $10 million just due to the unauthorized uses of the LoanForce system. PSSI is further entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged. PSSI at present is unable to ascertain the full extent of the gains, profits,

---

FIRST AMENDED COMPLAINT

21.

and advantages Defendants have obtained by reason of their misappropriation of intellectual property, but believes that those gains, profits, and advantages are hundreds of millions of dollars.

84. Defendants' acts of illegal misappropriation of intellectual property were both willful and malicious, and therefore PSSI is entitled to enhanced and exemplary damages against each such defendant.

**D.  FOURTH CLAIM FOR RELIEF --- BREACH OF CONTRACT**

85. PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

86. PSSI's agreements with respect to the LoanForce software constituted valid and existing agreements with NC Mortgage.

87. NC Mortgage breached the contracts described above by, among other things,

    (i)       failing to pay subscription fees when due;

    (ii)     having users in excess of the number allowed;

    (iii)    by copying PSSI's LoanForce software into its LoanTrack and mLOS software, which are identical or substantially similar to PSSI's LoanForce software in their underlying logic, structure, organization and sequence, as well as in various other respects;

    (iv)    failing and refusing to allow PSSI to conduct an audit of its use of the LoanForce software; and

    (v)     disclosed PSSI's software source code to third parties.

88.     By reason of the foregoing acts and conduct of NC Mortgage, PSSI is entitled to recover from such Defendant the damages sustained by it as a result of Defendant's acts as alleged above, in an amount in excess of $10,000,000.00, together with a reasonable attorneys' fee pursuant to section 38.001(8) of the Texas Civil Practice & Remedies Code.

**E.     FIFTH CLAIM FOR RELIEF --- SPECIFIC PERFORMANCE OF CONTRACTUAL AUDIT RIGHTS**

89.     PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

90.     Under PSSI's agreements with NC Mortgage, it has the right to audit NC Mortgage's use of the LoanForce software.

91.     In violation of such agreements, NC Mortgage has failed and refused to allow such an audit despite a request for it in accordance with the agreements.

92.     By reason of the foregoing acts and conduct of the Defendants, and pursuant to its agreements with NC Mortgage, PSSI is entitled to specific performance of its audit rights.

93.     Furthermore, PSSI is entitled to an injunction restraining the Defendants, their officers, agents, employees, and all persons acting in concert with them, from destroying or concealing any documents or computer records, including "back-up discs" that would be necessary for such an audit.

**F.     SIXTH CLAIM FOR RELIEF --- CONVERSION**

94.     PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

---

95.    As alleged in paragraph 74, the source code for LoanForce is confidential and constitutes "trade secrets" under Texas law.

96.    At all times, PSSI owned, possessed, and had the right of immediate possession of the LoanForce system and source code.

97.    By replicating the tables, processes, and functions of LoanForce in LoanTrack, as well as using LoanForce's source code in LoanTrack and mLOS, the Defendants have wrongfully exercised dominion or control over LoanForce, causing injury to PSSI.

98.    PSSI is entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged. The amount of such damages cannot be determined at this time, but are believed to be in excess of $10 million. PSSI is further entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged. PSSI at present is unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their wrongful conduct, but believes that those gains, profits, and advantages are many millions of dollars.

99.    Defendants' acts of conversion were both willful and malicious, and therefore PSSI is entitled to exemplary damages against each such defendant.

## G.    SEVENTH CLAIM FOR RELIEF --- DECLARATORY RELIEF

100.    PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

101.    An actual, justiciable controversy exists between PSSI, on the one hand, and the Defendants on the other with regard to their respective rights.

---

102.    First, PSSI seeks a declaration that as of the filing of this Complaint, NC Mortgage is in default of its agreements with PSSI because, among other things, NC Mortgage:

      (i)     failed to pay subscription fees when due;

      (ii)    has had users in excess of the number allowed;

      (iii)   copied PSSI'S LoanForce software into its LoanTrack and mLOS software, which are identical or substantially similar to PSSI'S LoanForce software in their underlying logic, structure, organization and sequence, as well as in various other respects; and

      (iv)    failed and refused to allow PSSI to conduct an audit of its use of the LoanForce software; and

      (v)     disclosed PSSI's software source code to third parties.

103.    Second, PSSI seeks a declaration that, due to the foregoing defaults, all license and subscription obligations on the part of PSSI are terminated and neither NC Mortgage or any of the other Defendants have any rights to use the LoanForce software.

104.    Third, PSSI seeks a declaration that the acts of the Defendants in duplicating the tables and functions of LoanForce in LoanTrack, deriving the LoanForce software code and incorporating it into LoanTrack and mLOS, and incorporating a copy of LoanForce's graphical user interface into LoanTrack and mLOS constitute Copyright Infringement under 17 U.S.C. § 101 *et seq.*

105.    Further, PSSI seeks an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

## H.    EIGHTH CLAIM FOR RELIEF — FRAUD

106.    PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

107.    Defendants Nese and Lemieux, individually and in their capacity as agents and officers of the other Defendants, made the following material representations to PSSI:

(i)     NC Mortgage was not growing or expanding the number of telemarketers, customer service representatives, or loan officers;

(ii)    Loan officers in the branches were not accessing the LoanForce database;

(iii)   The LoanTrack system is not tied into LoanForce and has "nothing to do" with LoanForce;

(iv)    NC Mortgage and eConduit intended to purchase additional licenses if Plaintiff allowed NC Mortgage to pay for its current licenses on a pro-rated basis and postponed cancellation of NC Mortgage's current licenses; and

(v)     NC Mortgage was only had 140 users accessing LoanForce.

108.    These representations were false, and the Defendants knew that they were false at the time the representations were made.  Furthermore, the Defendants intended that PSSI rely on these statements.

109.    PSSI relied on these statements and based on that reliance did not cancel NC Mortgage's license agreement, did not seek to enforce their contract rights, allowed removal of remote access, and continued providing software support.  Much of the software support requested by the Defendants was simply a ruse to get more technical information to aid Defendants in constructing LoanTrack and mLOS using code illegally derived from LoanForce.

110. These representations injured PSSI in that PSSI's reliance thereon allowed Defendants to build a duplicate system from illegally derived software code, misappropriate PSSI's trade secrets, misappropriate PSSI's intellectual property, and violate PSSI's copyrights. These misrepresentations and PSSI's reliance thereon also postponed PSSI's discovery of the Defendants' illegal activities and thus the termination of Defendants' use of LoanForce and initiation of litigation.

111. PSSI is entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged. The amount of such damages cannot be determined at this time, but are believed to be in excess of $10 million. PSSI is further entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged. PSSI at present is unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their wrongful conduct, but believes that those gains, profits, and advantages are many millions of dollars.

112. There is at least clear and convincing evidence of Defendants' fraud, and therefore PSSI is entitled to exemplary damages against each such Defendant.

I.    **NINTH CLAIM FOR RELIEF—DIGITAL MILLENIUM COPYRIGHT ACT**

113. PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

114. By means of the actions complained of herein, the Defendants, individually and in concert, have circumvented and will continue to circumvent at least one technological measure, including the user ID and password security measures pertaining to the USERADMIN table, that

effectively controls access to PSSI's copyrights in and relating to the LoanForce software, all in violation of at least § 1201 of the Digital Millennium Copyright Act of 1998.

115.   PSSI is entitled to preliminary injunction, permanent injunction, and impounding under §1203 of the Digital Millennium Copyright Act of 1998 against Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in further such violations.

116.   PSSI is further entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged, pursuant to § 1203 of the Digital Millennium Copyright Act of 1998, including but not limited to:  (A) actual damages, the exact amount of which cannot be ascertained at this time, but are believed to be in excess of $100 million just due to the unauthorized users of the LoanForce system; (B) profits from the Defendants' gains and advantages they have obtained as a result of their wrongful acts as hereinabove alleged, including but not limited to any points or origination fees earned by loan officers from making loans to prospects generated through LoanTrack and other illegal uses of LoanForce, the exact amount of which cannot be ascertained at this time, but are believed to be in the hundreds of millions of dollars; (C) attorneys' fees and costs; (D) at PSSI's election, statutory damages of $2,500 for each violative act of circumvention; and (E) trebled damages for repeated violations under § 1203(c)(4).

## J.   TENTH CLAIM FOR RELIEF – CIVIL CONSPIRACY

117.   PSSI realleges each and every allegation set forth in Paragraphs 1 through 68, inclusive, and incorporates them by reference herein.

118.    There was a meeting of the minds between the Defendant NC Mortgage, the other Defendants, and others individuals and entities, both known and unknown, to commit several unlawful acts, including, but not limited to, copyright infringement, misappropriation of trade secrets, misappropriation of intellectual property, and conversion. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause PSSI damages as previously set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, PSSI prays for judgment against the Defendants as follows:

1.    That Defendants each be held to have infringed PSSI's copyrights in its LoanForce software;

2.    That Defendants, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined, during both the pendency of this action and on a permanent basis, from directly or indirectly infringing PSSI's copyrights in its LoanForce software or continuing to use, market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop, use or manufacture any works derived or copied from the LoanForce software, including but not limited to the LoanTrack and mLOS software, or to participate or assist in any such activity;

3.    That Defendants, their directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined, during both the pendency of this action and on a permanent basis, to return to PSSI any originals, copies, facsimiles, or duplicates of the LoanForce software in their possession, custody or control;

---

4. That Defendants be enjoined, during both the pendency of this action and on a permanent basis, to recall from all distributors, wholesalers, jobbers, dealers, retailers, non-PSSI-licensed customers and distributors, and all others known to Defendants any originals, copies, facsimiles, or duplicates of any works shown by the evidence to infringe any PSSI copyright;

5. That Defendants each be enjoined to deliver upon oath, to be impounded during the pendency of this action, and for destruction pursuant to judgment herein, all originals, copies, facsimiles, or duplicates of any work shown by the evidence to infringe any PSSI copyright;

6. That Defendants each be held to have misappropriated PSSI'S trade secrets;

7. That Defendants each be held to have illegally misappropriated PSSI's intellectual property;

8. That NC Mortgage be held to have breached their agreements with PSSI with respect to the LoanForce software;

9. That an award of specific performance be entered against Defendants as described herein and that Defendants each be enjoined from destroying or concealing any documents or computer records, including "back-up discs" that would be necessary for such an audit;

10. That Defendants each be held liable for the conversion of PSSI's property and for committing a fraud upon PSSI;

11. That declaratory relief issue as prayed for herein;

12. That Defendants each be required to file with the Court and to serve on PSSI, within 30 days after service of the Court's order as herein prayed, a report in writing under oath setting forth in detail the manner and form in which Defendants each complied with the Court's order;

---

13. That judgment be entered for PSSI against Defendants, for PSSI'S actual damages according to proof, and for any additional profits attributable to infringements of PSSI'S copyrights, in accordance with proof; or alternatively, that judgment be entered for PSSI and against Defendants, for statutory damages based upon Defendants' acts of infringement, pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* or the Digital Millennium Copyright Act, 17 U.S.C. §1203;

14. That Defendants each be required to account for all gains, profits, and advantages derived from their acts of infringement and for their other violations of law;

15. That all gains, profits, and advantages derived by Defendants from their acts of infringement and other violations of law be deemed to be in constructive trust for the benefit of PSSI;

16. That judgment be entered for PSSI and against Defendants, for enhancement or trebling of the damages awarded to the fullest extent permitted by law;

17. That PSSI be awarded punitive, enhanced, and exemplary damages against Defendants;

18. That PSSI have judgment against Defendants for its costs and attorneys' fees; and

19. That the Court grant such other, further, and different relief as the Court deems just and proper under the circumstances.

---

FIRST AMENDED COMPLAINT                                                                 31.

Respectfully submitted,

SHORE ★ DEARY, L.L.P.


**W. RALPH CANADA, JR.**
State Bar No. 03733800
**MICHAEL W. SHORE**
State Bar No. 18294915
**KENNETH E. SHORE**
State Bar No. 24027972
**ALFONSO GARCIA CHAN**
State Bar No. 24012408
2515 McKinney Avenue
Suite 1565
Dallas, Texas 75201
(214) 292-2600
(214) 739-3879 (fax)

**JOE KENDALL**
Texas Bar No. 11260700
**PROVOST ★ UMPHREY, L.L.P.**
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
tel. 214-744-3000
fax 214-744-3015

**OF COUNSEL:**

**STEVEN THRASHER**
State Bar No. 00797555
391 Sandhill Drive, Suite 1600
Richardson, Texas 75080
(972) 918-9312
(972) 231-2686 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on counsel for Defendants via hand-delivery this 27th day of February, 2002.

Barry C. Barnett
Susman Godfrey, L.L.P.
901 Main Street
Dallas, Texas 75202

W. Ralph Canada, Jr.