# EXHIBIT A



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

SEP 2 6 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| POSITIVE SOFTWARE SOLUTIONS, INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:03-CV-0257-N |
| NEW CENTURY MORTGAGE CORPORATION, *et al.*, | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Positive Software Solutions, Inc.'s ("Positive Software") motions to hold defendant New Century Mortgage Corp., *et al.* (collectively, "New Century") in contempt for violation of the Court's preliminary injunction and protective order, and its motion to vacate the arbitration award.[1]  The Court finds that New Century violated the protective order but that the protective order is not sufficiently clear and definite to be enforced by contempt. The Court also finds that the arbitrator failed to disclose a significant prior relationship with New Century's counsel. Because the failure to disclose that relationship creates a reasonable impression of partiality, the motion to vacate is granted.

---

[1]New Century has reciprocal motions to hold Positive Software in contempt and to confirm the arbitration award.

MEMORANDUM OPINION AND ORDER – PAGE 1

## I. NEW CENTURY'S VIOLATION OF THE PROTECTIVE ORDER WAS NOT CONTEMPTUOUS

The Court has great difficulty with New Century's conduct as disclosed in this Order. With considerable reluctance, however, the Court has determined that it should not address that conduct through the sanction of contempt.

### A. Factual Background[2]

*1. New Century and Positive Software's Prior Business Relationship.* – New Century is in the mortgage business. It generates business through telephone contacts with prospective borrowers. Positive Software developed a software product called "LoanForce," which provides automated support for that process, in conjunction with other third-party supplied software. In 2000, New Century licensed LoanForce from Positive Software (the "Software Subscription Agreement" or "SSA"). Among other things, the SSA provides that New Century acknowledges that LoanForce is Positive Software's proprietary business information and agrees to return all such proprietary information to Positive Software upon termination of the SSA.

In late 2002 and early 2003, Positive Software became aware of a new software package that New Century was using called LoanTrack, together with what are apparently databases called LFMoon and LTKMoon (collectively, "LoanTrack-1"). Although Positive

---

[2]This section comprises the Court's factual findings in connection with the motions for contempt. Much of the language is drawn from the Court's prior fact findings in connection with other motions. Positive Software established the facts found in this section by clear and convincing evidence.

MEMORANDUM OPINION AND ORDER – PAGE 2

Software was not aware of the fact at the time, it presently appears that LoanTrack-1 was an interim product that New Century intended to use as it made a transition away from LoanForce to new products called LoanTrack-2 and MLAS. New Century claimed that LoanTrack-2 and MLAS were developed partly by in-house programmers and partly by a contractor called eConduit,[3] and that the programmers worked in a "clean room" environment with no access to the LoanForce code; that claim was false.

The Software Subscription Agreement required annual renewal and payment of license fees. During 2002, New Century told Positive Software that New Century might want to expand its LoanForce license to include all of New Century's branch offices. During that same time, New Century was preparing its transition away from LoanForce with the development of LoanTrack-1 and LoanTrack-2. At the end of 2002, when renewal license fees were due, New Century asked Positive Software to defer full payment of the renewal fee and to consider alternative billing arrangements. Although Positive Software did not know it at the time, New Century did this in order to continue its use of LoanForce until New Century's replacement product was ready, without having to incur the full annual license fee for LoanForce.

Positive Software, unbeknownst to New Century, was investigating New Century's LoanTrack-1 project and had concluded that LoanTrack-1 was making improper use of Positive Software's intellectual property rights in LoanForce. Positive Software thus began

---

[3]New Century subsequently acquired eConduit.

MEMORANDUM OPINION AND ORDER – PAGE 3

to prepare for litigation with New Century. On January 1, 2003, New Century went into default under the Software Subscription Agreement. On January 6, 2003, Positive Software sent New Century demand for payment. New Century never made the payments required under the Software Subscription Agreement. On February 6, 2003, Positive Software declared the Software Subscription Agreement to be terminated. This litigation soon followed.

   2. *The Protective Order and Preliminary Injunction.* – To protect the parties' confidential information during the pendency of this action, the Court entered a protective order (the "Protective Order"), signed on April 28, 2003. The agreed Protective Order specifically identified the categories of individuals who were entitled to use or disclose confidential information produced in the case and expressly provided, *inter alia*, that no confidential information shall be disclosed to non-attorney employees of the receiving party. Protective Order at 4, ¶ 3 ("No disclosure of Confidential Information documents shall be made to other [non-lawyer] employees.").

   The Protective Order specifically prohibited New Century's outside counsel from disclosing Confidential Information to New Century employees. *Id.* at 4, ¶ 5 ("Nothing in this Order shall preclude or impede Outside Counsel's ability to communicate with or advise his or her client based on his or her review and evaluation of Confidential Information produced by the opposing party, <u>provided</u> that such communications or advice shall not disclose or reveal such Confidential Information.") (emphasis in original).

MEMORANDUM OPINION AND ORDER – PAGE 4

On the same day the Protective Order was entered, the Court also entered a

Memorandum Order and Opinion granting Positive Software's Motion for Preliminary

Injunction ("Preliminary Injunction") enjoining New Century from any use of the LoanForce

software, the LoanForce database, LoanTrack-1, LF_Moon, and LTK_Moon.[4] Preliminary

Injunction at 17.[5]

   *3. New Century's Representations That It Would No Longer Use or Possess the*

*LoanForce Software.* – New Century represented that the backup tapes and forensic copies

of LoanForce would be kept securely in the custody and control of New Century's counsel.

Norment Declaration at ¶ 10 (March 7, 2003) ("All these materials have been or will be

placed in a temperature controlled, secure location in the custody and control of legal

counsel."). In an April 21, 2003 letter to the Court, lead counsel for New Century affirmed:

---

[4]The Preliminary Injunction "further ORDERED that New Century delete or return all
LoanForce software, including application software and the LoanForce database, that New
Century has the ability to access (excepting materials produced in discovery for use in this
litigation and/or arbitration.)" Preliminary Injunction at 17. However, upon request from
Positive Software, that sentence was later vacated. *See* Order (April 29, 2003). Had that
language remained in the Preliminary Injunction, this would be a much shorter Order.

[5]On January 15, 2004, after the instant dispute came to light, the Court signed an order
clarifying the Protective Order to include within the definition of "confidential information":

> the original and all copies (whether maintained as forensic images, or backup
> tapes or disks, or any other format, documentary or electronic) of all or any
> portion of the LoanForce code (both application and database), regardless of
> how originally acquired, that are in the possession, custody or control of any
> of the Defendants, any person or entity affiliated with the Defendants, or any
> employee, contractor, or agent (including attorneys) of Defendants . . . .

MEMORANDUM OPINION AND ORDER – PAGE 5

•    New Century had no intention of ever again using LoanForce
     application software, the LoanForce database, LoanTrack, LF_Moon,
     or LTK_Moon.

•    New Century would, no later than April 25, 2003 and under Dr.
     Pooch's supervision, delete or return to [Positive Software] all
     LoanForce software, including application software and the LoanForce
     database that New Century has the ability to access.

•    New Century would not use LoanTrack-2 for telemarketing or any
     other commercial purpose before May 12, 2003.

Based on those steps, he further represented that additional injunctive relief requested by

Positive Software "is not necessary. New Century, under Dr. Pooch's supervision, has

removed any danger of imminent harm to [Positive Software's] legitimate interests."

On April 24, 2003, Dr. Udo Pooch stated that "New Century ceased using LoanTrack-

1 and the LoanForce database . . . commencing April 18, 2003." Amended Declaration of

Udo Pooch, ¶ 3. According to Dr. Pooch, as of April 18, 2003, "no New Century-Retail IT

personnel had access" to the data from the LoanForce database. *Id.* at ¶ 3. Dr. Pooch

personally "supervised and observed the deletion of LoanForce, LoanTrack, LTK Moon and

LF Moon. This was done following my direction and in my presence . . . ." *Id.* at ¶ 4.

Finally, Dr. Pooch affirmed, "[b]ased on my professional opinion, New Century has

satisfactorily cleansed itself of LoanForce, LoanTrack, LTK Moon and LF Moon." *Id.* at ¶ 5.

These representations were made while the Court was considering the scope of preliminary

injunctive relief and were intended to persuade the Court that no further injunctive relief was

necessary to protect Positive Software's installed software at New Century's facilities; the

representations did in fact affect the Court's decision on that issue.

MEMORANDUM OPINION AND ORDER – PAGE 6

*4. New Century's Continued Use of the LoanForce Software.* – Notwithstanding those representations, New Century continued to make use of LoanForce. New Century accidentally produced to Positive Software a copy of an analysis New Century performed of LoanForce and LoanTrack, which precipitated this dispute; New Century never intended to disclose that use and sought return of the accidentally produced document. Following that accidental production, New Century described its use of LoanForce to the Court, characterizing it as minimal. New Century Mortgage's Chief Technology Officer for its Retail Division, John Norment, admitted that he had access to Positive Software's confidential source code in November 2003:

> In November 2003, as part of New Century's trial preparation, and in order to assist New Century's counsel in the case, I created a workbook using Microsoft's Excel spreadsheet program that compared the Loanforce database schema to the database schema for products New Century had created, including the LFMoon database, the LTKMoon database, and the LoanTrack (for LoanTrack-1) database. In doing this work, I used the same database schema for the databases that New Century produced to Positive in this litigation on April 9, 2003. I did not use any material produced in this litigation by Positive.

Norment Declaration at ¶ 4.

In a subsequent letter to the Court, dated January 15, 2004, New Century's lead counsel provided additional information about Norment's access to the Loanforce database:

> [W]e understand that Mr. Norment first obtained access to the compact disks containing [the] LoanForce database on June 16, 2003, when he signed the CD out from the New Century legal department, which was maintaining the CD and the forensic images that had been created under the supervision of Dr. Pooch. Mr. Norment signed the CD back in on July 10, 2003. . . . Mr. Norment may have kept a copy of the CD's contents on his "personal" sector of a New Century server . . . .

MEMORANDUM OPINION AND ORDER – PAGE 7

In the same letter, lead counsel explained that "Mr. Norment suggested the idea of comparing the code and reporting the results to counsel, and counsel agreed that such a comparison might be useful and directed him to create it for purposes of investigating the facts underlying Positive [Software]'s allegations of copying." These representations substantially understate New Century's actual subsequent use of LoanForce.

    *5.*    *New Century's Actual Conduct.* — Following the foregoing revelations, the Court authorized discovery into New Century's use of Positive Software's software in the course of this litigation, and held that the attorney-client privilege and work product immunity were waived under the crime-fraud exception. To say that New Century was reticent in providing discovery would be extreme understatement. Following this discovery, a different picture of the facts and New Century's conduct has emerged.

    First, contrary to New Century's representations that all of LoanForce had been purged from their computer systems and placed under lock and key in their legal department, it appears that New Century maintained numerous copies of the LoanForce databases in New Century's backups, which could be restored by a simple request to New Century's help desk.[6]

---

[6]The Court is not suggesting that it was misled regarding the *existence* of backups. Indeed, preservation of existing backups and images was required by the Court's May 2, 2003 modification of the Preliminary Injunction, made at Positive Software's request. Rather the Court is saying that the subsequent *reinstallation* of the backups was inconsistent with New Century's representation that it had purged its computers of LoanForce. Admittedly, New Century's lead counsel's letter to the Court advising that LoanForce would be purged from New Century's computer systems did not say "and we won't put it back." At the hearing on the contempt motions, New Century's lead counsel appeared to latch onto this possible loophole, stating he believed that New Century's subsequent conduct was consistent with his representations to the Court in his letter. *See* 8/12/04 Trans. at 119. The Court rejects the

Second, contrary to New Century's representations that Norment merely obtained the forensic copy from the legal department and used it for a month to generate his analysis, it appears that seven or eight different backup copies of the LoanForce database were restored to New Century's servers for analysis. Norment directed Robert Haas to undertake to recreate LoanForce for Norment's use in litigation support activities. Haas obtained no fewer than seven different versions of the LoanForce database from backup tapes and restored them to New Century servers. Some of those servers were available to any New Century employee with general network privileges, including database programmers and architects.[7]

This project also involved the restoration of the LoanForce application software on the desktop computer of Norment's personal assistant, Alicia Espinoza on December 18-19, 2003, to create a fully-operational LoanForce system (which requires both the database component as well as the desktop application software). Only a week before, on December 11, 2003, Norment testified at deposition that all LoanForce application software had been deleted from New Century's computers. New Century's co-counsel was aware of both

---

notion that counsel can properly represent to the Court that his client will implement corrective measures, and therefore no further Court action is required, and then covertly "undo" the corrective measures; that is wholly inconsistent with a lawyer's duty of candor toward the Court. *See, e.g.,* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.03(a)(2), (b).

[7]Indeed, more recent analysis of electronic discovery suggests that the presence of and access to LoanForce may have been even more pervasive at New Century after April 28, 2003. This would appear to be a difficulty for New Century's "clean room" defense of LoanTrack-2. Because further consideration of the electronic discovery is not material to disposition of the instant motions, the Court will not address it further. New Century's motion to strike such materials is therefore denied as moot.

MEMORANDUM OPINION AND ORDER – PAGE 9

Norment's testimony and the subsequent reinstallation of the software on Espinoza's desktop and took no steps to correct Norment's deposition testimony. New Century's co-counsel was also well aware of the scope of Norment's investigation and failed to correct the misleading impression created by New Century's lead counsel's representations to the Court.[8]

Two additional points are worth noting, though they do not directly affect the contempt issues. First, Haas's ability to locate LoanForce materials from New Century's backup media stands in sharp contrast to New Century's representations to the Court of the difficulty involved in locating such materials when Positive Software was seeking them in discovery. Second, during the course of the Norment project, New Century located the script used to create the original LoanForce database delivered to New Century in November 2000. In the arbitration proceeding, Positive Software had consistently sought in discovery the earliest version of LoanForce available, including repeated requests in November and December of 2003. Discovery of the original version was significant because LoanForce evolved after it was delivered to New Century, and apparently Positive Software did not retain a copy in the "as delivered" state. Because New Century did not produce the original version to Positive Software, Positive Software had no opportunity to compare it to LoanTrack-2; instead, Positive Software based its testimony of infringement at the arbitration on a comparison with a version of LoanForce that had been modified by New Century. *The Arbitrator significantly discounted Positive Software's comparison testimony because of this*

---

[8]The record is not clear regarding whether New Century's lead counsel was aware of Norment's activities when they were taking place.

MEMORANDUM OPINION AND ORDER – PAGE 10

*perceived defect. See* Award at 52-53, 79-80, 81-82 ("Given the paucity of evidence in the record respecting the work in which copyright was originally claimed, essentially no material comparisons have been made or can be made. Thus the burden of proof of showing copyright infringement respecting the SQL statements or database schema of the copyrighted work has not been met."). Significantly, Norment advised New Century's co-counsel of the discovery of the November 2000 version in e-mails in December 2003, approximately a month before the arbitration and during the same period Positive Software was repeatedly requesting production of the earliest available version. Amazingly, New Century's co-counsel nonetheless failed to produce the script for the original version of LoanForce.

### B. New Century's Conduct Violated the Protective Order[9]

The Court first addresses whether New Century's conduct actually violated the Protective Order. The Court conducts this inquiry before it considers whether the Protective Order is sufficiently definite and certain to be enforced by contempt. The Court follows this sequence, rather than the reverse, to ensure that future litigants have a clear understanding of how to follow protective orders such as the one in this case.[10]

---

[9]Much of this section is taken from the Court's Order of March 3, 2004.

[10]This is similar to the reason that courts in qualified immunity cases first analyze whether there is an allegation of violation of a constitutional right before considering whether the other elements of immunity are established; to follow the reverse order would result in the contours of constitutional rights never becoming clearly established.

In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional

MEMORANDUM OPINION AND ORDER – PAGE 11

●                              ●

### 1. The Text of the Protective Order Does Not Authorize New Century's Conduct.

– The starting point of this inquiry is the language of the Protective Order.[11] New Century

argues that its conduct was proper under two provisions of the Protective Order: (1) the

definition of Confidential Information; and (2) the provision excluding a party's own

materials from the limitations on use of Confidential Information. The Court finds that

neither of those provisions authorizes New Century's conduct.

The language of the Protective Order makes clear that "Confidential Information"

includes information, not merely the medium on which the information is found:

> **Confidential Information.** [1] Upon a determination by any party or non-
> party from whom discovery is sought (the "Designating Party") that any
> documentation or thing being produced or disclosed, whether formally or
> informally, including but not limited to [listing various discovery
> mechanisms], contains a trade secret or other proprietary or business
> information that the Designating Party would, in the ordinary course of
> business, not disclose to competitors, the Designating Party may designate
> such document or thing "Confidential" (collectively, "Confidential
> Information"). [2] Confidential Information shall include, *inter alia,* any
> document or thing that the Designating Party believes in good faith constitutes
> or embodies matter used by it in or pertaining to its business, which matter is
> not generally known and that the Designating Party would not normally reveal
> to third parties or would cause third parties to maintain in confidence.

---

right as the first inquiry. The law might be deprived of this explanation were
a court simply to skip ahead to the question whether the law clearly established
that the officer's conduct was unlawful in the circumstances of the case.
*Saucier v. Katz,* 533 U.S. 194, 201 (2001); *see also Siegert v. Gilley,* 500 U.S. 226, 232
(1991). Likewise here, the Court intends to ensure that future litigants find similar protective
orders to be clear, definite, and free from any ambiguity.

[11]When interpreting the terms of a court order, courts should consider the plain meaning of
the language and the normal usage of the terms in question. *See, e.g., City of Hartford v.
Chase,* 942 F.2d 130, 134 (2d Cir. 1991).

MEMORANDUM OPINION AND ORDER – PAGE 12

[3] Confidential Information further includes, but is not limited to, technical information such as product design and manufacturing techniques or processing information, trade secrets, formulas, research and development information, customer lists, sales and cost information, and pricing information, license agreements, or information that was generated in connection with, or reveals the content of, licensing negotiations; information that a party has treated as confidential and is not subject to public disclosure; information within the definition of trade secret as set forth in Section 1(4) of the Uniform Trade Secret Act (1985); and any other information that would qualify as Confidential pursuant to Federal Rule of Civil Procedure 26(c) or any other legal standard.

Protective Order at ¶ 1 (bracketed numbers added). The three sentences thus provide:

[1] A party producing a document or thing containing proprietary information may designate that as "Confidential Information";
[2] "Confidential Information" includes, among other things, the physical document or thing itself containing the proprietary information; and
[3] "Confidential Information" further includes the proprietary information that is contained in the designated physical document or thing.

The first sentence says *how* Confidential Information is designated, and the second and third sentences say *what* Confidential Information includes: both the physical document or thing and the proprietary information embodied in the physical document or thing.

New Century argues that the clause "any documentation or thing being produced or disclosed" in the first sentence limits the definition of Confidential Information to items produced in the course of litigation. This interpretation, however, ignores the language of the second and third sentences of the paragraph, which make clear that "Confidential Information" also includes information contained in the designated document or thing, not just the physical object by which that information was transferred from one party to another. While the first sentence read alone might be unclear regarding whether "Confidential

MEMORANDUM OPINION AND ORDER – PAGE 13

Information" means either the document or thing itself or the information contained in it, that

is clarified by the following two sentences: The answer is "both."

When construing the Protective Order as a whole, and not just the clause emphasized

by New Century, the Court reads "Confidential Information" to include information, not just

the physical object embodying that information (namely, a document or thing produced in

the course of litigation). Thus, a more logical reading of the clause in question would be that

Confidential Information refers to trade secrets or other proprietary business *information* that

would not ordinarily be disclosed to competitors. "Any documentation or thing being

produced or disclosed" may, if it qualifies as confidential information, be designated as

confidential. But if it is properly so designated, it is the information contained in the

document or thing, and not simply the document or thing itself, that is protected.

This is consistent with treatment of Confidential Information elsewhere in the

Protective Order. Thus, the Protective Order provides,

> No party, counsel, or other person receiving any document or thing that is
> designated as "CONFIDENTIAL" in accordance with ¶ 1 of this Order (the
> "Receiving Party") shall use, disclose, or permit the use or disclosure of any
> such *Confidential Information* to any other person or entity . . . .

Protective Order at ¶ 3. The prohibition on use or disclosure applies to the *information* in

designated materials, not merely the materials themselves. Once Positive Software

designated LoanForce as Confidential Information, that designation extended to the

proprietary information embodied in LoanForce, regardless whether that information was

embodied in the physical copy produced in discovery or the physical copy retained by New

MEMORANDUM OPINION AND ORDER – PAGE 14

Century as a forensic copy supposedly under lock and key in its counsel's office. Thus, the plain language of the Protective Order precludes New Century's conduct.

New Century also argues that its use of Positive Software's Confidential Information is permitted by the clause in the Protective Order that provides: "This Order does not restrict in any manner the use or disclosure by any Designating Party of any information in its own documents and things." Protective Order at ¶ 16. The fact that New Century may have retained a forensic copy of the LoanForce software does not make that "its own documents and things." Moreover, the Court already found that "Positive Software owns the rights to LoanForce and holds valid copyright registrations for LoanForce and its component parts." Order at 5 (April 28, 2003). Furthermore, Positive Software *licensed* its software to New Century for a limited purpose. Under the terms of the licensing agreement, any right to access in the Confidential Code licensed to New Century ended upon termination of the licensing agreement. Software Subscription Agreement at ¶ 12 ("Upon termination of any License hereunder, Customer shall return the Product (and any copies made pursuant to Section 2) and all related documentation to Positive."). As of February 6, 2003, Positive Software terminated the Software Subscription Agreement. See Preliminary Injunction at 4. The Court therefore finds that back-up tapes and forensic copies containing LoanForce clearly do not qualify as New Century's own documents and things for purposes of ¶ 16 of the Protective Order.

*2. An Order Must Not Be Given an Interpretation That Renders It a Nullity.* – In addition to being inconsistent with the actual language of the Protective Order, New

MEMORANDUM OPINION AND ORDER – PAGE 15

Century's interpretation would result in the Protective Order having essentially no practical effect. The Court is reluctant to interpret its orders in a manner that renders them a pointless exercise, and the case law supports that reluctance. That is particularly the case when, as here, there is an alternative construction that gives life and effect to the order. And here such an alternate construction need not be implied into the words of the order – the Protective Order itself makes clear that its protection extends not just to the document or thing produced, but also to the proprietary information contained or embodied in that document or thing.

The Fifth Circuit has made clear that it will not interpret "confidential information" in a way that renders a protective order a nullity by construing the term to refer to the medium on which information is stored, rather than the information itself. In *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, Lyn Lea and its counsel appealed a finding by the district court that they had violated "protective orders relating to confidential documents obtained during discovery" by disclosing the information contained in those documents. 283 F.3d 282, 290 (5th Cir. 2002). Seeking to avoid a finding of contempt, Lyn Lea and its counsel argued that the protective orders at issue "merely prohibited disclosure of the confidential documents but did not prohibit disclosure of the contents of such documents." *Id.* at 291. Affirming the contempt finding, the Fifth Circuit held that the protective orders must have precluded the disclosure of the information itself, and not merely the paper on which they were stored. Otherwise, the protective order would have no effect. *Id.* ("Lyn-Lea's reading of the protective orders would render them a nullity.").

MEMORANDUM OPINION AND ORDER – PAGE 16

Other circuits have likewise reached the conclusion that orders must not be read to render their terms a nullity. *See, e.g., United States v. Greyhound Corp.*, 508 F.2d 529, 533 (7th Cir. 1974) (rejecting "twisted interpretations" of an order that would render a provision of the order a nullity); *First Nat'l Bank & Trust v. Dep't of the Treasury*, 63 F.3d 894, 899 (9th Cir. 1995) ("The Bank admits violating various policies which it had adopted pursuant to the cease and desist order, yet insists it did not violate the cease and desist order. The Bank contends the order required only 'adoption,' not actual implementation, of the policies. Therefore, the Bank reasons, its failure to abide by those policies amounted to just that, a violation of the policies, *not* the terms of the cease and desist order. This argument is without merit. As the Comptroller puts it, 'the Bank's reading would render the cease and desist order meaningless; there is no point in having the Bank adopt a comprehensive revision of its policies and practices if the Bank is not obliged to abide by' them."); *Bancamerica Commer. Corp. v. Mosher Steel*, 100 F.3d 792, 795 (10th Cir. 1996) (rejecting a reading of an EPA order that would render meaningless one of its provisions).

If orders prohibiting the disclosure of confidential information are to have any meaning, they must prohibit disclosure in any form. In *City of Hartford v. Chase*, the parties reached a settlement agreement conditioned on a confidentiality order from the judge prohibiting the disclosure of materials related to the settlement agreement. 942 F.2d 130, 135 (2d Cir. 1991). The Hartford Courant and one of its reporters intervened to vacate the confidentiality order. The district judge ruled that it was unnecessary to vacate the confidentiality order because that order applied only to disclosure of the court file, not

materials containing the same information in the city's possession.  Disclosure of the city's

materials, the district judge reasoned, could be compelled under the Connecticut Freedom

of Information Act.  Rejecting the district court's interpretation of the Confidentiality Order,

the Second Circuit concluded that:

> [t]he district court's interpretation of the Confidentiality Order would also
> make that order meaningless.  If the City has in its possession all the
> documents that are contained in the court file, and documents in the City's
> possession are not protected from disclosure, sealing the court file would serve
> no purpose – the contested material could be obtained simply by requesting it
> from the City itself.  We find it hard to believe that the parties would have
> gone to such great efforts to draft an order with no practical effect.

*Id.*

In *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1437 (N.D.

Ill. 1995), an Illinois district court faced similar arguments:

> Mr. Messina's primary defense is his assertion that the scope of the orders of
> confidentiality was so limited that neither the protective order nor the seal
> prohibited his disclosures.  According to Mr. Messina, the protective order
> prohibited the dissemination of very little.  Mr. Messina testified that he did
> not understand the protective order to prohibit him from revealing the contents
> of pleadings.  Nor from revealing confidential discovery information such as
> answers to interrogatories nor answers to requests to admit.  Nor from
> disclosing the deposition testimony of witnesses.  Nor from disseminating the
> contents of documents marked "confidential."

> Mr. Messina's interpretation of the seal order is similarly cramped.  Mr.
> Messina testified that he did not understand the seal order as preventing him
> from revealing the contents of depositions under seal, other discovery
> materials under seal, or quoting verbatim from sealed materials.  The only
> thing that Mr. Messina believed the sealing order actually prohibited was the
> public disclosure of the actual pleadings – the physical documents themselves
> – filed in the case.

In rejecting Messina's argument, the *Grove* Court called the view that one may disclose the content of confidential documents but not the physical documents themselves a "tortured" interpretation of the Court's order. *Id.* at 1438 (noting that "[c]ourts are not and should not be compelled to accept 'twisted interpretations' or 'tortured constructions' of an order"). Messina's reading of the order renders it useless. *Id.* (noting that because a court order is issued to be obeyed, "a court should not interpret the order in such a way as to render it a nullity").

Together, *Lyn-Lea*, *City of Hartford*, and *Grove* stand for the proposition that a court should not read "confidential information" in a protective order in a way that will render the order a nullity. Yet that is precisely what New Century's reading of the Protective Order asks this Court to do. Under New Century's interpretation, the information that receives protection when it is stored on media produced in the course of litigation receives no protection when it is stored on backup tapes or forensic copies.[12] The cited cases reach that result as a matter of construction of the term "confidential information" in a manner to prevent the order in question from being a nullity. The argument against New Century's construction is even stronger in this case, where the Protective Order explicitly provides that a designation as Confidential Information includes not only the document or thing so designated, but also the information contained in that document or thing.

---

[12]Indeed, under New Century's reading, nothing in the Protective Order would prevent posting the source code for LoanForce on the Internet, so long as it was copied from the backup tapes, rather than media produced in the course of litigation.

MEMORANDUM OPINION AND ORDER – PAGE 19

**3. *Orders Must Be Read in Context with Other Orders.*** – The Protective Order does

not exist in a vacuum, and it should be read in the context of the litigation.[13] New Century's

interpretation of the Protective Order would conflict with other orders in effect at the time.

On April 28, 2003, this Court signed a Preliminary Injunction enjoining New Century and

any person acting in active concert with it "from any use of the LoanForce software, the

LoanForce database, Loan-Track-1, LF_Moon, and LTK_Moon." Preliminary Injunction

at 16-17. The Court made clear that the purpose of the Preliminary Injunction was to enforce

the terms of the Software Subscription Agreement and enjoin any further misappropriation

of Positive Software's confidential information. *Id.* at 4 n.4 ("Positive Software requests

relief to enforce the terms of the Software Subscription Agreement, enjoin further

misappropriation of its confidential information, and preserve the status quo between the

parties pending arbitration. The issuance of a preliminary injunction, thus, is proper."). The

Software Subscription Agreement makes clear that upon termination of the Subscription

Agreement, any continued use of Positive Software's software is prohibited. ("[U]pon

termination of this Agreement, Customer agrees to return to Positive, or promptly destroy at

the direction of Positive, at any time upon request of Positive for any reason, any other

Confidential Information, including any source of electronic information and all records,

---

[13]In one of its briefs, New Century cites *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002), for the proposition that courts must give their orders a "reasonable interpretation." New Century's Opposition to Positive Software's Motion for Contempt at 6. In determining whether an interpretation is reasonable, the *Riccard* Court emphasizes that "[c]ontext is often important to meaning, and so it is here." *Id.* at 1297.

MEMORANDUM OPINION AND ORDER – PAGE 20

notes, documents, drawings, prototypes, specifications, programs, data, devices and other

materials containing or pertaining to any Confidential Information." Software Subscription

Agreement at ¶ 7(D).[14]  As of February 6, 2003, Positive Software terminated the Software

Subscription Agreement.  *See* Preliminary Injunction at 4.

Together with the Protective Order, these documents demonstrate that the clear intent

of the Court and the parties was to prevent those making allegedly infringing and competing

software from using or copying LoanForce.  Taken in this context, New Century's

construction of the Protective Order is not viable.

*4. An Order Requires Less Specificity When It Is Written for Lawyers.* – New

Century's interpretation is even less reasonable because the audience was not laypersons, but

lawyers. An order requires less specificity when the audience is a member of the bar.  *Grove*,

888 F. Supp. at 1438 ("When the audience is a member of the bar, that fact will be taken into

account in determining reasonable specificity, and orders that would otherwise require

greater specificity for a layperson will require less for a lawyer.").

As Positive Software points out in its brief, the audience for the Protective Order at

issue in this case is a publicly traded corporation with an in-house legal department,

represented by a well-regarded law firm.  Moreover, the allegedly infringing conduct took

place at the direction and with the consent of New Century's counsel.  *See, e.g.*, New Century

Letter (January 15, 2004) ("Mr. Norment suggested the idea of comparing the code and

---

[14]In the Software Subscription Agreement, "Confidential Information" is a defined term, with
a definition that is not the same as that in the Protective Order.

MEMORANDUM OPINION AND ORDER – PAGE 21

reporting the results to counsel, and counsel agreed that such a comparison might be useful and directed him to create it for purposes of investigating the facts underlying Positive [Software]'s allegations of copying."). Thus while a layperson might not be familiar with the distinction in intellectual property law between the tangible medium containing information and the information itself, New Century is hard pressed to profess such ignorance.

The Court therefore finds that Positive Software has shown by clear and convincing evidence that New Century violated the Protective Order.

### C. The Protective Order Is Arguably Not Sufficiently Definite

The Court must now address New Century's contention that the Protective Order cannot be enforced by contempt because it is not sufficiently definite. Several of New Century's arguments appear to go to its state of mind, i.e., it had a good faith belief that the Protective Order should be read to apply only to documents produced by Positive Software in discovery.[15] The Court declines to consider those arguments for two reasons. First, in civil contempt state of mind is not a consideration. "In a civil contempt proceeding, the party seeking an order of contempt need only establish (1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)

---

[15]For example, New Century offers the Declaration of Michael O'Neil, indicating that orders such as the Protective Order are not typically construed to cover documents other than those produced in discovery.

MEMORANDUM OPINION AND ORDER – PAGE 22

(citing *Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir.1992)). "Intent is not an issue in civil contempt proceedings; rather, the question is whether the alleged contemnors have complied with the court's order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *Jim Walter Resources v. Int'l Union, United Mine Workers*, 609 F.2d 165, 168 (5th Cir. 1980)). Second, determining whether an order is sufficiently definite to be enforced by contempt is a question of law for the Court. *See Martin v. Trinity Indus. Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (reviewing issue de novo); *cf. Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (whether contract is ambiguous is question of law for the court). Accordingly, the Court need not, and does not, determine whether New Century or its counsel acted in good faith.

The Court now considers whether the Protective Order was sufficiently definite for New Century's violation to be punished by contempt. "Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act. The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." *Martin, supra*, 959 F.2d at 47 (internal quotations and citations omitted). *Accord Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382-83 (5th Cir. 1999).

As indicated above, the Court believes the Protective Order has a definite meaning, and in that sense it is not ambiguous. However, there are characteristics of the language that perhaps do not provide specific and definite language requiring New Century to refrain from making litigation-related use of its backup copies of LoanForce. First, the Protective Order

MEMORANDUM OPINION AND ORDER – PAGE 23

supervision of the arbitrator, not the Court, and thus is beyond the reach of Rule 37. The

Court's lack of response in this case to New Century's failure to produce the November 2000

script should not be taken as approval.

Accordingly, Positive Software's motion for contempt is denied.[16]

## II. THE ARBITRATOR'S FAILURE TO DISCLOSE HIS PRIOR RELATIONSHIP WITH NEW CENTURY'S COUNSEL GIVES RISE TO AN APPEARANCE OF PARTIALITY THAT REQUIRES VACATING THE AWARD

Following the Award, Positive Software became aware, for the first time, that the

Arbitrator had a prior relationship with New Century's counsel. The Arbitrator served as co-

counsel with New Century's counsel over a period of years in significant litigation.

Although the Arbitrator was required to disclose that relationship under AAA rules, he never

disclosed it. In Positive Software's view, this prior relationship explains the Arbitrator's

evident distaste for Positive Software's position. The Court need not reach that question,

however. The Court holds that the Arbitrator's prior relationship "might create an

impression of possible bias." *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393

U.S. 145, 149 (1968). Accordingly, the Arbitrator's failure to disclose that relationship

deprived Positive Software of the opportunity to make an informed choice of arbitrators and

requires vacatur of the award.

---

[16]New Century's motion for contempt and Positive Software's second motion for contempt are likewise denied. Positive Software's motion, to the extent it is based on violation of the Preliminary Injunction, is denied because the Court does not construe the prohibition on "use" of the software to include use of the software incidental to New Century's defense of this action.

MEMORANDUM OPINION AND ORDER – PAGE 26

### A. Factual Background

*1. The Intel Litigation.* – Intel Corporation and Cyrix Corporation were involved in protracted patent litigation for seven years in the 1990s (the "Intel Litigation").[17] The litigation began in 1990, *see Cyrix Corp. v. Intel Corp.*, 803 F. Supp. 1200 (E.D. Tex. 1992) (reflecting Cause No. 4:90CV264), and lasted until April 26, 1996, when rehearing was denied. *See Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996). It appears that New Century's outside law firm in this matter ("SG Law Firm") and the Arbitrator's law firm ("AWD Law Firm") represented Intel as co-counsel from the beginning of the action. *See* 803 F. Supp. at 1202. Indeed, New Century's co-counsel in this case appeared for Intel early in the litigation. *See id.*

The Arbitrator began representing Intel in the Intel Litigation in September 1992. New Century claims that co-counsel's personal involvement in the case ended in approximately July 1992, before the Arbitrator's involvement in the case began. However, co-counsel's name continues to appear with the Arbitrator's name on pleadings as late as June 1993. *See, e.g., Intel's Opposition to Cyrix's Motion to Preclude Intel from Referring to the Presumption of Validity in the Presence of the Jury*, filed January 19, 1993; *Intel's Supplemental Opposition to Cyrix's Motion to Set the Order of Trial*, filed June 15, 1993; *see also Intel's Notice of Appeal* to the Federal Circuit on September 19, 1993 (bearing co-counsel's name and AWD Law Firm, but not the Arbitrator personally). Moreover, Court

---

[17]The Intel Litigation involved five related lawsuits.

opinions still reflect New Century's co-counsel personally as one of the counsel for Intel, together with AWD Law Firm, as late as 1995. *See Cyrix Corp. v. Intel Corp.*, 879 F. Supp. 672, 673 (E.D. Tex. 1995). Apparently, New Century does not deny the Arbitrator's past relationship with SG Law Firm and other SG Law Firm lawyers who all served as co-counsel for Intel in the Intel Litigation.

*2. The Arbitrator's Failure to Disclose the Prior Relationship.* – Arbitration of this matter took place under the auspices of the American Arbitration Association ("AAA"). Pursuant to AAA procedures, AAA gave the parties a list of candidate arbitrators, including the Arbitrator, and asked them to rank the candidates. New Century's counsel did not disclose their prior relationship with the Arbitrator. After AAA eliminated candidates who were objectionable, the Arbitrator was the highest ranked candidate and he became the presumptive arbitrator.[18]  Had Positive Software been aware of the Arbitrator's prior relationship with New Century's co-counsel and with SG Law Firm, co-counsel's law firm, Positive Software would not have ranked the Arbitrator so highly, and he would not have become the arbitrator in this matter.

On June 18, 2003, AAA wrote the Arbitrator to determine his availability to serve; AAA's letter explicitly disclosed that SG Law Firm and, in particular, New Century's co-counsel, represented New Century in the pending arbitration. At the bottom of the letter appeared the following:

---

[18]There were other steps in the selection process not material to this decision.

****<u>IMPORTANT REMINDER</u>****
Please remember, *<u>your obligation to disclose any circumstance likely to
affect impartiality or create an appearance of partiality is ongoing.</u>* Should
you become aware of a new or additional disclosure, please notify your case
manager immediately[.] (emphasis in original).

On June 23, 2003, the AAA confirmed the Arbitrator's agreement to serve as the sole

arbitrator. The AAA informed the Arbitrator that the case "will be administered under the

Association's Commercial Dispute Resolution Procedures as amended and in effect January

1, 2003," and directed him to their location on the internet. The Arbitrator also received

written copies of the Rules, the Guide for Commercial Arbitrators, and the Code of Ethics.

The confirmation also included a Notice of Appointment Form and the Arbitrator's Oath.

The bottom of the confirmation letter contained the same "important reminder" regarding the

Arbitrator's duty to disclose.

On the same day he received the AAA's confirmation of his appointment, the

Arbitrator mailed in his acceptance. In that letter, he stated, "Enclosed is the completed

***Arbitration Disclosure Form*** indicating that I have nothing to disclosed [sic] in view of the

. . . attorneys . . . identified in the materials you sent me under cover of your June 18 letter."

In addition to the letter, the Arbitrator provided a completed Notice of Appointment

form that included questions "designed to help you decide if you have something to

disclose." One of the twelve questions was: "Have you had any professional or social

relationship with counsel for any party in this proceeding or the firms for which they work?"

The Arbitrator indicated, "I have nothing to disclose." The top of the Notice of Appointment

contains a boxed statement:

MEMORANDUM OPINION AND ORDER – PAGE 29

> It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. . . . Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. The AAA will call the facts to the attention of the parties' counsel.

Just below the boxed statement is the following: "If you are able to accept this responsibility as Arbitrator, please sign and return this form to the AAA." The Arbitrator signed the form, expressly affirming that "the panel biography provided by the American Arbitration Association is accurate and complete." At no time before, during, or after the arbitration did the Arbitrator disclose his prior relationship with SG Law Firm or New Century's co-counsel. Positive Software represents that it did not become aware of this relationship until it did additional background investigation on the Arbitrator following the award in an attempt to understand a result that it did not believe was consistent with the record.

### B. In a Nondisclosure Case, Vacatur Is Required Where the Facts Support a Reasonable Impression of Partiality

### 1. The Supreme Court's Commonwealth Coatings Decision. – The United States Arbitration Act authorizes vacatur of an arbitration award "where there was evident partiality . . . in the arbitrators." 9 U.S.C. § 10. Interpreting that provision in favor of broad disclosure, the Supreme Court adopted "the simple requirement that arbitrators disclose to the parties any dealings that *might* create an *impression* of *possible* bias." *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 149 (1968) (emphasis added). The standard of *Commonwealth Coatings* finds support in many of the policies underlying arbitration.

First, the high deference given to an arbitrator's rulings[19] demands a high standard of impartiality. Congress desired "to provide not merely for *any* arbitration but for an impartial one." *Commonwealth Coatings*, 393 U.S. at 147. Accordingly, "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Id.* at 149.

Second, a policy of full disclosure increases faith in the arbitration system by assuring the parties that they are aware of all relevant facts in the selection of the arbitrator. Inability to rely on the impartiality of the arbitrator frustrates the federal policy favoring arbitration and jeopardizes its continued use as an alternative method of dispute resolution. *See id.* at 150 ("We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another."); *see also* AAA Notice of Appointment ("It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or

---

[19]It is well-established that review of an arbitration award itself is "exceedingly deferential." *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004). The Fifth Circuit observed:

> [E]stablished rules of deference foreclose all but the most limited review. Arbitrators need not give reasons for their awards. Even when arbitrators do provide a rationale for their awards, courts may not review that reasoning. Uncertainty about arbitrators' reasoning cannot justify vacatur, for a court must resolve all doubts in favor of arbitration.

*Id.* at 385 (citations omitted).

potential witnesses, direct or indirect, whether financial, professional, social or of any other kind.").

Third, the Supreme Court's holding in *Commonwealth Coatings* reflects its judgment that the parties, rather than arbitrators or courts, are in the best position to ensure the selection of an impartial arbitrator. Arbitrators may have incentives not to disclose all potentially problematic relationships voluntarily. A rule favoring full disclosure protects both the arbitrator and the parties: "In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise." *Id.* at 151 (White, J., concurring).

Similarly, the parties are in a better position than courts to judge the impartiality of the arbitrator. "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." *Id.* A rule favoring full disclosure minimizes the court's role in determining the impartiality of the arbitrator. *Id.* at 152 ("If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.").

In the final paragraph of the majority opinion, the Court emphasizes that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Id.* at 150. This full disclosure has been incorporated by the

MEMORANDUM OPINION AND ORDER – PAGE 32

AAA, which provides arbitrators with multiple reminders of their "obligation to disclose any circumstance likely to affect impartiality or create an *appearance of partiality*." (emphasis added).

  *2. "Evident Partiality" in Nondisclosure Cases.* – After *Commonwealth Coatings*, the Fifth Circuit has not "definitively addressed" the standard for evident partiality. *Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 728 (N.D. Tex. 1997). Other circuits have developed two different standards for evident partiality, one for nondisclosure cases, and one for other claims of bias. In nondisclosure cases, courts have adopted a more lenient "reasonable impression of partiality" standard. *See, e.g., Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994); *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996); *Olson v. Merrill Lynch, Pierce, Fenner & Smith*, 51 F.3d 157, 159-60 (8th Cir. 1995); *Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197, 1200 (11th Cir. 1982). Cases not involving nondisclosure use a more strict standard for evident partiality. In *Morelite Construction Corporation v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir. 1984), the court concluded that an arbitrator is "evidently partial" only where the circumstances were such that a "reasonable person would have to conclude that [the] arbitrator was partial to one party to the arbitration." *Id.* at 84. *Accord Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993)[20]; *Health Services Mgmt. Corp. v. Hughes*, 975 F.2d 1253,

---

[20]*Peoples Security* is somewhat different in that it involved an attorney for a litigant joining a different office of the arbitrator's law firm after the arbitrator had been selected. Because *Peoples Security* did not involve a failure to disclose a prior relationship before selection of the arbitrator, it does not seem to fit in the nondisclosure category.

MEMORANDUM OPINION AND ORDER – PAGE 33

facially relates to materials produced in discovery; although the Court holds that it applies to the informational content, as well as the physical copy, a party might not have read it that way without the benefit of the Court's analysis above. Second, the Protective Order also expressly does not restrict a party's use of its own documents; again, although the Court holds that language does not permit New Century free use of the backup copies of LoanForce, a party might not have read it that way without the benefit of the Court's analysis above. Third, relief relating to copies of the software properly obtained during the pendency of the business relationship, which was one of Positive Software's substantive claims for relief, might reasonably be expected to be in the preliminary injunction, which related to relief on the merits, rather than in the protective order, which primarily related to discovery. Fourth, the Protective Order did not expressly state in so many words that a designation of materials as confidential also applied to copies of the designated materials already in the possession of the receiving party.

### D. Conclusion on Contempt

The Court, with considerable reluctance, holds that the Protective Order was not sufficiently clear and definite to be enforced by contempt. The Court's reluctance arises from the Court's view that New Century's conduct was not appropriate. The reluctance is heightened by the Court's conviction that New Century knew that if the Court or Positive Software were aware of New Century's conduct, it would be expressly prohibited. And the conduct was not already expressly prohibited only because New Century represented that such prohibition was unneeded. New Century thus created a loophole, and then covertly took

MEMORANDUM OPINION AND ORDER – PAGE 24

advantage of it. Although the Court has held that New Century's conduct was prohibited by the Protective Order, New Century has successfully muddied the waters to an extent that contempt for violation of the Protective Order is not available.

The Court must note two more concerns. First, the Court is distressed that New Century's lead counsel represented to the Court that New Century would take certain steps and, therefore, that Positive Software did not need further relief from the Court, and then once the Court denied additional relief, New Century did exactly the opposite of what it represented. While the Court is most unhappy at being misled, that is not a basis for contempt for violation of either the Protective Order or the Preliminary Injunction – the grounds raised by Positive Software in its motions. The Court is skeptical that New Century's lead counsel did not know what co-counsel was doing with Norment, and that co-counsel did not know what lead counsel had represented to the Court. Absent that double-ignorance, counsel should have *at minimum* notified the Court that the prior representations were no longer correct.

Second, the Court is most distressed that New Century did not timely produce the November 2000 SQL script. This is not simply a case of the document not being found in time to produce. It was found in time, about a month before the arbitration, and New Century so advised its co-counsel – at or about the same time Positive Software was reiterating its request for the earliest version of the database that New Century had. New Century simply did not produce it, and offers no explanation for that failure. But discovery abuse is likewise not a basis for contempt; in this case, moreover, the discovery was proceeding under the

MEMORANDUM OPINION AND ORDER – PAGE 25

1264 (7th Cir. 1992); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358  (6th Cir.

1989).[21]

---

[21]At least one court has not considered these to be different standards applicable in different circumstances, but rather two conflicting standards adopted by different courts in the wake of *Commonwealth Coatings*:

> Although Justices White and Marshall joined fully in Justice Black's opinion for the Court, some lower federal courts have purported to see a conflict between the two writings. By treating Justice Black's opinion as a mere plurality, they have felt free to reject the suggestion that "evident partiality" is met by an "appearance of bias," and to apply a much narrower standard.

> For example, in *Morelite Construction Corporation v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir. 1984), the court expressly referred to Justice Black's opinion as one for a plurality of four justices. *Id.* at 82. Working "on a relatively clean slate," the court reasoned that parties agree to arbitrate precisely because they prefer a panel with expertise regarding the subject matter of the dispute. *Id.* at 83. Because this expertise often comes through experience in the field, which may have involved personal dealings with the parties, the court concluded that something more than an "appearance of bias" was necessary to disqualify an arbitrator. *Id.* at 83-84. "To disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all." *Id.* at 83. Balancing the competing goals of expertise and impartiality, the court concluded that an arbitrator is "evidently partial" only where the circumstances were such that a "reasonable person *would have to conclude* that [the] arbitrator was partial to one party to the arbitration." *Id.* at 84 (emphasis added).

> At least three other federal circuits have also adopted an "evident partiality" standard. *See Peoples Security Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993) (adopting the *Morelite* standard); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989) (same); *Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992) (holding that the alleged conflict "must be so intimate . . . as to cast serious doubt on the arbitrator's impartiality," and further holding that the

●                              ●

Application of a more lenient standard in nondisclosure cases is appropriate for

several reasons. First, it is consistent with *Commonwealth Coatings*. "Finding a 'reasonable

impression' of partiality is not equivalent to, nor does it imply, a finding of actual bias.

---

interest or bias "must be direct, definite and capable of demonstration rather
than remote, uncertain or speculative").

In contrast, other federal courts, focusing on the need for full disclosure
to parties who are choosing their own arbitrators, have adopted a broader
standard. For example, in *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir.
1994), the court held that an arbitrator had a duty to disclose that his law firm
had represented the parent company of an arbitrating party. The court reasoned
that "parties can choose their arbitrators intelligently only when facts showing
potential partiality are disclosed." *Id.* at 1047. Concluding that *Commonwealth
Coatings* was controlling precedent, the court decided that the "best
expression" of the Supreme Court's holding is that evident partiality is present
when "undisclosed facts show a reasonable impression of partiality." *Id.* at
1046. This standard, of course, is much broader than that articulated in
*Morelite*, as circumstances can convey an *impression* of partiality without
necessarily dictating a *conclusion* of partiality, as required under *Morelite*. *See
also Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197, 1200 (11th Cir.
1982) (adopting "reasonable impression of possible bias" standard, and
holding that arbitrator had a duty to disclose that he was involved in an
ongoing legal dispute with an insurer party); *Olson v. Merrill Lynch, Pierce,
Fenner & Smith*, 51 F.3d 157, 159-60 (8th Cir. 1995) (recognizing that
disclosure of "even indirect ties" will aid the arbitration process, and holding
that arbitrator was under a duty to disclose business relationship between his
firm and party); *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996)
(recognizing arbitrator's duty to disclose facts which "might create an
impression of possible bias").

*Burlington N.R.R. v. TUCO*, 960 S.W.2d 629, 634 (Tex. 1997). *See id.* at 636 (holding "that
a prospective neutral arbitrator selected by the parties or their representatives exhibits evident
partiality if he or she does not disclose facts which might, to an objective observer, create a
reasonable impression of the arbitrator's partiality. We emphasize that this evident partiality
is established from the *nondisclosure itself*, regardless of whether the nondisclosed
information necessarily establishes partiality or bias.") (emphasis in original).

Otherwise, the *Commonwealth Coatings* court could not have held that a reasonable impression of partiality was present when no actual bias was shown." *Schmitz*, 20 F.3d at 1047. Second, it is consistent with the policies of the Federal Arbitration Act:

> The policies of 9 U.S.C. § 10 also support the notion that the standard for nondisclosure cases should differ from that used in actual bias cases. In a nondisclosure case, the integrity of the process by which arbitrators are chosen is at issue. Showing a "reasonable impression of partiality" is sufficient in a nondisclosure case because the policy of section 10(a)(2) instructs that the parties should choose their arbitrators intelligently. *Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring). The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed. Whether the arbitrators' decision itself is faulty is not necessarily relevant. But in an actual bias determination, the integrity of the arbitrators' decision is directly at issue. That a reasonable impression of partiality is present does not mean the arbitration award was the product of impropriety.

*Id.* at 1047.[22] Finally, the fact of the nondisclosure itself may create an appearance of bias, even when the underlying facts themselves would not support a finding of actual bias. *See Burlington, supra*, 960 S.W.2d at 636.

In view of this distinction, the line of cases adopting the heightened actual bias standard from *Morelite*, 748 F.2d 79 (2d Cir. 1984), which was not a nondisclosure case, is inapposite. The concern in actual bias cases is that absent a clear and direct showing of actual bias, the most qualified arbitrators, who are likely to have the broadest business experience, will frequently be disqualified because of their previous experience with parties.

---

[22]Even one of the cases that New Century cites for a heightened conclusion of partiality standard, recognizes the distinction between nondisclosure cases and ordinary bias cases. *Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 728-29 (N.D. Tex. 1997) (noting that for most courts the heightened actual bias standard applies "where non-disclosure is not alleged").

The question here is not whether the Arbitrator's co-counsel relationship with SG Law Firm, New Century's co-counsel, and others actually biased his decision, but whether the parties had a right to have those facts disclosed at the outset. The nondisclosure cases insist the parties do have that right and that it is an essential part of making an intelligent selection. The actual bias cases set the bar for what kind of information, if disclosed, would be sufficient to vacate an arbitration award on the basis of partiality toward one side. Thus, the Courts of Appeals have articulated two different standards designed to promote two different goals: while a higher threshold for showing actual bias ensures arbitrators with broad experience are not easily disqualified, a demanding full disclosure rule ensures that the parties have the information they need to make an intelligent selection.

*3. Promoting Disclosure Is Consistent with the Parties' Expectations.* – Additionally, the full disclosure rule of *Commonwealth Coatings* reinforces the parties' expectations that arbitrators will abide by the Rules of the American Arbitration Association (and related rules), which the Supreme Court deemed "highly significant." 393 U.S. at 149. The following AAA rules and guidelines echo the full disclosure principles and at times borrow the language of *Commonwealth Coatings*:

1.    AAA, Code of Ethics for Arbitrators in Commercial Disputes, provides in relevant part:

> Persons who are requested to serve as arbitrators should, before accepting, disclose . . . any existing or *past* financial, *business, professional,* family, or social *relationships* which are likely to affect impartiality or which might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should *disclose any such relationships* which they personally have *with any party or its lawyer* . . . (emphasis added).

MEMORANDUM OPINION AND ORDER – PAGE 37

2.   AAA, Disclosure and Challenge of an Arbitrator, provides in relevant part:

Q. Are arbitrators obligated to make disclosures?

A. Arbitrators *must* disclose *any relationship* between themselves and a party representative, or a witness. The AAA's rules require that neutral arbitrators be impartial, and that the parties have confidence in their impartiality. The rules require every neutral arbitrator "to disclose to the AAA any circumstances likely to affect his or her impartiality, including any bias or any financial or personal interest in the result of the arbitration or *any past* or present *relationship with the parties or their representatives*." This is also dealt with in the AAA's Code of Ethics for Commercial Arbitrators.

. . .

Q. Are there any general principles regarding disclosures?

A. Yes. They are as follows:

    1.   *Every disclosure, no matter how insignificant should be communicated to the parties*.

    2. If information received from the arbitrator or another source seems vague or incomplete, further inquiries should be made to gather pertinent facts for transmittal to the parties.

. . .

Q. Do I need to disclose prior arbitrations or contact with the law firms involved or only with counsel on the current case?

A. *All contact with the firm or parties involved shall be disclosed*.

. . .

Q. Can the final award be vacated if the arbitrator fails to make a disclosure?

A.   As guidelines for the exercise of arbitrator discretion in this area, the following circumstances were *deemed sufficient by the courts to require vacature* of the award on the ground of *partiality*: . . .

    5. *Arbitrator had a case in which the arbitrator was a party or counsel before [with] one who is now a party or counsel* (emphasis added).

3.   AAA, Guide to Commercial Arbitrators, provides in relevant part:

MEMORANDUM OPINION AND ORDER – PAGE 38

If you discover, upon being asked to serve, some prior or present business connection with one of the parties and the contact is so close as to be disqualifying, you should decline to serve. Not every business relationship casts doubt on an arbitrator's impartiality. Often, it is enough for an arbitrator to disclose the connection before accepting the appointment. Arbitrators are advised, whenever a question as to such potentially disqualifying information arises, to *err in favor of disclosing it to the parties.*

When parties and their witnesses assemble in the hearing room, you might recall for the first time an association with a person involved. *Prompt disclosure gives the parties an opportunity to waive their objections.* Such a waiver will bar any subsequent objection to the award on grounds of bias.

It is clear from these rules that arbitrators are expected by the AAA as well as the parties to provide extremely broad disclosure, certainly including serving as co-counsel with one of the party's law firms and, more specifically, one of the party's lawyers. These rules further illustrate that following the broad disclosure principles of *Commonwealth Coatings* will reinforce rather than upset the existing expectations of the parties.

### C. A Reasonable Impression of Partiality Exists in This Case

In view of *Commonwealth Coatings* and its progeny, the Court concludes that in nondisclosure cases, an arbitration award must be vacated where there is a reasonable impression of partiality. One way to assess whether undisclosed facts convey a reasonable impression of partiality is to inquire whether those facts would be material to a lawyer selecting an arbitrator, i.e., would a reasonable lawyer in Positive Software's position have wanted to know about the Arbitrator's role in the Intel Litigation before selecting an arbitrator. The answer to that question is clearly yes. Given the contentious nature of this dispute, the duration and importance of the Intel Litigation, and the fact that the arbitration was to be decided by a single arbitrator, the Court is of the firm conviction that any

MEMORANDUM OPINION AND ORDER – PAGE 39

reasonable trial lawyer would want to know of an arbitrator-candidate's prior association with opposing counsel before choosing him as the sole arbitrator. Accordingly, the nondisclosure of that information creates a reasonable impression of partiality.

Alternatively, the Court will consider directly whether the failure to disclose the prior relationship between the Arbitrator and New Century's counsel "might create an impression of possible bias." *Commonwealth Coatings*, 393 U.S. at 149. Here the prior relationship was an extensive one, extending over years in high profile litigation. It involved not just the two law firms working together, it personally involved the Arbitrator and New Century's co-counsel. And even if New Century is correct that its co-counsel quit working on the Intel Litigation before the Arbitrator began working on it, co-counsel's name remained on the pleadings and in court records for years after that; that fact alone is significant to the extent the appearance of impropriety is the issue. The relationship between the two law firms was even more extensive. Finally, because the AAA rules plainly required disclosure of that prior relationship, the nondisclosure in violation of AAA rules heightens the inference of concealment and the appearance of impropriety. Under all these circumstances, the Court holds that the nondisclosure of the prior relationship creates a reasonable impression of partiality.

Nevertheless, New Century suggests two reasons why the Court should find in its favor. First, New Century claims that Positive Software waived its nondisclosure objection by failing to raise it during the arbitration. "Although it is true that a disgruntled party cannot object after an award has been made, *Cook Industries, Inc. v. C. Itoh & Co.*, 449 F.2d 106

(2d Cir. 1971), *cert. denied*, 405 U.S. 921, 30 L. Ed. 2d 792, 92 S. Ct. 957 (1972), this rule

applies only where the party has actual knowledge of the facts that form the basis of the

objection, *see Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197 (11th Cir. 1982)."

*Morelite*, 748 F.2d at 84. Here, Positive Software did not learn those facts until after the

arbitration. Accordingly, it did not waive its objection.

    Second, although New Century does not expressly claim that the Arbitrator did not

remember that SG Law Firm and New Century's co-counsel served with him as co-counsel

in the Intel Litigation, New Century hints that perhaps he just forgot. The Court finds that

claim factually improbable and legally irrelevant. As the *Schmitz* Court noted,

> [A] reasonable impression of partiality can form when an actual conflict
> of interest exists and the lawyer has constructive knowledge of it. That the
> lawyer forgot to run a conflict check or had forgotten that he had previously
> represented the party is not an excuse. Also, an arbitrator may not know facts
> of which he may have been suspicious or of which he was on notice which, if
> true, would create a reasonable impression of partiality if not investigated and
> disclosed.    Requiring arbitrators to make investigations in certain
> circumstances gives arbitrators an incentive to be forthright with the parties,
> honestly disclosing what arbitrators might otherwise have an incentive to hide.
> *Commonwealth Coatings* establishes that the parties rather than the arbitrators
> or the courts should be the judges of the partiality of arbitrators.
>
> . . .
>
> If the parties are to be judges of the arbitrators' partiality, duties to
> investigate and disclose conflicts must be enforced, even if later a court finds
> that no actual bias was present. We therefore decline to adopt a per se rule that
> no reasonable impression of partiality can be found absent a showing that the
> arbitrator knew the facts on which it is based.

20 F.3d at 1048-49 (internal citations omitted). A full disclosure rule is rendered toothless

if the corresponding duty to investigate is not enforced. Prospective arbitrators must not be

MEMORANDUM OPINION AND ORDER – PAGE 41

permitted to turn a blind eye toward potentially problematic conflicts of interest. Here, the

Arbitrator had ample, even redundant, notice of his duty to investigate any prior co-counsel

relationships with SG Law Firm and New Century's co-counsel. The Court therefore finds

at minimum he had constructive knowledge of those relationships, and his failure to disclose

them raises a reasonable impression of partiality.[23] Positive Software's motion to vacate the

arbitration award is, therefore, granted.[24]

---

[23]The importance of disclosure here is amplified by Positive Software's claims that the Arbitrator was actually biased. On virtually every close issue, he decided against Positive Software. Some of those decisions appear to the Court to be questionable, though the Court need not decide on this occasion whether they were a manifest disregard of the law. Moreover, the tone of the Award reflects negative feelings towards Positive Software's claims. *See* Award at 7, 35, 46. Had the arbitrator disclosed his role in the Intel Litigation, and the parties agreed to go forward, Positive Software's arguments about actual bias might seem more like "sour grapes." However, the nondisclosure bolsters the significance of the facts left undisclosed, and also makes the actual bias argument more plausible. In view of the Court's disposition of the disclosure issue, it need not resolve the actual bias claim. It is certainly possible that Positive Software's aggressive conduct in the arbitration and its grandiose damage claims gave rise to the Arbitrator's disdain. *See* Award at 7 ("It involves a saga of how failure to renew an $86,100 software license has led to a claim for $500,000,000 in damages in this Arbitration, and for $38,000,000,000 in Federal Court."). Had the Arbitrator disclosed his prior relationship with New Century's counsel, this Court would not be left wondering whether Positive Software earned the Arbitrator's disdain in this case or inherited it from the Intel Litigation. *See, e.g., Commonwealth Coatings*, 393 U.S. at 151 ("[I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award."); AAA, Guide to Commercial Arbitrators ("Prompt disclosure gives the parties an opportunity to waive their objections. Such a waiver will bar any subsequent objection to the award on grounds of bias.").

[24]On August 27, 2004, Positive Software moved to amend its motion to vacate arbitration award to assert claims that the award should be vacated due to New Century's fraud in, *inter alia*, failing to produce the November 2000 script for the original LoanForce database. New

MEMORANDUM OPINION AND ORDER – PAGE 42

## CONCLUSION

Arbitration is intended to be an expeditious and less expensive alternative to traditional litigation. This is surely a case study of how that can go wrong. That state of affairs could not obtain without the active participation of both sides. Although the Court hopes that the second arbitration will be expeditious and inexpensive, the Court is not overly optimistic on that point. Given that, the Court would not order a second arbitration absent a firm conviction that it is here required by the law and facts. In view of the second arbitration, counsel are reminded that their duty to represent clients zealously is only one of the duties that attorneys owe to clients, to the courts, and to their profession.

Accordingly, it is ORDERED that all motions for contempt are denied; that New Century's motion to confirm is denied; that Positive Software's motion to vacate is granted. The parties are further ordered to arbitrate this dispute; in the second arbitration, the parties are directed to make no reference to any ruling of the Arbitrator in the first arbitration and are specifically directed not to advise the new arbitrator, directly or indirectly, of the Award or any portion of the Award. It is further ordered that the arbitrator selected for the second arbitration shall not read or consider in any way any ruling of the Arbitrator in the first arbitration, including but not limited to the Award. It is further ordered that this action is stayed pending conclusion of the second arbitration. The parties are ordered to file no further

---

Century opposes the motion as untimely. Due to the Court's disposition of the partiality issue, the motion to amend is denied as moot. If the Court were to address that motion on the merits, it likely would grant the motion to amend and grant the amended motion to vacate for, *inter alia*, New Century's failure to produce the November 2000 script.

MEMORANDUM OPINION AND ORDER – PAGE 43

pleadings in this Court without leave of Court other than (a) motions under Rules 59 and 60,

(b) motions incidental to any appeal of this Order, and (c) motions to lift stay.   New

Century's March 18, 2004 motion to alter is granted; all pending motions to seal are granted;

all pending motions not expressly granted in this Order are denied.


SIGNED this _28_ day of September, 2004.

David C. Godbey
United States District Judge


MEMORANDUM OPINION AND ORDER – PAGE 44

**Donna Sue Miller**

**From:**     ecf_txnd@txnd.uscourts.gov
**Sent:**     Tuesday, September 28, 2004 2:53 PM
**To:**       ecf_txnd@txnd.uscourts.gov
**Subject:** Activity in Case 3:03-cv-00257 Positive Software v. New Century Mortgage, et al "Memorandum
            Opinion and Order"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without
charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Northern District of Texas

Notice of Electronic Filing

The following transaction was received from aat, entered on 9/28/2004 at 2:51 PM CDT and filed on
9/28/2004
**Case Name:**          Positive Software v. New Century Mortgage, et al
**Case Number:**        3:03-cv-257
**Filer:**
**Document Number:** 372

**Docket Text:**
MEMORANDUM OPINION AND ORDER denying [121] motion for contempt filed by Positive
Software Solutions, Inc.; denying [238] motion to confirm filed by New Century Mortgage Corporation,
New Century Financial Corporation, eConduit Corporation, The Anyloan Company, Jeff Lemieux,
Frank Nese; and granting [252] motion to vacate filed by Positive Software Solutions, Inc. The parties
are ordered to arbitrate this dispute. This action is stayed pending conclusion of the second arbitration.
THE PARTIES ARE ORDERED TO FILE NO FURTHER PROCEEDINGS IN THIS CASE
WITHOUT LEAVE OF COURT other than (a) motions under Rules 59 and 60, (b) motions incidental
to any appeal of this order, and (c) motions to lift stay. The [179] motion to alter filed by Positive
Software Solutions, Inc. is granted. The pending [341],[272],[314],[357], [358],[194], [237], [343],
[275], [213],[198],[250], [226],[363],[277],[347],[187], [219], [291], [365],[335] and [351] motions to
seal are granted. All other pending m! otions are denied. (Signed by Judge David C Godbey on 9/28/04)
(aat, )

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=9/28/2004] [FileNumber=1520949-0
] [0921ca02c16d7be83c98da24106de72b1d0a5bed3fd75b4e2d94f43a750607ce5af
8c8ffe50306930d257dd705be93c6044fac1ab0339182faec037a22fa9a76]]

**3:03-cv-257 Notice will be electronically mailed to:**

9/28/04

Barry C Barnett    bbarnett@susmangodfrey.com, dmiller@susmangodfrey.com

W Ralph Canada    ralph.canada@shore-deary.com, patty.smith@shore-deary.com

Robin P Hartmann    hartmann@haynesboone.com, carol.ray@haynesboone.com

George M Kryder    gkryder@velaw.com, cobrien@velaw.com

Michael W Shore    mshore@akingump.com, ablackwelder@akingump.com

Jeven R Sloan    jeven.sloan@shore-deary.com,

**3:03-cv-257 Notice will be delivered by other means to:**

Gaynell C Methvin
Law Office of Gaynell C Methvin
300 Crescent Court
Suite 1500
Dallas, TX 75201

9/28/04