# UNITED STATES BANKRUPTCY COURT

## For the District of Delaware

| | |
|---|---|
| In re | Honorable Kevin J. Carey |
| | Chapter 11 |
| New Century Mortgage Corporation | 07-10419 |
| New Century Mortgage Ventures, LLC | 07-10429 |
| NC Capital Corporation | 07-10420 |
| NC Residual III Corporation | 07-10424 |
| New Century R.E.O.  Corp. | 07-10426 |
| New Century R.E.O.  II Corp. | 07-10427 |
| New Century R.E.O.  III Corp. | 07-10428 |
| NC Deltex, LLC | 07-10430 |
| NCoral, L.P. | 07-10431 |
| NC Asset Holding, L.P. | 07-10423 |
| Home123 Corporation | 07-10421 |
| New Century TRS Holdings, Inc. | 07-10416 |
| NC Residual IV Corporation | 07-10425 |
| New Century Credit Corporation | 07-10422 |
| New Century Financial Corporation | 07-10417 |
| New Century Warehouse Corporation | 07-11043 |
| Debtors. | |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF FEBRUARY 2, 2008

Suzzanne S. Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

Mark Collins
Michael J. Merchant
Christopher M. Samis
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Attorneys for the Debtors and Debtors in Possession

*Please note that this Disclosure Statement is a <u>draft</u> and that it has not been approved by the Bankruptcy Court.  Until this Disclosure Statement is approved by the Bankruptcy Court, after a determination that it contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code, <u>this Disclosure Statement may not be used for solicitation purposes.</u>  Accordingly, no party should rely on this Disclosure Statement for the purpose of determining whether or not to vote to accept or reject the Plan or for any other purpose until this Disclosure Statement is approved by the Bankruptcy Court.*

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

        A.      SUMMARY OF THE PLAN.............................................................. 3

        B.      RECOMMENDATION ..................................................................... 13

II.     VOTING ........................................................................................................... 14

        A.      ELIGIBILITY TO VOTE ................................................................ 14

        B.      BALLOTS....................................................................................... 16

        C.      VOTING PROCEDURE .................................................................. 17

        D.      DEADLINE FOR VOTING ............................................................ 17

        E.      IMPORTANCE OF YOUR VOTE .................................................. 17

III.    BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES ................. 17

        A.      INTRODUCTION ........................................................................... 17

        B.      EVENTS LEADING TO CHAPTER 11 CASES ............................. 23

        C.      THE CHAPTER 11 CASES ............................................................ 26

        D.      OTHER EVENTS DURING CHAPTER 11 CASES......................... 40

        E.      MANAGEMENT; HEADCOUNT REDUCTION ........................... 51

IV.     THE PLAN ....................................................................................................... 52

        A.      PLAN OVERVIEW......................................................................... 53

        B.      CLASSIFICATION ........................................................................ 65

        C.      THE MULTI-DEBTOR CLAIM PROTOCOL FOR TREATMENT OF
                CLAIMS AGAINST MULTIPLE DEBTORS .................................... 89

        D.      THE INTERCOMPANY PROTOCOL FOR TREATMENT OF
                INTERCOMPANY CLAIMS............................................................ 90

        E.      MEANS OF IMPLEMENTING THE PLAN...................................... 91

        F.      DISTRIBUTIONS UNDER THIS PLAN ........................................ 104

        G.      PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED
                CLAIMS ........................................................................................ 114

        H.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES......................... 116

        I.      EFFECT OF CONFIRMATION AND INJUNCTION.................................... 117

        J.      CONDITIONS PRECEDENT .......................................................... 119

        K.      RETENTION OF JURISDICTION................................................... 121

        L.      NON-SEVERABILITY ................................................................... 123

| | | | |
|---|---|---|---|
| | M. | BANKRUPTCY RULE 9019 REQUEST | 123 |
| V. | | FINANCIAL INFORMATION | 123 |
| | A. | STATUS OF ASSET DISPOSITION PROCESS; ADDITIONAL ASSETS OF DEBTORS; CURRENT CASH POSITION | 123 |
| | B. | RISKS ASSOCIATED WITH RECOVERY OF ASSETS | 130 |
| VI. | | CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN | 131 |
| VII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 131 |
| | A. | SUMMARY OF THE PLAN STRUCTURE | 132 |
| | B. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED UNSECURED CLAIMS AGAINST HOLDING COMPANY DEBTORS AND OPERATING DEBTORS | 132 |
| | C. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS AGAINST ACCESS LENDING | 133 |
| | D. | ALLOCATION OF CONSIDERATION TO INTEREST | 134 |
| | E. | FEDERAL INCOME TAX TREATMENT OF HOLDERS OF INTERESTS AND 510(B) CLAIMS | 134 |
| | F. | FEDERAL INCOME TAX TREATMENT OF THE LIQUIDATING TRUST | 134 |
| | G. | FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS | 136 |
| | H. | BACKUP WITHHOLDING | 137 |
| VIII. | | ALTERNATIVES TO CONFIRMATION OF THE PLAN | 137 |
| IX. | | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 138 |
| | A. | GENERAL CONFIRMATION REQUIREMENTS | 138 |
| | B. | BEST INTERESTS TEST | 138 |
| | C. | FINANCIAL FEASIBILITY TEST | 140 |
| | D. | ACCEPTANCE BY IMPAIRED CLASSES | 140 |
| X. | | CONCLUSION | 141 |

# I.     INTRODUCTION

The following debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on April 2, 2007 (the "Petition Date"), thereby commencing case numbers 07-10416, 07-10417, 07-10419, 07-10420, 07-10421, 07-10422, 07-10423, 07-10424, 07-10425, 07-10426, 07-10427, 07-10428, 07-10429, 07-10430, and 07-10431 (collectively, and with the chapter 11 case of New Century Warehouse Corporation, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"):

| | |
|---|---|
| New Century Financial Corporation, a Maryland corporation; Case No. 07-10417 | New Century R.E.O. Corp., a California corporation; Case No. 07-10426 |
| New Century TRS Holdings, Inc., a Delaware corporation; Case No. 07-10416 | New Century R.E.O. II Corp., a California corporation; Case No. 07-10427 |
| New Century Mortgage Corporation, a California corporation; Case No. 07-10419 | New Century R.E.O. III Corp., a California corporation; Case No. 07-10428 |
| NC Capital Corporation, a California corporation; Case No. 07-10420 | New Century Mortgage Ventures, LLC, a Delaware limited liability company; Case No. 07-10429 |
| Home123 Corporation, a California corporation; Case No. 07-10421 | NC Deltex, LLC, a Delaware limited liability company; Case No. 07-10430 |
| New Century Credit Corporation, a California corporation; Case No. 07-10422 | NCoral, L.P., a Delaware limited partnership; Case No. 07-10431 |
| NC Asset Holding, L.P., a Delaware limited partnership; Case No. 07-10423 | NC Residual IV Corporation, a Delaware corporation; Case No. 07-10425 |
| NC Residual III Corporation, a Delaware corporation; Case No. 07-10424 | |

Subsequently, on August 3, 2007, New Century Warehouse Corporation, a California corporation which is also known as and is referred to herein as "Access Lending" (collectively with the above-listed entities, the "Debtors"), filed a voluntary chapter 11 petition (Case No. 07-11043).

Since filing for bankruptcy protection, the Debtors have continued to operate their business and manage their affairs as Debtors and Debtors in Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On April 4, 2007, the Bankruptcy Court entered an order

authorizing the joint administration of the Chapter 11 Cases (the "Joint Administration Order"). After Access Lending filed its chapter 11 petition, the Joint Administration Order was amended to include Access Lending.

On February 2, 2008, the Debtors and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtor, the "Plan Proponents") filed their proposed Joint Plan of Liquidation Dated February 2, 2008 (the "Plan"). The Plan is the result of extensive negotiations among the Plan Proponents. THE DEBTORS AND THE COMMITTEE URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE PLAN.**

The information used in preparing this Disclosure Statement was prepared by and is the sole responsibility of the Debtors. This Disclosure Statement does not constitute financial or legal advice. Creditors and shareholders of the Debtors should consult their own advisors if they have questions about the Plan or this Disclosure Statement. Capitalized terms used in this Disclosure Statement and not expressly defined herein will have the meaning ascribed to such terms in the Plan. A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement.

**WHILE THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. YOU SHOULD READ THE PLAN AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, AS WELL AS COPIES OF THE LIQUIDATING TRUST AGREEMENT, CAN BE OBTAINED FROM NEW CENTURY FINANCIAL CORPORATION, C/O XROADS CASE MANAGEMENT SERVICES, P.O. BOX 8901, MARINA DEL REY, CALIFORNIA 90295, TELEPHONE (888) 784-9571, AND AT http://www.xroadscms.net/newcentury. THE COST OF COPIES MUST BE PAID BY THE PERSON ORDERING THEM. COPIES OF PAPERS FILED IN THIS CASE ALSO MAY BE INSPECTED DURING REGULAR COURT HOURS IN THE CLERK'S OFFICE, UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.**

**THE STATEMENTS AND INFORMATION CONCERNING THE DEBTORS, THE PLAN, AND THE LIQUIDATING TRUST SET FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED**

HEREIN. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED. THE DEBTORS ASSUME NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DO NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS, INCLUDING THOSE STATEMENTS, ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS AND INTERESTS, ESTIMATES OF THE AGGREGATE FINAL AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALES OF THE DEBTORS' REMAINING ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE LIQUIDATING TRUST DURING THE WIND DOWN PERIOD. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN, POSSIBLY BY MATERIAL AMOUNTS.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT. PURSUANT TO THE PLAN, ANY SECURITIES OF THE DEBTORS ISSUED TO ANY PARTY UNDER, PURSUANT TO OR IN EFFECTUATING THE PLAN, AND THE OFFERING AND ISSUANCE THEREOF BY ANY PARTY, INCLUDING WITHOUT LIMITATION THE DEBTORS, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OF, UNDERWRITER OF, OR BROKER OR DEALER IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING WITHOUT LIMITATION SECTION 1145 OF THE BANKRUPTCY CODE.

A. SUMMARY OF THE PLAN.

The following is a brief summary of the Plan, which is qualified in its entirety by

reference to the Plan, attached as <u>Exhibit A</u> to this Disclosure Statement. Capitalized terms not defined herein will have the meaning given to them in the Plan.

### 1. The Debtors' Organizational Structure.

The Plan provides for distributions to creditors of the 16 companies that are debtors in possession in these Chapter 11 Cases. These companies are related to one another as shown in the following chart.



## 2. The Structure of the Plan.

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified, while Priority Claims and Secured Claims against each Debtor are each placed in their own Classes.[1] The Plan provides for payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims and leaves Allowed Secured Claims unimpaired.

Holders of Interests in New Century Financial Corporation ("NCFC") and 510(b) Claims will receive no distributions under the Plan and, therefore, are deemed to reject the Plan. The securities owned by Holders of NCFC Interests will be cancelled pursuant to the Plan.

The Plan is a joint plan, which means that separate classes are established for Unsecured Claims against each of the Debtors, but the distributions made to the classes of Unsecured Claims are generally made on a joint basis for each of three groups of companies comprising the Debtors. These groupings of companies take into account such matters as intercompany claims among the Debtors and which Debtors owned which assets. These matters were not always subject to definitive answer. For example, multiple Debtors could assert that they should be the beneficiary of litigation claims related to the need to restate the Debtors' financials, and assets and liabilities were sometimes transferred among the Debtors in a manner that could lead to competing claims among the Debtors for ownership of assets or responsibility for liabilities. These matters are resolved and compromised through the Plan.

The three broad groups of Debtors (each, a "Debtor Group") established in the Plan for purposes of the treatment of Unsecured Claims are: (1) the Holding Company Debtors, (2) the Operating Debtors, and (3) Access Lending.

The Holding Company Debtors are NCFC, New Century TRS Holdings, Inc. ("TRS Holdings"), New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). The Holding Company Debtors generally qualified as real estate investment trusts. They typically held residual interests in securitization trusts and owned the stock in the Operating Debtors. The Holding Company Debtors also provided overall direction and management to the Operating Debtors.

The Operating Debtors are New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral"). The Operating Debtors were generally the entities that conducted the Debtors' business operations, including originating, purchasing and selling loans, and servicing loans for third parties.

Access Lending was a subsidiary that provided warehouse financing to independent mortgage companies. It was acquired by TRS Holdings in early 2006.

---

[1] Administrative Claims, Priority Tax Claims, Priority Claims, and Secured Claims are referred to collectively herein and in the Plan as "A/P/S Claims."

The Plan contains 16 Classes of Unsecured Claims, six of which are Classes of Claims against Holding Company Debtors, nine of which are Classes of Claims against Operating Debtors, and one of which is a Class of Claims against Access Lending.

The Plan provides for the distribution of the net Cash available from Assets of the Debtors in each Debtor Group to the Holders of Allowed Unsecured Claims in that Debtor Group. In general, the Cash available to distribute to Holders of Allowed Unsecured Claims in each Debtor Group is calculated based on gross proceeds from the disposition of that Debtor Group's Assets less (i) the amount of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and Allowed Secured Claims (defined collectively in the Plan as "A/P/S Claims"), (ii) expenses of administering the Debtors' Estates during the Chapter 11 Cases, and (iii) expenses of the Liquidating Trust, which will be allocated among the Debtor Groups pursuant to the terms of the Plan.

Each Holder of an Allowed Unsecured Claim against Access Lending will receive its Pro Rata share of the Assets of Access Lending remaining after the payment of the A/P/S Claims against Access Lending are allocated to Access Lending.

The Assets not owned by Access Lending are divided between the Holding Company Debtors and the Operating Debtors.

Assets of the Holding Company Debtors include the assets in the irrevocable trust established in connection with NCFC's deferred compensation plan (discussed in Section III.C.9.g hereof) and investments in structured securitizations in the residential subprime sector in a fund managed by Carrington Capital Management, LLC (discussed in Section V.A.4.a hereof).

Assets of the Operating Debtors include proceeds from the sales of the Debtors' servicing business (discussed in Section III.C.6.b hereof) and mortgage loans not subject to repurchase transactions (discussed in Section III.C.6.f hereof).

The net proceeds generated from any litigation (other than that belonging to Access Lending) are referred to in the Plan as "Litigation Proceeds" and include any net proceeds from Avoidance Actions as well as any net proceeds of litigation arising from NCFC's announced need for restate its 2006 financial statements. Any Litigation Proceeds will be allocated on a percentage basis to Holders of Allowed Unsecured Claims against the Holding Company Debtors and the Operating Debtors in order to effect a compromise concerning such matters as which Debtor(s) could assert such claims and intercompany claims related thereto. The Plan provides that Litigation Proceeds will be allocated 27.5% to Holders of Allowed Unsecured Claims against Holding Company Debtors and 72.5% to Holders of Allowed Unsecured Claims against Operating Debtors (subject to a further allocation among the Holders of Allowed Unsecured Claims against Operating Debtors to provide that the Holders of Allowed NC Capital EPD/Breach Claims will receive 45% of the Litigation Proceeds and Holders of all other Allowed Unsecured Claims against Operating Debtors will receive 27.5% of the Litigation Proceeds).

For purposes of calculating distributions to be made in respect of each Allowed Unsecured Claim, each Class of Unsecured Claims is assigned a "Determined Distribution Amount" -- a fixed percentage of the amount of each Allowed Unsecured Claim. This

mechanism permits the Plan to reflect the relative asset values of the Debtors and to apply the Multi-Debtor Claim Protocol (discussed below).

The Plan assigns Determined Distribution Amount percentages of 100%, 50%, or 25% to Classes of Allowed Unsecured Claims against Operating Debtors. While each Allowed Unsecured Claim against NCMC (which owned the assets relating to the Debtors' loan serving business) is assigned a Determined Distribution Amount equal to 100% of the amount of the Allowed Claim, each Allowed Unsecured Claim against NC Capital is assigned a Determined Distribution Amount of 50% or 100% of the amount of such Allowed Claim (depending on the basis of the Claim), and each Allowed Unsecured Claim against Home123, NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral is assigned a Determined Distribution Amount of 25% of the amount of such Allowed Claim. As a result, while net proceeds of Assets (other than Litigation Proceeds) are distributable Pro Rata within the Operating Debtor group, a Holder of an Allowed Unsecured Claim against NCMC will receive twice the rate of recovery on account of such Claim as would a Holder of an Allowed EPD/Breach Claim against NC Capital and four times the rate of recovery as would the Holder of an Allowed Unsecured Claim against Home123, NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, or NCoral. These Determined Distribution Amounts are designed to reflect the relative strengths of issues concerning which of the Operating Debtors owned the servicing rights and loans that the Debtors sold in the Chapter 11 Cases and relative arguments concerning some disputed intercompany claims among the Debtors.

The Plan assigns a Determined Distribution Amount of 100% of the amount of all Allowed Unsecured Claims against Holding Company Debtors and Access Lending. The ranges of recoveries for Holders of Allowed Unsecured Claims against Holding Company Debtors and Operating Debtors is set forth in the table located in Section I.A.4 hereof.

The Plan also compromises inter-Debtor issues related to the fact that multiple Debtors were jointly liable to some creditors (by virtue of agreements providing for joint and several liability or guarantees) through the Multi-Debtor Claim Protocol contained in Article 6 of the Plan. Pursuant to the Multi-Debtor Claim Protocol, each Holder of an Allowed Unsecured Claim for which multiple Debtors in a Debtor Group are jointly liable will receive a single distribution from that Debtor Group based on the highest Determined Distribution Amount assigned to such Claim. If, however, specific Debtors (i.e., those with recoverable assets) within a Debtor Group are jointly liable for such Claim, then the Holder of the Allowed Unsecured Claims will receive an enhanced recovery. For example, if both NCFC and NC Credit are liable for the an Allowed Unsecured Claim, the Holder of such Claim will receive a single Pro Rata distribution from the Holding Company Debtor group, but the Determined Distribution Amount assigned to such Claim will be 130% of the amount of the Allowed Claim. Similarly, if all of NCMC, NC Capital, and Home123 are jointly liable for the same Allowed Unsecured Claim, the Holder of such Claim will receive a single Pro Rata distribution from the Operating Debtor group, but with a Determined Distribution Amount of 130% of the amount of the Allowed Claim. The Multi-Debtor Claim Protocol will provide enhanced recoveries to certain Repurchase Counterparties (defined and discussed in Section III.A.1.a hereof), as many of the Master Repurchase Agreements (defined and discussed in Section III.A.1.a hereof) were entered into or guaranteed by multiple Holding Company Debtors and Operating Debtors.

The Multi-Debtor Protocol only enhances Determined Distribution Amounts of Allowed Claims within a Debtor Group. To the extent a Holding Company Debtor and an Operating Debtor are jointly liable for an Allowed Claim, the Holder of such Claim will receive a distribution from both Debtor Groups (after giving effect to the Multi-Debtor Claim Protocol, if applicable, to the multiple Allowed Claims within each Debtor Group).

The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending.

Through the Intercompany Claim Protocol set forth in Article 7 of the Plan, the Plan effects a settlement of the Debtors' intercompany claims by cancelling such claims within each Debtor Group and providing that intercompany claims of Holding Company Debtors against Operating Company Debtors are reduced by 50%.

The Plan also includes a protocol to determine the distribution amounts (before giving effect to the Determined Distribution Amounts and the Multi-Debtor Claim Protocol) for Holders of Allowed Unsecured Claims arising under an agreement between one or more of the Debtors and a loan buyer or securitization trust for (i) breach of a representation or warranty made by one or more of the Debtors under a loan sale agreement (a "Breach Claim") or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan (an "EPD Claim" and, collectively with Breach Claims, "EPD/Breach Claims"). Under the EPD/Breach Claim Protocol, the Determined Distribution Amount for each EPD/Breach Claim is determined (i) with respect to EPD Claims, as a percentage (from 0% to 45%) of a loan's unpaid principal balance on August 31, 2007 (the claims bar date for all Debtors other than Access Lending), with the percentage determined based on borrower payment history on that date and (ii) with respect to Breach Claims, by applying a set of assumptions regarding the percentage of loans in any pool of loans that will be subject to breach, the timing of when breaches are asserted, and damages resulting from breaches. The EPD/Breach Claim Protocol was developed by the Debtors working in conjunction with the Committee and a number of major securitization trustees and whole loan buyers. This protocol is designed to avoid the need to analyze whether the Debtors breached representations and warranties for individual loans and assessing damages for any such breaches or EPD Claims at a loan level. Given the extremely large magnitude of loans that the Debtors sold, if such matters were analyzed at a loan level, the parties involved in developing this aspect of the Plan were persuaded that the costs of determining Claims amount, both for the Estates and the Creditors, would consume a significant portion of the assets that otherwise would be available for distribution. In addition, resolving such matters at an individual loan level would severely delay such determinations thereby delaying distributions to Creditors. Thus, the EPD/Breach Claim Protocol is designed to simplify such determinations and, in the process, save significant costs of administration and speed distributions. The numeric factors used in this aspect of the Plan were developed from the Debtors' historic data, data supplied by loan buyers and securitization trusts, and industry data.

### 3. The Liquidating Trust.

The Plan provides that the Debtors will transfer all of their assets and all of their liabilities after giving effect to the Plan to a liquidating trust (the "Liquidating Trust") for the benefit of the Holders of Allowed Holding Company Debtor Unsecured Claims and the Holders

of Allowed Operating Debtor Unsecured Claims. The Liquidating Trust will assume the Debtors' obligations with respect to each A/P/S Claim as well as each Unsecured Claim against Access Lending.

The Liquidating Trust will be advised and supervised by a five member committee (the "Plan Advisory Committee") that will be selected by the Committee (and who may be members of the current Committee). The trustee for the Liquidating Trust (the "Liquidating Trustee") will be selected by the Plan Proponents no later than ten (10) days prior to the Confirmation Hearing.

To the extent not completed by the Debtors prior to the Effective Date, the Liquidating Trustee will complete the wind-down process, including filing tax returns, settling or satisfying and paying A/P/S Claims and Claims against Access Lending, resolving Disputed Claims, prosecuting Causes of Action, and completing any remaining asset sales. The Liquidating Trustee will also calculate and pay amounts distributable to Holders of Allowed Holding Company Debtor Unsecured Claims and Allowed Operating Debtor Unsecured Claims.

On the Effective Date, the Liquidating Trustee will establish reserves from which to pay costs of the Liquidating Trust necessary to complete the wind-down process and to pay all Allowed Claims and Disputed Claims not paid as of the Effective Date that are A/P/S Claims. Prior to any interim distributions to Holders of Allowed Unsecured Claims, the Liquidating Trustee will also establish appropriate reserves for Disputed Unsecured Claims against Access Lending, the Holding Company Debtors, and the Operating Debtors. In addition, the Liquidating Trustee will set aside reserves of approximately $[__][2] for the prosecution of the Causes of Action. The Liquidating Trustee also may withhold additional amounts for administration and other miscellaneous needs of the Liquidating Trust without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

The Liquidating Trustee will distribute all proceeds from the liquidation of the Liquidating Trust Assets, to the Holders of Allowed Holding Company Debtor Unsecured Claims and the Holders of Allowed Operating Debtor Unsecured Claims in accordance with each such Holders' beneficial interests in the Liquidating Trust as provided in the Plan. The Liquidating Trustee may make interim distributions (subject to establishing the reserves described above) when deemed appropriate by the Liquidating Trustee and the Plan Advisory Committee.

### 4.     Claims and Distributions.

Through January 21, 2008, 3,754 Claims, in an approximate amount of $35.1 billion, have been filed against the Debtors. In addition, exclusive of inter-company Claims, approximately 9,225 of the Claims, in the approximate amount of $37.9 million, listed on the Debtors' Schedules are not scheduled as contingent, unliquidated, or disputed and have not been

---

[2] This draft Disclosure Statement omits certain information, including financial information and information related to the estimated recoveries of Creditors under the terms of the Plan and the assumptions underlying the Plan. The Debtors will amend this Disclosure Statement to include such information no later than seven (7) days prior to hearing on the Disclosure Statement.

superseded by filed Claims. Of the Claims filed against the Debtors, 666 Claims in an approximate amount of $23.7 billion would be classified as Secured Claims, 98 Claims in an approximate amount of $64.1 million would be classified as Administrative Claims, 964 Claims in an approximate amount of $761 million would be classified as Priority Tax Claims or Priority Claims, and 2,026 Claims in an approximate amount of $10.5 billion would be classified as Unsecured Claims. Excluding duplicate Claims, late-filed Claims, and Claims with no supporting documentation with respect to which objections have been filed and sustained and giving effect to the Multi-Debtor Claim Protocol, 211 Claims in an approximate amount of $22.0 million would be classified as Secured Claims, 31 Claims in an approximate amount of $3.0 million would be classified as Administrative Claims, 611 Claims in an approximate amount of $163.0 million would be classified as Priority Tax Claims or Priority Claims, and 2,284 Claims in an approximate amount of $7.4 billion would be classified as Unsecured Claims.

In addition, the Debtors have undertaken an extensive analysis of the remaining A/P/S Claims and Unsecured Claims, many of which are subject to current settlement negotiations and pending objections. The Debtors analysis included an extensive review of unliquidated Claims and potential Claims for future contract rejections. Based upon such analysis, as well as a determination of the classification of each Claim consistent with the terms of the Plan, the estimates below have been developed.

At this time, the Debtors project that, through the liquidation of their Assets (other than via prosecution of the Causes of Action), the Cash available for distribution to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims will range from approximately $[__] to $[__] and that the Cash available for distribution to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims will range from approximately $[__] to $[__]. Additionally, the Debtors project that the Cash available for distribution to Holders of Allowed Access Lending Unsecured Claims will range from approximately $[__] to $[__]. The actual amount of such Cash (other than Litigation Proceeds) available for distribution to Holders of Allowed Unsecured Claims will depend on various factors, including: (1) the cost of administering the Estates and the Liquidating Trust, (2) amounts received on sales of assets, and (3) the amount of A/P/S Claims.

In light of the amounts of currently filed Claims against the Estates of the Holding Company Debtors, Claims listed on the Holding Company Debtors' Schedules, and the projected amount of Holding Company Debtor Net Distributable Assets, the Debtors project that Holders of Allowed Unsecured Claims against the Holding Company Debtors will be entitled to receive between $[__] and $[__], collectively, yielding a net average recovery (*prior to any recovery from the Causes of Action*) of between [_]% and [_]% of their Allowed Unsecured Claims.

In addition, given the amounts of currently filed Claims against the Estates of the Operating Debtors, Claims listed on the Operating Debtors' Schedules and the projected amount of Operating Debtor Net Distributable Assets, the Debtors project that Holders of Allowed Unsecured Claims against the Operating Debtors will be entitled to receive between $[__] and $[__], collectively, yielding a net average recovery (*prior to any recovery from the Causes of Action*) of between [___]% and [___]% of their Allowed Unsecured Claims.

Finally, given the amounts of currently filed Claims against the Estate of Access Lending, Claims listed on the Access Lending's Schedules and the projected amount of Access

Lending Net Distributable Assets, the Debtors project that Holders of Allowed Unsecured Claims against Access Lending will be entitled to receive between $[__] and $[__] collectively, yielding a net average recovery of between [__]% and [__]% of their Allowed Unsecured Claims.

These amounts are summarized in the following table:

| Class | Impaired/ Unimpaired | Percentage Recovery (Excluding Litigation) |
|---|---|---|
| **Claims to be Paid in Full Under the Plan** | | |
| **Administrative Claims against all Debtors** | Unimpaired | 100% |
| **Priority Tax Claims against all Debtors** | Unimpaired | 100% |
| **Claims Against and Interests in the Holding Company Debtors** | | |
| **Class HC1:  Priority Claims Against NCFC** | Unimpaired | 100% |
| **Class HC2:  Secured Claims Against NCFC** | Unimpaired | 100% |
| **Class HC3a:  Special Deficiency Claims Against NCFC** | Impaired | [__]% |
| **Class HC3b:  Other Unsecured Claims Against NCFC** | Impaired | [__]% |
| **Class 4a:  Series A Preferred Stock Interests** | Impaired | 0% |
| **Class 4b:  Series A 510(b) Claims** | Impaired | 0% |
| **Class 4c:  Series B Preferred Stock Interests** | Impaired | 0% |
| **Class 4d:  Series B 510(b) Claims** | Impaired | 0% |
| **Class 4e:  Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims** | Impaired | 0% |
| **Class HC5:  Priority Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC6:  Secured Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC7:  Other Unsecured Claims Against TRS Holdings** | Impaired | [__]% |
| **Class HC8:  Priority Claims Against NC Credit** | Unimpaired | 100% |

| Class | Impaired/ Unimpaired | Percentage Recovery (Excluding Litigation) |
|---|---|---|
| **Class HC9: Secured Claims Against NC Credit** | Unimpaired | 100% |
| **Class HC10a: Special Deficiency Claims Against NC Credit** | Impaired | [___]% |
| **Class HC10b: Other Unsecured Claims Against NC Credit** | Impaired | [___]% |
| **Class HC11: Priority Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC12: Secured Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC13: Other Claims Against NC Residual IV** | Impaired | [___]% |
| **Claims Against the Operating Debtors** | | |
| **Class OP1: Priority Claims Against NCMC** | Unimpaired | 100% |
| **Class OP2: Secured Claims Against NCMC** | Unimpaired | 100% |
| **Class OP3a: Special Deficiency Claims Against NCMC** | Impaired | [___]% |
| **Class OP3b: EPD/Breach Claims Against NCMC** | Impaired | [___]% |
| **Class OP3c: Other Unsecured Claims Against NCMC** | Impaired | [___]% |
| **Class OP4: Priority Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP5: Secured Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP6a: Special Deficiency Claims Against NC Capital** | Impaired | [___]% |
| **Class OP6b: EPD/Breach Claims Against NC Capital** | Impaired | [___]% |
| **Class OP6c: Other Unsecured Claims Against NC Capital** | Impaired | [___]% |
| **Class OP7: Priority Claims Against Home123** | Unimpaired | 100% |
| **Class OP8: Secured Claims Against Home123** | Unimpaired | 100% |
| **Class OP9a: Special Deficiency Claims Against Home123** | Impaired | [___]% |

| Class | Impaired/ Unimpaired | Percentage Recovery (Excluding Litigation) |
|---|---|---|
| **Class OP9b: Other Unsecured Claims Against Home123** | Impaired | [__]% |
| **Class OP10: Priority Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Unimpaired | 100% |
| **Class OP11: Secured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Unimpaired | 100% |
| **Class OP12: Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Impaired | [__]% |
| **Claims Against Access Lending** | | |
| **Class AL1: Priority Claims Against Access Lending** | Unimpaired | 100% |
| **Class AL2: Secured Claims Against Access Lending** | Unimpaired | 100% |
| **Class AL3: Other Unsecured Claims Against Access Lending** | Impaired | [__]% |

B.    RECOMMENDATION.

THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ON THE PLAN CAST THEIR BALLOTS TO ACCEPT THE PLAN. THE DEBTORS AND THE COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.

For the Committee's discussion of benefits of the Plan for Holders of Unsecured Claims, see the Committee's letter dated [____], 2008 that is included with the Plan solicitation materials.

## II.     VOTING

### A.     ELIGIBILITY TO VOTE.

The Plan divides Claims against and Interests in the Debtors into various Classes and provides separate treatment for each Class.

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims will not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims will be treated separately as unclassified Claims and will be paid in full.  The unclassified Claims are unimpaired and are not entitled to vote on the Plan.

The Claims in the Classes listed in the following table are unimpaired and conclusively presumed to have accepted the Plan:

| Class | Description |
|---|---|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |
| Class HC11 | Priority Claims against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL1 | Priority Claims against Access Lending |

| Class | Description |
|---|---|
| Class AL2 | Secured Claims against Access Lending |

Creditors in the Classes listed in the above table are not entitled to vote on the Plan. If and to the extent that any Class identified as unimpaired is determined to be impaired, such Class will be entitled to vote to accept or reject the Plan.

All other Classes of Claims and Interests under the Plan are impaired. Holders of Claims in the Classes listed in the following table are entitled to vote to accept or reject the Plan:

| Class | Description |
|---|---|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |
| Class OP3c | Other Unsecured Claims against NCMC |
| Class OP6a | Special Deficiency Claims against Home123 |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

Each of Classes HC3a, HC3b, HC10a, HC10b, OP3a, OP3b, OP3c, OP6a, OP6b, OP6c, OP9a, and OP9b is considered a separate Class for purposes of voting to accept or reject the Plan.

Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject

the Plan:

| Class | Description |
|---|---|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

The record date for determining any creditor's eligibility to vote on the Plan is [___], 2008. Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement.

**CREDITORS WHOSE CLAIMS ARE BEING OBJECTED TO ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTIONS ARE RESOLVED IN THEIR FAVOR OR, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. ANY CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).**

B. **BALLOTS.**

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class. Please read the voting instructions on the reverse side of the Ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT XROADS CASE MANAGEMENT SERVICES, P.O. BOX 8901, MARINA DEL REY, CALIFORNIA 90295, TELEPHONE (888) 784-9571, AND ELECTRONIC MAIL infocms@xroadscms.com. XROADS CASE MANAGEMENT SERVICES CANNOT PROVIDE YOU WITH LEGAL ADVICE.**

C.   **VOTING PROCEDURE.**

Unless otherwise directed in your solicitation package, mail your completed ballots to: Xroads Case Management Services, P.O.  Box 8901, Marina Del Rey, California 90295.  **DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.**  A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan.  If you cast more than one Ballot voting the same Claim before 4 p.m. Pacific time on the voting deadline, the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots.  Additionally, you may not split your votes for your Claims within a particular Class under the Plan either to accept or reject the Plan.  Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes.  **DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER SECURITIES WITH YOUR BALLOT.  FACSIMILE, EMAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

**PLEASE PUT YOUR TAXPAYER IDENTIFICATION NUMBER ON YOUR BALLOT; THE DISBURSING AGENT MAY NOT BE ABLE TO MAKE DISTRIBUTIONS TO YOU WITHOUT IT.**

D.   **DEADLINE FOR VOTING.**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY 4:00 P.M., PACIFIC TIME ON [TO BE DETERMINED].**

E.   **IMPORTANCE OF YOUR VOTE.**

Your vote is important.  The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of Allowed Claims in that Class that vote.  **ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PLAN.  YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

III.  **BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES.**

A.   **INTRODUCTION.**

The Debtors, other than Access Lending, commenced the Chapter 11 Cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on April 2, 2007.  Access Lending filed a voluntary Chapter 11 petition on August 3, 2007.  The Chapter 11 Cases are jointly administered, and pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors continue to operate their businesses and remain in possession of their property as debtors in possession.

### 1.    Prepetition Operations.

Prior to the Petition Date, the Debtors originated and purchased mortgage loans and sold mortgage loans through whole loan sales and securitizations.  The Debtors often retained residual economic interests in the loan securitizations.  The Debtors also serviced the loans that had been securitized and certain of the whole loans that they sold.

### a.    Loan Origination and Purchase.

The Debtors were engaged in the business of originating and purchasing mortgage loans through two divisions, the Wholesale Division and the Retail Division.

The Wholesale Division, which was operated by NCMC, originated and purchased mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its account executives.  As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states, and (3) employed approximately 1,087 account executives.  The broker's role in this process was to identify the applicant, assist in completing the loan application form, gather necessary information and documents, and serve as the NCMC's liaison with the borrower.  NCMC's role was to review and underwrite the applications submitted by the broker, approve or deny the application, set the interest rate and terms of the mortgage loan, and, upon acceptance by the borrower and satisfaction of all conditions imposed by the Debtors, fund the loan.  Correspondent lenders were independent mortgage bankers and financial institutions that sold loans to the Debtors that the correspondent had already funded.  For 2006, the Wholesale Division was responsible for approximately 85% of the mortgage loans originated by the Debtors.

The Retail Division, which was operated by Home123, originated mortgage loans through direct contact with consumers at branch offices as well as through referrals from builders, realtors, and other third parties.  As of December 31, 2006, the Retail Division employed approximately 1,702 retail loan officers located in 262 branch offices and three central telemarketing processing centers.  For 2006, the Retail Division originated approximately 15% of the mortgage loans produced by the Debtors.

A substantial portion of the mortgage loans originated by the Debtors were made to borrowers whose needs generally were not fulfilled by traditional financial institutions because these borrowers did not satisfy the credit, documentation, or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.  The practice of making mortgage loans to such borrowers is commonly referred to as "subprime lending."  Subprime loan production constituted approximately 86% of the Debtors' total loan production for fiscal year 2006.  The remaining production consisted of prime and "Alt-A" originations.  "Alt-A" refers to mortgage loans that fall between prime and sub-prime mortgage loans.

The Debtors used master repurchase agreements ("Master Repurchase Agreements"), to fund the origination and purchase of mortgage loans and to hold these loans pending sale or

securitization. During the months prior to the initiation of the Chapter 11 Cases, the Debtors and their non-Debtor subsidiaries were parties to repurchase facilities with Bank of America, N.A., Barclays Bank PLC, Citigroup Global Markets Realty Corp., Credit Suisse First Boston Mortgage Capital LLC, DB Structured Products, Inc., Goldman Sachs Mortgage Company, IXIS Real Estate Capital, Inc., Morgan Stanley Mortgage Capital Inc. and UBS Real Estate Securities, Inc. (each a "Repurchase Counterparty") and which in total provided the Debtors the capacity to fund approximately $17.4 billion of mortgage loans. The Debtors typically kept mortgage loans on a repurchase facility for several months until loans could be pooled for a securitization or a whole loan sale. In order to accomplish a securitization or whole loan sale, the Debtors would typically simultaneously repurchase the mortgage loans (often from several repurchase facilities), which transactions would occur simultaneously with the Debtors' sale of these mortgage loans to the securitization trust or whole loan buyer -- a portion of the proceeds from the mortgage loan sale or securitization would be used to pay down the repurchase obligations that the Debtors owed to the Repurchase Counterparty and the balance would be the Debtors' share of the transaction.

### b. Whole Loan Sales and Securitizations.

The Debtors sold most of the mortgage loans that they originated in the secondary mortgage market through whole loan sales or as securitizations.

In a whole loan sale, the selling Debtor typically sold a pool of mortgage loans to a financial institution that would either hold the loans for investment or pool the loans (often with loans bought from other originators) for subsequent securitizations.

In a securitization, the selling Debtor typically sold a pool of loans to a trust for a cash purchase price and a residual interest ownership in the trust (an "OTC" or a "residual"). The trust raised the cash portion of the purchase price for the pool of loans by selling to third party investors senior certificates representing senior interests in the loans in the trust. Purchasers of senior certificates received the principal collected, including prepayments, on the loans in the trust. In addition, they received a portion of the interest on the loans. Holders of OTCs, such as the Debtors, typically received the cash flows from the OTCs after payment of servicing fees, guarantor fees, and other trust expenses if specified over-collateralization requirements were met. Over-collateralization requirements were generally based on a percentage of the original or current unpaid principal balance of the loans and could be increased during the life of the securitization transaction depending upon actual delinquency or loss experience. The securitization trusts were distinct legal entities and were not included in the Debtors' Chapter 11 filings.

The loan sale agreements used by the Debtors often provided that the selling Debtor would repurchase or substitute a loan if (i) the borrower committed a payment default shortly after the loan was sold or (ii) the selling Debtor breached a representation or warranty contained in the loan sale agreement. The Debtors subsequently resold many such repurchased mortgage loans in discounted loan sales.

Prior to settling a whole loan sale transaction, the buyer typically engaged in a due

diligence review of a sample of mortgage loans in the pool.  The buyer typically identified mortgage loans that it would elect not to purchase, commonly referred to as "investor kick-outs." The Debtors subsequently sold many investor kick-outs in discounted loan pools.

### c.  Loan Servicing.

The Debtors serviced mortgage loans through NCMC.  NCMC serviced loans both for loan buyers (whole loan purchasers and securitization trusts) and for Repurchase Counterparties.

Loan servicing included a host of activities designed to collect payments from borrowers and to ensure that the borrowers repaid mortgage loans in accordance with their terms.  These servicing functions included: collecting and remitting loan payments; making required advances; accounting for principal and interest; customer service; holding escrow or impound funds for payment of taxes and insurance; and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults.

As of the Petition Date, the Debtors serviced approximately $19 billion of loans owned by the securitization trusts pursuant to the Master Servicing Agreements.  For servicing mortgage loans for third party whole loan buyers or securitization trusts, the Debtors generally received a servicing fee equal to 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio.  These servicing fees were typically collected from the monthly payments made by the borrowers on the loans.

Debtor entities, such as NC Residual IV, often owned OTCs or other interests in the securitization trusts.  Thus, the Debtors had a significant economic interest in the proper servicing of the securitized mortgage loans.

The Debtors also serviced mortgage loans that were subject to Master Repurchase Agreements.  The servicing of such mortgage loans was typically provided for in the Master Repurchase Agreements.  The Debtors did not receive fees for servicing mortgage loans that were subject to Master Repurchase Agreements.  As described below, as of the Petition Date, most of the Repurchase Counterparties had either terminated, or were in the process of terminating, NCMC as the servicer of mortgage loans subject to Master Repurchase Agreements. The Debtors cooperated with this effort and worked with the new servicers designated by the Repurchase Counterparties to transfer servicing of these mortgage loans.

### 2.  Funding of Loan Origination and Purchases Through Master Repurchase Agreements.

The Debtors used the Master Repurchase Agreements and their own working capital to fund the origination of mortgage loans.  The Master Repurchase Agreements structured as sale and repurchase agreements and were designed by the Repurchase Counterparties to attempt to qualify for special protections provided in the Bankruptcy Code for "repurchase agreements" (as defined in Bankruptcy Code section 101(47) or "securities contracts" as defined in Bankruptcy Code section 741(7)).

Each Master Repurchase Agreement provided that the Debtors would sell mortgage loans

to the Repurchase Counterparty and commit to repurchase these loans on a specified date for the same price paid plus a fee for the time value of money, termed a "Price Differential." The Price Differential was specified in a pricing side letter and was generally set at a floating rate based on LIBOR plus a spread. The Master Repurchase Agreements typically provided that the Debtors were required to repurchase each loan on the facility at a date (generally 30 or 60 days after the sale) specified in the individual commitment, or on each one-month anniversary loans were either repurchased or rolled for another month.  In addition, on the occurrence of an event of default, the Repurchase Counterparty could require the Debtors to repurchase all mortgage loans on a repurchase facility.

The amount paid for a mortgage loan by a Repurchase Counterparty depended on the quality of the mortgage loan and the rate of interest owed by the homeowner.  For some loans, this price could exceed the face principal amount because the parties assumed that the loan was worth significantly more than the face principal amount.  For other mortgage loans of lesser quality or as market conditions deteriorated, the Repurchase Counterparties were willing to pay less than the face principal amount of the mortgage loan, in which case the Debtors financed a portion of the principal amount of the loans with their own working capital (termed the "haircut").

The Master Repurchase Agreements varied in terms of the quality of the mortgage loans that were eligible -- some were designed only for prime mortgage loans, some for subprime mortgage loans, and some for mortgage loans that had been kicked or put back by the institutions that bought mortgage loans from the Debtors (termed "hospital loans").  The Master Repurchase Agreements also varied in their costs to the Debtors in terms of differing Price Differentials and other economic terms.  Thus, the Debtors worked to minimize their costs under these facilities and to maximize their funding capacity by negotiating with the Repurchase Counterparties over such terms and by moving mortgage loans among Master Repurchase Agreements.

The Debtors' business model contemplated that they would sell a mortgage loan in the secondary market for a profit generally within about one to three months after originating it. The Debtors pooled mortgage loans for sale to a whole loan buyer or a securitization trust, often drawing mortgage loans from a variety of Master Repurchase Agreements.  A portion of the price realized from the whole loan buyer or securitization trust was generally used to repurchase the loan from the Repurchase Counterparty, with the balance of the price going to the Debtors in satisfaction of any "haircut" funded by the Debtors plus to realize a profit for the Debtors.

The Master Repurchase Agreements allowed the Repurchase Counterparties to mark to market the mortgage loans that were subject to these facilities.  If the market value of the loans times an "advance rate" was less than the repurchase obligations that would be owed by the Debtors on repurchase, the Repurchase Counterparties were entitled to make a margin call.  The Debtors could satisfy a margin call through a cash payment or by delivering additional mortgage loans in order to bring the facility back into balance.

Under the Master Repurchase Agreements, in the event of default, each of the Repurchase Counterparties had a right to accelerate the Debtors' repayment obligations.  If the Debtors did not pay those repurchase obligations, the agreements generally provided that the

Repurchase Counterparties could sell the mortgage loans to third parties (often on very short notice) or retain the mortgage loans for their own accounts and credit the value of the mortgage loans against the Debtor's repurchase obligations (termed a "buy-in"), in effect foreclosing the Debtors rights to repurchase such mortgage loans. The Master Repurhcase Agreements also provided that if the Debtors' repurchase obligations were not fully satisfied by a third party sale or a buy-in, the Debtors party to the Master Repurchase Agreement were liable for any deficiency.

As noted above, the Repurchase Counterparties structured their facilities to take advantage of certain special provisions of the Bankruptcy Code that Congress added for bankruptcy cases commencing on or after October 17, 2005. These provisions are complex and many have not yet been tested in the courts. For qualifying repurchase agreements involving mortgage loans, the protections (often termed the "safe harbor") include the right of the counterparty to the repurchase agreement to terminate or to accelerate the repurchase agreement and to sell the mortgage loans subject to it. The Debtors and the Committee contend that these new provisions of the Bankruptcy Code also provide that any deficiency or surplus is to be measured as of the date that the repurchase agreement is terminated and accelerated, and that if there was a surplus on that date, the counterparty to the repurchase agreement owes that surplus to the estates. The Repurchase Counterparties disagree and the dispute is discussed in greater detail below. (See Section III.D.3 hereof). If an agreement does not qualify as repurchase agreement under Bankruptcy Code section 101(47) or as a security contract under Bankruptcy Code section 741(7), the counterparty would be subject to the provisions of the Bankruptcy Code that are generally applicable to secured creditors.

As discussed in further below, as of the Petition Date, each of the Repurchase Counterparties had made margin calls and terminated and accelerated its Master Repurchase Agreement, and some were in the process of exercising other remedies. As of the Petition Date, the Debtors' repurchase obligations under these facilities totaled approximately $8 billion and there were approximately $9 billion of mortgage loans subject to these Master Repurchase Agreements.

### 3. The Capital Trusts.

On September 13, 2006, NCFC sold through New Century Capital Trust I, a Delaware statutory trust ("Capital Trust I"), $50,000,000 in aggregate liquidation amount of preferred securities of Capital Trust I in a private placement transaction. Such preferred securities require quarterly distributions at a fixed rate of 8.65% through the distribution payment date in September 2011, whereupon the rate floats at three-month LIBOR plus 3.50% thereafter.

Capital Trust I simultaneously issued and sold 1,545 shares of common securities to NCFC for $1,545,000 in aggregate liquidation amount. The 1,545 shares of common securities constitute all of the issued and outstanding common securities of Capital Trust I. Capital Trust I used the proceeds from the sales of its preferred and common securities to purchase $51,545,000 aggregate principal amount of the NCFC's junior subordinated notes due 2036 (the "Capital Trust I Notes"). The terms of the Capital Trust I Notes are substantially the same as the terms of the preferred securities of Capital Trust I.

On November 16, 2006, NCFC sold through New Century Capital Trust II, a Delaware statutory trust ("Capital Trust II" and together with Capital Trust I, the "Capital Trusts"), $35,000,000 in aggregate liquidation amount of preferred securities of Capital Trust II in a private placement transaction. Such preferred securities require quarterly distributions at a fixed rate of 9.12 through the distribution payment date in December 2011, whereupon the rate floats at a three-month LIBOR plus 4.10% thereafter.

Capital Trust II simultaneously issued and sold 1,100 shares of common securities to NCFC for $1,100,000 in aggregate liquidation amount. The 1,100 shares of common securities constitute all of the issued and outstanding common securities of Capital Trust II. Capital Trust II used the proceeds from the sales of its preferred and common securities to purchase $36,100,000 aggregate principal amount of the NCFC's junior subordinated notes due 2036 (the "Capital Trust II Notes" and together with the Capital Trust I Notes, the "Capital Trust Notes"). The terms of the Capital Trust II Notes are substantially the same as the terms of the preferred securities of Capital Trust II.

The Capital Trust I Notes and the Capital Trust II Notes were issued, respectively, pursuant to (i) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of September 13, 2006 and (ii) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of November 16, 2006 (together, the "Capital Trust Indentures"). Under the Capital Trust Indentures, the Capital Trust Notes are subordinate to and subject in right of payment to the prior payment in full of "Senior Debt" as defined in each of the Capital Trust Indentures.

## B. EVENTS LEADING TO CHAPTER 11 CASES.

### 1. Deteriorating Market Conditions.

Calendar year 2006 was a challenging year for originators of mortgage loans. Interest rates continued their steady increase through the middle of the year. In the second half of 2006, short-term interest rates were generally higher than mid- or long-term interest rates (known as an inverted yield curve). For mortgage lenders, this resulted in the costs of funding loans under the short term repurchase agreements rising, which reduced the spread between these financing costs and the interest paid by homeowners. The higher average interest rates charged in 2006 also caused consumer demand for home purchase financings and refinancings to decrease from the recent past.

Lower consumer demand for mortgage products also contributed to pricing competition within the industry which resulted in lower profit margins on loans and motivated some lenders to make higher risk loans. Moreover, appreciation in residential real estate prices leveled off, and even declined in some areas, in 2006. This, in turn, made it more difficult for many borrowers to refinance their loans and loan delinquencies increased. As a result, the Debtors experienced higher investor rejects, more early payment defaults, and more loan repurchase demands than in prior periods. The Debtors repurchased many of these loans from whole loan purchasers and securitization trusts, which resulted in an increase in the quantity of lower quality loans in their inventory.

In addition, buyers in the secondary loan market began offering lower prices, which in

turn further reduced the profitability of loan originators. As a result of the lower prices offered by buyers of loans in the secondary loan market, the Repurchase Counterparties reduced the "mark to market" value of the loans subject to their facilities and made margin calls on the Debtors.

## 2. Restatement of Quarterly Results.

On February 7, 2007, NCFC announced that its board of directors (the "Board of Directors") had concluded, based upon the recommendation of management, that NCFC's previously filed financial statements for the quarters ended March 31, June 30, and September 30, 2006 should be restated to correct errors NCFC discovered in its application of generally accepted accounting principles regarding NCFC's allowance for loan repurchase losses. Further, NCFC also announced that it expected to post a fourth quarter loss and a full year loss, attributable primarily to lower net gain on sales, a reduction in the carrying value of residual assets, a reduction in the carrying value of mortgage loans held for sale, and an increase in the allowance for losses on loans held for investment.

The announcement resulted in the filing of various securities class action lawsuits alleging that NCFC and the other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCFC and therefore caused artificially inflated market prices of its common stock. Several derivative lawsuits based on the same factual allegations were also filed.

Additionally, on February 22, 2007, NCFC received a letter from NYSE Regulation Inc. indicating that its Market Trading Analysis Department was reviewing transactions in the NCFC's securities prior to the February 7, 2007 announcement.

## 3. Inability to File Annual Report with the SEC.

On March 2, 2007, NCFC announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") by March 1, 2007, without unreasonable effort and expense due to the following factors. First, the audit committee of the Board of Directors (the "Audit Committee"), advised by its independent counsel, was still in the process of investigating the issues giving rise to NCFC's need to restate its 2006 interim financial statements, as well as issues pertaining to NCFC's valuation of residual interests in securitizations in 2006 and prior periods. Second, NCFC had not yet completed its determination of the amount of the adjustment to the estimated fair value of its residual interests in securitizations necessary to reflect revised prepayment, cumulative loss and discount rate assumptions with respect to the mortgage loans underlying these assets. NCFC needed to revise these assumptions to reflect relevant data such as its then recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster repayment speeds. Finally, NCFC's management was still in the process of assessing the effectiveness of internal control over financial reporting as of December 31, 2006, in accordance with Section 404 of the Sarbanes-Oxley Act of 2002.

In addition, NCFC's independent registered public accounting firm, KPMG LLP

("KPMG"), informed NCFC that, among other matters, it would need to be informed of the results of the Audit Committee's investigation before completing its audit. Without completion of the audit, NCFC could not file the 2006 Form 10-K.

NCFC also announced that the Securities and Exchange Commission (the "SEC") had requested a meeting with NCFC to discuss these events and that the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") had commenced a criminal inquiry.

On March 13, 2007, the staff of the NYSE issued a press release announcing the delisting of NCFC's common stock, its Series A Cumulative Redeemable Preferred Stock, and its Series B Cumulative Redeemable Preferred Stock.

**4.      Exercise of Remedies by Repurchase Counterparties.**

The March 2, 2007 announcement had a devastating impact on the Debtors' business. During the following weeks, the Repurchase Counterparties made margin calls in excess of $150 million, approximately $70 million of which the Debtors were unable to satisfy by cash payments. Thereafter, the Repurchase Counterparties began restricting and ultimately ceased providing funding for loans originated by the Debtors. Generally around mid-March 2007, each of the Repurchase Counterparties declared the Debtors in default under its respective Master Repurchase Agreement.

Many of the Repurchase Counterparties began exercising control of the cash flow from the mortgage loans subject to their facilities and sent the Debtors notices that they would replace NCMC as servicer of these mortgage loans. The resulting constraints on the Debtors' normal cash flows from these loans further exacerbated the Debtors' liquidity situation. By March 5, 2007, the Debtors were able to fund only a portion of their loan originations. Due to the restrictions on access to the repurchase facilities and a number of state regulatory actions, the Debtors stopped accepting loan applications on March 8, 2007.

The Debtors continued to operate their mortgage loan servicing business for securitization trusts and whole loan purchasers and strived to comply with their obligations under their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Servicing generally required NCMC to advance funds for certain functions and the Debtors had historically financed a portion of these servicer advances through a secured loan facility provided by Citigroup Global Markets Realty Corp. ("Citigroup"). On March 8, 2007, Citigroup declared an event of default under this service advance facility and declined to finance additional servicer advances, which had the result of further constraining the Debtors' liquidity since thereafter they were required to provide necessary loan servicing advances from their own working capital.

During the weeks leading up to the Petition Date, the Debtors, aided by their professional advisors, including investment bank Lazard Freres & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

The Debtors' inability to originate loans and the commencement of the exercise of remedies by the Repurchase Counterparties left the Debtors with a severe liquidity crisis. The Debtors (other than Access Lending) commenced the Chapter 11 Cases on April 2, 2007 to pursue an expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

## C.     THE CHAPTER 11 CASES.

### 1.     Debtor in Possession Status.

Since filing for bankruptcy protection, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their business in the ordinary course of business. Transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

### 2.     Entry of the Debtors' First-Day Orders.

Concurrently with filing their bankruptcy petitions, the Debtors filed several emergency motions ("First-Day Motions") with the Bankruptcy Court that were intended to stabilize the Debtors and enable them to continue operations. Pursuant to their First-Day Motions, the Debtors sought and obtained from the Bankruptcy Court the following relief: (i) authority to jointly administer the Chapter 11 Cases [Docket Nos. 4, 52, and 67]; (ii) establishment of adequate assurance procedures with respect to utility providers [Docket Nos. 5, 51, and 395]; (iii) authority to continue all insurance policies and certain premium financing arrangements related thereto [Docket Nos. 6 and 50]; (iv) approval of the appointment of XRoads Case Management, LLC ("XRoads") as claims and noticing agent in the Chapter 11 Cases [Docket Nos. 7 and 179]; (v) authority to maintain the Debtors' prepetition centralized cash management system [Docket Nos. 8, 54, and 180]; (vi) authority to pay certain prepetition use taxes [Docket Nos. 9 and 49]; (vii) authority to honor prepetition employee wages and benefits [Docket Nos. 10, 47, and 227]; and (viii) authority to honor certain prepetition obligations to customers [Docket Nos. 11 and 48].

Shortly thereafter, the Debtors filed several other administrative motions with the Bankruptcy Court, including a motion seeking an extension of time to file the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules") [Docket No. 117], a motion requesting an order providing that the Committee is not authorized or required to provide access to the Debtors' confidential information to any member of its constituency [Docket No. 119], and a motion establishing interim compensation procedures for professionals employed by the Estates [Docket No. 121]. All three of these motions were granted by the Bankruptcy Court [respectively, Docket Nos. 393, 391, and 389].

### 3.     Debtor in Possession Financing.

Also on the first day of the Chapter 11 Cases, the Debtors sought and obtained approval of debtor in possession financing to maintain and stabilize their businesses until they were able to complete the sale of some of the Debtors' operating businesses and other assets. On the

Petition Date, the Debtors filed a motion (the "DIP Financing Motion") by which they sought interim and final orders authorizing them to enter into a debtor in possession financing facility agreement (the "DIP Credit Facility") with Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT" and together with Greenwich, the "DIP Lenders") [Docket No. 12]. On April 5, 2007, the Bankruptcy Court approved the DIP Credit Facility on an interim basis [Docket No. 89] and, then on May 7, 2007, the Bankruptcy Court entered a final order approving the DIP Credit Facility [Docket No. 565].

The DIP Credit Facility provided that the Debtors could borrow up to $150 million from the DIP Lenders and any other lenders that thereafter became a party to the DIP Credit Facility. The DIP Credit Facility consisted of one tranche under which the Debtors could borrow up to $50 million for general corporate purposes and to fund an orderly Section 363 sales process ("Tranche A") and provided that a second tranche could be opened under which the Debtors could be advanced up to $50 million to repay the Servicer Advance Financing Facility Agreement by and between NCMC and Citigroup and to fund new qualifying servicing advances ("Tranche B"). In addition, the DIP Lenders could, in their sole discretion, increase the maximum amounts that could be advanced under Tranche A to $100 million. Each of the Debtors was a joint and several obligor under the DIP Credit Facility. Pursuant to the DIP Credit Facility each obligor granted a first priority lien on its unencumbered assets and a junior lien on its encumbered assets as security for its obligations under the DIP Credit Facility.

Additionally, the Debtors entered into an asset purchase agreement with Greenwich for the sale of certain mortgage loans originated by the Debtors that were not subject to the Master Repurchase Agreements, as well as residual interest in certain securitization trusts owned by the Debtors (see Section 6(a) below). Under the DIP Credit Facility, the Debtors were required to proceed to complete the sale of those assets on an accelerated basis, and it would have been an event of default under the DIP Credit Facility if the Bankruptcy Court had declined to approve certain stalking horse protections for Greenwich related to this proposed sale.

On June 29, 2007 (the date that the Debtors closed the sale of their servicing business), the Debtors terminated the DIP Credit Facility. At the time of termination, no amounts were outstanding under the DIP Credit Facility, and no early termination fees were required to be paid by the Debtors in connection with the termination.

### 4. Appointment of the Official Committee of Unsecured Creditors.

On April 9, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors. The Committee has participated in virtually all aspects of these Chapter 11 Cases since its formation.

As of the date of this Disclosure Statement, the following were members of the Committee:

Credit-Based Asset Servicing and Securitization LLC
Credit Suisse First Boston Mortgage Capital LLC
Deutsche Bank National Trust Co.
Fidelity National Information Services, Inc.

Maguire Properties - Park Place, LLC
Residential Funding Company, LLC
Wells Fargo Bank, N.A., as Indenture Trustee

The Committee retained the law firms of Hahn & Hessen LLP and Blank Rome, LLP as its co-counsel and FTI Consulting, Inc. as its financial advisors.

## 5.     Retention of Professionals.

The Debtors retained professionals to assist them in managing the chapter 11 bankruptcy process.  O'Melveny & Myers LLP and Richards Layton & Finger, P.A. were retained as the Debtors' bankruptcy co-counsel, Lazard as the Debtors' financial advisors, and AP Services, LLC as the Debtors' crisis managers.  The Debtors also obtained Bankruptcy Court approval to retain the following professionals:  (i) Grant Thornton LLP, as tax accountant; (ii) Heller Ehrman LLP, as special counsel to the Special Investigation Subcommittee of the Independent Audit Committee of NCFC's Board of Directors; (iii) Hennigan, Bennett & Dorman LLP, as special litigation counsel; (iv) ICP Consulting, LLC, as special asset valuation and liquidation advisors; (v) Manatt, Phelps & Phillips LLP, as special securitization counsel; (vi) Pricewaterhousecoopers LLP, as accountants; (vii) Sheppard, Mullin, Richter & Hampton LLP, as special corporate and litigation counsel; and (viii) Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates, as special regulatory counsel.  The Debtors obtained Bankruptcy Court Approval to retain other special counsel as well.

Due to the large numbers of creditors in their cases, and pursuant to certain Local Bankruptcy Rule requirements, the Debtors retained XRoads as claims administrator and noticing agent.

The Debtors also sought and obtained authority to continue to employ professionals, including attorneys, that the Debtors employed prepetition in the ordinary course of their business ("Ordinary Course Professionals"), without having to file formal employment applications with the Bankruptcy Court [Docket Nos. 274 and 569].  Each Ordinary Course Professional is assigned a monthly maximum amount (typically $35,000) that it may be paid without having to seek approval of the Bankruptcy Court with an overall cap on payments of $150,000, subject to increase if approved by the Bankruptcy Court and the Committee.

## 6.     Asset Sales.

### a.     The First Sale of LNFA and Residuals.

On April 3, 2007, the Debtors filed a motion (the "Mortgage Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) to Greenwich of a pool of mortgage loans and mortgage-backed residual interests in securitization trusts (together with that pool of mortgage loans, the "Mortgage Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Mortgage Assets pursuant to an auction (the "Mortgage Assets Bid Procedures") [Docket No. 25].  The mortgage loans consisted of a pool of slightly over 2,000 residential mortgage loans owned by the Debtors.  Most of these loans were originated by the Debtors and then sold to securitization trusts and whole loan buyers.  Because,

however, the borrowers on these loans defaulted soon after the disposition occurred, the buyer had the right to, and did, require the Debtors to repurchase the loans. The loans, either because of quality or timing, were not subsequently the subject of a repurchase transaction and are generally referred to as "LNFA" or "loans not financed anywhere." Other loans in this pool were originated by the Debtors but were never financed under a repurchase agreement or disposed of in a loan sale in the secondary market. The Mortgage Assets Bid Procedures Motion proposed that Greenwich's agreement to purchase the Mortgage Assets for $50 million would serve as the stalking horse bid.

On April 12, 2007, the Bankruptcy Court entered an order approving the Mortgage Assets Bid Procedures, including approving a break-up fee of $945,000 to be paid to Greenwich in the event that Greenwich was not the successful bidder for the Mortgage Assets [Docket No. 226]. The auction for the Mortgage Assets was conducted on May 2, 2007. After nine rounds of bidding, the winning bidder for the Mortgaged Assets was Ellington Capital Management Group, L.L.C. on behalf of its client funds ("Ellington"). NCFC, NC Capital, and NC Asset Holding (together, the "Mortgage Asset Sellers"), on one hand, and Ellington, on the other hand, entered into an asset purchase agreement (the "Ellington Agreement"), dated as of May 2, 2007 and approved by the Bankruptcy Court by order dated May 7, 2007 (the "Mortgage Asset Sale Order"), pursuant to which Ellington agreed to purchase the Mortgage Assets for approximately $58.0 million [Docket No. 566].

On May 18, 2007, the sale of the Mortgage Assets to Ellington closed. After giving effect to certain closing adjustments, the net purchase price paid by Ellington was approximately $57.9 million, including approximately $2.6 million deposited by Ellington into an escrow account to indemnify Ellington for any claims made under the Ellington Agreement, and payment of Greenwich's break-up fee.

When the Mortgage Asset Sellers transferred servicing on the Mortgage Assets to Ellington's loan servicers on June 15, 2007, approximately $687,000 was released from the escrow account to Ellington in satisfaction of an indemnity claim related to certain undeliverable loans. After the servicing transfer, approximately $1.9 million remained in the escrow account. On August 9, 2007, Ellington submitted a second indemnification claim pursuant to the Ellington Agreement to NCFC and the escrow agent claiming that the $1.9 million balance of the escrow account should be released to Ellington in connection with additional undeliverable loans. Upon the termination of the escrow account, on December 24, 2007, approximately $1.88 million was released to Ellington and the remaining amount of approximately $107,000 was released to the Debtors.

On June 25, 2007, the Mortgage Asset Sellers and Ellington entered into Supplement No. 1 to the Ellington Agreement ("Supplement No. 1"), pursuant to which Ellington agreed to purchase certain additional mortgage loans originated by the Mortgage Asset Sellers (the "Additional Mortgage Loans") for approximately $4.4 million. Supplement No. 1 provided that approximately $300,000 of the purchase price would be placed into an escrow account to be used to indemnify Ellington for certain claims that may be made under the agreement. The Bankruptcy Court entered an order approving the Additional Mortgage Loans sale on June 27,

2007 [Docket No. 1715]. The closing of the sale of the Additional Mortgage Loans occurred on June 29, 2007.

On August 9, 2007, Ellington also submitted an indemnification claim to the Mortgage Asset Sellers and the escrow agent pursuant to Supplement No. 1 claiming that the entire $300,000 amount in the escrow account should be released to Ellington in connection with certain undeliverable loans. Upon the termination of the escrow account on December 24, 2007, approximately $212,000 was released to Ellington and the remaining amount of approximately $31,000 was released to the Debtors.

### b. Sale of Servicing Assets and Servicing Platform to Carrington.

On April 4, 2007, the Debtors filed a motion (the "Servicing Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) by NCFC and NCMC to Carrington Mortgage Services LLC ("Carrington") of their loan servicing assets and servicing platform (the "Servicing Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Servicing Assets pursuant to an auction (the "Servicing Assets Bid Procedures") [Docket No. 70]. The Servicing Assets Bid Procedures Motion proposed that Carrington's agreement to purchase the Mortgage Assets for $139 million, subject to certain purchase price adjustments and a break-up fee in the amount of 3% of the purchase price of the Servicing Assets, would serve as the stalking horse bid.

The Debtors' loan servicing operations typically included collecting and remitting loan payments received from borrowers, making required advances, accounting for principal and interest, customer service, holding escrow or impound funds for payment of taxes and insurance, and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Servicing contracts also generally required the servicer to advance principal, interest, and certain "property protection" costs (such as taxes and insurance) with respect to delinquent mortgage loans, unless such amounts were determined to be unrecoverable from the related loans. As discussed above, for performing these functions, the servicer (usually NCMC) generally received a servicing fee, one-twelfth of which was paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio, which fee was collected from the monthly payments made by the borrowers on the serviced loans. In addition, the Debtors received other remuneration for loan servicing, including float benefits representing interest earned on collection accounts where mortgage payments were held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.

On April 20, 2007 the Bankruptcy Court approved the Servicing Asset Bid Procedures, including the proposed break-up fee [Docket No. 340]. The auction for the Servicing Assets was conducted on May 16, 2007 with Carrington and three qualified bidders participating. After 12 rounds of bidding, Carrington emerged as the winning bidder, with a bid of approximately $188 million (netting $145.2 million to the Estates after payment of servicing advances and account reconciliations). On May 21, 2007, the NCFC and NCMC entered into a Second Amended and Restated Asset Purchase Agreement (the "Servicing Assets Agreement") with Carrington and its parent, Carrington Capital Management, LLC, for the sale of the Servicing Assets to Carrington

(the "Carrington Sale"). The Bankruptcy Court entered an order approving the Carrington Sale on May 23, 2007 (the "Carrington Sale Order") [Docket No. 844].

On June 29, 2007, the Carrington Sale closed. After giving effect to certain closing adjustments, the gross purchase price paid by Carrington was approximately $177.4 million, including approximately $5.0 million deposited by Carrington into an escrow account to indemnify Carrington for certain claims that could be made under the Servicing Assets Agreement. The balance of the escrow account after reimbursement of any claims submitted by Carrington will be paid to the Estates on or about March 29, 2008 (nine months after the closing of the Carrington Sale). As of the date of this Disclosure Statement, Carrington has submitted one claim against the amounts in the escrow account, which claim the Debtors are disputing.

Concurrently with the closing of the Carrington Sale, NCFC and NCMC entered into a Transition Servicing Agreement with Carrington, whereby NCFC and NCMC agreed to provide certain services to Carrington and Carrington agreed to provide certain services to the NCFC and NCMC. The Debtors continued operating the servicing business while it was transitioned to Carrington. As of the filing of this Disclosure Statement, the transition process is nearly complete, with only a small number of discrete issues outstanding.

### c. Unsuccessful Attempt to Sell the Loan Origination Platform Assets.

On April 10, 2007, the Debtors filed a motion (the "Origination Assets Bid Procedures Motion") seeking approval of the sale of their loan origination platform (the "Origination Assets"), as well as the approval of bid procedures and certain bid protections in connection with that sale pursuant to an auction (the "Origination Assets Bid Procedures") [Docket No. 149]. On April 25, 2007, the Bankruptcy Court entered an order approving the Origination Assets Bid Procedures [Docket No. 404]. At the time of the filing of the Origination Assets Bid Procedures Motion, the Debtors did not have a proposed stalking horse bid for the Origination Assets. The deadline for bids on the Origination Assets expired on May 2, 2007 without any qualified bids being submitted. Subsequently, the Debtors reduced their workforce by terminating the employment of their employees who had been engaged in loan originations. On May 4, 2007 the Debtors reduced their workforce by 1,230 employees and in the 30 days following reduced their workforce by over 700 additional employees.

### d. Technology Assets Disposition.

On June 4, 2007, the Debtors filed a motion (the "Technology Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) by NCFC and NCMC of certain technology related assets, including the Debtors' data centers and any computer equipment contained therein (the "Data Centers and Equipment"), proprietary software, intellectual property and computer software codes and data used in connection with the mortgage loan origination business (the "Origination Technology Assets"), and, on a non-exclusive basis, certain data related to the its loan origination business (the "Broker Data" and, together with the Origination Technology Assets, the "Technology Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Data Centers and Equipment and the

Technology Assets pursuant to an auction (the "Technology Assets Bid Procedures") [Docket No. 1064].

On June 22, 2007, the Debtors conducted and concluded an auction for the Data Centers and Equipment and the Technology Assets pursuant to procedures established by the Bankruptcy Court. There were 3 bidders at the auction, with EquiFirst Corporation ("EquiFirst") submitting the highest and best bid after multiple rounds of bidding. EquiFirst agreed to acquire the Technology Assets for approximately $8.05 million (the "Technology Assets Sale"). NCFC and NCMC, on one hand, and EquiFirst, on the other hand, subsequently entered into an Asset Purchase Agreement, dated June 22, 2007, with respect to the Technology Assets Sale (the "Technology Assets Agreement"), and on July 3, 2007, the Bankruptcy Court entered an order approving the Technology Assets Sale and one or more subsequent sales of certain data related to the Debtors' loan origination business, in each case on a non-exclusive basis [Docket No. 1819]. The closing of the Technology Assets Sales took place in July 2007. The Debtors ultimately decided not to go forward with the sale of the Data Centers and Equipment at the auction. The Debtors have since conducted four nonexclusive data sales.

### e. Sale of Access Lending's Assets.

Access Lending did not file bankruptcy on April 2, 2007 in order to let its management pursue a going-concern sale outside of bankruptcy. On April 13, 2007, TRS Holdings (as the parent of Access Lending) filed a motion requesting an order approving the sale of substantially all of the assets of Access Lending (the "Access Lending Assets") to Access Holdings Corporation ("Access Holdings") [Docket No. 231], which was a new company formed by the former management of Access Lending. This motion was granted by the Bankruptcy Court on April 26, 2007 [Docket No. 411]. Pursuant to the terms of the asset purchase agreement between Access Lending and Access Holdings, in exchange for the Access Lending Assets, Access Holdings agreed, among other things, to pay to Access Lending 60% of net proceeds realized on the sale of loans that were subject to Access Lending's warehouse lending facilities (the "Access Lending Loans"), with a minimum guaranteed amount of $4.5 million, plus approximately $76,000.00. The sale closed on April 27, 2007. As of the filing of this Disclosure Statement, Access Lending has received $2.4 million from Access Holdings on account of the Access Lending Loans.

On August 3, 2007, Access Lending filed for bankruptcy protection in order to resolve issues related to the disposition of the proceeds from the sale of its assets and approximately $2.35 million of cash that it held as of such date in its operating account and that was not sold to Access Holdings.

### f. Sale of Additional LNFA (Including Ohio Loans).

The Debtors had a relatively small number of mortgage loans that were not subject to repurchase agreements and were not sold in the prior sale to Ellington because of some complications related to the State of Ohio or because work was required to clarify title to the loans. On December 21, 2007, the Debtors filed a motion (the "GRP Bid Procedures Motion") seeking approval of the sale (subject to overbid) to GRP Financial Services Corp. ("GRP") of 46

mortgage loans that have not been financed through repurchase agreements or otherwise encumbered, as well as the approval of bid procedures and certain bid protections in connection with the sale of these mortgage loans pursuant to an auction (the "GRP Bid Procedures") [Docket No. 4190]. The 46 mortgage loans include 15 mortgage loans that are secured by property within the State of Ohio and are subject to a stipulated preliminary injunction as modified to permit the sale of these loans, but subject to the buyer abiding by certain procedures related to any foreclosure of the mortgages. The GRP Bid Procedures Motion sought approval of GRP's agreement to purchase the 46 mortgage loans for approximately $1.8 million (subject to adjustment based on due diligence) as the stalking horse bid.

On January 9, 2008, the Bankruptcy Court entered an order approving the GRP Bid Procedures, including approving a break-up fee of $40,000 to be paid to GRP in the event that GRP was outbid [Docket No. 4361]. No competing bids were received by the bid deadline and on January 24, 2008, the Bankruptcy Court approved the sale 40 of these 46 loans to GRP for approximately $1.4 million. [Docket No. 4556]. As of the date of the filing of this Disclosure Statement, this sale has not yet closed, but it is expected to close shortly.

### g. Miscellaneous Asset Sales.

On April 25, 2007, the Debtors filed a motion requesting that the Bankruptcy Court establish streamlined procedures governing the sale of furniture, equipment and similar miscellaneous assets (collectively, "Miscellaneous Assets") [Docket No. 403]. On May 16, 2007, the Bankruptcy Court entered an order establishing these procedures [Docket No. 704]. Under the approved procedures, on limited notice to the Committee and other key constituencies in these cases, the Debtors are permitted to sell Miscellaneous Assets not to exceed $100,000 in each instance. These procedures reduce the time and expense involved with obtaining Bankruptcy Court approval of relatively small transactions, many of which could not be effectuated in the event the transaction required approval in accordance with the notice and hearing requirements of Bankruptcy Code section 363.

On August 27, 2007, the Bankruptcy Court entered an order based on a motion of the Debtors expanding the procedures to permit the streamlined sale procedures to apply to sales of miscellaneous assets, including domain names, furniture and equipment, individual and small groups of mortgage loans and real properties obtained in connection with the foreclosure of mortgage loans, and other assets, up to $250,000 in each instance [Docket No. 2594].

Pursuant to the procedures, as of January 23, 2008, the Debtors have entered into forty-one (41) sale transactions in connection with the wind down of operations nation-wide, generating proceeds of over $1.86 million for the benefit of the estates and creditors. This amount may increase by up to $171,418 per the terms of the two purchase agreements with IBM Credit, LLC. Moreover, as of the filing of this Disclosure Statement, the objection deadline is still pending with respect to six additional Miscellaneous Asset sale transactions pursuant to which the Debtors propose to sell certain Miscellaneous Assets for $805,144.25. The Debtors anticipate that future sales of Miscellaneous Assets will generate between $100,000 to $200,000. The Debtors estimate that approximately $[___] of the proceeds generated from the sale of Miscellaneous Assets is subject to (i) liens of parties that provided certain of the Debtors with

secured equipment financing or (ii) personal property tax liens of various taxing authorities.

### h. GECC Objection to Servicing Sale; Motion for Relief from Stay.

In 2004, General Electric Capital Corporation ("GECC") extended financing to NCFC, NCMC, and TRS Holdings in exchange for five promissory notes totaling $25,966,000 in principal (the "GECC Notes"). The parties also entered into a Master Security Agreement dated February 18, 2004, pursuant to which all of the notes are secured by liens against certain computers, copiers, printers, and other personal property located in the Debtors' facilities nation-wide.

GECC filed identical Proofs of Claim against NCMC, NCFC and TRS Holdings. The Proofs of Claim assert that, as of the Petition Date, GECC was owed $7,515,537.78 under the GECC Notes and that the claims are secured in an "unknown" amount. The Debtors have analyzed the value of GECC's collateral and believe that GECC is undersecured, in large part.

GECC also leased telephone equipment, copy machines and fax machines to the Debtors under Master Lease Agreements with NCFC and Home123. In the aggregate, the Debtors' obligations to GECC under such Master Lease Agreements totaled approximately $69,500 per month. The Debtors have rejected these Master Lease Agreements, and GECC has collected most of the equipment leased to the Debtors thereunder.

On May 14, 2007, GECC filed an objection to the Carrington Sale [Docket No. 662], asserting that because its collateral was included in the sale, it could not be sold free and clear of its liens. The Carrington Sale Order provided that: (i) the Debtors would withhold the full amount of GECC's claim on account of the GECC Notes ($7,558.887.80) from the proceeds of the Carrington Sale as a "Secured Claim Reserve"; and (ii) GECC's liens against its collateral sold to Carrington would attach to the reserve to the same extent as its liens against that collateral. The Debtors and the Committee expressly reserved their rights to object to or dispute the claims of GECC and their entitlements to the Secured Clam Reserve or to seek to reduce the amount of the Secured Claim Reserve by agreement of the parties or order of the Bankruptcy Court, provided that GECC would have the right to contest any such reduction not based on an agreement of the parties. Upon the closing of the Carrington Sale, it was determined that the sale included less than 20% of GECC's collateral.

On May 11, 2007, GECC filed a motion for relief from stay ("GECC Stay Relief Motion") [Docket No. 630]. The Debtors, the Committee, and the Examiner (as defined in Section III.D.4 hereof) all filed oppositions to the GECC Stay Relief Motion. On July 20, 2007, the Debtors and GECC entered into a stipulation modifying the automatic stay to enable GECC to recover its collateral at the Debtors' location in Santa Ana, California and permitting the Debtors to include certain assets comprising GECC's collateral in the Debtors' sales of Miscellaneous Assets. GECC thereafter collected the collateral in the Santa Ana, California location, which collateral totaled $90,000 in value. Subsequently, the Debtors and GECC entered into additional stipulations continuing the hearing date on the GECC Relief Stay Motion. In connection with those stipulations, the Debtors paid GECC a total of $300,000 as an advance on the secured claims of GECC to be ultimately allowed by the Bankruptcy Court from the Secured Claim Reserve.

On December 26, 2007 the Debtors, the Committee, and GECC reached a settlement of GECC's claims under the GECC's secured financing arrangements with the Debtors, which was incorporated into a stipulation (the "GECC Settlement Stipulation") that was filed with the Bankruptcy Court under certification of counsel [Docket No. 4195]. The GECC Settlement Stipulation provides that, subject to approval of the Bankruptcy Court, the Debtors will pay to GECC from the Secured Claim Reserve the sum of $1,800,000. The GECC Settlement Stipulation specifies that the $1,800,000 payment, in addition to the $300,000 previously paid to GECC and the $90,000 worth of collateral previously returned to GECC, will be in complete satisfaction of the secured portion of GECC's claims under the secured financing arrangements (the "GECC Secured Claim"), and that the GECC Secured Claim would, therefore, total $2,190,000. The GECC Settlement Stipulation further provides that GECC will have an unsecured deficiency claim against NCFC, NCMC, and TRS Holdings and their estates for the balance of amounts owing under the secured financing arrangements in the amount of $5,325,527.78 (the "GECC Unsecured Deficiency Claim"). The Bankruptcy Court approved the GECC Settlement Stipulation on December 27, 2007 [Docket No. 4217]. Thereafter, on January 4, 2008, pursuant to the terms of the GECC Settlement Stipulation, GECC withdrew the GECC Stay Relief Motion [Docket No. 4310]. In order to effectuate the parties' settlement, on January 8, 2008, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 requesting, among other things, allowance of the GECC Unsecured Deficiency Claim and mutual releases among the Debtors and Committee, on one hand, and GECC, on the other hand [Docket No. 4345]. The hearing to approve such motion is scheduled for February 6, 2008.

### 7. Filing Schedules and Statement of Financial Affairs; Claims Bar Dates.

#### a. Debtors Other Than Access Lending.

Except for Access Lending, the Debtors each filed their Schedules on May 31, 2007. On June 28, 2007, the Bankruptcy Court entered the "Order Establishing Bar Dates For Filing Proofs Of Claim And Approving Form, Manner And Sufficiency Of Notice Thereof" (the "Bar Date Order") [Docket No. 1721]. Pursuant to the Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Chapter 11 Cases (except that of Access Lending) was August 31, 2007 (the "General Bar Date"). The Adequate Protection negotiations (see Section III.D.3 hereof) resulted in a short extension for the parties to the Adequate Protection Order (defined in Section III.D.3 hereof) to file Proofs of Claim. Subject to certain limited exceptions contained in the Bankruptcy Code and in the Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the General Bar Date), all other Proofs of Claim filed against Debtors other than Access Lending must have been submitted by the General Bar Date. The deadline for governmental units to assert prepetition Claims against any of the Debtors other than Access Lending was October 2, 2007.

Approximately 3,727 Proofs of Claim, asserting Claims totaling approximately $35.1 billion against the estates of Debtors other than Access Lending, have been submitted, and approximately 9,225 Claims, in the approximate amount of $37.9 million, listed on the Debtors' Schedules (other than the Schedules of Access Lending) are not scheduled as contingent,

unliquidated, or disputed and have not been superseded by filed Claims, resulting in an aggregate of $35.1 billion of filed and scheduled claims (exclusive of inter-company Claims).

### b.       Access Lending.

Access Lending filed its Schedules on September 17, 2007.  On October 23, 2007, the Bankruptcy Court entered the "Order Establishing Bar Dates For Filing Proofs Of Claim In The Chapter 11 Case Of New Century Warehouse Corporation And Approving Form, Manner And Sufficiency Of Notice Thereof" (the "Access Lending Bar Date Order") [Docket No. 3404]. Pursuant to the Access Lending Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Access Lending Chapter 11 Case was December 14, 2007 (the "Access Lending Bar Date").  Subject to certain limited exceptions contained in the Bankruptcy Code and in the Access Lending Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the Access Lending Bar Date), all proofs of claim filed against Access Lending must be submitted by the Access Lending Bar Date.  The deadline for governmental units to assert prepetition claims against Access Lending is January 31, 2008.

Approximately 27 Proofs of Claim, asserting Claims totaling more than $37.7 million against Access Lending's estate, have been filed.  In addition, Access Lending's Schedules list two non-contingent, liquidated, and undisputed Claims in amounts greater than $0.00:  (i) an Unsecured Claim of NCMC in the amount of $3,973,199.86, and (ii) an Unsecured Claim of a trade creditor in the amount of $1,675.00.

### 8.       Disposition of Leases and Executory Contracts.

Concurrently with the filing of the Chapter 11 Cases, the Debtors moved the Bankruptcy Court for authority to reject certain non-residential real property leases and for approval of procedures to reject executory contracts and additional leases of non-residential real property in order to avoid burdening the Debtors' estates with any unnecessary postpetition obligations.  The Debtors sought approval of expedited procedures for managing this process in order to avoid the significant delays and administration costs that would result without such procedures.  On April 25, 2007, the Bankruptcy Court entered an order approving the rejection of certain leases and approving the procedures by which the Debtors could reject executory contracts and any unexpired leases of non-residential real property.  Pursuant to those procedures, the Debtors have rejected approximately 825 executory contracts and approximately 295 real property leases to date.

### 9.       Litigation.

### a.       Securities Litigation.

A week after NCFC announced the need to restate its quarterly financial statements for the first three quarters of 2006, a putative securities class action lawsuit was filed on February 12, 2007 in the United States District Court for the Central District of California against NCFC and certain of its officers and directors.  The complaint alleged that NCFC and the other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCFC, which resulted in artificially inflated market prices of NCFC's common stock, and that the plaintiff and the putative class members purchased NCFC's

stock at these artificially inflated market prices between April 7, 2006 and February 7, 2007. The complaint seeks money damages in favor of its putative class of purchasers of NCFC's securities, the costs and expenses of the action and other relief that may be granted by the court.

At least eighteen additional putative securities class actions were filed in the United States District Court for the Central District of California between February 8, 2007 and March 16, 2007. These complaints named NCFC and certain of its officers and directors as defendants and present in large degree the same legal and factual issues as the complaint served on February 14, 2007.

On June 26, 2007, the New York State Teachers' Retirement System (the "Lead Plaintiff") was appointed lead plaintiff and the above-referenced cases were consolidated. The Lead Plaintiff filed four proofs of claim in this case on behalf of the securities purchasers in the putative class. On September 14, 2007, the Lead Plaintiff filed its consolidated complaint, excluding NCFC as defendant. On January 31, 2008, the District Court dismissed the consolidated complaint without prejudice and with leave to amend.

In addition to the putative securities class actions, at least eight derivative complaints have been filed against certain of NCFC's directors and officers that make essentially the same allegations as the federal securities cases relating to the NCFC's restatements. Six of these actions were filed in the Orange County, California Superior Court. Two were filed in the United States District Court for the Central District of California. These actions have been stayed.

### b.      WARN Litigation.

On April 17, 2007, former employees of TRS Holdings, NCFC, and NCMC (the "WARN Plaintiffs") filed a putative class action complaint with the Bankruptcy Court [Docket No. 292]. The WARN Plaintiffs filed an amended complaint on April 18, 2007, adding Home123 as a defendant. The WARN Plaintiffs allege that the defendant Debtors violated the federal Workers Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101, et seq., and the California WARN Act, California Labor Code §§ 1400 et seq., when they terminated corporate, wholesale, and retail employees without providing the requisite 60-day written notice. Putative class members, per a class certification stipulation executed by the parties and approved by the Bankruptcy Court on September 11, 2007, encompass two different groups: (1) employees terminated without cause from April 2, 2007 through May 1, 2007 as a result of a mass lay-off or plant closing at the defendants Debtors' facilities subject to WARN notification requirements; and (2) employees terminated without cause from May 2, 2007 and thereafter as a result of a mass lay-off or plant closing at the defendants Debtors' facilities subject to WARN notification requirements. The WARN Plaintiffs seek respective wages, salary, commissions, bonuses, accrued holiday, accrued vacation, pension contributions, and 401K contributions. The Debtors dispute that any amounts are owed to the WARN Plaintiffs. Substantial numbers of the Debtors employees executed releases of such claims against the Debtors in order to receive payments not otherwise payable to them under the Debtors retention plans. Further, the Debtors assert that they were liquidating fiduciaries at the times of the reductions in force and accordingly their actions are not subject to the WARN statutes. In addition, the Debtors assert that to the extent

the WARN statutes are applicable to either reduction in force, the unforeseeable business circumstance and faltering company exceptions provide complete defenses to the liability. In any event, the Debtors assert that the salary continuation and benefits paid to the affected employees after termination, as well as the amount paid in full to the employees on account of prepetition claims above the $10,950 limit of section 507(a)(4) of the Bankruptcy Code, may be offset against any amount determined owing to the Plaintiffs. The WARN Plaintiffs distributed notices to putative class members toward the latter part of October 2007. Fact discovery is under way and was set to close on January 31, 2008, though the parties have reached an agreement in principal to extend this deadline for at least 30 days. No trial date has been set as of the filing of this Disclosure Statement.

### c.        Deferred Compensation Plan Litigation.

On June 29, 2007, the Debtors (other than Access Lending) were served with a complaint for declaratory judgment and other equitable relief that was filed on June 20, 2007 in the Bankruptcy Court against the Debtors (other than Access Lending) and certain of NCFC's directors, captioned as *Gregory J. Schroeder, et al. v. New Century Holdings, Inc., et al.*, Adv. Pro. No. 07-51598 (the "Schroeder Adversary Proceeding") [Docket No. 1447]. The Deferred Compensation Complaint seeks a declaratory judgment on behalf of a putative class consisting of beneficiaries (the "Deferred Compensation Beneficiaries") of the New Century Financial Corporation Deferred Compensation Plan and the New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (collectively, the "Deferred Compensation Plan") that, among other things, the Deferred Compensation Beneficiaries are a proper class and that the Deferred Compensation Plan is subject to ERISA's substantive provisions, including its exclusive benefit and anti-inurement rules, which the Deferred Compensation Plan Beneficiaries assert prohibit NCFC from using the assets in the irrevocable trust that supports NCFC's obligations under the Deferred Compensation Plan (the "Trust") to pay creditors other than the participants in the Deferred Compensation Plan. The Deferred Compensation Plan Beneficiaries also seek equitable relief in the form of a trust or equitable lien and reformation of the Deferred Compensation Plan and the Trust in order to advance their position ahead of NCFC's other Creditors, a declaratory judgment that the assets in the Trust should be excluded from the Debtors' Estates, and payment of attorneys' fees.

It is the Debtors' position that as a result of the Debtors' insolvency, the Plaintiffs' deferred compensation claims are general unsecured claims against NCFC under the terms of the Deferred Compensation Plan and are not entitled to any priority to the assets in the Trust. The Debtors contend that in order to maintain the tax-deferred status of participant accounts, the Deferred Compensation Plan and Trust were structured so that assets held in the Trust are generally available to the creditors of NCFC. The Debtors argue that participants do not have an ownership interest in the investment options, the Trust assets, or in any other specific assets of NCFC. Indeed, the New Century Supplemental Benefit and Deferred Compensation Trust Agreement (the Trust's formative and governing document) provides: "[A]ssets of the Trust Fund will at all times be subject to the claims of the general creditors of the Company under Federal and state law," and "Participants and their beneficiaries will have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust Fund. Any rights created under the Plans and this Trust Agreement will be mere unsecured contractual rights of Participants and

their beneficiaries against the Company."

The Debtors and Wells Fargo filed motions to dismiss in the Schroeder Adversary Proceeding, and the Committee joined in such motions. A hearing on the motions to dismiss was held on October 2, 2007, and the motions are pending. As of the date of this Disclosure Statement, the Bankruptcy Court had these motions under submission.

### d. Deutsche Bank Cure Claim Litigation.

Deutsche Bank National Trust Company ("DBNTC") acted as a trustee or indenture trustee to certain of the securitization trusts (the "DBNTC Trusts") for which NCMC provided servicing. Pursuant to the terms of the pooling and servicing agreements for which DBNTC acted as trustee or indenture trustee (the "DBNTC PSAs"), under certain express circumstances, DBNTC had the right to assert indemnity and other contractual claims against NCMC (the "DBNTC PSA Claims").

In response to the proposed Carrington Sale, DBNTC filed an objection (the "DBNTC Objection") to the assumption and assignment of the DBNTC PSAs to Carrington on the grounds that, among other things, the Debtors had not cured, or provided adequate assurance that they would promptly cure, all of the existing defaults arising under the DBNTC PSAs [Docket No. 667]. In the DBNTC Objection, DBNTC asserted, inter alia, that the DBNTC Trusts were entitled to up to $28,500,000 in potential damages through the date of the DBNTC Objection (May 14, 2007), consisting of approximately $1,383,200 in fees and expenses for which DBNTC claimed that it was entitled to reimbursement under the indemnification provisions of the DBNTC PSAs (the "DBNTC Fee Indemnity Claim") and up to $27,100,000 for damages allegedly incurred by the Trusts on account of possible breaches by NCMC of its servicing obligations under the DBNTC PSAs (the "DBNTC Cure Indemnity Claim"). DBNTC also asserted that additional claims could arise between the date of the DBNTC Objection and the closing date of the Carrington sale (the "Stub Claims").

Notwithstanding the DBNTC Objection, the Bankruptcy Court approved the Carrington Sale [Docket No. 844]. The Carrington Sale Order, however, required that the Debtors reserve an amount either agreed upon by the parties or ordered by the Bankruptcy Court that would be deemed the maximum potential cure amount payable by the Debtors with respect to the DBNTC Objection and the assumption and assignment of the DBNTC PSAs to Carrington. On May 31, 2007, the Debtors, the Committee, and DBNTC entered into a stipulation regarding reserve and resolution procedures for DBNTC's disputed cure claim arising from the assumption and assignment of the DBNTC PSAs (the "DBNTC Stipulation"). Among other things, the DBNTC Stipulation provides that the Debtors will hold in reserve $10,000,000, which amount is the maximum potential liability for the Debtors on account of the DBNTC Cure Indemnity Claim. The DBNTC Stipulation does not limit the amount of the Stub Claims or the DBNTC Fee Indemnity Claim.

The Debtors' position with respect to the DBNTC Cure Indemnity Claim is that they do not have any liability on account of such claim because they serviced the mortgage loans subject to the DBNTC PSAs in a manner that complied with the terms of the DBNTC PSAs.

Procedurally, the DBNTC Stipulation provided certain dates by which DBNTC was required to submit detailed written information to the Debtors and the Committee setting forth the amount and bases of the DBNTC Cure Indemnity Claim and Stub Claims and by which the Debtors and the Committee had to respond. On September 12, 2007, DBNTC provided certain written information to the Debtors and the Committee. The Committee, on behalf of itself and the Debtors, provided a formal response to DBNTC on December 14, 2007. The parties subsequently held settlement conferences on December 19, 2007 and January 28, 2008. If the parties' dispute cannot be settled based on the mutual exchange of reports, the parties will proceed to litigate the matter.

### D. OTHER EVENTS DURING CHAPTER 11 CASES.

In addition to the events discussed in the preceding section, other material events since the commencement of the Chapter 11 Cases are summarized below:

### 1. Government Investigations.

#### a. SEC Investigation.

On March 12, 2007, the Debtors received a letter from the staff of the Los Angeles Regional Office of the SEC stating that the staff was conducting a preliminary investigation involving the Debtors and requesting production of certain documents. The SEC issued a formal order of investigation with respect to its investigation of the Debtors on June 14, 2007. Since that date, the SEC staff has issued various subpoenas for the production of certain documents and has made various additional requests for information. NCFC has been and continues to cooperate with the SEC in the conduct of its investigation.

#### b. United States Attorney's Investigation.

On February 28, 2007, NCFC received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the NCFC's securities, as well as accounting errors regarding the NCFC's allowance for repurchase losses. NCFC subsequently received a grand jury subpoena requesting production of certain documents. As described in the above section addressing the SEC's investigation, NCFC has been and continues to cooperate with the U.S. Attorney's Office in the conduct of its investigation.

### 2. Cease and Desist Orders and Consent Agreements.

#### a. Regulatory Actions Generally.

Prior to the Petition Date, the Debtors had been engaged in discussions with their state regulators regarding the Debtors' funding constraints and the impact on consumers who were in various stages of the loan origination process with the Debtors. During the first part of March 2007, the Debtors advised these regulators that they had ceased accepting loan applications. In addition, the Debtors advised these regulators that the Debtors were unable to fund any mortgage

loans, including mortgage loans for those consumers who were already in the loan origination process with the Debtors. The Debtors continued to work cooperatively with these regulators to mitigate the impact on the affected consumers, including transferring pending loans and loan applications to other mortgage lenders. The Debtors also provided daily reports to their various regulators regarding the status of loans in process in their states, as well as responding to ad hoc information requests. These efforts proved successful, and the Debtors were able to find other lenders to fund all mortgage loans that they had approved and were in their pipeline.

Subsequently, the Debtors variously received, had sought against them, or entered into cease and desist orders, a suspension order, temporary restraining orders, and stipulation and consent agreements (collectively, "Regulatory Actions") by/with the regulators in the states in which they operated. The cease and desist orders contained allegations that certain of the Debtors engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after a closing, failure to meet certain financial requirements, including net worth and available liquidity, and failure to timely notify the state regulators of defaults and terminations under certain of their financing arrangements. The Regulatory Actions contained allegations that certain of the Debtors engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after closing.

In general, the Regulatory Actions sought to restrain the Debtors from taking certain actions, including, among others, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdictions. The Regulatory Actions also sought to cause the Debtors to take certain affirmative actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the Debtors, and the provision of regular information to the state regulators regarding the Debtors' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. In general, the cease and desist orders and the suspension order became permanent when the Debtors did not promptly appeal them and the consent agreements and the stipulation became binding when entered into.

Following the receipt, issuance or entry into the Regulatory Actions, the Debtors continued to cooperate with their regulators to mitigate the impact on consumers resulting from the Debtors funding constraints.

### b. The Ohio Preliminary Injunction.

On March 28, 2007, the Cuyhahoga Count Court of Common Pleas in Cleveland, Ohio entered a Stipulated Preliminary Injunction (the "Ohio Preliminary Injunction") between the State of Ohio, ex. rel. Marc Dann, Attorney General, and NCFC, NCMC, and Home123. Pursuant to the Ohio Preliminary Injunction, NCFC, NCMC, and Home123 agreed to certain restraints on foreclosures and terms before they would sell, assign, or otherwise transfer any certain types of owner-occupied mortgages on Ohio properties. The State of Ohio objected to the Mortgage Assets Bid Procedures Motion to the extent that the Debtors proposed to sell any mortgage loan subject to the Ohio Preliminary Injunction [Docket No. 142]. As a result, the Ohio loans that were to have been the subject of this sale were removed from the pool of loans

being sold. Subsequently, the Ohio Attorney General and the Ohio Department of Commerce agreed to modify the Ohio Preliminary Injunction to allow the Debtors to sell 15 mortgage loans that are secured by property within the State of Ohio. As set forth in Section III.C.6.f hereof, such mortgage loans are part of a pool of 40 mortgage loans that are to be sold to GRP for approximately $1.4 million pursuant to an order entered by the Bankruptcy Court on January 24, 2008.

### 3. The Adequate Protection Dispute.

Shortly after the Petition Date, two of the Repurchase Counterparties, UBS Real Estate Securities, Inc. ("UBS") and DBSP, commenced adversary proceedings (respectively, the "UBS Adversary Proceeding" and the "DBSP Adversary Proceeding"). The UBS Adversary Proceeding asserted, inter alia, that funds collected on mortgage loans subject to the Master Repurchase Agreement with UBS were to be held in trust and turned over to them. The DBSP Adversary Proceeding centered on other issues, discussed below, but also asserted that certain funds, in an unspecified amount, should be held in trust for DBSP. Each complaint also sought an accounting. The Debtors decided to expand this effort to cover all the Repurchase Counterparties and undertook an effort to reconcile the amounts collected by NCMC as servicer of mortgage loans subject to all Master Repurchase Agreements and the amounts that the Debtors had paid to the Repurchase Counterparties.

The Master Repurchase Agreements vary as to their trust language and whether or not the funds in question were to be deposited into segregated accounts, but all provided that the Debtors were free to use funds collected on mortgage loans subject to Master Repurchase Agreements prior to the Repurchase Counterparties exercising remedies. Thus, for years the Debtors had used collections on these loans to satisfy general corporate needs and had settled with the Repurchase Counterparties, generally monthly, by making payments out of NCMC's general corporate funds.

In mid-March 2007, the Repurchase Counterparties generally declared events of default and began to exercise remedies. The Debtors reacted by establishing segregated and blocked accounts for the Repurchase Counterparties whose agreements had not required them previously, and by reprogramming the electronic system so that all collections on mortgage loans subject to Master Repurchase Agreements were directed to blocked collection accounts (for some of the Repurchase Counterparties, only principal but not interest on mortgage loans was previously directed to blocked accounts, others did not require any collections to be directed to such blocked accounts, and for others the system had always directed principal and interest to segregated accounts). Redirecting this system was complicated by the fact that mortgage loans were frequently transferred among repurchase facilities -- for example, in early March 2007, Morgan Stanley took out the repurchase facility that had been provided by Citigroup. In addition, some of the Repurchase Counterparties sought to sweep their collection accounts daily, even though their Master Repurchase Agreements did not provide for such daily payments. The Debtors generally cooperated with these efforts. But the turmoil that this provided, when added to the other crises with which the Debtors were dealing, made reconciliatons of the Master Repurchase Agreements difficult.

The initial reconciliation that the Debtors delivered to UBS pursuant to the procedure established in the UBS Adversary Proceeding showed that the Debtors had overpaid UBS. UBS disagreed and asserted that approximately $2.7 million had been collected by the Debtors on mortgage loans subject to its Master Repurchase Agreement and which had not been turned over to it. UBS asserted that this cash was its property and asserted that a constructive trust should be established to safeguard these funds. The Debtors disagreed, but agreed to escrow $2.7 million while this matter was being litigated.

In addition, prior to the Petition Date, the Debtors received some payments from borrowers with respect to loans that were subsequently sold in the secondary market to whole loan purchasers. Some of these whole loan purchasers asserted that these collections were their property or cash that should have been held in trust for them.

In early May 2007, the Debtors completed a preliminary reconciliation for all the Repurchase Counterparties and these whole loan purchasers that concluded that if one accepted (i) an argument asserted by UBS that all collections on loans subsequent to the last reconciliation were the Repurchase Counterparty's property, even collections that predated UBS's declaration of an event of default and (ii) an argument that all collections on loans that were subject to a whole loan sale agreement (even loans that had paid off before the loan sale closed) were the property of the loan buyers, then the amounts at issue could exceed the $42.1 million that NCMC had in its corporate operating account on the Petition Date. The Debtors promptly consulted with the Committee. The Debtors and the Committee decided to attempt to develop a procedure that would deal with all such trust fund claimants fairly and would preserve their rights plus the rights of the Debtors and unsecured creditors to assert contrary positions. The Debtors negotiated a motion with many of the major Repurchase Counterparties and on May 16, 2007 filed the "Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105, 361, 362 and 363(b)(1) [Docket No. 736] (the "Adequate Protection Motion"). In the Adequate Protection Motion, the Debtors sought an order providing adequate protection to all Repurchase Counterparties and whole loan purchasers who asserted an interest in property held by the Debtors on the Petition Date and providing for a collective process to resolve these issues.

On June 28, 2007, the Bankruptcy Court entered its "Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 361 and 363(b)(1)" [Docket no. 1729] (the "Adequate Protection Order"). Among other things, the Adequate Protection Order provided that the Debtors would deposit into an interest-bearing escrow account the sum of $39,331,614.71, which when added to the $2,670,000 that had previously been escrowed pursuant to the UBS Adversary Proceeding, would equal the $42.1 million in the NCMC corporate operating account on the Petition Date. In addition, the Repurchase Counterparties or whole loan purchasers that were subject to the Adequate Protection Order (the "Adequate Protection Parties") were granted liens and super administrative priorities on essentially all Estate assets to secure any legitimate trust fund claims. The Adequate Protection Order also detailed a series of accounting information exchanges that the parties agreed to make.

The Debtors and the Adequate Protection parties exchanged substantial amounts of forensic accounting data and legal analyses and engaged in extensive settlement discussions. Their efforts to resolve these matters resulted in three supplements to the Adequate Protection

Order designed to facilitate the continued exchange of accounting data and negotiations among the parties.

The parties disagreed on many of the facts and legal analysis. The Debtors and the Committee asserted that the Adequate Protection Parties could not establish a legitimate trust fund claims to any funds in the Debtors' non-segregated accounts, while the Adequate Protection Parties asserted trust fund claims against NCMC's corporate operating account that exceeded the amount in that account on the Petition Date. Many of the issues involved resolution of provisions in the 2005 amendments to the Bankruptcy Code that have not yet been tested in court.

While substantial progress has been made, as of the date of this Disclosure Statement, the Debtors are continuing to negotiate a settlement of this matter.

### 4.  Appointment of Examiner.

On April 17, 2007, the U.S. Trustee filed the "Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee or, in the Alternative, an Examiner" (the "Trustee Motion") [Docket No. 278], pursuant to which the U.S. Trustee requested that the Bankruptcy Court appoint (a) a chapter 11 trustee for cause under 11 U.S.C. § 1104(a)(1), or, (b) in the alternative, an examiner under 11 U.S.C. § 1104(c)(2). The Trustee Motion was joined by the New York State Teachers' Retirement System and was opposed by the Debtors, the Committee, and Ellington.

On June 1, 2007, the Bankruptcy Court entered an order denying the Trustee Motion insofar as it sought the appointment of a chapter 11 trustee, but granting the Trustee Motion insofar as it sought the appointment of an examiner [Docket No. 1023]. The Bankruptcy Court directed the U.S. Trustee to appoint an examiner (the "Examiner") to (a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pretax earnings in the 2005 financial statements were materially overstated, and (iii) identify and evaluate any claims or rights of action that the Estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible postpetition unauthorized use of cash collateral by the Debtors, and (c) otherwise perform the duties of an examiner set forth in section 1106(a)(3) and 1106 (a)(4) of the Bankruptcy Code (collectively, the "Investigation"). The Bankruptcy Court further ordered the Examiner to prepare and file a report within ninety (90) days of the date of the Examiner's appointment advising the Bankruptcy Court as to (a) the status of the Investigation, (b) whether the Examiner believed that the Examiner required additional time to complete the Investigation, and (c) whether the Examiner had identified additional areas or topics that should be investigated and therefore whether the scope of the Investigation should be broadened or otherwise amended.

Thereafter, on June 7, 2007, the Bankruptcy Court entered an order approving the U.S. Trustee's appointment of Michael J. Missal of Kirkpatrick & Lockhart Preston Gates Ellis LLP

("K&L Gates") as the Examiner [Docket No. 1162]. The Examiner subsequently retained K&L Gates as his legal counsel, Saul Ewing LLP as his Delaware counsel, and BDO Seidman, LLP as his accountants and financial advisor.

Since the appointment of the Examiner and the initiation of the Investigation, the Board of Directors has consistently instructed the company and its professionals to cooperate fully with the Examiner. The Debtors and their professionals believe that they have followed this mandate, as well as that of the Bankruptcy Court, and continue to do so.

The Debtors have made significant efforts to fulfill the Examiner's requests for documents and information as swiftly as possible, and the Debtors will continue to do so. The Debtors have devoted substantial resources to accomplish this undertaking. To date, the Debtors have produced millions of documents and more than one terabyte (i.e. more than 1,000 gigabytes) of native files from the Debtors' shared network drives in response to the Examiner's requests. This is addition to the Debtors' provision of witness interviews, responses to the Examiner's additional priority requests, and the Debtors' other efforts in response to the Examiner's requests for information.

On October 3, 2007, the Examiner moved for authority to serve subpoenas requesting information on certain former officers pursuant to Rule 2004. [Docket No. 3211]. The Bankruptcy Court granted the Examiner's motion on October 16, 2007 [Docket No. 3293]. The Examiner previously had sought authority to serve a subpoena on KPMG pursuant to Rule 2004 on July 16, 2007 [Docket No. 1946]. The Bankruptcy Court granted this request on August 1, 2007 [Docket No. 2107].

Citing the broad scope of the Investigation and the voluminous amount of documents produced by the Debtors, on September 5, 2007, the Examiner moved for an extension of time to submit his report to the Bankruptcy Court [Docket No. 2665]. On October 10, 2007, following a hearing on the matter and negotiations among the parties, the Bankruptcy Court entered the "Order (I) Supplementing June 1, 2007 Order Directing the Appointment of an Examiner and (II) Granting Motion of Michael J. Missal, Examiner for an Extension of Time to File His Report with the Court" (the "Supplemental Examiner Order") [Docket No. 3261]. While the Supplemental Examiner Order extended the deadline for the Examiner to file a comprehensive report regarding the results of the Investigation until January 15, 2008 (unless further extended by order of the Bankruptcy Court), it directed the Examiner to file his report pertaining to the Debtors' postpetition use of cash collateral upon completion of that portion of the Investigation.

The Examiner filed his First Interim Report on November 21, 2007, which dealt with the cash collateral issues (the "Cash Collateral Report"). On December 19, 2007, the Debtors filed a substantive response to the Cash Collateral Report. On January 7, 2008, the Examiner filed a reply to the Debtors' substantive response. Initially, the Examiner's Cash Collateral Report, the Debtors' reply, and the Examiner's response were filed under seal. On January 17, 2008, these documents were unsealed [Docket Nos. 4503, 4499, and 4502, respectively]. Each of these documents may be viewed free of charge at http://www.xroadscms.net/newcentury under the "Court Documents" section.

On January 8, 2008, the Examiner filed a motion to further extend the deadline to submit his report on the accounting issues. [Docket No. 4342]. In it, the Examiner asserted that some former New Century employees had only recently agreed to be interviewed by him and that the production of documents by the Debtors and KPMG had taken longer than expected. After the Examiner filed this motion, the Debtors disclosed to the Bankruptcy Court and to the Examiner that they had discovered that a third party vendor engaged to produce documents to the Examiner had inadvertently failed to produce approximately 600,000 documents to the Examiner. Previously, the Debtors had understood that the vendor had produced these documents. Of these documents, approximately 177,000 duplicated documents that had been produced to the Examiner from other sources. Upon discovering this vendor mistake, the Debtors instructed the vendor expeditiously to produce the documents to the Examiner, and all were produced. The Examiner asserted that this delay supported his request for an extension. On January 24, 2008, the Bankruptcy Court entered an order extending the deadline by which the Examiner must file his report to February 29, 2008 [Docket No. 4612].

### 5. The DBSP Adversary Proceeding and Settlement Thereof.

The DBSB Adversary Proceeding sought an adjudication of DBSP's and the Debtors' rights to approximately 235 mortgage loans that NCMC owned and which were not subject to any repurchase facility or otherwise encumbered (the "Disputed Loans"). The Disputed Loans had a principal balance of slightly more than $50 million. In early March 2007, DBSP made a $14.1 million margin call on the Debtors. The Debtors assert that they sent a tape with information about the Disputed Loans so that DBSP and the Debtors could negotiate over what portion of these loans might be transferred to DBSP in satisfaction of this margin call. DBSP, however, asserted that the Debtors authorized the transfer of all of these loans to it. DBNTC, which served as the custodian for the original borrower notes and other mortgage loan documents, transferred ownership of the Disputed Loans from NCMC to DBSP. The Debtors asserted that they never authorized this transfer by DBNTC to DBSP. DBSP and DBNTC, in contrast, claimed that the Debtors authorized this transfer.

DBSP also asserted claims for approximately $2 million under the Adequate Protection Motion and a deficiency claim under its Master Repurchase Agreement of approximately $50 million. The Debtors and the Committee disputed these assertions and argued that DBSP owed the Estates money since the market value of the mortgage loans subject to its Master Repurchase Agreement exceeded the amounts that the Debtors owed DBSP on the date that DBSP declared an event of default and accelerated that facility.

DBSP and the Debtors ultimately settled this dispute. On August 8, 2008, the Debtors filed a motion seeking approval of a settlement and mutual release of all of the disputes among the Debtors and DBSP regarding these issues (the "DBSP Settlement") [Docket No. 2214]. On August 21, 2007, the Bankruptcy Court entered an order approving the DBSP Settlement [Docket No. 2369].

Among other things, the DBSP Settlement provided that the Debtors would conduct an auction of the Disputed Loans with the proceeds of any sale, after deducting any costs and expenses of such sale (including amounts, if any, due to bidders for due diligence expense

reimbursement) to be paid as follows: (i) first, to DBSP until DBSP is paid $14,000,000 (the "DBSP Payment"), and (ii) second, to the Debtors' estates, to the extent of any excess proceeds after payment of the DBSP Payment. The settlement also provided that DBSP would assign to the estates any recovery to which it would be entitled in the Adequate Protection Motion. Finally, the settlement provided that DBSP would have an allowed general unsecured deficiency claim in the amount of $20,000,000 against NCFC, NC Credit, NCMC, NC Capital, and Home123; provided, however, that the recovery on such claim will be limited to such claim's pro rata share (determined in relation to other allowed general unsecured claims against the relevant Debtor), of proceeds distributed from recoveries realized on claims (net of professional fees and other costs of prosecution) arising out of events or circumstances that led to the restatement of the financial statements of the Debtors or such restatement itself, and such allowed claim will not be entitled to participate in distributions derived from any other source.

On August 27, 2007, the Bankruptcy Court entered an order approving bidding procedures in connection with the auction of the Disputed Loans [Docket No. 2595]. On September 10, 2007, the Debtors held an auction of the Disputed Loans in accordance with those bidding procedures. After 15 rounds of bidding, Residential Mortgage Solution L.L.C. ("RMS") was the winning bidder at the auction, with a winning bid of $23,330,000 in cash. Of that amount, approximately $11.9 million was remitted to the Estates and the remainder was paid to DBSP. On September, 14, 2007, the Bankruptcy Court entered an order approving the sale of the Disputed Loans to RMS. The sale closed on September 18, 2007.

### 6. Resignation of KPMG.

On April 27, 2007, KPMG resigned as principal accountants for NCFC and notified the Debtors that the client-auditor relationship between NCFC and KPMG had ceased. Because NCFC had already initiated liquidation proceedings under chapter 11 of the Bankruptcy Code as of the date of KPMG's resignation, NCFC did not engage a successor accounting firm.

### 7. Relief from Stay Procedures.

During the pendency of the Chapter 11 Cases, the Debtors were subject to a multitude of motions for relief from the automatic stay filed by entities seeking to foreclose on real property encumbered by loans that were originated and/or serviced by the Debtors. In some instances, the Debtors held a senior lien(s) on the properties. In others, the Debtors held a junior lien(s).

In order to avoid becoming mired in these stay relief requests, the Debtors adopted a two-tiered approach. First, on May 3, 2007, the Debtors filed the "Motion of the Debtors and Debtors in Possession for a Procedure to Grant Relief from the Automatic Stay for Certain Foreclosure Proceedings Pursuant to Sections 105(a) and 362 of the Bankruptcy Code" (the "Omnibus Stay Relief Motion") [Docket No. 526]. The Omnibus Stay Relief Motion contemplated an abbreviated procedure for obtaining stay relief for parties that held a senior lien(s) on a property where the Debtors held a junior lien(s) and the fee interest was not property of the Estates. Specifically, the Omnibus Stay Relief Motion requested approval of procedures providing that the movant could avoid filing a motion for relief from stay if the movant supplied the Debtors with certain information regarding the real property in question and its senior lien(s)

and pay the Debtors a fee for the administrative burden. A review of this information allowed the Debtors to determine whether or not they had an economic interest in the subject property that should be protected. An order was entered granting the Omnibus Stay Relief Motion on June 7, 2007 [Docket No. 1163]. Several entities faced with these factual circumstances chose to participate in the omnibus stay relief procedures described above resulting in a substantial savings for the Estates.

Second, the Debtors engaged in a one-off analysis of motions for relief from stay in situations not covered by the omnibus stay relief procedures or situations in which the movant chose not to participate in the omnibus stay relief procedures. In the first instance, the analysis of these stay relief motions involved a determination of whether the Debtors had an interest in the subject properties. In nearly every case, the fashion in which the Debtors conducted their business prepetition and/or the speed with which the Debtors conducted their asset sales postpetition, left the Debtors with no interest in the subject properties. Thus, in almost every instance, the Debtors were able to allow these motions for relief from stay to proceed unopposed. As of January 28, 2008, over 300 such motions have been filed and granted.

## 8. Extensions of Exclusivity.

By Order dated July 31, 2007, the Bankruptcy Court extended for sixty (60) days, through and including November 28, 2007, the exclusive period during which the Debtors, other than Access Lending, have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") in the Chapter 11 Cases with respect to all non-Debtor parties other than the Committee, and to extend for an additional sixty (60) days, through and including January 28, 2008, the period during which the Debtors have the exclusive right to solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods") in the Chapter 11 Cases [Docket No. 2106]. Subsequently, on November 28, 2007, the Debtors moved to further extend the Exclusive Periods with respect to all Debtors other than Access Lending by approximately 30 days and to extend Access Lending's Exclusive Periods for the first time [Docket No. 3969]. Specifically, the Debtors requested that the Bankruptcy Court enter an order extending the Exclusive Filing Period, with respect to all non-Debtor parties other than the Committee, through and including December 28, 2007 and the Exclusive Solicitation Period through and including February 27, 2008. The Bankruptcy court entered an order approving this request on December 20, 2007 [Docket No. 4177]. On December 28, 2007, the Debtors filed an additional motion to extend the Exclusive Filing Period, with respect to all non-debtor parties other than the Committee, through and including January 28, 2008 and the Exclusive Solicitation Period through and including March 28, 2008. [Docket No. 4263]. The Bankruptcy Court entered an order approving this request on January 23, 2008 [Docket No. 4530]. Thereafter, on January 28, 2008, at the request of the Committee, the Debtors moved to further extend the Exclusive Filing Period through and including February 21, 2008 and the Exclusive Solicitation Period through and including April 21, 2008 [Docket No. 4720]. This motion is set to be heard by the Bankruptcy Court on February 20, 2008.

## 9. Positive Software Litigation.

In February 2003, Positive Software Solutions, Inc. ("PSSI") brought an action against

NCMC, as well as former officers Jeffrey Lemieux and Frank Nese and certain non-Debtor affiliates, in the United States District Court for the Northern District of Texas (the "Texas District Court") alleging the breach of a certain software license agreement as well as theft, conversion and infringement of certain of PSSI's copyrights and trade secrets (the "2003 Lawsuit"). The 2003 Lawsuit alleges that the Debtors were seeking to reverse engineer a software application and data storage system known as LoanForce that was licensed by PSSI to NCMC and sought, among other things, $38 billion dollars in monetary damages.

The 2003 Lawsuit was arbitrated pursuant to the rules of the American Arbitration Assoication. The arbitrator first heard and decided eight motions for partial summary judgment. Thereafter, on January 19-23, 2004 and February 3-4, 2004, the arbitrator conducted a seven day trial. On May 5, 2004, following the submission of post-trial briefs, the arbitrator entered an 86-page written opinion constituting his arbitration award (the "Award"). The Award rejected all of PSSI's claims and awarded NCMC $11,500 in actual damages on its counterclaims, as well as $1.5 million in attorneys fees and $1,200 in costs. While the District Court granted PSSI's motion to vacate the arbitration award on the grounds that the arbitrator had an undisclosed conflict of interest based on his having been co-counsel with a lawyer representing NCMC in the 2003 Lawsuit, the *en banc* United States Court of Appeals for the Fifth Circuit reversed the District Court's vacature (see Positive Software Solutions, Inc. v. New Century Mortg. Corp., 476 F.3d 278 (5th Cir. 2007), and, on June 11, 2007, the United States Supreme Court denied a petition for *certiorari* by PSSI. The Fifth Circuit remanded the case to the Texas District Court for consideration of PSSI's other objections to the Award.

On July 9, 2007, PSSI filed a motion in the Texas District Court for leave to file a second motion to vacate the Award. The next day, July 10, 2007, PSSI filed a motion for relief from the automatic stay to further pursue the 2003 Lawsuit (the "2003 Lawsuit Stay Relief Motion") [Docket No. 1877]. The Debtors filed an objection to the PSSI Stay Relief Motion that also requested sanctions for a violation of the automatic stay (the "First Sanctions Motion") [Docket No. 2101]. On August 15, 2007, the Bankruptcy Court denied the 2003 Lawsuit Relief Motion and awarded damages for PSSI's violation of the stay in an amount to be determined after an evidentiary hearing [Docket No. 2265].

Thereafter, on August 20, 2007, PSSI filed a lawsuit in the Texas District Court against the NCMC's attorneys in the 2003 Lawsuit, Susman Godfrey, L.L.P. ("Susman"), as well as two of Susman's partners individually and two ex-NCMC officers that were defendants in the 2003 Lawsuit, alleging fraud in connection with the 2003 Lawsuit (the "2007 Lawsuit"). Identifying the potential harm that could result to the Debtors' estates if PSSI were permitted to litigate the 2007 Lawsuit, the Debtors filed a motion for additional sanctions for PSSI's further violation of the automatic stay, arguing that the 2007 Lawsuit was an attempt to circumvent the stay (the "Second Sanctions Motion") [Docket No. 2656]. The Bankruptcy Court reserved judgment on the Second Sanctions Motion, and subsequently, the Debtors filed a supplement to the Second Sanctions Motion [Docket No. 3252], by which the Debtors clarified that they sought an extension of the automatic stay to cover the 2007 Lawsuit as an alternative to sanctions. Further, out of an abundance of caution, the Debtors filed an adversary proceeding and related motion for temporary restraining order seeking to enjoin the 2007 Lawsuit (respectively, the "Adversary Proceeding" and the "TRO Motion") on October 9, 2007. Thereafter, on October 18, 2007, PSSI

filed a motion seeking relief from the automatic stay with respect to the 2007 lawsuit (the "2007 Lawsuit Stay Relief Motion") [Docket No. 3320]. The parties then agreed to mediate all of their disputes at a two-day mediation, scheduled for January 7 and 8 in Delaware, and all of the above-motions were held in abeyance.

Shortly after initiating the 2007 Lawsuit, PSSI filed a Proof of Claim against each of NCMC, TRS Holdings, NCFC, and Home123 by which PSSI asserted a general unsecured Claim in the amount of "580,000,000 (est.)" against each such Debtor (collectively, the "PSSI Claims"). The attachments to the PSSI Claims specify that the bases for the PSSI Claims are the allegations in the complaint underlying the 2003 Lawsuit and that the amount asserted is based upon the damages report of PSSI's expert witness in the 2003 Lawsuit.

The Debtors and PSSI participated in mediation on January 7-8, 2008 but were unable to reach a resolution of their disputes. On January 9, 2008, PSSI once again moved for relief from stay in the 2003 Lawsuit (the "Second 2003 Lawsuit Stay Relief Motion") [Docket No. 4354], which motion, along with the 2007 Lawsuit Stay Relief Motion, is scheduled to be heard by the Bankruptcy Court on February 6, 2008. On January 30, 2008, the Debtors filed a pleading by which they (i) objected to the Second 2003 Lawsuit Stay Relief Motion, (iii) objected to the PSSI Claims, and (iii) moved for an order disallowing the PSSI Claims, or, in the alternative, estimating them to be in the amount of $0 [Docket No. 4751]. The Debtors objected to each of the PSSI Claims on the basis that such Claims have no merit as the arbitrator concluded in the Award. Additionally, on January 30, 2008, the Debtors also filed an objection to the 2007 Lawsuit Stay Relief Motion [Docket No. 4757].

### 10. Objections to Claims.

As of the filing of this Disclosure Statement, the Debtors have filed 11 omnibus Claim objections (the "Omnibus Objections"). Six of the Omnibus Objections are objections that object to Claims on non-substantive bases, including, among other bases, that a particular Proof of Claim (a) has been amended and superseded by subsequently filed Proofs of Claim, (b) was filed without any supporting documentation, (c) is duplicative of another Proof of Claim filed against the same Debtor, or (d) was late filed. Five of the Omnibus Objections are objections that object to Claims on substantive bases, including, among other bases, that a particular Proof of Claim (a) is based on a shareholder interest in the Debtors or (b) assert amounts that the Debtors are unable to reconcile with their books and records. In total, through the Omnibus Objections, the Debtors have objected to approximately 1,236 Proofs of Claim in the aggregate amount of approximately $693.2 million (plus unliquidated amounts). The only Claims to which the Debtors have objected other than through the Omnibus Objections are the four PSSI Claims, each of which asserts a general unsecured Claim estimated (by PSSI) to be $580.0 million. To date, 737 Proofs of Claim asserting Claims in the amount of $233.9 million have been disallowed or reclassified, while the remainder of the Debtors' Claim objections are pending resolution before the Bankruptcy Court.

### E.     MANAGEMENT; HEADCOUNT REDUCTION.

#### 1.     Management.

As of the Petition Date, NCFC was managed by its Chief Executive Officer, Brad A. Morrice, its Chief Financial Officer, Tajvinder S. Bindra, other senior officers and its board of directors.   After the approval of the sales of NCFC's major assets, senior management transitioned, and on June 8, 2007, the Board of Directors appointed Holly Etlin of AP Services LLC ("AP Services") as NCFC's Chief Restructuring Officer, President, and Chief Executive Officer and Michael Tinsley, also of AP Services, as NCFC's controller and Chief Financial Officer.  Effective December 28, 2007, Mr. Tinsley resigned as Chief Financial Officer of NCFC and the board of directors appointed Jamie Lisac of AP Services as Chief Financial Officer.  Ms. Etlin and Mr. Lisac, respectively, are also either the President or CEO, as the case may be, or the Treasurer or CFO, as the case may be, of each of the other Debtors other than NC Asset Holding and NCoral, which are limited partnerships.

Ms. Etlin and Mr. Lisac are, and before his resignation, Mr. Tinsley was, independently compensated pursuant to arrangements between AP Services and its affiliate, AlixPartners LLP ("AlixPartners"), a financial advisory and consulting firm specializing in corporate restructuring which was retained and is compensated by the Debtors on a monthly basis pursuant to an order of the Bankruptcy Court dated June 15, 2007 [Docket No. 1268].  Ms. Etlin and Mr. Liscac do not receive any compensation directly from NCFC and will not participate in any of NCFC's employee benefit plans.  Prior to his resignation, Mr. Tinsley did not receive any compensation directly from NCFC nor did he participate in any of NCFC's employee benefit plans.

On April 2, 2007, in connection with their bankruptcy filings, the Debtors reduced their aggregate workforce by a total of approximately 3,200 people (approximately 54% of their total aggregate workforce) nationwide.  On May 4, 2007 and within the 30 days following such date, as a result of a lack of bids to purchase the Loan Origination Platform Assets (as described above) as a continuing business, the Debtors further reduced their aggregate workforce by a total of approximately 2,000 people (approximately 73% of their total aggregate workforce immediately prior to this workforce reduction) nationwide.

As of January 28, 2008, the Debtors' workforce consists of a limited staff of approximately 20 employees retained through Special Counsel, Inc. ("Special Counsel") as described under "Employment of Special Counsel, Inc." below, and approximately 14 independent contractors, led by Ms. Etlin, who are actively engaged in winding up the Debtors' operations, reconciling claims, and liquidating the Debtors' remaining assets.

#### 2.     Incentive Plans.

NCFC's board of directors approved the New Century Financial Corporation Key Employee Incentive Plan, Amendment No. 1 to the New Century Financial Corporation Key Employee Incentive Plan (as amended, the "Initial KEIP") and the New Century Key Employee Incentive Retention Plan (the "KEIRP").  The Bankruptcy Court entered an order approving the KEIRP and the Initial KEIP on May 29, 2007 [Docket No. 896].  Under the KEIRP, retention

bonuses in the amount approximately $1.0 million were paid. The KEIRP also provided $175,000 for discretionary payments of which $110,165 was paid. Additionally, the Initial KEIP and the KEIRP provided that certain key employees would receive incentive bonuses based upon the extent to which the liquidation prices for certain of the Debtors' asset classes meet or exceed targets. As a result of the asset sales described above, NCFC has paid $1,688,274 in incentive bonuses pursuant to the KEIRP and the Initial KEIP to date. Under the Initial KEIP and the KEIRP, additional incentive payments may be paid. Approximately 145 employees were eligible to participate in the Initial KEIP and the KEIRP.

Additionally, NCFC adopted the New Century Financial Corporation Wind Down Retention Plan (the "Wind Down Plan") and amended the KEIP ("Amended KEIP"), which actions were approved by order of the Bankruptcy Court dated August 14, 2007 [Docket No. 2245]. The Wind Down Plan provides approximately $800,000 to fund the payment of retention bonuses.

### 3. Employment of Special Counsel, Inc.

As of and following the Petition Date, the Debtors provided their employees with a variety of health benefit plans, most of which were self-funded. Given the limited personnel remaining in the Debtors' employ, the Debtors determined in November 2007 that it would be cost prohibitive to continue providing these health benefits on a self-funded basis. The Debtors attempted to obtain health insurance coverage for their employees from nearly every major health plan carrier in the country, but they also found that all options were cost prohibitive. In an effort to prevent the anticipated attrition caused by the Debtors' decision to terminate health coverage, the Debtors entered into an agreement with Special Counsel dated November 30, 2007 (the "Special Counsel Agreement"), pursuant to which the Debtors' employees would become employees of Special Counsel as of December 17, 2007. As employees of Special Counsel, the Debtors employees would be able to take advantage of the health benefit plans offered by Special Counsel, while still providing services to the Debtors. To that end, on November 30, 2007, the Debtors filed a motion requesting an order (i) approving the Special Counsel Agreement and (ii) authorizing the Debtors to employ Special Counsel to provide employee staffing services in accordance with the terms of the Special Counsel Agreement [Docket No. 3997], which motion was granted by order of the Bankruptcy Court dated December 12, 2007 [Docket No. 4078].

Accordingly, beginning December 17, 2007, the Debtors' work-force has been employed by Special Counsel. The Debtors anticipate that the total amount to be paid to Special Counsel on a weekly basis will be approximately $70,000. Special Counsel also required the Debtors to pay to Special Counsel a two-week security deposit in the approximate amount of $140,000.

## IV. THE PLAN

The following summary of certain principal provisions of the Plan is qualified in its entirety by reference to the Plan, which is attached as <u>Exhibit A</u> to this Disclosure Statement. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and

reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions. In the event of any discrepancy between this Disclosure Statement, including the following summary description, and any provision of the Plan, the Plan or order confirming the Plan will control. Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Plan.

## A. PLAN OVERVIEW.

### 1. Summary of Assets.

#### a. The Debtor Groups and the Estates' Non-Litigation Assets.

The Plan is a joint plan, which means that it is a plan that applies to all of the Debtors and that while separate Classes generally are established for Unsecured Claims against each of the Debtors, distributions made to the Classes of Unsecured Claims are generally made on a joint basis for each of three groups of companies comprising the Debtors. As set forth in Section I.A.2 above, the Plan refers to each of these three groups as a "Debtor Group," and the three Debtor Groups are (i) the Holding Company Debtors, (ii) the Operating Debtors, and (iii) Access Lending.

The Holding Company Debtors are NCFC, TRS Holdings, NC Credit, and NC Residual IV. The key assets of NCFC include investments in a hedge fund (discussed in Section V.A.4.a hereof), the funds available in the Deferred Compensation Trust (discussed in Section V.A.4.e hereof) and approximately $20 million that was in NCFC's bank accounts as of the Petition Date. NC Credit also held a limited amount of cash as of the Petition Date. Because ownership of some assets of NCFC and TRS Holding is difficult to ascertain in light of the transactions in 2004 pursuant to which NCFC became a publicly traded REIT, TRS Holdings is grouped with and is treated the same as other Holding Company Debtors.

The Operating Debtors are NCMC, NC Capital, Home123, NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. NCMC has the most substantial assets of the Operating Debtors. NCMC's assets include the majority of the proceeds generated from the sale of the Servicing Assets to Carrington (discussed in Section III.C.6.b hereof) and the majority of the proceeds generated from the sale of mortgage loans to Ellington (discussed in Section III.C.6a hereof) as well as cash in operating accounts on the Petition Date. NC Capital has substantially fewer assets recorded on its balance sheet, namely a small portion of the proceeds of the sales to Carrington and Ellington. Nevertheless, as discussed in Section IV.A.3.a(4) below, NC Capital potentially holds claims against NCMC. Home123's only assets consist of furniture, fixtures, and equipment in retail locations leased by the Debtors.

Access Lending was a wholly-owned subsidiary of TRS Holdings that provided warehouse financing to independent mortgage companies. It was acquired by the other Debtors in early 2006. As discussed in Section III.C.6.e of this Disclosure Statement, substantially all the assets of Access Lending were sold in April 2007. Access Lending's assets consist of the proceeds of that sale plus the cash in Access Lending's operating account as of the filing of its

chapter 11 filing on August 3, 2007.

The net proceeds from the liquidation of the assets of each Debtor Group (calculated as set forth in Articles 8.J.6, 9.C.2, and 9.C.3 of the Plan and as discussed in Sections V.A.1 hereof) will be distributed to Holders of Allowed Unsecured Claims against each respective Debtor Group and are defined as the Holding Company Debtor Net Distributable Assets, the Operating Debtor Net Distributable Assets, and the Access Lending Net Distributable Assets.

### b. The Estates' Litigation Assets.

All of the Holding Company Debtors and the Operating Debtors have litigation claims against third parties that might yield cash or other assets. In the Plan, these litigation claims fall within the definition of "Causes of Action," and the proceeds, if any, that will be generated from the Causes of Action (other than those of Access Lending) are defined as "Litigation Proceeds." The litigation claims that are likely to be brought on behalf of the Estates include actions related to NCFC's announced need to restate its financials and Avoiding Power Actions. The value of these litigation claims is inherently uncertain. None of this litigation has been filed as of the date of this Disclosure Statement. Most, if not all, of the potential defendants are likely to mount vigorous defenses and the resolution of these causes of action cannot be predicted presently.

Because of the fact that NCMC paid most of the Debtors' operating expenses (other than those of Access Lending), allocating Avoidance Actions (such as fraudulent transfer and preference actions) among the Debtors would be difficult. Similarly, allocating the litigation related to the need to restate NCFC's financial statements (discussed in Section III.B.2 hereof) would be extremely complicated and uncertain task the various underlying legal theories and the Debtors' interrelationships. Accordingly, the Causes of Action (other than those belonging to Access Lending) are grouped together, and, in turn, the Litigation Proceeds are divided among the Holders of Unsecured Claims against the Holding Company Debtors and the Operating Debtors on a percentage basis. The Litigation Proceeds are allocated 27.5% to Holders of Allowed Unsecured Claims against Holding Company Debtors and 72.5% to Holders of Allowed Unsecured Claims against Operating Debtors (subject to a further allocation among the Holders of Allowed Unsecured Claims against Operating Debtors to provide that the Holders of Allowed NC Capital EPD/Breach Claims will receive 45% of the Litigation Proceeds and Holders of all other Allowed Unsecured Claims against Operating Debtors will receive 27.5% of the Litigation Proceeds). This allocation reflects not only an effort to allocate the litigation assets among the Debtors, but also incorporates compromises negotiated as part of the Plan discussion with the members of the Committee and is part of an integrated global settlement that also deals with the Claims of the Holders of EPD/Breach Claims against NC Capital (discussed in Section IV.A.3.a(4) hereof).

Access Lending does not share in the Litigation Proceeds; however, all Causes of Action of Access Lending (including Avoidance Actions) remain assets of Access Lending.

### 2. Types of Claims Against the Debtors.

As required under section 1123(a)(1) of the Bankruptcy Code, the Plan places each Claim

against the Debtors (other than Administrative Claims and Priority Tax Claims) into a Class. The treatment of each Class under the Plan is specified in Article 4 of the Plan and is summarized in Section IV.B hereof. The Plan separately classifies Claims against each Holding Company Debtor. Classes of Claims against Holding Company Debtors are labeled with the prefix "**HC**" followed by a number. The Plan separately classifies Claims against NCMC, NC Capital, and Home123 and, based on the type of Claim, groups Claims against the other Operating Debtors into one of three omnibus Classes. Classes of Claims against Operating Debtors are labeled with the prefix "**OP**" followed by a number. The Plan separately classifies Claims against Access Lending, which Classes are labeled with the prefix "**AL**" followed by a number. A table listing the estimated distribution to each Class is located in Section I.A.4 hereof. Additionally, tables detailing the right of each Class to vote on the Plan is located in Section II.A hereof.

In classifying Claims, the Plan employs certain definitions to refer to different types of Claims. A summary of those definitions follows.

### a.      A/P/S Claims.

The Plan uses the defined term "A/P/S Claims" to refer collectively to Administrative Claims, Priority Tax Claims, Priority Claims, and Secured Claims, which are summarized, respectively, in Sections IV.B.1.a, IV.B.1.b, IV.B.2.a, and IV.B.2.b hereof. Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan. The Plan does classify Priority Claims and Secured Claims against each Debtor. Priority Claims are classified in Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1. Secured Claims are classified in Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2. Because none of these Classes are impaired under the Plan, Holders of Claims in these Classes are not entitled to vote on the Plan on account of such Claims.

### b.      Unsecured Claims.

The Plan defines "Unsecured Claim" as any Claim against the Debtors that is not an A/P/S Claim or a 510(b) Claim. In other words, the Plan uses the term "Unsecured Claim" to refer to the broad category Claims that are often referred to as "general unsecured claims." Each Holder of an Allowed Unsecured Claim against a Debtor(s) may receive distributions under the Plan from two sources: (i) net proceeds from the liquidation of the assets of the Debtors within the applicable Debtor Group (see Sections IV.E.10.f (Access Lending), IV.F.3.b (Holding Company Debtors), and IV.F.3.c (Operating Debtors) hereof), and/or (ii) the net proceeds from the prosecution of the Estates' Causes of Action as allocated to the applicable Debtor Group (see Section IV.E.10.f (Access Lending) and IV.F.3.a (Holding Company Debtors and Operating Debtors) hereof).

Under the Plan, there are three types of Unsecured Claims: (i) Special Deficiency Claims, EPD/Breach Claims, and Other Unsecured Claims. All Classes of Unsecured Claims are impaired and entitled to vote to accept or reject the Plan.

The Plan defines a Special Deficiency Claim as any Claim arising under a Master

Repurchase Agreement governing the sale and repurchase of mortgage loans by the Debtors to and from DBSP provided for in the DBSP Settlement, and any other settlement agreement entered into by any of the Debtors and approved by Final Order that provides that it gives rise to a Claim that is to be treated as a Special Deficiency Claim under the Plan. The terms of the DBSP Settlement and the Claims allowed thereunder are discussed in Section III.D.5 hereof. The Plan provides for Classes of Special Deficiency Claims against NCFC (Class HC3a), NC Credit (Class HC10a), NCMC (Class OP3a), NC Capital (Class OP6a), and Home123 (Class OP9a).

The Plan uses the defined term "EPD/Breach Claim" to refer to Claims of loan purchasers for (i) breach of a representation or warranty made by one or more of the Debtors under a loan sale agreement or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan. The Plan provides for Classes of EDP/Breach Claims against NCMC (Class OP3b) and NC Capital (Class OP6b). Under the Plan, the allowed amount of each EPD/Breach Claims is determined through application of the EDP/Breach Claim Protocol, which is discussed in Section IV.A.3.d hereof.

Under the Plan, any Unsecured Claim that is not a Special Deficiency Claim or an EPD/Breach Claim is an Other Unsecured Claim. The Plan provides for a Class of Other Unsecured Claims against each Debtor (though Other Unsecured Claims of certain Operating Debtors with minimal assets are group together in a single Class). In some cases, a Class of Other Unsecured Claims is the only Class of Unsecured Claims against a particular Debtor. The Classes of Other Unsecured Claims are as follows: NCFC (Class HC3c), TRS Holdings (Class HC7), NC Credit (Class HC10), NC Residual IV (Class NC13), NCMC (Class OP3c), NC Capital (Class OP6c), Home123 (Class OP9b), NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral (Class OP12), and Access Lending (Class AL3).

### c. Interests in NCFC and 510(b) Claims.

The Plan refers to equity interests in NCFC as an "NCFC Interests." NCFC Interests include the two series of preferred stock (defined as "Series A Preferred Stock Interests" and "Series B Preferred Stock Interests"), the common stock of NCFC (defined as "Common Stock Interests", and also, among other things, unexercised warrants and options to purchase common stock of NCFC. Claims arising out of the purchase or sale of NCFC Interests are defined as "510b Claims," and are broken down into Series A 510b Claims, Series B 510b Claims, and Common Stock 510b Claims.

The Plan provides for five (5) Classes of NCFC Interests and/or 510(b) Claims: Under the Plan, Class HC4a includes all Series A Preferred Stock Interests, Class HC4b includes all Series A 510b Claims, Class HC4c includes all Series B Preferred Stock Interests, Class HC4d includes all Series B 510b Claims, and Class HC4e includes all Common Stock Interests and Common Stock 510b Claims. Under the Plan, all NCFC Interests are canceled and neither the Holders of NCFC Interests nor the Holders of 510b Claims receive any distribution on account of such Interests and Claims. Accordingly, such Holders are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### 3. Key Plan Settlements.

The Plan contains several key components that the Plan Proponents believe will maximize value to the Estates' creditors through a series of interrelated settlements of issues between and among the various Classes of creditors. In addition to dividing the Debtors into three Debtor Groups and allocating the proceeds of the Debtors' Causes of Action among the Debtor Groups, these components include (i) employing the Determined Distribution Amount mechanism to adjust distributions to be received by creditors of different Debtors, (ii) applying the Multi-Debtor Claim Protocol to Claims for which Debtors are jointly liable, (iii) settling issues relating to intercompany claims through the Intercompany Claim Protocol, (iv) avoiding the expense of litigating EPD/Breach Claims through application of the EPD/Breach Claim Protocol; (v) reconciling the terms of the DBSP Settlement Agreement with the structure of the Plan. These mechanisms are summarized below.

#### a. Determined Distribution Amounts.

##### (1) Generally.

In formulating the Plan, the Plan Proponents analyzed the potential recoveries to creditors in the Plan's Classes on a number of different bases and under numerous scenarios. These analyses were based on numerous assumptions designed to aid the parties in crafting the structures contained in the Plan taking into account the cost of implementing alternative approaches and the legal and factual uncertainties inherent in this endeavor. This process was aided significantly by the fact that the Committee was comprised of creditors covering a broad range of stakeholders -- some creditors with claims only against the Holding Company Debtors, some EPD/Breach claimants, a major Repurchase Counterparty asserting claims under Master Repurchase Agreements, a major landlord, and a number of other types of creditors. The Plan Proponents considered the reasonable range of outcomes of intercompany issues involving potential claims and uncertainty of the ownership of particular assets.

The Plan that resulted provides treatment to each Class that takes into account the relative asset values of the Debtors within a Debtor Group, the projected amount of claims in each Debtor Group (and the asset value relative thereto), and the intercompany claims among the Debtors by assigning a "Determined Distribution Amount" -- a fixed percentage of the amount of each Allowed Unsecured Claim -- to each Class, which amount is subject to adjustment pursuant to the Multi-Debtor Claim Protocol and the Intercompany Protocol (discussed, respectively, in Sections IV.A.3.b and IV.A.3.c hereof).

##### (2) Holding Company Debtors.

The Determined Distribution Amount for each of Holding Company Debtor Class of Unsecured Claims is 100% of the amount of a particular Allowed Unsecured Claim. In other words, if a creditor holds an Allowed Unsecured Claim against a single Holding Company Debtor, the Determined Distribution Amount assigned to that creditor on account of such Claim will be the allowed amount of that Claim.

The uniformity of Determined Distribution Amounts across the Holding Company

Debtors was based in large part because, as noted above, certain assets of NCFC and TRS Holdings are difficult to allocate between them, thus arguing for similar treatment of Unsecured Claims against those Debtors. The equality of treatment of the Holding Company Debtors is also based on the fact that although it has fewer assets than NCFC, TRS Holdings also has a much lower amount of Claims against it than does NCFC. Additionally, the remaining Holding Company Debtors - NC Credit and NC Residual IV -- have minimal assets and, other than Claims under the Master Repurchase Agreements against NC Credit, have few Claims against them.

<div align="center">(3)     <u>Operating Debtors Other than NC Capital.</u></div>

In contrast, the Determined Distribution Amounts assigned to Classes of Unsecured Claims against the Operating Debtors vary depending on the Debtor liable for and the basis of the Claim. While NCMC has the most substantial liabilities -- the claims of the Repurchase Counterparties under the Master Repurchase Agreements, numerous litigation Claims, some EPD/Breach Claims of loan purchasers, and vendor Claims, among others -- of the Debtors in the Operating Group, NCMC also has the most substantial assets (as described above in Section IV.A.1.a). On the other hand, Home123's assets as of the Petition Date consisted of a small amount of furniture, fixtures, and equipment, while it faces liability for a comparatively large amount of Claims, including Claims under Master Repurchase Agreements and numerous litigation Claims. The remaining Operating Debtors (other than NC Capital) are liable for a relatively small amount of Claims, but have minimal, if any, assets.

Based on these facts, the Plan assigns Determined Distribution Amount percentages of (i) 100% to Unsecured Claims against NCMC, (ii) 25% to Unsecured Claims against Home123 (other than Special Deficiency Claims against Home123, which are assigned a 100% Determined Distribution Amount and are discussed in Section IV.B.2.i hereof), and (iii) 25% to Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. Thus, for example, subject to the Multi-Debtor Claim Protocol and the Intercompany Protocol, if a creditor holds an Allowed Unsecured Claim against NCMC, the Determined Distribution Amount assigned to that creditor on account of such Claim will be the allowed amount of that Claim, while if a creditor holds an Allowed Unsecured Claim (that is not a Special Deficiency Claim) against Home123, the Determined Distribution Amount assigned to that creditor on account of such Claim will be 25% of the allowed amount of that Claim.

<div align="center">(4)     <u>NC Capital.</u></div>

NC Capital owned certain Servicing Assets and mortgage loans and may have sizeable intercompany claims against NCMC arising out of NC Capital's prepetition relationship with NCMC. Specifically, most mortgage loans sold by the Debtors were originated by NCMC and Home123 and then sold to NC Capital. NC Capital then entered into loan sale agreements (the "Loan Sale Agreements") with third party purchasers in which NC Capital made typical representations and warranties and agreed to repurchase the mortgage loans if the borrower committed a payment default soon after the sale closed. Claims of those loan purchasers related to these sales (i.e. EPD/Breach Claims) comprise a substantial portion of the total Claims filed against the Debtors and the majority of EPD/Breach Claims are against NC Capital, as opposed

to other Operating Debtors, since NC Capital was generally the Debtor that entered into Loan Sale Agreements.

As noted above, the mortgage loans were generally sold by NCMC or Home 123 to NC Capital shortly before NC Capital sold them in the secondary market. In 1998, NCMC and NC Capital entered into a Master Mortgage Loan Purchase and Servicing Agreement (the "NC Capital Purchase Agreement"). The NC Capital Purchase Agreement envisioned that sales of mortgage loans from NCMC to NC Capital would take place pursuant to written confirmation and loan sale schedules. The NC Capital Purchase Agreement also contemplated that NCMC would make standard representations and warranties to NC Capital in connection with such sales. If, in fact, loans were sold by NCMC to NC Capital pursuant to this agreement, NC Capital would have an intercompany claims against NCMC that would largely mirror the EPD/Breach Claims that secondary loan buyers assert against NC Capital. However, the sales of mortgage loans from NCMC to NC Capital were not documented under the terms of the NC Capital Purchase Agreement nor were they reflected in the Debtors' books and records in the manner described in the NC Capital Purchase Agreement. Accordingly, the application of the NC Capital Purchase Agreement to the mortgage loans sold by NCMC to NC Capital is unclear. Nonetheless, it was the Debtors' practice for NCMC to repurchase mortgage loans from third party purchasers that had purchased mortgage loans from NC Capital to the extent such repurchase was required under the Loan Sale Agreements.

To resolve potential claims of NC Capital against NCMC with respect to mortgage loans purchased by NC Capital from NCMC, the Plan provides creditors of NC Capital a recovery greater than they would recover if only the assets of NC Capital were available to them, and NC Capital did not have a mirror intercompany claim against NCMC. The Plan Proponents negotiated the Determined Distribution Amount for Classes of Unsecured Claims against NC Capital in order to take into account the strengths and weaknesses of potential intercompany claims that NC Capital might have against NCMC.

This exercise led to the conclusion reached by the Committee and the Debtors that a recovery for Holders of Unsecured Claims against NC Capital equal to roughly one-half the rate of recovery for Holders of Unsecured Claims against NCMC would be a fair approximation of inherently uncertain issues. This issue was integrated with a number of other interrelated issues, including the appropriate share of Litigation Proceeds that should be allocated between creditors of NC Capital and the other Operating Debtors and the development of the EPD/Breach Claim Protocol. The overall result was that the Plan provides that (i) the Determined Distribution Amount assigned to each Allowed EPD/Breach Claim against NC Capital is 50% of the allowed amount of each such Claim as determined under the EPD/Breach Claim Protocol, and (ii) 45% of the Litigation Proceeds is allocated to Holders of Allowed EPD/Breach Claims against NC Capital.

### b. Multi-Debtor Claim Protocol.

The Plan Proponents developed the Multi-Debtor Claim Protocol to reduce expense in connection with claim resolution and to take into account the legal rights of creditors holding guarantees or other valid joint on several contractual arrangements with Debtors. As discussed in Section IV.A.1.a above, within the Holding Company Debtors, it is difficult to distinguish whether NCFC or TRS Holdings own certain assets. Accordingly, a creditor with a joint and

several claim against both NCFC and TRS Holdings may receive a windfall if permitted to receive from both NCFC and TRS Holdings in respect of such claim.

NC Credit did have certain separate assets, namely cash attributable to it as of the Petition Date. Accordingly, under a deconsolidated scenario, a Holder of an Allowed Unsecured Claim for which NCFC and NC Credit are jointly liable would have received a greater distribution than would a creditor holding an Allowed Unsecured Claims for which either NCFC or NC Credit is liable. To address this issue, the Multi-Debtor Claim Protocol provides that a Holder of Allowed Holding Company Debtor Unsecured Claims for which both NCFC and NC Credit are jointly liable will be assigned a Determined Distribution Amount of 130% of the amount of its Allowed Unsecured Claim against NCFC and will be assigned a Determined Distribution Amount of 0% with respect to its Claim against NC Credit.

A similar methodology is applied under the Plan to creditors holding Allowed Unsecured Claims for which certain Operating Debtors are jointly liable. As discussed in Sections IV.A.1.a and IV.A.3.a(3) above, most of the Operating Debtors have minimal assets other than NCMC, NC Capital, and Home 123. Unsecured Claims against these other Operating Debtors are also likely to be de minimis. However, if the Claims against these entities were not dealt with in a joint plan that pooled assets, a Holder of an Allowed Operating Debtor Unsecured Claim for which NCMC, NC Capital, and Home 123 are jointly liable, would recover additional value compared to holder of an Allowed Unsecured Claim against a single Operating Debtor. Accordingly, the Plan provides that if a creditor holds Allowed Unsecured Claims against NCMC, NC Capital, and Home123, and those debtors are jointly liable for such Claims, the creditor will receive an enhanced recovery (up to the allowed amount of such Claims) by virtue of being assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCMC of 130%. Such creditor will be assigned a Determined Distribution Amount of 0% on account of its other Allowed Operating Debtor Unsecured Claims that are based on the joint liability.

Other than with respect to the combinations set forth above, the Multi-Debtor Claim Protocol will treat as a single Claim all Unsecured Claims filed and allowed against multiple Debtors in a Debtors Group where such Debtors are jointly liable for such Claims. In those circumstances, the creditor will be assigned the Determined Distribution Amount that is the highest Determined Distribution Amount provided for in the Classes in which the creditor holds Claims. The Plan Proponents believe that this mechanism is both fair and will facilitate claim resolution where parties have erroneously filed proofs of claim against multiple Debtors.

The Multi-Debtor Claim Protocol does not alter the distributions of creditors with distinct claims against multiple Debtors. Accordingly, if a creditor holds an Allowed Unsecured Claim against NCMC under one contract and an Allowed Unsecured Claim against NC Capital under a different contract, the creditor will not be affected by the Multi-Debtor Claim Protocol: the creditor will hold two distinct Allowed Unsecured Claims against the Operating Debtors, will be assigned Determined Distribution Amounts based solely on the treatment of the Classes in which its two Claims are classified, and will receive distributions under the Plan on account of each of 100% with respect to both of its Claims.

Further, the Multi-Debtor Protocol treats as distinct Allowed Unsecured Claims against the different Debtor Groups. Accordingly, a creditor with an Allowed Unsecured Claim based on an agreement with NCMC and guaranteed by NCFC will have Allowed Unsecured Claims against both NCMC and NCFC, with each such Claim having a Determined Distribution Amount as provided in the Class to which it belongs and receiving distributions on account thereof from both the Holding Company Debtors and the Operating Debtors until such time as the joint liability is fully satisfied.

The Multi-Debtor Claim Protocol does not apply to Access Lending.

### c. Intercompany Claim Protocol.

As discussed above, certain of the Debtors' transactions among the Debtors created Claims against other Debtors ("Intercompany Claims"). The Plan provides for different treatment of these Intercompany Claims <u>within</u> a group of Debtors (i.e, the Operating Company Debtors versus the Holding Company Debtors) as opposed to Intercompany Claims <u>between</u> these two groups.

<u>Within</u> the Holding Company Debtor Group, the cancellation of the Intercompany Claims does not result in recoveries to creditors materially different from the recoveries in a deconsolidated scenario. As such, Claims of Holding Company Debtors against other Holding Company Debtors are assigned a Determined Distribution Amount of 0%.

The analysis yielded a similar result with respect to the Claims of Operating Debtors against other Operating Debtors, with the exception of the Claims and potential Claims between NC Capital and NC Mortgage, as discussed immediately below. Accordingly, Claims of Operating Debtors against other Operating Debtors are assigned a Determined Distribution Amount of 0%.

The potential Intercompany Claims between NC Capital and NCMC (which may also be characterized as fraudulent conveyance claims by the loans purchasers outside of the bankruptcy context) are resolved in connection of the assignment of the Determined Distribution Amount percentage for the loan purchaser claimants against NC Capital of 50%.

The Intercompany Claims <u>between</u> Holding Company Debtors, on one hand, and Operating Debtors, on the other hand, if netted against each other result in substantial Claims by the Holding Company Debtors against the Operating Debtors. A substantial portion of the Holding Company Debtors' Claims against the Operating Debtors results from the amounts contributed to the Operating Debtors from the Holding Company Debtors as capital. The amounts owing by the Holding Company Debtors to the Operating Debtors, on the other hand, appear to be based on payment of expenses by the Operating Debtors on behalf of the Holding Company Debtors. In light of the fact that the Holding Company Debtors' Intercompany Claims against the Operating Debtors may be recharacterized as equity contributions and therefore would not be debt entitled to setoff against the Claims by the Operating Debtors, the Plan Proponents formulated a compromise providing that the Holding Company Debtors' Intercompany Claims against the Operating Debtors are assigned a Determined Distribution

Amount percentage of 50%. As part of the overall Plan compromises, the distribution that can be made on account of these net Intercompany Claims is limited so that the Holding Company Debtors do not benefit from the compromises in the discounts of the Determined Distribution Amounts for Classes OP6b, OP9, and OP12.

### d. EPD/Breach Claim Protocol.

EPD and Breach Claims relate to claims for hundreds of thousands of mortgage loans sold by the Debtors in the secondary market. The Plan Proponents concluded that attempting to resolve these claims for each individual loan would require both the creditors and the estates to expend resources that would be grossly disproportionate to the amounts at issue, which would have the result of reducing the amount of cash that could be distributed to creditors. Litigating such matters at a loan level would also delay substantially the distributions to these creditors.

In addition, a review of the proofs of claim filed by Holders of EPD and Breach Claims revealed that many of the secondary loan buyers who asserted claims asserted that the amount of breach claims was presently unliquidated and could not be liquidated for years to come. This is true because many loan buyers have no reason to try to determine whether the selling Debtor breached a representation or warranty until and unless the borrower on that loan defaults. Thus, at a minimum, any plan would need to develop a mechanism for estimating unliquidated breach claims.

The Plan Proponents decided to invite the major indenture trustees for securitization trusts that bought loans from the Debtors and major whole loan purchasers who dealt with the Debtors to work with them to see if a streamlined protocol could be developed to deal with these issues. Over the course of approximately three months these parties have analyzed data collected by the Debtors, these participants in the secondary markets and industry data in an effort to develop a streamlined protocol that deals fairly with these issues. The EPD/Breach Claim Protocol attached as Exhibit B to the Plan is the result.

The protocol differentiates between EPD Claims and Breach Claims. The universe of EPD Claims is known since the period for a borrower payment default that gives rise to an EPD right passed generally by June 2007, if not before (since the Debtors stopped selling loans in about March 2007). As the Debtors' financial situation deteriorated during the first part of 2007, they were unable to honor many EPD repurchase demands. And, after filing for bankruptcy protection, it was not legally possible for the Debtors to honor these demands. The damages that flow from the Debtors' inability to repurchase loans subject to EPD rights is more difficult to assess. Because the claimant was unable to resell these loans to the Debtors, it suffered damages, but the Plan Proponents assert that these damages are not equal to the unpaid principal balance ("UPB") of the loans for the loans had value to the claimant. If such matters were litigated loan-by-loan they would involve such factual and legal issues as whether the amount of a "loss" realized by a claimant was the result of the Debtors' failure to repurchase the loans or some combination of deteriorating market conditions, how the claimant dealt with the loan or any number of other factors. The Plan Proponents and the major loan purchasers who helped to develop the EPD/Breach Claim Protocol concluded that the major determinant of the loss for a loan was the borrower payment history. For example, if a loan was at one point in payment

default but the borrower had cured that default and was presently performing the loss resulting from the Debtors' failure to repurchase the loan would likely be de minimis. On the other hand, if the loan purchaser had foreclosed on the property and held the property as real estate owned ("REO") the loss was likely to be more severe. The parties involved in developing this protocol analyzed the Debtors history of losses incurred by them when they had repurchased loans, the experience of the claimants, amounts asserted in proofs of claim, and industry data. In any such assessment, a date certain also needs to be picked and the parties agreed to use the claims bar date established by the Court of August 31, 2007. The protocol for EPD Claims is then based on the following grid for loans subject to EPD Claims measured as of August 31, 2007.

- Current: 0% of UPB
- 31 – 60 days delinquent: 15% of UPB
- 61 – 90 days delinquent: 20% of UPB
- 91 or more days delinquent: 30% of UPB
- Borrower in bankruptcy: 35% of UPB
- In foreclosure : 40% of UPB
- REO: 45% of UPB

Breach Claims are more complicated. Determining whether the Debtors breached a representation or warranty in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific allegation and that often would entail a degree of subjectivity since some of the standard representations and warranties are not susceptible to clear objective assessment. In addition, many of the secondary loan buyers asserted in their proofs of claim that they would not be able to liquidate such claims fully for years since there often would be no reason to ferret out a breach until and unless the borrower defaulted. And after such assessments were made, it would be necessary to develop a methodology for assessing the damages that resulted from the Debtors' inability to repurchase the loans, as opposed to losses that the loan buyers suffered based on market and other conditions. The parties analyzed substantial data and developed a protocol that takes into account statistical measures of the normal incidence of breaches of the life of a pool of loans. For example, the highest incidence of breaches will likely be recognized relatively soon after a pool of loans is sold. Conversely, after a pool of loans has been held by a loan buyer for a number of years, it is less likely that new breaches will come to the fore. In addition, the protocol utilizes a measure of damages that are likely to result from such a breach which is married with the statistical analysis of the likelihood of a breach based on the seasoning of the pool. The result is the following protocol.

The damages resulting from Breach Caims will be based upon the simplifying assumptions that: (i) 1.5% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this 1.5% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when Breach Claims are asserted, and (iii) damages resulting from breaches will be set at 30% of the UPB of the loan as of August 31, 2007. The following table sets forth this approach.

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | 1.500% | 0.450% |

| | | | |
|---|---|---|---|
| 2006 | 4 Qtr | 1.200% | 0.360% |
| 2006 | 3 Qtr | 1.120% | 0.336% |
| 2006 | 2 Qtr | 0.850% | 0.255% |
| 2006 | 1 Qtr | 0.680% | 0.204% |
| 2005 | 4 Qtr | 0.530% | 0.159% |
| 2005 | 3 Qtr | 0.360% | 0.108% |
| 2005 | 2 Qtr | 0.180% | 0.054% |
| 2005 | 1 Qtr | 0.140% | 0.042% |
| 2004 | 4 Qtr | 0.100% | 0.030% |
| 2004 | 3 Qtr | 0.085% | 0.026% |
| 2004 | 2 Qtr | 0.065% | 0.020% |
| 2004 | 1 Qtr | 0.060% | 0.018% |
| 2003 | 4 Qtr | 0.053% | 0.016% |
| 2003 | 3 Qtr | 0.045% | 0.014% |
| 2003 | 2 Qtr | 0.035% | 0.011% |
| 2003 | 1 Qtr | 0.025% | 0.008% |
| 2002 | 4 Qtr | 0.022% | 0.007% |
| 2002 | 3 Qtr | 0.018% | 0.005% |
| 2002 | 2 Qtr | 0.015% | 0.005% |
| 2002 | 1 Qtr | 0.012% | 0.004% |
| 2001 and Earlier | | 0.006% | 0.002% |

Damages, for purposes of distributions under the plan, will be measured by applying the percentage factor in the third column of this table against the 8/31/07 UPB of the loans purchased from the selling Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

The Plan Proponents and major secondary loan purchasers also developed a questionnaire that elicited information from EPD and Breach claimants that could be used to calculate the results for individual claimants and for the classes set forth in the Plan. The vast majority of claimants have embraced this process and have returned the questionnaires. The Debtors have communicated the results for a claimant to each of the claimants that has participated in this process and have used the data to estimate that aggregate determination for Class OP3b EPD/Breach Claims against NCMC will equal $[__] and that determination for Class OP6b against NC Capital will equal $[__].

**e.       DBSP's Special Deficiency Claims.**

As discussed in Section III.D.5 hereof, the DBSP Settlement, which was entered into just as Plan negotiations were beginning, provides that DBSP has an Allowed Unsecured Claim, defined in the Plan as a Special Deficiency Claim, in the amount of $20,000,000 against NCFC, NC Credit, NCMC, NC Capital, and Home123. The DBSP Settlement, however, limits the DBSP's recovery on such Claim to the Claim's pro rata share of all proceeds distributed from the net recoveries arising out of events or circumstances that led to the restatement of the financial

statements of NCFC or such restatement itself (collectively, the "Restatement"). Under the DBSP Settlement, DBSP cannot recover on account of this Claim from any other assets of the Debtors, including Causes of Action unrelated to the restatement of NCFC's financial statements.

The Plan's structure with respect to Causes of Action and net recoveries thereof differs from that contemplated by the DBSP Settlement. The Plan does not distinguish between Restatement-related Causes of Action and other Causes of Action, nor does the Plan distinguish between recoveries generated from Restatement-related Causes of Action and other Causes of Action. Rather, the Plan provides that the net recoveries from Restatement-related Causes of Action are included within the Litigation Proceeds, which are allocated 27.5% to Holders of Allowed Unsecured Claims against Holding Company Debtors, 27.5% to the Holders of Allowed Unsecured Claims against Operating Debtors other than Holders of Allowed EPD/Breach Claims against NC Capital, and 45% to Holders of Allowed EPD/Breach Claims against NC Capital.

This structure does not allow for DBSP to receive distributions on account of its Special Deficiency Claims solely from net recoveries arising out of all Restatement-related Causes of Action because (i) the Restatement-related Causes of Action are included within all Causes of Action (other than Causes of Action of Access Lending) and (ii) 45% of the Litigation Proceeds will be distributed to a Class that does not include a DBSP Special Deficiency Claim. Accordingly, the Plan Proponents reached a compromise whereby, notwithstanding the DBSP Settlement Agreement, DBSP's Special Deficiency Claims will receive a pro rata share of proceeds distributed from 60% of the net recoveries of all Causes of Action, as opposed receiving a pro rata share of proceeds distributed from 100% of the net recoveries of Restatement-related Causes of Action.

## B. CLASSIFICATION.

Section 1122 of the Bankruptcy Code provides that a Chapter 11 plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to other Claims and Interests in such Class.

The classification of Claims (except for Administrative Claims and Priority Tax Claims) and Interests listed below is for all purposes, including without limitation, voting, confirmation, and distributions under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim will be deemed classified in a particular Class only to the extent such Claim satisfies the definition of such Class and will be deemed classified in a different Class to the extent any remainder or other portion of such Claim satisfies the definition of such different Class. A Claim is in a particular Class only to the extent such Claim is an Allowed Claim in such Class and has not been paid or otherwise settled before the Effective Date. The Plan does not effect a substantive consolidation of the Debtors.

The classification of Claims pursuant to the Plan is as follows:

| CLASS | DESCRIPTION | STATUS/VOTING RIGHTS |
|---|---|---|
| **Claims Against Holding Company Debtors** | | |
| Class HC1 | Priority Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC2 | Secured Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC3a | Special Deficiency Claims against NCFC. | Impaired - entitled to vote |
| Class HC3b | Other Unsecured Claims against NCFC. | Impaired - entitled to vote |
| Class HC4a | Series A Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4b | Series A 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4c | Series B Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4d | Series B 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4e | Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC5 | Priority Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC6 | Secured Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC7 | Other Unsecured Claims against TRS Holdings. | Impaired - entitled to vote |
| Class HC8 | Priority Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC9 | Secured Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC10a | Special Deficiency Claims against NC Credit. | Impaired - entitled to vote |
| Class HC10b | Other Unsecured Claims against NC Credit. | Impaired - entitled to vote |
| Class HC11 | Priority Claims against NC Residual IV. | Unimpaired - not entitled to vote |

| CLASS | DESCRIPTION | STATUS/VOTING RIGHTS |
|---|---|---|
| Class HC12 | Secured Claims against NC Residual IV. | Unimpaired - not entitled to vote |
| Class HC13 | Other Unsecured Claims against NC Residual IV. | Impaired - entitled to vote |
| **Claims Against Operating Debtors** | | |
| Class OP1 | Priority Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP2 | Secured Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP3a | Special Deficiency Claims against NCMC. | Impaired - entitled to vote |
| Class OP3b | EPD/Breach Claims against NCMC. | Impaired - entitled to vote |
| Class OP3c | Other Unsecured Claims against NCMC. | Impaired - entitled to vote |
| Class OP4 | Priority Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP5 | Secured Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP6a | Special Deficiency Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6b | EPD/Breach Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6c | Other Unsecured Claims against NC Capital. | Impaired - entitled to vote |
| Class OP7 | Priority Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP8 | Secured Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP9a | Special Deficiency Claims against Home123. | Impaired - entitled to vote |
| Class OP9b | Other Unsecured Claims against Home123. | Impaired - entitled to vote |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Impaired - entitled to vote |

| CLASS | DESCRIPTION | STATUS/VOTING RIGHTS |
|-------|-------------|----------------------|
| **Claims Against Access Lending** | | |
| Class AL1 | Priority Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL2 | Secured Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL3 | Other Unsecured Claims against Access Lending. | Impaired - entitled to vote |

**1.    Unclassified Claims:  Administrative Claims and Priority Tax Claims.**

**a.    Administrative Claims.**

(1)    <u>Administrative Claims Generally.</u>

An Administrative Claim is defined in the Plan as any timely filed Claim for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation:  (a) Professional Fee Claims, (b) any post-petition taxes subject to administrative treatment, and (c) fees and charges assessed against the Debtors or the Estates pursuant to section 1930 of title 28 of the United States Code.

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims will not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims will be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan.  Holders of Administrative Claims are not entitled to vote on the Plan and, therefore, their votes will not be solicited, nor will they receive Ballots.

(2)    <u>Non-Professional Fee Administrative Claims.</u>

Article 3.A.1 of the Plan sets forth the manner in which requests for payment of Administrative Claims (other than Professional Fee Claims) must be made.  Specifically, the Plan provides that each Holder of an Administrative Claim (other than Professional Fee Claims) must file an Administrative Claim Request requesting payment of such Administrative Claim with the Bankruptcy Court no later than thirty (30) days after the Effective Date.   An Administrative Claim Request need not request a specific hearing date.  Nothing in the Plan, including the provisions related to filing Administrative Claim Requests, extends any claims bar date established by the Bankruptcy Court.

Article 3.A.1 of the Plan also provides that the Liquidating Trustee will pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) against any Debtor the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the Effective Date or within thirty (30) days after such Administrative Claim becomes an Allowed Claim.  Notwithstanding anything in the Plan to the contrary, (i) a Holder

of an Allowed Administrative Claim (excluding Holders of Professional Fee Claims) may be paid on such other date or dates and upon such other terms as may be agreed upon by such Holder and the Liquidating Trustee and (ii) the Debtors (if prior to or on the Effective Date) and the Liquidating Trustee (if after the Effective Date) may pay in the ordinary course of business any expenses of administering the Debtors' estates incurred in the ordinary course of business. Without limiting the foregoing, all outstanding fees payable to the U.S. Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date will be paid by the Liquidating Trustee no later than thirty (30) days after the Effective Date or when due in the ordinary course.

<div align="center">(3) <u>Professional Fee Claims.</u></div>

Under Article 3.A.2 of the Plan, the Liquidating Trustee will pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estates pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by such Professionals.

Any final application for allowance of a Professional Fee Claim for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors and the Liquidating Trust at the addresses listed in Article 14 of the Plan and on the Fee Auditor and the U.S. Trustee so that it is received no later than forty-five (45) days after the Effective Date, or such Professional Fee Claim will be forever barred and will not be enforceable against the Debtors, their Estates, the Liquidating Trust, and their successors, their assigns, or their Assets.  Allowed Professional Fee Claims must be paid in full or reserved for in Cash to pay Professional Fee Claims pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Unsecured Claims.

<div align="center">**b.** **Priority Tax Claims.**</div>

The Plan defines Priority Tax Claims as a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.  Such Claims, which are unsecured, include Claims of governmental units for taxes owed by the Debtors that are entitled to certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

As provided in Bankruptcy Code § 1123(a)(1), Priority Tax Claims will not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims will be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan.  While, the IRS has filed a Claim that exceeds the estimate of the Claims included in the foregoing amount, the Debtors are working with the IRS to resolve such Claim and believe that it will ultimately be reduced to an amount that will not effect the feasibility of the Plan. Holders of Priority Tax Claims are not entitled to vote on the Plan and, therefore, their votes will not be solicited, nor will they receive Ballots.

Under Article 3.B of the Plan, the Liquidating Trustee will pay, at the Liquidating Trustee's discretion, each Holder of an Allowed Priority Tax Claim either (i) in full in Cash as soon as practicable after the Effective Date or within thirty (30) days after such Priority Tax Claim becomes an Allowed Claim or (ii) over a period ending not later than five (5) years after the Petition Date, with deferred Cash payments in equal amounts on a quarterly basis in an aggregate amount equal to any such Allowed Priority Tax Claim, together with interest thereon (if and so required) at the legal rate required for such Claim in chapter 11 cases. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof. The Liquidating Trustee may prepay any Allowed Priority Tax Claim at any time after the Effective Date without any penalty or charge. Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with such Claims. Any Claim for any such penalty, or demand for any such penalty, will be deemed disallowed by confirmation of the Plan.

**2. Classes of Claims and Interests: Classification, Treatment, and Voting Rights.**

Holders of Claims and Interests are divided into Classes and treated as follows:

**a. Priority Claims Against All Debtors (Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1) -- *Not Impaired***

(1) <u>Classification.</u>

The Plan classifies Priority Claims as follows:

| Class | Claims Within Class |
|-------|---------------------|
| Class HC1 | All Allowed Priority Claims against NCFC |
| Class HC5 | All Allowed Priority Claims against TRS Holdings |
| Class HC8 | All Allowed Priority Claims against NC Credit |
| Class HC11 | All Allowed Priority Claims against NC Residual IV |
| Class OP1 | All Allowed Priority Claims against NCMC |
| Class OP4 | All Allowed Priority Claims against NC Capital |
| Class OP7 | All Allowed Priority Claims against Home123 |
| Class OP10 | All Allowed Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL1 | All Allowed Priority Claims against Access Lending |

(2) <u>Description and Treatment.</u>

The Plan defines a Priority Claim as a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim. Priority Claims include Claims for wages and salaries, including vacation earned within 180 days of the Petition Date up to $10,950.

The Plan provides identical treatment for all Allowed Priority Claims regardless of which Debtor(s) is liable for a particular Allowed Priority Claim. Specifically, under Article 4.A. of the Plan, Unless the Holder of an Allowed Class HC1 Claim and the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trust (if after the Effective Date) agree to a different treatment, the Liquidating Trustee will pay each such Holder of an Allowed Priority Claim, in full, in Cash, without interest, as soon as practicable after the Effective Date.

(3)    Voting.

Each of Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1 are unimpaired. Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1 are not entitled to vote to accept or reject the Plan.

**b.    Secured Claims Against All Debtors (Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2)  -- *Not Impaired***

(1)    Classification

The Plan classifies Secured Claims as follows:

| Class | Claims Within Class |
| --- | --- |
| Class HC2 | All Allowed Secured Claims against NCFC |
| Class HC6 | All Allowed Secured Claims against TRS Holdings |
| Class HC9 | All Allowed Secured Claims against NC Credit |
| Class HC12 | All Allowed Secured Claims against NC Residual IV |
| Class OP2 | All Allowed Secured Claims against NCMC |
| Class OP5 | All Allowed Secured Claims against NC Capital |
| Class OP8 | All Allowed Secured Claims against Home123 |
| Class OP11 | All Allowed Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL2 | All Allowed Secured Claims against Access Lending |

(2)      Description and Treatment

The Plan defines a Secured Claim as a Claim that is secured by a valid and unavoidable lien on property in which the Estates have an interest, or that is subject to recoupment or setoff under section 553 of the Bankruptcy Code to the extent of the value of the Holder's interest in the Estates' interest in such property, or to the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II), as applicable.

The Plan provides identical treatment for all Allowed Secured Claims regardless of which Debtor(s) is liable for a particular Allowed Secured Claim. Specifically, under Article 4.B of the Plan, at the sole option of the Liquidating Trustee, (i) Allowed Secured Claims will be unaltered and, subject to the requirements of Section 1124(2) of the Bankruptcy Code, on the Effective Date, the legal, equitable, and contractual rights of the holders of Allowed Secured Claims will be reinstated in full, or (ii) each Holder of an Allowed Class Secured will receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim (a) Cash in the amount of the Allowed Secured Claim on the later of the initial distribution date under the Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property of the estate which constitutes collateral for such Allowed Secured Claim on the later of the initial distribution date under the Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (c) such other treatment as may be agreed by the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trust (if after the Effective Date) and such Holder.

(3)      Voting

Each of Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2 are unimpaired. Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2 are not entitled to vote to accept or reject the Plan.

**c.      Unsecured Claims Against NCFC**

(1)      Special Deficiency Claims Against NCFC (Class HC3a) -- *Impaired*

(a)      Classification

Class HC3a consists of all Allowed Special Deficiency Claims against NCFC.

(b)      Description and Treatment

Special Deficiency Claims are discussed in Section IV.A.2.b hereof. As of the filing of this Disclosure Statement, DBSP's Special Deficiency Claim in the amount of $20 million against NCFC (and for which Home123, NC Capital, NC Credit, and NCMC are jointly liable) is the only Claim in Class HC3a. The Plan's definition of Special Deficiency Claim, however,

allows for the Debtors to enter into settlement agreements with other Creditors providing that such Creditors hold Special Deficiency Claims. To the extent that the Debtors enter into a settlement agreement providing that a Creditor holds an Allowed Special Deficiency Claim against NCFC, such Claim will be included in Class HC3a.

The Plan provides that Holders of Allowed Class HC3a Claims will receive distributions, if any, only from the Holding Company Debtor Portion of the Litigation Proceeds. Specifically, under Article 4.C.1 of the Plan, each Holder of an Allowed Class HC3a Claim will receive its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Unsecured Claims. The Determined Distribution Amount for each Allowed Class HC3a Claim will be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

<div align="center">(c)    <u>Voting</u></div>

Class HC3a is impaired. Therefore, Holders of Claims in Class HC3a are entitled to vote to accept or reject the Plan.

<div align="center">(2)    <u>Other Unsecured Claims Against NCFC (Class HC3b)</u> -- <u><i>Impaired</i></u></div>

<div align="center">(a)    <u>Classification</u></div>

Class HC3b consists of all Allowed Other Unsecured Claims against NCFC.

<div align="center">(b)    <u>Description and Treatment</u></div>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. As there are no EPD/Breach Claims against NCFC, Class HC3b includes all Allowed Unsecured Claims against NCFC other than Allowed Special Deficiency Claims.

Under the Plan, Holders of Allowed Class HC3b Claims will receive distributions, if any, from the Holding Company Debtor Net Distributable Assets and the Holding Company Debtor Portion of the Litigation Proceeds. Specifically, Article 4.C.2 of the Plan provides that, subject to the senior claims procedure set forth in Article 4.C.3 of the Plan, each Holder of an Allowed Class HC3b Claim will receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Holding Company Debtor Unsecured Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Other Unsecured Claims. The Determined Distribution Amount for each Allowed Class HC3b Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol, and with respect to Holders of Subordinated Claims, subject to the senior claims procedure set forth in Article 4.C.3 of the Plan.

(c)     Senior Claim Procedure

Article 4.C.3 of the Plan provides a procedure by which a Holder of a Class HC3b Claim may assert the benefits of the subordination provisions contained in the Capital Trust Indentures by establishing that such Holder holds a Class HC3b Claim that arises from an obligation of NCFC that comes within the definition of "Senior Debt" in either of the Capital Trust Indentures. The Plan defines such a Claim as a Senior Class HC3b Claim.  In order for any Holder of a Class HC3b Claim to assert that it holds a Senior Class HC3b Claim and, therefore, is entitled to the benefits of subordination as set forth in the Capital Trust Indentures, such Holder must file with the Bankruptcy Court and serve on the Debtors, the Holders of Claims against NCFC arising from NCFC's obligations under the Capital Trust Indentures (defined in the Plan as "Capital Trust Claims"), the Liquidating Trustee, and the Indenture Trustee a pleading describing with specificity the legal and factual basis for establishing that such Holder holds a Senior Class HC3b Claim (defined in the Plan as a Subordination Statement) no later than thirty (30) days after the Effective Date.

If any Holder of a Class HC3b Claim files a Subordination Statement, any distributions that would otherwise be made on account of Allowed Capital Trust Claims will be turned over to a reserve to be held by the Liquidating Trustee in a separate interest bearing account and to be distributed in accordance with Article 4.C.3 of the Plan.  No distributions will be made from this reserve to any Holder of a Senior Class HC3b Claim until, with respect to each Subordination Statement, (i) the Bankruptcy Court has made a determination as to whether and to what extent the Holder of a Class HC3b Claim that filed the Subordination Statements holds a Senior Class HC3b Claim or (ii) the Holders of Allowed Capital Trust Claims and the Holder of a Class HC3b Claim that filed the Subordination Statement reach and obtain approval of a settlement as set forth in Article 4.C.3.d of the Plan.  If no Holder of a Class HC3b Claim timely files and serves a Subordination Statement or, with respect to each timely filed Subordination Statement either (i) the Bankruptcy Court determines that the Holder of a Class HC3b Claim that filed Subordination Statements does not hold a Senior Class HC3b Claim or (ii) such Holder withdraws its Subordination Statement pursuant to settlement (or otherwise), distributions will be made to Holders of Allowed Capital Trust Claims along with other Holders of Allowed Class HC3b Claims in accordance with the Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses.

If (i) the Bankruptcy Court finds that any Holder of a Class HC3b Claim holds a Senior Class HC3b Claim, and such finding becomes a final non-appealable order, or (ii) the Holders of Allowed Capital Trust Claims and any Holder of a Class HC3b Claim that filed the Subordination Statement reach and obtain approval of a settlement as set forth in Article 4.C.3.d of the Plan then (a) Holders of Allowed Capital Trust Claims will receive no distribution from the reserve on account of their Allowed Capital Trust Claims unless and until all Holders of Senior Class HC3b Claims are paid in full on account of their Senior Class HC3b Claims and (b) Holders of Senior Class HC3b Claims will receive Pro Rata distributions from the amounts held in reserve until they are paid in full.  If a Debtor(s) other than NCFC is jointly liable with NCFC for the amount of a Senior Class HC3b Claim and the Holder of a Senior Class HC3b Claim holds an Allowed Unsecured Claim(s) against such Debtor(s) in respect of such liability, any distribution that the Holder receives on account of such Claims will be included in determining

whether the Holder's Senior Class HC3b Claim has been paid in full. If a Senior Class HC3b Claim has been paid in full, any distributions from the reserve that would have been paid on account of such Claim will be paid Pro Rata to Holders of Senior Class HC3b Claims, if any, that remain unpaid. If all Holders of Senior Class HC3b Claims (if any) have been paid in full on account of their Senior Class HC3b Claims, (i) any additional amounts distributed to Holders of Allowed Class HC3b Claims will be distributed to Holders of Allowed Capital Trust Claims on account of their Capital Trust Claims in accordance with the Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses, and (ii) Holders of Allowed Capital Trust Claims will be subrogated to the distributions that the Holders of Senior Class HC3b Claims would have received on account of their Allowed Unsecured Claims against the Debtors if such Holder's Senior Class HC3b Claims had not been paid in full.

Alternatively, if the Holders of Allowed Capital Trust Claims and the Holder(s) of Class HC3b Claims (if any) that file Subordination Statements reach a settlement of the disputes raised in the Subordination Statements, the Holders of Allowed Capital Trust Claims (or the Indenture Trustee) will file with the Bankruptcy Court and serve on the Debtors and the Liquidating Trustee a notice of settlement that is executed by the Holders of Allowed Capital Trust Claims and the settling Holder(s) of Class HC3b Claims that filed Subordination Statements. Such settlement notice will list the proposed Class HC3b Claim amounts (if any) for each of the signatories. If no written objection to the notice is filed within 10 calendar days after the notice is served, the Bankruptcy Court will approve and allow the Class HC3b Claims in the amounts proposed in the notice, provided that such settlement will not operate to increase the amount of the Class HC3b Claims unless it correspondingly reduces the amount of the Allowed Capital Trust Claims..

<center>(d)    <u>Voting</u></center>

Class HC3b is impaired. Therefore, Holders of Claims in Class HC3b are entitled to vote to accept or reject the Plan.

<center>**d.**    **Interests in NCFC**</center>

<center>(1)    <u>Class HC4a -- Series A Preferred Stock Interests --</u> <u>*Impaired*</u></center>

<center>(a)    <u>Classification</u></center>

Class HC4a consists of all Series A Preferred Stock Interests.

<center>(b)    <u>Description and Treatment</u></center>

The Plan defines Series A Preferred Stock Interests as the 9.125% Series A Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

Under Article 4.D.1 of the Plan, Holders of Interests in Class HC4a will receive no

distribution or dividend on account of such Interests. Subject to the provisions of Article 9.K of the Plan, the entry of the Confirmation Order will act as an order approving and effecting the cancellation of all shares of Series A Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series A Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

(c)     Voting

Class HC4a is impaired and will receive no distribution under the Plan. Holders of Interests in Class HC4a are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests in Class HC4a are not entitled to vote to accept or reject the Plan.

(2)     Class HC4b -- Series A 510(b) Claims-- *Impaired*

(a)     Classification

Class HC4b consists of all Series A 510(b) Claims.

(b)     Description and Treatment

The Plan defines Series A 510(b) Claim as any Claim (i) arising from rescission of a purchase or sale of Series A Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series A Preferred Stock Interests and of senior priority to Series B Preferred Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

Under Article 4.D.2 of the Plan, Holders of Claims in Class HC4b will receive no distribution on account of such Claims under the Plan

(c)     Voting

Class HC4b is impaired and will receive no distribution under the Plan. Holders of Class HC4b Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims in Class HC4b are not entitled to vote to accept or reject the Plan.

(3)     Class HC4c -- Series B Preferred Stock Interests -- *Impaired*

(a)     Classification

Class HC4c consists of all Series B Preferred Stock Interests.

(b)     Description and Treatment

The Plan defines Series B Preferred Stock Interests as the 9.75% Series B Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

Under Article 4.D.3 of the Plan, Holders of Interests in Class HC4c will receive no distribution or dividend on account of such Interests. Subject to the provisions of Article 9.K of the Plan, the entry of the Confirmation Order will act as an order approving and effecting the cancellation of all shares of Series B Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series B Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

(c)    <u>Voting</u>

Class HC4c is impaired and will receive no distribution under the Plan. Holders of Interests in Class HC4c are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests in Class HC4c are not entitled to vote to accept or reject the Plan.

(4)    <u>Class HC4d -- Series B 510(b) Claims-- *Impaired*</u>

(a)    <u>Classification</u>

Class HC4d consists of all Series B 510(b) Claims.

(b)    <u>Description and Treatment</u>

The Plan defines Series A 510(b) Claim as any Claim (i) arising from rescission of a purchase or sale of Series B Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series B Preferred Stock Interests and of senior priority to Common Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

Under Article 4.D.4 of the Plan, Holders of Claims in Class HC4d will receive no distribution on account of such Claims under the Plan

(c)    <u>Voting</u>

Class HC4d is impaired and will receive no distribution under the Plan. Holders of Class HC4d Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims in Class HC4d are not entitled to vote to accept or reject the Plan.

(5)    <u>Class HC4e -- Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims -- *Impaired*</u>

<div align="center">(a)     <u>Classification</u></div>

Class HC4e consists of all Common Stock Interests, all Option Interests, all Warrant Interests, and all Common Stock 510(b) Claims.

<div align="center">(b)     <u>Description and Treatment</u></div>

The Plan defines Common Stock Interests as the common stock of NCFC issued and outstanding immediately before the Effective Date. The Plan defines Option Interests as unexercised options to purchase Common Stock Interests and Warrant Interests as unexercised warrants to purchase Common Stock Interests. Finally, the Plan defines Common Stock 510(b) Claims as a Claim (i) arising from rescission of a purchase or sale of Common Stock Interests, Option Interests, or Warrant Interests, for damages arising from the purchase or sale of such a securities, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of the same respective priority as Common Stock Interests, Option Interests, or Warrant Interests pursuant to section 510(b) of the Bankruptcy Code.

Under Article 4.D.5 of the Plan, Holders of Interests or Claims in Class HC4e will receive no distribution or dividend on account of such Interests or Claims. Subject to the provisions of Article 9.K of the Plan, the entry of the Confirmation Order will act as an order approving and effecting the cancellation of all shares of all Common Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Common Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

<div align="center">(c)     <u>Voting</u></div>

Class HC4e is impaired and will receive no distribution under the Plan. Holders of Interests or Claims in Class HC4e are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests or Claims in Class HC4e are not entitled to vote to accept or reject the Plan.

<div align="center">**e.     Unsecured Claims Against TRS Holdings**</div>

<div align="center">(1)     <u>Other Unsecured Claims Against TRS Holdings (Class HC7) -- *Impaired*</u></div>

<div align="center">(a)     <u>Classification</u></div>

Class HC7 consists of all Allowed Other Unsecured Claims against TRS Holdings.

<div align="center">(b)     <u>Description and Treatment</u></div>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. As there are no EPD/Breach Claims or Special

Deficiency Claims against TRS Holdings, Class HC7 includes all Allowed Unsecured Claims against TRS Holdings.

Under the Plan, Holders of Allowed Class HC7 Claims will receive distributions, if any, from the Holding Company Debtor Net Distributable Assets and the Holding Company Debtor Portion of the Litigation Proceeds. Specifically, Article 4.E of the Plan provides that each Holder of an Allowed Class HC7 Claim will receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Holding Company Debtor Unsecured, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Other Unsecured Claims. The Determined Distribution Amount for each Allowed Class HC7 Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

<div align="center">(c)    <u>Voting</u></div>

Class HC7 is impaired. Therefore, Holders of Claims in Class HC7 are entitled to vote to accept or reject the Plan.

<div align="center">**f.    Unsecured Claims Against NC Credit**</div>

<div align="center">(1)    <u>Special Deficiency Claims Against NC Credit (Class HC10a) -- *Impaired*</u></div>

<div align="center">(a)    <u>Classification</u></div>

Class HC10a consists of all Allowed Special Deficiency Claims against NC Credit.

<div align="center">(b)    <u>Description and Treatment</u></div>

Special Deficiency Claims are discussed in Section IV.A.2.b hereof. As of the filing of this Disclosure Statement, DBSP's Special Deficiency Claim in the amount of $20 million against NCFC (and for which Home123, NC Capital, NC Credit, and NCMC are jointly liable) is the only Claim in Class HC3a. The Plan's definition of Special Deficiency Claim, however, allows for the Debtors to enter into settlement agreements with other Creditors providing that such Creditors hold Special Deficiency Claims. To the extent that the Debtors enter into a settlement agreement providing that a Creditor holds an allowed Special Deficiency Claim against NC Credit, such Claim will be included in Class HC10a.

The Plan provides that Holders of Allowed Class HC10a Claims will receive distributions, if any, only from the Holding Company Debtor Portion of the Litigation Proceeds. Specifically, under Article 4.F.1 of the Plan, each Holder of an Allowed Class HC10a Claim will receive its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Unsecured Claims.

The Determined Distribution Amount for each Allowed Class HC10a Claim will be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

<div align="center">(c)    <u>Voting</u></div>

Class HC10a is impaired. Therefore, Holders of Claims in Class HC10a are entitled to vote to accept or reject the Plan.

<div align="center">(2)    <u>Other Unsecured Claims Against NC Credit (Class HC10b)<br>-- Impaired</u></div>

<div align="center">(a)    <u>Classification</u></div>

Class HC10b consists of all Allowed Other Unsecured Claims against NC Credit.

<div align="center">(b)    <u>Description and Treatment</u></div>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. As there are no EPD/Breach Claims against NC Credit, Class HC10b includes all Allowed Unsecured Claims against NC Credit other than Allowed Special Deficiency Claims.

Under the Plan, Holders of Allowed Class HC10b Claims will receive distributions, if any, from the Holding Company Debtor Net Distributable Assets and the Holding Company Debtor Portion of the Litigation Proceeds. Specifically, Article 4.F.2 of the Plan provides that each Holder of an Allowed Class HC10b Claim will receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Holding Company Debtor Unsecured Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Other Unsecured Claims. The Determined Distribution Amount for each Allowed Class HC10b Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

<div align="center">(c)    <u>Voting</u></div>

Class HC10b is impaired. Therefore, Holders of Claims in Class HC10b are entitled to vote to accept or reject the Plan.

<div align="center">**g.**    **Unsecured Claims Against NC Residual IV**</div>

<div align="center">(1)    <u>Other Unsecured Claims Against NC Residual IV (Class<br>HC13) -- Impaired</u></div>

(a)     Classification

Class HC13 consists of all Allowed Other Unsecured Claims against NC Residual IV.

(b)     Description and Treatment

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.  As there are no EPD/Breach Claims or Special Deficiency Claims against NC Residual IV, Class HC13 includes all Allowed Unsecured Claims against NC Residual IV.

Under the Plan, Holders of Allowed Class HC13 Claims will receive distributions, if any, from the Holding Company Debtor Net Distributable Assets and the Holding Company Debtor Portion of the Litigation Proceeds.  Specifically, Article 4.G of the Plan provides that each Holder of an Allowed Class HC13 Claim will receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Holding Company Debtor Unsecured Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Holding Company Debtor Other Unsecured Claims.  The Determined Distribution Amount for each Allowed Class HC13 Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

(c)     Voting

Class HC13 is impaired.  Therefore, Holders of Claims in Class HC13 are entitled to vote to accept or reject the Plan.

## h.     Unsecured Claims Against NCMC

(1)     Special Deficiency Claims Against NCMC (Class OP3a) --
*Impaired*

(a)     Classification

Class OP3a consists of all Allowed Special Deficiency Claims against NCMC.

(b)     Description and Treatment

Special Deficiency Claims are discussed in Section IV.A.2.b hereof.  As of the filing of this Disclosure Statement, DBSP's Special Deficiency Claim in the amount of $20 million against NCFC (and for which Home123, NC Capital, NC Credit, and NCMC are jointly liable) is the only Claim in Class OP3a.  The Plan's definition of Special Deficiency Claim, however, allows for the Debtors to enter into settlement agreements with other Creditors providing that such Creditors hold Special Deficiency Claims.  To the extent that the Debtors enter into a settlement agreement providing that a Creditor holds an allowed Special Deficiency Claim

against NCMC, such Claim will be included in Class OP3a.

The Plan provides that Holders of Allowed Class OP3a Claims will receive distributions, if any, only from the Operating Debtor Portion of the Litigation Proceeds. Specifically, under Article 4.H.1 of the Plan, each Holder of an Allowed Class OP3a Claim will receive its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital. The Determined Distribution Amount for each Allowed Class OP3a Claim will be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

<center>(c)    <u>Voting</u></center>

Class OP3a is impaired. Therefore, Holders of Claims in Class OP3a are entitled to vote to accept or reject the Plan.

<center>(2)    <u>EPD/Breach Claims Against NCMC (Class OP3b) --</u><br><u>*Impaired*</u></center>

<center>(a)    <u>Classification</u></center>

Class OP3b consists of all Allowed EPD/Breach Claims against NCMC.

<center>(b)    <u>Description and Treatment</u></center>

The Plan defines EPD/Breach Claims as a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

Under the Plan, Holders of Allowed Class OP3b Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the Operating Debtor Portion of the Litigation Proceeds. Specifically, Article 4.H.2 of the Plan provides that each Holder of an Allowed Class OP3b Claim will receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors. The Determined Distribution Amount of each Allowed Class OP3b Claim will be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Protocol.

<div align="center">(c)     <u>EPD/Breach Claim Protocol</u></div>

The EPD/Breach Claim Protocol is attached as <u>Exhibit B</u> to the Plan. The rationale for and mechanics of the EPD/Breach Claim Protocol are summarized in Section IV.A.3.d hereof.

<div align="center">(d)     <u>Voting</u></div>

Class OP3b is impaired. Therefore, Holders of Claims in Class OP3b are entitled to vote to accept or reject the Plan.

<div align="center">(3)     Other Unsecured Claims Against NCMC (Class OP3c) -- <em>Impaired</em></div>

<div align="center">(a)     <u>Classification</u></div>

Class OP3c consists of all Allowed Other Unsecured Claims against NCMC.

<div align="center">(b)     <u>Description and Treatment</u></div>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. Class OP3c includes all Allowed Unsecured Claims against NCMC other than Allowed Special Deficiency Claims and Allowed EPD/Breach Claims.

Under the Plan, Holders of Allowed Class OP3c Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the Operating Debtor Portion of the Litigation Proceeds. Specifically, Article 4.H.3 of the Plan provides that each Holder of an Allowed Class OP3c Claim will receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors. The Determined Distribution Amount for each Allowed Class OP3c Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

<div align="center">(c)     <u>Voting</u></div>

Class OP3c is impaired. Therefore, Holders of Claims in Class OP3c are entitled to vote to accept or reject the Plan.

<div align="center">**i.     Unsecured Claims Against NC Capital**</div>

<div align="center">(1)     <u>Special Deficiency Claims Against NC Capital (Class OP6a) -- <em>Impaired</em></u></div>

(a) Classification

Class OP6a consists of all Allowed Special Deficiency Claims against NC Capital.

(b) Description and Treatment

Special Deficiency Claims are discussed in Section IV.A.2.b hereof. As of the filing of this Disclosure Statement, DBSP's Special Deficiency Claim in the amount of $20 million against NCFC (and for which Home123, NC Capital, NC Credit, and NCMC are jointly liable) is the only Claim in Class HC3a. The Plan's definition of Special Deficiency Claim, however, allows for the Debtors to enter into settlement agreements with other Creditors providing that such Creditors hold Special Deficiency Claims. To the extent that the Debtors enter into a settlement agreement providing that a Creditor holds an allowed Special Deficiency Claim against NC Capital, such Claim will be included in Class OP6a.

The Plan provides that Holders of Allowed Class OP6a Claims will receive distributions, if any, only from the Operating Debtor Portion of the Litigation Proceeds. Specifically, under Article 4.I.1 of the Plan, each Holder of an Allowed Class OP6a Claim will receive its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital. The Determined Distribution Amount for each Allowed Class OP6a Claim will be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

(c) Voting

Class OP6a is impaired. Therefore, Holders of Claims in Class OP6a are entitled to vote to accept or reject the Plan.

(2) EPD/Breach Claims Against NC Capital (Class OP6b) -- *Impaired*

(a) Classification

Class OP6b consists of all Allowed EPD/Breach Claims against NC Capital.

(b) Description and Treatment

The Plan defines EPD/Breach Claims as a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

Under the Plan, Holders of Allowed Class OP6b Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds. Specifically, Article 4.I.2 of the Plan provides that each

Holder of an Allowed Class OP6b Claim will receive (i) its Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors. The Determined Distribution Amount of each Allowed Class OP6b Claim will be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds and will be 50% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a distribution of its Pro Rata share of the Operating Debtor Net Distributable Assets.

<div align="center">(c) <u>EPD/Breach Claim Protocol</u></div>

The EPD/Breach Claim Protocol is attached as <u>Exhibit B</u> to the Plan. The rationale for and mechanics of the EPD/Breach Claim Protocol are summarized in Section IV.A.3.d hereof.

<div align="center">(d) <u>Voting</u></div>

Class OP6b is impaired. Therefore, Holders of Claims in Class OP6b are entitled to vote to accept or reject the Plan.

<div align="center">(3) <u>Other Unsecured Claims Against NC Capital (Class OP6c)</u> <br> <u>-- <i>Impaired</i></u></div>

<div align="center">(e) <u>Classification</u></div>

Class OP6c consists of all Allowed Other Unsecured Claims against NC Capital.

<div align="center">(f) <u>Description and Treatment</u></div>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. Class OP6c includes all Allowed Unsecured Claims against NC Capital other than Allowed Special Deficiency Claims and Allowed EPD/Breach Claims.

Under the Plan, Holders of Allowed Class OP6c Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the Operating Debtor Portion of the Litigation Proceeds. Specifically, Article 4.I.3 of the Plan provides that each Holder of an Allowed Class OP6c Claim will receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed

Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors. The Determined Distribution Amount for each Allowed Class OP6c Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

<p align="center">(g)    <u>Voting</u></p>

Class OP6c is impaired. Therefore, Holders of Claims in Class OP6c are entitled to vote to accept or reject the Plan.

<p align="center">**j.**    **Unsecured Claims Against Home123**</p>

<p align="center">(1)    <u>Special Deficiency Claims Against Home123 (Class OP9a) -- Impaired</u></p>

<p align="center">(a)    <u>Classification</u></p>

Class OP9a consists of all Allowed Special Deficiency Claims against Home123.

<p align="center">(b)    <u>Treatment</u></p>

Special Deficiency Claims are discussed in Section IV.A.2.b hereof. As of the filing of this Disclosure Statement, DBSP's Special Deficiency Claim in the amount of $20 million against NCFC (and for which Home123, NC Capital, NC Credit, and NCMC are jointly liable) is the only Claim in Class HC3a. The Plan's definition of Special Deficiency Claim, however, allows for the Debtors to enter into settlement agreements with other Creditors providing that such Creditors hold Special Deficiency Claims. To the extent that the Debtors enter into a settlement agreement providing that a Creditor holds an allowed Special Deficiency Claim against Home123, such Claim will be included in Class OP9a.

The Plan provides that Holders of Allowed Class OP9a Claims will receive distributions, if any, only from the Operating Debtor Portion of the Litigation Proceeds. Specifically, under Article 4.J.1 of the Plan, each Holder of an Allowed Class OP9a Claim will receive its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital. The Determined Distribution Amount for each Allowed Class OP9a Claim will be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

<p align="center">(c)    <u>Voting</u></p>

Class OP9a is impaired. Therefore, Holders of Claims in Class OP9a are entitled to vote to accept or reject the Plan.

<p align="center">(2)    <u>Other Unsecured Claims Against Home123 (Class OP9b) -- Impaired</u></p>

Class OP9b consists of all Allowed Other Unsecured Claims against Home123.

(b)    Description and Treatment

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.  As there are no EPD/Breach Claims against Home123, Class OP9b includes all Allowed Unsecured Claims against Home123 other than Allowed Special Deficiency Claims.

Under the Plan, Holders of Allowed Class OP9b Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the Operating Debtor Portion of the Litigation Proceeds.  Specifically, Article 4.J.2 of the Plan provides that each Holder of an Allowed Class OP9b Claim will receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors.  The Determined Distribution Amount for each Allowed Class OP9b Claim will be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

(c)    Voting

Class OP9b is impaired.  Therefore, Holders of Claims in Class OP9b are entitled to vote to accept or reject the Plan.

**k.    Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral**

(1)    Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral  (Class OP12) -- *Impaired*

(a)    Classification

Class OP12 consists of all Allowed Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.

(b)    Description and Treatment

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.  As there are no EPD/Breach Claims or Special

Deficiency Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, or NCoral, Class OP12 includes all Allowed Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.

Under the Plan, Holders of Allowed Class OP12 Claims will receive distributions, if any, from the Operating Debtor Net Distributable Assets and the Operating Debtor Portion of the Litigation Proceeds. Specifically, Article 4.K of the Plan provides that each Holder of an Allowed Class OP12 Claim will receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed EPD/Breach Claims against NC Capital, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Allowed Special Deficiency Claims against Operating Debtors. The Determined Distribution Amount for each Allowed Class OP12 Claim will be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

<div align="center">(c)     <u>Voting</u></div>

Class OP12 is impaired. Therefore, Holders of Claims in Class OP12 are entitled to vote to accept or reject the Plan.

**l.     Unsecured Claims Against Access Lending**

      (1)     <u>Other Unsecured Claims Against Access Lending (Class AL3) -- *Impaired*</u>

          (a)     <u>Classification</u>

Class AL3 consists of all Allowed Other Unsecured Claims against Access Lending.

          (b)     <u>Treatment</u>

The Plan defines Other Unsecured Claims as any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims. As there are no EPD/Breach Claims against Access Lending, Class AL3 includes all Allowed Unsecured Claims against Access Lending.

The Plan provides that Holders of Allowed Class AL3 Claims will receive distributions, if any, only from the Access Lending Net Distributable Assets. Specifically, Article 4.L of the Plan provides that each Holder of an Allowed Class AL3 Claim will receive its Pro Rata share, based on Allowed Access Lending Other Unsecured Claims, of the Access Lending Net Distributable Assets. The Multi-Debtor Protocol and the Intercompany Claim Protocol do not apply to Class AL3 Claims.

<center>(c) <u>Voting</u></center>

Class AL3 is impaired. Therefore, Holders of Claims in Class AL3 are entitled to vote to accept or reject the Plan.

**C. THE MULTI-DEBTOR CLAIM PROTOCOL FOR TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS.**

The Multi-Debtor Claim Protocol, which is summarized in Section 4.A.3.b hereof, applies to Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly liable.

**1. Allowed Unsecured Claims for Which More than One Holding Company Debtor Is Jointly Liable.**

Where a Creditor holds Allowed Holding Company Debtor Unsecured Claims for which more than one Holding Company Debtor is jointly liable, such Creditor will be (i) assigned a Determined Distribution Amount on account of one of its Allowed Holding Company Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Holding Company Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Holding Company Debtor Unsecured Claims, other than Allowed Class HC3a Claims and Allowed Class HC10a Claims, for which both NCFC and NC Credit are jointly liable, such Creditor will be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCFC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims.

**2. Allowed Unsecured Claims for Which More than One Operating Debtor Is Jointly Liable.**

Where a Creditor holds Allowed Operating Debtor Unsecured Claims for which more than one Operating Debtor is jointly liable, such Creditor will be (i) assigned a Determined Distribution Amount on account of one its Allowed Operating Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Operating Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Operating Debtor Unsecured Claims, other than Allowed Class OP3a Claims, Allowed OP6a Claims, and Allowed Class OP9a Claims, for which each of NCMC, NC Capital, and Home123 are jointly liable, such Creditor will be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCMC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims.

3. **Separate Application to Debtor Groups.**

The adjustment of Determined Distribution Amounts of a particular Creditor's Allowed Unsecured Claims against Debtors in one Debtor Group pursuant to Articles 6.A and 6.B of the Plan does not affect the Determined Distribution Amounts of such Creditor's Allowed Unsecured Claims, if any, against Debtors in another Debtor Group.

4. **Inapplicable to Claims Against Access Lending and to Intercompany Claims.**

The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending nor does it apply to Intercompany Claims.

D. **THE INTERCOMPANY PROTOCOL FOR TREATMENT OF INTERCOMPANY CLAIMS**

The Intercompany Claim Protocol, which is summarized in Section IV.A.3.c hereof, applies to any Claim of a Debtor (other than Access Lending) against any other Debtor (other than Access Lending).

1. **Claims of Holding Company Debtors Against Other Holding Company Debtors.**

The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against another Holding Company Debtor will be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under the Plan on account of such Claim.

2. **Claims of Operating Debtors Against Other Operating Debtors.**

The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against another Operating Debtor will be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under the Plan on account of such Claim.

3. **Claims of Holding Company Debtors Against Operating Debtors.**

The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against an Operating Debtor will be 50% of the allowed amount of such Claim; provided, however, that any recovery on an Allowed Claim held by a Holding Company Debtor against an Operating Debtor will be limited to the amount that would be distributed on account of such Claim if the Determined Distribution Amounts for Allowed Claims in Classes OP6b, OP9b, and OP12 were 100% of the allowed amount of Claims in those Classes.

4. **Claims of Operating Debtors Against Holding Company Debtors**.

The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against a Holding Company Debtor will be 100% of the allowed amount of such Claim.

### E. MEANS OF IMPLEMENTING THE PLAN

#### 1. Implementation of Joint Plan.

The Plan Proponents propose that the Plan be implemented and consummated through the means contemplated by sections 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2), (b)(3) and (b)(4) of the Bankruptcy Code on and after the Effective Date.

#### 2. Corporate Action.

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to the Plan, will be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries. The officers and directors of the Debtors will cease to serve immediately after the Effective Date.

#### 3. Dissolution of Debtors.

Immediately after the Effective Date, (i) the Liquidating Trustee will be authorized to take, in his sole and absolute discretion, all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including without limitation under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, that the Liquidating Trustee will not be compelled to dissolve any of the Debtors or their subsidiaries if to do so would unduly burden the Liquidating Trust; and (ii) no assets will revest in the Debtors (other than Access Lending). The Liquidating Trustee will have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, immediately after the Effective Date, the Debtors will have no authorization to implement the provisions of the Plan, unless specifically provided for in the Plan.

#### 4. Dissolution of the Committee.

On the Effective Date, the Committee will dissolve automatically, whereupon its members, Professionals and agents will be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties will continue to be bound by any obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases which will remain in full force and effect according to their terms and such parties will continue to have a right to be heard with respect to any and all (i) applications for Professional Fee Claims; (ii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.

5. **Vesting of Assets in Liquidating Trust; Assumption of Plan Obligations.**

a. **Distribution to Liquidating Trust.**

On the Effective Date, the Debtors other than Access Lending will distribute and will be deemed for all purposes to have distributed all Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, for the benefit of the Holders of Holding Company Debtor Unsecured Claims and for the benefit of the Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed Claims as of the Effective Date, to the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Debtors will have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

b. **Transfer of Assets.**

On the Effective Date, the Liquidating Trust Assets, as described in paragraph 5(a) above, will be conveyed directly by the Debtors other than Access Lending to the Liquidating Trust on behalf of the beneficiaries thereof.

c. **Assumption of Plan Obligations.**

On the Effective Date, all of the Debtors' rights and obligations with respect to each A/P/S Claim (other than A/P/S Claims against Access Lending) and all other rights and obligations of the Debtors (other than Access Lending) under the Plan will be assigned to and assumed by the Liquidating Trust.

d. **Treatment of Transfer of Assets.**

For federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of the Plan, as a transfer to the Holders of the Unsecured Claims that have a beneficial interest in the Liquidating Trust, with the Holders of Unsecured Claims against the Holding Company Debtors and Holders of Unsecured Claims against the Operating Debtors receiving an undivided interest in the Liquidating Trust Assets attributable to their respective Debtor Groups, followed by a transfer of the Liquidating Trust Assets by such Holders to the Liquidating Trust, and the beneficiaries of the Liquidating Trust will be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidating Trust.

6. **Liquidating Trust.**

a. **Formation of Liquidating Trust.**

On or prior to the Effective Date, the Liquidating Trust will be formed. The Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured

Claims will be the sole beneficiaries of the Liquidating Trust. Holders of Unsecured Claims against Access Lending will not be beneficiaries of the Liquidating Trust.

### b.     Liquidating Trust Agreement.

The Liquidating Trust Agreement will contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Liquidating Trustee and to ensure the treatment of the Liquidating Trust as a liquidating trust for federal income tax purposes. In the event a provision of the Plan or the Confirmation Order conflicts with a provision of the Liquidating Trust Agreement, the provision of the Liquidation Trust Agreement will control.

### c.     Appointment of the Liquidating Trustee.

No later than ten (10) days prior to the deadline to vote to accept or reject the Plan, the Plan Proponents will file the Liquidating Trust Agreement with the Bankruptcy Court, which Liquidating Trust Agreement will identify the Liquidating Trustee. The Liquidating Trustee will be appointed by the Bankruptcy Court in the Confirmation Order and will commence serving as the Liquidating Trustee on the Effective Date; provided, however, that the party appointed as Liquidating Trustee will be permitted to act in accordance with the terms of the Liquidating Trust Agreement from the Confirmation Date through the Effective Date (or such earlier date as authorized by the Committee) and will be entitled to seek compensation in accordance with the terms of the Liquidating Trust Agreement and the Plan.

The Liquidating Trustee will be deemed the Estates' representative (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) in accordance with section 1123 of the Bankruptcy Code and will have all powers, authority and responsibilities specified in the Plan and the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

The Confirmation Order will state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding will be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.

The Liquidating Trustee will at all times maintain a bond acceptable to the Plan Advisory Committee and approved by the Bankruptcy Court.

### d.     Term and Compensation of the Liquidating Trustee.

The Liquidating Trustee will initially be compensated as set forth in the Liquidating Trust Agreement (which compensation may be revised by the Liquidating Trust with the consent of the

Plan Advisory Committee) and will not be required to file a fee application to receive compensation. The Liquidating Trustee's compensation will, however, be subject to the review and, if appropriate, objection of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.

The Liquidating Trustee may be removed or replaced at any time by the Plan Advisory Committee in accordance with the procedures in the Liquidating Trust Agreement. In the event of the death or incompetency (in the case of a Liquidating Trustee that is a natural person), dissolution (in the case of a Liquidating Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Liquidating Trustee, the Plan Advisory Committee will have the authority to appoint a successor trustee as set forth in the Liquidating Trust Agreement.

### e. Liquidation of Liquidating Trust Assets; Responsibilities of Liquidating Trustee.

The Liquidating Trustee will be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement. The Liquidating Trust will be subject to the directions of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement. Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, any act by the Liquidating Trustee, including discretionary acts, will require the consent of or consultation with the Plan Advisory Committee in accordance with the terms of the Liquidating Trust Agreement. If there is any inconsistency or ambiguity in the Plan, Confirmation Order or the Liquidating Trust Agreement in respect of the Plan Advisory Committee's role in the Liquidating Trustee's authority to act, the provision of the Liquidating Trust Agreement will control.

The Liquidating Trustee, in its reasonable business judgment, and in an expeditious but orderly manner, will liquidate and convert to cash the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust. The liquidation of the Liquidating Trust Assets may be accomplished either through the sale of Liquidating Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

The Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) will be expressly authorized to do the following:

(1)  prosecute, collect, compromise and settle any Causes of Actions in accordance herewith and without further approval of or application to the Bankruptcy Court, except as otherwise provided herein.

(2)  file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court, except as otherwise provided herein

(3)  open and maintain bank accounts in the name of the Liquidating Trust, draw checks and drafts thereon on the

sole signature of the Liquidating Trustee, and terminate such accounts as the Liquidating Trustee deems appropriate;

(4)     execute any documents, pleadings, and take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Liquidation Trustee's powers granted in the Plan, including, but not limited to the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

(5)     hold legal title to any and all rights of the beneficiaries in or arising from the Assets, including but not limited to, the right to vote any claim or interest in an unrelated case under the Bankruptcy Code and receive any distribution thereon;

(6)     protect and enforce the rights to the Assets vested in the Liquidating Trustee by the Plan by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(7)     deliver distributions as may be authorized by the Plan;

(8)     file, if necessary, any and all tax returns with respect to the Liquidating Trust, pay taxes, if any, properly payable by the Liquidating Trust, and make distributions to the beneficiaries net of such taxes, and comply with the requirements of Article 4 of the Plan;

(9)     make all necessary filings in accordance with any applicable law, statute or regulation;

(10)    determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(11)    invest moneys received by the Liquidating Trust or otherwise held by the Liquidating Trust in accordance with Article 8.F.8 of the Plan;

(12)    in the event that the Liquidating Trustee determines that the beneficiaries or the Liquidating Trust may, will or have become subject to adverse tax consequences, take such

actions that will, or are intended to, alleviate such adverse tax consequences;

(13) utilize the Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Liquidating Trustee, and the Plan Advisory Committee and its members; and

(14) prepare and report telephonically, and if requested by the Plan Advisory Committee, in writing or in person, a monthly report of the status of the process of winding down the Estates including Causes of Action.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

### f.    Valuation of Assets.

As soon as possible after the Effective Date (i) the Liquidating Trustee will determine the fair market value, as of the Effective Date, of the Liquidating Trust Assets based on a good faith determination, and (ii) the Liquidating Trustee will apprise the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims in writing of such valuation (and indicate in such writing each Holder's percentage ownership interest in the Liquidating Trust based on each such Holder's relative beneficial interest in the Liquidating Trust or portion thereof as of the Effective Date). The valuation will be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Holding Company Debtor Unsecured Claims and Holders of Operating Debtor Unsecured Claims) for all federal income tax purposes.

### g.    Payments by the Liquidating Trust.

The Liquidating Trust will make distributions to Holders of Allowed Claims in accordance with Article 9 of the Plan.

### h.    Investment Powers of the Liquidating Trustee and Permitted Cash Expenditures.

All funds held by the Liquidating Trustee will be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Liquidating Trust Agreement; provided, however, that the right and power of the Liquidating Trustee to invest Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, will be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. The

Liquidating Trustee may expend the cash of the Liquidating Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidating Trust during liquidation, (y) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidating Trust) and (z) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

### i.      Reporting Duties.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee will file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidating Trustee will also send to each holder of a beneficial interest in the Liquidating Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate.  The Liquidating Trustee will file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

Allocations of Liquidating Trust taxable income will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the beneficial interests in the Liquidating Trust (treating any holder of a Disputed Claim, for this purpose, as a current holder of a beneficial interest in the Liquidating Trust entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including all distributions held in reserve pending the resolution of Disputed Claims).  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  For this purpose, the tax book value of the Liquidating Trust Assets will equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trustee will file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

### j.      Registry of Beneficial Interests.

To evidence each holder's beneficial interests in the Liquidating Trust, the Liquidating Trustee will maintain a registry of holders.

### k.      Non-Transferable.

Upon issuance thereof, interests in the Liquidating Trust will be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, will not be effective until and unless the Liquidating Trustee receives written notice of such transfer.

### l. Termination.

The Liquidating Trust will terminate after its liquidation, administration and distribution of its Liquidating Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Plan or in the Liquidating Trust Agreement. The Liquidating Trust will terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust if it is necessary to facilitate or complete the liquidation of the Liquidating Trust Assets administered by the Liquidating Trust. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions will not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

### m. Purpose of the Liquidating Trust.

The Liquidating Trust will be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the IRS, all parties will treat the Liquidating Trust as a liquidating trust for all federal income tax purposes. The Liquidating Trust will not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. Neither the Liquidating Trust nor any portion thereof, nor any reserve, account or fund established by the Plan will be treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(1).

### 7. Plan Advisory Committee.

### a. Appointment.

On the Effective Date, the Plan Advisory Committee will be deemed appointed and will adopt bylaws to govern the actions of the Plan Advisory Committee.

### b. Membership.

The Plan Advisory Committee will consist of up to five (5) members of the Committee chosen from those members of the Committee that notify counsel to the Committee in writing no later than fifteen (15) days prior to the Confirmation Hearing of their intention to serve on the Plan Advisory Committee. In the event that less than five (5) of the members of the Committee

notify counsel to the Committee of their intent to serve on the Plan Advisory Committee within fifteen (15) days prior to the Confirmation Hearing, then the Committee will choose from among the Holders of Unsecured Claims to fill any vacancy until five (5) members have been designated.  Unless and until such vacancy is filled, the Plan Advisory Committee will function with such reduced membership.  In the event of the resignation of a member of the Plan Advisory Committee, the remaining members may, but need not, designate a successor from among the Holders of Unsecured Claims.  Unless and until such vacancy is filled, the Plan Advisory Committee will function with such reduced membership

### c.  Fiduciary Duties.

The fiduciary duties that applied to the Committee prior to the Effective Date will apply to the Plan Advisory Committee.  The duties and powers of the Plan Advisory Committee will terminate upon the termination of the Liquidating Trust.

### d.  Rights and Duties.

The Plan Advisory Committee's role will be to advise and approve the actions of the Liquidating Trustee as more particularly set forth in the Liquidating Trust Agreement.  The Plan Advisory Committee will have the rights and duties set forth in the Liquidating Trust Agreement, including without limitation:

(1)  to terminate the Liquidating Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the Liquidating Trustee, to appoint a successor Liquidating Trustee; provided, that the Plan Advisory Committee will file with the Bankruptcy Court a notice appointing such successor trustee;

(2)  to approve any release or indemnity in favor of any third party granted or agreed to by the Liquidating Trustee other than as set forth in the Plan;

(3)  to authorize the Liquidating Trustee to commence or continue to prosecute any Cause of Action including, in the Liquidating Trustee's capacity as Plan Administrator, any Access Lending Cause of Action;

(4)  to approve the settlement of any Cause of Action if the amount sought to be recovered by the Liquidating Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $100,000;

(5)  to approve the allowance of any Disputed Claim if the final allowed amount of such Claim exceeds $50,000;

(6)     to approve the sale of any Assets by the Liquidating Trustee;

(7)     with respect to each six month period, to approve any budget for the Administrative Fund prepared by the Liquidating Trustee in respect of the Trust Operating Expenses and in connection with Causes of Action and to approve any additional funding of the Administrative Fund;

(8)     in addition to the mandatory distributions required under the Plan, to approve the making of interim distributions if such distributions are warranted and economical;

(9)     to review and object to fees and expenses of professionals retained by the Liquidating Trust; and

(10)    to approve of any investment of Cash or other Liquidating Trust Assets pending distributions to holders of the beneficial interests.

### e.     No Compensation.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Advisory Committee, including reasonable attorneys fees subject to a cap to be established by the Plan Advisory Committee in its discretion, the members of the Plan Advisory Committee will serve without compensation. Reasonable expenses, as set forth in Article 8.G.5 of the Plan, incurred by members of the Plan Advisory Committee may be paid by the Liquidating Trust without need for approval of the Bankruptcy Court.

### f.     Objection to Fees.

The Plan Advisory Committee will have thirty (30) days, or such other period as determined by the Plan Advisory Committee and the Liquidating Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Liquidating Trust or the Plan Advisory Committee by giving notice of any such objection to the professional seeking compensation or reimbursement. For an objection to be valid, it will be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made will be submitted to the Bankruptcy Court for resolution. The uncontested portion of each invoice will be paid within forty (40) days after its delivery to the Plan Advisory Committee and the Liquidating Trustee.

### 8.     Liability, Indemnification.

Neither the Liquidating Trustee (including in its capacity as Plan Administrator), the Plan Advisory Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Liquidating Trustee or the Plan Advisory Committee,

nor their respective employees, will be liable for the act or omission of any other member, designee, agent or representative of such Liquidating Trustee or Plan Advisory Committee, nor will such Liquidating Trustee, or any member of the Plan Advisory Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Liquidating Trustee, or as a member of the Plan Advisory Committee, respectively, other than for specific acts or omissions resulting from such Liquidating Trustee's or such member's willful misconduct, gross negligence or fraud. The Liquidating Trustee, or the Plan Advisory Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidating Trustee (including in its capacity as Plan Administrator) or the Plan Advisory Committee will be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so will not result in the imposition of liability on the Liquidating Trustee or Plan Advisory Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Liquidating Trust will indemnify and hold harmless the Liquidating Trustee and Plan Advisory Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.

### 9. Retention of Professionals.

### a. Liquidating Trust Professionals.

The Liquidating Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors and other agents on behalf of the Liquidating Trust as necessary or desirable to carry out the obligations of the Liquidating Trustee hereunder and under the Liquidating Trust Agreement. More specifically, the Liquidating Trustee may retain counsel in any matter related to its administration, including counsel that has acted as counsel for the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

Prior to the Effective Date, the Committee will approve a budget for the six (6) month period beginning on the Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Liquidating Trust, which budget may be altered from time to time by the Plan Advisory Committee in accordance with the Liquidating Trust Agreement provided that any fees and expenses of professionals retained by the Liquidating Trust that have

been incurred prior to the date of the modification of the budget will constitute budgeted amounts. Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, the Professionals retained by the Debtors or the Committee will only be entitled to compensation for services performed and expenses incurred after the Effective Date to the extent, if any, of the amount budgeted for each respective Professional. Following the Effective Date, the Liquidating Trustee may pay, without application to the Court or any other court of competent jurisdiction, such professionals retained by the Liquidating Trust in accordance with agreements that the Liquidating Trustee determines to be reasonable. The Plan Advisory Committee will approve in advance the Liquidating Trustee's retention of professionals and their compensation arrangements.

### b.    Plan Advisory Committee Professionals.

The Plan Advisory Committee will have the right to retain counsel of its choice in the event of a dispute or conflict with the Liquidating Trustee or for other purposes set forth in the Liquidating Trust Agreement and the reasonable fees and expenses of such counsel will be paid by the Liquidating Trustee.

### 10.    Access Lending.

### a.    Transfer of Access Lending Stock.

On the Effective Date, pursuant to Article 8.E of the Plan, TRS Holdings will distribute the stock of Access Lending to the Liquidating Trust, which will become the sole shareholder of Reorganized Access Lending.

### b.    The Plan Administrator.

The Liquidating Trustee will act as Plan Administrator with respect to Reorganized Access Lending and, in such capacity, will have entered into a Plan Administrator employment agreement to be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing. The initial Plan Administrator, and each successor Plan Administrator, will serve until the earlier of (i) the dissolution of Reorganized Access Lending or (ii) such Plan Administrator's resignation, death, incapacity, removal or termination. Upon the occurrence of the Effective Date, the articles of incorporation of Access Lending will be amended to provide that Plan Administrator will be the chief executive officer and sole director of Reorganized Access Lending. In such capacity, the Plan Administrator will have all necessary and appropriate power to act for, on behalf of and in the name of Reorganized Access Lending, with the same power and effect as if each of his or her actions in furtherance of his or her duties as a responsible person and as a board-appointed officer and shareholder-appointed director of Reorganized Access Lending were explicitly authorized by the appropriate board of directors or shareholders.

### c.    Resolution of Claims and Prosecution of Access Lending Causes of Action.

The Liquidating Trustee, as Plan Administrator, will resolve all Disputed Claims against Access Lending as soon as practicable following the Effective Date and will have the right to prosecute all Access Lending Causes of Action. The Liquidating Trustee, acting as Plan Administrator, will pay all Allowed A/P/S Claims against Access Lending as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim. Upon resolution of all Disputed Unsecured Claims against Access Lending and all Access Lending Causes of Action, the Liquidating Trustee, as Plan Administrator, will pay all the Allowed Unsecured Claims against Access Lending from the Access Lending Net Distributable Assets in accordance with Article 8.J.6 of the Plan.

### d.     Dissolution of Reorganized Access Lending.

After all the Allowed Claims against Access Lending have been paid, the Liquidating Trustee, acting as Plan Administrator, will file a certificate of dissolution in the applicable state of incorporation for Reorganized Access Lending, and Reorganized Access Lending will dissolve and cease to exist. Any remaining Assets of Reorganized Access Lending will be distributed to the Liquidating Trust as sole shareholder in a liquidating distribution, and will become Liquidating Trust Assets that may be distributed pursuant to the terms of the Plan.

### e.     Access Lending Income; Returns.

Any income earned by the Assets of Reorganized Access Lending is attributable to Access Lending and not to the Liquidating Trust or its beneficiaries. The Liquidating Trustee, acting as Plan Administrator, will make and file, if necessary, any and all tax returns for Reorganized Access Lending with respect to such taxable income, and will pay taxes, if any, properly payable by Access Lending from Reorganized Access Lending's Assets. The Liquidating Trustee will also file (or cause to be filed) any other statements, returns or disclosures relating to Reorganized Access Lending that are required by any governmental unit.

### f.     Calculation of Access Lending Net Distributable Assets.

The Access Lending Net Distributable Assets will be calculated by deducting from the gross amount available from the liquidation of Reorganized Access Lending's Assets and the prosecution of the Access Lending Causes of Action: (i) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estate of Access Lending, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of Access Lending paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, (iv) any taxes paid by the Liquidating Trustee from Reorganized Access Lending's Assets pursuant to Article 8.J.5 of the Plan, (v) any costs incurred in connection with the prosecution of the Access Lending Causes of Action, and (vi) Reorganized Access Lending's proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee.

### 11.  Preservation of All Causes of Action.

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) will be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity.  The Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) may pursue such retained claims or Causes of Action in accordance with the best interests of the creditors, the Estates, or the Liquidating Trust.

### 12.  Successors.

The Liquidating Trust will be the successor to the Debtors (other than Access Lending) for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters.  The Liquidating Trust will succeed to the attorney-client privilege of the Debtors (other than Access Lending) with respect to all Causes of Action (other than Access Lending Causes of Action) and other litigation-related matters, and the Liquidating Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.  Reorganized Access Lending will be the successor to the Access Lending for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Access Lending Causes of Action and other litigation-related matters.  Reorganized Access Lending will succeed to the attorney-client privilege of Access Lending with respect to all Access Lending Causes of Action and other litigation-related matters, and the Liquidating Trustee, it its capacity as Plan Administrator, may waive the attorney-client privilege with respect to any Access Lending Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.

### F.  DISTRIBUTIONS UNDER THIS PLAN

### 1.  Timing of Distributions.

#### a.  Distributions on Account of Allowed A/P/S Claims.

The Liquidating Trustee will pay any Allowed A/P/S Claim against Debtors other than Access Lending from the Liquidating Trust Assets, except as otherwise provided in the Plan, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

#### b.  Interim Distributions on Account of Allowed Unsecured Claims.

Subject to approval of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement and pursuant to the calculations set forth in Article 9.C of this Plan, (a) the Liquidating Trustee will make an interim distribution at least annually of its net income and the

net proceeds from the sale of Liquidating Trust Assets provided that any such distribution is not unduly burdensome to the Liquidating Trust, and (b) will have the right to make more frequent interim distributions, to Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed Operating Debtor Unsecured Claims if the Liquidating Trustee determines that such interim distributions are warranted, economical; provided, however, that any such distribution will only be made if (i) the Administrative Fund and the A/P/S Claims Reserve are fully funded; (ii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Holding Company Debtors, the Holding Company Debtor Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; (iii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Operating Debtors, the Operating Debtor Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; and (iv) the Liquidating Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.  This provision will be interpreted to be consistent with Revenue Procedure 94-45 § 3.10.

### c.      Final Distributions on Allowed Unsecured Claims.

Notwithstanding anything else in the Plan, upon the settlement and satisfaction of all A/P/S Claims, the settlement and satisfaction of all Claims against Access Lending, the dissolution of Reorganized Access Lending and the distribution in liquidation of all remaining Assets of Reorganized Access Lending to the Liquidating Trust, the completion of the prosecution and/or settlement of all objections to all other Claims and the Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidating Trustee will distribute, as soon as practicable, all remaining Liquidating Trust Assets pursuant to the terms of the Plan using the calculations set forth in Article 9.C of the Plan.

### 2.      Reserves.

### a.      Administrative Fund.

On the Effective Date, the Liquidating Trustee will establish the Administrative Fund. The initial amount of the Administrative Fund will be based on the Liquidating Trustee's good faith estimate of the cost necessary to complete the Liquidating Trust's obligations under the Plan and the Liquidating Trust Agreement.  The Liquidating Trust will pay all costs and expenses related to carrying out its obligations under the Plan and the Liquidating Trust Agreement from the Administrative Fund and, in the Liquidating Trustee's discretion, and with approval of the Plan Advisory Committee, may add additional amounts to the Administrative Fund to prosecute the Causes of Action (other than Access Lending Causes of Action) or for administration and other miscellaneous needs of the Liquidating Trusts without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

### b.    A/P/S Claims Reserve.

On the Effective Date, the Liquidating Trustee will establish the A/P/S Claims Reserve for all A/P/S Claims that are Disputed A/P/S Claims or Allowed A/P/S Claims that are not paid on the Effective Date, provided, however, that none of the provisions in Article 9.B.2 of the Plan apply to A/P/S Claims against Access Lending.   The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim that is not paid on the Effective Date will be based upon the Administrative Claim being in the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly liable, the Liquidating Trustee will contributed to the A/P/S Reserve on account of only one such Claim. The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim that is not paid on the Effective Date will be based upon such Claim being in the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of the Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly liable, the Liquidating Trustee will contributed to the A/P/S Reserve on account of only one such Claim.  As soon as practicable after (and to the extent) that a Disputed A/P/S Claim becomes an Allowed A/P/S Claim, the Liquidating Trustee will make a payment from the A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim.   After (and to the extent) a Disputed A/P/S Claim or a Disallowed Claim is determined not to be an A/P/S Claim, the portion of the A/P/S Claims Reserve reserved for such Claim will be released from the A/P/S Claims Reserve and will be distributed pursuant to the terms of the Plan.   Any amount remaining in the A/P/S Claims Reserve following the final disposition of all A/P/S Claims will be released from the A/P/S Claims Reserve and will be distributed pursuant to the terms of the Plan.

### c.    Holding Company Debtor Claims Reserve.

On the Effective Date, the Liquidating Trustee will establish the Holding Company Debtor Claims Reserve.  With respect to any interim distribution made to Holders of Allowed Holding Company Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Holding Company Debtor will be the amount that would be distributed on account of such Claim if it was an Allowed Holding Company Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of the Plan.   As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against a Holding Company Debtor becomes an

Allowed Unsecured Claim against such Holding Company Debtor, the Liquidating Trustee will make a payment, subject to the Multi-Debtor Claim Protocol, from the Holding Company Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim will be released from the Holding Company Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against a Holding Company Debtor becomes a Disallowed Claim, the portion of the Holding Company Debtor Claims Reserve reserved for such Claim will be released from the Holding Company Debtor Claims Reserve and will be distributed pursuant to the terms of the Plan. Any amount remaining in the Holding Company Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Holding Company Debtors will be released from the Holding Company Debtor Claims Reserve and will be distributed pursuant to the terms of the Plan.

### d.    Operating Debtor Claims Reserve.

On the Effective Date, the Liquidating Trustee will establish the Operating Debtor Claims Reserve. With respect to any interim distribution made to Holders of Allowed Operating Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Operating Debtor will be the amount that would be distributed on account of such Claim if it was an Allowed Operating Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of the Plan. As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against an Operating Debtor becomes an Allowed Unsecured Claim against such Operating Debtor, the Liquidating Trustee will make a payment, subject to the Multi-Debtor Claim Protocol, from the Operating Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim will be released from the Operating Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against an Operating Debtor becomes a Disallowed Claim, the portion of the Operating Debtor Claims Reserve reserved for such Claim will be released from the Operating Debtor Claims Reserve and will be distributed pursuant to the terms of the Plan. Any amount remaining in the Operating Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Operating Debtors will be released from the Operating Debtor Claims Reserve and will be distributed pursuant to the terms of the Plan.

### 3.    Distribution Calculations.

### a.    Calculation of Litigation Proceeds.

The Litigation Proceeds will be calculated by deducting all expenses related to any Causes of Action (other than Access Lending Causes of Action) including, but not limited to, fees and costs of attorneys, other professionals, and expert witnesses, and all expenses incurred

in the pursuit of such Causes of Action, as determined by the Liquidating Trustee, from the proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance. The Holding Company Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds. The Operating Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds. The NC Capital EPD/Breach Claimant Portion of Litigation Proceeds is 45% of the Litigation Proceeds.

<p style="text-align:center"><strong>b.      Calculation of Holding Company Debtor Net Distributable Assets.</strong></p>

The Holding Company Debtor Net Distributable Assets will be calculated by deducting from the gross amount (other than Litigation Proceeds) available from the liquidation of the Holding Company Debtors' Assets: (i) the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Holding Company Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Holding Company Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of the Holding Company Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Holding Company Debtors' proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee.

<p style="text-align:center"><strong>c.      Calculation of Operating Debtor Net Distributable Assets.</strong></p>

The Operating Debtor Net Distributable Assets will be calculated by deducting from the gross amount available from the liquidation of the Operating Debtors' Assets, which gross amount will include the Adequate Protection Proceeds but exclude the Litigation Proceeds: (i) the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Operating Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Operating Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date, (iii) the Joint Administrative Expense Share of the Operating Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Operating Debtors' proportionate share of the expenses of the Trust Operating Expenses as determined by the Liquidating Trustee.

<p style="text-align:center"><strong>d.      Calculation of Interim Distributions.</strong></p>

Subject to the terms of the Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol:

> (1)      the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Holding Company Debtors up to the amount of the Holding Company Debtor Net Distributable Assets (calculated as of the date of the interim distribution in accordance with

Article 9.C.2 of the Plan) plus the Holding Company Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Holding Company Debtor Claims Reserve pursuant to Article 9.B.3 of the Plan and (ii) to fully fund the Holding Company Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve; and

(2)     the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Operating Debtors up to the amount of the Operating Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.3 of the Plan) plus the Operating Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Operating Debtor Claims Reserve pursuant to Article 9.B.4 of the Plan and (ii) to fully fund the Operating Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve;.

### 4.     Payment in Full of Unsecured Claims.

#### a.     Limitation on Distributions on Account of Allowed Unsecured Claims.

Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of the Plan, any Allowed Unsecured Claim is paid in full under the Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly liable, such Creditor is not entitled to receive distributions under the Plan in excess of the amount of the Debtors' joint liability in respect of such Claims plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claims for which more than one Debtor is jointly liable will be deemed paid in full at such time as the Creditor has been paid the allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

#### b.     Payment of Interest on Allowed Unsecured Claims.

Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of the Plan, (i) if, and only if, all Holders of Allowed Unsecured Claims against the Holding Company Debtors and all Holders of Allowed Unsecured Claims against Operating Debtors have been paid 100% of the amount of their Allowed Claims, such Holders will be entitled to receive interest (calculated as of the Petition Date at a rate to be

determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of the Holding Company Debtors and the Operating Debtors and (ii) if, and only if, all Holders of Allowed Unsecured Claims against Access Lending have been paid 100% of the amount of their Allowed Claims, such Holders will be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of Access Lending; provided, however; that with respect to Allowed Unsecured Claims for which more than one Debtor is jointly liable, interest is payable on such Claims pursuant to the terms of Article 9.D.2 of the Plan based on the allowed amount of the joint liability fixed by such Claims.

### c. Payment in Full of Allowed Unsecured Claims for Which Debtors in More than One Debtor Group Are Jointly Liable.

To the extent a Holder of Allowed Unsecured Claims for which Debtors in more than one Debtor Group are jointly liable is paid 100% of the allowed amount of the joint liability fixed by such Claims through interim distributions, the Liquidating Trustee will retain any further interim distributions that would be made on account of such Claims (giving effect, if applicable, to the Multi-Debtor Claim Protocol) as if only Debtors within a single Debtor Group were liable for such Claim until the Liquidating Trustee makes a final distribution under the Plan. Prior to making a final distribution under the Plan, the Liquidating Trustee will determine, with respect to every Allowed Unsecured Claim for which Debtors in more than one Debtor Group are jointly liable that has been paid 100% of the allowed amount of the joint liability fixed by such Claim, the amount of distributions in respect of such Claim made on account of Debtors within each Debtor Group. The Liquidating Trustee will reallocate the excess distributions, if any, that it has retained to be included in the appropriate Debtor Group's Assets based on the relative distributions made to Claims in each Debtor Group on account of such joint liability.

### d. Payment in Full of All Allowed Holding Company Debtor Unsecured Claims.

If, in accordance with the terms of the Plan, all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid 100% of the allowed amount of their Allowed Holding Company Debtor Unsecured Claims, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds will be paid, in accordance with the terms of the Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 of the PLan, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds will be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

### e. Payment in Full of All Allowed Operating Debtor Unsecured Claims Other Than EPD/Breach Claims Against NC Capital.

If, in accordance with the terms of the Plan, all Holders of Allowed Operating Debtor Unsecured Claims other than Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Operating Debtor Unsecured Claims, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds will be paid, in accordance with the terms of the Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol first to Holders of Allowed Class OP6b Claims on account of such Claims until such Claims are paid 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their allowed amounts. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 of the Plan, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds will be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

### f. Payment in Full of All Allowed EPD/Breach Claims Against NC Capital.

If, in accordance with the terms of the Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, all Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Class OP6b Claims, any remaining amount of the NC Capital EPD/Breach Claimant Portion of Litigation Proceeds will be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, first to Holders of Allowed Operating Debtor Claims other than Allowed Class OP6b Claims on account of such Claims until such Claims are 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their Allowed Amounts. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 of the Plan, any remaining amount of NC Capital EPD/Breach Claimant Portion of Litigation Proceeds will be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

### 5. Manner of Distribution.

At the option of the Liquidating Trustee, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

### 6. De Minimis Distributions.

All De Minimis Distributions will be held by the Liquidating Trust for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions. When the aggregate amount of De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor exceeds

$50.00, the Liquidating Trust will distribute such De Minimis Distributions to such Creditor.  If, at the time that the final distribution under the Plan is to be made, the De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor total less than $50.00, such funds will not be distributed to such Creditor, but rather, will vest in the Liquidating Trust and be distributed to other Holders of Allowed Claims in accordance with the terms of the Plan.

### 7.      Delivery of Distributions.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be made by the Debtors, if on the Effective Date, or the Liquidating Trustee, if after the Effective Date, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Liquidating Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address.  The distributions to Holders of Capital Trust Claims will be made to the Indenture Trustee, which, subject to the right of the Indenture Trustee to assert its charging lien against the distributions for payment of the Indenture Trustee Expenses, will transmit the distributions to the Holders of Capital Trust Claims.

### 8.      Undeliverable Distributions.

If payment or distribution to the Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Liquidating Trustee will file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment.  If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the holder will be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim will be deemed satisfied to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

### 9.      Setoffs and Recoupments.

The Debtors, if on the Effective Date, or the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator), if after the Effective Date, may, pursuant to sections 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but will not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to the Plan, any claims or Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim will constitute a waiver or release by the Debtors, the Estates, or the Liquidating Trust of any right of setoff or recoupment that the Debtors or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action.

### 10.     Distributions in Satisfaction; Allocation.

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the distributions and rights that are provided in the Plan will be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors and the Estates and the assets and properties of the Debtors and the Estates, whether known or unknown, arising or existing prior to the Effective Date. Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

## 11. Cancellation of Notes and Instruments.

As of the Effective Date, except as with respect to the stock of Access Lending, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the holders thereof will, with respect to the Debtors, be canceled and deemed null and void and of no further force and effect, and the holders thereof will have no rights against the Debtors, the Estates, or the Liquidating Trust, and such instruments will evidence no such rights, except the right to receive the distributions provided for in the Plan. Additionally, the Capital Trust Indentures, and all related notes and documents, including without limitation, the two series of Junior Subordinated Notes due 2036, the Amended and Restated Trust Agreement, dated as of September 13, 2006, and the Amended and Restated Trust Agreement, dated as of November 16, 2006, and the two series of trust preferred securities and trust common securities, respectively, will be deemed automatically canceled and discharged on the Effective Date, provided, however, that the Capital Trust Indentures, and related notes and documents will continue in effect solely for the purposes of (i) allowing the Holders of Capital Trust Claims to receive their distributions, if any, hereunder, (ii) allowing the Indenture Trustee to make distributions on account of the Capital Trust Claims, and (iii) permitting the Indenture Trustee to asserts its charging lien against such distributions for payment of the Indenture Trustee Expenses. The Capital Trust Indentures and related notes and documents will terminate completely upon completion of all such distributions. The Liquidating Trust will not be responsible for any of the fees, expenses or costs incurred in connection with the continuation or termination of the Capital Trust Indentures.

## 12. No Interest on Claims.

Unless otherwise specifically provided for in the Plan and except as set forth in Article 9 of the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an order of the Bankruptcy Court, postpetition interest will not accrue or be paid on any Claim, and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest will not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

## 13. Withholding Taxes.

The Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, will be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan. As a condition to making any distribution under the Plan, the Debtors, if on the

Effective Date, and the Liquidating Trustee, if after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, to comply with applicable tax reporting and withholding laws.

### 14. Reports.

From the Effective Date, until a Final Decree is entered, the Liquidating Trustee will submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Liquidating Trust as required by the U.S. Trustee guidelines.

### G. PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

### 1. Reservation of Rights to Object to Claims.

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidating Trustee will be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, 510(b) Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases will be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

### 2. Objections to Claims.

Prior to the Effective Date, the Debtors will be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, the Liquidating Trustee will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims by the Liquidating Trustee will be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim will not be deemed an amendment to the Plan.

### 3. Service of Objections.

An objection to a Claim will be deemed properly served on the Holder of such Claim if the Liquidating Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

### 4. Determination of Claims.

Except as otherwise agreed by the Debtors or the Liquidating Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Liquidating Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated will be deemed to be an Allowed Claim for such liquidated amount and will be satisfied in accordance with the Plan. Nothing contained in Article 10 of Plan will constitute or be deemed a waiver of any claim, right, or Causes of Action that the Debtors or the Liquidating Trustee may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

### 5. No Distributions Pending Allowance.

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Liquidating Trustee may make, in his or her discretion, a distribution pursuant to the Plan on account of the portion of such Claim that becomes an Allowed Claim.

### 6. Claim Estimation.

In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if on or prior to the Effective Date) and the Liquidating Trust (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), will have the right to seek an order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the

amount of property that must be withheld from distribution on account of Disputed Claims; provided, however, that the Bankruptcy Court will determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

### 7. Allowance of Claims Subject to Section 502 of the Bankruptcy Code.

Allowance of Claims will be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

### H. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption of Certain Contracts and Leases and Cure Payments.

Twenty (20) days prior to the Confirmation Hearing, the Plan Proponents will file the Assumption Schedule, which will be attached to the Plan as Exhibit A. Objections to any proposed cure payment must be filed and served no later than the Assumption Objection Deadline and will be adjudicated, if necessary, at the Confirmation Hearing. Any non-debtor party or Person to an Executory Contract that has not filed an appropriate pleading with the Bankruptcy Court on or before the applicable Assumption Objection Deadline will be deemed to have waived its right to dispute the cure amount. All unpaid cure payments under any Executory Contracts that are assumed or assumed and assigned under the Plan will be made by the Liquidating Trustee as soon as practicable after the Effective Date but not later than thirty (30) days after the Effective Date, provided that, in the event that there is a dispute regarding the amount of any cure payments, the Liquidating Trustee will make such cure payments as may be required by section 365(b)(1) of the Bankruptcy Code within ten (10) days following the entry of a Final Order resolving such dispute. The Plan Proponents reserve the right to remove any Executory Contract from the Assumption Schedule prior to the Effective Date.

### 2. Rejection of Remaining Executory Contracts and Unexpired Leases.

On the Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, will be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

### 3. Rejection Damages Bar Date.

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under the Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) must be filed with XRoads Case Management Services, P.O. Box 8901, Marina Del Rey, California 90295 (Telephone (888) 784-9571), and a copy served on counsel for the Plan

Proponents and the Liquidating Trustee, within thirty (30) days after the Effective Date, or such Claim will be forever barred and will not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, their successors, their assigns, or their Assets. Any Claim arising from the rejection of an Executory Contract will be treated as a Claim in Class HC3b (Other Unsecured Claims against NCFC), Class HC7 (Other Unsecured Claims against TRS Holdings), Class HC10b (Other Unsecured Claims against NC Credit), Class HC13 (Other Unsecured Claims against NC Residual IV), Class OP3c (Other Unsecured Claims against NCMC), Class OP6c (Other Unsecured Claims against NC Capital), Class OP9b (Other Unsecured Claims against Home123), Class OP12 (Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral), or Class AL3 (Other Unsecured Claims against Access Lending), depending on which Debtor the Claim is asserted against. Nothing in the Plan extends or modifies any previously applicable Bar Date.

### 4. Insurance Policies.

To the extent that any or all of the insurance policies set forth on <u>Exhibit A</u> to the Plan are considered to be Executory Contracts, then notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume the insurance policies set forth on <u>Exhibit A</u> to the Plan and to assign them to the Liquidating Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy set forth on <u>Exhibit A</u> to the Plan. To the extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the Plan Proponents reserve the right to seek rejection of such insurance policy or other available relief. The Plan will not affect contracts that have been assumed and assigned by order of the Bankruptcy Court prior to the Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on <u>Exhibit A</u> to the Plan and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Liquidating Trust pursuant to the Plan.

### I. EFFECT OF CONFIRMATION AND INJUNCTION

### 1. Injunction.

**Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests**

in the Debtors or the Estates that arose prior to the Effective Date (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of the Plan. Any Person or entity injured by any willful violation of such injunction will recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in Article 12 of Plan will prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under the Plan. The Confirmation Order also will constitute an injunction enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of the Plan have been made or are not yet due under Article 4 of the Plan.**

### 2. Term of Injunctions.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court under sections 105 or 362 of the Bankruptcy Code, the Plan, or otherwise, and extant on the Confirmation Date, will remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust.

### 3. Exculpation.

**On and after the Effective Date, none of the Exculpated Parties will have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action or liabilities arising from the gross negligence,**

willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party will be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance will form an absolute defense to any such claim, cause of action, or liability.  **Without limiting the generality of the foregoing, each Exculpated Party will be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  No provision of the Plan or the Disclosure Statement will be deemed to act or release any claims, Causes of Action or liabilities that the Liquidating Trust or the Estates may have against any Person or entity for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor will any provision of the Plan be deemed to act to release any Avoidance Actions.**

## 4.     Binding Effect of Plan.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan will bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not the Holder has filed a Claim.  The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, will be binding on and will inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

## 5.     No Effect on Objections to Fee Applications.

Nothing contained in Article 12 of the Plan will affect the rights of parties in interest to object to Fee Applications or obviate the power of the Bankruptcy Court to issue orders with respect to Fee Applications.

## J.     CONDITIONS PRECEDENT

### 1.     Conditions Precedent to Effective Date.

The Plan will not become effective unless and until each of the following conditions will have been satisfied in full in accordance with the provisions specified below:

#### a.     Approval of Disclosure Statement.

The Bankruptcy Court will have approved a disclosure statement to the Plan in form and substance acceptable to the Plan Proponents in their sole and absolute discretion.

#### b.     Approval of Plan Compromises.

The compromises and settlements contained in Articles 4, 6, and 7 of the Plan are approved without material modification by Final Order in accordance with Bankruptcy Rule

9019 and are binding and enforceable against all Holders of Claims and Interests under the terms of the Plan.

### c. Form of Confirmation Order.

The Confirmation Order will be in form and substance acceptable to the Plan Proponents in their sole and absolute discretion

### d. Entry of Confirmation Order.

The Confirmation Order (i) will have been entered by the Bankruptcy Court, (ii) will not be subject to any stay of effectiveness, and (iii) will have become a Final Order, the Confirmation Date will have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code will have been made, or, if made, will remain pending.

### e. Liquidating Trust.

The Liquidating Trust will have been formed, and all formation documents for such entities will have been properly executed and filed as required by the Plan and applicable law.

### f. Liquidating Trustee.

The appointment of the Liquidating Trustee will have been confirmed by order of the Bankruptcy Court.

### g. Plan Administrator.

The appointment of the Plan Administrator will have been confirmed by order of the Bankruptcy Court.

### 2. Revocation, Withdrawal, or Non-Consummation of Plan.

If after the Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the Plan Proponents, the Confirmation Order may be vacated by the Bankruptcy Court; provided however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents. If the Confirmation Order is vacated pursuant to this Section, the Plan will be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, nor any pleadings filed in connection with the approval thereof will (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors (iii) prejudice in any manner the rights of the Plan Proponents in the Chapter 11 Cases, or (iv) constitute an admission

of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

### K.     RETENTION OF JURISDICTION

The Plan will not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) that relates to the following:

1.     to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of Executory Contracts or unexpired leases and the allowance of Claims resulting therefrom;

2.     to adjudicate any and all disputes over the ownership of a Claim or Interest;

3.     to adjudicate any and all disputes arising from or relating to the distribution or retention of consideration under the Plan;

4.     to hear and determine timely objections to Claims, whether filed before or after the Confirmation Date, including objections to the classification, estimation or establishment of priority or status of any Claim, and to allow or disallow any Claim, in whole or in part;

5.     to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors or the Estates or property abandoned or transferred by the Debtors or the Estates;

6.     to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of the Plan;

7.     to hear and determine matters related to the assets of the Estates, including liquidation of the Debtors' assets; provided that notwithstanding the foregoing, the Liquidating Trustee will have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of assets; provided further, that the Liquidating Trustee may seek "comfort orders" or similar orders of the Bankruptcy Court approving the Liquidating Trustee's sale or disposition of such assets to facilitate such transactions;

8.     to adjudicate disputes relating to any alleged subordination of the Capital Trust Claims;

9.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10.     to consider modifications of or amendments to the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including without limitation, the Confirmation Order;

11.     to issue orders in aid of execution, implementation, or consummation of the Plan;

12.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

13.     to hear and determine all motions requesting allowance of an Administrative Claim;

14.     to hear and determine all Fee Applications;

15.     to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses and parties entitled thereto;

16.     to hear and determine all controversies arising in connection with the implementation of the Plan;

17.     to hear and determine all Causes of Action, Avoidance Actions, and other suits and adversary proceedings to recover assets of the Liquidating Trust, as successor-in-interest to any of the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

18.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     to resolve all conflicts and disputes between the Liquidating Trustee, the Liquidating Trust, the Plan Advisory Committee, and Holders of Claims or Interests;

20.     to hear any matter not inconsistent with the Bankruptcy Code;

21.     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     to consider matters regarding the Debtors' insurance policies, if any, including jurisdiction to reimpose the automatic stay or its applicable equivalent provided in the Plan;

23.     to issue injunctions, provide declaratory relief, take such other legal or equitable actions, or issue such other orders as may be necessary of appropriate to restrain interference with the Plan, the Debtors, the Estates or their property, the Committee, the Liquidating Trust, the Liquidating Trustee, the Plan Advisory Committee, Professionals, or the Confirmation Order;

23.     to enter a Final Decree closing the Chapter 11 Cases; and

24.     to enforce all orders previously entered by the Bankruptcy Court.

## L.     NON-SEVERABILITY.

Except as specifically provided in the Plan, the terms of the Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated

## M.     BANKRUPTCY RULE 9019 REQUEST

In Article 16 of the Plan, the Plan Proponents, pursuant to Bankruptcy Rule 9019, request approval of all compromises and settlement included in the Plan, including, without limitation, the compromises and settlements included in Articles 4, 6, and 7 of the Plan.

# V.     FINANCIAL INFORMATION

## A.     STATUS OF ASSET DISPOSITION PROCESS; ADDITIONAL ASSETS OF DEBTORS; CURRENT CASH POSITION.

### 1.     Status of Asset Disposition Process.

The Debtors filed voluntary petitions for bankruptcy under chapter 11 of the Bankruptcy Code on April 2, 2007. On the Petition Date, the Debtors had approximately $62 million of cash in their operating accounts. As described above (see Section III.C.6.b), NCMC continued to operate its mortgage loan servicing business until approximately June 29, 2007. In addition, the Debtors generated an aggregate of $[___] from asset sales through [___], 2008 (see the table

below).  The Debtors also generated $[___] in interest income.  The proceeds and status of the asset sales, all of which are Assets of the Operating Debtors, are summarized below:

| Description of Assets | Date Sold | Proceeds (millions) | Funds Received by Estate |
|---|---|---|---|
| Servicing Assets and Servicing Platform | 6/29/2007 | $[__] | [__] |
| Mortgage Assets | 5/18/2007 and 6/29/2007 | $[__] | [__] |
| Access Lending Assets | 4/27/07 | $[__] | [__] |
| Technology Assets | 7/31/07 | $[__] | [__] |
| Miscellaneous Assets | Various | $[__] | [__] |
| Additional LNFA Sale (including Ohio Loans) | Closing pending | $[__] | [__] |
| **Total Proceeds** | | $[__] | |
| **Proceeds Collected as of [        ], 2008** | | $[__] | |

### 2.       Current Cash Position.

From the Petition Date through [___], 2008, the Debtors paid operating expenses and administrative claims in the total amount of $[__], $[__] in disbursements to restructuring professionals and for retention and severance payments, and $[__]in taxes.  As of _____, 2008, the Debtors' had cash of approximately $[__] in their operating accounts.  Cash flow statements for Debtors from the period from the Petition Date through [___], 2008 are set forth on <u>Exhibit B</u> hereto.

### 3.       Projected Net Distributable Assets.

The Debtors project that (i) the Access Lending Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Access Lending Unsecured Claims) will be in the range of $[__] to $[__]; (ii) the Holding Company Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Holding Company Debtor Claims excluding Litigation Proceeds) will be in the range of $[__] to $[__]; and (iii) the Operating Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Operating Debtor Claims excluding Litigation Proceeds) will be in the range of $[__] to $[__].  This projection assumes that Allowed A/P/S Claims will be in the range of $[__] to $[__] and that the expenses of the Liquidating Trust will be in the range of $[__] to $[__]These ranges are subject to final Claims reconciliation.

THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THESE PROJECTIONS ARE BASED ARE SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES. IT IS LIKELY THAT SOME ASSUMPTIONS WILL NOT MATERIALIZE BECAUSE OF UNANTICIPATED EVENTS AND CIRCUMSTANCES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD ARE LIKELY TO VARY FROM THE PROJECTED RESULTS. THE VARIATIONS MAY BE MATERIAL AND ADVERSE OR POSITIVE.

THE DEBTORS DO NOT ANTICIPATE AT THIS TIME THAT THEY WILL UPDATE THESE PROJECTIONS AT THE HEARING ON CONFIRMATION OF THE PLAN, FURNISH UPDATED PROJECTIONS IN DOCUMENTS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR OTHERWISE MAKE SUCH PROJECTIONS PUBLIC.

### 4. Other Assets.

In addition to the proceeds form the asset sales described in Section V.A.1. above, the Debtors expect to realize value from the following:

### a. Carrington Fund.

NCFC has investments in structured securitizations in the residential subprime sector in a fund (the "Fund") managed by Carrington Capital Management, LLC (the "GP"). NCFC owns a stake of approximately 4% in the Fund and a 36.75% stake in the GP, which, in turn, has a 20% carried interest in the Fund. To date, the Fund, which was established in 2004, has structured securitizations with approximately $22 billion of subprime mortgage loans. The GP is the parent of Carrington Mortgage Services, LLC, which recently acquired the Debtors' servicing operations, as discussed in Section III.C.6.b hereof.

On November 2, 2007, the Debtors filed a motion requesting an order authorizing the Debtors to given an investor consent to an amendment (the "Amendment") to the Fund's partnership agreement (the "Partnership Agreement") [Docket No. 3514]. In the weeks prior to the filing of such motion, the Debtors and their professionals reviewed the Debtors' investments in the Fund and conducted discussions with principals of the GP with respect to such investments. The Debtors' analysis and discussions with the GP took place against the back-drop of the Debtors' liquidating Chapter 11 cases, as well as a sharp downturn in the residential subprime sector. As a means of preserving and maximizing the value of its investments, the GP proposed that investors, including the Debtors, agree to certain modifications to the Partnership Agreement by consenting to the Amendment. In connection with this motion, the Debtors filed the Partnership Agreement, the Amendment, and summary thereof under seal because such documents are highly confidential and contain proprietary information relating to the GP and the Fund. By order dated November 20, 2007 [Docket No. 3917], the Bankruptcy Court authorized the Debtors to consent and to perform under the Amendment.

As of May 2007, the book value of the Debtors' investments in the Fund was approximately $42 million. The Debtors' investments in the Fund are illiquid until late 2008 under the terms of the operative agreements. Further, Carrington may assert that the operative documents limit the transferability of the Debtors' investments in the Fund. Additionally, given the nature of the Fund's investments (largely, if not exclusively, subprime residential mortgage loans), the value of the Debtors' investments in the Fund is subject to fluctuation and the book value may not reflect the market value of such assets. Accordingly, the timing and amount of any recovery to the Liquidating Trust from these assets is uncertain at this time.

Any funds realized from the investments in the Fund, either through distribution or disposition, will be included in the amounts used to determine the Holding Company Debtor Net Distributable Assets.

### b.      Liberty Mutual Litigation.

On April 20, 2004, the Debtors commenced suit in the Los Angeles Superior Court (Northeast District) in a case styled *New Century Financial Corporation v. Liberty Surplus Ins. Corp., et al.,* Case No. GC 033678 (the "Liberty Action"). The Liberty Action is a breach of insurance contract, declaratory judgment, bad faith, professional negligence, breach of fiduciary duty, negligence, and fraud suit seeking to establish that Liberty Surplus Insurance Corporation ("Liberty Surplus"), under a certain D&O policy of insurance, has an immediate contractual duty to reimburse NCFC for the defense fees and costs that it has paid and will continue to pay on behalf of certain of its officers and former officers, in the lawsuit styled *Positive Software Solutions, Inc. v. New Century Mortgage Corporation, New Century Financial Corporation, eConduit Corporation, the AnyLoan Company, Jeff Lemieux and Frank Nese*, United States District Court for the Northern District of Texas, Dallas Division, Case No. 303-CV-0257-N (the "*Positive Software* Action"). NCFC also claims that in the event Liberty Surplus successfully asserts a defense based on late notice, Hodgkiss Insurance Brokers and its principal, Daniel Hodgkiss, Crump Financial Services, Inc. and its principal, Michael McCluskey (collectively, that "Broker"), breached their fiduciary duties and professional and general duties of care to NCFC and committed fraud, as its insurance brokers, by not tendering the *Positive Software* Action in a proper fashion so as to avoid Liberty Surplus' defense of late notice and by covering up their action, thereby depriving NCFC of Liberty Surplus' reimbursement of defense expenses. Moreover, NCFC claims that the Broker is liable even if Liberty Surplus is liable, because the Broker permitted NCFC to enter into an insurance contract with an ambiguous notice provision.

The parties to the Liberty Action have, to date, conducted over 23 days of depositions. Discovery on liability issues is nearly complete, but some discovery remains on damages issues. The Liberty Action currently is scheduled for trial in June 2008, but that date is subject to change.

Any funds received on account of the Liberty Action will be included in the amounts used to determine the Holding Company Debtor Net Distributable Assets.

### c.    Tax Refund.

The Debtors are owed a tax refund (the "Tax Refund") from the Internal Revenue Service (the "IRS") of approximately $66 million.  In July 2007, pursuant to and in accordance with Section 6411 of the Internal Revenue Code, the Debtors timely filed a Form 1139 with the IRS. On their Form 1139, the Debtors claimed a net operating loss carryback (pursuant to Section 172(b) of the Internal Revenue Code) from the Debtors' 2006 taxable year to the 2004 taxable year—a year in which the Debtors had taxable income and paid federal income taxes. As indicated on the Form 1139, the net operating loss carryback reduces the Debtors' 2004 taxable income and results in an allowable tax refund for the 2004 taxable year in the amount of approximately $66 million. On November 15, 2007, the Debtors filed a motion for an order enforcing the automatic stay against the IRS and directing the IRS to release the Tax Refund (the "Tax Refund Motion") [Docket No. 3829], to which the IRS objected on November 28, 2007 [Docket No. 3955].  Thereafter, on December 31, 2007, the IRS denied the request for the Tax Refund made on Form 1139 and filed a further objection to the Tax Refund in which the IRS asserted that the Bankruptcy Court lacked jurisdiction to review denial of the Form 1139 request Docket No. 4267] and to which the Debtors responded on January 4, 2008 [Docket No. 4319]. Subsequently, on January 8, 2008, the Bankruptcy Court held a hearing on the question of whether the Bankruptcy Court has jurisdiction to review denial of the Debtors' Form 1139 request.  Following such hearing, the Bankruptcy Court took the issue under submission and, as of the date of the filing of this Disclosure Statement, the Bankruptcy Court has not ruled on the matter.  In order to expedite the resolution of this dispute, on January 30, 2008 the Debtors filed a claim for refund in the amount of the Tax Refund on Form 1120x with the IRS pursuant to Sections 6402 and 7422 of the IRC.

### d.    Next Ace.

In January 2004, NCMC purchased 56,688 shares of common stock of NextAce Corporation ("NextAce") for $500,000.  The 56,688 shares of common stock represented 10% of the common stock of NextAce on a fully-diluted, post-money basis at the time of the investment. Currently, the 56,688 shares represent approximately 9% of the outstanding common stock of NextAce.  NextAce is a technology company that provides software and services primarily to the title insurance and mortgage lender industries.   The Debtors used the optical title search technology developed by NextAce to enable them and their customers to verify title information in minutes.

NCMC's shares in NextAce are subject to a right of first refusal that inhibits the transferability and highly diminishes the value of the shares.  Specifically, pursuant to Section 2 of the Amended and Restated Shareholders Agreement dated December 15, 2003, in the event that any shareholder receives a "bona fide" offer for the purchase of its shares in NextAce, NextAce and the existing shareholders of NextAce have a right of first refusal to purchase the shares at the offer price.  The Debtors have been attempting to locate buyers for these shares but to day have not been successful, and any recovery is uncertain.

Any funds received from disposition of the Next Ace shares will be included in the amounts used to determine the Operating Debtor Net Distributable Assets.

### e. Deferred Compensation Trust.

NCFC adopted the Deferred Compensation Plan effective January 1, 1999 in order to allow "certain key employees" to defer certain amounts of their compensation. NCFC also adopted the Supplemental Executive Retirement/Savings Plan ("SERP") as supplemental compensation for certain senior level executives.

NCFC established the Trust to fund the Debtors' future obligations to pay the deferred amounts and earnings, and appointed Wells Fargo Bank, N.A. as the trustee ("Wells Fargo" or the "Trustee"). The Trust holds a Flexible Premium Variable Life Insurance Policy with Lincoln National Life Insurance Company (the "Policy"). Under the Policy, NCFC provides directions with respect to the investment of the premiums within the Policy. As of December 31, 2007, the net assets in the Trust were approximately $42.5 million. Pursuant to the Bankruptcy Court's Order dated December 20, 2007 [Docket No. 4164], on January 14, 2008 all of the assets in the Trust were reallocated so that they are invested in money market funds, and the loan that was outstanding against the cash value of the Trust's assets was repaid from the Trust's assets to stop accrual of interest.

As described in Section III.C.9.c above, on June 20, 2007, certain former employees of the Debtors who participated in the Deferred Compensation Plan commenced an adversary proceeding. The Deferred Compensation Plan Beneficiaries seek a declaratory judgment that the Deferred Compensation Plan's assets are held in trust for the exclusive benefit of the Deferred Compensation Beneficiaries.

As discussed in Section Section III.C.9.c hereof, it is the Debtors' position that Deferred Compensation Plan Beneficiaries do not have a property interest in the assets of the Trust. As a result, the Deferred Compensation Plan Beneficiaries are not entitled to share in any post-petition earnings on vested and unvested benefits. Deferred Compensation Plan Beneficiaries merely hold general unsecured claims against NCFC the amounts of which will be determined based upon the fair market value of the participants' hypothetical investment accounts as of the Petition Date pursuant to Section 502(b) of the Bankruptcy Code.

### f. Escrows and Holdbacks, DB Fund and Carrington.

As described in Sections III.C.6(b) and C.9(d) above, the Debtors currently hold $5 million in an escrow account in connection with the sale of the servicing business to Carrington and $10 million in escrow in connection with the Deutsche Bank cure claim litigation.

### g. Estate Litigation.

Except as otherwise provided in the Plan, any and all Causes of Action under any theory of law or fact, including without limitation under the Bankruptcy Code, accruing to or assertable by the Debtors (other than Access Lending) will remain Assets of the Estates and on the Effective Date will be transferred to the Liquidating Trust. The Causes of Action of Access Lending will revest in Reorganized Access Lending. Pursuant to Bankruptcy Code § 1123(b)(3)(B), only the Liquidating Trustee, subject to any approval of the Plan Advisory Committee, will have the right to pursue or not to pursue, or, subject to the terms of the Plan,

compromise or settle any Causes of Action, including Avoidance Actions, owned or held by the Debtors or their Estates as of the Effective Date.

From and after the Effective Date, the Liquidating Trustee, subject to approval by the Plan Advisory Committee, may litigate or settle any avoidance, recovery or subordination actions under sections 510, 543, 544, 545, 547, 548, 549, 550, 551, 553 or 724(a) of the Bankruptcy Code or any other Causes of Action or rights to payments or claims that belong to the Debtors that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date, except as otherwise expressly provided in the Plan. The Liquidating Trustee, with approval of the Plan Advisory Committee where required under the Plan, may settle without need of Bankruptcy Court approval any Avoidance Actions and may seek an order of the Bankruptcy Court approving the compromise, release or settlement of any such Avoidance Action. The Bankruptcy Court will retain jurisdiction to adjudicate any and all Causes of Action, including Avoidance Actions, and approve of any such settlement, whether commenced prior to or after confirmation of the Plan. The Liquidating Trustee will have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of the Liquidating Trust Assets; provided, that the Plan Advisory Committee approves of such sale, transfer, assignment or disposition of the Liquidating Trust Assets. Any dispute regarding the sale, transfer, assignment or disposition of the Liquidating Trust Assets will be resolved by the Bankruptcy Court.

Except as otherwise provided in the Plan, from and after the Effective Date, the Liquidating Trust, with consent of the Plan Advisory Committee, will have sole authority to commence, litigate or settle any Causes of Action, including Avoidance Actions. The Bankruptcy Court will retain jurisdiction to adjudicate any and all Causes of Action, including Avoidance Actions, and approve of any such settlement (if required), whether commenced prior to or after confirmation of the Plan.

The Debtors and the Committee are in the process of analyzing the Avoidance Actions and/or other Causes of Action, including any Cause of Action related to the restatement of NCFC's financial statements. These Causes of Action may include derivative claims as well as claims against NCFC's former auditor. The Debtors believe that the Examiner's reports may also identify additional Causes of Action related to the restatement of NCFC's financial statements.

The Debtors and the Committee notify the categories of parties listed on Exhibit C attached hereto that (i) Avoidance Actions and/or other Causes of Action of the Debtors (other than Access Lending) may be prosecuted by the Liquidating Trust and the Plan Advisory Committee for the benefit of Creditors of the Holding Company Debtors and the Operating Debtors and (ii) Avoidance Actions and/or other Causes of Action of Access Lending may be prosecuted by the Liquidating Trustee, in its capacity as Plan Administrator for Reorganized Access Lending. All Creditors who received payments from the Debtors within 90 days of the Petition Date (or 1 year if the Creditor was an "Insider", as such term is defined in section 101(31) of the Bankruptcy Code), are subject to being sued for recovery of preferences under section 547 of the Bankruptcy Code.

## B. RISKS ASSOCIATED WITH RECOVERY OF ASSETS.

### 1. Risks Regarding The Amount Of A/P/S Claims; Operating Expenses.

The Debtors' projections assume that unpaid Administrative Claims on the Effective Date will be in a range of $[____] – $[_____], Priority Tax Claims will be in a range of $[_____] to $[_____] and Priority Claims will be approximately $[_____].  Those amounts are only estimates.  The Administrative Claim Request Deadline will not occur until thirty (30) days after the Effective Date.  It is anticipated that additional Administrative Claims will be filed against the Debtors.

In addition, the projections assume that the Effective Date will occur on or before May 30, 2008.  If the Effective Date is delayed as a result of litigation concerning confirmation of the Plan or otherwise, the Debtors will likely incur additional operational expenses as well as professional fees.

### 2. Risks Regarding Amount of Unsecured Claims.

As of January 28, 2008, there are approximately $35.1 billion of Claims (excluding intercompany Claims) scheduled and filed against the Debtors.  The aggregate amount of filed Unsecured Claims is approximately $10.5 billion, though excluding duplicate Claims, late-filed Claims, and Claims with no supporting documentation with respect to which objections have been filed and sustained and giving effect to the Multi-Debtor Claim Protocol, the Debtors estimate that there are approximately 2,284 Unsecured Claims in an approximate amount of $7.4 billion.  The Claim estimates do not include contract rejection Claims for which the time to file a Claim has not expired or Claims listed without dollar amounts.  It is also possible that the dollar amount of Unsecured Claims could increase if the Bankruptcy Court determines that any claimant did not receive adequate notice of the Claims bar dates and therefore allows such claimant's late-filed Claim.

Many of these Claims are subject to objection, defenses or counterclaims, and the Estates intend to vigorously contest such Claims as appropriate.  Accordingly, the percentage of recovery for Holders of Unsecured Claims is uncertain.

### 3. Recovery on Remaining Assets.

The assets of the Debtors remaining to be sold are subject to sale contingencies and other restrictions.  As a result it is impossible to predict precisely the proceeds that will be realized upon such sales.

### 4. Recovery on Estate Litigation.

A portion of the property to be distributed to the creditors pursuant to the Plan includes litigation claims.  It is extremely difficult to value litigation and, litigation outcomes cannot be predicted.  It is possible that the Estates may recover nothing at all on account of such litigation. The risks in such litigation include, but are not limited to, those associated with defenses and counter-claims of opposing parties to the litigation; the delay and expense associated with

discovery and trial of factually intensive and complex disputes; the additional delay and expense inherent in appellate review; difficulties in pursuing claims pertaining to the Debtors because Debtors may no longer operating entities; the diminishing availability of former employees of the Debtors to serve as witnesses because they have moved from the geographic area or have otherwise become unavailable; the impossibility of predicting judicial outcomes; and the difficulty collecting favorable judgments.

## VI.   CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

An objection to confirmation of the Plan could prevent confirmation or delay confirmation for a significant period of time.  In such case, the Effective Date may not occur and payments to creditors may not commence for several months.  In addition, if the Plan is not confirmed, the case may be converted to a case under Chapter 7, in which event the Debtors believe that creditor recoveries will be substantially diminished.

The Debtors believe that the Effective Date should occur within forty-five (45) days following the entry of the Confirmation Order, although there can be no assurance that each of the conditions to the Effective Date will be satisfied by then.

## VII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors, and to Holders of Unsecured, Interests, and 510(b) Claims.  This summary does not address the federal income tax consequences to Holders whose Claims are paid in full in Cash or are otherwise unimpaired under the Plan (i.e., Holders of Allowed A/P/S Claims).

This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS") currently in effect.  These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, investors in pass-through entities, broker-dealers and tax-exempt organizations).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

Due to the complexity of the transactions to be consummated pursuant to the Plan, the lack of applicable legal precedent, the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim or Interest Holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

### A.    SUMMARY OF THE PLAN STRUCTURE.

Under the Plan, the Debtors' Assets, other than the Assets of Access Lending, will be transferred by the Debtors to the Liquidating Trust (described below) for the benefit of the Holders of Unsecured Claims against the Holding Company Debtors and the Operating Debtors. The Holders of NCFC Interests and 510(b) Claims will receive nothing under the Plan, and the Debtors will liquidate and cease to exist.

### B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED UNSECURED CLAIMS AGAINST HOLDING COMPANY DEBTORS AND OPERATING DEBTORS.

The federal income tax consequences of the Plan to a Holder of an Unsecured Claim will depend upon several factors, including but not limited to: (i) whether the Holder's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Holder's Claim, (iii) the Holder's holding period for the Claim, (iv) the type of consideration received by the Holder in exchange for the Claim, (v) whether the Holder is a United States or foreign person for tax purposes, (vi) whether the Holder reports income on the accrual or cash basis method, (vii) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and (viii) whether the Holder receives distributions under the Plan in more than one taxable year.

Generally, a Holder of an Unsecured Claim will recognize gain or loss equal to the difference between the "amount realized" by such holder and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim, including the fair market value of each such holder's proportionate share, if any, of the cash and assets transferred

to the Liquidating Trust for the benefit of such Holder (to the extent that such cash or other property is not allocable to any portion of the Claim representing accrued but unpaid interest (see Paragraph C below)). The Liquidating Trust will provide valuations of the transferred assets to the Holders of Claims who have beneficial interests in the Liquidating Trust. These valuations must be used consistently by the Liquidating Trust and such Holders for all federal income tax purposes. Any amounts a Holder subsequently receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included in the Holder's amount realized in respect of its Allowed Claim for federal tax purposes, but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidating Trust.

A Holder of an Unsecured Claim, whether or not allowed, will typically recognize gain or loss on the Effective Date, as a result of the transfer, of cash and other assets of the Debtors to the Liquidating Trust for the benefit of such Holder in accordance with the Plan. In addition, after the Effective Date, a Holder of a Disputed Claim whose Claim is disallowed will recognize a loss in the taxable year of the disallowance equal to the difference between the amount of such Disallowed Claim and the total amount previously allocated to such Holder in respect of such Claim pursuant to this Section VII.B. Also, the total amount previously allocated to such Holder in respect of such Disallowed Claim will be allocated to the remaining Holders of Unsecured Claims in the same Debtor Group to which the Disallowed Claim relates as the disallowed Holder

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in its hands, the purpose and circumstances of its acquisition, the Holder's holding period for the Claim, the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim, and whether such Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the Holder had not made an election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the disposition of such Claim (subject to a *de minimis* rule) would generally be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## C. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS AGAINST ACCESS LENDING

Pursuant to the Plan, each Holder of an Allowed Unsecured Claim against Access Lending will be entitled to receive such Holder's Pro Rata share, up to the amount of such Holder's Claim, of the Access Lending Net Distributable Assets. Each Holder of an Allowed Unsecured Claim against Access Lending will recognize gain or loss upon receipt of its Pro Rata share of the Access Lending Net Distributable Assets equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in such Holder's Claim. The amount realized is equal to the value of such Holder's Pro Rata share of the Access Lending Net Distributable Assets.

The character of any recognized gain or loss (i.e., ordinary income, short-term or long-term capital gain or loss) will depend on factors specific to each such Holder, including but not limited to: (i) whether the Holder's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Holder's Claim, (iii) the type of consideration received by the Holder in exchange for the Claim, (iv) whether the Holder is a United States person or a foreign person for tax purposes, (v) whether the Holder reports income on the accrual or cash basis method, and (vi) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim.

### D.     ALLOCATION OF CONSIDERATION TO INTEREST.

Pursuant to the Plan, distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS will respect this allocation. In general, to the extent that an amount received by a Holder of a Claim is received in satisfaction of interest that accrued on its Claim during its holding period, such amount will be taxable to the Holder as interest income, except to the extent such Holder previously included such interest in gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in its gross income and is not paid in full. To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

### E.     FEDERAL INCOME TAX TREATMENT OF HOLDERS OF INTERESTS AND 510(B) CLAIMS.

Pursuant to the Plan, Holders of Interests and 510(b) Claims will not receive any recovery under the Plan. A Holder of such an Interest or Claim will generally recognize loss in an amount equal to such Holder's adjusted tax basis in the Interest or Claim. The character of any recognized loss will depend upon several factors including, but not limited to, the status of the Holder, the nature of the Interest or Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period, and the extent to which the Holder had previously claimed a deduction for the worthlessness of all or a portion of the Interest or Claim.

### F.     FEDERAL INCOME TAX TREATMENT OF THE LIQUIDATING TRUST.

#### 1.     Transfer of Assets to the Liquidating Trust.

Pursuant to the Plan, the Holders, as of the Effective Date, of Unsecured Claims against the Holding Company Debtors and Operating Debtors are required, for all federal income tax purposes, to treat the assets transferred by the Debtors to the Liquidating Trust as having been transferred directly to such Holders (with each such Holder receiving an undivided interest in the specific Liquidating Trust Assets the proceeds of which such Holder may receive provided distributions in respect of its interest in the Liquidating Trust are made), and then transferred by such Holders to the Liquidating Trust in exchange for beneficial interests therein.

## 2.     Classification as a Liquidating Trust.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  In Revenue Procedure 82-58, as modified and amplified by Revenue Procedures 91-15 and 94-45 (the "Revenue Procedures"), the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a bankruptcy plan.  The Liquidating Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with the Revenue Procedures, all parties (including the Debtors, the Liquidating Trustee, and the holders of beneficial interests in the Liquidating Trust) are required to treat, for federal income tax purposes, the Liquidating Trust as a grantor trust of which its creditor-beneficiaries are the owners and grantors, and the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes.  However, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust.   If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and its creditor-beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

## 3.     Tax Reporting.

For all federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee, and holders of beneficial interests in the Liquidating Trust) will treat the Liquidating Trust as a grantor trust of which such holders are the owners and grantors.  Thus, each holder (and any subsequent holders) of interests in the Liquidating Trust will be treated as the direct owner of an undivided interest, for all federal income tax purposes, in the specific Liquidating Trust Assets the proceeds of which such holder may receive provided distributions in respect of its interest in the Liquidating Trust are made.  Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in a Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds.  Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of any beneficial interests in the Liquidating Trust it holds, the holder may be entitled to a subsequent loss or deduction.  In general, a distribution of cash from the Liquidating Trust to a holder of a beneficial interest will not be subject to tax.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Regulation §1.671-4(a). The Liquidating Trustee will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

### 4. Allocation of Taxable Income and Loss.

All allocations of Liquidating Trust taxable income will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein or in the Plan) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of interests in the Liquidating Trust, taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust assets. The tax book value of the Liquidating Trust Assets for this purpose will equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

### G. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS.

### 1. Overview of Current Year Tax Position.

In general, the Debtors expect to have a substantial net operating loss ("NOL") for the 2007 taxable year and an additional NOL for the 2008 taxable year. As a result, the Debtors expect to have substantial NOL carryovers and do not expect to incur any substantial tax liability as a result of implementation of the Plan. Notwithstanding the foregoing, the Debtors expect to recognize taxable "excess inclusion income" in 2007 in the approximate amount of [$__]. Such income cannot be offset by the Debtors other losses.

### 2. Transfers of Assets.

Under the Plan, the Debtors' Assets (other than the Assets of Access Lending) will be deemed transferred to the Holders of Unsecured Claims against the Holding Company Debtors and Operating Debtors, followed by a deemed transfer of such assets by such Holders to the Liquidating Trust. The Debtors' (other than Access Lending) deemed transfer of assets (other than cash) to such Holders will result in the recognition by the Debtors of gain or loss based on the difference between the fair market value and tax basis of the assets being so transferred. To the extent that the Debtors recognize a net gain from the transfer of these assets, it is expected that such gain will be offset by the Debtors' current year losses and NOL carryforwards.

### 3. Cancellation of Indebtedness.

The IRC provides that a taxpayer generally realizes and recognizes cancellation of indebtedness income ("COD") when a taxpayer's indebtedness is discharged in whole or in part. COD income is the excess of the amount of a taxpayer's indebtedness that is discharged over the amount or value of the consideration exchanged therefor. A debtor in a chapter 11 bankruptcy case, however, does not recognize COD income. As a result of the discharge and satisfaction of Claims pursuant to the Plan, the Debtors will realize a substantial amount of COD income, but the Debtors will not be required to recognize any of that COD income.

### 4. Alternative Minimum Tax.

The Debtors believe that current year losses and NOL carryforwards will be sufficient to eliminate any alternative minimum taxable income that may be realized as a result of the transfer of assets in satisfaction of Claims pursuant to the Plan. As a result, the Debtors do not anticipate having any alternative minimum tax liability for 2008 as a result of the transactions that occur upon confirmation of the Plan.

### H. BACKUP WITHHOLDING.

Payments of interest, dividends, and certain other payments are generally subject to backup withholding unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The withholding rate is currently 30%. The Debtors, the Liquidating Trust, and the Liquidating Trustee may be required to withhold the applicable percentage of any payments made to a holder who does not provide its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## VIII. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Plan provides a recovery to creditors that is greater than or equal to the probable recoveries by creditors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See Section IX.B hereof. **If the Plan is not confirmed because the requisite classes did not vote to accept the Plan, then the Debtors will likely file a motion to convert the case to a case under Chapter 7.**

## IX. ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Plan satisfies all the requirements for confirmation.

### A. GENERAL CONFIRMATION REQUIREMENTS.

Bankruptcy Code § 1129(a) contains several requirements for confirmation of a plan. Among those requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders and that the plan comply with the applicable provisions of chapter 11. The Debtors believe that they have complied with these requirements, including those requirements discussed below.

### B. BEST INTERESTS TEST.

Each holder of a Claim or Interest in an impaired class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to the Holders in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Plan Proponents believe that the Holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the sale of the Debtors' assets as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons.

The Debtors are liquidating and therefore are not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value. Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a Holder of a Claim or Interest in an impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' Assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' Assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 case.

As explained below, the Liquidation Value available for satisfaction of Claims and Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7.

The Debtors believe that Creditors have and will continue to clearly benefit from the liquidation by the Debtors. Had the Assets been liquidated by a chapter 7 trustee, the Plan

Proponents project that the maximum recovery would have been substantially less. The Debtors have realized a greater return than a chapter 7 trustee would have obtained on the sale of their Assets, specifically due to the Debtors' familiarity with the Assets and their ability to negotiate the highest and best price for the sale thereof. The Debtors have already reduced the significant majority of their Assets to Cash through auction or private sales approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of the Assets of the Estates and are in the process of liquidating their limited remaining Assets.

In addition, converting the Chapter 11 Cases to a chapter 7 liquidation at this stage of the winddown would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the Assets and would delay converting the remaining Assets to Cash. It would also result in substantial additional claims against the Estates.

Moreover, under the Plan the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals. Although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Bankruptcy Code § 326(a) permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors. The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors. Moreover, these chapter 7 trustee fees would reduce the Assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the proceeds of successful Estate litigation or settlement.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to Creditors. Bankruptcy Rule 3002(c) provides that conversion of chapter 11 cases to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the chapter 11 cases convert. Not only would a chapter 7 liquidation delay distribution to Creditors, but it is possible that additional Claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. The Debtors have received and are analyzing late-filed Claims and may file claims objections in the near future. Reopening the Bar Dates in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estates. Moreover, the Debtors would lose the benefit of having an established Administrative Claim Request Deadline.

For the reasons set forth above, the Debtors believe that the Plan provides a superior recovery for Holders of Claims, and the Plan meets the requirements of the Best Interest Test. Furthermore, for the reasons set forth above, the Debtors believe that, in a chapter 7 liquidation, the holders of NCFC Interests and 510(b) Claims would receive no recovery. Accordingly, the Plan meets the Best Interest Test with respect to NCFC Interests and 510(b) Claims, which will recover the same as they would in a chapter 7 liquidation.

## C.    FINANCIAL FEASIBILITY TEST.

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test").  Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to operate profitably and will be able to meet its obligations under the plan.  Because a form of liquidation is proposed in the Plan and no further financial reorganization of the Debtors will be possible, the Debtors believe that the plan meets the feasibility requirement.

## D.    ACCEPTANCE BY IMPAIRED CLASSES.

Section 1129(a) of the Bankruptcy Code requires that each class of claims or interests that is impaired under a plan accept the plan (subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy Code, if at least one but not all impaired classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if (i) the Plan meets all confirmation requirements except the requirement of section 1129(a)(8) of the Bankruptcy Code that the Plan be accepted by each class of claims or interests that is impaired and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan, as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan.  A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan.  Solicitation of acceptances from such a class is not required.  A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated.  Under the Plan, Class HC1, Class HC2, Class HC5, Class HC6, Class HC8, Class HC9, Class HC11, Class HC12, Class OP1, Class OP2, Class OP4, Class OP5, Class OP7, Class OP8, Class OP10, Class OP11, Class AL1, and Class AL2 are not impaired and are deemed to accept the Plan, while Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are not entitled to receive or retain any property under the Plan on account of Claims or Interests and are conclusively presumed to have rejected the Plan. All other Classes of Claims under the Plan are impaired under the Plan and Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan.

The Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims and Interests that are junior to such Class of impaired claims will not receive or retain any property under the Plan, subject to the applicability of the judicial new value doctrine. Pursuant to the Plan, no Holders of any Claim or Interest junior to the Holders of such impaired Classes will receive or retain any property on account of such junior Claims.

Holders of Claims and Interests in Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan are receiving no property under the Plan and are therefore deemed to reject the Plan. The Plan provides fair and equitable treatment to these Holders because there are no Classes junior to this class and no Class senior to this Class is being paid more than in full on its Allowed Claims.

If any impaired Class fails to accept the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to those Classes.

## X.    CONCLUSION

**THE DEBTORS AND THE COMMITTEE URGE YOU TO VOTE TO ACCEPT THE PLAN AND TO RETURN YOUR BALLOTS SO THAT THEY WILL BE RECEIVED AT THE ADDRESS AND PURSUANT TO THE PROCEDURES DESCRIBED IN SECTION II.C OF THIS DISCLOSURE STATEMENT, NO LATER THAN 4:00 P.M. PACIFIC TIME ON _____ [__], 2008.**

Dated: Irvine, California
       February 2, 2008

Respectfully submitted,

NEW CENTURY FINANCIAL CORPORATION, et al,
as Debtors

_____

By:    Holly Etlin
Its:    Chief Executive Officer, President and Chief
Restructuring Officer

O'MELVENY & MYERS LLP

By: /s/ *Suzzanne Uhland*
Suzzanne Uhland
Attorneys for the Debtors

**Exhibits**

A - Debtors' Joint Plan of Liquidation
B - Cash flow statement (Petition Date through [___], 2008)
C - Estate Litigation

**<u>Exhibit A</u>**

**Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors**
**(Attached)**

## UNITED STATES BANKRUPTCY COURT
### For the District of Delaware

| | |
|---|---|
| In re | Honorable Kevin J. Carey |
| | Chapter 11 |

| | |
|---|---|
| New Century Mortgage Corporation | 07-10419 |
| New Century Mortgage Ventures, LLC | 07-10429 |
| NC Capital Corporation | 07-10420 |
| NC Residual III Corporation | 07-10424 |
| New Century R.E.O. Corp. | 07-10426 |
| New Century R.E.O. II Corp. | 07-10427 |
| New Century R.E.O. III Corp. | 07-10428 |
| NC Deltex, LLC | 07-10430 |
| NCoral, L.P. | 07-10431 |
| NC Asset Holding, L.P. | 07-10423 |
| Home123 Corporation | 07-10421 |
| New Century TRS Holdings, Inc. | 07-10416 |
| NC Residual IV Corporation | 07-10425 |
| New Century Credit Corporation | 07-10422 |
| New Century Financial Corporation | 07-10417 |
| New Century Warehouse Corporation | 07-11043 |

| | |
|---|---|
| Debtors. | |

## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF FEBRUARY 2, 2008

Suzzanne S. Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

and

Mark Collins
Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Counsel for the Debtors

Mark S. Indelicato
Mark T. Power
Janine M. Cerbone
HAHN & HESSEN LLP
488 Madison Avenue
New York, NY 10022
(212) 478-7200

and

Bonnie Glantz Fatell
BLANK ROME LLP
1201 Market Street
Suite 800
Wilmington, DE 19891
(302) 425-6400

Regina Stango Kelbon
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
(215) 569-5500

Counsel for Official Committee of Unsecured Creditors

# TABLE OF CONTENTS

ARTICLE 1.    DEFINITIONS ............................................................................... 1

    A.    Defined Terms ............................................................................. 1

    B.    Other Terms .............................................................................. 18

    C.    Time Periods ............................................................................. 18

    D.    Exhibits .................................................................................... 18

ARTICLE 2.    CLASSIFICATION OF CLAIMS AND INTERESTS ...................... 19

    A.    Summary .................................................................................. 19

    B.    Classification ............................................................................ 21

ARTICLE 3.    TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................................................... 24

    A.    Administrative Claims ............................................................... 24

    B.    Priority Tax Claims ................................................................... 26

ARTICLE 4.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ....... 27

    A.    Priority Claims Against All Debtors (Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1) ................................... 27

    B.    Secured Claims Against All Debtors (Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2) ................................... 27

    C.    Class HC3:  Unsecured Claims Against NCFC ........................ 28

    D.    Class 4:  NCFC Interests ........................................................ 31

    E.    Class HC7:  Other Unsecured Claims against TRS Holdings.... 32

    F.    Class HC10:  Unsecured Claims Against NC Credit. ............... 33

    G.    Class HC13:  Other Unsecured Claims against NC Residual IV .............. 33

    H.    Class OP3:  Unsecured Claims Against NCMC. ....................... 34

    I.    Class OP6:  Unsecured Claims Against NC Capital ................. 35

    J.    Class OP9:  Unsecured Claims Against Home123 ................... 36

    K.    Class OP12:  Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral ........................................................ 37

    L.    Class AL3:  Other Unsecured Claims Against Access Lending .............. 38

ARTICLE 5.    ACCEPTANCE OR REJECTION OF THIS PLAN ......................... 38

    A.    Impaired Classes of Claims Entitled to Vote ............................. 38

    B.    Classes Deemed to Accept this Plan ........................................ 39

    C.    Classes Deemed to Reject this Plan ......................................... 40

    D.    Nonconsensual Confirmation ................................................... 40

    E.    Removal of Debtors .................................................................. 41

ARTICLE 6.     THE MULTI-DEBTOR CLAIM PROTOCOL FOR TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS ..... 41

    A.     Allowed Unsecured Claims for Which More than One Holding Company Debtor Is Jointly Liable ............................................................. 41

    B.     Allowed Unsecured Claims for Which More than One Operating Debtor Is Jointly Liable .................................................................................. 41

    C.     Separate Application to Debtor Groups ..................................................... 42

    D.     Inapplicable to Claims Against Access Lending ...................................... 42

    E.     Inapplicable to Intercompany Claims ....................................................... 42

ARTICLE 7.     THE INTERCOMPANY PROTOCOL FOR  TREATMENT OF INTERCOMPANY CLAIMS ................................................................ 42

    A.     Claims of Holding Company Debtors Against Other Holding Company Debtors ....................................................................................... 42

    B.     Claims of Operating Debtors Against Other Operating Debtors ............... 43

    C.     Claims of Holding Company Debtors Against Operating Debtors............ 43

    D.     Claims of Operating Debtors Against Holding Company Debtors............ 43

ARTICLE 8.     MEANS OF IMPLEMENTING THIS PLAN ..................................... 43

    A.     Implementation of Joint Plan ................................................................... 43

    B.     Corporate Action ...................................................................................... 43

    C.     Dissolution of Debtors.............................................................................. 44

    D.     Dissolution of the Committee ................................................................... 44

    E.     Vesting of Assets in Liquidating Trust; Assumption of Plan Obligations................................................................................................ 45

    F.     Liquidating Trust ...................................................................................... 46

    G.     Plan Advisory Committee ......................................................................... 55

    H.     Liability, Indemnification......................................................................... 57

    I.     Retention of Professionals......................................................................... 58

    J.     Access Lending ......................................................................................... 60

    K.     Preservation of All Causes of Action ....................................................... 62

    L.     Successors ................................................................................................. 62

ARTICLE 9.     DISTRIBUTIONS UNDER THIS PLAN ............................................ 63

    A.     Timing of Distributions ............................................................................ 63

    B.     Reserves.................................................................................................... 64

    C.     Distribution Calculations.......................................................................... 68

    D.     Payment in Full of Unsecured Claims....................................................... 70

E.   Manner of Distribution ................................................................. 73
F.   De Minimis Distributions ............................................................ 74
G.   Delivery of Distributions ............................................................. 74
H.   Undeliverable Distributions ......................................................... 74
I.   Setoffs and Recoupments ............................................................ 75
J.   Distributions in Satisfaction; Allocation ...................................... 75
K.   Cancellation of Notes and Instruments ....................................... 75
L.   No Interest on Claims ................................................................. 76
M.   Withholding Taxes ..................................................................... 76
N.   Reports ....................................................................................... 77
ARTICLE 10.   PROVISIONS FOR CLAIMS ADMINISTRATION AND
             DISPUTED CLAIMS ................................................... 77
A.   Reservation of Rights to Object to Claims .................................. 77
B.   Objections to Claims .................................................................. 77
C.   Service of Objections ................................................................. 78
D.   Determination of Claims ............................................................ 78
E.   No Distributions Pending Allowance .......................................... 79
F.   Claim Estimation ....................................................................... 79
G.   Allowance of Claims Subject to Section 502 of the Bankruptcy Code ..... 79
ARTICLE 11.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 80
A.   Assumption of Certain Contracts and Leases and Cure Payments ........... 80
B.   Rejection of Remaining Executory Contracts and Unexpired Leases ....... 80
C.   Rejection Damages Bar Date ...................................................... 81
D.   Insurance Policies ...................................................................... 81
ARTICLE 12.   EFFECT OF CONFIRMATION AND INJUNCTION ...................... 82
A.   Injunction ................................................................................... 82
B.   Term of Injunctions ................................................................... 83
C.   Exculpation ................................................................................ 83
D.   Binding Effect of Plan ............................................................... 84
E.   No Effect on Objections to Fee Applications .............................. 85
ARTICLE 13.   CONDITIONS PRECEDENT ................................................ 85
A.   Conditions Precedent to Effective Date ...................................... 85
B.   Revocation, Withdrawal, or Non-Consummation of Plan ........... 86

ARTICLE 14.    ADMINISTRATIVE PROVISIONS....................................................86

    A.    Retention of Jurisdiction ........................................................................86

    B.    Payment of Statutory Fees........................................................................89

    C.    General Authority......................................................................................90

    D.    Headings....................................................................................................90

    E.    Final Order ................................................................................................90

    F.    Amendments and Modifications ................................................................90

    G.    Payment Date ............................................................................................90

    H.    Withholding and Reporting Requirements................................................90

    I.    No Waiver ................................................................................................91

    J.    Tax Exemption ..........................................................................................91

    K.    Securities Exemption................................................................................91

    L.    Non-Severability ......................................................................................92

    M.    Revocation................................................................................................92

    N.    Plan Controls Disclosure Statement.........................................................92

    O.    Governing Law..........................................................................................92

    P.    Notices......................................................................................................92

    Q.    Filing of Additional Documents...............................................................93

    R.    Direction to a Party...................................................................................93

    S.    Successors and Assigns.............................................................................93

    T.    Final Decree .............................................................................................94

ARTICLE 15.    CONFIRMATION REQUEST............................................................94

ARTICLE 16.    BANKRUPTCY RULE 9019 REQUEST...........................................94

## INTRODUCTION

New Century Financial Corporation, New Century TRS Holdings, Inc., New Century Mortgage Corporation, NC Capital Corporation, Home123 Corporation, New Century Credit Corporation, NC Asset Holding, L.P., NC Residual III Corporation, NC Residual IV Corporation, New Century R.E.O. Corporation, New Century R.E.O. II Corporation, New Century R.E.O. III Corporation, New Century Mortgage Ventures, LLC, NC Deltex, LLC, NCoral, L.P., and New Century Warehouse Corporation, debtors and debtors in possession in the above-captioned chapter 11 cases and the Official Committee of Unsecured Creditors appointed in the above-captioned chapter 11 cases as co-proponents propose this Joint Chapter 11 Plan of Liquidation pursuant to the provisions of the Bankruptcy Code.

## ARTICLE 1.

## DEFINITIONS

### A.      Defined Terms.

Unless otherwise provided in this Plan, all terms used herein shall have the meanings assigned to such terms in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. For the purposes of this Plan, the following terms (which appear in this Plan in capitalized forms) shall have the meanings set forth below, and such meanings shall be equally applicable to the singular and to the plural form of the terms defined, unless the context requires otherwise.

"**510(b) Claims**" means, collectively, Series A 510(b) Claims, Series B 510(b) Claims, and Common Stock 510(b) Claims.

"**Access Lending**" means New Century Warehouse Corporation, a California corporation and a Debtor.

"**Access Lending Bar Date**" means, with respect to Access Lending, (i) December 14, 2007 and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including governmental units, asserting a Claim against Access Lending must have filed a Proof of Claim against Access Lending or be forever barred from asserting such Claim.

"**Access Lending Causes of Action**" means all Causes of Action, including Avoidance Actions, of Access Lending, which Causes of Action are not included within the Liquidating Trust Assets.

"**Access Lending Interest**" means an Interest in Access Lending, all of which are owned by TRS Holdings.

"**Access Lending Net Distributable Assets**" means the amount as calculated pursuant to Article 8.J.6 of this Plan.

"**ACH**" means an automated clearing house transfer from a domestic bank.

"**Adequate Protection Proceeds**" means any funds allocated by a Final Order to be distributed to the estate of NCMC from either of two escrow accounts established pursuant to the Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims dated June 29, 2007 [Docket No. 1729] and held by Hahn & Hessen LLP, as escrow agent.

"**Administrative Claim**" means any Claim for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation:  (a) Professional Fee Claims, (b) any post-petition taxes subject to administrative treatment, and (c) fees and charges assessed against the Debtors or the Estates pursuant to Section 1930 of title 28 of the United States Code.

"**Administrative Claim Request**" means a request for payment of an Administrative Claim (excluding Professional Fee Claims) that is to be filed with the Bankruptcy Court and served on counsel for the Plan Proponents, if on or before the Effective Date, or on the Liquidating Trustee, if after the Effective Date, and in any event by no later than the Administrative Claim Request Deadline.

"**Administrative Claim Request Deadline**" means the date set as the deadline for filing Administrative Claim Requests for Administrative Claims (excluding Professional Fee Claims) that are not subject to the Bar Date Orders, which shall be thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

"**Administrative Fund**" means the reserve established for the Trust Operating Expenses and expenses incurred in connection with the pursuit of the Causes of Action in accordance with Article 9.B.1 herein, which reserve may be augmented by the Liquidating Trustee in consultation with the Plan Advisory Committee.

"**Allowed Claim**" or "**Allowed Interest**" means, respectively, a Claim or Interest: (i) that has been Scheduled and (a) is not Scheduled as disputed, contingent, or unliquidated and (b) as to which no Proof of Claim has been filed; (ii) as to which a timely Proof of Claim has been filed as of the relevant Bar Date and no objection thereto, or application to equitably subordinate or otherwise limit recovery, has been made; (iii) as to which a timely Administrative Claim Request has been filed as of the Administrative Claim Request Deadline and no objection thereto, or application to equitably subordinate or otherwise limit recovery, has been made, or (iv) that has been allowed by a Final Order; provided, however, that prior to the deadline imposed by this Plan to file objections to a given Claim, no Claim shall be treated as Allowed to the extent that it is filed by the holder of such Claim (x) in an amount greater than the amount listed for such Claim by the Debtors in their Schedules or (y) asserting a priority higher than the priority listed for such Claim by the Debtors in their Schedules.

"**Allowed [Class Designation, A/P/S, Administrative, Priority Tax, Priority, Secured, Unsecured, Other Unsecured, 510(b), or Capital Trust] Claim**" means an Allowed Claim of the specified Class or a Allowed Claim that is an A/P/S Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Claim, Other Unsecured Claim, 510(b) Claim, or Capital Trust Claim.

"**Allowed [Debtor Group] Unsecured Claims**" means Unsecured Claims that are allowed against Debtors in the specified Debtor Group.

"**April Debtors Bar Date**" means with respect to all Debtors other than Access Lending (i) August 31, 2007 and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including governmental units, asserting a Claim against any Debtor(s) other

than Access Lending must have filed a Proof of Claim against such Debtor(s) or be forever barred from asserting such Claim.

"**A/P/S Claim**" means any Claim that is an Administrative Claim, Priority Claim, Priority Tax Claim, or Secured Claim.

"**A/P/S Claims Reserve**" means the reserve established, in accordance with Article 9.B.2 of this Plan, to pay (i) all Allowed A/P/S Claims to the extent such Claims are not paid on the Effective Date and (ii) any Disputed A/P/S/ Claim to the extent such Claim becomes an Allowed A/P/S Claim.

"**Assets**" means the assets of each of the Debtors, of any nature whatsoever, including, without limitation, all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, book and records of the Estates.

"**Assumption Objection Deadline**" means the date seven (7) days prior to the Confirmation Hearing.

"**Assumption Schedule**" means the schedule of Executory Contracts (not previously assumed in the Chapter 11 Cases) to be assumed by the Debtors as of the Effective Date pursuant to this Plan, together with the amount of cure payments, if any, to be paid by the Liquidating Trustee in accordance with section 365(b)(1) of the Bankruptcy Code.

"**Avoidance Actions**" means all Claims and Causes of Action arising under sections 522, 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code.

"**Ballot**" means the form or forms distributed to each Holder of an Allowed Claim in an impaired Class entitled to vote on this Plan on which the Holder indicates acceptance or rejection of this Plan or any election for treatment of such Claim under this Plan.

"**Ballot Date**" means the date set by the Bankruptcy Court by which all Ballots must be received.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, as in effect on the date hereof.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware and any other court that exercises jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure applicable to the Chapter 11 Cases and the Local Rules of the Bankruptcy Court, each as in effect from time to time.

"**Bar Dates**" means, collectively, the Access Lending Bar Date and the April Debtors Bar Date.

"**Bar Date Orders**" means (i) the "Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency Thereof" [Docket No. 1721] and (ii) the "Order Establishing Bar Dates for Filing Proofs of Claim in the Chapter 11 Case of New Century Warehouse Corporation and Approving Form, Manner and Sufficiency Thereof" dated October 23, 2007 [Docket No. 3404].

"**Business Day**" means any day except a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

"**Capital Trust Claim**" means a Claim against NCFC arising from NCFC's obligations under the Capital Trust Indentures.

"**Capital Trust Indenture**" means, collectively, (i) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of September 13, 2006 and (ii) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of November 16, 2006.

"**Cash**" means cash or cash equivalents in certified or immediately available funds, including but not limited to bank deposits, checks, and similar items.

"**Causes of Action**" means all claims, causes of action, third-party claims, counterclaims and crossclaims (including but not limited to any Causes of Action described in the Disclosure Statement) of the Debtors and/or their Estates that may be pending on the Effective Date or instituted after the Effective Date against any Person based on law, equity, or otherwise, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or

otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions; provided, however, that any affirmative defense or crossclaim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce or is offset against such Claim.

"**Chapter 11 Cases**" means the 16 above-captioned chapter 11 cases of the Debtors pending in the Bankruptcy Court and jointly administered with one another under Case No. 07-10416 (KJC).

"**Claim**" means "claim," as such term is defined in Section 101(5) of the Bankruptcy Code and, except as otherwise provided in the context, means a Claim against the Debtors or the Estates.

"**Class**" means a group of Claims or Interests as established under Article 2 of this Plan pursuant to Bankruptcy Code section 1122.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

"**Common Stock 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Common Stock Interests, Option Interests, or Warrant Interests, for damages arising from the purchase or sale of such securities, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of the same respective priority as Common Stock Interests, Option Interests, or Warrant Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Common Stock Interests**" means the common stock of NCFC issued and outstanding immediately before the Effective Date.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the docket in the Chapter 11 Cases by the Bankruptcy Court.

"**Confirmation Hearing**" means the hearing pursuant to Bankruptcy Rule 3020(b) at which the Bankruptcy Court considers confirmation of this Plan, as such hearing may be continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Cramdown Plan**" means this Plan if confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code.

"**Creditor**" means "creditor," as such term is defined in section 101(10) of the Bankruptcy Code.

"**De Minimis Distribution**" means a distribution to be made in accordance with the terms of this Plan that is $50.00 or less.

"**Debtor Group**" means, individually or collectively, the Holding Company Debtors, the Operating Debtors, or Access Lending.

"**Debtors**" means, collectively, the following entities in existence on the Petition Date: Access Lending; Home123; NC Asset Holding; NC Capital; NC Credit; NC Deltex; NC Residual III; NC Residual IV; NCFC; NCMC; NCoral; NCM Ventures, LLC; NC R.E.O.; NC R.E.O. II; NC R.E.O. III; and TRS Holdings.

"**Determined Distribution Amount**" means the amount assigned to each Allowed Unsecured Claim, as set forth in Article 4 of this Plan and subject to the Multi-Debtor Protocol and Intercompany Claim Protocol, for purposes of determining distributions to be made to Holders of Allowed Unsecured Claims in accordance with the terms of this Plan.

"**Disallowed Claim**" means a Claim or any portion thereof that (i) has been disallowed by Final Order, (ii) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (iii) is not Scheduled and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under

applicable law or this Plan, (iv) has been withdrawn by agreement of the Debtors and the Holder thereof, or (v) has been withdrawn by the Holder thereof.

"**Disclosure Statement**" means the disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time.

"**Disputed Claim**" means a Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim, including without limitation all Claims that (i) have not been Scheduled by the Debtors or have been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, (ii) are the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules, or (iii) are the subject of an objection filed with the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order of the Bankruptcy Court; provided however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

"**Disputed [Class Designation, A/P/S, Administrative, Priority Tax, Priority, Secured, Unsecured, Other Unsecured, or 510(b)] Claim**" means a Disputed Claim of the specified Class or a Disputed Claim that is an A/P/S Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Claim, Other Unsecured Claim, or 510(b) Claim.

"**Effective Date**" means the Business Day on which this Plan becomes effective pursuant to Article 13.A of this Plan; provided however, that if any stay or injunction against enforcement or execution of the Confirmation Order is issued prior to the date that would otherwise be the Effective Date, the Effective Date shall be the first Business Day after all such stays or injunctions are no longer in effect.

"**EPD/Breach Claim**" means a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an

agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

"**EPD/Breach Claim Protocol**" means the protocol, attached as Exhibit B hereto, by which the amount of damages for EPD/Breach Claims are calculated.

"**Estates**" means the estates created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

"**Executory Contract**" means any executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, between any Debtor and any other Person.

"**Examiner**" means Michael J. Missal, acting in his capacity as the examiner appointed in the Chapter 11 Cases by the Bankruptcy Court pursuant to section 1104(c) of the Bankruptcy Code, or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

"**Exculpated Party**" means any of the Debtors, the Liquidating Trustee, the Estates, the Liquidating Trust, Reorganized Access Lending, the Committee, the Plan Advisory Committee, and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals.

"**Fee Application**" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for compensation of a Professional Fee Claim.

"**Fee Auditor**" means Warren H. Smith & Associates, P.C., acting in its capacity as the fee auditor appointed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court dated October 10, 2007 [Docket No. 3260], or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

"**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of the Chapter 11 Cases, that has not been reversed, rescinded, stayed, modified or amended, that is in full force and effect, and with respect to which: (a) the time to appeal, seek review or rehearing, or petition for certiorari has expired and

no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; (b) any right to appeal, seek review or rehearing, or petition for certiorari has been waived in writing; or (c) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which review, rehearing or certiorari was sought. Notwithstanding, and in lieu of the foregoing, insofar as the Confirmation Order confirming this Plan is concerned, Final Order means only such order or judgment which has been entered on the docket and as to which no stay is in effect.

"**Holder**" means the owner or holder of any Claim or Interest.

"**Holding Company Debtor Claims Reserve**" means the reserve established, in accordance with Article 9.B.3 of this Plan, to pay any Disputed Unsecured Claim against a Holding Company Debtor to the extent such Claim becomes an Allowed Unsecured Claim against a Holding Company Debtor.

"**Holding Company Debtor Net Distributable Assets**" means the amount as calculated pursuant to Article 9.C.2 of this Plan.

"**Holding Company Debtor Portion of Litigation Proceeds**" means 27.5% of the Litigation Proceeds.

"**Holding Company Debtors**" means, collectively, NCFC, NC Credit, NC Residual IV, and TRS Holdings.

"**Home 123**" means Home123 Corporation, a California corporation and a Debtor.

"**Indenture Trustee**" means Wells Fargo Bank, N.A., in its capacity as trustee of the Capital Trust Indentures.

"**Indenture Trustee Expenses**" means the reasonable compensation and expenses of the Indenture Trustee, including the fees and expenses of its counsel, agents and advisers.

"**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

"**Intercompany Claim Protocol**" means the protocol, set forth in Article 7 of this Plan, pursuant to which each Intercompany Claim is assigned a Determined Distribution Amount,

notwithstanding the treatment of the Class in which a particular Intercompany Claim is classified.

"**Interest**" means, with respect to any Debtor, any "equity interest," as such term is defined in Bankruptcy Code § 101(16). Interests shall also include, without limitation, all stock, partnership, membership interest, warrants, options, or other rights to purchase or acquire any shares of stock in the Debtors.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Joint Administrative Expense**" means (i) an Allowed Administrative Claim (including, without limitation, Professional Fee Claims) or portion thereof or (ii) an expense of administering the Debtors' Estates, or portion thereof, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course in either case for which, as determined by the Liquidating Trustee and approved by the Plan Advisory Committee, (a) liability cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable.

"**Joint Administrative Expense Share**" means the share (expressed in terms of percentage) of a Joint Administrative Expense allocated to each of Access Lending, the Holding Company Debtors, and the Operating Debtors as set forth in Exhibit C to this Plan, which share varies depending on the Debtor Groups to which the Liquidating Trustee, in its discretion, has allocated liability for such Joint Administrative Expense.

"**Lien**" means any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt, or litigation.

"**Liquidating Trust**" means the liquidating trust into which all of the Assets of the Debtors, other than the Assets of Access Lending, will be transferred upon the Effective Date.

"**Liquidating Trust Agreement**" means the formative trust agreement for the Liquidating Trust, to be filed by the Plan Proponents with the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject this Plan.

"**Liquidating Trust Assets**" means the Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, contributed to the Liquidating Trust.

"**Liquidating Trustee**" means the Person appointed to act as trustee of the Liquidating Trust in accordance with the terms of this Plan, the Confirmation Order, and the Liquidating Trust Agreement, or any successor appointed in accordance with the terms of this Plan and the Liquidating Trust Agreement

"**Litigation Proceeds**" means the net proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance, as calculated pursuant to Article 9.C.1 of this Plan.

"**Multi-Debtor Claim Protocol**" means the protocol, set forth in Article 6 of this Plan, pursuant to which a Creditor's Determined Distribution Amount is assigned where such Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly liable.

"**NC Asset Holding**" means NC Asset Holding, L.P., a Delaware limited partnership and a Debtor.

"**NC Capital**" means New Century Capital Services, Inc., a California corporation and a Debtor.

"**NC Capital EDP/Breach Claimant Portion of Litigation Proceeds**" means 45% of the Litigation Proceeds.

"**NC Credit**" means New Century Credit Corporation, a California corporation and a Debtor.

"**NC Deltex**" means NC Deltex, LLC, a Delaware limited liability company and a Debtor.

"**NC REO**" means New Century R.E.O. Corp., a California corporation and a Debtor.

"**NC REO II**" means New Century R.E.O. II Corp., a California corporation and a Debtor.

"**NC REO III**" means New Century R.E.O. III Corp., a California corporation and a Debtor.

"**NC Residual III**" means NC Residual III Corporation, a Delaware corporation and a Debtor.

"**NC Residual IV**" means NC Residual IV Corporation, a Delaware corporation and a Debtor.

"**NCFC**" means New Century Financial Corporation, a Maryland corporation and a Debtor.

"**NCFC Interest**" means an Interest in NCFC, including Stock Interests, Option Interests, and Warrant Interests.

"**NCFC Interest Holder**" means a Holder of an NCFC Interest.

"**NCM Ventures**" means New Century Mortgage Ventures, LLC, a Delaware limited liability company and a Debtor.

"**NCMC**" means New Century Mortgage Corporation, a California corporation and a Debtor.

"**NCoral**" means NCoral, L.P., a Delaware limited partnership and a Debtor.

"**Operating Debtor Claims Reserve**" means the reserve established, in accordance with Article 9.B.4 of this Plan, to pay any Disputed Unsecured Claim against an Operating Debtor to the extent such Claim becomes an Allowed Unsecured Claim against an Operating Debtor.

"**Operating Debtor Net Distributable Assets**" means the amount as calculated pursuant to Article 9.C.3 of this Plan.

"**Operating Debtor Portion of the Litigation Proceeds**" means 27.5% of the Litigation Proceeds.

"**Operating Debtor Unsecured Claims**" means all Unsecured Claims against Operating Debtors.

"**Operating Debtors**" means, collectively, Home 123, NC Asset Holding, NC Capital, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, NCMC, and NCoral.

"**Option Interest**" means unexercised options to purchase Common Stock Interests.

"**Other Unsecured Claim**" means any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.

"**Person**" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

"**Petition Date**" means, (i) with respect to all Debtors other than Access Lending, April 2, 2007, the date on which all of the Debtors other than Access Lending commenced the Chapter 11 Cases, and (ii) with respect to Access Lending, August 3, 2007, the date on which Access Lending commenced its Chapter 11 Case.

"**Plan**" means this Joint Chapter 11 Plan of Liquidation (either in its present form or as it may be amended or modified from time to time), any exhibits hereto, and any documents incorporated herein by reference.

"**Plan Administrator**" means the Liquidating Trustee, acting in its capacity as the chief executive officer and sole director of Reorganized Access Lending and as the Person responsible for liquidating and winding down the Estate of Access Lending as set forth in Article 8.J of this Plan.

"**Plan Advisory Committee**" means the post-confirmation committee formed on the Effective Date and selected by the Committee and identified by the Plan Proponents in a pleading filed with the Bankruptcy Court no less than ten (10) days prior to the Confirmation Hearing.

"**Plan Proponents**" means, collectively, the Debtors and the Committee.

"**Priority Claim**" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"**Priority Tax Claim**" means a Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means the Examiner, the Fee Auditor, or any Person employed by the Debtors, the Committee, and/or the Examiner pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, and/or 331 of the Bankruptcy Code. This definition excludes professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Effective Date with respect to services rendered by such professionals on and after the Effective Date.

"**Professional Fee Claim**" means all fees and expenses claimed by Professionals retained by the Debtors, the Committee, and/or the Examiner that have not been approved on a final basis by a Final Order as of the Effective Date. This definition excludes professional fees and expenses incurred by any professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Effective Date.

"**Proof of Claim**" means a proof of claim filed in the Chapter 11 Cases pursuant to section 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

"**Pro Rata**" means proportionate, so that, for example, the ratio of the consideration distributed on account of the Determined Distribution Amount of an Allowed Claim to the amount of the Determined Distribution Amount of the Allowed Claim is the same as the ratio of the consideration distributed on account of all Determined Distribution Amounts of Allowed Claims in such Class of Claims to the amount of all Determined Distribution Amounts of Allowed Claims in that Class.

"**Protected Party**" means any of the Debtors, the Liquidating Trustee, the Estates, the Liquidating Trust, Reorganized Access Lending, and the Plan Advisory Committee.

"**Reorganized Access Lending**" means Access Lending on and after the Effective Date.

"**Scheduled**" means, with respect to any Claim, such Claim is listed on the Schedules.

"**Schedules**" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtors with the Bankruptcy Court, pursuant to section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(b), and the Official Bankruptcy Forms, as may be amended from time to time.

"**Secured Claim**" means a Claim that is secured by a valid and unavoidable lien on property in which the Estates have an interest, or that is subject to recoupment or setoff under section 553 of the Bankruptcy Code to the extent of the value of the Holder's interest in the Estates' interest in such property, or to the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II), as applicable.

"**Senior Class HC3b Claim**" means a Class HC3b Claim that arises from an obligation of NCFC that comes within the definition of "Senior Debt" in either of the Capital Trust Indentures.

"**Series A 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Series A Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series A Preferred Stock Interests and of senior priority to Series B Preferred Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Series A Preferred Stock Interests**" means the 9.125% Series A Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

"**Series B 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Series B Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority

to Series B Preferred Stock Interests and of senior priority to Common Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Series B Preferred Stock Interests**" means the 9.75% Series B Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

"**Special Deficiency Claim**" means any Claim arising under a master repurchase agreement governing the sale and repurchase of mortgage loans by the Debtors to and from DB Structured Products, Inc., provided for in that certain Settlement Agreement with DB Structured Products, Inc. dated as of August 8, 2007 and approved in the "Order Approving Settlement Agreement with DB Structured Products, Inc. Pursuant to Bankruptcy Rule 9019 and Sections 105(a), 361, 363,502 and 542 of the Bankruptcy Code" entered on August 21, 2007 [Docket No. 2369], and any other settlement agreement entered into by any of the Debtors and approved by Final Order that provides that it gives rise to a Claim that is to be treated as a Special Deficiency Claim under this Plan.

"**Stock Interests**" means Common Stock Interests, Series A Preferred Stock Interests, and Series B Preferred Stock Interests.

"**Subordination Statement**" means the pleading that a Holder of a Class HC3b Claim must file with the Bankruptcy Court no later than thirty (30) days after the Effective Date in order to assert that such Holder holds a Senior Class HC3b Claim, which pleading must describe with specificity the legal and factual basis for establishing that such Holder holds a Senior Class HC3b Claim and, therefore, is entitled to the benefits of subordination as set forth in the Capital Trust Indentures.

"**TRS Holdings**" means New Century TRS Holdings, Inc, a Delaware corporation and a Debtor"

"**Trust Operating Expenses**" means the expenses incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust pursuant to the terms of this

Plan or the Liquidating Trust Agreement, in each case with the exception of any expenses incurred in connection with the Causes of Action.

"**Unsecured Claim**" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Priority Tax Claim, a Secured Claim or a 510(b) Claim, provided that Unsecured Claims shall include, without limitation, any Claim secured by an interest in property of the Estate to the extent the amount of such Claim exceeds the value, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in property of the Estate securing such Claim.

"**U.S. Trustee**" means the Office of the United States Trustee.

"**Warrant Interests**" means unexercised warrants to purchase Common Stock Interests.

**B.      Other Terms.**  The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Plan as a whole and not to any particular article, section or clause contained in this Plan.  A reference to an "Article" refers to an Article of this Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in construing this Plan.

**C.      Time Periods.**  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any act under this Plan is required to be made or performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**D.      Exhibits.**  All Exhibits to this Plan are incorporated by reference into and are made a part of this Plan as if set forth in full herein.

# ARTICLE 2.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.      **Summary.**  The categories of Claims and Interests listed below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| [unclassified] | Administrative and Priority Tax Claims against all Debtors. | Unimpaired - not entitled to vote |
| **Claims Against Holding Company Debtors** | | |
| Class HC1 | Class HC1 consists of Priority Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC2 | Class HC2 consists of Secured Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC3a | Class HC3a consists of Special Deficiency Claims against NCFC. | Impaired - entitled to vote |
| Class HC3b | Class HC3b consists of Other Unsecured Claims against NCFC. | Impaired - entitled to vote |
| Class HC4a | Class HC4a consists of Series A Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4b | Class HC4b consists of Series A 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4c | Class HC4c consists of Series B Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4d | Class HC4d consists of Series B 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4e | Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC5 | Class HC5 consists of Priority Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC6 | Class HC6 consists of Secured Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC7 | Class HC7 consists of Other Unsecured Claims against TRS Holdings. | Impaired - entitled to vote |
| Class HC8 | Class HC8 consists of Priority Claims against | Unimpaired - not entitled |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| | NC Credit. | to vote |
| Class HC9 | Class HC9 consists of Secured Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC10a | Class HC10a consists of Special Deficiency Claims against NC Credit. | Impaired - entitled to vote |
| Class HC10b | Class HC10b consists of Other Unsecured Claims against NC Credit. | Impaired - entitled to vote |
| Class HC11 | Class HC11 consists of Priority Claims against NC Residual IV. | Unimpaired - not entitled to vote |
| Class HC12 | Class HC12 consists of Secured Claims against NC Residual IV. | Unimpaired - not entitled to vote |
| Class HC13 | Class HC13 consists of Other Unsecured Claims against NC Residual IV. | Impaired - entitled to vote |
| **Claims Against Operating Debtors** | | |
| Class OP1 | Class OP1 consists of Priority Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP2 | Class OP2 consists of Secured Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP3a | Class OP3a consists of Special Deficiency Claims against NCMC. | Impaired - entitled to vote |
| Class OP3b | Class OP3b consists of EPD/Breach Claims against NCMC. | Impaired - entitled to vote |
| Class OP3c | Class OP3c consists of Other Unsecured Claims against NCMC. | Impaired - entitled to vote |
| Class OP4 | Class OP4 consists of Priority Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP5 | Class OP5 consists of Secured Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP6a | Class OP6a consists of Special Deficiency Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6b | Class OP6b consists of EPD/Breach Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6c | Class OP6c consists of Other Unsecured Claims against NC Capital. | Impaired - entitled to vote |
| Class OP7 | Class OP7 consists of Priority Claims against Home123. | Unimpaired - not entitled to vote |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class OP8 | Class OP8 consists of Secured Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP9a | Class OP9a consists of Special Deficiency Claims against Home123. | Impaired - entitled to vote |
| Class OP9b | Class OP9b consists of Other Unsecured Claims against Home123 | Impaired - entitled to vote |
| Class OP10 | Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP11 | Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP12 | Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Impaired - entitled to vote |
| **Claims Against Access Lending** | | |
| Class AL1 | Class AL1 consists of Priority Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL2 | Class AL2 consists of Secured Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL3 | Class AL3 consists of Other Unsecured Claims against Access Lending. | Impaired - entitled to vote |

B.      **Classification.**  The Claims against the Debtors shall be classified as specified below (other than Administrative Claims and Priority Tax Claims, which shall be treated in accordance with Article 3 below).  Consistent with section 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class.  This Plan does not effect a substantive consolidation of the Debtors.  The classification of Claims pursuant to this Plan is as follows:

1.  *Class HC1.*  Class HC1 consists of Priority Claims against NCFC.

2.  *Class HC2.*  Class HC2 consists of Secured Claims against NCFC.

3.  *Classes HC3a-b.*  Class HC3 consists of Unsecured Claims against NCFC, and shall be further classified in separate Classes as follows:

    (a)    Class HC3a consists of Special Deficiency Claims against NCFC.

    (b)    Class HC3b consists of Other Unsecured Claims against NCFC.

4.  Class HC4.  *Class HC4 consists of NCFC Interests and 510(b) Claims against NCFC, and shall be further classified in separate Classes as follows:*

    (a)    Class HC4a consists of Series A Preferred Stock Interests.

    (b)    Class HC4b consists of Series A 510(b) Claims.

    (c)    Class HC4c consists of Series B Preferred Stock Interests.

    (d)    Class HC4d consists of Series B 510(b) Claims.

    (e)    Class HC4e consists of Common Stock Interests. Option Interests, Warrant Interests, and Common Stock 510(b) Claims.

5.  *Class HC5.*  Class HC5 consists of Priority Claims against TRS Holdings.

6.  *Class HC6.*  Class HC6 consists of Secured Claims against TRS Holdings.

7.  *Class HC7.*  Class HC7 consists of Other Unsecured Claims against TRS Holdings.

8.  *Class HC8.*  Class HC8 consists of Priority Claims against NC Credit.

9.  *Class HC9.*  Class HC9 consists of Secured Claims against NC Credit.

10.  *Classes HC10a-b.*  Class HC10 consists of Unsecured Claims against NC Credit, and shall be further classified in separate Classes as follows:

    (a)    Class HC10a consists of Special Deficiency Claims against NC Credit.

    (b)    Class HC10b consists of Other Unsecured Claims against NC Credit.

11.     *Class HC11.*  Class HC11 consists of Priority Claims against NC Residual IV.

12.     *Class HC12.*  Class HC12 consists of Secured Claims against NC Residual IV.

13.     *Class HC13.*  Class HC13 consists of Other Unsecured Claims against NC Residual IV.

14.     *Class OP1.*  Class OP1 consists of Priority Claims against NCMC.

15.     *Class OP2.*  Class OP2 consists of Secured Claims against NCMC.

16.     *Classes OP3a-c.*  Class OP3 consists of Unsecured Claims against NCMC, and shall be further classified in separate Classes as follows:

(a)     Class OP3a consists of Special Deficiency Claims against NCMC.

(b)     Class OP3b consists of EPD/Breach Claims against NCMC.

(c)     Class OP3c consists of Other Unsecured Claims against NCMC.

17.     *Class OP4.*  Class OP4 consists of Priority Claims against NC Capital.

18.     *Class OP5.*  Class OP5 consists of Secured Claims against NC Capital.

19.     *Classes OP6a-c.*   Class OP6 consists of Unsecured Claims against NC Capital, and shall be further classified in separate Classes as follows:

(a)     Class OP6a consists of Special Deficiency Claims against NC Capital.

(b)     Class OP6b consists of EPD/Breach Claims against NC Capital.

(c)     Class OP6c consists of Other Unsecured Claims against NC Capital.

20.     *Class OP7.*  Class OP7 consists of Priority Claims against Home123.

21.     *Class OP8.*  Class OP8 consists of Secured Claims against Home123.

22.     *Classes OP9a-b.*   Class OP9 consists of Unsecured Claims against Home123, and shall be further classified in separate Classes as follows:

(a)     Class OP9a consists of Special Deficiency Claims against Home123.

(b)     Class OP9b consists of Other Unsecured Claims against Home123.

23.     *Class OP10.*  Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

24.     *Class OP11.*  Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

25.     *Class OP12.*  Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.

26.     *Class AL1.*   Class AL1 consists of Priority Claims against Access Lending.

27.     *Class AL2.*   Class AL2 consists of Secured Claims against Access Lending.

28.     *Class AL3.*  Class AL3 consists of Other General Claims against Access Lending.

## ARTICLE 3.

## TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under this Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article 3.

**A.     Administrative Claims.**

1.     **Non-Professional Fee Administrative Claims**.  Each Holder of an Administrative Claim (other than Professional Fee Claims) must file an Administrative

Claim Request requesting payment of such Administrative Claim with the Bankruptcy Court by no later than thirty (30) days after the Effective Date; provided, however, that any such Administrative Claim Request need not be filed with a hearing date. Nothing herein extends a Bar Date established in the Bar Date Orders. The Liquidating Trustee shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the Effective Date or within thirty (30) days after such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, (i) a Holder of an Allowed Administrative Claim (excluding Holders of Professional Fee Claims) may be paid on such other date or dates and upon such other terms as may be agreed upon by such Holder and the Liquidating Trustee and (ii) the Debtors (if prior to or on the Effective Date) and the Liquidating Trustee (if after the Effective Date) may pay in the ordinary course of business any expenses of administering the Debtors' estates incurred in the ordinary course of business. Without limiting the foregoing, all outstanding fees payable to the U.S. Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date shall be paid by the Liquidating Trustee no later than thirty (30) days after the Effective Date or when due in the ordinary course.

   2. **Professional Fee Claims**. The Liquidating Trustee shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estates pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by such Professionals.

Any final application for allowance of a Professional Fee Claim for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors and the Liquidating Trust at the addresses listed in Article 14 of this Plan and on the Fee Auditor and the U.S. Trustee so that it is received no later than forty-five (45) days after the Effective Date, or such Professional Fee Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Liquidating Trust, and their successors, their assigns, or their Assets. Allowed Professional Fee Claims must be paid in full or reserved for in Cash to pay Professional Fee Claims pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Unsecured Claims.

**B. Priority Tax Claims.** The Liquidating Trustee shall pay, at the Liquidating Trustee's discretion, each Holder of an Allowed Priority Tax Claim either (i) in full in Cash as soon as practicable after the Effective Date or within thirty (30) days after such Priority Tax Claim becomes an Allowed Claim or (ii) over a period ending not later than five (5) years after the Petition Date, with deferred Cash payments in equal amounts on a quarterly basis in an aggregate amount equal to any such Allowed Priority Tax Claim, together with interest thereon (if and so required) at the legal rate required for such Claim in chapter 11 cases. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. The Liquidating Trustee may prepay any Allowed Priority Tax Claim at any time after the Effective Date without any penalty or charge. Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with such Claims. Any Claim for any such penalty, or demand for any such penalty, will be deemed disallowed by confirmation of this Plan.

# ARTICLE 4.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

As required by the Bankruptcy Code, this Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and this Plan sets forth the treatment each Class will receive.

**A.      Priority Claims Against All Debtors (Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1).**  Each of Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1, which are unimpaired, consists of all Allowed Priority Claims against a particular Debtor.  Unless the Holder of an Allowed Priority Claim and the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trust (if after the Effective Date) agree to a different treatment, the Liquidating Trustee shall pay each such Holder of an Allowed Priority Claim, in full, in Cash, without interest, as soon as practicable after the Effective Date.

**B.      Secured Claims Against All Debtors (Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2).**  Each of Classes HC2, HC6, HC9, HC10, OP2, OP5, OP8, OP11, and AL2, which are unimpaired, consists of all Allowed Secured Claims against a particular Debtor.  At the sole option of the Liquidating Trustee, (i) Allowed Secured Claims will be unaltered and, subject to the requirements of Section 1124(2) of the Bankruptcy Code, on the Effective Date, the legal, equitable, and contractual rights of the Holders of Allowed Secured Claims shall be reinstated in full, or (ii) each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim (a) Cash in the amount of the Allowed Secured Claim on the later of the initial distribution date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property of the estate which constitutes collateral for such Allowed Secured Claim on the later of the initial distribution date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (c) such other treatment as may be

agreed by the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trust (if after the Effective Date) and such Holder.

C.      **Class HC3:  Unsecured Claims Against NCFC.**

1.      **Class HC3a:  Special Deficiency Claims against NCFC.**  Class HC3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCFC. Each Holder of an Allowed Class HC3a Claim shall receive its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on its the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC3a Claim shall be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

2.      **Class HC3b:  Other Unsecured Claims against NCFC.**  Class HC3b, which is impaired, consists of all Allowed Other Unsecured Claims against NCFC. Subject to Article 4.C.3 and Article 9.G of this Plan, each Holder of an Allowed Class HC3b Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC3b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol, (ii) the Intercompany Claim Protocol, and (iii) with respect to Holders of Capital Trust Claims, to Article 4.C.3 of this Plan.

3.      **Senior Claim Procedure.**

(a)      In order for any Holder of a Class HC3b Claim to assert that it holds a Senior Class HC3b Claim and, therefore, is entitled to the benefits of

subordination as set forth in the Capital Trust Indentures, such Holder must file with the Bankruptcy Court and serve on the Debtors, the Holders of the Capital Trust Claims, the Liquidating Trustee, and the Indenture Trustee a Subordination Statement no later than thirty (30) days after the Effective Date.

(b)      If any Holder of a Class HC3b Claim files a Subordination Statement, any distributions that would otherwise be made on account of Allowed Capital Trust Claims shall be turned over to a reserve to be held by the Liquidating Trustee in a separate interest bearing account and to be distributed in accordance with this Article 4.C.3.  No distributions shall be made from this reserve until, with respect to each Subordination Statement, (i) the Bankruptcy Court has made a determination as to whether and to what extent the Holder of a Class HC3b Claim that filed the Subordination Statement holds a Senior Class HC3b Claim or (ii) the Holders of Allowed Capital Trust Claims and the Holder of a Class HC3b Claim that filed the Subordination Statement reach and obtain approval of a settlement as set forth in Article 4.C.3.d hereof.  If no Holder of a Class HC3b Claim timely files and serves a Subordination Statement or, with respect to each timely filed Subordination Statement either (i) the Bankruptcy Court determines that the Holder of a Class HC3b Claim that filed Subordination Statement does not hold a Senior Class HC3b Claim or (ii) such Holder withdraws its Subordination Statement pursuant to settlement (or otherwise), distributions shall be made to Holders of Allowed Capital Trust Claims along with other Holders of Allowed Class HC3b Claims in accordance with this Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses.

(c)      If the Bankruptcy Court finds that any Holder of a Class HC3b Claim holds a Senior Class HC3b Claim, and such finding becomes a final non-appealable order, then (i) Holders of Allowed Capital Trust Claims shall receive

no distribution from the reserve on account of their Allowed Capital Trust Claims unless and until all Holders of Senior Class HC3b Claims are paid in full on account of their Senior Class HC3b Claims and (ii) Holders of Senior Class HC3b Claims shall receive Pro Rata distributions from the amounts held in reserve until they are paid in full. If a Debtor(s) other than NCFC is jointly liable with NCFC for the amount of a Senior Class HC3b Claim and the Holder of a Senior Class HC3b Claim holds an Allowed Unsecured Claim(s) against such Debtor(s) in respect of such liability, any distribution that the Holder receives on account of such Claims shall be included in determining whether the Holder's Senior Class HC3b Claim has been paid in full. If a Senior Class HC3b Claim has been paid in full, any distributions from the reserve that would have been paid on account of such Claim shall be paid Pro Rata to Holders of Senior Class HC3b Claims, if any, that remain unpaid. If all Holders of Senior Class HC3b Claims (if any) have been paid in full on account of their Senior Class HC3b Claims, (i) any additional amounts distributed to Holders of Allowed Class HC3b Claims shall be distributed to Holders of Allowed Capital Trust Claims on account of their Capital Trust Claims in accordance with this Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses, and (ii) Holders of Allowed Capital Trust Claims shall be subrogated to the distributions that the Holders of Senior Class HC3b Claims would have received on account of their Allowed Unsecured Claims against the Debtors if such Holder's Senior Class HC3b Claims had not been paid in full.

(d)     Alternatively, if the Holders of Allowed Capital Trust Claims and the Holder(s) of Class HC3b Claims (if any) that file Subordination Statements reach a settlement of the disputes raised in the Subordination Statements, the Holders of Allowed Capital Trust Claims (or the Indenture Trustee) shall file with

the Bankruptcy Court and serve on the Debtors and the Liquidating Trustee a notice of settlement that is executed by the Holders of Allowed Capital Trust Claims and the settling Holder(s) of Class HC3b Claims that filed Subordination Statements. Such settlement notice shall list the proposed Class HC3b Claim amounts (if any) for each of the signatories. If no written objection to the notice is filed within 10 calendar days after the notice is served, the Bankruptcy Court shall approve and allow the Class HC3b Claims in the amounts proposed in the notice, provided that such settlement shall not operate to increase the amount of the Class HC3b Claims unless it correspondingly reduces the amount of the Allowed Capital Trust Claims.

**D.     Class 4:  NCFC Interests.**

1.     **Class HC4a:  Series A Preferred Stock Interests**. Class HC4a, which is impaired, consists of all Series A Preferred Stock Interests. Holders of Interests in Class HC4a shall receive no distribution or dividend on account of such Interests. Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Series A Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series A Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

2.     **Class HC4b:  Series A 510(b) Claims.** Class HC4b, which is impaired, consists of all Series A 510(b) Claims. Holders of Claims in Class HC4b shall receive no distribution on account of such Claims under this Plan.

3.     **Class HC4c:  Series B Preferred Stock Interests.** Class HC4c, which is impaired, consists of all Series B Preferred Stock Interests. Holders of Interests in Class HC4c shall receive no distribution or dividend on account of such Interests. Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Series B Preferred Stock

Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series B Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

4. **Class HC4d: Series B 510(b) Claims.** Class HC4d, which is impaired, consists of all Series B 510(b) Claims. Holders of Claims in Class HC4d shall receive no distribution on account of such Claims under this Plan.

5. **Class HC4e: Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims.** Class HC4e, which is impaired, consists of all Common Stock Interests, all Option Interests, all Warrant Interests, and all Common Stock 510(b) Claims. Holders of Interests or Claims in Class HC4e shall receive no distribution or dividend on account of such Interests or Claims. Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Common Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Common Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

**E. Class HC7: Other Unsecured Claims against TRS Holdings.** Class HC7, which is impaired, consists of all Allowed Other Unsecured Claims against TRS Holdings. Each Holder of an Allowed Class HC7 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims. The Determined Distribution Amount for each Allowed Class HC7 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**F.      Class HC10:  Unsecured Claims Against NC Credit.**

1.      **Class HC10a:  Special Deficiency Claims against NC Credit.**  Class HC10a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Credit.  Each Holder of an Allowed Class HC10a Claim shall receive its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC10a Claim shall be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

2.      **Class HC10b:  Other Unsecured Claims against NC Credit.**  Class HC10b, which is impaired, consists of all Allowed Other Unsecured Claims against NC Credit.  Each Holder of an Allowed Class HC10b Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC10b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**G.      Class HC13:  Other Unsecured Claims against NC Residual IV.**  Class HC13, which is impaired, consists of all Allowed Other Unsecured Claims against NC Residual IV.  Each Holder of an Allowed Class HC13 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding

Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims. The Determined Distribution Amount for each Allowed Class HC13 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**H.**     **Class OP3:  Unsecured Claims Against NCMC.**

1.     **Class OP3a:  Special Deficiency Claims against NCMC.**  Class OP3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCMC. Each Holder of an Allowed Class OP3a Claim shall receive its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims. The Determined Distribution Amount for each Allowed Class OP3a Claim shall be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

2.     **Class OP3b:  EPD/Breach Claims against NCMC.**  Class OP3b, which is impaired, consists of all Allowed EPD Breach Claims against NCMC.  Each Holder of an Allowed Class OP3b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount of each Allowed Class OP3b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol.

3. **Class OP3c: Other Unsecured Claims against NCMC.** Class OP3c, which is impaired, consists of all Allowed Other Unsecured Claims against NCMC. Each Holder of an Allowed Class OP3c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP3c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

I. **Class OP6: Unsecured Claims Against NC Capital.**

1. **Class OP6a: Special Deficiency Claims against NC Capital.** Class OP6a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Capital. Each Holder of an Allowed Class OP6a Claim shall receive its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims. The Determined Distribution Amount for each Allowed Class OP6a Claim shall be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

2. **Class OP6b: EPD/Breach Claims against NC Capital.** Class OP6b, which is impaired, consists of all Allowed EPD Breach Claims against NC Capital. Each Holder of an Allowed Class OP6b Claim shall receive (i) its Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined

Distribution Amounts of all Allowed Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount of each Allowed Class OP6b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds and shall be 50% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a distribution of its Pro Rata share of the Operating Debtor Net Distributable Assets.

3.      **Class OP6c: Other Unsecured Claims against NC Capital.**  Class OP6c, which is impaired, consists of all Allowed Other Unsecured Claims against NC Capital. Each Holder of an Allowed Class OP6c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP6c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**J.      Class OP9:  Unsecured Claims Against Home123.**

1.      **Class OP9a:  Special Deficiency Claims against Home123.**  Class OP9a, which is impaired, consists of all Allowed Special Deficiency Claims against Home123. Each Holder of an Allowed Class OP9a Claim shall receive its Pro Rata share of the

Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims. The Determined Distribution Amount for each Allowed Class OP9a Claim shall be 100% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol.

  2. **Class OP9b: Other Unsecured Claims against Home123.** Class OP9b, which is impaired, consists of all Allowed Other Unsecured Claims against Home123. Each Holder of an Allowed Class OP9b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP9b Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**K.** **Class OP12: Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.** Class OP12, which is impaired, consists of all Allowed Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. Each Holder of an Allowed Class OP12 Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution

Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP12 Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

L. **Class AL3:  Other Unsecured Claims Against Access Lending.**  Class AL3, which is impaired, consists of all Allowed Other Unsecured Claims against Access Lending. Each Holder of an Allowed Class AL3 Claim shall receive its Pro Rata share of the Access Lending Net Distributable Assets, based on Allowed Class AL3 Claims.  The Multi-Debtor Protocol and the Intercompany Claim Protocol do not apply to Class AL3 Claims.

## ARTICLE 5.

## ACCEPTANCE OR REJECTION OF THIS PLAN

A. **Impaired Classes of Claims Entitled to Vote.**  Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan, the Classes set forth in the following table are impaired and shall be entitled to vote to accept or reject this Plan:

| Class | Description |
|---|---|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |
| Class OP3c | Other Unsecured Claims against NCMC |
| Class OP6a | Special Deficiency Claims against NC Capital |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |

| Class | Description |
|---|---|
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

Each of Classes HC3a, HC3b, HC10a, HC10b, OP3a, OP3b, OP3c, OP6a, OP6b, OP6c, OP9a, and OP9b, shall be considered a separate Class for purposes of voting to accept or reject this Plan. If and to the extent any Class identified as being unimpaired is impaired (whether as a result of the terms of this Plan or any modification or amendment thereto), such Class shall be entitled to vote to accept or reject this Plan.

**B.** **Classes Deemed to Accept this Plan.** The Classes set forth in the following table are unimpaired and shall be deemed to accept this Plan:

| Class | Description |
|---|---|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |
| Class HC11 | Priority Claims against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, |

| Class | Description |
|---|---|
| | NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL1 | Priority Claims against Access Lending |
| Class AL2 | Secured Claims against Access Lending |

Pursuant to sections 1126(f) of the Bankruptcy Code, Classes HC1, HC2, HC5, HC6, HC8, HC9, HC11, HC12, OP1, OP2, OP4, OP5, OP7, OP8, OP10, OP11, AL1, and AL2 are conclusively presumed to have accepted this Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited.

   C.   **Classes Deemed to Reject this Plan.**  Holders of Claims in the Classes set forth in the following table are not entitled to receive or retain any property under this Plan on account of such Claims and Interests:

| Class | Description |
|---|---|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

Pursuant to section 1126(g) of the Bankruptcy Code, Classes HC4a, HC4b, HC4c, HC4d, and HC4e are impaired and are conclusively presumed to have rejected this Plan, and the votes of Holders of Claims and Interests in such Classes therefore will not be solicited.

   D.   **Nonconsensual Confirmation.**  As set forth in Article 15 hereof, if any impaired Class fails to accept this Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm this Plan as a Cramdown Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class.

**E.    Removal of Debtors.**  If this Plan cannot be confirmed with respect to one or more Debtors, the Plan Proponents may remove such Debtor(s) from this Plan.  In such event, the Classes pertaining to such Debtor(s) will be removed from this Plan, and the Plan will omit any treatment of the assets and liabilities of such Debtor(s).  The removal of any Debtor from this Plan will not affect this Plan with respect to any other Debtor.

<div align="center">

**ARTICLE 6.**

**THE MULTI-DEBTOR CLAIM PROTOCOL FOR**

**TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS**

</div>

**A.    Allowed Unsecured Claims for Which More than One Holding Company Debtor Is Jointly Liable.**  Where a Creditor holds Allowed Holding Company Debtor Unsecured Claims for which more than one Holding Company Debtor is jointly liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one of its Allowed Holding Company Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Holding Company Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Holding Company Debtor Unsecured Claims, other than Allowed Class HC3a Claims and Allowed Class HC10a Claims, for which both NCFC and NC Credit are jointly liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCFC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims.

**B.    Allowed Unsecured Claims for Which More than One Operating Debtor Is Jointly Liable.**  Where a Creditor holds Allowed Operating Debtor Unsecured Claims for which more than one Operating Debtor is jointly liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one its Allowed Operating Debtor Unsecured

Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Operating Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Operating Debtor Unsecured Claims, other than Allowed Class OP3a Claims, Allowed OP6a Claims, and Allowed Class OP9a Claims, for which each of NCMC, NC Capital, and Home123 are jointly liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCMC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims.

C. **Separate Application to Debtor Groups.** The adjustment of Determined Distribution Amounts of a particular Creditor's Allowed Unsecured Claims against Debtors in one Debtor Group pursuant to Articles 6.A and 6.B of this Plan does not affect the Determined Distribution Amounts of such Creditor's Allowed Unsecured Claims, if any, against Debtors in another Debtor Group.

D. **Inapplicable to Claims Against Access Lending.** The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending.

E. **Inapplicable to Intercompany Claims.** The Multi-Debtor Claim Protocol does not apply to Intercompany Claims.

<div align="center">

**ARTICLE 7.**

**THE INTERCOMPANY PROTOCOL FOR**

**TREATMENT OF INTERCOMPANY CLAIMS**

</div>

A. **Claims of Holding Company Debtors Against Other Holding Company Debtors.** The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against another Holding Company Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Plan on account of such Claim.

**B.      Claims of Operating Debtors Against Other Operating Debtors.**   The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against another Operating Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Plan on account of such Claim.

**C.      Claims of Holding Company Debtors Against Operating Debtors.**   The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against an Operating Debtor shall be 50% of the allowed amount of such Claim; provided, however, that any recovery on an Allowed Claim held by a Holding Company Debtor against an Operating Debtor shall be limited to the amount that would be distributed on account of such Claim if the Determined Distribution Amounts for Allowed Claims in Classes OP6b, OP9b, and OP12 were 100% of the allowed amount of Claims in those Classes.

**D.      Claims of Operating Debtors Against Holding Company Debtors.**   The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against a Holding Company Debtor shall be 100% of the allowed amount of such Claim.

## ARTICLE 8.

## MEANS OF IMPLEMENTING THIS PLAN

**A.      Implementation of Joint Plan.**   The Plan Proponents propose that the Plan be implemented and consummated through the means contemplated by sections 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2), (b)(3) and (b)(4) of the Bankruptcy Code on and after the Effective Date.

**B.      Corporate Action.**   On the Effective Date, the matters under this Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to this Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or

their subsidiaries. The officers and directors of the Debtors shall cease to serve immediately after the Effective Date.

C.　**Dissolution of Debtors.**　Immediately after the Effective Date, (i) the Liquidating Trustee shall be authorized to take, in his sole and absolute discretion, all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including without limitation under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, that the Liquidating Trustee shall not be compelled to dissolve any of the Debtors or their subsidiaries if to do so would unduly burden the Liquidating Trust; and (ii) no assets shall revest in the Debtors (other than Access Lending). The Liquidating Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, immediately after the Effective Date, the Debtors shall have no authorization to implement the provisions of this Plan, unless specifically provided for in the Plan.

D.　**Dissolution of the Committee.**　On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms and such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Fee Claims; (ii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order.

**E.      Vesting of Assets in Liquidating Trust; Assumption of Plan Obligations.**

1.      *Distribution to Liquidating Trust.*   On the Effective Date, the Debtors other than Access Lending shall distribute and shall be deemed for all purposes to have distributed all Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, for the benefit of the Holders of Holding Company Debtor Unsecured Claims and for the benefit of the Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed Claims as of the Effective Date, to the Liquidating Trust.   Upon the transfer of the Liquidating Trust Assets, the Debtors shall have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

2.      *Transfer of Assets.*   On the Effective Date, the Liquidating Trust Assets, as described in paragraph (E)(1) above, will be conveyed directly by the Debtors other than Access Lending to the Liquidating Trust on behalf of the beneficiaries thereof.

3.      *Assumption of Plan Obligations.*   On the Effective Date, all of the Debtors' rights and obligations with respect to each A/P/S Claim (other than A/P/S Claims against Access Lending) and all other rights and obligations of the Debtors (other than Access Lending) under this Plan shall be assigned to and assumed by the Liquidating Trust.

4.      *Treatment of Transfer of Assets.*   For federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust, in accordance with the terms of this Plan, as a transfer to the Holders of the Unsecured Claims that have a beneficial interest in the Liquidating Trust, with the Holders of Unsecured Claims against the Holding Company Debtors and Holders of Unsecured Claims against the Operating Debtors receiving an undivided interest in the Liquidating Trust Assets attributable to their respective Debtor Groups, followed by a

transfer of the Liquidating Trust Assets by such Holders to the Liquidating Trust, and the beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidating Trust.

**F.    Liquidating Trust.**

1.    *Formation of Liquidating Trust.*    On or prior to the Effective Date, the Liquidating Trust shall be formed.  The Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims shall be the sole beneficiaries of the Liquidating Trust.  Holders of Unsecured Claims against Access Lending shall not be beneficiaries of the Liquidating Trust.

2.    *Liquidating Trust Agreement.*    The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Liquidating Trustee and to ensure the treatment of the Liquidating Trust as a liquidating trust for federal income tax purposes.  In the event a provision of this Plan or the Confirmation Order conflicts with a provision of the Liquidating Trust Agreement, the provision of the Liquidation Trust Agreement shall control.

3.    *Appointment of the Liquidating Trustee.*

(a)    No later than ten (10) days prior to the deadline to vote to accept or reject this Plan, the Plan Proponents will file the Liquidating Trust Agreement with the Bankruptcy Court, which Liquidating Trust Agreement shall identify the Liquidating Trustee. The Liquidating Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Liquidating Trustee on the Effective Date; provided, however, that the party appointed as Liquidating Trustee shall be permitted to act in accordance with the terms of the Liquidating Trust Agreement from the Confirmation Date (or such earlier date as authorized by the Committee) through the Effective Date and shall

be entitled to seek compensation in accordance with the terms of the Liquidating Trust Agreement and this Plan.

(b)     The Liquidating Trustee shall be deemed the Estates' representative (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in this Plan and the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

(c)     The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.

(d)     The Liquidating Trustee shall at all times maintain a bond acceptable to the Plan Advisory Committee and approved by the Bankruptcy Court.

4.     *Term and Compensation of the Liquidating Trustee.*

(a)     The Liquidating Trustee shall initially be compensated as set forth in the Liquidating Trust Agreement (which compensation may be revised by the Liquidating Trust with the consent of the Plan Advisory Committee) and shall not be required to file a fee application to receive compensation. The Liquidating

Trustee's compensation shall, however, be subject to the review and, if appropriate, objection of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.

(b)     The Liquidating Trustee may be removed or replaced at any time by the Plan Advisory Committee in accordance with the procedures in the Liquidating Trust Agreement. In the event of the death or incompetency (in the case of a Liquidating Trustee that is a natural person), dissolution (in the case of a Liquidating Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Liquidating Trustee, the Plan Advisory Committee shall have the authority to appoint a successor trustee as set forth in the Liquidating Trust Agreement.

5.      *Liquidation of Liquidating Trust Assets; Responsibilities of Liquidating Trustee.*

(a)     The Liquidating Trustee shall be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement. The Liquidating Trust shall be subject to the directions of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement. Notwithstanding anything to the contrary contained in this Plan or the Confirmation Order, any act by the Liquidating Trustee, including discretionary acts, will require the consent of or consultation with the Plan Advisory Committee in accordance with the terms of the Liquidating Trust Agreement. If there is any inconsistency or ambiguity in the Plan, Confirmation Order or the Liquidating Trust Agreement in respect of the Plan Advisory Committee's role in the Liquidating Trustee's authority to act, the provision of the Liquidating Trust Agreement shall control.

(b)     The Liquidating Trustee, in its reasonable business judgment, and in an expeditious but orderly manner, shall liquidate and convert to cash the Liquidating Trust Assets, make timely distributions and not unduly prolong the

duration of the Liquidating Trust. The liquidation of the Liquidating Trust Assets may be accomplished either through the sale of Liquidating Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

(c)     The Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) shall be expressly authorized to do the following:

(i)     prosecute, collect, compromise and settle any Causes of Actions in accordance herewith and without further approval of or application to the Bankruptcy Court, except as otherwise provided herein.

(ii)     file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court, except as otherwise provided herein

(iii)     open and maintain bank accounts in the name of the Liquidating Trust, draw checks and drafts thereon on the sole signature of the Liquidating Trustee, and terminate such accounts as the Liquidating Trustee deems appropriate;

(iv)     execute any documents, pleadings, and take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Liquidation Trustee's powers granted herein, including, but not limited to the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

(v)     hold legal title to any and all rights of the beneficiaries in or arising from the Assets, including but not limited to, the right to vote any claim or interest in an unrelated case under the Bankruptcy Code and receive any distribution thereon;

(vi)     protect and enforce the rights to the Assets vested in the Liquidating Trustee by this Plan by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(vii)    deliver distributions as may be authorized by this Plan;

(viii)   file, if necessary, any and all tax returns with respect to the Liquidating Trust, pay taxes, if any, properly payable by the Liquidating Trust, and make distributions to the beneficiaries net of such taxes, and comply with the requirements of Article 4 hereof;

(ix)     make all necessary filings in accordance with any applicable law, statute or regulation;

(x)      determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(xi)     invest moneys received by the Liquidating Trust or otherwise held by the Liquidating Trust in accordance with Article 8.F.8 of this Plan;

(xii)    in the event that the Liquidating Trustee determines that the beneficiaries or the Liquidating Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

(xiii)   utilize the Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Liquidating Trustee, and the Plan Advisory Committee and its members; and

(xiv)   prepare and report telephonically, and if requested by the Plan Advisory Committee, in writing or in person, a monthly report of the status of the process of winding down the Estates including Causes of Action.

(d)     The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

6.      *Valuation of Assets.*  As soon as possible after the Effective Date (i) the Liquidating Trustee shall determine the fair market value, as of the Effective Date, of the Liquidating Trust Assets based on a good faith determination, and (ii) the Liquidating Trustee shall apprise the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims in writing of such valuation (and indicate in such writing each Holder's percentage ownership interest in the Liquidating Trust based on each such Holder's relative beneficial interest in the Liquidating Trust or portion thereof as of the Effective Date).  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Holding Company Debtor Unsecured Claims and Holders of Operating Debtor Unsecured Claims) for all federal income tax purposes.

7.      *Payments by the Liquidating Trust.*  The Liquidating Trust shall make distributions to Holders of Allowed Claims in accordance with Article 9 of this Plan.

8.      *Investment Powers of the Liquidating Trustee and Permitted Cash Expenditures.*  All funds held by the Liquidating Trustee shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Liquidating Trust Agreement; provided, however, that the right and power of the Liquidating Trustee to invest Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be

limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.  The Liquidating Trustee may expend the cash of the Liquidating Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidating Trust during liquidation, (y) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidating Trust) and (z) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.

9. *Reporting Duties.*

(a) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidating Trustee shall also send to each holder of a beneficial interest in the Liquidating Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate.  The Liquidating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

(b) Allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution,

the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the beneficial interests in the Liquidating Trust (treating any holder of a Disputed Claim, for this purpose, as a current holder of a beneficial interest in the Liquidating Trust entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. For this purpose, the tax book value of the Liquidating Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)     The Liquidating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

10.     *Registry of Beneficial Interests.*   To evidence each holder's beneficial interests in the Liquidating Trust, the Liquidating Trustee shall maintain a registry of holders.

11.     *Non-Transferable.*   Upon issuance thereof, interests in the Liquidating Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, shall not be effective until and unless the Liquidating Trustee receives written notice of such transfer.

12.     *Termination.*   The Liquidating Trust shall terminate after its liquidation, administration and distribution of the Liquidating Trust Assets in accordance with this Plan and its full performance of all other duties and functions set forth herein or in its

Liquidating Trust Agreement. The Liquidating Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust if it is necessary to facilitate or complete the liquidation of the Liquidating Trust Assets administered by the Liquidating Trust. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

13. *Purpose of the Liquidating Trust.* The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the IRS, all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes. The Liquidating Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. Neither the Liquidating Trust nor any portion thereof, nor any reserve, account or fund established by this Plan shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(1).

**G.  Plan Advisory Committee.**

1.  *Appointment.*  On the Effective Date, the Plan Advisory Committee shall be deemed appointed and shall adopt bylaws to govern the actions of the Plan Advisory Committee.

2.  *Membership.*  The Plan Advisory Committee shall consist of up to five (5) members of the Committee chosen from those members of the Committee that notify counsel to the Committee in writing no later than fifteen (15) days prior to the Confirmation Hearing of their intention to serve on the Plan Advisory Committee.  In the event that less than five (5) of the members of the Committee notify counsel to the Committee of their intent to serve on the Plan Advisory Committee within fifteen (15) days prior to the Confirmation Hearing, then the Committee will choose from among the Holders of Unsecured Claims to fill any vacancy until five (5) members have been designated.  Unless and until such vacancy is filled, the Plan Advisory Committee shall function with such reduced membership.  In the event of the resignation of a member of the Plan Advisory Committee, the remaining members may, but need not, designate a successor from among the Holders of Unsecured Claims.  Unless and until such vacancy is filled, the Plan Advisory Committee shall function with such reduced membership

3.  *Fiduciary Duties.*  The fiduciary duties that applied to the Committee prior to the Effective Date shall apply to the Plan Advisory Committee.  The duties and powers of the Plan Advisory Committee shall terminate upon the termination of the Liquidating Trust.

4.  *Rights and Duties.*  The Plan Advisory Committee's role shall be to advise and approve the actions of the Liquidating Trustee as more particularly set forth in the Liquidating Trust Agreement.  The Plan Advisory Committee shall have the rights and duties set forth in the Liquidating Trust Agreement, including without limitation:

(a)  to terminate the Liquidating Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the

Liquidating Trustee, to appoint a successor Liquidating Trustee; provided, that the Plan Advisory Committee shall file with the Bankruptcy Court a notice appointing such successor trustee;

(b)  to approve any release or indemnity in favor of any third party granted or agreed to by the Liquidating Trustee other than as set forth in the Plan;

(c)  to authorize the Liquidating Trustee to commence or continue to prosecute any Cause of Action including, in the Liquidating Trustee's capacity as Plan Administrator, any Access Lending Cause of Action;

(d)  to approve the settlement of any Cause of Action if the amount sought to be recovered by the Liquidating Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $100,000;

(e)  to approve the allowance of any Disputed Claim if the final allowed amount of such Claim exceeds $50,000;

(f)  to approve the sale of any Assets by the Liquidating Trustee;

(g)  with respect to each six month period, to approve any budget for the Administrative Fund prepared by the Liquidating Trustee in respect of the Trust Operating Expenses and in connection with Causes of Action and to approve any additional funding of the Administrative Fund;

(h)  in addition to the mandatory distributions required under the Plan, to approve the making of interim distributions if such distributions are warranted and economical;

(i)  to review and object to fees and expenses of professionals retained by the Liquidating Trust; and

(j)  to approve of any investment of Cash or other Liquidating Trust Assets pending distributions to holders of the beneficial interests.

5.  *No Compensation.*  Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan

Advisory Committee, including reasonable attorneys fees subject to a cap to be established by the Plan Advisory Committee in its discretion, the members of the Plan Advisory Committee shall serve without compensation. Reasonable expenses, as set forth in this Article 8.G.5, incurred by members of the Plan Advisory Committee may be paid by the Liquidating Trust without need for approval of the Bankruptcy Court.

6. *Objection to Fees.* The Plan Advisory Committee shall have thirty (30) days, or such other period as determined by the Plan Advisory Committee and the Liquidating Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Liquidating Trust or the Plan Advisory Committee by giving notice of any such objection to the professional seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution. The uncontested portion of each invoice shall be paid within forty (40) days after its delivery to the Plan Advisory Committee and the Liquidating Trustee.

**H. Liability, Indemnification.** Neither the Liquidating Trustee (including in its capacity as Plan Administrator), the Plan Advisory Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Liquidating Trustee or the Plan Advisory Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Liquidating Trustee or Plan Advisory Committee, nor shall such Liquidating Trustee, or any member of the Plan Advisory Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Liquidating Trustee, or as a member of the Plan Advisory Committee, respectively, other than for specific acts or omissions resulting from such Liquidating Trustee's or such member's willful misconduct, gross negligence or fraud. The Liquidating Trustee, or the Plan Advisory Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and

shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidating Trustee (including in its capacity as Plan Administrator) or the Plan Advisory Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or Plan Advisory Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee and Plan Advisory Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.

## I. Retention of Professionals.

1. Liquidating Trust Professionals.

(a) The Liquidating Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors and other agents on behalf of the Liquidating Trust as necessary or desirable to carry out the obligations of the Liquidating Trustee hereunder and under the Liquidating Trust Agreement. More specifically, the Liquidating Trustee may retain counsel in any matter related to its administration, including counsel that has acted as counsel for

the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

(b)     Prior to the Effective Date, the Committee shall approve a budget for the six (6) month period beginning on the Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Liquidating Trust, which budget may be altered from time to time by the Plan Advisory Committee in accordance with the Liquidating Trust Agreement provided that any fees and expenses of professionals retained by the Liquidating Trust that have been incurred prior to the date of the modification of the budget shall constitute budgeted amounts.  Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, the Professionals retained by the Debtors or the Committee shall only be entitled to compensation for services performed and expenses incurred after the Effective Date to the extent, if any, of the amount budgeted for each respective Professional.  Following the Effective Date, the Liquidating Trustee may pay, without application to the Court or any other court of competent jurisdiction, such professionals retained by the Liquidating Trust in accordance with agreements that the Liquidating Trustee determines to be reasonable. The Plan Advisory Committee shall approve in advance the Liquidating Trustee's retention of professionals and their compensation arrangements.

2.     *Plan Advisory Committee Professionals.*  The Plan Advisory Committee shall have the right to retain counsel of its choice in the event of a dispute or conflict with the Liquidating Trustee or for other purposes set forth in the Liquidating Trust Agreement and the reasonable fees and expenses of such counsel shall be paid by the Liquidating Trustee.

**J.     Access Lending.**

1.     *Transfer of Access Lending Stock.*   On the Effective Date, pursuant to Article 8.E of the Plan, TRS Holdings shall distribute the stock of Access Lending to the Liquidating Trust, which shall become the sole shareholder of Reorganized Access Lending.

2.     *The Plan Administrator.*   The Liquidating Trustee shall act as Plan Administrator with respect to Reorganized Access Lending and, in such capacity, shall have entered into a Plan Administrator employment agreement to be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing.  The initial Plan Administrator, and each successor Plan Administrator, shall serve until the earlier of (i) the dissolution of Reorganized Access Lending or (ii) such Plan Administrator's resignation, death, incapacity, removal or termination.   Upon the occurrence of the Effective Date, the articles of incorporation of Access Lending shall be amended to provide that Plan Administrator shall be the chief executive officer and sole director of Reorganized Access Lending.  In such capacity, the Plan Administrator shall have all necessary and appropriate power to act for, on behalf of and in the name of Reorganized Access Lending, with the same power and effect as if each of his or her actions in furtherance of his or her duties as a responsible person and as a board-appointed officer and shareholder-appointed director of Reorganized Access Lending were explicitly authorized by the appropriate board of directors or shareholders.

3.     *Resolution of Claims and Prosecution of Access Lending Causes of Action.*   The Liquidating Trustee, as Plan Administrator, shall resolve all Disputed Claims against Access Lending as soon as practicable following the Effective Date and shall have the right to prosecute all Access Lending Causes of Action.  The Liquidating Trustee, acting as Plan Administrator, shall pay all Allowed A/P/S Claims against Access Lending as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.  Upon resolution of all Disputed

Unsecured Claims against Access Lending and all Access Lending Causes of Action, the Liquidating Trustee, as Plan Administrator, shall pay all the Allowed Unsecured Claims against Access Lending from the Access Lending Net Distributable Assets in accordance with Article 8.J.6 of the Plan.

4.     *Dissolution of Reorganized Access Lending.*  After all the Allowed Claims against Access Lending have been paid, the Liquidating Trustee, acting as Plan Administrator, shall file a certificate of dissolution in the applicable state of incorporation for Reorganized Access Lending, and Reorganized Access Lending shall dissolve and cease to exist.  Any remaining Assets of Reorganized Access Lending shall be distributed to the Liquidating Trust as sole shareholder in a liquidating distribution, and shall become Liquidating Trust Assets that may be distributed pursuant to the terms of this Plan.

5.     *Access Lending Income; Returns.*  Any income earned by the Assets of Reorganized Access Lending is attributable to Access Lending and not to the Liquidating Trust or its beneficiaries.  The Liquidating Trustee, acting as Plan Administrator, shall make and file, if necessary, any and all tax returns for Reorganized Access Lending with respect to such taxable income, and shall pay taxes, if any, properly payable by Access Lending from Reorganized Access Lending's Assets.  The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to Reorganized Access Lending that are required by any governmental unit.

6.     *Calculation of Access Lending Net Distributable Assets.*  The Access Lending Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of Reorganized Access Lending's Assets and the prosecution of the Access Lending Causes of Action: (i) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estate of Access Lending, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint

Administrative Expense Share of Access Lending paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, (iv) any taxes paid by the Liquidating Trustee from Reorganized Access Lending's Assets pursuant to Article 8.J.5 of the Plan, (v) any costs incurred in connection with the prosecution of the Access Lending Causes of Action, and (vi) Reorganized Access Lending's proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee.

**K.      Preservation of All Causes of Action.**  Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity.  The Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) may pursue such retained claims or Causes of Action in accordance with the best interests of the creditors, the Estates, or the Liquidating Trust.

**L.      Successors.**  The Liquidating Trust shall be the successor to the Debtors (other than Access Lending) for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters.  The Liquidating Trust shall succeed to the attorney-client privilege of the Debtors (other than Access Lending) with respect to all Causes of Action (other than Access Lending Causes of Action) and other litigation-related matters, and the Liquidating Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.  Reorganized Access Lending shall be the successor to the Access Lending for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Access Lending Causes of Action and other litigation-related matters.  Reorganized Access Lending shall succeed to the attorney-client privilege of Access Lending with respect to all Access Lending Causes of Action and other

litigation-related matters, and the Liquidating Trustee, it its capacity as Plan Administrator, may waive the attorney-client privilege with respect to any Access Lending Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.

## ARTICLE 9.

## DISTRIBUTIONS UNDER THIS PLAN

A.      **Timing of Distributions.**

1.      *Distributions on Account of Allowed A/P/S Claims.*   The Liquidating Trustee shall pay any Allowed A/P/S Claim against Debtors other than Access Lending from the Liquidating Trust Assets, except as otherwise provided in this Plan, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

2.      *Interim Distributions on Account of Allowed Unsecured Claims.*   Subject to approval of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement and pursuant to the calculations set forth in Article 9.C of this Plan, (a) the Liquidating Trustee shall make an interim distribution at least annually of its net income and the net proceeds from the sale of Liquidating Trust Assets provided that any such distribution is not unduly burdensome to the Liquidating Trust, and (b) shall have the right to make more frequent interim distributions, to Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed Operating Debtor Unsecured Claims if the Liquidating Trustee determines that such interim distributions are warranted, economical; provided, however, that any such distribution shall only be made if (i) the Administrative Fund and the A/P/S Claims Reserve are fully funded; (ii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Holding Company Debtors, the Holding Company Debtor Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; (iii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Operating Debtors, the Operating Debtor Claims Reserve is fully funded and will remain fully

funded after such interim distributions are made; and (iv) the Liquidating Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.  This provision shall be interpreted to be consistent with Revenue Procedure 94-45 § 3.10.

3.      *Final Distributions on Allowed Unsecured Claims.*   Notwithstanding anything else in this Plan, upon the settlement and satisfaction of all A/P/S Claims, the settlement and satisfaction of all Claims against Access Lending, the dissolution of Reorganized Access Lending and the distribution in liquidation of all remaining Assets of Reorganized Access Lending to the Liquidating Trust, the completion of the prosecution and/or settlement of all objections to all other Claims and the Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidating Trustee shall distribute, as soon as practicable, all remaining Liquidating Trust Assets pursuant to the terms of this Plan using the calculations set forth in Article 9.C of this Plan.

**B.      Reserves.**

1.      *Administrative Fund.*   On the Effective Date, the Liquidating Trustee shall establish the Administrative Fund.  The initial amount of the Administrative Fund shall be based on the Liquidating Trustee's good faith estimate of the cost necessary to complete the Liquidating Trust's obligations under this Plan and the Liquidating Trust Agreement.  The Liquidating Trust shall pay all costs and expenses related to carrying out its obligations under this Plan and the Liquidating Trust Agreement from the Administrative Fund and, in the Liquidating Trustee's discretion, and with approval of the Plan Advisory Committee, may add additional amounts to the Administrative Fund to prosecute the Causes of Action (other than Access Lending Causes of Action) or for administration and other miscellaneous needs of the Liquidating Trusts without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

2.    *A/P/S Claims Reserve.*    On the Effective Date, the Liquidating Trustee shall establish the A/P/S Claims Reserve for all A/P/S Claims that are Disputed A/P/S Claims or Allowed A/P/S Claims that are not paid on the Effective Date, provided, however, that none of the provisions in this Article 9.B.2 apply to A/P/S Claims against Access Lending.  The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim that is not paid on the Effective Date shall be based upon the Administrative Claim being in the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of this Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly liable, the Liquidating Trustee shall contributed to the A/P/S Reserve on account of only one such Claim.  The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim that is not paid on the Effective Date shall be based upon such Claim being in the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of this Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly liable, the Liquidating Trustee shall contributed to the A/P/S Reserve on account of only one such Claim.  As soon as practicable after (and to the extent) that a Disputed A/P/S Claim becomes an Allowed A/P/S Claim, the Liquidating Trustee shall make a payment from the A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim.  After

(and to the extent) a Disputed A/P/S Claim or a Disallowed Claim is determined not to be an A/P/S Claim, the portion of the A/P/S Claims Reserve reserved for such Claim shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Plan. Any amount remaining in the A/P/S Claims Reserve following the final disposition of all A/P/S Claims shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Plan.

       3.     *Holding Company Debtor Claims Reserve.* On the Effective Date, the Liquidating Trustee shall establish the Holding Company Debtor Claims Reserve. With respect to any interim distribution made to Holders of Allowed Holding Company Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Holding Company Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Holding Company Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of this Plan. As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against a Holding Company Debtor becomes an Allowed Unsecured Claim against such Holding Company Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Holding Company Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Holding Company Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against a Holding Company Debtor becomes a Disallowed Claim, the portion of the Holding Company Debtor Claims Reserve reserved for such Claim shall be released from the

Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan. Any amount remaining in the Holding Company Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Holding Company Debtors shall be released from the Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan.

4. *Operating Debtor Claims Reserve.* On the Effective Date, the Liquidating Trustee shall establish the Operating Debtor Claims Reserve. With respect to any interim distribution made to Holders of Allowed Operating Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Operating Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Operating Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.F of this Plan. As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against an Operating Debtor becomes an Allowed Unsecured Claim against such Operating Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Operating Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Operating Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against an Operating Debtor becomes a Disallowed Claim, the portion of the Operating Debtor Claims Reserve reserved for such Claim shall be released from the Operating Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan. Any amount remaining in the Operating Debtor Claims Reserve following the

final disposition of all Disputed Unsecured Claims against Operating Debtors shall be released from the Operating Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan.

**C.      Distribution Calculations.**

1.      *Calculation of Litigation Proceeds.*   The Litigation Proceeds shall be calculated by deducting all expenses related to any Causes of Action (other than Access Lending Causes of Action) including, but not limited to, fees and costs of attorneys, other professionals, and expert witnesses, and all expenses incurred in the pursuit of such Causes of Action, as determined by the Liquidating Trustee, from the proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance.  The Holding Company Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds.   The Operating Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds.  The NC Capital EPD/Breach Claimant Portion of Litigation Proceeds is 45% of the Litigation Proceeds.

2.      *Calculation of Holding Company Debtor Net Distributable Assets.*   The Holding Company Debtor Net Distributable Assets shall be calculated by deducting from the gross amount (other than Litigation Proceeds) available from the liquidation of the Holding Company Debtors' Assets:  (i)  the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Holding Company Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Holding Company Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of the Holding Company Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Holding Company Debtors' proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee.

3. *Calculation of Operating Debtor Net Distributable Assets.* The Operating Debtor Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of the Operating Debtors' Assets, which gross amount shall include the Adequate Protection Proceeds but exclude the Litigation Proceeds: (i) the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Operating Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Operating Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date, (iii) the Joint Administrative Expense Share of the Operating Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Operating Debtors' proportionate share of the expenses of the Trust Operating Expenses as determined by the Liquidating Trustee.

4. *Calculation of Interim Distributions.* Subject to the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol:

(a) the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Holding Company Debtors up to the amount of the Holding Company Debtor Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.2 of this Plan) plus the Holding Company Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Holding Company Debtor Claims Reserve pursuant to Article 9.B.3 of this Plan and (ii) to fully fund the Holding Company Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve; and

(b) the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Operating Debtors up to the amount of the Operating Net Distributable Assets (calculated as of the date of the

interim distribution in accordance with Article 9.C.3 of this Plan) plus the Operating Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Operating Debtor Claims Reserve pursuant to Article 9.B.4 of this Plan and (ii) to fully fund the Operating Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve;.

**D.     Payment in Full of Unsecured Claims.**

1.      *Limitation on Distributions on Account of Allowed Unsecured Claims.* Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Plan, any Allowed Unsecured Claim is paid in full under this Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly liable, such Creditor is not entitled to receive distributions under this Plan in excess of the amount of the Debtors' joint liability in respect of such Claims plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claims for which more than one Debtor is jointly liable shall be deemed paid in full at such time as the Creditor has been paid the allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

2.      *Payment of Interest on Allowed Unsecured Claims.* Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Plan, (i) if, and only if, all Holders of Allowed Unsecured Claims against the Holding Company Debtors and all Holders of Allowed Unsecured Claims against Operating Debtors have been paid 100% of the amount of their Allowed

Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of the Holding Company Debtors and the Operating Debtors and (ii) if, and only if, all Holders of Allowed Unsecured Claims against Access Lending have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of Access Lending; provided, however; that with respect to Allowed Unsecured Claims for which more than one Debtor is jointly liable, interest is payable on such Claims pursuant to the terms of this Article 9.D.2 based on the allowed amount of the joint liability fixed by such Claims.

3.      *Payment in Full of Allowed Unsecured Claims for Which Debtors in More than One Debtor Group Are Jointly Liable.*  To the extent a Holder of  Allowed Unsecured Claims for which Debtors in more than one Debtor Group are jointly liable is paid 100% of the allowed amount of the joint liability fixed by such Claims through interim distributions, the Liquidating Trustee shall retain any further interim distributions that would be made on account of such Claims (giving effect, if applicable, to the Multi-Debtor Claim Protocol) as if only Debtors within a single Debtor Group were liable for such Claim until the Liquidating Trustee makes a final distribution under this Plan.  Prior to making a final distribution under this Plan, the Liquidating Trustee shall determine, with respect to every Allowed Unsecured Claim for which Debtors in more than one Debtor Group are jointly liable that has been paid 100% of the allowed amount of the joint liability fixed by such Claim, the amount of distributions in respect of such Claim made on account of Debtors within each Debtor Group.  The Liquidating Trustee shall reallocate the excess distributions, if any, that it has retained to be included in the

appropriate Debtor Group's Assets based on the relative distributions made to Claims in each Debtor Group on account of such joint liability.

4.     *Payment in Full of All Allowed Holding Company Debtor Unsecured Claims.*  If, in accordance with the terms of this Plan, all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid 100% of the allowed amount of their Allowed Holding Company Debtor Unsecured Claims, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

5.     *Payment in Full of All Allowed Operating Debtor Unsecured Claims Other Than EPD/Breach Claims Against NC Capital.*  If, in accordance with the terms of this Plan, all Holders of Allowed Operating Debtor Unsecured Claims other than Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Operating Debtor Unsecured Claims, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol first to Holders of Allowed Class OP6b Claims on account of such Claims until such Claims are paid 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their allowed amounts.

After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

6. *Payment in Full of All Allowed EPD/Breach Claims Against NC Capital.* If, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, all Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Class OP6b Claims, any remaining amount of the NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, first to Holders of Allowed Operating Debtor Claims other than Allowed Class OP6b Claims on account of such Claims until such Claims are 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their Allowed Amounts. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

**E.** **Manner of Distribution.** At the option of the Liquidating Trustee, any distributions under this Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH. Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan. Cash will be issued to Holders entitled

to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

F.      **De Minimis Distributions.**  All De Minimis Distributions will be held by the Liquidating Trust for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor exceeds $50.00, the Liquidating Trust will distribute such De Minimis Distributions to such Creditor.  If, at the time that the final distribution under this Plan is to be made, the De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor total less than $50.00, such funds shall not be distributed to such Creditor, but rather, shall vest in the Liquidating Trust and be distributed to other Holders of Allowed Claims in accordance with the terms of this Plan.

G.      **Delivery of Distributions.**  Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made by the Debtors, if on the Effective Date, or the Liquidating Trustee, if after the Effective Date, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Liquidating Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address.  The distributions to Holders of Capital Trust Claims shall be made to the Indenture Trustee, which, subject to the right of the Indenture Trustee to assert its charging lien against the distributions for payment of the Indenture Trustee Expenses, shall transmit the distributions to the Holders of Capital Trust Claims.

H.      **Undeliverable Distributions.**  If payment or distribution to the Holder of an Allowed Claim under this Plan is returned for lack of a current address for the Holder or otherwise, the Liquidating Trustee shall file with the Bankruptcy Court the name, if known, and

last known address of the Holder and the reason for its inability to make payment. If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

I.      **Setoffs and Recoupments.**     The Debtors, if on the Effective Date, or the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator), if after the Effective Date, may, pursuant to sections 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to this Plan, any claims or Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, or the Liquidating Trust of any right of setoff or recoupment that the Debtors or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action.

J.      **Distributions in Satisfaction; Allocation.**     Except for the obligations expressly imposed by this Plan and the property and rights expressly retained under this Plan, if any, the distributions and rights that are provided in this Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors and the Estates and the assets and properties of the Debtors and the Estates, whether known or unknown, arising or existing prior to the Effective Date. Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

K.      **Cancellation of Notes and Instruments.**     As of the Effective Date, except as with respect to the stock of Access Lending, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the holders thereof shall, with respect to the

Debtors, be canceled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights against the Debtors, the Estates, or the Liquidating Trust, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in this Plan. Additionally, the Capital Trust Indentures, and all related notes and documents, including without limitation, the two series of Junior Subordinated Notes due 2036, the Amended and Restated Trust Agreement, dated as of September 13, 2006, and the Amended and Restated Trust Agreement, dated as of November 16, 2006, and the two series of trust preferred securities and trust common securities, respectively, shall be deemed automatically canceled and discharged on the Effective Date, provided, however, that the Capital Trust Indentures, and related notes and documents shall continue in effect solely for the purposes of (i) allowing the Holders of Capital Trust Claims to receive their distributions, if any, hereunder, (ii) allowing the Indenture Trustee to make distributions on account of the Capital Trust Claims, and (iii) permitting the Indenture Trustee to asserts its charging lien against such distributions for payment of the Indenture Trustee Expenses. The Capital Trust Indentures and related notes and documents shall terminate completely upon completion of all such distributions. The Liquidating Trust shall not be responsible for any of the fees, expenses or costs incurred in connection with the continuation or termination of the Capital Trust Indentures.

**L.** **No Interest on Claims.** Unless otherwise specifically provided for in this Plan and except as set forth in Article 9 hereof, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes and Allowed Claim.

**M.** **Withholding Taxes.** The Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, shall be entitled to deduct any federal, state or local

withholding taxes from any payments under this Plan. As a condition to making any distribution under this Plan, the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, to comply with applicable tax reporting and withholding laws.

**N.     Reports.**  From the Effective Date, until a Final Decree is entered, the Liquidating Trustee shall submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Liquidating Trust as required by the U.S. Trustee guidelines.

## ARTICLE 10.

## PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

**A.     Reservation of Rights to Object to Claims.**  Unless a Claim is expressly described as an Allowed Claim pursuant to or under this Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidating Trustee shall be deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, 510(b) Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.  The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

**B.     Objections to Claims.**  Prior to the Effective Date, the Debtors shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Liquidating Trustee will retain responsibility for administering, disputing,

objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement. Unless otherwise provided in this Plan or by order of the Bankruptcy Court, any objections to Claims by the Liquidating Trustee will be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to this Plan.

C. **Service of Objections.** An objection to a Claim shall be deemed properly served on the Holder of such Claim if the Liquidating Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

D. **Determination of Claims.** Except as otherwise agreed by the Debtors or the Liquidating Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an

application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Liquidating Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Plan. Nothing contained in this Article 10 shall constitute or be deemed a waiver of any claim, right, or Causes of Action that the Debtors or the Liquidating Trustee may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

E.    **No Distributions Pending Allowance.**  No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Liquidating Trustee may make, in his or her discretion, a distribution pursuant to the Plan on account of the portion of such Claim that becomes an Allowed Claim.

F.    **Claim Estimation.**  In order to effectuate distributions pursuant to this Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if on or prior to the Effective Date) and the Liquidating Trust (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of property that must be withheld from distribution on account of Disputed Claims; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

G.    **Allowance of Claims Subject to Section 502 of the Bankruptcy Code.**  Allowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

# ARTICLE 11.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A. Assumption of Certain Contracts and Leases and Cure Payments.** Twenty (20) days prior to the Confirmation Hearing, the Plan Proponents shall file the Assumption Schedule, which shall be attached to this Plan as <u>Exhibit A</u>. Objections to any proposed cure payment must be filed and served no later than the Assumption Objection Deadline and shall be adjudicated, if necessary, at the Confirmation Hearing. Any non-debtor party or Person to an Executory Contract that has not filed an appropriate pleading with the Bankruptcy Court on or before the applicable Assumption Objection Deadline shall be deemed to have waived its right to dispute the cure amount. All unpaid cure payments under any Executory Contracts that are assumed or assumed and assigned under this Plan shall be made by the Liquidating Trustee as soon as practicable after the Effective Date but not later than thirty (30) days after the Effective Date, provided that, in the event that there is a dispute regarding the amount of any cure payments, the Liquidating Trustee shall make such cure payments as may be required by section 365(b)(1) of the Bankruptcy Code within ten (10) days following the entry of a Final Order resolving such dispute. The Plan Proponents reserve the right to remove any Executory Contract from the Assumption Schedule prior to the Effective Date.

**B. Rejection of Remaining Executory Contracts and Unexpired Leases.** On the Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

**C.     Rejection Damages Bar Date.**   Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under this Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) must be filed with XRoads Case Management Services, P.O. Box 8901, Marina Del Rey, California 90295 (Telephone (888) 784-9571), and a copy served on counsel for the Plan Proponents and the Liquidating Trustee, within thirty (30) days after the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, their successors, their assigns, or their Assets.   Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class HC3b (Other Unsecured Claims against NCFC), Class HC7 (Other Unsecured Claims against TRS Holdings), Class HC10b (Other Unsecured Claims against NC Credit), Class HC13 (Other Unsecured Claims against NC Residual IV), Class OP3c (Other Unsecured Claims against NCMC), Class OP6c (Other Unsecured Claims against NC Capital), Class OP9b (Other Unsecured Claims against Home123), Class OP12 (Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral), or Class AL3 (Other Unsecured Claims against Access Lending), depending on which Debtor the Claim is asserted against.  Nothing in this Plan extends or modifies any previously applicable Bar Date.

**D.     Insurance Policies.**   To the extent that any or all of the insurance policies set forth on Exhibit A to this Plan are considered to be Executory Contracts, then notwithstanding anything contained in this Plan to the contrary, this Plan shall constitute a motion to assume the insurance policies set forth on Exhibit A to this Plan and to assign them to the Liquidating Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the

parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy set forth on Exhibit A to this Plan. To the extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the Plan Proponents reserve the right to seek rejection of such insurance policy or other available relief. The Plan shall not affect contracts that have been assumed and assigned by order of the Bankruptcy Court prior to the Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on Exhibit A and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Liquidating Trust pursuant to this Plan.

## ARTICLE 12.

## EFFECT OF CONFIRMATION AND INJUNCTION

**A.      Injunction.  Except as otherwise expressly provided in this Plan, the documents executed pursuant to this Plan, or the Confirmation Order, on and after the Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or**

encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of this Plan.  Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in this Article 12 shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under this Plan.  The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of this Plan have been made or are not yet due under Article 4 of this Plan.

B.  **Term of Injunctions.**  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under sections 105 or 362 of the Bankruptcy Code, this Plan, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust.

C.  **Exculpation.**  On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or

Interest, or to any other party in interest, for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, and/or the administration of this Plan and/or the property to be distributed under this Plan, except for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under this Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of this Plan or the Disclosure Statement shall be deemed to act or release any claims, Causes of Action or liabilities that the Liquidating Trust or the Estates may have against any Person or entity for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor shall any provision of this Plan be deemed to act to release any Avoidance Actions.

      **D.**      **Binding Effect of Plan.** Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted this Plan and whether or not the Holder has filed a Claim. The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

**E.      No Effect on Objections to Fee Applications.**  Nothing contained in this Article 12 shall affect the rights of parties in interest to object to Fee Applications or obviate the power of the Bankruptcy Court to issue orders with respect to Fee Applications.

## ARTICLE 13.

## CONDITIONS PRECEDENT

**A.      Conditions Precedent to Effective Date.**  This Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

1.      *Approval of Disclosure Statement.*  The Bankruptcy Court shall have approved a disclosure statement to this Plan in form and substance acceptable to the Plan Proponents in their sole and absolute discretion.

2.      *Approval of Plan Compromises.*  The compromises and settlements contained in Articles 4, 6, and 7 of this Plan shall be approved without material modification by Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of this Plan.

3.      *Form of Confirmation Order.*  The Confirmation Order shall be in form and substance acceptable to the Plan Proponents in their sole and absolute discretion

4.      *Entry of Confirmation Order.*  The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

5.      *Liquidating Trust.*  The Liquidating Trust shall have been formed, and all formation documents for such entities shall have been properly executed and filed as required by this Plan and applicable law.

6. *Liquidating Trustee.* The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

7. *Plan Administrator.* The appointment of the Plan Administrator shall have been confirmed by order of the Bankruptcy Court.

**B.** **Revocation, Withdrawal, or Non-Consummation of Plan.** If after the Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the Plan Proponents, the Confirmation Order may be vacated by the Bankruptcy Court; provided however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents. If the Confirmation Order is vacated pursuant to this Section, this Plan shall be null and void in all respects, and nothing contained in this Plan, the Disclosure Statement, nor any pleadings filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors (iii) prejudice in any manner the rights of the Plan Proponents in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

## ARTICLE 14.

## ADMINISTRATIVE PROVISIONS

**A.** **Retention of Jurisdiction.** This Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising

under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) that relates to the following:

1. to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of Executory Contracts or unexpired leases and the allowance of Claims resulting therefrom;

2. to adjudicate any and all disputes over the ownership of a Claim or Interest;

3. to adjudicate any and all disputes arising from or relating to the distribution or retention of consideration under this Plan;

4. to hear and determine timely objections to Claims, whether filed before or after the Confirmation Date, including objections to the classification, estimation or establishment of priority or status of any Claim, and to allow or disallow any Claim, in whole or in part;

5. to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors or the Estates or property abandoned or transferred by the Debtors or the Estates;

6. to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of this Plan;

7. to hear and determine matters related to the assets of the Estates, including liquidation of the Debtors' assets; provided that notwithstanding the foregoing, the Liquidating Trustee shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of assets; provided further, that the Liquidating Trustee may seek "comfort orders" or similar orders of the Bankruptcy Court approving the Liquidating Trustee's sale or disposition of such assets to facilitate such transactions;

8. to adjudicate disputes relating to any alleged subordination of the Capital Trust Claims;

9. to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10. to consider modifications of or amendments to this Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including without limitation, the Confirmation Order;

11. to issue orders in aid of execution, implementation, or consummation of this Plan;

12. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

13. to hear and determine all motions requesting allowance of an Administrative Claim;

14. to hear and determine all Fee Applications;

15. to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses and parties entitled thereto;

16. to hear and determine all controversies arising in connection with the implementation of this Plan;

17. to hear and determine all Causes of Action, Avoidance Actions, and other suits and adversary proceedings to recover assets of the Liquidating Trust, as successor-in-interest to any of the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, proceedings to adjudicate the

allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

18.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     to resolve all conflicts and disputes between the Liquidating Trustee, the Liquidating Trust, the Plan Advisory Committee, and Holders of Claims or Interests;

20.     to hear any matter not inconsistent with the Bankruptcy Code;

21.     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     to consider matters regarding the Debtors' insurance policies, if any, including jurisdiction to reimpose the automatic stay or its applicable equivalent provided in this Plan;

23.     to issue injunctions, provide declaratory relief, take such other legal or equitable actions, or issue such other orders as may be necessary of appropriate to restrain interference with this Plan, the Debtors, the Estates or their property, the Committee, the Liquidating Trust, the Liquidating Trustee, the Plan Advisory Committee, Professionals, or the Confirmation Order;

24.     to enter a Final Decree closing the Chapter 11 Cases; and

25.     to enforce all orders previously entered by the Bankruptcy Court.

**B.      Payment of Statutory Fees.**      All fees payable through the Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid on or before the Effective Date.  All fees payable after the Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid by the Liquidating Trustee.

**C.** **General Authority.** The Debtors, if on or prior to the Effective Date, and the Liquidating Trust, if after the Effective Date, shall execute such documents, and take such other actions, as are necessary to effectuate the transactions provided for in this Plan.

**D.** **Headings.** The headings of the Articles, paragraphs, and sections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

**E.** **Final Order.** Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Debtors and the Committee (if prior to the Effective Date) or the Liquidating Trustee (if after the Effective Date) upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

**F.** **Amendments and Modifications.** The Plan Proponents may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Plan with respect to any Debtor, the Plan Proponents, the Plan Advisory Committee, or the proposed Liquidating Trustee, as appropriate, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 services list only, and the solicitation of all Creditors and other parties in interest shall not be required.

**G.** **Payment Date.** Whenever any payment or distribution to be made under this Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**H.** **Withholding and Reporting Requirements.** In connection with this Plan and all instruments issued in connection therewith and distributions thereon, the Debtors (if prior to or on the Effective Date) or the Liquidating Trustee (if after the Effective Date) shall comply with

all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**I.      No Waiver.**  The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtors' or the Liquidating Trust's right to object to or examine such Claim, in whole or in part.

**J.      Tax Exemption.**  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security under this Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by this Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by this Plan (including, without limitation, any subsequent transfers of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**K.      Securities Exemption.**  Any rights issued under, pursuant to or in effecting this Plan, including the stock of Reorganized Access Lending, and the offering and issuance thereof by any party, including without limitation the Debtors or the Liquidating Trust, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

**L.** **Non-Severability.** Except as specifically provided herein, the terms of this Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated.

**M.** **Revocation.** The Plan Proponents reserve the right to revoke and withdraw this Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw this Plan, then this Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors and/or the Committee, including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

**N.** **Plan Controls Disclosure Statement.** In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan shall control and take precedence.

**O.** **Governing Law.** Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically stated, the rights, duties, and obligations arising under this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and, with respect to the Debtors incorporated in Delaware, corporate governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles. Corporate governance matters relating to any Debtor not incorporated in Delaware shall be governed by the law of the state of incorporation of the applicable Debtor.

**P.** **Notices.** Any notices or requests of the Debtors or the Liquidating Trust by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable

overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

> If to the Debtors:
>
> O'Melveny & Myers LLP
> Attn:  Suzzanne Uhland, Esq.
> 275 Battery Street
> San Francisco, CA  94111
>
> and
>
> Richards, Layton & Finger, P.A.
> Attn:  Mark D. Collins, Esq.
> One Rodney Square
> Box 551
> Wilmington, DE 19899
>
> If to the Liquidating Trust or the Liquidating Trustee:
>
> To the persons indicated in the notice provisions of the Confirmation Order.

**Q.**     **Filing of Additional Documents.**  On or before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Plan, the Plan Proponents may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate and further evidence the terms and conditions of this Plan.

**R.**     **Direction to a Party.**  From and after the Effective Date, the Plan Proponents may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Plan.

**S.**     **Successors and Assigns.**  The rights, benefits, duties, and obligations of any Person named or referred to in this Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

**T.     Final Decree.**  Once any of the Estates has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trust or another party, as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case of the applicable Estate(s).

## ARTICLE 15.

## CONFIRMATION REQUEST

The Plan Proponents hereby request confirmation of this Plan as a Cramdown Plan with respect to any impaired Class that does not accept this Plan or is deemed to have rejected this Plan.

## ARTICLE 16.

## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019, the Plan Proponents hereby request approval of all compromises and settlement included in this Plan, including, without limitation, the compromises and settlements included in Articles 4, 6, and 7 of this Plan.

Dated:  Irvine, California
        February 2, 2008

Respectfully submitted,

NEW CENTURY FINANCIAL CORPORATION, on behalf of the Debtors and Debtors-in-Possession

 /s/ *Holly Etlin*
By:  Holly Etlin
Its:   Chief Executive Officer, President and Chief Restructuring Officer

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 /s/ *Donald A. Workman*
By:  Donald A. Workman, Esq.
Counsel for Fidelity National Information Services, Inc. (Co-chair)

# EXHIBIT A TO THE PLAN

*(TO BE FILED)*

# EXHIBIT B TO THE PLAN

Draft - Subject to the Final
Review and Approval
of the Plan Proponents

## EPD/ BREACH PROTOCOL[1]

I.      EPD/FPD Claims.

      A.      Methodology.

EPD and FPD Claims are Claims based on a provision in a loan purchase agreement that obligated a Debtor to repurchase a loan if the borrower defaulted on his or her first loan payment after the loan was sold (a First Payment Default or "FPD") or defaulted on a payment due within a period of time (usually 30 or 60 days) after the loan was sold (an Early Payment Default or "EPD").  Loan purchase agreements varied as to whether the EPD/FPD provision was set forth as a standalone provision of the loan sale agreement or was styled as a representation or warranty.  A Claim based on either is treated as an EPD/FPD Claim for purposes of the protocol.

Each Creditor that establishes a valid EPD or FPD under the applicable loan purchase agreement will receive a distribution in the Plan premised upon damages assessed based upon the borrower payment history and the unpaid principal balance ("UPB") for the loan, in both cases measured as of August 31, 2007, according to the following grid:[2]

- Current:  0% of UPB

- 31 – 60 days delinquent:  15% of UPB

- 61 – 90 days delinquent:  20% of UPB

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 1, 2008.

[2] The applicable category that would lead to the highest calculation takes precedence.  For example, if as of 8/31/07 a loan was 61 days delinquent and the borrower was in bankruptcy, the applicable percentage is 35% of UPB.

Draft - Subject to the Final
Review and Approval
of the Plan Proponents

- 91 or more days delinquent:  30% of UPB

- Borrower in bankruptcy:  35% of UPB

- In foreclosure[3]:  40% of UPB

- Real estate owned ("REO"):  45% of UPB

If the Creditor sold the loan prior to August 31, 2007 and does not have the loan status as of August 31, 2007, the damage assessment will be measured as of the date of sale.  If a loan has been foreclosed, the measurement will consider the property to be REO and the measurement will be based on the UPB at the time of foreclosure.

In order to establish the validity of the EPD/FPD Claim and to apply the grid, each EPD/FPD claimant must provide to the Debtors information set forth in questionnaire for loans on which it asserts an EPD/FPD claim.  This information includes:

- The payment history for each loan for which an EPD or FPD is asserted in electronic format, including identification of the payment status as of August 31, 2007.

- Identification of the loan purchase agreement pursuant to which the loan was sold by a Debtor, including a copy of the relevant EPD/FPD payment provisions (note: the length of time for EPD and FPD claims varied among the master loan purchase agreements).

Draft - Subject to the Final
Review and Approval
of the Plan Proponents

II.     BREACH CLAIMS.

A.     Methodology.

        The damages resulting from breach Claims will be calculated based upon the simplifying assumptions that: (i) 1.5% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this 1.5% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when breach claims are asserted, and (iii) damages resulting from breaches will be set at 30% of the UPB of the loan as of August 31, 2007.  The following table sets forth the calculation methodology:

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | 1.500% | 0.450% |
| 2006 | 4 Qtr | 1.200% | 0.360% |
| 2006 | 3 Qtr | 1.120% | 0.336% |
| 2006 | 2 Qtr | 0.850% | 0.255% |
| 2006 | 1 Qtr | 0.680% | 0.204% |
| 2005 | 4 Qtr | 0.530% | 0.159% |
| 2005 | 3 Qtr | 0.360% | 0.108% |
| 2005 | 2 Qtr | 0.180% | 0.054% |
| 2005 | 1 Qtr | 0.140% | 0.042% |
| 2004 | 4 Qtr | 0.100% | 0.030% |
| 2004 | 3 Qtr | 0.085% | 0.026% |
| 2004 | 2 Qtr | 0.065% | 0.020% |
| 2004 | 1 Qtr | 0.060% | 0.018% |
| 2003 | 4 Qtr | 0.053% | 0.016% |
| 2003 | 3 Qtr | 0.045% | 0.014% |
| 2003 | 2 Qtr | 0.035% | 0.011% |
| 2003 | 1 Qtr | 0.025% | 0.008% |
| 2002 | 4 Qtr | 0.022% | 0.007% |
| 2002 | 3 Qtr | 0.018% | 0.005% |
| 2002 | 2 Qtr | 0.015% | 0.005% |
| 2002 | 1 Qtr | 0.012% | 0.004% |

[3] In foreclosure means that the period set in a notice of intent to foreclosure during which the borrower has the ability to bring the loan current has expired.

Draft - Subject to the Final
Review and Approval
of the Plan Proponents

2001 and Earlier                            0.006%                  0.002%

Damages, for purposes of distributions under the Plan, will be measured by applying the percentage factor in the final column of this table against the August 31, 2007 UPB of the loans purchased from a Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

       B.      <u>Interaction with EPD/FPD Claims</u>.

EPD/FPD claims will take precedence over breach claims.  Thus, to the extent that a creditor establishes a valid EPD or FPD claim for a loan, that loan's UPB as of August 31, 2007 will be subtracted from the pool of loans for which breaches are computed.

This methodology is designed to avoid the need to resolve disputes over individual breach claims that are presently being asserted and to establish a methodology for assessing unliquidated claims based upon breaches that come to the fore when borrowers default in the future.  Accordingly, this statistical approach will be used <u>both</u> with respect to individual breach claims presently being asserted by creditors and to assess unliquidated breaches to be discovered in the future; both types of breaches are subsumed within the statistical analysis set forth above.

III.     <u>Information</u>.

In order to receive a distribution under the Plan, each Holder of an EPD/Breach Claim must supply information to the Debtors that enables the Debtors to calculate the damages that result from this protocol and to ensure that multiple creditors are not asserting overlapping

Draft - Subject to the Final
Review and Approval
of the Plan Proponents

claims.  That information will be set forth in a questionnaire that the Debtors will submit to each

Creditor that has asserted an EPD/Breach Claim.

# EXHIBIT C TO THE PLAN

*(TO BE FILED)*

## Exhibit B

## Statements of Cash Flows

## [To be filed]

**Exhibit C**


**Estate Litigation**

**Potential Defendants of Avoidance Actions and/or Rights of Action**


**[To be filed]**