UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
NEW CENTURY TRS HOLDINGS, INC.,.    Case No. 07-10416(KJC)
a Delaware corporation, *et al.*,.   (Jointly Administered)
                                .
                                .    February 6, 2008
                                .    1:30 p.m.
          Debtors.              .    (Wilmington)
                                .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: All rise.  Be seated, please.

2            THE COURT: Good afternoon all.

3            ALL: Good afternoon, Your Honor.

4            MS. MANUEL-COUGHLIN (Telephonic): Good afternoon.

5            MR. MERCHANT: Good afternoon, Your Honor.  Mike

6    Merchant of Richards, Layton & Finger on behalf of the

7    Debtors.  Your Honor, turning to the agenda, agenda items 1

8    through 6 have been continued, and certificates of no

9    objection were filed with respect to agenda items 7 through

10   17.  I don't know if Your Honor had any questions regarding

11   any of those matters.

12           THE COURT: Well I did, but they've been resolved.

13   And the orders on 7 through 17 have been signed.

14           MR. MERCHANT: Thank you, Your Honor.  Your Honor,

15   before getting to agenda item no. 18, and the Positive

16   Software related matters that my colleague Russell

17   Silberglied will be handling, we'd like to quickly take

18   agenda item no. 25, which is the Debtors' motion to abandon

19   certain materials.  And Ms. Uhland will be addressing that

20   motion.

21           THE COURT: Very well.

22           MS. UHLAND: Good afternoon, Your Honor.

23           THE COURT: Good afternoon.

24           MS. UHLAND: In this motion, we were seeking to

25   abandon extra copies of numerous brochures and mailing

1   envelopes that are being stored at a vendor in order to cut

2   off administrative and storage - - I'm sorry.

3        THE COURT: One moment, Ms. Uhland.  This is Judge

4   Carey.  Let me ask all the phone participants to be certain

5   that their phones are on mute, please.  Thank you.

6        MS. UHLAND: In order, these are multiple pallets of

7   duplicate documents, and we wanted to cut off our expense of

8   storage, and the vendor was understandably reluctant to

9   simply dispose of them without an appropriate court order.

10  We do want to be clear.  We are complying, in all respects,

11  with all of our various document retention protocols, and in

12  response to the New York State Teachers litigation

13  plaintiffs, we want to commit, on the record, and we'll

14  commit in the order, the, the documents that we're retaining

15  in connection with that.  What we have agreed - -

16       THE COURT: I think you ought to just send them a

17  pallet full.  What do you think?

18       MS. UHLAND: Yes.  Maybe they're, they can do Boy

19  Scout projects with them, or something.  But what we've,

20  we've been working with some express language in the order.

21  We had a proposed order.  We've agreed to some additional

22  language today in Court to, for some clarifications.  I'd

23  like to go ahead and read that into the record, and then

24  rather than, you know, given that it's under certification,

25  we'll just submit it under certification of counsel, a nice

1    clean copy.  But essentially the Debtors are requesting the

2    Court enter an order that the Debtors are authorized to

3    abandon the marketing materials as set forth in the motion.

4    And recite that the Debtors are retaining copies of the

5    subject materials in their possession or control, including

6    any drafts and any related materials, in accordance, with

7    among other things, their obligations to retain documents

8    under the various lawsuits and government investigation in

9    which the Debtors are parties.  Based on this representation,

10   the New York State Teacher's Retirement Fund has authorized

11   the Debtors to advise the Court that its objection to the

12   motion is resolved.

13          THE COURT: All right.  Thank you.  What about Mr.

14   Austin's response?

15          MS. UHLAND: I have been addressing that one

16   informally.  We're also going to be preserving copies to

17   them, and producing them to them.  And we, that has also been

18   resolved.

19          THE COURT: Very well.

20          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

21          THE COURT: Thank you.

22          MS. UHLAND: Thank you, Your Honor.  And Your Honor,

23   I have a, a bit of a cold, and I'm having occasional coughing

24   issues.  So if I, I feel one coming on, I may excuse myself

25   briefly from the courtroom so as not to disrupt proceedings.

1            THE COURT: All right.  Thank you.

2            MS. UHLAND: Thank you.

3            MR. SILBERGLIED: Good afternoon, Your Honor.  For

4    the record, Russ Silberglied, Richards, Layton & Finger.

5    Back to no. 18 on the agenda.  This is the Debtors' motion

6    for additional sanctions against Positive Software for

7    further violation of the automatic stay.  We tried to be

8    pretty explicit on the status line here, Your Honor.  We are

9    not pressing this motion at this time, but it appears to us

10   that Positive Software might or might not want us to press

11   this motion.

12           THE COURT: Well, don't - -

13           MR. SILBERGLIED: I suppose in - -

14           THE COURT:  - - don't you know?

15           MR. SILBERGLIED: Excuse me?

16           THE COURT: Don't you know?

17           MR. SILBERGLIED: I, I actually do not know.  I do

18   know that they are pressing - -

19           THE COURT: Did you ask them?

20           MR. SILBERGLIED: We've had round about

21   communications on the subject.  In connection with no. 19 on

22   the agenda, which is sort of the counter-punch to no. 18, I

23   do understand them to be going forward on no. 19.  And I

24   guess that may be part of my understanding about no. 18.  It

25   may simply make more sense to address no. 19 first, then.

1    Because that's their motion, and I do understand that - -

2                THE COURT: Well, I'd like to address 18, 19, and 24

3    all together.  If we may.

4                MR. SILBERGLIED: I'm perfectly happy to, Your

5    Honor.  Although, 24 - - let's make sure I have the right

6    one.  Right.  24 is actually with respect to a different

7    suit.  So it is slightly different.  It's also sort of the

8    remaining item on the agenda.  18 and 19 are highly related,

9    and 24, while related, is slightly different.

10               THE COURT: They're - -

11               MR. SILBERGLIED: And that's clearly the main event

12   for today.

13               THE COURT: They're all related.

14               MR. SILBERGLIED: Yes, Your Honor.

15               THE COURT: All right.

16               MR. SILBERGLIED: Well, with respect to, with

17   respect to these, Your Honor, I mean, I think our position

18   is, is pretty clear.  They're not really ripe for, 18 and 19,

19   that is.  The suit with respect to Susman Godfrey is not

20   really ripe for adjudication right now.  We asked for the

21   original relief.  We at first asked Your Honor to rule that

22   Susman Godfrey, that the Susman Godfrey suit, the filing of

23   the Susman Godfrey suit in 2007 by Positive Software, itself

24   violated the automatic stay because it was an end run around

25   the automatic stay.  The - -

1        THE COURT: I remember the recent past history.

2   Tell me where you are now, and if - -

3        MR. SILBERGLIED: Thank you, Your Honor.

4        THE COURT: - - if you've told me from the Debtors'

5   standpoint all you need to tell me, let me hear from

6   Positive.

7        MR. SILBERGLIED: Thank you, Your Honor.

8        THE COURT: Because I have read the papers.

9        MR. SILBERGLIED: Thank you, Your Honor.

10       MR. ASTIN: Your Honor, good afternoon.  Daniel

11  Astin of Fox Rothschild representing Positive Software.  I'd

12  like to introduce to the Court again my co-counsel, Mark

13  Ralston from Ralston Associates.  Also in the courtroom is

14  Michael Shore from Shore, Chan & Bragalone, and also Mr. Ed

15  Mandel, President and CEO of Positive Software Solutions.

16       THE COURT: Very well.

17       MR. RALSTON: And Your Honor, briefly, we think that

18  there's so much interrelationship between all of these

19  matters.  Mr., I plan to present Mr. Shore's direct

20  examination to the Court today.  He's going to testify as to

21  everything.  As far as the 2000 litigation, my understanding

22  is that there is a - -

23       THE COURT: 2003?  Or - -

24       MR. RALSTON: Two thousand, the Susman Godfrey

25  litigation.

1              THE COURT: That's 2007.

2              MR. RALSTON: That'S '07, that Mr. Silberglied was

3    addressing.  It's sort of to me, well, if this Court lifts

4    the stay as to 2003, and let's us go forward there, it sort

5    of moots the issues on 2007, the burden, because they're so

6    similar.  I mean, they're different parties, but there are

7    such a similarity of issues.  So we just think that really

8    things will fall into place, if the 2003 litigation, if the

9    stay is lifted, in whole or in part, we think that it will

10   probably address a lot of the issues in the 2007 litigation,

11   also, because of the interrelated facts, it makes sense to

12   have just one hearing on all of these matters that involve

13   Positive Software.

14             THE COURT: All right.  Let me, let me give all the

15   parties my preliminary views after having reviewed the

16   papers.  And let me start with the motion, the second motion

17   – – no, let me start with the motion regarding the '07

18   litigation.  It seems to me that the Debtor is right.  That

19   so long as the District Court has stayed discovery anyway,

20   pending decision on the motion to dismiss, what ought to

21   happen is after the motion to dismiss is determined, the

22   parties then ought to come back to me to decide what, what

23   ought to be done.  And I say that understanding that it's

24   been Positive's position that on the '07 action, it's here

25   only as a matter, I suppose, of caution, as opposed to having

1   to think that they're required to come and seek relief.  But

2   understanding the Debtors' position, I certainly see why

3   Positive has, has filed that motion.  With respect to the

4   '03, the '03 action, consistent with what I think I pretty

5   much signaled to the parties at the August hearing, this is

6   not a matter that, that I think it's appropriate for me to

7   try.  Understanding the history that's already occurred in

8   the District Court.  I understand the Debtor may feel as if,

9   based on certain things the District Judge has said, that he

10  might not be considering their position favorably, and I

11  think the Debtor, anticipating this in its papers, has

12  proposed what I think is probably a pretty reasonable

13  alternative.  And that is to lift the stay on a limited basis

14  to do the things that the Debtor has suggested should occur,

15  after which, if the matter is not resolved, the parties can

16  come back here.  I am willing, and have no hesitation, to

17  estimate, for purposes of voting or distribution, if the

18  parties can't otherwise make an agreement about that.  Those

19  are summary type proceedings, and don't involve this Court

20  having to redo that which has been done in Texas, either as

21  part of the arbitration, or in front of the District Court.

22  I think the Debtor has a good argument that from the estate

23  standpoint, resolution of that, at least for plan and

24  distribution, plan voting and distribution purposes, that

25  shouldn't wait.  And I tend to agree with it.  Now those are

1  my preliminary views.  Oh, and with respect to no. 18, if the

2  Debtor is not pressing it today, I'm not going to hear it

3  today.  To resolve it for the sake of resolving it makes no

4  sense to me.  At least at this juncture in the proceedings.

5  Now, having said that, I will hear whatever evidence either

6  party wants to put on today, or hear whatever further

7  argument parties wish to make.  But I tell you, I have read

8  the papers.  But what you might want to do is, given those

9  views, see if you can talk.  While I acknowledge mediation

10  was unsuccessful, perhaps you can make some interim

11  arrangement based on what I've suggested.  But if none, none

12  is to be had, I will have a hearing, and I will make my

13  ruling.

14        MR. SILBERGLIED: Thank you very much for those

15  preliminary remarks, Your Honor.  I guess what I would

16  suggest, perhaps, is that we have Mr. Samis continue with the

17  remaining items on the agenda.  I would like to speak with

18  Ms. Uhland, with Ms. Eplin (phonetic), my client, as well as

19  the Creditors Committee, and then maybe with Positive

20  Software out in the hall after we've gotten our collective

21  heads together in light of Your Honor's remarks.  Since I

22  don't think Mr. Samis has all that much, that might also

23  require some recess, depending on how long we're talking.

24        THE COURT: I'll hang around.

25        MR. SILBERGLIED: Thank you, Your Honor.

1        MR. RALSTON: Your Honor, if we just could get a

2   little bit - -

3        THE COURT: Come to the microphone.

4        MR. RALSTON: Could we get a little bit of

5   clarification as to what this Court is preliminarily sense of

6   the matter is.  One, as far as relief from the automatic stay

7   to permit us to go forward with what I would call the vacatur

8   proceeding before the District Court, one of the issues that

9   appears to be the case, at least as far as reading the

10  Debtors' motion to estimate, is whether Positive Software

11  would be able to present its motion, second motion for leave

12  to amend its original motion to vacate.  And I assume that

13  when the Court would lift the stay, that we would be

14  permitted to go forward with that, as, that motion as well.

15       MR. SILBERGLIED: Your Honor, I can, I can solve

16  that concern very easily.  I don't think I can be heard.

17  That appears to have been an unintentional use of words by me

18  in the pleading.  And I apologize for any confusion on the

19  subject.  I noted it, because it was footnote 16, I think, in

20  the reply.  We did not mean to say otherwise in connection

21  with our request for alternative relief.  If there is going

22  to be a lifting of the automatic stay to determine the motion

23  to vacate, certainly that would also encompass any already X

24  stamped motion for leave for an amended motion to vacate.

25       THE COURT: Yes.  As I understand it, in concept

1    what the Debtor was proposing was to let the parties haggle

2    out in front of the District Court concerning whether the

3    arbitration award should be confirmed or vacated, and any

4    appeal in connection with that.  Is that correct?

5              MR. SILBERGLIED: I think that's right, although

6    there could be some nuances that we want to talk about in the

7    hall.

8              THE COURT: Yeah.  I just - -

9              MR. SILBERGLIED: But, but as a general directional

10   point, yes.

11             THE COURT: Okay.  Any other questions?

12             MR. SHORE: Your Honor, Michael Shore.  I have one

13   clarification.  I want to make sure the Court has a full

14   understanding of the context of what's going on back in

15   Texas.  There is a ancillary proceeding going on in Texas

16   where the Court has issued a show cause order as to why the

17   attorneys not subject to, I suppose the District Court, I

18   believe, not subject to any Bankruptcy stay - -

19             THE COURT: Apparently not.

20             MR. SHORE: Yeah.  Apparently not, yeah.  The Susman

21   Godfrey attorneys and their conduct had anything, should be

22   referred to the State Bar for discipline, disbarred from the

23   Northern District of Texas, and other sanctions imposed

24   against them.  In fact, the lawyer for Susman Godfrey is

25   actually here monitoring what goes on today, Mr. Fogler

1   (phonetic).  What we would want to make sure we do, and for

2   efficiency quite frankly, is make sure that in the motion

3   practice to either confirm or vacate the award, that we also

4   have the ability to bring a motion for sanctions, as is part

5   of the sanctions, striking the pleadings of the Debtors for

6   their misconduct, and the misconduct of their officers and

7   directors, and others, so that basically you can get one,

8   unified order from the District Court that will either go up

9   on appeal to the 5th Circuit or result in a settlement or

10  something else, and not do the sanctions part of it piecemeal

11  as related to the vacate or confirm.

12          THE COURT: Well, let me ask counsel to do this.

13  Confer outside of my presence.  See if you can make an

14  agreement concerning that.  If you can't, I would normally

15  say I'll resolve it, but I don't know that that issue is

16  before me.  As I read the papers, none of them tee up for my

17  decision today anything other than having described that,

18  that occurred, anything for me to rule on.

19          MR. SHORE: And I guess the, the point that is when

20  we asked to have the stay lifted unconditionally in the 2003

21  litigation, it obviously would have allowed anything like

22  that.

23          THE COURT: Again, the general concept is things

24  concerning the fate of the arbitration award - -

25          MR. SHORE: Exactly.

1          THE COURT:  - - let me say it that way, should be

2     bundled together and limited in that fashion.  And hopefully

3     counsel can make some agreement concerning that.  If you

4     can't, then, then I will.

5          MR. SHORE: I think I understand you perfectly.

6          THE COURT: Okay.

7          MR. SILBERGLIED: Thank you, Your Honor.

8          MR. RALSTON: Thank you, Your Honor.

9          MR. MERCHANT: Your Honor, Mike Merchant again, for

10    the record.  Moving back through the agenda, I believe agenda

11    item 20 was the motion for entry of an order authorizing the

12    deposit of funds into the Court's registry.  It was resolved

13    by stipulation, and that stipulation and a proposed form of

14    order were submitted under certification of counsel.

15          THE COURT: And I have them.  And simply held it,

16    oops, for today because of the statement and reservation of

17    rights that had been filed.  And I guess in the event that

18    anyone wished to engage in any further dialog as a result of

19    that filing.  So I held it for discussion in open court

20    today.  So let me ask if anyone wishes to be heard in

21    connection with that matter, which is no. 20 on the agenda

22    today.

23          MR. KORTANEK: Good afternoon, Your Honor.  Steve

24    Kortanek with Womble Carlyle.  We represent Carrington

25    Mortgage Services, and we, I filed the certification.

1    Reviewing the reservation of rights, Carrington has no

2    problem with it.  So we would ask Your Honor to enter the

3    order.  I'm not sure if anyone else, any other stakeholders

4    are represented today, but it was a fairly straightforward

5    matter where the first mortgage holder, who had foreclosed,

6    simply wanted certainty how to disperse those proceeds.  So

7    we think this satisfies that need.

8             THE COURT: All right.

9             MR. KORTANEK: Thank you.

10            THE COURT: Does anyone else care to be heard?  I

11   hear no response.  Do you have a form of order handy?

12            MR. MERCHANT: One moment, Your Honor.

13            MR. KORTANEK: If I may approach, Your Honor?

14            THE COURT: Yes.

15            MR. KORTANEK: Thank you.

16            THE COURT: Thank you.  That order has been signed.

17            MR. KORTANEK: Thank you, Your Honor.

18            MR. MERCHANT: Your Honor, I'm going to cede the

19   podium to my colleague Chris Samis.  I believe he's going to

20   handle agenda items 26 and then the two claim objections,

21   agenda items 21 and 22.

22            THE COURT: All right.

23            MR. SAMIS: Your Honor, good afternoon.  Chris Samis

24   from Richards, Layton & Finger here today on behalf of the

25   Debtor.  If possible, Your Honor, we'd like to take the

1  status conference on the, on the complaint filed by Mr. Gary

2  Forest Edwards first.

3          THE COURT: Okay.

4          MR. SAMIS: The - - and you just let me know when I

5  should proceed, Your Honor.

6          THE COURT: I'm ready.

7          MR. SAMIS: Okay.  Mr. Edwards filed a complaint

8  that's, that's very difficult to understand.  I believe the

9  cause of action contained therein that appears to most

10 directly implicate the Debtors is an allegation of fraud

11 based upon the Debtors' failure to fund Mr. Edwards's loan

12 with what he considers to be real money.  From reading Mr.

13 Edwards's papers, it appears that he believes that United

14 States currency is valueless, and because the Debtors funded

15 his mortgage with valueless money, without disclosing that it

16 was valueless, they committed fraud.  The, the remaining

17 causes of action appear to relate to the servicing of the

18 loan and the subsequent foreclosure proceedings in the state

19 of Illinois.  The Debtors believe that Mr. Edwards's

20 complaint is, is without merit for the reasons that are set

21 forth in the Debtors' motion to dismiss, which was, which was

22 filed just a couple of days ago on February 4th.  In fact,

23 Your Honor, as I'm sure you're aware there were actually

24 three motions to dismiss that have been filed.  One by the

25 Debtors, one by Codilis & Associates, Rhonda Peak and Wayne

1    Youell, and one by Chase Home Finance, LLC.  The grounds for

2    the motions to dismiss in many respects are, are very

3    similar.  And Your Honor, because of the unusual nature of

4    Mr. Edwards's complaint, the pending motions to dismiss, and

5    the fact that we've just been unable to communicate with Mr.

6    Edwards, despite having made several calls to him, the

7    Debtors believe that it will prudent at this time to refrain

8    from putting together a scheduling order for this adversary

9    proceeding, pending a decision on the motions to dismiss.

10   This will prevent the Debtors and the other defendants from

11   devoting more time and money than necessary to the adversary

12   proceeding.

13          THE COURT: All right.  Well, I see from the

14   telephone sign up sheet anyway that Mr. Edwards is signed up.

15   Mr. Edwards, are you there?

16          MR. EDWARDS (Telephonic): Yes, Judge Carey.  I'm

17   here.

18          THE COURT: All right.  Good afternoon, sir.

19          MR. EDWARDS (Telephonic): Good afternoon to you

20   sir.  I trust things are going well in Delaware.

21          THE COURT: Oh, they're going swimmingly, thank you.

22   Have you heard what counsel for the Debtor has just said?

23          MR. EDWARDS (Telephonic): Yes.  Good afternoon Mr.

24   Samis.  Good to talk to you again.

25          MR. SAMIS: Good afternoon Mr. Edwards.

1          THE COURT: All right.  Well now that we have Mr.

2    Edwards, I guess the - - well, let me ask, let me ask Mr.

3    Edwards.  Mr. Edwards is it your intention to file responses

4    to the motions to dismiss?

5          MR. EDWARDS (Telephonic): Yes it is, Your Honor.  I

6    received those just a matter of a couple of days ago, and of

7    course was not really prepared to handle that at this

8    particular juncture, as I understand it was primarily a

9    scheduling hearing, as opposed to, you know, a full blown

10   trial.

11         THE COURT: No, no.  It's, it's a pre-trial status

12   conference.

13         MR. EDWARDS (Telephonic): Right.  And I do

14   apologize for my pleadings in the respect that obviously

15   while proceeding pro se, I am not schooled in law, and it, I

16   can understand why Mr. Samis might have been somewhat

17   confused with my motion.  However, one of the things that he

18   mentioned as a core issue is not in fact true.  The aspect of

19   valueless money, and things of that nature, that's merely the

20   fluff.  The issue before the bar, really, is the fact that

21   this court proceeding alleges a fraudulent transfer of assets

22   out of the bankruptcy estate.  That's why I'm appearing

23   before you.  It is my contention, by proof that I will be

24   able to provide for the Court, that New Century Mortgage did

25   in fact, in the process of their Chapter 11 filing,

1    fraudulently transfer assets which included the particular

2    property in question here that has been subsequently been

3    foreclosed and so forth.  I believe it can be proven to be

4    fraudulent, and then therefore fraud ad admissio (phonetic).

5         THE COURT: All right.  I have not, so that you know

6    Mr. Edwards, reviewed any of, of the papers in connection

7    with the motions to dismiss.

8         MR. EDWARDS (Telephonic): Okay.

9         THE COURT: Let me ask counsel for Debtor, is it, is

10   it now appropriate then to submit a scheduling order which

11   provides for response time for Mr. Edwards, and I know the

12   Local Rules would otherwise provide for that, but it might

13   bring some - - I think it would be good to memorialize that

14   in an order.

15        MR. SAMIS: Your Honor, we're happy to do that.

16   The, and obviously, though, we would ask, before there is,

17   you know, any discovery schedule set, or anything of that

18   nature, that we would give Mr. Edwards the opportunity to

19   respond, and then, and then have a decision made on the

20   papers.  Before entering into a, you know, a longer term type

21   of, type of scheduling arrangement.

22        THE COURT: All right.  Do you understand what

23   counsel is saying, Mr. Edwards?

24        MR. EDWARDS (Telephonic): Yes sir, I do.  I would

25   like to also make the request of the Court that part of the

1    filing I made included a motion for injunctive relief, at

2    least to grant a temporary stay of execution pending outcome.

3    I would like to reserve the right to present that as well.

4    Assuming we go forward beyond a, the motion to dismiss.

5            THE COURT: Well, let's put it this way.  In a

6    situation in which a complaint contains a request for

7    injunctive relief, that's not automatically scheduled for

8    hearing.  What you need to do is file a separate motion

9    requesting what would be, in federal practice, either a

10   temporary restraining order, or a permanent, or a preliminary

11   injunction.  If it turns out that you have a, a timing issue

12   with respect to a pending foreclosure, that's something you

13   need to act on right away.  Now I can't, I can't advise you,

14   and neither can, can counsel for Debtor.  You are, of course,

15   perfectly free to represent yourself.

16           MR. EDWARDS (Telephonic): Yes, sir.  And I

17   appreciate that.

18           THE COURT: But under these circumstances you might

19   wish to consider engaging counsel to represent you in

20   connection with this matter.  But again, I emphasize it's not

21   required.  All right.  So here's what - - I'll ask counsel

22   for Debtor to prepare a form of scheduling order.  I will ask

23   him to communicate with you and ask, ask you to review it.

24   Promptly after you've received it.  And then what would

25   normally happen is counsel would submit the order, as you've

1    agreed, under certification to the Court, and I would sign

2    the order.  If you're able to deal with the filing of a

3    motion in connection with that, that's fine.  I won't require

4    it.  Otherwise, you must move forward, sir, with the filing

5    of your motion, and get it scheduled for hearing under our

6    local procedures.

7              MS. MANUEL-COUGHLIN (Telephonic): Your Honor?

8              THE COURT: Yes.

9              MS. MANUEL-COUGHLIN (Telephonic): It's Jill Manuel-

10   Coughlin from Mattleman, Weinroth & Miller on behalf of

11   Codilis Associates and the Mason County Sheriff.  If

12   possible, if Your Honor could actually just pick a date for

13   when his response would be due.  Because I know that all

14   parties have had a difficult time reaching Mr. Edwards, as he

15   doesn't necessarily return telephone calls.  And it might be

16   beneficial if we just picked a date now.

17             THE COURT: Mr. Edwards, how much time would you

18   like to respond to the motions to dismiss?  And there are

19   three.

20             MR. EDWARDS (Telephonic): I believe, would 30 days

21   be too much to ask?

22             THE COURT: No, I don't think so.  Any counsel have

23   a problem with that?

24             MS. MANUEL-COUGHLIN (Telephonic): As long as

25   there's no injunctive relief at the temporary time.  A

1   Sheriff's Sale took place, Your Honor, in September.

2          THE COURT: Oh.

3          MS. MANUEL-COUGHLIN (Telephonic): And the Sheriff's

4   office is proceeding with eviction at this time.

5          THE COURT: Well, I'm just talking about time to

6   respond to the motions to dismiss.  Again, if counsel can't

7   make an agreement in that order with respect to scheduling of

8   any requests for injunctive relief, Mr. Edwards will simply

9   have to press forward with that separately.  And the Court

10  will schedule, upon receipt of the appropriate request, you

11  know, a hearing as its calendar permits.  Okay.  Mr. Edwards,

12  I don't want to get into who returned phone calls and who

13  didn't, but I just wish to emphasize that you must make

14  yourself available, and be responsive to inquiries from the

15  various counsel in connection - -

16         MR. EDWARDS (Telephonic): Absolutely.  I'm sorry,

17  Ms. Manuel-Coughlin, I believe it was.  If you had tried to

18  call, I apologize.  But I only received your notice of

19  appearance, I believe, the 28th.  Have you tried to call since

20  that time?

21         MS. MANUEL-COUGHLIN (Telephonic): Not with respect

22  to this adversary.

23         MR. EDWARDS (Telephonic): Okay.  Then I wouldn't

24  have returned a call, if in fact you had called, because I

25  wouldn't know what it would be about.

1          THE COURT: All right.  Let's, let's just leave it

2    at this.  Mr. Edwards, let me ask that you provide - - I

3    assume everyone has your address.

4          MR. EDWARDS (Telephonic): Yes.

5          THE COURT: That you provide a telephone number that

6    can be used to reach you during business hours.

7          MR. EDWARDS (Telephonic): Yes.

8          THE COURT: That you provide an email address, if

9    you communicate regularly with others that way.

10          MR. EDWARDS (Telephonic): Yes.

11          THE COURT: And/or a fax number, if you have one

12    available to you, so that we can open up as many channels as,

13    of communication as possible.

14          MR. EDWARDS (Telephonic): I'd be happy to do that

15    - -

16          THE COURT: All right.

17          MR. EDWARDS (Telephonic):  - - Your Honor.

18          THE COURT: Mr. Edwards, do you have any questions

19    at this point?

20          MR. EDWARDS (Telephonic): No, sir.  With the

21    exception of the fact are we going, do you in fact want my

22    response in 30 days?

23          THE COURT: Yes.

24          MR. EDWARDS (Telephonic): Okay.  I don't believe I

25    have any other questions, sir.

1          THE COURT: All right.  Is that all on this matter,

2   counsel?

3          MR. SAMIS: I have one question, Your Honor.

4          THE COURT: Okay.

5          MR. SAMIS: Just for clarity.  Would you like us to

6   memorialize that 30 day mark in an order?

7          THE COURT: Absolutely.

8          MR. SAMIS: Okay.  Very well.  Then I think that,

9   that concludes this matter, unless there's comment from any

10  of the parties.

11         THE COURT: Any other parties in this adversary care

12  to be heard?

13         MS. MANUEL-COUGHLIN (Telephonic): Thank you, Your

14  Honor.

15         THE COURT: Okay.

16         MR. EDWARDS (Telephonic): Thank you very much, Your

17  Honor.

18         THE COURT: Hold on.  There is one other.

19         MR. EDWARDS (Telephonic): Oh, I'm sorry.

20         MR. FINGER: Good afternoon, Your Honor.  David

21  Finger on behalf of the defendant, Chase Finance.  There's

22  been no discussion of reply, which is normally permitted, at

23  least under the District Court Rules, and I didn't want the

24  order, any order to necessarily foreclose that.

25         THE COURT: No.  It should provide for replies.

1          MR. FINGER: Thank you, Your Honor.

2          THE COURT: All right.  That concludes this matter?

3          MR. SAMIS: I believe that's correct.

4          THE COURT: All right.  Mr. Edwards, you are very

5   welcome to remain on the telephone connection if you like,

6   but you may also get off at this point if you would prefer.

7          MR. EDWARDS (Telephonic): I think I would sir, in

8   deference to your time.  And, but I appreciate your time and

9   consideration.

10         THE COURT: You're welcome.

11         MR. EDWARDS (Telephonic): And we'll be in touch

12  with opposing counsel.

13         THE COURT: Very well.

14         MR. EDWARDS (Telephonic): Thank you.

15         THE COURT: Thank you.

16         MS. MANUEL-COUGHLIN (Telephonic): Thank you, Your

17  Honor.

18         MR. SAMIS: Thank you, Your Honor.  The next two

19  items that I'll be handling are agenda items 21 and 22, which

20  are the Debtors' eighth and ninth omnibus objections to

21  claims.  I will take them in turn.  There were, there were

22  multiple responses, and several of them are going forward

23  today.  However, per practice over the past couple of

24  hearings, rather than enter into a discussion of the factual

25  background with respect to each, and the legal argument with

1    respect to each.  I, I, it might be faster to simply read the

2    claimant's name, determine whether or not they're on the

3    phone or the in courtroom, and, and just proceed accordingly.

4    I do know that Mr. Votruba is on the phone.  He is a, he has

5    responded to the eighth omnibus objection.

6              THE COURT: Okay.  Let me get to that response.

7              MR. VOTRUBA (Telephonic): Good afternoon, Your

8    Honor, this is Stanley Votruba.

9              THE COURT: Good afternoon, sir.  Give me one

10   moment, please.

11             MR. VOTRUBA (Telephonic): Thank you.

12             THE COURT: Okay.  I've read your response.

13             MR. SAMIS: Your Honor, Mr. Votruba is asserting a

14   claim for wages for a period of two weeks in the amount of

15   $25 hundred.  Expenses he allegedly incurred in the amount of

16   $463, and then $12 thousand for loss of income and severance.

17   At the outset, with respect to the $463 in expenses, Mr.

18   Votruba, this morning, did provide me with backup information

19   for that, and the Debtors are going to allow him a priority

20   claim of $463 for the expense of that.

21             THE COURT: All right.

22             MR. SAMIS: As for the severance piece, there was

23   never an agreement to pay Mr. Votruba for a severance.  And

24   thus the, the $12 thousand amount is, is wholly unsupported

25   by the, by the underlying documentation.  With respect to the

1    $25 hundred amount, Mr. Votruba was only paid on commission,

2    and according to the Debtors' records, he was paid on every

3    sale that was made.  Accordingly, Mr. Votruba is not entitled

4    to payment, regardless of the fact that he showed up for work

5    for the last two weeks, he was not a salaried employee, and

6    was only granted, and was only granted guarantees against

7    commission during the first four months of his employment,

8    which was well before the two weeks that he's, that he's

9    complaining about now with respect to wages.  He did not

10   provide the Debtors with supporting document, documentation

11   that would, that would suggest anything otherwise, despite

12   the Debtors' repeated requests.  And he has also not pointed

13   the Debtors to any applicable non-bankruptcy law.  Although

14   in conversations that I've had with Mr. Votruba, he has

15   referenced that state law, the state law of New Jersey

16   guarantees him some sort of minimum amount.  But the Debtors

17   feel that the onus is on, is on Mr. Votruba to, to point them

18   to the applicable non-bankruptcy law to the extent that he

19   believes that applies, in order to establish the prima facie

20   validity of his claim.  With that, Your Honor, I would turn

21   over the, the Court's ear to Mr. Votruba.  I also think that

22   it might be helpful in discussing this to, to hand up a copy

23   of Mr. Votruba's employment contract, which was not attached,

24   but which Mr. Votruba has agreed is a true and correct copy.

25   I provided him, this to him before the hearing.

1          THE COURT: All right.  Go ahead.

2          MR. VOTRUBA (Telephonic): Your Honor, the employer

3    has a copy of my compensation agreement, and also an offer

4    letter.  There was no need for me to provide that to counsel.

5    The offer letter, dated September 8, 2006, is very clear that

6    there was a meeting of the minds between my direct supervisor

7    and a senior vice president, Mr. Faulkner (phonetic) as to

8    the compensation, according to industry standards for sales

9    position.  It does state that it's a monthly guarantee of $5

10   thousand against commissions for the first month of

11   employment.  It also states that in the compensation plan.

12   It was very clear that any salary, it was a salaried

13   position, draw against commission.  It is also mentioned that

14   in the offer letter a draw against commission is a base

15   salary that is paid to an employee, and the base salary was

16   $5 thousand.  The guarantee was for four months.  In that

17   respect, the only way I could earn more money than the base

18   guarantee of 5 thousand would be if I closed deals.  But

19   basically since they didn't have an office in New Jersey,

20   they weren't licensed to operate in New Jersey, that's why we

21   agreed on a guarantee of four months, irrespective if I

22   produced any business, that guarantee would be non-payable

23   back to Home 1,2,3.  But going forward, it was always

24   understood that it was a draw against commissions.  And there

25   was never any acknowledgment that I was not getting a draw

1    against the commission.  Basically they failed to inform me

2    that I was not going to get paid.  And after I did not get

3    paid, and questioned it, I was told I was not getting paid.

4    And that's when New Century found out they had financial

5    problems, and everything started going south.  The basis of a

6    draw against commissions is to have, you know, employment

7    income coming to an employee.  And it is a salary.  And it

8    was, and it, you know, the guaranteed portion was a non-

9    returnable draw.  So in other words, in January or February

10   or March, if they paid me $5 thousand base salary, and my

11   commissions were above that, it would be a positive for me.

12   If the commissions were less than that, it would be a carry

13   forward negative draw until I could recoup it.  And this is,

14   you know, this goes back to Fair Labor Standards Act.  You

15   can either be a W2 employee, which I was, and you have to pay

16   at least minimum wage or overtime.  You cannot expect someone

17   to work for weeks for free.  We don't have indentured

18   servitude in America.  So it was, the onus is, yes, they

19   could fire me at any given time according to the agreement,

20   but then they should have done that.  And more importantly,

21   what transpired is, I worked for two weeks, didn't get

22   compensated, when I applied for unemployment benefits, New

23   Jersey Department of Labor looked upon it as I was waiting,

24   you know, gainfully employed.  And I was also not able to

25   collect unemployment for two weeks that I worked for a

1    company.

2            THE COURT: Let me - -

3            MR. VOTRUBA (Telephonic): It's unconscionable that

4    the employer did not notify me that you're not getting paid.

5            THE COURT: Mr. Edwards, let me ask a couple of

6    questions.  And this goes to you and to Debtors' counsel.

7    When was your first day of employment, actually?

8            MR. VOTRUBA (Telephonic): I actually started on the

9    16th for Mr. Muti (phonetic) out of Freehold.  And I signed

10   the contract, I think I was, on the 18th of September.

11           THE COURT: And your first day was the 16th of

12   September?

13           MR. VOTRUBA (Telephonic): Correct.

14           THE COURT: Is there any dispute about that?

15           MR. SAMIS: There's not, Your Honor.  In fact, the

16   second line of the letter from Mr. Steven Muti actually

17   indicates that.

18           THE COURT: Well it says 16, but then that's crossed

19   out - -

20           MR. SAMIS: It's crossed out.

21           THE COURT:  - - and handwritten, the 18th is

22   handwritten in.  But it was actually the 16th.  Okay.  And how

23   were you paid your guarantee against commissions?

24           MR. VOTRUBA (Telephonic): With a check that said,

25   with a W, you know, I received a W2 and a regular company

1    check.

2              THE COURT: Okay.  Well when did you receive them?

3    Did you get a $5 thousand - -

4              MR. VOTRUBA (Telephonic): Every two weeks.

5              THE COURT: Pardon?

6              MR. VOTRUBA (Telephonic): It was every two weeks.

7              THE COURT: So you got $25 hundred payments every

8    other - -

9              MR. VOTRUBA (Telephonic): Every two weeks.

10             THE COURT:  - - every other week?

11             MR. VOTRUBA (Telephonic): Correct.

12             THE COURT: And how many - -

13             MR. VOTRUBA (Telephonic): And they took out

14   withholdings for 401K, you know, and the normal, you know,

15   normal expenses associated with, with, withholding.  Federal

16   taxes, state taxes, you know, unemployment benefits, and what

17   not.

18             THE COURT: Okay.  And how many $25 hundred payments

19   did you receive?

20             MR. VOTRUBA (Telephonic): $20 thousand.  For the

21   four months.

22             THE COURT: So you received your four months of

23   guaranteed payments?

24             MR. VOTRUBA (Telephonic): Correct.

25             MR. SAMIS: There's no dispute as to that, Your

1   Honor.  And then the Debtors would add that based upon a

2   plain reading of the agreement, it switches to a commission

3   based structure.  And it's an entirely commission based

4   structure.

5          MR. VOTRUBA (Telephonic): Well, it doesn't state

6   that, though, Your Honor.  If you read it very clearly, you

7   know, this is a master/servant relationship here.  I was, you

8   know, I signed an employment contract.  It's not even, it's

9   an offer letter with a compensation plan attached.  And, you

10  know, the tie should go to the runner, Your Honor.  No where

11  does it state that, it states it's a draw against commission.

12  I never received the draw past the four months guaranteed,

13  and I worked.  And I think it's the onus on the employer to

14  make it very clear in their offer letter that this was 100%

15  commission, you know, endeavor, where it doesn't state that.

16  Nor does it say that I was, you know, a 1099 employee.  I was

17  hired as an employee draw against commission.  That means you

18  work, you get paid the minimum draw.  The draw was $5

19  thousand a month.

20         MR. SAMIS: Your Honor, if I could - -

21         MR. VOTRUBA (Telephonic): And, and if the employers

22  didn't want me to work for them, for whatever reason, they

23  could have called me and said, you know, when, when Mr.

24  Faulkner fired my supervisor in early January, I think,

25  January 12th, I sent emails to him.  I think Mr. Samis has a

1    whole barrage of emails that was also sent to Human Resources

2    indicating who my next supervisor would be.  And that became

3    Mr. Faulkner, Senior Vice President.  We're talking about a

4    senior vice president individual of a major stockholder

5    company that received emails from me, and then at, at the end

6    of the month, after I complained that I didn't get my money,

7    then essentially I was told to, you know, jump in the creek.

8    I mean, it's unconscionable.  You cannot have someone working

9    for free.  Either you have to be paid a minimum wage with,

10   with overtime, or you have to be a, a subcontractor.  And

11   1099.  And I think IRS rules are very clear about that.  You

12   know, you can, anyone can look that up on their website.  The

13   difference between an independent contractor as well as a

14   salaried or a wage worker.  But you can't have people working

15   free without any compensation unless that was a term of the

16   bargain.  I didn't come on as a 1099 independent contractor.

17   I was hired as an employee who would draw against commission.

18   And I worked, and I didn't get paid.

19           THE COURT: All right.

20           MR. VOTRUBA (Telephonic): That's the bottom line.

21   And I didn't, and if they didn't want to have me work there,

22   they should have fired me or let me go.

23           THE COURT: Let me - -

24           MR. VOTRUBA (Telephonic): But - -

25           THE COURT: Let me ask this.

1          MR. VOTRUBA (Telephonic):  - - you don't have an

2    employee there because, and you, you fail to even acknowledge

3    that they're not going to get paid.  That person, a senior

4    vice president should have came to me and said, Stanley, you

5    know, our agreement says one thing, but we're really looking

6    at it from a different interpretive position that we're not,

7    we're going to stop paying you on the 15th or 16th going

8    forward.  And I would have said, Thank you, goodby.  And I

9    would have filed for unemployment benefits immediately.  You

10   don't have me out there conducting business and work for an

11   employer not expecting to get a basic draw.

12          THE COURT: All right, Mr. - -

13          MR. VOTRUBA (Telephonic): Which was part of the

14   bargain.

15          THE COURT: All right, Mr. - -

16          MR. VOTRUBA (Telephonic): From the onset when I

17   took the position.

18          THE COURT: Mr. Votruba.  This is Judge Carey.  I've

19   heard you.

20          MR. VOTRUBA (Telephonic): Yeah.

21          THE COURT: And I understand your claim.

22          MR. VOTRUBA (Telephonic): Yes, Your Honor.

23          THE COURT: Is there agreement about what the date

24   of termination was?

25          MR. SAMIS: I believe - -

1          MR. VOTRUBA (Telephonic): No.  It's at the end of

2     the month.  Yeah.

3          MR. SAMIS: I think that's correct, Your Honor.

4          THE COURT: End of January.

5          MR. SAMIS: I think it was the end of January.

6          MR. VOTRUBA (Telephonic): Yes.  Yes.

7          THE COURT: January 31, '06.  '07.

8          MR. VOTRUBA (Telephonic): Correct.  '07, Your

9     Honor, '07.

10         THE COURT: '07.  I understand.  Okay.  And is there

11    a, did the company have a severance policy for such employees

12    at the time?

13         MR. SAMIS: Your Honor, it did not.

14         THE COURT: Mr. Votruba, are you aware of any

15    severance policy that the company had at the time?

16         MR. VOTRUBA (Telephonic): I don't know, Your Honor.

17    I'm going on the fact that I left the position where I was,

18    with a company where I was nine years.  I was sold a bill of

19    goods.  And, you know, they got licensed in the end of

20    November.  The office in Freehold didn't open until January

21    1, and then my supervisor was brought on board, was fired on

22    January 6th.  And we were there at the office.  The irony is

23    the senior vice president came down on January 6th to

24    terminate the individual, and never spoke of anything going

25    bad until the end of the month.  And obviously, we all know

1    that everybody knew at corporate what was going to happen.

2            THE COURT: How were you advised of your - -

3            MR. VOTRUBA (Telephonic): Within a month and a half

4    they filed for bankruptcy.

5            THE COURT: Mr. - -

6            MR. VOTRUBA (Telephonic): That just doesn't happen

7    out of the blue moon.

8            THE COURT: Mr. Votruba?

9            MR. VOTRUBA (Telephonic): And now I had to go find

10   a job, and I was lost of income - -

11           THE COURT: Mr. - -

12           MR. VOTRUBA (Telephonic):  - - I had to pay my

13   bills.  And that's why I filed that in - -

14           THE COURT: Mr. Votruba?

15           MR. VOTRUBA (Telephonic): Yes.

16           THE COURT: When I ask a question, you must take

17   care to confine your response to the answer to my question.

18           MR. VOTRUBA (Telephonic): Yes, Your Honor.

19           THE COURT: When were you advised of your

20   termination?

21           MR. VOTRUBA (Telephonic): At the end of the month.

22           THE COURT: So?

23           MR. VOTRUBA (Telephonic): With, with correspondence

24   with Donna Bailey, Human Resource Director.

25           THE COURT: So do you remember the date of that?

1    Was it on the 31st?

2            MR. VOTRUBA (Telephonic): I believe it was, I think

3    it was July, I mean, January 31st, I believe.

4            THE COURT: Okay.

5            MR. SAMIS: I think that's correct, Your Honor.

6            THE COURT: So that was when you were advised, and

7    that was your last day.

8            MR. VOTRUBA (Telephonic): Correct.

9            THE COURT: Okay.  Well, Mr. Votruba, it seems to me

10   that based on the, both on the offer letter, which I have in

11   front of me, that you've described, and the attached

12   compensation plan, which you've referred to, which I also

13   have in front of me, both say very clearly that the monthly

14   guarantee of $5 thousand is for the first four months of

15   employment.  There's nothing that indicates, in either

16   document, that you were to receive anything but commission

17   after that time.  And you've told me that you've received

18   your $20 thousand payments, which were the first four months

19   of guarantee, so I see no basis to award anything beyond the

20   expenses that the Debtor has acknowledged that it now has

21   backup for.  With respect to loss of income, I, you know,

22   unless there, it seems to me unless there's some wrongful

23   termination, which I don't think legally is evidenced in the

24   papers that you've filed, it doesn't seem to me a claim would

25   lie for that.  You would be entitled to severance only if the

1    company had a severance policy for these employees, and the

2    company has said it does not have one.  And you have not

3    indicated that there is, that there is evidence of such a

4    policy.  Now I will tell you this.  If you think there are

5    grounds, under state law, or under any other law, to assert

6    some other right, I'll give you a brief window to do that.

7    But for today's purpose, I'm going to sustain - -

8           MR. VOTRUBA (Telephonic): Okay.

9           THE COURT:  - - the Debtors' objection to your

10   claim, except for the expense reimbursement claim, with leave

11   for you to file, within 30 days, a claim based upon Federal

12   or state law, applicable state law, with respect to the

13   termination of your employment.  And I'll ask counsel to

14   draft a form of order that embodies that ruling.  Mr.

15   Votruba, do you have any questions?

16          MR. VOTRUBA (Telephonic): No, I don't.  It was, I,

17   you know, I understand the, you know, the Court's position on

18   this.  But it was very clear about, you know, a draw against

19   commissions, and it was very stated in that.  And a draw

20   means that it's the continuous thing beyond just the

21   guaranteed portion.  That's the, that's the definition of a

22   draw against commission.  You know, maybe the Court and other

23   people that are on strictly salary are not familiar with

24   this, but a basis of draw is against commission.  And that is

25   assumed that it's paid on, on a weekly or monthly basis.  And

1   a guarantee is non-repayable.

2            THE COURT: Okay.  Mr. Votruba?

3            MR. VOTRUBA (Telephonic): And that's - - yes.

4            THE COURT: Again, what I did was ask you if you had

5   any questions.

6            MR. VOTRUBA (Telephonic): Okay.

7            THE COURT: Do you have any questions?

8            MR. VOTRUBA (Telephonic): I don't.

9            THE COURT: Okay.

10            MR. VOTRUBA (Telephonic): No I don't, Your Honor.

11            THE COURT: All right.  I'll just say that the

12   documents don't evidence support for your position.  However,

13   I've granted you the leave that I've granted you, and that

14   will be embodied in a written order, which counsel will

15   submit to me, and which you will get a copy of.  And we'll go

16   from there.  Okay?

17            MR. VOTRUBA (Telephonic): Thank you.

18            THE COURT: Thank you, sir.

19            MR. VOTRUBA (Telephonic): Bye-bye.

20            THE COURT: Good bye.

21            MR. SAMIS: Thank you, Your Honor.  As for the

22   remaining responses, I'm not aware that there's anyone who's

23   on the phone or in court, but I can read the names, and - -

24            THE COURT: Why don't you read the names and ask if

25   anyone is present either in person or on the telephone, or

1    otherwise represented.

2         MR. SAMIS: Very well.  The first response - - and

3    some of these have also been withdrawn in the interim period.

4    I'll indicate that as I go on, Your Honor.

5         THE COURT: All right.

6         MR. SAMIS: On the eighth omnibus objection, Alvin

7    Schell, this claimant has withdrawn his response in the

8    interim period.  Christina L. Dolan, I would ask if she is on

9    the phone or present in the courtroom today.  Your Honor, I

10   hear no response.

11        THE COURT: Very well.

12        MR. SAMIS: Erin E. Conroy, I would ask if she is

13   present in the courtroom or on the phone today.  Your Honor,

14   I hear no response.  Mortgage Plus Funding, Incorporated.  I

15   would ask if they are present in the courtroom or on the

16   phone today.  Your Honor, I hear no response.  Amber Saxby, I

17   would ask if she is present or, in the courtroom or on the

18   phone today.  Your Honor, I hear no response.  Tracy P. Dunn,

19   I would ask if she is in the courtroom or on the phone today.

20   Your Honor, I hear no response.  And Virginia Granato, I

21   would ask if she is present in the courtroom today, or other,

22   or on the phone.  Your Honor, I hear no response.

23        THE COURT: All right.

24        MR. SAMIS: The, Mr. Votruba was the last response,

25   and we've handled him.

1        THE COURT: And again, from the telephone sign up

2    sheet, it appears that none of those persons or entities had

3    signed up to participate by phone.

4        MR. SAMIS: Your Honor, with respect to the ninth

5    omnibus objection.  Those were only the claimants with

6    respect to the eighth.  With respect to the ninth, I would

7    proceed in the same fashion as I just did with the eighth.

8        THE COURT: Very well.

9        MR. SAMIS: Elaine Michael Rizk, I would ask if she

10   is on the phone or in the courtroom today.  Your Honor, I

11   hear no response.  Enrique Baltierra, I would ask if he is

12   present in the courtroom or on the phone today.  Your Honor,

13   I hear no response.  Joseph A. Fischer & Company,

14   Incorporated.  I would ask if, if that entity is, is

15   represented in the courtroom today or on the phone.  Your

16   Honor, I hear no response.  Arash Mostafavipour, this

17   claimant withdrew his response in the interim period.

18       THE COURT: All right.

19       MR. SAMIS: Nancy Anderson, the Debtors have

20   withdrawn their response to this claimant.  And Richard

21   Martin, the Debtors have withdrawn their response to this, or

22   their objection to this claimant.

23       THE COURT: All right.

24       MR. SAMIS: And Your Honor, that takes care of the

25   two omnibus objections.  I do have forms of order.  And the

1     form of order for the eighth omnibus objection does embody

2     the expenses that I, that the Debtors agreed to, to grant Mr.

3     Votruba.  The $463 amount.  I can submit a separate form of

4     order afterwards that embodies your ruling here today, in

5     order to fully address that situation.

6               THE COURT: That would be fine.

7               MR. SAMIS: Okay.  With that, Your Honor, I'd like

8     to hand up the, the two.

9               THE COURT: Go ahead.  Thank you.  All right.  Those

10    orders have been signed.

11              MR. SAMIS: Thank you, Your Honor.  With that, I

12    believe I will be turning the podium back over to Mr.

13    Merchant, or Mr. Silberglied, directly, actually.

14              THE COURT: All right.

15              MR. SILBERGLIED: Your Honor, the Debtors are

16    prepared to proceed just as the way Your Honor outlined.  I

17    think that there are two issues that I want to address with

18    it.  One is in terms of dates for an estimation proceeding.

19    Since we want to have a disclosure statement hearing, since

20    we're currently scheduled to have a disclosure statement

21    hearing on March 5, we'd like to see if we can do this

22    estimation proceeding at the next omnibus hearing, which I'm

23    told is the 20th.

24              THE COURT: Of this month?

25              MR. SILBERGLIED: Yes, Your Honor.  Subject to

1   having to confirm with our damages expert that the person is

2   available.

3          THE COURT: How much time are you going to need?

4          MR. SILBERGLIED: I expect, Your Honor, that it

5   would probably be the better part of a day.

6          MR. RALSTON: Your Honor, we object.  We're ready to

7   go forward on that, if they so wish.  We of course, with a

8   minor clarifications which, to prevent further disputes with

9   the Debtors, would agree to this Court's suggestion regarding

10  how this matter should proceed.  That would the way, we think

11  that's quite logical.  We think it preserves the parties'

12  resources, and it would be efficient, and it's consistent

13  with the interest of justice.  If the, and I believe, at

14  least if I heard the Court correctly, the estimation, motion

15  to estimate the Positive Software claim, along with the

16  related motion that we have filed to abstain, have this Court

17  abstain from estimating the claim, or hearing any claim

18  objection before we've had the matter adjudicated, would

19  essentially be abated until the Texas District Court has

20  entered an order either confirming the arbitration order, or

21  vacating the arbitration order.

22         THE COURT: Well let me ask this.  If the Court, if

23  this Court were to do nothing further, other than let you go

24  to Texas, and it came time for voting on the plan, what would

25  be the amount of your claim for plan voting purposes?

1          MR. RALSTON: I haven't looked at this, Your Honor,

2    but they've objected to our claim, and that objection stands

3    with the disputed claim.

4          MR. SHORE: We wouldn't get a vote.

5          MR. RALSTON: We would be able to object, like any

6    other creditor, but we would have to, I think we would have,

7    I think it's incumbent upon us, if we wish to vote in some

8    amount, to come back to this Court and ask, ourselves, for

9    estimation purposes for plan voting.

10          THE COURT: Well, okay.

11          MR. RALSTON: And I don't think we've done that, and

12    I don't, we haven't made a final decision, but I don't think

13    we're inclined to do so.

14          THE COURT: Is that a, I mean, from the Debtors'

15    standpoint, is that a bad thing?

16          MR. SILBERGLIED: Well, insofar as it goes, no.  But

17    the problem is that there is, you know, the next level down.

18    You know, we're going to be soliciting a plan.  The plan is

19    going to, they have, if their claim were to be allowed, or we

20    had to reserve for the amount of their claim, it's in the

21    amount of $1.16 billion.

22          THE COURT: Well, let's talk - -

23          MR. SILBERGLIED: So we have - -

24          THE COURT: Let's, that's distribution.  Now when

25    would you anticipate that distribution would occur?

1          MR. SILBERGLIED: Within six months, Your Honor.  As

2     a first distribution.

3          THE COURT: Okay.  So it's not a today thing, and

4     it's not a, necessarily a disclosure hearing date thing.  Or

5     even a confirmation date thing.  Now, I understand that given

6     the size of the claim it's not something to be ignored.  I

7     also understand the Debtors' position regarding the claim.

8     But it seems to me that procedurally, normally, it would be

9     the creditor that would come in, who'd been the recipient of

10    an objection, and say, okay, now you've got to estimate,

11    estimate it.  You don't think it's sufficient for disclosure

12    purposes to say it's out there, we think it's worth bupkus,

13    and we're proceeding.

14         MR. SILBERGLIED: I think given the size of this

15    claim, and that it can dwarf the unsecured creditor pool, it

16    could be literally over 50% of claims after giving effect to

17    the claims protocol and the like.  That the creditors should

18    know that, and should know that it is going to be estimated

19    in this Court on a prompt time frame.

20         THE COURT: Well, but I, that's, and I think that's

21    fair enough.  It's just a matter of when that happens.  And

22    what, what Positive Software is indicating is that that

23    doesn't have to be by the disclosure hearing date.

24         MR. SHORE: Correct.  One other clarification.  It

25    is not a $1.16 billion claim.

1          THE COURT: No, I, I saw the number in the papers.

2          MR. SHORE: Yeah.  So here's what we believe is a

3    reasonable next step in this process.  We think that, we

4    would ask the Court, Positive Software requests an order from

5    the Court lifting the automatic stay in the 2003 litigation

6    limited to one, matters relating to the confirmation by

7    judgment of the arbitration award, and two, matters relating

8    to the vacatur of the arbitration award by order, appealable

9    order.  That way we can go into the Judge, the Texas District

10   Court, and can look the thing over, decide what matters he

11   needs to address to get us a final, appealable judgment or a

12   appealable order.

13          THE COURT: All right.

14          MR. SHORE: They don't have to appeal the order.

15          THE COURT: Are you telling me this is what counsel

16   have agreed to as a result of your discussions?

17          MR. SHORE: Well, no.  I don't think we, this is

18   what we're proposing.  I think what they wanted to do was

19   constrict what the Texas District Court could look at as to

20   only based upon the pleadings currently before the Court, the

21   Texas District Court, and not allowing anything else to be

22   filed or done.  Basically rule on the record as it stands.

23   That's the understanding I had.  Now obviously, that's not

24   how litigation practice works when you're moving to confirm

25   or, confirm an award or if you're moving to vacate an award.

1   There are factual issues that have to be determined.  It's

2   not going to be a long, a long trial or process.  I would

3   think it would, could be over with within two months.  But

4   it's not going to be a, a go and you're not allowed to, to

5   seek anymore information to support your basis for vacatur,

6   or in their sense, they're not allowed to seek anymore

7   information to support their defenses to our positions to

8   vacatur.  So I think it's important that the order have that

9   relating language.  You know, that the Texas District Court

10  is, the stay is lifted to matters relating to affirming the

11  award, confirming the award by judgment, or vacating the

12  award by order.  And one of the things that we had offered,

13  and intended to offer, we intended to offer to make that a

14  non-appealable decision.  If it goes against us, we're done.

15  It's a zero.  If it goes against them, then we come back to

16  you, and we talk about who's going to estimate the claim.  We

17  think it should be best estimated in the Texas District

18  Court, but that's something we can, we can talk about another

19  day.  But there's no reason why - -

20          THE COURT: Well - -

21          MR. SHORE:  - - this can't be done - -

22          THE COURT: But this - -

23          MR. SHORE:  - - very quickly.

24          THE COURT:  - - this proceeding is going to move

25  more rapidly, I'm pretty certain, than, than what the

1  District Court would be likely to do, it strikes me, with

2  respect to estimating the claim.  I, and I don't know what

3  the result of, of the competing motions concerning the

4  arbitration are going to be.  And I'm not inclined to hold

5  this Chapter 11 process up to see what happens.

6          MR. SHORE: And I don't, and, and I'm not asking, we

7  don't want it held up either, quite frankly, because we don't

8  get paid whatever we're going to get until after the Chapter

9  11 process is done as well.  That's why we say we're willing

10  to waive any rights of appeal.  The Texas District Court has

11  already had in front of it, for three years, the 800 thousand

12  page record with 8.85 gigabytes of code that it has already

13  reviewed in a preliminary injunction proceeding, and it has

14  already reviewed in the vacatur proceeding.  The idea that

15  you could have an estimation hearing on the claims - - just a

16  summary of the claims in the case is 38 pages long, single

17  spaced.  So the idea that you could have an estimation of

18  those claims in one day is, is pretty preposterous, frankly,

19  and, and I'm not an expert in bankruptcy law, and I would

20  never even dream that I could sit and handle some complex

21  bankruptcy procedure that had that type of volume in a day,

22  and I don't think, you could be the most brilliant judge on

23  the face of the earth, but unless you have some familiarity

24  of these facts, and these very, very esoteric types of law,

25  like Judge Godbey has in Texas, this is not going to be a one

1    day procedure, if we're going to be fair to either side.

2            MR. RALSTON: Your Honor, and I think Mr. Shore, not

3    to, not to overstep him, but one of the things that I had

4    under, well, I was trying to understand, and it wasn't clear,

5    and it relates to this.  Do we come back here and argue about

6    what the proper procedure would be?  And I think the Judge

7    has indicated its inclination that it will hear the

8    estimation, although we might, we'll, we'll still be able to

9    argue what Mr. Shore is essentially arguing here.  I don't

10   think it's, I don't think it's really, if this Court's going

11   to send, send this matter back for the limited purpose that

12   has been articulated, I think the most appropriate thing to

13   do is permit us to come back and say, Your Honor, these are

14   the reasons why we think we ought to go back and have an

15   estimation done in some other fashion.  Or at least argue for

16   a more, a different procedure than at least the Debtors have

17   articulated in their briefing.  I don't think it's for here,

18   but I just want to make that clear.  That we would like the

19   ability to continue to, to bring to this Court what we, what

20   we think we would need to get a full and fair hearing, at

21   least on estimation.  Because one of the concerns we have,

22   obviously, is a mootness issue.  If our claim gets estimated

23   at a much lower amount than is actually allowed later on,

24   there may not be assets to pay our pro rata share of what

25   we'd otherwise be entitled to.

1          THE COURT: Well, look.  But that's always the case.

2     Or almost always the case.  There is some risk to that.  And

3     there are ways, some, sometimes to eliminate or minimize the

4     risk with respect to set asides, but you know, we're not,

5     we're not there yet.

6          MR. RALSTON: I agree, Your Honor.

7          MR. INDELICATO: Your Honor, Mark Indelicato on

8     behalf of the Committee.  Your Honor, just two short points,

9     and one thing I want to, at least from the Committee's

10    perspective, make absolutely clear.  We agree with the

11    Court's analysis of how this should be handled.  One thing I

12    am concerned about, and I think I had heard Mr. Shore earlier

13    talk about making a motion in the, in the Texas District

14    Court, and he didn't want his rights precluded to make a

15    motion to strike the pleadings.  I think what he is referring

16    to there is, is a result of the sanctions that he thinks may

17    be, they may be entitled to as a result of the Debtors'

18    employees may have done something or Susman & Godfrey may

19    have done something.  Your Honor, our concern there is that

20    is punitive in nature, and he was looking to have the

21    estate's creditors pay for wrongdoing that may have been done

22    by others.  He's commenced another law suit to seek recovery

23    for those damages against Susman Godfrey directly, and the

24    individuals.  I don't think that would be an appropriate

25    remedy in the, to allow that in the Texas District Court.  I

1    think, as we have said, and we would be agreeable to, have

2    this Court estimate what the appropriate claim would be for

3    his client in this, in this bankruptcy proceeding.  To the

4    extent he has damages resulting from sanctionable conduct by

5    third party individuals, that shouldn't be, that shouldn't

6    be, the estate should not be, and the estate and its

7    creditors should not bear the burden of that.  The second

8    thing, Your Honor, I wanted to, and you know, we were, I was

9    hoping to not have to go through this, or have Ms. Uhland go

10   through it, because the Court hasn't had the opportunity yet

11   to review either the disclosure statement or the plan that

12   was recently filed in this case.  But when we talk about the

13   timing of the estimation proceeding, Your Honor, this plan

14   has been drafted and negotiated with, with a lot of adverse

15   parties, and it contains, as this Court will see, a lot of

16   complex settlements and adjustments regarding claims.  And

17   it's been talked about, the size of this Positive Software

18   claim in relation to other claims.  That's after taking into

19   account a complicated protocol that's been put in place in a

20   number of different levels, so that we could actually get

21   distributions to creditors in a meaningful manner.  If in

22   fact the estimation proceeding did not occur before the

23   disclosure statement was sent out, I'm not so sure the

24   creditors who would be voting upon implementing this protocol

25   would have a full understanding of how their claims would

1   otherwise be affected.  So we would urge the Court, if

2   possible, to have that, have that estimation hearing before

3   this disclosure statement ultimately was sent out to

4   creditors.  So they could truly get an understanding of how

5   this claim might affect their distribution, and how accepting

6   the plan as is might affect their distribution.  So with

7   those two caveats, Your Honor, we would support the procedure

8   proposed by the Court and the Debtor for the estimation of

9   this claim.  For both plan voting and distribution purposes.

10          MR. SHORE: And this is exactly the issue we've

11  raised about any matters.  Obviously when you're in

12  litigation and you're moving to vacate an award, one of the

13  grounds for vacatur can be misconduct by the other side.  And

14  frankly, that's one of the actual Federal Arbitration Act

15  grounds for vacatur.  Fraud or other misconduct.  And we need

16  to be able to bring that to the attention of the, that's part

17  of the normal process of seeking to vacate an award.  The

18  simple fact that we have found out a lot subsequent to the

19  original motion to vacate, and Judge Godbey can address this

20  issue.  But if he's vacating the award based, as a sanction,

21  or vacating the award based upon fraud, or vacating the award

22  based upon some combination of sanctions or fraud, that's

23  part of vacating the award.  And so what they're trying to do

24  is lift the stay with one hand tied behind our backs, and one

25  leg, and have us hop on one leg down there to court.  And

1    ultimately those issues are going to be decided anyway.  So

2    that's why we think that the order should read the stay is

3    lifted to any matters related to confirming the award, and

4    any matters related to vacating the award, so that you end up

5    with a final appealable judgment to, or judgment or order to

6    the 5th Circuit.

7          THE COURT: And how long do you think that process

8    will take?

9          MR. SHORE: I don't think it will take, I think it

10   will take less than two months.  Because, and let me give you

11   some, some reason why.  In the corresponding proceeding with

12   Susman Godfrey, there's a pleading deadline of February 8th,

13   this Friday.  We will file a, a reply brief, that's their

14   response, we'll file a reply brief the following Wednesday,

15   maybe sooner than that, depending on what their response is.

16   So the briefing in that, as to that part of the misconduct,

17   is over.  There will be a motion for a further waiver of the

18   attorney client privilege based upon the crime fraud

19   exception based upon what's been discovered.  Judge Godbey

20   ruled on the last one of those in three weeks.  I have a

21   feeling he will probably rule on this one just as quickly.

22   This is a case that he's sua sponte put for the show cause

23   order.  It wasn't, it's something he obviously has a lot of

24   interest in.  And the other thing is this case, once the stay

25   is lifted, will go on his three year list.  Which, in the 5th

1   Circuit, I don't know if you have it here, but in the 5th

2   Circuit, when you've had a case pending three years, those

3   automatically get top precedence by the Texas District

4   Courts, so this will go to the very top of his list of things

5   to do.  And the other thing, if you had any doubts about

6   that, or any doubts about his commitment to getting a

7   relatively, you know, quick resolution - -

8           THE COURT: I would never question the commitment of

9   a District Court Judge to prompt resolution of any matter

10  before him or her.

11          MR. SHORE: Well I would urge you, in this case, if

12  you have any, if you have any, not, let's not call them

13  doubts, let's call them questions, pick up the phone and call

14  him.  And just ask him.  He's a very accessible judge, and

15  I'm sure he would tell you immediately what he thought about

16  this, and what he thought he could do.  But I don't think

17  that we should hamstring what Judge Godbey can or cannot do

18  related to vacating the award or confirming the award,

19  because then you end up with more piecemeal and more

20  potential for delay.  Let him do whatever he believes is

21  necessary to confirm or vacate.  I think that will be done in

22  relatively short order.  And then once that's done, we can

23  come back and talk about claim estimation.  And I think it's

24  probably likely that what he does in confirming or vacating

25  the award will give you a lot of guidance on how you should

1   estimate the claim.  Because he's obviously going to talk,

2   the, the merits of the arbitration award, whether it will be

3   confirmed or not, is not just based on fraud and misconduct.

4   It's also based upon the underlying facts and the, and the

5   errors in the award.  So I think you're likely to get a lot

6   of guidance from Judge Godbey on exactly what this claim is

7   worth, and who should likely prevail in the second go around.

8           MR. RALSTON: Your Honor, if I may.  Just a couple

9   points.  One, I under, I appreciate Mr. Indelicato's concern.

10  We can see, just by weighing the disclosure statement, how

11  much time and effort's been put into it.  But lest the Court

12  forget, we were asking for the same relief that we permitted

13  to go forward, even with respect to just the limited

14  procedure regarding the arbitration award back in July.  And

15  so the fact of the matter is that this may cause the Debtors

16  and the Committee some concern on timing is, should not be

17  laid at our shoes.  I mean, this was something that we were

18  ready to go forward to, and quite honestly we would have, we

19  wanted to, and we still want to.  And we still want to get

20  this thing heard.  The second reason why I think it would be

21  premature to come back before this Court in an estimation

22  procedure before there's been a final ruling on the

23  arbitration award, and we're assuming that we will prevail in

24  that, is that the cornerstone of their argument that our

25  claim should be estimated at zero is that arbitration award.

1    So unless that is ruled upon, we think that that basis for

2    estimating a claim at a nominal amount still exists.

3            THE COURT: All right.

4            MR. RALSTON: And maybe we're wrong, and - -

5            THE COURT: Let me, let me turn to the Debtor.

6    What's the, give me confirmation time table that you

7    anticipate again.

8            MR. SILBERGLIED: March 5 disclosure statement

9    hearing, and a, hopefully a mid-April confirmation hearing,

10   Your Honor.

11           THE COURT: Yeah, because you currently don't have

12   any April dates scheduled.

13           MR. SILBERGLIED: Correct, Your Honor.  That's,

14   that's why I've just sort of said mid-April without pinning

15   down a date.  May I address a couple of the points - -

16           THE COURT: You may.

17           MR. SILBERGLIED: - - that were raised?  Let's try

18   to do them in order.  Striking the pleadings, Your Honor.

19   There was a big shift in Mr. Shore's argument half way

20   through.  I said earlier before we broke, and I will say it

21   again, we do not object to lifting the stay for them to

22   pursue the motion for leave.  The motion for leave to file an

23   amended, a second amended motion to vacate has those very

24   fraud allegations.  We will take them head on before Judge

25   Godbey, and we believe we will win.  We are not asking Your

1    Honor not to lift the stay on that.  Go ahead and lift the

2    stay.

3              THE COURT: But if there - -

4              MR. SILBERGLIED: The point is different - -

5              THE COURT: If there are rights to be asserted in

6    connection with the efficacy of the arbitration award,

7    shouldn't they be heard all at once?

8              MR. SILBERGLIED: Well, but Your Honor, it's a

9    slightly different point.  And this is what Mr. Indelicato

10   was addressing, but maybe I can place it into context.  What,

11   what he now wants to do is he wants to use the exact same

12   conduct, which we're saying go ahead and litigate if it was,

13   if Judge Godbey finds it was not untimely - - and we contend

14   it was untimely.  But if Judge Godbey disagrees with us, go

15   ahead and raise that as a basis to vacate the award.  But

16   what he wants to do with it is he wants to use it as

17   something else.  To so-called strike pleadings.  The remedy

18   for striked pleadings, as I understand what he is arguing, is

19   he gets to skip right to damages against us for this ill

20   conduct, and it's damages - -

21             THE COURT: Well, but doesn't - -

22             MR. SILBERGLIED:  - - for the case itself.

23             THE COURT:  - - the Court first have to find there

24   was some ill conduct before damages?

25             MR. SILBERGLIED: Yes.  So why, so again, if what's

1    before the Court is whether to confirm or not confirm the

2    arbitration award, they don't need to get to let's strike all

3    the, the remedy should be striking the pleadings, and then

4    we're going to skip right to the damages stage of trial.  So

5    that's, that's point number one.  And the reason why we don't

6    believe that that's appropriate, and we believe it is a

7    bankruptcy matter is for the reason Mr. Indelicato said.

8    Which is that will effect a penalty on the creditors of this

9    estate for alleged contempt of former Debtors and counsel.

10   Which we don't believe happened, for the record, but, but the

11   point is the same.  The second thing.  Getting a, getting a

12   decision by Judge Godbey in two months.  With all due

13   respect, Your Honor, that's a myth.  They confirmed in their

14   pleadings that they're going to take more discovery on the

15   motion to vacate.  And we knew that that was the fact,

16   because they actually served two subpoenas.  They violated

17   the stay by doing it, but they served two subpoenas.  They're

18   part of the record because they were attached to our cross

19   motion.  Those subpoenas, of course, if the stay were lifted,

20   there would be 30 days to respond to the subpoenas,

21   presumably.  I don't know.  Maybe they could shorten notice.

22   But probably there's 30 days to respond to the subpoenas.

23   Well, I don't think that they served those subpoenas out of

24   intellectual curiosity.  They're going to use whatever

25   documents they get from those subpoenas to amend motions.  So

1    those amended motions don't even go in for a couple of

2    months.  And then Judge Godbey has to rule.  So I don't know

3    if, maybe we're talking about four months instead of two,

4    maybe it's six months.  I don't know what the number is.  But

5    two months is a myth.  He mentions that Judge Godbey is going

6    to have to look at the merits of the case.  Well, he's going

7    to have to look at the merits of the case in addressing the

8    so-called manifest error standard.  No 5th Circuit case has

9    ever agreed to throw out an arbitration award because of

10   manifest error, because manifest error, the standard is did

11   the arbitrator know what the law is and intentionally

12   disregard it.  It's not like an appellate type of review and

13   abuse of discretion.  It's a heightened level.  So maybe

14   there will be some guidance for Your Honor, but it's, I don't

15   think it's very likely.  The fact that they asked for this

16   relief six months ago.  Your Honor, it leaves out a key fact.

17   When we were here six months ago, Your Honor, they had not

18   yet filed four separate proofs of claim for $580 million.  We

19   may have taken a very different position six months ago had

20   we known that that's what they were going to do.  Within

21   about six weeks of that, we proceeded down the path to try to

22   go to mediation.  The mediation took a while before getting

23   in mediation statements, we went to a two day mediation, we

24   mediated in good faith, we continued to negotiate for three

25   weeks, we thought we would get this resolved, unfortunately

1   we didn't get it resolved.  We've been acting in good faith

2   all along.  And the last thing I would say is that Mr.

3   Ralston says the cornerstone of our estimation at zero

4   dollars is the arbitration award.  Well, true with respect to

5   our estimation at zero dollars, but it sounded to us like

6   that's not necessarily what Your Honor had in mind.  So we

7   will be prepared to put on evidence in addition to that at

8   the estimation proceeding that I think that Your Honor had

9   contemplated.  As to what this claim would be worth if it's

10  not estimated in the amount of the arbitration award.  So I

11  don't think that Mr. Ralston's statement there is accurate

12  either.

13        MR. RALSTON: Sorry, Your Honor.  I don't want to

14  get into a tit for tat with Mr. Silberglied.  But just

15  responding - -

16        THE COURT: Yes.  Resist it.  With all of the

17  strength of your being.

18        MR. RALSTON: I'm weak, Your Honor.  I'm weak.  Your

19  Honor, we filed a proof of claim, what was it?  August 30th.

20  But of course the arbitration proceeding was filed for $580

21  million, and of course the Debtors knew that from the get go.

22  All right?  Yes, we had a two day mediation.  But that never

23  precludes, if, if they're creating a train, and they want

24  that train to leave the station right now, nothing precluded

25  them from coming to us.  We waited.  This Court said, I

1   basically asked this Court, back in July, Your Honor, at some

2   point we think this claim needs to be liquidated.  And the

3   Court agreed with me.  And I asked the Court, when does this

4   Court believe it would be appropriate for us to come back?

5   And the Court said to us, in so many words, probably when

6   they've got a plan on file.  And we essentially did that.  We

7   mediated.  I think both parties acted in good faith, and

8   tried to reach a resolution, and unfortunately we weren't

9   able to.  But nothing prevented them - -

10          THE COURT: Where, where does that stand, by the

11   way?  Have there been any follow-up discussions, or are they

12   - -

13          MR. RALSTON: There were follow-up discussions and I

14   believe they, I think, essentially they've broken down.  And

15   certainly, you know, maybe they'll resume.  Maybe after this

16   proceeding, maybe after this Court's decision, there will be

17   good reason for them to resume.  On the part of both sides.

18   So we certainly remain amenable to discussing settlement with

19   the Debtors and with the Committee.  And in fact, Your Honor,

20   it's been our position that perhaps having this go back to

21   the District Court will, on both sides, prompt us to talk and

22   resume settlement negotiations.  But anyway, Your Honor,

23   again, our concern is Mr., Mr. Silberglied said something

24   very telling, I think, regarding the arbitration award.  He

25   says, they say, he says that the Debtors will produce

1    evidence in addition to the arbitration award.  Well that's

2    the problem, Your Honor.  It's going to be in addition to.

3    It's not going to be, let's toss out that arbitration award.

4    I think that we really need to get this arbitration award

5    issue behind us before we have any estimation proceeding.

6    Thank you, Your Honor.  And I will do my best to keep myself

7    seated.

8           THE COURT: Thank you.  Does anyone else care to be

9    heard?  All right.  I've heard the arguments.  In lieu of an

10   agreement there seems to be no easy way out to placate both

11   sides, or all sides, of this matter.  I do feel that the

12   process should go forward in the, in the Texas District Court

13   centered around whether the arbitration award should be

14   confirmed or vacated, and for no other purpose.  And to the

15   extent the motion that Positive Software wants to file

16   concerning striking pleadings is in the nature of a sanction,

17   I would not permit that.  I do tend to agree with the Debtor

18   that to the extent there is wrongdoing, it can later be

19   decided what the consequence of that ought to be.  And I'll

20   allow that to move forward.  However, again not presuming

21   what the District Court will or won't do, and along what time

22   frame, I am unwilling to delay the administration of this

23   estate, understanding that anything, anything else can happen

24   between now and any confirmation date.  If it turns out that

25   nothing has resolved itself sufficiently to allow the parties

1    to move forward with respect to estimation for purposes of

2    voting or distribution, I'll hold an estimation hearing in

3    connection with the confirmation hearing.  I will not push it

4    up to disclosure.  The Debtor will just have to deal with

5    that in its disclosure statement.  If it hasn't already.  And

6    I'm assuming it probably has, at least to some extent.  What

7    I would like is for the parties to confer and embody in the

8    order my ruling today.  I think for all of our benefits, and

9    the benefit of the District Court in Texas.  The order should

10   also provide, I think, for a deadline by which Positive

11   Software - - well let's put it this way.  I'd like to design

12   a process under which if Positive Software does intend to

13   vote on the plan, that sufficiently in advance of

14   confirmation, it indicates that.  But in any event, well,

15   obviously sufficiently in advance of the voting deadline that

16   it indicates that.  And counsel can talk about that deadline.

17   If they can't agree, reach out to me by conference telephone,

18   and I'll make a decision.  If we come up on confirmation in

19   mid-April, and there's been no resolution, either by the

20   District Court or by agreement of the parties, I will

21   estimate this claim.  And I'll set aside, I don't know, as

22   many as three days for estimation and confirmation purposes.

23   The parties should confer and suggest a time frame, if they

24   can, tentatively, so I can at least block off the dates.  And

25   that's not to put the rabbit in the hat with respect to

1   whether or not I'll approve a disclosure statement.  But just

2   for my calendering purposes, so that we can keep the process

3   moving.  Does anybody have any questions about what should go

4   in the order, or about what my ruling involves?

5          MR. SILBERGLIED: One very minor one on my part, and

6   it has to do with the very last comment.  I take it that the

7   three days, do I take it correctly that the three days are a

8   combined Positive Software and confirmation, so that if we

9   think we need three quarters of the day for the confirmation

10  hearing, we have two and a quarter for Positive Software?

11         THE COURT: That would be right.

12         MR. SILBERGLIED: Thank you, Your Honor.

13         MR. SHORE: I just want to make sure I understand.

14  We are not, the stay will not be lifted to allow us to move

15  to strike their pleadings.

16         THE COURT: That's correct.

17         MR. SHORE: But I guess we can simply move to vacate

18  on whatever grounds we want.  And then obviously Judge Godbey

19  can do whatever he wants to do, because he's the District

20  Judge.

21         THE COURT: That would be about right.

22         MR. SHORE: Okay.

23         MR. RALSTON: Your Honor, there are certain matters

24  involving in the confirmation process that obviously the

25  Court is basically, I think, I take it the Court is ruling

1    that, that you will have a, excuse me, an estimation

2    proceeding before this Court.

3           THE COURT: Unless something occurs between now and

4    then - -

5           MR. RALSTON: I would like a - -

6           THE COURT:  - - in the Texas District Court which

7    obviates the need for that.

8           MR. RALSTON: And, and Your Honor, we don't think

9    that's going to happen.  But it could happen.  I suppose.

10   Theoretically.  The question that I'd like to clarify on the

11   record, because it was unclear, the way I read the motion to

12   estimate, for an estimation proceeding.  Was that the

13   proceeding was for a, what essentially would be a permanent

14   estimation of the claim.  I understood, and I took Ms.

15   Eplin's deposition today - - very cordial person, by the way

16   - - and now I have a different understanding that I would

17   like to clarify with counsel for the Debtors.  That the

18   estimation would be essentially for interim distributions.

19   Because that is one of the objections that we have.  Is that

20   if there's an estate that's going to be administered over the

21   course of years, we would put it to - - and it doesn't, it

22   would at least obviate an argument that we would have,

23   possibly two, or three, or four months from now when this

24   comes up.  And so I, I guess I'd like to get some

25   clarification as to what the estimation procedure would be

1   for.  Obviously the Court has addressed it for voting

2   purposes.  It would be our duty to inform the Court and

3   Debtors, and the Committee, with sufficient time so that we

4   could have an estimation.  But I guess I'd like to get some

5   guidance from the Debtors as to what their, or confirmation

6   that it's for interim, an interim basis.  And we can discuss

7   how, mechanics at hearing.

8           THE COURT: Well, let's do this.  I would prefer

9   that counsel initially talk about that outside of my

10  presence.  To the extent that you can't agree, and it needs

11  to be in, in the order, embodied in the order that we just

12  talked about, reach out to me by conference telephone, and

13  I'll resolve it.

14          MR. RALSTON: Okay, Your Honor.

15          THE COURT: Okay.

16          MR. RALSTON: That's, that seems very fair.  Thank

17  you.

18          THE COURT: Or, or - - okay.  I'll leave it at that.

19          MR. RALSTON: Thank you.

20          THE COURT: Any other questions?  Okay.  Anything

21  else for today?

22          MR. MERCHANT: Your Honor, Mike Merchant again for

23  the record.  There is one remaining matter on the agenda, and

24  it's agenda item no. 23.  Which was the motion to approve the

25  settlement with GECC.  This is really the second part of that

1   settlement.  Your Honor previously approved a stipulation

2   that authorized a $1.8 million payment - -

3           THE COURT: Payment.  Yeah.  I remember.

4           MR. MERCHANT:  - - relating to their secured claim.

5   The motion really just seeks approval of the releases and the

6   allowed unsecured deficiency claim relating to that

7   settlement that was reached with GECC.  There were two

8   objections filed.  They were filed by Maricopa County and a

9   Mr. Andre Mutchnik.  Mr. Mutchnik has withdrawn his

10  objection, or at least indicated that he's withdrawing his

11  informal objection, and he'll pursue his issues in connection

12  with the disclosure statement and plan hearings.  Maricopa

13  County's objection has been resolved through language we've

14  added to the order.  If I may approach, I have a revised

15  order and a black line of the revised order.

16          THE COURT: Okay.  And before we leave Positive, so

17  that the parties are clear, what should also be included in,

18  in the order is my denial, without prejudice, of the second

19  request, of the request for relief regarding the '07 action.

20  For the reasons that I had indicated earlier.

21          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

22          MR. MERCHANT: Your Honor, with respect to the GECC

23  order, the main revision, there's some cleanup revisions, but

24  the main revision is in paragraph 5 of the order.  And we've

25  simply added a line that says, To the extent any such

1   equipment and property is subject to tax liens of a

2   government or governmental unit for personal property taxes,

3   those liens will continue to attach to the equipment and

4   property, and to the proceeds thereof, following, following

5   sale by the Debtors, with the same priority that existed as

6   of the petition date.

7        THE COURT: This is respect, with respect to sales

8   which have not yet occurred?

9        MR. MERCHANT: That's correct, Your Honor.

10        THE COURT: Does anyone else care to be heard in

11   connection with this matter?

12        MR. MERCHANT: The only other change, Your Honor, is

13   at the request of GECC.  They've asked that it be a consent

14   order.  So the Committee, GECC, and the Debtors have each

15   signed the order after the so ordered line.

16        THE COURT: I see that.  That order has been signed.

17        MR. MERCHANT: Thank you, Your Honor.  I believe Mr.

18   Silberglied has one more thing.

19        MR. SILBERGLIED: Your Honor, it just occurred to me

20   that for whatever reason, rather than being a separate item

21   on the agenda, 24(i), under Related Documents, is our motion

22   for relief to file under seal the arbitration award.  And

23   just so we don't have to try to deal with that again later,

24   if we get to an estimation proceeding, is Your Honor prepared

25   to grant that motion?

1          THE COURT: Well, let me ask if anyone else would

2   care to be heard in connection with that motion.

3          MR. SILBERGLIED: Thank you, Your Honor.

4          MR. SHORE: Your Honor, we strenuously object.  It

5   violates the software subscription agreement itself.  That

6   says everything related to the arbitration is to be held

7   confidential.  It's strictly confidential, not published

8   anywhere else.  Also, since the Texas District Court is going

9   to decide, relatively shortly, whether that arbitration award

10  has any relevance at all to the estimation proceeding, I

11  would ask the Court to at least carry this motion until we

12  get to the estimation time, and if, it may be completely

13  moot, and we don't have to worry about it.  But this is like

14  the fourth, the third time, either in this court or some

15  other court, where they've tried to file that, and they've

16  been rejected every single time.  And we know what this is

17  about, and it has nothing to do with the estimation

18  proceeding that's not going forward today.  It has to do with

19  they're trying to cause prejudice to my client.  And they've

20  already reported it to his creditors, and done other things

21  like that, you know, maliciously.  So I would ask that you

22  wait to carry this motion until you actually find out if it's

23  necessary to have this thing in the record.

24          MR. McMAHON: Your Honor, good afternoon.  Joseph

25  McMahon for the United States Trustee.  Mr. Silberglied can

1   correct me if I'm wrong, but my understanding was this was

2   teed up for the next omnibus date.  It was actually noticed

3   for that date.  With a corresponding objection deadline.

4           THE COURT: It's, the hearing date on the motion is,

5   indicates February 20th.

6           MR. SILBERGLIED: I apologize, then.  I did not

7   realize that fact.  And I apologize to the United States

8   Trustee.  And, in any event, you know, in response to Mr.

9   Shore, I would not have a problem carrying it, because I

10  suppose he's right.  It could be a moot issue on the District

11  Court.  But I do want to correct the record.  This is not the

12  third time we tried to offer it, it's the second.  And the

13  other time, it was accepted without objection.  So I do not

14  understand where this is coming from.

15          THE COURT: Well, and I, and I don't need to know at

16  the moment.  I haven't read it yet.  I just haven't had the

17  time.  But based on what's been said, we'll just sit in

18  confidence, at least until February 20th.  Okay.

19          MR. SILBERGLIED: And, and perhaps maybe we ought to

20  continue it to April.  Just so if Mr. McMahon were, were

21  planning on taking a position, we don't have to have it come

22  back in February.  I have no objection to that.

23          THE COURT: Well, when you, when you find a date in

24  April, that's fine with me.

25          MR. SILBERGLIED: Thank you, Your Honor.

1          THE COURT: All right.

2          MR. SHORE: That's fine with us too.

3          THE COURT: Okay.  I have, I did receive recently

4    three certifications of counsel, and because I just got them,

5    I just held them to see whether anyone wants to be heard

6    today on them.  They concern the certifications regarding

7    stipulations between the Debtor and Douglas Emmit (phonetic)

8    Realty Fund, 500 Eagles Landing, LLC, and Foster Plaza

9    Associates, LP.  No one is standing.  All right.  I'll act

10   upon them in due course.  Anything further for today.

11         MR. SILBERGLIED: Not from the Debtors, Your Honor.

12         THE COURT: All right.  Thank you all.  That

13   concludes this hearing.

14         ALL: Thank you, Your Honor.

15         THE COURT: Court is adjourned.

16      (Whereupon at 3:08 p.m. the hearing in this matter was

17   concluded for this date.)

18         I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                    ___02/13/08___
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905