## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

FILED

2008 FEB 26  PM 12: 28

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.[1],** | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Re: Dockets 4986** |
| | : | |
| | : | **Objection Deadline: February 27,** |
| | : | **2008 @ 4:00 pm.** |
| | : | **Hearing Date: March 5, 2008 @** |
| | : | **1:30 pm** |

**Objection of Andre Mutchnik("I") to Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a) Approving a Settlement Between the Debtors, Positive Software Solutions, Inc. and Edward Mandel and Granting Related Relief (Docket 4986)**

I am a holder of preferred and common stock of New Century Financial Corp ("NCFC"). As such, I am an interest holder as defined in the Bankruptcy Code and have the standing to file this objection.

---

[1]The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home 123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

## Table of contents

Introduction............................................................................................................... 3
   1. Legal criteria in approving a settlement........................................................ 3
   2. Summary of the litigation with PSSI ........................................................... 3
   3. Summary of the reasons for objecting ......................................................... 6
1 - This settlement proposition is unnecessarily premature.................................... 7
   1. Immediate settlement with PSSI will not necessarily accelerate the distribution of
   the estates' moneys ....................................................................................... 8
   2. The desire to put the litigation behind ......................................................... 8
   3. Confirmation of the Plan is not to be taken for granted................................ 9
   4. Confirmation of the Feb. 2nd Plan will not necessarily accelerate distributions...... 10
   5. Debtor's "let's just get it over with" mentality of can lead to nefarious consequences
   .................................................................................................................... 10
   6. My solution – proposed protocol for considering settlements, including the
   settlement concerning PSSI ........................................................................... 11
II - There is no recourse against the estate of NCFC or NC TRS.......................... 13
   1. The allegations of PSSI, even if taken for granted, fail to show any conclusive action
   against NCFC and are thus not even likely to survive a motion to dismiss.................. 14
      Summary of PSSI's allegations with respect to NCFC ........................... 14
      Argument 1: NCFC did not directly participate in a "single course of conduct" with
      NCMC or any other defendant................................................................. 15
      Argument 2: The Proposed Settlement might deprive NCFC of some of the
      recourses it currently has........................................................................ 18
      Argument 3: NCMC is neither an agent nor a façade for NCFC and cannot be
      confused with NCFC.............................................................................. 18
      Argument 4: arguing that NCMC is nothing more than a tool (or a façade) through
      which NCFC operated is an attempt to pierce the corporate veil ............................ 19
      Argument 5: Judicial policy and equity arguments ................................... 20
      Partial conclusion: PSSI's allegations against NCFC would not survive a motion to
      dismiss.................................................................................................. 20
   2. Subsidiarily, it is not clear that there is enough evidence to implicate NCFC, even
   assuming that a cause of action exists against NCMC ................................... 20
Conclusion ............................................................................................................ 22
   a.   Implementing the protocol I am proposing in "6. My solution – proposed protocol
   for considering settlements, including the settlement concerning PSSI"; .................... 22

## Introduction

### 1. Legal criteria in approving a settlement

The Court is undoubtedly more knowledgeable than I am with respect to the case law that governs settlements in bankruptcy. Nevertheless, I would like to underline some relevant factors to consider.

In bankruptcy, settlements are favored. The Court does not substitute its judgment for that of the Trustee (or, in this case, the Debtors) and does not conduct a mini-trial of the claims at hand. However, the Court should not "rubber stamp" the settlement either.

In *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 US 414 (1968), the Supreme Court said that an informed and independent judgment as to whether a proposed compromise is fair and equitable requires that:

> [T]he bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the compromised claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

At the very minimum, it means that the reasons advanced in support of a proposed settlement must be specific enough to allow the Court to evaluate the *TMT Trailer Ferry* factors. If the reasons are too vague, I respectfully submit that the court should not hesitate to disapprove the proposed settlement. In *In Re RNI Wind Down Corporation et al., Case No. 06-10110(CSS)*, Judge Sontchi disapproved a proposed settlement on the basis that the factual reasons advanced in support of the proposed settlement were not specific enough[2]. In *In re Congoleum Corporation*, No. 03-51524 (Bankr. D.N.J. May 11, 2007), the Court said that they should not rule on "this settlement in a vacuum".

### 2. Summary of the litigation with PSSI

The litigation between PSSI and the Debtors has been long and acrimonious. The following are the known relevant pleadings and decisions related to PSSI:

District Court Action

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*
Civil Action No. 3:03-CV-0257-N , District Court for the Northern District of Texas

Vacatur Proceedings

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*

---

[2] As will be argued later, I belive that Debtors' reasons for this settlement are too vague.

Civil Action No. 3:03-CV-0257-N , District Court for the Northern District of Texas, Docket 372

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 436 F.3d 495 (5th Cir. 2006).

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278 (5th Cir. 2007).

Bankruptcy Court Proceedings

Docket 0318: Limited Objection of Positive Software Solutions, Inc. to Debtors' Motion for an Order Approving Bid Procedures.

Docket 1877: Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation.

Docket 1969: Notice of Filing re: Motion for Relief from the Stay Regarding Copyright Infringement Litigation [Docket No. 1877]

Docket 2101: Debtors' Response to the "Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation", and Cross-Motion for Sanctions for Violation of the Automatic Stay.

Docket 2146: Objection of the Official Committee of Unsecured Creditors to the Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation.

Docket 2171: Motion of Positive Software Solutions, Inc. to File Under Seal its Reply Regarding its Motion for Relief From the Stay and Response to Debtors' Cross-Motion for Alleged Stay Violation.

Docket 2265: Order (I) Denying the Motion of Positive Software Solutions, Inc. for Relief From the Stay Regarding Copyright Infringement Litigation and (II) Granting the Debtors' Cross-Motion for Sanctions for Violation of the Automatic Stay.

Docket 2451: Transcript of Hearing of August 7th.

Docket 2566: Debtors' Motion for Additional Sanctions Against Positive Software Solutions, Inc. for Further Violation of the Automatic Stay [re: Docket Nos. 1877, 2101, and 2265].

Docket 2656: Objection of Positive Software Solutions, Inc. to Debtors' Motion for Additional Sanctions Against Positive Software Solutions, Inc. for Further Violation of the Automatic Stay [Docket No. 2566].

Docket 2667: Amended Objection of Positive Software Solutions, Inc., to Debtors' Motion for Additional Sanctions Against Positive Software Solutions, Inc. for Further Violation of the Automatic Stay.

Docket 2683: Declaration of Russell C. Silberglied in Support of Damages Pursuant to 11 U.S.C. § 363(k) Incurred by the Debtors Due to Positive Software Solutions, Inc.'s Violations of the Automatic Stay.

Docket 2843: Appeal Transmittal Sheet re: Order (I) Denying the Motion of Positive Software Solutions, Inc. for Relief [Docket No. 2265].

Docket 3045: Objection of Positive Software Solutions, Inc., to Debtors' Alleged Damages [Docket No. 2265].

Docket 3252: Debtors' Supplement to "Motion for Additional Sanctions Against Positive Software Solutions, Inc. for Further Violation of the Automatic Stay.

Docket 3320: Motion of Positive Software Solutions, Inc., and Edward Mandel for an Order Granting Relief From the Automatic Stay.

Docket 3858: Order Authorizing Positive Software Solutions, Inc. to File Under Seal its Reply Regarding its Motion for Relief from the Stay and Response to Debtors' Cross-Motion for Alleged Stay Violation.

Docket 4354: Second Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation.

Docket 4714: Stipulation by and Between the Debtors and Positive Software Solutions, Inc. Regarding Amount of Compensable Costs and Damages Relating to Alleged Violations of Automatic Stay [Docket No. 2265].

Docket 4751: Debtors' (A) Response to the "Second Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation," (B) Cross-Motion to Disallow or Estimate Positive Software's Proofs of Claim, and (C) Objection to Proofs of Claim.

Docket 4757: Debtors' Objection to Motion of Positive Software Solutions, Inc. and Edward Mandel for Relief from the Automatic Stay Concerning 2007 Suit.

Docket 4758: Debtors' Motion to File Under Seal Arbitration Award in Connection with Debtors' (A) Response to the "Second Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation," (B) Cross-Motion to Disallow or Estimate Positive Software's Proofs of Claim, and (C) Objection to Proofs of Claim.

Docket 4759: Objection of Positive Software Solutions, Inc., to Debtors' Supplement to

Motion for Additional Sanctions Regarding Litigation Against Susman Godfrey, LLP.

Docket 4799: Joinder of the Official Committee of Unsecured Creditors to the Debtors' (A) Response to the "Second Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation," (B) Cross-Motion to Disallow or Estimate Positive Software's Proofs of Claim, and (C) Objection to Proofs of Claim.

Docket 4807: Positive Software Solutions, Inc.'s (I) Response to (A) Debtors' Cross-Motion to Disallow or Estimate Proofs of Claim and (B) Debtors' Objection to Proofs of Claim; (II) Motion to Abstain from Adjudicating Objection to Claims and Motion to Estimate

Docket 4808: Exhibits A and B to Response of Positive Software to Debtors' Cross-Motion to Disallow or Estimate Proofs of Claim and Debtors' Objection to Proofs of Claims, Motion for Abstention and its Reply to Motion for Relief from Automatic Stay

Debtors have been very critical and acrimonious with respect to PSSI throughout the Bankruptcy Court Proceedings and have consistently alleged that PSSI's claim is meritless[3]. In a surprising twist, the Debtors now want to scrap all the efforts previously put into this case and propose a settlement of the PSSI claim ("Proposed Settlement"). The attempt to settle is even more surprising in that it comes after numerous arguments have been submitted to this Court with respect to whether or not to lift the automatic stay in Texas District Court, and with respect to scheduling a damage evaluation hearing. As PSSI argues[4] (and I agree), Debtors' assertion that they are trying to save money for the estates by doing what they are doing is incredible.

Debtors articulate the reasons substantiating the proposed settlement in paragraphs 11 and 12 of the Motion to Settle with PSSI[5]. Essentially, the reasons are the following:
1. The litigation with PSSI will be put behind ("first reason");
2. The Debtors will be able to focus on the confirmation of the plan ("second reason").

### 3. Summary of the reasons for objecting

The reasons set forth by the Debtors seem to demonstrate a desire to "just get it over with" with PSSI, rather then to truly seek an outcome which is best for all interested parties and estates.

Debtors cannot "focus on the confirmation of the Plan", because their Disclosure Statement hasn't even been confirmed yet (and is facing another objection that I filed) and there are serious indications that the February 2nd Plan will face objections as well. I

---

[3] See, for instance, Debtors' Cross-Motion to Disallow or Estimate Proofs of Claim and Debtors' Objection to Proofs of Claims, Motion for Abstention and its Reply to Motion for Relief from Automatic Stay.
[4] See PSSI's Response to Debtors' Cross-Motion to Disallow, docket 4807.
[5] Docket 4986.

believe the Debtors should not assume that their Plan will necessarily be approved. Thus, characterization of PSSI's claims in the Proposed Settlement as HC3b claim and OP3c claim[6] is putting the cart before the horse.

Debtors' rush to conclude a settlement regardless of whether this settlement truly is in the interest of all parties is made even more incomprehensible by the fact that apparently, even if the case became a smooth sailing to Plan confirmation, the first interim distribution is only expected to occur within 6 months *after* that confirmation[7].

**I would like to bring the Court's attention something that seems to me as sloppy drafting on behalf of the Debtors. Clause 4.1 of the Proposed Settlement agreement which specifies that "*the Debtors*" will pay to PSSI the sum of two million dollars. This clause does not specify which Debtor will pay that sum! Is it NCFC that will pay? Or NCMC? Or some other Debtor?** That is not specified in the proposed Settlement Agreement. I respectfully submit to the Court that this clause shows the real motive for Debtor's motion to settle with PSSI – the desire (perhaps understandable) to "just get it over with" rather then a careful, rational judgment of what is best for all the parties.

The saga with PSSI is very unfortunate. Not only because of the significant expenses incurred by both sides to prosecute their claims, but also because of the grave allegations and the acrimonious atmosphere that permeated this saga.

This Court has access to confidential data to which I am not privy. For those reasons, I believe the Court is better placed than I am to judge whether PSSI's claims have merit and which quantum is justified. I nevertheless respectfully urge the Court not to rely blindly on the Debtors' statement that the Proposed Settlement is in the best interests of all estates and not to assume that the Debtors (or the Creditors' Committee for that matter) speak for all interested parties.

My present objection hinges on two main distinct threads:
1. This settlement proposition is unnecessarily premature and should be denied;
2. PSSI's claim against NCFC would have no chance of success in Court, regardless of whether it had a valid claim against NCMC. Because the Proposed Settlement leaves PSSI with a $15,000,000 claim against NCFC, this Proposed Settlement is not in the interests of the estates of NCFC and should be denied.

## I - This settlement proposition is unnecessarily premature

By its very nature, a settlement affects parties in interest to the estate. In order to evaluate whether this settlement is truly fair, I believe that parties in interest should – as a matter of procedural fairness - have the opportunity to have their voices heard in connection with a proposed settlement.

---

[6] Proposed Settlement Agreement, article 4.4

[7] As Mr. Silberglied stated during the Feb. 6th hearing: see Transcript of Feb 6th hearing, page 45.

That is not possible, unless the parties in interest are aware of the relevant information related to the settlement in question – either through an approved Disclosure Statement or through the disclosure of the relevant information in a Motion to approve a settlement.

In this case, I believe that the reasons exposed by the Debtors in the Proposed Settlement are extremely laconic and boilerplate. On the other hand, as I argue in my Objection to Disclosure Statement, the Disclosure Statement is – in my humble opinion – severely deficient.

On top of it, approving a settlement with PSSI *right now* is not dictated by any imperatives – the first distribution is expected to occur only within 6 months *after* the confirmation of the Plan (even assuming a smooth sailing to confirmation of the Plan).

As will be further substantiated, there is no need to rush to conclude a settlement which I believe is premature.

**1. Immediate settlement with PSSI will not necessarily accelerate the distribution of the estates' moneys**

As said above, the main concern that transpires from the Motion to Settle is that the Debtors wish to get over with PSSI and proceed to the confirmation of the Plan. For reasons set out below and also in the introduction, I believe those concerns are not justified.

Debtors had expressed a concern[8] that it could be necessary to establish significant reserves for the $580,000,000 claim by PSSI. Pursuant to the terms of the settlement, PSSI seems willing to accept a $15,000,000 claim against NCFC, a $15,000,000 claim against NCMC, and a $2,000,000 payment[9].

Given that PSSI agrees to reduce its claims to $15,000,000 against NCMC and $15,000,000 against NCFC, the above problem is obviated because if a reserve was to be established, the amount of such a reserve would be much more reasonable than the initial amount of $580,000,000. I will deal with that point in more detail in "My solution - proposed protocol for considering settlements, including the settlement concerning PSSI" below.

**2. The desire to put the litigation behind**

A subjective desire to put the litigation with PSSI behind is not sufficient justification to approve a settlement. For a purpose of evaluating the fairness of a settlement, what matters is not what the litigation has *already cost*[10], but what will be the *future* costs to the estate of pursuing litigation as well as the risks and benefits of pursuing litigation.

---

[8] Cross-Motion to disallow PSSI's claim, Docket 4751, paragraph 29.

[9] Motion to settle, page 3. As specified in the introduction, it is very strange that the Proposed Settlement does not specify which Debtor is to pay this $2,000,000.

[10] Docket 4986, par. 12

As said before, the Debtors were very critical of PSSI in the bankruptcy proceedings. They seemed so certain and adamant that PSSI's claim is meritless. How could they now imply that PSSI has reasonable chances of success? At best, that might indicate a lack of professionalism on behalf of Debtors' attorneys.

My understanding is that, at this point, there are two main proceedings pending. The first one relates to the second vacatur proceedings to vacate the arbitrator's award in favor of New Century. In the event the award is not vacated, the claims will normally be disallowed. In the event the award is vacated, it will normally be up to this Court to judge on the merits of the claim.

In the case at hand, this Court has already ruled that it will schedule a hearing related to the estimation of PSSI damages[11]. It is curious that, after all that effort *already* expended in this litigation, the Debtors make such a volte-face. Given how the Debtors seem to be concerned with respect to the costs of litigation, one can only wonder why the Debtors managed this case the way they did. For instance, why did the Debtors request an estimation hearing in the first place if they want to settle now? Why did the Debtors go through so much trouble to enforce the automatic stay only to end up agreeing to $25,000 in damages[12]?

### 3. Confirmation of the Plan is not to be taken for granted

I believe that discussing confirmation of the Plan and even of a Disclosure Statement is premature at this point.

It seems to me that the Debtors are unduly assuming that their Disclosure Statement and their Plan will necessarily be approved – and without any contestation – because the Creditors' Committee approved it. I would like to point out my lengthy objection related to the adequacy of the information contained in the Disclosure Statement. If this Court accepts the reasons (or at least some of them) set out in my objection to the Disclosure Statement, this would mean that the Disclosure Statement will have to be further substantiated; consequently, the approval hearing would be postponed.

Furthermore, although the Proposed Plan is still being analyzed, the Proposed Plan might possibly face objections in due course[13]. Upon information and belief, some other (generally smaller) constituencies such as the Beneficiaries of the Rabbi Trusts and the

---

[11] Transcript of the Feb. 6th hearings, Docket 4988, pages 62-63.
[12] See Docket 4714: Stipulation by and Between the Debtors and Positive Software Solutions, Inc. Regarding Amount of Compensable Costs and Damages Relating to Alleged Violations of Automatic Stay [Docket No. 2265].
[13] For instance, the Plan could potentially be contested on the basis that it effectuates substantive consolidation in a matter contrary to the 2005 Third Circuit ruling in *In Re Owens Corning*, on the basis that it contravenes to section 1129 of the *Bankruptcy Code* by ranking creditors of *Operating Debtors* ahead of Equity Holders of *Holding Debtors* for distributions , on the basis that the Senior Claims procedure is unduly burdensome for smaller creditors of NCFC, and on several other grounds.

preferred stock holders have not had their voices heard in connection with that Disclosure Statement and Plan and I am not certain the Plan is fair to the constituencies in question.

## 4. Confirmation of the Feb. 2nd Plan will not necessarily accelerate distributions

As stated in the introduction, the February 2nd Plan does not contemplate immediate distributions. Rather, it provides for combining of the New Century assets into a Liquidating Trust, with the Liquidating Trustee then having significant discretion (often without the need for prior Court approval) as to which causes of action to pursue, what settlements to proceed to, and when to effectuate distributions. No date for distribution is predicted in the Disclosure Statement. Upon information and belief, even upon plan confirmation, the first interim distribution is expected to occur within 6 months[14].

In addition, before any distribution is done, the Debtors will have to deal with several other significant contested claims. For instance, upon information and belief, the IRS still has a priority claim of $102,607,408.77[15] against NC TRS which, since it is a priority claim and given its significance, will have to be dealt with before ordinary creditors of Holding Debtors will receive a meaningful distribution. IRS also holds a $13,631,904.54 priority claim against Home123 which must be dealt with. Claims pursuant to the MRAs will also have to be settled or litigated – and there was no proposed settlement disclosed in the Disclosure Statement[16].

The Debtors still have plenty of work ahead of them before creditors start receiving distributions. I believe the rush to confirm the Plan is misplaced.

## 5. Debtor's "let's just get it over with" mentality of can lead to nefarious consequences

I believe that Debtor's mentality of "let's just get it over with" as fast as possible can bring the Debtors to accept unfavorable settlements or low prices for their remaining assets (such as the interest in Carrington) in the future.

While Creditors and other parties might be prejudiced if distributions are delayed, they (and, a fortiori, any other interested party) will likewise be prejudiced if the claims are unfavorably settled or assets are unfavorably sold for the sole purpose of having a distribution as fast as possible.

If we were to accept (for the sake of the argument) that PSSI's claim is as devoid of merit as the Debtors imply it is, would the Proposed Settlement not entice other creditors whose claims are arguably equally devoid of merit to engage in a protracted judicial arm-

---

[14] As Mr. Silberglied stated during the Feb. 6th hearing: see Transcript of Feb 6th hearing, page 45.
[15] Claim 3752
[16] Claims with respect to deficiencies pursuant to MRAs are one of the most important issues for interest holders and smaller creditors such as beneficiaries of the Rabbi Trust of NCFC. Smaller creditors and equity holders of NCFC should definitely get a voice on any settlement with Debtors' former MRA counterparties.

wrestling with the Debtors and adopt an aggressive stance in order to stall the case and force the Debtors to accept an unfavorable settlement?

## 6. My solution – proposed protocol for considering settlements, including the settlement concerning PSSI

Besides objecting, I would like to make a proposition which I believe will be constructive – not just for the case at hand but also for future proposed settlements in general.

As explained before, the Debtors face several other significant claims which must be resolved before distribution is to take place.

The Debtors have approved settlements via motions (settlement with GECC for instance). The motions in question typically contain statements saying "this settlement is reasonable". However, when it comes to *substantiating* that statement, I believe that the reasons are often extremely laconic – one or two paragraphs at most. Thus, parties in interest and even the Court cannot adequately assess the actual, detailed reasons substantiating the statement that "this settlement is reasonable".

Furthermore, parties in interest cannot assess the fairness of the settlement of one or several settlements on the estate, given that there is no approved Disclosure Statement or even other means of obtaining actual information. The matter is further complicated given that there are *at least* two major groups of Debtors – the Operating and the Holding[17]. I respectfully submit that procedural fairness to parties in interest commands that parties in interest have the necessary information before decisions as important as a major claim settlement such as the PSSI settlement were to take place.

I would respectfully propose that the Court deals with all major settlements  - including this one – in a comprehensive basis rather then in standalone motions, and only after a Disclosure Statement has been approved as containing adequate information. In the mean time, nothing would preclude the Debtors from concluding *tentative* settlements – subject to the right of parties in interest to eventually contest them. And nothing would preclude the Debtors from settling minor claims such as small landlords rejection damages and claims such as Joseph and Lavon Taylor's that were recently settled.  Finally, if the Debtors feel a claim has no merit, why not object to such a claim? Granted, the Debtors have filed objections to claims, but those objections usually dealt with small claims.

As part of their tentative settlements, nothing would preclude the Debtors from establishing reasonable reserves – agreed upon by the Debtors and the other party to the litigation - if the Debtors seek to proceed with interim distributions. For instance, if the Debtors were to seek to proceed to an interim distribution now, they could establish reserves that would be equivalent to the amount of money PSSI would be entitled to receive had this settlement been approved. I will illustrate by an example:

---

[17] As described in the February 2nd Plan. The use of words "Operating" and "Holding" is for convenience only.

11

Illustration(all numbers are for illustrative purposes only):

Debtors have an ongoing litigation against Mr. X, Mr. Y and Mr. Z. Debtors and X agree on a settlement of a claim of $10,000,000 against NCMC. Debtors and Y agree a settlement of a claim of $5,000,000 against NCMC. Debtors and Z agree a settlement of a claim of $1,000,000 against NCMC.

NCMC has $60,000,000 of cash they seek to distribute and $284,000,000 of debt (other than the debt subject to proposed settlements). Had the settlements with X, Y, and Z been approved by the Court, the total debt would have been $300,000,000 and each creditor would have received 20 cents on the dollar.

Rather then approving settlements outright, the following happens:
- Creditors of the already allowed debt (284 million) get the recovery they're entitled to had the proposed settlements been accepted. In this case, this recovery equals $60,000,000 / ($284,000,000 accepted claims + $16,000,000 claims subject to proposed settlement) = 20 cents on the dollar. In this case, the creditors of the already allowed debt get $56,800,000 ($284,000,000 * 0.20).
- The remaining amount ($60,000,000 - $56,800,000 = $3,200,000) goes to a special reserve. This is the aggregate amount X, Y, Z would have obtained had the settlement been approved.
- For the purpose of voting, Mr. X, Mr. Y, and Mr. Z would have voting rights as if the settlement was accepted by the Court.

The hearing with respect to the settlements is heard *after* a Disclosure Statement has been approved. The Court disapproves the settlement with respect to Mr. X and disallows Mr. X's claim, but approves with respect to Mr. Y and Z.

Mr. Y and Z get their distributions out of their reserve, on a pro rata basis of their claims: Mr. Y gets $1,000,000 and Mr. Z gets $200,000. The amount of reserve attributed to Mr. X (in this case  $2,000,000) is released to NCMC. This amount if then distributed to the creditors (second distribution).  Each creditor gets an additional $2,000,000 / ($284,000,000 accepted claims + 6,000,000 claims pursuant to approved settlements) = another around 0.7 cents on the dollar.

This arrangement has the following advantages:
1. Creditors get their distributions as if the settlement was approved and do not experience unnecessary delays;
2. Interested parties are not precluded from contesting settlements which are not in their interest based on a Disclosure Statement containing adequate information (presumably in this example they did contest a settlement with respect to Mr. X);
3. Mr. X, Mr. Y, and Mr. Z have their voting rights as if the proposed settlement was approved by the Court;
4. Proposed settlements will be dealt with in a more organized, transparent, and comprehensive manner.

> This arrangement has the following disadvantages:
>   1.  There will have to be more distributions;
>   2.  Distributions to Mr. X, Mr. Y, and Mr. Z would be delayed.
>
> However, I respectfully submit that the advantages of such a procedure largely outweigh the disadvantages.

## II - There is no recourse against the estate of NCFC or NC TRS

NOTE: Any discussion of NCFC in this objection is equally applicable to Debtors other than NCMC (for instance, NC TRS)

One of the criteria on whether a proposed settlement is to be approved depends on the probabilities of success in litigation. As will be elaborated later in this objection, I believe that PSSI does not have a cause of action against NCFC, for the following reasons:
  i)  The allegations of PSSI, even if taken for granted, fail to show any conclusive cause of action against NCFC and are thus not even likely to survive a motion to dismiss;
  ii) Subsidiarily, it is not clear that there is enough evidence to implicate NCFC, even assuming that a cause of action exists against NCMC.

The main premise of my argument is thus: it is trite law that each corporation is a separate legal person. Thus, even assuming PSSI has a cause of action against NCMC that does not imply it has a cause of action against NCFC.

I respectfully submit to this Court that the Memorandum Opinion and Order dated April 28, 2003 (District Court Action Docket No. 88), which is referred to in the footnote 2 on page 3 of the PSSI Claims, the **Texas District Court does not address the issue of NCFC's liability**. The District Court simply says[18]:

> Accordingly, the Court holds that Positive Software has shown a substantial likelihood of success on the merits of its claim that LoanTrack-1 (including the associated LFMoon and LTKMoon components) infringe Positive Software's copyrights in LoanForce.

Furthermore, upon information and belief, nowhere on any record does any Court say that PSSI has a reasonable chance of success *against NCFC*. Granted, Judge Godbey seems very critical of NCMC in its vacatur order[19]. But here again, he did not deal with NCFC's liability.

Given the context prevailing at that time, it was understandable that no one really cared whether it was NCFC or NCMC that was liable: when NCFC was a NASDAQ 100 Financial Company, enjoying its success in a large glass building[20], it did not matter.

---

[18] Last sentence of the section "Likelihood of success on the merits".

[19] *Memorandum Opinion and Order* [District Court Action Docket No. 372] (the "Vacatur Order").

[20] District Court Complaint, par. 39.

13

New Century, both NCMC and NCFC, are now under bankruptcy protection. The question of whether NCFC can be held liable in this case is of crucial importance[21].

I respectfully submit that the case at hand could be solved following the teachings of the U.S. Supreme Court in *United States v. Bestfoods*, 524 US 51 (1998).

As will be shown below, it seems to me that PSSI bases its arguments against NCFC on little more then NCFC's indirect stock ownership of NCMC. In *United States v. Bestfoods*, 524 US 51 (1998), the Supreme Court rejected such an approach.

## 1. The allegations of PSSI, even if taken for granted, fail to show any conclusive action against NCFC and are thus not even likely to survive a motion to dismiss

Summary of PSSI's allegations with respect to NCFC

In the District Court Complaint[22], PSSI's allegations that specifically mentioned NCFC were the following[23]:

> 6. New Century Financial Corporation ("NC Financial") is a Delaware Corporation with its principal place of business at 18400 Von Karmen (sic) Avenue, Suite 1000, Irvine, California 92612. NC Financial is doing business in the state of Texas, may be found in the state of Texas, and has agents, including NC Mortgage, doing business in the state of Texas. NC Mortgage is a wholly-owned subsidiary of NC Financial.

> 27. According to its own press releases, NC Financial is a "leading nationwide specialty mortgage banking company that, through its subsidiaries, originates, purchases, sells, and services residential mortgage loans secured primarily by first mortgages on single-family residences". In that line of business, an enterprise prospect marketing solution like LoanForce is critical. When PSSI debuted LoanForce, NC Mortgage, one of the subsidiaries through which NC Financial markets, wanted the upgrade.

> 36. On December 18, 2002, Mr. Mandel and Mr. Welding visited Mr. Nese to discuss 2003 budget and needs for additional user licenses. Mr. Nese replied that NC Mortgage did not anticipate much growth in his area of business and the current 140 licenses would be plenty for his central operation. Mr. Nese also referred Mr. Mandel and Mr. Welding to Jeff Lemieux, currently COO of eConduit.com, a company NC Financial acquired in the beginning of 2002. Mr. Lemiex (sic) is currently in charge of purchasing technology. Mr. Nese said all future license purchases must go through Mr. Lemieux.

> 39. NC Financial is a NASDAQ 100 Financial Company based in California with $700,000,000 market capitalization. Since 1998 NC Mortgage has grown almost eight-fold, but it has never purchased additional user licenses. Just in 2002 alone, NC Mortgage's revenue grew 400% and the stock price rose by 350% going from $10 to $35. The Retail lending division that uses LoanForce originated at least $6 billion in loans in 2002. NC Financial and NC Mortgage are enjoying their success and are now housed in a large glass building in Irvine, California. NC Financial and NC Mortgage clearly did not achieve this level of success with just 140 telemarketers. PSSI saw the huge increase in the level of loans and the swelling in the ranks of NC Mortgages' telemarketers,

---

[21] The importance of distinction between different Debtors is even somewhat recognized in the February 2nd Plan, dividing the Debtors into "Holding" and "Operating" Debtors.

[22] Docket 1 of the District Court Action.

[23] Certain paragraphs were filed under seal. I, of course, have no means of knowing what is alleged in those paragraphs but I suppose it relates to the methods PSSI employed to discover the alleged fraud.

customer service representatives, and loan officers. Something was definitely going on, an in December 2002, PSSI discovered what it was.

[My comment: I cannot refrain from remarking that indeed New Century was based in a glass building. The subprime crisis hit and the building shattered. I must also say that the sentence that says "NC Mortgage's revenue grew 400% and the stock price rose by 350%" is inaccurate. NC Mortgage being an indirect subsidiary of NCFC, NC Mortgage's stock does not trade!]

63. NC Financial controlled, directed, and supervised their subsidiary NC Mortgage during the relevant time period, and was responsible during that period for NC Mortgage's actions.

Numerous other paragraphs of the District Court Complaint mentioned "Defendants", which included NCFC without specifically naming it[24].

Based upon those allegations, two possible reasons can be advanced to implicate NCFC:

1. NCFC participated in a "single course of conduct" with the other Defendants in the District Court Action;
2. NCMC was nothing more then a façade or an agent of NCFC.

As Judge Godbey (the Texas District Court Judge who handled PSSI's District Court Action) puts it (emphasis is mine)[25]:

Positive Software complains that its claims against the non-signatories are entirely separate and different from its claims against New Century Mortgage and should not be sent to arbitration. When most of the non-signatories moved to dismiss Positive Software's claims against them for lack of personal jurisdiction, Positive Software opposed that motion, arguing that the claims as alleged in its complaint were that all of the Defendants engaged in a single course of conduct, and indeed, that New Century Mortgage was nothing more than a tool through which New Century Financial Operated. The Court agrees with that characterization of Positive Software's complaint: all Defendants acted together in a single course of conduct that allegedly breached the Software Subscription Agreement, as well as allegedly violated various of Positive Software's intellectual property rights in the software. The second circumstance of *Grigson*, if it means anything, must encompass such claims. Accordingly, the Court stands by its prior ruling regarding which parties should be compelled to arbitrate.

The reasons advanced by PSSI are akin to what is referred to "direct" and "indirect" types of liability referred to in *Bestfoods*.

Argument 1: NCFC did not directly participate in a "single course of conduct" with NCMC or any other defendant

Paragraphs that mentioned "Defendants", which included NCFC without specifically naming it seem to suggest a single course of conduct between NCMC and NCFC.

It is a truism to say that a corporation *acting* is a legal fiction. A corporation's "acts" must necessarily come from one or more individuals acting. Thus, for NCFC to illegally copy, analyze, and reverse engineer PSSI's software source code as PSSI claims in its District Court Complaint, it must be done by someone who has a relationship with NCFC.

---

[24] See paragraphs 60 and ss of the Complaint in the District Court Action [Docket 1]

[25] District Court Action, docket 101, pages 4 and 5.

Both Jeff Lemieux and Frank Nese were <u>not</u> officers of NCFC. Paragraph 107 of the District Court Complaint says that Nese and Lemieux are officers *of other defendants*; yet, this paragraph is in contradiction with paragraphs 9 and 10 which say(emphasis is mine):

> 9. Jeff Lemieux is the Chief Operating Officer of Defendant eConduit and currently in charge of the illegal activity of the Defendants. He may be served at 17701 Cowen, Suite D, Irvine California, 92814.

> 10. Frank Nese is a senior manager at Defendant NC Mortgage and ordered the illegal activity that is the subject of this lawsuit. He may be served at 340 Commerce, Suite 100, Irvine California, 92602.

As a matter of fact, upon information and belief, not any one single individual mentioned in the District Court complaint was an employee, agent, or had any other relationship with NCFC.

The more recent complaint by PSSI against Susman Godfrey et al.("Susman Action")[26], sues several other persons for fraud and civil conspiracy: Susman Godfrey, Ophelia F. Camiña (attorney from Susman Godfrey), Barry C. Barnett (attorney from Susman Godfrey), and John Norment("New Century's Chief Technology Officer for their Retail Division"[27]. All of the above individuals and other named individuals that were not defendants in that suit were related to "New Century", which is defined earlier in the Susman Action as "New Century Mortgage Corporation"[28]. Further in this complaint, PSSI clearly makes the distinction between NCMC and "other related defendants"[29].

As a consequence, PSSI does not even allege *one single individual* who acted on behalf of NCFC as an employee, an agent, or any other relation. All the individual defendants related to NCMC, and PSSI was very specific in alleging which actions were attributable to each named individual so it is unlikely that PSSI has simply forgotten to implicate someone from NCFC.

The above analysis is not limited to PSSI's pleadings. Upon information and belief, no Court record – in either the District Court action, Bankruptcy Court Proceedings, or other – named even one single individual who participated in the alleged scheme against PSSI and who was acting on behalf of NCFC or discussed the merits of any grounds to hold NCFC responsible.

It cannot be presumed that, because NCMC or some individuals working for NCMC allegedly participated in the scheme, that NCFC or any individuals working for NCFC (who, upon information and belief, are hierarchically superior to individuals who worked for NCMC) participated in or were even aware of the alleged scheme. It is trite law that allegations such as these cannot be implied but must be alleged and proved.

---

[26] U.S. District Court, Northern District of Texas, No 3-07CV1422-N

[27] *According to Susman Action, par. 42.* Upon information and belief, Norment's title is more correctly cited as Vice President, Technology, of *New Century Mortgage*. Furthermore, upon information and belief, NCMC is the *wholesale* division, not the retail division. Once again, we're dealing with NCMC, not NCFC.

[28] Susman Action, par. 12.

[29] Susman Action, par. 32

evidence – that an agent for <u>NCFC alone</u> has engaged himself in the alleged scheme against PSSI.

<u>Argument 2: The Proposed Settlement might deprive NCFC of some of the recourses it currently has</u>

There is one additional important nuance why the settlement is not in the best interests of NCFC. If the Court finds that an individual working for NCFC actually *did* participate in the alleged scheme against PSSI, then NCFC could potentially be held liable for their actions under the doctrine of vicarious liability. If NCFC was to be held responsible through the doctrine of vicarious liability, NCFC would typically still have a recourse against the individual at fault.

As PSSI's complaint involves very serious allegations such as fraud and conversion, any individual working for NCFC that is held liable and triggers NCFC's vicarious liability is typically precluded by state law from invoking the either the benefit of a provision of his employment contract limiting NCFC's causes of action against that individual or an indemnification agreement between that individual and NCFC.

Thus, in the event that PSSI's claims against NCFC were allowed to proceed in Court and the Court was to rule that one or more individuals acting on behalf of NCFC did participate in a *fraud* scheme against PSSI, NCFC could have a cause of action against the specific individuals implicated in the alleged scheme. However, the estate of NCFC is unduly deprived of the above cause of action because the Proposed Settlement:
   1. Contemplates a dismissal of all proceedings against NCFC[32];
   2. Releases, inter alia, all present and former employees[33].

Finally, upon information and belief, NCFC is covered by a D&O insurance; however, the insurer denied coverage[34]. **Thus, unless the Debtors can somehow reach a settlement with *Liberty Surplus* providing for a liability against NCFC that will cover the <u>entire amount</u> of PSSI's claim against NCFC and will make sure that NCFC suffers no prejudice as a result of the Proposed Settlement with PSSI, the Proposed Settlement is not in NCFC's interest.**

<u>Argument 3: NCMC is neither an agent nor a façade for NCFC and cannot be confused with NCFC</u>

With all due respect, I believe that the idea that NCMC was NCFC's agent (as implied by the paragraph 6 of the District Court Complaint) is absurd. Nowhere does PSSI provide any reasons as to *why* should NCMC be considered as NCFC's agent. PSSI's District Court Complaint neither alleges any agency contract nor discusses the case law

---

[32] Proposed Settlement, article 4.5.

[33] Proposed Settlement, article 2.1.

[34] See docket 2101: Debtors' Response to the "Motion of Positive Software Solutions, Inc. for Relief from the Stay Regarding Copyright Infringement Litigation", and Cross-Motion for Sanctions for Violation of the Automatic Stay, paragraph 2. See also paragraphs 11-13.

conditions of a tacit agency agreement and why it is believed that there was such a contract in this case.

The argument that NCMC is but a façade for NCFC or even that NCMC and NCFC can be confused by a reasonable person is even more untenable.

In paragraph 27 of the District Court Complaint, PSSI themselves allege that NCMC is just one of the subsidiaries through which NC Mortgage Markets: "When PSSI debuted LoanForce, NC Mortgage, **one of the subsidiaries through which NC Financial markets,** wanted the upgrade."

Upon information and belief, NCMC's role was originating loans and then selling them to NC Capital, which would then sell them on the secondary market or securitize them and sell residual interests to NC Residual IV or NC Residual III. The secondary market aspect was crucial to NCFC[35], and that aspect was not conducted through NCMC.

NCFC, on the other hand, was a holding company.

The idea that NCMC was neither a façade nor an agent for NCFC was clearly recognized by the Mortgage Repurchase Agreements ("MRA") counterparties. Although the MRAs were signed with operating subsidiaries, a separate guarantee agreement was always signed with NCFC.

For the above reasons, I believe that no reasonable person would perceive NCMC to be either an agent or a façade for NCFC and will not confuse NCMC with NCFC.

<u>Argument 4: arguing that NCMC is nothing more than a tool (or a façade) through which NCFC operated is an attempt to pierce the corporate veil</u>

Even if NCMC was nothing more than a tool or a façade through which NCFC operated, it does not mean by itself that PSSI has a cause of action against NCFC, as the principle still stands that distinct corporations such as NCMC and NCFC are distinct legal persons.

Rather, the argument that NCMC is nothing but tool for NCFC is an attempt to pierce the corporate veil, because this argument will provide PSSI with a cause of action against NCFC only if PSSI pierces the corporate veil. Piercing the corporate veil is regulated under state law[36]. Upon information and belief, NCFC is a Maryland corporation, NC TRS is a Delaware Corporation and NCMC is a California Corporation. The District Court Action is pending in Texas, and the current bankruptcy proceedings take place in Delaware.

While the law of each jurisdiction varies, upon information and belief, all of the above mentioned states require something than the subsidiary being a façade for the parent to

---

[35] In fact, one of the reasons why the Debtors had to file for bankruptcy in the first place was a disruption of the secondary market.

[36] See, for instance, part II of Supreme Court's opinion in *Bestfoods*.

pierce the corporate veil. At the very least, an inequity at the inception of the subsidiary company is required (California). At most, the subsidiary company must generally be established with the express purpose of defrauding for the corporate veil to be pierced(Maryland, Delaware, and Texas).

Clearly the case at hand is not proper for piercing the veil. It is also unequitable, as if it was to be established that NCMC is nothing but a tool through which NCFC operated, then all creditors whose claims are strictly against NCMC (such as EPD claims) could then argue that they have a recourse against NCFC. The result would be a blatant inequity for NCFC's estates.

<u>Argument 5: Judicial policy and equity arguments</u>

I respectfully submit to the attention of this Court the fact that PSSI has filed claims against Home123 and New Century TRS, Debtors who were not even parties to the original complaint. As such (with all due respect to PSSI), it seems to me that PSSI is trying to "shoot everything that moves" rather then pursue its claims against the parties that could actually be held liable (in this case, NCMC and the individual defendants).

If the Court was to accept that PSSI's claim has any probability of success against NCFC, the inequitable results will be as follows:
1. If a holding company can be held liable for the actions of its operating subsidiary on a basis of allegations as general as the ones advanced by PSSI in its District Court Complaint and other pleadings, then what goal does the very idea of a holding corporation serve?
2. It seems to me that PSSI are a rather vigorous and persistent litigant. What would happen if other litigants whose cause of action is only against NCMC were to persistently allege that NCMC is either a façade or an agent for NCFC or that NCFC somehow participated in a course of action that harmed the litigant in question? Would the Debtors eventually decide they would rather settle the suit, supposedly in order to accelerate distributions?

<u>Partial conclusion: PSSI's allegations against NCFC would not survive a motion to dismiss</u>

I believe that PSSI's claim against NCFC would not even survive a motion to dismiss on the basis that allegations as they appear in PSSI's claim (and, in fact, in the entire record) are insufficient to establish the relief sought. As such, I respectfully submit that PSSI has virtually no chance of winning against NCFC and thus, the Proposed Settlement which proposes to allow a claim of $15,000,000 against NCFC should be rejected by the Court.

**2. Subsidiarily, it is not clear that there is enough evidence to implicate NCFC, even assuming that a cause of action exists against NCMC**

The Court is better placed then me to appraise the value of evidence implicating NCFC. I defer to the Court's judgment on that question. However, I respectfully urge the Court to

consider whether there is sufficient evidence to implicate NCFC. In the event that there is no sufficient evidence, I am respectfully asking the Court to rule that PSSI's potential claim against has virtually no chance of winning against NCFC and thus, the Proposed Settlement which proposes to allow a claim of $15,000,000 should be rejected by the Court.

### 3. Interested parties should have their word to say

In the event that this Court judges that PSSI's claim against NCFC had some chances of success and is not persuaded by the arguments above, I nevertheless urge the Court to give interested parties a chance of replying to PSSI's arguments by:

1. Order PSSI to provide a *detailed* exposé explaining why PSSI believes it has a sufficient cause of action against NCFC;
2. Allow interested parties to respond to this statement within reasonable a delay.

[Remainder of the page intentionally left blank]

## Conclusion

For the above reasons, please the Court to:

1. Deny the Proposed Settlement:
   a. On the grounds that it is premature; AND/OR
   b. On the grounds that it allows PSSI a claim of $15,000,000 against NCFC, despite the fact that PSSI has virtually no chance of succeeding in Court against NCFC(or any Debtor other than NCMC); AND/OR
   c. Any other reason.
2. In the event the Court refuses to deny the Proposed Settlement outright, postpone the consideration of the Proposed Settlement until confirmation hearings or at least until a reasonable delay has elapsed after the Disclosure Statement is approved in order to allow interested parties to evaluate the relevant information and to have their word to say.
3. In the event the Court refuses to deny the Proposed Settlement outright,
   a. Order PSSI to provide a *detailed* exposé explaining why PSSI believes it has a sufficient cause of action against NCFC;
   b. Allow interested parties to respond to this statement within a reasonable delay;
   c. Postpone the hearing related to the Proposed Settlement to a date that is after the deadline for interested parties to respond to PSSI's statement.
4. Make any other ruling that the Court deems just and proper, possibly including:
   a. Implementing the protocol I am proposing in "6. My solution - proposed protocol for considering settlements, including the settlement concerning PSSI";
   b. Requesting PSSI and the Debtors to propose a settlement that does not involve any Debtor other than NCMC.

Dated: February 25, 2008                    Respectfully submitted,

                                            A Mutchnik

22

## CERTIFICATE OF SERVICE

I, ____André Mutchnik_____, certify that I am, and at all times during the service of process was,
(name)
not less than 18 years of age and not a party to the matter concerning which service of process was made. I further
certify that the service of this ~~summons and a copy of the complaint~~ was made ____on February 25, 2008____ by:
*objection* (date)

☐ Mail Service: Regular, first class United States mail, postage fully pre-paid, addressed to:

☐ Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

☐ Residence Service: By leaving the process with the following adult at:

☐ Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:

☐ Publication: The defendant was served as follows: [Describe briefly]

☒ State Law: The defendant was served pursuant to the laws of the State of ____Delaware____,
as follows: [Describe briefly] (name of state)

Via e-mail (andre_mutchnik2@yahoo.ca ) to the following addresses:
- Mark D. Collins: Collins@rlf.com
- Michael J. Merchant: Merchant@rlf.com
- Christopher M. Samis: Samis@rlf.com
- Ben H. Logan: blogan@omm.com
- Suzanne S. Uhland : suhland@omm.com
- Joseph McMahon, Jr. : joseph.mcmahon@usdoj.gov

Under penalty of perjury, I declare that the foregoing is true and correct.

25 February 2008
Date

A. Mutchnik
Signature

Print Name: André Mutchnik

Business Address: 17, de la Poudrière, suite 105

City: Verdun             State: Quebec (Canada)        Zip: H4G 3J5