## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Re: Dockets 4804-4806** |
| | : | |
| | : | **Objection Deadline: February 27,** |
| | : | **2008 @ 4:00 pm.** |
| | : | **Hearing Date: March 5, 2008 @** |
| | : | **1:30 pm** |

**OBJECTION OF ANDRE MUTCHNIK ("I" OR "ME") TO THE APPROVAL OF DISCLOSURE STATEMENT REGARDING THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF FEBRUARY 2, 2008 (DOCKET 4804) AND TO THE MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER (A) APPROVING PROPOSED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF FEBRUARY 2, 2008; (B) ESTABLISHING PROCEDURES FOR SOLLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT PROPOSED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND (C) SCHEDULING A HEARING ON CONFIRMATION OF PROPOSED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND APPROVING RELATED NOTICE PROCEDURES (DOCKET 4897)**

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home 123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

**Introduction**

I am a holder of New Century Financial Corp ("NCFC"), class A and class B preferred shares. As such, I am an interest holder as defined in the Bankruptcy Code and have standing to file is an interested party in the New Century TRS et al. case and has standing to file this objections.

The Court might probably wonder why I am doing this. After all, isn't New Century hopelessly insolvent? The short answer is that while I am fairly certain not all creditors will be made whole, New Century is not one single entity. The Joint Disclosure Statement ("Disclosure Statement"), filed on February 2nd by the Debtors and the Official Committee of Unsecured Creditors, divides the Debtors into two major groups (Holding and Operating Debtors). That alone shows that proper apportionment of assets and liabilities is of paramount importance. Based on known information, I believe it is not certain yet that equity holders, in particular holders of NCFC preferred stock will receive recovery.

As many other parties in interest, I looked forward to the Disclosure Statement for adequate information. Yet, I believe the Disclosure Statement is severely deficient. This Objection exposes and provides reasons *which are believed to be the most relevant* substantiating the above assertion. *It is not intended to be an exhaustive narration of all the perceived deficiencies of the Disclosure Statement.* Therefore, the Proponents of the Disclosure Statement are invited to be proactive and push their disclosure beyond the specific points mentioned in this objection.

Competing imperatives when considering a Disclosure Statement

When considering a Disclosure Statement, the Court is often torn between two opposing imperatives:

A. The need to ensure adequate disclosure to all parties, on one hand , and, on the other hand;
B. To avoid harm to the estates by:
    a. Avoiding unneeded delays;
    b. Avoiding a possible loss of financing that is contingent to the Debtors emerging from Chapter 11 before a certain date;
    c. Minimizing the costs that are involved in preparing the valuation of assets or a projection of financial performance and the litigation costs that usually follow;
    d. Forcing the Debtors to divulge commercial information that might hinder the Debtor's competitiveness post-emergence.

As will be seen more fully, none of the information I seek require valuation or any financial expertise. Most of the information I seek relates to factual events that already happened, and disclosing it would be neither time-consuming nor hinder Debtor's commercial operations[2]. Part of the information requested relates to future events (such as future tax refunds) that nevertheless do not require any extensive analysis.

In an effort to be proactive and resolve the questions before the hearing, I sent via email a draft of the present objection on February 13th to the U.S. Trustee and to all parties named in the Notice related to the Disclosure Statement[3]. I have not received any response from the parties, though the U.S. Trustee did confirm reception of the objection I sent.

Analysis of the imperatives in the case at hand

The Plan contemplates liquidation[4]. This is not a case with a financing that is contingent to the approval of a plan before a certain deadline. Further, since the Debtors intend to liquidate, I believe they cannot now argue that disclosing information would eventually harm their commercial operations post-emergence.

In addition, the liquidation is not expected to be immediate. Rather, the Plan:
1. Proposes certain compromises;
2. Creates a Liquidating Trust, which will *eventually* pay distributions to beneficial owners and will *eventually* prosecute causes of action, file tax returns, etc. Neither the Plan nor the Disclosure Statement makes it clear *when* will creditors start receiving distributions.

Thus, it is not possible to argue that disclosing additional information will consume valuable time and harm the estates by not allowing a consummation of the Plan as fast as possible. For instance, filing tax returns, launching lawsuits, and objecting to claims, does not necessitate a quick consummation of a plan. Furthermore, as explained before, a draft of the present objection has been previously sent via e-mail to the relevant parties precisely to save time. Finally, most of the information requested would not consume time to disclose, as it relates to factual events that already happened.

The need for adequate disclosure, on the other hand, is flagrant. Parties in interest other then the Debtors and the Creditors' Committee are not privy to many relevant information to which the Debtors and the Creditors' Committee is privy.

The need for adequate disclosure is further exacerbated by the following facts:

---

[2] For instance, I believe that addressing the deficiencies I discuss with respect to the May Auctions of Morgan Stanley collateral (the second point in my objection) would take the Debtors a couple of hours tops.

[3] Docket 4806.

[4] See, for example, page 44 of the Plan.

1. The Joint Plan("Plan") contemplates liquidation of the Debtors[5]. Because it means the Debtors will cease operations, it is not possible to argue that disclosing a given piece of information would jeopardize the operations of the Debtors going forward (for example, by divulging confidential information which could then be used by competitors);
2. Upon information and belief, the bulk of Debtors' assets have been liquidated. As will be seen later in this objection, numerous points which lack adequate disclosure relate to current – not projected information;
3. The Plan contemplates a Liquidating Trust[6] and the Liquidating Trustee will have no reporting requirements to the Court[7] or to interest holders[8].
4. The Debtors have filed motions to approve settlements (with GECC and, recently, with Positive Software Solutions). As will be explained in my objection to the Motion to settle with Positive Software Solutions, I believe that it is important and fair that all compromises that might adversely affect any party in interest in the estate of NCFC (in particular, any settlement with respect to the mortgage repurchase agreements[9] or the EPD claims) are dealt with in a comprehensive Plan, rather than via standalone motions.

Analysis of the Debtors' Motions

On February 15 2008, the Debtors Filed the Motion of Debtors and Debtors in Possession for an Order (A) Approving Proposed Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008; (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Chapter 11 Plan of Liquidation and (C) Scheduling a Hearing on Confirmation of Proposed Joint Chapter 11 Plan of Liquidation and Approving Related Notice Procedures[10] ("Motion"). The Motion sets out some legal standards related to the standard of disclosure[11], with only *one* paragraph[12] dealing with the ultimate question: *how* does the February 2nd Disclosure Statement contain adequate information? This paragraph contains only a bare-bone assertion that "The Disclosure Statement contains ample information with respect to the topics identified above where applicable".

---

[5] See, for example, page 44 of the Plan.
[6] See pages 11 and 46 of the Plan.
[7] See page 87 of the Plan: "[...]provided that notwithstanding the foregoing, the Liquidating Trustee shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of assets"
[8] As only *creditors* have a beneficial interest in the Liquidation Trust.
[9] As will be seen further, one ground for the present objection is that Disclosure Statement does not mention what compromises have been reached with respect to the Mortgage Repurchase Agreement Parties. Approving a disclosure statement now, when it is not even known what compromise is proposed by the Debtors on that important point, is premature.
[10] Docket 4897
[11] Paragraphs 12-14 of the Motion.
[12] Paragraph 15 of the Motions .

It seems to me that the Plan Proponents place undue reliance on the fact that the Disclosure Statement has been approved by the Creditors' Committee. A Disclosure Statement should allow *all* interested parties to have the benefit of adequate disclosure. As an interested party, I believe I should not have to rely upon the Plan Proponents' bare bone assertions made in the Disclosure Statement and/or the Motion and believe I am entitled to the benefit of adequate (i.e. *specific* and *exhaustive*) disclosure. Further, I respectfully submit that the Court's ruling with respect to my rights should not be affected by the widespread belief that NCFC equity is worthless, as adequate disclosure statement aims to answer precisely that question: would a reasonable preferred stock holder of NCFC be able to make an informed opinion as to the recovery (or lack thereof) that this holder is entitled to?

Structure of this objection

The specific issues outlined in this Objection are structured in five Sections, each Section containing four sub-sections (Issues not discussed, Relevance of the requested information, Legal analysis, and Conclusion).

As the decision to whether a Disclosure Statement should be approved is done on a case by case basis[13] and without rigid guidelines, this objection sometimes draws on the U.S. Trustee Manual as an authoritative source of doctrine related to adequate information.

**Table of Contents**

Introduction ........................................................................................................................ 2
Table of Contents ............................................................................................................... 5
1. Lack of any liquidation analysis or financial statements ............................................... 6
2. Morgan Stanley and affiliates("MS") ........................................................................... 7
3. Issues with respect to MRA providers other than MS ................................................ 12
4. Expected Tax returns ................................................................................................... 16
5. Treatment of intercompany claims .............................................................................. 21
Conclusion ........................................................................................................................ 26

---

[14] See section 1125 (b).

### 1. Lack of any liquidation analysis or financial statements

#### a) Issues not discussed or ambiguous in the Disclosure Statement

Disclosure Statement does not have a liquidation analysis. Although the Disclosure Statement discusses Chapter 7 as an alternative, they fail to list actual numbers relating to proceeds that would be obtained by each class if the Debtors were to be liquidated in a Chapter 7[14]. There is in fact *not one single number* in the section discussing the Chapter 7 alternative!

Further, it is ironic that the Disclosure Statement says that "For the reasons set forth above, the Debtors believe that the Plan provides a superior recovery for Holders of Claims"[15], yet the spaces where the aggregate amount of proceeds obtained attributable to Holders of Operating claims are left blank[16]. One can only wonder how can Proponents of the Disclosure Statement be so affirmative that the Plan provides a superior recovery for *all* Holders of Claims, yet seem to be unaware of the total proceeds expected to be obtained by those Holders of Claims (as evidenced by the blanks)?

Disclosure Statement's section V titled "Financial Information" is also deficient. Disclosure Statement does not contain anything even remotely similar to financial statements or a liquidation analysis. Nowhere does the Disclosure Statement discuss the financial condition of each individual Debtor, of each group of Debtors ("Operating" and "Holding" Debtors) or even of the Debtors on a consolidated basis.

Information is scattered across the Disclosure Statement[17]. I believe it is desirable that financial information be more coherently grouped in the relevant section.

#### b) Relevance of the requested information

The relevance of the financial statements is obvious. Besides providing an indication as to the general financial condition *of each Debtor,* liquidation analysis *for each Debtor* would allow interested parties to properly evaluate the impact of the compromises proposed in the Plan.

#### c) Legal analysis

Section 3-10.3.20 of the U.S. Trustee Manual says that:

---

[14] See Disclosure Statement, pages 138-139.
[15] See Disclosure Statement, page 139.
[16] For example, see Disclosure Statement, page 10.
[17] As an illustration, page 56 mentions (emphasis is mine): The key assets of NCFC include investments in a hedge fund (discussed in Section V.A.4 a hereof), the funds available in the Deferred Compensation Trust (discussed in Section V.A.4.e hereof) *and approximately $20 million that was in NCFC's bank accounts as of the Petition Date.* Yet, those approximately $20 million cash were not listed as assets in Section V – Financial Information. I believe they should have been listed there, for the sake of coherence.

A creditor cannot make an informed judgment regarding a proposed plan of reorganization without information as to the available alternatives.

Section 1129 (a) (7) of the Bankruptcy code says(emphasis is mine):
> The court shall confirm a plan only if all of the following requirements are met:
> [...]
> (7) With respect to each impaired class of claims or interests—
> (A) *each* holder of a claim *or interest* of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

A holder of preferred stock is an "interest" in the class, and, as the Plan provides no recovery for such an interest, is deemed to reject the Plan[18]. Therefore, the Plan cannot be accepted unless such an interest holder would receive a recovery greater to or equal to what such a holder would receive had the Debtors been liquidated pursuant to Chapter 7. That begs the question: *how much* will such an interest holder receive in a Chapter 7 liquidation? That question should be adequately addressed in the Disclosure Statement[19]; in this case, I believe it is not.

I realize that some spaces in the Statement are left blank and some Appendices are intentionally omitted. While filling the blanks and filing the Appendices might moot certain concerns exposed above, I believe that -- at least until such blanks and Appendices are *actually* filed -- all concerns exposed above are still valid.

### d) Conclusion

I am respectfully asking the Court to request the Proponents of the Disclosure Statement to provide financial statements(not necessarily in accordance with GAAP) and proper liquidation analysis with their Disclosure Statement. Because the Debtor's Plan contemplates substantive consolidation of several Debtors into two major groups (the Holding and the Operating Debtors) I believe the financial statements should describe the assets and liabilities related *to each individual Debtor* in order to evaluate the impact of the consolidation.

### 2. Morgan Stanley and affiliates("MS")

### a) Issues not discussed or ambiguous in the Disclosure Statement

*i) With respect to the Auctions*

---

[18] Section 1126 (g) of the Bankruptcy Code.
[19] Section 1126 of the Bankruptcy Code.

The section "III.C.6 Asset sales" of the Disclosure Statement omits to discuss the sale of loans and residuals which previously comprised the collateral of MS.

Upon information and belief, the following is known:
   a) Pursuant to a Certification of Counsel[20], the loans and residuals which previously comprised the collateral of MS were held in May 2007;
   b) Separate auctions were held for the loans and the residuals[21];
   c) Total proceeds of $2,415,000,000 were obtained for *both the loans and residuals*[22];

A reasonable investor is therefore unaware of the amount obtained for the loans *and* the amount obtained for the residuals, the sum of which amounts should total 2,415,000,000;

*ii) With respect to the claim filed by MS*

Schedules of Assets and Liabilities for New Century Mortgage disclose an amount of claim equal to $2,103,001,933.16 pertaining to the "MASTER REPURCHASE AGREEMENT DATED DECEMBER 12, 2005, FINANCING STATEMENT NO. 057049093623 [with] MORGAN STANLEY MORTGAGE CAPITAL INC. AS AGENT"[23], with a footnote saying "2. Amount includes warehouse borrowings outstanding consisting of estimated amounts secured by related mortgage loans held for sale pursuant to various warehouse agreements as of March 31, 2007 and estimated accrued interest due as of March 31, 2007, calculated on an accrual basis."[24]

Yet, Claim 3037 filed by an affiliate of MS says that "[a]s of the Petition Date, each Seller and the Guarantor was indebted to the Buyers, jointly and severally or otherwise, in the amount of at least $2,468,000,000 for amounts due and owing by the Sellers under the MRA…"

There is therefore a discrepancy of at least $364,998,066.84 between the amount due to MS as listed in the Schedules of Assets and Liabilities and the Amount listed on the MRA claims. Further complicating the matters, the Schedules of Assets and Liabilities listed a contingent receivable of $19,386,631.00 of "Morgan Stanley net interest from loans held for investment for March 2007 sent to Morgan Stanley for assets that are pledged to Morgan Stanley"[25], which could result in the discrepancy described above being even higher. *The debtors do not explain this discrepancy, despite the substantial nature of the amount in question.*

Strangely enough, despite the fact that New Century Residual IV was a "Seller" as defined in the MS Master Repurchase Agreement ("MRA"), Schedules of Assets and

---

[20] Docket 432;

[21] Article 2.1 of the Agreement for the Disposition of Certain Mortgage Loans and Residual Interests, annexed as Exhibit 1 to the Certification of Counsel in Docket 432.

[22] See Claim 3035 filed by an affiliate of Morgan Stanley.

[23] Schedules of Assets and Liabilities for NCMC, Docket 1006, page 6 of Schedule D.

[24] Schedules of Assets and Liabilities for NCMC, Docket 1006, page 7 of Schedule D.

[25] Schedules of Assets and Liabilities for NCMC, Docket 1006, page 6 of Schedule B.

liabilities for New Century Residual IV[26] do not disclose any amount due to MS. The only liability disclosed is an intercompany payable of $152,733,363.90 to NCMC.

The nature of the above intercompany liability is unclear. Is it a note between New Century Residual IV which has been "sold" to MS pursuant to the MS MRA (instead of "selling" the residual interests directly)?

The Disclosure Statement does not shed light on the issues listed above.

*iii) Certain important information with respect to the Event of default on the MS MRA*

The Disclosure Statement says that[27]:
> Additionally, the remaining Holding Company Debtors - NC Credit and NC Residual IV -- have minimal assets.

However, in their Reply to the Examiner's report, the Debtors say(emphasis is mine)[28]:
> On March 9[th], 2007 Morgan Stanley delivered the Debtors both a notice of default and a mark that showed that the market value of the mortgage loans and residuals exceeded New Century's repurchase obligations by over $176 million. *This was not surprising, since the prior day Morgan Stanley had taken out Citigroup and had received residuals with a value of $350 million against which it advanced 265 million.*

Furthermore, the Monthly Operating Report for the period ended May 31st disclosed an amount of $300,297,199.77 of restricted cash in multiple bank accounts[29].

Upon information and belief, NC Residual IV held the vast majority of the residuals[30]. If indeed the Court comes to a conclusion that there was a $85 million equity in residuals(namely because of the Sections 559 and 562 argument[31]) as the Debtors asserted in their Reply to the Examiner's report, then the vast majority of this equity might belong to NC Residual IV, *contrary to the Disclosure Statement's assertion that NC Residual IV has minimal assets.* Certainly the possibility that New Century Residual IV might be entitled to a significant amount of assets merits disclosure.

b) Relevance of the requested information

The relevance of the information discussed above is threefold:
1. To estimate the amount of equity – if any  -  realized either upon the sale of the MS loans and residuals or upon the notice of default by MS;

---

[26] Docket 1012.
[27] Disclosure Statement, page 58.
[28] Docket 4499, page 54.
[29] Docket 2005, page 5.
[30] See Schedules of Assets and Liabilities for New Century Residual IV, docket 1012, Schedule B. See also Disclosure Statement, page 20: "Debtor entities, such as NC Residual IV, often owned OTCs or other interests in the securitization trusts."
[31] For further discussion, see *Infra*, Section 3 Sub-section a)

2.  To apportion the equity amongst the Debtors;
3.  To get a general understanding on what's happening with respect to MS.

In their Reply to the Examiner's First interim Report[32], Debtors mentioned that "Attempting to realize the equity on the loans and residuals subject to the Morgan Stanley MRA was a central part of the effort to negotiate a joint sale of these loans and residuals with the Debtors' sale of their servicing business"[33]. Parties in interest would be extremely interested in knowing all relevant details about the sale of loans and residuals which previously comprised the collateral of Morgan Stanley (MS), as further described above in the section "a) Issues not discussed or ambiguous in the Debtor's statements".

As this information pertains to past or current events (the auctions have already taken place), any rule to the effect that the Debtors are not obliged to provide a *valuation* (which implies an exercise of judgment with respect to the value of an asset) is not applicable. At this point, both the loans and the residuals are sold and the Debtors are simply requested to detail the proceeds obtained for those loans and residuals.

Issues outlined in this Section are of paramount relevance. If, as the Debtors assert[34], the sale of the loans and residuals that were previously subject to Morgan Stanley's MRA resulted in equity to the estate, then the Debtors should have at least mentioned the amount of this equity and the apportionment of this equity amongst the Operating and Holding Debtors(as such terms are defined in the Debtor's Plan).

In addition, if equity was realized on the sale of the loans and residuals which previously comprised the collateral of MS, it is unclear why the section "III.C.6 Asset sales" of the Disclosure Statement omits to discuss that sale.

Upon information and belief, all residual interests were held by New Century Residual III and IV and New Century Capital whereas all loans were held by NCMC[35]. Thus, equity that can be attributed to the loans will probably comprise the assets of Operating Debtors (as defined in the Disclosure Statement), whereas equity that can be attributed to the residuals will probably comprise the assets of Holding Debtors (as defined in the Disclosure Statement).

The knowledge of the portion of the proceeds of the Auction that pertains to the Residuals is likewise absolutely necessary, as it will allow a reasonable investor in my situation as defined in the Bankruptcy Code to estimate the apportioning of the equity(if any) attributable to the Operating Companies and Holding Companies as described in the above paragraph. This apportioning of equity – if it exists – is of paramount importance.

---

[32] Docket 4499.

[33] Docket 4499, page 33 in the footnote.

[34] See page 53 of the Docket 4499: "Thus, the Debtors assert that Morgan Stanley owes them money instead of vice versa"

[35] No Schedule of Assets and Liabilities other than that for NCMC mentions any asset that is Collateral for Morgan Stanley.

c) Legal Analysis

In accordance with the U.S. Trustee Manual, point 3-10.2.3, the following factors are to be taken into account when assessing the adequacy of disclosure:

1. *The nature of the proposed plan of reorganization or liquidation:* This is a Plan of liquidation. Pursuant to the Plan, the Plan Advisory Committee and the Liquidation Trustee have significant discretion, and access to the relevant information by other interested parties such as Preferred Stockholders is significantly limited.

2. *The sophistication of the various holders of claims and interests and their familiarity with the debtor and its business:* the Preferred Stockholders are public shareholders and are not necessarily familiar with the Debtor's business and financial condition.

3. *Whether the expense of the disclosure would substantially outweigh its anticipated benefit to creditors and stockholders:* the expense of the disclosure in this case is expected to be null, as the relevant information is factual and is already in Debtor's possession.

4. *The peculiarities of the debtor's business or financial condition:* As seen above and will be further elaborated in this Objection, numerous details with respect to Debtor's financial condition are omitted from the Disclosure Statement. Further, as the Debtors intend to liquidate, disclosing this information will not harm their business post-emergence (because there will be no business in the first place).

5. *The need for an expeditious resolution:* once again, since this section requests information that is factual and present (it involves neither valuation nor future estimates), it should take the Debtors less then a day to draft a narrative disclosing the requested points.

6. *The access of a plan proponent, other than the debtor, to factual information regarding the debtor:* this Disclosure Statement and Plan is submitted as a joint Plan by the Debtors and the Official Committee of Unsecured Creditors. Yet, other parties still exist (such as the Preferred Stockholders, the Beneficiaries of the NCFC deferred compensation trust, etc) who have not had the opportunity of negotiating the Plan and reviewing non-public information - an opportunity the Committee of Unsecured Creditors had.

All the six factors above clearly point in favor of the Court intervening with respect to the information sought in the section "d) Conclusion".

d) Conclusion

I am respectfully asking the Court to request the Debtors to provide all relevant information discussed in this section that will allow the parties in interest to evaluate and apportion the equity realized upon the disposition of loans and residuals previously subject to the MS MRA.

Such information includes (without limitation):

1. The amount realized on the residuals *and* the amount realized on the loans;

2. An explanation as to the discrepancy between what the total amount allegedly due to MS pursuant to the Schedules of Assets and Liabilities and what MS asserted was due to it;

3. The amounts the Debtors believe are due by each Debtor to MS;

### 3. Issues with respect to MRA providers other than MS

#### a) Issues not discussed or ambiguous in the Disclosure Statement

*i) MRA deficiency claims*

Upon information and belief, the following MRA deficiency claims have been filed:

1. Credit Suisse: $102,777,247.94  (Claim 3574);
2. UBS Securities: $50,705,000.00 (Claim 3591);
3. Bank of America: $38,006,043.76 (Claim 3498);
4. IXIS $16,494,811.17 (Claim 3554);
5. Goldman Sachs: $15,109,754 (Claim 3587);
6. Barclays Bank: rights reserved (Claim 3589).

Yet, in their Reply to the Examiner's First Report[36], the Debtors have asserted that the Debtors should in fact have a surplus - not a deficiency, and base their argument, inter alia, on Sections 559 and 562 of the Bankruptcy Code[37].

The Disclosure Statement does not make it clear exactly what compromises have been reached with respect to the MRA deficiency claims[38]:
> While substantial progress has been made, as of the date of this Disclosure Statement, the Debtors are continuing to negotiate a settlement of this matter.

Furthermore, the Disclosure Statement does not disclose any arguments put forth by the MRA providers countering Debtors' and Creditors' Section 559 and 562 arguments[39]:
> The Debtors and the Committee contend that these new provisions of the Bankruptcy Code also provide that any deficiency or surplus is to be measured as of the date that the repurchase agreement is terminated and accelerated, and that if there was a surplus on that date, the counterparty to the repurchase agreement owes that surplus to the estates. *The Repurchase Counterparties disagree and the dispute is discussed in greater detail below. (See Section III.D.3 hereof).*

Section III.D.3 ("Adequate Protection Dispute" of the Disclosure Statement does not, however, put forth any legal or factual arguments against the section 559 and 562 arguments.

---

[36] Docket 4499
[37] Docket 4499, pages 45 – 47.
[38] Disclosure Statement, page 44.
[39] Disclosure Statement, page 22.

12

*ii) The total amount of loans subject to MRAs*

Schedules of Assets and Liabilities filed by the Debtors[40] disclose the following amounts with respect to the MRAs:

| *Creditor* | *Amount in NCMC* | *Amount in Home 123* | *Total* |
|---|---|---|---|
| *Face value of loans*[41] | | | |
| Bank of America | 353,461,019.67 | 189,572,312.76 | 543,033,332.43 |
| CDC[42] | 807,481,802.37 | 1,825,845.59 | 809,307,647.96 |
| Credit Suisse | 1,026,256,414.96 | 325,074,382.50 | 1,351,330,797.46 |
| Morgan Stanley | 2,340,417,939.95 | 520,505.02 | 2,340,938,444.97 |
| UBS | 1,524,055,397.82 | | 1,524,055,397.82 |
| DBSP | 212,166,868.52 | 716,491,233.87 | 928,658,102.39 |
| Total | 6,263,839,443.29 | 1,233,484,279.74 | 7,497,323,723.03 |
| *Corresponding liabilities*[43] | | | |
| Bank of America | 341,280,276.58 | 166,970,071.27 | |
| Citigroup[44] | 777,826,950.69 | | 777,826,950.69 |
| Credit Suisse | 856,427,823.01 | 427,547,408.29 | 1,283,975,231.3 |
| Morgan Stanley | 2,103,001,933.16 | | 2,103,001,933.16 |
| UBS | 1,464,892,044.86 | | 1,464,892,044.86 |
| DBSP | 147,403,439.80 | 691,847,219.03 | 839,250,658.83 |
| Total | 5,690,832,468.10 | 1,286,364,698.59 | 6,977,197,166.69 |

---

[40] Dockets 1004-1018

[41] See Schedules of Assets and Liabilities for NCMC, Docket 1006, page 10 of Schedule B and Schedules of Assets and Liabilities for Home 123, Docket 1008, page 10 of Schedule B.

[42] The name "CDC" appears in Schedules

[43] See Schedules of Assets and Liabilities for NCMC, Docket 1006, Schedule D and Schedules of Assets and Liabilities for Home 123, Docket 1008, Schedule D

[44] The name "Citigroup" appears in the Schedules

3. *Whether the expense of the disclosure would substantially outweigh its anticipated benefit to creditors and stockholders:* the expense of the disclosure in this case is expected to be null, as the relevant information is already in Debtor's possession.

4. *The peculiarities of the debtor's business or financial condition:* Part of the information is factual. Part of the information relates to the arguments put forward by the Debtors to MRA counterparties and by MRA counterparties to the Debtors. Though I understand the negotiations between the Debtors and the MRA counterparties are supposed to be confidential, the unfairness resulting in depriving all parties of interest of NCFC (not just NCFC preferred stock holders) of the information which is probably the most important to them in this case should largely outweigh any need (real or perceived) for secrecy[46]. I respectfully propose that the Court take into account the Debtors intend to liquidate. Thus, disclosing this information will not harm their business post-emergence (because there will be no business in the first place).

5. *The need for an expeditious resolution:* once again, since this section requests information that is factual and present (it involves neither valuation nor future estimates), it should take the Debtors less then a day to draft a narrative disclosing the requested points.

6. *The access of a plan proponent, other than the debtor, to factual information regarding the debtor:* this Disclosure Statement and Plan is submitted as a joint Plan by the Debtors and the Official Committee of Unsecured Creditors. Yet, other parties still exist (such as the Preferred Stockholders, the Beneficiaries of the NCFC deferred compensation trust, etc) who have not had the opportunity of negotiating the Plan and reviewing non-public information  - an opportunity the Committee of Unsecured Creditors had.

All the six factors above clearly point in favor of the Court intervening with respect to the *factual* information sought in the section "d) Conclusion". With respect to the arguments for and against the MRA deficiency claims, although it could be argued that those arguments must remain confidential, the need for fairness towards interested parties (especially interested parties of NCFC) should largely outweigh the need for secrecy (in a similar fashion as the need for disclosure outweighed the need for secrecy with respect to the Examiner's report).

d) Conclusion

I am respectfully asking the Court to request the Debtors to provide all relevant information discussed in this section that will allow the parties in interest to evaluate:

1. The amount of loans subject to each individual MRAs before the Debtor's default on the MRAs and the amounts due under each individual MRAs before the Debtor's default;

2. The legal merit of the arguments put forth by each MRA counterparty and by the Debtors;

---

[46] In a similar way the need for disclosure outweighed Debtor's arguments requesting to keep the Examiner's report under seal.

3. The solidity of the factual assertions and evidence buttressing each argument put forth by each MRA counterparty and by the Debtors.

Such information includes (<u>without limitation</u>):
1. The face value of loans subject to each MRA before the default under that MRA;
2. The amounts due under each MRA;
3. An explanation of the discrepancy outlined in point *ii) The total amount of loans subject to MRAs*;
4. A copy of the notice of default and any other relevant document should be annexed to a Disclosure Statement;
5. A *detailed and specific* narrative describing the arguments of the Debtors and the counter arguments put forward by each individual MRA counterparty.


## 4. Expected Tax returns

### a) Issues not discussed or ambiguous in the Disclosure Statement

Section V.A.4.c ("Tax refund")[47] of the Disclosure Statement discusses the federal net operating loss carryback from the Debtors' 2006 taxable year to the 2004 taxable year.

The following points are not discussed by the Disclosure Statement:

*i. State or other taxing authorities tax returns*

Apparently, the discussed loss carryback pertains only to the I.R.S. Individual State tax consequences and returns are not discussed. It is not clear:
1. Whether, and when, did the Debtors file any *state* tax refunds(preferably, for every individual state);
2. What is the total amount of the *state* tax refunds anticipated to be received by the Debtors(preferably, for every individual state);

*ii. Additional loss carryback*

Federal Operating losses can be carried back for up to two years[48]. Thus, taxable losses incurred in 2007 and 2006 can be carried back against 2005's taxable income. Page F-37 of the SEC Form 10-K for the year 2005 shows the follows:

| | 2005 | | 2004 | 2003 |
|---|---|---|---|---|
| Computed "expected" income taxes | $ 155,162 | | 213,899 | 148,141 |
| State tax, net of federal benefit | 22,169 | | 34,309 | 23,795 |
| Benefit of REIT election | (137,117) | | (17,568) | — |
| Recapture of tax reserve | (14,800) | | | |
| Other | 1,400 | | 4,930 | 5,833 |
| | $ 26,834 | | 235,570 | 177,769 |

---

[47] Located on page 127 of the Disclosure Statement.
[48] See section 172(b) of the Internal Revenue Code

Thus, absent the recapture of tax reserve, the actual tax paid in 2005 was around $40,234,000. Page F-10 discloses "income tax paid" for the year 2005 to be around $25,382,000 (approximately consistent with actual tax paid minus recapture of tax reserve of $14,800,000).

The Disclosure Statement does not reveal:
1. Whether the Debtors intend to seek or have already sought a loss carryback against 2005 taxable income;
2. What is the total amount of the tax returns anticipated to be received by the Debtors for loss carryback against 2005 taxable income:
    a. For the Federal tax carryback;
    b. For the State tax carryback;

*iii. Taxes paid in 2006 on a provisional tax basis*

The SEC Form 10-Q for the third quarter of 2006 reveals that income taxes paid during the first 9 months of 2006 were $60,720,000[49] and an income tax expense of $64,822,000 was recorded during the nine months ending September 30, 2005[50].

Upon information and belief, those taxes were paid by the Debtors pursuant to the procedure of Regulation 1.6154-1, pursuant to which corporations estimate and pay their income taxes on a quarterly basis.

As the Debtors realized a taxable loss for the year 2006[51], I believe that those tax payments should be refunded pursuant to, inter alia, Section 6145 of the Tax Code and Regulations 1.6425-1 to 1.6425-3. Yet, the Disclosure Statement does not reveal what, if any consequences the Debtors expect to happen with respect to the taxes paid in 2006 as quarterly tax estimates. In addition, the Disclosure Statement does not reveal whether the Debtors actually requested a refund of the taxes paid in 2006 as quarterly tax estimates.

*iv. The overall amount of the tax refunds and some discrepancies*

The Disclosure Statement does not reveal any estimate of the *aggregate* tax refunds the Debtors plan to seek, either from the I.R.S. or from the relevant State tax authorities.

The only number discussed in the Disclosure Statement is the 66 million dollar tax loss carryback of 2006 loss against 2004 income. Yet, the Schedules of Assets and Liabilities for New Century TRS disclosed $82,313,110.36 of "2006 IRS tax refund"[52].

---

[49] Form 10-Q for Q3 2006, page 5.
[50] Form 10-Q for Q3 2006, page 4.
[51] Disclosure Statement, page 127: "Debtors claimed a net operating loss carryback (pursuant to Section 172(b) of the Internal Revenue Code) from the Debtors' 2006 taxable year [...]"
[52] Docket 1005, page 5 of Schedule B.

Upon information and belief, During the May 8th hearing, the Debtors mentioned that they believe they are entitled to around "at least" 110 million dollars in tax refunds.

The Disclosure Statement does not explain:
1. The discrepancy between the 66 million dollar amount disclosed in the Disclosure Statement and the 82 million dollar disclosed in the Schedules of Assets and liabilities, and the 111 million dollar discussed during the hearings;
2. The aggregate amount of state and federal tax returns that the Debtors expect to receive.

*v. The exact Debtor(s) entitled to the tax refunds*

Neither the Disclosure Statement nor the Proposed Plan is helpful in determining which Debtor or Debtors are believed to be entitled to the tax refunds.

In contrast with sections V.A.4.a, b, d, e, and f, section V.A.4.c ("Tax refund")[53] of the Disclosure Statement does not specify which Debtor or Debtors are believed to be entitled to the Tax Refunds.

Further, section "b. Calculation of Holding Company Debtor Net Distributable Assets."[54] of the Disclosure Statement does not specify which Debtor or Debtors are believed to be entitled to the Tax Refunds.

The Plan does not make the issue of which Debtor or group of Debtors are believed to be entitled to the Tax Refunds *and on what basis*. The plan merely defines "Holding Company Debtor Net Distributable Assets" to mean "the amount as calculated pursuant to Article 9.C.2 of this Plan"[55].

Article 9.C.2. simply says:
> 2. *Calculation of Holding Company Debtor Net Distributable Assets.* The Holding Company Debtor Net Distributable Assets shall be calculated by deducting from the gross amount (other than Litigation Proceeds) available from the liquidation of the Holding Company Debtors' Assets [...]

An automated search of the word "refund" in the Disclosure Statement and Plan does not yield any results.

Furthermore, nothing in the Disclosure Statement specifies whether a Tax Sharing Agreement exists between one or more Debtors.

In short, upon information and belief, nothing in the Disclosure Statement or the Plan allows a reasonable investor to appreciate which Debtor or group of Debtors will the tax refunds be allocated to.

---

[53] Located on page 127 of the Disclosure Statement.
[54] Page 108 of the Disclosure Statement
[55] Plan, page 10.

*vi. The I.R.S. claim*

Upon information and belief, the I.R.S. filed a $399,824,500.16 priority and $196,191.28 claim against NC TRS[56], and this claim was subsequently amended to $102,607,408.77 priority and $196,191.28 general unsecured claim[57].

Upon information and belief, this claim relates to an assessment pending an audit, currently performed by the I.R.S. on the Debtors. The Disclosure Statement does not include a narrative relating the progress of the Debtors with respect to this audit.

b) Relevance of the requested information

The requested information will allow a reasonable investor to:
1. Estimate the aggregate tax refunds or tax liabilities the Debtors will face;
2. Estimate the apportionment amongst Debtors or groups of Debtors of such tax refunds;
3. Give interested parties an idea of the progress achieved by the Debtors in dealing with tax-related issues.

c) Legal analysis

*With respect to current information*

Some points (points i, iii, v, and vi) generally pertain to Debtor's present condition or actions the Debtors have already done.

In accordance with the U.S. Trustee Manual, point 3-10.2.3, the following factors are to be taken into account:
1. *The nature of the proposed plan of reorganization or liquidation:* This is a Plan of liquidation. Pursuant to the Plan, the Plan Advisory Committee and the Liquidation Trustee have significant discretion, and access to the relevant information by other interested parties such as Preferred Stockholders is significantly limited.
2. *The sophistication of the various holders of claims and interests and their familiarity with the debtor and its business:* the Preferred Stockholders are public shareholders and are not necessarily familiar with the Debtor's business and financial condition. They are not privy to any non-public information.
3. *Whether the expense of the disclosure would substantially outweigh its anticipated benefit to creditors and stockholders:* the expense of the disclosure in this case is expected to be null, as the relevant information is factual and is already in Debtor's possession.

---

[56] Claim 378.
[57] Claim 3752.

4. *The peculiarities of the debtor's business or financial condition:* As seen above and will be further elaborated in this Objection, numerous details with respect to Debtor's financial condition are omitted from the Disclosure Statement. Tax returns and refunds are not commercial information and it cannot be said that providing a detailed disclosure with respect to Tax returns and refunds will harm the Debtor's estate. Further, as the Debtors intend to liquidate, disclosing this information will not harm their business post-emergence (because there will be no business in the first place).

5. *The need for an expeditious resolution:* once again, since this section requests information that is factual and present (it involves neither valuation nor future estimates).

6. *The access of a plan proponent, other than the debtor, to factual information regarding the debtor:* this Disclosure Statement and Plan is submitted as a joint Plan by the Debtors and the Official Committee of Unsecured Creditors. Yet, other parties exist (such as the Preferred Stockholders, the Beneficiaries of the NCFC deferred compensation trust, etc) who have not had the opportunity of negotiating the Plan and reviewing non-public information - an opportunity the Committee of Unsecured Creditors had.

All the six factors above clearly point in favor of the Court intervening with respect to the information sought in the Subsection "d) Conclusion".

*With respect to estimates*

Some points, for instance the estimated amount of tax refunds after loss carryback against 2005 taxable income, pertain to Debtor's future condition.

Section 3-10.3.9 of the Trustee Manual says:
> The United States Trustee should ensure that the underlying assumptions utilized by management in developing the projections are disclosed as specifically as possible.

Section 3-10.3.20 adds:
> The disclosure statement should enable the reader to determine what assumptions were made in connection with the estimate of claims and asset values.

I respectfully submit that projections and estimates with respect to future recoveries due to net operating loss carryback fit the description of assumptions necessary to properly estimate claims and asset values.

d) Conclusion

I am respectfully asking the Court to request the Debtors to provide all relevant *and detailed* information with respect to the Debtors' tax issues, including (without limitation) all issues discussed in Subsection a) of this Section.

## 5. Treatment of intercompany claims

### a) Issues not discussed or ambiguous in the Disclosure Statement

*i) Introduction*

Upon information and belief, the following are the intercompany claims that existed as of petition date.

| Creditor | Debtor | Amount of claim | Allocated amount claim as per the Plan |
|---|---|---|---|
| NCFC | NC TRS | $268,251,608.16[58] | $0 |
| NCFC | NCMC | $112,100,213.55[59] | $56,050,106,78 |
| NCTRS | NCMC | $391,528,048.51[60] | $195,764,024.26 |
| NCTRS | NC Residual III | $30,942,889.00[61] | $15,471,444.50 |
| NCTRS | NC Insurance | $1,883,200.00[62] | Unknown |
| NC Credit | NC TRS | $67,632,943.86[63] | $0 |
| NC Residual IV | NC TRS | $469,667,498.00[64] | $0 |
| Home 123 | NC TRS | $177,371,649.92[65] | $177,371,649.92 |
| NCMC | Home 123 | $364,782,648.99[66] | $0 |
| NCMC | NC Capital | $1,447,743,832.68[67] | $0 |
| NCMC | NC Warehouse | $1,092,024.72[68] | Unknown |
| NCMC | NC Residual IV | $152,733,363.90[69] | Unknown |

The allocated amount claim as per the Plan is calculated as exposed in the Plan:
- For intercompany claims between Debtors classified in the same group (Operating or Holding), an amount of 0% of the face value is allocated;

---

[58] Schedules of Assets and Liabilities for New Century Financial Corporation, Docket 1004, page 4 of Schedule B; see also Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 2 of Schedule F.

[59] Schedules of Assets and Liabilities for New Century Financial Corporation, Docket 1004, page 4 of Schedule B; see also Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 2 of Exhibit B16.

[60] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 4 of Schedule B; see also Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 2 of Exhibit B16.

[61] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 5 of Schedule B;

[62] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 5 of Schedule B;

[63] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 2 of Schedule F

[64] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 2 of Schedule F

[65] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 2 of Schedule F

[66] Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 1 of Exhibit B16.

[67] Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 1 of Exhibit B16.

[68] Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 1 of Exhibit B16.

[69] Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 1 of Exhibit B16.

- For intercompany claims where the creditor is a Debtor belonging to the Operating Group and the debtor is a Debtor belonging to the Holding Group ("Operating – Holding claims"), 100% of the face value of the claim is allocated;
- For intercompany claims where the creditor is a Debtor belonging to the Holding Group and the debtor is a Debtor belonging to the Operating Group, 50% of the face value of the claim is allocated ("Holding-Operating claims").

*ii) Holding-Operating claims*

Upon information and belief, the following were the only three Holding-Operating Claims:

| Creditor | Debtor | Amount of claim |
|----------|--------|-----------------|
| NCFC | NCMC | $112,100,213.55[70] |
| NCTRS | NCMC | $391,528,048.51[71] |
| NCTRS | NC Residual III | $30,942,889.00[72] |

The proposed Intercompany Debt Protocol says (my emphasis)[73]:

> A *substantial* portion of the Holding Company Debtors' Claims against the Operating Debtors results from the *amounts contributed to the Operating Debtors from the Holding Company Debtors as capital.* The amounts owing by the Holding Company Debtors to the Operating Debtors, on the other hand, appear to be based on payment of expenses by the Operating Debtors on behalf of the Holding Company Debtors. In light of the fact that the Holding Company Debtors' Intercompany Claims against the Operating Debtors may be recharacterized as equity contributions and therefore would not be debt entitled to setoff against the Claims by the Operating Debtors, the Plan Proponents formulated a compromise providing that the Holding Company Debtors' Intercompany Claims against the Operating Debtors are assigned a Determined Distribution Amount percentage of 50%. As part of the overall Plan compromises, the distribution that can be made on account of these net Intercompany Claims is limited so that the Holding Company Debtors do not benefit from the compromises in the discounts of the Determined Distribution Amounts for Classes OP6b, OP9, and OP12.

The Disclosure Statement does not provide any narrative describing legal rules *and their application* that can substantiate the hypothesis that "Holding Company Debtors'

---

[70] Schedules of Assets and Liabilities for New Century Financial Corporation, Docket 1004, page 4 of Schedule B; see also Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 2 of Exhibit B16.

[71] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 4 of Schedule B; see also Schedules of Assets and Liabilities for New Century Mortgage Corporation, Docket 1006, page 2 of Exhibit B16.

[72] Schedules of Assets and Liabilities for New Century TRS, Docket 1005, page 5 of Schedule B;

[73] Disclosure Statement, page 61.

Intercompany Claims against the Operating Debtors may be recharacterized as equity contributions".

For instance, in *AutoStyle Plastics*[74] the Court noted that "the more a transaction appears to reflect the characteristics of an arm's-length negotiation, the more likely such a transaction is to be treated as debt."

In addition, the Disclosure Statement fails to discuss the relevant legal factors outlined in *In Re Submicron Systems Corp*[75], in In *Roth Steel Tube Co. ıv. Comm'r*[76], or in any other relevant case. Neither did the Disclosure Statement specify whether, in the past, similar intercompany liabilities were perceived as loans or not.

In addition, the Disclosure Statement does not explain how, if the relevant legal factors were applied, it would be *plausible* that Holding-Operating claims or part thereof would be re-characterized as equity. For instance, were the advances evidenced by notes? Was inter-company interest paid on Holding-Operating intercompany claims? How was the Holding-Operating intercompany claims characterized for Tax Purposes? All those questions are not discussed in the Disclosure Statement.

*iii) Operating-Operating and Holding-Holding intercompany claims*

The Disclosure Statement provides that Operating-Operating and Holding-Holding claims will be cancelled[77]. The Disclosure Statement does not explain the rationale for this, with the exception of the following excerpt [78](emphasis is mine):

> Within the Holding Company Debtor Group, the cancellation of the Intercompany Claims does not result in recoveries to creditors materially different from the recoveries in a *deconsolidated* scenario. As such, Claims of Holding Company Debtors against other Holding Company Debtors are assigned a Determined Distribution Amount of 0%.

I believe that the drafters of the Disclosure Statement are aware that they are substantively consolidating the Debtors into two major groups (Operating and Holding). This is evident by the use of the word "deconsolidated" in the above excerpt.

To begin, the Debtors have not shown any analysis comparing recoveries *to all interested parties* (not just creditors!) under the "deconsolidated" and the "consolidated" scenario.

Also, in the *Owens Corning*[79] decision, which is binding on this Court, the Third Circuit Court ruled that separateness of debtors is a fundamental rule, that substantive consolidation is a rare and last resort remedy[80]. The Circuit Court explicitly said:

---

[74] 269 F.3d at 750
[75] 291 B.R. 314 (Bankr. D. Del. 2003), as subsequently confirmed by the Third Circuit Court of Appeals.
[76] 800 F.2d 625 (6th Cir.1986). Quoted with approval in *In Re Submicron* 432 F.3d 448 (3d Cir. 2006), page 14.
[77] Disclosure Statement, page 61
[78] Disclosure Statement, page 61
[79] 2005 U.S. App. LEXIS. 17150 (3d Cir. 2005)

Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

As such, the statement that "within the Holding Company Debtor Group, the cancellation of the Intercompany Claims does not result in recoveries to creditors materially different from the recoveries in a *deconsolidated* scenario" flies directly in the face of the *Owens Corning* precedent.

Other than the "no materially different recoveries" above, no other reasons have been provided by the Disclosure Statement to justify the substantive consolidation. I believe parties in interest are entitled to those reasons.

b) Relevance of the requested information

The requested information will allow parties in interest to evaluate the issues surrounding the intercompany relations between the Debtors.

For instance, it is obvious that a 50% allocation on Holding-Operating intercompany claims means a lower recovery for the Holding-Operating claims and thus, the estate of the Holding Companies will end up with fewer assets. Parties in interest are entitled to know what reasons might make the proponents of the Disclosure Statement believe that part or all of the Holding-Operating claims might be re-characterized as equity contributions.

c) Legal analysis

In accordance with the U.S. Trustee Manual, point 3-10.2.3, the following factors are to be taken into account:
  1. *The nature of the proposed plan of reorganization or liquidation:* This is a Plan of liquidation. Pursuant to the Plan, the Plan Advisory Committee and the Liquidation Trustee have significant discretion, and access to the relevant information by other interested parties such as Preferred Stockholders is significantly limited.
  2. *The sophistication of the various holders of claims and interests and their familiarity with the debtor and its business:* the Preferred Stockholders are public shareholders and are not necessarily familiar with the Debtor's business and financial condition. They are not privy to any non-public information.
  3. *Whether the expense of the disclosure would substantially outweigh its anticipated benefit to creditors and stockholders:* the expense of the disclosure in this case is expected to be minimal, as the relevant information is factual and is already in Debtor's possession. At the worst case, the Debtors would have to dig up some documents evidencing or related to the intercompany indebtedness.
  4. *The peculiarities of the debtor's business or financial condition:* As seen above and will be further elaborated in this Objection, numerous details with respect to

---

[80] *Owens Corning,* page 37

Debtor's financial condition are omitted from the Disclosure Statement. Disclosing inter-company liabilities will not endanger commercial or confidential information. Further, as the Debtors intend to liquidate, disclosing this information will not harm their business post-emergence (because there will be no business in the first place).

5. *The need for an expeditious resolution:* once again, since this section requests information that is factual and present (it involves neither valuation nor future estimates). However, this point might need a bit more time if the documents evidencing the intercompany indebtedness are scattered. Unfortunately, I have no means to know whether the evidence in question is scattered.

6. *The access of a plan proponent, other than the debtor, to factual information regarding the debtor:* this Disclosure Statement and Plan is submitted as a joint Plan by the Debtors and the Official Committee of Unsecured Creditors. Yet, other parties exist (such as the Preferred Stockholders, the Beneficiaries of the NCFC deferred compensation trust, etc) who have not had the opportunity of negotiating the Plan and reviewing non-public information - an opportunity the Committee of Unsecured Creditors had.

All the six factors above clearly point in favor of the Court intervening with respect to the information sought in the Subsection "d) Conclusion".

d) Conclusion

I am respectfully asking the Court to request the Proponents of the Disclosure Statement to provide all relevant information with respect to the Debtors' intercompany claims, including (without limitation):

*With respect to the Holding-Operating claims issue*

1. List each source for each Operating-Holding intercompany claim(ex: Note 1 between NCFC and NCMC for 40 million dollars, Note 2 between NCMC for 30 million dollars, etc);

2. Provide a narrative that should, *as specifically and exhaustively as possible*:
    a. List and discuss the factors the Proponents of the Disclosure Statement believe are relevant in the determination of whether a debt should be re-characterized as equity;
    b. For each source identified pursuant to #1,
        i. List and discuss the subset of the aforementioned factors that tend to favor the thesis that this debt should be recharacterized as equity;
        ii. List and discuss the subset of the aforementioned factors that tend to favor the thesis that this debt should *not* be recharacterized as equity.

Example – for illustration purposes only

((Section where the relevant factors are listed)

25

1. Intercompany liability source #1: intercompany 40 m$ note between NCFC and NCMC
   a. Pro "capital contribution" factors:
      i. Note does not have a definite repayment schedule;
      ii. Note does not have a security;
      iii. No sinking fund to provide repayment.
   b. Con "capital contribution" factors:
      i. Instrument is entitled "Note";
      ii. Instrument bears interest;
      iii. Past party behavior tends to evidence that similar notes were perceived as debt;
2. Intercompany liability source #2: advance of funds by wire transfer of 100 m$
   a. Pro "capital contribution" factors:
      i. No formalities were observed in this transfer;
   b. Con "capital contribution" factors:
      i. None.

*With respect to the Operating-Operating and Holding-Holding claims issue*

Discuss the factors substantiating its belief why substantive consolidation is appropriate in this case, and why the *Owens Corning* Third Circuit precedent is either not binding, does not contemplate, or allows the substantive consolidation envisaged by canceling Operating-Operating and Holding-Holding claims[81].

## Conclusion

For the above reasons, I am respectfully requesting the Court to:

1. Deny the Motion of Debtors and Debtors in Possession for an Order (A) Approving Proposed Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008; (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Chapter 11 Plan of Liquidation and (C) Scheduling a Hearing on Confirmation of Proposed Joint Chapter 11 Plan of Liquidation and Approving Related Notice Procedures(Docket 4897);
2. Rule that the February 2nd Disclosure Statement does not contain adequate information;
3. Disapprove the February 2nd Disclosure Statement in its entirety;
4. Order that Proponents of the February 2nd Disclosure Statement should file an amended disclosure statement that specifically addresses, *inter alia*, the points outlined in this objection;

---

[81] I believe that this consolidation is contrary to *Owens Corning* and, therefore am envisaging challenging the substantive consolidation contemplated in the Plan in due Course.

5. Order that any subsequent amendment to the Disclosure Statement should grant an additional 25 day delay for interested parties to analyze and potentially object to;

6. Grant such further relief as the Court deems just and appropriate.

For further certainty, I respectfully request that all of the above without prejudice of Andre Mutchnik's right to object to the amended Disclosure Statement.

Dated: February 22, 2008                    Respectfully submitted,

                                            s://Andre Mutchnik

                                            A Mutchnik

27

## CERTIFICATE OF SERVICE

I,____André Mutchnik_____, certify that I am, and at all times during the service of process was,
           (name)
not less than 18 years of age and not a party to the matter concerning which service of process was made.  I further
certify that the service of this objection was made ____on February 25, 2008___ by:
                                       (date)

[ ]   Mail Service: Regular, first class United States mail, postage fully pre-paid, addressed to:

[ ]   Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

[ ]   Residence Service: By leaving the process with the following adult at:

[ ]   Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail
     addressed to the following officer of the defendant at:

[ ]   Publication: The defendant was served as follows: [Describe briefly]

[X]   State Law: The defendant was served pursuant to the laws of the State of ____Delaware_____,
     as follows: [Describe briefly]                     (name of state)

Via e-mail (andre_mutchnik2@yahoo.ca ) to the following addresses:
- o  Monika L. McCarthy: mmccarth@ncen.com
- o  Andrew Parlen: aparlen@omm.com
- o  Suzanne Uhland: suhland@omm.com
- o  Michael Merchant: merchant@rlf.com
- o  Mark Collins: collins@rlf.com
- o  Holly F. Etlin: hetlin@alixpartners.com
- o  Bonnie G. Fatell: fatell@blankrome.com
- o  Mark S. Indelicato: mindelicato@hahnhessen.com
- o  "U.S. Bankruptcy Trustee" ustp.region03@usdoj.gov
- o  Andrew Vara: andy.vara@usdoj.gov
- o  Joseph McMahon, Jr.: joseph.mcmahon@usdoj.gov

Under penalty of perjury, I declare that the foregoing is true and correct.

25 February 2008
Date

A. Mutchnik
Signature

Print Name: André Mutchnik

Business Address: 17, de la Poudrière, suite 105

City: Verdun          State: Quebec (Canada)          Zip: H4G 3J5