## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Objection Deadline: March 25, 2008 at 4:00 p.m. |
| | : | Hearing Date: March 18, 2008 at 1:30 p.m. |

### JOINT MOTION OF DEBTORS AND DEBTORS IN POSSESSION AND THEIR OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AND SECTIONS 105(a), 361, 362, and 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF STIPULATION OF GLOBAL SETTLEMENT RESOLVING DISPUTES WITH ADEQUATE PROTECTION PARTIES

New Century Financial Corporation ("NCFC"), a Maryland corporation, New Century TRS Holdings, Inc. ("New Century TRS"), a Delaware corporation, and their direct and indirect subsidiaries, each as a debtor and debtor-in-possession (collectively, "New Century" or the "Debtors"), and The Official Committee of Unsecured Creditors of the Debtors (the "Committee")[2], by and through their undersigned counsel, hereby move for the entry of an order, pursuant to sections 105(a), 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the Stipulation of Global Settlement Resolving Disputes with Adequate Protection Claimants (the "Settlement Agreement") by and

---

[1]  The debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California Corporation.

[2]  Members of the Committee that are party to or have an affiliate that is a party to the Settlement Agreement did not participate in the Committee's decision to enter into the Settlement Agreement.

among the Debtors, the Committee, Bank of America, N.A. ("BofA"), Barclays Bank PLC, for itself and for its affiliates ("Barclays"), Credit Suisse First Boston Mortgage Capital LLC ("CSFB"), IXIS Real Estate Capital Inc. ("IXIS"), Morgan Stanley Capital REIT II Inc., Morgan Stanley Mortgage Capital Holdings LLC (collectively with Morgan Stanley Capital REIT II Inc., "Morgan Stanley"), JPMorgan Chase Corporation ("JPMC"), IndyMac Bank, F.S.B. ("IndyMac"), Citigroup Global Markets Realty Corp. ("Citigroup"), UBS Real Estate Securities Inc. ("UBS"), Goldman Sachs Mortgage Company ("Goldman"), Countrywide Bank, N.A., Countrywide Home Loans Servicing, LP (collectively with Countrywide Bank, N.A., "Countrywide") and Wells Fargo Bank, N.A. ("Wells") (collectively, the "Parties"). A copy of the Settlement Agreement is attached hereto as Exhibit A (the "Settlement Agreement").[34]  In support of this motion (the "Motion"), the Debtors and the Committee respectfully represent to the Court as follows:

## JURISDICTION

1.        This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding as defined in 28 U.S.C. § 157(b).

2.        The bases for the relief requested herein are sections 105(a), 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

## I.        BACKGROUND

3.        NCFC, a publicly owned real estate investment trust, was one of the largest specialty mortgage finance businesses in the United States.    Through its subsidiaries and its primary holding company subsidiary, New Century TRS, NCF originated, purchased, sold, and serviced mortgage loans nationwide.  NCF historically

---

[3] Capitalized terms used herein without definition have the meaning set forth in the Settlement Agreement.

[4] This Motion has been prepared by the Debtors and the Committee and sets forth their views of the facts and the law.  None of the other Parties to the Settlement Agreement is deemed to agree with these asserted facts or legal positions, nor should any of the positions taken in this Motion be construed to be an admission by or finding against any of the other Parties to the Settlement Agreement.

focused on "sub-prime" lending, or lending to individuals whose borrowing needs were generally not fulfilled by traditional financial institutions because they did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.    In September 2005, NCFC through some of its subsidiaries also began offering conventional mortgage loans, including "Alt-A" mortgage loans, loans insured by the Federal Housing Administration ("FHA"), and loans guaranteed by the Veterans Administration ("VA").    During the fiscal year ending December 31, 2006, the Debtors originated or purchased approximately $60 billion of mortgage loans, most of which were sold in the secondary market.    Since their inception, the Debtors have issued or enabled over $220 billion in loans.    These loans have helped millions of homebuyers and homeowners across the nation access credit and realize the benefits of home ownership, including many who might not otherwise have been able to do so.

4.    On April 2, 2007 (the "Petition Date"), the Debtors filed the instant petitions for relief.    The Court has entered an order authorizing the joint administration of the Debtors' bankruptcy cases for procedural purposes only.    The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

5.    On April 9, 2007, the Office of the United States Trustee appointed seven of the Debtors largest creditors to the Committee.

6.    In this Motion, the Debtors and the Committee seek approval of a global settlement with the parties to a series of master repurchase agreements ("MRAs") and purchasers of whole loans.    These creditors assert that various funds, including the $42.1 million balance New Century Mortgage Corporation ("NCMC") held in its general operating account on the Petition Date, were their property or that the Court should impose a constructive trust on these funds for their benefit.    The Debtors and the Committee, on the other hand, dispute these allegations and assert that these funds are unencumbered estate assets.    Pursuant to the "Order Granting Adequate Protection

Pursuant to Bankruptcy Code Section 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims" that the Court entered on June 28, 2007 (Docket No. 1729) (the "Adequate Protection Order"), the Debtors deposited $42.1 million in an escrow account. After approximately eight months of negotiations and factual inquiries, the parties to this dispute have reached a global settlement which provides that approximately $32 million will be distributed to the Adequate Protection Claimants and approximately $12.8 million will be distributed to NCMC. The sum distributed to NCMC will be held by it in a segregated interest-bearing account to be used (i) to fund a liquidating trust or otherwise distributed pursuant to a confirmed chapter 11 plan, or (ii) distributed pursuant to a further order of the Court. The funds distributed to NCMC may not be used to fund any litigation, claims or investigation of any of the other Parties to the Settlement Agreement

## A.    The MRAs and Whole Loan Sales

7.    New Century funded the origination of loans through a variety of MRAs. The MRAs typically provided that New Century sold loans to the MRA Counterparties and had an obligation to repurchase them at a later date or upon default. NCMC serviced the mortgage loans during the time that they were subject to an MRA. In addition, the MRAs provided that New Century was to pay the MRA counterparties a "Price Differential" computed as a percentage (generally expressed as LIBOR plus a spread) monthly. They further provided that if the MRA Counterparties determined that the market value of the mortgage loans had dropped such that the fair market value times an advance rate was less than New Century's repurchase obligations, New Century was required to satisfy a margin call.

8.    Prior to the Petition Date, NCMC and Home 123 Corporation funded loans through MRAs with BofA, CSFB, IXIS, Morgan Stanley, UBS, Barclays and DB Structured Products, Inc. ("DBSP"). These MRAs were generally structured as joint and several obligations, either directly or pursuant to a guaranty, of NCMC, NC Capital

Corporation, Home 123 Corporation, NCFC, New Century Credit Corporation, and sometimes other operating companies in the Debtors' family of companies, other than NC Warehouse Corporation. As of mid-March, 2007, NCMC's repurchase obligations under these MRAs totaled in excess of $8.5 billion while the mortgage loans and mortgage-related residual interests subject to these MRAs had face principal amounts totaling approximately $9.4 billion. New Century typically repurchased pools of mortgage loans that were subject to these MRAs and sold these pools either in whole loan sales or securitization transactions. The proceeds of such sales were used to repay the related repurchase obligations and to realize a profit for New Century.

9.      New Century Warehouse Corporation ("NC Warehouse") is a subsidiary of NCMC. NC Warehouse was a mortgage warehouse lender. NC Warehouse financed its operations through three repurchase facilities, one of which was with Goldman. NC Warehouse was not obligated on any of the MRAs listed in paragraph 8.

10.      BofA, CSFB, IXIS, DBSP, Morgan Stanley, UBS, Barclays and Goldman are referred to herein as the "MRA Counterparties."

11.      New Century typically structured a whole loan sale as a sale of a pool of loans (often drawn from multiple MRAs) to a financial institution, which would either (i) hold the loans for its own account, (ii) later complete its own securitization (sometimes pooling with loans bought from other originators) or (iii) resell these loans to other investors. Whole loan sales were generally large transactions involving thousands of mortgage loans with balances in the hundreds of millions or billions of dollars. The master sale agreements typically provided that the price paid at the closing was based on a "tape" with information about the loans to be sold generated as a cut-off date, which was generally about 1 week before the loans were to be sold. After a sale closed, the parties would engage in post-closing reconciliations for often some borrowers would pay off their loans (via a refinancing) between the cut-off date and the date the loan sale closed. Such repaid loans did not exist on the closing date and the Debtors and

Committee believe that they were, therefore, not sold to the whole loan buyer, but the price the buyer paid at the closing was set based on the tape run on the cut-off date. Thus, New Century often owed whole loan buyers money post-closing.

12.    Barclays, Morgan Stanley, JPMC, IndyMac, Citigroup, Countrywide and Wells Fargo (the "Affected Whole Loan Purchasers") were parties to whole loan sales and are involved in the Settlement Agreement in their capacities as whole loan buyers.[5] New Century sold loans to many other whole loan buyers, but those sales did not present the issues that gave rise to the disputes that are settled in the Settlement Agreement.

**B.    The Adequate Protection Dispute**

13.    The MRAs generally have language that provides, in various forms, that collections on the mortgage loans subject to the MRAs were to be held in trust for the MRA Counterparties. The Debtors and the Committee argue that each of the MRAs also allowed New Century to use collections on the mortgage loans subject to MRAs until and unless the MRA Counterparty declared an event of default (and often gave a notice to a collection bank). The MRAs varied in the particular collection systems they required. Some required that all funds collected on the mortgage loans subject to an MRA be deposited in a segregated account. Others required such a segregated account only at the counterparty's election after it declared an event of default.

14.    In early and mid-March 2007, the MRA Counterparties began declaring events of default under the MRAs. Upon receiving these notices of default, New Century decided to establish segregated collection accounts for all MRA Counterparties including those that had not yet declared an event of default and whose MRAs did not require the establishment of collection accounts. Opening new segregated collection accounts for the MRA Counterparties who did not previously have them was relatively simple. Reprogramming MortgagServ[6] to direct all collections on loans subject to MRAs, was

---

[5] Morgan Stanley and Barclays are also parties to this Settlement Agreement as MRA Counterparties.

[6] The third-party software that directed thousands of daily receipts to one of over 350 bank accounts.

more difficult and involved many thousands of daily transactions.[7] Reprogramming the funds flows was difficult, in part because of the enormous volume of mortgage loans involved — over $9 billion in face amount — and the fact that New Century frequently moved mortgage loans from one MRA facility to another in order to comply with borrowing base requirements of the MRA Counterparties, which differed among them, and to take advantage of the lowest cost funding available for a particular pool of loans.

15.    New Century accomplished this work by mid-March 2007. New Century maintains that it did not withdraw funds from these segregated accounts from that point forward. New Century and the Committee do not assert that funds in these segregated collection accounts on the Petition Date are property of the estates.

16.    On April 5, 2007, UBS filed an adversary proceeding (Adv. Pro. No. 07-50875) (Docket No. 3) asserting, among other things, that New Century had collected funds on loans that were financed under its MRA and which had not been turned over to UBS. UBS sought an injunction, establishment of a constructive trust and an accounting. The Debtors disputed these allegations, but agreed to provide UBS an accounting. On April 26, 2007, the Debtors delivered that accounting to UBS. It indicated that the collection account turned over to UBS had been over funded by $229,881.29. UBS responded that this accounting was wrong and that approximately $2.7 million had not been deposited into the collection account, but should have been. In an effort to resolve this matter, the parties entered into a stipulation pursuant to which the Debtor deposited approximately $2.7 million into an escrow account, which was to be held pending resolution of the factual and legal issues. "Stipulated Scheduling Order Regarding UBS Real Estate Securities Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction," May 15, 2007 (Docket No. 36). Subsequent reconciliations between UBS

---

[7] Prior to mid-March 2007, MortgagServ directed collections of principal and interest collected from borrowers to collection accounts established by some MRA Counterparties, directed principal (but not interest) collected on mortgage loans to collection accounts established for other MRA Counterparties and other MRA Counterparties did not require MortgagServ to direct these collections to a segregated account.

and the Debtors revealed that UBS's allegations focused largely on regularly scheduled borrower interest paid during the first few days of March before UBS started to sweep its collection account and before it declared an event of default or sent a notice to the depositing bank that held the collection account blocking New Century's access to this collection account.

17.    On April 25, 2007, DBSP filed an adversary proceeding (Docket No. 402). This complaint centered on a dispute between New Century and DBSP concerning whether New Century had "delivered" to DBSP on March 6, 2007 235 mortgage loans with principal balances of approximately $50 million in order to satisfy a $14.1 million margin call or had merely sent information concerning these loans to DBSP for review and possible negotiations over which of these loans might later be delivered by New Century to DBSP in satisfaction of this margin call. This dispute does not relate to the Adequate Protection Motion. Although it was not the gravamen of the complaint, DBSP asserted, in a fashion similar to UBS, that some collections on loans subject to its MRAs had not been deposited in its collection account with Union Bank of California and sought establishment of a constructive trust. The Debtors and DBSP were able to reach a procedural agreement and entered into a stipulation to allow them to deal with these issues. "Stipulation and Order Resolving DB Structured Products, Inc.'s Motion for Preliminary Injunction," May 15, 2007. (Docket No. 709).

18.    The Debtors undertook to prepare reconciliations for each of the MRA Counterparties, not just UBS and DBSP. In early May 2007, New Century's accounting personnel completed a preliminary reconciliation involving all of the MRA Counterparties. It indicated that if one were to assume that UBS was correct (an assumption the Debtors disputed) that collections on mortgage loans prior to the exercise of remedies, particularly with respect to borrower interest, are nonetheless the counterparty's property, the amounts at issue were substantial. In addition, this exercise illustrated that New Century had not turned over to the Affected Whole Loan Purchasers

$9.3 million of collections on loans that were to have been sold to them. Moreover, as had been discussed previously in Court and disclosed to Goldman, shortly prior to the Petition Date, NC Warehouse had transferred to NCMC approximately $10.1 million on account of some intercompany debt it owed to NCMC; Goldman asserted that this cash had been collected by NC Warehouse on some loans that were subject to the MRA between NC Warehouse and Goldman, or were otherwise owned by Goldman, and was its property.

19.    The Debtors and the Committee concluded this situation should be brought to the attention of the MRA Counterparties and the Affected Whole Loan Purchasers (and the Court) and that action should be taken to deal fairly with each of them. The form of a motion and the order were negotiated with several of the MRA Counterparties over the course of the first two weeks of May. On May 16, 2007 the Debtors filed their "Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105, 361, 362 and 363(b)(1)" (the "Adequate Protection Motion") (Docket No. 736). This Motion was heard on May 30, 2007 and after further substantial negotiations, an agreed order was entered on June 28, 2007 (Docket No. 1729) (the "Adequate Protection Order").

20.    There was no dispute that money in the segregated accounts that New Century had established for the Adequate Protection Claimants on the Petition Date or deposited thereafter was the property of the Adequate Protection Claimants, and the Adequate Protection Order specifically authorized the Debtors to turn over all such segregated funds to the appropriate party. But there were disputes as to whether the Adequate Protection Claimants could trace funds that they asserted were their property to NCMC's general corporate operating account, account no. ******4025 maintained with Union Bank of California ("Account 4025"). The Parties disagreed whether legally and factually any such funds in Account 4025 were estate property or property of others and the relative strengths of the arguments of various claimants as they competed among

themselves and with general unsecured creditors for a limited pool of funds. In order to preserve the status quo ante as of the Petition Date, the Adequate Protection Order granted liens on essentially all estate assets to secure any legitimate claims of the Adequate Protection Claimants that the funds in Account 4025 on the Petition Date were their property, and provided that the Debtors would escrow the equivalent amount of money as the balance in Account 4025 as of the Petition Date. On July 5, 2007, the Debtors deposited $39,331,614.71 with counsel for the Committee and transferred to Committee counsel $2,670,000 from the escrow that the Debtors had earlier established in connection with the UBS adversary proceeding. As a result, Committee counsel held in escrow approximately $42.1 million which equaled the full balance of Account 4025 as of the Petition Date. Committee counsel deposited this money in an interest-bearing account maintained through LaSalle Bank.

## II.    THE FACTUAL INVESTIGATIONS AND NEGOTIATIONS UNDERTAKEN PURSUANT TO THE ADEQUATE PROTECTION ORDER

### A.    FACTUAL ANALYSES

21.    The Adequate Protection Order established procedures for a detailed factual reconciliation of the collections on loans subject to MRAs and loans sold to the Affected Whole Loan Purchasers and an analysis of the funds flows in and out of Account 4025.

22.    On June 29, 2007, the Debtors delivered to each of the Adequate Protection Claimants, the Debtors' "Initial Accountings" and a global summary of the amounts at issue. These materials included loan level reconciliations involving many thousands of loans. In total, the Debtors' initial research indicated that collection on loans that were subject to dispute equaled approximately $51 million, although the Debtors expressly reserved as to whether any of these sums were subject to valid trust fund claims. On July 20, 2007 the Adequate Protection Claimants countered with their "Alternative Accountings." Some showed agreement with the Debtors, others asserted

substantial differences. Many included substantial loan-level detail. Others were more summary.

23.    On July 23, 2007, the Debtors distributed a flow chart depicting the funds flows in and out of Account 4025 and a compilation of data that showed all transfers in and out of Account 4025 during the relevant time.

24.    In early August, the Debtors sent to each of the Adequate Protection Claimants a position paper tailored for each MRA Counterparty and Affected Whole Loan Purchaser summarizing the Debtors' and Committee's view of the facts and applicable law which the Debtors and the Committee believed supported their contention that the funds in question were estate property. At an all-hands meeting held on August 15, 2007, the Adequate Protection Claimants expressed their strong disagreement with the positions advocated by the Debtors and the Committee. The Parties agreed that further factual analysis was appropriate in an effort to reconcile the accounting issues and additional structure for settlement discussions would be wise. This resulted in the development of a consensual supplemental order. On August 21, 2007, the Court entered this "Supplement to Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims." (Docket No. 1729) (the "Supplemental Order").

25.    As required by the Supplemental Order, on August 31, 2007, each of the Adequate Protection Claimants delivered to the Debtors and to the Committee their good faith estimates of all their claims. These good faith estimates included more detail than is normally set forth in a proof of claim and were used by the Debtors and the Committee both to fashion settlement proposals to the Adequate Protection Claimants and to develop a protocol for resolving many of the most difficult issues that could affect a chapter 11 plan.

26.    On September 4, 2007, the Debtors submitted to each Adequate Protection Claimant a revised reconciliation, including loan-level detail. On September 14, 2007,

the Debtors and the Committee also submitted to each Adequate Protection Claimant a settlement proposal and a global summary of the then current range of assertions on the accounting issues. Thereafter, settlement negotiations intensified.

27.     This work identified money in segregated accounts. As a result, (i) in July 2007 the Debtors turned over to Bank of America ("BofA") approximately $4.966 million that New Century had deposited in a segregated account the Debtors had established in mid-March 2007 at Union Bank of California for BofA's benefit, (ii) also in July 2007, the Debtors turned over $3.956 million to Morgan Stanley that New Century had deposited in a segregated account at Union Bank of California for the benefit of Morgan Stanley of which Morgan Stanley was previously unaware, (iii) in July 2007, the Debtors caused Union Bank of California to release $1.15 million to CSFB that New Century had deposited into a segregated account established for CSFB and which CSFB was having difficulty getting Union Bank to release, and (iv) in October 2007, the Debtors turned over to Morgan Stanley $9.65 million that was held in two custodial accounts at Union Bank of California for the benefit of Morgan Stanley.[8]

28.     In addition, the Debtors discovered that some of the MRA Counterparties had received deposits in their collection accounts consisting of (i) tax and insurance ("T&I") collections that the Debtors asserted should have been deposited in T&I escrow accounts, (ii) funds that the Debtors argued should have been directed to other MRA Counterparties, or (ii) what the Debtors believed were double payments. As a result, the Debtors and the Committee asserted that some MRA Counterparties had been overpaid.

29.     Attempting to reconcile these accounting issues was difficult. The work narrowed differences, but as of October 2007, the parties were still $6 million apart. The

---

[8]   The transfers to BofA, CSFB and Morgan Stanley during July 2007 – which total $10.07 million – were authorized pursuant to the Adequate Protection Order (Docket No. 1729). Paragraph 8 of the Adequate Protection Order allowed the Debtors to turn over to the MRA Counterparties any such segregated funds. The $9.65 million distributed to Morgan Stanley in October 2007 was authorized by this Court's "Order Approving Stipulation Regarding Release of Segregated Funds to Morgan Stanley Mortgage Capital Holdings LLC" entered on October 23, 2007 (Docket No. 3401).

Debtors' accountings concluded that the amounts at issue equaled about $59 million (but the Debtors and the Committee contended legally that the Adequate Protection Claimants were not entitled to these funds), while the total claims asserted by the Adequate Protection Claimants equaled about $65 million. The Parties concluded that they had reached the point of diminishing returns, particularly since the amounts at issue exceeded the balance in Account 4025 as of the Petition Date, so that the resolution was more likely to turn on the legal issues than refining the facts further.

## B.    THE LEGAL ISSUES

30.    Negotiations dealt with a host of legal issues. Many involved questions presented by the 2005 amendments to the Bankruptcy Code that have yet to be tested in the courts. Some pitted MRA Counterparties against Affected Whole Loan Purchasers. Many pitted the Debtors and the Committee against the Adequate Protection Claimants. These disputes often involved strongly held contrary positions. Ultimately a global settlement was reached in which each Party compromises its position.

### 1.    The Positions of the MRA Counterparties and Affected Whole Loan Purchasers.

31.    The MRA Counterparties argued strenuously that collections on loans that were subject to their MRAs were their property. They pointed out that the MRAs were structured as sales of these loans to them so that they owned the loans and all collections on them. The MRAs provided that New Century was to service the loans and contained language that provided that New Century was to hold collections on these loans in trust. The MRA Counterparties also contended that the 2005 amendments to the Bankruptcy Code were intended to strengthen their positions, which they asserted were strong even under pre-2005 law. For example, effective for cases filed on or after October 17, 2005, §101(47) of the Bankruptcy Code defines a repurchase agreement to include an agreement which "provides for the transfer" or one or more mortgage loans. (Emphasis supplied). There is no requirement that the transfer be a true sale. The 2005 House

Report states that the intent was to "eliminate any inquiry ... as to whether a repurchase or reverse repurchase transaction is a purchase and sale transaction or a secured financing". H.R. Rep. No. 109-31 Pt. 1, 109th Cong., 1st Sess. (2005) at 119. In addition, they pointed to a substantial body of prior case law that holds that repos are not secured financings, based in part on the importance of repos to the Federal Reserve Board and to the banking system. See, e.g., Granite Partners v. Bear, Stearns, 17 F. Supp.2d 275 (S.D.N.Y. 1998). The MRA Counterparties argued that this was part of an overall structure designed to acknowledge property rights of counterparties to mortgage loan repos and, therefore, the collections on loans subject to MRAs were their property. Goldman also made these arguments with respect to proceeds of loans that had been subject to its MRA with NC Warehouse (or which it otherwise owned) and which NC Warehouse transferred to NCMC prior to the Petition Date. The MRA Counterparties further argued that they would be able to recover their funds under tracing rules applicable to commingled funds under relevant Third Circuit case law.

32.    The MRA Counterparties and Affected Whole Loan Purchasers also argued that Bankruptcy Code § 541(d) establishes a strong policy that mortgage loans, and collections on them, are not property of a bankruptcy estate when the debtor does not own the equitable interest in the loans. Bankruptcy Code § 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property or an interest in such a mortgage sold by a debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this subsection only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property, that the debtor does not hold.

They argued that § 541(d) is directly applicable to the facts at hand and that Congress selected the mortgage loan industry as the example used in § 541(d) because of the particularly strong policy not to disrupt ownership rights of parties, such as the MRA

Counterparties and Affected Whole Loan Purchasers, to the mortgage loans and collection on them that gave rise to this dispute.

33.    The Affected Whole Loan Purchasers also contended that they had bought the loans sold to them by New Century and that any collections on these loans were proceeds of their property. Some of them asserted that their claims were stronger than the claims of the MRA Counterparties for various reasons related to the structure of the MRAs and the fact that the MRAs generally allowed New Century to use collections on loans subject to MRAs prior to the MRA Counterparties exercising remedies.

2.    **The Positions of the Debtors and the Committee.**

34.    The Debtors and the Committee made seven primary arguments. To be clear, the Adequate Protection Claimants disagreed with each of these arguments.

a.    **Sections 559 and 562 of the Bankruptcy Code.**

35.    The Debtors and the Committee argued that Bankruptcy Code §§ 559 and 562 provide that if a repo participant liquidates, terminates or accelerates a repurchase agreement, the earliest of those dates sets the measurement date for determining whether a surplus or deficiency exists under the MRA. Bankruptcy Code § 559 provides that in "the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to the repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotations from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to available rights of setoff." Section 562 similarly provides that any damages owed to a repo participant are to be measured on the earlier of liquidation, termination or acceleration of

the repo facility. These sections of the Bankruptcy Code were adopted as part of the 2005 amendments and the Debtors and the Committee contended are a logical corollary to the safe-harbor provisions that were adopted then for the benefit of repo participants. In 2005, Congress granted mortgage loan repo counterparties certain special and powerful rights, including the ability to sell mortgage loans that had been financed under qualified repos without obtaining relief from the automatic stay. The Debtors and the Committee argued that it was logical, therefore, for Congress also to provide that any deficiency claim or surplus is to be measured based on the market value of the mortgage loans determined as of the date that the repo counterparty accelerates and terminates the repo; if a repo counterparty chooses to delay in disposing of the loans, any market decline should be for its account.

36.    Each of the MRA Counterparties accelerated and terminated its MRA pre-petition — generally in mid-March. The MRA Counterparties also, with one exception, regularly delivered to New Century reports that compared New Century's repurchase obligations under their MRAs to the calculations that were used to determine whether New Century was in balance or owed a margin payment. The starting point was the unpaid principal balance ("UPB") of the mortgage loans subject to the MRA. The MRA Counterparties provided New Century their assessments of the market value of these loans, generally expressed as a percentage of the UPB and termed in the industry as the counterparty's "mark." The MRA Counterparties then set the amount they were willing to pay for these loans expressed in terms of an advance rate applied against the mark. The MRA Counterparties set forth their assessments of the market value of the mortgage loans (and in the case of Morgan Stanley, also the residual interests) that were subject to their MRAs by delivering these marks to New Century regularly. The Debtors and the Committee contended that the marks that the MRA Counterparties sent to New Century on the date they accelerated and terminated their MRAs, or in a few cases shortly before, established substantial surpluses over New Century's total repurchase obligations.

According to the Debtors, these surpluses totaled approximately $260 million. The Debtors, joined by the Committee, argued that this meant that most of the MRA Counterparties had no claim against the estates, much less to monies in Account 4025 as of the Petition Date.

37.     The MRA Counterparties strongly disagreed. Among other things, they argued that Bankruptcy Code §§ 559 and 562 only apply to liquidations of loans, not liquidations of MRAs, and only to post-petition liquidations of loans. They also contended that the "marks" they delivered to New Century did not establish surpluses since the marks were just estimates based on assumptions concerning the loans, including compliance with certain underwriting standards, many of which turned out be incorrect. Further, they argued that the Debtors were estopped from asserting that the loans should be valued as of the termination of their MRAs because at the time, the Debtors had demanded that the MRA Counterparties not dispose of the whole loans in a distressed liquidation sale but instead work with the Debtors to develop a commercially reasonable process designed to maximize the values received for the loans. Some MRA Counterparties also argued that the Debtors failed to provide them with accurate and up-to-date information on the performance of their loans, which prevented or delayed the MRA Counterparties from being able to liquidate their loans at the time.

> **b.    The Debtors and the Committee Contended that the MRAs Permitted the Debtors to Use the Funds Collected on the Mortgage Loans Prior to the Exercise of Remedies.**

38.     The Debtors and the Committee contended that many of the funds claimed by the MRA Counterparties resulted from collections received by NCMC from borrowers prior to the declaration of an event of default or the exercise of remedies under the MRAs. The Debtors and the Committee argued that the MRAs and control agreements (for those MRA Counterparties who had negotiated control agreements) allowed the Debtors to use these funds prior to the declaration of an event or default. The Debtors and the Committee contended that since the MRAs allowed New Century to spend this

money or to commingle it with other funds, the MRA Counterparties cannot assert that this is their money held in "trust," at least to the extent that New Century actually spent the funds or commingled them as allowed.

39.     The MRA Counterparties disagreed and contended that nothing in the MRAs provided that monies collected on mortgage loans were freed from the requirement that they be held in trust or changed the more basic fact that the MRAs provided that the MRA Counterparties owned these mortgage loans and collections on them.

c.     **Borrower Interest Payments.**

40.     The Debtors and the Committee contended that a substantial portion of the collections on loans subject to the MRAs received by New Century prior to the exercise of remedies consisted of regularly scheduled interest payments made by borrowers. Such interest payments were typically made on the first of the month (here around March 1, 2007) and were at rates of interest reflecting the fact that these were sub-prime consumer loans. The Debtors and the Committee argued that, in contrast, the payments reflecting the time-value of money owed by New Century to the MRA Counterparties (termed "Price Differential" payments) were set at substantially lower amounts (typically LIBOR plus a small spread) reflecting the investment grade quality of New Century at the time the MRAs were negotiated, and were paid at different times than collections of borrower interest. The Debtors and the Committee asserted that during the periods of time at issue in the adequate protection dispute, New Century made substantial Price Differential payments to the MRA Counterparties — $21.5 million in total, according to the Debtors. The Debtors and the Committee argued that collections of borrower interest do not give rise to trust fund claims at least to the extent that the MRA Counterparties received Price Differential payments. The Debtors and the Committee contended that otherwise the MRA Counterparties would get a double count.

41.    In addition, the Debtors' accounting analysis showed that most of the money deposited into the Account 4025 during the relevant time had nothing to do with collections on mortgage loans subject to MRAs.  For example, New Century realized substantial income by way of servicing fees, its profits on loan sales, funds from joint ventures in which it was a partner and other sources unrelated to the claims of the MRA Counterparties or Affected Whole Loan Purchasers.  The Debtors' analysis showed that over $190 million flowed into Account 4025 during March 2007 that had nothing to do with the MRA Counterparties or Affected Whole Loan Purchasers.  These funds were commingled in Account 4025 with funds that the Adequate Protection Parties claim. Thus, the Debtors and the Committee contended that to the extent the MRA Counterparties received Price Differentiated payments from Account 4025, this should reduce the claims of the Adequate Protection Claimants to the funds in Account 4025.

42.    The MRA Counterparties disagreed and contended that collections of interest from borrowers were their property, irrespective of whether they received Price Differential payments from Account 4025 that were funded from sources that were the Debtors' property.

> **d.    The Debtors and the Committee Contended that the MRA Counterparties Have Already Been Paid More From Account 4025 Than the Collections from Borrowers That Might be Traced to Account 4025.**

43.    The MRA Counterparties received substantial margin payments from New Century during March 2007.  During the relevant time periods, New Century asserts that it paid $58.8 million to the MRA Counterparties from Account 4025 as margin calls.  In the course of negotiations, the Debtors and the Committee argued that these margin payments should properly be credited against any trust fund claims that might otherwise be asserted, for whether the MRA Counterparties applied these payments to satisfy margin calls or any other obligation owed under the MRAs does not change the fact that the amount of money paid out of Account 4025 to the MRA Counterparties during this

time on margin calls exceeds the collections on mortgage loans subject to the MRAs that might conceivably be traced into Account 4025 when combined with Price Differential payments that the MRA Counterparties also received from Account 4025.

44.     The MRA Counterparties disagreed and contended that payments they received from margin projects does not alter the fact that all collections on mortgage loans subject to MRAs were, they argued, their property.

> e.     **The Debtors and the Committee Argued that Neither the MRA Counterparties nor the Whole Loan Buyers Can Trace Funds to Account 4025; Under Third Circuit Law the Funds were Largely Spent Prior to the Petition Date.**

45.     The Debtors and the Committee argued that Third Circuit law provides that any party asserting a trust fund claim has the burden of proof. A party asserting a trust fund claim must "(1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust fund funds if they are commingled." City of Farrell v. Sharon Steel (In re Sharon Steel), 41 F.3d 92 (3d Cir. 1994). Third Circuit law also provides that the burden is on the claimant. See, e.g., In re Columbia Gas Systems Inc., 997 F.2d 1039, 1063 (3d Cir. 1993).

46.     When a party attempts to trace funds to a commingled account, most courts, including the Third Circuit Court of Appeals, endorse the lowest intermediate balance test. Id. at 1063-1064; In re Sharon Steel, 41 F.3d at 102. The Debtors and the Committee argued that this means that a party attempting to trace funds into a commingled account is capped at the lowest subsequent balance after the asserted trust funds are deposited into the commingled account.

47.     The present situation is complicated by the fact that multiple parties are trying to trace into a single commingled account. While unusual, the Third Circuit has suggested that in this situation each trust fund claimant that can satisfy its burden is entitled to share pro rata. Goldberg v. New Jersey Lawyers' Fund for Client Protection, 932 F.2d 273, 280 (3d Cir. 1991). Here the Debtors and Committee believe that this

means that each party asserting a property interest in Account 4025 would have to trace collections on the loans subject to its MRA or whole loan sale into Account 4025, and all of these claimants combined would be capped at the lowest subsequent balance in Account 4025; they would share in this fund pro rata. To the extent that the balance in Account 4025 was higher at a previous point in time, legally that higher amount would be deemed spent. And any funds that were deposited into Account 4025 subsequent to the deposit of the traced trust funds (for example, receipts of New Century's servicing fees) could not be claimed as trust funds.

48.    New Century's reconciliations showed that most of the loan collections at issue were received by New Century in early March – representing regularly scheduled interest and principal paid around March 1, 2007 before the exercise of remedies by the MRA Counterparties. That analysis also showed that the balance in Account 4025 was approximately $4.7 million on March 2, 3 and 4, 2007. It grew to $25.4 million in March 5, 2007, dipped to $17.1 million on March 6, 2007 and from that point until the Petition Date fluctuated up and down, settling at $42.1 million on the Petition Date. The Debtors and Committee argued that this means that the funds that the MRA Counterparties and Affected Whole Loan Purchasers might try to trace to Account 4025 are generally capped at around $4.7 - 17.1 million in the aggregate.

49.    The Adequate Protection Claimants disagreed with the analysis of tracing rules set forth above, particularly with respect to multiple trust fund claimants asserting claims to a single account, which is an unusual situation. They also asserted that any outflows of funds from Account 4025 would be applied first to reduce the Debtors' claims to funds that they deposited into Account 4025.

> **f.    The Debtors and the Committee Asserted that the MRA Affected Whole Loan Purchasers do not Have Valid Trust Fund Claims.**

50.    The Debtors' accountings revealed that most of the funds at issue with respect to the Affected Whole Loan Purchasers related to collections on loans received by

New Century after the information cut-off date established in the loan purchase agreement, but prior to the closing of the actual loan sale to the Affected Whole Loan Purchasers. Thus, the Debtors and the Committee argued that these are not trust fund claims, but rather general unsecured claims for purchase price adjustments. Typically, these mortgage loans were repaid in full, usually as a result of a refinancing, prior to the closing of the loan sale. Thus, the Debtors and the Committee argued that these mortgage loans did not exist at the time of the closing and were not, and could not, be sold to the Affected Whole Loan Purchasers.

51.     In addition, most of the whole loan sales were documented as sales by NC Capital Corporation ("NC Capital") to the whole loan buyer. At the time that NC Capital entered into a contract to sell loans to a whole loan buyer, it generally did not own the loans in question. Rather, at the time of the contract, the loans were typically owned either by NCMC or an MRA Counterparty (to the extent that the loans were subject to an MRA). At the time of the closing of a whole loan sale, NCMC would repurchase loans from the MRA Counterparties and then sell these loans to NC Capital, which in turn then sold the loans to the whole loan buyer. For loans that NCMC owned that were not subject to an MRA, at the time of the closing, NCMC sold the loans to NC Capital, which then sold them to a whole loan buyer. As a result of this structure, the Debtors and the Committee argued that Affected Whole Loan Purchasers could not assert trust claims for loans that paid off prior to the closing of the loan sale since at the time of the pay-off, the owner of the loan -- either an MRA Counterparty or NCMC -- that received the proceeds was not the party that would have sold the loans to the loan purchaser if they had not paid off prior to the closing of the loan sale.

52.     The Affected Whole Loan Purchasers disagreed and contended that their contract provided that the seller (which sometimes was NCMC) sold to them all collections in these loans after the cut-off date, even if received prior to the closing of the loan sale.

53.    In addition, some of the collections on these loans resulted from monthly flow sales, which were transactions where a Debtor (typically Home 123 Corporation) sold individual loans (or small batches of loans) to whole loan purchasers as these loans were funded throughout a month, as opposed to pooling a large collections of loans for a whole loan sale. The Debtors' records were less than clear with respect to whether some collections were received on these flow sales before or after the closing of a flow sale for the individual loans in question. To the extent the Debtors received payments after a flow sale closed, this would strengthen a whole loan purchaser's claims.

g.    **The Debtors and the Committee Contended that Constructive Trusts are Disfavored in Bankruptcy.**

54.    Since the alleged trust funds were commingled in Account 4025, rather than held in an express trust, the MRA Counterparties and Affected Whole Loan Purchasers asserted that a constructive trust should be established for their benefit. A constructive trust is a remedy, as opposed to a true trust. The Debtors and the Committee contended that constructive trusts are disfavored in bankruptcy and that most courts have held that the avoiding powers of Bankruptcy Code §544 trump any such constructive trust remedies. See, e.g., In re Omega Group, Inc., 16 F.3d 1443 (6th Cir. 1994); Belisle v. Plunkett, 877 F.2d 512 (7th Cir. 1989); In re Tleel, 876 F.2d 769 (9th Cir. 1989); In re Paul Paradise & Associates, Inc., 249 B.R. 360 (Bankr. D. Del. 2000).

55.    The MRA Counterparties and Affected Loan Purchasers disagreed. They argued that Bankruptcy Code § 541(d) establishes that when a debtor only holds legal title to an asset, but equitable title is held by a buyer, estate property does not include the equitable interest. They argued that § 541(d) uses the sale of mortgage loans as an example in order to reflect a particularly strong policy to recognize that an equitable interest in mortgage loans should not be undone by virtue of the avoiding powers of Bankruptcy Code § 544. See; In re Mortgage Lenders Network, USA, Inc. 380 B.R. 131 (Bankr. D. Del. 2007) (holding that the debtor only held legal title under Bankruptcy

Code § 541(d) to real estate that it held in its name after foreclosure sales on behalf of a securitization trust which held the underlying mortgage and note and the debtor could not avoid the trust's interest in such properties pursuant to § 544.)  In addition, there is Third Circuit authority that provides that § 544 does not prevail over § 541(d) at least in the context of a statutory trust.  <u>Universal Bonding Insurance Co. v. Gittens</u>, 960 F.2d 366; (3rd Cir. 1992).

## III.    RELIEF REQUESTED

56.    By this Motion, the Debtors seek authority, pursuant to §§ 105(a), 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), to enter into the Settlement Agreement.  While the factual and legal issues are complex, the settlement is relatively simple:

57.    The escrowed funds (which with interest equal about $42.8 million) will be split (i) 77.5% to the MRA Counterparties and Affected Whole Loan Purchasers, and (ii) 22.5% to the estate of NCMC.

58.    Under the settlement with DBSP that this Court previously approved, the Debtors are entitled to DBSP's share of the proceeds of this dispute.  Thus, DBSP's portion of the escrowed funds, out of the 77.5% allocated to the MRA Counterparties and the Affected Whole Loan Purchasers, will also be delivered to NCMC.

59.    Barclays' share will be reduced by $2.038 million and this $2.038 million will be distributed to NCMC.  This reflects a resolution of an asserted double payment that Barclays received in March 2007 as the parties attempted to implement a March 16, 2007 termination agreement.  The extra $2.038 million that Barclays received was funded out of proceeds that should have gone to T&I escrow accounts and which the Debtors replenished with their corporate funds.

60.    With respect to CSFB, $1.553 million of CSFB's share will continue to be held in escrow pending resolution of a similar dispute concerning $1.553 million of T&I funds.  The Debtors and the Committee contend that CSFB inadvertently received these

T&I funds and, as with Barclays, the Debtors replenished the T&I accounts with general corporate funds. CSFB, the Debtors and the Committee will attempt to resolve these remaining issues, but that dispute is not resolved in this settlement.

61.    The funds to be allocated to the MRA Counterparties and the Affected Whole Loan Purchasers will be split among them pro rata based on an attachment to the Settlement Agreement. The attachment was derived from the Debtors' accountings delivered in mid-September, except for the amounts shown for Countrywide and JPMC. As of the time of the Debtors' mid-September accountings, the factual disagreements for these Affected Whole Loan Purchasers were quite large in terms of the percentage of money at issue -- (i) for Countrywide, the Debtors asserted that the amount at issue was approximately $450,000, while Countrywide asserted that the correct amount was approximately $1.45 million, and (ii) for JPMC, the Debtors' accounting totaled approximately $1.7 million, while JPMC asserted approximately $3.5 million was at issue. These two whole loan buyers presented unusually complex transactions. For example, the JPMC whole loan sales involved resales to Fannie Mae in return for mortgage-backed securities issued by Fannie Mae and Fannie Mae periodically drafted against the custodial account set up for the JPMC whole loan sales. These two disputes required further one-off negotiations that consumed much of December. They resulted in compromises of $600,000 in the case of Countrywide and $2.5 million in the case of JPMC -- *i.e.*, below the mid-points.

62.    The funds allocated to the NCMC estate will equal approximately $12.8 million (not counting the possible release of the $1.553 million of T&I money being escrowed pending further negotiations with CSFB). The Settlement Agreement requires NCMC to hold this in a separate escrow account to be used to fund a liquidating trust, to fund a confirmed chapter 11 plan, or to be distributed pursuant to further order of this Court. These funds may not be used to pursue litigation, claims or proceedings against or investigations of any of the Adequate Protection Claimants.

63.    The Adequate Protection Claimants, on one hand, and the Debtors and the Committee, on the other hand, will exchange mutual releases related to these matters (including, in the case of Goldman, the release of avoidance claims related to the upstreaming and downstreaming of funds between NC Warehouse and the other Debtors); provided that the Adequate Protection Claimants will retain their rights to assert general unsecured claims, for example, for deficiencies asserted on the MRAs or price adjustments asserted by Affected Whole Loan Purchasers, with all rights reserved with respect to such general unsecured claims. The Debtors and the Committee reserve their rights to object to any such claims.

64.    In sum, the Settlement Agreement will realize approximately $12.8 million for the benefit of the unsecured creditors of NCMC and will resolve one of the most difficult and protracted disputes that has arisen during these cases.

## APPLICABLE AUTHORITY

65.    Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). In addition, the issues at hand involve resolution of claims for adequate protection and use of property governed by Bankruptcy Code Sections 361, 362 and 363.

66.    Bankruptcy Rule 9019(a) provides as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

67.    See Bankruptcy Rule 9019(a). Courts have interpreted this rule, as well as its predecessor, section 27 of the Bankruptcy Act, as granting the debtor in possession broad authority to settle controversies.

68.    A starting point in analyzing any proposed settlement agreement is the general policy of encouraging settlements and favoring compromises. See Myers v.

Martin (In re Martin), 91 F. 3d 389, 894 (3rd Cir. 1996); In re Coram Healthcare Corp.,

315 B.R. 321, 329-30 (Bankr. D. Del. 2004); Florida Trailer and Equip. Co. v. Deal, 284

F. 2d 567, 571 (5th Cir. 1960).   The standard by which courts evaluate a proposed

compromise and settlement are well established.  In bankruptcy, the court should approve

a proposed compromise and settlement when it is fair and equitable and in the best

interests of the debtor's estate and its creditors.  See In re Marvel Entm't Group, Inc., 222

B.R. 243, 249 (D. Del. 1998); In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997); In re

Texaco, 84 B.R. 893, 801-02 (Bankr. S.D.N.Y. 1988); Depo v. Chase Lincoln First Bank,

N.A. (In re Depo), 77 B.R. 381, 383 (N.D.N.Y. 1987), aff'd, 863 F. 2d 45 (2nd Cir.

1988).[9]

69.    Under the well-established standard for consideration of the merits of a

settlement, a settlement should be approved unless it falls below "the lowest point in the

range of reasonableness."   In re Coram Healthcare Corp., 315 B.R. at 330 (quoting

Official Unsecured Creditors' Comm. v. Pennsylvania Truck Lines, Inc. (In re

Pennsylvania Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa. 1992)); Cosoff v. Rodman

(In re W.T. Grant Co.), 699 F. 2d 599, 608 (2nd Cir.), cert. denied, 464 U.S. 822 (1983))

(quoting Newman v. Stein, 464 F. 2d 689, 693 (2nd Cir.), cert. denied sub nom, Benson v.

Newman, 409 U.S. 1039 (1972)); see also Am. Reserve Corp., 841 F. 2d at 161;

Teltronics Servs., Inc., 762 F. 2d at 187-89.

70.    In determining whether a settlement is within the range of reasonableness,

the Court should consider four principal factors:

(1)    the probability of success in the litigation;

(2)    difficulties to be encountered in collection;

---

[9]  See also In re Energy Coop, Inc., 886 F. 2d 921, 927 (7th Cir. 1989); LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F. 2d 159, 161 (7th Cir. 1987) (a court is not required to resolve the issues of fact and law compromised by a proposed settlement); Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.), 762 F. 2d 185, 187-89 (2nd Cir. 1985).

(3)     the complexity of the litigation and related expense,
        inconvenience, and delay; and

(4)     the interests of the creditors.

Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F. 3d 159, 165 (3rd Cir. 2002); In re

Etoys, Inc., 311 B.R. 176, 198 (Bankr. D. Del. 2005); In re Coram Healthcare Corp., 315 B.R. at

330-31; Marvel, 222 B.R. at 249; see also Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine,

Ltd.), 258 B.R. 119, 123 (D. N.J. 2000); Wallis v. Justice Oaks II, Ltd., (In re Justice Oaks II,

Ltd.), 898 F. 2d 1544 (11th Cir.), cert. denied, 498 U.S. 959 (1990); Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Martin v. Kane

(In re A&C Props.), 784 F. 2d 1377, 1381 (9th Cir.), cert. denied sub nom., Martin v. Robinson,

479 U.S. 854 (1986). These factors seek to balance the probable benefit and potential cost of

pursuing a claim or defense against the costs of the proposed settlement. The Debtors and the

Committee submit that the Settlement Agreement clearly meets this standard.

71.     The Settlement Agreement reflects an integrated global compromise of a
large number of complicated issues with a large number of parties with disparate
interests. It is the product of extensive, hard-fought negotiations. It is also an integrated
whole, so it would be inappropriate to consider any element in isolation.

72.     The issues presented by this dispute are complicated, both factually and
legally. Even after eight months, there are open factual issues. Moreover, the legal
disputes present a host of questions many of which have yet to be tested in the courts.
Such a situation cries out for a settlement. After a long and good faith battle, the Parties
have reached a settlement.

73.     For all of the foregoing reasons, the Debtors and the Committee
respectfully submit that the Settlement Agreement is fair and reasonable and in the best
interests of the Debtors and their creditors and estates, and should be approved by the
Court.

**NOTICE**

74.    No trustee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to:  (1) the Office of the United States Trustee for the District of Delaware, (2) the Official Committee of General Unsecured Creditors; (3) the Adequate Protection Parties, and (4) all parties who have timely filed requests for notice under Bankruptcy Rule 2002.  The Debtors and the Committee submit that, in light of the nature of the relief requested, no other or further notice need be given.

75.    The Debtors and the Committee submit that this Motion does not present any novel issues of law requiring briefing.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (as amended from time to time, the "Local District Court Rules"), incorporated by reference into Local Rule 1001-1(b), the Debtors and the Committee respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

**NO PRIOR REQUEST**

76.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors and the Committee request entry of an order, substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief requested herein and such other further relief the Court deems just and proper.

Dated: March 4, 2008
      Wilmington, Delaware

Respectfully submitted,

_Christopher M. Samis_
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Ben H. Logan
Suzzanne Uhland
Victoria Newmark
Andrew Parlen
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
(213) 430-7704

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

  /s/ Bonnie Glantz Fatell
Bonnie Glantz Fatell (No. 3809)
BLANK ROME
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400 - Telephone
(302) 425-6464 - Facsimile

- and -

Mark T. Power
Mark S. Indelicato
Janine M. Cerbone
Huria S. Naviwala
HAHN & HESSEN LLP
488 Madison Avenue, 15th Floor
New York, New York 10022
(212) 478-7200 - Telephone

Co-Counsel to the Official Committee of
Unsecured Creditors