UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
NEW CENTURY TRS HOLDINGS, INC.,.    Case No. 07-10416(KJC)
a Delaware corporation, *et al.*,.    (Jointly Administered)
                                .
                                .    March 5, 2008
                                .    1:30 p.m.
              Debtors.          .    (Wilmington)
                                .



TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE









Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: All rise.  Be seated.

2            THE COURT: Good afternoon all.

3            MR. MERCHANT: Good afternoon, Your Honor.

4            UNIDENTIFIED SPEAKER: Good afternoon, Your Honor.

5            MR. MERCHANT: Mike Merchant of Richards, Layton &

6    Finger on behalf of the Debtors.  Your Honor, before turning

7    to the agenda, I would like to orally move the *pro hac*

8    admission of Andrew Parlen with O'Melveny & Myers.  We are,

9    at this moment, filing Mr., Mr. Parlen's *pro hac* motion, but

10   I wanted to at least orally move it for purposes of this

11   hearing.  He's a member of good standing in the state of

12   California.

13           THE COURT: Very well.

14           MR. MERCHANT: Turning to the agenda, Your Honor,

15   items 1 through 6 have been continued, and an order has been

16   entered with respect to agenda item no. 7.  Agenda item no. 8

17   was a motion filed by Carrington to approve a stipulation to

18   assume and assign certain software licenses.  I don't believe

19   there's been any objections to that, but I can cede the

20   podium to Carrington's counsel to the extent they want to

21   handle it.

22           THE COURT: I signed that order today.

23           MR. MERCHANT: Great.  Thank you very much, Your

24   Honor.  Your Honor, we'd like to move the agenda around a

25   little bit.  We would like to handle agenda item no. 14

1    first, which is the Positive Software settlement motion.

2    Then turn to the disclosure statement items, and then handle

3    all claim objections at the end of the hearing.  If that's

4    acceptable to the Court.

5            THE COURT: That's fine with me.

6            MR. MERCHANT: I'm going to cede the podium to my

7    colleague, Mr. Silberglied, to handle the Positive Software

8    matter.

9            THE COURT:    Very well.

10            MR. SILBERGLIED: Good afternoon, Your Honor.  For

11    the record, Russ Silberglied, Richards, Layton & Finger on

12    behalf of the Debtors.  Your Honor probably never thought

13    we'd get here today.  It's obviously been a long time in

14    coming.  We've been here, I believe I counted four times

15    before Your Honor on the Positive Software matters.  Not to

16    mention before the District Court, and of course it's the tip

17    of the iceberg of the Texas litigation.  So the Debtors are

18    quite pleased to put this chapter behind them.  I had

19    intended my presentation to be two parts.  One of which was

20    going to be the overall structure of the settlement, which is

21    a little bit more complex than a typical one.  The other was

22    going to be to address the four or five objections raised by

23    Mr. Mutchnik.  I do understand that Mr. Mutchnik is not

24    appearing either in person or on the telephone, so if Your

25    Honor would prefer that I skip over certain matters, such as

1    certain objections or the background of the settlement, feel

2    free to let me know.  I'm not here to hear myself talk.

3              THE COURT: Well as disappointing as it might be to

4    others in the courtroom, it's not necessary, if Mr. Mutchnik

5    isn't present, to address his objection.  But let me ask for

6    the record whether Andre Mutchnik is present either in person

7    or by telephone, or whether anyone is appearing on his behalf

8    in support of his objection to this motion.  I hear no

9    response.  I have read, I have read his objection.  And

10   normally what I do with parties who don't appear, even pro se

11   parties, in support of their objections, while I read them, I

12   generally sustain, overrule the objections for failure of the

13   movant to appear in support of it.  But beyond that, I did

14   read it, and he was very specific in a lot of his complaints

15   about the proposed settlement, but frankly in a way his

16   objection supports the reason why matters like this are

17   settled.  And with that, I'll turn it to you for your

18   presentation.  Abbreviated presentation.

19             MR. SILBERGLIED: Thank you, Your Honor.  I will

20   abbreviate it.  First of all, he asks the question which of

21   the Debtors are going to be making the cash payment under the

22   settlement.  I will put on the record that it was always the

23   intention, and it will be the case, that New Century Mortgage

24   will be making the payment.  And that as a result, while,

25   because allowed claims are obviously ranges in percentages,

1    so it's difficult to say this with any precision, New Century

2    Mortgage, in the total financial package of what's being

3    given here, is going to be paying ⅔ or ¾ of the

4    consideration, which we believe is certainly appropriate.  I

5    don't really think that much needs to be said about his idea

6    of, you know, we should tentatively settle it and the claim

7    be reduced, and then we could come back later.  We had many

8    responses like specifics on why Positive Software wouldn't

9    agree to that, and why the Debtors wouldn't agree to it.  If

10   Your Honor has questions, I'll go through it.  But I think

11   the nub of the issue really is his concern about whether New

12   Century Financial ought to be entering into this settlement

13   at all.  So I guess that's where I would focus my time in

14   light of the fact that he is not here.

15        THE COURT: No, I, I've read the papers, including

16   the memorandum in support of Positive's response.

17        MR. SILBERGLIED: Your Honor, if Your Honor has no

18   questions about it, I mean, we would rest on the papers,

19   then.  I mean, we do believe that the motion sets forth

20   bases, and as Your Honor said, we think the objections, and

21   as well as Positive Software's supplemental filings, show

22   it's in the best interest of the estate.  I also, just in

23   case, because we didn't realize Mr. Mutchnik wasn't coming,

24   we also got an affidavit of the mediator, David Stratton, to

25   walk through what he did to mediate this case.  And the fact

1    that in the mediator's view, with his background and with his

2    knowledge of what's, what was at stake, that this is a good

3    settlement.  And I can hand that up to the Court, if Your

4    Honor would like to take the record.

5         THE COURT: Well mediations, in my view, are a

6    little bit like Las Vegas.  What happens there should stay

7    there.

8         MR. SILBERGLIED: It has nothing to do with the

9    merits.  And I agree under Rule 408.  That would be

10   inappropriate if we were talking about the merits of it.  I

11   agree with that.  But if Your Honor doesn't want it

12   submitted, we're happy with that approach as well, and we

13   would just rest on the papers at that point.

14        THE COURT: All right.  And I have reviewed the

15   papers.  Let me ask if anyone else cares to be heard in

16   connection with this motion.

17        MR. INDELICATO: Good afternoon, Your Honor.  Mark

18   Indelicato from Hahn & Hessen on behalf of the Committee.

19   Your Honor, just very briefly since Mr. Mutchnik isn't here.

20   I think we should just address some of the concerns he

21   raised, and concerns others may have regarding the payments

22   and how, and how this was arrived at.  And I will tell the

23   Court that the Committee was an active member in the

24   mediations and the discussions that occurred after the

25   mediations.  And to put it mildly, to say that the Committee

1   wasn't thrilled about having to pay $2 million is again

2   putting it mildly.  But the Committee, after having reviewed

3   all the analysis, including the cost of the litigation had

4   the mediation not been successful, believe that this

5   settlement was an appropriate settlement, was reasonable in

6   light of all the circumstances, was an appropriate way to

7   move this case forward.  So we just want the Court to

8   understand that we did consider all of the analysis, our

9   financial advisor was involved in it as well.  So we truly

10  believe that this is a settlement that should be approved.

11  It's well above the lowest level of reasonableness, and we

12  would urge the Court to approve the settlement.

13          THE COURT: Thank you.  Does anyone else care to be

14  heard?  I hear no response.

15          MR. SILBERGLIED: Your Honor, I do have a revised

16  form of order if, if you will entertain it.

17          THE COURT: Someone has stood.

18          MR. SILBERGLIED: I'm sorry.  They're behind me, so

19  I didn't see it.

20          MR. NIEDERMAN: Good afternoon, Your Honor.  Seth

21  Niederman from Fox Rothschild on behalf of Positive Software.

22  If I may introduce Mr. Mark Ralston from the Ralston Law Firm

23  in Dallas, Texas.

24          MR. RALSTON: Your Honor, I won't - - this Court has

25  been very indulgent, and we, this may be the last time, at

1   least, I appear before you in this case.  I'm sure you will

2   miss us.  But - -

3           THE COURT: Desperately.

4           MR. RALSTON: But it will go on.  We did mention in

5   our response that there was a damages report that we thought

6   relevant indicating the enormity of the damages we think that

7   we could obtain in litigation, and we told the Court that we

8   would submit it under seal.  Rather than do that, if the

9   Court wishes to review the report, I have it here to present

10  for an in chambers review.

11          THE COURT: I, I do not feel it's necessary.  I've

12  reviewed the papers.  And because of the several proceedings

13  which have preceded this motion, I'm well steeped in the

14  nature of the dispute between the parties, the complexity of

15  the dispute, the ongoing litigation in other fora, and I'm

16  well satisfied, based upon the review of the papers and the

17  structure of the settlement, that this settlement as proposed

18  more than meets the standards which apply in this circuit for

19  approval of such agreements.

20          MR. RALSTON: Yes, and Your Honor I only say that

21  because I said in the, we said in our response that we would

22  do that.  So I wanted just to take care of that as a

23  housekeeping.  I also wanted to briefly address, I feel

24  compelled, actually, you know, it's interesting that Mr.

25  Silberglied and I, after the many appearances we've both had,

1    are actually on the same side of something.  And I wanted

2    just to - -

3              THE COURT: That happens in bankruptcy cases.

4              MR. RALSTON: It does.  And it's, I think the result

5    is, is one where we're, it was a tough result, it was hard

6    fought, and I just wanted to correct one thing for the record

7    that appeared in Mr. Mutchnik's objection.  That the Debtors

8    threw in the towel.  As this Court is well aware, this was

9    hard fought litigation.  And here really, mostly, regarding

10   procedural matters.  And certainly the Debtors did no such

11   thing.  They were zealous in their representation of the

12   Trustee, or excuse me, of the Debtor as we were also in

13   representation of Positive Software.

14             THE COURT: I agree.

15             MR. RALSTON: Thank you, Your Honor.

16             MR. SILBERGLIED: Your Honor, if I may submit a

17   revised form of order.  Positive Software's counsel pointed

18   out to me that because there would be some limited further

19   proceedings in Texas, we actually need stay relief to

20   accomplish that.  So we have added a paragraph 7 to the form

21   of order that gets the limited stay relief accomplished.  May

22   I approach with a clean and a black line?

23             THE COURT: You may.

24             MR. SILBERGLIED: Thank you.

25             THE COURT: Thank you.  The order has been signed.

1        MR. SILBERGLIED: Thank you, Your Honor.  May I ask

2    Your Honor's indulgence that Mr. Ralston and I be excused?

3        THE COURT: You may.

4        MR. SILBERGLIED: Thank you, Your Honor.

5        MR. RALSTON: Thank you, Your Honor.

6        MS. UHLAND: Good afternoon, Your Honor.

7        THE COURT: Good afternoon.

8        MS. UHLAND: Next we have the matters of the

9    disclosure statement and the voting procedures.  Because we

10   filed two red lines with the Court, or we filed one red line

11   with the Court, and we have also tried to address some

12   additional objections, it's a little bit unwieldy, and I've

13   been trying to think through the most effective way to go

14   through these issues this afternoon.  We believe that through

15   the course of these disclosure statement revisions that we

16   have addressed all objections to the disclosure statement,

17   and that while there were some confirmation objections that

18   we have not addressed, we would identify those as

19   confirmation objections.  We've been working very closely,

20   we've been working with formal and informal objectors over

21   the last, actually the last 10 days, to come up with both

22   drafts, as well as very closely with, with the Committee as

23   we've been, as we are co-proponents of the plan, to try to

24   get a disclosure statement prepared and drafted so we can get

25   this plan process moving as promptly as possible, and wrap up

1   this part of these cases.  What I think makes the most sense,

2   as far as trying to take this in some bite-sized pieces, is

3   to first, what I would propose to do is walk through the

4   changes in the filed disclosure statement.  And I will note,

5   as I go through them, and this won't take too long, and that

6   should be in your binder, it's at minus as matter little

7   romanette three, Exhibit B.  What I'd like to do is walk

8   through the changes to that disclosure statement, and I'll

9   note where we've addressed certain objections.

10         THE COURT: Well actually, what I have in front of

11  me, Ms. Uhland, is the black line that was delivered to

12  chambers this morning.

13         MS. UHLAND: In the hearing binder that the Court

14  should have, the three, the 2/27 black line is in, should be

15  at tab, tab 3, Exhibit B.  That's at least where my - - a

16  hard time with the tabbing system, I think.  I need a special

17  Delaware decoder ring to understand it.  But - -

18         THE COURT: All right.  Hold on.

19         MS. UHLAND:  - - it looked like a little romanette

20  three, and then behind it a B.

21         THE COURT: I have that.

22         MS. UHLAND: Okay.

23         THE COURT: But the one I reviewed in preparation

24  for the hearing today is the black line that was delivered

25  this morning.

1        MS. UHLAND: And that's appropriate, Your Honor.

2        THE COURT: Okay.

3        MS. UHLAND: I, there's about five black line

4  sections of that one I'll just point the Judge to.  I don't

5  think that, I just wanted to point to the Judge where we

6  added language to address certain objections, because it's,

7  it will be difficult to tell from the subsequent black line.

8        THE COURT: Okay.

9        MS. UHLAND: So what I would propose to do is I'm

10  going to go very briefly and point out just five sections of

11  the prior black line.  Then we'll turn to the black line that

12  I think everyone is more focused on.

13        THE COURT: Okay.

14        MS. UHLAND: First in that black line I wanted to

15  point the Court to page - - I haven't flagged every point,

16  where in the 2/27 black line we added financial information.

17  I would just note for the Court that on the 2/27 black line,

18  as we indicated, we did include the financial information

19  regarding the recovery analysis and asset values we had left

20  blank.  And that change alone addressed a substantial number

21  of the objections which were filed prior to the filing of the

22  amended disclosure statement.  I would also point out on page

23  68 of the black line that we added additional disclosure

24  about the amount and the nature of the inter-company claims.

25  This was to address a concern of Mr. Mutchnik.  He's not here

1    today, but he did file a substantial objection, and we did

2    - - and I will note to the Court where we addressed his

3    objections in the disclosure statement.

4         THE COURT: All right.

5         MS. UHLAND: Similarly, on pages 69 and 70 and 71,

6    the Debtors added additional, an incremental amount of

7    disclosure about the EPD breach claims process.  On pages 137

8    and 138, and this is again in response to Mr. Mutchnik's

9    objection, we added additional, additional disclosure with

10   respect to the Debtors' federal and state tax refunds.  And

11   we also added additional disclosure on page 151 to address

12   some of the tax, the objections regarding tax issues and tax

13   disclosure filed by Mr. Mutchnik.  And finally in this draft

14   of the disclosure statement, on pages 155 to 156, we added

15   disclosure, more detail with respect to our best interest

16   analysis and the way our plan settlements address that issue.

17   That was in response to Mr. Mutchnik's objection with respect

18   to liquidation analysis.  Now Your Honor, what I'd like to do

19   is turn to the black line that was delivered this morning

20   that was in response to the objections - - there's also

21   substantial black line in some of the, there's some update

22   black line that I won't spend the time going through.

23   There's also some, we received, as we've been working toward

24   the settlement with the adequate protection parties, I don't

25   know if it hit the Court's docket yet, the Court's aware we

1    have reached that settlement, and filed the motion for

2    approval of the adequate protection party settlement.  Which

3    we can - -

4              THE COURT: Yeah.  That's set for hearing on the

5    25th.

6              MS. UHLAND: That's correct, Your Honor.  As part of

7    that process, we've been working with the counter-parties to

8    the MRA's and receiving their comments, their informal

9    comments on the disclosure statement.  And many of the

10   changes in this, the version of the disclosure statement you

11   have is to address their informal comments.

12             THE COURT: All right.

13             MS. UHLAND: First Your Honor, and pointing out, you

14   know, like I said, I'm going to skip through just what I'll

15   call the simple updating changes.  Page 24.  We added some

16   red line with respect to the repurchase, further red line on

17   the, on the MRA agreements.  This is again in response to Mr.

18   Mutchnik and the MRA claimants.  On page 38, we added

19   additional information with respect to Access Lending.  This

20   is 38 and 39.  This was to address the, in part the

21   objections raised by Goldman Sachs, which is a creditor to

22   Access.  Page 47, we provided our update with respect to the

23   adequate protection motion I just mentioned.  On pages 56,

24   57, 58, 59 through the top of 60, we added substantial more

25   disclosure about the deficiency claims in part in light of

1   the issues raised by Mr. Mutchnik in his informal objection,

2   and also working through this language with the MRA parties.

3   On pages 72 and 73, we added additional language in our EPD

4   breach section.  And, sorry, on 74.  Again to address we

5   believe this now addresses all of the objections on the EPD

6   disclosure raised in the objections.  On page 76, just to

7   point out to the Court, this was an updated on a financial

8   term of the plan.  As part of the black line plan that the

9   Court has, we have disclosed what the percentage is we're

10   using for the holding of any operating company Debtors for

11   administrative claims that cannot be allocated under, and

12   this was an agreed percentage.  It's a term of the plan, and

13   we explain that on page 76.  I'm sorry, I missed, I'll talk

14   about the - - there are a couple of issues with respect to

15   the deferred comp claimants.  And I think I'd like to just

16   get through the, the balance of the, they're sort of more,

17   why don't I, why don't I address their objections when I

18   address their objection generally?

19        THE COURT: Okay.

20        MS. UHLAND: On page 139 we added some additional

21   disclosure about the Carrington funds pursuant to an informal

22   request by Carrington in an effort to resolve their potential

23   objection.  And then at paragraph 161, we received objections

24   with respect to substantive consolidation issues from both

25   the United States Trustee and the deferred comp litigants.

1    We don't know that, you know, this is our effort at

2    addressing their concerns.  We believe that's a confirmation

3    issue.  And I'll walk through, briefly, this language when

4    we, when I talk about their specific objections.  What I'd

5    like to do now, Your Honor, is I know that there are some,

6    I'd like to walk through the way, just on some of the

7    objections we believe we've now satisfied them, and how we

8    satisfied them.  And, and then have, I think, the objectors

9    come up and respond to the extent they think that their,

10   their issues have not been addressed.

11         THE COURT: Okay.

12         MS. UHLAND: As I said, on the deferred comp

13   parties, we believe that the bulk of their objection is a

14   confirmation objection relating to the substantive

15   consolidation issues.  We do not believe it is a substantive,

16   substantively consolidating plan, but we have added a

17   disclosure that they may take that position at the end.  We

18   also added language, and I'm sorry this is out of order,

19   page, at pages 41 and 42 of the red line, to provide more

20   detail about their, the legal positions taken by the, in the

21   deferred comp litigation.  As I said, we believe that their

22   other issues with respect to whether or not the plan

23   appropriately treats the Rabbi Trust funds, and whether this

24   plan is in fact substantive consolidation, that those are

25   plan objections and that the, the latter portion of our

1  disclosure statement addresses that.  With respect to Mr.

2  Mutchnik's objection, he's not here today, I just want to

3  make the Court aware that he sought additional disclosure

4  with respect to financial information, the Morgan Stanley

5  auction, the MRA deficiency claims, tax issues, and inter-

6  company issues.  And we did our best to address each of his

7  required, or requested insertions and additional information.

8  Your Honor, with respect to the New York State Teacher's

9  Retirement System, we believe that theirs is also largely a

10  confirmation objection.  We have, we have added, at page 40,

11  the information that they requested that they intend to file

12  an amended complaint.  Their other objections were that we

13  didn't provide financial information, and that they wanted

14  further information about the Examiner's report.  We have

15  provided the financial information.  We have updated the

16  disclosure statement to provide that when the Examiner's

17  final report, if it is issued and when it is unsealed, that

18  we are going to provide a link to that on our Crossroads

19  website.  So the link, we're going to put in this disclosure

20  statement how it can be obtained if it, if it's unsealed by

21  the Court.  If and when.  We believe that the balance of our

22  information about the Examiner's report is satisfactory.  The

23  US Trustee, we will also be talking to him about that.  He

24  has some issues on that.  So I'd like to sort of pause, or

25  skip that for now, and deal with any issues on, further

1    information about the Examiner's report when we address the

2    United States Trustee's issues.  We have confirmed with the

3    parties, the plaintiffs in the class action litigation, that

4    while we haven't attached our schedule of assumed contracts,

5    that we do intend to, as a precautionary matter, list all

6    insurance policies to make sure that, I mean, that's really

7    the reason for that assumption provision to make sure that an

8    insurance policy doesn't argue that we're not entitled to

9    coverage because of a possible rejection.  So we've confirmed

10   that with them.  They have also raised issues with respect to

11   the retention of information for them in the event when they,

12   if and when they get relief from their discovery stay, they

13   want to make sure that there's going to be documents for them

14   to review.  And that we adhere to our protocols.  Your Honor,

15   we have opened and will continue to have a dialog with them

16   about that.  So we can try to work out something reasonable

17   as far as maintaining the documents that they need us to

18   maintain in protecting their rights without requiring the

19   cost, overwhelming cost for the Liquidating Trust.  We're

20   committed to having a dialog with them.  We've started that,

21   asking them sort of what they think is an appropriate

22   protocol.  If we can't work it out, our view is they can

23   bring, they can raise that as a confirmation objection at

24   that time.  We're hoping we can work it out with them.  The

25   other two items that they raised, we do believe are squarely

1   confirmation issues.  One is the extension of the stays.

2   We've asked that effectively our automatic stay be continued

3   and that would require them to obtain relief from that stay

4   to get discovery.  Even from the Liquidating Trust, to the

5   extent they obtain the relief from the Federal Court in

6   California.  They've also asked for some provisions that

7   would allow their claims, although they're subordinated, to

8   seek insurance policies.  We view that as a plan issue, not a

9   disclosure issue.  On both of these issues, the plan

10  proponents' position is that they are not amenable to those

11  changes in the plan, and if they want to raise those as

12  objection issues, confirmation issues, they may.

13          THE COURT: Has that dispute been described in the

14  disclosure statement?

15          MS. UHLAND: The - -

16          THE COURT: That facet of the dispute been described

17  in the disclosure statement?

18          MS. UHLAND: The, no it has not.  The issue of

19  whether the estate continues has not been addressed.  That

20  they dispute the continuation of the stay.  With respect to

21  the United States Trustee - -

22          THE COURT: Should we hear from each - -

23          MS. UHLAND: Do you want to take them one at a time?

24          THE COURT: I think so.

25          MS. UHLAND: Okay.  Well then since we went through

1   the deferred comp individuals first, if they, maybe to the

2   extent they have further, we could take them, and then the

3   New York State Teachers.

4           THE COURT: All right.

5           MS. UHLAND: Then we can go to the US Trustee.

6           MR. KEACH: Thank you, Your Honor.  Robert Keach for

7   the Ad Hoc Committee of Beneficiaries.  First, with respect

8   to process.  While we certainly think that this effort is an

9   improvement, I first received the most recent black line

10   attempting to put in language addressing some of our

11   disclosure concerns while in transit today.  And they're

12   obviously considerable changes.  Some of which affect us,

13   some of which may or may not affect us.  And it seems as a

14   matter of process that will make for maybe perhaps several

15   parties that all the parties should have more time to study

16   these changes, rather than simply have to respond to them on

17   the fly.  Having said that - -

18           THE COURT: That's so unusual in a bankruptcy case.

19           MR. KEACH: Well even in the, and I'm, you know,

20   having done this for 30 years, I'm used to the pace of

21   bankruptcy, but this is, that's a little rapid even under the

22   pace of bankruptcy.  With respect to the specific objections

23   we raised, we don't think they begin to be addressed by the

24   proposed changes.  First with respect to the issue of

25   substantive consolidation, the Debtors provided their own

1   definition in their attempted change.  We provided the

2   definition used by the 3rd Circuit of substantive

3   consolidation in our objection.  And it seems patently clear

4   to us, at least, and I gather the US Trustee's office agrees

5   with us, that that is what is happening with respect to this

6   joint plan.  With respect to the formation of the Debtor

7   groups, and the one that concerns us, obviously, is the

8   holding company Debtor group, but others may be concerned

9   about others.  There is no question that what's going on

10  group to group is substantive consolidation.  The 3rd Circuit

11  defines substantive consolidation, or said that substantive

12  consolidation treats separate legal entities as if they were

13  merged into a single survivor left with all the cumulative

14  assets and liabilities, save for inter liabilities, which are

15  erased.  And the result is that claims of separate Debtors

16  morph into claims against the consolidated survivor.  Well

17  the holding company group in this case is the consolidated

18  survivor.  All of the assets of all of the holding company

19  Debtors are being treated as one unified pile of assets, and

20  all of the claims of all of the holding company Debtors are

21  applied to that unified pile of assets.  The, the

22  beneficiaries of the deferred comp plan and the SERP are

23  precisely in the position that the banks in the Owens Corning

24  case were put in.  And that is that we are the net

25  contributor of assets to that consolidation to the extent - -

1    and we'll get to whether this does or does not affect the

2    litigation in a second, because it's completely unclear.  And

3    I'm even less clear having heard Ms. Uhland this morning.

4    This afternoon, excuse me.  The, but we are, we are a net

5    contributor and undoubtedly we are harmed by the effective

6    consolidation.

7              THE COURT: Okay.  And that's a confirmation

8    objection, right?

9              MR. KEACH: We don't think so, Your Honor.  We think

10   on the face of the disclosure statement that harm is evident,

11   and they have admitted to it in their description of the

12   holding company consolidation.

13             THE COURT: Mr. Keach, I disagree.  Now I will say

14   that although the disclosure statement cites Augie Restivo as

15   opposed to Owens Corning - -

16             MR. KEACH: Right.

17             THE COURT: - - it strikes me, and the Debtor can

18   correct me if I'm wrong, that this scheme - - and I don't use

19   that in the pejorative sense of the word - -

20             MR. KEACH: Um-hum.

21             THE COURT:  - - was developed with Owens Corning in

22   mind.  Now whether it passes the test or not, I don't have to

23   decide today.

24             MR. KEACH: Um-hum.

25             THE COURT: The question in my mind just comes back

1    to does the disclosure statement accurately describe the

2    dispute.  You're not the only one that raised that objection.

3         MR. KEACH: Sure.

4         THE COURT: And I do agree it needs to be addressed

5    appropriately.  But if you're saying the plan as proposed is

6    unconfirmable of its, on it's face because of the alleged

7    substantive consolidation, I will not make that ruling today.

8         MR. KEACH: Well I hear Your Honor.  And let me, let

9    me move to the disclosure aspects of that in a second.  We

10   also, we also think it's not confirmable on its face for

11   other reasons that I'll get to in a second.  But that may

12   depend, in fact, on what the Debtor is trying to do with the

13   plan vis a vis the deferred comp litigation.  Because it's

14   not at all clear what they're trying to do.  But let me move

15   to the disclosure point with respect to substantive

16   consolidation in a second.  And in this we share a common

17   ground with the US Trustee's Office.  Even the amended

18   disclosure doesn't begin to tell people whether or not they

19   would be remotely better off in a consolidated scenario

20   proposed by the plan versus unconsolidated scenarios.  And

21   that's not the same as - -

22        THE COURT: Well as I - -

23        MR. KEACH: - - disclosing an ultimate plan.

24        THE COURT:  - - as I read the disclosure statement,

25   that's exactly what the Debtor is saying.  And in fact

1    they're saying, Look we created this allocation formula - -

2              MR. KEACH: Um-hum.

3              THE COURT:  - - because to do otherwise makes the

4    task if not economically impossible, impossible for other

5    reasons.  And this is our solution.  Now the creditors may or

6    may not like it, but they'll have a chance to vote on it.

7              MR. KEACH: Sure.  But well, well but first, Your

8    Honor, they don't say that it's impossible.  They've actually

9    never come close to saying it was impossible.  They said it

10   was - -

11             THE COURT: Well, my words - -

12             MR. KEACH:  - - they said it was - -

13             THE COURT: My words.

14             MR. KEACH: Sure.

15             THE COURT: But that's, frankly that's the, that's

16   how I took them.

17             MR. KEACH: Well and I don't I don't dispute that

18   they have mentioned the conclusion.  I.e. we, they think it's

19   more convenient to do it this way, because it would be

20   difficult to do it otherwise.  Which isn't the test.  But

21   more importantly, they don't provide any basis for that

22   conclusion.  For example, they don't even disclose, which

23   they could easily do in a schedule, what the, let's take NC,

24   NCFC for, as an example.  They don't disclose what the

25   alleged secured claims are just against NCFC.  They don't

1   disclose what the priority claims are just against NCFC.  And

2   they don't disclose what the unsecured claims are just

3   against NCFC, despite the fact that they insisted, when we

4   were negotiating the bar date motion, that claimants be

5   required to designate the specific Debtor against whom they

6   were filing, under penalty of losing their claim.  So there's

7   no question that they have the data, but they haven't

8   disclosed it.  And without that data, there is no basis by

9   anybody to test this conclusion that they reach that we're

10  better off consolidated as opposed to unconsolidated.  And it

11  seems to me they have to tell us that.  And I think that's

12  the critical sort of non-disclosure when it comes to that

13  point.  And we believe that they need to disclose that, that

14  very important financial information.  With respect to the

15  other issue that we think is fatal to the disclosure

16  statement from a facial and non-confirmability standpoint,

17  the, the Debtor appears to say at one point, and including in

18  their amended discussion of the risk, that if they lose the

19  deferred comp litigation with respect to the top hat issue

20  the assets are excluded from the plan.  We obviously agree

21  with that.  There's no mention, however, of what I would call

22  the sort of secondary position of the beneficiaries, and that

23  is that under the terms of the plan and trust, even if the

24  beneficiaries were to lose their primary argument, that the

25  plan and - -

1          THE COURT: You have an alternate argument.

2          MR. KEACH: - - trust restricts access - -

3          THE COURT: And I'm, I'm familiar with that

4     argument.

5          MR. KEACH: Right.

6          THE COURT: And see no reason why it shouldn't be

7     mentioned.

8          MR. KEACH: Okay.  The only concern we have, and

9     perhaps the Debtors can clarify this, is that in their new

10    discussion about compromise, the position of the Debtors

11    seems to be that with respect to at least that second issue

12    that parties other than the beneficiaries and the Debtors and

13    the actual parties to the adversary proceeding can somehow

14    settle their way around that.  That by agreement with other

15    parties, they could eliminate those rights of the

16    beneficiaries to limit access as if that were a settlement to

17    which we could be bound.  Obviously we disagree with that,

18    and we also think to the extent that the plan is premised

19    upon other parties being able to settle our rights, then it's

20    non-confirmable on its face.  If that's not what they're

21    trying to do, if they are in fact saying that if we win

22    either aspect of that litigation, then they'll have

23    restricted access to the funds, or no access to the funds,

24    then we don't have a problem.  But they should tell us what

25    it is.  Thank you, Your Honor.

1           MR. McMAHON: Your Honor, good afternoon.  Joseph

2    McMahon for the United States Trustee.  With the Court's

3    permission, I'd just like to be heard briefly on the

4    substantive consolidation issue.

5           THE COURT: Okay.

6           MR. McMAHON: We believe, to a certain extent Your

7    Honor, that this issue is a today issue for the following

8    reasons.  Your Honor is correct in noting that substantive

9    consolidation disputes are typically heard at confirmations.

10   Usually what happens is there's a plan that's filed, the plan

11   expressly requests some level of consolidation, it is noticed

12   to the creditors along with the Debtors' view as to what the

13   appropriate legal standard is in terms of satisfying that

14   consolidation request.  And then we approach confirmation

15   with all parties in interest having been on notice as to what

16   the Debtor is requesting.  Here, as between the counsel that

17   just spoke, our office, the Debtors, we have a dispute still

18   as to what it is.  We just don't agree as to whether or not

19   they're requesting substantive consolidation or not.  And the

20   supposed fix, Your Honor, that the Debtors have proposed is

21   to include a provision in the risk section of the disclosure

22   statement which indicates that, well, the, the certain other

23   parties have indicated that this may be a substantive

24   consolidation, and the Court may rule as such at

25   confirmation, if the plan would not be confirmable.  Given

1    what has transpired in these cases to date, Your Honor, and

2    given the cost that goes along with the plan processing, in

3    particularly its tail-end, in connection with a public

4    company Chapter 11 set of debtors this size, we believe that

5    strictly the cost issue would be served by the Court, I

6    guess, ruling today as to whether or not what it is the

7    Debtors are requesting is or is not substantive

8    consolidation, so we can just proceed from this point with

9    what disclosure is appropriate.  In our discussions with the

10   Debtors, they, I guess they described what's going on as a

11   series of 9019 settlements.  Well given that substantive

12   consolidation effects the rights of particularly creditors,

13   for that analogy to be complete, the settling parties,

14   meaning the various creditors of the estates, would have to

15   be on board with the settlement, and, and presumably you

16   would have to square that analogy with other facets of 1129

17   and applicable law.  For example, here we have a creditor

18   that does not want to be part of the settlement.  Well how,

19   how are those claims treated to the extent that, you know,

20   they don't agree to whatever it is that is being proposed?

21   There's no separate treatment for creditors that do not want

22   to be, become part of the Debtors' and the Committee's agreed

23   formula for resolving this issue.

24            THE COURT: Well I addressed, in part, that issue in

25   my Exide confirmation decision in which a settlement was

1    proposed, but vigorously opposed by a class that wasn't part

2    of the settlement, but was directly, arguably directly

3    affected by it.  And I, I commend you to the reading of that,

4    and others here, to decide how I handled it in those

5    circumstances.  It's a, it's a ticklish issue, I agree, but I

6    don't think there's a bright line rule about whether it's

7    okay all the time or never acceptable.  I think the answer

8    lies somewhere in between.  But again, I don't view that as a

9    today issue.  I know you might think it might be more

10   convenient for the Court to rule on whether what's been

11   proposed is violative of 3rd Circuit standard regarding

12   substantive consolidation, but I find an important factor in

13   deciding that issue is going to be how the creditors vote.  I

14   would be very reluctant to make that decision absent seeing

15   how the creditors feel about it.

16           MR. McMAHON: Your Honor, respectfully I - -

17           THE COURT: And - -

18           MR. McMAHON:  - - we - -

19           THE COURT: And I would say, as you know Mr.

20   McMahon, lots of things happen between the time of disclosure

21   and the time of confirmation.  And many of them are good

22   things.

23           MR. McMAHON: I appreciate that, Your Honor.  What

24   I, the point I'd like to make on behalf of our office is that

25   clearly whether or not 70% of the parties that I guess favor

1    a certain treatment agree to that treatment, that will not

2    make what is requested as a matter of law any more or any

3    less substantive consolidation or not.  What they're doing is

4    or is not substantive consolidation.  In other words - -

5            THE COURT: Well if it's a - -

6            MR. McMAHON:  - - while - -

7            THE COURT: If it's a settlement, it might be

8    relevant.  That's my point.  So again these are all

9    confirmation issues, as I see them.  I don't, I don't

10   disagree either with Mr. Keach or with you, as I said.  Maybe

11   there should be a fuller discussion of the pros and cons.  It

12   doesn't have to be a white paper.  I mean, people can get

13   their own counsel if they wish.  If they have enough at stake

14   to do that.  But beyond having a better discussion and a

15   better place in the arguably, arguably a better place in the

16   disclosure statement, I think that's all that's called for

17   today with respect to that issue.

18           MR. McMAHON: Your Honor, our concern is that to the

19   extent that you were to rule that it is a substantive

20   consolidation at the plan stage, that it would require a re-

21   solicitation because it would be a material modification at

22   that point.

23           THE COURT: Listen.  The way I typically approach

24   these things is I give the Debtor at least one shot at it.

25   And it may be that the decision goes against them and other

1  things have to happen.  But I think the Debtor is entitled to

2  a first shot in any event.

3          MR. McMAHON: Thank you, Your Honor.

4          THE COURT: Does anyone else care to be heard?  Any

5  of the objectors care to be heard on the substantive

6  consolidation issue?

7          MR. KEACH: Your Honor may I be heard briefly just,

8  in a slight addendum to my earlier remarks?

9          THE COURT: Briefly.

10         MR. KEACH: Very brief.  Your Honor, one of the

11 concerns we have, and this is typical of trying to do these

12 things in a 9019 context, is that we believe, and I think

13 there's authority in the 3rd Circuit for precisely this point

14 in settling substantive consolidation issues, and I have read

15 Your Honor's opinion in respect to 9019's, and that is we

16 believe that in order for this to even go forward on a 9019

17 basis, the Debtors have to establish, with evidence at a

18 confirmation, at least a prima facie case for substantive

19 consolidation under one of the two prongs of Owens Corning

20 test.

21         THE COURT: They might, they might not dispute that.

22 I don't know.

23         MR. KEACH: Well - -

24         THE COURT: But it's for confirmation.

25         MR. KEACH: I understand that.  But we, we have

1   reason to believe, and we can hear from Debtors' counsel on

2   this, that they do dispute that.  And that they think that

3   what they have to establish is some basic fairness of the

4   settlement to the overall estate.  And if it goes forward as

5   a confirmation issue, and we respect Your Honor's views on

6   that, I think we understand clearly where the Court's going

7   on that point, it would be very important to set up, we

8   think, some kind of litigation scheduled relating to this

9   issue.  Because we want to know who their experts are on this

10  issue.  We want to be able to take discovery of their

11  experts.  We want to be able to test the bona fides of their

12  experts.  And there are lots of other litigation issues that

13  go with that.

14          THE COURT: But you can - -

15          MR. KEACH: But what - -

16          THE COURT: And I - -

17          MR. KEACH:  - -  what I don't think helps anybody

18  - -

19          THE COURT: But we can deal with - -

20          MR. KEACH:  - - is to get - -

21          THE COURT: - - scheduling issues at the conclusion

22  of the hearing.

23          MR. KEACH: Sure.  What - -

24          THE COURT: Assuming, assuming I get to the point

25  where I'm willing to approve a disclosure statement.

1          MR. KEACH: Sure.  My only point, Your Honor, is it

2    does nobody any good to get to confirmation and have a

3    disagreement as to precisely what the litigation structure is

4    and what the issues are.

5          THE COURT: I don't disagree with that at all.

6          MR. KEACH: Thank you, Your Honor.

7          MS. UHLAND: Your Honor, in light of the Court's

8    inclination, I think what we can, one piece of disclosure we

9    are, can clearly put in is, that I don't believe is in our

10   current version, is to clearly set out the arguments of Mr.

11   Keach's clients with respect to the, the funds that are held

12   in the NCFC trust being available only to NCFC unsecured

13   creditors as they define them.  So we can lay out that, we

14   can, we'll work with him on language, and on his position,

15   and, and the plan proponents disputing that position.

16   Because that, that argument wasn't included in our disclosure

17   statement.  We don't object to that.

18         THE COURT: But the deeper concern, or one of them

19   that was expressed was, Look, you don't have to tell very

20   much – – my words, not his – – about what the law is on the

21   topic.  That you can set out, I think, in fairly simple

22   order.  There's just a present disagreement about how that

23   ought to be said.  I'm sure you can work that out.  I think

24   the deeper issue is the disclosure statement should contain

25   enough information for creditors to say, Hey this is a good

1    deal for us, or it isn't.  And he's saying the disclosure

2    statement doesn't now have that level of information.  As

3    extensive as it already is.  I'm not a, I'm not a fan of

4    making them longer.

5         MS. UHLAND: Right.  This is the confusion, and I

6    might ask Mr. Indelicato to help me out on this a little bit.

7    But our disclosure - - this plan is a, we've been saying, I

8    think when we first got the Creditors Committee appointed in

9    this case, we sort of looked at it and thought, okay, it's a

10   Creditors Committee.  As it turns out, it was a, it's been a

11   great Creditors Committee, both in the participants and in

12   the fact that we have participants at sort of every, turns

13   out every major debtor, kind of every pool of assets and

14   every major constituency.  So we have MRA claimants, we have

15   loan purchasers, we have parties that are just at NCFC, and

16   parties just at mortgage.  So - -

17        THE COURT: Do you hear that Mr. McMahon?  Take that

18   back to the office.

19        MS. UHLAND: So what has happened, and one of the

20   reasons this was such a difficult, took us longer - - and we

21   thought we had a plan in shape much earlier.  But these,

22   because of the concern among the creditors, it became such a

23   delicate balance of each creditor being concerned sort of how

24   their, how they would compare in a deconsolidation scenario

25   compared to the plan.  And the fact that a deconsolidation

1    scenario is very difficult to construct, because we have

2    questions about, we have litigation, you know, potential when

3    a company claims it.  It's not just a matter of sorting out

4    books and records.  There's many questions.  And this is a

5    very delicate compromise.

6             THE COURT: I will tell you I'm about not quite half

7    way through the Examiner's report.  I'm, it's not something

8    you can sit and read all at once.  So over a period of time I

9    spend half the day or all day on it, as I did yesterday.

10   It's apparent from what I've read so far that, I don't want

11   to say cleaning up the situation, but bringing it to an

12   organized conclusion is an enormously complex exercise.  And

13   I recognize this.  And I'm assuming in part that's how the

14   allocation formulas were developed, and why.

15            MS. UHLAND: That's correct.

16            THE COURT: And it may be that you'll convince me

17   that it's not substantive consolidation, and that it's the

18   best thing.  And maybe you won't.  I'm curious to see how the

19   creditors vote on it.  I, I do think that enough information

20   needs to be provided so that the creditors, and I know that

21   many of them are sophisticated entities and institutions

22   involved in the financial markets.  So you know, a certain

23   level of explanation is necessary, it seems to me, but not,

24   you don't have to go all the way to ground level, is what I'm

25   saying.

1           MS. UHLAND: I understand, Your Honor.  I guess the

2     point I'm trying to make is it isn't as if it's this plan, or

3     maybe, you know, some different treatment we can offer you.

4     It's this plan or we throw up our hands.  I mean this is,

5     this has been a hard negotiated, carefully balanced - - I

6     mean this is the compromise we've been able to get the major

7     creditors to agree on in this case.  With all of the

8     information.  And you know, any tweak for one group of

9     creditors affects all the other creditors.  And as I said,

10    this has been a delicate balance.  So when we say, Well we

11    want to see how we do in the plan compared to something else,

12    there isn't a menu here.  I mean, this has been months of

13    effort, complicated, the parties have been working in very

14    good faith.  So - -

15          THE COURT: I, no I took Mr. Keach's request to be

16    show us how we do on a consolidated basis and on a

17    deconsolidated basis.  That, I think was the request.

18          MS. UHLAND: Right.

19          THE COURT: Correct me if I'm wrong.

20          MR. KEACH: No, precisely Your Honor.  And I think

21    an example, if you, you go to page 11 of the amended

22    disclosure statement in the center of the page, you know,

23    there's a description, for example, of the holding company

24    Debtors as to different types of claims that are against the

25    holding company Debtors.  There are only, I think, five

1    holding company Debtors, you know.  It is, I think in a one

2    page chart you could say, These are the claims against NCFC,

3    these are the claims against TRS Holdings and so forth.  And

4    even if they can't allocate the assets, at least they can

5    allocate the claims.  And if there are issues of contest,

6    that chart can be footnoted.  I think this can be done on a

7    one or two page chart.  They had to get to these totals

8    somehow.  And we're just asking to deconstruct the totals.

9            THE COURT: Yeah, it doesn't, Ms. Uhland, it doesn't

10    strike me as an unreasonable request.

11            MS. UHLAND: As what, Your Honor?

12            THE COURT: It does not strike me as an unreasonable

13    request.

14            MR. POWER: Excuse me, Your Honor.  Mark Power from

15    Hahn & Hessen.  Your Honor, the Committee has been debating

16    this issue and the Court should be aware the US Trustee's

17    Office did a very good job of forming the Committee because

18    there are creditors of every constituency in this case on our

19    Committee.  And as Ms. Uhland said, this was a tremendous

20    negotiation and a tremendous back and forth.  And the

21    difficulty with the request is it doesn't quite work that way

22    because there are settlements of inter-company claims, there

23    are settlements of whether they're capital or debt on those

24    inter-company claims, there are settlements of whether the

25    assets that are in an entity belong in that entity and

1   whether they should be somewhere else.  There are settlements

2   of issues of whether Mortgage Corp., which was the operating

3   entity that had all the funds, and funded the Rabbi Trust,

4   which is the parent level, and all the employees who work at

5   the Mortgage Corp. level along that.  So we have a solution

6   that we'd like to suggest, Your Honor.  Which is the

7   Committee was considering in this case to do a summary of

8   basically that compromise, and how that came about, and

9   basically lay out the issues that were just considered and

10  discussed, and how the compromise came about.  And we could

11  lay out in that summary a short, relatively short, more than

12  2 pages, less than 10, that says, These are the issues that

13  we faced, and these are the ways they were resolved.  So for

14  example, if Holding Corp. has a claim against Mortgage Corp.,

15  or the other way around, how that was resolved to deal with

16  the re-characterization issue or the settlement issues.

17  There was compromises throughout, and it was a, a really

18  delicately negotiated plan.  So our suggestion is that maybe

19  the way to handle it is just to summarize, basically, that

20  compromise process so that the creditors can understand how

21  we got where we are.  Because it's not simply as simple as

22  saying, Okay, 40 million here, 50 million claims.  It's a

23  much more comp - -

24           THE COURT: Well, and I understand that.  And there

25  would be a number of different ways to present the

1   information on a chart.  But maybe what you ought to do is

2   pick a, pick a way of presenting it, and then you just orally

3   described the summary or the footnote, however you want to

4   present it.

5        MR. POWER: We could do that, Your Honor, in a

6   summary or chart.  We could try to do that.

7        THE COURT: Okay.

8        MS. UHLAND: Yes, Your Honor.  I was trying to sort

9   out just this question on whether we could do a, sort of a,

10  maybe it would be in a chart, maybe it would be an exhibit,

11  which had a - - excuse me, Your Honor - - a claim range at

12  the different Debtors, which is what I heard Mr. Keach

13  request.

14       MR. KEACH: Yeah, I mean, since we haven't seen any

15  of the backup information, it's hard for me to, to comment on

16  any particular methodology.  But I mean when one arrives at

17  totals of claims against consolidated Debtors, then you ought

18  to be able deconstruct how you got to the totals.  And both

19  of these suggestions seem conceptually appropriate, and

20  obviously if we are presented with a summary and language, we

21  can comment on whether it works, Your Honor.

22       THE COURT: And understand, Mr. Keach, what I'm

23  suggesting, and I guess directing here is a, a mini-exercise.

24  Not a, not a move off the path to derail the process.

25       MR. KEACH: No, and we understand that, Your Honor.

1          THE COURT: Okay.

2          MR. KEACH: Which is why I was suggesting I thought

3   it could be done in a simple chart form.  We're not looking

4   for anything that's going to take months.

5          THE COURT: All right.  Now with that, does that

6   address, for purposes of the disclosure statement, your

7   clients' objection?

8          MR. KEACH: Well subject to seeing it, Your Honor,

9   obviously.  It's a, it does address the disclosure concern.

10  Obviously we continue to believe, as does the US Trustee's

11  Office, that this is a today concern, but we understand the

12  Court's point of view on that.

13         THE COURT: All right.  So that, well there's one

14  objector we've addressed.  Now let's go back to the other

15  objector that you addressed.

16         MS. UHLAND: The New York State Teachers.

17         THE COURT: The New York State Teachers, yes.

18         MR. ETKIN: Good afternoon, Your Honor.  Michael

19  Etkin, Lowenstein Sandler, on behalf of the New York State

20  Teachers Retirement System.  I agree with several of the

21  points that Ms. Uhland made, and accept the spirit in which

22  they were made in connection with some of the issues we

23  raised in our objection.  Let me try to go through, briefly,

24  where I think we are, Your Honor.  Our concern with respect

25  to the documents and the computer information was simply that

1    the disclosure statement does spend some time talking about

2    the responsibilities of the Liquidating Trustee, the transfer

3    of assets, but there's nothing in there concerning the

4    transfer of documents.  A so-called chain of custody type

5    issue that at some point those, this, the Debtors are going

6    to cease to exist, and litigation issues will remain, and I

7    just wanted to see something in the disclosure statement as

8    it relates to how the chain of custody was going to be

9    maintained with respect to all these documents.  But I am

10   prepared to take Ms. Uhland up on her suggestion, and discuss

11   it, see whether we can come up with something that's

12   workable, and if we can't, raise it at the confirmation

13   hearing.  So that, that's resolved.  As far as our comments

14   concerning the Examiner, Your Honor, I think Ms. Uhland in

15   her presentation indicated that she was going to get into

16   some more of those issues as they relate to the US Trustee's

17   objection.  Let me just tell you, in general, what our

18   concerns are there.  We don't think the, the historical

19   description of what went on with the Examiner is entirely

20   accurate, but I think that's really not something that we

21   need to press, we need to press now.  I think we're more

22   concerned, Your Honor, given the significance of the

23   appointment to the Examiner in this case, and the Examiner's

24   charge, and now the filing of the report, currently under

25   seal, last Friday, and the, the sort of exquisite timing of

1  the disclosure statement, and when it's going to be sent out

2  to creditors, that there should be something in the

3  disclosure statement regarding the Examiner's report, and the

4  substance of the Examiner's report.

5          THE COURT: Well - -

6          MR. ETKIN: If possible.

7          THE COURT: I, you know, I don't know how you do

8  that.  I mean, I, like I said, I'm, I'm only at about 200

9  pages in or so.  I don't know how you'd even summarize that

10  in a disclosure statement.  The disclosure statement provides

11  that they will be on the website.  Now I guess what could

12  happen between today and March 10th, I think is the deadline,

13  someone could file a motion to keep, to keep the report in

14  whole or in part under seal.  And maybe we should explore

15  today whether at least anyone present intends to do that.

16  And if that's the case, it would be my intention to set a

17  hearing on that motion sufficiently in advance of the voting

18  deadline so that such, such portion of it, or all of it that

19  gets to the website will be available for review prior to a

20  creditor having to vote on the plan.  That was my thought on

21  that.

22          MR. ETKIN: I think it's a good thought, Your Honor.

23  And to the extent that kind of motion is made by the

24  deadline, and again as Your Honor suggested we can talk about

25  that and you can make whatever inquiries to the extent there

1    are parties here today, but whatever motion practice is going

2    to exist with respect to that, if any, should be done on an

3    expedited schedule.

4            THE COURT: Well the deadline to file is 10 days

5    after the report.  Which I put it - -

6            MR. ETKIN: I believe it's Monday.

7            THE COURT:  - - so I put that at March 10.  My

8    thought was if such a motion were filed, I would hear it on

9    the 25th.  Which is sufficiently in advance of the proposed

10   voting deadline that there would be time to either just put

11   it on or make the appropriate redactions and put it on.

12           MR. ETKIN: Personally I'd like to see it even more

13   expedited than that, Your Honor.  But obviously I leave that

14   up to the Court.

15           THE COURT: Well I'm, you know, those were just my

16   thoughts in the privacy of my own office.  But I come here to

17   solicit the thoughts of others as well.

18           MR. ETKIN: I think that the idea of having it

19   referenced and then available to review prior to the voting

20   deadline is the appropriate thought, Your Honor.  And I think

21   as, as quickly as possible is also the appropriate thought,

22   given the obvious scope of the report and, and its

23   significance in connection with this case.  So that was the

24   other issue that we had raised with respect to the Examiner's

25   report.  Not just the issue of what has happened, but the

1   availability of that report, ultimately.  Your Honor, we, I

2   guess fortunately for me, I couldn't sleep very well last

3   night, so I had a chance to read the, the last set of

4   changes.  There are some changes in the injunction and

5   exculpation provisions of the plan which just raised some,

6   some concerns or red flags for us.  There's now a carve out

7   for the SEC, and the carve out does not just relate to the

8   protected parties, but the carve out is a more general carve

9   out.  Why that's in there, and why they asked for it,

10  obviously I don't know, but it certainly, you know, raises

11  the question, you know, from my perspective, that, you know,

12  we should be getting a similar carve out.  But again, I'm

13  prepared to try to work that out, and discuss that with Ms.

14  Uhland.  And to the extent that we can't come to grips with

15  it one way or the other, that could get raised as a point at

16  confirmation as well.  Similarly, Your Honor, the, the

17  rather, at least in my experience, unique provision which

18  potentially keeps the automatic stay in place for years, and

19  years, and years beyond the effective date, clearly we have a

20  problem with that.  I think it's inappropriate across the

21  board, and I would be prepared to take up Your Honor's

22  suggestion of just disclosing the dispute and leaving that

23  issue on the merits for confirmation.  And similarly with

24  respect to the issue that we raised concerning access to

25  insurance that would cover our claim against the Debtor, I

1   understand that the Debtor and the Committee may take a

2   different view with respect to that, but, and again on the

3   merits that's something that can await confirmation.  But I

4   guess the dispute, or the issue itself, could be identified.

5   So with all of that, Your Honor, I think that given those,

6   those few tweaks, and the reservation for confirmation and

7   the ability to try to work some of these things out with Ms.

8   Uhland and the Committee in advance of confirmation, that

9   would resolve our, our disclosure statement objection.  When

10  we do come down, later on in the hearing, to discussing the,

11  the Examiner's report, and scheduling, and issues relating to

12  that, if I feel compelled to, I'll weigh in at that point on

13  those issues.

14          THE COURT: Thank you.

15          MR. INDELICATO: Your Honor, since this is a hearing

16  on the disclosure statement, in the interest of full

17  disclosure, and the Court hit the nail on the head when you

18  said that you are still going through the Examiner's report,

19  so are the Committee and its professionals.  It is presently

20  our intention, Your Honor, and that's why I wanted to bring

21  it up now, subject to our Committee approval, to make a

22  motion to keep the Examiner's report under seal for a short

23  period of time in order to give the Committee and its

24  professionals an opportunity to fully digest the information

25  and determine what, if anything needs to be kept under seal.

1  So based on the Court's directive, we will file that motion

2  promptly, and schedule it to be heard on the 25th.  We would

3  be prepared to do it sooner if the Court would want, but we

4  think the 25th is appropriate.  And we were trying to deal

5  with any concerns the Court would have, and if, if the Court

6  would be inclined to keep it under seal for some period of

7  time, maybe we can work some summary, or something.  But we

8  can address that at a different time.  But we did want the

9  Court to know that at least what our present thinking is,

10  given the, the magnitude and volume of the report.

11        THE COURT: Yeah.  My, my inclination is to make all

12  of it publicly available.  But I can understand why there

13  might be certain sensitivities, particularly on the

14  Committee's behalf with respect to the discussion.  I did

15  jump to the back, by the way.

16        MR. INDELICATO: We did as well, Your Honor.

17        THE COURT: To review the cause of action

18  discussion.  And I suppose that might be where one of your

19  sensitivities might lie.  Although after having read it, it's

20  sort of general in the discussion, I'm not so sure - -

21        MR. INDELICATO: It's really, Your Honor, I think

22  our concern is really fully understanding what the report

23  says before it becomes public.  And that's why we, maybe we'd

24  just be requesting a very short extension of time the by

25  which it remains under seal.

1          THE COURT: Well, I do, as I said to Mr. Etkin, I do

2    believe that creditors ought to have an appropriate

3    opportunity to review it prior to the voting deadline, and

4    that's not an overnight exercise.

5          MR. INDELICATO: We under, we certainly understand

6    that Your Honor.

7          THE COURT: All right.

8          MR. INDELICATO: Thank you.

9          MS. UHLAND: Your Honor, just a couple of points.

10   One, the Debtors will be take, will be deferring entirely to

11   the Creditors Committee on all matters with respect to the

12   seal.  So it will really just be the Creditors Committees

13   filing that motion.

14         THE COURT: All right.  Am I to take it also that

15   the Debtor, it's not the Debtors' intention to prepare and

16   file any kind of response to the report?

17         MS. UHLAND: That's correct, Your Honor.

18         THE COURT: All right.  I think that's a good thing.

19         MS. UHLAND: So the, just briefly, and I apologize

20   for not raising it before, I did, in the black line plan that

21   the Court has, if you go to page 84 - -

22         THE COURT: That's today's black line or the one

23   before?

24         MS. UHLAND: Today's black line, yes.

25         THE COURT: Okay.

1          MS. UHLAND: We did receive comments and contact by

2     the SEC.  And even though, with respect to our disclosure

3     statement.  And even though this is really a plan issue, we,

4     since we'll, you know, we're tweaking the plan, we did want

5     to address their issues in the plan.  What they wanted to be

6     clear about is to the extent they have, you know, two parts

7     to their investigation, obviously.  There's their

8     investigation which is not stayed under the police power, and

9     then the claim that they filed, which has to be treated like

10    a claim.  They wanted it to be clear that their investigation

11    was not going to be disrupted by the injunctions that we were

12    proposing in the plan.  And we wanted to clarify that for

13    them.

14          THE COURT: Okay.

15          MS. UHLAND: And also that none of this could affect

16    any claims they have against non-Debtors.  Second, we will

17    add to our disclosure the two disputes that the Secureds

18    Class Action plaintiffs has.  That they dispute the

19    continuation of the stay and that they, I guess we'll phrase

20    it, request or believe they should have access to pursue the

21    insurance proceeds to the extent there are such insurance

22    proceeds.  To be, to be clear, the, the insurance policies

23    that are at issue, most of them cover both directors and

24    officers, and the entity.  And there is, I don't think, you

25    know, I think that there is not a question about, at least,

1    and maybe we could clarify this, I mean, they have the right

2    to go after the insurance to the extent it's covering, you

3    know, part of pursuing non-Debtor entities.  Pursuant to our

4    prior, you know, we've had relief, motions for relief from

5    stay, stipulations for relief from stay with respect to the

6    insurance policies.  So the only issue, I understand, that

7    they're, that they have here is that their right to go

8    against the, on behalf of their claims against the Debtor

9    under those insurance policies.  Which we, is what the

10   Committee and the, and the Debtors dispute.

11        MR. ETKIN: Your Honor, we don't believe the plan

12   impacts our rights to go after the non-Debtor entities at

13   all.

14        MS. UHLAND: Okay.

15        MR. ETKIN: And if somebody believes it does, I'd

16   like to hear that today.

17        MS. UHLAND: Okay.

18        MR. ETKIN: But, but given that, our issue is

19   restricted to our rights to proceed against the Debtor,

20   solely to the extent that they are independent and insured

21   under the policy.

22        MS. UHLAND: Okay.

23        THE COURT: All right.

24        MS. UHLAND: I just wanted to confirm our

25   understanding on that.

1          THE COURT: All right.  Thank you.

2          MS. UHLAND: The next issue, Your Honor, before

3    getting to the - - I guess what I'd like to do is this.

4    There's one other issue with respect to the United States

5    Trustee that is not a procedure, a voting procedure issue.

6    And Your Honor, we believe we have a resolution on the voting

7    procedure issues.  On all of them.  We've been working on

8    that.  The next issue that the United States Trustee raised

9    was a request that we add additional disclosure about the

10   first, the first Examiner report.  The cash collateral

11   report.  And our, frankly, we had taken a stab, we the

12   Debtors had taken a stab at some language, and then, you

13   know, in discussing it over with the Creditors Committee,

14   thought you know, it's difficult to, while that report's

15   shorter, that it's more difficult to summarize reports and

16   positions, and people are going to be sort of more, just more

17   ground for issue and debate, if you're trying to summarize

18   these documents.  And so that's why we had drafted it as we

19   had, which was just a, you know, a cite and an availability

20   in our revised disclosure statement, tried to make it easier

21   for people to get to the report and the response.  We think

22   that that's the better way to go.  We'll also have the cite

23   to the other report.  Rather than attempting to summarize the

24   first report and the Examiner's position.  So the current

25   language that we have is, is quite summary - - I'm sorry.  I

1  didn't have that page on the right flag.  It starts on my

2  page, of the one filed today, page 48.  And like I said, we

3  had, so we had taken some stab at, in the middle of page 49,

4  you know, the question is, is where we talk about the

5  Examiner filing his first interim report, and whether we try

6  to expand it, or as, as the Debtor and the Committees

7  thought, it would be smoother and easier just to add this

8  link, which should be very easy for people to get to.  Rather

9  than trying to summarize it.  And then we have the link

10  repeated on page 50 to get to the final reports.  I know that

11  the US Trustee had a different view on that, so I'll cede the

12  podium to him.

13         MR. McMAHON: Your Honor, good afternoon.  The

14  Examiner's first report is obviously shorter in length than

15  the report that was recently filed, and addresses a more

16  narrow topic.  It is clearly an important event in the, in

17  the development of these cases.  We believe that it's

18  possible, and even desirable to simply have a paragraph

19  summarizing the Examiner's findings.  We're not opposed to

20  having an additional paragraph which summarizes the Debtors'

21  reply to the extent that they deem that appropriate.  Or just

22  simply note that the Debtor disagrees with the Examiner's

23  findings with respect to cash collateral.  But it would be a

24  short and desirable addition to the text of the disclosure

25  statement.

1        THE COURT: Well let me, let me take a stab at the

2   simplest way of describing the Examiner's findings in that

3   preliminary report.  And these are my words, not his

4   necessarily.  And the conclusion was, the ultimate conclusion

5   was that the Debtor either used cash collateral without the

6   consent of the secured party, or used the property of others

7   without the consent of those others.  And then as you said,

8   the Debtor would say it disagrees with these findings.

9   What's the relevance of that?  In terms of a creditor's

10  decision whether to vote for or against the plan?

11       MR. McMAHON: Well Your Honor, 11, §1129(a), I

12  believe it's (a)(1) and (a)(2), go to the, the good faith

13  conduct of the plan proponent in connection with proposing

14  the plan.  Certainly, while I'm not going to sit here and

15  predict as to how the Court may rule on that issue, but a

16  party in interest may elect to use that, that information to

17  make such an argument with respect to the plan proponent's

18  conduct in connection with the bankruptcy cases.  So I think

19  clearly it could have relevance under §1129.

20       THE COURT: Does anyone else care to be heard on

21  that issue?  Any of the objectors care to be heard on that

22  issue?  Anyone else care to be heard?

23       MR. INDELICATO: Thank you, Your Honor.  Your Honor,

24  just picking up where the Court left off and Mr. McMahon's

25  comments.  Part of the Committee's concern was that there is

1   obviously a dispute between the Examiner's first interim

2   report, the Debtors' response, the Examiner's reply, and we

3   just didn't feel that you could adequately develop that in a,

4   in a one to two paragraph reply.  The Court's one sentence

5   analysis is, is probably even more accurate, and then refer

6   them to the report.  What we said is just if it's that

7   important of an issue for them, refer them to the reports.

8   Because then they can truly understand it.  And if Mr.

9   McMahon's issue is whether it's an 1129 issue, that paragraph

10  is not going to tell it to them.  But directing them to the

11  report might.  So our sense was we're not putting any color

12  on it, just refer to them to the report.  I think that was

13  the best way to get them the adequate information they needed

14  regarding what was in that report and the Debtors' response.

15          THE COURT: I happen to agree with you.  In terms of

16  is it an 1129 issue, I don't know.  The Debtors' name is on

17  as the plan proponent, but it's my impression this is largely

18  a Committee driven plan.  And what happened pre-petition with

19  respect to that event, and then in the early days, early days

20  of the post-petition time period, I just, I have difficulty

21  fathoming its relevance.  And I guess the other side of that

22  coin is to order that the exercise be undertaken, having read

23  the Debtors' response, it just seems to me to be directing

24  that estate resources be further depleted in an exercise of

25  little or no value with respect to the, the US Trustee's

1    objection.

2         MR. McMAHON: Your Honor, with respect to documents

3    that have yet to be filed in connection with the disclosure

4    statement, our understanding, well, there's an exhibit to the

5    disclosure statement which identifies potential estate claims

6    and causes of action.

7         THE COURT: I haven't seen it.

8         MR. McMAHON: My understanding is that the, the plan

9    of the parties in interest is to submit that prior to the

10   voting deadline.  And I'd just like to have some, I guess

11   some indication from the Debtors and/or the Committee as to

12   where they're at with that.

13        MS. UHLAND: Your Honor, as an exhibit to the

14   disclosure statement, we do have an exhibit, in light of some

15   3rd Circuit law on estoppel issues, that will list certain

16   creditors that may be investigated, may be potential parties

17   to litigation to be undertaken by the Liquidating Trust.  We

18   are working with the Committee to prepare that exhibit.  Our

19   intention would be to file that with the final disclosure

20   statement when we submit a revised disclosure statement.

21        THE COURT: Okay.

22        MS. UHLAND: So it will be, it will, that list will

23   go out in the voting materials.

24        THE COURT: All right.  And where does that leave

25   what was a pretty long list of objections that the US Trustee

1    had, had made?  In her filing?

2         MS. UHLAND: We are, from a disclosure point of

3    view, as opposed to the voting procedures, which I said we

4    will get to, I believe we are through the disclosure

5    objections.

6         MR. McMAHON: Your Honor, I can confirm that we've

7    addressed the substance issues.

8         THE COURT: All right.  Thank you.  Is there any

9    resolution on the procedure issues?

10        MS. UHLAND: Yes.

11        THE COURT: Okay.

12        MS. UHLAND:  We believe we've reached agreement

13   with the United States Trustee on that.

14        THE COURT: Wonderful.  Thank you.

15        MS. UHLAND: We have a, it's a creative process.  A

16   little bit complicated, not you know, typical of this case,

17   that we'll be presenting to you.

18        THE COURT: Is there anything typical about this

19   case?  I don't know.

20        MS. UHLAND: Your Honor, the, I'm going to group - -

21   GECC has withdrawn their objection.  I believe that might

22   have, was indicated.  I'm going to group the remaining

23   objections and take them as a group.  My colleague, Mr.

24   Logan, has been dealing with the loan purchasers and the MRA

25   claimants in this process.  So to the extent there are

1    further disclosure issues that are remaining parts of their

2    objections, I'll ask him to address them.  But briefly, Your

3    Honor, we have objections from CitiMortgage.  They had raised

4    information, financial information issues.  Information about

5    disclosure of the EPD breach claims.  And they also had

6    concerns about the EPD breach voting.  And we believe that

7    through the revised disclosure statement, the additional

8    disclosure I pointed the Court to with respect to financial

9    information in the EPD breach process, as well as, I'm sorry,

10   they also raised issues about the MRA, that we have addressed

11   all of their disclosure objections.  In addition, Your Honor,

12   as I said, we'll talk a little bit about the EPD breach

13   process when we, when we get through the disclosure portion.

14   Wells Fargo filed, also, a substantive objection raising

15   information, again, largely about the EPD breach protocol and

16   noting that our financial information at that time was

17   missing.  Again, we believe that the information and

18   disclosure that we've added, our discussions with them about

19   the protocol, as well as the revisions to how we're going to

20   handle the voting addressed those issues.  And I will, I will

21   - - DBTNC, we've got a lot of DB's in this case, was a

22   joinder, as was, well, Washington Mutual really joined in

23   Goldman's objection, which was a little bit odd.  So I'll

24   take that with the Goldman objection.  But Your Honor, why

25   don't we see if on those, before I take the Goldman Sachs

1    objection, were there any of those parties who'd raised

2    objections largely with respect to the EPD breach disclosure

3    have any further remaining objections.

4            THE COURT: Okay.  That's CitiMortgage, Wells Fargo,

5    and Deutsche Bank National Trust.

6            MS. UHLAND: Yes.

7            UNIDENTIFIED SPEAKER: (Microphone not recording.)

8            MS. UHLAND: Oh, I'm sorry.  And then we also have

9    the RFC reservation of rights that was filed yesterday.

10           THE COURT: Okay.

11           MR. CANDEUB: Good afternoon, Your Honor.  Doug

12   Candeub of Morris James on behalf of CitiMortgage, Inc.  We

13   do still have objections with regard to those matters.  The,

14   the Debtor, in the disclosure statement, explains that

15   holders of early payment default EPD and breach claims will

16   be subject to a certain protocol, which they say they've

17   developed based on data they pulled together from various

18   unnamed industry sources and from Fannie Mae, and they came

19   up with these calculations.  And they explain that that

20   protocol will essentially replace what we would otherwise be

21   dealing with based on the actual claims.  That it'd be, there

22   would be these averages that would be applied, instead of

23   dealing with individual claims on a claim by claim basis.  We

24   have no way of knowing what they looked at to come up with

25   those calculations.  We've asked for that.  We asked for the

1   underlying, you know, historical data, or industry data, or

2   other calculations that they ran, and it doesn't necessarily

3   have to be in the disclosure statement.  If they want to make

4   it available to us separately or on the website.  But as it

5   stands, we have no way of knowing what that black box of,

6   that is the, you know, from which this protocol came out,

7   what that contained.  And really describing the fact that

8   they went through a process of consulting various experts to

9   come up with something doesn't really answer our question of

10  how they're going to go about this process, how they came up

11  with these numbers such as to substitute these percentages

12  for what our actual claims are.  There's also related to that

13  a clarification question, Your Honor.  The, the protocol

14  talks about, in part, damages.  That says that the damages

15  resulting from breached claims, this is on the breach part of

16  it, will be calculated based upon simplifying assumptions

17  that 1, 2, and 3, and 3 is damages resulting from breaches

18  will be set at 30% of the UPB or unpaid balance of the loan

19  as of August 31.  And then they have charts saying you have

20  damages at the highest point for 5%.  So I don't know if

21  that, if they're, they put the point in there

22  unintentionally, or by accident, or if there's some

23  confusion.  Because otherwise they're talking about a 45

24  hundredths of a 1% versus 30%, and it's actually quite

25  confusing.  They, and then on down to .36% and .333 and so

1    on.  So we really need to know what the basis is for this

2    calculation.  And this is, Your Honor, because of the plan

3    voting issue, is very much an issue for now rather than

4    later.  Because they also provide in their proposed order in

5    support of the disclosure statement that unless otherwise

6    provided the, this is the tabulation issue, that claimants

7    with EPD or breach claims are going to have their votes

8    tabulated based on this protocol, and if they don't answer

9    the questions about how to calculate it, provide the

10   information to the Debtor, then it doesn't matter, that it

11   all gets down to zero, to $1.  So that really compels us to

12   know in advance what that's all about.  We, we also, Your

13   Honor raise questions about the liquidation analysis itself.

14   We would note that the Exhibit C on litigation is, unless I'm

15   mistaken, is still not there.  Presumably it would be

16   included.  But as of this point, if Your Honor is to be

17   approving a, reviewing a disclosure statement, that

18   information is, I think not there yet.  And we also agree

19   that a liquidation chart, rather than just the exposition,

20   really would be helpful to know if it was Chapter 7 versus

21   Chapter 11.  Thank you.

22            THE COURT: Thank you.

23            MR. SMITH: Good afternoon, Your Honor.  J. R. Smith

24   on behalf of Wells Fargo Bank, which is a trustee for 18 of

25   the securitization trusts that hold mortgage loans originated

1   by one or more of the Debtors.  Wells Fargo, in it's

2   objection, raised substantive and sort of procedural type of

3   issues.  It's my understanding that right now we're just

4   dealing with the substance, and we can address the procedural

5   a little bit later in this afternoon's hearing.  As to the

6   substance, Your Honor, Wells Fargo Bank is one of the

7   beneficiaries that would be able to assert and EPD or a

8   breach claim under the protocol that has been proposed by the

9   Debtors.  And substantively Wells Fargo's objection relates

10  specifically to the calculation of the breach component of

11  the protocol.  The protocol establishes a formulaic or a

12  matrix approach to establishing these breach claims.  It

13  looks at when the Debtor originated the loan.  It then looks

14  that the UPB of the loan as of August 31, 2007, and then

15  ascribes a percentage to be applied toward the UPB as of

16  August 31, 2007 to establish the value of the breach claim.

17  The disclosure statement and the protocol state that the

18  Debtors examined historical losses on mortgage loans on a

19  pool level basis from the date of origination, and examined

20  how the pools performed over a period of time, that's the

21  seasoning component, to derive the percentages that they

22  would apply against the UPB's of the mortgage loans to

23  establish the claim.  However the Debtors state, in the

24  disclosure statement and the protocol, that the percentages

25  again were established based on pools from the date of

1    origination, and while they've said this, they have

2    unilaterally carved out mortgage loans that are not in the

3    pool as of August 31, 2007.  When Wells Fargo raised this

4    point with Debtors' counsel, and we have been working in good

5    faith on both sides, Your Honor, to try to resolve these

6    issues, the Debtors acknowledged the issue, and agreed to add

7    back into the pool calculation mortgage loans that left the

8    pool prior to August 31, 2007, as it related to foreclosure,

9    mortgage loans that had been foreclosed upon, or otherwise

10   sold out of the pool.  The Debtors left out, however, loans

11   that have paid off since origination, in the time between

12   origination and August 31, 2007.  And since the breach claim

13   percentages are based on pool performance, at least that's

14   what the disclosure statement describes those percentages to

15   be derived from, it would be appropriate for those mortgage

16   loans to form part of the calculation.  Now the Debtors may

17   argue that the seasoning component considered mortgage loans

18   that exited the pool over time, such as loans that paid off,

19   but that argument, it strikes us, falls flat given that the

20   Debtors have agreed to put back into the breach claim

21   calculation two categories of mortgage loans that exited the

22   pool prior to August 31, 2007.  Namely the foreclosure

23   related mortgage loans, or mortgage loans that had been sold

24   out of the pool.  Thus the breach claim calculation really

25   should be, Your Honor, based upon the UPB of the pools when

1   they were originated.  With that modification, Wells Fargo is

2   fine with the protocol as it's been proposed, and the

3   percentages therein.  I would note, too, Your Honor, that

4   this approach also would free up considerable administrative

5   time and expense.  The purpose of the EPD breach claim

6   protocol was to sort of avoid a loan level damage analysis.

7   The breach claim calculation in its current form requires

8   such an analysis to examine what's the UPB on a loan level

9   basis as of August 31, or now in the case of mortgage loans

10  that have been foreclosed upon or sold out of the pool, what

11  is the mortgage loan UPB as of the date it was foreclosed or

12  sold.  This is one of the reasons why the trustees, such as

13  Wells Fargo, has had great difficulty in compiling the

14  information requested by the Debtors in their questionnaires

15  to sort of respond to this process.  Basing the breach claim

16  calculation on the UPB of the mortgage loans as and when they

17  were originated would be a ten minute exercise.  It seems to

18  us that it would save considerable time and expense for the

19  bankruptcy estates, the Committee, Wells Fargo, and similarly

20  situated creditors.  But also it, this is the basis for which

21  the percentages that would apply to breach claims appear to

22  have been derived.

23              THE COURT: Thank you.

24              MR. SMITH:  Thank you, Your Honor.

25              MR. DREBSKY: Good afternoon, Your Honor.  Dennis

1    Drebsky on behalf of Deutsche Bank.  I'm not going to try to

2    get into any possible objections we might have to

3    confirmation, because that's not the point of this exercise.

4    Our concern at this point was procedural in nature, and the

5    nature of the questionnaire for the protocol, and the timing

6    of having to respond to it.  We manage something over a

7    hundred trusts, and we thought the time frame in which we

8    were asked to do the questionnaire was much too, much too

9    compressed.  I've spoken to Mr. Logan, and he's agreed to

10   work with us in getting a more practical time frame given

11   ours.  So that point I'm not going to press that right now.

12   In addition, I've also talked to Mr. Logan about another

13   problem we have with the questionnaire asks for information

14   from the time the Debtor received the loan until we.  We

15   don't have any of the information from, we can give

16   information from after we've received the loan, and it's

17   history forward from that.  And I believe Mr. Logan has

18   agreed that that's, that's an appropriate modification of the

19   questionnaire.  I think any other objections we might have

20   really go to confirmation issues, which I don't believe the

21   Court wants to hear today, and may really be obviated by the

22   process itself.

23            THE COURT: All right.  Thank you.

24            MR. LOGAN: Your Honor, let me lay some of the

25   background as to the derivation of the EPD and breach

1    protocol, how it came about, and why the plan proponents

2    believe it's a very, very both creative and practical

3    solution to a problem we otherwise faced.  We knew at the

4    outset that EPD and breach claims would largely, would be

5    very large claims.  They would probably be among the largest

6    claims that the Debtors would need to figure out a way to

7    deal with.  And when the claims bar date came and passed, our

8    prediction proved to be correct.  The Debtors received

9    approximately 155, I guess exactly 155 EPD and breach claims.

10   They totaled, in the stated amount, approximately $3.9

11   billion.  That's the stated amount.  Many of the EPD and

12   breach claims, 62 in fact, stated that the trustee or the

13   whole loan buyer could not specify the dollar amount of the

14   claim because breaches in particular don't necessarily come

15   to the floor, are not discovered until there's a problem with

16   the borrower.  So they would have claims for breaches that

17   the Debtors allegedly committed back at the time the loan was

18   sold, but actually liquidating the dollar amount would be an

19   imponderable that would be very difficult to deal with.  So

20   $3.9 billion understates, by a substantial margin, the amount

21   of the claims that the estates faced.  At the same time,

22   though, most of the claims, when they tried to state a dollar

23   amount, did so at the full unpaid principle amount of the

24   loan.  The Committee and the Debtors took the position,

25   that's not a measure of your damages.  Those loans, as of the

1    date of the breach, had value.  It may not be the full value

2    that you paid for, but they're not worthless.  And therefore,

3    you're not entitled to the full unpaid principle balance.

4    There's some amount of value that could be realized from this

5    loan, and some claimants, in fact, tried to assess that for

6    us.  Gave us a calculation of what they thought the real

7    damage was.  And in fact, we started this process that really

8    grabbed our attention.  There were half a dozen or so

9    claimants that tried to give us damage calculations,

10   including Fannie Mae.  And Fannie Mae referenced some

11   industry data as to what damages were likely to be.  And even

12   though Fannie Mae's claim was not large in and of itself, it

13   occurred to us that here was a vehicle to try to cut through

14   what otherwise would be an extremely difficult, time

15   consuming process.  Or otherwise we would have to go through

16   for hundreds and hundreds of thousands of loans to assess

17   what the real damages were that the creditor realized as a

18   result of the breach or EPD.  In the case of the breaches,

19   we'd also have to go through the incredibly expensive and

20   time consuming process of determining whether there was

21   really a breach.  Breach allegations are inherently

22   subjective.  They're not like an EPD where you can either say

23   yes the borrower defaulted within the relevant time period,

24   or he or she didn't.  In practice pre-petition, the Debtors

25   had a full organization that was dedicated to resolving

1   breach claims submitted by loan buyers.  Sometimes the breach

2   claims were valid, sometimes they were not, often they were

3   not.  And going through that process was something that we

4   were fearful would consume substantial estate resources.

5   People involved in resolving these disputes would consume

6   substantial creditor resources, and would delay distributions

7   out of the plan, from the plan of reorganization.  And as a

8   result, we reached out to all the MRA counter parties, most

9   of whom were also loan buyers, and we reached out to each of

10  the indentured trustees for the major securitizations, and we

11  reached out to the other major full loan buyers with whom New

12  Century worked, sold loans.  And we collectively tried to see

13  if we could develop a protocol that would simplify the

14  process.  The EPD and the breach protocol that's set forth in

15  the plan of reorganization is the result of that.  It

16  reflects input and a lot of iterations from data and input

17  that we got from, from all sorts of participants who had

18  their own view as to what should and should not be done.  And

19  there are at least two open issues with respect to the

20  protocol, and I want to talk about them briefly in just a

21  second.  But let me get back, let me deal with process for a

22  second.  In order to try to simplify the process for both the

23  creditors and for the estates, we did develop a

24  questionnaire.  We sent it out.  We had a deadline we

25  requested information by.  That deadline had no teeth in it.

1    And it consciously had no teeth in it, because we were not

2    trying to develop a firm rule that somebody had to provide

3    all the information set forth in the questionnaire or they

4    were out of luck.  Instead the letter that transmitted the

5    questionnaire said that, please provide us this information

6    by this date, and to be honest, we didn't expect everybody to

7    deliver the information by that date.  But we wanted to set a

8    date to advance the process, and to work with all the

9    creditors so we could get the information, work with them to

10   see what might have been requested in the questionnaire that

11   would be difficult for them to obtain.  What information

12   requested in the questionnaire might not be strictly relevant

13   to their particular types of claims, and work in a

14   constructive process to get the most information possible so

15   that we could do several things.  One is put in the

16   disclosure statement a far more accurate assessment of what

17   the total damage assessments would be under the protocol than

18   we otherwise would have.  Otherwise we would be working off

19   of a lot of assumptions.  And the second objective was to

20   provide that information to the creditors to see if we could

21   reconcile and reach agreement that in fact we'd done the

22   calculations correctly, we're on the same page.  We haven't

23   gotten back all of the questionnaires yet, but we've gotten

24   back most of them.  Including CitiMortgage who, who objected

25   strenuously to the concept of a questionnaire, they were,

1  quite frankly, their their affiliate, CitiGroup was within

2  our tenet of people trying to develop the protocol.

3  CitiMortgage is a much, much smaller loan buyer, and was not

4  included the group that worked to develop this.  But they

5  objected to the concept of the questionnaire, but after

6  having grousing, they sent it in.  And we have sufficient

7  data from the questionnaire so that we were able to put into

8  the disclosure statement fairly precise estimates, and they

9  are estimates, of where we think this process will come out.

10  And as the admitted disclosure statement says, it indicates

11  that $495.9 million is our estimate of what will result from

12  the application of the protocol for claims against NC Capital

13  Corporation, and $63.5 million is the total for claims

14  against NC Mortgage Corporation.  And that largely reflects a

15  process that as one applies the statistical data we worked

16  with our, we developed with working with our creditors, to

17  calculate what real damages are that flow from EPD's, what's

18  the correct number.  And with respect to breaches, which is

19  even more difficult, because we have to assess unliquidated

20  damages, and take into account seasoning and the like, it

21  affects the combination of the two.  So we've accomplished

22  objective number one.  We are in the process of developing

23  information to submit to, to creditors to try to work out a

24  reconciliation concerning the correct amounts.  And quite

25  frankly, most of the objections we received had to do more to

1    the process of how that plays into the voting, the voting

2    process.  And I want to give a preview of that.  But, but let

3    me just hit a couple of other highlights to begin with.  RFC,

4    which is one of the parties with whom we've been discussing

5    this at extreme lengths has a particular issue because of a

6    unique aspect of the pool loans they purchased.  The

7    Committee and counsel for RFC and we have been engaged in

8    substantial dialog, and we made a lot of progress,

9    particularly over the last few days.  As Your Honor

10   mentioned, it's amazing how these hearing dates cause people

11   to focus and try to reach closure.  I am confident, not

12   certain, but confident that we are within spitting distance

13   of a refinement to the protocol that deals with the unique

14   situation that RFC has, and counsel for RFC is here, and can

15   address that.  Based upon the status of those negotiations,

16   RFC told us that they would file, and did file just a

17   statement of reservation of rights on a confirmation issue.

18   Because it's a confirmation issue, it's not a disclosure

19   issue.  But most importantly, we have been open to

20   constructive suggestions from any of the participants in this

21   process as to how to make it work fairly, taking into

22   consideration any special circumstances, and how to work with

23   them concerning the development of the data to make this

24   process as inexpensive as possible for the creditors, as

25   inexpensive as possible for the estates, and fair, and so we

1    can actually make distributions to this class of creditors

2    very shortly after the confirmation date, instead of

3    deferring things for years.  That gets me then to the

4    process.  CitiMortgage, like I said, was not part of the

5    group that developed the protocol, so they were a little bit

6    behind the eight ball in that situation.  We are more than

7    happy to share with them the gory detail on how we developed

8    the statistics.  It is an iterative process.  It's not

9    something that's in a neat package.  In response to their

10   objection we did describe it in greater detail on pages,

11   pages 72 and 73 of the black line of the disclosure

12   statement.  In there, in fact, we - -

13        THE COURT: Which, which version?  The one I have

14   - -

15        MR. LOGAN: It's the one, it's not the latest

16   version, Your Honor, because I don't have my secret Delaware

17   decoder key.  It's the version that I think was filed with

18   the, the binders.

19        THE COURT: Okay.  Okay.  I have it.

20        MR. LOGAN: And we described that on pages 71 and

21   72, how that was developed.  Pardon?  It is today's?  Sorry,

22   Your Honor.  And it's also on page 74.  And perhaps the key

23   part on page 74 that I'd like to flag is that we do indicate

24   how the breach incidences used for breach plaintiffs, 1.5%

25   over the life of a pool, compares to New Century's historic

1    incidence of breaches.  And it turns out that it's about 3.66

2    times higher than the historic data that New Century had.  We

3    started with the New Century historic data, and the other

4    participants in the process persuaded us that that reflected

5    more halcyon times, if you will.  At least times that

6    preceded the substantial number of borrower defaults.  Which

7    really shouldn't have to do with a breach.  You either

8    breached or didn't.  These are not EPD's.  But nonetheless,

9    people were more likely to discover breaches once borrowers

10   started to default.  And we are persuaded to substantially

11   increase, substantially increase by a factor of 3.66, the New

12   Century historic incidence.  And that was the derivation of,

13   of that particular factor.  A lot of this is the process of

14   negotiations, and I'm not going to claim that there's

15   absolute precision to the development of them, but we're more

16   than happy to share with CitiMortgage, outside the disclosure

17   process, more of these details.  But I think the disclosure

18   statement is more than adequate as describing how this, this

19   was developed.

20        THE COURT: Well because it ties into voting, it's

21   married to the disclosure process, if not the disclosure

22   statement.

23        MR. LOGAN: Um-hum.

24        THE COURT: In part.  And then secondly, you know,

25   the request is can you - - well, apart from what you can send

1   or give to the respective objectors after the hearing, and

2   during the plan voting process, what if anything additionally

3   can you say in the disclosure statement which would say,

4   Here's what we relied on other than what Fannie Mae had

5   suggested, and other industry sources we consulted.  It may

6   be that there's nothing more that you can say, or nothing,

7   nothing to which others can be directed on their own which

8   would be helpful.

9         MR. LOGAN: Your Honor, there's - -

10        THE COURT: And if that's the case then, you know,

11  maybe we just need to say that.

12        MR. LOGAN: Your Honor, we'd be hard pressed to say

13  a whole lot more.  It's, the truth is that people would say

14  - - I'll give you an example.  And I'm not sure they would

15  want this laid out in gory detail, but Carrington gave us,

16  for all the Carrington securitization trust, the full gory

17  detail, I don't know how many reams of XL files, and people

18  tried to analyze that data in various permutations to see how

19  it played out.

20        THE COURT: Yeah.  And I have to believe, although I

21  don't know, I mean I - - let's put it this way.  This is not

22  my first mortgage case.  I mean, I had one in Philadelphia at

23  the end of the last downturn.  In the late 90's which spilled

24  over to when I took the bench.  But this is the first full

25  experience I've had with finishing up an estate.  And it

1  seems to me that the exercise that you're undertaking is

2  unique.  I don't know that it's ever been done before.

3  Perhaps it has been, but that's how it strikes me, you know,

4  viscerally.  And maybe there's just not - - I mean, I look at

5  the, I look at the magnitude of the operations here, and I'll

6  refer again to the Examiner's report, and I don't think this

7  lets any sensitive information out, but at one point he says,

8  Between April of 2005 and December of 2006 the Debtor here

9  was funding $200 million of mortgage loans every business

10  day.  The magnitude of trying to get your arms around that,

11  and what followed after origination, is just mind boggling.

12         MR. LOGAN: Your Honor, that's exactly right.  I

13  think it is a unique process.  And it's a process that I

14  think the professionals who were involved in developing it

15  really deserve a lot of credit.  And as a process, it was

16  embraced strongly by every participant we reached out to.

17  They had quarrels with some of the numeric values, and we

18  adjusted things, and the charts that are in here are fairly

19  complicated in part as we try to deal with specific

20  situations.  But as far as the process is concerned, we just

21  received, I'd have to say unanimous and ringing endorsement

22  for doing something like this.  And as far as getting more

23  detail about the data, I'm really at a loss as how to do much

24  more than what we described here.  We're happy to,

25  CitiMortgage is the only one who's asked about this.  And

1   we're more than happy to either put them in touch with their

2   affiliate, or get them under the tent as far as the

3   development of the data, but I don't think describing it in

4   the disclosure statement one, would be very, would really be

5   possible.

6           THE COURT: All right.  Well let me, let me ask

7   another question.  And I guess Wells Fargo asked this most

8   directly.  And again my words not counsel's words.  But the

9   way I'm gathering the basis of the objection with respect to

10  what gets included in the formula, meaning it excludes loans

11  that are paid off and foreclosures, I'm assuming there's an

12  objection because at least Wells Fargo believes it

13  undervalues or limits the amount of the claim, at least for

14  voting purposes, they'd otherwise be able to employ.  How do

15  you address that?  I mean, if in fact I'm correct about that,

16  how do you address that?

17          MR. LOGAN: Well Your Honor, two responses.  One on

18  the process.  And let's, let me talk about process first.

19  And it really, I'm going to steal some thunder from Mr.

20  Parlen.  But we are also sensitive to how, given the fact the

21  questionnaires are coming back, and we really do want to work

22  with people if they find that there's certain information,

23  like counsel for Deutsche Bank said, that's not readily

24  available, and probably not all that relevant, the way the

25  protocol ultimately got pinned down.  We'll work with them on

1    that.  And I would far prefer not to fix hard and set

2    deadlines for somebody who gets his questionnaire in or he's

3    just totally out of luck.

4          THE COURT: Well, let me ask - -

5          MR. LOGAN: I want to work with people.

6          THE COURT:  - - this.  Are, are what you suggesting

7    or is maybe what's best for the process at this point is

8    today we try to get to a place where, at least in concept, we

9    decide what needs to be in the disclosure statement.  And

10   then at some later date, within the next couple of days

11   literally, you come back to me after you finished your

12   discussions, and see how we address the process.

13         MR. LOGAN: No, actually we have had the process

14   discussions.  And Mr. McMahon has been very helpful in this.

15   And I will, I will steal a little thunder here.  The

16   procedure we have developed working with Mr. McMahon's office

17   is that based upon the questionnaires that we have received

18   as of the solicitation mailing deadline, which we anticipate

19   would be March 17th, we will include for each EPD and breach

20   claimant the Debtors' view of how the protocol applies to

21   them.  What is the number?  And if you haven't completed your

22   questionnaire at all, and that's, there are only a handful of

23   those people right now Your Honor, the answer is you get a

24   dollar.  That's for voting purposes.  But married with an

25   opportunity for somebody within a period of time, we've got a

1   blank in there now, sometime in April before the confirmation

2   hearing, to object to it.  So really a - - cure amount.  If

3   you object to it, then the Court will schedule a hearing, and

4   we can go off into issues like have we, anything you want to

5   raise is appropriate.

6           THE COURT: Well - -

7           MR. LOGAN: And when I have told - -

8           THE COURT:  - - easy for you to say.

9           MR. LOGAN: What I've, what I've, it's easy for me

10   to say, but I'd have to live through it.  And so what I've

11   really told people, including Wells Fargo and CitiMortgage is

12   that let's get real here.  This whole process is designed to

13   avoid court costs and attorney time.  We have a business

14   staff at New Century, one of the few remaining parts of New

15   Century, that is dedicated to working with you, and to

16   simplifying the process, and reach numbers.  I am confident

17   that we can stipulate to your claim for voting purposes.

18   Even if we aren't all the way there through with what your

19   distribution would really be.  And the, the voting procedures

20   that Mr. Parlen's going to review expressly acknowledges that

21   that could be a vehicle to avoid having a hearing before Your

22   Honor in April on a particular issue that a creditor raised.

23           THE COURT: Well and it strikes me that given the

24   numbers that are involved in this case, and the fact that

25   we're playing with what I call bankruptcy dollars, and my

1  experience tells me that that's something that normally

2  happens.  It doesn't always happen, but it normally does.

3        MR. LOGAN: There's also, there's a very real world

4  element to that, Your Honor.  Remember, we're talking about

5  bankruptcy dollars, and somebody who wanted to tweak the

6  protocol would raise the entire tide, and therefore their pro

7  rata share would stay exactly the same.  And that short

8  circuited a lot of the issues about whether or not the right

9  incidence percentage of 1.5% of 1.3%, it didn't matter.  As

10 long as everybody was treated fairly.  So Your Honor, that is

11 how we propose to handle this.  I think the disclosure

12 statement is fully adequate.  And I think the process that we

13 are going to outline in the voting procedures maintains

14 ultimate flexibility for anybody who wants to try to quibble

15 with how we're doing this for voting purposes.  Let, let me

16 just give you an example with CitiMortgage.  Because I told

17 counsel for CitiMortgage, not Delaware counsel, but their,

18 their counsel who filed the objection, who wrote the

19 objection, CitiMortgage's proof of claim claimed EPD's that

20 they asserted totaled about $15 million.  No evidence

21 whatsoever that an EPD occurred.  And they just stated the

22 unpaid principle balance of all the loans that they asserted

23 were subject to an EPD.  We could file an objection to their

24 claim, unless they brought on an estimation motion, they

25 wouldn't be able to vote.  That's fine.  But that's not what

1   we want to do.  We don't want to get down to that level of

2   detail.  They did turn in their questionnaire.  We're

3   hopeful, I'm confident that we can get the business people at

4   CitiMortgage together, help them understand the process and

5   how it really does benefit them as part of a collective

6   endeavor, and minimizes their cost, and reach a resolution.

7   One final thing I wanted to mention.  Wells Fargo.  Wells

8   Fargo has been part of our group we've been working with.

9   And they certainly did raise their concern about loans that

10  were not part of a pool because they had gone REO.  It was

11  always our intent that if the lenders, securitization trust

12  or the whole loan buyers, had foreclosed somebody out and now

13  had the property, and therefore wrote the loan off their

14  books, well what we meant by UPB was the UPB at the time of

15  that event.  And we clarified that.  And we also clarified

16  that if they sold a loan to somebody else, and retained the

17  claim - - one thing I should mention, one of the things that

18  New Century and the Committee were very concerned about is we

19  don't have double counted claims.  That a loan buyer and the

20  loan seller both assert they have the claim, and therefore we

21  have two people double counted.  So we want to make sure that

22  we're dealing with the right claim asserter.  But if Wells

23  Fargo or anybody else sold a loan, maintained the claim for

24  EPD or breach, and doesn't know what the UPB is as of our

25  measure date, which is the claims bar date, fine.  The

1    refinement that would be involved in trying to chase down

2    what UPB was presumably a couple of months later is just not

3    worth the cost, and so we made that refinement as well.  The

4    issue he raised about PIF's, though, I had not realized,

5    probably I didn't hear well enough, but I didn't realize they

6    were going to press.  We'll continue to talk to them about

7    that, but that was conscious.  At least the Committee's view

8    and our view is that if a loan buyer got paid off in full on

9    a loan, it doesn't have any damages.  And it's inappropriate

10   to include it in this statistical analysis.  And that in

11   fact, when New Century analyzed its historic statistics, it

12   had pulled out loans that had been, that had been PIF'd.

13   That had been paid out in full.  So it's already based in,

14   built into the factoring.  That's a confirmation issue, or

15   that's a request to refine the EPD breach protocol, however

16   you want to phrase it.  We'll continue to explore it with

17   Wells Fargo.  But just on, quite frankly, in a little

18   conversation Mr. Power and I had here when we heard counsel

19   for Wells Fargo raise it, that was a new one on us.  At least

20   it didn't enter my conscious mind.  We'll explore it.  But my

21   initial reaction is that's a, that wouldn't be fair.  That

22   wouldn't be fair to the EPD claimants, and that wouldn't be

23   fair to the others who share in this collective process.

24   Just to reiterate something that's been said before.  The US

25   Trustee did do a really spectacular job of forming a

1    Committee here.  It really did.

2            THE COURT: I hope you're keeping a list, Mr.

3    McMahon.  Accolades just keep coming.

4            MR. LOGAN: And as a result, there is an interplay

5    between this protocol and how other creditors who are not EPD

6    breach creditors are treated in the plan.  And a lot of what

7    we call plan compromises and others might call substantive

8    consolidation reflect a whole lot of give and take on that.

9    That's why we have certain claims sharing in a joint pot at

10   130%, others at 50% and the like.  And to the extent we start

11   tweaking the protocol in any material fashion, it does have

12   repercussions for the delicate compromise.  Something that we

13   have to keep into account as we try to be responsive to the

14   comments we get back from EPD claimants, but make sure we

15   don't destroy a very delicate compromise, and a fair and very

16   vigorously arrived at compromise.  So Your Honor, I think the

17   disclosure statement is fine on this particular issue and the

18   process that Mr. McMahon's office and we worked out in,

19   largely in conjunction with some of the other EPD and breach

20   claimants on voting will solve all of their issues as well.

21           THE COURT: All right.  Let me hear from RFC.

22           MR. LOPEZ SCHNABEL: Good afternoon, Your Honor.

23   For the record Eric Lopez Schnabel of Dorsey & Whitney on

24   behalf of RFC.  Your Honor we did file a reservation of

25   rights.  There is some tweaking that we would like to do with

1    the protocol.  RFC, as a member of the Committee, has

2    obviously been very active behind the scenes in this case,

3    and is supportive of the plan, and in fact is supportive of a

4    protocol.  But has, had some issues given some unique

5    structures with our particular loans, which might be

6    indicative of some other creditors.  Hence the accolades to

7    the US Trustee for putting a good mix on the Committee.  But

8    Mr. Logan is correct.  I think we are really within short

9    reach of an agreement that would provide for some slight

10   tweaking of the protocol that would then fully resolve any

11   confirmation issue we would have.  So we just reserve our

12   rights that any protocol issue would be a confirmation issue,

13   not a disclosure statement issue.  But we're hopeful to be

14   able to wrap that up hopefully today.  And that's where we

15   stand right now.

16             THE COURT: Thank you.

17             MR. LOPEZ SCHNABEL: Thank you, Your Honor.

18             THE COURT: Briefly.

19             MR. CANDEUB: Your Honor, briefly.  We appreciate

20   what Mr. Logan said.  Our, that they've worked with many

21   parties, but not us, that they have the gory details that

22   they can make available to us.  I don't know if Your Honor

23   would rather put that in the order approving it, that

24   CitiMortgage should be, have that detail made available to

25   them, or whether the, Your Honor would - -

1          THE COURT: I assume with great confidence that if

2     Mr. Logan has said he will make the information available to

3     you, he will do so.

4          MR. CANDEUB: Okay.  We welcome having that being

5     made available to us.  We just do need to make sure that

6     whatever protocol they've come up with sufficiently

7     approximates what our claims are so that we will have, to

8     know whether we're being fairly treated or not fairly treated

9     vis a vis the other creditors when it comes to confirmation

10    and so - -

11         THE COURT: Well and it sounds, also, as if you have

12    a further opportunity to object to what the Debtor concludes

13    is the amount in which your vote should be counted.

14         MR. CANDEUB: Yes.  Thank you.

15         THE COURT: All right.  Well then does that address

16    the points of your objection?

17         MR. CANDEUB: Your Honor, with the understanding

18    that that, that information, the underlying basis will be

19    fully made available to us, that addresses our concern about

20    the underlying information about the claims.  And then in

21    terms of the tabulation issue, really we just heard about it

22    just now, so it's actually somewhat unclear, and I'd like to

23    reserve our rights.  I'm not sure if this is going to be put

24    in some other writing in terms of a - -

25         THE COURT: I take it it's going to be built into an

1    order.  I haven't been told that, but that would be my

2    assumption.

3              MR. CANDEUB: We haven't seen that yet, so Your

4    Honor - -

5              THE COURT: Me neither.

6              MR. CANDEUB: You have, no, right.  Exactly.  So

7    we'd like to reserve our rights to comment on that upon

8    seeing how that actually is formulated.

9              THE COURT: Understood.

10             MR. CANDEUB: Thank you.

11             THE COURT: All right.  What about Wells Fargo?

12             MR. SMITH: Thank you, Your Honor.  Wells Fargo did

13   participate in the development of the protocol.  We think

14   it's a unique, out of the box approach that we support across

15   the board and very much appreciate the Debtors' cooperation

16   with Wells Fargo in developing the protocol.  And look

17   forward to further discussions.  The substantive issue that

18   we raised, though, is relevant today, because the motion

19   approving the disclosure statement also would approve the

20   protocol.  There wouldn't be an opportunity, at least for

21   voting purposes, to further modify the protocol.

22             THE COURT: That's not what I'm hearing.  Unless I

23   heard it incorrectly.

24             MS. UHLAND: That's correct, Your Honor.  For voting

25   purposes, the proposal is that we will in effect file these

1   amounts as like a cure schedule.  So we'll file your claim

2   for voting purposes.  If you object to voting the amount that

3   we determine, then any party objecting will have the

4   opportunity to be heard.

5        MR. SMITH: The objection that counsel refers to

6   would require a 3018 motion to seek some fixing of our claim,

7   I believe.

8        MS. UHLAND: No, Your Honor.  Just to be a little

9   more clear, what, what we did to try to shift that burden

10   somewhat to, to make it actually easier for the EPD breach

11   claimants is rather than objecting to their claims and

12   forcing them to file a motion, we're going to set out and

13   provide to you the information of the, or each EPD breach

14   claimant the amount that we determined it should be for

15   voting purposes, and then you need to file an objection to

16   that amount.  Similar to the way you would file a cure

17   objection if you're going to seek the Court to have you vote

18   in a different amount, I assume you would want to provide

19   some evidence on why some other amount than our amount should

20   be determined.  But you do not need to file a motion.  You'll

21   simply need to file an objection with the, you know, with the

22   appropriate support for the Court.  We tried to make it less

23   of a burden for the parties objecting.

24        MR. SMITH: Your Honor, certainly we reserve our

25   rights to analyze the process and the procedure that would be

1  proposed, and had had some objection as to procedural issues

2  that we have not described yet.  But substantively, with

3  respect to the way that a breach claim would be calculated,

4  again, the disclosure statement does suggest that the breach

5  claim was based upon a pool level analysis, and the pool, the

6  whole pool, as it was created with the seasoning component

7  applied to it, it doesn't seem appropriate then to pull out

8  part of the loans that were part of that pool.

9          THE COURT: I heard your objection, and I'm inclined

10  to agree with the Debtor that if it can't be worked out with

11  you, then we'll go through the process, and you'll come back

12  to me, and I'll make a decision about whether it's right or

13  wrong.  Or whether something else should be.

14          MR. SMITH: On the substance.

15          THE COURT: Yes.

16          MR. SMITH: Thank you, Your Honor.

17          THE COURT: All right.  But with that, all of the

18  points of your objection have been addressed.

19          MR. SMITH: Your Honor, with, with respect to the

20  substantive issues.  That's correct.

21          THE COURT: Well in process and part I guess.

22          MR. SMITH: That's correct, Your Honor.

23          THE COURT: Okay.  Deutsche Bank.  Let me just ask

24  that same question.

25          MR. DREBSKY: Yes, Your Honor.

1          THE COURT: Mr. Drebsky, have, with that colloquy

2     and those discussions, have the points of your objections now

3     all been addressed?

4          MR. DREBSKY: Yes, Your Honor.

5          THE COURT: All right.  Thank you.  Okay.  Now that

6     leaves, at least according to my score card, Goldman Sachs

7     and Pima County.

8          MS. UHLAND: And Your honor, Washington Mutual, who

9     joined Goldman.

10         THE COURT: Ah.

11         MR. LOGAN: Okay.  Your Honor - -

12         THE COURT: Yes.

13         MR. LOGAN: - - I drew, I drew Goldman.  We've,

14    we've worked with counsel for Goldman Sachs.  Their

15    objections partly were just to make sure you fill in the

16    blanks about the financial information, so we dealt with that

17    in the omnibus discussion.  The other had to do with the, the

18    claims they have against Access Lending.  And we worked with

19    them to supplement the disclosure statement.  And you'll find

20    on pages 34 of I guess this morning's red line, and then

21    again on pages 38 and 39 of the supplemental disclosure that

22    we provided concerning the issues they raised regarding

23    Access Lending.  And as that disclosure indicates, there's a

24    dispute with Goldman.  There's a dispute with Goldman as to

25    the amount, if any, of their claims against Access Lending.

1    They assert $15.1 million.  Certainly former management of

2    Access Lending asserts that it should be zero.  There's a

3    dispute with Goldman as to the inter-company claim that

4    Access Lending shows on its books that's owed to New Century

5    Mortgage Corporation, and therefore the, to the extent that

6    claim is valid and shares pro rata, or whatever, in the

7    distribution of Access Lending, that rebounds to the benefit

8    of creditors up at the parent company level.  The adequate

9    protection dispute settlement that is before Your Honor in a

10   couple of weeks will pay down a portion of Goldman's claim.

11   That will be factored in.

12          THE COURT: But not resolve it.

13          MR. LOGAN: But not resolve it.  Less money will be

14   at stake.  We have confirmation issues with Goldman, and we

15   had a - - Mr. Power and I had a conversation with Ms.

16   Schweitzer yesterday about some of the other technical

17   confirmation issues she has.  But they're confirmation

18   issues.  We will do our utmost to try to resolve them

19   consensually with Goldman between now and the confirmation

20   hearing.  If we don't, they'll be confirmation issues for

21   Your Honor.  But I don't think it's a disclosure problem.

22   And I think Ms. Schweitzer can confirm that at least as far

23   as disclosure is concerned, we've satisfied their issues.

24          MS. SCHWEITZER: Good afternoon, Your Honor.  Lisa

25   Schweitzer from Cleary, Gottlieb, Steen & Hamilton for

1   Goldman Sachs Mortgage Company.  As Mr. Logan indicated, we,

2   Goldman is a creditor of various New Century entities, but

3   the objection was primarily focused on Access Lending.  And

4   as the disclosure statement makes clear that one of the

5   reasons you haven't seen our face in court this whole time is

6   this is a liquidating entity that really has two creditors at

7   stake.  You know, two primary creditors, Goldman and this

8   inter-company claim.  We are talking to counsel for the

9   Debtors and the Committee, working through the substantive

10  objections.  As Mr. Logan indicated, we've made them aware of

11  confirmation objections that we have that we would view as

12  more than technical.  We're almost the opposite of

13  substantive consolidation in that we're the Debtor along for

14  the ride in this plan process.  But certainly in our view

15  it's a separate plan that they have to, you know, we'll have

16  to work through this all.  We've got a couple of weeks or

17  months to do that, and hopefully it will be productive, and

18  as far as for today, we do believe the disclosure statement

19  objections are resolved, and we hope we can make progress on

20  the rest of the issues.  And if not, we will see you in two

21  months and raise them then.

22          THE COURT: Thank you.  All right.  That leaves Pima

23  County and Washington Mutual.

24          MS. UHLAND: Your Honor, Pima County, I only saw an

25  objection to confirmation that they filed.

1        THE COURT: That's what it, that's what it looked

2   like it said.  But I don't know if anyone's here.  I don't

3   see anyone signed up for Pima County.  And I'll treat that as

4   a confirmation objection, not as a disclosure objection.

5        MS. UHLAND: And Washington Mutual joined in the

6   Goldman objection.  I don't know if they have any further, if

7   anyone's here or if they have any comment.

8        THE COURT: I hear no response.  Okay.

9        MS. UHLAND: Your Honor, with respect to logistics,

10  what I propose to do is why don't we go ahead and talk about

11  the time line on voting procedures.  What I would propose

12  that we do, and we built in some cushion, I'm going to turn

13  all this over to Mr. Parlen in a moment to go through that

14  process.  Is, you know, our target was to mail by March 17.

15  So what I would hope to do is submit, under certification of

16  counsel, an amended plan, and an amended disclosure statement

17  as promptly as possible.  But I think that that will be early

18  next week.  Would be my expected timing.  And that should

19  allow us still sufficient time to print ballots and mail by

20  our targeted mailing deadline of the 17th.

21        THE COURT: Well that's fine with me.  But let me

22  just, let me just go over my list of, of things that have

23  been raised that we haven't yet I don't think put to bed.

24  Well and I'll, I'll just give you my list.  I think the

25  Debtor understands there needs to be a new discussion of

1    substantive consolidation.  And we'll work with the parties

2    to, who placed those objections to revise that.  And with

3    respect to the Ad Hoc Committee objection, there will be a

4    discussion of their secondary claim that's now not in the

5    disclosure statement.  I'd like to build into whatever

6    procedures order we have how to address the Examiner's

7    report, and any motions to be filed and answer dates with

8    respect to those who are opposing any request to keep it

9    under seal.  And then to talk about what one counsel

10   described as a, quote, "litigation schedule".  Now whether we

11   put these in one order or two orders, I'm open to discussion.

12   But that's, that's what's on my list.  I think that with

13   respect to - -

14        MS. UHLAND: Your Honor, I'd also add that I'd

15   committed to add some disclosure about the, from the New York

16   State Fund, their dispute with respect to the automatic stay,

17   and their disputes with respect to access to the Debtors'

18   insurance.

19        THE COURT: Yes.  I, I'm not going to order anything

20   additionally with respect to the protocol that was discussed

21   with respect to EPD and breach claims with the understanding

22   that based on the process that is to be proposed those

23   parties will have an opportunity to object and come back to

24   Court prior to the plan deadline, plan voting deadline to

25   resolve any problems that there may be with respect to what

1    the Debtor proposes for voting purposes.  And I think, I

2    think that addresses, at least so far as I understand it, the

3    issues that have been raised.  If someone disagrees with

4    that, stand now.

5         MR. KEACH: Are we talking about the substantive

6    objections, Your Honor?

7         THE COURT: Yes.  Okay.  I hear no other response.

8    Let's take just a five minute break, and we'll go on to the

9    next phase.

10        MS. UHLAND: Okay.  Thank you, Your Honor.

11        (Whereupon at 3:48 p.m. a recess was taken in the

12   hearing in this matter.)

13        (Whereupon at 3:59 p.m. the hearing in this matter

14   reconvened and the following proceedings were had:)

15        THE CLERK: All rise.  You may be seated.

16        THE COURT: All right.  What's next?

17        MS. UHLAND: Just briefly, Your Honor, as far as the

18   orders go.  On the litigation schedule proposal, and this is

19   not in the order that Mr. Parlen's about to go through with

20   you, what we think we ought to just add to the order, and I

21   think we're going to need to further revise it in any event,

22   is that, you know, upon the filing of an objection, that the

23   Debtor, the parties will agree to expedited discovery with

24   respect to the confirmation objection.

25        THE COURT: Well - -

1          MS. UHLAND: And then we can kind of, if we can't

2    get agreements on, I mean, it's just tough to schedule this

3    out as we sit here today on the timing.

4          THE COURT: Well the proposed objection deadline, is

5    it the same as the voting deadline?  Or is it an earlier

6    date?

7          MS. UHLAND: It's a slightly earlier date, Your

8    Honor.  Because we wanted to give parties, it's the statutory

9    25 days plus 3 for mailing.  So it's now proposed at April

10   14.

11         THE COURT: And you're still proposing that the

12   confirmation be on the 23rd?

13         MS. UHLAND: Yes.

14         THE COURT: That really doesn't leave much time.

15         MS. UHLAND: Well I, I guess the question is, is

16   there's plenty of, I expect that the other parties, if they

17   want substantial discovery will be able to file their

18   confirmation objection well in advance of the 14th.  And then

19   we can agree to discovery.  It's hard to conduct discovery

20   without the - -

21         THE COURT: I don't disagree with that.

22         MS. UHLAND:  - - objection.

23         THE COURT: What I'm thinking is, well.  We have to

24   find a way to either advance the objection deadline, if it

25   can be under the rules, for those who wish to take discovery.

1   Because I'm assuming the Debtor is not, today at least,

2   agreeing to push back the confirmation deadline that it's

3   proposing.

4          MS. UHLAND: I, that's correct, Your Honor.  I mean,

5   I think that all parties are trying to, you know, delay

6   begets expense.  And that's one of the most important things

7   we're trying to avoid here.  I have not looked at, I have

8   never tried to shorten a confirmation objection deadline.  I

9   sort of view that 25 plus 3 days as a, I don't know whether

10  - -

11         THE COURT: I'd prefer - -

12         MS. UHLAND: I assume any deadline could be - -

13         THE COURT: And I'd prefer not to.  I mean what

14  would normally happen, at least in my experience in a

15  contested confirmation, if there's to be one, and maybe

16  people know now there's to be one, that normally the

17  confirmation deadline would be pushed, the hearing date would

18  be pushed out to permit the discovery to occur.  I mean,

19  here's what I'm willing to do.  I'm willing to, you know,

20  give the parties 'til, you know, Friday or Monday to think

21  about it, and if you want to get back to me in a conference

22  call, you know, we can, we can address it that way.

23         MS. UHLAND: That's fine, Your Honor.

24         THE COURT: All right.  With respect to the

25  Examiner's report, I, you know, I'm, I think in terms of the

1    timing as it's presently set up, assuming a motion is filed

2    by the 10th, I would be inclined to hear it on the 25th.  And

3    objections should be in by say the 20th.  That still leaves,

4    that still gives 10 days.  And then I'll hear it on March

5    25th.

6              MR. ETKIN: Your Honor, may I be heard on that for

7    just a moment?

8              THE COURT: Yes you may.

9              MR. ETKIN: And I might as well put it squarely on

10   the table since I'm sure Committee counsel is well aware.

11   The, the deadline for the filing of the amended complaint in

12   the District Court is March 24th.  Which is in the plan.  So

13   by putting this hearing on for the 25th, I don't know what the

14   motion is going to say, I don't know what Your Honor is going

15   to rule, obviously, one way or the other.  But certainly, the

16   one thing I do know is that if the hearing is on for the 25th,

17   it makes it an impossibility that that report will be

18   available in advance of the 24th.  I don't see why, under

19   these circumstances, the hearing could not be scheduled for

20   the latter part of the preceding week.  I don't think it's

21   particularly complicated.  I don't think there are going to

22   be a bevy of motions.  In fact, it seems like it's only going

23   to be one.  In terms of keeping the report under seal.  To

24   the extent that we have anything to add, once we read the

25   motion, we'd be prepared to put those papers in extremely

1   quickly.  And if it is not inconvenient for the Court, even

2   if we could schedule it for that Friday, it would be I think

3   just a fairer process.

4          THE COURT: Well that's Good Friday.

5          MR. ETKIN: Oh, it is.

6          THE COURT: I typically try to stay away from

7   religious holidays if I, if I can.

8          MR. ETKIN: I didn't, I didn't look Your Honor.

9   Scratch that.  Then Thursday or Wednesday?

10          THE COURT: I mean, I could, I can hear you at 4

11   o'clock on the 20th.  No, I couldn't.  I couldn't.  10 o'clock

12   on the 19th would be available.

13          MR. ETKIN: That's fine, Your Honor.  I appreciate

14   - -

15          THE COURT: Well let me hear from others.

16          MR. ETKIN: I appreciate - -

17          MR. POWER: Your Honor, before we just go there, I

18   guess I'm a little concerned.  Our, as Your Honor recalls,

19   the Committee has to file the motion to keep under seal

20   within 10 days.  So we were going to do that probably Monday.

21   And we're happy to accelerate it to the 25th.  The problem is

22   is you have a 550 page report with multiple exhibits which we

23   have to go through and comb through.  And we wanted to do

24   that before the hearing to basically advise the Court if

25   there is anything in that report that we think can be under

1    seal.  And we are trying to basically be very judicious in

2    terms of what stays under seal.  It's not our goal to keep

3    that report from not being disclosed, because we know that

4    you wouldn't agree to that.  And besides that, we understand

5    the purpose of it.  We just need to make sure, for the

6    benefit of the estate.  Counsel who's basically asking this

7    Court to accelerate a time table so he can sue third parties

8    that aren't party to this bankruptcy, quite frankly I don't

9    think is really a relevant decision for this.  What we want

10   to do, because we have to time that report, and Your Honor's

11   already said you want that report public so people can refer

12   to it before they vote on the plan.  So we have time,

13   basically, getting through that process, figuring out what we

14   think is appropriate, and convincing Your Honor what should

15   be under seal, and then also, then getting the voting process

16   set.  So I respectfully ask that if Your Honor just keeps the

17   25th, we will try to advise the Court, and hopefully by the

18   25th we'll have it very narrowly limited in terms of what

19   issues, if any, and I'm not sure we have any, that should be

20   made public.  But to truncate it on top of negotiating the

21   plan disclosure and doing all this just seems inappropriate

22   in this context.  Particularly simply to accommodate a third

23   party litigation in California that's really not a part of

24   this suit.  If plaintiff's counsel brought a law suit, and

25   they were supposed to amend the complaint, let them amend the

1    complaint.  They can deal with that in their litigation.

2    That's really not relevant to this proceeding in our view.

3         THE COURT: Mr. Etkin.

4         MR. ETKIN: Well I mean, what's obvious, Your Honor,

5    is that I think from the Committee's perspective, since at

6    some point we're going to be competing claimants, they would,

7    what hasn't been said to you is that, and I assume that they

8    would be happy with the idea that that report were not

9    available prior to the 24th.  This is just, it's really an

10   issue of fairness, as I pointed out before.  You know, there

11   are revisions to a disclosure statement that are served on

12   parties at 1 o'clock in the morning for a, you know, for a

13   1:30 hearing.  Sometimes it's in the nature of bankruptcy.

14   This is not an accelerated time table.  It is not a

15   complicated process.  There have already been tens of

16   millions of dollars spent in legal fees in this case.  The

17   idea of going through that report, which is, which was

18   available on Friday of last week, so it's essentially giving,

19   and the ten day time period to make the motion was already

20   built in to a prior order of the Court.  That's not of our

21   making.  So the idea that having several weeks to read

22   through that report, and take a position one way or the other

23   prior to a hearing I don't think is an accelerated process.

24   I don't think it's unfair.  And I think that what would be

25   unfair would be to advantage indirectly the Committee when it

1    would be just as easy to get that issue in front of Your

2    Honor and get it resolved a couple of days prior to the 25th.

3              THE COURT: Why is it unfair to you?

4              MR. ETKIN: Because Your Honor, the Debtor isn't

5    even indicating that it is making a motion to keep the report

6    under seal.

7              THE COURT: Let me ask - -

8              MR. ETKIN: I'm not going to conjecture - -

9              THE COURT: Let me ask it another way.  How does it

10   prejudice, in any legal way, your clients?

11             MR. ETKIN: Because it's a report that will, in some

12   form, ultimately be available to the public.  It's a report

13   that is, at least we assume, going to be relevant to the

14   issues that are going to be pending before the California

15   court.  That court should have the benefit of having that

16   report in front of it in terms of reviewing the merits of

17   that case and the issues before it in that case.

18             THE COURT: How does holding the hearing on 25th and

19   making a decision on that day or after that prejudice your

20   ability to do that at some point?

21             MR. ETKIN: It prejudices our ability, Your Honor,

22   of having that report available to us so that it can be put

23   in front of the District Court by the deadline set for the

24   District Court for the filing of the amended complaint.

25             THE COURT: But you have a remedy under the rules to

1    seek further amendments.

2           MR. ETKIN: Um - -

3           THE COURT: And it seems to me if you find something

4    relevant or material in the report that it's likely that

5    relief would be granted.  I don't want to speak for any other

6    judge.

7           MR. ETKIN: I always get a little nervous, Your

8    Honor, when I try to anticipate what another judge in another

9    court who I'm really not before is or is not going to do.  I

10   guess I look at it from the different perspective of what

11   harm is there to holding the hearing on the 19th at 10 o'clock

12   to anyone, when the motion itself has to be filed by Monday

13   according to an existing order of the Court.  And the only

14   one that's really being disadvantaged are those who would

15   respond to the motion who would have to put in their papers

16   earlier than they would otherwise have to put them in.

17          THE COURT: Well, what the Committee is saying is

18   that under the prior order we have to file our motion by

19   Monday, but our exercise won't be completed by then.  That's

20   what I'm being told.

21          MR. ETKIN: And I understand that that's what the

22   Committee is saying, Your Honor.  And I guess what I'm saying

23   is that that exercise can be completed, in terms of reviewing

24   that report, all 500 pages of it, by the 19th.  Just as easily

25   as it could by the 25th.

1          THE COURT: Well I've started reading it.  I'm not

2    sure I agree with that.  I'm going to stay with my original

3    plan.  We'll have the hearing on the 25th.  Responses are to

4    be filed by the 20th.  And if counsel will embody that in one

5    or more of the orders they're about to propose, or in a

6    separate one, I would appreciate it.

7          MR. ETKIN: Thank you, Your Honor.

8          MR. PARLEN: Good afternoon, Your Honor.  Andrew

9    Parlen of O'Melveny & Myers on behalf of the Debtors.  With

10   Your Honor's permission I'd like to approach and present the

11   Court with a further black line of the proposed order

12   approving the disclosure statement and solicitation

13   procedures.  That's the result of continued dialog this

14   morning with Mr. McMahon.

15         THE COURT: All right.  Thank you.

16         MR. PARLEN: Unless Your Honor would like to proceed

17   otherwise, I propose to take Your Honor through the black

18   line changes in the order, and explain them, and then at the

19   end summarize our proposed confirmation time line.

20         THE COURT: All right.  Let's take that walk.

21         MR. PARLEN: The first substantive change, Your

22   Honor, is on page - - I'm sorry.  The pages aren't numbered

23   on this, unfortunately.  My apologies.  It's paragraph 5.

24         THE COURT: I have it.

25         MR. PARLEN: What we've done in this order is break

1   out the tabulation rules.  And we're going to have two sets

2   of tabulation rules.  One set of rules is going to apply to

3   non-EPD breach claims and the procedures are very similar, if

4   not identical to what was in the proposed order filed with

5   the motion.  The only change that we made in those

6   procedures, besides omitting the EPD breach claims,

7   specifically claims and classes OP3B and OP6B, is to change

8   the claim objection deadline.  The claim - - for voting

9   purposes.  The objection, the deadline to object to claims

10  for voting purposes we're proposing will now be March 24th.

11  As you can see in paragraph 5(e).  Other than that, those

12  procedures remain the same.  If Your Honor will take a look

13  at paragraph 6, that is the second set of tabulation rules,

14  and those apply to EPD breach claims.  This is the procedure

15  that Mr. Logan referred to when he was talking about the

16  process side of things with EPD breach claims.  And

17  essentially, as Your Honor can see from paragraphs (a)

18  through (f), we've developed what we hope is an extensive set

19  of rules.  We've worked with Mr. McMahon to formulate these

20  rules, and I believe, I don't want to speak for him, that,

21  that these rules are acceptable to him and his office.  If

22  you'd like me to get, would you like me to go through them in

23  detail?

24          THE COURT: Let me read it.

25          MR. PARLEN: Okay.

1          THE COURT: If I might.  For a minute.  Looking at

2     paragraph (b), is there a deadline somewhere else for the

3     time by which a holder must submit the questionnaire to the

4     Debtor or be relegated to a dollar vote?

5          MR. PARLEN: Your Honor, though it's not explicitly

6     set forth here, we can make it explicit.  My understanding is

7     that we're going to use the record date of March 10th.

8          MR. LOGAN: Your Honor, I'd like to suggest that we

9     keep this as flexible as possible, and not have a date by

10    that, that they have to provide the questionnaire.

11         THE COURT: Well what if you get the questionnaire

12    the day before the voting deadline?

13         MR. LOGAN: Well in that case, you're right.  I

14    mean, we need to have it sufficiently so that we can put it

15    in, but not the voting deadline.  The way it works is that by

16    the time the solicitation package goes out, we will put in

17    our information to the calculation.  And if they didn't get

18    us the questionnaire, then we'll put a dollar in.  And they

19    have a date in April by which they can, we'll fill in the

20    blank in April.  But you're right.  In order to, for us to

21    properly complete the information we give them with the

22    solicitation package, we have to get it before midnight the

23    night before.  I'd just be making up a date now.  But

24    probably we need, we've already got most of these back.  So

25    it's not as, quite as problematic as it might otherwise seem.

1   So maybe we pick - - I don't even have a calendar.  What's,

2   the 17th is - -

3          THE COURT: Monday.

4          MR. LOGAN: Monday?

5          THE COURT: Two Mondays from now.

6          MR. LOGAN: The prior Wednesday?

7          THE COURT: The 12th?

8          MR. LOGAN: The 12th.

9          THE COURT: Well when will the package - - well.

10          MR. LOGAN: And then we mail the package on the 17th.

11          THE COURT: Okay.  But when will the parties who

12   haven't given you questionnaires, but need to do so, get this

13   order?

14          MR. LOGAN: That's a very good question.  Your

15   Honor, let me go back to my initial suggestion.  Let's not

16   put a deadline in here.  If somebody has not given us a

17   package or gave it to us the night before, we'll put in a

18   dollar.  And if they object to it, we'll have a hearing and

19   more than likely we'll stipulate.

20          THE COURT: Okay.  Does anyone else care to be heard

21   on that particular issue?

22          MR. SMITH: Your Honor, J. R. Smith on behalf of

23   Wells Fargo.  Just on that point alone.  The proposed

24   reformulation would have any entity that has not submitted a

25   questionnaire by January 23rd, 2008 to already have their

1   claim established at a dollar.  That seems a little

2   ridiculous now that we're sitting here in March, that there

3   already is a presumption that a claim would be established at

4   a dollar.  And that is, Your Honor, on - -

5          THE COURT: Well it's, it refers to the date that

6   the questionnaires were originally sent.  Not to a deadline

7   by which they should have come in.  If I'm reading it

8   correctly.

9          MR. SMITH: You are.  My apologies, Your Honor.

10          THE COURT: That's okay.

11          MR. LOGAN: Your Honor, maybe - - Mr. Power and I

12   were also - -

13          THE COURT: Somebody else care to be heard?

14          MR. SHIPMAN: Your Honor, William Shipman on behalf

15   of Countrywide.  Can I just talk with Mr. Logan for a second?

16          MR. LOGAN: Your Honor, let me make a suggestion

17   that Mr. Power and I started to talk about this a second ago.

18   I think a lot of it will be based upon some calculations that

19   we'll calculate back from the confirmation date and the

20   objection dates.  My suggestion is we pick those, and then

21   give Mr. Power and me a chance to talk to the various counsel

22   who stood up and see if we could work out something that

23   makes sense.

24          THE COURT: Okay.  That's fair enough.  All right.

25   Let me finish reading that paragraph.  Okay.  Do you have

1    dates to suggest?

2         MR. PARLEN: For the hearing in April to consider

3    objections?  In paragraph (c), 6(c), or - -

4         THE COURT: The (c), the two dates in (c).

5         MR. PARLEN: Yes, Your Honor.  We would suggest that

6    the hearing be held the week before the confirmation hearing.

7    So the week beginning Monday, April 14th, I believe.  And then

8    we'll key the objection deadline, the, the deadline off that.

9         THE COURT: Well, how about the 16th at 10 o'clock?

10        MR. LOGAN: The 15th is fine, Your Honor.

11        THE COURT: The 16th at 10.

12        MR. LOGAN: 16th?

13        THE COURT: Yes.

14        MR. LOGAN: One, six?

15        THE COURT: One, six.  Wednesday, April 16th.

16        MR. LOGAN: And what was the time on that?

17        THE COURT: Ten.

18        MR. LOGAN: That's perfect.

19        THE COURT: Okay.  And then objection date?

20        MR. PARLEN: We propose, Your Honor, a week earlier?

21    April 9th?

22        THE COURT: Anyone care to be heard on that?

23        MR. CANDEUB: Your Honor, Doug Candeub on behalf of

24    CitiMortgage.  I'm not clear when the solicitation package is

25    going to be sent out, and when we're going to have notice of

1  when, of what they, the Debtors think our claim is.  And I

2  would request some clarity on that.

3      MR. PARLEN: Your Honor, the proposed solicitation

4  package mailing deadline is March 17th.  And for convenience

5  of the Court and others, I'll at the end, summarize in

6  chronological fashion what our proposed deadlines are.

7      THE COURT: All right.  April 9th at 4 o'clock.  What

8  will then be Eastern Daylight time.  Okay.  And in paragraph

9  (d), April 16th at 10 is to be filled in again?

10     MR. PARLEN: Yes, Your Honor.

11     THE COURT: All right.

12     MR. PARLEN: May I proceed?

13     THE COURT: Let's continue.

14     MR. PARLEN: So if we're done with paragraph 6 and

15  the EPD breach claim tabulation rules, Your Honor will see

16  in, in paragraph 7 we've accepted again EPD breach claimants,

17  and this paragraph refers to motions under Rule 3018 of the

18  Federal Rules of Bankruptcy Procedure for parties to file

19  motions to have their claims allowed, temporarily allowed for

20  voting purposes.  And in consultation with the Office of the

21  United States Trustee, we've amended that date, proposed date

22  to April 11th, 2008.  Further, paragraph 8, we've added a

23  sentence at the end of that paragraph that basically provides

24  for the, acknowledges the Court's authority to review ballots

25  that are discounted, or not counted, to the extent the

1   decision or the determination not to count those ballots is

2   material to the, to determining whether the plan is

3   confirmable.

4        THE COURT: Hopefully I won't have to look for

5   hanging chads.

6        MR. PARLEN: In paragraph 11, in order to conform

7   with the applicable rules, we've moved the confirmation

8   objection deadline back three days from April 11th to April

9   14th.  Which would be 28 days after the March 17th mailing

10  deadline.

11       THE COURT: Okay.

12       MR. PARLEN: The last few changes are at the end of

13  the proposed order, paragraph 20, in which we specifically

14  acknowledge that we will be posting a copy of the EPD breach

15  claim protocol that's used to determine the voting amounts on

16  the Crossroads website.  Paragraph 21 acknowledges that we

17  will be publishing notice of the confirmation hearing,

18  including with specific reference to holders of interests,

19  which are classes HC4A through E, notifying them of their

20  impaired non-voting status under the plan.  And we will be

21  providing that notice, internet address at which the plan and

22  disclosure statement will be available free of charge.

23  Further the publication notice will provide that the Debtors

24  will provide, at their expense, a copy of the solicitation

25  package to any beneficial holder of an interest in NCFC that

1   certifies that they are such a holder.  Those are the changes

2   we've made since the proposed order was filed.  Does Your

3   Honor have any questions?

4           THE COURT: I do not.  But let me ask if others care

5   to be heard with respect to the proposed form or order as

6   it's been amended.

7           MR. CANDEUB: I would ask that Debtor if there's a

8   date for a hearing on any questions about non-EPD claim

9   allowance objections.

10          MR. PARLEN: We have not proposed to schedule such a

11  date.

12          THE COURT: Well I anticipated you'd expect that

13  it'd be heard at confirmation, but - -

14          MR. PARLEN: I suppose references made to 3018

15  motions and other such matters -  -

16          MS. UHLAND: Your Honor, unless the party sits to

17  schedule a different date when they file the motion, we would

18  expect that it be heard at confirmation.

19          THE COURT: All right.  So would I.  Anyone else

20  care to be heard?

21          MR. KEACH: Very briefly, Your Honor.  Ms. Uhland

22  and I had a short discussion in the break.  In paragraph

23  5(g), there's a provision in the order that basically says

24  that if, if a party hasn't filed a proof of claim and their

25  claim is scheduled as continued, disputed, or unliquidated,

1    that claim doesn't count.  As Your Honor is aware, the class

2    of beneficiaries is the only class of parties that doesn't

3    have to file a proof of claim yet, because of the exception

4    to the bar date.  And it's not my recollection that all of

5    these claims were scheduled as contingent, unliquidated, or

6    disputed, but I note there have been recent amendments to the

7    schedules, I haven't been able to review them all, and

8    frankly I can't tell you that I reviewed every single one of

9    the 570 designations.  So what we have proposed, and I

10    understand that Debtors' counsel agrees to, is that there be

11    an exception to this provision for the class of

12    beneficiaries.  In other words, they could vote their

13    scheduled amount regardless of whether it's contested,

14    unliquidated, or disputed, in light of the fact that they're

15    not due to file proofs of claim until the resolution of the

16    litigation.

17         MS. UHLAND: That's correct, Your Honor.  I am also

18    fairly certain we did not indicate that any of those

19    designations.  That we just, we just scheduled the deferred

20    comp plan participants and their amounts.

21         THE COURT: Okay.

22         MS. UHLAND: To the extent we did, we agree.

23         THE COURT: All right.  So you'll make that change

24    to the form of order?

25         MS. UHLAND: Since it may take us some time, I'll,

1   what I'll do is I'll double check the schedules, and if we

2   need to make the change, we'll make the change.  If they are,

3   if there's no designation, and they're effectively voting in

4   their full amount as it is, I probably wouldn't make a change

5   to the order.  But I'll work with Mr. Keach on that.

6            MR. KEACH: We can work together on that.  And then

7   obviously that goes on the presumption they're not going to

8   amend the schedules to do so.  So - -

9            THE COURT: Or file an objection.

10            MR. KEACH: Right.  The only other point I would

11   make, Your Honor, is that - - and I don't want to undo any of

12   the handiwork that's been done, but one of the possible

13   resolutions of the litigation schedule point was to push out

14   the confirmation date.  And I guess if that happens, the

15   question is do the, do the dates - - and I don't want to get

16   into the EPD breach protocol balance - - but on everything

17   else, it seems to me appropriate to slip the objections dates

18   if we slip the confirmation dates.  And I think that's

19   something we have to decide in the next day or two,

20   obviously.

21            THE COURT: I nod my head only to acknowledge that

22   I've heard your position.

23            MR. SMITH: Briefly, Your Honor.  J. R. Smith on

24   behalf of Wells Fargo.  The EPD breach claim resolution

25   deadlines are aggressive and they, they do push up against

1    the confirmation hearing.  Wells Fargo simply would request

2    to reserve its right with respect to objecting to the time

3    line that's been proposed.  We fully hope that we will have

4    resolved and stipulated, if we can't agree as to the actual

5    claim value for voting purposes.

6              THE COURT: Well, let's put it this way.  I'm going

7    to approve the time line today, but you could ask, I suppose,

8    at the appropriate time, that it be changed.

9              MR. SMITH: Thank you, Your Honor.

10             THE COURT: All right.

11             MR. McMAHON: Your Honor, good afternoon.  Joseph

12    McMahon.  With respect to the EPD breach notice that's slated

13    to go out under the order and a publication notice, Debtors'

14    counsel has agreed to share that with our office for review

15    prior to its mailing.  And we'll attempt to resolve any

16    language issues that we may have.

17             MR. POWER: Your Honor, Mark Power from Hahn &

18    Hessen.  I have no objection to the time lines at all.  I

19    want to alert the Court to two issues that we will seek to

20    modify the order slightly.  One I mentioned before, which was

21    that given the objections received, and quite frankly, the

22    phone calls we received, my office has received, from a lot

23    of creditors, we do plan on preparing a summary.  Not only a,

24    we typically we do a letter in support of the plan, it's a

25    joint plan, but we find a separate letter.  But in this case

1    we think a more detailed summary of how we, how the plan got

2    to where it is, and what the compromise, nature of the

3    compromises were is appropriate here, because we think it's

4    very complicated.  The plan is, it's difficult to go through,

5    quite frankly.  It doesn't quite rival the Examiner's report,

6    but it is pretty close.  And we think it might be very

7    helpful.  So we plan on filing that shortly, and then we

8    would seek to have the Court authorize that as part of the

9    solicitation materials, because it's going to be a little

10   different than we typically do.  The other thing I would - -

11            THE COURT: Whoa.  Hold on a minute.

12            MR. POWER: Okay.

13            THE COURT: You're seeking a court order authorizing

14   that to go.  Give me a timing on opportunities for parties to

15   object hearing.  What had you anticipated?

16            MR. POWER: Well we anticipated filing - -

17            THE COURT: That I would just read it and say, okay.

18            MR. POWER: Well Your Honor, it doesn't, I guess

19   it's really the Committee's position in support of the plan.

20   It's really not a disclosure item in our view.

21            THE COURT: Well, you know, look, I've had this

22   situation from time to time, and there are occasions in which

23   parties come and say, We don't, we don't think that's been

24   accurately stated, and it shouldn't go out that way.  And

25   that's why I ask whether there should be some opportunity for

1    somebody to comment on it.  That's all.

2            MR. POWER: I guess that's fine, Your Honor.  I

3    didn't anticipate that.  I think we were planning to file it

4    - -

5            THE COURT: I'm not looking to create problems for

6    you.

7            MR. POWER: Well we were planning to file it by

8    Monday with the thought that this would all be submitted, the

9    package to the Court to approve, hopefully under

10   certification of counsel.  Which means that really all the

11   objections would have to be resolved, or we'd have to go back

12   before Your Honor.  My second request was could we get a time

13   before Your Honor if we can't resolve these issues that we

14   could go back and try to get through this?  Because all of

15   these time tables work on the assumption we're going to get

16   this out next week.  And I guess in terms of the Committee

17   support for the papers, we can get it filed, and then we

18   could deal with any objections next week if they come up.  I

19   don't, I don't anticipate there will be any, but if there are

20   any we can obviously deal with that.  I assume the parties

21   who object to the disclosure will object to the Committee's

22   position as well.

23           THE COURT: Well don't, don't extend invitations.

24           MR. POWER: Yeah.

25           THE COURT: You know.  Well is Wednesday the 12th too

1   early?

2            MS. UHLAND: No, Your Honor.  I think it's the right

3   day.

4            THE COURT: 3:30.

5            MR. POWER: Thank you, Your Honor.

6            THE COURT: Okay.

7            MR. McMAHON: Your Honor, just very quickly to

8   clarify with respect to the Committee's proposed materials to

9   go out.  I gather that parties can be heard at that hearing

10   without the filing of an objection with respect to their

11   concerns with - -

12            THE COURT: Yes.

13            MR. McMAHON: - - respect to such materials.  Thank

14   you.

15            MR. KEACH: Your Honor, if I may briefly, because

16   this anticipated a question I was going to ask the Court just

17   as a matter of courtesy.  And that is how the Court wanted to

18   handle Century Glove type materials.  I mean, it may come as

19   no surprise that we intend to communicate with a class of

20   beneficiaries which are over 500 people.  And there is no

21   class certified yet, so we're not under the class rules with

22   respect to the Ad Hoc Committee's recommendations with

23   respect to the plan.  We expect that to be short and non-

24   editorial, but it's probably not going to be the same

25   recommendation the Committee's making.  Would Your Honor like

1    us to submit whatever we're going to do in that respect by

2    the same deadline?

3          THE COURT: Well, I don't like to extend invitations

4    myself either.  I guess - -

5          MR. KEACH: I just wanted to alert the Court that it

6    was our intention to do so.  And courts handle Century Glove

7    materials differently.  Some want to approve them, some

8    don't.

9          THE COURT: I try not to look for work.  If you wish

10   to submit it along the same time frame, I'll consider it.  I

11   leave it really to your judgment.  I don't have a, put it

12   this way, I don't have a rule.

13         MR. KEACH: Okay.

14         THE COURT: So I leave it to your judgment whether

15   you'd like to go through that process or not.

16         MR. KEACH: We're comfortable not going through the

17   process, Your Honor.  We know what we can say and what we

18   can't.

19         THE COURT: All right.

20         MR. KEACH: Thank you.

21         MS. UHLAND: With that, Your Honor, what we propose

22   to do is take the, the current version of the order back,

23   revise it, and I think, and work with Mr. Keach.  We're going

24   to incorporate the timing provisions in that order.  We can,

25   you know, submit a revised order, and we'll be doing so as

1    soon as possible, and submitting the, if we can, a revised

2    disclosure statement and plan under certification of counsel

3    prior to this holding date.  And if not, we'll deal with

4    those issues on the holding date.

5          THE COURT: Okay.

6          MS. UHLAND: All right?

7          THE COURT: Yes.

8          MS. UHLAND: I believe that's all we have on this

9    portion, Your Honor.  With that, I was wondering if Mr.

10   Parlen and I could be excused.

11         THE COURT: Before you, before I do, let me just ask

12   if anyone cares to be heard who's not yet been heard on the

13   issues that, at least the Debtor thinks we've just been put

14   to bed.  Okay.  I hear no response.  And for the record, I am

15   prepared to approve, subject to the changes we talked about

16   today, the disclosure statement.

17         MS. UHLAND: Thank you very much, Your Honor.

18         THE COURT: All right.

19         MR. KEACH: Your Honor, I understand there are other

20   matters, but if I could be excused, I would appreciate it.

21   Thank you, Your Honor.

22         THE COURT: You may.

23         MR. SAMIS: Good afternoon, Your Honor.  Chris Samis

24   of Richards, Layton & Finger.  I'll be handling the claims

25   portion of the hearing today.  Your Honor, the 9th, 11th, and

1   12th items on the agenda are the 11th, 12th, and 13th omnibus

2   objections.

3          THE COURT: What about item no. 5?

4          MR. SAMIS: Item no. 5.  Let me take a look, Your

5   Honor.

6          THE COURT: That's the Debtors 9th omnibus objection.

7   The status line indicates the hearing on the matter is going

8   forward, but that's not what the exhibit indicates.  So I was

9   a little confused by that.

10          MR. SAMIS: That is in the - - Your Honor, that's an

11   error.  That matter is not going forward.

12          THE COURT: All right.  Thank you.

13          MR. SAMIS: The 11th, 12th, and 13th omnibus

14   objections are going forward however, Your Honor.

15          THE COURT: All right.

16          MR. SAMIS: With respect to the objections that have

17   drawn responses that are contained in the 11th, 12th, and 13th

18   omnibus objections, many of them are continued pending

19   further negotiation and/or the execution of global

20   stipulations that will resolve those claims.  Thus, if it

21   pleases the Court, I'll only address those objections that

22   are either going forward, being withdrawn by the Debtors,

23   where a settlement has been reached, or that the Debtors

24   would otherwise like to comment upon.

25          THE COURT: Very well.

1          MR. SAMIS: Your Honor, with respect to the 11th

2    omnibus objection, the LoanLeaders claim, the Debtors have

3    settled this dispute with regard to the claim, and a

4    settlement is reflected on the revised form of order that I

5    have with me in court today.

6          THE COURT: Okay.

7          MR. SAMIS: As for the Bank of Oklahoma, the Debtors

8    are going to be withdrawing their objection to the Bank of

9    Oklahoma claim.  With respect to the TCAM Core Property Fund

10   claim, we're going forward with this today, Your Honor, but

11   after discussing the claim with the Debtors, TCAM has agreed

12   to withdraw it's response.  So that's going forward on an

13   uncontested basis.

14         THE COURT: Okay.

15         MR. SAMIS: Your Honor that brings us, the remaining

16   responses there are all continued.  That brings us to the 12th

17   omnibus objection, Your Honor.  The only response that we

18   received to that was the response of PromoShop.  The hearing

19   on this claim is also going forward.  I actually, PromoShop's

20   counsel was, was in the courtroom earlier today.  I spoke

21   with them.  They've since left, based upon my representation

22   that, you know, and my understanding that essentially that

23   PromoShop concedes the grounds that, for the Debtors'

24   objection are valid.  They simply sought confirmation that

25   the surviving claim was being left unaffected for the time

1    being.

2              THE COURT: That's what it looked like.

3              MR. SAMIS: Yeah.  And that's correct, Your Honor.

4    Now, of course, the Debtors expressly reserve their right on

5    the record to object to the remaining claim pending further

6    analysis, we just haven't reached that point in the claims

7    analysis.  That brings us to the 13th omnibus objection, Your

8    Honor.  The first claim there is also a PromoShop claim, and

9    that's essentially the same situation.  Your Honor, the other

10   response that we received with respect to the 13th omnibus

11   objection was the response of Alyse Rafidi.  I've been in, I

12   was actually contacted by Your Honor's chambers personnel and

13   they indicated that a motion for reconsideration is actually

14   going to be docketed in the next couple of days.  That was,

15   that was sent to the Court by Mr. Rafidi.  So in lieu of

16   that, we're going to continue our objection with respect to

17   those claims for now, to see when the motion for

18   reconsideration is docketed, and then try to handle it

19   globally.  Your Honor, the response of Tracy P. Dunn is the

20   next one that we'd just like to speak about.  The hearing on

21   this claim is also going forward.  I spoke with Ms. Dunn.

22   She actually misunderstood the purpose of the objection, and

23   thought that all of her claims were being expunged in their

24   entirety.  Once I explained to her that that wasn't the case,

25   she was comfortable with the relief sought in the objection.

1    That brings us to NFS Loans, Your Honor.  This is only the,

2    the only truly contested claim, I guess, that's, that's here

3    today.  The hearing on this claim, we're going to go forward

4    with it.  NFS's Loans apparently misunderstands the objection

5    and believes, much like Ms. Dunn, that all of its claims are

6    being expunged in their entirety.  I attempted to contact

7    their representative multiple times regarding the matter, I

8    didn't receive any calls back.  I don't believe they're

9    represented in court today or on the telephone, but I'll just

10   I guess ask the question.

11        THE COURT: Just for the record.  Is anyone present,

12   either in person or on the telephone, on behalf of NFS Loans?

13   I hear no response.

14        MR. SAMIS: Your Honor, that brings us to, to the

15   ACE, and it's affiliated entities claims.  These are actually

16   continued to 3/25, but I did want to represent on the record

17   that we essentially have an agreement in principle.  We hope

18   to file the agreement under certification of counsel within

19   the next few days.  And with that, Your Honor, I believe that

20   brings me to the end of my presentation on claims.  And I do

21   have the forms of order with me here in court if Your Honor

22   would like me to pass them up.

23        THE COURT: Yes.  And while you're doing that, just

24   let me ask for the record whether anyone else wishes to be

25   heard in connection with any of these three claims

1   objections.  I hear no response.  Those orders have been

2   signed.

3           MR. SAMIS: Thank you, Your Honor.

4           THE COURT: Is there anything further for today?

5           MR. SAMIS: I don't believe so, Your Honor.

6           THE COURT: Then that concludes this hearing.  Court

7   is adjourned.

8           MR. SAMIS: Thank you.

9       (Whereupon at 4:44 p.m. the hearing in this matter was

10  concluded for this date.)

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19  the United States Courts, certify that the foregoing is a

20  correct transcript from the electronic sound recording of the

21  proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                    ___03/12/08___
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905