# STATEMENT OF THE COMMITTEE IN
## SUPPORT OF CONFIRMATION OF THE JOINT PLAN[1]

The Plan embodies a number of intricate and complex settlements among the various creditor constituencies that have claims against the different Debtor entities.  These settlements are interrelated and cannot be modified without impacting the other compromises embodied in the Plan.  The members of the Committee played an active role with the Debtors in analyzing the various positions of the different creditor constituencies and in negotiating the terms of the consensual Plan.  After several months of analysis and negotiations, the Committee voted unanimously to approve the terms of the Plan and recommends that all creditors cast their ballots in favor of the Plan.  The purpose of this Summary is to explain to creditors in general terms the material factors that the Committee members considered when deciding to support the Plan.

**This memorandum is intended to only be a summary of relevant factors considered by the Committee in deciding to support the Plan, not a detailed explanation of all factors considered by or the deliberations of the Committee.  When deciding whether or not to vote for or against the Plan, creditors should review and rely on the Plan and the Disclosure Statement, the terms of which govern over this Summary.[2]**

## The Composition of the Committee

The Office of the United States Trustee appointed a seven member Committee.  The Committee is comprised of a balanced cross-section of the different creditor constituencies in these cases, with different Committee members holding Claims against the Holding Company Debtors; Claim against the Operating Debtors; EPD/Breach Claims against NC Capital; and a Claim that is subject to the Multi-Debtor Claim Protocol because more than one Debtor is jointly and severally liable for such Claim.

## The Starting Point of the Committee's Analysis

The starting point of the Committee's analysis was recognizing that these are liquidating chapter 11 cases with a finite number of assets remaining to be liquidated.  The Debtors' Disclosure Statement projects that aggregate asset recoveries (other than litigation recoveries), after deducting anticipated administrative expenses, will range between $56.8 million and $194.4 million.  The Disclosure Statement estimates that general unsecured claims, a significant portion of which are presently unliquidated, (excluding intercompany claims) should ultimately be allowed between $1.13 billion and $2.12 billion.  Thus, the Disclosure Statement projects that, excluding any litigation recoveries and without giving affect to any increased determined

---

[1]    All undefined capitalized terms contained herein shall have the meanings ascribed to such terms in the First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and The Official Committee of Unsecured Creditors dated as of March 11, 2008 (the "Plan").

[2]    Nothing contained herein is intended to constitute a waiver of the Committee's attorney-client privilege or confidentiality, which are expressly reserved.  All settlement negotiations in which the Committee was involved are governed by Rule 408 of the Federal Rules of Evidence.

1413850.v2

distribution amounts assigned to certain claims that are subject to the Multi-Debtor Protocol, distributions to Creditors holding Allowed Unsecured Claims are expected to be in the following recovery ranges: Creditors of Holding Company Debtors – 1.9%-14.3%; Creditors of Operating Debtors –  3.5%-23.6%; EPD Breach Creditors with Claims against NC Capital - 1.8%-11.8%; Creditors of Home123 - .9% - 5.9%; and Creditors holding Claims against Access Lending 11.7%-31.3%.

The members of the Committee also recognized that significant portions of the Claims asserted against the Debtors are of a similar nature and type, such as the EPD/Breach Claims asserted by the whole loan purchasers and trustees of securitization trusts and the deficiency claims asserted by the repurchase counter-parties under their repurchase agreements. Consequently, as modifications to the proposed treatment of those classes of Claims are made, the tide of Claims is likely to rise or fall in unison, resulting in such Creditors not receiving a significantly improved benefit vis-à-vis similarly situated Creditors in the class.

The Committee was also very concerned about the significant administrative costs being incurred by these estates.  The Committee believes that confirmation of a consensual Plan will result in a significant and immediate reduction in the on-going administrative expenses being incurred by these estates.  Unsecured creditors should benefit from such reductions in expenses.

Lastly, the Committee placed a high value on Creditors receiving their distributions as quickly as possible.  The Plan compromises several major issues, including streamlining the resolution through the EPD/Breach Protocol of highly complex disputes over alleged breaches and damage assessments involving the sale or transfer of hundreds of thousands of loans with unpaid principal balances in the tens of billions of dollars.  The Plan also settles issues concerning recharacterization of intercompany claims and piercing the corporate veils of certain Debtor entities and complex contractual disputes as well as potential fraudulent transfer issues between Debtors entities.  These issues are highly complex and would be extremely expensive and time-consuming for both the estates and individual Creditors if the issues had to be litigated to a final conclusion in the Bankruptcy Court.

## The Compromises and Settlements Contained in the Plan

The Professionals for the Debtors and the Committee analyzed the Debtors' accounting books and corporate records to determine whether it was appropriate to substantively consolidate. either completely or partially, the assets and liabilities of the various Debtor entities, under the guidelines espoused in the Third Circuit Court of Appeals' decision in *In re Owens Corning*, 419 F.3rd 195, 211 (3rd Cir. 2005) *as amended by* 2005 U.S. App. LEXIS 18043 (3d Cir. Aug. 23, 2005), *cert. denied*, 126 S.Ct. 1910 (2006).

In addition to analyzing the appropriateness of the Debtors' estates being substantively consolidated, the Debtors and the Committee also inquired into numerous other issues involving the Assets and liabilities of the separate Debtors' estates, including, for example, whether (i) Assets listed as Assets on a certain Debtor's books and records were properly recorded as Assets of that Debtor, (ii) a Debtor which funded the acquisition of certain Assets that were then recorded on the books as being owned by a different Debtor for administrative or other reasons

was proper, and (iii) certain intercompany claims should be recharacterized as capital contributions, not debt obligations, as there appeared to be no or little evidence that the Debtors ever paid in the past or intended to repay in the future such intercompany claims.

The Debtors and the Committee also looked into other material issues not reflected on the Debtors' books and records that would have a direct impact on Creditor recoveries, such as (i) what is the proper method for allocating administrative expenses incurred and to be incurred among the various Debtors' estates, and (ii) how to allocate potential recoveries from assets not recorded on the various Debtor's books and records, such as tax refunds and anticipated litigation recoveries, among the various Debtor estates.

The Plan reflects the Debtors' and Committee's efforts to comply with the deconsolidation mandates of *Owens Corning,* while at the same time recognizing and resolving as part of a global compromise the various intercompany and intercreditor disputes described above. This included, for example, establishing in the Plan (described at Section IV.A.3.b of the Disclosure Statement) the Multi-Debtor Claim Protocol, which increases by a specified factor the claim of certain Creditors to the extent certain other Debtors are jointly and/or severally liable for such Claim. The Multi-Debtor Claim Protocol seeks to mitigate the potential adverse affect that a consolidation of certain Debtor entities into the Holding Company Debtors and certain other Debtor entities into the Operating Company Debtors may have. The terms of the other compromises are contained in the Plan and described in the Disclosure Statement.

## The EPD/Breach Protocol Constitutes a Key Component of the Plan

As explained in greater detail in the Disclosure Statement, the EPD/Breach Protocol is a key component of the Plan. The protocol provides a streamlined method for fixing the allowed amount of claims asserting either breaches by the Debtors for early payment defaults or breaches of representations and warranties under individual Creditor's loan purchase agreements. If the EPD/Breach Protocol is not approved, the Plan Proponents anticipate that the Debtors' estates and individual creditors will incur millions of dollars of expenses and time-consuming delays litigating issues concerning whether the alleged breaches actually qualify as breaches under the operative documents, and, if so, whether the damages asserted are appropriate. In addition, a number of whole loan purchasers and securitization trustees have asserted large unliquidated claims for breaches that exist but have not yet been discovered since such breaches are typically discovered only after the underlying loan goes into default and the servicer discovers the alleged breach. The Committee believes that the cost and anticipated delay in trying to litigate before the Bankruptcy Court estimation hearings to determine each Creditor's allowed claim amount for existing, but unknown breaches based on pools of thousands or tens of thousands of loans would be prohibitive. The EPD/Breach Protocol provides a streamlined, efficient method for estimating these claims based on a formula to be applied uniformly to all EPD/Breach Creditors.

Another key component of the Plan is the settlement of the dispute between the majority of the Holders of EPD/Breach Claims and the creditors of NCMC. The dispute arises out of the fact that a vast majority of the Holders of EPD/Breach Claims contracted with NC Capital, not NCMC, for the purchase and sale (or transfer to securitization trusts) of mortgage loans. NC

Capital is a Debtor entity that has no material Assets.  The Creditors of NC Capital have argued however, that NCMC, which in most cases originated and then "sold" the mortgage loans to NC Capital at the time of NC Capital's sale of the loans to the Creditors is contractually liable for the representations and warranties made by NC Capital to the mortgage loan purchasers. Alternatively, EPD/Breach Claimants have asserted that as creditors of NC Capital, the estate has substantial fraudulent conveyance/piercing the corporate veil claims against NCMC (and possibly NCFC) because NCMC failed to provide NC Capital with reasonable consideration at the time of the sale in exchange for NC Capital incurring substantial repurchase obligations to whole loan purchasers and securitization trustees.  This dispute is settled in the Plan by providing that the Holders of Allowed EPD/Breach Claims against NC Capital (based on the application of the EPD/Breach Protocol) shall have allowed claims against NCMC discounted by 50%.

The Holders of EPD/Breach Claims also asserted that the EPD/Breach Protocol will result in the allowed amount of their claims being reduced to amounts substantially lower than they would otherwise be entitled to.  In an effort to obtain such Holders' support for the EPD/Breach Protocol, the Plan provides for a sharing of any the Litigation Recoveries 27.5%, 27.5% and 45% to Holders of Allowed Claims against the Holding Company Debtors, Holders of Allowed Claims against the Operating Debtors and Holders of EPD/Breach Claims, respectively.  This was also a key component of the compromises contained in the Plan.