## EXHIBIT C

## UNITED STATES BANKRUPTCY COURT

### For the District of Delaware

| | |
|---|---|
| In re | Honorable Kevin J. Carey |
| | Chapter 11 |

| | |
|---|---|
| New Century Mortgage Corporation | 07-10419 |
| New Century Mortgage Ventures, LLC | 07-10429 |
| NC Capital Corporation | 07-10420 |
| NC Residual III Corporation | 07-10424 |
| New Century R.E.O. Corp. | 07-10426 |
| New Century R.E.O. II Corp. | 07-10427 |
| New Century R.E.O. III Corp. | 07-10428 |
| NC Deltex, LLC | 07-10430 |
| NCoral, L.P. | 07-10431 |
| NC Asset Holding, L.P. | 07-10423 |
| Home123 Corporation | 07-10421 |
| New Century TRS Holdings, Inc. | 07-10416 |
| NC Residual IV Corporation | 07-10425 |
| New Century Credit Corporation | 07-10422 |
| New Century Financial Corporation | 07-10417 |
| New Century Warehouse Corporation | 07-11043 |

Debtors.

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF MARCH 18, 2008

| | |
|---|---|
| Suzzanne S. Uhland | Mark Collins |
| Ben H. Logan | Michael J. Merchant |
| Andrew M. Parlen | Christopher M. Samis |
| O'MELVENY & MYERS LLP | RICHARDS, LAYTON & FINGER, P.A. |
| 275 Battery Street | One Rodney Square |
| San Francisco, California 94111 | 920 North King Street |
| (415) 984-8700 | Wilmington, Delaware 19801 |
| | (302) 651-7700 |

Attorneys for the Debtors and Debtors in Possession

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................... 1
    A.  SUMMARY OF THE PLAN ............................................. 4
    B.  RECOMMENDATION ..................................................... 16

II.  VOTING ........................................................................... 16
    A.  ELIGIBILITY TO VOTE ................................................ 16
    B.  BALLOTS ..................................................................... 19
    C.  VOTING PROCEDURE ................................................. 19
    D.  DEADLINE FOR VOTING ............................................. 20
    E.  IMPORTANCE OF YOUR VOTE ................................... 20

III.  BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES ................... 20
    A.  INTRODUCTION ........................................................ 20
    B.  EVENTS LEADING TO CHAPTER 11 CASES ............... 26
    C.  THE CHAPTER 11 CASES ............................................ 28
    D.  OTHER EVENTS DURING CHAPTER 11 CASES ......... 46
    E.  MANAGEMENT; HEADCOUNT REDUCTION ............. 62

IV.  THE PLAN ....................................................................... 63
    A.  PLAN OVERVIEW ....................................................... 64
    B.  CLASSIFICATION ....................................................... 81
    C.  THE MULTI-DEBTOR CLAIM PROTOCOL FOR TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS ................... 107
    D.  THE INTERCOMPANY PROTOCOL FOR TREATMENT OF INTERCOMPANY CLAIMS ................... 108
    E.  MEANS OF IMPLEMENTING THE PLAN ................... 109
    F.  DISTRIBUTIONS UNDER THE PLAN ........................ 123
    G.  PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS ................... 133
    H.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 135
    I.  EFFECT OF CONFIRMATION AND INJUNCTION ..... 137
    J.  CONDITIONS PRECEDENT ......................................... 139
    K.  RETENTION OF JURISDICTION ................................ 140
    L.  NON-SEVERABILITY ................................................. 143

## TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | M. | BANKRUPTCY RULE 9019 REQUEST | 143 |
| V. | | FINANCIAL INFORMATION | 143 |
| | A. | STATUS OF ASSET DISPOSITION PROCESS; ADDITIONAL ASSETS OF DEBTORS; CURRENT CASH POSITION | 143 |
| | B. | RISKS AND ASSUMPTIONS ASSOCIATED WITH RECOVERY PROJECTIONS | 153 |
| VI. | | CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN | 156 |
| VII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 157 |
| | A. | SUMMARY OF THE PLAN STRUCTURE | 157 |
| | B. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED UNSECURED CLAIMS AGAINST HOLDING COMPANY DEBTORS AND OPERATING DEBTORS | 158 |
| | C. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS AGAINST ACCESS LENDING | 159 |
| | D. | ALLOCATION OF CONSIDERATION TO INTEREST | 159 |
| | E. | FEDERAL INCOME TAX TREATMENT OF HOLDERS OF INTERESTS AND 510(B) CLAIMS | 160 |
| | F. | FEDERAL INCOME TAX TREATMENT OF THE LIQUIDATING TRUST | 160 |
| | G. | FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS | 162 |
| | H. | BACKUP WITHHOLDING | 163 |
| VIII. | | ALTERNATIVES TO CONFIRMATION OF THE PLAN | 163 |
| IX. | | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 164 |
| | A. | GENERAL CONFIRMATION REQUIREMENTS | 164 |
| | B. | BEST INTERESTS TEST | 164 |
| | C. | FINANCIAL FEASIBILITY TEST | 168 |
| | D. | ACCEPTANCE BY IMPAIRED CLASSES | 168 |
| | E. | APPROVAL OF PLAN SETTLEMENTS; SUBSTANTIVE CONSOLIDATION | 169 |
| X. | | CONCLUSION | 170 |

# I.    INTRODUCTION

The following debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on April 2, 2007 (the "Petition Date"), thereby commencing case numbers 07-10416, 07-10417, 07-10419, 07-10420, 07-10421, 07-10422, 07-10423, 07-10424, 07-10425, 07-10426, 07-10427, 07-10428, 07-10429, 07-10430, and 07-10431 (collectively, and with the chapter 11 case of New Century Warehouse Corporation, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"):

| | |
|---|---|
| New Century Financial Corporation, a Maryland corporation; Case No. 07-10417 | New Century R.E.O. Corp., a California corporation; Case No. 07-10426 |
| New Century TRS Holdings, Inc., a Delaware corporation; Case No. 07-10416 | New Century R.E.O. II Corp., a California corporation; Case No. 07-10427 |
| New Century Mortgage Corporation, a California corporation; Case No. 07-10419 | New Century R.E.O. III Corp., a California corporation; Case No. 07-10428 |
| NC Capital Corporation, a California corporation; Case No. 07-10420 | New Century Mortgage Ventures, LLC, a Delaware limited liability company; Case No. 07-10429 |
| Home123 Corporation, a California corporation; Case No. 07-10421 | NC Deltex, LLC, a Delaware limited liability company; Case No. 07-10430 |
| New Century Credit Corporation, a California corporation; Case No. 07-10422 | NCoral, L.P., a Delaware limited partnership; Case No. 07-10431 |
| NC Asset Holding, L.P., a Delaware limited partnership; Case No. 07-10423 | NC Residual IV Corporation, a Delaware corporation; Case No. 07-10425 |
| NC Residual III Corporation, a Delaware corporation; Case No. 07-10424 | |

Subsequently, on August 3, 2007, New Century Warehouse Corporation, a California corporation which is also known as and is referred to herein as "Access Lending" (collectively with the above-listed entities, the "Debtors"), filed a voluntary chapter 11 petition (Case No. 07-11043).

Since filing for bankruptcy protection, the Debtors have continued to operate their business and manage their affairs as Debtors and Debtors in Possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  On April 4, 2007, the Bankruptcy Court entered an order authorizing the joint administration of the Chapter 11 Cases (the "Joint Administration Order"). After Access Lending filed its chapter 11 petition, the Joint Administration Order was amended to include Access Lending.

On February 2, 2008, the Debtors and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtor, the "Plan Proponents") filed their proposed First Amended Joint Plan of Liquidation Dated March 18, 2008 (the "Plan").  The Plan is the result of extensive negotiations among the Plan Proponents.  THE DEBTORS AND THE COMMITTEE URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE PLAN.**

The information used in preparing this Disclosure Statement was prepared by and is the sole responsibility of the Debtors.  This Disclosure Statement does not constitute financial or legal advice.  Creditors and shareholders of the Debtors should consult their own advisors if they have questions about the Plan or this Disclosure Statement.  Capitalized terms used in this Disclosure Statement and not expressly defined herein will have the meaning ascribed to such terms in the Plan.  A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement.

**WHILE THIS DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  YOU SHOULD READ THE PLAN AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS.  ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, AS WELL AS COPIES OF THE LIQUIDATING TRUST AGREEMENT, CAN BE OBTAINED FROM NEW CENTURY FINANCIAL CORPORATION, C/O XROADS CASE MANAGEMENT SERVICES, P.O. BOX 8901, MARINA DEL REY, CALIFORNIA 90295, TELEPHONE (888) 784-9571, AND AT http://www.xroadscms.net/newcentury.  THE COST OF COPIES MUST BE PAID BY THE PERSON ORDERING THEM.  COPIES OF PAPERS FILED IN THIS CASE ALSO MAY BE INSPECTED DURING REGULAR COURT HOURS IN THE CLERK'S OFFICE, UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.**

**THE STATEMENTS AND INFORMATION CONCERNING THE DEBTORS, THE PLAN, AND THE LIQUIDATING TRUST SET FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR**

REJECTIONS OF THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED. THE DEBTORS ASSUME NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DO NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE HEARING ON CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS, INCLUDING THOSE STATEMENTS, ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS AND INTERESTS, ESTIMATES OF THE AGGREGATE FINAL AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALES OF THE DEBTORS' REMAINING ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE LIQUIDATING TRUST DURING THE WIND DOWN PERIOD. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN, POSSIBLY BY MATERIAL AMOUNTS.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT. PURSUANT TO THE PLAN, ANY SECURITIES OF THE DEBTORS ISSUED TO ANY PARTY UNDER, PURSUANT TO OR IN EFFECTUATING THE PLAN, AND THE OFFERING AND ISSUANCE THEREOF BY ANY PARTY, INCLUDING WITHOUT LIMITATION THE DEBTORS, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OF, UNDERWRITER OF, OR BROKER OR DEALER IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING WITHOUT LIMITATION SECTION 1145 OF THE

BANKRUPTCY CODE.

### A.    SUMMARY OF THE PLAN.

The following is a brief summary of the Plan, which is qualified in its entirety by reference to the Plan, attached as <u>Exhibit A</u> to this Disclosure Statement. Capitalized terms not defined herein will have the meaning given to them in the Plan.

### 1.    The Debtors' Organizational Structure.

The Plan provides for distributions to creditors of the 16 companies that are debtors in possession in these Chapter 11 Cases. These companies are related to one another as shown in the following chart.



### 2.    The Structure of the Plan.

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified, while Priority Claims and Secured Claims against each Debtor are placed in their own Classes.[1]  The Plan provides for payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims and leaves Allowed Secured Claims unimpaired.

Holders of Interests in New Century Financial Corporation ("NCFC") and 510(b) Claims will receive no distributions under the Plan and, therefore, are deemed to reject the Plan.  The securities owned by Holders of NCFC Interests will be cancelled pursuant to the Plan.

The Plan is a joint plan, which means that separate classes are established for Unsecured Claims against each of the Debtors, but the distributions made to the classes of Unsecured Claims are generally made on a joint basis for each of three groups of companies comprising the Debtors.  These groupings of companies take into account such matters as Intercompany Claims among the Debtors and which Debtors owned which assets.  These matters were not always subject to definitive answer.  For example, multiple Debtors could assert that they should be the beneficiary of litigation claims related to the need to restate the Debtors' financials, and assets and liabilities were sometimes transferred among the Debtors in a manner that could lead to competing claims among the Debtors for ownership of assets or responsibility for liabilities.  These matters are resolved and compromised through the Plan, as is discussed in detail in Section IV.A.3 hereof.

The Plan Proponents do not believe that the series of compromises embodied in the Plan constitute "substantive consolidation" of the Debtors for Plan purposes.    Substantive consolidation is an equitable remedy whereby the assets and liabilities of different entities may be consolidated and dealt with as if the debts were held by, and the liabilities were incurred by, a single entity.  Thus, if the Debtors were being substantively consolidated under the Plan, the assets of the Debtors would be collapsed into a common fund for the payment of their prepetition liabilities, and any Intercompany Claims between and among the Debtors would be extinguished.  Substantive consolidation may be ordered where, inter alia, the assets of the estates are so intermingled that separating them is prohibited and will reduce the assets available for distribution to creditors.  While the Plan Proponents do not believe that the Plan constitutes substantive consolidation – or partial substantive consolidation within the Debtor Groups – if and to the extent necessary to effectuate the joint nature of the Plan, the Debtors request in connection with confirmation of the Plan that the Debtors be substantively consolidated within the Debtor Groups for the purposes of the actions under the Plan.  In such case, entry of the Confirmation Order would constitute the approval pursuant to section 105(a) of the Bankruptcy Code of the substantive consolidation within the Debtor Groups for Plan purposes.  Subject to Bankruptcy Court approval, the Plan proposes to provide the same treatment for each Class of Claims upon confirmation of the Plan regardless of whether the Bankruptcy Court approves the Plan under Bankruptcy Rule 9019 or orders the partial substantive consolidation of the Debtors

---

[1]  Administrative Claims, Priority Tax Claims, Priority Claims, and Secured Claims are referred to collectively herein and in the Plan as "A/P/S Claims."

5

under sections 105(a) and 1123(a)(5) of the Bankruptcy Code.

The three broad groups of Debtors (each, a "Debtor Group") established in the Plan for purposes of the treatment of Unsecured Claims are: (1) the Holding Company Debtors, (2) the Operating Debtors, and (3) Access Lending.

The Holding Company Debtors are NCFC, New Century TRS Holdings, Inc. ("TRS Holdings"), New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). The Holding Company Debtors generally qualified as real estate investment trusts. They typically held residual interests in securitization trusts and owned the stock in the Operating Debtors. The Holding Company Debtors also provided overall direction and management to the Operating Debtors.

The Operating Debtors are New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral"). The Operating Debtors were generally the entities that conducted the Debtors' business operations, including originating, purchasing and selling loans, and servicing loans for third parties.

Access Lending was a subsidiary that provided warehouse financing to independent mortgage companies. It was acquired by TRS Holdings in early 2006.

The Plan contains 16 Classes of Unsecured Claims, six of which are Classes of Claims against Holding Company Debtors, nine of which are Classes of Claims against Operating Debtors, and one of which is a Class of Claims against Access Lending.

The Plan provides for the distribution of the net Cash available from Assets of the Debtors in each Debtor Group to the Holders of Allowed Unsecured Claims against Debtors in that Debtor Group. In general, the Cash available to distribute to Holders of Allowed Unsecured Claims in each Debtor Group is calculated based on gross proceeds from the disposition of that Debtor Group's Assets less (i) the amount of Allowed A/P/S Claims, (ii) expenses of administering the Debtors' Estates during the Chapter 11 Cases, and (iii) expenses of the Liquidating Trust, which, in each case, will be allocated among the Debtor Groups pursuant to the terms of the Plan.

The Debtors' Assets, other than those by Access Lending, are divided between the Holding Company Debtors and the Operating Debtors.

Assets of the Holding Company Debtors include the assets in the irrevocable trust established in connection with NCFC's deferred compensation plan (discussed in Sections III.C.10.d and V.A.4.e hereof) and investments in structured securitizations in the residential subprime sector in a fund managed by Carrington Capital Management, LLC (discussed in Section V.A.4.a hereof).

Assets of the Operating Debtors include proceeds from the sales of the Debtors' servicing business (discussed in Section III.C.6.b hereof) and mortgage loans not subject to repurchase transactions (discussed in Sections III.C.6.a and III.C.6.f hereof).

The net proceeds generated from any litigation (other than that belonging to Access Lending) are referred to in the Plan as "Litigation Proceeds" and include any net proceeds from Avoidance Actions as well as any net proceeds of litigation arising from NCFC's announced need to restate its 2006 financial statements. Any Litigation Proceeds will be allocated on a percentage basis to Holders of Allowed Unsecured Claims against the Holding Company Debtors and the Operating Debtors in order to effect a compromise concerning such matters as which Debtor(s) could assert such claims and Intercompany Claims related thereto. The Plan provides that Litigation Proceeds will be allocated 27.5% to Holders of Allowed Unsecured Claims against Holding Company Debtors and 72.5% to Holders of Allowed Unsecured Claims against Operating Debtors (subject to a further allocation among the Holders of Allowed Unsecured Claims against Operating Debtors to provide that the Holders of Allowed NC Capital EPD/Breach Claims will receive 45% of the Litigation Proceeds and Holders of all other Allowed Unsecured Claims against Operating Debtors will receive 27.5% of the Litigation Proceeds).

For purposes of calculating distributions to be made in respect of each Allowed Unsecured Claim, each Class of Unsecured Claims is assigned a "Determined Distribution Amount" -- a fixed percentage of the amount of each Allowed Unsecured Claim. This mechanism permits the Plan to reflect the relative asset values of the Debtors and to apply the Multi-Debtor Claim Protocol (discussed below).

The Plan assigns Determined Distribution Amount percentages of 100%, 50%, or 25% to Classes of Allowed Unsecured Claims against Operating Debtors. While each Allowed Unsecured Claim against NCMC (which owned the assets relating to the Debtors' loan serving business) is assigned a Determined Distribution Amount equal to 100% of the amount of the Allowed Claim, each Allowed Unsecured Claim against NC Capital is assigned a Determined Distribution Amount of 50% or 100% of the amount of such Allowed Claim (depending on the basis of the Claim), and each Allowed Unsecured Claim against Home123, NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral is assigned a Determined Distribution Amount of 25% of the amount of such Allowed Claim. As a result, while net proceeds of Assets (other than Litigation Proceeds) are distributable Pro Rata within the Operating Debtor group, a Holder of an Allowed Unsecured Claim against NCMC will receive twice the rate of recovery on account of such Claim as would a Holder of an Allowed EPD/Breach Claim against NC Capital and four times the rate of recovery as would the Holder of an Allowed Unsecured Claim against Home123, NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, or NCoral. These Determined Distribution Amounts are designed to reflect the relative strengths of issues concerning which of the Operating Debtors owned the servicing rights and loans that the Debtors sold in the Chapter 11 Cases and relative arguments concerning some disputed intercompany claims among the Debtors.

The Plan assigns a Determined Distribution Amount of 100% of the amount of all

Allowed Unsecured Claims against Holding Company Debtors and Access Lending. The ranges of recoveries for Holders of Allowed Unsecured Claims against Holding Company Debtors and Operating Debtors is set forth in the table located in Section I.A.4 hereof.

The Plan also compromises inter-Debtor issues related to the fact that multiple Debtors were jointly and/or severally liable to some creditors (by virtue of agreements providing for joint and several liability or guarantees) through the Multi-Debtor Claim Protocol contained in Article 6 of the Plan. Pursuant to the Multi-Debtor Claim Protocol, each Holder of an Allowed Unsecured Claim for which multiple Debtors in a Debtor Group are jointly and/or severally liable will receive a single distribution from that Debtor Group based on the highest Determined Distribution Amount assigned to such Claim. If, however, specific Debtors (i.e., those with recoverable assets) within a Debtor Group are jointly and/or severally liable for such Claim, then the Holder of the Allowed Unsecured Claims will receive an enhanced recovery. For example, if both NCFC and NC Credit are liable for an Allowed Unsecured Claim, the Holder of such Claim will receive a single Pro Rata distribution from the Holding Company Debtor group, but the Determined Distribution Amount assigned to such Claim will be 130% of the amount of the Allowed Claim. Similarly, if all of NCMC, NC Capital, and Home123 are jointly and/or severally liable for the same Allowed Unsecured Claim, the Holder of such Claim will receive a single Pro Rata distribution from the Operating Debtor group, but with a Determined Distribution Amount of 130% of the amount of the Allowed Claim. The Multi-Debtor Claim Protocol will provide enhanced recoveries to certain Repurchase Counterparties (defined and discussed in Section III.A.1.a hereof), as many of the Master Repurchase Agreements (defined and discussed in Section III.A.1.a hereof) were entered into or guaranteed by multiple Holding Company Debtors and Operating Debtors.

The Multi-Debtor Protocol only enhances Determined Distribution Amounts of Allowed Claims within a Debtor Group. To the extent a Holding Company Debtor and an Operating Debtor are jointly and/or severally liable for an Allowed Claim, the Holder of such Claim will receive a distribution from both Debtor Groups (after giving effect to the Multi-Debtor Claim Protocol, if applicable, to the multiple Allowed Claims within each Debtor Group).

The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending.

Through the Intercompany Claim Protocol set forth in Article 7 of the Plan, the Plan effects a settlement of the Debtors' Intercompany Claims by canceling such Claims within each Debtor Group and providing that (i) the Determined Distribution Amounts of Intercompany Claims of Holding Company Debtors against Operating Debtors are reduced by 50% and (ii) the Determined Distribution Amount percentage for Claims of Operating Debtors against Holding Company Debtors is 100%.

The Plan also includes a protocol to determine the distribution amounts (before giving effect to the Determined Distribution Amounts and the Multi-Debtor Claim Protocol) for Holders of Allowed Unsecured Claims arising under an agreement between one or more of the Debtors and a loan buyer or securitization trust for (i) breach of a representation or warranty made by one or more of the Debtors under a loan sale agreement (a "Breach Claim") or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the

borrower on such loan (an "EPD Claim" and, collectively with Breach Claims, "EPD/Breach Claims"). Under the EPD/Breach Claim Protocol, the Determined Distribution Amount for each EPD/Breach Claim is determined (i) with respect to EPD Claims, as a percentage (from 0% to 45%) of a loan's unpaid principal balance on August 31, 2007 (the claims bar date for all Debtors other than Access Lending), with the percentage determined based on borrower payment history on that date and (ii) with respect to Breach Claims, by applying a set of assumptions regarding the percentage of loans in any pool of loans that will be subject to breach, the timing of when breaches are asserted, and damages resulting from breaches.  The EPD/Breach Claim Protocol was developed by the Debtors working in conjunction with the Committee and a number of major securitization trustees and whole loan buyers.  This protocol is designed to avoid the need to analyze whether the Debtors breached representations and warranties for individual loans and assessing damages for any such breaches or EPD Claims at a loan level.  Given the extremely large magnitude of loans that the Debtors sold, if such matters were analyzed at a loan level, the parties involved in developing this aspect of the Plan were persuaded that the costs of determining Claim amounts, both for the Estates and the Creditors, would consume a significant portion of the assets that otherwise would be available for distribution.  In addition, resolving such matters at an individual loan level would severely delay such determinations thereby delaying distributions to Creditors.  Thus, the EPD/Breach Claim Protocol is designed to simplify such determinations and, in the process, save significant costs of administration and speed distributions.  The numeric factors used in this aspect of the Plan were developed from the Debtors' historic data, data supplied by loan buyers and securitization trusts, and industry data.

### 3.    The Liquidating Trust.

The Plan provides that the Holding Company Debtors and the Operating Debtors will transfer all of their assets and all of their liabilities after giving effect to the Plan to a liquidating trust (the "Liquidating Trust") for the benefit of the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims.  The Liquidating Trust will assume the Debtors' obligations with respect to each A/P/S Claim against the Holding Company Debtors and the Operating Debtors.

The stock of Access Lending, which is owned by TRS Holdings, will be among the assets of the Holding Company Debtors that are distributed to the Liquidating Trust on the Effective Date.  Thereafter, the Liquidating Trust will be the sole shareholder of Reorganized Access Lending and will act as Plan Administrator with respect to Access Lending.

The Liquidating Trust will be advised and supervised by a five member committee (the "Plan Advisory Committee") that will be selected by the Committee (and who may be members of the current Committee).  The trustee for the Liquidating Trust (the "Liquidating Trustee") will be selected by the Plan Proponents no later than fifteen (15) days prior to vote to accept or reject the Plan.

To the extent not completed by the Debtors prior to the Effective Date, the Liquidating Trustee (including, with respect to Access Lending, in its capacity as Plan Administrator) will complete the wind-down process, including filing tax returns, settling or satisfying and paying

A/P/S Claims, resolving Disputed Claims, prosecuting Causes of Action, and completing any remaining asset sales. The Liquidating Trustee (including, with respect to Access Lending, in its capacity as Plan Administrator) will also calculate and pay amounts distributable to Holders of Allowed Unsecured Claims.

On the Effective Date, the Liquidating Trustee will establish reserves from which to pay costs of the Liquidating Trust necessary to complete the wind-down process and to pay all Allowed Claims and Disputed Claims not paid as of the Effective Date that are A/P/S Claims. Prior to any interim distributions to Holders of Allowed Unsecured Claims, the Liquidating Trustee will also establish appropriate reserves for Disputed Unsecured Claims against the Holding Company Debtors and the Operating Debtors. In addition, the Liquidating Trustee will set aside reserves in an amount to be determined by the Committee (if prior to the Effective Date) or the Plan Advisory Committee (if after the Effective Date) for the prosecution of the Causes of Action. The Liquidating Trustee also may withhold additional amounts for administration and other miscellaneous needs of the Liquidating Trust without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

The Liquidating Trustee will distribute all proceeds from the liquidation of the Liquidating Trust Assets, to the Holders of Allowed Holding Company Debtor Unsecured Claims and the Holders of Allowed Operating Debtor Unsecured Claims in accordance with each such Holder's beneficial interests in the Liquidating Trust as provided in the Plan. The Liquidating Trustee may make interim distributions to the Holders of Allowed Holding Company Debtor Unsecured Claims and the Holders of Allowed Operating Debtor Unsecured Claims (subject to establishing the reserves described above) when deemed appropriate by the Liquidating Trustee and the Plan Advisory Committee.

### 4.    Claims and Distributions.[2]

Through January 21, 2008, 3,726 Claims, in an approximate amount of $35.1 billion, have been filed against the Debtors. In addition, exclusive of inter-company Claims, approximately 4,814 of the Claims, in the approximate amount of $37.9 million, listed on the Debtors' Schedules are not scheduled as contingent, unliquidated, or disputed and have not been superseded by filed Claims. Of the Claims filed against the Debtors, 666 Claims in an approximate amount of $23.7 billion would be classified as Secured Claims, 98 Claims in an approximate amount of $64.1 million would be classified as Administrative Claims, 964 Claims in an approximate amount of $761 million would be classified as Priority Tax Claims or Priority Claims, and 2,026 Claims in an approximate amount of $10.5 billion would be classified as Unsecured Claims. Excluding duplicate Claims, late-filed Claims, and Claims with no supporting documentation with respect to which objections have been filed and sustained and giving effect to the Multi-Debtor Claim Protocol, 211 Claims in an approximate amount of $22.0 million would be classified as Secured Claims, 31 Claims in an approximate amount of $3.0 million would be classified as Administrative Claims, 1,141 Claims in an approximate amount of

---

[2] **All estimates contained herein with respect recoveries on Allowed Unsecured Claims are subject to various risks and assumptions, including those discussed in Section V.B hereof. Moreover, these estimates are subject to revision in material ways. They should not be considered a representation that actual outcomes will necessarily fall within this range.**

$164.0 million would be classified as Priority Tax Claims or Priority Claims, and 6,568 Claims in an approximate amount of $7.4 billion would be classified as Unsecured Claims. The Debtors currently estimate that after completing the Claims reconciliation process and giving effect to the EPD/Breach Protocol, for distribution purposes under the Plan, the estimated Unsecured Claims (excluding Intercompany Claims) will range from approximately $1.0 billion to $2.0 billion.[3]

In addition, the Debtors have undertaken an extensive analysis of the remaining A/P/S Claims and Unsecured Claims, many of which are subject to current settlement negotiations and pending objections. The Debtors analysis included an extensive review of unliquidated Claims and potential Claims for future contract rejections. Based upon such analysis, as well as a determination of the classification of each Claim consistent with the terms of the Plan, the estimates below have been developed.

At this time, the Debtors project that, through the liquidation of their Assets (other than via prosecution of the Causes of Action) and after giving effect to the Intercompany Claim Protocol, the Cash available for distribution to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims will range from approximately $11 million to $54 million and that the Cash available for distribution to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims will range from approximately $43 million to $136 million. Additionally, the Debtors project that the Cash available for distribution to Holders of Allowed Access Lending Unsecured Claims (including NCMC) will range from approximately $2.3 million to $4.4 million. The actual amount of such Cash (other than Litigation Proceeds) available for distribution to Holders of Allowed Unsecured Claims will depend on various factors, including: (1) the cost of administering the Estates and the Liquidating Trust, (2) amounts received on sales of Assets, (3) the amount of A/P/S Claims, and (4) the risks and assumptions discussed in Section V.B hereof.

In light of the amounts of currently filed Claims against the Estates of the Holding Company Debtors, Claims listed on the Holding Company Debtors' Schedules, and the projected (i) outcome of the Claims reconciliation process, (ii) effect of the Intercompany Claim Protocol, and (iii) Assets of the Holding Company Debtors, the Debtors project that, for distribution purposes under the Plan, the aggregate amount of Unsecured Claims against the Holding

---

[3] For purposes of this estimate, Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable are counted up to the estimated allowed amount of the joint and/or several liability. For example, if a Creditor holds an Allowed Other Unsecured Claim in the amount of $5.0 million for which both NCFC and NCMC are jointly and severally liable and therefore holds both Class HC3b and OP3c Claims in the amount of $5.0 million, this estimate calculates the Creditor's Allowed Unsecured Claim as a $5.0 million Claim because, under the Plan, such Creditor may not recover more than $5.0 million plus interest thereon in the aggregate on account of such Claims.

The total estimated amount of Unsecured Claims for distribution purposes is less than the sum of the estimates for distribution purposes of Unsecured Claims against each of the Debtor Groups because certain Creditors hold Unsecured Claims against Debtors in more than one Debtor Group for which such Debtors are jointly and/or severally liable. The full estimated amount of each such Claim is included in the calculation of the estimated amount of Unsecured Claims for distribution purposes against each Debtor Group that includes a Debtor with liability on the Claim. As noted above, however, in calculating the total estimate of Unsecured Claims for distribution purposes, Unsecured Claims for which more than one Debtor is jointly and/or severally liable are counted up to the estimated allowed amount of the joint and/or several liability.

Company Debtors will be between approximately $340 million to $520 million and that Holders of Allowed Unsecured Claims against the Holding Company Debtors will be entitled to receive between approximately $11.5 million to $54 million, collectively, yielding a blended average recovery (*prior to any recovery from the Causes of Action*) of between approximately 2.2% and 15.9%.

In addition, given the amounts of currently filed Claims against the Estates of the Operating Debtors, Claims listed on the Operating Debtors' Schedules, and the projected (i) outcome of the Claims reconciliation process, (ii) effect of the EPD/Breach Claim Protocol and Intercompany Claim Protocol, and (iii) Assets of the Operating Debtors, the Debtors project that, for distribution purposes under the Plan, the aggregate amount of Unsecured Claims against the Operating Debtors will be between approximately $790 million to $1.6 billion and that Holders of Allowed Unsecured Claims against the Operating Debtors will be entitled to receive between approximately $43 million to $136 million, collectively, yielding a blended average recovery (*prior to any recovery from the Causes of Action*) of between approximately 2.6% and 17.1%.

Finally, given the amounts of currently filed Claims against the Estate of Access Lending, Claims listed on the Access Lending's Schedules, and (i) outcome of the Claims reconciliation process and (ii) Assets of Access Lending, the Debtors project that, for distribution purposes under the Plan, the aggregate amount of Unsecured Claims against Access Lending will be between approximately $14 million to $20 million and that Holders of Allowed Unsecured Claims against Access Lending will be entitled to receive between approximately $2.3 million and $4.4 million collectively, yielding a net average recovery of between approximately 11.7% and 31.3%.

These amounts, **which are qualified by the risks and assumptions discussed in Section V.B hereof,** are summarized in the following table:

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| Claims to be Paid in Full Under the Plan | | |
| Administrative Claims against all Debtors | Unimpaired | 100% |
| Priority Tax Claims against all Debtors | Unimpaired | 100% |
| Claims Against and Interests in the Holding Company Debtors | | |
| Class HC1: Priority Claims Against NCFC | Unimpaired | 100% |

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Class HC2: Secured Claims Against NCFC** | Unimpaired | 100% |
| **Class HC3a: Special Deficiency Claims Against NCFC** | Impaired | N/A[4] |
| **Class HC3b: Other Unsecured Claims Against NCFC** | Impaired | 1.9%-14.3% (2.5%-18.5% if Creditor holds a Claim for which NC Credit has joint and/or several liability) |
| **Class 4a: Series A Preferred Stock Interests** | Impaired | 0% |
| **Class 4b: Series A 510(b) Claims** | Impaired | 0% |
| **Class 4c: Series B Preferred Stock Interests** | Impaired | 0% |
| **Class 4d: Series B 510(b) Claims** | Impaired | 0% |
| **Class 4e: Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims** | Impaired | 0% |
| **Class HC5: Priority Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC6: Secured Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC7: Other Unsecured Claims Against TRS Holdings** | Impaired | 1.9%-14.3% |
| **Class HC8: Priority Claims Against NC Credit** | Unimpaired | 100% |
| **Class HC9: Secured Claims Against NC Credit** | Unimpaired | 100% |
| **Class HC10a: Special Deficiency Claims Against NC Credit** | Impaired | N/A[5] |

---

[4] The sole source of recovery for Allowed Class HC3a Claims is from the Holding Company Debtor Portion of Litigation Proceeds or the Holding Company Debtor Portion of Restatement Litigation Proceeds.

[5] The sole source of recovery for Allowed Class HC10a Claims is from the Holding Company Debtor Portion of Litigation Proceeds or the Holding Company Debtor Portion of Restatement Litigation Proceeds.

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Class HC10b: Other Unsecured Claims Against NC Credit** | Impaired | 1.9%-14.3% (2.5%-18.5% if Creditor holds a Claim for which NCFC has joint and/or several liability) |
| **Class HC11:  Priority Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC12:  Secured Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC13: Other Claims Against NC Residual IV** | Impaired | 1.9%-14.3% |
| **Claims Against the Operating Debtors** | | |
| **Class OP1:  Priority Claims Against NCMC** | Unimpaired | 100% |
| **Class OP2:  Secured Claims Against NCMC** | Unimpaired | 100% |
| **Class OP3a: Special Deficiency Claims Against NCMC** | Impaired | N/A[6] |
| **Class OP3b: EPD/Breach Claims Against NCMC** | Impaired | 3.5%-23.6% |
| **Class OP3c: Other Unsecured Claims Against NCMC** | Impaired | 3.5%-23.6% (4.6%-30.7% if Creditor holds a Claim for which NC Capital and Home123 have joint and/or several liability) |
| **Class OP4:  Priority Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP5:  Secured Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP6a: Special Deficiency Claims Against NC Capital** | Impaired | N/A[7] |
| **Class OP6b: EPD/Breach Claims Against NC Capital** | Impaired | 1.8%-11.8% |

---

[6] The sole source of recovery for Allowed Class OP3a Claims is from the Operating Debtor Portion of Litigation Proceeds or the Operating Debtor Portion of Restatement Litigation Proceeds.

[7] The sole source of recovery for Allowed Class OP6a Claims is from the Operating Debtor Portion of Litigation Proceeds or the Operating Debtor Portion of Restatement Litigation Proceeds..

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| Class OP6c: Other Unsecured Claims Against NC Capital | Impaired | 3.5%-23.6% (4.6%-30.7% if Creditor holds a Claim for which NCMC and Home123 have joint and/or several liability) |
| Class OP7:  Priority Claims Against Home123 | Unimpaired | 100% |
| Class OP8:  Secured Claims Against Home123 | Unimpaired | 100% |
| Class OP9a: Special Deficiency Claims Against Home123 | Impaired | N/A[8] |
| Class OP9b: Other Unsecured Claims Against Home123 | Impaired | 0.9%-5.9% (4.6%-30.7% if Creditor holds a Claim for which NCMC and NC Capital have joint and/or several liability) |
| Class OP10:  Priority Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral | Unimpaired | 100% |
| Class OP11:  Secured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral | Unimpaired | 100% |
| Class OP12: Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral | Impaired | 0.9%-5.9% |
| Claims Against Access Lending | | |
| Class AL1:  Priority Claims Against Access Lending | Unimpaired | 100% |

---

[8] The sole source of recovery for Allowed Class OP9a Claims is from the Operating Debtor Portion of Litigation Proceeds or the Operating Debtor Portion of Restatement Litigation Proceeds.

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Class AL2:  Secured Claims Against Access Lending** | Unimpaired | 100% |
| **Class AL3:  Other Unsecured Claims Against Access Lending** | Impaired | 11.7%-31.3% |

**B.  RECOMMENDATION.**

THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ON THE PLAN CAST THEIR BALLOTS TO ACCEPT THE PLAN.  THE DEBTORS AND THE COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.

For the Committee's discussion of benefits of the Plan for Holders of Unsecured Claims, see the Committee's letter that is included with the Plan solicitation materials.

**II.  VOTING**

**A.  ELIGIBILITY TO VOTE.**

The Plan divides Claims against and Interests in the Debtors into various Classes and provides separate treatment for each Class.

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims will not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims will be treated separately as unclassified Claims and will be paid in full.  The unclassified Claims are unimpaired and are not entitled to vote on the Plan.

The Claims in the Classes listed in the following table are unimpaired and conclusively presumed to have accepted the Plan:

| Class | Description |
|---|---|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |

| Class | Description |
|---|---|
| Class HC11 | Priority Claims against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL1 | Priority Claims against Access Lending |
| Class AL2 | Secured Claims against Access Lending |

Creditors in the Classes listed in the above table are not entitled to vote on the Plan. If and to the extent that any Class identified as unimpaired is determined to be impaired, such Class will be entitled to vote to accept or reject the Plan.

All other Classes of Claims and Interests under the Plan are impaired. Holders of Claims in the Classes listed in the following table are entitled to vote to accept or reject the Plan:

| Class | Description |
|---|---|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |

17

| Class | Description |
|-------|-------------|
| Class OP3c | Other Unsecured Claims against NCMC |
| Class OP6a | Special Deficiency Claims against NC Capital |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

Each of Classes HC3a, HC3b, HC10a, HC10b, OP3a, OP3b, OP3c, OP6a, OP6b, OP6c, OP9a, and OP9b is considered a separate Class for purposes of voting to accept or reject the Plan.

Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan:

| Class | Description |
|-------|-------------|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

The record date for determining any creditor's eligibility to vote on the Plan is March 10, 2008. Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement.

**CREDITORS WHOSE CLAIMS ARE BEING OBJECTED TO ARE NOT ELIGIBLE TO VOTE UNLESS SUCH OBJECTIONS ARE RESOLVED IN THEIR FAVOR OR, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(a), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. ANY CREDITOR THAT WANTS ITS CLAIM**

TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a).

### B.    BALLOTS.

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class. Please read the voting instructions on the reverse side of the Ballot for a thorough explanation of voting procedures.

IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT XROADS CASE MANAGEMENT SERVICES, ATTN: KATHY MORRIS, P.O.  BOX 8901, MARINA DEL REY, CALIFORNIA 90295, TELEPHONE (888) 784-9571, AND ELECTRONIC MAIL infocms@xroadscms.com. XROADS CASE MANAGEMENT SERVICES CANNOT PROVIDE YOU WITH LEGAL ADVICE.

### C.    VOTING PROCEDURE.

Unless otherwise directed in your solicitation package, mail your completed ballots to: Xroads Case Management Services, P.O. Box 8901, Marina Del Rey, California 90295. DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT. A Ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one Ballot voting the same Claim before 5:00 p.m. Pacific Time on the voting deadline (April 21, 2008), the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Plan either to accept or reject the Plan. Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER SECURITIES WITH YOUR BALLOT. FACSIMILE, EMAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.

PLEASE PUT YOUR TAXPAYER IDENTIFICATION NUMBER ON YOUR BALLOT; THE DISBURSING AGENT MAY NOT BE ABLE TO MAKE DISTRIBUTIONS TO YOU WITHOUT IT.

### D.    DEADLINE FOR VOTING.

**IN ORDER TO BE COUNTED, BALLOTS MUST BE <u>RECEIVED</u> BY 5:00 P.M., PACIFIC TIME ON APRIL 21, 2008.**

### E.    IMPORTANCE OF YOUR VOTE.

Your vote is important. The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of Allowed Claims in that Class that vote. **ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PLAN. YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PLAN.**

## III.    BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES.

### A.    INTRODUCTION.

The Debtors, other than Access Lending, commenced the Chapter 11 Cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on April 2, 2007. Access Lending filed a voluntary Chapter 11 petition on August 3, 2007. The Chapter 11 Cases are jointly administered, and pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors continue to operate their businesses and remain in possession of their property as debtors in possession.

#### 1.    Prepetition Operations.

Prior to the Petition Date, the Debtors originated and purchased mortgage loans and sold mortgage loans through whole loan sales and securitizations. The Debtors often retained residual economic interests in the loan securitizations. The Debtors also serviced the loans that had been securitized and certain of the whole loans that they sold.

##### a.    Loan Origination and Purchase.

The Debtors were engaged in the business of originating and purchasing mortgage loans through two divisions, the Wholesale Division and the Retail Division.

The Wholesale Division, which was operated by NCMC, originated and purchased mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its account executives. As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states, and (3) employed approximately 1,087 account executives. The broker's role in this process was to identify the applicant, assist in completing the loan application form, gather necessary information and documents, and serve as the NCMC's liaison with the borrower. NCMC's role was to review and underwrite the applications submitted by the broker, approve or deny the application, set the interest rate and terms of the mortgage loan, and, upon acceptance by the borrower and satisfaction of all conditions imposed by the Debtors, fund the loan. Correspondent lenders were

independent mortgage bankers and financial institutions that sold loans to the Debtors that the correspondent had already funded. For 2006, the Wholesale Division was responsible for approximately 85% of the mortgage loans originated by the Debtors.

The Retail Division, which was operated by Home123, originated mortgage loans through direct contact with consumers at branch offices as well as through referrals from builders, realtors, and other third parties. As of December 31, 2006, the Retail Division employed approximately 1,702 retail loan officers located in 262 branch offices and three central telemarketing processing centers. For 2006, the Retail Division originated approximately 15% of the mortgage loans produced by the Debtors.

A substantial portion of the mortgage loans originated by the Debtors were made to borrowers whose needs generally were not fulfilled by traditional financial institutions because these borrowers did not satisfy the credit, documentation, or other underwriting standards prescribed by conventional mortgage lenders and loan buyers. The practice of making mortgage loans to such borrowers is commonly referred to as "subprime lending." Subprime loan production constituted approximately 86% of the Debtors' total loan production for fiscal year 2006. The remaining production consisted of prime and "Alt-A" originations. "Alt-A" refers to mortgage loans that fall between prime and sub-prime mortgage loans.

The Debtors used master repurchase agreements ("Master Repurchase Agreements"), to fund the origination and purchase of mortgage loans and to hold these loans pending sale or securitization. During the months prior to the initiation of the Chapter 11 Cases, the Debtors and their non-Debtor subsidiaries were parties to repurchase facilities with Bank of America, N.A., Barclays Bank PLC ("Barclays"), Citigroup Global Markets Realty Corp. ("Citigroup"), Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse First Boston"), DB Structured Products, Inc. ("DBSP"), Goldman Sachs Mortgage Company ("Goldman Sachs"), IXIS Real Estate Capital, Inc., Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley"), and UBS Real Estate Securities, Inc. ("UBS") (each a "Repurchase Counterparty") and which in total provided the Debtors the capacity to fund approximately $17.4 billion of mortgage loans. The Debtors typically kept mortgage loans on a repurchase facility for several months until loans could be pooled for a securitization or a whole loan sale. In order to accomplish a securitization or whole loan sale, the Debtors would typically simultaneously repurchase the mortgage loans (often from several repurchase facilities), which transactions would occur simultaneously with the Debtors' sale of these mortgage loans to the securitization trust or whole loan buyer -- a portion of the proceeds from the mortgage loan sale or securitization would be used to pay down the repurchase obligations that the Debtors owed to the Repurchase Counterparty and the balance would be the Debtors' share of the transaction.

### b.      Whole Loan Sales and Securitizations.

The Debtors sold most of the mortgage loans that they originated in the secondary mortgage market through whole loan sales or as securitizations.

In a whole loan sale, the selling Debtor typically sold a pool of mortgage loans to a financial institution that would either hold the loans for investment or pool the loans (often with

loans bought from other originators) for subsequent securitizations.

In a securitization, the selling Debtor typically sold a pool of loans to a trust for a cash purchase price and a residual interest ownership in the trust (an "OTC" or a "residual"). The trust raised the cash portion of the purchase price for the pool of loans by selling to third party investors senior certificates representing senior interests in the loans in the trust. Purchasers of senior certificates received the principal collected, including prepayments, on the loans in the trust. In addition, they received a portion of the interest on the loans. Holders of OTCs, such as the Debtors, typically received the cash flows from the OTCs after payment of servicing fees, guarantor fees, and other trust expenses if specified over-collateralization requirements were met. Over-collateralization requirements were generally based on a percentage of the original or current unpaid principal balance of the loans and could be increased during the life of the securitization transaction depending upon actual delinquency or loss experience. The securitization trusts were distinct legal entities and were not included in the Debtors' Chapter 11 filings.

The loan sale agreements used by the Debtors often provided that the selling Debtor would repurchase or substitute a loan if (i) the borrower committed a payment default shortly after the loan was sold or (ii) the selling Debtor breached a representation or warranty contained in the loan sale agreement. The Debtors subsequently resold many such repurchased mortgage loans in discounted loan sales.

Prior to settling a whole loan sale transaction, the buyer typically engaged in a due diligence review of a sample of mortgage loans in the pool. The buyer typically identified mortgage loans that it would elect not to purchase, commonly referred to as "investor kick-outs." The Debtors subsequently sold many investor kick-outs in discounted loan pools.

### c.    Loan Servicing.

The Debtors serviced mortgage loans through NCMC. NCMC serviced loans both for loan buyers (whole loan purchasers and securitization trusts) and for Repurchase Counterparties.

Loan servicing included a host of activities designed to collect payments from borrowers and to ensure that the borrowers repaid mortgage loans in accordance with their terms. These servicing functions included: collecting and remitting loan payments; making required advances; accounting for principal and interest; customer service; holding escrow or impound funds for payment of taxes and insurance; and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults.

As of the Petition Date, the Debtors serviced approximately $19 billion of loans owned by the securitization trusts pursuant to the Master Servicing Agreements. For servicing mortgage loans for third party whole loan buyers or securitization trusts, the Debtors generally received a servicing fee equal to 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio. These servicing fees were typically collected from the monthly payments made by the borrowers on the loans.

Debtor entities, such as NC Residual IV, often owned OTCs or other interests in the

securitization trusts. Thus, the Debtors had a significant economic interest in the proper servicing of the securitized mortgage loans.

The Debtors also serviced mortgage loans that were subject to Master Repurchase Agreements. The servicing of such mortgage loans was typically provided for in the Master Repurchase Agreements. The Debtors did not receive fees for servicing mortgage loans that were subject to Master Repurchase Agreements. As described below, as of the Petition Date, most of the Repurchase Counterparties had either terminated, or were in the process of terminating, NCMC as the servicer of mortgage loans subject to Master Repurchase Agreements. The Debtors cooperated with this effort and worked with the new servicers designated by the Repurchase Counterparties to transfer servicing of these mortgage loans.

### 2.    Funding of Loan Origination and Purchases Through Master Repurchase Agreements.

The Debtors used the Master Repurchase Agreements and their own working capital to fund the origination of mortgage loans. The Master Repurchase Agreements were structured as sale and repurchase agreements.

Each Master Repurchase Agreement provided that the Debtors would sell mortgage loans to the Repurchase Counterparty and commit to repurchase these loans on a specified date for the same price paid plus a fee for the time value of money, termed a "Price Differential." The Price Differential was specified in a pricing side letter and was generally set at a floating rate based on LIBOR plus a spread. The Master Repurchase Agreements typically provided that the Debtors were required to repurchase each loan on the facility at a date (generally 30 or 60 days after the sale to the Repurchase Counterparty) specified in the individual commitment, or on each one-month anniversary loans were either repurchased or rolled for another month. In addition, on the occurrence of an event of default, the Repurchase Counterparty could require the Debtors to repurchase all mortgage loans on a repurchase facility.

The amount paid for a mortgage loan by a Repurchase Counterparty depended on the quality of the mortgage loan and the rate of interest owed by the homeowner. For some loans, this price could exceed the face principal amount because the parties assumed that the loan was worth more than the face principal amount. For other mortgage loans of lesser quality or as market conditions deteriorated, the Repurchase Counterparties were willing to pay less than the face principal amount of the mortgage loan, in which case the Debtors financed a portion of the principal amount of the loans with their own working capital (termed the "haircut").

The Master Repurchase Agreements varied in terms of the quality of the mortgage loans that were eligible -- some were designed only for prime mortgage loans, some for subprime mortgage loans, and some for mortgage loans that had been kicked or put back by the institutions that bought mortgage loans from the Debtors in the secondary market (termed "hospital loans"). The Master Repurchase Agreements also varied in their costs to the Debtors in terms of differing Price Differentials and other economic terms. Thus, the Debtors worked to minimize their costs under these facilities and to maximize their funding capacity by negotiating with the Repurchase Counterparties over such terms and by moving mortgage loans among Master Repurchase

Agreements.

The Debtors' business model contemplated that they would sell a mortgage loan in the secondary market for a profit generally within about one to three months after originating it. The Debtors pooled mortgage loans for sale to a whole loan buyer or a securitization trust, often drawing mortgage loans from a variety of Master Repurchase Agreements. A portion of the price realized from the whole loan buyer or securitization trust was generally used to repurchase the loan from the Repurchase Counterparty, with the balance of the price going to the Debtors in satisfaction of any "haircut" funded by the Debtors plus to realize a profit for the Debtors.

The Master Repurchase Agreements allowed the Repurchase Counterparties to mark to market the mortgage loans that were subject to these facilities. If the market value of the loans times an "advance rate" was less than the repurchase obligations that would be owed by the Debtors on repurchase, the Repurchase Counterparties were entitled to make a margin call. The Debtors could satisfy a margin call through a cash payment or by delivering additional mortgage loans in order to bring the facility back into balance.

Under the Master Repurchase Agreements, in the event of default, each of the Repurchase Counterparties had a right to accelerate the Debtors' obligations to repurchase the loans subject to the facility. If the Debtors did not pay those repurchase obligations, the agreements generally provided that the Repurchase Counterparties could sell the mortgage loans to third parties (often on short notice) or retain the mortgage loans for their own accounts and credit the value of the mortgage loans against the Debtor's repurchase obligations (termed a "buy-in"), in effect foreclosing the Debtors rights to repurchase such mortgage loans. The Master Repurchase Agreements also provided that if the Debtors' repurchase obligations were not fully satisfied by a third party sale or a buy-in, the Debtors that were party to the Master Repurchase Agreement were liable for any deficiency.

The Repurchase Counterparties contend that the Master Repurchase Agreements are "repurchase agreements" (as defined in Bankruptcy Code section 101(47) or "securities contracts" as defined in Bankruptcy Code section 741(7)), which entitle them to certain benefits, often termed the "safe harbor", that resulted from amendments to the Bankruptcy Code that are effective for bankruptcy cases commenced on or after October 17, 2005. According to the Repurchase Counterparties, these "safe harbor" provisions include right of the counterparty to the repurchase agreement to terminate. liquidate or accelerate the repurchase agreement and to sell the mortgage loans subject to it without obtaining leave of the Bankruptcy Court.

As discussed in further detail below, as of the Petition Date, each of the Repurchase Counterparties had made margin calls and terminated and accelerated its Master Repurchase Agreement, and some were in the process of exercising other remedies. During the time shortly prior to the Petition Date, the Debtors' repurchase obligations under these facilities totaled approximately $8 billion and there were approximately $9 billion of mortgage loans subject to these Master Repurchase Agreements.

The dollar amounts cited in the preceding paragraph -- total repurchase obligations of approximately $8 billion and approximately $9 billion of mortgage loans -- include the Master

Repurchase Agreement with Barclays under the conservative assumption that this facility had not been terminated as of the Petition Date, whereas the Schedules filed by the Debtors report lower totals reflecting the Debtors' position that this facility was terminated in mid-March 2007. In a letter agreement dated March 16, 2007, the Debtors and Barclays agreed to terminate this Master Repurchase Agreement. The Debtors had concluded that there was not likely to be any equity in the mortgage loans subject to the Master Repurchase Agreement with Barclays and, accordingly, had entered into negotiations with Barclays over the possibility of terminating this facility. The letter agreement provided, among other things, that the Master Repurchase Agreement would be terminated, the Debtors would cooperate with Barclays in transferring servicing of the mortgage loans subject to this facility, Barclays would waive any claim for a deficiency owed by the Debtors party to the Master Repurchase Agreement related to any shortfall between the value of the mortgage loans and the repurchase obligations owed by those Debtors, and the parties would make various cash payments to each other based on such matters as the accrued Price Differential owed to Barclays, collections from borrowers and interest accrued on the mortgage loans. The Debtors contend that these calculations resulted in Barclays owing the Debtors approximately $2 million. In contrast, Barclays contends that the relevant Debtors owe it approximately $2.7 million and as a result of not paying this sum, Barclays has preserved its full claims under the Master Repurchase Agreement. The parties have negotiated over this dispute in the course of the global settlement discussions among the parties to the Adequate Protection Dispute discussed in Section III.D.3 hereof. This matter is proposed to be settled in the global settlement of the Adequate Protection Dispute, which as is discussed in Section III.D.3 hereof, is the subject of a motion current pending before the Bankruptcy Court.

### 3.    The Capital Trusts.

On September 13, 2006, NCFC sold through New Century Capital Trust I, a Delaware statutory trust ("Capital Trust I"), $50,000,000 in aggregate liquidation amount of preferred securities of Capital Trust I in a private placement transaction. Such preferred securities require quarterly distributions at a fixed rate of 8.65% through the distribution payment date in September 2011, whereupon the rate floats at three-month LIBOR plus 3.50% thereafter.

Capital Trust I simultaneously issued and sold 1,545 shares of common securities to NCFC for $1,545,000 in aggregate liquidation amount. The 1,545 shares of common securities constitute all of the issued and outstanding common securities of Capital Trust I. Capital Trust I used the proceeds from the sales of its preferred and common securities to purchase $51,545,000 aggregate principal amount of the NCFC's junior subordinated notes due 2036 (the "Capital Trust I Notes"). The terms of the Capital Trust I Notes are substantially the same as the terms of the preferred securities of Capital Trust I.

On November 16, 2006, NCFC sold through New Century Capital Trust II, a Delaware statutory trust ("Capital Trust II" and together with Capital Trust I, the "Capital Trusts"), $35,000,000 in aggregate liquidation amount of preferred securities of Capital Trust II in a private placement transaction. Such preferred securities require quarterly distributions at a fixed rate of 9.12 through the distribution payment date in December 2011, whereupon the rate floats at a three-month LIBOR plus 4.10% thereafter.

Capital Trust II simultaneously issued and sold 1,100 shares of common securities to NCFC for $1,100,000 in aggregate liquidation amount. The 1,100 shares of common securities constitute all of the issued and outstanding common securities of Capital Trust II. Capital Trust II used the proceeds from the sales of its preferred and common securities to purchase $36,100,000 aggregate principal amount of the NCFC's junior subordinated notes due 2036 (the "Capital Trust II Notes" and together with the Capital Trust I Notes, the "Capital Trust Notes"). The terms of the Capital Trust II Notes are substantially the same as the terms of the preferred securities of Capital Trust II.

The Capital Trust I Notes and the Capital Trust II Notes were issued, respectively, pursuant to (i) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of September 13, 2006 and (ii) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of November 16, 2006 (together, the "Capital Trust Indentures"). Under the Capital Trust Indentures, the Capital Trust Notes are subordinate to and subject in right of payment to the prior payment in full of "Senior Debt" as defined in each of the Capital Trust Indentures.

## B.    EVENTS LEADING TO CHAPTER 11 CASES.

### 1.    Restatement of Quarterly Results.

On February 7, 2007, NCFC announced that its board of directors (the "Board of Directors") had concluded, based upon the recommendation of management, that NCFC's previously filed financial statements for the quarters ended March 31, June 30, and September 30, 2006 should be restated to correct errors NCFC discovered in its application of generally accepted accounting principles regarding NCFC's allowance for loan repurchase losses. Further, NCFC also announced that it expected to post a fourth quarter loss and a full year loss, attributable primarily to lower net gain on sales, a reduction in the carrying value of residual assets, a reduction in the carrying value of mortgage loans held for sale, and an increase in the allowance for losses on loans held for investment.

The announcement resulted in the filing of various securities class action lawsuits alleging that NCFC and the other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCFC and therefore caused artificially inflated market prices of its common stock. Several derivative lawsuits based on the same factual allegations were also filed.

Additionally, on February 22, 2007, NCFC received a letter from NYSE Regulation Inc. indicating that its Market Trading Analysis Department was reviewing transactions in the NCFC's securities prior to the February 7, 2007 announcement.

### 2.    Inability to File Annual Report with the SEC.

On March 2, 2007, NCFC announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") by March 1, 2007, without unreasonable effort and expense due to the following factors. First, the audit committee of the Board of Directors (the "Audit Committee"), advised by its independent counsel, was still in the

process of investigating the issues giving rise to NCFC's need to restate its 2006 interim financial statements, as well as issues pertaining to NCFC's valuation of residual interests in securitizations in 2006 and prior periods.    Second, NCFC had not yet completed its determination of the amount of the adjustment to the estimated fair value of its residual interests in securitizations necessary to reflect revised prepayment, cumulative loss and discount rate assumptions with respect to the mortgage loans underlying these assets. NCFC needed to revise these assumptions to reflect relevant data such as its then recent loss experience, changing market conditions and updated expectations regarding higher credit losses and faster repayment speeds. Finally, NCFC's management was still in the process of assessing the effectiveness of internal control over financial reporting as of December 31, 2006, in accordance with Section 404 of the Sarbanes-Oxley Act of 2002.

In addition, NCFC's independent registered public accounting firm, KPMG LLP ("KPMG"), informed NCFC that, among other matters, it would need to be informed of the results of the Audit Committee's investigation before completing its audit. Without completion of the audit, NCFC could not file the 2006 Form 10-K.

NCFC also announced that the Securities and Exchange Commission (the "SEC") had requested a meeting with NCFC to discuss these events and that the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") had commenced a criminal inquiry.

On March 13, 2007, the staff of the NYSE issued a press release announcing the delisting of NCFC's common stock, its Series A Cumulative Redeemable Preferred Stock, and its Series B Cumulative Redeemable Preferred Stock.

### 3.    Exercise of Remedies by Repurchase Counterparties.

The March 2, 2007 announcement had a devastating impact on the Debtors' business. During the following weeks, the Repurchase Counterparties made margin calls in excess of $150 million, approximately $70 million of which the Debtors were unable to satisfy by cash payments. Thereafter, the Repurchase Counterparties began restricting and ultimately ceased providing funding for loans originated by the Debtors. Generally around mid-March 2007, each of the Repurchase Counterparties declared the Debtors in default under its respective Master Repurchase Agreement.

Many of the Repurchase Counterparties began exercising control of the cash flow from the mortgage loans subject to their facilities and sent the Debtors notices that they would replace NCMC as servicer of these mortgage loans. The resulting constraints on the Debtors' normal cash flows from these loans further exacerbated the Debtors' liquidity situation. By March 5, 2007, the Debtors were able to fund only a portion of their loan originations. Due to the restrictions on access to the repurchase facilities and a number of state regulatory actions, the Debtors stopped accepting loan applications on March 8, 2007.

The Debtors continued to operate their mortgage loan servicing business for securitization trusts and whole loan purchasers and strived to comply with their obligations under

27

their agreements with indenture trustees and other parties to provide servicing for mortgage loans. Servicing generally required NCMC to advance funds for certain functions and the Debtors had historically financed a portion of these servicer advances through a secured loan facility provided by Citigroup. On March 8, 2007, Citigroup declared an event of default under this service advance facility and declined to finance additional servicer advances, which had the result of further constraining the Debtors' liquidity since thereafter they were required to provide necessary loan servicing advances from their own working capital.

During the weeks leading up to the Petition Date, the Debtors, aided by their professional advisors, including investment bank Lazard Freres & Co. LLC ("Lazard"), sought sources of additional financing, infusions of debt and/or equity capital, or a sale of their businesses to a strategic or financial investor.

The Debtors' inability to originate loans and the commencement of the exercise of remedies by the Repurchase Counterparties left the Debtors with a severe liquidity crisis. The Debtors (other than Access Lending) commenced the Chapter 11 Cases on April 2, 2007 to pursue an expedited sale of their businesses and the Debtors' other assets for the benefit of the Debtors' stakeholders.

## C.    THE CHAPTER 11 CASES.

### 1.    Debtor in Possession Status.

Since filing for bankruptcy protection, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their business in the ordinary course of business. Transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

### 2.    Entry of the Debtors' First-Day Orders.

Concurrently with filing their bankruptcy petitions, the Debtors filed several emergency motions ("First-Day Motions") with the Bankruptcy Court that were intended to stabilize the Debtors and enable them to continue operations. Pursuant to their First-Day Motions, the Debtors sought and obtained from the Bankruptcy Court the following relief: (i) authority to jointly administer the Chapter 11 Cases [Docket Nos. 4, 52, and 67]; (ii) establishment of adequate assurance procedures with respect to utility providers [Docket Nos. 5, 51, and 395]; (iii) authority to continue all insurance policies and certain premium financing arrangements related thereto [Docket Nos. 6 and 50]; (iv) approval of the appointment of XRoads Case Management, LLC ("XRoads") as claims and noticing agent in the Chapter 11 Cases [Docket Nos. 7 and 179]; (v) authority to maintain the Debtors' prepetition centralized cash management system [Docket Nos. 8, 54, and 180]; (vi) authority to pay certain prepetition use taxes [Docket Nos. 9 and 49]; (vii) authority to honor prepetition employee wages and benefits [Docket Nos. 10, 47, and 227]; and (viii) authority to honor certain prepetition obligations to customers [Docket Nos. 11 and 48].

Shortly thereafter, the Debtors filed several other administrative motions with the Bankruptcy Court, including a motion seeking an extension of time to file the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules") [Docket No. 117], a motion requesting an order providing that the Committee is not authorized or required to provide access to the Debtors' confidential information to any member of its constituency [Docket No. 119], and a motion establishing interim compensation procedures for professionals employed by the Estates [Docket No. 121]. All three of these motions were granted by the Bankruptcy Court [respectively, Docket Nos. 393, 391, and 389].

### 3.    Debtor in Possession Financing.

Also on the first day of the Chapter 11 Cases, the Debtors sought and obtained approval of debtor in possession financing to maintain and stabilize their businesses until they were able to complete the sale of some of the Debtors' operating businesses and other assets. On the Petition Date, the Debtors filed a motion (the "DIP Financing Motion") by which they sought interim and final orders authorizing them to enter into a debtor in possession financing facility agreement (the "DIP Credit Facility") with Greenwich Capital Financial Products, Inc. ("Greenwich") and The CIT Group/Business Credit, Inc. ("CIT" and together with Greenwich, the "DIP Lenders") [Docket No. 12]. On April 5, 2007, the Bankruptcy Court approved the DIP Credit Facility on an interim basis [Docket No. 89] and, then on May 7, 2007, the Bankruptcy Court entered a final order approving the DIP Credit Facility [Docket No. 565].

The DIP Credit Facility provided that the Debtors could borrow up to $150 million from the DIP Lenders and any other lenders that thereafter became a party to the DIP Credit Facility. The DIP Credit Facility consisted of one tranche under which the Debtors could borrow up to $50 million for general corporate purposes and to fund an orderly section 363 sales process ("Tranche A") and provided that a second tranche could be opened under which the Debtors could be advanced up to $50 million to repay the Servicer Advance Financing Facility Agreement by and between NCMC and Citigroup and to fund new qualifying servicing advances ("Tranche B"). In addition, the DIP Lenders could, in their sole discretion, increase the maximum amounts that could be advanced under Tranche A to $100 million. Each of the Debtors was a joint and several obligor under the DIP Credit Facility. Pursuant to the DIP Credit Facility each obligor granted a first priority lien on its unencumbered assets and a junior lien on its encumbered assets as security for its obligations under the DIP Credit Facility.

Additionally, the Debtors entered into an asset purchase agreement with Greenwich for the sale of certain mortgage loans originated by the Debtors that were not subject to the Master Repurchase Agreements, as well as residual interest in certain securitization trusts owned by the Debtors (see Section III.6.a below). Under the DIP Credit Facility, the Debtors were required to proceed to complete the sale of those assets on an accelerated basis, and it would have been an event of default under the DIP Credit Facility if the Bankruptcy Court had declined to approve certain stalking horse protections for Greenwich related to this proposed sale.

On June 29, 2007 (the date that the Debtors closed the sale of their servicing business), the Debtors terminated the DIP Credit Facility. At the time of termination, no amounts were

outstanding under the DIP Credit Facility, and no early termination fees were required to be paid by the Debtors in connection with the termination.

### 4.  Appointment of the Official Committee of Unsecured Creditors.

On April 9, 2007, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors.  The Committee has participated in virtually all aspects of these Chapter 11 Cases since its formation.

As of the date of this Disclosure Statement, the following were members of the Committee:

> Credit-Based Asset Servicing and Securitization LLC
> Credit Suisse First Boston Mortgage Capital LLC
> Deutsche Bank National Trust Co.
> Fidelity National Information Services, Inc.
> Maguire Properties - Park Place, LLC
> Residential Funding Company, LLC
> Wells Fargo Bank, N.A., as Indenture Trustee

The Committee retained the law firms of Hahn & Hessen LLP ("Hahn & Hessen") and Blank Rome, LLP ("Blank Rome") as its co-counsel, and FTI Consulting, Inc. ("FTI") as its financial advisors.

### 5.  Retention of Professionals.

The Debtors retained professionals to assist them in managing the chapter 11 bankruptcy process. O'Melveny & Myers LLP ("OMM") and Richards Layton & Finger, P.A. ("RLF") were retained as the Debtors' bankruptcy co-counsel, Lazard as the Debtors' financial advisors, and AP Services, LLC ("AP Services") as the Debtors' crisis managers.  The Debtors also obtained Bankruptcy Court approval to retain the following professionals:  (i) Grant Thornton LLP ("Grant Thornton"), as tax accountant; (ii) Heller Ehrman LLP ("Heller Ehrman"), as special counsel to the Special Investigation Subcommittee of the Independent Audit Committee of NCFC's Board of Directors; (iii) Hennigan, Bennett & Dorman LLP ("Hennigan"), as special litigation counsel; (iv) ICP Consulting, LLC, as special asset valuation and liquidation advisors; (v) Manatt, Phelps & Phillips LLP ("Manatt"), as special securitization counsel; (vi) Pricewaterhousecoopers LLP ("PWC"), as accountants; (vii) Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin"), as special corporate and litigation counsel; and (viii) Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates ("Skadden"), as special regulatory counsel.  The Debtors obtained Bankruptcy Court Approval to retain other special counsel as well.

Due to the large numbers of creditors in their cases, and pursuant to certain Local Bankruptcy Rule requirements, the Debtors retained XRoads as claims administrator and noticing agent.

The Debtors also sought and obtained authority to continue to employ professionals, including attorneys, that the Debtors employed prepetition in the ordinary course of their business ("Ordinary Course Professionals"), without having to file formal employment applications with the Bankruptcy Court [Docket Nos. 274 and 569]. Each Ordinary Course Professional is assigned a monthly maximum amount (typically $35,000) that it may be paid without having to seek approval of the Bankruptcy Court with an overall cap on payments of $150,000, subject to increase if approved by the Bankruptcy Court and the Committee.

### 6.    Asset Sales.

#### a.    The First Sale of LNFA and Residuals.

On April 3, 2007, the Debtors filed a motion (the "Mortgage Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) to Greenwich of a pool of mortgage loans and mortgage-backed residual interests in securitization trusts (together with that pool of mortgage loans, the "Mortgage Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Mortgage Assets pursuant to an auction (the "Mortgage Assets Bid Procedures") [Docket No. 25]. The mortgage loans consisted of a pool of slightly over 2,000 residential mortgage loans owned by the Debtors. Most of these loans were originated by the Debtors and then sold to securitization trusts and whole loan buyers. Because, however, the borrowers on these loans defaulted soon after the disposition occurred, the buyer had the right to, and did, require the Debtors to repurchase the loans. The loans, either because of quality or timing, were not subsequently the subject of a repurchase transaction and are generally referred to as "LNFA" or "loans not financed anywhere." Other loans in this pool were originated by the Debtors but were never financed under a repurchase agreement or disposed of in a loan sale in the secondary market. The Mortgage Assets Bid Procedures Motion proposed that Greenwich's agreement to purchase the Mortgage Assets for $50 million would serve as the stalking horse bid.

On April 12, 2007, the Bankruptcy Court entered an order approving the Mortgage Assets Bid Procedures, including approving a break-up fee of $945,000 to be paid to Greenwich in the event that Greenwich was not the successful bidder for the Mortgage Assets [Docket No. 226]. The auction for the Mortgage Assets was conducted on May 2, 2007. After nine rounds of bidding, the winning bidder for the Mortgaged Assets was Ellington Capital Management Group, L.L.C. on behalf of its client funds ("Ellington"). NCFC, NC Capital, and NC Asset Holding (together, the "Mortgage Asset Sellers"), on one hand, and Ellington, on the other hand, entered into an asset purchase agreement (the "Ellington Agreement"), dated as of May 2, 2007 and approved by the Bankruptcy Court by order dated May 7, 2007 (the "Mortgage Asset Sale Order"), pursuant to which Ellington agreed to purchase the Mortgage Assets for approximately $58.0 million [Docket No. 566].

On May 18, 2007, the sale of the Mortgage Assets to Ellington closed. After giving effect to certain closing adjustments, the net purchase price paid by Ellington was approximately $57.9 million, including approximately $2.6 million deposited by Ellington into an escrow account to indemnify Ellington for any claims made under the Ellington Agreement, and payment of Greenwich's break-up fee.

When the Mortgage Asset Sellers transferred servicing on the Mortgage Assets to Ellington's loan servicers on June 15, 2007, approximately $687,000 was released from the escrow account to Ellington in satisfaction of an indemnity claim related to certain undeliverable loans. After the servicing transfer, approximately $1.9 million remained in the escrow account. On August 9, 2007, Ellington submitted a second indemnification claim pursuant to the Ellington Agreement to NCFC and the escrow agent claiming that the $1.9 million balance of the escrow account should be released to Ellington in connection with additional undeliverable loans. Upon the termination of the escrow account, on December 24, 2007, approximately $1.88 million was released to Ellington and the remaining amount of approximately $107,000 was released to the Debtors.

On June 25, 2007, the Mortgage Asset Sellers and Ellington entered into Supplement No. 1 to the Ellington Agreement ("Supplement No. 1"), pursuant to which Ellington agreed to purchase certain additional mortgage loans originated by the Mortgage Asset Sellers (the "Additional Mortgage Loans") for approximately $4.4 million. Supplement No. 1 provided that approximately $300,000 of the purchase price would be placed into an escrow account to be used to indemnify Ellington for certain claims that may be made under the agreement. The Bankruptcy Court entered an order approving the Additional Mortgage Loans sale on June 27, 2007 [Docket No. 1715]. The closing of the sale of the Additional Mortgage Loans occurred on June 29, 2007.

On August 9, 2007, Ellington also submitted an indemnification claim to the Mortgage Asset Sellers and the escrow agent pursuant to Supplement No. 1 claiming that the entire $300,000 amount in the escrow account should be released to Ellington in connection with certain undeliverable loans. Upon the termination of the escrow account on December 24, 2007, approximately $269,000 was released to Ellington and the remaining amount of approximately $31,000 was released to the Debtors.

### b.    Sale of Servicing Assets and Servicing Platform to Carrington.

On April 4, 2007, the Debtors filed a motion (the "Servicing Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) by NCFC and NCMC to Carrington Mortgage Services LLC ("Carrington") of their loan servicing assets and servicing platform (the "Servicing Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Servicing Assets pursuant to an auction (the "Servicing Assets Bid Procedures") [Docket No. 70]. The Servicing Assets Bid Procedures Motion proposed that Carrington's agreement to purchase the Mortgage Assets for $139 million, subject to certain purchase price adjustments and a break-up fee in the amount of 3% of the purchase price of the Servicing Assets, would serve as the stalking horse bid.

The Debtors' loan servicing operations typically included collecting and remitting loan payments received from borrowers, making required advances, accounting for principal and interest, customer service, holding escrow or impound funds for payment of taxes and insurance, and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults. Servicing contracts also generally required the servicer to advance principal, interest, and certain "property protection" costs (such as taxes and

insurance) with respect to delinquent mortgage loans, unless such amounts were determined to be unrecoverable from the related loans. As discussed above, for performing these functions, the servicer (usually NCMC) generally received a servicing fee, one-twelfth of which was paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio, which fee was collected from the monthly payments made by the borrowers on the serviced loans. In addition, the Debtors received other remuneration for loan servicing, including float benefits representing interest earned on collection accounts where mortgage payments were held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.

On April 20, 2007 the Bankruptcy Court approved the Servicing Asset Bid Procedures, including the proposed break-up fee [Docket No. 340]. The auction for the Servicing Assets was conducted on May 16, 2007 with Carrington and three qualified bidders participating. After 12 rounds of bidding, Carrington emerged as the winning bidder, with a bid of approximately $188 million (netting approximately $155.9 million to the Estates after payment of servicing advances). On May 21, 2007, the NCFC and NCMC entered into a Second Amended and Restated Asset Purchase Agreement (the "Servicing Assets Agreement") with Carrington and its parent, Carrington Capital Management, LLC, for the sale of the Servicing Assets to Carrington (the "Carrington Sale"). The Bankruptcy Court entered an order approving the Carrington Sale on May 23, 2007 (the "Carrington Sale Order") [Docket No. 844].

On June 29, 2007, the Carrington Sale closed. After giving effect to certain closing adjustments, the gross purchase price paid by Carrington was approximately $177.4 million, including approximately $5.0 million deposited by Carrington into an escrow account to indemnify Carrington for certain claims that could be made under the Servicing Assets Agreement. The balance of the escrow account after reimbursement of any claims submitted by Carrington will be paid to the Estates on or about March 29, 2008 (nine months after the closing of the Carrington Sale). As of the date of this Disclosure Statement, Carrington has submitted one claim against the amounts in the escrow account, which claim the Debtors are disputing.

As noted above, the Carrington Sale yielded approximately $155.9 million to the Estates after servicing advances. Of this amount, approximately $57.6 million was placed in reserves or escrow accounts pursuant to the terms of the Carrington Sale Order. Specifically, approximately $39.3 million was placed in an escrow account pending the resolution of the Adequate Protection Dispute (discussed in Section III.D.3 hereof), $10.0 million was placed in reserve pending the resolution of the DBNTC cure claim litigation (discussed in Section III.C.10.d hereof), $7.6 million was placed in the Secured Claim Reserve established in connection with the Debtors dispute with GECC (discussed in Section III.C.7 hereof), $560,000 was placed in a reserve pending the resolution of the Debtors' dispute with National City, and $150,000 was placed in reserve pending the reconciliation of fees incurred by Wells Fargo in objecting to the assumption of servicing agreements for which it acts as indenture trustee. Additionally, the Debtors subsequently made account reconciliations of approximately $25.4 million.

Concurrently with the closing of the Carrington Sale, NCFC and NCMC entered into a Transition Servicing Agreement with Carrington, whereby NCFC and NCMC agreed to provide certain services to Carrington and Carrington agreed to provide certain services to the NCFC and

NCMC. The Debtors continued operating the servicing business while it was transitioned to Carrington. As of the filing of this Disclosure Statement, the transition process is nearly complete, with only a small number of discrete issues outstanding.

c.      <strong>Unsuccessful Attempt to Sell the Loan Origination Platform Assets.</strong>

On April 10, 2007, the Debtors filed a motion (the "Origination Assets Bid Procedures Motion") seeking approval of the sale of their loan origination platform (the "Origination Assets"), as well as the approval of bid procedures and certain bid protections in connection with that sale pursuant to an auction (the "Origination Assets Bid Procedures") [Docket No. 149]. On April 25, 2007, the Bankruptcy Court entered an order approving the Origination Assets Bid Procedures [Docket No. 404]. At the time of the filing of the Origination Assets Bid Procedures Motion, the Debtors did not have a proposed stalking horse bid for the Origination Assets. The deadline for bids on the Origination Assets expired on May 2, 2007 without any qualified bids being submitted. Subsequently, the Debtors reduced their workforce by terminating the employment of their employees who had been engaged in loan originations. On May 4, 2007 the Debtors reduced their workforce by 1,230 employees and in the 30 days following reduced their workforce by over 700 additional employees.

d.      <strong>Technology Assets Disposition.</strong>

On June 4, 2007, the Debtors filed a motion (the "Technology Assets Bid Procedures Motion") seeking approval of the sale (subject to overbid) by NCFC and NCMC of certain technology related assets, including the Debtors' data centers and any computer equipment contained therein (the "Data Centers and Equipment"), proprietary software, intellectual property and computer software codes and data used in connection with the mortgage loan origination business (the "Origination Technology Assets"), and, on a non-exclusive basis, certain data related to the its loan origination business (the "Broker Data" and, together with the Origination Technology Assets, the "Technology Assets"), as well as the approval of bid procedures and certain bid protections in connection with the sale of the Data Centers and Equipment and the Technology Assets pursuant to an auction (the "Technology Assets Bid Procedures") [Docket No. 1064].

On June 22, 2007, the Debtors conducted and concluded an auction for the Data Centers and Equipment and the Technology Assets pursuant to procedures established by the Bankruptcy Court. There were 3 bidders at the auction, with EquiFirst Corporation ("EquiFirst") submitting the highest and best bid after multiple rounds of bidding. EquiFirst agreed to acquire the Technology Assets for approximately $8.05 million (the "Technology Assets Sale"). NCFC and NCMC, on one hand, and EquiFirst, on the other hand, subsequently entered into an Asset Purchase Agreement, dated June 22, 2007, with respect to the Technology Assets Sale (the "Technology Assets Agreement"), and on July 3, 2007, the Bankruptcy Court entered an order approving the Technology Assets Sale and one or more subsequent sales of certain data related to the Debtors' loan origination business, in each case on a non-exclusive basis [Docket No. 1819]. The closing of the Technology Assets Sales took place in July 2007. The Debtors ultimately decided not to go forward with the sale of the Data Centers and Equipment at the

auction. The Debtors have since conducted four nonexclusive data sales through which the Debtors have generated proceeds of approximately $890,000.

### e.   Sale of Access Lending's Assets.

Access Lending did not file bankruptcy on April 2, 2007 in order to let its management pursue a going-concern sale outside of bankruptcy. On April 13, 2007, TRS Holdings (as the parent of Access Lending) filed a motion requesting an order approving the sale of substantially all of the assets of Access Lending (the "Access Lending Assets") to Access Holdings Corporation ("Access Holdings") [Docket No. 231], which was a new company formed by the former management of Access Lending. This motion was granted by the Bankruptcy Court on April 26, 2007 [Docket No. 411]. Pursuant to the terms of the asset purchase agreement between Access Lending and Access Holdings (the "Access Purchase Agreement"), in exchange for the Access Lending Assets, Access Holdings agreed, among other things, to pay to Access Lending 60% of net proceeds realized on the sale of loans that were subject to Access Lending's warehouse lending facilities (the "Access Lending Loans"), with a minimum guaranteed amount of $4.5 million, plus approximately $76,000.00. The sale closed on April 27, 2007. As of the filing of this Disclosure Statement, Access Lending has received $2.4 million from Access Holdings on account of the Access Lending Loans. Access Lending, in consultation with the Committee, had extended the due date for the payment of the minimum guaranteed amount, but that extended date passed without Access Holding satisfying its obligations under the Access Purchase Agreement. On February 28, 2008, Access Lending notified Access Holdings of this default and made demand on Access Holdings to pay immediately the remaining balance due -- approximately $2.1 million. Access Lending consulted with the Committee before making this demand and intends to continue to consult with the Committee and to pursue collection of the balance owed by Access Holding. However, whether or when this remaining $2.1 million will be collected is presently uncertain.

On August 3, 2007, Access Lending filed for bankruptcy protection in order to resolve issues related to the disposition of the proceeds from the sale of its assets and approximately $2.35 million of cash that it held as of such date in its operating account and that was not sold to Access Holdings.

### f.   Sale of Additional LNFA (Including Ohio Loans).

The Debtors had a relatively small number of mortgage loans that were not subject to repurchase agreements and were not sold in the prior sale to Ellington because of some complications related to the State of Ohio or because work was required to clarify title to the loans. On December 21, 2007, the Debtors filed a motion (the "GRP Bid Procedures Motion") seeking approval of the sale (subject to overbid) to GRP Financial Services Corp. ("GRP") of 46 mortgage loans that have not been financed through repurchase agreements or otherwise encumbered, as well as the approval of bid procedures and certain bid protections in connection with the sale of these mortgage loans pursuant to an auction (the "GRP Bid Procedures") [Docket No. 4190]. The 46 mortgage loans include 15 mortgage loans that are secured by property within the State of Ohio and are subject to a stipulated preliminary injunction as modified to permit the sale of these loans, but subject to the buyer abiding by certain procedures

related to any foreclosure of the mortgages. The GRP Bid Procedures Motion sought approval of GRP's agreement to purchase the 46 mortgage loans for approximately $1.8 million (subject to adjustment based on due diligence) as the stalking horse bid.

On January 9, 2008, the Bankruptcy Court entered an order approving the GRP Bid Procedures, including approving a break-up fee of $40,000 to be paid to GRP in the event that GRP was outbid [Docket No. 4361]. No competing bids were received by the bid deadline and on January 24, 2008, the Bankruptcy Court approved the sale 41 of these 46 loans to GRP for approximately $1.4 million [Docket No. 4556]. This sale closed on February 28, 2008, yielding $1,452,187.60 to the Estates.

### g.  Miscellaneous Asset Sales.

On April 25, 2007, the Debtors filed a motion requesting that the Bankruptcy Court establish streamlined procedures governing the sale of furniture, equipment and similar miscellaneous assets (collectively, "Miscellaneous Assets") [Docket No. 403]. On May 16, 2007, the Bankruptcy Court entered an order establishing these procedures [Docket No. 704]. Under the approved procedures, on limited notice to the Committee and other key constituencies in these cases, the Debtors are permitted to sell Miscellaneous Assets not to exceed $100,000 in each instance.    These procedures reduce the time and expense involved with obtaining Bankruptcy Court approval of relatively small transactions, many of which could not be effectuated in the event the transaction required approval in accordance with the notice and hearing requirements of Bankruptcy Code section 363.

On August 27, 2007, the Bankruptcy Court entered an order based on a motion of the Debtors expanding the procedures to permit the streamlined sale procedures to apply to sales of miscellaneous assets, including domain names, furniture and equipment, individual and small groups of mortgage loans and real properties obtained in connection with the foreclosure of mortgage loans, and other assets, up to $250,000 in each instance [Docket No. 2594].

Pursuant to the procedures, as of January 31, 2008, the Debtors have entered into forty-seven (47) sale transactions in connection with the wind down of operations nation-wide, generating proceeds of over $2.8 million for the benefit of the estates and creditors. This amount may increase by up to $171,418 per the terms of the two purchase agreements with IBM Credit, LLC. The Debtors anticipate that future sales (including sales that may occur after the Effective Date) of Miscellaneous Assets will generate between $300,000 to $500,000. Certain of the proceeds generated from the sale of Miscellaneous Assets may be subject to (i) liens of parties that provided certain of the Debtors with secured equipment financing or (ii) personal property tax liens of various taxing authorities.

### 7.    GECC Objection to Servicing Sale; Motion for Relief from Stay.

In 2004, General Electric Capital Corporation ("GECC") extended financing to NCFC, NCMC, and TRS Holdings in exchange for five promissory notes totaling $25,966,000 in principal (the "GECC Notes"). The parties also entered into a Master Security Agreement dated February 18, 2004, pursuant to which all of the notes are secured by liens against certain

computers, copiers, printers, and other personal property located in the Debtors' facilities nationwide.

GECC filed identical Proofs of Claim against NCMC, NCFC and TRS Holdings. The Proofs of Claim assert that, as of the Petition Date, GECC was owed $7,515,537.78 under the GECC Notes and that the claims are secured in an "unknown" amount. The Debtors have analyzed the value of GECC's collateral and believe that GECC is undersecured, in large part.

GECC also leased telephone equipment, copy machines and fax machines to the Debtors under Master Lease Agreements with NCFC and Home123. In the aggregate, the Debtors' obligations to GECC under such Master Lease Agreements totaled approximately $69,500 per month. The Debtors have rejected these Master Lease Agreements, and GECC has collected most of the equipment leased to the Debtors thereunder.

On May 14, 2007, GECC filed an objection to the Carrington Sale [Docket No. 662], asserting that because its collateral was included in the sale, it could not be sold free and clear of its liens. The Carrington Sale Order provided that: (i) the Debtors would withhold the full amount of GECC's claim on account of the GECC Notes ($7,558.887.80) from the proceeds of the Carrington Sale as a "Secured Claim Reserve"; and (ii) GECC's liens against its collateral sold to Carrington would attach to the reserve to the same extent as its liens against that collateral. The Debtors and the Committee expressly reserved their rights to object to or dispute the claims of GECC and their entitlements to the Secured Clam Reserve or to seek to reduce the amount of the Secured Claim Reserve by agreement of the parties or order of the Bankruptcy Court, provided that GECC would have the right to contest any such reduction not based on an agreement of the parties. Upon the closing of the Carrington Sale, it was determined that the sale included less than 20% of GECC's collateral.

On May 11, 2007, GECC filed a motion for relief from stay ("GECC Stay Relief Motion") [Docket No. 630]. The Debtors, the Committee, and the Examiner (as defined in Section III.D.4 hereof) all filed oppositions to the GECC Stay Relief Motion. On July 20, 2007, the Debtors and GECC entered into a stipulation modifying the automatic stay to enable GECC to recover its collateral at the Debtors' location in Santa Ana, California and permitting the Debtors to include certain assets comprising GECC's collateral in the Debtors' sales of Miscellaneous Assets. GECC thereafter collected the collateral in the Santa Ana, California location, which collateral totaled $90,000 in value. Subsequently, the Debtors and GECC entered into additional stipulations continuing the hearing date on the GECC Relief Stay Motion. In connection with those stipulations, the Debtors paid GECC a total of $300,000 as an advance on the secured claims of GECC to be ultimately allowed by the Bankruptcy Court from the Secured Claim Reserve.

On December 26, 2007 the Debtors, the Committee, and GECC reached a settlement of GECC's claims under the GECC's secured financing arrangements with the Debtors, which was incorporated into a stipulation (the "GECC Settlement Stipulation") that was filed with the Bankruptcy Court under certification of counsel [Docket No. 4195] and approved by order of the Bankruptcy Court dated December 27, 2007 [Docket No. 4217]. The GECC Settlement Stipulation provides for the payment by the Debtors to GECC from the Secured Claim Reserve

the sum of $1,800,000. The GECC Settlement Stipulation specifies that the $1,800,000 payment, in addition to the $300,000 previously paid to GECC and the $90,000 worth of collateral previously returned to GECC, is in complete satisfaction of the secured portion of GECC's claims under the secured financing arrangements (the "GECC Secured Claim"), and that the GECC Secured Claim therefore totals $2,190,000. The GECC Settlement Stipulation further provides that GECC has unsecured deficiency claim against NCFC, NCMC, and TRS Holdings and their estates for the balance of amounts owing under the secured financing arrangements in the amount of $5,325,527.78 (the "GECC Unsecured Deficiency Claim"). Under the terms of the GECC Settlement Stipulation, the approximately $5.0 million remaining in the Secured Claim Reserve after payment to GECC was released to the Debtors at the end of December, 2007.

Thereafter, on January 4, 2008, pursuant to the terms of the GECC Settlement Stipulation, GECC withdrew the GECC Stay Relief Motion [Docket No. 4310]. In order to effectuate the parties' settlement, on January 8, 2008, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 requesting, among other things, allowance of the GECC Unsecured Deficiency Claim and mutual releases among the Debtors and Committee, on one hand, and GECC, on the other hand [Docket No. 4345]. The motion was granted by order of the Bankruptcy Court dated February 6, 2008 [Docket No. 4847].

### 8.    Filing Schedules and Statement of Financial Affairs; Claims Bar Dates.

#### a.    Debtors Other Than Access Lending.

Except for Access Lending, the Debtors each filed their Schedules on May 31, 2007, which Schedules were amended on March 4, 2008. On June 28, 2007, the Bankruptcy Court entered the "Order Establishing Bar Dates For Filing Proofs Of Claim And Approving Form, Manner And Sufficiency Of Notice Thereof" (the "Bar Date Order") [Docket No. 1721]. Pursuant to the Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Chapter 11 Cases (except that of Access Lending) was August 31, 2007 (the "General Bar Date"). The Adequate Protection negotiations (see Section III.D.3 hereof) resulted in a short extension for the parties to the Adequate Protection Order (defined in Section III.D.3 hereof) to file Proofs of Claim. Subject to certain limited exceptions contained in the Bankruptcy Code and in the Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the General Bar Date), all other Proofs of Claim filed against Debtors other than Access Lending must have been submitted by the General Bar Date. The deadline for governmental units to assert prepetition Claims against any of the Debtors other than Access Lending was October 2, 2007.

Approximately 3,726 Proofs of Claim, asserting Claims totaling approximately $35.1 billion against the estates of Debtors other than Access Lending, have been submitted, and approximately 4,814 Claims, in the approximate amount of $37.9 million, listed on the Debtors' Schedules (other than the Schedules of Access Lending) are not scheduled as contingent, unliquidated, or disputed and have not been superseded by filed Claims, resulting in an aggregate of $35.1 billion of filed and scheduled claims (exclusive of inter-company Claims). As noted in

Section IV.A.3.c hereof, the Debtors estimate that after completing the Claims reconciliation process and giving effect to the Intercompany Claim Protocol and the EPD/Breach Protocol, for distribution purposes under the Plan, the estimated Unsecured Claims against the Holding Company Debtors and Operating Debtors will range from approximately $1.0 billion to $2.0 billion.

### b.    Access Lending.

Access Lending filed its Schedules on September 17, 2007 and amended its Statement of Financial Affairs on March 4, 2008. On October 23, 2007, the Bankruptcy Court entered the "Order Establishing Bar Dates For Filing Proofs Of Claim In The Chapter 11 Case Of New Century Warehouse Corporation And Approving Form, Manner And Sufficiency Of Notice Thereof" (the "Access Lending Bar Date Order") [Docket No. 3404]. Pursuant to the Access Lending Bar Date Order, the deadline for non-governmental entities to submit Proofs of Claim in the Access Lending Chapter 11 Case was December 14, 2007 (the "Access Lending Bar Date"). Subject to certain limited exceptions contained in the Bankruptcy Code and in the Access Lending Bar Date Order (including with respect to Claims arising from the rejection of executory contracts after the Access Lending Bar Date), all proofs of claim filed against Access Lending must be submitted by the Access Lending Bar Date. The deadline for governmental units to assert prepetition claims against Access Lending is January 31, 2008.

Approximately 28 Proofs of Claim, asserting Claims totaling more than $52.8 million against Access Lending's Estate, have been filed. In addition, Access Lending's Schedules list two non-contingent, liquidated, and undisputed Claims in amounts greater than $0.00: (i) an Unsecured Claim of NCMC in the amount of $3,973,199.86, and (ii) an Unsecured Claim of a trade creditor in the amount of $1,675.00. As noted in Sections I.A.4 and V.B.3 hereof, the Debtors estimate that after completing the Claims reconciliation process, for distribution purposes under the Plan, the estimated Unsecured Claims against Access Lending will range from approximately $14 million to $20 million.

The Debtors expect that the major Claims that will share in the distributions to Class AL3: Other Unsecured Claims Against Access Lending will consist of (i) the intercompany Claim of NCMC for $3,973,199.86, and (ii) a Claim asserted by Goldman Sachs for approximately $15.1 million.

The Claim asserted by Goldman Sachs arises out of a Master Repurchase Agreement between Goldman Sachs and Access Lending. On March 8, 2007, Goldman Sachs notified Access Lending that it was terminating this Master Repurchase Agreement based on some asserted events of default and on March 12, 2007 notified Access Lending that it was purporting to exercise a remedy under the Master Repurchase Agreement by crediting what Goldman Sachs asserted was the fair market value of the mortgage loans subject to this Master Repurchase Agreement against Access Lending's repurchase obligations. Goldman Sachs asserted in the March 12, 2007 letter that this resulted in a surplus of slightly in excess of $1.7 million, but Goldman Sachs asserted that it could offset this surplus against obligations owed to it by NCMC for EPD and Breach Claims arising from some unrelated sales of mortgage loans by NCMC.

Subsequently, Goldman Sachs asserted that it had a Claim of approximately $15.1 million against Access Lending (and guaranteed by NCFC) because former management of Access Lending allegedly collected proceeds from the sale of some mortgage loans subject to this Master Repurchase Agreement or otherwise owned by Goldman Sachs. Former management of Access Lending asserts, in contrast, that Access Lending collected approximately $13 million (rather than $15.1 million) from the sale of these mortgage loans and that Goldman Sachs was in fact made whole from proceeds on other mortgage loans that Goldman Sachs received after declaring and event of default under the Master Repurchase Agreement that exceeded the amount financed by Goldman Sachs and that was owed by Access Lending to Goldman Sachs.

Shortly prior to the Petition Date for NCMC and the other Debtors other than Access Lending, NCMC directed Access Lending to transfer approximately $10.1 million to NCMC's general corporate operating account. This transfer has been the subject of the Adequate Protection Dispute discussed in section III.D.3 hereof. If the Bankruptcy Court approves the motion to approve the Adequate Protection Dispute, Goldman Sachs will receive a payment of approximately $5.6 million, which the Debtors assert will reduce its remaining Claim against Access Lending to approximately $9.5 million.

NCMC's Claim against Access Lending arises out of funding that NCMC provided to Access Lending for Access Lending's operations. These advances were made by NCMC as loans and are documented on the books of both Access Lending and NCMC as intercompany loans. The $10.1 million transfer from Access Lending shortly prior to NCMC's Petition Date were accounted for as partial payments on such intercompany debt and the $3.9 million balance is the amount outstanding after application of these payments. Goldman Sachs has advised the Plan Proponents that it contests whether this intercompany debt is debt or should be recharacterized as equity contributions.

The Plan Proponents have initiated settlement negotiations with Goldman Sachs over such issues as the correct amount of any Claim Goldman Sachs has against Access Lending and whether the NCMC Claim can be recharacterized. If these negotiations result in a settlement, it will be presented to the Bankruptcy Court. Otherwise, these issues may be resolved through litigation.

### 9.    Disposition of Leases and Executory Contracts.

Concurrently with the filing of the Chapter 11 Cases, the Debtors moved the Bankruptcy Court for authority to reject certain non-residential real property leases and for approval of procedures to reject executory contracts and additional leases of non-residential real property in order to avoid burdening the Debtors' estates with any unnecessary postpetition obligations. The Debtors sought approval of expedited procedures for managing this process in order to avoid the significant delays and administration costs that would result without such procedures. On April 25, 2007, the Bankruptcy Court entered an order approving the rejection of certain leases and approving the procedures by which the Debtors could reject executory contracts and any unexpired leases of non-residential real property. Pursuant to those procedures, the Debtors have

rejected approximately 825 executory contracts and approximately 295 real property leases to date.

### 10.    Litigation.

#### a.    Securities Litigation.

A week after NCFC announced the need to restate its quarterly financial statements for the first three quarters of 2006, a putative securities class action lawsuit was filed on February 12, 2007 in the United States District Court for the Central District of California against NCFC and certain of its officers and directors. The complaint alleged that NCFC and the other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCFC, which resulted in artificially inflated market prices of NCFC's common stock, and that the plaintiff and the putative class members purchased NCFC's stock at these artificially inflated market prices between April 7, 2006 and February 7, 2007. The complaint seeks money damages in favor of its putative class of purchasers of NCFC's securities, the costs and expenses of the action and other relief that may be granted by the court.

At least eighteen additional putative securities class actions were filed in the United States District Court for the Central District of California between February 8, 2007 and March 16, 2007. These complaints named NCFC and certain of its officers and directors as defendants and present in large degree the same legal and factual issues as the complaint served on February 14, 2007.

On June 26, 2007, the New York State Teachers' Retirement System (the "Lead Plaintiff") was appointed lead plaintiff and the above-referenced cases were consolidated. The Lead Plaintiff filed four proofs of claim in this case on behalf of the securities purchasers in the putative class.

On August 16, 2007, the Lead Plaintiff sought a limited modification of the automatic stay to obtain from the Debtors copies of all documents and the materials that the Debtors produced or provided in connection with any inquiries by the Audit Committee of NCFC's Board of Directors, the SEC, the United States Attorney's Office, the New York Stock Exchange, and the Examiner relating to NCFC's accounting and financial statement irregularities, errors and/or misstatements [Docket No. 2274]. The court denied the Lead Plaintiff's motion to modify the automatic stay without prejudice to renew the motion upon the earlier of the filing of the Examiner's report, confirmation of a plan, or a change in circumstances regarding any available factual predicate for such motion [Docket No. 4057].

Under Article 12.B of the Plan, stays and injunctions provided for in the Chapter 11 Cases by order of the Bankruptcy Court, pursuant to sections 105 or 362 of the Bankruptcy Code, the Plan, or otherwise, and extant on the Confirmation Date, remain in effect until the later of the entry of the Final Decree or dissolution of the Liquidating Trust. The Lead Plaintiff asserts that there is no basis for the Liquidating Trust to be able to maintain the automatic stay in effect beyond the Effective Date and that such extension will frustrate Lead Plaintiff's ability to obtain relevant documents in the securities litigation while the Liquidating Trust has those

documents available to pursue its own claim. The Plan Proponents assert that the extension of injunctions and stays is a critical component of the Plan necessary to preserve the Estates' Assets for the beneficiaries of the Liquidating Trust and that NYSTRS is not prejudiced by the extension of the automatic stay because, given the filing of the Examiner's report, the Lead Plaintiff may now renew its motion for relief from the automatic stay, by which it may seek the same relief with respect to the automatic stay as continued by operation of the Plan, when and if confirmed.

On September 14, 2007, the Lead Plaintiff filed its consolidated complaint, excluding NCFC as defendant. On January 31, 2008, the District Court dismissed the consolidated complaint without prejudice and with leave to amend by March 24, 2008. As of the filing of this Disclosure Statement, an amended complaint has not been filed, but the Lead Plaintiff has informed the Debtors that it intends to file an amended consolidated complaint within the time allowed by the District Court.

Notwithstanding the Plan Proponents' position that the Claims arising from the securities litigation constitute 510b Claims against NCFC and are not entitled to any distribution under the Plan, the Lead Plaintiff asserts that it should be able to maintain those Claims against the Debtors to the extent of available insurance coverage and proceeds. The Plan Proponents do not agree that the Lead Plaintiff has any legal entitlement to such treatment and that such treatment would disadvantage other Holders of Claims against the Debtors.

In addition to the putative securities class actions, at least eight derivative complaints have been filed against certain of NCFC's directors and officers that make essentially the same allegations as the federal securities cases relating to the NCFC's restatements. Six of these actions were filed in the Orange County, California Superior Court. Two were filed in the United States District Court for the Central District of California. These actions have been stayed.

### b.    WARN Litigation.

On April 17, 2007, former employees of TRS Holdings, NCFC, and NCMC (the "WARN Plaintiffs") filed a putative class action complaint with the Bankruptcy Court [Docket No. 292]. The WARN Plaintiffs filed an amended complaint on April 18, 2007, adding Home123 as a defendant. The WARN Plaintiffs allege that the defendant Debtors violated the federal Workers Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101, et seq., and the California WARN Act, California Labor Code §§ 1400 et seq., when they terminated corporate, wholesale, and retail employees without providing the requisite 60-day written notice. Putative class members, per a class certification stipulation executed by the parties and approved by the Bankruptcy Court on September 11, 2007, encompass two different groups:  (1) employees terminated without cause from April 2, 2007 through May 1, 2007 as a result of a mass lay-off or plant closing at the defendants Debtors' facilities subject to WARN notification requirements; and (2) employees terminated without cause from May 2, 2007 and thereafter as a result of a mass lay-off or plant closing at the defendants Debtors' facilities subject to WARN notification requirements. The WARN Plaintiffs seek respective wages, salary, commissions, bonuses, accrued holiday, accrued vacation, pension contributions, and 401K contributions. The Debtors

dispute that any amounts are owed to the WARN Plaintiffs. Substantial numbers of the Debtors employees executed releases of such claims against the Debtors in order to receive payments not otherwise payable to them under the Debtors retention plans. Further, the Debtors assert that they were liquidating fiduciaries at the times of the reductions in force and accordingly their actions are not subject to the WARN statutes. In addition, the Debtors assert that to the extent the WARN statutes are applicable to either reduction in force, the unforeseeable business circumstance and faltering company exceptions provide complete defenses to the liability. In any event, the Debtors assert that the salary continuation and benefits paid to the affected employees after termination, as well as the amount paid in full to the employees on account of prepetition claims above the $10,950 limit of section 507(a)(4) of the Bankruptcy Code, may be offset against any amount determined owing to the Plaintiffs. The WARN Plaintiffs distributed notices to putative class members toward the latter part of October 2007. Fact discovery is under way and was set to close on January 31, 2008, though prior to such date, the parties reached an agreement in principal to extend this deadline for at least 30 days. Subsequently, on February 22, 2008, the parties entered into a stipulation providing a 30-day moratorium on all fact discovery as of the execution date of the stipulation and a 60-day extension of all deadlines thereafter if no settlement is reached during the moratorium. No trial date has been set as of the filing of this Disclosure Statement.

### c.    Deferred Compensation Plan Litigation.

On June 29, 2007, the Debtors (other than Access Lending) were served with a complaint for declaratory judgment and other equitable relief that was filed on June 20, 2007 in the Bankruptcy Court against the Debtors (other than Access Lending) and certain of NCFC's directors, captioned as *Gregory J. Schroeder, et al. v. New Century Holdings, Inc., et al.*, Adv. Pro. No. 07-51598 (the "Schroeder Adversary Proceeding") [Docket No. 1447]. The Deferred Compensation Complaint seeks a declaratory judgment on behalf of a putative class consisting of beneficiaries (the "Deferred Compensation Beneficiaries") of the New Century Financial Corporation Deferred Compensation Plan and the New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (collectively, the "Deferred Compensation Plan") that, among other things, the Deferred Compensation Beneficiaries are a proper class and that the Deferred Compensation Plan is subject to substantive provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including its exclusive benefit and anti-inurement rules, which the Deferred Compensation Plan Beneficiaries assert prohibit NCFC from using the assets in the irrevocable trust that may be available to NCFC to fund NCFC's obligations under the Deferred Compensation Plan to pay creditors other than the participants in the Deferred Compensation Plan (the "Deferred Compensation Trust"). The Deferred Compensation Plan Beneficiaries also seek equitable relief in the form of a trust or equitable lien and reformation of the Deferred Compensation Plan and the Trust in order to advance their position ahead of NCFC's other Creditors, a declaratory judgment that the assets in the Trust should be excluded from the Debtors' Estates, and payment of attorneys' fees.

There are two key questions at issue in the Schroeder Adversary Proceeding: (1) whether the Deferred Compensation Plan is a "top hat" plan as defined by ERISA and (2) even if the Deferred Compensation Plan is not a "top hat" plan, whether the plaintiffs have stated a claim under ERISA. A "top hat" plan is a form of deferred compensation arrangement, where an

employee agrees with his or her employer to defer current compensation until a future tax year. See In re IT Group, Inc., 448 F.3d 661, 664-65 (3d Cir. 2006). ERISA defines a top hat plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." ERISA § 201(2), 301(a)(3), and 401(a)(1); 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). The plaintiffs urge the Court to engage in a fact specific inquiry, focusing on whether the Deferred Compensation Plan was "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." The Debtors and the Committee disagree, arguing that the allegations in the complaint establish conclusively that the Deferred Compensation Plan constituted a "top hat" plan. The Debtors and the Committee also argue that ERISA bars the plaintiffs' claims in any event and that their claims are time barred. The plaintiffs also claim that if the Deferred Compensation Plan did not constitute a "top hat" plan, the court has the power to convert the assets of the Trust into ERISA plan assets. The Debtors, the Committee, and Wells Fargo disagree, arguing, among other things, that the plain language of the New Century Supplemental Benefit and Deferred Compensation Trust Agreement (the "Trust Agreement") (the Deferred Compensation Trust's formative and governing document) precludes this relief.

It is the Debtors' position that as a result of the Debtors' insolvency, the Deferred Compensation Beneficiaries' deferred compensation claims are general unsecured claims against NCFC under the terms of the Deferred Compensation Plan and are not entitled to any priority to the assets in the Deferred Compensation Trust. The Debtors contend that in order to maintain the tax-deferred status of participant accounts, the Deferred Compensation Plan and Deferred Compensation Trust were structured so that assets held in the Deferred Compensation Trust are generally available to the creditors of NCFC. The Debtors argue that participants do not have an ownership interest in the investment options, the Trust assets, or in any other specific assets of NCFC. Indeed, the Trust Agreement provides: "[A]ssets of the Trust Fund will at all times be subject to the claims of the general creditors of the Company under Federal and state law," and "Participants and their beneficiaries will have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust Fund. Any rights created under the Plans and this Trust Agreement will be mere unsecured contractual rights of Participants and their beneficiaries against the Company."

The Deferred Compensation Beneficiaries also assert in the Schroeder Adversary Proceeding that, even if the Deferred Compensation Plan is a "top hat" plan, the assets of the Deferred Compensation Trust, by virtue of the express language of the Deferred Compensation Trust and the Deferred Compensation Plan, are to be shared only among the Deferred Compensation Beneficiaries and the "general creditors" of NCFC who held claims as of the insolvency of NCFC, and may not be used to pay any Claims of any other Creditors of NCFC or any Claims of any Creditors of any other Debtor. The Deferred Compensation Beneficiaries assert that the term "general creditors" excludes claimants asserting secured, deficiency, administrative and priority claims. Accordingly, in the event that the Deferred Compensation Beneficiaries prevail in this alternative argument, the assets of the Deferred Compensation Trust could not be used to pay any secured, administrative or priority claims, any deficiency claims arising from secured claims or repurchase agreements, or any unsecured claims against any of the Holding Company Debtors other than NCFC. The Debtors and the Committee disagree with

this interpretation of the Deferred Compensation Plan and Deferred Compensation Trust and contend that use of the assets of the Deferred Compensation Trust is not limited in the fashion asserted by the Deferred Compensation Beneficiaries, but will instead become available to fund liabilities as set forth in the Plan.

The Debtors and Wells Fargo filed motions to dismiss in the Schroeder Adversary Proceeding, and the Committee joined in such motions. A hearing on the motions to dismiss was held on October 2, 2007, and the motions are pending. As of the date of this Disclosure Statement, the Bankruptcy Court had these motions under submission.

### d.    DBNTC Cure Claim Litigation.

Deutsche Bank National Trust Company ("DBNTC") acted as a trustee or indenture trustee to certain of the securitization trusts (the "DBNTC Trusts") for which NCMC provided servicing. Pursuant to the terms of the pooling and servicing agreements for which DBNTC acted as trustee or indenture trustee (the "DBNTC PSAs"), under certain express circumstances, DBNTC had the right to assert indemnity and other contractual claims against NCMC (the "DBNTC PSA Claims").

In response to the proposed Carrington Sale, DBNTC filed an objection (the "DBNTC Objection") to the assumption and assignment of the DBNTC PSAs to Carrington on the grounds that, among other things, the Debtors had not cured, or provided adequate assurance that they would promptly cure, all of the existing defaults arising under the DBNTC PSAs [Docket No. 667]. In the DBNTC Objection, DBNTC asserted, inter alia, that the DBNTC Trusts were entitled to up to $28,500,000 in potential damages through the date of the DBNTC Objection (May 14, 2007), consisting of approximately $1,383,200 in fees and expenses for which DBNTC claimed that it was entitled to reimbursement under the indemnification provisions of the DBNTC PSAs (the "DBNTC Fee Indemnity Claim") and up to $27,100,000 for damages allegedly incurred by the Trusts on account of possible breaches by NCMC of its servicing obligations under the DBNTC PSAs (the "DBNTC Cure Indemnity Claim"). DBNTC also asserted that additional claims could arise between the date of the DBNTC Objection and the closing date of the Carrington sale (the "Stub Claims").

Notwithstanding the DBNTC Objection, the Bankruptcy Court approved the Carrington Sale [Docket No. 844]. The Carrington Sale Order, however, required that the Debtors reserve an amount either agreed upon by the parties or ordered by the Bankruptcy Court that would be deemed the maximum potential cure amount payable by the Debtors with respect to the DBNTC Objection and the assumption and assignment of the DBNTC PSAs to Carrington. On May 31, 2007, the Debtors, the Committee, and DBNTC entered into a stipulation regarding reserve and resolution procedures for DBNTC's disputed cure claim arising from the assumption and assignment of the DBNTC PSAs (the "DBNTC Stipulation"). Among other things, the DBNTC Stipulation provides that the Debtors will hold in reserve $10,000,000, which amount is the maximum potential liability for the Debtors on account of the DBNTC Cure Indemnity Claim. The DBNTC Stipulation does not limit the amount of the Stub Claims or the DBNTC Fee Indemnity Claim.

The Debtors' position with respect to the DBNTC Cure Indemnity Claim is that they do not have any liability on account of such claim because they serviced the mortgage loans subject to the DBNTC PSAs in a manner that complied with the terms of the DBNTC PSAs.

Procedurally, the DBNTC Stipulation provided certain dates by which DBNTC was required to submit detailed written information to the Debtors and the Committee setting forth the amount and bases of the DBNTC Cure Indemnity Claim and Stub Claims and by which the Debtors and the Committee had to respond. On September 12, 2007, DBNTC provided certain written information to the Debtors and the Committee. The Committee, on behalf of itself and the Debtors, provided a formal response to DBNTC on December 14, 2007. The parties subsequently held settlement conferences on December 19, 2007 and February 1, 2008. If the parties' dispute cannot be settled based on the mutual exchange of reports, the parties will proceed to litigate the matter.

## D.    OTHER EVENTS DURING CHAPTER 11 CASES.

In addition to the events discussed in the preceding section, other material events since the commencement of the Chapter 11 Cases are summarized below:

### 1.    Government Investigations.

#### a.    SEC Investigation.

On March 12, 2007, the Debtors received a letter from the staff of the Los Angeles Regional Office of the SEC stating that the staff was conducting a preliminary investigation involving the Debtors and requesting production of certain documents. The SEC issued a formal order of investigation with respect to its investigation of the Debtors on June 14, 2007. Since that date, the SEC staff has issued various subpoenas for the production of certain documents and has made various additional requests for information. NCFC has been and continues to cooperate with the SEC in the conduct of its investigation.

#### b.    United States Attorney's Investigation.

On February 28, 2007, NCFC received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in the NCFC's securities, as well as accounting errors regarding the NCFC's allowance for repurchase losses. NCFC subsequently received a grand jury subpoena requesting production of certain documents. As described in the above section addressing the SEC's investigation, NCFC has been and continues to cooperate with the U.S. Attorney's Office in the conduct of its investigation.

### 2.    Cease and Desist Orders and Consent Agreements.

#### a.    Regulatory Actions Generally.

Prior to the Petition Date, the Debtors had been engaged in discussions with their state

regulators regarding the Debtors' funding constraints and the impact on consumers who were in various stages of the loan origination process with the Debtors. During the first part of March 2007, the Debtors advised these regulators that they had ceased accepting loan applications. In addition, the Debtors advised these regulators that the Debtors were unable to fund any mortgage loans, including mortgage loans for those consumers who were already in the loan origination process with the Debtors. The Debtors continued to work cooperatively with these regulators to mitigate the impact on the affected consumers, including transferring pending loans and loan applications to other mortgage lenders. The Debtors also provided daily reports to their various regulators regarding the status of loans in process in their states, as well as responding to ad hoc information requests. These efforts proved successful, and the Debtors were able to find other lenders to fund all mortgage loans that they had approved and were in their pipeline.

Subsequently, the Debtors variously received, had sought against them, or entered into cease and desist orders, a suspension order, temporary restraining orders, and stipulation and consent agreements (collectively, "Regulatory Actions") by/with the regulators in the states in which they operated. The cease and desist orders contained allegations that certain of the Debtors engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after a closing, failure to meet certain financial requirements, including net worth and available liquidity, and failure to timely notify the state regulators of defaults and terminations under certain of their financing arrangements. The Regulatory Actions contained allegations that certain of the Debtors engaged in violations of applicable state law, including, among others, failure to fund mortgage loans after closing.

In general, the Regulatory Actions sought to restrain the Debtors from taking certain actions, including, among others, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdictions. The Regulatory Actions also sought to cause the Debtors to take certain affirmative actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the Debtors, and the provision of regular information to the state regulators regarding the Debtors' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. In general, the cease and desist orders and the suspension order became permanent when the Debtors did not promptly appeal them and the consent agreements and the stipulation became binding when entered into.

Following the receipt, issuance or entry into the Regulatory Actions, the Debtors continued to cooperate with their regulators to mitigate the impact on consumers resulting from the Debtors funding constraints.

### b.    The Ohio Preliminary Injunction.

On March 28, 2007, the Cuyhahoga County Court of Common Pleas in Cleveland, Ohio entered a Stipulated Preliminary Injunction (the "Ohio Preliminary Injunction") between the State of Ohio, ex. rel. Marc Dann, Attorney General, and NCFC, NCMC, and Home123. Pursuant to the Ohio Preliminary Injunction, NCFC, NCMC, and Home123 agreed to certain restraints on foreclosures and terms before they would sell, assign, or otherwise transfer any

certain types of owner-occupied mortgages on Ohio properties. The State of Ohio objected to the Mortgage Assets Bid Procedures Motion to the extent that the Debtors proposed to sell any mortgage loan subject to the Ohio Preliminary Injunction [Docket No. 142]. As a result, the Ohio loans that were to have been the subject of this sale were removed from the pool of loans being sold. Subsequently, the Ohio Attorney General and the Ohio Department of Commerce agreed to modify the Ohio Preliminary Injunction to allow the Debtors to sell 15 mortgage loans that are secured by property within the State of Ohio. As set forth in Section III.C.6.f hereof, such mortgage loans are part of a pool of 41 mortgage loans that were sold to GRP for approximately $1.45 million pursuant to an order entered by the Bankruptcy Court on January 24, 2008.

### 3.    The Adequate Protection Dispute.

Shortly after the Petition Date, two of the Repurchase Counterparties, UBS Real Estate Securities, Inc. and DBSP, commenced adversary proceedings (respectively, the "UBS Adversary Proceeding" and the "DBSP Adversary Proceeding"). The UBS Adversary Proceeding asserted, inter alia, that funds collected on mortgage loans subject to the Master Repurchase Agreement with UBS were to be held in trust and turned over to them. The DBSP Adversary Proceeding centered on other issues, discussed below, but also asserted that certain funds, in an unspecified amount, should be held in trust for DBSP. Each complaint also sought an accounting.

The initial reconciliation that the Debtors delivered to UBS pursuant to the procedure established in the UBS Adversary Proceeding showed that the Debtors had overpaid UBS. UBS disagreed and asserted that approximately $2.7 million had been collected by the Debtors on mortgage loans subject to its Master Repurchase Agreement and which had not been turned over to it. UBS asserted that this cash was its property and asserted that a constructive trust should be established to safeguard these funds. The Debtors disagreed, but agreed to escrow $2.7 million while this matter was being litigated.

In addition, prior to the Petition Date, the Debtors received some payments from borrowers with respect to loans that were subsequently sold in the secondary market to whole loan purchasers. Some of these whole loan purchasers asserted that these collections were their property or cash that should have been held in trust for them.

In early May 2007, the Debtors completed a preliminary reconciliation for all the Repurchase Counterparties and these whole loan purchasers that concluded that if one accepted (i) an argument asserted by UBS that all collections on loans subsequent to the last reconciliation were the Repurchase Counterparty's property, including collections that predated the Repurchase Counterparty's declaration of an event of default and (ii) an argument that all collections on loans that were subject to a whole loan sale agreement (even loans that had paid off before the loan sale closed) were the property of the loan buyers, then the amounts at issue were substantial. The Debtors consulted with the Committee, and the Debtors and the Committee decided to attempt to develop a procedure that would deal with all such trust fund claimants fairly and would preserve their rights plus the rights of the Debtors and unsecured creditors to assert contrary positions. The Debtors negotiated a motion with many of the major Repurchase

Counterparties and on May 16, 2007 filed the "Motion to Provide Adequate Protection Pursuant to Bankruptcy Code Sections 105, 361, 362 and 363(b)(1) [Docket No. 736] (the "Adequate Protection Motion"). In the Adequate Protection Motion, the Debtors sought an order providing adequate protection to all Repurchase Counterparties and whole loan purchasers who asserted an interest in property held by the Debtors on the Petition Date and providing for a collective process to resolve these issues.

On June 28, 2007, the Bankruptcy Court entered its "Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 361 and 363(b)(1)" [Docket no. 1729] (the "Adequate Protection Order"). Among other things, the Adequate Protection Order provided that the Debtors would deposit into an interest-bearing escrow account the sum of $39,331,614.71, which when added to the $2,670,000 that had previously been escrowed pursuant to the UBS Adversary Proceeding, would equal the $42.1 million in the NCMC corporate operating account on the Petition Date. In addition, the Repurchase Counterparties or whole loan purchasers who were subject to the Adequate Protection Order (the "Adequate Protection Parties") were granted liens and super administrative priorities on essentially all Estate assets to secure any legitimate trust fund claims. The Adequate Protection Order also detailed a series of accounting information exchanges that the parties agreed to make.

Certain of the Repurchase Counterparties have advised the Debtors that they disagree concerning the facts, legal analysis and any characterization of the Master Repurchase Agreements, any characterizations of the Master Repurchase Agreements or any assertions concerning what the Master Repurchase Agreements provide, as set forth in the Disclosure Statement.

The Adequate Protection Parties, the Debtors and the Committee have reached an agreement to settle this dispute. The factual and legal contentions of the parties are described in detail in the Motion of Debtors and Debtors in Possession Pursuant to Federal Rule of Bankruptcy Procedure 9019 ad Sections 105(a), 361, and 363 of the Bankruptcy Code For Approval of Stipulation of Global Settlement Resolving Disputes with Adequate Protection Parties (the "Adequate Protection Settlement Motion") [Docket No. 5183]. A copy of the Adequate Protection Settlement Motion may be viewed free of charge at http://www.xroadscms.net/newcentury under the "Court Documents" section. The Bankruptcy Court has scheduled a hearing on this motion for March 25, 2008. If the Bankruptcy Court approves the settlement, the NCMC estate will realize approximately $12.8 million which will be held by NCMC in a segregated escrow account that can be used to fund the Plan or used pursuant to an order of the Bankruptcy Court, and the Adequate Protection Parties will realize approximately $32 million. If the Bankruptcy Court does not grant the Adequate Protection Settlement Motion, the parties will likely either reengage in settlement discussion or litigate the issues that are described in the Adequate Protection Settlement Motion.

### 4.    Appointment of Examiner.

On April 17, 2007, the U.S. Trustee filed the "Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee or, in the Alternative, an Examiner" (the "Trustee Motion") [Docket No. 278], pursuant to which the U.S. Trustee requested that the

Bankruptcy Court appoint (a) a chapter 11 trustee for cause under 11 U.S.C. § 1104(a)(1), or, (b) in the alternative, an examiner under 11 U.S.C. § 1104(c)(2). The Trustee Motion was joined by the New York State Teachers' Retirement System and was opposed by the Debtors, the Committee, and Ellington.

On June 1, 2007, the Bankruptcy Court entered an order denying the Trustee Motion insofar as it sought the appointment of a chapter 11 trustee, but granting the Trustee Motion insofar as it sought the appointment of an examiner [Docket No. 1023]. The Bankruptcy Court directed the U.S. Trustee to appoint an examiner (the "Examiner") to (a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated, and (iii) identify and evaluate any claims or rights of action that the Estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible postpetition unauthorized use of cash collateral by the Debtors, and (c) otherwise perform the duties of an examiner set forth in section 1106(a)(3) and 1106 (a)(4) of the Bankruptcy Code (collectively, the "Investigation"). The Bankruptcy Court further ordered the Examiner to prepare and file a report within ninety (90) days of the date of the Examiner's appointment advising the Bankruptcy Court as to (a) the status of the Investigation, (b) whether the Examiner believed that the Examiner required additional time to complete the Investigation, and (c) whether the Examiner had identified additional areas or topics that should be investigated and therefore whether the scope of the Investigation should be broadened or otherwise amended.

Thereafter, on June 7, 2007, the Bankruptcy Court entered an order approving the U.S. Trustee's appointment of Michael J. Missal of Kirkpatrick & Lockhart Preston Gates Ellis LLP ("K&L Gates") as the Examiner [Docket No. 1162]. The Examiner subsequently retained K&L Gates as his legal counsel, Saul Ewing LLP ("Saul Ewing") as his Delaware counsel, and BDO Seidman, LLP ("BDO Seidman") as his accountants and financial advisor.

Since the appointment of the Examiner and the initiation of the Investigation, the Board of Directors consistently instructed the company and its professionals to cooperate fully with the Examiner. The Debtors and their professionals believe that they have followed this mandate, as well as that of the Bankruptcy Court.

The Debtors have made significant efforts to fulfill the Examiner's requests for documents and information as swiftly as possible, and the Debtors will continue to do so. The Debtors have devoted substantial resources to accomplish this undertaking. To date, the Debtors have produced millions of documents and more than one terabyte (i.e. more than 1,000 gigabytes) of native files from the Debtors' shared network drives in response to the Examiner's requests. This is in addition to the Debtors' provision of witness interviews, responses to the Examiner's additional priority requests, and the Debtors' other efforts in response to the Examiner's requests for information.

On October 3, 2007, the Examiner moved for authority to serve subpoenas requesting

information on certain former officers pursuant to Rule 2004. [Docket No. 3211]. The Bankruptcy Court granted the Examiner's motion on October 16, 2007 [Docket No. 3293]. The Examiner previously had sought authority to serve a subpoena on KPMG pursuant to Rule 2004 on July 16, 2007 [Docket No. 1946]. The Bankruptcy Court granted this request on August 1, 2007 [Docket No. 2107].

Citing the broad scope of the Investigation and the voluminous amount of documents produced by the Debtors, on September 5, 2007, the Examiner moved for an extension of time to submit his report to the Bankruptcy Court [Docket No. 2665]. On October 10, 2007, following a hearing on the matter and negotiations among the parties, the Bankruptcy Court entered the "Order (I) Supplementing June 1, 2007 Order Directing the Appointment of an Examiner and (II) Granting Motion of Michael J. Missal, Examiner for an Extension of Time to File His Report with the Court" (the "Supplemental Examiner Order") [Docket No. 3261]. While the Supplemental Examiner Order extended the deadline for the Examiner to file a comprehensive report regarding the results of the Investigation until January 15, 2008 (unless further extended by order of the Bankruptcy Court), it directed the Examiner to file his report pertaining to the Debtors' postpetition use of cash collateral upon completion of that portion of the Investigation.

The Examiner filed his First Interim Report on November 21, 2007, which dealt with the cash collateral issues (the "Cash Collateral Report"). On December 19, 2007, the Debtors filed a substantive response to the Cash Collateral Report. On January 7, 2008, the Examiner filed a reply to the Debtors' substantive response. Initially, the Examiner's Cash Collateral Report, the Debtors' reply, and the Examiner's response were filed under seal. On January 17, 2008, these documents were unsealed [Docket Nos. 4503, 4499, and 4502, respectively]. Each of these documents may be viewed free of charge at http://www.xroadscms.net/newcentury via the link labeled "Examiner's Reports."

On January 8, 2008, the Examiner filed a motion to further extend the deadline to submit his report on the accounting issues. [Docket No. 4342]. In it, the Examiner asserted that some former New Century employees had only recently agreed to be interviewed by him and that the production of documents by the Debtors and KPMG had taken longer than expected. After the Examiner filed this motion, the Debtors disclosed to the Bankruptcy Court and to the Examiner that they had discovered that a third party vendor engaged to produce documents to the Examiner had inadvertently failed to produce approximately 600,000 documents to the Examiner. Previously, the Debtors had understood that the vendor had produced these documents. Of these documents, approximately 177,000 duplicated documents that had been produced to the Examiner from other sources. Upon discovering this vendor mistake, the Debtors instructed the vendor expeditiously to produce the documents to the Examiner, and all were produced. The Examiner asserted that this delay supported his request for an extension. On January 24, 2008, the Bankruptcy Court entered an order extending the deadline by which the Examiner must file his report to February 29, 2008 [Docket No. 4612].

On February 29, 2008, the Examiner filed his Final Report. Pursuant to the Supplemental Examiner Order, the Final Report was filed under seal. If and when the Final Report is unsealed, it will be made available and may be viewed free of charge at http://www.xroadscms.net/newcentury via a link labeled "Examiner's Reports."

### 5.    The DBSP Adversary Proceeding and Settlement Thereof.

The DBSB Adversary Proceeding sought an adjudication of DBSP's and the Debtors' rights to approximately 235 mortgage loans that NCMC owned and which were not subject to any repurchase facility or otherwise encumbered (the "Disputed Loans"). The Disputed Loans had a principal balance of slightly more than $50 million. In early March 2007, DBSP made a $14.1 million margin call on the Debtors. The Debtors assert that they sent a tape with information about the Disputed Loans so that DBSP and the Debtors could negotiate over what portion of these loans might be transferred to DBSP in satisfaction of this margin call. DBSP, however, asserted that the Debtors authorized the transfer of all of these loans to it. DBNTC, which served as the custodian for the original borrower notes and other mortgage loan documents, transferred ownership of the Disputed Loans from NCMC to DBSP. The Debtors asserted that they never authorized this transfer by DBNTC to DBSP. DBSP and DBNTC, in contrast, claimed that the Debtors authorized this transfer.

DBSP also asserted claims for approximately $2 million under the Adequate Protection Motion and a deficiency claim under its Master Repurchase Agreement of approximately $50 million. The Debtors and the Committee disputed these assertions and argued that DBSP owed the Estates money since the market value of the mortgage loans subject to its Master Repurchase Agreement exceeded the amounts that the Debtors owed DBSP on the date that DBSP declared an event of default and accelerated that facility.

DBSP and the Debtors ultimately settled this dispute. On August 8, 2008, the Debtors filed a motion seeking approval of a settlement and mutual release of all of the disputes among the Debtors and DBSP regarding these issues (the "DBSP Settlement") [Docket No. 2214]. On August 21, 2007, the Bankruptcy Court entered an order approving the DBSP Settlement [Docket No. 2369].

Among other things, the DBSP Settlement provided that the Debtors would conduct an auction of the Disputed Loans with the proceeds of any sale, after deducting any costs and expenses of such sale (including amounts, if any, due to bidders for due diligence expense reimbursement) to be paid as follows: (i) first, to DBSP until DBSP is paid $14,000,000 (the "DBSP Payment"), and (ii) second, to the Debtors' estates, to the extent of any excess proceeds after payment of the DBSP Payment. The settlement also provided that DBSP would assign to the estates any recovery to which it would be entitled in the Adequate Protection Motion. Finally, the settlement provided that DBSP would have an allowed general unsecured deficiency claim in the amount of $20,000,000 against NCFC, NC Credit, NCMC, NC Capital, and Home123; provided, however, that the recovery on such claim will be limited to such claim's pro rata share (determined in relation to other allowed general unsecured claims against the relevant Debtor), of proceeds distributed from recoveries realized on claims (net of professional fees and other costs of prosecution) arising out of events or circumstances that led to the restatement of the financial statements of the Debtors or such restatement itself, and such allowed claim will not be entitled to participate in distributions derived from any other source.

On August 27, 2007, the Bankruptcy Court entered an order approving bidding procedures in connection with the auction of the Disputed Loans [Docket No. 2595]. On

September 10, 2007, the Debtors held an auction of the Disputed Loans in accordance with those bidding procedures. After 15 rounds of bidding, Residential Mortgage Solution L.L.C. ("RMS") was the winning bidder at the auction, with a winning bid of $23,330,000 in cash. Of that amount, approximately $11.9 million was remitted to the Estates and the remainder was paid to DBSP. On September, 14, 2007, the Bankruptcy Court entered an order approving the sale of the Disputed Loans to RMS. The sale closed on September 18, 2007.

### 6.   Resignation of KPMG.

On April 27, 2007, KPMG resigned as principal accountants for NCFC and notified the Debtors that the client-auditor relationship between NCFC and KPMG had ceased. Because NCFC had already initiated liquidation proceedings under chapter 11 of the Bankruptcy Code as of the date of KPMG's resignation, NCFC did not engage a successor accounting firm.

### 7.   Relief from Stay Procedures.

During the pendency of the Chapter 11 Cases, the Debtors were subject to a multitude of motions for relief from the automatic stay filed by entities seeking to foreclose on real property encumbered by loans that were originated and/or serviced by the Debtors. In some instances, the Debtors held a senior lien(s) on the properties. In others, the Debtors held a junior lien(s).

In order to avoid becoming mired in these stay relief requests, the Debtors adopted a two-tiered approach. First, on May 3, 2007, the Debtors filed the "Motion of the Debtors and Debtors in Possession for a Procedure to Grant Relief from the Automatic Stay for Certain Foreclosure Proceedings Pursuant to Sections 105(a) and 362 of the Bankruptcy Code" (the "Omnibus Stay Relief Motion") [Docket No. 526]. The Omnibus Stay Relief Motion contemplated an abbreviated procedure for obtaining stay relief for parties that held a senior lien(s) on a property where the Debtors held a junior lien(s) and the fee interest was not property of the Estates. Specifically, the Omnibus Stay Relief Motion requested approval of procedures providing that the movant could avoid filing a motion for relief from stay if the movant supplied the Debtors with certain information regarding the real property in question and its senior lien(s) and pay the Debtors a fee for the administrative burden. A review of this information allowed the Debtors to determine whether or not they had an economic interest in the subject property that should be protected. An order was entered granting the Omnibus Stay Relief Motion on June 7, 2007 [Docket No. 1163]. Several entities faced with these factual circumstances chose to participate in the omnibus stay relief procedures described above resulting in a substantial savings for the Estates.

Second, the Debtors engaged in a one-off analysis of motions for relief from stay in situations not covered by the omnibus stay relief procedures or situations in which the movant chose not to participate in the omnibus stay relief procedures. In the first instance, the analysis of these stay relief motions involved a determination of whether the Debtors had an interest in the subject properties. In nearly every case, the fashion in which the Debtors conducted their business prepetition and/or the speed with which the Debtors conducted their asset sales postpetition, left the Debtors with no interest in the subject properties. Thus, in almost every instance, the Debtors were able to allow these motions for relief from stay to proceed unopposed.

As of January 28, 2008, over 300 such motions have been filed and granted.

### 8.   Extensions of Exclusivity.

By Order dated July 31, 2007, the Bankruptcy Court extended for sixty (60) days, through and including November 28, 2007, the exclusive period during which the Debtors, other than Access Lending, have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") in the Chapter 11 Cases with respect to all non-Debtor parties other than the Committee, and to extend for an additional sixty (60) days, through and including January 28, 2008, the period during which the Debtors have the exclusive right to solicit acceptances of a chapter 11 plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods") in the Chapter 11 Cases [Docket No. 2106].   Subsequently, on November 28, 2007, the Debtors moved to further extend the Exclusive Periods with respect to all Debtors other than Access Lending by approximately 30 days and to extend Access Lending's Exclusive Periods for the first time [Docket No. 3969].   Specifically, the Debtors requested that the Bankruptcy Court enter an order extending the Exclusive Filing Period, with respect to all non-Debtor parties other than the Committee, through and including December 28, 2007 and the Exclusive Solicitation Period through and including February 27, 2008. The Bankruptcy court entered an order approving this request on December 20, 2007 [Docket No. 4177].   On December 28, 2007, the Debtors filed an additional motion to extend the Exclusive Filing Period, with respect to all non-debtor parties other than the Committee, through and including January 28, 2008 and the Exclusive Solicitation Period through and including March 28, 2008. [Docket No. 4263].   The Bankruptcy Court entered an order approving this request on January 23, 2008 [Docket No. 4530].   Thereafter, on January 28, 2008, at the request of the Committee, the Debtors moved to further extend the Exclusive Filing Period through and including February 21, 2008 and the Exclusive Solicitation Period through and including April 21, 2008 [Docket No. 4720].   On February 19, 2008, the Bankruptcy Court entered an order granting this motion [Docket No. 4925].   Accordingly, although the February 2, 2008 filing of the Plan rendered the Debtors' request to extend the Exclusive Filing Period moot, the Debtors' Exclusive Solicitation Period has been extended through and including April 21, 2008.

### 9.   Positive Software Litigation.

In February 2003, Positive Software Solutions, Inc. ("PSSI") brought an action against NCMC, as well as former officers Jeffrey Lemieux and Frank Nese and certain non-Debtor affiliates, in the United States District Court for the Northern District of Texas (the "Texas District Court") alleging the breach of a certain software license agreement as well as theft, conversion and infringement of certain of PSSI's copyrights and trade secrets (the "2003 Lawsuit").   The 2003 Lawsuit alleges that the Debtors were seeking to reverse engineer a software application and data storage system known as LoanForce that was licensed by PSSI to NCMC and sought, among other things, $38 billion dollars in monetary damages.

The 2003 Lawsuit was arbitrated pursuant to the rules of the American Arbitration Association. The arbitrator first heard and decided eight motions for partial summary judgment. Thereafter, on January 19-23, 2004 and February 3-4, 2004, the arbitrator conducted a seven day trial. On May 5, 2004, following the submission of post-trial briefs, the arbitrator entered an 86-

page written opinion constituting his arbitration award (the "Award"). The Award rejected all of PSSI's claims and awarded NCMC $11,500 in actual damages on its counterclaims, as well as $1.5 million in attorneys' fees and $1,200 in costs. While the District Court granted PSSI's motion to vacate the arbitration award on the grounds that the arbitrator had an undisclosed conflict of interest based on his having been co-counsel with a lawyer representing NCMC in the 2003 Lawsuit, the *en banc* United States Court of Appeals for the Fifth Circuit reversed the District Court's vacature (see Positive Software Solutions, Inc. v. New Century Mortg. Corp., 476 F.3d 278 (5th Cir. 2007), and, on June 11, 2007, the United States Supreme Court denied a petition for *certiorari* by PSSI. The Fifth Circuit remanded the case to the Texas District Court for consideration of PSSI's other objections to the Award.

On July 9, 2007, PSSI filed a motion in the Texas District Court for leave to file a second motion to vacate the Award. The next day, July 10, 2007, PSSI filed a motion for relief from the automatic stay to further pursue the 2003 Lawsuit (the "2003 Lawsuit Stay Relief Motion") [Docket No. 1877]. The Debtors filed an objection to the PSSI Stay Relief Motion that also requested sanctions for a violation of the automatic stay (the "First Sanctions Motion") [Docket No. 2101]. On August 15, 2007, the Bankruptcy Court denied the 2003 Lawsuit Relief Motion and awarded damages for PSSI's violation of the stay in an amount to be determined after an evidentiary hearing [Docket No. 2265].

Thereafter, on August 20, 2007, PSSI filed a lawsuit in the Texas District Court against the NCMC's attorneys in the 2003 Lawsuit, Susman Godfrey, L.L.P. ("Susman"), as well as two of Susman's partners individually and two ex-NCMC officers that were defendants in the 2003 Lawsuit, alleging fraud in connection with the 2003 Lawsuit (the "2007 Lawsuit"). Identifying the potential harm that could result to the Debtors' estates if PSSI were permitted to litigate the 2007 Lawsuit, the Debtors filed a motion for additional sanctions for PSSI's further violation of the automatic stay, arguing that the 2007 Lawsuit was an attempt to circumvent the stay (the "Second Sanctions Motion") [Docket No. 2656]. The Bankruptcy Court reserved judgment on the Second Sanctions Motion, and subsequently, the Debtors filed a supplement to the Second Sanctions Motion [Docket No. 3252], by which the Debtors clarified that they sought an extension of the automatic stay to cover the 2007 Lawsuit as an alternative to sanctions. Further, out of an abundance of caution, the Debtors filed an adversary proceeding and related motion for temporary restraining order seeking to enjoin the 2007 Lawsuit (respectively, the "Adversary Proceeding" and the "TRO Motion") on October 9, 2007. Thereafter, on October 18, 2007, PSSI filed a motion seeking relief from the automatic stay with respect to the 2007 lawsuit (the "2007 Lawsuit Stay Relief Motion") [Docket No. 3320]. The parties then agreed to mediate all of their disputes at a two-day mediation, scheduled for January 7 and 8 in Delaware, and all of the above-motions were held in abeyance.

Shortly after initiating the 2007 Lawsuit, PSSI filed a Proof of Claim against each of NCMC, TRS Holdings, NCFC, and Home123 by which PSSI asserted a general unsecured Claim in the amount of "580,000,000 (est.)" against each such Debtor (collectively, the "PSSI Claims"). The attachments to the PSSI Claims specify that the bases for the PSSI Claims are the allegations in the complaint underlying the 2003 Lawsuit and that the amount asserted is based upon the damages report of PSSI's expert witness in the 2003 Lawsuit.

The Debtors and PSSI participated in mediation on January 7-8, 2008 but were unable to reach a resolution of their disputes at that time. On January 9, 2008, PSSI once again moved for relief from stay in the 2003 Lawsuit (the "Second 2003 Lawsuit Stay Relief Motion") [Docket No. 4354], which motion, along with the 2007 Lawsuit Stay Relief Motion, is scheduled to be heard by the Bankruptcy Court on February 6, 2008. On January 30, 2008, the Debtors filed a pleading by which they (i) objected to the Second 2003 Lawsuit Stay Relief Motion, (iii) objected to the PSSI Claims, and (iii) moved for an order disallowing the PSSI Claims, or, in the alternative, estimating them to be in the amount of $0 [Docket No. 4751]. The Debtors objected to each of the PSSI Claims on the basis that such Claims have no merit as the arbitrator concluded in the Award. Additionally, on January 30, 2008, the Debtors also filed an objection to the 2007 Lawsuit Stay Relief Motion [Docket No. 4757].

At the omnibus hearing on February 6, 2008, the Bankruptcy Court indicated that it would lift the automatic stay on a limited basis to allow proceedings on the Second 2003 Stay Relief Motion, and also would conduct a multiple day estimation hearing in connection with the Confirmation Hearing on the PSSI Claims. Accordingly, the Debtors, PSSI, and the Committee recognized that litigation fees would start to accrue immediately, and, therefore, revived settlement communications.

Subsequently, the parties entered into a settlement agreement (the "PSSI Settlement Agreement"), which the Debtors have requested the Bankruptcy Court approve pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a) (the "PSSI Settlement Motion") [Docket No. 4986]. The most salient terms of the PSSI Settlement are as follows:

- Payment and Other Financial Considerations: The Debtors will pay to PSSI a one-time cash payment of $2.0 million within five days after the Effective Date. Additionally, PSSI shall have an Allowed Class HC3c Claim in the amount of $15.0 million and an Allowed Class OP3c Claim in the amount of $15.0 million. PSSI's Proofs of Claim against Home123 and TRS Holdings shall be disallowed.

- Privilege Waiver: The parties will enter into the "Waiver of Privileges, Exemptions and Objections to Discovery" attached as Exhibit A to the PSSI Settlement Agreement, which, in general, (i) waives the Debtors' attorney-client privilege and work product immunity in connection with PSSI-related matters, and (ii) provides that the Debtors will turn over certain hard and electronic documents in their possession to a third party vendor which, at PSSI's expense, will segregate documents to produce to PSSI.

- Mutual Release: PSSI and Edward Mandel will release the Debtors and, among others, their successors, assigns, subsidiaries, predecessors, present and former employees, certain Professionals, the Committee and its Professionals, and the Liquidating Trust for any acts, omissions, statements or conduct that is related in way to "Released Claims" (as defined in the PSSI Settlement Agreement").

- Dismissal of Pending Motions and Proceedings: The parties will dismiss the various proceedings among them which are specified in the Settlement Agreement

and which include all proceedings in the Bankruptcy Court, the appeal the United States District Court for the District of Delaware, and proceedings in Texas.

- <u>No Plan Objection</u>: PSSI will not object to the Plan as filed on February 2, 2008 and will not object to any modification of the Plan except as specified in the Settlement Agreement.

The PSSI Settlement Motion was granted by order of the Bankruptcy Court dated March 5, 2008 [Docket No. 5246].

### 10.    Rubio Litigation.

On March 21, 2005, Daniel Rubio ("Rubio") filed a purported class action complaint (the "Rubio Complaint") against NCMC in Orange County Superior Court, Case No. 04CC00063, alleging various violations of California wage and hour laws. After overtime claims arising under the Fair Labor Standards Act ("FLSA") were added, NCMC removed the case to the United States District Court for the Central District of California ("California District Court"), Case No. SACV-06-811 (AJWx). Subsequently, two additional purported class members were added as named plaintiffs: John Hicks and David Vizcarra (collectively, the "Rubio Plaintiffs"). The Rubio Plaintiffs have amended their complaint several times, and NCMC has succeeded in obtaining orders dismissing and/or striking certain counts, including Rubio Plaintiffs' request for punitive damages. Thus, the current iteration of the Rubio Complaint (the Fifth Amended Complaint) alleges the following causes of action: (1) recovery of unpaid overtime wages; (2) failure to pay overtime wages pursuant to the FLSA; (3) failure to provide meal periods; (4) failure to provide rest periods; (5) denial of overtime compensation (FLSA 29 USC § 207, 211(c), 216(b)); (6) illegal record keeping; (7) violations of California Labor Code § 203; (8) unfair business practices; (9) misrepresentation; (10) promissory estoppel; (11) wrongful failure to enforce corporate policies; and (12) unfair business practices. The Fifth Amended Complaint also added former officers or employees of the Debtors as defendants to certain counts.

The case is being asserted as a class action, but NCMC intends to vigorously oppose class certification. The California District Court has not yet considered whether a class should be certified, as the case remains stayed by the automatic stay.

On behalf of the proposed class, Rubio Plaintiffs have filed three separate but identical Proofs of Claim against NCMC, Home123, and NCFC, each in the amount of $63,950,300.63 as a general unsecured Claim and an additional $3,164,827.50 as a Priority Claim under 11 U.S.C. § 507(a)(4). The Debtors contest (a) liability, (b) class certification and therefore the claim amount, (c) that damages could be established in the amount sought in the proofs of claim, and (d) that any of the claim, and certainly not $3.1 million of it, constitutes a Priority Claim.

On March 1 and 2, 2008, the Debtors, the Committee, and the Rubio Plaintiffs mediated this case and the proofs of claim before an experienced mediator in Delaware. No settlement agreement was reached at the mediation, though the parties are engaged in ongoing negotiations as of the filing of this Disclosure Statement.

### 11.    Objections to Claims.

As of the filing of this Disclosure Statement, the Debtors have filed 17 omnibus Claim objections (the "Omnibus Objections"). Nine of the Omnibus Objections are objections that object to Claims on non-substantive bases, including, among other bases, that a particular Proof of Claim (a) has been amended and superseded by subsequently filed Proofs of Claim, (b) was filed without any supporting documentation, (c) is duplicative of another Proof of Claim filed against the same Debtor, or (d) was late filed. Eight of the Omnibus Objections are objections that object to Claims on substantive bases, including, among other bases, that a particular Proof of Claim (a) is based on a shareholder interest in the Debtors or (b) assert amounts that the Debtors are unable to reconcile with their books and records. In total, through the Omnibus Objections, the Debtors have objected to approximately 2,002 Proofs of Claim in the aggregate amount of approximately $2.9 billion (plus unliquidated amounts). The only Claims to which the Debtors have objected other than through the Omnibus Objections are the four PSSI Claims, each of which asserts a general unsecured Claim estimated (by PSSI) to be $580.0 million, which objections, pending Bankruptcy Court approval, have been settled under the PSSI Settlement Agreement, as discussed in Section III.D.9 hereof. To date, 1,214 Proofs of Claim asserting Claims in the amount of $572.7 million have been disallowed or reclassified, while the remainder of the Debtors' Claim objections are pending resolution before the Bankruptcy Court.

### 12.    Deficiency Claims Under Master Repurchase Agreements.

The Debtors and the Repurchase Counterparties are attempting to resolve disputes over the amounts, if any, owed to these Repurchase Counterparties related to their Master Repurchase Agreements. As discussed in Section III.B.2, generally in mid-March 2007, each of the Repurchase Counterparties declared events of default and notified the Debtors that they were terminating the Master Repurchase Agreements and accelerating the Debtors' repurchase obligations thereunder. Most of the Repurchase Counterparties then exercised remedies related to the mortgage loans. These remedies varied among the Repurchase Counterparties and included asserting that they were crediting the asserted value of the mortgage loans against the relevant Debtors' repurchase obligations (termed a "buy in"), selling the mortgage loans in various secondary market transactions and, in the case of Morgan Stanley (discussed in Section III.D.12 below) conducting a public auction of the mortgage loans and residual interests in securitization trusts subject to its Master Repurchase Agreement pursuant to an order of the Bankruptcy Court. Many of these actions were taken after the Petition Date, and the Repurchase Counterparties asserted that they were free to sell these mortgage loans and/or exercise buy-in rights without leave from the Bankruptcy Court because the Master Repurchase Agreements were "repurchase agreements" subject to the "safe harbor" provisions passed by Congress for bankruptcy cases filed on or after October 17, 2005. Based on legal analysis of the issues, the Debtors determined not to bring actions to attempt to enjoin these dispositions of the mortgage loans nor did the Debtors bring actions to contend that the Master Repurchase Agreements could be recharacterized as secured financings not subject to these "safe harbors."

The Repurchase Counterparties assert that the relevant Debtors are liable for any deficiency that resulted from the disposition of the mortgage loans and residual interests, whether via a "buy-in", secondary market sale, or public auction. In the aggregate, the Repurchase

Counterparties have filed Proofs of Claim asserting that these deficiency claims total approximately $270 million. The Master Repurchase Agreements were generally structured as joint obligations of NCMC, NC Capital, Home123, and NC Credit and were guaranteed by NCFC. These Claims, if valid, would generally fall in Classes HC3b (Other Unsecured Claims against NCFC), HC10b (Other Unsecured Claims against NC Credit), OP3c (Other Unsecured Claims against NCMC), OP6c (Other Unsecured Claims against NC Capital), and OP9b (Other Unsecured Claims against Home123) and would entitle the Repurchase Counterparties to the benefits of the Multi-Debtor Claim Protocol since they would have Claims for which (i) both NCFC and NC Credit are jointly and/or severally liable and (ii) NCMC, NC Capital, and Home123 are jointly and/or severally liable. Goldman's Master Repurchase Agreement is different than the other Master Repurchase Agreements in that it was entered into by Access Lending, as opposed to the Operating Debtors, and is guaranteed by NCFC. Thus, Goldman's Claims under this Master Repurchase Agreement would generally fall in Classes HC3b (Other Unsecured Claims Against NCFC) and Class AL3 (Other Unsecured Claims Against Access Lending).

The Debtors dispute the validity of most of these Claims. Each of the Repurchase Counterparties accelerated and terminated its MRA prepetition — generally in mid-March, 2007. The MRA Counterparties also, with one exception, regularly delivered to the Debtors reports that compared the relevant Debtors' repurchase obligations under the Master Repurchase Agreements to the calculations that were used to determine whether the Debtors were in balance or owed a margin payment. The starting point was the unpaid principal balance ("UPB") of the mortgage loans subject to the Master Repurchase Agreement. The Repurchase Counterparties provided the Debtors their assessments of the market value of these loans, generally expressed as a percentage of the UPB and termed in the industry as the Repurchase Counterparty's "mark." The Repurchase Counterparties then set the amount they were willing to pay for these loans expressed in terms of an advance rate applied against the mark. The Repurchase Counterparties set forth their assessments of the market value of the mortgage loans (and in the case of Morgan Stanley, also the residual interests) that were subject to their Master Repurchase Agreements by delivering these marks to the Debtors regularly. The Debtors contend that the marks that the Repurchase Counterparties sent to the Debtors on the date they accelerated and terminated their Master Repurchase Agreements, or in a few cases shortly before doing so, established substantial surpluses over the Debtors' total repurchase obligations. The Debtors further contend that pursuant to Bankruptcy Code §§ 559 and 562 the value of the mortgage loans and residuals on the date of acceleration of the Master Repurchase Agreements determines whether the Repurchase Counterparty has a deficiency claim or owes a surplus to the estates. The Debtors argue that in the aggregate, these surpluses totaled approximately $260 million and, as a result, most of the Repurchase Counterparties do not have valid Claims against the Estates for such deficiencies. Section 559 of the Bankruptcy Code provides that the Repurchase Counterparties will be entitled to assert rights of offset with respect to any amounts owed under section 559. Many of the Repurchase Counterparties have also asserted substantial EPD and Breach Claims pursuant to loan purchases, so if the Debtors prevail in this position some of the Repurchase Counterparties would contend that they can reduce their EPD and Breach Claims rather than make a cash payment to the Estates. Notwithstanding these arguments, the Debtors believe that some of the Repurchase Counterparties have valid deficiency claims, which are in the aggregate at least $120 million, so the Debtors do not envision a scenario where the aggregate Master

Repurchase Agreement deficiency claims would be allowed at less than that amount.

The Repurchase Counterparties strongly disagree with the Debtors' contentions. Among other things, they argue that §§ 559 and 562 of the Bankruptcy Code only apply to liquidations of loans, not liquidations of Repurchase Agreements, and only to postpetition liquidations of loans. They also contend that the "marks" they delivered to the Debtors do not establish surpluses owed to the Estates since the marks were estimates based on assumptions concerning the loans, many of which turned out be incorrect.

The Debtors and DBSP resolved these matters in connection with the DBSP Settlement discussed in Section III.D.5 hereof and which resulted in a Special Deficiency Claim for DBSP in the amount of $20 million. With respect to the other Repurchase Counterparties, the Plan Proponents attempted to resolve these Claims in connection with the Adequate Protection Dispute (discussed in Section III.D.3) but ultimately determined to segregate these deficiency Claims from the other matters at issue in the Adequate Protection Dispute.

The Debtors are presently engaged in settlement negotiations with some of the Repurchase Counterparties over the amount, if any, of deficiency Claims under Master Repurchase Agreements and intend to engage in similar settlement discussions with the other Repurchase Counterparties. If such settlement discussions result in agreements, they will be presented to the Bankruptcy Court for approval. To the extent that the parties are not able to resolve these matters via settlement, the Debtors intend to object to many of these deficiency Claims. If the Debtors object to these Claims, it is likely that the Repurchase Counterparties will strenuously oppose those objections. .

### 13.    The Morgan Stanley Auction.

The Master Repurchase Agreement between Morgan Stanley and certain of the Debtors was the largest such facility that the Debtors used to fund the origination of mortgage loans. In addition to mortgage loans, some residual interests in securitization trusts were subject to the Master Repurchase Agreement with Morgan Stanley. Prior to early March 2007, most of these residual interests had been subject to a Master Repurchase Agreement with Citigroup. These residual interests had been owned by NC Residual IV and NC Residual III prior to selling them to Citigroup under the Citigroup Master Repurchase Agreement or to Morgan Stanley under its Master Repurchase Agreement. Morgan Stanley took out the Citigroup Master Repurchase Agreement on March 8, 2007 by amending its Master Repurchase Agreement to, among other things, add NC Residual IV and NC Residual III as "Sellers." Morgan Stanley advanced $265 million to the Debtors on account of these residual interests at the time of this amendment. The Morgan Stanley Master Repurchase Agreement (as was the case with the other Master Repurchase Agreements) provided that the Debtors that were party to it were jointly and severally liable for all obligations owed by the Debtors under the agreement, including all repurchase obligations. As of the Petition Date, the total repurchase obligations owed under the Morgan Stanley Master Repurchase Agreement totaled approximately $2.4 billion -- the Schedules filed by NCMC incorrectly listed this total at approximately $2.1 billion primarily because the Schedules inadvertently failed to take into account amounts related to these residual interests.