# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | | |
|---|---|---|
| MELVIN J. PROCTOR, JR. | * | |
| NADINE M. MCKENZIE-PROCTOR, *et al.* | | |
| | * | |
| On behalf of themselves and a class of | | CASE NO. 07-cv-01957-RWT |
| others similarly situated | * | |
| | | |
| | * | **FIRST AMENDED** |
| | | **CLASS ACTION COMPLAINT** |
| | * | **FOR DAMAGES &** |
| v. | | **INJUNCTIVE RELIEF &** |
| | * | **DEMAND FOR JURY TRIAL** |
| METROPOLITAN MONEY STORE CORP., | | |
| *et al.* | * | |
| | | |
| **AND NEW DEFENDANTS**: | * | |
| | | |
| RTE TITLE, LLC | * | |
| 9701 Apollo Drive, Suite 297 | | |
| Largo, Maryland 20774 | * | |
|     <u>Serve on</u>: | | |
|     Valeria Tomlin, Resident Agent | * | |
|     14400 Woodmore Oaks Court | | |
|     Bowie, Maryland 20721 | * | |
| | | |
| And | * | |
| | | |
| ALI FARAHPOUR | * | |
| 4701 Monacho Circle | | |
| Bethesda MD 20817 | * | |
| | | |
| And | * | |
| | | |
| WILBUR BALLESTEROS | * | |
| 7332 Morrison Drive | | |
| Greenbelt, Maryland 20770 | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Case 0:10-41 DLS    Doc 5428-2    Filed 03/18/08    Page 2 of 103

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................4

PARTIES ...............................................................................................................................6

       A.     The Named Plaintiffs .......................................................................7

       B.     The Defendants and Sussex Title, LLC .........................................7

JURISDICTION AND VENUE ..........................................................................................15

FACTUAL BACKGROUND ...............................................................................................15

FACTS APPLICABLE TO NAMED PLAINTIFFS ...........................................................35

       a.     The Proctor Family .......................................................................35

       b.     The Wallace Family .......................................................................40

       c.     The Simon Family...........................................................................46

CLASS ACTION ALLEGATIONS AND DEFINITION OF THE CLASS................................52

CIVIL RICO SUMMARY...................................................................................................57

COUNT I - VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962(a) (AGAINST THE
RICO DEFENDANTS, JACKSON, MCCALL, MR. FORDHAM, METROPOLITAN
AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND SOUTHERN: RTE AND
TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS AND CHICAGO AND
SOUTHERN)..........................................................................................................................69

COUNT II - VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962(c) (AGAINST THE
RICO DEFENDATNS, JACKSON, MCCALL, MR. FORDHAM, METROPOLITAN
AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND SOUTHERN: RTE AND
TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS AND CHICAGO AND
SOUTHERN)..........................................................................................................................76

COUNT III - VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962(d) (AGAINST THE
RICO DEFENDANTS, JACKSON, MCCALL, MR. FORDHAM, METROPOLITAN
AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND SOUTHERN: RTE AND

TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS AND CHICAGO AND
SOUTHERN)..........................................................................................................................78

COUNT IV - VIOLATION OF THE FEDERAL REAL ESTATE SETTLEMENT
PROCEDURES ACT ("RESPA") 12. U.S.C. §2601, et seq.  (AGAINST ALL
DEFENDANTS)......................................................................................................................80

COUNT V - VIOLATION OF THE MARYLAND PROTECTION OF HOMEOWNERS
IN FORECLOSURE ACT (PHIFA) (MD. CODE ANN., REAL PROP., §§ 7-301 et seq.)
(AGAINST ALL DEFENDANTS ON BEHALF OF THE MARYLAND SUB CLASS)..........86

COUNT VI - DECLARATORY AND INJUNCTIVE RELIEF (AGAINST NICHOLLS,
JONES AND JOHN DOES 1-50 ON BEHALF OF THE MARYLAND SUB CLASS
MEMBERS)............................................................................................................................91

COUNT VII - GROSS NEGLIGENCE (AGAINST RTE, TOMLIN, CHAUDHRY,
FARAHPOUR, BALLESTEROS, SOUTHERN AND CHICAGO)...........................................94

INDEX OF EXHIBITS………………………………………………………………….......102

Plaintiffs, Melvin J. Proctor, Jr., Nadine M. McKenzie-Proctor, Delores Wallace, and Ronnell Wallace (collectively, "Plaintiffs"), on their own behalf and on behalf of the Class defined herein, by and through their attorneys Scott Borison and Janet Legg of the LEGG LAW FIRM, LLC, Peter A. Holland and Benjamin H.  Carney of the HOLLAND LAW FIRM, P.C., and Phillip R. Robinson of CIVIL JUSTICE, INC., file this First Amended Complaint against the Defendants and state as follows:

## INTRODUCTION

1.      This matter involves the single largest mortgage scam in the Mid-Atlantic history which has bilked homeowners of millions of dollars of lost equity, threatens these families with imminent foreclosure, and involved the willful participation of so-called real estate professionals—including licensed mortgage broker Metropolitan Money Store, Corp. (hereinafter "Metropolitan"), its sham affiliated business entity Fordham and Fordham Investments Group Ltd. (hereinafter "FFIG"), the principals of Metropolitan and Fordham, Joy Jackson (hereinafter "Jackson"), Jennifer McCall (hereinafter "McCall"), and Kurt Fordham (hereinafter "Fordham"), licensed settlement agents Sussex Title, LLC (hereinafter "Sussex") [1] and its part owners and employees, Alexander Chaudhry, an attorney, (hereinafter "Chaudhry"), Ali Farahpour (hereinafter "Farahpour"), Wilbur Ballesteros (hereinafter "Ballesteros") and RTE Title, LLC (hereinafter "RTE") and its owner and settlement attorney Valeria Tomlin (hereinafter "Tomlin") and the settlement agents principals, Chicago Title Insurance Company

---

[1] Sussex is not a defendant in this action. Sussex filed for bankruptcy and the references to it are only to set forth its role in the scheme but not to seek to recover against it or suggest that it is a defendant in this action. .

(hereinafter "Chicago") and Southern Title Insurance Company (hereinafter "Southern") —who orchestrated and enabled the entire scheme.

2.        Hundreds of Maryland, Virginia, and District of Columbia families, who thought they had entered into contracts to save their homes from foreclosure and/or mortgage refinance transactions, did in fact enter into illegal contracts and transactions facilitated by real estate professionals whose sole motive was to enrich their extravagant lifestyles at the expense of hard working homeowners who were cash poor but equity rich in their properties. All of the Defendants had superior knowledge of real estate transactions than the Plaintiffs and other class members.

3.        The purpose of the Defendants' scheme to cheat consumers was simple – Metropolitan, FFIG, Fordham, Jackson and McCall wished to enrich themselves by liquidating and stealing the equity of homeowners in distress, and Sussex, Chaudhry, Farahpour and Ballesteros, RTE and Tomlin as well as their principals, Chicago and Southern wished to increase the referrals they received for settlement of real estate transactions, in order to obtain a higher volume of title insurance commissions, higher commissions for the transactions and settlement fees.

4.        The scam having now been exposed by various public agency investigations, these families are at risk of losing their homes through no fault of their own except for trusting real estate professionals and negligent third parties who did not look out for the homeowners' best interests and instead participated in and facilitated fraudulently and deceptively tricking the homeowners.

5.        So-called real estate investor wannabes, a/k/a "Straw Buyers", who were complicit in the scheme, loaned their credit to fund the scam so that the real estate professionals could reduce

6.      As a result of the scheme, many homeowners are now threatened with loss of their home in tens or hundreds of pending foreclosures that, upon information and belief, involve loans funded as a direct and proximate result of New Century Mortgage's loose if not non-existent underwriting standards.  New Century Mortgage originated many of the mortgage loans involved in the scheme described in this Complaint.  New Century Mortgage is currently in bankruptcy.  Its bankruptcy filing was one of the early symptoms of the current nationwide credit crisis resulting from loose "subprime" loan underwriting standards.

7.      At a time when the region has already been identified by the Federal Bureau of Investigation as a "hotspot" for mortgage fraud, this scam will likely move it to the highest possible ranking.  Governor O'Malley has also recently introduced a series of bills in the Maryland General Assembly to specifically address mortgage fraud issues in Maryland as another indicator of the problem.

8.      The negative impact for all homeowners in the region as a result of this scheme is that hundreds of neighbors will needlessly lose their homes, unless immediate steps are taken, neighborhoods will lose millions of dollars in home values as a secondary negative impact from the impending foreclosures, local governments will have a lower tax base, lenders will write off huge losses since their title insurers are not honoring claims, and the so-called professional real estate professionals have been unjustly enriched through their illegal scheme and will be able to retain those unjust benefits unless and until they are compelled to return them.

**PARTIES**

6

### A.    The Named Plaintiffs

9.      From November 1999 until April 2007, Melvin J. Proctor, Jr. and Nadine M. McKenzie-Proctor ("the Proctors") resided at 8604 Sapienza Drive, Fort Washington, Maryland 20744 ("the Proctor Property").   Beginning in 2004, the Proctor Family faced financial difficulties, and fell behind in their mortgage payments owed on the Proctor Property. On or about November 21, 2005, a foreclosure was docketed against the Proctors in the Circuit Court for Prince George's County, CAE05-24499.

10.     At all times pertinent to this action Mr. & Mrs. Wallace (the "Wallace Family") resided at 816 Avanti Place, Hyattsville, Maryland (the "Wallace Property") with their 8 children.  The Wallace Family was facing financial troubles in 2005 and 2006, and foreclosure proceedings were instituted against the Wallace Property on or about November 23, 2006 in the Circuit Court of Prince George's County, Maryland, CAE06-25405.

11.     At all times pertinent to this action Ms. Simon and her children (the "Simon Family") resided at 4506 Hiwassee Drive, Clinton, MD  20735 (the "Simon Property").  The Simon Family was facing financial troubles in 2006, was behind on her mortgage payments and incident to foreclosure, and sought the services of a possible refinance with the Metropolitan Money Store Corporation.

### B.    The Defendants and Sussex Title LLC.

12.     Metropolitan is a Maryland entity that advertises for distressed homeowners, acts as a foreclosure consultant and credit services business, arranges for straw purchasers to obtain title to residences during or incident to a proposed foreclosure proceeding based on representations to homeowners that it will help repair their credit, arranges for mortgages for those straw

purchasers in an amount far exceeding the defaulted mortgages on those properties, and then siphons off substantial amounts of the mortgages it arranges for itself and its co-conspirators. In other words, Defendant Metropolitan would arrange for mortgages for amounts substantially more than was owed by the homeowners, pay off the homeowner's defaulted residential mortgage, and then pocket the excess funds for itself and its co-conspirators. Metropolitan's principal place of business is in Prince George's County, Maryland. Upon information and belief, it is closely affiliated by common ownership with FFIG which also acts as its agent. Metropolitan and FFIG are used by the individual Defendants, Jackson, McCall, Fordham and others to carry out their fraudulent and illegal activities set forth herein.

13.     FFIG is a sham entity that is paid money from the transactions involved in this case in exchange for no valuable, legal services. The services allegedly to be provided were credit repair services. The credit repair services were offered in violation of both state and federal laws. Fordham is a foreclosure consultant which assists its affiliate and principal Metropolitan in its foreclosure consulting and credit repair service business. FFIG's principal place of business is in Prince George's County, Maryland.

14.     RTE Title, LLC (hereafter "RTE") is one of the title companies which acted as a regular settlement agent and as an agent for Southern in foreclosure rescue scam transactions orchestrated by Metropolitan and FFIG. RTE Title's principle place of business is in Prince George's County. At all times relevant to the facts described herein, RTE was an agent for Southern Title Insurance Corporation ("Southern"), and was acting within the scope of that agency relationship. On information and belief, RTE Title is owned and operated by Defendant Valeria Tomlin.

15.     Sussex Title, LLC, f/k/a CAP Title, LLC ("Sussex") is not a Defendant but another title company which acted as a regular settlement agent and agent of Chicago in foreclosure rescue scam transactions orchestrated by Metropolitan and FFIG and their affiliates.  Sussex regularly conducts business in Prince George's County. At all times relevant to the facts described herein, Sussex was an agent for Chicago Title Insurance Company ("Chicago"), and was acting within the scope of that agency relationship.

16.     Chicago is the largest title insurance company in the nation.   In its advertising Chicago claims that, in addition to any defect in title known from an abstract or the public records, its title policies protect homeowners from unforeseen defects not in the public records or abstracts or even attorney opinions.  At all times relevant to the facts described herein, Sussex, Chaudhry Farahpour and Ballesteros were acting as agents of Chicago and within the scope of their agency relationship with Chicago.  While Chicago's agency agreement with Sussex and Chaudhry is currently unavailable to Plaintiffs as discovery in this case has not yet commenced, two agency agreements used by Chicago with Maryland title companies are attached as **EXHIBIT 1**, and the attached agreements are believed to be identical in all material respects with the agency agreement between Chicago and Sussex and Chaudhry.  The attached agency agreements explicitly define part the agents' responsibilities within the agency relationship to include:

> In those instances where Agent closes real estate transactions and receives and disburses funds of others, Agent shall: … c. disburse such funds only for the purposes for which they were entrusted; d. maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order; … f. reconcile monthly the control account and ledger records to the monthly bank statement.

**EXHIBIT 1**, Chicago's Issuing Agency Contracts; para. 4(L) in first and 4(G) in second.

This language in Chicago's Issuing Agency Contract, on information and belief identical in all material respects to the agency agreement between Chicago and Sussex, clearly shows that the agency relationship between those Defendants extended to Sussex's and its owners and employees treatment and disbursement of funds in connection with transactions in which Chicago's title insurance is involved.

Further, Chicago regularly sends out bulletins to its agents. Chicago maintains a website for its agents to access bulletins on many topics as well provides seminars. Chicago gives directions to its agents beyond title issues that may arise in connection with title insurance policies. The bulletins have included directions on what type of disbursements should not be made, e.g., payments to non-sellers, the Maryland's Protection of Homeowners in Foreclosure Act ("PHIFA"), guidance against possible rescission by the homeowner under PHIFA and advising the agents that it is there to help the agents on issues beyond title defects but also the structures of transactions. As part of its involvement with the activities of its agents, Chicago regularly conducts audits of its agents that includes review of disbursements and other records.

Upon information and belief, Chicago also contractually agreed to be responsible for the disbursements by issuing closing protection letters.

As will be described herein, a major part of the role of Sussex and its owners and employees, Chaudhry, Farahpiur and Ballesteros, in the scheme victimizing Plaintiffs was the misappropriation of funds, illegal disbursements of funds "in connection with transactions in which [Chicago's] title insurance [was] involved", the structure of these transactions as sales when in fact they were refinances, and, in the case of most Marylanders, violating PHIFA. Accordingly, Chicago is responsible, as principal, for the actions of Sussex , Chaudhry,

Farahpour and Ballesteros described herein in misappropriating, illegally disbursing funds to persons and/or entities not entitled to the funds and structuring the transactions as sales when they were refinances as well as violating PHIFA in transactions involving Marylanders subject to the act.

17.     Southern provides title insurance through its authorized, partner agents, including RTE, and claims in its adverting that it insures the interests of lenders and homeowners involved in real estate transactions. Southern also advertises that it works with its partner agents to grow their business. Southern also provides "unsurpassed title searches…a large title plant…[and] attentive underwriting support" for its partner agents involved in real estate transactions for buyers and sellers. Finally, Southern claims in its advertising that it is distinguished "from other underwriters by being a business partner." At all times relevant to the facts described in this Complaint, RTE and Tomlin were acting as agents of Southern, and within the scope of their agency relationship with Southern. Southern's "Issuing Agency Contract" with RTE and Tomlin explicitly includes within the agency relationship the requirement that RTE and Tomlin:

> keep safely in accounts separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transactions in which Principal's title insurance is involved, disburse said funds only for the purposes for which same were entrusted and reconcile all such accounts not less frequently than monthly. Principal shall have the right to examine, audit and approve Agent's accounting procedures.

*See* **EXHIBIT 2**, Southern's Issuing Agency Contract with RTE, para. 4(f).

This language in the agency agreement between RTE, Tomlin and Southern clearly shows that the agency relationship between those Defendants extended to RTE and Tomlin's treatment and disbursement of funds "in connection with transactions in which [Southern's] title insurance is involved."

11

In addition to the admission that it would act as partners with its agents to grow business, upon information and belief, Southern also provides it agents information on many topics and gives advice and direction to its agents beyond title issues that may arise in connection with title insurance policies.

As part of its involvement with the activities of its agents, Southern regularly conducts audits of its agents that includes review of disbursements.

Upon information and belief, Southern also contractually agreed to be responsible for the disbursements by issuing closing protection letters, an example of which is attached as **EXHIBIT 3**.

As will be described herein, a major part of RTE and Tomlin's role in the scheme victimizing Plaintiffs was its misappropriation of funds, illegal disbursements of funds "in connection with transactions in which [Southern's] title insurance [was] involved," and structuring refinance transactions as sales. Accordingly, Southern is responsible, as principal, for the actions of RTE and Tomlin described herein in misappropriating funds, illegally disbursing funds to persons and/or entities not entitled to those funds and permitting the transactions to be structured as sales when they were refinances.

18.     Diane Linda Jones ("Ms. Jones") acted as the straw purchaser in the Proctor transaction, took title to the Proctor Property and obtained a mortgage in her name on the Proctor Property in a settlement conducted by Sussex, personally supervised by Chaudhry and Ballesteros. Upon information and belief, Farahpour was directly involved in the funding of the transaction as well as disbursements or supervised the activities. Jones took thousands of dollars of the Proctor

Family's money, through Metropolitan and FFIG, in payment for her illegal actions. Upon information and belief, Ms. Jones is a resident of Prince George's County.

19.    Leticia Nicholls ("Ms. Nicholls") acted as the straw purchaser in the Wallace Family's transaction, took title to the Wallace Property and obtained a mortgage in her name on the Wallace Property in a settlement conducted by RTE and Tomlin. Ms. Nicholls took thousands of dollars of the Wallace Family's money, through Metropolitan and FFIG, in payment for her illegal actions. Leticia Nicholls also acted as straw purchaser in one or more additional transactions with member(s) of the Class. Upon information and belief Ms. Nicholls is a resident of Montgomery County, Maryland.

20.    Jamie Clark ("Clark") acted as the straw purchaser in the Simon Family's transaction and currently has record title to the Simon Property and is a resident of Prince George's County, Maryland.

21.    Joy Jackson ("Jackson") participated in operating, maintaining and furthering the entity known as Metropolitan to commit the fraud and illegal practices complained of herein and is a resident of Prince George's County, Maryland.

22.    Jennifer McCall ("McCall") participated in operating, maintaining and furthering the entity known as Metropolitan to commit the fraud and illegal practices complained of herein and is a resident of Prince George's County, Maryland.

23.    Kurt Fordham ("Mr. Fordham") participated in operating, maintaining and furthering the entity known as FFIG to commit the fraud and illegal practices complained of herein and is a resident of Prince George's County, Maryland.

24.     Valerina Tomlin ("Tomlin") actively participated in operating, maintaining and furthering the entity known as RTE as an agent of Southern to commit the fraud and illegal practices complained of herein and is a resident of Prince George's County, Maryland. Upon information and belief, Tomlin would receive payments from RTE based on transactions she settled.

25.     Alexander J. Chaudhry ("Chaudhry") actively participated in operating, maintaining and furthering the entity known as Sussex as an agent of Chicago to commit the fraud and illegal practices complained of herein and is a resident of Montgomery County, Maryland. Chaudhry would receive a monthly payment from Sussex based on the funds collected by Sussex that month rather than any salary.

26.     Ali Farahpour ("Farahpour") actively participated in operating, maintaining and furthering the entity known as Sussex as an agent of Chicago to commit the fraud and illegal practices complained of herein and is a resident of Montgomery County, Maryland. Farahpour would receive a monthly payment from Sussex based on the funds collected by Sussex during that month rather than any salary.

27.     Wilbur Ballesteros ("Ballesteros") actively participated as a settlement agent for the entity known as Sussex as an agent of Chicago and was personally involved in the Proctor Transaction and many of the transactions involving the putative class members. Ballesteros was personally involved in the fraud and illegal practices complained of herein and is, upon information and belief, a resident of Montgomery County, Maryland. Upon information and belief, Ballesteros received payments and/or commissions from Sussex based on the fees collected from transactions he settled.

14

28.     John Does 1-50 are other participants in the schemes as well as the straw purchasers,

affiliated with Metropolitan and FFIG who, like Ms. Jones and Ms. Nicholls, took a deed to the

homes of members of the class in the refinance transactions arranged and supervised by

Metropolitan, Jackson, McCall, Mr. Fordham and FFIG and closed by RTE or Sussex.  The

identities of these John Doe Defendants are not currently known but will be easily ascertainable

from the records of the Defendants.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331

(Federal Question), and 28 U.S.C. §1367 (Supplemental Jurisdiction).

30.     Venue is proper in this District because, under 28 U.S.C. §1391(b), a substantial part of

the events giving rise to claims herein occurred within this District and the Defendants all

systematically and continually transact business in this District.

## FACTUAL BACKGROUND

31.     This case is about a well organized and far reaching foreclosure rescue scam designed,

implemented and furthered by the Defendants Jackson, McCall, Mr. Fordham, using

Metropolitan and FFIG, Tomlin, Chaudhry and the John Does which the defendants labeled a

"Foreclosure Reversal Program". The scam was carried out, facilitated and furthered through the

participation and cooperation of the remaining defendants. All of the defendants were

improperly, unfairly and illegally enriched by the Defendants by willfully, systematically and

uniformly taking illegal advantage of hundreds of homeowners in foreclosure or at risk of

foreclosure.  The Foreclosure Reversal Program was a criminal enterprise which was made up of

an association in fact consisting of the individual defendants, Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros. These Defendants, collectively, will be identified as the "RICO Defendants" in this Complaint.

32.    The Maryland Commissioner of Financial Regulation, and other federal agencies, have initiated a major investigation of Metropolitan and other Defendants in connection with the foreclosure rescue fraud described herein, which has caused significant damages to the Plaintiffs and members of the Class, as defined herein.  **EXHIBIT 4**.

33.    Upon information and belief only after the scheme was exposed by regulatory authorities did Sussex, begin to admit its participation in the scam in which it had significantly profited.  As of the filing of this First Amended Complaint, Sussex, Chaudhry, Farahpour, Ballesteros nor Chicago have ever moved to repay any of the money that they received from its participation in the foreclosure rescue fraud scheme.

34.    As of the filing of this First Amended Complaint, RTE, Tomlin nor Southern have ever moved to repay any of the money that they received from its participation in the foreclosure rescue fraud scheme.

35.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros have engaged in willful, systemic and widespread violations of the Federal Racketeer Influenced And Corrupt Organizations Act ("RICO"), the Real Estate Settlement Procedures Act (RESPA), and as to the Plaintiffs and other class members residing in Maryland the emergency legislation

known as the Protection of Homeowners in Foreclosure Act ("PHIFA"), which was unanimously passed by the Maryland legislature, and made effective immediately upon the Governor's signature on May 26, 2005.

36.     RICO provides protections against patterns of racketeering, which consist of the repeated violations of predicate acts which are criminal violations such as mail fraud, wire fraud or money laundering to evade taxes as well as the collection of unlawful debt.

37.     RESPA is a consumer protection statute that regulates the settlement procedures in real estate transactions, which requires that consumers, both buyers and sellers, receive disclosures at various times in the transaction, and which outlaws kickbacks or unearned fees that increase the cost of settlement services.

38.     PHIFA provides protections to homeowners facing foreclosure from unscrupulous predators who seek to prosper by taking advantage of vulnerable homeowners. The PHIFA requires that foreclosure consultants, such as Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, provide mandatory disclosures, provide mandatory and open-ended right of rescission, and prohibits foreclosure consultants from being in any way related to foreclosure purchasers.

39.     The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros wholly ignored the requirements of each of these laws, and conducted their "Foreclosure Reversal Program" enterprise willfully and without regard for the rights of homeowners or state or federal

laws. Instead, they developed an elaborate scheme to dupe homeowners out of both their homes and the significant home equity in each property.

40.     All of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros, in this case knew that the Plaintiffs and the Class were homeowners covered, and thus were protected, by RICO, RESPA as well as the Maryland residents by PHIFA, but the RICO Defendants made no effort to comply with the requirements of each law.  Instead, they willfully and knowingly violated the laws in many respects.

41.     The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros developed, implemented and furthered the scheme at issue in this case – the "Foreclosure Reversal Program" - to enrich themselves at the expense of hundreds of Maryland, Virginia, and District of Columbia vulnerable homeowners who were already in dire financial straits, and who generally had few assets aside from the substantial equity in their home.   The RICO Defendants illegally took millions of dollars of equity from Plaintiffs and the other members of the Class as part of this standardized and illegal "Foreclosure Reversal Program" scheme.

42.     The scheme started with a massive advertising campaign by Metropolitan, implemented by Metropolitan, Jackson, McCall, FFIG and Mr. Fordham, on television, radio, print, and in the public right-of-ways to find homeowners in distress—especially targeting African American

homeowners. The ads encouraged the homeowners facing foreclosure or potential foreclosure to call Metropolitan for help with their financial situation.

43.    Once the Plaintiffs and other members of the class were lured in through the marketing program, Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin or Sussex and Chaudhry, Farahpour, and Ballesterros systematically ran the homeowners through the "Foreclosure Reversal Program" if the homeowners had sufficient equity in their properties – i.e. the properties were worth in excess of the defaulted mortgages on those properties.  In most cases over $100,000 in equity was required for the homeowner to be part of the program.

44.    To put the Plaintiffs and the other members of the Class through the program, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros uniformly had the homeowners sign illegal form documents representing that the homeowners would be assisted to save their homes and improve their credit.  These Defendants also had the Plaintiffs and the other members of the Class sign HUD-1 Settlement Statements that contained false entries. Defendants RTE, Tomlin, Chaudhry, Farahpour and Ballesteros supervised the creation, execution, and submission of these false Settlement Statements over interstate wires and through interstate mails. The agreements and Settlement Statements failed to include required notices and disclosures, and violated RICO, RESPA, and PHIFA (as to the Maryland residents).  The form documents included contracts for the "Foreclosure Reversal Program," an example of which (titled "Addendum Contract") is attached as **EXHIBIT 5**, the "Fordham & Fordham Investment

Group" form, an example of which is attached as **EXHIBIT 6**, an "Assignment of Heirs" form, an example of which is attached as **EXHIBIT 7**, among other documents.

45.     Despite the representations of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros that they were helping homeowners to save their homes from foreclosure, the RICO Defendants sought only to convert the equity in the properties of Plaintiffs and members of the class to themselves. In order to convert that equity, the RICO Defendants arranged for the sale of the particular homeowner's equity rich property to a "straw buyer." The RICO Defendants then arranged a mortgage loan in the name of the straw buyer on the property. In this part of the process, Jackson, McCall, Mr. Fordham, and Metropolitan and FFIG acted as purported mortgage brokers.  RTE, Tomlin Chaudhry, Farahpour and Ballesteros then settled the transactions as agents of Chicago and Southern with full knowledge of the falsity of the transactions and the falsity of the HUD-1 Settlement Statements they prepared.  The mortgage(s) taken out by the straw buyer were invariably far in excess of the total amount of the homeowner's defaulted or delinquent mortgage, which allowed the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros as well as the straw purchasers, and other affiliates, to cash out the equity in the property to enrich themselves through various kickbacks. The straw purchasers were each paid thousands of dollars as kickbacks for loaning their credit to fund the transactions using federally related mortgages acquired in their names and engaging in

20

these illegal transactions.  These kickbacks were taken from the equity of the Plaintiffs and the other members of the Class. These kickbacks were channeled and facilitated by Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin through their intentional false representations on HUD-1 Settlement Statements, and through their delivery through the interstate mails, wires and otherwise of equity proceeds to other Defendants not entitled to those proceeds.  The scheme described herein would not have been possible but for the complicity and participation of Sussex, Chaudhry, Farahpour and Ballesteros and RTE and Tomlin.

46.     The straw purchasers used as the "paper" purchasers of the properties were all affiliated with Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as revealed by Metropolitan and FFIG's form documents.  Among other things, each of these straw purchasers signed "Investor" forms developed by Jackson, McCall, Mr. Fordham, using Metropolitan and FFIG, an example of which is attached as **EXHIBIT 8**, and also signed powers of attorney giving Metropolitan all rights to the properties the straw purchasers were purportedly buying for themselves. Accordingly, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were taking interests in residences in foreclosure while simultaneously acting as foreclosure consultants purportedly helping to save those residences, in direct violation of PHIFA.

47.     To finance the foreclosure reversal transactions, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros arranged and settled federally related mortgage loans on the properties in foreclosure for the straw purchasers, taking mortgage broker fees, settlement fees, insurance premiums based on the full purchase price as opposed to the loan amount, and

various other fees in the process. The title insurance premiums were paid to Southern, Chicago through their agents, Sussex , Chaudhry, Farahpour and Ballesteros  and RTE and Tomlin, in the transactions. Many of these mortgage loans were obtained through New Century Mortgage Corporation and the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros also arranged and settled extensions of credit for the straw purchasers through other mortgage companies.

48.     New Century Mortgage Corporation recently made headlines across the nation when it became insolvent as the result of its improvident extensions of credit in the sub-prime mortgage marketplace. It is not named as a Defendant due to its bankruptcy filing.

49.     Jackson, McCall, Mr. Fordham, and Metropolitan and FFIG, represented to Plaintiffs and members of the class that they would be allowed to stay in the properties for a year or more, and would be able to re-purchase the properties at the end of that time period.  However, by that time Jackson, McCall, Mr. Fordham, and Metropolitan and FFIG, had increased the mortgages on the properties at issue by extracting fees payable to themselves as well as to RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros for fees, including insurance premiums they took as agents for Defendants Southern and Chicago, to such a degree that all or most of the equity in the property was gone, and so that Plaintiffs and members of the class would be forced to obtain new mortgages in much larger amounts than those on which they had already defaulted or were delinquent in order to re-purchase the properties.  This meant that Plaintiffs and other members

of the class were in a far worse situation after completing the RICO Defendants' program than they had been when they were identified by the RICO Defendants for the program.

50.     Jackson, McCall, Mr. Fordham, and Metropolitan and FFIG, identified and selected settlement companies with settlement agents and insurers which they knew would overlook the illegalities inherent in their regular business practices to close these transactions, including Sussex,  Chaudhry, Farahpour and Ballesteros and RTE and Tomlin.  Sussex settled virtually all of the transactions for the scheme described herein until about August 2006, and since then RTE and Tomlin have virtually exclusively settled the transactions described herein. RTE and Tomlin acted as agents for Defendant Southern in the course of their settlement of these transactions, their preparation of false HUD-1 Settlement Statements, the misappropriation of funds, the illegal disbursement of those funds and structuring the refinance transactions as sales. Sussex, Chaudhry, Farahpour and Ballesteros acted as agents for Defendant Chicago in the course of their settlement of these transactions, their preparation of false HUD-1 Settlement Statements, the misappropriation of funds, the illegal disbursement of those funds and structuring the refinance transactions as sales.  Southern and Chicago had control over their respective agents in these transactions, received title insurance premiums as the result of these transactions, had the right to oversee and audit these transactions, and upon information and belief voluntarily assumed the duties of oversight of disbursements by issuing closing protection letters but nevertheless permitted their agents to engage in these illegal acts and accepted the title insurance premiums and fees for closing protection letters which were garnered as the direct result of engaging in these sham settlements.  Had the transactions been truthfully disclosed as refinancing transactions, which they were in substance, Southern and Chicago would not have

been able to charge high premiums for title insurance that they charged and would have only be able to charge a lesser reissue rate.  Had the "purchase prices" in the transactions been truthfully disclosed as to the actual amount of consideration paid by the buyer in the transaction, instead of as the amount of the inflated mortgages, Southern and Chicago would not have been able to charge as much for title insurance premiums.  Southern and Chicago directly benefited from the fraud and illegal actions of RTE and Tomlin and Sussex , Chaudhry, Farahpour and Ballesteros in these transactions, allowed those transactions to continue, and Southern and Chicago have never disgorged the proceeds of the title insurance premiums or otherwise acted to undo or rectify the wrongs perpetrated by their agents, thus ratifying the acts of their agents with full knowledge of the illegality of the actions.

51.     RTE and Tomlin, and Sussex, Chaudhry, Farahpour and Ballesteros perform real estate settlement closing services for hundreds or thousands of mortgage loan transactions each year in Maryland, Virginia, and the District of Columbia and regularly perform in the course of their business certain abstract review, title search, or title examination services. These abstract review, title search and title examination services are conducted, like their disbursements at settlement, within the scope of their respective agency relationships with Southern and Chicago.

52.     As part of abstract, title search, or title examination services, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were made aware, before the subject property's settlement date, of the pending foreclosure(s) or defaulted mortgages docketed against the properties of the Plaintiffs and members of the class.  Tomlin and RTE and Sussex, Chaudhry, Farahpour and Ballesteros' knowledge of these facts put them on clear notice that the transactions were potentially in violation of PHIFA, and of the fact that they were prohibited

from recording any deeds relating to those transactions within the rescission period prescribed by

PHIFA. Tomlin and RTE and Sussex, Chaudhry, Farahpour and Ballesteros further knew that

any rescission period had not expired since the notices required by PHIFA were never given.

53.     As part of other settlement services provided in the regular course of their business, RTE

and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were also made aware of other

certain facts which demonstrated the irregularities and illegalities in the transactions of Plaintiffs

and members of the class. RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros

knew that the "buyer's" expenses were actually being paid by the "sellers" of the property. This

included fees ordinarily paid by buyers such as premiums for title insurance in favor of the buyer

and his or her lender.  Nevertheless, RTE and Tomlin and Sussex, Chaudhry, Farahpour and

Ballesteros used and prepared false HUD-1 Settlement Statements which represented that the

fees were being paid by the "buyer."  Moreover, Sussex, Chaudhry, Farahpour and Ballesteros

and RTE and Tomlin represented that the equity in the property transaction was going to the

homeowner Plaintiffs and other members of the class in each transaction; but in each transaction,

RTE and Tomlin and Sussex, Chaudhry Farahpour and Ballesteros permitted and assisted in

diverting these funds and channeled them to other Defendants, including Metropolitan, FFIG,

Mr. Fordham, Jackson, McCall and the John Doe Defendants.  This was accomplished by

delivering checks made payable to the Plaintiffs and other members of the class to Metropolitan,

FFIG, Mr. Fordham, Jackson, and McCall, so that those checks could be endorsed with forged

signatures of the Plaintiffs and other members of the Class, or by directly wiring the funds to

bank accounts of Metropolitan, FFIG, Mr. Fordham, Jackson, and McCall.

54.     A settlement or title company of ordinary prudence, when presented with the evidence of

pending foreclosures in the transactions of Plaintiffs and members of the class, would have inquired further as to the consumer's equitable interests in the property (especially given the volume of transactions from a single referral source which were in foreclosure or incident to foreclosure), whether Jackson, McCall, and Mr. Fordham, Metropolitan and FFIG, and their straw purchasers had complied with laws including RESPA and PHIFA for Maryland residents and would not have filed deeds in violation of the PHIFA and/or would have simply refused to engage in the transactions fraught with illegal kickbacks and fee splits. The misappropriation and illegal disbursements of funds, the falsification of HUD-1 Settlement Statements and the structuring of refinances as sales by RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were in violation of their state-issued licenses. The licenses held by RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros did not provide a license for them to steal or even turn a willful blind eye to improper and illegal activities.

55.     Any meaningful supervision or review by Southern or Chicago of their respective agents RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros' activities would have caused Southern and Chicago to inquire further as to the legality and propriety of the activities. Southern and Chicago had the right to control their agents actions with regard to the disbursements of funds and creation of Settlement Statements in these transactions, as shown by the Issuing Agency Agreements attached as **EXHIBITS 1 and 2**.  Indeed, Southern and Chicago had an affirmative obligation under the law to oversee the acts of RTE and Tomlin, and Sussex, Ballesteros, Farahpour, and Chaudhry, respectively.  As more fully described in the Maryland Attorney General Opinion attached hereto as **EXHIBIT 9**, the title insurance law was amended in 1995 and 1996, and "[t]wo key elements of the reform legislation were the expansion of the

class of agents subject to regulation and the enlistment of title insurers in the effort to oversee

those agents." The opinion makes clear that a title insurance company's oversight obligations

with respect to its agents now includes more than simple oversight of the issuance of title

insurance policies –

> to carry out the purposes of the reform legislation, the Legislature mandated that the title insurance industry undertake a measure of self- regulation. It charged each title insurer with monitoring certain business practices of its agents. Oversight responsibilities included maintaining agents' statements of financial condition, conducting annual on-site reviews, preparing written reports of the on-site reviews, and reporting to the Commissioner when problems were discovered. IN § 10-121(j). Under this legislative scheme, each on-site review is to encompass "the underwriting, claims, and escrow practices...." of the agent. IN § 10-121(j)(2) (emphasis supplied). Funds are normally escrowed as part of a real estate settlement, to pay off existing mortgages, tax bills, and other obligations that might constitute a lien on the property. Misappropriation of such funds would adversely impact the title to property. Thus, the statute does not limit on-site reviews to tracking title insurance premiums. Rather, it contemplates that a title insurer will review the handling of escrowed funds by the agencies that conduct settlements of the transactions involving the insurer's policies.

*Id*.

The clear import of this legislative reform was to require insurance companies such as Chicago

and Southern to oversee agents such as Sussex, Chaudhry, Farahpour and Ballesteros and RTE

and Tomlin to prevent the very type of illegal activity complained of in this Complaint and

expanded any agency relationship beyond mere title insurance sales agents. Additionally,

Chicago and Southern voluntarily assumed a greater role as described more fully in ¶¶ 16 and 17

above and, in particular, over the disbursements from these transactions when, upon information

and belief, they provided closing protection letters.

56.    The Maryland  reform was enacted as the result of "a number of high- profile cases arose

involving the misappropriation of funds by those handling real estate settlements," which is the

very kind of conduct complained of in this Complaint.

57.     Upon information and belief, the Commonwealth of Virginia and the District of Columbia also rely upon the same general and specific supervision scheme of each title insurer of its title agents within their borders.  Without the title insurers self-policing their title agents, no state could effectively supervise the acts of hundreds or thousands of agents conducting real estate transactions in their jurisdiction.

58.     In addition to the knowledge of RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros that the properties of Plaintiffs and members of the class were in foreclosure or default, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros also had other knowledge of the scam being carried out by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG that relied on their assistance and participation.  RTE and Tomlin and Sussex,  Chaudhry, Farahpour and Ballesteros simply closed too many of the same transactions to be ignorant of the illegal scheme of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, unless they willfully blinded themselves to the activities of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG. Sussex, Chaudhry, Farahpour and Ballesteros and RTE and Tomlin closed multiple transactions with Jackson, McCall, and Mr. Fordham as well as multiple transactions with their straw buyers, who often were involved in more than one transaction.  In addition, Sussex and Chaudhry and RTE and Tomlin affirmatively and intentionally misrepresented HUD-1 Settlement Statements in each transaction of the Plaintiffs and other members of the Class, affirmatively and intentionally misappropriated and illegally disbursed funds in those transactions and allowed these refinances to be structured as sales  providing them and their principals, Southern and Chicago, higher fees.

59.     At the settlement of the Maryland transactions, RTE and Tomlin and/or Sussex, Chaudhry, Farahpour and Ballesteros would identify Metropolitan as the mortgage broker on the

HUD-1 forms made out for the transactions, and would pay them substantial and unearned fees.
These fees were paid by Plaintiffs and the other members of the Class, though RTE and Tomlin
and/or Sussex, Chaudhry, Farahpour and Ballesteros showed on the HUD-1 statements that these
fees were paid by the straw purchasers. The fees were channeled to the RICO Defendants,
Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago
and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and
RTE, Tomlin and Chaudhry, Farahpour and Ballesteros and the John Doe Defendants by RTE
and Tomlin and/or Sussex, Chaudhry, Farahpour and Ballesteros through checks signed by
Chaudhry or Tomlin and delivered by them to themselves and the other RICO Defendants, or
through other actions of Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin, such
as wiring the funds directly to bank accounts held by the other RICO Defendants.

60.     Similarly, the HUD 1 forms showed fees payable to RTE and Tomlin and Sussex and
Chaudhry and their respective principals, Southern and Chicago. These fees were actually paid
by Plaintiffs and the other members of the Class, though RTE and Tomlin and Sussex and
Chaudhry intentionally and affirmatively misrepresented on the HUD-1 statements that these
fees were paid by the straw purchasers. Chicago and Southern accepted these fees and ratified
the actions of their agents by not returning them.

61.      In other transactions conducted in the District of Columbia and Virginia, entities other
than Metropolitan may have appeared on the HUD-1 settlement statement as providing mortgage
brokerage services, but in reality those fees benefited Jackson, McCall, Mr. Fordham,
Metropolitan and FFIG. Some of other entities were affiliated business arrangements of Sussex
and Chaudhry and RTE and Tomlin and appeared in the transaction as an additional avenue for

62.     Sussex , Chaudhry, Farahpour and Ballesteros and RTE and Tomlin also prepared false HUD-1s in each transaction in which they were involved, in that the settlement statement was designed to show that significant proceeds, exceeding tens or even hundreds of thousands of dollars, were being paid to the homeowners as sellers in the transaction but in fact were not paid to the homeowner Plaintiffs and other members of the Class.  Instead, these payments were channeled by RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros to various affiliates and affiliated business arrangements as illegal kickbacks and unearned fees.  RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros falsified the HUD-1 Settlement Statements for the continued referral of business to themselves and their principals, Southern and Chicago. Their actions facilitated and enabled these transactions which were part of the widespread scam. RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros benefited from their involvement in the transactions through title insurance commissions they received, settlement fees, and other benefits they obtained from conducting numerous settlements and having a stream of referrals of settlement business from the other RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG. Their principals, Southern and Chicago likewise benefited from their involvement in the transactions through title insurance premiums. The insurance premiums received by Southern and Chicago were increased as a direct result of the structuring of the transactions as sales instead of refinance.

63.     Sussex, Chaudhry, Farahpour and Ballesteros and RTE and Tomlin took settlement,

processing, and various and sundry other fees for closing the transactions.  In addition to the

settlement services, the title company would sell the lender and/or the straw buyer title insurance

as the agent for the title insurers Southern and Chicago. Sussex, Chaudhry, Farahpour and

Ballesteros and RTE and Tomlin received hefty fees for their role as agents.

64.     RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were aware of the

illegal nature of the transactions they settled involving Plaintiffs and other members of the Class,

and yet facilitated the closing of these transactions anyway.  RTE and Tomlin and Sussex,

Chaudhry, Farahpour and Ballesteros systematically misrepresented the nature of the

transactions of Plaintiffs and members of the class on the HUD-1 forms for those transactions,

and systematically misrepresented the distribution of funds in the transactions of Plaintiffs and

members of the class on those forms.  These title companies channeled unearned fees back to the

straw buyer, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and others, through the use

of agreements outside of the settlement statements purportedly authorizing the transfer of equity

in the homes of Plaintiffs and other members of the Class to Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG. The consideration given by RTE and Tomlin and Sussex, Chaudhry,

Farahpour and Ballesteros to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG was in

violation of Maryland law.

65.     The equity, often a substantial amount exceeding tens or even hundreds of thousands of

dollars, would have gone to the homeowner Plaintiffs and other members of the Class had the

house actually gone to foreclosure or had been sold through a listing agent on the open market.

However, due to the "help" provided by the RICO Defendants, Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE,

respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry,

Farahpour and Ballesteros, the homeowners were deprived of all their equity.

66.     The systematic false representations on HUD-1 Settlement Statements by Chicago and

Southern's agents, Sussex,  Chaudhry, Farahpour and Ballesteros and RTE and Tomlin in the

transactions for Plaintiffs and members of the class were designed to conceal the illegalities of

the transactions, to prevent the Plaintiffs and members of the class from actually knowing what

was going on in the transactions until it was too late to back out since RTE and Tomlin and

Sussex, Chaudhry, Farahpour and Ballesteros wrongfully filed the deeds, and to give the

Plaintiffs and members of the class false assurances that RTE and Tomlin and Sussex and

Chaudhry were providing necessary, legal and legitimate settlement services to save the subject

property from foreclosure in order to lull the victim into a false sense of legitimacy thereby

preventing victim from contesting or questioning the services of the RICO Defendants, Jackson,

McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and

Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE,

Tomlin and Chaudhry, Farahpour and Ballesteros.  The HUD-1 Settlement Statements succeeded

in this respect.

67.     RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros also recorded deeds

from Plaintiffs Proctor and Wallace and other Class and Subclass members from Maryland to the

straw purchasers before the Plaintiffs and other class members' legal rights to rescind the

transaction and those rights expired pursuant to PHIFA.

68.    In doing these acts described above, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros breached their duties to ensure that the transactions were free from illegality and in compliance with state and federal laws, among other things.

69.    Southern and Chicago are responsible for the actions of their respective agents, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros.  The illegal acts of RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were perpetrated within the scope of their agency agreements with Southern and Chicago, respectively.  Southern and Chicago benefited from these transactions through obtaining title insurance premiums in an amount they would not otherwise have obtained.   Moreover, Southern and Chicago had rights and obligations both contractually and under the law to oversee their agents in order to prevent the very type of illegalities and misappropriation of funds which occurred in the subject transactions.  Southern and Chicago breached these obligations, failed to oversee their agents as they were required to do, thus causing the damages suffered by Plaintiffs and other members of the Class.

70.    In connection with the closing of the transactions by RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros and the receipt of the equity in the homes of Plaintiffs and other class members by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Metropolitan and FFIG systematically prepared disbursement sheets in the form represented by **EXHIBIT 10**. This form is invariably a direct contradiction to the respective HUD-1 forms for Plaintiffs and members of the class.

71.    As shown by the disbursement sheet, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and others, shared and split the equity they stole from the Plaintiffs and other class members in the form of unearned and exorbitant fees.  In addition, Jackson, McCall, Mr.

Fordham, Metropolitan and FFIG, shared and split the equity they stole with the straw buyers of the properties. The actual homeowners, who had come to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, seeking help to save their homes and/or potential mortgage refinances, had been robbed blind instead.

72. The disbursement sheets also show that while the HUD-1 forms invariably show large amounts of closing costs being incurred by the straw purchaser/borrower, these costs are actually being paid under the table by the Plaintiffs and the other members of the Class at the direction of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG. In other words, the straw buyers never paid any sums for the transactions. The funds paying the fees for the transactions were funneled from RTE and Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as part of the continuing money laundering scheme used by the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros to conceal the illegal nature of the transactions and to evade taxes.

73. The acts and omissions of all of the Defendants have caused damage to hundreds of Maryland, Virginia, and District of Columbia consumers entitled to certain protections under by RICO, RESPA, PHIFA, and other state laws, as a result of practices prohibited by these laws through the unlawful loss of the equity in their properties, illegal fees, and other costs.

74. The Plaintiffs seek relief, on behalf of themselves and a Class of persons similarly situated, in the form of damages for the equity that was stolen, the illegal kickbacks and the damage to their property as a result of the racketeering activity of the RICO Defendants,

Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, the agents of the title insurers Chicago and Southern, Sussex and RTE, respectively, and the owners and/or employees of Sussex and RTE, Tomlin and Chaudhry, Farahpour and Ballesteros.  Plaintiffs also seek, on behalf of themselves and the Class, declaratory judgment that the transfers of deeds to their homes are void, and statutory treble damages under RICO, RESPA, and, for the subclass, PHIFA for the willful conduct of the RICO Defendants. The Plaintiffs also seek damages from Chicago and Southern for the acts of their agents within the scope of their agency relationships, and for Chicago and Southern's failure to properly supervise and abide by their obligations to oversee their agents and the transactions at issue.

## FACTS APPLICABLE TO NAMED PLAINTIFFS

### a.  The Proctor Family

75.     The Proctor Family lived in the Proctor Property (i.e. 8604 Sapienza Drive, Ft. Washington, MD 20744) from November 2, 1999 until April 2007.

76.     Beginning in 2004, the Proctor Family faced financial difficulties, and fell behind in their mortgage payments owed on the Proctor Property.

77.     On or about November 21, 2005, a foreclosure was docketed against the Proctor Family in the Circuit Court for Prince George's County, CAE05-24499.

78.     The Proctor Family saw and responded to a Metropolitan advertisement on a roadside advertisement that said "Stop Foreclosure" as well as an advertisement they heard on the radio. The couple was lead to believe that Metropolitan could help them save their home from foreclosure.

79.     As part of the transaction the Proctor Family was provided a number of documents to sign but they were not given copies of all the documents.

80.     Form documents signed by the Proctor Family and prepared by Jackson, McCall, Mr. Fordham, FFIG and Metropolitan, represented that the transaction and the documents were to help save their home and improve their credit.

81.     The documents signed by the Proctor Family represented, among other things, that the Proctor Family would be allowed to stay in their home, that the Proctor Property would be put into the name of Metropolitan, that Metropolitan and FFIG would obtain an interest in the Proctor Property, that the Proctor Family would be able to re-purchase the Proctor Property for the amount of the new mortgages on their property after one year, and that if the Proctor Family did not repay the outstanding mortgages, it would become the property of Metropolitan.

82.     Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for one of their straw purchasers, Defendant Ms. Jones, to take title to the Proctor Property, **EXHIBIT 11,** and arranged for a federally related mortgage loans in the name of Ms. Jones for residential purposes on the Proctor Property funded by Argent Mortgage Company, LLC ("Argent").  .

83.     Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, arranged for Sussex,  Chaudhry, Farahpour and Ballesteros to conduct the settlement and disbursements in the transaction transferring title to Ms. Jones.

84.     Sussex, Chaudhry, Farahpour and Ballesteros failed to comply with Argent's closing instructions on the loans for Ms. Jones in several material aspects in that they did not verify any of Ms. Jones' so-called down payment funds for the transaction, they followed Metropolitan and/or FFIG's closing instructions instead of Argent's, and they intentionally prepared a HUD-1

36

settlement that affirmatively misrepresented the actual receipts and disbursements from the transaction. **EXHIBIT 12.**

85.     As part of the transaction, Sussex, Chaudhry, Farahpour and Ballesteros used the U.S. Mail and electronic wires to transfer and receive funds and documents related to the transaction. Specifically, Argent wired funds to Sussex's account at Citibank, F.S.B. Washington named CAP Title. LLC-MD/DC Escrow. **EXHIBIT 13.**

86.     As part of the transaction, Sussex, Chaudhry, Farahpour and Ballesteros also acted as agents of Chicago and, within the scope of that agency, requested a Commitment for Title Insurance from Chicago for Argent and Ms. Jones. **EXHIBIT 14.** This was purchase, not refinance, title insurance.

87.     As part of the transaction Sussex, Chaudhry, Farahpour and Ballesteros requested sometime before 4:51pm on September 9, 2005 by fax a title abstract from Express Abstracts and Title, also within the scope of their agency with Chicago. **EXHIBIT 15.**

88.     As part of the transaction Sussex, Chaudhry, Farahpour and Ballesteros, Argent, and Chicago had significant indications of the true nature of the overall scheme including: (a) that the abstract report conducted as part of the transaction by Express Abstracts and Title, which was provided by fax to Sussex at 2:47pm on January 11, 2006 and showed that the Proctor Family was facing foreclosure at the time of their transaction in the Circuit Court of Prince George's County, Maryland (Case No. CAE05-24499); (b) a letter in Sussex's closing file that was received by fax on January 17, 2006 at 9:50pm from Friedman & McFadden, P.A. (a known foreclosure firm in Maryland) to the Proctor Family disclosing the foreclosure case and sums necessary to pay the Proctor's defaulted mortgage; and (c) no licensed realtor was involved in

the transaction but the purported contract between the parties included form contracts from the Prince George's County Board of Realtors.

89.     The balance of the residential mortgage on the Proctor Property at the time of settlement was $163,382.17.

90.     Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, arranged for at least one new loan totaling $280,000.00 to be taken against the Proctor Property.  After payment of the Proctor's residential mortgage balance on the property as part of the Foreclosure Reversal Program, there was more than $164,372.59 in equity remaining.

91.     The HUD-1s for the Proctor Family's January 24, 2006 transaction shows that the remaining equity of more than $164,372.59 was all going to the Proctors, but Jackson, McCall, and Mr. Fordham, Metropolitan and FFIG and their affiliates actually illegally took more than $100,000 of the Proctor Family's money, as shown by the disbursement sheet attached as **EXHIBIT 12**. Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were only able to obtain these funds through the complicity, concealment and affirmative misrepresentations of Sussex, Chaudhry, Farahpour and Ballesteros.

92.     The disbursement sheet prepared by Sussex, Chaudhry, Farahpour and Ballesteros for the transaction and loan file also shows a payment in the form of check number 28470 to the Proctor Family drawn on the account of CAP Title LLC n/k/a Sussex at CitiBank FSB.  **EXHIBIT 16.** However, this check was never given to the Proctor family.  **EXHIBIT 17.**  Instead, Sussex, Chaudhry, Farahpour and Ballesteros delivered this check to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, so that the check could be endorsed to FFIG through a forged endorsement and deposited into FFIG's bank account.

93.     This transaction, which constituted a loan of money to the Proctor Family, carried an interest rate in excess of twice the enforceable rate in Maryland.  The loan to the Proctor Family, in the amount of the mortgage paid off, was in the amount of $163,382.17.  In exchange for this loan, the Jackson, McCall, Mr. Fordham, Metropolitan and FFIG took as compensation more than $100,000.00 and split it among themselves in a kickback scheme.  The transaction, by its terms, required the Proctor Family to repay the debts within one year.

94.      Accordingly, the loan transaction involving the Proctor Family carried an interest rate of approximately 60% per annum, which is far in excess of twice the enforceable interest rate on such a loan, and closer to ten times the enforceable interest rate.

95.     The loans obtained and settled by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and Sussex and Chaudhry on the Proctor Property stripped away the equity in that Property, and raised the mortgages on the Property by close to $117,000.

96.     None of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG Sussex or Chaudhry, or the straw purchaser ever provided the Proctor Family with a "Notice of Right to Cancel Transfer of Deed or Title" or required Affiliated Business Arrangement disclosures for their retention and records, as they were required to do pursuant to PHIFA and RESPA.

97.     Notwithstanding that the Proctors' right to rescind had not expired pursuant to PHIFA, Sussex, Chaudhry, Farahpour and Ballesteros recorded the deed from the Proctors to the straw purchaser in the county land records on April 25, 2006 at 12:52PM at Liber 24924, folio 414-416, in violation of PHIFA.  Chicago is specifically identified on the Deed as providing title insurance for the transaction.

98.     The straw purchaser, Linda Jones, transferred, purported to transfer, or encumbered her

interest in the Proctor Property, with the aid and assistance of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros and other parties, to the lender of the residential mortgage(s) obtained on the Proctor Property before the Proctors' right to rescind or cancel the transaction pursuant to PHIFA had expired.

99.     The acts, omissions and representations of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros described above were unfair and deceived and tended to deceive the Proctor Family.  The acts and representations of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros violated several express prohibitions of the RICO, RESPA, PHIFA, and other state laws.

100.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros failed to provide the Proctors with the required statutory disclosures from PHIFA, Truth in Lending Act ("TILA") and RESPA and copies of all agreements and contracts executed with them.

101.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros represented or held themselves out as advisors or consultants acting on behalf of the Proctors, homeowners and consumers entitled to certain protections.

102.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG as well as Ms. Jones, acquired illegal interests in the Property while acting as foreclosure consultants to the Proctors.

### b.      The Wallace Family

103.    The Wallace Family has lived in the Wallace Property since 2002.

104.    During 2006, the Wallace Family faced financial difficulties, and fell behind in their mortgage payments.

105.    On or about November 22, 2006, a foreclosure was docketed against the Wallace

Property in the Circuit Court for Prince George's County, Case No. CAE - 06-25405.

106.    Delores Wallace saw and responded to a Metropolitan advertisement on television as well

as radio advertisements.   Metropolitan told her that it could help her save her home from

foreclosure, and that she and her husband needed to come to their office.

107.    Initially the Wallace Family was told they could not be helped but then received a

telephone call from Metropolitan telling the Wallace Family that they could be helped since their

home was worth more than originally thought but they needed to come to Metropolitan's place

of business to discuss the matter further. When the Wallace family arrived, they were presented

with and executed form documents as directed by employees of Metropolitan and/or FFIG.

108.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, told the Wallace Family that the

form documents they signed were to help save their home and improve their credit.  Indeed, the

documents themselves stated as much.

109.    The documents signed by the Wallace Family represented, among other things, that the

Wallace Family would be allowed to stay in their home, that the Wallace Property would be put

into the name of a straw purchaser affiliated with Metropolitan and FFIG, that Metropolitan and

FFIG would obtain an interest in the Wallace Property, that the Wallace Family would be able to

regain title to the Wallace Property for the amount of the mortgage on that property after one

year, and that if the Wallace Family did not pay off the mortgages, it would become the property

of FFIG and Metropolitan.

110.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for one of their straw purchasers, Defendant Ms. Nicholls, to take title to the Wallace Property, and arranged for a mortgage in the name of Ms. Nicholls for residential purposes on the Property.  **EXHIBIT 18.**

111.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for RTE and Tomlin to act as the settlement agents in the transaction transferring title to Ms. Nicholls.

112.    RTE and Tomlin acted as agents of Southern when settling the transaction, and, within the scope of that agency, sold purchase title insurance on behalf of Southern. As part of the transaction, RTE and Tomlin, New Century, and Southern had significant indications of the true nature of the overall scheme including: (a) that the abstract report conducted as part of the transaction by Aogotech Services, which was provided by fax to RTE before November 30, 2006 and which was obtained by RTE and Tomlin within the scope of their agency relationship with Southern showed that the Wallace Family was facing foreclosure at the time of their transaction in the Circuit Court of Prince George's County, Maryland; (b) a "Notice of Foreclosure Sale" letter in RTE and Tomlin's closing file that was from Cohn Goldberg, and Deutsch (a known foreclosure firm in Maryland) to the Wallace Family disclosing the foreclosure case; and (c) the funds required for Ms. Nicholls to acquire the Wallace Property did not in fact come from Ms. Nicholls but came from FFIG or Metropolitan's account at Chevy Chase Bank in the form of a cashier's check dated December 1, 2006 for a November 30, 2006 transaction.

113.    The balance of the mortgage on the Wallace Property at the time of settlement was $201,960.79.

114.    Jackson, McCall, Mr. Fordham, FFIG, Metropolitan, RTE and Tomlin arranged and settled two new residential mortgage loans totaling $271,328.55 against the Wallace Property.

After payment of the Wallace's mortgage on the property, there was over $68,000.00 in equity remaining. RTE and Tomlin intentionally prepared a HUD-1 settlement that affirmatively misrepresented the actual receipts and disbursements from the transaction.

115.    The remaining equity of more than $68,000.00 in the Wallace Property was used to pay the straw purchaser Nicholls $10,000 and the remainder was split by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and other participants in the scheme. This money was delivered and channeled to these Defendants by RTE and Tomlin.

116.    Accordingly, for a loan of $201,960.79 for one year, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG demanded and took more than $68,000.00 in compensation, resulting in an interest rate of about 34% per annum, far in excess of twice the enforceable rate on such a loan, and closer to six times the enforceable interest rate on such a loan. Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were only able to obtain these funds through the complicity, concealment and affirmative misrepresentations of RTE and Tomlin.

117.    The loans arranged and settled by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and RTE and Tomlin on the Wallace Property stripped away the equity in that Property, and raised the mortgages on the Property by close to $70,000.00.  The loans also virtually assured that the Wallace Family would not be able to regain title to the Property as they were originally told they could, since the residential mortgage they would have to pay off to get the property back was now significantly higher than the residential mortgage they were already having trouble paying.

118.    RTE and Tomlin failed to comply with New Century's closing instructions, that they received by fax at 4:47pm on July 24, 2006, on the loans for Nicholls in several material aspects

43

in that they conducted a settlement in which the borrower was not present, they did not seek New Century's prior approval for conducting the transaction on Nicholls' behalf by a power of attorney, they made amendments to the disbursements on the HUD-1 settlement statement without seeking prior approval of New Century, and they accepted funds for the down payment from Metropolitan or FFIG and not from Nicholls. **EXHIBIT 19.**

119.    As part of the transaction, RTE and Tomlin used the electronic wires to receive funds and documents related to the transaction. Specifically, upon information and belief RTE and Tomlin received funds by wire transfer representing federally related loan(s) Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for Ms. Nicholls.

120.    As part of the transaction, RTE and Tomlin used the electronic wires to transfer funds and documents related to the transaction. Specifically, RTE and Tomlin wired proceeds from the transaction from its account at M&T Bank to Metropolitan's account at Chevy Chase Bank on December 5, 2006 in the amount of $10,880 and to FFIG's account at Chevy Chase Bank on November 30, 2006 in the amount of $48,403. **EXHIBIT 20.**

121.    As part of the transaction Naomi Wright of RTE, under the supervision and with the knowledge of Tomlin, used the wires to email Jill Hess at New Century that the final proposed HUD-1 Settlement statements for the transaction had in fact been "just faxed" to Ms. Hess' attention on November 30, 2006. **EXHIBIT 21.**

122.    This transaction, which constituted a loan of money to the Wallace Family, carried an interest rate in excess of twice the enforceable interest rate in the State of Maryland. The Wallace Family's original mortgage which was paid off was $201, 960.79. The compensation received by the Defendants in exchange for paying off this mortgage was more than $68,000.00,

which is in excess of 34% of the amount that was paid off. The transaction under its terms was to be complete in one year, with the Wallace family paying off the new mortgages within one year.

123.    None of the Defendants ever provided the Wallace Family with a "Notice of Right to Cancel Transfer of Deed or Title" for her retention and records, as they were required to do.

124.    Notwithstanding that Plaintiff's right to rescind had not expired, RTE and Tomlin recorded the deed from Plaintiff to the straw purchaser in the county land records on December 28, 2006 at Liber 26734 Folio 152-155.

125.    The straw purchaser, Letecia Nicholls, transferred, purported to transfer, or encumbered her interest in the Property to the lender of the two residential mortgages before Wallace's right to rescind or cancel the transaction pursuant to PHIFA had expired.

126.    The acts and representations of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin described above were unfair and deceived and tended to deceive the Wallace Family. The acts and representations of these Defendants violated several express prohibitions of the PHIFA.

127.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin failed to provide the Wallace Family the required statutory disclosures and copies of all agreements and contracts executed with them.

128.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin represented or held themselves out as advisors or consultants acting on behalf of the Wallace Family.

129.    The straw purchaser Ms. Nicholls acquired an interest in the Property while acting as a foreclosure consultant to Wallace. Similarly, Jackson, McCall, Mr. Fordham, Metropolitan and

FFIG, RTE and Tomlin acquired an interest in the Wallace property while acting as foreclosure consultants.

   **c.**  **The Simon Family** .

130.  The Simon Family lived in the Simon Property (i.e. 4506 Hiwasse Drive in Clinton, MD 20735) from 2001 until the present. The family includes children aged 17, 13 and 12 years of age.

131.  Beginning in 2002, the Simon Family faced financial difficulties, and fell behind in their mortgage payments owed on the Simon Property.  Several foreclosures against the property were docketed against the Simon Property as a result.

132.  The Simon Family was referred to Metropolitan by a real estate professional at a time when they were delinquent on their mortgage and incident to foreclosure.  The Simon Family also heard and responded to a Metropolitan advertisement that they had seen or heard on the radio on WPGC 95.5.

133.  On or about May 22, 2006 Christopher Duncan at Metropolitan represented to Ms. Simon that Metropolitan could serve as her mortgage broker and could simply refinance her to a safer loan.  As part of this representation Metropolitan provided Ms. Simon certain form documents that made it appear it would work to arrange her a new mortgage including a Mortgage Broker Agreement, a Maryland Financing Agreement, and a Borrowers Certification and Authorization. **EXHIBITS 22, 23, &24.**

134.  However, in truth Jackson, McCall, Mr. Fordham, Metropolitan and FFIG identified Ms. Simon as an easy mark for their "Foreclosure Reversal Program" because of her vulnerabilities and because the Simon property was rich in equity.

135.     As part of the transaction the Simon Family was provided a number of documents to sign but Jackson, McCall, Mr. Fordham, Metropolitan and FFIG did not provide the Simon family copies of all the documents.

136.     One such form document that Ms. Simon was required to sign by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, but of which she was not given a copy, was a "Disclosure of Required Settlement Service Providers" in which Metropolitan identified itself as a lender and required Ms. Simon to use State Farm Insurance, CAP Title n/k/a Sussex and Equifax for certain settlement services.   **EXHIBIT 25.**

137.     The form documents signed by the Simon Family represented that the transaction and the documents were to help save their home and improve their credit.

138.     The documents signed by the Simon Family represented, among other things, that the Simon Family would be allowed to stay in their home, that the Simon Property would be put into the name of Metropolitan, that Metropolitan and FFIG would obtain an interest in the Simon Property, that the Simon Family would be able to regain title to the Simon Property by paying the amount of the new mortgage after one year, and that if the Simon Family did not repay the new mortgage, it would become the property of Metropolitan.

139.     Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for one of their straw purchasers, Mr. Clark, to take title to the Simon Property, and arranged for a federally related residential mortgage loans in the name of Mr. Clark for residential purposes on the Simon Property funded by New Century.

140.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG arranged for Sussex,  Chaudhry,

Farahpour and Ballesteros to act as the settlement agent in the transaction transferring title to Mr.

Clark.

141.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and Sussex, Chaudhry Farahpour

and Ballesteros had Ms. Simon sign and execute a power of attorney, purportedly notarized by

Jennifer McCall, on July 24, 2006 but Ms. Simon was not given a copy of the POA.

142.    Sussex, Chaudhry, Farahpour and Ballesteros failed to comply with New Century's

closing instructions, that it received by fax at 4:47pm on July 24, 2006, on the loans for Mr.

Clark in several material aspects in that they conducted a settlement in which the borrower was

not present, they did not seek New Century's prior approval for conducting the transaction on

Mr. Clark's behalf by a power of attorney, they made amendments to the disbursements on the

HUD-1 settlement statement without seeking prior approval of New Century, and they accepted

funds for the downpayment from Metropolitan or  FFIG and not from Mr. Clark.  **EXHIBIT 26.**

143.    As part of the transaction, Sussex, Chaudhry, Farahpour and Ballesteros used the

electronic wires to receive funds and documents related to the transaction.  Specifically, Sussex,

Chaudhry, Farahpour and Ballesteros received funds by two separate wire transfers representing

the two federally related residential loans Metropolitan arranged for Mr. Clark at 1:40:05pm and

1:40:06 pm on July 24, 2006.  **EXHIBIT 27.**

144.    As part of the transaction, Sussex, Chaudhry, Farahpour and Ballesteros used the

electronic wires to transfer funds and documents related to the transaction.  Specifically, Sussex,

Farahpour and Ballesteros wired proceeds from the transaction on at least two separate occasions

to Metropolitan's account at SunTrust bank on July 26, 2006 in the amounts of $17,611 and $1,500 respectfully. **EXHIBIT 28.**

145.     During the transaction, Sussex, Chaudhry, Farahpour and Ballesteros acted as agents of Chicago and requested a Commitment for Title Insurance from Chicago for New Century and Mr. Clark. **EXHIBIT 29.**

146.     Sussex, Chaudhry, Farahpour and Ballesteros acted as agents of Chicago when settling the transaction, and, within the scope of that agency, sold purchase title insurance on behalf of Chicago. As part of the transaction Sussex, Chaudhry, Farahpour and Ballesteros as agents of Chicago, requested sometime before 4:51pm on September 9, 2006 by fax a title abstract from Express Abstracts and Title.

147.     As part of the transaction Sussex, Chaudhry, Farahpour and Ballesteros and Chicago had significant indications of the true nature of the overall scheme including: (a) that the abstract report conducted as part of the transaction by Express Abstracts and Title, which was provided by fax to Sussex, Chaudhry, Farahpour and Ballesteros at 10:08am on July 12, 2006 and showed that the Simon Family had faced foreclosure several times and had other financial difficulties pending; (b) Sussex, Chaudhry, Farahpour and Ballesteros had actually requested from Express Abstracts and Title the abstract report on Ms. Simon's behalf as the borrower ; and (c) no licensed realtor was involved in the transaction but the purported contract between the parties included form agreements intended for use by members of the Prince George's County Board of Realtors.

148.     The balance of the mortgage on the Simon Property at the time of settlement was less than $392,000.

149.     Jackson, McCall, Mr. Fordham Metropolitan and FFIG, and Sussex, Chaudhry,
Farahpour and Ballesteros arranged and settled at least two new federally related residential
loans totaling more than $480,000 to be taken against the Simon Property.  After payment of the
Simon's mortgage balance on the property, there was more than $100,000 in equity remaining.

150.     As part of the transaction, Sussex, Chaudhry, Farahpour and Ballesteros intentionally
prepared a HUD-1 settlement that affirmatively misrepresented the actual receipts and
disbursements from the transaction.  The HUD-1 for the Simon Family's July 24, 2006
transaction shows that the remaining equity of more than $64,232.79 was all going to the
Simons, but Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and their affiliates actually
illegally took more than $64,232.79  of the Simon's Family's money, as shown by the
disbursement sheet from the settlement file.  **EXHIBIT 30.**  Jackson, McCall, Mr. Fordham,
Metropolitan and FFIG were only able to obtain these funds through the complicity, concealment
and affirmative misrepresentations of Sussex, Chaudhry, Farahpour and Ballesteros.

151.     The disbursement sheet prepared by Sussex, Chaudhry, Farahpour and Ballesteros for the
transaction and loan file also shows a payment of $64,232 in the form of a wire transfer to the
Simon Family drawn on the account of CAP Title LLC n/k/a Sussex.  However, this wire
transfer was never made to the Simon family and upon information and belief was actually wired
by Sussex, Chaudhry, Farahpour and Ballesteros to the account controlled by FFIG at Chevy
Chase Bank.

152.     This transaction, which constituted a loan of money to the Simon Family, carried an
interest rate in excess of twice the enforceable rate in Maryland.  The loan to the Simon Family,
in the amount of the mortgage paid off, was in the amount of $392,202.  In exchange for this

loan, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG took as compensation more than $100,000.00 and split it among themselves in a kickback scheme. The transaction, by its terms, was to be completed within one year with the Simon Family's regaining title to the property by paying the amount of the new mortgages on the property. Accordingly, the transaction carried an interest rate far in excess of twice the enforceable rate of interest on such a loan.

153.    The loans obtained and settled by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and Sussex, Chaudhry, Farahpour and Ballesteros on the Simon Property stripped away the equity in that Property, and raised the residential mortgages on the Property by close to $100,000.

154.    None of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex , Chaudhry, Farahpour and Ballesteros ever provided the Simon Family with a required Affiliated Business Arrangement disclosures for their retention and records, as they were required to do pursuant to RESPA; the one form in which Metropolitan had Ms. Simon actually sign but was not given to her did not comply with the requirements of RESPA in several material aspects. **EXHIBIT 25.**

155.    The acts and representations of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros described above were unfair and deceived and tended to deceive the Simon Family. The acts and representations of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros  violated several express prohibitions of RICO, RESPA, TILA and state laws.

156.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour and Ballesteros failed to provide the Simon Family with the required statutory disclosures from RESPA and copies of all agreements and contracts executed with them.

157.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex, Chaudhry, Farahpour

and Ballesteros represented or held themselves out as advisors or consultants acting on behalf of

the Simon Family, homeowners and consumers entitled to certain protections.

158.    Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and Mr. Clark acquired interests

in the Property while acting as foreclosure consultants to the Simon Family.

159.    Through counsel, Ms. Simon has informed Clark's mortgage lenders of the fraudulent

nature of the transaction including a statement from Clark supporting Ms. Simon's allegations.

With knowledge of its defective interest in the Simon Property Clark's lender, now US Bank

National Association had referred the matter to the foreclosure law firm of Buonassissi, Henning

& Lash which has initiated foreclosure proceedings against the Simon Property.  If this

foreclosure proceeding proceeds, Ms. Simon is at risk of losing her home.

## CLASS ACTION ALLEGATIONS AND DEFINITION OF THE CLASS

160.    The Plaintiffs bring this action on behalf of themselves and all other similarly situated

individuals pursuant to *F.R.C.P. 23*. The class consists of:

> All homeowners who entered into an agreement with Jackson, McCall, Fordham,
> Metropolitan and/or FFIG, whereby (1) title to the homeowners principal
> residence was transferred to a third person with whom Jackson, McCall, Mr.
> Fordham, Metropolitan and/or FFIG had an agreement to have an interest in the
> transferred property, (2) where Jackson, McCall, Fordham Metropolitan and/or
> FFIG obtained proceeds which settlement documents indicated were to go to the
> homeowners, and (3) where the property transfer was settled by RTE and/or
> Tomlin or Sussex and/or Chaudhry and/or other affiliates of Metropolitan.

> The Subclass consists of:

> All Named Plaintiffs and class members who reside in the State of Maryland
> where the transaction took place during or incident to a proposed foreclosure
> proceeding against their principal residence.

161.    The Class and Subclass, as defined above, are identifiable.  The Class Representatives are

members of the Class, and the Proctors and the Wallaces are members of the Subclass.

162.    The Class and Subclass consist of individuals so numerous that joinder of all members is impracticable, within the meaning of *F.R.C.P. 23(a)(1).*  Upon information and belief the class and Subclass consist of hundreds of persons.

163.    There are questions of law and fact which are not only common to the Class but which predominate over any questions affecting only individual class members, within the meaning of *F.R.C.P. 23(a)(2).*  The common and predominating questions include, but are not limited to:

(a)  Whether the actions of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their principals Southern and Chicago violated RESPA;

(b)  Whether the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their principals Chicago and Southern, engaged in a pattern of racketeering;

(c)  Whether the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros, and their principals, Chicago and Southern engaged in the collection of unlawful debt;

(d)  Whether RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their respective principals Southern and Chicago breached duties to Plaintiffs and members of the Class, causing them damages;

(e)  Whether the acts of the Defendants caused damages to the Plaintiffs and members of the Class.

(f)  Whether the PHIFA applies to the transactions involving Plaintiffs Proctors and Wallace

and the members of the sub class of Maryland residents

(g)  Whether the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG,

as well as RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their

principals Chicago and Southern are foreclosure consultants under the PHIFA;

(h)  Whether the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG,

as well as RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their

principals Chicago and Southern are foreclosure purchasers and/or affiliated with foreclosure

purchasers;

(i)  Whether Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Sussex and Chaudhry,

Farahpour and Ballesteros and RTE and Tomlin, their principals Chicago and Southern, Ms.

Jones, Ms. Nicholls and John Does 1-50 made the written disclosures and gave Plaintiffs and

Members of the Subclass the written notices required under the PHIFA and otherwise

complied with the statute in applicable transactions;

(j)  Whether the deeds to the properties of Plaintiffs and members of the Subclass obtained

by Ms. Jones, Ms. Nicholls and John Does 1-50 are void as in violation of public policy as

set forth in the PHIFA;

(k)  Whether RTE and Tomlin, and Sussex, Chaudhry, Farahpour and Ballesteros and their

respective principals Southern and Chicago knew or should have known of the scheme of

Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and their straw purchasers which

was in violation of RICO, RESPA, the PHIFA and other law;

(l)  Whether RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros and their

respective principals Southern and Chicago had a duty to inquire to determine whether the

transactions of Plaintiffs and members of the Class complied with RICO, RESPA and the

PHIFA.

(m) Whether Chicago and Southern may be held liable for the acts and omissions of their

agents under RICO, RESPA and PHIFA.

164.    The claims of the Plaintiffs are typical of the claims of each member of the class, within

the meaning of *F.R.C.P. 23(a)(3)*, and are based on and arise out of identical facts constituting

the wrongful conduct of the Defendants.

165.    The Plaintiffs will fairly and adequately protect the interests of the Class, within the

meaning of *F.R.C.P. 23(a)(4)*.  The Plaintiffs have no interests antagonistic to the class and are

committed to representing the class in this action.  The Plaintiffs are represented by counsel with

extensive experience in consumer law, including cases under RESPA and PHIFA, as well as

experience in class actions.  Plaintiffs' counsel have previously been appointed as class counsel

by both state and federal courts.

166.    The prosecution of separate actions by individual members of the classes would create a

risk of establishing incompatible standards of conduct for the Defendants, within the meaning of

*F.R.C.P 23(b)(1)(A)*.  In addition, adjudications with respect to individual members of the Class

would as a practical matter be dispositive of the interests of the other members not parties to the

adjudications, or would substantially impair or impede their ability to protect their interests,

within the meaning of *F.R.C.P. 23(b)(1)(B)*.

167.    The Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making injunctive or declaratory relief with respect to the Class as a whole appropriate, within the meaning of *F.R.C.P. 23(b)(2)*.

168.    Common questions of law and fact enumerated above predominate over questions affecting only individual members of the class, and a class action is the superior method for fair and efficient adjudication of the controversy, within the meaning of *F.R.C.P. 23(b)(3)*.

169.    A class action is superior for the fair and efficient prosecution of the litigation.  Class-wide liability is essential to cause Defendants to stop illegal and improper conduct.  Many class members may not be able to enforce their rights or are unaware of the remedial legislation that can provide them relief.

170.    The Defendants' affirmative, active steps to cover up their true unfair and deceptive violation of RICO, RESPA, PHIFA and state law claims actually concealed the class members causes of action until Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, and their straw purchasers stopped paying the mortgages acquired for the straw purchasers and managed by Jackson, McCall, Mr. Fordham, Metropolitan and FFIG.

171.    The Plaintiffs had no reason to know of the true illegal nature of the "Foreclosure Reversal Program" until notices concerning the defaulted mortgages were sent to the various properties or the Plaintiffs were visited by investigators from the Maryland Department of Labor, Licensing, and Regulation from November 1, 2006 through July 16, 2007.

172.    This case is one of those rare instances where circumstances external to the Plaintiffs' own conduct warrant a finding that it would be unconscionable to enforce the RESPA limitations period against the Plaintiffs since such an act would create a gross injustice of allowing the

Defendants to be wrongfully and unjustly enriched to the detriment of the Plaintiffs in total sum of $60,000,000 or more.

173.   This matter is an extraordinary circumstance of the single largest mortgage scam in the Mid-Atlantic region; is beyond the control of the Plaintiffs who were vulnerable homeowners who enlisted the help of so-called professionals licensed and regulated by state agencies, and because of the Defendants concealment of the true facts of their scheme many members of the Plaintiff class were prevented from discovering or filing their claims.

## CIVIL RICO SUMMARY

174.   In connection with the activities giving rise to this action, Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros (the "RICO Defendants") acted with malice, intent and knowledge, and with a wanton disregard for the rights of the Plaintiffs and other members of the Class.

175.   At all relevant times herein, the "enterprise" described herein operated separately and distinct from each individual RICO Defendant. The enterprise consisted of an association in fact of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros to implement and conduct the "Foreclosure Reversal Program," which has been operated over the course of at least a two-year period through the use of mail, wire, and tax fraud, and the collection of unlawful debts, and involving hundreds of victims.

176.   The enterprise was engaged in interstate commerce in that, *inter alia*, the mortgage loans and real properties which are subject to of the scheme to defraud set forth in this Complaint,

57

were secured in Maryland, Virginia, and District of Columbia and were funded and serviced out-of-state by various lenders around the United States.  *See* RICO, §1961(4) and §1962(a).

177.    On information and belief, the initial capital contributions invested by each RICO Defendant in forming the enterprise, the Foreclosure Reversal Program, was illicit income derived from a previous pattern of racketeering activity and the collection of unlawful debts through an informal association and prior business dealings between the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros.

178.    Upon information and belief, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros had each previously set up, operated, invested in and conspired to create other illegal real estate related enterprises to conduct various settlement services that used a pattern of racketeering activity and the collection of unlawful debts to conduct its business including multiple instances of mail fraud, wire fraud and money laundering to evade taxes.

179.    At all relevant times herein, in connection with the activities giving rise to this action, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros conspired with each other and engaged in the various activities set forth herein, took action in furtherance of the conspiracy  and agreed to participate in the operation of the conspiracy and scheme to defraud Plaintiffs and other class members, and aided and abetted one another in these activities, all as proscribed by federal law.

180. As set forth herein, during the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros on numerous occasions used and caused to be used, mail depositories of the United States Postal Service by both placing and causing to be placed mailable matters in said depositories and by removing and causing to be removed mailable matter from said depositories, including but not limited to HUD-1 Settlement Statements, correspondence, other closing documents, and original copies of owner's title insurance policies that fraudulently misrepresented and concealed the true nature of the relationship between the conspirators and concealed the true nature of services provided by the Foreclosure Reversal Program.

181. Specifically, RTE and Tomlin, and Sussex, Chaudhry, Farahpour and Ballesteros illegally misappropriated and disbursed through mail, wired and/or other delivery funds which was represented on the HUD-1 Settlement Statements as going to Plaintiffs and the other members of the Class in each of the transactions in which they were involved, to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG as well as themseves.  The misrepresentation of the receiver of the funds was an attempt to present the Foreclosure Reversal Program as a bona fide and legal real estate transaction. The efforts by RTE and Tomlin and Sussex,  Chaudhry, Farahpour and Ballesteros were successful in deceptively hiding the fact that the Foreclosure Reversal Program was not a bona fide and legal real estate transaction.  The delivery of these disbursements to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG was successful in deceptively hiding the fact that the Foreclosure Reversal Program was a sham and not operating

according to the law and was merely created to launder money back into the hands of Jackson, McCall, Mr. Fordham, Metropolitan and FFIG and their affiliates.  The Named Plaintiffs did not and could not reasonably learn from their transactions' correspondence the fact that the Foreclosure Reversal Program was a sham and not operating according to the law.

182.    Further, the activities of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros were designed to evade the payment of taxes for the equity wrongfully obtained by Jackson, McCall, and Mr. Fordham, using Metropolitan and FFIG, in violation of 18 U.S.C. § 1956.

183.    The RICO Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros have engaged in a pattern of racketeering by repeatedly engaging in activities designed to evade the payment of taxes on the equity wrongfully obtained by them.

184.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros participated in the conduct of the enterprise by knowingly preparing false HUD-1 Settlement Statements, and by illegally misappropriating and delivering funds to Jackson, McCall, Mr. Fordham, Metropolitan and FFIG.

185.    In a letter dated December 1, 2006 that was purportedly sent through the United States mails by RTE and Tomlin to Nationstar Mortgage LLC (the Wallace Family's former residential mortgage lender for whom they had defaulted and were facing foreclosure at the time they completed their deal with the enterprise), RTE and Tomlin sent "a check representing the net proceeds" of the Wallace Property to Ms. Nicholls.  **EXHIBIT 31**.

186.    In a letter dated January 30, 2006 that was apparently sent through the United State Postal
Service by Sussex, Chaudhry, Farahpour and Ballesteros to Friedman and McFadden P.A. (the
foreclosure firm representing the Proctor Family's former residential mortgage lender, for whom
they had defaulted and were facing foreclosure at the time they completed their deal with the
enterprise), Sussex, Chaudhry, Farahpour and Ballesteros sent or directed "a payoff check" of the
Proctor Families' defaulted mortgage. **EXHIBIT 32**. The disbursement sheet prepared by
Sussex, Chaudhry, Farahpour and Ballesteros for the Proctor Family transaction also shows a
number of various payments made by check which upon information and belief were purportedly
sent through the United States mails by Sussex to varies entities including Capitol One Bank,
Chicago, Express Abstracts, Metropolitan, Prince George's County, Ron Bozman, and State
Farm. **EXHIBIT 16**.

187.    Additionally, the disbursement sheet prepared by Sussex, Chaudhry, Farahpour and
Ballesteros for the Simon Family transaction shows a number of various payments made by
check which upon information and belief were sent through the United States mails by Sussex to
various entities including Chicago, Express Abstracts, Metropolitan, Popular Mortgage, Prince
George's County, and State Farm. **EXHIBIT 3**.

188.    These mailings were not limited to the Named Plaintiffs, but rather, are also present in
the transactions of each member of the Class.  Sussex, Chaudhry, Farahpour and Ballesteros and
RTE and Tomlin used interstate mails or wires in each transaction.  The RICO Defendants,
Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and
Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros repeated this pattern—
that is, the fraudulent use of interstate mails and wires —in each of several hundred similar real

estate transactions that were part of the Foreclosure Reversal Program. The Named Plaintiffs

and each class member relied on deceptive correspondence and payments that were produced by

Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin that resulted from the false

HUD-1 Settlement Statements prepared by those Defendants. Each such use of the interstate

mails or wires in connection with the scheme and artifice to defraud constituted the offense of

mail fraud or wire fraud as proscribed and prohibited by 18 U.S.C. § 1341.

189.    As set forth herein, during the relevant times, and in furtherance of and for the purpose of

executing the scheme and artifice to defraud, the RICO Defendants, Jackson, McCall, Mr.

Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and

Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros on hundreds of occasions also used and

caused to be used interstate telephone and other wire transactions including, but not limited to

emailing loan documents such as the HUD-1 Settlement Statements and fraudulent ABA

Disclosure forms to the Named Plaintiffs and the Class as well as the receipt and dissemination

of funds through interstate bank wire transfers in each and every Class member's transaction

with the intent and in furtherance of the scheme to defraud. Each such use of the interstate

telephone and wire transmission in connection with the scheme and artifice to defraud

constituted the offense of wire fraud as proscribed and prohibited by 18 U.S.C. § 1343.

190.    The RICO Defendants' enterprise, which operated for several years and affected as many

as, or more than, 400 transactions involving vulnerable homeowners who were in trouble

financially but equity rich in their properties in the region of Maryland, Virginia, and the District

of Columbia, used form documents that intentionally contained false information that was sent

through the interstate mails and wires—constituting a pattern of racketeering activity.

191.    The HUD-1 Settlement Statements and disclosures prepared by Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin (which contained fraudulent and false representations made to Plaintiffs and the other members of the Class and which concealed material facts) were intended to and did assure the Plaintiffs herein and the Class that the real estate settlement services and credit repair services of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros were proceeding legitimately and legally, and influenced the Plaintiffs and the Class to accept the process, as well as the kickbacks and fee splits built into the co-conspirators' fees, without question.

192.    Plaintiffs and the other members of the Class did not learn from the HUD-1 Settlement Statements that the Foreclosure Reversal Program was a bogus program and that it was operating in violation of federal and state laws.  If Plaintiffs and the class members had then suspected that the Foreclosure Reversal Program was a bogus operation and merely being used to facilitate and launder the payment of illegal referral fees and kickbacks, at their expense, they would have refused to conduct business with the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros.  Further,  they would not have paid the fees and given up their equity rich properties, and would have sought to secure their rights under the law at that time.

193.    Neither the Named Plaintiffs nor any member of the Class refused to pay the fees and give up their home equity, however, because of their reasonable reliance upon the deceptive documents provided to them by the RICO Defendants, Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros which included licensed professionals, in connection with the transaction.  Plaintiffs' and the Class' reasonable reliance on the mortgage documents, disclosures, and the apparent legitimacy of the sham enterprise enabled the scheme to continue, and thus was the proximate cause of the damages suffered by Plaintiffs and the Class.

194.    The injuries to the property of Plaintiffs and the Class were caused by the RICO Defendants' initial contribution from illicit income to create the enterprise that was derived from previous racketeering activity and the collection of unlawful debts, in that the enterprise would not have been in operation had it not been for the RICO Defendants' racketeering activities and collection of unlawful debts before forming the Foreclosure Reversal Program.  Plaintiffs and the other Class members were charged fees and had their equity rich homes stolen from them for illegal services by the enterprise, which was then split between the enterprise's members according to a common scheme and plan.

195.    Each of the conspirators used proceeds derived from a pattern of racketeering activity under 18 U.S.C. § 1961(1) & (5) and proceeds derived from the collection of unlawful debts to acquire an interest in, establish, or operate the enterprise consisting of an association in fact to implement the Foreclosure Reversal Program.

196.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros associated together for a common purpose of engaging in a course of conduct.

197.    The RICO Defendants' enterprise involved in this scheme had an ongoing organization with a decision-making framework and/or a mechanism for controlling the group enterprise.

198.    As described herein, the RICO Defendants engaged in ongoing, coordinated behavior in the Foreclosure Reversal Program victimizing Named Plaintiffs and other members of the Class. Each of these Defendants was aware of each other's existence as part of the scheme to defraud.

199.    Jackson, McCall, and Mr. Fordham, Metropolitan and FFIG solicited the business of Named Plaintiffs and other members of the Class; Mr. Fordham and Ms. McCall arranged for "credit repair" for Named Plaintiffs and other members of the Class; and RTE and Ms. Tomlin or Sussex and Mr. Chaudhry closed the transactions of Named Plaintiffs and the other members of the Class, fraudulently facilitating and concealing the illegal transactions and channeling funds back to the other RICO Defendants to launder funds and evade taxes.

200.    The association of these RICO Defendants into an enterprise served as the vehicle through which the unlawful acts described herein were conducted.  Without the association of these persons, the unlawful acts described herein would not have been possible.

201.    As described above, these enterprises had organizational structures or chains of command, including phases for soliciting and recruiting victim homeowners, preparing contracts including sales contracts and leases, preparing loan documents, brokering loans, obtaining title insurance, closing real estate transactions, falsifying distribution records to evade taxes and creating the appearance of a credit repair business.

202.    These enterprises used organized efforts to fraudulently and illegally lure Named Plaintiffs and other members of the Class to engage their services, to systematically deceive the Named Plaintiffs and other members of the Class, to close fraudulent and illegal real estate

transactions involving the Named Plaintiffs and other members of the Class, and to benefit the RICO Defendants and their affiliates at the expense of the Named Plaintiffs and other members of the Class.

203.    The RICO Defendants engaged in the enterprises described above and functioned as continuing units identifiable over a period of time.  The RICO Defendants were involved in the transactions involving Named Plaintiffs and other members of the Class over a period spanning at least two years and involving hundreds of transactions.

204.    Defendants Sussex and Mr. Chaudhry closed transactions for the enterprise and functioned as part of the enterprise from its inception until about August 2006, closing hundreds of transactions as part of the enterprise.

205.    Beginning about July 2006, RTE and Ms. Tomlin replaced Sussex and Mr. Chaudhry and took over their functions in closing transactions involving the other RICO Defendants, closing tens if not hundreds of transactions for the enterprise.

206.    On information and belief, the enterprises described above did not exist solely for the purpose of engaging in predicate acts violative of RICO, but the enterprises also engaged in legitimate real estate transactions over the same period of time for the purpose of further concealing the true intent of their enterprise.

207.    The RICO Defendants each engaged in a pattern of racketeering activity, as defined under RICO, §1961(5), as each engaged in a pattern of mail and wire fraud as well as money laundering to evade taxes.

208.    Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were in charge of fraudulently soliciting homeowners including Named Plaintiffs and other members of the Class,

through its website and the public airways, including radio, television and the mails.  Defendants

Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were also in charge of fraudulently

convincing Named Plaintiffs and other members of the Class to sign documents including

contracts of sale, lease agreements, and other documents under representations that these

documents were intended to save the homes of Named Plaintiffs and the other members of the

Class, and transmitting these documents via interstate mail and wires.

209.    Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG were also in charge

of brokering loans from various mortgage lenders, including New Century, for the "straw

buyers" who would take title to the homes of the Named Plaintiffs and the other members of the

Class.

210.    Defendants Jackson, McCall, Mr. Fordham, Metropolitan and FFIG used the interstate

mails and wires in the course of its activities in contacting and communicating with the Named

Plaintiffs and class members and straw purchasers, and transferring loan applications for those

straw purchasers, among other things.

211.    In the next step of this scheme, Defendants RTE and Tomlin or Sussex, Chaudhry,

Farahpour and Ballesteros, acting on behalf of the enterprise, prepared fraudulent settlement

statements and closing documents for Named Plaintiffs and the other members of the Class

which were transmitted through the interstate mails and/or wires, and prepared illegal documents

purporting to permit RTE and Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros to split

proceeds of the settlement transactions that were to go to Named Plaintiffs and the other

members of the Class to instead be paid to Jackson, McCall, Mr. Fordham, Metropolitan and

FFIG, which were also transmitted over interstate mails or wires.

212.    The use of the false settlement statements which showed funds paid to the Named

Plaintiffs and class members when they were not, allowed Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG to evade paying taxes on the funds they received from the scams.

213.    To this end, Defendant Mr. Fordham, through FFIG, also served as a means of

fraudulently channeling the equity owned by Named Plaintiffs and other members of the Class to

the other members of the enterprises involved, through the use of the U.S. Mails, telephone lines,

facsimile lines, and the Internet.

214.    Defendants RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros facilitated

the channeling of funds to FFIG, which in turn split these funds between Jackson, McCall, Mr.

Fordham, Metropolitan and  FFIG,  the investor/straw purchaser Defendants, and other persons

or entities who did not provide bona fide settlement services in disbursements that were "under

the table" and "off the HUD-1 Settlement Statements" so as to further conceal the true nature of

their enterprise.

215.    Further, the funds paid to the investor/straw purchasers and to Defendants Jackson,

McCall, Mr. Fordham, Metropolitan and FFIG were never reported as income allowing the

investor/straw purchasers and Defendants Jackson, McCall, Mr. Fordham, Metropolitan and

FFIG to wrongfully evade the payment of taxes.

216.    The fraud in the HUD-1 Settlement Statements prepared in the transactions involving

Named Plaintiffs and the other members of the Class implicates all of the Defendants who

received or dispersed funds as additional kickbacks and illegal splits, oversaw the closings,

and/or prepared closing documents, including the RICO Defendants, Jackson, McCall, Mr.

Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and

Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros.

217.    Each of the transactions concerned herein also involved the collection of "unlawful

debts," as defined by RICO, §1961(6).  These transactions were unenforceable under applicable

State law, in whole and in part as to principal or interest because of the laws relating to usury,

and these debts were incurred in connection with the business of lending money and/or things of

value at a rate usurious under applicable State law, and the usurious rates involved in each of

these transactions was more than twice the enforceable rate.

218.    The enforceable rate of each of these loans to Plaintiffs and the other members of the

Class was no more than 6% per annum, and each of the transactions of the Plaintiffs and the

other members of the Class involved a loan which carried an annual percentage rate of far more

than 12% per annum.

## COUNT I
## VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## 18 U.S.C. §1962(a)
(AGAINST THE RICO DEFENDANTS, JACKSON, MCCALL, MR. FORDHAM, METROPOLITAN AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND SOUTHERN: RTE AND TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS AND CHICAGO AND SOUTHERN)

219.    Plaintiffs re-allege and incorporate by reference the foregoing allegations.

220.    Each Plaintiff and each member of the Class is a "person" within the meaning of 18

U.S.C. §§ 1961(3) and 1964(c).

221.    Each RICO Defendant, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well

as the agents of Chicago and Southern: RTE and Tomlin, Chaudhry, Farahpour and Ballesteros is

a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(a).

222.    Through the agreements between the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Chaudhry, Farahpour and Ballesteros and through the arrangements and joint activity between the RICO Defendants, the RICO Defendants formed an association in fact with each other which constitutes an "enterprise" engaged in illegal activities affecting interstate commerce pursuant to 18 U.S.C. §§ 1961(4) and 1962(a).

223.    Each of the RICO Defendants used proceeds derived from a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5) or from the collection of unlawful debts, to acquire an interest in, establish, or operate the enterprise.

224.    These unlawful activities included multiple instances of mail and wire fraud, including but not limited to the issuance of false and deceptive HUD-1 settlement statements and other mortgage documents, fraudulent and false correspondence, and bank wired monies in violation of 18 U.S.C. §§ 1341 and 1343, which occurred uniformly.

225.    Further, the false HUD 1 Settlement statements were utilized to launder the money being paid to the RICO defendants for the purpose of evading taxes in violation of 18 U.S.C. § 1956.

226.    The unlawful activities also included the collection of unlawful debts as defined by RICO, which occurred uniformly and consistently.

227.    The purpose of the RICO Defendants association in fact was to channel illegal fees and kickbacks to Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, to reward these Defendants, at the dire expense of the Plaintiffs and other members of the Class, for having duped them and for having referred settlement business to Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin so these Defendants could charge excessive fees and generate

commissions from the sale of title insurance policies that also benefited their respective

principals, Defendants Chicago and Southern..

228.    The association in fact between the RICO Defendants, Jackson, McCall, Mr. Fordham,

Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin,

Sussex, Chaudhry, Farahpour and Ballesteros had a common or shared purpose, to give effect to

the scheme described above, and had a distinct division of labor as described above.  It continued

as a unit, with a core membership, over a substantial period of time exceeding two years, and

was an ongoing organization established for an economic motive.

229.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well

as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and

Ballesteros each played a substantial and distinct role in this scheme.

230.    In this association in fact, Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and

FFIG made the initial contacts with the homeowner.  Metropolitan falsely and intentionally

represented that the Foreclosure Reversal Program was a legitimate means of saving their homes.

Metropolitan did not disclose that the Foreclosure Reversal Program was designed solely to

channel illegal fees to itself and the other RICO Defendants at the expense of the homeowners.

231.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG then referred the title

and closing work required to Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Ms.

Tomlin, in return for which these persons and entities channeled illegal fees to Ms. Jackson, Ms.

McCall, Mr. Fordham, Metropolitan and FFIG, and others and facilitated the illegal transactions.

232.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well

as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and

Ballesteros each and all knew that the Foreclosure Reversal Program was an illegal means of stripping equity from the homes of the homeowners they engaged and that it allowed Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, to evade taxes.

233.    Sussex, Chaudhry, Farahpour and Ballesteros and RTE and Ms. Tomlin, utilized this scheme to generate a large volume of referrals from Metropolitan to Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin.  To further this scheme, the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros issued and used false and deceptive disclosures and HUD-1 settlement statements, which were intended to and did mislead the homeowners and the public about the true nature of this scheme to defraud and the true costs and fees resulting from the transactions. Additionally, the false disclosures and statements mislead tax authorities as to the income received by Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, and their affiliates including the straw purchasers.

234.    Each member of the Class received a HUD-1 settlement statement, various documents, and/or correspondence through the interstate mails or wires that contained false and fraudulent statements and which concealed material facts that caused Plaintiffs and the other members of the Class to act in reasonable reliance on those deceptive documents that the Foreclosure Reversal Program was legitimate and designed to help save their homes.

235.    Mr. Fordham's role in this scheme was to use FFIG to launder the illegal fees charged by the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros.  These fees were paid and split between the RICO Defendants. Moreover, since the

documentation showed payments actually paid to the RICO Defendants having been paid to

Plaintiffs and other class members, it allowed the RICO Defendants to evade paying taxes. The

straw purchasers were also shown as having paid fees that they did not allowing them to claim

deductions they were not entitled to. The Plaintiffs and the members of the Class relied upon the

representations of the RICO Defendants that the Foreclosure Reversal Program was a valid and

legitimate program, and that true and valid services were being provided for the payments of fees

to the RICO Defendants.

236.    All of these activities of the association in fact form a pattern, continuous in nature,

which consists of numerous unlawful individual acts directed to the Plaintiffs and the other

members of the Class.  The illegal activities of the RICO Defendants persisted over an extended

period of time starting in or before 2005 and ending, on information and belief, in mid-2006,

once an investigation into their activities was commenced by State and/or Federal agents.  Each

of the false and fraudulent documents and mailed correspondence was provided to homeowners

in furtherance of the conspiracy for which the RICO Defendants are liable.  The reliance of

Plaintiffs and the other members of the Class on the material falsehoods and omissions in the

documents were reasonable and justified because such documents would and did cause persons

of ordinary experience to be convinced of the legality and legitimacy of the Foreclosure Reversal

Program.

237.    These activities of the RICO Defendants entailed multiple instances of mail fraud

consisting of intentional mail fraud intended to induce, and inducing, the Plaintiffs and other

members of the Class to part with property and to surrender legal rights in violation of 18 U.S.C.

§ 1341.

238.    These activities of the RICO Defendants also entailed multiple instances of wire fraud consisting of intentional wire fraud intended to induce, and inducing, Plaintiffs and the other members of the Class to part with property and to surrender legal rights in violation of 18 U.S.C. § 1343.

239.    These activities of the RICO Defendants also entailed multiple instances of the collection of unlawful debts consisting of the intentional collection of unlawful debts intended to induce, and inducing, Plaintiffs and the other members of the Class to part with property and to surrender legal rights in violation of RICO.

240.    These activities of the RICO Defendants also entailed multiple instances of money laundering designed to evade taxes in violation of 18 U.S.C. § 1956.

241.    Through the use of this illegal and fraudulent scheme, and through the efforts to operate and maintain the enterprise described herein, to maintain the conspiracy and to facilitate the payment of illegal fees and kickbacks to the RICO Defendants by laundering funds through the use of the Foreclosure Reversal Program, the RICO Defendants have been able to retain money which is rightfully payable to the Plaintiffs and the other members of the Class, to collect money not properly due from the Plaintiffs or other members of the Class and evade taxes.

242.    The RICO Defendants retained these illegally gained funds and reinvested and used these funds in their operations in violation of 18 U.S.C. § 1962(a).  Furthermore, as alleged above, the RICO Defendants each previously acquired illicit funds through similar fraudulent operations, using mail and wire fraud and the collection of unlawful debts and used those proceeds to continue the scheme with the Foreclosure Reversal Program.

243.    Plaintiffs and the other members of the Class have been injured in their property by

reason of the operation of the association in fact enterprise in this unlawful manner and

investment of illicit proceeds from previous racketeering activities in the association in fact

enterprise.

244.    Chaudhry, Farahpour and Ballesteros and Sussex were agents of Chicago at all times

relevant to the facts alleged in this count, as agents, and were acting within the scope of their

agency agreement with  Chicago at all times relevant to the facts composing this Count.

245.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged

herein, as agents, and were acting within the scope of their agency agreement with Southern at

all times relevant to the facts composing this Count.

246.    Chaudhry, Farahpour and Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in

the acts and omissions described above, which caused injuries and damages to the Plaintiffs and

the other members of the Class, as described above.

247.    The acts and omissions of Chaudhry, Farahpour and Ballesteros and Sussex, which

caused injuries to the Plaintiffs and the other members of the Class, were committed within the

scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry,

Farahpour and Ballesteros and Sussex were performing services as agents for which they had

been engaged by Chicago, and while acting in furtherance of Chicago's interests.

248.    The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs

and the other members of the Class, were committed within the scope of the agency of Ms.

Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin

and RTE were performing services as agents for which they had been engaged by Southern, and

while acting in furtherance of Southern's interests.

**COUNT II**
**VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. §1962(c)**
(AGAINST THE RICO DEFENDANTS, JACKSON, MCCALL, MR. FORDHAM,
METROPOLITAN AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND
SOUTHERN: RTE AND TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS
AND CHICAGO AND SOUTHERN)

249.    Plaintiffs re-allege and incorporate by reference the foregoing allegations.

250.    Each Plaintiff and member of the Class is a "person" within the meaning of 18 U.S.C. §§

1961(3) and 1964(c).

251.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well

as the agents of Chicago and Southern: RTE and Tomlin, Chaudhry, Farahpour and Ballesteros

are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

252.    The association in fact described above was an "enterprise" within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in, and the activities of which

affect, interstate commerce.

253.    The RICO Defendants were each associated with the enterprise and participated in its

management and operation by directing its affairs and by conducting business with each other as

assisting in the scheme to charge borrowers phony, illegal and fraudulent fees in connection with

the Foreclosure Reversal Program.  The RICO Defendants each participated, directly and

indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under

18 U.S.C. § 1961(i)(b), 1961(5) and 1962(c), to wit:

     a.    Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341;

     b.    Multiple instances of wire fraud, in violation of 18 U.S.C. § 1343;

    c.   Multiple instances of money laundering to evade taxes in violation of 18 U.S.C. §

        1956; and,

    d.   Multiple instances of the collection of unlawful debts in violation of RICO.

254.    Each Plaintiffs and each member of the Class suffered injury to their property, within the meaning of 18 U.S.C. § 1964(c), by reason of the violation of 18 U.S.C. §1962(c).

255.    Chaudhry, Farahpour and Ballesteros and Sussex were agents of Chicago at all times relevant to the facts alleged in this count, as agents, and were acting within the scope of their agency agreement with  Chicago at all times relevant to the facts composing this Count.

256.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged herein, as agents, and were acting within the scope of their agency agreement with Southern at all times relevant to the facts composing this Count.

257.    Chaudhry, Farahpour and Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in the acts and omissions described above, which caused injuries and damages to the Plaintiffs and the other members of the Class, as described above.

258.    The acts and omissions of Chaudhry, Farahpour and Ballesteros and Sussex, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry, Farahpour and Ballesteros and Sussex were performing services as agents for which they had been engaged by Chicago, and while acting in furtherance of Chicago's interests.

259.    The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of the agency of Ms. Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin

and RTE were performing services as agents for which they had been engaged by Southern, and

while acting in furtherance of Southern's interests.

## COUNT III
## VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### 18 U.S.C. §1962(d)
(AGAINST THE RICO DEFENDANTS, JACKSON, MCCALL, MR. FORDHAM, METROPOLITAN AND FFIG, AS WELL AS THE AGENTS OF CHICAGO AND SOUTHERN: RTE AND TOMLIN, CHAUDHRY, FARAHPOUR AND BALLESTEROS AND CHICAGO AND SOUTHERN)

260.    Plaintiffs re-allege and incorporate by reference the foregoing allegations.

261.    Each Plaintiff and member of the Class is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

262.    The RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Chaudhry, Farahpour and Ballesteros are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

263.    The association in fact described above was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise was engaged in, and the activities of which affect, interstate commerce.

264.    The RICO Defendants as co-conspirators were associated with the enterprise described herein, and conspired within the meaning of 18 U.S.C. § 1962(d) to violate §1962(a) and (c).

265.    The RICO Defendants as co-conspirators conspired to use or invest income derived from a pattern of unlawful activity and the collection of unlawful debts under 18 U.S.C. § 1961 to acquire an interest in, establish or operate the enterprise and have done so through a pattern of unlawful activity including multiple instances of mail fraud, wire fraud, money laundering to evade taxes and the collection of unlawful debts.

266.    The RICO Defendants as co-conspirators conspired to operate, maintain control of, and maintain an interest in the enterprise and have done so through a pattern of unlawful activity including multiple instances of mail fraud, wire fraud, money laundering to evade taxes and the collection of unlawful debts.

267.    The Plaintiffs and the other members of the Class have suffered injury to their property within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of overt acts constituting illegal activity in violation of 18 U.S.C. §§ 1961 and 1962(d).

268.    Chaudhry, Farahpour, Ballesteros and Sussex were agents of Chicago at all times relevant to the facts alleged in this count, as agents, and were acting within the scope of their agency agreement with Chicago at all times relevant to the facts composing this Count.

269.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged herein, as agents, and were acting within the scope of their agency agreement with Southern at all times relevant to the facts composing this Count.

270.    Chaudhry, Farahpour and Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in the acts and omissions described above, which caused injuries and damages to the Plaintiffs and the other members of the Class, as described above.

271.    The acts and omissions of Chaudhry, Farahpour and Ballesteros and Sussex, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry, Farahpour and Sussex were performing services as agents for which they had been engaged by Chicago, and while acting in furtherance of Chicago's interests.

272.    The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs

and the other members of the Class, were committed within the scope of the agency of Ms.

Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin

and RTE were performing services as agents for which they had been engaged by Southern, and

while acting in furtherance of Southern's interests.

**COUNT IV**
**VIOLATION OF THE FEDERAL REAL ESTATE SETTLEMENT PROCEDURES ACT**
**("RESPA") 12 U.S.C. §2601, et seq.**
(AGAINST ALL DEFENDANTS)

273.    Plaintiffs re-allege and incorporate by reference the foregoing allegations.

274.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin and

Sussex , Chaudhry, Farahpour and Ballesteros procured and/or provided closing, title or

settlement services concerning residential mortgage loans, including "federally related mortgage

loans" as that phrase is defined by RESPA at 12 U.S.C. § 2602(l) and at 24 C.F.R. § 3500.2(3),

involving the named Plaintiffs and other members of the Class.  Upon information and belief,

these RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the

agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros

procured and settled federally related mortgage loans and/or provided closing, title or settlement

services for more than 100 residential mortgage loans in each of the last three years.

275.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, conducted business

with Named Plaintiffs and other members of the class as a "mortgage broker," as that phrase is

defined by Regulation X at 24 C.F.R. § 3500.2, and contracted with the named Plaintiffs and

other class members.  As such, the mortgage brokers Ms. Jackson, Ms. McCall, Mr. Fordham,

Metropolitan and FFIG provided to the Plaintiffs and other Class members real estate "settlement

services" as that phrase is defined by RESPA at 12 U.S.C. § 2602(3) and 24 C.F.R. § 3500.2.

276.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros conducted settlement business with Named Plaintiffs and other members of the Class as "title companies," as that phrase is defined by RESPA at 12 U.S.C. §2602(4), and provided, among other things, title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, the handling of the processing, and closing or settlement, in connection with real estate settlements. As such, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros provided to the Plaintiffs and other Class members real estate "settlement services" as that phrase is defined by RESPA at 12 U.S.C. § 2602(3) and 24 C.F.R. § 3500.2.

277.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, gave and accepted portions, splits, and percentages of charges made and received for the rendering of real estate settlement services among themselves and to straw purchasers in connection with the transactions of Named Plaintiffs and other members of the Class, involving federally related residential mortgage loans, other than for services actually performed, in violation of 12 U.S.C §2607(b).

278.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG systematically paid, and their "investors," including Letecia Nicholls, Diane Linda Jones, and John Does 1-50, accepted, portions, splits and percentages of charges made and received by Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG from the Named Plaintiffs and other members of the Class other than for services actually performed.  Indeed, the "investors" provided no valuable services to Named Plaintiffs and other members of the class.

279.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were "associates" of Metropolitan in connection with the transactions involving Named Plaintiffs and the other members of the Class, under 12 U.S.C. §2602(8)(D).  Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG acted as mortgage brokers and orchestrators of the foreclosure rescue scheme described herein, aned were persons in a position to refer settlement business to title companies.  Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG did, indeed, refer business to RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros.  RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros each had agreements, arrangements and understandings with Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, the purpose and substantial effect of which was to enable Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, to benefit financially from the referral of business to RTE and Tomlin and Sussex and Chaudhry.  Under this agreement, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros would perform settlement services and charge fees to the Named Plaintiffs and other members of the Class in illegal transactions, would systematically overlook those illegalities, would systematically allow the notarization of forged signatures and/or signatures not made in the presence of a notary, would systematically sign HUD-1 settlement statements which did not reflect the true disbursement of money in the transaction, would channel fees to Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, for work that was not performed, and would facilitate the payment to Ms. Jackson, Ms. McCall, and Mr. Fordham, using Metropolitan and FFIG  of "under the table" fees out of the equity in the homes of Named Plaintiffs and other members of the Class which were represented by the RICO Defendants as fees paid for settlement services to Ms. Jackson, Ms. McCall, Mr. Fordham,

Metropolitan and FFIG – fees they would not have been able to take had the title company or settlement service provider refused to participate in the illegal scheme. Additionally, the actions of RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros allowed Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG to evade taxes. RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros benefited from the referral of settlement business by Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, and Ms. Jackson, Ms. McCall, and Mr. Fordham, using Metropolitan and FFIG, benefited by having a title company which would overlook their illegal business practices and would provide them with the ability to carry out their illegal scheme and evade taxes.

280.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, on the one hand and RTE and Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros on the other hand were all "affiliated business arrangements" in connection with the transactions involving Named Plaintiffs and the other members of the Class, under 12 U.S.C. 2602(7). As discussed above, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were associates of Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG. RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros were providers of settlement services, and owners or employees of providers of settlement services. Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, directly and indirectly referred settlement service business to both RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros.

281.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros all systematically failed to provide proper disclosure of their affiliated business arrangement, as required under 12 U.S.C. §2607(c).

282.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, required Named
Plaintiffs and other members of the class to utilize the settlement services of either RTE and
Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros.

283.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros provided settlement
services in transactions involving Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and
FFIG, and the Named Plaintiffs and other members of the class, overlooked the irregularities and
illegalities in the transactions as described above, gave checks or payments consisting of the
equity of Named Plaintiffs and other members of the Class to Ms. Jackson, Ms. McCall, Mr.
Fordham, Metropolitan and  FFIG, and allowed them to obtain the equity belonging to Named
Plaintiffs and other members of the Class in those transactions, and added some appearance of
legitimacy to those transactions, in exchange for their referral of business incident to or part of a
real estate settlement service to RTE and Tomlin and Sussex, Chaudhry, Farahpour and
Ballesteros.

284.    Based upon the foregoing facts, RTE, Tomlin, Sussex, Chaudhry, Farahpour and
Ballesteros, Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, violated RESPA
with respect to Plaintiffs and all other class members by giving, paying or receiving fees,
kickbacks or other things of value to or from Ms. Jackson, Ms. McCall, Mr. Fordham,
Metropolitan and FFIG, pursuant to an agreement or understanding that business incident to or a
part of a real estate settlement or closing services involving "federally related mortgage loans"
would be referred to RTE and Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros by Ms.
Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG. The federally related residential
mortgage loans involved in the transaction included the Named Plaintiff's defaulted mortgage

loans paid off as part of the scheme by Sussex, Chaudhry, Farahpour and Ballesteros or RTE and Tomlin and the new loans acquired by Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, on behalf of the straw purchasers which were purportedly intended for residential purposes.

285.    The giving by RTE and Tomlin or Sussex, Chaudhry, Farahpour and Ballesteros of fees, kickbacks and other things of value, including the provision of settlement services in illegal and irregular transactions, to Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG and the other Defendants in the manner described herein constituted a violation of § 8(a) of RESPA, 12 U.S.C. §2607(a).

286.    Chaudhry, Farahpour, Ballesteros and Sussex were agents of Chicago at all times relevant to the facts alleged in this count, and as agents were acting within the scope of their agency agreement with Chicago  at all times relevant to the facts composing this Count.

287.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged herein, as agents, and were acting within the scope of their agency agreement with Southern at all times relevant to the facts composing this Count.

288.    Chaudhry, Farahpour, Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in the acts and omissions described above, which caused injuries and damages to the Plaintiffs and the other members of the Class, as described above.

289.    The acts and omissions of Chaudhry, Farahpour, Ballesteros and Sussex, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry, Farahpour, Ballesteros and Sussex were performing services as agents for which they had been

290.     The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of the agency of Ms. Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin and RTE were performing services as agents for which they had been engaged by Southern, and while acting in furtherance of Southern's interests.

### COUNT V
### VIOLATION OF THE MARYLAND PROTECTION OF HOMEOWNERS IN FORECLOSURE ACT (PHIFA)
### (MD. CODE ANN., REAL PROP., §§ 7-301 *et seq.*)
### (AGAINST ALL DEFENDANTS ON BEHALF OF THE MARYLAND SUB CLASS)

291.     Plaintiffs re-allege and incorporate by reference the foregoing allegations.

292.     The acts and representations of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros, Nicholls, Jones and John Does 1-50 described above deceived and tended to deceive the Plaintiffs and the other members of the Maryland subclass, who were all homeowners of Maryland residences in foreclosure pursuant to the PHIFA.

293.     The acts and representations of the RICO Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, as well as the agents of Chicago and Southern: RTE and Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros, Nicholls, Jones and John Does 1-50 as described herein systematically violated several express prohibitions of the PHIFA.

294.     Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG willfully, systematically, and uniformly violated the PHIFA with respect to the Plaintiffs and the Maryland

subclass members in the following ways, among others:

    a.   When they systematically claimed, demanded, charged, collected, and received compensation prior to fully performing each and every service they contracted to perform and represented that they would perform;

    b.   When they systematically claimed, demanded, charged, collected, and received interest and compensation for their Foreclosure Reversal Program loans that exceeded 8% a year;

    c.   When they systematically took security to secure the payment of compensation by the Plaintiffs and other members of the class in the form of their residences;

    d.   When they systematically received consideration from third parties in connection with their foreclosure consulting services provided to Plaintiffs and the members of the Class when the consideration was not fully disclosed in writing to the homeowner;

    e.   When they systematically acquired interests in the residences of Plaintiffs and the other members of the Class;

    f.   When they systematically took powers of attorney from Plaintiffs and the other members of the Class for reasons other than to inspect documents; and

    g.   When they systematically induced Plaintiffs and the other members of the Class to enter into foreclosure consulting contracts that did not comply in all respects with the PHIFA.

295.    Additionally, Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG violated the PHIFA by failing to provide Plaintiffs and Maryland subclass members with the disclosures

and rights of rescission as required under the PHIFA, Md. Real Prop. §7-305 and 7-306.

296.    Jones, Nicholls and John Does 1-50 willfully, systematically, and uniformly violated the PHIFA with respect to Plaintiffs and Maryland subclass members in the following ways, among others:

      a.   When they systematically failed to give Plaintiffs and other members of the Class notices of transfer of deed or title, notices of rights to rescind, and rescission forms, in the forms prescribed under the PHIFA, Md. Real Prop. §7-310.

      b.   When they systematically failed to verify that the Plaintiffs and other members of the class would be able to re-purchase their properties or perform the leases which were executed as part of the foreclosure reconveyances;

      c.   When they entered into contracts with Plaintiffs and other members of the Class which were illegal, unfair, and commercially unreasonable;

      d.   When they systematically induced Plaintiffs and the other members of the Class to enter into foreclosure consulting contracts which did not comply in all respects with the PHIFA;

      e.   When they recorded documents signed by Plaintiffs and other members of the Class, and encumbered the properties of Plaintiffs and other members of the Class prior to the expiration of the right to rescind of Plaintiffs and other members of the Class.

297.    RTE, Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros willfully, systematically, and uniformly violated PHIFA with respect to Plaintiffs and Maryland subclass members in the following ways, among others:

a.  When they systematically failed to give Plaintiffs and other members of the Class notices of transfers of deed or title, notices of rights to rescind, and rescission forms, in the forms required and proscribed by PHIFA, Md. Real Prop. §7-310.

b.  When they recorded documents signed by Plaintiffs and other members of the Class, and encumbered the properties of the Plaintiffs and other members of the Class before the expiration of any rescission period.

298.    Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG, Nicholls, Jones,  John Does 1-50, RTE, Tomlin, Sussex, Chaudhry, Farahpour and Ballesteros willfully violated PHIFA and caused damages to the Plaintiff and Maryland subclass members that includes the unlawful loss of the equity in their homes, illegal fees and rents paid by the Plaintiff and Maryland subclass members, and other costs and damages.

299.    The straw purchasers in these transactions, who were affiliated with Ms. Jackson, Ms. McCall, and Mr. Fordham, using Metropolitan and FFIG, including Nicholls, Jones and John Does 1-50 each constituted "foreclosure purchasers" as defined by the PHIFA, Md. Real Prop. §7-301(e), as in each transaction these straw purchasers were acquiring title or possession of a deed or other document to a residence in foreclosure as a result of a foreclosure reconveyance. Additionally, since they were entering into agreements with the Plaintiffs and Maryland subclass members to lease back the property to them and provide them an option to repurchase their homes, they were also "foreclosure consultants" as defined by the PHIFA, Md. Real Prop. §7-301(b).

300.    Each of the transactions of the Maryland subclass members constituted "foreclosure reconveyances," as defined by the PHIFA, Md. Real Prop. §7-301(f), as each of the transactions

involved, as set forth above:

> (1) The transfer of title to real property by a homeowner during or incident to a proposed foreclosure proceeding, either by transfer of interest from the homeowner to another party or by creation of a mortgage, trust, or other lien or encumbrance during the foreclosure process that allows the acquirer to obtain legal or equitable title to all or part of the property; and
>
> (2) The subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the homeowner by the acquirer or a person acting in participation with the acquirer that allows the homeowner to possess the real property following the completion of the foreclosure proceeding, including an interest in a contract for deed, purchase agreement, land installment sale, contract for sale, option to purchase, lease, trust, or other contractual arrangement.

*Id*.

The fact that the transactions of the Maryland subclass members were foreclosure reconveyances is clearly set forth in the Foreclosure Reversal Program form contracts and the other forms which were used for their transactions.

301.    The straw purchasers in these transactions, as foreclosure purchasers involved in foreclosure reconveyances, were required to give certain notices and other documents to the Maryland subclass members under the PHIFA, including notices of the transfer of their deeds, and notices of their rights to rescind, which they systematically failed to give to Plaintiffs and Maryland subclass members.

302.    Chaudhry, Farahpour, Ballesteros and Sussex were agents of Chicago at all times relevant to the facts alleged in this count, as agents, and were acting within the scope of their agency agreement with  Chicago at all times relevant to the facts composing this Count.

303.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged herein, as agents, and were acting within the scope of their agency agreement with Southern at all times relevant to the facts composing this Count.

304.    Chaudhry, Farahpour, Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in the acts and omissions described above, which caused injuries and damages to the Plaintiffs and the other members of the Class, as described above.

305.    The acts and omissions of Chaudhry, Farahpour, Ballesteros and Sussex, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry, Farahpour, Ballesteros and Sussex were performing services as agents for which they had been engaged by Chicago, and while acting in furtherance of Chicago's interests.

306.    The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of the agency of Ms. Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin and RTE were performing services as agents for which they had been engaged by Southern, and while acting in furtherance of Southern's interests.

### COUNT VI
### DECLARATORY AND INJUNCTIVE RELIEF
(AGAINST NICHOLLS, JONES AND JOHN DOES 1-50 ON BEHALF OF
THE MARYLAND SUBCLASS MEMBERS)

307.    Plaintiffs re-allege and incorporate by reference the foregoing allegations.

308.    This claim for declaratory relief is brought under the Federal Declaratory Judgment Act, 28 U.S.C. §2201(a), to settle and obtain relief from uncertainty and insecurity with respect to the rights, status and legal relations under the deeds of the Plaintiffs and Maryland subclass members and the consumer protections embodied in Maryland's PHIFA statute.

309.    Jones, Nicholls and John Does 1-50 maintain that they have valid deeds to the Properties of Plaintiffs and Maryland subclass members, despite the fact that they violated the PHIFA as

described herein, despite the fact that they acted as foreclosure consultants when also acting as foreclosure purchasers, and despite the fact that Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG took interests in the properties along with Jones, Nicholls and John Does 1-50 while they, along with Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and FFIG also simultaneously acted as foreclosure consultants in direct violation of the PHIFA.

310.    Plaintiffs and Maryland subclass members maintain that the deeds to Jones, Nicholls and John Does 1-50 are void as in violation of the public policy set forth in the PHIFA.

311.    Jones, Nicholls and Johns Does 1-50 will continue to maintain that they have title to the Properties of Plaintiffs and Maryland subclass members unless and until this Court declares and affirms that the deeds are void.

312.    This presents an actual, judicable controversy between the parties relating to the construction of the deeds to the properties of Plaintiffs and Maryland subclass members and the application of the Maryland PHIFA statute to those deeds.

313.    Plaintiffs and Maryland subclass members have a right to be free from the claim of Jones, Nicholls and John Does 1-50 to their properties.

314.    The benefits to Plaintiffs and Maryland subclass members in obtaining an injunction preventing Jones, Nicholls, and John Does 1-50 from transferring or encumbering the properties of Plaintiffs and Maryland subclass members outweigh any potential harm Jones, Nicholls or John Does 1-50 would incur as a result of an injunction, under the balance of the convenience test, as Jones, Nicholls and John Does 1-50 have no legal or contractual right to title of the properties of Plaintiffs and Maryland subclass members and illegally obtained title by recording the deeds before the expiration of the rescission period afforded to the Plaintiffs and Maryland

subclass members, and as Plaintiffs and Maryland subclass members would greatly benefit from being relieved of the attempts of Jones, Nicholls and John Does 1-50 to transfer and/or encumber the properties.

315.    Plaintiffs and Maryland subclass members will suffer irreparable injury unless the requested injunctions are granted, as Jones, Nicholls and John Does 1-50 will continue to attempt to transfer and/or encumber the properties of Plaintiffs and Maryland subclass members.

316.    The public interest is best served by granting the requested injunctions.  The public policy reflected in the PHIFA shows that the public interest is served by enforcing the statute, and the public and the State have a compelling interest in preventing illegal foreclosure rescue scams from occurring in violation of the law.

317.    Plaintiffs and Maryland subclass members are likely to succeed on the merits of this action, as the PHIFA explicitly requires that Jones, Nicholls, and John Does 1-50 provide disclosures and rescission notices, and comply with the PHIFA in other respects, which these Defendants clearly did not do as established by the form documents in the transactions of Plaintiffs and Maryland subclass members.

318.    In addition, the PHIFA expressly prohibits any foreclosure consultant from taking any interest in a property subject to a foreclosure reconveyance, and the form documents in this case clearly establish that Metropolitan and FFIG, as well as Jones, Nicholls and John Does 1-50 took interests in the properties of Plaintiffs and Maryland subclass members while simultaneously acting as foreclosure consultants, rendering the deeds void *ab inito*.

319.    Finally, PHIFA expressly prohibits the recordation of any deed or other document, including the Deeds of Trusts in the names of Jones, Nicholls and John Does 1-50, which affect

title to the Plaintiffs' and Maryland subclass members' residences until after the homeowners'

right of rescission period has ended, rendering any recorded documents as void *ab initio*.

Notwithstanding this express prohibition, the Defendants recorded documents from the Plaintiffs

and Maryland subclass members.

**COUNT VII**
**GROSS NEGLIGENCE**
(AGAINST RTE, TOMLIN, CHAUDHRY, FARAHPOUR, BALLESTEROS, SOUTHERN
AND CHICAGO)

320.     Plaintiffs reallege and incorporate by reference the foregoing allegations.

321.     RTE and Tomlin, and Sussex, Chaudhry, Farahpour and Ballesteros had duties to

exercise due diligence to determine that the transactions of Named Plaintiffs and the other

members of the Class describe herein were not illegal in violation of the PHIFA, in violation of

other law, or otherwise irregular.  RTE and Tomlin and Sussex, Chaudhry, Farahpour and

Ballesteros had duties to inquire into the nature of the transactions of Plaintiffs and the other

members of the Class due to the fact that the properties of certain Named Plaintiffs and the other

members of the class were residences in foreclosure under the PHIFA, due to the fact that Ms.

Jackson, Ms. McCall, Mr. Fordham, Metropolitan and  FFIG, were repeatedly involved in

transactions involving residences in foreclosure, due to the fact that Ms. Jackson, Ms. McCall,

Mr. Fordham, Metropolitan and FFIG were repeatedly using their straw purchasers to obtain

interests in the properties of Plaintiffs and other members of the Class, and due to the fact that

the disbursements of funds shown on the HUD-1 did not comport with reality and Sussex,

Chaudhry, Farahpour and Ballesteros and RTE and Tomlin had knowledge of those facts, or

should have known of those facts, or willfully blinded themselves to those facts.

322.     RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros further owed a duty

94

as a result of the fees paid by the Plaintiffs and other class members to them.

323.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros breached their duties when they failed to conduct due diligence inquiries into the transactions of Plaintiffs and the other members of the Class to determine the legitimacy of the transactions, failed to determine whether the HUD-1 forms they prepared accurately reflected the disbursement of funds in the settlements they were conducting, failed to flag the transactions as in violation of the PHIFA despite knowledge that the residences of certain Named Plaintiffs and other members of the Class were in foreclosure, failed to refuse to settle the transactions when on actual and/or constructive notice of the irregularities and illegalities apparent in the transaction, and when they willfully blinded themselves to the illegalities in the transactions.

324.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros' breaches of duty proximately caused damages to the Plaintiffs and other members of the Class, including the loss of title to their homes, the equity taken from their homes, and the other fees taken in the transactions.

325.    RTE and Tomlin and Sussex, Chaudhry, Farahpour and Ballesteros acted in wanton or reckless disregard for the rights of the Plaintiffs and the other members of the Class.

326.    Chaudhry, Farahpour, Ballesteros and Sussex were agents of Chicago at all times relevant to the facts alleged in this count, as agents, and were acting within the scope of their agency agreement with  Chicago at all times relevant to the facts composing this Count.

327.    Ms. Tomlin and RTE were agents of Southern at all times relevant to the facts alleged herein, as agents, and were acting within the scope of their agency agreement with Southern at all times relevant to the facts composing this Count.

328.     Chaudhry, Farahpour, Ballesteros and Sussex, and Ms. Tomlin and RTE, engaged in the acts and omissions described above, which caused injuries and damages to the Plaintiffs and the other members of the Class, as described above.

329.     The acts and omissions of Chaudhry, Farahpour, Ballesteros and Sussex, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of their agency with Chicago.  These acts and omissions were committed when Chaudhry, Farahpour, Ballesteros and Sussex were performing services as agents for which they had been engaged by Chicago, and while acting in furtherance of Chicago's interests.

330.     The acts and omissions of Ms. Tomlin and RTE, which caused injuries to the Plaintiffs and the other members of the Class, were committed within the scope of the agency of Ms. Tomlin and RTE with Southern.  These acts and omissions were committed when Ms. Tomlin and RTE were performing services as agents for which they had been engaged by Southern, and while acting in furtherance of Southern's interests.

331.     In addition, Chicago and Southern had duties to oversee their agents under the law, as described above.  Chicago and Southern failed to oversee their agents, and their negligent failure to oversee their agents as required by state and federal law caused the damages of the Plaintiffs described herein.  Had Chicago and Southern overseen their agents, audited their closings, and performed the oversight role that state governments required them to perform in order to protect persons such as the Named Plaintiffs and other members of the Class from misappropriations of funds and illegal disbursements, the Named Plaintiffs and other members of the Class would not have suffered the damages described herein, which were caused by the negligent failures of oversight by Chicago and Southern.

**WHEREFORE**, Plaintiffs request:

A.          Certification of a class and subclass of persons as defined herein;

B.          Appointment of Plaintiffs as the class representatives;

C.          Appointment of Plaintiffs' counsel as Class Counsel;

D.          An Award consisting of a trebling of the damages suffered by the Plaintiffs and the other members of the class against the Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Chicago, Southern, RTE and Tomlin, Chaudhry, Farahpour and Ballesteros, jointly and severally, as a result of the RICO Violations as set forth herein, including amounts improperly paid to the "Foreclosure Reversal Program" with respect to their mortgage loan transactions;

E.          Pursuant to 12 U.S.C. § 2607(d)(2), an amount equal to three times the amount of any and all payments to Ms. Jackson, Ms. McCall, and Mr. Fordham, Metropolitan and FFIG, Nicholls, Jones, John Does 1-50, RTE and/or Sussex in respect of each mortgage loan, as well as any and all other amounts or damages allowed to be recovered by RESPA including the equity stripped from the class members properties for excessive non-bona fide services and not actually made in accordance with the transaction's HUD-1 Settlement statement, to be paid by the Defendants, Jackson, McCall, Mr. Fordham, Metropolitan and FFIG, Chicago, Southern, RTE and Tomlin, Chaudhry, Farahpour and Ballesteros, jointly and severally;

F.          An Award of compensatory damages in the amount of the equity taken from the residences of Plaintiffs, currently believed to be $60 million, and the other members of the Class against the Defendants, jointly and severally;

G.          Pursuant to PHIFA for the Plaintiffs and Maryland subclass members, an award

against the Defendants, jointly and severally, equal to up to three times the amount of any and all damages due to the Defendants' willful conduct;

H.          An award against RTE, Tomlin, Chaudhry, Farahpour, Ballesteros, Chicago and Southern for their gross negligence, in an amount to be determined at trial, but in no event less than the total equity of the Plaintiffs and class members plus punitive damages in the amount of three times the Plaintiffs' and class members lost equity in their properties;

I.          An Award against Southern in the amount of any and all awards made against Ms. Tomlin, and/or RTE;

J.          An award against Chicago in the amount of any and all awards made against Chaudhry, Farahpour and Ballesteros;

K.          A declaration that the deeds from Plaintiffs and Maryland subclass members to any straw buyers, obtained and filed in violation of PHIFA, are void;

L.          A declaration that any encumbrances incurred by the straw purchasers based on the illegally recorded deed are void;

M.          An injunction prohibiting Ms. Jones, Ms. Nicholls and John Does 1-50 from transferring or otherwise encumbering the properties of Plaintiffs and Maryland subclass members;

N.          An award of pre- and post-judgment interest, costs

O.          Attorney's fees and costs as permitted under RESPA, RICO or PHIFA in favor of Plaintiffs, the class and Maryland subclass members; and,

P.          Such other and further relief as the nature of this case may require.

Respectfully submitted,

_____/s/_____
SCOTT C. BORISON (Bar No. 22576)
JANET LEGG (Bar No. 15552)
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
FAX: (301)620-1018
legg@legglaw.com
borison@legglaw.com


PETER A. HOLLAND (Bar No. 10866)
BENJAMIN H. CARNEY (Bar No. 27984)
The Holland Law Firm, P.C.
1410 Forest Drive, Suite 21
Annapolis, Maryland 21403
(410) 280-6133
FAX: (410) 280-8650
peter@hollandlawfirm.com
ben@hollandlawfirm.com

PHILLIP R. ROBINSON (Bar No. 27824)
Civil Justice, Inc.
520 West Fayette Street, Suite 410
Baltimore, Maryland 21201
(410) 706-0174
FAX: 410-706-3196
probinson@civiljusticenetwork.org

ATTORNEYS FOR PLAINTIFFS AND THE CLASS


### Request for Jury Trial

Plaintiff demands a trial by jury on all causes of action set forth herein.


_____/s/_____
SCOTT C. BORISON

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served this 21 day of January, 2008, by electronic service to:

Alvin I. Frederick
Daniel R Hodges
Eccleston and Wolf, PC
Scarlett Place, 7th Floor
729 E. Pratt Street
Baltimore, Maryland 21202
Counsel for Defendant V. Tomlin

Richard Lawrence Beizer
Keith J Harrison
Adrian D Mebane
Crowell and Moring LLP
1001 Pennsylvania Ave NW Ste 1100
Washington, DC 20004
Counsel for Defendant A. Chaudhry

John Thomas Prisbe
Venable LLP
Two Hopkins Plz Ste 1800
Baltimore, MD 21201
Counsel for Chicago Title

James K Archibald
Venable LLP
Two Hopkins Plz, Ste. 1800
Baltimore, MD 21201
Counsel for Southern Title

John M Alten
John J Haggerty
Ulmer and Berne LLP
1660 W Second St Ste 1100
Cleveland, OH 44113
Counsel for Southern Title

Sidney S. Friedman
Weinstock, Friedman and Friedman, P.A.
4 Reservoir Circle
Baltimore, Maryland 21208

Counsel for Jamie Clark

 I HEREBY FURTHER CERTIFY that a copy of the foregoing will be served on 22 January 2008, by U.S. Mail to the following parties:


METROPOLITAN MONEY STORE CORP.
9320 Annapolis Road, #100
Lanham, Maryland 20706
Serve on:
Jennifer McCall, Resident Agent
9800 Huxley Drive
Lanham, Maryland 20706

FORDHAM AND FORDHAM INVESTMENT
GROUP, LTD
9420 Annapolis Road,#310
Lanham, Maryland 20706
 Serve on:
 Kurt Fordham, President
 7602 Alloway Lane
 Beltsville, Maryland 20705

DIANE LINDA JONES
508 Balboa Avenue
Capitol Heights, Maryland 20743

LETICIA NICHOLLS
400 Browning Ave #2
Takoma Park, Maryland 20912-7146

JOY JENIS JACKSON
12811 Glasgow Ct
Fort Washington, MD 20744-7034
KURT FORDHAM
7602 Alloway Ln.
Beltsville, MD  20705-6321

JENNIFER MCCALL
7602 Alloway Ln.
Beltsville, MD  20705-6321

       /s/
      Scott Borison

## INDEX OF EXHIBITS

EXHIBIT 1 - Chicago's Issuing Agency Contract

EXHIBIT 2 - Southern's Issuing Agency Contract with RTE

EXHIBIT 3 - Closing Protection Letters

EXHIBIT 4 - State of Maryland Dept. Of Labor, Licensing and Regulation Letter of May 4, 2007

EXHIBIT 5 - Addendum Contract

EXHIBIT 6 - Fordham & Fordham Investment Group form

EXHIBIT 7 - Assignment of Heirs form

EXHIBIT 8 - Investor's Addendum form

EXHIBIT 9 - Maryland Attorney General Opinion

EXHIBIT 10 - Metropolitan Money Store Disbursement Sheet

EXHIBIT 11 - Deed from Proctors to investor

EXHIBIT 12 - HUD-1 for Proctors

EXHIBIT 13 - Wiring Instructions Form

EXHIBIT 14 - Commitment for Title Insurance

EXHIBIT 15 - Title Request Form

EXHIBIT 16 - Trust Accounting Report

EXHIBIT 17 - Proctor Check

EXHIBIT 18 - Deed of Trust by Letecia Nicholls for Wallace property

EXHIBIT 19 - Check to RTE

EXHIBIT 20 - Wire Transfer Confirmation forms

EXHIBIT 21 - November 30, 2006 email that HUD-1 had been faxed to Ms. Hess

EXHIBIT 22 - Mortgage Broker Agreement

EXHIBIT 23 - Maryland Financing Agreement

EXHIBIT 24 - Borrower's Certification and Authorization

EXHIBIT 25 - Disclosure of Required Settlement Service Providers

EXHIBIT 26 - Check to CAP Title

EXHIBIT 27 - Wire Transfer forms

EXHIBIT 28 - Wire Transfer forms

EXHIBIT 29 - Statutory Notice re Title Policy

EXHIBIT 30 - Trust Accounting Report - Simon

EXHIBIT 31 - December 1, 2006 letter from RTE to Nationstar Mortgage

EXHIBIT 32 - January 31, 2006 letter from Ballesteros of CAP Title re payoff of Proctor mortgage