# EXHIBIT B

## LEASE AMENDMENT

THIS LEASE AMENDMENT, dated _____ by and between CRT Properties, Inc. (formerly known as Koger Equity, Inc.), a corporation organized and existing under the laws of the State of Florida ("Landlord"), with its principal offices at 225 NE Mizner Blvd., Suite 200, Boca Raton, FL 33432, (Federal I.D. 59-2898045) and New Century Mortgage Corporation., a corporation organized and existing under the laws of the State of name state ("Tenant"), with its principal office at18400 Von Karman, Suite 1000, Irvine, California 92612 (Federal I.D.93-1195257). The Landlord and the Tenant executed a Lease Agreement dated August 6, 2002. The parties hereto desire to alter and modify said Lease Agreement, effective December 1, 2004 as follows:

Tenant is the current Tenant under that certain Lease dated August 6, 2002 (the "Lease") covering certain premises known as Suite 105, located in a building known as the Hamilton Building (the "Building") having an address of 8375 Dix Ellis Trail, Jacksonville, Florida, consisting of approximately 2,153 rentable square feet on the first (1st) floor, all as more particularly set forth in the Lease.

The parties desire to relocate the Premises, extend the term of the Lease, modify the rent, provide for certain additional improvements to the Premises, and amend the Lease in certain other respects.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows (capitalized terms used and not otherwise defined herein shall have the meanings given in the Lease):

## AGREEMENT

**New Premises.** Effective as of the Effective Date (as defined below), the Premises, as defined in the Lease, shall be relocated from Suite 105 on the first floor of the Building (the "Original Premises"), to approximately 3,462 rentable square feet known as Suite 303 on the third floor of the Building (the "New Premises"), and shown on Exhibit "A" attached hereto. All measurements described in the Lease, including without limitation those described above, have been determined by Landlord's architect in accordance with the standards set forth in ANSI Z65.1-1996, as promulgated by the Building Owners and Managers Association. From and after the Effective Date, the New Premises shall be deemed the Premises, as defined in the Lease. The Term for the New Premises shall commence on the Effective Date and end on the date that is sixty (60) months following the Effective Date (the "Expiration Date"). Landlord will not deliver Premises to Tenant until substantial completion has occurred. The New Premises are subject to all the terms and conditions of the Lease except as expressly modified herein. The Effective Date shall be December 1, 2004. Tenant may occupy the Leased Premises before or after December 1, 2004, at which time all provisions of the Lease Agreement will be in effect. Rent will be prorated in the amount of $177.21 per day, plus 7% Florida sales tax of $12.40 per day for any partial month of occupancy prior to the first full month, with due date for rent remaining the first (1st) day of each month of occupancy. The Effective Date and the Expiration Date shall be redetermined at the time of occupancy to be either December 1, 2004, OR the first day of the first full month of occupancy (Effective Date) and the expiration date shall be 11:59 pm, 60 months from the new Effective Date. Tenant and Landlord shall execute a letter stating the Effective Date and the Expiration Date at the time of occupancy. Landlord agrees to use commercially reasonable efforts to deliver the New Premises to Tenant on or before December 1, 2004. The term "substantial completion" shall mean the date Landlord delivers the New Premises ready for use to Tenant with the Tenant Improvements (as defined in Section 5 below) completed except for minor punch list items, with all the utilities available for use, and with a certificate of occupancy having been issued by the appropriate government agency. Landlord shall provide Tenant with access to the Premises throughout the two week period immediately prior to the Effective Date for purposes of installing its fixtures, data and telecommunications cabling and equipment , preparing the Premises for Tenant's use and occupancy, or for any other purpose permitted by Landlord; provided that Tenant shall not unreasonably interfere with the work to be performed by Landlord in the Premises.

**Monthly Basic Rent.** The Monthly Rent during the period commencing on the Effective Date and ending on the Expiration Date shall be as follows:

- During the initial one year period following the Effective Date, Monthly Rent shall be $5,409.38, plus 7% tax of $378.66, for a total monthly payment of $5,788.04;

- During the second one year period following the Effective Date, Monthly Rent shall be $5,553.63, plus 7% tax of $388.75, for a total monthly payments of $5,942.38;

- During the third one year period following the Effective Date, Monthly Rent shall be $5,697.88, plus 7% tax of $398.75, for a total monthly payment of $6,096.73;

- During the fourth one year period following the Effective Date, Monthly Rent shall be $5,842.13, plus 7% tax of $408.95, for a total monthly payment of $6,251.08; and

- During the fifth one year period following the Effective Date, monthly Basic Rent shall be $5,986.38, plus a 7% tax of $419.05, for a total monthly payment of $6,405.43.

**Operating Costs, Proportionate Share.** Effective on the Effective Date, Tenant's new Base Year for direct expense pass-through shall be 2005. The total rentable square footage of the Building is 106,900. Effective on the Effective Date, Tenant's proportionate share shall be 2.30%. All other items in Paragraph 6, "Rent Adjustment and Real Estate Taxes" will remain as stated in the original Lease.

**Tenant Improvements.** Landlord shall construct, at its sole cost and expense, on a turn-key basis, all of the improvements (with the exception of furniture, file cabinets, cubicles and related accessories shown on the plan, which shall be provided and installed by Tenant) to the Premises (the "Tenant Improvements") described or referenced on the plan attached hereto as Exhibit "B" and incorporated herein by this reference, and in accordance with the New Century Building Standards attached hereto as Exhibit "C" and incorporated herein by this reference. If Tenant makes changes or additions after plans are approved and initialed by both parties, and should such changes increase Landlord's build-out costs, Tenant agrees to pay such extra costs within thirty (30) days following receipt of an invoice from Landlord for the extra cost.

**Termination Option.** Section 29D of the Lease, contained in the Lease Rider, is hereby deleted. Provided Tenant is not in default of the Lease beyond all applicable cure periods, Landlord hereby grants to Tenant, and Tenant shall have, the option to terminate the Lease (the "Termination Option") at the end of the thirty-sixth (36th) month of the Term for the New Premises (the "Termination Date") by (a) providing Landlord with six (6) months' prior written notice of its intent to terminate the Lease, and (b) reimbursing Landlord for unamortized Tenant Improvement costs and lease commissions paid by Landlord in connection with this Amendment, plus a termination fee equivalent to two (2) months of rent. Amortization of the Tenant Improvement costs and lease commissions paid by Landlord in connection with this Amendment shall be on a straight line basis over the term of this Lease Amendment. Upon Tenant's request, Landlord shall provide Tenant with its determination of the amount required to be paid by Tenant pursuant to subsection 6(b) above. Tenant acknowledges that any termination notice presented without the cancellation fee will not be considered a valid notice. The cancellation fee is not payment for the right to use or occupy the Premises and is in addition to any Monthly Rent due, which Monthly Rent Tenant agrees to continue to pay through the "Termination Date".

**Option to Renew.** Section 29C of the Lease, contained in the Lease Rider, is hereby modified to change (i) the words "September 1, 2007" to the words "the Expiration Date"; (ii) the words "August 31, 2012" to the words "a date that is five (5) years following the Expiration Date (the 'Modified Expiration Date')"; and (iii) the words "February 28, 2007" to the words "the date that is six (6) months prior to the Modified Expiration Date."

**Right of First Refusal.** Subject to any rights held by other tenants in the Building as of the date of this Amendment, Tenant shall have a one-time right of first refusal to Lease additional office space adjacent to the New Premises, which may be or become available during the Term for the New Premises, provided that Tenant takes the entire space as offered, and provided that should Tenant exercise the right of first refusal contained in this Section 8 during the first 36 months of the Term for the New Premises, Tenant's option to terminate pursuant to Section 6 above shall become null and void. Landlord shall notify Tenant of the availability of such space, and

2

Tenant shall have five (5) business days following receipt of such notice to accept or reject the space.  If Tenant accepts the additional space, it shall be on the same terms and conditions as set forth herein and the rental rate shall be the amount that is then in effect on a per rentable square foot basis, as set forth in Section 3 above, except that Landlord shall provide an allowance for making Tenant improvements to such space equal to $9.00 per rentable square foot of such space, which amount shall be reduced by $ 1.80 per rentable square foot of such space for each year that has passed since the Effective Date.  Tenant's failure to notify Landlord of its acceptance of such space shall be deemed a rejection, and in such event Landlord shall be free to lease this space to other parties.

**Authority**.  Each individual executing this Lease on behalf of Landlord or Tenant hereby represents and warrants that Landlord or Tenant, as appropriate, is a duly formed and existing entity qualified to do business in  Florida and that Landlord or Tenant, as appropriate, has full right and authority to execute and deliver this Lease and that each person signing on behalf of Landlord or Tenant, as appropriate, is authorized to do so.

**Attorneys' Fees**.  If either party commences litigation against the other for the specific performance of this Lease, for damages for the breach hereof or otherwise for enforcement of any remedy hereunder, the parties hereto agree to and hereby do waive any right to a trial by jury and, in the event of any such commencement of litigation, the prevailing party shall be entitled to recover from the other party such costs and reasonable attorneys' fees as may have been incurred, including any and all costs incurred in enforcing, perfecting and executing such judgment.

**Confirmations**.  Landlord and Tenant each hereby certifies and confirms to the other that as of the execution and delivery hereof, the other party is not in default under the Lease following the expiration of applicable cure periods, and the first party knows of no claim, defense or offset with respect to the Lease.

**Brokers.**  Landlord and Tenant each represents and warrants to the other party that it has not dealt with any real estate broker or agent in connection with this Amendment or its negotiation except for CB Richard Ellis.  Tenant and Landlord shall each indemnify, defend, protect and hold the other party harmless from and against any and all cost, expenses, claims, and liabilities (including costs of suit and reasonable attorneys' fees) for any compensation, commission or fees claimed by any other real estate broker or agent in connection with this Amendment or its negotiation by reason of any act of the first party.  Landlord shall be solely responsible for payment of a broker's commission to the broker identified above, under the terms of a separate agreement.

**Entire Agreement**.  It is understood and acknowledged that, other than the original Lease, there are no oral agreements between the parties hereto affecting this Amendment and this Amendment supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Amendment.  All negotiations and oral agreements acceptable to both parties have been merged into and are included herein.  Any deletion of language from this Amendment prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.

**Ratification.**  In the event of any conflict or inconsistency between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern.  Except to the extent modified by this Amendment, the Lease shall remain unmodified and in full force and effect.

**Parking.**  Landlord acknowledges that availability of parking for the Building is necessary in order for Tenant to operate its business on the Premises.  Accordingly, Landlord shall make available to Tenant on a non-exclusive basis with the other tenants of the Building at no cost for the term of this Lease and all extensions thereof, 11 parking spaces (based on a ratio of 1 parking space for every 200 square feet of space leased).  The parking allocation set forth herein shall be increased in accordance with the parking ratio described above if and when Tenant expands the Premises or leases additional space in the Building, at no cost to Tenant for such additional spaces throughout the term of this Lease and all extensions thereof.

IN WITNESS WHEREOF, the parties have entered into this First Amendment to Lease as of the day and year first written above.

Except as specifically amended and modified by this Lease Amendment., all other terms of the Lease and the Exhibits attached thereto remain in full force and effect.

IN WITNESS WHEREOF, the Landlord and the Tenant have executed or caused to be executed this Amendment on the dates shown below their signatures to be effective as of the date set forth above.

Tenant: **New Century Mortgage Corporation**

Landlord: **CRT Properties, Inc**

Change:

By _____ (SEAL)
(Print Name) _____ Elise Luckham _____ 11-4-04
Title _____ Vice President
Corporate Services

Attest _____
(Print Name) Amy Gossin
Title Ass't Secretary
(Corporate Seal)

Date 11-4-04
Signed and sealed in the presence of:

(1) _____
(Print Name) Jan Tran
(2) _____
(Print Name) Luke Peluso
As to Tenant

By _____ Ben M. Wakfld _____ (SEAL)
(Print Name) ____ Ben M. Wakefield
Title _____ Vice President

Attest _____
(Print Name) Vicki P Cervasio
Title _____
(Corporate Seal)

Date 11-17-04
Signed and sealed in the presence of:

(1) _____
(Print Name) Gloria Thompson
(2) _____
(Print Name) Patricia Williams
As to Landlord



Suite 303
3,462 rsf

Exhibit "A"

HAMILTON BLDG. THIRD FLOOR
8375 DIX ELLIS TRAIL
JACKSONVILLE, FLORIDA

SCALE: N.T.S.

DATE: 9/15/04

SHEET:

OF 1

CRT Properties
8375 DIX ELLIS TRAIL, SUITE 101
JACKSONVILLE, FL 32256
904-464-0900

EXHIBIT "B"



NEW CENTURY MORTGAGE
address
Jacksonville, FL
HMWR 11-1-04
SYSTEMS FURNITURE PLAN OPT.B

24-6x6 Stations
2-Manager Office
1-Closing Room
1-Break Room
1-Lobby Area

# EXHIBIT "C"

## NEW CENTURY MORTGAGE BUILDING STANDARDS

### RETAIL BRANCH

*VERIFY INFORMATION WITH NEW CENTURY*
*ADMINISTRATIVE SERVICES FOR EACH LOCATION*

## DATA/TELECOMMUNICATIONS CABLING

- Remove all existing data cabling.
- New phone and data cabling to be installed by tenant.

## STORAGE/EQUIPMENT ROOM

- Approximately 10'4" X 11'0"
- ¾" X 4' x 8' painted plywood mounted vertically, 3" AFF.
- One dedicated circuit with quad electrical outlets
- Refer to "New Century Backboard" Spec.pdf".
- Install adjustable shelving on two walls comparable to existing

## SECURITY

- Rough-in & power for: access panel adjacent to suite entry door.

## SYSTEMS FURNITURE

- One electrical "J" box with 3 circuits for each six cubicles (for cubicles away from walls or columns, provide a monument in the floor.
- "J" box with conduit/monument and pull string for data cabling at each electrical supply location.

## PRIVATE OFFICE (BRANCH MANAGER)

- Approximately 10' X 12' – should have one interior window on 90 degree walls, minimum glass of 4'H X 5'W - 30" AFF with blinds to match the exterior windows
- One 20A circuit for every two offices.
- Electrical duplexes on opposite walls.
- Data outlet box provided next to each electrical outlet location with conduit in the wall to ceiling height and a pull string.

## PRIVATE OFFICE (REGIONAL MANAGER)

- Approximately 255 sf
- Electrical duplexes on opposite walls.
- Data outlet box provided next to each electrical outlet location with conduit in the wall to ceiling height and a pull string.
- No view window per Regional Manager

## OFFICE EQUIPMENT

- Dedicated 20A circuit with a data outlet at each copier location, per space plan (Exhibit "B").

## GENERAL LIGHTING

- Large cell parabolic lens; 50 foot-candles at desk height.

## GENERAL FINISHES

- All to be Landlord's building standard:
- Paint: ICI Paint – White High Hiding 2013 (302)
- Carpet: Mohawk – (26) College Park #510 Ocean
- Base: Burke – Sterling 663P
- VCT: Azrock V-886 Cloudburst

## CLOSING ROOM

- Approximately 10'0" X 13'0" – close proximity to suite entrance
- Duplex outlet and cabling coordinated with table configuration and location.
- Duplex on every wall. Data outlet box provided next to one electrical outlet location with conduit in the wall to ceiling height and a pull string.
- Door sidelight 24" by door height

## BREAKROOM

- Approximately 16'3" X 10'0"
- Millwork cabinets (upper & lower): D52-6 Britney Blue (Wilsonart); 5'x24" upper cabinets
- Single bowl sink with compact two gallon hot water heater
- Electrical outlets for:
- Full-size refrigerator
- Microwave oven
- Coffee machine
- Water dispenser

## RECEPTION

- One duplex electrical outlet and one data outlet

## CONSTRUCTION DRAWINGS

- Single .dwg file with a layout tab for each construction as-built set sheet. Xref's are bound. Proxy items converted to standard AutoCAD objects.
- .pdf with complete set of dimensions for all walls, including locations of electrical outlets and plumbing

# LEASE

THIS LEASE AGREEMENT, dated _August 6, 2002_ by and between Koger Equity, inc., a corporation organized and existing under the laws of the State of Florida ("Landlord"), with its principal offices at 433 Plaza Real, Suite 335, Boca Raton, FL 33432, (Federal I.D. 59-2898045) and New Century Mortgage Corporation, a corporation organized and existing under the laws of the State of California ("Tenant"), with its principal office at 18400 Von Karman, Suite 1000, Irvine, CA 92612, (Federal I.D. 93-1195257).

## 1. LEASE PROVISIONS

### A. DESCRIPTION OF PREMISES
Suite Numbers(s)    **105**

| | |
|---|---|
| Building Name | **Hamilton (02)** |
| Address | **8375 Dix Ellis Trail** |
| County | **Duval** |
| City | **Jacksonville** |
| State/Zip | **FL  32256** |
| Center | **JACKSONVILLE BAYMEADOWS (60)** |

### B. LEASED AREA
Agreed to be approximately **2,153** rentable square feet (includes Tenants share of common area).

### C. LEASE TERMS
| | |
|---|---|
| Lease Term(Months) | **60** |
| Commencement Date | **01 September 2002** |
| Expiration Date | **31 August 2007** |
| Monthly Base Rent | **$3,319.20** |
| Sales or Use Tax | **$232.34** |
| Monthly Total | **$3,551.54** |
| Security Deposit | **$3,670.02 Existing** |
| After Hours HVAC Access Fee Per Hour/Unit | **$15.00** |

### D. PAYMENTS
| | |
|---|---|
| Payee | **Koger Equity, Inc.** |
| Address | **P.O. Box D860498** |
| City/State/Zip | **Orlando, FL  32886-0498** |
| Tenant Account# | **607007 (note on remittance)** |

### E. NOTICES
| | |
|---|---|
| Tenant | **New Century Mortgage Corporation 18400 Von Karman, Suite 1000 Irvine, CA 92612 Attn: Corporate Services** |
| Copy to | **Premises Attn:  Office Manager** |
| Landlord | **Koger Equity, Inc. 8880 Freedom Crossing Trail Suite 103 Jacksonville, FL  32256** |
| Copy to | **Koger Equity, Inc. 433 Plaza Real Suite 335 Boca Raton, FL  33432** |

### F. MANAGER
N/A

### G. GUARANTOR(S)
N/A

The provisions contained in Sections 2 through 29 are incorporated into and become a part of this Lease by reference. Tenant and Landlord have executed or caused to be executed this Lease on the dates shown below the signatures, effective as of the date first set forth above.

Tenant: **New Century Mortgage Corporation**

By_____(SEAL)

(Print Name) __G. W. Jaquess_____
Title__Vice President, Corporate Services_____

Attest_____

(Print Name)_____
Title_____
(Corporate Seal)

Date_____
Signed and sealed in the presence of:

(1)_____
(Print Name)_____
(2)_____
(Print Name) _Regina McBride_____
As to Tenant

Landlord:  Koger Equity, Inc.

By_____(SEAL)

(Print Name)   **Christopher L. Becker**
Title              **Senior Vice President**

Attest_____

(Print Name) Kim K. Chase
Title             Executive Assistant
(Corporate Seal)

Date_____8/6/02_____
Signed and sealed in the presence of:

(1)_____
(Print Name)_____
(2)_____
(Print Name)_____
As to Landlord

2. **LEASE OF PREMISES:** Landlord leases to Tenant and Tenant takes from Landlord the premises ("Premises") shown on Exhibit "A", to be used exclusively by Tenant, in the building ("Building") on the property ("Property") located at the address stated in Section 1A under the terms and conditions contained in this Lease.

3. **TERM AND POSSESSION:** The term of this Lease ("Term") shall commence on the date ("Commencement Date") and expire on the date ("Expiration Date") all as stated in Section 1C unless modified under other provisions in this Lease.

Landlord agrees to perform all tenant improvements pursuant to Section 29a herein, and to have the Premises substantially completed (with the exception of any "punch-key" items) and ready for possession on or before Commencement Date, subject to causes or events beyond the control of Landlord ("Unforeseen Causes"). Should there be a delay, Tenant agrees to accept possession of the Premises within 10 days after the receipt of written notice by Landlord of substantial completion and the Commencement Date then shall be the first day of the calendar month immediately following the occupancy date, and the Expiration Date shall be changed to maintain the Term in Section 1C, and these changes shall be reflected in a Lease Amendment.

4. **USE:** Tenant shall use the Premises for general office purposes only and shall not use or permit the use or occupancy of the Premises in any manner which: (a) is unlawful; (b) may be dangerous; (c) may invalidate any insurance policy held by Landlord affecting the Building; (d) may create a nuisance, or unreasonably disturb other Tenants of the Building or the occupants of neighboring Property; or (e) violates the "Rules and Regulations," which are subject to change, of the Building, a copy of which is available in Landlord's office, or any restriction, covenant or encumbrance of record affecting the Property. Tenant shall be responsible for any costs incurred by Landlord by reason of Tenant's and/or Tenant's agents', employees' or invitees' misuse and/or damage of the Premises or common areas. Tenant shall pay Landlord such costs as Additional Rent.

5. **RENT AND SALES/USE TAX:** Monthly Rent is due in advance on the first day of each month and will be delinquent on the 6th day of the month. "Monthly Rent" shall mean: (a) the initial monthly base rent stated in Section 1C for the first twelve months following the Commencement Date of the Term of this Lease ("Base Year") and (b) the adjusted Monthly Rent, as adjusted under this Lease as described in Paragraph 6 below. Monthly Rent and any Additional Rent ("Additional Rent") (collectively called "Rent") plus any sales or use taxes shall be paid without notice or demand and without any deduction. Tenant agrees to pay to Landlord all Rent and other sums under this Lease at the address specified in Section 1D, or at any other place designated in writing by Landlord. Rent for any partial lease month shall be prorated. Tenant's obligation to pay Rent to Landlord shall be independent of every other covenant or obligation under this Lease. All delinquent Rent or other sums due shall bear interest at the maximum rate permitted by applicable law or 18% per annum whichever is less, from the date due until paid, plus, if Rent is not paid by the 7th day of the month, Tenant shall pay a late payment service charge, equal to 10% of the total delinquent amount for each month for which payment of Rent or other sums due are not received by Landlord when due. Tenant shall pay a charge equal to $50.00 per returned check or the amount to which Landlord is entitled under state law, whichever is greater. No late fees and charges shall exceed the amounts permitted by applicable state law.

Unless Tenant has tax exempt status, in addition to the Rent and other sums due to Landlord under this Lease, Tenant shall pay to Landlord any sales, use, or other tax, excluding Federal or State income taxes, now or hereafter imposed upon rents and other sums due to Landlord under this Lease.

6. RENT ADJUSTMENT AND REAL ESTATE TAXES: Landlord and Tenant agree that monthly rent shall be paid at the following rate:

| Period | Rate/rsf | Mo amt | 7% tax | Total Mo. Payment |
|---|---|---|---|---|
| 9/1/02-8/31/03 | $18.50 | $3,319.21 | $232.34 | $3,551.55 |
| 9/1/03-8/31/04 | $19.00 | $3,408.91 | $238.62 | $3,647.54 |
| 9/1/04-8/31/05 | $19.50 | $3,498.63 | $244.90 | $3,743.53 |
| 9/1/05-8/31/06 | $20.00 | $3,588.33 | $251.18 | $3,839.52 |
| 9/1/06-8/31/07 | $20.50 | $3,678.04 | $257.46 | $3,935.50 |

Tenant agrees to pay to Landlord, as Additional Rent, each year after the first complete twelve (12) months of the Lease (base year) in a lump sum, Tenant's proportionate share of any increases in direct expenses incurred on account of the operation or maintenance of the Building in which the Premises are situated, above such direct expense paid or incurred by Landlord for the base year. Tenant's proportionate share shall be calculated by dividing the area of the Premises by the area of the Building, which equals 2153/106,900 = 2.01%.

The term "direct expense" as used herein, shall include all costs of operation and maintenance as determined by standard accounting practices and shall include by way of illustration but not limited to: ad valorem real and personal property taxes, hazard and liability insurance premiums, utilities, heat, air conditioning, janitorial service, labor, materials, supplies, equipment and tools, management, permits, licenses and inspection fees. The base year for real and personal property taxes shall be the "Base Year" as defined above grossed up to full occupancy if the Building is not fully occupied. The term "direct expense" shall not include depreciation on the buildings in which the leased premises are situated or equipment therein, interest, executive salaries, real estate brokers commissions, or capital expenditures.

Landlord shall send to Tenant, in writing, a statement of the amount of any additional rent plus any applicable sales or use taxes payable by Tenant, on or before ninety days after the end of the year with respect to which the rent adjustment is due. The amount of any such increase shall be paid by Tenant within 30 days after receipt of invoice from Landlord.

In the event Tenant's pro rata share of operating costs increases by more than 5% in any Lease Year, Tenant may audit Landlord's operating costs in order to verify the accuracy of the charges provided that:

(A)  Tenant specifically designates the fiscal year(s) that Tenant intends to audit, which shall be a year within 3 years of the date of the audit but must be within the Term of this Lease; and

(B)  Such audit will be conducted only during regular business hours at the office where Landlord maintains operating expense records and only after Tenant gives Landlord 14 days notice.

Tenant shall deliver to Landlord a copy of the results of such audit within 15 days of its receipt by Tenant. No such audit shall be conducted if any other tenant has conducted an audit for the time period Tenant intends to audit and Landlord furnishes to Tenant a copy of the results of such audit.

No audit shall be conducted at any time that Tenant is in material default of any terms beyond applicable grace periods of the Lease. No subtenant, sublessee or assignee shall have any right to conduct an audit.


7.  ORDINANCES AND REGULATIONS: Tenant shall comply promptly, at Tenant's sole cost and expense, with all current and future laws, codes, ordinances, rules and regulations of any municipal, county, state, federal or other governmental authority, applicable to Tenant's specific use or occupancy of the Premises; provided, however, that it shall be the obligation of Landlord to comply with the Americans with Disabilities Act and other similar ordinances and laws which affect the Building generally. Tenant agrees for itself and for its subtenants, employees, agents, and invitees to comply with the "Rules and Regulations" of the Building.

Landlord has no knowledge that any hazardous substances defined in "Rules and Regulations" or petroleum products, other than small quantities of typical cleaning and office equipment supplies, are located on or within the Premises or common areas within the building in which the Premises are located. To Landlord's knowledge, there are no hazardous substances or petroleum products disposed of on or in the property which, if present, would materially or adversely affect Tenant's use or enjoyment of the Premises, common areas of the building, or common parking areas serving the building. To Landlord's knowledge, there is no existing environmental condition caused by hazardous substances affecting the Premises, common areas, or parking areas which would adversely or materially affect Tenant's use and enjoyment of the Premises. Landlord and Tenant agree each will use and dispose of all hazardous materials and petroleum products in compliance with applicable laws, and each agrees to indemnify and hold the other harmless from any actual loss suffered due to the other's failure to properly dispose of hazardous materials and petroleum products.


8.  SIGNS: Tenant shall place no signs or advertising matter on the exterior or interior of the Building or at any other location on the Property other than within the Premises. Initial placement of Building standard directional and identification signage shall be provided by Landlord at Landlord's sole cost and expense and shall be limited to Tenant directory of the Building and individual Tenant entry suite identification signage and subsequent modifications shall be at Tenant's expense.

9.  SERVICES: Landlord shall provide, at Landlord's expense and according to its customary standards, excluding national holidays: (a) water from regular building fixtures; (b) electricity for normal business usage excluding any special uses such as computer rooms; (c) janitorial services five times per week; (d) non-exclusive parking proximate to the building. Landlord, at its expense in accordance with its customary standards, shall provide heating and cooling (HVAC) of the Premises Monday through Friday, 8:00 a.m. to 5:00 p.m., excluding national holidays. HVAC may be provided at other times, at the sole cost and expense of Tenant, paid as Additional Rent, according to the HVAC Access Fee Per Hour/Unit provided in Section 1C. Other Tenant requested services may be provided by Landlord at sole cost and expense of Tenant, paid as Additional Rent including maintenance or replacement of non-standard items defined in the "Rules and Regulations" of the Building.

Landlord shall not be liable for damages for failure to furnish any service in a timely manner due to any causes described in Section 12 and 13, or as a result of Unforeseen Causes. Any failure or delay as a result of these reasons shall not be considered an eviction or disturbance of Tenant's quiet enjoyment, use or possession of the Premises.

10.  **ALTERATIONS:** Subject to the tenant improvements described in Section 29a herein, Tenant accepts the Premises as being in good repair and condition, except to the extent of latent defects, and Tenant shall maintain the Premises in good repair and condition, reasonable use, wear and tear excepted. Tenant shall not make any alterations, additions or improvements to the Premises without Landlord's prior written consent, which shall not be unreasonably withheld, and shall permit no lien or claim for lien of a mechanic, laborer, or supplier or any other lien to be filed against the Property arising out of work performed, or alleged to have been performed by, or at the direction of, or on behalf of Tenant.

The interest of Landlord in the Property shall not be subject to liens for improvements made by Tenant or by persons claiming by, through or under it, and Tenant agrees it shall notify any person making any improvements on its behalf of this provision. Upon request of Landlord, Tenant will execute a short form of this Lease which may be recorded which states that the terms of this Lease expressly prohibit any liability to Landlord or its property for any improvements made by, through or under Tenant.

11.  **RIGHT OF ENTRY:** Landlord and its agents shall have the right, at all reasonable times during the Term of this Lease, to enter and inspect the Premises and to make repairs and alterations Landlord deems necessary, with reasonable notice, except in cases of emergency.  In such cases, no notice shall be required. Upon reasonable advance notice to Tenant, Landlord has the right to show the Premises to prospective tenants during the last 90 days of the lease term or at any time after a lease cancellation notice is received. Landlord shall have the right at all times to alter, renovate, and repair portions of the Building which do not include the Premises, notwithstanding any reasonable, temporary, short-term inconvenience or disturbance to Tenant.

12.  **DESTRUCTION OF PREMISES:** If a fire or other casualty (collectively, "Casualty") which damages the Premises or the Building occurs and materially affects the use of the Premises, Landlord shall determine whether the Premises are rendered substantially untenantable and make an initial estimate of the time needed to complete necessary repairs to the Building and Premises. Within 10 business days after the Casualty, Landlord shall notify Tenant in writing of Landlord's determinations ("Landlord's Notice") as follows:

A.  If Landlord's Notice states that the Premises are rendered substantially untenantable by the Casualty and Landlord's initial estimate of the time needed for repair exceeds 120 days, Landlord or Tenant may, by written notice, terminate this Lease as of the date of the Casualty. If Landlord's Notice states that the Premises are rendered substantially untenantable by the Casualty but Landlord's initial estimate of the time needed for repair is 120 days or less, Landlord will proceed with the restoration of the Premises and Building as set forth in 12D below.  Landlord will use reasonable efforts to make other office space owned by Landlord available to Tenant for the operation of Tenant's business or to make other alternate arrangements which are suitable to Tenant during the time the Premises are being restored.  If the work is not completed within 120 days or alternate arrangements are not provided, Tenant may terminate this Lease as of the date of the Casualty by providing written notice to Landlord, given no later than 120 days after the date of the Casualty.

B.  If Landlord's notice states that the Premises are still substantially tenantable after the Casualty, then neither Landlord nor Tenant shall have the right to terminate this Lease.

C.  Either party may terminate this lease if the Casualty occurs within the last 6 months of the Lease and Landlord's estimate of the time needed to repair the damage caused by the Casualty exceeds more than 20% of the remaining term of the Lease.

D.  Written notice of Landlord's or Tenant's election to terminate the Lease pursuant to A and C above will be given by the 15th business day after the date of the Casualty. Unless the Lease is terminated, Landlord will repair the Premises and Building (other than leasehold improvements installed by Tenant and personal property) to substantially the same condition as existed immediately prior to the Casualty. Tenant shall relocate, at Tenant's expense, all personal property from the Premises prior to and during the repairs.

E.  If the Premises are damaged by Casualty and the Lease is not terminated, the Rent shall abate for that part of the Premises which is rendered untenantable and not occupied by Tenant on a per-diem and proportionate area basis from the date of the Casualty until the date on which Landlord has substantially completed the required work. If Landlord makes other space available to Tenant, Rent for the substitute premises shall be payable as mutually agreed by both parties.

13.  **CONDEMNATION:** If all or part of the Building is taken or condemned by any authority for any public use or purpose (including a deed given in lieu of condemnation), which renders the Premises substantially untenantable, this Lease shall terminate as of the date title vests in such authority, and the Rent shall be apportioned as of such date.

If any part of the Building is taken or condemned but the Premises are still substantially tenantable (including a deed given in lieu of condemnation), this Lease shall not terminate. If the taking reduces the leased area in the Premises, Rent shall be equitably reduced for the period of such taking by an amount which bears the same ratio to the Rent then in effect as the leased area so taken or condemned bears to the Leased Area set forth in Section 1B. Landlord, upon receipt and to the extent of the award in condemnation or proceeds of sale, shall make necessary repairs and restorations (exclusive of leasehold improvements and personal property installed by Tenant) to restore the Premises remaining to as near their former condition as circumstances will permit, and to the Building and the Property to the extent necessary to constitute the portion not so taken or condemned as complete.

Landlord shall be entitled to receive the entire price or award from any sale, taking or condemnation without any payment to Tenant. Tenant shall have the right separately to pursue against the condemning authority an award in respect to the loss, if any, to leasehold improvements paid by Tenant without any credit or allowance for Landlord and for any loss for injury, damage, or destruction of Tenant's business resulting from such taking. Under no circumstances shall Tenant seek or be entitled to any compensation for the value of its leasehold estate which Tenant hereby assigns to Landlord.

14.  **ASSIGNMENT AND SUBLEASE:** Tenant may, with Landlord's prior written consent, which will not be unreasonably withheld, sublease the Premises, or assign or transfer or permit the transfer of this Lease or the interest of Tenant in the Lease, in whole or in part. If Tenant desires to assign this Lease or to enter into any sublease of the Premises, Tenant shall deliver written notice of such intent to Landlord together with a copy of the proposed assignment or sublease at least 30 days prior to the effective date of the proposed assignment or commencement date of the term of the proposed sublease. Any approved sublease shall be expressly subject to the terms and conditions of this Lease. In the event of any approved sublease or assignment, Tenant shall not be released or discharged from any liability, whether past, present, or future, under this Lease, including any renewal term of this Lease, and if the sublease or assignment provides for rent in excess of the Rent payable to Landlord under the terms of this Lease, 50% of the difference between the Rent payable by the assignee or subtenant and the Rent payable to Landlord under the terms of this Lease, after deduction of all costs incurred in connection with the assignment or sublease, including the cost of any tenant improvement, and all other costs reasonably associated with the assignment or sublease.  shall be paid to Landlord in consideration of its consent to the assignment or sublease. An assignment shall be considered to include a change in the majority ownership or control of Tenant if Tenant is a corporation whose shares of stock are not traded publicly, or, if Tenant is a partnership, a change in the general partner of the partnership or a change in the persons holding more than 50% interest in the partnership, or a change in majority ownership or control of any general partner of the partnership. Tenant shall not mortgage, pledge or hypothecate its leasehold interest without Landlord's prior written consent, which may be withheld at Landlord's sole discretion. Notwithstanding the foregoing, an assignment or subletting of all or a portion of the Premises to an "Affiliate" of Tenant  shall not be deemed an assignment or subletting that requires Landlord's consent hereunder.  The term "Affiliate" of Tenant shall mean an entity which is (a) controlled by, controls, or is under common control with Tenant; (b) any entity with which Tenant has merged or consolidated, or (c) any entity which acquires all or substantially all of the assets and/or shares of stock or assets of Tenant, and which continues to operate substantially the same business at the Premises as had been maintained by Tenant.  The term "control," or "controlled" as used herein shall mean the ownership, directly or indirectly, of at least fifty percent (50%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, of at least fifty percent (50%) of the voting interest in, an entity."

15. **SUBORDINATION, ATTORNMENT, AND ESTOPPEL:** This Lease and the rights of Tenant are expressly subject and subordinate to the lien and provisions of any mortgage, deed of trust, deed to secure debt, ground lease, assignment of leases, or other security instrument or operating agreement (collectively a "Security Instrument") now or hereafter encumbering the Premises, Building, Property, or any part thereof, and all amendments, renewals, modifications and extensions of and to any such Security Instrument and to all advances made or hereafter to be made upon such Security Instrument. Tenant shall, within 7 days after receipt of written notice by Landlord, execute and deliver such further instruments, in such form as may be required by Landlord or any holder of a proposed or existing Security Instrument, subordinating this Lease to the lien of any such Security Instrument as may be requested in writing by Landlord or holder from time to time.

In the event of the foreclosure of any such Security Instrument by voluntary agreement or otherwise, or the commencement of any judicial action seeking such foreclosure, Tenant, at the request of the then Landlord, shall attorn to such mortgagee or purchaser in foreclosure. Tenant agrees to execute and deliver at any time upon request of such mortgagee, purchaser, or their successors, any instrument to further evidence such attornment.

Tenant shall, within 7 days of receipt of written notice by Landlord, deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect, or, if there have been modifications, that this Lease, as modified, is in full force and effect; providing a true, correct and complete copy of the Lease and any and all modifications of the Lease; the amount of each item of the Rent then payable under this Lease and the date to which the Rent has been paid; that, to Tenant's actual knowledge, Landlord is not in default under this Lease or, if in default, a detailed description of such default; that Tenant is or is not in possession of the Premises, as the case may be; and containing such other information and agreements as may be reasonably requested.

Landlord will use commercially reasonable efforts to obtain a Subordination and Non-Disturbance Agreement from any current or future lender or mortgage-holder of the Building. All costs relating to the securing of this agreement shall be a direct cost paid for by Tenant.

16. **WAIVER AND INDEMNIFICATION:** Landlord agrees to indemnify and hold harmless Tenant, and its respective agents and employees, from and against any and all liabilities, claims, demands, costs and expenses of every kind and nature, arising from any injury or damage (including death) to any person or property sustained in or about the Building proximately caused by the gross negligence or willful act or omission of Landlord; provided, however, Landlord's obligations under this section shall not apply to injury or damage resulting from the gross negligence or willful act or omission of Tenant, or its agents or employees.

Tenant agrees to indemnify and hold harmless Landlord and its agents and employees, from and against any and all liabilities, claims, demands, costs, and expenses of every kind and nature, including those arising from any injury or damage (including death) to any person or property sustained in the Premises, or resulting from the failure of Tenant to perform its obligations under this Lease; provided, however, Tenant's obligations under this section shall not apply to injury or damage resulting from the gross negligence or willful act of Landlord or its agents or employees. To the full extent permitted by law, Tenant hereby releases and waives all claims against Landlord and its agents, employees, officers, directors, and independent contractors, for injury or damage to person, property or business sustained in or about the Property, Building, or Premises by Tenant, other than damage proximately caused by the gross negligence or willful act of Landlord or its agents or employees.

Tenant shall obtain and keep in force during the Term of this Lease, including any extension and renewal, comprehensive general liability insurance, including contractual liability coverage, insuring Tenant against any liability arising out of the use, occupancy or maintenance of the Premises, and all areas appurtenant thereto. Such policy shall provide minimum limits of one million dollars for damage to property or for death or injury to any one person in any one accident and shall name Landlord as an additional insured. Landlord shall not be responsible or liable to Tenant for any event, act or omission to the extent covered by insurance maintained or required to be maintained by Tenant with respect to the Premises and its use and occupancy thereof (whether or not such insurance is actually obtained or maintained). At the request of Landlord, Tenant shall from time to time cause its insurers to provide effective waivers of subrogation for the benefit of Landlord and its agents or employees and insurers, in a form reasonably satisfactory to Landlord.

17.  **RELOCATION:** Landlord may relocate Tenant to other premises ("Relocated Premises"), provided: (a) the Relocated Premises shall be generally similar to the Premises in area, configuration, and general geographic location; (b) if Tenant is then occupying the Premises, Landlord will provide Tenant 90 days prior written notice of relocation and pay the actual and reasonable expenses of physically moving Tenant, its then existing property and its then existing equipment to the Relocated Premises, and pay the actual and reasonable expenses of replacing the then unusable printed materials of Tenant; and (c) Landlord shall improve the Relocated Premises in a manner substantially similar to the Premises at the time of the substitution or as otherwise agreed between Tenant and Landlord in writing.

18.  **DEFAULT:** Each of the following shall constitute an event of default by Tenant: (a) Tenant fails to pay any installment of Rent or Additional Rent following 10 days written notice from Landlord; (b) Tenant fails to observe or perform its obligations under Section 4 and such violation continues for more than 10 days after notice or Tenant fails to observe or perform any of the covenants, conditions or provisions of this Lease other than the payment of any installment of Rent or Additional Rent, and fails to cure such default within 15 days after written notice from Landlord; (c) ~~a petition is filed by or against Tenant or Guarantor to declare Tenant or Guarantor, as the case may be, bankrupt or to seek relief for Tenant or Guarantor under any chapter of the Bankruptcy Code, as amended, or under any other law imposing a moratorium on, or granting debtor's relief with respect to, the rights of creditors~~; (d) Tenant or any Guarantor becomes or is declared insolvent by law or Tenant or any Guarantor makes an assignment for the benefit of creditors; (e) a receiver is appointed for Tenant or Tenant's property or for any Guarantor or any of Guarantor's property; or, (f) interest of Tenant in this Lease is levied upon under execution or other legal process.

~~Upon the occurrence of an event of default~~ by Tenant, Landlord, at its option, without further notice or demand to Tenant, may in addition to all other rights and remedies provided herein, at law or in equity:

A.  ~~Terminate this Lease and Tenant's right of possession of the Premises~~, and recover all damages to which Landlord is entitled herein, at law and in equity, specifically including, without limitation, all Landlord's expenses of reletting (including repairs, alterations, improvements, additions, decorations, legal fees and brokerage commissions).

B.  ~~Terminate Tenant's right of possession of the Premises without terminating this Lease~~, in which event Landlord may, but shall not be obligated to, relet the Premises, or any part thereof, for the account of Tenant, for rent, term and conditions acceptable to Landlord. For the purposes of any reletting of the Premises, Landlord is authorized to redecorate, repair, alter and improve the Premises to the extent necessary or desirable in Landlord's judgement. For any period during which the Premises have not been relet, Tenant shall pay Landlord monthly on the first day of each month during the period that Tenant's right of possession is terminated, a sum equal to the amount of Rent due under this Lease for such month. If and when the Premises are relet and a sufficient sum is not realized after payment of all Landlord's expenses of reletting (including repairs, improvements, additions, decorations, legal fees and brokerage commissions) to satisfy the payment of Rent due for any month, Tenant shall pay to Landlord any deficiency monthly upon demand. Tenant agrees that Landlord may file suit to recover any sums due to Landlord and that suit or recovery of any amount due Landlord shall not be any defense to any subsequent action brought for any amount not previously reduced by judgement in favor of Landlord. If Landlord elects to terminate Tenant's right to possession only without terminating this Lease, Landlord may, at its option, enter into the Premises, remove Tenant's signs and other evidences of tenancy, and take possession provided that such entry and possession shall not terminate this Lease or release Tenant, in whole or in part, from Tenant's obligation to pay the Rent for the full Term or from any other obligation of Tenant.

C.  ~~In the case of failure to observe or perform any of the covenants, conditions or provisions of the Lease other than the payment of any installment of Rent or Additional Rent, Landlord may perform the same for the account of and at the expense of Tenant~~ (but shall not be obligated to do so) without notice in a case of emergency and in any other case after the cure period stated above.  Bills for all amounts paid by Landlord and all losses, costs, and expenses incurred by landlord in connection with any such performance by Landlord pursuant to this clause, including, without limitation, all amounts paid and costs and expenses incurred by Landlord for any property, material, labor, or services provided, furnished, or rendered, or caused to be provided, furnished or rendered, by Landlord to Tenant (together with interest at 10% per annum, from the date Landlord pays the amount or incurs the loss, cost, or expense until the date of full repayment by Tenant) may be sent by Landlord to Tenant monthly or immediately, at Landlord's option, and shall be due and payable by Tenant to Landlord as Additional Rent within 30 days after the same is sent to Tenant by Landlord.

In the event of any legal action under this Section 18, the prevailing party shall be entitled to recover its costs and reasonable attorney's fees, both at trial and on appeal.

19. **SURRENDER OF PREMISES:** Upon expiration, termination or default of this Lease, Tenant shall surrender and vacate the Premises immediately and deliver possession to Landlord in a clean, good, and tenantable condition, except for (a) damage beyond the control of Tenant; (b) reasonable use; (c) ordinary wear and tear. Charges incurred by Landlord for removal of boxes and debris left in Premises which exceed normal janitorial costs shall be at the expense of Tenant. If there are no amounts owed by Tenant, any movable trade fixtures, personal property and all telephone, communication and data lines and cables owned, installed or caused to be installed by Tenant in the Premises or in the plenum of the Building shall be removed by Tenant. All items authorized to be removed but subsequently not removed shall, at Landlord's option, be presumed to have been abandoned by Tenant, and title thereto shall pass to Landlord, or Landlord may, at its option, either store or dispose of these items at Tenant's expense. If any improvements are made by Tenant, with or without Landlord's approval, Tenant will, at its expense and upon request by Landlord, restore the Premises to their original condition.

20. **HOLDING OVER:** If Tenant, or any assignee or sublessee of Tenant, shall continue to occupy the Premises after the termination or expiration of this Lease without the prior written consent of Landlord, such tenancy shall be a Tenancy at sufferance. During the period of any holdover tenancy by Tenant, or any assignee or sublessee, Landlord, by notice to Tenant, may adjust the Rent by 150% or to an amount equal to the maximum allowed by law. Acceptance by Landlord of any Rent after termination shall not constitute a renewal of this Lease or a consent to such holdover occupancy, nor shall it waive Landlord's right of re-entry or any other right contained in this Lease or provided by law.

21. **AUTOMATIC RENEWAL:** This section was intentionally left blank.

22. **SECURITY DEPOSIT:** As security for the performance of its obligations under this Lease, Tenant, upon its execution of this Lease, has paid to Landlord a security deposit ("Security Deposit") in the amount stated in Section 1C. ~~The Security Deposit may be applied by Landlord to cure or partially cure any default of Tenant, and upon notice by Landlord of application, Tenant shall replenish the Security Deposit in full by promptly paying to Landlord the amount so applied.~~ Landlord shall not pay interest on the Security Deposit. The Security Deposit shall not be deemed an advance payment of Rent or a measure of damages for any default by Tenant, nor shall it be a bar or defense to any action which Landlord may at any time commence against Tenant.

If Tenant has fulfilled all terms and conditions of this Lease including the payment of Rent and returns Premises to Landlord in accordance with Section 19, then Landlord will refund the Security Deposit within 45 days of Lease Expiration Date.  Landlord may retain any or all of the Security Deposit to repair any damage to Premises caused by Tenant or remove any abandoned personal property including all communication and data lines.

23. **LIMITATION OF LANDLORD'S LIABILITY:** As used in this Lease, "Landlord" shall mean the entity herein named as such, and its successors and assigns. No person holding Landlord's interest under this Lease (whether or not such person is named as "Landlord") shall have any liability after such person ceases to hold such interest, except for any liability accruing while such person held such interest. No principal, officer, employee, or partner (general or limited) of Landlord shall have any personal liability under any provision of this Lease. If Landlord defaults in the performance of any of its obligations under this Lease or otherwise, Tenant shall look solely to Landlord's interest in the Building and not to the other assets of Landlord or the assets, interest, or rights of any principal, officer, employee, or partner (general or limited) for satisfaction of Tenant's remedies.

24. **ENCUMBRANCES ON LANDLORD'S TITLE:** Upon request of Landlord, Tenant will promptly release or modify, or cause to be released or modified at Tenant's expense, any financing statement given by Tenant to a third party, any notice of commencement filed by Tenant with respect to work on the Premises, or any other recorded document filed by or on account of Tenant ("Document"), which, financing statement, notice of commencement, or other document in Landlord's reasonable opinion, adversely affects, clouds, or otherwise encumbers Landlord's title to any part of the Building, Property, or Landlord's landlord's lien so that the financing statement, notice of commencement, or other document shall not encumber any portion of the Building or Property other than Tenant's leasehold interest in the Premises or does not take priority over Landlord's landlord's lien. Tenant's obligations in this Lease shall survive termination of this Lease.

25. **NOTICES:** For the purpose of any notice or demand under this Lease, the parties shall be served by overnight delivery, personal delivery or certified or registered mail, return receipt requested, addressed to the other party at the address in Section 1E or such other addresses designated in writing by Landlord or Tenant. Any notice shall be effective when delivered.

26. **SUCCESSOR AND ASSIGNS:** This Lease shall bind and inure to the benefit of the successors, assigns, heirs, executors, administrators, and legal representatives of the parties. In the event of the sale, assignment, or transfer by Landlord of its interest in the Building or in this Lease (other than a collateral assignment to secure a debt of Landlord prior to enforcement) to a successor in interest who expressly assumes the obligations of Landlord, Landlord shall be released and discharged from all of its covenants and obligations, except such obligations as Landlord shall have accrued prior to any such sale, assignment or transfer; and Tenant agrees to look solely to such successor of Landlord for performance of such obligations. Any securities or funds given by Tenant to Landlord to secure performance by Tenant of its obligations must be assigned by Landlord to such successor of Landlord and, upon acknowledgment by such successor of receipt of such security and its assumption of the obligation to account for such security in accordance with the terms of this Lease, Landlord shall be discharged of any further obligation. Landlord's assignment of the Lease or of any or all of its rights shall in no manner affect Tenant's obligations. Landlord shall have the right to freely sell, assign or otherwise transfer its interest in the Building and/or this Lease.

27. **MISCELLANEOUS:** When the consent of either Landlord or Tenant is required before the other party acts, both will make reasonable decisions honestly, equitably, suitably and in an ordinary and usual manner that is fit and appropriate to the end in view. The reasonable decisions by Landlord and Tenant will apply to all terms and conditions set forth in this Lease. This Lease, the Exhibits, the Riders and Incorporated Addenda contain the entire agreement between Landlord and Tenant and there are no other agreements, either oral or written. This Lease shall not be modified or amended except by a written document signed by Landlord and Tenant which specifically refers to this Lease. The captions in this Lease are for convenience only and in no way define, limit, construe or describe the scope or intent of the provisions of this Lease.

No waiver of any covenant or condition of this Lease by either party shall be deemed to imply or constitute a further waiver of any other covenant or condition of this Lease. This Lease is construed in accordance with the laws of the state in which the Building is located. If any provision of this Lease or amendment is invalid or unenforceable in any instance, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision, or such provision in any circumstance not controlled by such determination.

Tenant shall on demand pay or reimburse Landlord for payment of Landlord's reasonable attorney's fees, expenses and court costs in negotiation, at trial, and on appeal incurred by Landlord or in connection with any action or proceeding arising out of or occasioned by any lien or claim of lien on the Premises, or the Building or in defending or otherwise participating in any legal proceeding initiated by Tenant or against Tenant(except for any action by Tenant against Landlord or by Landlord against Tenant which shall be governed by Section 18 herein).

"Common Areas" mean all areas, improvements, space or equipment (owned or controlled by Landlord) in or at the Property, provided by Landlord for the common or joint use and benefit of tenants and invitees. Landlord may add to or reduce or otherwise modify common areas at any time.

Except as specifically designated in this Lease, neither this Lease nor any memorandum of this Lease may be recorded or filed for record in any public records without the separate express written consent, in recordable form, of Landlord.

Radon is a naturally occurring radioactive gas which, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Tenant acknowledges this disclosure by signing this Lease.

28. **JURY WAIVER; COUNTERCLAIMS:**      Landlord and Tenant waive trial by jury in any action, proceeding, or counterclaim involving any matter whatsoever arising out of or in any way connected with (i) this lease, (ii) the relationship of Landlord and Tenant, (iii) Tenant's use or occupancy of the Premises, or (iv) the right to any statutory relief or remedy. Tenant further waives the right to interpose any permissive counterclaim of any nature in any action or proceeding commenced by Landlord to obtain possession of the Premises, provided, however that this provision shall

not limit Tenant's right to assert any defense to such action or proceeding for possession.  If Tenant violates this provision by filing a permissive counterclaim, without prejudice to Landlord's right to have the counterclaim dismissed, the parties stipulate that should the court permit Tenant to maintain the counterclaim, the counterclaim shall be severed and tried separately from the action for possession under rule 1.270(b) of the Florida rules of civil procedure or other applicable law.  The action for possession shall then proceed under the summary procedures set forth in section 51.011, Florida statutes.  The waivers set forth in this section are made knowingly, intentionally, and voluntarily by Tenant. Tenant further acknowledges that it has been represented (or has had the opportunity to be represented) in the signing of this lease and in the making of this waiver by independent counsel, selected of its own free will, and that it has had the opportunity to discuss these waivers with counsel.  This provision is a material inducement to Landlord in agreeing to enter into this lease.

29.  **RIDERS AND ADDENDA:** All Riders and Addenda contained in or attached to this Lease shall be deemed to be a part of and are incorporated in this Lease by reference.

      29A.  Tenant Improvements
      29B.  Early Occupancy
      29C.  Option to Renew
      29D.  Option to Cancel

## LEASE RIDER

This rider is attached to and made part of the Lease dated _____8 | 6 | 02_____ by and between Koger Equity, Inc., a corporation organized and existing under the laws of the State of Florida ("Landlord"), with its principal offices at 433 Plaza Real, Suite 335, Boca Raton, FL 33432, (Federal I.D. 59-2898045) and New Century Mortgage Corporation, a corporation organized and existing under the laws of the State of California ("Tenant"), with its principal office at 18400 Von Karman, Suite 1000, Irvine, CA 92612, (Federal I.D. 93-1195257).

29A.  **Tenant Improvements:**  A tenant improvement allowance of up to $27,000 or $12.54 per rentable square foot, for the purpose of constructing the lease space of occupancy shall be provided, and shall include but not be limited to space planning, construction documents, permitting fees and all construction and decorating costs, based on mutually agreed upon construction plans and specifications, which are attached as Exhibit "B".  The tenant improvements shall be undertaken by Landlord, (subject to the tenant improvement allowance) using first quality construction, workmanship and materials.  Any unused monies of the improvement allowance shall go towards payment of Tenant's relocation costs. Landlord shall advise Tenant within two weeks of occupancy of available unused improvement allowance and Tenant shall forward copies of relocation invoices to Landlord within thirty (30) days of receipt of said invoices.Landlord shall furnish Tenant final cost estimates for its approval prior to commencing such work.  Tenant shall approve said cost estimates or make such modifications as it deems necessary to same within ten (10 days of receiving same from Landlord.  Should said approved final plans and cost estimates exceed said allowance, Tenant shall reimburse Landlord said overage upon completion of the build-out, and receipt of an invoice from Landlord, which Tenant agrees to pay within thirty (30) days of receipt of such invoice from Landlord.

29B.  **Early Occupancy:**  Tenant may occupy the Leased Premises on an undetermined date in August, 2002, at which time all provisions of this Lease Agreement will be in effect.  Rent will be prorated in the amount of $107.07 per day, plus 7% Florida sales tax of $7.50 per day or the month of August.  Full monthly rental payments in the amount of $3,319.20 plus 7% Florida sales tax in the amount of $232.34 shall commence September 1, 2002.

29C.  **Option to Renew:**  Provided (i) Tenant is not in material default subject to any cure periods of any terms or conditions of this Lease beyond any applicable cure period Tenant shall have the option to renew this Lease Agreement for one successive Lease Term of five years commencing  September 1, 2007 and expiring  August 31, 2012 ("renewal term") by providing Landlord with advance notice of such intent no later than February 28, 2007, providing Tenant is occupying the Premises as of the date of notice and on the date renewal commences.  The renewal term shall be under the same terms and conditions as the original lease term, except for the rental rate, which will be $21.00 prsf for the first year of "renewal term" with annual steps of  $.50 prsf after year one.

29D.  **Option to Cancel:**  If Tenant is not in default under the terms of this Lease, Tenant shall have the one-time right to terminate this Lease Agreement, effective on  August 31, 2005 ("Modified Expiration Date"), by providing Landlord with advance written notice of such intent prior to February 28, 2005, accompanied by a cancellation fee which shall include unamortized Tenant Improvements and two months rent then in effect, plus sales tax, if applicable.   Tenant acknowledges that any termination notice presented without the cancellation fee will not be considered a valid notice. The cancellation fee is not a payment for the right to use or occupy tenant space and is in addition to any Rent due.

Tenant agrees to continue to pay rent through the Modified Expiration Date.  Upon receipt of proper notice and all monies due and payable, the Lease shall terminate on the Modified Expiration Date.

# KOGER

**Koger Baymeadows**
On Interstate 95
at Baymeadows Road

## The Hamilton Building



First Floor

Suite 105
2153 rsf

Fourth Floor

INITIAL