UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                     .     Case No. 07-10416 (KJC)
                           .
                           .
NEW CENTURY TRS            .
HOLDINGS, INC., et al.,    .     824 North Market Street
                           .     Wilmington, DE 19801
                           .
         Debtors.          .     March 17, 2008
. . . . . . . . . . . . ..        1:37 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Richards, Layton & Finger
                          By:  MICHAEL J. MERCHANT, ESQ.
                          One Rodney Square
                          920 North King Street
                          Wilmington, DE 19801

                          O'Melveny & Myers, LLP
                          By:  SUZZANNE S. UHLAND, ESQ.
                          275 Battery Street
                          San Francisco, CA 94111
                          (Appearing telephinically)

                          O'Melveny & Myers, LLP
                          By:  BEN H. LOGAN, III, ESQ.
                          400 South Hope Street
                          Los Angeles, CA 90071


Audio Operator:           ANISSA COTHRAN


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For the Official          Hahn & Hessen, LLP
Committee of Unsecured    By:  MARK T. POWER, ESQ.
Creditors:                     MARK S. INDELICATO, ESQ.
                          488 Madison Avenue
                          New York, NY 10022

                          Blank Rome, LLP
                          By:  REGINA STANGO KELBON, ESQ.
                          One Logan Square
                          130 North 18th Street
                          Philadelphia, PA 19103

For the Ad Hoc            Bernstein, Shur, Sawyer & Nelson, P.A.
Committee:                By:  ROBERT J. KEACH, ESQ.
                          100 Middle Street
                          Portland, ME 04104

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon, all.

3          MR. MERCHANT:  Good afternoon, Your Honor, Mike

4 Merchant of Richards, Layton & Finger on behalf of the debtors.

5 Your Honor, this is the hearing to address, I guess, some

6 cleanup issues with respect to the disclosure statement and the

7 solicitation procedures motion.  We sent over a blackline of

8 some documents a little while ago today.  I just wanted to make

9 sure Your Honor received them.

10          THE COURT:  I have them.

11          MR. MERCHANT:  Okay.  And my co-counsel, Suzzanne

12 Uhland, is on the telephone, and she'll be addressing these

13 issues today.

14          THE COURT:  Very well.

15          MS. UHLAND:  Good morning, Your Honor.  Can you hear

16 me in the courtroom?

17          THE COURT:  Loud and clear.

18          MS. UHLAND:  Okay.  I'm always a bit wary of

19 appearing on the phone.  What I thought I would do first is

20 because of the coordination of people on the phone and people

21 in the courtroom is lay out how I'd like to go through this.

22 My plan would be to do the following.  First, I was going to

23 walk through the changes briefly, just the important changes to

24 the plan.  Then I was going to defer to, on one of those

25 changes, was going to ask the creditor's committee, which has

4

1 been more closely involved, to address one of those changes in

2 a little more detail.

3          After that, my proposal would be to turn to the

4 disclosure statement.  Again, I would walk the Court through

5 the material changes to the disclosure statement and then turn

6 over to my colleague, Ben Logan, to address some of the EPD

7 breach issues, some of which are also in the plan, but they're

8 also in the disclosure statement.  But that was my

9 choreography, at least to start out with --

10          THE COURT:  Okay.

11          MS. UHLAND:  -- if that's acceptable.

12          THE COURT:  That's fine.

13          MS. UHLAND:  Okay.  So, first, Your Honor, with

14 respect to the plan and the blackline that the Court has this

15 morning, this blackline is against the last plan that was

16 filed.  So we have been through, at the last hearing, many of

17 the blackline changes, and I do not propose to go through those

18 changes with the Court today.

19          THE COURT:  That's fine.

20          MS. UHLAND:  Okay.  The two key conceptual changes in

21 this plan relate to two discrete issues.  One is our Access

22 case and the second is the Deutsche Bank structured products

23 claims and settlement.

24          First let me take Access, even though it's a little

25 bit out of order page-wise.  We received some comments and some

5

1  confirmation type objection from Goldman Sachs, who's one of

2  the largest creditors of Access, probably the largest creditor

3  of Access.   In connection with that, we endeavored to address

4  some of those, to the extent we could address those issues now

5  and reach agreement, we have gone ahead and modified the plan.

6  Goldman is still reserving its rights with respect to other

7  issues with respect to the plan.   But we did endeavor to see

8  what bridges we could build.

9       I would just note to the Court just a couple of pages

10 where we have made changes, and I'm looking at the blackline.

11 The first is on Page 64 which -- if the Court wants to go

12 there.

13           THE COURT:  I have it.

14           MS. UHLAND:   Okay.  There's some blackline about

15 two-thirds of the way down clarifying that, although the

16 liquidating trustee -- we planned to have a single person serve

17 as liquidating trustee and plan administrator -- clarifying

18 that the liquidating trustee will be really serving with its

19 fiduciary duty to access the Access estate in performing its

20 duties as the Access plan administrator.  Throughout the

21 balance of the plan, we went through and caught come cleanup

22 changes of some other portions where we needed to add

23 clarification about the capacity that the liquidating trustee

24 when its acting as plan administrator.

25           The second change I would note with respect to Access

1  is on Page 66 of the plan blackline --

2          THE COURT:  I have it.

3          MS. UHLAND:  -- the statement -- the provision

4  removal of Access Lending.  This provides that if the Access

5  plan cannot be confirmed that we will -- we can remove Access

6  Lending plan effectively or their treatment of those classes

7  from this plan and confirm the balance of the plan with respect

8  to the other debtors.  And finally, Your Honor, with respect to

9  Access, on Page 90 --

10          THE COURT:  I have it.

11          MS. UHLAND:  Okay.  At the top, with respect to

12  exculpation provisions, because Access Lending had a different

13  petition date, there was a desire to clarify some of the

14  language with respect to the timing of the exculpation

15  provisions as it pertained to Access Lending.

16          THE COURT:  Okay.

17          MS. UHLAND:  The next group of changes, and this

18  accounts for an unfortunate amount of redline, but if the Court

19  will turn to page -- back to Page 28, and this relates to the

20  special deficiency claims.  Now, there are special deficiency

21  claims classes against several debtors.  And what that claim

22  and class -- the origins of that claim class is that the

23  debtors entered into a settlement with Deutsche Bank structured

24  products in the fall of last year in connection with the sale

25  of certain disputed loans, and is part of that overall

1  settlement.

2         And what we agreed at that time, and of course that

3  was before we had our plan structure, was that Deutsche Bank

4  agreed to take a collection on its remaining claim that was

5  agreed to by that settlement only from proceeds of restatement

6  litigation.  Now, as our plan has turned out, restatement

7  litigation isn't a -- is not -- under the original version of

8  our plan, we did not carve out restatement litigation from

9  other estate litigation and we, in fact, pooled all of the

10  litigation of all of the debtors except Access when we began to

11  allocate the -- this litigation among the different classes.

12         We've had ongoing discussions -- and it has been led

13  by the creditors committee which is one reason I will defer to

14  them when I'm finished pointing out to the Court where these

15  changes are in the plan -- that they were concerned that our

16  original proposal in the plan was less advantageous to them or

17  did not fully mirror their understanding of the way the

18  settlement should have worked through the plan given the

19  different buckets that we created.

20         Our proposal to them, the plan proponent's proposal

21  is to provide to them a slightly enhanced recovery, whereas the

22  other MRA deficiency claim, because of their joint -- the joint

23  nature of their claim, receive 130 percent of their claim

24  amount as a determined distribution amount.  Our proposal is to

25  provide these creditors, who also have claims against multiple

1   debtors, 115 percent of the amount of their allowed claim as

2   their determined distribution amount.  And the reason it's 115

3   percent instead of 130 percent is because we're proposing to

4   provide them 115 percent on their claim as it applies to a

5   collection of all estate litigation proceeds, not the smaller

6   subset of restatement proceeds.  So that was our -- that's our

7   proposal.

8          Alternatively, we are, as part of this attempt to

9   resolve this issue, offering an alternative treatment for the

10  holder in this category of 130 percent of just the restatement

11  proceeds.  Now, we are continuing to have dialog with the

12  Deutsche Bank structured parties -- products, which is

13  currently the only member in this class.  It may be that

14  through settlements other deficiency claimants -- MRA claimants

15  -- are determined to become part of this class.  But, right

16  now, it's just Deutsche Bank structured products.

17         But what we wanted to do is come up with a plan

18  structure that we hope -- you know, we hope that it's

19  acceptable to them, that our compromise is 115 percent.  But we

20  wanted to come up with some structure to make sure that we

21  could stay on track with the plan and give us some flexibility

22  to work -- you know, if we -- in the event we don't reach this

23  agreement with them and to go ahead and have a confirmable

24  plan.

25         But, now because we now had to come up with this,

1 there's additional definitions, more than one would think

2 because now we have to sort of carve up the litigation proceeds

3 and this same treatment which is the 115 percent of all

4 litigation or 130 percent of the restatement litigation, gets

5 mirrored through all of the class treatment wherein each debtor

6 that has the special deficiency claim.  So, while it's a pretty

7 simple change, it did account for a great deal of the blackline

8 in the plan.

9 With that, those are the two primary changes to the

10 plan since we were in court last.  If Mr. Power is on the

11 phone, I would turn it over to him to add any current status

12 with respect to this -- the resolution of the special

13 deficiency claim.

14 MR. POWER:  Good afternoon, Your Honor, Mark Power

15 from Hahn & Hessen, counsel to the committee.  Ms. Uhland has

16 accurately reflected the change.  The committee had voted and

17 approved the revised protocol, but the attorney for DBSP was

18 not able to get his client sign-off so we -- the plan provides

19 for an election, in essence, and by the effective date the --

20 any creditor holding that special deficiency claim needs to

21 make that election.  But, otherwise, I think Ms. Uhland

22 accurately reflected the changes.

23 We think, basically, this makes the -- you know, the

24 plan confirmable because the parties holding those claims can

25 either get the treatment they're entitled to in the

1   stipulation, or if they elect to go for a smaller percentage of

2   a larger pool of litigation recovery, they can do that.  One of

3   the problems here was that it's a little bit of a pig in a poke

4   in that they're not quite sure what claims there are.  The

5   examiner's report, once that's released, will help, I think,

6   narrow that issue and hopefully DBSP and any other claim in

7   that class will then be able to make a better educated judgment

8   as to which is in their best interest, at least that's our

9   hope.  Otherwise, I have nothing to add to that, Your Honor.

10          THE COURT:  All right.  Anything further on the plan

11  revisions?  All right, Ms. Uhland, would you like to move on?

12          MS. UHLAND:  Yes.  With respect to the disclosure

13  statement, Your Honor, what I think I will do is I will take

14  them by category, and this is pretty close to the way the pages

15  work.  First, Your Honor, with respect to -- we endeavored to

16  address all the open language issues with the objectors.  This

17  document is redlined from the last hearing, so it is a little

18  bit -- the last one the Court reviewed and is a little bit

19  easier to read.  Of course, we've had to go through and make

20  all the conforming changes to the plan changes.  Again, because

21  of the definitional changes added for the Deutsche Bank

22  treatment, there's a little more redline than there are

23  necessarily changes.

24          But, with respect to the disclosure issues, the first

25  set of changes that I'd like to draw the attention of the Court

1  to are on Page 41, starting on Page 41 and 42, where we

2  endeavor to add the language with respect to the securities

3  litigation plaintiff.  And we've reviewed this language with

4  them and have been working with them.  And my understanding,

5  and I can perhaps pause here, is that this language with

6  respect to the securities litigation is acceptable to the

7  plaintiff.  I don't know if anyone is appearing from the

8  Lowenstein firm.  But I will, as I said, we've been in

9  communication with them as of this morning.

10         THE COURT:  Yes, I don't see anybody signed up either

11  on the phone or here.

12         MS. UHLAND:  Okay.  The next set of changes -- and

13  I'll -- I'm going to take these in two parts -- relate to the

14  deferred -- from the deferred compensation litigation issues,

15  as well as issues with respect to the assertion -- the -- is

16  what I'll call the, you know, settlement versus substantive

17  consolidation issue.

18         With respect to the deferred compensation litigation

19  itself, aside from the substantive consolidation issues, we

20  added language on Pages 44, 151, and 155.  Those language

21  changes address text about the arguments with respect to that

22  specific litigation.  That language we've worked out with Mr.

23  Keach.  Actually, we worked that language out last week with

24  Mr. Keach, and that accounts for those changes.

25         The second set of changes and we -- I want to go

1 through these a little more slowly because these were sort of

2 more recent changes for the parties -- are the language we

3 added to address, you know, different parties' concern about

4 having clarity or at least different information with respect

5 to the debtors and assets and substantive consolidation issues.

6        On Page 5 of the plan, the debtor has moved up or

7 introduced the issues related to the substantive consolidation

8 and put them at an earlier point in the disclosure statement to

9 -- you know, per the Court's kind of questioning of this or

10 whether they might have been a little buried at the back.  And

11 then on Pages, really, 68 and 69, what we are doing there is

12 trying to introduce the concept and the schedule with respect

13 to the assets and liabilities.  We've prepared a schedule of

14 assets and when we put this in the attachment to the plan

15 that's mailed, we will reformat it so it's legible without

16 wearing two pairs of reading glasses.

17        But what we tried to do is, by debtor, include just

18 by category some of the different types of assets and it is

19 tied to the recovery model in the plan.  I don't know if the

20 Court has found that.  That's Exhibit D.  It's a one-page

21 document.

22        THE COURT:  I have it.

23        MS. UHLAND:  Okay.  This is a pretty simple table.

24 This is the -- sort of where the different types of assets are

25 and what their approximate value ranges are.  The piece that

1  became a little more complicated when we tried to put it

2  together was the claim assessment.  And one of the reasons this

3  became more difficult is because of the -- sort of the

4  treatment of the administrative expenses in the case and the

5  joint nature of those.

6          The relevant, being able to really just pull claims

7  out after some discussion and analysis, we determined it was

8  best to represent the claim, perhaps, in the liquidation

9  analysis so that we could really be providing more data to the

10 parties and put those claims in context.  So what we've

11 provided -- and, again, we'll work on sort of the presentation

12 so those are -- at least this one is a font size that's

13 reasonable.  We have in our liquidation analysis four of the

14 different debtors.  It's a stand alone liquidation analysis.

15 And so what we were able to do is put the amounts of claims at

16 each debtor and the low and the high in the liquidation so that

17 the parties have a sense of the scope of the claim.

18         Per my e-mail communications with Mr. Keach this

19 morning, he'd like us to add, and we're going to clarify with

20 respect to any debtors that have deficiency claims, either MRA

21 claims or equipment finance claims which are the two types of

22 deficiency claims that we arguably, you know, have in our case.

23 We are going to footnote that to explain what portion of the

24 extra creditors make up those two types of claims.

25         THE COURT:  Okay.

1          MS. UHLAND:  Okay.  So on 68 and 69, the purpose of

2  that is to really -- and this is where we're introducing the

3  concept of why we have different -- well, if you call -- you

4  know, different determined distribution amounts for different

5  creditors and so are introduced in the concept of the claims

6  and the assets.  In -- then, because of, as I said, our

7  determination that this is most helpful in context if we added

8  the liquidation, you know, scenarios.  On Pages 164 to 168 in

9  the back, we provided -- because now we have the numerical, you

10  know, sort of illustration of -- what we had before is purely

11  textural comments with respect to the best interest test.  We

12  have now tied those comments to, and the assumptions, to the

13  schedule that was attached in the liquidation analysis.  So

14  that is the explanation of the additional changes to that

15  portion.  So it'll tie up the other exhibit.

16          THE COURT:  Okay.

17          MS. USLAND:  Those are the changes, as I said, the --

18  that's really the material changes that are addressing the

19  concerns raised by the -- for comp litigation claimants for

20  some transparency on the asset and claim side, as well as some,

21  you know, language we included on -- with respect to objection.

22          What I'd like to do now is, I think, turn over to Mr.

23  Logan to go through the EPD breach issues and then maybe we can

24  turn back and see if there's any remaining open issues on the

25  disclosure statement.

1            THE COURT:  All right.

2            MR. LOGAN:  Good morning, Your Honor -- or afternoon

3  I guess in Delaware.  On EPD and breach, there are two things

4  I'd like to explain to the Court.  The first is best analyzed

5  by looking at Page 78 of the blackline of the disclosure

6  statement.

7            THE COURT:  Okay.

8            MR. LOGAN:  This relates to an issue that Mr. Power

9  and I discussed when we were last before you, and it had to do

10 with a possible resolution we were hoping to achieve with one

11 of the major EPD breach claimants that I'm pleased to report

12 we, in fact, achieved.  And the text that's highlighted on Page

13 78 of the disclosure statement explains that change and the

14 rationale for it.

15           And just for Your Honor's benefit, we had at least

16 one significant EPD breach claimant who is very concerned that

17 because its contract did not have an EPD provision, the pool of

18 loans against which one would analyze breaches was

19 statistically biased because it was the full pool, as opposed

20 to a pool where some of the worst quality loans where there was

21 likely to have been a breach would have been pulled out because

22 of an EPD provision.

23           The debtors and the committee and that creditor spent

24 a fair amount of time analyzing the statistical implications of

25 that and developed a compromise that's set forth here, which is

1  basically to take their damage calculation and gross it up by

2  multiplying that calculation times 1.5667.

3         Since we have circulated this to some of the other

4  creditors involved in the EPD breach process, we've gone

5  through the explanation of that which really is a statistical

6  measure or a factor to take into account a statistical anomaly

7  that otherwise would result and have vetted this with or with

8  the other EPD breach claimants to the extent they've expressed

9  interest in this.  And I'm sure Mr. Power has done the same

10  thing with the committee, which includes many EPD and breach

11  claimants.

12         The second thing I wanted to mention relates to some

13  of the process issues that were raised at the last hearing,

14  principally by Wells Fargo.  We have had substantial ongoing

15  dialog with Wells Fargo.  As I promised to do at the last

16  hearing, we sent to Wells Fargo all of the data that we had

17  submitted to the EPD breach claimants involved in developing

18  the protocol so they could see the sorts of information that

19  others saw in development of the numeric calculations.  And

20  I've been advised by counsel by -- to Wells Fargo that they're

21  satisfied with the information and they don't seek any

22  supplemental disclosure.

23         We also have talked to them about the process, and

24  I'm pleased to report that they have been working with our

25  business people and were able to submit at least the

1  questionnaire with respect to EPD claims last Friday.  They're

2  still working on the data for breaches.  We're going to

3  continue to work with them and make sure they understand the

4  process and make it as painless as possible and still get the

5  relevant information.

6          The order that will be submitted to Your Honor, it

7  still envisions that we will send out with the disclosure

8  statement and other solicitation package an approved form,

9  approved in the sense that Mr. McMahon is also -- we've edited

10 it with Mr. McMahon's office.  It identifies for each EPD and

11 breach claimant how the calculations the debtors derived based

12 upon the information supplied work under the protocol.

13         They then will have until April 11 to object to that

14 if they think that's an improper calculation or indeed if they

15 have a problem with the concept.  And then we have a hearing

16 set for April 16 before Your Honor, if necessary, with the hope

17 also that we can stipulate to voting amounts and not burden the

18 Court or the rest of us with hearings on that topic.

19         I talked to counsel for Wells Fargo this morning,

20 shortly before the commencement of this hearing, and was

21 advised that they find that process acceptable, although they

22 reserve all their rights both on the substance of any

23 calculations or the whole concept.  But as far as the orders we

24 would be asking Your Honor to sign today, it's my understanding

25 that Wells Fargo finds them as acceptable and I think we've

1  reached resolution with all the other parties at the last

2  hearing who raised any questions about the EPD breach protocol.

3          THE COURT:  Including CitiMortgage?

4          MR. LOGAN:  Including CitiMortgage.  Excuse me --

5  CitiMortgage, yes.  I -- if I said Wells Fargo, I think I

6  probably misspoke.  CitiMortgage was the entity that I had the

7  conversations with shortly before the hearing.

8          THE COURT:  Okay.

9          MR. LOGAN:  I did misspeak.  I meant CitiMortgage was

10 the entity that reserves all of its rights on the protocol and

11 the calculations, but finds the disclosure adequate and the

12 process to be acceptable with full reservation of rights.

13         THE COURT:  All right.

14         MR. LOGAN:  And that's all I had, Your Honor.

15         THE COURT:  All right.

16         MS. UHLAND:  Your Honor, I wanted to -- one thing I

17 realized -- and then I think, again, we'll want to check on the

18 disclosure statement -- all exhibits to the disclosure

19 statement have been to -- are part of the Court's package and

20 to circulate to the objectors, save one, which is our Exhibit

21 C, which is the list of parties that, you know, we'll be

22 listing within the disclosure statement to avoid -- you know,

23 to preserve argument with respect to litigation.  We understand

24 that the United States Trustee would like to review that

25 exhibit before filing and we, of course, will do that.

1          The creditor's committee, it shouldn't be a surprise

2   to the Court, is taking a laboring or completing that exhibit.

3   We expect that we'll have their comments back or their

4   substantially completed draft at the conclusion of this

5   hearing.  We'll -- the debtors will review it and we will

6   provide it to the trustee today.

7          THE COURT:  All right.  Okay.  Let me ask whether

8   anyone has any comments or wishes to be heard in connection

9   with the proposed further changes to the disclosure statement.

10          MR. KEACH:  Your Honor, Robert Keach for the ad hoc

11  committee of deferred compensation plan beneficiaries on the

12  phone.  First, let me state that Ms. Uhland has relayed

13  accurately the agreements with respect to the ad hoc committee

14  and the debtors on the disclosure statement.  Subject to seeing

15  the newly footnoted Exhibit E, we -- and, again, assuming it

16  contains the content as represented and we are sure it will --

17  then we have reached agreement on the disclosure statement

18  issues, reserving, of course, the confirmation issues that we

19  raised in our prior objection to be reasserted, as appropriate,

20  at confirmation.

21          There are some continuing issues with respect to the

22  scheduling order that we were attempting to work out, but I

23  assume that Ms. Uhland will get to those later in the

24  proceeding.  But on the disclosure statement issues, we are

25  satisfied.

1          THE COURT:  All right.  Does anyone else care to be

2  heard in connection with the disclosure statement?  I hear no

3  further response.  Okay.  Ms. Uhland, when will the final,

4  final, final changes be made to the disclosure statement?

5          MS. UHLAND:  In order -- we'll be making those in the

6  next couple of hours.  We'll be doing this footnote and the

7  exhibit.  Those are the only two things that we'll be changing.

8  So we expect to have a -- file a later disclosure statement

9  sometime today.

10         THE COURT:  All right.  Shall we turn to the proposed

11 confirmation schedule at this point, or is there something else

12 you'd like to address next?

13         MS. UHLAND:  No, I -- why don't we turn to that and

14 then after that we do have some scheduling order issues on the

15 discovery issues that will -- so I would take them in that

16 order.

17         THE COURT:  Okay.

18         MS. UHLAND:  Your Honor, with respect to the revised

19 order and date, what I work with, because these documents have

20 become voluminous, is the chart that the Court should have and

21 I hope you have in front of you.

22         THE COURT:  I do.

23         MS. UHLAND:  It's just real short; the proposed

24 dates.  What we've -- what we are proposing to keep the record

25 date the same, if we get our -- everything done today, as

1  planned, we will be able to turn this around and mail it on

2  Friday, the 21st, which is approximately four days later than

3  we'd originally planned to mail.  What we tried to do is -- and

4  then as the Court is aware, the Court has given us the 25th as

5  a confirmation hearing or we're requesting it or it's at least

6  available.  So what we tried to do is stay as quickly -- as

7  closely as we could to the prior schedule with this sort of

8  four-day delay in mailing.

9         THE COURT:  See, I thought we had reserved the 24th

10 and the 25th, or am I wrong about that?  At least as of the

11 latest notes that I had.

12        MS. UHLAND:  The Court may have.  What we were trying

13 -- and that would be fine with us to use the 24th as the date,

14 but what we were -- on some of these deadlines, we wanted to --

15 I think it was a question of, you know, giving people that much

16 time.  The one, I think, just so that the Court's aware, the

17 deadline, I think, that we couldn't really move is the voting

18 report.  If the votes come in on the 21st, I don't think we'll

19 be able to get the voting report to the Court before the 23rd.

20        THE COURT:  Okay.

21        MS. UHLAND:  And that -- so that would be what I'll

22 call the only kind of compression on the schedule.  The

23 other -- so that would be the -- that would take it out of the

24 Court's -- kind of out of the Court's time, if you will.  So if

25 we -- but if we go ahead, we just roll forward the claim

**J&J COURT TRANSCRIBERS, INC.**

1  objection deadline to the 28th.  The EPD breach objection

2  deadline, which was pretty generous, we've given them 23 days

3  before.  And this is, again, with respect to the objections.

4  You know, when you get the notice of what your claim is

5  determined under our protocol, it's your time by which you must

6  scream and say no, I don't agree with that amount.  That's a

7  21-day period, and those would now be due April 11th.

8         The ordinary 30-18 motion deadline just rolls forward

9  from the mailing date so that it's April 15th.  The

10 confirmation hearing deadline -- objection deadline, also just

11 rolls forward the four days to April 18th.  But, we kept our

12 EPD breach hearing date of the 16th on the same timing.  What

13 we really did here is we took some of the response time away

14 from the debtors in order to hold the timing, but since the

15 Court has it on its calendar, it works for everybody, and as

16 Mr. Logan has stated, and we're hoping to avoid any hearing at

17 all, we wanted to keep that date on track.

18         We rolled the voting deadline forward to the 21st.

19 And with that date of the 21st, like I said, we pressed to make

20 sure we could get the voting report by the 23rd, and we can do

21 it by the 23rd.  I don't think we'll be able to do it any

22 earlier than that.  So, if the Court wants to commence the

23 confirmation hearing on the 24th, I think that would be

24 preferable --

25         THE COURT:  Yes, I mean I --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  -- from the --

2          THE COURT:  Yes, unless, you know, we know that it's

3     going to be done in a day, I hate to start on that Friday.

4          MS. UHLAND:  Like I -- our only issue when we were

5     trying to do this was to make sure that we weren't -- because

6     I think there's some -- I don't know whether it's local rules

7     on the timing of the voting report or it's common practice, we

8     didn't -- we were just trying to push that forward.  But if we

9     can all work with that, then I agree, it's better to start on a

10    Thursday, if we can.

11         THE COURT:  Yes, because I have our circuit's

12    judicial conference the beginning of the following week and I'd

13    like to see us get finished by that Friday, if we can.  I'm

14    sure there are others that share that view.

15         MS. UHLAND:  I agree.  With respect to the order of

16    the ballot, these -- there -- we haven't included blacklines.

17    We were just, you know, running through all conforming changes

18    on the deadline.  We did add, as a new exhibit -- the Court may

19    recall the U.S. Trustee added a -- requested that we add a

20    publication notice.  And with this opportunity of the further

21    hearing, we've worked out the language with the Trustee's

22    Office and added that as an exhibit to the order at this point.

23         The only other, if the Court sees some blacklining

24    here, the other thing that we realized when we began to discuss

25    with the people who are actually stuffing our 5,000 or so

1 packages is that with respect to solicitation packages,

2 identifying any creditor who's in multiple classes and then

3 trying to consolidate those ballots is actually far more time

4 consuming and expensive than just mailing multiple packages.

5 So -- and that's the other minor change to the order other than

6 the conforming of some of these dates, and procedures and

7 exhibits.

8          THE COURT:  All right.  I'm going to embarrass myself

9 and ask the following question.  Where did the April 16th date

10 come from?  Did we give that to you?  Did I give that to you at

11 a recent hearing?

12          MS. UHLAND:  Yes, that was at the hearing -- the

13 March 5th hearing when we were trying to get a date for the EPD

14 breach.  I think it was a morning hearing.  I don't have the

15 exact time in front of me.  Does that no longer work for the

16 Court?

17          THE COURT:  Well, hold on.  I don't think it worked

18 to begin with, but I don't blame you for that.

19          MR. LOGAN:  We set it -- Your Honor, Ben Logan.  We

20 set it at ten o'clock on April 16th.

21          THE COURT:  Okay.  Well, we do have matters

22 scheduled.  It's actually my monthly trial day.  But rather

23 than jinx myself and say I can't remember the last time one of

24 those trial dates actually went off -- let me just look in the

25 neighborhood.  That's -- how much -- well, how much time do you

**J&J COURT TRANSCRIBERS, INC.**

1  anticipate we need for a hearing if we have it?  I know it's

2  hard to predict.

3        MR. LOGAN:  Your Honor, I -- this is a fairly wild

4  guess, but I would guess probably an hour and a half.  But I

5  really, honestly don't anticipate that we will have an actual

6  hearing.  I'll be disappointed if we do.

7        THE COURT:  Okay.  Nancy, I'm looking at that first

8  matter, and I --

9        THE CLERK:  You sent us this order that reopened up

10  and set it for trial there.

11        THE COURT:  Oh, okay.  You know, I don't think that

12  trial is going to happen because of the circumstances of the

13  reopening, but if it does, we'll have to move it.  What about

14  the 1:30 matter, is that just another one of those collections

15  of things that we address from time to time?

16        THE CLERK:  (Inaudible).

17        THE COURT:  All right.  We'll leave this hearing at

18  the 16th at ten o'clock and we'll move around what we need to

19  move around to keep that.

20        MR. LOGAN:  Thank you, Your Honor.  And we'll do our

21  upmost to make sure it doesn't actually happen on ours either.

22        THE COURT:  That's okay, too.  All right.  Anything

23  more on the confirmation schedule?

24        MS. UHLAND:  No.  We will need to tweak and come back

25  to the Court with a cleaned up order with the correct exhibits

1 to reflect the commencement date change on the confirmation

2 hearing.

3          THE COURT:  All right.

4          MS. UHLAND:  So we'll bring that back or submit it

5 under certification counsel a little bit later today.

6          THE COURT:  All right.  But if I act on it tomorrow,

7 that's not an issue for anybody, is it?

8          MS. UHLAND:  No.  Our issue is basically getting the

9 proofs of the final form.  Oh, I'm going to ask Mr. Parlen

10 whether if we -- I assume we're doing a -- not the actual

11 disclosure statement order in the packages so it doesn't --

12 we'll be able to -- we'll do -- we won't be able to include --

13 start the printing of the packages tonight.  So -- well, I'm

14 fairly confident on that piece since it's the disclosure

15 statement that requires all the arrangement that the order

16 being entered tomorrow morning is not a problem.

17          THE COURT:  Okay.  Next.

18          MS. UHLAND:  Next, I think we have two more items.

19 One is with respect to the scheduling order, and then I know

20 that the committee has a letter to be included in the

21 solicitation packages.  But the scheduling order with Mr.

22 Keach, and Mr. Keach and I have worked out the dates and, Mr.

23 Keach, I think your last e-mail is fine with respect to the

24 expert question.

25          MR. KEACH:  All right.  Thank you.

1          MS. UHLAND:  And so why don't you go ahead and -- so

2    Mr. Keach and I worked out the issues with respect to the

3    timing and the witnesses and documents, but there remains an

4    issue with respect to a request with respect to the examiner's

5    report.  Mr. Keach, why don't I turn that over to you?  And

6    then I'll ask the committee, because this is really their court

7    on these examiner report issues, to go ahead and respond to Mr.

8    Keach's request on this.

9          MR. KEACH:  All right.  Thank you.  Robert Keach for

10   the ad hoc committee, Your Honor.  I think the only remaining

11   issue on the scheduling order is that in our original proposal

12   for the scheduling order in the discussion generally of

13   production of information documents, the ad hoc committee had

14   asked for the relatively immediate production of the examiner's

15   report.  Ms. Uhland and I, I think, had reached agreement on

16   that and the way that was going to be handled was that the

17   examiner's report would be turned over to the ad hoc committee

18   for review only by counsel and by litigation support personnel

19   assisting counsel until such time as the Court might make the

20   examiner's report part of the public record.

21          And as to the extent that we wanted to use it as

22   evidence or any part of that examiner's report as part of the

23   hearing, if we were using a part that was not a portion or

24   which had not been made part of the public record, we would

25   have to move the Court for leave to do so.  In light of the

1    committee's recently filed motion, Ms. Uhland reported to me

2    that the debtors and the committee were not in a position to

3    agree to that portion of the scheduling order, and that remains

4    an issue.  We believe that the ad hoc committee, as a potential

5    objecting party to the plan in the course of litigating

6    confirmation issues, including substantive consolidation and

7    the best interest test, should be permitted at least the

8    limited review that we've asked for, in other words, limited to

9    counsel and litigation support, if we are going to be able to

10   properly prepare.

11          A major part of the debtor's argument, in terms of

12   defending consolidation and in terms of complying with the best

13   interest test, is that the plan permits all debtors, including

14   the holding company debtors, to share in the litigation

15   proceeds that are being generated by the alleged causes of

16   action under investigation or now completed investigation by

17   the examiner.  The debtors have argued that it's not clear that

18   the holding company debtors would otherwise share in those

19   proceeds and that they benefit to, for example, the NCSD

20   creditors such as the beneficiaries would be in the event we

21   don't prevail in the litigation.

22          If that's the case, if the efficacy of these causes

23   of action is being used as an alleged benefit, we should be

24   able to look at what the examiner has said with respect to what

25   causes of action exist, the likelihood of a meaningful

1 recovery, and any possible ownership of those causes of action.

2 And that's why we've asked for it.  And we've tried to -- we

3 offered the counsel and support only provision as a way of

4 trying to meet the debtor and the committee half way on this

5 issue while the Court considered which parts of the report to

6 make public.  So that's an open issue, and I think where the

7 parties are at this point is that we're submitting that to the

8 Court for adjudication because we're unable to reach agreement.

9       THE COURT:  Well, tell me what today is before me, is

10 that you're asking as part of an order that you'd be given

11 access to the examiner's report prior to the hearing that's

12 coming up next week on the committee motion, is that correct?

13       MR. KEACH:  That's correct, Your Honor.

14       THE COURT:  Yes, I'm not going to make a ruling

15 before that time for any party, including the committee.

16       MR. KEACH:  Well, we can certainly -- I mean, the

17 only issue then, I think, Your Honor, procedurally then is that

18 we would have this aspect of the scheduling order would remain

19 open until after that hearing, and I can understand the Court

20 wanted to take this as one matter and not bifurcate it over

21 this issue of the scheduling order.  I think in the context of

22 where we are today that means that the scheduling order will

23 have to wait, or at least that portion will have to wait until

24 the Court rules on that issue.

25       THE COURT:  Well, let me ask the debtor what the

1  debtor thinks about that.

2       MS. UHLAND:  Your Honor, I think that, you know,

3  frankly, we're going to start -- I think our first proposed

4  deadline under the scheduling order is a designation of

5  experts, which would be near the end of that week, and we'll go

6  ahead and proceed in accordance with our agreed schedule.  And

7  if the Court -- we just want to wait one week to resolve this

8  issue if that's acceptable to the debtors.  We'll start acting

9  on our agreements with respect to the timing of the production.

10       MR. KEACH:  Yeah, and what I'm proposing, just so

11  that it's clear -- again, this is Robert Keach for the ad hoc

12  committee -- is that we enter the remainder of the scheduling

13  order as an agreed order with a provision in the order that

14  simply reserves the issue of the examiner's report pending the

15  Court's ruling on the committee's motion.

16       MR. INDELICATO:  That would be -- this is Mark

17  Indelicato, Your Honor -- that would be fine with the

18  committee.

19       MS. UHLAND:  And that's fine with the debtor.

20       THE COURT:  All right.  I have not read the

21  committee's motion, but is the committee -- and I don't want

22  to -- I do not want to get into an extended discussion about

23  this -- but is the committee asking that the report remain

24  under seal in toto or has it targeted parts of it that it

25  wishes to remain under seal for some period of time?

1            MR. INDELICATO:  Your Honor, the motion was filed on

2    the premise that it was a long report and we needed to digest

3    it.  We are working, given sort of the Court's indication to

4    us, that we shouldn't look to have the whole thing kept under

5    wraps.  If there are isolated portions that need to be kept

6    under seal, we're working through that.  We've communicated

7    with the U.S. Trustee and our hope is that we will either be

8    able to pull the motion or deal with it in some way, shape or

9    form with a very tailored order to this Court keeping portions

10   of it under seal.

11           THE COURT:  All right.  Thank you.

12           MS. KELBON:  Your Honor, Regina Stango Kelbon on

13   behalf of the official committee of unsecured creditors.  Your

14   Honor, I just wanted to address one final point in connection

15   with the solicitation package that's going out.  Before we came

16   over here today, Your Honor, the committee filed a statement in

17   support of confirmation.  I'm not sure if Your Honor has even

18   had a chance -- it's even reached your desk or if you've had a

19   chance to see it.

20           THE COURT:  It's reached my desk.  It's only been

21   since I've been on the bench.

22           MS. KELBON:  Okay.  So, Your Honor, our hope would be

23   that Your Honor would have a chance to review it and see it

24   before the order is approved.  And we will -- there will be a

25   provision in the order making reference to it.  So that is

**J&J COURT TRANSCRIBERS, INC.**

1 going to be revised, as well.  I have another copy for Your

2 Honor if you want me to hand it up to you.

3            THE COURT:  All right.  Yes.  Thank you.  All right.

4 Anything further for today?

5            The silence is deafening.

6            MS. UHLAND:  Nothing from the debtors, Your Honor.

7            THE COURT:  All right.  Then I will look for the

8 package under certification tomorrow sometime, I suppose.  And

9 I will be in all day.  Thank you.  That concludes this hearing.

10 Court will stand in recess.

11            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12            MS. UHLAND:  Thank you, Your Honor.

13                         * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

I, KELLI R. PHILBURN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kelli R. Philburn                    DATE:  MARCH 24, 2008
KELLI R. PHILBURN
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**